Nos. 22-55988, 56036

---

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

---

AL OTRO LADO, INC., *et al.*,
*Plaintiffs-Appellees/Cross-Appellants*,

v.

ALEJANDRO MAYORKAS, Secretary of Homeland Security, *et al.*
*Defendants-Appellants/Cross-Appellees*,

and

the EXECUTIVE OFFICE FOR IMMIGRATION REVIEW,
*Appellant/Cross-Appellee*.

---

On Appeal from a Final Judgment Issued by the U.S. District Court for the Southern District of California (Civil Action No. 3:17-cv-02366-BAS-KSC)

---

**EXCERPTS OF RECORD**
**VOLUME 1 OF 4**

---

BRIAN M. BOYNTON
Principal Deputy Assistant
Attorney General

WILLIAM C. PEACHEY
Director

KATHERINE J. SHINNERS
Senior Litigation Counsel

ALEXANDER J. HALASKA
Trial Attorney
U.S. Department of Justice
Civil Division
Office of Immigration Litigation -
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 307-8704 | Fax: (202) 305-7000
Email: alexander.j.halaska@usdoj.gov

*Counsel for the Government*

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

AL OTRO LADO, INC.; ABIGAIL DOE, BEATRICE DOE, CAROLINA DOE, DINORA DOE, INGRID DOE, ROBERTO DOE, MARIA DOE, JUAN DOE, VICTORIA DOE, BIANCA DOE, EMILIANA DOE, AND CESAR DOE, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

ALEJANDRO MAYORKAS, Secretary, U.S. Department of Homeland Security, in his official capacity; TROY A. MILLER, Acting Commissioner, U.S. Customs and Border Protection, in his official capacity; WILLIAM A. FERRERA, Executive Assistant Commissioner, Office of Field Operations, U.S. Customs and Border Protection, in his official capacity,

Defendants.[1]

Case No. 17-cv-02366-BAS-KSC

**FINAL JUDGMENT**

Having decided this matter on summary judgment, after consideration of the parties' cross-motions for summary judgment, oral argument on the parties' cross-motions for summary judgment, and the parties' subsequent briefing on remedies, this Court enters final judgment, resolving all claims in the operative Second Amended

[1] Because all Defendants are sued in their official capacities, the successors for these public offices are automatically substituted as Defendants per Fed. R. Civ. P. 25(d).

Complaint (ECF No. 189), in accordance with its opinions and orders entered on September 2, 2021 (ECF No. 742) and on August 5, 2022 (ECF Nos. 816 and 817), as follows:

Judgment is entered in favor of Defendants on Plaintiffs' First Claim for Relief ("Violation of the Right to Seek Asylum Under the Immigration and Nationality Act") and Fifth Claim for Relief ("Violation of the Non-Refoulement Doctrine").

Judgment is entered in favor of Plaintiffs and the Class[2] on their Second Claim for Relief ("Violation of Section 706(1) of the Administrative Procedure Act") and Fourth Claim for Relief ("Violation of Procedural Due Process").

Plaintiffs' Third Claim for Relief ("Violation of Section 706(2) of the Administrative Procedure Act—Agency Action in Excess of Statutory Authority and Without Observance of Procedures Required by Law") is **DISMISSED** as **MOOT**.

The Court grants the following relief concerning Plaintiffs' Second and Fourth Claims for Relief:

(1) The Court **ORDERS** Defendants to restore the *status quo ante* for the named Plaintiffs prior to Defendants' unlawful conduct, including by taking the necessary steps to facilitate Beatrice Doe's entry into the United States, including issuing any necessary travel documents to allow her to travel to the United States (by air if necessary) and to ensure her inspection and asylum processing upon arrival.

(2) The Court **DECLARES** that, absent any independent, express, and lawful statutory authority, Defendants' denial of inspection or asylum processing to Class Members who have not been admitted or paroled, and who are in the process of arriving in the United States at Class A Ports of Entry, is unlawful regardless of the purported justification for doing so.

---

[2] The "Class" is the class certified by this Court on August 6, 2020, defined as "all noncitizens who seek or will seek to access the U.S. asylum process by presenting themselves at a Class A [Port of Entry] on the U.S.-Mexico border, and were or will be denied access to the U.S. asylum process by or at the instruction of [U.S. Customs and Border Protection] officials on or after January 1, 2016" (ECF No. 513).

(3) The Court **CONVERTS** its prior preliminary injunctive-relief orders (ECF Nos. 330, 605, 671, 674) to a **PERMANENT INJUNCTION**, as follows:

a. Defendants and the Executive Office for Immigration Review ("EOIR") are permanently **ENJOINED** from applying the interim final rule entitled "Asylum Eligibility and Procedural Modifications," 84 Fed. Reg. 33,829 (July 16, 2019) (the "Interim Final Transit Rule") or the final rule entitled Asylum Eligibility and Procedural Modifications, 85 Fed. Reg. 82,260 (Dec. 17, 2020) ("Final Transit Rule") to members of the "Preliminary Injunction Class"—defined as "all non-Mexican asylum seekers who were unable to make a direct asylum claim at a U.S. [Port of Entry] before July 16, 2019 because of the U.S. Government's metering policy, and who continue to seek access to the U.S. asylum process"—and **ORDERED** to return to the pre-Transit Rule practices for processing the asylum applications of members of the Preliminary Injunction Class.[3]

b. The Department of Homeland Security ("DHS") and EOIR must take immediate affirmative steps to reopen or reconsider past determinations that potential Preliminary Injunction Class Members were ineligible for asylum based on the Interim Final Transit Rule, for all potential Preliminary Injunction Class Members in expedited or regular removal proceedings. Such steps include identifying

[3] Defendants suggest in their proposed Final Judgment that by this Court's order at ECF No. 815, it did not convert to a permanent injunction the preliminary injunction enjoining the Final Transit Rule, entered at ECF No. 674. This Court had temporarily restrained application of the Final Transit Rule to the Preliminary Injunction Class Members on January 18, 2021, reasoning that this Rule was, in essence, "an extension of the [Interim Transit Rule] previously enjoined" (ECF No. 671); the parties jointly moved to convert the Court's temporary restraining order into a preliminary injunction on January 29, 2021 (ECF No. 674). Although Plaintiffs did not explicitly seek conversion of the Court's order at ECF No. 674, it would be illogical given the substantial similarity between the Interim Final Transit Rule and the Final Transit Rule, were the permanent injunction entered at ECF No. 816 incorporate the former but not the latter.

affected Preliminary Injunction Class Members and either directing immigration judges or the Board of Immigration Appeals to reopen or reconsider their cases or directing DHS attorneys representing the government in such proceedings to affirmatively seek, and not oppose, such reopening or reconsideration.

c. Defendants must inform identified Preliminary Injunction Class Members in administrative proceedings before United States Citizenship and Immigration Services or EOIR, or in DHS custody, of their class membership, as well as the existence and import of the Preliminary Injunction (ECF No. 330), Clarification Order (ECF No. 605), and Order Converting Preliminary Injunction into a Permanent Injunction (ECF No. 816).

d. Defendants must make all reasonable efforts to identify Preliminary Injunction Class Members, including but not limited to reviewing their records for notations regarding class membership made pursuant to the guidance issued on November 25, 2019, and December 2, 2019, to U.S. Customs and Border Protection and sharing information regarding Class Members' identities with Plaintiffs.

The Clerk of Court is directed to close this case.

**IT IS SO ORDERED.**

**DATED: August 23, 2022**

**Hon. Cynthia Bashant**
**United States District Judge**

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

AL OTRO LADO, INC.; ABIGAIL DOE, BEATRICE DOE, CAROLINA DOE, DINORA DOE, INGRID DOE, URSULA DOE, JOSE DOE, ROBERTO DOE, MARIA DOE, JUAN DOE, VICTORIA DOE, BIANCA DOE, EMILIANA DOE, AND CESAR DOE, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

ALEJANDRO MAYORKAS, Secretary, U.S. Department of Homeland Security, in his official capacity; CHRIS MAGNUS Commissioner, U.S. Customs and Border Protection, in his official capacity; PETE FLORES, Executive Assistant Commissioner, Office of Field Operations, U.S. Customs and Border Protection, in his official capacity,

Defendants.[1]

Case No. 17-cv-2366-BAS-KSC

**REMEDIES OPINION**

[1] Because all Defendants are sued in their official capacities, the successors for these public offices are automatically substituted as Defendants per Federal Rule of Civil Procedure 25(d).

In its September 2, 2021 decision, this Court held the right to access the U.S. asylum process conferred vis a vis § 1158(a)(1) applies extraterritorially to noncitizens who are arriving at Class A POEs along the U.S.-Mexico border, but who are not yet within the jurisdiction of the United States, and is of a constitutional dimension. (Op. Granting in Part and Denying in Part Parties' Cross-Mots. for Summ. J. ("MSJ Opinion"), ECF No. 742.) It further held that Defendants' systematic turnbacks of asylum seekers arriving at Class A POEs (the "Turnback Policy") amounted to an unlawful withholding by immigration officials of their mandatory ministerial "inspection and referral duties" detailed in 8 U.S.C. § 1225 ("§ 1225"), in violation of the Administrative Procedures Act, 5 U.S.C. § 706(1) *et seq.*, and the Fifth Amendment Due Process Clause. (MSJ Opinion at 33–34, 37–38); *see* 8 U.S.C. §§ 1225(a)(3) (mapping out immigration officials' duty to inspect asylum seekers), 1225(b)(1)(A)(ii) (mapping out immigration officials' duty to refer asylum seekers to the U.S-asylum process).

In casting appropriate equitable relief to rectify the irreparable injury Defendants' unauthorized and constitutionally violative Turnback Policy has inflicted upon members of the Plaintiff class,[2] this Court ordinarily would be guided by the fundamental principle that an equitable remedy should be commensurate with the violations it is designed to vindicate. *See Columbus Bd. of Educ. v. Penick*, 443 U.S. 449, 465 (1979) ("[It is an] accepted rule that the remedy imposed by a court of equity should be commensurate with the violation ascertained."). Equitable relief should leave no stone unturned: it should correct entirely the violations it is aimed at vindicating. That cornerstone of Article III courts' equitable powers generally is unfaltering, whether the party against whom an injunction is sought is a private entity, a state actor, or, as here, a federal official. Thus, in

---

[2] Plaintiffs consist of the named Plaintiffs listed in the case caption, along with a certified class consisting of "all noncitizens who seek or will seek to access the U.S. asylum process by presenting themselves at a Class A [POE] on the U.S.-Mexico border, and were or will be denied access to the U.S. asylum process by or at the instruction of [Customs and Border Protection] officials on or after January 1, 2016." (Class Certification Order at 18, ECF No. 513.) The Court also certified a subclass consisting of "all noncitizens who were or will be denied access to the U.S. asylum process at a Class A POE on the U.S.-Mexico border as a result of Defendants' metering policy on or after January 1, 2016." (*Id.*)

the ordinary course of things, this Court would not hesitate to issue broad, programmatic relief enjoining Defendants from now, or in the future, turning back asylum seekers in the process of arriving at Class A POEs, absent a valid statutory basis for doing so.

Yet the circumstances with which this Court is presented are not ordinary because of the extraordinary, intervening decision of the United States Supreme Court in *Garland v. Aleman Gonzalez*, 142 S. Ct. 2057 (2022). That decision takes a sledgehammer to the premise that immigration enforcement agencies are bound to implement their mandatory ministerial duties prescribed by Congress, including their obligation to inspect and refer arriving noncitizens for asylum, and that, when immigration enforcement agencies deviate from those duties, lower courts have authority to issue equitable relief to enjoin the resulting violations. It does so through unprecedented expansion of a provision of the Illegal Immigration Reform and Immigrant Responsibility Act of 1989 ("IIRIRA"), 8 U.S.C. § 1252(f)(1) *et seq.* ("§ 1252(f)(1)"), which for years the Ninth Circuit has interpreted as placing a relatively narrow limit on injunctive relief. In essence, *Aleman Gonzalez* holds that § 1252(f)(1) prohibits lower courts from issuing class-wide injunctions that "require officials to take actions that (in the Government's view) are not required" by certain removal statutes, including § 1225, or "to refrain from actions that (again in the Government's view) are allowed" by those same provisions. *Id.*, 142 S. Ct. at 2065. Federal courts (except for the Supreme Court) now may only issue injunctions enjoining federal officials' unauthorized implementation of the removal statutes in the individual cases of noncitizens against whom removal proceedings have been initiated. *See id.*

In no uncertain terms, the logical extension of *Aleman Gonzalez* appears to bestow immigration enforcement agencies *carte blanche* to implement immigration enforcement policies that clearly are unauthorized by the statutes under which they operate because the Government need only *claim* authority to implement to immunize itself from the federal judiciary's oversight.

With acknowledgment that its decision will further contribute to the human suffering of asylum seekers enduring squalid and dangerous conditions in Mexican border

communities as they await entry to POEs, this Court finds the shadow of *Aleman Gonzalez* inescapable in this case. Even the most narrow, meaningful equitable relief would have the effect of interfering with the "operation" of § 1225, as that term is construed by the *Aleman Gonzalez* Court, and, thus, would clash with § 1252(f)(1)'s remedy bar. *Aleman Gonzalez* not only renders uneconomical vindication of Plaintiff class members' statutorily- and constitutionally-protected right to apply for asylum, those inefficiencies inevitably will lead to innumerable instances in which Plaintiff class members will be unable to vindicate their rights at all. Thus, while the majority and dissent in *Aleman Gonzalez* hash out their textual disagreements concerning § 1252(f)(1)'s scope in terms of remedies, make no mistake, *Aleman Gonzalez* leaves largely unrestrained immigration enforcement agencies to rapaciously scale back rights. *See* Tracy A. Thomas, *Ubi Jus, Ibi Remedium: The Fundamental Right to a Remedy Under Due Process*, 41 San Diego L. Rev. 1633, 1634 (2004) ("Disputes over remedies provide a convenient way for dissenters to resist conformance to legal guarantees. Courts can declare rights, but then default in the remedy to avoid a politically unpopular result." (footnote omitted)).

Although it is no substitute for a permanent injunction, class-wide declaratory relief is both available and warranted here. In lieu of even a circumscribed injunction enjoining Defendants from again implementing a policy under which they turn back asylum seekers presenting themselves at POEs along the U.S.-Mexico border, the Court enters a declaration in accordance with its MSJ Opinion that turning back asylum seekers constitutes both an unlawful withholding of Defendants' mandatory ministerial inspection and referral duties under § 1158 and § 1225 in violation of both the APA and the Fifth Amendment Due Process Clause. The Court also issues relief as necessary to named Plaintiff Beatrice Doe.

//

//

//

//

# I. BACKGROUND[3]

On September 2, 2022, this Court granted Plaintiffs' motion for summary judgment on their APA and Fifth Amendment claims.[4] (*See generally* MSJ Op.) Specifically, this Court found that Defendants' implementation of the Turnback Policy withheld their mandatory ministerial duties to inspect and refer asylum seekers who present themselves at Class A POEs along the U.S.-Mexico border, but who are not yet within the jurisdiction of the United States, in violation of Section 706(1) of the APA.[5] (*See id.* at 34.) This Court further found that, because Defendants' withholding of inspection and referral duties infringed upon the Plaintiff class's right to access the U.S.-asylum process secured by § 1158(a)(1), and because the Plaintiff class's Fifth Amendment due process rights are coextensive with that statute, the Turnback Policy also violates the Fifth Amendment. (*Id.* at 37–38.)

The Court asked the parties to weigh in on what equitable relief these statutory and constitutional violations warrant. (*Id.* at 44.) The parties contemporaneously filed briefs in accordance with the MSJ Opinion on October 1, 2021. (*See* Pls.' Remedies Br., ECF No. 768; Defs.' Remedies Br., ECF No. 770.) Plaintiffs additionally filed a Proposed Order listing the injunctive, oversight, and declaratory relief they believe is appropriate to rectify Defendants' systemic violations. (*See* Proposed Order, ECF No. 773-4.) On October 22, 2021, Defendants sought leave to file essentially a sur-reply, which addresses the purported

---

[3] Familiarity with this Court's prior orders granting in part and denying in part Defendants' motion to dismiss ("MTD Opinion") (ECF No. 280) and MSJ Opinion is presumed. The factual and procedural history needed to understand this Remedies Opinion is found in the background section of those Opinions.

[4] This Court also found legally invalid on summary judgment Plaintiffs' claims Defendants committed *ultra vires* violations of the Plaintiff class's right to seek asylum under the Immigration and Nationality Act ("INA") and violated the Alien Tort Statute. (MSJ Opinion at 11–13, 38–43.)

[5] The term "inspection and referral duties" to which the Court alludes throughout retains the same meaning given to that term in the MSJ Opinion. (MSJ Opinion at 8 n.7.) Those duties refer to the asylum provision in § 1158(a)(1), which this Court found bestows upon noncitizens who are in the process of arriving at a Class A POE—but who are still physically outside the international boundary line at the POE—a right to apply for asylum, and § 1225, which sets forth specific asylum processing duties Defendants must undertake to give meaning to that right. *See* 8 U.S.C. §§ 1225(a)(3) (delineating immigration officers' duty to inspect), 1225(b)(1)(A)(ii) (delineating immigration officers' duty to refer).

overbreadth of Plaintiffs' proposed class-wide injunctions.[6] (*See* Mot. for Leave to File Sur-Reply, ECF No. 773; Defs.' Sur-Reply, ECF No. 773-2.)

Several requests for relief Plaintiffs proffer are not in dispute. The parties agree Plaintiffs are entitled under the APA to vacatur of the Department of Homeland Security ("DHS")'s Metering Guidance and Prioritization-Based Que Management ("PBQM") Memorandum and the Office of Field Operations' Metering Guidance Memorandum, both of which served to formalize Defendants' Turnback Policy in approximately 2018. (*See* Proposed Order ¶ 5; Defs.' Remedies Br. at 6–8 (proposing vacatur of the Memoranda as an appropriate form of relief).)

Furthermore, Defendants do not appear to oppose entry of an order restoring the *status quo ante* for named Plaintiffs Roberto Doe and Beatrice Doe, including requiring Defendants to issue any necessary travel documents to allow them to travel to the United States and to ensure their processing for asylum upon arrival. (*See* Proposed Order ¶ 7.)

Finally, Defendants appear to welcome Plaintiffs' request for entry of a declaratory judgment giving legal effect to the MSJ Opinion's conclusion that § 1158 and § 1225 *require* Defendants to inspect and refer noncitizens who present themselves at Class A POEs but who are not yet within the jurisdiction of the United States (*see* MSJ Opinion 33–34). (*See* Proposed Order ¶ 1; Defs.' Remedies Br. at 6–8 (encouraging Court to enter class-wide declaratory relief, which can then be used "as a predicate to further relief, including an injunction" in individual suits by Plaintiff class members seeking an injunction against Defendants).)

Despite these areas of agreement, there is contentious disagreement concerning whether this Court has authority to enter class-wide injunctive relief and, if so, the proper

[6] The Court **GRANTS** Defendants leave to file a sur-reply (ECF No. 773), but notes that Defendants' arguments therein were irrelevant to the issue on which this Court's decision not to enter a class-wide injunction ultimately turns: whether § 1252(f)(1)'s remedy bar applies to this case. *See infra* Sec. III.A.

scope of such relief.  Plaintiffs primarily request the Court to issue a class-wide injunction stating:

> Defendants and others acting at their direction or in active concert or participation with them are PERMANENTLY ENJOINED from turning away, turning back, or otherwise denying access to inspection and/or asylum processing to noncitizens who have not been admitted or paroled and who are in the process of arriving in the United States at Class A Ports of Entry regardless of their purported justification for doing so, absent any independent, express, and lawful statutory authority to do so outside of Title 8 of the U.S. Code.

(Proposed Order ¶ 2.)  Plaintiffs also seek an ancillary injunction directing Defendants and the Executive Office of Immigration Review "[t]o inspect and provide asylum" to each Plaintiff class member "under the rules and regulations that would have applied [to each member] at the time" he or she would have first entered the United States, but for Defendants' unlawful Turnback Policy.  (*Id.* ¶ 3.)[7]  Finally, Plaintiffs seek appointment of Magistrate Judge Karen S. Crawford as special master pursuant to Federal Rule of Civil Procedure ("Rule") 65 to monitor and oversee Defendants' implementation of all class-wide injunctive relief.  (*Id.* ¶ 8.)

Defendants contend the IIRIRA at § 1252(f)(1) bars *any* class-wide injunctive relief in the instant case.  (*See* Defs.' Remedies Br. at 3–4.)  They aver § 1252(f)(1), which prohibits lower courts from "enjoin[ing] or restrain[ing] the operation of [8 U.S.C. §§ 1221 through 1332]," precludes entry of even a circumscribed injunction enjoining Defendants' unauthorized practice of turning back asylum seekers arriving at Class A POEs because such an injunction would interfere with the "operation" of § 1225.  (Defs.' Remedies Br.

---

[7] Additionally, Plaintiffs ask the Court to convert into a permanent injunction the Preliminary Injunction enjoining application of 8 C.F.R. § 208.13(c)(4), known more commonly as the "Asylum Ban," to the immigration proceedings of members of a provisionally certified class consisting of "non-Mexican asylum seekers who were unable to make a direct asylum claim at a [Class A POE] before July 16, 2019 because of [Defendants'] metering policy" (Prelim. Inj., ECF No. 330).  (*See* Proposed Order ¶ 4; *see also* Clarification Order, ECF No. 605.)  The Court addresses this request for class-wide injunctive relief separately in its contemporaneously filed Opinion at ECF No. 816, which principally resolves Plaintiffs' motions to essentially clarify for a second time the contours of the Preliminary Injunction and Clarification Orders (*see* ECF Nos. 644, 736).

at 3–4.) Defendants further argue that Plaintiffs have failed to show that a balancing of the parties' respective hardships and the public interest favor entry of their proposed permanent injunctions. Moreover, they contend the class-wide injunctions set forth in the Proposed Order are overbroad, impermissibly vague, and would threaten to hamper implementation of the Department of Health and Human Services' Center for Disease Control and Prevention ("CDC") orders, which, with limited exceptions, effectively suspend asylum processing at land POEs pursuant to 42 U.S.C. § 265 ("Title 42") to prevent the spread of COVID-19 virus at POE facilities. (*See* Defs.' Remedies Br. at 8–18; Defs.' Sur-Reply at 7–12.)

Several intervening factual developments since the MSJ Opinion have rendered moot certain of Plaintiffs' requests for relief in their Proposed Order. On November 2, 2022, Defendants voluntarily rescinded the PBQM and Metering Guidance Memoranda; those Memoranda have not been replaced with revised or amended policy documents. (*See* Rescission of June 5, 2018, Prioritization-Based Queue Management Memorandum, Ex. 2 to Notice of Administrative Action ("NOAA"), ECF No. 775-2; Guidance for Management and Processing of Undocumented Noncitizens at Southwest Border Land Ports of Entry, Ex. 1 to NOAA, ECF No. 775-1.)[8] Then, on January 28, 2022, the parties indicated that Plaintiff Roberto Doe had arrived in the United States by commercial airline and was allowed to access the U.S.-asylum process. (*See* Joint Status Report, ECF No. 796.)

//

[8] Despite rescission of the PBQM and Metering Guidance Memoranda in November of 2021, asylum processing at the U.S.-Mexico border is still restricted in light of the CDC's COVID-19 Title 42 orders, which generally "suspend[s] the introduction of persons into the United States" who are "traveling from Canada or Mexico (regardless of their country of origin) [and] who would otherwise be introduced into a congregate setting in a land [POE] or Border Patrol station at or near the United States borders with Canada and Mexico[.]" 85 Fed. Reg. 17,060 (Mar. 26, 2020). On April 1, 2022, CDC Director Rochelle Walensky issued an order terminating the then-operative Title 42 order, *see* 87 Fed. Reg. 15,243 (Mar. 17, 2022). 87 Fed. Reg. 19,941 (Apr. 6, 2022). However, the CDC's rescission was enjoined by a district court in the Lafayette Division of the Western District of Louisiana on May 20, 2022. *See Louisiana v. Ctrs. for Disease Control & Prevention*, --- F. Supp. 3d ---, 2022 WL 1604901, at *1 (W.D. La. May 20, 2022). The legality of the Title 42 orders is not at issue in this case.

In addition to these factual developments, the legal landscape concerning § 1252(f)(1) has changed drastically since the MSJ Opinion. At the time of the MSJ Opinion, it was the law in the Ninth Circuit that § 1252(f)(1) "d[id] not . . . categorically insulate immigration enforcement from judicial classwide injunctions." *Gonzalez v. United States Immigration & Customs Enf't*, 975 F.3d 788, 812 (9th Cir. 2020). Rather, the Ninth Circuit left in place lower courts' authority to enjoin or restrain immigration enforcement agencies' *violations* of the covered statutory provisions. *See Rodriguez v. Hayes*, 591 F.3d 1105, 1120 (9th Cir. 2010) (citing *Ali v. Ashcroft*, 346 F.3d 873, 896 (9th Cir. 2003)). The Ninth Circuit did so on the ground that when immigration enforcement agencies implement their duties under §§ 1221 through 1332 in a manner that is not authorized by those statutes, an injunction rectifying the resulting violation(s) does not enjoin the "operation" of those statutes. *See id*.

But on June 13, 2022, the Supreme Court effectively held in *Garland v. Aleman Gonzalez*, 142 S. Ct. 2057 (2022) ("*Aleman Gonzalez*"), that § 1252(f)(1) prohibits lower court injunctions that enjoin even immigration enforcement agencies' "unlawful" or "improper operation" of the covered provisions, including § 1225. *Id.* at 2065 (holding injunctions that "require officials [either] to take actions that (in the Government's view) are not required by [§§ 1221–32]" or "to refrain from actions that (again in the Government's view) are allowed by [§§ 1221–32]" are barred by § 1252(f)(1)). *Aleman Gonzalez* has breathed new life into Defendants' contention that this Court is foreclosed by § 1252(f)(1) from simply enjoining Defendants' unauthorized turnbacks or directing Defendants to administer their inspection and referral duties with respect to Plaintiff class members. (*See* Defs.' Supp. Br., ECF No. 813.) Plaintiffs acknowledge *Aleman Gonzalez* has truncated the legal ground for the injunctive relief they seek; however, they aver there still exist paths forward to rectify in a single order the systemic statutory and constitutional violations found in the MSJ Opinion. (*See* Pls.' Supp. Br., ECF No. 814.)

//

//

## II. LEGAL STANDARD

### A. Permanent Injunctive Relief

In the Ninth Circuit, a plaintiff who seeks a permanent injunction must satisfy a four-factor test. *See Kurin, Inc. v. Magnolia Med. Techs., Inc.*, 473 F. Supp. 3d 1117, 1141 (S.D. Cal. July 20, 2020) (citing *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)). A plaintiff must establish:

> (1) [t]hat it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction [("*eBay* factors")].

*eBay Inc.*, 547 U.S. at 391. Where the Government is the party opposing issuance of injunctive relief, the above-mentioned third and fourth factors—balancing of hardships and public interest—merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). This merger requires the Court to examine whether "any significant 'public consequences' would result from issuing the preliminary injunction" and, if so, whether they favor or disfavor its entry. *See Fraihat v. United States Immigration & Customs Enf't*, 445 F. Supp. 3d 709, 749 (C.D. Cal. 2020) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

It is well-established that deprivation of a constitutional right "unquestionably constitutes irreparable injury," and that no public interest is served by withholding equitable relief without which those rights will continue to be infringed. *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("*Melendres I*") (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *see also Sammartano v. First Judicial Dist. Ct.*, 303 F.3d 959 (9th Cir. 2002) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights.").

District courts have "broad discretion to fashion injunctive relief" to eliminate constitutional violations. *See Melendres v. Maricopa Cty.*, 897 F.3d 1217, 1221 (9th Cir. 2018) ("*Melendres IV*"); *Milliken v. Bradley*, 433 U.S. 267, 282 (1977) ("Where . . . a constitutional violation has been found, the remedy does not exceed the violation if the

remedy is tailored to cure the condition that offends the Constitution." (internal quotation marks and citation omitted). "Further, where the enjoined party has a 'history of noncompliance with prior orders,' and particularly where the trial judge has 'years of experience with the case at hand,' [district courts are given] a 'great deal of flexibility and discretion in choosing the remedy best suited to curing the violation.'" *Melendres IV*, 897 F.3d at 1221 (quoting *Melendres v. Arpaio*, 784 F.3d 1254, 1265 (9th Cir. 2015)).

**B. Declaratory Judgment Act**

The Declaratory Judgment Act provides, in pertinent part, that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a); *see* Fed. R. Civ. P. 57 ("The existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate."); *see also In re Singh*, 457 B.R. 790, 798 (Bankr. E.D. Cal. 2011) ("Declaratory relief is an equitable remedy distinctive in that it allows adjudication of rights and obligations on disputes regardless of whether claims for damages or injunction have arisen.").

The question whether to issue declaratory relief is a matter of the district court's sound discretion. *See Wilton v. Seven Falls Co.*, 515 U.S. 277, 288 (1995) ("By the Declaratory Judgment Act, Congress sought to place a remedial arrow in the district court's quiver[.]"). A court's decision to enter declaratory relief must be firmly implanted "in sound reason," *McGraw-Edison Co. v. Preformed Line Products. Co.*, 362 F.2d 339, 342 (9th Cir. 1966) (quoting *Yellow Cab Co. v. City of Chicago*, 186 F.2d 946, 950–51 (7th Cir. 1951)), and should be issued with "two principal criteria guiding the policy in favor of rendering declaratory judgments" in mind: (1) "clarifying and settling the legal relations in issue"; and (2) "terminat[ing] and afford[ing] relief from the uncertainty, insecurity, and controversy giving rise to the proceeding," *id.* (quoting Borchard, *Declaratory Judgments* 299 (2d ed. 1941)). *See also Crossley v. California*, 479 F. Supp. 3d 901, 920 (S.D. Cal. 2020).

## III. ANALYSIS

### A. Class-Wide Permanent Injunction

#### 1. 8 U.S.C. § 1252(f)(1)

Among the "'judicial power[s]' committed to the federal courts by Article III" is the power to grant broad, equitable relief, including on a class-wide basis. *Rodriguez v. Hayes*, 591 F.3d 1105, 1120 (9th Cir. 2010) ("*Rodriguez*") (citing *Pennsylvania v. Wheeling & Belmont Bridge Co.*, 59 U.S. 460, 462 (1855)). These "traditional equitable powers can be curtailed only by an unmistakable legislative command." *Id.*; *see Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946) ("Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied.").

Here, the remedy-stripping statute at issue is § 1252(f)(1). That provision states:

> Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter, [which includes § 1225,] as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated.

8 U.S.C. § 1252(f)(1). Section 1252(f)(1) is "nothing more or less than a limit on injunctive relief." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 482 (1999).

At the heart of the parties' dispute concerning remedies is whether § 1252(f)(1) is so broad in scope as to preclude the entry of any permanent class-wide injunction that remediates Defendants' statutory and constitutional violations.

#### 2. The Ninth Circuit's Interpretation of § 1252(f)(1)

It has been the law in the Ninth Circuit for nearly twenty years that § 1252(f)(1) "does not . . . categorically insulate immigration enforcement from judicial classwide injunctions." *Gonzalez v. U.S. Immigration & Customs Enf't*, 975 F.3d 788, 812 (9th Cir. 2020) (internal quotation marks omitted). The Ninth Circuit concluded in *Ali v. Ashcroft*,

346 F.3d 873, 886 (9th Cir. 2003) ("*Ali*"), *vacated on unrelated grounds sub nom. Ali v. Gonzales*, 421 F.3d 795 (9th Cir. 2005), and reaffirmed in *Rodriguez v. Hayes*, 591 F.3d 1105, 1120 (9th Cir. 2010), that § 1252(f)(1) does not prohibit injunctions that "enjoin or restrain" *violations* of the covered provisions therein.  The Ninth Circuit found there is a qualitative distinction between injunctions that "enjoin or restrain the *operation* of [§§ 1221–32]" and those that direct immigration enforcement agencies to conform their extra-legal conduct that "is not even authorized" under the covered provisions.  *Ali*, 346 F.3d at 886 (emphasis added and citations omitted).

Thus, in the Ninth Circuit, lower courts have had authority to enter injunctions against violations of the detention statutes.  *See Rodriguez*, 591 F.3d at 1120 (holding § 1252(f)(1) "prohibits only injunction[s] of 'the operation of' the detention statutes, not injunction[s] of a violation of th[ose] statutes"); *see also Immigrant Defs. Law Ctr. v. U.S. Dep't of Homeland Sec.*, No. CV 21-0395 FMO (RAOx), 2021 WL 4295139, at *7 (C.D. Cal. July 27, 2021) ("To the extent plaintiffs establish that the remedy they seek addresses violations of the relevant statutes, § 1252(f) will not be an obstacle to relief."); *Osny Sort-Vasquez Kidd v. Mayorkas*, No. 2:20-cv-3512-ODW (JPRx), 2021 WL 1612087, at *5 (C.D. Cal. Apr. 26, 2021) ("Whereas Plaintiffs seek . . . an injunction to prevent further violations, such requested relief does not target 'the operation of' the Immigration and Nationality Act ('INA').  Plaintiffs' attempt to enjoin 'violation of' the INA through unconstitutional practices falls outside the injunction bar of § 1252(f)(1)."); *accord Grace v. Barr*, 965 F.3d 883, 907 (D.C. Cir. 2020) ("[S]ection 1252(f)(1) . . . places no restriction

//
//
//
//
//
//
//

on the district court's authority to enjoin agency action found to be unlawful." (emphasis omitted)).[9]

Prior to *Aleman Gonzalez*, this Court would have little difficulty finding that *Rodriguez* and *Ali* provide fertile ground upon which it could enter an injunction enjoining Defendants from turning back asylum seekers in the process of arriving at Class A POEs, or compelling Defendants to inspect and refer those individuals in accordance with § 1158(a)(1) and § 1225, despite § 1252(f)(1)'s remedial bar. Defendants' turning back of asylum seekers unlawfully withholds inspection and referral duties that § 1158(a)(1) and § 1225 require Defendants to perform; by failing to perform those duties, Defendants act without statutory authority and commensurately violate the due process rights of Plaintiff class members. (*See* MSJ Opinion at 33–34, 37–38.) *Rodriguez* and *Ali* make explicitly clear that a class-wide injunction enjoining Defendants from withholding their inspection and referral duties would not interfere with the "operation" of § 1225 because such an injunction would be directed at unauthorized and unconstitutional practices. *See also Osny Sorto-Vasquez Kidd*, 2021 WL 1612087, at *5.

Nor would this Court have difficulty concluding each of the *eBay* factors tip decidedly in favor of such an injunction. *See* 547 U.S. at 391; *Nken*, 556 U.S. at 435. Plaintiffs have established irreparable harm. Defendants' Turnback Policy inflicted constitutional injuries upon members of the Plaintiff class. (MSJ Opinion at 37–38.) Deprivation of a Fifth Amendment due process right "unquestionably constitutes irreparable injury." *See Melendres I*, 695 F.3d at 1002. And while this harm is sufficient, it deserves special mention that Plaintiff class members have endured—and, absent

[9] The Supreme Court in *Jennings v. Rodriguez*, 138 S. Ct. 830, 851 (2018), accepted without repudiation the underlying logic of the Ninth Circuit's interpretation of § 1252(f)(1): that the injunction bar "d[oes] not affect [lower courts'] jurisdiction over . . . *statutory* claims because those claims d[o] not 'seek to enjoin the operation of the immigration detention statutes, but to enjoin conduct . . . not authorized by the statutes.'" *Id.* (quoting *Rodriguez*, 591 F.3d at 1120). Here, however, there is little distinction between Plaintiffs' statutory and constitutional claims. Indeed, the MSJ Opinion found Plaintiffs' Fifth Amendment due process right to access the U.S.-asylum process is derived exclusively from statute, specifically by way of § 1158(a)(1) and the process of inspection and referral afforded in § 1225.

injunctive relief, will continue to endure—another form of irreparable harm: preventable human suffering. *See Hernandez v. Sessions*, 872 F.3d 976, 996 (9th Cir. 2017). As this Court has found repeatedly, and as the record reflects, Defendants' Turnback Policy "resulted in asylum seekers' deaths, assaults, and disappearances after they were returned to Mexico," (*see, e.g.*, Decl. of Erika Pinheiro ¶ 17 (attesting that in a survey of 12,500 refugees arriving at the U.S.-Mexico border prior to the Title 42 restrictions implemented in March of 2020, 30% of respondents reported having been kidnapped or having escaped attempted kidnapping and 40% reported having been assaulted while waiting in Mexico), ECF No. 768-2), and has contributed to humanitarian crises in the Mexican border communities adjacent to Class A POEs (*see id.* ¶ 11 (attesting that, in Tijuana alone, "[t]housands of migrants live in a makeshift tent encampment . . . next to San Ysidro," where residents sleep under plastic tarps, have no bathrooms or access to running water, and are subjected to extreme weather conditions and organized crime)). (*See* SMJ Opinion at 32–33; MTD Opinion at 16–17.) Like constitutional injuries, the threat of physical danger and harm absent injunctive relief qualifies as irreparable. *Cf. Leiva-Perez v. Holder*, 640 F.3d 962, 969 (9th Cir. 2011) (holding irreparable harm inures where a noncitizen shows removal from the United States would place an individual in physical danger).

Furthermore, intolerable public consequences would arise from withholding class-wide injunctive relief tailored to remediate the specific violations found in the MSJ Opinion. Without issuance of an injunction enjoining Defendants' systemic withholding of their referral and inspection duties, Defendants will continue to have free rein to trample upon Plaintiffs' statutory and constitutional rights. *See Melendres I*, 695 F.3d at 1002 ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights." (quoting *Sammartano*, 303 F.3d at 974)). Moreover, absent an injunction, noncitizens awaiting entry to the United States in Mexican border communities will continue to be exposed to great risk of illness, kidnapping, assault, and death. *See Hernandez*, 872 F.3d at 996 ("Faced with such a conflict between [defendant's] financial concerns and [plaintiff's] preventable human suffering, we have little difficulty concluding that the

balance of hardships tips decidedly in plaintiffs' favor." (quoting *Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir. 1983))).

However, as Defendants assert, and Plaintiffs concede, *Aleman Gonzalez* completely changes this Court's calculus. (*See* Defs.' Suppl. Br. at 1–3.) The Court must answer the question whether *Ali* and *Rodriguez* are still viable post-*Aleman Gonzalez* and, if not, whether § 1252(f)(1) precludes issuance of a permanent class-wide injunction in this case.[10]

### 3. *Aleman Gonzalez* is Clearly Irreconcilable with *Ali* and *Rodriguez*

An intervening change in controlling law is found where the reasoning or theory of a case "is clearly irreconcilable with the reasoning or theory of intervening higher authority," *Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003), or where "a subsequent decision 'creates a *significant shift* in [a court's] analysis,'" *Teamsters Local 617 Pension & Welfare Funds v. Apollo Grp., Inc.*, 282 F.R.D. 216, 222 (D. Ariz. 2012) (quoting *Beckstrand v. Elec. Arts Grp. Long Term Disability Ins. Plan*, No. CV F 05-0323 AWI LJO, 2007 WL 177907, at *2 (E.D. Cal. Jan. 19, 2007)). For example, "[i]ntervening Supreme Court authority only overrules past circuit precedent to the extent that the Supreme Court decision 'undercut[s] the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable.'" *United States v. Cisneros*, 763 F.3d 1236, 1240 (9th Cir. 2014) (quoting *Miller*, 335 F.3d at 900)).

Before the Supreme Court in *Aleman Gonzalez* was the question whether the discretionary detention provision at 8 U.S.C. § 1231(a)(6), which enables the federal government to detain noncitizens pending removal, requires the Immigration and Naturalization Service ("INS") to provide bail hearings to individuals in DHS custody for

[10] Importantly, the Court notes that the Ninth Circuit requested briefing on precisely this issue on June 29, 2022 in *Leobardo Moreno Galvez v. Tracy Renaud*, No. 20-36052, Dkt. No. 62 ("The parties are directed to address . . . whether the Supreme Court's decision in *Aleman Gonzalez* overrules this Court's holding that Section 1252(f) prohibits only injunction of 'the operation of the detention statutes, not injunction of a violation of the statutes.'" (citing *Rodriguez*, 591 F.3d at 1120)). As of the date of this Opinion, the Ninth Circuit has yet to weigh in on the fate of *Rodriguez* and *Ali*.

a period of six months or more. 142 S. Ct. at 2057. The district courts in the two underlying cases certified classes consisting of individuals detained pursuant to § 1231(a)(6) for at least six months, concluded INS likely is required by statute to hold a bail hearing in the case of an individual detained for six months or more, and issued class-wide preliminary injunctive relief requiring INS to administer bail hearings to all class members. *See Gonzalez v. Sessions*, 325 F.R.D. 616, 629 (N.D. Cal. 2018), *aff'd sub nom.*, *Aleman Gonzalez v. Barr*, 955 F.3d 762, 766 (9th Cir. 2020); *Baños v. Asher*, No. C16-1454JLR, 2018 WL 1617706, at *1 (W.D. Wash. Apr. 4, 2018), *aff'd in relevant part sub nom.*, *Flores Tejada v. Godfrey*, 954 F.3d 1245, 1247 (9th Cir. 2020). The Ninth Circuit affirmed the lower courts' class certification and issuance of injunctive relief. *See Aleman Gonzalez*, 955 F.3d at 762; *Flores Tejada*, 954 F.3d at 1245. It did not address application of § 1252(f)(1) in either decision. *Aleman Gonzalez*, 955 F.3d at 762; *Flores Tejada*, 954 F.3d at 1245.

The Government appealed to the Supreme Court, which granted certiorari and *sua sponte* requested additional briefing concerning whether § 1252(f)(1) precluded the lower courts from issuing preliminary injunctions in the first instance. *Aleman Gonzalez*, 142 S. Ct. at 2063.

On June 13, 2022, the Supreme Court held § 1252(f)(1) "generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out [§§ 1221–32]," with "one exception": lower courts "retain the authority to 'enjoin or restrain the operation of' the relevant statutory provisions 'with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated.'" *Aleman Gonzalez*, 142 S. Ct. at 2065 (quoting 8 U.S.C. §1252(f)(1)). Applying this principle, the Supreme Court vacated the lower courts' preliminary injunctions, finding § 1252(f)(1) precluded those orders because they "require[d] officials to take actions that (in the Government's view) are not required by § 1231(a)(6) and to refrain from actions that (again in the

Government's view) are allowed by § 1231(a)(6)" and, thus, "interfere[d] with the Government's efforts to operate § 1231(a)(6)." *Id.* at 2065.

Although it does not mention them by name, there can be little doubt *Aleman Gonzalez* repudiates the central holdings of *Ali* and *Rodriguez*. Indeed, the Supreme Court in *Aleman Gonzalez* poured cold water on the premise for which *Ali* and *Rodriguez* stand—that § 1252(f)(1) is inapplicable to injunctions that merely seek to force immigration enforcement agencies to implement the statute consistent with its terms—by concluding even injunctions that "enjoin or restrain" the "unlawful" or "improper operation," *i.e.*, violations, of § 1252(f)(1)'s covered provisions clash with that statute's remedy bar.[11] *Aleman Gonzalez*, 142 S. Ct. at 2066. Thus, following *Aleman Gonzalez*, this Court no longer can enter injunctive relief under *Ali* and *Rodriguez* that enjoins or restrains Defendants' unauthorized implementation of their mandatory ministerial inspection and referral duties on the ground that the practice of turning back arriving asylum seekers constitutes a violation, as opposed to the "operation," of § 1225.

**4. 8 U.S.C. § 1252(f)(1) Bars Class-Wide Injunctive Relief**

Having concluded *Aleman Gonzalez* appears to repudiate *Ali* and *Rodriguez*, this Court finds itself at odds between two competing obligations: its duty to avoid interpreting and applying § 1252(f)(1) in a manner that "produce[s] absurd results," *see Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 576 (1982), and its overriding fidelity to apply controlling Supreme Court precedent, *see Hart v. Massanari*, 266 F.3d 1155, 1171 (9th Cir. 2001).

---

[11] The *Aleman Gonzalez* Court's interpretation rests principally upon its observation that "it is very common to refer to the 'unlawful' or 'improper' operation of whatever it is that is being operated," pointing by way of example to, *inter alia*, cars, airplanes, railroads, radios, and video poker machines, all of which "can be unlawfully or improperly operated." *Aleman Gonzalez*, 142 S. Ct. at 2066. Of course, whether lawfully operated or not, a car is still a car, an airplane is still an airplane, a railroad is still a railroad, a radio is still a radio, and a video poker machine is still a video poker machine. The unlawful or improper operation of those objects does not fundamentally change what they are. The same cannot be said of a law. As the dissent in *Aleman Gonzalez* opines, when officials unlawfully operate a statute, they put the statute at odds with itself: a contradiction that neither withstands textual interpretation nor logic. *Id.* at 2074 (Sotomayor, J., dissenting).

On the one hand, *Aleman Gonzalez* flips on their heads two fundamental principles that guide Article III courts in exercising their inherent judicial powers: that "it is emphatically the province and duty of the judicial department to say what the law is," *Marbury v. Madison*, 5 U.S. 137, 177 (1803), and that when government officials exceed the scope of their statutory authority as properly interpreted by the federal courts, federal courts have broad equitable power to enjoin those violations, *see, e.g.*, *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 108 (1902) ("That the conduct of the postoffice is a part of the administrative department of the government is entirely true, but that does not necessarily and always oust the courts of jurisdiction to grant relief to a party aggrieved by any action by the head, or one of the subordinate officials, of that Department, which is unauthorized by the statute under which he assumes to act.").

"Generally, judicial relief is available to one who has been injured by an act of a government official which is in excess of his express or implied powers." *Harmon v. Bruckler*, 355 U.S. 579, 581–82 (1958) (citing *McAnnulty*, 187 U.S. at 108). Indeed, since at least *Brown v. Board of Education*, 394 U.S. 294 (1955), the general rule has been that federal courts should exercise their broad equitable power to fashion injunctive relief to vindicate rights infringed by the systematic unlawfulness of government actors. *See* Richard H. Fallon, Jr. *et al.*, *The Federal Courts and the Federal System* 803 (5th ed. 2003); *cf. Brown*, 349 U.S. at 301 (affirming lower court's issuance of a permanent injunction "ordering the immediate admission of the plaintiffs to schools previously attended only by white children"); *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1 (1971) (affirming a district court's injunction requiring school board to implement plan to desegregate school district); *Milliken*, 433 U.S. at 269 (upholding the equitable powers of a district court, as part of a desegregation decree, to "order compensatory or remedial educational programs for schoolchildren who have been subjected to past acts of *de jure* segregation"); *Orantes-Hernandez v. Thornbugh*, 919 F.2d 549 (9th Cir. 1990) (affirming lower court's permanent injunction enjoining INS, *inter alia*, from forcing detainees to sign voluntary departure agreements and transferring detainees irrespective of their established

attorney-client relationships on ground those practices violate the Fifth Amendment due process clause); *Hernandez v. Sessions*, 872 F.3d 976, 990 (9th Cir. 2017) (similar).[12]

It would be quite absurd if, in *Brown*, *Swann*, or *Milliken*, the lower courts were restrained to issue injunctive relief, schoolchild-by-schoolchild. *See Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) ("[T]he scope of injunctive relief is dictated by the extent of the violation established[.]"). One can hardly think of a remedial methodology that is less economical, particularly where the members of a class raise indistinguishable claims and seek identical relief, and less effective. Yet that is precisely the approach the Supreme Court deems proper for remediating statutory and constitutional violations committed by immigration enforcement agencies.

By restraining the lower federal courts' authority to issue meaningful relief, *Aleman Gonzalez* simultaneously confers to immigration enforcement agencies power to unilaterally ignore or deviate from the Congressional mandates set forth in the removal provisions of the INA, *see* 8 U.S.C. §§ 1221–32. In this way, *Aleman Gonzalez* not only deflates the historical and traditional role of Article III courts, but it also undermines a fundamental principle of federalism: that when Congress explicitly speaks to a specific issue, federal agencies and courts are bound to "give effect to the unambiguously expressed intent of Congress." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984). Although § 1158 and § 1225 in no uncertain terms impose upon Defendants a mandatory ministerial duty to inspect and refer asylum seekers in the process of arriving at Class A POEs, *Aleman Gonzalez* appears to suggest that Defendants have *carte blanche* to refuse to do so, as long as they present to a lower court a *claimed* ground for their refusal, even if a federal court ultimately finds that basis meritless. *But see Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 600 (2004) (holding courts need only

---

[12] While the Supreme Court decisions cited all involve unauthorized acts taken by state officials, it is well-settled that federal courts' equitable powers extend to entering class-wide injunctive relief to enjoin violations of federal law *by federal officers*. *See, e.g.*, *McAnnulty*, 187 U.S. at 110; *Harmon*, 355 U.S. at 582.

defer to an agency's "statutory interpretation . . . when the devices of judicial construction have been tried and found to yield no clear sense of congressional intent").

Defendants suggest *Aleman Gonzalez*'s implications are not as damaging to the rights of the Plaintiff class as they appear at first glance. Defendants say that, if this Court issues class-wide declaratory relief, Plaintiff class members can institute a separate, non-class action suit and rely upon this Court's declaratory judgment "as a predicate to further relief, including [an] injunction," which would fit within § 1252(f)(1)'s carve out. (Defs.' Remedies Br. at 7.) But by requiring injunctive relief to be issued Plaintiff class member-by-member, there inevitably will be individuals deprived of their due process right to access asylum. As the dissent in *Aleman Gonzalez* observed:

> Noncitizens subjected to removal proceedings are disproportionately unlikely to be familiar with the U.S. legal system or fluent in the English language. Even so, these individuals must navigate the Nation's labyrinthine immigration laws without entitlement to appointed counsel or legal support.

142 S. Ct. at 2076 (Sotomayor, J., dissenting). These practical difficulties are amplified where, as here, the noncitizens in need of a permanent injunction are not even located within the United States, but rather in Mexican border communities, where they have even less access to legal assistance and must endure horrid conditions and threats to life and safety as they prosecute their cases.

On the other hand, this Court has an unfaltering obligation to faithfully apply pertinent Supreme Court precedent. *Hart*, 266 F.3d at 1171. "[I]ndividual judges, cloaked with the authority granted by Article III of the Constitution, are not at liberty to impose their personal view of a just result in the face of a contrary rule of law." *In re United States*, 945 F.3d 616, 627 (2d Cir. 2019). The instant case squarely is controlled by *Aleman Gonzalez*.

The inspection and referral duties this Court found Defendants had withheld by implementing their Turnback Policy are explicitly imposed by the INA at § 1225(a)(3) (delineating immigration officers' duty to inspect) and § 1225(b)(1)(A)(ii) (delineating

immigration officers' duty to refer asylum seekers). *See Al Otro Lado v. Wolf*, 952 F.3d 999, 1010 (9th Cir. 2020) (holding § 1158(a)(1) "creates a right to apply for asylum" while § 1225 "imposes two key mandatory duties on immigration officers with respect to potential asylum seekers"). Section 1225 is among § 1252(f)(1)'s covered provisions. Clearly, after *Aleman Gonzalez*, such an injunction must be construed as "enjoin[ing] or restrain[ing] the operation" of § 1225 because it would have the effect of "interfer[ing] with the Government's efforts to operate § [1225]." 142 S. Ct. at 2066.

Nevertheless, Plaintiffs fashion several creative arguments for why an injunction is appropriate despite *Aleman Gonzalez*'s repudiation of *Rodriguez* and *Ali*. None are availing.

**i. Vacatur under the Administrative Procedures Act**

First, Plaintiffs argue that the Court can issue vacatur relief. (Pls.' Supplemental Br. at 2.) As an initial matter, Plaintiffs are wrong to suggest this Court simply can issue an injunction disguised as vacatur relief; though the two remedies may overlap, they are not the same. Unlike an injunction, a vacatur does not restrain the enjoined defendants from pursuing other courses of action to reach the same or a similar result as the vacated agency action. *See* Daniel Mach, *Rules Without Reasons: The Diminishing Role of Statutory Policy and Equitable Discretion in the Law of NEPA Remedies*, 35 Harv. Envtl. L. Rev. 205, 237 (2011). For example, here, either vacatur or an injunction would suffice to strike down the Turnback Policy, but only an injunction, not vacatur, would restrain Defendants from, in the future, experimenting with and instituting a modified or amended version of the Turnback Policy. *See. id.*

Moreover, although this Court believes (and Defendants appear to as well) that neither § 1252(f)(1) nor *Aleman Gonzalez* restrict lower courts from "set[ting] aside" or "vacating" a policy based upon an APA violation,[13] Defendants accurately observe that

[13] *See Texas v. United States*, --- F. Supp. 3d ---, 2022 WL 2466786, at *5–6 (S.D. Tex. July 6, 2022) ("There are meaningful differences between an injunction, which is a 'drastic and extraordinary remedy,' and a vacatur, which is 'a less drastic remedy.'" (quoting *Monsanto Co. v. Geertson Seed Farms*,

because the PBQM and Metering Guidance Memoranda were rescinded in November of 2021, there exists no "agency action" for this Court to vacate (Defs.' Supp. Br. at 3). *See* 5 U.S.C. § 706(2).

**ii. Anchoring an Injunction in § 1158**

Second, Plaintiffs argue that a separate line of Ninth Circuit precedent, besides *Ali* and *Rodriguez*, provides this Court with authority to issue a class-wide permanent injunction despite § 1252(f)(1)'s remedial bar. Specifically, citing *Gonzales v. Department of Homeland Security*, 508 F.3d 1227, 1233 (9th Cir. 2007), in which the Ninth Circuit held § 1252(f)(1) does not prohibit class-wide injunctions that directly implicate provisions not covered by § 1252(f)(1), "even if that injunction has some *collateral* effect on the operation of [one of § 1252(f)(1)'s] covered provision[s]," Plaintiffs argue this Court simply should anchor its injunction in § 1158 as opposed to § 1225. *Aleman Gonzalez*, 142 S. Ct. at 2067 n.4 (interpreting *Gonzales*, 508 F.3d at 1233, and describing its central holding as "nonresponsive" to the issues in the case at bar) (emphasis added); *see also Catholic Soc. Servs., Inc. v. Immigration & Naturalization Servs.*, 232 F.3d 1139, 1149–50 (9th Cir. 2000) (upholding preliminary injunction because it was issued under "Part V" of the subchapter and thus "by its terms, the limitation on injunctive relief [in § 1252(f)(1)] does not apply"); *Gonzalez v. U.S. Immigration & Customs Enf't*, 975 F.3d 788, 814 (9th Cir. 2020) ("[§ 1252(f)(1)'s] plain text makes clear that its limitations on injunctive relief *do not* apply to *other* provisions of the INA [beyond 8 U.S.C. §§ 1221 through 1332]." (emphasis added)).

Despite Plaintiffs' assertion otherwise, *Gonzales* is not applicable here. Unlike in *Gonzales*, there is practically no attenuation between § 1158, the statute in which Plaintiffs ask this Court to anchor an injunction, and § 1225, the statute that Plaintiffs acknowledge § 1252(f)(1) prohibits this Court from influencing through injunctive relief. Those statutes are inextricably intertwined. (*See* MTD Opinion at 5 ("This case turns on [§] 1225(b)

---

561 U.S. 139, 165 (2010))); *Capital Area Immigrants' Rights Coal. v. Trump*, 471 F. Supp. 3d 25, 60 (D.D.C. 2020) ("[B]y vacating the Rule, the Court is not enjoining or restraining the INA's operation.").

asylum procedure that [§] 1158 incorporates") and 42 ("As the Court has discussed, [§] 1158(a)(1) incorporates [§] 1225, which in turn places a focus on immigration officers who process arriving aliens.").) Section 1158(a)(1) provides noncitizens arriving at Class A POEs along the U.S.-Mexico border a right to apply for asylum; that statute does not explicitly impose any duties upon Defendants to carry out tasks to put that right into practice. *Al Otro Lado*, 952 F.3d at 1010; *see also Al Otro Lado v. Nielsen*, 327 F. Supp. 3d 1284, 1310 n.12 (S.D. Cal. 2018) (observing § 1158(a)(1) "does not identify any specific obligations placed on an immigration officer"). Rather, § 1158(a)(1) only does so through its express incorporation of § 1225(b)(1). *See* 8 U.S.C. § 1158(a)(1) ("Any alien who . . . arrives in the United States . . . may apply for asylum in accordance with this section or, where applicable, *section 1225(b) of this title*." (emphasis added)). Indeed, it is § 1225 that sets forth the specific asylum procedure that § 1158 incorporates. As this Court put it in its MTD Opinion, § 1225 imposes "certain inspection duties of immigration officers, which undergird additional specific duties that arise when certain aliens express an intent to seek asylum in the United States or a fear of persecution." (MTD Opinion at 5.) Thus, the Court sees no way, and Plaintiffs do not explain how, an injunction anchored in § 1158 would have only collateral consequences on Defendants' operation of § 1225. Accordingly, this argument, too, is unavailing.

**iii. Anchoring an Injunction in 8 U.S.C. § 1103(a)(1) and 6 U.S.C. § 202**

Relying again on *Gonzales*, Plaintiffs aver that this Court can issue an injunction anchored in the statutory provisions Defendants claimed authorized their Turnback Policy: 8 U.S.C. § 1103(a)(1) and 6 U.S.C. § 202. As this Court has explained previously, Defendants predicated the Turnback Policy based upon their interpretation of those statutes as authorizing the DHS Secretary with incredibly broad discretion to prioritize DHS's responsibilities in the manner he or she deems necessary. (MTD Opinion at 55 ("Defendants point to [§] 1103(a)(1) in particular, which provides that the Secretary 'shall establish such regulations; prescribe such forms of bonds, reports, entries, and other papers;

issue instructions; and *perform other acts as he deems necessary for carrying out his authority under the provisions of this chapter.*" (emphasis added)).)

While the Court is intrigued by this theory, Plaintiffs miss the mark. *Aleman Gonzalez* requires this Court to inquire whether an injunction would "interfere with [Defendants'] efforts to operate" § 1225, which this Court answered in the affirmative above, *see supra* Sec. III.A.4. *Aleman Gonzalez*, 142 S. Ct. at 2065. This is analytically distinct from the narrower question that Plaintiffs appear to propose as the relevant inquiry: under which statute did Defendants principally invoke as a legal basis to implement the unlawful regulation? Because any class-wide injunction in this case would "interfere" with Defendants' "operation" of § 1225, as that word is construed in *Aleman Gonzalez*, this Court cannot simply anchor injunctive relief in 6 U.S.C. § 202 and 8 U.S.C. § 1103(a)(1) to evade § 1252(f)(1)'s remedial bar.

Accordingly, this Court concludes that § 1252(f)(1) prohibits it from entering a permanent class-wide injunction enjoining Defendants from turning back noncitizen asylum seekers in the process of arriving at Class A POEs or compelling Defendants to inspect and refer such asylum seekers.

* * * *

Having concluded § 1252(f)(1) strips this Court of authority to enter a permanent injunction, Plaintiffs' request for oversight of all permanent injunctive relief is therefore moot.[14]

**B. Individual Relief**

Plaintiffs seek an order restoring the *status quo ante* for named Plaintiff Beatrice Doe prior to Defendants' unlawful Turnback Policy. Defendants neither argue § 1252(f)(1) prohibits this Court from issuing such an injunction nor assert that such relief is

[14] This decision does not cover Plaintiffs' request to convert the Preliminary Injunction into a permanent one or Plaintiffs' request for oversight over Defendants' compliance with the Preliminary Injunction and Clarification Order. As mentioned above, *supra* note 7, those issues are addressed at ECF No. 816.

unwarranted. Indeed, it is apparent to the Court that Plaintiff Beatrice Doe is entitled to the relief sought in the Proposed Order. (*See* Proposed Order ¶ 7.) Accordingly, the Court orders Defendants to restore the *status quo ante* for named Plaintiff Beatrice Doe prior to Defendants' unlawful conduct. This includes taking the necessary steps to facilitate Plaintiff Beatrice Doe's entry into the United States, including issuing any necessary travel documents to allow her to travel to the United States (by air if necessary) and to ensure her asylum processing upon arrival.

Although Plaintiff Beatrice Doe does not seek an injunction directing Defendants to "inspect and refer" her to the U.S. asylum process at a Class A land POE along the U.S.-Mexico border, Defendants suggest that the appropriate recourse for the innumerable Plaintiff class members waiting in Mexican border communities is to seek individualized relief in accordance with § 1252(f)(1) and *Aleman Gonzalez*. The Court, therefore, takes this occasion to point out yet another absurd consequence *Aleman Gonzalez* produces when taken to its logical endpoint.

The Supreme Court held in *Aleman Gonzalez* that § 1252(f)(1) has "one exception" to its general prohibition against lower court injunctions: lower courts "retain authority to restrain or enjoin the operation of the [covered] statutory provisions 'with respect to the application of such provisions to an individual *alien against whom* [*removal*] *proceedings . . . have been initiated*.'" *Aleman Gonzalez*, 142 S. Ct. at 2065 (quoting 8 U.S.C. § 1252(f)(1)) (emphasis added). But the text of § 1252(f)(1) places the individual members of the Plaintiff class in a devastatingly cruel catch-22. Unlike the class members in *Aleman Gonzalez*, removal proceedings have yet to be instituted against all members of the Plaintiff class here precisely because of Defendants' unlawful Turnback Policy. Definitionally, inspection and referral is a prerequisite to removal. Thus, without *Ali* and *Rodriguez* to rest upon, *Aleman Gonzalez* appears to effectively render illusory Plaintiff class members' Fifth Amendment due process right to apply for asylum. This is despite Congress's clear legislative intent in enacting § 1252(f)(1) that the statute "not hamper a district court's

ability to address imminent rights violations." *Padilla v. Immigration & Customs Enf't*, 953 F.3d 1134, 1150–51 (9th Cir. 2020) (citing H.R. Rep. No. 104-469(I), at 161 (1996)).[15]

"The government of the United States has been emphatically termed a government of laws, and not men. It will certainly cease to deserve this high appellation, if the laws furnish no remedy for the violation of a vested legal right. *Marbury*, 5 U.S. (1 Cranch) 137, 163; *see also Ashby v. White*, 92 Eng. Rep. 126 (K.B. 1703) ("If the plaintiff has a right, he must of necessity have means to vindicate and maintain it, and a remedy if he is injured in the exercise of enjoyment of it; and indeed it is a vain thing to imagine a right without a remedy and want of a remedy are reciprocal."). Because of *Aleman Gonzalez*, innumerable Plaintiff class members may well end up living in this gray area where they possess a due process right but no remedy when that right is violated by rapacious executive overreach.

**C. Class-wide Declaratory Relief is Warranted**

Although the issuance of a class-wide injunction is prohibited, § 1252(f)(1) does not strip this Court of jurisdiction to issue a class-wide declaration. *See Rodriguez*, 591 F.3d at 119 (construing § 1252(f)(1) narrowly as not banning class-wide declaratory relief), *cited affirmatively by Padilla*, 953 F.3d at 1150; *see also Aleman Gonzalez*, 142 S. Ct. at 2065 n.2 ("Because only injunctive relief was entered here, we have no occasion to address [the Government's suggestion that § 1252(f)(1) bars class-wide declaratory relief].").

The parties agree that this Court has both constitutional and statutory jurisdiction to issue a declaratory judgment in this case. *See Gov't Emps. Ins. Co. v. Dizol*, 133 F.3d 1220,

---

[15] It is true that even if this dire interpretation of § 1252(f)(1) and *Aleman Gonzalez* is the correct one, § 1252(f)(1) still leaves open the possibility that the Supreme Court can fashion class-wide injunctive relief to vindicate the Plaintiff class's right to access the U.S.-asylum process. *See Biden v. Texas*, 142 S. Ct. 2528, 2539 (2022) ("A second feature of the text of section 1252(f)(1) leaves no doubt that this Court has jurisdiction: the parenthetical explicitly preserving this Court's power to enter injunctive relief."). But the Supreme Court "grants only a very small percentage of certiorari petitions." *United States v. Burch*, 202 F.3d 1274, 1277 (10th Cir. 2000). The mere prospect that that Court might, after months or years, grant certiorari in this case must be cold comfort to asylum seekers awaiting Defendants to fulfill their mandatory ministerial asylum inspection and referral duties and, in so doing, give meaning to Plaintiff class members' Fifth Amendment due process right to apply for asylum.

1224 (9th Cir. 1998) ("[W]hen a district court has constitutional and statutory authority to hear a case brought pursuant to the Declaratory Judgment Act, the district court may entertain the action without *sua sponte* addressing whether jurisdiction should be declined" as a matter of discretion).

Both parties aver that declaratory relief will serve a useful purpose in clarifying where the balance lies between Defendants' authority to regulate the flow and methodology of inspecting and processing asylum seekers in the process of arriving at Class A POEs and the Plaintiff class's right to access the U.S. Asylum Process. (Pls.' Remedy Br. at 7–8 ("[T]he Court should issue a judgment declaring, pursuant to its earlier opinion on the parties' cross-motion for summary judgment, that turnbacks of noncitizens in the process of arriving at POEs on the U.S.-Mexico border violate the INA, section 706(1) of the APA, and the Due Process Clause of the Fifth Amendment."); *see* Defs.' Remedy Br. at 6–7.) They also concur that a declaratory judgment memorializing the Court's central holdings in its MSJ Opinion would extinguish the disputes giving rise to this action and avoid future litigation concerning the scope of Defendants' inspection and referral duties. (*See* Pls.' Remedy Br. at 7–8 (arguing a declaratory judgment would terminate in advance disputes that might arise "should this Administration or another one wish to experiment with new ways of denying arriving noncitizens access to the asylum process at POEs."); Defs.' Remedy Br.at 7 ("[A declaratory judgment] could be used by individual [*AOL*] Class Members 'as a predicate to further relief, including an injunction.'" (quoting *Powell v. McCormack*, 395 U.S. 486, 499 (1969))).)

The Court is persuaded that declaratory relief that captures the central holdings of its MSJ Opinion would serve the dual purposes of the Declaratory Judgment Act. Accordingly, the Court enters the following declaratory relief:

> This Court enters a DECLARATORY JUDGMENT that, absent any independent, express, and lawful statutory authority, Defendants' refusal to deny inspection or asylum processing to noncitizens who have not been admitted or paroled and who are in the process of arriving in the United States

Case: 22-55988, 12/20/2022, ID: 12615953, DktEntry: 13-2, Page 34 of 301

at Class A Ports of Entry is unlawful regardless of the purported justification for doing so.

## IV. CONCLUSION

For the foregoing reasons stated above:

1) The Court **ORDERS** Defendants to restore the status quo ante for the named Plaintiffs prior to Defendants' unlawful conduct. This includes taking the necessary steps to facilitate Plaintiff Beatrice Doe's entry into the United States, including issuing any necessary travel documents to allow her to travel to the United States (by air if necessary) and to ensure her inspection and asylum processing upon arrival.

2) The Court **DECLARES** that, absent any independent, express, and lawful statutory authority, Defendants' refusal to deny inspection or asylum processing to noncitizens who have not been admitted or paroled and who are in the process of arriving in the United States at Class A Ports of Entry is unlawful regardless of the purported justification for doing so.

The parties are further **ORDERED** to meet and confer and lodge a Proposed Final Judgment that incorporates this Court's rulings in its MSJ Opinion (ECF No. 742) and set forth herein **by no later than August 22, 2022**.

**IT IS SO ORDERED.**

**DATED: August 5, 2022**

Cynthia Bashant

**Hon. Cynthia Bashant**
**United States District Judge**

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

AL OTRO LADO, INC.; ABIGAIL DOE, BEATRICE DOE, CAROLINA DOE, DINORA DOE, INGRID DOE, URSULA DOE, JOSE DOE, ROBERTO DOE, MARIA DOE, JUAN DOE, VICTORIA DOE, BIANCA DOE, EMILIANA DOE, AND CESAR DOE, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

ALEJANDRO MAYORKAS, Secretary, U.S. Department of Homeland Security, in his official capacity; CHRIS MAGNUS Commissioner, U.S. Customs and Border Protection, in his official capacity; PTEER FLORES, Executive Assistant Commissioner, Office of Field Operations, U.S. Customs and Border Protection, in his official capacity,

Defendants.[1]

Case No. 17-cv-02366-BAS-KSC

**ORDER:**

**(1) GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTIONS SEEKING CLARIFICATION OR MODIFICATION OF THE PRELIMINARY INJUNCTION AND CLARIFICATION ORDER (ECF Nos. 644, 736);**

**(2) CONVERTING PRELIMINARY INJUNCTION INTO A PERMANENT INJUNCTION; AND**

**(3) DENYING PLAINTIFFS' REQUEST FOR OVERSIGHT (ECF No. 736)**

[1] Because all Defendants are sued in their official capacities, the successors for these public offices are automatically substituted as Defendants per Federal Rule of Civil Procedure 25(d).

Case: 22-55988, 12/20/2022, ID: 12615053, DktEntry: 13-2, Page 36 of 301

In an Opinion dated November 19, 2019, this Court enjoined Defendants from applying 8 C.F.R. § 208.13(c)(4), known more commonly as the "Asylum Ban," to the immigration proceedings of members of a provisionally certified class comprised of "all non-Mexican asylum seekers who were unable to make a direct asylum claim at a [United States] [port of entry] before July 16, 2019 because of the [United States] Government's metering policy" ("P.I. Class"). (Prelim. Inj. at 36, ECF No. 330.) On October 30, 2020, this Court issued a Clarification Order elucidating what is required to remain in compliance with the Preliminary Injunction. (Clarification Order, ECF No. 605.) The Clarification Order established that the Preliminary Injunction applies both to Defendants *and* the Executive Office of Immigration Review ("EOIR," together with Defendants, the "Government"). (*Id.* at 24–25.) It also explained that the Preliminary Injunction requires the Government to: (1) "make all reasonable efforts to identify" members of the P.I. Class; (2) provide notice to P.I. Class members in Department of Homeland Security ("DHS") custody or "in administrative proceedings" of their potential "membership and the existence and import of the Preliminary Injunction"; and (3) "take immediate affirmative steps to reopen or reconsider" prior asylum determinations of P.I. Class members that were predicated upon the Asylum Ban. (*Id.*)

Since October 30, 2020, the Government has developed procedures at various stages of the immigration process with the aim of effectuating the directives of the Clarification Order. The Government has begun to implement many of these procedures and represents that it soon plans to implement those that have yet to be administered. (*See generally* First Decl. of Katherine J. Shinners ("First Shinners Decl.") ¶ 8, ECF No. 758-1.)

Nevertheless, in two separate motions before this Court, Plaintiffs challenge various aspects of the Government's procedures as falling short of the Clarification Order's requirements for P.I. Class-member identification, notice, and immigration case re-opening and re-consideration. (*See* Pls.' Mot. to Enforce Prelim. Inj. & Clarification Order ("Enforcement Mot."), ECF No. 644; Mem. in Supp. of Enforcement Mot. ("Enforcement Mem."), ECF No. 646; Pls.' Mot. to Oversee Prelim. Inj. & Clarification Order ("Oversight

Mot."), ECF No. 736; Mem. in Supp. of Oversight Mot. ("Oversight Mem."), ECF No. 736-1; *see also* Pls.' Statement ¶¶ 1–16, Joint Status Report at 1–2, ECF No. 803.) Plaintiffs seek "enforcement" of the Preliminary Injunction and Clarification Order in the form of an order (1) finding the challenged aspects of the Government's procedures noncompliant and (2) adopting Plaintiffs' interpretation of the Clarification Order's directives. (Enforcement Mot.; Oversight Mot.)

Additionally, Plaintiffs seek to convert into a permanent injunction the Preliminary Injunction, inclusive of the Clarification order and any other clarification and/or modification relief this Court issues here, as well as an order appointing Magistrate Judge Karen S. Crawford special master pursuant to Federal Rule of Civil Procedure ("Rule") 53 to oversee and monitor the Government's compliance therewith.[2] (Proposed Order ¶¶ 4, 8, ECF No. 773-4.)

For the reasons explained below, the Court construes Plaintiffs' pending motions as ones to clarify and/or modify the Clarification Order and Preliminary Injunction, which this Court **GRANTS IN PART** and **DENIES IN PART**, as set forth in Section III.A. (*See* ECF Nos. 644; 736.) Furthermore, the Court **GRANTS** Plaintiffs' request for to convert the Preliminary Injunction into a permanent injunction but **DENIES** Plaintiffs' request for appointment of a special master.

## I. BACKGROUND

The Court presumes the parties' familiarity with the factual and procedural history of this case. That history is incorporated by reference hereto and repeated only to the extent necessary to frame the issues placed before the Court by Plaintiffs' Enforcement and Oversight Motions. (*See* Prelim. Inj. at 1–7; Clarification Order at 1–7.)

//

[2] Plaintiffs also request other permanent injunctions to vindicate the statutory and constitutional violations found in this Court's September 2, 2021 opinion granting in part and denying in part the parties' cross-motions for summary judgment ("MSJ Opinion") (ECF No. 742). (*See* Proposed Order ¶¶ 2–3.) Those requests are addressed in the Remedies Opinion, filed contemporaneously with this Opinion. (Remedies Opinion, ECF No. 817.)

Case: 22-55988, 12/20/2022, ID: 12615053, DktEntry: 13-2, Page 38 of 301

### A. Procedural History

Plaintiffs commenced this action in 2017, alleging, *inter alia*, that Defendants' "Turnback Policy" violates Section 706 of the Administrative Procedures Act ("APA") and, thus, deprives the *AOL* Class of their Fifth Amendment due process right to access the U.S. asylum process.[3, 4] (Second Am. Compl. ("SAC") ¶ 3; *see id.* ¶¶ 256–59, 283–92.) Plaintiffs allege that the "Turnback Policy" was a formal policy "to restrict access to the asylum process" at Class A Ports of Entry ("POEs"), pursuant to which low-level CBP officials were ordered to "directly or constructively turn back asylum seekers at the [U.S.-Mexico] border." (*Id.* ¶ 3.) The Turnback Policy included a "metering" or "waitlist" system, which involved instructing asylum seekers "to wait on the bridge, in the pre-inspection area, or a shelter," or simply telling asylum seekers that "they [could not] be processed because the [POE] [was] 'full' or 'at capacity[.]'" (*Id.*) Accordingly, asylum seekers who arrived at Class A POEs often were unable to pursue asylum at the time they presented themselves, and instead had to wait indeterminate lengths of time for Defendants to reopen POEs for asylum processing. (*See id.* ¶¶ 1–3.)

On July 16, 2019, while this action was pending, the DHS promulgated the Asylum Ban. *See* 84 Fed. Reg. 33,829 (July 16, 2019), *codified at* 8 C.F.R. § 208.13(c)(4). Among other things, the Asylum Ban rendered ineligible for asylum noncitizens who entered, attempted to enter, or arrived at the U.S.-Mexico border after transiting through at least one

---

[3] The plaintiff class (defined above as, "*AOL* Class") consists of "all noncitizens who seek or will seek to access the U.S. asylum process by presenting themselves at a Class A Port of Entry on the U.S.-Mexico border, and were or will be denied access to the U.S. asylum process by or at the instruction of [Customs and Border Protection ("CBP")] officials on or after January 1, 2016." (Class Certification Order at 18, ECF No. 513). The Court also certified a subclass consisting of "all noncitizens who were or will be denied access to the U.S. asylum process at a Class A POE on the U.S.-Mexico border as a result of Defendants' metering policy on or after January 1, 2016." (*Id.*)

[4] This Court has since granted summary judgment in favor of Plaintiffs on these claims. (Summary Judgment Order, ECF No. 742.) As previously mentioned, *supra* note 2, this Court's Remedies Opinion, which issues relief tailored to address these violations, is filed concurrently herewith at ECF No. 816.

country other than their country of origin without applying for humanitarian protection in that country ("Transit Rule").[5] *Id.*

On September 26, 2019, Plaintiffs moved to preliminarily enjoin application of the Asylum Ban to P.I. Class members, arguing that the "[Transit Rule] would not have affected [P.I. Class members' eligibility for asylum] but for Defendants' illegal use of metering, which forced [P.I. Class members] to stay in Mexico longer than they otherwise would have," *i.e.*, until July 16, 2019 or later. (Pls.' Mot. for Prelim Inj. at 7–8, ECF No. 294-1.) This Court granted Plaintiffs' application on November 19, 2019 in its Preliminary Injunction, which states:

> Defendants are hereby **ENJOINED** from applying the Asylum Ban to members of the [P.I. Class] and **ORDERED** to return to the pre-Asylum Ban practices for processing the asylum applications of members of the [P.I. Class].

(Prelim. Inj. at 36.)[6]

In July of 2020, citing what they believed to be deficiencies in Defendants' compliance procedures, Plaintiffs sought clarification of the Preliminary Injunction. (Pls.' Mot. for Clarification, ECF No. 494.) On October 30, 2020, this Court granted Plaintiffs' application and clarified the Preliminary Injunction as follows:

> (1) EOIR is bound by the terms of the [P]reliminary [I]njunction [("Paragraph 1")];
>
> (2) DHS and EOIR must take immediate affirmative steps to reopen and reconsider past determinations that potential [P.I.] [C]lass members

---

[5] By its express terms, the Asylum Ban applied only to the immigration proceedings of individuals who entered, attempted to enter, or arrived at the U.S.-Mexico border on or after July 16, 2019. 8 C.F.R. § 208.13(c)(4). It did not apply retroactively. *Id.*

[6] Defendants appealed the Preliminary Injunction and sought an emergency stay. On December 20, 2019, the Ninth Circuit administratively stayed the Preliminary Injunction pending resolution on the merits of Defendants' stay application. (ECF No. 369.) Following oral argument, the Ninth Circuit lifted the stay on March 5, 2020. *Al Otro Lado v. Wolf*, 952 F.3d 999, 1013 (9th Cir. 2020). The Ninth Circuit held oral argument on the underlying appeal on July 20, 2020; that appeal still is pending. *See Al Otro Lado et al. v. Chad Wolf, et al.*, No. 19-56417 (9th Cir. Dec. 5, 2019), Dkt. Nos. 97, 105.

were ineligible for asylum based on the Asylum Ban, for all potential class members in expedited or regular removal proceedings. Such steps include identifying affected class members and either directing immigration judges or the [Board of Immigration Appeals ("BIA")] to reopen or reconsider their cases or directing DHS attorneys representing the government in such proceedings to affirmatively seek, and not oppose, such reopening or reconsideration [("Paragraph 2")];

(3) Defendants must inform identified [P.I. Class] members in administrative proceedings before [United States Citizenship and Immigration Services ("USCIS")] or EOIR, or in DHS custody, of their potential [P.I.] [C]lass membership and the existence and import of the [P]reliminary [I]njunction [("Paragraph 3")]; and

(4) Defendants must make all reasonable efforts to identify [P.I. Class] members, including but not limited to reviewing their records for notations regarding class membership made pursuant to the guidance issued on November 25, 2019, and December 2, 2019, to [U.S. Customs and Border Protection] CBP and [CBP's Office of Field Operations ("OFO")], respectively, and sharing information regarding [P.I. Class] members' identities with Plaintiffs [("Paragraph 4")].

(Clarification Order at 24–25.)[7]

Crucially, in *Capital Area Immigrants' Rights Coalition v. Trump*, 471 F. Supp. 3d 25 (D.D.C. 2020) ("*C.A.I.R.*"), the Asylum Ban was deemed legally invalid and, thus, vacated, on June 30, 2020. *See id.*, 471 F. Supp. 3d at 25, *appeal dismissed as moot I.A. v. Garland*, No. 20-5271, 2022 WL 696459, at *1 (D.C. Cir. Feb. 24, 2022). The Government avers that after June 30, 2020, "the Asylum Ban should not have been applied to anyone." (First Shinners Decl. ¶ 8.)

//

//

[7] As with the Preliminary Injunction, the Government sought a stay of the Clarification Order, which the Ninth Circuit granted in part but lifted shortly thereafter. *See Al Otro Lado et al. v. Chad Wolf, et al.*, No. 20-56287 (9th Cir. Dec. 4, 2020), Dkt. Nos. 15, 30. The Government's underlying appeal of the Clarification Order remains pending alongside their appeal of the Preliminary Injunction. *Id.*, Dkt. 62. Those appeals were consolidated on May 26, 2022. *See Id.*, Dkt. 72.

## B. The Government's Preliminary Injunction and Clarification Order Compliance Procedures

The Government has developed and implemented, or soon plans to implement, procedures at various stages of immigration proceedings to (1) identify potential P.I. Class members; (2) provide notice to those individuals; and (3) screen potential P.I. Class members to determine (a) whether they, in fact, meet the criteria for P.I. Class membership and, if so, (b) whether their cases are eligible for reopening and reconsideration.

### 1. Identifying Potential P.I. Class Members

On November 20, 2020, the Government queried CBP's electronic system of records to identify "all non-Mexican aliens encountered along the southwest border by both [U.S. Border Patrol ("USB")] and OFO, with an encounter date of July 16, 2019 through June 30, 2020, who were processed for expedited removal, expedited removal/credible fear, or a notice to appear[.]" (Decl. of Jay Visconti ("Second Visconti Decl.") ¶ 5 (attesting CBP STAT Division "queried available data from the relevant systems of record for all records based on the requested criteria"), ECF No. 695-2.) The Government then narrowed this list to individuals who: "(1) as of February 1, 2021, the electronic records of EOIR indicated that the individual filed for [a]sylum, [w]ithholding, or the [c]onvention against [t]orture before EOIR on or after July 16, 2019, and that a decision had been entered on that application; (2) were noted as being originally processed by CBP for [expedited removal/credible fear]; or (3) as of January 11, 2021, USCIS ha[d] an electronic record of the individual in the Asylum Division's case management system (other than records reflecting a Migrant Protection Protocols case or a Reasonable Fear case)." (*See* First Shinners Decl. ¶ 24; *see* Decl. of Katherine J. Shinners ("Second Shinners Decl.") ¶¶ 3–4, Ex. 1 to Unopposed Mot. to Correct, ECF No. 784-2.)[8]

[8] The Court **GRANTS** Defendants' Unopposed Motion to Correct, which identifies, and seeks to amend and correct, a misstatement in Defendants' Oversight Opposition respecting the parameters of its query for potential P.I. Class members. (ECF No. 784.)

The Government compiled names of individuals who met each of the above-mentioned criteria into a "Master List." (First Shinners Decl. ¶ 24.) The individuals whose names appear on the Master List are deemed "potential" P.I. Class members by the Government; USCIS and/or EOIR assesses those individuals for P.I. Class-membership and entitlement to relief under the Preliminary Injunction pursuant to the procedures set forth below, *infra* Sec. I.B.2. (Decl. of Andrew J. Davidson ("Davidson Decl.") ¶¶ 4–5 (USCIS), ECF No. 758-2; First Decl. of Jill W. Anderson ("First Anderson Decl.") ¶ 4, ECF No. 695-6 (EOIR).) The Master List is also used to facilitate notice to potential P.I. Class members. (First Shinners Decl. ¶ 24; Davidson Decl. ¶¶ 4–5; First Anderson Decl. ¶ 4.)

**2. P.I. Class Membership Determinations and Affirmative Steps to Reopen and Reconsider Eligible Cases**

**a. ICE**

On November 6, 2020, Immigration and Customs Enforcement ("ICE") directed its Enforcement and Removal Operations ("ERO") division to "suspend all removals . . . pending further screening by USCIS" of individuals appearing on a list consisting of non-Mexican noncitizens in DHS custody who had a final order of removal issued between July 16, 2019 and June 30, 2020. (Decl. of Robert Guadian ("Gaudian Decl.") ¶ 5, ECF No. 695-5; Guidance Regarding *Al Otro Lado v. McLeenan*, 423 F. Supp. 3d 848 (Nov. 19, 2019) ("ICE P.I. Notice"), Ex. 1 to Guadian Decl., ECF No. 695-5.)[9] On November 13, 2020, ICE distributed to ERO additional guidance, entitled "Review of Cases for Potential Membership in the Provisionally Certified Class" ("ICE Interim P.I. Guidance"). (*See* ICE Interim P.I. Guidance, Ex. 2 to Guadian Decl.) The ICE Interim P.I. Guidance essentially forbids ERO from removing noncitizens in DHS custody who possibly could qualify as P.I. Class members, while "enabl[ing] removal operations to proceed" with respect to noncitizens in DHS custody who, based on agreed-upon, objective criteria, could not

[9] All exhibits to the Guadian Declaration are annexed at ECF No. 695-5.

possibly qualify for P.I. Class membership. (*Id.* at 2–3 (listing 10 agreed-upon P.I. Class exclusionary criteria, which, if just one is found present in a given case, authorizes ERO to proceed with removal); Guadian Decl. ¶¶ 5–6; Decl. of Elizabeth Mura ("Mura Decl.") ¶¶ 3, 5, ECF No. 695-3.)

On January 15, 2021, ICE issued updated guidance instructing ERO to "[c]ontinue to screen cases at imminent risk of removal using the [ICE Interim P.I. Guidance]" and to refer immediately to USCIS for "further class membership screening" those individuals who "d[o] not meet any of the exclusion[ary] criteria." (Further Guidance on *Al Otro Lado Compliance* ("ICE Referral Guidance"), Ex. 3 to Guadian Decl.) The ICE Referral Guidance, which remains in effect, requires ERO to, *inter alia*, serve upon individuals whom it refers to USCIS for P.I. Class membership screening "a copy of the Notice of Potential Class Membership in Cases Subject to Removal," notify USCIS of the referral, and provide USCIS with documentation in ICE's possession that could bear upon P.I. Class membership. (ICE Referral Guidance at 2.) Additionally, as of April of 2022, DHS has posted notice concerning the Preliminary Injunction and its import in all ICE detention facilities. (Joint Status Report at 5.)

**b. USCIS**

**i. Procedures for Potential P.I. Class Members with Final but Unexecuted Orders of Removal**

The USCIS has delineated a framework (1) to make P.I. Class-membership determinations for individuals with final but unexecuted orders of removal and (2) to assess what form of reopening and/or reconsideration relief is warranted for those individuals who qualify for P.I. Class status ("USCIS Guidance"). (Mura Decl. ¶¶ 3, 4, 7; *see* ECF No. 695-3; Email of Andrew Davidson re: "*Al Otro Lado* Preliminary Injunction Guidance" ("Davidson Email"), Ex. 1 to Mura Decl.; USCIS *AOL* Preliminary-Injunction Class

Membership Screening Guidance ("Non-detained P.I. Class Screening Procedures"), Ex. 2 to Mura Decl., ECF No. 758-2).)[10]

P.I. Class-Membership Determinations: USCIS asylum officers undertake P.I. Class-membership determination interviews for two sets of potential P.I. Class members: (1) those in ICE custody who were referred to USCIS by ICE pursuant to the ICE Referral Guidance; and (2) those named in the Master List who (a) are not in ICE custody; (b) were issued final orders of removal, (c) have not yet been removed; and (d) were last located inside the United States according to ICE data. (Mura Decl. ¶¶ 3, 5–6.)

Prior to a P.I. Class-membership interview, asylum officers must review DHS records for any evidence that might bear upon an interviewee's P.I. Class membership, *i.e.*, evidence that the interviewee was metered prior to the relevant pre-Asylum Ban period. (*See* Non-detained P.I. Class Screening Procedures at 2.) Specifically, asylum officers must "[n]ote whether the [interviewee's] name seems to appear on one of the . . . waitlists [in the Government's possession] . . . that may indicate [the interviewee's] presence in a Mexican border town[.]"[11] (*Id.* at 2–3.) Asylum officers also review, *inter alia*, any Form I-213s, I-867A/Bs, and I-877s in an interviewee's case file. (*Id.* at 4.) Finally, asylum officers examine an interviewee's case file to assess whether he or she "was previously

[10] All exhibits to the Mura Declaration are annexed to ECF No. 758-2. Although the Government proffers only the document for Non-detained P.I. Class Screening Procedures, it attests that USCIS implements substantially identical procedures for potential P.I. Class members in DHS custody. (Mura Decl. ¶ 7.)

[11] As explained in this Court's March 8, 2022 Order, "[i]n response to the growing backlog of asylum seekers [in Mexican border cities], Mexican federal and municipal officials and shelter workers . . . Mexican border cities began collecting the names, nationalities, and contact information of migrants awaiting processing, and compiled that information into 'waitlists.'" (Class Facilitation Order at 4, ECF No. 800.) Although the Government did not create or administer these waitlists, it is undisputed that the Government relied upon them to call asylum seekers waiting in Mexican border towns to Class A POEs for asylum inspection and referral. *See Al Otro Lado*, 952 F.3d at 1008. According to Plaintiffs, waitlists operated in at least the Mexican border cities and towns of Agua Prieta, Ciudad Acuña, Ciduad Juárez, Matamoros, Mexicali, Nogales, Nuevo Laredo, Piedras Negras, Reynoso, San Luis Rio Colorado, Tijuana. (Class Facilitation Order at 4 n.4.) However, the Government possesses only a fraction of the waitlists that were in operation during the Asylum Ban period. These were provided to the Government either by Plaintiffs' counsel or Mexico's federal immigration agency ("INAMI"). (Non-detained P.I. Class Screening Procedures at 1 n.2 and 3 n.6.)

asked class membership screening questions" in connection with the Government's prior P.I. Class-membership screening process, which was instituted immediately after the Preliminary Injunction. If so, asylum officers must note "whether the responses contained evidence of [P.I.] [C]lass membership or evidence that would tend to negate [P.I.] [C]lass membership." (*Id.* at 4; *see also* First Shinners Decl. ¶ 13 (describing briefly USCIS's pre-Clarification Order screening procedures).)

At the P.I. Class-membership interview, asylum officers ask interviewees a set of scripted questions "to determine whether the individual sought to enter the United States at a [Class A POE] to seek asylum before July 16, 2019" but was prevented from doing so because of the Government's Turnback Policy. (USCIS *AOL* Preliminary-Injunction Class Member Screening Interview Questions ("Amended Screening Questions"), Ex. 4 to Mura Decl.; Non-detained P.I. Class Screening Procedures at 4.) The USCIS Guidance explicitly instructs asylum officers to ask these Amended Screening Questions even if the interviewee was previously interviewed in connection with USCIS's prior screening procedures. Furthermore, it forbids asylum officers from using the scripted interview questions ("Initial Screening Questions") that were deployed in USCIS's prior screening procedures. (*See* Initial Screening Questions, Ex. 1 to Enforcement Mot., ECF No. 644-3 (setting forth P.I. Class screening questions developed by USCIS immediately following Preliminary Injunction); *see also* Non-detained P.I. Class Screening Procedures at 4; *see also* Davidson Email at 2 ("As of today, asylum officers must *no longer use* the USCIS *AOL* metering questions distributed by Deputy Chief Ashley Caudill-Mirillo on November 24, 2019 [Initial Screening Questions].") (emphasis in original).) At the conclusion of the interview, asylum officers must solicit from interviewees any additional evidence of P.I. Class membership they wish to submit. (Amended Screening Questions ¶ 10.)

After the P.I. Class-membership interview, "the asylum officer must determine if the [interviewee] has established he or she is more likely than not [a P.I. Class] member." (Non-detained P.I. Class Screening Procedures at 5; Mura Decl. ¶ 16.) "Documentary evidence of [P.I.] [C]lass membership is not required to meet this standard." (Non-detained

P.I. Class Screening Procedures at 5.) However, documentary evidence of P.I. Class membership—"including but not limited to, documentation of a stay in a shelter or hotel in a Mexican border town/city during the relevant pre-[Asylum Ban] time period[,] documentation regarding the placement of a name on a waitlist during the relevant pre-[Asylum Ban] time period[,] and declarations, affidavits, or the individual's own statements regarding whether they may have been subject to metering during the relevant pre-[Asylum Ban] time period"—"will *generally be sufficient* to establish" P.I. Class membership. (*Id.* (emphasis added).)

The USCIS Guidance permits asylum officers to consider "contradictory evidence" in an interviewee's DHS records or testimony, including testimony elicited in response to the Initial Screening Questions. (*Id.*) Indeed, while the USCIS Guidance instructs asylum officers "not [to] rel[y] on the results of prior [P.I] class membership screenings to exclude individuals from consideration for [P.I.] [C]ass membership," it also states asylum officers may consider "an individual's prior statements in prior screening interviews" in deciding whether an interviewee establishes P.I. Class membership. (First Shinners Decl. ¶ 13; *see* Non-detained P.I. Class Screening Procedures at 6.)

The USCIS Guidance deems "generally sufficient" for establishing P.I. Class membership the presence of a potential P.I. Class member's name on a metering waitlist pre-dating the Asylum Ban. (Non-detained P.I. Class Screening Procedures at 4–5.) However, the USCIS Guidance explicitly confers asylum officers discretion to "giv[e] greater weight" to an individual's own statements—including those elicited at a prior P.I. Class-membership screening—that are "clearly and unequivocally contradict[ory]" of P.I. Class membership status. (*Id.* at 5; *see also id.* at 3 n.6 ("These [metering waitlists] may not be reliable, accurate, or comprehensive lists of those who were waiting to enter the United States through a [POE] at any given time.").)

The USCIS Guidance further prescribes that "[t]he absence of an individual's name on a waitlist should not be used to conclude that the individual is not a [P.I.] [C]lass member where there is other credible evidence of [P.I.] class membership, including but

not limited to the individual's own testimony." (*Id.* at 6.) The USCIS Guidance explains that such flexibility is necessary in part because the Government only has incomplete waitlists from four Mexican border cities and towns and none of the waitlists from the other seven Mexican border cities and towns in which such a system was known to operate. (*Id.* at 5–6.)

If, after an interview, an asylum officer concludes an interviewee fails to satisfy the standard for P.I. Class membership, a negative P.I. Class-membership determination will issue. (Non-detained P.I. Class Screening Procedures at 6–7.) However, if the asylum officer finds the interviewee establishes that he or she is more likely than not a P.I. Class member, the asylum officer must proceed to the second strand of the USCIS Guidance's framework: identifying the appropriate form of relief to administer. (*Id.* at 7.)

Reopening and Reconsideration Relief: The USCIS Guidance instructs asylum officers to ascertain whether the Asylum Ban was applied to deny asylum in the cases of identified P.I. Class members and, if so, at which stage in immigration proceedings. (Mura Decl. ¶¶ 16–17.) In the case of a P.I. Class member to whom USCIS previously applied the Asylum Ban during his or her credible fear interview, the USCIS Guidance mandates that the case be reopened, the prior negative fear determination be vacated, and the responsible asylum officer reconduct the new credible fear interview and make a new credible fear determination without applying the Transit Rule. (*See id.* ¶ 17.) In the case of a P.I. Class member to whom an EOIR immigration judge ("IJ") previously applied the Asylum Ban during review of the USCIS's negative fear determination, the USCIS Guidance confers jurisdiction to EOIR for the purpose of fashioning reopening or reconsideration relief. The asylum officers merely must re-issue the negative fear determination paperwork, re-refer for review the negative fear determination to the IJ, and notify the EOIR of USCIS's determination and referral. (*Id.* ¶ 17; Non-detained P.I. Class Screening Procedures at 8–9.) The propriety of reopening and/or reconsideration relief in this second category of cases is governed by the EOIR's procedures delineated below, *see infra* Sec. 1.B.2.c.

### ii. Procedures for Potential P.I. Class Members Removed from the United States

As of September 2021, USCIS had developed, but not yet implemented, procedures to identify and screen potential P.I. Class members who have been removed pursuant to an expedited removal order and, thus, presumably are no longer located in the United States. (*See* Davidson Decl. ¶ 18.)[12] This process begins with USCIS querying the Master List to isolate individuals "who received a negative [credible fear] determination where the Asylum Ban was applied and [who] were removed pursuant to an expedited removal order." (*Id.* ¶ 18; *see id.* ¶ 24 ("To identify [removed potential P.I. Class members], USCIS will rely on the same data available in the [M]aster [L]ist[.]").) Class counsel—not the Government—has agreed to provide notice to these potential P.I. Class members, who then must self-identify by sending directly to USCIS applications for P.I. Class membership in accordance with such notice. Upon receipt of a potential P.I. Class member's submission is received, a USCIS asylum officer will review the individual's DHS case file and solicit the individual to submit additional evidence. (*Id.* ¶¶ 20–21, 25–26.) USCIS will deploy substantially the same process for evaluating evidence to determine P.I. Class membership as set forth above, *see supra* Sec. I.2.b.i, except that potential P.I. Class members who have been removed will not receive an in-person screening interview. (*Id.* ¶ 26.)

Individuals deemed P.I. Class members will "be provided instructions on further processing, including how to request to return to the [United States] to participate in their immigration case." (Davidson Decl. ¶ 27.) Specifically, P.I. Class members must submit to DHS a Form I-131, Application for Travel Document; if the application is approved, DHS will send the P.I. Class member a travel letter allowing him or her to board an aircraft and travel to a POE. (First Shinners Decl. ¶ 35 (citing 8 C.F.R. § 212.5(f)).) Upon a removed P.I. Class member's arrival at a POE, CBP will inspect and determine how to process the individual depending upon the specific circumstances of his or her case. (*Id.*)

[12] The Government did not state in its section of the Joint Status Report whether USCIS had begun to institute its contemplated procedures for this subset of potential P.I. Class members. (*See* ECF No. 803.)

**c. EOIR**

On October 30, 2020, EOIR's Office of General Counsel ("EOIR-OGC") issued legal guidance to its adjudicators—IJs and the BIA—regarding how to effectuate the directives of the Clarification Order ("EOIR Guidance"). (First Anderson Decl. ¶ 7.)[13] The EOIR Guidance instructs its adjudicators to undertake a *sua sponte* review of the records of proceeding ("ROP") in the cases of individuals identified from the Master List and referred to EOIR by USCIS pursuant to the above-referenced procedures ("ROP Review"). (*Id.* ¶ 4.) EOIR has also established a collateral process through which potential P.I. Class members themselves can affirmatively move to reopen their cases, notwithstanding the results of the ROP Review. (Decl. of Jill W. Anderson ("Second Anderson Decl.") ¶ 7, Ex. B to First Shinners Decl., ECF No. 758-3.)

**i. ROP Review**

The ROP Review entails (1) identifying eligible potential P.I. Class members and (2) reviewing the contents of the ROPs in those cases to (a) determine whether those potential P.I. Class members are, in fact, P.I. Class members, and (b) fashion the appropriate reopening and reconsideration relief to P.I. Class members.[14] (*See* Second Anderson Decl. ¶ 5.) The potential P.I. Class members subject to the ROP Review includes those individuals identified from the Master List who are in Section 240 removal proceedings, whose application for asylum was denied, and who were encountered by CBP between July 16, 2019 and June 30, 2020. (*Id.* ¶ 4.) The ROP Review also encompasses

[13] The EOIR Guidance does not refer to a specific document proffered by the Government but rather to a policy about which the Government has attested the details and accuracy. The EOIR-OGS contends the policy documents are protected by attorney-client privilege and, thus, the Government has chosen not to proffer those papers to this Court. (First Anderson Decl. ¶ 7.)

[14] The task of conducting an ROP Review is the responsibility of the last entity to issue a decision in a given case, *i.e.*, the IJ or BIA. (*See* First Anderson Decl. ¶ 15.) "For example, when an [IJ] issues a decision in an individual's removal proceeding and neither the individual nor DHS appeals the decision to the BIA, the IJ is the last entity to issue a decision and jurisdiction over a motion to reopen would lie with the IJ." (*Id.*) "If an IJ's decision is appealed to the BIA, and the BIA is the last entity to issue a decision in the case, the BIA would have jurisdiction to reopen proceedings," with some limited exceptions. (*Id.*)

P.I. Class members referred to EOIR by USCIS under the process delineated above, *supra* Sec. I.B.2.b.i. (First Anderson Decl. ¶¶ 9–19; Mura Decl. ¶ 7.) However, in this second set of cases, adjudicators leave undisturbed USCIS's P.I. Class-membership determination and address only the question of whether reconsideration relief is warranted. (Mura Decl. ¶ 7.)

To identify P.I. Class members, adjudicators examine the ROP of a potential P.I. Class member's case to determine whether he or she: (1) is a non-citizen or national of Mexico; (2) most recently entered the United States on or after July 16, 2019; (3) was subject to metering at the southwest border before July 16, 2019; and (4) continues to seek access to the U.S. asylum process. (First Anderson Decl. ¶ 11.) During this process, EOIR adjudicators examine only the ROP. They do not search DHS records to locate additional evidence of metering that was not made part of the ROP. (First Shinners Decl. ¶ 38; Second Anderson Decl. ¶ 8.)

The EOIR Guidance requires its adjudicators to examine the final order of removal in the cases of individuals deemed P.I. Class members pursuant to the above-referenced procedure to ascertain whether that determination "was based on the Asylum Ban." (Second Anderson Decl. ¶ 5.) Where the Asylum Ban is listed as a ground for denial, adjudicators must reopen the case and issue a "new decision on the merits." (First Anderson Decl. ¶ 14.) The Government attests that it is standard practice for adjudicators to deny applications for asylum "on a number of grounds in the alternative should one of the grounds fail to survive further review." (*Id.* ¶ 13.) Thus, it is not uncommon for P.I. Class members' final orders of removal to identify the Asylum Ban, along with other legal bases, as grounds for denying asylum. (*Id.*) The EOIR Guidance requires case reopening even where there are alternative grounds for denying asylum listed in the final order of removal. However, it also confers to adjudicators discretion to issue in reopened cases a new merits decision denying a P.I. Class member's asylum application predicated upon alternative, non-Asylum Ban grounds for denying asylum, if any, identified in the prior order of removal. (*Id.* ¶¶ 13–14 (explaining "[w]here asylum was denied based on the

Asylum Ban, but the adjudicator alternatively determined that the respondent had not satisfied his or her burden of proving eligibility for asylum on the merits," on reconsideration "the adjudicator [has discretion to] issue an order reopening the proceedings and setting forth the [negative] merits determination in the same order").)

The EOIR-OGC reviews each new decision resulting from ROP Review. (Second Anderson Decl. ¶ 6 ("EOIR-OGC reviews the results of the adjudicator-level review for each filing, including review of the adjudicator's notes and findings, and the individual file if necessary.").) If a deficiency is identified, the case is returned to the pertinent IJ or the BIA for remediation. (*Id.*)

As of September of 2021, the EOIR has completed ROP Review for 1,631 of the 2,117 identified cases. (Second Anderson Decl. ¶ 4.) EOIR adjudicators deemed 1,169 of those cases ineligible for reopening and 462 eligible.[15] Of the 462 cases reopened, in 271 adjudicators found that the Asylum Ban had been applied to deny asylum. (*Id.* ¶ 8.) An additional 46 cases subject to the ROP Review were determined to have "insufficient evidence" to make a P.I. Class-membership determination. (Second Anderson Decl. ¶¶ 4, 8.) The Government is "determining how to best accomplish any further review" respecting these 46 cases. (Shinners Decl. ¶ 38; *see also* Second Anderson Decl. ¶ 8 ("EOIR continues to explore whether and what further review procedures may be necessary for these 46 cases.").)

**ii. Motions to Reopen**

In addition to the ROP Review, EOIR established a process for individuals in Section 240 removal proceedings whose applications for asylum were denied to "file an affirmative motion to reopen." (Second Anderson Decl. ¶ 7.) An individual deemed ineligible for relief pursuant to the EOIR's ROP Review is *not* precluded from filing such a motion. (*Id.* ¶ 9.) The EOIR will reopen a case pursuant to the above-described motion practice when

[15] The Government cautions the EOIR did not issue positive P.I. Class-membership determinations in all 462 re-opened cases. (Second Anderson Decl. ¶ 8 n.1.) Rather, some of those cases purportedly were reopened based upon adjudicators' "*sua sponte* authority" to do so "for other reasons." (*Id.*)

Case: 22-55988, 11/2022, ID: 12615153, DktEntry: 13-2, Page 52 of 301

a movant establishes P.I. Class membership and the movant's ROP indicates the Asylum Ban was applied in his or her immigration case. (*Id.* ¶ 7.) If the movant fails to provide sufficient evidence of P.I. Class membership, the EOIR Guidance instructs adjudicators "to solicit additional information pursuant to an order or by conducting a hearing on the motion." (*Id.*)

The EOIR has in recent months developed a template motion, which it has posted to its website "with instructions and a link to [Plaintiffs' counsel's] website to obtain additional information." (Joint Status Report at 3 (stating EOIR developed the template motion together with Plaintiffs' counsel).) "The template motion and instructions . . . provide potential [P.I. Class] members with additional information about their existing right to file motions to reopen[,] to submit additional evidence of class membership[,] and [to] seek reopening or reconsideration." (*Id.* at 4.)

**C. Plaintiffs' Pending Motions**

In both their Enforcement and Oversight Motions, Plaintiffs identify numerous aspects of the Government's Preliminary Injunction-compliance procedures that purportedly fall short of the Clarification Order's directives for screening P.I. Class members, providing notice to P.I. Class members, and providing P.I. Class members with the reopening and reconsideration relief. (Enforcement Mem. 13–25; Oversight Mem. at 13–25; Pls.' Statement ¶¶ 1–16.) Plaintiffs seek to "enforce" the Clarification Order's directives against the Government by requesting that the Court resolve the disputes Plaintiffs have identified and once again clarify or modify the Preliminary Injunction and, moreover, the Clarification Order.

The Government opposes. It contends its procedures are compliant with both the Preliminary Injunction and Clarification Order. (Opp'n to Enforcement Mot. ("Enforcement Opp'n"), ECF No. 657; Opp'n to Oversight Mot. ("Oversight Opp'n"), ECF No. 758.) Plaintiffs reply. (Reply in supp. of Enforcement Mot. ("Enforcement Reply"), ECF No. 665; Reply in supp. of Oversight Mot. ("Oversight Reply"), ECF No. 759.)

Additionally, Plaintiffs seek: (1) to convert to a permanent injunction the Preliminary Injunction, inclusive of the Clarification Order and any further relief issued here; and (2) to appoint Magistrate Judge Karen S. Crawford special master for the purpose of overseeing the Government's compliance with a permanent injunction. (*See generally* Oversight Mem; Proposed Order ¶¶ 4, 8.) The Government opposes both requests. (*See* Defs.' § 1252(f)(1) Br., ECF No. 813; Oversight Reply.) Relying upon a newly issued United States Supreme Court decision, the Government contends this Court lacked jurisdiction to issue either the Preliminary Injunction or Clarification Order under 8 U.S.C. § 1252(f)(1) and, thus, lacks jurisdiction to now enter a permanent injunction. (*See* Defs.' § 1252(f)(1) Br. at 1 (citing *Garland v. Aleman Gonzalez*, 142 U.S. 2057 (2022)).) The Government further argues that even if injunctive relief is not barred, the Court need not institute procedures for monitoring the Government's compliance, considering it "ha[s] continued to adhere to and progressively implement the terms of the [Preliminary Injunction] and the [Clarification Order]." (Oversight Opp'n at 17.)

## II. LEGAL STANDARDS

### A. Rule 65

"It is undoubtedly proper for a district court to issue an order clarifying the scope of an injunction in order to facilitate compliance with the order and to prevent 'unwitting contempt.'" *Paramount Pictures Corp. v. Carol Publ'g Grp.*, 25 F. Supp. 2d 372, 374 (S.D.N.Y. 1998) (citing *Regal Knitwear Co. v. Nat'l Labor Relations Bd.*, 324 U.S. 9, 15 (1945)); *Sunburst Prod., Inc. v. Derrick Law Co.*, 922 F.2d 845 (9th Cir. 1991) (Memorandum Disposition) ("The modification or clarification of an injunction lies within the 'sound discretion of the district court[.]'") (citing same). Rule 65 requires that injunctions be specific "so that those who must obey them will know what the court intends to require and what it intends to forbid." *Int'l Longshoremen Ass'n, Local 1291 v. Phila. Marine Trade Ass'n*, 389 U.S. 64, 76 (1968). "By clarifying the scope of a previously issued preliminary injunction, a court 'add[s] certainty to an implicated party's effort to comply with the order and provide[s] fair warning as to what future conduct may be found

contemptuous.'" *Robinson v. Delicious Vinyl Records Inc.*, No. CV 13-411-CAS (PLAx), 2013 WL 12119735, at *1 (C.D. Cal. Sept. 24, 2013) (alterations in original) (quoting *N.A. Sales Co. v. Chapman Indus. Corp.*, 736 F.2d 854, 858 (2d Cir. 1984)).

**B. Permanent Injunctive Relief**

In the Ninth Circuit, a plaintiff who seeks a permanent injunction must satisfy a four-factor test. *See Kurin, Inc. v. Magnolia med. Techs., Inc.*, No. 3:18-CV-1060-L-LL, 2020 WL 4049977, at *9 (S.D. Cal. July 20, 2020) (citing *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)). A plaintiff must establish:

> (1) That it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction [(collectively, "*eBay* factors")].

*eBay Inc.*, 547 U.S. at 391. Where the Government is the party opposing issuance of injunctive relief, the above-mentioned third and fourth factors—balancing of hardships and public interest—merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). This merger requires the Court to examine whether the "public consequences" that would result from the permanent injunction sought favor or disfavor its issuance. *See Fraihat v. U.S. Immigration & Customs Enf't*, 445 F. Supp. 3d 709, 749 (C.D. Cal. 2020).

Typically, courts hold an evidentiary hearing before converting a previously-ordered preliminary injunction into a permanent one. *See Charlton v. Estate of Charlton*, 841 F.2d 988, 989 (9th Cir. 1989). However, no evidentiary hearing is necessary "when the facts are not in dispute." *Id.*; *see United Food & Commercial Workers Local 99 v. Bennett*, 934 F. Supp. 2d 1167 (D. Ariz. Mar. 29, 2013) (holding that where plaintiffs had satisfied the *eBay* factors in their prior order "and nothing in the record indicates that the circumstances have changed," no evidentiary hearing is necessary).

//

//

**C. Rule 53**

"The appointment of a Special Master, with appropriately defined powers, is within both the inherent equitable powers of the court and the provisions of [Rule 53]." *Madrid v. Gomez*, 899 F. Supp. 1146, 1282 (N.D. Cal. 1995). Rule 53 provides, in pertinent part, "[u]nless a statute provides otherwise, a court may appoint a master only to . . . hold trial proceedings and make or recommend findings of fact on issues to be decided without a jury if appointment is warranted by . . . some exceptional condition." Fed. R. Civ. P. 53(a)(1)(B)(i). Under this provision, a special master may "be appointed because of the complexity of litigation and problems associated with compliance with [a] district court order." *United States v. Suquamish Indian Tribe*, 901 F.2d 772, 775 (9th Cir. 1990) (citing *Hoptowit v. Ray*, 682 F.2d 1237, 1263 (9th Cir. 1982)). Circumstances that particularly warrant a special master's oversight of injunctive relief include those in which "a party has proved resistant or intransigent to complying with the remedial purpose of the injunction in question." *United States v. Apple*, 992 F. Sup. 2d 263, 280 (S.D.N.Y. 2014) (citing *United States v. Yonkers Bd. of Educ.*, 29 F.3d 40, 44 (2d Cir. 1994) (per curiam)).

**III. ANALYSIS**

**A. Motions to Clarify or Modify**

Before the Court are eleven distinct disputes concerning the Government's Preliminary Injunction and Clarification Order implementation measures: four disputes relate to the Government's purported failure to identify P.I. Class members pursuant to Paragraphs 2 and 4 of the Clarification Order; two relate to the Government's purported failure to provide notice to individuals identified in Paragraph 3 of the Clarification Order; and five relate to the Government's purported failure to issue reopening and/or reconsideration relief in accordance with Paragraph 4 of the Clarification Order and the Preliminary Injunction. (Pls.' Statement ¶¶ 2–11, 13–16.)[16]

---

[16] The Court notes that while Plaintiffs identified 16 disputes in their Joint Status Report, there truly exist only 11. The disputes identified at Paragraphs 3 and 4 and Paragraphs 6 and 7 essentially overlap. (Pls.' Statement ¶¶ 3–4, 6–7.) Paragraph 15 identifies a dispute that was never raised in either

While Plaintiffs style their request to have the Court weigh in on these disputes as a motion to "enforce," what Plaintiffs truly seek is further clarification, or modification, of the Preliminary Injunction and, moreover, the Clarification Order. In so construing Plaintiffs' request, the Court finds significant both that (1) Plaintiffs do not seek the imposition of measures to compel the Government to comply with the Clarification Order, *e.g.*, sanctions or civil contempt, and (2) Plaintiffs' Enforcement and Oversight Motions principally ask the Court to define the requirements of the directives of Paragraphs 2, 3, and 4 of the Clarification Order more precisely. *See*, *e.g.*, *Shilitani v. United States*, 384 U.S. 364, 370 (1966) (observing motions to enforce generally seek sanctions or civil contempt to compel the nonmovant's compliance with a prior order).

Thus, the Court construes Plaintiffs' requests in their Enforcement and Oversight Motions to "enforce" the Preliminary Injunction and Clarification Order as requests to clarify and/or modify and grants in part and denies in part those requests for the reasons set forth below.

**1. Paragraph 4: Defendants' P.I. Class-Membership Identification Procedures**

As set forth above, Paragraph 4 of the Clarification Order provides:

> Defendants must make all reasonable efforts to identify [P.I. Class] members, including but not limited to reviewing their records for notations regarding class membership made pursuant to the guidance issued on November 25, 2019, and December 2, 2019, to CBP and OFO, respectively, and sharing information regarding [P.I. Class] members' identities with Plaintiffs.

(Clarification Order at 25.)

Plaintiffs allege the Government has failed to "make all reasonable efforts to identify P.I. Class members." First, Plaintiffs contend that the Master List is underinclusive

---

of Plaintiffs' Motions. (*Id.* ¶ 15.) The dispute listed in Paragraph 1—that the Government must "provide a timeline for fully complying with the [Preliminary Injunction] and Clarification Order—effectively seeks oversight and does not identify any actual dispute concerning the manner in which the Government has carried out its compliance procedures. (*Id.* ¶ 1.) And there is no enumerated Paragraph 13.

because the Government did not review USB Form I-213 annotations as an independent source to identify potential P.I. Class members, despite the explicit instruction to do so in Paragraph 4. (*See* Oversight Mem. at 24–25; Pls.' Statement ¶ 16.) Second, Plaintiffs assert the USCIS Guidance is noncompliant because it (A) does not contemplate the Government obtaining outstanding metering waitlists from its Mexican counterparts; (B) does not attribute sufficient evidentiary weight to metering waitlist; and (C) permits asylum officers to consider potential P.I. Class members' answers to the Initial Screening Questions in making P.I. Class-membership determinations. (Enforcement Mem. at 13–17; Pls.' Statement ¶¶ 3–6.)[17]

**a. USB Form I-213 Review**

"The Form I-213 is essentially a recorded recollection of [an agent's] conversation with [an] alien[.]" *Bustos-Torres v. Immigration & Naturalization Servs.*, 898 F.2d 1053, 1056 (5th Cir. 1990). Both OFO *and* USB agents routinely complete Form I-213 after a first encounter with an undocumented noncitizen. *See Espinoza v. Immigration & Naturalization Servs.*, 45 F.3d 308, 309 (9th Cir. 1995). Following the Preliminary Injunction, USB and OFO agents were instructed on November 25, 2019 and December 2, 2019, respectively, to annotate Form I-213s with "Potential AOL Class Member" if they encountered an individual who affirmatively stated they were metered, provided information from which an agent could infer the individual had been subjected to metering, or affirmatively claimed to be an *AOL* Class member. (First Decl. of Jay Visconti ("First Visconti Decl.") ¶¶ 1, 4, 6.) These policies have remained in effect ever since. (Clarification Order at 24.)

[17] Plaintiffs further aver that the ROP Review procedure is noncompliant with Paragraph 4 because it excludes from review P.I. Class members who received a final order of removal after June 30, 2020 and does not involve a separate examination of DHS records. (Enforcement Mem. at 18; Oversight Mem. at 17; Pls.' Statement ¶¶ 11, 14.) However, the text of Paragraph 4 clearly applies to *Defendants* only, not the EOIR. The Clarification Order sets forth the requirements applicable to EOIR's P.I. Class-identification procedures under Paragraph 2. *See infra* Sec. III.A.3.

The Clarification Order directed Defendants to "make all reasonable efforts to identify" P.I. Class members, "including but not limited to reviewing their records for notations regarding class membership" in the Form I-213s. (Clarification Order at 23–25.) Defendants digitized and made text searchable OFO Form I-213s, rendering these forms queryable data. Therefore, OFO Form I-213 annotations were among the information the Government reviewed in identifying potential P.I. Class members to place on the Master List. The Government attests it identified 10 potential P.I. Class members from its review of OFO Form I-213 annotations. In contrast, the USB Form I-213s are in paper form only and, therefore, must be manually reviewed. The Government acknowledges that it did not systematically search for and review notations made on USB Form I-213s as an independent source of data for identifying potential P.I. Class members in the first instance, but contend that its implementation measures nonetheless comply with Paragraph 4 because the USCIS Guidance requires asylum officers to review both OFO and USB Form I-213s, if any, found in a potential P.I. Class member's case file when making a P.I. Class-membership determination. (Shinners Decl. ¶¶ 26, 37.)

It is self-evident that Form I-213s are particularly useful in identifying *potential* P.I. Class members. The objective, defining trait of all P.I. Class members is that they were metered at a Class A POE along the U.S.-Mexico border, during the relevant pre-Asylum Ban period, and the Form I-213 annotations explicitly indicate whether a noncitizen claims to have been, or has evidence that he or she was, metered upon arriving at a Class A POE. (*See* Clarification Order.) Therefore, it is inexplicable why the Government would screen only OFO Form I-213s for the purpose of identifying potential P.I. Class members, and not USB Form I-213s. The Government does not offer any qualitative distinction between the two Form I-213s that might justify the Government's decision to use OFO Form I-213s, but not USB Form I-213s, in compiling its Master List. Nor is one apparent to this Court.

Rather, the Government's argument that a fulsome review of USB Form I-213s is unnecessary rests exclusively on burdensomeness grounds. (Oversight Opp'n 22–23.) But as this Court has repeatedly opined, the Government's burdensomeness arguments

respecting class-identification garner little sympathy. (Clarification Order at 23 n.6 ("[T]he [P.I. Class] is based on a metering system established by Defendants . . . . It therefore does not follow that determining who was subject to metering for the purposes of complying with the Preliminary Injunction now presents an insurmountable task.").) That is particularly the case where, as here, it appears that a review of USB Form I-213s is likely to unearth additional potential P.I. Class Members. (*See* First Shinners Decl. ¶ 37 (attesting that review of OFO Form I-213s identified 10 potential P.I. Class members).) Furthermore, the Government's assertion of undue burden rings hollow because there exists a simple alternative to conducting a purportedly burdensome manual review of paper documents: digitizing and rendering text-searchable the USB Form I-213s just as it did the OFO Form I-213s.

Accordingly, the Court **CLARIFIES** that Paragraph 4 of the Clarification Order directs the Government to review *all* Form I-213s—including those completed by USB agents—for annotations of *AOL* Class membership in identifying potential P.I. Class members for inclusion to the Master List.

**b. USCIS Guidance**

**i. Metering Waitlists**

Plaintiffs allege that Paragraph 4's directive that the Government make "all reasonable efforts to identify" includes attempting to obtain metering waitlists from the Mexican federal or municipal government officials or charity staff members responsible for managing those waitlists.[18] They also allege that "reasonable efforts to identify" P.I. Class members requires that asylum officers treat as "presumptive" evidence of P.I. Class membership the presence of a potential P.I. Class member's name on a metering waitlist. Plaintiffs claim that because the Government refuses to attempt to obtain outstanding metering waitlists and because the USCIS Guidance treats waitlist evidence as merely

[18] The Government has partial copies of the waitlists from Tijuana, Ciudad Juarez, Mexicali, and Ojinaga. (Non-detained P.I. Class Screening Procedures at 3.) It does not have any metering waitlists from the other Mexican border cities and towns in which those lists were maintained. (*Id.*)

"probative," the Government's Clarification Order implementation measures violate Paragraph 4. (Pls.' Statement ¶¶ 2–4.)

Attempting to Obtain Metering Waitlists: As this Court has stated repeatedly, it is well-established Defendants relied upon waitlists managed by Mexican government and charity officials in border towns and cities to facilitate metering. (*See*, *e.g.*, Clarification Order at 23 n.6.) The Government has obtained from class counsel and INAMI incomplete versions of waitlists from four Mexican border towns/cities in which such lists were maintained. However, the Government refuses to attempt to obtain outstanding metering waitlists used at numerous other Mexican border cities and towns, despite Plaintiffs' repeated pleas that it do so.[19] Plaintiffs attest that they have been unsuccessful in their endeavors to obtain outstanding waitlists, and that the Government is in a much better position to access these documents. (*See*, *e.g.*, Decl. of Ori Lev ("Lev Decl.") ¶ 24(c), ECF No. 644.) The Government contends that this premise ignores complex and nuanced diplomatic considerations and the fallout that could result from requesting INAMI to produce copies of the metering waitlists. (*See*, *e.g.*, Decl. of Joseph Draganac ("Draganac Decl.") ¶ 12 ("[W]ere CBP to make a request to the Mexican government for the waitlists for use in this litigation, it could cause harm to CBP's relationship with Mexico, especially on the local level . . . . I am concerned that a request for the waitlists could be perceived by individuals in the Mexican government as CBP attempting to monitor or regulate Mexico's internal processes for addressing immigration."), ECF No. 657-2.)

[19] Furthermore, Plaintiffs have repeatedly sought court orders directing the Government to obtain outstanding metering waitlists. For example, Plaintiffs sought discovery from Defendants of some metering waitlists not in the Government's control, essentially implying the Government has an obligation to retrieve those waitlists from its Mexican counterparts pursuant to Rule 34 discovery procedures. (ECF No. 760.) Magistrate Judge Crawford found that request overbroad; she instructed Plaintiffs to serve Defendants "with a more narrowly tailored document request . . . that only requires [Defendants] to produce copies of any waitlists in their physical possession that they have used or intend to use to determine whether any individual is a class member." (ECF No. 795 at 7.) Moreover, Plaintiffs Motion for Class Facilitation asked this Court to order Defendants to take all reasonable steps to obtain all outstanding metering waitlists from Mexican federal, state, and municipal officials. (ECF No. 720.) However, the Court denied this request on the ground that it lacked authority to issue such an order pursuant to Rule 23. (ECF No. 800.)

Plaintiffs argue that "tak[ing] all reasonable steps to identify [P.I. Class] members" includes attempting to procure from Mexican officials copies of all the relevant metering waitlists that the Government does not possess. (Enforcement Mem. at 13–14; Pls.' Statement ¶ 2.) The Government contends that Plaintiffs' argument is without textual basis in the Clarification Order, which requires only that the Government "must review [its] *own* records to aid in the identification of class members." (Clarification Order at 23 (emphasis added); *see* Enforcement Opp'n at 14–15.) The Court agrees with the Government. The Clarification Order directed the Government in unambiguous terms to review its *own* records. (*See* Clarification Order at 25.) It did not require the Government to obtain and review waitlists in the sole possession, custody, or control of Mexican authorities.

To the extent Plaintiffs request that the Court modify its Preliminary Injunction and Clarification Order to direct the Government to attempt to obtain from Mexican government and charity officials all outstanding waitlists, the Court declines to do so. Courts have jurisdiction to modify the terms of an injunction consistent with its original purposes in order to "preserve the status quo." *Nat'l Res. Def. Council, Inc. v. Sw. Marine Inc.*, 242 F.3d 1163, 1166 (9th Cir. 2001) (holding district court may take action pursuant to Rule 62 so long as that action does not "materially alter the status of the case on appeal"); *see also Tribe v. U.S. Bureau of Reclamation*, 319 F. Supp. 3d 1168, 1171 (N.D. Cal. Apr. 30, 2018).

Here, Plaintiffs have not shown modification of the Clarification Order is warranted. Individuals whose names are listed on metering waitlists the Government does not possess are not comparably disadvantaged when it comes to qualifying for "potential" P.I. Class membership. The Master List is purposefully overinclusive and, thus, additional waitlists are unlikely to serve a unique or necessary purpose for identifying potential P.I. Class members. Indeed, the Government currently identifies individuals for its Master List without examining the metering lists in its possession, a practice to which Plaintiffs do not object. Thus, this Court is not persuaded that USCIS's procedures for identifying potential P.I. Class members are impermissibly narrow absent the outstanding metering waitlists.

Nor does the USCIS Guidance put at a comparable disadvantage individuals whose names are listed on metering waitlists the Government does not possess. The USCIS Guidance explicitly provides "the absence of an individual's name on a waitlist should not be used to conclude that the individual is not a [P.I.] [C]lass member." (Non-detained P.I. Class Screening Procedures at 5–6.) Under the USCIS Guidance, there are many other forms of evidence in DHS records or that the potential P.I. Class member can proffer him- or herself that are "generally sufficient" to establish P.I. Class membership. (*Id.* at 4–5.) For example, although asylum officers will be unable to examine metering waitlists from the Mexican border town of San Luis Rio Colorado—waitlists which the Government does not possess—such potential P.I. Class members may rely upon other, easily-attainable alternative forms of evidence to establish P.I. Class membership. This evidence includes: (1) Form I-213s, I-867A/Bs, and I-877s in their DHS case files; (2) documentary evidence indicating presence along the U.S.-Mexico border during the pre-Asylum Ban period, including but not limited to documentation of a stay at a shelter or hotel; and (3) testimony of metering during the pre-Asylum Ban period, all of which are "generally . . . sufficient to establish" P.I. Class membership. (*Id.* at 5.) Thus, Plaintiffs have failed to show that unless the Government obtains the outstanding metering waitlists, implementation of the USCIS Guidance will lead to exclusionary P.I. Class membership determinations. Without such a showing, it cannot be said Plaintiffs' proposed modification is necessary to preserve the status quo of the Preliminary Injunction or Clarification Order. *See, e.g.*, *Sierra Club v. U.S. Army Corps of Eng'rs*, 732 F.2d 253, 257 (2d Cir. 1984) ("[W]hen reviewing an order modifying a preliminary injunction we look to see whether or not the status quo is maintained by the modification[.]") (emphasis omitted)).

<u>Waitlists as "Presumptive" Evidence</u>: Plaintiffs complain that the USCIS Guidance violates Paragraph 4 because it treats evidence of an interviewee's name on a waitlist as merely "probative" of P.I. Class membership, rather than "presumptive." (Enforcement Mem. at 13–14; Pls.' Statement ¶¶ 3–4.) The Government contends that the Clarification Order does not prescribe evidentiary rules or presumptions; rather, it requires the

Government to undertake "reasonable efforts" to identify P.I. Class members, which, the Government avers, the USCIS Guidance does. (Enforcement Opp'n at 16–17.)

Under the USCIS Guidance, the presence of a potential P.I. Class member's name on a metering waitlist is generally sufficient to establish P.I. Class membership. (Non-detained P.I. Class Screening Procedures at 4–5.) "However, if an individual's name is on one of these waitlists, but the individual's own statements . . . clearly and unequivocally contradict that information . . . the individual's own statements may be given greater weight than the existence of a name on the waitlist." (*Id.*)

As an initial matter, it is unclear to the Court how, in Plaintiffs' view, the USCIS Guidance treats metering waitlists as "probative" as opposed to "presumptive." Indeed, Plaintiffs repeatedly use the term "presumptive" to describe the evidentiary weight they believe should attach to the waitlists, but never in their papers do Plaintiffs explain what the USCIS Guidance must do to treat waitlists as "presumptive" rather than "probative." Is the presumption they imagine should attach to metering waitlists rebuttable, or is it irrefutable? Plaintiffs do not say. Nor do Plaintiffs explain how the USCIS Guidance, particularly its requirement that evidence a potential P.I. Class member was not metered must be "clear and unequivocal" to outweigh other documentary evidence demonstrating metering, is incompatible with treating metering waitlists "presumptive" of P.I. Class membership. The answers to these questions ultimately matter not because this Court is solely concerned with the question whether USCIS's P.I. Class-identification procedures are "reasonable" ones. (*See* Clarification Order at 25.) The Court is satisfied that, indeed, they are.

On the one hand, the USCIS Guidance acknowledges that the presence of an individual's name on a metering waitlist during the pre-Asylum Ban period strongly indicates that person was metered at a Mexican border city or town and, thus, is likely a P.I. Class member. Indeed, the USCIS Guidance instructs asylum officers to treat that evidence as sufficient for establishing P.I. Class membership in ordinary cases. (Non-detained P.I. Class Screening Procedures at 5 ("[D]ocumentation regarding the placement

of a name on a waitlist during the relevant pre-July 16, 2019 time period . . . will generally be sufficient to establish that an individual is more likely than not a class member.").) In fact, where waitlist evidence exists in a case, it may only be rebutted by "clear and unequivocal" evidence to the contrary. (*Id.*) However, the USCIS Guidance also provides the Government with the necessary flexibility to account for unusual instances in which a potential P.I. Class member stated in no uncertain terms that he or she was not actually subjected to metering during relevant the pre-Asylum Ban period. (*Id.*) This scenario is far from inconceivable, as Plaintiffs themselves have attested that there have been "numerous reports" of list managers adding individuals' names to waitlists remotely, before they reached a Class A POE. (*See* Decl. of Nicole Ramos ("Ramos Decl.") ¶ 10, ECF No. 390-48.)

Accordingly, the Court **DENIES** the Motions to the extent they seek an order clarifying or modifying Paragraph 4 to (1) require the Government to attempt to obtain from its Mexican official counterparts the outstanding metering waitlists and (2) impose evidentiary rules overriding the USCIS Guidance's procedures for weighing evidence of a potential P.I. Class member's name on a metering waitlist.

**c. Prior P.I. Class Membership Screening**

Following the Preliminary Injunction, but before the Clarification Order, USCIS screened for P.I. Class membership a group of individuals whose names appear on the Master List. (First Shinners Decl. ¶ 13; *see* Non-detained P.I. Class Screening Procedures at 6.) That process involved a prior set of interviews, at which asylum officers asked the Initial Screening Questions and after which asylum officers made P.I. Class-membership determinations. (*See* First Shinners Decl. ¶ 13.) USCIS amended its procedures for P.I. Class-membership screening following the Clarification Order, vacated all prior P.I. Class-membership determinations, and directed asylum officers to re-interview potential P.I. Class members subjected to the prior screening process using the Amended Screening Questions. (*See id.*; *see also* Non-detained P.I. Class Screening Procedures at 4, 6.) But while the USCIS Guidance invalidates the *results* of the prior P.I. Class-membership

screening process, it does not restrict asylum officers from considering testimony elicited from that prior screening process in making new P.I. Class-membership determinations. (Non-detained P.I. Class Screening Procedures at 6.) Plaintiffs claim that Paragraph 4 forbids consideration of interviewees' answers to the Initial Screening Questions. (*See* Enforcement Mem. at 16; Pls.' Statement ¶ 5.)

The Initial Screening Questions, Plaintiffs aver, are plagued by a "myriad" of problems. (Enforcement Mem. at 15–16 & n.6; *compare* Initial Screening Questions *with* Amended Screening Questions.) Plaintiffs list the following flaws:

- Question 2 asks interviewees whether they "[sought] to enter the United States" before the date of their entry? (Initial Screening Question ¶ 2.) Plaintiffs aver that "sought to enter" could easily have been misconstrued to mean "attempts to enter without inspection between [POEs] or the physical act of approaching the limit line (as opposed to putting one's name on [a] waitlist)." (Enforcement Mem. at 16);

- Question 3 asks interviewees "[d]id you ever put your name on any sort of list in Mexico that you believed would get you a place in line to get into the United States?" (Initial Screening Question ¶ 3.) Plaintiffs aver that this question easily could have been construed both narrowly and literally as asking whether the interviewee ever personally "physically wr[o]te" his or her name on a waitlist, as opposed to whether the list manager wrote his or her name on the list, as is usual practice. (Enforcement Mem. At 15 n.6); and

- Finally, Question 3(a) asks interviewees whether they "put [their] name on [a waitlist] after [July 16, 2016]? (Initial Screening Question ¶ 3(a).) Plaintiffs correctly point out that there is a typographical error in Question 3(a): "2016" should have been "2019." (Enforcement Mem. at 15 n.6.)

(Enforcement Mem. at 15–16 & n.6.) Plaintiffs aver that reliance upon answers to those questions would "threaten improper exclusion" of P.I. Class members. (Enforcement Reply at 7.)

Plaintiffs' argument, however, overlooks that USCIS has rephrased and revised the P.I. Class-membership screening questions to address fully Plaintiffs' list of concerns. (*See* Amended Screening Questions ¶ 4 (asking "did you ever try to approach a [POE] to enter

the United States" instead of "did you seek entry"), ¶ 5 (asking "did you ever add your name to any sort of list in Mexico that you believed would get you a place in line to cross through a [POE]" and if so "did you add your name to the waitlist by writing it yourself" or "did someone else write your name on the list" instead of "did you ever put your name on any sort of list in Mexico"), ¶ 5(d) (asking whether metering occurred prior to "July 16, 2019" as opposed to "July 16, 2016").) Also, every potential P.I. Class member who was asked the Initial Screening Questions in connection with USCIS's prior screening process must be granted a new interview where he or she will be asked the Amended Screening Questions. (Davidson Email at 2; Non-detained P.I. Class Screening Procedures at 4.) Thus, it appears the USCIS Guidance is designed to rectify instances in which the Initial Screening Questions may have led to imprecise, inaccurate, or unreliable testimony.

Plaintiffs further argue that this Court should disallow consideration of prior statements because it has previously found the Initial Screening Questions ambiguous. (Enforcement Mem. at 16 (citing Order Granting Emergency Prelim. Inj. ("Emergency Order") at 5, ECF No. 607).) This is not true. Plaintiffs cite to an Emergency Order of this Court, which found that an asylum officer had erred when he asked an interviewee an unauthorized and ambiguous question. (*Id.* ("Although the asylum officer asked whether she was told to put her name on a list to get to a POE, Applicant did not answer the question and asked if it could be repeated. Critically, the asylum officer did not repeat this exact question, but instead asked if Applicant had put her name on a list to enter a POE *besides San Ysidro*, to which Applicant said she had not.") (emphasis in original).) Contrary to Plaintiffs' assertion, this Court has never found any one of the Initial Screening Questions to be ambiguous or otherwise improper.

Accordingly, the Court **DENIES** the Motions to the extent they seek clarification or modification of Paragraph 4 to forbid asylum officers from consulting for the purpose of making P.I. Class-membership determinations an interviewee's testimony elicited in response to the Initial Screening Questions.

//

**2. Paragraph 3: P.I. Class Notice**

As set forth above, Paragraph 3 of the Clarification Order provides:

> Defendants must inform identified [P.I] [C]lass members in administrative proceedings before USCIS or EOIR, or in DHS custody, of their potential [P.I.] [C]lass membership and the existence and import of the preliminary injunction.

(Clarification Order at 25.) Plaintiffs allege the Government refuses to provide notice to certain groups of P.I. Class members identified in Paragraph 3. (Pls.' Statement ¶ 11.)

<u>First</u>, Plaintiffs aver it is the Government's position that it need not provide notice to persons in DHS custody at ICE detention centers. (Oversight Mem. at 22; Pls.' Statement ¶ 11.) However, the Government represented in the Joint Status Report that DHS posted notice in all ICE detention facilities in October of 2021 containing language that was the result of a collaborative process between DHS and class counsel. (Joint Status Report at 5.) Plaintiffs do not contest the accuracy of this attestation or assert that this method of notice is flawed. Accordingly, this dispute appears to be moot, and the Court is unpersuaded that the Government has failed to provide notice to P.I. Class members in DHS custody.

<u>Second</u>, Plaintiffs claim the Government believes it need not provide notice to individuals who, on or after the date of the Clarification Order, "had pending motions to reopen before EOIR or pending petitions for review of final removal orders in the federal courts of appeal." (Oversight Mem. at 22.) Plaintiffs allege that, unless the EOIR finds in its ROP Review that such an individual is, in fact, a P.I. Class member, a noncitizen with a pending motion to reopen will not receive notice to which they are purportedly entitled pursuant to Paragraph 3. (*Id.* (noting the EOIR only notifies individuals with cases subject to ROP Review if there is a positive P.I. Class-membership identification).) The Government contends it has mooted this dispute by posting to the EOIR website a "template motion" and, more importantly, "instructions and a link to [class counsel's] website to obtain additional information" concerning potential P.I. Class members'

Case: 22-55988, 12/20/2022, ID: 12615153, DktEntry: 13-2, Page 68 of 301

"existing right to file motions to reopen[,] to resubmit additional evidence of class membership[,] and [to] seek reopening or reconsideration." (Joint Status Report at 4.) The Government effectively asserts that, together with the *sua sponte* review for potential P.I. Class members undertaken by USCIS and EOIR, these notice procedures provide adequate and reasonable procedural safeguards to individuals who had pending motions to reopen or appeals when the Court issued its Clarification Order and may qualify for P.I. Class-membership status.

The parties' arguments are slightly off target in that they miss a different, but related, issue with Paragraph 3's language. That directive instructs the Government to notify individuals it already has "identified" as P.I. Class members that they *may potentially be* P.I. Class members. On its face, this directive is backwards: as a matter of procedure, it places the cart before the horse. What this Court meant by Paragraph 3 is to direct the Government to notify individuals in administrative proceedings before USCIS or EOIR, or in DHS custody of the existence of the Preliminary Injunction and their potential *rights to reopening and/or reconsideration relief thereunder* (not potential P.I. Class membership). Because this strand of Plaintiffs' Paragraph 3 challenge seeks to require the Government to provide notice to a potentially broad swath of individuals whom the Government has not even identified as potential P.I. Class members pursuant to its Master List query and ROP Review processes, Plaintiffs' interpretation goes beyond both the letter and spirit of the Court's intended directives concerning P.I. Class notice.

Accordingly, the Court **MODIFIES** Paragraph 3 of the Clarification Order as follows:

> Defendants must inform identified Preliminary Injunction class members in administrative proceedings before USCIS or EOIR, or in DHS Custody, of their class membership, as well as the existence and import of the Preliminary Injunction (ECF No. 330), Clarification Order (ECF No. 605), and this Order (ECF No. 808).

Furthermore, the Court **DENIES** the Motions to the extent they seek clarification or modification of Paragraph 3 to require the Government to provide notice to all individuals

with pending motions to reopen before EOIR or pending petitions for review of final removal orders in the federal courts of appeal. The Clarification Order requires that notice be given to "identified" P.I. Class members. It does not direct that notice be given to individuals who have not even been identified as *potential* P.I. Class members.

**3. Paragraph 2: EOIR's P.I. Class Membership Identification Procedures and the Implementation of Reopening and Reconsideration Relief**

As set forth above, Paragraph 2 of the Clarification Order provides:

> DHS and EOIR must take immediate affirmative steps to reopen and reconsider past determinations that potential [P.I.] [C]lass members were ineligible for asylum based on the Asylum Ban, for all potential class members in expedited or regular removal proceedings. Such steps include identifying affected class members and either directing immigration judges or the BIA to reopen or reconsider their cases or directing DHS attorneys representing the government in such proceedings to affirmatively seek, and not oppose, such reopening or reconsideration.

(Clarification Order at 25.) Plaintiffs allege the Government has failed to comply with Paragraph 2 in several respects.

First, Plaintiffs claim that the EOIR Guidance violates the P.I. Class membership-identification procedures applicable to the EOIR under Paragraph 2 because the ROP Review (A) excludes P.I. Class members who received a final order of removal after June 30, 2020 and (B) does not include an independent review of DHS records that might bear upon P.I. Class-membership, which have not been made part of the EOIR case file. (Pls.' Statement ¶¶ 8, 14.) Second, Plaintiffs claim the Government has failed to "take immediate affirmative steps to reopen and reconsider" the immigration cases of P.I. Class members. (Pls.' Statement ¶¶ 6–7, 9–10, 13.)

//

//

//

//

**a. EOIR P.I. Class Identification Procedures**

**i. June 30, 2020 Cutoff**

The EOIR Guidance instructs its adjudicators to undertake the ROP Review in cases where an IJ or the BIA issued a final order of removal identifying the Asylum Ban as a ground for denying asylum, between July 16, 2019, the date on which the Asylum Ban was effectuated, and June 30, 2020, the date on which the Asylum Ban was vacated by the *C.A.I.R.* Court. (First Anderson Decl. ¶ 4.) Plaintiffs contend that one would reasonably expect some delay between the *C.A.I.R.* decision and the IJs "recogniz[ing] the import of [the *C.A.I.R.* decision], especially in light of the government's appeal of that decision." (Enforcement Mem. at 25 (citing ECF No. 605-6).) Plaintiffs therefore argue that the temporal scope of the ROP Review is likely to exclude P.I. Class members who received final orders of removal *after* June 30, 2020, in violation of Paragraph 4's directive that the EOIR "identif[y] potential [P.I. Class] members." (Enforcement Mem. at 25.)

Plaintiffs aver that the Government could put to rest concerns about misapplication of the Asylum Ban after June 30, 2020 if it showed that EOIR provided notice to its adjudicators of the *C.A.I.R.* decision and its import immediately following issuance of the decision. (Enforcement Mem. at 25.) But the Government has not done so, despite the ease with which it could have.[20] Instead, it conclusively attests that on July 1, 2020, the Asylum Ban "*should* not have applied to anyone." (First Shinners Decl. ¶¶ 8, 27 (emphasis added).) This is cold comfort, particularly given that the record reflects instances of delays between pivotal judicial decisions of this Court, on the one hand, and notice to the pertinent agency of the policy changes that necessarily flowed therefrom, on the other. For example, it took ICE approximately one week following the Clarification Order to notify ERO of that Order's import and to instruct ERO personnel not to remove potential P.I. Class members in ICE custody pending USCIS screening. (*See* ICE P.I. Notice (issued

[20] The Government attests that EOIR-OGC has deemed the EOIR Guidance attorney-client privileged, and, thus, has chosen not to proffer any documentation concerning that Guidance. (*See* First Anderson Decl. ¶ 7.)

November 6, 2020).) While anecdotal, this data point supports the premise that complex agency guidance takes time to issue and, thus, there may have been a delay between the *C.A.I.R.* decision and uniform non-application of the Asylum Ban by EOIR adjudicators.

The Government contends that the benefit of expanding the ROP Review does not justify the burden considering instances of Asylum Ban misapplication are likely "rare." (Enforcement Opp'n at 24 n. 9.) But Plaintiffs do not seek an open-ended expansion of the ROP Review; their position contemplates that a cutoff is consistent with Paragraph 2, although they do not explicitly identify a cutoff for the ROP Review they view as reasonable. (Enforcement Mem. at 25.) Plaintiffs certainly have not made a showing that a lengthy expansion of the ROP Review's temporal scope is necessary. Indeed, Plaintiffs do not appear to have identified a single instance in a post-June 30, 2020 EOIR proceeding where the Asylum Ban was relied upon by an IJ or the BIA to issue a declination. Indeed, each of the exemplar cases cited by Plaintiffs either pre-date the *C.A.I.R.* decision or do not involve application of the Transit Rule at all. (*Id.* (citing Immigration Case #1, Lev Decl., Ex. 3 (issued on June 30, 2020); Immigration Case #2, Lev Decl., Ex. 4 (Asylum Ban not applied)).)

The Court finds that an expansion of the ROP Review period by one month adequately accounts for the potential lack of uniformity among EOIR adjudicators in applying the Transit Rule immediately following the *C.A.I.R.* decision, while limiting the burden of an expanded ROP Review of cases, the majority of which it appears will rarely be eligible for relief under the Preliminary Injunction. *See Syst. Fed'n No. 91, Ry. Emp. Dep't, AFL-CIO v. Wright*, 364 U.S. 642, 648 (1961) (describing district court's discretion to modify its injunctive relief as "wide").

Accordingly, the Court **CLARIFIES** that Paragraph 2's language requiring EOIR to take affirmative steps "to reopen and reconsider past determinations that potential [P.I.] [C]lass members were ineligible for asylum based on the Asylum Ban" requires EOIR to extend the temporal scope of its ROP Review to include final orders of removal issued up until July 31, 2020.

**ii. Review of DHS Records**

The EOIR's ROP Review requires adjudicators to examine only the ROPs in potential P.I. Class members' immigration proceedings. (First Shinners Decl. ¶ 38; First Anderson Decl. ¶ 8.) EOIR adjudicators do not separately examine DHS records for evidence bearing upon P.I. Class membership. (First Shinners Decl. ¶ 38.) Plaintiffs allege that this approach is noncompliant with the EOIR's P.I. Class-identification requirements under Paragraph 2 because it will inevitably lead to the exclusion of P.I. Class members whose DHS records reflect evidence of metering but whose ROPs do not. (Oversight Mem. at 17.)

To quell Plaintiffs' concerns, the Government insinuates it is amenable to reviewing the DHS records in the 46 cases where EOIR adjudicators declared there was "insufficient evidence" to make a P.I. Class-member determination. (Shinners Decl. ¶ 38; Anderson Decl. ¶ 8.) The Government's modest concession does not suffice to bring the EOIR Guidance into compliance with the directive under Paragraph 2 that EOIR "identify affected" P.I. Class members. Under the EOIR Guidance for the ROP Review, an adjudicator would review DHS data indicative of metering—*e.g.*, waitlists, Form I-213s, Form I-867A/Bs, Form I-87s, or any other processing document of DHS's that might contain affirmative indications of class membership—only if the asylum seeker filed that information in his or her immigration case. (*See* Non-detained P.I. Class Screening Procedures at 3–4 (describing the DHS data USCIS asylum officers review in making P.I. Class-membership determinations).) But as Plaintiffs point out, "[t]here would have been little reason for metering information to be filed with EOIR when the Asylum Ban was in full effect because at that time," evidence that an asylum seeker was metered at the U.S.-Mexico border "was not relevant to access to the asylum process or eligibility for relief." (Oversight Mem. at 18.) Thus, it appears that under the EOIR Guidance, adjudicators conducting ROP Reviews are making P.I. Class determinations without regard to evidence in the Government's possession that is most probative of P.I. Class membership.

Case: 22-55988, 12/20/2022, ID: 12615153, DktEntry: 13-2, Page 73 of 301

This strand of the EOIR Guidance cannot reasonably be said to accord with the letter or spirit of Paragraph 2. It is not sufficient for the EOIR merely to examine DHS records in the 46 cases where it could not determine P.I. Class membership. The Government has not—nor can it—assure this Court that, in each of those 410 cases where a negative P.I. Class-membership determination was issued, adjudicators did not overlook evidence in DHS's possession that might contradict that determination. Thus, the EOIR Guidance taints the validity of these at least 410 negative P.I. Class-membership determinations yielded by the ROP Review. (*See* Second Anderson Decl. ¶ 8.)

Accordingly, the Court **CLARIFIES** that the EOIR's obligation under Paragraph 2 to "identify affected [P.I.] [C]lass members" precludes the EOIR from issuing a negative P.I. Class-membership determination without first considering any evidence of metering during the relevant pre-Asylum Ban period in DHS's records.

**3. Reopening and Reconsideration Relief**

**a. USCIS**

**i. Self-Identification of Removed Potential P.I. Class Members**

The USCIS Guidance developed to apply to potential P.I. Class members removed from the United States operates in the following manner. First, USCIS queries the Master List and identifies individuals who (1) received a negative credible fear determination where the Asylum Ban was applied and (2) ICE data reflects the individual was removed pursuant to an expedited removal order and is no longer located in the United States. (Davidson Decl. ¶¶ 18, 24.) The Government will next provide this information to class counsel, who is responsible for providing notice. Removed potential P.I. Class members then must self-identify to the Government in accordance delineated in the class notice to begin the P.I. Class-membership identification process. (*Id.* ¶¶ 20–21, 23.)

Plaintiffs allege the Government abdicates its "affirmative duty" under Paragraph 2 to provide reopening and reconsideration relief to all P.I. Class members because the USCIS Guidance places the burden on removed potential P.I. Class members to invoke

their prospective rights under the Preliminary Injunction. (Oversight Mem. at 16; Pls.' Statement ¶ 13.) But Paragraph 2 encumbers Defendants with an "*affirmative* duty" to provide reopening and reconsideration relief only to the eligible cases of P.I. Class members "in expedited or regular removal proceedings." (Clarification Order at 25.) Because they have been removed, the distinct subset of potential P.I. Class members at issue here cannot be said to be "in expedited or regular removal proceedings" and, thus, the Government's affirmative duty does not extend to them. Thus, procedures such as the USCIS Guidance's reliance upon self-identification, which aid the Government in dealing with the complex cases of potential P.I. Class members who have been removed and whose locations are unknown, are entirely consistent with both the letter and spirit of Paragraph 2.

Accordingly, the Court **DENIES** the Motions to the extent they seek to clarify or modify Paragraph 2 to invalidate the self-identification process delineated in the USCIS Guidance applicable to potential P.I. Class members who have been removed.

**ii. Solicitation and Receipt of Metering Evidence**

Plaintiffs further complain that the USCIS Guidance respecting removed potential P.I. Class members violates Paragraph 2 because it does not provide to that specific subset of individuals an equivalent process under which the USCIS solicits or receives evidence of P.I. Class membership. This argument mischaracterizes the Government's planned procedures. The Government attests that the USCIS will solicit and provide a process for potential P.I. Class members who self-identify to submit evidence of metering during the relevant Asylum Ban period. (Davidson Decl. ¶¶ 10, 20–21, 25–26.) Therefore, this Court is unpersuaded by Plaintiffs' assertion the Government's putative procedures do not contemplate soliciting and considering evidence of metering for potential P.I. Class members removed from the United States.

//

//

//

**iii. Return to the United States of Removed P.I. Class Members**

Finally, Plaintiffs argue that USCIS's failure to delineate any process for returning to the United States removed individuals who, after self-identifying, establish they qualify for P.I. Class membership violates Paragraph 2. (Pls.' Statement ¶ 9 ("Defendants have not adopted procedures for [P.I.] [C]lass members located outside the United States to return to the United States.").) But this is inaccurate. As explained above, *supra* Sec. I.B.2.b.ii, the USCIS intends to instruct removed individuals who make the requisite showing of P.I. Class membership to submit to DHS a Form I-131, Application for Travel Document; if the application is approved, the individual will receive from DHS a travel letter allowing him or her to board an aircraft and travel to a POE. (First Shinners Decl. ¶ 35 (citing 8 C.F.R. § 212.5(f)).) Once at a POE, CBP will inspect the individual and will ultimately determine how to proceed, which may depend on the circumstances of the case. (*Id.*) Plaintiffs do not challenge these procedures. Again, Plaintiffs fail to establish that the Government's putative procedures do not contemplate a process for returning removed P.I. Class members to the United States for asylum processing.

* * * *

Having concluded that Plaintiffs challenges to the contemplated USCIS procedures concerning potential P.I. Class members who have been removed are either moot or do not warrant judicial intervention, the Court notes that the Government still has not informed this Court whether implementation of the procedures delineated in *supra* Sec. I.B.2.b has begun or, if not, when the Government plans to begin the process of identifying and providing reopening and/or reconsideration relief to removed P.I. Class members. Thus, the Court **ORDERS** the Government to provide an update concerning the status of these procedures **by no later than August 22, 2022**.

//

//

//

**b. EOIR**

Where an ROP Review of a case results in a positive P.I. Class-membership determination, the adjudicator must reopen the case if the prior order of removal identified the Asylum Ban as a basis for denying asylum. (Second Anderson Decl. ¶ 9.) In each of those cases, adjudicators must issue a new asylum decision on the merits. (*Id.*) However, under the EOIR Guidance, an adjudicator may review the prior order of removal to see what, if any, alternative bases for denying asylum besides the Asylum Ban were also applied. (Anderson Decl. ¶ 12.) If the adjudicator identifies such an alternative basis, it may issue a new decision denying asylum predicated upon that alternative ground set forth in the prior order of removal. (*Id.*)

Plaintiffs claim that, in this respect, the EOIR Guidance is noncompliant with the directive in Paragraph 4 to "reconsider" eligible cases. (Pls.' Statement ¶¶ 6–7; Enforcement Mem. at 23–24.) In their view, EOIR's adjudicators should be strictly forbidden from relying upon prior final orders of removal in which the Asylum Ban was identified as one of several grounds for denial, because all such orders are inevitably "tainted." (Enforcement Mem. at 23–24.)

Plaintiffs do not cite to a textual basis in the Clarification Order for this premise. Rather, they argue that the Preliminary Injunction's mandate that the Government "return to pre-Asylum Ban practices" requires the Government, in all eligible cases, to invalidate alternative, independent grounds for declination in a final order of removal and to require further factfinding. (Enforcement Mem. at 23–24 (citing Preliminary Injunction at 36).) But the Preliminary Injunction did not enjoin, disturb the application of, or even touch upon other rules or regulations constituting a basis for denying asylum. Indeed, Plaintiffs do not identify any other rule or regulation besides the Asylum Ban as having a nexus to the Turnback Policy Plaintiffs principally challenged by this action. (Mot. for Prelim. Inj. at 1 ("[T]he very reason the [P.I. Class] members face application of the categorical prohibition in the Asylum Ban is the unlawful metering policy which forced them to wait in Mexico. These class members would have had their asylum claims heard under pre-

existing law but for the illegal metering policy that is challenged in this case.").) Thus, Plaintiffs' interpretation of Paragraph 2 is untenable, for it would lead to an untenably overbroad and, therefore, abusive Preliminary Injunction. *See*, *e.g.*, *Milliken v. Bradley*, 433 U.S. 267, 281–82 (1974) ("The well-settled principle that the nature and scope of the remedy are to be determined by the violation means simply that federal-court decrees must directly address and relate to the [alleged wrongful conduct] itself."); *see also Church of Holy Light of Queen v. Holder*, 443 F. App'x 302 (9th Cir. 2011) (finding preliminary injunction "overly broad because it . . . enjoins government regulations that were explicitly never challenged or litigated" (citing, *inter alia*, *Stormans*, 586 F.3d at 1141)); *Meinhold v. U.S. Dep't of Def.*, 34 F.3d 1469, 1480 (9th Cir. 1994) (similar).

Accordingly, the Court **DENIES** the Motions to the extent they seek to clarify or modify Paragraph 2 to prohibit EOIR adjudicators from predicating a new merits decision in a reopened case upon an alternative, legally valid ground for denying asylum that was set forth in the P.I. Class member's prior final order of removal.

**B. Permanent Injunction**

Plaintiffs seek entry of an order converting the Preliminary Injunction—inclusive of the Clarification Order and the orders in the instant Opinion at *supra* Sec. III.A—into a permanent one. Ordinarily, a court must conduct an evidentiary hearing to convert preliminary injunctive relief into permanent relief. *See Bennett*, 934 F. Supp. 2d at 1188. But this Court already concluded in its Preliminary Injunction that the factors enumerated in *eBay Inc.* tip sharply in favor of enjoining application of the Asylum Ban to the P.I. Class. (Prelim. Inj. at 35 ("The Court concludes Plaintiffs have clearly shown . . . irreparable harm[] and that the balance of equities and the public interest fall in their favor.").) Since this Court issued its preliminary injunction, nothing in the record indicates that circumstances have changed such that this Court's analysis of the *eBay* factors today would yield a different result. Moreover, since this Court issued its preliminary injunction, it has since found on summary judgment that Defendants' Turnback Policy is both statutorily and constitutionally unlawful and, thus, no facts are in dispute as to whether the

P.I. Class was subjected to the Asylum Ban by virtue of an infringement of their legal rights. *See Bennett*, 934 F. Supp. 2d at 1188. Because the Government admittedly has yet to finish complying with that Order, it is clear conversion of the Preliminary Injunction into a permanent injunction is warranted.

The Government does not ask for an evidentiary hearing. Nor does it contest that the factors enumerated in *eBay Inc.* tip in Plaintiffs' favor. Rather, the Government asserts this Court never had jurisdiction to issue the Preliminary Injunction or Clarification Order in the first place and, therefore, it does not have jurisdiction to make those orders permanent. (Defs.' § 1252(f)(1) Br.) This is the same stale argument that the Government raised in opposition to Plaintiffs' initial request for the Preliminary Injunction and their subsequent request for clarification: that the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA") at 8 U.S.C. § 1252(f)(1) strips this Court of jurisdiction to "enjoin or restrain the operation of" specifically enumerated immigration enforcement laws, which govern removal proceedings, and that the Preliminary Injunction falls within this jurisdictional bar because it applies to a class of individuals "who are or will be placed into expedited removal or Section 1229a removal proceedings."[21] This Court has twice rejected this same argument. (*See* Prelim. Inj. at 15; Clarification order at 19–21.) It has held repeatedly that § 1252(f) is not implicated because the Preliminary Injunction enjoins the Government from taking actions "not authorized by the Asylum Ban or, in fact, by any implementing regulation or statute." (Prelim. In. at 15.)

---

[21] § 1252(f)(1) provides:

> Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter, [which includes 8 U.S.C. § 1225,] as amended by the Illegal Immigration Reform and Immigration Responsibility Act of 1996, other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated.

8 U.S.C. § 1252(f)(1).

Despite this Court's repeated rejection of its § 1252(f)(1) argument, the Government, citing the recent United States Supreme Court decision, *Garland v. Aleman Gonzalez*, 142 S. Ct. 2057 (2022) ("*Aleman Gonzalez*"), asserts a different outcome is warranted in this instance.[22] The Government argues that *Aleman Gonzalez* repudiates the Ninth Circuit precedent upon which this Court purportedly relied in the Preliminary Injunction and Clarification Order, *Rodriguez v. Hayes*, 591 F.3d 1105, 1120 (2003) ("*Rodriguez*") and *Ali v. Ashcroft*, 346 F.3d 873, 896 (2003) ("*Ali*"). *Ali* and *Rodriguez* hold § 1252(f)(1) is inapplicable "[w]here . . . a petitioner seeks to enjoin conduct that allegedly is not even authorized by [§§ 1221–32]" because in such instances "the court is not enjoining the *operation* of [the covered Immigration and Nationality Act ("INA") provisions]." *Ali*, 346 F.3d at 896. *Aleman Gonzalez*, however, suggests that lower courts lack jurisdiction even to enjoin or restrain immigration enforcement agencies' unauthorized implementation of the covered INA provisions. *Aleman Gonzalez*, 142 S. Ct. at 2065 (holding an injunction that "requires officials to take actions that (in the Government's view) are not required by [8 U.S.C. §§ 1221–32]" or "to refrain from actions that (again in the Government's view are allowed by [§§ 1221–32] . . . interfere[s] with the Government's efforts to *operate* [§§ 1221–32]" and, thus, is barred by § 1252(f)(1)).

While this Court agrees with the Government's assertion *Ali* and *Rodriguez* are irreconcilable with *Aleman Gonzalez*, it disagrees that the latter seals the fate of the Preliminary Injunction and Clarification Order In its Preliminary Injunction and Clarification Order. Rather the injunctive relief issued in this case fits squarely within a different line of Ninth Circuit precedent, which *Aleman Gonzalez* explicitly did not displace: *Catholic Social Services. v. Immigration & Naturalization Services.*, 232 F.3d 1139 (9th Cir. 2000) ("*Catholic Social Services*"), *Gonzales v. Department of Homeland Security*, 508 F.3d 1227 (9th Cir. 2007) ("*Gonzales*"), and *Gonzalez v. U.S. Immigration*

[22] For an in-depth analysis on *Aleman Gonzalez* and the implication it appears to have on permanent injunctions in the context of immigration enforcement, *see* this Court's Remedies Opinion at ECF No. 817.

*& Customs Enforcement*, 975 F.3d 788 (9th Cir. 2020) ("*Gonzalez*"), which this Court cited as a ground for finding § 1252(f)(1) inapplicable in its Clarification Order (Clarification Order at 20). Taken together, these cases stand for the premise that lower courts may "enjoin the unlawful operation of a provision *that is not specified in § 1252(f)(1)* even if that injunction has some collateral effect on the operation of a covered provision." *Aleman Gonzalez*, 142 S. Ct. at 2067 n.4 (citing *Gonzales*, 508 F.3d at 1227 and describing the principle holding in that case as "nonresponsive" to the questions at issue in *Aleman Gonzalez*) (emphasis in original).

The Preliminary Injunction enjoins application of the Asylum Ban to the P.I. Class members on the basis that the regulation, by its express terms, does not apply to them because they are "non-Mexican foreign nationals . . . who attempted to enter or arrived at the southern border *before* July 16, 2019." (Prelim. Inj. at 31.) The Government does not explain how enjoining or restraining the Government from taking actions not even authorized by the Asylum Ban, let alone any implementing regulation or statute, interferes with the operation of 8 U.S.C. §§ 1221 through 1332.[23]

Here, the Preliminary Injunction "directly implicates" 8 U.S.C. § 1158(b)(2)(C), the statute under which it was issued, not one of § 1252(f)(1)'s covered provisions. *Gonzales*, 508 at 1233 (holding an injunction that "directly implicates" a provision that is not covered by § 1252(f)(1) is authorized, notwithstanding that injunction's "collateral consequence[s]" on the operation of a covered provision); *see C.A.I.R.*, 471 F. Supp.3d at 59–60 (citing 84 Fed. Reg. at 33,835 (July 16, 2019)). And while the Preliminary Injunction no doubt effects the removal proceedings of potential and actual P.I. Class members, those consequences definitionally are collateral, and, thus, insufficient under *Catholic Social Services, Gonzales*, and *Gonzalez* to bring the injunctive relief issued here within the panoply of § 1252(f)(1). *See Gonzales*, 508 F.3d at 1233. It does not interfere with the "independent judgment and discretion" afforded to immigration judges in deciding the

[23] As the *C.A.I.R.* Court found, to the extent the Asylum Ban directly implicates a provision of the INA, it is 8 U.S.C. § 1158(b)(2)(C), to which § 1252(f)(1) is inapplicable. *C.A.I.R.*, 471 F.3d at 59–60.

individual cases before them. 8 C.F.R. § 1003.10(b). Immigration judges are still tasked with addressing whether the individual asylum seekers have sufficiently demonstrated class membership and are thus subject to the Preliminary Injunction's mandate, and, moreover, these judges maintain the authority to make other findings on the merits that warrant removal. Any effect the Preliminary Injunction has on the decisions of adjudicators with whom authority is vested to preside over removal proceedings is "one step removed" from enjoining application of the Asylum Ban to P.I. Class members. *Gonzales*, 508 F.3d at 1233.

Because neither the Preliminary Injunction, Clarification Order, nor the orders in this Opinion enjoin or restrain the INA's operation, the Court **GRANTS** Plaintiffs' request to convert the Preliminary Injunction into a Permanent Injunction.

**C. Oversight**

Plaintiffs seek appointment of Magistrate Judge Karen S. Crawford as Special Master to oversee the Government's compliance with the Preliminary Injunction. Furthermore, they request that this Court issue "instructions that [Judge Crawford] hold regular status conferences with the parties regarding [Preliminary Injunction] compliance issues, seek to mediate areas of disagreement, and either decide, or make recommendations to this Court regarding, disputes that the parties cannot resolve through mediation." (Oversight Mem. at 1–2; Proposed Order ¶ 8; *see also id.* ¶ 6.) Plaintiffs principally argue that the Government's "continued intransigence" warrants the appointment they request. (*Id.*)

But the record does not support Plaintiffs' bold claim. Rather, as set forth in detail above, *supra* Sec. I.B, the Government has developed and implemented (or nearly implemented) procedures to comply with the Preliminary Injunction and Clarification Order at each stage of immigration proceedings. For example, ICE has procedures in place to ensure no potential P.I. Class member in its custody removed; USCIS has implemented procedures to screen for P.I. Class membership for potential P.I. Class members within the United States; and the EOIR is nearly three-quarters of the way complete with their ROP

Review of nearly 2,000 immigration cases. While the instant case is no doubt a complicated one, Plaintiffs make no showing of the Government's resistance or obduracy in complying with the Preliminary Injunction. *See Apple*, 992 F. Sup. 2d at 280 ("[M]onitors have been found to be appropriate where consensual methods of implementation of remedial orders are 'unreliable' or where a party has proved resistant or intransigent to complying with the remedial purpose of the injunction in question."). Moreover, Plaintiffs have not identified a single instance in which a noncitizen, despite qualifying for P.I. Class-membership, was removed due to application of the Asylum Ban.

Accordingly, the Court **DENIES** Plaintiffs' request for oversight of the now-Permanent Injunction.

## IV.    CONCLUSION

Plaintiffs' Enforcement Motion and Oversight Motion are **GRANTED IN PART** and **DENIED IN PART**. For the reasons stated above:

(1)     The Court **CLARIFIES** that Paragraph 4 of the Clarification Order directs the Government to review *all* Form I-213s—including those of USB agents—for annotations of *AOL* Class membership in identifying potential P.I. Class members to add to the Master List.

(2)     The Court **MODIFIES** Paragraph 3 of the Clarification Order to read as follows:

> Defendants must inform identified Preliminary Injunction class members in administrative proceedings before USCIS or EOIR, or in DHS Custody, of their class membership, as well as the existence and import of the Preliminary Injunction (ECF No. 330), Clarification Order (ECF No. 605), and this Order (ECF No. 808).

(3)     The Court **CLARIFIES** that Paragraph 2's language requiring EOIR to take affirmative steps "to reopen and reconsider past determinations that potential [P.I.] [C]lass members were ineligible for asylum based on the Asylum Ban" requires EOIR to extend the temporal scope of its ROP Review to include final orders of removal issued up until July 31, 2020.

Case: 22-55988, 12/20/2022, ID: 12615953, DktEntry: 13-2, Page 83 of 301

(4) The Court **CLARIFIES** that the EOIR's obligation under Paragraph 2 to "identify affected [P.I.] [C]lass members" precludes the EOIR from issuing a negative P.I. Class-membership determination without first considering any evidence of metering during the relevant pre-Asylum Ban period in DHS's records.

(5) The Court **GRANTS** Plaintiffs' request to convert to a **PERMANENT INJUNCTION** the Preliminary Injunction (ECF No. 330), as clarified in the Clarification Order (ECF No. 605) and above, *supra* Sec. III.A.

(6) The Court **DENIES** Plaintiffs' request to appoint a special master pursuant to Federal Rule of Civil Procedure 53 to oversee Defendants' compliance with this Permeant Injunction

* * * *

The Court also **GRANTS** Defendants' Unopposed Motion to Correct. (ECF No. 784.) Further, the Court **ORDERS** the Government to provide an update concerning the implementation status of USCIS's procedures for P.I. Class-membership identification and the provision of reopening and reconsideration relief to potential P.I. Class members who were removed from the United States **by no later than August 22, 2022.** Finally, the Court **ORDERS** that, in the event any party hereafter seeks clarification, modification, or enforcement of the Permanent Injunction, the parties **ALL MUST CERTIFY** in a court filing that despite having undertaken all reasonable efforts to resolve their disputes they believe they have reached an impasse that necessitates court intervention.

**IT IS SO ORDERED.**

**DATED: August 5, 2022**

Cynthia Bashant

**Hon. Cynthia Bashant**
**United States District Judge**

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

AL OTRO LADO, INC.; ABIGAIL DOE, BEATRICE DOE, CAROLINA DOE, DINORA DOE, INGRID DOE, ROBERTO DOE, MARIA DOE, JUAN DOE, VICTORIA DOE, BIANCA DOE, EMILIANA DOE, AND CÉSAR DOE, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

ALEJANDRO MAYORKAS, Secretary, U.S. Department of Homeland Security, in his official capacity; TROY A. MILLER, Acting Commissioner, U.S. Customs and Border Protection, in his official capacity; WILLIAM A. FERRERA, Executive Assistant Commissioner, Office of Field Operations, U.S. Customs and Border Protection, in his official capacity,

Defendants.[1]

Case No. 17-cv-02366-BAS-KSC

**ORDER:**

**(1) GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (ECF No. 535);**

**(2) GRANTING IN PART AND DENYING IN PART DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT (ECF No. 563); AND**

**(3) REQUIRING SUPPLEMENTAL BRIEFING**

This action challenges the lawfulness of the Government's practice of systematically denying asylum seekers access to the asylum process at ports of entry ("POEs") along the U.S.-Mexico border. Plaintiffs allege that in violation of existing statutory, constitutional, and international law, Customs and Border Protection ("CBP") officers do not inspect

[1] Because all Defendants are sued in their official capacities, the successors for these public offices are automatically substituted as Defendants per Fed. R. Civ. P. 25(d).

asylum seekers when they arrive at POEs and refer them for asylum interviews but instead turn them back to Mexico on the basis that the ports are "at capacity[.]"[2,3] (Second Am. Compl. ("SAC") ¶ 13, ECF No. 189.)

Now before the Court are the parties' respective summary judgment motions. (Pls.' Mot. for Summ. J. ("Pls.' MSJ"), ECF No. 535; Defs.' Cross-Mot. for Summ. J. and Opp'n to Pls.' Mot. for Summ. J. ("Defs.' MSJ"), ECF No. 563.) For the reasons stated below, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiffs' Motion for Summary Judgment and **GRANTS IN PART AND DENIES IN PART** Defendants' Cross-Motion for Summary Judgment.

## STATEMENT OF FACTS

### I. Factual Background[4]

#### A. Overview of CBP

CBP, a component agency of the Department of Homeland Security ("DHS"), is tasked with monitoring the flow of people and goods across United States borders. (JSUF ¶ 1.) The Office of Field Operations ("OFO"), a division of CBP, is responsible for the management of operations at POEs in the United States. (JSUF ¶ 4.) OFO operates various different classes of POEs. (JSUF ¶ 5.) Relevant here is a "Class A" land POE, designated for all aliens. (*Id.*) Class A POEs on the U.S.-Mexico border include, among others: San Ysidro, Otay Mesa, Calexico, Nogales, El Paso, Laredo, Hidalgo, and Brownsville. (JSUF

---

[2] Plaintiffs in this case include Al Otro Lado and the above-captioned individuals on behalf of a class of "all noncitizens who seek or will seek to access the U.S. asylum process by presenting themselves at a Class A [POE] on the U.S.-Mexico border, and were or will be denied access to the U.S. asylum process by or at the instruction of [CBP] officials on or after January 1, 2016." (ECF No. 513.) The Court also certified a subclass consisting of "all noncitizens who were or will be denied access to the U.S. asylum process at a Class A POE on the U.S.-Mexico border as a result of Defendants' metering policy on or after January 1, 2016." (*Id.*)

[3] This practice of turning back asylum seekers at POEs is alternatively referred to as "metering" or "queue management."

[4] The parties filed a lengthy joint statement of undisputed facts ("JSUF") in support of their respective summary judgment motions. For the sake of brevity, the Court includes an abridged version to provide an overview of the events since 2016 precipitating this litigation and relevant to this Order. The complete joint statement is available on the docket. (*See* ECF No 619.)

¶ 8.) These POEs are overseen by four regional field offices: San Diego, Tucson, El Paso, and Laredo. (JSUF ¶ 7.)

**B. First Use of Metering in 2016**

Before metering was implemented in 2016, migrants seeking asylum who lacked documents for lawful entry would queue between the limit line[5] at a POE and the primary inspection booths to wait until there was sufficient space for their intake. (JSUF ¶ 49.)

Beginning in February 2016, CBP saw an increase in the number of inadmissible Haitian nationals seeking admission at San Diego POEs. (JSUF ¶ 31.) CBP had both border-wide and port-specific "contingency plans" in place for the purpose of responding to such "mass migration events." (JSUF ¶¶ 28–29, 191.) In response to the increase in Haitian migration in 2016, the San Ysidro POE converted spaces to create more temporary holding rooms, increased its staffing, and took other measures to increase capacity consistent with the contingency plans in place. (JSUF ¶¶ 35–39, 40–41, 44–47, 55–58.) No contingency plan includes metering or queue management as a tactic for managing port capacity constraints during a period of high-volume arrivals. (*Id.*) However, in 2016, San Ysidro port officials began to stop migrants at the limit line outside the POE to prevent them from entering the port building and coordinated with the Government of Mexico to "meter" asylum seekers at the San Diego POEs "due to facility and processing constraints." (JSUF ¶¶ 66–69, 70, 86–87.)

The high volume of migration continued into the fall of 2016, spread east, and included more family units ("FAMUs") and unaccompanied alien children ("UAC") in addition to the Haitian nationals. (JSUF ¶ 76.) Ports reported challenges with managing the number of people in custody. (JSUF ¶¶ 94–95, 105–07.) CBP officials were informed that their counterparts in Mexico were under pressure for assisting with processing of

[5] The Court understands the "limit line" to be an area at or near the U.S.-Mexico border where CBP officers stand "to control the flow of undocumented aliens entering CBP ports for processing." (*See* "CBP Has Taken Steps to Limit Processing of Undocumented Aliens at Ports of Entry," Office of Inspector General (Oct. 27, 2020) ("OIG Report") at 4, Ex. 1 to Decl. of Stephen Medlock in supp. of Pls.' Reply, ECF No. 610-2.)

asylum seekers because of the "local humanitarian crisis" developing in border towns. (JSUF ¶ 81.) After Hurricane Matthew struck in October 2016, the number of arrivals increased. (JSUF ¶¶ 96–97.) DHS, with the assistance of MCAT,[6] developed a multi-phased plan to "address the surge of migration along the Southwest border," including constructing "soft-sided holding facilities" to increase capacity. (JSUF ¶¶ 116, 121–22, 125–26, 128.)

The presidential election was held on November 8, 2016. (JSUF ¶ 133.) On November 9, 2016, some soft-sided facilities were put on hold. (JSUF ¶¶ 134, 151.) Shortly after, then-CBP Deputy Commissioner Kevin McAleenan attended a meeting at DHS where he discussed increasing "efforts to meter arrivals of non-UAC, non-Mexican CF [credible fear] cases mid-bridge." (JSUF ¶ 140.) Then-DHS Secretary Jeh Johnson approved the proposal to increase metering on November 10, 2016. (JSUF ¶ 141.) Soft-sided facilities were ultimately scrapped or put on stand-by. (JSUF ¶¶ 134, 151, 170–71.)

Metering was then adopted by POEs, although the way in which it was implemented varied. (JSUF ¶¶ 142–44.) At some ports, officers were stationed too far from the limit line and consequently turned back asylum seekers on U.S. soil. (JSUF ¶¶ 157, 159, 160, 162–63, 166–67.) There were also differences in approach, with some ports verbally providing "return" appointments to asylum seekers while others advised them only "to come back at a later time." (JSUF ¶¶ 164–65.) Officials at Laredo noticed that the so-called "turnbacks" were having a strong enough deterrent effect that constant metering was not necessary. (JSUF ¶ 165.)

The levels of migration ebbed and flowed in the following 16 months. In December 2016, the number of inadmissible arrivals presenting at POEs on the southwest border decreased. (JSUF ¶ 168.) In a 2017 report, the Office of the Inspector General ("OIG")

---

[6] In October 2016, the CBP Commissioner established a Migrant Crisis Action Team ("MCAT"), which was composed of various CBP and DHS components and headed by Border Patrol's Deputy Chief. (JSUF ¶¶ 117–18.) The MCAT reported on DHS-coordinated plans "for addressing the surge of migration along the Southwest border." (JSUF ¶ 120.)

stated that the "surge of migrants arriving on the Southwest border in 2016" "abruptly, drastically, and unexpectedly ended" in January 2017. (JSUF ¶ 169.) Nonetheless, some ports continued to meter in December 2017. (JSUF ¶¶ 193–98.) In 2018, the migration numbers again began to increase and peaked in the spring. (JSUF ¶ 199.) However, a "migrant caravan" reportedly making its way from Guatemala quickly dwindled and did not have an impact on port operations. (JSUF ¶¶ 206–12, 214–17, 223, 227.) One CBP officer in 2018 noted that metering "deterred [other than Mexican] traffic." (JSUF ¶ 235.)

**C. The Memorialization of Metering/Queue Management**

On April 27, 2018, the then-Executive Assistant Commissioner of the OFO, Todd Owen, issued a memorandum with the subject line "Metering Guidance to the Directors of Field Operations ['DFOs'] overseeing operations at POEs on the U.S.-Mexico border." (JSUF ¶ 228.) In the memorandum, Owen wrote, in part:

> When necessary or appropriate to facilitate orderly processing and maintain the security of the port and safe and sanitary conditions for the traveling public, DFOs may elect to meter the flow of travelers at the land border to take into account the port's processing capacity. Depending on port configuration and operating conditions, DFOs may establish and operate physical access controls at the borderline, including as close to the U.S.-Mexico border as operationally feasible. DFOs may not create a line specifically for asylum-seekers only, but could, for instance, create lines based on legitimate operational needs, such as lines for those with appropriate travel documents and those without such documents.
>
> Ports should inform the waiting travelers that processing at the port is currently at capacity and CBP is permitting travelers to enter the port once there is sufficient space and resources to process them. At no point may an officer discourage a traveler from waiting to be processed, claiming fear of return, or seeking any other protection. . . . Once a traveler is in the United States, he or she must be fully processed.

(*Id.*; *see also* "Metering Guidance," Ex. 82 to Decl. of Stephen Medlock in supp. of Pls.' MSJ ("Medlock Decl."), ECF No. 535-84.) The guidance was disseminated to other executives as "processing guidance for surge events." (JSUF ¶ 230.)

In May 2018, DHS made its position on metering publicly known. The DHS Secretary at the time, Kirstjen Nielsen, publicly stated: "We are 'metering,' which means that if we don't have the resources to let them in on a particular day, they are going to have to come back." (JSUF ¶ 238.) Around this time, CBP officials responded to DHS's requests for information regarding the number of people likely to be turned away under a full implementation of the metering policy. (JSUF ¶¶ 239–43.)

Shortly thereafter, in June 2018, Nielsen issued a "Prioritization-Based Queue Management" ("PBQM") memorandum to the CBP Commissioner. (JSUF ¶ 244; *see also* "Prioritization-Based Queue Management," Ex. 3 to Decl. of Alexander Halaska in supp. of Defs.' MSJ, ECF No. 563-5.) In the memorandum, Nielsen explained that apprehensions between POEs and arrivals at POEs of inadmissible migrants "continue to rise," but "CBP's resources remain strained along the Southwest Border." (*Id.*) Specifically, she noted that inadmissible arrivals at POEs require additional processing because they lack documents, which "delays the flow of legitimate trade and travel" and "draws resources away from CBP's fundamental responsibilities." (*Id.*) Nielsen sought to refocus CBP "on its primary mission: to protect the American public from dangerous people and materials while enhancing our economic competitiveness through facilitating legitimate trade and travel." (*Id.*)

To this end, she directed the CBP Commissioner to "initiate a 30-day pilot program to prioritize staffing and operations in accordance with the following order of priority at all Southwest border ports of entry:" (1) national security efforts, (2) counter-narcotics operations, (3) economic security, and (4) trade and travel facilitation. (*Id.*) The PBQM memorandum further explains how these priorities function practically: Nielsen further granted DFOs the discretion to "establish and operate physical access controls at the borderline, including as close to the U.S.-Mexico border as operationally feasible." (JSUF ¶ 245.) Thus, according to Nielsen, ports could process asylum seekers to the extent their capacity would allow "without negatively impacting their other responsibilities" under this priority-based regime. (JSUF ¶ 247.) Port officials subsequently began to use "operational

capacity" instead of "detention capacity" to determine when to employ metering at their respective POEs. (JSUF ¶ 50.) CBP has not officially defined the term "operational capacity" in its written policy and procedure documents. (JSUF ¶ 251.)

Additional metering guidance was issued by CBP in 2019 and 2020, reiterating the objectives in the PBQM memorandum. (JSUF ¶¶ 263–65.) The 2020 guidance cautioned immigration officers not to "discourage any traveler from waiting to be processed, claiming fear of return, or seeking any other protection." (JSUF ¶ 265.) Port officials were also informed that if they "determine that, due to a particular port's operating conditions, it is not operationally feasible to safely process" inadmissible arrivals at the port, these individuals could "be encouraged to initiate their processing and entry at another port that is better positioned to process" them. (*Id.*) However, the guidance made clear that "[o]nce a traveler is in the United States, he or she must be inspected and processed, and may not be directed to return to Mexico." (*Id.*)

## II. Statutory and Regulatory Framework

Two statutory provisions in the Immigration and Nationality Act ("INA") are implicated in this case. The first, 8 U.S.C. § 1158(a)(1), provides:

> Any alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status, may apply for asylum in accordance with this section or . . . section 1225(b) . . . ."

Section 1225 concerns the process of "inspection." This section requires immigration officials to inspect all applicants for admission to the United States. 8 U.S.C. § 1225(a)(1)(3); *see also* 8 C.F.R. § 235.1(a) ("Application to lawfully enter the United States shall be made in person to an immigration officer at a U.S. port-of-entry when the port is open for inspection . . . ."). Applicants for admission are noncitizens "present in the United States who have not been admitted" or those "who arrive[] in the United States." 8 U.S.C. § 1225(a)(1).

Section 1225(b) establishes the specific procedure by which immigration officials must conduct this inspection. 8 U.S.C. § 1225(b)(1)(A). Officers are required to order all noncitizens determined to be "inadmissible" removed without further hearing or review—a process known as "expedited removal"—"unless the alien indicates either an intention to apply for asylum under section 1158 of this title or a fear of persecution." 8 U.S.C. § 1225(b)(1)(A)(i). Once an applicant for admission indicates either of the above, "the officer shall refer the alien for an interview by an asylum officer under subparagraph (B)." 8 U.S.C. § 1225(b)(1)(A)(ii).[7] Subparagraph (B) elaborates on the interview process and events following the credible fear determination. *See* 8 U.S.C. § 1225(b)(1)(B)(i)–(iii).

## LEGAL STANDARD

### I. Summary Judgment

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). Summary judgment is appropriate under Rule 56(c) where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

When cross-motions for summary judgment are filed by the parties, as here, "[e]ach motion must be considered on its own merits." *Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). In other words, a court must review the evidence submitted in support of each cross-motion, *id.*, and "giv[e] the nonmoving party in each instance the benefit of all reasonable inferences," *A.C.L.U. of Nevada v. City of Las Vegas*, 466 F.3d 784, 791 (9th Cir. 2006). Further, even where neither party disputes

---

[7] The Court refers to the asylum provision in § 1158(a)(1) and the specific actions listed in § 1225(a)(1)(3) and § 1225(b)(1)(A)(i)–(ii) as the "inspection and referral duties."

issues of material fact, the court is still required to analyze the record to determine whether disputed issues of material fact are present. *United States v. Fred A. Arnold, Inc.*, 573 F.2d 605, 606 (9th Cir. 1978); *see also Chevron USA, Inc. v. Cayetano*, 224 F.3d 1030, 1037 n.5 (9th Cir. 2000) ("[T]he district court is responsible for determining whether the requirements of [Rule 56] are met, whether or not the parties believe that they are.").

Summary judgment can turn on factual issues or legal questions. "Where a case turns on a mixed question of law and fact and . . . the only disputes relate to the legal significance of undisputed facts, the controversy collapses into a question of law suitable to disposition on summary judgment." *Blue Lake Rancheria v. United States*, 653 F.3d 1112, 1115 (9th Cir. 2011) (quotations omitted); *see also Johnson v. Allstate Ins. Co.*, 126 Wash. App. 510, 515 (2005) (questions of law include the interpretation of contracts, statutes, "and other writings"), *cited with approval in Campidoglio LLC v. Wells Fargo & Co.*, 870 F.3d 963, 973 (9th Cir. 2017).

## II.  Administrative Procedure Act

The Administrative Procedure Act ("APA") generally limits the scope of judicial review to the administrative record. 5 U.S.C. § 706 (directing the court to "review the whole record or those parts of it cited by a party"); *see, e.g.*, *GB Int'l v. Crandall*, 403 F. Supp. 3d 927, 931 (W.D. Wash. 2019) ("[T]he Court reviews the evidence included in the administrative record to determine whether, as a matter of law, the evidence permitted the agency to make the decision it did." (citing *Nw. Motorcycle Ass'n v. U.S. Dep't Agric.*, 18 F.3d 1468, 1471–72 (9th Cir. 1994) and *Occidental Eng'g Co. v. I.N.S.*, 753 F.2d 766, 769–70 (9th Cir. 1985))), *aff'd sub nom. GB Int'l, Inc. v. Crandall*, 851 F. App'x 689 (9th Cir. 2021).

The parties did not designate an administrative record in this action. However, because this Court's evaluation of the APA claims is limited to Plaintiffs' contention that Defendants failed to act under § 706(1), an administrative record is not necessary here. *See San Francisco BayKeeper v. Whitman*, 297 F.3d 877, 886 (9th Cir. 2002) ("[W]hen a court considers a claim that an agency has failed to act in violation of a legal obligation, review

is not limited to the record as it existed at any single point in time, because there is no final agency action to demarcate the limits of the record." (quoting *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 560 (9th Cir. 2000))); *Cherokee Nation v. United States Dep't of the Interior*, No. 19-CV-2154-TNM-ZMF, 2021 WL 1209205, at *6 (D.D.C. Mar. 31, 2021) ("Review under [§ 706(1)] is not limited to the administrative record."); *see also Consejo de Desarrollo Economico de Mexicali, AC v. United States*, 438 F. Supp. 2d 1207, 1221 (D. Nev. 2006) (refusing to limit its review to the administrative record when evaluating a § 706(1) claim, instead considering "materials submitted by Plaintiffs as they relate to the present matter"), *rev'd on other grounds*, 482 F.3d 1157 (9th Cir. 2007).

Accordingly, when evaluating the APA claims in this case, the Court considers all materials submitted by the parties.

**ANALYSIS**

Plaintiffs move for summary judgment on all claims in this case, arguing that Defendants' act of turning back asylum seekers at POEs violates the INA, the APA, the Fifth Amendment to the United States Constitution, and the Alien Tort Statute ("ATS"). Defendants move for summary judgment on the basis that turning back class members does not violate their statutory duties of inspection and referral and is therefore lawful under the Constitution. They further argue that metering does not violate the duty of non-refoulement and that, even where the Court finds it does, various factors counsel again this Court's recognition of a cause of action under the ATS. (*Id.*)

The Court confronts two threshold questions on summary judgment: (1) whether, as a matter of law, Defendants' metering policy satisfies their inspection and referral duties under the INA; and (2) if it does, whether the record evinces any genuine issues of material fact as to whether Defendants' decision to turn back asylum seekers at POEs was pretextual such that it is unlawful under the APA. In addition, the Court determines whether turnbacks violate due process and the ATS. The Court states below its conclusions as to each claim.

## I. Immigration and Nationality Act

Plaintiffs' first claim for relief alleges that Defendants have violated their inspection and referral duties under the INA by turning back asylum seekers at POEs and thereby denying them the statutorily prescribed access to the asylum process. (SAC ¶¶ 244–52.) They request as relief a judicial determination of their rights under these provisions. (*Id.* ¶¶ 253–55.) Defendants move for summary judgment against this claim on the basis that the INA provides no private right of action allowing for standalone claims, leaving Plaintiffs to seek enforcement of its provisions only through the APA. (Mem. of P. & A. in supp. of Defs.' MSJ ("Defs.' Mem. of P. & A.") at 31–32, ECF No. 563-1.) Plaintiffs do not argue that the INA creates a private right of action but instead contend that this Court can, under its inherent authority, issue equitable relief even in the absence of a statutory cause of action. (Pls.' Opp'n to Defs.' MSJ ("Pls.' Opp'n") at 24–25, ECF No. 585.)

"[S]ection 706 of the APA functions as a default judicial review standard" for decisions made by administrative agencies. *Ninilchik Traditional Council v. United States*, 227 F.3d 1186, 1194 (9th Cir. 2000) (construing *Dickinson v. Zurko*, 527 U.S. 150, 154–55 (1999)). Some courts have understood the APA to displace traditional equitable authority to set aside ultra vires actions taken by the executive branch while others have found that this inherent power persists. *Compare Eagle Tr. Fund v. U.S. Postal Serv.*, 365 F. Supp. 3d 57, 65–66 (D.D.C. 2019) (finding that no "pre-APA equitable review" of agency action was available because the APA was "a catch-all cause of action for plaintiffs who seek to challenge agency decisionmaking where none otherwise exists"), *aff'd*, 811 F. App'x 669 (D.C. Cir. 2020), *with Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988) (finding that notwithstanding the APA, courts still maintain judicial authority to review ultra vires actions taken by the executive).

Recently, in a set of related cases, the Ninth Circuit has expressed support for the view that ultra vires claims independent of the APA are viable. *See California v. Trump*, 963 F.3d 926, 941 n.12 (9th Cir. 2020) (finding that an equitable ultra vires cause of action

and APA cause of action can proceed separately, but declining to address the ultra vires claims because the plaintiffs sought "the same scope of relief" under both and prevailed under the APA), *cert. granted sub nom. Trump v. Sierra Club*, 141 S. Ct. 618 (2020); *see also Sierra Club v. Trump*, 963 F.3d 874, 890–92 (9th Cir. 2020) (citing *Dart* to support holding that the Sierra Club could assert an equitable ultra vires cause of action to hold unconstitutional an agency's conduct), *majority op. vacated sub nom.*, *Biden v. Sierra Club*, __ U.S. __, __ S. Ct. __, 2021 WL 2742775 (July 2, 2021). However, both decisions were addressing requests to enjoin ultra vires activities alleged to be unconstitutional, which the Court does not understand to be the basis of Plaintiffs' INA claim here.

In the context of this case, the Court finds instructive *E. V. v. Robinson*, 906 F.3d 1082 (9th Cir. 2018), which established that ultra vires claims independent of the APA and of any statutory private right of action can be brought against federal officers on a non-constitutional and constitutional basis. Specifically, the Ninth Circuit held that these ultra vires claims are available in "(1) suits alleging that a federal official acted ultra vires of statutorily delegated authority, and (2) suits alleging that a federal official violated the Constitution." *Id.* at 1090 (citing *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 687–89 (1949) (noting that these suits are not considered "suits against the sovereign" and therefore did not require a waiver of sovereign immunity)).

The defendant-appellees in *Robinson* argued that ultra vires claims under *Larson* were no longer available because they were abrogated by the APA's express waiver of sovereign immunity.[8] *Id.* at 1092. The Ninth Circuit found that while Congress intended the APA's sovereign immunity waiver to "'replace[] the [*Larson* exceptions] as the doctrinal basis for a claim for prospective relief'" against federal officers, it did not intend for the APA to eliminate the *Larson* exceptions altogether. *Id.* at 1092–93 (quoting

[8] The APA's waiver of sovereign immunity states: "An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein denied on the ground that it is against the United States or that the United States is an indispensable party." 5 U.S.C. § 702.

*E.E.O.C. v. Peabody W. Coal Co.*, 610 F.3d 1070, 1085 (9th Cir. 2010)). Thus, the Ninth Circuit concluded that the APA's waiver "superseded the *Larson* exceptions only for suits in which the . . . waiver applies[.]" *Id.* at 1092. Finding the APA waiver did not apply, the court held that the ultra vires claim was not abrogated by the APA.

Here, on summary judgment, neither party argues that the APA's waiver of sovereign immunity does not apply to Plaintiffs' claims. The Court also independently finds no reason why the APA's waiver would not apply in this case. Thus, in keeping with the rule as articulated in *Robinson*, the Court finds that the APA waiver applies to Plaintiffs' claims and consequently abrogates Plaintiffs' ultra vires INA claim. *Cf. Jafarzadeh v. Duke*, 270 F. Supp. 3d 296, 311 (D.D.C. 2017) (dismissing plaintiffs' ultra vires claim for adjustment of status under the INA because plaintiffs could obtain review under the APA). Summary judgment in favor of Defendants on this claim is therefore warranted.

**II. Unlawful Withholding Under the APA (5 U.S.C. § 706(1))**

The purpose of the APA is, in part, to provide an avenue for judicial review of "agency action." *See* 5 U.S.C. § 702 ("A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."). Reviewing courts "decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." *Id.* § 706. In relevant part, courts must "compel agency action unlawfully withheld or unreasonably delayed." *Id.* § 706(1).

Plaintiffs state that summary judgment is warranted on their § 706(1) claims because Defendants' undisputed act of turning asylum seekers arriving at POEs back to Mexico violates their statutorily mandatory duties to inspect and refer asylum seekers. Defendants argue that, as a matter of law, summary judgment should be granted on Plaintiffs' § 706(1) claim because: (1) Plaintiffs have not identified a final or discrete agency action; (2) their inspection and referral duties under § 1225 are not mandatory ministerial actions as to class

members not on U.S. soil,[9] and; (3) in any event, their inspection and referral duties were not unlawfully withheld because asylum seekers were still ultimately provided access to the process, although it was delayed.

**A. Final Agency Action**

Defendants move for summary judgment on both APA claims on the basis that no final agency action exists (Defs.' Mem. of P. & A. at 32–34), while the context of Plaintiffs' arguments implies that finality only applies to Defendants' affirmative "Turnback Policy," which is a feature only of the § 706(2) claim. (Pls.' Mem. of P. & A. in supp. of Pls.' MSJ ("Pls.' Mem. of P. & A.") at 20–21, ECF No. 535-1.)

Section 704 of the APA limits judicial review to "final agency actions," a standard which "does not easily accommodate an agency's *failure to act*." *W. Org. of Res. Councils v. Zinke*, 892 F.3d 1234, 1247 (D.C. Cir. 2018) (Edwards, J., concurring). There remains confusion over whether the finality requirement applies to § 706(1) "failure to act" claims. *Id.* However, the Ninth Circuit has given several indications that finality is not a consideration when evaluating § 706(1) claims. *See, e.g.*, *Hells Canyon Pres. Council v. U.S. Forest Serv.*, 593 F.3d 923, 930 (9th Cir. 2010) (stating that plaintiffs were required to identify a final agency action for § 706(2) claims but not stating the same for § 706(1) claims); *Nw. Env't Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 681 n.10 (9th Cir. 2007) (distinguishing between "seek[ing] redress for agency inaction under § 706(1)" and "challeng[ing] a final agency action under" § 706(2)); *Indep. Min. Co. v. Babbitt*, 105 F.3d 502, 511 (9th Cir. 1997) ("Judicial review of an agency's actions under § 706(1) for alleged delay has been deemed an exception to the 'final agency decision' requirement."); *Ecology Ctr., Inc. v. U.S. Forest Serv.*, 192 F.3d 922, 926 (9th Cir. 1999) ("Courts have permitted jurisdiction under the limited exception to the finality doctrine only when there has been a genuine failure to act.").

---

[9] Defendants conceded at oral argument that turning back asylum seekers on U.S. soil is unlawful.

Accordingly, the Court finds no "final agency action" is necessary for Plaintiffs' § 706(1) claim and rejects Defendants' arguments as to the same.

**B. Discrete Agency Action**

A § 706(1) claim "can only proceed where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take." *Norton v. S. Utah Wilderness Alliance* ("*SUWA*"), 542 U.S. 55, 64 (2004); *Hells Canyon Pres. Council*, 593 F.3d at 932. "This condition precludes attacks that seek broad programmatic improvements of agency behavior and also precludes judicial review of 'even discrete agency action that is not demanded by law.'" *Ramirez v. U.S. Immigr. & Customs Enf't*, 310 F. Supp. 3d 7, 20 (D.D.C. 2018) (quoting *SUWA*, 542 U.S. at 65); *see Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990) ("[R]espondent cannot seek wholesale improvement of this program by court decree, rather than in the offices of the Department or the halls of Congress, where programmatic improvements are normally made.").

Defendants argue that no "discrete" action has been identified here because the record shows only that the alleged "Turnback Policy" is a "constellation of actions" with "different factual bases" that do not show "an across-the-board measure to purposefully restrict access to the asylum process." (Defs.' Mem. of P. & A. at 34–35; *see also* Defs.' Reply in supp. of MSJ ("Defs.' Reply") at 4, ECF No. 611.) Plaintiffs maintain that the agency practices cited identify a discrete and particularized action by Defendants "to purposefully restrict access to the asylum process in violation of their statutory obligations." (Pls.' Opp'n at 5–6.)

Preliminarily, to the extent the parties make this argument as to the § 706(1) claim, the Court notes that the parties slightly misconstrue the issue. The discreteness element of a § 706(1) failure to act claim is intended to identify the contours of the agency duty or responsibility that has purportedly been withheld or delayed by the agency. Plaintiffs identify that duty as the inspection of asylum seekers for admissibility when they arrive at POEs and refer them for credible fear interviews under 8 U.S.C. § 1158(a)(1) and § 1225. (Pls.' Mem. of P. & A. at 21.) Defendants have agreed throughout this litigation that these

are mandatory duties for which this Court can compel § 706(1) relief and do not raise any argument on summary judgment to the contrary. *See Al Otro Lado, Inc. v. McAleenan*, 394 F. Supp. 3d 1168, 1196 (S.D. Cal. 2019) ("The parties agree that the mandatory duties to inspect all aliens and refer certain aliens seeking asylum are discrete actions for which this Court can compel Section 706(1) relief . . . .").

This defeats any argument that the record reflects a "broad programmatic attack" on agency action that is not permitted under § 706(1). These types of attacks occur when a plaintiff fails to identify a discrete agency action to which the court should compel compliance and instead identifies several purported agency "failures" that constitute violations of the law. *See Lujan*, 497 U.S. at 891 n.2 (finding that "land withdrawal review program" was not an agency action because it did not identify "some specific order or regulation" that applied to everyone but instead constituted "a generic challenge to all aspects" of the program). But Plaintiffs here have identified specific statutory duties to inspect and refer every applicant for admission who approaches a POE. This is the discrete agency action Plaintiffs claim Defendants failed to take when they turned class members back. *See Ramirez*, 310 F. Supp. 3d at 20–21 ("Plaintiffs in this case seek to compel an agency to take the discrete and concrete action of considering statutorily specified factors in determining where and how to place [unaccompanied minors] . . . now that they have aged out of HHS's care and custody."); *Meina Xie v. Kerry*, 780 F.3d 405, 408 (D.C. Cir. 2015) (finding discrete agency action where plaintiff "point[ed] to a precise section of the INA, establishing a specific principle of temporal priority that clearly reins in the agency's discretion, and argues that the disparate cut-off dates for various subcategories manifest a violation of the principle").

Further, the record does not contain a grab bag of miscellaneous CBP practices which have been merged under an amorphous and broad programmatic umbrella for purposes of demonstrating multiple and varied failures to act on the part of Defendants. Rather, the record contains undisputed evidence that in 2016, 2017, and 2018, CBP officers did not carry out their discrete statutory duties to inspect and refer asylum seekers to start

the asylum process once they arrived at POEs; instead, Defendants stationed CBP personnel at the limit line to "turn away" or "push back" asylum seekers as they reached POEs.

These "turnbacks" involved a combination of CBP officers (1) coordinating with Mexican immigration officials to "control the flow" of migrants seeking asylum before they reached the border and (2) affirmatively turning asylum seekers away from the border when Mexican immigration officials did not control the flow. This second step, which the Court understands to be the "turnbacks" at issue, involved "placing CBP personnel at the international line to screen legitimate passengers with entry documents . . . while asking those that do not have documents and that may otherwise be seeking some sort of benefit to return to Mexico with a date and time issued by our personnel." (Nov. 18, 2016 "RE: Consolidated Weekly highlights" email, Ex. 71 Medlock Decl., ECF No. 535-73 (referring to port-initiated "push back" of migrants as "self-metering").)

This strategy has been used on-and-off since 2016. The DHS's own Office of Inspector General identified that "[s]ince 2016, CBP has used Queue Management at various times to control the flow of undocumented aliens into ports of entry." (*See* OIG Report at 4.) Additionally, in response to the Haitian migrant surge, CBP officials discussed coordination with Mexican immigration to meter based on POE capacity. (JSUF ¶¶ 68, 70; AOL-DEF-00023718, Ex. 49 to Medlock Decl., ECF No. 535-51.) During the same period, CBP officials also instructed officers "to not allow any asylees past the limit line" and "hold the line to prevent any [migrants] from entering." (JSUF ¶¶ 68–70, 86–87.) Similarly, when metering was authorized after the November 2016 election, officers were instructed to meet with their immigration counterparts in Mexico to discuss controlling the flow of migrants to POEs and, if Mexican officials did not assist with metering, Port Directors were authorized "to return the individuals claiming fear without valid entry documents to Mexico with an alternate date and time to return" if a port exceeded capacity. (JSUF ¶¶ 141, 149, 155–56, 158 ("[O]ur ports will be pushing migrants without entry documents back to Mexico to await an appointment to be processed at the

POEs."); Nov. 11, 2016 "Metering Flow" email, Ex. 70 to Medlock Decl., ECF No. 535-72; Nov. 12, 2016 "Meeting with INM" email, Ex. 13 to Medlock Decl., ECF No. 535-15 (noting that CBP officers are "to meet with [their] INM counterpart and request they control the flow of aliens to the [POE]" and "[i]f [Mexican immigration] cannot or will not control the flow, your staff is to provide the alien with a piece of paper identifying a date and time for an appointment and return them to Mexico").)  At least one CBP official expressly understood the metering of South and Central American migrants at POEs as an extension of the previous measure used by CBP concerning Haitian migrants.  (*See* JSUF ¶ 145 (email from CBP official explaining that the metering practices that had been applied to "Haitians at most locations" was now being extended to South and Central Americans).) It is also undisputed that turnbacks, including of asylum seekers "on the U.S. side of the [POE] bridge," continued in 2017.  (JSUF ¶¶ 157, 174–76, 181.)

Finally, the 2018 Metering Guidance and PBQM memorandum formally implemented the same "self-metering" measures by authorizing turnbacks at points nearest the border.  Both documents authorized Directors of Field Operations to "meter the flow of travelers at the land border" based on capacity by "establish[ing] and operat[ing] physical access controls at the borderline, including as close to the U.S.-Mexico border as operationally feasible."  (JSUF ¶¶ 244–45, 228.)  Metering continued to be used into 2020 as a part of the PBQM model.  (JSUF ¶¶ 263–65.)

While the aforementioned circumstances in which CBP turned away asylum seekers span several years and have "different factual bases," they all involve CBP "pushing back" asylum seekers without inspecting and referring them upon arrival.  The fact that Defendants sought to turn back asylum seekers in different contexts does not transform Plaintiffs' claim into a programmatic attack.  *See Ramirez*, 310 F. Supp. 3d at 21 ("Defendants confuse aggregation of similar, discrete purported injuries—claims that many people were injured in similar ways by the same type of agency action—for a broad programmatic attack.").  Thus, it remains undisputed on summary judgment that Defendants did not inspect and refer class members as they arrived at POEs and instead

turned them away. The Court addresses below whether these turnbacks violated the statutes at issue. (*See infra* Section II.C.4.) But here, finding no dispute of fact regarding the aforementioned evidence, the Court finds a discrete agency action exists for purposes of Plaintiffs' § 706(1) claim.

**C. Mandatory and Ministerial Duties**

"An agency 'ministerial act' for purposes of mandamus relief has been defined as a clear, non-discretionary agency obligation to take a specific affirmative action, which obligation is positively commanded and so plainly prescribed as to be free from doubt." *Indep. Min. Co.*, 105 F.3d at 508 (quotations omitted). The issue on summary judgment is whether Defendants' duties to inspect and refer class members for asylum upon their arrival to a POE are mandatory and ministerial. Specifically, the Court must address to whom and when these duties attach.

1. Duties attach to class members arriving at POEs but outside the U.S.

Defendants reiterate their position that the relevant statutes do not apply to asylum seekers who are outside the United States. (Defs.' Mem. of P. & A. at 37–40.) In support, Defendants raise many of the same arguments in their MSJ that they made on dismissal regarding the scope of § 1158(a)(1) and the relevant subsections of § 1225 as applied to individuals not on U.S. soil. (*Id.* at 38.) As Plaintiffs note, the Court has already conducted an extensive analysis of the text of both § 1158(a)(1) and § 1225 to determine their scope as they apply to class members who were standing in Mexico, due to metering efforts, when they raised their asylum requests with CBP officers at POEs. *See Al Otro Lado*, 394 F. Supp. 3d at 1198–1205. The Court found that the plain language of both statutes applies to migrants who are "in the process of arriving," which includes "aliens who have not yet come into the United States, but who are 'attempting to' do so" and may still be physically outside the international boundary line at a POE. *Id.* at 1205 (quoting 8 C.F.R. § 1.2).[10]

[10] The Court also incorporated this conclusion in its preliminary injunction order regarding the Asylum Ban. *See Al Otro Lado, Inc. v. McAleenan*, 423 F. Supp. 3d 848, 859 (S.D. Cal. 2019). In denying a motion to stay the injunction, the Ninth Circuit noted that the Court's statutory analysis "has considerable force" and is "likely correct." *Al Otro Lado v. Wolf*, 952 F.3d 999, 1011–13 (9th Cir. 2020).

This analysis expressly rejected Defendants' arguments concerning plain meaning and the presumption against extraterritoriality. *Id.* at 1199–1202.

Defendants do not cite to a different factual basis or intervening legal developments to alter the Court's previous holding that both statutes mandate inspection and referral for asylum seekers not standing on U.S. soil at the time they interacted with CBP officers who turned them back. Thus, the Court abides by its previous conclusion regarding the scope of the statutes in this case. *See Huynh v. Harasz*, No. 14-CV-02367-LHK, 2016 WL 2757219, at *21 (N.D. Cal. May 12, 2016) (applying the "law of the case" doctrine to preclude summary judgment on legal issues previously decided by a court on a motion to dismiss "[i]f no factual issues have changed between the initial decision and the instant [summary judgment] motion" (citing *Bollinger v. Oregon*, 172 F. App'x 770, 771 (9th Cir. 2006) (unpublished))).

2. Defendants' statutory scheme argument fails.

Defendants also rehash an argument regarding the statutory scheme. They argue that metering is a "reasonable exercise of CBP's 'broad discretion' to allocate its limited resources to accomplish it many statutory functions." (Defs.' Mem. of P. & A. at 43.) Defendants argue that metering helps DHS balance the allocation of its limited resources to its multiple congressionally mandated "mission sets"—including facilitating lawful trade and travel, carrying out immigration enforcement measures, and interdicting unlawful entrants and goods—of which processing asylum seekers is only a part. (Defs.' Mem. of P. & A. at 41–43 (citing 6 U.S.C. §§ 202, 211(c), 211(g)(3)).) Defendants also repeatedly state that in 2002, Congress "elevat[ed] . . . DHS's national-security function over all others" by making antiterrorism efforts the agency's "primary mission." (*Id.* (citing 6 U.S.C. § 111(b)(1)(A), (E).)

These statutes do not support Defendants' arguments. First, the Court again finds that Defendants' citations to broad delegations of statutory authority to the DHS Secretary, CBP Commissioner, and the OFO are insufficient, as a matter of law, to establish that their ability to meter asylum seekers is "committed to agency discretion by law." *See Al Otro*

*Lado*, 394 F. Supp. 3d at 1210 ("Sections 1158 and 1225 cannot be nullified by general statutory provisions regarding the Secretary's authority unless Congress clearly intended so."). Defendants' reliance on additional statutes in their summary judgment motion is similarly futile, as these provisions still do not provide a basis for agency discretion that supplants Defendants' duty to inspect and refer asylum seekers in § 1158(a)(1) and § 1225.

As this Court previously found, § 1225 codifies Congress's specific and detailed instructions regarding "how immigration officers are to 'manage the flow' of arriving aliens who express to an immigration officer an intention to apply for asylum or a fear of persecution." *Id.* at 1210; *see also P.J.E.S. by & through Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492, 542 (D.D.C. 2020) ("[T]he immigration laws cited are clearly part of a 'comprehensive scheme [that] has deliberately targeted specific problems with specific solutions.'" (quoting *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012))). None of the enumerated lists of various responsibilities and missions in 6 U.S.C. § 111, 211(c), 211(g)(3) include any indication that Congress intended to supersede the duties established by § 1225. *See BNSF Ry. Co. v. Cal. Dep't of Tax & Fee Admin.*, 904 F.3d 755, 766 (9th Cir. 2018) ("[W]here there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment." (quoting *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 445 (1987))). Section 211(c)(8)(A) states that the CBP Commissioner shall "enforce and administer all immigration laws" including "the inspection, processing, and admissions of persons who seek to enter or depart the United States." Similarly, § 211(g)(3)(B) indicates that OFO is responsible for "conduct[ing] inspections" at POEs to prevent illegal entry and "carry out other duties and power prescribed by the Commissioner." Nothing indicates that these lists are exhaustive or in order of priority such that one duty takes precedence over another, let alone that they preempt other specific statutory mandates.

Indeed, one of the cited provisions includes as a "primary mission" that DHS "ensure that the functions of the agencies and subdivisions within the Department that are not related directly to securing the homeland *are not diminished or neglected except by a*

*specific explicit Act of Congress*." 6 U.S.C. § 111(1)(b)(E) (emphasis added). This language belies Defendants' entire argument. Rather than signaling that general national security directives displace more specific processing obligations, § 111(1)(b)(E) preserves DHS's other responsibilities absent a specific act of Congress. Defendants cite to no such act.

3. Defendants' citations to case law are inapposite.

Defendants also cite to several cases to support their position that, as a matter of law, inspection and referral duties are not conferred on asylum seekers physically outside the United States. (Defs.' Reply at 9–11.) The Court addresses these cases below and finds they do not support Defendants' proposition that inspection and referral under § 1225 is a discretionary duty.

(a) *Sale v. Haitian Centers Council, Inc.*

First, Defendants cite to *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155 (1993), for the proposition that certain INA provisions, including § 1158, contemplate that immigration proceedings can only occur in the United States. In *Sale*, the Supreme Court addressed the lawfulness of the Coast Guard's interdiction of vessels on the high seas illegally transporting passengers from Haiti to the United States, after which the Coast Guard immediately repatriated passengers to Haiti. *Id.* at 159. Plaintiffs brought suit challenging the interdiction program as violating § 243(h)(1) of the INA. *Id.* at 166. This statute prohibited the deportation or return of "any alien . . . to a country if the Attorney General determines that such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion." *Id.* at 170. The Court concluded that the Coast Guard's actions did not violate this provision because the statute's protection did not extend outside the United States where deportation and exclusion hearings were not authorized. *Id.* at 177.

The Court finds *Sale* inapposite. First, § 243(h)(1) no longer exists. This provision was ultimately repealed by the Illegal Immigration Reform and Immigration Responsibility Act of 1996 ("IIRIRA" or "1996 amendments"), which also overhauled entirely the

deportation and exclusion systems that are referenced in *Sale*. *See* Omnibus Consolidated Appropriations Act of 1997, Pub. L. No. 104-208, §§ 307, 309, 110 Stat. 3009, 3009-612 to 3009-614 (1996) (revising § 243 to exclude subparagraph (h)). Thus, the statutory interpretation in *Sale* is not applicable here.

Second, Defendants cite to a footnote in *Sale* that uses § 1158 as an example of "other provisions of the INA" that "obviously contemplate that such proceedings would be held in the country[.]" 509 U.S. at 173 n.29. First, the Supreme Court's citation to § 1158(a) in *Sale* is purely dicta. The asylum statute serves as an example and is not the subject of the Court's holding. Second, the text of § 1158(a) referenced in *Sale* is significantly different than the current version. The Supreme Court quotes § 1158(a) as instructing the Attorney General to "establish a procedure for an alien *physically present in the United States or at a land border or port of entry*." *Id.* at 161 n.11. The present-day statute—which, again, is the subject of this Court's prior, extensive statutory interpretation—states that asylum is available to "any alien who is physically present in the United States *or who arrives in the United States* . . . ." 8 U.S.C. § 1158(a)(1) (2009) (emphasis added); *see* Pub. L. No. 104-208, 110 Stat. at 3009-690 (revising § 208 of the INA, codified as 8 U.S.C. § 1158). This is not a trivial distinction. The former requires physical presence in one of three places: (1) the United States; (2) a land border; or (3) a POE. The new statute requires either physical presence in the United States or arrival in the United States, which is not, as Defendants suggest, "just as or more territorially-focused" than the statute at issue in *Sale*. The Court has already found this language to cover class members in the process of arriving at a POE but physically outside the United States. *See Al Otro Lado*, 394 F. Supp. 3d at 1199.

Third, as to the presumption of extraterritoriality, *Sale* is distinguishable because, unlike here, the alleged unlawful conduct of U.S. government actors took place outside of the territorial United States. In this Court's previous extraterritoriality analysis, it found § 1158(a)(1) imposed inspection and referral duties on immigration officers via § 1225(b), and that the conduct relevant to § 1225(b)'s focus—"whether the Court looks

at the alleged Turnback Policy or the alleged acts of individual CBP officers standing on the U.S. side of the international bridge between Mexico and the United States"—occurs within the United States and therefore involves a permissible domestic application of the statute. *See id.* at 1202 (citing *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2101 (2016)).

The Court therefore finds *Sale* inapposite and rejects Defendants' arguments based on this case.

(b) *DHS v. Thuraissigiam*

The second case Defendants cite to support their position is *DHS v. Thuraissigiam*, __ U.S. __, 140 S. Ct. 1959 (2020), a recent Supreme Court decision that post-dates this Court's dismissal order. In *Thuraissigiam*, the respondent asylum seeker filed a habeas action to challenge his expedited removal order after he entered the United States without inspection or entry documents. *Id.* at 1967. In relevant part, the respondent asserted that his due process rights were violated by a jurisdiction-stripping provision of the INA that precluded judicial review of his allegedly deficient credible fear proceeding. *Id.* at 1981. In rejecting his claim, the Supreme Court held that because respondent had not "effected an entry" when he illegally crossed into the United States, he "ha[d] only those rights regarding admission that Congress has provided by statute." *Id.* at 1983. In so finding, the Court cited, as an equivalent example, noncitizens who seek admission at a POE, stating that "[w]hen an alien arrives at a port of entry . . . the alien is on U. S. soil" but still not considered to have entered the country. *Id.* at 1982 (quoting *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212, 215 (1953)) (other quotations and citations omitted).

Defendants argue that this language subverts the Court's determination that the scope of "arriving in the United States" at a POE includes those not on U.S. soil. The Court disagrees. First, as with *Sale*, the language in *Thuraissigiam* is mere dicta. The respondent in the case was not, in fact, arriving at a POE. This cursory example assumes a usual state of affairs—which, notably, would have been true for some class members had metering not been in effect—and does not involve any close readings of the relevant statutes or their

applicability under the factual circumstances present here. Second, shortly after making this statement, the Supreme Court uses more expansive language when referring to the respondent by stating that "an alien who *tries to enter the country illegally* is treated as an 'applicant for admission'" who has also not "effected an entry." *Id.* at 1983 (citing § 1225(a)(1)) (emphasis added). The Court could have, but did not, state that the noncitizen who "enters the country illegally" and is therefore on U.S. soil is an applicant for admission, but instead extends it to those who "try to enter." This is incongruent with the notion that the Court's earlier language limited "arrival" at a POE to include only those on U.S. soil and would therefore exclude those "trying to enter" a POE but being obstructed by U.S. officials at the international boundary line. It makes little sense to use more expansive language to encompass those seeking to enter unlawfully and not those attempting to enter lawfully. This would be contrary to DHS implementing regulations, which the Court previously noted define "arriving aliens" as those "attempting to come into the United States at a port-of-entry." 8. C.F.R. § 1.2. It would also defeat the purpose of the 1996 amendments to the INA. *See Torres v. Barr*, 976 F.3d 918, 928 (9th Cir. 2020) (explaining that § 1225(a)(1) "ensures that all immigrants who have not been lawfully admitted, *regardless of their physical presence in the country*, are placed on equal footing in removal proceedings under the INA—in the position of an 'applicant for admission'" (emphasis added)).[11] Thus, the Court does not read the language used by the Supreme Court in *Thuraissigiam* as a definitive statement about the specific territorial scope of § 1158.

Once again, the Court abides by its prior finding that the statutes at issue apply to those who may be physically outside the United States but who are in the process of arriving at a POE. Thus, the Court finds that the duties to inspect and refer contained in § 1158(a)(1) and § 1225 are mandatory ministerial duties under § 706(1).

[11] The Court discusses this in more depth below. (*See infra* Section II.C.4(b)).

4. Turnbacks unlawfully withhold inspection and referral duties.

Plaintiffs' position is that, as a matter of law, Defendants' undisputed act of turning asylum seekers arriving at POEs back to Mexico unlawfully withholds their statutorily mandatory duties to inspect and refer asylum seekers. Defendants argue that they did not, in fact, withhold statutorily mandated duties under § 1158(a)(1) and § 1225 because class members were instructed to return to POEs and later inspected and referred, as reflected in Defendants' continued processing of asylum seekers throughout the relevant period. (Defs.' Mem. of P. & A. at 39.) Plaintiffs contend that this still constitutes an unlawful withholding of inspection of referral because "[g]iven the risks of living in Mexican border towns . . . and the extraordinary delays," turning back asylum seekers deprives them of a guaranteed opportunity to access the asylum process.[12] (Pls.' Opp'n at 7–8.)

The Ninth Circuit has said that judicial authority to "compel agency action" pursuant to § 706(1) "is carefully circumscribed to situations where an agency has ignored a specific legislative command." *Hells Canyon Pres. Council*, 593 F.3d at 932; *see also Vietnam Veterans of Am. v. Central Intelligence Agency*, 811 F.3d 1068, 1075–76 (9th Cir. 2016) ("[S]ection 706(1) applies to the situation where a federal agency refuses to act in disregard of its legal duty to act."). In a § 706(1) context, the Court must apply the two-step analysis in *Chevron v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), to determine the meaning of the statutory language and whether it establishes whether Defendants can

[12] The parties also appear to dispute whether Plaintiffs raise that immediate inspection and referral of asylum seekers on their first arrival to the port should be compelled as an agency action "unreasonably delayed." *See In re Ctr. for Auto Safety*, 793 F.2d 1346, 1353 (D.C. Cir. 1986) (noting that a party can also obtain judicial review "of a prolonged agency inaction" under § 706(1)'s "unreasonable delay" prong (quoting *Costle v. Pacific Legal Found.*, 445 U.S. 198, 220 n.14 (1980))). Defendants argue that Plaintiffs have not properly raised the issue in their opening brief; however, Defendants do not move for summary judgment on this claim themselves. (*See* Defs.' Mem. of P. & A. at 40; Defs.' Reply in supp. of MSJ at 12, ECF No. 611.) Plaintiffs do not expressly raise this argument but address this issue for the first time in reply to Defendants' characterization of metering as a delayed agency action. (Pls.' Reply in supp. of MSJ at 11, ECF No. 610.) For these reasons, the Court does not understand either party to move for summary judgment on this claim and does not address it in this Order. *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief.").

defer processing asylum seekers after they have arrived at a POE.  *See San Francisco Baykeeper*, 297 F.3d at 885–86 (following *Chevron* framework when considering the EPA's interpretation of the law it was charged with administering); *see also O.A. v. Trump*, 404 F. Supp. 3d 109, 147 (D.D.C. 2019) (applying *Chevron* even where not explicitly invoked by the parties because "[t]he judiciary is the final authority on issues of statutory construction and must reject administrative constructions . . . which are contrary to clear congressional intent" (quotations omitted)).

The *Chevron* analysis "mandates that absent a clear expression of congressional intent to the contrary, courts should defer to reasonable agency interpretations of ambiguous statutory language."  *Friends of Cowlitz v. FERC*, 253 F.3d 1161 (9th Cir. 2001); *T. Vanderbilt Co. v. Babbitt*, 113 F.3d 1061, 1065–67 (9th Cir. 1997) ("A court should accept the 'reasonable' interpretation of a statute chosen by an administrative agency except when it is clearly contrary to the intent of Congress.").  This requires courts to first consider "whether Congress has directly spoken to the precise question at issue.  If the intent of Congress is clear, that is the end of the matter."  *Campos-Hernandez v. Sessions*, 889 F.3d 564, 568 (9th Cir. 2018) (quoting *Chevron*, 467 U.S. at 842).  However, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."  *Chevron*, 467 U.S. at 843.  The Court understands the specific legal question here to be whether § 1158(a)(1) and § 1225 permit metering where asylum seekers who were turned back were ultimately processed for asylum.

(a)     *Chevron* Step One

"To determine whether the statute unambiguously bars an agency interpretation we apply the normal tools of statutory construction."  *Valenzuela Gallardo v. Lynch*, 818 F.3d 808, 815 (9th Cir. 2016) (quotations omitted).  This includes "ask[ing] whether Congress intended to permit the agency interpretation."  *Id.* at 815–16.  If a court "ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect."  *Chevron*, 467 U.S. at 843 n.9.

"To implement its immigration policy, the Government must be able to decide (1) who may enter the country and (2) who may stay here after entering." *Jennings v. Rodriguez*, 138 S. Ct. 830, 836 (2018). "That process of decision," captured in part by 8 U.S.C. § 1225, "generally begins at the Nation's borders and ports of entry, where the Government must determine whether an alien seeking to enter the country is admissible." *Id.* As the Court previously summarized, § 1225(a) establishes a general inspection duty and § 1225(b)(1) sets forth additional specific duties that arise for aliens arriving in the United States.

With regard to the inspection duty, the statute states that "[a]n alien present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival . . . ) shall be deemed for purposes of this chapter an applicant for admission." *Id.* § 1225(a)(1); *see also* 8 C.F.R. § 1001.1(q) ("The term arriving alien means an applicant for admission coming or attempting to come into the United States at a port-of-entry."). All applicants for admission, moreover, "shall be inspected by immigration officers." 8 U.S.C. § 1225(a)(3). With regard to referral, the statute requires the following:

> [i]f an immigration officer determines that an alien . . . who is arriving in the United States . . . is inadmissible . . . and the alien indicates either an intention to apply for asylum under section 1158 of this title or a fear of persecution, the officer shall refer the alien for an interview by an asylum officer under subparagraph (B).

*Id.* § 1225(b)(1)(A)(ii). Under a straightforward reading of the statutes, a noncitizen must do two things for inspection and referral to be triggered: first, arrive at a POE, which prompts inspection (§ 1225(a)(1), (3)) and second, indicate an intention to apply for asylum, which prompts referral (§ 1225(b)(1)(A)(ii)). At each stage, once arriving asylum seekers satisfy their end of the bargain, immigration officers must satisfy theirs.[13]

---

[13] There is no temporal element to this statute, i.e., how much time can elapse between arrival and inspection or inspection and referral. However, because the Court is addressing only unlawful

The plain text requires that an asylum seeker "arrives" or "is arriving" in the United States to prompt inspection, the first step in this process of decision. "Arrive" is not modified or conditioned to contemplate, let alone require, more than one arrival at a POE before Defendants' duties attach. *See, e.g.*, *Matter of F-P-R*, 24 I & N Dec. 681, 683, Int. Dec. 3630, 2008 WL 4817462 (BIA 2008) (distinguishing, for purposes of one-year asylum application deadline, between "arrival"—"to come to a certain point in the course of travel; reach one's destination" and "to come to a place after traveling,"—and "last arrival" which "refer[s] to an alien's most recent coming or crossing into the United States after having traveled from somewhere outside the country"). But the Court acknowledges, as it has previously, Congress's instruction that "[i]n determining the meaning of any Act of Congress, unless the context indicates otherwise—words used in the present tense include the future as well as the present." 1 U.S.C. § 1; *see Al Otro Lado*, 394 F. Supp. at 1200 (noting that this provision of the Dictionary Act has been applied to the INA). The present and present progressive use of "arrive," then, can be understood to encompass both the asylum seekers' present arrival at a POE and any future arrival at a POE.

However, construing "arrives" or "is arriving" in this way deprives the word of any real meaning. *See Chowdhury v. I.N.S.*, 249 F.3d 970, 973 (9th Cir. 2001) (stating that courts must interpret a statute in a way that "giv[es] effect to each word"). If immigration officers can forgo inspection upon an asylum seeker's first arrival and defer this duty to some unspecified future arrival without flouting the statute, the first arrival loses legal significance. *See Al Otro Lado v. Wolf*, 952 F.3d 999, 1013–14 (9th Cir. 2020) ("It is the INA . . . that makes an alien's first arrival legally significant.").[14] Moreover, if the statute

withholding and not unreasonable delay (*see supra* note 12), the Court does not find this omission relevant to its analysis.

[14] As such, regulations promulgated after class members were turned back have not applied to them because their "first arrival triggered a statutory right to apply for asylum and have that application considered" and thus the regulations in question, which were "not in place at the time each class member's right to apply for asylum attached," could not apply. *See id.* (regarding "Asylum Eligibility and Procedural Modifications," 84 Fed. Reg. 33,829 (July 16, 2019)); *see also Al Otro Lado v. Gaynor*, 513 F. Supp. 3d 1253, 1260 (S.D. Cal. 2021) (regarding "Asylum Eligibility and Procedural Modification," 85 Fed. Reg. 82,260 (Dec. 17, 2020)).

is construed in this way, this would permit Defendants to turn back asylum seekers any number of times—perhaps indefinitely—without running afoul of their statutory obligations.

The Court finds the plain meaning of the statutory text cuts in favor of a finding that inspection and referral attach when asylum seekers arrive at a POE the first time. Nonetheless, out of an abundance of caution, the Court proceeds to the second *Chevron* step.

(b) *Chevron* Step Two

Where statutes are silent or ambiguous, the Court "must give effect to an agency's reasonable interpretation of a statute, unless the interpretation is inconsistent with clearly expressed congressional intent." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 671 (9th Cir. 2021). "[D]eference is not owed to an agency decision if it construes a statute in a way that is contrary to congressional intent or frustrates congressional policy." *CHW W. Bay v. Thompson*, 246 F.3d 1218, 1223 (9th Cir. 2001). Accordingly, the Court next turns to Congress's intent in establishing the inspection and referral procedures in § 1225 and whether metering is consistent with that intent.

The INA's inspection and referral duties were enacted as part of the larger expedited removal process. *See United States v. Barajas-Alvarado*, 655 F.3d 1077, 1080 n.2 (9th Cir. 2011) ("Expedited removal proceedings provide a streamlined process by which U.S. officers can remove aliens who attempt to gain entry to the United States but are not admissible." (citing 8 U.S.C. § 1225(b))). This process accelerates secondary inspection by authorizing immigration officers who find a noncitizen inadmissible after inspection to order the noncitizen removed "without further hearing or review." *See Am. Immigr. Laws. Ass'n v. Reno*, 199 F.3d 1352, 1354–55 (D.C. Cir. 2000) (citing 8 U.S.C. § 1225(b)(1)(A)(i)); *see also* H.R. Conf. Rep. No. 104–828, at 209 (1996) (stating that reforms to secondary inspection were intended to "expedite the removal from the United States of aliens who indisputably have no authorization to be admitted . . . ."). In this way, IIRIRA sought to deter illegal immigration by "simplify[ing] removal proceedings *while*

*protecting credible asylum applicants*." *Arcinega-Contreras v. Gonzales*, 138 F. App'x 961, 963 (9th Cir. 2005) (citing H.R. Rep. No. 104–469, pt. 1, at 1 (1996)) (emphasis added); *see also* H.R. Rep. No. 104–469(I), at 111 (1996) (stating that the purpose behind IIRIRA was to "*enable the prompt admission of those who are entitled to be admitted*, the prompt exclusion or removal of those who are not so entitled, and *the clear distinction between these categories*" (emphasis added)). Specifically, the amendments were intended to eliminate the "anomaly" in which noncitizens who were unlawfully present in the country were subject to "deportation proceedings," which afforded them greater procedural and substantive rights, "while non-citizens who presented themselves at a port of entry for inspection were subjected to more summary exclusion proceedings" and were therefore "in a worse position than persons who had crossed the border unlawfully." *Torres*, 976 F.3d at 927–28; H.R. Rep. No. 104-469, pt. 1, at 225–29.

Under the current metering framework, the right to an asylum determination is more onerous to an inadmissible individual who seeks to lawfully make a claim at a POE than to an inadmissible individual who illegally enters the country. A migrant who is apprehended after unlawfully crossing the border is afforded "the right to a determination whether he had a significant possibility of establish[ing] eligibility for asylum . . . ." *Thuraissigiam*, 140 S. Ct. at 1982. Because of metering, migrants who approach POEs to lawfully request asylum face a far more complicated process. Defendants, by turning away immigrants at POEs who are lawfully seeking admission into the United States, sending them to shelters in Mexico, and requiring them to make their way back to the POE at least a second time to access asylum, create additional, logistical barriers to entry that contravene the attempt of IIRIRA to put all those not lawfully admitted "on equal footing." *Id.* (*See* OIG Report at 7, 14 (noting that implementation of queue management in 2018 and creation of other "barriers to ports of entry" created incentive to cross illegally)

This reality is undisputed. In fact, the record is replete with uncontroverted evidence that Defendants' interpretation of their inspection and referral duties under the statute creates multiple logistical hurdles for migrants seeking asylum who have otherwise

complied with the statute by "arriving" at a POE and stating that they seek asylum. For example, the evidence in this case shows that class members, at the instruction of CBP officers, are required to leave the ports, coordinate with Mexican immigration officials to put their name on a list (which, evidence shows, itself sometimes required a wait), and spend additional time in Mexico waiting for their "appointments." (*See* JSUF ¶¶ 81, 157–58, 161, 163, 164, 260; Decl. of Stephanie Leutert ("Leutert Decl.") ¶¶ 51–52, Ex. 20 to Medlock Decl., ECF No. 535-22.)[15] The evidence shows that Defendants did not monitor the list and were not aware how Mexican officials determined who came over from the list. (Leutert Decl. ¶¶ 52–53; OIG Report at 9 n.22; Dep. of Samuel Cleaves 216:12–217:10; 221:8–10, Ex. 102 to Medlock Decl., ECF No. 535-102.) There is also evidence that the lists themselves have been subject to fraud and corruption. (Leutert Decl. ¶¶ 53–54.)

The failure to inspect and refer as asylum seekers first arrived also creates additional burdens by requiring that asylum seekers stay in Mexico and make return trips to POEs to access the process. The risks of waiting in Mexico, often for an extended period of time, are high. The evidence submitted shows that turnbacks resulted in asylum seekers' deaths, assaults, and disappearances after they were returned to Mexico. (Dep. of Erika DaCruz Pinheiro 161:25–162:9, Ex. 113 to Medlock Decl., ECF No. 535-115; *see also* Dep. of Frank Longoria 202:24–203:5 (migrants waiting in Mexico for more than a day waiting to be processed at the Hidalgo POE would be in danger), Ex. 100 to Medlock Decl., ECF No. 535-102).) This is further supported by evidence that turnbacks created humanitarian issues in border communities and local pressure to remove them. (*See* May 24, 2018 "RE: Today's Meeting – A few items" email (noting that queue management would increase the number of people waiting in Mexico "and begin to strain local [Mexican] border communities" as seen with Haitians in Tijuana in 2016), Ex. 96 to Medlock Decl., ECF

[15] The Court grants Defendants' Motion to Exclude Stephanie Leutert's Expert Testimony only as it pertained to port operations or capacities. Ms. Leutert has directly observed turnbacks at POEs and personally conducted fieldwork in Mexican border cities with asylum seekers, shelter staff, civil society organizations, and Mexican government officials as part of her work. (Leutert Decl. ¶ 6.) She therefore has personal knowledge of the steps imposed by metering on asylum seekers.

No. 535-98); Sept. 13, 2016 "RE: Haitians arriving in Tijuana" email (Haitian migrants waiting in Tijuana for appointments were causing a local humanitarian crisis and political pressure was mounting in Mexico to manage the situation), Ex. 50 to Medlock Decl., ECF No. 535-52.)

As the Court has stated before, "it is entirely possible that there may exist potentially legitimate factors that prevent CBP officers from immediately discharging the mandatory duties set forth in 8 U.S.C. § 1158(a)(1) and 8 U.S.C. § 1225." *Al Otro Lado*, 394 F. Supp. 3d at 1212. There may in fact be times when capacity or resource constraints prevent Defendants from processing asylum seekers expeditiously. However, it is also true that because courts "are not at liberty to rewrite the words chosen by Congress," *United States v. Vargas-Amaya*, 389 F.3d 901, 906 (9th Cir. 2004), the Court cannot find that these statutory duties are subject to modification or displacement based on Defendants' assessments. *See O.A.*, 404 F. Supp. 3d at 151 (holding that an executive assessment of a large-scale arrival of unlawful entrants does not override a statutory mandate permitting all aliens present in the United States to apply for asylum). As stated by the Ninth Circuit, "[w]here Congress itself has significantly limited executive discretion by establishing a detailed scheme that the Executive must follow in [dealing with] aliens," the Executive cannot "abandon that scheme because [it] thinks it is not working well[.]" *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 774 (9th Cir. 2018).

As aforementioned, an asylum seeker must only arrive and indicate an intention to apply for asylum for inspection and referral to commence. Requiring asylum seekers to arrive again at POEs requires an additional step neither stated in nor contemplated by § 1225(b)(1)(A)(ii). Therefore, failing to inspect and refer class members upon arrival, and instead turning them back, conditions the ability to apply for asylum "on a migrant's manner of entry," and "flouts this court's and the BIA's discretionary, individualized treatment of refugees' methods of entry[.]" *E. Bay Sanctuary Covenant*, 993 F.3d at 675. Accordingly, the Court concludes that turning back asylum seekers at POEs without inspecting and referring them upon their arrival unlawfully withholds Defendants'

statutory duties under 8 U.S.C. § 1158(a)(1) and § 1225. Because the Court concludes that turnbacks are unlawful regardless of their purported justification, the Court finds it unnecessary to address the parties' arguments regarding the § 706(2) arbitrary and capricious claim based on pretext.[16]

## III.  Fifth Amendment

Plaintiffs' second claim alleges that Defendants' act of turning back asylum seekers from POEs violates the Fifth Amendment. The Fifth Amendment provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. "The touchstone of due process is protection of the individual against arbitrary action of government[.]" *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974).

Plaintiffs argue that Defendants' violation of the procedural protections embodied in the INA provisions alone prove a violation of due process. (Pls.' Mem. of P. & A. at 32.) Alternatively, they argue that weighing the individual interest in seeking asylum outweighs any governmental interest or burden. (*Id.* at 31–32.) Defendants argue that summary judgment is appropriate on this issue because: (1) neither § 1225 nor due process protects foreign nationals outside U.S. territory; and (2) "class members cannot obtain more than what the statute already provides: to be inspected and processed for admission." (Defs.' Mem. of P. & A. at 54.) The Court addresses each argument below.

### A.    The Fifth Amendment Still Applies

Defendants first take issue with the Court's prior conclusion regarding the extraterritorial application of due process. The Court previously held that the extraterritorial application of constitutional rights under the Fifth Amendment was not

---

[16] Other courts have found significant overlap between § 706(1) and the contrary to law provisions in § 706(2). *See Ramirez*, 471 F. Supp. 3d at 191 (finding, after bench trial, that ICE's failure to follow procedures was "otherwise not in accordance with law" and an unlawful withholding or unreasonable delay of agency action); *N.A.A.C.P. v. Sec'y of Hous. & Urb. Dev.*, 817 F.2d 149, 160 (1st Cir. 1987) (finding no difference between a "failure to exercise" discretion and "abuse" of discretion as revealed by a pattern of activity); *Ligon Specialized Hauler, Inc. v. I. C. C.*, 587 F.2d 304, 315 (6th Cir. 1978) (noting that "unlawful" in § 706(1) includes but is not limited to the meaning given in § 706(2)(A) and (D)); *see also* Eric Biber, *Two Sides of the Same Coin: Judicial Review of Administrative Agency Action and Inaction*, 26 Va. Environmental L.J., 461–503 (2008).

Case: 22-55988, 11/20/2022, ID: 12615053, DktEntry: 13-2, Page 118 of 301

subject to a bright-line test but instead required that the court examine the "particular circumstances, the practical necessities, and the possible alternatives which Congress had before it and, in particular, whether judicial enforcement of the provision would be impracticable and anomalous." *Al Otro Lado, Inc.*, 394 F. Supp. 3d at 1218 (citing the "functional approach" in *Boumediene v. Bush*, 553 U.S. 723 (2008)). The Court specifically found that the "substantial connection" test articulated by the Supreme Court in *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990)—applied alongside *Boumediene*'s functional approach by the Ninth Circuit in *Ibrahim v. Department of Homeland Security*, 669 F.3d 983 (9th Cir. 2012)—"does not constitute a ceiling on the application of the Constitution to aliens." *Id.* Relying on *Rodriguez v. Swartz*, 899 F.3d 719 (9th Cir. 2018), this Court rejected Defendants' argument that class members outside the country were required to allege a "prior significant voluntary connection" with the United States to receive the protections of the Fifth Amendment, particularly where the defendant's conduct occurred on American soil. *Id.* at 1219–21.

Defendants argue that two intervening Supreme Court decisions invalidate these previous legal conclusions. First, the Supreme Court vacated the judgment in *Rodriguez* and remanded the decision to the Ninth Circuit "for further consideration in light of *Hernandez v. Mesa*, 589 U.S. __, 140 S. Ct. 735 (2020)." In *Hernandez*, the Court found it improper to extend *Bivens v. Six Unknown Agents*, 403 U.S. 388 (1971), to provide a damages remedy for a cross-border shooting in which a Border Patrol agent standing on American soil shot and killed a 15-year-old Mexican national standing on Mexican soil. The Court's analysis focused on the "special factors counseling hesitation" unique to the *Bivens* context, specifically the separation of powers and Congress's role in providing for a damages remedy. *Hernandez*, 140 S.Ct. at 749–50 ("[T]his case features multiple factors that counsel hesitation about extending *Bivens*, but they can all be condensed to one concern—respect for the separation of powers.").

Although *Rodriguez* was remanded in light of *Hernandez*, the Court does not understand *Hernandez* to invalidate the propositions in *Rodriguez* on which this Court

relied. While the Supreme Court in *Hernandez* found that the particular circumstances of that case implicated foreign policy and national security in a way that counseled against fashioning a *Bivens* remedy "for injuries incurred on foreign soil," it did not hold that due process itself cannot extend extraterritorially in any circumstance or that exterritorial application would require a "previous voluntary significant connection." Indeed, the Fifth Circuit's earlier decision found Hernandez was not entitled to protection under the Fourth Amendment because of his lack of "significant voluntary connection." *Hernandez v. United States*, 785 F.3d 117, 120 (5th Cir. 2015). The Supreme Court ultimately vacated this decision and remanded to the Fifth Circuit for consideration of a completely different question: whether Hernandez had a cause of action under *Bivens* to bring a due process claim in the first place. *Hernandez v. Mesa*, 137 S. Ct. 2003 (2017). Thus, this particular holding in *Rodriguez* that a substantial connection is not necessary for extraterritorial application was never addressed by the Supreme Court in its *Hernandez* decision.

Second, Defendants argue that *Thuraissigiam* contravenes the Court's reliance on *Boumediene*'s functional test for due process. As aforementioned, the Court in *Thuraissigiam* addressed a constitutional challenge to 8 U.S.C. § 1252(e)(2), which limits habeas review of expedited removal orders. The Court indeed distinguished *Boumediene* because it "is not about immigration at all." *Id.* at 1981. The decision, however, makes this distinction in the context of habeas relief, noting that the challengers in *Boumediene* "were apprehended on the battlefield in Afghanistan and elsewhere, not while crossing the border," and "sought only to be released from Guantanamo, not to enter this country." *Id.* (quotations omitted). However, this Court did not cite to *Boumediene* for its conclusions regarding the propriety of habeas relief; rather, the Court relied on its instruction to conduct fact-specific extraterritoriality analyses and not rely on formalism. *See Al Otro Lado*, 394 F. Supp. 3d at 1218. Nothing in *Thuraissigiam* has any bearing on this principle.[17]

[17] While *Thuraissigiam* primarily concerned whether the statute violated the Suspension Clause, the respondent also raised a due process claim related to his "allegedly flawed credible-fear proceeding." *Id.* at 1982. The Court addresses the Supreme Court's holding into its analysis below.

While future case law could alter this holding, the cases cited by Defendants do not, at this juncture, displace the Court's adoption of the extraterritorial application of the Fifth Amendment. Thus, the Court finds no basis in the case law cited by Defendants to depart from its original conclusion that, under the functional approach in *Boumediene*, the Fifth Amendment applies to conduct that occurs on American soil and therefore applies here, where CBP failed to inspect and refer class members for asylum under statute. *See id.* at 1218–21.

**B. Denial of Due Process**

The Supreme Court recently emphasized that "the only procedural rights of an alien seeking to enter the country are those conferred by statute," and as such "'the decisions of executive or administrative officers, *acting within powers expressly conferred by congress*, are due process of law.'" *Thuraissigiam*, 140 S. Ct. at 1977 (emphasis added) (quoting *Nishimura Ekiu v. United States*, 142 U.S. 651, 660 (1892)); *see also Wolff*, 418 U.S. at 557 ("A liberty interest created by statute is protected by due process."); *Meachum v. Fano*, 427 U.S. 215, 226 (1976) ("[A] person's liberty is equally protected, even when the liberty itself is a statutory creation of the State." (quotation omitted) (quoting *Wolff*, 418 U.S. at 557)). As Plaintiffs point out, Defendants have conceded this point. *See Al Otro Lado*, 394 F. Supp. 3d at 1221 (quoting Defendants' argument that "[w]here plaintiffs premise their procedural due process challenge on having a protected interest in a statutory entitlement, the protections of the Due Process Clause . . . extend only as far as the plaintiffs' statutory rights").

Plaintiffs allege that their due process rights derive from a congressionally enacted statute; namely, the process of inspection and referral afforded in § 1225 by way of § 1158(a)(1). Plaintiffs' due process rights therefore extend as far as their rights under these provisions. *Thuraissigiam*, 140 S. Ct. at 1977. The Court determined above that turning asylum seekers away from POEs constitutes an unlawful exercise of Defendants' authority under the INA to inspect and refer asylum seekers both on U.S. soil and outside the international boundary line who are arriving at POEs. (*See supra* Section II.C.4.) *Al*

*Otro Lado*, 394 F. Supp. 3d 1168, 1198–1205. Because Defendants' turning back of asylum seekers unlawfully withholds their duties under statute, it violates the process due to class members.[18] Thus, the Court finds summary judgment appropriate in Plaintiffs' favor on their due process claim.

## IV. Alien Tort Statute

The ATS confers on district courts "original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. "The ATS 'is a jurisdictional statute creating no new causes of action,' although the First Congress adopted it on the assumption that 'district courts would recognize private causes of action for certain torts in violation of the law of nations . . . .'" *Mujica v. AirScan Inc.*, 771 F.3d 580, 591 (9th Cir. 2014) (quoting *Sosa v. Alvarez–Machain*, 542 U.S. 692, 724 (2004)). When a plaintiff seeks to plead an ATS claim based on an alleged violation of the law of nations, the plaintiff must identify an international norm that is specific, universal, and obligatory. *Sosa*, 542 U.S. at 732. Courts must "determine whether a norm of customary international law has attained the status of jus cogens" by consulting scholarship, judicial decisions, and "the general usage and practice of nations" but "must also determine whether the international community recognizes the norm as one from which no derogation is permitted." *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 715 (9th Cir. 1992) (quotations omitted).

Even where a jus cogens norm exists, the Supreme Court has advised courts to exercise "a restrained conception of the discretion [it] should exercise in considering a new cause of action" under the ATS. *Id.* at 724–25. Specifically, the Court cited to the following five reasons:

---

[18] During oral argument, Defendants argued that Plaintiffs' due process argument fails because they cannot show a deprivation on a class-wide basis. However, the Court found above that Defendants unlawfully withhold the duties of inspection and referral for all asylum seekers by turning them back upon their arrival at a POE. Thus, the class was uniformly subject to the same deprivation of process. (*See supra* note 2.) Defendants' argument regarding this issue therefore fails.

> First, . . . the [modern] understanding that the law is not so much found or discovered as it is either made or created[;] . . . [s]econd, . . . an equally significant rethinking of the role of the federal courts in making it [;] . . . [t]hird, [the modern view that] a decision to create a private right of action is one better left to legislative judgment in the great majority of cases[;] . . . [f]ourth, . . . risks of adverse foreign policy consequences [; and] . . . fifth[,] . . . [the lack of a] congressional mandate to seek out and define new and debatable violations of the law of nations.

*Presbyterian Church Of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 255 (2d Cir. 2009) (quoting *Sosa*, 542 U.S. at 725–28).

The norm at issue in this case is the duty of non-refoulement.  The principle is defined in Article 33 of the United Nations Convention Relating to the Status of Refugees ("Refugee Convention") as follows:

> No Contracting State shall expel or return ("refouler") a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion.

Jan. 31, 1967, 19 U.S.T. 6223, 6276 ("Article 33").  Plaintiffs have previously provided extensive citation to sources—including findings and conclusions from the Executive Committee of the United Nations High Commissioner for Refugees ("UNHCR"), the Oxford Encyclopedia of Human Rights, and academic journals and other scholarship—to establish that non-refoulement is a jus cogens norm. (*See* Pls.' Opp'n to Defs.' Mot. to Dismiss the SAC at 28–29, ECF No. 210 (citing to sources).)  The UNHCR, in particular, has expressly concluded that non-refoulement had achieved the status of a jus cogens norm "not subject to derogation."  UNHCR Executive Cmty. Conclusion No. 79 (XLVII), General Conclusion on Int'l Protection (1996).

The more nuanced question in this case is whether the duty of non-refoulement is universally understood to provide protection to those who present themselves at a country's borders but are not within a country's territorial jurisdiction.  This is analogous to the earlier question addressed by the Court regarding the scope of the INA provisions governing

inspection and referral. (*See supra* Section II.C.1.) Concerning the ATS, however, the Court cannot rely on its previous interpretation of the relevant domestic statutes but must instead determine here, with reference to scholarship, judicial decisions, and "the general usage and practice of nations," whether this understanding of the duty of non-refoulement is specific, universal, and obligatory from which no derogation is permitted.

"Turnbacks" or "pushbacks" have been acknowledged in international legal literature as a "direct arrival prevention measure" that, on land, usually involve some tactics or measures "to prevent migrants from approaching or crossing the border" such that "screening for protection needs will be summary or non-existent." Rep. of the Special Rapporteur on Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, U.N. Human Rights Council, at ¶ 51, U.N. Doc. A/HRC/37/50 (Nov. 23, 2018). Several international legal authorities have expressed that pushbacks are incompatible with the duty of non-refoulement because they deprive migrants of their right to seek international protection on an individualized basis. *Id.* ¶ 52; *see also* Advisory Op. on the Extraterritorial Application of Non-Refoulement Obligations under the 1951 Convention relating to the Status of Refugees and its 1967 Protocol ("Advisory Op."), U.N. High Comm'r for Refugees (UNHCR), ¶ 43 (Jan. 26, 2007). This is premised on the legal principle that the source of this duty, Article 33, applies extraterritorially to asylum seekers approaching land borders from contiguous countries. *See* UNHCR Advisory Op. ¶ 7 ("The prohibition of refoulement to a danger of persecution under international refugee law is applicable to any form of forcible removal, including . . . non-admission at the border . . . ."); UNHCR Executive Cmty. Conclusion No. 22 (XXXII), Protection of Asylum-Seekers in Situations of Large-Scale Influx (1981) ("In all cases the fundamental principle of non-refoulement—including non-rejection at the frontier—must be scrupulously observed."); *see also* Mark Gibney, Refugees, 4 Encyclopedia of Human Rights 315, 318 (Oxford University Press, 2009) ("In practice, [the duty of non-refoulement] means that a . . . state must either admit

the person to its territory and process her claim for protection or send the person to a safe third state.").[19]

However, acceptance of this specific extraterritorial application of non-refoulement is not universal. Several countries have adopted pushback or "offshoring" policies that seek to "offload" the obligations of non-refoulement on other countries and "seal" borders from asylum seekers.[20]  *See* Azadeh Erfani and Maria Garcia, "Pushing Back Protection: How Offshoring and Externalization Imperil the Right to Asylum," at 7, Nat'l Immigrant Justice Center and FWD.us (Aug. 3, 2021).  This practices, in some form or another, has been implemented in some European Union members states and Australia.  *See generally*, *id.*; *see also* Marianna Karakoulaki, et al., *Critical Perspectives on Migration in the Twenty-First Century*, at 144, (E-International Relations Publishing, July 30, 2018) (noting "states are able to significantly limit the activation of their Convention obligations through the implementation of 'non-arrival regimes' that aim to directly impede access to asylum").  This stems from significant disagreement over the scope and extent of countries' jurisdictions, within which they are obligated not to refoul asylum seekers.  *See* Cathryn Costello and Itamar Mann, "Border Justice: Migration and Accountability for Human Rights Violations," 21 German L.J. 311, 313–14 & n.19 (Cambridge Univ. Press, March 3, 2020) (describing the definition of "jurisdiction" in human rights treaties as "constantly contested").

---

[19] These resources do not expressly address whether the duty of non-refoulement is breached where a country turns back asylum seekers temporarily and processes them at a later date.  However, many seem to embrace a broad view of this obligation as prohibiting any country from subjecting or exposing asylum seekers, for any amount of time, to foreseeable risks of violence (including not only persecution on a protected ground, but also ill-treatment, abuse, and other forms of bodily harm).  Because the Court's conclusion here is that the extraterritorial application of the duty has not been established as a jus cogens norm, the Court need not determine whether the duty of non-refoulement extends to these other circumstances.

[20] Evidence in this case demonstrates that some of these "offshoring" techniques are used by CBP in coordination with the Government of Mexico to interdict migrants en route to United States POEs.  The Court does not address the lawfulness of any measures taken by CBP, beyond metering, regarding asylum seekers in contiguous countries.

This rift has manifested itself in judicial and tribunal determinations as well. Some courts have adopted an expansive understanding of jurisdiction and even applied it to find an extraterritorial duty regarding non-refoulement obligations.[21] The United States Supreme Court, however, has not. In *Sale v. Haitian Centers Council, Inc.*, the Court held that "the text of Article 33 cannot reasonably be read to say anything at all about a nation's actions toward aliens outside its own territory[.]" 509 U.S. at 183 (1993). The Court in *Sale* relied heavily on statutory interpretation of the text of Article 33 and the "negotiating history" of this provision to conclude that it was not intended to apply outside the territorial seas of the United States. *See id.* at 179–87. The Court acknowledges that this precedent is almost three decades old, and its conclusion is dependent on an interpretation of Article 33 that has since been explicitly disagreed with by the UNHCR itself. UNHCR Advisory Op. ¶¶ 24 n.54, 28–29, 31; *see also The Haitian Centre for Human Rights et al. v. United States*, Inter-American Comm. on Human Rights, Case 10.675 (1997). Nonetheless, its interpretation of Article 33 remains binding precedent on this Court. *See Hart v. Massanari*, 266 F.3d 1155, 1170 (9th Cir. 2001) ("Binding authority within this regime cannot be considered and cast aside; it is not merely evidence of what the law is. Rather,

---

[21] *See Hirsijamaa and Others v. Italy*, Application No. 27765/09, European Court of Human Rights ("ECHR") (2012) ("[T]he Italian border control operation of 'push-back' on the high seas, coupled with the absence of an individual, fair and effective procedure to screen asylum seekers, constitutes a serious breach of the prohibition of collective expulsion of aliens and consequently of the principle of non-refoulement."); *Bankovic et al. v. Belgium and 16 other contracting States (Admissibility)*, Application No. 52207/99, ECHR (Dec. 12, 2001) (recognizing exercise of extraterritorial jurisdiction when a "State, through the effective control of the relevant territory and its inhabitants abroad as a consequence of military occupation or through the consent, invitation or acquiescence of the Government of that territory, exercises all or some of the public powers normally to be exercised by that Government"); *see also*, *Coard et al. v. United States*, Report No. 109/99, Case No. 10.951, Inter-American Comm. on Human Rights ("IACHR") (Sept. 29, 1999) (noting that extraterritorial application may be "required by the norms which pertain" and as such, the focus should not be "on the presumed victim's nationality or presence within a particular geographic area, but on whether, under the specific circumstances, the State observed the rights of a person subject to its authority and control"); *Loizidou v. Turkey (Preliminary Objections)*, Application No. 15318/89, ECHR (Feb. 23, 1995), Series A, No. 310, para. 62 (finding, in the context of the convention at issue, that "the concept of 'jurisdiction' under this provision is not restricted to the national territory of the High Contracting Parties" but also extends to "acts of their authorities, whether performed within or outside national boundaries, which produce effects outside their own territory").

caselaw on point is the law. If a court must decide an issue governed by a prior opinion that constitutes binding authority, the later court is bound to reach the same result, even if it considers the rule unwise or incorrect. Binding authority must be followed unless and until overruled by a body competent to do so."); *cf. Guaylupo-Moya v. Gonzales*, 423 F.3d 121, 136 (2d Cir. 2005) ("[C]lear congressional action trumps customary international law and previously enacted treaties.").[22, 23]

Abiding by non-refoulement principles in the instant circumstances is an objective toward which all countries—including this one—should undoubtedly strive. However, given both controlling case law and the ongoing debate over the proper scope of countries' jurisdictions, the Court regrettably cannot find that this norm is universally applied beyond borders. As such, the Court finds that the duty of non-refoulement as it applies to migrants at the border but physically outside the territorial United States is not a norm from which no derogation is permitted. *See Sosa*, 542 U.S. at 725 (limiting the international norms actionable under the ATS to only those that "rest on a norm of international character accepted by the civilized world"). In the absence of jus cogens norm, the Court finds Plaintiffs' ATS claim is not actionable as a matter of law.

---

[22] The Department of Justice ("DOJ") also does not recognize the extraterritoriality of Article 33, even after the UNHCR stated that it applies extraterritorially. *See* Legal Obligations of the United States Under Article 33 of the Refugee Convention, Dep't of State Mem. Op. for the Legal Adviser (Dec. 12, 1991), accessed at https://www.justice.gov/file/23326/; U.S. observations on UNCHR Advisory Opinion on Extraterritorial Application of Non-Refoulement Obligations (Dec. 28, 2007), accessed at https://2001-2009.state.gov/s/l/2007/112631.htm.

[23] Although the law is not conclusive on customary international laws' relationship with domestic laws, lower courts have held that federal statutes have supremacy. *See, e.g.*, *Flores-Nova v. Att'y Gen. of U.S.*, 652 F.3d 488, 495 (3d Cir. 2011) (finding customary international law not binding on the court to the extent that it conflicted with a statute); *Payne–Barahona v. Gonzales*, 474 F.3d 1, 3–4 (1st Cir. 2007) (stating that where customary international law conflicts with a federal statute, "the clear intent of Congress would control"); *Guaylupo-Moya v. Gonzales*, 423 F.3d 121, 136 (2d Cir. 2005) (same); *Martinez–Lopez v. Gonzales*, 454 F.3d 500, 502–03 (5th Cir. 2006) (same). The Court finds no reason why this well-established rule establishing the supremacy of federal statutes over customary international law would not also apply to the decisions of the Supreme Court.

## V. Equitable Relief

Plaintiffs seek declaratory relief on the basis that Defendants violated the law by implementing turnbacks. (Pls.' Mem. of P. & A. at 38–39.) Further, Plaintiffs request a permanent injunction on the basis that the denial of access to the asylum process causes irreparable harm, no remedy at law will cure the violations, and access to the asylum process is both in the public interest and outweighs any burden to Defendants in complying with asylum procedure. (Pls.' Mem. of P. & A. at 36–38.) Defendants argue that equitable relief is unwarranted because Plaintiffs fail on the merits and raise several, specific objections to a permanent injunction, including based on 8 U.S.C. § 1252(f)(1) and an argument that vacatur, rather than an injunction, is the proper remedy here. (*See* Defs.' Mem. of P. & A. at 59 (citing *Cal. Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1095 (9th Cir. 2011)).

Although the parties raise several arguments regarding this limitation, both parties agree that additional briefing on the scope of the remedy is warranted due to the complexity of the issues. (Defs.' Mem. of P. & A. at 58; Pls.' Reply at 16 n.11.) Because the parties request an additional opportunity to fully explore the legal questions related to the requested remedy, the Court orders further briefing below.

## CONCLUSION

Accordingly, the Court orders as follows:

(1) As to Plaintiffs' first claim for ultra vires violations of the right to seek asylum under the INA, Plaintiffs' MSJ is **DENIED** and Defendants' MSJ is **GRANTED**;

(2) As to Plaintiffs' second claim for violations of APA § 706(1), Plaintiffs' MSJ is **GRANTED** and Defendants' MSJ is **DENIED**;

(3) As to Plaintiffs' second claim for violations of APA § 706(2), Plaintiffs' MSJ and Defendants' MSJ are **DENIED AS MOOT**;

(4) As to Plaintiffs' third claim for a violation of the Fifth Amendment's Due Process clause, Plaintiffs' MSJ is **GRANTED** and Defendants' MSJ is **DENIED**;

(5) As to Plaintiffs' fourth claim for a violation of the ATS, Plaintiffs' MSJ is **DENIED** and Defendants' MSJ is **GRANTED**;

(6) As to Plaintiffs' fifth claim for equitable relief, both parties are **DENIED WITHOUT PREJUDICE** pending further briefing on the following questions:

a. What remedy is appropriate in light of the Court's § 706(1) finding?

b. How does 42 U.S.C. § 265 ("Title 42") affect the implementation of a remedy in this case?

The parties shall submit their supplemental briefs regarding the appropriate remedy in this action, not to exceed 20 pages each, by **October 1, 2021**.

**IT IS SO ORDERED.**

**DATED: September 2, 2021**

Cynthia Bashant

**Hon. Cynthia Bashant**
**United States District Judge**

Case: 22-55988, 11/21/2022, ID: 12591503, DktEntry: 13-2, Page 129 of 301

**UNITED STATES DISTRICT COURT**

**FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

AL OTRO LADO, *et al.*,

Petitioners,

v.

PETER T. GAYNOR, Acting Secretary of Homeland Security, *et al.*,

Respondents.

Case No. 17-cv-02366-BAS-KSC

**TEMPORARY RESTRAINING ORDER**

Before the Court is Plaintiffs' Motion for a Temporary Restraining Order ("Motion") requesting that the Court prohibit Defendants from applying yet another regulation— titled Asylum Eligibility and Procedural Modification, 85 Fed. Reg. 82,260 (Dec. 17, 2020) ("Final Transit Rule")—to members of the provisional class previously certified by this Court. (ECF No. 658.) Defendants oppose the Motion and Plaintiffs reply. (ECF Nos. 667, 670.) For the reasons stated below, the Court **GRANTS** Plaintiffs' Motion and temporarily restrains Defendants from applying this regulation to provisional class members.

## I. BACKGROUND

Plaintiffs' underlying claims in this case concern Defendants' purported "Turnback Policy," which included a "metering" or "waitlist" system in which asylum-seekers at the southern border were instructed "to wait on the bridge [at a port of entry], in the pre-inspection area, or at a shelter"—or were simply told that "they [could not] be processed because the ports of entry [were] 'full' or 'at capacity[.]'" (Second Am. Compl. ¶ 3, ECF

No. 189.) Plaintiffs allege that this policy was intended to deter individuals from seeking asylum in the United States, in violation of constitutional, statutory, and international law. (*Id.* ¶¶ 3, 5, 72–83.) The Court has certified the class in this underlying dispute. (ECF No. 513.) The parties have also filed and briefed cross motions for summary judgment that await resolution. (ECF Nos. 535, 563.)

During the pendency of this action, Defendants have promulgated new asylum eligibility regulations—including the Final Transit Rule—that have threatened the preservation of the underlying class of metered asylum-seekers. This has led to a morass of litigation ancillary to the primary case regarding the lawfulness of Defendants' metering practices. The Court summarizes this byzantine procedural history below.

**A. Asylum Ban**

On July 16, 2019, Defendants promulgated a regulation entitled "Asylum Eligibility and Procedural Modifications"—also known as the "Asylum Ban" or the "Interim Final Rule" ("IFR").[1] 84 Fed. Reg. 33,829 (July 16, 2019), *codified at* 8 C.F.R. §§ 208.13(c)(4), 1208.13(c)(4). Among other things, the rule renders asylum seekers who enter, attempt to enter, or arrive at the United States-Mexico border after July 16, 2019 ineligible for asylum if they transit through at least one country, other than their country of origin, and fail to apply for any available humanitarian protection in that country.

Plaintiffs moved for a preliminary injunction and provisional class certification to partially enjoin the application of the IFR to asylum-seekers from countries other than Mexico who were metered before its effective date. (ECF Nos. 293, 294.) They argued that: (1) the provisional class was prevented from accessing the asylum process before the effective date of the IFR only because they were subject to Defendants' unlawful metering practices; and (2) the IFR, if applied to this class, would preclude these individuals from obtaining any form of humanitarian protection, since they their 30-day window to apply for asylum in Mexico—a country through which they transited—had already expired.

[1] Because the Final Transit Rule refers to this initial regulation as the IFR, the Court does the same in this Order for the sake of clarity.

Case: 22-55988, 12/20/2022, ID: 12615093, DktEntry: 13-2, Page 131 of 301

On November 19, 2019, the Court granted Plaintiffs' Motions. (Prelim. Inj., ECF No. 330.) The Court's order was partly based on its previous finding that Plaintiffs located on Mexican soil at the time they were metered were "arriving in" the United States for purposes of asylum under the plain language of the Immigration and Nationality Act ("INA"). (*See id.* at 4–5 (citing *Al Otro Lado v. McAleenan*, 394 F. Supp. 3d 1168, 1199–1201 (S.D. Cal. 2019)).) In its concluding paragraph, the Court issued the following order:

> The Court provisionally certifies a class consisting of "all non-Mexican asylum seekers who were unable to make a direct asylum claim at a U.S. POE before July 16, 2019 because of the U.S. Government's metering policy, and who continue to seek access to the U.S. asylum process."
>
> …
>
> Defendants are hereby **ENJOINED** from applying the Asylum Ban to members of the aforementioned provisionally certified class and **ORDERED** to return to the pre-Asylum Ban practices for processing the asylum applications of members of the certified class.

(*Id.* at 36.)

Defendants appealed the Preliminary Injunction to the Ninth Circuit. (ECF No. 335.) After granting an administrative stay on December 20, 2019, the Ninth Circuit denied Defendants' motion to stay the Preliminary Injunction on March 5, 2020. (ECF Nos. 369, 418.) The court heard oral argument on July 10, 2020 on the merits of the appeal but issued an order on December 2, 2020 holding the proceedings in abeyance pending issuance of the mandates in two related cases. (ECF No. 636.)

**B. Subsequent Litigation**

While this underlying appeal of the Preliminary Injunction has been pending, several disputes related to the Preliminary Injunction or the provisionally certified class have arisen between the parties.

First, Plaintiffs moved for a temporary restraining order similar to the instant motion but concerning a different regulation, "Implementing Bilateral and Multilateral Asylum Cooperative Agreements Under the Immigration and Nationality Act" (the "ACA Rule"). (ECF Nos. 344, 352.) Plaintiffs claimed Defendants intended to impose the ACA Rule on members of the provisional class to extinguish their underlying metering claims and bar

them from accessing the asylum process. (*Id.*) The Court denied the motion without prejudice, finding that Plaintiffs had not established a likelihood that Defendants would apply the new regulation to class members. (ECF No. 382.) The Court also based its decision on the fact that the terms of the Preliminary Injunction, if affirmed on appeal, would require Defendants to "return to the pre-Asylum Ban practices" for asylum-seekers metered before July 16, 2019 and therefore "necessarily prohibit[ed]" the application of the more recently promulgated ACA Rule. (*Id.* at 5–6.) The Court stated that it assumed Defendants would act in good faith by "avoid[ing] taking steps that could complicate or preclude its compliance with a court order." (*Id.* at 6.)

Second, on July 17, 2020, Plaintiffs filed a Motion for Clarification of the Preliminary Injunction after the parties failed to resolve disputes about the scope of the order and Defendants' attendant obligations. (ECF No. 494.) The Court then issued an order on October 30, 2020 (the "Clarification Order") clarifying that the Preliminary Injunction: (1) applied to individuals denied asylum before the order issued and during the administrative stay; (2) bound the Executive Office of Immigration Review to the terms of the order; and (3) required Defendants to take affirmative steps to reopen or reconsider past asylum denials for class members, make reasonable efforts to identify class members and inform them of their class membership, and share identifying information with Plaintiffs. (ECF No. 605.)

Defendants appealed the Clarification Order and moved to stay the order in this Court. (ECF Nos. 636, 637.) The briefing on the motion to stay is ongoing. (ECF No. 641.) On December 18, 2020, the Ninth Circuit granted in part and denied in part Defendants' request for an administrative stay. (ECF No. 652.) The stay applies to the Clarification Order's requirement that Defendants take affirmative steps to find and reopen or reconsider the asylum denials of provisional class members that became final before the Preliminary Injunction was entered or during the period of the administrative stay, but was denied in all other respects. (*Id.*)

Lastly, Plaintiffs have filed another Motion to Enforce the Preliminary Injunction on December 15, 2020, citing continued conflicts over the implementation measures required by the Clarification Order. (*See* ECF Nos. 644, 657, 665.)

**C. New Regulation**

The regulation that is the subject of the instant Motion, referred to by Defendants as the "Final Transit Rule," purports to "respond[] to comments received on the [IFR]," "make[] minor changes to regulations implemented or affected by the IFR for clarity and correction of typographical errors," and "adopt[] 'as final' certain of the IFR's amendments to the Code of Federal Regulations." (Defs.' Opp'n to Pls.' Mot. ("Opp'n") at 6 (citing Asylum Eligibility and Procedural Modification, 85 Fed. Reg. 82,260, 82,289 (Dec. 17, 2020)).)

Relevant here is the Final Transit Rule's response to a comment that the IFR conflicts with the language of the INA establishing that "[a]ny alien who . . . arrives in the United States (whether or not at a designated port of arrival . . . ) . . . may apply for asylum." 8 U.S.C. § 1158(a)(1). In response, the rule clarifies that the IFR

> applies to all aliens who enter, attempt to enter, or arrive in the United States across the southern land border on or after July 16, 2019. These three terms . . . require physical presence in the United States, and, as a result, any aliens who did not physically enter the United States before July 16, 2019, are subject to this rule. ***This includes, for example, aliens who may have approached the U.S. border but were subject to metering by DHS at a land border port of entry and did not physically cross the border into the United States before July 16, 2019.***

(85 Fed. Reg. at 82,268 (emphasis added).) In a footnote immediately following this paragraph, the rule further explains:

> The Departments note that this result is different from the district court's reasoning in granting a preliminary injunction in *Al Otro Lado, Inc. v. McAleenan*, 423 F. Supp. 3d 848, 875–76 (S.D. Cal. 2019), which included aliens who approached a U.S. port of entry but were not immediately permitted to cross the border as within the class of aliens who had "attempted to enter or arrived in" the United States. *See Al Otro Lado v. McAleenan*, 394 F. Supp. 3d 1168, 1199–1205 (S.D. Cal. 2019). The district court's

> interpretation is contrary to the Departments' intent, as explained below. The Departments also note that, even if aliens subject to metering prior to July 16, 2019, were exempt from this rule, they would nevertheless become subject to the rule upon any subsequent entry into the United States.

(*Id.* n.22.) The Final Transit Rule then explains that agencies intend the terms "entry," "attempted entry," and "arrival" to require physical presence in the United States, excluding asylum-seekers whom CBP "encounter[s] at the physical border line of the United States and Mexico, who have not crossed the border line at the time of that encounter[.]" *Id.* at 82,269. The rule takes effect on January 19, 2021.

## II. LEGAL STANDARD[2]

The purpose of a temporary restraining order is to "preserv[e] the status quo and prevent[] irreparable harm just so long as is necessary to hold a hearing, and no longer." *Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers*, 415 U.S. 423, 439 (1974) (footnote omitted). If the nonmovant has received notice of a motion for a temporary restraining order, the standard for issuing such order is the same as that for issuing a preliminary injunction. *See Brown Jordan Int'l, Inc. v. Mind's Eye Interiors, Inc.*, 236 F. Supp. 2d 1152, 1154 (D. Haw. 2002); *Lockheed Missile & Space Co., Inc. v. Hughes Aircraft Co.*, 887 F. Supp. 1320, 1323 (N.D. Cal. 1995). Here, Defendants have received notice of the Motion and have had the opportunity to be heard in opposition. Therefore, the preliminary injunction standard applies.

To obtain preliminary injunctive relief, a movant must "meet one of two variants of the same standard." *All for the Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017). Under the first standard, the movant must show "that he is likely to succeed on the merits,

[2] The parties dispute whether this Court must issue another injunction to enjoin the Final Transit Rule or whether prohibiting the application of this rule requires only that the Court enforce its initial Preliminary Injunction. Defendants claim that the Final Transit Rule is a "new agency action" requiring a new injunction. (Opp'n at 12–13.) Plaintiffs argue nothing prevents the Court from modifying or enforcing its earlier Preliminary Injunction against the Final Transit Rule. (Mot. at 7–12; Reply at 3.) The parties provide little by way of citation to supporting authorities for their arguments. In any event, solely for purposes of this Order, the Court assumes without deciding that separate injunctive relief is required to provide a remedy in this instance, and therefore applies the preliminary injunction standard to its analysis.

that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Under the second standard, the movant must show "that there are serious questions going to the merits—a lesser showing than likelihood of success on the merits," that the "balance of hardships tips *sharply* in the Plaintiff's favor," and that "the other two *Winter* factors are satisfied." *Id.* (quotation omitted). "Serious questions are substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation." *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988) (quotations and citation omitted). The balance of equities and public interest factors merge "[w]hen the government is a party." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

## III. ANALYSIS

The Court finds that Plaintiffs have sufficiently shown that serious questions exist as to the merits of this challenge, that class members are likely to suffer irreparable harm in the absence of the requested relief, and that the balance of equities and public interest tip strongly in their favor.

First, Defendants allege that it is lawful under the Executive's rulemaking authority to proceed with the issuance of a final rule despite the existence of the Preliminary Injunction on the same topic. (Opp'n at 11–12.) However, this is an incomplete characterization of the facts of this case. The Court previously interpreted the asylum provisions of a statute, the INA, to apply to asylum-seekers metered at ports of entry, thus concluding that these individuals could have requested asylum but for Defendants' metering practices. Defendants now claim that their rulemaking authority can be used to craft definitions in a regulation that run contrary to the Court's interpretation of the same language in the enabling statute, all for the explicit purpose of circumventing the Court's Preliminary Injunction. It is at least questionable, if not altogether doubtful, that Defendants can redefine statutory terms in a regulation in direct contradiction to the Court's

plain language interpretation, especially when their intention in doing so is to evade the import of the Court's previous rulings.[3] *See California Cosmetology Coal. v. Riley*, 871 F. Supp. 1263, 1270 (C.D. Cal. 1994) (citing *Koshland v. Helvering*, 298 U.S. 441, 447 (1936)) ("A regulation may not serve to amend a statute or to add to the statute something which is not there." ), *aff'd*, 110 F.3d 1454 (9th Cir. 1997); *see also Brown v. Gardner*, 513 U.S. 115, 122 (1994) ("[T]he fact . . . that [a regulation] flies against the plain language of the statutory text exempts courts from any obligation to defer to it."). The Final Transit Rule's lengthy interpretive arguments to the contrary cannot preemptively resolve these serious questions arising from this rather blatant evasive maneuvering around the Court's interpretation of the INA.

This action is especially legally dubious because the Court's interpretation has not been overturned or otherwise invalidated on appeal, which is still pending resolution. Indeed, the Ninth Circuit expressed in its order denying Defendants' motion for stay that this Court's "linguistic and contextual analysis has considerable force" and affirmed that pursuant to this statutory interpretation, "a class member's first arrival triggered a statutory right to apply for asylum and have that application considered . . . . As the [IFR] was not in place at the time each class member's right to apply for asylum attached, it makes sense that it would not apply." *Al Otro Lado, Inc. v. Wolf*, 952 F.3d 999, 1013–14 (9th Cir. 2020). This Court sees no reason why this rationale would not apply equally to the Final Transit Rule, which will take effect 18 months after the IFR.

The remaining prongs of the preliminary injunctive standard are easily met, considering the similarities between the Final Transit Rule and the IFR. It is clear that irreparable injury would occur if this relief were not issued. Defendants are unambiguous, both in the regulatory language of the Final Transit Rule and in their briefings, that one

---

[3] Further, as aforementioned, the Court previously denied Plaintiffs' request for a temporary restraining order regarding the ACA Rule on the basis that Defendants would comply in good faith with the instructions in the Preliminary Injunction, which implicitly barred the ACA Rule's implementation as to the class. It follows that the Final Transit Rule—which simply modifies the previously enjoined IFR—would be subject to the same prohibition.

purpose of the rule is to ensure that the asylum eligibility limitation applies to the asylum-seekers metered at the border who form the specific provisional class certified in this case. It is thus beyond doubt that Defendants seek to enforce the regulation against the class, and that without injunctive relief, Plaintiffs will be permanently barred from seeking asylum in the United States and could face physical danger if forced to return to their countries of origin. Lastly, given that the Final Transit Rule is an extension of the IFR previously enjoined, the Court finds that the balance of equities and public interest analysis stated in its Preliminary Injunction applies here with the same force. (*See* Prelim. Inj. at 34–35.) These factors favor Plaintiffs because Defendants' metering practices were the root cause of their inability to access the asylum process prior to the promulgation of the IFR. This remains true for any regulation that seeks to limit asylum eligibility, including the Final Transit Rule.

Lastly, Defendants raise several challenges to this Court's jurisdiction to hear this Motion under various jurisdiction-stripping provisions of the INA and under the All Writs Act. (*See* Opp'n at 9–11.) It is well-settled that a court may issue the orders necessary to determine its own jurisdiction. *See United States v. United Mine Workers of Am.*, 330 U.S. 258, 290 (1947) ("[T]he District Court unquestionably had the power to issue a restraining order for the purpose of preserving existing conditions pending a decision upon its own jurisdiction."); *see also Derminer v. Kramer*, 386 F. Supp. 2d 905, 906 (E.D. Mich. 2005) ("A court always has jurisdiction to determine its jurisdiction.").[4]

[4] The Court also notes that the way in which the Rule was authorized also raises questions as to its validity. The Rule states:

> The Acting Secretary of Homeland Security, Chad F. Wolf, having reviewed and approved this document, is delegating the authority to electronically sign this document to Chad R. Mizelle, who is the Senior Official Performing the Duties of the General Counsel for DHS, for purposes of publication in the Federal Register.

85 Fed. Reg. at 82,289. Recently, the Northern District of California issued a preliminary injunction regarding other regulations signed in a similar manner, finding that the plaintiffs had shown a likelihood that DHS lacked authority through Wolf for the proposed rulemaking because he was not nominated by the President and confirmed by the Senate. *Pangea Legal Servs. v. U.S. Dep't of Homeland Sec.*, No. 20-CV-09253-JD, 2021 WL 75756, at *3 (N.D. Cal. Jan. 8, 2021). Several other courts have also invalidated

Because of complex issues raised in this Motion, the Court finds that it is necessary to enjoin the application of the Final Transit Rule to the provisional class pending the Court's determination regarding the merits.

## IV. CONCLUSION

Accordingly, the Court **GRANTS** Plaintiffs' Motion for a TRO (ECF No. 658). Defendants are **TEMPORARILY ENJOINED** from applying 85 Fed. Reg. 82,260 (Dec. 17, 2020) to all non-Mexican asylum seekers who were unable to make a direct asylum claim at a U.S. Port of Entry ("POE") before July 16, 2019 because of the U.S. government's metering policy, and who continue to seek access to the U.S. asylum process. This Order extends to Defendants and any other federal officials and personnel involved in the asylum and/or removal process.

**IT IS FURTHER ORDERED** that a telephonic oral argument on the issues raised in the Motion is set for **February 3, 2021 at 1:30 p.m.** This temporary restraining order shall remain in effect until this date.

Information for calling into the teleconference is listed below. The parties and the public may access the hearing by calling the Court's teleconference number before 1:30 p.m. When prompted, enter the access code followed by the pound sign (#).

**Teleconference number**: (888) 557-8511

**Access code**: 6968297

Any members of the public that join the teleconference must mute their lines after joining.

**IT IS SO ORDERED.**

**DATED: January 18, 2021**

Cynthia Bashant
**Hon. Cynthia Bashant**
**United States District Judge**

---

Wolf's action on the basis that he was not a duly authorized Acting Secretary. *See Batalla Vidal v. Wolf*, No. 16-CV-4756 (NGG) (VMS), ––– F. Supp. 3d ––––, ––––, 2020 WL 6695076, at *9 (E.D.N.Y. Nov. 14, 2020); *Nw. Immigrant Rights Project v. United States Citizenship & Immigration Servs.*, No. CV 19-3283 (RDM), ––– F. Supp. 3d ––––, ––––, 2020 WL 5995206, at *24 (D.D.C. Oct. 8, 2020); *Immigrant Legal Res. Ctr. v. Wolf*, No. 20-CV-05883-JSW, ––– F. Supp. 3d ––––, ––––, 2020 WL 5798269, at *7 (N.D. Cal. Sept. 29, 2020); *Casa de Maryland, Inc. v. Chad F. Wolf*, Case No. 8:20-cv-02118-PX, ––– F.Supp.3d ––––, ––––, 2020 WL 5500165, at *23 (D. Md. Sept. 11, 2020).

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

AL OTRO LADO, *et al.*,

Plaintiffs,

v.

CHAD F. WOLF, Acting Secretary of Homeland Security, *et al.*,

Defendants.

Case No. 17-cv-02366-BAS-KSC

**ORDER:**

**(1) GRANTING PLAINTIFFS' MOTION FOR CLARIFICATION OF THE PRELIMINARY INJUNCTION (ECF No. 494);**

**(2) GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION TO SEAL (ECF No. 495);**

**AND**

**(3) DENYING AS MOOT PLAINTIFFS' EX PARTE MOTION FOR ORAL ARGUMENT (ECF No. 509)**

Before the Court is Plaintiffs' Motion for Clarification of this Court's November 19, 2019 Preliminary Injunction ("Motion"). (ECF No. 494.) Defendants oppose, and Plaintiffs reply. (ECF Nos. 508, 516.) After considering the parties' arguments, the Court **GRANTS** Plaintiffs' Motion and **CLARIFIES** the parameters of the Preliminary Injunction below. The Court further **GRANTS IN PART** and **DENIES IN PART** Plaintiffs' Motion to Seal filed in connection with the Motion (ECF No. 495) and **DENIES AS MOOT** Plaintiffs' Ex Parte Motion for Oral Argument on the Motion (ECF No. 509).

## I. BACKGROUND

### A. Procedural History

Plaintiffs' underlying claims in this case concern Defendants' purported "Turnback Policy," which included a "metering" or "waitlist" system in which asylum seekers were instructed "to wait on the bridge, in the pre-inspection area, or at a shelter"—or were simply told that "they [could not] be processed because the ports of entry is 'full' or 'at capacity[.]'" (Second Am. Compl. ¶ 3, ECF No. 189.) Plaintiffs allege that this policy is intended to deter individuals from seeking asylum in the United States and violates constitutional, statutory, and international law. (*Id.* ¶¶ 3, 5, 72–83.)

While this lawsuit was pending, Defendants promulgated a regulation on July 16, 2019 entitled "Asylum Eligibility and Procedural Modifications"—also known as the "Asylum Ban" or the "Asylum Transit Rule." 84 Fed. Reg. 33,829 (July 16, 2019), *codified at* 8 C.F.R. § 208.13(c)(4). Among other things, the rule renders asylum seekers who enter, attempt to enter, or arrive at the United States-Mexico border after July 16, 2019 ineligible for asylum if they transit through at least one country other than their country of origin and fail to apply for humanitarian protection in that country.

Plaintiffs filed Motions for a Preliminary Injunction and Provisional Class Certification to partially enjoin the application of the Asylum Ban to asylum seekers from countries other than Mexico who were metered before its effective date. (ECF Nos. 293, 294.) They argued the Asylum Ban would, if applied to these asylum seekers who were metered at the border before July 16, 2019, permanently bar these individuals from accessing any asylum process altogether, since they their 30-day window to apply for asylum in Mexico—a country they transited through—had already expired.

On November 19, 2019, the Court granted Plaintiffs' Motions. (Prelim. Inj., ECF No. 330.) Specifically, the Court ordered the following:

> The Court provisionally certifies a class consisting of "all non-Mexican asylum seekers who were unable to make a direct asylum claim at a U.S. POE before July 16, 2019 because of the U.S. Government's metering policy, and who continue to seek access to the U.S. asylum process."

…

> Defendants are hereby **ENJOINED** from applying the Asylum Ban to members of the aforementioned provisionally certified class and **ORDERED** to return to the pre-Asylum Ban practices for processing the asylum applications of members of the certified class.

(Prelim. Inj. at 36.)

Defendants appealed and concurrently filed an emergency motion to stay the Preliminary Injunction pending the appeal's resolution. (ECF Nos. 335, 354.) The Ninth Circuit issued an administrative stay of the order on December 20, 2019 pending resolution of the motion to stay on the merits. (ECF No. 369.) After oral argument, the court lifted the stay on March 5, 2020. (ECF No. 418.) Oral argument on the underlying appeal was held on July 10, 2020 and a determination remains pending. (*See Al Otro Lado et al. v. Chad Wolf, et al.*, No. 19-56417 (9th Cir. Dec. 5, 2019), Dkt. Nos. 97, 105.)

**B. Effect of Preliminary Injunction on Immigration Proceedings**

In the aftermath of the Preliminary Injunction, Defendants have made piecemeal efforts at various stages of immigration proceedings to identify class members. Below, the Court summarizes the steps Defendants allege they have taken after the Order issued on November 19, 2019, after the Ninth Circuit granted an administrative stay of the Order on December 20, 2019, and after the stay was lifted on March 5, 2020.

1. United States Citizenship and Immigration Services ("USCIS")

Five days after the Preliminary Injunction issued, USCIS directed asylum officers to ask screening questions during credible fear interviews to determine if individuals were more likely than not members of the class; if so, they were instructed to apply the more generous pre-Asylum Ban standard to class members' asylum claims. (Opp'n to Mot. ("Opp'n") at 5, 16, ECF No. 508; Updated Guidance on Credible Fear Processing Pursuant to Al Otro Lado Litigation ("USCIS Updated Guidance") at 7–9, Ex. 1 to Decl. of Alexander J. Halaska ("Halaska Decl."), ECF No. 508-2.) USCIS also paused credible fear decisions for those who had been interviewed between November 20, 2019 and November 26, 2019 and conducted follow-up interviews to determine class member status

for those previously believed to be subject to the Asylum Ban. (Opp'n at 5, 16; Decl. of Ashley B. Caudill-Mirillo ("Caudill-Mirillo Decl.") ¶ 4, Ex. 2 to Halaska Decl., ECF No. 508-3.)

On December 29, 2020, nine days after the Ninth Circuit imposed the stay, USCIS directed asylum officers to stop asking class member screening questions in credible fear interviews, "but to note in the record if the interviewee affirmatively asserted that they were metered or were an Al Otro Lado class member." (USCIS Updated Guidance at 4–5; Decl. of Ori Lev ("Lev Decl.") ¶ 9a, ECF No. 494-2.) However, the screening practice was reinstituted once the administrative stay was lifted on March 5, 2020. (USCIS Updated Guidance at 2–4.)

2. Immigration and Customs Enforcement ("ICE")

On December 8, 2019, ICE suspended the removal of all individuals in custody who had received negative credible fear determinations between July 16, 2019 (the date the Asylum Ban took effect) and November 19, 2019 (the date the Preliminary Injunction issued) and who had no case pending before Executive Office of Immigration Review. (Opp'n at 17; Email from Joseph P. Laws, Ex. 5 to Halaska Decl., ECF No. 508-6.) They were referred to USCIS to be screened for class membership at this time. (*Id.*)

It appears ICE stopped referring these individuals to USCIS once the administrative stay took effect on December 20, 2019, but returned to this practice on March 16, 2020, after the stay was lifted. (Opp'n at 6; USCIS Updated Guidance at 2; Email from Peter B. Berg, Ex. 6 to Halaska Decl., ECF No. 508-7.) ICE then began referring to USCIS for class membership screening the cases of potential class members who were still in ICE custody or who had been released or paroled from ICE custody. (Lev Decl. ¶ 10d.) This was later limited to only class members in ICE custody and excluded those released or paroled because, Defendants contend, asylum seekers not in custody "likely are still in removal proceedings and remain eligible for relief under the preliminary injunction through the administrative review process." (*Id.* ¶¶ 10d, 11.) ICE's screening procedures were

Case: 22-55988, 12/20/2022, ID: 12615053, DktEntry: 13-2, Page 143 of 301

followed only once after the dissolution of the stay, and ICE has confirmed that it will not continue to screen for class members. (*Id.*)

3. Customs and Border Protection ("CBP")

Also following the issuance of the Court's Order, CBP issued guidance instructing CBP officers and Border Patrol agents to annotate the Form I-213 with "Potential AOL Class Member" if they encountered an individual who affirmatively stated that they were metered, provided information from which an agent could infer they have been subject to metering, or affirmatively claimed to be a class member. (Lev Decl. ¶ 8a–b; Decl. of Jay Visconti ("Visconti Decl.") ¶ 5, Ex. 7 to Halaska Decl., ECF No. 508-8.) The instruction was issued to all Border Patrol agents and other CBP officers and was applicable to all ports of entry along the U.S.-Mexico border. (Lev. Decl. ¶ 8a–b.) This guidance was never rescinded, but as of June 12, 2020, CBP represented that it "was not relying on this information or taking any other steps to identify potential class members." (*Id.* ¶ 11.)

4. Executive Office for Immigration Review ("EOIR")

Lastly, as to EOIR, Defendants state that the office "has voluntarily agreed to act consistently with the preliminary injunction" and has issued guidance to this effect at the time it was issued, shortly after the imposition of the administrative stay, and shortly after the stay was lifted. (Decl. of Jill W. Anderson ("Anderson Decl.") ¶¶ 4–6, Ex. 3 to Halaska Decl., ECF No. 508-4.) Supplemental guidance was also disseminated through the immigration court systems in the months following. (*Id.* ¶¶ 7–9.)

Defendants represented to Plaintiffs, as late as April 20, 2020, that EOIR's position was that immigration judges and members of the Board of Immigration Appeals "are not to apply the third-country transit rule to provisional class members." (Lev Decl. ¶ 4.) However, in June 2020, Defendants made clear that they did not consider EOIR bound by the Preliminary Injunction and that they did not consider any non-final application of the Asylum Ban to class members a violation of the Preliminary Injunction "while administrative proceedings remain ongoing." (*Id.* ¶ 7b.)

Plaintiffs identify several cases in which they claim class members with final orders denying asylum raised their entitlement to the Preliminary Injunction's protection and were improperly rejected by immigration judges. (Mem. of P. & A. at 2, 6–7, ECF No. 494-1.) In two instances, after the stay was lifted, immigration judges denied motions to reopen because they considered the state of law "unsettled" due to the pending appeal on the merits, meaning there was no "material change in the law" warranting reconsideration of their orders of removal. (*See In re E.T.M.*, Ex. 1 to Lev Decl., ECF No. 494-3; *In re A.N.A.*, Ex. 2 to Lev Decl., ECF No. 494-4.) These cases were ultimately reopened *sua sponte* upon "further consideration." (*Id.*) In another case, DHS affirmatively opposed a class member's motion to reopen on the basis that the copy of the waitlist provided to prove class membership was not sufficiently reliable. (*In re M.T.A.*, Ex. 3 to Lev Decl., ECF No. 494-5.) While initially the immigration judge found in favor of the Government and denied the motion to reopen, the judge later granted the applicant's motion to reconsider and granted asylum pursuant to *East Bay Sanctuary Covenant v. Barr*, 964 F.3d 382 (9th Cir. 2020). (*Id.*; Order of the Immigration Judge, Ex. 23 to Halaska Decl., ECF No. 508-24.)

Defendants also cite a case where, while the preliminary injunction was stayed, an applicant was denied asylum pursuant to the Asylum Ban but granted withholding of removal. (*In re F.S.S.*, Ex. 15 to Halaska Decl., ECF No. 508-16.) The applicant moved to reconsider the asylum denial before the immigration judge the day after the Ninth Circuit lifted its administrative stay and appealed the asylum denial to the Board of Immigration Appeals one week later. (Order of the Immigration Judge on Mot. to Reconsider at 1, Ex. 16 to Halaska Decl., ECF No. 508-17; Notice of Appeal, Ex. 17 to Halaska Decl., ECF No. 508-18.) The immigration judge later denied the motion to reconsider, which the applicant also appealed. (Order of the Immigration Judge at 3; Ex. 18 to Halaska Decl., ECF No. 508-19.) Both this appeal and the direct appeal remain pending before the BIA. (Opp'n at 10.)

Case: 22-55988, 12/20/2022, ID: 12615052, DktEntry: 13-2, Page 145 of 301

### C. Parties' Arguments on Motion for Clarification[1]

On July 17, 2020, Plaintiffs filed the instant Motion seeking an order clarifying that the Government must: (1) take "immediate affirmative steps to reopen or reconsider" past asylum denials for potential class members, "regardless of what stage of removal proceedings such potential class members are in"; and (2) "make all reasonable efforts to identify class members and inform identified class members of their potential class membership" and "the existence and import of the preliminary injunction." (Mem. of P. & A. at 17–18.) The first of these requests additionally requires that the Court clarify that EOIR is bound by the Preliminary Injunction. (*Id.*)

Defendants oppose, arguing that the terms of the Preliminary Injunction do not require them to reopen or reconsider any asylum denials issued pursuant to the Asylum Ban that became administratively final before the Preliminary Injunction was issued or while it was stayed. (Opp'n at 1.) First, they contend that the Preliminary Injunction is prospective only, meaning that it requires Defendants to return to pre-Asylum Ban practices from the date of the order (November 19, 2019) forward. (*Id.* at 13–15.) Second, they contend that because the administrative stay divested the Preliminary Injunction of enforceability between December 20, 2019 and March 5, 2020, they are also not required to affirmatively reopen and readjudicate asylum denials that became final for class members during this period. (*Id.* at 13.) Regarding EOIR, Defendants claim that while the agency is complying with the Preliminary Injunction, it is not bound by the order because it is not in active concert or participation with DHS in removal proceedings. (*Id.* at 19–20.) Lastly, Defendants argues it should not be required to develop a comprehensive list of class members because it is already making reasonable efforts to identify them and the only lists available are over- or under-inclusive of class membership. (*Id.* at 23–25.)

---

[1] Plaintiffs moved *ex parte* for oral argument on the Motion. (ECF No. 509.) A hearing on a related dispute in this case included argument directly relevant to the instant Motion. (*See* ECF No. 595.) The Court did not find further argument necessary to decide the Motion and therefore denies as moot Plaintiff's *ex parte* request.

ER-0145

## II. LEGAL STANDARD

"It is undoubtedly proper for a district court to issue an order clarifying the scope of an injunction in order to facilitate compliance with the order and to prevent 'unwitting contempt.'" *Paramount Pictures Corp. v. Carol Publ'g Grp.*, 25 F. Supp. 2d 372, 374 (S.D.N.Y. 1998) (citing *Regal Knitwear Co. v. Nat'l Labor Relations Bd.*, 324 U.S. 9, 15 (1945)); *Sunburst Prod., Inc. v. Derrick Law Co.*, 922 F.2d 845 (9th Cir. 1991) ("The modification or clarification of an injunction lies within the 'sound discretion of the district court[.]") (citing same). Rule 65 requires that injunctions be specific "so that those who must obey them will know what the court intends to require and what it intends to forbid." *Int'l Longshoremen Ass'n, Local 1291 v. Philadelphia Marine Trade Ass'n*, 389 U.S. 64, 76 (1968). "By clarifying the scope of a previously issued preliminary injunction, a court 'add[s] certainty to an implicated party's effort to comply with the order and provide[s] fair warning as to what future conduct may be found contemptuous.'" *Robinson v. Delicious Vinyl Records Inc.*, No. CV 13-411-CAS (PLAx), 2013 WL 12119735, at *1 (C.D. Cal. Sept. 24, 2013) (quoting *N.A. Sales Co. v. Chapman Indus. Corp.*, 736 F.2d 854, 858 (2d Cir. 1984)).

## III. DISCUSSION

### A. Scope of the Preliminary Injunction

First, the Court addresses whether its Preliminary Injunction applies to orders denying class members' asylum claims based on the Asylum Ban that became final before the Preliminary Injunction issued on November 19, 2019 and during the Ninth Circuit's administrative stay of the order from December 20, 2019 to March 5, 2020.

#### 1. Asylum denials that became final before November 19, 2019

Plaintiffs argue that the Preliminary Injunction's effect is not conditioned on a class member's current stage of removal proceedings. (Mem. of P. & A. at 12.) Therefore, they argue, Defendants should be required to reopen or reconsider the eligibility of all class members previously denied asylum due to the Asylum Ban, even those with final orders of removal that predate the Court's order or that were issued during the administrative stay.

Case: 22-55988, 12/20/2022, ID: 12615053, DktEntry: 13-2, Page 147 of 301

(Mem. of P. & A. at 12.) The thrust of Defendants' position is that because asylum seekers with final orders of removal have had the Asylum Ban "applied" to them in the past, the Government cannot continue to apply the Asylum Ban to them in the future, which it understands to be the Preliminary Injunction's only prohibition. (Opp'n at 13 ("The order covers 'all' class members, but the government cannot refrain 'from applying' a rule to a class member who is not before it.").) Defendants thus contend that they are only required to refrain from applying the Asylum Ban, going forward, at four stages of the immigration process: (1) the credible-fear screening; (2) reviews of credible fear determinations; (3) full removal proceedings before immigration judges; and (4) on appeal to the BIA. (*Id.* at 12.)

Defendants focus their arguments on the purported "retroactivity" of the Court's Preliminary Injunction, relying on case law regarding the retroactive effect of the Supreme Court's application of a rule of federal law. (Opp'n at 15, 19 (citing *Harper v. Va. Dep't of Taxation*, 509 U.S. 86 (1993), and *Teague v. Lane*, 489 U.S. 288 (1989)).) The Court finds this framing inapposite in the context of equitable relief. Defendants do not cite—and the Court does not find—"any authority establishing any bright line rule or precedent limiting the Court's broad equitable discretion to decide whether to extend an injunction" to actions approved or pending before the relief issued. *People of State of California ex rel. Lockyer v. U.S. Dep't of Agric.*, No. C05-03508 EDL, 2006 WL 2827903, at *2 (N.D. Cal. Oct. 3, 2006) (rejecting defendants' claim of "retroactive" application of an injunction on logging practices to previously approved project and finding instead that the court must "examine the specific facts of each case to determine the proper scope of injunctive relief").

"'District courts have broad latitude in fashioning equitable relief when necessary to remedy an established wrong.'" *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1024 (9th Cir. 2016) (quoting *Earth Island Inst. v. Carlton*, 626 F.3d 462, 475 (9th Cir. 2010)). The Supreme Court has made clear that "the scope of injunctive relief is dictated by the extent of the violation established." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 15 (1971) ("As with any equity case, the nature of the violation determines the scope of the remedy.").

"A preliminary injunction . . . is not a preliminary adjudication on the merits but rather a device for preserving the status quo and preventing the irreparable loss of rights before judgment." *Sierra On-Line, Inc. v. Phx. Software, Inc.*, 739 F.2d 1415, 1422 (9th Cir. 1984). Therefore, "[t]he 'purpose of a preliminary injunction is to preserve the status quo ante litem pending a determination of the action on the merits.'" *Id.* (quoting *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1023 (9th Cir. 2009)). "The status quo ante litem refers not simply to any situation before the filing of a lawsuit, but instead to the last uncontested status which preceded the pending controversy." *GoTo.com, Inc. v. Walt Disney, Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000) (internal quotation marks omitted).

The pending controversy in this proceeding for injunctive relief concerns the applicability of the Asylum Ban's eligibility bar to members of the provisionally certified class. Therefore, the last uncontested status of class members in this case exists at the point before the Asylum Ban went into effect on July 16, 2019, when DHS was still processing asylum seekers according to its previous and longstanding asylum eligibility requirements. *See, e.g.*, *Regents of the Univ. of Calif. v. U.S. Dep't of Homeland Sec.*, 279 F. Supp. 3d 1011, 1046, 1048 n.20 (N.D. Cal. 2018), *aff'd*, 908 F.3d 476 (9th Cir. 2018) (enjoining DHS from rescinding the Deferred Action for Childhood Arrivals ("DACA") program and ordering it "to maintain the DACA program on a nationwide basis on the same terms and conditions as were in effect before the rescission," because that was "the status quo before which was that DACA was fully implemented"), *rev'd in part, vacated in part*, __ U.S. __, 140 S.Ct. 1891 (2020); *S.A. v. Trump*, No. 18-CV-03539-LB, 2019 WL 990680, at *13 (N.D. Cal. Mar. 1, 2019) (finding, where plaintiffs sought a preliminary injunction requiring DHS to continue to process conditionally approved beneficiaries under the recently rescinded Central American Minors program, that the status quo ad litem was the point before DHS stopped processing those applications).

This is consistent with the equitable purpose of the Preliminary Injunction. The violation requiring a remedy is Defendants' decision to apply the Asylum Ban to divest all class members of access to the asylum process because they were unable, due to

Defendants' metering practices, to cross the border before the rule's effective date. Accordingly, the Court's order was structured to restore class members to the status quo by preventing the application of the Asylum Ban to class members who, but for metering, would have had the opportunity to enter the United States before the regulation imposed additional asylum eligibility requirements. (*See* Prelim. Inj. at 34 (finding that but for the metering policy, asylum seekers "would have entered the United States and started the asylum process without delay . . . under the law in place at the time of their metering, which did not include the requirement that they first exhaust asylum procedures in Mexico").)[2]

For this reason, Defendants were instructed to "return to the pre-Asylum Ban practices for processing the asylum applications *of members of the certified class*." (Prelim. Inj. at 36 (emphasis added).) Class members were not limited to only those non-Mexican asylum seekers with non-final removal orders. Rather, class membership was contingent on whether an asylum seeker had been metered and thereby prevented from making a direct asylum claim at a port of entry before July 16, 2019. If the Court were to narrow this application of injunctive relief only to those without final removal orders, it would vitiate the equitable nature of its remedy. The scope of the remedy, therefore, must provide redress to all those metered in order to restore equity.

To the extent Defendants contend that requiring them to take affirmative action to comply with the Court's order impermissibly changes the nature of the injunctive relief from prohibitive to mandatory—which is subject to a higher standard—the Court similarly finds this position untenable. Preliminary injunctions "that prohibit enforcement of a new law or policy . . . [are] prohibitory," not mandatory. *Ariz. Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1061 (9th Cir. 2014). Here, the Preliminary Injunction prohibited

---

[2] The Court adopted its analysis from its earlier order denying Defendants' motion to dismiss establishing that those who had been metered had "arrived" or "attempted to enter" POEs before the effective date of the Asylum Ban and thus were not subject to the plain language of the regulation. (Order Re: Mot. to Dismiss at 35–40, ECF No. 280.) In its order denying Defendants' motion to stay, the Ninth Circuit noted that this Court's interpretation of the regulation had "considerable force" and was "likely correct," although it did not decide the issue. (Order Denying Mot. to Stay at 31, *Al Otro Lado, et al. v. Chad F. Wolf, et al.* (9th Cir.), No. 19-56417, Dkt. No. 84.)

application of the Asylum Ban to class members in order to preserve the status quo ante litem, or the class members' last uncontested status.  Actions required to reinstate the status quo ante litem do not convert prohibitive orders into mandatory relief.  *See, e.g.*, *S.A.*, 2019 WL 990680, at *14 (requiring DHS to process the applications of conditionally-approved beneficiaries of the CAM program "in good faith" by prohibiting DHS from "adopt[ing] any policy, procedure, or practice of not processing the beneficiaries or placing their processing on hold en masse"); *Regents*, 279 F. Supp. 3d at 1025–26, 1048 n.20 (where plaintiffs did not file their complaint for three months after DHS terminated the DACA program, court nonetheless held that its injunction vacating DHS's rescission of DACA and ordering DHS to continue processing DACA renewal applications was prohibitory, not mandatory, as it simply preserved the status quo ante litem); *Angotti v. Rexam, Inc.*, No. C 05-5264 CW, 2006 WL 1646135, at *6–*7 (N.D. Cal. June 14, 2006) (citing *GoTo.com*, 202 F.3d at 1210) (rejecting defendant's argument that requiring it to resume payment and administration of benefits requires the court's injunction to be treated as mandatory because the proposed injunctive relief "would simply preserve the last uncontested status preceding the current litigation").[3]

The Preliminary Injunction provides equitable relief to restore class members to the appropriate status quo ante litem in this case—the period before July 16, 2019 when asylum eligibility requirements preceding the Asylum Ban were still in effect.  It therefore applies

---

[3] The Ninth Circuit has also made clear the following:

> [A]fter a defendant has been notified of the pendency of a suit seeking an injunction against him, even though a temporary injunction be not granted, he acts at his peril and subject to the power of the court to restore the status, wholly irrespective of the merits as they may be ultimately decided . . . .

*Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172, 1187 (9th Cir. 2000) (quoting *Nat'l Forest Preservation Group v. Butz*, 485 F.2d 408 (9th Cir.1973)).  Defendants were aware of Plaintiffs' motions for injunctive relief and provisional class certification regarding the Asylum Ban, at the latest, by the date of filing on September 26, 2019.  Thus, Defendants acted at their peril if they decided to proceed with intended removals of class members after receiving notice of these motions.  *See Angotti*, 2006 WL 1646135, at *6–*7.

to all class members, including those with asylum denial orders that became final before the Preliminary Injunction issued on November 19, 2019.

2. Asylum denials that became final during the administrative stay

An administrative stay "is only intended to preserve the status quo until the substantive motion for a stay pending appeal can be considered on the merits, and does not constitute in any way a decision as to the merits of the motion for stay pending appeal." *Doe #1 v. Trump*, 944 F.3d 1222, 1223 (9th Cir. 2019). Defendants argue that because the Ninth Circuit's administrative stay suspended the Court's "alteration of the status quo" and "temporarily divest[ed] [the] order of enforceability," the Preliminary Injunction does not apply to removal orders based on the Asylum Ban that became final during the stay. (Opp'n at 13–14 (quoting *Nken v. Holder*, 556 U.S. 418, 428–29 (2009).) Further, Defendants contend that even once this order was lifted, it did not require reopening or reconsidering past determinations regarding asylum eligibility. (*Id.* at 14.)

First, the Court notes that *Nken* concerns a traditional motion to stay pending appeal. 556 U.S. at 422. However, the Ninth Circuit has expressly stated that it is improper to consider the *Nken* factors when considering an administrative stay. *Nat'l Urban League v. Ross*, ___ F.3d ___, No. 20-16868, 2020 WL 5815054, at *3 (9th Cir. Sept. 30, 2020) (citing *Doe #1*, 944 F.3d at 1223) (holding that applying the factors for a motion for stay pending appeal to an administrative stay "erroneously collapses the distinct legal analyses" for the two motions and that the "touchstone" for administrative stays is "the need to preserve the status quo").

In this case, the Ninth Circuit stated that its stay was intended to "preserve the status quo" by allowing the Government to continue applying the Asylum Ban to proposed class members until the motion to stay was decided on the merits. (Order at 3, *Al Otro Lado, et al. v. Chad Wolf, et al.* (9th Cir.), No. 19-56417, Dkt. No. 24.) Thus, between December 20, 2019 and March 5, 2020, Defendants were permitted to lawfully continue applying the Asylum Ban to class members. However, once the motion to stay was denied on its merits, the Preliminary Injunction took full effect.

Defendants' position that they are not required to reopen or reconsider removal orders for class members that became final during the stay assumes, again, that the Preliminary Injunction can only be enforced against those cases that are not final. However, as stated above, the terms of the Preliminary Injunction are not so limited. In fact, in order to remedy the harm identified by the Court, its Order must restore to the status quo ante litem all those metered who did not receive a determination on the merits of their asylum claim due to the application of the Asylum Ban to their case. *See GoTo.com*, 202 F.3d at 1210; *see also Califano*, 442 U.S. at 702.

While the administrative stay allowed Defendants to stay the course regarding the application of the Asylum Ban at the time of the stay, it does not deprive the Preliminary Injunction of its full effect once the stay was lifted. Defendants are correct that their application of the Asylum Ban during the stay was lawful and not in contempt of the Order. Now that the Preliminary Injunction is fully in effect, however, refusing to reopen or reconsider orders of removal based on the Asylum Ban that became final during the stay is antithetical to the aforementioned purpose and intent of the order.

**B. Effect of Preliminary Injunction on EOIR Proceedings**

Defendants' argument regarding EOIR is twofold. First, they contend that there is no need for clarification because EOIR is complying with the Preliminary Injunction. (Opp'n at 18–19.) Second, they claim that EOIR, as a non-party, is not bound by the terms of the Preliminary Injunction. (*Id.* at 20–22.)

EOIR's voluntary compliance with this Court's Order does not obviate the need for clarification of that Order's terms. Indeed, the Supreme Court has indicated that enforcement orders are important preemptive measures against potential contempt. *See Regal*, 324 U.S. at 15 (encouraging clarification "in the light of a concrete situation that left parties or 'successors and assigns' in the dark as to their duty toward the court . . . *to avoid unwitting contempts* as well as to punish deliberate ones") (emphasis added); *see also Matter of Hendrix*, 986 F.2d 195, 200 (7th Cir. 1993) (holding that requests to clarify whether injunction "applies to conduct in which the person proposes to engage," even if it

"looks like a request for an 'advisory opinion,' . . . is one that even a federal court can grant, in order to prevent unwitting contempts"); Wright & Miller, 11A Fed. Prac. & Proc. Civ. § 2956 (3d ed.) ("It should be noted that an interested individual who is confused as to the applicability of an injunction to him or whether the scope of an order applies to certain conduct may request the granting court to construe or modify the decree."). In any event, the aforementioned immigration cases where the Asylum Ban has served as the basis for denying class members' asylum claims, even if ultimately resolved in their favor, evince some degree of uncertainty about the scope of the order, which necessitates clarification. Indeed, the instant dispute itself reveals that certain ambiguities exist necessitating clarification of the Preliminary Injunction. As such, the Court turns to whether EOIR is bound by the Preliminary Injunction.

1. Whether EOIR is Bound Under Rule 65(d)(2)

Rule 65(d)(2) provides that an injunction or restraining order "binds only the following who receive actual notice of it by personal service or otherwise: (A) the parties; (B) the parties' officers, agents, servants, employees, and attorneys; and (C) other persons who are in active concert or participation with anyone described" in paragraphs (A) or (B). The Supreme Court has summarized the scope of the rule as follows:

> This [rule] is derived from the common law doctrine that a decree of injunction not only binds the parties defendant but also those identified with them in interest, in "privity" with them, represented by them or subject to their control. In essence it is that defendants may not nullify a decree by carrying out prohibited acts through aiders and abettors, although they were not parties to the original proceeding.

*Regal*, 324 U.S. at 14. Thus, "[a]n injunction binds a non-party only if it has actual notice and either 'abets the enjoined party' in violating the injunction or is 'legally identified' with the enjoined party." *CFPB v. Howard Law, P.C.*, 671 F. App'x 954, 955 (9th Cir. 2016) (citing *United States v. Baker*, 641 F.2d 1311, 1313 (9th Cir. 1981), and *NLRB v. Sequoia Dist. Council of Carpenters, AFL-CIO*, 568 F.2d 628, 633 (9th Cir. 1977)); *see also Saga Int'l, Inc. v. John D. Brush & Co.*, 984 F. Supp. 1283, 1286 (C.D. Cal. 1997)

("An injunction applies only to a party, those who aid and abet a party, and those in privity with a party.").

Subsection C's "active concert or participation" criterion "is directed to the actuality of concert or participation, without regard to the motives that prompt the concert or participation." *New York State Nat'l Org. for Women v. Terry*, 961 F.2d 390, 397 (2nd Cir. 1992), *vacated on other grounds*, 506 U.S. 901 (1993); *see also Estate of Kyle Thomas Brennan v. Church of Scientology Flag Serv. Org., Inc.*, No. 809-CV-264-T-23EAJ, 2010 WL 4007591, at *2 (M.D. Fla. Oct. 12, 2010) (holding that "'in active concert or participation' . . . in no respect implies any conspiratorial, devious, or insidious intent or design" but instead "means a purposeful acting of two or more persons together or toward the same end, a purposeful acting of one in accord with the ends of the other, or the purposeful act or omission of one in a manner or by a means that furthers or advances the other."). In considering whether a non-party engaged in "active concert and participation" for purposes of Rule 65(d), the Court must conduct "[a] fact-sensitive inquiry . . . to determine whether persons not named in an injunction can be bound by its terms because they are acting in concert with an enjoined party." *In re Zyprexa Injunction*, 474 F. Supp. 2d 385, 419 (E.D.N.Y. 2007) (citing 11A Wright & Miller at § 2956).

Here, the Department of Homeland Security and its component parts—including CBP and OFO—have been enjoined from enforcing the Asylum Ban regulation against members of the class. The Court finds, based on the role and function of EOIR in enforcing immigration regulations, that it generally works "in active concert and participation" with Defendants such that it is bound by the Preliminary Injunction.

Although housed under the U.S. Department of Justice, EOIR is responsible for the adjudication, interpretation, and administration of immigration laws. *See* About the Office, United States Department of Justice, https://www.justice.gov/eoir/about-office (last updated Aug. 14, 2018). To this end, EOIR contains the immigration court system within the Office of the Chief Immigration Judge (OCIJ) and the Board of Immigration Appeals (BIA). 8 C.F.R. § 1003.0(a). Immigration judges are inextricably linked to the credible

fear process for asylum claims, as they are responsible for adjudicating asylum applications in regular removal proceedings and reviewing USCIS's negative credible-fear determinations in expedited removal proceedings. 8 U.S.C. §§ 1225(b)(1)(B)(iii)(III), 1229a(a)(1); 8 C.F.R. §§ 1003.1(b)(9), 1003.10(c), 1003.42, 1240.1(a)(ii), 1208.30(g). The BIA, the administrative body that sits in review of immigration judge decisions in full removal proceedings, reviews immigration judge decisions in regular removal proceedings. 8 C.F.R. §§ 1003.1(a)(1), (b), 1003.10(c). EOIR's function is therefore an extension of immigration enforcement efforts initiated by CBP or USCIS officers; it does not represent a separate or distinct enforcement mechanism, but merely a secondary step of the enforcement process.

This is further reflected in the regulatory scheme governing DHS and EOIR. Both are governed by the same set of regulations concerning asylum and withholding of removal. *Compare* 8 C.F.R §§ 208.1–208.31, *with* 8 C.F.R. §§ 1208.1–1208.31. Indeed, DHS and the Department of Justice jointly published the Asylum Ban and required both asylum officers and immigration judges to apply this new bar on asylum eligibility when administering the credible fear screening process. 84 Fed. Reg. at 33,830; *see also M.M.V. v. Barr*, 456 F. Supp. 3d 193, 202 (D.D.C. 2020). And as Defendants have conceded, EOIR personnel have several occasions to apply the Asylum Ban during expedited or regular removal proceedings initiated by either USCIS or CBP officers: (1) when immigration judges conduct a de novo review of a USCIS asylum officer's negative credible-fear determination; (2) when immigration judges adjudicate asylum claims in full removal proceedings; and (3) when the BIA adjudicates an appeal from an immigration judge's order denying asylum. (Opp'n at 3–4.)

DHS and EOIR are not coordinating or cooperating to share information, nor are they separately pursuing administrative enforcement of immigration laws. *But c.f. Vance v. Block*, 881 F.2d 1085 (9th Cir. 1989) (unpublished) (finding preparation of a "biological assessment" to constitute "[i]nteragency coordination and cooperation" insufficient for "active concert" for purposes of Rule 65(d)); *U.S. Commodity Futures Trading Comm'n v.*

*Amaranth Advisors, LLC*, 523 F. Supp. 2d 328, 335 (S.D.N.Y. 2007) ("Rule 65(d) does not apply to collaboration between two agencies pursuing enforcement actions pursuant to different statutes."). Much to the contrary, the statutory and regulatory scheme make clear that DHS and EOIR are essential parts of the same enforcement mechanism.[4] Thus, the Court finds that EOIR is, for purposes of general immigration enforcement, "in active concert or participation" with Defendants and is therefore bound by the Preliminary Injunction.

2. All Writs Act ("AWA")

Under the AWA, federal courts have authority to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651. The AWA provides this Court with the ability to construct a remedy to right a "wrong [which] may [otherwise] stand uncorrected." *United States v. Morgan*, 346 U.S. 502, 512 (1954). In the context of administrative law, the AWA allows the court "to preserve [its] jurisdiction or maintain the status quo by injunction pending review of an agency's action through the prescribed statutory channels." *F.T.C. v. Dean Foods Co.*, 384 U.S. 597, 604 (1966).

"The power conferred by the [All Writs] Act extends, under appropriate circumstances, to persons who, though not parties to the original action or engaged in wrongdoing, are in a position to frustrate the implementation of a court order or the proper administration of justice." *United States v. New York Telephone Co.*, 434 U.S. 159, 174 (1977); *see also In re Baldwin–United Corp.*, 770 F.2d 328, 339 (2d Cir. 1985) ("Preliminary injunctions under Rule 65 are designed to preserve the status quo between

[4] Defendants contend that "EOIR adjudicators do not work 'in active concert or participation' with DHS any more than appellate courts work with trial courts or judges work with prosecutors." (Opp'n at 22.) Defendants' analogy appears to misinterpret the phrase "in active concert or participation." The phrase implies purposeful acts done toward the same end; it does not suggest improper motive or conduct otherwise unbecoming of judicial officers or officers of the court. *See Estate of Kyle Thomas Brennan*, 2010 WL 4007591, at *2 (noting Rule 65(d)(2)(C) does not imply "a partisan act or an act lacking in judicial impartiality"). Thus, just as courts and advocates work toward applying and enforcing the law, so too do DHS and EOIR work toward applying and enforcing immigration statutes and regulations.

the parties before the court pending a decision on the merits of the case at hand. In contrast, injunctions [under the AWA] are needed to prevent third parties from thwarting the court's ability to reach and resolve the merits of the federal suit before it."); *Stratton v. Glacier Ins. Adm'rs, Inc.*, No. 1:02-cv-06213 OWW DLB, 2007 WL 274423, at *16 (E.D. Cal. Jan. 29, 2007) ("Injunctions under the All Writs Act are not subject to the standards for preliminary injunction under Fed. R. Civ. P. 65.") (citing *Baldwin*).

EOIR's compliance with the Court's Preliminary Injunction is necessary to effectuate its terms. First, this Court previously established that it has independent jurisdiction over the underlying suit and therefore invokes the AWA only in aid of jurisdiction already established. (*See* Prelim. Inj. at 8–19.) Second, based on the explanation above, the Court's Preliminary Injunction is intended to protect all members of the class, i.e., those who were metered at ports of entry before July 16, 2019. EOIR officials, namely immigration judges and the BIA, have the authority to reopen and reconsider final removal orders, as well as pass upon credible fear findings that may include testimony about metering, at critical stages in class members' removal proceeding. To be clear, the Preliminary Injunction does not override the ability of immigration judges to make independent determinations about the merits of the class members' asylum claims; rather, it requires only that class members receive consideration of their claim instead of having it foreclosed by the Asylum Ban's automatic eligibility bar.

Because courts can determine the lawfulness of immigration regulations, it follows that these findings will necessarily have an impact on all actors in the immigration system tasked with implementing such regulations. The Court therefore finds that, under the AWA, binding EOIR to the terms of the Preliminary Injunction is necessary to preserve this Court's jurisdiction.

3. <u>8 U.S.C. § 1252(f)(1)</u>

Finally, Defendants argue that Plaintiffs' interpretation of the Preliminary Injunction, if granted, would run afoul of a jurisdiction-stripping provision of the Immigration and Nationality Act ("INA"). (Opp'n at 22.) Specifically, the INA states that

this Court has no jurisdiction or authority "to enjoin or restrain the operation of the provisions of part IV of this subchapter, . . . other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated." 8 U.S.C. § 1252(f)(1). "Part IV" is a reference to the provisions of the INA titled "Inspection, Apprehension, Examination, Exclusion, and Removal," which currently include 8 U.S.C. §§ 1221–1232. In other words, § 1252(f)(1) "limits the district court's authority to enjoin [immigration authorities] from carrying out legitimate removal orders." *Ali v. Gonzales*, 421 F.3d 795, 886 (9th Cir. 2005).

However, "[b]y its terms, § 1252(f)(1) does not . . . categorically insulate immigration enforcement from 'judicial classwide injunctions.'" *Gonzalez v. United States Immigration & Customs Enf't*, 975 F.3d 788 (9th Cir. 2020). For example, the Ninth Circuit has held that where a court enjoins "conduct that allegedly is not even authorized by the statute, the court is not enjoining the operation of part IV of subchapter II, and § 1252(f)(1) therefore is not implicated." *Id.*; *see also Rodriguez v. Hayes*, 591 F.3d 1105, 1120 (9th Cir. 2010) (finding § 1252(f)(1) not applicable where the petitioner did "not seek to enjoin the operation of the immigration detention statutes, but to enjoin conduct it asserts is not authorized by the statutes").

Similarly, here, the Preliminary Injunction does not enjoin operation of expedited or regular removal proceedings authorized by Part IV of the INA; rather, it enjoined the application of the Asylum Ban to class members on the basis that the regulation, "by its express terms, does not apply to those non-Mexican foreign nationals . . . who attempted to enter or arrived at the southern border *before* July 16, 2019." (Prelim. Inj. at 31.) Again, the Court does not intend by its Order to interfere with the "independent judgment and discretion" afforded to immigration judges in deciding the individual cases before them. *See* 8 C.F.R. § 1003.10(b). Immigration judges are still tasked with addressing whether individual asylum seekers have sufficiently demonstrated class membership and are thus subject to the Preliminary Injunction's mandate, and these judges maintain the authority to make other findings on the merits. Thus, applying the Preliminary Injunction to prevent

removals of class members based on the Asylum Ban, and instead requiring a merits-based determination of their asylum claims, is not precluded by § 1252(f)(1).

**C. Class Member Identification**

Plaintiffs also move this Court to clarify the requirement that Defendants make "all reasonable efforts to identify all potential class members, including those already removed from the United States, and inform them of their potential class membership and of the injunction." (Mem. of P. & A. at 3.) Under Rule 23(c)(2), "the court shall direct" notice to class members, which is commonly understood to mean that the court "should order one of the parties to perform the necessary tasks." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 354 n.21 (1978). In instances where defendants "may be able to perform a necessary task with less difficulty or expense than could the representative plaintiff," a district court "properly may exercise its discretion under Rule 23(d) to order the defendant to perform the task in question." *Id.* at 355–56; *see also Barahona-Gomez v. Reno*, 167 F.3d 1228, 1236–37 (9th Cir. 1999).

First, the parties disagree on the ability of the class members to independently raise their entitlement to relief under the Preliminary Injunction during administrative proceedings. Defendants take the position that only class members with final removal orders should be identified and screened for class membership, because those with ongoing cases can affirmatively raise their claims at later stages of the administrative proceedings. (Lev Decl. ¶¶ 7b, 11.) Plaintiffs challenge the effectiveness of requiring class members to recognize their entitlement to relief and raise these claims on their own, and note that Defendants are not screening those with final removal orders in ICE custody as a failsafe if class members are unsuccessful in doing so. (Mem. of P. & A. at 16.)

As the Court notes above, the Preliminary Injunction applies to a class defined by whether purported members were metered at ports of entry before July 16, 2019, not by the class members' current stage of removal proceedings. Further, the Court agrees, given the general complexity of immigration law and its recently changing landscape, that requiring class members to identify their right to relief under the Preliminary Injunction is

an unreasonable allocation of the notice burdens under Rule 23(d). *See Castro-O'Ryan v. U.S. Dep't of Immigration & Naturalization*, 821 F.2d 1415, 1419 (9th Cir. 1987), *superseded*, 847 F.2d 1307 (9th Cir. 1987) ("[T]he immigration laws have been termed second only to the Internal Revenue Code in complexity. A lawyer is often the only person who could thread the labyrinth.") (citations and quotations omitted). Thus, the Court finds it appropriate for Defendants to make reasonable efforts to aid in identifying potential class members at all stages of removal proceedings.[5] *See Barahona-Gomez v. Reno*, 167 F.3d at 1237 (finding district court did not err in requiring the government to provide notice where "notice was required to inform class members that equitable relief may be available," "to ensure that the INS did not mistakenly deport a class member," and where "the INS [was] unique positioned to ascertain class membership").

In light of this and the Court's finding below regarding information sharing, the Court finds that it is not necessarily easier for Defendants to notify individuals who are not in expedited removal proceedings, regular removal proceedings, or otherwise in DHS custody (such as ICE or CBP custody) of their potential class membership. For these individuals, Plaintiffs and their counsel will have access to the same contact details of class members and can facilitate the notification process for those who were removed and remain outside the United States or for those who otherwise are not in pending administrative proceedings or in the custody of the government.

Second, there is an issue regarding supporting documentation. Plaintiffs seek clarification that Defendants are required to review their own documentation to help identify class members because they have already made efforts to do so and because they have access to these and other relevant documents, such as immigration files of potential class members. (Mem. of P. & A. at 15–16.) Defendants concede that they have "twice generated a list of aliens in ICE's custody who received negative credible-fear

[5] This would not shift the burdens during removability proceedings. As Plaintiffs readily concede, individuals would still bear the burden of demonstrating their class membership, and therefore their eligibility for relief, to immigration officials. (Reply at 8.)

determinations from USCIS pursuant to the [Asylum Ban], and those whose cases were not pending before EOIR." (Opp'n at 24.) However, they argue that because these lists were both over- and under-inclusive, they should not be required to produce them. (*Id.*)[6] Considering the administrative complexity of the instant case—as attested to by Defendants themselves— the Court sees no reason for this information, however imperfect, to be withheld. Deficient lists can be cross-referenced with immigration files, annotated I-213s, and other documentation—all within Defendants' custody—through which class members can be identified and corroborated. *See Oppenheimer*, 437 U.S. at 355–56.[7] Thus, Defendants must review their own records to aid in the identification of class members and must share the information in their custody regarding the identities of class members with Plaintiffs.

**D. Motion to Seal**

Plaintiffs request to redact and seal the names of asylum seekers and A-file numbers contained in Exhibits 1–3 to their Motion and to seal excerpts from the transcript of the June 2, 2020 deposition of Rodney Harris attached as Exhibit 4. (Pls.' Mot to Seal, ECF No. 495.) Defendants filed a Response in support of the motion. (Defs.' Resp., ECF No. 531.)

As to the identifying information of asylum seekers, both parties request sealing these details for privacy and confidentiality reasons. The Court has previously allowed

---

[6] Defendants also rehash their ascertainability arguments from their class certification and preliminary injunction opposition briefs—"that there is no reliable, comprehensive way to identify class members and that attempts to do so would be substantially burdensome." (Opp'n at 23.) Defendants cite to various deficiencies in their own recordkeeping—e.g., that the annotated I-213s cover only certain time periods and EOIR's records do not track who was metered—to support their argument. The Court again rejects these arguments on the basis that the class is based on a metering system established by Defendants and that Defendants relied on lists managed by the Mexican Government to facilitate metering. (*See* Prelim. Inj. at 28–29.) It therefore does not follow that determining who was subject to metering for purposes of complying with the Preliminary Injunction now presents an insurmountable task.

[7] The situation prompting Plaintiffs to recently file an Emergency Motion (ECF No. 494) in this case reflect the challenges associated with identifying and corroborating class membership claims in this case. (*See* ECF Nos. 574, 588, 595.)

targeted redactions for this purpose and adopts the same reasoning to allow the parties to do so here.

As to the Deposition of Rodney Harris ("Harris Deposition"), attached as Exhibit 4 to Plaintiffs' Motion, Defendants explain that it should be sealed in its entirety because his testimony relating to the lists of migrants waiting in shelters to enter the United States includes communications between CBP and the State Department and between the U.S. Government and non-governmental organizations working in Mexico. (Defs.' Resp. at 4.) According to Defendants, disclosure of these communications could chill communications with officials in the Mexican Government or NGO personnel and reveal "the manner in which Mexico operates shelter systems along the border and specific actions taken by the Mexican." (*Id.*)

The Court does not find compelling reasons to seal this testimony. First, the fact that information-sharing occurs between U.S. and Mexican officials regarding the list of asylum seekers has already been publicly disclosed as a part of the metering policy. (*See* Prelim. Inj. at 27–28.) Further, the testimony does not describe wide-ranging discussions between CBP, the State Department, and /or the Mexican Government regarding border infrastructure or security measures; rather, it is limited to questions about Defendants' access to the waitlists, which is at the core the parties' dispute over class member determination. There is one vague reference to the utility of the lists; the remainder of the testimony excerpts confirms, in general terms, that lists were exchanged between shelters, the INM, and CBP, to which Harris played a peripheral role in facilitating. Thus, the Court denies the Motion to Seal. However, the Court will allow Defendants to redact the names of State Department and other non-party contacts to maintain their privacy.

## V. CONCLUSION

Accordingly, Plaintiffs' Motion for Clarification of the Preliminary Injunction (ECF No. 494) is **GRANTED**. The Court **CLARIFIES** the Preliminary Injunction as follows:

(1) EOIR is bound by the terms of the preliminary injunction;

Case: 22-55988, 12/20/2022, ID: 12615513, DktEntry: 13-2, Page 163 of 301

(2) DHS and EOIR must take immediate affirmative steps to reopen or reconsider past determinations that potential class members were ineligible for asylum based on the Asylum Ban, for all potential class members in expedited or regular removal proceedings. Such steps include identifying affected class members and either directing immigration judges or the BIA to reopen or reconsider their cases or directing DHS attorneys representing the government in such proceedings to affirmatively seek, and not oppose, such reopening or reconsideration;

(3) Defendants must inform identified class members in administrative proceedings before USCIS or EOIR, or in DHS custody, of their potential class membership and the existence and import of the preliminary injunction; and

(4) Defendants must make all reasonable efforts to identify class members, including but not limited to reviewing their records for notations regarding class membership made pursuant to the guidance issued on November 25, 2019, and December 2, 2019, to CBP and OFO, respectively, and sharing information regarding class members' identities with Plaintiffs.

***

Further, the Court **GRANTS IN PART** the Motion to Seal (ECF No. 495). The Clerk shall accept and file under seal Exhibit 1 (ECF No. 496-1), Exhibit 2 (ECF No. 496-2), and Exhibit 3 (ECF No. 496-3) to Plaintiffs' Motion. However, the Court **DENIES WITHOUT PREJUDICE** the request to seal Exhibit 4 to Plaintiffs' Motion (Deposition of Rodney Harris). Defendants shall file a redacted version of this exhibit, in accordance with the Court's aforementioned instructions, by **November 13, 2020**, which shall be accepted and filed by the Clerk upon receipt. The exhibit shall remain sealed in the interim.

Lastly, for the reasons stated above, Plaintiffs' Ex Parte Motion for Oral Argument is **DENIED AS MOOT** (ECF No. 509).

**IT IS SO ORDERED.**

**DATED: October 30, 2020**

Cynthia Bashant

**Hon. Cynthia Bashant**
**United States District Judge**

**UNITED STATES DISTRICT COURT**

**FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

AL OTRO LADO, INC., *et al.*,

Plaintiffs,

v.

CHAD F. WOLF, *et al.*,

Defendants.

Case No.: 17-cv-02366-BAS-KSC

**ORDER:**

**(1) GRANTING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION [ECF No. 390];**

**(2) DENYING AS MOOT DEFENDANTS' MOTIONS TO STRIKE [ECF No. 411, 425];**

**AND**

**(3) TERMINATING AS MOOT THE PARTIES' MOTION TO SEAL [ECF No. 432]**

Before the Court is Plaintiffs' Motion for Class Certification ("Motion"). (ECF No. 390.) Plaintiffs request that the Court certify a class of all noncitizens who seek or will seek to access the U.S. asylum process by presenting themselves at a Class A port of entry ("POE") on the U.S.-Mexico border, and were or will be denied access to the U.S. asylum process by or at the instruction of U.S. Customs and Border Protection ("CBP") officials on or after January 1, 2016. Plaintiffs further request that the Court certify a subclass of all noncitizens who were or will be denied access to the asylum process at a Class A POE on the U.S.-Mexico border as a result of Defendants' metering policy on or after January 1, 2016. For the reasons explained below, the Court **GRANTS** Plaintiffs' Motion, **DENIES AS MOOT** Defendants' Motions to Strike, and **TERMINATES AS MOOT** the related Motion to seal.

## I. RELEVANT BACKGROUND

On November 13, 2018, Plaintiffs filed the operative Second Amended Complaint ("SAC") in this action seeking class-wide injunctive and declaratory relief regarding CBP's purported pattern and practice of systematically denying asylum seekers access to the asylum process along the U.S.-Mexico border. (*See* ECF No. 189.) Specifically, Plaintiffs claim that "CBP refused to inspect and process" asylum-seekers in accordance with the governing statute, which requires CBP officers to refer for an interview by an asylum officer any noncitizens who arrive at POEs and "indicate an intention to apply for asylum." (Mem. of P. & A. in supp. of Mot. ("Mem. of P. & A.") at 6–7, ECF No. 390-1 (citing 8 U.S.C. § 1225(b)).) Instead, Plaintiffs allege, CBP prevents asylum-seekers from accessing the asylum process on the pretext that the POEs are at capacity, when its true intent is to deter individuals from seeking asylum in the United States at all. (*Id.* at 13.)

First, Plaintiffs claim that in 2016, CBP officers engaged in "various means to turn back asylum seekers arriving at Class A POEs on the U.S.-Mexico border"—including lies, threats, intimidation and coercion, verbal abuse, physical force or obstruction, delays and denials, and racial discrimination. (Mem. of P. & A. at 7; *see also* SAC ¶ 2.) Second, Plaintiffs contend that as early as May 2016, Defendants began implementing a policy to restrict the flow of asylum seekers at the San Ysidro POE. (SAC ¶ 51.) Pursuant to this policy, CBP coordinates with the Government of Mexico to "control the flow" of asylum applicants by limiting the number of intakes performed daily at POEs. (*Id.* ¶ 52.) Noncitizens who attempt to seek asylum at POEs outside certain "intake periods" are given "numbers with intake dates" and told to "remain in-line in Mexico" until their number is called—a practice referred to as "metering."[1] (*Id.* ¶¶ 52–53.) Plaintiffs allege that CBP has been metering asylum-seekers border-wide since November 2016. (*Id.* ¶¶ 55–57.)

Ultimately, according to Plaintiffs, Defendants announced the existence of a "Turnback Policy" in spring 2018 "mandating that lower-level officials directly or

[1] This process is also referred to as "queue management." (Defs.' Opp'n to Mot. ("Opp'n") at 8, ECF No. 406.)

constructively turn back asylum seekers at the border," including through pretextual assertions that POEs lack capacity to process asylum seekers.  (SAC ¶¶ 3, 61–62, 65; *see also* Metering Guidance, Ex. 1 to Defs.' Opp'n to Mot., ECF No. 406-2.)  Per this Metering Guidance, CBP officers instruct asylum-seekers "to wait on the bridge, in the preinspection area, or at a shelter until there is adequate space at the POE" or inform them that they cannot be processed because the POE is "full" or "at capacity."  (SAC ¶ 3; Metering Guidance at 1.)

Plaintiffs claim that CBP "continued to buttress the Turnback Policy" with the other unlawful tactics, some of which were implemented independently of the Turnback Policy, while others were "part of or incident to the Turnback Policy."  (SAC ¶¶ 62, 84.)  In sum, Plaintiffs' allege that CBP officials commit the following acts to further their goal of restricting access to the asylum process:

1) Misrepresent the state of the law, asylum-seekers' eligibility, prerequisites for asylum claims, or POE capacity (*id.* ¶ 85)[2];

2) Threaten to detain, deport, arrest, ban, bring criminal charges against, or physically harm asylum-seekers, or threaten to separate them from their children, if they continue to pursue their asylum claims (*id.* ¶ 87)[3];

3) Verbally and physically abuse asylum seekers (*id.* ¶ 89)[4];

4) Coerce asylum seekers into recanting their alleged credible fear on video or

---

[2] (*See* Decl. of Abigail Doe ¶¶ 13, 15, Ex. 9 to Decl. of Stephen Medlock ("Medlock Decl."), ECF No. 390-11; Decl. of Beatrice Doe ¶¶ 10–12, 24, Ex. 10 to Medlock Decl., ECF No. 390-12; Decl. of Carolina Doe ¶¶ 18, 20, Ex. 11 to Medlock Decl., ECF No. 390-13; Decl. of Dinora Doe ¶¶ 9, 12, Ex. 12 to Medlock Decl., ECF No. 390-14; Decl. of Ingrid Doe ¶¶ 15, 17, Ex. 13 to Medlock Decl., ECF No. 390-15; Decl. of Jose Doe ¶¶ 9, 18–19, Ex. 14 to Medlock Decl., ECF  No 390-16; Decl. of Maria Doe ¶¶ 4, 9, Ex. 97 to Medlock Decl., ECF No. 390-99; *see also* Expert Report of Stephanie Leutert ("Leutert Rep.") ¶ 45, Ex. 7 to Medlock Decl., ECF No. 389-9 (attesting that turnbacks from POEs are often accompanied by messages that the U.S. was "not accepting any more people" and CBP was not "receiving people from Honduras").)

[3] (*See* Decl. of Abigail Doe ¶¶ 14–16; Decl. of Beatrice Doe ¶¶ 16, 21, 24; Decl. of Carolina Doe ¶¶ 19–21; Decl. of Dinora Doe ¶¶ 16–17; Decl. of Jose Doe ¶ 11.)

[4] (*See* CBP Report of Investigation, Ex. 5 to Medlock Decl., ECF No. 389-7; Decl. of Dinora Doe ¶¶ 16–17; Decl. of Jose Doe ¶ 11.)

withdrawing their applications for admission (*id.* ¶ 91)[5];

5) Deny access to POEs without any explanation (*id.* ¶ 93)[6];

6) Obstruct access to POEs by setting up "pre-checkpoints" that prevent asylum-seekers from entering the POE building (*id.* ¶ 95)[7];

7) "Meter" asylum seekers by limiting the number of individuals they process per day, "routinely tell[ing] asylum seekers approaching POEs that in order to apply for asylum, they must get on a list or get a number," and preventing asylum-seekers from coming to the POE "until their number is called which can take days, weeks or longer" (*id.* ¶ 100)[8];

8) Discriminate against certain asylum-seekers by denying access to those with darker complexion or those from certain countries (*id.* ¶¶ 103–04).[9,10]

Plaintiffs argue that Defendants, through the above conduct, "single out asylum seekers for treatment that applies to no other group of individuals seeking admission to the U.S." and that no statutory authorization or other lawful justification exists for the underlying policy to turn away asylum-seekers from POEs. (Mem. of P. & A. at 1, 4, 7 (noting that it is undisputed that CBP officers must refer individuals seeking asylum for an interview with an asylum officer or place them into removal proceedings where they can raise an asylum claim before an immigration judge).)

---

[5] (*See* Decl. of Abigail Doe ¶¶ 16–18; Decl. of Beatrice Doe ¶ 21; Decl. of Carolina Doe ¶¶ 23–27.)

[6] (*See* Decl. of César Doe ¶ 11, Ex. 99 to Medlock Decl., ECF No. 390-11; Decl. of Victoria Doe ¶ 11, Ex. 100 to Medlock Decl., ECF No. 390-102.)

[7] (*See* Decl. of Roberto Doe ¶¶ 4–5, Ex. 73 to Medlock Decl., ECF No. 390-75; Decl. of Maria Doe ¶¶ 4, 9; Decl. of Juan Doe ¶¶ 6, 9, Ex. 101 to Medlock Decl., ECF No. 390-103; Decl. of Úrsula Doe ¶¶ 6, 9, Ex. 102 to Medlock Decl., ECF No. 390-104; *see also* Dep. of Todd Owens 155:10–156:17, 274:7–8, Ex. 2 to Medlock Decl., ECF No. 389-4 (testifying that CBP officers were posted at the limit line or in the middle of POE bridges); March 19, 2019 email, Ex. 15 to Medlock Decl., ECF No. 390-17 (concerning dangers to CBP officers standing at bridge midpoint); Leutert Rep. ¶¶ 51, 60.)

[8] (*See* Decl. of Roberto Doe ¶¶ 4–5; Decl. of Maria Doe ¶ 4; Decl. of Bianca Doe ¶¶ 8–9, Ex. 98 to Medlock Decl., ECF No. 390-100; Decl. of Victoria Doe ¶ 11; Decl. of Juan Doe ¶¶ 6, 9; Decl. of Úrsula Doe ¶¶ 6, 9; Decl. of Emiliana Doe ¶¶ 9–12, Ex 103 to Medlock Decl., ECF No. 390-105.)

[9] (*See* Leutert Rep. ¶ 45; Decl. of Dinora Doe ¶ 12.)

[10] The Court refers to these practices collectively as "turnbacks."

Based on these assertions, Plaintiffs now bring this Motion to certify: (1) a class of asylum-seekers who were or will be denied inspection and access to the U.S. asylum process at certain POEs due to these practices; and (2) a subclass of asylum-seekers specifically denied access due to CBP's metering practices. (*Id.* at 4.) Five of the Named Plaintiffs—Plaintiffs Abigail Doe, Beatrice Doe, Carolina Doe, Dinora Doe, and Ingrid Doe—claim they were subjected to coercion or lies when CBP officials denied them access to the asylum process at various POEs. The other eight Named Plaintiffs—Roberto Doe, Maria Doe, Juan Doe, Úrsula Doe, Victoria Doe, Bianca Doe, Emiliana Doe, and César Doe—allege that they were subjected to CBP's metering policy.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 23 governs the certification and maintenance of class actions. Plaintiffs bear the burden of demonstrating that their proposed class and subclass comport with both Rule 23(a) and (b). *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011); *Zinser v. Accufix Res. Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001). A plaintiff whose lawsuit meets the requirements of Rule 23 has a "categorical" right "to pursue his claim as a class action." *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins.*, 559 U.S. 393, 398 (2010).

Federal courts possess broad discretion over class certification under this Rule. *Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708, 712 (9th Cir. 2010) ("The decision to grant or deny class certification is within the trial court's discretion."). A district court must take the substantive allegations of the complaint as true but is also "required to consider the nature and range of proof necessary to establish [the] allegations" of the complaint. *In re Coordinated Pretrial Proceedings in Petroleum Prod. Antitrust Litig.*, 691 F.2d 1335, 1342 (9th Cir. 1982) (citing *Blackie v. Barrack*, 524 F.2d 891, 901 n.17 (9th Cir. 1975)). A court may therefore consider evidentiary submissions as part of its Rule 23 analysis. *United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. &*

*Serv. Workers Int'l Union, AFL-CIO, CLC v. ConocoPhillips Co.*, 593 F.3d 802, 810 (9th Cir. 2010).

However, a court has "no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013). "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether Rule 23 prerequisites for class certification are satisfied." *Id.* at 466 (internal quotation marks omitted). Ultimately, "[t]he district court's class certification order, while important, is also preliminary" because "'[a]n order that grants or denies class certification may be altered or amended before final judgment.'" *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1004 (9th Cir. 2018) (quoting Fed. R. Civ. P. 23(c)(1)(C)).

## III.    ANALYSIS

Plaintiffs request that the Court certify a class consisting of:

> all noncitizens who seek or will seek to access the U.S. asylum process by presenting themselves at a Class A [POE] on the U.S.-Mexico border, and were or will be denied access to the U.S. asylum process by or at the instruction of [CBP] officials on or after January 1, 2016.

(Mem. of P. & A. at 1.) Plaintiffs also request that the Court certify a subclass of "all noncitizens who were or will be denied access to the U.S. asylum process at a Class A POE on the U.S.-Mexico border as a result of Defendants' metering policy on or after January 1, 2016." (*Id.*) The Court briefly addresses evidentiary issues before turning to the class certification analysis.

### A.    Evidentiary Objections

Preliminarily, the Court addresses Defendants' two Motions to Strike the anonymous and pseudonymous declarations submitted in support of Plaintiffs' Motion and Reply briefs. (*See* ECF Nos. 411, 425.) Defendants filed these motions after the parties failed to reach an agreement about how to limit the disclosure of the declarants' identifying

information.[11] Defendants now move to strike 23 declarations submitted in support of Plaintiffs' Motion for Class Certification and 44 declarations submitted in support of the Reply on the basis that Plaintiffs never requested or received permission for these unidentified declarants to proceed anonymously or pseudonymously.[12] Because the Court did not rely on the declarations to resolve the issues raised on class certification, the Court **DENIES AS MOOT** Defendants' Motions to Strike.[13]

**B. Fed. R. Civ. P. 23(a)**

Rule 23(a) provides that a class may be certified only if:

> (1) the class is so numerous that joinder of members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a); *see also Shady Grove*, 559 U.S. at 398. Courts refer to the Rule 23(a) factors as "numerosity, commonality, typicality, and adequacy of representation." *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012). Plaintiffs generally bear the burden to show that their proposed subclass "independently meet[s] the requirements for the maintenance of a class action." *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 630 (9th Cir. 1982). The Court addresses each factor below and finds that Plaintiffs have satisfied the Rule 23(a) requirements.

1. <u>Numerosity</u>

Rule 23(a) requires that the class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). When a class action seeks only equitable relief,

---

[11] Plaintiffs' counsel twice offered to share the information with Defendants on the condition that Defendants agree to limit disclosure to only certain members of the defense team, but Defendants did not agree to Plaintiffs' terms. (*See* Decl. of Alexander Halaska in supp. of Mot. to Strike Mot. Decls. ¶¶ 4, 5, ECF No. 411-2; Decl. of Stephen Medlock in supp. of Opp'n ¶ 6, ECF No. 434-1.)

[12] The Court previously allowed the Named Plaintiffs to proceed pseudonymously or anonymously in this case without prejudice to future challenges by Defendants at later stages of the proceedings. (*See* ECF No. 138.) Defendants do not seek to strike Named Plaintiffs' declarations in their instant Motions to Strike.

[13] Because the Court did not consider any supporting documentation in conjunction with the Motions to Strike, the parties' Motion to Seal certain exhibits to and portions of Plaintiffs' Opposition to Defendants' Motions to Strike (ECF No. 432) is **TERMINATED AS MOOT**.

as here, "the numerosity requirement is relaxed and plaintiffs may rely on the reasonable inference arising from plaintiffs' other evidence that the number of unknown and future members" of a proposed class is sufficient to make joinder impracticable. *Sueoka v. United States*, 101 F. App'x 649, 653 (9th Cir. 2004).

The numerosity requirement is generally satisfied when the class contains 40 or more members. *Consolidated Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995); *Celano v. Marriott Int'l, Inc.*, 242 F.R.D. 544, 549 (N.D. Cal. 2007). Plaintiffs claim that this threshold is far exceeded in this case, noting that in Ciudad Juarez and Tijuana alone, a total of 57,460 people placed their names on waitlist in 2018 and 2019. (Mem. of P. & A. at 23.) Defendants concede that this satisfies the numerosity requirements for the subclass, *i.e.*, people who have been subjected or will be subjected to CBP's metering policy since April 2018. (Defs.' Opp'n to Mot. ("Opp'n") at 17–18, ECF No. 406.)

However, Defendants argue that Plaintiffs' class/subclass distinction is flawed because "[m]etering is so distinct from the allegations of other 'turnbacks' that the metering sub-class cannot properly be considered" derivative of the larger class.[14] (*Id.* at 18.) Instead, Defendants contend, the two groups should be considered separate classes. (*Id.*) Defendants claim that under this formulation, the proposed class covering turnbacks other than metering does not meet the numerosity requirement. (*Id.*)

The Court finds no issue with the class/subclass structure. Metering, like the other conduct alleged, is one way in which CBP officers turn asylum-seekers away from POEs instead of referring them to asylum officers for credible fear interviews under 8 U.S.C. § 1225(b). The proposed class and subclass capture all individuals allegedly subject to some form of CBP conduct—metering or otherwise—that denied them access to this statutory process. The subclass of metered asylum-seekers, therefore, does not encompass anyone who is not also in the class; every individual who was or will be denied access to a POE

[14] Defendants' challenge to numerosity overlaps considerably with their argument regarding commonality and typicality. The Court addresses these issues in Sections III.B.2 and III.B.3, *infra*.

necessarily includes any individual subject to metering at a POE. *C.f. Ashker v. Gov. of State of Calif.*, No. C 09-5796 CW, 2014 WL 2465191, at *3 n.1 (N.D. Cal. June 2, 2014) (treating a proposed subclass as a separate class where plaintiff's definition of the subclass "conceivably could encompass inmates who are not members of the proposed . . . class"). Where a subclass is subsumed within larger class, as here, plaintiffs are required to show only that the subclass was sufficiently numerous to satisfy numerosity requirement. *See McCurley v. Royal Seas Cruises, Inc.*, 331 F.R.D. 142, 168 (S.D. Cal. 2019); *see also Langley v. Coughlin*, 715 F. Supp. 522, 553 (S.D.N.Y. 1989) (finding allegations that subclasses each encompassed anywhere between 30 and 250 class members were sufficient to meet numerosity requirement for class and subclass certification). Plaintiffs have done so. Thus, the Court finds numerosity is satisfied.

2. Commonality

The commonality requirement requires that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "What matters to class certification . . . is not the raising of common questions—even in droves—but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Dukes*, 564 U.S. at 350 (quotations omitted). "All questions of fact and law need not be common to satisfy the [commonality requirement]. The existence of shared legal issues with divergent factual predicates is sufficient." *Meyer v. Portfolio Recovery Assocs.*, 707 F.3d 1036, 1041 (9th Cir. 2012) (quotations omitted). "The common contention 'must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Id.* at 1041–42 (quoting *Dukes*, 564 U.S. at 350).

In this case, Plaintiffs argue that the commonality requirement is met because Plaintiffs have shown that "that the existence and effects of turnbacks, including metering, are systemic and capable of common proof." (Mem. of P. & A. at 27.) With respect to metering specifically, Plaintiffs state that it is undisputed that this practice applied to all

POEs on the U.S.-Mexico border, regardless of capacity. (*Id.* at 26–27.) Plaintiff thus identify the following common questions of law and fact in this action:

> (1) whether Defendants are misinterpreting 8 U.S.C. §§ 1158(a)(1) and 1225(a)(1), (a)(3), and (b)(1)(A)(ii) to apply only to individuals who are physically present in the U.S.; (2) whether Defendants denied noncitizens arriving at Class A POEs on the U.S.-Mexico border access to the U.S. asylum process; (3) whether class members have been "adversely affected or aggrieved" by agency action taken by Defendants, 5 U.S.C. § 701; (4) whether Defendants "unlawfully withheld or unreasonably delayed" mandatory agency action; (5) whether Defendants denied class members due process in violation of the Fifth Amendment; (6) whether Defendants' conduct violated the universal and obligatory international norm of nonrefoulement; (7) whether Defendants' turnbacks are ultra vires; and (8) whether the Turnback Policy was adopted and implemented based on pretext and an unlawful desire to deter asylum seekers.

(*Id.* at 28.)

Defendants argue that Plaintiffs' commonality argument fails for a number of reasons. First, Defendants contend that Plaintiffs fail to "identify any common policy beyond metering" regarding the broader class because the eight individuals allegedly subjected to "turnbacks" other than metering describe conduct too disparate for purposes of commonality. (Opp'n at 20–21.) Second, Defendants state that there are no questions common to the metering subclass because Plaintiffs' claims "turn on the highly-variable factual circumstances unique to each port of entry," some of which provide legitimate reasons for turnbacks and thus require "an individual assessment of the officer's use of discretion." (*Id.* at 22–23, 28–29.)

The Court is not persuaded. While Plaintiffs include eight discrete practices as the factual bases for their claims,[15] this does not defeat commonality where the claims themselves are still capable of class-wide resolution. In this regard, Plaintiffs identify

---

[15] There is evidence that the reason for these varied practices was due to the fact that despite turning asylum-seekers away since 2016, CBP had no standard practice governing the way in which officers were to carry out that objective before the issuance of the Metering Guidance in 2018. (*See* CBP Report of Investigation at 8–9 (noting that at the beginning of 2017, CBP's instructions at the San Ysidro POE about stopping undocumented individuals were "conflicting and constantly changing" and while written policy was to allow those claiming asylum into the U.S., "management instructed the [CBP officers] to direct [undocumented aliens] to the Beta group in Tijuana"); *see also* Leutert Rep. ¶¶ 45–47 (noting that "CBP officials were not using a uniform explanation for why [turnbacks] were taking place" and that metering was not standardized in 2017–2018).)

sufficient commonalities between all eight practices to generate common answers in this case, including the following: (1) each practice is carried out by a single agency, CBP; (2) each furthers the administration's objective of restricting asylum access; (3) all members of the class are subject to at least one of these practices; and (4) each practice is unlawful as to every asylum-seeker, regardless of the unique circumstances at each POE. (*See* Mem. of Ps. & As. at 27 ("[T]urnbacks, including metering, are illegal regardless of Defendants' proffered justification for them.").) Thus, Defendants' argument that "potentially legitimate factors" exist to justify individual instances of metering is inapposite.[16] *See Parsons*, 754 F.3d at 678 (holding that commonality existed where the inquiry into class claims did not require a determination as to "the effect of those policies and practices upon any individual class member (or class members) or to undertake any other kind of individualized determination").

What remains for the Court to resolve on the merits is whether these practices constitute "agency actions unlawfully withheld"—namely, a refusal to inspect or process asylum-seekers by referring them for credible fear interviews under 8 U.S.C. § 1225(b). (Pls.' Reply in. supp. of Mot. ("Reply") at 5, ECF No. 413.) This is sufficient for commonality. The different factual circumstances between each class member's particular experience does not destroy commonality because there is still a common underlying legal question regarding whether each and every class member was illegally denied access to the asylum system because of Defendants' overarching policy. *See Parsons v. Ryan*, 754 F.3d 657, 678 (9th Cir. 2014) (finding commonality where putative class sought to challenge 17 statewide policies governing "the overall conditions of health care services

---

[16] In any event, Plaintiffs have provided evidence to support that Defendants' capacity-related justifications for turnbacks are pretextual. (*See, e.g.*, "Prioritization Queue Management Strategy," Ex. 35 to Medlock Decl., ECF No. 389-37 (shifting from "detention capacity" to "operational capacity" and prioritizing other tasks over asylum processing); Exs. 43–47 to Medlock Decl., ECF Nos. 389-45, 389-46, 389-47, 389-48, 390-49 (noting processing capacities at POEs and CBP's "funneling" of asylum-seekers from smaller POEs to larger POEs with long wait times); Exs. 52–56 to Medlock Decl., ECF No. 389-54 through 389-58 (citing to statements by CBP and DHS officials implying intended deterrent effect of turnbacks); *see also* Dep. of Whistleblower 99:15–100:2, 111:18–25, 112:23–113:6, Ex. 3 to Medlock Decl., ECF No. 389-5 (testifying that capacity claims were false).)

and confinement" because "either each of the policies and practices [was] unlawful as to every inmate or it [was] not"); *Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 957 (9th Cir. 2013) ("[Commonality] does not . . . mean that every question of law or fact must be common to the class; all that Rule 23(a)(2) requires is a single significant question of law or fact.") (quotations and citation omitted); *see also Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001) (finding commonality satisfied "where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members"), *abrogated on other grounds by Johnson v. California*, 543 U.S. 499 (2005). The fact that "precise practices" among POEs or CBP officials differ does not mean that a constitutional or statutory floor does not apply equally to all asylum claims raised at a POE. *See Lyon v. U.S. Immigration & Customs Enf't*, 300 F.R.D. 628, 642 (N.D. Cal. 2014) (finding commonality existed where plaintiffs alleged that they were denied effective access to telephones at detention facilities, despite the variation in phone policies and practices at each facility).

Thus, the Court finds commonality satisfied for purposes of certification.

3. Typicality

In general, the claims of the representative plaintiffs "need not be substantially identical" to those of all absent class members and need only be "reasonably co-extensive" to qualify as typical. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998), *overruled on other grounds by Dukes*, 464 U.S. 338. "The test of typicality is 'whether other members [of the class] have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'" *Parsons*, 754 F.3d at 685 (citation omitted).

According to Plaintiffs, the claims of the 14 Named Plaintiffs illustrate the myriad ways in which denials of access to the asylum process are carried out at the southern border. While some Named Plaintiffs were able to reach the entrance to the POE building

or even the building itself before being turned away by CBP,[17] others were prevented from approaching the POE building by CBP or officials from the Government of Mexico,[18] often at the midpoint of the bridge that divides the United States and Mexico.[19] Some were told by CBP officials that the POE was full or closed,[20] while others were told to wait in Mexico, referred to Mexican authorities, or simply told that they could not apply for asylum.[21] Further, five Named Plaintiffs allege that they experienced coercion, threats, misrepresentations, and abuse as part of CBP's denial of access to the asylum process.[22]

The Court finds that the Named Plaintiffs' claims are all "reasonably co-extensive" of the claims of the broader class of asylum-seekers who were or will be denied access to a Class A POE "by or at the instruction of" CBP officials, and of the claims of the metered subclass. Although the mechanics and locations of the Named Plaintiffs' claims vary, they all involve the same injury—denial of access to the asylum process. The Named Plaintiffs also raise the same legal arguments as those of the class and subclass; namely, that CBP's refusal to inspect and process them violates the Immigration and Nationality Act ("INA"), the Administrative Procedures Act ("APA"), the Due Process Clause of the Fifth Amendment, and the Alien Tort Statute. (Mem. of P. & A. at 29–30.) Identical factual circumstances are not necessary where, as here, the claims of the Named Plaintiffs, class, and subclass are based on the same legal theories arising from the same alleged unlawful practice. *See Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010) (finding typicality where the petitioner and proposed class "raise[d] similar constitutionally-based arguments and [were] alleged victims of the same practice of prolonged detention while in

---

17 (*See* Decl. of Abigail Doe ¶¶ 9–10; Decl. of Beatrice Doe ¶ 9; Decl. of Carolina Doe ¶¶ 14; Decl. of Dinora Doe ¶¶ 8, 11, 16; Decl. of Ingrid Doe ¶¶ 13, 16; Decl. of Bianca Doe ¶¶ 8, 11–14; Decl. of Victoria Doe ¶ 11; Decl. of Emiliana Doe ¶ 12.)

18 (*See* Decl. of César Doe ¶ 4; Decl. of Maria Doe ¶¶ 4, 9–12.)

19 (*See* Decl. of Roberto Doe ¶¶ 2–4; Decl. of Maria Doe ¶ 7; Decl. of Juan Doe ¶¶ 6, 9; Decl. of Úrsula Doe ¶¶ 6, 9.)

20 (*See* Decl. of Beatrice Doe ¶ 10, 12; Decl. of Jose Doe ¶ 18; Decl. of Roberto Doe ¶ 5; Decl. of Bianca Doe ¶ 8; Decl. of Juan Doe ¶ 6; Decl. of Úrsula Doe ¶ 6; Decl. of Emiliana Doe ¶ 12.)

21 (*See* Decl. of Abigail Doe ¶ 15; Decl. of Ingrid Doe ¶¶ 15, 16; Decl. of Jose Doe ¶¶ 9, 18–19; Decl. of Maria Doe ¶ 4; Decl. of Bianca Doe ¶¶ 11–14; Decl. of Victoria Doe ¶ 11.)

22 (*See* Decl. of Abigail Doe ¶¶ 13–18; Decl. of Beatrice Doe ¶¶ 9, 12, 20–21, 24; Decl. of Carolina Doe ¶¶ 16, 18–21, 23–24, 26; Decl. of Dinora Doe ¶¶ 9, 12, 16–17; Decl. of Jose Doe ¶ 12.)

immigration proceedings").  Further, there is no indication that these denials were unique to Named Plaintiffs; indeed, given the undisputed number of people on waitlists, it is clear that others have been subjected to this same course of conduct.

Defendants raise several challenges to typicality.  First, Defendants contend that the claims of Plaintiffs Abigail Doe, Beatrice Doe, Carolina Doe, Dinora Doe, and Ingrid Doe are not typical of the putative subclass members' claims because they allege they were turned back by CBP officers before the Metering Guidance was issued in 2018.  (Opp'n at 31–32.)  However, the Court is not persuaded by any suggestion that these claims are atypical simply because of their timing.  Plaintiffs have alleged, with citation to supporting evidence, that Defendants began metering asylum seekers at the San Ysidro POE in 2016 and that the metering policy adopted in 2018 was merely a formalization of this process.[23] As such, the Court does not find that the chronology of these Plaintiffs' claims means they are not reasonably co-extensive of the subclass's metering claims.

Second, echoing their challenge to the commonality requirement, Defendants state they "can raise unique factual defenses" as to each Named Plaintiff's individual turnback at a POE that defeats typicality for both the class and subclass.  (Opp'n at 32–33.)  By way of example, they state that the unlawfulness of Roberto Doe's turnback, given the timing, "depends on whether the government's delay in processing him was unreasonable in light of other congressionally-mandated activities occurring at the port that day[.]"  (*Id.* at 32.) This appears to be another iteration of Defendants' argument that other "potentially legitimate factors" could provide legal justification for the decision to turn back asylum-seekers at POEs.  Again, this argument misunderstands Plaintiffs' core legal claim that all turnbacks are illegal regardless of the proffered justification.  *See* Section III.B.2., *supra*.

Lastly, Defendants contend that in some Plaintiffs' cases, they were "intercepted by Mexican officials" or otherwise did not encounter CBP officials and were therefore not

---

[23] *See* Rule 30(b)(6) Dep. of U.S. CBP 241:9–242:6, Ex. 1 to Medlock Decl., ECF No. 389-3 (noting that metering began in 2016 with influx of Haitian migrants); Dep. of Todd Owens 38:9–16, 100:2–6 (testifying that metering has been in place from 2016 to present).

subject to the enumerated turnback practices. (Opp'n at 32–33.) However, Plaintiffs have sufficiently supported their arguments at this stage that Mexican officials acted at the direction of CBP officials as part of the metering policy.[24] Moreover, to the extent some asylum-seekers placed themselves on waitlists without approaching a POE at all pursuant to the understanding that metering was in effect at the U.S.-Mexico border, these claims are also reasonably-coextensive of the Named Plaintiffs' claims. The Court sees no meaningful difference between asylum-seekers who metered directly by CBP at or near a POE and those who placed their names on waitlists after receiving information about the practice from third parties, such as Mexican officials or other asylum-seekers.[25]

Thus, the Court therefore finds typicality has been met.

4. Adequacy of Representation

For the class representatives to adequately and fairly protect the interests of the class, two criteria must be satisfied. "First, the named representatives must appear able to prosecute the action vigorously through qualified counsel, and second, the representatives must not have antagonistic or conflicting interests with the unnamed members of the class." *Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir. 1978). Defendants do not contest the adequacy of the representation in this case.

The Court finds no evidence that the proposed class representatives have any

---

[24] *See, e.g.*, Sept. 4, 2016 Email, Ex. 40 to Medlock Decl., ECF No. 389-42 ("Yesterday was the first day we have coordinated with [G]rupo [B]eta to slowdown the intake process."); Queue Management Brief (AOL-DEF-00517231), Ex. 41 to Medlock Decl., ECF No. 389-43 ("CBP has established a collaborative bi-national effort with The Government of Mexico (GoM) . . . to assist in slowing the flow of individuals to the border."); Nov. 22, 2016 Email, Ex. 54 to Medlock Decl., ECF No. 389-56 ("Mexican Immigration/Grupo Beta are handling the metering for San Ysidro and Calexico."); *see also* Decl. of Roberto Doe ¶ 6 (stating that a CBP official called Mexican immigration officials to "come and pick up" asylum-seekers from POE); Decl. of César Doe ¶¶ 4–6 (attesting that Grupo Beta told him that he "would need to go through them to apply for asylum"); Decl. of Juan Doe ¶ 9 (stating that Mexican officials were "standing on the sidewalk checking people's documents before they could reach the American officials standing in the middle of the bridge); "FW: General Update on Migrant Caravan," Ex. 29 to Mot., ECF No. 389-31 (summarizing updates from and coordination with Mexican Government and Grupo Beta regarding migrant caravan).

[25] Two Named Plaintiffs did not initially approach POEs on the advice of third parties that they would first need to put their names on waitlists. (*See* Decl. of Cesar Doe ¶ 4 (told by Grupo Beta that "they would put [him] on a list and give [him] a number"); Decl. of Emiliana Doe ¶¶ 9–11 (learned about waitlist from another asylum-seeker and placed herself on the list in the parking lot next to the Chaparral POE.)

antagonistic or conflicting interests with the unnamed members of the class, and counsel has shown that they are qualified and willing to prosecute this action vigorously. (*See* Medlock Decl. ¶¶ 4–5, ECF No. 390-2.) Thus, the requirements of Rule 23(a)(4) have been met.

**C. Fed. R. Civ. P. 23(b)(2)**

If a proposed class satisfies Rule 23(a)'s requirements, then the proposed class must also qualify as one of the types of class actions Rule 23(b) identifies. Fed. R. Civ. P. 23(b); *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 979–80 (9th Cir. 2011). Plaintiffs seek certification of the class and subclass pursuant to Rule 23(b)(2). (Mem. of P. & A. at 6.)

Rule 23(b)(2) permits class certification when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). The Ninth Circuit has held that "'it is sufficient' to meet the requirements of Rule 23(b)(2) [when] 'class members complain of a pattern or practice that is generally applicable to the class as a whole.'" *Rodriguez*, 591 F.3d at 1125 (quoting *Walters v. Reno*, 145 F.3d 1032, 1047 (9th Cir. 1998)). "The rule does not require [the Court] to examine the viability or bases of class members' claims for declaratory and injunctive relief, but only to look at whether class members seek uniform relief from a practice applicable to all of them." *Id.* at 1125; *see also Dukes*, 564 U.S. at 360 ("The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.") (internal quotation marks omitted).

The Court finds that Rule 23(b)(2)'s requirements are plainly met. Plaintiffs Prayer for Relief requests that this Court: (1) declare that Defendants' Turnback Policy violates the INA, APA, the Due Process Clause of the Fifth Amendment, and/or principles of non-refoulement; and (2) issue injunctive relief prohibiting Defendants from continuing to implement the Policy and requiring Defendants to implement oversight and accountability

procedures related to inspecting and processing asylum-seekers at POEs along the southern border. (SAC ¶ 304.) This relief would benefit the Named Plaintiffs as well as all members of the proposed class and subclass in the same manner in a single stroke. *See Parsons*, 754 F.3d at 689 ("[E]very [member] in the proposed class is allegedly suffering the same (or at least a similar) injury and that injury can be alleviated for every class member by uniform changes in . . . policy and practice."); *see also Inland Empire-Immigrant Youth Collective v. Nielsen*, No. EDCV 17-2048 PSG (SHKx), 2018 WL 1061408, at *12 (C.D. Cal. Feb. 26, 2018).

Defendants claim that because the evidence does not support that CBP officers acted generally to implement each of the eight distinct practices alleged by Plaintiffs, there is no evidence a "Turnback Policy" is applicable to the broader class and therefore no basis for finding that CBP officials "acted or refused to act on grounds that apply generally to the class" as required under Rule 23(b)(2). (Opp'n at 34 ("[T]here is no evidence that Defendants have acted generally to . . . take[] any of the other myriad actions that Plaintiffs claim is part of the same general course of conduct.").)[26]

This argument is without merit. Factual differences among class member claims is not a focus of the Rule 23(b)(2) inquiry. *See Walters*, 145 F.3d at 1047 (noting that "the government's dogged focus on the factual differences among the class members appears to demonstrate a fundamental misunderstanding" of Rule 23(b)(2)). Plaintiffs allege that CBP officers refused to process asylum-seekers, an act which they claim is unlawful regardless of the grounds for the refusal. (*See* Mem. of P. & A. at 9 (arguing alternatively that all turnbacks "are categorically unlawful because they exceed CBP's authority" or that turnbacks in this case are unlawful because "they are based on pretext and an unlawful deterrence motive").) The officers' refusal to process asylum-seekers, therefore, is the generally applicable ground for class-wide relief under Rule 23(b)(2). *See Walters*, 145

---

[26] Defendants also note that if Rule 23(b)(2) requirements are met, "there are important limits on the relief available to a 23(b)(2) class." (Opp'n at 35.) Because these contentions concern the scope of the requested injunctive relief, which falls outside the class certification inquiry, the Court does not address these arguments in this Order.

F.3d at 1047 ("It is sufficient [for Rule 23(b)(2)] if class members complain of a pattern or practice that is generally applicable to the class as a whole."); *Rodriguez*, 591 F.3d at 1126 (certifying class of immigrant detainees under Rule 23(b)(2) where "relief from a single practice is requested by all class members").

Hence, Plaintiffs have shown that the requirements of Rule 23(b)(2) have been met.

## IV. CONCLUSION

Accordingly, the Court **ORDERS** as follows:

(1) Plaintiffs' Motion for Class Certification (ECF No. 390) is **GRANTED**.

The Court certifies a class consisting of

> all noncitizens who seek or will seek to access the U.S. asylum process by presenting themselves at a Class A [POE] on the U.S.-Mexico border, and were or will be denied access to the U.S. asylum process by or at the instruction of [CBP] officials on or after January 1, 2016.

The Court also certifies a subclass of

> "all noncitizens who were or will be denied access to the U.S. asylum process at a Class A POE on the U.S.-Mexico border as a result of Defendants' metering policy on or after January 1, 2016."

(2) Defendants' Motions to Strike (ECF No. 411, 425) are **DENIED AS MOOT**;

(3) The related Motion to Seal (ECF No. 432) is **TERMINATED AS MOOT**.

**IT IS SO ORDERED.**

**Dated: August 6, 2020**

**Hon. Cynthia Bashant**
**United States District Judge**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

Al Otro Lado, Inc., *et al.*,

Plaintiffs,

v.

Kevin K. McAleenan, *et al.*,

Defendants.

Case No.: 17-cv-02366-BAS-KSC

**ORDER:**

**(1) GRANTING PLAINTIFFS' MOTION FOR PROVISIONAL CLASS CERTIFICATION (ECF No. 293);**

**AND**

**(2) GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (ECF No. 294)**

Before the Court are Plaintiffs' Motion for Provisional Class Certification and Plaintiffs' Motion for a Preliminary Injunction. (Mot. for Provisional Class Certification, ECF No. 293; Mot. for Prelim. Inj., ECF No. 294.) These Motions identify a subclass of asylum-seekers caught in the legal bind created by Defendants' previous policies at the southern border and a newly-promulgated regulation known as the Asylum Ban. The Asylum Ban requires non-Mexican nationals who enter, attempt to enter, or arrive at a port of entry ("POE") at the southern border on or after July 16, 2019 to first seek asylum in Mexico, subject to narrow exceptions. Plaintiffs ask the Court to prevent the Government Defendants from applying the Asylum Ban to a class of non-Mexican nationals who were prevented from making direct claims

for asylum at POEs before July 16, 2019 and instructed to instead wait in Mexico pursuant to the Government's own policies and practices.

The putative class members in this case did exactly what the Government told them to do: they did not make direct claims for asylum at a POE and instead returned to Mexico to wait for an opportunity to access the asylum process in the United States. Now, the Government is arguing that these class members never attempted to enter, entered, or arrived at a POE before July 16, 2019, and, therefore, the newly promulgated Asylum Ban is applicable to them.

The Court disagrees. Because the Court finds that members of the putative class attempted to enter a POE or arrived at a POE before July 16, 2019, and that as such, the Asylum Ban by its terms does not apply to them, the Court **GRANTS** Plaintiffs' Motions.

## I. BACKGROUND

Plaintiffs filed their initial complaint in the underlying action on July 12, 2017 in the Central District of California. (Compl., ECF No. 1.) The case was subsequently transferred to the Southern District of California. (ECF Nos. 113, 114.) The Court provides a brief overview of the action's lengthy litigation history below.

### A. Overview of the Litigation

Plaintiffs' putative class action complaint alleges that Customs and Border Protection ("CBP") uses various unlawful tactics, "including misrepresentation, threats and intimidation, verbal abuse and physical force, and coercion" to systematically deny asylum seekers access to the asylum process. (Compl. ¶ 2.) Defendants moved to dismiss the Complaint on December 14, 2017. (ECF No. 135.) In its order on the motion, the Court found that organizational Plaintiff Al Otro Lado had standing to bring the case and that the case was not moot, even though some named Plaintiffs had received an asylum hearing. *See Al Otro Lado, Inc. v. Nielsen*, 327 F. Supp. 3d 1284, 1296–1304 (S.D. Cal. 2018). The Court further denied requests to dismiss the lawsuit based on sovereign immunity and held that Plaintiffs

had adequately alleged a claim under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(1), to "compel agency action unlawfully withheld." (*Id.* at 1304–05, 1309–10.)

However, the Court dismissed the § 706(1) claims brought by Plaintiffs Abigail Doe, Beatrice Doe and Carolina Doe to the extent they sought to compel relief under 8 C.F.R. § 235.4 for allegedly being coerced into withdrawing their applications for admission. *Id.* at 1314–15 (concluding that § 235.4 did not require CBP to take "discrete agency action" to determine whether a withdrawal was made voluntarily). The Court also dismissed Plaintiffs' § 706(2) claims based on an alleged "pattern or practice" because Plaintiffs had not alleged facts to plausibly "support [] the inference that there is an overarching policy" to deny access to the asylum process, and thus had not identified a "final agency action" reviewable under this provision of the APA. *Id.* at 1320. The Court granted Plaintiffs leave to amend their § 706(2) claims. *Id.* at 1321.

Plaintiffs then filed a First Amended Complaint ("FAC") on October 12, 2018, followed by a Second Amended Complaint ("SAC") on November 13, 2018. (ECF Nos. 176, 189). The amended complaints added allegations regarding the Government's purported "Turnback Policy," which included a "metering" or "waitlist" system in which asylum seekers were instructed "to wait on the bridge, in the pre-inspection area, or at a shelter"—or were simply told that "they [could not] be processed because the [POE] is 'full' or 'at capacity[.]'" (SAC ¶ 3.) Plaintiffs contend that CBP officials "routinely tell asylum seekers approaching POEs that in order to apply for asylum, they must get on a list or get a number" and that CBP prevents asylum-seekers from coming to the POE "until their number is called which can take days, weeks or longer." (*Id.* ¶ 100.) Some individuals are prevented from registering on the lists due to discrimination based on race, sexual orientation, or gender identity by the Mexican officials or third parties managing the lists. (*Id.*) Plaintiffs allege that CBP's rationale for this system—that the POEs did not have the

capacity to process the asylum claims—is a pretext to serve "the Trump administration's broader, public proclaimed goal of deterring individuals from seeking access to the asylum process." (*Id.* ¶¶ 3, 5; *see also id.* ¶¶ 72–83.)

Defendants moved to dismiss the SAC on November 29, 2018. (ECF No. 192.) Following briefing—including six amicus briefs filed in support of Plaintiffs' arguments[1]—and oral argument, the Court largely denied Defendants' motion to dismiss the SAC. *See Al Otro Lado v. McAleenan*, 394 F. Supp. 3d 1168 (S.D. Cal. 2019). First, the Court denied Defendants' Motion to Dismiss the SAC with respect to the amended § 706(2) allegations, finding that:

> Unlike the original Complaint, the SAC now alleges that as early as 2016, Defendants were implementing a policy to restrict the flow of asylum seekers at the San Ysidro Port of Entry. Plaintiffs allege that Defendants formalized this policy in spring 2018 in the form of the border-wide Turnback Policy, an alleged "formal policy to restrict access to the asylum process at POEs by mandating that lower-level officials directly or constructively turn back asylum seekers at the border," including through pretextual assertions that POEs lack capacity to process asylum seekers.

*Id.* at 1180 (citing SAC ¶¶ 3, 48–93).

The Court also rejected, without prejudice, Defendants' argument that the SAC raised issues barred by the political question doctrine because they implicated "Defendants' coordination with a foreign national to regulate border crossings." *Id.* at 1190–93. The Court found that although some allegations "touch on coordination with Mexican government officials[,]" this coordination was "merely an outgrowth of the alleged underlying conduct by U.S. Officials." *Id.* at 1192

Finally, the Court rejected Defendants' arguments that Plaintiffs located on Mexican soil were not "arriving in" the United States for purposes of asylum. *Id.* at 1199–1201 (citing 8 U.S.C. § 1158(a)(1) (applicants for asylum include "[a]ny alien who is physically present in the United States or who arrives in the United States") and 8 U.S.C. § 1225(b)(1)(A)(ii) (requiring an immigration officer to refer for an

[1] Amicus briefs were filed in support of Plaintiffs by: (1) twenty states; (2) Amnesty International; (3) certain members of Congress; (4) certain immigration law professors; (5) nineteen organizations representing asylum seekers; and (6) Kids In Need of Defense ("KIND").

Case: 22-55988, 12/20/2022, ID: 12615053, DktEntry: 13-2, Page 186 of 301

asylum interview certain individuals who are "arriving in the United States")). The Court found that the plain language and legislative histories of these statutes supported the conclusion that the statute applies to asylum seekers in the process of arriving. *Id.* at 1199–1201. Furthermore, the Court concluded that the allegations in the SAC plausibly showed that Plaintiffs were in the process of arriving in the United States at the time they attempted to raise their asylum claims at POEs. *Id.* at 1203.

Defendants then answered the Complaint on August 16, 2019. (ECF No. 283).

**B. The Asylum Ban**

On July 16, 2019, the Government issued a joint interim final rule entitled "Asylum Eligibility and Procedural Modifications," widely known as the "Asylum Ban." 84 Fed. Reg. 33,829 (July 16, 2019), *codified at* 8 C.F.R. § 208.13(c)(4). In relevant part, Asylum Ban provides the following:

> (c) Mandatory denials—
>
> (4) Additional limitation on eligibility for asylum. Notwithstanding the provisions of § 208.15, any alien who enters, *attempts to enter, or arrives* in the United States across the southern land border *on or after July 16, 2019*, after transiting through at least one country outside the alien's country of citizenship, nationality, or last lawful habitual residence en route to the United States, shall be found ineligible for asylum unless:
>
> (i) The alien demonstrates that he or she applied for protection from persecution or torture in at least one country outside the alien's country of citizenship, nationality, or last lawful habitual residence through which the alien transited en route to the United States, and the alien received a final judgment denying the alien protection in such country.

*Id.* (emphasis added). Although the initial implementation of this new regulation was enjoined by the Northern District of California, the Supreme Court subsequently stayed the district court's injunction of the Asylum Ban on September 11, 2019, without explanation, "pending disposition of the Government's appeal in the United States Court of Appeals for the Ninth Circuit and disposition of the Government's petition for a writ of certiorari, if such a writ is sought." *Barr v. East Bay Sanctuary Covenant*, __S. Ct. __, 2019 WL 4292781 (Sept. 11, 2019) (mem.). Thus, at present,

non-Mexican asylum-seekers who entered, attempted to enter, or arrived at the United States-Mexico border after July 16, 2019 must first seek and be denied asylum in Mexico to establish eligibility for asylum in the United States.[2]

Due to the Government's metering policies, these individuals were prevented from crossing through POEs and were instead instructed to "wait their turn" in Mexico for U.S. asylum processing.[3] Many understood this to be a necessary and sufficient way to legally seek asylum in the United States.[4] Their understanding of the process, under the law that existed at the time of they sought asylum at the southern border, was correct.

Plaintiffs argue the Asylum Ban would, if applied to non-Mexican asylum-seekers who were metered at the border *before* July 16, 2019, preclude these individuals from accessing any asylum process altogether due to circumstances entirely of the Government's making. Mexico's Commission to Assist Refugees, the administrative agency responsible for processing asylum claims, requires that applicants for asylum submit their petitions within 30 days of entering Mexico. (*See* Decl. of Alejandra Macias Delgadillo ¶¶ 34–37, Ex. 27 to Mot. for Prelim. Inj., ECF No. 294-27; Decl. of Michelle Brané ¶ 22, Ex. 28 to Mot. for Prelim. Inj., ECF No. 294-28.) However, because the Asylum Ban was not promulgated until after the time these individuals were subject to metering, none of the members of the putative

---

[2] The regulation provides two alternative circumstances in which an individual will still be considered eligible for asylum in the United States even though he or she cannot demonstrate compliance with subsection (i): (1) if an individual can show that he or she is a victim of trafficking; or (2) if the countries through which an individual traveled in transit to the United States were not parties to the 1951 United Nations Convention relating to the Status of Refugees, the 1967 Protocol Relating to the Status of Refugees, or the United Nations Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. *See* 8 C.F.R. § 208.13(c)(4)(ii)–(iii). Neither exception is relevant to the instant action.

[3] *See, e.g.*, Decl. of Roberto Doe ¶¶ 4–6, Ex. 5 to Mot. for Prelim. Inj., ECF No. 294-7; Decl. of K-S ¶¶ 15-–16, Ex. 6 to Mot. for Prelim. Inj., ECF No. 294-8; Decl. of S.N. ¶¶ 14–16, Ex. 7 to Mot. for Prelim. Inj., ECF No. 294-9; Decl. of Dora Doe ¶¶ 6–9, Ex. 13 to Mot. for Prelim. Inj., ECF No. 294-15; Decl. of Jordan Doe ¶ 9, Ex. 15 to Mot. for Prelim. Inj., ECF No. 294-17; Decl. of B.B. ¶ 8, Ex. 22 to Mot. for Prelim. Inj., ECF No. 294-24; Decl. of Mowha Doe ¶ 8, Ex. 49 to Mot. for Prelim. Inj., ECF No. 294-47.

[4] *See, e.g.*, Decl. of K-S ¶ 16; Decl. of S.N. ¶ 17; Decl. of China ¶ 9, Ex. 9 to Mot. for Prelim. Inj., ECF No. 294-11; Decl. of Jordan Doe ¶ 9; Decl. of A.V.M.M. ¶ 8, Ex. 17 to Mot. for Prelim. Inj., ECF No. 294-19.

class attempted to exhaust Mexico's asylum procedures within the 30-day window. In short, should the Asylum Ban apply to these individuals, the situation would effectively be this: Based on representations of the Government they need only "wait in line" to access the asylum process in the United States, the members of the putative class may have not filed an asylum petition in Mexico within 30 days of entry, thus unintentionally and irrevocably relinquishing their right to claim asylum in Mexico and, due to the Asylum Ban, their right to claim asylum in the United States.[5]

Thus, Plaintiffs seek to provisionally certify a subclass of the original class consisting of "all non-Mexican noncitizens who were denied access to the U.S. asylum process before July 16, 2019 as a result of the Government's metering policy and continue to seek access to the U.S. asylum process[.]" (Mot. for Provisional Class Certification at 13.) Plaintiffs further request that the Court preliminarily enjoin Defendants from applying the Asylum Ban to provisional class members who were metered prior to July 16, 2019. (Mot. for Prelim. Inj. at 24–25.)

Defendants argue that this Court has no jurisdiction to issue the requested relief in either Motion under a variety of provisions in the Immigration and Nationality Act ("INA") and because the subject of Plaintiffs' injunction is not of the same character as the underlying lawsuit. As to the merits of Plaintiffs' Motions, Defendants contend that Plaintiffs are not entitled to an injunction because the Government's metering policies are lawful, the balance of equities tips sharply in favor of the Government, and Plaintiffs have failed to satisfy any of the prerequisites to class certification under Federal Rule of Civil Procedure 23. For the reasons explained below, the Court rejects Defendants' arguments.

---

[5] Plaintiffs note that Mexico's 30-day limitation to file petitions for asylum is subject to a waiver for good cause. However, appealing untimeliness determinations on the basis of the waiver "are often decided on legal formalities" that generally require the legal expertise of an attorney, which very few of those waiting in Mexico have the means to retain. (Decl. of Alejandra Macias Delgadillo ¶¶ 35–36; Decl. of Michelle Brané ¶ 22.)

## II. JURISDICTION

Defendants challenge the Court's jurisdiction to grant the requested relief, citing to various provisions of 8 U.S.C. § 1252 that preclude jurisdiction in certain contexts. Before turning to the specific subsections, it is necessary to clarify the factual and legal framework within which this Order operates. First, it is important to identify what precise question the Court has been asked to decide—and what it has *not* been asked to decide—on Plaintiffs' two Motions. Plaintiffs ask that the Court enjoin the Government from applying the Asylum Ban to them because they arrived at POEs before July 16, 2019. Plaintiffs do not make a facial challenge to the Asylum Ban's legality by asking the Court to pass upon the constitutionality of the regulation as an exercise of the Executive Branch's powers. Plaintiffs' request also does not require the Court to make any determinations about the merits of their asylum claims, review removal proceedings (expedited or otherwise), or determine the legitimacy of any orders of removal.

Second, Defendants' challenge to jurisdiction in this case calls into question bars on courts' inherent powers of equity. It is undisputed that Congress can restrict a federal courts' traditional equitable discretion. *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 194–95 (1978). "However, because of the long and established history of equity practice, 'we do not lightly assume that Congress has intended to depart from established principles [of equitable discretion].'" *Owner Operator Indep. Drivers Ass'n, Inc. v. Swift Transp. Co. (AZ)*, 367 F.3d 1108, 1112 (9th Cir. 2004) (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982)). Therefore, "[u]nless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied." *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946); *see also United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 496 (2001) (holding that trial courts' equitable discretion "is displaced only by a clear and valid legislative command") (internal quotations omitted); *Rodriguez v. Hayes*, 591 F.3d 1105, 1120

Case: 22-55988, 12/20/2022, ID: 12615053, DktEntry: 13-2, Page 190 of 301

(9th Cir. 2010) ("[T]raditional equitable powers can be curtailed only by an unmistakable legislative command.").

Turning to Defendants' specific challenges to the Court's jurisdiction, Defendants make two arguments. First, Defendants argue that various subsections of 8 U.S.C. § 1252 divest this Court of jurisdiction to review the implementation of the Asylum Ban. (Opp'n to Prelim. Inj. Mot. at 6–10, ECF No. 307.) Second, Defendants argue that the requested injunction is improper because it is not of the same character as the underlying lawsuit and deals with matter lying wholly outside the issues in the suit. (*Id.* at 10–11.) The Court rejects both arguments for the reasons discussed below.

**A. Bars to Jurisdiction Under 8 U.S.C. § 1252**

The provisions of 8 U.S.C. § 1252 deprive this Court of jurisdiction over certain cases. Defendants take a scattershot approach, arguing that multiple subsections are applicable to Plaintiffs' requests and thus the court has no jurisdiction to reach the issues raised. The Court disagrees.

1. <u>The relief requested does not arise from, pertain to, or otherwise relate to pending removal proceedings or removal orders.</u>

Several subsections of § 1252 limit judicial review of claims and questions that relate to removal proceedings or existing orders of removal. Defendants argue that §§ 1252(a)(2)(A)(i), 1252(g), 1252(a)(5), and 1252(b)(9) all strip this Court of jurisdiction.[6]

---

[6] *See* 8 U.S.C. § 1252(a)(2)(A)(i) (precluding jurisdiction over causes or claims "arising from or relating to the implementation or operation of an order of removal pursuant to section 1225(b)(1)"); § 1252(a)(5) (directing that "a petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of an order of removal entered or issued under any provision of this chapter, except as provided in subsection (e)"); § 1252(b)(9) ("Judicial review of all questions of law and fact, including interpretation and application of statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section."); 8 U.S.C. § 1252(e)(1)(A) (divesting courts' jurisdiction to issue equitable relief "in any action pertaining to an order to exclude an alien in accordance with section 1225(b)(1)[,]" with exceptions); § 1252(g) (barring exceptions, "no court shall have jurisdiction to hear any cause or claim by or on behalf of an alien arising from the decision or action by the

Section 1252(a)(2)(A)(i) prohibits "a direct challenge to an expedited removal order." *Pena v. Lynch*, 815 F.3d 452, 455 (9th Cir. 2016); *see also Jennings v. Rodriguez*, 138 S. Ct. 830, 841 (2018) (§ 1252(b)(9) did not apply where respondents were not asking for review of an order of removal, challenging the decision to detain them or seek removal, or challenging the process for determining removability); *M.M.M. on Behalf of J.M.A. v. Sessions*, 347 F. Supp. 3d 526, 532 (S.D. Cal. 2018) (§ 1252(a)(2)(A)(i) did not apply where plaintiffs did not have final removal orders and where they were "not challenging the Government's ultimate decision to detain or remove them").

Section 1252(g), by its terms, applies to only the three discrete actions that the Attorney General may take—to commence proceedings, adjudicate cases, or execute removal orders. *Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471, 482 (1999). It does not refer to "all claims arising from deportation proceedings." *Id.*

Finally, the prohibitory language in § 1252(a)(5) and § 1252(b)(9) "mean[s] that any issue—whether legal or factual—arising from any removal-related activity can be reviewed only through the PFR [petition for review] process." *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1031 (9th Cir. 2016) (emphasis omitted). However, § 1259(b)(9) "excludes from the PFR process any claim that does not arise from removal proceedings. Accordingly, claims that are independent of or collateral to the removal process do not fall within the scope of § 1252(b)(9)." *Id.* at 1032; *see also Jennings*, 138 S. Ct. at 841. The question is not whether the challenged action "is an action taken to remove an alien but whether the legal questions in this case arise from such an action." *Jennings*, 138 S. Ct. at 841 n.3.

The Government does not allege that any Plaintiff is in removal proceedings or that a final order of removal has been issued as to any Plaintiff. Likewise, Plaintiffs

---

Attorney General to commence proceedings, adjudicate cases or execute removal orders against any alien under this chapter").

do not request review of an order of removal, challenge the decision to seek removal, or contest any step that has been taken by the Government to determine their removability, including a decision to commence or adjudicate proceedings. (*See* Mot. for Prelim. Inj. at 2 (stating that Plaintiffs did not "file this motion to seek a specific outcome in provisional class members' asylum cases").) In fact, the very relief Plaintiffs seek is to commence such proceedings and have their asylum claims adjudicated by being granted access to the asylum process.

Defendants have not alleged that any final removal orders have been issued as to any Plaintiff, or that Plaintiffs' requests challenge any such orders per subsection (a)(2)(A), implicate the discrete actions outlined in subsection (g), or arise from actions taken to remove these aliens under subsections (a)(5) and (b)(9). Thus, the Court finds that these provisions do not preclude its jurisdiction over the claims raised in Plaintiffs' Motions.

2. The Asylum Ban does not implement the expedited removal statute (8 U.S.C. § 1225(b)).

Two subsections in § 1252 prohibit judicial review of policies, regulations, or procedures issued or adopted by the Attorney General "to implement 8 U.S.C. § 1225(b)(1)."[7] Defendants claim that § 1225(b)(1) is implicated because of the possibility that some Plaintiffs "will be adjudicated in expedited removal proceedings under section 1225(b)(1), and some in regular removal proceedings under section 1229a." (Opp'n to Mot. for Prelim. Inj. at 6–7.)

Although the Asylum Ban's limitation on eligibility requirements may derivatively affect certain aspects of the expedited removal process authorized in

[7] *See* 8 U.S.C. § 1252(a)(2)(A)(iv) (providing courts have no jurisdiction to review "procedures or policies adopted by the Attorney General to implement the provisions of § 1225(b)(1)" except as provided in subsection (e)); § 1252(e)(3)(A)(ii) (limiting judicial review to the United States District Court for the District of Columbia to determine "whether a regulation, or a written policy directive, written policy guideline, or written procedure issued by or under the authority of the Attorney General to implement" 8 U.S.C. § 1225(b)(1) is inconsistent with the statute or otherwise unlawful).

§ 1225(b)(1), the Asylum Ban does not *implement* § 1225(b)(1).  *See E. Bay Sanctuary Covenant v. Trump*, 354 F. Supp. 3d 1094, 1118–19 (N.D. Cal. 2018), *appeal filed*, Nos. 18-17274, 18-17436 (9th Cir. Dec. 26, 2018).  Rather, the Asylum Ban implements the asylum eligibility requirements stated in the asylum statute, 8 U.S.C. § 1158.

Section 1158 states that asylum may be granted "to an alien who has applied for asylum in accordance with the requirements and procedures established by the Secretary of Homeland Security or the Attorney General under this section."  8 U.S.C. § 1158(b)(1)(A).  The Asylum Ban, housed in the Code of Federal Regulations under Part 208 ("Procedures for Asylum and Withholding of Removal"), Section 208.13 ("Establishing Asylum Eligibility"), appears to be one such procedure.  The Ban itself is characterized not as an additional procedure for expedited removal, but as an "Additional limitation on eligibility for asylum."  *See* 8 C.F.R. § 208.13(c)(4).  Nothing in the language of the Ban discusses § 1225(b)(1), cites to § 1225(b)(1), or otherwise indicates that it implements expedited removal under § 1225(b)(1).  Thus, the Court sees no basis for concluding that the Asylum Ban implements expedited removal.  *See Kucana v. Holder*, 558 U.S. 233, 252 (2010) ("[T]he textual limitations upon a law's scope are no less a part of its purpose than its substantive authorizations.") (quoting *Rapanos v. United States*, 547 U.S. 715, 752 (2006) (plurality op.)).

An analysis of the relevant provisions of § 1252 leads to the same conclusion.  Nothing in the language of § 1252, including in § 1252(a)(2)(A)(iv) and § 1252(e)(3)(A)(ii), precludes judicial review of regulations implementing asylum eligibility requirements under 8 U.S.C. § 1158.  Courts must interpret congressional language barring jurisdiction precisely.  *Cheng Fan Kwok v. INS*, 392 U.S. 206, 212 (1968) (holding that a statute affecting federal jurisdiction "must be construed both with precision and with fidelity to the terms by which Congress has expressed its wishes").  "[W]here Congress includes particular language in one section of a statute

but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Nken v. Holder*, 556 U.S. 418, 430 (2009). Thus, in these provisions, where Congress sought to limit judicial review of policies, procedures, and regulations made under only § 1225(b)(1), the Court must presume that Congress intentionally excluded § 1158 from this jurisdictional bar. *See E. Bay Sanctuary Covenant*, 354 F. Supp. at 1118–19.

Further, the regulatory scheme for immigration law already includes a separate section discussing the implementation of the expedited removal system. *See* 8 C.F.R. Part 235 (Inspection of Persons Applying for Admission). These regulations specify the record an immigration officer must create during the expedited removal process and the advisements that the officer must give to individuals subject to expedited removal. *United States v. Barajas-Alvarado*, 655 F.3d 1077, 1081 (9th Cir. 2011) (citing 8 C.F.R. §§ 235.3, 1235.3 ("Inadmissible aliens and expedited removal")); *see also Am. Immigration Lawyers Ass'n v. Reno*, 18 F. Supp. 2d 38, 43 (D.D.C. 1998) (Part 235 "regulate[s] how the inspecting officer is to determine the validity of travel documents, how the officer should provide information to and obtain information from the alien, and how and when an expedited removal order should be reviewed"), *aff'd*, 199 F.3d 1352 (D.C. Cir. 2000). Courts have identified these regulations as the "implementing regulations" for the expedited removal system. *See id.* at 43–45 (applying § 1252(e)(3) to bar claims challenging regulations in Part 235).

A decision from the District Court for the District of Columbia illustrates when a rule or policy implements § 1225(b)(1). In *Grace v. Whitaker*, asylum applicants challenged new credible fear policies, established by the Attorney General's decision in *Matter of A-B-*, for asylum applications based on domestic or gang violence. 344 F. Supp. 3d 96, 108–10 (D.D.C. 2018), *appeal docketed*, No. 19-5013 (D.C. Cir. Jan. 30, 2019). In finding that § 1252(e)(3)(A)(ii) conferred jurisdiction on the D.C. District Court to hear the challenge, the court focused on the fact that the Attorney

General's decision in *Matter of A-B-* "went beyond" asylum and "explicitly address[ed] 'the legal standard to determine whether an alien has a credible fear of persecution' under 8 U.S.C. § 1225(b)." *Id.* at 116 (citing *Matter of A-B-*, 27 I. & N. Decl. 316, 320 n.1 (A.G. 2018)). Further, in *Matter of A-B-*, the Attorney General expressly directed immigration judges and asylum officers to "analyze the requirements as set forth" in the decision and stated that generally, claims of domestic or gang-related violence would often fail to satisfy the credible fear standard. The District Court cited this direction as evidence that the decision constituted a "written policy directive" or "written policy guidance" about expedited removal such that it was brought "under the ambit of section 1252(e)(3)." *Id.* Thus, the court concluded that "[b]ecause the Attorney General cited section 1225(b) and the standard for credible fear determinations when articulating the new general legal standard, the Court finds that *Matter of A-B-* implements section 1225(b) within the meaning of section 1252(e)(3)." *Id.*

Conversely, here, the Asylum Ban contains no similar explicit invocation of § 1225 or articulation of the credible fear standard such that the Court can conclude that this regulation falls within the ambit of § 1252(e)(3). As stated above, the regulation is framed as an additional limitation on asylum eligibility and makes no reference to the expedited removal statute or the procedures contained therein. Therefore, the Asylum Ban does not "implement" § 1225(b).

Defendants have not demonstrated how determinations about asylum eligibility constitute an "implement[ation]" of § 1225(b), the statute governing expedited removal. *See East Bay Sanctuary Covenant*, 354 F. Supp. at 1118–19. Hence, the Court does not find that § 1252(a)(2)(A)(iv) or § 1252(e)(3)(A)(ii) divests it of jurisdiction to hear challenges to the Asylum Ban's applicability in this case.

3. The Court is not being asked to determine the lawfulness of the Asylum Ban.

Several statutes also prohibit the judicial review of certain regulations.[8] Here, the Court is not reviewing the Asylum Ban such that these statutes apply.

Plaintiffs are not asking the Court to allow a class action challenge to the implementation of § 1225 or the Asylum Ban, to enjoin the operation of either provision, or to determine whether the Asylum Ban itself is constitutional, consistent with the Immigration and Nationality Act ("INA"), or otherwise lawful. Instead, Plaintiffs request that the Court enjoin the Government's improper application of the Asylum Ban—the constitutionality of which is the subject of other lawsuits—outside the confines of its self-imposed limitations on its scope, *i.e.*, to those who arrived in the United States before July 16, 2019.

In other words, Plaintiffs ask the Court to enjoin the Government from taking actions not authorized by the Asylum Ban or, in fact, by any implementing regulation or statute. The Court's authority to do so is well-recognized. *See, e.g.*, *Rodriguez*, 591 F.3d at 1120 ("Where, however, a petitioner seeks to enjoin conduct that allegedly is not even authorized by the statute, the court is not enjoining the operation of part IV . . . and § 1252(f)(1) therefore is not implicated.") (quoting *Ali v. Ashcroft*, 346 F.3d 873, 886 (9th Cir. 2003)), *vacated on unrelated ground sub nom.*, *Ali v. Gonzales*, 421 F.3d 795 (9th Cir. 2005).

4. The Court is not reviewing the Attorney General's decision to invoke or apply expedited removal to individual cases.

Various subsections of § 1252 also prevent the Court from reviewing decisions by the Attorney General to "invoke expedited removal proceedings" or the

[8] *See* 8 U.S.C. § 1252(a)(2)(A)(iv) and 1252(e)(3)(A)(ii) (prohibiting review of regulations implementing expedited removal and limiting determinations about a regulation's constitutionality, consistency with the INA, and general lawfulness to the United States District Court for the District of Colombia); § 1252(f)(1) (divesting the courts of "jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter . . . other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated").

application of expedited removal in individual cases.[9] *See, e.g.*, *In re Li*, 71 F. Supp. 2d 1052, 1061 (D. Haw. 1999) ("Section 1252(a)(2), entitled Matters not subject to judicial review, provides that no court shall have jurisdiction to review the application of section 1225(b)(1) *to individual aliens*.") (citing 8 U.S.C. § 1252(a)(20(A)(iv)) (emphasis added). Here, neither party has alleged that there has been any such decision to invoke expedited removal or apply expedited removal to individual Plaintiffs. Instead, Defendants argue that this provision, particularly subsection (iii), divests this Court of jurisdiction "to enjoin the application of the [Asylum Ban] to putative provisional subclass members who *will* be placed in expedited removal proceedings." (Opp'n to Mot. for Prelim. Inj. at 7.)

Defendants offer no support for the proposition that any relevant subsection of § 1252 seeks to prevent review of any issue because the Attorney General will invoke expedited removal as to Plaintiffs in the future. Further, as stated before, Plaintiffs do not seek review of any decision to place them in expedited removal proceedings. The Court's determination at the injunction stage, therefore, is not a "review" of decisions related to expedited removal, and these sections do not apply to divest this Court of jurisdiction regarding Plaintiffs' Motions.

5. Plaintiffs do not raise systemic challenges to expedited removal.

The Court also finds that the jurisdictional bar under 8 U.S.C. § 1252(e)(3) does not apply to Plaintiffs' claims. This provision states that judicial review of "determinations under section 1225(b) of this title and its implementation" may only be brought in the U.S. District Court for the District of Columbia, and limits those actions to questions about whether a regulation "issued to implement such section [1225(b)]" is constitutional, inconsistent with other provisions of the Immigration

[9] *See* 8 U.S.C. § 1252(a)(2)(A)(ii) ("[N]o court shall have jurisdiction to review . . . a decision by the Attorney General to invoke the provisions of [§ 1225(b)(1)]"); § 1252(a)(2)(A)(iii) ("[N]o court shall have jurisdiction to review "the application of [§ 1225(b)(1)] to individual aliens," including credible fear determinations); § 1252(a)(2)(A)(iv) (courts have no jurisdiction to review "procedures or policies adopted by the Attorney General to implement the provisions of § 1225(b)(1)").

and Nationality Act ("INA"), or "is otherwise in violation of the law." *See* 8 U.S.C. § 1252(e)(3)(A)(i)–(ii).

The provision, entitled "Challenges on validity of the system," limits its jurisdictional reach only to actions calling into question the legality of the expedited removal process itself. *See Innovation Law Lab v. Nielsen*, 366 F. Supp. 3d 1110, 1120 (N.D. Cal. 2019), *reversed on other grounds*, *Innovation Law Lab v. McAleenan*, 924 F.3d 503 (9th Cir. 2019). The challenges that are subject to the circumscribed jurisdiction in subsection (e)(3) must therefore target the process of removal directly, not target other circumstances incidental to removal, such as access to the asylum process. *See Padilla v. U.S. Immigration & Customs Enf't*, 387 F. Supp. 3d 1219, 1227 (W.D. Wash. 2019) ("[Section] 1252(e)(3) is addressed to challenges to the removal *process* itself, not to detentions attendant upon that process."), *appeal filed*, No. 19-35565 (9th Cir. July 2, 2019).

In *Innovation Law Lab*, the Northern District found the plaintiffs' challenge to the Migrant Protection Protocols ("MPP")—namely, that MPP did not apply to them—was not a challenge to the expedited removal system under § 1252(e)(3). *Id.* at 1119–20. Similarly, here, Plaintiffs are not raising a systemic challenge to any part of the expedited removal process. As Plaintiffs state, they do not seek to challenge, either as individual cases or systemically, Defendants' discretion to place them in expedited removal proceedings. (*See* Reply in Supp. of Mot. for Prelim. Inj. at 10–11 ("Plaintiffs take no position on whether provisional class members should be put into expedited removal, or instead placed directly into regular removal proceedings or paroled into the United States."), ECF No. 313.) Rather, they are challenging the Government's application of a specific condition of asylum eligibility to Plaintiffs themselves, regardless of the type of removal proceedings in which they are currently placed or will be placed in the future. *See Olivas v. Whitford*, No. 14-CV-1434-WQH-BLM, 2015 WL 867350, at *8 (S.D. Cal. Mar. 2, 2015) ("Plaintiff's challenge is not subject to 8 U.S.C. section 1252(e)(3) because it is not a challenge to the

validity of expedited removal proceedings pursuant to section 1225(b)(1).”). Accordingly, the Court finds that § 1252(e)(3) does not bar the relief requested in Plaintiffs’ Motions.

In sum, this Court finds that none of the cited subsections of 8 U.S.C. § 1252 divest this Court of jurisdiction to decide the issues raised by Plaintiffs’ Motions.

**B. Different Character From the Underlying Suit**

Defendants argue that the request for a preliminary injunction must be denied because Plaintiffs are seeking relief that is of a different character and deals with matter lying wholly outside the issues in the suit. The Court disagrees.

“A preliminary injunction is always appropriate to grant intermediate relief of the same character as that which may be granted finally.” *See Kaimowitz v. Orlando*, 122 F.3d 41, 43 (11th Cir. 1997) (citing *De Beers Consol. Mines v. United States*, 325 U.S. 212, 220 (1945)). To determine whether the preliminary and final relief are of the same character, “there must be a relationship between the injury claimed in the motion for injunctive relief and the conduct asserted in the underlying complaint.” *Pac. Radiation Oncology, LLC v. Queen’s Med. Ctr.*, 810 F.3d 631, 636 (9th Cir. 2015) (adopting the rule in *Devose v. Herrington*, 42 F.3d 470, 471 (8th Cir. 1994)). This requires “a sufficient nexus between the claims raised in a motion for injunctive relief and the claims set forth in the underlying complaint itself.” *Id.*

The Court finds that a sufficient nexus exists between Plaintiffs’ request for an injunction of the Asylum Ban and the claims in the SAC. In their SAC, Plaintiffs allege numerous violations of the law based on CBP’s “unlawful, widespread pattern and practice of denying asylum seekers access to the asylum process at POEs with the United States border through a variety of illegal tactics.” (SAC ¶ 2.) For example, according to Plaintiffs, Defendants are “[i]mposing unreasonable delays before granting access to the asylum process” and “denying outright access to the asylum process.” (*Id.*) In the Prayer for Relief, Plaintiffs include a request that the Court certify a class and issue injunctive relief requiring Defendants to comply with the

INA, the APA, the Due Process Clause of the Fifth Amendment and the duty of *non-refoulement* under international law. (SAC, Prayer for Relief, ¶ 3.)

In the instant Motions, Plaintiffs request that the Court require Defendants to comply with the limited scope of the Asylum Ban to preserve their access to the asylum process. This relates to the allegations in the SAC, described above, regarding Defendants' denial of Plaintiffs' right to asylum access. *See Williams v. Navarro*, No. 3:18-CV-01318-DMS (RBM), 2019 WL 2966314, at *4 (S.D. Cal. July 9, 2019) ("The character of relief requested in the Motion, i.e., increased law library access, relates to conduct alleged in the Complaint, i.e., denial of the right to law library access."). Indeed, Plaintiffs' claims regarding the Asylum Ban and Plaintiffs' underlying claims in their SAC are so intertwined that denying Plaintiffs' Motion for Preliminary Injunction could effectively eviscerate the asylum claims Plaintiffs seek to preserve in their underlying suit.

Thus, Plaintiffs are not seeking relief that is of a different character than that sought in the SAC, and a preliminary injunction can be appropriately granted.

**C. All Writs Act**

Alternatively, the Court finds that the All Writs Act ("AWA"), 28 U.S.C. § 1651, authorizes this Court to issue injunctive relief to preserve its jurisdiction in the underlying action. The AWA allows Article III courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). The AWA provides this Court with the ability to construct a remedy to right a "wrong [which] may [otherwise] stand uncorrected." *United States v. Morgan*, 346 U.S. 502, 512 (1954). In the context of administrative law, the AWA allows court "to preserve [its] jurisdiction or maintain the status quo by injunction pending review of an agency's action through the prescribed statutory channels." *F.T.C. v. Dean Foods Co.*, 384 U.S. 597, 604 (1966).

Plaintiffs claim the AWA independently authorizes this Court to grant injunctive relief to prevent the claims in the SAC from being "prematurely extinguished" by the application of the Asylum Ban. (Mot. For Prelim. Inj. at 23.) Defendants argue that the AWA is not a source of this Court's authority to grant the requested relief because: (1) the Court "does not have jurisdiction in the first instance over the substantive standards governing the putative provisional subclass members' asylum applications"; (2) Plaintiffs have not shown how application of the Asylum Ban affects the Court's jurisdiction over the claims in the SAC; and (3) the INA divests this Court of jurisdiction over the expedited removal process. (Opp'n to Mot. for Provisional Class Certification at 24–25, ECF No. 308.) The Court does not find Defendants' arguments persuasive.

First, Defendants misidentify the source of the Court's jurisdiction for purposes of the AWA. Jurisdiction over the claims in the SAC arises not from the substantive standards governing the subclass's asylum applications, but from the statutory and constitutional questions over Defendants' issuance of policies and practices barring access to the asylum process. The Government does not argue that this Court lacks jurisdiction in the underlying lawsuit concerning the Government's metering practices. Therefore, jurisdiction has already been independently conferred on this Court. *See Hamilton v. Nakai*, 453 F.2d 152, 157 (9th Cir. 1971) (§ 1651 "does not confer original jurisdiction, but rather, prescribes the scope of relief that may be granted when jurisdiction otherwise exists").

Second, as Plaintiffs argue, the improper application of the Asylum Ban affects this Court's jurisdiction because it would effectively moot Plaintiffs' request for relief in the underlying action by extinguishing their asylum claims. Should the Asylum Ban be applied to Plaintiffs, these individuals' asylum claims would be foreclosed, as would any claim and request for relief regarding their right to access the asylum process. As a result, an order from this Court finding metering practices unlawful and requiring Defendants to comply with the law at the time of the metering

would provide no remedy. Thus, the metering practices, if found unlawful, are the type of wrong that may otherwise stand uncorrected without the invocation of the AWA, as contemplated by the Supreme Court. *See Morgan*, 346 U.S. at 512.

Hence, to preserve its jurisdiction over the underlying claims in the SAC, the Court finds that it possesses the authority under the AWA to issue an injunction preserving the status quo in this case and allow this Court to resolve the underlying questions of law before it. *See United States v. N.Y. Tel. Co.*, 434 U.S. 159, 173 (1977) (holding that the AWA allows a federal court to "avail itself of all auxiliary writs as aids in the performance of its duties, when the use of such historic aids is calculated in its sound judgment to achieve the ends of justice entrusted to it").

## III. CLASS CERTIFICATION

Concurrent with their request for a preliminary injunction, Plaintiffs request that the Court provisionally certify a subclass consisting of "all non-Mexican noncitizens who were denied access to the United States Asylum process before July 16, 2019 as a result of the Government's metering policy and continue to seek access to the U.S. asylum process." (Mem. of P. & A. in support of ("ISO") Mot. for Provisional Class Certification at 13, ECF No. 293-1.) The Court is inclined to modify this subclass to consist of

> all non-Mexican asylum-seekers who were unable to make a direct asylum claim at a U.S. POE before July 16, 2019 because of the Government's metering policy, and who continue to seek access to the U.S. asylum process.

*See Victorino v. FCA US LLC*, 326 F.R.D. 282, 301–02 (S.D. Cal. 2018) ("[D]istrict courts have the inherent power to modify overbroad class definitions.")

The Court may provisionally certify a class for purposes of a preliminary injunction. *Meyer v. Portfolio Recovery Assoc., LLC*, 707 F.3d 1036, 1043 (9th Cir. 2012). However, "[t]he class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011). Therefore, Plaintiffs have the burden

of meeting the threshold requirements of Federal Rule of Civil Procedure 23(a). *Meyer*, 77 F.3d at 1041.

Rule 23(a) provides that a class may be certified only if:

> (1) the class is so numerous that joinder of members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). In addition to meeting the 23(a) requirements, a class action must fall into one of the categories laid out in Rule 23(b). Fed. R. Civ. P. 23(b). Plaintiffs move for provisional certification under Rule 23(b)(2).

**A. Fed. R. Civ. P. 23(a)**

1. <u>Numerosity</u>

Plaintiffs claim that as of August 2019, there were 26,000 asylum seekers either on waitlists or waiting to get on those waitlists in 12 Mexican border cities. (*See* Decl. of Stephanie Leutert ¶¶ 4, 7, Ex. A, Ex. 6 to Mot. for Provisional Class Certification, ECF No. 293-8.) The numerosity requirement is generally satisfied when the class contains 40 or more members, a threshold far exceeded in this case. *Consolidated Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995); *Celano v. Marriott Int'l, Inc.*, 242 F.R.D. 544, 549 (N.D. Cal. 2007). Defendants do not contest that Plaintiffs have met the numerosity requirement in this case. Further, a class of 26,000 individuals is large enough on its face that individual joinder of all class members would be impracticable. Rule 23(a)(1) is, therefore, satisfied.

2. <u>Commonality</u>

The commonality requirement requires that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "What matters to class certification . . . is not the raising of common questions—even in droves—but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Dukes*, 564 U.S. at 350 (quotations omitted).

"All questions of fact and law need not be common to satisfy the [commonality requirement]. The existence of shared legal issues with divergent factual predicates is sufficient." *Meyer*, 707 F.3d at 1041 (quotations omitted). "The common contention 'must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Id.* at 1041–42 (quoting *Dukes*, 564 U.S. at 350).

In this case, Plaintiffs argue that the common question capable of generating a common answer involves whether the metering is statutorily and constitutionally legal. (Mem. of P. & A. ISO Mot. for Provisional Class Certification at 18–19.) Defendants argue that this requires individual determinations of whether there was capability to process the asylum applications at each POE for each class member at the time they sought asylum. (Opp'n to Mot. for Provisional Class Certification at 17, ECF 308.)

The Court sees the common question differently. The common question raised by the instant preliminary injunction and class certification motions is whether Defendants are improperly construing the Asylum Ban to apply to those class members who attempted to enter or arrived at a U.S. POE before July 16, 2019. Even assuming the Government's metering practice was legal, the fact remains that the members of the proposed subclass intended to apply for asylum at a U.S. POE and yet were required, pursuant to the Government's policy, to wait their turn in Mexico. The Court can determine, in one fell swoop, whether class members attempted to enter or arrived in the United States such that the Asylum Ban is inapplicable to them. This is a common issue for all subclass members. Thus, the Court finds the requirement of Rule 23(a)(2) has been met.

3. <u>Typicality</u>

In general, the claims of the representative parties "need not be substantially identical" to those of all absent class members and need only be "reasonably co-

extensive" in order to qualify as typical. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998), *overruled on other grounds by Wal-Mart Stores, Inc. v. Dukes*, 464 U.S. 338 (2011). "The test of typicality is 'whether other members [of the class] have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'" *Parsons v. Ryan*, 754 F.3d 657, 685 (9th Cir. 2014) (citation omitted).

Defendants contend that the named Plaintiffs in this action have not and will not be injured "in the manner in which they claim the putative subclass members have been or will be injured." (Opp'n to Mot. for Provisional Class Certification at 11.) Defendants allege that the named individual Plaintiffs are either Mexican nationals to whom the Asylum Ban does not apply or eventually entered and were processed before July 16, 2019. (*Id.* at 11–12.) Further, Defendants claim that Roberto Doe, the one named Plaintiff whose case does not suffer from the above deficiencies, has not provided "sufficient information to establish that he is subject to the" Asylum Ban. (*Id.* at 12–13.)

The Court finds that, contrary to Defendants' assertions, the Declaration of Roberto Doe contains such sufficient information. Roberto Doe alleges that he is a national of Nicaragua and traveled through Mexico to reach the United States' southern border. (Decl. of Roberto Doe ¶¶ 2–4.) He attests that on October 2, 2018, he presented himself to U.S. immigration officials at the Reynosa-Hidalgo POE with a group of Nicaraguan nationals and requested asylum. (*Id.* ¶ 4.) He then alleges that U.S. officials told him the POE was "all full" and that he would have to wait "hours, days, or weeks" before he would have the opportunity to apply before contacting the Mexican authorities to remove them from the POE. (*Id.* ¶¶ 5–6.) While waiting in Mexico, he applied for asylum but was denied due to the 30-day time bar and was subsequently deported from Mexico. (Suppl. Decl. of Roberto Doe ¶ 7, Ex. 2 to

Reply ISO Mot. for Provisional Class Certification, ECF No. 315-3.) He still seeks to apply for asylum in the United States. (*Id.*)

Because Roberto Doe claims he came to a U.S. POE from a country other than Mexico to seek asylum, attempted to make a direct claim for asylum at a POE before July 16, 2019 but was turned away due to the metering policy, and still intends to seek asylum in the United States, the Court finds that he has provided sufficient information to satisfy the test of typicality for the purposes of Rule 23.

4. Adequacy of Representation

For the class representative to adequately and fairly protect the interests of the class, two criteria must be satisfied. "First, the named representatives must appear able to prosecute the action vigorously through qualified counsel, and second, the representatives must not have antagonistic or conflicting interests with the unnamed members of the class." *Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir. 1978). Defendants do not contest the adequacy of the representation in this case.

Pursuant to its own assessment, the Court finds no evidence that the proposed class representatives have any antagonistic or conflicting interests with the unnamed members of the class, and counsel has shown that they are qualified and willing to prosecute this action vigorously. (*See* Decl. of Stephen Medlock ISO Mot. for Provisional Class Certification ¶¶ 2–6, ECF No. 293-2.) Thus, the requirements of Rule 23(a)(4) have been met.

**B. Fed. R. Civ. P. 23(b)(2)**

Plaintiffs seek certification under subsection (b)(2), which allows the court to certify a class if it finds that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "The key to a (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that

it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Dukes*, 564 U.S. at 360 (quotation omitted). "In other words, Rule 23(b)(2) applies only when a single injunctive or declaratory judgment would provide relief to each member of the class." *Id.*

In this case, a single preliminary injunctive or declaratory judgment would provide that each member of the subclass does not fall within the Asylum Ban. The conduct of the Government, therefore, can be enjoined or declared unlawful as to all members of the subclass. Hence, Plaintiffs have shown that the requirements of Rule 23(b)(2) have been met.

Defendants make an additional argument that the requirements of Rule 23(b)(2) are not met because the class is not ascertainable. Specifically, they contend that "there is no reliable way to confirm the date when individuals first sought to present themselves at ports to seek access to the U.S. asylum process." (Opp'n to Mot. for Provisional Class Certification at 23.)

Although the Ninth Circuit has yet to expressly address the ascertainability requirement in the context of Rule 23(b)(2), courts in this Circuit have held that it does not apply. *See In re Yahoo Mail Litig.*, 308 F.R.D. 577, 597 (N.D. Cal. 2015) (distinguishing (b)(2) actions from (b)(3) actions in finding that ascertainability was not required under the former); *Inland Empire-Immigrant Youth Collective v. Nielsen*, No. EDCV 17-2048 PSG (SHKx), 2018 WL 1061408, at *12 (C.D. Cal. Feb. 26, 2018) (same); *see also Hernandez v. Lynch*, No. EDCV 16-00620-JGB (KKx), 2016 U.S. Dist. LEXIS 191881, at *43 n.17 (C.D. Cal. Nov. 10, 2016) ("Courts have held that ascertainability may not be required with respect to a class seeking injunctive relief."). This Court has itself noted in previous opinions that "ascertainability should not be required when determining whether to certify a class in the Rule 23(b)(2) context." *Bee, Denning, Inc. v. Capital Alliance Group*, No. 13-

CV-2654-BAS (WVG), 14-cv-2915-BAS (WVG), 2016 WL 3952153 at *5 (S.D. Cal. July 21, 2016).[10]

The Court notes, however, that even if the class was required to satisfy the ascertainability requirement, "it would be satisfied because it is 'administratively feasible' to ascertain whether an individual is a member." *Inland Empire-Immigrant Youth Collective*, 2018 WL 1061408, at *12 (citing *Greater L.A. Agency on Deafness, Inc. v. Reel Servs. Mgmt. LLC*, No. CV 13–7172 PSG (ASx), 2014 WL 12561074, at *5 (C.D. Cal. May 6, 2014)).

Defendants' arguments to the contrary do not alter this conclusion. Defendants allege that because they do not maintain a systematic record of encounters at the limit line, the class is not ascertainable. Specifically, Defendants state the Government of Mexico, and not the U.S. Government, was responsible for implementing a process to monitor asylum-seekers (Opp'n to Mot. for Provisional Class Certification at 24) and CBP officers who metered asylum-seekers at the limit line "do not memorialize the encounter in any way." (Decl. of Randy Howe ¶¶ 4–5, Ex. 4 to Opp'n to Mot. for Provisional Class Certification, ECF No. 308-5.)

Ironically, however, the class is based on a system established to facilitate the Defendants' metering policy. As the system currently stands, when a port is allegedly at capacity, asylum-seekers are informed that access to the POE "is not immediately available" and that they will be permitted to enter "once there is sufficient space and resources to process them." (Decl. of Randy Howe ¶ 2; CBP Metering Guidance Memorandum, Ex. 5 to Opp'n to Mot. for Provisional Class Certification, ECF No. 308-6.) Further, Defendants do not address, let alone challenge, that Grupo Beta, a

[10] The absence of an ascertainability requirement "does not obviate the basic requirement that Plaintiffs provide a clear class definition under Rule 23(c)(1)(B)." *In re Yahoo Mail Litig.*, 308 F.R.D. at 597–98 (citing Fed.R.Civ.P. 23(c)(1)(B) ("An order that certifies a class action must define the class and the class claims, issues, or defenses . . . . ")). However, Defendants do not argue that the definition of the class proposed by Plaintiff is so unclear as to fail to satisfy Rule 23(c)(1)(B). In any event, "[a] precise class definition is less important in cases in which plaintiffs are attempting to certify a class for injunctive relief because the representative plaintiffs may move the Court to enforce compliance." *Conant v. McCaffrey*, 172 F.R.D. 681, 693 (N.D. Cal. 1997).

service run by the Mexican Government's National Institute of Migration, maintains a formalized list of asylum-seekers, communicates with CBP regarding POE capacity, and transports asylum-seekers from the top of the list to CBP. (Decl. of Nicole Ramos ¶ 7, Ex. 26 to Mot. for Provisional Class Certification, ECF No. 293-28; Decl. of J.R. ¶ 11, Ex. 14 to Mot. for Prelim. Inj., ECF No. 294-16 (alleging waitlist "was controlled by Mexican immigration officials, and they were in touch with U.S. officials who would ask every day for a certain number of people to present themselves at the U.S. offices").)

Therefore, CBP relied on these lists to facilitate the process of metering, which was premised on the idea that those individuals who were metered would have to wait—but were not precluded from—applying for asylum in the United States. Despite this, Defendants now take the position, without contradicting claims that they themselves relied on the lists for purposes of metering, that the waitlists are "subject to fraud and corruption and are not themselves reliable means of ascertaining class membership." (Opp'n to Mot. for Provisional Class Certification at 34.)

The Court does not find Defendants' position persuasive. Class members are defined by a completely objective criteria: whether these individuals were prohibited from requesting asylum at a U.S. POE and instead required to place themselves on a waitlist and effectively "take a number" before July 16, 2019 pursuant to the U.S. Government's metering policy. Class membership can be determined by cross-checking a class members' name with the names included on these waitlists. Surely the Government can determine, taking into account the delay in processing asylum claims at each POE, which individuals listed arrived before July 16, 2019, the Asylum Ban's effective date. Alternatively, individuals could be required to submit proof (either by list or declaration) that he or she is a member of the class in order to get the relief sought. *See In re Vitamin C Antitrust Litig.*, 279 F.R.D. at 116 ("The fact that this manual process may be slow and burdensome cannot defeat the ascertainability requirement.") (internal quotations omitted); *see also Inland Empire-*

*Immigrant Youth Collective*, 2018 WL 1061408, at *13 ("That some administrative effort is required does not preclude certification."). Thus, even if ascertainability is required under Rule 23(b)(2), the Court finds that the proposed class satisfies this requirement.

Because Plaintiffs have met the requirements of Federal Rules of Civil Procedure 23(a) and 23(b)(2), the Court finds certification of a subclass is appropriate. Accordingly, the Court **GRANTS** Plaintiffs' Motion for Provisional Class Certification consisting of all non-Mexican noncitizens who sought unsuccessfully to make a direct asylum claim at a U.S. POE before July 16, 2019, were instead required to wait in Mexico due to the U.S. Government's metering policy, and who continue to seek access to the U.S. asylum process.

## IV. PRELIMINARY INJUNCTION

The Court now turns to Plaintiffs' Motion for Preliminary Injunction. Plaintiffs request that the Court enjoin the newly passed Asylum Ban, 8 C.F.R. § 208.13(c)(4)(i), from applying to members of the provisionally certified class who arrived before the regulation's stated date of effect.

"A preliminary injunction is a matter of equitable discretion and is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *California v. Azar*, 911 F.3d 558, 575 (9th Cir. 2018) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). "Crafting a preliminary injunction is 'an exercise of discretion and judgment often dependent as much on the equities of a given case as the substance of the legal issues it presents.'" *Azar*, 911 F.3d at 582 (quoting *Trump v. Int'l Refugee Assistance Project*, __U.S. __, 137 S. Ct. 2080, 2087 (2017)). "'The purpose of such interim equitable relief is not to conclusively determine the rights of the parties but to balance the equities as the litigation moves forward.'" *Id.*

In order to obtain a preliminary injunction, the plaintiff must establish: (1) that he or she is likely to succeed on the merits; (2) that he or she is likely to suffer

irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his or her favor; and (4) that an injunction is in the public interest. *Winter*. 555 U.S. at 20. "When the government is a party, the last two factors merge." *Azar*, 911 F.3d at 575 (citing *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014)).

A preliminary injunction can take two forms. *Marlyn Nutraceuticals Inc. v. Mucus Pharma GmbH & Co.*, 571 F.3d 873, 878–79 (9th Cir. 2009). "'A mandatory injunction orders a responsible party to take action,' while '[a] prohibitory injunction prohibits a party from taking action and preserves the status quo pending a determination of the action on the merits.'" *Ariz. Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1060 (9th Cir. 2014) (quoting *McCormack v. Hiedeman*, 694 F.3d 1004, 1019 (9th Cir. 2012)). "The 'status quo' refers to the legally relevant relationship *between the parties* before the controversy arose." *Id.* at 1061. When the Government seeks to revise a policy, it is affirmatively changing the status quo, and any injunction ordering that the new policy not take effect is a prohibitory injunction. *Id.* A mandatory injunction is particularly disfavored and requires heightened scrutiny. *Marlyn Nutraceuticals*, 571 F.3d at 878; *Ariz. Dream Act Coalition*, 757 F.3d at 1060.

The Plaintiffs in this case seek a prohibitory injunction. The Government has passed a regulation which affirmatively changes the status quo. Plaintiffs are seeking an injunction ordering that this new policy not be applied to a small subclass of asylum seekers. As such, the heightened scrutiny is not applicable to Plaintiffs' Motion.

**A. Likelihood of Success on the Merits**

The wording of the Asylum Ban is clear. It is only applicable to aliens who enter, attempt to enter, or arrive in the United States after July 16, 2019. *See* 8 C.F.R. § 208.13(c)(4)(i) (applying additional limitation on asylum eligibility to "any alien

who enters, attempts to enter, or arrives in the United States across the southern land border on or after July 16, 2019").

In its most recent order in this case, this Court concluded that class members "who may not yet be in the United States, but who [are] in the process of arriving in the United States through a POE[,]" were "arriving in the United States" such that the statutory and regulatory provisions at issue applied to them. *See Al Otro Lado*, 394 F. Supp. at 1199–1205. Adopting and applying the same reasoning here, the Court concludes that the Asylum Ban, by its express terms, does not apply to those non-Mexican foreign nationals in the subclass who attempted to enter or arrived at the southern border *before* July 16, 2019 to seek asylum but were prevented from making a direct claim at a POE pursuant to the metering policy.

"A regulation should be construed to give effect to the natural and plain meaning of its words." *Bayview Hunters Point Cmty. Advocates v. Metro. Transp. Comm'n*, 366 F.3d 692, 698 (9th Cir. 2004) (quoting *Crown Pac. v. Occupational Safety & Health Review Comm'n*, 197 F.3d 1036, 1038 (9th Cir. 1999)). Construing the Asylum Ban consistent with this principle, the Court finds that Plaintiffs are likely to succeed on the merits of their claim that the Asylum Ban does not apply to them.

The Government knowingly and intentionally implemented the Turnback Policy at its POEs before July 16, 2019. The Government also knew that, pursuant to this policy, CBP turned away many asylum-seekers who had approached a United States POE but could not cross the international boundary because they were required to wait in Mexico as a condition to accessing the asylum process in the United States. Despite this knowledge, the Government decided to issue a regulation applying only from July 16, 2019 forward. The Government could have enacted the Asylum Ban without specifying a time period, and thus imposed it on those subject to the metering procedures of the Turnback Policy. It could have also enacted the Asylum Ban with language specifying that it would be effective retrospectively to those metered at the border before the date the regulation was adopted. The Government chose to do

neither. Instead, although the regulation clearly states that it applies only to aliens who entered, attempted to enter, or arrived on or after July 16, 2019, the Government is now attempting to apply the Asylum Ban beyond its unambiguous constraints to capture the subclass of Plaintiffs who are, by definition, not subject to this rule.

The Government's position that the Asylum Ban applies to those who attempted to enter or arrived at the southern border seeking asylum before July 16, 2019 contradicts the plain text of their own regulation. Thus, the Court finds that Plaintiffs are likely to succeed on this issue on the merits.

**B. Irreparable Harm**

"Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages." *Ariz. Dream Coalition*, 757 F.3d at 1068. "Because intangible injuries generally lack an adequate legal remedy, 'intangible injuries [may] qualify as irreparable harm.'" *Id.* (quoting *Rent-A-Ctr, Inc. v. Canyon Television and Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991)). One potential component of irreparable harm in an asylum case can be the claim that the individual is in physical danger if returned to his or her home country. *Leiva-Perez v. Holder*, 640 F.3d 962, 969 (9th Cir. 2011).

In this case, the provisionally certified subclass came to the southern border seeking asylum, claiming that they faced physical danger, torture or death if returned to their country of origin.[11]

CBP officers prevented asylum-seekers from crossing the international line to U.S. soil on the basis that the POE was at capacity, and CBP guidance instructed officers to inform individuals "that they will be permitted to enter once there is sufficient space and resources to process them." (OIG Special Review at 6, Ex. 2 to Mot. for Prelim. Inj., ECF No. 294-4.) In other words, these asylum seekers

[11] *See, e.g.*, Decl. of Roberto Doe ¶ 3; Decl. of S.N. ¶ 5; Decl. of Bianka Doe ¶ 3, Ex. 8 to Mot. for Prelim. Inj., ECF No. 294-10; Decl. of Djamal Doe ¶ 3, Ex. 12 to Mot. for Prelim. Inj., ECF No. 294-14; Decl. of Jordan Doe ¶ 3; Decl. of S.M.R.G. ¶ 4, Ex. 16 to Mot. for Prelim. Inj., ECF No. 294-20; Decl. of B.B. ¶ 4; Decl. of Mowha Doe ¶¶ 3–6.

understood their access to asylum in the United States to be premised on their willingness to wait in Mexico. In reliance on this representation by the U.S. Government, they did so. (*See* Decl. of B.B. ¶ 9 ("We put our names on the list because we believed in the process.").)

The Government—in a shift that can be considered, at best, misleading, and at worst, duplicitous—now seeks to change course. Although these individuals had already attempted to seek asylum in the United States and returned to Mexico only at the instruction of the Government, the Government intends to construe the fact that they were waiting in Mexico on or after July 16, 2019 as a failure to arrive in the United States before that date, thus subjecting them to the asylum eligibility bar contained in the Asylum Ban.

As such, the Government argues that the members of the subclass must first seek asylum in Mexico before they will be permitted to make a claim for asylum in the United States. *See* 8 C.F.R. § 208.13(c)(4)(i) (requiring foreign nationals to apply for asylum in at least one country through which they transited to the United States, "and receive[]a final judgment denying the alien protection in such country"). Again, however, based on the representations of the Government, these individuals have not done so because they believed that the process to receive an asylum hearing in the United States required only that they place themselves on a waitlist. As a result, they are now subject to Mexico's 30-day window for submitting asylum petitions and will likely be unable to meet the requirements of Asylum Ban. (Mot. for Prelim. Inj. at 12 ("[P]rovisional class members who were metered before July 16, 2019, by definition, have been in Mexico longer than a month, and are now barred from applying for asylum in Mexico by that country's 30-day bar on asylum applications."); *see also* Suppl. Decl. of Roberto Doe ¶ 7.). By extension, should the Asylum Ban be imposed on them, they will also lose their right to claim asylum in the United States.

Plaintiffs are simply seeking an opportunity to have their asylum claims heard. Failure to grant this preliminary injunction and return Plaintiffs to the status quo before the Asylum Ban went into effect, giving rise to the instant controversy, would therefore lead Plaintiffs to suffer irreparable harm.

**C. Balance of Equities/Public Interest**

While the Court must consider the public interest in preventing asylum-seekers from being improperly denied their access to the asylum process—particularly when the resulting ban could result in their removal to countries where they could face substantial harm—the Court is also mindful of the Government's position that it has a limited capacity to process all asylum-seekers in a timely fashion. Defendants argue that the Asylum Ban was passed in response to these limitations and that a preliminary injunction could complicate the Government's ability to deal with these issues, slowing the asylum process for others.

However, ultimately the Court finds the balance of equities and public interest tips in Plaintiffs' favor for two reasons. First, the putative subclass relied on the Government's representations. They returned to Mexico reasonably believing that if they followed these procedures, they would eventually have an opportunity to make a claim for asylum in the United States. But for the Government's metering policy, these asylum-seekers would have entered the United States and started the asylum process without delay. Similarly, but for the Government's current attempt to apply the Asylum Ban to them, these individuals could have their asylum claims adjudicated under the law in place at the time of their metering, which did not include the requirement that they first exhaust asylum procedures in Mexico. But because they did as the Government initially required and waited in Mexico, the Government is now arguing that they did not enter, attempt to enter, or arrive in the United States before July 16, 2019 and are now subject to this additional eligibility limitation. This situation, at its core, is quintessentially inequitable.

Second, as discussed above, if the Asylum Ban was meant to apply to those individuals waiting for their asylum hearing in Mexico due to the metering policy, the regulation could simply have said so. The fact that the Government is now so broadly interpreting a regulation that could have, but did not, include those who were metered, also leads the Court to include that the balance of equities tips in favor of Plaintiffs.

The Court concludes Plaintiffs have clearly shown a likelihood of success on the merits and irreparable harm, and that the balance of equities and public interest fall in their favor. Hence, the Court **GRANTS** Plaintiffs' Motion for a Preliminary Injunction.

**D. Scope of the Injunction**

"[T]he scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). In the immigration context, moreover, courts "have consistently recognized the authority of district courts to enjoin unlawful policies on a universal basis." *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 779 (9th Cir. 2018) (citing cases).

Unlike *East Bay Sanctuary*, however, nationwide injunctive relief is not necessary in this case to offer complete redress. Rather, the scope of the injunctive relief is limited by the class definition. *See All. to End Repression v. Rochford*, 565 F.2d 975, 980 (7th Cir. 1977) ("If, however, the suit is based on the constitutionality of a statute as applied or of a general practice, as is the case here, then the scope of the appropriate remedy can be defined more clearly by reference to the definition of the plaintiff class.").[12] The injunctive relief in this case would apply only to the class

[12] In fact, critics of the universal or nationwide injunction endorse the use of Rule 23(b)(2) class actions when injunctive relief limited to the named plaintiff "proves too narrow." Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 Harv. L. Rev. 417, 475–76 (2017) ("Indeed, if federal courts were to end the practice of issuing national injunctions, and instead were to issue only plaintiff-protective injunctions, it would become easier to see the rationale for the Rule 23(b)(2) class action as a means of achieving broad injunctive relief.").

certified in this case, defined in Section III, *supra*. The preliminary injunction therefore does not restrain nationwide effect of the Asylum Ban; it restrains only the effect of the Ban on those members of the provisionally certified class who fall outside the Ban's stated parameters.

## V. CONCLUSION

For the reasons stated above, the Court **GRANTS** Plaintiffs' Motion for Provisional Class Certification (ECF No. 293). The Court provisionally certifies a class consisting of "all non-Mexican asylum-seekers who were unable to make a direct asylum claim at a U.S. POE before July 16, 2019 because of the U.S. Government's metering policy, and who continue to seek access to the U.S. asylum process."

Furthermore, the Court **GRANTS** Plaintiffs' Motion for a Preliminary Injunction (ECF No. 294) and orders the following: Defendants are hereby **ENJOINED** from applying the Asylum Ban to members of the aforementioned provisionally certified class and **ORDERED** to return to the pre-Asylum Ban practices for processing the asylum applications of members of the certified class.

**IT IS SO ORDERED.**

**Dated: November 19, 2019**

Cynthia Bashant
**Hon. Cynthia Bashant**
**United States District Judge**

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

AL OTRO LADO, INC.; ABIGAIL DOE, BEATRICE DOE, CAROLINA DOE, DINORA DOE, INGRID DOE, ROBERTO DOE, MARIA DOE, JUAN DOE, ÚRSULA DOE, VICTORIA DOE, BIANCA DOE, EMILIANA DOE, AND CÉSAR DOE, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

KEVIN MCALEENAN, Acting Secretary of U.S. Department of Homeland Security, in his official capacity, *et al*.,

Defendants.

Case No. 17-cv-02366-BAS-KSC

**AMENDED ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**[1]

**[ECF No. 192]**

In this case, Organizational Plaintiff Al Otro Lado, Inc. ("Al Otro Lado"), an organization that helps individuals seek asylum in the United States, and thirteen Individual Plaintiffs—Abigail Doe, Beatrice Doe, Carolina Doe, Dinora Doe, Ingrid Doe, Roberto Doe, Maria Doe, Juan Doe, Úrsula Doe, Victoria Doe, Bianca Doe, Emiliana Doe, and César Doe—challenge conduct that they allege is "designed to

[1] This Amended Order amends certain citations in the Court's July 29, 2019 order. (ECF No. 278.) It is substantively identical to the July 29, 2019 order.

serve the Trump [A]dministration's broader, publicly proclaimed goal of deterring individuals from seeking access to the asylum process." (ECF No. 189 Second Am. Compl. ("SAC") ¶ 4.) According to Plaintiffs, U.S. Customs and Border Protection ("CBP") officials "have systematically restricted the number of asylum seekers who can access the U.S. asylum process through POEs along the U.S.-Mexico border." (*Id.* ¶ 48.) Plaintiffs seek to hold various Defendant federal officials[2] that have authority over immigration enforcement liable in their official capacities for an alleged pattern or practice by CBP officers of denying asylum seekers at ports of entry ("POEs") along the U.S.-Mexico border access to the U.S. asylum process, and an alleged formalized policy designed for the same end, which Plaintiffs refer to as the Turnback Policy.

In the months following the Court's grant in part and denial in part of Defendants' motion to dismiss the original complaint, *see Al Otro Lado, Inc. v. Nielsen*, 327 F. Supp. 3d 1284 (S.D. Cal. 2018), Plaintiffs filed the operative Second Amended Complaint ("SAC"). Like the original complaint, Plaintiffs allege in the SAC that since late 2016 there is an alleged pattern and practice amongst CBP officials at POEs along the U.S-Mexico border to "deny[] asylum seekers access to the asylum process" "through a variety of illegal tactics." (SAC ¶ 2.) Five original Individual Plaintiffs—Plaintiffs Abigail Doe, Beatrice Doe, Carolina Doe, Dinora Doe, and Ingrid Doe (the "Original Individual Plaintiffs")—once more allege that

---

[2] The SAC names the following Defendants in their official capacities: (1) Kirstjen M. Nielsen, Secretary, U.S. Department of Homeland Security ("DHS"), (2) Kevin McAleenan, Commissioner, U.S. Customs and Border Protection ("CBP"), and (3) Todd C. Owens, Executive Assistant Commissioner, Office of Field Operations, U.S. CBP. (SAC ¶¶ 36–39.) In the time since the SAC's filing in November 2018, at least two defendants have changed. Pursuant to Rule 25(d), the Court hereby substitutes (1) Kevin McAleenan as Acting Secretary of DHS in place of Nielsen and (2) John P. Sanders as the Acting Commissioner of CBP. Defendants shall notify the Court in the event any further substitution is warranted.

they were subjected to these tactics when CBP officials denied them access to the U.S. asylum process at various POEs.[3] Unlike the original complaint, the SAC now alleges that as early as 2016, Defendants were implementing a policy to restrict the flow of asylum seekers at the San Ysidro POE. Plaintiffs allege that Defendants formalized this policy in spring 2018 in the form of the border-wide Turnback Policy, an alleged "formal policy to restrict access to the asylum process at POEs by mandating that lower-level officials directly or constructively turn back asylum seekers at the border," including through pretextual assertions that POEs lack capacity to process asylum seekers. (*Id.* ¶¶ 3, 48–83.) Eight new Individual Plaintiffs—Roberto Doe, Maria Doe, Juan and Úrsula Doe, Victoria Doe, Bianca Doe, Emiliana Doe, and César Doe (the "New Individual Plaintiffs")—have joined this lawsuit, alleging that they were subjected to this Turnback Policy. Both the illegal tactics and the alleged Turnback Policy have resulted in many asylum seekers, particularly those from Central America, who present themselves at POEs along the U.S.-Mexico border being "turned back by" and "at the instruction of" CBP officials. (*Id.* ¶ 58.)

Based on the conduct alleged, Plaintiffs press claims for violations of various Immigration and Nationality Act ("INA") provisions, which Plaintiffs call "the U.S. asylum process." In connection with the alleged INA violations, Plaintiffs assert claims under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 706(1), 706(2), and claims directly under the Fifth Amendment Due Process Clause for alleged procedural due process violations. All Plaintiffs further assert claims under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, on the ground that the alleged

---

[3] For reasons unknown to the Court, Original Individual Jose Doe was dropped from this suit in the First Amended Complaint ("FAC") filed nearly two months after the Court's prior dismissal order and he is not a plaintiff to the SAC filed a month after the FAC. (ECF Nos. 176, 189.)

conduct violates a duty of non-*refoulement*, which Plaintiffs contend is an international law norm that "forbids a country from returning or expelling an individual to a country where he or she has a well-founded fear of persecution and/or torture[.]" Defendants move to dismiss the SAC under Rule 12(b)(6) for failure to state a claim. (ECF Nos. 192, 238.) Plaintiffs oppose. (ECF No. 210.) The parties presented oral argument to the Court. (ECF No. 259; ECF No. 260, Hr'g Tr.) In addition to the parties' submissions, six amicus briefs have been submitted with the Court's permission. (ECF Nos. 215, 216, 219, 221, 223.)[4]

For the reasons herein, the Court grants in part and denies in part Defendants' motion to dismiss the SAC.

## BACKGROUND

### I. Statutory and Regulatory Background

8 U.S.C. § 1158(a)(1) is this case's statutory bedrock. It provides that:

> Any alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States

[4]The briefs are: (1) *Amicus Curiae* Brief of the States of California, Connecticut, the District of Columbia, Delaware, Hawaii, Illinois, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia, and Washington in support of Plaintiffs, (ECF No. 215-1); (2) *Amicus Curiae* Brief of Amnesty International in Opposition to Defendants' Motion to Dismiss, (ECF No. 216-1); (3) *Amicus* Brief of Certain Members of Congress in Support of Plaintiffs' Opposition to Defendants' Motion to Dismiss the Second Amended Complaint, (ECF No. 219-1); (4) Brief of Certain Immigration Law Professors as *Amici Curiae* in Support of Plaintiffs' Opposition to Defendants' Motion to Partially Dismiss the Second Amended Complaint, (ECF No. 221-1); (5) *Amicus Curiae* Brief of Nineteen Organizations Representing Asylum Seekers, (ECF No. 223-2); and (6) Brief of *Amici Curiae* Kids in Need of Defense, *et al*., in Support of Plaintiffs' Opposition to Motion to Dismiss, (ECF No. 225-1).)

> after having been interdicted in international or United States waters), irrespective of such alien's status, may apply for asylum in accordance with this section or. . . section 1225(b)[.]
>
> 8 U.S.C. § 1158(a)(1).

This case turns on the Section 1225(b) asylum procedure that Section 1158 incorporates. Section 1225 sets forth, in relevant part, certain inspection duties of immigration officers, which undergird additional specific duties that arise when certain aliens express an intent to seek asylum in the United States or a fear of persecution.

Section 1225(a) establishes the general inspection duty: "[a]ll aliens . . . who are applicants for admission or otherwise seeking admission . . . to . . . the United States shall be inspected by immigration officers." 8 U.S.C. § 1225(a)(3). In language that echoes Section 1158(a)(1), Section 1225(a) defines as an "applicant for admission" "[a]n alien present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival including an alien who is brought to the United States after having been interdicted in international or United States waters)[.]" 8 U.S.C. § 1225(a)(1). An implementing regulation more broadly defines "arriving alien" as "an applicant for admission coming or attempting to come into the United States at a port-of-entry, or an alien seeking transit through the United States at a port-of-entry, or an alien interdicted in international or United States waters and brought into the United States by any means, whether or not to a designated port-of-entry, and regardless of the means of transport." 8 C.F.R. § 1.2. By regulation, "application to lawfully enter the United States shall be made in person to an immigration officer at a U.S. port-of-entry when the port is open for inspection, or as otherwise" provided. 8 C.F.R. § 231.1(a).

Section 1225(b) sets forth two sets of procedures that apply to aliens "arriving

in the United States." First, pursuant to the procedure under Section 1225(b)(1), an arriving alien may be summarily "removed from the United States without further hearing or review" "if an immigration officer determines" that the alien "is inadmissible" for making certain fraudulent or misleading representations or for not having valid entry or travel documents. 8 U.S.C. § 1225(b)(1)(A)(i); *Thuraissigiam v. U.S. Dep't of Homeland Sec.*, 917 F.3d 1097, 1100 (9th Cir. 2019) (citing, *inter alia*, 8 U.S.C. § 1182(a)(6)(C) and 8 U.S.C. § 1182(a)(7)). Section 1225(b)(1)'s removal mandate, however, does not apply if "the alien indicates either an intention to apply for asylum under section 1158 [] or a fear of persecution." *Id.* Instead, "[i]f the immigration officer determines that an alien" is "inadmissible" for making certain fraudulent or misleading representations or for not having valid entry or travel documents "*and* the alien indicates either an intention to apply for asylum under section 1158 [] or a fear of persecution, the officer shall refer the alien for an interview by an asylum officer[.]" 8 U.S.C. § 1225(b)(1)(A)(ii) (emphasis added). An implementing regulation governing this expedited removal procedure imposes an analogous obligation. 8 C.F.R. § 235.3(b)(4). In these circumstances, the immigration officer must refer the alien to an "asylum officer," who is statutorily required to be "an immigration officer who has had professional training in country conditions, asylum law, and interview techniques comparable to that provided to full-time adjudicators of applications under section 1158 of this title," and "is supervised by an officer who," *inter alia*, "has had substantial experience adjudicating asylum applications." 8 U.S.C. § 1225(b)(1)(E).

In contrast with the Section 1225(b)(1) procedure, Section 1225(b)(2) establishes the procedure for "inspection of other aliens." 8 U.S.C. § 1225(b)(2). "Subject to subparagraphs (B) and (C), in the case of an alien who is an applicant for admission," the alien "shall be detained for a proceeding under [8 U.S.C. §] 1229a" (the general "removal proceedings" provision) "if the examining immigration officer

determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted[.]"  8 U.S.C. § 1225(b)(2)(A).  Subparagraph (C) provides that "in the case of an alien described in subparagraph (A) who is arriving on land . . . from a foreign territory contiguous to the United States, the Attorney General may return the alien to that territory pending a proceeding under section 1229a[.]"  8 U.S.C. § 1225(b)(2)(C).  In relevant part, Subparagraph (B) provides that "[s]ubparagraph (A) shall not apply to an alien—(ii) "to whom paragraph (1) applies"—*i.e.* aliens who are subject to the procedure in 8 U.S.C. § 1225(b)(1).  8 U.S.C. § 1225(b)(2)(B)(ii).  Consistent with Section 1225(b)(2)'s instruction that asylum applicants are channeled through the Section 1225(b)(1) procedure, Section 1225(b)(2) does not elaborate on any asylum procedure.

During the Section 1225 admission process, "[a]n alien applying for admission may, in the discretion of the Attorney General and at any time, be permitted to withdraw the application for admission and depart immediately from the United States."  8 U.S.C. § 1225(a)(4).  By regulation, "the alien's decision to withdraw his or her application for admission must be made voluntarily[.]" 8 C.F.R. § 235.4.

## II.    Factual Allegations

### A.    Allegations Regarding Defendants

Defendants are U.S. government officials sued in their official capacity who exercise authority over CBP in various capacities.  The Defendant Secretary of Homeland Security (the "Secretary") "has ultimate authority over all CBP policies, procedures, and practices."  (SAC ¶ 36.)  The Secretary "is responsible for ensuring that all CBP officials perform their duties in accordance with the Constitution and all relevant laws."  (*Id.*)  The Defendant CBP Commissioner "has direct authority over all CBP policies, procedures, and practices."  (*Id.* ¶ 37.)  Defendant oversees a

staff of more than 60,000 employees and "exercises authority over all CBP operations." (*Id.*) The Defendant Executive Assistant Commissioner ("EAC") of CBP's Office of Field Operations oversees "the largest component of CBP and is responsible for border security, including immigration and travel through U.S. POEs," for which the EAC oversees a staff of "more than 24, 000 CBP officials and specialists[.]" (*Id.* ¶ 38.) Plaintiffs also sue 25 Doe Defendants who "were agents or alter egos of Defendants, or [who] are otherwise responsible for all of the acts" alleged. (*Id.* ¶ 39.) Defendants allegedly have denied access to the U.S. asylum process to noncitizens fleeing "grave harm in their countries to seek protection in the United States" "in contravention of U.S. and international law" pursuant to (1) "a policy initiated by Defendants"—the Turnback Policy—and (2) "practices effectively ratified by Defendants." (*Id.* ¶ 1.) The Court describes Plaintiffs' allegations regarding each.

**1. Alleged Pattern and Practice of Illegal Tactics**

"Since 2016 and continuing to this day, CBP has engaged in an unlawful, widespread pattern and practice of denying asylum seekers access to the asylum process at POEs on the U.S.-Mexico border through a variety of illegal tactics." (SAC ¶¶ 2, 84.) CBP officials have carried out this practice through misrepresentations, threats and intimidation, verbal and physical abuse, and coercion. (*Id.* ¶¶ 84–106.) For example, CBP officials are alleged to turn away asylum seekers by falsely informing them that the U.S. is no longer providing asylum, that President Trump signed a new law ending asylum, that a law providing asylum to Central Americans ended, that Mexican citizens are not eligible for asylum, and that the U.S. is no longer accepting mothers with children for asylum. (*Id.* ¶¶ 85–86.) CBP officials allegedly intimidate asylum seekers by threatening to take away their children if they do not renounce a claim for asylum and by threatening to deport asylum seekers. (*Id.* ¶¶ 87–88.) CBP officials allegedly force

asylum seekers to sign forms in English, without translation, in which the asylum seekers recant their fears of persecution. (*Id*. ¶¶ 91–92.) CBP officials are alleged to instruct some asylum seekers to recant their fears of persecution while being recorded on video. (*Id*.) In some instances, CBP officials have "simply turn[ed] asylum seekers away from POEs without any substantive explanation." (*Id.* ¶¶ 93–94.) Other alleged tactics include: (1) CBP officers physically block access to the POE, including by "CBP sometimes enlist[ing] Mexican officials to act as their agents"; (2) CBP officials impose "a fixed number of asylum seekers" per day and place asylum seekers on a waiting list that results in "asylum-seeking men, women and children wait[ing] endlessly on or near bridges leadings to POEs in rain, cold, and blistering heat, without sufficient food or water and with limited bathroom access"; and (3) racially discriminatory denials of access by CBP officers, including by denying asylum seekers from specific countries access to POEs and allowing "lighter-skinned individuals to pass." (*Id.* ¶¶ 95–106.) Plaintiffs point to numerous reports by non-governmental organization and "other experts working in the U.S.-Mexico border region" as corroborating the existence and use of these tactics by CBP officers. (*Id*. ¶¶ 107–08, 110–111, 113–16.)

**2. The Alleged "Turnback Policy"**

**a. Nascent Stages**

Plaintiffs allege that "evidence of a Turnback Policy" exists as early as May 2016, at least insofar as it concerns the San Ysidro POE, a POE that figures prominently in the SAC and the Plaintiffs' allegations. (SAC ¶¶ 51–53, 60; *see also id.* ¶¶ 16, 25–26, 28, 32–35, 48 & n.37.) Plaintiffs point to a communication from the "Watch Commander at the San Ysidro POE" indicating that "[t]he Asylee line in the pedestrian building is not being used at this time," with a follow-up communication indicating that "it's even more important that when the traffic is free-flowing that the limit line officers ask for and check documents to ensure that groups

that may be seeking asylum are directed to remain in the waiting area on the Mexican side." (*Id.* ¶ 51.) At the time, CBP allegedly "collaborat[ed] with the Mexican government to turn back asylum seekers at the San Ysidro POE," collaboration that was allegedly formalized in July 2016 and confirmed in December 2016. (*Id.* ¶¶ 52–53.)

A border-wide policy allegedly existed as early as November 2016 because the Assistant Director of Field Operations for the Laredo Field Office "instructed all Port Directors under his command to follow the mandate of the then-CBP Commissioner and Deputy Commissioner" to request that Mexico's immigration agency "control the flow of aliens to the port of entry." (*Id.* ¶ 55.) Under this mandate, the Commissioner allegedly directed that "if you determine that you can only process 50 aliens, you will request that [Mexico's immigration agency] release only 50," and if the agency "cannot or will not control the flow," then CBP staff "is to provide the alien with a piece of paper identifying a date and time for an appointment and return then [sic] to Mexico." (*Id.*) This directive "was promptly implemented" at POEs along the Texas-Mexico portion of the U.S.-Mexico border and "memorialized in January 2017." (*Id.* ¶¶ 56, 57.) Plaintiffs allege that in a June 13, 2017 hearing before the House Appropriations Committee, John P. Wagner, the Deputy Executive Assistant Commissioner for CBP's Office of Field Operations, admitted that CBP officials were turning back asylum seekers at POEs along the U.S-Mexico border and argued that "the practice was justified by a lack of capacity." (*Id.* ¶ 59.) The CBO Field Operations Director in charge of the San Ysidro POE similarly acknowledged and defended the turnbacks in December 2017. (*Id.* ¶ 60.)

**b. Alleged Formalization and High-Level Recognition**

The alleged border-wide policy to turnback asylum seekers through false assertions of lack of capacity took on a new life in spring 2018 "following an

arduous, widely-publicized journey" of "a group of several hundred asylum seekers"—dubbed by the press as a "caravan"—who "arrived at the San Ysidro POE." (*Id.* ¶ 61.) "President Trump posted a series of messages on Twitter warning of the dangers posed by the group, including one indicating that he had instructed DHS 'not to let these large Caravans of people into our Country.'" (*Id.* (citations omitted).)

Around this time, high-level Trump Administration officials unambiguously proclaimed, "the existence of their policy to intentionally restrict access to the asylum process at POEs in violation of U.S. law." (*Id.* ¶¶ 5, 62.) Then-U.S. Attorney General Jeff Session "characterized the caravan's arrival as 'a deliberate attempt to undermine our laws and overwhelm our system.'" (*Id.* ¶ 63.) Following the arrival of the "caravan," "CBP officials indicated—in accordance with the Turnback Policy—that they had exhausted their capacity to process individuals traveling without proper documentation." (*Id.* ¶¶ 7, 64, 67.) On May 15, 2018, then-Secretary of Homeland Security Kirstjen Nielsen "characterized the asylum process . . . as a legal 'loophole' and publicly announced a 'metering' process designed to restrict—and constructively deny—access to the asylum process through unreasonable and dangerous delay." (*Id.* ¶¶ 5, 65.) President Trump made a number of tweets throughout June and July 2018 that further confirmed the alleged Turnback Policy, including statements that "[w]hen somebody comes in, we must immediately, with no Judges or Court Cases, bring them back from where they came from," and "we must IMMEDIATELY escort them back without going through years of maneuvering." (*Id.* ¶ 66.) Plaintiffs point to numerous other confirmations of the existence of the alleged Turnback Policy, designed and implemented by U.S. officials, including statements by then-CBP Commissioner McAleenan in April 2018 indicating that "individuals [without appropriate entry documentation] may need to wait in Mexico as CBP officers work to process those already within our

facilities"; a September 27, 2018 report from the Office of the Inspector General (the "OIG Report"); and statements by Mexican immigration officials, one of whom allegedly complained that "[CBP] was making [the Mexican immigration agency] do [CBP's] dirty work." (*Id.* ¶¶ 68–76 & nn. 56–71.)

According to Plaintiffs, the asserted capacity concerns used to justify the alleged Turnback Policy are a pretextual and false "cover for a deliberate slowdown of the rate at which agency receives asylum seekers at POEs." (*Id.* ¶¶ 3, 76–83.) They allege that "CBP's own statistics indicate that there has not been a particular surge in [the] numbers of asylum seekers coming to POEs." (*Id.* ¶ 76.) Amnesty International has allegedly characterized capacity concerns as "a fiction" based on the available statistics. (*Id.* (citation omitted).) Plaintiffs point to statements by "senior CBP and ICE officials in San Ysidro, California" in early 2018, in which the officials stated that "CBP has only actually reached its detention capacity a couple times per year and during 'a very short period' in 2017." (*Id.* ¶ 77.) Plaintiffs further note that in the OIG Report, "the OIG team did not observe severe overcrowding at the ports of entry it visited." (*Id.*) And "[h]uman rights researchers visiting seven POEs in Texas in June 2018 reported that '[t]he processing rooms visible in the [POE] . . . appeared to be largely empty.'" (*Id.* (citations omitted).) Plaintiffs otherwise point to anecdotal accounts for specific POEs, which Plaintiffs allege show "abrupt" changes in assertions of a lack of capacity at POEs and CBP officers allowing some asylum seekers to cross—sometimes in the span of a few hours. (*Id.* ¶ 78.) For example, CBP officials at the Nogales, Arizona POE abruptly switched from processing 6 asylum seekers a day, based on assertions of lack of capacity, to 20 asylum seekers a day. (*Id.*) And, of course, there are the alleged experiences of the eight New Individual Plaintiffs, which provide a further gloss on the Turnback Policy. (*Id.* ¶ 83.)

### B. The Plaintiffs

The challenge to Defendants' alleged conduct is pressed by Organizational Plaintiff Al Otro Lado and thirteen Individual Plaintiffs. For the purposes of this order, the Court refers to the Individual Plaintiffs as two groups: the Original Individual Plaintiffs and the New Individual Plaintiffs.[5] As the Court has noted, Organizational Plaintiff Al Otro Lado and the Original Individual Plaintiffs have been parties since this case's inception. The Court will not retrace in great detail the allegations pertaining to these Plaintiffs. The Court, however will provide relatively more detail regarding the New Individual Plaintiffs because this order is the first occasion to do so.

#### 1. Organizational Plaintiff Al Otro Lado

Al Otro Lado is a non-profit California legal services organization established in 2014, which provides services to indigent deportees, migrants, refugees, and their families. (SAC ¶ 17.) Al Otro Lado alleges that the Defendants' alleged conduct has frustrated its ability to advance and maintain its "central" and "organizational mission" because Al Otro Lado has had "to divert substantial" time and resources away from its programs "to counteract the effects of the Turnback Policy and Defendants' other unlawful practices." (*Id.* ¶¶ 12–13, 17–23.)

---

[5] In their present motion to dismiss, Defendants divide the Individual Plaintiffs into two groups. Defendants refer to the Original Individual Plaintiffs as "Territorial Plaintiffs" on the ground that the SAC's allegations show that all Original Individual Plaintiffs were in a POE at the time they were allegedly denied access to the asylum process. (ECF No. 192-1 at 1–2.) In contrast, Defendants refer to all New Individual Plaintiffs as "Extraterritorial Plaintiffs," based on Defendants' view that these Individual Plaintiffs' allegations show that "they experienced the purported 'Turnback Policy' when they approached the border to the territorial United States at the San Ysidro, Laredo, or Hidalgo [POEs] but were prevented by CBP officers or Mexican immigration officials from physically crossing the international boundary." (*Id.* at 2.) The Court declines to use Defendants' labeling.

### 2. Original Individual Plaintiffs

Plaintiffs Abigail Doe, Beatrice Doe, Carolina Doe are natives and citizens of Mexico, who fled to Tijuana, Mexico where they attempted to access the U.S. asylum process at various points in May 2017, due to violence they experienced at the hands of drug cartels. (SAC ¶¶ 24–26, 119–121, 125–127, 133–134.) They allege that CBP officers at the San Ysidro and Otay Mesa POEs located along the California-Mexico portion of the U.S.-Mexico border coerced them into signing English language forms in which they recanted their fears of returning to Mexico and withdrew their applications for admission. (*Id.* ¶¶ 24–26, 122–123, 128–130, 135–136.) Plaintiffs Dinora Doe and Ingrid Doe are natives and citizens of Honduras, who fled to Tijuana, Mexico after violence they experienced at the hands of criminal gangs and Ingrid experienced severe abuse from her partner. (*Id.* ¶¶ 27–28, 138–140, 147–149.) Dinora presented herself at the Otay Mesa POE three times in August 2016 but was told "there was no asylum in the United States," including specifically "for Central Americans," and that she "would be handed over to Mexican authorities and deported to Honduras." (*Id.* ¶¶ 27, 141–144.) Ingrid presented herself at the Otay Mesa and San Ysidro POEs, where CBP officers told her and her children that they could not seek asylum in the United States. (*Id.* ¶¶ 28, 149–151.) Based on developments that occurred after the original complaint's filing and which the Court determined did not moot this case, *Al Otro Lado*, *Inc.*, 327 F. Supp. 3d at 1295, 1302–04, the Original Individual Plaintiffs allege that "Defendants made arrangements to facilitate" their "entry . . . into the United States." (SAC ¶¶ 24–28, 124, 132, 137, 145, 152.)

### 3. New Individual Plaintiffs

Plaintiffs Juan and Úrsula Doe, husband and wife, are natives and citizens of Honduras, who fled Honduras "with their sons after receiving death threats from gangs." (SAC ¶¶ 31, 171–72.) They presented themselves at the Laredo POE in late

September 2018, but when they "reached the middle of the bridge to the POE, CBP officials denied them access to the asylum process by telling them the POE was closed and that they could not enter." (*Id.* ¶¶ 31, 173–74.)

Plaintiff Roberto Doe is a native and citizen of Nicaragua, who alleges that he fled Nicaragua due to threats of violence "from the Nicaraguan government and paramilitaries allied with the government." (*Id.* ¶¶ 29, 153.) Roberto presented himself at the Hidalgo, Texas POE in October 2018, where he encountered CBP officials in the middle of the bridge between Mexico and the United States, who he told that he wanted to seek asylum in the United States. (*Id.* ¶¶ 29, 154.) The officials "t[old] him the POE was full and that he could not enter." (*Id.* ¶¶ 29, 155.) After the FAC was filed in October 2018, Roberto returned to the Hidalgo POE "where Mexican officials detained him as he was walking onto the international bridge to seek access to the asylum process in the United States" and he "remains in the custody of the Mexican government." (*Id.* ¶¶ 29, 159.)

Plaintiff Maria Doe is a native and citizen of Guatemala and permanent resident of Mexico. (*Id.* ¶¶ 30, 160.) Maria "left her husband, who was abusive and is involved with cartels[.]" (*Id.* ¶¶ 30, 161.) Since she left him, "two different cartels have been tracking and threatening her," and located her despite her attempts to find a "safe place to live" in both Guatemala and Mexico. (*Id.* ¶¶ 30, 161.) Maria and her two children presented themselves at the Laredo, Texas POE on September 10, 2018. (*Id.* ¶¶ 30, 162.) However, "[w]hen Maria encountered CBP officials in the middle of the bridge, [and] she told them that she and her children wanted to seek asylum in the United States," the CBP officials told them to wait on the Mexican side of the bridge. (*Id.* ¶¶ 30, 162.)

Plaintiff Bianca Doe is a transgender woman who is a native and citizen of

Honduras.  (*Id.* ¶¶ 33–34, 184, 191.)  Bianca "has been subjected to extreme and persistent physical and sexual assault, as well as discrimination and ongoing threats of violence in Honduras and Mexico City . . . because she is a transgender woman[.]" (*Id.* ¶¶ 33, 184–85.)  Bianca presented herself at the San Ysidro POE on September 19, 2018, where "CBP officers . . . stat[ed] that she could not apply at that time because they were at capacity."  (*Id.* ¶¶ 33, 185.)  Bianca returned the next day and "was given a piece of paper with the number '919,' placed on a waiting list, and told that she would have to wait several weeks to proceed to the POE."  (*Id.* ¶¶ 33, 186.) On September 28, 2018, Bianca "attempted to enter the United States without inspection by climbing a fence on a beach in Tijuana[,]" but "once over the fence, a U.S. Border Patrol officer stopped [her]" and she "expressed her desire to seek asylum in the U.S."  (*Id.* ¶¶ 33, 187.)  "The U.S. Border Patrol Officer told [her] that there was no capacity in U.S. detention centers and threatened to call Mexican police if [she] did not climb the fence back into Mexico."  Bianca did so.  Bianca presented herself "again" at the San Ysidro POE on October 8, 2018.  (*Id.* ¶¶ 33, 188.)  "She was told, once again, that CBP had no capacity for asylum seekers."  (*Id.* ¶¶ 33, 188.)

Plaintiff Emiliana Doe is a transgender woman and a native and citizen of Honduras.  (*Id.* ¶¶ 34, 191.)  She "was subjected to multiple sexual and physical assaults, kidnapping, and discrimination, as well as threats of severe harm and violence in Honduras because she is a transgender woman."  (*Id.* ¶ 34.)  After fleeing Honduras in June 2018, Emiliana reached Tijuana in September 2018 and presented herself at the San Ysidro POE, where a stranger told her she would need to get on "the waiting list" to apply for asylum.  (*Id.* ¶ 192.)  After going to the San Ysidro POE and speaking with two women, "[s]he was given a piece of paper with the number '1014' on it, placed on a waiting list, and told to return in six weeks."  (*Id.* ¶¶ 34, 192.)  On October 8, 2018, "[f]eeling desperate and unsafe, Emiliana returned to the POE just a few weeks later," but "CBP officers . . . t[old] her that there was

no capacity for asylum seekers and instruct[ed] her to wait for Mexican officials." (*Id*. ¶¶ 34, 193.)

Plaintiff César Doe is a native and citizen of Honduras. (*Id*. ¶¶ 35, 196.) "César has been threatened numerous times with severe harm and death and kidnapped by members of the 18th street gang." (*Id*. ¶¶ 35, 196.) He alleges, *inter alia*, that on one occasion, he "present[ed] himself at the San Ysidro POE" "with two staff members from Al Otro Lado" "but CBP officers refused to accept him." (*Id*. ¶¶ 35, 199.)

Plaintiff Victoria Doe is a 16-year old native and citizen of Honduras. (*Id*. ¶¶ 32, 179.) She "has been threatened with severe harm and death by members of the 18th street gang for refusing to become the girlfriend of one of the gang's leaders." (*Id*. ¶¶ 32, 179.) Victoria fled to Mexico where she gave birth to a son. (*Id*. ¶¶ 32, 179.) Victoria and her son arrived in Tijuana as part of a "refugee caravan" and went to the San Ysidro POE on October 8, 2018. (*Id*. ¶¶ 32, 180.) "When Victoria expressed her desire to seek asylum in the United States, CBP officers . . . stat[ed] that she could not apply for asylum at that time and t[old] her to speak to a Mexican official without providing any additional information." (*Id*. ¶¶ 32, 181.) Except for Roberto Doe, all New Individual Plaintiffs allege that "following the filing of the First Amended Complaint in this case, Defendants made arrangements to facilitate the[ir] entry . . . into the United States." (SAC ¶¶ 30–35.)

## III. Procedural Synopsis

Organizational Plaintiff Al Otro Lado and, on behalf of themselves and a putative class, the Original Individual Plaintiffs commenced this action against Defendants on July 12, 2017 in the United States District Court for the Central District of California. (ECF No. 1.) After the Central District transferred the action

to this Court on November 29, 2017, Defendants renewed their motion to dismiss the original complaint in its entirety.  (ECF No. 135.)

The Court granted Defendants' motion in part.  *Al Otro Lado, Inc. v. Nielsen*, 327 F. Supp. 3d 1284 (S.D. Cal. 2018).  In relevant part, the Court dismissed the Section 706(1) APA claims of Plaintiffs Abigail Doe, Beatrice Doe, and Carolina Doe to the extent they sought to compel relief under 8 C.F.R. § 235.4 for allegedly being coerced into withdrawing their applications for admission.  *Id.* at 1314–15.  The Court also dismissed Plaintiffs' Section 706(2) APA claims based on an alleged "pattern or practice" because the Court was not convinced that Plaintiffs had plausibly alleged facts to "support[] the inference that there is an overarching policy" and, consequently, had failed to identify a final agency action.  *Id*. at 1320.  The Court granted Plaintiffs leave to amend their Section 706(2) claims.  *Id.* at 1321.  The Court otherwise denied Defendants' motion to dismiss on all other grounds.  *Id.* at 1295–1304 (rejecting Defendants' argument that the entire case was moot because Defendants had allowed original Individual Plaintiffs to be processed for admission at a POE after filing of the case); *id*. at 1306–08 (rejecting Defendants' argument that the United States had not waived sovereign immunity for ATS claims on the ground that Section 702 of the APA provides a "broad waiver of sovereign immunity for claims against the United States for nonmonetary relief"); *id.* at 1311–13 (rejecting Defendants' argument that Plaintiffs cannot challenge an alleged pattern or practice of alleged CBP officer denials of access to the asylum process under Section 706(1) of the APA).

In November 2018, Plaintiffs filed the operative Second Amended Complaint, a pleading that raises claims largely identical to those in the original complaint albeit upon an expanded set of factual allegations and with some refinement.  (SAC ¶¶ 244–303.)  All Individual Plaintiffs seek to press their claims on behalf of a putative

Case: 22-55988, 12/20/2022, ID: 12615053, DktEntry: 13-2, Page 236 of 301

class of "noncitizens who seek or will seek to access the U.S. asylum process by presenting themselves at a POE along the U.S.-Mexico border and are denied access to the U.S. asylum process by or at the instruction of CBP officials." (*Id.* ¶¶ 1, 236–43.) Once more, Plaintiffs seek only declaratory and injunctive relief. (*Id.* at 100.)

**LEGAL STANDARDS**

Federal Rule of Civil Procedure 8(a)(2) requires that a complaint set forth "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the. . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). A defendant may test the sufficiency of a complaint on several grounds, including on the ground that the court lacks subject matter jurisdiction over the complaint or that the complaint fails to state a claim for relief. Fed. R. Civ. P. 12(b)(1), (6).

A Rule 12(b)(1) motion tests whether a court possesses subject matter jurisdiction to adjudicate the claims in the action. Fed. R. Civ. P. 12 (b)(1); *Savage v. Glendale Union High Sch.*, 343 F.3d 1036, 1039–40 (9th Cir. 2003), *cert. denied*, 541 U.S. 1009 (2004). As is relevant here, a Rule 12(b)(6) motion that asserts lack of jurisdiction due to the alleged presence of a political question in a case is "more appropriately construed as a Rule 12(b)(1) motion[.]" *Corrie v. Caterpillar*, 503 F.3d 974, 982 (9th Cir. 2007); *Yellen v. United States*, Civ. No. 14-00134 JMS-KSC, 2014 WL 2532460, at *1 (D. Haw. June 4, 2014) (same). Thus, although Defendants nominally raise a Rule 12(b)(6) motion, the Court construes their motion on this issue as raised under Rule 12(b)(1). When a party asserts a Rule 12(b)(1) challenge limited to the pleadings, as Defendants do here, the Court accepts Plaintiffs' factual allegations as true and draws all reasonable inferences in Plaintiffs' favor to determine whether the allegations are sufficient to invoke federal jurisdiction. *Pride*

*v. Correa*, 719 F.3d 1130, 1133 (9th Cir. 2013).

A Rule 12(b)(6) motion tests whether the allegations, even if true, fail to state a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6); *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983). To survive a Rule 12(b)(6) motion, a plaintiff is required to set forth "enough facts to state a claim for relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw reasonable inferences that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). To assess the legal sufficiency of a complaint, the court accepts as true the complaint's factual allegations and construes them in the light most favorable to the plaintiff. *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984). A court may consider materials properly submitted as part of the complaint. *Lee v. City of Los Angeles*, 250 F.3d 668, 688–89 (9th Cir. 2001).

**DISCUSSION**

Defendants' motion to dismiss raises a variety of arguments for why the SAC should be dismissed in whole or in part, some of which are familiar and others of which are new. The Court distills Defendants' arguments into four overarching parts. First, Defendants argue that the Court lacks jurisdiction under the political question doctrine to consider certain factual allegations or grant certain forms of relief. Second, and forming the bulk of Defendants' motion to dismiss, is a set of arguments that Plaintiffs fail to state Sections 706(1) and 706(2) APA claims. Third, Defendants seek dismissal of the New Individual Plaintiffs' Fifth Amendment Due Process Clause claims, principally on the ground that the Fifth Amendment does not apply extraterritorially. Fourth, Defendants seek dismissal of Plaintiffs' ATS claims. The Court considers each set of arguments in turn.

## I. The Political Question Doctrine

Defendants argue that that the political question doctrine bars judicial review of "Defendants' coordination with a foreign nation to regulate border crossings." (ECF No. 192-1 at 25.) Pointing to allegations in the SAC regarding interactions between U.S. and Mexican government officials, Defendants argue that granting Plaintiffs' request to enjoin the alleged Turnback Policy "would prohibit Defendants from 'coordinating' with Mexican government officials as they carry out their statutory responsibility to manage the flow of traffic across the border." (*Id.* at 25–26, 28 (citing SAC ¶¶ 3, 7, 50–83, 86–87, 96, 98–102, 108–10, 114, 116).) The Court rejects Defendants' political question doctrine argument at this juncture.

"In general, the Judiciary has a responsibility to decide cases properly before it, even those it 'would gladly avoid.'" *Zivotofsky v. Clinton*, 566 U.S. 189, 194–95, (2012) (quoting *Cohens v. Virginia*, 19 U.S. 264, 404 (1821)). The "political question doctrine" is a recognized "narrow exception" to the Judiciary's Article III responsibility. *Id*. at 195 (citing *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986)). The doctrine "excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch[.]" *Japan Whaling Ass'n*, 478 U.S. at 230. As such, "[t]he political question doctrine concerns the jurisdictional 'case or controversy requirement' of Article III of the Constitution, . . . and the Court must address it '*before* proceeding to the merits[.]'" *Ahmed Salem Bin Ali Jaber v. United States*, 861 F.3d 241, 245 (D.C. Cir. 2017) (citing first *Schlesinger v. Reservists Comm. To Stop the War*, 418 U.S. 208, 215 (1974) and quoting second *Tenet v. Doe*, 544 U.S. 1, 6 n.4 (2005)) (emphasis added). If a political question is inextricable from a case, the doctrine "prevents a plaintiff's claims from proceeding to the merits." *Ahmed Salem Bin Ali Jaber*, 861 F.3d at 245 (citing *Baker v. Carr*, 369 U.S. 186, 211

(1962)).

There are at least six different "formulations" for determining whether a case presents a political question that is understood to deprive a federal court of subject matter jurisdiction. *Baker*, 369 U.S. at 217. As Defendants recognize, a case need only present one formulation for a political question to preclude jurisdiction. *Ahmed Salem Bin Ali Jaber*, 861 F.3d at 245 (citing *Schneider v. Kissinger*, 412 F.3d 190, 194 (D.C. Cir. 2005)). The only formulation on which Defendant rely here is that there is a "textually demonstrable constitutional commitment of the issue to a coordinate political department[.]" *Baker*, 369 U.S. at 217.

In particular, Defendants contend that this case presents the political question "whether and to what extent it is lawful for the United States to (allegedly) collaborate with the government of Mexico to control the flow of travel across the countries' shared border[.]" (ECF No. 192-1 at 26.) Viewed in this light, Defendants contend that "Plaintiffs' allegations and requests for relief are squarely outside the Court's jurisdiction" under the first *Baker* formulation because "[f]oreign-relations matters are clearly committed by [the] Constitution to the Executive Branch, particularly as they relate to the United States' efforts to manage the flow of travel across the border." (*Id*. at 27.) For this reason, Defendants argue that "[t]he Court does not have jurisdiction to declare unlawful or enjoin [the alleged coordination with Mexican government officials][.]" (*Id.* at 28.) The Court disagrees with Defendants' view about the questions this case presents and, thus, rejects Defendants' argument that the political question doctrine precludes this Court from reviewing Plaintiffs' claims or granting corresponding relief.

The Court acknowledges that "[t]he exclusion of aliens is 'a fundamental act of sovereignty' by the political branches[.]" *Trump v. Hawaii*, 138 S. Ct. 2392, 2407

(2018) (quoting *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950)).  The Executive possesses a recognized power "to regulate the entry of aliens into the United States" through its "inherent" "executive power to control the foreign affairs of the nation[.]"  *Knauff*, 338 U.S. at 542; *E. Bay Sanctuary Covenant v. Trump*, No. 18-17274, —F.3d—, 2018 WL 8807133, at *4 (9th Cir. Dec. 7, 2018).  The Executive's foreign affairs powers are understood to "derive from the President's role as 'Commander in Chief,' [the President's] right to 'receive Ambassadors and other public Ministers,' and [the President's] general duty to 'take Care that the Laws be faithfully executed'[.]"  *E. Bay Sanctuary Covenant*, 2018 WL 8807133, at *4 (internally citing U.S. Const. art. II, § 2, cl. 1 (referring to President as "Commander in Chief") and *id.* § 3 (President's power to receive ambassadors) and further citing *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003)).  But the Executive's recognized power over foreign affairs under Article II of the Constitution is not exercised in a constitutional vacuum.  By virtue of Article I, Congress possesses certain powers that render the admission or exclusion of aliens and foreign affairs an intimately legislative matter, including the specific constitutionally enumerated legislative powers "'[t]o establish an uniform rule of Naturalization,' to 'regulate Commerce with foreign Nations,' and to 'declare War[.]'"  *E. Bay Sanctuary Covenant*, 2018 WL 8807133, at *4 (internally citing U.S. Const. art. I § 8, cl. 4 (uniform naturalization rule power), *id.* § 8, cl. 3 (foreign commerce power), *id.* § 8, cl. 11 (war power)).  For this reason, it is indisputable that "'over no conceivable subject is the legislative power of Congress more complete than it is over' the admission of aliens."  *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (quoting *Oceanic Navigation Co. v. Stranahan*, 214 U.S. 320, 339 (1909)).

The claims asserted in this case undercut Defendants' invocation of the political question doctrine.  Plaintiffs' claims primarily concern alleged violations of various INA provisions and an implementing regulation through alleged denials of

access to the U.S. asylum process and an alleged policy and pattern or practice of denying asylum seekers access to the U.S. asylum process. (SAC ¶¶ 203–223 (describing statutory and regulatory scheme that applies to asylum seekers); *id.* ¶¶ 256–69 (APA Section 706(1) claims based on certain INA provisions and implementing regulation); *id.* ¶¶ 270–82 (APA Section 706(2) claims premised on certain INA provisions and implementing regulation); *id.* ¶¶ 283–93 (Fifth Amendment Due Process Clause claims premised on certain INA provisions and implementing regulation).) Federal courts have the power to "review the political branches' action to determine whether they exceed the constitutional or statutory scope of their authority." *E. Bay Sanctuary Covenant*, 2018 WL 8807133, at *5 (citing *Hawaii*, 138 S. Ct. at 2419).

Although Plaintiffs' claims concern immigration, the statutory questions the claims raise do not task the Court with, nor require the Court to engage in a freewheeling inquiry into the wisdom of immigration policy choices. *See Sale v. Haitian Ctrs. Council*, 509 U.S. 155, 165–66 (1993) (noting that "the wisdom of the policy choices made by Presidents Reagan, Bush, and Clinton is not a matter for our consideration. We must decide only whether Executive Order No. 12807, 57 Fed. Reg. 23133 (1992), which reflects and implements those choices, is consistent with § 243(h) of the INA."). When "Congress has expressed its intent regarding an aspect of foreign affairs" through a legislative command and a court is asked to "evaluate the Government's compliance" with that command, the court "is 'not being asked to supplant a foreign policy decision of the political branches with the courts' own unmoored determination of what United States policy . . . should be.'" *Ctr. for Bio. Diversity v. Mattis*, 868 F.3d 803, 823 (9th Cir. 2017) (quoting *Zivotofsky*, 566 U.S. at 196). "Instead, a court must engage in the 'familiar judicial exercise' of reading and applying a statute, conscious of the purpose expressed by Congress." *Id.* (quoting *Zivotofsky*, 566 U.S. at 196). In this case, resolution of Plaintiffs' claims

turns on whether Defendants' alleged conduct complies with or violates the relevant INA provisions and implementing regulation. It is well within this Court's Article III province and duty to resolve these claims.

The Court acknowledges that there are some allegations that touch on alleged coordination with Mexican government officials.[6]   (SAC ¶¶ 3, 7, 50–60.)   The coordination, however, is merely an outgrowth of the alleged underlying conduct by U.S. officials. Based on the statutory claims in this case, review of such conduct does not present a nonjusticiable political question. Accordingly, the Court denies Defendants' present motion to dismiss based on the political question doctrine. Defendants may reassert their political question doctrine challenge "[i]f it becomes clear at a later stage that resolving any of the plaintiffs' claims requires" resolution of an asserted political question over which this Court might lack subject matter jurisdiction. *Al-Tamimi v. Adelson*, 916 F.3d 1, 14 (D.C. Cir. 2019).

---

[6] As Defendants point out (ECF No. 192-1 at 26 n.8), there are also allegations that concern alleged (mis)conduct by Mexican government officials. (SAC ¶¶ 29–31, 35, 44–45, 52–54, 74–75, 83, 96–97, 110, 156–59, 163, 166, 175–76, 197, 199–200.) Defendants argue that the act of state doctrine bars the issuance of declaratory or injunctive relief relating to these allegations. (ECF No. 192-1 at 26 n.8.) The Court does not agree. The act of state doctrine "bars a suit where '(1) there is an official act of a foreign sovereign performed within its own territory; and (2) the relief sought or the defense interposed [in the action would require] a court in the United States to declare invalid the [foreign sovereign's] official act.'" *Sea Breeze Salt, Inc. v. Mitsubishi Corp.*, 899 F.3d 1064, 1069 (9th Cir. 2018) (quoting *Credit Suisse v. U.S. Dist. Court*, 130 F.3d 1342, 1346 (9th Cir. 1997)). The act of state doctrine does not bar the claims in this case because the Court is not asked to declare that any official acts of the Mexican government are unlawful. Instead, pursuant to U.S. law, Plaintiffs challenge the legality of conduct by U.S. officials. Although these officials have allegedly instructed Mexican officials to take certain conduct in furtherance of the challenged Turnback Policy, the Court can assess the legality of the U.S. officials' alleged conduct and order any corresponding relief pursuant to the statutory provisions at issue in this case without contravening the act of state doctrine.

## II. Administrative Procedure Act Claims

The bulk of Defendants' motion to dismiss concerns the Plaintiffs' APA claims. (ECF No. 192-1 at 6–18, 28–31; ECF No. 238 at 2–12.) Defendants' multipronged challenge to Plaintiffs' APA claims consists of several arguments: (A) Organizational Plaintiff Al Otro Lado cannot state APA claims based on the INA provisions at issue as a "non-profit legal services organization," (B) (1) the repleaded Section 706(1) claims of Plaintiffs Abigail, Beatrice, and Carolina Doe fail because they allegedly withdrew their applications for admission and (2) the Section 706(1) claims of all New Individual Plaintiffs fail because the relevant INA provisions and implementing regulation underlying their claims for relief "do not apply to individuals in Mexico," and (C) Plaintiffs' Section 706(2) APA claims fail because (1) Plaintiffs do not identify final agency action, (2) Plaintiffs challenge discretionary conduct over which the APA forecloses judicial review, and (3) Plaintiffs have not plausibly alleged an unlawful agency action. The Court considers Defendants' arguments in turn and rejects each of them.

### A. Al Otro Lado's APA Claims

For a second time, Defendants challenge Al Otro Lado's ability to assert APA claims premised on violations of the INA provisions and regulations at issue. (ECF No. 192-1 at 28; ECF No. 238 at 20.) Defendants contend that Al Otro Lado's APA claims must be dismissed under Rule 12(b)(6) for failure to state a claim because whereas the statutory and regulatory provisions pertain exclusively to aliens or refugees, Al Otro Lado is merely a "non-profit legal services organization[.]" (ECF No. 192-1 at 28; ECF No. 238 at 20.) Defendants' argument simply reconfigures Defendants' prior argument that Al Otro Lado falls outside the zone of interests of the relevant INA provisions. The Court squarely rejected Defendants' argument in the prior dismissal order. *See Al Otro Lado, Inc.*, 327 F. Supp. 3d at 1298–1302. Defendants identify no basis for the Court to depart from its prior decision.

However, in the time since the Court's prior dismissal order, the Ninth Circuit has issued a decision that strengthens the Court's prior rejection of Defendants' challenge to Al Otro Lado's APA claims in this case.  Specifically, in *East Bay Sanctuary Covenant v. Trump*, —F.3d—, 2018 WL 8807133 (9th Cir. Dec. 7, 2018), the government argued that various organizations, including Organizational Plaintiff Al Otro Lado who is also a plaintiff in that case, fell outside the zone of interests of certain INA provisions, including 8 U.S.C. § 1158, as "legal services organizations" and therefore could not challenge a rule promulgated by the Department of Justice and the Department of Homeland Security ("DHS"), coinciding with a presidential proclamation, which together purported to make aliens who entered the United States at a place other than at a POE ineligible to apply for asylum in the United States.  *Id.* at *3–4, *8–10.  The Ninth Circuit rejected the government's zone of interest argument, reasoning that "the Organizations' interest in aiding immigrants seeking asylum is consistent with the INA's purpose to 'establish[] . . . [the] statutory procedure for granting asylum to refugees.'"  *Id.* at *16 (quoting *INS v. Cardoza-Fonseca*, 480 U.S. 421, 427 (1987)).  The Court noted that "[w]ithin the asylum statute, Congress took steps to ensure that pro bono legal services of the type that the Organizations provide are available to asylum seekers."  *Id.* (citing 8 U.S.C. § 1158(d)(4)(A)–(B)).  The Ninth Circuit also determined that the INA, taken as a whole, otherwise supports the inference that Congress intended eligibility for organizations like the ones in *East Bay Sanctuary Covenant* to bring suit.  *Id.* (identifying various INA provisions expressly referring to nongovernmental organizations as giving such organizations "a role in helping immigrants navigate the immigration process").  The Ninth Circuit's reasoning in *East Bay Sanctuary Covenant* is equally applicable to this case and reinforces the Court's prior rejection of Defendants' challenge to Al Otro Lado's APA claims.[7]

---

[7] In the time since both the Court's ruling and *East Bay Sanctuary Covenant*,

**B.     Section 706(1) APA Claims**

The Court has previously discussed the principles governing Section 706(1) APA claims.   Under Section 706(1), a court "shall . . . compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).  A Section 706(1) claim "can only proceed where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take."  *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004) [hereinafter "*SUWA*"]."); *Hells Canyon Preservation Council v. U.S. Forest Serv.*, 593 F.3d 923, 932 (9th Cir. 2010).  The "limitation to required agency action rules out judicial direction of even discrete agency action that is not demanded by law." *SUWA*, 542 U.S. at 65.  Because of this limitation, courts "have no authority to compel agency action merely because the agency is not doing something we may think it should do." *Zixiang Li v Kerry*, 710 F.3d 995, 1004 (9th Cir. 2013).

---

one out-of-circuit district court has described this Court's prior zone of interests analysis as a "limited circumstance[]" for "organizations advocating for clients[.]" *De Dandrade v. United States Dep't of Homeland Sec.*, 367 F. Supp. 3d 174, 189 (S.D.N.Y. 2019) ("In the limited circumstances in which district courts determined organizations advocating for clients fell within the INA's zone of interest, the provisions of the INA at issue did not concern naturalization.").  The *De Dandrade* court in part misreads this Court's prior analysis, which did not turn on whether Al Otro Lado has clients that fall within the zone of interests of the relevant INA provisions.  The Court identified this as a potentially separate basis for Al Otro Lado to assert APA claims, but on which Al Otro Lado *did not rely*.  *Al Otro Lado, Inc.*, 327 F. Supp. 3d at 1301 n.7.  In any event, as *East Bay Sanctuary Covenant* confirms, it is not necessary for an organization to premise its APA claims for the underlying INA provisions at issue in this case on the ground that the organization is representing specific clients seeking asylum. *See E. Bay Sanctuary Covenant*, 2018 WL 8807133, at *15–16.  Indeed, in *East Bay Sanctuary Covenant*, the Ninth Circuit expressly found that the organizations lacked third-party standing to assert claims on behalf of asylum seeker clients, yet concluded that the organizations possessed both Article III standing and fell within the INA's zone of interests in their capacity as legal organizations that assist asylum seekers. *Compare id. with id.* at *12.

Plaintiffs assert claims under Section 706(1) claims based on 8 U.S.C. § 1225(a)(3), § 1225(b)(1)(A)(ii), 1225(b)(2)(A), and 8 C.F.R. § 235.3(b)(4). (SAC ¶¶ 256–69). In broad terms, Section 1225(a)(3) imposes a mandatory duty for immigration officers to inspect "[a]ll aliens . . . who are applicants for admission or otherwise seeking admission . . . to . . . the United States[.]" 8 U.S.C. § 1225(a)(3). Section 1225(b)(1)(A)(ii) imposes on an immigration officer a duty to refer an alien who indicates either an intention to apply for asylum under section 1158 or a fear of persecution for an asylum interview under 8 U.S.C. § 1225(b)(1)(B) with an asylum officer. 8 U.S.C. § 1225(b)(1)(A)(ii). In turn, 8 C.F.R. § 235.3(b)(4) imposes an analogous regulatory duty on the inspecting officer. For all other aliens, Section 1225(b)(2)(A) imposes on an immigration officer a duty to detain the alien for general removal proceedings under 8 U.S.C. § 1229a. 8 U.S.C. § 1225(b)(2)(A).

Defendants raise two dismissal arguments that together concern the Section 706(1) claims of ten Individual Plaintiffs. Defendants first move to dismiss the repleaded Section 706(1) claims of Original Individual Plaintiffs Abigail, Beatrice and Carolina Doe because these Plaintiffs allegedly withdrew their applications for admission. (ECF No. 192-1 at 5.) Second, Defendants argue that all New Individual Plaintiffs fail to state Section 706(1) claims because the statutory and regulatory provisions at issue "do not apply to individuals located in Mexico." (*Id.* at 6–11.) The Court considers each argument in turn.

**1. Repleaded Section 706(1) Claims of Certain Plaintiffs**

Plaintiffs Abigail Doe, Beatrice Doe, and Carolina Doe once more each allege that, on one of the occasions they sought asylum at a POE, CBP officials coerced them into signing documents which stated that they lacked a fear of persecution and were withdrawing their applications for admission. (SAC ¶¶ 24–26, 122–23, 129–30, 136.) Carolina further alleges that CBP officers coerced her into recanting her

fear on video. (*Id.* ¶¶ 26, 135.)

Based on their coercion allegations, Plaintiffs claimed in the original complaint that "CBP officials failed to take actions mandated" by, *inter alia*, 8 C.F.R. § 235.4, the regulation which states that "[t]he alien's decision to withdraw his or her application for admission must be made voluntarily." (ECF No. 1 ¶ 153.) In the prior dismissal order, the Court dismissed Plaintiffs Abigail Doe, Beatrice Doe, and Carolina Doe's Section 706(1) claims insofar as the claims sought to compel agency action under 8 C.F.R § 235.4, reasoning that "[t]he regulation does not require CBP officers to determine whether a withdrawal was made voluntarily, and it does not specify what CBP officers must do if a withdrawal was not." *Al Otro Lado, Inc.*, 327 F. Supp. 3d at 1314. The Court stated that "[t]his determination does not affect the Court's conclusion that these Plaintiffs have otherwise stated Section 706(1) claims regarding their alleged denial of access to the asylum process in the United States." *Id.* at 1315. Plaintiffs Abigail Doe, Beatrice Doe, and Carolina Doe thus understandably replead Section 706(1) claims based on the alleged failure of immigration officers to inspect and refer them for asylum interviews or to otherwise detain them for a removal proceeding. (SAC ¶¶ 256, 260.)

Notwithstanding the Court's prior ruling expressly permitting Plaintiffs Abigail Doe, Beatrice Doe, and Carolina Doe's Section 706(1) claims to proceed and the fact that no Plaintiff now alleges Section 706(1) claims based on 8 C.F.R. § 235.4, (*see* SAC ¶ 260), Defendants argue that these Plaintiffs' Section 706(1) claims must be dismissed because these Plaintiffs withdrew their applications for admission. (ECF No. 192-1 at 29–30.) Citing 8 U.S.C. § 1225(a)(4) and 8 C.F.R. § 235.4—the statutory and regulatory provisions that authorize an alien to voluntarily withdraw an application for admission and "depart immediately from the United States"—Defendants argue that there is no continuing duty to inspect, refer, or detain

an alien who has withdrawn her application.  (ECF No. 192-1 at 30.)

Defendants' dismissal argument mistakes the Court's prior conclusion regarding a judicial inability to compel relief under 8 C.F.R. § 235.4 with an inability of the Court to otherwise compel discrete "agency action unlawfully withheld."  5 U.S.C. § 706(1).  As should have been clear from the Court's prior order, the inability to compel Section 706(1) relief under 8 C.F.R § 235.4 does not preclude relief under 8 U.S.C. § 1225(a)(3), 8 U.S.C. § 1225(b)(1)(A)(ii), and 8 C.F.R. § 235.3(b)(4) in this case.  The parties agree that the mandatory duties to inspect all aliens and refer certain aliens seeking asylum are discrete actions for which this Court can compel Section 706(1) relief under 8 U.S.C. § 1225(a)(3), 8 U.S.C. § 1225(b)(1)(A)(ii), and 8 C.F.R. § 235.3(b)(4).  In view of the parties' agreement regarding these duties, the Court does not understand Defendants' present dismissal argument.

Under the provisions that form the basis of the repleaded Section 706(1) claims, an immigration officer must inspect an alien applying for admission and if the alien is inadmissible for making misrepresentations or lacking proper documentation and states an intent to seek or apply for asylum, the officer must refer the alien for a credible fear interview.  As even Defendants do not dispute, Plaintiffs Abigail Doe, Beatrice Doe, and Carolina Doe's allegations plausibly show that CPB officers failed to take the discrete actions an immigration officer must take during the admission process for aliens like these Plaintiffs, who allege that they asserted an intent to apply for asylum and a fear of persecution.  (SAC ¶¶ 24–26, 122–23, 129–30, 134–36.)  All parties also agree that 8 C.F.R § 235.4 requires that an alien voluntarily withdraw an application.  Taking these Plaintiffs' factual allegations of coercion as true, these Plaintiffs did not voluntarily withdraw their applications for admission.  Thus, the mandatory duties to inspect and refer or detain were plausibly "unlawfully withheld" such that these Plaintiffs may seek Section 706(1) relief.

Accordingly, the Court denies Defendants' latest attempt to dismiss Plaintiff Abigail Doe, Beatrice Doe, and Carolina Doe's Section 706(1) claims.[8]

**2. New Individual Plaintiffs' Section 706(1) Claims**

As noted, all Plaintiffs' Section 706(1) claims are premised on alleged failures of CBP officers to take actions mandated by 8 U.S.C. § 1225(a)(3), 8 U.S.C. § 1225(b)(1)(A)(ii), 8 U.S.C. § 1225(b)(2), and 8 C.F.R. § 253.3(b)(4). (SAC ¶ 260.) Two interlocking arguments are central to Defendants' dismissal challenge to the New Individual Plaintiffs' Section 706(1) claims. First, Defendants contend that the text of the underlying statutory and regulatory provisions "do not apply to individuals in Mexico." (ECF No. 192-1 at 6–11; ECF No. 238 at 1–7.) Second, Defendants contend that, unlike the Original Individual Plaintiffs' allegations, the New Individuals Plaintiffs' allegations show that these latter Plaintiffs were in Mexico when they were allegedly turned away. (ECF No. 192-1 at 2 & n.2, 6–11; ECF No. 238 at 1–7.) The Court finds it prudent to outline the SAC's allegations and then to address whether the allegations are sufficient to state claims for Section 706(1) relief under a proper construction of the relevant INA statutory and regulatory provisions.

---

[8] In opposition to Defendants' motion to dismiss the SAC, Plaintiffs state in a footnote that they "respectfully disagree with and preserve for appeal the Court's conclusion that it cannot compel relief under Section 706(1) based on Defendants' alleged violation of 8 C.F.R. § 235.4[.]" (ECF No. 210 at 34 n.30.) The Court does not understand how Plaintiffs have preserved an issue for appeal (1) which they chose not to replead in their Section 706(1) claims and (2) for which Plaintiffs offer no argument based on an application of the legal standards that govern a Section 706(1) claim to the text of 8 C.F.R. § 235.4. In any event, to the extent Plaintiffs' assertion is animated by a concern that the Court would dismiss the repleaded Section 706(1) claims on the grounds Defendants raise, this Order moots that concern.

**a. New Individual Plaintiffs' Factual Allegations**

As a threshold matter, Plaintiffs dispute whether the Court can even resolve Defendants' challenge to the New Individual Plaintiffs' Section 706(1) claims at this juncture. (ECF No. 210 at 4–5.) Plaintiffs contend that Defendants' argument calls for the Court to improperly find facts at the pleading stage, "specifically, that the new Individual Plaintiffs were standing in Mexico when they confronted CBP officers." (ECF No. 210 at 4.) According to Plaintiffs, the SAC "does not actually state that any Plaintiffs were in Mexico territory when CBP turned them back," and thus the Court must "assume that all Individual Plaintiffs were on U.S. soil when Defendants turned them back." (*Id.* at 4–5.) This argument is echoed by *Amici* Immigration law Professors. (ECF No. 221-1 at 4–5.)

Implicit in Plaintiffs' argument is the notion that the Court should assume facts essential to their ability to state Section 706(1) claims to compel agency action pursuant to 8 U.S.C. § 1225(a)(3), § 1225(b)(1)(A)(ii), 1225(b)(2)(A), and 8 C.F.R. § 235.3(b)(4). The Court cannot do this. "Dismissal is warranted under Rule 12(b)(6) where the complaint lacks a cognizable theory or where the complaint presents a cognizable legal theory *yet fails to plead essential facts under that theory*." *C.B. v. Sonora Sch. Dist.*, 691 F. Supp. 2d 1123, 1128 (E.D. Cal. 2009) (citing *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 534 (9th Cir. 1984)) (emphasis added). And this Court has recognized, "[d]espite the deference the Court must pay to the plaintiff's allegations, it is not proper for the Court to assume that the [plaintiff] can prove facts that [he or she] has not alleged.'" *Tinoco v. San Diego Gas & Elec. Co.*, 327 F.R.D. 651, 657 (S.D. Cal. 2018) (quoting *Associated Gen. Contractors of Cal, Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983)) (alterations in original). Tellingly, both sides expressly rely on the SAC's allegations to argue whether the relevant INA provisions embrace the New Individual Plaintiffs. (ECF No. 192-1 at 7, 8, 9, 11; ECF No. 210 at 4.) Thus, the

Court rejects Plaintiffs' threshold dispute.

The Court turns to a key concession that undergirds Defendants' argument. Defendants concede that a POE is within the U.S. (*See* ECF No. 192-1 at 11 ("[A]s the regulation says, an 'arriving alien' is an 'applicant for admission' *at a port of entry, all of which are located within the territorial United States*." (quoting 8 C.F.R. §§ 1.2, 235.3(b)(4), 8 U.S.C. § 1225(a)(1)) (emphasis added).) Defendants further argue that a POE is not a "geographic area," but instead a discrete facility. (ECF No. 238 at 5–6.) Defendants ground this argument in a Ninth Circuit decision regarding a conviction for illegal entry under 8 U.S.C. § 1325—a statutory provision that criminalizes an alien's entry into the United States at any time or place other than as designed by immigration officers—for entry at a place other than a POE. *See United States v. Aldana*, 878 F.3d 877, 880–82 (9th Cir. 2017) ("[T]here is no indication that DHS intended to change the meaning of 'port of entry' [in 8 C.F.R. § 235.1(a)] to refer to geographical areas, as opposed to specific facilities where an alien could apply for entry.") (upholding convictions under Section 1325(a)(1) for unlawful entry in the United States based in part on 8 C.F.R. § 235.1(a)).

Under Defendants' own view, any New Individual Plaintiff who has sufficiently alleged that he or she was "at a POE" has stated Section 706(1) claims for the various INA provisions and implementing regulation that form the basis of Plaintiffs' claims. Defendants' dismissal argument should therefore fail on its own terms for New Individual Plaintiffs Victoria Doe, Bianca Doe, Emiliana Doe, and César Doe. These four New Individual Plaintiffs offer allegations that, on one or more occasion, they were "at a POE" and requested asylum, but CBP officers refused. (SAC ¶¶ 32–35, 181, 185, 187, 193, 199.) As Plaintiffs observe, (ECF No. 210 at 7), the preposition "at" is a "function word" used "to indicate presence or occurrence in, on, or near." *See* Merriam-Webster Dictionary,

https://www.merriam-webster.com/dictionary/at (last accessed May 2, 2019). Although Defendants would like these New Individual Plaintiffs to plead additional factual allegations, the word "at" can plausibly embrace the inference that these New Individual Plaintiffs are not subject to Defendants' challenge.[9]

The remaining four New Individual Plaintiffs, however, offer allegations that defeat such an inference. New Individual Plaintiffs Roberto Doe, Maria Doe, and Juan and Úrsula Doe allege that they "sought access to the asylum process by presenting" themselves at the Hidalgo, Texas POE and Laredo, Texas POE and "encountered CBP officials in the middle of the bridge" between Mexico and the U.S. POE and "told them" they "wanted to seek asylum in the United States." (SAC ¶¶ 29–31, 154–55, 162, 174.) The CBP officials, however, allegedly denied Roberto Doe access "by telling him the POE was full and that he could not enter," told Maria Doe to wait on the Mexican side of the border where she was told "U.S. officials would not let her and her children cross the bridge," and told Juan and Úrsula Doe that "the POE was closed and that they could not enter." (*Id.* ¶¶ 155, 162, 174.) These allegations squarely call on the Court to address Defendants' arguments regarding the proper construction of the statutory and regulatory provisions in this case and to apply that construction to the factual allegations.

**b. Scope of the Relevant Provisions**

The starting point of statutory interpretation is the statute's language. *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 685 (1985). "[I]f the statutory

---

[9] Even if the Court did not draw the inference that New Individual Plaintiffs Victoria Doe, Bianca Doe, Emiliana Doe, and César Doe were sufficiently "at a POE" for the purposes of Defendants' present motion, the Court's analysis regarding the scope of the statutory and regulatory provision similarly applies to their allegations and Section 706(1) claims.

language is plain," a court "enforce[s] it according to its terms." *King v. Burwell*, 135 S. Ct. 2480, 2489 (2015) (citing *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 251 (2010)). A court interprets a statute "to give effect, if possible, to every clause and word of a statute." *Duncan v. Walker*, 533 U.S. 167, 174 (2001) (citation omitted). This process of statutory interpretation proceeds "with reference to the statutory context, structure, history, and purpose, 'as well as overall common sense.'" *Abramski v. United States*, 573 U.S. 169, 179 (2014) (quoting *Maracich v. Spears*, 570 U.S. 48, 76 (2013)). Two statutory provisions are relevant to Defendants' motion to dismiss: 8 U.S.C. § 1158(a)(1)'s general provision for asylum and 8 U.S.C. § 1225's articulation of certain immigration officer duties. The Court considers the relevant statutory text in light of these principles.

**(1) 8 U.S.C. § 1158(a)(1)**

Although Plaintiffs do not premise their Section 706(1) claims to compel agency action on 8 U.S.C. § 1158(a)(1), both sides anchor their statutory analysis in this provision. Under Section 1158(a)(1)'s plain language, two classes of aliens may apply for asylum: (1) any alien "who is physically present in the United States" and (2) any alien "who arrives in the United States." Applying the rule against surplusage, the Court must presume that the phrases "mean different things." *Duncan*, 533 U.S. at 174.[10] The parties' dispute turns on whether the New Individual

---

[10] The Court recognizes that the rule against surplusage "is not absolute." *Lamie v. U.S. Tr.*, 540 U.S. 526, 536 (2004). A court need not apply the rule when its application would be "at the expense of [the statute's] more natural reading, the structure of the [statutory provision], and the structure of the Act." *Tima v. AG, United States*, 903 F.3d 272, 278 (3d Cir. 2018). Defendants appear to argue against application of the rule and insist that Section 1158(a)(1)'s phrases are "not surplusage" but together "ensure that any alien within the United States may apply for asylum[.]" (ECF No. 238 at 4.) For reasons the will become clear, the Court does not agree with Defendants' arguments regarding the full scope of the provisions. And the Court cannot find that application of the rule against surplusage

Plaintiffs fall within the second class of aliens.

Defendants argue that any Plaintiffs on Mexican soil cannot qualify as an alien who was "arriving in the United States." Defendants' opening brief largely does not offer meaningful analysis regarding Section 1158(a)(1), except to contend that a plain language reading of the statute shows that it does not apply to the New Individual Plaintiffs. (ECF No. 192-1 at 7–8.) In the face of Plaintiffs' statutory analysis, however, Defendants advance three arguments. First, Defendants contend that "the use of the present simple tense creates a nexus between the alien's ability to apply for asylum and the alien's current physical presence (or arrival) in the United States." (ECF No. 238 at 2.) Defendants observe that the phrase "alien who arrives in" is still linked with the geographic location of the United States. Second, Defendants argue that the presumption against extraterritorial application of federal statutes forecloses application of Section 1158 to conduct that occurs outside the United States. (*Id.* at 3.) Third, Defendants argue that Congress has enacted a separate scheme to deal with refugee claims for persons outside the United States. (*Id.* at 3–4.) The Court rejects each of Defendants' arguments and, in doing so, the Court concludes that Congress included aliens in the process of arriving in the United States in Section 1158(a)(1)'s general authorization to apply for asylum.

**(a) The Statute's Present Tense (Con)Text**

Defendants argue that the statute's use of the phrase "alien who arrives in" is linked with a geographic location because "use of the present simple tense creates a nexus between the alien's ability to apply for asylum and the alien's current physical presence (or arrival) in the United States." (ECF No. 238 at 2.) Although Plaintiffs

---

contravenes Section 1158(a)(1)'s natural reading as identifying two different classes of aliens who may apply for asylum, one of which includes aliens who are not physically in the United States but are in the process of doing so.

assert that "arrives in" "must mean something different than geographic presence in the United States[,]" (ECF No. 210 at 8), Plaintiffs do not so much dispute that Section 1158(a)(1)'s use of "arrives in" has a geographic focus. Rather, Plaintiffs' fundamental contention is that the statute's use of the present tense embraces an alien who is in the process of arriving in the United States. (*Id.* at 7.) According to Plaintiffs, the "natural meaning" of "arrives in," as used in the statute, encompasses "someone who is in the process of 'arriv[ing] in' the United States[.]" (*Id.*) Based on this reading, Plaintiffs argue that "because all Individual Plaintiffs were arriving in the United States, they are covered by" this provision. (*Id.*) The Court agrees.

"Congress' use of a verb tense is significant in construing statutes." *United States v. Wilson*, 503 U.S. 329, 333 (1992) (collecting statutes). Although neither side raises this point, it bears noting that Congress has enacted the Dictionary Act to guide interpretation of congressional statutes. Pursuant to the Act, "[i]n determining the meaning of any Act of Congress, unless the context indicates otherwise—words used in the present tense include the future as well as the present." 1 U.S.C. § 1. This provision of the Dictionary Act has been applied to the INA. *See Carrillo de Palacios v. Holder*, 651 F.3d 969, 976 (9th Cir. 2011) (citing 1 U.S.C. § 1). When accounting for the rule against surplusage, application of the Dictionary Act readily leads to the conclusion that Section 1158(a)(1)'s use of the present tense of "arrives" plainly covers an alien who may not yet be in the United States, but who is in the process of arriving in the United States through a POE.

This reading is buttressed by statutory provisions that Section 1158(a)(1) expressly incorporates. Section 1158(a)(1) references the Section 1225 procedure for aliens seeking asylum at the border. 8 U.S.C. § 1158(a)(1). In relevant part, Section 1225(b)(1)(A)(ii) requires an immigration officer to refer an inadmissible alien "*who is arriving* in the United States" and who expresses a fear of persecution

or "an intention to apply for asylum" for an interview with an asylum officer. 8 U.S.C. § 1225(b)(1)(A)(ii) (emphasis added). The use of the present progressive, like use of the present participle, denotes an ongoing process. *See United States v. Balint*, 201 F.3d 928, 933 (7th Cir. 2000) [U]se of the present progressive tense, formed by pairing a form of the verb 'to be' and the present participle, or '-ing' form of an action verb, generally indicates continuing action."); *Laube v. Allen*, 506 F. Supp. 2d 969, 980 (M.D. Ala. 2007) (observing that a statute's use of the present participle "denotes action that is continuing or progressing"); *cf. Khakhn v. Holder*, 371 Fed. App'x 933, 937 (10th Cir. 2010) (finding use of the present participle phrase "applying for adjustment" in section 1104(g) of the LIFE Act as "unambiguous" that an alien who "is no longer applying for adjustment of status under the LIFE Act" cannot prevent reinstatement of a prior deportation order). Section 1225(b)(1)(A)(ii) therefore reinforces the conclusion that Congress intended to authorize aliens in the process of arriving into the United States to apply for asylum under Section 1158(a)(1). *See E. Bay Sanctuary Covenant v. Trump*, 349 F. Supp. 3d 838, 844 (N.D. Cal. 2018) (observing that "[a]sylum is a protection granted to foreign nationals already in the United States *or at the border* who meet the international law definition of a 'refugee.'" (emphasis added)).

Although Defendants focus on the "geographic nexus" that Section 1158(a)(1) creates with the United States, they ignore its use of the present tense. In fact, Defendants' opening briefing expressly rewrites the statutory provision into the past tense to seek dismissal of the New Individual Plaintiffs' claims: "[n]one of the Extraterritorial Plaintiffs alleges he or she was 'physically present in' the United States or *had 'arrive[d] in' the United States* when subjected to Defendants' alleged conduct." (ECF No. 192-1 at 8 (brackets in original and emphasis added).) In reply, Defendants similarly argue for a past tense revision. (ECF No. 238 at 2 (purporting to argue about the meaning of the statute's "present simple tense" yet citing *Matter*

*of F-P-R*, 24 I. & N. Dec. 681, 683 (BIA 2008) for the proposition that "'last *arrival* in' at 8 C.F.R. § 1208.4(a)(2)(ii) . . . mean[s] the alien's most recent coming or crossing into the United States *after having traveled* from somewhere outside of the country." (emphasis added)).)  Defendants' argument must fail because it invites the Court to do what it cannot: "[w]e are not at liberty to rewrite the words chosen by Congress."  *United States v. Vargas-Amaya*, 389 F.3d 901, 906 (9th Cir. 2004).

Were the statute's text not enough, as *Amici* Immigration Law Professors observe, there is relevant legislative history on Congress's intent in adopting the term "arriving alien," as reflected in a statement by Representative Lamar Smith, Chairman of the House Judiciary Committee's Subcommittee on Immigration and Claims.  (ECF No. 221-1 at 11.)  In particular, Representative Smith observed that the term "was selected specifically by Congress in order to provide a flexible concept that would include all aliens who are in the process of physical entry past our borders[.]. . . .  'Arrival' in this context should not be considered ephemeral or instantaneous but, consistent with common usage, as a process.  An alien apprehended at any stage of this process, whether attempting to enter, at the point of entry, or just having made entry, should be considered an 'arriving alien' for the various purposes in which that term is used in the newly revised provisions of the INA."  *Implementation of Title III of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996: Hearing Before the Subcomm. on Immigration and Claims of the H. Comm. on the Judiciary*, 105th Cong. 17–18 (1997).  Despite Defendants' attempt to dismiss this legislative history, (ECF No. 238 at 6), it confirms the propriety of the Court's conclusion that the statute's use of the present tense encompasses aliens in the process of arriving.  *See Daniel v. Nat'l Park Serv.*, 891 F.3d 762, 775 (9th Cir. 2018) ("[T]he legislative history 'confirms what we have concluded from the text alone.'" (quoting *Mohamad v. Palestinian Auth.*, 566 U.S. 449, 460 (2012))).

**(b) Presumption Against Extraterritoriality**

Faced with the statute's text, Defendants turn to the statutory canon of the presumption against extraterritoriality to argue that "the right codified at section 1158(a)(1)" simply cannot extend "to persons outside the United States borders" because this would be "in direct contravention of Supreme Court precedent and in violation of the presumption against extraterritoriality." (ECF No. 238 at 3 (citing *Sale*, 509 U.S. at 173–74; *E.E.O.C. v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991) ("It is a longstanding principal of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." (internal quotation marks omitted)).) The Court does not find Defendants' argument persuasive.

The presumption against extraterritoriality is what its name suggests—a presumption. Application of the presumption is a two-step process, which may reveal that Congress has rebutted the presumption for an entire statutory provision or that the presumption is displaced in the context of a particular case's facts. Under the first step, a court considers "whether the presumption against extraterritoriality has been rebutted—that is, whether the statute gives a clear, affirmative indication that it applies extraterritorially." *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2101 (2016). Second, if the statute does not clearly indicate an intent that it applies extraterritorially, the court must consider "whether the case involves a domestic application of the statute . . . by looking to the statute's 'focus.'" *Id.* at 2101. "If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad; but if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory." *Id.*

Defendants fail to actually apply the framework to Section 1158. The Court will not undertake the task of doing Defendants' work for them, particularly when Defendants effectively seek to rely on the presumption as a bar to application of Section 1158 to the New Individual Plaintiffs. This is not how the presumption works.

In any event, the Court finds that the presumption is rebutted in this case. First, as Plaintiffs contend (ECF No. 210 at 8–9), "[i]mmigration statutes, by their very nature, pertain to activity at or near international borders. It is natural to expect that Congress intends for laws that regulate conduct that occurs near international borders to apply to some activity that takes place on the foreign side of those borders." *United States v. Villanueva*, 408 F.3d 193, 199 (5th Cir. 2005). A reading of Section 1158(a)(1), when placed into context, shows that Congress intended the statute to apply to asylum seekers in the process of arriving. The Court concludes that the statute's language sufficiently displaces the presumption. *See RJR Nabisco, Inc*., 136 S. Ct. at 2102 (observing that "[w]hile the presumption can be overcome only by a clear indication of extraterritorial effect, an express statement of extraterritoriality is not essential. 'Assuredly context can be consulted as well.'" (quoting *Morrison v. Nat'l Australian Bank Ltd*., 561 U.S. 247, 265 (2010))). Even if the Court proceeded to the second step of the extraterritoriality analysis, the factual allegations of this case concern the conduct of U.S. officials acting from within the United States or from areas over which the U.S. exercises sovereignty, whether the Court looks at the alleged Turnback Policy or the alleged acts of individual CBP officers standing on the U.S. side of the international bridge between Mexico and the United States. As the Court has discussed, Section 1158(a)(1) incorporates Section 1225, which in turns places a focus on immigration officers who process arriving aliens. Thus, even if the New Individual Plaintiffs had not crossed into the United States when they were attempting admission and expressed to CBP officers

an intent to seek asylum in the United States, they have alleged conduct occurring in the United States that is a focus of the relevant statutory provisions when viewed in context. Thus, this case involves a permissible territorial application of Section 1158.

**(c) 8 U.S.C. § 1157(c) Refugee Admission Process**

Finally, for the first time in reply, Defendants point to 8 U.S.C. § 1157(c) to argue that this Court should not read Section 1158(a)(1) to encompass aliens who are not yet in the United States. (ECF No. 238 at 3–4, 16.) According to Defendants, under Section 1157(c), "a process already exists for accepting applications for refugee status from persons outside the United States." (ECF No. 238 at 3–4, 16.) Defendants argue that "to adopt Plaintiffs' interpretation of Section 1158 would render section 1157 redundant." (*Id.* at 4.) The Court does not share Defendants' view.

Even a cursory review of Section 1157 shows that the statute establishes a fundamentally different and separate scheme for admission of refugees into the United States in the case of "humanitarian concerns" or "national interest." 8 U.S.C. § 1157(a)(1). The number of admissions is limited to "such number as the President determines, before the beginning of the fiscal year and after appropriate consultation, is justified by humanitarian concerns or is otherwise in the national interest." 8 U.S.C. § 1157(a)(2). Section 1157(c) permits the Attorney General, subject to the numerical limitation, to "admit any refugee who is not firmly resettled in any foreign country, is determined to be of special humanitarian concern to the United States, and is admissible. . . as an immigrant." 8 U.S.C. § 1157(c)(1). Notably, Section 1157 does not refer to the asylum procedures set forth in Section 1158(a)(1), nor does Section 1157 concern Section 1225's focus on inspection of arriving aliens. These textual differences blunt the force of Defendants' argument that reading

Section 1158(a)(1) in the manner the Court has would improperly render Section 1157 redundant, particularly in this case. No New Individual Plaintiff seeks relief under Section 1157. In contrast, their allegations plausibly show that they were arriving aliens and thus may avail themselves of the procedural protections available under Sections 1158 and 1225. Accordingly, the Court rejects Defendants' Section 1157(c) argument.

* * *

In sum, the Court concludes that Section 1158(a)(1)'s plain language, properly construed, embraces any New Individual Plaintiffs whose allegations show that they were in the process of arriving in the United States at the time of the challenged conduct. With this construction in mind, the Court turns to the statutory provisions pursuant to which the New Individual Plaintiffs seek to compel Section 706(1) relief.

**(2) 8 U.S.C. § 1225**

The core of the New Individual Plaintiffs' Section 706(1) APA claims lies in certain mandatory duties that 8 U.S.C. § 1225 imposes on an immigration officer. As a threshold matter, Plaintiffs' opposition to Defendants' motion to dismiss is silent on dismissal of the New Individual Plaintiffs' Section 706(1) claims insofar as the claims are premised on 8 U.S.C. § 1225(b)(2)(A), a provision that requires detention of aliens not otherwise covered under 8 U.S.C. § 1225(b)(1) and who have not shown that they are entitled to admission clearly and beyond a doubt. (*Compare* ECF No. 192-1 at 9–10 *with* ECF No. 210 at 5–9.) Thus, the Court construes Defendants' motion to dismiss as unopposed insofar as Defendants seek dismissal of Plaintiffs' Section 706(1) claims. The Court limits its analysis to the statutory and regulatory duties to inspect and refer asylum seekers under 8 U.S.C. § 1225(a)(3), 8 U.S.C. § 1225(b)(1)(A)(ii), and 8 C.F.R. § 235.3(b)(4). Many of the previously articulated statutory construction principles applied to Section 1158(a)(1)

carry over and lead the Court to a similar interpretation of these provisions.

**(a) Statutory Duty to Inspect**

Section 1225 establishes that "[a]ll aliens . . . who are applicants for admission or *otherwise seeking admission* or readmission to or transit through the United States shall be inspected by immigration officers." 8 U.S.C. § 1225(a)(3) (emphasis added). Section 1225(a)(3) provides a stronger textual argument that the duty to inspect applies to aliens who may not yet be in the territorial United States. Referring to the statute, albeit in passing, the Ninth Circuit has observed that "[a]ll applicants for admission, whether they are at the border or already physically present inside the country, must 'be inspected by immigration officers' who will determine their admissibility." *Ortega-Cervantes v. Gonzales*, 501 F.3d 1111, 1118 (9th Cir. 2007) (quoting 8 U.S.C. § 1225(a)(3)). This interpretation makes sense because Section 1225(a)(3)'s duty to inspect reaches beyond "applicants for admission" to encompass aliens who are "otherwise seeking admission." 8 U.S.C. § 1225(a)(3).

Defendants fail to explain how, as a textual matter, Section 1225(a)(3)'s use of the phrase "otherwise seeking admission . . . to. . . the United States" does not include aliens who may be located outside the United States, but who are in the process of seeking admission to the United States. Instead, Defendants contend that the New Individual Plaintiffs were not seeking admission "in the manner prescribed by statute and regulation." (ECF No. 192-1 at 8 (citing 8 U.S.C. § 1225(a)(1), 8 C.F.R. § 235.1(a)).) Defendants point to a regulation, which provides that "[a]pplication to lawfully enter the United States shall be made in person to an immigration officer at a U.S. port-of-entry when the port is open for inspection, or as otherwise designated in this section." 8 C.F.R. § 235.1(a). All New Individual Plaintiffs, however, allege that they sought admission to the United States by presenting him or herself to a CBP officer at a U.S. POE. (SAC ¶¶ 29–35, 154–56,

162, 165–67, 174–75, 181, 185, 187–88, 193, 199.) Plaintiffs do not allege that the POE was not open, but rather that CBP officers told them that the POE purportedly did not have "capacity" to accept applications from asylum seekers. (*Id.* ¶¶ 83, 85–86, 93– 94, 95–97, 98–102, 103–05, 153–202.) These allegations plausibly show that these Plaintiffs were seeking admission into the United States. Defendants' challenge to any Section 706(1) claims premised on the duty to inspect therefore fails.

**(b) Statutory and Regulatory Duties to Refer**

Section 1225(b)(1)(A)(ii) provides that:

> If an immigration officer determines that *an alien* (other than an alien described in subparagraph (F)) *who is arriving in the United States* or is described in clause (iii) is inadmissible under section 1182(a)(6)(C) or 1182(a)(7) of this title and the alien indicates either an intention to apply for asylum under section 1158 of this title or a fear of persecution, the officer shall refer the alien for an interview by an asylum officer under subparagraph (B).
>
> 8 U.S.C. § 1225(b)(1)(A)(ii) (emphasis added).

Unlike Section 1225(a)(1), Section 1225(b)(1)(A)(ii) uses the present progressive phrase "to be arriving." This phrase plainly encompasses aliens who are in the process of arriving in the United States. As the Court has discussed, Defendants' challenge to the New Individual Plaintiffs' Section 706(1) claims largely turns on rewriting the statute into the past tense. Properly applying the statute's use of the phrase alien "who is arriving in the United States" to the allegations of the New Individual Plaintiffs blunts Defendants' argument. This is equally true for the four New Individual Plaintiffs who allege that they were crossing the international bridge to the physical POE and were stopped midway on the bridge, yet who told the CBP officers that they wanted to seek asylum in the United States.

The plain language of DHS's own implementing regulations sweeps more

broadly. 8 C.F.R. § 235.3(b)(4) imposes an analogous regulatory duty on the inspecting officer not to proceed further with removal of an alien subject to the expedited removal provisions if the alien indicates an intention to apply for asylum, expresses a fear of persecution or torture, or expresses a fear of return to his or her country. 8 C.F.R. § 235.3(b)(4). Two additional regulations directly bear on the scope of 8 C.F.R. § 235.3(b)(4). By regulation, the expedited removal provisions of the INA apply to "arriving aliens, as defined in 8 C.F.R. 1.2." 8 C.F.R. § 235.3(b)(1)(i). 8 C.F.R. § 1.2 in turn defines "arriving alien" to mean, in relevant part, "an applicant for admission coming or *attempting to come into the United States at a port-of-entry*[.]" 8 C.F.R. § 1.2 (emphasis added). "A regulation should be construed to give effect to the natural and plain meaning of its words." *Bayview Hunters Point Cmty. Advocates v. Metro. Transp. Comm'n*, 366 F.3d 692, 698 (9th Cir. 2004) (quoting *Crown Pacific v. Occupational Safety & Health Review Comm'n*, 197 F.3d 1036, 1038 (9th Cir. 1999)). Here, by including aliens "attempting to come into the United States at a [POE]," the regulation is broader than 8 U.S.C. § 1225(a)(1)'s definition of "applicant for admission." And these regulations indicate that DHS—contrary to Defendants' current position in this litigation—interprets the statutory obligations under Section 1225 to apply to aliens who have not yet come into the United States, but who are "attempting to" do so. As the Court has already determined, the New Individual Plaintiffs were in the process of seeking admission into the United States or otherwise attempting to do so. Their allegations plainly show that they expressed an intent to seek asylum in the United States to a CBP officer. Thus, the Court concludes that the New Individual Plaintiffs have stated a claim for relief under the mandatory duties reflected in 8 U.S.C. § 1225(b)(1)(A)(ii) and 8 C.F.R. § 235.3(b)(4).

**C. Plaintiffs' Section 706(2) APA Claims**

Under Section 706(2) of the APA, a reviewing court must "hold unlawful and

set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] without observance of procedure required by law."  5 U.S.C. § 706(2)(A)–(D).

Plaintiffs assert Section 706(2) APA claims based on three sets of allegations. (SAC ¶¶ 270–82.)   First, Plaintiffs challenge the alleged Turnback Policy and "sanctioning of CBP's unlawful widespread pattern or practice of denying and unreasonably delaying asylum seekers' access to the asylum process" under Sections 706(2)(C) and 706(2)(D). (*Id.* ¶¶ 272, 274.)  Plaintiff allege that the Turnback Policy is a final agency action under 5 U.S.C. § 704.  (*Id.* ¶ 274.)   Second, Plaintiffs challenge the alleged turnbacks of Individual Plaintiffs and class members "at POEs or along the U.S.-Mexico border without following the procedures mandated by the INA and its implementing regulations" as unlawful conduct by CBP officials.  (*Id.* ¶ 273.)  Plaintiffs allege that each instance when Defendants directly or constructively deny Class Plaintiffs or purported class members access to the asylum process constitutes a final agency action under 5 U.S.C. § 704.  (*Id.* ¶ 275.)   Third, like the original complaint, Plaintiffs allege that Defendants have a pattern and practice of unlawfully turning back asylum seekers at POEs.

Defendants raise three arguments for dismissal of Plaintiffs' Section 706(2) claims.  First, Defendants argue that Plaintiffs fail to identify final agency action to state APA claims for either the alleged Turnback Policy, the alleged widespread pattern or practice of denying access to the asylum process, or any individual turnbacks.   Second, Defendants challenge the Section 706(2) claims of New Individual Plaintiffs allegedly in Mexico at the time of their injuries.  Defendants argue that "metering is lawful" based on the Executive's "inherent power" to control

the Nation's foreign affairs and two statutory provisions that Defendants contend "authorize CBP officers to keep the [POEs] from being overwhelmed by an unsafe number of pedestrians at a given time." (ECF No. 192-1 at 9–12 (relying on 8 U.S.C. § 1103(a)(3) and 6 U.S.C. § 202(2), (8).) Tucked into Defendants' "metering is lawful" argument is Defendants' third argument that the asserted breadth of Defendants' authority under the same two statutory provisions makes Defendants' conduct unreviewable under the APA. The Court addresses the arguments and rejects them all.

**1. Final Agency Action**

The APA limits judicial review to agency action in the form of "the whole or part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). An agency action must be "reviewable by statute" or be a "final agency action for which there is no other adequate remedy[.]" 5 U.S.C. § 704; *Navajo Nation v. Dep't of the Interior*, 876 F.3d 1144, 1171 (9th Cir. 2017).

Two conditions must be satisfied for an agency action to be final: (1) "the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature" and (2) "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *United States Army Corps of Engineers v. Hawkes Co.*, 136 S. Ct. 1807, 1813 (2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)). "In determining whether an agency's action is final, we look to whether [a] the action amounts to a definitive statement of the agency's position or [b] has a direct and immediate effect on the day-to-day operations of the subject party, or [c] if immediate compliance with the terms is expected." *Or. Nat. Desert Ass'n v. United States Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006) (internal quotations

and citations omitted). The focus is "on the practical and legal effects of the agency action." *Id.*

"[A]gency action . . . need not be in writing to be final and judicially reviewable" pursuant to the APA. *Al Otro Lado, Inc.*, 327 F. Supp. 3d at 1319 (quoting *R.I.L.-R v. Johnson*, 80 F. Supp. 3d 164, 184 (D.D.C. 2015)). An unwritten policy can still satisfy the APA's pragmatic final agency action requirement. *See Venetian Casino Resort LLC v. EEOC*, 530 F.3d 925, 929 (D.C. Cir. 2008) (reviewing challenge to an agency's "decision . . . to adopt [an unwritten] policy of disclosing confidential information without notice" because such a policy was "surely a consummation of the agency's decisionmaking process" that impacted the plaintiff's rights); *R.I.L.-R*, 80 F. Supp. 3d at 174–176 (determining that plaintiffs had shown a reviewable unwritten "DHS policy direct[ing] ICE officers to consider deterrence of mass migration as a factor in their custody determinations" as underlying the plaintiffs' detention). "[A] contrary rule 'would allow an agency to shield its decisions from judicial review simply by refusing to put those decisions in writing.'" *R.I.L.-R*, 80 F. Supp. 3d at 184 (quoting *Grand Canyon Tr. v. Pub. Serv. Co. of N.M.*, 283 F. Supp. 2d 1249, 1252 (D.N.M. 2003)); *see also Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 138 (D.D.C. 2018) ("Despite Defendants' assertions to the contrary, agency action need not be in writing to be judicially reviewable as a final action.").

There are, of course, limitations on whether challenged agency action is properly characterized as a policy, even if the policy is alleged to be unwritten. A plaintiff may not simply attach a policy label to disparate agency practices or conduct. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 870, 890 (1990); *Bark v. U.S. Forest Serv.*, 37 F. Supp. 3d 41, 50 (D.D.C. 2014) (concluding that although the plaintiffs "have attached a [policy] label to their own amorphous description of the

[agency's] practices," "a final agency action requires more."); *Lightfoot v. District of Columbia*, 273 F.R.D. 314, 326 (D.D.C. 2011) ("The question is not whether a constellation of disparate but equally suspect practices may be distilled from the varying experiences of the class; rather, Plaintiffs must first identify the 'policy or custom' they contend violates [the law] and then establish that the 'policy or custom' is common to the class.").

The parties dispute whether Plaintiffs have shown the existence of final agency action for their Section 706(2) claims. Insofar as Plaintiffs seek to state Section 706(2) claims for individual turnbacks, the Court has already advised Plaintiffs that individual turnbacks—which fundamentally concern alleged failures by CBP officers to discharge certain mandatory statutory duties—are appropriately considered under Section 706(1). *See Al Otro Lado, Inc.*, 327 F. Supp. 3d at 1309 (citing *Rosario v. United States Citizenship & Immigration Servs.*, No. C15-0813JLR, 2017 WL 3034447, at *7 n.6 (W.D. Wash. July 18, 2017); *Leigh v. Salazar*, No. 3:13-cv-00006-MMD-VPC, 2014 WL 4700016, at *4 (D. Nev. Sept. 22, 2014) (construing a Section 706(2) claim regarding an agency's alleged failure to act as in fact a Section 706(1) claim)). This admonition applies equally to individual turnbacks that allegedly occurred because of the Turnback Policy. Thus, the Court limits its present analysis to whether the Turnback Policy and the alleged pattern or practice of illegal tactics by CBP officers constitute final agency action sufficient for Plaintiffs to state an APA claim.

**a. Alleged Turnback Policy**

In the wake of the Court's dismissal of Plaintiffs' previous Section 706(2) claims, Plaintiffs have revised their factual allegations and their Section 706(2) policy claim. Plaintiffs disavow a policy of categorical denials of access to the asylum system. (ECF No. 210 at 10–11.) Instead, Plaintiffs contend that

"Defendants, high-level agency officials, have adopted a policy mandating that CBP officers at POEs drastically restrict the flow of asylum seekers at POEs along the U.S.-Mexico border by turning them back to Mexico when they present themselves for inspection, based on the false claims of 'capacity constraints.'" (*Id.*) Plaintiffs have sufficiently alleged the existence of such a policy that constitutes a final agency action.

Plaintiffs allege that the Turnback Policy originated in 2016, was formalized in 2018 as a culmination of the agency's decision-making process, and is being actively implemented along the border. (SAC ¶¶ 48–83 (explaining the initiation and development of the Turnback Policy, based on publicly available materials and limited discovery from CBP).) Plaintiffs point to various instances of U.S. government officials' acknowledgement of a policy concerning the ability of noncitizens to access asylum when they present themselves at the U.S-Mexico border. The SAC cites a DHS Office of Inspector General report indicating that DHS has embraced a policy to limit access to the asylum process. (SAC ¶¶ 70–71.) The SAC identifies statements from President Trump, former U.S. Attorney General Jeff Sessions, then-DHS Secretary Kirstjen Nielsen, then-Commissioner McAleenan, and other CBP employees, all of which are plausibly read to show the existence of the alleged Turnback Policy. (SAC ¶¶ 60–66, 68–69, 71, 75.) The SAC otherwise contains extensive allegations of alleged turnbacks of asylum seekers by CBP officers at POEs along U.S.-Mexico border based on assertions of lack of capacity, all of which plausibly point to the existence of an unwritten policy. (*See* SAC ¶¶ 49, 75, 77–78, 83–201.)

Defendants' arguments that Plaintiffs fail to establish a final agency action miss the mark. For one, despite arguing that Plaintiffs have simply attached a "policy" label to Defendants' alleged conduct, Defendants' briefing leaves the

distinct impression that Defendants concede the existence of a policy from which Plaintiffs' alleged injuries flow. Whereas Plaintiffs refer to this policy as the "Turnback Policy," Defendants refer to the challenged conduct as one of "metering." (ECF No. 192-1 at 11–15; ECF No. 238 at 9–12.) Second, Defendants recycle an argument that they raised in their first motion to dismiss Plaintiffs' Section 706(2) claims. Defendants argue once more that Plaintiffs have not plausibly alleged a policy of categorical denials of asylum at POEs along the U.S-Mexico border. (ECF No. 192-1 at 16, 30.) The Court previously dismissed Plaintiffs' Section 706(2) claims on this basis. But, as Plaintiffs expressly argue in opposition (ECF No. 210 at 10–11), they do not claim that the Turnback Policy is a policy to categorically deny asylum seekers entry into the United States. Instead, Plaintiffs allege this is a policy aimed at deterring or limiting asylum seekers from seeking asylum in the United States. Defendants' argument therefore lacks force based on the current pleadings. Third, Defendants challenge Plaintiffs' reliance on statements by U.S. government officials as premised on a "limited selection of Defendants' own statements and communications[.]" (ECF No. 192-1 at 16–17.) Defendants' argument is ostensibly based on the notion that there are other statements by U.S. government officials that would defeat or undermine Plaintiffs' claims regarding the Turnback Policy. Such a merits challenge is inappropriate at this stage. Accordingly, the Court concludes that Plaintiffs have adequately identified a final agency action in the form of the Turnback Policy.

**b. Alleged Pattern and Practice**

Defendants move to dismiss Plaintiffs' Section 706(2) claims insofar as the claims concern the allegations that Defendants have "sanctioned" a practice and pattern of denying access to the asylum procedure in the United States. Defendants contend that "alleged misrepresentations, threats, intimidation, verbal and physical abuse, coercion, 'unreasonable delays,' and racially discriminatory denial of access"

are not final agency action because they "are not plausibly attributable to a DHS or CBP Policy." (ECF No. 238 at 8.) In previously dismissing Plaintiffs' Section 706(2) claims, the Court observed that allegations regarding this conduct could not state a Section 706(2) claim because Plaintiffs failed to connect the conduct to any "unwritten policy" of Defendants. *Al Otro Lado*, 327 F. Supp. 3d at 1319. The Court, however, does not find that this previous conclusion controls here. Plaintiffs expressly allege that the pattern and practice of unlawful tactics and the Turnback Policy "are designed" together to serve the Trump Administration's "broader goal" of deterring asylum seekers from accessing the asylum process and the allegations show both co-existing. (SAC ¶¶ 2, 4, 48, 51–60, 84–106.) Plaintiffs' allegations regarding a "sanctioned" pattern and practice of CBP officers using certain tactics to deny access to the asylum process dovetail with Plaintiffs' allegations that the Turnback Policy is based on false assertions of lack of capacity. Accordingly, the Court finds that Plaintiffs' allegations of an alleged pattern and practice are directly linked with the alleged Turnback Policy such that it is not proper to dismiss Plaintiffs' Section 706(2) claims as to the alleged pattern and practice.

**2. Asserted Unreviewable Agency Discretion**

Defendants point to 8 U.S.C. § 1103(a)(1) and 6 U.S.C. § 202 as "especially authoriz[ing] CBP officers to keep the ports from being overwhelmed by an unsafe number of pedestrians at a given time," thus requiring dismissal of Plaintiffs' Section 706(2) claims. (ECF No. 192-1 at 13–14.) Defendants argue that the New Individual Plaintiffs "make no attempt . . . to square the breadth of Defendants' authority to meter under these statutes with the APA's prohibition on judicial review of agency action 'committed to agency discretion by law.'" (ECF No. 192-1 at 14 (quoting 5 U.S.C. § 701(a)(2)).) Because the APA precludes review of "agency action . . . committed to agency discretion by law," 5 U.S.C. § 701(a)(2), the Court must consider this argument before addressing the merits of Plaintiffs' claim that the

alleged Turnback Policy is unlawful.

Section 1103 establishes the powers and duties of the Secretary of Homeland Security. As a general matter, "[t]he Secretary of Homeland Security shall be charged with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens[.]" 8 U.S.C. § 1103(a)(1). Defendants point to Section 1103(a)(3) in particular, which provides that the Secretary "shall establish such regulations; prescribe such forms of bond, reports, entries, and other papers; issue such instructions; and *perform such other acts as he deems necessary for carrying out his authority under the provisions of this chapter*." 8 U.S.C. § 1103(a)(3) (emphasis added). 6 U.S.C. § 202 in turn provides, in relevant part, that "[t]he Secretary shall be responsible for" "[s]ecuring the borders, territorial waters, ports, terminals, waterways, and air, land, and sea transportation systems of the United States, including managing and coordinating those functions transferred to the Department [of Homeland Security] at ports of entry." 6 U.S.C. § 202(2). "In carrying out" this responsibility, the Secretary is responsible for "ensuring the speedy, orderly, and efficient flow of lawful traffic and commerce." 6 U.S.C. § 202(8). According to Defendants, Section 1103(a) and 202 are so broad, that they do not offer any standard against which the challenged conduct may be evaluated under the APA. (ECF No. 192-1 at 14–15.)

"[A]t the outset, there is reason to be skeptical of [Defendants'] position[.]" *Weyerhaeuser Co. v. United States Fish & Wildlife Serv.*, 139 S. Ct. 361, 370 (2018) (Roberts, C.J.). There exists a "strong presumption that Congress intends judicial review of administrative action." *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670 (1986); *see also Mach Mining, LLC v. EEOC*, 135 S. Ct. 1645, 1652–53 (2015) ("[L]egal lapses and violations occur, and especially so when they have no consequence. That is why this Court has so long applied a strong presumption

favoring judicial review of administrative action."). "The presumption may be rebutted only if the relevant statute precludes review, 5 U.S.C. § 701(a)(1), or if the action is 'committed to agency discretion by law,' § 701(a)(2)." *Weyerhaeuser Co.*, 139 S. Ct. at 370. The exception in Section 701(a)(2) is read "quite narrowly, restricting to 'those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'" *Id.* (quoting *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993)); *see also Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476, 494 (9th Cir. 2018) (noting only "rare" agency actions fit this "narrow" committed-to-agency-discretion exception to judicial reviewability). Defendants have failed to show that judicial review is precluded under the relevant statutes.

Sections 1158 and 1225 cannot be nullified by general statutory provisions regarding the Secretary's authority unless Congress clearly intended so. *See BNSF Ry. Co. v. Cal. Dep't of Tax & Fee Admin.*, 904 F.3d 755, 766 (9th Cir. 2018) ("[W]here there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment." (quoting *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 445 (1987))). Congress has already determined how immigration officers are to "manage the flow" of arriving aliens who express to an immigration officer an intention to apply for asylum or a fear of persecution. Section 1225 imposes mandatory obligations to inspect all aliens who are applicants for admission or otherwise seeking admission and further imposes certain screening duties for asylum seekers. Notably, 8 U.S.C. § 1103(a)(1) expressly charges the Secretary with the enforcement of "all other laws relating to the immigration," which certainly includes the provisions at issue in this case.

In the face of these specific statutes, Defendants endeavor to argue that any

constraints on their authority under 8 U.S.C. § 1158(a)(1) and 8 U.S.C. § 1225 are not at issue in this case and thus these statutory provisions do not bear on the Secretary's asserted exercise of discretionary authority under 8 U.S.C. § 1103(a)(3) and 6 U.S.C. § 202(2). Defendants first contend that because the New Individual Plaintiffs were not in the United States at the time of their alleged injuries, Plaintiffs' argument that "Sections 1158 and 1225 limit the scope of the Secretary's authority under 8 U.S.C. § 1103(a)(3) and 6 U.S.C. § 202" "has no force." (ECF No. 238 at 9.) Insofar as Defendants raise this argument against the Turnback Policy, this argument fails because, at a minimum, Plaintiff Al Otro Lado—a domestic Plaintiff—joins the Individual Plaintiffs in challenging Defendants' conduct. The argument otherwise fails because the Court has rejected Defendants' underlying premise regarding the scope of Sections 1158 and 1225 in relation to the New Individual Plaintiffs.

Defendants further argue that the interpretative canon that specific statutes limit general statutes "does not apply here, because the processes mandated by Section 1225 do not implicate the authority conferred by Sections 1103(a)(3) and 202." (ECF No. 238 at 10.) This argument makes no sense. There is no logical way to treat the Secretary's asserted authority and charge to secure the border as mutually exclusive from the procedures Section 1225 mandates. Section 202(2) expressly refers to "ports." 6 U.S.C. § 202(2). Both Sections 1185(a)(1) and 1225 refer to aliens who arrive in the United States, including at a "port of arrival." Defendants elsewhere argue that applications for admission must be made at ports of entry. 8 C.F.R. § 235.1(a) ("[a]pplication to lawfully enter the United States shall be made in person to a U.S. immigration officer at a U.S. port-of-entry."); (ECF No. 192-1 at 9 (citing 8 C.F.R. § 235.1(a)). Thus, the relevant INA provisions governing the duties of immigration officers with respect to aliens who seek admission at POEs plainly bear on how the Secretary may exercise whatever authority the Secretary has

to manage POEs. Defendants conspicuously do not argue that these provisions do not provide a means to assess the legality of Defendants' conduct.

Accordingly, the Court rejects Defendants' argument that Plaintiffs' Section 706(2) claims are unreviewable on the asserted basis of discretion committed to the agency. Whatever authority the Secretary may possess pursuant to the general grants of authority in Sections 1103(a)(1) and 202(2) over the "flow of traffic" across the border, Congress's general allowance for the Secretary to "perform such other acts as [she] deems necessary for carrying out" her authority to administer and enforce the INA, 8 U.S.C. § 1103(a)(3), cannot entail the authority to rewrite specific congressional mandates or to pretend that such mandates do not exist. "The power of executing the laws . . . does not include a power to revise clear statutory terms that turn out not to work in practice," and it is thus a "core administrative-law principle that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate." *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 328 (2014).

**3. The Unlawfulness of the Alleged Turnback Policy**

The core of Plaintiffs' Section 706(2) claims is that the alleged Turnback Policy is "in excess of statutory jurisdiction, authority, or limitations" and "without observance of procedure required by law." (SAC ¶¶ 271–72 (citing 5 U.S.C. § 706(2)(C), (D)).) In particular, Plaintiffs claim that the alleged Turnback Policy contravenes the congressionally-established procedure set forth in 8 U.S.C. § 1158(a)(1) and 8 U.S.C. § 1225.

Plaintiffs offer two principal theories why the alleged policy violates the procedures that Congress established in these provisions. First, Plaintiffs contend that Defendants' alleged conduct acting pursuant to the Turnback Policy is *ultra*

*vires* because it "ignore[s] the mandatory procedures to inspect and process asylum seekers that Congress has put in place." (ECF No. 210 at 17.) Second, Plaintiffs contend that the alleged Turnback Policy is unlawful because it is "impermissibly aimed at deterrence" and "based on false claims of lack of capacity." (*Id.* at 20.) Although Plaintiffs treat these theories as distinct bases to find the alleged Turnback Policy unlawful, (*id*. at 16–22), the Court finds that they cannot be disentangled from each other. Construing them together, the Court concludes that Plaintiffs have sufficiently alleged that the Turnback Policy is unlawful.[11]

As an initial matter, Defendants resist application of 8 U.S.C. § 1158(a)(1) and 8 U.S.C. § 1225 to assess the legality of the alleged Turnback Policy. Defendants reiterate their argument that the challenged conduct is entirely lawful under 8 U.S.C. § 1103(a)(3) and 6 U.S.C. § 202 because 8 U.S.C. § 1158(a)(1) and 8 U.S.C. § 1225 have "no force as to the Extraterritorial Plaintiffs and the putative class members they seek to represent" who, according to Defendants, "do not allege that they were ever present in the United States." (ECF No. 238 at 9.) These arguments falter at this juncture for reasons the Court has already discussed. 8 U.S.C. § 1158(a)(1) and 8 U.S.C. § 1225 qualify the authority set forth in 8 U.S.C. § 1103(a)(3) and 6 U.S.C. § 202.

Next, relying on Sections 1103(a)(3) and 202(2), Defendants contend that there are valid reasons why CBP officers cannot unwaveringly adhere to the procedures set forth in 8 U.S.C. § 1158(a)(1) and 8 U.S.C. § 1225. According to Defendants, "port management is a complex task[.]" (ECF No. 192-1 at 13.)

---

[11] Because the Court concludes that these theories are together sufficient for Plaintiffs to state Section 706(2) claims, the Court declines to address Plaintiffs' alternative and third argument that the alleged Turnback Policy is unlawful because it unreasonably delays the processing of asylum seekers. (ECF No. 210 at 22–23.)

Defendants contend that "CBP necessarily could not 'secure' or 'manage' a port if, in addition to its other mission responsibilities, *any* alien without appropriate travel documents could cross the border whenever she chooses and immediately trigger Defendants' statutory duties to 'inspect[],' 'refer,' or 'detain[]' her under section 1225." (*Id.* (emphasis in original).) Defendants argue the Sections 1103(a)(3) and 202(2) authorize CBP officers "to permit an alien without appropriate travel documentation to cross the border *only if the port has the capacity to safely and humanely process her application for admission and hold her for further proceedings*," (ECF No. 192-1 at 13 (emphasis added)), and "especially authorize CBP officers to keep ports from being overwhelmed by an unsafe number of pedestrians entering at any time," (*id*). Consistent with this view about their authority over "port management," Defendants urge the Court to conclude that the alleged conduct does not occur *ultra vires*, exceed the scope of their authority, or without observance of the procedure required by law. (*Id.*)

The Court acknowledges that it is entirely possible that there may exist potentially legitimate factors that prevent CBP officers from immediately discharging the mandatory duties set forth in 8 U.S.C. § 1158(a)(1) and 8 U.S.C. § 1225. Even Plaintiffs acknowledge as much. (ECF No. 210 at 21.) And the Court acknowledges that federal agencies and the individuals who lead them can face co-existing obligations that Congress has chosen to place on the agency, obligations that may at times be viewed as competing with each other and competing for the resources an agency has.

The problem with Defendants' reliance on Sections 1103(a)(3) and 202(2) is that Plaintiffs allege that the asserted concerns over capacity are merely a pretext to avoid discharging the duties set forth in 8 U.S.C. § 1158(a)(1) and 8 U.S.C. § 1225 and deter asylum seekers from seeking asylum in the United States. Plaintiffs offer

numerous factual allegations on this point.  (SAC ¶¶ 4–6, 48, 61, 66, 72–73, 76–78, 109, 111, 274.)  And, contrary to Defendants' suggestion regarding complex port management, Plaintiffs contend that Defendants' Turnback Policy "screen[s] out asylum seekers from other applications for admission approaching POEs and send[s] them back to an uncertain fate in Mexico[.]"  (ECF No. 210 at 17.)  In other words, the purported exercise of authority under Sections 1103(a)(3) and 202(2) specifically targets asylum seekers—not any other aliens who may be crossing into the United States through POEs.

In the face of these allegations, Defendants challenge the sufficiency of Plaintiffs' deterrence allegations as a factual matter by largely relying on materials outside of the pleadings.  (ECF No. 192-1 at 15; ECF No. 238 at 10.)  Indeed, in their opening brief, Defendants argue that "[t]he record before the Court shows clearly that the Secretary and her designees have deemed it necessary to manage the flow of pedestrian traffic when port resources are strained."  (ECF No. 192-1 at 15 (citing Exs. 1–6).)  There is no "record" before the Court on a Rule 12(b)(6) motion, but rather the Court is limited to a review of the pleadings and any documents attached to them.  *United States v. Ritchie*, 342 F.3d 903, 907–09 (9th Cir. 2003).  Defendants' reliance on non-pleadings materials underscores that Defendants' arguments about the truthfulness of Plaintiffs' deterrence allegations are fundamentally merits arguments that the Court cannot resolve at this stage.[12]

Assuming the truth of Plaintiffs' deterrence allegations, the remaining issue is whether an alleged motive to deter asylum seekers from seeking asylum in the United States is unlawful.  Plaintiffs argue that it is.  Plaintiffs' fundamental

---

[12] For this reason, the Court also rejects Defendants' attempt to direct the Court to factual assertions made in a declaration filed in a different case.  (ECF No. 192-1 at 5, 13.)

contention is that "[t]he plain language and intent of the INA's asylum provision unambiguously preclude Defendants from adopting a policy or otherwise engaging in a practice of denying individuals access to the U.S. asylum process at POEs, even if Defendants prevent those asylum seekers from physically crossing the U.S.-Mexico border." (ECF No. 210 at 17.)  On this issue, Defendants argue that Plaintiffs offer nothing more than a "legal conclusion."  (ECF No. 238 at 11.)  The Court, however, finds nothing conclusory about Plaintiffs' assertions of illegality.

Congress has enacted a scheme that mandates inspection of all aliens seeking admission to the United States and mandates referral to an asylum officer of asylum seekers who present themselves at a POE and indicate their intention to apply for asylum or a fear of persecution.  8 U.S.C. § 1225(a)(3); 8 U.S.C. § 1225(b)(1)(A)(i).  Although this statutory scheme treats asylum seekers differently, it does so only in the sense that such aliens are to be promptly identified and their asylum claims are to be appropriately considered.  As Plaintiffs and *Amici* Immigration Law Professors observe (ECF No. 210 at 19; ECF No. 221-1 at 5–6), the "uniform asylum policy" driving the 1980 Refugee Act, an act which replaced the previous *ad hoc* refugee and asylum system, was "[a] fundamental belief that the granting of asylum is inherently a humanitarian act distinct from the normal operation and administration of the immigration process." Aliens and Nationality; Asylum and Withholding of Deportation Procedures, 55 Fed. Reg. 30674-01, 30675 (July 27, 1990) (to be codified at 8 CFR Parts 3, 103, 208, 236, 242, and 253) (emphasis added); *see also E. Bay Sanctuary Covenant*, 2018 WL 8807133, at *3 (observing that "[i]n 1980, Congress codified our obligation to receive persons who are 'unable or unwilling to return to' their home countries 'because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.' (quoting 8 U.S.C. §§ 1101(a)(42), 1158(b)(1))).  Congress's intent to prescribe a uniform asylum procedure remains reflected in the

current asylum procedure. 8 U.S.C. § 1158; 8 U.S.C. § 1225; *see also E. Bay Sanctuary Covenant*, 2018 WL 8807133, at *3.

Turning back prospective asylum applicants pursuant to an alleged executive policy that seeks to deter asylum seekers through false assertions of lack of capacity is plausibly inconsistent with and violative of the scheme Congress enacted. This conclusion follows from a comparison of Section 1157 and Section 1158. Although Defendants have elsewhere pointed to Section 1157 as a purported limitation on the extraterritorial scope of 8 U.S.C. § 1158(a)(1), Defendants overlook a key distinction between Sections 1157 and 1158 that cuts against the lawfulness of adopting a policy to deter asylum seekers. Section 1157 expressly authorizes the President to set numerical limits for aliens who may be admitted as refugees into the United States on an annual basis. 8 U.S.C. § 1157(a)(2). Neither Section 1158(a)(1), nor Section 1225(b), however, establishes numerical limits on the total number of aliens who may seek asylum pursuant to the asylum procedure these statutes establish. *See* 8 U.S.C. § 1158; 8 U.S.C. § 1225. Pretextual assertions of "lack of capacity" to turn away asylum seekers who seek access to a POE and express an intent to apply for asylum directly to a CBP officer suggest the existence of an unlawful *de facto* numerical limit on the number of asylum applicants that finds no support in Section 1158 or Section 1225. The imposition of such a limit, through false assertions of lack of capacity, surely violates the scheme Congress enacted, particularly when contrasted with the separate scheme in Section 1157. *See Util. Air Regulatory Grp.*, 573 U.S. at 327 ("The power of executing the laws necessarily includes both authority and responsibility to resolve some questions left open by Congress that arise during the law's administration. But it does not include a power to revise clear statutory terms that turn out not to work in practice.").

Defendants nevertheless question that even if "any alleged metering is

'motivated by deterrence,' such an aim would not be inappropriate." (ECF No. 238 at 11–12 n.8.) Most curiously, Defendants support this assertion by citing "Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims, 83 Fed. Reg. 55,934 (Nov. 9, 2018)," a rule for which the Ninth Circuit upheld a preliminary injunction barring its enforcement. *See E. Bay Sanctuary Covenant v. Trump*, No. 18-17274, —F.3d—, 2018 WL 8807133, at *19–20 (9th Cir. Dec. 7, 2018), *stay denied by*, *Trump v. E. Bay Sanctuary Covenant*, 139 S. Ct. 782, 2018 WL 6713079 (U.S. Supreme Court Dec. 21, 2018).

In *East Bay Sanctuary Covenant*, the Ninth Circuit affirmed a preliminary injunction barring implementation of a Rule promulgated by the Secretary of DHS and the Attorney General. The Rule provided that "[f]or applications filed after November 9, 2018, an alien shall be ineligible for asylum if the alien is subject to a presidential proclamation or other presidential order suspending or limiting the entry of aliens along the southern border with Mexico that is issued pursuant to [§ 1182(f)]." 83 Fed. Reg. 55,952 (to be codified at 8 C.F.R. § 208.13(c)(3) (DHS) and 8 C.F.R. § 1208.13(c)(3) (DOJ)). The Rule coincided with a presidential proclamation suspending the "entry of any alien into the United States across the international boundary between the United States and Mexico," but exempting from that suspension "any alien who enters the United States at a port of entry and properly presents for inspection." Addressing Mass Migration Through the Southern Border of the United States, 83 Fed. Reg. 57,661, 57,663 (Nov. 9, 2018).

In relevant part, the *East Bay Sanctuary Covenant* majority found the Rule likely to be unlawful under Section 706(2)(A) because the Rule "is inconsistent with § 1158(a)(1)." *E. Bay Sanctuary Covenant*, 2018 WL 8807133, at *18. Although the majority noted that "[r]ather than restricting who may apply for asylum, the rule of decision facially conditions only who is eligible to receive asylum," the majority

found this to be a distinction without a difference. *Id*. The majority concluded that: "the technical differences between applying for and eligibility for asylum are of no consequence to a refugee when the bottom line—no possibility of asylum—is the same." *Id.* The majority acknowledged that "[w]e are acutely aware of the crisis in the enforcement of our immigration laws," but concluded that "the Attorney General may not abandon [a congressional] scheme because he thinks it is not working well. . . . but continued inaction by Congress is not a sufficient basis under our Constitution for the Executive to rewrite our immigration laws." *Id.* at *20.

The key lesson of *East Bay Sanctuary Covenant* is that the Executive cannot "amend the INA"—specifically Section 1158—through executive action to establish a procedure at variance with the scheme Congress chose. *Id.* Much like the challenged rule in *East Bay Sanctuary Covenant*, Defendants' alleged Turnback Policy directly concerns the statutory scheme for asylum seekers that Congress has established. The Turnback Policy directly concerns the Section 1225(b)(1) aspect of this procedure for aliens seeking admission to the United States. As Plaintiffs persuasively argue, there is no room for deterrence under the scheme Congress has enacted. An alleged policy that is premised on and implements such a motive contravenes the clear purpose, intent, and text of the statutory scheme that enables aliens arriving at POEs, including those in the process of doing so, to apply for asylum. Accordingly, the Court concludes that Plaintiffs have stated Section 706(2) claims premised on the unlawfulness of the alleged Turnback Policy.

**III. The New Individual Plaintiffs' Fifth Amendment Due Process Claims**

The Fifth Amendment's Due Process Clause provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. The Individual Plaintiffs assert a protected Fifth Amendment due process interest in the various provisions of the INA that allows aliens to seek asylum in the

United States. (SAC ¶¶ 225–26, 283–93.) Specifically, the Individual Plaintiffs allege that they possess "the right to be processed at a POE and granted meaningful access to the asylum process" under 8 U.S.C. §§ 1158(a)(1), 1225(a)(3), 1225(b)(1)(A)(ii), 1225(b)(1)(B), and 8 C.F.R. § 235.3(b)(4). Defendants' motion to dismiss presents two issues. First, the Court must revisit the propriety of judicial review of Plaintiffs' constitutional claims independently of the APA. Second, the Court must turn to the merits of Defendants' dismissal arguments, in which Defendants contend that the New Individual Plaintiffs seek to impermissibly apply the Constitution extraterritorially and, alternatively, the New Individual Plaintiffs were not denied any process that these Plaintiffs claim was due. The Court addresses each issue in turn.

**A. Non-APA Judicial Review of Constitutional Claims**

In its prior dismissal order, the Court determined that "[w]hile a right to seek judicial review of agency action may be created by a separate statutory or constitutional provision, once created it becomes subject to the judicial review provisions of the APA unless explicitly excluded." *Al Otro Lado*, 327 F. Supp. 3d at 1316. The parties dispute what the Court's prior ruling should mean for the INA and Fifth Amendment Due Process Clause claims that Plaintiffs raise independently of the APA. Plaintiffs request that, to the extent the Court believes it resolved the issue of reviewability of these claims in its prior dismissal order, the Court should revise its previous order pursuant to Rule 54(b) to clarify that Plaintiffs' INA and Fifth Amendment due process claims may be reviewed even if Plaintiffs cannot state APA claims. (ECF No. 210 at 26.) Defendants argue that Plaintiffs "offer no reason to depart from the correct application of the APA to this case" and expressly argue that the Court "should also reject Plaintiffs' request to adjudicate their freestanding INA claims under the concept of 'nonstatutory review' instead of the APA." (ECF No. 238 at 18.)

As an initial matter, the Court clarifies that its prior statement regarding the scope of judicial review flowed from the nature of the parties' prior dismissal briefing. Defendants did not move to dismiss Plaintiffs' constitutional claims on the merits, but rather limited their merits briefing to the sufficiency of Plaintiffs' APA claims. Plaintiffs in turn presented arguments regarding their APA claims, yet in doing so, relied on case law regarding liability under 42 U.S.C. § 1983. Faced with this briefing, the Court's prior dismissal analysis necessarily turned on the APA's strictures.

The present motion to dismiss briefing alters the calculus. The parties have briefed the merits of Plaintiffs' constitutional due process claims, implicitly assuming that the Court can and should review those claims independently of the APA's strictures. Although Defendants argue that Plaintiffs cannot raise freestanding INA claims independently of the APA's strictures, Defendants conspicuously do not make a similar argument with respect to Plaintiffs' Fifth Amendment Due Process claims in their opening brief. (*Compare* ECF No. 192-1 at 18–22 (dismissal arguments regarding Plaintiffs' due process claims) *and* ECF No. 238 at 15 *with* ECF No. 192-1 at 23 (arguing that "Extraterritorial Plaintiffs' INA claims must be evaluated under the APA, as the Court described, or not at all.").)[13]

---

[13] Defendants argue for the first time in their reply brief that even if the Plaintiffs state procedural due process claims, review of these claims must proceed under the APA. (ECF No. 238 at 15.) The apparent reason for this argument is the assumption that if Plaintiffs fail to state a claim in accordance with the APA's strictures (*i.e.*, final agency action, identification of discrete agency action for Section 706(1) claims, *etc*.), then this Court cannot address the merits of Plaintiffs' constitutional claims. This argument underscores for the Court that non-APA review of Plaintiffs' constitutional claims is appropriate.

Guided by more recent precedent, the Court finds it necessary to clarify the propriety of judicial review independently of the APA's strictures. The Court's prior dismissal order observed that, at times, courts have resolved only APA claims concerning agency action, even when a plaintiff asserts constitutional claims premised on statutory provisions that underlie the APA claims. *See Graham v. Fed. Emergency Mgmt. Agency*, 149 F.3d 997, 1001 n.2 (9th Cir. 1998) ("declin[ing] to address the plaintiffs' Fifth Amendment claim and affirm[ing] the district court's denial of this claim" because "plaintiffs' due process claim is premised on their assertion that they 'have a statutory entitlement to the [individual and family grant] disaster assistance program'" and thus "they may obtain all the relief they request under the provisions of the APA."); *Al Otro Lado, Inc.*, 327 F. Supp. 3d at 1316 (relying on *Graham*).

Recently, the Ninth Circuit has made clear that although "the APA is the general mechanism by which to challenge final agency action," "this does not mean that the APA forecloses other causes of action." *Sierra Club v. Trump*, 929 F.3d 670, 699 (9th Cir. 2019). And relying on *Navajo Nation v. Department of the Interior*, 876 F.3d 1144 (9th Cir. 2017)—a case that figured prominently in the Court's prior determination that the APA waives the United States' sovereign immunity for any claims for nonmonetary relief, whether asserted under the APA or not—*Sierra Club* instructs that *Navajo Nation* as well as an earlier Ninth Circuit decision "clearly contemplate that claims challenging agency actions—particularly constitutional claims—may exist wholly apart from the APA.'" *Sierra Club*, 929 F.3d at 699 (also relying on *Presbyterian Church v. United States*, 870 F.2d 518 (9th Cir. 1989) for this proposition). Thus, the Court concludes that review of the New Individual Plaintiffs' constitutional claims, independently of their APA claims, is appropriate.

**B. The New Individual Plaintiffs State Due Process Claims**

The New Individual Plaintiffs' claims, like those of the other Individual Plaintiffs, are fundamentally procedural due process claims. "The requirements of procedural due process apply to the deprivation of interests encompassed by [the Due Process Clause's] protection of liberty and property." *Bd. of Regents v. Roth*, 408 U.S. 564, 569 (1972). "To assert a procedural due process claim under the Fifth Amendment, [a plaintiff] must first establish a constitutionally protected interest." *Stanley v. Gonzales*, 476 F.3d 653, 660 (9th Cir. 2007); *Foss v. Nat'l Marine Fisheries Serv.*, 161 F.3d 584, 588 (9th Cir. 1998) (noting that "[t]he threshold question" in a procedural due process claim is whether the plaintiff has a constitutionally protectible interest). "[T]he plaintiff must have more than a unilateral expectation of it; instead, she must have a legitimate claim of entitlement." *Serra v. Lappin*, 600 F.3d 1191, 1196 (9th Cir. 2010). If the plaintiff shows the existence of a constitutionally protected interest, the plaintiff must further establish "a denial of adequate procedural protections." *Foss*, 161 F.3d at 588.

Defendants do not contest that if any New Individual Plaintiff sufficiently alleges that he or she was in the United States, such a New Individual Plaintiff may assert a Fifth Amendment Due Process Clause claim against Defendants' alleged conduct. Indeed, "[i]t is well established that aliens legally within the United States may challenge the constitutionality of federal and state actions." *Ibrahim v. Dep't of Homeland Sec.*, 669 F.3d 983, 994 (9th Cir. 2012). Thus, to the extent any New Individual Plaintiffs sufficiently plead that they were in the United States at the time of their alleged injuries, Defendants' argument, by its own terms, does not apply.

With respect to the remaining New Individual Plaintiffs, Defendants raise two arguments for why they fail to state Fifth Amendment Due Process Clause claims. Defendants first argue that these New Individual Plaintiffs possess no protected

interests under the Due Process Clause in the INA statutory and regulatory provisions in this case because "the Fifth Amendment does not apply to aliens outside the United States[.]" (ECF No. 192-1 at 18.) Second, Defendants argue that "[e]ven assuming *arguendo* that the Fifth Amendment applie[s] to [these] Plaintiffs while they were outside the United States, they still fail to state a cognizable Fifth Amendment claim." (*Id.* at 21.)

**1. The Fifth Amendment Applies**

Defendants' principal challenge to the New Individual Plaintiffs' Fifth Amendment Due Process Clause claims is that "the Fifth Amendment does not apply to aliens outside the United States, particularly where they do not allege they have any previous voluntary connection to the United States." (ECF No. 192-1 at 18; ECF No. 238 at 14–15.) Defendants' challenge raises a threshold issue about the proper scope and application of the Constitution.

As an initial matter, the Court rejects Defendants' formalistic, territorial argument that the Due Process "Clause's reference to 'person[s],' while broad, does not include non-resident aliens outside the United States." (ECF No. 192-1 at 19 (citing *Johnson v. Eisentrager*, 339 U.S. 763, 770 (1950)).) Defendants' reliance on *Eisentrager* is understandable because there is language in the decision that places a constitutional premium on territorial presence in the United States, suggesting that such presence is the only basis for a noncitizen to receive constitutional protection that a federal court in turn has the power to enforce. *See Eisentrager*, 339 U.S. at 771 ("[I]n extending constitutional protections beyond the citizenry, the Court has been at pains to point out that it was the alien's presence within its territorial jurisdiction that gave the Judiciary power to act."); *id.* at 777–78 ("[T]hese prisoners at no relevant time were within any territory over which the United States is sovereign, and the scenes of their offense, their capture, their trial and their

punishment were all beyond the territorial jurisdiction of any court of the United States.").

The Supreme Court, however, squarely rejected bright-line rules regarding the extraterritorial application of the Constitution in *Boumediene v. Bush*, 553 U.S. 723 (2008). In *Boumediene*, the Supreme Court permitted alien plaintiffs who the U.S. government had designated as enemy combatants and who were detained at the United States Naval Station in Guantanamo, Cuba to seek habeas relief. In doing so, the Supreme Court rejected the government's proposed bright-line rule that the plaintiffs were not entitled to seek habeas relief as aliens who had committed acts outside the United States as a "formal sovereignty-based test." *Id.* at 764. The Supreme Court stated that "questions of extraterritoriality turn on objective factors and practical concerns, not formalism." *Id.* To resolve such questions, the Supreme Court directed the federal courts to examine the "'particular circumstances, the practical necessities, and the possible alternatives which Congress had before it' and, in particular, whether judicial enforcement of the provision would be 'impracticable and anomalous.'" *Id.* at 759 (quoting, *inter alia*, *Reid v. Covert*, 354 U.S. 1, 74–75 (1957) (Harlan, J., concurring)).

Defendants rely heavily on *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990), and *Ibrahim v. Department of Homeland Security*, 669 F.3d 983 (9th Cir. 2012), to argue that the New Individual Plaintiffs must nevertheless allege a "prior significant voluntary connection" with the United States to receive protection under the Fifth Amendment Due Process Clause. The Court briefly discusses these cases and then explains why they do not foreclose the New Individual Plaintiffs' claims.

In *Verdugo-Urquidez,* the Supreme Court addressed the question "whether the Fourth Amendment applies to the search and seizure by United States agents of

property that is owned by a nonresident alien and located in a foreign country." 494 U.S. at 261. The Court held that the "nonresident alien" plaintiff in that case had "no previous significant voluntary connection with the United States" and therefore had no right to assert a Fourth Amendment challenge to the searches and seizures of his property by United States agents in Mexico. *Id.* at 271 (emphasis added). In *Ibrahim*, the Ninth Circuit expressly relied on *Verdugo-Urquidez* to permit a Malaysian citizen who was precluded from entering the U.S., who had previously been in the U.S. for four years on a student visa and who alleged that she was mistakenly placed on a No-Fly List and other terrorist watchlists, to raise Fourth and Fifth Amendment claims against the federal government. The Ninth Circuit expressly observed that "the border of the United States is not a clear line that separates aliens who may bring constitutional challenges from those who may not." *Ibrahim*, 669 F.3d at 995 (collecting cases including *Boumediene*). The Ninth Circuit held that, "[u]nder *Boumediene* and *Verdugo*, we hold that Ibrahim has 'significant voluntary connection' with the United States. She voluntarily established a connection to the United States during her four years at Stanford University while she pursued her Ph.D. She voluntarily departed from the United States to present the results of her research at a Stanford-sponsored conference. The purpose of her trip was to further, not to sever, her connection to the United States, and she intended her stay abroad to be brief." *Id.* at 997. Defendants contend that because the New Individual Plaintiffs lack a "previous voluntary significant connection" with the United States, they have no protected due process interests.

The fundamental problem with Defendants' reliance on the "previous voluntary significant connection" test set forth in *Verdugo-Urquidez* and applied in *Ibrahim* is that the test does not constitute a ceiling on the application of the Constitution to aliens. Plaintiffs direct this Court to the Ninth Circuit's recent decision in *Rodriguez v. Swartz*, 899 F.3d 719 (9th Cir. 2018), a case in which the

panel majority relied on *Boumediene* to conclude that an alien located outside the United States could press a Fourth Amendment claim against a U.S. border officer who, standing on the U.S. side of the border, allegedly shot and killed a Mexican teenager located on the Mexican side of the border.  The *Rodriguez* majority underscored that "[n]either citizenship nor voluntary submission to American law is a prerequisite for constitutional rights[,]" rather, "citizenship is just one of several non-dispositive factors to consider."  899 F.3d at 729.  The *Rodriguez* majority determined that *Verdugo-Urquidez*'s "voluntary significant connection" test did not apply in the circumstances of the case because "unlike the American agents in *Verdugo-Urquidez*, who acted on Mexican soil, Swartz [the defendant U.S. border officer] acted on American soil" and "[j]ust as Mexican law controls what people do there, American law controls what people do here." *Id.* at 731 (brackets added).  The *Rodriguez* majority underscored that "[t]he practical concerns in *Verdugo-Urquidez* about regulating conduct on Mexican soil also do not apply here." *Id.*

Defendants passingly refer to *Boumediene* only once in their opening brief and do not acknowledge *Rodriguez*.  (ECF No. 192-1 at 19–20 (observing that *Ibrahim* cites *Boumediene*); *id.* at 18–22 (full argument regarding extraterritorial application without reference to *Rodriguez*.)  Faced with Plaintiffs' opposition brief, Defendants attempt to limit the scope and application of *Boumediene* in this case.  Defendants first contend that "*Boumediene* is the only case extending a constitutional right to 'noncitizens detained by our Government in territory over which another country maintains *de jure* sovereignty.'" (ECF No. 238 at 13 (quoting *Boumediene*, 553 U.S. at 770).)  Defendants then argue that "this Court must follow" "pre-*Boumediene* law holding that the Due Process Clause does not extend to aliens without property or presence in the sovereign territory of the United States[.]" (*Id.*)

The Court rejects both of Defendants' arguments.  For one, *Rodriguez* alone

renders Defendants' first argument factually erroneous. Defendants' erroneous argument appears to stem from Defendants' attempt to dismiss *Rodriguez* as irrelevant in a footnote. (ECF No. 238 at 14 n.9 (stating that "[i]f any Ninth Circuit case applies here, it is *Ibrahim*, not *Rodriguez*.").) The Court does not understand Defendants' dismissive argument. *Rodriguez* is as much binding precedent on this Court as is *Ibrahim*. And *Rodriguez*, applying *Boumediene*, indicates that *Verdugo-Urquidez*'s "previous voluntary significant connection" test—and, by extension, *Ibrahim*'s application of that test—do not alone control the question of constitutional protection for aliens, particularly when the challenged conduct concerns the conduct of U.S. officers acting on U.S. soil. *Rodriguez*, 899 F.3d at 731. Second, and more critically, Defendants' attempt to limit *Boumediene* simply ignores *Boumediene*'s analysis. *Boumediene* expressly rejected a reading of *Eisentrager* that would establish a "formalistic, sovereignty-based test" and expressly narrowed *Eisentrager*'s reach, observing that "the United States lacked both *de jure* sovereignty and plenary control" over the area where the petitioner prisoners were located and "[n]othing in *Eisentrager* says that *de jure* sovereignty is or has ever been the only relevant consideration in determining the geographic reach of the Constitution or of habeas corpus." *Boumediene*, 553 U.S. at 763–64. Thus, both *Boumediene* and *Rodriguez* apply here.

Appropriately relying on both *Boumediene* and *Rodriguez*, Plaintiffs persuasively argue that there is nothing "'impracticable [or] anomalous' in applying elementary due process protection at the U.S. border." (ECF No. 210 at 25.) For one, as an objective matter, the New Individual Plaintiffs' allegations do not show conduct occurring wholly in foreign territory. Defendants attempt to argue that "[t]he United States does not have *de jure* or *de facto* sovereignty over Mexican border towns[.]" (ECF No. 238 at 14.) Insofar as Plaintiffs' constitutional claims concern the Turnback Policy, allegedly formed by high-level federal officials,

Defendants' argument falters on its own terms because surely such a policy was not developed in Mexican border towns.  (*See* SAC ¶ 287 (referring to Turnback Policy as violation procedural due process rights); *id.* ¶¶ 50–60.)  Insofar as the New Individual Plaintiffs' constitutional claims concern individual turnbacks, all New Individual Plaintiffs offer allegations regarding conduct of CBP officers who presumably were located on U.S. soil.

The allegations of the four New Individual Plaintiffs who were stopped in the middle of the international bridge between Mexico and the United States and denied access by the CBP officers on the U.S. side of the bridge also concerns conduct occurring on territory subject to U.S. sovereign authority.  (SAC ¶¶ 29–31, 154, 162, 173–74.)  Defendants cite an 1886 U.S.-Mexico treaty, (ECF No. 238 at 14), which expressly provides that "[i]f any international bridge have been or shall be built across either of the rivers named, *the point on such bridge exactly over the middle of the main channel as herein determined shall be marked by a suitable monument, which shall denote the dividing line for all the purposes of such bridge*, notwithstanding any change in the channel which may thereafter supervene." Convention Between the United States of America and the United States of Mexico Touching the International Boundary Line Where It Follows the Bed of the Rio Grande and the Rio Colorado, U.S.-Mex., arts. I, IV, Nov. 12, 1884, 24 Stat. 1011, 1886 WL 15138, at *2.  New Individual Plaintiffs Roberto Doe, Maria Doe, and Juan and Úrsula Doe allege that they "sought access to the asylum process by presenting [themselves]" at the Hidalgo, Texas POE and Laredo, Texas POE and "encountered CBP officials in the middle of the bridge" between Mexico and the U.S. POE and "told them" they "wanted to seek asylum in the United States."  (SAC ¶¶ 29–31, 154–55, 162, 174.)  Pursuant to the very treaty on which Defendants rely, these allegations plausibly show conduct by CBP officers occurring on the U.S. side of the international bridge subject to U.S. sovereignty.

Second, as Plaintiffs argue, "the practical necessities" also warrant application of the Due Process Clause in this case. (ECF No. 210 at 25–26.) The New Individual Plaintiffs' claims concern alleged denials of procedural due process by U.S. immigration officers upon whom Congress has placed certain statutory obligations, all in furtherance of the asylum protections Congress has also chosen to extend to certain "arriving aliens" that express an intent to apply for asylum or fear of persecution. And their claims concern adoption of an alleged policy that aims to impede access to the statutorily-mandated asylum procedure. The lesson of *Boumediene* is that the political branches do not enjoy the prerogative to "switch the Constitution on or off at will[.]" *Boumediene*, 553 U.S. at 765. Appropriately applying *Boumediene* and *Rodriguez,* the Court rejects Defendants' threshold argument that none of the New Individual Plaintiffs can even avail themselves of the Fifth Amendment in this case.

**2. Plaintiffs Have Plausibly Alleged Denials of Procedural Due Process**

For the reasons set forth in the Court's statutory analysis, the Court can swiftly reject Defendants' second dismissal argument. Defendants concede that "[w]here plaintiffs premise their procedural due process challenge on having a protected interest in a statutory entitlement, 'the protections of the Due Process Clause . . . extend only as far as the plaintiffs' statutory rights.'" (ECF No. 192-1 at 21 (quoting *Graham v. Fed. Emergency Mgmt. Agency*, 149 F.3d 997, 1001 & n.2 (9th Cir. 1998)).) This concession all but forecloses dismissal of the New Individual Plaintiffs' due process claims at this juncture. Congress has the power to prescribe the terms and conditions upon which aliens may come to this country. *Kleindienst v. Mandel*, 408 U.S. 753, 766 (1972). "In the enforcement of [congressional] policies, the Executive Branch of the Government must respect the procedural safeguards of due process[.]" *Id.* at 767. Here, as the Court has discussed in its

construction of the relevant statutory provisions, Congress has plainly established procedural protections for aliens like the New Individual Plaintiffs in this case, who allege that they were in the process of arriving to the United States and expressed an intent to seek asylum.  The New Individual Plaintiffs have plausibly alleged that immigration officers failed to discharge their mandatory duties under the relevant provisions.  Consequently, the Court concludes that the New Individual Plaintiffs have stated procedural process claims and the Court denies Defendants' motion to dismiss these claims.

## IV.    ATS Claims

The ATS provides in full that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350.  All Individual Plaintiffs and Al Otro Lado seek to raise ATS claims for Defendants' alleged "violation of the non-*refoulement* doctrine."  (SAC ¶¶ 294–303.)  Plaintiffs specifically allege that:

> CBP officials have systematically denied, or unreasonably delayed, access to the asylum process by Class Plaintiffs, and the asylum seekers they represent, in violation of customary international law reflected in treaties which the United States has ratified and implemented: namely, the specific, universal and obligatory norm of non-*refoulement*, which has also achieved the status of a *jus cogens* norm, and which forbids a country from returning or expelling an individual to a country where he or she has a well-founded fear of persecution and/or torture . . .

(*Id.* ¶ 295.)  Plaintiffs contend that Defendants' alleged violations have caused them harm by forcing them to return to Mexico or other countries where they face threats of further persecution.  (*Id.* ¶ 296.)  Al Otro Lado also raises ATS claims for these alleged violations on the ground that its core mission is harmed through resource diversion.  (*Id.* ¶ 300.)

As a preliminary matter, Defendants argue that Plaintiffs' "non-*refoulement* claims are [not] actionable as presented" based on the Court's prior ruling that "Plaintiffs 'may not' seek judicial review of Defendants' conduct 'independently' of the APA's judicial review framework." (ECF No. 192-1 at 23.) Defendants misstate the Court's prior ruling, which did not speak to the Court's jurisdiction over Plaintiffs' ATS claims. The ATS is a "strictly jurisdictional statute" in its own right that "creates no new causes of action." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 713, 742 (2004); *Tobar v. United States*, 639 F.3d 1191, 1196 (9th Cir. 2011) (noting the ATS "has been interpreted as a jurisdiction statute only"). Thus, independently of the APA, the relevant issue is whether Plaintiffs can state claims under the ATS over which the Court has jurisdiction.

**A. No Jurisdiction Exists for Al Otro Lado's ATS Claims**

Insofar as Defendants move to dismiss ATS claims that Organizational Plaintiff Al Otro Lado raises, (ECF No. 192-1 at 28 (citing SAC ¶¶ 294–303)), the Court finds that such claims must be dismissed for lack of subject matter jurisdiction because"Al Otro Lado is corporation." (ECF No. 238 at 20.) Although the fact that Al Lado Lado is a corporation does not preclude Al Otro Lado's assertion of APA claims, its status as a corporation has jurisdictional consequences under the ATS.

Under its plain language, the ATS provides for federal jurisdiction only over civil actions "by an alien." 28 U.S.C. §1350. Thus, irrespective of the substantive cause of action that underlies an asserted ATS claim, a federal court lacks jurisdiction under the ATS over claims asserted by anyone or anything other than an alien. *See Serra v. Lappin*, 600 F.3d 1191, 1198 (9th Cir. 2010) ("The ATS admits no cause of action by non-aliens."); *Yousuf v. Samantar*, 552 F.3d 371, 375 n.1 (4th Cir. 2009) ("To the extent that any of the claims under the ATS are being asserted by plaintiffs who are American citizens, federal subject-matter jurisdiction may be

lacking."); *Kadic v. Karadzic*, 70 F.3d 232, 238 (2d Cir. 1995) (same); *Sikhs for Justice Inc. v. Indian Nat'l Cong. Party*, 17 F. Supp. 3d 334, 345 (S.D.N.Y. 2014) ("[J]urisdiction is inapplicable because Plaintiff Sikhs is not an 'alien' under the ATS[.]"); *S.K. Innovation, Inc. v. Finpol*, 854 F. Supp. 2d 99, 113 (D.D.C. 2012) ("[T]he American corporate Plaintiffs, as non-aliens, lack standing to bring claims under the ATS"); *Presbyterian Church of Sudan v. Talisman Energy, Inc*., 453 F. Supp. 2d 633, 661 (S.D.N.Y. 2006) (concluding that an institutional plaintiff that is a United States corporation "is not an alien and may not bring suit under the ATS."), *aff'd*, 582 F.3d 244 (2d Cir. 2009). Al Otro Lado is concededly not an alien. Accordingly, the Court grants Defendants' motion to dismiss Organizational Plaintiff Al Otro Lado's ATS claims lack of jurisdiction.

**B. The Individual Plaintiffs' ATS Claims**

Defendants initially moved to dismiss the ATS claims of only the New Individual Plaintiffs and Al Otro Lado. (ECF No. 192-1 at 22–25.) In reply, Defendants extend the scope of their motion to dismiss Plaintiffs' ATS claims to encompass the Original Individual Plaintiffs as well. (ECF No. 238 at 16–18.) To resolve Defendants' present motion, the Court will not venture beyond Defendants' actual arguments. Reviewing these arguments, the Court finds that Defendants have failed to show that the ATS claims must be dismissed at this juncture.

**1. The Asserted Law of Nations Norm**

Defendants first argue that (1) the ATS "has no bearing in this case" because Plaintiffs "have not brought a civil action for a tort[.]" (ECF No. 192-1 at 25, ECF No. 238 at 16–17.) Defendants point to the ATS's use of the word "tort" and argue that Plaintiffs have no ATS claim here because they have not sued for a "tort." (ECF No. 192-1 at 25, ECF No. 238 at 16–17.) Defendants' argument misconstrues the ATS.

By its terms, the ATS "enable[s] federal courts to hear claims in a very limited category defined by the law of nations and recognized at common law." *Sosa*, 542 U.S. at 712. For this reason, it should not be disputed that "[t]he ATS 'grants jurisdiction over two types of claims: those for violations of a treaty of the United States, and those for violations of the law of nations.'" *Aragon v. Ku*, 277 F. Supp. 3d 1055, 1064 (D. Minn. 2017) (quoting 14A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3661.2 (4th ed., Apr. 2017 Update)); *see also Al-Tamimi*, 916 F.3d at 11 (recognizing that "[a]n ATS claim . . . incorporates the law of nations"). When a plaintiff seeks to plead an ATS claim based on an alleged violation of the law of nations, the plaintiff must identify an international norm that is "specific, universal, and obligatory." *Sosa*, 542 U.S. at 732. As a general matter, "[c]ourts ascertain customary international law 'by consulting the works of jurists, writing professedly on public law; or by the general usage and practice of nations; or by judicial decisions recognizing and enforcing that law.'" *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 714–15 (9th Cir. 1992) (quoting *United States v. Smith*, 18 U.S. 153, 160–61 (1820)).

Plaintiffs allege that the duty of non-*refoulement* is a *jus cogens* norm recognized by the law of nations. (SAC ¶¶ 227–35.)[14] And, in opposition to

---

[14] "As defined in the Vienna Convention on the Law of Treaties, a *jus cogens* norm, also known as a 'peremptory norm' of international law, 'is a norm accepted and recognized by the international community of states as a whole as a norm from which no derogation is permitted and which can be modified only by a subsequent norm of general international law having the same character.'" *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 714 (9th Cir. 1992) (quoting Vienna Convention on the Law of Treaties, art. 53, May 23, 1969, 1155 U.N.T.S. 332, 8 I.L.M. 679). Courts determine whether a *jus cogens* norm exists by looking to the works of jurists, writing professedly on public law; or by the general usage and practice of nations; or by judicial decisions recognizing and enforcing that law, but courts must make the additional determination "whether the international community recognizes the norm as one 'from which no derogation is permitted.'"

dismissal, Plaintiffs elaborate on these allegations under the applicable standard, locating the asserted *jus cogens* norm in (1) a range of fundamental international treaties, including Article 33 of the Convention on the Status of Refugees and its Protocol ("Refugee Convention"), Article 13 of the International Covenant on Civil and Political Rights ("ICCPR"), and Article 3 of the Convention Against Torture and Other Cruel, Inhuman and Degrading Treatment or Punishment ("CAT"); (2) statements by international law bodies, including the Executive Committee of the United Nations High Commissioner for Refugees (UNHCR); and (3) international law commentators. (ECF No. 210 at 27–30.) Defendants simply fail to grapple with Plaintiffs' allegations or arguments on whether non-*refoulement* is a norm that is recognized by the law of nations.[15]

The only somewhat applicable argument Defendants raise is that "even if the Extraterritorial Plaintiffs had raised tort claims, Defendants' alleged conduct does

---

*Id.* (quoting *Comm. of U.S. Citizens Living in Nicaragua v. Reagan*, 859 F.2d 929, 940 (D.C. Cir. 1988)).

[15] None of Defendants' dismissal arguments grapples with the Plaintiffs' fundamental contention that non-refoulement is a *jus cogens* norm whose violation is actionable. Defendants initially moved to dismiss the "non-*refoulement* claims" of the New Individual Plaintiffs allegedly in Mexico at the time of their alleged injuries on three grounds. First, Defendants argued that each of the treaties the SAC identifies is not independently enforceable and separately analyzed each treaty. (ECF No. 192-1 at 23–24.) Second, Defendants argued that the Refugee Act of 1980 does not provide Plaintiffs with any independent cause of action in this Court because the Act only allows claims to be adjudicated defensively before an immigration judge or affirmatively before USCIS. (*Id.* at 24.) These arguments elide the ATS claims that Plaintiffs have actually pleaded. Plaintiffs' opposition brief expressly observes that Defendants' opening brief fundamentally misconstrues Plaintiffs' ATS claims. (ECF No. 210 at 27.) And the SAC is fairly clear in alleging Plaintiffs' theory that the duty of non-*refoulement* is a *jus cogens* norm whose violation is actionable—not that each individual treaty cited in the SAC is a separate basis for Plaintiffs' ATS claims.

not come close to the type of egregious 'violations of the law of nations' even potentially within the ATS's grant of jurisdiction." (ECF No. 192-1 at 25 (citing *Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir. 1980) as "allowing wrongful death claim to proceed against Paraguayan police supervisor alleged to have 'deliberate[ly] tortured' an individual in Paraguay 'under color of official authority'"). The inquiry under the ATS, however, does not turn on subjective assertions about whether the challenged conduct is "egregious" or not. The Court can only understand Defendants' current briefing to concede, at this stage, the core contention underlying Plaintiffs' ATS claims that there exists a recognized duty of non-*refoulement* that qualifies as an international law norm under the law of nations.

**2. The INA Does Not "Preempt" Plaintiffs' ATS Claims**

Defendants' second argument is that the existence of a "comprehensive and exclusive scheme of legislation" under the INA "preempt[s] the enforcement of a freestanding international law norm of non-*refoulement* in this Court." (ECF No. 238 at 17–18.) Curiously, Defendants raise this argument while arguing in the same breath that the New Individual Plaintiffs fall outside the scope of the relevant INA provisions in this case. If this latter argument is to be credited, then there is no comprehensive and exclusive scheme under which these Plaintiffs could seek relief and Defendants' argument collapses.

In any event, the Court has already rejected Defendants' argument. The Court expressly stated in the prior dismissal order, "[t]o the extent that Defendants contend that the ATS claims must be dismissed because a remedy is available under domestic law, the Court rejects that argument. 'Contrary to defendants' argument, there is no absolute preclusion of international law claims by the availability of domestic remedies for the same alleged harm.'" *Al Otro Lado, Inc*., 327 F. Supp. 3d at 1307 n.10 (quoting *Hawa Abdi Jama v. United States INS*, 22 F. Supp. 2d 353, 364 (D.N.J.

1998)). Defendants' latest assertion of their prior argument under a "preemption" label overlooks *Jama*'s express recognition that "there is nothing in the [ATS] which limits its applications to situations where there is no relief available under domestic law" and *Jama*'s conclusion that "[t]here is no reason why plaintiffs cannot seek relief on alternative grounds." *Jama*, 22 F. Supp. 2d at 364. Defendants otherwise direct the Court to cases in which federal courts rejected an alien's attempt to rely on international law norms to seek immigration relief and, in doing so, stated that "[w]here a controlling executive or legislative act does exist, customary international law is inapplicable." *Cortez-Gastelum v. Holder*, 526 Fed. App'x 747, 749 (9th Cir. 2013); *Galo-Garcia v. INS*, 86 F.3d 916, 918 (9th Cir. 1996). Defendants' reliance on this caselaw underscores for the Court that, at a minimum, Plaintiffs may plead their ATS claims as alternative claims in the event that their INA-based claims fail. *See* Fed. R. Civ. P. 8(a)(3) ("A pleading that states a claim for relief must contain . . . a demand for the relief sought, which may include relief in the alternative or different types of relief."); Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims . . . as it has, regardless of consistency."). Thus, the Court rejects Defendants' "preemption" argument.

* * *

Nevertheless, the Court observes that Plaintiffs do not cite a single case in which another federal court has recognized that the duty of non-*refoulement* is actionable through a federal court's ATS jurisdiction. The paucity of such caselaw should at least give this Court pause on whether it is appropriate to recognize the particular ATS cause of action the Individual Plaintiffs raise in this case. Having reviewed Defendants' present dismissal arguments, however, the Court cannot conclude that it lacks jurisdiction over the Individual Plaintiffs' ATS claims. Because the ATS is a jurisdictional statute, Defendants are not foreclosed from challenging the Plaintiffs' ATS claims at a later stage. *See* Fed. R. Civ. P. 12(h)(3)

(recognizing that subject matter jurisdiction can be assessed "at any time"); *see also Baloco v. Drummond Co.*, 767 F.3d 1229, 1234 (11th Cir. 2014) (affirming dismissal of ATS claims under Rule 12(b)(1)); *Best Med. Belg., Inc. v. Kingdom of Belg.*, 913 F. Supp. 2d 230, 236 (E.D. Va. 2012) ("The [ATS] is jurisdictional in nature and also subject to challenge by a Rule 12(b)(1) motion."); *In re Chiquita Brands Int'l, Inc.*, 792 F. Supp. 2d 1301, 1354 (S.D. Fla. 2011) (observing that "a complaint that fails to sufficiently plead the elements of an ATS claim is analyzed under Rule 12(b)(1)").

## CONCLUSION & ORDER

For the foregoing reasons, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' motion to dismiss the SAC. The Court **GRANTS** Defendants' motion as follows:

1. The Court **DISMISSES WITHOUT LEAVE TO AMEND** the Section 706(1) claims of the New Individual Plaintiffs for alleged failures to take agency action required by 8 U.S.C. § 1225(b)(2)(A).

2. The Court **DISMISSES WITH PREJUDICE** Organizational Plaintiff Al Otro Lado's ATS claim for lack of subject matter jurisdiction.

The Court otherwise **DENIES** Defendants' motion to dismiss the SAC. Defendants **SHALL ANSWER** the SAC **no later than August 16, 2019**. Given the length of time this case has been pending at the motion to dismiss stage, the Court will not grant extensions of the deadline.

The Court **WITHDRAWS** the previously docketed July 29, 2019 order (ECF No. 278) and **REPLACES** it with this Amended Order. Because the Amended Order is substantively the same, the Court does not alter any deadlines.

**IT IS SO ORDERED.**

**DATED: August 2, 2019**

Cynthia Bashant

**Hon. Cynthia Bashant**
**United States District Judge**