Nos. 22-55988, 56036

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

AL OTRO LADO, INC., *et al.*,
*Plaintiffs-Appellees/Cross-Appellants*,

v.

ALEJANDRO MAYORKAS, Secretary of Homeland Security, *et al.*
*Defendants-Appellants/Cross-Appellees*,

and

the EXECUTIVE OFFICE FOR IMMIGRATION REVIEW,
*Appellant/Cross-Appellee.*

On Appeal from a Final Judgment Issued by the U.S. District Court for the
Southern District of California (Civil Action No. 3:17-cv-02366-BAS-KSC)

## EXCERPTS OF RECORD
## VOLUME 2 OF 4

BRIAN M. BOYNTON
Principal Deputy Assistant
Attorney General

WILLIAM C. PEACHEY
Director

KATHERINE J. SHINNERS
Senior Litigation Counsel

ALEXANDER J. HALASKA
Trial Attorney
U.S. Department of Justice
Civil Division
Office of Immigration Litigation -
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 307-8704 | Fax: (202) 305-7000
Email: alexander.j.halaska@usdoj.gov

*Counsel for the Government*

# UNITED STATES DISTRICT COURT

**FOR THE DISTRICT OF** Southern District of California

### Form 1. Notice of Appeal from a Judgment or Order of a United States District Court

U.S. District Court case number: 3:17-cv-02366-BAS-KSC

Notice is hereby given that the appellant(s) listed below hereby appeal(s) to the United States Court of Appeals for the Ninth Circuit.

Date case was first filed in U.S. District Court: 11/22/2017

Date of judgment or order you are appealing: 08/23/2022

Docket entry number of judgment or order you are appealing: 819

Fee paid for appeal? *(appeal fees are paid at the U.S. District Court)*

⦿ Yes    ○ No    ○ IFP was granted by U.S. District Court

**List all Appellants** *(List each party filing the appeal. Do not use "et al." or other abbreviations.)*

Al Otro Lado, Inc.; Abigail Doe; Beatrice Doe; Bianca Doe; Carolina Doe; Cesar Doe; Dinora Doe; Emiliana Doe; Ingrid Doe; Juan Doe; Maria Doe; Roberto Doe; Ursula Doe; Victoria Doe

Is this a cross-appeal? ⦿ Yes    ○ No

If yes, what is the first appeal case number? 22-55988

Was there a previous appeal in this case? ⦿ Yes    ○ No

If yes, what is the prior appeal case number? 19-56417; 20-56287

Your mailing address (if pro se):

City:    State:    Zip Code:

Prisoner Inmate or A Number (if applicable):

**Signature** /s/ Ori Lev    **Date** 11/4/2022

*Complete and file with the attached representation statement in the U.S. District Court*

ER-0303    **Form 1**    *Rev. 06/09/2022*

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
Civil Division
WILLIAM C. PEACHEY
Director
SAMUEL P. GO
Assistant Director
KATHERINE J. SHINNERS (DC 978141)
Senior Litigation Counsel
United States Department of Justice
Civil Division
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 598-8259 | Fax: (202) 305-7000
katherine.j.shinners@usdoj.gov
ALEXANDER J. HALASKA (IL 6327002)
Trial Attorney

*Counsel for Defendants*

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA
### (San Diego)

| | |
|---|---|
| AL OTRO LADO, Inc., *et al.*, | Case No. 3:17-cv-02366-BAS-KSC |
|           *Plaintiffs*, | Hon. Cynthia A. Bashant |
|           v. | **NOTICE OF APPEAL** |
| ALEJANDRO MAYORKAS, Secretary of Homeland Security; CHRISTOPHER MAGNUS, Commissioner of U.S. Customs and Border Protection (CBP); PETE FLORES, Executive Assistant Commis- | |

1  sioner of CBP's Office of Field Opera-
2  tions, in their official capacities;[*]

3                    *Defendants-Appellants*,

4                    and

5
6  the EXECUTIVE OFFICE FOR IMMI-
   GRATION REVIEW,
7
8                    *Appellant.*

9

---

[*] Pursuant to Federal Rule of Civil Procedure 25(d), Secretary Mayorkas, Commissioner Magnus, and Executive Assistant Commissioner Flores are automatically substituted as Defendants for their predecessors in office.

ER-0305

Defendants Alejandro Mayorkas, Secretary of Homeland Security; Christopher Magnus, Commissioner of U.S. Customs and Border Protection (CBP); and Pete Flores, Executive Assistant Commissioner of CBP's Office of Field Operations, in their official capacities, and the Executive Office for Immigration Review (EOIR)[1] hereby appeal from the Court's August 23, 2022 Final Judgment (ECF No. 819), including any and all orders that are merged into that Final Judgment (including but not limited to ECF Nos. 278, 513, 742, 816, and 817), to the United States Court of Appeals for the Ninth Circuit.

---

[1] EOIR is not a party to this litigation. It nevertheless appeals from the Final Judgment because it is bound by the terms of the permanent injunction entered by the Court. *See* Final Judgment (ECF No. 819) at 3; *EEOC v. Pan Am. World Airways, Inc.*, 897 F.2d 1499, 1504 (9th Cir. 1990) (non-parties may "appeal where they actually participated in proceedings before the district court and the equities weigh in favor of hearing the appeal").

DEFS.' NOTICE OF APPEAL
Case No. 3:17-cv-02366-BAS-KSC

ER-0306

1    DATED: October 21, 2022            Respectfully submitted,

2                                        BRIAN M. BOYNTON
3                                        Principal Deputy Assistant Attorney General
                                         Civil Division
4

5                                        WILLIAM C. PEACHEY
                                         Director
6

7                                        SAMUEL P. GO
                                         Assistant Director
8

9                                        */s/ Katherine J. Shinners*
                                         KATHERINE J. SHINNERS
10                                       Senior Litigation Counsel
11                                       United States Department of Justice
                                         Civil Division
12                                       Office of Immigration Litigation
13                                       District Court Section
                                         P.O. Box 868, Ben Franklin Station
14                                       Washington, D.C. 20044
                                         Tel: (202) 598-8259 | Fax: (202) 305-7000
15
                                         katherine.j.shinners@usdoj.gov
16

17                                       ALEXANDER J. HALASKA
18                                       Trial Attorney

19                                       *Counsel for Defendants and the Executive Of-*
20                                       *fice for Immigration Review*

21

22

23

24

25

26

27

28

DEFS.' NOTICE OF APPEAL
Case No. 3:17-cv-02366-BAS-KSC

**<u>CERTIFICATE OF SERVICE</u>**

*Al Otro Lado v. Wolf*, No. 17-cv-02366-BAS-KSC (S.D. Cal.)

I certify that I served a copy of this document and its attachments on the Court and all parties by filing this document with the Clerk of the Court through the CM/ECF system, which will provide electronic notice and an electronic link to this document to all counsel of record.

DATED: October 21, 2022          Respectfully submitted,

                                 */s/ Katherine J. Shinners*
                                 KATHERINE J. SHINNERS
                                 Senior Litigation Counsel
                                 United States Department of Justice

DEFS.' NOTICE OF APPEAL
Case No. 3:17-cv-02366-BAS-KSC

ER-0308

BRIAN M. BOYNTON
Acting Assistant Attorney General
Civil Division
WILLIAM C. PEACHEY
Director, Office of Immigration Litigation –
District Court Section
SAMUEL P. GO
Assistant Director
KATHERINE J. SHINNERS (DC 978141)
Senior Litigation Counsel
United States Department of Justice
Civil Division
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 598-8259 | Fax: (202) 305-7000
katherine.j.shinners@usdoj.gov
DHRUMAN Y. SAMPAT
ALEXANDER J. HALASKA
Trial Attorneys
*Counsel for Defendants*

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA
### (San Diego)

| | |
|---|---|
| AL OTRO LADO, Inc., *et al.*, | Case No. 3:17-cv-02366-BAS-KSC |
| *Plaintiffs*, | Hon. Cynthia A. Bashant |
| v. | **DEFENDANTS' NOTICE OF ADMINISTRATIVE ACTION** |
| ALEJANDRO MAYORKAS, Secretary of Homeland Security, *et al.*, in their official capacities, | |
| *Defendants*. | |

ER-0309

## <u>NOTICE OF ADMINISTRATIVE ACTION</u>

Defendants hereby respectfully notify the Court of the following administrative actions, as discussed at the August 31, 2021, hearing on the parties' Motions for Summary Judgment (*see* Tr., ECF No. 754, at 17:1-3):

(1) Memorandum from Troy A. Miller, Acting Commissioner, U.S. Customs and Border Protection, *Guidance for Management and Processing of Undocumented Noncitizens at Southwest Border Land Ports of Entry* (Nov. 1, 2021), attached hereto as Exhibit 1, and available at https://www.cbp.gov/document/guidance/guidance-management-and-processing-undocumented-non-citizens-southwest-border-land.

(2) Memorandum from Alejandro N. Mayorkas, Secretary of Homeland Security, *Rescission of June 5, 2018,* Prioritization-Based Queue Management *Memorandum* (Nov. 1, 2021), attached hereto as Exhibit 2.

//

DATED: November 2, 2021            Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General
Civil Division

WILLIAM C. PEACHEY
Director

SAMUEL P. GO
Assistant Director

NOTICE OF ADMINISTRATIVE ACTION
Case No. 3:17-cv-02366-BAS-KSC

ER-0310

1    /s/ Katherine J. Shinners
2    KATHERINE J. SHINNERS
     Senior Litigation Counsel
3    United States Department of Justice
     Civil Division
4    Office of Immigration Litigation
5    District Court Section
     P.O. Box 868, Ben Franklin Station
6    Washington, D.C. 20044
7    Tel: (202) 598-8259 | Fax: (202) 305-7000
8    katherine.j.shinners@usdoj.gov

9
10   ALEXANDER J. HALASKA
     DHRUMAN Y. SAMPAT
11   Trial Attorneys

12   *Counsel for Defendants*

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ER-0311

## CERTIFICATE OF SERVICE

*Al Otro Lado v. Mayorkas*, No. 17-cv-02366-BAS-KSC (S.D. Cal.)

I certify that I served a copy of this document on the Court and all parties by filing this document with the Clerk of the Court through the CM/ECF system, which will provide electronic notice and an electronic link to this document to all counsel of record.

DATED: November 2, 2021         Respectfully submitted,

*/s/ Katherine J. Shinners*
KATHERINE J. SHINNERS
Senior Litigation Counsel
United States Department of Justice

ER-0312

# EXHIBIT 1

ER-0313



1300 Pennsylvania Avenue, NW
Washington, DC 20229

**U.S. Customs and
Border Protection**

*Commissioner*

November 1, 2021

| | |
|---|---|
| MEMORANDUM FOR: | William A. Ferrara<br>Executive Assistant Commissioner<br>Office of Field Operations |
| FROM: | Troy A. Miller<br>Acting Commissioner<br>U.S. Customs and Border Protection |
| SUBJECT: | **Guidance for Management and Processing of<br>Undocumented Noncitizens at Southwest Border<br>Land Ports of Entry** |

This memorandum provides updated guidance for the management and processing of noncitizens who, without proper documents ("undocumented noncitizens"), present at land ports of entry (POEs) along our Southwest Border, including those who may be seeking humanitarian protection in the United States. This memorandum also rescinds and supersedes the November 27, 2019 memorandum from the former Commissioner, *Prioritization-Based Queue Management*; and CBP Office of Field Operations (OFO) April 27, 2018 and April 30, 2020 memoranda, *Metering Guidance*. Today, Secretary Mayorkas rescinded Secretary Nielsen's June 5, 2018 memorandum, *Prioritization-Based Queue Management*, upon my recommendation.

The ability to process undocumented noncitizens in a timely manner is impacted by a wide range of factors, including staffing constraints, outdated infrastructure, and significantly at this time, the COVID-19 pandemic. The COVID-19 pandemic specifically has limited processing and holding capacity based on protocols to protect the workforce, the noncitizens whom we encounter at the POEs, and the American public. The Centers for Disease Control and Prevention's August 2, 2021 Public Health Order, which was issued pursuant to Title 42 of the U.S. Code and suspends the introduction of certain non-citizens into the United States for public health reasons, remains in force, and we will continue to implement it as applicable. At all times, the capacity to process undocumented noncitizens must take into account CBP's other vital priorities, including our mission to protect public safety and national security, interdict the flow of narcotics and contraband, and facilitate lawful trade and travel.

ER-0314

Even before the COVID-19 pandemic, processing capacity was limited due to increasingly large volumes of lawful trade and travel. During the five years preceding the pandemic, CBP processed, on average, 326 inadmissible individuals each day at POEs across the Southwest land border. At the same time, CBP apprehended, on average, a much larger number—1,266 individuals each day—between POEs.

As a complement to enforcement efforts between POEs and to incentivize an alternative to such unlawful crossings, I instruct Southwest Border OFO management to consider and take appropriate measures, as operationally feasible, to increase capacity to process undocumented noncitizens at Southwest Border POEs, including those who may be seeking asylum and other forms of protection. As part of this effort, CBP personnel should continue to employ and should further accelerate ongoing steps to leverage technological and processing efficiencies to streamline POE processing.

Possible additional measures include the innovative use of existing tools such as the CBPOne™ mobile application, which enables noncitizens seeking to cross through land POEs to securely submit certain biographic and biometric information prior to arrival and thus streamline their processing upon arrival. OFO also should accelerate ongoing efforts to digitize processing at POEs and more effectively use data to increase throughput. In developing these solutions, CBP should, as appropriate, collaborate with interested non-governmental organizations and other key partners, consistent with applicable privacy protections and civil rights and civil liberties.

Importantly, however, asylum seekers or others seeking humanitarian protection cannot be required to submit advance information in order to be processed at a Southwest Border land POE. The submission (or lack thereof) of advance information should not influence the outcome of any inspection. CBP will continue to make admissibility and processing determinations on a case-by-case-basis at the POE.

A POE's capacity to process undocumented noncitizens is influenced by operational realities and circumstances that could change day to day and could include unanticipated incidents, emergencies, or challenges. However, POEs must strive to process all travelers, regardless of documentation status, who are waiting to enter, as expeditiously as possible, based on available resources and capacity. At all times, the capacity to process undocumented noncitizens must take into account CBP's other vital priorities, including our mission to protect public safety and national security, interdict the flow of narcotics and contraband, and facilitate lawful trade and travel.

CBP may manage the intake of undocumented noncitizens at POEs, including by providing staffing at the border line to facilitate and manage safe and orderly travel into the POE. In all cases, however, undocumented noncitizens who are encountered at the border line should be permitted to wait in line, if they choose, and proceed into the POE for processing as operational capacity permits. Absent a POE closure, officers also may not instruct travelers that they must return to the POE at a later time or travel to a different POE for processing. Officers also may not preclude those in line from departing and returning at a later time. Once in the United States, an individual must be inspected and processed by CBP Officers and may not be directed to return across the land border without appropriate processing.

ER-0315

Case 3:17-cv-02366-BAS-KSC   Document 1251-5   Filed 01/02/21   PageID. 7633829   Page 4 of 4
Guidance for Management and Processing of Undocumented Noncitizens at the SWB LPOEs
Page 3

Based on past, current, and expected volumes of individuals seeking entry at Southwest Border land POEs, there may be extended wait times in processing lines.

This Administration has outlined a comprehensive strategy to expand safe, orderly, and humane pathways for migration, including for noncitizens who may be seeking protection to access the United States. *See* Executive Order 14010, 86 FR 8267 (2021). This guidance is issued in furtherance of that strategy and is effective immediately.

# EXHIBIT 2

ER-0317



*Secretary*

**U.S. Department of Homeland Security**
Washington, DC 20528

November 1, 2021

MEMORANDUM FOR:    Troy A. Miller
                   Acting Commissioner
                   U.S. Customs and Border Protection

FROM:              Alejandro N. Mayorkas
                   Secretary

SUBJECT:           **Rescission of June 5, 2018,** *Prioritization-Based*
                   *Queue Management* **Memorandum**

---

Upon the recommendation of Acting Commissioner Troy A. Miller of U.S. Customs and Border Protection, I hereby rescind Secretary Nielsen's June 5, 2018 memorandum, *Prioritization-Based Queue Management*.

ER-0318

1   MAYER BROWN LLP
      Matthew H. Marmolejo (CA Bar No.
2   242964)
      *mmarmolejo@mayerbrown.com*
3   350 S. Grand Avenue
    25th Floor
4   Los Angeles, CA 90071-1503
      Ori Lev (DC Bar No. 452565)
5     (*pro hac vice*)
      *olev@mayerbrown.com*
6     Stephen M. Medlock (VA Bar No. 78819)
      (*pro hac vice*)
7     *smedlock@mayerbrown.com*
8   1999 K Street, N.W.
    Washington, D.C. 20006
9   Telephone:  +1.202.263.3000
    Facsimile:   +1.202.263.3300

10  SOUTHERN POVERTY LAW CENTER
      Melissa Crow (DC Bar No. 453487)
11    (*pro hac vice*)
      *melissa.crow@splcenter.org*
12  1101 17th Street, N.W., Suite 705
    Washington, D.C. 20036
13  Telephone: +1.202.355.4471
    Facsimile: +1.404.221.5857
14
15  *Additional counsel listed on next page*
    *Attorneys for Plaintiffs*
16
17          **UNITED STATES DISTRICT COURT**
         **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**
18

19  AL OTRO LADO, Inc., *et al.*,          | Case No. 3:17-cv-02366-BAS-KSC
20                          *Plaintiffs*,  | Hon. Cynthia A. Bashant
21              v.                          | **JOINT STATEMENT OF UNDIS-**
                                            | **PUTED FACTS CONCERNING**
22  CHAD F. WOLF, Acting Secretary, U.S.   | **THE PARTIES' CROSS-MO-**
    Department of Homeland Security, in his| **TIONS FOR SUMMARY JUDG-**
23  official capacity, *et al.*,            | **MENT**
24                          *Defendants*   |
25                                          | **Special Briefing Schedule Granted**
26
27
28

ER-0319

CENTER FOR CONSTITUTIONAL RIGHTS
  Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
  *bazmy@ccrjustice.org*
  Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
  *gschwarz@ccrjustice.org*
  Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
  *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
  Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
  *sarah.rich@splcenter.org*
  Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
  *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
  Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
  *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

1

ER-0320

Pursuant to Local Rule 7.1(f)(1) and the Court's Standing Order for Civil Cases ¶ 4(F), Plaintiff Al Otro Lado, Inc. and the Class ("Plaintiffs") and Defendants submit the following Joint Statement of Undisputed Facts Concerning the Parties' Cross-Motions for Summary Judgment. The parties' agreement to these facts as undisputed is for the purposes of the above-captioned litigation only, and the parties reserve the right to dispute any and all facts in future litigation or other contexts. By agreeing that facts presented below are undisputed for purposes of summary judgment, the parties do not necessarily concede their materiality or relevance.[1] The parties reserve any arguments as to relevance and materiality, including those set forth in their summary judgment briefing.

| Fact | Source |
|------|--------|
| 1. U.S. Customs and Border Protection (CBP)'s mission is "to safeguard America's borders thereby protecting the public from dangerous people and materials while enhancing the Nation's global economic competitiveness by enabling legitimate trade and travel." | https://www.cbp.gov/about (Defs.' Ex. 7) |
| 2. DHS's component agencies include: CBP; Cybersecurity and Infrastructure Security Agency; U.S. Citizenship and Immigration | Stipulation of the parties |

---

[1] Specifically, Plaintiffs object to the materiality and relevance of facts that are offered in support of rationales for metering and/or turnbacks. In their summary judgment papers, Plaintiffs argue that turnbacks are illegal regardless of the justification for them. Defendants object to the materiality and relevance of facts that are offered in support of Plaintiffs' arguments regarding motive. In their summary judgment papers, Defendants argued that motive is irrelevant to Plaintiffs' claims.

2

ER-0321

| | |
|---|---|
| Services; the Federal Emergency Management Agency (FEMA); U.S. Coast Guard; U.S. Immigration and Customs Enforcement; United States Secret Service; and the Transportation Security Administration. | |
| 3. U.S. Customs and Border Protection's (CBP) Office of Field Operations' (OFO) is the largest operational component within CBP. Its operations span over 328 ports of entry (POEs) within 20 field offices, as well as 70 international locations. OFO "is responsible for border security—including anti-terrorism, immigration, anti-smuggling, trade compliance, and agriculture protection—while simultaneously facilitating the lawful trade and travel at U.S. ports of entry that is critical to our Nation's economy." | https://www.cbp.gov/about/leadership-organization/executive-assistant-commissioners-offices (Defs.' Ex. 6) |
| 4. The Office of Field Operations ("OFO") is the organization within CBP that is responsible for the management of operations at ports of entry into the United States. | Stipulation of the parties. |
| 5. OFO operates various different classes of ports of entry ("POEs"). A Class A land POE is a designated Port-of-Entry for all aliens. | Howe Dep. at 75:18-76:8 |

3

ER-0322

| | |
|---|---|
| 6. CBP officers inspect, and, as applicable, process all individuals entering the United States in vehicles through vehicle lanes at Class A POEs as those vehicles arrive at primary inspection. Individuals may then be referred for further inspection and processing, as appropriate. | Stipulation of the parties. |
| 7. OFO's POEs are overseen by regional field offices. There are four field offices that oversee the land POEs along the U.S.-Mexico border: San Diego, Tucson, El Paso, and Laredo. | Stipulation of the parties. |
| 8. Class A POEs on the U.S.-Mexico border include, among others: San Ysidro, Otay Mesa, Calexico, Nogales, El Paso, Laredo, Hidalgo, and Brownsville. | Stipulation of the parties. |
| 9. The San Diego Field Office's land border POEs include the San Ysidro, Otay Mesa, Tecate, Andrade, and Calexico POEs. | Stipulation of the parties |
| 10. The Tucson Field Office's land border POEs include the Nogales and San Luis POEs. | Stipulation of the parties |
| 11. The El Paso Field Office's land border POEs include the El Paso POE. | Stipulation of the parties |
| 12. The Laredo Field Office's land border POEs include the Laredo, Hidalgo, Brownsville, | Stipulation of the parties |

4

ER-0323

| | |
|---|---|
| Roma, Progreso, Rio Grande City, and Eagle Pass POEs. | |
| 13. In Fiscal Year 2020 (through August), OFO seized 37,830 pounds of cocaine; 4,552 pounds of heroin; 313,813 pounds of marijuana; 141,663 pounds of methamphetamine; and 3,302 pounds of fentanyl. In Fiscal Year 2019, OFO had seized over 117,000 pounds of methamphetamine, 19,000 pounds of cocaine, 2,400 pounds of fentanyl, 4,700 pounds of heroin, and 253,900 pounds of marijuana. | Declaration of Beverly Good (Defs.' Ex. 1) at ¶ 12a |
| 14. POEs in the San Diego and Tucson field offices together accounted for 57% of all opioid seizures by POE officers in 2016 and 2017. In fiscal year 2020 (through September), OFO along the southern border seized more than 412,658 pounds of illicit narcotics | Defs.' Ex. 9 at 2.<br><br>Defs.' Ex. 1 at ¶ 12a |
| 15. "Currently, OFO faces ongoing staffing shortages at air, land, and sea ports across the country, and officers are often required to work overtime to meet the operational needs that arise on a daily basis." | Defs.' Ex. 1 at ¶ 15 |
| 16. As of May 2018, CBP had been required to | Defs.' Ex. 9 at 2. |

JOINT STATEMENT OF UNDISPUTED FACTS

ER-0324

| | |
|---|---|
| assign temporary staff details to fulfill staffing needs in the San Diego and Tucson field offices; the May 10, 2018 Senate report described the practice of temporary details as "systemic." For instance, OFO deployed 1,865 officers over the course of five fiscal years to supplement critical staffing shortages in the San Diego and Tucson Field Offices, at a cost of over $41,757,580 in travel expenditures." | Defs.' Ex. 1 at ¶ 18 |
| 17. The senior-most official in OFO is the Executive Assistant Commissioner of OFO. Within OFO headquarters, the Executive Director of Operations is responsible for oversight of operations of POEs. The Executive Director of Admissibility and Passenger Programs is responsible for the development, management, and implementation of policies concerning the entry, admission, and processing of travelers to the United States. | Stipulation of the parties. |
| 18. The senior-most official in each OFO field office is the director of field operations (DFO). Depending on the size of the field office, a director of field operations may be assisted by one or more assistant directors of | Stipulation of the parties. |

6

ER-0325

| | |
|---|---|
| field operations. | |
| 19. Some CBP officers that work at POEs on the U.S.-Mexico border are members of the National Treasury Employees Union ("NTEU"). The NTEU has various chapters that may include employees at different POEs. | Stipulation of the parties |
| 20. From time to time, DHS and CBP have adopted contingency plans for responding to surges of undocumented migrants seeking to enter the United States at or between POEs along the U.S.-Mexico border. | *See, e.g.,* AOL-DEF-00392542; AOL-DEF-00094256; AOL-DEF-00237660; AOL-DEF-0011011 |
| 21. The San Ysidro POE in San Diego is the busiest land border crossing in the Western Hemisphere. | GSA Fact Sheet – San Ysidro Port of Entry (Defs.' Ex. 11) at 1. |
| 22. Between January 1, 2016 and 2020, there has been at least one instance in which a CBP Officer instructed an alien without documents sufficient for lawful entry who was standing on U.S. soil to return to Mexico without inspecting or processing them. | Defs' Resps. to Pltfs' Third Set of RFA at Req. 7 |
| 23. On at least one occasion since January 1, 2016, CBP officers have engaged in metering/queue management when the number of individuals in custody at a particular POE was less than the stated maximum physical | Defs' Resps. to Pltfs' Third Set of RFA at Req. 8 |

7

ER-0326

| | |
|---|---|
| capacity of the designated holding space within the particular POE. | |
| 24. On at least one occasion since January 1, 2016, CBP officers at at least one POE have referred aliens without documents sufficient for lawful entry to another POE for inspection and processing when the number of individuals at the referring POE was less than the stated maximum physical capacity of the designated holding space at the referring POE. | Defs' Resps. to Pltfs' Third Set of RFA at Req. 9 |
| 25. Since January 1, 2016, at least one CBP officer has questioned the legality of the metering and/or queue management policy. | Defs' Resps. to Pltfs' Third Set of RFA at Req. 10 |
| 26. Since January 1, 2016, at least one CBP officer has expressed an opinion that the metering/queue management policy as implemented during specific periods at specific POEs put CBP officers in unsafe situations. | Defs' Resps. to Pltfs' Third Set of RFA at Req. 11 |
| 27. Since January 1, 2016, at least one CBP official conducted inquiries into whether metering and/or queue management had a deterrent effect. | Defs' Resps. to Pltfs' Third Set of RFA at Req. 17 |
| 28. On August 6, 2015, DHS adopted a "Southwest Border Land Migration Contingency | AOL-DEF-00094256 at 259, 261 |

8

ER-0327

| | |
|---|---|
| Plan" with the purpose of preventing and responding to "a surge of . . . undocumented migrants." | |
| 29. In its January 22, 2016, Maximum Capacity Contingency plan for its Admissibility Enforcement Unit (AEU), the San Ysidro POE noted that, at that time and based on the facilities then available, it could hold ██ detainees safely. The plan noted that the San Ysidro POE could use detention cells, repurposed spaces, and intake seating areas to hold up to ██ people total, but not overnight; the San Ysidro POE could hold only ██ people overnight. | AOL-DEF-00392542 |
| 30. In late 2016, the San Ysidro POE was able to augment its capacity of ██ by detaining additional individuals at the Imperial Beach and Chula Vista Border Patrol Stations. | AOL-DEF-00030002 at 002 |
| 31. Beginning in February 2016, CBP saw an increase in the number of inadmissible Haitian nationals seeking admission at ports of entry at ports of entry in the San Diego Field Office. | AOL-DEF-00031442 (Pls.' Ex. 33) at 443 |
| 32. As of March 25, 2016, the San Ysidro POE AEU's overflow contingency plan provided | AOL-DEF-00237660 |

9

ER-0328

that the port would "draft all eligible personnel" at the port to assist with migrant processing, using the "Old Port" building to hold "Family Units and low-risk detainees (capacity ▇ detainees)," using the second floor of the AEU—which at that time was located in the Pedestrian Building on the site where the "PedEast" facility is now located—to hold family units ("capacity ▇ detainees"), contacting nearby U.S. Border Patrol stations to request detention space at those facilities, utilizing the "streamlined Withdrawal" of application for admission process, and contacting other POEs "to request assistance via Virtual Processing," i.e., processing individuals via video conference. The overflow contingency plan also called for, among other things, "assign[ing] a minimum of two [Detention Control Officers] (more if warranted) to each overflow area," "[e]nsur[ing] two Supervisors (one on the desk and one roving) are assigned per shift," "▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇," requesting help from the Calexico Port of Entry "with processing Expedited Removals,

10

| | |
|---|---|
| Withdrawals, and Credible fear claim cases," and "request[ing] expedited ICE/ERO transportation of detainees." This March 2016 overflow contingency plan did not include metering or queue management. | |
| 33. As of April 2016, POEs in the San Diego field office were experiencing a significant increase in the number of inadmissible Haitian nationals seeking admission at ports of entry in the San Diego Field Office. | Pls.' Ex. 33 at 443. |
| 34. The Admissibility Enforcement Unit (AEU) at the San Ysidro POE is a unit designated for processing aliens without documents sufficient for lawful entry. | Pls.' Ex. 17 at 55:14-56:11 |
| 35. The maximum capacity contingency plan activated by the San Ysidro AEU involved using converted administrative spaces of the POE facilities as holding areas for family units and low-risk detainees. | AOL-DEF-00237660 (Defs.' Ex. 12) at 660; AOL-DEF-00392542 |
| 36. In May 2016, the San Ysidro POE converted a maintenance working area that was had been recently vacated by the General Services Administration (GSA) in-to a temporary holding room. | AOL-DEF-00761338 (Pls.' Ex. 34) at 339 |
| 37. In May 2016, the San Ysidro POE converted GSA offices into holding rooms and closed | Pls.' Ex. 35 at 271 |

11

| | |
|---|---|
| its "Old Port" building in order to process Haitian nationals. | |
| 38. "By May 2016, port leadership [at the San Ysidro POE] had converted office and administrative spaces to temporary holding areas to increase capacity to over 900 persons awaiting transfer to ICE/ERO detention." | AOL-DEF-00031442 |
| 39.     The conversion of administrative and other space in May 2016 temporarily increased the holding capacity of the San Ysidro POE's AEU to approximately 800 to 900 persons awaiting transfer to ICE/ERO for detention. | Pls.' Ex. 33 at 444; AOL-DEF-00030002 (Pls.' Ex. 26) at 002 |
| 40. In May 2016, the San Ysidro AEU increased its staffing on all three daily shifts from ███ ████████████ per shift. | Pls. Ex. 35 at 271 |
| 41. In May 2016, the San Ysidro POE requested, coordinated, and activated virtual processing with local POEs within the San Diego Field Office. | Pls.' Ex. 35 at 271 |
| 42. "Virtual processing" is "where some portion of the processing is done virtually." | Deposition of Randy Howe (Pls.' Ex. 4) at 168:3-5 |
| 43. Virtual processing involves using "technology to process inadmissibility cases." | Pls.' Ex. 17 at 216:2-6 |
| 44. In May 2016, the San Ysidro POE used vir- | AOL-DEF-00216804 (Defs.' Ex. 10) at 835. |

12

| | |
|---|---|
| tual processing to allow the El Centro Border Patrol Station, along with OFO officers from the San Diego, Los Angeles, Detroit, and Miami Field Offices to assist with the processing of migrants at San Ysidro. | |
| 45. In May 2016, the San Ysidro POE reassigned ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ to the AEU to assist with the processing of certain inadmissible aliens. | Pls.' Ex. 35 at 271 |
| 46. In May 2016, the San Ysidro POE reassigned 3 CBP Officers who spoke Creole to interview Haitian nationals. | Pls.' Ex. 35 at 271 |
| 47. In May 2016, the San Ysidro POE utilized several U.S. Border Patrol facilities, if those facilities were not already at capacity, to hold detainees. | Pls.' Ex. 33 at 445; Pls.' Ex. 34 at 339. |
| 48. In May 2016, all of the San Ysidro POE's I-94 permit processing was transferred to the Otay Mesa POE in order to secure additional workstations to conduct in person or virtual interviews. | Pls.' Ex. 34 at 339. |
| 49. Before the inception of metering at the San Ysidro POE in 2016, when the AEU was full, aliens without documents for lawful entry would queue in an area between the limit | Pls.' Ex. 17 at 159:12-19. |

13

ER-0332

| | |
|---|---|
| line at the port of entry and the primary inspection booths to wait until there was sufficient space in the AEU for their intake. | |
| 50. During her deposition, Mariza Marin testified that in late May 2016, this queue from the primary inspection booths at the San Ysidro POE stretched "clear south into Mexico." | Pls.' Ex. 17 at 160:10-12. |
| 51. In late May 2016, the San Ysidro POE surpassed 1,000 individuals in custody. | Pls.' Ex. 17 at 161:3-4 |
| 52. At one point in late May 2016, the San Ysidro POE stopped intake at the "international boundary" because there "was no space" left. | Pls.' Ex. 17 160:15-18 |
| 53. As of May 2016, San Ysidro was already in the middle of a multi-phase reconfiguration and expansion of the port that included the demolition and construction of the land POE, including primary and secondary inspection areas, administration and pedestrian buildings, and all other support structures. | Defs.' Ex. 11 at 1 |
| 54. In July 2016, as part of this port reconfiguration, San Ysidro POE opened a new West Pedestrian Building ("PedWest"). | Defs.' Ex. 11 at 1 |

14

| 55. On May 25, 2016, Johnny Armijo, then-Assistant Director of Field Operations, Border Security for the San Diego Field Office, sent an email listing actions that San Ysidro has "undertaken . . . to create additional space": used Border Patrol Stations to temporarily hold detainees awaiting transfer to ICE Enforcement and Removal Operations (ERO); transferred all accompanied and unaccompanied unit processing to the PedEast Old Port overflow processing area; transferred all permit (I-94) processing to the Otay Mesa POE in order to secure additional workstations for processing; and converted GSA's recently vacated maintenance working area at the PedEast Old Port into a temporary holding room. This email did not mention metering or queue management. | PX 34, Todd Owen Dep. Ex. 26 at AOL-DEF-00761338-39 |
|---|---|
| 56. On May 25, 2016, Robert W. Hood, then an Assistant Port Director for the San Ysidro POE, sent an email outlining a "Haitian Processing Action Plan" for the San Ysidro POE. The action plan called for the San Ysidro POE to use a nearby U.S. Border Patrol station to temporarily process and house Haitian detainees and to utilize CBP officers | AOL-DEF-00243099 |

15

| | |
|---|---|
| in Miami to conduct virtual processing. The action plan calls for OFO to staff the facility and to create a dedicated transportation team, taken from officers from units other than the AEU, to transport Haitian detainees from the San Ysidro POE to the U.S. Border Patrol station. The action plan does not list metering or queue management as a step that would be taken. | |
| 57. On May 25, 2016, Carlos Martel, the Acting Executive Director of Operations for OFO, informed Todd Owen of "mitigation actions" being taken to deal with an "increase in [credible fear] cases" at the San Ysidro POE "resulting in saturation of temp detention space" by forwarding the May 25, 2016, email from Johnny Armijo identified in Paragraph 21. | AOL-DEF-00034741 |
| 58. On May 26, 2016 at 5:38pm, Robert W. Hood, an Assistant Port Director for the San Ysidro POE, sent an email listing the actions that the San Ysidro POE had taken "since May 15, 2016 . . . regarding the current Haitian influx." This email lists steps such as activating the SYS AEU Max Capacity Contingency Plan, coordinating with nearby | AOL-DEF-00030271 |

16

ER-0335

| | |
|---|---|
| U.S. Border Patrol Stations, utilizing virtual processing, and dedicating "a separate expedited intake of families into the Old Port 2nd floor." It also notes that "[a]ll three shifts have been upstaffed from █ officers to █ officer per shift," and that "not all officers assigned from passenger can process cases" but are assigned to "intake, Detention Control, transportation and file preparation"; that there was a "temporary realignment of ███████████████████ to assist AEU." The email does not list metering or queue management as a step taken. | |
| 59. On May 25, 2016, Johnny Armijo, Assistant Director of Border Security for the San Diego Field Office, sent an email to Carlos Martel, the Acting Executive Director of Operations at OFO, noted that the San Diego Field Office "ha[d] received multiple media requests regarding the Credible Fear/Asylum activity at the San Ysidro Port of Entry. The inquiries are most likely attributed to our usage of a designated queuing area (Asylum line) in pedestrian that we utilize due to current infrastructure con- | PX 39, AOL-DEF-00034741 |

17

| | |
|---|---|
| straints that currently exist within our Admissibility Enforcement Unit." | |
| 60. On May 26, 2016, Jackie Wasiluk, a CBP Public Affairs representative, stated that she had received a voicemail from San Diego's local ABC affiliate "asking to confirm that there were hundreds of other than Mexican nationals at the San Ysidro claiming asylum." | AOL-DEF-00063869 |
| 61. Early on May 26, 2016, Sandra Dibble, a reporter at the San Diego Union-Tribune, sent several questions to Jackie Wasiluk, a CBP Public Affairs representative, concerning "several hundred people . . . sleeping on the floor of the [San Ysidro] pedestrian entrance," many of whom "appear[ed] to be from Haiti, or perhaps African countries, but not all." She stated that "[m]erchants on the Mexican side tell me that they've seen a large increase in groups of people coming and hoping to be let in since last weekend." She asked, among other questions, "[h]ow are these people getting to the border? Is there a new smuggling route or rings behind this?" She informed Ms. Wasiluk that she would be "writing an article, based on what | AOL-DEF-00063869 at 872 |

JOINT STATEMENT OF UNDISPUTED FACTS

ER-0337

| | |
|---|---|
| I saw with my own eyes, on what merchants in M[e]xico tell me, and what a couple of Haitians who were waiting to be let in told me when I spoke to them in Tijuana." | |
| 62. The afternoon of May 26, 2016, Dane W. Norman, the Congressional Liaison in CBP's Office of Congressional Affairs received several questions from staffers for U.S. Senator Barbara Boxer regarding reports of "a large number of people seeking asylum" at the San Ysidro POE. Senator Boxer's office noted that the "press is working on a story about what's happening. We'd like to know what [is] happening before it hits . . . the press." | AOL-DEF-00063869 at 870 |
| 63. On May 26, 2016, the San Diego Union-Tribune published a story entitled "Surge of Haitians at San Ysidro Port of Entry." The story noted that "more than 200 people were crowded inside the port's pedestrian entrance." | https://www.sandiegoun-iontribune.com/news/border-baja-california/sdut-haitians-flood-san-ysidro-port-entry-2016may26-story.html; AOL-DEF-00088702 |
| 64. In the morning on May 26, 2016, Sidney Aki, the Port Director of the San Ysidro POE, wrote: "We need to do all we can to get this under control. The media is asking about our influx of Haitians. We need to | AOL-DEF-00067551 at 552 |

19

ER-0338

| | |
|---|---|
| continue to process in a timely matter, we need to stage the subjects in our courtyard then place in our housing as efficiently as possible. If needed we should be reaching out to BP and placing subjects in th[ei]r facility. I would like to have this done immediately." | |
| 65. On May 27, 2016, Sidney Aki, Port Director for San Ysidro, wrote to supervisors on his staff: "Please guide our team to process case and only focus on processing case[s] at this time. Let's hold the line as best we can." | AOL-DEF-00303657; AOL-DEF-00321285 |
| 66. On May 28, 2016, Robert Hood, then Assistant Port Director of the San Ysidro POE, wrote: "I got a call late last night from [Port Director Sidney] Aki. . . . I have called the [watch commanders] and told them to not allow any asylees past the limit line at both [the San Ysidro] and [Otay Mesa POEs]. They can line up until we have room." | AOL-DEF-00741876 |
| 67. On May 28, 2016, Robert Hood, Assistant Port Director for the San Ysidro POE stated in an email to Sidney Aki, Port Director for the San Ysidro POE, that "this could go on for a while," and that if the San Ysidro POE intakes "the ■ from the shelter, the ■ [he] | AOL-DEF-00321316 |

20

| | |
|---|---|
| saw this morning, plus whatever else is arriving, we will be overcrowded." Mr. Aki responded in an email to his direct reports: "We should coordinate and bring small groups at a time and hold the line to prevent any from entering." Robert Hood, Assistant Port Director for the San Ysidro POE, responded to Mr. Aki: "Ideally, that is what we should do. We need some breathing room." | |
| 68. On May 28, 2016, Sidney Aki, Port Director for the San Ysidro POE, responded to Mr. Hood: "It would be a good symbol to the shelter/INMI to at least take a little at a time and meter it based on our capacity since they are helping us out. ███████████ ████████████ | AOL-DEF-00321325 |
| 69. On May 27, 2016, Robert Hood, then Assistant Port Director of the San Ysidro POE, wrote in response to a report that one of the shelters in Mexico was returning a van of asylum seekers to the limit line outside the San Ysidro POE: "We should hold them at the turnstile and not allow them to come into the line. We have no space and it is ugly." | PX 42, AOL-DEF-00243127 |
| 70. On May 29, 2016, Vona Rossilli, Watch | Pls' SJ Ex. 11 at 298, AOL- |

21

| | |
|---|---|
| Commander for Passenger Operations at the San Ysidro POE, wrote: "The asylee line in the pedestrian building is not being used at this time, there is a line staged on the Mexican side. . . . The Government of Mexico (GOM) is assisting with this increase, and has helped by setting up shelters in Tijuana to house those waiting to claim credible fear/asylum. The GOM officials will coordinate the transportation of those individuals from the shelters to the POE . . . ." She went on to state: "The GOM officials will coordinate the transportation of those individuals from the shelters to the POE through ▮▮▮▮▮▮▮ who in turn calls the on duty AEU supervisor and advises that a group of Asylees (currently all are Haitian) will be transported to the port and provide us with an ETA. We should be coordinating the arrival of this group [of individuals from shelters] as they are to be taken into AEU intake immediately and not placed in the existing Asylee line . . . . It's very important that we are all on the same page with the intake and processing of peo- | DEF-00030298 |

ER-0341

| | |
|---|---|
| ple arriving and claiming credible fear/asylum here at the port." Ms. Rossilli explained that "with these changes it will be important to continue to ensure that we are staffing the Old Port Limit Line to ensure that travels have documents to try and catch those coming to seek credible fear/asylum are identified and directed appropriately at the onset if feasible." | |
| 71. In late June 2016, as phase 2 of the GSA construction project began, the facilities that San Ysidro had used in May to create makeshift detention space for the overflow of undocumented migrants was demolished, cutting short-term holding capacity to ▮. | Pls.' Ex. 33 at 444; Defs.' Ex. 10 at 837; Defs.' Ex. 11 |
| 72. The June 2016 demolition "required the use of semi-mobile facilities to be set up, and the legal occupant capacity for the holding of inadmissible persons was again decreased to ▮ persons." | Pls.' Ex. 33 at 444; Pls.' Ex. 26 at 002 |
| 73. In July 2016, as part of this port reconfiguration, San Ysidro POE opened a new West Pedestrian Building ("PedWest"). | Defs.' Ex. 11 at 1 |
| 74. Officers at the San Ysidro were reminded on July 27, 2016, September 1, 2016, and November 15, 2016 that (1) On July 27, 2016, | AOL-DEF-00014041 (Pls.' Ex. 8) at 069, 070, 071 |

23

ER-0342

|  | September 1, 2016, and November 15, 2016, limit line personnel at the San Ysidro POE were sent emails stating that "[u]nder no circumstances will an asylum applicant be denied entry into the U.S." and to "direct all applicants to the Pedestrian West (Ped-West) facility for proper intake and processing." In those emails, Primary personnel were directed to take "any applicant for asylum encountered on primary [inspection]" should be into custody, "escorted to the security office, and transported to the Ped-West facility for proper intake and processing." No asylum applicant should be denied entry into the U.S. and officers should direct all applicants to the Pedestrian West (PedWest) facility for proper intake and processing; and (2) any applicants for asylum encountered at the primary inspection area were to be taken into custody and transported to the Pedestrian West facility for intake and processing. |  |
|---|---|---|
| 75. | On August 4, 2016, Todd Hoffman, the Executive Director of Admissibility and Passenger Programs at OFO, wrote of an upcoming call with DHS regarding the asylum | AOL-DEF-00023574 |

24

ER-0343

| | |
|---|---|
| process at the San Ysidro POE. Mr. Hutton had indicated in a prior email that the call was "a perfect opportunity" to get "ICE ERO more on board with the 'whole of government approach.'" Mr. Hoffman noted that "[h]opefully, the natural question [to ICE ERO] could be 'what contingency plans did you make when you knew you were going to lose 2/3 of your POE detention space?'" | |
| 76. The high number of migrants continued into the fall of 2016, began spreading east, and included more family units (FAMU or FMUA) and unaccompanied alien children (UAC) in addition to the Haitian nationals. | Deposition of Todd Owen (Pls.' Ex. 10) at 313:9-319:8 |
| 77. On September 3, 2016, the El Paso POE in Texas, which around that time reported a capacity of ███ persons, received 92 cases in one shift. | AOL-DEF-0799100 (Defs.' Ex. 13) at 100; AOL-DEF-00797893 (Defs.' Ex. 14) at 893-94 |
| 78. Between September 4 and September 13, the El Paso POE averaged 232 subjects in custody per day. | Defs.' Ex. 14 at 894 |
| 79. On September 9, 2016, at 7:48 am, the El Paso POE had "an all-time high of 263 detainees in custody, with 87 pending processing." | AOL-DEF-00797737 (Defs.' Ex. 15) at 737 |

ER-0344

| | |
|---|---|
| 80. During [the] spike [at the El Paso POE between September 4 and September 13], an average of 23% FAMU cases were held at [the El Paso] POE in excess of 72 hours pending placement." | Defs.' Ex. 14 at 894 |
| 81. On September 13, 2016, Carlos Gonzalez, the Attaché for CBP at the U.S. Embassy in Mexico City, sent an email explaining: "████████████████████████ ████████████████████████ ████████████████████████ ████████████████████████ ████████████████████████ ████████████████████████ ████████████████████████ ████████████████████████ ██████████████." | PX 50, AOL-DEF-00762746 |
| 82. The El Paso POE reported on September 14, 2016, that it was "providing up to a 1,000 meals a day using microwaves," but that it was "not equipped for" doing so. | Defs.' Ex. 14 at 894 |
| 83. On September 14, 2016, the El Paso Field Office also reported: "Active caseload management is being performed by transporting cases for processing to less affected Ports. However, the increased transports between | Defs.' Ex. 14 at 894 |

26

ER-0345

| | |
|---|---|
| POEs, to ERO facilities, and to the Airport is straining OFO vehicle and personnel resources." | |
| 84. On September 14, 2016, the El Paso Field Office reported, "The El Paso Field Office has no ground transportation contract. All transports are performed by OFO officers." | Defs.' Ex. 14 at 893 |
| 85. The El Paso Field Office reported on September 14, 2016, that it was scheduled to detail eight officers to San Diego and Tucson on October 3, 2016. | Defs.' Ex. 14 at 894. |
| 86. In a September 16, 2016 presentation, CBP noted that "Mexico is assisting with the flow of Haitians and Other than Mexican nationals" into POEs within the San Diego Field Office and that Mexico was "metering … Haitians into the POEs of [San Ysidro] and [Calexico]." | AOL-DEF-00023715 at 718 |
| 87. On September 17, 2016, Pete Flores, the Director of Field Operations for OFO's San Diego Field Office, wrote to John Wagner, the Deputy Executive Assistant Commissioner: "We are currently operating under an agreement with Mexican Immigration to limit the flow of [other than Mexicans] (Haitians included) to the port[s] of San Ysidro | PX 48, AOL-DEF-00090986 |

27

| | |
|---|---|
| and Calexico due to facility and processing constraints. The agreement in San Ysidro is current ███ a day and in Calexico it is ███ a day[;] these numbers are mostly Haitians." | |
| 88. On September 27, 2016, the El Paso POE reported 361 detainees in custody "as more FAMU and UAC continue[d] to arrive." | AOL-DEF-00806817 (Defs.' Ex. 17) at 817. |
| 89. On September 28, 2016, the El Paso POE reported that it had: (1) "re-directed" "AT-CET Supervisors and Officers" "to assist with PCS, PVP and transportation duties until further notice[;]" (2) "re-directed" "Training Officers and Supervisor" "to assist with PCS and PVP duties[;]" (3) "suspended" training and "assigned [trainees] to assist with PCS or PVP duties[;]" (4) "re-directed" firearms staff "to assist with transportation and PCS duties[;]" and (5) "re-directed" CBP techs assigned to the Administration Office "after 1000 hours to each bridge location to assist with feeding and other duties as necessary to keep the Officers focused on processing." | AOL-DEF-00890684 (Defs.' Ex. 18) at 684 |
| 90. On September 30, 2016, the number of detainees at El Paso surpassed 400. | AOL-DEF-00806830 (Defs.' Ex. 20) at 830 |
| 91. On September 30, 2016, Hector Mancha, | Defs.' Ex. 20 at 830 |

28

ER-0347

| | |
|---|---|
| Director of Field Operations for the El Paso Field Office reported to Beverly Good that he would "continue [working] with local ERO in trying to relieve the [El Paso POE] of these [Haitian] detainees. If there is anything you can do in messaging at HQ the urgency of finding beds for our local needs versus using bed space for other AOR[s] would be appreciated." | |
| 92. According to an October 21, 2016 presentation, in fiscal year 2016 (October 1, 2015 to September 30, 2016), the southwest border POEs encountered more than 150,800 inadmissible aliens, a 70% increase over FY 2014. | AOL-DEF-0003554 (Defs.' Ex. 32) at 562 |
| 93. On October 3, 2016, the El Paso Field Office reported that a "surge" of UACs and FAMUs continued to "create adverse impacts to port operations, as UACs and FAMUs were being placed throughout administrative spaces of the port." | AOL-DEF-00893755 (Defs.' Ex. 21) at 755. |
| 94. On October 3, 2016, the El Paso Border Patrol Sector, which does not operate POEs, reported that its "current operational tempo was very high" it was "barely staying afloat" with processing. It requested that the El | AOL-DEF-00802270 (Defs.' Ex. 22) at 270 |

29

ER-0348

| | |
|---|---|
| Paso Field Office move its detainees out of Border Patrol's Paso Del Norte facility and into others because the Paso Del Norte facility was "currently out of policy . . . by holding subjects in non-holding cells." | |
| 95. On October 3, 2016, the Brownsville POE reported that it "continue[d] to experience an increasing surge of [UACs, family units] and EF/CF cases. This surge continues to create adverse impacts to port operations . . . ." The port reported that it had reassigned: (1) Port Support Personnel "to assist with transportation and vehicle primary;" and (2) CBP administrative staff to assist "(feeding, restocking supplies, etc.)," which allowed officers "to focus on case processing." | AOL-DEF-00896692 (Defs.' Ex. 23) at 692 |
| 96. On October 4, 2016, "Hurricane Matthew struck Haiti . . . as a Category 4 hurricane. The combined effects of wind, coastal flooding and rain caused heavy flooding, landslides, and the destruction of a great deal of infrastructure, agricultural crops and natural ecosystems." | Glabe Dep. Ex. 321 at 3. |
| 97. On October 5, 2016, the Deputy CBP Commissioner wrote, the Deputy Commissioner McAleenan asked ICE about increasing ICE | AOL-DEF-00044527 (Defs.' Ex. 30) |

30

| | |
|---|---|
| personnel and ICE bedspace. The Acting ICE Director responded that the agency had 39,650 individuals in custody, the "highest level in [its] history." | |
| 98. On October 6, 2016, Chiara Cardoletti-Carrol, Deputy Regional Representative for the USA and Caribbean of the United Nations High Commissioner for Refugees (UN-HCR), issued a report based on UNCHR's site visit at the San Ysidro POE during the week of September 12, 2016. | PX 12, AOL-DEF-0046740; PX 51 AOL-DEF-00339435 |
| 99. The October 6, 2016 UNHCR report stated that "the Mexican press reports that at least 950 Haitians, requested appointments at the San Ysidro port of entry on September 12 alone." | PX 12, AOL-DEF-0046740; PX 51 AOL-DEF-00339435 |
| 100. The October 6, 2016 UNHCR report stated that "[a]ccording to NGOs, Haitians have been arriving in increasing numbers at other ports of entry in recent weeks, such as Calexico, which is far less resourced than San Ysidro." | PX 12, AOL-DEF-0046740; PX 51 AOL-DEF-00339435 |
| 101. In the October 6, 2016 UNHCR report, representatives from UNHCR stated that CBP reports that "most Haitian nationals seeking admission at the San Ysidro port | PX 12, AOL-DEF-0046740; PX 51 AOL-DEF-00339435 |

31

ER-0350

| | |
|---|---|
| of entry are not seeking asylum. While some may fear return to Haiti, CBP reports that the majority are not expressing fear at the port of entry. Instead, they are expressing interest in working and/or reuniting with family in the US. This was also confirmed by the anecdotal accounts of a group of Haitian nationals in CBP custody. A large majority of the Haitians are coming from Brazil. Many had children born there.". | |
| 102. In the October 6, 2016 UNHCR report, UNCHR stated that it had learned that "[a]t least half of CBP's staffing and space previously dedicated to processing asylum-seekers was being used to process Haitian parole cases. A multi-year construction project is further limiting CBP's asylum processing capacity." | PX 12, AOL-DEF-0046740; PX 51 AOL-DEF-00339435 |
| 103. In the October 6, 2016 UNHCR report, UNCHR found that "both CBP and ICE in Southern California" were "doing what they [could] with existing resources to process the Haitians expeditiously and humanely and maintain regular processing of asylum seekers." Ms. Cardoletti-Carrol | PX 12, AOL-DEF-0046740; PX 51 AOL-DEF-00339435 |

32

| | |
|---|---|
| wrote that UNHCR "was particularly impressed to see the sincere efforts made by the various DHS counterparts at the border to ensure access to the United States protect for vulnerable persons despite ongoing capacity challenges and increasing number of arrivals." | |
| 104.    In the October 6, 2016 UNHCR Report, Ms. Cardoletti-Carrol, wrote that CBP should "[u]rgently reconsider the use of a metering system (appointment system) for asylum-seekers and other vulnerable populations approaching the [San Ysidro] port of entry." | PX 12, AOL-DEF-0046740; PX 51 AOL-DEF-00339435 |
| 105.    On October 10, 2016, the Port of San Luis, part of the Tucson Field Office, reported that 65 individuals were "lined in the pedestrian pathway from Mexico to our pedestrian entrance," which "severally limit[ed] the space" the port had and needed "for the field workers and the general travelling public." | AOL-DEF-01265180 (Defs.' Ex. 27) at 180 |
| 106.    On October 14, 2016, the Laredo Field Office reported that "CBP personnel are being reassigned to support the influx, | AOL-DEF-00903363 (Defs.' Ex. 24) at 363 |

33

| | |
|---|---|
| resulting in an impact to other critical areas." Specifically, the Field Office reported that it had: (1) reassigned "personnel to assist with alien transportation and support daily port operations;" (2) reassigned "CBP administrative staff to assist with alien special needs (feeding, restocking supplies, etc.) allowing our officers to focus on case processing;" (3) farm[ed] out aliens to neighboring ports of entry to assist with case processing;" (4) "provid[ed] internal Field Office TDY support to the Port of Hidalgo (one supervisor and ten officers) to assist with case processing." | |
| 107. On October 16, 2016, at 7:14 pm, the Port of Hidalgo reported that "got hard hit with arrivals yesterday [and] were up to 185 [individuals in custody]," and had to deal with medical issues related to one of the individuals in custody, which caused delays in processing. | AOL-DEF-00906636 (Defs.' Ex. 25) at 636 |
| 108. On October 17, 2016, the CAT reported that San Diego Field Office was utilizing 155% of its capacity, the Tucson Field Office was utilizing 231% of its capacity, the El Paso Field Office was using 99% of | AOL-DEF-00793584 (Defs.' Ex. 31) at 585 |

34

ER-0353

| | |
|---|---|
| its capacity, and the Laredo Field Office was utilizing 106% of its capacity. | |
| 109.　　On October 18, 2016, Deputy CBP Commissioner Kevin McAleenan sent an email to Todd Owen, the Executive Assistant Commissioner for OFO; Mark Morgan, the Chief of U.S. Border Patrol; and others entitled "Haitian Migrants – Updates and policy decision re El Centro Processing Center concept."　In that email, Mr. McAleenan stated: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ | PX 54, AOL-DEF-00802340 at 340 |

35

ER-0354



| | |
|---|---|
| ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ Mr. McAleenan went on to state that he ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ | |
| 110. On October 18, 2016, then-CBP Deputy Commissioner Kevin McAleenan emailed Mark Morgan, then-Chief of U.S. Border Patrol, and Todd Owen, then-Executive Assistant Commissioner of OFO concerning news that ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ | AOL-DEF-00525116 |

36



| | |
|---|---|
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | 111.    On October 18, 2016, CBP Deputy | AOL-DEF-00525116    (Pls.' |
| 26 | Commissioner  McAleenan  reported  that | Ex. 47) at 116-17 |
| 27 | |
| 28 | 37 |

ER-0356

| | |
|---|---|
| ICE ERO had over 2,000 Haitians in custody and "has crested 41,000 beds overall." | |
| 112.     On October 19, 2016, at 7:33 am, the Nogales POE reported that it had 20 adult male Haitian Nationals at the DeConcini crossing.  The port had "brought in 3 so far and the remainder are waiting outside the turnstile on the Mexican side.  The port reported that it would "bring in and process as we can facilitate, due to current PCU detention status."  Later that same morning, the port reported that it would use the Deconcini Passport Control Unit/Area to process Haitian nationals and would use the Mariposa POE (PCU Area) to hold Haitians awaiting processing. | AOL-DEF-01266827  (Defs.' Ex. 28) at 827 |
| 113.     On October 25, 2016, the Port of Hidalgo reported that, as of 9:45 am, "every seat in the Mainhouse" was taken. "[W]e keep processing as fast as possible . . . but they keep arriving!!" | AOL-DEF-00896989  (Defs.' Ex. 26) at 989 |
| 114.     On October 25, 2016, the Director of Field Operations for the Tucson Field Office reported that the ports of San Luis and Nogales had "far exceeded capacity and are in desperate need of relief." | AOL-DEF-01393904  (Defs.' Ex. 29) at 904 |

38

ER-0357

| | |
|---|---|
| 115. On October 30, 2016, Randolph "Tex" Alles, Acting Executive Assistant Commissioner of CBP's Enterprise Services, wrote: "[The] [d]irection from [CBP Commissioner Gil Kerlikowske] is to continue El Centro work and a new task of looking at bringing the Nogales[, Arizona] facility from 2014 back on line." | AOL-DEF-00258173 at 175 |
| 116. On October 31, 2016, a meeting was held at DHS' headquarters, the Nebraska Avenue Complex. After that meeting, then-DHS Secretary Jeh Johnson and then-CBP Commissioner Gil Kerlikowske "approved moving forward with the plan to establish the infrastructure that would support ██████ ████████████████████████" in a "FEMA tent city." | PX 55, AOL-DEF-00258173 at 173 |
| 117. In October 2016, the CBP Commissioner established a Crisis Action Team (CAT). | Defs.' Ex. 33 at 4 |
| 118. The purpose of the CBP CAT was to "to address the [] migrant surge" and to "mitigate impacts to mission essential functions." "Deputy Chief Gloria Chavez (U.S. Border Patrol) [was] designated by the CBP | AOL-DEF-00019710 (Defs.' Ex. 34) at 710 |

39

| | |
|---|---|
| Commissioner to oversee the CBP mass migratory response." | |
| 119.    The CAT was "composed of representatives from various CBP components" and DHS components, such as "ERO." "The CAT team combined data and intelligence gathered by different CBP offices into a daily report, which it provided to CBP leadership. The CAT team also briefed the leadership daily on the data and what it was doing to address the surge." "The CAT team considered several approaches to address the overcrowding." | Defs.' Ex. 33 at 4.<br><br>Pls.' Ex. 4 at 113:14-114:9 |
| 120.    Around the time it was developed, the CAT began reporting on DHS-coordinated plans "for addressing the surge of migration along the Southwest border." | *See e.g.* AOL-DEF-00904529 (Pls.' Ex. 61) at 530 |
| 121.    DHS led coordination efforts for a multi-phased plan to "address the surge of migration along the Southwest border": (1) in Phase 1, "ICE/ERO will increase the rate of custodial transfer from CBP; (2) in Phase 2, to run semi-concurrently with Phase 1, potentially opening processing facilities in El Centro, California, and Nogales, Arizona; (3) in Phase 3, ██████████ | Pls.' Ex. 61 at 530 |

40



| , erecting a larger soft-sided holding facility, ████████████████ ████████████████ (4) in Phase 4, █ ████████████████, developing contingency planning for four soft-sided facilities adjacent to POEs to be rolled out respectively in ████████ ████████████████ ██████████. | |
|---|---|
| 122. On November 1, 2016, DHS Secretary Jeh Johnson held a telephone conference. After the call, "CBP was asked to look at soft-sided housing that can be stood up at CBP locations (POEs and [Border Patrol] Stations)." | PX 56, AOL-DEF-00019314 at 316 |
| 123. On November 1, 2016, U.S. Border Patrol Deputy Division Chief and CBP Crisis Action Team (CAT) head Gloria Chavez sent an email entitled "CBP Migration CAT Update 11/01/16." In that email, Ms. Chavez noted that the "El Centro Processing/Detention Facility will undergo a soft opening on November 14th and a full opening November 28th." In the same email, Ms. Chavez noted that DHS was examining | AOL-DEF-00019314 at 315-16 |

41

ER-0360

| | |
|---|---|
| "build[ing] out capacity within 30-days . . . [at] multiple sites [including] San Marcos, TX, Mission, TX, and Sharpe Army Depot near Stockton, CA." | |
| 124. On November 1, 2016, Blas Nunez-Neto, then-Senior Advisor to CBP Commissioner Gil Kerlikowske, in an email entitled "IJ and Asylum Surge," reported ███████ ████████████████████████ ████████████████████████ ████████████████████████ ████████████████████████ ████████████████████████ ████████████████████████ ████████████████████████ ████████████████████████ ████████████████████████ ████████████████████████ ████████████████████████ ████████████████████████ ████████████████████████ ███████████████████ He reported that, ████████████ ████████████████████████ ████████████████████████ ███████████████████." He further wrote: ███████████ | PX 57, AOL-DEF-00043575 at 577-578 |

42

| | |
|---|---|
| ██████████████████ | |
| ██████████████████ | |
| ██████████████████ | |
| ██████████████████ | |
| ██████████████████ | |
| ██████████████████ | |
| ███████████ | |
| 125.     On November 1, 2016, Todd Owen, the Executive Assistant Commissioner of OFO, "attended several migration meetings . . . with [CBP Commissioner Gil Kerlikowske] and staff," as well as "discussions with [DHS Secretary Jeh Johnson] and others with [White House] staff." | AOL-DEF-00258210 at 211 |
| 126.     During a 9am ET telephone conference on November 2, 2016 with CBP Commissioner Gil Kerlikowske and DHS. In an email describing that call, EAC Owen stated that OFO and U.S. Border Patrol were "directed to identify POEs and [Border Patrol] stations where soft sided tents with cots, shower trailers, [and] eating areas[] can be deployed in the next 7-10 days." | PX 60, AOL-DEF-00815228 at 228 |
| 127.     On November 2, 2016, Todd Owen, the Executive Assistant Commissioner of OFO, wrote to the four Directors of Field | AOL-DEF-00019314 at 315 |

43

ER-0362

Operations overseeing all POEs on the U.S.-Mexico border. In that email, Mr. Owen stated that "[a]fter several frustrating weeks, we are finally seeing engagement by senior leaders at the department and in the administration on our migration and detention issues." EAC Owen noted that "[s]everal efforts [are] underway, from building soft sided tents in several locations in Texas and California, ████████████████████ ████████████████████████ ████████████  Mr. Owen stated that "[t]he OFO position" is that "building soft sided tents at ports of entry or [Border Patrol] stations . . . is not an option for us. We lack the physical space and more importantly the sanitary items like showers and bathrooms for large scale housing in a POE." Mr. Owen also noted that one effort was to move away from expedited removal to regular removal proceedings, "██████████████ ████████████████████████ ████████████████" He noted "[w]e all are concerned with the pull effect this decision to almost immediately release family unites would have."

44

ER-0363

| | |
|---|---|
| 128. According to a November 2, 2016 email titled "CBP Migration CAT Update 11/02/16," "CBP [was] actively exploring the implementation of soft-sided facilities adjacent to Ports of Entry[] and Border Patrol Stations to relieve stress on aliens in custody. Priority [was] being given to the POEs due to their operational footprint." The same email noted that CBP was also exploring building larger "soft-sided facilities" at ██████████████████████ ████████████████████. The same email noted that "[t]he El Centro Processing Center is scheduled for a soft opening November 14th and a hard opening November 28th." That Center "will support the Calexico port of entry with processing single adult Haitians," and "[A]ll Haitians will be processed for expedited removal and immediately turned over to ICE/ERO." | AOL-DEF-00272845 at 845 |
| 129. On November 4, 2016, Gloria Chavez stated in an email titled "CBP Migration CAT - COB 11/04/16," that "the [Office of Facilities and Asset Management], in coordination with U.S. Border Patrol and the Of- | PX 61, AOL-DEF-00904527 at 530 |

45

JOINT STATEMENT OF UNDISPUTED FACTS

| | |
|---|---|
| fice of Procurement, continue[d] to complete the milestones" for opening the Nogales Processing Center. Ms. Chavez also noted that "[r]ental furniture" would be delivered to the El Centro Facility on "11/9." | |
| 130.    On November 7, 2016, a telephone conference was held with OFO's San Diego Field Office management "to discuss the 'soft opening' of the El Centro Processing [C]enter on 11/14/16." A November 7, 2016, Crisis Action Team update email noted that the plans for the soft opening included "[a] total of █ [ICE] ERO Officers" to "arrive in El Centro on 11/14/2016"; and a "specific line-up of ERO resources to support (e.g. buses/vans?)." The email also reported: "San Ysidro and Calexico are at capacity and are prioritizing intake to manage the flow; still utilizing USBP Imperial Beach Station and Barracks 5 for holding." | PX 62, AOL-DEF-00272790 at 790 |
| 131.    On November 7, 2016, the CAT reported that it held "a 1230 meeting to coordinate plans and requirements for site assessments on" two potential Texas holding | Pls.' Ex. 62 at 790, 791 |

46

| | |
|---|---|
| facilities (Tornillo and San Marcos), in addition to establishing the conditions that would trigger the establishment of those soft-sided facilities. | |
| 132. On November 7, 2016, the CAT reported that it was assessing and evaluating the usage of the Ysleta Del Sur Pueblo Facility on reservation land in El Paso, Texas as a potential site to temporarily hold FMUAs. The CAT was also evaluating the requirements at the Nogales Processing Center regarding the "transferring of bodies to the [Nogales Processing Center] from other locations." | Pls.' Ex. 62 at 790 |
| 133. November 8, 2016 was election day for the 2016 presidential election. Early in the morning of November 9, 2016, it became apparent that Donald Trump had won the presidential election. | Glabe Dep. Ex. 325; Glabe Dep. at 114:20-115:2 |
| 134. On November 9, 2016, Gloria Chavez sent an email entitled "RE: CBP MIGRATION CAT – COB 11/09/16" to multiple recipients. In that email, Ms. Chavez wrote: "El Centro Facility will NOT have a soft opening on 11/14 and will NOT go live on | PX 65, AOL-DEF-00272878 at 878-879 |

47

ER-0366

| | |
|---|---|
| 11/28. Planning and contracting will continue but NO [temporary duty] personnel from OFO and ICE will be deployed." Ms. Chavez also stated: "CBP CAT [Crisis Action Team] discussed El Centro Facility Plans with ERO. ERO will not be able to fulfill a commitment of daily ███████ out of El Centro Facility due to not being able to secure the Cibola County Detention Center in New Mexico as a viable option to hold Haitians. Therefore, as noted above, the El Centro Facility will be placed on pause for TDY personnel until further notice." | |
| 135.     On November 9, 2016, the CAT informed CBP leadership that the El Centro facility would not have a soft opening nor go live, but noted that CBP "will continue to work and have [the] facility ready for when trigger is pulled to staff it." | Pls.' Ex. 65 at 879 |
| 136.     Upon learning that the El Centro project was on hold, Todd Owen said on November 9, 2016, that "the TDY's tomorrow" should "stand down [t]emporarily, with a likely future deployment." | Pls.' Ex. 65 at 878 |

48

ER-0367

| 137. On November 9, 2016, the CAT discussed other options for developing soft-sided facilities at Tornillo and contingency planning for a facility at Otay Mesa and the Brownsville Border Patrol station. | Pls.' Ex. 65 at 879 |
|---|---|
| 138. Late on November 9 or early on November 10, 2016, Gloria Chavez responded to an email from Beverly Good at OFO asking about the status of the El Centro facility: "Tomorrow – [CBP Commissioner Gil Kerlikowske and Deputy CBP Commissioner Kevin McAleenan] will socialize with [DHS Secretary Jeh Johnson] and explain our challenge." Ms. Chavez stated "[g]ive me until tomorrow after our NAC meeting so we know for sure that S1 is not going to 'force' ICE to do something different (doubt it as the issue is bed space)." | AOL-DEF-00272878 at 878 |
| 139. On November 10, 2016 at 1:15pm, Johnny Armijo, then Assistant Director of Field Operations, Border Security for OFO's San Diego Field Office, wrote: "The issues surrounding the influx is extremely fluid involving the Department (DHS) and White House." He added: "[T]here are mul- | PX 66, AOL-DEF-00314214 at 214 |

49

| | |
|---|---|
| tiple lines of effort in play to address the sustained influx we are currently experiencing and [those efforts] require priority attention." | |
| 140.    On November 10, 2016, CBP Deputy Commissioner Kevin McAleenan attended a meeting at DHS' Nebraska Avenue Complex Headquarters.  During the meeting, Mr. McAleenan discussed increasing "efforts to meter arrivals of non-UAC [unaccompanied children], non-Mexican CF [credible fear] cases mid-bridge. . . . This will be mostly CENTAM [Central American] families." | PX 67 AOL-DEF-00272936 at 936 (date of meeting); PX 68 AOL-DEF-00353880 |
| 141.    On November 10, 2016 at 2:48pm, Gloria Chavez wrote to Beverly Good: "I just received word from [CBP Commissioner Kerlikowske's] staff that [the] proposal [to  increase metering efforts] that [CBP Deputy Commissioner Kevin McAleenan] introduced to [DHS Secretary Johnson] for consideration earlier today was approved by [DHS Secretary Johnson] and to make notification to OFO.  So please proceed with informing your OFO field leadership at some of our Texas POEs of this approval so they can start this new operational | PX 67, AOL-DEF-00272936 at 936 |

50

ER-0369

| | |
|---|---|
| alignment to bring relief at the POEs." | |
| 142.　　On November 11, 2016, Deputy Commissioner of CBP Kevin McAleenan informed OFO Executive Assistant Commissioner Todd Owen and OFO Deputy Executive Assistant Commissioner John P. Wagner of the briefing with DHS Secretary Jeh Johnson via an email with the subject line "Metering in TX." Mr. McAleenan wrote: "Just wanted to touch base directly because I'm not sure it was conveyed with full clarity from CAT. [CBP Commissioner Kerlikowske] and I briefed [DHS Secretary Johnson] that we wanted to increase efforts to meter arrivals of non-[unaccompanied children], non-Mexican [credible fear] cases mid-bridge. . If INAMI [Mexican immigration] is not willing to help, we will push up to the line and hold them back there. This will mostly be [Central American] families." | PX 68, AOL-DEF-00353883 |
| 143.　　On November 11, 2016 at 2:55pm, Todd Owen wrote to Kevin McAleenan (then the Deputy Commissioner of CBP): "Deputy, we are on board with the metering. Wanted to express this verbally with the | AOL-DEF-00272935　　(Pls.' Ex. 69) at 935 |

51

ER-0370

| | |
|---|---|
| [southwestern border] [Directors of Field Operations] as opposed to a written record. I thought we had advised them via telephone last night to start, and this would be among the various custody issues to discuss more in depth next week." | |
| 144.    On November 11, 2016 at 3:00pm, Deputy Commissioner Kevin McAleenan wrote to Todd Owen, the Executive Assistant Commissioner of OFO, and John Wagner, the Deputy Executive Assistant Commissioner of OFO: "The implementation is subject to your discretion and [the Directors of Field Operations] (and [Port Director]s) on what will work best operationally and whether it is required on any given day or any specific location. We should try to bring INAMI on board with us and certainly give them a heads up.  I just want our folks to have an additional tool to keep conditions safe and working at our POEs." | PX 69, AOL-DEF-00272935 at 935 |
| 145.    On November 11, 2016 at 6:55pm, William Brooks, the Director of Field Operations for the Tucson Field Office, sent an email to the port directors of POEs in OFO's Tucson Field Office with the subject line | AOL-DEF-01266662 at 662 |

ER-0371

| | |
|---|---|
| "Metering Flow." Mr. Brooks wrote: "Today I received the following guidance from HQ. HQ asked that each Port management work with their Mexican counterparts to meter the [flow] of Haitians, South and Central Americans. While this is being done for Haitians at most locations it is not so for South and Central Americans." | |
| 146. On November 11, 2016, the El Paso POE reported "406 detainees in custody." | AOL-DEF-00799100 (Defs.' Ex. 13) at 100 |
| 147. The night of November 11, 2016, the El Paso POE began metering "at the middle of the bridge at all 3 crossing locations." | Defs.' Ex. 13 at 100 |
| 148. On November 11 and 12, 2016, the Tucson, Laredo, and El Paso Field Offices transmitted instructions to their ports authorizing metering. | AOL-DEF-01266662 (Pls.' Ex. 70) at 662 (email from Tucson Field Office) AOL-DEF-01267496 (Pls.' Ex. 71) at 496 (email discussing metering at El Paso) AOL-DEF-00814130 (Defs.' Ex. 36) (email from Laredo Field Office to Port Directors) |
| 149. When metering began in November 2016, metering practices were not standardized. | Expert Report from Stephanie Leutert (Pls.' Ex. 20), dated December 10, 2019, at ¶ 47 |

53

| | |
|---|---|
| 150. On November 12, 2016, Frank Longoria, Assistant Director of Field Operations for Border Security in OFO's Laredo Field Office, wrote to port directors in the Laredo Field Office: "At the request of [the Commissioner] and [Deputy Commissioner of CBP], you are to meet with your [Mexican immigration] counterpart and request they control the flow of aliens to the port of entry. ███████████████████ ███████████████████ ███████████████████ ██████ This is similar to what San Diego is doing." | PX 13, AOL-DEF-00576607 |
| 151. On November 15, 2016, U.S. Border Patrol Chief sent an email entitled "CBP MIGRATION CAT – COB 11/15/16" to multiple recipients. In the email, Ms. Chavez wrote: "As of this evening, 11/15/16, CBP leadership has decided to place the Nogales Processing Center on **HOLD** status until further notice. At this time, we are going to conduct an assessment on the cost-benefit and whether this is a viable option operationally as there are other | PX 72, AOL-DEF-00272938 at 939 |

54

ER-0373

| | |
|---|---|
| soft-sided facilities at various strategic locations along the Southwest border under consideration at this time." | |
| 152. On November 15, 2016, the Acting Deputy Executive Director of Admissibility and Passenger Programs (APP) notified the Assistant Director of Field Operations at the Laredo Field Office that "if any individual arrives at POE, we cannot just send them back to MX to wait to be processed but must process them upon arrival." | Defs.' Ex. 36 at 130 |
| 153. On November 15, 2016, CAT informed CBP leadership that a Notice to Proceed was issued the night before "to erect a temporary CBP processing center" at Tornillo "with 500 bed capacity with option to expand." | Pls.' Ex. 72 at 939 |
| 154. CBP stood up two soft-sided facilities, one on November 25, 2016, in Tornillo, Texas, and the other on December 10, 2016, in Donna, Texas. | Defs.' Ex. 33 at 5 |
| 155. Between November 26, 2016 and February 14, 2017, the Tornillo facility held a total of 5,721 individuals. The Tornillo facility went to "stand-by" mode on February 14, 2017. | Defs.' Ex. 33 at 6 |

55

ER-0374

| 156. | Between December 10, 2016 and February 10, 2017, the Donna facility held 2,172 individuals. The Donna facility went to stand-by status on February 10, 2017. | Defs.' Ex. 33 at 6 |
| 157. | In a November 17, 2016 email, Fernando Thome, a CBP officer in OFO's El Paso Field Office, explained that the El Paso POE was conducting metering "at the top of the bridge or the base of the bridge on the U.S. side, therefore all aliens are being turned away and given appointments while on the U.S. side of the bridge." | AOL-DEF-00799450 at 450 |
| 158. | On November 18, 2016, Carlos Gonzalez, the Attaché for CBP at the U.S. Embassy in Mexico City, wrote: ███████████ ████████████████████ ████████████████████ ████████████████████ ████████████████████ ████████████████████ | PX 71, AOL-DEF-01267496 at 496 |
| 159. | The morning of November 18, 2016, Greta Campos, the Acting Director of Field Programs at OFO noted that OFO was "working with the port[s] to address" the instances of ports turning away people on U.S. soil. | AOL-DEF-00562927 (Defs.' Ex. 37) at 927 |

56

| | |
|---|---|
| 160.      On November 18, 2016, the Executive Assistant Commissioner emailed Deputy Commissioner McAleenan, notifying him that OFO would address instances of turning away people on U.S. soil at the Hidalgo POE and "have the officers push back to the actual boundary line on the bridge." | AOL-DEF-00370791 (Defs.' Ex. 38) at 791 |
| 161.      On November 22, 2016, Hector Mancha, the Director of Field Operations for OFO's El Paso Field Office stated in an email: "Metering is definitely working. Overall numbers for poes are significantly down since initiating metering while in comparison the BP numbers for between ports are showing an upward trend." The email also stated: "El Paso started out by giving appointments and has since course corrected and stopped with the appointments and is now just advising immigrants to come back at a later time if the poe is at detention capacity." | PX 106, AOL-DEF-00081089 |
| 162.      During the first week in which the El Paso POE was metering, the port learned that its officers "weren't stationed as close to the international boundary as they were supposed to, and there were shifts" in which | Deposition of Samuel Cleaves (Pls.' Ex. 102) at 137:17-138:3. |

| | |
|---|---|
| the officers were not at the international boundary. The port had "some corrections to make in the first week of implementation." | |
| 163.    The El Paso POE at first in November 2016 had "people stepping onto U.S. soil" to when the port was metering but then "corrected" its metering practices. | Pls.' Ex. 102 at 207:9-14 |
| 164.    When it began metering, the El Paso POE "started out be giving appointments." By November 22, 2016, the port had "course corrected . . . and stopped with the appointments and is now just advising immigrants to come back at a later time if the POE is at detention capacity." | AOL-DEF-00022783 (Defs.' Ex. 39) at 783 |
| 165.    On November 22, 2016, Beverly Good wrote to Todd Owen, the Executive Assistant Commissioner of OFO, providing information about how the four Southwest Border field offices were metering at that time. With respect to the Laredo Field Office, Ms. Good reported: "Laredo- Laredo gives them an appointment (verbally) and tells them when to come back. Officers are on the bridge now as well but the metering seems to have had a deterrent effect and they | PRX 1, AOL-DEF-00032389; DX 39, AOL-DEF-00022783 |

58

| | |
|---|---|
| are not seeing too many cases daily so they don't really have to meter at the moment. However, they are prepared to do so at any moment their capacity reaches its maximum." | |
| 166.     On December 23, 2016, William Haralson, an official at Chapter 149 of the National Treasury Employees Union ("NTEU"), sent an email to CBP Officers Jessica Ibara, Christopher Perez, Sylvia Guerra, and Abraham Pena with the subject line "Incident 12/6/2016." Mr. Haralson wrote: "I am contacting you all regarding an incident that occurred on December 2, 2016 at the Pharr, Texas [POE]. The Union has received reports that a large group of undocumented aliens were apprehended at the Pharr [POE] and were subsequently transported to the Hidalgo [POE] and returned to Mexico without any type of adverse action. Apparently, Supervisors . . . have initiated this practice of circumventing the political asylum process and it is an ongoing issue." | PX 77, NTEU - 000136 |
| 167.     On December 26, 2016, CBP Officer Sylvia Guerra sent a memorandum to Eric Clough, a representative of NTEU Chapter | NTEU – 000139-140 |

59

ER-0378

| | |
|---|---|
| 149. In the memorandum, she wrote: "On December 6, 2016 I, CBPO Sylvia Guerra was advised by SCBPO Ismael Hernandez to aid in transporting a group of [other than Mexican migrants] that had arrived to the Pharr Poe earlier in the evening. The transportation was from Pharr Poe to Hidalgo Poe. We drove up to the back entry of [the port building] where I witnessed the group of [other than Mexican migrants] entered in a single file line into [the port building] and as they walked in they were escorted to the front of [the port building], thru the pedestrian entry and w[]ere told to go back to Mexico. No adverse actions were taken." | |
| 168. In December 2016, the number of individuals without documents sufficient for lawful entry presenting at the southwest border decreased. | AOL-DEF-00034127 (Defs.' Ex. 43) at 127 |
| 169. In a 2017 report, the Office of the Inspector General (OIG) stated that the "surge of migrants arriving on the Southwest border in 2016" "abruptly, drastically, and unexpectedly ended" in January 2017. | Defs.' Ex. 33 at 2, 5 |
| 170. In a 2017 report, OIG wrote: "In | Defs.' Ex. 33 at 8 |

60

ER-0379

| | |
|---|---|
| March 2017, several CBP executives recommended permanently closing the Donna and Tornillo facilities (which at that time were in stand-by status) because they believed the migration levels would remain low due to policy changes and other factors." | |
| 171.  OIG noted that "[Deputy Commissioner] McAleenan decided to keep the facilities in stand-by status for one additional month," because: (1) "he worried that policy changes at ICE might lead to another backup;" (2) "he was mindful that a recent Executive Order and DHS guidance for implementing that order instructed CBP to ensure sufficient short-term detention capacity;" (3) "he was concerned that migrants' initial reluctance to come to the U.S. after the inauguration might wear off;" and "he feared the annual Spring migration increase." | Defs.' Ex. 33 at 8 |
| 172.  The January 2017 Standard Operating Procedure for the San Ysidro POE's Admissibility Enforcement Unit ("AEU"), which is the unit within the POE that is responsible for processing inadmissible non- | PX 101, AOL-DEF-00749854 |

61

ER-0380

| | |
|---|---|
| U.S. citizens that arrive at the port, including non-U.S. citizens without documents sufficient for lawful entry, does not use the phrase "operational capacity." | |
| 173.    Mariza Marin, then Watch Commander for the San Ysidro POE, participated in the drafting of the 2017 Standard Operating Procedure for the San Ysidro POE's AEU. | PX 17, Marin Dep. at 95:5-22. |
| 174.    On January 2, 2017, a CBP officer dragged a non-U.S. citizen by the legs from U.S. soil toward Mexican soil at the San Ysidro POE. | AOL-DEF-00014041 at 043 |
| 175.    CBP's Office of Professional Responsibility investigated an incident in which a CBP officer was alleged to have dragged an individual without documents sufficient for lawful entry back toward Mexico in January 2017. The investigation sustained that the officer engaged in the alleged conduct and that he did not follow "CBP policy and procedures pertaining to the processing of asylum seekers." | AOL-DEF-00014041    (Pls.' Ex. 8) at 043 |
| 176.    On August 27, 2019, the San Diego Field Office issued a letter suspending the CBP officer involved in the January 2017 | Defs.' Ex. 40 |

62

ER-0381

| incident discussed in Paragraph 175 for 30 days for Conduct Unbecoming a CBP Officer and Failure to Follow Procedures. | |
|---|---|
| 177.    On January 19, 2017, NTEU Chapter 149 initiated a Step 1 grievance with Carlos Gonzalez, Port Director of the Hidalgo (Texas) POE via letter.    The grievance stated: "Since, on or about 12/6/2016 and in a continuing manner, the Agency has unilaterally implemented a policy that prevents and/or blocks CBP Officers (pedestrian primary/secondary) from processing political asylum seekers and assessing their possible persecution or torture, and their potential national security and/or terrorist threats to the United States."  The grievance also asserts that CBP "[r]educ[ed] the safety environment for employees at the passenger and secondary sites by not evaluating or screening persons who are Other Than Mexicans (OTM) seeking political asylum . . . as lawfully mandated and past practiced."  According to the grievance: private security guards at the POE "stop certain asylum seekers from entering the [port] building," then they "call a CBP Supervisor," and | NTEU – 000142 at 142-143 |

63

ER-0382

| | |
|---|---|
| "both Supervisors and security guards deny entry and processing and escort them back to the path to Mexico." The grievance also asserted that CBP has failed to "provide health screening or hazard plans for employees who come in contact with overnight ill or non-ill asylum seekers in the [Passport Control Secondary] areas, asserting that "certain asylum seekers are told by Agency officials (Acting Chief Jose Uribe) not to disclose their illnesses to any person, as they would be returned to their country. This in turn creates an[] unsanitary and unhealthy working environment for employees in the passenger secondary rotational sites, as the PCS [Passport Control Secondary] areas have a continuous strong odor of human waste lingering in the air." | |
| 178.     On January 26, 2017, the San Ysidro POE was engaged in metering. | Stipulation of the parties |
| 179.     On February 21, 2017, NTEU Chapter 149 initiated a Step 2 grievance with Javier Cantu, then-Port Director for the Hidalgo POE, regarding CBP's "Failure to Process ER/CF & Asylum Seekers." Ac- | NTE - 000145 |

64

ER-0383

| | |
|---|---|
| cording to the letter, CBP "fail[ed] to respond to this issue at the Step 1 grievance level." | |
| 180.     On April 12, 2017, NTEU Chapter 149 invoked arbitration concerning its grievance asserting that the Hidalgo POE "fail[ing] to properly process asylum and/or credible fear seekers." | PX 79 NTEU – 000141 |
| 181.     On April 10, 2017, Nicole Ramos emailed a complaint to CRCL asserting that on April 9, 2017 CBP officers at the San Ysidro POE turned away a Honduran asylum seeker. | PRX 4, AOL-DEF-00014822; DX 44, AOL-DEF-00722915 |
| 182.     On April 14, 2017, Assistant Port Director Hood emailed the managers at San Ysidro and Otay Mesa noting, "AEU has adequate detention space to process any applicant for asylum encountered at our facilities. Any asylum application we encounter should be taken into custody, escorted to the security office, and then transported to AEU for proper intake and processing. We should not be sending any asylum seekers back to Mexico. Please remind our officers." | AOL-DEF-00090443 (Defs.' Ex. 45) at 443 |
| 183.     Between October 1, 2016, and April 12, 2017, CBP spent over $45.25 million to | Pls.' Ex. 33 at 446 |

65

| | |
|---|---|
| address the migrant surge. | |
| 184. OFO spent: (1) $15.76 million in overtime, temporary duty assignments, and operations support; (2) Border Patrol spent about $9.13 million in overtime, TDY, and operations support; and CBP spent over $20.24 million on facilities and maintenance costs. | Pls.' Ex. 33 at 446 |
| 185. On June 9, 2017, Mariza Marin sent guidelines on the San Diego Field Office's "Streamlined Withdrawal of Application for Admission" process to CBP Officers at the San Ysidro POE's Admissibility Enforcement Unit ("AEU"). Ms. Marin attached to her email the 2009 Streamlined Standard Operating Procedures along with a "2012 HQ memo instructing the field of the procedural requirements to provide travelers with documentation of the adverse action taken at the Port of Entry." Ms. Marin noted in her email that the Streamlined Withdrawal process was "to be used to mitigate overcrowding when we are at capacity and should be used during high volumes of apprehensions. Since apprehensions are currently manageable and there is no processing backlog, the | PX 7, AOL-DEF-00069611 |

66

ER-0385

| | |
|---|---|
| streamlined process should not be used." Ms. Marin also noted that "[w]hen using the streamlined process of Withdrawals (especially for alleged Mexican CF cases that have no fear) is we should continue to record (video/audio the complete interview not just the 4 question[s identified in the Standard Operating Procedures]. When we record just the 4 questions, we have been accused of doctoring the interview and removing other CBP officer's remarks and favorable answers by the alien that support their claims." | |
| 186.     In 2009, the San Diego Field Office issued standard operating procedures allowing for a streamlined procedure for withdrawals of application for admission for aliens inadmissible pursuant to Immigration and Nationality Act § 212(a)(6)(C) and/or (a)(7). | AOL-DEF-00069617 (Defs.' Ex. 41) |
| 187.     Under the San Diego Field Office streamlined withdrawal procedures, an applicant for admission indicating a request for asylum or articulating fear of returning to his/her country of citizenship "must" be referred for a credible-fear interview. | Defs.' Ex. 41 at 619 |

67

ER-0386

| | |
|---|---|
| 188.    Under the San Diego Field Office streamlined withdrawal procedures, a CBP officer who permits an inadmissible alien to withdraw his application for admission and return to Mexico without adverse immigration consequences (as agency regulations permit) records the alien's responses to four specific questions about his application instead of recording a comparatively lengthy oral statement from the alien on a separate form. | Defs.' Ex. 41 at 618–19. |
| 189.    The San Diego Field Office streamlined withdrawal procedures are authorized "in situations where the use of the streamlined process will mitigate overcrowding, detention issues or secondary space issues or high volumes of apprehensions and an Expedited Removal will not be used." | Defs.' Ex. 41 at 617 |
| 190.    The San Diego Field Office streamlined withdrawal procedures require that "if the applicant indicates a request for asylum or articulates fear of returning to his/her country of citizenship or last country of residence..., then the subject must be processed under the Expedited Removal with Credible | Defs.' Ex. 41 at 619 |

68

ER-0387

| | |
|---|---|
| Fear process and detained pending a credible fear determination." | |
| 191.     On August 31, 2017, OFO's Laredo Field Office updated the "Laredo Field Office Contingency Plan."  The plan outlines certain steps that POEs in the Laredo Field Office can take to adjust their operations to "[t]o ensure port management is provided the necessary resources to address the influx of unaccompanied alien children, family units, or other alien populations expressing fear or returning to Mexico and/or country of origin and minimize the impact to legitimate trade and travel."  For example, if the Brownsville POE's ████████ ████████ ████████ ████████ ████████ ████████ ████████ ████████ ████████ ████████ ████████ | AOL-DEF-00011011 at 011, 021-024 |

69

ER-0388

| ██████████████████████ When operating under this Contingency Plan, ████████████████ ████████████████████ ████████████████████ ████████████████████ ██████████████ | |
|---|---|
| 192. The San Ysidro POE engaged in metering on December 5, 2017. | PX 17 at 48:20–49:2; 258:15-21 |
| 193. The San Ysidro POE engaged in metering in December 2017. | PX 17 at 48:20–49:2; 258:15-21. |
| 194. On December 23 and 24, 2017, the San Luis POE was holding at the limit line. | Stipulation of the parties |
| 195. On December 25 and 27, 2017, the San Luis and Nogales POEs were holding at the limit line. | Stipulation of the parties |
| 196. On December 29, 2017, the San Luis POE was holding at the limit line. | Stipulation of the parties |
| 197. On December 30, 2017, the Nogales POE was holding at the limit line. | Stipulation of the parties |
| 198. On December 31, 2017, the Nogales POE was holding at the limit line. | Stipulation of the parties |
| 199. In his deposition, Todd Owen testified, in part: "In 2018, the migrants [sic] numbers started to increase again and | Pls.' Ex. 10 at 68:19-20 |

70

ER-0389

| | |
|---|---|
| reached a high point in the spring of 2018." | |
| 200. In January 2018, the Southwest Border Field Offices processed 9,930 inadmissible arriving aliens. | Defs.' Ex. 46 at 4. |
| 201. In February 2018, the Southwest Border Field Offices processed 10,085 inadmissible arriving aliens. | Defs.' Ex. 47 at 4 |
| 202. In March 2018, the Southwest Border Field Offices processed 12,957 inadmissible arriving aliens. | Defs.' Ex. 48 at 4 |
| 203. In April 2018, the Southwest Border Field Offices processed 12,295 inadmissible arriving aliens. | Defs.' Ex. 49 at 4 |
| 204. On April 3, 2018, the Laredo Field Office reported that the number of single adult credible fear cases had increased for the fourth week in a row, with a 73% increase week to week. The report went on to note that "there has been a significant shift of arriving aliens claiming credible gear to the smaller ports of entry, specifically Eagle Pass and Roma, which affect their processing and holding capacity." | AOL-DEF-00909574 (Defs.' Ex. 51) at 574 |
| 205. On April 4, 2018, the El Paso Field Office reported that, "As a result of the in- | AOL-DEF-00801853 (Defs.' Ex. 50) at 853 |

71

JOINT STATEMENT OF UNDISPUTED FACTS

| | |
|---|---|
| creased CF claims, [Family Units], and [Unaccompanied Alien Children," the El Paso POE had created two processing teams "to place focus on processing without the added distraction of feeding, detention checks, cleaning, etc." "As the increase in detainees occurs, humanitarian functions increase, which takes away from case processing. Additionally, with increasing numbers of [CBP Officers] focused on case process, this also causes impact to frontline functions and increased expenditures." | |
| 206. On March 31, 2018, Aaron Mitchell, a CBP official stationed at the U.S. Embassy in Mexico City, began providing regular reports on the size and activities of the "Viacrucis" migrant caravan as it crossed Mexico after leaving Guatemala. ███████ ████████████████████████████ ██████████████. | PX 80, AOL-DEF-00280783 at 793 |
| 207. On April 1, 2018, Aaron Mitchell, a CBP official stationed at the U.S. Embassy in Mexico City, reported of the Viacrucis migrant caravan that "██████████ ████████████████████████████ | Pls.' Ex. 80 at 792 |

72

| | |
|---|---|
| ██████████████████████████████████<br>████████████ " | |
| 208.　On April 2, 2018,  Aaron Mitchell, a CBP official stationed at the U.S. Embassy in Mexico City, reported that as ████████ ██████████████████████████████████ ██████████████████████████████████ ████████████. | PX 80,  AOL-DEF-00280783 at 792 |
| 209.　On April 2, 2018, Aaron Mitchell, a CBP official stationed at the U.S. Embassy in Mexico City, reported ████████████ ██████████████████████████████████ ██████████████. | PX 80,  AOL-DEF-00280783 at 792 |
| 210.　On  April  4,  2018,  Aaron  Mitchell stated: ████████████████████████ ██████████████████████████████████ ██████████████████████████████████ ██████████████████████████████████ ██████████████████████████████████ ██████████████████████████████████ ██████████████████████████████████ ████████████ | Pls.' Ex. 80 at 790 |
| 211.　On April 14, 2018, Aaron Mitchell, a CBP official stationed at the U.S. Embassy in Mexico City, reported ████████████ ██████████████████████████████████ | PX 80,  AOL-DEF-00280783 at 786 |

73

ER-0392

| 212. On April 17, 2018, Aaron Mitchell, a CBP official stationed at the U.S. Embassy in Mexico City, ███████████████████████████████████████████████████. | PX 80, AOL-DEF-00280783 at 786 |
|---|---|
| 213. On April 18, 2018, Robert Hood, the Assistant Port Director of the San Ysidro POE, sent an email noting that the ████ ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ | PX 90, AOL-DEF-00063246 at 246 |
| 214. On April 18, 2018, the San Ysidro POE reported that it "experienced a surge in asylum seekers yesterday (187 applicants), which brought us to max capacity (██ detainees)." There were another 120 individuals at El Chaparral awaiting to make entry, which required additional support in the AEU for case processing. The POE went on | AOL-DEF-00729220 (Defs.' Ex. 52) at 220 |

74

| | |
|---|---|
| to report that "[d]ue to the emergent need, we will not have enough time to announce and solicit for volunteers. We will need to temporarily pull" six passenger officers to AEU for case processing. | |
| 215. On April 20, 2018, Aaron Mitchell, a CBP official stationed at the U.S. Embassy in Mexico City, reported ██████████ ██████████████████████. | PX 80, AOL-DEF-00280783 at 785 |
| 216. On April 22, 2018, Aaron Mitchell, a CBP official stationed at the U.S. Embassy in Mexico City, reported ██████ ██████████████ ██████████████ ██████████████ ██████████████ ██████████████ ████████████ | PX 80, AOL-DEF-00280783 at 784 |
| 217. On April 22, 2018, Aaron Mitchell reported ████████████ ████████████ ████████████ ██████ | Pls.' Ex. 80 at 784 |
| 218. On April 23, 2018, Carlos Gonzalez, the Attaché for CBP at the U.S. Embassy in | PX 80, AOL-DEF-00280783 at 783 |

75



| | |
|---|---|
| 219. On April 24, 2018, CBP Commissioner Kevin McAleenan sent an email to Todd Owen, the Executive Assistant Commissioner of OFO, Randy Howe, the Executive Director of Operations at OFO, Pete Flores, the Director of Field Operations for OFO's San Diego Field Office, Sidney Aki, | PX 81 AOL-DEF-00041777 at 777-778 |

76

| | |
|---|---|
| the San Ysidro POE Port Director, and Deputy Executive Assistant Commissioner John P. Wagner with the subject line "Increased Flow and Caravan Anticipated Arrival." Mr. McAleenan wrote: "[I]t is increasingly likely that we will face the arrival of a large portion of these 500-600 individuals [from the migrant caravan] . . . in the coming days without a change in enforcement posture, and without new processing options (such as 235(b)(2)(c)) in place.  That said, I know you have been planning and preparing, and that your field leadership and our officers will act with utmost professionalism and competence, in accordance with law, regulation, and CBP policy, as well as the guidance from the Secretary to effectively enforce the immigration laws of the United States, while appropriately considering and processing claims of fear for those seeking protection.  Please confirm that you have sent out guidance regarding safe processing and port security and capacity issues relating to queue management." | |
| 220.    At approximately 4:30 p.m. on April 24, 2018, the San Ysidro POE AEU, which | PX 84, AOL-DEF-00010764; PX 17 at 125:17-24 (San |

JOINT STATEMENT OF UNDISPUTED FACTS

ER-0396

| | |
|---|---|
| had a total maximum capacity of ▇ in its holding cells, had "209 detainees in custody," and at 5:43 p.m that same day, the AEU was in the process of intaking 82 more individuals without documents sufficient for lawful entry. | Ysidro POE AEU definition of intake). |
| 221. On April 25, 2018, at about 9:00 AM, the San Ysidro POE had 290 individuals in custody. | AOL-DEF-00010711 (Defs.' Ex. 53) at 712 |
| 222. Around 1:00 PM, the Mexican government notified CBP that three buses containing ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ | AOL-DEF-00704631 (Defs.' Ex. 54) at 632 |
| 223. That same day, the San Ysidro POE received approximately 50 Mexican Family Units claiming asylum, and "0 encounters from [the] Migrant Caravan." | AOL-DEF-00704631 (Defs.' Ex. 55) at 632 |
| 224. On April 26, 2018, at about 9:00 AM, the San Ysidro POE had 329 individuals in custody. | AOL-DEF-00011644 (Defs.' Ex. 56) at 645 |
| 225. At the San Ysidro POE, the short-term hold rooms are "used to detain *__all__* inadmissible and deportable aliens pending their processing and, where appropriate, | Defs.' Ex. 57 ¶ 6 |

78

| | |
|---|---|
| their transfer to ICE, HHS, or other federal agencies, as well as all individuals subject to criminal prosecution awaiting transfer to the custody of a third-party federal or state agencies." | |
| 226.     At the San Ysidro POE, when an individual is first brought into the AEU, he/she goes to an area known as "intake." There, CBP gathers the individual's biographical information, starts a record for the individual in CBP's database, inventories the individual's personal property, and determines whether the individual needs to visit the onsite medical provider for medical care. The individual is then brought to another area of the AEU for processing. The processing is conducted by a specially trained CBP officer who determines the appropriate course of action for the individual, which may be an expedited removal order, or an expedited removal order with a credible fear referral, or placement in removal proceedings before an immigration judge, or allowing the individual to withdraw his/her application for admission. | Defs.' Ex. 60 ¶ 10. |

79

ER-0398

| | | |
|---|---|---|
| 227. | Todd Owen and Todd Hoffman testified at their depositions that queue management and MCAT reports provide information about the number of detainees in custody at the particular time the information is reported, and thus reflect a snapshot in time. | Pls.' Ex. 10 at 45:1-15<br>Pls.' Ex. 9 171:22-173:3 |
| 228. | On April 27, 2018, Todd Owen, the Executive Assistant Commissioner of OFO, issued a memorandum with the subject line "Metering Guidance to the Directors of Field Operations overseeing operations at POEs on the U.S.-Mexico border. In the memorandum, Mr. Owen wrote: "When necessary or appropriate to facilitate orderly processing and maintain the security of the port and safe and sanitary conditions for the traveling public, DFOs [directors of field operations] may elect to meter the flow of travelers at the land border to take into account the port's processing capacity. Depending on port configuration and operating conditions, DFOs may establish and operate physical access controls at the borderline, including as close to the U.S.-Mexico border as operationally feasible. DFOs may not | PX 82, April 27, 2018 Metering Guidance Memorandum |

80

ER-0399

| | |
|---|---|
| create a line specifically for asylum-seekers only, but could, for instance, create lines based on legitimate operational needs, such as lines for those with appropriate travel documents and those without such documents."  The memorandum also stated: "Ports should inform the waiting travelers that processing at the port is currently at capacity and CBP is permitting travelers to enter the port once there is sufficient space and resources to process them.  At no point may an officer discourage a traveler from waiting to be processed, claiming fear of return, or seeking any other protection. . . . Once a traveler is in the United States, he or she must be fully processed." | |
| 229.    The April 27, 2018 Metering Guidance memorandum states: "At no point may an officer discourage a traveler from waiting to be processed, claiming fear of return, or seeking any other protection." | Defs.' Ex. 2 |
| 230.    On April 27, 2018, Todd Hoffman, the Executive Director of Admissibility and Passenger Programs at OFO, sent a copy of Mr. Owen's Metering Guidance memoran- | PX 83, AOL-DEF-00091332 |

JOINT STATEMENT OF UNDISPUTED FACTS

ER-0400

| | |
|---|---|
| dum to the four Directors of Field Operations for the U.S.-Mexico border via email. In this cover email, Mr. Hoffman stated: "Please see the attached processing guidance during surge events." | |
| 231.     In Fiscal Year 2017, the Southwest Border Field Offices processed 111,275 inadmissible individuals, 17,284 of whom were placed into expedited removal and referred for credible fear interviews. | Defs.' Ex. 4 at 2 |
| 232.     In Fiscal Year 2018, the Southwest Border Field Offices processed 124,876 inadmissible individuals, 38,399 of whom were placed into expedited removal and referred for credible fear interviews. | Defs.' Ex. 4 at 2 |
| 233.     At approximately 9:30 a.m. on April 27, 2018, the San Ysidro POE AEU had "257 detainees in custody," of whom 158 were pending processing. Of the individuals pending processing, 117 were from 39 family units, and one was an unaccompanied alien child (UAC). | PX 85, AOL-DEF-00010718 at 719 |
| 234.     At approximately 8:40 a.m. on Saturday, April 28, 2018, the San Ysidro POE AEU had "253 detainees in custody," of whom 171 were pending processing. Of the | PX 86, AOL-DEF-00010722 at 723 |

82

| | |
|---|---|
| individuals pending processing, 120 were from 43 family units, and 4 were unaccompanied alien children. | |
| 235. On April 28, 2018, Oscar Saenz, a CBP Officer at the Roma POE, noted in an email reporting updates from Passport Control Secondary as to the status of 3 family units, "Metering has deterred [other than Mexican] traffic." | PX 108, AOL-DEF-00566881 |
| 236. On Sunday, April 29, 2018, no later than 6:44 a.m. Pacific Time, the San Ysidro POE, had 289 detainees in custody. | PX 87, AOL-DEF-00048757 at 759; Pls.' Ex. 64 at 148, 153-54. |
| 237. On April 29, 2018 at 3:20pm, Pete Flores, the Director of Field Operations for OFO's San Diego Field Office, sent an email to Kevin McAleenan, the Commissioner of CBP, Todd Owen, the Executive Assistant Commissioner of OFO, and others. In the email, he reported: "No caravan subjects have arrived at the San Ysidro Port." | PX 88, AOL-DEF-00047694 at 694; |
| 238. On May 15, 2018, the Secretary of Homeland Security publicly stated: "We are 'metering,' which means that if we don't have the resources to let them in on a particular day, they are going to have to come | Stipulation of the parties. |

JOINT STATEMENT OF UNDISPUTED FACTS

ER-0402

| | |
|---|---|
| back." | |
| 239.     On May 24, 2018 at 12:59pm, Todd Owen, the Executive Assistant Commissioner of OFO, sent an email to Randy Howe, the Executive Director of Operations at OFO, and C. Shane Campbell, the Deputy Executive Director of Operations at OFO with the subject line "Info needed by 1600" with high importance.  In the email, Mr. Owen stated: "For a [meeting with DHS Secretary Kirstjen Nielsen] this afternoon [the Secretary's] office is asking if we fully implement the priority based Que[ue] Management option—what's a rough magnitude of CBP folks that will be needed to man the boundary line?  What's a rough estimate of the number of folks that would likely be turned away per day? Can you please contact the 4 SWB [Southwest border] DFOs and get a very rough estimate by field office?" | PX 93, AOL-DEF-00074316 at 317 |
| 240.     On May 24, 2018 at 10:49am, Pete Flores, the Director of Field Operations for OFO's San Diego Field Office, stated that "the numbers that would [] be held at or near the limit line would vary significantly at | PX 93, AOL-DEF-00074316 at 316-317 |

84

| | |
|---|---|
| each port and throughout the year," but estimated that based on focusing on priorities the San Ysidro and Calexico POEs would intake 50% or more fewer individuals without documents sufficient for lawful entry, and the Otay Mesa POE would redirect individuals without documents sufficient for lawful entry to the San Ysidro POE. | |
| 241.    On May 24, 2018, Ray Provencio, the Assistant Director of Field Operations for the El Paso Field Office, estimated that, if prioritization-based queue management was fully implemented, the El Paso Field Office could "anticipate a 60% reduction . . . in those processed" and "could anticipate 234 [individuals] turned away per day." | PX 94, AOL-DEF-00095574 at 575 |
| 242.    On May 24, 2018 at 2:31pm, the Tucson Field Office estimated that, "if current volumes remain consistent," it "would be turning back roughly 65 [individuals] a day, about 40 in Nogales and 25 at San Luis" if prioritization-based queue management were fully implemented. | PX 95, AOL-DEF-00377294 |
| 243.    On May 24, 2018, Todd Owen, the Executive Assistant Commissioner of OFO, | PX 96, AOL-DEF-00288009; AOL-DEF-00288011 |

85

| | |
|---|---|
| informed Kevin McAleenan, the Commissioner of CBP, and others that if prioritization-based queue management were fully implemented "we would turn away approx. 650 subjects a day.  The number waiting in [Mexico] would grow each day and begin to strain those local [Mexican] border communities."  In response to that email, Mr. McAleenan stated: "Please let [DHS Secretary Nielsen] know today."  Mr. Owen responded: "10-4, heading up there now." | |
| 244.     On June 5, 2018, DHS Secretary Kirstjen Nielsen issued a "Prioritization-Based Queue Management" (PBQM) memorandum to the CBP Commissioner.  In the memorandum, Secretary Nielsen explained that "apprehensions of those crossing our border illegally between the ports of entry and the number of arriving aliens determined to be inadmissible at ports of entry continue to rise.  At the same time," the Secretary continued, CBP's "resources remain strained along the Southwest Border. Inadmissible arriving aliens presenting at ports of entry, many of whom arrive without pos- | PX 35; AOL-DEF-00273294 at 296 |

JOINT STATEMENT OF UNDISPUTED FACTS

ER-0405

sessing appropriate travel and identity doc-
uments required by law, such as a visa and
passport, require additional processing time
that delays the flow of legitimate trade and
travel.  In many cases, CBP officers must
take sworn statements from those individu-
als, which requires a substantial amount of
time and resources."  Secretary Nielsen in-
structed the Commissioner that "CBP must
focus on its primary mission: to protect the
American public from dangerous people
and materials while enhancing our eco-
nomic competitiveness through facilitating
legitimate trade and travel."  Secretary Niel-
sen stated that "[t]he processing of travelers
without documentation draws resources
away from CBP's fundamental responsibil-
ities."  "Moreover," Secretary Nielsen con-
tinued, "staffing at Southwest border ports
of entry is below our target levels for almost
all major ports, and our officers are increas-
ingly working extensive overtime hours
each pay period, leading to increased fatigue
and stress on the workforce.  At several of
the largest ports of entry, upwards of 10 per-

87

ER-0406

cent of the CBP officer workforce are en-
gaged in immigration secondary screening
and processing functions, primarily address-
ing persons presenting without documents
sufficient for admission or other lawful en-
try." Thus, Secretary Nielsen directed the
CBP Commissioner to "initiate a 30-day pi-
lot program to prioritize staffing and opera-
tions in accordance with the following order
of priority at all Southwest border ports of
entry:"   (1) national security efforts, (2)
counter-narcotics operations, (3) economic
security, and (4) trade and travel facilitation.
The memorandum states that "[p]rocessing
persons without documents required by law
for admission arriving at the Southwest Bor-
der remains a component of CBP's mission,
but priority should be given to the [four] ef-
forts described above in the prescribed or-
der.  Field leaders have the discretion to al-
locate resources and staffing dedicated to
any areas of enforcement and trade facilita-
tion not covered by the above priorities and
queue management process based on the
availability of resources and holding capac-
ity at the local port level."

JOINT STATEMENT OF UNDISPUTED FACTS

ER-0407

| 245. | In the PBQM memo, the Secretary wrote, "Depending on port configuration and operation conditions, Directors of Field Operations may establish and operate physical access controls at the borderline, including as close to the U.S.-Mexico border as operationally feasible." | Defs.' Ex. 3 at 296 |
|---|---|---|
| 246. | By midnight on June 8, 2018, the Laredo Field Office had mandated that all of its POEs implement "mid-bridge queue management." | AOL-DEF-00190367 |
| 247. | On June 16, 2018, the Deputy Commander of the Migration Crisis Action Team (MCAT) reported to ICE that "all ports along the [southwest border] will increase their daily intake. The ports will not go beyond their capacity limits but will get as close as possible without negatively impacting their other responsibilities. This will result in a significant increase of referrals of FMUAs and single adults [to ICE]." | AOL-DEF-00380555 (Defs.' Ex. 63) at 555 |
| 248. | In response to the email referred to in paragraph 247, another member of the MCAT reported that he would "convey this operational modification and ensure ERO is ready to support all facets of [the] mission." | Defs.' Ex. 63 at 555 |

89

ER-0408

| | |
|---|---|
| 249. On July 3, 2018, Eddie Arias, a Program Manager within CBP's Tactical Assessment Unit, wrote an email to Johnny Armijo, an official in OFO's San Diego Field Office. In the email, Mr. Arias explained that "[a]s requested, over the past week I worked towards gauging the overall sentiment of subjects detained at the San Ysidro (SYS) port of entry." Mr. Arias' goal was "to determine what effect, if any, are measures such as 'zero tolerance' and 'metering' implemented by [CBP] making on subjects attempting entry either illegally or through the credible fear/asylum process." Mr. Arias reviewed detainee interview narratives from their processing records to conclude that "[d]etainees did not claim fear of prosecution, possible separation of family units, and long wait times in Mexico as deterrent factors." | PX 107, Owen Dep. Ex. 47 |
| 250. On July 6, 2018, Frank Longoria, the Assistant Director of Field Operations for OFO's Laredo Field Office, observed in an email to other Laredo Field Office officials: "It's been approximately 30 days since we initiated the Queue Management Strategy | PX 99, AOL-DEF-00812864 |

90

| | |
|---|---|
| and shifted from 'detention' capacity to 'operational' capacity." | |
| 251.    CBP has not officially defined the term "operational capacity" in its written policy and procedure documents. | Marin Dep. at 73:6-11, 110:24-111:11 |
| 252.    On July 6, 2018, Bradd Skinner, Deputy Director of Field Operations for the Laredo Field Office, wrote to Director of Field Operations for the Laredo Field Office, David P. Higgerson, about a conversation with Ryan Koseor, then Deputy Commander of the CBP Migration Crisis Action Team (MCAT): "The view is that we [should be] processing up to 70% of detention/holding capacity depending upon what is coming at us on any given day." | PX 104, AOL-DEF-01037408 at 408 |
| 253.    On July 24, 2018, Sylvia Briones, an Assistant Port Director at the Hidalgo POE, reported that the implementation of queue management had led to the "circumventing of [the] que[ue]" via bus, taxi, and the SENTRI passenger vehicle lane. | AOL-DEF-00235276 |
| 254.    On August 6, 2018, Ryan Koseor, then Deputy Commander of MCAT, asked Mariza Marin, then Watch Commander at the San Ysidro POE: "How many cases | PX 112, AOL-DEF-00602802; PX 17, at 173:3-17 |

91

ER-0410

could [the San Ysidro POE] process a day if ERO moved them out the next day?" Ms. Marin responded "[w]ell, if we didn't have over half of the officers at the [overtime] cap about ▮ or so." Mr. Koseor responded: "10-4. [The] Front Office just tasked me with finding some solutions. I will try to work this from here. I know [CBP Commissioner McAleenan] and [Executive Assistant Commissioner Owen] don't' want to just throw money at it because that would defeat the purpose of queue management." Mariza Marin responded that the front office tasking was an effort to "fix[] things that aren't broken."

|  |  |
|---|---|
| 255.    On August 7, 2018, Robert Hood, the Assistant Port Director at the San Ysidro POE, asked Mariza Marin, then Watch Commander at the San Ysidro POE, "At this rate how long will it take us to get rid of the current back log in Mexico?" Ms. Marin responded: ▮▮▮▮▮▮▮ | PX 92, AOL-DEF-00072964 |

JOINT STATEMENT OF UNDISPUTED FACTS

| | |
|---|---|
| 256.　　On August 23, 2018, the U.S. Office of Special Counsel (OSC) referred a whistleblower disclosure to DHS, requesting a report of DHS's investigation into the allegations by October 22, 2018. The referral stated: "Pursuant to my authority under 5 U.S.C. § 1213(c), I have concluded that there is a substantial likelihood that the information provided to OSC discloses violation of law, rule, or regulation." The referral stated that "[p]er statutory requirements, I will review the report [of investigation] for sufficiency and reasonableness." | AOL-DEF-00216900 at 421 |
| 257.　　In a memorandum of record regarding a DHS OIG August 28, 2018 tour of the San Ysidro POE and interviews of OFO staff members, DHS OIG wrote: "CBP uses a queue management system when a facility is at capacity and cannot process aliens." | PX 15, AOL-DEF-00205966 at 966 |
| 258.　　On August 29, 2018, Ryan Koeseor, Deputy Commander of CBP's Migration Crisis Action Team ("MCAT") wrote to C. Shane Campbell, Deputy Executive Director for Operations at OFO: "I know you are extremely busy but didn't you send some | PX 105, AOL-DEF-00039597 |

93

ER-0412

| | |
|---|---|
| guidance out on keeping our capacity numbers around 60-70%? Why do we have people waiting in line in Laredo when we are at 14%[?]." In response, Mr. Campbell stated: "Info from Laredo: this was temporary due to operational constraints, not facility constraints. The line has already been cleared." | |
| 259. On November 11, 2018, Pete Flores, the Director of Field Operations for OFO's San Diego Field Office, responded to an email from CBP Commissioner Kevin McAleenan entitled "Re: C1 Migrant Processing Direction." In that email, Mr. Flores explained that the Field Office was ████████ ████████████████████████ ████████████████████████ ████████████████████████ ████████████████████████ ████████████████████████ ████████████████████████ ████████████████████████ ████████████████████████ ████████████████████████ ████████████████████████ ████████████████████████ | PX 109, AOL-DEF-00028473 at 473-474; AOL-DEF-00028469; PX 111, AOL-DEF-00050247 |

94



In response to this proposal, Todd Owen, the Executive Assistant Commissioner of OFO, wrote:

At or around 7:30pm on November 11, 2018, Todd Owen forwarded a ▮▮▮▮▮▮▮ to CBP Commissioner Kevin McAleenan ▮▮▮▮▮▮▮

On November 13, 2018, CBP Commissioner Kevin McAleenan responded: "This is a very good and productive plan. I briefed the Secretary [of Homeland Security] this evening and re-

95

| | |
|---|---|
| ceived guidance on next steps. At this planning stage, the Secretary's preferred approach is: (1) to maintain queue management as currently balanced against all mission sets, including security and passenger/trade facilitation at land border POEs and international airports; and (2) to pursue accelerated planning for a Return to Territory approach to be applied to caravan participants and other arrivals as soon as practicable, pending GoM agreement." | |
| 260.    On March 19, 2019, David Atkinson, the President of National Treasury Employees Union ("NTEU") Chapter 149, sent an email to CBP Commissioner Kevin McAleenan with the subject line "Safety Alert/Rule Clarification." In the email, Mr. Atkinson wrote: "The Port of Hidalgo, Texas employees would like a written order provided to them that mirrors their instructions to return individuals who enter the U.S. and request asylum back to Mexico without appointment or system for a future appointment. The Agency is allowing Mexican officials to create a list and detention area mid[-]bridge to facilitate who would be | PX 76, NTEU – 000110 at 110, 113-114 |

96

next to enter the United States from that de-
tention site on the Mexican side, which is
under the control and direction of CBP of-
ficers on the U.S. side." Mr. Atkinson went
on to state: "The employees would like you
to provide them with proper authority and
sections of law that allows them to detain
these asylum seekers on the Mexican side,
and prevent them from entering the U.S. af-
ter presenting themselves for inspection and
requesting asylum. The [e]mployees would
like something in writing to protect their or-
dered activities, as the Agency is claiming
publicly that they are not conducting these
activities when they really are." Mr. Atkin-
son also noted the NTEU's position that
placing CBP officers at the limit line put of-
ficers in an unsafe position because they are
"out of line of sight of other CBP staff and
outnumbered by the asylum seekers and the
possible smugglers who are attempting to
enter the U.S. by foot and/or by vehicle. The
employees request [Mr. McAleenan's] in-
tervention in this matter to ensure that they
are not injured or killed as Port management
is incompetent in assigning the proper

97

ER-0416

| | |
|---|---|
| amount of or stationing these officers in a safe position." Mr. Atkinson's email also included pictures that he said depicted "[c]hairs [being] reduced" at the Hidalgo POE "to minimize the amount of persons held in the seating area" and "no officers stationed to process work at 10-11 pm." | |
| 261.   David Atkinson is a retired CBP Officer who served at the Hidalgo POE as a full-time Union President during the relevant time period. Mr. Atkinson was stationed at the Hidalgo POE since the late 1990s or early 2000s. | Pls.' Ex. 3, at 36:6-10, 45:21-22. |
| 262.   On September 26, 2019, DHS OIG issued a report concerning its investigation into alleged violations of immigration laws at the Tecate, California POE. DHS OIG "found instances of CBP officials returning some asylum applicants to Mexico after they had already entered the United States, and instructing those individuals to go to other ports to make their asylum claims." DHS OIG concluded that this conduct was "contrary to Federal law and CBP policy requiring that asylum seekers present in the United States be accepted for processing." | Pltfs' SJ Ex. 19 |

98

| DHS OIG was, however, "unable to substantiate that managers specifically instructed [the whistleblower] or others to engage in the practice, or that it was otherwise the Port's standard practice." The report noted: "The distinction between redirecting asylum seekers from the limit line versus returning and redirecting them from inside the port has potential legal significance. Returning asylum seekers to Mexico from inside a Port violates Federal law and CBP policy, which require officers to accept and process asylum seekers." The DHS OIG report "contains no recommendations." | |
| 263.      On November 27, 2019, the Acting Commissioner of CBP issued a memorandum to the OFO Executive Assistant Commissioner reiterating the Prioritization-Based Queue Management guidance. The memorandum had the subject line "Prioritization-Based Queue Management." The Acting Commissioner explained that "[o]ver the past several years, CBP has seen an increase in the number of inadmissible aliens presenting at POEs without possessing | CBPALOTRO000303-08 |

ER-0418

appropriate travel and identification documents. The processing of these aliens requires a substantial amount of time and resources, which may negatively affect the flow of trade and other travel. CBP must carefully balance its space and resources to ensure that each POE has sufficient capacity to address its mission sets, in order of priority, including the safety and expeditious processing of all travelers accessing the port."

"In order to ensure the continued success of the CBP mission," the Acting Commissioner asked for "continued vigilance in prioritizing staffing and operations in accordance with the order of priority as outlined in the June 5, 2018 memorandum." The memo states that in Fiscal Year 2019, while prioritization-based queue management was being implemented, CBP officers at the southwest border ports of entry arrested 1,800 convicted criminals, encountered 1,601 Special Interest Aliens, and found inadmissible three aliens who were on the terrorist watchlist. The Acting Commisioner went on

100

ER-0419

to state that as "'super labs' in Mexico ... increase[ed] production and ... flood[ed] the United States with cheaper and purer forms of methamphetamine," CBP officers at the ports seized 19% more methamphetamine and 58% more fentanyl by volume. CBP officers also interdicted more than $9.4 million in outbound currency in FY 2019, an increase of more than $2.4 million from the previous fiscal year.

The Acting Commissioner explained that "[t]hese demands create an inherent strain on CBP personnel and resources to process an increasing number of inadmissible arriving aliens while simultaneously focusing on the detection and apprehension of narcotics and currency smugglers. In accordance with the mission of [OFO] to protect the American people, advance the national economy, and safeguard our borders, field leaders must continue to balance resources according to the order of priority listed above," *i.e.*, national security efforts, counter-narcotics and outbound operations, economic security, and trade and travel facilitation. The Acting Commissioner "reminded"

101

ER-0420

| | |
|---|---|
| field leaders that they retain discretion to allocate resources to "any areas of enforcement and trade facilitation not covered by the priorities and queue management process," that they may implement queue-management controls at or as close to the physical borderline as operationally feasible, that they may establish lines "based on legitimate operational needs, such as lines for those with appropriate travel documents and those without such documents," and that "the safety of employees and the public is paramount in operational decisions." | |
| 264. On March 23, 2020, the U.S. Office of Special Counsel wrote a letter addressed to the President of the United States, in accordance with 5 U.S.C. § 1213, concerning "disclosures of wrongdoing at the Customs and Border Protection (CBP), Tecate Port of Entry, Tecate, California." Special Counsel Henry J. Kerner stated that he had "reviewed the agency report and, in accordance with 5 U.S.C. § 1213(e), provide the following summary of the report and my findings." He summarized the contents of the DHS | https://www.oig.dhs.gov/sites/default/files/assets/2020-04/OSC-File-No-DI-18-5034-Agency-Report-Redacted.pdf |

| OIG Tecate Report, Mr. Kerner concluded: "The agency substantiated many of the whistleblower's allegations regarding the processing of asylum seekers at the Tecate Port of Entry. The agency made targeted recommendations and issued guidance to address these concerns. In light of the agency's responsiveness, I have determined that the report meets all statutory require-ments, and the findings of the report appear reasonable." | |
| --- | --- |
| 265.     On April 30, 2020, OFO's Executive Director for Operations issued a new meter-ing guidance memorandum to the Directors of Field Operations. That memorandum has the subject line "Metering Guidance". The Executive Director reiterated that DFOs "maintain the discretion to meter the flow of travelers into the ports of entry, when nec-essary, to facilitate the orderly processing of travelers and maintain the safety and secu-rity of the port. As a reminder, any physical access controls established in accordance with the April 2018 Metering Guidance must be implemented at the borderline be-tween the United States and Mexico, or as | CBPALOTRO000314-315 |

103

ER-0422

| | |
|---|---|
| close as physically possible to that line." Further, "[o]fficers may not discourage any traveler from waiting to be processed, claiming fear of return, or seeking any other protection. Once a traveler is in the United States, he or she must be inspected and processed by CBP officers." "Should a DFO determine that, due to a particular port's operating conditions, it is not operationally feasible to safely process travelers without appropriate entry documents at that particular port, such travelers may be encouraged to initiate their processing and entry at another port that is better positioned to process travelers without appropriate entry documents. ... Once a traveler is in the United States, he or she must be inspected and processed, and may not be directed to return to Mexico." | |
| 266.     On October 30, 2020, DHS' Office of Inspector General (OIG) made public a report entitled, "CBP Has Taken Steps to Limit Processing of Undocumented Aliens." | PX Rep. 1. |
| 267.     In FY 2018, the Southwest Border | Defs.' Ex. 4 at 2. |

104

ER-0423

| | |
|---|---|
| Field Offices processed 124,879 inadmissible arriving aliens, 38,399 of whom were referred for a credible-fear interview. | |
| 268. In FY 2019, the Southwest Border Field Offices processed 126,001 inadmissible arriving aliens, 80,055 of whom were referred for a credible-fear interview. | Defs.' Ex. 4 at 2 |
| 269. A Special Interest Alien is a non-U.S. person who, based on an analysis of travel patterns, potentially poses a national security risk to the United States or its interests. | https://www.dhs.gov/news/2019/01/07/mythfact-known-and-suspected-terroristsspecial-interest-aliens |

Dated: October 30, 2020                    Respectfully submitted,

MAYER BROWN LLP
    Matthew H. Marmolejo
    Ori Lev
    Stephen M. Medlock

SOUTHERN POVERTY LAW CENTER
    Melissa Crow
    Sarah Rich
    Rebecca Cassler

CENTER FOR CONSTITUTIONAL RIGHTS
    Baher Azmy
    Ghita Schwarz
    Angelo Guisado

AMERICAN IMMIGRATION COUNCIL
    Karolina Walters

105

JOINT STATEMENT OF UNDISPUTED FACTS

By: /s/ Stephen M. Medlock
Stephen M. Medlock

*Attorneys for Plaintiffs*


JEFFREY BOSSERT CLARK
Acting Assistant Attorney General
Civil Division

WILLIAM C. PEACHEY
Director

SAMUEL P. GO
Assistant Director

KATHERINE J. SHINNERS
Senior Litigation Counsel

s/ Dhruman Y. Sampat
DHRUMAN Y. SAMPAT
Trial Attorney
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 532-4281| Fax: (202) 305-7000
dhruman.y.sampat@usdoj.gov

*Counsel for Defendants*

106

JOINT STATEMENT OF UNDISPUTED FACTS

**CERTIFICATE OF SERVICE**

I certify that I served a copy of this document on the Court and all parties by filing this document with the Clerk of the Court through the CM/ECF system, which will provide electronic notice and an electronic link to this document to all counsel of record.

DATED: November 6, 2020

/s/ Stephen M. Medlock

*Counsel for Plaintiffs*

107

ER-0426

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General
Civil Division
WILLIAM C. PEACHEY
Director, Office of Immigration Litigation –
District Court Section
KATHERINE J. SHINNERS (DC 978141)
Senior Litigation Counsel
ALEXANDER J. HALASKA (IL 6327002)
Trial Attorney
United States Department of Justice
Civil Division
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 307-8704 | Fax: (202) 305-7000
alexander.j.halaska@usdoj.gov

*Counsel for Defendants*

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA
### (San Diego)

| | |
|---|---|
| AL OTRO LADO, Inc., *et al.*, | Case No. 3:17-cv-02366-BAS-KSC |
| *Plaintiffs*, | Hon. Cynthia A. Bashant |
| v. | **MEMORANDUM IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| CHAD F. WOLF, Acting Secretary of Homeland Security, *et al.*, in their official capacities, | |
| *Defendants*. | |

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................... iii

INTRODUCTION ........................................................................................1

LEGAL STANDARD ..................................................................................7

UNDISPUTED FACTS ...............................................................................7

    A.    Congress Charged DHS, CBP, and OFO With Numerous Duties to Safeguard America's Borders...............................................7

    B.    The 2016 Migration Surge Stretches the San Ysidro Port of Entry's Capabilities and Diverts Resources From Other Statutory Missions.............................................................10

    C.    The Surge's Adverse Impacts Expand to Other Ports of Entry. .........12

    D.    DHS and CBP Take Additional Steps to Address the Surge..............15

    E.    As the 2018 Migrant Caravan Approaches, CBP Issues Written Metering Guidance...........................................................22

    F.    DHS Directs CBP to Prioritize Statutory Mission Sets. ....................25

    G.    CBP Issues the Prioritization-Based Queue Management Memorandum. .................................................................30

ARGUMENT .............................................................................................31

    I.    Plaintiffs Lack a Private Right of Action to Enforce the INA. ...........31

    II.    Defendants Have Not Taken Discrete and Final Agency Action of the Sort Plaintiffs Contend................................................32

        A.    There is No Discrete "Turnback Policy." ..................................32

        B.    The Border-Wide Metering Decisions are Not Final Agency Action. .........................................................................35

    III.    Defendants Have Not "Direct[ed] CBP Officers to Unlawfully Withhold a Discrete, Mandatory Ministerial Action."......................37

    IV.    Metering is Statutorily Permissible......................................................40

    V.    Defendants' Actions are Not Arbitrary and Capricious......................44

        A.    Defendants' Border-Wide Actions are Not Based on "Pretext."............................................................................45

        B.    The "True Motivations" for Metering are Lawful...................51

ER-0428

C.    Metering is Consistent with Congressional Intent...................53

VI.    Metering Does Not Deprive Class Members of Procedural Due Process...........................................................................................54

VII.    Plaintiffs' International-Law Claim is Not Actionable.......................55

VIII.    Plaintiffs are Not Entitled to the Relief They Seek............................58

CONCLUSION ...............................................................................................60

ER-0429

# TABLE OF AUTHORITIES

## Federal Cases

*AID v. All. for Open Soc. Int'l,*
140 S. Ct. 2082 (2019)......................................................54

*Al Otro Lado, Inc. v. McAleenan,*
394 F. Supp. 3d 1168 (S.D. Cal. 2019) ........................ 5, 32, 36, 38

*Al Otro Lado, Inc. v. Nielsen,*
327 F. Supp. 3d 1284 (S.D. Cal. 2018) .......................... 31, 32, 40

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986).........................................................7

*Arlington Heights v. Metro. Housing Dev. Corp.,*
429 U.S. 252 (1977).........................................................51

*Bark v. U.S. Forest Service,*
37 F. Supp. 3d 41 (D.D.C. 2014)......................................34

*Bennett v. Spear,*
520 U.S. 154 (1997).........................................................35

*Cal. Communities Against Toxics v. EPA,*
934 F.3d 627 (D.C. Cir. 2019)..........................................36

*Cal. Wilderness Coalition v. DOE,*
631 F.3d 1072 (9th Cir. 2011) ..........................................59

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986).........................................................7

*City of Indianapolis v. Edmond,*
531 U.S. 32 (2000)...........................................................56

*Compassion Over Killing v. FDA,*
849 F.3d 849 (9th Cir. 2017) ............................................44

*Dept. of Commerce v. New York,*
139 S. Ct. 2551 (2019)............................................. 6, 46, 51, 52

ER-0430

*DHS v. Thuraissigiam,*
 140 S. Ct. 1959 (2020)........................................................................... *passim*

*E. Bay Sanctuary Covenant v. Trump,*
 932 F.3d 742 (9th Cir. 2018) ..................................................... 43, 60

*E. Bay Sanctuary Covenant v. Trump,*
 950 F.3d 1242 (9th Cir. 2020)).................................................. 53, 59

*E. Bay,* 950 F.3d at 1273 .....................................................................53

*Edmo v. Corizon, Inc.,*
 935 F.3d 757 (9th Cir. 2019) ............................................................59

*Gardner v. Toilet Goods Ass'n, Inc. v. Gardner,*
 387 U.S. 158 (1967)...........................................................................36

*Hamama v. Adducci,*
 912 F.3d 869 (6th Cir. 2018) ............................................................58

*Hells Canyon Preservation Council v. U.S. Forest Service,*
 593 F.3d 923 (9th Cir. 2010) ............................................................37

*Hernandez v. Mesa,*
 140 S. Ct. 735 (2020).......................................................... 1, 43, 56

*INS v. Stevic,*
 467 U.S. 407 (1984) ............................................................... 55, 57

*Jean v. Nelson,*
 472 U.S. 846 (1985)...........................................................................53

*Jennings v. Rodriguez,*
 138 S. Ct. 830 (2018).........................................................................49

*Lightfoot v. District of Columbia,*
 273 F.R.D. 314 (D.D.C. 2011) .................................................. 33, 35

*Lujan v. Nat'l Wildlife Fed'n,*
 497 U.S. 871 (1990)................................................................ 32, 34, 36

*Massachusetts v. EPA,*
 549 U.S. 497 (2007).............................................................. 6, 43

ER-0431

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010)..........................................................................60

*Morrison v. Nat'l Australia Bank Ltd.*,
    561 U.S. 247 (2010)..........................................................................38

*Motor Vehicle Mfts. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)............................................................................44

*Ms. L. v. ICE*,
    302 F. Supp. 3d 1149 (S.D. Cal. 2018) ...........................................31

*Munaf v. Geren*,
    553 U.S. 674 (2008)..........................................................................58

*Navajo Nation v. Dept. of the Interior*,
    876 F.3d 1144 (9th Cir. 2017) .........................................................35

*New Mexico v. McAleenan*,
    450 F. Supp. 3d 1130 (D. N.M. 2020)..............................................31

*Norton v. Southern Utah Wilderness Alliance*,
    542 U.S. 55 (2004)................................................... 5, 32, 34, 37

*Padilla v. ICE*,
    953 F.3d 1134 (9th Cir. 2020) .........................................................58

*Quidel Corp. v. Siemens Med. Solutions USA, Inc.*,
    --- F. Supp. 3d ---, 2020 WL 1820247 (S.D. Cal. 2020) .................7

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
    566 U.S. 639 (2012)..........................................................................43

*Rafeedie v. INS*,
    880 F.2d 506 (D.C. Cir. 1989)..........................................................55

*Sale v. Haitian Ctrs. Council, Inc.*,
    509 U.S. 155 (1993)..........................................................................38

*San Luis & Delta-Mendota Water Authority v. Locke*,
    776 F.3d 971 (9th Cir. 2014) .............................................. 44, 51

ER-0432

*Sanchez-Espinoza v. Reagan*,
    770 F.2d 202 (D.C. Cir. 1985)........................................................................59

*Shaughnessy v. United States ex rel. Mezei*,
    345 U.S. 206 (1953).......................................................................... 39, 54

*Sierra Club v. Costle*,
    657 F.2d 298 (D.C. Cir. 1981)........................................................................46

*Sierra Club v. Trump*,
    963 F.3d 874 (9th Cir. 2020) ........................................................................59

*Sosa v. Alvarez-Machain*,
    542 U.S. 692 (2004).......................................................................... 55, 56

*Sturgeon v. Frost*,
    136 S. Ct. 1061 (2016)........................................................................38

*Tripoli Rocketry Ass'n v. ATF*,
    437 F.3d 75 (D.C. Cir. 2006)........................................................................50

*U.S. Army Corps of Engineers v. Hawkes Co., Inc.*,
    136 S. Ct. 1807 (2016)........................................................................ 5, 35

*Ukiah Valley Med. Ctr. v. FTC*,
    911 F.2d 261 (9th Cir. 1990)........................................................................35

*Underhill v. Hernandez*,
    168 U.S. 250, 252 (1897) ........................................................................58

*United States ex rel. Knauff v. Shaughnessy*,
    338 U.S. 537 (1950)........................................................................54

*United States v. Balint*,
    201 F.3d 928 (7th Cir. 2000) ........................................................................38

*United States v. City of Fulton*,
    475 U.S. 657 (1986)........................................................................53

*Wild Fish Conservancy v. Jewell*,
    730 F.3d 791 (9th Cir. 2013) ........................................................................ 32, 34

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

ER-0433

*Winter v. NRDC*,
    555 U.S. 7 (2008) ................................................................ 58, 60

*Zadvydas v. Davis*,
    533 U.S. 678 (2001) ............................................................ 38, 54

**<u>Federal Statutes</u>**

5 U.S.C. § 551(13) .....................................................................32

5 U.S.C. § 704 ...........................................................................35

5 U.S.C. § 706(1) .........................................................................5

5 U.S.C. § 706(2) ......................................................... 6, 40, 44, 59

6 U.S.C. § 111(b)(1) ............................................................ *passim*

6 U.S.C. § 202 ....................................................................... 1, 9, 41

6 U.S.C. § 211(a) ........................................................................9

6 U.S.C. § 211(c) ............................................................... *passim*

6 U.S.C. § 211(g) ............................................................... *passim*

8 U.S.C. § 1225(b)(1)(A)(i) .......................................................38

8 U.S.C. § 1225(b)(1)(A)(ii) ......................................................54

8 U.S.C. § 1225(b)(2)(A) ...........................................................39

8 U.S.C. § 1225(b)(2)(C) ...........................................................53

8 U.S.C. § 1231(b)(3)(A) ...................................................... 55, 57

8 U.S.C. § 1231(h) .....................................................................55

8 U.S.C. § 1252(a)(5) .................................................................56

8 U.S.C. § 1252(b)(9) .................................................................56

8 U.S.C. § 1252(f)(1) .................................................................58

28 U.S.C. § 1350 .......................................................................55

ER-0434

**Federal Regulations**

8 C.F.R. § 235.1(a) .............................................................37

**Federal Rules**

Fed. R. Civ. P. 23(b)(2) ......................................................57

Fed. R. Civ. P. 56(a) ............................................................7

**Acts of Congress**

Homeland Security Act of 2002,
    Pub. L. No. 107-296, 116 Stat. 2135 (2002) ................................40

Trade Facilitation and Trade Enforcement Act of 2015,
    Pub. L. No. 114-125, 130 Stat. 122 (2016) ..................................41

**Administrative Rules and Decisions**

*Matter of Lewiston-Queenston Bridge*,
    17 I. & N. Dec. 410 (BIA 1980) ...............................................38

**Legislative Materials**

H.R. Rep. No. 104-469, pt. 1 (1996) ....................................... 38, 49, 53

H.R. Rep. No. 104-828 (1996)...................................................39

**Other Authorities**

The American Heritage Dictionary of the English Language (3d ed. 1992)..........38

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ER-0435

## **INTRODUCTION**

"The United States' border with Mexico extends for 1,900 miles, and every day thousands of persons and a large volume of goods enter this country at ports of entry on the southern border." *Hernandez v. Mesa*, 140 S. Ct. 735, 746 (2020). "One of the ways in which the Executive protects this country is by attempting to control the movement of people and goods across the border, and that is a daunting task." *Id.* This case is about whether U.S. Customs and Border Protection (CBP) can control the flow of undocumented aliens into the ports of entry to help accomplish that daunting task.

"[T]he inspection, processing, and admission" of aliens is one of CBP's functions, 6 U.S.C. § 211(c), but it is not the government's primary function at the ports of entry. Congress tasked CBP's Office of Field Operations (OFO), the component that operates the ports, with deterring and preventing terrorists, weapons, illegal entrants, illicit drugs, agricultural pests, and contraband from entering the United States through the ports and "facilitat[ing] and expedit[ing] the flow of legitimate travelers and trade." *Id.* § 211(g)(3). Congress directed the Secretary of Homeland Security to secure the borders and the ports and to "ensur[e] the speedy, orderly, and efficient flow of lawful traffic and commerce." *Id.* § 202. The Department of Homeland Security's (DHS) "primary mission" is preventing terrorism in the United States and "ensur[ing]" that its component agencies' functions "that are not related directly to securing the homeland are not diminished or neglected except by a specific explicit Act of Congress." *Id.* § 111(b)(1).

In recent years, however, inspecting, processing, and detaining inadmissible arriving aliens has consumed an outsize proportion of OFO's strained resources to the detriment of CBP's national-security, counter-narcotics, economic-security, and trade-and-travel-facilitation missions. Beginning in 2016, a sustained and overwhelming surge of undocumented Haitian nationals, the majority of whom were not seeking asylum, sought admission to the United States through the San Ysidro Port

ER-0436

of Entry in San Diego. CBP made every effort to expand the Port's processing and detention capacity, including implementing its contingency plan for surge events, converting office and other spaces into temporary holding areas, diverting port officers from anti-narcotics functions, and using virtual processing to allow CBP officers and Border Patrol agents at other locations to process migrants remotely. But the queue of migrants awaiting processing continued to grow, until eventually the line stretched from the primary inspection booth inside the Port building "clear south into Mexico." Pl. Ex. 17 at 160:12. In late May 2016, around the time the Port surpassed 1,000 individuals in custody and individuals were sleeping in the elements for lack of holding space, San Ysidro stopped intake at the international boundary and directed officers to focus their efforts on processing migrants in custody.

The surge continued into the fall of 2016, changed in composition, and spread east to other ports of entry in OFO's San Diego Field Office and then to ports in the Tucson, El Paso, and Laredo Field Offices. The severe overcrowding, case-processing delays, and adverse impacts to frontline operations followed with it. By the close of Fiscal Year (FY) 2016, ports in the four southwest border Field Offices had encountered and processed more than 150,800 inadmissible aliens, a 70% increase from the recent major surge in 2014. In FY 2016, the southwest border ports seized 8% less narcotics by weight than in FY 2015, a decrease that was not consistent with rising trends in the years preceding and the years since. Def. Ex. 1 ¶ 21. From October 2016 to mid-April 2017, CBP spent more than $45.25 million in overtime, temporary details, and facilities in maintenance costs to address the surge.

In the fall of 2016, DHS and CBP took overarching steps to address the overcrowding and lessen the strain from the unprecedented migrant surge on DHS's operations. CBP created a Crisis Action Team (CAT). DHS and CBP approved the construction of a temporary processing center in El Centro, California. The facility ultimately did not open due to contracting issues, but DHS opened two other facilities in Tornillo and Donna, Texas, later that year. And in November 2016, the CBP

ER-0437

Deputy Commissioner authorized the use of "metering" or "queue management" procedures border-wide. Generally, when a port is metering, an officer stands at the international boundary and screens pedestrians' travel documents. Travelers with facially legitimate documents are permitted to proceed across the border into the port for inspection, and travelers without such documents may be instructed to wait until the port has sufficient capacity to process their resource-intensive applications for admission. There have been isolated missteps, particularly in the initial phases, but the government's policy is and has always been that aliens on U.S. soil must be processed for admission. The Deputy Commissioner explained: "I just want our folks to have an additional tool to keep conditions safe and working at our POEs." Pl. Ex. 69 at 935.

In January 2017, the surge abruptly ended. By that time, the southwest border ports for the most part had stopped metering. But in spring 2018, the ports saw another sustained increase in inadmissible aliens and again reported impacts to their frontline operations. CBP also had evidence that a "caravan" of 550 undocumented migrants was heading north to the border from Central America. Faced with increasing numbers and evidence of a potential mass influx event, and seeking to avoid the crisis that consumed the southwest border in 2016, the OFO Executive Assistant Commissioner issued guidance to the four border Field Offices memorializing their discretion to use queue management "[w]hen necessary or appropriate to facilitate orderly processing and maintain the security of the port and safe and sanitary conditions for the traveling public." Def. Ex. 2. The guidance is clear that "[o]nce a traveler is in the United States, he or she must be fully processed." *Id.*

Although not all 550 caravan members reached the border at once, the number of inadmissible arriving aliens continued trending upwards. DHS and CBP knew the adverse impacts that a sustained migrant surge can bring, so in June 2018, the Secretary of Homeland Security decided that "CBP must focus on its primary mission:

3

ER-0438

to protect the American public from dangerous people and materials while enhancing our economic competitiveness through facilitating legitimate trade and travel." Def. Ex. 3 at 294. The Secretary instructed CBP to structure its staffing and resources at the southwest border ports of entry in order of CBP's national-security, counter-narcotics, economic-security, and trade-and-travel-facilitation mission sets, and to use queue management to ensure that the ports have sufficient operational capacity to implement those missions. *Id.* at 296. The Secretary explained that processing undocumented aliens "remains a component of CBP's mission," *id.*, and indeed, it did: The border Field Offices processed 13,604 more inadmissible aliens in FY 2018 than they did in FY 2017, and they referred twice as many of those inadmissible arriving aliens for credible-fear interviews. Def. Ex. 4 at 2. "[B]ut priority should be given to the" four identified mission sets. Def. Ex. 3 at 296.

The prioritization regime was successful. From FY 2018 to FY 2019, the border Field Offices' narcotics seizure weights for fentanyl and methamphetamine increased by 58% and 19%, respectively, and the value of interdicted outbound currency increased by more than $2.4 million. Def. Ex. 5 at 304. During the same period, the Field Offices saw a moderate increase in the total number of inadmissible arriving aliens (from 124,876 to 126,001), and again referred twice as many aliens for credible-fear interviews in FY 2019 (80,055) as they did in FY 2018 (38,399). Def. Ex. 4 at 2. In November 2019, OFO directed the Field Offices to renew their focus on the priority missions, and the Acting CBP Commissioner ordered the OFO Executive Assistant Commissioner to continue prioritizing staffing and resources at the ports in accordance with the Secretary's June 2018 memorandum.

Plaintiffs contend that these and a host of other DHS and CBP actions since 2016 together constitute "the turnback policy," which is a purported "overarching agency policy directing th[e] unlawful withholding of mandatory action" under the INA, and which was adopted with the "desire to limit access to the asylum process at POEs for its own sake." Pls.' Mem. in Support of Mot. for Summ. J. 21, 29 (Pl.

MSJ; ECF No. 535-1). Plaintiffs contend that "the turnback policy" is unlawful under the Immigration and Nationality Act (INA), the Administrative Procedure Act (APA), the Due Process Clause, and the international law norm of non-refoulement.

Plaintiffs are wrong, and this Court should enter summary judgment for the government on all counts.

*First*, Defendants are entitled to summary judgment on Plaintiffs' APA claims because they fail to challenge a "circumscribed, discrete agency action[]." *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 62 (2004). There is no such thing as "the turnback policy," nor is there any evidence that the myriad government actions that Plaintiffs identify were taken pursuant to the same agency policy. Plaintiffs have "simply attach[ed] a policy label to disparate agency practices or conduct" and called it agency action, which under the APA they simply "may not" do. *Al Otro Lado, Inc. v. McAleenan*, 394 F. Supp. 3d 1168, 1207 (S.D. Cal. 2019). Further, the government's border-wide metering decisions do not "give[] rise to direct and appreciable legal consequences," *U.S. Army Corps of Engineers v. Hawkes Co., Inc.*, 136 S. Ct. 1807, 1814 (2016) (quotation marks omitted), and thus are not "final."

*Second*, Defendants are entitled to summary judgment on Plaintiffs' first APA claim (under 5 U.S.C. § 706(1)) because the government has not "directed [CBP] officers to unlawfully withhold" the government's obligations under 8 U.S.C. §§ 1158 and 1225. *See* Pl. MSJ 21–23. Defendants respectfully maintain their position that §§ 1158 and 1225 do not impose obligations on the government toward aliens who stand outside the United States. But even if the statutes applied, the government has not "direct[ed] th[e] unlawful withholding of" its legal obligations. The southwest border Field Offices continue to inspect and process inadmissible arriving aliens and in fact referred almost five times as many of those aliens for credible-fear interviews in FY 2019 than they did in FY 2017. Def. Ex. 4 at 2. At *most*, such agency action is delayed, and Plaintiffs do not attempt to argue that delays attendant to metering were unreasonable. *See* Pl. MSJ 19–31. Thus, their § 706(1) claim fails.

*Third*, Defendants are entitled to summary judgment on Plaintiffs' second APA claim (under 5 U.S.C. § 706(2)) because the government's border-wide metering decisions are statutorily permissible. *See* Pl. MSJ 24–25. Congress ordered CBP to perform a number of critical national-security, counter-narcotics, economic-security, and trade-and-travel functions at the ports and elevated DHS's national-security and counter-narcotics functions above all others, 6 U.S.C. §§ 111(b)(1), 211(c), (g)(3), and the agency has reasonably exercised its "broad discretion to choose how best to marshal its limited resources and personnel to carry out its delegated responsibilities," *Massachusetts v. EPA*, 549 U.S. 497, 527 (2007) (citation omitted).

*Fourth*, each of the government's border-wide metering decisions is well-supported by the facts, is the product of reasoned decisionmaking, and is not based on an arbitrary and capricious interpretation of the INA. *See* Pl. MSJ 26–31. The stated purpose of metering is to address capacity constraints. There is no "pretext" because CBP *in fact was facing capacity constraints*. Even if the evidence showed that there were other reasons for metering, "a court may not reject an agency's stated reasons for acting simply because the agency might also have had other unstated reasons." *Dept. of Commerce v. New York*, 139 S. Ct. 2551, 2573 (2019).

*Fifth*, the government has not violated class members' procedural-due-process rights, *see* Pl. MSJ 31–33, because they do not have a protected statutory interest while they stand in Mexico. Even if class members had a protected interest, they cannot obtain more than what the statute already provides.

*Sixth*, Plaintiffs' Alien Tort Statute (ATS) claim (at 33–36) is not actionable. There is no cause of action for purported violations of the non-refoulement doctrine, and it would be an extraordinary exercise of lawmaking power for this Court to create such a cause of action here.

*Finally*, even if Plaintiffs were to succeed on their claims, they are not entitled to the permanent injunctive and declaratory relief they seek. Vacatur of the border-wide metering decisions is an appropriate legal remedy that provides complete relief.

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

ER-0441

1  Moreover, the balance of the harms weighs starkly against an injunction of metering,

2  as it would harm CBP's national-security and economic security functions and lead

3  to overcrowded facilities where class members would suffer.

4  This Court should enter summary judgment for the government on all Claims.

5  ## LEGAL STANDARD

6  The Court "shall grant summary judgment if the movant shows that there is

7  no genuine dispute as to any material fact and the movant is entitled to judgment as

8  a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if "the evidence is such

9  that a reasonable jury could return a verdict for the nonmoving party." *Anderson v.*

10 *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). The moving party

11 can carry its burden: "(1) by presenting evidence that negates an essential element

12 of the nonmoving party's case; or (2) by demonstrating that the nonmoving party

13 failed to make a showing sufficient to establish an element essential to that party's

14 case on which that party will bear the burden of proof at trial." *Quidel Corp. v. Sie-*

15 *mens Med. Solutions USA, Inc.*, --- F. Supp. 3d ---, 2020 WL 1820247, at *2 (S.D.

16 Cal. 2020) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). "'Credi-

17 bility determinations, the weighing of the evidence, and the drawing of legitimate

18 inferences from the facts are jury functions, not those of a judge" at the summary-

19 judgment stage. *Id.* at *3 (quoting *Anderson*, 477 U.S. at 255). The non-movant's

20 evidence "is to be believed, and all justifiable inferences are to be drawn in [its]

21 favor." *Anderson*, 477 U.S. at 255; *Quidel Corp.*, 2020 WL 1820247, at *3.

22 ## UNDISPUTED FACTS

23 **A.    Congress Charged DHS, CBP, and OFO With Numerous Duties to Safe-**
       **guard America's Borders.**

24 CBP's Office of Field Operations is the largest component of the largest fed-

25 eral law-enforcement agency in the United States, with operations spanning over 328

26 ports of entry within 20 field offices and 70 international locations. *See* Def. Ex. 6

27 at 1. Almost 30,000 OFO employees implement CBP's mission "[t]o safeguard

28

7

America's borders thereby protecting the public from dangerous people and materials while enhancing the Nation's global economic competitiveness by enabling legitimate trade and travel." Pl. Ex. 10, at 51:2–4; Def. Ex. 7 at 1.

Congress mandated that OFO "shall coordinate the enforcement activities of [CBP] at United States air, land, and sea ports of entry to deter and prevent terrorists and terrorist weapons from entering the United States at such ports of entry; conduct inspections at such ports of entry to safeguard the United States from terrorism and illegal entry of persons; prevent illicit drugs, agricultural pests, and contraband from entering the United States; in coordination with the Commissioner, facilitate and expedite the flow of legitimate travelers and trade; ... coordinate with the Executive Assistant Commissioner for the Office of Trade with respect to the trade facilitation and trade enforcement activities of [CBP]; and carry out other duties and powers prescribed by the Commissioner." 6 U.S.C. § 211(g)(3) (numbering omitted).

OFO is only one of several offices within CBP. Congress has tasked CBP with many additional functions, including to coordinate CBP's "security, trade facilitation, and trade enforcement functions"; to direct and administer CBP's commercial operations; to "detect, respond to, and interdict terrorists, drug smugglers and traffickers, human smugglers and traffickers" and other national security threats from abroad; to "ensure the overall economic security of the United States is not diminished by efforts, activities, and programs aimed at securing the homeland"; to "develop and implement screening and targeting capabilities," including for passengers and cargo; to "enforce and administer the laws relating to agricultural import and entry inspection"; and, "in coordination with [ICE] and United States Citizenship and Immigration Services [USCIS], [to] enforce and administer all immigration laws ... including the inspection, processing, and admission of persons who seek to enter or depart the United States, and the detection, interdiction, removal, departure from the United States, short-term detention, and transfer of persons unlawfully entering, or who have recently unlawfully entered, the United States." *Id.* § 211(c).

8

ER-0443

And CBP in turn is only one component agency of the Department of Homeland Security (DHS). *Id.* § 211(a). DHS's "primary mission[s]" are focused on securing the nation and the prevention of terrorism and terrorist attacks. *See id.* § 111(b)(1). Further, DHS is charged with not only preventing the entry of terrorists and securing the borders, but also administering customs laws, conducting agricultural inspections, carrying out all immigration enforcement functions, administering the laws governing permissions for aliens to enter the United States, and "establishing national immigration policies and priorities." *Id.* §§ 202(1)–(7). "In carrying out the foregoing responsibilities," the Secretary shall "[e]nsur[e] the speedy, orderly, and efficient flow of lawful traffic and commerce." *Id.* § 202(8).

The southwest border Field Offices perform an immense job. In 2019, the ports in those Field Offices processed approximately 49.2 million pedestrians; 73 million personal vehicles and 136.9 million personal passenger vehicles; 2.2 million bus passengers; and 6.4 million trucks and 6.5 million truck containers. *See* Def. Ex. 8 at 1, 2, 4–5. OFO also "plays a vital role in interdicting illicit narcotics." Def. Ex. 9 at 1. The "vast majority of all opioids interdicted by CBP are seized at ports of entry." *Id.* at 1; *see id.* at 4–5. From 2013 to 2017, 88% of CBP's opioid seizures occurred at ports of entry, and 75% of those seizures occurred at ports on the southwest border. *Id.* at 1. CBP currently "does not have technology that screens all packages, cargo, or vehicles," so the agency's "ability to detect narcotics hidden on individuals, in vehicles, or comingled with shipments of goods currently relies heavily on targeting intelligence and officer training and experience." *Id.* at 16.

The ports of entry often operate with "significant shortages" of CBP officers. *Id.* at 1. As of May 2018, there were "4,000 [CBP officers] less than the number needed to staff all ports of entry. Ports of entry in the San Diego and Tucson areas ... have required CBP to assign temporary staff details to fulfill staffing needs at those locations. The practice of temporary details has become so systemic ... that CBP has named it 'Operation Overflow.'" *Id.* at 2; *see also* Def. Ex. 10 at 836.

9

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

**B.    The 2016 Migration Surge Stretches the San Ysidro Port of Entry's Capabilities and Diverts Resources From Other Statutory Missions.**

Beginning in February 2016, inadmissible Haitian nationals traveling from Brazil began presenting themselves in significant numbers at the San Ysidro Port of Entry in San Diego, the busiest land border crossing in the Western Hemisphere. *See* Pl. Ex. 33 at 443; Def. Ex. 11 at 1. By May 2016, CBP officials in Southern California "exhausted every effort" to "expand any additional processing and [short-term] detention capacity" to accommodate this influx. Pl. Ex. 17 at 160:9–18. Measures included activating the San Ysidro Admissibility Enforcement Unit's (AEU) "Max Capacity Contingency Plan" San Ysidro's Admissibility Enforcement Unit, Pl. Ex. 35 at 271, which involved "convert[ing] office and administrative spaces to temporary holding areas to increase capacity to over 900 persons," Pl. Ex. 33 at 444; Pl. Ex. 29 at 660; Def. Ex. 12; converting a maintenance area recently vacated by the General Services Administration (GSA) into a holding area, Pl. Ex. 34 at 339; almost doubling the number of CBP officers assigned to the AEU per shift, Pl. Ex. 35 at 271; diverting officers from anti-narcotics functions to assist the AEU with processing, Pl. Ex. 35 at 271; using "virtual processing" to allow CBP officers in the San Diego, Los Angeles, Detroit, and Miami Field Offices and Border Patrol agents in the El Centro Sector to assist in processing migrants at San Ysidro, *id.*; Pl. Ex. 34 at 338; Def. Ex. 10 at 835; housing detainees at nearby Border Patrol facilities, if the facilities "were not already at capacity," Pl. Ex. 33 at 445; and transferring processing of all I-94 arrival records for documented non-resident aliens to the Otay Mesa Port of Entry to free up workstations at San Ysidro, Pl. Ex. 34 at 339. Even with all of these measures, undocumented aliens still had to wait to be processed and detained. Aliens "without documents for admission would queue in an area between the [international boundary] at the port of entry and the primary [pedestrian] lanes to wait until there was sufficient space" to be processed. Pl. Ex. 17 at 159:12–19. By late May 2016, this queue stretched from the primary inspection booths at the POE

10

1  "clear south into Mexico." *Id.* at 160:12.

2   The numbers of undocumented aliens seeking entry at San Ysidro continued

3  to grow, to the point that the Port reached surpassed 1,000 individuals in custody

4  and CBP officers at San Ysidro were compelled to "stop intake at the international

5  boundary" because there "was no space" left, and they needed to bring in everyone

6  from the queue "to make sure they were not left in the elements." Pl. Ex. 17 at 160:6–

7  161:9; Def. Ex. 10 at 836; *see also* Def. Ex. 1 ¶ 22. On May 26, 2016, when asked

8  by a media outlet about the "several hundred people [] sleeping on the floor of the

9  [San Ysidro] pedestrian entrance," the San Ysidro Port Director directed his staff "to

10  do all we can to get this under control." Pl. Ex. 41, at 552–53. He instructed them

11  "to continue to process in a timely manner" and locate temporary holding space "as

12  efficiently as possible." *Id.* at 552. On May 27, 2016, upon receiving word that

13  "[o]ne of the shelters" in Mexico was bringing "a van full" of individuals to the limit

14  line, the San Ysidro Assistant Port Director instructed the Watch Commander to

15  "hold them at the turnstile and not allow them to come into the line. We have no

16  space and it is ugly." Pl. Ex. 42 at 127; *see also* Def. Ex. 1 ¶ 21. Shortly thereafter,

17  the Port Director instructed his deputies "to hold the line the best we can" to enable

18  staff to "process cases and only focus on processing case[s] at this time." Pl. Ex. 43

19  at 657. The next evening, the Assistant Port Director remarked that "[t]his could go

20  on for a while. When they bring the 74+ from the shelter, the 50 I saw this morning

21  plus whatever else is arriving, we will be overcrowded." Pl. Ex. 44 at 316. In re-

22  sponse, the Port Director ordered his deputies to "coordinate and bring small groups

23  at a time and hold the line to prevent any from entering." *Id.*

24   On May 29, 2016, San Ysidro leadership notified supervisors that the govern-

25  ment of Mexico had "set[] up shelters in Tijuana to house those waiting to claim

26  credible fear/asylum," rather than continue to allow them to wait unsheltered in "a

27  line staged on the Mexican side" of the border. Pl. Ex. 11 at 298. The Mexican gov-

28  ernment would ████████████

ER-0446

1  ███████████  *Id.* CBP officers were to "staff[] the ... Limit Line to ensure that trav-

2  elers have documents" and ensure that "those coming to seek credible fear/asylum

3  are identified and directed appropriately at the onset if feasible." *Id.*

4      To add to the operational challenges posed by surge, San Ysidro was in the

5  middle of a multi-phase, multi-year "complete reconfiguration and expansion of the

6  port" that "included the demolition and construction of the LPOE [land port of en-

7  try], including primary and secondary inspection areas, administration and pedes-

8  trian buildings, and all other support structures." Def. Ex. 11 at 1. In late June 2016,

9  as phase 2 of the GSA construction project began, the "PedEast" facilities that San

10  Ysidro had utilized in May to create makeshift detention space for the overflow of

11  undocumented migrants were demolished. Pl. Ex. 33 at 444; Def. Ex 12. This effec-

12  tively cut the Port's short-term detention capacity from ███ (which it achieved by

13  converting office and other space, *see* Pl. Ex. 33 at 444) to ██. Def. Ex. 10 at 837.

14  During the surge at San Ysidro, officers were regularly reminded that "[u]nder no

15  circumstances will an asylum applicant be denied entry into the U.S. Please direct

16  all applicants to the Pedestrian West (PedWest) facility for proper intake and pro-

17  cessing." Pl. Ex. 8 at 069, 070, 071 (instructions issued in July, Sept., and Nov. 2016

18  to the San Ysidro and Otay Mesa POEs).

19  **C.   The Surge's Adverse Impacts Expand to Other Ports of Entry.**

20      The migrant surge continued into the fall of 2016, began spreading east, and

21  started to change in composition to include more family units (FAMU or FMUA)

22  and unaccompanied alien children (UAC). *See* Pl. Ex. 10 at 313:9–319:8. Other ports

23  began to experience severe overcrowding, case-processing delays, and related ad-

24  verse impacts to their operations. For example, on September 3, 2016, the El Paso

25  Port of Entry in Texas, which around that time reported a detention capacity of ██

26  persons, Def. Ex. 13 at 100, "received 92 cases in one shift. Since th[at] date, the

27  Port [] experienc[ed] a significant spike in FAMU cases. In the ten day span between

28  September 4 and September 13 the Port [was] averaging ███ subjects in custody per

12

day." Def. Ex. 14 at 893–94; *see* Def. Ex. 15 at 737 (reporting on Sept. 9, 2016 "an all-time high of 265 detainees in custody"). "During this spike, an average of 23% FAMU cases [were] held at a POE in excess of 72 hours pending placement." Def. Ex. 14 at 894. The Port was "providing up to 1,000 meals per day using microwaves. The facility [was] not equipped for this amount of volume." *Id.* "Active caseload management [was] being performed by transporting cases for processing to less af-fected Ports." *Id.* But the El Paso Field Office "has no ground transportation contract. All transports are performed by OFO officers." *Id.* at 893. "[T]he increased trans-ports between Ports, to ERO facilities, and to the Airport is straining OFO vehicle and personnel resources." *Id.* at 894. Moreover, the Field Office was "scheduled to detail eight (8) Officers to San Diego" on October 3, 2016. *Id.; see also* Def. Ex. 16 at 099 (on Sept. 21, 2016, noting need for overflow holding area and more staffing).

On September 12, 2016, "at least 950 Haitians" arrived in Tijuana to be pro-cessed at San Ysidro. Pl. Ex. 12 at 741; Pl. Ex. 50 at 747–48. "Haitians [were] also [] arriving in increasing numbers at other ports of entry in [preceding] weeks, such as Calexico, which is far less resourced than San Ysidro." Pl. Ex. 12 at 741. Repre-sentatives from the U.N. High Commissioner for Refugees (UNHCR) "confirmed" that "most" of the Haitian nationals were "not seeking asylum. ... Instead, they [were] expressing interest in working and/or reuniting with family in the" United States. *Id.* "At least half of CBP's staffing and space previously dedicated to pro-cessing asylum-seekers [was] being used to process Haitian parole cases." *Id.* at 742. UNHCR acknowledged that "[b]oth CBP and ICE in Southern California [were] ... doing what they c[ould] with existing resources to process the Haitians expeditiously and humanely and maintain regular processing of asylum-seekers." *Id.* at 741–42.

On September 27, 2016, the El Paso POE reported that it "ha[d] 361 detainees in custody" (surpassing its September 9 "all-time high of 265 detainees in custody," Def. Ex. 15 at 737) "as more FAMU and UAC continue to arrive." Def. Ex. 17 at 817. On September 28, 2016, the El Paso POE reported that it had diverted resources

ER-0448

from various other operational areas "to address the current Credible Fear processing and detention overflow at the" Port. Def. Ex. 18 at 684. It redirected officers who work on terrorism-related enforcement to assist with inadmissible alien case processing and related duties (*see id.*, "ATCET [Anti-Terrorism Contraband Enforcement Team] Supervisors and Officers have been re-directed to assist with PCS [Passport Control Secondary], PVP [Passenger-Vehicle-Pedestrian] and transportation duties until further notice"); suspended new-officer training; redirected training officers and firearm staff to assist with inadmissible alien case processing and transportation; redirected "CBP Techs assigned to the Administration Office ... to each bridge location to assist with feeding and other duties as necessary to keep the Officers focused on processing." Def. Ex. 18 at 684; *see* Def. Ex. 19 at 859–68 (images of overcrowding at the El Paso Field Office's ports of entry). Even so, on September 30, 2016, ports of entry in the El Paso Field Office ports "surpassed 400" in custody. Def. Ex. 20 at 830. The situation was "critical." *Id.* Nevertheless, OFO was in the process of transporting Haitian migrants into the El Paso Field Office from the San Diego Field Office to relieve the pressure at the California ports. *Id.*

On October 3, 2016, the El Paso Field Office reported that the surge of UACs and family units "continues to create adverse impacts to port operations, as UAC and FAMU's [*sic*] are being placed throughout administrative spaces of the port. Additionally, CBP personnel are being reassigned to support this influx, impacting other critical areas." Def. Ex. 21 at 755. The same day, the El Paso Border Patrol Sector reported that it was "barely staying afloat," and requested that the El Paso Field Office move its detainees out of Border Patrol's Paso Del Norte facility and into others because Border Patrol was "currently out of policy ... by holding subjects in non-holding cells." Def. Ex. 22 at 270.

Other southwest border ports experienced similar overcrowding and adverse impacts on port operations. *See, e.g.*, Def. Ex. 23 (Oct. 3, 2016 report that Brownsville POE had to re-allocate staff to address "high volume of detainees"); Def. Ex.

14

24 (Oct. 14, 2016 report that the Laredo Field Office had to divert staff, detail offic-ers, and was "expanding use of port administrative space for temporary holding," which required additional personnel); Def. Ex. 25 (Oct. 16, 2016 report from the Port of Hidalgo); Def. Ex. 26 (Oct. 25, 2016 report from the Port of Hidalgo); Def. Ex. 27 (Oct. 10, 2016 report from the Port of San Luis in the Tucson Field Office); Pl. Ex. 16 at 46:5–13 (numbers in custody at San Luis were "unsafe" and "un-healthy"); Def. Ex. 28 (Oct. 19, 2016 report from Port of Nogales); Def. Ex. 29 (Oct. 25, 2016, Ports of Nogales and San Luis had "far exceeded capacity").

On October 5, 2016, ███████████████████████████████████ █████████████████████████████████████████████████████████ ████████████████████████████ the Deputy CBP Commissioner asked ICE about the possibility of increasing the rate of pickups from the San Ysidro and Calex-ico Ports of Entry. Def. Ex. 30 at 527. The Acting ICE Director responded that ICE was "currently at 39,650 aliens in custody," "the highest level in [its] history." *Id.*

On October 17, 2016, the San Diego Field Office was utilizing 155% of its detention capacity, the Tucson Field Office was utilizing 231% of its detention ca-pacity, the El Paso Field Office was using 99% of its detention capacity, and the Laredo Field Office was utilizing 106% of its detention capacity. Def. Ex. 31 at 585. In FY 2016, the southwest border ports of entry encountered more than 150,800 inadmissible aliens, a 70% increase over FY 2014. Def. Ex. 32 at 562.

**D.     DHS and CBP Take Additional Steps to Address the Surge.**

Against this backdrop, in the fall of 2016, DHS and CBP evaluated and took additional, overarching steps to address overcrowding and to lessen the strain of the unprecedented migrant surge on DHS operations and mitigate humanitarian con-cerns. These steps involved plans to increase processing and holding capacity, as well as to meter the intake of aliens without documents sufficient for lawful entry.

In October 2016, the CBP Commissioner "established a single CBP Crisis Action Team," Def. Ex. 33 at 4, the purpose of which was "to mitigate impacts to

1   mission essential functions," Def. Ex. 34 at 710, and "to learn lessons from and avoid
2   repeating mistakes made during a prior surge of UAC in 2014," Def. Ex. 33 at 4.
3   The Crisis Action Team (CAT) was "[c]omposed of representatives from various
4   CBP components" and "compiled data and developed strategies to address the surge
5   and overcrowding." *Id.* at 4.

6       On October 18, the day ICE reported surpassing 41,000 detention beds, CBP
7   Deputy Commissioner McAleenan communicated to CBP leadership that the Secre-
8   tary and Commissioner had approved the establishment of a temporary processing
9   center for Haitian nationals in El Centro, California. Pl. Ex. 47 at 116–17. Consid-
10  erations supporting the facility's establishment included the "current numbers in
11  Baja California and throughout the transit route from Panama," the "lack of near-
12  term removals to Haiti" because of Hurricane Matthew, the lack of "near-term agree-
13  ment with Brazil for returns of Haitians with residency status there," the "pressure
14  on Mexico and Central American partners" caused by "over 12,000 Haitian nationals
15  in various stages of transit and high-level requests from Mexico and others for US
16  assistance," and "no immediately available path for providing foreign assistance for
17  Central American partners to conduct detention and removal operations." *Id.* at 116.
18  In this broader discussion of regional migration patterns and international coordina-
19  tion, Mr. McAleenan also noted that ███████████████████████████████
20  ███████████████████████████████████████████████████████████
21  ███████████████████████████████████████████████████████████
22  ███████████████████████████████████████████████████████████
23  ███ *Id.*

24      On October 30, 2016, the CBP Commissioner directed his staff "to continue
25  El Centro work" and "look[] at bringing the Nogales facility from 2014 back on
26  line." Pl. Ex. 55 at 175. On or about October 31, 2016, the Secretary and the Com-
27  missioner "approved moving forward with the plan to establish the infrastructure
28  that would support ███████ soft-sided FMUA or UAC beds." *Id.* at 173. On or about

16

1   November 1, 2016, the El Centro facility was expected to have a "soft opening on

2   November 14th and a full opening on November 28th." Pl. Ex. 56 at 316.

3         On November 2, 2016, the OFO Executive Assistant Commissioner wrote to

4   his deputies that he was "seeing engagement by senior leaders at the department and

5   in the administration on our migration and detention issues." Pl. Ex. 60 at 228. In

6   addition to steps identified above, DHS was working to █████████████████████

7   ████████████████████████████████████████████████████████████

8   ████████████████████████████████████████████████████████████

9   ████████████████████████████████ *Id.* at 228; *see also* Pl. Ex. 59 at 845

10   ████████████████████████████████████████████████████████████

11   ████████████████████████████████████████████████████████████

12   ██████████.

13         At this time, the CAT began reporting on the ongoing DHS-coordinated plans

14   "for addressing the surge of migration along the Southwest border." Pl. Ex. 61 at

15   530. ██████████████████████████████████████████████████████

16   ████████████████████████████████████████████████████████████

17   ████████████████████████████████████████████████████████████

18   ████████████████████████████████████████████████████████████

19   ████████████████████████████████████████████████████████████

20   ████████████████████████████████████████████████████████████

21   ████████████████████████████████████████████████████████████

22   ████████████████████████████████ *Id.*

23         On November 7, 2016, both the San Ysidro and Calexico Ports of Entry were

24   "at capacity and [were] prioritizing intake to manage the flow." Pl. Ex. 62 at 790.

25   That same day, the CAT held an "operational conference call" with the San Diego

26   Field Office to "discuss the 'soft opening' of the El Centro Processing center" on

27   November 14. *Id.* ████████████████████████████████████████

28   ████████████████████████████████████████████████████████████



*Id.*

*Id.* at 790, 791.

*See id.* at 790.

On November 9, 2016, the CAT informed CBP leadership that the "El Centro Facility will NOT have a soft opening of 11/14 and will NOT go live on 11/28. Planning and contracting will continue but NO TDY personnel from OFO and ICE will be deployed. CBP will continue to work and have [the] facility ready for when trigger is pulled to staff it." Pl. Ex. 65 at 879. "[T]he issue [was] bed space." *Id.* at 878.

Pl. Ex. 66 at 216. The CAT continued to discuss and work on other options for soft-sided facilities. Pls.' Ex. 65, at 879.

On November 10, 2016, CBP Deputy Commissioner McAleenan discussed "meter[ing] the flow ... at the POE bridges (at the middle of the bridge) at some of our Texas POEs to prevent the overflow at the actual POE." Pl. Ex. 67 at 936; *see also* Pl. Ex. 68 (Commissioner Kerlikowske and Mr. McAleenan "briefed" Secretary Jeh Johnson "that [they] wanted to increase efforts to meter arrivals of non-UAC, non-Mexican CF cases mid-bridge"). That afternoon, Secretary Johnson approved the proposal. Pl. Ex. 67 at 936. OFO was directed to "proceed with informing [the] OFO field leadership at some of our Texas POEs of this approval so they can start this new operational alignment to bring relief at the POEs." *Id.*

On November 11, 2016, the OFO Executive Assistant Commissioner in-formed the CBP Deputy Commissioner that he was "on board with the metering," and that he "advised [the Directors of Field Operations] via telephone last night to

1  start." Pl. Ex. 69 at 935. The Deputy Commissioner responded: "[t]he implementa-
2  tion [of metering] is subject to your discretion and theirs (and PDs') on what will
3  work best operationally and whether it is required on any given day or any specific
4  location." *Id.* The Deputy Commissioner explained that " ███████████████████
5  ████████████████████████████████████████ I just want our folks to
6  have an additional tool to keep conditions safe and working at our POEs." *Id.*

7      On November 11, the El Paso POE reported "406 detainees in custody." Def.
8  Ex. 13 at 100; *see also* Def. Ex. 35. The Port "beg[a]n metering at the middle of the
9  bridge at all 3 crossing locations." Def. Ex. 13 at 100. On November 11 and 12,
10  2016, the Tucson, Laredo, and El Paso Field Offices transmitted instructions to their
11  ports authorizing metering-like practices. *See* Pl. Ex. 70 at 662 (Nov. 11, 2016 email
12  from Tucson Field Office to Port Directors); Pl. Ex. 71 at 496; Pl. Ex. 13 at 607
13  (Nov. 12, 2016 email from Laredo Field Office authorizing ports to use "appoint-
14  ment[s]" ███████████████████████████████); Def. Ex. 36
15  (Nov. 11, 2016 email from Laredo Field Office to Port Directors).

16      Metering practices at this time were "not standardized." Pl. Ex. 20 ¶ 47. For
17  example, on November 17, 2016, the Port of El Paso reported that it was using an
18  appointment system and that it was metering aliens "while on the U.S. side of the
19  bridge [walkway into the port]." Pl. Ex. 74 at 450. Upon learning that aliens may be
20  being turned away while on U.S. soil, OFO headquarters immediately began "work-
21  ing with the port to address" the issue. Def. Ex. 37 (Nov. 18, 2016 email noting that
22  the Ports of El Paso and Hidalgo were turning people away on U.S. soil, and that it
23  was being addressed); Def. Ex. 36 (Nov. 15, 2016 email from OFO headquarters
24  clarifying to Laredo Field Office that "[i]f any individual arrives at POE, we cannot
25  just send them back to MX ... but must process them upon arrival"); *see also* Def.
26  Ex. 38; Pl. Ex. 102 at 137:10–20 (the officers at El Paso were not stationed correctly
27  during the first week of metering in November 2016, "so we had some corrections
28  to make"); Def. Ex. 39 (El Paso "course corrected" and ceased using appointment

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

ER-0454

system). At this and all times, the use of physical force to return an asylum seeker to Mexico was "CBP['s] policy and procedures pertaining to the processing of asylum seekers." Pl. Ex. 8, at 043 (report from CBP's Office of Professional Responsibility (OPR)).[1]

On November 15, 2016, the CAT informed CBP leadership that the planned Nogales Processing Center was on hold. *See* Pl. Ex. 72 at 938, 939. The CAT explained that ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████ *Id.* at 939. The same day, the CAT informed CBP leadership that a "Notice to Proceed issued last night to erect a temporary CBP processing center" at Tornillo "with 500 bed capacity with option to expand." *Id.*

CBP then stood up two soft-sided facilities, one on November 25, 2016, in Tornillo, Texas, and the other on December 10, 2016, in Donna, Texas. Def. Ex. 33 at 5; *see also* Pl. Ex. 33 at 445; Def. Ex. 42 (Dec. 8, 2016 CAT report). From November 25 until February 14, 2017, when the facility went to stand-by status, the

---

[1] Plaintiffs' "undisputed facts" recite a handful of unrelated incidents involving alleged coercion or use of physical force, claiming that these incidents are related to metering in 2016 and 2017. *See, e.g.*, Pl. MSJ 5 & n.4, 11. The one cited use-of-force incident in January 2017 resulted in an internal OPR investigation and discipline. Pl. Ex. 8; Def. Ex. 40 (disciplinary letter for unbecoming conduct and "failure to follow procedures"). Plaintiffs cite only three incidents of claimed coercion from only one POE (San Ysidro), in which Plaintiffs were allegedly coerced in May 2017 into withdrawing their asylum applications. Pl. MSJ 5 n.4. Yet Plaintiffs do not, and cannot, connect these claimed incidents to any overarching or border-wide DHS or CBP policy, let alone to the decisions to implement metering. The most Plaintiffs cite is a San Diego Field Office policy regarding a "streamlined withdrawal" process for aliens who chose to withdraw their applications for admission. *See* Pl. Ex. 7 at 611. Under that local policy, "[i]f the applicant indicates a request for asylum or articulates a fear of returning," he or she "must" be referred for a credible-fear interview. Def. Ex. 41 at 619; *see also* Pl. Ex. 7 at 611.

Tornillo facility held a total of 5,721 aliens. Def. Ex. 33 at 6. From December 10 until February 10, 2017, when the facility went to stand-by status, the Donna facility held 2,172 aliens. *Id.*

In December 2016, as the numbers of migrants abated, most ports stopped using metering-like practices to control intake of aliens without documents sufficient for lawful entry. Def. Ex. 43 (Dec. 17, 2016 custody report showing decreased numbers); Pl. Ex. 102 at 86:15–19 (El Paso engaged in metering for three weeks beginning in November 2016); *accord* Pl. Ex. 20 ¶ 41 (noting that metering had ceased in Nogales, Arizona in December 2016).[2]

In January 2017, the surge "abruptly, drastically, and unexpectedly ended." Def. Ex. 33 at 2; *see also id.* at 5 ("[W]itnesses ... were stunned at how low the numbers were."). "In March 2017, several CBP executives recommended permanently closing the [Donna and Tornillo] facilities (which at that time were in stand-by status) because they believed the migration levels would remain low due to policy changes and other factors." *Id.* at 8. But Deputy Commissioner "McAleenan decided to keep the facilities in stand-by status for one additional month" because "he worried [about] another backup," "he was mindful that a recent Executive Order and DHS guidance ... instructed CBP to ensure sufficient short-term detention capacity," he was concerned that the migrants' initial reluctance to come to the U.S. after the inauguration might wear off," and "he feared the annual Spring migration increase." Def. Ex. 33 at 8 (footnote omitted).

Between October 1, 2016, and April 12, 2017, CBP spent more than $45.25

---

[2] Although San Ysidro did not cease metering in December 2016, it was usually not metering between February and December 2017 due to the low numbers. *See* Pl. Ex. 17 at 258:15–21. In April 2017, upon learning of a complaint that a CBP supervisor turned back an individual at the border, *see* Def. Ex 44, port leadership promptly messaged San Ysidro and Otay Mesa managers: "Any asylum applicant we encounter should be taken into custody, escorted to the security office, and then transported to AEU for proper intake and processing. We should not be sending any asylum seekers back to Mexico. Please remind our officers." Def. Ex 45.

21

1   million to address the migrant surge. Pl. Ex. 33 at 446. This included OFO's ex-
2   penditure of $15.76 million in overtime, temporary duty assignments, and operations
3   support; Border Patrol's expenditure of $9.13 million in overtime, TDY, and opera-
4   tions support; and more than $20.24 million in facilities and maintenance costs. *Id.*

5   **E.    As the 2018 Migrant Caravan Approaches, CBP Issues Written Metering Guidance.**

6       In early 2018, the number of undocumented aliens approaching the border
7   began to rise and "start[ed] to reach a high point in the spring of 2018." Pl. Ex. 10 at
8   68:19–20. In January 2018, the southwest border Field Offices processed 9,930 in-
9   admissible arriving aliens. Def. Ex. 46 at 4. In February 2018, the Field Offices pro-
10  cessed 10,085 inadmissible arriving aliens. Def. Ex. 47 at 4. In March 2018, the Field
11  Offices processed 12,957 inadmissible arriving aliens. Def. Ex. 48 at 4. In April
12  2018, the Field Offices processed 12,295 inadmissible arriving aliens. Def. Ex. 49
13  at 4. Ports began to report "impacts to frontline functions" from the "increase in
14  detainees." Def. Ex. 50 at 853 (Apr. 4, 2018 email from the El Paso Assistant Direc-
15  tor of Field Operations); *see also* Def. Ex. 51 (Apr. 3, 2018 Laredo Field Office
16  report of increased numbers and impact on processing and holding capacity, alt-
17  hough "currently manageable"); Def. Ex. 52 (Apr. 18, 2018 San Ysidro report of
18  passenger officers being diverted to provide emergency case-processing assistance).

19      Between March 31, 2018, and April 23, 2018, CBP received information that
20  a migrant caravan originating in Central America was making its way north from
21  southern Mexico to the U.S.-Mexico border. *E.g.*, Pl. Ex. 80. On April 21, 2018, 550
22  members of the caravan arrived in Hermosillo, Sonora (a city about 175 miles south
23  of Nogales, Arizona), intending to "continu[e] their voyage northward." *Id.* at 784.
24  On April 24, CBP Commissioner McAleenan wrote to his deputies: "While we are
25  working diligently with Mexico to address as many caravan members as possible,
26  pressing ICE and others to prepare effective coordination of detention and immigra-
27  tion proceedings, and recommending strong posture changes for [the Secretary's]

28

22

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

decision, it is increasingly likely that we will face the arrival of a large portion of these 500–600 individuals ... in the coming days without a change in enforcement posture ... ." Pl. Ex. 81 at 778. Commissioner McAleenan continued: "I know that you have been planning and preparing, and that our field leadership and our officers will act with utmost professionalism and competence, in accordance with law, regulation, and CBP policy, as well as the guidance from the Secretary to effectively enforce the immigration laws of the United States, while appropriately considering and processing claims of fear for those seeking protection. Please confirm that you have sent out guidance regarding safe processing and port security and capacity issues relating to queue management. Please confirm that, absent special circumstances, we will utilize ER [expedited removal], vice NTA [notice to appear], and that release decisions will be made by ICE unless there is a medical emergency or humanitarian emergency." *Id.*

On April 25, 2018, at about 9:00 AM, the San Ysidro Port of Entry had █████ individuals in custody, representing 92% of its detention capacity. Def. Ex. 53 at 712. Around 1:00 PM, the Mexican government notified CBP that ████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ Def. Ex. 54 at 632. That day, San Ysidro had brought in "50 Mexican Family Units claiming asylum." Def. Ex. 55 at 632. On April 26, 2018, at about 9:00 AM, the San Ysidro Port of Entry had ████ individuals in custody, representing 104% of its detention capacity. Def. Ex. 56 at 645.

On April 27, 2018, the OFO Executive Assistant Commissioner issued a memorandum with the subject line "Metering Guidance" to the Directors of Field Operations (DFOs) for the El Paso, Laredo, San Diego, and Tucson Field Offices. *See* Def. Ex 2. The memorandum states: "When necessary or appropriate to facilitate orderly processing and maintain the security of the port and safe and sanitary conditions for the traveling public, DFOs may elect to meter the flow of travelers at the

ER-0458

1    land border to take into account the port's processing capacity." *Id.* When metering,

2    "[p]orts should inform the waiting travelers that processing at the port is currently at

3    capacity and CBP is permitting travelers to enter the port once there is sufficient

4    space and resources to process them." *Id.* DFOs "may establish and operate physical

5    access controls at the borderline." *Id.* Ports "may not create a line specifically for

6    asylum-seekers only, but could, for instance, create lines based on legitimate opera-

7    tional needs, such as lines for those with appropriate travel documents and those

8    without such documents." *Id.* "At no point may an officer discourage a traveler from

9    waiting to be processed, claiming fear of return, or seeking any other protection."

10   *Id.* "Once a traveler is in the United States, he or she must be fully processed." *Id.*

11   Thus, the memorandum clarifies that port leaders may exercise their discretion

12   to engage in metering "to facilitate orderly processing and maintain the security of

13   the port and safe and sanitary conditions for the traveling public." Def. Ex. 2. Me-

14   tered travelers are asked to wait on the other side of U.S.-Mexico border until there

15   is "sufficient space and resources to process them." *Id.* One factor in assessing "suf-

16   ficient space and resources" is the port's detention capacity. Def. Ex. 57 ¶ 6; Def.

17   Ex. 58 ¶¶ 13–16. A port's capacity to hold individuals is not a fixed number, but is

18   instead "fluid." Pls.' Ex. 14, at 291:1–3. Although GSA has established the ports'

19   numerical "cell capacit[ies]" (which is typically what is reported as the port's phys-

20   ical detention capacity), "in reality, [CBP] can hold far less" than that maximum-

21   occupancy number. Pl. Ex. 15 at 967. "GSA does not take into account space for

22   sleeping." *Id.*; *see also* Pls. Ex. 102 at 58:15-21. The reported detention capacity

23   number also does not account for the demographics of those in custody, which CBP

24   must account for when allocating detention space; for example, "a family unit with

25   a male head of household who has children who are older and another family unit

26   with a female head of household who has relatively young children" are not "able to

27   [be] detain[ed] ... in the same detention areas or holding" areas. Pl. Ex. 14 at 289:19–

28   288:2; *see also, e.g.,* Def. Ex. 59 at 055 (CBP's Nat'l Transportation, Escort, and

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

1   Detention Standards (TEDS) requiring gender and juvenile/adult segregation in
2   CBP's hold rooms); Def. Ex. 57 ¶ 10; Def. Ex. 60 ¶ 7; Def. Ex. 58 ¶¶ 13–15.

3       The memorandum was issued to give the ports the ability "to address the ca-
4   pacity" for "large numbers of volumes" of inadmissible aliens attempting to cross
5   into the United States. Pl. Ex. 10 at 70:6–13. There is "[n]o other reason" the mem-
6   orandum was issued. *Id.* at 70:18. The guidance "was not desired to deter migrants
7   from entering the [United States]." Pl. Ex. 10 at 70:1–5; *see also* Pl. Ex. 69 at 935
8   (Nov. 11, 2016 email from Mr. McAleenan: "I just want our folks to have an addi-
9   tional tool to keep conditions safe and working at our POEs.").

10  **F.   DHS Directs CBP to Prioritize Statutory Mission Sets.**

11      From FY 2017 to FY 2018, the number of inadmissible arriving aliens pro-
12  cessed by the southwest border Field Offices crept upwards, and the proportion of
13  those aliens who were placed into expedited removal and referred for a credible-fear
14  interview doubled. In FY 2017, those Field Offices processed 111,275 inadmissible
15  aliens, 17,284 of whom were placed into expedited removal and referred for a cred-
16  ible-fear interview. Def. Ex. 4 at 2. In FY 2018, those Field Offices processed
17  124,879 inadmissible arriving aliens, 38,399 of whom were placed into expedited
18  removal and were referred for a credible-fear interview. *Id.*

19      On June 5, 2018, the Secretary of Homeland Security issued a memorandum
20  to the CBP Commissioner entitled "Prioritization-Based Queue Management." *See*
21  Def. Ex. 3. The Secretary explained that "apprehensions of those crossing our border
22  illegally between the ports of entry and the number of arriving aliens determined to
23  be inadmissible at ports of entry continue to rise," all while CBP's "resources remain
24  strained along the Southwest Border. Inadmissible arriving aliens presenting at ports
25  of entry, many of whom arrive without possessing appropriate travel and identity
26  documents required by law, such as a visa and passport, require additional pro-
27  cessing time that delays the flow of legitimate trade and travel." Def. Ex. 3 at 294.
28

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

ER-0460

The Secretary instructed that "CBP must focus on its primary mission: to protect the American public from dangerous people and materials while enhancing our economic competitiveness through facilitating legitimate trade and travel." *Id.* "The processing of travelers without documentation draws resources away from CBP's fundamental responsibilities." *Id.* at 295–96. "Moreover," the Secretary continued, "staffing at Southwest Border ports of entry is below our target level for almost all major ports, and our officers are increasingly working extensive overtime hours each pay period, leading to increased fatigue and stress on the workforce. At several of the largest ports of entry, upwards of 10 percent of the CBP officer workforce are engaged in immigration secondary screening and processing functions, primarily addressing persons presenting without documents sufficient for admission or other lawful entry." *Id.* at 296.

Thus, "[i]n recognition of (1) the continued prevalence of security threats, (2) the dire consequences of illicit narcotics on our communities (especially the devastating opioid epidemic), (3) the staffing and resource challenges summarized above, and (4) the increase of irregular migration flows," the Secretary "direct[ed the Commissioner] to initiate a 30-day pilot program to prioritize staffing and operations at all Southwest Border ports of entry in accordance with the following order of priority": (1) national-security efforts; (2) counter-narcotics operations; (3) economic security: trade and cargo processing efforts to facilitate lawful commerce into the United States, while enforcing trade laws, protecting agriculture, and addressing anticompetitive elements in the supply chain; and (4) trade and travel facilitation. *Id.* at 296. The memorandum "memorializes a preexisting prioritization" scheme that has been "CBP's policy since [it] w[as] created in 2003." Pl. Ex. 10 at 203:12–20.

The Secretary explained that "[p]rocessing persons without documents required by law for admission arriving at the Southwest Border remains a component of CBP's mission." Def. Ex. 3 at 296; *see also* Pl. Ex. 4 at 133:12–18 (CBP "continue[s] to process migrants in the midst of prioritizing all these different things.").

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

"[B]ut priority should be given to the efforts described above in the prescribed order. Field leaders have the discretion to allocate resources and staffing dedicated to any areas of enforcement and trade facilitation not covered by the above priorities and queue management process based on the availability of resources and holding capacity at the local port level. Depending on port configuration and operating conditions, [DFOs] may establish and operate physical access controls at the borderline, including as close to the U.S.-Mexico border as operationally feasible. DFOs may create lines based on legitimate operational needs, such as lines for those with appropriate travel documents and those without such documents. As in all operations the safety of employees and the public is paramount in operational decisions." Def. Ex. 3 at 296.

Before issuing the June 5, 2018 memo, DHS considered the impact of prioritization-based queue management on both staffing and daily intake. ███████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████ Pl. Ex. 96 at 009.

Thus, under the June 5, 2018 memo, when determining whether and when to conduct metering, ports were to consider not only the detention and processing capacity factors noted above, but also other operational factors, and were to avoid allocating resources away from priority mission sets. Accordingly, CBP officials began to more frequently refer to the ports' capacity to process inadmissible aliens in terms of "operational capacity." *E.g.*, Pl. Ex. 99 at 864 (OFO "shifted from 'deten-

ER-0462

tion' capacity to 'operational' capacity" after June 5, 2018). "The operational capacity at a POE varies depending on overall port volume, facility capacity, resource constraints, and daily tactical and enforcement activities. Operational impact at POEs cannot always be planned; for example, [OFO] do[es] not know in advance when [it] will discover human, narcotics, or weapons smuggling attempts, or which individuals may present a threat to our officers. It takes significant resources to manage this highly variable environment." Def. Ex. 61 at 279. There are "a lot of factors that go into operational capacity." Pl. Ex. 14 at 286:9–10. Operational capacity turns "primarily [on] what else is going on at the port," including "other mission sets that [the port] ha[s] to fulfill," like "immigration secondary processing, drug seizures, money seizures, weapons seizures," or "trade processing," *id.* at 286:25–287:1, 288:13–21; "how much physical space is available," which turns on a calculation of the port's "holding capacity" or "detention capacity" and "how many people [the port] already ha[s] in custody," *id.* at 287:2–7; "the type and the makeup of the cases," such as "whether or not they are migrant cases or other types of admissibility cases" and "the complexity of the cases," *id.* at 287:25–288:2, 287:3–4, 289:1; and the number of "people that [the port] ha[s] to dedicate to the other mission sets,' *id.* at 288:22–25; *see also* Pl. Ex. 102 at 222:16-24.

OFO does not regularly quantify, record, or report the ports' operational capacity, let alone its specific operational capacity to process aliens without entry documents. It "would just be too cumbersome to record every event that's taking place in the port through out [*sic*] the day, which has had an impact on how many migrants we could come across. If a port was working multiple simultaneous seizures, and then we had to pull officers to do that, we wouldn't record all of those activities. It's just too cumbersome of a report to come together for the 46 crossings along the southwest border as to what's taking place." Pl. Ex. 10 at 186:11–21; *see also* Pl. Ex. 102 at 66:13–14. "And," operational capacity "is fluid" and "differs from port to port and from day-to-day." Pl. Ex. 10 at 186:11–12, 186:22–187:3. "There may

1  be no capacity at 9:00 a.m, but [ICE] ERO comes and picks folks up at 11:00. And

2  at 12 o'clock we have capacity." *Id.* at 186:22–187:3.

3       OFO has used "operational capacity" as a metric for port operations in the

4  past. *E.g.*, Def. Ex. 62 at 712 (Sept. 14, 2016 report from CBP's Incident Manage-

5  ment Division: "The current influx of inadmissible aliens coupled with added ad-

6  ministrative functions and decreased operational capacity due to construction has

7  created an untenable situation for which ERO assistance is critical."); Pl. Ex. 17 at

8  70:4–13 ("[F]or as long as I have worked in detention as a manager, going back to

9  '15–'16, we have always used operational capacity.").

10      On June 16, 2018, the Migration Crisis Action Team (MCAT) Deputy Com-

11  mander reported to ICE that "all the ports along the SWB [southwest border] will

12  increase their daily intake. The ports will not go beyond their capacity limits but will

13  get as close as possible without negatively impacting their other responsibilities.

14  This will result in a significant increase of referrals of FMUAs and single adults [to

15  ICE]." Def. Ex. 63 at 555. Another member of the MCAT "convey[ed]" this infor-

16  mation to the ICE field offices on the southwest border to "ensure ERO is ready to

17  support all facets of [the] mission." *Id.*

18      Between June 26 and July 3, 2018, a CBP officer in the San Diego Field Office

19  "worked toward gauging the overall sentiment of subjects detained at" the San

20  Ysidro Port of Entry. Pl. Ex. 107 at 2. His "goal was to determine what effect, if

21  any," measures "such as ... metering" were having "on subjects attempting entry ei-

22  ther illegally or through the credible fear/asylum process." *Id.* (quotation marks

23  omitted). The officer "assess[ed] that the Mexican, Honduran, El Salvadorian and

24  Guatemalan citizen sentiment detained at the POE is unshaken. Detainees did not

25  claim ... long wait times in Mexico as deterrent factors." *Id.*

26      On August 6, 2018, the MCAT Deputy Commander asked "[h]ow many cases

27  SYS [could] process a day if ERO moved them out the next day." Pl. Ex. 112 at 802.

28  The Watch Commander overseeing San Ysidro's AEU responded ▮▮▮▮▮▮▮ but

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

ER-0464

1  only if "half of the officers" were not already at their overtime cap. *Id.*[3] The Deputy
2  Commander indicated that he would not recommend that solution because
3  "throw[ing] money at" the problem "would defeat the purpose of queue manage-
4  ment." *Id.*

5  ## G. CBP Issues the Prioritization-Based Queue Management Memorandum.

6  From FY 2018 to FY 2019, the number of inadmissible arriving aliens pro-
7  cessed by the southwest border Field Offices continued to creep upwards, and the
8  proportion of those inadmissible arriving aliens who were placed into expedited re-
9  moval and referred for a credible-fear interview doubled again. In FY 2018, those
10 Field Offices processed 124,879 inadmissible arriving aliens, 38,399 of whom were
11 referred for a credible-fear interview. Def. Ex. 4 at 2. In FY 2019, those Field Offices
12 processed 126,001 inadmissible arriving aliens, 80,055 of whom were referred for a
13 credible-fear interview. *Id.*

14 In late November 2019, CBP determined that OFO should renew its focus on
15 directing its resources toward the priority mission sets. *See* Def. Ex. 67 at 15–16. On
16 November 27, 2019, Mark Morgan, the Acting CBP Commissioner issued a memo-
17 randum to the OFO Executive Assistant Commissioner with the subject "Prioritiza-
18 tion-Based Queue Management." Def. Ex. 5. The Acting Commissioner cited the
19 sustained increase in the number of inadmissible aliens presenting at ports of entry
20 and the substantial resources their processing requires, and stated that "CBP must
21 carefully balance its space and resources to ensure that each POE has sufficient ca-
22 pacity to address its mission sets, in order of priority, including the safety and expe-
23 ditious processing of all travelers accessing the port." *Id.* at 303. The Acting Com-
24 missioner explained that Secretary Nielsen previously instructed the southwest bor-
25 der Field Offices to structure their staffing and resources to accomplish four priority

26

27 ---
[3] On August 7, 2018, San Ysidro reported that over the preceding 60 days, it aver-
28 aged ▮ intakes per day, processed ▮ cases per day, and ▮ individuals were moved
from the Port per day. Pl. Ex. 92 at 964.

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

mission sets. *See id.* at 303–04. In Fiscal Year 2019, while the Nielsen memorandum was in effect, CBP officers at the southwest border ports of entry arrested 1,800 convicted criminals, encountered 1,601 Special Interest Aliens,[4] and found three individuals on the terrorist watchlist. *Id.* at 304. CBP officers at the ports seized 19% more methamphetamine and 58% more fentanyl by weight and interdicted $2.4 million more in outbound currency than the previous fiscal year. *Id.* Accordingly, the Acting Commissioner reiterated that "field leaders must continue to balance resources according to the order of priority listed above," *i.e.*, national security efforts, counter-narcotics and outbound operations, economic security, and trade and travel facilitation. *Id.* at 305.

## **ARGUMENT**

## I.    **Plaintiffs Lack a Private Right of Action to Enforce the INA.**

Defendants are entitled to summary judgment on Claim I for purported independent violations of the INA (*see* SAC ¶¶ 244–55) because Plaintiffs lack a private right of action under the INA. *New Mexico v. McAleenan*, 450 F. Supp. 3d 1130, 1166 (D. N.M. 2020) (the INA "does not provide a private right of action" to litigants seeking to enforce its terms); *Ms. L. v. ICE*, 302 F. Supp. 3d 1149, 1168 (S.D. Cal. 2018) (dismissing claim under § 1158 because "it is unclear to the Court whether Plaintiffs have a private right of action under the Asylum Statute"). As this Court recognized, "[w]hile a right to judicial review of agency action may be created by a separate statutory or constitutional provision, once created it becomes subject to the judicial review provisions of the APA unless specifically excluded." *Al Otro Lado, Inc. v. Nielsen*, 327 F. Supp. 3d 1284, 1316 (S.D. Cal. 2018) (brackets in original;

---

[4] A Special Interest Alien is "a non-U.S. person who, based on an analysis of travel patterns, potentially poses a national security risk to the United States or its interests." https://www.dhs.gov/news/2019/01/07/mythfact-known-and-suspected-terroristsspecial-interest-aliens (last visited Sept. 25, 2020).

1   citation and quotation marks omitted). "Insofar as [Plaintiffs] have such an entitle-
2   ment under the INA and its implementing regulations, Plaintiffs may obtain all the
3   relief they request under the provisions of the APA." *Id.* (quotation marks omitted).
4   This Court should thus grant summary judgment for Defendants on Claim I.

5   **II.  Defendants Have Not Taken Discrete and Final Agency Action of the Sort**
    **Plaintiffs Contend.**

6       **A.     There is No Discrete "Turnback Policy."**

7       Plaintiffs in their APA claims challenge "the turnback policy," a purported
8   "overarching agency policy directing th[e] unlawful withholding of mandatory ac-
9   tion" under 8 U.S.C. §§ 1158 and 1225. Pl. MSJ 19, 21; *see also id.* at 7–16, 19–21.
10  Defendants are entitled to summary judgment on these claims because "the turnback
11  policy," as Plaintiffs describe it, is not sufficiently discrete for APA review.

12      "The APA authorizes suit by '[a] person suffering legal wrong because of
13  agency action, or adversely affected or aggrieved by agency action within the mean-
14  ing of a relevant statute.'" *Norton*, 542 U.S. at 61 (brackets in original; quoting
15  5 U.S.C. § 702). "'[A]gency action' is defined in § 551(13) to include 'the whole or
16  a part of an agency rule, order, license, sanction, relief, or the equivalent or denial
17  thereof, or failure to act.'" *Id.* at 62 (brackets in original; emphasis omitted). These
18  are "circumscribed, discrete agency actions, as their definitions make clear." *Id.*
19  APA challenges can succeed only where the plaintiff "identif[ies] a discrete 'agency
20  action' that fits within the APA's definition of that term" *Wild Fish Conservancy v.*
21  *Jewell*, 730 F.3d 791, 801 (9th Cir. 2013) (citations omitted). It is "entirely certain"
22  that an "entire 'program'—consisting principally of the many individual actions ref-
23  erenced in the complaint, and presumably actions yet to be taken as well—cannot be
24  laid before the courts for wholesale correction under the APA." *Lujan v. Nat'l Wild-*
25  *life Fed'n*, 497 U.S. 871, 892–93 (1990). "A plaintiff may not simply attach a policy
26  label to disparate agency practices or conduct" to satisfy the APA's discrete agency
27  action requirement. *Al Otro Lado, Inc.*, 394 F. Supp. 3d at 1207. They must identify
28

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

ER-0467

an actual government policy. *See Lightfoot v. District of Columbia*, 273 F.R.D. 314, 326 (D.D.C. 2011).

   The "turnback policy," as Plaintiffs describe it, is not a "circumscribed, discrete" agency action. *Norton*, 542 U.S. at 62. It comprises many claimed actions or decisions spanning several years that have different factual bases. These purported various disparate actions include: the San Ysidro Port of Entry purportedly "abandon[ing]" its surge contingency plans in May 2016 and "turning back asylum seekers instead," Pl. MSJ 8; OFO "turning back asylum seekers" at the Calexico Port of Entry in September 2016, supposedly with knowledge that there were "multiple investigations" into the policy's legality, *id.* at 9; DHS and CBP deciding "[w]ithin hours" of the 2016 presidential election "not to open" a temporary processing facility in El Centro, California and expanding metering to Texas ports of entry, *id.* at 10; DHS and CBP "plac[ing] the planned Nogales[, Arizona] processing center on hold" "within a week of the 2016 presidential election" and electing instead "to expand turnbacks" border-wide, *id.* at 11; the government "return[ing]" "asylum seekers standing on U.S. soil" to Mexico in November and December 2017, *id.* at 11, 12; a CBP officer at a Texas port of entry allegedly "'cross[ing] into Mexican territory to keep a migrant from coming onto U.S. soil'"[5] in June 2018, *id.* (quoting Pl. Ex. 75 at 272); the Hidalgo Port of Entry purportedly "intentionally remov[ing] seats from the secondary inspection area to reduce the number of asylum seekers processed at the port," *id.* at 11 (quotation marks omitted); the OFO Executive Assistant Commissioner issuing metering guidance in April 2018, *id.* at 12–14; and DHS and CBP "adopt[ing] the prioritization-based queue management policy" in June 2018 and "using 'operational capacity' as [their] stated metric to justify turning back asylum

---

[5] This statement is inadmissible hearsay. *See* Fed. R. Civ. P. 56(c)(2). It was made by an individual who has not testified or submitted a declaration, Pl. Ex. 75 at 272, and Plaintiffs offer it for the truth of the matter asserted, *i.e.*, that an officer crossed the border to prevent a migrant from coming onto U.S. soil.

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

ER-0468

seekers," *id.* at 14.

Plaintiffs do not provide a sound representation of the facts. *See supra* at Facts §§ B–G. But in any event, this constellation of actions grouped together under the banner of "the turnback policy" is not a "'discrete' action[] by an agency" amenable to APA review. *Bark v. U.S. Forest Service*, 37 F. Supp. 3d 41, 50 (D.D.C. 2014) (quoting *Norton*, 542 U.S. at 63). In fact, there is no "turnback policy." The reference appears only in litigation documents, and Plaintiff Al Otro Lado inexplicably has no memory of where the term came from. *See* Pl. Ex. 113 at 121:11–126:11. The "turn-back policy" is "simply the name by which" Plaintiffs "refer[] to the continuing (and thus constantly changing) operations of" CBP at the southwest border ports of entry. *Lujan*, 497 U.S. at 890. "It is no more an identifiable 'agency action'—much less a 'final agency action'—than a 'weapons procurement program' of the Department of Defense or a 'drug interdiction program' of the Drug Enforcement Administration." *Id.*; *see, e.g.*, *Wild Fish Conservancy*, 730 F.3d at 801 (government's operation of dams "in a manner that obstructs fish passage" is "not ... a discrete 'agency action'").

Nor is there any evidence connecting these disparate actions to a single agency policy. To the contrary, the evidence shows that many of these actions were *against* government policy and that the agency took steps to correct them. *E.g.*, Def. Ex. 2 ("Once a traveler is in the United States, he or she must be fully processed."); Def. Ex. 64 at 294–95 (finding the "misconduct" described in Pl. Ex. 8 to be "very seri-ous" and "not in compliance" with CBP policy and suspending the officer for 30 days); Def. Ex. 37 at 927 (on Nov. 18, 2016, OFO immediately began "working with the" El Paso and Hidalgo POEs "to address" use of appointments and metering on U.S. soil). Plaintiffs say that CBP officers "lied to" asylum seekers, Pl. MSJ 5, "co-erced some to withdraw their applications for admission" through the use of "stream-lined withdrawal" procedures, *id.*, and "used physical force to turn back others," *id.*, as part of a "widespread pattern and practice" sanctioned by DHS and CBP leader-ship "of denying asylum seekers access to the asylum process at POEs on the U.S.-

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

ER-0469

Mexico border," SAC ¶ 2. But even if those allegations were true, the evidence does not show they were part of or pursuant to any border-wide policy or practice that "is common to the class." *Lightfoot*, 273 F.R.D. at 326. At *most*, Plaintiffs' Exhibits show that "lies" occurred at the Tecate and Hidalgo POEs, *see* Pl. Ex. 1 at 99:25–101:6 (testimony of Tecate CBP officer), *and* Pl. Ex. 3 at 145:3–7 (testimony of Hidalgo CBP officer); and that "coercion" or "physical force" was used at the San Ysidro POE, *see* Pl. Ex. 7 at 611 (email to San Ysidro CBP officers regarding streamlined withdrawal procedures), *and* Pl. Ex. 8 at 042 (CBP OPR report relating to a single incident at San Ysidro). The evidence does not show any border-wide "turnback policy," nor is there any evidence of a border-wide policy, instruction, or guidance that links these disparate actions together. The challenged "turnback policy" is not sufficiently discrete to permit review under the APA.

### B.     The Border-Wide Metering Decisions are Not Final Agency Action.

Besides being sufficiently discrete, a challenged agency action must be "final." 5 U.S.C. § 704; *Navajo Nation v. Dept. of the Interior*, 876 F.3d 1144, 1171 (9th Cir. 2017). Agency action is final when it "mark[s] the consummation of the agency's decisionmaking process" and is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citations and quotation marks omitted). "The general rule" under the second *Bennett* prong is that agency action must "impose an obligation, deny a right, or fix some legal relationship" to be final. *Ukiah Valley Med. Ctr. v. FTC*, 911 F.2d 261, 264 (9th Cir. 1990) (quotation marks omitted).

While Defendants' border-wide metering decisions may be discrete and mark the consummation of the decisionmaking process, none are "final" under *Bennett* because they do not "give[] rise to direct and appreciable legal consequences" as to the Plaintiff class. *Hawkes*, 136 S. Ct. at 1814 (quotation marks omitted). The metering decisions do not compel or obligate class members to take a particular action, do not deny class members any rights, and do not fix the legal relations between the

ER-0470

1    parties. An alien who is subject to metering is in the same legal position that he

2    would be in if he were never subject to metering. He still may cross the border into

3    a port of entry (albeit at a later date), and when he "is physically present in the United

4    States or [] arrives in the United States," he "may apply for asylum in accordance

5    with" the INA and its implementing regulations. 8 U.S.C. § 1158(a)(1).

6        Plaintiffs' arguments to the contrary (at Pl. MSJ 20–21) lack merit. *First*, me-

7    tering does not alter or change existing statutory entitlements or duties. Defendants

8    acknowledge that this Court previously held that certain aliens who are outside the

9    United States but are "in the process of arriv[ing] in" the country fall within the

10   scope of the asylum statute, *Al Otro Lado*, 394 F. Supp. 3d at 1200, but respectfully

11   maintain their position that §§ 1158 and 1225 by their terms do not apply to class

12   members outside the United States, *see infra* Argument § III. Even if class members

13   were within the scope of the statutes, Defendants' policies have not "den[ied] them

14   access to the asylum process." Pl. MSJ 20–21. Plaintiffs identify no direct order to

15   "deny access," and class members continue to be referred for asylum processing.

16   Def. Ex. 4 at 2. If Plaintiffs are correct that "[m]any" class members are "ultimately

17   deprived" of the opportunity to apply for asylum in the United States, Pl. MSJ 21,

18   this is not a direct legal consequence of the metering decisions, *see* Roberto Doe

19   Decl. ¶ 6 (ECF No. 390-75) (detention by Mexico); Roberto Doe Decl. ¶ 7 (ECF No.

20   390-97) (deportation by Mexico). *Second*, Plaintiffs assert that queue management

21   is final because it has an "'actual or immediately threatened effect,'" namely, class

22   members being "forced to wait" in Mexico. Pl. MSJ 21 (quoting *Lujan*, 497 U.S. at

23   894). But whether agency action has an "actual or immediately threatened effect"

24   goes to whether a claim is ripe, not whether it is final. *Lujan*, 497 U.S. at 894 (citing

25   *Gardner v. Toilet Goods Ass'n, Inc.*, 387 U.S. 158, 164–66 (1967)). Waiting in Mex-

26   ico may be an immediate and practical effect of queue management, but it is not a

27   *legal* consequence. *See Cal. Communities Against Toxics v. EPA*, 934 F.3d 627, 637

28   (D.C. Cir. 2019) ("pragmatic" inquiry looks to consequences of agency action "as a

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

ER-0471

result of the specific statutes and regulations that govern it"). Plaintiffs fail to challenge any discrete and final agency action. Therefore, Defendants are entitled to summary judgment on Plaintiffs' APA claims.

## III. Defendants Have Not "Direct[ed] CBP Officers to Unlawfully Withhold a Discrete, Mandatory Ministerial Action."

For two reasons, Defendants are entitled to summary judgment on Plaintiffs' claim that Defendants "direct[ed] CBP officers to unlawfully withhold a discrete, mandatory ministerial action" under §§ 1158 and 1225 in violation of the APA, § 706(1). Pl. MSJ 21–23. *First*, § 706(1) requires Plaintiffs to show "that an agency failed to take a *discrete* agency action that it is *required* to take." *Norton*, 542 U.S. at 64; *Hells Canyon Preservation Council v. U.S. Forest Service*, 593 F.3d 923, 932 (9th Cir. 2010). Defendants respectfully maintain that §§ 1158 and 1225 do not mandate any actions toward aliens who are outside the United States. Section 1158(a)(1) allows an alien to apply for asylum if he "is physically present in the United States" or "arrives in the United States." Section 1225(a)(3) requires the government to inspect for admission "[a]ll aliens ... who are applicants for admission or otherwise seeking admission or readmission to or transit through the United States." Section 1225(a)(1) defines an applicant for admission as "[a]n alien present in the United States who has not been admitted or who arrives in the United States," and regulations require anyone who is seeking admission to do so "at a U.S. port-of-entry," all of which are in the United States, *United States v. Aldana*, 878 F.3d 877, 880–82 (9th Cir. 2017), *cert. denied* 139 S. Ct. 157 (2018), "when the port is open for inspection," 8 C.F.R. § 235.1(a). Section 1225(b)(1)(A)(ii) requires the government to refer for a credible-fear interview an alien "who is arriving in the United States," "[i]f" it "determines" that the alien is inadmissible on certain grounds "and the alien indicates either an intention to apply for asylum" or fear.

Sections 1158 and 1225 apply exclusively to aliens "in the United States." This reading is supported by: (1) the statutes' present-tense language, *see DHS v.*

1   *Thuraissigiam*, 140 S. Ct. 1959, 1982 (2020) ("[w]hen an alien arrives at a port of

2   entry ... the alien is on U.S. soil"); *United States v. Balint*, 201 F.3d 928, 933 (7th

3   Cir. 2000); (2) the definition of the word "arrive," which means "to reach a destina-

4   tion," The American Heritage Dictionary of the English Language 102 (3d ed. 1992);

5   (3) the presumption against extraterritoriality, *see Morrison v. Nat'l Australia Bank

6   Ltd.*, 561 U.S. 247, 255, 261 (2010) ("When a statute gives no clear indication of

7   extraterritorial application, it has none."); (4) the structure of the INA, *see Sale v.

8   Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 173 (1993) (there is "no provision in the

9   statute for the conduct of such proceedings outside the United States"); *Zadvydas v.

10  Davis*, 533 U.S. 678, 693 (2001) ("The distinction between an alien who has effected

11  an entry into the United States and one who has never entered runs throughout im-

12  migration law."); *Matter of Lewiston-Queenston Bridge*, 17 I. & N. Dec. 410, 413

13  (BIA 1980) ("when an individual comes to this country by way of an international

14  bridge, he has 'landed' when he touches United States soil"); (5) the rule that "the

15  words of a statute must be read in their context and with a view to their place in the

16  overall statutory scheme," *Sturgeon v. Frost*, 136 S. Ct. 1061, 1070 (2016) (citation

17  and quotation marks omitted), which here is a scheme for expedited "remov[al] *from*

18  the United States," 8 U.S.C. § 1225(b)(1)(A)(i) (emphasis added); and (6) the legis-

19  lative history of § 1225, *see* H.R. Rep. No. 104-469, pt. 1, at 175–76 (1996) (an

20  asylum claim should "be commenced as soon as possible *after* the alien's arrival in

21  the U.S." (emphasis added)).[6]

22  _____

23  [6] The use of the present-progressive tense ("arriving in") in § 1225(a)(1)(A)(ii) does

24  not change this conclusion. Even if "arriving in" may refer to a "process of arriving,"
    *Al Otro Lado, Inc.*, 394 F. Supp. 3d at 1200, for the reasons discussed, that process

25  does not begin before an alien crosses the border. Further, the obligation to refer an
    alien for a credible-fear interview does not attach until the government "determines"

26  the alien is inadmissible on certain grounds, 8 U.S.C. § 1225(b)(1)(A)(ii), and that

27  determination can occur only once an alien is physically present *in* the United States.

28  Nor does the rule against surplusage support a contrary interpretation. Congress

ER-0473

This entitles the government to summary judgment on all subclass members' claims, since by the class definition they did not cross onto U.S. soil "as a result of Defendants' metering policy." ECF No. 513, at 18. Pursuant to that policy, any class member who is on U.S. soil must be inspected and processed and may not be returned to Mexico. Def. Ex. 2; *supra* Facts §§ B–G; Argument § II.A (failure to process aliens on U.S. soil is against CBP policy).

*Second*, even if the statutes applied to aliens outside the United States, Defendants have not in fact implemented "an overarching agency policy directing th[e] unlawful withholding of [these] mandatory agency action[s]." Pl. MSJ 21. The undisputed evidence shows just the opposite: "Processing persons without documents required by law for admission arriving at the Southwest Border remains a component of CBP's mission." Def. Ex. 3 at 296; *accord* Def. Ex. 2. Moreover, class members *are in fact* being processed for asylum. Concurrently with the implementation of metering, the number of inadmissible arriving aliens referred by the southwest border Field Offices for credible-fear interviews increased four-and-a-half times over, from 17,284 in FY 2017 to 80,055 in FY 2019. Def. Ex. 4 at 2. This figure represents only a subset of class members whom CBP referred for asylum processing, since some class members would have been placed into full removal proceedings to raise their claim before an immigration judge. *See* 8 U.S.C. § 1225(b)(2)(A). Even if some

---

wrote § 1225 to ensure that both aliens encountered within the United States (the alien who "is physically present") and aliens subject to expedited removal (the alien "who arrives in") may apply for asylum, which was an important clarifying measure included as part of Congress's enactment of major immigration legislation in 1996. *See* H.R. Rep. No. 104-828, at 209 (1996) ("[t]he purpose of these provisions is to expedite [] removal *from* the United States" (emphasis added)). Without such clarifying language, Congress would have risked an interpretation of the statute that precluded arriving aliens from applying for asylum at all, since, under the entry doctrine, "an alien detained after arriving at a port of entry ... is 'on the threshold'" and is treated "'as if stopped at the border.'" *Thuraissigiam*, 140 S. Ct. at 1983, 1982 (quoting *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212, 215 (1953)).

class members ultimately did not enter the United States to seek asylum after being subject to metering, as Plaintiffs' contend, *see* Pl. MSJ 21, the fact that "many more asylum seekers were not denied access" to the asylum process "defeats the inference that a categorical policy of the nature Plaintiffs intimate exists." *Al Otro Lado, Inc.*, 327 F. Supp. 3d at 1320–21.[7] There is no "overarching agency policy directing th[e] unlawful withholding of mandatory action" under §§ 1158 and 1225. Pl. MSJ 21. At most, agency action is delayed, and Plaintiffs make no attempt to argue that these delays are unreasonable. *See id.* at 21–23. Defendants are thus entitled to summary judgment on Plaintiffs' § 706(1) claim.

## IV.  Metering is Statutorily Permissible.

Plaintiffs argue that "[e]ven if" the statutes do not apply to aliens in Mexico, Defendants' "policy" nevertheless "contravenes" the "statutory scheme governing inspection at POEs and exceeds Defendants' statutory authority" in violation of the APA, § 706(2). Pl. MSJ 24; *see also id.* at 24–25. This is wrong. Metering is statutorily permissible. Defendants are thus entitled to summary judgment on this claim.

The government's border-wide metering decisions—which as discussed are the only decisions that apply class-wide—are statutorily permissible. In the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (2002), Congress ordered DHS as its "primary mission" to prevent terrorism in the United States and, in so doing, "ensure that the functions of the agencies and subdivisions within [DHS] that are not related directly to securing the homeland are not diminished or neglected except by a specific explicit Act of Congress." 6 U.S.C. § 111(b)(1). Congress made

---

[7] Plaintiffs cite a Rule 30(b)(6) witness's statement that, "[i]n her experience[]," "asylum seekers who are at the border between the United States and Mexico [are] attempting to enter the United States at a port of entry." Pl. MSJ 23 (second brackets in original; quoting Pl. Ex. 17 at 201:22–202:3). But the witness's testimony (which was provided subject to a timely scope objection, Pl. Ex. 17 at 202:1–2) shows at most that CBP officers understood that those individuals intended to present themselves at the port, not that CBP has a policy to withhold legal obligations. Those obligations are being discharged concurrently with metering. *See* Def. Ex. 4 at 2.

1  the Secretary "responsible for" "preventing the entry of terrorists," "securing the

2  borders [and] ports," "carrying out the immigration enforcement functions," "estab-

3  lishing and administering rules" governing "forms of permission ... to enter the

4  United States," "establishing national immigration enforcement policies and priori-

5  ties," and, "in carrying out the foregoing responsibilities, ensuring the speedy, or-

6  derly, and efficient flow of lawful traffic and commerce." *Id.* § 202 (capitalization

7  altered).

8      In the Trade Facilitation and Trade Enforcement Act of 2015, Pub. L. No.

9  114-125, 130 Stat. 122 (2016), Congress mandated that the CBP Commissioner

10  "shall" "coordinate and integrate [CBP's] security, trade facilitation, and trade en-

11  forcement functions," ensure the interdiction of illegal entrants and goods, "facilitate

12  and expedite the flow of legitimate travelers and trade," "direct and administer

13  [CBP's] commercial operations" and "enforce[] the customs and trade laws," "de-

14  tect, respond to, and interdict terrorists, drug smugglers and traffickers, human

15  smugglers and traffickers" and other dangerous persons, "safeguard the borders"

16  against "the entry of dangerous goods," coordinate with ICE and USCIS to "enforce

17  and administer all immigration laws," including "the inspection, processing, and ad-

18  mission of persons who seek to enter or depart the United States" and "the detection,

19  interdiction, removal, departure from the United States, short-term detention, and

20  transfer of persons unlawfully entering, or who have recently unlawfully entered,

21  the United States," and various other functions. 6 U.S.C. § 211(c). In the same Act,

22  Congress ordered the OFO Executive Assistant Commissioner to "coordinate

23  [CBP's] enforcement activities" at the ports of entry to "deter and prevent terrorists

24  and terrorist weapons from entering," "conduct inspections at [the] ports of entry to

25  safeguard [against] ... terrorism and illegal entry of persons," "prevent illicit drugs,

26  agricultural pests, and contraband from entering the United States," "in coordination

27  with the Commissioner, facilitate and expedite the flow of legitimate travelers and

28

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

ER-0476

trade," administer the National Targeting Center, coordinate the agency's "trade facilitation and trade enforcement activities" with CBP's Office of Trade, and "carry out other duties and powers prescribed by the Commissioner." *Id.* § 211(g)(3).

Metering, whether to facilitate safe and orderly processing at the ports of entry, *see* Def. Ex. 2, or to facilitate the prioritization of resources in order of CBP's national-security, counter-narcotics and outbound-operations, economic-security, and trade-and-travel mission sets, *see* Def. Ex. 3 at 296; Def. Ex. 5 at 303–04, is permissible under this statutory scheme. During the 2016 surge, the physical port facilities at San Ysidro were overrun by the sheer volume of individuals waiting to be processed. *See, e.g.*, Pl. Ex. 41 at 553 (referring to "several hundred people [] sleeping on the floor of the [San Ysidro] pedestrian entrance"). At the same time, CBP was regularly diverting resources from the entire agency to process inadmissible arriving aliens at the southwest border. *See supra* at Argument § B–E; Def. Ex. 9 at 2 ("The practice of temporary details has become so systemic ... that CBP has named it 'Operation Overflow.'"); Pl. Ex. 33 at 446 (showing more than $45 million of expenditures in six and a half months). This was at the direct expense of CBP's obligations (for example) to coordinate and integrate security, trade facilitation, and trade enforcement functions at the ports and to facilitate and expedite the flow of legitimate travelers and trade. 6 U.S.C. § 211(c). Border-wide metering was necessary to CBP's functioning and performance of its statutory mission and duties.

In 2018, at the beginning of another sustained increase in undocumented migration on the southwest border and when faced with evidence of a forthcoming potential mass influx event, CBP elected to issue border-wide guidance that permits the ports to meter "[w]hen necessary or appropriate to facilitate orderly processing and maintain the security of the port and safe and sanitary conditions for the traveling public." Def. Ex 2. Then, rather that continuing to expend millions of dollars to address another sustained surge, DHS instructed CBP to prioritize its national-security

ER-0477

1 and other critical missions at the southwest border ports and the use queue manage-

2 ment procedures to facilitate this prioritization, Def. Ex. 3 at 294–96, and later to

3 continue operating under this scheme, Def. Ex. 5 at 303–05. This is consistent with

4 Congress's elevation of DHS's national-security function over all others and is a

5 reasonable exercise of CBP's "broad discretion" to allocate its limited resources to

6 accomplish it many statutory functions. *Massachusetts*, 549 U.S. at 527; *Hernandez*,

7 140 S. Ct. at 746 ("attempting to control the movement of people and goods across

8 the border" "implicates an element of national security").

9     Plaintiffs contend that DHS and CBP have "'abandon[ed]'" § 1225 because

10 "they think it is not working well," Pl. MSJ 24 (quoting *E. Bay Sanctuary Covenant*

11 *v. Trump*, 932 F.3d 742, 774 (9th Cir. 2018)). Not so. CBP prioritizes certain mission

12 sets over processing undocumented aliens at the southwest border POEs, but the

13 processing of such individuals continues, Def. Ex. 4 at 2, and it "remains a compo-

14 nent of CBP's mission," Def. Ex. 3 at 296; *see also* Pl. Ex. 4 at 133:12–18.

15     Plaintiffs also contend that "CBP's general power to operate POEs does not

16 include authority to contravene more specific provisions of the INA" because the

17 "specific" provisions of § 1225 "govern[] the general.'" Pl. MSJ 25 n.16 (quoting

18 *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012)).

19 Plaintiffs never specify which "general" statutory provisions they are referring to.

20 Regardless, this argument ignores that Congress also enacted a detailed statutory

21 scheme setting forth CBP's and OFO's functions at the ports of entry. *See* 6 U.S.C.

22 §§ 211(c), (g)(3). As part of that scheme, it elevated DHS's national security func-

23 tions over all others, including processing undocumented migrants. *Id.*

24 § 111(b)(1)(A), (E). In all events, the Supreme Court "ha[s] repeated time and again"

25 that when faced with competing obligations, "an agency has broad discretion to

26 choose how best to marshal its limited resources and personnel to carry out its dele-

27 gated responsibilities." *Massachusetts*, 549 U.S. at 527. CBP continues to discharge

28 its obligations under § 1225 as intakes individuals from Mexico, *see* Def. Ex. 4 at 2,

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

so the "agency's decision to prioritize other projects is entitled to great deference," *Compassion Over Killing v. FDA*, 849 F.3d 849, 857 (9th Cir. 2017).

Plaintiffs further contend that "the logical result" of the government's position is that DHS and CBP "would have sole authority to end asylum for noncitizens arriving at POEs, without any involvement by Congress." Pl. MSJ 25. But none of the government's border-wide metering decisions permit CBP to do this. The metering decisions are well within the government's statutory authority.

## V. Defendants' Actions are Not Arbitrary and Capricious.

The undisputed facts also demonstrate that each of Defendants' relevant decisions regarding metering is well-supported by the factual record before the agency, is logical and coherent, and is the product of reasoned decisionmaking. Each decision more than satisfies the narrow and deferential standard for arbitrary-and-capricious review. *See Motor Vehicle Mfts. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Defendants are thus entitled to summary judgment.

The APA "requires a reviewing court to uphold agency action unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *San Luis & Delta-Mendota Water Authority v. Locke*, 774 F.3d 971, 994 (9th Cir. 2014) (quoting 5 U.S.C. § 706(2)(A)). "Under this standard, [courts] will sustain an agency action if the agency has articulated a rational connection between the facts found and the conclusions made." *Id.* (quotation marks omitted). The 2016 metering decisions were necessitated by overwhelming numbers of migrants seeking to present themselves for processing, the resultant overcrowding and unsanitary conditions at the ports, and the prolonged diversion of staffing resources from other statutory mission sets. *See supra* at Facts §§ B–C. Each later decision by CBP or DHS was made against this factual backdrop, and with consideration of substantiated increases in the number of undocumented aliens seeking entry to the United States. Plaintiffs claim that the capacity constraints are exaggerated or nonexistent, and thus "pretextual," but this is not so. Moreover, Plaintiffs ignore that the stated reasons for

ER-0479

1   metering include to proactively *avoid* overcrowding and diversion of resources. Def.

2   Ex. 2 (metering to be used when "necessary or appropriate to facilitate orderly pro-

3   cessing"); Def. Ex. 5 at 303–05. It is eminently reasonable to act to prevent an oper-

4   ational crisis before one occurs. Further, the evidence shows that queue management

5   in fact facilitated orderly processing: The border Field Offices referred more inad-

6   missible arriving aliens for credible-fear interviews after the metering memoranda

7   were issued. *See* Def. Ex. 4 at 2. Field personnel attribute this to metering "allow[ing]

8   them] to prevent emergencies." Pl. Ex. 102 at 188:18–25.

9       Plaintiffs nonetheless contend that the "turnback policy" is arbitrary and ca-

10   pricious because it is "based on pretext," its "true motivations are unlawful," and it

11   "amounts to an arbitrary and capricious interpretation of the INA." Pl. MSJ 26, 29,

12   30 (capitalization altered); *see also id.* at 26–31. Plaintiffs' arguments are flawed.

13       **A.    Defendants' Border-Wide Actions are Not Based on "Pretext."**

14       Plaintiffs say that "Defendants' stated justification for the turnback policy—

15   a 'lack of capacity' at POEs—is pretextual." *Id.* at 26 (quoting Answer ¶ 7). That is

16   not true. The undisputed facts demonstrate that the capacity concerns giving rise to

17   metering—and the resulting overcrowding and diversion of resources—are genuine.

18       When the San Ysidro Port of Entry began metering in late May 2016, the Port

19   was overwhelmed by individuals seeking admission despite having taken a number

20   of steps to increase its processing and detention capacity, *supra* at Facts § B, which

21   required the Port Director to eventually instruct his deputies to "hold the line the best

22   we can" to enable staff to "process cases and only focus on processing case[s] at this

23   time." Pl. Ex. 43 at 657. The subsequent instructions to other ports of entry to control

24   the flow of travelers through metering were animated by the same concerns. *See*

25   *supra* at Facts § C; Pl. Ex. 69 at 935 ("I just want our folks to have an additional tool

26   to keep conditions safe and working at our POEs.").

27       Likewise, in April and May 2018, directly preceding the April and June 2018

28

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

memoranda, the southwest border ports were processing an increased number of inadmissible arriving aliens and had begun to report "impacts to frontline functions," Def. Ex. 50 at 853, and CBP was facing another potential mass migration event, *see* Pl. Ex. 10 at 68:19–20; Def. Ex. 46 at 4; Def. Ex. 47 at 4; Def. Ex. 48 at 4; Def. Ex. 49 at 4; Def. Ex. 3 at 295–96; Pl. Ex. 80. By the time the CBP Acting Commissioner issued the prioritization-based queue management memorandum in November 2019, the number of inadmissible arriving aliens referred by the southwest border Field Offices for credible-fear screening had doubled again, from 38,399 in FY 2018 to 80,055 in FY 2019. Def. Ex. 4 at 2.

Defendants' capacity justifications are not a "pretext" because *CBP in fact was facing capacity constraints when the government made the border-wide metering decisions*. Even if there were additional reasons for the government's actions, "a court may not reject an agency's stated reasons for acting simply because the agency might also have had other unstated reasons." *Dept. of Commerce*, 139 S. Ct. at 2573.[8] The facts show that the government truthfully "disclose[d] the basis of its action." *Id.* (quotation marks omitted).

Plaintiffs' arguments to the contrary (at Pl. MSJ 26–29) lack merit. *First*, Plaintiffs contend that that the government's justifications are pretextual because "POEs generally operated well below 100%" while metering and the numbers "almost never impacted port operations." Pl. MSJ 26. But that is not evidence of pretext; it is evidence that the government's policies work as intended. When metering,

---

[8] "Relatedly, a court may not set aside an agency's policymaking decision solely because it might have been influenced by political considerations or prompted by an Administration's priorities. Agency policymaking is not a 'rarified technocratic process, unaffected by political considerations or the presence of Presidential power.' Such decisions are routinely informed by unstated considerations of politics, the legislative process, public relations, interest group relations, foreign relations, and national security concerns (among others)." *Dept. of Commerce*, 139 S. Ct. at 2573 (quoting *Sierra Club v. Costle*, 657 F.2d 298, 408 (D.C. Cir. 1981)).

ports will generally detain fewer people at a time, which in turn allows them to dedicate their resources to their priority missions. *See* Def. Ex. 5 at 303–05 (showing an increase in inbound drug interdictions and currency seizure under the priority scheme). When not metering, there are "impacts to frontline functions," Def. Ex. 50 at 853, including, for example, lower border-wide drug seizure weights, Def. Ex. 1 ¶ 21, and lines of people waiting to be processed that stretch "clear south into Mexico," Pl. Ex. 17 at 160:12. Further, as explained, physical detention capacity is only one aspect of a port's ability to detain individuals, and whether the port can safely detain and orderly process them depends on myriad other factors, including the demographics of the detained population, available staffing and overtime, and the other enforcement actions occurring at the port. That CBP does not continuously max out its detention capacity is not evidence of pretext, nor is it unlawful in any way.

*Second*, Plaintiffs raise several port-specific examples that purportedly show that Defendants' capacity concerns are pretextual, but none support Plaintiffs' argument nor undermine Defendants' stated reasons for metering. Plaintiffs say that "a CBP officer at the Tecate POE testified that this 'capacity excuse' is a lie." Pl. MSJ 26–27. But testimony from a single first-line officer at Tecate is probative only of what the officer believes occurred at Tecate, not of whether an entire government agency implemented a policy for a pretextual reason. In any event, the officer's testimony supports the government's stated reasons for metering, because the officer also testified that if the Port of Tecate were not permitted to meter, it would "back up our operations very fast." Pl. Ex. 1 at 146:9–18.

Quoting their attorney's leading questions, Plaintiffs also say that CBP officers at Otay Mesa "were telling travelers that the facility was at capacity but weren't actually checking on the capacity of the facility.'" Pl. MSJ 27 (quoting Pl. Ex. 118, at 93:4–12; *see id.* at 93:9 (objection)). That is inaccurate. The evidence shows that the officers "'*tell travelers they can go to San Ysidro or wait at the limit line*,'" Pl. Ex. 118 at 92:18–93:1 (emphasis added), not that limit line officers tell travelers that

1    the "facility was at capacity" without checking. Regardless of what line officers do,
2    this does not mean that supervisors at the port have not assessed a port's capacity
3    based on a number of operational considerations.

4            Again quoting their own attorney's leading questions, Plaintiffs say that the
5    Hidalgo POE "'intentionally removed seats' from the port's secondary inspection
6    area, 'so that they could say that [the port] couldn't process as many people.'" Pl.
7    MSJ 27 (quoting Pl. Ex. 3 at 157:15–18; *see id.* at 156:9, 21 (objections)). But this
8    testimony is inadmissible for lack of foundation and cannot be considered on sum-
9    mary judgment. *See* Fed. R. Civ. P. 56(c)(2). This witness (another first-line CBP
10   officer) was being asked his "opinion," Pl. Ex. 3 at 156:19–20, and he did not testify
11   that he personally knows port leadership to have removed seats with the intention of
12   processing fewer asylum seekers, *see id.* at 155:19–157:18.[9] Plaintiffs also incor-
13   rectly state that the same officer "testified that there was no justification for metering
14   because CBP could process asylum seekers in the order that they came to a POE
15   without resorting to turnbacks." Pl. MSJ 27 (quoting Pl. Ex. 3 at 71:9–16). What the
16   officer actually testified was that he "couldn't see a reason why [CBP] couldn't"
17   "process asylum seekers in the order that they came to the port of entry." Pl. Ex. 3
18   at 71:9–16. This merely shows that this one local officer does not have insight into
19   the government's border-wide operations and capacity constraints, not that those
20   constraints are false. As explained, those constraints are real.

21           *Third*, Plaintiffs say that prior to issuing the June 2018 memorandum, Secre-
22   tary Nielsen "explicitly asked for and considered the fact that the policy would result
23   in [] turnbacks ... without linking those expected turnback numbers to any actual
24   capacity shortage at POEs." Pl. MSJ 27 (emphasis removed). That is not accurate.
25   The Secretary's office asked, "if we fully implement the priority based Que [*sic*]

26

27   ───────────────
28   [9] The witness also has a self-described "traumatic brain injury," Pl. Ex. 3 at 179:13–
     14, and expressed concern with "[his] memory a little bit" when asked about the
     chairs, *id.* at 157:7–13.

ER-0483

1   Management option—what's a rough magnitude of the CBP folks that will be
2   needed to man the boundary line? What's a rough estimate of the number of folks
3   that would likely be turned away per day?" Pl. Ex. 93 at 317. Requesting information
4   about the potential costs and impacts of implementing a policy is a regular aspect of
5   the policymaking process. It does not show that there were no capacity constraints.

6   *Fourth*, Plaintiffs say that "[i]f there really were capacity issues, Defendants
7   have long had contingency plans" for mass migration events but "repeatedly de-
8   clined to implement such plans and in some instances scrapped their rollout." Pl.
9   MSJ 27. Plaintiffs ignore that ports *did* implement contingency plans and that De-
10  fendants engaged in extensive contingency planning in 2016 before authorizing me-
11  tering border-wide. *See supra* at Facts §§ B–D.[10] But those efforts were insufficient
12  to prevent overcrowding in the event of a sustained migrant surge and came at the
13  expense of the government's other statutory obligations.

14  *Fifth*, Plaintiffs say that the government can simply parole class members
15  from the ports. Pl. MSJ 27. But mass parole would be manifestly contrary to the
16  plain language of § 1225, which "mandate[s]" the detention of an alien until his asy-
17  lum application is adjudicated or he is removed from the United States. *Jennings v.*
18  *Rodriguez*, 138 S. Ct. 830, 845 (2018). Parole "should not be used to circumvent
19  Congressionally-established immigration policy." H.R. Rep. No. 104-469, pt. 1, at
20  141. In any event, Plaintiffs acknowledge that Defendants attempted this approach
21  "in fall 2016," Pl. MSJ 27, but like the other steps taken, it did not solve the problem.

22  *Sixth*, Plaintiffs say that in June 2018, "CBP began using 'operational capac-
23  ity,' as opposed to 'detention capacity,'" to justify metering, and that this metric

---

26  [10] The planned El Centro facility was delayed because of "bed space." Pl. Ex. 65 at
27  879. ███████████████████████████████████████████████████████████████
28  ████ Pl. Ex. 66 at 216. The government would later open two soft-sided facilities in
    Tornillo and Donna, Texas. Def. Ex. 33 at 5.

49

1   "'lacks any coherence,' and is anything but a 'concrete standard.'" Pl. MSJ 28 (quot-

2   ing *Tripoli Rocketry Ass'n v. ATF*, 437 F.3d 75, 77 (D.C. Cir. 2006)). This is wrong.

3   CBP used "operational capacity" long before June 2018. *E.g.*, Def. Ex. 62 at 712

4   (Sept. 2016); Pl. Ex. 17 at 70:4–13 (2015–16). While operational capacity may not

5   be quantifiable, that does not make it arbitrary and capricious. Operational capacity

6   is an established metric in detention contexts. *See Coleman v. Schwarzenegger*, 922

7   F. Supp. 2d 882, 921 (N.D. Cal. 2009) ("A prison system's capacity is not defined

8   by square footage alone; it is also determined by the system's resources and its abil-

9   ity to provide inmates with essential services such as food, air, and temperature and

10  noise control."); DOJ, Bureau of Justice Statistics, https://www.bjs.gov/index.cfm?

11  ty=tdtp&tid=1 (defining "operational capacity" as "[t]he number of inmates that can

12  be accommodated based on a facility's staff, existing programs, and services").

13      *Seventh*, it is not true that the purported "shift to 'operational capacity' simply

14  resulted in POEs processing 'fewer immigrants.'" Pl. MSJ 28 (quoting Pl. Ex. 100

15  at 207:7–14; *see also id.* at 207:12–13 (objection)). From FY 2018 (when Plaintiffs

16  say that CBP was not using operational capacity) to FY 2019 (when Plaintiffs say

17  that CBP was using operational capacity), the border Field Offices maintained their

18  overall levels of inadmissible-alien processing, and their credible-fear referrals more

19  than doubled. Def. Ex. 4 at 2. Further, the border Field Offices' inbound drug sei-

20  zures and currency interdictions increased following the Secretary's memorandum,

21  Def. Ex. 5 at 304, which shows that the Secretary's memorandum had its intended

22  effects on CBP's priority mission sets.

23      *Finally*, Plaintiffs say that "after June 2018, POEs set arbitrary numerical caps

24  on asylum seeker processing" below "actual capacity." Pl. MSJ 29. But again, more

25  class members were referred for asylum processing overall. Def. Ex. 4 at 2. As one

26  Assistant Port Director explained, his port was "able to process more with metering"

27  in 2019 "because metering allowed [CBP] to prevent emergencies," like those "that

28  occurred in 2016." Pl. Ex. 102 at 188:18–25. Metering is not pretextual.

50

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

### B. The "True Motivations" for Metering are Lawful.

Plaintiffs say that metering has an unlawful "[t]rue [m]otivation," Pl. MSJ 29; *id.* at 29–30, but this argument is flawed for several reasons. *First*, arbitrary-and-capricious review "is ordinarily limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record." *Dept. of Commerce*, 139 S. Ct. at 2573; *see San Luis & Delta-Mendota Water Auth.*, 776 F.3d at 992 (collecting cases). This rule "reflects the recognition that further judicial inquiry into 'executive motivation' represents 'a substantial intrusion' into the workings of another branch of Government and should normally be avoided." *Dept. of Commerce*, 139 S. Ct. at 2573 (quoting *Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 268 n.18 (1977)). As explained above, the government's border-wide metering decisions easily satisfy this test when evaluated against the evidence before the agency when the decisions were made. *Supra* at Facts §§ B–G; Argument § V.A. The decisions are "within the bounds of reasoned decisionmaking," and this Court should not "improperly substitute[] its judgment for that of the agency." *Dept. of Commerce*, 139 S. Ct. at 2569, 2570 (quotation marks omitted).

*Second*, even if this Court were to look behind the government's explanations, Plaintiffs offer no direct evidence that the "true motivation" for metering is to "limit access to the asylum process at POEs for its own sake." Pl. MSJ 29. The metering memoranda address the constraints on Defendants' capacity to process undocumented aliens, not just asylum-seekers. *See* Def. Ex. 2; *supra* at Argument § V.A. Further, border-wide metering has not resulted in reduced numbers of asylum seekers, as the southwest border Field Offices' credible-fear referrals doubled following the 2018 memoranda's implementation. Def. Ex. 4 at 2.

*Third*, Plaintiffs' circumstantial evidence falls well short of showing that Defendants "proceeded with the turnback policy in pursuit of" limiting asylum "for its own sake." Pl. MSJ 30. Plaintiffs say that CBP Deputy Commissioner McAleenan, "who ultimately proposed the turnback policy, lament[ed] in mid-2016 that there

ER-0486

was 'no appetite to try and refuse [asylum seekers] and push them back to Mexico.'" *Id.* at 30 (quoting Pl. Ex. 47 at 116; alteration in Pl. MSJ). But the Deputy Commissioner was not referring to "asylum seekers," he was referring to the Haitian nationals, whom UNHCR "confirmed" were mostly "not seeking asylum." Pl. Ex. 12 at 741. Moreover, Mr. McAleenan was not "lamenting"; he was discussing potential policy proposals within a broader discussion about regional migration patterns and international coordination. Pl. Ex. 47 at 116. He would later authorize metering because he "just want[ed] our folks to have an additional tool to keep conditions safe and working at our POEs." Pl. Ex. 69 at 935. This does not show an intent to deter asylum processing for its own sake. But even if it did, that would not show an APA violation, particularly because "a court may not set aside an agency's policymaking decision solely because it might have been influenced by political considerations or prompted by an Administration's priorities." *Dept. of Commerce*, 139 S. Ct. at 2573.

*Fourth*, Plaintiffs say that a deterrence motive exists because ████████████ ██████████████████████████████████████████████████████████████████ ██████████████ Pl. MSJ 30. ████████████████████████████████████ ████████████████████████████ Pl. Ex. 96 at 009. This shows that the purpose of the request was to gather information about the policy's anticipated costs and effects, which is a normal aspect of policymaking.

*Fifth*, Plaintiffs say that in November 2016, "CBP put out a call for proposals 'that would have a deterrent effect on the sending populations.'" Pl. MSJ 30. But a call for proposals that deter people from making the dangerous journey to the United States is not a call for proposals to deter people from seeking asylum. Indeed, most of the Haitian population seeking admission at San Ysidro at the time were not asylum seekers, but rather were seeking to work or reunite with family. Pl. Ex. 12 at 741. There is nothing unlawful about seeking policy solutions to irregular migration.

*Finally*, even if the evidence showed that Defendants implemented metering to deter individuals from accessing the asylum process for its own sake, Defendants

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

respectfully maintain their position that this would not be contrary to the statute or unlawful. *See, e.g.*, *Thuraissigiam*, 140 S. Ct. at 1964–67; H.R. Rep. No. 104-469, pt. 1, at 1; *cf. Jean v. Nelson*, 472 U.S. 846, 880 (1985) (Marshall, J., dissenting) (noting "the valid immigration goal of reducing the number of undocumented aliens arriving at our borders"). Further, IIRIRA was motivated by "legitimate concerns" that the government's "capacity for admitting, assimilating, and naturalizing immigrants ha[s] been strained by current levels of legal immigration," including increases attributable to the 1980 Refugee Act. H.R. Rep. No. 104-469, pt. 1, at 133. If Defendants had a "deterrence" motive, that would not be inconsistent with § 1225.

## C. Metering is Consistent with Congressional Intent.

Plaintiffs argue that metering "is 'inconsistent with clearly expressed congressional intent'" because it "turns asylum seekers back to danger en masse." Pl. MSJ 30 (quoting *E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1273 (9th Cir. 2020)); *see also id.* at 30–31. This is wrong. *First*, Plaintiffs do not identify any "clear[]" statutory language evidencing that Congress did not intend for asylum seekers to wait in Mexico. *See E. Bay*, 950 F.3d at 1273 (citing *United States v. City of Fulton*, 475 U.S. 657, 666–67 (1986)). Nor could they. Section § 1225 applies by its terms to aliens "in the United States." Further, Congress included in § 1225 a provision expressly permitting the government to "return [an] alien" "who is arriving on land ... from a foreign territory contiguous to the United States" back "to that territory pending" full removal proceedings. 8 U.S.C. § 1225(b)(2)(C). Congress did not object to asylum seekers waiting in Mexico.

*Second*, policies that authorize metering to facilitate safe and orderly processing, Def. Ex. 2, or the prioritization of specific statutory functions, Def. Ex. 5 at 303–04; *see also* Def. Ex. 3 at 294–96, are consistent with the relevant Acts of Congress. As explained, the Homeland Security Act, IIRIRA, and the Trade and Travel Facilitation Act prioritize DHS's national-security mission over all others and require CBP to facilitate the flow of legitimate travel and trade. Metering is consistent

ER-0488

with the Acts because it facilitates these functions. The government is entitled to summary judgment on Plaintiffs' APA claims because the challenged metering decisions are well-supported, are the product of reasoned decisionmaking, and are consistent with congressional intent.

## VI.    Metering Does Not Deprive Class Members of Procedural Due Process.

On their due-process claims (at Pl. MSJ 31–33), Plaintiffs first contend that Defendants have deprived class members of their statutory "procedural protections" to "be inspected and processed for asylum at POEs pursuant to § 1225." Pl. MSJ 32. But § 1225 does not establish any such protections for aliens outside the United States. *Supra* at Argument § III. Nor does the obligation to refer an alien for a credible-fear interview attach until the government "determines" that an alien is inadmissible on certain grounds, which does not occur until an alien is physically present *in* the United States. 8 U.S.C. § 1225(b)(1)(A)(ii). By seeking to compel inspection and processing, class members seek to compel entry to the United States, which is not provided by the statute or the Constitution. "[I]t is long settled as a matter of American constitutional law that foreign citizens outside U.S. territory do not possess rights under the U.S. Constitution." *AID v. All. for Open Soc. Int'l*, 140 S. Ct. 2082, 2086 (2019) (collecting cases); *Zadvydas*, 533 U.S. at 693. Thus, Defendants do not violate any claimed due-process interest by subjecting class members to metering.

Plaintiffs argue "[i]n addition" that metering violates the due-process requirement of "fundamental procedural fairness" toward class members. Pl. MSJ 32–33. It is unclear what Plaintiffs seek by raising this "addition[al]" argument, but in all events class members cannot obtain more than what the statute already provides: to be inspected and processed for admission. *Thuraissigiam*, 140 S. Ct. at 1983 (arriving alien "has only those rights regarding admission that Congress has provided by statute," and "the Due Process Clause provides nothing more"); *Mezei*, 345 U.S. at 215; *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 544 (1950); *Rafeedie*

ER-0489

1    *v. INS*, 880 F.2d 506, 520 (D.C. Cir. 1989).[11]

2    **VII.   Plaintiffs' International-Law Claim is Not Actionable.**

3            Plaintiffs' claim under the ATS, 28 U.S.C. § 1350, is not actionable. *See* Pl.

4    MSJ 33–36. *First*, Plaintiffs fail to show why this Court should use its restricted

5    power to create federal common law to fashion a cause of action for injunctive and

6    declaratory relief against the United States for purported violations of the non-re-

7    foulement obligation. The "three primary offenses" cognizable under the ATS in-

8    clude "violation of safe conducts, infringements of the rights of ambassadors, and

9    piracy." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 724 (2004). While courts in certain

10   circumstances may create a cause of action for an additional offense that would in-

11   corporate a "specific, universal, and obligatory" international-law standard, *id.* at

12   732, courts must exercise "great caution in adapting the law of nations to private

13   rights," *id.* at 728, and engage in "vigilant doorkeeping," *id.* at 729.

14           The non-refoulement obligation is binding on the Executive only by statute

15   and regulation. *See* 8 U.S.C. § 1231(b)(3)(A) (prohibiting the government from "re-

16   mov[ing] an alien to a country if the Attorney General decides that the alien's life or

17   freedom would be threatened in that country" on a protected ground); *INS v. Stevic*,

18   467 U.S. 407, 421 (1984) (Congress amended the INA to "basically conform[] it to

19   the language of Article 33 of the United Nations Protocol"). When it acceded to the

20   obligation, Congress made clear that "[n]othing in this section shall be construed to

21   create any substantive or procedural right or benefit that is legally enforceable by

22   any party against the United States or its agencies or officers or any other person."

23   8 U.S.C. § 1231(h). And when it allowed for judicial review of claims arising out of

24   the withholding statute, Congress divested district courts of authority to hear such

25

26   ───────────────

27   [11] To the extent that Plaintiffs raise a *Mathews* balancing argument, *see* Pl. MSJ 33,
     that argument fails. As discussed, class members lack a protected interest. Even if
28   they had a protected interest, the burdens to those interests are far outweighed by the
     burdens to the government's and the public's interests. *See infra* at Argument § VIII.

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

ER-0490

claims and channeled them instead into the courts of appeals to be reviewed along-side a final order of removal. *Id.* §§ 1252(a)(5), (b)(9). In light of these statutory restrictions, it would be an extraordinary exercise of lawmaking power by the Judi-ciary that is nowhere suggested in the text or origins of the ATS, and that would be manifestly contrary to the Supreme Court's instruction to exercise "great caution" in recognizing new causes of action under the ATS, *Sosa*, 542 U.S. at 727–28, for this Court to recognize Plaintiffs' novel cause of action. Plaintiffs seek to enforce the same obligation that Congress adopted by statute, but to avoid the attendant lim-itations on judicial review. Plaintiffs should not be permitted to circumvent those statutory restrictions by couching their claims under the ATS.

*Second*, that Plaintiffs' claims implicate national security and foreign relations further demonstrates that the Court should not fashion a cause of action here. The Supreme Court recently held that courts may not fashion a cause of action for dam-ages under *Bivens* against U.S. officials based on claimed violations arising out of cross-border shootings, reasoning that "the conduct of agents positioned at the bor-der has a has a clear and strong connection to national security" and "regulating the conduct of agents at the border unquestionably has national security implications." *Hernandez*, 140 S. Ct. at 746, 747; *see also City of Indianapolis v. Edmond*, 531 U.S. 32, 42 (2000). "[T]he risk of undermining border security provides reason to hesitate before extending *Bivens* into this field." *Hernandez*, 140 S. Ct. at 747. Fur-ther, the claimed violations arose from a cross-border shooting (which "is by defini-tion an international incident," *id.* at 744) and "implicated" foreign relations, which provided "even greater reason for hesitation" before creating a cause of action. *Id.* at 747. The same national-security and foreign-relations implications are present here. OFO's function "to control the movement of people and goods across the bor-der" indisputably "implicates an element of national security," *id.* at 746, and its cooperation with the Mexican government to regulate crossings of the shared border is "by definition" an international affair, *id.* at 744. Thus, this Court should decline

to fashion a private cause of action for much the same reasons the Supreme Court declined to fashion one in *Hernandez*.

Plaintiffs do not explain why this Court should recognize an ATS cause of action, and instead merely argue that they *succeed* on an ATS claim. *See* Pl. MSJ 33–36. Those arguments are also flawed. *First*, the non-refoulement obligation that Congress acceded to has never been "available to aliens at the border." *Stevic*, 467 U.S. at 415. Even if this Court creates an ATS cause of action under the ATS, Plaintiffs offer no explanation why it should extend further than the INA. *Second*, a non-refoulement obligation attaches under U.S. law when an individual's life or freedom would be threatened *on a protected ground*. 8 U.S.C. § 1231(b)(3)(A). Plaintiffs' contention (at 34) that Defendants "'knew or should have known'" that Mexican "border towns are ... dangerous" is facially insufficient to establish this nexus. *Third*, Plaintiffs cite only eighteen declarations[12] filed in support of their class-certification motion (but not attached to their summary-judgment motion) showing the declarants fear waiting in Mexico. Pl. MSJ 34. Even if credited, the declarations do not show that all class or sub-class members "fear persecution or other harm" in Mexico, it shows only that the eighteen declarants do. Accordingly, Plaintiffs fail to show that relief would be "appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). *Finally*, Plaintiffs contend that Defendants have subjected class members to "impermissible chain refoulement—that is, the risk that CBP's expulsion of migrants to Mexico will lead to Mexican-initiated deportation." Pl. MSJ 35. But class members have not been "exp[elled]" to Mexico, they are waiting in Mexico, a country through which many have voluntarily traveled. In any event, this theory would require the Court to sit in judgment of Mexico's enforcement of its own immigration

---

[12] Defendants previously moved to strike some of these and other anonymous declarations because Plaintiffs refused to share the declarants' identities under the terms of the protective order, which precluded Defendants from even evaluating whether to seek discovery from the declarants. *See* ECF Nos. 411, 425. This Court should decline to consider the declarations for the reasons discussed in the motions to strike.

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

ER-0492

laws within its own borders, which is precluded under the act-of-state doctrine. *See Underhill v. Hernandez*, 168 U.S. 250, 252 (1897) ("the courts of one country will not sit in judgment on the acts of the government of another, done within its own territory"); *see also Munaf v. Geren*, 553 U.S. 674, 700–01 (2008) (under the rule of non-inquiry, "it is for the political branches, not the judiciary, to assess practices in foreign countries and to determine national policy in light of those assessments"). Plaintiffs' ATS claim is not actionable, but even if it were it fails.

## VIII. Plaintiffs are Not Entitled to the Relief They Seek.

Plaintiffs seek a permanent injunction requiring "Defendants to cease treating asylum seekers differently from all other people arriving at POEs on foot or by vehicle" and a declaratory judgment. Pl. MSJ 36–39. They are entitled to neither, and this Court should deny the request or allow briefing on the appropriate remedy, if necessary, after it rules on the merits.

*First*, Plaintiffs' requested injunction is prohibited by 8 U.S.C. § 1252(f)(1) because it would "enjoin or restrain the operation of" § 1225(b)(1)(A)(ii) by rewriting it to apply to aliens outside the United States. *See Hamama v. Adducci*, 912 F.3d 869, 879–80 (6th Cir. 2018), *cert. denied* 2020 WL 3578681 (July 2, 2020) (§ 1252(f)(1) prohibits injunctions that "create[] out of thin air a requirement ... that does not exist in the statute"). Moreover, § 1252(f)(1) "restrict[s] courts' power to impede" admission and removal statutes "on the basis of suits brought by organizational plaintiffs and noncitizens not yet facing [removal] proceedings." *Padilla v. ICE*, 953 F.3d 1134, 1151 (9th Cir. 2020). Class members are by definition not yet facing removal proceedings, so they cannot obtain the requested injunction that rewrites § 1225's clear terms.

*Second*, Plaintiffs are not entitled to an injunction under the traditional test. Injunctive relief is an "extraordinary remedy never awarded as of right." *Winter v. NRDC*, 555 U.S. 7, 24 (2008). A party must demonstrate "(1) actual success on the merits; (2) that it has suffered an irreparable injury; (3) that remedies available at

58

ER-0493

1    law are inadequate; (4) that the balance of hardships justify a remedy in equity; and

2    (5) that the public interest would not be disserved by a permanent injunction." *Edmo*

3    *v. Corizon, Inc.*, 935 F.3d 757, 784 (9th Cir. 2019). Because "it must be presumed

4    that federal officers will adhere to the law as declared by the court," the requirements

5    for discretionary declaratory relief in this context should be the same. *Sanchez-Es-*

6    *pinoza v. Reagan*, 770 F.2d 202, 208 n.8 (D.C. Cir. 1985) (Scalia, J.). An injunction

7    "should be no more burdensome to the defendant than necessary to provide complete

8    relief." *E. Bay*, 950 F.3d at 1282 (quotation marks omitted).

9        Plaintiffs' claims fail on the merits, so they are not entitled to an injunction.

10   But even if Plaintiffs showed actual success on the merits, the remaining prongs do

11   not support the injunctive relief they request. The third prong weighs against a per-

12   manent injunction because vacatur, which is the customary and "appropriate rem-

13   edy" for an APA violation, is an adequate legal remedy. *Cal. Wilderness Coalition*

14   *v. DOE*, 631 F.3d 1072, 1095 (9th Cir. 2011); 5 U.S.C. § 706(2). If Plaintiffs were

15   to succeed on their APA and duplicative due-process claims, the Court can vacate

16   Defendants' border-wide metering decisions rather than enter a permanent injunc-

17   tion and provide Plaintiff with complete relief on all claims, including their ATS

18   claim, which is based on the same operative facts. And because the APA is the only

19   statute that waives the United States' sovereign immunity for an injunctive ATS

20   claim, any ATS relief should be no broader than the relief granted under the APA.

21       The balance of hardships and the public interest, which should be considered

22   together, *Sierra Club v. Trump*, 963 F.3d 874, 895 (9th Cir. 2020), also weigh against

23   a permanent injunction. An order categorically enjoining metering at minimum

24   "would require OFO to divert staffing and resources, both at the southern land border

25   POEs and across the country, away from their priority missions and towards the

26   processing of" undocumented aliens. Def. Ex. 1 ¶ 16. Although some class members

27   may be adversely affected by metering, the order would impose direct economic

28   harms on border communities, *id.* ¶¶ 16–17, result in significantly fewer inbound

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

ER-0494

drug interdictions from Mexico, *id.* ¶ 18, and would create humanitarian challenges by crowding class members into facilities that "do not have showers, beds, laundry facilities, or space for recreation" and "are not equipped to meet the needs of families with small children" or "those with unique medical needs," *id.* ¶ 19. It would also significantly degrade the government's national-security and law-enforcement missions. *Winter*, 555 U.S. at 31 n.5; Def. Ex. 9 at 1; Pl. Ex. 102 at 136:7–18 (overcrowding "flat out degraded [CBP's] ability to do other mission sets"), 184:7–21 (same); Def. Ex. 65; Def. Ex. 66 (showing diversions of resources); *supra* Facts §§ B–D. There would also be a significant financial cost to the government. Def. Ex. 1 ¶ 23; Pl. Ex. 33 at 446. Mass parole, besides being contrary to the mandatory detention scheme and the public's "weighty interest in efficient administration of the immigration laws at the border," *E. Bay*, 932 F.3d at 779 (quotation marks omitted); *supra* at Argument § V.A, would not alleviate these burdens. It would merely reallocate them to "local NGOs, shelters, and other community organizations that often provide assistance to aliens released from DHS custody." Def. Ex. 1 ¶ 25. These costs to the public, class members, and the government vastly outweigh the harms to class members' interests from metering.

Finally, Plaintiffs' requested injunction is more burdensome than necessary to provide complete relief. The "less drastic remedy" of vacatur would be "sufficient to redress [Plaintiffs'] injury," so "no recourse to the additional and extraordinary relief of an injunction [is] warranted." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165–66 (2010). Even if the Court were to issue an injunction, it should order the narrowest relief permissible and preserve metering as an option in certain circumstances to give CBP the flexibility to adapt to changing circumstances and mitigate harms to the United States.

## **CONCLUSION**

The Court should deny Plaintiffs' Motion for Summary Judgment and enter summary judgment for Defendants.

1   DATED: September 25, 2020          Respectfully submitted,

2

3                                      JEFFREY BOSSERT CLARK
                                       Acting Assistant Attorney General
4                                      Civil Division

5
                                       WILLIAM C. PEACHEY
6                                      Director, Office of Immigration Litigation –
                                       District Court Section
7

8                                      KATHERINE J. SHINNERS
                                       Senior Litigation Counsel
9

10                                     */s/ Alexander J. Halaska*
                                       ALEXANDER J. HALASKA
11                                     Trial Attorney
                                       United States Department of Justice
12                                     Civil Division
                                       Office of Immigration Litigation
13                                     P.O. Box 868, Ben Franklin Station
                                       Washington, D.C. 20044
14                                     Tel: (202) 307-8704 | Fax: (202) 305-7000
                                       alexander.j.halaska@usdoj.gov
15

16
                                       *Counsel for Defendants*
17

18

19

20

21

22

23

24

25

26

27

28

ER-0496

61                          MEM. IN SUPPORT OF DEFS.' CROSS-
                            MSJ & IN OPP'N TO PLS.' MSJ
                            Case No. 3:17-cv-02366-BAS-KSC

1    **<u>CERTIFICATE OF SERVICE</u>**

2    No. 17-cv-02366-BAS-KSC

3    I certify that I served a copy of this document on the Court and all parties by

4    filing this document with the Clerk of the Court through the CM/ECF system, which

5    will provide electronic notice and an electronic link to this document to all counsel

6    of record.

7

8    DATED: September 25, 2020          Respectfully submitted,

9

10                                     */s/ Alexander J. Halaska*
                                       ALEXANDER J. HALASKA

11                                     Trial Attorney
                                       United States Department of Justice

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

ER-0497

1  JEFFREY BOSSERT CLARK
2  Acting Assistant Attorney General
   Civil Division
3  WILLIAM C. PEACHEY
4  Director, Office of Immigration Litigation –
   District Court Section
5  KATHERINE J. SHINNERS (DC 978141)
6  Senior Litigation Counsel
   ALEXANDER J. HALASKA (IL 6327002)
7  Trial Attorney
8  United States Department of Justice
   Civil Division
9  Office of Immigration Litigation
10 P.O. Box 868, Ben Franklin Station
   Washington, D.C. 20044
11 Tel: (202) 307-8704 | Fax: (202) 305-7000
12 alexander.j.halaska@usdoj.gov

13 *Counsel for Defendants*
14

15        **UNITED STATES DISTRICT COURT**
          **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**
16                    **(San Diego)**
17

18 AL OTRO LADO, Inc., *et al.*,          Case No. 3:17-cv-02366-BAS-KSC

19              *Plaintiffs*,            **DEFENDANTS' EXHIBIT 1**

20
          v.
21

22 Chad F. WOLF, Acting Secretary of
   Homeland Security, in his official
23 capacity, *et al.*,

24
                *Defendants*.
25

26

27

28

ER-0498

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| Al Otro Lado, Inc., *et al.*, | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| | ) | |
| v. | ) | No. 3:17-cv-02366-BAS-KSC |
| | ) | |
| Chad Wolf, *et al.*, | ) | |
| *Defendants.* | ) | |
| | ) | |

## DECLARATION OF BEVERLY GOOD

I, Beverly Good, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge and information made known to me from official records, and reasonably relied upon in the course of my employment, hereby declare as follows relating to the above-captioned matter.

1.      I am currently on a temporary duty assignment as the Acting Executive Director, Admissibility and Passenger Programs, Office of Field Operations (OFO), U.S. Customs and Border Protection (CBP), U.S. Department of Homeland Security (DHS).  I have been on this assignment since September 7, 2020.  In this role, I oversee policy and procedures related to primary and secondary system requirements and processes at over 328 ports of entry (POEs). My permanent position is Port Director, El Paso Port of Entry (ELP POE). I have held that position since November 2014.  In this role, I lead over 1,000 CBP Officers (CBPOs), Agriculture Specialists, Import and Entry Specialists, and administrative personnel with a strong commitment to achieve the CBP mission, through collaboration, innovation, integration and necessary training. Until March 18, 2020, the ELP POE encompassed four distinct international bridges (two with commercial import lots), two international railroad operations, an international airport operation and a Foreign Trade Zone.  CBPOs in ELP POE inspected approximately 14.9 million travelers, 7.2 million passenger vehicles, and more than

1

389,000 commercial conveyances, and processed an estimated $26.3 billion in trade in Fiscal Year 2019. From August 2016–December 2016, I was temporarily assigned as the Acting Executive Director for Operations, where I oversaw operations at 20 field offices across the entire United States, as well as overseas locations. I had oversight over 20 Directors of Field Operations, provided guidance to the field and reported back to the Executive Assistant Commissioner (EAC) and the Deputy EAC daily. I have also held several other positions within the Office of Field Operations throughout my 29 years of service.

2.      CBP has a broad mission of both protecting the United States from external threats (such as terrorists and other dangerous individuals, narcotics and other substances that can harm U.S. citizens, and counterfeit goods and other products that can undermine U.S. economic prosperity) and facilitating lawful trade and travel in ways that can help support and enhance the U.S. economy and the U.S. population. Implementing these dual mission sets requires a careful balancing of resources, personnel, and attention. OFO is the main component of CBP that is responsible for implementing these missions, as OFO is responsible for inspecting everything and everyone that enters the United States at its 328 POEs across the country (e.g., all vehicles, conveyances, goods, people, plants, animals, food, medicine, merchandise, etc.), and determining whether that person or thing complies with U.S. law. Therefore, OFO is the first line of defense against threats entering the nation and is primarily responsible for facilitating the free flow of travel and trade.

3.      I am aware of the above captioned case. Specifically, I understand that Plaintiffs allege that OFO has taken steps to deny individuals access to the asylum process at POEs along the southern border. I understand that Plaintiffs have requested that this court "enter a permanent injunction prohibiting all forms of turnbacks and requiring Defendants to inspect asylum seekers as they arrive at Class A POEs on the U.S.-Mexico border." It is my understanding that plaintiffs define "turnbacks" to include acts of misconduct by CBP officers (such as lies,

2

misrepresentations, threats, coercion, physical or verbal abuse, and discrimination), as well as actions that OFO takes to manage the flow of aliens without documents sufficient for lawful entry into land POEs on the southern border. I understand that plaintiffs are requesting an order that would prohibit OFO from taking any of the above actions, including metering or queue management.

4.  I also understand that plaintiffs are seeking an order from this court that would require OFO to inspect and process "asylum seekers" in the order in which they arrive at the POE, or an order that would require OFO to inspect and process "asylum seekers" in the order in which they arrive *and* at the time they arrive at a port of entry.

5.  I make this declaration in support of Defendants' Cross-Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment in this case, specifically to explain the harm that would result if OFO were enjoined from managing the flow of pedestrian travel into land ports of entry on the southwest border.

6.  Queue management is an operational practice by which OFO ensures that land ports of entry along the southwest border only take in as many aliens who arrive without documents sufficient for lawful entry to the United States as they are able to safely process and hold in accordance with CBP's short-term detention standards, and ensures that ports have sufficient resources to fulfill their priority mission sets. When ports engage in queue management, officers generally stand at the physical border between the United States and Mexico and determine whether individuals approaching the border have documents that would permit them lawful entry to the United States. Individuals who do not have such documents may be required to wait to proceed to the port until there is sufficient operational capacity to safely process them. Port directors have discretion to determine how many aliens without documents sufficient for lawful entry can be processed at a particular time on a particular

3

day, based on an assessment of all the factors influencing the port's operational capacity to both safely process and hold such individuals in appropriate conditions at that particular time.

7.      Under the law and policy, OFO has a duty to inspect and process all individuals, regardless of nationality or citizenship, who enter the United States at a designated port of entry. For those individuals who are aliens and are determined to be inadmissible, OFO processes them for appropriate removal proceedings or other appropriate action (such as criminal prosecution). Engaging in acts such as lies, misrepresentations, threats, coercion, physical or verbal abuse, and discrimination is viewed as misconduct. Such actions are prohibited by OFO policy, and officers who engage in such actions may be subject to disciplinary action. Additionally, OFO policy specifically prohibits officers from returning any individual who has crossed the international boundary onto U.S. soil without appropriate processing.

8.      There are several avenues for individuals to bring complaints or concerns about conduct to the attention of the agency for appropriate action, including the DHS Office of Inspector General, DHS's Office of Civil Rights and Civil Liberties, and directly to CBP. Complaints submitted to any of these entities will be referred to the appropriate entity within DHS, including CBP's Office of Professional Responsibility, for appropriate investigation and action.

9.      As outlined above, OFO utilizes queue management in order to appropriately allocate resources to address the myriad of missions being executed at a POE, to protect against unsafe conditions at the POEs, and to ensure that individuals who do enter the United States can be properly processed. Were port directors enjoined from utilizing queue management when there are a significant number of individuals entering the United States without sufficient entry documents, they would be required to divert resources away from their other priority missions. This diversion of resources would leave the southwest border vulnerable to

4

ER-0502

drug-trafficking organizations, transnational criminal organizations, and other nefarious actors.

10.     OFO's operations at ports of entry generally fall within executing the following priority missions: National Security, Counter-Narcotics and Outbound Operations, Economic Security, and Trade and Travel Facilitation. As explained above, OFO is charged with defending the nation's borders. As a result, OFO must ensure not only that aliens who seek to enter without sufficient entry documents are processed, but also that dangerous individuals, counterfeit goods which do direct harm to the nation's economy (and, depending on the product, physical harm to individuals), and illicit narcotics that cause significant harm to the country, are intercepted. OFO also inspects outbound travelers and vehicles for undeclared currency, firearms, and ammunition, which fund and facilitate the activities and fuel the violence of transnational criminal organizations in Mexico. OFO has made significant outbound seizures along the southwest border every year. While processing individuals without documents required by law for admission arriving at the southwest border remains a component of CBP's mission, priority is given to the efforts described above. I outline below some information to provide an overview of these missions and explain their breadth and significance. When OFO must reallocate resources towards the processing of aliens without sufficient entry documents it is, by necessity, taking resources from other critical missions that are important in keeping the United States safe, secure, and prosperous. Therefore, any order preventing OFO from utilizing queue management would have the effect of forcing OFO to shift a significant portion of its finite resources towards safely processing aliens without documents, and holding such individuals in conditions consistent with CBP's short-term detention standards, and away from OFO's other priority missions.

11.     _National Security_: This includes detecting and identifying potential public safety and security threats, including known or suspected terrorists, criminals, other violent actors, and

ER-0503

implements of terror such as biological and other potential weapons of mass destruction (WMD). CBP is uniquely positioned to enhance the safety of the United States and needs to be exceptionally focused on addressing the threats posed by counter intelligence activities, terrorism, transnational criminal organizations and others who wish to do us harm.

a. In Fiscal Year 2019, OFO encountered 9,297 individuals with outstanding warrants at POEs across the country. In Fiscal Year 2020 (through August), OFO encountered 6,406 individuals with outstanding warrants.

b. CBP's Tactical Terrorism Response Teams (TTRT), which are comprised of CBP officers and agents who are specially trained in counterterrorism response, are currently operational at 77 U.S. POEs and all 20 U.S. Border Patrol Sectors. TTRT officers and agents utilize information derived from targeting and inspection to mitigate possible threats. TTRT members are immersed in the current and developing threat picture through the continuous review of information, and are responsible for the examination of travelers suspected of having a nexus to terrorism who are encountered at or apprehended between the POE. CBP officers and agents also support FBI Joint Terrorism Taskforces with manpower and CBP's unique information holdings to assist with counterterrorism investigations.

c. CBP employs a counter network approach that leverages CBP's unique authorities, data holdings, intelligence enterprise, and partnerships as part of a coordinated approach against cross-border threat networks. In order to identify, disrupt, dismantle and degrade threats, which include terrorists and transnational criminal organizations, CBP participates with whole of government and international partners to illuminate, analyze, and understand threat networks, takes action with our partners to affect these networks, and grows, enhances, and sustains CBP capabilities critical to effective execution of counter network activities.

6

ER-0504

    d.  CBP officers use various mechanisms to identify travelers of possible counterterrorism and other national security concerns, and coordinate with our partners to further their investigations based on information discovered during CBP inspections.

12.  *Counter-Narcotics and Outbound Operations*:  OFO's mission includes countering transnational criminal organizations, whose networks continue to threaten U.S. public health and safety, undermine our nation's economic prosperity, and provide support to hostile foreign powers.  These organizations smuggle humans and illicit narcotics, infest the legitimate supply chain with counterfeit items and launder proceeds through the trade, and smuggle weapons and currency to fund and fuel their violent control in areas they operate. OFO collaborates with our partner agencies to disrupt and dismantle these criminal enterprises.

    a.  In Fiscal Year 2020 (through August), OFO nationwide seized 37,830 pounds of cocaine; 4,552 pounds of heroin; 313,813 pounds of marijuana; 141,663 pounds of methamphetamine; and 3,302 pounds of fentanyl.  The amount of fentanyl, in particular, increased significantly from Fiscal Year 2019 (when OFO seized 2,545 pounds). More specifically, OFO along the southern border intercepted over 117,000 pounds of methamphetamine, 19,000 pounds of cocaine, 2,400 pounds of fentanyl, 4,700 pounds of heroin, and 253,900 pounds of marijuana in fiscal year 2019. In FY20 (through September), CBP OFO seized more than 412,658 pounds of illicit narcotics on the southern border.

    b.  In the month of August 2020 alone, OFO nationwide seized 41,021 pounds of marijuana; 3,633 pounds of cocaine; 503 pounds of heroin; 23,452 pounds of methamphetamine; and 451 pounds of fentanyl.

ER-0505

    c.  Further, the amount of methamphetamine seized along the southern border increased to 117,532.67 pounds in Fiscal Year 2019 (a more than 66% increase from Fiscal Year 2018). In Fiscal Year 2020 (through August), OFO on the southern border has seized more than 130,000 pounds of methamphetamine (another 22% increase).

    d.  In Fiscal Year 2019, along the southwest border, OFO intercepted $9,442,827 in illicit outbound currency along the southwest border. Further, OFO also intercepted 170 firearms and 104,740 rounds of ammunition outbound along the southwest border in Fiscal Year 2019.

    e.  In FY 2020 (through Sept. 5, 2020), OFO along the southwest border has seized 340 firearms, 3,200 firearms parts and accessories, 190,171 rounds of ammunition, and $16,907,507 in outbound currency.

13.   *Economic Security*: CBP facilitates legitimate trade, enforces import and export laws, and protects the American economy to create a level playing field for American businesses. CBP focuses its enforcement efforts around priority trade issues that include interdicting counterfeit and unsafe goods, enforcing trade agreements, protecting revenue, and protecting American agricultural from pests and other threats .

    a.  During Fiscal Year 2019, CBP processed 35.5 million entries valued at over $2.7 trillion and more than 28.7 million imported cargo containers at POEs across the United States.

    b.  Since the end of March 2020, CBP's COVID-19 Cargo Resolution Team, working with interagency and private sector partners, has facilitated the importation of approximately $1.2 billion in medical supplies critical for the U.S.'s COVID-19 response.

    c.  Of particular importance in the pandemic, since the pandemic began through the first week of September 2020, OFO has seized more than 170,000 unlawful COVID-19

8

test kits in 368 separate incidents. OFO seized more than 12 million counterfeit face masks in 309 separate incidents; nearly 3,000 EPA-prohibited anti-virus lanyards in 105 incidents; more than 24,000 FDA-prohibited chloroquine and hydrochloroquine tablets in 180 incidents; and more than 45,000 tablets of counterfeit or unsafe antibiotics (such as azithromycin) in 92 incidents.

    d.  In Fiscal Year 2020 (through September 1, 2020), CBP has had over 23,700 seizures of counterfeit goods with an estimated value of $1.2 billion.

14.    *Facilitation of Lawful Trade and Travel*: This includes effectively anticipating, detecting and intercepting threats prior to and at ports of entry to enable the flow of travelers, including U.S. citizens, lawful permanent residents, and visa holders, at POEs across the country. International trade and tourism are two of the biggest drivers for the U.S. economy. Many local economies on the southern border depend on cross-border trade and travel.

    a.  In Fiscal Year 2019, the Field Offices on the southwest border processed 73,365,568 personally-owned vehicles; 136,931,326 vehicle passengers; and 48,749,851 pedestrians. In Fiscal Year 2020 (through August), the Field Offices on the southwest border processed 53,037,706 personally-owned vehicles; 94,884, 249 vehicle passengers; and 30,565,954 pedestrians.

15.    These priority missions must be implemented in conjunction with the mandate to inspect, process, and temporarily detain those aliens who are determined to be inadmissible to the United States. A port must maintain sufficient personnel and resources to be able to simultaneously identify national security threats; detect and seize illicit narcotics; facilitate the entry of vehicles, cargo, and travelers; and inspect, process, and hold those aliens that are determined to be inadmissible to the United States. Each port must therefore carefully allocate its limited resources to ensure that it is able to devote sufficient resources towards each of these missions. OFO has a finite number of personnel, resources, and space, and so

9

any requirement to focus more resources towards a particular area – for any reason –
necessarily means that OFO will have fewer personnel and resources to devote to other
mission sets. This is particularly important when considering the broader impact of diverting
resources from OFO across the country. OFO faces ongoing staffing shortages at air, land,
and sea ports across the country, and officers are often required to work overtime to meet the
operational needs that arise on a daily basis. Many officers, however, reach their statutory
overtime cap each fiscal year, which may lead, and has led, to critical staffing shortages
across POEs. While OFO often grants overtime cap exemptions to involuntary overtime,
significant involuntary overtime can cause significant fatigue of front-line officers, making
them more vulnerable to officer assaults. There have been 200 reported assaults on CBP
officers at southwest border POEs for Fiscal Year 2020 (through September).

16.    Since we do not know the specific parameters of an order enjoining OFO from utilizing
queue management, it is difficult to say precisely what the harm of such an order may be.
However, at a minimum, any order that enjoins the use of queue management would require
OFO to divert staffing and resources, both at the southwest land border POEs and across the
country, away from their priority missions and towards the processing of aliens without
documents sufficient for lawful entry. Such diversion of resources has, in the past, had a
significant negative impact on OFO operations, as well as on the U.S. population and the
U.S. economy, across the country. As outlined above, local economies depend on cross-
border trade and travel, and will be negatively impacted by the inevitable lane closures and
processing slow-downs in pedestrian, vehicle, and cargo traffic. Such a negative impact
would be of particular significance during this time when state and local economies – indeed,
the entire country – are trying to recover from the impact of the COVID-19 pandemic and
associated economic shutdowns.

10

ER-0508

17. For instance, in the summer of 2019, OFO deployed 731 officers to assist the U.S. Border Patrol to address the significant surge of individuals apprehended in between ports of entry along the southwest border as part of Operation Southern Support. These 731 officers came from all across the country. During that extreme circumstance where the agency was forced to divert its resources to address an emergent issue, wait times for passengers, pedestrians, passenger vehicles, and commercial trucks trying to cross the border increased at some airports and land ports of entry. Some ports of entry were forced to close travel lanes and curtail weekend cargo processing hours, which affected the flow of commerce and travel into the United States. Similarly, when the port of San Ysidro closed for five and a half hours in late 2018 in response to an emergency (and thus was required to divert *all* of its resources away from its priority mission sets), the San Ysidro Chamber of Commerce reported an estimated loss of $5.3 million to the region and local economy. I have every expectation that any order enjoining the use of queue management would have at least the same impact. However, unlike the impacts of Operation Southern Support, these would be lasting, not temporary impacts. Longer-lasting deployments of officers have previously led to significant financial cost for OFO. For instance, OFO deployed 1,865 officers over the course of five fiscal years to supplement critical staffing shortages in the San Diego and Tucson Field Offices, at a cost of over $41,757,580 in travel expenditures. I expect that similar financial costs would arise from an order preventing OFO from utilizing queue management, in addition to the operational impacts described above.

18. Similar impacts would be seen for narcotic-interdiction and national-security efforts. For instance, if ports were forced to divert officers from front-line duties to assist in processing and holding individuals in custody, the ports would become more vulnerable to illicit drugs successfully being smuggled into the ports. Fentanyl, in particular, is a drug that is difficult to detect, as it is easily concealed in small packages and other small compartments. OFO's

11

fentanyl seizures have increased significantly over the past several years, but having fewer officers available to detect this drug makes it significantly more likely that it will be successfully smuggled into the United States, contributing to the ongoing opioid crisis plaguing the country. Methamphetamine smuggling is also significantly increasing. Mexico is the largest supplier of methamphetamine to the United States. While OFO's seizures of methamphetamine have increased over the last few fiscal years, a decrease in front-line officers would similarly make the ports more vulnerable to this smuggling.

19.     In addition to the harms that would be caused by taking officers away from priority missions, I expect that if OFO were not permitted to use queue management, significant humanitarian challenges would also follow. Specifically, OFO's facilities are not designed for nor equipped to hold large numbers of individuals, nor are they designed to hold individuals for long periods of time. They do not have showers, beds, laundry facilities, or space for recreation. They are not equipped to meet the needs of families with small children, nor of those with unique medical needs. This also makes it difficult to segregate vulnerable populations from the rest of those in custody. Without any method of managing the flow into the ports of entry, they can quickly become overcrowded, especially if large groups of individuals are encountered at once. Indeed, this was the very reason why ports of entry began utilizing queue management in the first place – to prevent such overcrowding and to ensure safe conditions for everyone in custody. Such overcrowding would be particularly dangerous during the current COVID-19 pandemic, as having large numbers of people in close, overcrowded conditions would increase the likelihood of the virus spreading in OFO's facilities, putting both officers and individuals in custody at risk.

20.     I base my humanitarian concerns, in part, on my experience working to address how OFO managed a large surge of migrants at ports of entry prior to the implementation of queue management. Specifically, in 2016, OFO across the southwest border faced a significant

12

surge in the number of aliens without travel documents entering the ports. Many of these individuals were families and unaccompanied alien children. To help mitigate the humanitarian concerns caused by the surge, various POEs converted office space, areas designated for cargo or other inspections, and other available space into hold rooms in an attempt to process and hold more individuals in a safe manner. POEs also worked to hold as many individuals as possible at local U.S. Border Patrol facilities, and worked with U.S Immigration and Customs Enforcement (ICE) to increase transportation of individuals out of CBP custody. POEs also diverted resources from other OFO mission sets, including outbound enforcement and vehicle processing. During this surge, OFO detailed officers from across the country and increased overtime, at significant cost to the agency.

21.　While such actions did permit OFO to process more individuals and bring them indoors from the elements, such actions had a significant cost to both officers and the individuals in custody. Repurposed office space, for example, often did not have restrooms, and so officers were required to escort individuals back and forth to restrooms. Such spaces were not designed for sleeping or provide comfortable living conditions. Additionally, converting spaces such as cargo processing space and office space into hold rooms, and diverting officers from frontline duties, further diverted resources and personnel from other mission sets at the POE. In particular, the humanitarian crisis in 2016 had a negative impact on OFO's ability to detect and intercept illicit narcotics along the southwest border. Hard narcotics drug seizure weights decreased by 8.147% to 542,925 pounds in Fiscal Year 2016, when compared to Fiscal Year 2015. This decrease was not on par with rising seizure trends over the prior years, and in the subsequent years.

22.　Even when undertaking such actions, some ports quickly reached a point at which the POE became overcrowded and unsafe. On October 24, 2016, for instance, the San Diego Field Office was operating at 207% of its detention capacity, the Tucson Field Office was

13

ER-0511

operating at 192% of its detention capacity; the El Paso Field Office was operating at 146% of its detention capacity; and the Laredo Field Office was operating at 96% of its detention capacity. By October 30, 2016, the Field Offices on the southwest border were collectively operating at 140% of their stated detention capacity. Additionally, and because of these safety concerns, individuals waited in line – on U.S. soil – until the port had the capability to process and hold additional individuals. These individuals were essentially camped out in this space, sitting for extended periods of time, and at times sleeping on the bare ground. These individuals did not have access to showers or hygiene supplies, or regular access to toilet facilities. These lines stretched far beyond the port building, exposing some of these individuals to the elements.

23.   Addressing these humanitarian issues, even on a temporary basis, resulted in significant costs for OFO and CBP. For instance, OFO spent more than $1.5 million on supplies such as blankets, food, and other hygiene products, in addition to the costs spent on overtime and other travel expenses. The U.S. Border Patrol also spent more than $9 million on overtime, travel expenses, and humanitarian supplies. Additionally, in November of 2016, CBP opened a soft-sided facility at the Tornillo POE. This facility initially had a capacity of 500 beds, with a scalable capacity up to 3,000. However, the cost to operate each 500-bed unit of the facility was $2.6 million for 30 days, and the facility required 50 CBP employees (either CBP officers or Border Patrol agents) for adequate staffing, again taking both CBP officers and Border Patrol agents away from critical mission sets. CBP opened a similar facility at the Donna POE in December 2016, at similar costs. Such facilities are intended to be temporary, but were necessary at the time due to the extremely high numbers in custody at both POEs and at the facilities of the U.S. Border Patrol.

24.   Based on past experience, I expect that any order preventing OFO from utilizing queue management and requiring OFO to process aliens without documents as they arrive at POEs

14

would lead to similar humanitarian concerns and would require CBP to take similar steps to address these concerns, regardless of the exact scope or mechanisms of the order. Regardless of the exact requirements of any order enjoining the use of queue management, I expect that large numbers of aliens without documents would arrive at POEs in large groups, which would present similar humanitarian concerns for CBP as those that existed in 2016. This is particularly so because CBP's role in the immigration system is to inspect, process, and refer individuals to other agencies as appropriate. As such, CBP is heavily reliant on partner agencies, particularly ICE, to accept custody of individuals for long-term detention. In my experience, ICE has similarly limited and finite resources. Therefore, ICE does not always have available bed space. This would be particularly so if OFO were unable to utilize queue management. If ICE is limited in its ability to transfer individuals out of CBP custody, OFO must either parole individuals from custody or locate an appropriate place to hold these individuals while securing space with ICE.

25.     However, paroling large numbers of individuals in this way would be inconsistent with both longstanding OFO policy and the legal guidelines for parole. CBP officers exercise their parole authority by weighing the totality of circumstances for each encounter. Specifically, under the law and OFO policy, parole is intended to be exercised on a limited and case-by-case basis. Paroling large numbers of individuals would create an additional "pull factor" for those who have no intention of appearing for all required portions of their removal proceedings. Additionally, executing releases in this manner places a significant strain on local NGOs, shelters, and other community organizations that often provide assistance to aliens released from DHS custody, as these organizations often have limited resources and limited personnel. Additionally, in some border communities, there is not extensive public transportation that would permit individuals released from the POEs to efficiently travel to other parts of the country.

15

ER-0513

26.     If ICE is limited in its ability to transport individuals out of OFO custody, individuals will likely remain in OFO custody for longer than 72 hours. OFO facilities are only designed for processing and short-term detention. Holding individuals for extended periods of time in OFO facilities therefore leads to increased risks to the health and safety of both these individuals and CBP Officers – particularly during the current pandemic.  Such high numbers in custody and increased time-in-custody would also require additional OFO resources to ensure detention standards are met, including increased costs for food and other humanitarian supplies.  As described above, such a diversion of resources increases the likelihood of successful smuggling events and poses a national security risk at the border that is frequently exploited by organized transnational criminal organizations and other nefarious actors. CBP officers have a responsibility to meet priority missions, including performance of secondary inspections of high-risk conveyances and travelers, and facilitation of lawful trade and travel. I have witnessed the challenges of maintaining the integrity of border security operations when unable to manage the flow of aliens without documents sufficient for lawful entry at the southwest border. Without being able to utilize queue management, OFO's operations and facilities would be negatively impacted.

27.     I declare, under penalty of perjury, that the foregoing is true and correct to the best of my knowledge and belief.


Executed this 25th day of September, 2020.

Beverly Good
Acting Executive Director,
Admissibility and Passenger Programs
Office of Field Operations
U.S. Customs and Border Protection

ER-0514

1  JEFFREY BOSSERT CLARK
2  Acting Assistant Attorney General
   Civil Division
3  WILLIAM C. PEACHEY
4  Director, Office of Immigration Litigation –
   District Court Section
5  KATHERINE J. SHINNERS (DC 978141)
6  Senior Litigation Counsel
   ALEXANDER J. HALASKA (IL 6327002)
7  Trial Attorney
8  United States Department of Justice
   Civil Division
9  Office of Immigration Litigation
10  P.O. Box 868, Ben Franklin Station
   Washington, D.C. 20044
11  Tel: (202) 307-8704 | Fax: (202) 305-7000
12  alexander.j.halaska@usdoj.gov

13
   *Counsel for Defendants*
14

15              **UNITED STATES DISTRICT COURT**
16        **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**
                        **(San Diego)**
17

18  AL OTRO LADO, Inc., *et al.*,          Case No. 3:17-cv-02366-BAS-KSC

19                    *Plaintiffs*,        **DEFENDANTS' EXHIBIT 2**
20
21          v.
22  Chad F. WOLF, Acting Secretary of
23  Homeland Security, in his official
   capacity, *et al.*,
24
25                    *Defendants*.
26
27
28

ER-0515

Produced in Al Otro Lado v. McAleenan, No. 3:17-cv-02366 (S.D. Cal.)

1300 Pennsylvania Avenue NW
Washington, DC 20229



**U.S. Customs and Border Protection**

APR 2 7 2018

MEMORANDUM FOR:     See Distribution

FROM:     Todd C. Owen
Executive Assistant Commissioner
Office of Field Operations

SUBJECT:     Metering Guidance

When necessary or appropriate to facilitate orderly processing and maintain the security of the port and safe and sanitary conditions for the traveling public, DFOs may elect to meter the flow of travelers at the land border to take into account the port's processing capacity. Depending on port configuration and operating conditions, the DFO may establish and operate physical access controls at the borderline, including as close to the U.S.-Mexico border as operationally feasible. DFOs may not create a line specifically for asylum-seekers only, but could, for instance, create lines based on legitimate operational needs, such as lines for those with appropriate travel documents and those without such documents.

Ports should inform the waiting travelers that processing at the port is currently at capacity and CBP is permitting travelers to enter the port once there is sufficient space and resources to process them. At no point may an officer discourage a traveler from waiting to be processed, claiming fear of return, or seeking any other protection. Officers may not provide tickets or appointments or otherwise schedule any person for entry. Once a traveler is in the United States, he or she must be fully processed.

INAMI has, at times, elected to conduct exit controls at some locations in Mexico to limit the throughput of travelers into the United States. DFOs should be particularly aware of any INAMI controls that are preventing U.S. citizens, LPRs, or Mexican nationals (some of whom may intend to claim fear) from entering the United States, and should work with INAMI, as appropriate, to address such concerns.

Please ensure that this memorandum is disseminated to all ports of entry within your area of responsibility. Should you have any questions or require additional information, please contact ████████████ Executive Director, APP, at ████████████.

Distribution:     Director, Field Operations, El Paso
Director, Field Operations, Laredo
Director, Field Operations, San Diego
Director, Field Operations, Tucson

ER-0516
CBPALOTRO000299

1  JEFFREY BOSSERT CLARK
2  Acting Assistant Attorney General
   Civil Division
3  WILLIAM C. PEACHEY
4  Director, Office of Immigration Litigation –
   District Court Section
5  KATHERINE J. SHINNERS (DC 978141)
6  Senior Litigation Counsel
   ALEXANDER J. HALASKA (IL 6327002)
7  Trial Attorney
8  United States Department of Justice
9  Civil Division
   Office of Immigration Litigation
10 P.O. Box 868, Ben Franklin Station
11 Washington, D.C. 20044
   Tel: (202) 307-8704 | Fax: (202) 305-7000
12 alexander.j.halaska@usdoj.gov
13
14 *Counsel for Defendants*

15            **UNITED STATES DISTRICT COURT**
16     **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**
                    **(San Diego)**
17

18 AL OTRO LADO, Inc., *et al.*,          Case No. 3:17-cv-02366-BAS-KSC
19                      *Plaintiffs*,     **DEFENDANTS' EXHIBIT 3**
20
21                v.
22 Chad F. WOLF, Acting Secretary of
23 Homeland Security, in his official
   capacity, *et al.*,
24
25                      *Defendants.*
26
27
28

ER-0517



U.S. Department of Homeland Security
Washington, DC 20528

June 5, 2018

MEMORANDUM FOR:     Kevin K. McAleenan
                            Commissioner
                            U.S. Customs and Border Protection

FROM:                    Kirstjen M. Nielsen
                            Secretary

SUBJECT:             Prioritization-Based Queue Management

While enhancing border security at and between our Southwest Border ports of entry and increasing our effectiveness at identifying and interdicting threats, apprehensions of those crossing our border illegally between the ports of entry and the number of arriving aliens determined to be inadmissible at ports of entry continue to rise.

At the same time, U.S. Customs and Border Protection's (CBP) resources remain strained along the Southwest Border. Inadmissible arriving aliens presenting at ports of entry, many of whom arrive without possessing appropriate travel and identity documents required by law, such as a visa and passport, require additional processing time that delays the flow of legitimate trade and travel. In many cases, CBP officers must take sworn statements from those individuals, which requires a substantial amount of time and resources.

CBP must focus on its primary mission: to protect the American public from dangerous people and materials while enhancing our economic competitiveness through facilitating legitimate trade and travel. As we strengthen our screening and vetting across multiple agencies to identify potential threats before they impact the United States, we continue to face a multi-faceted and dispersed terrorist adversary. In Fiscal Year 2017, CBP officers at our land ports of entry found 335 individuals inadmissible who were on the terrorist watchlist, and have already had 70 such encounters in the first quarter of 2018. Furthermore, on a typical day, CBP arrests 21 wanted criminals at our ports of entry. The officers at our ports must be vigilant about identifying national security and public safety threats above all others and denying entry to those who might do us harm.

Particularly, I am concerned by increasing seizures of illicit narcotics across all categories—especially methamphetamine and synthetic opioids such as fentanyl.

FOR OFFICIAL USE ONLY

ER-0518

Confidential

AOL-DEF-00273294

Prioritization-based Queue Management
Page 2

| | Drug Type (lbs) | FY 2017 (May 16th) | FY 2018 (May 16th) | % Change |
|---|---|---|---|---|
| Inbound Narcotics Seizures | Methamphetamine | 23,318.59 | 37,584.20 | 61.18% |
| | Heroin | 1,820.03 | 2,769.16 | 52.15% |
| | Fentanyl | 771.22 | 827.18 | 7.26% |

CBP must prioritize resources to intercept illicit drugs that have no place in a safe society. Security in border communities and beyond is threatened by transnational criminal organizations transferring drugs and currency across our borders.

We know from experience that seizures of illicit narcotics inbound and the outbound currency that sustains transnational criminal organizations both increase when inadmissible arriving aliens, particularly those without documents, are down. For example, during Fiscal Year 2017, when our ports of entry saw a 25 percent decrease in migrant crossings and processing from the year before, seizures of outbound currency increased by 37 percent.

| | FY 2016 | | FY 2017 | | % Change |
|---|---|---|---|---|---|
| | Incidents | USD | Incidents | USD | |
| Outbound Currency Interdictions | 1,047 | $28,371,089 | 1,233 | $38,996,437 | 37.45% |

CBP personnel and resources that would otherwise be deployed to process inadmissible arriving aliens can focus on the detection and apprehension of narcotics and currency smugglers.

CBP must protect the economic security of the United States by enforcing trade laws and protecting legitimate commerce. Seizures of shipments that violate intellectual property rights increased by eight percent in Fiscal Year 2017 over the previous fiscal year, and if those seized items had been genuine, the total estimated manufacturer's suggested retail price would have been more than $1.2 billion. CBP officers must be able to focus on identifying fake and dangerous goods, as well as invasive pests, through the cargo processing and agriculture inspection efforts that protect the American economy.

Finally, continued efficient transit for vetted trade partners and trusted travelers must be a priority. Approximately 545,000 passengers and pedestrians pass through our Southwest Border ports of entry every day, as well as 214,000 privately owned vehicles. The vast majority of that traffic is legitimate and necessary, and border communities and our larger economy rely on their efficient processing.

The processing of travelers without documentation draws resources away from CBP's fundamental responsibilities. The number of inadmissible persons arriving at ports of entry has risen by 62 percent in the last three months, when compared to the same three months of the previous fiscal year:

FOR OFFICIAL USE ONLY

Confidential

Prioritization-based Queue Management
Page 3

| Fiscal Period | All Inadmissibles |
|---|---|
| February 2017 | 12,078 |
| March 2017 | 13,079 |
| April 2017 | 12,531 |
| February 2018 | 17,862 |
| March 2018 | 22,513 |
| April 2018 | 20,956 |

Moreover, staffing at Southwest Border ports of entry is below our target levels for almost all major ports, and our officers are increasingly working extensive overtime hours each pay period, leading to increased fatigue and stress on the workforce. At several of the largest ports of entry, upwards of 10 percent of the CBP officer workforce are engaged in immigration secondary screening and processing functions, primarily addressing persons presenting without documents sufficient for admission or other lawful entry.

While we address these staffing concerns, we remain focused on accomplishing the mission. In recognition of (1) the continued prevalence of security threats, (2) the dire consequences of illicit narcotics on our communities (especially the devastating opioid epidemic), (3) the staffing and resource challenges summarized above, and (4) the increase of irregular migration flows, I direct you to initiate a 30-day pilot program to prioritize staffing and operations in accordance with the following order of priority at all Southwest Border ports of entry:

1. **National security efforts:** detecting public safety and identifying potential security threats, such as known or suspected terrorists, members of transnational criminal organizations, and other violent actors.
2. **Counter-narcotics operations:** targeting and examining increasing numbers of conveyances and travelers for potential smuggling of illicit narcotics.
3. **Economic security:** trade and cargo processing efforts to facilitate lawful commerce into the United States, while enforcing trade laws, protecting agriculture, and addressing anticompetitive elements in the supply chain.
4. **Trade and travel facilitation:** managing flows of people and goods at pedestrian and vehicle lanes of entry for U.S. citizens, lawful permanent residents, Border Crossing Card and visa holders, and others presenting documents sufficient for admission or other lawful entry into the United States, while detecting fraudulent documents.

Processing persons without documents required by law for admission arriving at the Southwest Border remains a component of CBP's mission, but priority should be given to the efforts described above in the prescribed order. Field leaders have the discretion to allocate resources and staffing dedicated to any areas of enforcement and trade facilitation not covered by the above priorities and queue management process based on the availability of resources and holding capacity at the local port level. Depending on port configuration and operating conditions, Directors of Field Operations may establish and operate physical access controls at the borderline, including as close to the U.S.-Mexico border as operationally feasible. DFOs may create lines based on legitimate operational needs, such as lines for those with appropriate travel documents and those without such documents. As in all operations, the safety of employees and the public is paramount in operational decisions.

FOR OFFICIAL USE ONLY

Confidential

1
2
3
4
5
6
7
8
9
10
11
12

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General
Civil Division
WILLIAM C. PEACHEY
Director, Office of Immigration Litigation –
District Court Section
KATHERINE J. SHINNERS (DC 978141)
Senior Litigation Counsel
ALEXANDER J. HALASKA (IL 6327002)
Trial Attorney
United States Department of Justice
Civil Division
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 307-8704 | Fax: (202) 305-7000
alexander.j.halaska@usdoj.gov

13
14

*Counsel for Defendants*

15
16
17

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF CALIFORNIA**
**(San Diego)**

18
19
20
21
22
23
24
25
26
27
28

AL OTRO LADO, Inc., *et al.*,

                              *Plaintiffs*,

            v.

Chad F. WOLF, Acting Secretary of
Homeland Security, in his official
capacity, *et al.*,

                              *Defendants*.

Case No. 3:17-cv-02366-BAS-KSC

**DEFENDANTS' EXHIBIT 4**

ER-0521



Official website of the Department of Homeland Security

(https://www.facebook.com/CBPgov/) (https://www.instagram.com/cbpgov/)

(https://www.flickr.com/photos/cbpphotos/) (https://twitter.com/cbp)

(https://www.linkedin.com/company/2997?trk=tyah) (https://www.youtube.com/user/customsborderprotect)

U.S. Customs and
Border Protection
(/)

(https://public.govdelivery.com/accounts/USDHSCBP/subscriber/new)

# Claims of Fear

## CBP Southwest Border and Claims of Credible Fear Total Apprehensions/Inadmissibles (FY2017 - FY2019)

|  | FY17 | FY18 | FY19 |
|---|---|---|---|
| **Total Apprehensions & Inadmissibles** | 415,517 | 521,090 | 977,509 |
| **Total Claims of Credible Fear Apprehensions & Inadmissibles** | 55,584 | 92,959 | 146,660 |
| **CF Apprehensions/Inadmissibles % of Total** | 13% | 18% | 15% |

**Individuals Claiming Credible Fear**

Those who are apprehended between Ports of Entry and claim credible fear are processed for expedited removal by U.S. Border Patrol. Those who arrive at Ports of Entry, are found inadmissible, and claim credible fear are processed for expedited removal by the Office of Field Operations. All claims of credible fear are referred to Asylum Officers of the U.S. Citizenship and Immigration Services (USCIS).

Under the Expedited Removal Provisions, an agent or officer takes the applicant's sworn statement, including asking four questions regarding any fear the alien may have of returning to his or her home country and the potential of being harmed. During Expedited Removal proceedings, detainees are questioned regarding any fear they may have of returning to their country of origin, to ensure that each detainee is afforded the ability to articulate claims of fear. Those questions are:

1. Why did you leave your home or country of last residence?

ER-0522

2. Do you have any fear or concern about being returned to your home country or being removed from the United States?

3. Would you be harmed if you are returned to your home country or country of last residence?

4. Do you have any questions or is there anything else you would like to add?

CBP Agents and Officers have no discretion as to whether or not to refer an alien for a credible fear interview. CBP Agents and Officers do not make any determination on the validity of such claims and refer the person for an interview with a USCIS Asylum Officer.

Note: Figures are accurate as of October 2019 and are subject to variances based on the adjudication of cases.

# U.S. Border Patrol Southwest Border Apprehensions (FY2017 - FY2019)

| Southwest Border | FY17 | FY18 | FY19 |
|---|---|---|---|
| Total Apprehensions | 303,916 | 396,579 | 851,508 |
| Total Claims of Credible Fear Apprehensions | 38,300 | 54,690 | 66,605 |
| CF Apprehensions % of Total | 13% | 14% | 8% |

For breakdown by Sector, visit **USBP Claims of Credible Fear Apprehensions by Sector (/newsroom/stats/sw-border-migration/claims-fear/apprehensions-sector)**.

# Office of Field Operations Southwest Border Inadmissibles (FY2017 - FY2019)

| Southwest Border | FY17 | FY18 | FY19 |
|---|---|---|---|
| Total Inadmissibles | 111,275 | 124,876 | 126,001 |
| Total Claims of Credible Fear Inadmissibles | 17,284 | 38,399 | 80,055 |
| CF Inadmissibles % of Total | 16% | 31% | 64% |

For breakdown by Field Office, visit **Southwest Border Claims of Credible Fear Inadmissibles by Field Office (/newsroom/stats/sw-border-migration/claims-fear/inadmissibles-field-office)**.

ER-0523

**Last modified:** July 17, 2020

 Share This Page.

ER-0524

1   JEFFREY BOSSERT CLARK
2   Acting Assistant Attorney General
    Civil Division
3   WILLIAM C. PEACHEY
4   Director, Office of Immigration Litigation –
    District Court Section
5   KATHERINE J. SHINNERS (DC 978141)
6   Senior Litigation Counsel
    ALEXANDER J. HALASKA (IL 6327002)
7   Trial Attorney
8   United States Department of Justice
    Civil Division
9   Office of Immigration Litigation
10  P.O. Box 868, Ben Franklin Station
    Washington, D.C. 20044
11  Tel: (202) 307-8704 | Fax: (202) 305-7000
12  alexander.j.halaska@usdoj.gov

13
    *Counsel for Defendants*
14

15              **UNITED STATES DISTRICT COURT**
16       **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**
                    **(San Diego)**
17

18  AL OTRO LADO, Inc., *et al.*,           Case No. 3:17-cv-02366-BAS-KSC

19                       *Plaintiffs*,      **DEFENDANTS' EXHIBIT 5**

20               v.

21
    Chad F. WOLF, Acting Secretary of
22  Homeland Security, in his official
23  capacity, *et al.*,

24                       *Defendants.*
25

26

27

28

ER-0525



**U.S. Department of Homeland Security**
Washington, DC 20229

**U.S. Customs and Border Protection**

NOV 2 7 2019

MEMORANDUM FOR:     Todd C. Owen
                    Executive Assistant Commissioner
                    Office of Field Operations

FROM:               Mark A. Morgan
                    Acting Commissioner

SUBJECT:            Prioritization-Based Queue Management

**Background and Purpose:**

On June 5, 2018, the Secretary of Homeland Security issued policy memorandum, *Prioritization-Based Queue Management,* (attached), which establishes an order of priority for the allocation of resources at the U.S. Southwest Border land ports of entry (POE). This policy directs U.S. Customs and Border Protection (CBP) to focus on its primary mission: to safeguard America's borders thereby protecting the public from dangerous people and materials while enhancing the Nation's global economic competiveness by enabling legitimate trade and travel.

Over the past several years, CBP has seen an increase in the number of inadmissible aliens presenting at POEs without possessing appropriate travel and identification documents. The processing of these aliens requires a substantial amount of time and resources, which may negatively affect the flow of trade and other travel. CBP must carefully balance its space and resources to ensure that each POE has sufficient capacity to address its mission sets, in order of priority, including the safety and expeditious processing of all travelers accessing the port.

Therefore, to ensure the continued success of the CBP mission, I ask for your continued vigilance in prioritizing staffing and operations in accordance with the order of priority as outlined in the June 5, 2018 memorandum. By prioritizing resource and staffing efforts, CBP officers will focus on enhancing border security, increasing CBP's effectiveness in identifying and interdicting threats, and processing individuals presenting themselves for admission into the United States.

More specifically, the Secretary's 2018 memorandum identified the following order of priority at all Southwest Border POEs:

1. **National security efforts:** detecting public safety and identifying potential security threats, such as known or suspected terrorists, members of transnational criminal organizations (TCOs), and other violent actors.

Law Enforcement Sensitive/For Official Use Only

ER-0526    CONFIDENTIAL

Law Enforcement Sensitive/For Official Use Only

2. **Counter-narcotics and outbound operations:** targeting and examining increasing numbers of conveyances and travelers for potential smuggling of illicit narcotics, currency, and firearms.
3. **Economic security:** trade and cargo processing efforts to facilitate lawful commerce into the United States, while enforcing trade laws, protecting agriculture, and addressing anticompetitive elements in the supply chain.
4. **Trade and travel facilitation:** managing flows of people and goods at pedestrian and vehicle lanes of entry for U.S. citizens, lawful permanent residents, Border Crossing Card and visa holders, and others presenting documents sufficient for admission or other lawful entry into the United States.

## Current Situation:

CBP continues to face multi-faceted threats at our Southwest border. As such, the agency needs to position resources appropriately to combat all threats. In Fiscal Year 2019, CBP officers at our Southwest Border land POEs found three individuals inadmissible who were on the terrorist watchlist at the time of encounter. In Fiscal Year 2019, CBP officers have encountered 1,601 Special Interest Aliens along the Southwest Border. Furthermore, in Fiscal Year 2019, CBP officers arrested 1,800 convicted criminals at our Southwest Border land POEs.

Additionally, TCOs are flooding our country with dangerous drugs. Last year, there were over 68,000 deaths in the United States due to illicit narcotic use. Additionally, methamphetamine has seen a resurgence in this country as "super labs" in Mexico are increasing production and are flooding the United States with cheaper and purer forms of methamphetamine. There has been a 19 percent increase in inbound methamphetamine seizures. According to the Drug Enforcement Administration, the overall average purity for the second half of 2018 was 97.5 percent.

| | DRUG TYPE | FY18 (LBS) | FY19 (LBS) | FY18 TO FY19 % CHANGE |
|---|---|---|---|---|
| **INBOUND DRUG SEIZURES** | Methamphetamine | 53,244.69 | 64,646.93 | 19% |
| | Heroin | 4,826.28 | 4,790.46 | -1% |
| | Fentanyl | 1,513.13 | 2,388.13 | 58% |
| | Cocaine | 19,937.79 | 19,255.12 | -3% |

Finally, in Fiscal Year 2019, CBP outbound seizures of currency along the Southwest Border also increased.

| | FY18 | | FY19 | |
|---|---|---|---|---|
| **OUTBOUND CURRENCY INDICATIONS** | Incidents | USD | Incidents | USD |
| | 164 | $7,017,683.61 | 165 | $9,442,827.38 |

These demands create an inherent strain on CBP personnel and resources to process an increasing number of inadmissible arriving aliens while simultaneously focusing on the detection and apprehension of narcotics and currency smugglers.

Law Enforcement Sensitive/For Official Use Only

ER-0527    CONFIDENTIAL

**Action:**

In accordance with the mission of the Office of Field Operations, Operations Directorate to protect the American people, advance the national economy, and safeguard our borders, field leaders must continue to balance resources according to the order of priority listed above and are reminded that:

- They have the discretion to allocate resources and staffing to any areas of enforcement and trade facilitation not covered by the priorities and queue management process based on the availability of resources and holding capacity at the local port level.
- Depending on port configuration and operating conditions, Directors of Field Operations may establish and operate physical access controls at the borderline, including as close to the US-Mexico border as operationally feasible.
- Directors of Field Operations may create lines based on legitimate operational needs, such as lines for those with appropriate travel documents and those without such documents.
- As in all operations, the safety of employees and the public is paramount to in operational decisions.

ER-0528    CONFIDENTIAL



U.S. Department of Homeland Security
Washington, DC 20528

**Homeland Security**

June 5, 2018

MEMORANDUM FOR:    Kevin K. McAleenan
                          Commissioner
                          U.S. Customs and Border Protection

FROM:               Kirstjen M. Nielsen
                          Secretary

SUBJECT:          Prioritization-Based Queue Management

While enhancing border security at and between our Southwest Border ports of entry and increasing our effectiveness at identifying and interdicting threats, apprehensions of those crossing our border illegally between the ports of entry and the number of arriving aliens determined to be inadmissible at ports of entry continue to rise.

At the same time, U.S. Customs and Border Protection's (CBP) resources remain strained along the Southwest Border. Inadmissible arriving aliens presenting at ports of entry, many of whom arrive without possessing appropriate travel and identity documents required by law, such as a visa and passport, require additional processing time that delays the flow of legitimate trade and travel. In many cases, CBP officers must take sworn statements from those individuals, which requires a substantial amount of time and resources.

CBP must focus on its primary mission: to protect the American public from dangerous people and materials while enhancing our economic competitiveness through facilitating legitimate trade and travel. As we strengthen our screening and vetting across multiple agencies to identify potential threats before they impact the United States, we continue to face a multi-faceted and dispersed terrorist adversary. In Fiscal Year 2017, CBP officers at our land ports of entry found 335 individuals inadmissible who were on the terrorist watchlist, and have already had 70 such encounters in the first quarter of 2018. Furthermore, on a typical day, CBP arrests 21 wanted criminals at our ports of entry. The officers at our ports must be vigilant about identifying national security and public safety threats above all others and denying entry to those who might do us harm.

Particularly, I am concerned by increasing seizures of illicit narcotics across all categories—especially methamphetamine and synthetic opioids such as fentanyl.

FOR OFFICIAL USE ONLY

ER-0529   CONFIDENTIAL

Prioritization-based Queue Management
Page 2

| | Drug Type (lbs) | FY 2017 (May 16th) | FY 2018 (May 16th) | % Change |
|---|---|---|---|---|
| Inbound Narcotics Seizures | Methamphetamine | 23,318.59 | 37,584.20 | 61.18% |
| | Heroin | 1,820.03 | 2,769.16 | 52.15% |
| | Fentanyl | 771.22 | 827.18 | 7.26% |

CBP must prioritize resources to intercept illicit drugs that have no place in a safe society. Security in border communities and beyond is threatened by transnational criminal organizations transferring drugs and currency across our borders.

We know from experience that seizures of illicit narcotics inbound and the outbound currency that sustains transnational criminal organizations both increase when inadmissible arriving aliens, particularly those without documents, are down. For example, during Fiscal Year 2017, when our ports of entry saw a 25 percent decrease in migrant crossings and processing from the year before, seizures of outbound currency increased by 37 percent.

| | FY 2016 | | FY 2017 | | % Change |
|---|---|---|---|---|---|
| | Incidents | USD | Incidents | USD | |
| Outbound Currency Interdictions | 1,047 | $28,371,089 | 1,233 | $38,996,437 | 37.45% |

CBP personnel and resources that would otherwise be deployed to process inadmissible arriving aliens can focus on the detection and apprehension of narcotics and currency smugglers.

CBP must protect the economic security of the United States by enforcing trade laws and protecting legitimate commerce. Seizures of shipments that violate intellectual property rights increased by eight percent in Fiscal Year 2017 over the previous fiscal year, and if those seized items had been genuine, the total estimated manufacturer's suggested retail price would have been more than $1.2 billion. CBP officers must be able to focus on identifying fake and dangerous goods, as well as invasive pests, through the cargo processing and agriculture inspection efforts that protect the American economy.

Finally, continued efficient transit for vetted trade partners and trusted travelers must be a priority. Approximately 545,000 passengers and pedestrians pass through our Southwest Border ports of entry every day, as well as 214,000 privately owned vehicles. The vast majority of that traffic is legitimate and necessary, and border communities and our larger economy rely on their efficient processing.

The processing of travelers without documentation draws resources away from CBP's fundamental responsibilities. The number of inadmissible persons arriving at ports of entry has risen by 62 percent in the last three months, when compared to the same three months of the previous fiscal year:

FOR OFFICIAL USE ONLY

ER-0530   CONFIDENTIAL

Prioritization-based Queue Management
Page 3

| Fiscal Period | All Inadmissibles |
|---|---|
| February 2017 | 12,078 |
| March 2017 | 13,079 |
| April 2017 | 12,531 |
| February 2018 | 17,862 |
| March 2018 | 22,513 |
| April 2018 | 20,956 |

Moreover, staffing at Southwest Border ports of entry is below our target levels for almost all major ports, and our officers are increasingly working extensive overtime hours each pay period, leading to increased fatigue and stress on the workforce. At several of the largest ports of entry, upwards of 10 percent of the CBP officer workforce are engaged in immigration secondary screening and processing functions, primarily addressing persons presenting without documents sufficient for admission or other lawful entry.

While we address these staffing concerns, we remain focused on accomplishing the mission. In recognition of (1) the continued prevalence of security threats, (2) the dire consequences of illicit narcotics on our communities (especially the devastating opioid epidemic), (3) the staffing and resource challenges summarized above, and (4) the increase of irregular migration flows, I direct you to initiate a 30-day pilot program to prioritize staffing and operations in accordance with the following order of priority at all Southwest Border ports of entry:

1. **National security efforts:** detecting public safety and identifying potential security threats, such as known or suspected terrorists, members of transnational criminal organizations, and other violent actors.
2. **Counter-narcotics operations:** targeting and examining increasing numbers of conveyances and travelers for potential smuggling of illicit narcotics.
3. **Economic security:** trade and cargo processing efforts to facilitate lawful commerce into the United States, while enforcing trade laws, protecting agriculture, and addressing anticompetitive elements in the supply chain.
4. **Trade and travel facilitation:** managing flows of people and goods at pedestrian and vehicle lanes of entry for U.S. citizens, lawful permanent residents, Border Crossing Card and visa holders, and others presenting documents sufficient for admission or other lawful entry into the United States, while detecting fraudulent documents.

Processing persons without documents required by law for admission arriving at the Southwest Border remains a component of CBP's mission, but priority should be given to the efforts described above in the prescribed order. Field leaders have the discretion to allocate resources and staffing dedicated to any areas of enforcement and trade facilitation not covered by the above priorities and queue management process based on the availability of resources and holding capacity at the local port level. Depending on port configuration and operating conditions, Directors of Field Operations may establish and operate physical access controls at the borderline, including as close to the U.S.-Mexico border as operationally feasible. DFOs may create lines based on legitimate operational needs, such as lines for those with appropriate travel documents and those without such documents. As in all operations, the safety of employees and the public is paramount in operational decisions.

FOR OFFICIAL USE ONLY

ER-0531    CONFIDENTIAL

1  JEFFREY BOSSERT CLARK
2  Acting Assistant Attorney General
   Civil Division
3  WILLIAM C. PEACHEY
4  Director, Office of Immigration Litigation –
   District Court Section
5  KATHERINE J. SHINNERS (DC 978141)
6  Senior Litigation Counsel
   ALEXANDER J. HALASKA (IL 6327002)
7  Trial Attorney
8  United States Department of Justice
   Civil Division
9  Office of Immigration Litigation
10 P.O. Box 868, Ben Franklin Station
   Washington, D.C. 20044
11 Tel: (202) 307-8704 | Fax: (202) 305-7000
12 alexander.j.halaska@usdoj.gov
13
14 *Counsel for Defendants*
15            **UNITED STATES DISTRICT COURT**
16     **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**
               **(San Diego)**
17

| | |
|---|---|
| 18  AL OTRO LADO, Inc., *et al.*, | Case No. 3:17-cv-02366-BAS-KSC |
| 19                    *Plaintiffs*, | **DEFENDANTS' EXHIBIT 10** |
| 20          v. | [Redacted Public Version] |
| 21 | |
| 22  Chad F. WOLF, Acting Secretary of | |
| 23  Homeland Security, in his official | |
     capacity, *et al.*, | |
| 24 | |
| 25                  *Defendants*. | |

26
27
28

ER-0532

CONTROLLED UNCLASSIFIED INFORMATION – FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

# Tactical Division
# End of Year Report
## Fiscal Year 2016

## U.S. Customs and Border Protection – Office of Field Operations – San Diego

## San Ysidro Port of Entry
## Otay Mesa (PAX) Port of Entry



CONTROLLED UNCLASSIFIED INFORMATION – FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

ER-0533

Highly Confidential/Attorneys' Eyes Only

AOL-DEF-00216804

**Tactical Division Review**                                    **Fiscal Year 2016**

This page is intentionally blank.

ER-0534

Highly Confidential/Attorneys' Eyes Only                        AOL-DEF-00216805

CONTROLLED UNCLASSIFIED INFORMATION – FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

**Tactical Division Review**                                    **Fiscal Year 2016**

# CONTENT

I.  Executive Summary ........................................................................ 1

II.  Tactical Units................................................................................ 2

    a) Advanced Targeting Unit (ATU) ................................................ 2

    b) Canine Enforcement (K-9) ........................................................ 9

    c) Anti-Terrorism Contraband Enforcement Team (A-TCET)..................... 15

    d) Criminal Enforcement Unit (CEU) ............................................. 21

    e) Admissibility Enforcement Unit (AEU) ...................................... 28

III.  Sustained - Special Operations and Projects .................................. 32

    Advanced Targeting Unit (ATU)..................................................... 32

    Canine Enforcement (K-9).............................................................. 37

    Anti-Terrorist Contraband Enforcement Team (A-TCET) ........................... 38

    Criminal Enforcement Unit (CEU).................................................... 39

    Admissibility Enforcement Unit (AEU)........................................... 39

CONTROLLED UNCLASSIFIED INFORMATION – FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

ER-0535

Highly Confidential/Attorneys' Eyes Only                                    AOL-DEF-00216806

This page is intentionally blank.

ER-0536

Highly Confidential/Attorneys' Eyes Only        AOL-DEF-00216807

CONTROLLED UNCLASSIFIED INFORMATION – FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

**Tactical Division Review**                                    **Fiscal Year 2016**

# I.     Executive Summary

The global threat posed by terrorism continues to affect nearly all aspects of trade and travel. Terrorists use established alien and narcotic smuggling routes and direct links have been established between terrorism, drug and arms trafficking, money laundering and counterfeiting. As the Office Field Operations (OFO) leverages technology and anti-terrorism inspections, it is believed that terrorists and other criminal elements will shift focus of their efforts toward identified or perceived vulnerabilities at and between the ports of entry.

Our tactical units bring invaluable tools to the field, a pro-active approach to expand the boundary of the border and a commitment to leverage technology.  To be successful, each tactical component must work collectively to acquire actionable information to identify smuggling trends, methods, routes, document vendors, supporters, facilitators and other vulnerabilities that impact port operations. I look to continue to unify and assimilate our traditional disciplines.  Doing so will enable us to apply new concepts in our fight to combat crime, allows us the flexibility to effectively manage a dynamic work environment and strengthen our control over the port(s) of entry.

As Assistant Port Director of Tactical Operations, I envision an integrated, unified and sustained approach to disrupt terrorist networks and alien/narcotic smuggling organizations operating within our AOR.  We are committed to delivering a robust Consequence Delivery System (CDS) to combat those threats to our Port of Entry (PoE).  Strategically, our focus is on developing techniques, tactics, and procedures (TTPs) to enhance our ability to identify, disrupt, deter, and dismantle drug trafficking and alien smuggling organizations.

This group of dedicated officers, works vigorously to develop intelligence and targets, provide layered enforcement and a consequence delivery for the Port as well as supporting other law enforcement activities throughout the country.  The outstanding performance of officers assigned to this unit exemplifies CBP's core values of vigilance, service to country and integrity.  Through their successful total team philosophy and effort, the San Ysidro/Otay Mesa Tactical Unit is a top performing unit.  Their hard work and dedication to duty is an example to not only the other Officers at the port but also to Officers across the country. The Officers of this Unit bring credit and honor to themselves, the Office of Field Operations and to Customs and Border Protection, and are essential to the agency in accomplishing its mission.

---

**Executive Summary**                    1        **San Ysidro / Otay Mesa (PAX) Port of Entry**

CONTROLLED UNCLASSIFIED INFORMATION – FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

ER-0537

Highly Confidential/Attorneys' Eyes Only                                    AOL-DEF-00216808

## II.  Tactical Units

### a) Advanced Targeting Unit (ATU)

**Executive Summary:**

The mission of the ATU is to effectively assess, report, respond to, and target threats CBP faces. This is accomplished through the development and evaluation of intelligence-based targeting rules, development of intelligence driven special operations, statistical analysis, the use of classified information and sources up to the TOP SECRET level, and the identification and acquisition of advanced analytic technologies.

The ATU develops port specific land border intelligence, targets in real time, and disseminates the information accordingly to all officers. Several Senior CBP-OFO officials, as well as local management, consider the San Ysidro ATU as a nationally recognized unit and several member have been chosen as Team members for Organized Crime Drug Enforcement Task Force (OCDETF). The ATU accomplishes this as part of an integrated Tactical Team in combination with the Admissibility Enforcement Unit (AEU), Criminal Enforcement Unit (CEU), International Liaison Unit (ILU), Anti-Terrorism and Contraband Enforcement Team (AT-CET), Canine Enforcement Unit (K-9), the Tactical Terrorism Response Team (TTRT), and the Joint Terrorism Task Force (JTTF).

**Staffing (During the reporting period):**

- **LE**  Customs and Border Protection Officers.
- CBP Agriculture Specialist
- Supervisors
- Branch Chief
- Watch Commander
- HSI Intelligence Research Specialist (Liaison)
- HSI Special Agent (Liaison)

During the reporting period, there was a reduction in staffing. Through attrition, and other events **LE** Targeters were lost. This loss represents a reduction in staffing of 31.25%.

**Resources:**

- As the operational aspects and parameters of ATU's complex mission have developed and refined, the unit's operational needs to further its capabilities and resources have expanded. With the expansion into a wider range of targeting and research activities, the unit's personnel need to be augmented. The current Table of Organization and Equipment (TO&E) is minus five (5) Officers/Targeters. As increasing workload and mission requirements

ER-0538

Highly Confidential/Attorneys' Eyes Only                                        AOL-DEF-00216809

**Tactical Division Review**                                    **Fiscal Year 2016**

continue, ATU's TO&E will need to expand. The ATU needs the ability to utilize advanced systems and processes requiring additional/ upgraded hardware for assigned terminals. An upgrade to current hardware will enable us to accomplish the mission and operational assignments more effectively and counter future threats. Additionally, due to the increase in work volume, information driven products are being generated (e.g. larger and more complex i2 charts, presentations and briefings, and video recovery projects), the allocation of larger storage capabilities, in the form of a dedicated ATU server, is essential to maintain files and records.

**Highlights**:

- The ATU continues to evolve its mission parameters. During FY 2016, the ATU has addressed/identified operational needs and expanded its participation in operational activities. Two (2) team members have received credentials as Homeland Security Intelligence Analysts after completion of the Basic Intelligence & Threat Analysis Course. ATU has maintained the practice of cross training with AEU and CEU to develop a cohesive Tactical Group. As we learn the methods and techniques of other Tactical units, we begin to see commonalities and develop a better understanding of each other's strengths and vulnerabilities. In addition, we de-conflict targets and can prioritize targets based on needs.

- During this FY, ATU planned and executed a joint exercise with Special Reconnaissance Team-1 assigned to Navy Special Warfare. The training was a joint activity between all San Ysidro Tactical Units and all Units within AEU. The training was lauded as a great success by the Navy and plans to request regular trainings with OFO are being developed.

- ATU was tasked with several special video productions. As part of the introduction during a Director of Field Operations conference ATU recorded and produced a video introduction to the San Diego Field Office. ATU also created a video as part of a public service announcement for General Services Administration (GSA) for the opening of the PED-West. ATU Officers were also requested for Headquarters level Information Technology (IT) projects, specifically with a focus to support the Special Response Team (SRT).

**Accomplishments**



**LE**

---

**Advanced Targeting Unit**                3                **San Ysidro / Otay Mesa (PAX) Port of Entry**

ER-0539

Highly Confidential/Attorneys' Eyes Only                                    AOL-DEF-00216810

**LE**

ER-0540

**LE**

ER-0541

Highly Confidential/Attorneys' Eyes Only                                    AOL-DEF-00216812

**LE**

ER-0542

Highly Confidential/Attorneys' Eyes Only

**LE**

ER-0543

CONTROLLED UNCLASSIFIED INFORMATION – FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

**Tactical Division Review**          **Fiscal Year 2016**

### Interdiction Snapshot

| Positive Lookouts Types | TOTAL |
|---|---|
| Agriculture | 1 |
| Aliens | 100 |
| Aliens Prosecuted | 2 |
| Marihuana | 58 |
| MAR - Weight in kilograms | 3,179.30 |
| Cocaine | 53 |
| COC - Weight in kilograms | 1,063.07 |
| Heroin | 21 |
| HER - Weight in kilograms | 125.84 |
| Methamphetamines | 96 |
| MET - Weight in kilograms | 1,433.07 |
| Pharmaceuticals | 1 |
| Currency | 14 |
| Value of Currency | $2,232,509.00 |
| Other Agencies - State and Local | 9 |
| Mutual Aid/Research/Assist - Federal LEO/A | 1 |
| Mutual Aid/Research/Assist - STL LEO/A | 16 |
| Mutual Aid/Research/Assist - TTRT | 2 |
| DOMEX Activities | 3 |
| Total (Positive Lookouts): | 351 |
| Total (Weight (kg.) of Drugs Intercepted): | 5,801.28 |

CONTROLLED UNCLASSIFIED INFORMATION – FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

ER-0544

Highly Confidential/Attorneys' Eyes Only       AOL-DEF-00216815

**Tactical Division Review**                                    **Fiscal Year 2016**

### b) Canine Enforcement (SYCEP)



**Executive Summary:**

The San Ysidro K-9 Enforcement Program (SYCEP) is committed to the use of canine assets to proactively defend the United States by disrupting the flow of and interdicting narcotics, reducing narcotic abuse and demand through awareness presentations, interdicting aliens being smuggled into the United States and denying funding and material support to terrorist groups and drug trafficking organizations by detecting and intercepting smuggled currency and firearms. The screening of arriving or exiting conveyances, cargo, international mail, passengers, passenger luggage and pedestrians by the SYCEP is an integral part of CBP's overall enforcement strategy. It will continue to serve as a training ground of assistance and expertise for the National Canine Enforcement Program (NCEP) and external Office of Field Operation's (OFO) Canine Enforcement Programs. The entirety, of the mission of the SYCEP, is integral in deterring acts of terrorism abroad and within the United States by denying the funding necessary for such acts by the innate nature of its mission.

**Staffing:**

- Authorized Personnel and Billets

  - **LE** personnel billeted and/or assigned to the San Ysidro Canine Enforcement Program.

    o One (1) Deputy Assistant Port Director.
    o **LE** K9 Branch Chief.

  - **LE** Supervisory Canine Enforcement Officers (SCEO's).

  - **LE** Detector Dog personnel positions assigned.

    o **LE** Narcotic Detector Dog Teams assigned.

      A. Breakdown:

        1. **LE** employed HD/NDD-PP Teams.
        2. **LE** employed HD/NDD Teams.
        3. **LE** Canine Enforcement Officer (CEO) (OWCP).
        4. **LE** CEO (Light duty).
        5. **LE** CEO's decertified and assigned to Operations.

  - **LE** Currency Firearms Detector Dog Teams (passenger processing) (C&F).

  - T **LE** Animal Quarantine and Inspection (AQI) Detector Dog Teams.

  - **LE** Canine Field Trainers (CFT).

  - **LE** Mission Support Specialist (MSS).

---

**Canine Enforcement Unit**             9          **San Ysidro / Otay Mesa (PAX) Port of Entry**

ER-0545

Highly Confidential/Attorneys' Eyes Only                                    AOL-DEF-00216816

CONTROLLED UNCLASSIFIED INFORMATION – FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

**Tactical Division Review**                                    **Fiscal Year 2016**

- **LE** Animal Caretakers (AC).
  - o Breakdown:
    - A. Four (4) Wage Grade.
    - B. Three (3) American Staffing Partners (ASP) contracted staff.
    - C. One (1) ASP contract AC was hired in December 2015 bringing the number to seven (7).

## CEO Vacancies

- **LE** immediate vacant CEO handler positions and an additional **LE** beginning of FY-17.
  - o Breakdown:
    - A. **LE** newly assigned HD/NDD positions (pending selections).
    - B. **LE** immediate HD/NDD back-fill positions (pending selections).
    - C. Two (2) back-fill positions for two (2) CEO's resigning Oct 02, 2016 (FY-17) due to medical concerns (pending selections).
    - D. One (1) AQI back-fill (pending announcement of position).
- Awaiting appointment of:
  - o **LE** additional America's Staffing Partner (ASP) contract AC (pending background).
  - o **LE** additional Wage Grade (WG) AC (pending selection).

## Highlights:

- ***U.S. Navy Military Working Dog (MWD) Unit & CBP SYCEP Memorandum of Understanding (MOU).***
  In collaboration with the Department of the U.S. Navy and the 32nd Street Naval Centre Military Working Dog Program, CBP continued to maintain established relations with an updated local MOU, which provides mutual support in the areas of kennelling, emergency transportation/relocation of canine assets as well as the framework for detector dog training and training sites. This effort provides additional assets to address emergencies and resources not typically available to CBP K9 in San Diego

- ***U.S. Marine Corps (MWD) Unit & CBP SYCEP MOU.***
  The SYCEP is reaching out to the Miramar Marine Corps Air Station (MCAS) MWDP to establish the same mutual assistance MOU as it currently shares with the U.S. Navy. This process will continue into FY-17.

- ***Military Working Dog Veterinarian.***
  - The SYCEP has maintained permanent relations with the Department of the Army's Veterinary Corps through a National Partnership.

---

**Canine Enforcement Unit**          10     **San Ysidro / Otay Mesa (PAX) Port of Entry**

CONTROLLED UNCLASSIFIED INFORMATION – FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

ER-0546

Highly Confidential/Attorneys' Eyes Only                                    AOL-DEF-00216817

- This maintains the addition of Working Dog medical skills through the Miramar NAS Military Working Dog Veterinarian, Colonel Cummins (U.S. Army DVM). Colonel Cummins' 30 years of experience provides us with a wealth of experience in observing, diagnosing and treating injuries and maladies commonly seen in working dogs.

- This agreement continues to save the service financially in veterinary/medical supply and prescription costs.

- Medical evaluation under this agreement consistently reports more precise diagnosis and treatment plans resulting in faster healing and less "down time" for the canine.

- ***Red Ribbon Week.***

  - CBP Canine Teams participated in outreach programs such a "Red Ribbon Week" to promote drug awareness, safety, and education to schools in San Diego County.

  - In addition to national Drug Awareness Programs, CBP Teams have conducted numerous outreach activities with:

    - Local schools and organizations (Government personnel, foreign dignitaries, International Order of Police Chiefs, etc.).

    - The SYCEP also participated in recruitment events to provide insight, knowledge, and possible career paths for men and women seeking opportunities in law enforcement. This type of participation has resulted in positive feedback from the public, educators, and government officials.

- ***National Canine Enforcement Program (NCEP) Assistance Requests***

  - The SYCEP was requested by the Port of Miami CEP (MCEP) to accept two of its CEO's for a two week TDY to the SYCEP to assist in identifying proficiency issues, and assist with training and local deployment to the San Ysidro and Otay Mesa Ports of Entry. In exchange, two SYCEP CEO's went TDY to Miami where they initiated seven (7) narcotics seizures (noted to be the first CEO initiated narcotics seizures in Miami in the past four (4) years).

  - It is anticipated that the request to locally assist with the training of CEO's from throughout the U.S. will become more frequent in the coming fiscal year. Additionally, requests to TDY STATUS SYCEP Managers to other U.S. locations to assist with proficiency, performance and other issues will begin.

  - The SYCEP due to its fundamental principles underlying all facets of operations, administration and logistics is recognized nationally. Resultant will be an increase in the workload for the SYCEP to accommodate requests from NCEP and other OFO's

ER-0547

Highly Confidential/Attorneys' Eyes Only                                    AOL-DEF-00216818

**Tactical Division Review**                                  **Fiscal Year 2016**

### FY-16 Enforcement Review:

- SYCEP interdiction and impact: Marijuana, Heroin, Ecstasy, Cocaine and Methamphetamine.

  The effectiveness of the SYCEP Human Detection Narcotic Detector Dog Passenger Processing (HD/NDD-PP) and Human Detection Narcotic Detector Dogs (HD/NDD) Teams in FY-16 led to:

| Category | Number | Number & Multiples | Dollar Amount | Weight (in KG) | Units |
|---|---|---|---|---|---|
| Illegal Narcotic Seizures | 1859 | 2080 | N/A | N/A | N/A |
| Seized Assets | N/A | N/A | $5,287,527.00 | N/A | N/A |
| Fines & Penalties | N/A | N/A | $16,902,861.00 | N/A | N/A |
| Arrests | 1273 | N/A | N/A | N/A | N/A |
| Concealed Human Interdictions (Persons) | 63 | N/A | N/A | N/A | N/A |
| Marijuana Seizures & Weight | 866 | N/A | N/A | 967,395 | N/A |
| Heroin Seizures & Weight | 147 | N/A | N/A | 924 | N/A |
| Cocaine Seizures & Weight | 255 | N/A | N/A | 3828 | N/A |
| Methamphetamine Seizures & Weight | 677 | N/A | N/A | 7662 | N/A |
| Liquid Methamphetamine Seizures & Weight | 3 | N/A | N/A | 140 | N/A |
| Fentanyl & Carfentanil Seizures & Weight | 1 | N/A | N/A | 12 | N/A |
| Other Drugs Seizures & Weight | 51 | N/A | N/A | 770 | N/A |
| Other Non-Narcotic Seizures & Units | 8 | N/A | N/A | N/A | 406 |

- The SYCEP updated the way it maintains seizure statistics in FY-2015. In the past, each narcotic type of a multi-narcotic interdiction counted as one seizure. By this accounting method in FY-2016, the SYCEP had 2080 narcotic seizures, a decrease of 142 narcotics interdictions (6 % decrease) that's been realized FY-15 over FY-16. This decrease is directly attributable to:
  - **LE** canines retiring.
  - **LE** new canines in the field (thirty-six (36) % of the workforce).
  - **LE** quarter FY-16 nil overtime funding.
  - Overtaxed canines **LE** and personnel.

---

**Canine Enforcement Unit**                12                **San Ysidro / Otay Mesa (PAX) Port of Entry**

ER-0548

Highly Confidential/Attorneys' Eyes Only                                  AOL-DEF-00216819

CONTROLLED UNCLASSIFIED INFORMATION – FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

**Tactical Division Review**                                                    **Fiscal Year 2016**

- K-9 Currency and Firearms (C&F) Program.
  - SYCEP C&F (SYCEP-CF) teams have had a direct impact on the success of CBP's mission in detecting and intercepting smuggled currency. These five (5) teams were responsible for interdicting $ 1,347,664.00 dollars of undeclared currency and seizure of twenty-two (22) weapons in thirty-four (34) separate actions.
  - Animal Caretakers (AC's)
    - The BTKF operated in FY 16 through December 2015 with a cadre of **LE** AC's; in December 2015 a seventh (7) AC was hired. There are **LE** additional AC's projected early in FY 17 to bring the manning number to **LE** . Due to the shortage of assigned AC's, CEO's were assigned duty at the BTKF to act as AC's. This action resulted in an expenditure of overtime funds and reduced CEO coverage at the POE's. The significant impact was and will continue divert assets from their primary mission to supplement SYCEP peripheral logistics.

- SYCEP Training Department
  - First Aid Training for K-9's.
    - The SYCEP-TD continues to incorporate care, welfare and safety classes as part of a continuing effort to keep its assets safe and its personnel educated. For the second year in a row, because of the training and experiences of the past FY's, the SYCEP has not had a single case of Bloat/Torsion. This was due to the diligent care by the handlers and the Animal Caretakers, and the continuing education program by the SYCEP-TD.
    - Additionally, FY 16 saw the fruition of extensive planning and coordination resulting in the initiation of Gastropexy Surgery of six (6) healthy canines as an additional measure to reduce the incidence of Bloat/Torsion and the resulting deaths and medical expenses incurred to mitigate this significant medical event. This procedure, performed by our Military Veterinarian, staples the stomach to the chest wall, reducing the incidence of "Torsion", or the stomach twisting, as a result of "Bloat", or build-up and blockage of air in the intestines. This SYCEP pro-active measure, ahead of its time in CBP, will most importantly save lives, money (medical and overtime costs) and lost time due to the illness.
  - Training Department: Intra and Inter Agency Training Assistance.
    - The increase in inter and intra agency assistance has led to a dramatic increase in training and proficiency review requests.
    - The SYCEP has received requests for, and provided for, the training of internal federal as well as external state and local law enforcement agencies K-9 programs.

CONTROLLED UNCLASSIFIED INFORMATION – FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

ER-0549

Highly Confidential/Attorneys' Eyes Only                                    AOL-DEF-00216820

CONTROLLED UNCLASSIFIED INFORMATION – FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

**Tactical Division Review**        **Fiscal Year 2016**

- ▪ The increasing demands on the SYCEP-TD, currently staffed by two (2) SCEO's and two (2) Canine Field Trainers (CFT's) warrants an additional position to fulfil the ever increasing demands placed upon this department.

- ▪ Late in FY 16, the SYCEP was tasked with assessing and assisting with proficiency training of two (2) Temporary Duty Assignment (TDY) handlers from Florida. National recognition of the capability, performance and experience of the SYCEP will only increase the demand for training assistance into the coming FY.

- • Intra and Inter Agency Assistance.

  - o This past FY has seen an increase in inter and intra-agency cooperation with the SYCEP receiving requests for assistance from a number of federal, state and local law enforcement organization.

  - o The (SYCEP) is recognized by law enforcement agencies as the yardstick for canine excellence. Continued cooperation in support of these agencies has resulted in increased demands/requests for assets, which will carry into the coming FY.

### Interdiction Snapshot:

| Interdiction Summary (By FY) | FY 2016 Total | FY 2015 Total | FY 2014 Total | FY 2013 Total | FY 2012 Total |
|---|---|---|---|---|---|
| **CANINE ENFORCEMENT PROGRAM** | | | | | |
| Intensive Narcotic Interdictions | 749 | 846 | 641 | 702 | 712 |
| Sweep - Narcotic Interdictions | 1110 | 1176 | 875 | 1270 | 1068 |
| Pedestrian Narcotic Interdictions | 244 | 402 | 466 | 298 | 357 |
| Intensive Human Interdictions | 9 | 20 | 10 | 13 | 20 |
| Sweep - Human Interdictions | 29 | 30 | 20 | 25 | 48 |
| Currency | 33 | 46 | 25 | 12 | 20 |
| Arrests | 1273 | N/A | N/A | N/A | N/A |
| Assets (Seized Assets and Fines) | $22,190,388.00 | N/A | N/A | N/A | N/A |
| Aggregate Pedestrian Seizures | 244 (13% of all seizures) | N/A | N/A | N/A | N/A |

---

**Canine Enforcement Unit**     14     **San Ysidro / Otay Mesa (PAX) Port of Entry**

CONTROLLED UNCLASSIFIED INFORMATION – FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

ER-0550

Highly Confidential/Attorneys' Eyes Only        AOL-DEF-00216821

**Tactical Division Review**                                    **Fiscal Year 2016**

### c) Anti-Terrorism Contraband Enforcement Team (A-TCET)

**Executive Summary:**



The San Ysidro and Otay Mesa A-TCET teams provide enhanced layered enforcement in the pre-primary, post primary and pedestrian environments to address threats affecting the San Diego area of responsibility. In addition, the San Ysidro A-TCET team provides outbound enforcement operations necessary to counter threats posed by powerful criminal enterprises, rogue states, transnational terrorists, and other entities violating U.S. export control laws in the San Diego areas of responsibility, which includes the vehicle (I-5 freeway south) and pedestrian environments. A-TCET utilizes a multi-layered enforcement approach, and leverages technology and officer enforcement skills, to develop actionable intelligence to conduct effective enforcement operations.

**Staffing:**

- **LE** ) Customs and Border Protection Officers
- Supervisors, plus one temporary promotion supervisor
- Branch Chief
- Deputy Assistant Port Director
- Total staffing of six (6) supervisors, with the sixth position filled by promotion of officers to temporary supervisor for a period not to exceed of 120 days.

**Highlights:**

**LE**

---

**Anti-Terrorism Contraband Enforcement Team**   15   **San Ysidro / Otay Mesa (PAX) Port of Entry**

ER-0551

Highly Confidential/Attorneys' Eyes Only                              AOL-DEF-00216822

CONTROLLED UNCLASSIFIED INFORMATION – FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

**Tactical Division Review**          **Fiscal Year 2016**

**LE**

**Anti-Terrorism Contraband Enforcement Team**   16     **San Ysidro / Otay Mesa (PAX) Port of Entry**

CONTROLLED UNCLASSIFIED INFORMATION – FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

ER-0552

Highly Confidential/Attorneys' Eyes Only        AOL-DEF-00216823

**Tactical Division Review**         **Fiscal Year 2016**

**LE**

**Anti-Terrorism Contraband Enforcement Team**   17      **San Ysidro / Otay Mesa (PAX) Port of Entry**

ER-0553

Highly Confidential/Attorneys' Eyes Only        AOL-DEF-00216824

CONTROLLED UNCLASSIFIED INFORMATION – FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

**Tactical Division Review** **Fiscal Year 2016**

**LE**

**Anti-Terrorism Contraband Enforcement Team** 18 **San Ysidro / Otay Mesa (PAX) Port of Entry**

CONTROLLED UNCLASSIFIED INFORMATION – FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

Highly Confidential/Attorneys' Eyes Only AOL-DEF-00216825

**LE**

### Approach (Inbound):

- A-TCET has a multi-layered enforcement approach, and leverages technology and officer enforcement skills, to develop actionable intelligence to conduct effective enforcement operations.

### Interdiction Snapshot (In Bound):

| Interdiction Summary | 1st QTR. FY 2016 | 2nd QTR. FY 2016 | 3rd QTR. FY 2016 | 4th QTR. FY 2016 | FY 2016 Total | FY 2015 Total |
|---|---|---|---|---|---|---|
| ANTI-TERRORISM CONTRABAND ENFORCEMENT TEAM (A-TCET) – Aggregate SYS and OTM | | | | | | |
| Marijuana Interdictions | 94 | 70 | 68 | 68 | 300 | 311 |
| Cocaine Interdictions | 24 | 27 | 30 | 26 | 107 | 96 |
| Methamphetamine Interdictions | 64 | 57 | 70 | 60 | 251 | 261 |
| Heroin Interdictions | 11 | 13 | 19 | 20 | 63 | 85 |
| Human Smuggling Interdictions | 26 | 29 | 28 | 28 | 111 | 181 |
| Currency Interceptions / Seizures | 5 | 1 | 1 | 1 | 8 | 7 |
| Value of Currency Seized (in US Dollars) | $72,662 | $19,612 | $12,650 | $20,125 | $125,049 | $86,282 |

ER-0555

Highly Confidential/Attorneys' Eyes Only      AOL-DEF-00216826

## Approach (Outbound):

- Current outbound operations are conducted on a "pulse-and-surge" basis on as needed basis.



. The key to successful outbound enforcement is developing actionable intelligence. Intelligence and technology are leveraged through partnerships with the San Ysidro ATU, Homeland Security Investigations, State and Local partners, and other CBP components.

## Interdiction Snapshot (Out Bound):

| Interdiction Summary | 1st QTR. FY 2016 | 2nd QTR. FY 2016 | 3rd QTR. FY 2016 | 4th QTR. FY 2016 | FY 2016 Total | FY 2015 Total |
|---|---|---|---|---|---|---|
| ANTI-TERRORISM CONTRABAND ENFORCEMENT TEAM (A-TCET) – Aggregate SYS and OTM | | | | | | |
| Number of Currency Seizures | 0 | 1 | 3 | 1 | 5 | 7 |
| Value of Currency Seized– in U.S. Dollars | 0.00 | $19,320 | $77,262 | $899,900 | $996,482 | $562,968 |
| Weapons (Firearms – all types) | 0 | 2 | 0 | 0 | 2 | 2 |
| NCIC Stolen Vehicles | 0 | 0 | 0 | 0 | 0 | 0 |
| NCIC Fugitives/ Warrants/Wanted Persons | 0 | 0 | 0 | 0 | 0 | 4 |

ER-0556

Highly Confidential/Attorneys' Eyes Only                    AOL-DEF-00216827

d) **Criminal Enforcement Unit** (CEU)



**Executive Summary:**

Encompassed within this year-end achievement, CEU affected the arrest of more than 2379 subjects who were successfully booked into a correctional facility without incident. 570 cases were presented for prosecution either through the U.S. Attorney's Office or the San Diego District Attorney's Office. In a collaborative effort with the Department of State-Diplomatic Security Service (DOS-DSS), CEU directed the prosecution of 106 documented fraud cases. In addition, CEU processed 1636 NCIC fugitive arrests who were wanted for crimes such as: Homicide, Rape, Sexual Assault, Robbery, etc. The Unit also expanded criminal inquiry capabilities with Homeland Security Investigations (HSI) and the Federal Bureau of Investigations (FBI). CEU has contributed in, an ancillary role, with five (5) proactive investigations. The reduction of G4S (transportation) resources, has impacted the CEU which recorded 2,513 man-hours transporting prisoners to various correctional facilities.

**Staffing:**



- **LE** Enforcement Officers,
- **LE** Supervisory Enforcement Officers,
- Supervisory ILU Officer,
- **LE** Chief Enforcement Officer
- Watch Commander and
- Mission Support Specialist

**Highlights:**

- **CBP District Liaison Officers (DLO):** The Criminal Enforcement Unit sustained a 98% conviction success rate in cases presented to the United States Attorney's Office within the Southern District of California. CBP District Liaison Officers (DLO) assisted in the court proceedings of two jury trials – (2) 1326 Attempted Entry after Deportation. DLO also served as the agency representative in thirty-four (34) Grand Jury Hearings. They are responsible for the integrity of cases that are presented to the USAO for prosecution. Currently, CEU has two officers assigned as District Liaison Officers.

- **CBP Material Witness Coordinator (MWC):** The Criminal Enforcement Unit has one officer designated as a Material Witness Coordinator (MWC). MWC establishes and maintains constant communication with Pre-Trial Services and Material Witness Attorneys. They maintain a docket control over paroled witnesses and work closely with the US Marshal's Service for individuals in custody. Once a material witness is no longer needed for a

ER-0557

Highly Confidential/Attorneys' Eyes Only     AOL-DEF-00216828

CONTROLLED UNCLASSIFIED INFORMATION – FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

**Tactical Division Review**                                    **Fiscal Year 2016**

criminal case, the MWC will make arrangements to meet with the material witness to repatriate them to their country of citizenship. FY-2016 the MWC had a docket control of 169 material witnesses. Only 1 of the 169 material witnesses is not within current status and a warrant for her arrest has been issued by the U.S. Marshal's Service.

- **CBP International Liaison Officer:** CBP Supervisor _____ s assigned as the CBP International Liaison Unit (ILU), with assistance from CBP Chiefs _____ and _____ who previously held this position. During FY-2016, instrumental negotiations continued to take place, resulting in the modification of the repatriation agreement between CBP OFO and the Government of Mexico (GOM). The Liaison Officer has also been able to establish valuable relationships with many Mexican Government officials both in public sector and in law enforcement, which has ultimately led to positive results in assisting the enforcement efforts of many Local, State and Federal agencies in the United States. Due to these relationships, OFO benefits have included several drug seizures and the apprehension of wanted fugitives both in the U.S. and Mexico. Also in collaboration with Instituto Nacional de Migracion (INM) new protocols have assisted with the influx of individuals arriving to the Baja California region applying for credible fear.

  - **Enforcement Results:** ILU plays a pivotal role in USC minors' repatriation from Mexico with the coordinated assistance of the U.S. Consulate in Tijuana and local CPS. ILU is also instrumental in coordinating the deportation of U.S. wanted fugitives with Mexico. The fugitives are ultimately turned over to U.S. law enforcement entities. ILU has also assisted in several narcotic seizures at the ports of entry. ILU has worked with the United States Attorney's Office in obtaining identity documents from various places throughout Mexico which has proven to be crucial evidence that has been used in trials.

## CEU Initiatives:

- **Narcotic Case work:** In December 2015 CEU partnered with HSI to begin the "Port Disposition Team" to respond to the narcotics interdictions stemming from inspections. The Criminal Enforcement Unit has committed to participate in the post Miranda interview and be a deciding factor in the prosecutorial decision and disposition of the criminal case. CEU took the lead on the narcotic arrest up to presenting the case work package to the federal or state prosecutors. CEU represents CBP's vested interest and will provide a viable consequence delivery system. In FY-2016 CEU filed 175 narcotics cases.

---

CONTROLLED UNCLASSIFIED INFORMATION – FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

ER-0558

Highly Confidential/Attorneys' Eyes Only                                    AOL-DEF-00216829

- Law Enforcement Privileged

**Task Force Officers:**

**LE**

---

**Criminal Enforcement Unit**    23    **San Ysidro / Otay Mesa (PAX) Port of Entry**

CONTROLLED UNCLASSIFIED INFORMATION – FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

ER-0559

Highly Confidential/Attorneys' Eyes Only      AOL-DEF-00216830

# LE

ER-0560

Highly Confidential/Attorneys' Eyes Only                                        AOL-DEF-00216831

**LE**

ER-0561

**LE**

ER-0562

Highly Confidential/Attorneys' Eyes Only

**Tactical Division Review**         **Fiscal Year 2016**

### Interdiction Snapshot

| Interdiction Summary | 1st QTR. FY 2016 | 2nd QTR. FY 2016 | 3rd QTR. FY 2016 | 4th QTR. FY 2016 | FY 2016 Total | FY 2015 Total |
|---|---|---|---|---|---|---|
| **CRIMINAL ENFORCEMENT UNIT (CEU)** | | | | | | |
| Immigration Cases | 82 | 94 | 94 | 125 | 395 | 500 |
| Narcotics Cases | 15 | 49 | 49 | 62 | 175 | 16 |
| NCIC Wanted Persons | 374 | 395 | 408 | 459 | 1636 | 1662 |
| Material Witnesses Handled | 21 | 40 | 47 | 61 | 169 | 91 |

ER-0563

Highly Confidential/Attorneys' Eyes Only      AOL-DEF-00216834

CONTROLLED UNCLASSIFIED INFORMATION – FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

**Tactical Division Review**        **Fiscal Year 2016**

## e) Admissibility Enforcement Unit (AEU)

**Executive Summary:**

AEU is principally charged with the application of administrative immigration statutes. Over 42,000 apprehensions were reported between the San Ysidro and Otay Mesa ports of entry, for FY 16.

Between both ports, the AEU executed 5,520 Expedited Removals, issued 23,337 Notices to Appear, and processed 8,358 Credible Fear claims.

**Staffing:**

- **LE** CBP Officers
- ) Supervisors
- **LE** Branch Chiefs
- Watch Commander
- ) CBP Technician

**Highlights:**

- **Virtual Processing Centre (VPC)** – The Virtual Processing Centre was established as a result of the surge of asylum claims at the San Ysidro and Otay Mesa Ports of Entry. The VPC allowed cases apprehended at San Ysidro and Otay Mesa to be processed "virtually" by OFO Officers and OBP Agents throughout the country. El Centro Border Patrol Station along with OFO Officers from the San Diego, Los Angeles, Detroit, and Miami Field Offices assisted with case processing. During FY-16, OFO processed 6,666 cases and OBP processed an additional 1,926 using Microsoft Communicator.

- **Tactical Terrorism Response Team (TTRT)** – TTRT is responsible for the vetting, screening, and processing of all **LE** encountered at The San Ysidro and Otay Mesa Ports of Entry. During FY-16, TTRT detected and processed **LE** TTRT vetted all Special Interest Aliens (SIA) from countries determined to be of interest by the FBI. TTRT cold referrals led to the development of cases of two individuals who were placed on a no-fly list and identification of several individuals not previously identified as subjects of interest to the FBI.



- **Operation "_CLOSED GATES_":** Operation Closed Gates was developed in cooperation with Homeland Security Investigations SAC San Diego National Security Group (NSG) as an initiative to target and prosecute individuals making fraudulent asylum claims. Specifically, widespread Asylum Fraud being perpetuated by Iraqi and East African Nationals in the San Diego Area of Responsibility. AEU Officers worked closely with HSI Agents to target,

---

CONTROLLED UNCLASSIFIED INFORMATION – FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

ER-0564

Highly Confidential/Attorneys' Eyes Only      AOL-DEF-00216835

interview and track these individuals, and eventually prosecute them. A TTRT Officer was embedded with HSI Agents to assist in this operation.

After multiple arrests and administrative removal orders were executed in the months of July and August which generated massive media attention, a sharp decrease in this fraud has been observed, resulting in significant benefits to various agencies that are already overburdened by asylum claims and a clear disruption of this smuggling route. In FY-16:

- 518 Individuals Identified
- 2 Smugglers/facilitators under investigation.
- 2 Immigration Attorneys under investigation.

- **Operation "*OVERFLOW*":** With the large influx of detainees and cases, AEU was inundated with work and requested assistance to help maintain with workload levels. CBP Officers from several field offices were granted TDYs to the San Ysidro AEU to assist with the workload. There were four phases of officer deployments. The first phase began in November of FY 16 and lasted through February. The deployment of additional officers increased staffing in AEU by 30 Officers. Operation Overflow resulted in the processing of over 5800 cases throughout its duration.

- **Surge of Detainees** – FY 16 saw an unprecedented increase in the migration of large groups of people from various geographical areas around the world, arriving and asserting Credible Fear (CF) claims. The significant volume of arriving undocumented travellers surpassed the physical capacity of the port and resulted in a tremendous strain on all available local resources, including personnel.

In May 2016 AEU converted the GSA workshop to a temporary detention facility in order to accommodate the 1076 detainees in custody. While there was a large increase in the migration of all nationalities, there was a notable increase in the apprehension of Haitian Nationals, which spiked from 339 in FY-15 to 5,649 in FY 16.

In response to this influx, U.S. Border Patrol (USBP) provided SYS PoE with temporary holding space at the Imperial Beach Border Patrol Station and Chula Vista Border Patrol Station (Barracks 5). In an effort to expedite the transfer of aliens to ERO custody, SYS PoE assumed a large portion of ICE/ERO administrative functions, which added substantially to processing time but did not yield any efficiencies for ERO in accepting transfer. The influx of inadmissible aliens coupled with added administrative functions and decreased operational capacity due to construction created an untenable situation. To address the needs, SYS PoE took the following steps to maximize operational output:

1. Temporarily assigned personnel to support and enhance San Ysidro workload;

ER-0565

Highly Confidential/Attorneys' Eyes Only AOL-DEF-00216836

2. Utilized USBP Stations to temporarily hold migrants awaiting custodial transfer to ICE/ERO;

3. Converted administrative work space to accommodate increase surge of migrants;

4. Transferred all inadmissibility case processing to alternate areas within the Port;

5. Transferred all permit (I-94) processing to the Otay Mesa Port of Entry;

6. Increased AEU staffing assignments;

7. Committed outlying ports of entry to augment resources with virtual processing efforts; and,

8. Integrated Haitian Creole speakers throughout the whole of CBP to conduct virtual processing.

During June of FY 16, AEU experienced several infrastructural limitations caused by ongoing construction at the San Ysidro Port of Entry.

Amongst the limitations, was the loss of detention space down to a current capacity of 316, though the number is augmented with assistance from Border Patrol at the Imperial Beach and Chula Vista Stations.

Pedestrian West was identified as the designated area for all asylum intake. All asylum seekers were re-directed to Pedestrian West for intake and processing. The Sally Port was established as the best area to intake and take initial biometrics of all detainees. Portable Jump Kits and CBP Wi-Fi were installed to assist with intake processing.

AEU has a need to balance the number of individuals that are able to be brought in versus the ability to humanely provide for their needs. The Government of Mexico (GoM) developed a numeric process in order to address the number of asylum seekers waiting in Mexico. Mexico assists individuals who have to wait for an intake time by providing services at one of the five shelters in Tijuana. Mexican Nationals are not part of the numeric process. Any Mexican National seeking asylum is directed to the Pedestrian West Facility, and brought to AEU for processing.

Asylum seekers that are from places other than Mexico (OTM) are still being metered by GoM Grupo Beta and are provided numbers for intake.

AEU is committed to working with Non-Government Organizations (NGOs) to develop a relationship with a third party NGO who can resume providing numbers to Mexican Nationals who have no fear of being in Tijuana so that AEU can maintain a balance of humanely caring for all individuals in custody while continuing to address the influx of subjects requesting asylum. The current process of numbering and metering asylum seekers from countries other than Mexico by GoM Grupo Beta will remain in place as long as the current surge continues unabated.

---

**Admissibility Enforcement Unit**     30     **San Ysidro / Otay Mesa (PAX) Port of Entry**

ER-0566

Highly Confidential/Attorneys' Eyes Only                    AOL-DEF-00216837

- **Medical Care** – AEU worked closely with Evolution Health during FY-16 to ensure all detainees with medical issues were adequately cared for. The care was provided by on-site Physician's Assistants (PAs), who are able to take care of most complaints without a visit to the emergency room, saving money and staffing. During FY-16, a large backlog of over 10,000 TARS, the payment mechanism for Evolution Health was addressed and resolved by creating a streamlined process for payment in cooperation with AEU and ICE Health Services Corps (IHSC).

| Interdiction Summary | 1st QTR. FY 2016 | 2nd QTR. FY 2016 | 3rd QTR. FY 2016 | 4th QTR. FY 2016 | FY 2016 Total | FY 2015 Total |
|---|---|---|---|---|---|---|
| **Admissibility Enforcement Unit (AEU) - San Ysidro PoE** | | | | | | |
| Expedited Removals | 1141 | 1,158 | 1,258 | 1905 | 5,520 | 3,622 |
| Expedited Removals/Credible Fear | 1,622 | 2,342 | 2,830 | 1,548 | 8,358 | 4,748 |
| EOIR Referrals (240 Cases) NTA Asylum | 5,448 | 3,821 | 5,259 | 7,687 | 21,094 | 12, 882 |
| UACs | 750 | 523 | 573 | 393 | 2,243 | 1,788 |
| W/D s | 1,077 | 1,364 | 1,657 | 1,605 | 5,718 | 4,126 |
| Totals | 10,038 | 9,208 | 11,577 | 13,138 | 43,961 | 27,515 |

ER-0567

Highly Confidential/Attorneys' Eyes Only                                              AOL-DEF-00216838

**Tactical Division Review** **Fiscal Year 2016**

## III. Sustained - Special Operations and Projects

### ADVANCED TARGETING UNIT (ATU)



- Drug Trafficking Organizations (DTOs) have control of the human smuggling routes in Mexico and utilize "plaza bosses" to collect payment for use of these routes to help finance their illicit drug enterprises. Lenient asylum law requirements exist to qualify for a Credible Fear/Asylum interview creating opportunities to conceal their identity and commit immigration fraud generating an added vulnerability to gain illegal entry to the United States. In collaboration with CEU and AEU, ATU has developed a process/mechanism (CENTRIFUGE), which targets and investigates sponsors and criminal organizations who are exploiting the Credible Fear/Asylum process for alien smuggling.

**LE**

**LE**

**Sustained-Special Operations and Projects** 32 **San Ysidro / Otay Mesa (PAX) Port of Entry**

ER-0568

Highly Confidential/Attorneys' Eyes Only AOL-DEF-00216839

**LE**

ER-0569

Highly Confidential/Attorneys' Eyes Only

**LE**

ER-0570

Highly Confidential/Attorneys' Eyes Only

**LE**

ER-0571

Highly Confidential/Attorneys' Eyes Only                                                              AOL-DEF-00216842

# LE

ER-0572

AOL-DEF-00216843

**LE**

ER-0573

Highly Confidential/Attorneys' Eyes Only AOL-DEF-00216844

**LE**

ER-0574

Highly Confidential/Attorneys' Eyes Only

# LE

ER-0575

AOL-DEF-00216846

**LE**

ER-0576

AOL-DEF-00216847

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General
Civil Division
WILLIAM C. PEACHEY
Director, Office of Immigration Litigation –
District Court Section
KATHERINE J. SHINNERS (DC 978141)
Senior Litigation Counsel
ALEXANDER J. HALASKA (IL 6327002)
Trial Attorney
United States Department of Justice
Civil Division
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 307-8704 | Fax: (202) 305-7000
alexander.j.halaska@usdoj.gov

*Counsel for Defendants*

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF CALIFORNIA**
**(San Diego)**

| | |
|---|---|
| AL OTRO LADO, Inc., *et al.*, | Case No. 3:17-cv-02366-BAS-KSC |
| *Plaintiffs*, | **DEFENDANTS' EXHIBIT 11** |
| v. | |
| Chad F. WOLF, Acting Secretary of Homeland Security, in his official capacity, *et al.*, | |
| *Defendants*. | |



# San Ysidro Land Port of Entry
# fact sheet



**Location**
720 East San Ysidro Boulevard
San Diego, CA 92173-3116

**Facility Size (Planned)**
~ 402,754 Authorized Gross
Square Feet
~ 50 Acres (Project Area)

**Funding Status**
Phase 1 - Fully Funded
Phase 2 - Fully Funded
Phase 3 - Fully Funded

**Project Cost**
Approximately $741 Million



**Project Phasing & Completion Schedule**
Phase 1A:  Pedestrian Bridge – Completed April 2011
Phase 1B:  Northbound Vehicle Inspection – Completed December 2014
Phase 1C:  Southbound Pedestrian Crossing – Completed August 2012
Phase 1D: West Pedestrian Building (PedWest) – Completed July 2016
Phase 1E:  Virginia Ave Transit Center – Completed July 2016
Phase 2:  East Pedestrian Building (PedEast) – Completed August 2018
        Historic Custom House –  Completed November 2018
        Expanded Southbound Plaza– Completed September 2019
Phase 3:  Southbound I-5 Realignment & Northbound Vehicle
         Inspection - November 2019



**Project Overview**
The San Ysidro Land Port of Entry (LPOE) is the busiest land border crossing in the Western Hemisphere; currently processing an average of 70,000 northbound vehicle passengers and 20,000 northbound pedestrians per day. The San Diego Association of Governments (SANDAG) projects an 87 percent increase in vehicle traffic in San Ysidro by the year 2030.



To accommodate that growth and to better meet the changing needs of the tenant agencies and the traveling public, GSA conducted a complete reconfiguration and expansion of the port. The scope included the demolition and construction of the LPOE, including primary and secondary inspection areas, administration and pedestrian buildings, and all other support structures. The project expanded pedestrian processing facilities including a new pedestrian crossing on the east side of the LPOE that connects with a new multimodal transportation hub in Mexico and expanded northbound inspection facilities. Additionally, there is a new bi-directional crossing at El Chaparral/Virginia Avenue with an associated transit center.



The new port boasts 62 northbound vehicle primary inspection booths, one dedicated bus lane and inspection booth spread over 34 lanes, as well as improved processing facilities for bus and Secure Electronic Network for Travelers Rapid Inspection (SENTRI) travelers. The LPOE has over 110,000 square feet of new primary and secondary vehicle inspection canopies utilizing state-of-the-art materials that  both conserve and produce energy. In addition, a portion of the Interstate 5 South freeway has been realigned and expanded from four lanes to ten lanes connecting to Mexico's El Chaparral facility. A corresponding southbound inspection canopy has been constructed to support the U.S. Customs and Border Protection's (CBP) southbound vehicle inspection efforts.





ER-0578

GSA collaborated with local agencies to develop additional pedestrian capacity and constructed a bi-directional pedestrian crossing (PedWest) and the Virginia Avenue Transit Center (VATC) on the west side of the port. PedWest includes ten northbound and two reversible pedestrian processing lanes and serves the traveling public crossing into the U.S. from Mexico's El Chaparral Inspection Station. The VATC accommodates taxis, buses, pedicabs and privately owned vehicles dropping off and picking up passengers. This transit center was jointly funded by GSA and the Caltrans District 11 using Coordinated Border Infrastructure program funds administered by Federal Highway Administration. The facility was a collaborative effort that involved the federal government, Caltrans, the City of San Diego, the San Diego Metropolitan Transit System, and SANDAG. More recently, GSA completed construction on a new pedestrian facility (PedEast) on the east side of the port which features 22 northbound pedestrian inspection booths.





In designing the new San Ysidro LPOE, GSA was committed to build the "Port of the Future" and built a facility that is sustainable, operationally scalable, and dramatically reduces the Port's carbon footprint, while at the same time enhancing CBP's ability to conduct their mission. With the innovative applications of energy production projects, as well as sustainable energy and water-saving features, the San Ysidro LPOE aspires to receive the Leadership in Energy and Environmental Design (LEED) Platinum certification.



## Primary Tenants

U.S. Department of Homeland Security - Customs and Border Protection (CBP)
U.S. Department of Homeland Security - Immigration and Customs Enforcement (ICE)



## Energy & Sustainability Features

*Energy*

- Solar photovoltaic system
- Solar thermal hot water system
- Geothermal heat exchange system

*Water*

- Ultra-low flow fixtures
- Rainwater retention and reuse system
- Onsite waste water treatment system
- Xeriscape landscaping (drought tolerant plants)



## Architect

Master Plan - Miller|Hull Partnership
Phase 1 - Miller|Hull Partnership
Phase 2 - Stantec
Phase 3 - Miller|Hull Partnership

## Construction Management

Phase 1 - URS Corporation
Phase 2 - Heery International
Phase 3 - Jacobs Engineering

## General Contractor

Phase 1A - Clark Construction Co.
Phases 1B & 1C - Hensel Phelps Construction Co.
Phase 1D - Halbert Construction Company, Inc.
Phase 1E - Hensel Phelps Construction Co.
Phase 2 - Hensel Phelps Construction Co.
Phase 3 - Atkinson Clark Construction Co.






"like" us on facebook
facebook.com/gsapacificrimregion    www.gsa.gov/SanYsidro


Follow us on twitter
@US_GSAR9

ER-0579

Updated: December 11, 2019

1   JEFFREY BOSSERT CLARK
2   Acting Assistant Attorney General
    Civil Division
3   WILLIAM C. PEACHEY
4   Director, Office of Immigration Litigation –
    District Court Section
5   KATHERINE J. SHINNERS (DC 978141)
6   Senior Litigation Counsel
7   ALEXANDER J. HALASKA (IL 6327002)
    Trial Attorney
8   United States Department of Justice
9   Civil Division
    Office of Immigration Litigation
10  P.O. Box 868, Ben Franklin Station
11  Washington, D.C. 20044
    Tel: (202) 307-8704 | Fax: (202) 305-7000
12  alexander.j.halaska@usdoj.gov
13
14  *Counsel for Defendants*

15              **UNITED STATES DISTRICT COURT**
16       **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**
                        **(San Diego)**
17

18  AL OTRO LADO, Inc., *et al.*,         Case No. 3:17-cv-02366-BAS-KSC

19                      *Plaintiffs*,     **DEFENDANTS' EXHIBIT 14**

20              v.                        [Redacted Public Version]
21
22  Chad F. WOLF, Acting Secretary of
23  Homeland Security, in his official
    capacity, *et al.*,
24
25                      *Defendants*.
26
27
28

**From:** CLEAVES, SAMUEL B
**Sent:** Wednesday, September 14, 2016 4:59 PM
**To:** MANCHA, HECTOR
**CC:** BROWN, FRANCIS D; OLIVAS, BERNARDO; SAINDON, CHRISTOPHER; RUSSELL, WILLIAM E; THOME, FERNANDO A; MORA, ROSANA; REZA, ROBERT; PROVENCIO, RAY; THORPE, TRACY S; SIFFORD, DONNA R; DEPUTY, JOHN; SOLIS, SEVERIANO; MILLER, BARRY F; AVEITIA, PATRICIA; BEBON, NORMAN A; RODRIGUEZ, JULIO E
**Subject:** FW: Spike in CF/FAMU cases at Port of El Paso in month of September
**Attachments:** IP - Spike in CF-FAMU Cases at Port of El Paso 09142016.docx

Mr. Mancha,

The IP was provided to the Field Liaison and IMD.

Sam

Samuel Cleaves
Watch Commander
El Paso Field Office

████ (cell)

**From:** CLEAVES, SAMUEL B
**Sent:** Wednesday, September 14, 2016 2:48 PM
**To:** Field Liaison ████████ OFO-Incident-Management
**Subject:** Spike in CF/FAMU cases at Port of El Paso in month of September

Good afternoon,

Please see attached Issue Paper regarding a significant spike in credible fear family unit cases received by the Port of El Paso this month (September).

Sam

**Office of Field Operations**
**El Paso Field Office**
**September 14, 2016**

**Action Required:** Informational

**Time Constraint:** None

**Issue:** September spike in credible fear family units (FAMU) and unaccompanied alien children (UAC) encountered at the Port of El Paso.

**Executive Summary:**
- The Port of El Paso has entered ████ of the New Mexico / West Texas Corridor Joint Task Force-West (JTF-W) Land Migration Plan indicating this facility's holding capacity and resources to process and detain has been exceeded.
- Overall, the El Paso Field Office (EPFO) remains at ████ of the JTF-W Land Migration Plan. The other Ports within EPFO do not routinely have excessive amounts of detainees on-site. Capacity has been exceeded at the Port of El Paso only.
- EPFO is standing up an overflow staging area at the Port of Tornillo.

**Background:**
- On May 25, June 15, and July 15; EPFO provided the Incident Management Division (IMD) a brief summary via Issue Paper on the current UAC and FAMU situation in El Paso.
- For FY16 to date, the number of UAC and FAMU received has been heavy and steady.
  - FY16TD: 6,773 credible fear cases (excluding Cubans). 106.9% increase from FY15.
  - FY16TD: 2,621 UAC cases. 336.1% increase from FY15.
- The rate of cases received has been slowly increasing throughout the year. In July, the Port of El Paso was averaging ████ subjects in custody per day.
- EPFO has no ground transportation contract. All transports are performed by OFO officers.

**Current Status:**
- On September 3, 2016 the Port of El Paso received 92 cases in one shift. Since this date, the Port is experiencing a significant spike of FAMU cases.

ER-0581

AOL-DEF-00797893

- In the ten day span between September 4 and September 13 the Port is averaging ███ subjects in custody per day. The range was a high of ███ persons in custody and low of ███
- During this spike, an average of 23% of FAMU cases are held at a POE in excess of 72 hours pending placement. It is rare for a UAC to be held for 72 hours however.
- The Port is experiencing events where family units attempt to enter without inspection (EWI) and then claim credible fear. In the last ten days, the Port apprehended twenty-one (21) EWI attempts by families with eight (8) resisting and fighting Officers during apprehension. Criminal prosecution is pursued when appropriate for those that resist and/or fight.
- Close coordination with ICE Enforcement and Removal Office (ERO) is continuing. ERO provided an additional charter flight on September 10 to assist with FAMU movement from the Port resulting in 110 FAMU cases transferred. However, 33 new cases were received shortly thereafter. And an additional 67 were received in one shift on the following day.
- Active caseload management is being performed by transporting cases for processing to less affected Ports. However the increased transports between Ports, to ERO facilities, and to the Airport is straining OFO vehicle and personnel resources.
- Expenditure of COPRA overtime has increased to effectively process, detain, and transport this unforeseen spike.
- Between August 1st and September 9th, the Port of El Paso spent $37,941.86 on supplies specific to UAC and FAMU cases to include snacks, meals, and clothing. The recent spike in September has depleted current stocks at the Port.
- The Port is providing up to 1,000 meals per day using microwaves. The facility is not equipped for this amount of volume.
- The Port is low on supplies of sleeping mats, blankets, pillows, and child car seats.
- The EPFO has transferred remaining funds in the amount of $23,000 to the Port of El Paso's purchase card to immediately replenish UAC and FAMU supplies.
- The Ports of Tornillo and Santa Teresa continue to assist with processing Port of El Paso cases. However, these Ports are small and have limited processing capability.
- Border Patrol has allowed the Port to use several cells at the Ysleta substation that may accommodate up to 40 FAMU subjects for temporary holding pending placement. However, USBP has removed all Operation Intrepid personnel that were assisting with outbound operations due to an increase in apprehensions.
- The Field Office Director for ICE ERO reported on September 13th that the Dilley and Karnes family residential centers in San Antonio are full.

**Moving Forward:**
- The EPFO is standing up an overflow staging area at the Port of Tornillo.
- The Port of Tornillo will be able to temporarily hold up to ███ FAMU subjects from the Port of El Paso. Tornillo's hours of operation are 0600 – 2200 hours. However, the staging area will operate 24/7.
- The Tornillo Overflow Staging Area will not hold UACs. The primary staging area for UACs will remain at Paso Del Norte (PDN) crossing. Subjects with medical conditions (lice, scabies, etc.) will be quarantined and treated per existing guidelines at the Port of El Paso.
- EPFO Mission Support is stocking Tornillo with FAMU supplies such as bedding, meals, and water. PODs / auxiliary storage containers are being rented.
- Expenditure of COPRA is projected to increase while the Tornillo overflow staging area is operational.
- EPFO will detail Officers and first-line Supervisors from the Ports of Columbus, Santa Teresa, and El Paso to Tornillo to assist in operating the staging area.

**Watch Out For/If Asked:**
- The same Ports listed above for detailing Officers to Tornillo are also scheduled to detail eight (8) Officers to San Diego and Tucson for Operation Overflow Phase I on October 3, 2016.

Samuel Cleaves
Watch Commander
El Paso Field Office

███████ (cell)

WARNING: This document is LAW ENFORCEMENT SENSITIVE and is designated FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5USC552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information, and is not to be released to the public or personnel who do not have a valid "need-to-know" without prior approval from Office of Field Operations, United States Customs & Border Protection.

ER-0582

AOL-DEF-00797894

1   JEFFREY BOSSERT CLARK
2   Acting Assistant Attorney General
    Civil Division
3   WILLIAM C. PEACHEY
4   Director, Office of Immigration Litigation –
    District Court Section
5   KATHERINE J. SHINNERS (DC 978141)
6   Senior Litigation Counsel
    ALEXANDER J. HALASKA (IL 6327002)
7   Trial Attorney
8   United States Department of Justice
    Civil Division
9   Office of Immigration Litigation
10  P.O. Box 868, Ben Franklin Station
    Washington, D.C. 20044
11  Tel: (202) 307-8704 | Fax: (202) 305-7000
12  alexander.j.halaska@usdoj.gov

13  *Counsel for Defendants*
14

15              **UNITED STATES DISTRICT COURT**
16      **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**
                     **(San Diego)**
17

18  AL OTRO LADO, Inc., *et al.*,          Case No. 3:17-cv-02366-BAS-KSC

19                    *Plaintiffs*,         **DEFENDANTS' EXHIBIT 23**
20
                         v.                 [Redacted Public Version]
21

22  Chad F. WOLF, Acting Secretary of
23  Homeland Security, in his official
    capacity, *et al.*,
24

25                    *Defendants*.
26

27

28

**From:** PARRA, OSCAR A on behalf of BROWNSVILLE OPS CENTER
**Sent:** Monday, October 3, 2016 7:28 PM
**To:** BROWNSVILLE OPS CENTER; LAREDO OPS CENTER; LFO-Admissibility; HORNE, PETRA
**CC:** OFO BRO Managers; OFO BRO Chiefs; OFO BRO Supervisors; PARRA, OSCAR A
**Subject:** INFLUX of detainees at Brownsville, Texas Port of Entry 10/03/16 @ 1800 hrs.
**Attachments:** Brownsville.pptx

All,

At this time the Port of Brownsville is experiencing a high volume of detainees.

The total number of subjects currently in custody are **twenty-eight (28).**

# Brownsville Processing October 3, 2016

**Detention Report FAMU & UAC**

| LOC | TOTAL |
|---|---|
| GWB | 11 |
| BMB | 8 |
| VETS | 5 |
| LIB | 4 |
| TOTAL | 28 |

**FAMU & UAC Pending Processing**

| LOC | FAMU | UAC | TOTAL |
|---|---|---|---|
| GWB | 1 | 0 | 1 |
| BMB | 0 | 0 | 0 |
| VETS | 1 | 0 | 1 |
| LIB | 2 | 0 | 3 |
| TOTAL | 4 | 0 | 5 |

**FAMU and UAC Pending Placement/Transport**

| LOC | FAMU | UAC | TOTAL |
|---|---|---|---|
| GWB | 1 | 0 | 1 |
| BMB | 0 | 0 | 0 |
| VETS | 0 | 0 | 0 |
| LIB | 2 | 0 | 0 |
| TOTAL | 3 | 0 | 1 |

**ER/CF Adult Female/Male Pending Processing**

| LOC | FEMALE | MALE | TOTAL |
|---|---|---|---|
| GWB | 1 | 8 | 9 |
| BMB | 2 | 6 | 8 |
| VETS | 1 | 1 | 2 |
| LIB | 0 | 0 | 0 |
| TOTAL | 4 | 15 | 19 |

**Background**: The Brownsville Field Office continues to experience an increasing surge of Unaccompanied Children (UAC), Family Units (FAMU), and ER/CF cases. This surge continues to create adverse impacts to port operations, as UAC's, FAMU's, and ER/CF's are being placed throughout administrative spaces of the port. Additionally, CBP personnel are being reassigned to support this influx, impacting other critical areas.

**Staffing Adjustments and Reassignments:**
* Reassignment of Port Support Personnel to assist with transportation and vehicle primary.
* Reassignment of CBP administrative staff to assist (feeding, restocking supplies, etc.). Allows CBPO'S to focus on case processing.

**Case Processing and Detention:**
* Provided guidance for aliens amenable to ER/CF as NTA cases (I-862) for aliens that ERO cannot be placed in detention.
* Coordinating with ERO to determine bed space provided by local NGO, to determine number of cases processed as NTA.
* Currently, anticipate that ERO will have capacity to handle approximately ____ NTA cases per day. Well short of the needed space required to support Brownsville POE Operations.

**Port Considerations:**



DP

  

Thank-You,

**Oscar A. Parra**
Supervisory CBP Officer
U.S. Customs & Border Protection
Brownsville Operations Center
Brownsville, Texas Port of Entry

ER-0584

Confidential

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General
Civil Division
WILLIAM C. PEACHEY
Director, Office of Immigration Litigation –
District Court Section
KATHERINE J. SHINNERS (DC 978141)
Senior Litigation Counsel
ALEXANDER J. HALASKA (IL 6327002)
Trial Attorney
United States Department of Justice
Civil Division
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 307-8704 | Fax: (202) 305-7000
alexander.j.halaska@usdoj.gov

*Counsel for Defendants*

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF CALIFORNIA**
**(San Diego)**

AL OTRO LADO, Inc., *et al.*,

                  *Plaintiffs*,

            v.

Chad F. WOLF, Acting Secretary of
Homeland Security, in his official
capacity, *et al.*,

                *Defendants*.

Case No. 3:17-cv-02366-BAS-KSC

**DEFENDANTS' EXHIBIT 24**

[Redacted Public Version]

**From:** ROJAS, FELIPE on behalf of LAREDO OPS CENTER
**Sent:** Saturday, October 15, 2016 5:15 AM
**To:** LAREDO OPS CENTER; HIGGERSON, DAVID P; LONGORIA, FRANK S; HARRIS, RODNEY H; LOZANO, LUIS G; CALDERON, GEORGE G; CEREZO-SUAREZ, CARLOS; GUERRA, ADRIAN C; HARRIS, RODNEY H; MARES, LIZET M; MERCADO, DANIEL; DONNELLY, STEVEN J; OFO-IMD; OFO-OPS-CAT
**Subject:** Daily Snapshot of Laredo Field Office Immigration Case Processing - FAMU and UAC for Oct. 14, 2016
**Attachments:** 10142016 Daily OFO-LFO UAC FMAU Snapshot.pptx

ALCON,

Attached is the Daily Snapshot of Laredo Field Office Immigration Case Processing - FAMU and UAC for Oct. 14, 2016.

| LAREDO FIELD OFFICE | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **PORT** | **CUSTODY INTAKE** | | | **PROCESSING** (Pending) | | | **PROCESSED** (RELEASED/TRANSFERRED) | | | **PROCESSED** (Awaiting Transport) | | |
| | UAC | FAMU | SINGLE | UAC | FAMU | SINGLE | UAC | FAMU | SINGLE | UAC | FAMU | SINGLE |
| Brownsville | | | | | | | | | | | | |
| Progresso | | | | | | | | | | | | |
| Hidalgo | | | | | | | | | | | | |
| Rio Grande | | | | | | | | | | | | |
| Roma | | | | | | | | | | | | |
| Laredo | | | | | | | | | | | | |
| Eagle Pass | | | | | | | | | | | | |
| Del Rio | | | | | | | | | | | | |
| **Totals:** | | | | | | | | | | | | |

*Hidalgo* – 72 Cuban nationals were farmed out to the Port of Progreso (64) and Roma (8).

**Background:** The Laredo Field Office continues to experience an increasing surge of unaccompanied Children (UACs) and Family Units (FAMUs). This surge continues to create adverse impacts to port operations, as UACs and FAMUs are being placed throughout administrative spaces of the port. Additionally, CBP personnel are being reassigned to support the influx, resulting in an impact to other critical areas.

**Staffing Adjustments and Reassignments:** Reassignment of personnel to assist with alien transportation and support daily port operations. Reassignment of CBP administrative staff to assist with alien special needs (feeding, restocking supplies, etc.) allowing our officers to focus on case processing. Farming out aliens to neighboring ports of entry to assist with case processing. Providing internal Field Office TDY support to the Port of Hidalgo (one supervisor and ten officers) to assist with case processing.

**Case Processing, Detention and Transportation:** LFO POEs advise ICE-ERO that all arriving aliens expressing fear will be processed for ERCF with mandatory detention. Should ERO deny detention space for any ERCF cases, LFO POEs will process for NTA-Person Detained and remand to ICE-ERO for custody determination. Transportation of FAMUs and UACs provided by G4S and/or CBP officers.

**Port Considerations:** Expanding use of port administrative space for temporary holding. Additional personnel will be required for security, escorts, feeding and transportation.

 

ER-0586

Confidential

 

Respectfully,

**Felipe Rojas**
*CBP Officer*
*Email: fe*
*Laredo Field Office | Laredo, Texas*



**Report Smuggling Activities a**

WARNING: This document is LAW ENFORCEMENT SENSITIVE and is designated FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5USC552). Printouts and/or screen prints from the Automated Targeting System (ATS) are not part of CBP's System of Record Notification (SORN); therefore should not be used as evidence in Court Proceedings. CBP Official records must be obtained through TECS and reviewed by Office of Chief Counsel prior to dissemination of records outside CBP. This document is to be controlled, handled, transmitted, distributed and disposed of in accordance with DHS policy relating to FOUO information, and is not to be released outside of CBP or the public without the prior approval from the Laredo Field Office.

Confidential

1   JEFFREY BOSSERT CLARK
2   Acting Assistant Attorney General
    Civil Division
3   WILLIAM C. PEACHEY
4   Director, Office of Immigration Litigation –
    District Court Section
5   KATHERINE J. SHINNERS (DC 978141)
6   Senior Litigation Counsel
    ALEXANDER J. HALASKA (IL 6327002)
7   Trial Attorney
8   United States Department of Justice
    Civil Division
9   Office of Immigration Litigation
10  P.O. Box 868, Ben Franklin Station
    Washington, D.C. 20044
11  Tel: (202) 307-8704 | Fax: (202) 305-7000
12  alexander.j.halaska@usdoj.gov
13
14  *Counsel for Defendants*

15              **UNITED STATES DISTRICT COURT**
16        **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**
                        **(San Diego)**
17

| 18 | AL OTRO LADO, Inc., *et al.*, | Case No. 3:17-cv-02366-BAS-KSC |
|----|------------------------------|-------------------------------|
| 19 | *Plaintiffs*, | **DEFENDANTS' EXHIBIT 25** |
| 20 21 | v. | [Redacted Public Version] |
| 22 23 24 | Chad F. WOLF, Acting Secretary of Homeland Security, in his official capacity, *et al.*, | |
| 25 | *Defendants*. | |

26

27

28

**From:** BRIONES, SYLVIA
**Sent:** Sunday, October 16, 2016 7:14 PM
**To:** DE LOS SANTOS, EFRAIN; LONGORIA, FRANK S
**Subject:** RE: ICE/ERO Traffic (Pending Placement)- Hidalgo POE

Sir

We got hit hard with arrivals yesterday abd we were up to 185......with the Cubans that arrived and issues with pregnant arrivals as well. This morning we had a 13 year old female getting contractions as she arrived 9 months pregnant with mother and minor brother. We called an ambulance and followed to the hospital these issues is what sets the port back.....we NTA release the whole family etc...but custodial and medical issues delay the processing and now bed space not available....plus other issues and most importantly the fear of losing the TDY HELP!!!!!

So the new NORMAL for the Port is 100 plus but we also get our officers moving as fast as possible but they do get tired of not seeing the light at the end if the tunnel!

Thanks for asking though we can tell you better in the morning when they release from detention. LET'S HOPE!

Sylvia

---

**From:** DE LOS SANTOS, EFRAIN
**Sent:** Sunday, October 16, 2016 6:00:24 PM
**To:** LONGORIA, FRANK S
**Cc:** BRIONES, SYLVIA
**Subject:** ICE/ERO Traffic (Pending Placement)- Hidalgo POE

10/16/2016- 6:00 PM

Processed and awaiting detention space: **12 Aliens**

12 Male ER/CF (Processed and waiting)- **32 Hours**

| PENDING TRANSPORT-12 |
|---|
| ER/CF #101 Eritrea Male |
| ER/CF #102 Ghana Male |
| ER/CF #103 Ghana Male |
| ER/CF #104 Ghana Male |
| ER/CF #108 Nepal Male |
| ER/CF #119 Honduras Male * |
| ER/CF #109 Nepal Male |
| ER/CF #114 Ghana Male |
| ER/CF #123 Guatemala Male (Prior) $ |
| ER/CF #115 Ghana Male |
| ER/CF #126 El Salvador Male ^ |
| ER/CF #128 El Salvador Male % |

Efrain De Los Santos
Customs and Border Protection
Hidalgo, Texas POE

---

**From:** LONGORIA, FRANK S
**Sent:** Sunday, October 16, 2016 5:55 PM
**To:** DE LOS SANTOS, EFRAIN
**Cc:** BRIONES, SYLVIA
**Subject:** RE: Hidalgo Admissibility Unit- 4:00 PM

How long has it been now?

When did you get the first message there was no bed space?

Frank S. Longoria
Assistant Director Field Operations - Border Security

ER-0589

Confidential

AOL-DEF-00906636

Office of Field Operations
Laredo Field Office
███████████ (office)
       ███ (cell)

**From:** DE LOS SANTOS, EFRAIN
**Sent:** Sunday, October 16, 2016 3:45:05 PM
**To:** HIDALGO APDS-CHIEFS; Hidalgo POE-ADMISSIBILITY
**Cc:** LFO-Admissibility
**Subject:** Hidalgo Admissibility Unit- 4:00 PM

**169 Total Aliens Currently in Custody**
   **52** Arrival 10/16/16 as of 4:00 PM
       No Medical Issues

| SNAPSHOT |
|---|
| **In Process- 16** |
| **0 – CRAA** |
| UAC **#64** Guatemala 17M |
| UAC **#68** Guatemala 16 M |
| FAMU **NTA/D #322** El Sal (M-4F-5M) |
| FAMU **NTA/D #321** El Sal (M-14F-10M) |
| FAMU **NTA/D #323** El Sal (D-3F) |
| FAMU **NTA/D #324** El Sal (M-14F) |
| FAMU **NTA/D #325** Hondo (M-7M-2M) |
| ER/CF **#120** Ghana Male |
| |
| **Pending Processing –135** |
| **0-Cubans** |
| UAC **#70** El Salvador 10M * |
| UAC **#71** El Salvador 6F * |
| UAC **#72** El Salvador 17M |
| UAC **#73** El Salvador 16F |
| UAC **#74** El Salvador 17F |
| UAC **#75** Honduras 14F * |
| UAC **#76** Honduras 12M * |
| UAC **#77** Honduras 9M |
| FAMU **NTA/D #316** El Sal (M-7M-5F) |
| FAMU **NTA/D #326** El Sal (M-12M) |
| FAMU **NTA/D #327** El Sal (M-3F) |
| FAMU **NTA/D #328** El Sal (M-6M) |
| FAMU **NTA/D #329** El Sal (D-10M) |
| FAMU **NTA/D #330** El Sal (M-3M) |
| FAMU **NTA/D #331** El Sal (M-8M) |
| FAMU **NTA/D #332** Hondo (M-4M) |
| FAMU **NTA/D #333** El Sal (M-16F-13M) |
| FAMU **NTA/D #334** El Sal (M-8F) |
| FAMU **NTA/D #335** El Sal (M-12 mo.) |
| FAMU **NTA/D #336** Guat. (M-15M) |
| FAMU NTA/D **#337** Guat. (D-8M) |
| FAMU **NTA/D #338** Brazil (D-17F) |
| FAMU **NTA/D #339** El Sal (M-10M) |
| FAMU **NTA/D #340** El Sal (M-7M) |
| FAMU **NTA/D #341** El Sal (M-9F) |
| FAMU **NTA/D #342** El Sal (M-16M) |
| FAMU **NTA/D #343** El Sal (D-4M) |
| FAMU **NTA/D #345** Guat. (M-20 mo.) |
| FAMU **NTA/D #346** Guat. (M-9M) |
| FAMU **NTA/D #347** Guat. (M-3M) |
| FAMU **NTA/D #348** Guat. (D-16M) |
| FAMU **NTA/D #349** Guat. (M-17M) |
| FAMU **NTA/D #350** Guat. (D-16M) |
| FAMU **NTA/D #351** Guat. (M-2M) |
| FAMU **NTA/D #352** Guat. (D-5M) |
| FAMU **NTA/D #353** Guat. (D-13F) |
| FAMU **NTA/D #354** El Sal (M-3F) |
| FAMU **NTA/D #355** El Sal (M-4F) |

ER-0590

Confidential

AOL-DEF-00906637

| | |
|---|---|
| **FAMU NTA/D #356** Hondo (M-4F) | |
| **FAMU NTA/D #357** El Sal (M-16M-10F) | |
| **FAMU NTA/D #358** El Sal (D-5M) | |
| **FAMU NTA/D #359** El Sal (M-11M) | |
| **FAMU NTA/D #360** Hondo (M-12M-3M) | |
| **FAMU NTA/D #361** El Sal (M-3F) | |
| **FAMU NTA/D #362** El Sal (M-13M-3F) | |
| **FAMU NTA/D #363** Hondo (M-11F) | |
| **FAMU NTA/D #364** El Sal (M-6F) | |
| **FAMU NTA/D #365** Hondo (M-13F) | |
| **FAMU NTA/D #366** Hondo (M-13F) | |
| **FAMU NTA/D #367** Hondo (M-14 mo.) | |
| **FAMU NTA/D #368** Guat. (M-15F) | |
| **FAMU NTA/D #369** El Sal (M-10M) | |
| **FAMU NTA/D #370** Hondo (M-8F) | |
| **FAMU NTA/D #371** Hondo (M-8 mo.) | |
| **FAMU NTA/D #373** El Sal (M-15F) | |
| **FAMU NTA/D #374** El Sal (5F-9M) | |
| **FAMU NTA/D #375** Guat (D-2f ) | |
| **FAMU NTA/D #377** El Sal (M-3M) | |
| **FAMU NTA/D #378** El Sal (M-16M) | |
| **FAMU NTA/D #379** El Sal (M-8F) | |
| **FAMU NTA/D #380** Hondo (M-15 mo.) | |
| **FAMU NTA/D #381** Hondo (M-10M) | |
| **ER/CF #121** El Salvador Male | |
| **ER/CF #122** Guatemala Male | |
| **ER/CF #124** Guatemala Male | |
| **ER/CF #125** El Salvador Male | |
| **ER/CF #129** Mexico Male | |
| **ER/CF #130** Eritrea Male | |
| **ER/CF #131** Eritrea Male | |
| **ER/CF #132** Eritrea Male | |
| **ER/CF #133** Eritrean Female | |
| **ER/CF #134** Eritrean Male | |
| **ER/CF #135** India Male | |
| **ER/CF #136** India Male | |
| **ER/CF #137** Guatemalan Male | |
| **ER/CF #138** El Salvador Female | |
| | |
| **PENDING TRANSPORT-18** | |
| **ER/CF #101** Eritrea Male | |
| **ER/CF #102** Ghana Male | |
| **ER/CF #103** Ghana Male | |
| **ER/CF #104** Ghana Male | |
| **ER/CF #108** Nepal Male | |
| **ER/CF #119** Honduras Male * | |
| **ER/CF #109** Nepal Male | |
| **ER/CF #114** Ghana Male | |
| **ER/CF #123** Guatemala Male (Prior) $ | |
| **ER/CF #115** Ghana Male | |
| **ER/CF #126** El Salvador Male ^ | |
| **ER/CF #128** El Salvador Male % | |
| **FAMU NTA/D #312** Hondo (M-2M) | |
| **FAMU NTA/D #317** El Sal (M-10M) | |
| **FAMU NTA/D #320** El Sal (D-7M) | |
| | |
| **MEDICAL- 0** | |
| | |
| | |
| **FARMED OUT- 26** | |
| **PGR/DNA-** 26 | |
| **RIO-** 0 | |
| **ROM-** 0 | |
| **BRO-** 0 | |
| **No longer in Custody- 41** | |
| **UAC #39** El Salvador 15F- 7 mo. Preg. | |
| **UAC #49** Guatemala 16M | |
| **UAC #45** Guatemala 16F | |

**ER-0591**

AOL-DEF-00906638

| | |
|---|---|
| **UAC #48** El Salvador  17M | |
| **UAC #50** Guatemala 16M | |
| **UAC #51** Guatemala 15M | |
| **UAC #52** Guatemala 14M | |
| **UAC #46** Guatemala 17M | |
| **UAC #53** Guatemala 15M $ | |
| **FAMU NTA/R #376** Hon(M-13F-2M) Pregnant | |
| **FAMU NTA/D #309** El Sal (M-2M) | |
| **FAMU NTA/D #311** Guat. (D-3M) | |
| **FAMU NTA/D #314** El Sal (M-11M-7M) | |
| **FAMU NTA/D #315** El Sal (M-14M-9M) | |
| **FAMU NTA/D #319** El Sal (D-12F) | |
| **NTA/D #1** Guatemala- 2 mo. Preg. | |
| **FAMU NTA/R #372** Hon (M-12M-12M)-4 Preg. | |
| **UAC #56** El Salvador 13F % | |
| **UAC #61** Honduras 12F | |
| **UAC #62** Honduras 10M | |
| **UAC #54** El Salvador 15M | |
| **UAC #55** El Salvador 14M ^ | |
| **UAC #58** Honduras 14M | |
| **UAC #60** El Salvador 3F | |
| **UAC #63** Guatemala 15M | |
| **UAC #65** Honduras 17F | |
| **UAC #59** Honduras 12F | |
| **UAC #69** Honduras 8F | |
| **UAC #66** Honduras 13F | |
| **UAC #57** Honduras 8F | |
| | |
| | |

ER-0592

Confidential

AOL-DEF-00906639

1  JEFFREY BOSSERT CLARK
2  Acting Assistant Attorney General
   Civil Division
3  WILLIAM C. PEACHEY
4  Director, Office of Immigration Litigation –
   District Court Section
5  KATHERINE J. SHINNERS (DC 978141)
6  Senior Litigation Counsel
   ALEXANDER J. HALASKA (IL 6327002)
7  Trial Attorney
8  United States Department of Justice
   Civil Division
9  Office of Immigration Litigation
10 P.O. Box 868, Ben Franklin Station
   Washington, D.C. 20044
11 Tel: (202) 307-8704 | Fax: (202) 305-7000
12 alexander.j.halaska@usdoj.gov

13
14 *Counsel for Defendants*

15                **UNITED STATES DISTRICT COURT**
16       **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**
                        **(San Diego)**
17

18 AL OTRO LADO, Inc., *et al.*,            Case No. 3:17-cv-02366-BAS-KSC

19                *Plaintiffs*,            **DEFENDANTS' EXHIBIT 26**

20          v.                             [Redacted Public Version]

21
22 Chad F. WOLF, Acting Secretary of
23 Homeland Security, in his official
   capacity, *et al.*,
24
25                *Defendants*.
26
27
28

ER-0593

**From:** BRIONES, SYLVIA
**Sent:** Tuesday, October 25, 2016 10:51 AM
**To:** LFO-Admissibility
**CC:** HIDALGO APDS-CHIEFS; Hidalgo POE-ADMISSIBILITY
**Subject:** FW: Hidalgo Port of Entry- 10/25/2016 09:45 a.m.

LFO,

HID POE at 9:45 a.m. we have every seat in the Mainhouse taken...we keep processing as fast as possible...but they keep arriving!!

Sylvia

**From:** DE LOS SANTOS, EFRAIN
**Sent:** Tuesday, October 25, 2016 9:46 AM
**To:** DIAZ, RICHARD                    DIAZ, JOSE T                        BRIONES, SYLVIA -
**Subject:** Hidalgo Port of Entry- 10/25/2016

### 226 Aliens in Custody at Hidalgo POE

PPC at capacity



Adult Males waiting outside pedestrians area



UACs awaiting processing

ER-0594

Confidential

AOL-DEF-00896989



Efrain De Los Santos
Customs and Border Protection
Hidalgo, Texas POE

ER-0595

Confidential

1  JEFFREY BOSSERT CLARK
2  Acting Assistant Attorney General
   Civil Division
3  WILLIAM C. PEACHEY
4  Director, Office of Immigration Litigation –
   District Court Section
5  KATHERINE J. SHINNERS (DC 978141)
6  Senior Litigation Counsel
7  ALEXANDER J. HALASKA (IL 6327002)
   Trial Attorney
8  United States Department of Justice
9  Civil Division
   Office of Immigration Litigation
10 P.O. Box 868, Ben Franklin Station
11 Washington, D.C. 20044
   Tel: (202) 307-8704 | Fax: (202) 305-7000
12 alexander.j.halaska@usdoj.gov

13
14 *Counsel for Defendants*

15            **UNITED STATES DISTRICT COURT**
16      **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**
                      **(San Diego)**
17

18 AL OTRO LADO, Inc., *et al.*,          Case No. 3:17-cv-02366-BAS-KSC

19              *Plaintiffs*,            **DEFENDANTS' EXHIBIT 27**

20
21                  v.

22 Chad F. WOLF, Acting Secretary of
23 Homeland Security, in his official
   capacity, *et al.*,
24
25              *Defendants.*

26
27
28

ER-0596

**From:** HUMPHRIES, MICHAEL W
**Sent:** Monday, October 10, 2016 8:19 AM
**To:** BALDENEGRO, MARGARET R
**Subject:** FW: Pedestrian Pathway and temp staging area.

---

**From:** SCHWAMM, JOHN A
**Sent:** Monday, October 10, 2016 12:01:50 AM
**To:** BROOKS, WILLIAM K; HUMPHRIES, MICHAEL W
**Cc:** SCHMUNK, THOMAS R; BRADLEY, CLIFTON G; BEICHLER, JAMES; VALADEZ, MIGUEL A; LEON, CHRIS; VELA, NANCY E
**Subject:** Pedestrian Pathway and temp staging area.

Depending on how the evening goes, I will be in a little later in the morning than I was today.

CURRENT SITUATIONAL CONCERNS :

There are now over 65 folks lined in the pedestrian pathway from Mexico to our pedestrian entrance. They are occupying both the East and West sides of the pathway leading to our facility severally limiting the space we have and need for the field workers and general travelling public.

I have instructed WC Bradley to use the OBP translator to inform these folks that we will prioritize UAC'S and Family Units. They will also be told all to line up on the East side of the pathway and remain there to minimize impeding our regular pedestrian flow. I am told they are cooperative but some are voicing concerns to the length of time they are having to wait.

We are doing out best to inform these folks that we are limited in space and resources to take in and process everyone at once.

This evening we also set up a temp waiting or staging area in the old cargo area by using old traffic barriers. This was done in hope of staging the arriving Asylum and CF cases tomorrow during day light hours.

We will notify OBP and alert them to our growing situation.

ER-0597

Confidential

AOL-DEF-01265180

1   JEFFREY BOSSERT CLARK
2   Acting Assistant Attorney General
    Civil Division
3   WILLIAM C. PEACHEY
4   Director, Office of Immigration Litigation –
    District Court Section
5   KATHERINE J. SHINNERS (DC 978141)
6   Senior Litigation Counsel
7   ALEXANDER J. HALASKA (IL 6327002)
    Trial Attorney
8   United States Department of Justice
9   Civil Division
    Office of Immigration Litigation
10  P.O. Box 868, Ben Franklin Station
11  Washington, D.C. 20044
    Tel: (202) 307-8704 | Fax: (202) 305-7000
12  alexander.j.halaska@usdoj.gov
13
14  *Counsel for Defendants*

15            **UNITED STATES DISTRICT COURT**
16      **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**
                      **(San Diego)**
17

18  AL OTRO LADO, Inc., *et al.*,          Case No. 3:17-cv-02366-BAS-KSC

19                  *Plaintiffs*,          **DEFENDANTS' EXHIBIT 28**

20          v.                             [Redacted Public Version]
21
22  Chad F. WOLF, Acting Secretary of
23  Homeland Security, in his official
    capacity, *et al.*,
24
25                  *Defendants*.
26
27
28

**From:** CAMPOS, GEORGE E
**Sent:** Wednesday, October 19, 2016 11:24 AM
**To:** BROOKS, WILLIAM K; RAMIREZ, GUADALUPE H; HUMPHRIES, MICHAEL W
**CC:** NOGALES-PD-AND-APDS; NOGALES WATCH COMMANDERS; NOGALES CHIEFS
**Subject:** FW: ***Situational Awareness*** 20 Adult Male Haitian Nationals in Nogales AZ

FYSA:

The following contingency plan has been implemented for the process of Haitian Nationals arriving in Nogales:

Deconcini Passport Control Unit/Area will be utilized to process Haitian Nationals

Mariposa POE (PCU Area) will be utilized to hold the Haitians awaiting process

SIGMA will be up and running to enroll detainees

Mission Support will be on site to ensure food, water, snacks, blankets and other additional supplies are available

In the event PCU's detainee capacity is exhausted, detainees will be transported to the Santa Cruz County Sherriff and be held at that location.

Nogales will be providing updates in a continuous basis.

Thanks,

Campos

---

**From:** BRISENO, RICARDO A
**Sent:** Wednesday, October 19, 2016 7:33 AM
**To:** NOGALES-PD-AND-APDS ▮ NOGALES CHIEFS ▮ NOGALES WATCH COMMANDERS ▮
**Cc:** TUCSON FIELD OFFICE ▮
**Subject:** ***Situational Awareness*** 20 Adult Male Haitian Nationals in Nogales AZ

ALCON,

We currently have a total of 20 Adult Male Haitian Nationals at the DeConcini POE.  We have brought in 3 so far and the remainder are waiting outside the turnstile on the Mexican Side.  We will bring in and process as we can facilitate, due to current PCU Detention Status.

Thanks,

*Ricardo A. Briseno*
Chief CBP Officer
Passenger Operations/PCU
Tactical Terrorism Response Team (TTRT)
Use of Force Incident Team (UFIT)
Nogales Port of Entry
Office: ▮
BB ▮
Fax: ▮
Work ▮



ER-0599

Confidential

AOL-DEF-01266827

**Warning: This document is UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO).** It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public, the media, or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official. State and local Homeland security officials may share this document with authorized security personnel without further approval from DHS.

ER-0600

Confidential

AOL-DEF-01266828