Nos. 22-55988, 56036

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

AL OTRO LADO, INC., *et al.*,
*Plaintiffs-Appellees/Cross-Appellants*,

v.

ALEJANDRO MAYORKAS, Secretary of Homeland Security, *et al.*
*Defendants-Appellants/Cross-Appellees*,

and

the EXECUTIVE OFFICE FOR IMMIGRATION REVIEW,
*Appellant/Cross-Appellee.*

On Appeal from a Final Judgment Issued by the U.S. District Court for the
Southern District of California (Civil Action No. 3:17-cv-02366-BAS-KSC)

## EXCERPTS OF RECORD
## VOLUME 3 OF 4

BRIAN M. BOYNTON
Principal Deputy Assistant
Attorney General

WILLIAM C. PEACHEY
Director

KATHERINE J. SHINNERS
Senior Litigation Counsel

ALEXANDER J. HALASKA
Trial Attorney
U.S. Department of Justice
Civil Division
Office of Immigration Litigation -
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 307-8704 | Fax: (202) 305-7000
Email: alexander.j.halaska@usdoj.gov

*Counsel for the Government*

1  JEFFREY BOSSERT CLARK
2  Acting Assistant Attorney General
   Civil Division
3  WILLIAM C. PEACHEY
4  Director, Office of Immigration Litigation –
   District Court Section
5  KATHERINE J. SHINNERS (DC 978141)
6  Senior Litigation Counsel
   ALEXANDER J. HALASKA (IL 6327002)
7  Trial Attorney
8  United States Department of Justice
   Civil Division
9  Office of Immigration Litigation
10 P.O. Box 868, Ben Franklin Station
   Washington, D.C. 20044
11 Tel: (202) 307-8704 | Fax: (202) 305-7000
12 alexander.j.halaska@usdoj.gov
13
14 *Counsel for Defendants*
15            **UNITED STATES DISTRICT COURT**
16   **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**
                    **(San Diego)**
17
18 AL OTRO LADO, Inc., *et al.*,          Case No. 3:17-cv-02366-BAS-KSC
19                    *Plaintiffs*,        **DEFENDANTS' EXHIBIT 29**
20              v.                         [Redacted Public Version]
21
22 Chad F. WOLF, Acting Secretary of
23 Homeland Security, in his official
   capacity, *et al.*,
24
25                    *Defendants*.
26
27
28

**From:** BROOKS, WILLIAM K
**Sent:** Tuesday, October 25, 2016 11:36 AM
**To:** SCHWAMM, JOHN A; HUMPHRIES, MICHAEL W; AGOSTTINI, JOE
**Subject:** FW: Pending Placement

---

**From:** Carter, Albert E
**Sent:** Tuesday, October 25, 2016 8:35 AM
**To:** BROOKS, WILLIAM K <
**Subject:** RE: Pending Placement

We are trying to get you some relief. Let me see what we can do.

Albert

Sent with Good (www.good.com)

---

**From:** BROOKS, WILLIAM K
**Sent:** Tuesday, October 25, 2016 11:32:05 AM
**To:** Carter, Albert E
**Subject:** Pending Placement

Good morning:

Both San Luis and Nogales have far exceeded capacity are in desperate need of relief.

San Luis has 107 in custody.
Pending placement:
20 males adults
7 female adults
17 FAMU total 45 people

Nogales has 102 in custody.
Pending placement:
11 adults
13 FAMU total 29 people

Nogales has approximately 60 Haitian males waiting in line to get in and San Luis has approximately 90 in line.

William K. Brooks
Director Field Operations
Tucson Field Office
Office of Field Operations
U.S. Customs And Border Protection
4740 N. Oracle Road, Suite 310
Tucson, Arizona 85705
(tel)
(fax)

Confidential

AOL-DEF-01393904

1  JEFFREY BOSSERT CLARK
2  Acting Assistant Attorney General
   Civil Division
3  WILLIAM C. PEACHEY
4  Director, Office of Immigration Litigation –
   District Court Section
5  KATHERINE J. SHINNERS (DC 978141)
6  Senior Litigation Counsel
7  ALEXANDER J. HALASKA (IL 6327002)
   Trial Attorney
8  United States Department of Justice
9  Civil Division
   Office of Immigration Litigation
10 P.O. Box 868, Ben Franklin Station
11 Washington, D.C. 20044
   Tel: (202) 307-8704 | Fax: (202) 305-7000
12 alexander.j.halaska@usdoj.gov
13
14 *Counsel for Defendants*
15
        **UNITED STATES DISTRICT COURT**
16  **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**
              **(San Diego)**
17

| | |
|---|---|
| 18  AL OTRO LADO, Inc., *et al.*, | Case No. 3:17-cv-02366-BAS-KSC |
| 19                    *Plaintiffs*, | **DEFENDANTS' EXHIBIT 30** |
| 20            v. | [Redacted Public Version] |
| 21 | |
| 22  Chad F. WOLF, Acting Secretary of | |
| 23  Homeland Security, in his official | |
     capacity, *et al.*, | |
| 24 | |
| 25                    *Defendants*. | |

26
27
28

**From:** Owen, Todd C (AC OFO)
**Sent:** Wednesday, October 5, 2016 3:26 PM
**To:** HOFFMAN, TODD A; WAGNER, JOHN P; GOOD, BEVERLY
**Subject:** FW: Two Urgent Issues

FYSA.

*Todd C. Owen*
*Executive Assistant Commissioner*
*Office of Field Operations*
*U.S. Customs & Border Protection*

**From:** Homan, Thomas [mailto█████████████████]
**Sent:** Wednesday, October 05, 2016 2:21 PM
**To:** MCALEENAN, KEVIN K <_____LE_____>; Ragsdale, Daniel H ████████████
**Cc:** Owen, Todd C (AC OFO) ████████████ LUCK, SCOTT A (USBP) ████████████
**Subject:** RE: Two Urgent Issues

Here is where we are:

- We are currently at 39,650 aliens in custody. This is the highest level in our history. Unprecedented. We have officers moving aliens all over the country to create bed space for Haitians within the 9th Circuit. So there are many moving parts transferring aliens from one facility to another facility, many times in different states. We are pulling officers from other duties to assist with the movement and the Haitian ERO processing work. To add to this, we had to empty 650 beds in the Hurricane evacuation area in Florida because the facility was not rated high enough to safely withstand a storm of this size/strength. That is also requiring the detailing of officers from other duties to assist in the evac (both ERO detainees and ORR residents in south Florida). In addition, we have lost 650 needed beds. So we are busier right now than we have ever been and we are short staffed dealing with it. As far as bed space for adults, we are working 24/7 to find additional beds.

- 

Hope this helps.

**From:** MCALEENAN, KEVIN K
**Sent:** Wednesday, October 05, 2016 12:18 PM
**To:** Ragsdale, Daniel H
**Cc:** Owen, Todd C (AC OFO); LUCK, SCOTT A (USBP); Homan, Thomas
**Subject:** Two Urgent Issues

Dan,
I know you are tracking developing issues with Haitians and UACs. I wanted to touch base directly and make sure we are lashed up and clear on our joint needs and efforts:

1

ER-0605

Highly Confidential/Attorneys' Eyes Only                    AOL-DEF-00044527

(1) Haitians in Baja California.

███████████████████████████████████████████████

I am advised that we have
benefitted from 4-6 personnel from ERO that are working 2 per 2 shifts to help with processing. This is appreciated, but candidly, we were really hoping for a much larger effort. We were expecting 30 TDYs, two weeks ago, and increasingly free bed space as of 10/1. Is there anything we can do to ramp up this effort?

(2) UACs and HHS

You probably heard that HHS is evacuating Homestead and claims that, as a result, they are at capacity and can't accept any UACs as of this morning. This, despite their Deputy Secretary's statements at the last DC that they had fully adequate capacity on short recall, that they realized Homestead was in So. Florida and that hurricane season wasn't over. The UCG has a call on this right now, but I plan to follow up with HHS Deputy and was hoping you and Joe Nimmich could join that call later today. We can't wait until a Friday DC. Any ideas or options that you can offer would be appreciated.

Thanks,
KM



Kevin K. McAleenan
Deputy Commissioner
U.S. Customs and Border Protection

┌─────────────────────────┐
│                         │
│         **LE**          │
│                         │
└─────────────────────────┘

*We are the guardians of our Nation's borders.*
*We are America's frontline.*

*Vigilance • Service • Integrity*

ER-0606

Highly Confidential/Attorneys' Eyes Only

AOL-DEF-00044528

1   JEFFREY BOSSERT CLARK
2   Acting Assistant Attorney General
    Civil Division
3   WILLIAM C. PEACHEY
4   Director, Office of Immigration Litigation –
    District Court Section
5   KATHERINE J. SHINNERS (DC 978141)
6   Senior Litigation Counsel
7   ALEXANDER J. HALASKA (IL 6327002)
    Trial Attorney
8   United States Department of Justice
9   Civil Division
    Office of Immigration Litigation
10  P.O. Box 868, Ben Franklin Station
11  Washington, D.C. 20044
    Tel: (202) 307-8704 | Fax: (202) 305-7000
12  alexander.j.halaska@usdoj.gov
13
14  *Counsel for Defendants*

15          **UNITED STATES DISTRICT COURT**
16     **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**
                  **(San Diego)**
17

18  | AL OTRO LADO, Inc., *et al.*, | Case No. 3:17-cv-02366-BAS-KSC |
    | --- | --- |
19  |                    *Plaintiffs*, | **DEFENDANTS' EXHIBIT 31** |
20  | | |
21  |                  v. | [Redacted Public Version] |
22  | Chad F. WOLF, Acting Secretary of | |
23  | Homeland Security, in his official | |
    | capacity, *et al.*, | |
24  | | |
25  |                    *Defendants*. | |

26
27
28

**U.S. Customs and Border Protection**
**Office of Field Operations**
**Bullets for the Executive Assistant Commissioner**
**October 18, 2016**

<span style="color:red">**Limited Distribution**</span>

**EAC Bullets - Southwest Border Daily Operations Report**

**Executive Summary:**
U.S. Customs and Border Protection (CBP) southern land border ports of entry continue to experience extraordinary levels of unlawful migration as thousands of foreign nationals, unaccompanied alien children (UAC), and family units attempt to migrate to the U.S. via a Central American land route the result of this surge has caused an extraordinary draw of resources and is outpacing temporary holding capacities at ports of entry.

**Details:**
- CBP, in collaboration with ICE/ERO, continues to explore the feasibility of using ERO's El Centro detention facility as a remote collection and processing center to alleviate congestion at the San Ysidro and Calexico Ports of Entry
    - HQ-OFO-Incident Management Division (OFO-IMD) is currently in El Centro assessing the viability of restoring operations at a retired ICE/ERO detention facility. Additionally, OFO-IMD will also be meeting with port leadership in San Luis, AZ and Calexico, CA and closing out with the DFO at San Diego Field Office.
- CBP has deployed personnel to the impacted ports of entry, streamlining administrative processes, utilized technology applications as a force-multiplier, and re-framed the distribution of workload.
    - OFO has deployed 100 additional officers to support the San Diego Field Office ports of entry;
    - CBP has deployed (16) CBP personnel with special language fluency (Creole) to support the processing of Haitian nationals at the POE.
    - OFO has leveraged remote processing capabilities at impacted POEs. OFO, in collaboration with the Office of Chief Counsel, ICE, and USCIS is streamlining administrative case processes.
- OFO San Diego continues their partnership with USBP to support the overflow of inadmissible aliens in custody.
    - USBP provided OFO San Diego with temporary holding space at the Imperial Beach Border Patrol Station and Barracks Five/Chula Vista location in South San Diego.
- Inadmissible adult males, such as Haitians are being relocated to the Imperial Beach Border Patrol Station where ICE/ERO then employs alternatives to detention (ATD) programs prior to release, if appropriate.

<span style="color:blue">ER-0608</span>

Confidential

AOL-DEF-00793584



FOR OFFICIAL USE ONLY/LAW ENFORCEMENT SENSITIVE (FOUO//LES)

**SW Border Field Office Admissibility Case Processing, October 17, 2016**

**PERSONS IN OFO CUSTODY**

| Field Office | UAC | FAMU | SINGLE | TOTALS |
|---|---|---|---|---|
| San Diego | | | | |
| Tucson | | | | |
| El Paso | | | | |
| Laredo | | | | |
| **Totals:** | | | | |

**Capacity**

| | |
|---|---|
| 155% | |
| 231% | (*San Luis POE) |
| 99% | |
| 106% | |
| **175%** | |

**SAN DIEGO FIELD OFFICE**

| PORT | CUSTODY INTAKE | | | IN PROCESS (Pending) | | | PROCESSED Awaiting Transfer | | | PROCESSED (Released/Transferred) | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | UAC | FAMU | SINGLE | UAC | FAMU | SINGLE | UAC | FAMU | SINGLE | UAC | FAMU | SINGLE |
| San Ysidro | | | | | | | | | | | | |
| Calexico | | | | | | | | | | | | |
| **Totals:** | | | | | | | | | | | | |

**TUCSON FIELD OFFICE**

| PORT | CUSTODY INTAKE | | | IN PROCESS (Pending) | | | PROCESSED Awaiting Transfer | | | PROCESSED (Released/Transferred) | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | UAC | FAMU | SINGLE | UAC | FAMU | SINGLE | UAC | FAMU | SINGLE | UAC | FAMU | SINGLE |
| San Luis | | | | | | | | | | | | |
| Nogales | | | | | | | | | | | | |
| **Totals:** | | | | | | | | | | | | |

**El PASO FIELD OFFICE**

| PORT | CUSTODY INTAKE | | | PROCESSING (Pending) | | | PROCESSED Awaiting Transfer | | | PROCESSED (Released/Transferred) | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | UAC | FAMU | SINGLE | UAC | FAMU | SINGLE | UAC | FAMU | SINGLE | UAC | FAMU | SINGLE |
| Paso del Norte | | | | | | | | | | | | |
| BOTA | | | | | | | | | | | | |
| Ysleta | | | | | | | | | | | | |
| **Totals:** | | | | | | | | | | | | |

**LAREDO FIELD OFFICE**

| PORT | CUSTODY INTAKE | | | PROCESSING (Pending) | | | PROCESSED Awaiting Transfer | | | PROCESSED (Released/Transferred) | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | UAC | FAMU | SINGLE | UAC | FAMU | SINGLE | UAC | FAMU | SINGLE | UAC | FAMU | SINGLE |
| Brownsville | | | | | | | | | | | | |
| Hidalgo | | | | | | | | | | | | |
| Laredo | | | | | | | | | | | | |
| **Totals:** | | | | | | | | | | | | |

ER-0609

Confidential

AOL-DEF-00793585

| San Diego Field Office Haitian Inadmissibles (Since 09/21/2016) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| POE | Disposition | 10/11/2016 | 10/12/2016 | 10/13/2016 | 10/14/2016 | 10/15/2016 | 10/16/2016 | 10/17/2016 | Sum: |
| ANDRADE, CA (2502) | EXPEDITED REMOVAL (I-860) | | | | | | | | 7 |
| | POE Subtotal | | | | | | | | 7 |
| CALEXICO, CA (2503) | EXPEDITED REMOVAL (I-860) | 31 | 34 | 36 | 38 | 36 | 30 | 33 | 809 |
| | EXPEDITED REMOVAL WITH CREDIBLE FEAR | | | | 2 | | | | 12 |
| | NOTICE TO APPEAR DETAINED (I-862) | 4 | 3 | 2 | | 3 | 3 | 2 | 124 |
| | NOTICE TO APPEAR RELEASED (I-862) | | | | | | | | 2 |
| | PAROLED | | | | | | | | 4 |
| | POE Subtotal | 35 | 37 | 38 | 40 | 39 | 33 | 35 | 951 |
| SAN YSIDRO (2504) | EXPEDITED REMOVAL (I-860) | 51 | 61 | 30 | 66 | 66 | 53 | 59 | 1,225 |
| | EXPEDITED REMOVAL WITH CREDIBLE FEAR | | 1 | | 3 | 1 | 1 | 2 | 83 |
| | NOTICE TO APPEAR DETAINED (I-862) | 14 | 4 | 14 | 17 | 10 | 17 | 1 | 245 |
| | NOTICE TO APPEAR RELEASED (I-862) | 1 | | | 2 | 1 | 1 | | 14 |
| | PAROLED | | | | | | | | 1 |
| | PROSECUTORIAL DISCRETION | | | | | | | | 1 |
| | POE Subtotal | 66 | 66 | 44 | 88 | 78 | 72 | 62 | 1,569 |
| Grand Total | | 101 | 103 | 82 | 128 | 117 | 105 | 97 | 2,527 |

**Prepared by**: OFO, Migration Coordination Center
**Date**: October 18, 2016

Confidential

AOL-DEF-00793586

1    JEFFREY BOSSERT CLARK
2    Acting Assistant Attorney General
     Civil Division
3    WILLIAM C. PEACHEY
4    Director, Office of Immigration Litigation –
     District Court Section
5    KATHERINE J. SHINNERS (DC 978141)
6    Senior Litigation Counsel
7    ALEXANDER J. HALASKA (IL 6327002)
     Trial Attorney
8    United States Department of Justice
9    Civil Division
     Office of Immigration Litigation
10   P.O. Box 868, Ben Franklin Station
11   Washington, D.C. 20044
     Tel: (202) 307-8704 | Fax: (202) 305-7000
12   alexander.j.halaska@usdoj.gov

13
     *Counsel for Defendants*
14

15            **UNITED STATES DISTRICT COURT**
          **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**
16                      **(San Diego)**

17
     AL OTRO LADO, Inc., *et al.*,          Case No. 3:17-cv-02366-BAS-KSC
18

19                       *Plaintiffs*,      **DEFENDANTS' EXHIBIT 32**

20                                          [Redacted Public Version]
                    v.
21

22   Chad F. WOLF, Acting Secretary of
     Homeland Security, in his official
23   capacity, *et al.*,
24
25                       *Defendants*.
26
27
28

Confidential



U.S. Customs and Border Protection

# Southern Border Inadmissibility Processing Report for October 21, 2016

(Data collected as of 1200 PM October 20, 2016)

AOL-DEF-00035554

ER-0612

Confidential

UNCLASSIFIED // FOR OFFICIAL USE ONLY

# Haitian Migration Trend Analysis



Darien Gap/Panama 4,532*

Acre
Brazil

**12,235 Estimated numbers in Transit

- On October 21, 2016, the CBP International Liaison Unit (ILU) in San Diego reported an estimated **5000** Haitian nationals were currently in norther Mexico waiting to enter the U.S.:

- **3000** are in humanitarian shelters in Tijuana.

- Another **1500** were estimated to be in Mexicali, and

- Approximately **500** are in San Luis Rio Colorado.



Confidential

# INADMISSIBLE HAITIAN NATIONALS PROCESSED

## Calexico, San Luis and San Ysidro Haitian Inadmissibles (Previous 7 Days)

| POE | Disposition | 10/14/2016 | 10/15/2016 | 10/16/2016 | 10/17/2016 | 10/18/2016 | 10/19/2016 | 10/20/2016 | Sum: |
|---|---|---|---|---|---|---|---|---|---|
| CALEXICO, CA (2503) | EXPEDITED REMOVAL (I-860) | 37 | 34 | 27 | 27 | 40 | 35 | 35 | 235 |
| | EXPEDITED REMOVAL, WITH CREDIBLE FEAR | 2 | | | | | | | 5 |
| | NOTICE TO APPEAR DETAINED (I-862) | 1 | 4 | 6 | 3 | | 4 | | 18 |
| | POE Subtotal | 40 | 38 | 33 | 33 | 40 | 39 | 35 | 258 |
| SAN LUIS, AZ (2608) | EXPEDITED REMOVAL (I-860) | | 2 | | 4 | 4 | 13 | 1 | 24 |
| | EXPEDITED REMOVAL WITH CREDIBLE FEAR | 12 | 4 | 7 | 11 | 4 | 1 | 2 | 37 |
| | NOTICE TO APPEAR DETAINED (I-862) | 7 | 16 | 19 | 18 | 16 | 16 | 4 | 96 |
| | POE Subtotal | 19 | 22 | 26 | 33 | 20 | 30 | 7 | 157 |
| SAN YSIDRO (2504) | EXPEDITED REMOVAL, (I-860) | 66 | 66 | 51 | 60 | 69 | 53 | 69 | 434 |
| | EXPEDITED REMOVAL, WITH CREDIBLE FEAR | 3 | 1 | 2 | 2 | 3 | 2 | 1 | 14 |
| | NOTICE TO APPEAR DETAINED (I-862) | 17 | 10 | 19 | 5 | 8 | 8 | 8 | 75 |
| | NOTICE TO APPEAR RELEASED (I-862) | 2 | 1 | 1 | | | | | 4 |
| | POE Subtotal | 88 | 78 | 73 | 67 | 80 | 63 | 78 | 527 |
| Grand Total | | 147 | 138 | 132 | 133 | 140 | 132 | 120 | 942 |

- 7-Day Average = **135**

AOL-DEF-00035558

ER-0614

Confidential

# Laredo Processing October 20, 2016

**Background**: The Laredo Field Office continues to experience an increasing surge of unaccompanied Children (UACs) and Family Units (FAMUs). This surge continues to create adverse impacts to port operations, as UACs and FAMUs being placed throughout administrative spaces of the port.

**Staffing Adjustments and Reassignments:**

- Reassignment of personnel to assist with alien transportation and support daily port operations.
- Reassignment of CBP administrative staff to assist with alien special needs (feeding, restocking supplies, etc.)
- Farming out aliens to neighboring ports of entry to assist with case processing.
- Providing internal Field Office TDY support to the Port of Hidalgo (one (1) supervisor and ten (10) officers) to assist with case processing.

**Port Considerations**: Expanding use of port administrative space for temporary holding. Additional personnel will be required for security, escorts, feeding and transportation.

| PORT | LAREDO FIELD OFFICE | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | CUSTODY INTAKE | | | PROCESSING (Pending) | | | PROCESSED Awaiting Transfer | | | PROCESSED (Released/Transferred) | | |
| | UAC | FAMU | SINGLE | UAC | FAMU | SINGLE | UAC | FAMU | SINGLE | UAC | FAMU | SINGLE |
| Brownsville | | | | | | | | | | | | |
| Hidalgo | | | | | | | | | | | | |
| Laredo | | | | | | | | | | | | |
| Totals: | | | | | | | | | | | | |







AOL-DEF-0003555

ER-0615

Confidential

# SW Border Field Office Admissibility Case Processing, October 20, 2016



## PERSONS IN OFO CUSTODY

| Field Office | UAC | FAMU | SINGLE | TOTALS |
|---|---|---|---|---|
| San Diego | | | | |
| Tucson | | | | |
| El Paso | | | | |
| Laredo | | | | |
| **Totals:** | | | | |



## Capacity

| | |
|---|---|
| 153% | |
| 146% | (*San Luis POE) |
| 88% | |
| 100% | |
| **163%** | |



## USBP

| UAC | FAMU | SINGLE |
|---|---|---|

AOL-DEF-00035558

ER-0616

Confidential

# El Paso Processing October 20, 2016

## EL PASO FIELD OFFICE

| PORT | CUSTODY INTAKE | | | PROCESSING (Pending) | | | PROCESSED Awaiting Transfer | | | PROCESSED (Released/Transferred) | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | UAC | FAMU | SINGLE | UAC | FAMU | SINGLE | UAC | FAMU | SINGLE | UAC | FAMU | SINGLE |
| Paso del Norte | | | | | | | | | | | | |
| BOTA | | | | | | | | | | | | |
| Ysleta | | | | | | | | | | | | |
| Totals: | | | | | | | | | | | | |

**Case Processing:**

The EPFO stood up an overflow staging area at the Port of Tornillo. Officers from the Ports of Columbus, Santa Teresa, and El Paso were detailed to Tornillo to assist.

The Port of Tornillo is able to temporarily hold up to [ ] FAMU subjects.

Tornillo's hours of operation are 0600 – 2200 hours. However, the staging area operates 24/7.

Increased transports between Ports, to ERO facilities, and to the Airport is straining OFO vehicle and personnel resources.

**Port Considerations:**

ERO continues to provide additional charter flights and continues to accept FAMU cases processed for NTA for local release to include coordination with local NGOs.

Local ERO does not foresee issues with detention bed space locally at this time

For this weekend, ERO indicates San Antonio residential centers are open for ER and placements. And ERO has coordinated with local NGO for local release of a limited number of FAMU cases processed for NTA.









Confidential

# Tucson Processing October 20, 2016

The POE has converted additional administrative spaces for processing;
OFO Field Office and USBP Sector Leadership are engaged

- o USBP's Yuma and Welton Stations are providing resources to OFO San Luis;
- o Single adults are being processed for Expedited removal;
- o Family units are being processed for I-240 removal proceedings.

On October 20, 2016, ERO transported six (6) pregnant inadmissible applicants to Phoenix for Alternatives to Detention (ATD) release.

ERO also transported four (4) Family Units (nine [9] total persons) for local release in Yuma.

Transportation continues to be a plaguing issue; example; ERO will go to Yuma BP station but will not go 25 more miles to the POE.

Placement is very slow with family units, single males' placement is the only thing that is running smooth. However, CBPOs normally haves to make an 8-hour round trip to get them there.

## TUCSON FIELD OFFICE

| PORT | CUSTODY INTAKE | | | IN PROCESS (Pending) | | | PROCESSED Awaiting Transfer | | | PROCESSED (Released/Transferred) | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | UAC | FAMU | SINGLE | UAC | FAMU | SINGLE | UAC | FAMU | SINGLE | UAC | FAMU | SINGLE |
| San Luis | | | | | | | | | | | | |
| Nogales | | | | | | | | | | | | |
| Totals: | | | | | | | | | | | | |







Confidential

# San Diego Processing October 20, 2016

## SAN DIEGO FIELD OFFICE

| PORT | CUSTODY INTAKE | | | IN PROCESS (Pending) | | | PROCESSED Awaiting Transfer | | | PROCESSED (Released Transferred) | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | UAC | FAMU | SINGLE | UAC | FAMU | SINGLE | UAC | FAMU | SINGLE | UAC | FAMU | SINGLE |
| San Ysidro | | | | | | | | | | | | |
| Calexico | | | | | | | | | | | | |
| Totals: | | | | | | | | | | | | |

**Staffing Adjustments and Reassignments:**

Reassignment of Port Support Personnel to assist with processing, transportation, in-custody care.

Supported with TDY staff for *Operation Overflow* + 12 special language CBPOs + 4 special language BPAs

Support by processing via remote technology

**Case Processing and Detention:**

Coordinating with ERO to determine bed space provided.

**Port Considerations:**

Expanding use of port administrative space for temporary holding.





Confidential



1   JEFFREY BOSSERT CLARK
2   Acting Assistant Attorney General
    Civil Division
3   WILLIAM C. PEACHEY
4   Director, Office of Immigration Litigation –
    District Court Section
5   KATHERINE J. SHINNERS (DC 978141)
6   Senior Litigation Counsel
7   ALEXANDER J. HALASKA (IL 6327002)
    Trial Attorney
8   United States Department of Justice
9   Civil Division
    Office of Immigration Litigation
10  P.O. Box 868, Ben Franklin Station
11  Washington, D.C. 20044
    Tel: (202) 307-8704 | Fax: (202) 305-7000
12  alexander.j.halaska@usdoj.gov
13
14  *Counsel for Defendants*

15              **UNITED STATES DISTRICT COURT**
16      **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**
                    **(San Diego)**
17

18  AL OTRO LADO, Inc., *et al.*,              Case No. 3:17-cv-02366-BAS-KSC

19                  *Plaintiffs*,              **DEFENDANTS' EXHIBIT 33**

20
            v.
21

22  Chad F. WOLF, Acting Secretary of
23  Homeland Security, in his official
    capacity, *et al.*,
24
25                  *Defendants*.

26

27

28



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

Washington, DC 20528 / www.oig.dhs.gov

October 10, 2017

MEMORANDUM FOR: The Honorable Claire M. Grady
Under Secretary for Management
Department of Homeland Security

FROM: John Roth
Inspector General

SUBJECT: Investigation of Allegations Related to Temporary
Holding Facilities and Non-Intrusive Inspection
Equipment at U.S. Customs and Border
Protection (OSC File No. DI-17-0368)

The U.S. Office of Special Counsel (OSC) received a whistleblower
disclosure alleging that Kevin McAleenan, Acting Commissioner, U.S.
Customs and Border Protection (CBP), engaged in conduct that
constitutes an abuse of authority and a gross waste of funds.
Specifically, the whistleblower alleged that against the advice of senior
CBP executives:

- McAleenan improperly allocated $32,200,000 of CBP's Operations
  and Maintenance (O&M) funds to construct and operate temporary
  holding facilities in Tornillo, Texas and Donna, Texas from
  November 2016 to March 2017; and

- McAleenan halted Border Patrol agents' use of Non-Intrusive
  Inspection (NII) equipment from June 9, 2017 to June 19, 2017 in
  order to avoid scrutiny from the National Border Patrol Council
  prior to his confirmation hearing.

On July 14, 2017, OSC referred this complaint to then-DHS Secretary
General John F. Kelly. The Department referred the matter for our
consideration, and we agreed to investigate the allegations. Pursuant to 5
U.S.C. § 1213(c)(1)(B) and OSC procedures, a response from the
Secretary (or her delegate) is due by November 13, 2017.

We have not substantiated these allegations. The decision to establish
and operate the Tornillo and Donna facilities was based on sound

ER-0622



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

evidence, after significant research, and with the consensus of CBP senior officials. Separately, while McAleenan did unilaterally decide to temporarily suspend the use of NII equipment by Border Patrol agents in the El Paso, Texas Sector for 10 days in June 2017, he did not receive objections from any senior officials, and we identified no evidence that his decision was based on anything other than a concern for the safety of CBP employees and their potential lack of confidence in the safety of the NII equipment. Consequently, we found no violations of law, rule, or regulation, or any gross mismanagement, gross waste of funds, abuse of authority, or substantial and specific danger to public health or safety. *See* 5 U.S.C. § 1213(a)(2).

In the course of this investigation, we interviewed approximately 15 witnesses and reviewed emails and other key documents. The whistleblower declined our request for an interview, but provided answers to our written questions.

## Tornillo and Donna Temporary Holding Facilities

According to the whistleblower, McAleenan decided to build temporary facilities to hold undocumented immigrants at Tornillo, Texas and Donna, Texas. The whistleblower alleged that McAleenan made this decision unilaterally, without a proper basis, and against the advice and objections of CBP senior executives. The whistleblower stated the facilities were each built to hold approximately 450 individuals, but they never held more than a fraction of that capacity. The whistleblower claimed that CBP spent approximately $32.2 million of O&M funds to build and operate these facilities, which left insufficient funds to purchase ammunition and other necessary equipment. Finally, the whistleblower claimed it was improper for CBP to use appropriated funds on holding facilities because U.S. Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO), and not CBP, is responsible for detaining aliens.

We found that the Tornillo and Donna facilities were built to address a documented surge of migrants arriving on the Southwest border in 2016. While the facilities were never filled to capacity, that was because the surge abruptly, drastically, and unexpectedly ended. The decision to build the facilities was collaborative, and we found no disagreement about that decision among CBP leadership. We also found that CBP kept DHS, Congress, and the White House informed about the need for and

2

ER-0623



# OFFICE OF INSPECTOR GENERAL
### Department of Homeland Security

cost of the holding facilities, and we identified no appropriations, accounting, or procurement abnormalities related to the temporary facilities.

### The decision to build the Tornillo and Donna facilities had a sound basis

In the summer and fall of 2016, CBP observed a large increase of foreign nationals arriving at the Southwest border. For example, in October and November 2016, the number of Border Patrol apprehensions and inadmissible aliens who arrived at Ports of Entry (POE) was 75% higher than the prior five-year averages for those months. Many witnesses told us this surge was related to the upcoming U.S. presidential election. Regardless of the election's outcome, there was a strong desire among migrants to arrive in the United States before the new president took office. According to the witnesses, the migrants believed they might receive amnesty if Hillary Clinton took office or that the border would close under Donald Trump's administration. Additionally, there were also substantial increases of Cubans and Haitians arriving at the U.S. border.

CBP lacked sufficient space to hold all the apprehended and inadmissible aliens. Generally, CBP only holds aliens for short periods of time while they are being processed and awaiting transfer to either the U.S. Department of Health and Human Services (HHS) (for unaccompanied alien children (UAC)) or to ICE ERO (for everyone else).[1] However, HHS and ICE ERO both struggled to keep up with the surge of individuals, which resulted in a backup at CBP facilities. In particular, the POEs became especially crowded. Several witnesses told us that aliens, including children, were forced to sleep in hallways, conference rooms, and breakrooms because there was nowhere else to put them. Witnesses told us that holding people in these conditions presented health and safety concerns for both the people being held and the CBP employees at these facilities. Moreover, CBP employees were taken away from their regular enforcement duties in order to help feed and care for the detainees. According to one witness, CBP facilities were "drowning in bodies."

---

[1] CBP's policy is to make every effort to hold individuals for the least amount of time possible and "generally not . . . longer than 72 hours." U.S. Customs and Border Protection, National Standards on Transport, Escort, Detention, and Search (Oct. 2015), § 4.1. Additionally, except in exceptional circumstances, UACs must be transferred to HHS within 72 hours of determining that the child is a UAC. 8 U.S.C. § 1232(b)(3).

ER-0624



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

Seeking to learn lessons from and avoid repeating mistakes made during a prior surge of UAC in 2014,[2] CBP established a Crisis Action Team (CAT team) in October 2016 to manage its response to this migration surge. Composed of representatives from various CBP components, the CAT team compiled data and developed strategies to address the surge and overcrowding. The CAT team combined data and intelligence gathered by different CBP offices into a daily report, which it provided to CBP leadership. The CAT team also briefed the leadership daily on the data and what it was doing to address the surge.

The CAT team considered several approaches to address the overcrowding. For example, it tried working with Mexico to "meter" the number of individuals allowed to enter the U.S. at a given time, to ensure that CBP had space for everyone. It also tried getting ICE to increase the number of deportation flights. Additionally, ICE offered to transfer a building it was no longer using to CBP so that CBP could convert it into a holding facility. However, the building was far from where CBP had the most need and CBP did not want to assume permanent control of it.

The CAT team, in conjunction with CBP's Office of Facilities & Asset Management (OFAM), also explored building temporary facilities to hold aliens until ICE ERO and HHS could accept them. In CBP's view, temporary facilities offered several advantages. First, they could be built much more quickly and less expensively than permanent facilities. Within just a few weeks, CBP could solicit bids, sign a contract, and have a facility built and operational. Temporary facilities were also scalable, meaning capacity could be increased or decreased relatively easily to meet demand. Additionally, the facilities could be primarily staffed by contractors, which was attractive to CBP because it would allow CBP personnel to return to their regular enforcement duties rather than caretaking and custodial work.

In evaluating potential sites for temporary facilities, OFAM, the CAT team, and CBP leadership evaluated several factors, such as the

---

[2] *See, e.g.*, Memoranda from John Roth, DHS Inspector General to the Honorable Jeh C. Johnson re: Oversight of Unaccompanied Alien Children (July 30, Aug. 28 & Oct. 2, 2014),
https://www.oig.dhs.gov/sites/default/files/assets/Mga/2016/Over_Un_Ali_Chil.pdf;
https://www.oig.dhs.gov/sites/default/files/assets/Mga/2016/Sig_Mem_Over_Unac_Alien_Child090214.pdf;
https://www.oig.dhs.gov/sites/default/files/assets/Mga/2016/Over_Un_Ali_Child_100214.pdf.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

locations of migration flows, accessibility, and logistical needs. After considering several sites in Texas, Arizona, and California they ultimately selected Tornillo as the first location. They chose Tornillo because it was adjacent to a POE, it was on land already owned by the government, and it was only 45 miles from El Paso, which was one of the most overcrowded POEs. They later selected Donna as the second location because it was also near the migration flow, it had a lot of available land, and it met other logistical needs. Tornillo opened on November 25, 2016 and Donna opened on December 10, 2016. Both facilities became operational approximately two weeks after CBP selected the site. Both facilities were initially built to hold up to 500 people, and both could be expanded if necessary.

In December 2016 and January 2017, the number of aliens arriving at the border began to decline from the prior months but was still significantly higher than in prior years. Many witnesses told us this was a normal pattern. Every year, the numbers decline in these months because people stay in their native countries to celebrate the holidays. Then, the numbers begin to increase in the new year and into the spring. Therefore, even though fewer people arrived in December and January, the witnesses uniformly told us that they expected the numbers to rise again. However, this did not happen. After the presidential inauguration, the numbers dropped suddenly and drastically, to historic lows. The witnesses told us they were stunned at how low the numbers were.

Table 1, taken from the CAT team's May 2, 2017 briefing, shows the total number of Border Patrol apprehensions and inadmissible aliens who arrived at POEs on the Southwest border. As shown, from August 2016 through January 2017, this number was significantly higher than any of the prior five years, and it drastically declined beginning in February 2017. In prior years, the table shows the typical December – January decrease and February – May increase that many of the witnesses described to us.

5

ER-0626



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

Table 1



CBP Southwest Border Total Apprehensions / Inadmissibles

|  | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FY17 | 66,710 | 63,363 | 58,431 | 42,477 | 23,570 | 16,712 | 15,850 | | | | | |
| FY16 | 45,546 | 45,774 | 48,761 | 33,676 | 38,316 | 46,150 | 48,541 | 55,442 | 45,722 | 46,966 | 51,961 | 56,535 |
| FY15 | 35,895 | 33,023 | 34,238 | 30,178 | 32,550 | 39,159 | 38,296 | 40,681 | 38,616 | 38,610 | 42,414 | 41,165 |
| FY14 | 41,828 | 38,685 | 36,695 | 35,181 | 42,399 | 57,405 | 59,119 | 68,804 | 66,541 | 48,819 | 39,758 | 34,003 |
| FY13 | 34,836 | 33,153 | 29,075 | 32,481 | 40,632 | 54,009 | 54,761 | 50,481 | 40,785 | 39,993 | 41,110 | 38,182 |
| FY12 | 31,323 | 28,601 | 24,360 | 30,758 | 36,990 | 48,520 | 46,660 | 42,995 | 36,794 | 32,801 | 33,686 | 32,375 |

As the numbers of apprehensions and inadmissible arrivals dropped, so too did the number of people being held at the Tornillo and Donna facilities. By February, there were only a few days in which the two facilities held more than 100 people combined (out of 1,000 total capacity). Therefore, in mid-February 2017, CBP decided to place the facilities in "stand-by" mode. This meant that the facilities remained intact with basic maintenance, but they did not hold any detainees. It cost approximately $1.8 million to keep the two facilities in stand-by mode each month, which was approximately $2.8 million less than keeping them fully operational. The facilities could be reactivated from stand-by status within 72 hours, at a minimal cost. In contrast, if the facilities were permanently closed, it would cost approximate $6.6 million to reopen them if necessary. Therefore, in CBP's view, keeping the facilities in stand-by mode was a form of insurance, in case the migration flow increased again. By mid-April 2017, the numbers had not increased and so McAleenan gave the order to permanently close the facilities.

The Tornillo facility held a total of 5,721 aliens over 82 days (November 25, 2016 – February 14, 2017). It held an average of 174.34 aliens per day. The Donna facility held 2,172 aliens over 63 days (December 10, 2016 – February 10, 2017). It held an average of 43.52 aliens per day.[3] The total cost for the two facilities was approximately $20 million.

---

[3] The daily average is higher than the number of aliens divided by the number of days the facility was open because aliens often remained at a facility for more than one day.

6



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

<u>The decision to build and maintain the facilities was a collaborative agency decision</u>

We found that McAleenan did not unilaterally make the decision to build the Tornillo and Donna facilities, as the whistleblower alleged. Many CBP senior executives, as well as the CAT team, were closely involved in the process of addressing the surge and the specific decisions to open and locate temporary holding facilities. The CAT team met with CBP senior executives daily during this time, and one senior member of the CAT team told us that McAleenan did not dictate any particular course of action. Instead, according to the witnesses we interviewed, there was always a discussion based on the information provided by the CAT team. Indeed, McAleenan was not even CBP's Commissioner when the facilities were built in 2016. Then-Commissioner Gil Kerlikowske ultimately made the decision to open the facilities.

Moreover, CBP was in constant communication about the migration surge with the White House, then-DHS Secretary Jeh C. Johnson, then-acting DHS Deputy Secretary Russ Deyo, and others throughout DHS and its components. One senior member of the CAT team recounted attending regular meetings at DHS headquarters where then-Secretary Johnson was briefed on the crisis and approved a number of proposed solutions, including the temporary facilities. We also identified emails confirming the Secretary's awareness and involvement.

Every current and former CBP senior executive whom we interviewed (which includes every person the whistleblower identified as objecting to the facilities) told us they agreed with the decision to establish the temporary facilities. Most witnesses also told us that all CBP senior executives agreed with the decision to open the Tornillo and Donna facilities, though one witness recalled another senior official who agreed with the need for the temporary facilities, but argued that it was ICE's responsibility to establish them. While we reviewed documents that identified potential benefits and risks of various measures for addressing the migration surge, including the temporary facilities, we found no emails or documents showing major objections to the proposed plan. Nor

---

The daily averages above reflect the total number of aliens that were at each facility each day, regardless of how long each alien spent at the facility. We identified other CBP reports that showed different figures because the data was collected using different methodologies (e.g. measuring the number of aliens at the facilities at one particular time each morning).

ER-0628



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

did we identify any documents that contradicted the witnesses' assertions that CBP leadership was generally all in agreement with the decision to open the Tornillo and Donna facilities.

However, there was some disagreement as to when to close the facilities. In March 2017, several CBP executives recommended permanently closing the facilities (which at that time were in stand-by status) because they believed the migration levels would remain low due to policy changes and other factors. However, McAleenan decided to keep the facilities in stand-by status for one additional month. He told us there were several reasons for his decision. First, he worried that policy changes at ICE might lead to another backup. Second, he was mindful that a recent Executive Order and DHS guidance for implementing that order instructed CBP to ensure sufficient short-term detention capacity.[4] Third, he was concerned that the migrants' initial reluctance to come to the U.S. after the inauguration might wear off. Finally, he feared the annual Spring migration increase. We identified a contemporaneous email demonstrating McAleenan's concern related to ICE, but no documentation of the other concerns he shared with us. Nonetheless, his explanation was credible and we found no evidence to the contrary.

In any event, no senior official we spoke to, including the ones who recommended closing the facilities in March, criticized McAleenan's decision to keep the facilities in stand-by status for another month. To the contrary, the officials said they understood McAleenan's decision, that it was a judgment call, and that it was not an objectively incorrect decision. The following month, McAleenan accepted the recommendation and decommissioned the facilities.

---

[4] On January 25, 2017, President Trump signed Executive Order 13,767, which directed the DHS Secretary to "take all appropriate action and allocate all legally available resources to immediately construct, operate, control, or establish contracts to construct, operate, or control facilities to detain aliens at or near the land border with Mexico" and "immediately take all appropriate actions to ensure the detention of aliens apprehended for violations of immigration law . . . ." Exec. Order No. 13,767, §§ 5(a), 6. On February 20, 2017, then-DHS Secretary General Kelly issued a memorandum implementing the Executive Order that instructed the ICE Director and CBP Commissioner to "take all necessary action and allocate all available resources to expand their detention capabilities and capacities at or near the border with Mexico to the greatest extent practicable" and for CBP to focus on expanding "short-term detention" capability. Memorandum from John Kelly, DHS Secretary to Kevin McAleenan, Acting Commissioner, CBP, *et al.*, Implementing the President's Border Security and Immigration Enforcement Improvements Policies, https://www.dhs.gov/sites/default/files/publications/17_0220_S1_Implementing-the-Presidents-Border-Security-Immigration-Enforcement-Improvement-Policies.pdf.

ER-0629



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

<u>We identified no appropriations, accounting, or procurement abnormalities associated with the Tornillo and Donna facilities</u>

The whistleblower claimed it was unlawful for CBP to use appropriated funds on "detention" facilities because only ICE may detain aliens. Similarly, some witnesses told us that others within CBP believed ICE should be responsible for building temporary facilities because ICE was the cause of the backlog. As an initial matter, there was nothing fundamentally improper about CBP establishing temporary facilities to hold aliens. The Tornillo and Donna facilities merely did what CBP is statutorily required to do (and has continued to do since the facilities closed) – holding aliens in short-term detention until they can be processed and transferred to HHS or ICE ERO. During the surge, CBP simply ran out of space to hold the aliens in its existing facilities, and the temporary facilities were built to expand its capacity.

Moreover, CBP was transparent about the Tornillo and Donna facilities with DHS, Congress, and the White House. Indeed, CBP argued to then-DHS Secretary Johnson that ICE should build the facilities, but he decided that CBP would be responsible for standing up the facilities. During the migration surge, CBP regularly briefed and communicated with Congress about the surge and its costs, and provided specific information about the Tornillo and Donna facilities. For example, in November 2016, CBP representatives, along with representatives from DHS, ICE, and U.S. Citizenship and Immigration Services, provided a briefing on the surge to staff from the Homeland Security Subcommittees of Congress' Appropriations Committees. During that briefing, CBP summarized the surge's impact on its budget and identified its surge-related expenses, including the actual and projected costs of the Tornillo and Donna facilities. In January 2017, CBP again briefed staff from those subcommittees on its surge response and provided updated cost information on the Tornillo and Donna facilities. Finally, McAleenan told us, and we found emails confirming, that White House officials were closely involved in managing the surge and were well aware of the Tornillo and Donna facilities.

Nor did we find any other appropriations issues related to the Tornillo and Donna facilities. CBP was operating under two continuing resolutions (CR) during much of the time it was addressing the surge.

ER-0630



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

During the first CR,[5] CBP was able to address its surge-related expenses, including the Tornillo and Donna facilities, with the funds it had been apportioned by the Office of Management and Budget (OMB). However, CBP projected that its surge-related expenses would continue to increase after the CR expired, and therefore asked Congress for the authority in the next CR "to obligate funding under the CR formula at a rate for operations necessary to respond to ongoing unpredictable surges in migration."[6] Congress granted CBP this flexibility through an anomaly in the second CR for Fiscal Year 2017.[7] A CBP official familiar with the anomaly process told us that CBP followed typical procedures for seeking and receiving this anomaly. After Congress included this anomaly in the second CR, DHS requested an exception apportionment from OMB on CBP's behalf.[8] The materials accompanying this request specifically referenced the Tornillo and Donna facilities. OMB approved the exception apportionment request in February 2017.

We also found that CBP used the correct source of funds for the temporary facilities and the other surge expenses. CBP used funds from the Operations and Support (O&S) appropriations category, which is the category used to support the costs associated with DHS operations and maintenance activities.[9] This funding category was new for Fiscal Year 2017 so there was no precedent for using it. However, Congress validated this approach by twice later using the O&S category for surge expenses: in the anomaly in the second CR and in its enacted Fiscal Year 2017 appropriation for CBP.

---

[5] The first CR was in place October 1, 2016 – December 9, 2016. Continuing Appropriations Act, 2017, Pub. L. No. 114-223, div. C, § 106, 130 Stat. 908, 909–10 (2016).

[6] *See* OFFICE OF MGMT. & BUDGET, EXEC. OFFICE OF THE PRESIDENT, FY 2017 CONTINUING RESOLUTION (CR) APPROPRIATIONS ISSUES (ANOMALIES REQUIRED FOR A CR THROUGH MARCH) 8.

[7] Further Continuing and Security Assistance Appropriations Act, 2017, Pub. L. No. 114-254, div. A, § 101, 130 Stat. 1005, 1008 (2016) (amending first CR to add section 163). The second CR for Fiscal Year 2017 was in place December 10, 2016 – April 28, 2017.

[8] An exception apportionment "is a colloquial term that describes the written apportionment that is issued for operations under a [CR], in lieu of the OMB-issued automatic apportionment." OFFICE OF MGMT. & BUDGET, EXEC. OFFICE OF THE PRESIDENT, OMB CIRCULAR NO. A-11, PREPARATION, SUBMISSION, AND EXECUTION OF THE BUDGET § 120 5 (2016).

[9] DHS, Financial Management Policy Manual ch. 2, § 2.0 15 (Oct. 1, 2016).

ER-0631



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

While we did not formally audit the procurement of the Tornillo and Donna facilities, we found nothing in either our review of documents or interviews of relevant personnel which would indicate any abnormality in the procurement process. Witnesses told us that CBP relied mainly on its procurement staff to handle the procurement process for the facilities, and that McAleenan and other senior executives did not interfere with or influence the process. Nor is there evidence that McAleenan benefitted in any way from the facilities contracts. He was not involved in the procurement process, his financial disclosure forms reveal no financial ties to the contractor that was selected, and no witnesses were aware of McAleenan receiving any benefit from the contracts. Indeed, McAleenan seemed to genuinely not recognize the name of the contractor during our interview of him.

Lastly, we did not substantiate the whistleblower's claim that the Tornillo and Donna facilities left CBP unable to purchase ammunition and other necessary equipment. We asked the whistleblower for more information about this allegation, but he/she could not identify any specific needs that were not met because CBP funded the facilities. In fact, in the Fiscal Year 2017 omnibus appropriation, Congress included sufficient "surge operations" funding to CBP to cover all of its surge-related costs. Therefore, CBP was eventually made whole for all of the costs associated with the Tornillo and Donna facilities. Before the omnibus appropriation, DHS acknowledged to Congress that CBP had temporarily diverted funds from other needs to pay for the facilities, but witnesses told us that no mission critical requirements or equipment were unfunded.

In our view, CBP's decision to stand up the two detention facilities in the manner it did was reasonable and did not constitute an abuse of authority or a gross waste of funds.

## Shutdown of Non-Intrusive Inspection (NII) Equipment

The whistleblower separately alleged that in response to a National Border Patrol Council (NBPC) advisory, McAleenan ordered Border Patrol agents on the Southwest Border to stop using NII equipment from June 9, 2017 to June 19, 2017. According to the whistleblower, McAleenan ordered this shutdown even though senior Border Patrol officials informed him that CBP had previously shut down the NII equipment, examined it, and determined it to be safe. Further, the whistleblower



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

suggested that McAleenan did not conduct a substantive review of the NII equipment during the June shutdown, and allowed Office of Field Operations (OFO) officers at POEs, who are not NBPC members, to continue using NII equipment. The whistleblower claimed McAleenan ordered the shutdown in order to avoid NBPC scrutiny before his confirmation hearing.

We found no evidence that McAleenan ordered the shutdown for any reasons other than his concerns for the health and safety of CBP employees and their confidence in the NII equipment. At the time he ordered the shutdown, McAleenan was unaware that the NII equipment in question was previously examined in March 2017. While he learned that shortly after ordering the shutdown, he did not cancel the shutdown because he believed the complaint was specific and credible and he did not know the details of the prior examination. Moreover, the NBPC advisory was specific to Border Patrol agents in the El Paso region and so, in McAleenan's view, there was no reason to stop using NII equipment in other regions or at POEs. During the June shutdown, CBP leadership reviewed the results of the prior examination, consulted with subject matter experts, and determined that no further testing was necessary to confirm the safety of the equipment.

### McAleenan was not aware of the prior examination when he ordered the shutdown

On June 9, 2017, the Deputy Chief of the Border Patrol briefed CBP leadership about a NBPC advisory she had just received. The advisory stated that there were "at least 8 confirmed cases of cancer (7 Papillary Thyroid Carcinoma, 1 Medullary Thyroid Carcinoma) among" Border Patrol agents who used NII equipment in the El Paso Sector. McAleenan was not at the briefing because he was on official travel in Mexico City. Following the briefing, the Acting CBP Chief of Staff forwarded the NBPC advisory to McAleenan, and 17 minutes later, McAleenan responded with an instruction to stand down the equipment.

We confirmed McAleenan's assertion that when he received the NBPC advisory on June 9, 2017, he was not aware that the NII equipment in El Paso previously had been shut down and examined in March 2017. The March shutdown was ordered by the El Paso Sector Chief, not by officials at CBP headquarters in Washington. Most of the headquarters officials we spoke to said they were not aware of the March shutdown when they received the NBPC advisory in June, and they did not think McAleenan

12



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

was aware of it either. We reviewed McAleenan's emails between March and June 2017, and found no mention of the March shutdown or any other NII equipment safety concerns until he received the NBPC advisory on June 9, 2017.

Later on June 9, 2017, after McAleenan had already ordered the shutdown, he received a brief timeline about the March shutdown. However, because he was in Mexico City and attending meetings all day, he was not able to speak to anybody extensively about the March shutdown or fully evaluate the thoroughness of that inspection. Therefore, he did not reverse his decision.

<u>McAleenan offered credible reasons for ordering the June shutdown and received no objections about that decision</u>

McAleenan told us he was most concerned that eight people within the El Paso Sector had been diagnosed with cancer. He believed that eight agents with similar cancers within one region were too many to be a coincidence. Further, he thought the specificity of the diagnoses in the advisory gave it credibility. McAleenan said he decided to shut down the equipment only in the El Paso Sector, and only within the Border Patrol, because the eight diagnoses there suggested that the problem was localized. Moreover, shutting down OFO's use of NII equipment at the POEs would be much more debilitating than shutting down the Border Patrol's use of it. NII equipment is one of many tools that the Border Patrol uses, and a temporary shutdown would not substantially harm the Border Patrol's operations. In contrast, NII is an integral tool for OFO, and a shutdown at the POEs would have a major impact.

McAleenan's explanation is internally consistent and was corroborated by other witnesses. The existence of eight cancer cases within a relatively small population suggests specific faulty equipment rather than a widespread problem with NII equipment. Therefore, it was not unreasonable, in our view, to stop using and examine the particular equipment in El Paso rather than shutting down all equipment throughout the country. Additionally, many witnesses confirmed that NII equipment is much more important to OFO than the Border Patrol. For example, a senior OFO official told us that NII equipment "is a cornerstone" of their operations at POEs, while a senior Border Patrol official told us that NII equipment is not a primary tool. In fact, the Border Patrol generally does not employ replacement equipment when a NII machine breaks or is taken offline for repairs. Instead, while NII

13



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

equipment is out of service, the Border Patrol increases its use of other inspection tools.

The whistleblower claimed that several senior CBP officials communicated objections about the shutdown to McAleenan. While some witnesses told us they disagreed with McAleenan's decision and might have made a different decision, they understood his decision and did not express their objections to McAleenan. Nor did we find any emails suggesting that any objections were communicated to McAleenan about this decision. Before it was clear that McAleenan was only shutting down the Border Patrol's use of NII equipment, the head of OFO objected to shutting down the use of NII equipment at the POEs. But he did not express objections once he learned that the shutdown only affected the Border Patrol.

> The Border Patrol developed and presented sound evidence for restarting the use of NII equipment to McAleenan

During the June shutdown, the Border Patrol re-evaluated the testing done in March, spoke with experts from CBP's Occupational Safety and Health Division who oversaw the March testing, reviewed recent radiation measurements, met with other stakeholders, and prepared detailed timelines and issue papers on the NII equipment. Based on this work, the Border Patrol determined that the NII equipment in the El Paso Sector was safe, and that no new testing was necessary. Consequently, after they presented their findings to McAleenan on June 19, 2017, he ordered the end of the shutdown.

Importantly, during the shutdown CBP attempted to confirm the eight cancer diagnoses alleged by the NBPC, but only identified two people who claimed their cancer diagnoses were related to their use of NII equipment. Given the importance McAleenan had placed on the number of alleged diagnoses, discovering that number was incorrect gave McAleenan comfort that the NII equipment was safe.

> We found no evidence that McAleenan shut down the use of NII equipment to appease the union

McAleenan told us that he ordered the shutdown for two primary reasons – the safety of CBP employees and their confidence in using the NII equipment. First, he said safety of CBP employees "is paramount" and "an unacceptable risk." Secondarily, he said the morale and engagement

14



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

of CBP employees was important and he wanted to be sure that they were comfortable using the equipment. We found nothing that contradicted this. Other witnesses told us that McAleenan was concerned only with the safety and welfare of CBP employees. Not one witness thought his confirmation process or his relationship with the union factored into McAleenan's decision at all. Nor did we find anything in McAleenan's emails that suggested anything untoward in regard to the union. There were limited references to the union before and during the shutdown, and those references reflected a balance of tension and cooperation that would be expected between an agency and a union.

Based on our review of the evidence, we do not believe McAleenan's decision to temporarily shut down the use of NII equipment in El Paso constituted an abuse of authority. We believe it was a reasonable decision based on the information he had at the time, and that he ordered the shutdown out of concern for CBP employees rather than his own self-interest.

ER-0636

1  JEFFREY BOSSERT CLARK
2  Acting Assistant Attorney General
   Civil Division
3  WILLIAM C. PEACHEY
4  Director, Office of Immigration Litigation –
   District Court Section
5  KATHERINE J. SHINNERS (DC 978141)
6  Senior Litigation Counsel
   ALEXANDER J. HALASKA (IL 6327002)
7  Trial Attorney
8  United States Department of Justice
   Civil Division
9  Office of Immigration Litigation
10 P.O. Box 868, Ben Franklin Station
   Washington, D.C. 20044
11 Tel: (202) 307-8704 | Fax: (202) 305-7000
12 alexander.j.halaska@usdoj.gov
13
14 *Counsel for Defendants*
15           **UNITED STATES DISTRICT COURT**
16      **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**
                    **(San Diego)**
17

18 AL OTRO LADO, Inc., *et al.*,        Case No. 3:17-cv-02366-BAS-KSC

19              *Plaintiffs*,           **DEFENDANTS' EXHIBIT 36**

20           v.                         [Redacted Public Version]
21

22 Chad F. WOLF, Acting Secretary of
   Homeland Security, in his official
23 capacity, *et al.*,
24
25              *Defendants*.
26
27
28

| | |
|---|---|
| **From:** | LONGORIA, FRANK S |
| **Sent:** | Tuesday, November 15, 2016 2:09 PM |
| **To:** | HIGGERSON, DAVID P |
| **Subject:** | FW: Meeting with INM |

See below.

This is what I need to discuss with you.

Frank S. Longoria
Assistant Director Field Operations – Border Security
Office of Field Operations
Laredo Field Office

**From:** HUTTON, JAMES R
**Sent:** Tuesday, November 15, 2016 12:35 PM
**To:** LONGORIA, FRANK S
**Cc:** SCHROEDER-FAWCETT, JENNIFER L
**Subject:** FW: Meeting with INM

Frank
Just as a follow to our conversation apropos the highlighted portion of your message below. If any individual arrives at POE, we cannot just send them back to MX to wait to be processed but must process them upon arrival.

Let me know if you need any additional support from HQ to work out the operational/policy portion of this.

J. Ryan Hutton
Deputy Executive Director (A)
Admissibility and Passenger Programs
RRB #2.4G-56
Washington, DC

1

**ER-0638**

Highly Confidential/Attorneys' Eyes Only



**Warning**: This document is UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official. No portion of this report should be furnished to the media, either in written or verbal form. *This document, and any attachment(s) hereto, may contain confidential and/or sensitive U.S. Government information, and is not for release, review, retransmission, dissemination or use by anyone other than the intended recipient(s). Please notify the sender if this email has been misdirected and immediately destroy all originals and copies of the original. Any disclosure of this document must be approved by U.S. Customs and Border Protection.*

---

**From:** LONGORIA, FRANK S
**Sent:** Sunday, November 13, 2016 8:06:20 AM
**To:** LONGORIA, FRANK S; ALVAREZ, GREGORY; BRANDT, JOHN L; CANTU, CRESCENCIO JR; GARZA, NESTOR III; GONZALEZ, DAVID JOHN; HORNE, PETRA; PEREZ, ALBERTO D; RODRIGUEZ, CARLOS; SOLIS, EFRAIN
**Cc:** CANTU, JAVIER N; FLORES, ALBERTO A; HIGGERSON, DAVID P; SKINNER, BRADD M.; HARRIS, RODNEY H; DELAGARZA, ALFONSO; CRAWFORD, EUGENE E; MOLASKI, WILLIAM H; BRUMFIELD, BONITA; MARES, LIZET M
**Subject:** RE: Meeting with INM

Port Directors :

This only applies to Central Americans.

Frank S. Longoria
Assistant Director Field Operations - Border Security
Office of Field Operations
Laredo Field Office

---

**From:** LONGORIA, FRANK S
**Sent:** Saturday, November 12, 2016 2:42:07 PM
**To:** ALVAREZ, GREGORY; BRANDT, JOHN L; CANTU, CRESCENCIO JR; GARZA, NESTOR III; GONZALEZ, DAVID JOHN; HORNE, PETRA; PEREZ, ALBERTO D; RODRIGUEZ, CARLOS; SOLIS, EFRAIN
**Cc:** CANTU, JAVIER N; FLORES, ALBERTO A; HIGGERSON, DAVID P; SKINNER, BRADD M.; HARRIS, RODNEY H; DELAGARZA, ALFONSO; CRAWFORD, EUGENE E; MOLASKI, WILLIAM H; BRUMFIELD, BONITA; MARES, LIZET M
**Subject:** Meeting with INM

Port Directors:



ER-0639

Highly Confidential/Attorneys' Eyes Only                                                                                    AOL-DEF-00814131

your staff is to provide the alien with a piece of paper identifying a date and time for an appointment and return then to Mexico. This is similar to what San Diego is doing. We understand the alien may express a fear of returning to Mexico and we will address as the situation dictates.

Please schedule a meeting with your INM counterparts ASAP. Let us know the date and time of the meeting as soon as it's scheduled, We will also need a summary of your meeting to include who you met with, what was discussed, what was agreed to, issues/concerns, and timeline.

That's all the information we have on the tasking but we can anticipate being asked to provide an update early next week.

Frank S. Longoria
Assistant Director Field Operations  - Border Security
Office of Field Operations
Laredo Field Office

3

ER-0640

Highly Confidential/Attorneys' Eyes Only

AOL-DEF-00814132

1    JEFFREY BOSSERT CLARK
2    Acting Assistant Attorney General
     Civil Division
3    WILLIAM C. PEACHEY
4    Director, Office of Immigration Litigation –
     District Court Section
5    KATHERINE J. SHINNERS (DC 978141)
6    Senior Litigation Counsel
     ALEXANDER J. HALASKA (IL 6327002)
7    Trial Attorney
8    United States Department of Justice
     Civil Division
9    Office of Immigration Litigation
10   P.O. Box 868, Ben Franklin Station
     Washington, D.C. 20044
11   Tel: (202) 307-8704 | Fax: (202) 305-7000
12   alexander.j.halaska@usdoj.gov
13
     *Counsel for Defendants*
14

15                 **UNITED STATES DISTRICT COURT**
              **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**
16                          **(San Diego)**
17

18   AL OTRO LADO, Inc., *et al.*,        Case No. 3:17-cv-02366-BAS-KSC
19                  *Plaintiffs*,          **DEFENDANTS' EXHIBIT 37**
20
21            v.                           [Redacted Public Version]

22   Chad F. WOLF, Acting Secretary of
23   Homeland Security, in his official
     capacity, *et al.*,
24
25                  *Defendants.*
26
27
28

**From:** TAMAYO, ENRIQUE S
**Sent:** Sunday, July 23, 2017 1:29 PM
**To:** CALONDER, DANIEL; DONNELLY, STEVEN J; MEJIA, LUIS A; VAQUERO, ROBERTO
**Subject:** FW: SWB Metering.pptx
**Attachments:** SWB Metering.pptx

FYSA – Metering powerpoint to EAC.

**From:** CAMPOS, GRETA R
**Sent:** Friday, November 18, 2016 8:55 AM
**To:** GOOD, BEVERLY <BEVERLY.GOOD@cbp.dhs.gov>
**Cc:** CAMPBELL, CARL S <CARL.S.CAMPBELL@cbp.dhs.gov>; TAMAYO, ENRIQUE S <ENRIQUE.S.TAMAYO@CBP.DHS.GOV>
**Subject:** FW: SWB Metering.pptx

XD,

FYSA – Metering is a hot topic right now. Lots of international political pressure, and some of it is focused on El Paso and Hidalgo because they are turning people away at the port on US soil. Enrique is working with the port to address.

Greta R. Campos
Acting Director, Field Programs
Office of Field Operations
U.S. Customs and Border Protection



**From:** TAMAYO, ENRIQUE S
**Sent:** Friday, November 18, 2016 8:03 AM
**To:** Owen, Todd C (AC OFO), WAGNER, JOHN P
**Cc:** CAMPOS, GRETA R, CHAVEZ, GLORIA I
**Subject:** FW: SWB Metering.pptx

EAC,

Attached are the Southwest Border metering slides and responses from each of the field offices.

Enrique

**From:** VAQUERO, ROBERTO
**Sent:** Friday, November 18, 2016 7:40 AM
**To:** TAMAYO, ENRIQUE S <ENRIQUE.S.TAMAYO@CBP.DHS.GOV>
**Subject:** SWB Metering.pptx

See the attached PPT regarding SW land border POEs.

Robert Vaquero
Supervisory Program Manager
Admissibility and Passenger Programs
Office of Field Operations
U.S. Customs and Border Protection
Office:
Mobile:
Email:

ER-0642

Confidential

AOL-DEF-00562927

1  JEFFREY BOSSERT CLARK
2  Acting Assistant Attorney General
   Civil Division
3  WILLIAM C. PEACHEY
4  Director, Office of Immigration Litigation –
   District Court Section
5  KATHERINE J. SHINNERS (DC 978141)
6  Senior Litigation Counsel
7  ALEXANDER J. HALASKA (IL 6327002)
   Trial Attorney
8  United States Department of Justice
9  Civil Division
   Office of Immigration Litigation
10 P.O. Box 868, Ben Franklin Station
11 Washington, D.C. 20044
   Tel: (202) 307-8704 | Fax: (202) 305-7000
12 alexander.j.halaska@usdoj.gov
13
14 *Counsel for Defendants*
15            **UNITED STATES DISTRICT COURT**
16    **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**
                    **(San Diego)**
17
18 AL OTRO LADO, Inc., *et al.*,          Case No. 3:17-cv-02366-BAS-KSC
19              *Plaintiffs*,             **DEFENDANTS' EXHIBIT 38**
20
21              v.                        [Redacted Public Version]
22 Chad F. WOLF, Acting Secretary of
23 Homeland Security, in his official
   capacity, *et al.*,
24
25              *Defendants*.
26
27
28

**From:** MCALEENAN, KEVIN K
**Sent:** Friday, November 18, 2016 8:49 AM
**To:** Owen, Todd C (AC OFO)
**CC:** WAGNER, JOHN P
**Subject:** RE: SWB Metering.pptx

Thank you. El Paso seems to be the interagency focus, so if I could get that estimate in the next 20 mins, I would appreciate it very much.

---

**From:** Owen, Todd C (AC OFO)
**Sent:** Friday, November 18, 2016 8:43:13 AM
**To:** MCALEENAN, KEVIN K
**Cc:** WAGNER, JOHN P
**Subject:** RE: SWB Metering.pptx

Deputy,

Hard to say. In El Paso, they keep a log with names and appointment times as they turn them away, so we might be able to get a sense of the backlog there. In other locations, especially So Cal and San Luis, the migrants are staying at the shelters ███████████████████████████████████████████████████████████ Hard to know the volume in the shelters

but we'll see if we can find it out.

I'm sure someone already raised this, but we need to watch and see if apprehensions go up between the ports as a result of the metering and people not wanting to wait.

Also, Hidalgo may be turning folks away after they reach US soil. We will address that this am and have the officers push back to the actual boundary line on the bridge.

*Todd C. Owen*
*Executive Assistant Commissioner*
*Office of Field Operations*
*U.S. Customs & Border Protection*

**From:** MCALEENAN, KEVIN K
**Sent:** Friday, November 18, 2016 8:26 AM
**To:** Owen, Todd C (AC OFO) <████████████████████>
**Cc:** WAGNER, JOHN P ████████████████████
**Subject:** RE: SWB Metering.pptx

EAC,
Thank you. Any ballpark on the numbers "turned away"? That seems to be the focus.
KM

---

**From:** Owen, Todd C (AC OFO)
**Sent:** Friday, November 18, 2016 8:09:14 AM
**To:** MCALEENAN, KEVIN K
**Cc:** WAGNER, JOHN P
**Subject:** FW: SWB Metering.pptx



Outside of El Paso, process works smoothly because of the infrastructure and turnstiles which give us control before they reach US soil.

*Todd C. Owen*
*Executive Assistant Commissioner*
*Office of Field Operations*
*U.S. Customs & Border Protection*

**From:** TAMAYO, ENRIQUE S
**Sent:** Friday, November 18, 2016 8:03 AM
**To:** Owen, Todd C (AC OFO) ████████████████; WAGNER, JOHN P
**Cc:** CAMPOS, GRETA R <████████████████; CHAVEZ, GLORIA I ████████████████
**Subject:** FW: SWB Metering.pptx

ER-0644

Highly Confidential/Attorneys' Eyes Only AOL-DEF-00370791

EAC,

Attached are the Southwest Border metering slides and responses from each of the field offices.

Enrique

**From:** VAQUERO, ROBERTO
**Sent:** Friday, November 18, 2016 7:40 AM
**To:** TAMAYO, ENRIQUE S <
**Subject:** SWB Metering.pptx

See the attached PPT regarding SW land border POEs.

Robert Vaquero
Supervisory Program Manager
Admissibility and Passenger Programs
Office of Field Operations
U.S. Customs and Border Protection
Office:
Mobile
Email:

ER-0645

Highly Confidential/Attorneys' Eyes Only                                    AOL-DEF-00370791.0001

1  JEFFREY BOSSERT CLARK
2  Acting Assistant Attorney General
   Civil Division
3  WILLIAM C. PEACHEY
4  Director, Office of Immigration Litigation –
   District Court Section
5  KATHERINE J. SHINNERS (DC 978141)
6  Senior Litigation Counsel
7  ALEXANDER J. HALASKA (IL 6327002)
   Trial Attorney
8  United States Department of Justice
9  Civil Division
   Office of Immigration Litigation
10 P.O. Box 868, Ben Franklin Station
11 Washington, D.C. 20044
   Tel: (202) 307-8704 | Fax: (202) 305-7000
12 alexander.j.halaska@usdoj.gov
13
14 *Counsel for Defendants*

15        **UNITED STATES DISTRICT COURT**
16  **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**
            **(San Diego)**
17

18 AL OTRO LADO, Inc., *et al.*,            Case No. 3:17-cv-02366-BAS-KSC

19                *Plaintiffs*,           **DEFENDANTS' EXHIBIT 42**

20                                         [Redacted Public Version]
        v.
21

22 Chad F. WOLF, Acting Secretary of
23 Homeland Security, in his official
   capacity, *et al.*,
24

25                *Defendants*.

26

27

28

ER-0646

**From:** FLORES, PETE ROMERO
**Sent:** Thursday, December 8, 2016 7:32 PM
**To:** AKI, SIDNEY K; HERNANDEZ, ROSA E; SNYDER, WILLIAM P; SILVA, CARLOS NMI; SALAZAR, DAVID A; SARRASIN, DAVID A; ARMIJO, JOHNNY L; WILSON, LAURA; RAMIREZ, ELLEN
**Subject:** FW: CBP Migration CAT - COB 12/8/2016

FYSA

Pete Flores
Director, Field Operations
San Diego Field Office
U.S. Customs and Border Protection
Work Phone: 619-645-6622
Fax: 619-645-6644

**From:** CHAVEZ, GLORIA I
**Sent:** Thursday, December 08, 2016 1:47 PM
**To:**



**Subject:** RE: CBP Migration CAT - COB 12/8/2016

Deputy Commissioner and all – Please see the CBP Migration Crisis Action Team (CAT) "end of day" report for your situational awareness.

**CBP CAT HIGHLIGHTS:**
- **The Tornillo, TX, facility reported 133 detainees with four operational Pods.**
- **Met with PDO and CRCL staffs to discuss CBP's temporary holding facilities capabilities.**
- **Held discussions with OPA to finalize CBP's new public facing website that will display FY17 statistics on Family Units, Unaccompanied Minors, Haitians, and Cubans.**

**J1-ADMINISTRATION:**
- No Updates.

**J2-INTELLIGENCE:**
- 

**J3-OPERATIONS:**
**Tornillo Updates:**
- There is a total of 133 migrants at the Tornillo, TX, facility.
- The four Tornillo, TX facility pods are operational.
- Medicine dispensing MOU is pending revisions.
- Leadership met with Guatemalan Consulate and meeting was very positive.
- Temperature is maintained at 75 degrees in the pods (comfortable setting)

ER-0647

Confidential                                                                                                AOL-DEF-00089288

**Donna Updates:**

- Finalizing the Donna, TX, facility's repairs including: fencing, door, and TV installations, painting, IT connections, and general repairs.
- The Donna, TX, facility comprises of five pods and is scheduled for completion on <u>December 8, 2016</u> with operations tentatively scheduled for <u>December 9, 2016</u>.
- Leadership met with Honduran, Mexican and Guatemalan Consulates. Meeting was very positive.
- Leadership met with ACLU and provided a tour of the facility.
- CBP supervisors received an operations brief and then toured the Donna Facility.
- Facility leadership located a local clinic that accepts MEDPAR.

### J4-LOGISTICS:

- No Updates.

### J5-PLANNING:

- No Updates.

### J6–COMMUNICATIONS:

- Completed a successful presentation on CBP's holding facilities capabilities that included the PDO and Civil Rights Civil Liberties (CRCL) staffs.

### J7 – TRAINING:

- No Updates.

### J-8 - FINANCE:

- Contract extensions deadlines for both holding facilities are due (Tornillo - 12/17 and Donna - 12/23).

### J-9 - LIAISON:

- The total number of ICE/ERO transfers processed within the last 24 hours is 
- ICE/ERO will repatriate two flights of ▮Haitians weekly during week 12/04 to 12/10 and two flights of  Haitians during week of 12/11 to 12/17.
- NGOs who toured the Donna facility were pleased with the amenities being provided to those in custody and no real issues were identified at the time.
- Congressional staffers visited the Donna facility and were satisfied with the visit.

| Total | Demographic | App's / Inadmissibles (Previous Day) | Currently in Custody |
|---|---|---|---|
| CBP Southwest Border | UAC | 311 | 580 |
| | FMUA | 665 | 1432 |
| | Single Adults | 1194 | 1703 |
| | Total App's | 2170 | 3715 |

| Total | Demographic | Apprehensions (Previous Day) | Currently in Custody |
|---|---|---|---|
| USBP Southwest Border | UAC | 266 | 534 |
| | FMUA | 544 | 1314 |
| | Single Adults | 864 | 1226 |
| | Total App's | 1674 | 3074 |

| Total | Demographic | Inadmissibles (Previous Day) | Currently in Custody |
|---|---|---|---|
| OFO Southwest Border | UAC | 45 | 46 |
| | FMUA* | 121 | 118 |
| | Singles | 330 | 477 |
| | Total Subjects | 496 | 641 |
| | Total Haitians | 68 | 315 |

Regards,

Gloria I. Chavez

Commander

Crisis Action Team

U.S. Customs and Border Protection

1300 Pennsylvania Avenue, Wash. D.C.

▮ (O)

▮ (C)

ER-0648

Confidential

AOL-DEF-00089289

1  JEFFREY BOSSERT CLARK
2  Acting Assistant Attorney General
   Civil Division
3  WILLIAM C. PEACHEY
4  Director, Office of Immigration Litigation –
   District Court Section
5  KATHERINE J. SHINNERS (DC 978141)
6  Senior Litigation Counsel
7  ALEXANDER J. HALASKA (IL 6327002)
   Trial Attorney
8  United States Department of Justice
9  Civil Division
   Office of Immigration Litigation
10 P.O. Box 868, Ben Franklin Station
11 Washington, D.C. 20044
   Tel: (202) 307-8704 | Fax: (202) 305-7000
12 alexander.j.halaska@usdoj.gov
13
14 *Counsel for Defendants*

15        **UNITED STATES DISTRICT COURT**
16     **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**
                **(San Diego)**
17

18 AL OTRO LADO, Inc., *et al.*,          Case No. 3:17-cv-02366-BAS-KSC

19              *Plaintiffs*,             **DEFENDANTS' EXHIBIT 46**

20
              v.
21

22 Chad F. WOLF, Acting Secretary of
23 Homeland Security, in his official
   capacity, *et al.*,
24
25              *Defendants*.

26

27

28

ER-0649

9/25/2018   Case 3:17-cv-02366-BAS-KSC   Document 563-4 Filed 09/25/20   PageID.52581   Page 2 of 6



Official website of the Department of Homeland Security

(https://www.facebook.com/CBPgov/)   (https://www.instagram.com/cbpgov/)

(https://www.flickr.com/photos/cbpphotos/)   (https://twitter.com/cbp)

(https://www.linkedin.com/company/2997?trk=tyah)   (https://www.youtube.com/user/customsborderprotect)

U.S. Customs and Border Protection
(https://public.govdelivery.com/accounts/USDHSCBP/subscriber/new)
(/)

# Southwest Border Inadmissibles by Field Office FY2018

**Southwest Border Unaccompanied Alien Children (0-17 yr old) Inadmissibles**

Comparisons below reflect Fiscal Year 2018 compared to Fiscal Year 2017.

| Unaccompanied Alien Children | | | |
|---|---|---|---|
| **Field Offices** | **FY 2017** | **FY 2018** | **% Change FY17 to FY18** |
| El Paso | 2,566 | 2,847 | 11% |
| Laredo | 2,294 | 2,163 | -6% |
| San Diego | 1,208 | 1,767 | 46% |
| Tucson | 1,465 | 1,847 | 26% |
| **Field Ops Southwest Border Total** | 7,533 | 8,624 | 14% |

**Southwest Border Family Unit Inadmissibles\***[1]

Numbers below reflect Fiscal Year 2018 compared to Fiscal Year 2017.

| Family Units | | | |
|---|---|---|---|
| **Field Offices** | **FY 2017** | **FY 2018** | **% Change FY17 to FY18** |
| El Paso | 8,361 | 14,089 | 69% |
| Laredo | 11,558 | 13,612 | 18% |
| San Diego | 7,049 | 15,772 | 124% |

ER-0650

https://www.cbp.gov/newsroom/stats/ofo-sw-border-inadmissibles   1/5

| Family Units | | | |
|---|---|---|---|
| **Field Offices** | **FY 2017** | **FY 2018** | **% Change FY17 to FY18** |
| Tucson | 6,956 | 10,428 | 50% |
| **Field Operations Southwest Border Total** | 33,924 | 53,901 | 59% |

**Unaccompanied Alien Children Inadmissibles by Fiscal Year**

Numbers below reflect totals for Fiscal Years 2017 and FY 2018

| Unaccompanied Alien Children by Country | | |
|---|---|---|
| **Country** | **FY 2017** | **FY 2018** |
| El Salvador | 1,721 | 833 |
| Guatemala | 2,829 | 3,691 |
| Honduras | 1,173 | 1,655 |
| Mexico | 1,556 | 2,210 |

**Family Unit Inadmissibles by Fiscal Year\*** [1]

Numbers below reflect the total for FY 2017 and FY 2018

| Family Unit by Country | | |
|---|---|---|
| **Country** | **FY 2017** | **FY 2018** |
| El Salvador | 4,577 | 3,738 |
| Guatemala | 6,789 | 12,185 |
| Honduras | 4,246 | 8,327 |
| Mexico | 10,628 | 21,411 |

**\*Note:** (Family Unit represents the number of individuals (either a child under 18 years old, parent or legal guardian) deemed inadmissible with a family member by the Office of Field Operations.)

[1] **Note:**Field Operations only started collecting Family Unit numbers as of March 2016

**Cuban Inadmissibles**

U.S. Customs and Border Protection maintains a robust posture regarding the enforcement of our immigration laws along the nation's borders and coastal areas. We continue to promote safe, legal and orderly migration from Cuba under our Migration Accords and deter dangerous and unlawful migration from Cuba.

ER-0651

*Effective January 12, 2017, the United States ended the special parole policy, also known as the "wet-foot/dry-foot" policy, for Cuban migrants that has been in place since the mid-1990s. Since then, Cuban nationals who attempt to illegally enter the United States are subject to removal, consistent with our enforcement priorities. These actions are part of the ongoing normalization of relations between the governments of the United States and Cuba, and reflect a commitment to have a broader immigration policy in which we treat people from different countries consistently.

Numbers below reflect totals for Fiscal Years 2012-2017, FY 2018

| Cuban Inadmissibles | | | | | | | |
|---|---|---|---|---|---|---|---|
| Field Office | FY2012 | FY2013 | FY2014 | FY2015 | FY2016 | FY2017 | FY2018 |
| El Paso | 154 | 219 | 415 | 685 | 5,018 | 340 | 394 |
| Laredo | 9,429 | 12,384 | 15,333 | 26,181 | 34,658 | 14,275 | 6,533 |
| San Diego | 727 | 959 | 1,229 | 1,555 | 1,589 | 600 | 131 |
| Tucson | 86 | 142 | 132 | 221 | 258 | 168 | 21 |
| Southwest Border Totals | 10,396 | 13,704 | 17,109 | 28,642 | 41,523 | 15,383 | 7,079 |

## Haitian Inadmissibles

The number of Haitian inadmissibles arriving at ports of entry has decreased dramatically, with a decline of 97 percent compared to last year, attributable to the end of Temporary Protected Status in November 2017.

Numbers below reflect totals for Fiscal Years 2012-2017, FY 2018

| Haitian Inadmissibles | | | | | | | |
|---|---|---|---|---|---|---|---|
| Field Office | FY2012 | FY2013 | FY2014 | FY2015 | FY2016 | FY2017 | FY2018 |
| El Paso | 0 | 0 | 1 | 0 | 2 | 18 | 0 |
| Laredo | 1 | 1 | 6 | 1 | 6 | 160 | 2 |
| San Diego | 821 | 921 | 477 | 333 | 6,377 | 8,057 | 294 |
| Tucson | 0 | 0 | 0 | 0 | 39 | 960 | 1 |
| Southwest Border Totals | 822 | 922 | 484 | 334 | 6,424 | 9,195 | 297 |

ER-0652

Southwest Border Inadmissibles Fiscal Year 2018 - By Month

| FY18 Totals by Field Office | October | November | December | January |
|---|---|---|---|---|
| February | March | April | May | June | July | August | September |

| | FMUA | UAC | Total Inadmissibles |
|---|---|---|---|
| Field Offices | FY 2018 JAN | FY 2018 JAN | FY 2018 JAN |
| El Paso | 1,125 | 264 | 1,963 |
| Laredo | 1,086 | 166 | 4,035 |
| San Diego | 1,101 | 122 | 2,600 |
| Tucson | 795 | 168 | 1,332 |
| Total | 4,107 | 720 | 9,930 |

## Cuban and Haitian inadmissibles*

| | Cubans | Haitians |
|---|---|---|
| Field Offices | FY 2018 JAN | FY 2018 JAN |
| El Paso | 2 | 0 |
| Laredo | 336 | 0 |
| San Diego | 7 | 24 |
| Tucson | 2 | 0 |
| Total | 347 | 24 |

*Note:Cuban and Haitian inadmissibles are a subset of the Total Southwest Border Inadmissibles data above

Back to **Southwest Border Migration (/newsroom/stats/sw-border-migration)**

**Last modified:** October 23, 2018

**Tags:** Statistics, Port Security, Unaccompanied Alien Children (UAC)

ER-0653

Case 3:17-cv-02366-BAS-KSC Document 563-47 Filed 09/25/20 PageID.52421 Page 6 of 6

 Share This Page.

ER-0654

1  JEFFREY BOSSERT CLARK
2  Acting Assistant Attorney General
   Civil Division
3  WILLIAM C. PEACHEY
4  Director, Office of Immigration Litigation –
   District Court Section
5  KATHERINE J. SHINNERS (DC 978141)
6  Senior Litigation Counsel
7  ALEXANDER J. HALASKA (IL 6327002)
   Trial Attorney
8  United States Department of Justice
9  Civil Division
   Office of Immigration Litigation
10 P.O. Box 868, Ben Franklin Station
11 Washington, D.C. 20044
   Tel: (202) 307-8704 | Fax: (202) 305-7000
12 alexander.j.halaska@usdoj.gov
13
14 *Counsel for Defendants*

15         **UNITED STATES DISTRICT COURT**
16    **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**
              **(San Diego)**
17

18 AL OTRO LADO, Inc., *et al.*,          Case No. 3:17-cv-02366-BAS-KSC

19              *Plaintiffs*,             **DEFENDANTS' EXHIBIT 47**

20
            v.
21

22 Chad F. WOLF, Acting Secretary of
23 Homeland Security, in his official
   capacity, *et al.*,
24

25              *Defendants*.

26

27

28

ER-0655



Official website of the Department of Homeland Security

(https://www.facebook.com/CBPgov/) (https://www.instagram.com/cbpgov/)

(https://www.flickr.com/photos/cbpphotos/) (https://twitter.com/cbp)

(https://www.linkedin.com/company/2997?trk=tyah) (https://www.youtube.com/user/customsborderprotect)

U.S. Customs and
Border Protection
(https://public.govdelivery.com/accounts/USDHSCBP/subscriber/new)
(/)

# Southwest Border Inadmissibles by Field Office FY2018

**Southwest Border Unaccompanied Alien Children (0-17 yr old) Inadmissibles**

Comparisons below reflect Fiscal Year 2018 compared to Fiscal Year 2017.

| Unaccompanied Alien Children | | | |
|---|---|---|---|
| Field Offices | FY 2017 | FY 2018 | % Change FY17 to FY18 |
| El Paso | 2,566 | 2,847 | 11% |
| Laredo | 2,294 | 2,163 | -6% |
| San Diego | 1,208 | 1,767 | 46% |
| Tucson | 1,465 | 1,847 | 26% |
| Field Ops Southwest Border Total | 7,533 | 8,624 | 14% |

**Southwest Border Family Unit Inadmissibles\*** [1]

Numbers below reflect Fiscal Year 2018 compared to Fiscal Year 2017.

| Family Units | | | |
|---|---|---|---|
| Field Offices | FY 2017 | FY 2018 | % Change FY17 to FY18 |
| El Paso | 8,361 | 14,089 | 69% |
| Laredo | 11,558 | 13,612 | 18% |
| San Diego | 7,049 | 15,772 | 124% |

| Family Units | | | |
|---|---|---|---|
| Field Offices | FY 2017 | FY 2018 | % Change FY17 to FY18 |
| Tucson | 6,956 | 10,428 | 50% |
| Field Operations Southwest Border Total | 33,924 | 53,901 | 59% |

**Unaccompanied Alien Children Inadmissibles by Fiscal Year**

Numbers below reflect totals for Fiscal Years 2017 and FY 2018

| Unaccompanied Alien Children by Country | | |
|---|---|---|
| Country | FY 2017 | FY 2018 |
| El Salvador | 1,721 | 833 |
| Guatemala | 2,829 | 3,691 |
| Honduras | 1,173 | 1,655 |
| Mexico | 1,556 | 2,210 |

**Family Unit Inadmissibles by Fiscal Year*[1]**

Numbers below reflect the total for FY 2017 and FY 2018

| Family Unit by Country | | |
|---|---|---|
| Country | FY 2017 | FY 2018 |
| El Salvador | 4,577 | 3,738 |
| Guatemala | 6,789 | 12,185 |
| Honduras | 4,246 | 8,327 |
| Mexico | 10,628 | 21,411 |

**\*Note:** (Family Unit represents the number of individuals (either a child under 18 years old, parent or legal guardian) deemed inadmissible with a family member by the Office of Field Operations.)

[1] **Note:** Field Operations only started collecting Family Unit numbers as of March 2016

**Cuban Inadmissibles**

U.S. Customs and Border Protection maintains a robust posture regarding the enforcement of our immigration laws along the nation's borders and coastal areas. We continue to promote safe, legal and orderly migration from Cuba under our Migration Accords and deter dangerous and unlawful migration from Cuba.

ER-0657

*Effective January 12, 2017, the United States ended the special parole policy, also known as the "wet-foot/dry-foot" policy, for Cuban migrants that has been in place since the mid-1990s. Since then, Cuban nationals who attempt to illegally enter the United States are subject to removal, consistent with our enforcement priorities. These actions are part of the ongoing normalization of relations between the governments of the United States and Cuba, and reflect a commitment to have a broader immigration policy in which we treat people from different countries consistently.

Numbers below reflect totals for Fiscal Years 2012-2017, FY 2018

| Cuban Inadmissibles | | | | | | | |
|---|---|---|---|---|---|---|---|
| Field Office | FY2012 | FY2013 | FY2014 | FY2015 | FY2016 | FY2017 | FY2018 |
| El Paso | 154 | 219 | 415 | 685 | 5,018 | 340 | 394 |
| Laredo | 9,429 | 12,384 | 15,333 | 26,181 | 34,658 | 14,275 | 6,533 |
| San Diego | 727 | 959 | 1,229 | 1,555 | 1,589 | 600 | 131 |
| Tucson | 86 | 142 | 132 | 221 | 258 | 168 | 21 |
| Southwest Border Totals | 10,396 | 13,704 | 17,109 | 28,642 | 41,523 | 15,383 | 7,079 |

## Haitian Inadmissibles

The number of Haitian inadmissibles arriving at ports of entry has decreased dramatically, with a decline of 97 percent compared to last year, attributable to the end of Temporary Protected Status in November 2017.

Numbers below reflect totals for Fiscal Years 2012-2017, FY 2018

| Haitian Inadmissibles | | | | | | | |
|---|---|---|---|---|---|---|---|
| Field Office | FY2012 | FY2013 | FY2014 | FY2015 | FY2016 | FY2017 | FY2018 |
| El Paso | 0 | 0 | 1 | 0 | 2 | 18 | 0 |
| Laredo | 1 | 1 | 6 | 1 | 6 | 160 | 2 |
| San Diego | 821 | 921 | 477 | 333 | 6,377 | 8,057 | 294 |
| Tucson | 0 | 0 | 0 | 0 | 39 | 960 | 1 |
| Southwest Border Totals | 822 | 922 | 484 | 334 | 6,424 | 9,195 | 297 |

ER-0658

Southwest Border Inadmissibles Fiscal Year 2018 - By Month

| FY18 Totals by Field Office | October | November | December | January |
|---|---|---|---|---|
| February | March | April | May | June | July | August | September |

| Field Offices | FMUA | UAC | Total Inadmissibles |
|---|---|---|---|
| | FY 2018 FEB | FY 2018 FEB | FY 2018 FEB |
| El Paso | 1,270 | 256 | 1,986 |
| Laredo | 1,062 | 167 | 3,785 |
| San Diego | 1,396 | 110 | 2,997 |
| Tucson | 776 | 115 | 1,317 |
| Total | 4,504 | 648 | 10,085 |

## Cuban and Haitian inadmissibles*

| Field Offices | Cubans | Haitians |
|---|---|---|
| | FY 2018 FEB | FY 2018 FEB |
| El Paso | 4 | 0 |
| Laredo | 405 | 0 |
| San Diego | 2 | 20 |
| Tucson | 1 | 0 |
| Total | 412 | 20 |

*Note:Cuban and Haitian inadmissibles are a subset of the Total Southwest Border Inadmissibles data above

Back to **Southwest Border Migration (/newsroom/stats/sw-border-migration)**

**Last modified:** October 23, 2018

**Tags:** Statistics, Port Security, Unaccompanied Alien Children (UAC)

ER-0659

 Share This Page.

ER-0660

1  JEFFREY BOSSERT CLARK
2  Acting Assistant Attorney General
   Civil Division
3  WILLIAM C. PEACHEY
4  Director, Office of Immigration Litigation –
   District Court Section
5  KATHERINE J. SHINNERS (DC 978141)
6  Senior Litigation Counsel
7  ALEXANDER J. HALASKA (IL 6327002)
   Trial Attorney
8  United States Department of Justice
9  Civil Division
   Office of Immigration Litigation
10 P.O. Box 868, Ben Franklin Station
11 Washington, D.C. 20044
   Tel: (202) 307-8704 | Fax: (202) 305-7000
12 alexander.j.halaska@usdoj.gov
13
14 *Counsel for Defendants*
15              **UNITED STATES DISTRICT COURT**
              **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**
16                       **(San Diego)**
17
18 AL OTRO LADO, Inc., *et al.*,          Case No. 3:17-cv-02366-BAS-KSC
19              *Plaintiffs*,             **DEFENDANTS' EXHIBIT 48**
20
21              v.
22 Chad F. WOLF, Acting Secretary of
23 Homeland Security, in his official
   capacity, *et al.*,
24
25              *Defendants*.
26
27
28



Official website of the Department of Homeland Security

(https://www.facebook.com/CBPgov/)    (https://www.instagram.com/cbpgov/)

(https://www.flickr.com/photos/cbpphotos/)    (https://twitter.com/cbp)

(https://www.linkedin.com/company/2997?trk=tyah)    (https://www.youtube.com/user/customsborderprotect)

U.S. Customs and
Border Protection
(https://public.govdelivery.com/accounts/USDHSCBP/subscriber/new)
(/)

# Southwest Border Inadmissibles by Field Office FY2018

**Southwest Border Unaccompanied Alien Children (0-17 yr old) Inadmissibles**

Comparisons below reflect Fiscal Year 2018 compared to Fiscal Year 2017.

| Unaccompanied Alien Children | | | |
|---|---|---|---|
| **Field Offices** | **FY 2017** | **FY 2018** | **% Change FY17 to FY18** |
| El Paso | 2,566 | 2,847 | 11% |
| Laredo | 2,294 | 2,163 | -6% |
| San Diego | 1,208 | 1,767 | 46% |
| Tucson | 1,465 | 1,847 | 26% |
| **Field Ops Southwest Border Total** | 7,533 | 8,624 | 14% |

**Southwest Border Family Unit Inadmissibles*** [1]

Numbers below reflect Fiscal Year 2018 compared to Fiscal Year 2017.

| Family Units | | | |
|---|---|---|---|
| **Field Offices** | **FY 2017** | **FY 2018** | **% Change FY17 to FY18** |
| El Paso | 8,361 | 14,089 | 69% |
| Laredo | 11,558 | 13,612 | 18% |
| San Diego | 7,049 | 15,772 | 124% |

ER-0662

| Family Units | | | |
|---|---|---|---|
| Field Offices | FY 2017 | FY 2018 | % Change FY17 to FY18 |
| Tucson | 6,956 | 10,428 | 50% |
| Field Operations Southwest Border Total | 33,924 | 53,901 | 59% |

**Unaccompanied Alien Children Inadmissibles by Fiscal Year**

Numbers below reflect totals for Fiscal Years 2017 and FY 2018

| Unaccompanied Alien Children by Country | | |
|---|---|---|
| Country | FY 2017 | FY 2018 |
| El Salvador | 1,721 | 833 |
| Guatemala | 2,829 | 3,691 |
| Honduras | 1,173 | 1,655 |
| Mexico | 1,556 | 2,210 |

**Family Unit Inadmissibles by Fiscal Year\*[1]**

Numbers below reflect the total for FY 2017 and FY 2018

| Family Unit by Country | | |
|---|---|---|
| Country | FY 2017 | FY 2018 |
| El Salvador | 4,577 | 3,738 |
| Guatemala | 6,789 | 12,185 |
| Honduras | 4,246 | 8,327 |
| Mexico | 10,628 | 21,411 |

**\*Note:** (Family Unit represents the number of individuals (either a child under 18 years old, parent or legal guardian) deemed inadmissible with a family member by the Office of Field Operations.)

[1] **Note:** Field Operations only started collecting Family Unit numbers as of March 2016

**Cuban Inadmissibles**

U.S. Customs and Border Protection maintains a robust posture regarding the enforcement of our immigration laws along the nation's borders and coastal areas. We continue to promote safe, legal and orderly migration from Cuba under our Migration Accords and deter dangerous and unlawful migration from Cuba.

ER-0663

*Effective January 12, 2017, the United States ended the special parole policy, also known as the "wet-foot/dry-foot" policy, for Cuban migrants that has been in place since the mid-1990s. Since then, Cuban nationals who attempt to illegally enter the United States are subject to removal, consistent with our enforcement priorities. These actions are part of the ongoing normalization of relations between the governments of the United States and Cuba, and reflect a commitment to have a broader immigration policy in which we treat people from different countries consistently.

Numbers below reflect totals for Fiscal Years 2012-2017, FY 2018

| Cuban Inadmissibles | | | | | | | |
|---|---|---|---|---|---|---|---|
| Field Office | FY2012 | FY2013 | FY2014 | FY2015 | FY2016 | FY2017 | FY2018 |
| El Paso | 154 | 219 | 415 | 685 | 5,018 | 340 | 394 |
| Laredo | 9,429 | 12,384 | 15,333 | 26,181 | 34,658 | 14,275 | 6,533 |
| San Diego | 727 | 959 | 1,229 | 1,555 | 1,589 | 600 | 131 |
| Tucson | 86 | 142 | 132 | 221 | 258 | 168 | 21 |
| Southwest Border Totals | 10,396 | 13,704 | 17,109 | 28,642 | 41,523 | 15,383 | 7,079 |

**Haitian Inadmissibles**

The number of Haitian inadmissibles arriving at ports of entry has decreased dramatically, with a decline of 97 percent compared to last year, attributable to the end of Temporary Protected Status in November 2017.

Numbers below reflect totals for Fiscal Years 2012-2017, FY 2018

| Haitian Inadmissibles | | | | | | | |
|---|---|---|---|---|---|---|---|
| Field Office | FY2012 | FY2013 | FY2014 | FY2015 | FY2016 | FY2017 | FY2018 |
| El Paso | 0 | 0 | 1 | 0 | 2 | 18 | 0 |
| Laredo | 1 | 1 | 6 | 1 | 6 | 160 | 2 |
| San Diego | 821 | 921 | 477 | 333 | 6,377 | 8,057 | 294 |
| Tucson | 0 | 0 | 0 | 0 | 39 | 960 | 1 |
| Southwest Border Totals | 822 | 922 | 484 | 334 | 6,424 | 9,195 | 297 |

ER-0664

Southwest Border Inadmissibles Fiscal Year 2018 - By Month

| FY18 Totals by Field Office | October | November | December | January |
|---|---|---|---|---|
| February | March | April | May | June | July | August | September |

| | FMUA | UAC | Total Inadmissibles |
|---|---|---|---|
| Field Offices | FY 2018 MAR | FY 2018 MAR | FY 2018 MAR |
| El Paso | 1,709 | 397 | 2,691 |
| Laredo | 1,475 | 335 | 4,860 |
| San Diego | 1,674 | 208 | 3,770 |
| Tucson | 1,009 | 164 | 1,636 |
| Total | 5,867 | 1,104 | 12,957 |

## Cuban and Haitian inadmissibles*

| | Cubans | Haitians |
|---|---|---|
| Field Offices | FY 2018 MAR | FY 2018 MAR |
| El Paso | 8 | 0 |
| Laredo | 653 | 0 |
| San Diego | 14 | 20 |
| Tucson | 0 | 0 |
| Total | 675 | 20 |

*Note:Cuban and Haitian inadmissibles are a subset of the Total Southwest Border Inadmissibles data above

Back to **Southwest Border Migration (/newsroom/stats/sw-border-migration)**

**Last modified:** October 23, 2018

**Tags:**   Statistics,   Port Security,   Unaccompanied Alien Children (UAC)

ER-0665

 Share This Page.

ER-0666

1  JEFFREY BOSSERT CLARK
2  Acting Assistant Attorney General
   Civil Division
3  WILLIAM C. PEACHEY
4  Director, Office of Immigration Litigation –
   District Court Section
5  KATHERINE J. SHINNERS (DC 978141)
6  Senior Litigation Counsel
7  ALEXANDER J. HALASKA (IL 6327002)
   Trial Attorney
8  United States Department of Justice
9  Civil Division
   Office of Immigration Litigation
10 P.O. Box 868, Ben Franklin Station
11 Washington, D.C. 20044
   Tel: (202) 307-8704 | Fax: (202) 305-7000
12 alexander.j.halaska@usdoj.gov
13
14 *Counsel for Defendants*

15              **UNITED STATES DISTRICT COURT**
16        **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**
                        **(San Diego)**
17

18 AL OTRO LADO, Inc., *et al.*,          Case No. 3:17-cv-02366-BAS-KSC

19                     *Plaintiffs*,       **DEFENDANTS' EXHIBIT 49**

20
          v.
21

22 Chad F. WOLF, Acting Secretary of
23 Homeland Security, in his official
   capacity, *et al.*,
24

25                     *Defendants.*

26

27

28

ER-0667

9/26/2018    Case 3:17-cv-02366-BAS-KSC   Document 563-11   Filed 09/25/20   PageID.62556   Page 2 of 6

Official website of the Department of Homeland Security



(https://www.facebook.com/CBPgov/)   (https://www.instagram.com/cbpgov/)

(https://www.flickr.com/photos/cbpphotos/)   (https://twitter.com/cbp)

(https://www.linkedin.com/company/2997?trk=tyah)   (https://www.youtube.com/user/customsborderprotect)

U.S. Customs and Border Protection

(https://public.govdelivery.com/accounts/USDHSCBP/subscriber/new)

(/)

# Southwest Border Inadmissibles by Field Office FY2018

**Southwest Border Unaccompanied Alien Children (0-17 yr old) Inadmissibles**

Comparisons below reflect Fiscal Year 2018 compared to Fiscal Year 2017.

| Unaccompanied Alien Children | | | |
|---|---|---|---|
| **Field Offices** | **FY 2017** | **FY 2018** | **% Change FY17 to FY18** |
| El Paso | 2,566 | 2,847 | 11% |
| Laredo | 2,294 | 2,163 | -6% |
| San Diego | 1,208 | 1,767 | 46% |
| Tucson | 1,465 | 1,847 | 26% |
| **Field Ops Southwest Border Total** | 7,533 | 8,624 | 14% |

**Southwest Border Family Unit Inadmissibles\*** [1]

Numbers below reflect Fiscal Year 2018 compared to Fiscal Year 2017.

| Family Units | | | |
|---|---|---|---|
| **Field Offices** | **FY 2017** | **FY 2018** | **% Change FY17 to FY18** |
| El Paso | 8,361 | 14,089 | 69% |
| Laredo | 11,558 | 13,612 | 18% |
| San Diego | 7,049 | 15,772 | 124% |

ER-0668

| Family Units | | | |
|---|---|---|---|
| Field Offices | FY 2017 | FY 2018 | % Change FY17 to FY18 |
| Tucson | 6,956 | 10,428 | 50% |
| Field Operations Southwest Border Total | 33,924 | 53,901 | 59% |

**Unaccompanied Alien Children Inadmissibles by Fiscal Year**

Numbers below reflect totals for Fiscal Years 2017 and FY 2018

| Unaccompanied Alien Children by Country | | |
|---|---|---|
| Country | FY 2017 | FY 2018 |
| El Salvador | 1,721 | 833 |
| Guatemala | 2,829 | 3,691 |
| Honduras | 1,173 | 1,655 |
| Mexico | 1,556 | 2,210 |

**Family Unit Inadmissibles by Fiscal Year***[1]

Numbers below reflect the total for FY 2017 and FY 2018

| Family Unit by Country | | |
|---|---|---|
| Country | FY 2017 | FY 2018 |
| El Salvador | 4,577 | 3,738 |
| Guatemala | 6,789 | 12,185 |
| Honduras | 4,246 | 8,327 |
| Mexico | 10,628 | 21,411 |

**\*Note:** (Family Unit represents the number of individuals (either a child under 18 years old, parent or legal guardian) deemed inadmissible with a family member by the Office of Field Operations.)

[1] **Note:** Field Operations only started collecting Family Unit numbers as of March 2016

**Cuban Inadmissibles**

U.S. Customs and Border Protection maintains a robust posture regarding the enforcement of our immigration laws along the nation's borders and coastal areas. We continue to promote safe, legal and orderly migration from Cuba under our Migration Accords and deter dangerous and unlawful migration from Cuba.

ER-0669

*Effective January 12, 2017, the United States ended the special parole policy, also known as the "wet-foot/dry-foot" policy, for Cuban migrants that has been in place since the mid-1990s. Since then, Cuban nationals who attempt to illegally enter the United States are subject to removal, consistent with our enforcement priorities. These actions are part of the ongoing normalization of relations between the governments of the United States and Cuba, and reflect a commitment to have a broader immigration policy in which we treat people from different countries consistently.

Numbers below reflect totals for Fiscal Years 2012-2017, FY 2018

| Cuban Inadmissibles | | | | | | | |
|---|---|---|---|---|---|---|---|
| Field Office | FY2012 | FY2013 | FY2014 | FY2015 | FY2016 | FY2017 | FY2018 |
| El Paso | 154 | 219 | 415 | 685 | 5,018 | 340 | 394 |
| Laredo | 9,429 | 12,384 | 15,333 | 26,181 | 34,658 | 14,275 | 6,533 |
| San Diego | 727 | 959 | 1,229 | 1,555 | 1,589 | 600 | 131 |
| Tucson | 86 | 142 | 132 | 221 | 258 | 168 | 21 |
| Southwest Border Totals | 10,396 | 13,704 | 17,109 | 28,642 | 41,523 | 15,383 | 7,079 |

## Haitian Inadmissibles

The number of Haitian inadmissibles arriving at ports of entry has decreased dramatically, with a decline of 97 percent compared to last year, attributable to the end of Temporary Protected Status in November 2017.

Numbers below reflect totals for Fiscal Years 2012-2017, FY 2018

| Haitian Inadmissibles | | | | | | | |
|---|---|---|---|---|---|---|---|
| Field Office | FY2012 | FY2013 | FY2014 | FY2015 | FY2016 | FY2017 | FY2018 |
| El Paso | 0 | 0 | 1 | 0 | 2 | 18 | 0 |
| Laredo | 1 | 1 | 6 | 1 | 6 | 160 | 2 |
| San Diego | 821 | 921 | 477 | 333 | 6,377 | 8,057 | 294 |
| Tucson | 0 | 0 | 0 | 0 | 39 | 960 | 1 |
| Southwest Border Totals | 822 | 922 | 484 | 334 | 6,424 | 9,195 | 297 |

ER-0670

Southwest Border Inadmissibles Fiscal Year 2018 - By Month

| FY18 Totals by Field Office | October | November | December | January |
|---|---|---|---|---|
| February | March | April | May | June | July | August | September |

|  | FMUA | UAC | Total Inadmissibles |
|---|---|---|---|
| Field Offices | FY 2018 APR | FY 2018 APR | FY 2018 APR |
| El Paso | 1,927 | 388 | 2,888 |
| Laredo | 1,505 | 312 | 4,681 |
| San Diego | 1,801 | 152 | 3,666 |
| Tucson | 1,069 | 195 | 1,690 |
| **Total** | **6,302** | **1,047** | **12,925** |

## Cuban and Haitian inadmissibles*

|  | Cubans | Haitians |
|---|---|---|
| Field Offices | FY 2018 APR | FY 2018 APR |
| El Paso | 9 | 0 |
| Laredo | 616 | 0 |
| San Diego | 13 | 19 |
| Tucson | 2 | 0 |
| **Total** | **640** | **19** |

*Note:Cuban and Haitian inadmissibles are a subset of the Total Southwest Border Inadmissibles data above

Back to **Southwest Border Migration (/newsroom/stats/sw-border-migration)**

**Last modified:** October 23, 2018

**Tags:** Statistics, Port Security, Unaccompanied Alien Children (UAC)

ER-0671

 Share This Page.

ER-0672

1   JEFFREY BOSSERT CLARK
2   Acting Assistant Attorney General
    Civil Division
3   WILLIAM C. PEACHEY
4   Director, Office of Immigration Litigation –
    District Court Section
5   KATHERINE J. SHINNERS (DC 978141)
6   Senior Litigation Counsel
    ALEXANDER J. HALASKA (IL 6327002)
7   Trial Attorney
8   United States Department of Justice
    Civil Division
9   Office of Immigration Litigation
10  P.O. Box 868, Ben Franklin Station
    Washington, D.C. 20044
11  Tel: (202) 307-8704 | Fax: (202) 305-7000
12  alexander.j.halaska@usdoj.gov
13
    *Counsel for Defendants*
14
15              **UNITED STATES DISTRICT COURT**
        **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**
16                      **(San Diego)**
17
18  AL OTRO LADO, Inc., *et al.*,          Case No. 3:17-cv-02366-BAS-KSC
19                  *Plaintiffs*,          **DEFENDANTS' EXHIBIT 50**
20
21          v.                             [Redacted Public Version]
22  Chad F. WOLF, Acting Secretary of
    Homeland Security, in his official
23  capacity, *et al.*,
24
25                  *Defendants.*
26
27
28

ER-0673

**From:** PROVENCIO, RAY
**Sent:** Wednesday, April 4, 2018 11:34 AM
**To:** MANCHA, HECTOR
**Subject:** Cadence Calls - Supplemental Information

DFO,

A few bullets to supplement the TPs:

**Case processing team:**
- As a result of the increased CF claims, FAMUs and UACs, the Port has created 2 processing teams to place focus on processing without the added distraction of feeding, detention checks, cleaning, etc. As the increase in detainees occurs, humanitarian functions increase, which takes away from case processing. Additionally, with increasing the numbers of CBPOs focused on case processing, this also causes impacts to frontline functions and increased expenditures.

**Bus Pass:**
- The EPFO successfully negotiated a unique process with ERO. Only found in the Ursala combined processing center prior to the establishment of Operation bus pass... EPFO Ports now have DOs collocated at Ports of Entry, working alongside CBP Officers, to further movement of detainees. Without operation bus pass, Ports are reliant on NGOs and FRCs

**CDC:**
- Ports are engaging CDC, as appropriate, when encountering detainees with possible disease. The CDC has increased port engagement, to include an upcoming meet and greet for their new leadership

**Honduran Fraud:**
- 

**BP Facility:**
When detainee movement results in decreased detention space, EPFO personnel suspend housing at BP, Station 1, which allows for the reallocation of personnel to enforcement actions and/or the backfill of personnel conducting case processing/detainee management. The suspension of overflow space is a balancing act, with increased use when detainees are approaching capacity (i.e. anticipated to occur mostly on weekends).

*Ray Provencio*
Assistant Director of Field Operations
Office of Field Operations – El Paso Field Office
U.S. Customs and Border Protection
Office:

Highly Confidential/Attorneys' Eyes Only  AOL-DEF-00801853

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General
Civil Division
WILLIAM C. PEACHEY
Director, Office of Immigration Litigation –
District Court Section
KATHERINE J. SHINNERS (DC 978141)
Senior Litigation Counsel
ALEXANDER J. HALASKA (IL 6327002)
Trial Attorney
United States Department of Justice
Civil Division
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 307-8704 | Fax: (202) 305-7000
alexander.j.halaska@usdoj.gov

*Counsel for Defendants*

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF CALIFORNIA**
**(San Diego)**

| | |
|---|---|
| AL OTRO LADO, Inc., *et al.*, | Case No. 3:17-cv-02366-BAS-KSC |
| *Plaintiffs*, | **DEFENDANTS' EXHIBIT 51** |
| v. | [Redacted Public Version] |
| Chad F. WOLF, Acting Secretary of Homeland Security, in his official capacity, *et al.*, | |
| *Defendants*. | |

**From:** HARRIS, RODNEY H
**Sent:** Tuesday, April 3, 2018 1:14 PM
**To:** LONGORIA, FRANK S
**Subject:** RE: Leadership Cadence Call

### Update on the operational environment – five minutes

We've been monitoring the numbers and they have increased for the fourth week in a row. The greatest increase has been single adult credible fear cases. (What country has the highest number?)

218 to 378 = 73% increase (week to week)

ER/CFs in order are: Cuba, Honduras, Guatemala, El Salvador, Mexico

Hondurans are by far the greatest number of family units (41%).

There has been a significant shift of arriving aliens claiming credible fear to the smaller ports of entry, specifically Eagle Pass and Roma, which affect their processing and holding capacity. However, the situation is currently manageable and the neighboring ports of entry support as necessary.

Custody Count - (3/1/2018 - 3/31/2018)

Disposition Name : EXPEDITED REMOVAL-CREDIBLE FEAR (ERCF)

| Country of Citizenship \ Location | BROWNSVILLE, TX | DEL RIO, TX | EAGLE PASS, TX | HIDALGO,TX | LAREDO, TX | PROGRESO, TX | RIO GRANDE CITY, TX | ROMA, TX | Total |
|---|---|---|---|---|---|---|---|---|---|
| ANGOLA | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 2 |
| BANGLADESH | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| BRAZIL | 28 | 0 | 4 | 2 | 0 | 0 | 0 | 2 | 34 |
| CAMEROON | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| CONGO | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 2 |
| CONGO - DEMOCRATIC REPUBLIC | 7 | 0 | 0 | 0 | 12 | 0 | 0 | 0 | 19 |
| COTE DIVOIRE | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| CUBA | 14 | 0 | 0 | 299 | 280 | 0 | 0 | 0 | 593 |
| ECUADOR | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 2 |
| EL SALVADOR | 4 | 1 | 6 | 48 | 15 | 0 | 10 | 31 | 115 |
| ERITREA | 1 | 0 | 0 | 14 | 0 | 0 | 0 | 0 | 15 |
| ETHIOPIA | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 2 |
| GEORGIA (OLD CODE) | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 2 |
| GUATEMALA | 12 | 0 | 8 | 48 | 8 | 0 | 7 | 40 | 125 |
| GUINEA | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| HONDURAS | 18 | 7 | 66 | 90 | 53 | 6 | 17 | 73 | 324 |
| IRAQ | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| MEXICO | 6 | 2 | 16 | 32 | 41 | 2 | 0 | 0 | 109 |
| NICARAGUA | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| PARAGUAY | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| PERU | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7 | 7 |
| ROMANIA | 4 | 0 | 0 | 2 | 0 | 0 | 0 | 3 | 9 |
| RUSSIA | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 2 |
| SENEGAL | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| SYRIA | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 2 |
| TURKEY | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| UZBEKISTAN | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| VENEZUELA | 3 | 0 | 0 | 2 | 3 | 0 | 0 | 1 | 9 |
| Total: | 103 | 10 | 91 | 544 | 421 | 7 | 34 | 167 | 1,377 |

ER-0676

Confidential

1  JEFFREY BOSSERT CLARK
2  Acting Assistant Attorney General
   Civil Division
3  WILLIAM C. PEACHEY
4  Director, Office of Immigration Litigation –
   District Court Section
5  KATHERINE J. SHINNERS (DC 978141)
6  Senior Litigation Counsel
7  ALEXANDER J. HALASKA (IL 6327002)
   Trial Attorney
8  United States Department of Justice
9  Civil Division
   Office of Immigration Litigation
10 P.O. Box 868, Ben Franklin Station
11 Washington, D.C. 20044
   Tel: (202) 307-8704 | Fax: (202) 305-7000
12 alexander.j.halaska@usdoj.gov
13
14 *Counsel for Defendants*

15             **UNITED STATES DISTRICT COURT**
16     **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**
                    **(San Diego)**
17

18 AL OTRO LADO, Inc., *et al.*,          Case No. 3:17-cv-02366-BAS-KSC

19              *Plaintiffs*,             **DEFENDANTS' EXHIBIT 52**

20                                        [Redacted Public Version]
          v.
21

22 Chad F. WOLF, Acting Secretary of
   Homeland Security, in his official
23 capacity, *et al.*,
24
25              *Defendants*.
26
27
28

| From: | CHAVEZ, VERONICA J |
|---|---|
| Sent: | Wednesday, April 18, 2018 6:30 PM |
| To: | HOOD, ROBERT W |
| Cc: | AKI, SIDNEY K; MARIN, MARIZA |
| Subject: | FW: Emergency AEU support |
| Attachments: | FLEX Unit.xlsx |

Sir,

The 8 passenger officers have been assigned to AEU to assist with case processing through Monday, April 23rd. NTEU has been advised and is on board.

Thank you,

Veronica

**From:** CHAVEZ, VERONICA J
**Sent:** Wednesday, April 18, 2018 3:28 PM
**To:** guillermo.barragan@nteu105.org; 'Ken's NTEU' <kenneth.keller@nteu105.org>; jorge.llanos@nteu105.org
**Subject:** Emergency AEU support

Good Afternoon,

We are in need of your assistance. The Port experienced a surge in asylum seekers yesterday (187 applicants), which brought us to max capacity ▉ detainees). We just received notification that another 120 asylum seekers are at El Chaparral awaiting to make entry.

We need to provide support to AEU for case processing.

Attached is a list of Passenger Flex capable officers. Out of the entire list only 2 are qualified to process cases:

1. Beatriz Honorato (FLEX mids)
2. Melissa Cange (FLEX mids)

Due to the emergent need, we will not have enough time to announce and solicit for volunteers. We will need to temporarily pull the following 6 passenger officers to AEU for case processing:

1. Yolanda Pedraza (temp pull mids)
2. Abel Aldape (temp pull days)
3. Ryan Maddela (temp pull nights)
4. Jazmin Garibay (temp pull nights)
5. Francisco Orellna (temp pull nights)
6. Thell Langley (temp pull nights)

The eight officers (2 flex and 6 temporary pull) have been contacted and have agreed to the temporary detail. They will be placed in AEU through Monday, April 23rd on their same shift and RDOs.

Please advise if you require any additional information. Your assistance and understanding is greatly appreciated.

1

ER-0678

Confidential

AOL-DEF-00729220

*Veronica J. Chavez*
*Watch Commander*
*Employee Services Department*
*San Ysidro Port of Entry*

2

ER-0679

Confidential

AOL-DEF-00729221

1   MAYER BROWN LLP
2     Matthew H. Marmolejo (CA Bar No. 242964)
      *mmarmolejo@mayerbrown.com*
3   350 S. Grand Avenue
    25th Floor
4   Los Angeles, CA 90071-1503
      Ori Lev (DC Bar No. 452565)
5     (*pro hac vice*)
      *olev@mayerbrown.com*
6     Stephen M. Medlock (VA Bar No. 78819)
      (*pro hac vice*)
7     *smedlock@mayerbrown.com*
8   1999 K Street, N.W.
    Washington, D.C. 20006
    Telephone:  +1.202.263.3000
9   Facsimile:  +1.202.263.3300

10  SOUTHERN POVERTY LAW CENTER
      Melissa Crow (DC Bar No. 453487)
11    (*pro hac vice*)
      *melissa.crow@splcenter.org*
12  1101 17th Street, N.W., Suite 705
    Washington, D.C. 20036
13  Telephone: +1.202.355.4471
    Facsimile: +1.404.221.5857

14  *Additional counsel listed on next page*
    *Attorneys for Plaintiffs*
15
                **UNITED STATES DISTRICT COURT**
16
              **SOUTHERN DISTRICT OF CALIFORNIA**
17

18  | Al Otro Lado, Inc., *et al.*, | Case No.:  17-cv-02366-BAS-KSC |
19  |                               | **EXHIBIT 10 IN SUPPORT OF** |
    |              Plaintiffs,      | **PLAINTIFFS' MEMORANDUM OF** |
20  |                               | **POINTS AND AUTHORITIES IN** |
    |        v.                     | **SUPPORT OF THEIR MOTION** |
21  | Chad F. Wolf,[1] *et al.*,    | **FOR SUMMARY JUDGMENT** |
22  |              Defendants.      |                               |
23  |                               | **REDACTED VERSION**          |
24

25

26

27  ────────────────────
    [1] Acting Secretary Wolf is automatically substituted for former Acting Secretary
28  McAleenan pursuant to Fed. R. Civ. P. 25(d).

ER-0680

1

CENTER FOR CONSTITUTIONAL RIGHTS
  Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
  *bazmy@ccrjustice.org*
  Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
  *gschwarz@ccrjustice.org*
  Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
  *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
  Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
  *sarah.rich@splcenter.org*
  Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
  *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
  Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
  *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EXHIBIT 10 IN SUPPORT OF PLAINTIFFS' MEMORANDUM
OF POINTS AND AUTHORITIES IN SUPPORT
OF THEIR MOTION FOR SUMMARY JUDGMENT

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

---------------------------------x

AL OTRO LADO, INC., et al.,        :

        Plaintiffs,        : Case No.:

      vs.        : 17-cv-02366-BAS-KSC

KEVIN K. MCALEENAN, et al.,        :

        Defendants.        :

---------------------------------x

DEPOSITION MARKED CONFIDENTIAL

DEPOSITION OF TODD OWEN

Washington, D.C.

Friday, December 13, 2019

9:40 a.m.

Job No.:  529549

Pages:  1 - 332

Reported by:  Elizabeth Mingione, RPR



Page 2

1

2          Deposition of TODD OWEN, held at the offices

3    of Mayer Brown, LLP, 1999 K Sreet, Northwest,

4    Washington, D.C., commencing at 9:40 a.m., Friday,

5    December 13, 2019, and taken down stenographically by

6    Elizabeth Mingione, Registered Professional Reporter

7    and Notary Public for the Commonwealth of Virginia.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22



Page 3

```
 1    A P P E A R A N C E S   O F   C O U N S E L:

 2    ON BEHALF OF PLAINTIFFS:

 3            MAYER BROWN, LLP

 4            Stephen M. Medlock, Esquire

 5            Ori Lev, Esquire

 6            1999 K Street, Northwest

 7            Washington, DC 20006

 8            (202) 263-3000

 9            Smedlock@mayerbrown.com

10

11    ON BEHALF OF DEFENDANTS:

12            U.S. DEPARTMENT OF JUSTICE

13            Katherine J. Shinners, Esquire

14            David White, Esquire

15            Ben Franklin Station

16            PO Box 868

17            Washington, DC 20044

18            (202) 598-8259

19            Katherine.J.Shinner@usdoj.gov

20

21    (Appearances, Continued)

22
```



ER-0684

Page 4

1                     A L S O   P R E S E N T

2                   Louisa Slocum,  Esquire

3                       Rameez Burney

4        Karolina Walters, American Immigration Council

5                       Kristine King

6           Matthew Fenn (via phone, as indicated)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22



```
                                                          Page 5
 1                    C O N T E N T S
 2                 WITNESS:  TODD OWEN
 3   EXAMINATION BY:                            PAGE
 4   Mr. Medlock ...................................   9
 5   Ms. Shinners .................................. 312
 6   Mr. Lev ....................................... 322
 7
 8                      *    *    *
 9
10                 DEPOSITION EXHIBITS
11                      TODD OWEN
12   NUMBER          DESCRIPTION                  PAGE
13   Exhibit 20   Notice of Deposition ............  19
14   Exhibit 21   Website Printout of Todd Owen
15        Description ............................  49
16   Exhibit 22   U.S. Customs and Border Protection
17        Standard of Conduct, AOL-DEF-00669013 ....  51
18   Exhibit 23   Metering Guidance Memorandum, Date
19        Stamped April 27, 2018 ..................  63
20   Exhibit 24   E-mail from Randy Howe, June 19,
21        2018, AOL-DEF-00088501 ..................  81
22   (Exhibits Continued)
```



```
                                                     Page 6
  1   NUMBER              DESCRIPTION                  PAGE

  2   Exhibit 25   E-mail from Robert Hood, August

  3        2, 2017, AOL-DEF-00328857 ...............  100

  4   Exhibit 26   E-mail from Todd Owen, May 25,

  5        2016 AOL-DEF-00761338 ...................  104

  6   Exhibit 27   E-mail Chain, Sept. 13, 2016,

  7        AOL-DEF-00762746 ........................  123

  8   Exhibit 28   E-mail Chain from Todd Hoffman,

  9        Sept. 16, 2016, AOL-DEF-00762523 ........  132

 10   Exhibit 29   E-mail from Katherine Stark, Sept. 7,

 11        2016 AOL-DEF-00761290 ...................  135

 12   Exhibit 30   E-mail Chain from Todd Owen, August

 13        17, 2016, AOL-DEF-00761340 ..............  142

 14   Exhibit 31   E-mail chain, Novemer 11, 2016,

 15        AOL-DEF-00272936 ........................  146

 16   Exhibit 32   ***   Exhibit is removed ***

 17   Exhibit 33   E-mail from Hector Mancha,

 18        AOL-DEF-00081089 ........................  162

 19   Exhibit 34   E-mail from Beverly Good, Nov. 22,

 20        2016, AOL-DEF-00032389 ..................  167

 21   Exhibit 35   E-mail from Alberto Flores, November

 22        14, 2016, AOL-DEF-00576607 ..............  174
```

ER-0687



Page 7

1   NUMBER            DESCRIPTION                  PAGE

2   Exhibit 36    ***  Exhibit is Removed ***

3   Exhibit 37    ***  Exhibit is Removed ***

4   Exhibit 38  E-mail from Valerie Boyd, June 5,

5        2018, AOL-DEF-00273293 .................. 196

6   Exhibit 39  Homeland Security Memo of June 5,

7        2018, AOL-DEF-00273294 .................. 199

8   Exhibit 40  Memo from Kevin McAleenan, August 1,

9        2018, AOL-DEF-00039620 .................. 213

10  Exhibit 41  Evaluation of Prioritization Queue

11       Management Pilot, AOL-DEF-00039621 ...... 213

12  Exhibit 42 Mark Morgan Memo, CBPALTR0000303 .. 213

13  Exhibit 43  Complaint fof Declaratory and

14       Injunctive Relief ....................... 220

15  Exhibit 44  E-mail Chain Aug. 14, 2017,

16       AOL-DEF-00723886 ........................ 223

17  Exhibit 45  Confidential Al Otro Lado Lawsuit

18       Document, AOL-DEF-00723887 .............. 225

19  Exhibit 46  E-mail from William Haralson,

20       March 15, 2017, NTEU 000132 ............. 229

21  Exhibit 47   Search Results Report and E-mail

22       from Eddie Arias, July 3, 2018 .......... 243



Page 8

1    NUMBER           DESCRIPTION                      PAGE

2    Exhibit 48   Five-Page Document, Annotations ..  248

3    Exhibit 49   E-mail from David Atkinson,

4        March 19, 2019, NTEU-000110 ..............  255

5    Exhibit 50   Photograph of Mother and Child ...  291

6    Exhibit 51   Photograph of Bodies in Water ....  292

7    Exhibit 52   E-mail Chain, March 19, 2019,

8        AOL-DEF-00269970 .........................  293

9    Exhibit 53   E-mail Chain, March 19, 2019,

10        AOL-DEF-00270451 ........................  296

11

12

13

14            (Exhibits Attached to Transcript,

15             Except for Nos. 32, 36, 37 TBD)

16

17

18

19

20

21

22



Page 9

```
 1                   P R O C E E D I N G S
 2      Whereupon,
 3                        TODD OWEN,
 4                having been first duly sworn was
 5                examined and testified as follows:
 6                         -  -  -
 7                   EXAMINATION CONDUCTED
 8         BY MR. MEDLOCK:
 9         Q.    Good morning, sir.
10         A.    Good morning.
11         Q.    Can you please state and spell your name
12      for the record.
13         A.    My name is Todd Owen, T-O-D-D, O-W-E-N.
14         Q.    Have you ever gone by any other names, sir?
15         A.    No.
16         Q.    Are you presently employed?
17         A.    Yes.
18         Q.    Where are you employed?
19         A.    With U.S. Customs and Border Protection,
20      Washington, D.C.
21         Q.    What is your -- if I refer to U.S. Customs
22      and Border Protection as CBP, you'll understand that?
```



Page 63

```
 1                (A document was marked as Deposition

 2     Exhibit Number 23.)

 3                    -   -   -

 4        BY MR. MEDLOCK:

 5        Q.    All right, sir.  I've marked as Exhibit 23

 6     a one-page document.  Again this is probably one you

 7     are familiar with.  That was previously marked in

 8     another deposition in this matter as Exhibit 3.

 9                Can you please take a moment to review

10     Exhibit 23, and let know when you are done doing so.

11                MS. SHINNERS:  Exhibit 3?

12                MR. MEDLOCK:  Well, I marked it as 23 as

13     well.

14                MS. SHINNERS:  Okay.

15                THE WITNESS:  Okay.

16        BY MR. MEDLOCK:

17        Q.    ███████████████████████████████████

18     ████████████████████████████████████████████████

19     ████████████████████████████

20        A.    ████████

21        Q.    ████████████████████████████████████████

22     ██████████
```

ER-0691



Page 64

1      A.     Yes.

2      Q.     You wrote the memorandum shown in Exhibit

3    23 as part of your job at CBP, correct?

4      A.     Well, my executive director for

5    Admissibility Programs would have written the initial

6    draft.  I would have commented on the draft, and then

7    I would have signed the official guidance that went

8    out, so --

9      Q.     Who's the individual that would have

10   drafted this?

11     A.     Todd Hoffman.

12     Q.     And would Mr. Hoffman have received any

13   input from any of his reports, do you know?

14     A.     I don't know.

15     Q.     Do you know if Ryan Koseor had any input

16   into this guidance?

17     A.     Ryan Koseor does not work for Mr. Hoffman,

18   so I would doubt it.

19     Q.     Do you know if anybody else at CBP had any

20   input into this metering guidance?

21     A.     Mr. Hoffman's director deals with all

22   immigration matters.  So subject matters on his staff



Page 65

1    may very well help contribute to this.

2         Q.    But you don't know one way or the other as

3    you sit here today?

4         A.    I don't know within his staff who helped

5    draft this memo.  No.

6         Q.    So this memorandum was prepared for your

7    signature; is that right?

8         A.    Yes, it was.

9         Q.    And you had the opportunity to give

10   feedback on a draft of this memorandum?

11        A.    I believe so.  Yes.

12        Q.    Do you recall when in relation to April 27,

13   2018, you would have received the draft?

14        A.    No.

15        Q.    Do you recall whether you actually had any

16   edits to this memorandum?

17        A.    I don't recall.

18        Q.    You may have, you may not have.  You just

19   don't recall?

20        A.    I sign a lot of memos.  I don't recall on

21   this specific one I had comments on the draft or not.

22        Q.    Do you recall how long you spent reviewing

ER-0693



Page 66

1    this memo?

2         A.    No, I do not.

3         Q.    How long would you typically spend

4    reviewing a one-page memo?

5         A.    I mean, not very long.  I mean, I would

6    look to make sure that the guidance I felt was clear

7    from this.

8         Q.    Okay.

9         A.    So not very long.

10        Q.    When you say not very long, can you give me

11   an estimate?

12        A.    You know maybe five or ten minutes.

13        Q.    So --

14        A.    Some documents I will review and let them

15   sit and then come back to them and review them again

16   with fresh eyes at a later time.  I mean, I don't

17   recall this one specifically.

18        Q.    Do you recall whether you reviewed this

19   memorandum more than one time?

20        A.    Yes.

21        Q.    How many times did you review it?

22        A.    Prior to its issuance or since then or --



Page 67

1     Q.    Prior to its issuance?

2     A.    Prior to it issuance, I don't recall.

3     Q.    You cite in this memorandum as part of your

4     official duties as the EAC at CBP's Office of Field

5     Operations; is that correct?

6     A.    Yes.

7     Q.    And you would have been knowledgeable about

8     the contents of this memorandum at the time you signed

9     it; is that right?

10    A.    Yes.

11    Q.    And you signed it on or about the date list

12    on the memorandum, April 27, 2018; is that right?

13    A.    Correct. On or about the date.

14    Q.    Correct.

15    A.    Because when the memos come to me, they

16    don't have a date on them yet.  And then when the

17    executive secretaries issue it, within the next day or

18    two that's when they date stamp it.

19    Q.    Okay.  And from reviewing this memorandum,

20    other than the fact there's been a few redactions on

21    it, to your knowledge is this memorandum accurate and

22    correct?



MAGNA
LEGAL SERVICES

 1      A.    Yes.

 2      Q.    And if I refer to this memorandum as the

 3  metering policy, you'll understand that?

 4      A.    Metering guidance.  Yes, sir.

 5      Q.    Okay.  It's your position, isn't it, sir,

 6  that the metering policy was motivated by capacity

 7  constraints at ports of entry on the Mexico border?

 8      A.    In 2016 in San Ysidro.  Yes.

 9      Q.    Any other ports of entry where there were

10  capacity constraints that you believe justified this

11  memorandum?

12      A.    The metering practice started in 2016.  It

13  started in San Ysidro.  As other ports were

14  overwhelmed with the volume of migrants, then we

15  adopted the same practice across the southwest border

16  as needed.  That was throughout 2016.

17           In 2017, the migrant numbers subsided

18  significantly.  It was less necessary to implement

19  metering throughout 2017.  In 2018, the migrants

20  numbers again started to increase, starting to reach a

21  high point in the spring of 2018.  That was what drove

22  this message, this guidance across our southwest



MAGNA
LEGAL SERVICES

Page 69

1    border.

2        Q.    At the time this memorandum was issued,

3    what were the capacity -- what ports of entry were

4    capacity constrained that you felt justified the

5    issuance of this metering guidance?

6        A.    I don't recall specifically what ports, but

7    our primary gateway ports in the southwest border

8    began to experience capacity issues again throughout

9    2016.  Those would be the major ports, the San

10   Ysidros, the Calexico, Nogales, El Paso, Laredo,

11   Hidalgo off and on, Brownsville off and on.

12       Q.    And it's your assumption that those were

13   the ports that were capacity constrained at that time;

14   is that right?

15       A.    At that time, but again we have 26 ports

16   along the southwest border, 46 actual crossings.  A

17   port of entry may have multiple crossings.  El Paso

18   has four crossings.  At some point because of the

19   migrant situation which ebbs and flows, one of those

20   bridges might have capacity while the other three do

21   not.  It really is a very fluid situation at the ports

22   from port to port, day to day.



Page 70

1    Q.    Is it your position that the metering

2    policy was not motivated by a desire to deter asylum

3    seekers from entering the U.S.?

4    A.    The policy was not desired to deter

5    migrants from entering the U.S.  No, it was not.

6    Q.    And there was no communication that went to

7    any field office or port director that -- from you,

8    that would have led those field offices or port

9    directors to believe that the metering policy should

10   be used to deter asylum seekers; is that right?

11   A.    The metering policy, which again began in

12   2016, was used to address the capacity when we were

13   having large numbers of volumes.

14   Q.    And that's it?

15   A.    That's the reason we do the metering in the

16   ports of entry.

17   Q.    There's no other reason?

18   A.    No other reason.

19   Q.    So I shouldn't see any e-mails or

20   correspondence that would indicate there was another

21   reason; is that right?

22   A.    I can't speak for the whole agency.

ER-0698



Page 71

1      Q.    Okay.  But you would be surprised to see
2  that, wouldn't you?
3      A.    This is the official guidance that I issued
4  to the directors to cascade down through their
5  leadership.  This is why we do metering, because of
6  the operational necessity based on the capacity at the
7  ports.
8      Q.    Okay.  So there shouldn't be any port
9  director or CBP officer who would believe that there
10  was a policy to deter asylum seekers; is that right?
11      A.    If they are following the April 2018 memo,
12  they should not believe there's any other reason.
13      Q.    Okay.  You mentioned that in 2017 the
14  migrant numbers went down; is that right?
15      A.    Correct.
16      Q.    Isn't it the case that some ports of entry
17  continued to meter, even though the number of migrants
18  went down?
19      A.    The number of migrants went down compared
20  th 2016.  We had 154,000 inadmissibles in 2016.  We
21  had 111,000 inadmissibles in 2017.
22            So while the numbers did go down somewhat,



Page 72

1    there were still large numbers of migrants seeking

2    entry into the country, primarily through the gateway

3    land borders, which there would then be a need to

4    meter, as the operational needs dictated.

5         Q.    So the answer to my question is yes, there

6    was metering that occurred in 20 --

7         A.    In 2017.  Yes.

8         Q.    Okay.  And metering occurred in 2018 as

9    well; is that right?

10        A.    Yes.

11        Q.    And 2019 it still occurs.

12        A.    Still occurs.

13        Q.    The metering policy did have a deterrent

14   effect though, didn't it?

15             MS. SHINNERS:  Objection argumentative.

16   You can answer.

17        A.    I don't believe it had a deterrent effect.

18   When you look at the number of migrants that have come

19   in and sought refuge at the ports of entry, the flows

20   -- there have been ebbs and flows as we typically see.

21   But again, last year 126,000 migrants came in and

22   sough refuge; 124,000 the year before.  So I don't



Page 312

```
 1      A.    As far as I can recall.  I don't have the

 2  exact date.

 3      Q.    So best recollection would be Friday the

 4  6th or Monday the 9th?

 5      A.    Best recollection maybe a little before the

 6  6th.  I'm trying to think with the Thanksgiving, it

 7  was -- it was within the last, you know, 10 days

 8  maybe.

 9            MR. MEDLOCK:  Okay.  All right.  I have no

10  further questions at this time, sir.

11            THE WITNESS:  Okay.  Thank you.

12            MS. SHINNERS:  Defendant's counsel would

13  like to do redirect.  We'll take a quick break.

14                      -  -  -

15              (Recessed at 4:10 p.m.)

16              (Reconvened at 4:20 p.m.)

17                      -  -  -

18              EXAMINATION CONDUCTED

19      BY MS. SHINNERS:

20      Q.    Mr. Owen, I'd like to ask you if -- to the

21  extent of your recollection, if you could explain to

22  me the sequence of events in 2016 in San Ysidro in
```



Page 313

1    terms of accommodations that were made at the San

2    Ysidro port with respect to the Haitian migrant surge?

3         MR. LEV:  Objection.  Vague.  I don't know

4    what accommodations means.

5         Q.   Do you understand my question?

6         A.   I can talk about what processes we

7    implemented to address the Haitians.

8         Q.   That's fine.

9         A.   Okay.  So, to put this in context, the

10   migrants have undergone waves as they have come into

11   the United States.  In 2014, it was unaccompanied

12   alien children.  They were primarily entering between

13   the ports, which is a border responsibility.  It was

14   not an OFO issue.

15        So we really did not start to engage with

16   the high numbers of migrants until 2016.  So that

17   started in the early part of 2016 with the Haitians

18   that were leaving Brazil.  Historically, the

19   earthquake Haiti, destruction in Haiti.  Brazil opened

20   their doors to the Haitians.  They needed cheap labor

21   to build the venues for the Olympics.

22        By 2015, those venues were built.  They



Page 314

1    canceled all of the Haitian work permits and directed

2    the Haitians to leave.  The Haitians did not go back

3    to Haiti because Haiti was still in bad shape.  They

4    came up through the southern border and arrived in San

5    Ysidro.

6              So at the start of 2006 is when we started

7    to sea all of these Haitians, which quickly began to

8    overwhelm our detention and processing capabilities.

9    The entire system was overwhelmed with the Haitians.

10   ERO, who would remove the Haitians from our temporary

11   detention, put them into permanent detention where it

12   was also overwhelmed.  So this is what started the

13   metering.

14             So we needed to control the flow, because

15   we simply had no more processing or holding capacity.

16   What we did throughout 2016, and this started to

17   spread with the Haitians as they went east into

18   Calexico, into San Luis, Arizona, into Nogales,

19   because this was our first dealing with such large

20   numbers, we would start to convert conference space,

21   training facilities room like this into temporary

22   holding facilities.



Page 315

1    So they were not designed for holing

2    individuals in detention, but because the numbers were

3    so overwhelming us, we would convert space like this.

4    And we had way too many people beyond our official

5    detention capacity.  Throughout 2006, the numbers

6    started to increase across the entire southwest

7    border, not just San Diego.

8    And then they started becoming not just

9    Haitians, but more family units as they were coming in

10   through out 2016, which is why we then rolled out the

11   metering across the southern border where it was

12   needed operationally.  We employed the same tactics at

13   those ports that we would convert conference space and

14   wherever we could make space to hold people.

15   Again ERO who is supposed to take them from

16   our temporary storage, temporary detention space to

17   the permanent detention facilities to was overwhelmed

18   as well.

19   2017 came along, and the numbers came down

20   to more manageable levels.  We had less metering at

21   that time.  And we assessed what we did in '16 in

22   terms of converting conference space and such into



Page 316

1    holding people.  And I really believed that in 2016,

2    we got lucky when we had so many people in our

3    facilities, that there was not a fire, that there was

4    not acts of violence, that there was not disease  that

5    would spread through the community.

6              So when '17 came along and we assessed

7    that, we said we would not do that again.  We would

8    only hold to what we had the physical capacity and the

9    operational capacity to do.  When 2018 came along and

10   the migrant numbers again started to increase, that's

11   when we decided operationally to hold at the limit

12   line to have folks remain in Mexico as opposed to in

13   our non-official detention space, you know, creating

14   unsafe conditions, not allowing people to remain at

15   the corridors in the open areas of the ports waiting

16   to be processed.

17             So that is why we switched from holding at

18   the doors of the port to holding at the limit line '16

19   versus '18.

20   Q.    Okay.  A couple times in your response you

21   mentioned in 2006.  Were you referring to 2016?

22   A.    Oh,2016.  Yes.  Sorry.

ER-0705



Page 317

1      Q.    You also mentioned that -- I believe you

2   mentioned that ports of entry were receiving family

3   units.

4            Can you explain the impact, if any, of

5   receiving more family units through ports of entry, of

6   the receipt of more family units in ports of entry on

7   the capacity of the port of entry?

8      A.    Yes.  ports of entry are not designed for

9   long-term holdings.  Our detention cells are like jail

10  cells in a police station.  They are intended for

11  short-term detention, primarily of single adults,

12  while we are waiting to turn them over to another

13  agency or to, you know, immigration and customs

14  enforcement, whatnot.

15           So as the composition of the migrants

16  started to change throughout 2016 and we started to

17  receive more and more family units, our space is not

18  designed for family units.  You look at a lot of our

19  ports, the cells are very small.  Some are what we

20  call wet cells, meaning they have toilets.  Some are

21  not.

22           So the increase in family units further



Page 318

1    taxed our abilities to bring in large numbers of folks

2    and hold them, because our cells were simply not

3    designed to do that.  We talked about the physical

4    capacity and the operational capacity.  If you take a

5    place like Hidalgo that has four cells designed to

6    hold 42 people, but only 3 of those cells has

7    bathrooms.  Okay.  So that is our total physical

8    capacity of 42.

9            When you start to factor in the operational

10   considerations, the demographics of who has come

11   across and filed a claim today.  Right?  So if you

12   have a family unit, you have to put them in one cell.

13   Another family unit comes in and they have scabies or

14   lice.  You can't put them in with the first family.

15   You Would put them into a second cell.

16           If you had an adult male, he would not go

17   in with the families and the children.  He would go

18   into a different cell.  If you -- we have to separate

19   individuals from different countries with different

20   gang affiliations as notated through their tattoos,

21   because they will not -- there will be trouble in the

22   cells.  So you have to separate those.

ER-0707



Page 319

1                    Anybody that we arrest, and we make 40,000

2       arrests a year, they go into a cell separate from the

3       migrants.  The migrants are here for an administrative

4       matter, if you will.  Anyone that we arrest for a

5       criminal matter goes into a separate cell by

6       themselves.  So you may have a physical capacity of

7       42, but in this example you actually only have 7

8       people in your cells, and you are a full capacity.

9            Q.    Thank you.  Can you explain what impacts

10      there might be on trade and travel, in general, at any

11      port of entry, if resources are diverted from

12      facilitating trade and travel?

13           A.    Okay.

14                 MR. LEV:  Objection.  Calls for

15      speculation.

16           A.    I do understand.

17           Q.    Just to clarify, I'm asking can you explain

18      to your knowledge --

19           A.    This is confusing with you objecting.  Do I

20      look at you or do I look at her.  Can I answer?

21           Q.    You may answer, but I'm going to go ahead

22      and rephrase.

ER-0708



Page 320

1      A.   Okay.

2      Q.   So can you explain, based on your knowledge

3   and your experience, in general any impacts on trade

4   and travel from -- if you divert resources, or if a

5   port of entry diverts resources from the facilitation

6   of trade or travel?

7           MR. LEV:  Same objection.

8      A.   Okay.  From my knowledge, we prioritize our

9   mission sets within the ports of entry along the

10  guidance that we receive from the secretary.  So if we

11  had to divert officers from the counter-terrorism

12  mission, or if we had to divert officers to put more

13  officers towards the processing of undocumented

14  migrants, we would not pull them from the

15  counter-terrorism mission.  We would not pull them

16  from the narcotics intradiction mission.

17          So the two missions that they would be

18  pulled from, one would be the facilitation of lawful

19  trade and travel.  So those are folks who have lawful

20  documents to enter the country.  Most of the

21  cross-border traffic on the southern border comes and

22  goes with border crossing cards.



1  MAYER BROWN LLP
     Matthew H. Marmolejo (CA Bar No. 242964)
2     *mmarmolejo@mayerbrown.com*
   350 S. Grand Avenue
3  25th Floor
   Los Angeles, CA 90071-1503
4     Ori Lev (DC Bar No. 452565)
      (*pro hac vice*)
5     *olev@mayerbrown.com*
      Stephen M. Medlock (VA Bar No. 78819)
6     (*pro hac vice*)
      *smedlock@mayerbrown.com*
7  1999 K Street, N.W.
   Washington, D.C. 20006
8  Telephone:  +1.202.263.3000
   Facsimile:   +1.202.263.3300
9
   SOUTHERN POVERTY LAW CENTER
10    Melissa Crow (DC Bar No. 453487)
      (*pro hac vice*)
11    *melissa.crow@splcenter.org*
   1101 17th Street, N.W., Suite 705
12 Washington, D.C. 20036
   Telephone: +1.202.355.4471
13 Facsimile: +1.404.221.5857

14 *Additional counsel listed on next page*
   *Attorneys for Plaintiffs*
15
                  **UNITED STATES DISTRICT COURT**
16
                  **SOUTHERN DISTRICT OF CALIFORNIA**
17

18 Al Otro Lado, Inc., *et al.*,          Case No.:  17-cv-02366-BAS-KSC

19              Plaintiffs,               **EXHIBIT 11 IN SUPPORT OF**
                                          **PLAINTIFFS' MEMORANDUM OF**
20      v.                                **POINTS AND AUTHORITIES IN**
                                          **SUPPORT OF THEIR MOTION**
21 Chad F. Wolf,[1] *et al.*,             **FOR SUMMARY JUDGMENT**

22              Defendants.

23

24

25

26

27 ────────────────
   [1] Acting Secretary Wolf is automatically substituted for former Acting Secretary
28 McAleenan pursuant to Fed. R. Civ. P. 25(d).

CENTER FOR CONSTITUTIONAL RIGHTS
    Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
    *bazmy@ccrjustice.org*
    Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
    *gschwarz@ccrjustice.org*
    Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
    *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
    Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
    *sarah.rich@splcenter.org*
    Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
    *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
    Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
    *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

**From:** ROSSILLI, VONA M
**Sent:** Sunday, May 29, 2016 8:31 PM
**To:** SYS-OTM-MNGR; AVILA, EDWARD; CASTILLO, MOISES; CHAVEZ, VERONICA J; DELGADO, ALBERT F; FORD,
STEPHEN C; HALL, TONY L (OFO CBS POE); KAPCZYNSKI, ROBERT A; MCCULLOCH, CHANTELLE; MENDOZA, DANIEL;
MILLER, CHRIS; RODRIGUEZ, CARLOS C; RODRIGUEZ, CARY; ROSSILLI, VONA M
**CC:** HOOD, ROBERT W; MARIN, MARIZA; KIRKMAN, JOSEPH E; CARRILLO, SALLY R; MISENHELTER, JOSEPH
**Subject:** FW: GOM transports from Shelters

Managers,

Due to the increased workload in AEU with regard to the Asylee line and the changes made to increase our intake and processing efforts, there
have been some modifications that you need to be aware of. The Asylee line in the pedestrian building is not being used at this time, there is
a line staged on the Mexican side which is where the people used to wait for permits. The Government of Mexico (GOM) is assisting with this
increase, and has helped by setting up shelters in Tijuana to house those waiting to claim credible fear/asylum. The GOM officials will
coordinate the transportation of those individuals from the shelters to the POE through our ILU Supervisor ███████ who in turn calls the on
duty AEU supervisor and advises that a group of Asylees (currently all are Haitian) will be transported to the port and provide us with an ETA.
We should be coordinating the arrival of this group as they are to be taken into AEU intake immediately and not placed in the existing Asylee
line, they've been in the shelters for multiple days at this point. I've asked the AEU managers if they can please notify the on duty WC and
Operations Chief so that the Old Port personnel can be used to meet and accept the group being transported from the Mexican Shelters. At
this time, we are not getting exact numbers from the Shelters, hopefully the information will be more precise as we move forward. It's very
important that we are all on the same page with the intake and processing of people arriving and claiming credible fear/ asylum here at the
port. Also to note*, with these changes it will be important to continue to ensure that we are staffing the Old Port Limit Line to ensure that
travelers have documents to try and catch those coming to seek credible fear/asylum are identified and directed appropriately at the onset if
feasible.

Respectfully,

Vona Rossilli
Watch Commander, Passenger Ops
San Ysidro Port of Entry
████████ office
████████ mobile
██████████████

**From:** HOOD, ROBERT W
**Sent:** Sunday, May 29, 2016 2:46 PM
**To:** PEREZ, MARICELA R ██████████████; CASTILLO, MOISES ██████████████; SYS AEU
██
**Cc:** CHAVOYA, EDWARD R ██████████████; DELGADO, ALBERT F ██████████████; ROSSILLI, VONA
M ██████████████
**Subject:** RE: GOM transports from Shelters

Please bring them into Intake immediately. Since they are coming from the shelter we need to intake per our agreement with INAMI and the
shelters.

Thank you

**From:** PEREZ, MARICELA R
**Sent:** Sunday, May 29, 2016 2:36:33 PM
**To:** CASTILLO, MOISES; SYS AEU
**Cc:** CHAVOYA, EDWARD R; DELGADO, ALBERT F
**Subject:** RE: GOM transports from Shelters

Alcon,

This group was brought to us around 1315 hours by GOM. They were escorted to the Asylum line by SCBPO Jerez and CBPO Lababi and AEU
Supervisor was notified to take them into intake to begin processing as per DAPD Castillo.

Officer Lanier went out at 1420 hours to Pedestrian and there were no subjects in line.

Per the Pedestrian lead, they were taken back to Mexico by Night Shift officers.

**From:** CASTILLO, MOISES
**Sent:** Sunday, May 29, 2016 12:00 PM
**To:** SYS AEU ████████
**Cc:** CHAVOYA, EDWARD R ██████████████; DELGADO, ALBERT F ██████████████

AOL-DEF-00030298

ALCON,

From 1300-1330 GOM will transport a van full of males to the POE. Please meet them at the limit line and take custody of those individuals. Take them directly into intake and begin to process them.

Thank you,

"Vires et Honor"

Moises Castillo
Watch Commander
San Ysidro Port of Entry
Special Response Team

1   MAYER BROWN LLP
       Matthew H. Marmolejo (CA Bar No. 242964)
2      *mmarmolejo@mayerbrown.com*
    350 S. Grand Avenue
3   25th Floor
    Los Angeles, CA 90071-1503
4      Ori Lev (DC Bar No. 452565)
       (*pro hac vice*)
5      *olev@mayerbrown.com*
       Stephen M. Medlock (VA Bar No. 78819)
6      (*pro hac vice*)
       *smedlock@mayerbrown.com*
7   1999 K Street, N.W.
    Washington, D.C. 20006
8   Telephone:  +1.202.263.3000
    Facsimile:   +1.202.263.3300
9
    SOUTHERN POVERTY LAW CENTER
10     Melissa Crow (DC Bar No. 453487)
       (*pro hac vice*)
11     *melissa.crow@splcenter.org*
    1101 17th Street, N.W., Suite 705
12  Washington, D.C. 20036
    Telephone: +1.202.355.4471
13  Facsimile: +1.404.221.5857

14  *Additional counsel listed on next page*
    *Attorneys for Plaintiffs*
15
                  **UNITED STATES DISTRICT COURT**
16
                 **SOUTHERN DISTRICT OF CALIFORNIA**
17

| | |
|---|---|
| 18  Al Otro Lado, Inc., *et al.*, | Case No.:  17-cv-02366-BAS-KSC |
| 19                    Plaintiffs, | **EXHIBIT 12 IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF** |
| 20           v. | **POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION** |
| 21  Chad F. Wolf,[1] *et al.*, | **FOR SUMMARY JUDGMENT** |
| 22                    Defendants. | |
| 23 | **REDACTED VERSION** |

24

25

26

27  ────────────────────
    [1] Acting Secretary Wolf is automatically substituted for former Acting Secretary
28  McAleenan pursuant to Fed. R. Civ. P. 25(d).

CENTER FOR CONSTITUTIONAL RIGHTS
    Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
    *bazmy@ccrjustice.org*
    Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
    *gschwarz@ccrjustice.org*
    Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
    *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
    Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
    *sarah.rich@splcenter.org*
    Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
    *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
    Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
    *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

1   MAYER BROWN LLP
       Matthew H. Marmolejo (CA Bar No. 242964)
2       *mmarmolejo@mayerbrown.com*
    350 S. Grand Avenue
3   25th Floor
    Los Angeles, CA 90071-1503
4       Ori Lev (DC Bar No. 452565)
       (*pro hac vice*)
5       *olev@mayerbrown.com*
       Stephen M. Medlock (VA Bar No. 78819)
6       (*pro hac vice*)
       *smedlock@mayerbrown.com*
7   1999 K Street, N.W.
    Washington, D.C. 20006
8   Telephone:  +1.202.263.3000
    Facsimile:   +1.202.263.3300
9
    SOUTHERN POVERTY LAW CENTER
10      Melissa Crow (DC Bar No. 453487)
       (*pro hac vice*)
11      *melissa.crow@splcenter.org*
    1101 17th Street, N.W., Suite 705
12  Washington, D.C. 20036
    Telephone: +1.202.355.4471
13  Facsimile: +1.404.221.5857

14  *Additional counsel listed on next page*
    *Attorneys for Plaintiffs*
15
                **UNITED STATES DISTRICT COURT**
16              **SOUTHERN DISTRICT OF CALIFORNIA**

17
    Al Otro Lado, Inc., *et al.*,         |   Case No.:  17-cv-02366-BAS-KSC
18
19              Plaintiffs,
                                          |   **EXHIBIT 22 TO**
20      v.                                |   **PLAINTIFFS' MOTION FOR**
                                          |   **CLASS CERTIFICATION**
21  Chad F. Wolf,[1] *et al.*,
                                          |   **AOL-DEF-00046740 to AOL-**
22              Defendants.               |   **DEF-00046743**
23                                        |   ***FILED UNDER SEAL***
24

25

26

27  _____

28  [1]  Acting Secretary Wolf is automatically substituted for former Acting Secretary
    McAleenan pursuant to Fed. R. Civ. P. 25(d).

CENTER FOR CONSTITUTIONAL RIGHTS
  Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
  *bazmy@ccrjustice.org*
  Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
  *gschwarz@ccrjustice.org*
  Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
  *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
  Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
  *sarah.rich@splcenter.org*
  Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
  *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.401.221.5857

AMERICAN IMMIGRATION COUNCIL
  Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
  *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.56

UNHCR
United Nations High Commissioner for Refugees
Haut Commissariat des Nations Unies pour les réfugiés

UNHCR
**United Nations High Commissioner for Refugees**
Regional Representation in Washington

| 1800 Massachusetts Ave NW | Tel.: (202) 296.5191 |
| Suite 500 | Fax: (202) 296.5660 |
| Washington, DC 20036 | Email: cardoletti@unhcr.org |

6 October 2016

René N. Hanna
Deputy Chief of Staff (Policy)
Office of the Commissioner
US Customs and Border Protection
1300 Pennsylvania Ave. NW, Ste. 4.4A
Washington, DC 20229

**Re:       UNHCR Site Visit to San Ysidro Port of Entry**

Dear Ms. Hanna,

On behalf of the United Nations High Commissioner for Refugees (UNHCR), I wish to thank you and your staff for facilitating the site visit for me and my colleagues, Ms. Katie Tobin, Assistant Protection Officer, and Mr. Jose Sieber Luz, Senior Protection Officer (Mexico), at the San Ysidro port of entry during the week of 12 September 2016. The warm reception and thorough briefings received by my colleagues from Customs and Border Protection (CBP) and Immigration and Customs Enforcement (ICE) during the visit were very much appreciated.

We were particularly impressed to see the sincere efforts made by the various DHS counterparts at the border to ensure access to the United States protection for vulnerable persons despite ongoing capacity challenges and increasing numbers of arrivals.

Kindly find enclosed a short report reflecting UNHCR's findings and recommendations from the site visit. These recommendations aim not only to address the situation of Haitians arriving at the San Ysidro port of entry, but also ensure that access to asylum for all individuals seeking protection at the US border is preserved.

We are aware that following our site visit, there has been a change in the US policy on returns to Haiti. UNHCR advises careful consideration in the implementation of this new policy, particularly in light of current events affecting stability in the country, such as the National Elections and Hurricane Matthew.

We remain available, of course, to discuss any aspects of the report and look forward to continued collaboration on this situation and other issues of mutual concern.

Kind regards,

Chiara Cardoletti-Carroll
Deputy Regional Representative for
the USA & Caribbean

CC:     Serena Hoy, Senior Counsel, Office of the Deputy Secretary, DHS
        Jennifer Higgins, Deputy Chief of Staff, Office of the Deputy Secretary, DHS
        J. Ryan Hutton, Deputy Executive Director, Admissibility and Passenger Programs, CBP Office of Field Operations, DHS

ER-0718

Confidential

UNHCR
United Nations High Commissioner for Refugees
Haut Commissariat des Nations Unies pour les réfugiés

**UNHCR Findings and Recommendations**
**Site Visit to San Ysidro Port of Entry**
**12-14 September 2016**

**Background:**

In recent months, the Office of the United Nations High Commissioner for Refugees (UNHCR) has been closely following the secondary movement of Haitians from Brazil to the United States and is aware that nearly 5000 have arrived at the San Ysidro port of entry since May 2016, disrupting business as usual for US Customs & Border Protection (CBP) and other sub-agencies within the Department of Homeland Security (DHS) processing cases there.

On the week of 12 September 2016, the Department of Homeland Security (DHS) Headquarters facilitated a site visit for UNHCR to observe CBP and ICE operations at San Ysidro to better understand the challenges created by the recent influx. In its advisory capacity, UNHCR agreed to provide confidential comments to DHS following the visit. Below is a summary of UNHCR's key findings and recommendations.

**Findings**:

- The number of Haitian nationals arriving at San Ysidro port of entry is on the rise. UNHCR witnessed large numbers being processed while visiting the port of entry on 13 September. According to CBP, most Haitian nationals seeking admission at the San Ysidro port of entry are not seeking asylum. While some may fear return to Haiti, CBP reports that the majority are not expressing fear at the port of entry. Instead, they are expressing interest in working and/or reuniting with family in the US. This was also confirmed by the anecdotal accounts of a group of Haitian nationals in CBP custody. A large majority of the Haitians are coming from Brazil. Many had children born there.

- When it comes to the magnitude of the phenomenon, UNHCR understands there is a significant backlog of Haitian cases at the Tijuana side of the border. Furthermore, the Mexican press reports that at least 950 Haitians requested appointments at the San Ysidro port of entry on 12 September alone. According to NGOs, Haitians have also been arriving in increasing numbers at other ports of entry in recent weeks, such as Calexico, which is far less resourced than San Ysidro. In addition to adult males, there is an increasing number of women and children making the journey. This flow is expected to continue in the coming months.

- According to CBP, some of the key reasons underlining this rise in movements are: 1) declining opportunities in Brazil following the end of the Olympics; 2) the recent extension of Temporary Protected Status (TPS) by the Secretary of DHS which has been interpreted by many Haitians (and smugglers) as a signal that the current favorable treatment of Haitians will continue.

- Both CBP and ICE in Southern California are currently doing what they can with existing resources to process the Haitians expeditiously and humanely and maintain regular

1

ER-0719

AOL-DEF-00046741

processing of asylum-seekers. The agencies have also developed strong partnerships with local NGOs to manage release and family reunification. Due to the influx of Haitians, CBP's asylum processing capacity has however been significantly limited in recent months. At least half of CBP's staffing and space previously dedicated to processing asylum-seekers is now being used to process Haitian parole cases. A multi-year construction project is further limiting CBP's asylum processing capacity.

- Haitians and non-Mexican asylum-seekers, including those from Central America, continue to be subject to a metering system in Tijuana. The Mexican authorities (INM) are currently running the metering system in collaboration with CBP to issue appointments to be processed at the port of entry. Appointment dates are distributed every Monday, Wednesday and Friday. According to CBP, the wait time for an appointment is currently between four days and one week. NGOs in Mexico report that the wait time is considerably higher, averaging between 20 and 25 days. The metering system was developed in an effort to better manage the influx at the port of entry. However, by increasing reception and processing capacity at the port of entry and streamlining procedures, such a metering system could be avoided. Needless to say, a system that limits and regulates access to a border is inherently problematic, as it is vulnerable to abuse and exploitation. Just this week, UNHCR received reports of Haitians selling their appointments for 500 USD.

- On the positive side, according to CBP, Mexican asylum-seekers are no longer subject to the metering system at San Ysidro. However, INM and Mexican NGOs both report that a ceiling of 50 Mexican asylum-seekers per day persists. Mexican asylum-seekers turned away at the port of entry on a given day are seeking to stay at the same four migrant shelters as the Haitians. Many are also resorting to sleeping on the streets of Tijuana.

- Tijuana and San Diego are currently overwhelmed with the number of Haitians arriving and seeking shelter. In recent weeks, there has been increasing media coverage of what is being labeled a "humanitarian crisis." Images and stories of long lines in Tijuana featured prominently in the Mexican press this week. This vulnerable population requires urgent attention.

**Recommendations:**

- Recognize the Haitian situation at San Ysidro as a surge and activate existing protocols for mass migration processing. To this end, UNHCR recommends that DHS open as a pilot project a temporary central processing center near the San Ysidro port of entry to offer reception and process Haitian parole claims. This is something that CBP is already positively considering following discussions with them at the border.

- Re-evaluate current protocols and streamline parole processing at the port of entry to significantly reduce the processing time for Haitian parolees and look for opportunities to curtail the process and omit any duplicative steps taken by CBP and ICE in light of the rising numbers.

2

ER-0720

Confidential

AOL-DEF-00046742

- Urgently reconsider the use of a metering system (appointment system) for asylum-seekers and other vulnerable populations approaching the port of entry. This recommendation goes hand-in-hand with the recommendation for a central processing center.

- Invest in shelter capacity and other humanitarian aid in Tijuana and San Diego for the Haitian population. Take proactive steps to meet the needs of this vulnerable population.

**UNHCR Regional Office Washington**
**6 October 2016**

3

ER-0721

Confidential

AOL-DEF-00046743

1    MAYER BROWN LLP
        Matthew H. Marmolejo (CA Bar No. 242964)
2        *mmarmolejo@mayerbrown.com*
      350 S. Grand Avenue
3    25th Floor
     Los Angeles, CA 90071-1503
4        Ori Lev (DC Bar No. 452565)
          (*pro hac vice*)
5         *olev@mayerbrown.com*
        Stephen M. Medlock (VA Bar No. 78819)
6         (*pro hac vice*)
          *smedlock@mayerbrown.com*
7    1999 K Street, N.W.
     Washington, D.C. 20006
8    Telephone:  +1.202.263.3000
     Facsimile:   +1.202.263.3300
9
     SOUTHERN POVERTY LAW CENTER
10      Melissa Crow (DC Bar No. 453487)
          (*pro hac vice*)
11        *melissa.crow@splcenter.org*
     1101 17th Street, N.W., Suite 705
12   Washington, D.C. 20036
     Telephone: +1.202.355.4471
13   Facsimile: +1.404.221.5857
14   *Additional counsel listed on next page*
     *Attorneys for Plaintiffs*
15
                    **UNITED STATES DISTRICT COURT**
16
                 **SOUTHERN DISTRICT OF CALIFORNIA**
17

| | |
|---|---|
| 18  Al Otro Lado, Inc., *et al.*, | Case No.:  17-cv-02366-BAS-KSC |
| 19                 Plaintiffs, | **EXHIBIT 16 IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** |
| 20          v. | |
| 21  Chad F. Wolf,[1] *et al.*, | |
| 22                 Defendants. | |
| 23 | **FILED UNDER SEAL** |
| 24 | |

25

26

27   ――――――――――――――――
     [1] Acting Secretary Wolf is automatically substituted for former Acting Secretary
28   McAleenan pursuant to Fed. R. Civ. P. 25(d).

CENTER FOR CONSTITUTIONAL RIGHTS
    Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
    *bazmy@ccrjustice.org*
    Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
    *gschwarz@ccrjustice.org*
    Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
    *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
    Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
    *sarah.rich@splcenter.org*
    Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
    *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
    Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
    *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

ER-0723

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA


Al Otro Lado, Inc., et al., ) No. 17-cv-02366-BAS-KSC
                            )
        Plaintiffs,         )
                            )
v.                          )
                            )
                            )
Kevin K. McAleenan, et      )
al.,                        )
                            )
        Defendants.         )
                            )



VIDEOTAPED VIRTUAL 30(B)(6) DEPOSITION OF

U.S. CUSTOMS AND BORDER PROTECTION

April 29, 2020

Phoenix, Arizona




MAGNA LEGAL SERVICES

(866)624-6221

www.MagnaLS.com


Reported by Alisa Smith, AZ CR

AZ Certified Reporter No. 50712

ER-0724



Page 2

```
 1              VIDEOTAPED VIRTUAL 30(b)(6) DEPOSITION OF
 2    U.S. CUSTOMS AND BORDER PROTECTION was taken on
 3    April 29, 2020, commencing at 8:41 a.m., with all
 4    parties appearing virtually at their respective
 5    offices, before Alisa Smith, a Certified Reporter of
 6    the State of Arizona.
 7
 8                            * * *
 9    COUNSEL APPEARING:
10    For Plaintiffs:
11              By:  Ori Lev
                MAYER BROWN LLP
12              350 South Grand Avenue, 25th Floor
                Los Angeles, California 90071
13              olev@mayerbrown.com
14              By:  Karolina Walters
                AMERICAN IMMIGRATION COUNCIL
15              1331 G Street NW, Suite 200
                Washington, D.C. 20005
16              kwalters@immcouncil.org
17    For Defendants:
18              By:  Katherine J. Shinners
                By:  Ari Nazarov
19              U.S. DEPARTMENT OF JUSTICE
                Office of Immigration Litigation
20              950 Pennsylvania Avenue, NW
                Washington, DC 20530
21              katherine.j.shinners@usdoj.gov
22    Also present:  Kendra Dobson, Videographer
                     Kevin Cranford, Exhibit Coordinator
23
24
25
```



```
                                                      Page 3
 1                    I N D E X
 2     WITNESS                                          PAGE
 3     MICHAEL HUMPHRIES
       30(b)(6) U.S. CUSTOMS AND BORDER PROTECTION
 4
 5        Examination by Mr. Lev                          6
 6        Examination by Ms. Walters                    121
 7        Examination by Ms. Shinners                   143
 8
 9                    *  *  *  *  *
10                    EXHIBITS MARKED
11     EXHIBIT     DESCRIPTION                          PAGE
12     Exhibit 120 Exhibit 29 to Defendants' Opposition  29
13     Exhibit 128 E-mail attaching the MCAT Report     110
14                 dated 8/24/2019
15     Exhibit 129 E-mail attaching the MCAT Report     112
16                 dated 8/25/2019
17     Exhibit 130 E-mail attaching the MCAT Report     115
18                 dated 6/17/2019
19     Exhibit 131 E-mail attaching the MCAT Report     117
20                 dated 6/27/2019
21     Exhibit 132 E-mail attaching the MCAT Report     119
22                 dated 4/25/2019
23     Exhibit 141 E-mail FW: Asylum Processing dated    71
24                 4/2/2019
25     ///
```



```
                                                     Page 4
 1                    EXHIBITS MARKED

 2    EXHIBIT      DESCRIPTION                          PAGE

 3    Exhibit 142 E-mail FW Metering Flow dated          123

 4                11/22/2016

 5    Exhibit 143 E-mail RE SWB POE Holding Capacity      96

 6                dated 10/26/2016

 7    Exhibit 152 E-mail FW San Luis FAMU surge dated    122

 8                8/24/2016

 9    Exhibit 153 E-mails FW MCAT Daily Report for        95

10                October 23 dated 10/23/2018

11    Exhibit 154 E-mail Re San Luis- UDAS in            132

12                custody... dated 11/16/2016

13    Exhibit 155 E-mail RE **RFI** Please Provide       129

14                Response by COB Today dated

15                11/17/2016

16    Exhibit 156 E-mail RE Shelters and Metering        137

17                dated 8/21/2019

18    Exhibit 158 E-mail - Asylum Claims from large      104

19                groups... dated 2/21/2019

20

21

22

23

24

25
```

ER-0727



Page 5

```
 1              THE VIDEOGRAPHER:  We are now on the

 2    record.  This begins Media No. 1 in the deposition

 3    of Michael Humphries in the matter of Al Otro Lado

 4    v. Kevin K. McAleenan in the United States District

 5    Court, Southern District of California.  Today is

 6    Wednesday, April 29th, 2020, and the time is

 7    8:41 a.m.

 8              This is the -- this deposition is being

 9    taken completely by remote at the request of Mayer

10    Brown, LLP - DC.  The videographer is Kendra Dobson,

11    and the court reporter is Alisa Smith, both of Magna

12    Legal Services.

13              Will counsel and all parties present state

14    their appearances and whom they represent?

15              MR. LEV:  Good morning.  This is Ori

16    Lev from Mayer Brown.  I represent the plaintiffs.

17              MS. WALTERS:  Good morning.  This is

18    Karolina Walters with the American Immigration

19    Council.  I also represent the plaintiffs.

20              MS. SHINNERS:  This is Katherine

21    Shinners of the U.S. Department of Justice, Office

22    of Immigration Litigation, District court Section,

23    and I represent the defendants in this matter.

24              MR. NAZAROV:  This is Ari Nazarov, also

25    with the Department of Justice, and I represent the
```



Page 6

1    defendants in this matter.

2              THE VIDEOGRAPHER:  Will the court

3    reporter please swear in the witness.

4                    MICHAEL HUMPHRIES,

5       30(b)(6) U.S. CUSTOMS AND BORDER PROTECTION,

6    the witness herein, having been first duly sworn by

7    the Certified Court Reporter, was examined and

8    testified as follows:

9                    EXAMINATION

10   BY MR. LEV:

11      Q.   Good morning, Mr. Humphries, and thank you

12   for your patience this morning.  As you heard, my

13   name is Ori Lev.  I represent the plaintiffs in this

14   litigation, as well as Ms. Walters.  She's going to

15   be asking you some questions toward the end of the

16   deposition.

17              Before we begin, I would like to go over

18   some ground rules.  This is essentially a one-way

19   conversation where Ms. Walters and I ask questions

20   and you answer them.  So that the court reporter can

21   get an accurate record of your testimony, we need

22   you to give audible responses.  Not -- no head

23   shakes or nods and no "uh-huhs" and "huh-uhs," but

24   "yes," "no," and [indiscernible audio].

25              Do you understand that?

ER-0729



Page 44

1              You can answer.

2    BY MR. LEV:

3        Q.   You can answer.

4        A.   I would say that they -- they were

5    undocumented, and they were lining up along the

6    sidewalk of the port, and they were waiting to come

7    in.

8        Q.   And the only reason they were unable to come

9    in was because CBP officers stopped them allegedly

10   at the border line; correct?

11       A.   CBP officers stopped them because we had no

12   capacity to bring additional in at the time.

13       Q.   Okay.  Give me one second.  I'm sorry.

14            Did any other ports in Arizona engage in

15   metering while you were serving as the Assistant

16   Director of Border Security?

17       A.   As I mentioned --

18            MS. SHINNERS:  Object to the scope to

19   the extent it is before 2016.

20            But continue, Mr. Humphries.

21            THE WITNESS:  As I said before, the

22   Haitians, large groups started arriving in San

23   Ysidro.  From there, they kind of moved their way

24   west to Calexico.  Then San Luis.  At some point

25   after San Luis, Nogales began to -- to receive



Page 45

1    Haitians applying.

2                   And I should say that when I brought in

3    the TDY folks to San Luis, they were all -- also

4    moving individuals to Nogales from San Luis for

5    processing.

6    BY MR. LEV:

7        Q.   And you were moving individuals from

8    San Luis to Nogales for processing because Nogales

9    actually had a greater capacity to handle them than

10   San Luis did at that time; correct?

11       A.   The large groups had started [indiscernible

12   audio] west, and when they were in San Luis, Nogales

13   weren't getting those large numbers as San Luis did,

14   and later it moved -- the Haitians kind of kept

15   moving west.

16       Q.   I understand.

17            But you said that at one point you were

18   taking migrants from San Luis to -- and bringing

19   them to Nogales for processing.

20            Did I understand you correctly?

21       A.   Yes.

22       Q.   And you did that because at that time there

23   were -- there was greater processing capability at

24   Nogales, and you were trying to implement a system

25   that would allow them to process the maximum number



Page 46

1    of people given your resources; correct?

2        A.    Nogales was not busy.  They were busy but

3    not as busy as San Luis was and in the numbers that

4    they were getting.

5        Q.    And so the reason you were taking migrants

6    from San Luis to Nogales for processing was to

7    increase the numbers that you could process at the

8    ports of entry in Arizona.  Is that correct?

9        A.    I would say that the reason they were taken

10   to Nogales was because the numbers in custody at

11   San Luis was unsafe, unhealthy, and we were trying

12   to get a better handle to be able to accommodate

13   those in our custody.

14       Q.    You were trying to solve a problem by using

15   your resources to process the greater number of

16   migrants than if you just left them all at San Luis.

17   Is that correct?

18       A.    I would say that, again, the numbers that

19   were in custody at San Luis was unhealthy and not

20   safe.  They were individuals in our custody who had

21   been in our custody for days and days who had not

22   been medically screened, who were sleeping outside

23   the port at San Luis.

24             And so to better manage the situation and to

25   try and -- in an attempt to try to make San Luis



Page 47

1    more safe so that the employees there could -- could

2    work safely, along with all those in our custody be

3    safe, we had asked Nogales to help accommodate.

4        Q.   Did Nogales engage in metering during that

5    time in 2016?

6             MS. SHINNERS:  Objection.  Vague as to

7    time.

8    BY MR. LEV:

9        Q.   Did Nogales engage in metering at any time

10   in 2016?

11       A.   I believe that's when the metering first

12   started at Nogales was late in 2016.

13       Q.   And -- okay.

14            In connection with the Haitian migrants?

15       A.   Correct.  And it wasn't only Haitian.  There

16   were -- there were Central American family units as

17   well and --

18       Q.   You testified that in November of 2017, you

19   became the acting Port Director for Nogales;

20   correct?

21       A.   On an acting basis, yes.

22       Q.   And then you stayed in that role and

23   continued and became the permanent Area Port

24   Director for Nogales in June of 2018; correct?

25       A.   Correct.



Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

AL OTRO LADO, INC., et al.,

         Plaintiffs,

         vs.              Case No.

                          17-cv-02366-BAS-KSC

KEVIN K. McALEENAN1, et al.,

         Defendants.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~

VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF

MARIZA MARIN

THURSDAY, MAY 28, 2020

8:37 A.M.

SAN DIEGO, CALIFORNIA

Reported remotely by Megan M. Grossman-Sinclair,

CSR No. 12586



Page 2

```
 1              APPEARANCES OF COUNSEL
 2
 3      For Plaintiffs:
 4          MAYER BROWN LLP
            STEPHEN M. MEDLOCK, ESQ.
 5          (By Videoconference)
            1999 K Street, N.W.
 6          Washington, D.C.  20006
            T:  (202) 263-3000
 7          smedlock@mayerbrown.com
 8
            CENTER FOR CONSTITUTIONAL RIGHTS
 9          ANGELO GUISADO, ESQ.
            (By Videoconference)
10          666 Broadway
            7th Floor
11          New York, New York  10012
            T:  (212) 614-6464
12          aguisado@ccrjustice.org
13
14      For Defendants:
15          U.S. Department of Justice
            OFFICE OF IMMIGRATION LITIGATION
16          KATHERINE J. SHINNERS, ESQ.
            (By Videoconference)
17          SUSAN IMERMAN, ESQ.
            (By Telephone)
18          Ben Franklin Square
            P.O. Box 868
19          Washington, D.C.  20044
            T:  (202) 598-8259
20          katherine.j.shinners@usdoj.gov
21
22
23
24
25
```



Page 3

```
 1              APPEARANCES (Continued)
 2
 3        Also Present:
 4              JOSEPH NEW, Videographer
                (By Videoconference)
 5
                KEVIN CRANFORD, technical support
 6              (By Videoconference)
 7              LOUISA SLOCUM, ESQ., CBP
                (By Telephone)
 8
                STACEY FALKOFF, ESQ., CBP
 9              (By Telephone)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



```
                                                        Page 4
 1                    INDEX OF EXAMINATION

 2      WITNESS:  MARIZA MARIN

 3

 4      EXAMINATION                          PAGE

 5      By Mr. Medlock                       13, 303

 6      By Mr. Guisado                       243

 7      By Ms. Shinners                      308

 8

 9                 INSTRUCTIONS NOT TO ANSWER

10                      PAGE    LINE

11                       29      25

12                       30      21

13                       31      11

14                       43       2

15                       84       4

16                       84      12

17                      263       9

18

19                 INFORMATION REQUESTED

20                      PAGE    LINE

21                      (None)

22

23

24

25                       *  *  *
```



Page 5

```
 1                    INDEX TO EXHIBITS
 2     MARKED                                          PAGE
 3     Exhibit 182  E-mail chain, top e-mail            23
                    from Robert Hood to Sidney
 4                  Aki, April 26, 2018.
                    (Bates AOL-DEF-00072448)
 5
       Exhibit 183  Definition of "Capacity"            79
 6                  from Ballentine's Law
                    Dictionary.
 7
       Exhibit 184  Exhibit 27 to Defendants'           80
 8                  Opposition to Plaintiffs'
                    Motion for Class
 9                  Certification.
10     Exhibit 185  Standard Operating Procedure        94
                    San Ysidro Port of Entry
11                  Admissibility Enforcement,
                    Date:   January 2017
12                  Review Date:   August 2017
                    Subject:  Admissibility
13                  Enforcement Unit Standard
                    Operating Procedure.
14
       Exhibit 186  U.S. Customs and Border            113
15                  Protection Directive,
                    August 8, 2008, Subject:
16                  Secure Detention, Transport
                    and Escort Procedures at
17                  Ports of Entry.
                    (Bates AOL-DEF-00372536 -
18                   00372570)
19     Exhibit 187  E-mail from Mariza Marin to        123
                    Robert Hood, April 18, 2018,
20                  Subject:  Intake.
                    (Bates AOL-DEF-00600149)
21
       Exhibit 188  E-mail chain, top e-mail           133
22                  from Robert Hood to Sidney
                    Aki, November 9, 2018,
23                  Subject: Re: Surge efforts
                    at SYS.
24                  (Bates AOL-DEF-00348763 -
                     00348764)
25
```

ER-0738



```
                                                          Page 6
 1                INDEX TO EXHIBITS (Continuing)
 2       MARKED                                            PAGE
 3       Exhibit 189   E-mail chain, top e-mail        138
                       from Robert Hood to Sidney
 4                     Aki, November 9, 2018,
                       Subject: CBP UAC FMUA CAT
 5                     REPORT 6:15.
                       (Bates AOL-DEF-00072448)
 6
         Exhibit 190   E-mail chain, top e-mail        141
 7                     from Johnny Armijo to Robert
                       Hood, October 12, 2016,
 8                     Subject:  Capacity.
                       (Bates AOL-DEF-00062088 -
 9                      00062089)
10       Exhibit 191   E-mail chain, top e-mail        162
                       from Sidney Aki to Robert
11                     Hood and others, September
                       10, 2016, Subject:
12                     San Ysidro End of Day AEU
                       Reporting for September 9,
13                     2016.
                       (Bates AOL-DEF-00065872 -
14                      00065874)
15       Exhibit 192   E-mail from Justin Kelemen      163
                       to various recipients, July
16                     27, 2016, Subject:  San
                       Ysidro End of Day AEU
17                     Reporting for July 26, 2016.
                       (Bates AOL-DEF-00065048 -
18                      00065050)
19       Exhibit 193   E-mail chain, top e-mail        166
                       from Mariza Marin to Kylvin
20                     Gomez, September 8, 2018,
                       Subject:  Intake.
21                     (Bates AOL-DEF-00603278)
22       Exhibit 194   E-mail chain, top e-mail        176
                       from Eric Crouston to Sidney
23                     Aki and others, July 12,
                       2019, Subject:  SYS Daily
24                     Custody Intake and ERO
                       Movement 7/10/2019.
25                     (Bates AOL-DEF-00084038)
```



Page 7

```
 1              INDEX TO EXHIBITS (Continuing)
 2    MARKED                                            PAGE
 3    Exhibit 195  Admissibility Enforcement      155/227
                   Unit 24 Hour Reporting for
 4                 September 11, 2016.
                   (Bates AOL-DEF-00073938 -
 5                  00073940)
 6    Exhibit 196  Queue Management Report for        181
                   July 1st, 2019, spreadsheet.
 7                 (Bates AOL-DEF-00083448)
 8    Exhibit 197  Queue Management Report for        186
                   July 2nd, 2019, spreadsheet.
 9                 (Bates AOL-DEF-00523370)
10    Exhibit 200  Federal Rules of Evidence          190
                   1006 Summary Exhibit for
11                 San Ysidro Port of Entry:
                   Impact to Port Operations.
12
      Exhibit 201  Federal Rules of Evidence          191
13                 1006 Summary Exhibits for
                   Calexico Port of Entry:
14                 Impact to Port Operations.
15    Exhibit 202  Federal Rules of Evidence          192
                   1006 Summary Exhibits for
16                 Otay Mesa Port of Entry:
                   Impact to Port Operations.
17
      Exhibit 203  Lesson 11: Processing              199
18                 Expedited Removals.
                   (Bates AOL-DEF-01090765 -
19                  01090828)
20    Exhibit 204  Memorandum April 6, 2012           201
                   Subject:  Providing
21                 Inadmissible Travelers with
                   Documentation of an Adverse
22                 Action Case.
                   (Bates AOL-DEF-00596511 -
23                  00596513)
24
25
```



Page 8

```
 1              INDEX TO EXHIBITS (Continuing)
 2      MARKED                                      PAGE
 3      Exhibit 205  Defendants' Supplemental and   207
                     Amended Responses to
 4                   Plaintiffs' Fourth Set of
                     Interrogatories to All
 5                   Defendants.
 6      Exhibit 206  San Ysidro Pedestrian          211
                     Facilities May 2018.
 7                   (Bates AOL-DEF-00036093 -
                      00036096)
 8
        Exhibit 207  E-mail from Mariza Marin to    215
 9                   Sidney Aki, November 9,
                     2018, Subject:  AEU
10                   Processing Plan.
                     (Bates AOL-DEF-00073676)
11
        Exhibit 208  E-mail chain, top e-mail       218
12                   from Mariza Marin to Robert
                     Hood, August 7, 2018,
13                   Subject:  AEU Data.
                     (Bates AOL-DEF-00072964)
14
        Exhibit 209  E-mail chain, top e-mail       220
15                   from Robert Hood to Sidney
                     Aki, September 1, 2017,
16                   Subject:  Streamlined
                     Withdrawals and I-275's.
17                   (Bates AOL-DEF-00069611 -
                      00069612)
18
        Exhibit 210  E-mail chain, top e-mail       223
19                   from Claudia Taitague to
                     various recipients,
20                   January 3, 2016, Subject:
                     SIGMA 5063573.
21                   (Bates AOL-DEF-00707315 -
                      00707316)
22
23
24
25
```



Page 9

```
 1                    INDEX TO EXHIBITS (Continuing)
 2      MARKED                                        PAGE
 3      211         E-mail chain, top e-mail          229
                    from Kevin McAleen to Todd
 4                  Owen, June 16, 2018,
                    Subject:  SWB Queue
 5                  Management Update.
                    (Bates AOL-DEF-00047772 -
 6                   00047773)
 7      212         Memorandum April 30, 2020         235
                    Subject:  Metering Guidance.
 8                  (Bates CBPALOTRO000314 -
                     000315)
 9
        213         E-mail chain, top e-mail          244
10                  from Robert Hood to Mariza
                    Marin, November 17, 2016,
11                  Subject:  **RFI** Please
                    Provide Response by COB
12                  today.
                    (Bates AOL-DEF-00030087)
13
        214         E-mail chain, top e-mail          244
14                  from Moises Castillo to
                    Robert Hood, November 17,
15                  2016, Subject:  **RFI**
                    Please Provide Response by
16                  COB today.
                    (Bates AOL-DEF-00706277 -
17                   00706278)
18      215         Letter from Katherine            256
                    Shinners, Esq., to Stephen
19                  Medlock, Esq., May 27, 2020.
20      216         U.S. Customs and Border          269
                    Protection and Mexico's
21                  National Migration Institute
                    Joint Pedestrian Pilot at
22                  the San Ysidro-El Chaparral
                    Port of Entry Pedestrian
23                  West Facility
                    January 25, 2018, Meeting
24                  Readout.
                    (Bates AOL-DEF-00243914 -
25                   00243918)
```


ER-0742

```
                                                             Page 10
 1                  INDEX TO EXHIBITS (Continuing)
 2      MARKED                                               PAGE
 3      217        E-mail from ███████████ to      275
                   Peter Flores and Mariza
 4                 Marin, December 9, 2018,
                   ████████████████████████████
 5                 ████████████████████████████
                   ████████████████████████████
 6                 (Bates AOL-DEF-00036576)
 7      218        E-mail chain, top e-mail        282
                   from Edward Chavoya to
 8                 Sidney Aki and others,
                   August 16, 2016, Subject:
 9                 Numbers on the Mexico Side.
                   (Bates AOL-DEF-00065471)
10
        219        E-mail chain, top e-mail        285
11                 from Robert Hood to various
                   recipients, May 8, 2017,
12                 Subject:  AEU Detention
                   Space and Asylum Seekers.
13                 (Bates AOL-DEF-00753684 -
                    00753685)
14
        220        E-mail chain, top e-mail        292
15                 from Pete Flores to Mariza
                   Marin, January 29, 2019,
16                 Subject:  Asylum Book.
                   (Bates AOL-DEF-00083821)
17
        221        Audio recording from            305
18                 June 13, 2017.
                   (Bates ALOTROLADO 00018604)
19
20
21                 PRIOR EXHIBITS REFERENCED
22                    Exhibit      Page
23                       3          229
24
25                        *  *  *
```

ER-0743



Page 11

```
 1                    SAN DIEGO, CALIFORNIA
 2              THURSDAY, MAY 28, 2020; 8:37 A.M.
 3
 4                    VIDEOGRAPHER:  We are now on the
 5    record.  This begins video -- the video deposition
 6    of Mariza Maria (sic) in the matter of Al Otro
 7    Lado v. McAleenan in the United States District
 8    Court, Southern District of California.  Today is
 9    Thursday, May 28th, 2020.  The time is 8:38 a.m.
10    This deposition is being taken remotely at the
11    request of Mayer Brown.
12                    The videographer is Joseph New, and
13    the court reporter is Megan Grossman-Sinclair of
14    Magna Legal Services.
15                    Will counsel and all parties
16    present state their appearances and whom they
17    represent.
18                    MR. MEDLOCK:  Good morning.  This
19    is Stephen Medlock, Mayer Brown LLP, on behalf of
20    plaintiffs and the putative class.
21                    MR. GUISADO:  Good morning.  This
22    is Angelo Guisado, Center for Constitutional
23    Rights, on behalf of the plaintiffs and the
24    putative class.
25                    MS. SHINNERS:  Good morning.  This
```



Page 12

1    is Katherine Shinners.  I am with the U.S.

2    Department of Justice, Office of Immigration

3    Litigation, on behalf of Defendant.  With me is my

4    colleague, Susan Imerman.

5                    Susan.

6                    MS. IMERMAN:  Yes.  Sorry.  This is

7    Susan Imerman with the U.S. Department of Justice.

8                    VIDEOGRAPHER:  Will the court

9    reporter please swear in the witness.

10                   THE COURT REPORTER:  My name is

11   Megan Grossman-Sinclair, a California Certified

12   Shorthand Reporter, and this deposition is being

13   held via videoconferencing equipment.  The witness

14   and reporter are not in the same room.  The

15   witness will be sworn in remotely pursuant to

16   agreement of all parties.  The parties stipulate

17   that the testimony is being given as if the

18   witness was sworn in person.

19                   So stipulated.

20                   MR. MEDLOCK:  So stipulated.

21                   MS. SHINNERS:  Yes.

22                   THE COURT REPORTER:  Also I'd like

23   to remind everyone it's very important not to

24   interrupt each other during question and answer as

25   well as colloquy because the technology cuts out



Page 13

1    and it increases the chances that I will miss

2    what's said.  Thank you.

3

4                    MARIZA MARIN,

5              having been first duly sworn,

6                 testifies as follows:

7

8                    EXAMINATION

9    BY MR. MEDLOCK:

10            Q.   Good morning, Ms. Marin.

11            A.   Good morning.

12            Q.   Can you please state and spell your

13   full name.

14            A.   Sure.  It's Mariza Marin,

15   M-a-r-i-z-a, M-a-r-i-n.

16            Q.   Have you ever gone by any other

17   name?

18            A.   No.

19            Q.   Are you presently employed?

20            A.   Yes.

21            Q.   Who are you employed by?

22            A.   U.S. Customs and Border Protection.

23            Q.   What is your present job title at

24   U.S. Customs and Border Protection?

25            A.   I am the assistant director of

ER-0746



Page 156

1    any standard operating procedure or muster where

2    it is written down that the audience room is

3    supposed to be used for only a short period of

4    time?

5               MS. SHINNERS:  Object to the scope.

6               THE WITNESS:  That I can recollect,

7    no.

8               MR. MEDLOCK:  All right.  I would

9    like to pull up Tab 10, please, Kevin.

10             Showing you what we've marked --

11    what will be marked as Exhibit 190 to your

12    deposition, it is a three-page e-mail that bears

13    the Bates numbers AOL-DEF-0073938 through -40.

14           (Exhibit No. 190, later reassigned

15           as Exhibit No. 195 on Page 227, was

16           marked for identification by the

17           shorthand reporter and is attached

18           hereto.)

19    BY MR. MEDLOCK:

20         Q.  And if you look at the top of the

21    e-mail, it's sent from you to Sidney Aki on

22    September 16, 2016, at 8:31 p.m.

23         Do you see that?

24         A.  I do.

25           MR. MEDLOCK:  And if you can exit

ER-0747



Page 157

 1    out of that blow-up, Kevin.

 2    BY MR. MEDLOCK:

 3              Q.   The top of the document or the

 4    e-mail says:

 5              "Admissibility enforcement

 6              unit 24-hour reporting

 7              September 11, 2016."

 8              Do you see that?

 9              A.   I do.

10              Q.   Have you created reports in this

11    format for Mr. Aki on a regular basis?

12              A.   Someone in the unit, typically a

13    supervisor, would create that report.

14              Q.   And what's the purpose of these

15    admissibility enforcement unit 24-hour reports?

16              A.   It's a daily report from port

17    leadership.  I believe it does go up to the field

18    office -- I don't know if it initially did -- but

19    on the status of what's going on in -- or what --

20    a 24-hour snapshot of AEU.

21              Q.   Okay.  Isn't it true that there

22    have been several days where the number of

23    migrants transported out of the AEU at San Ysidro

24    is substantially higher than the number of

25    migrants that the port intakes?



Page 158

```
 1                    A.   I don't know the number of days,
 2      but yes, that could have happened.
 3                    Q.   Okay.  So I want to focus on the
 4      first page of this e-mail, and it has a table at
 5      the top under current detainees in CBP custody.
 6                    And it shows that there are 349
 7      individuals on site; correct?
 8                    A.   Correct.
 9                    Q.   And that refers to individuals at
10      the San Ysidro AEU; correct?
11                    A.   Correct.
12                    Q.   And then there is a reference to
13      individuals being held at Barracks 5.
14                    What does that mean?
15                    A.   Barracks 5 is a border patrol
16      facility at the Chula Vista station.
17                    Q.   And there is a reference to
18      Brownfield, although it notes that there is nobody
19      being held there on this day.
20                    What's Brownfield?
21                    A.   Brownfield is another border patrol
22      station.
23                    Q.   And then there is a reference to
24      Imperial Beach, and this report shows 36
25      individuals being held there.
```



Page 159

1           What is Imperial Beach?

2           A.   That's also a border patrol

3      station.

4           Q.   So on occasion the San Ysidro port

5      of entry has been able to house migrants that

6      would otherwise be at the AEU in Barracks 5,

7      Brownfield, or the Imperial Beach substations;

8      correct?

9           A.   Yes.

10          Q.   And then beneath that, there is a

11     reference to asylum line.

12          What does "asylum line" mean, to

13     your knowledge?

14          A.   So prior to the inception of

15     metering, when the AEU was full, non-U.S. citizens

16     without documents for admission would queue in an

17     area between the limit line at the port of entry

18     and the primary lanes to wait until there was

19     sufficient space in the unit to be -- for intake.

20          Q.   So there was a period in which

21     individuals who were metered were waiting in

22     asylum line on U.S. soil before they were metered;

23     correct?

24          MS. SHINNERS:  Objection;

25     mischaracterizes testimony.



Page 160

1          THE WITNESS:  That is not correct.

2     There was a period prior to metering where

3     individuals would wait in that asylum line on U.S.

4     soil and be brought in to be processed.

5     BY MR. MEDLOCK:

6          Q.   When did the asylum line stop being

7     used at the San Ysidro port of entry, to your

8     knowledge?

9          A.   The asylum line stop being used in

10    late May of 2016 when the number of non-U.S.

11    citizens without documents exceeded from primary

12    clear south into Mexico.  At that point the old --

13    we exhausted every effort to be able to expand any

14    additional processing and detention capacity.  And

15    at that point we had to stop intake at the

16    international boundary because that line stretched

17    all the way through the infrastructure and there

18    was no space for them.

19          That was the first time we saw

20    large groups in the hundreds of -- primarily

21    Haitian nationals arrived at that time, but there

22    were already other nationalities at the front of

23    that queue on primary.

24          And so at that point, we had to

25    intake all of those people to make sure they were

ER-0751



Page 161

1    not left in the elements, and at that point we had

2    to convert some additional space to be able to

3    take those people in -- the custody I believe was

4    about 1,076 at that point.

5              So we were severely over what our

6    custody capacity was, and then we had to hold that

7    line.  From that point on, we had to stop intake

8    in Mexico, and there was not an asylum line after

9    that.

10             Q.  Okay.  Move to strike everything

11   after "May 2016" as nonresponsive.

12             My -- I do want to ask you:  The

13   events you described occurred in May 2016, but the

14   San Ysidro port of entry didn't actually start

15   metering until July 2016; correct?

16             A.  We started metering in May of '16.

17             Q.  So if an interrogatory response

18   says that the San Ysidro port of entry began

19   metering in July 2016, it's just simply wrong; is

20   that right?

21             A.  That is right.  To the best of my

22   knowledge, we started in May of 2016.

23             Q.  So I want to turn back to the

24   exhibit in front of you, Exhibit 190.  And if you

25   turn to the second page of the e-mail ending in



1  MAYER BROWN LLP
     Matthew H. Marmolejo (CA Bar No. 242964)
2    *mmarmolejo@mayerbrown.com*
   350 S. Grand Avenue
3  25th Floor
   Los Angeles, CA 90071-1503
4    Ori Lev (DC Bar No. 452565)
     (*pro hac vice*)
5    *olev@mayerbrown.com*
     Stephen M. Medlock (VA Bar No. 78819)
6    (*pro hac vice*)
     *smedlock@mayerbrown.com*
7  1999 K Street, N.W.
   Washington, D.C. 20006
8  Telephone:  +1.202.263.3000
   Facsimile:   +1.202.263.3300
9
   SOUTHERN POVERTY LAW CENTER
10   Melissa Crow (DC Bar No. 453487)
     (*pro hac vice*)
11   *melissa.crow@splcenter.org*
   1101 17th Street, N.W., Suite 705
12 Washington, D.C. 20036
   Telephone: +1.202.355.4471
13 Facsimile: +1.404.221.5857
14 *Additional counsel listed on next page*
   *Attorneys for Plaintiffs*
15

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*, | Case No.:  17-cv-02366-BAS-KSC |
| Plaintiffs, | **EXHIBIT 33 IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| Chad F. Wolf,[1] *et al.*, | |
| Defendants. | |

---

[1] Acting Secretary Wolf is automatically substituted for former Acting Secretary McAleenan pursuant to Fed. R. Civ. P. 25(d).

EXHIBIT 33 IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT

CENTER FOR CONSTITUTIONAL RIGHTS
   Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
   *bazmy@ccrjustice.org*
   Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
   *gschwarz@ccrjustice.org*
   Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
   *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
   Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
   *sarah.rich@splcenter.org*
   Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
   *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
   Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
   *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

**Office of Field Operations**
**Incident Management Division**
**July 13, 2017**

**Action Required:** Information Only

**Time Constraint:** July 14, 2017

**Issue:** CBP Southwest Border Migration Surge – Asylum Issue

**Executive Summary:**
On July 12, 2017, Al Otoro Lado, Incorporated, filed a complaint with the United States District Court for the Central District of California (Los Angeles) alleging that U.S. Customs and Border Protection (CBP) officers systematically violated U.S. and International law by refusing to allow individuals to seek protection in the United States.

During the time period listed in the complaint, CBP was on the forefront of a global migration crisis. Increased numbers of unaccompanied alien children (UAC), family units (FAMUs), and single adults, seeking to unlawfully enter the United States, overwhelmed CBP's capabilities to protect and process those persons in an expeditious manner.

It is CBP's attempts to manage these challenges, in concert with the Government of Mexico, which are being challenged as a willful violation of human and civil rights by CBP officers and agents.

**Context:**
To understand the context of the large numbers of illegal migration experienced in 2016 and 2017, it is necessary to acknowledge that the immigration policies of Panama, Costa Rica, El Salvador, Guatemala, and Mexico, all sought to allow unlawful entry of person into those countries with the understanding that those persons would only transit, while en route to the United States. Years of unrestrained access through these countries facilitated the amassing of record numbers of unlawful migrants at, and between, United States southwest border ports of entry.

Beginning in early 2016 and cumulating in October 2016, unexpected levels of illegal migration caused a large draw on resources and outpaced temporary holding capacities at POEs (Figure 1). In that same month, CBP's total apprehensions were 76 percent above the previous five-year average.

Confidential

AOL-DEF-00031442

**Figure 1: CBP Internal In-Custody Report vs. Capacity for October 30, 2016**





While surges in illegal immigration on the southern Texas border created holding capacity challenges for the U.S. Border Patrol, the catalyst for detention space challenges for CBP' Office of Field Operations (OFO) occurred in San Ysidro California. As early as April 2016, OFO ports of entry in the San Diego area began experiencing a surge of Haitian nationals attempting to seek refuge in the U.S. when fleeing the economic collapse in Brazil (figure 2).

Figure 2 – Inadmissible Haitian nationals at San Diego Ports of Entry



Confidential

ER-0756

**Figure 3 – Total Inadmissible Alien Nationals at San Diego Area Ports of Entry**



Concurrently, the San Ysidro Port of Entry began extensive renovations which decreased temporary holding capacities by two-thirds. Detention space at the port of entry was originally certified for occupancy at ▮ persons. By May of 2016, port leadership had converted office and administrative spaces to temporary holding areas to increase capacity to over 900 persons awaiting transfer to ICE/ERO for detention. However, the ultimate demolition of that building required the use of semi-mobile facilities to be set up, and the legal occupant capacity for the holding of inadmissible persons was again decreased to ▮ individuals.

As construction at San Ysidro continued, it was necessary for officers to re-direct foreign nationals arriving by foot away from the old pedestrian entrance on the east side of port, to the **new** pedestrian facility, located on the west side of the port. It is believed that this redirection for processing may have been misconstrued as a denial of the applicant's request.

Additionally, because CBP was forced to limit intake of pedestrian applicants due to legal and safety capacity requirements, the Government of Mexico, in collaboration with the Government of Tijuana, and Non-Governmental Organizations (NGOs), sought to relieve the unsafe and unsanitary conditions created by people awaiting CBP processing outside the port of entry. Those entities established shelters to ensure their health and safety, and escorted them away from the elements while they waited. This humanitarian service is believed to be the source of allegations of collusion by CBP with the Government of Mexico to deny the illegal migrants the opportunity to ask for asylum in the U.S.

Page **3** of **7**

**Management of Illegal Migration Surge:**

To mitigate, overcrowding at POEs, CBP:

- Modified administrative space to meet the needs of the growing detention population.
- POEs leveraged U.S. Border Patrol (USBP) facilities, if USBP locations were not already at capacity.
- CBP continued to coordinate with ICE-ERO as lack of available detention space limited their ability receive those referred by CBP for detention under sections 235 and 236 of the INA, as amended.
  - o Due to the slow turn-over of custody, the numbers of those in CBP's temporary custody continued to increase, making conditions potentially unsafe and unsustainable.
- CBP surged agents and officers to southwest border locations in California, Arizona, and Texas (Figure 4)
- CBP further deployed agents and officers with special language abilities to assist in the immigration processing of persons representing many foreign language needs.
- CBP immediately began efforts to establish temporary holding facilities at heavily impacted areas on the southwest border.
  - o On November 23, 2017 the first of these facilities became operational at Tornillo, TX at a cost of $2.6M for 30-days.
  - o On December 10, 2017, the second facility became operational at Donna, TX at a cost of $3.8M for 30 days.
  - o CBP spent a total of $20.2M on the operation of these facilities to ensure the health and safety of inadmissible family units (Figure 4).

Confidential

AOL-DEF-00031445

ER-0758

**Figure 4 – FY17 Migrant Surge Cost Actuals**

| Office | Actuals as of 4/12/17 | Comments |
|---|---|---|
| **USBP** | **$9,126,299** | |
| Overtime | $4,385,823 | Includes FEPA OT only (excludes BPAPRA OT) |
| TDY | $1,743,714 | Actual TDY personnel supporting overflow operations in RGV |
| Operations Support | $2,996,763 | Increased wraparound services (laundry, shower, medical) and purchase card consumables/supplies |
| **OFO** | **$15,757,187** | |
| Overtime | $6,246,029 | OFO OT includes all overtime above what was originally planned pre surge |
| TDY | $7,972,128 | OFO TDY personnel supporting overflow operations in Tucson and San Diego, and TDY personnel for the Haitian Crisis |
| Operations Support | $1,539,030 | Includes purchase card purchases, supplies, blankets, care and feeding etc. |
| **Facilities and Maintenance** | **$20,244,931** | |
| Overtime | $14,952 | Site prep/stand-up and maintenance |
| TDY | $13,546 | Site prep/stand-up and maintenance |
| Facilities | $20,169,683 | Includes funding for both Donna and Tornillo soft sided facilities (as of 4.15.17 softsides are closed) |
| Operations Support | $46,749 | Site prep/stand-up and maintenance |
| **OIT** | **$121,786** | |
| Overtime | $23,128 | OIT overtime for support of El Centro Haitian efforts |
| Operations Support | $98,658 | Site prep/stand-up and maintenance |
| **Surge Total** | **$45,250,204** | |

- On November 11, 2016, Office of Field Operations (OFO) leadership held a conference call with southwest border Directors of Field Operations to discuss mitigation strategies to ensure the safety of officers and the individuals being processed by CBP. Discussion focused on utilizing available options to mitigate overcrowding such as:
  - Leveraging OFO headquarters for additional resources.
  - Utilizing all available space at ports of entry, adapting to supplement detention space.
  - Collaborating with ERO to transfer and transport processed detainees.

Confidential

AOL-DEF-00031446

ER-0759

- o Coordinating with USBP on available detention space.
- o Coordinating with local Government of Mexico officials on managing the flow of migrants without lawful status to enter the United States (referred to as "metering").

**Figure 5 - Collaborative Migration Management Efforts with the Government of Mexico**

| Location | Start | End |
|---|---|---|
| **San Diego Field Office:** | | |
| San Ysidro | May 30, 2016 | February 5, 2017 |
| Calexico | September 19, 2016 | February 5, 2017 |
| **Tucson Field Office:** | Not applicable | |
| **El Paso Field Office:** | | |
| Bridge of America | November 11, 2016 | December 2, 2016 |
| Paso Del Norte | November 11, 2016 | December 2, 2016 |
| Ysleta | November 11, 2016 | December 2, 2016 |
| **Laredo Field Office:** | | |
| Brownsville | November 2016 | January 2017 |
| Eagle Pass | November 2016 | January 2017 |
| Laredo | November 2016 | January 2017 |
| Hidalgo/Pharr/Anzalduas | November 2016 | January 2017 |

**Conclusion:**

The laws of the United States allow people to seek asylum on the grounds that they are being persecuted because of their race, religion, nationality, membership in a particular social group, or political opinion. CBP policies and procedures are based on these laws and are designed to protect vulnerable and persecuted persons. Those policies include compliance with federal and state laws, including Sections 101(b)(1) and 101(c)(1) of the Immigration and Naturalization Act (INA), 8 C.F.R. § 1236.2, 8 C.F.R. § 1236.3, Reno v. Flores settlement (including 9th Circuit ruling of Judges Gee and Moskowitz), and Certifications of Occupancy issued for CBP facilities.

It was the convergence of the high work demand and the legal guidelines which predicated CBP's otherwise extraordinary, efforts to ensure the health and welfare of all would-be asylum seekers, as well as the officers and agents on the front lines of this migration tsunami.

In unusual circumstances, where the number of individuals at a particular port of entry is more than the facility can safely accommodate, CBP limited the number of people permitted to enter at one time. This process was designed to ensure the safety of officers and those being processed, in compliance with the laws and policies listed in paragraph 6, above). In these rare instances where a port of entry could not accommodate all of those individuals seeking admission to the United States at one time, the Government of

Confidential

AOL-DEF-00031447

Mexico, in collaboration with the Government of Tijuana, and Non-Governmental Organizations (NGOs), established shelters to ensure their health and safety, while they waited. Representatives of these humanitarian programs would keep in close contact with CBP to escort those awaiting processing to the port of entry, when it was safe to do so.

Confidential

AOL-DEF-00031448

ER-0761

MAYER BROWN LLP
  Matthew H. Marmolejo (CA Bar No. 242964)
  *mmarmolejo@mayerbrown.com*
350 S. Grand Avenue
25th Floor
Los Angeles, CA 90071-1503
  Ori Lev (DC Bar No. 452565)
  (*pro hac vice*)
  *olev@mayerbrown.com*
  Stephen M. Medlock (VA Bar No. 78819)
  (*pro hac vice*)
  *smedlock@mayerbrown.com*
1999 K Street, N.W.
Washington, D.C. 20006
Telephone:  +1.202.263.3000
Facsimile:   +1.202.263.3300

SOUTHERN POVERTY LAW CENTER
  Melissa Crow (DC Bar No. 453487)
  (*pro hac vice*)
  *melissa.crow@splcenter.org*
1101 17th Street, N.W., Suite 705
Washington, D.C. 20036
Telephone: +1.202.355.4471
Facsimile: +1.404.221.5857

*Additional counsel listed on next page*
*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*,<br><br>                 Plaintiffs,<br><br>         v.<br><br>Chad F. Wolf,[1] *et al.*,<br><br>                 Defendants. | Case No.:  17-cv-02366-BAS-KSC<br><br>**EXHIBIT 20 IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION TO EXCLUDE DEFENDANTS' PURPORTED EXPERT TESTIMONY**<br><br>**EXHIBIT 50 IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** |

[1] Acting Secretary Wolf is automatically substituted for former Acting Secretary McAleenan pursuant to Fed. R. Civ. P. 25(d).

CENTER FOR CONSTITUTIONAL RIGHTS
   Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
   *bazmy@ccrjustice.org*
   Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
   *gschwarz@ccrjustice.org*
   Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
   *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
   Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
   *sarah.rich@splcenter.org*
   Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
   *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
   Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
   *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

| | |
|---|---|
| **From:** | WAGNER, JOHN P |
| **Sent:** | Tuesday, September 13, 2016 9:42 AM |
| **To:** | DUGAN, MAUREEN B; HOFFMAN, TODD A; HUTTON, JAMES R |
| **Subject:** | FW: Haitians arriving in Tijuana |

**From:** WAGNER, JOHN P
**Sent:** Tuesday, September 13, 2016 9:41 AM
**To:** NUNEZ-NETO, BLAS ████████████████; Owen, Todd C (AC OFO) ████████████
**Cc:** MCALEENAN, KEVIN K ████ LE ████ QUINN, TIMOTHY <████████████
**Subject:** RE: Haitians arriving in Tijuana

# DP

**From:** NUNEZ-NETO, BLAS
**Sent:** Tuesday, September 13, 2016 9:34 AM
**To:** Owen, Todd C (AC OFO) ████████████████; WAGNER, JOHN P ████████████
**Cc:** MCALEENAN, KEVIN K ████ LE ████ QUINN, TIMOTHY ████████████
**Subject:** FW: Haitians arriving in Tijuana
**Importance:** High

EAC Owen, see the below from our Attache in Mexico. ████████████████████

# DP

**From:** GONZALEZ, CARLOS L
**Sent:** Tuesday, September 13, 2016 8:54 AM
**To:** KOUMANS, MARK <████████████████>; NUNEZ-NETO, BLAS <████████████ SAUNDERS, IAN C ████████████ ORTIZ, ABDIAS ████████████>; MCGILL, JENNIFER A
**Subject:** RE: Haitians arriving in Tijuana

Sir,

████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████

1

**EXHIBIT NO. 27**
Dec. 13, 2019

Highly Confidential/Attorneys' Eyes Only

AOL-DEF-00762746

happens, I fear that we will have mass crowds not only coming up the pedestrian lanes, but the vehicle ones as well as the local police will follow their leadership instructions and most likely guide the crowds to the port as they arrive in the City.



Carlos L. Gonzalez
Attaché
Customs and Border Protection
U.S. Embassy, Mexico City
Office: 5080 2515
Cell: 55 4339 5432
U.S. # 301 985 8843 X 2515



**From:** KOUMANS, MARK
**Sent:** Tuesday, September 13, 2016 5:57 AM
**To:** NUNEZ-NETO, BLAS ██████████████████████; SAUNDERS, IAN C. ████████████████████; ORTIZ, ABDIAS ██████████ GONZALEZ, CARLOS L ███████████████ MCGILL, JENNIFER A ████████████████

**Subject:** FW: Haitians arriving in Tijuana

**From:** Owen, Todd C (AC OFO)
**Sent:** Tuesday, September 13, 2016 6:16:39 AM
**To:** MCALEENAN, KEVIN K; KOUMANS, MARK
**Subject:** FW: Haitians arriving in Tijuana

Deputy, update. 900 Haitians arrived into Tijuana yesterday.

Todd C. Owen
Executive Assistant Commissioner
Office of Field Operations
U.S. Customs & Border Protection

From: FLORES, PETE ROMERO
Sent: Tuesday, September 13, 2016 2:53:31 AM
To: Owen, Todd C (AC OFO); WAGNER, JOHN P; GOOD, BEVERLY
Cc: ARMIJO, JOHNNY L
Subject: FW: Haitians arriving in Tijuana

2

ER-0765 Highly Confidential/Attorneys' Eyes Only

AOL-DEF-00762747

Over 900 Haitians showed up in TJ today looking to be processed by Mexican Immigration for appointments into SYS.

---

From: CASTILLO, MOISES
Sent: Monday, September 12, 2016 6:43:21 PM
To: FLORES, PETE ROMERO; AKI, SIDNEY K
Cc: MISENHELTER, JOSEPH; CARRILLO, SALLY R; MARIN, MARIZA: GUZMAN, SERGIO M; ARMIJO, JOHNNY L;
HOOD, ROBERT W
Subject: Haitians arriving in Tijuana

Sir,

Video of Hatians at El Chaparral in Tijuana

---

3

Highly Confidential/Attorneys' Eyes Only

ER-0766

AOL-DEF-00762748

1   MAYER BROWN LLP
      Matthew H. Marmolejo (CA Bar No. 242964)
2      *mmarmolejo@mayerbrown.com*
    350 S. Grand Avenue
3   25th Floor
    Los Angeles, CA 90071-1503
4      Ori Lev (DC Bar No. 452565)
      (*pro hac vice*)
5      *olev@mayerbrown.com*
      Stephen M. Medlock (VA Bar No. 78819)
6      (*pro hac vice*)
      *smedlock@mayerbrown.com*
7   1999 K Street, N.W.
    Washington, D.C. 20006
8   Telephone:  +1.202.263.3000
    Facsimile:   +1.202.263.3300
9
    SOUTHERN POVERTY LAW CENTER
10     Melissa Crow (DC Bar No. 453487)
      (*pro hac vice*)
11     *melissa.crow@splcenter.org*
    1101 17th Street, N.W., Suite 705
12  Washington, D.C. 20036
    Telephone: +1.202.355.4471
13  Facsimile: +1.404.221.5857

14  *Additional counsel listed on next page*
    *Attorneys for Plaintiffs*
15
                 **UNITED STATES DISTRICT COURT**
16
              **SOUTHERN DISTRICT OF CALIFORNIA**
17

18  Al Otro Lado, Inc., *et al.*,          Case No.:  17-cv-02366-BAS-KSC

19               Plaintiffs,               **EXHIBIT 74 IN SUPPORT OF**
                                           **PLAINTIFFS' MEMORANDUM OF**
20        v.                               **POINTS AND AUTHORITIES IN**
                                           **SUPPORT OF THEIR MOTION**
21  Chad F. Wolf,[1] *et al.*,             **FOR SUMMARY JUDGMENT**

22               Defendants.

23

24

25

26

27  ———————————
    [1] Acting Secretary Wolf is automatically substituted for former Acting Secretary
28  McAleenan pursuant to Fed. R. Civ. P. 25(d).

CENTER FOR CONSTITUTIONAL RIGHTS
    Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
    *bazmy@ccrjustice.org*
    Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
    *gschwarz@ccrjustice.org*
    Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
    *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
    Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
    *sarah.rich@splcenter.org*
    Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
    *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
    Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
    *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

From: THOME, FERNANDO A
Sent: Thursday, November 17, 2016 2:10 PM
To: CBP-CAT
CC: BROWN, FRANCIS D; CLEAVES, SAMUEL B; BROWN, FRANCIS D; OLIVAS, BERNARDO; SAINDON, CHRISTOPHER;
CLEAVES, SAMUEL B; SOLIS, SEVERIANO; MILLER, BARRY F; REYES, VICTOR R; SIFFORD, DONNA R; MANCHA, HECTOR
Subject: RE:**RFI** Please Provide Response by COB today
Attachments: PDN1.jpg; YSL1.jpg; BOTA1.bmp

ALCON,

1. Is the POE/crossing metering OTMs?
   - Port of El Paso: Yes
   - Port of Columbus: No
   - Port of Santa Teresa: No
   - Port of Albuquerque: No
   - Port of Tornillo: No
   - Port of Presidio: No

2. Who is doing the metering? (CBP or Mexico)
   - CBP OFO officers are performing the metering.

3. Where is the metering taking place? (In Mexico, in the U.S., on the bridge)
   - At the top of the bridge or the base of the bridge in the United States at the Port of El Paso
     (Paso Del Norte, Bridge of the Americas, Ysleta). Location of metering varies between the top of the bridge or the bottom depending on operational feasibility

4. How is the metering being handled? (e.g. turnstile, tickets, turning people away)
   - They are provided an appointment for a future date (within a day or two). For example: they are instructed to return on Thursday at 0800.
   - They are then turned away and provide NGO locations in Juarez

5. If the metering is done by Mexico, how is the POE communicating the number of OTMs to be metered to the POE? (Phone call, how often, when, etc.)
   - Not applicable – Metering conducted by CBP OFO

6. Has the POE/crossing turned away any aliens due to capacity issues once the aliens were on U.S. soil?
   - All metering is conducted at the top of the bridge or the base of the bridge on the U.S. side, therefore all aliens are being turned away and given appointments while on the U.S. side of the bridge.

Additional note: PAO received inquiry from Mexican Media (El Norte) regarding a group of Hondurans who were turned away at the Port of El Paso. PAO coordinating with OPA on response.

BSC Thome

<span style="background:black"> </span>

---

From: CLEAVES, SAMUEL B
Sent: Thursday, November 17, 2016 11:18 AM
To: THOME, FERNANDO A
Subject: FW: **RFI** Please Provide Response by COB today


Samuel Cleaves
Watch Commander
El Paso Field Office

<span style="background:black"> </span>

---

From: CBP-CAT
Sent: Thursday, November 17, 2016 10:21:30 AM
To: ARMIJO, JOHNNY L; BROWN, FRANCIS D; CLEAVES, SAMUEL B; LONGORIA, FRANK S; HUMPHRIES, MICHAEL W
Cc: THORNBLOOM, LINDA A; TAMAYO, ENRIQUE S; VAQUERO, ROBERTO
Subject: **RFI** Please Provide Response by COB today

All,

Please provide an immediate response to the information below for each POE and bridge on the Southwest Border:

1. Is the POE/crossing metering OTMs?

AOL-DEF-00799450

2. Who is doing the metering? (CBP or Mexico)

3. Where is the metering taking place? (In Mexico, in the U.S., on the bridge)

4. How is the metering being handled? (e.g. turnstile, tickets, turning people away)

5. If the metering is done by Mexico, how is the POE communicating the number of OTMs to be metered to the POE? (Phone call, how often, when, etc.)

6. Has the POE/crossing turned away any aliens due to capacity issues once the aliens were on U.S. soil?

Finally, please send pictures of your pedestrian bridges/turnstile areas as part of the response.

CBP-CAT

ER-0770

1     MAYER BROWN LLP
      Matthew H. Marmolejo (CA Bar No. 242964)
2      *mmarmolejo@mayerbrown.com*
    350 S. Grand Avenue
3     25th Floor
    Los Angeles, CA 90071-1503
4      Ori Lev (DC Bar No. 452565)
      (*pro hac vice*)
5      *olev@mayerbrown.com*
     Stephen M. Medlock (VA Bar No. 78819)
6       (*pro hac vice*)
     *smedlock@mayerbrown.com*
7     1999 K Street, N.W.
    Washington, D.C. 20006
8     Telephone:  +1.202.263.3000
    Facsimile:   +1.202.263.3300
9
    SOUTHERN POVERTY LAW CENTER
10      Melissa Crow (DC Bar No. 453487)
      (*pro hac vice*)
11      *melissa.crow@splcenter.org*
    1101 17th Street, N.W., Suite 705
12     Washington, D.C. 20036
    Telephone: +1.202.355.4471
13     Facsimile: +1.404.221.5857

14     *Additional counsel listed on next page*
    *Attorneys for Plaintiffs*
15

             **UNITED STATES DISTRICT COURT**
16
          **SOUTHERN DISTRICT OF CALIFORNIA**
17

18 | Al Otro Lado, Inc., *et al.*, | Case No.:  17-cv-02366-BAS-KSC |

19              Plaintiffs,        **EXHIBIT 81 IN SUPPORT OF
PLAINTIFFS' MEMORANDUM OF**
20             v.                **POINTS AND AUTHORITIES IN
SUPPORT OF THEIR MOTION**
21     Chad F. Wolf,[1] *et al.*,          **FOR SUMMARY JUDGMENT**

22              Defendants.

23

24

25

26

27      ───────────────
    [1] Acting Secretary Wolf is automatically substituted for former Acting Secretary
28     McAleenan pursuant to Fed. R. Civ. P. 25(d).

CENTER FOR CONSTITUTIONAL RIGHTS
    Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
    *bazmy@ccrjustice.org*
    Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
    *gschwarz@ccrjustice.org*
    Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
    *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
    Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
    *sarah.rich@splcenter.org*
    Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
    *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
    Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
    *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

EXHIBIT 81 IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT

ER-0772

| From: | HOFFMAN, TODD A |
|---|---|
| Sent: | Wednesday, April 25, 2018 6:15 AM |
| To: | HOWE, RANDY J |
| Subject: | RE: Increased Flow and Caravan Anticipated Arrival |

Thx

**From:** HOWE, RANDY J
**Sent:** Wednesday, April 25, 2018 2:39:27 AM
**To:** HUTTON, JAMES R; HOFFMAN, TODD A
**Subject:** FW: Increased Flow and Caravan Anticipated Arrival

Info. Direction from the Commissioner on the handling of the Caravan.


Randy J. Howe
Executive Director, Operations
Office of Field Operations
U.S. Customs and Border Protection



**From:** FLORES, PETE ROMERO
**Sent:** Tuesday, April 24, 2018 11:53:46 PM
**To:** MCALEENAN, KEVIN K; Owen, Todd C (AC OFO); WAGNER, JOHN P; HOWE, RANDY J; AKI, SIDNEY K
**Cc:** FLANAGAN, PATRICK S
**Subject:** RE: Increased Flow and Caravan Anticipated Arrival

Sir,

Message acknowledge. We have started verbal briefing on the importance of being professional and ensuring our limit line (border gate area) personnel are using appropriate messaging. We are also coordinating with Mexican authorities and local partners (BP and ERO).

Caravan subjects are arriving in separate waves into Tijuana, hopefully they will not arrive all together at the San Ysidro POE.

Pete


**From:** MCALEENAN, KEVIN K
**Sent:** Tuesday, April 24, 2018 8:26:43 PM
**To:** Owen, Todd C (AC OFO); WAGNER, JOHN P; HOWE, RANDY J; FLORES, PETE ROMERO; AKI, SIDNEY K
**Cc:** FLANAGAN, PATRICK S
**Subject:** Increased Flow and Caravan Anticipated Arrival

FOR OFFICIAL USE ONLY//PRE-DECISIONAL//DELIBERATIVE



ER-0773
Highly Confidential/Attorneys' Eyes Only

AOL-DEF-00041777

EAC and team,

While we are working diligently with Mexico to address as many caravan members as possible, pressing ICE and others to prepare effective coordination of detention and immigration proceedings, and recommending strong posture changes for S1 decision, it is increasingly likely that we will face the arrival of a large portion of these 500-600 individuals (along with lawyers, activists, and media) in the coming days without a change in enforcement posture, and without new processing options (such as 235(b)(2)(c)) in place.

That said, I know that you have been planning and preparing, and that your field leadership and our officers will act with utmost professionalism and competence, in accordance with law, regulation, and CBP policy, as well as the guidance from the Secretary to effectively enforce the immigration laws of the United States, while appropriately considering and processing claims of fear for those seeking protection. Please confirm that you have sent out guidance regarding safe processing and port security and capacity issues relating to queue management. Please confirm that, absent special circumstances, we will utilize ER, vice NTA, and that release decisions will be made by ICE unless there is a medical emergency or humanitarian exigency. Please also advise if you have any questions or concerns.

Given the attention and generalized concern, I would appreciate updates in near real-time as we manage this unique circumstance among your already busy San Diego Field Office POEs.

I appreciate your good work. Thank you in advance for how you will manage this effort as well,

KM

Highly Confidential/Attorneys' Eyes Only

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

```
                            )  IN THE DISTRICT COURT
AL OTRO LADO, INC., ET      )
AL.,                        )
      PLAINTIFFS,           )  CASE NO.
                            )  17-cv-02366-BAS-KSC
VS.                         )
                            )
                            )
KEVIN K. MCALEENAN, ET      )
AL.,                        )
      DEFENDANTS.           )
```

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

CONFIDENTIAL

ORAL AND VIDEOTAPED DEPOSITION OF

SAMUEL CLEAVES

MAY 20, 2020

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION of SAMUEL CLEAVES,
produced as a witness at the instance of the Plaintiff,
and duly sworn, was taken in the above-styled and
numbered cause on May 20, 2020, from 8:59 a.m. to 5:04
p.m., Mountain Time, before Delia Ordonez, CSR in and
for the State of Texas, reported by machine shorthand,
via Webex Magna LegalVision.

Magna Legal Services

866.624.6221

www.MagnaLS.com

ER-0775



Page 2

```
 1               A P P E A R A N C E S
 2
 3    FOR THE PLAINTIFFS:
 4         Matthew Fenn
           Sydney Fields
 5         Mayer Brown
           1999 K Street, N.W.
 6         Washington, D.C. 20006
           202.263.3221
 7         Mfenn@mayerbrown.com
           Sfields@mayerbrown.com
 8
      FOR THE DEFENDANTS:
 9
           Katherine J. Shinners
10         Ari Nazarov
           U.S. Department of Justice
11         Office of Immigration Litigation
           Ben Franklin Station, P.O. Box 868
12         Washington, D.C. 20044
           202.598.8259
13         Katherine.j.shinners@usdoj.gov
           Ari.Nazarov@usdoj.gov
14
           Rebecca Cassler
15         Southern Poverty Law Center
           1101 17th Street, N.W., Suite 705
16         Washington, D.C. 20036
           202.355.4471
17
18    ALSO PRESENT:
19         Evan McCulloch
20         Louisa Slocum, CBP
21    THE VIDEOGRAPHER:
22         Solange Tran
23    THE MAGNA LEGAL TECHNICIAN:
24         Kevin Cranford
25
```



Page 3

1                           INDEX
           ORAL AND VIDEOTAPED DEPOSITION OF
2                       SAMUEL CLEAVES
                       MAY 20, 2020
3

4                  E X A M I N A T I O N

5    SAMUEL CLEAVES                         P A G E
6    Examination by Mr. Matthew E. Fenn....     7
7    Examination by Ms. Sydney Fields......   199
8    Examination by Ms. Katherine J. Shinners   246
9    Signature and Changes.................   250
10   Reporter's Certificate................   252

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ER-0777



```
                                                        Page 4
 1                         EXHIBITS
              ORAL AND VIDEOTAPED DEPOSITION OF
 2                      SAMUEL CLEAVES
                        MAY 20, 2020
 3
 4   NO.           DESCRIPTION                    P A G E
 5   Exhibit 3     Metering Guidance               121
 6   Exhibit 79    30(b)(6) Notice                  14
 7   Exhibit 86    AOL-DEF-00041455                183
 8   Exhibit 159   AOL-DEF-00090647                 33
 9   Exhibit 160   AOL-DEF-00290938                 32
10   Exhibit 161   AOL-DEF-00273818                 68
11   Exhibit 162   AOL-DEF-00027382                 81
12   Exhibit 163   FRE 1006 Summary of Impact to    83
                   Port Operation 2018
13
     Exhibit 164   Defendants' Supplemental and     90
14                 Amended Responses to
                   Plaintiffs' Fourth Set of
15                 Interrogatories to All
                   Defendants
16
     Exhibit 165   AOL-DEF-00047772                125
17
     Exhibit 166   AOL-DEF-01267496                132
18
     Exhibit 167   AOL-DEF-00272935                134
19
     Exhibit 168   AOL-DEF-00272936                141
20
     Exhibit 169   Defendants' Objections and      149
21                 Responses to Plaintiffs'
                   Fifth Set of Interrogatories
22                 to All Defendants
23   Exhibit 170   Human Rights First Report       155
24   Exhibit 171   AOL-DEF-00038270                163
25   Exhibit 172   AOL-DEF-00037758                171
```



Page 5

```
 1                      EXHIBITS

           ORAL AND VIDEOTAPED DEPOSITION OF
 2                    SAMUEL CLEAVES
                      MAY 20, 2020
 3
 4    NO.          DESCRIPTION               P A G E
 5    Exhibit 173  Beto O'Rourke Twitter Video   175
 6    Exhibit 174  AOL-DEF-00095574              189
 7    Exhibit 175  AOL-DEF-00799450              200
 8    Exhibit 176  AOL-DEF-00808783              206
 9    Exhibit 177  AOL-DEF-00845774              214
10    Exhibit 178  AOL-DEF-00811791              218
11    Exhibit 179  AOL-DEF-00838795              224
12    Exhibit 180  AOL-DEF-00851607              236
13    Exhibit 181  AOL-DEF-00842504              241
14
15
16
17
18
19
20
21
22
23
24
25
```



Page 6

```
 1              THE VIDEOGRAPHER:  We are now on the
 2    record.  This begins Media No. 1 in the deposition of
 3    Sam Cleaves in the matter of Al Otro Lado, Inc., et al.
 4    versus Kevin K. McAleenan, et al., in the United States
 5    District Court Southern District of California.
 6              Today is Wednesday, May 20th, 2020, and the
 7    time is 9:59 a.m.  This deposition is being held
 8    remotely at the request of Mayer Brown, LLP.
 9    Videographer is Solange Tran, our trial tech, Kevin
10    Cranford, and the court reporter is Delia Ordonez, all
11    through Magna Legal Services.
12              Will counsel and all parties present please
13    state their appearances and who they represent?
14              MR. FENN:  Matthew Fenn from Mayer Brown,
15    and I represent the plaintiffs.
16              MS. FIELDS:  Sydney Fields from Mayer
17    Brown, also for the plaintiffs.
18              MS. SHINNERS:  Katherine Shinners from U.S.
19    Department of Justice for the defendants.
20              MR. NAZAROV:  Ari Nazarov, also from the
21    U.S. Department of Justice, for the defendants.
22              MS. SHINNERS:  And we have agency counsel
23    present from U.S. Customs and Border Protection, Louisa
24    Slocum, and Evan McCulloch on the phone.
25              THE VIDEOGRAPHER:  Will the court reporter
```



Page 7

1    please swear in the witness?

2                         SAMUEL CLEAVES,

3    having been first duly sworn, testified as follows:

4                         EXAMINATION

5    BY MR. FENN:

6        Q.  Good morning, Mr. Cleaves.  Thank you for

7    taking the time to testify today -- we -- we appreciate

8    it -- under more challenging circumstances than -- than

9    normal.

10       A.  Yes, sir.

11       Q.  My name is Matt Fenn, and I represent the

12   plaintiffs in this action, as you just heard.  Before we

13   begin, I'd like to go over some ground rules.  This is a

14   one-way conversation in which I and my colleague,

15   Ms. Fields, will ask you questions, and you answer them.

16   So that the court reporter can accurately record your

17   testimony, you must give audible responses, no head

18   shakes, no "uh-huhs."  Do you understand that?

19       A.  Yes.

20       Q.  And as you've probably seen already, given the

21   web format and the slight time lag in the audio

22   transmission, it's even more important than usual that

23   we not talk over each other.  So if you could please

24   wait until I finish a question before answering it, I

25   will also do my best to wait for you to finish your



Page 134

1   metering even before November 18th, 2016?

2        A.  Yes, they did.

3        Q.  Do you know if every port of entry in the

4   El Paso Field Office was metering in November 2016?

5        A.  No.  My understanding, it was the Port of

6   El Paso.

7        Q.  Only the Port of El Paso?

8        A.  That's my understanding.

9             MR. FENN:  Kevin, if we could put up

10  Exhibit 167, please.

11       Q.  (BY MR. FENN)  I'm showing you what's been

12  marked as Exhibit 167 or -- I'm sorry -- will be marked

13  as Exhibit 167 and is Bates-stamped AOL-DEF-00272935.

14  This is a November 11th, 2016, e-mail from Kevin

15  McAleenan to Todd Owen and John Wagner with subject

16  line:  "RE:  Metering in Texas."

17            Do you see that?

18       A.  Yes, sir.

19       Q.  And if I can direct your attention to the

20  first-in-time e-mail down at the bottom there,

21  Mr. McAleenan writes to Owen and Wagner:

22            "EAC/DDAC, Just wanted to touch base

23  directly because I'm not sure it was conveyed with full

24  clarity from CAT.  C1 and I briefed S1 that we wanted to

25  increase efforts to meter arrivals of non-UAC, non-



Page 135

 1   Mexican CF cases mid-bridge.  If INAMI is not willing to

 2   help, we will push up to the line and hold them back

 3   there.  This will be mostly CENTAM families.  Please

 4   advise if you have concerns and let me know how

 5   implementation goes."

 6              Did I read that correctly?

 7        A.  Yes.

 8        Q.  What do EAC and DEAC stand for?

 9        A.  EAC is the executive assistant commissioner.

10   DEAC is the deputy, deputy assistant -- deputy executive

11   assistant commissioner.

12        Q.  And what about CAT?

13        A.  Crisis Action Team.

14        Q.  Okay.  How about C1 and S1?

15        A.  C1 is the abbreviation for commissioner.  S1 is

16   for the Secretary of Homeland Security.

17        Q.  Okay.  And when you say "commissioner," you

18   mean the commissioner of CBP?

19        A.  Yes, sir.

20        Q.  And in November of 2016, who would the

21   commissioner of CBP have been?

22              MS. SHINNERS:  Object to the scope.

23              But go ahead.

24        A.  I believe it was Mr. McAleenan, but I might

25   be -- I don't know when he took over.

ER-0783



Page 136

1      Q.   (BY MR. FENN)  And in November of 2016, who

2   would S1 have been, the secretary of DHS?

3                 MS. SHINNERS:  Object to the scope.

4                 You can answer.

5      A.   I think it would have been Ms. Nielsen, but I'm

6   not sure.

7      Q.   (BY MR. FENN)  Do you know why CBP wanted to

8   increase efforts to meter at this time?

9      A.   Yes, I do.  From the Port of El Paso

10   perspective, we had a severe overcrowding issue,

11   extremely severe.  And we had tried other methods, like

12   all kinds of methods to deal with it, you know, take

13   them all in and place them in other locations, and it

14   started to -- actually it didn't start to, it flat out

15   degraded our ability to do other mission sets.  It got

16   to the point where it became an emergency, and so other

17   methods were being discussed on how to address this

18   situation.

19      Q.   And Mr. McAleenan notes that the metering would

20   occur midbridge and that CBP officers would push up to

21   the line and hold them back there; is that correct?

22      A.   It says that.

23      Q.   In the ports of entry in the El Paso Field

24   Office, were there officers stationed at the limit line

25   in November of 2016?



Page 137

1     A.  There were, yes.

2     Q.  And what did Mr. McAleenan mean by "hold them

3  back there"?

4          MS. SHINNERS:  Objection, scope,

5  foundation.

6     A.  My understanding is that that's just informal

7  wording of if you can't process them now, then don't let

8  them in, and they'll have to wait.  So I guess that

9  would be his wording for waiting, waiting in line.

10     Q.  (BY MR. FENN)  And so what -- what would that

11  have looked like in practice at, for instance, the Port

12  of El Paso in November 2016?

13     A.  It would have been very similar, if not the

14  same, to what we talked about in 2018 for the ports of

15  entry in your questions on the interrogatories, with the

16  exception of the first week.  There were -- we didn't do

17  it right in the first week, so we had officers stationed

18  correctly sometimes and officers not stationed correctly

19  at other times, so we had some corrections to make in

20  the first week of this implementation.

21     Q.  When you say "not stationed correctly," what do

22  you mean?

23     A.  I mean sometimes the officers weren't stationed

24  clo- -- as close to the international boundary as they

25  were supposed to, and there were shifts, especially on



Page 138

1    the midnight shift, where they pulled the officers down

2    to the end of the pedestrian catwalks, meaning they were

3    not at the international boundary.

4        Q.  And when you say the "end of the pedestrian

5    catwalks," do you mean on the U.S. side?

6        A.  On the U.S. side, yes, sir.

7        Q.  What does CENTAM stand for?

8        A.  Central American.

9        Q.  Were you personally -- and I'm asking you this

10   question in your personal capacity.  Were you personally

11   responsible for the implementation or execution of this

12   guidance?

13       A.  No, sir.

14       Q.  Was there ever any written guidance issued

15   outlining this metering effort in November 2016, either

16   from OFO or the director of the El Paso Field Office?

17       A.  I don't think so.

18       Q.  How then was the metering guidance conveyed to

19   CBP officers at ports of entry within the El Paso Field

20   Office?

21       A.  Well, it was definitely conveyed verbally, so

22   where to be, how to do it, and the reasoning behind it.

23   In the first week, it wasn't done correctly all the

24   time, and so we had to do some corrections.

25       Q.  And who -- who would have been responsible for



Page 158

1      A.  No, I don't have any reason to believe that

2  it's not accurate.

3      Q.  And so would you agree that, in some instances,

4  turnbacks did, in fact, occur at the Port of El Paso

5  between December 2016 and April 2018?

6      A.  No, I don't agree with that.  I do agree with

7  our officers have made mistakes.  We've done it wrong.

8  This is obviously incorrect and inappropriate, and we

9  have had that type of thing occur.  So...

10     Q.  And -- and you testified earlier that even when

11  metering was being implemented officially in

12  November 2016, Mexicans who expressed credible fear were

13  not supposed to be metered at that time; is that right?

14     A.  That's correct.

15     Q.  Would you agree that if the CB -- CBP agent in

16  question in this account did, in fact, tell Martin that

17  Mexicans could not get asylum in the United States, that

18  CBP officer was lying?

19             MS. SHINNERS:  Objection, scope.

20             Go ahead.

21     A.  No, I don't know.  It could be, but it is

22  definitely wrong and inappropriate.

23     Q.  (BY MR. FENN)  Okay.

24     A.  Whether or not he actually thought that or not,

25  it's still completely wrong, but...

ER-0787



Page 159

1    Q.  I'd like to go back to the April 2018 metering

2    guidance issued by Mr. Owen that we were looking at

3    earlier.

4              MR. FENN:  Kevin, if you could please put

5    up Exhibit 165.

6    Q.  (BY MR. FENN)  You may recall from our

7    discussion of this document earlier that Mr. McAleenan,

8    on June 16, 2018, just two months after the metering

9    guidance was issued by Mr. Owen, stated that asylum

10   seekers were really just a San Ysidro problem, correct?

11             MS. SHINNERS:  Objection, mischaracterizes

12   document.

13   A.  I recall the e-mail that you showed me, yes.

14   Q.  (BY MR. FENN)  Were there -- were the ports of

15   entry in the El Paso Field Office engaged in metering

16   asylum seekers as of April 2018, immediately after the

17   April 2018 metering guidance was issued?

18   A.  My understanding is no.  My understanding is we

19   started at the Port of El Paso in late May.

20   Q.  Okay.  So as of June 2018, when this e-mail

21   correspondence on your screen took place, ports of entry

22   in the El Paso Field Office would have been engaged in

23   metering?

24   A.  The Port of El Paso was engaged in metering in

25   June of 2018, yes, sir.



Page 160

1    Q.  Okay.  At ports of entry in the El Paso Field
2  Office, how are CBP officers who are stationed at the
3  limit line kept apprised of port capacity?
4    A.  Generally speaking, that would be outside their
5  span of control, so that would be port leadership and
6  port management control.  So they will meter according
7  to the supervisors and the second line chiefs and the
8  watch commanders on duty.  They will apprise them, I
9  guess.
10    Q.  So the -- the -- if -- if I can just rephrase
11  to make sure I understand what you're saying.
12        The watch commanders and supervisors and
13  others at the port of entry will inform or apprise the
14  officers stationed at the limit line what the port
15  capacity is?
16    A.  Yeah, not directly.  I guess it would be more
17  appropriate to say that they will let them know when
18  we're able to take people in and when we're not.
19    Q.  And how often does that occur?
20    A.  Every day.
21    Q.  Once a day or at multiple times throughout the
22  day?
23    A.  Multiple times throughout the day.  There's
24  actually two times specifically throughout the day that
25  Mexican immigration prefers to be notified, so multiple

ER-0789



Page 161

1    times throughout the day.

2        Q.  And when the supervisor or watch commander or

3    others at the port of entry are informing CBP officers

4    who are stationed at the limit line what the capacity

5    is, do they do that verbally or via radio, or how is

6    that information conveyed?

7        A.  Again, they don't get into specifics of

8    capacity, but their communications with officers at the

9    international boundary is primarily through radio.

10       Q.  Okay.  So you said they don't get into

11   specifics.  Is it possible that the -- that a CBP

12   officer who is stationed at the limit line would have no

13   idea what the current capacity of the port is at any

14   given point in time?

15       A.  Yeah, that's possible.  They wouldn't have the

16   operational knowledge of -- of what's going on with the

17   entire port that would determine whether or not we could

18   take anybody in or not.  Their interest would be "do I

19   take someone in or not?"

20       Q.  So how does a CBP officer who's stationed at

21   the limit line know what to tell an asylum seeker who

22   approaches the limit line when metering is occurring?

23       A.  If they've been informed that we're not able to

24   take people at that time, then they will inform the

25   people approaching undocumented migrants that we will

ER-0790



Page 162

1    not be able to take people at that time.

2         Q.  What is CBP's opinion of nonprofit

3    organizations that attempt to help migrants seek asylum?

4              MS. SHINNERS:  Objection, scope.

5         A.  I don't think CBP, as an agency, has one

6    opinion of any organization.

7         Q.  (BY MR. FENN)  Is an asylum seeker who

8    approaches the limit line at a port of entry in the

9    El Paso Field Office more likely to gain entry if they

10   are accompanied by an advocate or a lawyer, in your

11   experience?

12        A.  No.  However, that has occurred.  So we

13   occasionally do get them accompanied by various

14   advocates.

15        Q.  And from your personal experience, why do you

16   think asylum seekers feel that they need to be

17   accompanied by an advocate or a lawyer when they present

18   themselves at a POE?

19             MS. SHINNERS:  Objection, foundation, that

20   calls for speculation, scope.

21        A.  From my personal perspective, I don't think

22   they do that.  I actually think it's the other way

23   around.  I -- I think the advocates go out recruiting

24   people to bring with them.  Judging from the -- the

25   migrants that come in, they -- they make comments of,



Page 163

1    you know, "that person there," and -- in other words, it

2    doesn't seem like they even know them.

3         Q.   (BY MR. FENN)  So you don't think that asylum

4    seekers seek out help from advocates or lawyers before

5    presenting at a port of entry?

6         A.   I think --

7              MS. SHINNERS:  Objection, scope, calls for

8    speculation.

9              You can answer.

10        A.   I think it's possible they do seek help, but in

11   your example of those being brought up to a port of

12   entry by advocates, in my personal experience, it

13   appears like the advocates are seeking people to -- to

14   bring them in.

15        Q.   (BY MR. FENN)  Okay.

16             MR. FENN:  Let's take a look at

17   Exhibit 171, please.

18        Q.   (BY MR. FENN)  Mr. Cleaves, I'm showing you

19   what's been marked -- what will be marked as

20   Exhibit 171.  This is a June 3rd, 2018, e-mail from

21   Randy Howe to Hector Mancha, with the subject line "RE:

22   Bridge even."  I'm not sure, that might be a typo in the

23   subject line there.

24             But do you see that?

25        A.   Yes.



Page 164

```
 1        Q.  I'd like to look at the earliest e-mail on the
 2   third page of the document, please.  This is an e-mail
 3   from Robert Moore to Roger Maier.
 4             Do you personally know who Robert Moore is?
 5        A.  I know that he's a reporter, but I don't
 6   personally know him.
 7        Q.  Do you know who Mr. Moore works for?
 8        A.  I think it's something called Texas Monthly,
 9   but I'm not sure.
10        Q.  Okay.  And do you personally know Roger Maier?
11        A.  I do, yes, sir.
12        Q.  And what is his position within CBP?
13        A.  He works for the Office of Public Affairs.
14        Q.  Okay.  Mr. Moore's e-mail reads:  "I
15   accompanied Ruben Garcia from Annunciation House today
16   to talk to a group of Guatemalans who said they were
17   denied the opportunity to come into the United States to
18   make an asylum claim.  After being with them, Ruben took
19   a badly sunburned mother and her baby, as well as a
20   16-year-old unaccompanied girl.  Our group was stopped
21   at the top of the bridge, just inside U.S. territory,
22   for CBP agents who asked the Guatemalans for ID.  The
23   agents initially said they would not allow the three
24   Guatemalans to move forward."
25             Did I read that correctly?
```



Page 165

```
 1         A.   You read that correctly.

 2         Q.   Are you familiar -- excuse me.

 3              Are you familiar with the organization

 4    Annunciation House?

 5         A.   I am.

 6         Q.   And are you personally familiar with Ruben

 7    Garcia?

 8         A.   I am.

 9         Q.   What is CBP's position regarding asylum seekers

10    who are on U.S. soil when they make their asylum claim?

11         A.   We process them.

12         Q.   Always?

13         A.   We should be processing them, yes.

14         Q.   The e-mail goes on:  "While we were waiting,

15    another agent armed with a semiautomatic or automatic

16    rifle arrives.  At one point, he discharged his Taser

17    toward the ground.  It was not a threatening move, but

18    it was audible and visible."

19              Are all CBP officers who are stationed at

20    the limit line armed?

21         A.   ████████████████████████████████████████████

22    ██████

23         Q.   And I assume CBP officers undergo weapons

24    training?

25         A.   They do.
```



Page 166

1    Q.  Does that training include any portion on power

2    dynamics for the perception of armed officers?

3                    MS. SHINNERS:  Object to the scope.

4    A.  In general, yes.  Officer --

5                    MS. SHINNERS:  You can go ahead.

6    A.  -- officer presence or perception, yes, there

7    is training on that.

8    Q.  (BY MR. FENN)  Does the weapons training

9    include use of a Taser?

10                   MS. SHINNERS:  Scope objection.

11   A.  Yes.  Those who have a Taser are trained in the

12   use of a Taser.

13   Q.  (BY MR. FENN)  The e-mail continues:  "The

14   supervisor, Agent Gomez, arrives after a few minutes.

15   He told Ruben the facilities were at capacity, a claim

16   Ruben challenged.  Agent Gomez also initially said that

17   Guatemalans couldn't move forward.  Ruben and his

18   assistant insisted that since they were on U.S. soil,

19   the law required that they be processed.  Agent Gomez

20   eventually agreed to allow them to come forward to be

21   processed."

22                   Did I read that correctly?

23   A.  Yes.

24   Q.  And my question is:  Are CBP officers who are

25   stationed at the limit line and the supervisors at ports



Page 167

1  of entry in the El Paso Field Office trained on the law

2  regarding asylum seekers stepping foot onto U.S. soil?

3      A.  Yes.  Yes, they know if they're on U.S. soil,

4  they should be processed.

5      Q.  And the e-mail continues, from Mr. Moore:

6  "While I was there, I saw agents standing at the

7  boundary blocking Guatemalans from coming in or trying

8  to urge Guatemalans back to the Mexican side.  At one

9  point, one of the agents crossed into Mexican territory

10 to keep a migrant from coming onto U.S. soil."

11          If it's true that the Guatemalans in

12 question in this account were on U.S. soil, should they

13 have been allowed to enter the port of entry?

14     A.  If it's true, yes.

15     Q.  And are CBP officers trained to station

16 themselves in Mexican territory?

17     A.  They're trained not to.  My understanding is

18 that did not occur.

19     Q.  When you say "that did not occur," do you mean

20 generally or in this particular instance?

21     A.  In this particular instance.

22     Q.  So do you have familiarity with this particular

23 event?

24     A.  On a personal, no, but as a representative,

25 yes.  I also know that the officer who discharged the



Page 168

1    Taser, he was doing a spark test at the beginning of his

2    shift, which is part of the training.  However, all

3    officers were reminded you don't do that in public.  So

4    that was inappropriate for him to do at that time.

5        Q.  So the -- so CBP officers are trained not to

6    perform their spark tests in public?

7        A.  Yes.  Well, they were definitely told after

8    this that's the case, but my understanding is, yes, that

9    there's no reason for a spark test to be done in public.

10       Q.  Okay.  Let's go -- strike that.

11            You mentioned that Roger Moore is, you

12   think, a reporter for Texas Monthly, correct?

13       A.  Yes.

14       Q.  And in your personal experience, is it common

15   for reporters or other media members to accompany asylum

16   seekers to ports of entry in the El Paso Field Office?

17       A.  I think at this time, when it was starting

18   back, it was somewhat common.

19       Q.  Do you personally read Texas Monthly?

20       A.  No.

21       Q.  Did you read the article that Mr. Moore wrote

22   regarding this incident?

23       A.  No.

24            MR. FENN:  Let's go two e-mails up to the

25   bottom of the first page, please.

ER-0797



Page 169

1    Q.   (BY MR. FENN)  And if I could direct your

2    attention to Mr. Moore's e-mail, the thir- -- yeah, the

3    third sentence there, starting "Ruben Garcia

4    challenged."  Do you see that sentence?

5    A.   Yes.

6    Q.   Okay.  It reads:  "Ruben Garcia challenged the

7    accuracy of the capacity claims.  Can you tell me the

8    capacity for holding people at the bridges, particularly

9    PDN, where we were today?  Can you provide some

10   statistics for the past week or so on the number of

11   people detained at the ports?"

12            Did I read that correctly?

13   A.   Yes.

14   Q.   Do you know whether Mr. Maier ever responded to

15   this portion of Mr. Moore's enquiry about capacity

16   numbers?

17   A.   I imagine it might be on the top of this

18   message string, whatever his response was, I guess.

19   Q.   Well, we can take a minute if you want to look

20   at the rest of the e-mail chain.

21   A.   Okay.

22            MR. FENN:  Kevin, if you could scroll up so

23   that we can see the rest of it, that would be helpful.

24   Q.   (BY MR. FENN)  And, then, Mr. Cleaves, let me

25   know when you've had a chance to read the rest of the



Page 170

1    chain.

2        A.  Okay.  It looks like he responded on June 2nd,

3    Roger Maier back to Robert Moore.

4        Q.  Right.  But in any of Mr. Maier's responses,

5    did you see anything about capacity numbers at the port

6    of entry that day?

7        A.  Yeah.  He says it would vary based on multiple

8    factors.

9        Q.  Okay.  And if you were asked for capacity

10   numbers for Paso del Norte or for the El Paso Port of

11   Entry by somebody at OFO for a given day, you would be

12   able to get those numbers, correct?

13       A.  I can give them physical capacity, detention

14   capacity numbers, but operational capacity, probably

15   not.  At best, we'd have to make an estimate of what was

16   occurring at that time, and the farther back you go, the

17   more difficult that would be to estimate.

18       Q.  Okay.  And, in fact --

19       A.  Farther back in time I mean.

20       Q.  I'm sorry.  I didn't mean to interrupt you.

21       A.  No.

22       Q.  In fact, we did look at an example where the

23   El Paso Field Office provided capacity numbers for each

24   port of entry within the El Paso Field Office to OFO,

25   correct?

ER-0799



Page 171

1      A.  You provided past e-mails that listed the

2  physical detention capacity of multiple ports of entry,

3  of which El Paso was one of them.  Are you referring to

4  those e-mails?

5      Q.  Yes, yes, correct.

6      A.  Yes, I remember those.

7      Q.  Okay.

8          MR. FENN:  Kevin, if we could please pull

9  up Exhibit 172.

10     Q.  (BY MR. FENN)  Mr. Cleaves, I'm showing you

11 what will be marked as Exhibit 172.  This is a document

12 Bates-numbered AOL-DEF-37758.  It is an e-mail dated

13 June 15th, 2018, from Ryan Koseor to the El Paso Ops

14 Center copying Randy Howe, Hector Mancha, you, and

15 others.  Do you see that?

16     A.  Yes.

17     Q.  I'd like to move one e-mail down in the chain

18 to Daniel Thomson's 6:35 p.m. e-mail.  Do you see that?

19     A.  Yes.

20     Q.  Okay.  Mr. Thomson is, in this e-mail,

21 providing capacity numbers for the POEs in the El Paso

22 Field Office, correct?

23     A.  Yes.

24     Q.  And Mr. Thomson states that the Port of El Paso

25 is on at 50.4 percent capacity, correct?



Page 172

1     A.  Yes.

2     Q.  But Mr. Thomson also states that PDN and Ysleta

3  are "holding the line," correct?

4     A.  Yes.

5     Q.  And does that mean that they, at this time,

6  were metering?

7     A.  Yes.

8     Q.  And staying within that same e-mail but moving

9  down to Mr. Thomson's description for the Port of

10  Tornillo, the description for the Port of Tornillo

11  states that it is:  "Processing and housing 0 detainees

12  with capacity of ▮▮ "

13          Correct?

14     A.  Yes.

15     Q.  Do you see where it says "Current State -

16  Challenges" right underneath Tornillo Port of Entry?

17     A.  Yes, sir.

18     Q.  And under that, the first bullet reads:

19  "National media (CNN) attention outside the port and

20  media request to enter the port due to the HHS UAC

21  facility.  Media is attempting to capture photos of the

22  housing and children."

23          Did I read that correctly?

24     A.  Yes.

25     Q.  In your experience, why would this be

ER-0801



Page 173

1  considered a challenge?

2      A.  Well, they decided to -- and I think it was

3  GSA.  I'm not sure who made the decision, but the

4  Tornillo Port of Entry has a large amount of land, and

5  their cargo facility, it is not used due to -- they were

6  built for cargo, and the Mexican side was supposed to

7  build their infrastructure and facilities to match it,

8  but they haven't done it yet.

9          So there's a lot of open space that -- a

10  lot of that space was given away to another agency, in

11  this case, Health and Human Services.  However, those

12  facilities use the same exit gates and entrance gates,

13  so it presents a challenge to the port of entry because

14  these people are protesting one facility, but it -- it

15  impedes on the port of entry's ability to -- to operate

16  sometimes.

17      Q.  Do you recall at this time what CBP's position

18  would have been with respect to CNN taking photos of the

19  HHS UAC facility?

20      A.  No.  I mean, it was -- it was Health and Human

21  Services' facility, so I think our view was it's --

22  Health and Human Services would have to deal with

23  whether or not that was appropriate or not.

24      Q.  Okay.  And then, the second bullet point there

25  under "Current State - Challenges" says:  "Congressman



Page 174

1    Beto O'Rourke planning march to Tornillo Port of Entry
2    on June 17th, 2018."
3               Did I read that correctly?
4        A.   Yes.
5        Q.   Do you recall if the march described in that
6    bullet point actually occurred?
7               MS. SHINNERS:  Object to the scope.
8        A.   Yes, I think so.  There were -- there were
9    several protests and marches, so I think this was one of
10   them.  The -- these were protests against the Health and
11   Human Services facility, but since it's on the same land
12   as the Tornillo Port of Entry, you know, it -- it
13   involved us, only because we're nearby, we're next door,
14   so...
15       Q.   (BY MR. FENN)  Is it common for media or
16   politicians to visit ports of entry in the El Paso Field
17   Office?
18       A.   It's common -- somewhat common for the Port of
19   El Paso.  It's extremely uncommon for the Port of
20   Tornillo.
21       Q.   Uh-huh.  And is that because Tornillo is a
22   smaller port of entry than El Paso?
23       A.   I think so.
24               MS. SHINNERS:  Object to the scope.
25       Q.   (BY MR. FENN)  Congressman O'Rourke was a



Page 175

1  member of the U.S. House of Representatives and

2  represented El Paso, correct?

3        A.  Yes, sir.

4        Q.  Did Congressman O'Rourke often visit ports of

5  entry in the El Paso Field Office?

6              MS. SHINNERS:  Object to the scope.

7        A.  I know he often visited the Port of El Paso.

8  How often he visited the other ports of entry, I don't

9  know if you would describe it as frequent or not, but...

10       Q.  (BY MR. FENN)  And did you ever personally

11  interact with Congressman O'Rourke?

12             MS. SHINNERS:  Same objection to scope.

13       A.  At least on two occasions, yes.

14       Q.  (BY MR. FENN)  And can you describe the nature

15  of those interactions?

16       A.  Sure.  One of those --

17             MS. SHINNERS:  Same objection.

18       A.  One of those was a leadership meeting at the

19  El Paso Field Office that he attended and spoke to us

20  on, and one was when there was a Tornillo holding

21  facility in 2016 at the Tornillo -- on the land of

22  Tornillo Port of Entry, and he visited that site.

23       Q.  (BY MR. FENN)  Okay.

24             MR. FENN:  Kevin, could we pull up

25  Exhibit 173, please?

ER-0804



Page 176

1          MS. SHINNERS:  I just -- I don't have that

2     exhibit yet.  I'll let you know when we get it.

3          MR. FENN:  Okay.

4          MS. SHINNERS:  Received.  Received.

5          MR. FENN:  Okay.  Thank you.

6     Q.  (BY MR. FENN)  Mr. Cleaves, I am showing you

7     what's -- what will be marked as Exhibit 173.  This is

8     Congressman Beto O'Rourke's Twitter page, and it

9     contains a video clip that was posted on December 14th,

10    2018.  Do you see that?

11    A.  Yes.

12    Q.  And in December 2018, was the El Paso Port of

13    Entry engaged in metering?

14    A.  Yes.

15    Q.  Okay.

16          MR. FENN:  Kevin, could we -- actually,

17    strike that.

18    Q.  (BY MR. FENN)  The description that accompanies

19    the video on Mr. O'Rourke's Twitter page says that

20    Congressman O'Rourke visited Juárez.  Do you see that?

21    A.  Yes, sir.

22    Q.  And Juárez is on the Mexican side of the border

23    adjacent to El Paso; is that correct?

24    A.  Yes, sir, a large city adjacent to El Paso on

25    the Mexican side.



Page 177

1     Q.  Okay.

2             MR. FENN:  Kevin, could we play the video?

3             (Video playing.)

4             (Video stopped.)

5     Q.  (BY MR. FENN)  Mr. Cleaves, do you agree with

6     Congressman O'Rourke's comparison of the asylum process

7     before metering was implemented in El Paso as compared

8     to after metering was implemented in El Paso?

9             MS. SHINNERS:  Objection, to memory test of

10    the video.

11            But go ahead.

12    A.  The only thing I disagree with his

13    characterization is the word "rejected."  They haven't

14    been rejected.  They're just waiting in line to then go

15    into the same process that he described as before

16    metering.

17    Q.  (BY MR. FENN)  And in the video, the asylum

18    seekers had wait-list numbers written on their arms.

19    Did you see that?

20    A.  I did.

21    Q.  Has it ever been a CBP practice at ports of

22    entry in the El Paso Field Office to write wait-list

23    numbers on asylum seekers?

24    A.  No.  Mexican Immigration reported that the

25    migrants themselves actually started that practice.



Page 178

1    Q.  Do you have any reason to believe that that

2    type of action was ever performed by a CBP officer

3    metering an asylum seeker in the El Paso Field Office?

4    A.  No, sir.

5         MS. SHINNERS:  Object to the form.

6         Sorry, Mr. Cleaves.  Go ahead.

7    A.  No.

8    Q.  (BY MR. FENN)  Okay.  And has it ever been a

9    CBP practice at ports of entry in the El Paso Field

10   Office to hand out tickets with wait-list numbers to

11   asylum seekers?

12   A.  I don't think we ever handed out tickets, but

13   in the first week of 2016 when we first implemented it,

14   they were giving appointments.  They were taking names

15   down, and then we had to correct that.  So that was part

16   of the -- that was part of the operational steps we took

17   in -- in -- when it was first implemented in 2016, it

18   was not correct.

19   Q.  And when asylum seekers were given appointments

20   in 2016, was that a verbal appointment or a verbal

21   notification of when their appointment was?

22   A.  My understanding, it -- it was, yes, sir.

23   Q.  At that time in 2016 when metering was

24   occurring at El Paso, were asylum seekers who were

25   turned back given any -- any documentation or anything



Page 179

1   on paper?

2              MS. SHINNERS:  Object to the form.

3       A.  No.  My understanding is they were not issued

4   anything.

5       Q.  (BY MR. FENN)  Okay.  Are you aware that

6   Congresswoman Alexandria Ocasio-Cortez and other members

7   of Congress visited border patrol and CBP detention

8   facilities in El Paso in July of 2019?

9              MS. SHINNERS:  Object to the scope.

10      A.  Yes.

11      Q.  (BY MR. FENN)  I'm sorry, Mr. Cleaves.  Was

12  that a "yes"?

13      A.  Yes.

14      Q.  Did you personally interact with any of the

15  members of Congress when they visited?

16             MS. SHINNERS:  Same objection to scope.

17      A.  Yes.

18      Q.  (BY MR. FENN)  Which -- which congressmen or

19  women did you interact with during their visit?

20             MS. SHINNERS:  Same objection.

21      A.  I don't remember --

22             THE WITNESS:  I'm sorry.

23             MS. SHINNERS:  Go ahead.

24      A.  I don't remember because they were in a group.

25  So the -- the one I remember answering questions from



Page 180

1  was Ms. Escobar, and that's because she's our local

2  representative, so I know her.  And then, the others,

3  you know, I had -- we had questions from multiple, so

4  I -- I don't know which ones.  I don't remember which

5  ones asked questions and which ones we were answering,

6  and it was quite brief actually.

7       Q.  (BY MR. FENN)  Okay.  And I know you testified

8  earlier that you do not have a Facebook account and --

9  and never have.  Are you aware of the Facebook group

10  called "I'm 10-15"?

11            MS. SHINNERS:  Object to the scope.

12       A.  I am not aware of that Facebook group, but I am

13  aware of the circumstances on how that Facebook group

14  came to -- to be known, I guess, in general.

15       Q.  (BY MR. FENN)  And, if you could, tell us how

16  did that Facebook group come to be known?

17       A.  My understanding is --

18            MS. SHINNERS:  Object to the scope.

19            THE WITNESS:  Oh, I'm sorry.

20       A.  My --

21            MS. SHINNERS:  You can continue.

22            THE WITNESS:  Okay.

23       A.  My understanding is that there were some

24  extremely inappropriate posts on that site related to

25  migrants, and that's how I became aware of it.

ER-0809



MAGNA
LEGAL SERVICES

1     Q.  (BY MR. FENN)  Had you ever seen any of those

2  allegedly inappropriate posts from that Facebook group?

3              MS. SHINNERS:  Object to the scope.

4     A.  In my --

5     Q.  (BY MR. FENN)  Sorry.  I didn't hear your

6  response, Mr. Cleaves.

7     A.  No problem.  No, I don't think I've seen any of

8  the posts.  I think I've seen a photograph that was

9  supposed to be a part of a post because I think it was

10  widely distributed in the media or something like that.

11     Q.  And was -- was the photograph you're referring

12  to a photograph of a father and daughter who died

13  attempting to cross through the Rio Grande?

14     A.  Yes, sir.

15              MS. SHINNERS:  Object to the scope.

16     Q.  (BY MR. FENN)  Are you aware that -- strike

17  that.

18              Do you know whether CBP ever issued any

19  sort of statement condemning the allegations surrounding

20  the Facebook group "I'm 10-15"?

21              MS. SHINNERS:  Object to the scope.

22     A.  I don't know if the agency did or not, but

23  I -- I -- I want to say I think they did, but I don't

24  recall if something specific was issued like that or

25  not.



MAGNA
LEGAL SERVICES

Page 182

```
 1        Q.  (BY MR. FENN)  Okay.  So it's fair to say that
 2   you wouldn't have been personally involved in issuing
 3   such a statement if one was issued?
 4        A.  No, and I would be the wrong component.  My
 5   understanding was that was a border patrol site or -- or
 6   border patrol agent's site, so OFO didn't have much
 7   knowledge or involvement in any of that other than us
 8   finding out about it or hearing about it.
 9                MR. FENN:  This might be a good time to
10   take a break if you want.  We've been going for about an
11   hour and a half.
12                MS. SHINNERS:  Okay.  Do you know how much
13   you have -- you guys have left?
14                MR. FENN:  I think we're -- we're getting
15   closer, but I would estimate maybe an hour.
16                MS. SHINNERS:  Okay.  Yeah, we can go off
17   the record.
18                MR. FENN:  Okay.
19                THE VIDEOGRAPHER:  The time is 2:31 p.m.
20   We're going off the record.
21                (Break was taken.)
22                THE VIDEOGRAPHER:  The time is 2:49 p.m.
23   We're back on the record.
24        Q.  (BY MR. FENN)  Welcome back, Mr. Cleaves.
25                MR. FENN:  Kevin, if you could please put
```



Page 183

1    up Exhibit 86.

2              Katy, have you received this exhibit?

3              MS. SHINNERS:  Yes.  Thank you.

4    Q.  (BY MR. FENN)  Okay.  Mr. Cleaves, I'm showing

5    you what's been previously marked as -- I'm sorry --

6    what will be previously marked as exhibit -- let me try

7    that again.  I promise I'll stop doing that.

8              I am showing you what will be marked as

9    Exhibit 86.  This is a June 5th, 2018, memorandum from

10   Homeland Security Secretary Kirstjen Nielsen, with the

11   subject line "Prioritization-Based Queue Management."

12             Do you see that?

13   A.  Yes.

14             MR. FENN:  And if we could flip to the

15   second page of the memo.

16   Q.  (BY MR. FENN)  About halfway down, there is a

17   highlighted section, and that section reads:  "CBP

18   personnel and resources that would otherwise be deployed

19   to process inadmissible arriving aliens can focus on the

20   detention and apprehension of narcotics and currency

21   smugglers."

22             Did I read that correctly?

23   A.  Yes.

24   Q.  Does this sentence still reflect the policy of

25   CBP?



Page 184

```
 1        A.   It --

 2               MS. SHINNERS:  Objection.

 3               THE WITNESS:  I'm sorry.

 4               MS. SHINNERS:  But you can answer,

 5    Mr. Cleaves.

 6               THE WITNESS:  Yes, ma'am.

 7        A.   Yes.  In 2016, at the Port of El Paso, the

 8    overcrowding reached emergent levels, so we pulled from

 9    other mission sets.  We pulled a lot from other mission

10    sets, and it degraded our ability to perform those

11    mission sets to some degree.  And it was the focus in

12    2018, as the surge began again, to -- to not do that.

13        Q.   (BY MR. FENN)  So in 2016, you were able to

14    shift resources in order to handle what -- what might

15    have been a surge in migrants seeking asylum; is that

16    right?

17        A.   Yeah.  In 2016, we shifted resources to try and

18    handle that emergent surge that we were experiencing,

19    but it didn't work.  It wasn't sustainable, and it was

20    degrading our -- our other mission sets.  Some of the

21    mission sets were degraded significantly.  So it was

22    becoming a problem.

23               So as -- as 2018, at least for the Port of

24    El Paso's perspective, when the surge started hitting

25    again and -- and -- and started to become very similar,
```



Page 185

1    it was a concern.  And -- and it was expressed to us to

2    not degrade the other mission sets to the point that you

3    did before.  So continue processing, but there will have

4    to be some waiting in line so that way we don't degrade

5    the other mission sets.

6         Q.  And you said that --

7              MS. SHINNERS:  I'm sorry to interrupt.  I

8    have lost -- we can go off the record if you'd like, but

9    I've lost my -- Kevin, I've lost my ability to chat.

10             MR. FENN:  Yeah, let's go.

11             MAGNA TECH:  One second.

12             THE VIDEOGRAPHER:  The time is 2:52 p.m.

13   We're going off the record.

14                  (Off the record.)

15             THE VIDEOGRAPHER:  The time is 2:53 p.m.

16   We're back on the record.

17        Q.  (BY MR. FENN)  Okay.  Mr. Cleaves, you -- you

18   mentioned that the shifting of resources in 2016 was not

19   effective, correct?

20        A.  Correct.

21        Q.  But you also said before that the Port of

22   El Paso did not engage in metering between December 2016

23   and, we'll call it, May of 2018, correct?

24        A.  Correct.

25        Q.  Okay.



Page 186

1          MR. FENN:  If we could look back at the

2  document on the next page.

3     Q.  (BY MR. FENN)  And I'm looking at the second

4  full paragraph, the second-to-the-last line there.

5  Secretary Neilsen directs CBP to "initiate a 30-day

6  pilot program to prioritize staffing and operations" at

7  all ports of entry on the U.S.-Mexico border, correct?

8     A.  Yes.

9          MR. FENN:  And if we could zoom in on

10  the -- the numbered portion below.

11     Q.  (BY MR. FENN)  That prioritized order is,

12  first, national security efforts; second,

13  counter-narcotics operations; third, economic security;

14  and fourth, trade and travel facilitation, correct?

15     A.  Yes.

16     Q.  And inspecting and processing asylum seekers

17  does not fall within those four priorities, correct?

18     A.  It's not listed within those four, correct.

19     Q.  And because of this prioritization, fewer

20  asylum seekers get processed than if CBP treated all of

21  its statutory mandates with equal priority, correct?

22     A.  Incorrect.

23          MS. SHINNERS:  Objection.

24     A.  I need to learn to pause.

25          Incorrect.  At least for the Port of



Page 187

1   El Paso, fiscal year 2019 was the only year the Port of

2   El Paso consistently did metering for the entire year,

3   and we processed more inadmissibles that year than any

4   other year without metering.  We processed 12 percent

5   more inadmissibles in 2019 than 2018.  2018, we only did

6   metering for about half the year, and we processed

7   10 percent more inadmissibles than 2016, and in 2016 we

8   only did 3 weeks.

9         MR. FENN:  I -- I'm sorry.  I'm -- I'm

10  hearing, I think, somebody else's voice or a clip or

11  something in the background.  If -- if -- wherever

12  that's coming from, if they could please mute it, that

13  would be helpful.

14  Q.  (BY MR. FENN)  Okay.  The queue management in

15  the title of Ms. Nielsen's memo, queue management refers

16  to metering, correct?

17  A.  Yes.

18  Q.  And so this entire memo is really about how to

19  implement metering in a way that ensures it is the

20  lowest of CBP's priorities, correct?

21  A.  No.

22        MS. SHINNERS:  Objection, argumentative.

23  A.  No.

24  Q.  (BY MR. FENN)  Would you agree -- I think you

25  did agree that processing and inspecting asylum seekers



Page 188

1    does not appear on this list of four priorities that we

2    have in front of us, correct?

3         A.  Correct.

4         Q.  And those four priorities are supposed to be

5    prioritized ahead of processing and inspecting asylum

6    seekers, correct?

7         A.  Yes, that's the emphasis of this memo, I

8    believe.  However, in many ways, that's always been our

9    priority, especially national security and narcotics,

10   which includes outbound and -- and trade, cargo.  That's

11   part of our mission statement.  So it's not too much of

12   a departure from what we've always been doing in

13   cer- -- in certain ways.

14        Q.  Did CBP know that adopting priority-based queue

15   management would impact the number of asylum seekers

16   that could be processed and increase the number that

17   could be turned away?

18        A.  I don't know if they knew if that would be the

19   case.  I know for the Port of El Paso, it -- it did

20   create a wait time, people waiting in line.  However,

21   for us, in 2019, we're actually able to process more

22   with metering, and I think it's because metering allowed

23   us to prevent emergencies.  They -- they allowed us to

24   prevent the crisis management that -- that occurred in

25   2016 and -- and other times.



Page 189

1          And so you can be pretty efficient and

2     effective, even though -- so the -- in other words,

3     keeping a consistent flow.  And it was successful in

4     processing more people than in the other years.  And

5     then, of course, at the end of 2019, we reached the end

6     of the line.  So Mexican Immigration in late

7     January 2020 started reporting that there were no people

8     in line.  And then, throughout February, intermittently

9     there would be some there in low numbers and some --

10    and -- and at times, there were none.

11         Q.  Okay.  But you don't know one way or another

12    whether CBP knew prior to adopting this priority-based

13    queue management system whether it had the potential to

14    lead to an increased number of asylum seekers who were

15    turned away?

16         A.  No, I do not know that.

17              MR. FENN:  Kevin, let's put up, please,

18    Exhibit 174.

19         Q.  (BY MR. FENN)  Mr. Cleaves, I'm showing you

20    what will be marked as Exhibit 174, and it's

21    Bates-labeled AOL-DEF-00095574.  It is a May 24th, 2018,

22    e-mail from Ray Provencio to Randy Howe and copying

23    Hector Mancha, with subject line:  "RE:  Info needed by

24    1600."

25              Do you see that?

