Nos. 22-55988, 22-56036

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

———————————————

AL OTRO LADO, INC., *et al.*,

*Plaintiffs-Appellees/Cross-Appellants*,

v.

ALEJANDRO MAYORKAS, Secretary of Homeland Security, *et al.*,

*Defendants-Appellants/Cross-Appellees*,

and

THE EXECUTIVE OFFICE FOR IMMIGRATION REVIEW,

*Appellant/Cross-Appellee*.

———————————————

APPEAL FROM FINAL JUDGMENT OF THE UNITED STATES DISTRICT
COURT FOR THE SOUTHERN DISTRICT OF CALIFORNIA
No. 17-cv-02366-BAS-KSC

———————————————

## APPELLEES/CROSS-APPELLANTS' REDACTED
## PRINCIPAL AND RESPONSE BRIEF

———————————————

Stephen M. Medlock
Evan Miller
Rami Abdallah E. Rashmawi
VINSON & ELKINS LLP
2200 Pennsylvania Ave., N.W., Ste. 500 W.
Washington, D.C. 20036
(202) 639-6500

Baher Azmy
Angelo Guisado
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6464

Ori Lev
MAYER BROWN LLP
1999 K Street, N.W.
Washington, D.C. 20006
(202) 263-3270

Matthew H. Marmolejo
MAYER BROWN LLP
333 S. Grand Ave., 47th Floor
Los Angeles, CA 90071
(213) 229-9500

*Additional Counsel listed inside cover*

Melissa Crow
CENTER FOR GENDER & REFUGEE STUDIES
1121 14th Street, N.W., Suite 200
Washington, D.C. 20005
(202) 355-4471

Neela Chakravartula
Anne Dutton
CENTER FOR GENDER & REFUGEE STUDIES
200 McAllister Street
San Francisco, CA 94102
(415) 565-4877

Katherine Melloy Goettel
Gianna Borroto
Suchita Mathur
AMERICAN IMMIGRATION COUNCIL
1331 G St N.W., Suite 200
Washington, D.C. 20005
(202) 507-7552

Sarah Rich
SOUTHERN POVERTY LAW CENTER
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
(404) 521-6700

Rebecca Cassler
SOUTHERN POVERTY LAW CENTER
201 Saint Charles Avenue, Suite 2000
New Orleans, LA 70170
(504) 486-8982

*Counsel for Appellees/Cross Appellants*

## CORPORATE DISCLOSURE STATEMENT

Plaintiffs are a certified class and a nonprofit entity with no parent corporation. No publicly held corporation owns ten percent or more of any stake or stock in Plaintiffs.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................... iii

INTRODUCTION ...................................................................................... 1

JURISDICTIONAL STATEMENT ........................................................... 2

ISSUES PRESENTED............................................................................... 2

STATEMENT OF THE CASE.................................................................... 3

    A.    POEs on the U.S.-Mexico Border Prior to 2016 .................................. 3

    B.    Defendants Begin Violating Their Statutory Duties ........................... 5

    C.    The Turnback Policy Expands ....................................................... 6

    D.    Defendants Memorialize the Turnback Policy.................................... 8

    E.    The Turnback Policy Harmed Plaintiffs ......................................... 9

    F.    Defendants' False Justifications for the Turnback Policy ................. 10

    G.    Procedural History................................................................... 13

STANDARD OF REVIEW ....................................................................... 14

SUMMARY OF THE ARGUMENT ......................................................... 14

ARGUMENT ............................................................................................ 15

    I.    Defendants Violated APA § 706(1) .................................................. 15

        A.    The District Court Correctly Held that Defendants Have a Mandatory Ministerial Duty to Inspect and Process Arriving Asylum Seekers........................................................ 15

        B.    Defendants Have Not Identified Any Defects in the District Court's Analysis........................................................ 23

        C.    Defendants' "Delay" Argument is Unfounded......................... 29

    II.    Defendants Violated the Fifth Amendment ....................................... 34

    III.    The District Court Properly Enjoined the Application of the Asylum Ban.......................................................................... 36

    IV.    The District Court's Remaining Summary Judgment Rulings Should be Reversed and Remanded................................................ 42

        A.    The District Court Erred by Not Addressing APA §

**TABLE OF CONTENTS**
(continued)

**Page**

706(2) ....................................................................................43

    1.    The Turnback Policy Is a Final Agency Action ............43

    2.    The Turnback Policy Exceeds Defendants' Authority........................................................................44

    3.    The Turnback Policy Is Arbitrary and Capricious and an Abuse of Discretion under APA § 706(2). ........48

B.    The Court Erred in Dismissing Plaintiffs' Independent INA Claim................................................................50

C.    The District Court Erred in Denying Plaintiffs Summary Judgment on Their ATS Claim ................................52

CONCLUSION .............................................................................59

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abramski v. United States*,
   573 U.S. 169 (2014) ........................................................................17

*Al Otro Lado v. Wolf*,
   952 F.3d 999 (9th Cir. 2020) ..................................................... *passim*

*Al Otro Lado, Inc. v. McAleenan*,
   423 F. Supp. 3d 848 (S.D. Cal. 2019) ..............................................38

*Almeida-Sanchez v. United States*,
   413 U.S. 266 (1973) ........................................................................47

*Barrios v. Holder*,
   581 F.3d 849 (9th Cir. 2009) ...........................................................24

*Bennett v. Spear*,
   520 U.S. 154 (1997) .................................................................. 43, 44

*Biden v. Texas*,
   142 S. Ct. 2528 (2022) .....................................................................27

*Blazevska v. Raytheon Aircraft Co.*,
   522 F.3d 948 (9th Cir. 2008) ...........................................................55

*Bostock v. Clayton Cnty.*,
   140 S. Ct. 1731 (2020) .....................................................................47

*Boumediene v. Bush,*
   553 U.S. 723 (2008) .................................................................. 35, 36

*Carr v. United States*,
   560 U.S. 438 (2010) ........................................................................19

*Carroll v. United States*,
   267 U.S. 132 (1925) ........................................................................47

*Catholic Social Services, Inc. v. INS*,
   232 F.3d 1139 (9th Cir. 2000) ............................................. 39, 40, 41

*Chae Chan Ping v. United States*,
   130 U.S. 581 (1889) ........................................................................47

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Cutler v. Hayes*,
    818 F.2d 879 (D.C. Cir. 1987) ............................................................33

*Daniel v. Nat'l Park Serv.*,
    891 F.3d 762 (9th Cir. 2018) .............................................................22

*Dart v. United States*,
    848 F.2d 217 (D.C. Cir. 1988) ............................................................52

*U.S. Department of Commerce v. New York*,
    139 S. Ct. 2551 (2019) ............................................................... 48, 50

*DHS v. Thuraissigiam*,
    140 S. Ct. 1959 (2020) ............................................................... 24, 25

*East Bay Sanctuary Covenant v. Trump*,
    932 F.3d 742 (9th Cir. 2018) .............................................................29

*E.V. v. Robinson*,
    906 F.3d 1082 (9th Cir. 2018) ...........................................................51

*Esquivel-Quintana v. Sessions*,
    581 U.S. 385 (2017) .........................................................................18

*Filartiga v. Pena-Irala*,
    630 F.2d 876 (2d Cir. 1980) ....................................................... 53, 54

*Galvan v. Press*,
    347 U.S. 522 (1954) .........................................................................47

*Garcia v. Lawn*,
    805 F.2d 1400 (9th Cir. 1986) ...........................................................38

*Garland v. Aleman Gonzalez*,
    142 S. Ct. 2057 (2022) ................................................... 39, 40, 41, 43

*Gonzales v. DHS*,
    508 F.3d 1227 (9th Cir. 2007) ............................................... 39, 40, 41

*Gonzalez v. Google LLC*,
    2 F.4th 871 (9th Cir. 2021) ...............................................................28

*Gonzalez v. ICE*,
    975 F.3d 788 (9th Cir. 2020) ................................................ 39, 40, 41

iv

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Gorbach v. Reno*,
219 F.3d 1087 (9th Cir. 2000) ..................................................................... 46, 47

*Guerrier v. Garland*,
18 F.4th 304 (9th Cir. 2021) .................................................................................34

*Hernandez-Rodriguez v. Barr*,
776 F. App'x 477 (9th Cir. 2019).........................................................................24

*Ibrahim v. U.S. Department of Homeland Security*,
669 F.3d 983 (9th Cir. 2012) ....................................................................... 35, 36

*In re A Community Voice*,
878 F.3d 779 (9th Cir. 2017)................................................................................33

*In re Barr Labs., Inc.*,
930 F.2d 72 (D.C. Cir. 1991) ...............................................................................33

*In re M-D-C-V-*,
28 I. & N. Dec. 18 (BIA 2020)..............................................................................21

*Independent Mining Co. v. Babbitt*,
105 F.3d 502 (9th Cir. 1997)................................................................................31

*INS v. Cardoza–Fonseca*,
480 U.S. 421 (1987) ..............................................................................................16

*Ivy Sports Med., LLC v. Burwell*,
767 F.3d 81 (D.C. Cir. 2014) ...............................................................................47

*Johnson v. Eisentrager*,
339 U.S. 763 (1950) ..............................................................................................36

*Landon v. Plasencia*,
459 U.S. 21 (1982) ................................................................................................36

*Larson v. Domestic & Foreign Com. Corp.*,
337 U.S. 682 (1949) ..............................................................................................51

*Latifi v. Neufeld*,
2015 WL 3657860 (N.D. Cal. 2015)....................................................................32

*Loughrin v. United States*,
573 U.S. 351 (2014) ...................................................................................... 19, 25

v

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Lujan v. Nat'l Wildlife Fed'n*,
  497 U.S. 871 (1990) ............................................................................ 44

*Maracich v. Spears*,
  570 U.S. 48 (2013) ............................................................................. 17

*Melendres v. Arpaio*,
  784 F.3d 1254 (9th Cir. 2015) ........................................................... 37

*Murray v. Schooner Charming Betsy*,
  6 U.S. (2 Cranch) 64 (1804) .............................................................. 56

*Nishimura Ekiu v. United States*,
  142 U.S. 651 (1892) ........................................................................... 47

*Niz-Chavez v. Garland*,
  141 S. Ct. 1474 (2021) ....................................................................... 29

*Norton v. S. Utah Wilderness All.*,
  542 U.S. 55 (2004) ............................................................................. 38

*Nw. Env't Def. Ctr. v. Gordon*,
  849 F.2d 1241 (9th Cir. 1988) ........................................................... 38

*ONRC Action v. Bureau of Land Mgmt.*,
  150 F.3d 1132 (9th Cir. 1998) ........................................................... 44

*Orantes-Hernandez v. Thornburgh*,
  919 F.2d 549 (9th Cir. 1990) ............................................................. 37

*Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*,
  810 F.3d 631 (9th Cir. 2015) ............................................................. 38

*Planned Parenthood of Greater Wash. & N. Idaho v. U.S. Dep't of Health & Human Servs.*,
  946 F.3d 1100 (9th Cir. 2020) ........................................................... 44

*Platero-Rosales v. Garland*,
  55 F.4th 974 (5th Cir. 2022) .............................................................. 47

*RadLAX Gateway Hotel v. Amalgamated Bank*,
  566 U.S. 639 (2012) ........................................................................... 45

vi

## TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Ramirez v. U.S. Immigration & Customs Enforcement*,
310 F. Supp. 3d 7 (D.D.C. 2018) ........................................................45

*Rasul v. Bush*,
542 U.S. 466 (2004) ..........................................................................36

*RJR Nabisco, Inc. v. European Community*,
579 U.S. 325 (2016) ..........................................................................27

*Rowland v. California Men's Colony*,
506 U.S. 194 (1993) ..........................................................................28

*Sale v. Haitian Centers Council, Inc.*,
509 U.S. 155 (1993) .................................................................. *passim*

*Sampson v. Fed. Republic of Germany*,
250 F.3d 1145 (7th Cir. 2001) ............................................................54

*San Luis & Delta-Mendota Water Auth. v. Locke*,
776 F.3d 971 (9th Cir. 2014) ................................................ 48, 49, 50

*Santillan v. Gonzales*,
388 F. Supp. 2d 1065 (N.D. Cal. 2005) ..............................................32

*Shaughnessy v. United States ex rel. Mezei*,
345 U.S. 206 (1953) ............................................................ 21, 22, 47

*Siderman de Blake v. Republic of Argentina*,
965 F.2d 699 (9th Cir. 1992) ................................................ 53, 54, 56

*Singh v. Napolitano*,
909 F. Supp. 2d 1164 (E.D. Cal. 2012) ..............................................32

*Sosa v. Alvarez-Machain*,
542 U.S. 692 (2004) ..........................................................................52

*Telecomms. Rsch. & Action Ctr. v. FCC*,
750 F.2d 70 (D.C. Cir. 1984) .......................................... 31, 32, 33, 34

*Tufail v. Neufeld*,
2016 WL 1587218 (E.D. Cal. 2016) ...................................................32

*United States ex. rel. Knauff v. Shaughnessy*,
338 U.S. 537 (1950) ..........................................................................47

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*United States v. Balint,*
  201 F.3d 928 (7th Cir. 2000) ........................................................... 21, 25

*United States v. Delgado-Garcia,*
  374 F.3d 1337 (D.C. Cir. 2004) ..................................................... 28, 48

*United States v. Lopez-Perera,*
  438 F.3d 932 (9th Cir. 2006) ................................................................24

*United States v. Ubaldo,*
  859 F.3d 690 (9th Cir. 2017) ................................................................27

*United States v. Verdugo-Urquidez,*
  494 U.S. 259 (1990) ..............................................................................36

*United States v. Villanueva,*
  408 F.3d 193 (5th Cir. 2005) ................................................................27

*United States v. Washington,*
  853 F.3d 946 (9th Cir. 2017) ................................................................14

*United States v. Wilson,*
  503 U.S. 329 (1992) ..............................................................................19

*Util. Air Regul. Grp. v. EPA,*
  573 U.S. 302 (2014) ........................................................................ 45, 47

*Wagafe v. Trump,*
  2017 WL 2671254 (W.D. Wash. 2017) ................................................44

*WesternGeco LLC v. ION Geophysical Corp.,*
  138 S. Ct. 2129 (2018) .................................................................... 26, 27

*Williams v. Taylor,*
  529 U.S. 362 (2000) ..............................................................................19

*Winston Research Corp. v. Minn. Min. & Mfg. Co.,*
  350 F.2d 134 (9th Cir. 1965) ................................................................37

**Statutes**

1 U.S.C. § 1 ...................................................................................... 20, 26

28 U.S.C. § 1291 ......................................................................................2

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

28 U.S.C. § 1331 ................................................................................................2

28 U.S.C. § 1350 ..............................................................................................52

5 U.S.C. § 702 ..................................................................................................51

5 U.S.C. § 704 ..................................................................................................43

5 U.S.C. § 706(1) ...................................................................................... passim

5 U.S.C. § 706(2) ...................................................................................... passim

6 U.S.C. § 111(b)(1) ................................................................................. 13, 46

6 U.S.C. § 202 ..................................................................................................46

6 U.S.C. § 211 ..................................................................................................46

8 U.S.C § 1253(h) ............................................................................................28

8 U.S.C. § 1101(a)(13) ............................................................................. 20, 21

8 U.S.C. § 1101(a)(18) .....................................................................................46

8 U.S.C. § 1157 ........................................................................................ 16, 50

8 U.S.C. § 1158 .......................................................................................... passim

8 U.S.C. § 1158(a)(1) ................................................................................ passim

8 U.S.C. § 1225 ......................................................................................... passim

8 U.S.C. § 1225(a)(1) ................................................................................ passim

8 U.S.C. § 1225(a)(2) .......................................................................................16

8 U.S.C. § 1225(a)(3) ................................................................................ passim

8 U.S.C. § 1225(b)(1)(A)(i) ..................................................................... 25, 32

8 U.S.C. § 1225(b)(1)(A)(ii) ..................................................................... passim

8 U.S.C. § 1225(b)(1)(B)(iii) ...........................................................................25

8 U.S.C. § 1229a(7)(C)(ii) ...............................................................................16

8 U.S.C. § 1231(a)(5) .......................................................................................40

8 U.S.C. § 1252 ................................................................................................42

8 U.S.C. § 1252(f)(1) .................................................................... 39, 40, 41, 42

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

8 U.S.C. § 1255(i) ................................................40

8 U.S.C. § 1255a ................................................40

8 U.S.C. §§ 1221–31 ............................................39

8. U.S.C. § 1158(b)(2)(C) .....................................40

Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102 ........16

**Regulations**

8 C.F.R. § 1.2 ..................................................22

8 C.F.R. § 1001.1(q) ...........................................22

8 C.F.R. § 208.13(c)(4) ........................................42

8 C.F.R. § 235.3(b)(1)(i) ......................................22

84 Fed. Reg 33,829 (July 16, 2019) ............................13

85 Fed. Reg. 82,260 ...........................................40

**Other Authorities**

Guy S. Goodwin-Gill & Jane McAdam, *The Refugee in International Law* 208 (3d ed. 2007) ................................................58

*Implementation of Title III of the Illegal Immigr. Reform and Immigrant Responsibility Act of 1996: Hearing Before the Subcomm. on Immigration and Claims of the H. Comm. on the Judiciary*, 105th Cong. 17–18 (1997) ...............23

Merriam-Webster's Collegiate Dictionary (11th ed. 2003) ......26

**International Authorities**

Austria - Administrative Court of the Province of Styria, LVwG 20.3-912/2016 (Sep. 9, 2016) ................................................57

*Cartagena Declaration*, Cartagena Declaration on Refugees, Colloquium on the International Protection of Refugees in Central America, Mexico and Panama, Nov. 22, 1984, OAS/Ser. L/V/II.66, doc. 10, rev. 1, at 190-93 ..........58

*D.D. v. Spain*, U.N. Doc. CRC/C/80/D/4/2016 ................................................57

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Dee M.A. and Others v. Lithuania*,
App. No. 59793/17, ¶ 21, Eur. Ct. H.R. (Dec. 11, 2018) ....................................57

European Union Agency for Fundamental Rights, *Scope of the principle of non-refoulement in contemporary border management* (2016) ...................................58

*Ilias and Ahmed v. Hungary*,
App. No. 47287/15, Eur. Ct. H.R. (Mar. 14, 2017)................................................57

INT'L L. ASS'N, *Resolution 6/2002 on Refugee Procedures (Declaration on International Minimum Standards for Refugee Procedures)*..............................58

*Mexico Declaration,* Mexico Declaration and Plan of Action to Strengthen the International Protection of Refugees in Latin America, Nov. 16, 2004 .............58

Org. of African Unity, Convention Governing the Specific Aspects of Refugee Problems in Africa, Sept. 10, 1969, 1001 U.N.T.S. 45.......................................58

*R.R. and Others v Hungary*,
App. No. 36037/17, Eur. Ct. H.R. (Mar. 2, 2021).................................................57

U.N. Committee Against Torture, *General Comment No. 4 (2017) on the Implementation of Article 3 of the Convention in the Context of Article 22*, ¶¶ 4, 11, 12, U.N. Doc. CAT/C/GC/4 (Sept. 4, 2018) ..................................................58

UNHCR Exec. Comm., *Conclusion No. 22* (XXXII) – 1981, *Protection of Asylum-Seekers in Situations of Large-Scale Influx*, ¶ II.A. ............................................56

UNHCR Exec. Comm., *Note on International Protection*, ¶ 16, U.N. Doc. A/AC.96/951 (Sept. 13, 2001)...................................................................... 52, 57

UNHCR, *Advisory Opinion on the Extraterritorial Application of Non-Refoulement Obligations Under the 1951 Convention Relating to the Status of Refugees and its 1967 Protocol* (Jan. 26, 2007)........................................... 53, 57

UNHCR, Non-Refoulement No. 6 (XXVIII) - 1977, ¶¶ (a), (c), U.N. DOC. A/32/12/Add.1 (Oct. 12, 1977) .................................................................56

## INTRODUCTION

This case presents a narrow but exceedingly important question: is it lawful for Defendants to turn back asylum seekers arriving in the U.S. at Class A Ports of Entry ("POEs")? The answer is "no," for a number of reasons. The district court properly concluded that Congress imposed upon Defendants a mandatory duty to inspect and process such asylum seekers under 8 U.S.C. §§ 1158(a)(1), 1225(a)(1), 1225(a)(3), and 1225(b)(1)(A)(ii), and that Defendants' denial of access to that process violated § 706(1) of the Administrative Procedure Act ("APA") and the Fifth Amendment's due process clause. The district court's conclusion was supported by multiple canons of statutory construction and an avalanche of admissions from Defendants.

The district court also appropriately concluded that its statutory analysis rendered an asylum-limiting rule adopted by Defendants inapplicable to a subclass of plaintiffs and enjoined Appellants from applying the rule to that subclass.

The district court should also have held that Defendants' policy of turning away suspected asylum seekers who were attempting to access the asylum process at POEs along the U.S.-Mexico border (the "turnback policy") is unlawful under § 706(2) of the APA and the Alien Tort Statute ("ATS") and as *ultra vires* agency action.

This Court should (1) affirm the district court's rulings under § 706(1) of the

APA and the Fifth Amendment, (2) affirm the district court's entry of a permanent injunction regarding the Asylum Ban (defined below), (3) reverse the district court's determinations with respect to § 706(2) of the APA, the ATS, and Plaintiffs' claim of *ultra vires* agency action, and (4) remand for consideration of appropriate relief under § 706(2) of the APA, the ATS, and Plaintiffs' claim of *ultra vires* agency action.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331. This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED

I.  Did the district court correctly conclude that Defendants unlawfully withheld mandatory agency action in violation of § 706(1) of the APA when the plain language, common meaning, relevant rules of statutory construction, relevant regulations, and legislative history all support the conclusion that 8 U.S.C. §§ 1158 and 1225 impose a mandatory duty on Defendants to inspect and process asylum seekers arriving in the U.S.?

II. Did the district court correctly conclude that Defendants' unlawful withholding of mandatory agency action violates the Fifth Amendment?

III. Did the district court correctly conclude that its statutory analysis rendered an asylum-limiting rule adopted by Appellants inapplicable to a subclass of

plaintiffs and properly enjoin Appellants from applying the rule to that sub-

class?

IV.     Should the district court have ruled that Defendants' turnback policy violates

§ 706(2) of the APA, is actionable under the ATS, and exceeds Defendants'

statutory authority?

## STATEMENT OF THE CASE

### A.     POEs on the U.S.-Mexico Border Prior to 2016

**1.**     POEs are supposed to be our nation's front door, where we make good

on our statutory promise to inspect and process noncitizens arriving in the U.S. Col-

lectively, Defendants—the Secretary of Homeland Security ("DHS"), the Commis-

sioner of Customs and Border Protection ("CBP"), and the Executive Assistant

Commissioner of the Office of Field Operations ("OFO")—are responsible for de-

veloping and enforcing policies that apply at POEs. ER-321–322.[1]

**2.**     POEs accept passenger vehicles, commercial vehicles, and pedestrians.

ER-323. Prior to the turnback policy, pedestrians crossed the border between the

U.S. and Mexico and continued to a primary inspection point—often a booth within

a POE building—on U.S. territory. *See* ER-323; 3-SER-542–545. Pedestrians with-

out valid travel documents (the bulk of whom are people seeking asylum or related

---

[1] References to "Appellants" throughout this brief refer to all Defendants as well as
the Executive Office for Immigration Review.

protection) were typically referred for secondary inspection. *See* ER-323. If a noncitizen expressed fear of persecution or a desire to apply for asylum, the CBP officer either referred the noncitizen to an asylum officer for an interview to determine whether the noncitizen had a credible fear of persecution or placed the noncitizen into removal proceedings in immigration court, where they could apply for asylum and other forms of relief. Plaintiffs refer to inspection and referral for a credible fear interview or placement in full removal proceedings as "inspection and processing." *See* 8 U.S.C. §§ 1158(a)(1), 1225(a)–(b).

3.      The Immigration and Nationality Act ("INA") requires Defendants to inspect all arriving noncitizens and refer those who express fear of persecution or a desire to apply for asylum for additional proceedings. *Infra* 16–23. There is no statutory limit on the number of noncitizens who can access the U.S. asylum process at POEs, and Congress has not given Defendants authority to set such limits. *See* ER-280 (explaining that a "numerical limit on the number of asylum applicants . . . finds no support in Section 1158 or Section 1225 [of the INA].").

Defendants have carried out these absolute statutory duties using various means. They have paroled arriving noncitizens into the U.S. 3-SER-579. Defendants have used tents, Border Patrol stations, and other government facilities to temporarily increase POE through-put. 3-SER-591–592. Defendants have used virtual processing, with a CBP officer located elsewhere interviewing an arriving noncitizen

4

via video conference. ER-331. Defendants have reassigned CBP officers to POEs in need of additional resources. ER-328–329. And each POE has a contingency plan to expand capacity during periods of increased arrivals. ER-326. Defendants used this flexibility to manage migration flows without repudiating their statutory duty to inspect and process arriving noncitizens, including during periods in the 1990s and 2000s when the levels of migration were significantly higher than the time period at issue here. 3-SER-557–58, 560.

## B. Defendants Begin Violating Their Statutory Duties

In May 2016, Defendants broke from decades of established practice and began to ignore their statutory duty to inspect and process arriving asylum seekers.

The San Ysidro POE, located just south of San Diego, is one of the busiest POEs. ER-326. In spring 2016, San Ysidro began to experience increased migration, driven by an increase in Haitian arrivals. ER-328. In response, the San Ysidro POE activated its mass migration plan, increased staffing, used virtual processing, streamlined inspection procedures, and commandeered detention space at nearby Border Patrol substations. 1-SER-245; 4-SER-814. Initially, the POE did not turn back arriving noncitizens, and POE leadership did not articulate a need to do so. 1-SER-251–52, 255–56; 4-SER-818.

But by May 25, 2016, senior OFO officials became concerned that the increased number of arriving Haitians would "start a media frenzy" or "spin up with

the election year shenanigans." 1-SER-51. Then, on May 26, 2016, Defendants "received multiple media requests regarding the [asylum] activity at the San Ysidro [POE]." 1-SER-57; *see also* 1-SER-61 (inquiry from San Diego television reporter). That day, the *San Diego Union-Tribune* published a story entitled "Surge of Haitians at San Ysidro Port of Entry," which noted that "more than 200 people were crowded inside the port's pedestrian entrance," even though the port had the ability to "process close to 25,000 northbound pedestrians a day." ER-338.

Responding to the media inquiries, a senior official emailed the port director at San Ysidro: "Need to get that asylum line out of the public viewing area." 1-SER-072, 077. The port director complied, telling his deputies: "We need to get this under control. The media is asking about our influx of Haitians . . . I would like to have this done immediately." 1-SER-260. On May 27, 2016, the port began turning asylum seekers back to Mexico. 2-SER-270 ("Let's hold the line the best we can."). POE leadership told CBP officers to "hold the line" and prevent arriving asylum seekers from entering the POE. 2-SER-267, 272, 275. Concerned with the optics, however, POE leadership agreed that "[i]t would be a good symbol" to inspect a few asylum seekers. 2-SER-279. By the end of May 2016, CBP was turning back nearly all asylum seekers from the POE. ER-712.

### C. The Turnback Policy Expands

Prior to the November 8, 2016 presidential election, DHS outlined a plan for

increasing POEs' capacity to process asylum seekers. 2-SER-294, 301, 329; 4-SER-822. By November 2, 2016, plans to increase POE capacity were underway in multiple locations along the border. 2-SER-322.

But, on the morning of November 9, 2016, the media reported that Donald Trump had won the presidential election. 2-SER-333. The next day, Defendants' leadership met to reevaluate asylum seeker inspection and processing. 2-SER-340. At the meeting, then-Assistant Commissioner of CBP Kevin McAleenan proposed "meter[ing] the flow of [family units] at POE bridges . . . to prevent the overflow of the actual POEs." *Id.*[2] Shortly after that meeting, DHS approved McAleenan's proposal to expand turnbacks to Texas POEs. *Id.*; *see also* 4-SER-839. Later, DHS expanded the directive to all POEs on the U.S.-Mexico border. *See* 1-SER-153–54, 200; 4-SER-845.

Defendants decided "███████████████████████████████████████ ███████████████████" 3-SER-599. Defendants' leadership disseminated the turnback policy by word of mouth to POE directors. 1-SER-153–54, 200; 4-SER-845. The following year, CBP acknowledged to a CBP union chapter in Texas that this policy "broke . . . Federal immigration rules and Laws." 1-SER-168.

---

[2] Defendants have used several euphemisms to refer to the turnback policy, including "metering" and "queue management." Regardless of Defendants' nomenclature, the effect is the same—arriving noncitizens are denied access to the asylum process at POEs.

### D.    Defendants Memorialize the Turnback Policy

In 2018, Defendants memorialized the turnback policy in advance of the predicted arrival of a well-publicized "migrant caravan," hoping to use the caravan to justify the policy. On April 27, 2018, CBP issued a memorandum entitled "Metering Guidance," which was distributed to all POEs on the U.S.-Mexico border. ER-516. According to the memorandum, Defendants could "meter the flow of travelers at the land border" between the U.S. and Mexico. *Id.*

Although the memorandum was supposed to address "███████████" 4-SER-848, there was no appreciable surge in asylum seekers in April 2018. The reported caravan broke apart before it reached the border, and POEs had *excess* processing capacity. 2-SER-395–396, 401–402, 406–407, 412, 417; 4-SER-851.

When the caravan failed to materialize, Defendants sought a new way to justify the turnback policy. In May 2018, DHS Secretary Nielsen began considering a "prioritization-based queue management" approach that purported to give Defendants discretion to turn back arriving asylum seekers if they believed that the port should prioritize other work. During a May 24, 2018 meeting, she "ask[ed] if we fully implement the priority based Que[ue] Management option . . . What's a rough estimate of the number of folks that would likely be turned away per day?" 2-SER-421. Defendants responded that the proposal would result in 650 asylum seekers being turned back from POEs daily. 2-SER-420, 424, 429, 432. Defendants warned

Nielsen that "[t]he number waiting in [Mexico]" would "grow each day and [would] begin to strain . . . local [Mexican] border communities." 2-SER-432. Despite this knowledge, Secretary Nielsen adopted the Prioritization-Based Queue Management ("PBQM") memorandum on June 5, 2018. ER-518. That memorandum directed POEs to focus on aspects of their work other than their duty to process arriving noncitizens. ER-520.

On November 1, 2021, two months after the district court's summary judgment opinion, Defendants rescinded the "Metering Guidance" and PBQM memorandum. On the same day, Defendants issued a new memorandum, "Guidance for Management and Processing of Undocumented Noncitizens at Southwest Border Land POEs," which still contemplates the use of turnbacks based on "operational capacity." ER-315; *see also infra* 11–12 (explaining that operational capacity is a pretext).

### E. The Turnback Policy Harmed Plaintiffs

Under the turnback policy as implemented thus far, CBP officers stood just inside U.S. territory. 1-SER-159–61. Those CBP officers identified individuals who were likely to be asylum seekers, blocked those individuals from crossing the border, and then ordered those individuals to go back to Mexico. *See* 1-SER-153–154, 200; 4-SER-845. The CBP officers did not give the asylum seekers a date to return to the POE and kept no records of these pre-inspections. Instead, many asylum seekers

placed their names on wait lists maintained by groups in Mexico, and CBP coordinated with Mexican officials to bring a small number of asylum seekers to the POEs for processing each day, often after asylum seekers had waited for weeks or months. 1-SER-234; 2-SER-475–478; 3-SER-670–671.

Al Otro Lado ("AOL") and the certified class have been harmed by Defendants' conduct. As Todd Owen predicted, the turnback policy caused the number of asylum seekers waiting in Mexico to increase exponentially. 1-SER-23–24. The policy sapped AOL's resources, as the organization struggled to provide legal services to asylum seekers who were turned back from POEs. 2-SER-462–466, 470–471.

Asylum seekers, easily identifiable in Mexican border towns, were extorted, assaulted, raped, and murdered after being turned back. 2-SER-475–478. Some asylum seekers saw no choice but to enter the U.S. between POEs and died while crossing the Rio Grande or the Sonoran Desert. 2-SER-482, 498–500, 503.

### F.    Defendants' False Justifications for the Turnback Policy

**1.**    The turnback policy was not created to deal with increased numbers of migrants at POEs. First, if the policy was actually an attempt to deal with increased migration, Defendants would presumably have stopped turning back arriving noncitizens in 2017, when migration numbers at the southern border hit historic lows. That did not happen. *See, e.g.*, 1-SER-82, 103, 106, 109, 112, 116, 120, 176; 2-SER-287; 3-SER-508, 516. Seven POEs "effectively stopped processing" arriving asylum

seekers "despite being designated as Class A ports, which are 'Port[s] of Entry for all [noncitizens].'" 1-SER-20. At two POEs, CBP "stopped using blocks of available holding cells, allowing those cells to sit empty while [asylum seekers] waited in Queue Management lines in Mexico." 1-SER-21. The Hidalgo POE went a step further and removed seats from the secondary inspection area to decrease capacity to process arriving asylum seekers. 2-SER-350; 3-SER-565. A CBP officer testified that "it was obvious to everyone implementing [the turnback policy] . . . that the capacity excuse was a lie." 1-SER-165.

Second, CBP's data show that POEs routinely had excess capacity to process arriving asylum seekers. 1-SER-236–237; 4-SER-728–744, 747–763, 766–782, 785–795, 798–811. To create the false impression that the POEs were full, CBP redefined how it measured capacity. POE capacity had always been a quantifiable number based on the POE's physical space. 1-SER-185–190 (Defendants' internal reports always used this traditional capacity figure). But in June 2018, CBP began using a newly invented "operational capacity" metric to justify turning back arriving asylum seekers. 2-SER-346 (July 2018 email referencing operational capacity). CBP has no internal definition for "operational capacity," does not have a methodology for calculating "operational capacity," and does not track "operational capacity." 1-SER-185–190; 3-SER-691-94, 696, 701–712; 4-SER-873–874, 892. Defendants have no way to reconstruct the "operational capacity" of a POE at any point in time.

11

1-SER-185–190; 3-SER-651–652, 716. In short, operational capacity is an undefined concept that allowed Defendants to arbitrarily cap the number of arriving asylum seekers they process. 1-SER-185–190; 3-SER-691–694, 696, 701–712; 4-SER-873–874, 892, 897; 2-SER-450 ("The view is that we [should be] processing up to 70% of the detention/holding capacity").

Third, Defendants resisted efforts to expand capacity to process asylum seekers. When a senior official proposed increasing the San Ysidro POE's processing capacity, 4-SER-900, 905, DHS ████████████████████████████ ████████████████" 4-SER-909. CBP vetoed another inquiry regarding increasing the capacity of the San Ysidro POE, because it "████████████ ██████████████████" 4-SER-915.

**2.** The turnback policy assumes that arriving asylum seekers present a heightened security risk. *See* Defs.' Br. 1. But there is no evidence in the record to support that proposition that asylum seekers pose a particular health or safety risk.

Defendants have also claimed—without evidence—that they cannot process arriving noncitizens because they need to focus on other tasks, such as drug interdiction, national security screening, and processing commercial traffic. But processing arriving noncitizens is a *co-equal* part of Defendants' "primary mission," which cannot be "diminished or neglected except by a specific explicit Act of Congress." 6 U.S.C. § 111(b)(1)(D), (b)(1)(E).

12

### G. Procedural History

Plaintiffs are AOL and a certified class of asylum seekers who were, or will be, turned back from POEs since January 1, 2016. ER-181. Plaintiffs claim that the turnback policy violates § 706(1)–(2) of the APA and the Due Process Clause and is actionable under the ATS because it violates the *jus cogens* norm of non-refoulement. Alternatively, they bring an equitable claim under nonstatutory review because turnbacks are *ultra vires*. ER-910–912. In August 2019, the district court denied Defendants' motion to dismiss. ER-218.

In July 2019, Appellants issued an interim final rule that made noncitizens who traveled through a third country ineligible for asylum unless they previously sought and were denied protection in that country. 84 Fed. Reg 33,829, 33,830 (July 16, 2019) ("Asylum Ban"). The Asylum Ban applied to people who entered, attempted to enter, or arrived in the U.S. across the southern border on or after July 16, 2019. *Id.* at 33,843–44. In November 2019, the district court entered a preliminary injunction ("PI") barring the application of the Asylum Ban to a subclass of asylum seekers who were turned back prior to July 16, 2019—who were subjected to the Asylum Ban only because of Defendants' prior turnbacks. ER-182. The court subsequently clarified the PI. ER-139. The government appealed the PI and clarification order. This Court declined to stay the PI pending appeal, finding that the district court's statutory analysis has "considerable force" and "is likely correct." *Al*

13

*Otro Lado v. Wolf*, 952 F.3d 999, 1013 (9th Cir. 2020).

In September 2021, the court granted Plaintiffs summary judgment on their APA § 706(1) and due process claims, granted summary judgment to Defendants on the ATS and nonstatutory review claims, and did not reach Plaintiffs' § 706(2) claim. ER-84–128. The court converted the PI to a permanent injunction, issued declaratory relief under § 706(1) and the Fifth Amendment, and held that it lacked the power to enjoin turnbacks of asylum seekers under § 706(1). ER-35–84.

## STANDARD OF REVIEW

Summary judgment is reviewed *de novo*. For permanent injunctions, legal conclusions are reviewed *de novo*, factual findings for clear error, and the injunction's scope for abuse of discretion. *United States v. Washington*, 853 F.3d 946, 961–62 (9th Cir. 2017), *aff'd by an equally divided Court*, 138 S. Ct. 1832 (2018).

## SUMMARY OF THE ARGUMENT

**1.** This Court should affirm summary judgment for Plaintiffs on their claims that Defendants' refusal to inspect and process asylum seekers arriving in the U.S. at Class A POEs violates APA § 706(1) and the Fifth Amendment. There is no dispute that Defendants turned back asylum seekers who were arriving in the U.S. at POEs. As the district court found, 8 U.S.C. §§ 1158(a)(1), 1225(a)(1), 1225(a)(3), and 1225(b)(1)(A)(ii) require Defendants to inspect and process such asylum seekers. ER-103–105.

14

**2.** Relying on the same statutory interpretation, the district court properly enjoined Defendants from applying the Asylum Ban to subclass members whom Defendants turned back before the Asylum Ban was issued and who would not have been subject to the Asylum Ban but for Defendants' unlawful turnbacks. The Court should affirm that permanent injunction.

**3.** The district court erred in denying Plaintiffs' motion for summary judgment on their claims that turnbacks and the turnback policy violate 5 U.S.C. § 706(2), exceed Defendants' statutory authority, and flout the *jus cogens* norm of non-refoulement. This Court should reverse the district court's rulings and remand for consideration of the proper remedy for these claims.

## ARGUMENT

## I. Defendants Violated APA § 706(1)

The district court correctly found that Defendants unlawfully withheld their mandatory ministerial duty to inspect and process asylum seekers arriving at POEs in violation of APA § 706(1) each time they turned back an arriving asylum seeker. The district court's conclusion resulted from a thorough and correct statutory analysis and a massive, undisputed factual record. Defendants fail to raise any arguments that disturb those conclusions.

### A. The District Court Correctly Held that Defendants Have a Mandatory Ministerial Duty to Inspect and Process Arriving Asylum Seekers

Congress created our modern asylum system by adopting the Refugee Act and

incorporating it into the INA in 1980. Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102.[3] The Refugee Act codified our obligations under the 1967 Protocol Relating to the Status of Refugees—including the fundamental principle of non-refoulement, or not returning people to a country where they would be persecuted or tortured. *INS v. Cardoza–Fonseca*, 480 U.S. 421, 436–37 (1987). Since then, Congress has included protections for asylum seekers throughout the INA. *See, e.g.*, 8 U.S.C. §§ 1225(a)(2), 1225(b)(1)(A)(ii), 1229a(c)(7)(C)(ii) .

In keeping with that decades-long commitment, Congress made clear in 8 U.S.C. §§ 1158 and 1225 that noncitizens arriving at POEs must be inspected and afforded access to the asylum process upon expressing an intention to apply for asylum or a fear of persecution in their country of origin. Defendants ask this Court to read the INA in a way that forecloses those protections. Such a reading is atextual and ahistorical, and should be rejected. *See Abramski v. United States*, 573 U.S. 169, 179 (2014) (statutory interpretation occurs "not in a vacuum, but with reference to the statutory context, 'structure, history, and purpose'" (quoting *Maracich v. Spears*,

---

[3] The existence of overseas refugee processing authorized by 8 U.S.C. § 1157 does not undermine the district court's holding or "threaten to collapse the distinction between Sections 1157 and 1158." Defs.' Br. 38. As this Court previously noted, "the district court's analysis does not authorize asylum seekers to submit an asylum application from outside the United States; it recognizes only that the statutory right to apply [for asylum] attaches once the asylum seeker is on the doorstep . . . in the process of arriving." *Al Otro Lado*, 952 F.3d at 1013.

16

570 U.S. 48, 76 (2013))).

The INA establishes Defendants' obligations when noncitizens arrive at POEs: inspect them and allow those seeking protection to access the asylum process. *See* 8 U.S.C. §§ 1158(a)(1), 1225(a)(1), (a)(3), (b)(1)(A)(ii); ER-248 (noting the parties' agreement that the inspection and processing duty is a mandatory ministerial duty enforceable through § 706(1)). Relying on a straightforward interpretation of these statutes' texts, aided by traditional canons of construction and Defendants' own regulations, the district court correctly concluded that Defendants' duty to inspect and process asylum seekers applies to noncitizens "arriving in the United States," including those who may not yet have crossed the physical border. ER-252–282. A motions panel of this Court found that analysis "sound and persuasive." *Al Otro Lado*, 952 F.3d at 1011–12. This Court should affirm.

Four statutory provisions establish the process for seeking asylum at a POE: 8 U.S.C. §§ 1158(a)(1), 1225(a)(1), (a)(3), and (b)(1)(A)(ii).

1. The INA mandates that Defendants "shall" inspect all noncitizens "who are applicants for admission or otherwise seeking admission." 8 U.S.C. § 1225(a)(3).

2. An "applicant for admission" is any noncitizen "present in the United States who has not been admitted *or* who arrives in the United States." *Id.* § 1225(a)(1) (emphasis added).

17

3. Section 1225(b)(1)(A)(ii) requires Defendants to refer "for an interview by an asylum officer" any noncitizen "who is arriving in the United States," "is inadmissible," and "indicates either an intention to apply for asylum under section 1158 . . . or a fear of persecution." *Id.* § 1225(b)(1)(A)(ii).

4. Section 1158(a)(1) establishes that a noncitizen "who is physically present in the United States *or* who arrives in the United States" may apply for asylum. 8 U.S.C. § 1158(a)(1) (emphasis added).

For six reasons, Defendants' statutory duty to inspect and process applies to asylum seekers whom Defendants prevent from crossing the border at a POE.

***First***, these statutes use terms that necessarily refer to noncitizens not yet present in the U.S. "[B]egin[ning], as always, with the text," *Esquivel-Quintana v. Sessions*, 581 U.S. 385, 391 (2017), §§ 1225(a)(1) and 1158(a)(1) each discuss two categories of noncitizens: those "present in the United States" and those "who arrive[] in the United States." If, as Defendants contend, people "arrive[] in" the U.S. only when they are also physically "present," then the statutes would be repetitive and the "arrives in" language would be surplusage. But the rule against surplusage is a "cardinal principle of statutory construction," *Williams v. Taylor*, 529 U.S. 362, 404 (2000), and thus the term "arrives in" must apply to noncitizens who are not yet geographically "present in" the U.S. *See, e.g.*, *Loughrin v. United States*, 573 U.S. 351, 357 (2014) (rejecting interpretation of statute's second clause that would have

18

made it "a mere subset of its first" because "or" does not mean "including").[4]

**Second**, Congress' use of the present tense in §§ 1158(a)(1) and 1225(a)(1) demonstrates that "arrives in" refers to noncitizens who have not yet crossed the border. Verb tense "is significant in construing statutes." *United States v. Wilson*, 503 U.S. 329, 333 (1992). In both provisions, Congress chose to use the simple present tense ("arrives") and not the past tense ("arrived"). "[T]he present tense generally does not include the past." *Carr v. United States*, 560 U.S. 438, 448 (2010). Indeed, Congress has explicitly explained how to interpret the present tense in federal statutes: "words used in the present tense *include the future as well as the present*." 1 U.S.C. § 1 (emphasis added). If Congress wanted the law to cover only noncitizens who *had arrived*, it would have used the past tense.

Given the structure and verb tense in §§ 1158(a)(1) and 1225(a)(1), class members qualify as "applicants for admission" under § 1225(a)(1), are owed a duty of inspection under § 1225(a)(3), and can apply for asylum under § 1158(a)(1).

**Third**, even if class members are not "applicants for admission" under

---

[4] "[H]istorical changes to the statutory language further support the distinction between 'physically present in' and 'arrives in' the United States in section 1158." *Al Otro Lado*, 952 F.3d at 1012. Specifically, the current "arrives in the United States" language replaced "at a land border or port of entry" from the original Refugee Act. *Id.* (citing 8 U.S.C. § 1158(a) (1980)). "A person standing *at* the border is not necessarily *across* it," and thus both statutory phrases apply to individuals in "the penultimate stage in the process of arriving in the United States." *Id.*

§ 1225(a)(1), they fit within the catch-all category of noncitizens "otherwise seeking admission" under § 1225(a)(3), whom Defendants must also inspect. "[A]dmission" is "the lawful entry of [a noncitizen] into the United States after inspection and authorization by an immigration officer," 8 U.S.C. § 1101(a)(13)(A), which is exactly what class members are seeking.

Defendants seek to limit the "otherwise seeking admission" category to lawful permanent residents ("LPRs") and other unspecified "noncitizens who are subject to inspection but are also deemed by statute not to be applicants for admission." Defs.' Br. 36. That is inconsistent with the INA. Unless one of six exceptions applies, an LPR "shall not be regarded as seeking an admission." 8 U.S.C. § 1101(a)(13)(C). Defendants fail to explain how most LPRs are both "otherwise seeking admission" and "not . . . regarded as seeking an admission." In fact, most LPRs seek "readmission," a situation already covered by this same provision of the INA. *See* 8 U.S.C. § 1225(a)(3). And while a small number of returning LPRs must seek admission, *see id.* § 1101(a)(13)(C)(i)–(vi), there is nothing in the statutory text that would limit the expansive term "otherwise seeking admission" solely to LPRs or even place them in that category rather than the run-of-the-mill "applicant for admission" category.

***Fourth***, the asylum referral provision, § 1225(b)(1)(A)(ii), reinforces the conclusion that Defendants must inspect and refer noncitizens who may not yet be in the U.S. but are in the process of arriving. Section 1225(b)(1)(A)(ii) applies to

20

noncitizens who are "arriving," in the present progressive tense—which, even Defendants admit, "plausibly denotes a process of arrival." Defs.' Br. 29; *see also United States v. Balint*, 201 F.3d 928, 933 (7th Cir. 2000). The process of "arriving" logically begins as one approaches the POE to cross the physical border into the pre-inspection area—just as a flight attendant might announce while still in the air that a plane is "arriving" in its destination city.[5]

*Fifth*, Defendants' reading of "arriving" in § 1225(b)(1)(A)(ii) contradicts their own regulations defining "arriving alien" as "an applicant for admission *coming or attempting to come* into the United States at a port-of-entry." 8 C.F.R. § 1.2 (emphasis added); *see also id.* § 1001.1(q).[6] This definition uses the present progressive, emphasizing the ongoing nature of the action. Moreover, "*attempting to come*

---

[5] Defendants' arguments to the contrary are unavailing and not supported by their citations. *In re M-D-C-V-* does not address whether a noncitizen who is in the process of arriving in the U.S. at a POE is covered by the statutory provisions at issue here. 28 I. & N. Dec. 18, 23 (BIA 2020) (noncitizen apprehended 20 yards north of the border between POEs was "arriving" under the statutory provision governing the Migrant Protection Protocols). The holding of *Shaughnessy v. United States ex rel. Mezei*—that a noncitizen the government wanted to exclude from the country had no constitutional procedural due process protections from indefinite detention on Ellis Island—is also irrelevant. 345 U.S. 206, 214–15 (1953). Plaintiffs do not challenge detention or assert procedural due process claims outside the due process requirements that attach to statutory rights. The plaintiff in *Mezei* landed at Ellis Island, was inspected, and was denied admission for unstated reasons. *Id.* at 219–20 (Jackson, J., dissenting).

[6] The expedited removal provisions of the INA, including § 1225(b)(1)(A)(ii), apply to "[a]rriving aliens, as defined in 8 C.F.R. 1.2." 8 C.F.R. § 235.3(b)(1)(i).

into the United States" clearly encompasses individuals who have not yet crossed the border. Both the relevant statutory provisions and Defendants' regulations interpreting them are clear: Defendants must inspect and process all class members who are attempting to come into the U.S. at a POE and would have crossed the border but for Defendants' unlawful turnbacks.

**Sixth**, the congressional record "confirms" what "the text alone" shows. *Daniel v. Nat'l Park Serv.*, 891 F.3d 762, 775 (9th Cir. 2018) (citation omitted). Then-Chairman of the House Judiciary Committee's Subcommittee on Immigration and Claims, Rep. Lamar Smith, commented on Congress' intent in adopting the term "arriving alien":

> The term "arriving alien" was selected specifically by Congress in order to provide a flexible concept that would include *all aliens who are in the process of physical entry* past our borders . . . . "Arrival" in this context should not be considered ephemeral or instantaneous but, consistent with common usage, as *a process*. An alien apprehended *at any stage of this process*, whether *attempting to enter*, at the point of entry, or just having made entry, should be considered an "arriving alien" . . . .

*Implementation of Title III of the Illegal Immigr. Reform and Immigrant Responsibility Act of 1996: Hearing Before the Subcomm. on Immigration and Claims of the H. Comm. on the Judiciary*, 105th Cong. 17–18 (1997) (letter from Rep. Smith to Dir., Pol'y Directives and Instructions Branch, INS) (emphases added). Defendants' citation to "[c]oncurrent congressional documents," Defs.' Br. 31, refers to a bill that never became law and has zero relevance to this case.

**B.** **Defendants Have Not Identified Any Defects in the District Court's Analysis**

Defendants attempt to identify defects in the district court's statutory analysis where none exist. Each of Defendants' arguments—(1) an atextual version of the rule against surplusage, (2) a stilted and incorrect view of English grammar, (3) a half-baked version of the presumption against extraterritoriality, (4) the improper assumption that Defendants can contravene specific statutory commands, and (5) the falsehood that "overwhelmed" POEs cannot manage exigent circumstances—is incorrect.

1.    Defendants' application of the rule against surplusage to § 1158(a)(1) results in an atextual, internally contradictory analysis. *See* Defs.' Br. 36–38. First, Defendants propose that "physically present in the United States" in § 1158(a)(1) refers only to noncitizens who have "entered" the country. Defs.' Br. 37. This ignores binding caselaw holding that "physical presence" means what it says and is not a synonym for or subtle reference to the legal concept of "entry." *Barrios v. Holder*, 581 F.3d 849, 863 (9th Cir. 2009) ("physical presence" as used in the INA is not a term of art), *abrogated on other grounds*, *Hernandez-Rodriguez v. Barr*, 776 F. App'x 477, 478 (9th Cir. 2019); *United States v. Lopez-Perera*, 438 F.3d 932, 935 (9th Cir. 2006) (a man was "physically present" in, but had not yet "entered," the U.S. when he drove from Mexico into a pre-inspection area at a POE). Defendants' reliance on *DHS v. Thuraissigiam*, 140 S. Ct. 1959, 1982–83 (2020), is unavailing.

That case involved an asylum seeker who *had already crossed* the border into the U.S. and was subsequently inspected and referred for a credible fear interview, as required by statute. *Id. Thuraissigiam* turned on the availability of judicial review and Congress' creation of streamlined expedited removal provisions. *Id.* at 1966–68. The Supreme Court did not consider what ministerial statutory duty is owed to migrants arriving at POEs before they are placed in expedited removal proceedings. *See id.*

Next, Defendants argue without support that "arrives in the United States" actually means "subject to expedited removal." Defs.' Br. 37.[7] But that just defines "physically present" and "arrives in" as overlapping categories, because some noncitizens who have already effected entry at a POE are also subject to expedited removal. *See* 8 U.S.C. § 1225(b)(1)(B)(iii). The two categories Defendants propose here are not distinct from one another, as normal statutory interpretation principles require. *See, e.g.*, *Loughrin*, 573 U.S. at 357.

This interpretation of "arrives in" actually *undermines* Defendants' statutory

---

[7] Defendants argue that the "arrives in" language in § 1158 allows "even 'aliens who arrive at ports of entry'" to apply for asylum, "notwithstanding the legal fiction that they were stopped at the border." Defs.' Br. 37 (quoting *Thuraissigiam*, 140 S. Ct. at 1982). But there is no need to resort to legal fiction here. This case involves physical and geographic reality: Defendants actually did stop Plaintiffs "at ports of entry" "at the border." Curiously, although Defendants read § 1158 to apply to people who were fictionally stopped at the border, they cannot seem to read it to apply to people whom they themselves *actually* stopped at the border.

arguments. Expedited removal applies, *inter alia*, to noncitizens who are "*arriving in the United States.*" 8 U.S.C. § 1225(b)(1)(A)(i) (emphasis added). Congress' choice of the present progressive tense indicates an ongoing process, not a completed past action—and thus, the expedited removal provision applies to noncitizens who have not yet crossed the border but are in the process of doing so. *See, e.g.*, *Balint*, 201 F.3d at 933.

    **2.**    Defendants lean heavily on the preposition "in" and a dictionary definition of "to arrive." Defs.' Br. 27–29. But "in" has meaning in those statutes only in context—and that preposition is used here alongside both "physically present" and "arrives." Principles of statutory interpretation establish that these two phrases—even with the same preposition—must mean different things. *Supra* 18–19. But under Defendants' reading, "arrives in" actually means "arrived in," and is a mere subset of "physically present in" and thus superfluous. That is not how English grammar or statutory interpretation works. Verb tense has meaning independent of any preposition used in a sentence, and this Court must interpret the present tense statutory language "arrives in" to encompass both the present and the future. *See* 1 U.S.C. § 1.[8]

---

[8] Some dictionaries define "to arrive" as "to reach a destination," *see, e.g.*, Merriam-Webster's Collegiate Dictionary 68 (11th ed. 2003). But the relevant point here is that Congress conjugated "to arrive" in the simple present ("arrives") and present progressive ("arriving") tenses, not in the past. Someone who "reaches a destination"

**3.** Defendants' presumption against extraterritoriality argument fails to cite the relevant two-step legal test. Defs.' Br. 32–36. First, a court determines whether "the text provides a clear indication of an extraterritorial application." *WesternGeco LLC v. ION Geophysical Corp.*, 138 S. Ct. 2129, 2136 (2018) (internal quotation marks and citation omitted). If so, the statute applies extraterritorially. If not, in the second step, a court asks "whether the case involves a domestic application of the statute" by "identifying the statute's focus and asking whether the conduct relevant to that focus" occurred in the United States. *Id.* (internal quotation marks and citation omitted).

Both steps favor Plaintiffs, who need to win at only one of the two. At the first step, §§ 1158 and 1225 provide a "clear indication of an extraterritorial application." *Id.* (citation omitted). A clear indication need not be "an express statement of extraterritoriality." *RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325, 340 (2016) (citation omitted). "Context" can provide the indication. *Id.* Here, the plain statutory language, Congress' choice of verb tense, and the rule against surplusage clearly show that §§ 1158 and 1225 cover asylum seekers who are approaching POEs but have not yet crossed the international border. The relevant "context" further rebuts the presumption. *RJR Nabisco*, 579 U.S. at 340. Regulating POEs and the border

---

or "is reaching a destination" is not the equivalent of someone who "reached a destination."

frequently reaches some activity that occurs across the border. *See, e.g.*, *Biden v. Texas*, 142 S. Ct. 2528, 2535 (2022); *United States v. Ubaldo*, 859 F.3d 690, 700 (9th Cir. 2017); *United States v. Villanueva*, 408 F.3d 193, 199 (5th Cir. 2005).

Second, the "focus" of § 1225(a)(3) and (b)(1)(A)(ii) is exclusively domestic. The "conduct" that these provisions "seek[] to regulate," *WesternGeco*, 138 S. Ct. at 2137 (internal quotation marks and citation omitted), is that of government officials working in the United States. Those officials' statutory obligations—inspecting noncitizens, § 1225(a)(3), and referring some of them for a credible fear interview, § 1225(b)(1)(A)(ii)—involve conduct occurring entirely *within* the United States. Thus, this case "involves a permissible domestic application" of §§ 1225(a)(3) and (b)(1)(A)(ii) of the INA. 138 S. Ct. at 2136; *see also Gonzalez v. Google LLC*, 2 F.4th 871, 888 (9th Cir. 2021) (plaintiffs' claims involved a domestic application of a statute because the regulated conduct occurred in the U.S.).

Instead of applying the required test, Defendants bring up *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155 (1993)—a case predating the Supreme Court's two-step framework that interpreted a different, now-abrogated section of the INA. *See* Defs.' Br. 33, 35–36. The Court read the relevant provision, INA § 243(h), to apply

27

to deportation and exclusion hearings that by statute could only be held by the Attorney General within the U.S. *Sale* 509 U.S. at 172–73;[9] *cf. United States v. Delgado-Garcia*, 374 F.3d 1337, 1348 (D.C. Cir. 2004) (distinguishing *Sale*). Moreover, *Sale* expressly limited its analysis to the Coast Guard's interdiction of Haitian migrants on the "high seas"—conduct that was entirely extraterritorial. *See* 509 U.S. at 160, 166–67, 173, 179–80, 187.[10]

4.      Because Congress designed a specific "statutory scheme" under which DHS must inspect and process all noncitizens arriving at POEs, Defendants' claim of general authority to "control the Nation's borders," Defs.' Br. 44, is unavailing. *See infra* 46–47. As this Court has noted, executive agencies may not "abandon" a detailed regulatory scheme proscribed by Congress simply because they "think[] it is not working well." *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 774 (9th Cir. 2018).

5.      Defendants' argument that POEs have been "overwhelmed" and that

---

[9] Defendants misconstrue the import of *Sale*'s dicta. *See* Defs.' Br. 33, 35–36. *Sale* merely notes that the INA does not provide "for the conduct of [deportation and exclusion hearings] outside the United States" and that "other provisions of the INA [including § 1158(a)] obviously contemplate that such [deportation and exclusion hearings] would be held in the country." *Id.* at 173 & n.29. The Court did not analyze what ministerial duty was owed to migrants arriving at POEs.

[10] *Rowland v. Cal. Men's Colony*, 506 U.S. 194, 200 (1993), does not help Defendants because they point to no "specific" statutory language in § 1225 or 1158 that might displace the Dictionary Act. Defs.' Br. 35.

the district court's interpretation of §§ 1158 and 1225 prevents them from managing exigent circumstances—or "require[s] immigration officers to allow undocumented noncitizens to cross the border without entry controls"—is wrong. Defs.' Br. 32. Congress has not prescribed how Defendants should comply with their statutory obligations, and Defendants used several methods to comply with the statute's requirements before they decided to abandon their duty to inspect and process. *Supra* 4–5. At most, Defendants have established that they were unwilling to comply with §§ 1158 and 1225 due to other policy priorities. But government inconvenience is not a reason for courts to disregard clear statutory text. *See Niz-Chavez v. Garland*, 141 S. Ct. 1474, 1484–85 (2021). Moreover, the INA—which creates and limits Defendants' authority at the border—does not allow "entry controls" of the type Defendants invented; rather, *all* "applicants for admission" are to be inspected. *See supra* 18. The inspection process *is* the entry control. And POEs were far from being "overwhelmed." The factual record, which Defendants do not dispute in their opening brief, shows that POEs had substantial excess capacity. *Supra* 10–11. Defendants turned back arriving asylum seekers regardless of the actual conditions on the ground because they wanted to do so. *Supra* 11–12.

## C. Defendants' "Delay" Argument is Unfounded

In a final attempt to find a defect in the district court's analysis, Defendants

recast their denial of a mandatory duty to inspect and process arriving asylum seekers as a reasonable delay of that duty. Defs.' Br. 40–45. That argument fails for three reasons. First, a turnback is an outright denial of inspection. *Supra* 16–23. Second, even if turnbacks could be seen as delay, those delays are unreasonable. Third, Defendants' arguments about waiver are misplaced.

**1.** Turnbacks do not merely "delay" Defendants' processing of arriving asylum seekers. Every turnback violates APA § 706(1) at the moment it occurs because it is mandatory "agency action unlawfully withheld." *Supra* 16–23. Moreover, CBP's 30(b)(6) witness was clear: when an asylum seeker is turned back there is no guarantee that they will ever be inspected at a later date. *See* 3-SER-670–671. In many cases, individuals have no opportunity to return to a POE. For example, some were deported by the Mexican government after they were turned back. *See* 1-SER-004.[11] Others were killed. 2-SER-475–478, 482, 498–500, 503. Even if some asylum seekers were subsequently processed at POEs, that does not erase Defendants' prior violation of their duty to inspect and process.

Defendants' view that any statute without temporal limitations contains a secret exception allowing them to indefinitely delay performing its statutory duty would lead to absurd results. Most pertinently here, Defendants could end all asylum

---

[11] Statistics on the aggregate numbers of asylum seekers who *were* processed, *see* Defs.' Br. 39–40, say nothing about what happened to those who were turned back.

processing by simply declaring their policy to be a "delay," effectively allowing them to ignore Congress' express commands.

**2.**     Even if turnbacks are delays, those delays are unreasonable. *See Telecomms. Rsch. & Action Ctr. v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984) ("*TRAC*").[12]

**Factor 1:** There is no "rule of reason" governing when, if ever, an asylum seeker might be processed. *TRAC*, 750 F.2d at 80. Past wait times for class members who were able to place their names on waitlists and were ultimately processed ranged from days to many months and were untethered from POEs' actual capacity. *Supra* 10–11. Moreover, Defendants do not maintain *any* means of determining which asylum seekers have been turned back, let alone when they might be processed. *Supra* 10–11.

**Factor 2:** The "statutory context" strongly suggests that any delay of inspection and processing of asylum seekers is unreasonable. *Santillan v. Gonzales*, 388 F. Supp. 2d 1065, 1083–84 (N.D. Cal. 2005). Defendants' mandatory duty to inspect applies to all who are "applicants for admission" or "otherwise seeking admission," including those who are in the process of arriving at a POE. *Supra* 16–23. Inspections must occur promptly upon arrival, rather than days, weeks, or months later.

---

[12] The *TRAC* factors are the Ninth Circuit standard governing § 706(1) delay. *Indep. Mining Co. v. Babbitt*, 105 F.3d 502, 507 & n.7 (9th Cir. 1997). Defendants did not argue at summary judgment or in their opening brief that any delay was reasonable under *TRAC*.

CBP inspects hundreds of thousands of non-asylum-seeking individuals each day, in roughly the order they arrive at POEs. If the duty to inspect did not attach promptly upon arrival, POEs would grind to a halt. Additionally, Congress's decision to create special protections for asylum seekers arriving in the U.S.—barring their expedited removal without first giving them access to the asylum process, § 1225(b)(1)(A)(i)–(ii)—reinforces the point that turnbacks are unreasonable.

**Factors 3 and 5:** The nature and extent of the interests prejudiced by the turnback policy—human life and physical well-being—cannot be overstated and weigh strongly in Plaintiffs' favor. *TRAC*, 750 F.2d at 80. The harms created by turnbacks have included assaults, kidnappings, and murder of asylum seekers. *Supra* 11–12. Courts routinely find the *TRAC* factors weigh in a plaintiff's favor based on much less direct harm. *Singh v. Napolitano*, 909 F. Supp. 2d 1164, 1176 (E.D. Cal. 2012); *Tufail v. Neufeld*, 2016 WL 1587218, at *8 (E.D. Cal. 2016); *Latifi v. Neufeld*, 2015 WL 3657860, at *7 (N.D. Cal. 2015).

**Factor 4:** Courts weigh the effect of expediting delayed action on activities of competing or higher agency priority. *TRAC*, 750 F.2d at 80. Here, Defendants have turned back asylum seekers even when they had the capacity to process them. *Supra* 10–11. At any rate, even if this factor were to weigh in Defendants' favor, delay may still be unreasonable when other factors weigh heavily in favor of relief—particularly where, as here, "there is a clear threat to human welfare." *In re A Cmty.*

*Voice*, 878 F.3d 779, 787 (9th Cir. 2017); *Cutler v. Hayes*, 818 F.2d 879, 898 (D.C. Cir. 1987).

**Factor 6:** Bad faith alone is a sufficient basis to find delay unreasonable. *Cutler*, 818 F.2d at 898. Because turnbacks are based on a false pretext of capacity constraints, they are the result of bad faith. *Supra* 10–13. Defendants "manifested bad faith . . . by singling . . .out [asylum seekers] for bad treatment," and therefore they "will have a hard time claiming legitimacy for [their] priorities." *In re Barr Labs., Inc.*, 930 F.2d 72, 76 (D.C. Cir. 1991).

3.      Defendants' waiver argument fails because it ignores the procedural posture. Defs.' Br. 41 & n.2. Below, Defendants did not move for summary judgment on the basis that the turnback policy was a reasonable delay of their duty to inspect and process arriving asylum seekers. ER-109; 1-SER-009. In their motion for summary judgment, Plaintiffs explained that by turning back arriving asylum seekers, Defendants failed to comply with a mandatory statutory duty. In their opposition, Defendants attempted, with no evidence or argument, to recharacterize those turnbacks as a reasonable delay. ER-466. Plaintiffs properly replied that Defendants' characterization of turnbacks as delays was factually inaccurate and that, even if they were delays, those delays were unreasonable under *TRAC*. 1-SER-234; 2-SER-475–478. No waiver occurred. Plaintiffs merely responded to Defendants' off-base "delay" argument.

* * *

The district court correctly found that Defendants failed to carry out their mandatory duty because the "record contains undisputed evidence that . . . CBP officers did not . . . inspect and refer asylum seekers to start the asylum process once they arrived at POEs." ER-99–100. This Court should affirm that conclusion.

## II.     Defendants Violated the Fifth Amendment

A noncitizen's due process rights are coextensive with the statutory rights Congress provides. *Guerrier v. Garland*, 18 F.4th 304, 313 (9th Cir. 2021). Congress has established procedural protections for arriving asylum seekers, according them the right to apply for asylum under § 1158 and dictating that they "shall" be inspected at POEs and processed pursuant to § 1225. *Supra* 16–23. Plaintiffs' procedural due process rights thus run concurrent with their statutory rights under §§ 1225 and 1158(a)(1).

Defendants attempt to evade this commonsense conclusion by incorrectly asserting that asylum seekers "on Mexican soil have no basis to invoke the Fifth Amendment." Defs.' Br. 47. *Boumediene v. Bush* speaks conclusively on the issue of extraterritorial application of the Constitution by requiring courts to assess the "particular circumstances, the practical necessities, and the possible alternatives which Congress had before it and, *in particular*, whether judicial enforcement of the

provision would be impracticable and anomalous." 553 U.S. 723, 759 (2008) (emphasis added; quotation omitted). It is a "functional approach," *Ibrahim v. Dep't of Homeland Sec.*, 669 F.3d 983, 995–97 (9th Cir. 2012), that considers the "specific circumstances of each particular case" when "determining the geographic scope of the Constitution." *Boumediene*, 553 U.S. at 759 (quotation omitted).

Here, the "specific circumstances" of this case demonstrate that arriving asylum seekers have a due process right that is coextensive with their statutory rights under §§ 1225 and 1158(a)(1). Requiring CBP to comply with statutory and due process protections accorded to arriving asylum seekers would not be "impracticable or anomalous," especially since doing so has been part of their daily responsibilities since the INA's inception. At the same time, it would be "anomalous" to permit U.S. officials to intentionally deny a noncitizen access to U.S. territory in order to deprive them of their statutory and due process rights. *Boumediene*, 553 U.S. at 765 (executive may not "switch the Constitution on or off at will" through manipulation of territorial lines).

Defendants' reliance on *Verdugo-Urquidez* and its requirement that noncitizens be "within the territory of the United States and develop[ing] substantial connections with this country" before rights accrue, 494 U.S. 259, 271 (1990), does not

comport with the Supreme Court's subsequent endorsement of a "functional approach" in *Boumediene*.[13] This Court has already held that the U.S. border is not a "clear line that separates aliens who may bring constitutional challenges from those who may not." *Ibrahim*, 669 F.3d at 995–97. As this Court noted, "[t]he government's proposed [bright-line 'formal sovereignty-based'] test is not the law." *Id.* at 997.[14] This Court should affirm the district court's finding that Defendants violated the Fifth Amendment.

## III. The District Court Properly Enjoined the Application of the Asylum Ban.

In addition to declaring turnbacks unlawful, the district court entered a per-

---

[13] *Verdugo-Urquidez* is also distinguishable because it involves the Fourth Amendment, which is analytically distinct from the claims raised here. 494 U.S. 259, 264 (1990).

[14] Defendants' attempted resuscitation of *Johnson v. Eisentrager* is remarkable in light of the two Supreme Court cases, *Rasul v. Bush*, 542 U.S. 466 (2004), and *Boumediene*, limiting *Eisentrager* to its distinctive facts. Unlike the *Eisentrager* petitioners detained in Germany who sought additional habeas review of a duly reviewed court martial conviction, Plaintiffs here are not nationals of a wartime "enemy" nation, have not received any procedural protections at all, and are in territory functionally under U.S. control. Defendants also rely on *Landon v. Plasencia*, which was decided before *Verdugo-Urquidez* and *Boumediene*, to assert that "no constitutional rights" extend to "alien[s] seeking initial admission to the U.S." 459 U.S. 21, 32 (1982). *Plasencia* was decided after the plaintiff there was afforded due process in an exclusion hearing as required by a separate section of the INA—a constitutional protection to which the government and the court agreed plaintiff was entitled under the statute. *Id.* at 32, 34.

manent injunction prohibiting Appellants from applying the Asylum Ban to a sub-class of asylum seekers who would not have been subject to the Ban but for having been turned back by Defendants. ER-4–5; ER-77–81. The injunction also requires Appellants to identify and re-open the cases of subclass members to whom the Asylum Ban was wrongfully applied. Appellants suggest this was an abuse of discretion. It was not.

**1.** Appellants argue that because Plaintiffs did not challenge the legality of the Asylum Ban in their complaint, the Ban cannot form any part of the relief in this case. Defs.' Br. 50. But "the district court has broad discretion in fashioning a remedy" and can order relief "necessary to remedy a constitutional violation." *Melendres v. Arpaio*, 784 F.3d 1254, 1265 (9th Cir. 2015) (internal quotation and citation omitted). The injunction "is required in this case as a remedial measure to counteract the pattern of interference by [Appellants] with the plaintiff class members' ability to exercise their rights," *Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 556 (9th Cir. 1990), even if it requires Appellants to take steps they would not otherwise be required to take to put plaintiffs "in the position [they] would have occupied" if the legal violation had not occurred, *Winston Research Corp. v. Minn. Min. & Mfg. Co.*, 350 F.2d 134, 142 (9th Cir. 1965). *See also Nw. Env't Def. Ctr. v. Gordon*, 849 F.2d 1241, 1245 (9th Cir. 1988); *Garcia v. Lawn*, 805 F.2d 1400, 1403–04 (9th Cir. 1986). Thus, both a motions panel of this Court and the district court

have rejected Appellants' argument. *Al Otro Lado*, 952 F.3d at 1006 n.6 ("Because the [preliminary] injunction sought to preserve class members' access to the asylum process, there was a sufficient 'relationship between the injury claimed in the motion for injunctive relief and the conduct asserted in the underlying complaint'") (quoting *Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 636 (9th Cir. 2015)); *Al Otro Lado, Inc. v. McAleenan*, 423 F. Supp. 3d 848, 867–68 (S.D. Cal. 2019).

**2.** Nor does the APA limit the district court's broad equitable discretion. *Norton v. S. Utah Wilderness All.*, on which Appellants rely, Defs.' Br. 50, held that the plaintiffs failed to state a claim under § 706(1); it did not address what relief was appropriate where, as here, a party succeeds on the merits of such a claim. 542 U.S. 55, 64–73 (2004). The Court's *dicta* that § 706(1) empowers a court to direct an agency to act but not "how" to act is inapposite. The injunction in this case does not compel Appellants to grant or deny asylum to anyone. It merely requires Appellants to restore a subclass of Plaintiffs to the position they would have been in absent the wrongful application of the Asylum Ban.

**3.** Appellants argue that the district court erred in concluding that the Asylum Ban—which applied to an individual who "enters, attempts to enter, or arrives in the United States . . . on or after July 16, 2019"—did not by its terms apply to

asylum seekers who were turned back from POEs prior to that date. ER-211. In Appellants' view, those asylum seekers did not arrive in the U.S. when they were turned back. Defs.' Br. 51. This is the same incorrect view of §§ 1158 and 1225 that is debunked above. *Supra* 23–30. Appellants offer no substantive argument as to why the district court's order was an abuse of discretion, other than their disagreement with the district court's statutory analysis. Defs.' Br. 51.

**4.**    Finally, § 1252(f)(1) does not bar the permanent injunction. Section 1252(f)(1) prohibits district and appellate courts from enjoining or restraining the operation of Part IV of the INA, codified at 8 U.S.C. §§ 1221–31 (the "1252(f) provisions"), on a class-wide basis. In *Aleman Gonzalez*, the Supreme Court clarified that § 1252(f)(1) generally prohibits any class-wide injunction that orders federal officials "to take or to refrain from taking actions to enforce, implement, or otherwise carry out *the specified statutory provisions*." 142 S. Ct. at 2065 (emphasis added).

*Aleman Gonzalez* did not abrogate a long line of cases holding that injunctions entered under *other* INA sections are outside § 1252(f)(1)'s scope. *See Gonzalez v. ICE*, 975 F.3d 788, 813 (9th Cir. 2020); *Gonzales v. DHS*, 508 F.3d 1227, 1233 (9th Cir. 2007); *Cath. Soc. Servs., Inc. v. INS*, 232 F.3d 1139, 1150 (9th Cir. 2000) (en banc). Indeed, *Aleman Gonzalez* states that its holding does not affect this line of precedent, noting that this Court's holding in *Gonzales* stands "for the unresponsive

proposition that a court may enjoin the unlawful operation of a provision *that is not specified in § 1252(f)(1)* even if that injunction has some collateral effect on the operation of a covered provision." 142 S. Ct. at 2067 n.4.

The district court's permanent injunction was firmly grounded in that line of precedent. For example, *Catholic Social Services* upheld an injunction against an adjustment of status policy issued under Part V of the INA (8 U.S.C. § 1255a) even though the injunction prohibited removal of class members under Part IV. 232 F.3d at 1145, 1150. Similarly, *Gonzales* affirmed the district court's authority to grant an injunction entered under Part V of the INA (8 U.S.C. § 1255(i)) even though the injunction prohibited the reinstatement of removal of class members under 8 U.S.C. § 1231(a)(5), a provision covered under § 1252(f). 508 F.3d at 1233.

The Asylum Ban, by its terms, implements § 1158(b)(2)(C) (which is not a 1252(f) provision) and addresses *substantive* requirements for asylum eligibility. *See* 84 Fed. Reg. 33,829, 33,834 (interim final rule); 85 Fed. Reg. 82,260, 82,261–62 (final rule).[15] Any impact on the procedural 1252(f)(1) provisions cited by Appellants is collateral at best. *See* Defs.' Br. 53–56. While the injunction may have a

---

[15] Under *Gonzalez*, § 1252(f)(1) is not implicated when, as here, a regulation is promulgated under a "grant of authority [that] is *not* located in Part IV," because this Court "presume[s] that Congress acted intentionally" when making the structural choice to codify authority outside the reach of § 1252(f)(1). 975 F.3d at 813–15 & n.16 (internal quotation marks omitted).

downstream impact on a noncitizen's removability, it does so only by altering the eligibility criteria for asylum, and has no effect on the operation of the procedures for removal proceedings. *See Cath. Soc. Servs.*, 232 F.3d at 1145, 1150; *Gonzales*, 508 F.3d at 1230–31, 1233. The injunction does not mandate any specific outcome in removal proceedings or alter any of the procedural rules regarding such proceedings, but simply clarifies the inapplicability of a now-defunct regulation.

In the words of *Aleman Gonzalez*, the permanent injunction does not order Appellants to "take or to refrain from taking actions to enforce, implement or otherwise carry out" any of the Part IV provisions. 142 S. Ct. at 2065. Appellants are free to implement those provisions as they see fit; they just cannot "enforce, implement or otherwise carry out" the Asylum Ban with respect to certain class members in doing so. *Id.* This is precisely the type of "collateral effect" the Supreme Court noted was outside the scope of its decision and comports with the injunctions approved in *Catholic Social Services* and *Gonzales*.

Appellants argue that § 1252(f)(1) should cover any action that *could* ultimately affect the outcome of an expedited or full removal proceeding. Defs.' Br. 55. That interpretation would enormously expand the reach of § 1252(f)(1) and run afoul of this Court's precedent approving injunctions with collateral effects on the operation of the Part IV provisions. The INA is a comprehensive and interdependent statutory scheme; virtually any judicial order related to immigration could potentially

have a ripple effect on the inspection, apprehension, examination, or removal of noncitizens under Part IV. Appellants' interpretation would erase the significance of Congress's intentional decisions to limit § 1252(f)(1) to specific provisions and to locate other statutory provisions outside Part IV.[16]

Contrary to Defendants' claim, the permanent injunction does not prohibit Appellants from implementing the Asylum Ban (which was separately enjoined). Defs.' Br. 55–56. It affirms that subclass members who attempted to enter the U.S. prior to July 16, 2019 but were prevented from doing so by the turnback policy fall outside the "express terms" of the Asylum Ban. ER-212; 8 C.F.R. § 208.13(c)(4). This Court should affirm the district court's permanent injunction.

## IV. The District Court's Remaining Summary Judgment Rulings Should be Reversed and Remanded

The district court's rulings concerning APA § 706(1), the Fifth Amendment, and the Asylum Ban are sound. But the district court erred by declining to find the turnback policy unlawful under APA § 706(2), actionable under the ATS, and otherwise statutorily unauthorized. This Court should reverse the district court's summary judgment rulings on those grounds and remand for consideration of appropriate remedies.

---

[16] By way of a single string cite, Defendants suggest the injunction violates other provisions of § 1252. Defs.' Br. 52. However, Defendants offer no further explanation or argument on this point, nor do they identify any errors in the district court's rejection of these arguments below. ER-190, 199.

### A.    The District Court Erred by Not Addressing APA § 706(2)

Each of Plaintiffs' theories under APA § 706(2), which the district court did not address, provides a sufficient alternative basis to affirm the district court's declaratory judgment and enter other appropriate relief.[17] Defendants' turnback policy is an arbitrary and capricious final agency action that exceeds their statutory authority and is not in accordance with law. § 706(2)(A), (C).

### 1.  The Turnback Policy Is a Final Agency Action

The turnback policy is a final agency action amenable to APA review. *See* 5 U.S.C. § 704; *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).

***First***, the turnback policy "mark[s] the 'consummation' of the agency's decisionmaking process," *Bennett*, 520 U.S. at 177–78, because it reflects a "conscious" and "deliberate decision" by Defendants, *ONRC Action v. Bureau of Land Mgmt.*, 150 F.3d 1132, 1137 (9th Cir. 1998), and is "an active program implemented by the agency," *Wagafe v. Trump*, 2017 WL 2671254, at *10 (W.D. Wash. 2017). Defendants adopted the turnback policy and orally communicated it to the field in the fall

---

[17] In ruling on the parties' summary judgment motions, the district court concluded that in light of its § 706(1) holding it was unnecessary to address Plaintiffs' § 706(2) claims. ER-117. Nearly a year later, after *Aleman Gonzalez* was decided, the district court assessed the remedy available for Plaintiffs' § 706(1) claim, but did not consider whether additional remedies—including injunctive relief—would be available for Plaintiffs' unresolved § 706(2) claim (or the other claims that the district court dismissed). That is why the district court should consider those issues in the first instance on remand.

of 2016; they first memorialized that policy in 2018 at the direction of the DHS Secretary. *Supra* 7–9.

**Second**, as a result of the policy, "'rights or obligations have been determined,' or … 'legal consequences will flow.'" *Bennett*, 520 U.S. at 177–78. Turnbacks produce immediate legal consequences—they force asylum seekers to wait in Mexico without access to the U.S. asylum system. *Supra* 10–11. These "actual or immediately threatened effect[s]" satisfy the finality test's second prong. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 894 (1990); *Wagafe*, 2017 WL 2671254, at *10 (action was final when policy resulted in "thousands of . . . qualified applications [being] allegedly indefinitely delayed or denied").

### 2. The Turnback Policy Exceeds Defendants' Authority

Federal agencies are limited to acting within the confines of their Congressionally-delegated statutory authority. *Planned Parenthood of Greater Wash. & N. Idaho v. U.S. Dep't of Health & Human Servs.,* 946 F.3d 1100, 1114 n.3 (9th Cir. 2020). Here, Defendants claim and exercise an authority never granted to them; the Court should reject this baseless power grab as "not in accordance with law," and "in excess of statutory . . . authority," in violation of the APA. § 706(2)(A), (C).

"[I]t is a commonplace of statutory construction that the specific governs the general," particularly where "Congress has enacted a comprehensive scheme and

has deliberately targeted specific problems with specific solutions." *RadLAX Gateway Hotel v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (citations omitted). Here, Congress created a specific statutory scheme to protect asylum seekers arriving at POEs, and imposed specific statutory mandates on Defendants. *Supra* 16–23.

But Defendants claim that general authorizing statutes permit CBP to block those very asylum seekers from entering POEs, thereby preventing their inspection and processing. Defs.' Br. 43–44. The implications of Defendants' arguments are radical. By interpreting general authorizing statutes as negating the specific statutory scheme to protect arriving asylum seekers, Defendants claim sole authority to control access to asylum for noncitizens arriving at POEs, without any involvement from Congress. Such an interpretation conflicts with Congress's statutory scheme; the exception would swallow the rule. *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 321 (2014) ("A statutory provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme . . . because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law."); *Ramirez v. U.S. Immigr. & Customs Enf't*, 310 F. Supp. 3d 7, 20–22 (D.D.C. 2018) (noting agency conduct may be unlawful where a plaintiff identifies specific statutory provisions that "clearly rein[ ] in the agency's discretion" and "argue[s] that the agency ha[s] failed to act in accordance with that mandate"). There is "no room" in these general authorizing statutes "to infer an implicit delegation" of

45

agency authority to evade an explicit statutory requirement. *Gorbach v. Reno*, 219 F.3d 1087, 1093 (9th Cir. 2000) (en banc).

Even a cursory analysis of the general authorizing statutes Defendants rely upon—6 U.S.C. §§ 111(b)(1), 202, 211(c), 211(g)(3) —reveals that they do not authorize what Defendants claim. Section 111(b)(1) outlines the agency's "primary mission"—which includes "carry[ing] out all functions of entities transferred to [DHS]," including the former Immigration and Naturalization Service's functions of inspecting and processing asylum seekers at POEs. *See* 8 U.S.C. § 1101(a)(18), (34). Section 111(b)(1) also emphasizes that DHS's "primary mission" is to "ensure that functions of the agencies and subdivisions within the Department that are not related directly to securing the homeland," such as inspection and processing of asylum seekers, "*are not diminished or neglected except by a specific explicit Act of Congress.*" 6 U.S.C. § 111(b)(1)(E) (emphasis added). Defendants point to no such Act of Congress that would allow them to deprioritize inspection and processing of asylum seekers at POEs for any reason. *See also id.* § 202 (similarly broad grant of general authority that does not mention turnbacks). Section 211 lists CBP's duties— including inspection of noncitizens arriving at POEs—supporting *Plaintiffs'* position that Defendants have no power to block access to such inspection. *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1747 (2020) (when Congress passes a statute and includes no exceptions, no "tacit exception" may be inferred).

Defendants also separately claim an inherent power to turn back asylum seekers. Defs.' Br. 43–44. But agencies lack "inherent" authority outside of a statutory mandate, *Gorbach*, 219 F.3d at 1095, particularly "where Congress has spoken" to the contrary, *Ivy Sports Med., LLC v. Burwell*, 767 F.3d 81, 86 (D.C. Cir. 2014); *see also Util. Air Regul. Grp.*, 573 U.S. at 328 ("[It is a] core administrative law principle that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate.").

The cases Defendants cite do not permit CBP to turn back asylum seekers. Defs.' Br. 43–44. *Almeida-Sanchez v. United States*, 413 U.S. 266, 272–75 (1973), and *Carroll v. United States*, 267 U.S. 132, 154 (1925), discuss Fourth Amendment limits on searches of vehicles and travelers at border crossings and near the border. In *United States ex. rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542–44 (1950), *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 210–211 (1953), *Galvan v. Press*, 347 U.S. 522, 531 (1954), *Nishimura Ekiu v. United States*, 142 U.S. 651 (1892), *Chae Chan Ping v. United States*, 130 U.S. 581, 604 (1889), and *Platero-Rosales v. Garland*, 55 F.4th 974, 975 (5th Cir. 2022), executive officials carried out functions explicitly authorized by statute, and the reviewing court upheld the constitutionality of the underlying statutes. In *United States v. Delgado-Garcia*, 374 F.3d 1337, 1345 (D.C. Cir. 2004), the court concluded a statute *could* be applied extrater-

ritorially, reasoning that "[i]t is natural to expect that a statute that protects the borders of the United States, unlike ordinary domestic statutes, would reach those outside the borders." These cases offer no support for the unauthorized conduct of a rogue federal agency.

Congress created a statutory scheme that specifically addresses how Defendants must treat individuals who are coming to POEs to seek asylum. Defendants may not revise that statutory scheme. Because Defendants are asserting authority they do not have, the turnback policy is "not in accordance with law," and "in excess of statutory . . . authority," in violation of the APA. 5 U.S.C. § 706(2)(A), (C).

### 3. The Turnback Policy Is Arbitrary and Capricious and an Abuse of Discretion under APA § 706(2).

An agency may not "offer[] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 994 (9th Cir. 2014) (quotation omitted). Essentially, "agencies [must] offer genuine justifications for important decisions." *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2575–76 (2019). Furthermore, those decisions must not be based on "factors which Congress has not intended [them] to consider." *Locke*, 776 F.3d at 994 (quotation omitted).

Here, Defendants' stated justification for the turnback policy—lack of capacity—is demonstrably false. *Supra* 10–11. Defendants meticulously tracked what

48

they internally termed "capacity" at each POE—a figure that related to the number of asylum seekers who could be inspected and processed—on a daily basis for years. Those internal "capacity" reports reveal a very different picture than what Defendants depict in their brief. The data show that in the years after adopting the turnback policy, Defendants routinely operated below capacity. Defendants' capacity reports also tracked the impact of asylum seeker processing on port operations—and that impact was nearly always listed as minimal or nonexistent. 1-SER-236–237; 4-SER-728–744, 747–763, 766–782, 785–795, 798–811. Even DHS's own Office of Inspector General ("OIG") concluded in October 2020 that "while DHS leadership urged asylum seekers to present themselves at [POEs], the agency took deliberate steps to limit the number of undocumented aliens who could be processed each day at the Southwest Border [POEs]." 1-SER-24. The OIG found that POEs "were not using all available detention space," even when they were turning back asylum seekers due to a claimed lack of capacity. 1-SER-30–32.

In addition, the record shows that in adopting the turnback policy, Defendants explicitly considered whether the policy could serve to artificially limit the number of asylum seekers who would be inspected and processed at POEs, without regard to POEs' capacity. *Supra* 8–9 (then-Secretary Nielsen was told in 2018 that metering would result in approximately 650 asylum seekers being turned away per day). Under the policy, Defendants also set caps in advance on the number of arriving asylum

seekers they processed per day, based on the artificial operational capacity metric. *E.g.*, 2-SER-450 ("The view is that we [should be] processing up to 70% of the detention/holding capacity"); 4-SER-897; *supra* 11–12. At bottom, as DHS OIG concluded, the turnback policy restricts the number of people who can access the U.S. asylum process at POEs. 1-SER-24. Defendants do not dispute this fact; indeed, they openly characterize their policy as one to "control the flow" of asylum seekers into POEs. Defs.' Br. 15.

But as the district court correctly concluded, limiting the number of people who may access the asylum process at POEs is not a factor Congress empowered Defendants to consider. *See* ER-280 (reasoning that, unlike the President's express authorization to set numerical limits on the number of refugee admissions per year in 8 U.S.C. § 1157, the INA does not cap the number of people who may access the asylum process at ports, and a "*de facto* numerical limit" would be "unlawful").

Because of the obvious "disconnect between the decision made and the explanation given," *Dep't of Com.*, 139 S. Ct. at 2575, and because it is based on a factor Congress did not intend Defendants to consider, *Locke*, 776 F.3d at 994, the turnback policy is arbitrary and capricious and an abuse of discretion.

## B. The Court Erred in Dismissing Plaintiffs' Independent INA Claim

Apart from Plaintiffs' claims under the APA, turnbacks are *ultra vires* of Defendants' authority. The district court improperly concluded that nonstatutory review

is available in this circuit only for claims of unconstitutional agency action, and not for claims of *ultra vires* agency action. But that holding was based on an erroneous reading of *E.V. v. Robinson*, 906 F.3d 1082 (9th Cir. 2018). ER-95–96.

The court in *Robinson* addressed a distinct situation: claims against a military judge, who is not an "agency or officer or employee thereof" and thus not covered by the broad waiver of sovereign immunity in 5 U.S.C. § 702. 906 F.3d at 1094. The district court in this case read *Robinson* as announcing a "rule" that an *ultra vires* cause of action for equitable relief may lie only when the sovereign immunity waiver in § 702 does not apply, and that otherwise an *ultra vires* equitable claim is "abrogated by" § 702. ER-95–96. *Robinson* stands for no such "rule"; the court there simply decided that courts need only undertake the detailed sovereign immunity analysis required by pre-§ 702 precedent, *see Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 687–89 (1949), in the rare case where § 702's waiver is inapplicable. If anything, *Robinson* supports Plaintiffs' claim because it generally illuminates the types of equitable claims (for *ultra vires* and unconstitutional conduct) that were available before the APA was enacted, as set forth in *Larson*. *See* 906 F.3d at 1090–91 (summarizing the pre-APA legal fiction that suits challenging *ultra vires*

or unconstitutional conduct are not against the sovereign and therefore are permissible even in the absence of a waiver of sovereign immunity).[18] Thus, the district court erred by granting summary judgment in Defendants' favor on the *ultra vires* claim. This court should reverse and remand for further consideration of this claim under the proper legal standard.

### C.     The District Court Erred in Denying Plaintiffs Summary Judgment on Their ATS Claim

**1.**     Noncitizens may bring claims under the ATS, 28 U.S.C. § 1350, if the challenged conduct violates an international human rights norm that has become "specific, universal, and obligatory." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 732 (2004). The norm at issue here, non-refoulement, "encompass[es] any measure . . . which could have the effect of returning an asylum-seeker or refugee to the frontiers of territories where his or her life or freedom would be threatened[.]" UNHCR Exec. Comm., *Note on International Protection*, ¶ 16, U.N. Doc. A/AC.96/951 (Sept. 13, 2001). Non-refoulement satisfies the *Sosa* test because, as Defendants concede, *see* ER-298, it has reached *jus cogens* status: "an elite subset of . . . customary international law" from which no derogation is ever permitted. *See Siderman de Blake v.*

---

[18] The district court acknowledged that courts outside the Ninth Circuit have recognized that nonstatutory review can be used to challenge agency conduct that is *ultra vires* of statutory authority. ER-94 (citing *Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988), for the principle that "notwithstanding the APA, courts still maintain judicial authority to review ultra vires actions taken by the executive").

*Rep. of Argentina*, 965 F.2d 699, 714–15 (9th Cir. 1992); *see also* UNHCR, *Advisory Opinion on the Extraterritorial Application of Non-Refoulement Obligations Under the 1951 Convention Relating to the Status of Refugees and its 1967 Protocol*, ¶ 12 (Jan. 26, 2007) (regarding non-refoulement's "fundamental" and "non-derogable" character) ("*UNHCR Advisory Opinion*").

Nevertheless, the district court held that this *jus cogens* norm did not constrain Defendants because: (1) existing state violations of the norm have diluted its obligatory nature and (2) *dicta* in *Sale* could be read to limit the extraterritorial reach of the non-refoulement provision of Article 33 of the 1951 Refugee Convention, not only on the "high seas" (which was the basis of the *Sale* Court's holding), but also at the border, despite the consensus, found in multiple additional international law authorities, that the norm unambiguously applies there.

**2.**     The district court erred in concluding that the non-refoulement norm at the border is not sufficiently obligatory simply because some states have violated the norm in that context. ER-124 (observing that "in some European Union member[] states and Australia" "countries have adopted pushback or 'offshoring' policies," "in some form or another").

Critically, violations of a norm do not diminish or undermine its "binding effect as a norm of international law." *Filartiga v. Pena-Irala*, 630 F.2d 876, 884 n.15 (2d Cir. 1980); *Siderman*, 965 F.2d at 717. In *Filartiga*, the Second Circuit firmly

rejected the district court's logic, emphasizing that "[t]he fact that the prohibition of torture is often honored in the breach does not diminish its binding effect as a norm of international law." *Filartiga*, 630 F.2d at 884 n.15. And while the U.S. and other countries have engaged in torture in the decades since *Filartiga*, these violations have not written this norm out of existence or diluted its *jus cogens* status, any more than acts of murder by law enforcement officers write homicide out of the penal code. *Id.* at 884. Acceptance of the district court's logic would undermine the binding concept of *jus cogens* norms altogether. *Siderman*, 965 F.2d at 715 (*jus cogens* "is derived from values taken to be fundamental by the international community, rather than from the fortuitous or self-interested choices of nations"). When a norm is established as *jus cogens*, "a state is bound by [it] even if it does not consent to [its] application." *Sampson v. Fed. Republic of Germany*, 250 F.3d 1145, 1150 (7th Cir. 2001).

**3.** The district court concluded that the norm does not apply to the U.S. border by relying on an inapposite pronouncement in *Sale* that "the text of Article 33 [of the 1951 Refugee Convention] cannot reasonably be read to say anything at all about a nation's actions toward aliens outside its own territory." 509 U.S. at 183. ER-125.

In *Sale*, the Court rejected petitioners' argument that a since-abrogated INA

provision and Article 33 of the Refugee Convention protected Haitian refugees interdicted in international waters from being returned to peril in their home country. Despite the Court's *dicta* regarding Article 33's extraterritorial reach relied upon by the district court, ER-125, the Supreme Court's actual *holding* was narrow: Article 33 does not "appl[y] to action taken by the Coast Guard *on the high seas*," *Sale*, 509 U.S. at 159, and Article 33's text does not to apply "to aliens interdicted *on the high seas*." *Id*. at 187 (emphases added); *see also id*. at 160, 166–67, 173, 179–80 (all emphasizing noncitizens' presence on the high seas). This Court has subsequently limited *Sale*'s holding to its facts. *See, e.g.*, *Blazevska v. Raytheon Aircraft Co*., 522 F.3d 948, 954 (9th Cir. 2008) (describing *Sale* as involving the "deportation of aliens from international waters").

Indeed, *Sale* recognized that the INA provision at issue there would have applied had the Haitian petitioners "*arrived at the border* of the United States," 509 U.S. at 160 (emphasis added), as class members have here, and that the text of Article 33 creates a distinction between the high seas, where Article 33 does not apply, and the border, where it does. The Court determined that the English translation of "*refouler*" from Article 33, typically translated as "return," is not synonymous with "return," but rather is akin to "repulse," "repel," "drive back," and "expel." Accordingly, "these translations imply that 'return' [in Article 33] means a defensive act of *resistance or exclusion at a border* rather than an act of transporting someone to a

55

particular destination." *Id*. at 181–82 (emphasis added).

To be sure, *Sale*'s narrow holding regarding Article 33's application to the high seas has been criticized by the UNHCR and other authoritative international law jurists, but this Court need not grapple with the holding's correctness. What is clear in this case is: (1) *Sale*, which is not an ATS case, examined only the text of Article 33 and did not consider other relevant sources required to assess the universality of the non-refoulement norm, *Siderman*, 965 F.3d at 714–15; and (2) those other sources and subsequent developments in the law demonstrate that, consistent with a proper interpretation of *Sale*'s narrow holding, the non-refoulement norm unambiguously applies *at the border* (a.k.a. the "frontier"), even if not on the high seas. Courts should not read *Sale* so expansively that it conflicts with this international law consensus regarding the binding nature of the non-refoulement norm at the border. *See Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64 (1804).

The "international community recognizes," *Siderman*, 965 F.2d at 715, that the non-refoulement norm applies to migrants at a country's borders. The UNHCR has consistently held that the norm applies at the border.[19] International courts have

---

[19] UNHCR, *Non-Refoulement No. 6* (XXVIII) - 1977, ¶¶ (a), (c), U.N. DOC. A/32/12/Add.1 (Oct. 12, 1977) ("the principle of non-refoulement … [applies] both *at the border* and within the territory of a State," a principle that "was generally accepted by states."); UNHCR Exec. Comm., *Conclusion No. 22* (XXXII) – 1981, *Protection of Asylum-Seekers in Situations of Large-Scale Influx*, ¶ II.A.

also consistently held that non-refoulement encompasses non-rejection at the border.[20] The Committee Against Torture has interpreted the Convention Against Torture's non-refoulement mandate to include "rejection at the frontier and pushback operations." U.N. Committee Against Torture, *General Comment No. 4 (2017) on the Implementation of Article 3 of the Convention in the Context of Article 22*, ¶¶ 4,

---

("[i]n all cases the fundamental principle of non-refoulement *including non-rejection at the frontier* must be scrupulously observed"); *see also UNHCR Advisory Opinion*, ¶ 7 (Article 33 encompasses "non-admission[s] at the border"); *id.* ¶ 8 ("[a]s a general rule, . . . [contracting] States [must] grant individuals seeking international protection *access to the territory*.") (emphases added); UNHCR Exec. Comm., *Note on International Protection*, ¶ 16, U.N. Doc. A/AC.96/951 (Sept. 13, 2001) (the "duty not to *refoule*" is a prohibition "[including] rejection at the frontier").

[20] *See, e.g.*, *Dee M.A. and Others v. Lithuania*, App. No. 59793/17, ¶ 21, Eur. Ct. H.R. (Dec. 11, 2018) ("States have a fundamental obligation to ensure that no [asylum seekers] shall be subjected to refusal of admission at the frontier"); *Hirsi Jamaa v. Italy*, App. No. 27765/09, Eur. Ct. H.R. (Feb. 23, 2012); Austria - Administrative Court of the Province of Styria, LVwG 20.3-912/2016 (Sep. 9, 2016) (asylum seekers cannot be rejected at the border crossing without having the possibility to state reasons for obtaining international protection); *D.D. v. Spain*, U.N. Doc. CRC/C/80/D/4/2016 (same); *see also R.R. and Others v Hungary*, App. No. 36037/17, Eur. Ct. H.R. (Mar. 2, 2021) (non-refoulement applies within the "transit zone" of a country); *Ilias and Ahmed v. Hungary*, App. No. 47287/15, Eur. Ct. H.R. (Mar. 14, 2017) (same).

11, 12, U.N. Doc. CAT/C/GC/4 (Sept. 4, 2018). Jurists' opinions are also conclusive,[21] as are the opinions of prominent international legal organizations.[22]

Because there is a "specific, universal and obligatory," norm of non-rejection at the border (regardless of actual state violations) and because it is undisputed that refoulement of Plaintiffs would subject them to risk of severe harm in a third country, this Court should reverse the district court's holding and grant summary judgment on Plaintiffs' ATS claim.

---

[21] *See, e.g.*, Guy S. Goodwin-Gill & Jane McAdam, *The Refugee in International Law* 208 (3d ed. 2007) ("States in their practice and in their recorded views [] have recognized that non-refoulement applies to the moment at which asylum seekers present themselves for entry, either within a State or at its border.").

[22] *See, e.g.*, INT'L L. ASS'N, *Resolution 6/2002 on Refugee Procedures (Declaration on International Minimum Standards for Refugee Procedures)* (The International Law Association stated that non-rejection at the border constitutes one of the "minimum standards of international [refugee] law for incorporation in all States.") at preamble, ¶¶ 5, 8; European Union Agency for Fundamental Rights, *Scope of the principle of non-refoulement in contemporary border management* (2016), https://fra.europa.eu/sites/default/files/fra_uploads/fra-2016-scope-non-re-foulement-0_en.pdf (same); *see also* Org. of African Unity, Convention Governing the Specific Aspects of Refugee Problems in Africa, Sept. 10, 1969, 1001 U.N.T.S. 45; *Cartagena Declaration*, Cartagena Declaration on Refugees, Colloquium on the International Protection of Refugees in Central America, Mexico and Panama, Nov. 22, 1984, OAS/Ser. L/V/II.66, doc. 10, rev. 1, at 190-93, https://perma.cc/U7AA-GG39; *Mexico Declaration,* Mexico Declaration and Plan of Action to Strengthen the International Protection of Refugees in Latin America, Nov. 16, 2004, https://perma.cc/Q33B-7A9F.

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's judgment concerning 5 U.S.C. § 706(1), the Fifth Amendment, and the Asylum Ban. The district court's judgment concerning Plaintiffs' remaining claims should be reversed and remanded for entry of appropriate relief.

Dated: February 21, 2023

Respectfully submitted,

Stephen M. Medlock
Evan Miller
Rami Abdallah E. Rashmawi
VINSON & ELKINS LLP
2200 Pennsylvania Ave., N.W., Ste. 500 W.
Washington, D.C. 20036
(202) 639-6500

Baher Azmy
Angelo Guisado
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6464

Melissa Crow
CENTER FOR GENDER & REFUGEE STUDIES
1121 14th Street, N.W., Suite 200
Washington, D.C. 20005
(202) 355-4471

Neela Chakravartula
Anne Dutton
CENTER FOR GENDER & REFUGEE STUDIES

*/s/ Ori Lev*
Ori Lev
MAYER BROWN LLP
1999 K Street, N.W.
Washington, D.C. 20006
(202) 263-3270

Matthew H. Marmolejo
MAYER BROWN LLP
333 S. Grand Ave., 47th Floor
Los Angeles, CA 90071
(213) 229-9500

Katherine Melloy Goettel
Gianna Borroto
Suchita Mathur
AMERICAN IMMIGRATION COUNCIL
1331 G St N.W., Suite 200
Washington, D.C. 20005
(202) 507-7552

Sarah Rich
SOUTHERN POVERTY LAW CENTER
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030

200 McAllister Street
San Francisco, CA 94102
(415) 565-4877

(404) 521-6700

Rebecca Cassler
SOUTHERN POVERTY LAW CENTER
201 Saint Charles Avenue, Suite 2000
New Orleans, LA 70170
(504) 486-8982

*Counsel for Appellees/Cross Appellants*

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that:

1. The brief is proportionally spaced, has a typeface of 14 point or more, and contains 14,246 words, exclusive of the exempted portions of the brief.

2. The brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font. As permitted by Fed. R. App. P. 32, the undersigned has relied on the word-count feature of this word-processing system in preparing this certificate.

Dated: February 21, 2023

Respectfully submitted,

*/s/ Ori Lev*
Ori Lev
MAYER BROWN LLP
1999 K Street, N.W.
Washington, DC 20006
(202) 263-3270