Nos. 22-55988, 22-56036

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

AL OTRO LADO, INC., *et al.*,

*Pls.-Appellees/Cross-Appellants*,

v.

ALEJANDRO MAYORKAS, Secretary of Homeland Security, *et al.*,

*Defendants-Appellants/Cross-Appellees*,

and

THE EXECUTIVE OFFICE FOR IMMIGRATION REVIEW,

*Appellant/Cross-Appellee*.

_____

APPEAL FROM FINAL JUDGMENT OF THE UNITED STATES DISTRICT
COURT FOR THE SOUTHERN DISTRICT OF CALIFORNIA
No. 17-cv-02366-BAS-KSC

_____

**APPELLEES/CROSS-APPELLANTS' SUPPLEMENTAL EXCERPTS OF
RECORD – VOLUME 1**

Stephen M. Medlock
Evan Miller
Rami Abdallah E. Rashmawi
VINSON & ELKINS LLP
2200 Pennsylvania Ave., N.W., Ste. 500 W.
Washington, DC 20036
(202) 639-6500

Baher Azmy
Angelo Guisado
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6464

Ori Lev
MAYER BROWN LLP
1999 K Street, N.W.
Washington, DC 20006
(202) 263-3270

Matthew H. Marmolejo
MAYER BROWN LLP
333 S. Grand Ave., 47th Floor
Los Angeles, CA 90071
(213) 229-9500

*Additional Counsel listed inside cover*

Melissa Crow
CENTER FOR GENDER & REFUGEE STUDIES
1121 14th Street, N.W., Suite 200
Washington, DC 20005
(202) 355-4471

Neela Chakravartula
Anne Dutton
CENTER FOR GENDER & REFUGEE STUDIES
200 McAllister Street
San Francisco, CA 94102
(415) 565-4877

Katherine Melloy Goettel
Gianna Borroto
Suchita Mathur
AMERICAN IMMIGRATION COUNCIL
1331 G St NW, Suite 200
Washington, DC 20005
(202) 507-7552

Sarah Rich
SOUTHERN POVERTY LAW CENTER
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
(404) 521-6700

Rebecca Cassler
SOUTHERN POVERTY LAW CENTER
201 Saint Charles Avenue, Suite 2000
New Orleans, LA 70170
(504) 486-8982

*Counsel for Appellees/Cross Appellants*

## DECLARATION OF ROBERTO DOE

I, Roberto Doe, hereby declare under the penalty of perjury:

1.      I make this declaration based on my own personal knowledge except where indicated otherwise.  If I am called as a witness, I could and would testify competently and truthfully on these matters.

2.      I am a national and citizen of Nicaragua.  I fled Nicaragua in early September of 2018, in fear for my life and the life of my family members due to threats of violence from the government and paramilitaries affiliated with the government.  I participated in protests, marches, and strikes against the government.

3.      I attempted to present myself to apply for asylum at the Reynosa-Hidalgo Port of Entry in early October 2018 with a group of Nicaraguans and one Honduran.  We told a U.S. immigration official stationed at the mid-point of the bridge that we wanted to seek asylum, and the official told us the port of entry was "all full" and that we could not enter.

4.      Shortly after that, a different U.S. official made a call on her radio.  She spoke in Spanish and I heard her tell someone to come and pick up some people.  A few minutes later, a Mexican immigration official approached us and asked to see our papers, which we handed to him.  The Mexican official told us to come with him.  Another of the Nicaraguans I was with asked the U.S. official to help and told him that Mexican immigration would deport us.  The U.S. official said that he did not care and he did nothing else.

5.      Mexican immigration officials detained us and told us that we did not have the right to apply for asylum in the U.S., that they were in communication with U.S. officials, and that if we came back and tried to apply for asylum in the U.S. again, the U.S. officials would turn

us over to Mexican officials and we would be deported to Nicaragua. We were then released, and I returned to the migrant shelter in Reynosa.

6.      After that initial turnback, my attorneys in this case informed me that the U.S. government had agreed to allow me to apply for asylum if I presented myself at the port of entry again. They told me the date and time I was supposed to present myself.

7.      In late October 2018, on the agreed date and time and in the company of a U.S. attorney, I returned to the Reynosa-Hidalgo Port of Entry to apply for asylum in the U.S. As I was going through a turnstile on the Mexican side of the bridge, Mexican immigration officials stopped and detained me. I was held in a facility near the bridge, and then transferred to a Mexican immigration detention center in Acayucan, Veracruz.

8.      I was detained for about four months in Acayucan, after which I was deported from Mexico to Nicaragua.

9.      Since February 2019, I have been living in hiding and have been unable to return to the U.S.-Mexico border. Staff from Al Otro Lado have tried to help me obtain travel documents from the Mexican government to transit through Mexico, but their efforts were unsuccessful. I also applied for a visa to travel to Mexico, but my application was rejected in November 2021. At present, I do not know how to travel to the U.S.-Mexico border to present myself at a port of entry to apply for asylum because I cannot get the necessary documents to travel through Mexico.

10.     The situation in Nicaragua is getting worse and I am afraid to remain here, even in hiding. I have heard that there is a list of people who oppose the government and that those people are being arrested. My sister told me that my name is on this list and that police or

paramilitaries are looking for me in my hometown. I worry that my life is in danger in Nicaragua. I still wish to apply for asylum in the United States.

      11.    I have authorized my attorney to sign on my behalf given the difficulty of exchanging and signing documents across borders and while I am in hiding. If required to do so, I will provide a signature when I am able.

      I declare under penalty of perjury under the laws of United States of America that the foregoing is true and correct.

Executed on December 3, 2021 at New York, NY.

Angelo Guisado, on behalf of Roberto Doe

## ATTORNEY DECLARATION

I, Angelo Guisado, declare the following under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1.     My name is Angelo Guisado.  I am a licensed attorney in good standing in the state of New York.  I am an attorney of record in this litigation.

2.     I represent the declarant, Roberto Doe.  Out of necessity in light of his current situation—living in hiding in fear for his life—I signed Roberto Doe's declaration on his behalf and with his express consent.

3.     I am fluent in the English and Spanish languages.

4.     I spoke with Roberto Doe via phone and read the foregoing declaration to him and orally translated it faithfully and accurately into Spanish.  After I completed translating the declaration, Roberto Doe verified that the contents of the foregoing declaration are true and accurate.  Roberto Doe also confirmed that I can sign the declaration on his behalf, as reflected in his declaration.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 3, 2021 at New York, NY.

Angelo Guisado

Attorney for Plaintiffs

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General,
Civil Division
WILLIAM C. PEACHEY
Director, Office of Immigration Litigation –
District Court Section
KATHERINE J. SHINNERS (DC 978141)
Senior Litigation Counsel
ALEXANDER J. HALASKA (IL 6327002)
Trial Attorney
United States Department of Justice
Civil Division
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 307-8704 | Fax: (202) 305-7000
alexander.j.halaska@usdoj.gov

*Counsel for Defendants*

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA
### (San Diego)

| | |
|---|---|
| AL OTRO LADO, Inc., *et al.*, | Case No. 3:17-cv-02366-BAS-KSC |
| *Plaintiffs*, | Hon. Cynthia A. Bashant |
| v. | **DEFENDANTS' REPLY IN SUPPORT OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| CHAD F. WOLF, Acting Secretary of Homeland Security, *et al.*, in their official capacities,* | |
| *Defendants*. | |

---

* Pursuant to Federal Rule of Civil Procedure 25(d), Acting Commissioner Morgan is automatically substituted as a Defendant for former Commissioner McAleenan, and Executive Assistant Commissioner Ferrara is automatically substituted as a Defendant for former Executive Assistant Commissioner Owen.

1   United States" is inadmissible on certain grounds, 8 U.S.C. § 1225(b)(1)(A)(ii), and

2   Plaintiffs do not claim that CBP fails to make such referrals following the requisite

3   inadmissibility determinations. Similarly, it is irrelevant to Plaintiffs' § 706(1) claim

4   that class members seek "access to the asylum process" writ large. Pl. Opp. 20. Un-

5   der § 706(1), a court may compel performance only of *discrete* legal obligations,

6   *Hells Canyon Preservation Council v. U.S. Forest Serv.*, 593 F.3d 923, 932 (9th Cir.

7   2010), and the only discrete legal obligation set forth in § 1225(b)(1)(A)(ii) is to

8   refer an alien for an interview, not to "grant access" to a process. *Barrios* is not to

9   the contrary, as it says only that "the definition of 'physical presence' does not re-

10  quire a specific 'status, intent, or state of mind'" and does not address §§ 1158 or

11  1225 at all. 581 F.3d at 863.

12       *Fifth*, Plaintiffs downplay H. Rept. 104-469 (1996) because it is associated

13  with H.R. 2202, a bill that supposedly "never became law," and because the legisla-

14  tive history relates to a "proposed 30-day deadline to file an affirmative asylum ap-

15  plication, which never became law." Pl. Opp. 19–20 (emphasis omitted). This is

16  wrong. H.R. 2202 was enacted as IIRIRA, and H. Rept. 104-469 is part of its legis-

17  lative history. *See* "Actions Overview," https://www.congress.gov/bill/104th-con-

18  gress/house-bill/2202/actions; H. Rept. 104-879, at 104 (1997) ("[m]ore complete

19  detail on the ... legislative history of [IIRIRA] may be found in ... Rept. 104–469,

20  Part I" (parenthesis omitted)). And although Congress ultimately provided more than

21  30 days to file an affirmative asylum application, that does not alter the point for

22  which Defendants cited H. Rept. 104-469: Congress clearly intended such applica-

23  tions to be made after "the date of the alien's arrival in the United States." 8 U.S.C.

24  § 1158(a)(2)(B).

25       *Sixth*, Plaintiffs contend that the Court should disregard the drastic increase in

26  CBP's credible-fear referrals, *see* Def. Ex. 4, because it "does not establish that [class

27  members] were not initially turned back or metered," Pl. Opp. 20. But Plaintiffs

28  challenge a class-wide policy "'aimed at deterring or limiting asylum seekers from

11

1  seeking asylum in the United States.'" *Id.* (quoting *Al Otro Lado*, 394 F. Supp. 3d at

2  1208). That there has been such a drastic increase in credible-fear referrals concur-

3  rent with the implementation of metering (and other alleged measures purportedly

4  part of a "turnback policy") defeats the inference that Defendants have implemented

5  such a policy or have taken such action for that purpose as to the entire class.

6        Plaintiffs' § 706(1) claim fails on the facts and the law.[4]

7  **IV.    Metering is Statutorily Permissible.**

8        As the government has demonstrated, metering to facilitate safe and efficient

9  processing or the prioritization of CBP's resources is statutorily permissible. *See*

10 Def. MSJ 40–44. Plaintiffs' arguments to the contrary, *see* Pl. Opp. 9–11, rest on the

11 incorrect view that CBP's duties to inspect applicants for admission are elevated

12 over all other statutory duties.

13       *First*, Plaintiffs argue that 6 U.S.C. §§ 111(b), 202, 211(c), and 211(g)(3) do

14 not "specifically grant Defendants the power to" meter, Pl. Opp. 9, whereas Con-

15 gress in 8 U.S.C. § 1225(a)(3) "specifically mandated" that the government "inspect

16 all noncitizens arriving at POEs," *id.* at 10. Relatedly, Plaintiffs contend that De-

17 fendants lack authority "to amend the INA or the HSA [Homeland Security Act] to

18 suit their needs." *Id.* at 11. These points misapprehend the statutory obligations at

19

---

20 [4] Plaintiffs indicate that they will argue "in their forthcoming reply" that metering

21 imposes unreasonable delays. Pl. Opp. 21 n.18 (citing *Telecommunications Re-*

22 *search and Action Center v. FCC* (*TRAC*), 750 F.2d 70 (D.C. Cir. 1984)). But "Plain-

    tiffs ma[d]e no attempt" in their opening brief "to argue that these delays are unrea-

23 sonable," Def. MSJ 40, so they cannot raise an unreasonable delay argument for the

    first time in reply, *see Eberle v. City of Anaheim*, 901 F.2d 814, 818 (9th Cir. 1990)

24 ("general rule" is that parties "cannot raise a new issue for the first time in their reply

25 briefs"). Plaintiffs will likely argue that their unreasonable-delay argument is re-

    sponsive to Defendants' arguments, *see* Pl. Opp. 18 n.21 (asserting that "Defendants

26 oppose Plaintiffs' motion for summary judgment under § 706(1) by citing the

27 [*TRAC*] factors"), but Defendants never cited the *TRAC* factors at all, *see* Def. MSJ

    1–60, and "merely not[ing] that [Plaintiffs] ... failed to raise the issue" "does not

28 constitute raising the issue," *Eberle*, 901 F.2d at 818.

DEFS.' REPLY IN SUPPORT
OF CROSS-MSJ
Case No. 3:17-cv-02366-BAS-KSC

1  MAYER BROWN LLP
     Matthew H. Marmolejo (CA Bar No. 242964)
2    *mmarmolejo@mayerbrown.com*
   350 S. Grand Avenue
3  25th Floor
   Los Angeles, CA 90071-1503
4    Ori Lev (DC Bar No. 452565)
     (*pro hac vice*)
5    *olev@mayerbrown.com*
     Stephen M. Medlock (VA Bar No. 78819)
6    (*pro hac vice*)
     *smedlock@mayerbrown.com*
7  1999 K Street, N.W.
   Washington, D.C. 20006
8  Telephone:  +1.202.263.3000
   Facsimile:   +1.202.263.3300
9
   SOUTHERN POVERTY LAW CENTER
10   Melissa Crow (DC Bar No. 453487)
     (*pro hac vice*)
11   *melissa.crow@splcenter.org*
   1101 17th Street, N.W., Suite 705
12 Washington, D.C. 20036
   Telephone: +1.202.355.4471
13 Facsimile: +1.404.221.5857

14 *Additional counsel listed on next page*
   *Attorneys for Plaintiffs*
15
                **UNITED STATES DISTRICT COURT**
16
               **SOUTHERN DISTRICT OF CALIFORNIA**
17

18 | Al Otro Lado, Inc., *et al.*, | Case No.:  17-cv-02366-BAS-KSC |
19 |                               Plaintiffs, | **EXHIBIT 1 IN SUPPORT OF PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** |
20 |        v. | |
21 | Chad F. Wolf,[1] *et al.*, | |
22 |                               Defendants. | |
23
24
25
26
27 ―――――――――――――
   [1] Acting Secretary Wolf is automatically substituted for former Acting Secretary
28 McAleenan pursuant to Fed. R. Civ. P. 25(d).

                                 EXHIBIT 1 IN SUPP. OF REPLY IN SUPP. OF PLTFS'
                                                              MOT. FOR S.J.

CENTER FOR CONSTITUTIONAL RIGHTS
Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
*bazmy@ccrjustice.org*
Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
*gschwarz@ccrjustice.org*
Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
*aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
*sarah.rich@splcenter.org*
Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
*rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
*kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

EXHIBIT 1 IN SUPP. OF REPLY IN SUPP. OF PLTFS'
MOT. FOR S.J.

**OFFICE OF INSPECTOR GENERAL**

# CBP Has Taken Steps to Limit Processing of Undocumented Aliens at Ports of Entry



**Homeland Security**

**October 27, 2020**
**OIG-21-02**

# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

Washington, DC 20528 / www.oig.dhs.gov

October 27, 2020

MEMORANDUM FOR:   Mark A. Morgan
Senior Official Performing the Duties of the
Commissioner
U.S. Customs and Border Protection

FROM:   Joseph V. Cuffari, Ph.D.
Inspector General

JOSEPH V
CUFFARI

Digitally signed by JOSEPH
V CUFFARI
Date: 2020.10.27 14:48:03
-04'00'

SUBJECT:   *CBP Has Taken Steps to Limit Processing of
Undocumented Aliens at Ports of Entry*

For your action is our final report, *CBP Has Taken Steps to Limit Processing
of Undocumented Aliens at Ports of Entry.* We incorporated the formal
comments provided by U.S. Customs and Border Protection (CBP).

The report contains three recommendations aimed at bringing CBP operations
in line with long-established practices and promoting the efficient processing of
undocumented aliens. CBP concurred with two of the three recommendations.
Based on information provided in the response to the draft report, we consider
one recommendation unresolved and open and two recommendations resolved
and open. Once your office has fully implemented the recommendations,
please submit a formal closeout letter to us within 30 days so that we may
close the recommendations. The memorandum should be accompanied by
evidence of completion of agreed-upon corrective actions. Please send your
response or closure request to OIGSREFollowup@oig.dhs.gov.

Consistent with our responsibility under the *Inspector General Act*, we will
provide copies of our report to congressional committees with oversight and
appropriation responsibility over the Department of Homeland Security. We
will post the report on our website for public dissemination.

Please call me with any questions, or your staff may contact Thomas Kait,
Assistant Inspector General for Special Reviews and Evaluations,
at (202) 981-6000.

*www.oig.dhs.gov*



# DHS OIG HIGHLIGHTS
## *CBP Has Taken Steps to Limit Processing of Undocumented Aliens at Ports of Entry*

**October 27, 2020**

## Why We Did This Review

We conducted this review to determine whether U.S. Customs and Border Protection (CBP) was turning away asylum seekers at the Southwest Border ports of entry.

## What We Recommend

We made three recommendations aimed at bringing CBP operations in line with long-established practices and promoting the efficient processing of undocumented aliens.

**For Further Information:**
Contact our Office of Public Affairs at (202) 981-6000, or email us at
DHS-OIG.OfficePublicAffairs@oig.dhs.gov

# What We Found

In May 2018, DHS and CBP leaders anticipated an increase in undocumented aliens seeking entry at the southern border. In response, the leaders urged undocumented aliens seeking protection under U.S. asylum laws ("asylum seekers") to enter the United States legally at ports of entry rather than illegally between ports. At the same time, the leaders asked CBP for "the number of [undocumented aliens] that would likely be turned away" if all ports conducted "Queue Management," a practice that posts CBP officers at or near the U.S.-Mexico border to control the number of undocumented aliens entering U.S. ports of entry. After learning that 650 aliens would be prevented from entering ports every day, in June 2018, then-DHS Secretary Kirstjen Nielsen authorized the practice. Nielsen also informed CBP ports that while processing undocumented aliens is a component of its mission, they should focus on other priorities, including detection and apprehension of narcotics and currency smugglers.

We found CBP took several additional actions to limit the number of undocumented aliens processed each day at Southwest Border land ports of entry. For instance, without prior public notice, seven ports of entry stopped processing virtually all undocumented aliens, including asylum seekers. Instead, CBP redirected them to other port locations. This redirection contravenes CBP's longstanding practice to process all aliens at a "Class A" port of entry or reclassify the port of entry. Moreover, although asylum seekers legally must be processed once physically within the United States, we found CBP staff turned away asylum seekers at four ports *after* they had already entered the United States. After waiting in Queue Management lines or being redirected to other ports, some asylum seekers and other undocumented aliens crossed the border illegally between ports of entry.

# CBP Response

CBP concurred with all recommendations, except one.



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

## Table of Contents

Introduction ............................................................................................. 3

Background ............................................................................................. 3

Results of Review ..................................................................................... 6

    DHS Urged Asylum Seekers to Come to Ports of Entry, But Reassigned
    Staff away from Asylum Processing ...................................................... 7

    Without Notice to the Public, CBP Stopped Routine Processing of Most
    Undocumented Aliens, Including Asylum Seekers, at Seven Ports and
    Redirected Them to Other Ports ......................................................... 10

    CBP Returned to Mexico Asylum Seekers Who Had Already Entered the
    United States ................................................................................... 15

    CBP Did Not Use All Available Detention Space ................................... 16

Conclusion ............................................................................................. 18

Recommendations .................................................................................. 19

## Appendixes

    Appendix A:  Objective, Scope, and Methodology ................................. 23
    Appendix B:  CBP Comments to the Draft Report ................................. 25
    Appendix C:  Timeline of Asylum Processing Significant
                   Events in 2018 ............................................................. 31
    Appendix D:  Office of Special Reviews and Evaluations Major
                   Contributors to This Report ............................................ 32
    Appendix E:  Report Distribution ........................................................ 33

## Abbreviations

| | |
|---|---|
| AUSA | Assistant United States Attorney |
| CBP | U.S. Customs and Border Protection |
| C.F.R. | Code of Federal Regulations |
| ICE | U.S. Immigration and Customs Enforcement |
| INA | Immigration and Nationality Act |
| MPP | Migrant Protection Protocol |



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

| | |
|---|---|
| NTA | Notice to Appear |
| OFO | Office of Field Operations |
| OIG | Office of Inspector General |
| POE | Port of Entry |
| TEDS | CBP National Standards on Transport, Escort, Detention, and Search |
| U.S.C. | United States Code |



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

# Introduction

From May through June 2018, in response to a surge of undocumented aliens attempting to enter the United States DHS senior leaders publicly urged those seeking asylum to lawfully present themselves at U.S. ports of entry, where U.S. Customs and Border Protection (CBP) Office of Field Operations (OFO) officers would process them.  However, DHS and CBP leadership did not take steps to maximize CBP's processing capability at ports of entry.  Instead, they instituted policies and took actions that limited the number of undocumented aliens, including asylum seekers, processed at the ports.

# Background

The *Immigration and Nationality Act* (INA) allows individuals who have fled their home countries because of persecution on account of their race, religion, nationality, membership in a particular social group, or political opinion to apply for asylum or other humanitarian protections in the United States.[1] These individuals may express fear of persecution or torture, a fear of return to their country, or an intent to seek asylum to the CBP OFO officers they encounter when they arrive at U.S. ports of entry, or to U.S. Border Patrol agents if these individuals are apprehended after crossing illegally between ports.

**CBP Processing of Asylum Seekers at Southwest Border Ports of Entry**

CBP refers to aliens who are not in possession of documents allowing them entry into the United States — e.g., a travel visa — as "undocumented aliens." This category of aliens includes asylum seekers,[2] who generally arrive without visas or other legal documentation that authorize entry to the United States.[3] When an undocumented alien arrives at a land port of entry and is processed for expedited removal, CBP OFO officers ask specific questions during processing[4] to determine whether the alien has a fear of persecution or torture in his or her home country or intends to seek asylum, such that the individual

---

[1] *See* 8 U.S.C. §§ 1158, 1225(b)(1)(A)(ii), 1231(b)(3)(A) & note.
[2] Throughout this report, we refer to undocumented aliens who express a fear of returning to their home country or intention to apply for asylum in the United States as asylum seekers.
[3] Other undocumented aliens could potentially include individuals who seek temporary humanitarian entry to attend a funeral or obtain medical care.
[4] CBP's processing includes verifying the alien's identity, checking databases for outstanding warrants or criminal history, searching the alien for drugs or contraband, taking statements from the alien, and requesting follow-on placement with U.S. Immigration and Customs Enforcement.  CBP also refers asylum seekers to U.S. Citizenship and Immigration Services for further processing of their asylum claims.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

should be placed in the asylum adjudication process.  In fiscal year 2018, CBP Southwest Border ports processed 38,269 undocumented aliens seeking asylum, representing approximately one-third of the nearly 125,000 undocumented aliens who arrived at U.S. ports of entry that year.

After processing, CBP OFO holds asylum seekers and other undocumented aliens at the port of entry until U.S. Immigration and Customs Enforcement (ICE) takes custody of the aliens and determines whether to place them in immigration detention or release them.  ICE maintains detention centers for single adults and families, but transfers unaccompanied or separated alien children to the Department of Health and Human Services, Office of Refugee Resettlement, for placement pending adjudication of the asylum claim.

From 2014 through 2018, surges, or "caravans," of undocumented aliens sought to enter the United States through the Southwest Border.  For example, CBP experienced a surge of unaccompanied alien children in 2014, and a surge of Haitian migrants in 2016.  Some came through the ports, while others entered illegally, between the ports of entry.[5]  In 2018, the caravans consisted of more families and unaccompanied alien children, and a greater number of asylum seekers, than in the past.

At times, these surges created overcrowded conditions at CBP port of entry holding facilities, which presented health and safety concerns to both officers and aliens.  The increase in families and unaccompanied children posed additional challenges for ports of entry because CBP national standards require holding vulnerable populations, such as families and children, separately and generally for no longer than 72 hours.[6]  Most ports were designed before the standards were established and before CBP OFO experienced surges of asylum seekers, especially families.  As a result, many ports do not have enough room to hold vulnerable populations separately.[7]  Similarly, ICE has limited detention bed space available to hold families.

---

[5] CBP's U.S. Border Patrol is responsible for processing aliens who have crossed into the United States illegally, between the ports of entry, including those who express an intent to seek asylum.

[6] U.S. Customs and Border Protection, *National Standards on Transport, Escort, Detention, and Search* (TEDS), October 2015. For example, TEDS, 5.0, requires CBP to hold families, unaccompanied children, single adults, and transgender individuals in separate spaces. TEDS, 4.1, also provides that "[d]etainees should generally not be held for longer than 72 hours in CBP hold rooms or holding facilities.  Every effort must be made to hold detainees for the least amount of time required for their processing, transfer, release, or repatriation as appropriate and as operationally feasible."

[7] As reported in *Results of Unannounced Inspections of Conditions for Unaccompanied Alien Children in CBP Custody*, OIG-18-87, in the past, some CBP ports converted offices and conference rooms to hold rooms to accommodate more people in the processing areas.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

In 2016, during the surge of Haitian asylum seekers, CBP's San Ysidro port of entry in California, in cooperation with the Mexican government, developed a new approach for preventing overcrowding and health and safety concerns. CBP officers and Mexican government officials began stopping asylum seekers and other undocumented aliens from crossing the international boundary into the U.S. port of entry. Instead, those aliens were required to put their names on a waiting list until CBP had space and staff to process them. The asylum seekers and other undocumented aliens waited in Mexico until CBP notified the Mexican government of the number of aliens CBP could take, and the Mexican government then delivered that number to the port. This practice became known as "Queue Management," though it is also referred to as "metering" or establishing a "limit line."[8]

Since 2016, CBP has used Queue Management at various times to control the flow of undocumented aliens into ports of entry. Most recently, in 2018, as migrant caravans arrived to the Southwest Border and the number of undocumented aliens seeking to enter the United States increased, CBP again began assigning officers to the limit line in an effort to control the number of aliens entering the ports. Since July 2018, Queue Management has become standard practice, with all Southwest Border ports implementing limit lines.

We initiated this review in response to two congressional requests and significant public interest in how CBP processes asylum seekers at ports of entry. Additionally, the U.S. Office of Special Counsel forwarded a whistleblower complaint related to similar issues at one port of entry. In 2018, we conducted unannounced site visits to 12 of the 24 land ports of entry across the four CBP field offices along the Southwest Border, where we interviewed CBP staff and observed port operations.[9] We also evaluated CBP's policies and procedures for processing asylum seekers and other undocumented aliens.[10]

---

[8] At the time of our fieldwork, CBP OFO was piloting another initiative. On January 28, 2019, the San Diego Field Office started the Migrant Protection Protocol (MPP). Under the MPP, certain undocumented aliens arriving from Mexico are required to stay in Mexico to await future immigration proceedings in the United States (e.g., hearing before a U.S. immigration court).

[9] CBP operates 24 land ports of entry along the Southwest Border comprising 46 crossing points; some ports have multiple crossing points or gates, e.g., the Nogales port of entry has three crossing points: DeConcini, Mariposa, and Morley Gate. Four field offices oversee the ports: San Diego in California; Tucson in Arizona; and El Paso and Laredo in Texas.

[10] Some laws and policies apply specifically to asylum seekers, while others apply to the broader category of undocumented aliens, which includes both asylum seekers and other aliens attempting to enter the country without valid documents. Throughout this report, we



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

Some of the issues we discuss in this report are similar to or the same as issues raised in lawsuits filed by a non-governmental organization and state governments. Specifically, the legality of CBP's Queue Management practice — i.e., the practice of CBP officers standing at a "limit line" position at or near the U.S.-Mexico border to control the number of undocumented aliens entering U.S. ports of entry — currently is being litigated in the court system. See *Al Otro Lado, Inc. v. Nielsen*, 17-cv-2366 (S.D. Cal. 2017).[11]

Accordingly, DHS Office of Inspector General (OIG) does not take a position on the legality of this practice, and will await a final determination by the courts.

## Results of Review

In May 2018, DHS and CBP leaders anticipated an increase in undocumented aliens seeking entry at the southern border. In response, the leaders urged asylum seekers to present their claims at ports of entry rather than presenting the claims after the individuals crossed the border illegally. However, a few weeks later, then-Secretary Kirstjen Nielsen asked CBP for the estimated "number of [undocumented aliens] that would likely be turned away" if all ports conducted "Queue Management." After learning that CBP could turn away 650 undocumented aliens every day, - the Secretary instructed ports to implement Queue Management. This involved CBP officers standing at a "limit line" position at or near the U.S.-Mexico border to control the flow of undocumented aliens entering CBP ports for processing. Further, the Secretary told the ports that processing inadmissible aliens (who include asylum seekers) was not one of CBP's main priorities, and they should consider re-assigning staff away from processing such aliens to focus instead on detection and apprehension of narcotics and currency smugglers.[12]

In addition, we found CBP took several actions to limit the number of undocumented aliens who could be processed each day at the Southwest Border land ports of entry. Seven ports effectively stopped processing undocumented aliens, despite being designated as Class A ports, which are "Port[s] of Entry for all aliens," not just those with documents, according to 8

---

refer to asylum seekers and undocumented aliens, both together and separately as appropriate.

[11] The plaintiffs allege violations of 8 U.S.C. §§ 1158, 1225, 1229; 8 C.F.R. Parts 208, 235; U.S. Const. Amend. V; the *1951 Convention on the Rights of Refugees*; and section 706 of the *Administrative Procedure Act.*

[12] June 5, 2018 Memorandum from Secretary Nielsen, "Prioritization-Based Queue Management."

1-SER-020



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

C.F.R. § 100.4.  CBP broke with a longstanding practice by changing the categories of aliens it would process at these seven ports without changing the ports' classification.  When asylum seekers and other undocumented aliens appeared at these seven ports, CBP officers redirected them to other ports, some of which were more than 30 miles away.  We observed CBP officers telling aliens the port was at capacity and did not have the capability to process them, regardless of actual capacity and capability at the time.  Further, four CBP ports turned away asylum seekers who had already stepped into the United States, telling them to return to Mexico.  Also, at two other ports we visited, CBP had stopped using blocks of available holding cells, allowing those cells to sit empty while asylum seekers and other undocumented aliens waited in the Queue Management lines in Mexico.  As the lines grew longer, some asylum seekers and other undocumented aliens may have crossed the border illegally, between ports of entry, where U.S. Border Patrol is responsible for apprehending and holding them.

## DHS Urged Asylum Seekers to Come to Ports of Entry, But Reassigned Staff away from Asylum Processing

Following the April 2018 announcement of the Zero Tolerance Policy, DHS and CBP began urging asylum seekers in May 2018 to come to ports of entry rather than attempt to enter the United States illegally between ports of entry.  At the same time, DHS and CBP directed ports to assign staff away from processing undocumented aliens, including asylum seekers, to other duties at the ports.  Appendix C provides a brief timeline of significant events from April to August 2018 related to CBP's asylum processing.

On April 6, 2018, then-Attorney General Jeff Sessions announced a "Zero Tolerance Policy,"[13] which, as implemented by DHS, required CBP to refer for prosecution every adult who entered the United States illegally, including those

---

[13] In an April 6, 2018 memo, the Attorney General directed United States Attorney's Offices along the Southwest Border, in consultation with the Department of Homeland Security, to adopt a Zero Tolerance Policy for all Improper Entry by Alien offenses, and refer them for prosecution under 8 United States Code (U.S.C.) § 1325(a).  In a press release announcing the "Zero Tolerance Policy," the Department of Justice said, "The implementation of the Attorney General's zero-tolerance policy comes as the Department of Homeland Security reported a 203 percent increase in illegal border crossings from March 2017 to March 2018, and a 37 percent increase from February 2018 to March 2018—the largest month-to-month increase since 2011." https://www.justice.gov/opa/pr/attorney-general-announces-zero-tolerance-policy-criminal-illegal-entry.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

---

traveling with their children.  As a result, parents who entered illegally were separated from their children upon referral for prosecution.[14]

After implementation of the Zero Tolerance Policy, then-DHS Secretary Nielsen and OFO Executive Assistant Commissioner Todd Owen made several public statements urging asylum seekers to come to the ports of entry instead of crossing illegally and risking separation from family members.  For instance, on May 8, 2018, Secretary Nielsen testified before Congress, "Help me message: If you are fleeing and coming to the United States please come to the ports of entry.  [We] will process your claim there."[15]  On June 18, 2018, at a White House Press Briefing, Secretary Nielsen also told reporters, "As I said before, if you're seeking asylum, go to a port of entry.  You do not need to break the law of the United States to seek asylum."[16]  When reporters noted media accounts of families turned away at ports of entry, the Secretary described that reporting as "incorrect."  Further, on July 9, 2018, OFO Executive Assistant Commissioner Owen said during a press conference:

> The lawful way is to claim asylum, present yourself for inspection at the port of entry.  We will keep the family unit together, again, absent concerns for the well-being of the child, absent criminal history for the adult.

However, despite encouraging asylum seekers to enter the United States through the ports of entry, DHS and CBP took actions that limited the number of undocumented aliens, including asylum seekers, CBP could process each day at the Southwest Border land ports of entry.[17]

On April 27, 2018, OFO Executive Assistant Commissioner Owen emailed a memorandum authorizing Southwest Border land ports of entry to establish Queue Management lines[18] when appropriate to facilitate "safe and orderly

---

[14] We assessed CBP's implementation of the policy in our report, *Special Review – Initial Observations Regarding Family Separation Issues Under the Zero Tolerance Policy,* OIG-18-84, September 27, 2018.
[15] *Homeland Security Secretary Nielsen on Fiscal Year 2019 Budget.*  Testimony before the Senate Appropriations Subcommittee on Homeland Security, May 8, 2018.
[16] White House Press Conference, June 18, 2018, "DHS Secretary Nielsen's Remarks on the Illegal Immigration Crisis."  *See* transcript at https://www.dhs.gov/news/2018/06/18/dhs-secretary-nielsens-remarks-illegal-immigration-crisis.
[17] Numerous factors affect CBP's ability to process undocumented aliens at ports of entry.  The exact number of asylum seekers who were unable to enter the United States because of CBP's Queue Management actions could not be stated with certainty.
[18] The memorandum specified ports "may not create a line specifically for asylum seekers," but could create lines "based on legitimate operational needs, such as lines for those with appropriate travel documents and those without such documents."



## OFFICE OF INSPECTOR GENERAL
### Department of Homeland Security

processing of travelers" based on the ports' processing capacity. Shortly thereafter, on May 24, 2018, DHS Chief of Staff Chad Wolf, on behalf of Secretary Nielsen's Office, asked CBP officials to determine "the number of [undocumented aliens] that would likely be turned away" every day if ports ran Queue Management operations full-time. Then-CBP Commissioner Kevin McAleenan instructed OFO Executive Assistant Commissioner Owen to report to the Secretary that if CBP assigned 200 officers to work limit lines, they would turn away approximately 650 undocumented aliens per day.

On June 5, 2018, Secretary Nielsen signed a memorandum authorizing port directors to establish Queue Management lines at all the Southwest Border ports.[19] The memorandum also informed port directors that processing inadmissible arriving aliens[20] (which may include asylum seekers) was not a priority,[21] and authorized port directors to reassign staff away from processing inadmissible arriving aliens, stating:

> CBP personnel and resources that would otherwise be deployed to process inadmissible arriving aliens can focus on the detection and apprehension of narcotics and currency smugglers.

Following this directive, the number of undocumented aliens waiting in Mexico to enter U.S. ports increased from 942 on June 20, 2018, to more than 2,000 on October 1, 2018.[22] In an October 5, 2018 email addressing the surge of aliens seeking asylum at the ports, then-DHS Deputy Secretary Claire Grady told senior CBP staff, "Business as usual, no matter how outstanding your officers are[,] isn't going to be a match for what we are facing." Nevertheless, CBP officials did not allocate additional resources to increase processing

---

[19] We made multiple requests to CBP for policies and guidance related to the "Queue Management" program. Despite the memorandum's title, "Prioritization-Based Queue Management," and the Secretary's initiation of an accompanying pilot program, CBP did not provide the document in response to our requests and none of the CBP staff we interviewed informed us of the memorandum's existence. DHS OIG only learned about the document through forensic email analysis.

[20] Documents we reviewed such as the "Prioritization-Based Queue Management" memorandum and CBP staff with whom we spoke use the term "inadmissible aliens" interchangeably with "undocumented aliens."

[21] The memorandum reiterated four superseding missions for the ports: 1) National security; 2) Counter-narcotics operations; 3) Economic security; and 4) Trade and travel facilitation.

[22] We derived this number from CBP daily Queue Management reports, which list the number of aliens awaiting processing on the Mexican side of the border. During OIG site visits and interviews, we learned CBP officials obtain these numbers from sources such as Mexican government officials, non-governmental organizations, and CBP officers' estimates of aliens in line. CBP does not track the number of aliens arriving at ports who are redirected to another port or told to place their names on a waiting list in Mexico.



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

capability at ports of entry.  For instance, in response to an October 18, 2018 email suggesting ways for CBP to mitigate the growing surge of undocumented aliens, a CBP executive told his staff that expanding the operating hours of ports was "too resource intensive just to help the migrants."  In the same email, the executive wrote:

> We might consider adding officers when the port is closed to help secure against breeches [*sic*], but don't want to add extra hours to process more migrants.

In other emails, the executive declined to consider establishing temporary detention facilities for undocumented aliens, or increasing the number of aliens released with Notices to Appear (NTA).[23]  In a March 2019 DHS OIG interview with a senior CBP official on the Southwest Border, the official summarized CBP's response to the surge of undocumented aliens by stating, "We are hoping this thing just goes away."

Thus, while DHS leadership urged asylum seekers to present themselves at ports of entry, the agency took deliberate steps to limit the number of undocumented aliens who could be processed each day at Southwest Border land ports of entry.  By October 30, 2018, the number of undocumented aliens waiting outside the ports to be processed grew to more than 3,000.

## Without Notice to the Public, CBP Stopped Routine Processing of Most Undocumented Aliens, Including Asylum Seekers, at Seven Ports and Redirected Them to Other Ports

During our fieldwork, we learned CBP had stopped the routine processing of most undocumented aliens[24] — including asylum seekers — at 7 of the 24 Southwest Border land ports of entry.[25]  At these seven ports, CBP staff at the limit line do not simply control the flow of undocumented aliens into the port

---

[23] A Notice to Appear (NTA) is a legal document placing an alien in removal proceedings before the U.S. Department of Justice, Executive Office for Immigration Review.  Typically, ICE determines whether to release an individual from DHS custody with an NTA.  Although CBP OFO also has authority to issue NTAs, according to CBP officials, CBP OFO does not exercise that authority routinely.

[24] CBP officials said they make exceptions for some vulnerable populations, such as unaccompanied alien children or pregnant asylum seekers.  This exception does not appear to be documented in CBP policy, and OIG did not independently corroborate CBP's claim.

[25] The seven ports are Otay Mesa, Tecate, Calexico East, and Andrade, which fall under the San Diego field office; and Roma, Rio Grande City, and Progreso, which fall under the Laredo field office.



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

facility; rather, they "redirect"[26] undocumented aliens who approach the limit line to different ports, telling the aliens the other port can process them more quickly. "Redirected" aliens must then travel through Mexico to another port and take their place behind others already waiting in the Queue Management line at that port.

The seven ports are designated as Class A ports, "Port[s] of Entry for all aliens," according to 8 C.F.R. § 100.4.[27] CBP has authority to change a port's classification[28] and has done so in the past to restrict, expand, open and close specific ports.[29] Designation of a port of entry is a formal DHS action.[30] When changing a port's classification, CBP has published a final rule in the Federal Register.[31] In a break from these longstanding practices, CBP has redirected undocumented aliens appearing at the seven ports yet has not redesignated those ports from Class A to another classification.

As discussed previously, DHS leadership made public pronouncements encouraging undocumented aliens to arrive at ports of entry, but never notified the public of its decision to stop processing aliens at the seven ports of entry. When DHS OIG asked a senior CBP official at one of the field offices about the lack of notification to the public, the official expressed concern about the legality of the redirection practice. At the Tecate port of entry in California, several officers also questioned the legality of the redirecting practice and said

---

[26] In this report, "redirect" means the practice of intercepting asylum seekers at a port's limit line position and instructing them to go to another port to apply for asylum.

[27] 8 C.F.R. § 100.4 regulates the type of individuals and cargo that ports process: "Class A means that the port is a designated Port-of-Entry for all aliens." The regulation also designates other classes of ports that do not process most undocumented aliens. For example, Class B ports process only certain aliens who are exempt from specific document requirements, in lawful possession of Lawful Permanent Resident cards, or who meet other eligibility requirements.

[28] The Regulation provides, "The designation of such a Port–of–Entry may be withdrawn whenever, in the judgment of the Commissioner, such action is warranted."

[29] See, e.g., CBP, Closing the Jamieson Line, New York Border Crossing, 79 Fed. Reg. 42,449-01 (July 22, 2014); see also INS, DOJ, Freedom of Information Act, 32 Fed. Reg. 9,616, 9,618 (July 4, 1967) (quoting 8 C.F.R. § 100.4 that Class A ports are "for all aliens" and that designation may be withdrawn by Commissioner whenever warranted). CBP has added a Class B port and terminated one, after providing the public with notice and a period for commenting on the proposed changes.

[30] United States v. Nunez-Soberanis, 406 F. Supp. 3d. 835, 841 (S.D. Cal. 2019).

[31] Statement of Organization; Ports of Entry for Aliens Arriving by Vessel or by Land Transportation, and by Aircraft, 54 Fed. Reg. 47,673 (Nov. 16, 1989) (redesignating St. Aurelie, Maine, from a "Class A" port of entry to "Class B"); Statement of Organization; Ports of Entry for Aliens Arriving by Vessel or by Land Transportation, 49 Fed. Reg. 31,054 (Aug. 3, 1984) (redesignating Fort Hancock, Texas from a "Class B" port of entry to "Class A"); Statement of Organization; Field Service Realignment, 49 Fed. Reg. 30,057-01 (July 26, 1984) (redesignating Richford, Vermont station to a substation).

1-SER-025



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

they were unwilling to work the limit line position. These officers addressed their concerns with port management and their union representatives, which in turn led to a modification in the redirecting practice — i.e., port management instituted a protocol allowing limit line officers to contact a supervisor to come to the line and assume responsibility for redirecting aliens. Although Tecate now has this protocol in place, the union representative is still unclear whether the practice is legal.

At these seven ports, which fall within the Laredo and San Diego field offices, CBP routinely told undocumented aliens at the limit line that the port currently lacked the capacity (holding space) or capability (staffing and resources) to process them, regardless of the port's actual capacity and capability.[32] For instance, CBP's daily Queue Management reports indicated that from June 20, 2018, until November 8, 2018, all seven ports redirected undocumented aliens to other ports every day for which data was available, even though these records also show the ports did not detain a single undocumented alien in their available hold rooms on 80 percent of those days.[33]

Meanwhile, the ports to which CBP staff redirected the undocumented aliens range from a few miles to more than 30 miles away. Often, this required traversing difficult desert terrain and potentially placed undocumented aliens at risk of encountering criminals who may exploit them, as areas in Mexico along the border with the United States are known to be controlled by criminal cartels. Figures 1 and 2 illustrate the distance redirected undocumented aliens had to travel to a port that might process them.

[32] Reports emailed to CBP headquarters indicate the policy of redirecting was known at least to the level of then-CBP Commissioner Kevin McAleenan.
[33] We obtained this data from CBP's daily Queue Management reports, which track how many ports engage in redirecting and how many aliens each port has in its hold rooms. CBP did not provide this data to OIG despite multiple requests, necessitating a forensic analysis of key CBP staff members' emails. CBP OFO did not always generate a daily Queue Management report; however, we were able to obtain and analyze reports for 95 of the 141 days that fall between June 20, 2018, the date of the first report we obtained, and November 8, 2018, the date of the last report we obtained.

1-SER-026



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

**Figure 1.  San Diego Field Office Redirecting Ports**



*Source*: OIG depiction of CBP data

**Figure 2.  Laredo Field Office Redirecting Ports**



*Source*: OIG depiction of CBP data

Moreover, because CBP officers at the limit line do not generally ask migrants where they are from before redirecting them to another port, Mexican nationals

1-SER-027



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

seeking asylum may be redirected along with asylum seekers from other countries. Redirected Mexican nationals must therefore remain in and travel through the very country in which they claim they are subject to persecution.

Our fieldwork indicated other destination ports have long lines of undocumented aliens already waiting to be processed. Accordingly, those who are redirected from one port must then go to the end of the Queue Management line at another port. For example, the Otay Mesa and Tecate ports of entry routinely redirected undocumented aliens to the San Ysidro port of entry. Once there, the aliens must enter the Queue Management line by putting their names on a list that often contains thousands of names, meaning they will wait in Mexico for weeks, if not months, before being granted access to the port to be processed by CBP.[34]

As shown in the following examples, creating barriers to entry at ports of entry may incentivize undocumented aliens to attempt to cross into the United States illegally, between ports of entry. For example, we interviewed 17 aliens who either were in detention or were recently released, 5 of whom said after growing frustrated with Queue Management and redirection practices at ports of entry, they decided to enter the United States illegally. We interviewed representatives from several non-profit and non-governmental organizations who stated they had similar concerns. We also learned of one case in which an asylum seeker crossed the border illegally after waiting in a Queue Management line for 2 days. When U.S. Border Patrol referred the asylum seeker's case to an Assistant United States Attorney (AUSA) for prosecution, the AUSA refused to prosecute given the long wait to which the asylum seeker was subjected.[35]

While temporarily holding aliens at ports of entry, CBP must directly supervise detained aliens and provide access to appropriate medical care, as detailed in TEDS.[36] CBP OFO leadership stated they implemented the redirecting procedure at these seven ports because they are remote ports with few staff and outdated facilities. For example, they said these ports closed at night and are far from medical care. Before implementing the redirecting procedure, CBP staff drove undocumented aliens to other ports for overnight holds and to medical facilities when necessary. We found four of the seven redirecting ports close at night, and one is more than 50 minutes away from medical care. Most

---

[34] CBP officials said they do not have direct access to the list, which is maintained in Mexico. In order to obtain the number of aliens waiting outside each port, CBP port officials and Mexican government officials communicate regularly to identify and schedule waiting aliens for entry and processing.
[35] We learned about this incident during our forensic email analysis.
[36] See TEDS, 4.6; TEDS, 4.10.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

of the ports' holding capacity is less than 20, but Tecate and Otay Mesa have capacity for 35 and 31, respectively.  Table 1 shows the capacity, distance from a medical center, and hours of operation for each redirecting port.

**Table 1.  Redirecting Ports of Entry Capacity, Distance to Medical Facilities, and Hours of Operation**

| Port | Capacity | Drive Time to Nearest Hospital | Port Hours of Operation |
|------|----------|-------------------------------|-------------------------|
| Tecate | 35 | Sharp Grossmont Hospital (53 min) | 5:00 am–11:00 pm, Daily |
| Calexico East | 10 | El Centro Medical Center (25 min) | 6:00 am–8:00 pm, Mon–Fri 10:00 am–6:00 pm, Sat |
| Andrade | 10 | Yuma Regional Medical Center (21 min) | 6:00 am–10:00 pm Daily |
| Otay Mesa | 31 | Sharp Chula Vista Medical Center (20 min) | 24 hours/7 days a week |
| Roma | 16 | Star County Memorial Hospital (15 min) | 24 hours/7 days a week |
| Rio Grande | 10 | Star County Memorial Hospital (10 min) | 7:00 am–12:00 am, Daily |
| Progreso | 17 | Knapp Medical Center (15 min) | 24 hours/7 days a week |

*Source:* OIG analysis of information CBP provided and information we identified from CBP.gov

## CBP Returned to Mexico Asylum Seekers Who Had Already Entered the United States

Despite provisions in the INA, CBP guidance, and statements from CBP senior leaders requiring CBP staff to process asylum seekers once they have physically entered the United States, at least four CBP ports returned to Mexico some asylum seekers who had crossed the international border and entered the United States.

The INA states any alien who is physically in the United States may apply for asylum.[37]  Consistent with this provision, CBP's April 27, 2018 Queue Management guidance states that once a traveler has entered the United States, he or she must be fully processed by CBP.  DHS also communicated its position on this matter to the public when, on June 18, 2018, it posted on its website:

> Myth: DHS is turning away asylum seekers at ports of entry;
> FACT: CBP processes all aliens arriving at all ports of entry without documents as expeditiously as possible….[38]

---

[37] 8 U.S.C. § 1225 requires CBP to inspect aliens who are seeking admission to the United States and 8 U.S.C. § 1158 states that any alien who is physically present or arrives in the United States may apply for asylum.
[38] https://www.dhs.gov/news/2018/06/18/myth-vs-fact-dhs-zero-tolerance-policy.

1-SER-029



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

Similarly, on July 9, 2018, OFO Executive Assistant Commissioner Owen said in a press conference, "...despite what you may have heard, we never turn away individuals seeking asylum at port[s] of entry."

However, we found that, at four ports of entry — Otay Mesa, San Ysidro, Tecate, and Nogales' Morley Gate — CBP did not process asylum seekers who had entered the United States, returning them to Mexico instead. For instance, our fieldwork indicated, CBP officers at San Ysidro and Tecate ports returned to Mexico asylum seekers who had not only crossed over the international boundary into the United States, but also had entered the ports' buildings.

In addition, all four ports established their limit lines inside the boundary line on the U.S. side of the international border. As a result, asylum seekers and other undocumented aliens stepped into the United States to reach the Queue Management line, where they were instructed either to go to another port, or to return to Mexico to wait in line.[39] Two of the ports, San Ysidro and Otay Mesa, eventually moved their limit lines to the border, but as of August 2019, the Tecate and Nogales' Morley Gate limit lines had not moved, and remained inside the United States. Asylum seekers and other undocumented aliens who approach those limit lines are physically present in the United States at the time CBP turns them away by redirecting them to another port.

## CBP Did Not Use All Available Detention Space

We found two ports had stopped using available detention space, even though undocumented alien families were waiting in Queue Management lines. Management at those ports said staffing was insufficient to monitor the rooms. However, other staff we interviewed disagreed with that assessment. Although CBP is short-staffed at Southwest Border ports, fiscal year 2018 staffing had improved from FY 2016, when larger numbers of aliens were processed.

On June 18, 2018, field offices began sending daily summaries from the ports of entry to CBP headquarters, detailing the number of aliens in custody, the number waiting to be processed, and available holding capacity.[40] The reports

---

[39] CBP officers at the San Ysidro Pedestrian East entry would tell asylum seekers they had to put their names on the Queue Management list and wait for their turn to be processed.
[40] Available holding capacity does not always reflect the ability of a port to accommodate additional detainees. CBP detention standards mandate aliens be segregated by gender and age, and other factors to protect at risk detainees. For example, if a port has only 2 cells, each able to hold 10 detainees, and CBP encounters 10 adult male aliens and 1 unaccompanied alien child, the adult males will all be placed in one cell, while the unaccompanied alien child will be placed in the other cell. The port is then unable to process more adult male aliens, despite being at only 55 percent capacity.

1-SER-030



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

show increasing numbers of aliens waiting to be processed on the Mexican side of the border, yet they also indicate the ports were not using all available detention capacity.

For example, we observed this scenario during our visit to the San Luis port of entry in Arizona. At the San Luis port, which has the capacity to hold 48 detainees, we found at the time of our visit in October 2018 that CBP was detaining only 5 undocumented aliens while a line of at least 30 more waited along the international border.[41] Yet, we observed several empty holding cells and an empty trailer fully equipped to hold undocumented families, even though there was a line of waiting aliens. We later learned from CBP's daily Queue Management Report that 105 aliens were in the queue to enter the port that day.

When interviewed by DHS OIG, staff at the San Luis port said they could process more asylum seekers than they were processing.[42] When we asked why the San Luis port elected not to process the undocumented aliens waiting at the Queue Management line, we received a range of answers. The senior port official said the undocumented aliens waiting outside were not real asylum seekers, but rather came to seek economic opportunity. However, this assumption on the part of the official is not an appropriate basis for CBP to refuse to process the individuals, as CBP officials do not have the authority to evaluate the credibility of asylum claims and must process all claiming to seek asylum, regardless of the officials' opinions about the strength of their claims. Alternatively, two staff members at the San Luis port of entry said management "above" the port sets limits on the numbers of undocumented aliens the port should process. One of these officers told us, "I know from what came down from HQ, we are trying to process the least amount of people."

During our visit in November 2018, we observed a similar situation at the Nogales port of entry, which consists of three separate crossing points close to each other geographically: the Mariposa facility, DeConcini crossing, and Morley Gate. CBP added family unit holding cells to the Mariposa facility when it renovated the port in 2014, but CBP was not using those cells during our fieldwork. We observed at least six hold rooms and office space that were either empty or used for storage. A port official said the staff had used these hold rooms during the 2016 surge of Haitian migrants, but did not recall the last time they were used since then.

---

[41] CBP provided us with internal reports stating the port's capacity is 48 aliens. However, in an interview, a senior port official told us the port's capacity was 35 aliens.
[42] We visited the San Luis port of entry on October 30, 2018 to observe operations, including the Queue Management line, and to interview CBP employees familiar with processing undocumented aliens.

1-SER-031



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

According to the official, the port does not use the hold rooms because it does not have enough staff to monitor aliens in the rooms, and the facility closes at night. The official told us when his staff encounter undocumented aliens, they drive them a short distance to the DeConcini crossing. However, on the day of our visit, the DeConcini crossing's hold rooms were full. As a result, the 20 or more aliens waiting outside the DeConcini facility would not be processed until the DeConcini crossing's hold rooms became available. In the meantime, the hold rooms in the Mariposa facility, 3 miles away, were empty.

It is unclear why officials at the Nogales port assigned staff to transport undocumented aliens to other CBP facilities rather than assigning the officers to monitor these aliens at the Nogales port. Additionally, by assigning staff to operate the limit line, the port reduced its capability to process undocumented aliens.

Although CBP has been attempting to hire more officers to fill vacant positions, many ports of entry are not at full staffing. According to CBP OFO's port of entry staffing data, shown in Table 2, overall staffing rates at four field offices' ports have improved since FY 2016, when three of four CBP field offices processed more undocumented aliens than in FYs 2017 and 2018.

**Table 2.  Southwest Border Land Port of Entry CBP OFO Staffing Levels and Numbers of Undocumented Aliens Processed in FYs 2016 – 2018**

| Field Office | FY 16 Staff % | Aliens Processed in FY 2016 | FY 17 Staff % | Aliens Processed in FY 2017 | FY 18 Staff % | Aliens Processed in FY 2018 |
|---|---|---|---|---|---|---|
| El Paso | 98.4% | 23,787 | 101.2% | 17,308 | 99.7% | 23,509 |
| Laredo | 90.0% | 68,957 | 94.5% | 48,524 | 99.2% | 48,059 |
| San Diego | 83.1% | 49,075 | 86.5% | 31,252 | 90.3% | 35,288 |
| Tucson | 73.9% | 12,105 | 71.9% | 13,885 | 78.7% | 17,303 |
| **All Southwest Border** | **87.1%** | **153,924** | **90.0%** | **110,969** | **93.6%** | **124,159** |

*Source*: CBP

## Conclusion

In 2018, as surges of undocumented aliens sought asylum in the United States, the DHS Secretary and CBP leadership urged asylum seekers to come to ports of entry to be processed. However, DHS and CBP took actions to reduce the number of asylum seekers CBP processed daily. Under the INA, the



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

U.S. Government must process all those who are physically in the United States and express fear of persecution in their home country or an intention to seek asylum.  The law does not set limits as to the number of asylum seekers the Government can or must process.  Nevertheless, the Secretary and CBP have effectively limited access for undocumented aliens wishing to claim asylum in the United States, sometimes without notice to the public.  As a result, the numbers of asylum seekers in Queue Management lines grew.  As the lines grew and asylum seekers were redirected to other ports, some undocumented aliens attempted to enter the United States illegally, exacerbating the very problem DHS sought to solve.

## Recommendations

We recommend the CBP Acting Commissioner:

**Recommendation 1:** Resume processing undocumented aliens at the seven ports of entry currently redirecting them to other ports, or formally redesignate the ports to exclude undocumented aliens.

**Recommendation 2:** Provide written guidance and training to CBP personnel at ports of entry relating to the proper handling of aliens who are physically present in the United States and indicate an intention to apply for asylum.

**Recommendation 3:** Evaluate whether CBP can more efficiently use available holding spaces to process undocumented aliens, including asylum seekers.

## Management Comments and OIG Analysis

We have included a copy of CBP's Management Response in its entirety in Appendix B.  We also received technical comments from CBP and incorporated them into the report where appropriate.  CBP did not concur with Recommendation 1, but concurred with Recommendations 2 and 3.  We consider Recommendation 1 unresolved and open.  Recommendations 2 and 3 are resolved and open.  A summary of CBP's responses and our analysis follows.

In its response to our report, CBP expressed concerns that the report "demonstrates a fundamental misunderstanding of Office of Field Operations (OFO) holding capacity holding capacity [*sic*] compared to its operational capacity."  CBP said its capacity to detain individuals in its short-term facilities depends on many factors, including:

- Demographics of the individual in custody;
- Medical or other needs of individuals in custody;



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

- Ability of ICE ERO or HHS to transfer individuals out of CBP custody;
- OFO's available resources to process and hold individuals;
- Competing priority missions; and
- Availability of staff, room, and resources.

In our report, we acknowledge the difference between holding and operational capacity, though we use the terms capacity and capability. The report explains that capacity (holding space) and capability (staffing and resources) were the reasons for CBP's stated limitations to process undocumented aliens. However, our evidence also indicates that CBP OFO used these reasons regardless of the port's actual capacity and capability, as detailed on page 10 of the report.

Moreover, throughout the report, we address the confluence of factors that affect the capability/operational capacity of a given port. For example, we explain in footnote 40,

> Available holding capacity does not always reflect the ability of a port to accommodate additional detainees. CBP detention standards mandate aliens be segregated by gender and age. For example, if a port has only 2 cells, each able to hold 10 detainees, and CBP encounters 10 adult male aliens and 1 unaccompanied alien child, the adult males will all be placed in one cell, while the unaccompanied alien child will be placed in another cell. The port is then unable to process more adult male aliens, despite being at only 55 percent capacity.

The report also recognizes the constraints facing CBP. As described on page 12, we detail that while temporarily holding aliens at ports of entry, CBP must directly supervise detained aliens and provide access to appropriate medical care. The report explains how and why CBP OFO leadership implemented the redirecting procedure at some ports. Finally, the report's background provides historical context for how challenging it has been for CBP to manage the surges of undocumented aliens in its facilities given CBP OFO's complex mission.

As the report describes, DHS leadership directed ports to focus resources and staff on all other OFO missions other than processing inadmissible aliens despite improved levels of staffing in every field office since 2016 and available holding capacity. The 2018 queue management reports showed that the redirecting ports rarely reported anyone in custody. Finally, the report details that staff at the ports we visited received instructions to redirect all asylum seekers, and port staff were not checking the port's capability or capacity before doing so. These findings were further corroborated by the OIG's



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

previous review, *Investigation of Alleged Violations of Immigration Laws at the Tecate, California, Port of Entry by U.S. Customs and Border Protection Personnel (OSC File No. DI-18-5034)*.

In its response, CBP also raised concerns about OIG's analysis and conclusions regarding 8 CFR § 100.4., stating "...it is not within OIG's mission or authority to provide legal advice to the Department." We note that the IG is duty-bound to promote efficiency and prevent and detect abuse within agency programs and operations.

**Recommendation 1:** Resume processing undocumented aliens at the seven ports of entry currently redirecting them to other ports, or formally redesignate the ports to exclude undocumented aliens.

**CBP Response:** CBP did not concur with the recommendation. CBP officials said their decision to redirect the processing of undocumented aliens at the seven ports of entry to other ports depended on operational capacity and the resources available to execute its primary mission of securing the border. Additionally, CBP stated that specific dynamics at each port of entry affect the port's capacity to process and hold aliens without documents and each port director must maintain a discretionary balance between processing aliens and facilitating trade, travel, and counter-narcotics missions. CBP requested that OIG consider this recommendation resolved and closed.

**OIG Response:** We consider this recommendation unresolved and open. The intent of the recommendation is for CBP to address the "discretionary balance" of missions at the seven redirecting ports. We understand that port directors consider many factors when prioritizing port resources and missions, however, these seven ports have effectively ceased processing aliens without regard to other missions. The recommendation will remain unresolved and open until CBP can show it is processing undocumented aliens at the seven ports of entry currently redirecting them to other ports, or CBP has formally reclassified those ports consistent with long-established procedures.

**Recommendation 2:** Provide written guidance and training to CBP personnel at ports of entry relating to the proper handling of aliens who are physically present in the United States and indicate an intention to apply for asylum.

**CBP Response:** CBP concurred with the recommendation. In its response, CBP said it has issued the following guidance to its employees:

1. *Processing of Expedited Removal Cases*, October 2, 2014
2. *Metering Guidance*, April 27, 2018

OIG-21-XXX

1-SER-035



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

3. *Metering Guidance,* April 30, 2020

CBP requested that OIG consider this recommendation resolved and closed as implemented.

**OIG Analysis:** We consider these actions responsive to the intent of the recommendation, which is resolved and open. CBP issued two of the three documents before we initiated our fieldwork, and based on our findings, those documents alone may be insufficient for training. CBP's April 30, 2020 "Metering Guidance" memorandum restates CBP policy on metering to Directors of Field Offices, however, it does not address officer training or provide any indication the guidance was disseminated to the OFO's line officers. We will close this recommendation when we receive documentation showing that CBP employees have received training on how to follow the metering guidance.

**Recommendation 3:** Evaluate whether CBP can more efficiently use available holding spaces to process undocumented aliens, including asylum seekers.

**CBP Response:** CBP concurred with the recommendation. CBP said its port directors use discretion in balancing mission requirements with respect to activities occurring at the port as well as available resources when evaluating the operational capacity to ensure the most efficient use of resources. CBP requested that OIG consider this recommendation resolved and closed as implemented.

**OIG Analysis:** We consider this action responsive to our recommendation, which is resolved and open. However, the intent of the recommendation is for CBP to assess the use of each port's available holding spaces to identify areas where port directors could address capacity and capability issues to enable more flexibility in balancing mission needs. CBP did not provide any documentation showing that it conducted an evaluation of available holding spaces. We will close this recommendation when we receive documentation that CBP has performed such an evaluation of more efficient use of available holding spaces to process undocumented aliens.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## Appendix A
## Objective, Scope, and Methodology

The Department of Homeland Security Office of Inspector General was established by the *Homeland Security Act of 2002* (Public Law 107−296) by amendment to the *Inspector General Act of 1978*.

We initiated this review in response to 2 congressional requests signed by 53 members that our office received in June 2018, with the following objectives, to determine whether CBP's OFO is: (1) turning away those who present themselves for asylum at ports of entry; and (2) separating family units seeking asylum and documenting this practice appropriately. We have split discussion of our findings into two separate reports. This report addresses the first objective, whether CBP's ports of entry are turning away asylum-seeking aliens. We are issuing a second report, which addresses the second objective, separation of family units at CBP OFO ports of entry.

To answer our objectives, we conducted unannounced site visits to 12 land ports of entry across 4 field offices along the Southwest Border, listed below, where we interviewed CBP staff and observed port operations. We also interviewed officials in CBP headquarters, Washington D.C.

<u>Laredo, Texas, Field Office and ports of entry:</u>
1. Brownsville
   a. Brownsville and Matamoros Bridge
   b. Gateway International Bridge
2. Hidalgo

<u>El Paso, Texas, Field Office and ports of entry:</u>
3. Paso Del Norte Bridge

<u>Tucson, Arizona, Field Office and ports of entry:</u>
4. Nogales
   a. DeConcini crossing
   b. Mariposa facility
   c. Morley Gate
5. Douglas
6. Lukeville
7. Naco
8. San Luis

<u>San Diego, California, Field Office and ports of entry:</u>
9. Calexico



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

10. Otay Mesa
11. San Ysidro
12. Tecate

To obtain a different perspective of the issues, we spoke with representatives of six non-governmental organizations.

We used forensic means to gather and search CBP emails because we had not received complete and accurate information from CBP during our fieldwork. Early in the review, we asked CBP for policies, procedures, and training related to CBP's asylum processing at the ports of entry, and received few, marginally related documents in response. We did not receive any policies or procedures for conducting Queue Management lines or redirecting undocumented aliens. During our interviews in the field, we heard conflicting accounts of CBP policies and procedures, and learned of policies CBP had not provided to us, despite their relevance to our work. As a result, we requested the email accounts of 49 senior OFO officials at Headquarters, Field Offices, and ports of entry from April 2018 through November 8, 2018. CBP provided the emails and because of this search, we identified the Secretary's June 5, 2018 announcement of the Prioritization-based Queue Management pilot program, preparations for it, and subsequent actions at the ports, such as Queue Management lines and redirecting procedures.

We conducted the preliminary research for this review between June and October 2018, and conducted fieldwork between November 2018 and April 2019, under the authority of the *Inspector General Act of 1978*, as amended, and according to the *Quality Standards for Inspection and Evaluation* issued by the Council of the Inspectors General on Integrity and Efficiency.

1-SER-038



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## Appendix B
## CBP Comments to the Draft Report

1300 Pennsylvania Avenue NW
Washington, DC 20229


U.S. Customs and
Border Protection

September 8, 2020

MEMORANDUM FOR:   Joseph V. Cuffari, Ph.D.
                  Inspector General

                                                            9/8/2020

FROM:             Henry A. Moak, Jr.             X ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
                  Senior Component Accountable Official
                  U.S. Customs and Border Protection    Signed by: HENRY A MOAK, JR

SUBJECT:          Management Response to Draft Report:  "CBP Has Taken Steps
                  to Limit Processing of Undocumented Aliens at Ports of Entry"
                  (Project No. 18-122-ISP-CBP)

Thank you for the opportunity to comment on this draft report. U.S. Customs and Border
Protection (CBP) appreciates the work of the Office of Inspector General (OIG) in
planning and conducting its review and issuing this report.

CBP is pleased that the OIG's draft report recognizes that CBP has taken disciplinary
action against CBP Officers (CBPO) found, in violation of asylum-processing policies, to
have returned individuals physically present in the U.S. and who expressed a fear of
return to Mexico. Integrity is one of CBP's Core Values and it is essential to the
effective functioning of the Agency. As an Agency charged with law enforcement
activities, it is imperative that all CBP employees demonstrate high standards.

CBP is concerned, however, that the draft report demonstrates a fundamental OIG
misunderstanding of the Office of Field Operations (OFO) holding capacity *holding
capacity* compared to its *operational capacity*. Title 6, United States Code (U.S.C.)
Section 211(g), assigns CBP OFO its multifaceted mission set to coordinate enforcement
activities at air, land, and sea ports of entry (POEs); safeguard the United States from
illegal entry of persons; and facilitate the flow of legitimate travelers and trade. As part
of its mission to secure the border and facilitate lawful trade and travel, CBP OFO takes
steps, as needed, to regulate the flow of travelers into the POEs. Regulating the flow
ensures that each POE has enough operational capacity to safely process all individuals,
as well as execute its priority mission sets. In recent years, CBP has seen an increasing
number of aliens presenting at POEs who do not possess appropriate travel and
identification documents required by law. Processing these aliens requires a substantial
amount of time and resources that, if not carefully managed, negatively affects the flow



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

of trade and other travel. Thus, CBP must carefully balance its space and resources to ensure that the POEs have enough capacity to address all aspects of its mission set, including the safety of all travelers accessing the POE.

In 2016, there was a significant influx of aliens, without appropriate documents, seeking entry into the United States along the U.S.-Mexico border. The demographics of the inadmissible applicants for admission also began evolving from single adults to include families. In addition, the number of individuals who presented themselves at the border exceeded CBP OFO's operational capacity to safely process, and hold, these individuals in its short-term detention facilities. It also strained the resources of U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) long-term custodial facilities. Regardless, upon completion of the inspection of an inadmissible applicant for admission, the U.S. Government is statutorily required to detain the inadmissible applicant for admission in accordance with the provisions of Sections 235(b)(1) and (2) of the Immigration and Nationality Act (INA) [8 U.S.C. 1225(b)(1)-(2)].

CBP's capacity to detain individuals in its short-term facilities depends on many factors, including:

- Demographics of the individuals in custody;
- Medical or other needs of individuals in custody;
- Ability of ICE ERO (or, if an unaccompanied alien child, the U.S. Department of Health and Human Services) to transfer individuals out of CBP custody; and
- OFO's available resources to safely process and hold individuals.

The operational capacity of a POE also depends largely on the resources available to the POE to execute its primary mission of securing the border. CBP's capacity to process and hold aliens without documents sufficient for lawful entry is dependent on more than the amount of available physical holding space. It is also dependent on other activities occurring at the POE, including:

- Encounters with individuals who have terrorist, criminal, or gang ties;
- Volume of trade and trade enforcement issues;
- Detection of contraband; and
- Volume of other travelers seeking entry into the United States.

Regarding OIG's analysis and conclusions that CBP actions were inconsistent with 8 CFR § 100.4, it is important to note that it is not within OIG's mission or authority to provide legal advice to the Department. It is also inappropriate for the OIG to infer that the Department must act in accordance with OIG's conclusions. To ensure that CBP maintains a safe inspectional environment for personnel, as well as all travelers and goods processed at POEs, CBP may engage, as necessary, in steps to regulate the flow of

2



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

travelers without documents sufficient for lawful entry. Queue management (also known as "metering") allows CBP to engage in all aspects of its multifaceted mission set at POEs along the U.S.-Mexico border. During queue management, CBPOs are required to stand at, or as close as operationally possible, to the international boundary, also known as the "limit line," to determine whether travelers approaching the POE have documents sufficient for lawful entry to the United States. If an alien does not have the requisite documents to apply for admission to the United States, the alien may be required to wait in Mexico until resources and capacity allows for processing.

CBP must have enough operational capacity, including personnel, space, and technology, to execute its full mission set of protecting national security, interdicting narcotics and other contraband, protecting the country's economic security and facilitating lawful trade and travel. When a POE lacks operational capacity to safely process and hold aliens without documents sufficient for lawful entry and execute its full mission set, queue management, which is consistent with principles of determining when, where, and how aliens may apply for admission to the United States may be required. This ensures CBP resources are efficiently balancing its multifaceted mission set until resources to process aliens without documents sufficient for lawful entry are operationally available.

CBP policy prohibits personnel from taking any steps to discourage travelers from waiting at the international border to be processed from claiming fear of return to another country or from seeking any other protections. On April 27, 2018, CBP's OFO issued guidance on metering, which states in part, "Once a traveler is in the United States, he or she must be fully processed …." Therefore, it is CBP policy that upon an individual's arrival at a POE that individual shall be inspected and processed. If, upon arrival in the United States, an individual (of any nationality) expresses an intention to apply for asylum, a fear of return to their home country, or a fear of persecution or torture in their home country, that individual's claim is referred to an asylum officer or an immigration judge for further consideration. CBP OFO holds its managers, supervisors, and CBPOs accountable to correctly follow the laws, regulations, and procedures in the processing of inadmissible applicants for admission, including those who express a fear of return or a desire to seek asylum. DHS and CBP have repeatedly provided CBPOs guidance to reinforce the correct laws, regulations, and help ensure procedures are adhered to in the processing of inadmissible applicants for admission. And, as recognized by the OIG, personnel that violate CBP's asylum-processing policies have been disciplined.

The draft report contained three recommendations, including two with which CBP concurs (Recommendations 2 and 3) and one with which CBP non-concurs (Recommendation 1). Attached find our detailed response to each recommendation. CBP previously submitted technical comments under a separate cover for OIG's consideration.

3

1-SER-041



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

Again, thank you for the opportunity to review and comment on this draft report.  Please feel free to contact me if you have any questions.

Attachment

4



## OFFICE OF INSPECTOR GENERAL
### Department of Homeland Security

### Attachment:  Management Response to Recommendations
### Contained in 18-122-ISP-CBP

OIG recommended that the CBP Acting Commissioner:

**Recommendation 1:**  Resume processing undocumented aliens at the seven ports of
entry currently redirecting them to other ports, or formally redesignate the ports to
exclude undocumented aliens.

**Response:**  Non-concur.  CBP will ensure public notification, as necessary, when POEs
make changes to better align with operational capacity.  However, CBP's decision to
redirect the processing of undocumented aliens at the seven ports of entry to other posts
was dependent on operational capacity, and the resources available to the POEs to
execute its primary mission of securing the border.  CBP's capacity to process and hold
aliens without documents sufficient for lawful entry is dependent on many factors, not
just on the amount of available holding space.  It is also contingent on other POE specific
dynamics, including:

- Operating hours;
- Access to medical facilities/personnel to comply with screening requirements;
- Isolation and quarantine requirements for certain individuals and those with
communicable diseases;
- Encounters of individuals with terrorist, criminal, or gang ties;
- Volume of trade and other trade enforcement issues;
- Detection of contraband; and,
- Volume of other travelers seeking entry to the United States.

There is a discretionary balance by port directors assessing their mission requirements to
process lawful trade and travel, to address CBP's counter-narcotics mission, and to
process people arriving without documents.  This balance must be maintained.

CBP requests that the OIG consider this recommendation resolved and closed.

**Recommendation 2:**  Provide written guidance and training to CBP personnel at ports of
entry relating to the proper handling of aliens who are physically present in the United
States and indicate an intention to apply for asylum.

**Response:**  Concur.  On October 2, 2014, CBP OFO issued a memorandum "Processing
of Expedited Removal Cases," which has been in effect through the period of OIG's audit
and which outlines the requirement that once an alien expresses a fear of return or a

5

1-SER-043



# OFFICE OF INSPECTOR GENERAL
### Department of Homeland Security

desire to apply for asylum, the alien must be processed accordingly. Additionally, on April 27, 2018, CBP OFO issued a memorandum "Metering Guidance," which emphasizes that once a traveler is in the United States, he or she must be processed. CBP OFO reiterated these requirements on April 30, 2020, with the issuance of second memorandum titled "Metering Guidance." Copies of these memorandums were previously provided to the OIG under separate cover.

CBP requests that the OIG consider this recommendation resolved and closed, as implemented.

**Recommendation 3:** Evaluate whether CBP can more efficiently use available holding spaces to process undocumented aliens, including asylum seekers.

**Response:** Concur. CBP port directors evaluate operational capacity daily at the POEs to ensure the most efficient use of resources. The assessment of operational capacity is based on the activities occurring at a POE at any given time, as well as the resources necessary to balance national security, and facilitating legitimate travel and trade. There is a discretionary balance by the port director assessing their mission requirements to process lawful trade and travel, to address our counter-narcotics mission, and to process people arriving without documents.

CBP requests that the OIG consider this recommendation resolved and closed, as implemented.

6

1-SER-044



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## Appendix C
## Timeline of Asylum Processing Significant Events in 2018



**Zero-Tolerance Policy**
As implemented by DHS, required CBP to refer for prosecution every adult who entered the United States illegally, including those traveling with their children. By early May, CBP separated parents, who entered illegally, from their children.

April 6, 2018

**Initial Queue Management Guidance**
CBP issued guidance for establishing queue management lines to slow the flow of undocumented aliens arriving in Southwest border ports.

April 27, 2018

**DHS Secretary Public Statement**
Secretary Nielsen told Congress, "Help me message: If you are fleeing and coming to the United States please come to the ports of entry. [We] will process your claim there."

May 9, 2018

**DHS Secretary Request**
Secretary Nielsen asked CBP officials to examine the number asylum seekers CBP could turn away every day if CBP ports ran queue management lines full-time.

May 24, 2018

**DHS Secretary Memo on CBP Priorities**
Secretary Nielsen signed an internally-circulated memo emphasizing that processing undocumented aliens was not one of CBP's main priorities and encouraging Port Directors to re-assign CBP staff away from processing such aliens.

June 5, 2018

**DHS Secretary White House Press Briefing**
Secretary Nielsen told reporters, "As I said before, if you're seeking asylum, go to a port of entry. You do not need to break the law of the United States to seek asylum." When reporters told the Secretary that media reported families turned away at ports of entry, she described that reporting as 'incorrect.'

June 18, 2018

**CBP OFO EAC Statement**
Executive Assistant Commissioner Owen said during a press conference, "despite what you may have heard, we never turn away individuals seeking asylum at port[s] of entry."

July 9, 2018

**OIG Observations**
During our site visit to San Ysidro POE, we observed a CBPO turn away a mother and two children who had crossed the border into the U.S.

August 28, 2018

1-SER-045



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

**Appendix D**
**Office of Special Reviews and Evaluations Major Contributors to This Report**

Tatyana Martell, Chief Inspector
Elizabeth Kingma, Team Lead
Adam Brown, Senior Inspector
Stephen Farrell, Senior Inspector
Paul Lewandowski, Senior Inspector
Jason Wahl, Senior Inspector
Jon Goodrich, Investigative Counsel
Gregory Flatow, Program Analyst
Michael Brooks, Independent Reference Reviewer



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## Appendix E
## Report Distribution

### Department of Homeland Security

Secretary
Deputy Secretary
Chief of Staff
Deputy Chiefs of Staff
General Counsel
Executive Secretary
Director, GAO/OIG Liaison Office
Assistant Secretary for Office of Strategy, Policy, and Plans
Assistant Secretary for Office of Public Affairs
Assistant Secretary for Office of Legislative Affairs
Commissioner, CBP
CBP Component Liaison

### Office of Management and Budget

Chief, Homeland Security Branch
DHS OIG Budget Examiner

### Congress

Congressional Oversight and Appropriations Committees

1-SER-047

## Additional Information and Copies

To view this and any of our other reports, please visit our website at: www.oig.dhs.gov.

For further information or questions, please contact Office of Inspector General Public Affairs at: DHS-OIG.OfficePublicAffairs@oig.dhs.gov.
Follow us on Twitter at: @dhsoig.



## OIG Hotline

To report fraud, waste, or abuse, visit our website at www.oig.dhs.gov and click on the red "Hotline" tab. If you cannot access our website, call our hotline at (800) 323-8603, fax our hotline at (202) 254-4297, or write to us at:

Department of Homeland Security
Office of Inspector General, Mail Stop 0305
Attention: Hotline
245 Murray Drive, SW
Washington, DC 20528-0305



1   MAYER BROWN LLP
      Matthew H. Marmolejo (CA Bar No. 242964)
2     *mmarmolejo@mayerbrown.com*
    350 S. Grand Avenue
3   25th Floor
    Los Angeles, CA 90071-1503
4     Ori Lev (DC Bar No. 452565)
      (*pro hac vice*)
5     *olev@mayerbrown.com*
      Stephen M. Medlock (VA Bar No. 78819)
6     (*pro hac vice*)
      *smedlock@mayerbrown.com*
7   1999 K Street, N.W.
    Washington, D.C. 20006
8   Telephone:  +1.202.263.3000
    Facsimile:   +1.202.263.3300
9
    SOUTHERN POVERTY LAW CENTER
10    Melissa Crow (DC Bar No. 453487)
      (*pro hac vice*)
11    *melissa.crow@splcenter.org*
    1101 17th Street, N.W., Suite 705
12  Washington, D.C. 20036
    Telephone: +1.202.355.4471
13  Facsimile: +1.404.221.5857

14  *Additional counsel listed on next page*
    *Attorneys for Plaintiffs*
15
                **UNITED STATES DISTRICT COURT**
16
               **SOUTHERN DISTRICT OF CALIFORNIA**
17

18  Al Otro Lado, Inc., *et al.*,          Case No.:  17-cv-02366-BAS-KSC

19                  Plaintiffs,            **EXHIBIT 3 IN SUPPORT OF
                                           PLAINTIFFS' REPLY IN SUPPORT
20          v.                             OF THEIR MOTION FOR
                                           SUMMARY JUDGMENT**
21  Chad F. Wolf,[1] *et al.*,

22                  Defendants.

23

24

25

26

27  _____
    [1]  Acting Secretary Wolf is automatically substituted for former Acting Secretary
28  McAleenan pursuant to Fed. R. Civ. P. 25(d).

                                    EXHIBIT 3 IN SUPP. OF REPLY IN SUPP. OF PLTFS'
                                                                  MOT. FOR S.J.

CENTER FOR CONSTITUTIONAL RIGHTS
  Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
  *bazmy@ccrjustice.org*
  Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
  *gschwarz@ccrjustice.org*
  Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
  *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
  Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
  *sarah.rich@splcenter.org*
  Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
  *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
  Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
  *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EXHIBIT 3 IN SUPP. OF REPLY IN SUPP. OF PLTFS'
MOT. FOR S.J.

From: Owen, Todd C (AC OFO)
Sent: Wednesday, May 25, 2016 10:25:20 PM
To: FLORES, PETE ROMERO
Subject: RE: Credible Fear Influx Spot Report

I gave the deputy a heads up.  Gaurenteed to spin up with the election
year shenanigans.


Todd C. Owen
Executive Assistant Commissioner
Office of Field Operations
U.S. Customs & Border Protection

From: FLORES, PETE ROMERO
Sent: Wednesday, May 25, 2016 7:22:43 PM
To: Owen, Todd C (AC OFO)
Subject: RE: Credible Fear Influx Spot Report

10-4, thanks. Hoping this doesn't start a media frenzy here. Local media
outlets have in the past asked for credible fear numbers and they have
been referred to DHS for a response.


From: Owen, Todd C (AC OFO)
Sent: Wednesday, May 25, 2016 7:17:55 PM
To: FLORES, PETE ROMERO
Subject: RE: Credible Fear Influx Spot Report

Pete, 10-4 on SRT.  I did ask Anne Maricich for what resources she could
immediately provide.  Told her I need to know by thurs late afternoon.
Also have Kirby tracking down the cap waiver.

I'm in phoenix, fly back to DC in the am and will be out of pocket most
of the day for the flight.


Todd C. Owen
Executive Assistant Commissioner
Office of Field Operations
U.S. Customs & Border Protection

From: FLORES, PETE ROMERO
Sent: Wednesday, May 25, 2016 7:12:32 PM
To: Owen, Todd C (AC OFO)
Subject: RE: Credible Fear Influx Spot Report

Todd,

No need for SRT but good to know that is an option.

Highly Confidential/Attorneys' Eyes Only                                    AOL-DEF-00356565

The Haitian volume has been increasing over the last couple of months but the surge has now reached new levels since they are arriving in much larger groups and frequency.

In regards to the Intel collected. Most of these Haitians have been in Brazil for a period of time working but since the economic downturn they are unemployed and now coming to the US for employment.  When they arrive in Mexico they are claiming to be from Congo or other African nations. Once they are released from Mexican Immigration custody they head to SYS and state they are Haitians, they have no documents and usually no bio-metrics in the system.

From: Owen, Todd C (AC OFO)
Sent: Wednesday, May 25, 2016 6:49:02 PM
To: FLORES, PETE ROMERO
Subject: RE: Credible Fear Influx Spot Report

Pete, let me work the cap waiver.  We can quickly deploy 50+ SRT if you need them, won't help with case processing but they are extra bodies that we can make available quickly if this continues.

Amy sense where the Haitians arw coming from, this volume is new, correct?  Getting anything out of Intel on that?

Todd C. Owen
Executive Assistant Commissioner
Office of Field Operations
U.S. Customs & Border Protection

From: FLORES, PETE ROMERO
Sent: Wednesday, May 25, 2016 6:40:03 PM
To: Owen, Todd C (AC OFO)
Subject: RE: Credible Fear Influx Spot Report

Todd,

At this point I am looking for additional existing space to hold detainees and officers that know how to work ER cases.

What we are doing locally to address both issues are:

- Reorganizing staff to add resources for case processing; sending staff at the FO to the port, pulling back some task force officers, moving officers out of their current unit to help with processing casing, reached out to Detroit and Miami for VP processing.

- For get additional space BP has agreed to open up their station(s) to us to hold or process detainees. We are in the process of putting that plan together however this will put an additional strain on resources.

Highly Confidential/Attorneys' Eyes Only                                    AOL-DEF-00356566



**DP**

From: Owen, Todd C (AC OFO)
Sent: Wednesday, May 25, 2016 6:23:08 PM
To: FLORES, PETE ROMERO
Subject: FW: Credible Fear Influx Spot Report

Pete, anything you need from us right now?

Todd C. Owen
Executive Assistant Commissioner
Office of Field Operations
U.S. Customs & Border Protection

From: MARTEL, CARLOS C
Sent: Wednesday, May 25, 2016 6:20:03 PM
To: Owen, Todd C (AC OFO); WAGNER, JOHN P; HOFFMAN, TODD A
Cc: BRAUNSTEIN, MARGARET A
Subject: FW: Credible Fear Influx Spot Report

Gentlemen:  FYSA - Significant increase in CF cases at SYS/Otay POEs
resulting in saturation of temp detention space.  Mitigation actions are
enumerated below to include virtual processing assistance from Detroit
and MIA.  Media coverage is expected.

Carlos C. Martel
Acting Executive Director, Operations
Office of Field Operations
U. S. Customs and Border Protection

          Office
                              Mobile

From: ARMIJO, JOHNNY L
Sent: Thursday, May 26, 2016 1:59:31 AM
To: MARTEL, CARLOS C; BRAUNSTEIN, MARGARET A
Cc: OFO-FIELD LIAISON; FLORES, PETE ROMERO; BRINTON, WALTER A; HENNING,
PAUL R; AKI, SIDNEY K; HOOD, ROBERT W; CARRILLO, SALLY R; MISENHELTER,
JOSEPH; CASTILLO, MOISES; MARIN, MARIZA; TAITAGUE, CLAUDIA; GRANADOS,
ANDREA M; COOK, VERNON; TIBBETTS, STEVEN L
Subject: Credible Fear Influx Spot Report

Highly Confidential/Attorneys' Eyes Only

AOL-DEF-00356567

Greetings, Sir.  The SDFO has received multiple media requests regarding the Credible Fear/Asylum activity at the San Ysidro Port of Entry.  The inquiries are most likely attributed to our usage of a designated queuing area (Asylum line) in pedestrian that we utilize due to the infrastructure constraints that currently exist within our Admissibility Enforcement Unit.

Credible Fear Influx

·        The number of Credible Fear encounters at the San Ysidro/Otay Mesa Ports of Entry remain elevated.

·        This morning's San Ysidro/Otay Mesa Admissibility Enforcement Unit (AEU) activity report indicated a total 885 individuals in various stages of immigration removal proceedings.  Many of them asserting Credible Fear/Asylum.

·        Additionally, Public Affair Officers/Liaisons have received multiple media inquiries regarding an influx of Haitians.

·        A Borderstat query indicates 422 Haitians have presented themselves and asserted Credible Fear during the month of May 2016 (May 1-25).

·        The San Ysidro/Otay Mesa AEU has exceeded its existing temporary detention capabilities and have undertaken the following remedies to create additional space.

1)      Utilized several Border Patrol Stations to temporarily hold detainees awaiting transfer to ICE-ERO.

2)      Transferred all accompanied and unaccompanied unit processing to the Old Port overflow processing area.

3)      Transferred all permit (I-94) processing to the Otay Mesa Port of Entry in order to secure additional workstations to conduct in person or virtual interviews.

4)      Converted GSA's recently vacated maintenance working area at the Old Port into a temporary holding room.

·        Port management is currently working with San Diego Sector Border Patrol to utilize the Imperial Beach station to hold and process single adult males awaiting Credible Fear.
Johnny Armijo
Assistant Director Border Security
San Diego, California
                          [O]
              [C]

Highly Confidential/Attorneys' Eyes Only                                        AOL-DEF-00356568



MAYER BROWN LLP
  Matthew H. Marmolejo (CA Bar No. 242964)
  *mmarmolejo@mayerbrown.com*
350 S. Grand Avenue
25th Floor
Los Angeles, CA 90071-1503
  Ori Lev (DC Bar No. 452565)
  (*pro hac vice*)
  *olev@mayerbrown.com*
  Stephen M. Medlock (VA Bar No. 78819)
  (*pro hac vice*)
  *smedlock@mayerbrown.com*
1999 K Street, N.W.
Washington, D.C. 20006
Telephone:  +1.202.263.3000
Facsimile:   +1.202.263.3300

SOUTHERN POVERTY LAW CENTER
  Melissa Crow (DC Bar No. 453487)
  (*pro hac vice*)
  *melissa.crow@splcenter.org*
1101 17th Street, N.W., Suite 705
Washington, D.C. 20036
Telephone: +1.202.355.4471
Facsimile: +1.404.221.5857

*Additional counsel listed on next page*
*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

Al Otro Lado, Inc., *et al.*,

                    Plaintiffs,

        v.

Chad F. Wolf,[1] *et al.*,

                    Defendants.

Case No.:  17-cv-02366-BAS-KSC

**EXHIBIT 4 IN SUPPORT OF PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

---

[1] Acting Secretary Wolf is automatically substituted for former Acting Secretary McAleenan pursuant to Fed. R. Civ. P. 25(d).

EXHIBIT 4 IN SUPP. OF REPLY IN SUPP. OF PLTFS'
MOT. FOR S.J.

CENTER FOR CONSTITUTIONAL RIGHTS
    Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
    *bazmy@ccrjustice.org*
    Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
    *gschwarz@ccrjustice.org*
    Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
    *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
    Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
    *sarah.rich@splcenter.org*
    Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
    *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
    Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
    *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

EXHIBIT 4 IN SUPP. OF REPLY IN SUPP. OF PLTFS'
MOT. FOR S.J.

| | |
|---|---|
| **From:** | HOFFMAN, TODD A |
| **Sent:** | Wednesday, May 25, 2016 9:33 PM |
| **To:** | HUTTON, JAMES R |
| **Subject:** | FW: Credible Fear Influx Spot Report |

Fyi

**From:** MARTEL, CARLOS C
**Sent:** Wednesday, May 25, 2016 6:20:03 PM
**To:** Owen, Todd C (AC OFO); WAGNER, JOHN P; HOFFMAN, TODD A
**Cc:** BRAUNSTEIN, MARGARET A
**Subject:** FW: Credible Fear Influx Spot Report

Gentlemen:  FYSA - Significant increase in CF cases at SYS/Otay POEs resulting in saturation of temp detention space.  Mitigation actions are enumerated below to include virtual processing assistance from Detroit and MIA.  Media coverage is expected.

Carlos C. Martel
Acting Executive Director, Operations
Office of Field Operations
U. S. Customs and Border Protection

 Office
Mobile

**From:** ARMIJO, JOHNNY L
**Sent:** Thursday, May 26, 2016 1:59:31 AM
**To:** MARTEL, CARLOS C; BRAUNSTEIN, MARGARET A
**Cc:** OFO-FIELD LIAISON; FLORES, PETE ROMERO; BRINTON, WALTER A; HENNING, PAUL R; AKI, SIDNEY K; HOOD, ROBERT W; CARRILLO, SALLY R; MISENHELTER, JOSEPH; CASTILLO, MOISES; MARIN, MARIZA; TAITAGUE, CLAUDIA; GRANADOS, ANDREA M; COOK, VERNON; TIBBETTS, STEVEN L
**Subject:** Credible Fear Influx Spot Report

*Greetings, Sir.  The SDFO has received multiple media requests regarding the Credible Fear/Asylum activity at the San Ysidro Port of Entry.  The inquiries are most likely attributed to our usage of a designated queuing area (Asylum line) in pedestrian that we utilize due to the infrastructure constraints that currently exist within our Admissibility Enforcement Unit.*

**Credible Fear Influx**

- The number of Credible Fear encounters at the San Ysidro/Otay Mesa Ports of Entry remain elevated.

- This morning's San Ysidro/Otay Mesa Admissibility Enforcement Unit (AEU) activity report indicated a total **885** individuals in various stages of immigration removal proceedings.  Many of them asserting Credible Fear/Asylum.

1

Confidential

AOL-DEF-00023065

- Additionally, Public Affair Officers/Liaisons have received multiple media inquiries regarding an influx of Haitians.

- A Borderstat query indicates 422 Haitians have presented themselves and asserted Credible Fear during the month of May 2016 (May 1-25).

- The San Ysidro/Otay Mesa AEU has exceeded its existing temporary detention capabilities and have undertaken the following remedies to create additional space.

    1) Utilized several Border Patrol Stations to temporarily hold detainees awaiting transfer to ICE-ERO.

    2) Transferred all accompanied and unaccompanied unit processing to the Old Port overflow processing area.

    3) Transferred all permit (I-94) processing to the Otay Mesa Port of Entry in order to secure additional workstations to conduct in person or virtual interviews.

    4) Converted GSA's recently vacated maintenance working area at the Old Port into a temporary holding room.

- Port management is currently working with San Diego Sector Border Patrol to utilize the Imperial Beach station to hold and process single adult males awaiting Credible Fear.

Johnny Armijo
Assistant Director Border Security
San Diego, California
                        O]
                  C ]

2

AOL-DEF-00023066

1-SER-058

MAYER BROWN LLP
  Matthew H. Marmolejo (CA Bar No. 242964)
  *mmarmolejo@mayerbrown.com*
350 S. Grand Avenue
25th Floor
Los Angeles, CA 90071-1503
  Ori Lev (DC Bar No. 452565)
  (*pro hac vice*)
  *olev@mayerbrown.com*
  Stephen M. Medlock (VA Bar No. 78819)
  (*pro hac vice*)
  *smedlock@mayerbrown.com*
1999 K Street, N.W.
Washington, D.C. 20006
Telephone:  +1.202.263.3000
Facsimile:   +1.202.263.3300

SOUTHERN POVERTY LAW CENTER
  Melissa Crow (DC Bar No. 453487)
  (*pro hac vice*)
  *melissa.crow@splcenter.org*
1101 17th Street, N.W., Suite 705
Washington, D.C. 20036
Telephone: +1.202.355.4471
Facsimile: +1.404.221.5857

*Additional counsel listed on next page*
*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*,<br><br>         Plaintiffs,<br><br>     v.<br><br>Chad F. Wolf,[1] *et al.*,<br><br>        Defendants. | Case No.:  17-cv-02366-BAS-KSC<br><br>**EXHIBIT 5 IN SUPPORT OF PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** |

---

[1] Acting Secretary Wolf is automatically substituted for former Acting Secretary McAleenan pursuant to Fed. R. Civ. P. 25(d).

EXHIBIT 5 IN SUPP. OF REPLY IN SUPP. OF PLTFS'
MOT. FOR S.J.

1   CENTER FOR CONSTITUTIONAL RIGHTS
2       Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
        *bazmy@ccrjustice.org*
3       Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
        *gschwarz@ccrjustice.org*
4       Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
        *aguisado@ccrjustice.org*
5   666 Broadway, 7th Floor
    New York, NY 10012
6   Telephone: +1.212.614.6464
7   Facsimile: +1.212.614.6499

8   SOUTHERN POVERTY LAW CENTER
        Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
9       *sarah.rich@splcenter.org*
        Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
10      *rebecca.cassler@splcenter.org*
    150 E. Ponce de Leon Ave., Suite 340
11  Decatur, GA 30030
    Telephone: +1.404.521.6700
12  Facsimile: +1.404.221.5857
13
14  AMERICAN IMMIGRATION COUNCIL
        Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
15      *kwalters@immcouncil.org*
    1331 G St. NW, Suite 200
16  Washington, D.C. 20005
    Telephone: +1.202.507.7523
17  Facsimile: +1.202.742.5619
18
19
20
21
22
23
24
25
26
27
28

EXHIBIT 5 IN SUPP. OF REPLY IN SUPP. OF PLTFS'
MOT. FOR S.J.

**From:** FLORES, PETE ROMERO
**Sent:** Thursday, May 26, 2016 10:07 AM
**To:** WASILUK, JACQUELINE E
**CC:** ARMIJO, JOHNNY L; HENNING, PAUL R; AKI, SIDNEY K; DECIMA, ANGELICA D
**Subject:** RE: SY MIGRANTS

Jackie - looks good.

---

**From:** WASILUK, JACQUELINE E
**Sent:** Thursday, May 26, 2016 6:56:45 AM
**To:** FLORES, PETE ROMERO
**Cc:** ARMIJO, JOHNNY L; HENNING, PAUL R; AKI, SIDNEY K; DECIMA, ANGELICA D
**Subject:** FW: SY MIGRANTS

Sir –

Here is an email from Sandra Dibble early this morning, as well as the email I received yesterday from her colleague Tatiana. I also received a voicemail from ABC 10 news asking to confirm that there were hundreds of other than Mexican nationals at San Ysidro claiming asylum.

Here is some draft messaging for your consideration:



Jackie Wasiluk
CBP Public Affairs

---

**From:** Dibble, Sandra [mailto:sandra.dibble@sduniontribune.com]
**Sent:** Thursday, May 26, 2016 4:11 AM
**To:** WASILUK, JACQUELINE E
**Cc:** Sanchez, Tatiana
**Subject:** SY MIGRANTS

Jackie,

As you must know, several hundred people are sleeping on the floor of the SY pedestrian entrance. Many appear to be from Haiti, or perhaps African countries, but not all, as some look Latino. Merchants on the Mexican side tell me that they've seen a large increase in groups of people coming and hoping to be let in since last weekend.

My questions are:
1. Who are these people, and why are they sleeping on the floor of the SY poe?
2. Are they expressing fear of returning to their countries, and if so, why aren't they being turned over to ICE for processing?
3. If the are not expressing fear, why aren't they being turned away at the border?
4. If an OTM comes to the border, trying to come in, what is the protocol? Who deports them?
5. How are these people getting to the border? Is there a new smuggling route or rings behind this?
6. What do your numbers say?> Is this business as usual to have this many people on the floor sleeping? I have never seen it before.

I will be writing an article, based on what I saw with my own eyes, on what merchants in MExico tell me, and what a couple of Haitians who were waiting to be let in told me when I spoke with them in Tijuana. And any other information I am able to get.

I hope you can answer my questions.

Thank you,

Sandra Dibble

■

**Sandra Dibble | Reporter, Sr**
O: +1 (619) 293 1716
sandra.dibble@sduniontribune.com
600 B Street, San Diego, California 92101

Confidential                                                      AOL-DEF-00062658

Jackie Wasiluk
CBP Public Affairs

**From:** Sanchez, Tatiana [mailto:tatiana.sanchez@sduniontribune.com]
**Sent:** Wednesday, May 25, 2016 12:23 PM
**To:** WASILUK, JACQUELINE E
**Cc:** Dibble, Sandra
**Subject:** RE: Haitians in San Ysidro

I believe it was in one group (and this happened recently, within the last few days). Definitely not referring to the beginning of the fiscal year.

Sandra is heading to her tour with CBP, so she will speak to you about it further. In the meantime, I will reach out to USCIS.

Thanks,

Tatiana

**Tatiana Sanchez | Reporter - Immigration**
O: +1 (619) 293 1380
tatiana.sanchez@sduniontribune.com
600 B Street, San Diego, California 92101

**From:** WASILUK, JACQUELINE E [mailto
**Sent:** Wednesday, May 25, 2016 12:03 PM
**To:** Sanchez, Tatiana <tatiana.sanchez@sduniontribune.com>
**Cc:** Dibble, Sandra <sandra.dibble@sduniontribune.com>
**Subject:** RE: Haitians in San Ysidro

Tatiana, thanks.  I figured I would have a chance to chat with Sandra about this in about an hour, but I'll follow up now… when you heard about 100 people that turned themselves in, what timeframe are we looking at? (In one day?  In one group?  Since the beginning of the fiscal year back in October?)

I will look into it, but if you have any additional information that would be helpful.

(Generally, my initial thought, not for quoting, but to help as you are reporting, is that if your source is saying "turning themselves in" then these would be persons entering the credible fear/asylum process.  CBP has a very limited role in that process, and I would highly recommend that you reach out to USCIS for a broader picture about what it means when someone without proper documents enters the credible fear/asylum process in the U.S., and what steps have to be taken by the government.)

I will get back to you as soon as I can, but what kind of deadline are you all working on?

Thank you

Jackie Wasiluk
CBP Public Affairs

**From:** Sanchez, Tatiana [mailto:tatiana.sanchez@sduniontribune.com]
**Sent:** Wednesday, May 25, 2016 11:46 AM
**To:** WASILUK, JACQUELINE E
**Cc:** Dibble, Sandra
**Subject:** Haitians in San Ysidro

Hi Jackie,

We've learned that there are about 100 Haitians that turned themselves into the SY Port of Entry. Would you be able to confirm this and provide further information about where they are being housed, why and how they arrived here, etc. We are looking to get as many details as possible.

I know Sandra reached out to you about this but I'm following up because our editors would really like us to report on this.

Confidential                                                           AOL-DEF-00062659

Thanks,

Tatiana

**Tatiana Sanchez | Reporter - Immigration**
O: +1 (619) 293-1380

tatiana.sanchez@sduniontribune.com
600 B Street, San Diego, California 92101

Confidential

AOL-DEF-00062660

MAYER BROWN LLP
  Matthew H. Marmolejo (CA Bar No. 242964)
  *mmarmolejo@mayerbrown.com*
350 S. Grand Avenue
25th Floor
Los Angeles, CA 90071-1503
  Ori Lev (DC Bar No. 452565)
  (*pro hac vice*)
  *olev@mayerbrown.com*
  Stephen M. Medlock (VA Bar No. 78819)
  (*pro hac vice*)
  *smedlock@mayerbrown.com*
1999 K Street, N.W.
Washington, D.C. 20006
Telephone:  +1.202.263.3000
Facsimile:   +1.202.263.3300

SOUTHERN POVERTY LAW CENTER
  Melissa Crow (DC Bar No. 453487)
  (*pro hac vice*)
  *melissa.crow@splcenter.org*
1101 17th Street, N.W., Suite 705
Washington, D.C. 20036
Telephone: +1.202.355.4471
Facsimile: +1.404.221.5857

*Additional counsel listed on next page*
*Attorneys for Plaintiffs*

### UNITED STATES DISTRICT COURT

### SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*,<br><br>          Plaintiffs,<br><br>     v.<br><br>Chad F. Wolf,[1] *et al.*,<br><br>          Defendants. | Case No.:  17-cv-02366-BAS-KSC<br><br>**EXHIBIT 8 IN SUPPORT OF PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** |

---

[1] Acting Secretary Wolf is automatically substituted for former Acting Secretary McAleenan pursuant to Fed. R. Civ. P. 25(d).

EXHIBIT 8 IN SUPP. OF REPLY IN SUPP. OF PLTFS'
MOT. FOR S.J.

1 │ CENTER FOR CONSTITUTIONAL RIGHTS
2 │   Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
   │   *bazmy@ccrjustice.org*
3 │   Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
   │   *gschwarz@ccrjustice.org*
4 │   Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
   │   *aguisado@ccrjustice.org*
5 │ 666 Broadway, 7th Floor
6 │ New York, NY 10012
   │ Telephone: +1.212.614.6464
7 │ Facsimile: +1.212.614.6499
8 │ SOUTHERN POVERTY LAW CENTER
   │   Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
9 │   *sarah.rich@splcenter.org*
   │   Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
10 │   *rebecca.cassler@splcenter.org*
   │ 150 E. Ponce de Leon Ave., Suite 340
11 │ Decatur, GA 30030
   │ Telephone: +1.404.521.6700
12 │ Facsimile: +1.404.221.5857
13 │
14 │ AMERICAN IMMIGRATION COUNCIL
   │   Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
15 │   *kwalters@immcouncil.org*
   │ 1331 G St. NW, Suite 200
16 │ Washington, D.C. 20005
   │ Telephone: +1.202.507.7523
17 │ Facsimile: +1.202.742.5619
18 │
19 │
20 │
21 │
22 │
23 │
24 │
25 │
26 │
27 │
28 │

EXHIBIT 8 IN SUPP. OF REPLY IN SUPP. OF PLTFS'
MOT. FOR S.J.

**From:** TAMAYO, ENRIQUE S
**Sent:** Friday, May 27, 2016 3:32 PM
**To:** ARMIJO, JOHNNY L
**CC:** FLORES, PETE ROMERO; AKI, SIDNEY K; MARTEL, CARLOS C
**Subject:** RE: C1 RFI: San Ysidro

Excellent – thank you for the feedback.

Enrique

---

**From:** ARMIJO, JOHNNY L
**Sent:** Friday, May 27, 2016 3:32 PM
**To:** TAMAYO, ENRIQUE S <
**Cc:** FLORES, PETE ROMERO <                          >; AKI, SIDNEY K                          >; MARTEL, CARLOS C

**Subject:** FW: C1 RFI: San Ysidro

Enrique,

Thank you for allowing us to review. Our injects are included below in red.

Johnny Armijo
Assistant Director Border Security
San Diego, California
                    O]
            C]

---

**From:** TAMAYO, ENRIQUE S
**Sent:** Friday, May 27, 2016 12:08 PM
**To:** FLORES, PETE ROMERO; ARMIJO, JOHNNY L
**Subject:** FW: C1 RFI: San Ysidro

Gents –

This an IP for C1, before we send this out can you review.

**Office of Field Operations**
**Incident Management Division**
**May 27, 2016**

**DP**

Highly Confidential/Attorneys' Eyes Only

AOL-DEF-00539629



**Prepared by:** Incident Management Division
**Date:** May 27, 2016

---

**From:** MARTEL, CARLOS C
**Sent:** Friday, May 27, 2016 2:58 PM
**To:** TAMAYO, ENRIQUE S ██████████; O'DONNELL, MARTIN E ██████████; GOLDSBERRY, SHERRY L < ██████████
**Subject:** FW: C1 RFI: San Ysidro

Carlos C. Martel
Acting Executive Director, Operations
Office of Field Operations
U.S. Customs and Border Protection

██████ Office
██████ Mobile

---

**From:** HISE, JENNIFER L
**Sent:** Friday, May 27, 2016 2:57 PM
**To:** MARTEL, CARLOS C < ██████████
**Subject:** C1 RFI: San Ysidro

Sir,

Highly Confidential/Attorneys' Eyes Only

AOL-DEF-00539630

Do we have an ETA on IMD's draft response?
Thank you,
Jen

**From:** HISE, JENNIFER L
**Sent:** Friday, May 27, 2016 10:50 AM
**To:** MARTEL, CARLOS C <
**Cc:** BRAUNSTEIN, MARGARET A <                                    >; MARTIN E O'DONNELL (
<MARTIN.E.O'DONNELL@cbp.dhs.gov>; TAMAYO, ENRIQUE S <                           >
**Subject:** C1 RFI: San Ysidro
**Importance:** High

Good Morning Sir,

May we please have your staff's assistance to research the below and prepare a draft response addressing the issues raised by the
Department?  DEAC Wagner will be asked to review/concur with the draft prior to providing to C1's staff.

Requesting a quick-turn on this priority request please.

Thank you,
Jennifer

Tribune adds that after the 2010 earthquake, "Brazil welcomed large numbers of Haitians," but some have been leaving "after encountering hard times there," as Brazil "is enduring one of its deepest recessions in years."

Highly Confidential/Attorneys' Eyes Only

AOL-DEF-00539632

MAYER BROWN LLP
  Matthew H. Marmolejo (CA Bar No. 242964)
  *mmarmolejo@mayerbrown.com*
350 S. Grand Avenue
25th Floor
Los Angeles, CA 90071-1503
  Ori Lev (DC Bar No. 452565)
  (*pro hac vice*)
  *olev@mayerbrown.com*
  Stephen M. Medlock (VA Bar No. 78819)
  (*pro hac vice*)
  *smedlock@mayerbrown.com*
1999 K Street, N.W.
Washington, D.C. 20006
Telephone:  +1.202.263.3000
Facsimile:   +1.202.263.3300

SOUTHERN POVERTY LAW CENTER
  Melissa Crow (DC Bar No. 453487)
  (*pro hac vice*)
  *melissa.crow@splcenter.org*
1101 17th Street, N.W., Suite 705
Washington, D.C. 20036
Telephone: +1.202.355.4471
Facsimile: +1.404.221.5857

*Additional counsel listed on next page*
*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*,<br><br>                   Plaintiffs,<br><br>        v.<br><br>Chad F. Wolf,[1] *et al.*,<br><br>                   Defendants. | Case No.:  17-cv-02366-BAS-KSC<br><br>**EXHIBIT 9 IN SUPPORT OF PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** |

---

[1]  Acting Secretary Wolf is automatically substituted for former Acting Secretary McAleenan pursuant to Fed. R. Civ. P. 25(d).

EXHIBIT 9 IN SUPP. OF REPLY IN SUPP. OF PLTFS'
MOT. FOR S.J.

CENTER FOR CONSTITUTIONAL RIGHTS
  Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
  *bazmy@ccrjustice.org*
  Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
  *gschwarz@ccrjustice.org*
  Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
  *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
  Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
  *sarah.rich@splcenter.org*
  Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
  *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
  Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
  *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

EXHIBIT 9 IN SUPP. OF REPLY IN SUPP. OF PLTFS'
MOT. FOR S.J.

**From:** AKI, SIDNEY K
**Sent:** Thursday, May 26, 2016 10:20 AM
**To:** FLORES, PETE ROMERO
**Subject:** RE: SY MIGRANTS

10-4. Thx.

---

**From:** FLORES, PETE ROMERO
**Sent:** Thursday, May 26, 2016 9:09:07 AM
**To:** AKI, SIDNEY K
**Subject:** FW: SY MIGRANTS

Sid,

Need to get that asylum line out of public viewing area.

---

**From:** WASILUK, JACQUELINE E
**Sent:** Thursday, May 26, 2016 6:56:45 AM
**To:** FLORES, PETE ROMERO
**Cc:** ARMIJO, JOHNNY L; HENNING, PAUL R; AKI, SIDNEY K; DECIMA, ANGELICA D
**Subject:** FW: SY MIGRANTS

Sir –

Here is an email from Sandra Dibble early this morning, as well as the email I received yesterday from her colleague Tatiana.  I also received a voicemail from ABC 10 news asking to confirm that there were hundreds of other than Mexican nationals at San Ysidro claiming asylum.

Here is some draft messaging for your consideration:



Jackie Wasiluk
CBP Public Affairs

---

**From:** Dibble, Sandra [mailto:sandra.dibble@sduniontribune.com]
**Sent:** Thursday, May 26, 2016 4:11 AM
**To:** WASILUK, JACQUELINE E
**Cc:** Sanchez, Tatiana
**Subject:** SY MIGRANTS

Jackie,

As you must know, several hundred people are sleeping on the floor of the SY pedestrian entrance. Many appear to be from Haiti, or perhaps African countries, but not all, as some look Latino. Merchants on the Mexican side tell me that they've seen a large increase in groups of people coming and hoping to be let in since last weekend.

My questions are:
1. Who are these people, and why are they sleeping on the floor of the SY poe?
2. Are they expressing fear of returning to their countries,  and if so, why aren't they being turned over to ICE for processing?
3. If the are not expressing fear, why aren't they being turned away at the border?
4. If an OTM comes to the border, trying to come in, what is the protocol? Who deports them?
5. How are these people getting to the border? Is there a new smuggling route or rings behind this?
6. What do your numbers say?> Is this business as usual to have this many people on the floor sleeping? I have never seen it before.

I will be writing an article, based on what I saw with my own eyes, on what merchants in MExico tell me, and what a couple of Haitians who were waiting to be let in told me when I spoke with them in Tijuana. And any other information I am able to get.

I hope you can answer my questions.

Thank you,

Confidential                                                                                                    AOL-DEF-00632354

Sandra Dibble

**Sandra Dibble | Reporter, Sr**
O: +1 (619) 2931716
sandra.dibble@sduniontribune.com
600 B Street, San Diego, California 92101

San Diego Union-Tribune, INC.

---

Jackie Wasiluk
CBP Public Affairs

**From:** Sanchez, Tatiana [mailto:tatiana.sanchez@sduniontribune.com]
**Sent:** Wednesday, May 25, 2016 12:23 PM
**To:** WASILUK, JACQUELINE E
**Cc:** Dibble, Sandra
**Subject:** RE: Haitians in San Ysidro

I believe it was in one group (and this happened recently, within the last few days). Definitely not referring to the beginning of the fiscal year.

Sandra is heading to her tour with CBP, so she will speak to you about it further. In the meantime, I will reach out to USCIS.

Thanks,

Tatiana

**Tatiana Sanchez | Reporter - Immigration**
O: +1 (619) 2931380
tatiana.sanchez@sduniontribune.com
600 B Street, San Diego, California 92101

**From:** WASILUK, JACQUELINE E [mailto
**Sent:** Wednesday, May 25, 2016 12:03 PM
**To:** Sanchez, Tatiana <tatiana.sanchez@sduniontribune.com>
**Cc:** Dibble, Sandra <sandra.dibble@sduniontribune.com>
**Subject:** RE: Haitians in San Ysidro

Tatiana, thanks.  I figured I would have a chance to chat with Sandra about this in about an hour, but I'll follow up now… when you heard about 100 people that turned themselves in, what timeframe are we looking at? (In one day?  In one group?  Since the beginning of the fiscal year back in October?)

I will look into it, but if you have any additional information that would be helpful.

I will get back to you as soon as I can, but what kind of deadline are you all working on?

Thank you

Jackie Wasiluk
CBP Public Affairs

**From:** Sanchez, Tatiana [mailto:tatiana.sanchez@sduniontribune.com]
**Sent:** Wednesday, May 25, 2016 11:46 AM
**To:** WASILUK, JACQUELINE E
**Cc:** Dibble, Sandra
**Subject:** Haitians in San Ysidro

Confidential                                                          AOL-DEF-00632355

Hi Jackie,

We've learned that there are about 100 Haitians that turned themselves into the SY Port of Entry. Would you be able to confirm this and provide further information about where they are being housed, why and how they arrived here, etc. We are looking to get as many details as possible.

I know Sandra reached out to you about this but I'm following up because our editors would really like us to report on this.

Thanks,
Tatiana

**Tatiana Sanchez | Reporter - Immigration**
O +1 (619) 2931380

tatiana.sanchez@sduniontribune.com
600 B Street, San Diego, California 92101

Confidential

AOL-DEF-00632356



MAYER BROWN LLP
  Matthew H. Marmolejo (CA Bar No. 242964)
  *mmarmolejo@mayerbrown.com*
350 S. Grand Avenue
25th Floor
Los Angeles, CA 90071-1503
  Ori Lev (DC Bar No. 452565)
  (*pro hac vice*)
  *olev@mayerbrown.com*
  Stephen M. Medlock (VA Bar No. 78819)
  (*pro hac vice*)
  *smedlock@mayerbrown.com*
1999 K Street, N.W.
Washington, D.C. 20006
Telephone:  +1.202.263.3000
Facsimile:   +1.202.263.3300

SOUTHERN POVERTY LAW CENTER
  Melissa Crow (DC Bar No. 453487)
  (*pro hac vice*)
  *melissa.crow@splcenter.org*
1101 17th Street, N.W., Suite 705
Washington, D.C. 20036
Telephone: +1.202.355.4471
Facsimile: +1.404.221.5857

*Additional counsel listed on next page*
*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*,<br><br>              Plaintiffs,<br><br>      v.<br><br>Chad F. Wolf,[1] *et al.*,<br><br>              Defendants. | Case No.:  17-cv-02366-BAS-KSC<br><br>**EXHIBIT 10 IN SUPPORT OF PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** |

---

[1]  Acting Secretary Wolf is automatically substituted for former Acting Secretary McAleenan pursuant to Fed. R. Civ. P. 25(d).

EXHIBIT 10 IN SUPP. OF REPLY IN SUPP. OF
PLTFS' MOT. FOR S.J.

CENTER FOR CONSTITUTIONAL RIGHTS
   Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
   *bazmy@ccrjustice.org*
   Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
   *gschwarz@ccrjustice.org*
   Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
   *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
   Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
   *sarah.rich@splcenter.org*
   Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
   *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
   Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
   *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

EXHIBIT 10 IN SUPP. OF REPLY IN SUPP. OF
PLTFS' MOT. FOR S.J.

**From:** FLORES, PETE ROMERO
**Sent:** Thursday, May 26, 2016 10:09 AM
**To:** AKI, SIDNEY K
**Subject:** FW: SY MIGRANTS

Sid,

Need to get that asylum line out of public viewing area.

---

**From:** WASILUK, JACQUELINE E
**Sent:** Thursday, May 26, 2016 6:56:45 AM
**To:** FLORES, PETE ROMERO
**Cc:** ARMIJO, JOHNNY L; HENNING, PAUL R; AKI, SIDNEY K; DECIMA, ANGELICA D
**Subject:** FW: SY MIGRANTS

Sir –

Here is an email from Sandra Dibble early this morning, as well as the email I received yesterday from her colleague Tatiana. I also received a voicemail from ABC 10 news asking to confirm that there were hundreds of other than Mexican nationals at San Ysidro claiming asylum.



Jackie Wasiluk
CBP Public Affairs

---

**From:** Dibble, Sandra [mailto:sandra.dibble@sduniontribune.com]
**Sent:** Thursday, May 26, 2016 4:11 AM
**To:** WASILUK, JACQUELINE E
**Cc:** Sanchez, Tatiana
**Subject:** SY MIGRANTS

Jackie,

As you must know, several hundred people are sleeping on the floor of the SY pedestrian entrance. Many appear to be from Haiti, or perhaps African countries, but not all, as some look Latino. Merchants on the Mexican side tell me that they've seen a large increase in groups of people coming and hoping to be let in since last weekend.

My questions are:
1. Who are these people, and why are they sleeping on the floor of the SY poe?
2. Are they expressing fear of returning to their countries, and if so, why aren't they being turned over to ICE for processing?
3. If the are not expressing fear, why aren't they being turned away at the border?
4. If an OTM comes to the border, trying to come in, what is the protocol? Who deports them?
5. How are these people getting to the border? Is there a new smuggling route or rings behind this?
6. What do your numbers say?> Is this business as usual to have this many people on the floor sleeping? I have never seen it before.

I will be writing an article, based on what I saw with my own eyes, on what merchants in MExico tell me, and what a couple of Haitians who were waiting to be let in told me when I spoke with them in Tijuana. And any other information I am able to get.

I hope you can answer my questions.

Thank you,

Sandra Dibble

**Sandra Dibble | Reporter, Sr**
O: +1 (619) 293 1716
sandra.dibble@sduniontribune.com

Confidential                                                                                          AOL-DEF-00632364

600 B Street, San Diego, California 92101

San_Diego_Union-Tribune_IMG

Jackie Wasiluk
CBP Public Affairs

**From:** Sanchez, Tatiana [mailto:tatiana.sanchez@sduniontribune.com]
**Sent:** Wednesday, May 25, 2016 12:23 PM
**To:** WASILUK, JACQUELINE E
**Cc:** Dibble, Sandra
**Subject:** RE: Haitians in San Ysidro

I believe it was in one group (and this happened recently, within the last few days). Definitely not referring to the beginning of the fiscal year.

Sandra is heading to her tour with CBP, so she will speak to you about it further. In the meantime, I will reach out to USCIS.

Thanks,

Tatiana

**Tatiana Sanchez | Reporter - Immigration**
O: +1 (619) 2931380
tatiana.sanchez@sduniontribune.com
600 B Street, San Diego, California 92101

**From:** WASILUK, JACQUELINE E
**Sent:** Wednesday, May 25, 2016 12:03 PM
**To:** Sanchez, Tatiana <tatiana.sanchez@sduniontribune.com>
**Cc:** Dibble, Sandra <sandra.dibble@sduniontribune.com>
**Subject:** RE: Haitians in San Ysidro

Tatiana, thanks. I figured I would have a chance to chat with Sandra about this in about an hour, but I'll follow up now... when you heard about 100 people that turned themselves in, what timeframe are we looking at? (In one day? In one group? Since the beginning of the fiscal year back in October?)

I will look into it, but if you have any additional information that would be helpful.

(Generally, my initial thought, not for quoting, but to help as you are reporting, is that if your source is saying "turning themselves in" then these would be persons entering the credible fear/asylum process. CBP has a very limited role in that process, and I would highly recommend that you reach out to USCIS for a broader picture about what it means when someone without proper documents enters the credible fear/asylum process in the U.S., and what steps have to be taken by the government.)

I will get back to you as soon as I can, but what kind of deadline are you all working on?

Thank you

Jackie Wasiluk
CBP Public Affairs

**From:** Sanchez, Tatiana [mailto:tatiana.sanchez@sduniontribune.com]
**Sent:** Wednesday, May 25, 2016 11:46 AM
**To:** WASILUK, JACQUELINE E
**Cc:** Dibble, Sandra
**Subject:** Haitians in San Ysidro

Hi Jackie,

We've learned that there are about 100 Haitians that turned themselves into the SY Port of Entry. Would you be able to confirm this and provide further information about where they are being housed, why and how they arrived here, etc. We are looking to get as many details as possible.

I know Sandra reached out to you about this but I'm following up because our editors would really like us to report on this.

Confidential                                                                AOL-DEF-00632365

1-SER-078

Thanks,
Tatiana

**Tatiana Sanchez | Reporter - Immigration**
O: +1 (619) 293 1380

tatiana.sanchez@sduniontribune.com
600 B Street, San Diego, California 92101

Confidential                              AOL-DEF-00632366

1   MAYER BROWN LLP
      Matthew H. Marmolejo (CA Bar No. 242964)
2     *mmarmolejo@mayerbrown.com*
    350 S. Grand Avenue
3   25th Floor
    Los Angeles, CA 90071-1503
4     Ori Lev (DC Bar No. 452565)
      (*pro hac vice*)
5     *olev@mayerbrown.com*
      Stephen M. Medlock (VA Bar No. 78819)
6     (*pro hac vice*)
      *smedlock@mayerbrown.com*
7   1999 K Street, N.W.
    Washington, D.C. 20006
8   Telephone:  +1.202.263.3000
    Facsimile:   +1.202.263.3300
9
    SOUTHERN POVERTY LAW CENTER
10    Melissa Crow (DC Bar No. 453487)
      (*pro hac vice*)
11    *melissa.crow@splcenter.org*
    1101 17th Street, N.W., Suite 705
12  Washington, D.C. 20036
    Telephone: +1.202.355.4471
13  Facsimile: +1.404.221.5857

14  *Additional counsel listed on next page*
    *Attorneys for Plaintiffs*
15
                **UNITED STATES DISTRICT COURT**
16
              **SOUTHERN DISTRICT OF CALIFORNIA**
17

18  Al Otro Lado, Inc., *et al.*,            Case No.:  17-cv-02366-BAS-KSC

19                      Plaintiffs,          **EXHIBIT 14 IN SUPPORT OF
                                             PLAINTIFFS' REPLY IN
20          v.                               SUPPORT OF THEIR MOTION
                                             FOR SUMMARY JUDGMENT**
21  Chad F. Wolf,[1] *et al.*,

22                      Defendants.

23

24

25

26

27  ─────────────────
    [1] Acting Secretary Wolf is automatically substituted for former Acting Secretary
28  McAleenan pursuant to Fed. R. Civ. P. 25(d).

                                    EXHIBIT 14 IN SUPP. OF REPLY IN SUPP. OF
                                              PLTFS' MOT. FOR S.J.

CENTER FOR CONSTITUTIONAL RIGHTS
    Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
    *bazmy@ccrjustice.org*
    Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
    *gschwarz@ccrjustice.org*
    Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
    *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
    Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
    *sarah.rich@splcenter.org*
    Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
    *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
    Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
    *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EXHIBIT 14 IN SUPP. OF REPLY IN SUPP. OF
PLTFS' MOT. FOR S.J.

**From:** CASTILLO, MOISES
**Sent:** Thursday, March 23, 2017 3:05 PM
**To:** WILSON, LAURA
**CC:** HOOD, ROBERT W; AKI, SIDNEY K
**Subject:** FW: URGENT : Reference 170131-003357

Laura,

On January 26th we had 306 detainees in custody and on the 27th we had 350. At the time of the complaint we were metering. I have not seen any complaints since our custody numbers began to decline. The conversation in regards to metering has taken place with the Port Director and management. If there are any complaints since our numbers declined please let us know.

Thanks,

**From:** WILSON, LAURA
**Sent:** Wednesday, March 22, 2017 3:59 PM
**To:** CASTILLO, MOISES ◄                ►
**Subject:** RE: URGENT : Reference 170131-003357

Moises,

We have drafted a copy of the response for this complaint and its sitting in Johnny's desk for review. We went over the information with Janet Murray and I understand why the metering was being used while you guys had the huge influx of Haitians. Maybe it's time to reassess if the process need to be changed or readdressed since we no longer have the overcrowding in the processing areas. I have seen a few complaints regarding this issue and I don't know if we can continue to explain the metering since we don't have the numbers to back us

**Thank you,**
**Laura Wilson**
**Supervisory Program Manager**
**San Diego Field Office**

**From:** CASTILLO, MOISES
**Sent:** Tuesday, March 21, 2017 2:38 PM
**To:** CASTORENA, EDUARDO C ◄              
**Cc:** WILSON, LAURA                   HOOD, ROBERT W            ; TAITAGUE, CLAUDIA
               >
**Subject:** RE: URGENT : Reference 170131-003357

10/4

**From:** CASTORENA, EDUARDO C
**Sent:** Tuesday, March 21, 2017 2:27 PM
**To:** CASTILLO, MOISES
**Cc:** WILSON, LAURA ◄              >; HOOD, ROBERT W ◄                 ; TAITAGUE, CLAUDIA

**Subject:** RE: URGENT : Reference 170131-003357

Moises,

Thank you. Looks like we got what we needed at this time. If anything else comes up, I will reach out to you. Please thank Supervisor Cruz for his prompt attention and quick response.

Ed Castorena

*Eduardo Castorena*
*Supervisory Program Manager / Trade Division*
*San Diego Field Office*
             *office*
             *mobile*

**From:** CASTILLO, MOISES
**Sent:** Tuesday, March 21, 2017 1:59 PM

Confidential                                                                                                        AOL-DEF-00242587

**To:** CASTORENA, EDUARDO C ████████████████████
**Cc:** WILSON, LAURA ████████████████████ HOOD, ROBERT W ████████████ ████████; TAITAGUE, CLAUDIA
████████

**Subject:** RE: URGENT : Reference 170131-003357

Ed,

I have been out of the office most of the day, but I know my supervisors have been providing information.  Let me know if there's anything else that is need and I will coordinate for you to receive the information.

**From:** CASTORENA, EDUARDO C
**Sent:** Tuesday, March 21, 2017 9:31 AM
**To:** CASTILLO, MOISES ████████████████████
**Cc:** WILSON, LAURA ████████████████████
**Subject:** FW: URGENT : Reference 170131-003357
**Importance:** High

Good morning Mr. Castillo,

I called and left you a voice message but wanted to follow up with this email. As you know, we are working with Chief Counsel in responding to a complaint from Attorney Nicole Ramos. **Attorney-Client Privileged**
**Attorney-Client Privileged** ████████████████████████████████████████
████████████████████████████████████████

Thank you in advance for your assistance.

Ed Castorena

*Eduardo Castorena*
*Supervisory Program Manager / Trade Division*
*San Diego Field Office*
████████████ *office*
████████████ *mobile*

**From:** CASTORENA, EDUARDO C
**Sent:** Friday, March 17, 2017 9:34 AM
**To:** PRECIADO, ROSA E ████████████████████; LOPEZ, TERRI L ████████████████
**Cc:** LEWENDA, PETER ████████████████; CHAVEZ, VERONICA J ████████████████████; WILSON, LAURA
████████████████; HODGERS, SONIA P ████████████
**Subject:** RE: URGENT : Reference 170131-003357
**Importance:** High

Good morning SCBPOs Preciado and Lopez,

We are working with Chief Counsel on formulating a response to Ms. Nicole Ramos. Chief counsel is **Attorney-Client Privileged**
**Attorney-Client Privileged** ████████████████████████████████████████
████████████████████████████████████████

Thank you,

Ed Castorena

*Eduardo Castorena*
*Supervisory Program Manager / Trade Division*
*San Diego Field Office*
████████████ *office*
████████████ *mobile*

**From:** MURRAY, JANET L (OCC)
**Sent:** Friday, March 17, 2017 8:37 AM
**To:** CASTORENA, EDUARDO C ████████████████████
**Cc:** WILSON, LAURA ████████████████; HODGERS, SONIA P ████████████████
**Subject:** RE: Assistance Requested with Complaint Response

**Attorney-Client Privileged** ████████████████████████████████████████

Janet L. Murray
Staff Attorney
Office of Assistant Chief Counsel

Confidential                                                                    AOL-DEF-00242588

U.S. Customs and Border Protection
610 West Ash Street, Suite 1200
San Diego, CA 92101

██████████████

**Notice:  Attorney Work Product/Privileged Communication-Circulation Restricted.**  This document may contain attorney work product and privileged attorney/client communications.  It is therefore not available for release, disclosure, or use outside of CBP without the express prior approval of the Commissioner of CBP and the Chief Counsel.

**From:** CASTORENA, EDUARDO C
**Sent:** Thursday, March 16, 2017 4:00 PM
**To:** MURRAY, JANET L (OCC) ██████████████
**Cc:** WILSON, LAURA <██████████████HODGERS, SONIA P ██████████████
**Subject:** Assistance Requested with Complaint Response

Good afternoon Ms. Murray;

Attorney-Client Privileged
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████

Ed Castorena

*Eduardo Castorena*
*Supervisory Program Manager / Trade Division*
*San Diego Field Office*
████████████*ffice*
████████████*mobile*

Confidential                                         AOL-DEF-00242589

1  MAYER BROWN LLP
     Matthew H. Marmolejo (CA Bar No. 242964)
2    *mmarmolejo@mayerbrown.com*
   350 S. Grand Avenue
3  25th Floor
   Los Angeles, CA 90071-1503
4    Ori Lev (DC Bar No. 452565)
     (*pro hac vice*)
5    *olev@mayerbrown.com*
     Stephen M. Medlock (VA Bar No. 78819)
6    (*pro hac vice*)
     *smedlock@mayerbrown.com*
7  1999 K Street, N.W.
   Washington, D.C. 20006
8  Telephone:  +1.202.263.3000
   Facsimile:   +1.202.263.3300
9
   SOUTHERN POVERTY LAW CENTER
10   Melissa Crow (DC Bar No. 453487)
     (*pro hac vice*)
11   *melissa.crow@splcenter.org*
   1101 17th Street, N.W., Suite 705
12 Washington, D.C. 20036
   Telephone: +1.202.355.4471
13 Facsimile: +1.404.221.5857

14 *Additional counsel listed on next page*
   *Attorneys for Plaintiffs*
15
                **UNITED STATES DISTRICT COURT**
16
              **SOUTHERN DISTRICT OF CALIFORNIA**
17

18 | Al Otro Lado, Inc., *et al.*, | Case No.:  17-cv-02366-BAS-KSC |
   | --- | --- |
19 |                   Plaintiffs, | **EXHIBIT 16 IN SUPPORT OF PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** |
20 |            v. | |
21 | Chad F. Wolf,[1] *et al.*, | |
22 |                   Defendants. | |
23 | | |
24

25

26

27  ───────────────
[1]  Acting Secretary Wolf is automatically substituted for former Acting Secretary
28 McAleenan pursuant to Fed. R. Civ. P. 25(d).

EXHIBIT 16 IN SUPP. OF REPLY IN SUPP. OF
PLTFS' MOT. FOR S.J.

CENTER FOR CONSTITUTIONAL RIGHTS
    Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
    *bazmy@ccrjustice.org*
    Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
    *gschwarz@ccrjustice.org*
    Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
    *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
    Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
    *sarah.rich@splcenter.org*
    Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
    *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
    Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
    *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

EXHIBIT 16 IN SUPP. OF REPLY IN SUPP. OF
PLTFS' MOT. FOR S.J.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

Washington, DC 20528 / www.oig.dhs.gov

March 8, 2019

MEMORANDUM FOR:   File OSC Inquiry Metering Tecate POE

THROUGH:        ▮▮▮▮▮▮▮▮▮▮▮▮
                Director
                Special Reviews Group

FROM:           ▮▮▮▮▮▮▮▮▮▮
                Investigative Counsel

                ▮▮▮▮▮▮
                Senior Program Analyst

SUBJECT:        *Memorandum of Interview with* ▮▮▮▮▮▮
                *(Follow-up), Assistant Port Director, Port of Otay
                Mesa, CA*

On February 15, 2019, ▮▮▮▮▮▮▮ Investigative Counsel, Special
Reviews Group (SRG), Office of Inspector General (OIG), and ▮▮▮▮▮▮
Senior Program Analyst, SRG, OIG conducted a teleconference with ▮▮
▮▮ Assistant Port Director (APD), Port of Otay Mesa, Office of Field
Operations (OFO), U.S. Customs and Border Protection (CBP) regarding
allegations made to the U.S. Office of Special Counsel (OSC) that
employees at the Port of Tecate, California, engage in conduct that may
constitute a violation of law, rule, or regulation. OSC referred this matter
to the OIG for investigation. We followed up with ▮▮▮ to discuss relevant
email exchanges that the OIG had obtained involving him. This
memorandum is not a verbatim transcript of the interview and includes
the thoughts and impressions of OIG personnel.

[Note: At the start of the meeting, the OIG emailed ▮▮▮ a password
protected PDF document containing a set of three email exchanges for
discussion during the interview. For reference, these emails are included
as an attachment to this memorandum.]

▮▮▮ provided the following information in substance:

                              1                    OSC Referral

Highly Confidential/Attorneys' Eyes Only                    AOL-DEF-00210387



**OFFICE OF INSPECTOR GENERAL**

Department of Homeland Security

Email 1

The OIG provided ___ time to read the first email exchange [page 1-2 of attached email packet]. When asked to explain ___ role, ___ said that ___ was a GS-14 manager at the San Diego Field Office. The San Diego Field Office oversees the six ports of entry (POEs) in the region. The Director of the San Diego Field Officer has several Assistant Directors. ___ was working for the Assistant Director for Border Security at the San Diego Field Office.

When asked whether he recalled this email exchange ___ said, "yes." The OIG asked why Supervisory CBP Officer (SCBPO) ___ had asked ___ to call ___ explained that ___ had not called him directly, and SCBPO ___ had taken a message for him.

The OIG asked why the San Diego Field Office was asking about Tecate's process for handling asylum claims, and seeking to confirm that Tecate was not returning anyone to Mexico ___ said that there was a time when media was asking the San Diego Field Office Director, ___ questions in this regard. ___ had provided guidance to the Port Directors during a conference call that he wanted them to communicate to their personnel not to turn back any credible fear asylum claims.

The OIG asked about the first bullet in the email, which states that the Port of Tecate does not return anyone expressing fear of returning back to Mexico. The OIG asked whether ___ recalled that being the message given to personnel at the Port of Tecate. ___ said, "yes," this was the message given to personnel at the port.

The OIG asked about the second bullet, which discusses an instance when an alien was returned to Mexico because he had a waitlist number from Tijuana. ___ said that he could not recall the details about this incident, such as where this individual was from.

The OIG mentioned seeing a shift log from February 2017, which indicated that a man with a Russian passport entered pedestrian primary requesting asylum and was told to go to San Ysidro. ___ did not know if this could have been the same instance described in the second bullet of the email.

The OIG referred ___ to the top of the email where it says, "currently we are not returning anyone back," and asked whether at some other time there had been a different policy. ___ said, "no." However, there had been

2

Highly Confidential/Attorneys' Eyes Only

AOL-DEF-00210388



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

instances several years before of individuals from the Mexican state of Michoacán who were returned to Mexico. ▉▉▉▉said this was explained in the third bullet of the email and he noted he had raised this issue during the OIG's previous interview of him.

Email 2

The OIG provided ▉▉▉ time to read the second email [page 4 of attached email packet]. The OIG referred ▉▉▉ to the last sentence, which said that, "Port Director ▉▉▉will be sending out an email to the troops addressing this issue," and asked ▉▉▉ if he recalled sending out an email related to this matter. ▉▉▉said that he recalled this incident, but he was unable to find the email he had sent. [Note: During our February 8, 2019 interview, the OIG had asked ▉▉▉to look for any guidance he had sent out in response to incidents when an asylum seeker was redirected.]

Seeing that there were multiple emails over a period of time on this matter, the OIG asked whether there was concern that supervisors might not have been following instruction for handling asylum seekers. ▉▉▉confirmed that the recipients of this email were the supervisors at the Port of Tecate. ▉▉▉ said that he did not remember the particulars of this incident. ▉▉▉ said that it appears that in this instance a line Officer took action without properly clearing it with a supervisor. ▉▉▉said this was a reminder that Officers must consult their supervisor prior to taking any such action.

The OIG asked whether ▉▉▉ or Assistant Port Director ▉▉▉▉▉ had a concern about whether supervisors were properly communicating the directive not to return asylum seekers to Mexico. ▉▉▉said that their concern was that Officers might be acting on their own without consulting their supervisors.

Email 3

The OIG provided ▉▉▉ time to read the third email exchange [page 7-9 of attached email packet].

The OIG asked ▉▉▉ whether he remembered this email exchange. ▉▉▉ said that he did. The OIG referred ▉▉▉ to the bottom of page 6 and top of page 7, where ▉▉▉wrote about his concern that accepting asylum seekers at the Port of Tecate and transferring them to the Port of San Ysidro could become a way for asylum seekers to avoid long waits at the Port of San Ysidro. ▉▉▉said that the Port of Tecate is small. There are approximately

3

Highly Confidential/Attorneys' Eyes Only

AOL-DEF-00210389



**OFFICE OF INSPECTOR GENERAL**

Department of Homeland Security

15 Officers staffing the port at any one time. There are two pedestrian lanes, and two vehicle passenger lanes. The port does not have asylum expertise, so they have to transfer individuals seeking asylum to the Port of San Ysidro. If asylum seekers started coming in through the Port of Tecate to avoid long waits at the Port of San Ysidro, it would be a problem because of the lack of resources, knowledge, and the time it takes to transport individuals to the Port of San Ysidro. Transporting individuals from the Port of Tecate to the Port of San Ysidro requires a several hour drive along winding roads. In this email, ▇▇ said he was stating his concern and conveying that they might have to offer voluntary withdrawal as an alternative if the port started getting more asylum cases. ▇▇ said that withdrawal of an individual's request for asylum at Tecate would have to be voluntary. The OIG asked whether the port had ever had to offer withdrawals. ▇▇ said, "no," it did not become necessary. ▇▇ believed that part of the reason was that on the Mexican side of the border, the city of Tecate was directing individuals toward larger ports. ▇▇ said that in Mexico the city of Tecate's population is about 80-100,000 people, and the outskirts nearly join with Tijuana.

The OIG referred ▇▇ to the top of this email exchange on page 6, and asked what was meant by, "sending anyone claiming credible fear down the hill." ▇▇ said that this referred to accepting asylum seekers at the Port of Tecate and transferring them to the Port of San Ysidro. The OIG asked whether in this case the Port of Tecate accepted the Eritreans and drove them to the Port of San Ysidro. ▇▇ said that was correct. The OIG asked whether there were other instances when individuals seeking asylum were sent "down the hill?" ▇▇ said, "no," he did not remember seeing any other instances after this one while at the Port of Tecate. [Note: ▇▇ left the Port of Tecate in February 2018.] He could not remember if he and APD ▇▇▇▇ had a conversation after ▇▇ posed the question in his email.

The OIG asked whether anything else like this came up between December and February, when ▇▇ transferred to the Port of Otay Mesa. ▇▇ again said no and that he and his APDs were frequently communicating that the port had to accept all individuals seeking asylum. When asked whether he had ever heard that this guidance was not being followed, ▇▇ said not at that time.

▇▇ said that Officers were concerned that the Port of Tecate did not have the staffing to handle an influx of asylum seekers, and the port could be quickly overwhelmed. The OIG asked whether Officers and supervisors

4

Highly Confidential/Attorneys' Eyes Only

AOL-DEF-00210390



**OFFICE OF INSPECTOR GENERAL**

Department of Homeland Security

might have sought to address their concerns by redirecting asylum seekers. ████ said, "no," he had not heard that this happened. The OIG asked whether it was possible for Officers and supervisors to do this without ████ knowing. ████ said, "yes," it was possible and that was why they were doing so much messaging. Officers should not be able to return anyone seeking asylum to Mexico without their supervisor's approval. During the night shift, fist line supervisors would be the Watch Commander. The Port Director and APD are not on duty.

Attachment

[PDF containing the three email exchanges discussed during this interview.]

5

Highly Confidential/Attorneys' Eyes Only

AOL-DEF-00210391

| | |
|---|---|
| **From:** | |
| **To:** | |
| **Subject:** | FW: CF Applicants |
| **Date:** | Wednesday, May 17, 2017 6:44:55 PM |
| **Attachments:** | FW Credible Fear - Processing Expedited Removal Cases.msg |

FYI

The Field Office (                    reached out yesterday to confirm that currently we are not returning anyone back.

HQ sent an inquiry and they wanted to confirm again :). Below is the note I sent          with the attachment.

**Port Director**
**OFO Chaplain**
**Customs & Border Protection**
**Tecate Port of Entry**
**Tecate, California**
                    Office
                    Fax


**From:**
**Sent:** Tuesday, May 16, 2017 4:21 PM
**To:**
**Subject:** CF Applicants

Hello

SCBPO          asked me to give you a call regarding our processing of Credible Fear applicants, I left you a voice mail and thought I would follow up with attached instructions that our Supervisors have been given.
Although I must say that we get very few CF applicants here due to the fact that the local government officials in Tecate, Mexico discourages non-locals coming to their city.

- Our guidance to our supervisors is that we do not return anybody that expresses fear in returning back to Mexico, we will process them and transport them to San Ysidro.
- Having said that, I did get briefed, (can't recall the date but it has been some time ago) that we had an occurrence where a traveler was advised to return to Tijuana as he had already been given a placement number there, (only one occurrence that I know of).
- About 3 years ago, we had an influx of people from Michoacan all carrying the same letter from a city representative indicating that there was a high crime rate in that city. At that time we referred them to the U.S. Consulate so that they could apply for a visa as they were not claiming Political Asylum or Credible Fear.

Hope this helps, I am leaving the office now but can be reached via cell phone if you should

Highly Confidential/Attorneys' Eyes Only                                                                          AOL-DEF-00210392

need additional information, ███████████

Thank you,

███████████

**Port Director**
**OFO Chaplain**
**Customs & Border Protection**
**Tecate Port of Entry**
**Tecate, California**
███████ **Office**
██████ **Fax**

Highly Confidential/Attorneys' Eyes Only

AOL-DEF-00210393

# BLANK PAGE

Highly Confidential/Attorneys' Eyes Only

AOL-DEF-00210394

| From: | |
|-------|---|
| To: | |
| Subject: | Asylum/Credible Fear |
| Date: | Saturday, August 26, 2017 1:55:55 AM |

To all,

Today one of our officers decided to take it upon himself to send a Guatemalan family seeking credible fear to the San Ysidro port of entry to be processed. The family did what it was told and reported to San Ysidro. During the interview process they told the SYS officers they were sent there by an officer from the Tecate Port of Entry. As you can imagine that did not go over well with their management. I would like to remind you all that we do not send any credible fear or asylum cases to another port for processing. I find it concerning that an officer feels he can make this kind of decision without consulting a supervisor. We need to remind officers to consult supervisors prior to making decisions that can have a negative impact on the port. I suggest you establish a good line of communication with your team and tell them what you expect them to notify you of. Port Director ▮▮▮ will be sending out an email to the troops addressing this issue.

Thank you,

**Asst. Port Director**
**Tecate Port of Entry**
**Office of Field Operations**

Highly Confidential/Attorneys' Eyes Only

AOL-DEF-00210395

BLANK PAGE

Highly Confidential/Attorneys' Eyes Only

AOL-DEF-00210396

**From:** ██████████
**To:** 
**Subject:** RE: Supreme Court Allows Full Implementation of Presidential Proclamation
**Date:** Friday, December 22, 2017 2:50:26 PM

Sir,

> # DP

██████

**From:** ██████████████
**Sent:** Friday, December 22, 2017 11:43 AM
**To:** ██████████████████████████
**Subject:** RE: Supreme Court Allows Full Implementation of Presidential Proclamation

Looks like they are not subject to the executive order then.

Will SYS still take them since they are not Somalis?

It will not be a big issue then if in the future we allow them to withdrawal their application and have them go to San Ysidro on their own.

Eritrea is not a country in the Executive Order.

Thank you,

██████████

**From:** ██████████████
**Sent:** Friday, December 22, 2017 11:15:35 AM
**To:** ████████
**Subject:** RE: Supreme Court Allows Full Implementation of Presidential Proclamation

FYI- The subjects are form ERITREA

**From** ██████████████
**Sent:** Friday, December 22, 2017 11:15 AM
**To:** ████████████████████████████
████████████████
**Cc:** ████████████████████████████████
████████████████████████████████████

**Subject:** RE: Supreme Court Allows Full Implementation of Presidential Proclamation

████,

We have been advised by WC ██████ that San Ysidro is able to accommodate these ten

Highly Confidential/Attorneys' Eyes Only                    AOL-DEF-00210397

Somali's. Due to lack of resources at Tecate we will in turn be turning them over to AEU after personal searches and logging them in.

Our hope is that this occurrence is isolated and they don't start using us as a stepping stone to get to San Ysidro and not having to wait in the longer line at that location. **DP**

**DP**

I have asked APD ▮▮▮▮▮ to ensure Field Office Bullets are prepared for our role.

Thank you,

▮▮▮▮▮▮

**Port Director**
**OFO Chaplain**
**Customs & Border Protection**
**Tecate Port of Entry**
**Tecate, California**

▮▮▮▮▮▮



**From:** ▮▮▮▮▮▮
**Sent:** Friday, December 22, 2017 10:41 AM
**To** ▮▮▮▮▮▮
< ▮▮▮▮▮▮
**Cc:** ▮▮▮▮▮▮

**Subject:** RE: Supreme Court Allows Full Implementation of Presidential Proclamation

Thanks ▮▮▮

▮▮▮▮▮▮
Deputy Director Field Operations
San Diego Field Office

▮▮▮▮▮▮

**From:** ▮▮▮▮▮▮
**Sent:** Friday, December 22, 2017 10:38 AM
**To:** ▮▮▮▮▮▮
< ▮▮▮▮▮▮ >
**Cc:** ▮▮▮▮▮▮

Highly Confidential/Attorneys' Eyes Only

AOL-DEF-00210398

**Subject:** FW: Supreme Court Allows Full Implementation of Presidential Proclamation

████████████

We have ten Somali nationals that are applying for entry (Political Asylum) at the Port of Tecate. This is the first time we get them at our door step.  We are coordinating with San Ysidro the processing of them as we will have to transport them there.

Bullets and more info will follow once we coordinate with AEU at San Ysidro.

Thank you,

████████████

**Port Director**
**OFO Chaplain**
**Customs & Border Protection**
**Tecate Port of Entry**
**Tecate, California**
████████████ **Office**
████████████ **Fax**

**From:** ████████████
**Sent:** Thursday, December 07, 2017 5:19 PM
**To:** ████████████

**Cc** ████████████

**Subject:** FW: Supreme Court Allows Full Implementation of Presidential Proclamation

Port Directors,

The Supreme Court has issued Orders which permits the Presidential Proclamation of Enhanced Vetting to go into full effect for certain nationals of **Chad, Iran, Libya, North Korea, Somalia, Syria, Venezuela and Yemen** on **December 8, 2017**.  This guidance supersedes all previously issued guidance on this Proclamation.  This should have a limited operational impact at ports of entry as The Department of State will, in most cases, issue a wavier as appropriate.

This updated guidance is contained in the attached muster, which should be disseminated immediately.  If you encounter a waiver request related to the travel restrictions Proclamation, please contact DFO ████ ADFO ████ or myself.

Thank you,

Highly Confidential/Attorneys' Eyes Only

AOL-DEF-00210399

Deputy Director Field Operations
San Diego Field Office
Phone:
Cell:

Highly Confidential/Attorneys' Eyes Only

AOL-DEF-00210400

1   MAYER BROWN LLP
      Matthew H. Marmolejo (CA Bar No. 242964)
2     *mmarmolejo@mayerbrown.com*
    350 S. Grand Avenue
3   25th Floor
    Los Angeles, CA 90071-1503
4     Ori Lev (DC Bar No. 452565)
      (*pro hac vice*)
5     *olev@mayerbrown.com*
      Stephen M. Medlock (VA Bar No. 78819)
6     (*pro hac vice*)
      *smedlock@mayerbrown.com*
7   1999 K Street, N.W.
    Washington, D.C. 20006
8   Telephone:  +1.202.263.3000
    Facsimile:   +1.202.263.3300
9
    SOUTHERN POVERTY LAW CENTER
10    Melissa Crow (DC Bar No. 453487)
      (*pro hac vice*)
11    *melissa.crow@splcenter.org*
    1101 17th Street, N.W., Suite 705
12  Washington, D.C. 20036
    Telephone: +1.202.355.4471
13  Facsimile: +1.404.221.5857

14  *Additional counsel listed on next page*
    *Attorneys for Plaintiffs*
15
                  **UNITED STATES DISTRICT COURT**
16
                **SOUTHERN DISTRICT OF CALIFORNIA**
17

| | |
|---|---|
| 18  Al Otro Lado, Inc., *et al.*, | Case No.:  17-cv-02366-BAS-KSC |
| 19                  Plaintiffs, | **EXHIBIT 17 IN SUPPORT OF** |
| 20        v. | **PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** |
| 21  Chad F. Wolf,[1] *et al.*, | |
| 22                  Defendants. | |

27  ─────────────
28  [1]  Acting Secretary Wolf is automatically substituted for former Acting Secretary
    McAleenan pursuant to Fed. R. Civ. P. 25(d).

                        EXHIBIT 17 IN SUPP. OF REPLY IN SUPP. OF
                                    PLTFS' MOT. FOR S.J.

CENTER FOR CONSTITUTIONAL RIGHTS
  Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
  *bazmy@ccrjustice.org*
  Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
  *gschwarz@ccrjustice.org*
  Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
  *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
  Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
  *sarah.rich@splcenter.org*
  Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
  *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
  Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
  *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

EXHIBIT 17 IN SUPP. OF REPLY IN SUPP. OF
PLTFS' MOT. FOR S.J.

 **U.S. CUSTOMS AND BORDER PROTECTION**
**Department of Homeland Security**
**San Diego Field Office**
**San Ysidro/Otay Mesa Passenger**
**Other Officer Report / Narrative Continuation** 

| | | |
|---|---|---|
| Narrative continuation ☐ | Report of Other Officer Involved in Incident ☒ | |
| REPORTING OFFICER (Name/Title/Agency): | / I / CBP(I) | |
| Subjects Name: | | DOB: |
| Port-of-Entry:   San Ysidro   Seizure No.:  200 -250 - | | Date:   04/01/2017 |
| TOPIC:  Political Asylum | | |
| IOIL No. (If Any):   2004-250 - | | |

(Write in first person: Record observations, statements and behavior, contraband concealment, and other pertinent facts)

On Sunday 04/01/2017 I was assigned to PED West facility as the swing shift Supervisor. At approximately 1500 hours a call over the radio from the Officer assigned to the limit line requesting a Supervisor to the limit line. When I arrived to the limit line the Officer informed me that a women was requesting Political Asylum for a lady and her child. I went to the gate and a women approached me stating that she was a lawyer representing her client and they were requesting Political Asylum. I asked her "are they minors or Mexicans citizens and she said, no they are from Honduras. I informed her that all Political Ashlee's unless they are unaccompanied minors or Mexican citizens who are allowed to make entry however everyone else is required to register with Mexican (INAMI.) I told her that CBP contacts INAMI daily requesting INAMI to bring Ashlee's who registered with them to the Port of Entry for processing. At that point another women that was accompanying the lawyer became angry and started yelling at me saying that we could not refuse them entry. Later a GSA Security Officer informed me that the lady who was yelling at me was MS. Ramos a lawyer from Mexico. I informed her that this is the process we tell everyone requesting Political Asylum because these are the orders that I have been told to follow.



REPORTING OFFICER/BADGE NO:                    SUPERVISOR/BADGE NO:

AREA CODE (619) SAN YSIDRO: 690-8800; OTAY MESA: 671-8900

Confidential                    AOL-DEF-00014832

1  MAYER BROWN LLP
    Matthew H. Marmolejo (CA Bar No. 242964)
2    *mmarmolejo@mayerbrown.com*
   350 S. Grand Avenue
3  25th Floor
   Los Angeles, CA 90071-1503
4    Ori Lev (DC Bar No. 452565)
     (*pro hac vice*)
5    *olev@mayerbrown.com*
     Stephen M. Medlock (VA Bar No. 78819)
6    (*pro hac vice*)
     *smedlock@mayerbrown.com*
7  1999 K Street, N.W.
   Washington, D.C. 20006
8  Telephone:  +1.202.263.3000
   Facsimile:   +1.202.263.3300
9
   SOUTHERN POVERTY LAW CENTER
10   Melissa Crow (DC Bar No. 453487)
     (*pro hac vice*)
11   *melissa.crow@splcenter.org*
   1101 17th Street, N.W., Suite 705
12 Washington, D.C. 20036
   Telephone: +1.202.355.4471
13 Facsimile: +1.404.221.5857

14 *Additional counsel listed on next page*
   *Attorneys for Plaintiffs*
15
                 **UNITED STATES DISTRICT COURT**
16
                **SOUTHERN DISTRICT OF CALIFORNIA**
17

18 | Al Otro Lado, Inc., *et al.*, | Case No.:  17-cv-02366-BAS-KSC |
|---|---|
19 |                 Plaintiffs, | **EXHIBIT 19 IN SUPPORT OF PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** |
20 |        v. | |
21 | Chad F. Wolf,[1] *et al.*, | |
22 |                 Defendants. | |
23 | | |
24

25

26

27 ─────────────────────
   [1] Acting Secretary Wolf is automatically substituted for former Acting Secretary
28 McAleenan pursuant to Fed. R. Civ. P. 25(d).

                          EXHIBIT 19 IN SUPP. OF REPLY IN SUPP. OF
                                      PLTFS' MOT. FOR S.J.

CENTER FOR CONSTITUTIONAL RIGHTS
  Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
  *bazmy@ccrjustice.org*
  Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
  *gschwarz@ccrjustice.org*
  Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
  *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
  Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
  *sarah.rich@splcenter.org*
  Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
  *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
  Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
  *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

EXHIBIT 19 IN SUPP. OF REPLY IN SUPP. OF
PLTFS' MOT. FOR S.J.

**From:** FLORES, PETE ROMERO
**Sent:** Thursday, May 18, 2017 10:07 AM
**To:** HOOD, ROBERT W
**CC:** ARMIJO, JOHNNY L
**Subject:** FW: Awareness: San Diego: Somali Fence Jumpers

Bob – are you aware of this reporting?

Pete Flores
Director, Field Operations
San Diego, CA
U.S. Customs and Border Protection
Work Phone: [redacted]
Fax: [redacted]

**From:** AKI, SIDNEY K
**Sent:** Thursday, May 18, 2017 4:39 AM
**To:** FLORES, PETE ROMERO [redacted]                              ; ARMIJO, JOHNNY L [redacted]
**Subject:** FW: Awareness: San Diego: Somali Fence Jumpers

Pete/Johnny,

FYI. Thx.

**From:** CAMPBELL, CARL S
**Sent:** Thursday, May 18, 2017 6:31:12 AM
**To:** Owen, Todd C (AC OFO); WAGNER, JOHN P
**Cc:** AKI, SIDNEY K
**Subject:** Awareness: San Diego: Somali Fence Jumpers

EAC/DEAC,

Just for your awareness: San Diego Field Office is reporting that a group of Somali nationals was recently apprehended by BP locally. It appears that the group initially claimed that they crossed between the ports of entry due to having been "turned back" at the POE. BP Agents didn't pursue further questioning at the time. Later, in further interviews by JTFW, the aliens clarified that they were given a number and time to report to the POE, but didn't want to wait.

Bringing this to your attention because this may come up with C1 via reporting from the Migration CAT and/or BP. There is a concern that a group called Human Rights First (HRF) may be involved and this may be used to bolster their allegations that CBP/OFO is violating human rights by denying persons the right to seek asylum.

San Diego states they are not turning anyone away and locally INAMI has not been giving out numbers for a while.


Thank you,

C. Shane Campbell
Deputy Executive Director (Acting)
Office of Field Operations - Operations
US Customs and Border Protection

[redacted]          (c)

Highly Confidential/Attorneys' Eyes Only                                    AOL-DEF-00036065

1   MAYER BROWN LLP
       Matthew H. Marmolejo (CA Bar No. 242964)
2      *mmarmolejo@mayerbrown.com*
    350 S. Grand Avenue
3   25th Floor
    Los Angeles, CA 90071-1503
4      Ori Lev (DC Bar No. 452565)
       (*pro hac vice*)
5      *olev@mayerbrown.com*
       Stephen M. Medlock (VA Bar No. 78819)
6      (*pro hac vice*)
       *smedlock@mayerbrown.com*
7   1999 K Street, N.W.
    Washington, D.C. 20006
8   Telephone:  +1.202.263.3000
    Facsimile:   +1.202.263.3300
9
    SOUTHERN POVERTY LAW CENTER
10     Melissa Crow (DC Bar No. 453487)
       (*pro hac vice*)
11     *melissa.crow@splcenter.org*
    1101 17th Street, N.W., Suite 705
12  Washington, D.C. 20036
    Telephone: +1.202.355.4471
13  Facsimile: +1.404.221.5857

14  *Additional counsel listed on next page*
    *Attorneys for Plaintiffs*
15
              **UNITED STATES DISTRICT COURT**
16
            **SOUTHERN DISTRICT OF CALIFORNIA**
17

18  Al Otro Lado, Inc., *et al.*,          Case No.:  17-cv-02366-BAS-KSC

19                   Plaintiffs,           **EXHIBIT 20 IN SUPPORT OF
                                           PLAINTIFFS' REPLY IN SUPPORT
20         v.                              OF THEIR MOTION FOR
                                           SUMMARY JUDGMENT**
21  Chad F. Wolf,[1] *et al.*,

22                   Defendants.

23

24

25

26

27  _____
    [1]  Acting Secretary Wolf is automatically substituted for former Acting Secretary
28  McAleenan pursuant to Fed. R. Civ. P. 25(d).

                              EXHIBIT 20 IN SUPP. OF REPLY IN SUPP. OF
                                        PLTFS' MOT. FOR S.J.

CENTER FOR CONSTITUTIONAL RIGHTS
  Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
  *bazmy@ccrjustice.org*
  Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
  *gschwarz@ccrjustice.org*
  Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
  *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
  Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
  *sarah.rich@splcenter.org*
  Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
  *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
  Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
  *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

EXHIBIT 20 IN SUPP. OF REPLY IN SUPP. OF
PLTFS' MOT. FOR S.J.

**From:** CAMPBELL, LORNE A on behalf of OFO-FIELD LIAISON
**Sent:** Sunday, May 13, 2018 12:50 PM
**To:** HOWE, RANDY J; CAMPBELL, CARL S; DRAGANAC, JOSEPH; FRASER, CATHERINE J
**CC:** OFO-FIELD LIAISON; SITROOM; QUINTERO, LILIANA; SHORR, JOSHUA; JOHNSON, DANIEL I; ROSS, MATTHEW; OFO-Incident-Management
**Subject:** FW: SITUATIONAL AWARENESS: Nogales POE Detention at capacity

FYSA:

On May 12, 2017, at 0600 hours, the Nogales POE reached ▮ detainees in custody and began metering. As of 0730 on May 13, 2018 there are a total of ▮ detainees in custody with ▮ of those pending processing. Additionally, there are approximately 56 persons on the Mexican side waiting for entry into the U.S. Those persons are in a separate line for individuals without documents to enter the U.S. These individuals have been waiting in line between 8 and 24 hours and have been told that the Nogales POE is at full capacity. Those persons will be brought in when the current detainee population decreases. Updates to follow.

Respectfully,

Lorne Campbell
CBP Officer/ Program Mgr
OFO - Field Liaison Division
US Customs & Border Protection
Unclass▮
HSDN▮
JWICS▮
Desk:▮
Office:▮
Mobile▮

**From:** ENRIQUEZ, NATHAN J **On Behalf Of** TUCSON OPERATIONS CENTER
**Sent:** Sunday, May 13, 2018 12:04 PM
**To:** OFO-FIELD LIAISON ▮       >; TFO DFO ADFOS <▮       >
**Cc:** TUCSON OPERATIONS CENTER ▮
**Subject:** SITUATIONAL AWARENESS: Nogales POE Detention at capacity

**Situational Awareness**: On May 12, 2017 at 0600 hours, The Nogales POE reached ▮ detainees in custody and began metering. As of 0730 on May 13, 2018 there are a total of ▮ detainees in custody with ▮ of those pending processing. Additionally, there are approximately 56 persons on the Mexican side waiting for entry into the U.S. Those persons are in a separate line for individuals without documents to enter the U.S. These individuals have been waiting in line between 8 and 24 hours and have been told that the Nogales POE is at full capacity. Those persons will be brought in when the current detainee population decreases. Updates to follow.

Thank you.

*William Badillo*
Chief - Passenger Operations
Nogales Port of Entry
9 N. Grand Ave
Nogales, AZ 85621
W:▮
C:▮

"Honor Earned, Never Given"

Confidential     AOL-DEF-00040005



1  MAYER BROWN LLP
      Matthew H. Marmolejo (CA Bar No. 242964)
2      *mmarmolejo@mayerbrown.com*
   350 S. Grand Avenue
3  25th Floor
   Los Angeles, CA 90071-1503
4      Ori Lev (DC Bar No. 452565)
      (*pro hac vice*)
5      *olev@mayerbrown.com*
      Stephen M. Medlock (VA Bar No. 78819)
6      (*pro hac vice*)
      *smedlock@mayerbrown.com*
7  1999 K Street, N.W.
   Washington, D.C. 20006
8  Telephone:  +1.202.263.3000
   Facsimile:   +1.202.263.3300
9
   SOUTHERN POVERTY LAW CENTER
10     Melissa Crow (DC Bar No. 453487)
      (*pro hac vice*)
11     *melissa.crow@splcenter.org*
   1101 17th Street, N.W., Suite 705
12  Washington, D.C. 20036
   Telephone: +1.202.355.4471
13  Facsimile: +1.404.221.5857

14  *Additional counsel listed on next page*
   *Attorneys for Plaintiffs*
15
            **UNITED STATES DISTRICT COURT**
16
           **SOUTHERN DISTRICT OF CALIFORNIA**
17

18  Al Otro Lado, Inc., *et al.*,          Case No.:  17-cv-02366-BAS-KSC

19                Plaintiffs,       **EXHIBIT 21 IN SUPPORT OF
                                    PLAINTIFFS' REPLY IN SUPPORT
20        v.                        OF THEIR MOTION FOR
                                    SUMMARY JUDGMENT**
21  Chad F. Wolf,[1] *et al.*,

22               Defendants.

23

24

25

26

27  _____
   [1] Acting Secretary Wolf is automatically substituted for former Acting Secretary
28  McAleenan pursuant to Fed. R. Civ. P. 25(d).

                              EXHIBIT 21 IN SUPP. OF REPLY IN SUPP. OF
                                         PLTFS' MOT. FOR S.J.

CENTER FOR CONSTITUTIONAL RIGHTS
    Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
    *bazmy@ccrjustice.org*
    Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
    *gschwarz@ccrjustice.org*
    Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
    *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
    Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
    *sarah.rich@splcenter.org*
    Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
    *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
    Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
    *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

EXHIBIT 21 IN SUPP. OF REPLY IN SUPP. OF
PLTFS' MOT. FOR S.J.

**From:** SCHNEIDAU, TOM R
**Sent:** Thursday, May 18, 2017 1:05 PM
**To:** SCUDDER, RYAN J; FITCH, DONALD J; YOUNG, CHRISTOPHER A; PARKS, DANIEL J; JOHNSON, BENEDICT;
KIRKPATRICK, MARK
**CC:** FLORES, PETE ROMERO
**Subject:** RE: Somali Nationals

Sirs, Ma'am,

Did the IMB or CHU interview of the recently encountered Somalis give any indication of how GoM was handling the Somalis' approach to the
POE.

Specifically, did the agents' interviews provide any insight into whether GoM was issuing the Somalis a number, or providing them with a time
window to 'meter' their approach to the POE?

Thanks,

Rodger

T. Rodger Schneidau
Chief of Staff
Joint Task Force West California Corridor

[redacted]

**From:** FLORES, PETE ROMERO
**Sent:** Thursday, May 18, 2017 9:58 AM
**To:** SCHNEIDAU, TOM R <[redacted]
**Subject:** RE: Somali Nationals

Did they have any documentation that indicated they were provided a number by the GoM?

We have had several conversations with GoM about stopping the issuance of numbers and they have stated the practiced has ceased.

Pete Flores
Director, Field Operations
San Diego, CA
U.S. Customs and Border Protection
Work Phone: [redacted]
Fax: [redacted]

**From:** SCHNEIDAU, TOM R
**Sent:** Thursday, May 18, 2017 9:53 AM
**To:** FLORES, PETE ROMERO <[redacted]
**Subject:** RE: Somali Nationals

Yes Sir,

I received the query from BP and provided them with an answer.  The query also came in from OI, Lorna and I gave the same response.

[redacted]

Short of the Long.....The detainees are given a time by GoM to report to the POE to be processed.  If they don't feel like waiting, they jump the
fence.

Rodger

**From:** FLORES, PETE ROMERO
**Sent:** Thursday, May 18, 2017 7:14 AM
**To:** SCHNEIDAU, TOM R <[redacted]
**Subject:** Somali Nationals

Rodger,

Confidential

AOL-DEF-00090819

Did we have JTF-W staff interview some Somalis that were apprehended by BP recently?

If so, I'm looking for some clarity on their claims they were either turned away from the port or issued a number and did not want to wait.

Thanks,

Pete Flores  ■
Director, Field Operations
San Diego, CA
U.S. Customs and Border Protection
Work Phone ▮▮▮▮▮▮▮
Fax ▮▮▮▮▮▮▮

Confidential

AOL-DEF-00090820

1   MAYER BROWN LLP
      Matthew H. Marmolejo (CA Bar No. 242964)
2     *mmarmolejo@mayerbrown.com*
    350 S. Grand Avenue
3   25th Floor
    Los Angeles, CA 90071-1503
4     Ori Lev (DC Bar No. 452565)
      (*pro hac vice*)
5     *olev@mayerbrown.com*
      Stephen M. Medlock (VA Bar No. 78819)
6     (*pro hac vice*)
      *smedlock@mayerbrown.com*
7   1999 K Street, N.W.
    Washington, D.C. 20006
8   Telephone:  +1.202.263.3000
    Facsimile:   +1.202.263.3300
9
    SOUTHERN POVERTY LAW CENTER
10    Melissa Crow (DC Bar No. 453487)
      (*pro hac vice*)
11    *melissa.crow@splcenter.org*
    1101 17th Street, N.W., Suite 705
12  Washington, D.C. 20036
    Telephone: +1.202.355.4471
13  Facsimile: +1.404.221.5857

14  *Additional counsel listed on next page*
    *Attorneys for Plaintiffs*
15
                  **UNITED STATES DISTRICT COURT**
16
                 **SOUTHERN DISTRICT OF CALIFORNIA**
17

| | |
|---|---|
| 18  Al Otro Lado, Inc., *et al.*, | Case No.:  17-cv-02366-BAS-KSC |
| 19              Plaintiffs, | **EXHIBIT 23 IN SUPPORT OF PLAINTIFFS' REPLY IN** |
| 20      v. | **SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** |
| 21  Chad F. Wolf,[1] *et al.*, | |
| 22              Defendants. | |
| 23 | |
| 24 | |

25

26

27  _____

28  [1]  Acting Secretary Wolf is automatically substituted for former Acting Secretary
    McAleenan pursuant to Fed. R. Civ. P. 25(d).

                                        EXHIBIT 23 IN SUPP. OF REPLY IN SUPP. OF
                                                    PLTFS' MOT. FOR S.J.

CENTER FOR CONSTITUTIONAL RIGHTS
   Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
   *bazmy@ccrjustice.org*
   Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
   *gschwarz@ccrjustice.org*
   Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
   *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
   Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
   *sarah.rich@splcenter.org*
   Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
   *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
   Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
   *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

EXHIBIT 23 IN SUPP. OF REPLY IN SUPP. OF
PLTFS' MOT. FOR S.J.

**From:** HOWE, RANDY J
**Sent:** Tuesday, December 5, 2017 11:49 AM
**To:** WAGNER, JOHN P; Owen, Todd C (AC OFO)
**CC:** MIRANDA, EDWARD; FLORES, PETE ROMERO; CAMPBELL, CARL S; DRAGANAC, JOSEPH; BORDEAUX, TYESHA; MODESTO, ALYCE M
**Subject:** FW: San Diego at limit

**Importance:** High

EAC:

San Ysidro is at capacity and metering as needed.

I met with the ERO rep at the MCAT this morning and he is taking the actions noted below.

They are striving to correct the shortage in bed space as soon as possible.

Randy J. Howe
Executive Director, Operations
Office of Field Operations
U.S. Customs and Border Protection
█████████ (Office)
█████████ (Cell)

---

**From:** MIRANDA, EDWARD
**Sent:** Tuesday, December 05, 2017 11:41 AM
**To:** HOWE, RANDY J <████████████████
**Subject:** RE: San Diego at limit

Randy,

As a follow up from our conversation with the ICE ERO rep (DFOD Sifuentes, Joe), ERO is taking the following actions:

- ERO states they have all hands on deck and they have daily coordination with ICE Crisis Action Team (CAT), in San Antonio.

- ERO FOD in San Diego is seeking available bed space within the AOR to accommodate the bed space needs.

- Scheduling additional staff to move the processed cases pending ERO movement.

- ERO is seeking additional courses of action to resolve the current issues of subjects pending placement.

- Pending ERO numbers of aliens being moved today and the next couple of days.

**Edward Miranda**
Deputy Commander
U.S. Customs and Border Protection
Migration Crisis Action Team (MCAT)
██████████ – Cell
██████████ – MCAT
██████████████████

---

**From:** MIRANDA, EDWARD
**Sent:** Tuesday, December 5, 2017 10:44 AM
**To:** HOWE, RANDY J █████████████ MODESTO, ALYCE M █████████████
**Cc:** CAMPBELL, CARL S █████████████ DRAGANAC, JOSEPH████████████████████
**Subject:** RE: San Diego at limit

Good morning XD,

Our team is coordinating with ERO HQ and ICE Crisis Action Team (CAT), in San Antonio, TX to find available bed space to accommodate the cases awaiting pickup at the ports of entry.

ERO HQ had a teleconference call last Friday with the FODs to instruct them to immediately start seeking available bed space within their

Highly Confidential/Attorneys' Eyes Only

AOL-DEF-00031410

respective AOR to accommodate the bed space needs, along the Southern border, especially the needs of San Diego.

I'll follow up with ERO this morning to get some movement asap of those subjects in custody at the POE.

**Edward Miranda**
Deputy Commander
U.S. Customs and Border Protection
Migration Crisis Action Team (MCAT)
███████ Cell
███████ MCAT

**From:** HOWE, RANDY J
**Sent:** Tuesday, December 5, 2017 10:13 AM
**To:** MIRANDA, EDWARD ███████      MODESTO, ALYCE M ███████
**Cc:** CAMPBELL, CARL S ███████      ; DRAGANAC, JOSEPH ███████
**Subject:** San Diego at limit
**Importance:** High

Good morning Edward,

I just received a call from DFO Flores in San Diego.

They currently have 348 in custody and the limit is ███.

As they are seeing ███ aliens per day they are metering individuals from the limit line moving forward.

What efforts are being made with ERO to address the need for coordination and additional bed space?

Randy

Randy J. Howe
Executive Director, Operations
Office of Field Operations
U.S. Customs and Border Protection
███████ (Office)
███████ (Cell)

Highly Confidential/Attorneys' Eyes Only                    AOL-DEF-00031411

MAYER BROWN LLP
  Matthew H. Marmolejo (CA Bar No. 242964)
  *mmarmolejo@mayerbrown.com*
350 S. Grand Avenue
25th Floor
Los Angeles, CA 90071-1503
  Ori Lev (DC Bar No. 452565)
  (*pro hac vice*)
  *olev@mayerbrown.com*
  Stephen M. Medlock (VA Bar No. 78819)
  (*pro hac vice*)
  *smedlock@mayerbrown.com*
1999 K Street, N.W.
Washington, D.C. 20006
Telephone:  +1.202.263.3000
Facsimile:   +1.202.263.3300

SOUTHERN POVERTY LAW CENTER
  Melissa Crow (DC Bar No. 453487)
  (*pro hac vice*)
  *melissa.crow@splcenter.org*
1101 17th Street, N.W., Suite 705
Washington, D.C. 20036
Telephone: +1.202.355.4471
Facsimile: +1.404.221.5857

*Additional counsel listed on next page*
*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*, | Case No.:  17-cv-02366-BAS-KSC |
| Plaintiffs, | **EXHIBIT 24 IN SUPPORT OF PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| Chad F. Wolf,[1] *et al.*, | |
| Defendants. | |

---

[1]  Acting Secretary Wolf is automatically substituted for former Acting Secretary McAleenan pursuant to Fed. R. Civ. P. 25(d).

EXHIBIT 24 IN SUPP. OF REPLY IN SUPP. OF
PLTFS' MOT. FOR S.J.

CENTER FOR CONSTITUTIONAL RIGHTS
   Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
   *bazmy@ccrjustice.org*
   Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
   *gschwarz@ccrjustice.org*
   Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
   *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
   Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
   *sarah.rich@splcenter.org*
   Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
   *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
   Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
   *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

EXHIBIT 24 IN SUPP. OF REPLY IN SUPP. OF
PLTFS' MOT. FOR S.J.

Case 3:17-cv-02366-BAS-KSC   Document 767-80   Filed 09/30/21   PageID.67575   Page 3 of 3

From: HOOD, ROBERT W
Sent: Thursday, December 21, 2017 9:15 PM
To: ROSSILLI, VONA M; SYS-OTM-MNGR; DAVIS, TAHIR; GARZA, DUSTIN
Subject: RE: REMINDER: AEU Over Capacity UPDATE (Wait Report)

Thank you Vona.

From: ROSSILLI, VONA M
Sent: Thursday, December 21, 2017 5:33:00 PM
To: SYS-OTM-MNGR; DAVIS, TAHIR; GARZA, DUSTIN
Subject: FW: REMINDER: AEU Over Capacity UPDATE (Wait Report)

Chiefs/Supervisors,

This message serves as a reminder that if you are assigned to either Pedestrian area at the port, that you are required to maintain the Asylee Wait Report. We are seeing instances of the wait times not being recorded which is cause for concern. Please ensure that you are remaining engaged with the wait times for all travelers as well as asylees and that the officers assigned to the limit line position are talking to the travelers and checking documents.

Thank you.

Vona

From: ROSSILLI, VONA M
Sent: Thursday, December 07, 2017 3:28 PM
To: SYS-OTM-MNGR
Cc: AKI, SIDNEY K ████████                                    HOOD, ROBERT W <                  ; MISENHELTER, JOSEPH
████████               CARRILLO, SALLY R ████████          >; ROSSILLI, VONA M <
Subject: REMINDER: AEU Over Capacity UPDATE (Wait Report)

Team,

Effective immediately, the attached wait time logs have been implemented at the San Ysidro and Otay Mesa pedestrian areas to assist in tracking Asylees waiting to be processed by our AEU staff. Please see message string below and ensure that we are adhering to the guidance from Port Director Aki. Each end of shift report should include the number of Asylee applicants waiting to be processed at each location.

Thank you.

From: CARRILLO, SALLY R
Sent: Thursday, December 07, 2017 2:40 PM
To: CHAVEZ, VERONICA J <                            ; CASTILLO, MOISES                         ; RODRIGUEZ, CARLOS C                        ; RODRIGUEZ,
CARY ████████         MCCULLOCH, CHANTELLE                          AVILA, EDWARD <                 ; DELGADO, ALBERT F
████████                 LAPCZYNSKI, ROBERT A                      MENDOZA, DANIEL <                ; MILLER, CHRIS
████████                 ROSSILLI, VONA M                 SCHNEIDER, CHRISTINE E
Cc: HOOD, ROBERT W ████████              >; MISENHELTER, JOSEPH <                   >; CARRILLO, SALLY R █████
Subject: REMINDER: AEU Over Capacity UPDATE (Wait Report)

Team,

The information below from PD Aki continues to apply and it is imperative that we maintain ongoing mustering and more importantly that we verify at all levels that we are complying with the below guidance. Our communication will be the key to our efficient processing and success. Effective immediately please incorporate to our existing pedestrian processing the monitoring and documentation of potential asylee applicants at the limit line.

Throughout each day, AEU will communicate with the duty Watch Commander the AEU capacity status. We must be able to provide AEU with a status of persons who appear to be waiting at each of our pedestrian locations. The midnight shift is responsible for the daily placement and collection of our "wait report", please verify that the report is complete and accurate prior to filing. Supervisors must instruct officers to record the hourly stats at the end of each hour. The reports will be filed by the San Ysidro midnight shift WC in a RED folder labeled "Wait Reports".

The reports for each pedestrian facility are attached, please implement ASAP.

Please make sure you conduct briefings with your teams to reemphasize the guidance and the fact that there is NO room for error by anyone. This should be fairly easy to accomplish if we all communicate effectively.

APD Carrillo for PD Aki

**************************************************************************************************************************

Team, [12/05/2017 PD Message]

Guidance on arriving Asylees at the SYS/OTM Ports of entry:

- Due to capacity issues (above ████ occupancy rate) at our AEU facility we are requesting that all asylee applicants be rerouted from OTM pedestrian and SYS Pedeast pedestrian to the SYS Pedwest pedestrian facility. This will help ensure that asylum applicants are processed in priority order and efficiently as possible. Upon arrival at Pedwest please message to the asylee applicants that we are accepting asylum claims at the port however due to capacity issues in our facility we are asking the applicants to temporarily wait at the limit line in Mexico until space is available. Once space is available we will prioritize our acceptance starting with UAC's, pregnant females, family units, and then singles (Supervisors will have the discretion to accept applicants on a case by case basis – medical, etc.).

- If we encounter an asylee applicant on primary (vehicle or pedestrian) we are to immediately take them into custody (secondary) and eventually transfer them to AEU when feasible for appropriate processing.

- If/when we encounter an asylee at the limit line (OTM pedestrian/SYS Pedeast pedestrian) who refuses to be rerouted to SYS Pedwest for processing, please emphasize that their processing will be more efficient at SYS Pedwest. However, if they continue to be persistent and want to remain at OTM pedestrian or SYS Pedeast, please ask them to temporarily wait until we can take them into custody and transport them to SYS Pedwest facility for appropriate processing.

- Managers please also identify a supervisor or a good lead officer who can communicate effectively and clearly to the potential asylum applicants – "that we are open and accepting asylum applicants at the SYS/OTM ports of entry, however due to capacity issues in our facility we are asking you to be patient and temporarily wait until we can orderly process you."

- Key points – given the rapidly evolving conditions, limit line personnel should not attempt to estimate wait times for the asylum applicants waiting in line; and that we should instead emphasize that under no circumstances will an applicant be denied entry into the U.S. for asylum processing.

- All limit line personnel should be cognizant that their messaging/communication with the asylum applicants and those escorting them (lawyers/advocates) may be recording the conversation via audio or video.

PD Aki

Highly Confidential/Attorneys' Eyes Only                                   AOL-DEF-00030508

1
MAYER BROWN LLP
   Matthew H. Marmolejo (CA Bar No. 242964)
2
   *mmarmolejo@mayerbrown.com*
350 S. Grand Avenue
3
25th Floor
Los Angeles, CA 90071-1503
4
   Ori Lev (DC Bar No. 452565)
   (*pro hac vice*)
5
   *olev@mayerbrown.com*
   Stephen M. Medlock (VA Bar No. 78819)
6
   (*pro hac vice*)
   *smedlock@mayerbrown.com*
7
1999 K Street, N.W.
Washington, D.C. 20006
8
Telephone:  +1.202.263.3000
Facsimile:   +1.202.263.3300
9
SOUTHERN POVERTY LAW CENTER
10
   Melissa Crow (DC Bar No. 453487)
   (*pro hac vice*)
11
   *melissa.crow@splcenter.org*
1101 17th Street, N.W., Suite 705
12
Washington, D.C. 20036
Telephone: +1.202.355.4471
13
Facsimile: +1.404.221.5857

14
*Additional counsel listed on next page*
*Attorneys for Plaintiffs*
15

16
**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**
17

18
Al Otro Lado, Inc., *et al.*,                  Case No.:  17-cv-02366-BAS-KSC

19
                    Plaintiffs,        **EXHIBIT 25 IN SUPPORT OF**
                                       **PLAINTIFFS' REPLY IN**
20
                                       **SUPPORT OF THEIR MOTION**
         v.                            **FOR SUMMARY JUDGMENT**
21
Chad F. Wolf,[1] *et al.*,
22
                    Defendants.
23

24

25

26

27    ───────────────
      [1] Acting Secretary Wolf is automatically substituted for former Acting Secretary
28    McAleenan pursuant to Fed. R. Civ. P. 25(d).

EXHIBIT 25 IN SUPP. OF REPLY IN SUPP. OF
PLTFS' MOT. FOR S.J.

CENTER FOR CONSTITUTIONAL RIGHTS
  Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
  *bazmy@ccrjustice.org*
  Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
  *gschwarz@ccrjustice.org*
  Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
  *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
  Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
  *sarah.rich@splcenter.org*
  Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
  *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
  Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
  *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EXHIBIT 25 IN SUPP. OF REPLY IN SUPP. OF
PLTFS' MOT. FOR S.J.

**From:** MENDOZA, DANIEL
**Sent:** Saturday, December 9, 2017 12:28 AM
**To:** HOOD, ROBERT W
**CC:** SANDOVAL, EVAN J; MARIN, MARIZA; AKI, SIDNEY K; CARRILLO, SALLY R
**Subject:** RE: Ped West Wait Line 12/8.17 2100 hours

Sir,

Give us a couple of minutes please. Evan is calculating at this time.

Daniel Mendoza
Watch Commander
San Ysidro Port of Entry
Office:
Cell:

This communication is intended only for the named addressee and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this communication is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and return the original communication to us at the above address.

**From:** HOOD, ROBERT W
**Sent:** Friday, December 08, 2017 9:26 PM
**To:** MENDOZA, DANIEL <
**Cc:** SANDOVAL, EVAN J <                        >; MARIN, MARIZA <                        >; AKI, SIDNEY K
<                        >; CARRILLO, SALLY R <                        >
**Subject:** RE: Ped West Wait Line 12/8.17 2100 hours

Danny

What are the AEU numbers in custody after we intake the 40 from the 77 in line?

**From:** MENDOZA, DANIEL
**Sent:** Friday, December 08, 2017 9:09:20 PM
**To:** HOOD, ROBERT W
**Cc:** SANDOVAL, EVAN J
**Subject:** Ped West Wait Line 12/8.17 2100 hours

Assistant Port Director (Tactical) Hood,

Please be advised that as of 1500 hours we had 71 people waiting at Ped West. As of 2100 hours, the number went up to 77. SCBPO Sandoval is in the process of taking 30 from Ped West thus lowering our number to 41. Please advise if you still need me to call ADFO Armijo. Thank you.

Daniel Mendoza
Watch Commander
San Ysidro Port of Entry
Office:
Cell:

This communication is intended only for the named addressee and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this communication is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and return the original communication to us at the above address.

**Importance:** High

Watch Commanders,

The SDFO AEU will be reporting the Limit Line numbers to the SDFO and up twice per day: 1) in the AEU Daily Report at 2200, and 2) on the morning SYS AEU Custody Report.

In addition, should the Limit Line numbers reach    in line AND those    have been waiting 4 hours or more, there is a mandatory notification requirement, which will be the Watch Commander's responsibility to make the notification. Please notify ADBS Johnny Armijo Desk
      r Cell                        and send a follow up email to WC Marin and myself.

Highly Confidential/Attorneys' Eyes Only                                        AOL-DEF-00249063

Thank you,

Robert Hood
Assistant Port Director

Highly Confidential/Attorneys' Eyes Only

AOL-DEF-00249064

MAYER BROWN LLP
    Matthew H. Marmolejo (CA Bar No. 242964)
    *mmarmolejo@mayerbrown.com*
350 S. Grand Avenue
25th Floor
Los Angeles, CA 90071-1503
    Ori Lev (DC Bar No. 452565)
    (*pro hac vice*)
    *olev@mayerbrown.com*
    Stephen M. Medlock (VA Bar No. 78819)
    (*pro hac vice*)
    *smedlock@mayerbrown.com*
1999 K Street, N.W.
Washington, D.C. 20006
Telephone:  +1.202.263.3000
Facsimile:   +1.202.263.3300

SOUTHERN POVERTY LAW CENTER
    Melissa Crow (DC Bar No. 453487)
    (*pro hac vice*)
    *melissa.crow@splcenter.org*
1101 17th Street, N.W., Suite 705
Washington, D.C. 20036
Telephone: +1.202.355.4471
Facsimile: +1.404.221.5857

*Additional counsel listed on next page*
*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*, | Case No.:  17-cv-02366-BAS-KSC |
| Plaintiffs, | **EXHIBIT 26 IN SUPPORT OF PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| Chad F. Wolf,[1] *et al.*, | |
| Defendants. | |

---

[1] Acting Secretary Wolf is automatically substituted for former Acting Secretary McAleenan pursuant to Fed. R. Civ. P. 25(d).

EXHIBIT 26 IN SUPP. OF REPLY IN SUPP. OF
PLTFS' MOT. FOR S.J.

1  CENTER FOR CONSTITUTIONAL RIGHTS
2      Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
       *bazmy@ccrjustice.org*
3      Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
       *gschwarz@ccrjustice.org*
4      Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
       *aguisado@ccrjustice.org*
5  666 Broadway, 7th Floor
6  New York, NY 10012
   Telephone: +1.212.614.6464
7  Facsimile: +1.212.614.6499

8  SOUTHERN POVERTY LAW CENTER
       Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
9      *sarah.rich@splcenter.org*
       Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
10     *rebecca.cassler@splcenter.org*
11 150 E. Ponce de Leon Ave., Suite 340
   Decatur, GA 30030
12 Telephone: +1.404.521.6700
   Facsimile: +1.404.221.5857
13
14 AMERICAN IMMIGRATION COUNCIL
       Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
15     *kwalters@immcouncil.org*
   1331 G St. NW, Suite 200
16 Washington, D.C. 20005
   Telephone: +1.202.507.7523
17 Facsimile: +1.202.742.5619

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 26 IN SUPP. OF REPLY IN SUPP. OF
PLTFS' MOT. FOR S.J.

**From:** SCHNEIDER, CHRISTINE L
**Sent:** Saturday, December 9, 2017 4:47 PM
**To:** ARMIJO, JOHNNY L; HOOD, ROBERT W; MARIN, MARIZA
**CC:** AKI, SIDNEY K; CARRILLO, SALLY R; MISENHELTER, JOSEPH; MENDOZA, DANIEL; MILLER, CHRIS
**Subject:** Asylee Report / 1400 Hours

To All:

  ➢ AEU has 323 detainees

  ➢ PED WEST has 47 Asylees at the limit line
  ➢ PED EAST has 00 Asylees at the limit line
  ➢ OTAY MESA PED has 00 Asylees at the limit line
  ➢ CBX has 00 Asylees

Christine L. Schneider
Watch Commander
U.S. Customs & Border Protection
San Ysidro Port of Entry
████████████ Office
████████████ Cell
████████████

Confidential

AOL-DEF-00249075

MAYER BROWN LLP
  Matthew H. Marmolejo (CA Bar No. 242964)
  *mmarmolejo@mayerbrown.com*
350 S. Grand Avenue
25th Floor
Los Angeles, CA 90071-1503
  Ori Lev (DC Bar No. 452565)
  (*pro hac vice*)
  *olev@mayerbrown.com*
  Stephen M. Medlock (VA Bar No. 78819)
  (*pro hac vice*)
  *smedlock@mayerbrown.com*
1999 K Street, N.W.
Washington, D.C. 20006
Telephone:  +1.202.263.3000
Facsimile:   +1.202.263.3300

SOUTHERN POVERTY LAW CENTER
  Melissa Crow (DC Bar No. 453487)
  (*pro hac vice*)
  *melissa.crow@splcenter.org*
1101 17th Street, N.W., Suite 705
Washington, D.C. 20036
Telephone: +1.202.355.4471
Facsimile: +1.404.221.5857

*Additional counsel listed on next page*
*Attorneys for Plaintiffs*

### UNITED STATES DISTRICT COURT

### SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*,<br><br>            Plaintiffs,<br><br>      v.<br><br>Chad F. Wolf,[1] *et al.*,<br><br>            Defendants. | Case No.:  17-cv-02366-BAS-KSC<br><br>**EXHIBIT 27 IN SUPPORT OF PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** |

---

[1] Acting Secretary Wolf is automatically substituted for former Acting Secretary McAleenan pursuant to Fed. R. Civ. P. 25(d).

EXHIBIT 27 IN SUPP. OF REPLY IN SUPP. OF
PLTFS' MOT. FOR S.J.

CENTER FOR CONSTITUTIONAL RIGHTS
   Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
   *bazmy@ccrjustice.org*
   Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
   *gschwarz@ccrjustice.org*
   Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
   *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
   Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
   *sarah.rich@splcenter.org*
   Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
   *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
   Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
   *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

EXHIBIT 27 IN SUPP. OF REPLY IN SUPP. OF
PLTFS' MOT. FOR S.J.

**From:** SCHNEIDER, CHRISTINE L
**Sent:** Monday, December 11, 2017 4:39 PM
**To:** ARMIJO, JOHNNY L; HOOD, ROBERT W; MARIN, MARIZA
**CC:** AKI, SIDNEY K; CARRILLO, SALLY R; MISENHELTER, JOSEPH; MENDOZA, DANIEL; MILLER, CHRIS; ROSSILLI, VONA M; KAPCZYNSKI, ROBERT A
**Subject:** Asylee Report / 1400 Hours / 12112017

To All:

➢ AEU has 329 detainees

➢ PED WEST has 30 Asylees at the limit line
➢ PED EAST has 00 Asylees at the limit line
➢ OTAY MESA PED has 00 Asylees at the limit line
➢ CBX has 00 Asylees

Christine L. Schneider
Watch Commander
U.S. Customs & Border Protection
San Ysidro Port of Entry
█████████ Office
█████████ Cell

Confidential

AOL-DEF-00247296

1   MAYER BROWN LLP
        Matthew H. Marmolejo (CA Bar No. 242964)
2       *mmarmolejo@mayerbrown.com*
    350 S. Grand Avenue
3   25th Floor
    Los Angeles, CA 90071-1503
4       Ori Lev (DC Bar No. 452565)
        (*pro hac vice*)
5       *olev@mayerbrown.com*
        Stephen M. Medlock (VA Bar No. 78819)
6       (*pro hac vice*)
        *smedlock@mayerbrown.com*
7   1999 K Street, N.W.
    Washington, D.C. 20006
8   Telephone:  +1.202.263.3000
    Facsimile:   +1.202.263.3300
9
    SOUTHERN POVERTY LAW CENTER
10      Melissa Crow (DC Bar No. 453487)
        (*pro hac vice*)
11      *melissa.crow@splcenter.org*
    1101 17th Street, N.W., Suite 705
12  Washington, D.C. 20036
    Telephone: +1.202.355.4471
13  Facsimile: +1.404.221.5857

14  *Additional counsel listed on next page*
    *Attorneys for Plaintiffs*
15
                 **UNITED STATES DISTRICT COURT**
16
               **SOUTHERN DISTRICT OF CALIFORNIA**
17

18  Al Otro Lado, Inc., *et al.*,                  Case No.:  17-cv-02366-BAS-KSC

19                          Plaintiffs,            **EXHIBIT 28 IN SUPPORT OF**
                                                   **PLAINTIFFS' REPLY IN**
20          v.                                     **SUPPORT OF THEIR MOTION**
                                                   **FOR SUMMARY JUDGMENT**
21  Chad F. Wolf,[1] *et al.*,

22                          Defendants.

23

24

25

26

27  ——————————————
    [1] Acting Secretary Wolf is automatically substituted for former Acting Secretary
28  McAleenan pursuant to Fed. R. Civ. P. 25(d).

                                          EXHIBIT 28 IN SUPP. OF REPLY IN SUPP. OF
                                                      PLTFS' MOT. FOR S.J.

CENTER FOR CONSTITUTIONAL RIGHTS
   Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
   *bazmy@ccrjustice.org*
   Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
   *gschwarz@ccrjustice.org*
   Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
   *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
   Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
   *sarah.rich@splcenter.org*
   Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
   *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
   Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
   *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

EXHIBIT 28 IN SUPP. OF REPLY IN SUPP. OF
PLTFS' MOT. FOR S.J.

**From:** KAPCZYNSKI, ROBERT A
**Sent:** Tuesday, December 12, 2017 4:06 PM
**To:** ARMIJO, JOHNNY L; HOOD, ROBERT W; MARIN, MARIZA
**CC:** AKI, SIDNEY K; CARRILLO, SALLY R; MISENHELTER, JOSEPH; MENDOZA, DANIEL; MILLER, CHRIS; ROSSILLI, VONA M; SCHNEIDER, CHRISTINE L
**Subject:** Asylum seeker report / 12-12-2017

To All:

- ➢ AEU has 324 detainees
- ➢ PED WEST has 55 Asylum seekers at the limit line
- ➢ PED EAST has 00 Asylum seekers at the limit line
  - o 4 Asylum seekers are in the security office awaiting transport to AEU
- ➢ OTAY MESA PED has 00 Asylum seekers at the limit line
- ➢ CBX has 00 Asylum seekers

*Robert Kapczynski*
*Watch Commander*
*San Ysidro / Otay Mesa Ports of Entry*

Confidential

AOL-DEF-00247309

1   MAYER BROWN LLP
       Matthew H. Marmolejo (CA Bar No. 242964)
2      *mmarmolejo@mayerbrown.com*
    350 S. Grand Avenue
3   25th Floor
    Los Angeles, CA 90071-1503
4      Ori Lev (DC Bar No. 452565)
       (*pro hac vice*)
5      *olev@mayerbrown.com*
       Stephen M. Medlock (VA Bar No. 78819)
6      (*pro hac vice*)
       *smedlock@mayerbrown.com*
7   1999 K Street, N.W.
    Washington, D.C. 20006
8   Telephone:  +1.202.263.3000
    Facsimile:   +1.202.263.3300
9
    SOUTHERN POVERTY LAW CENTER
10     Melissa Crow (DC Bar No. 453487)
       (*pro hac vice*)
11     *melissa.crow@splcenter.org*
    1101 17th Street, N.W., Suite 705
12  Washington, D.C. 20036
    Telephone: +1.202.355.4471
13  Facsimile: +1.404.221.5857

14  *Additional counsel listed on next page*
    *Attorneys for Plaintiffs*
15
                  **UNITED STATES DISTRICT COURT**
16
                **SOUTHERN DISTRICT OF CALIFORNIA**
17

18  Al Otro Lado, Inc., *et al.*,          Case No.:  17-cv-02366-BAS-KSC

19                    Plaintiffs,          **EXHIBIT 29 IN SUPPORT OF**
                                           **PLAINTIFFS' REPLY IN SUPPORT**
20          v.                             **OF THEIR MOTION FOR**
                                           **SUMMARY JUDGMENT**
21  Chad F. Wolf,[1] *et al.*,

22                    Defendants.

23

24

25

26

27  _____
    [1]  Acting Secretary Wolf is automatically substituted for former Acting Secretary
28  McAleenan pursuant to Fed. R. Civ. P. 25(d).

                                        EXHIBIT 29 IN SUPP. OF REPLY IN SUPP. OF
                                                  PLTFS' MOT. FOR S.J.

1  CENTER FOR CONSTITUTIONAL RIGHTS
2      Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
       *bazmy@ccrjustice.org*
3      Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
       *gschwarz@ccrjustice.org*
4      Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
       *aguisado@ccrjustice.org*
5  666 Broadway, 7th Floor
   New York, NY 10012
6  Telephone: +1.212.614.6464
7  Facsimile: +1.212.614.6499

8  SOUTHERN POVERTY LAW CENTER
       Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
9      *sarah.rich@splcenter.org*
       Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
10     *rebecca.cassler@splcenter.org*
   150 E. Ponce de Leon Ave., Suite 340
11 Decatur, GA 30030
   Telephone: +1.404.521.6700
12 Facsimile: +1.404.221.5857

13
14 AMERICAN IMMIGRATION COUNCIL
       Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
15     *kwalters@immcouncil.org*
   1331 G St. NW, Suite 200
16 Washington, D.C. 20005
   Telephone: +1.202.507.7523
17 Facsimile: +1.202.742.5619

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 29 IN SUPP. OF REPLY IN SUPP. OF
PLTFS' MOT. FOR S.J.

**From:** SCHNEIDER, CHRISTINE L
**Sent:** Friday, December 15, 2017 4:47 PM
**To:** ARMIJO, JOHNNY L; HOOD, ROBERT W; MARIN, MARIZA; FLORES, PETE ROMERO; MARICICH, ANNE L
**CC:** AKI, SIDNEY K; CARRILLO, SALLY R; MISENHELTER, JOSEPH; MENDOZA, DANIEL; MILLER, CHRIS; ROSSILLI, VONA M; KAPCZYNSKI, ROBERT A
**Subject:** Asylee Report / 1400 Hours / 12152017

To All:

  ➢ AEU has 316 detainees

  ➢ PED WEST has 17 Asylees at the limit line
  ➢ PED EAST has 00 Asylees at the limit line
     ○ Two (2) Asylum cases from Kyrgyz Republic in Security Office
  ➢ OTAY MESA PED has 00 Asylees at the limit line
  ➢ CBX has 00 Asylees

Christine L. Schneider
Watch Commander
U.S. Customs & Border Protection
San Ysidro Port of Entry
            Office
            Cell

Confidential                    AOL-DEF-00247380

1  MAYER BROWN LLP
     Matthew H. Marmolejo (CA Bar No. 242964)
2    *mmarmolejo@mayerbrown.com*
   350 S. Grand Avenue
3  25th Floor
   Los Angeles, CA 90071-1503
4    Ori Lev (DC Bar No. 452565)
     (*pro hac vice*)
5    *olev@mayerbrown.com*
     Stephen M. Medlock (VA Bar No. 78819)
6    (*pro hac vice*)
     *smedlock@mayerbrown.com*
7  1999 K Street, N.W.
   Washington, D.C. 20006
8  Telephone:  +1.202.263.3000
   Facsimile:   +1.202.263.3300
9
   SOUTHERN POVERTY LAW CENTER
10   Melissa Crow (DC Bar No. 453487)
     (*pro hac vice*)
11   *melissa.crow@splcenter.org*
   1101 17th Street, N.W., Suite 705
12 Washington, D.C. 20036
   Telephone: +1.202.355.4471
13 Facsimile: +1.404.221.5857

14 *Additional counsel listed on next page*
   *Attorneys for Plaintiffs*
15
                **UNITED STATES DISTRICT COURT**
16
             **SOUTHERN DISTRICT OF CALIFORNIA**
17

18 | Al Otro Lado, Inc., *et al.*, | Case No.:  17-cv-02366-BAS-KSC |
   |---|---|
19 | Plaintiffs, | **EXHIBIT 30 IN SUPPORT OF** |
   | | **PLAINTIFFS' REPLY IN** |
20 | v. | **SUPPORT OF THEIR MOTION** |
   | | **FOR SUMMARY JUDGMENT** |
21 | Chad F. Wolf,[1] *et al.*, | |
22 | Defendants. | |
23 | | |
24

25

26

27 ——————————————
   [1] Acting Secretary Wolf is automatically substituted for former Acting Secretary
28 McAleenan pursuant to Fed. R. Civ. P. 25(d).

                                     EXHIBIT 30 IN SUPP. OF REPLY IN SUPP. OF
                                                PLTFS' MOT. FOR S.J.

1-SER-137

CENTER FOR CONSTITUTIONAL RIGHTS
   Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
   *bazmy@ccrjustice.org*
   Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
   *gschwarz@ccrjustice.org*
   Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
   *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
   Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
   *sarah.rich@splcenter.org*
   Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
   *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
   Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
   *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

EXHIBIT 30 IN SUPP. OF REPLY IN SUPP. OF
PLTFS' MOT. FOR S.J.

**From:** SCHNEIDER, CHRISTINE L
**Sent:** Sunday, December 17, 2017 4:32 PM
**To:** ARMIJO, JOHNNY L; HOOD, ROBERT W; MARIN, MARIZA; FLORES, PETE ROMERO; MARICICH, ANNE L
**CC:** AKI, SIDNEY K; CARRILLO, SALLY R; MISENHELTER, JOSEPH; MENDOZA, DANIEL; MILLER, CHRIS; ROSSILLI, VONA M; KAPCZYNSKI, ROBERT A
**Subject:** Asylee Report / 1400 Hours / 12172017

To All:

> ➢ AEU has 316 detainees

> ➢ PED WEST has 17 Asylees at the limit line
> ➢ PED EAST has 00 Asylees at the limit line
>   ○ Two (2) Asylum cases from Mexico in Security Office
> ➢ OTAY MESA PED has 00 Asylees at the limit line
> ➢ CBX has 00 Asylees

Christine L. Schneider
Watch Commander
U.S. Customs & Border Protection
San Ysidro Port of Entry

Confidential

AOL-DEF-00247381

1   MAYER BROWN LLP
      Matthew H. Marmolejo (CA Bar No. 242964)
2      *mmarmolejo@mayerbrown.com*
    350 S. Grand Avenue
3   25th Floor
    Los Angeles, CA 90071-1503
4     Ori Lev (DC Bar No. 452565)
      (*pro hac vice*)
5      *olev@mayerbrown.com*
      Stephen M. Medlock (VA Bar No. 78819)
6      (*pro hac vice*)
       *smedlock@mayerbrown.com*
7   1999 K Street, N.W.
    Washington, D.C. 20006
8   Telephone:  +1.202.263.3000
    Facsimile:   +1.202.263.3300
9
    SOUTHERN POVERTY LAW CENTER
10    Melissa Crow (DC Bar No. 453487)
      (*pro hac vice*)
11     *melissa.crow@splcenter.org*
    1101 17th Street, N.W., Suite 705
12  Washington, D.C. 20036
    Telephone: +1.202.355.4471
13  Facsimile: +1.404.221.5857

14  *Additional counsel listed on next page*
    *Attorneys for Plaintiffs*
15
              **UNITED STATES DISTRICT COURT**
16
            **SOUTHERN DISTRICT OF CALIFORNIA**
17

18  Al Otro Lado, Inc., *et al.*,          Case No.:  17-cv-02366-BAS-KSC

19                Plaintiffs,              **EXHIBIT 31 IN SUPPORT OF**
                                           **PLAINTIFFS' REPLY IN**
20        v.                               **SUPPORT OF THEIR MOTION**
                                           **FOR SUMMARY JUDGMENT**
21  Chad F. Wolf,[1] *et al.*,

22                Defendants.

23

24

25

26

27  _____

28  [1] Acting Secretary Wolf is automatically substituted for former Acting Secretary
    McAleenan pursuant to Fed. R. Civ. P. 25(d).

                              EXHIBIT 31 IN SUPP. OF REPLY IN SUPP. OF
                              PLTFS' MOT. FOR S.J.

CENTER FOR CONSTITUTIONAL RIGHTS
   Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
   *bazmy@ccrjustice.org*
   Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
   *gschwarz@ccrjustice.org*
   Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
   *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
   Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
   *sarah.rich@splcenter.org*
   Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
   *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
   Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
   *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

EXHIBIT 31 IN SUPP. OF REPLY IN SUPP. OF
PLTFS' MOT. FOR S.J.

**From:** AKI, SIDNEY K
**Sent:** Tuesday, January 2, 2018 3:57 PM
**To:** VILLAREAL, ROY D; LEONARD, RALEIGH L; SCOTT, RODNEY S; YAMASAKI, RYAN; SCUDDER, RYAN J
**CC:** MOODY, MARK R; FLORES, PETE ROMERO; TAITAGUE, CLAUDIA; HOOD, ROBERT W; MARIN, MARIZA; MARICICH, ANNE L
**Subject:** RE: IMPORTANT: C1 VTC-Conference call w/SWB Leadership - Scheduled Monday, 12/18/17-Agenda

Thanks Roy.

---

**From:** VILLAREAL, ROY D
**Sent:** Tuesday, January 02, 2018 12:50:40 PM
**To:** AKI, SIDNEY K; LEONARD, RALEIGH L; SCOTT, RODNEY S; YAMASAKI, RYAN; SCUDDER, RYAN J
**Cc:** MOODY, MARK R; FLORES, PETE ROMERO; TAITAGUE, CLAUDIA; HOOD, ROBERT W; MARIN, MARIZA; MARICICH, ANNE L
**Subject:** RE: IMPORTANT: C1 VTC-Conference call w/SWB Leadership - Scheduled Monday, 12/18/17-Agenda

Sidney,

Mark Moody is covering for us today. Mark would you please coordinate with Sidney.
Thanks

---

**From:** AKI, SIDNEY K
**Sent:** Tuesday, January 02, 2018 6:13:21 PM
**To:** VILLAREAL, ROY D; LEONARD, RALEIGH L; SCOTT, RODNEY S; YAMASAKI, RYAN; SCUDDER, RYAN J
**Cc:** MOODY, MARK R; FLORES, PETE ROMERO; TAITAGUE, CLAUDIA; HOOD, ROBERT W; MARIN, MARIZA; MARICICH, ANNE L
**Subject:** RE: IMPORTANT: C1 VTC-Conference call w/SWB Leadership - Scheduled Monday, 12/18/17-Agenda

Roy/Raleigh,

Shall we have a quick conference call prior to the noon C1 call?

---

**From:** VILLAREAL, ROY D
**Sent:** Monday, December 18, 2017 11:17 AM
**To:** AKI, SIDNEY K <                    >; LEONARD, RALEIGH L                    >; SCOTT, RODNEY S
<                    >; YAMASAKI, RYAN                    >; SCUDDER, RYAN J <                    >
**Cc:** MOODY, MARK R <                    >; FLORES, PETE ROMERO -                    - TAITAGUE, CLAUDIA
                    HOOD, ROBERT W <                    >; MARIN, MARIZA <
**Subject:** RE: IMPORTANT: C1 VTC-Conference call w/SWB Leadership - Scheduled Monday, 12/18/17-Agenda

Sounds great....we can use the following number to communicate:

Access code

---

**From:** AKI, SIDNEY K
**Sent:** Monday, December 18, 2017 11:14 AM
**To:** VILLAREAL, ROY D <                    LEONARD, RALEIGH L <                    ; SCOTT, RODNEY S
<                    YAMASAKI, RYAN                    SCUDDER, RYAN J <
**Cc:** MOODY, MARK R -                    FLORES, PETE ROMERO                    ; TAITAGUE, CLAUDIA
                    HOOD, ROBERT W -                    ; MARIN, MARIZA
**Subject:** RE: IMPORTANT: C1 VTC-Conference call w/SWB Leadership - Scheduled Monday, 12/18/17-Agenda

1pm?

---

**From:** VILLAREAL, ROY D
**Sent:** Monday, December 18, 2017 12:53:50 PM
**To:** LEONARD, RALEIGH L; AKI, SIDNEY K; SCOTT, RODNEY S; YAMASAKI, RYAN; SCUDDER, RYAN J
**Cc:** MOODY, MARK R; FLORES, PETE ROMERO; TAITAGUE, CLAUDIA; HOOD, ROBERT W; MARIN, MARIZA
**Subject:** RE: IMPORTANT: C1 VTC-Conference call w/SWB Leadership - Scheduled Monday, 12/18/17-Agenda

What time do you all want to pre-call/discuss?

---

**From:** LEONARD, RALEIGH L
**Sent:** Monday, December 18, 2017 9:52 AM
**To:** VILLAREAL, ROY D                    ; AKI, SIDNEY K                    SCOTT, RODNEY S
<                    YAMASAKI, RYAN                    SCUDDER, RYAN J
**Cc:** MOODY, MARK R                    >; FLORES, PETE ROMERO -                    TAITAGUE, CLAUDIA

Confidential

AOL-DEF-00030448

████████ HOOD, ROBERT W ████████ ; MARIN, MARIZA ████████
**Subject:** RE: IMPORTANT: C1 VTC-Conference call w/SWB Leadership - Scheduled Monday, 12/18/17-Agenda

ELC is available -

Raleigh L. Leonard, Acting Deputy Chief Patrol Agent
U.S. Border Patrol – El Centro Sector
211 West Aten Road, Imperial, California 92251
████████ - Office
████████ - IPhone

**From:** VILLAREAL, ROY D
**Sent:** Monday, December 18, 2017 9:43 AM
**To:** AKI, SIDNEY K ████████ ; SCOTT, RODNEY S ████████ ; YAMASAKI, RYAN
████████ SCUDDER, RYAN J ████████ ; LEONARD, RALEIGH L ████████
**Cc:** MOODY, MARK R ████████ ; FLORES, PETE ROMERO ████████ ████████ >; TAITAGUE, CLAUDIA
████████ >; HOOD, ROBERT W ████████ ; MARIN, MARIZA ████████
**Subject:** RE: IMPORTANT: C1 VTC-Conference call w/SWB Leadership - Scheduled Monday, 12/18/17-Agenda

Sidney,

It's a call in teleconference. But I'm certainly amenable to a pre-telecom to discuss our presentation.

**From:** AKI, SIDNEY K
**Sent:** Monday, December 18, 2017 5:26:49 PM
**To:** SCOTT, RODNEY S; YAMASAKI, RYAN; SCUDDER, RYAN J; LEONARD, RALEIGH L; VILLAREAL, ROY D
**Cc:** MOODY, MARK R; FLORES, PETE ROMERO; TAITAGUE, CLAUDIA; HOOD, ROBERT W; MARIN, MARIZA
**Subject:** RE: IMPORTANT: C1 VTC-Conference call w/SWB Leadership - Scheduled Monday, 12/18/17-Agenda

Rodney/Roy/Ryan,

Would it possible for us to do a joint VTC at Sector? We could meet an hour earlier to discuss and then jointly be present for the C1 meeting.
Thoughts?

**From:** SCOTT, RODNEY S
**Sent:** Monday, December 18, 2017 8:24 AM
**To:** YAMASAKI, RYAN ████████ SCUDDER, RYAN J ████████ LEONARD, RALEIGH L
████████ ; VILLAREAL, ROY D ████████ >; AKI, SIDNEY K ████████ >
**Cc:** MOODY, MARK R ████████ >
**Subject:** FW: IMPORTANT: C1 VTC-Conference call w/SWB Leadership - Scheduled Monday, 12/18/17-Agenda

Roy, Ryan and Sid
FYI for this afternoon see below. Also,   Is there any chance that we can get shared talking points between SDC/ELC and SD OFO before the
call?

**From:** FLORES, PETE ROMERO
**Sent:** Monday, December 18, 2017 7:15 AM
**To:** SCOTT, RODNEY S ████████ ; VILLAREAL, ROY D ████████ >
**Cc:** AKI, SIDNEY K ████████ ; MARICICH, ANNE L ████████
**Subject:** RE: IMPORTANT: C1 VTC-Conference call w/SWB Leadership - Scheduled Monday, 12/18/17-Agenda

Rodney,

Sidney will be handling the call since Anne and I will be touring Owen at that time. Below are some bullet points that we have prepared for
the call.

## Executive Summary:
The San Ysidro Port of Entry (SYS) continues to experience high levels of foreign nationals asserting claims of fear of returning to their home
countries. Thousands of unaccompanied alien children (UAC), family units, and adults attempt to migrate to the U.S. via Central America and
Mexico. The foreign nationals are made up of numerous nationalities to include citizens of Mexico, Haiti, Africa, Eastern Europe, and Asia. Due
to the ongoing construction/infrastructure challenges at the SYS and the limited availability of ICE/ERO detention space and coordinated
movement; SYS is facing limitations in the intake and processing of inadmissible travelers.

## Background:
- The significant volume of arriving undocumented travelers has surpassed the physical capacity of the port and has resulted in a tremendous
  strain on all available local resources, to include personnel.
- When the Admissibility Enforcement Unit (AEU) is over the maximum capacity, the ability to comply with our detention policy (TEDS)
  and Reno v. Flores settlement is hindered and creates a liability for the agency.

AOL-DEF-00030449

- Without sufficient ICE detention facilities and the coordinated movement of completed cases into ICE/ERO custody, asylees remain at the port for extended periods of time, which compounds our infrastructure challenges and our ability to intake new surges of asylees. Concurrently, the extended holding time requires additional resources to ensure safe, habitable, and sanitary holding conditions.
- In FY 2015, The SYS POE apprehended 27,515 inadmissible aliens; a 22% increase in encounters at the Ports of Entry since FY 2014. In FY 2016, the number surged to 43,961; a 59% increase. During FY2017, the number of inadmissible aliens declined to 24,251.

**Current Status:**
This fiscal year SYS continues to experience an upward trend in undocumented travelers for all nationalities.



- The majority of asylum applicants are family units coming from Mexico and Central and South America. Most have stated that the reason for travel is fueled by social media posts saying the "Doors are Open to the U.S." for the people of Michoacan" and others have indicated that there are NGOs providing workshops and advice about claiming asylum.
- Given the limited infrastructure and current ongoing construction at Pedeast, Pedwest is now the primary intake area for asylum claims and other admissibility processing; and provides the capacity, intake area, and infrastructure to process the flow of travelers.
- SYS CBP personnel are not denying anyone requesting asylum, however are redirecting potential applicants to Pedwest to ensure a timelier and efficient intake process.
- All potential asylum applicants arriving at the primary lane (pedestrian, vehicle, CBX) and making entry into the U.S. are taken into custody and safeguarded.
- ICE ERO has conveyed that family unit housing facilities are at capacity, causing the movement of family units out of ERO custody to slow.
- SYS AEU is continuously at capacity of ███ In order to safely and humanely care for the detention population, asylum applicants are being queued at the limit line until ICE ERO can move subjects out of CBP custody. Once subjects are moved, SYS AEU continues the intake of asylum applicants until capacity is reached.
- The SYS AEU has coordinated with ICE ERO to modify case processing from ER/CF to NTA, in increments of 72 hours, to alleviate the backlog of family units. If ERO detention levels remain elevated, ERO will notify the PoE of such and respective management representatives will confer to establish a mutually agreeable additional time needed for continued NTA processing.
- SYS AEU has reached out to US Border Patrol (USBP) Stations to temporarily hold migrants awaiting custodial transfer to ICE/ERO. Locations include: Imperial Beach Border Patrol Station and the Barracks five facility located within the Chula Vista Border Patrol Station. (Currently, the bulk of detention population is family units, so USBP space has not been used).

Pete Flores
Director, Field Operations
San Diego, CA
U.S. Customs and Border Protection
Work Phone: ████
Fax: ████

From: SCOTT, RODNEY S
Sent: Saturday, December 16, 2017 7:45 AM
To: VILLAREAL, ROY D <████>; FLORES, PETE ROMERO <████
Subject: RE: IMPORTANT: C1 VTC-Conference call w/SWB Leadership - Scheduled Monday, 12/18/17-Agenda

A few bullets on the detention issues and the lack of light at the end of the tunnel right now for CA would be beneficial. I would like to coordinate that with OFO. I have copied the DFO for SA.

From: VILLAREAL, ROY D
Sent: Friday, December 15, 2017 6:05:23 PM
To: SCOTT, RODNEY S
Subject: FW: IMPORTANT: C1 VTC-Conference call w/SWB Leadership - Scheduled Monday, 12/18/17-Agenda

Chief,

This falls inline with the Harpers Ferry meeting. I tasked SIU and Yamasaki with giving us a breakdown/assessment of the Indian national flow, our

   AOL-DEF-00030450

staging at the TSA and to also view and assess as the California Corridor. Any concerns or other areas you'd like pursued?

---

**From:** CHAVEZ, GLORIA I
**Sent:** Saturday, December 16, 2017 12:04:53 AM
**To:** VILLAREAL, ROY D; LANDRUM, CARL E; SELF, JEFFREY D; BLANCHARD-JR, KENNETH W; VELAZQUEZ, VICTOR M; HUDAK, MATTHEW J; ORTIZ, RAUL L; LEONARD, RALEIGH L; GOOD, ANTHONY S
**Cc:** HASTINGS, BRIAN S
**Subject:** FW: IMPORTANT: C1 VTC-Conference call w/SWB Leadership - Scheduled Monday, 12/18/17-Agenda

DCPAs - FYSA only. See below.

GC

Regards,
Gloria I. Chavez
Deputy Chief - LEOD/Operations
U.S. Border Patrol Headquarters
██████ (office)
██████ (cell)

---

**From:** CHAVEZ, GLORIA I
**Sent:** Friday, December 15, 2017 2:49:07 PM
**To:** FLORES, PETE ROMERO; MANCHA, HECTOR; HIGGERSON, DAVID P; BROOKS, WILLIAM K; PADILLA, MANUEL JR; OWENS, JASON D; CHAVEZ, FELIX; BOATRIGHT, ROBERT L; HULL, AARON A; HARRISON, DOUGLAS E; KARISCH, RODOLFO; PORVAZNIK, ANTHONY J; SCUDDER, RYAN J; SCOTT, RODNEY S; BEESON, PAUL A; Owen, Todd C (AC OFO); PROVOST, CARLA ██████; BOYER, STEPHEN A; KOLBE, KATHRYN; SMITH, BRENDA BROCKMAN; LUCK, SCOTT A (USBP); PEREZ, ROBERT E; WAGNER, JOHN P
**Cc:** MCALEENAN, KEVIN K; VITIELLO, RONALD D (USBP); PETERLIN, MEGHANN K; FLANAGAN, PATRICK S; VISCONTI, JAY; NUTZHORN, JOSHUA B; MIRANDA, EDWARD; HIGGINS, CHRIS A; SCHORR, STEPHEN
**Subject:** IMPORTANT: C1 VTC-Conference call w/SWB Leadership - Scheduled Monday, 12/18/17-Agenda

Good afternoon CBP field leadership - CBP Acting Commissioner Kevin McAleenan will host a video tele-conference (VTC) and/or conference call with our Southwest Border Directors of Field Operations, Chief Patrol Agents, and JTF-W Director on **Monday, December 18, 2017** to provide an update on our collective efforts as we improve our shared consciousness of CBP's border security mission. Additionally, the Acting Commissioner has a key interest in hearing from you regarding your operational tempo, migration, holding, and detention issues; and any/all coordination efforts to mitigate the impacts to our border security across the Southwest border.

This will be a good opportunity to identify and discuss emerging threats, innovation efforts, and triggers or early warnings being experienced in the current operational environment.

Please see the attached agenda. If you have any questions, don't hesitate to contact me.

**Participants: DFOs, CPAs, JTW-Director**
**Time: 5:00 PM (EST) – 6:00 PM (EST).**
**Dial in:** ██████
**PIN#** ██████

GC

Gloria I. Chavez
Commander
CBP – MCAT
██████ (office)
██████ (cell)
██████

Confidential

AOL-DEF-00030451

1  MAYER BROWN LLP
2     Matthew H. Marmolejo (CA Bar No. 242964)
        *mmarmolejo@mayerbrown.com*
3  350 S. Grand Avenue
   25th Floor
   Los Angeles, CA 90071-1503
4     Ori Lev (DC Bar No. 452565)
        (*pro hac vice*)
5       *olev@mayerbrown.com*
        Stephen M. Medlock (VA Bar No. 78819)
6       (*pro hac vice*)
        *smedlock@mayerbrown.com*
7  1999 K Street, N.W.
   Washington, D.C. 20006
8  Telephone:  +1.202.263.3000
   Facsimile:    +1.202.263.3300
9
   SOUTHERN POVERTY LAW CENTER
10    Melissa Crow (DC Bar No. 453487)
        (*pro hac vice*)
11      *melissa.crow@splcenter.org*
   1101 17th Street, N.W., Suite 705
12 Washington, D.C. 20036
   Telephone: +1.202.355.4471
13 Facsimile: +1.404.221.5857

14 *Additional counsel listed on next page*
   *Attorneys for Plaintiffs*
15
                **UNITED STATES DISTRICT COURT**
16
               **SOUTHERN DISTRICT OF CALIFORNIA**
17

18 | Al Otro Lado, Inc., *et al.*, | Case No.:  17-cv-02366-BAS-KSC |

19              Plaintiffs,         **EXHIBIT 1 IN SUPPORT OF
                                    PLAINTIFFS' MEMORANDUM OF
20      v.                          POINTS AND AUTHORITIES IN
                                    SUPPORT OF THEIR MOTION
21 Chad F. Wolf,[1] *et al.*,        FOR SUMMARY JUDGMENT**

22              Defendants.
                                    **REDACTED VERSION**
23

24

25

26

27  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
   [1] Acting Secretary Wolf is automatically substituted for former Acting Secretary
28 McAleenan pursuant to Fed. R. Civ. P. 25(d).

EXHIBIT 1 IN SUPPORT OF PLAINTIFFS' MEMORANDUM
OF POINTS AND AUTHORITIES IN SUPPORT
OF THEIR MOTION FOR SUMMARY JUDGMENT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

CENTER FOR CONSTITUTIONAL RIGHTS
　Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
　*bazmy@ccrjustice.org*
　Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
　*gschwarz@ccrjustice.org*
　Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
　*aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
　Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
　*sarah.rich@splcenter.org*
　Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
　*rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
　Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
　*kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

EXHIBIT 1 IN SUPPORT OF PLAINTIFFS' MEMORANDUM
OF POINTS AND AUTHORITIES IN SUPPORT
OF THEIR MOTION FOR SUMMARY JUDGMENT

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

------------------------------

AL OTRO LADO, INC., et al.,

       Plaintiffs,

v.                         Case No.

                              17-cv-02366-BAS-KSC

KEVIN K. McALEENAN, et al.,

       Defendants.

------------------------------


       Deposition Taken of ███████████, on Thursday, November 21, 2019, at 9:30 a.m., held at the offices of Mayer Brown, 1999 K Street, N.W., Washington, D.C. 20006, before Goldy Gold, a Registered Professional Reporter and a Notary Public within and for District of Columbia.



```
                                                            Page 2
 1     A P P E A R A N C E S:
 2
 3     On Behalf of the Plaintiffs:
 4         STEPHEN M. MEDLOCK, ESQUIRE
           Mayer Brown
 5         1999 K Street, N.W.
           Washington, D.C. 20006
 6         Telephone:  202.263.3221
           E-mail:  smedlock@mayerbrown.com
 7
 8
       On Behalf of the Defendants:
 9
           ALEXANDER J. HALASKA, ESQUIRE
10         U.S. Department of Justice
           Office of Immigration Litigation
11         Ben Franklin Station, P.O. Box 868
           Washington, D.C. 20044
12         Telephone:  202.307.8704
           E-mail:  alexander.j.halaska@usdoj.gov
13
14
           MELISSA CROW, ESQUIRE
15         Southern Poverty Law Center
           1101 17th Street, N.W., Suite 705
16         Washington, D.C. 20036
           Telephone:  202.355.4471
17         E-mail:  melissa.crow@splcenter.org
18
19         REBECCA CASSLER, ESQUIRE
           Southern Poverty Law Center
20         P.O. Box 1287
           Decatur, Georgia 30031
21         Telephone:  404.521.6700
           E-mail:  rebecca.cassler@splcenter.org
22
23
       Also Present:
24         Kristine E. King, Esquire
           Jillian M. Clouse, Esquire
25         U.S. Department of Homeland Security
```



```
                                                          Page 3
  1                    I N D E X
  2            Deposition of ██████████████
  3                 November 21, 2019
  4
  5    Examination By:                              Page
  6  Mr. Medlock                                       5
  7  Mr. Halaska                                      247
  8  Mr. Medlock                                      253
  9  Mr. Halaska                                      263
 10  Mr. Medlock                                      264
 11
 12
 13
 14
 15
 16
 17
 18
 19
 20
 21
 22
 23
 24
 25
```



Page 44

1    Port of Entry has not been processing asylum seekers

2    is because they're being turned back at the limit

3    line; is that right?

4          A.     Well, we are still taking them.  They've

5    been running up the vehicle lanes.

6          Q.     Sure.  So outside of instances where

7    people are rushing the vehicle lanes, just normal

8    pedestrians flowing towards the limit line, those

9    individuals who are seeking asylum are being turned

10   back to Mexico; is that right?

11         A.     Yes.

12         Q.     And the officers at the limit line who

13   are turning those asylum seekers back to Mexico,

14   they're doing that because they have orders or

15   instructions to do that, right?

16         A.     Correct.

17         Q.     Where did those orders or instructions

18   to turn back asylum seekers come from?

19         A.     The port director.

20         Q.     Who is the port director that has

21   instructed officers at the limit line to turn back

22   asylum seekers?

23         A.     Ortega.

24         Q.     What's Mr. Ortega -- do you know

25   Mr. Ortega's full name?



Page 45

1           A.      I think it's Rene Ortega.

2           Q.      So Port Director Rene Ortega has

3    instructed officers at Tecate Port of Entry to turn

4    back asylum seekers at the limit line; is that right?

5           A.      Correct.

6           Q.      During the entire time that you have

7    been posted to the Tecate Port of Entry, have asylum

8    seekers that approach the limit line been turned

9    back?

10          A.      Yes.

11          Q.      And Rene Ortega has not been the port

12   director the entire time that you've been at the

13   Tecate Port of Entry, correct?

14          A.      No.

15          Q.      Who was the port director before Rene

16   Ortega?

17          A.      It was Avila.

18          Q.      Can you spell the last name or just

19   guess at it?

20          A.      I-v-i-l-i-a?

21          Q.      And did Port Director Avila also order

22   or instruct that asylum seekers be turned back at the

23   limit line?

24          A.      Yes.

25          Q.      Do you know whether the port directors



Page 46

```
 1    received orders or instructions from either the San

 2    Diego field office or senior management at OFO to

 3    turn back asylum seekers at the limit line?

 4          A.      That's what they were telling us.

 5          Q.      When you say "they were telling us,"

 6    what do you mean by that?

 7          A.      The supervisors would tell us that they

 8    had instructions from higher management.

 9          Q.      Do you know what "higher management"

10    means?

11          A.      I don't.

12          Q.      So is it your impression, based on your

13    work at the Tecate Port of Entry, that there is some

14    sort of broader policy of turning back asylum

15    seekers?

16          A.      What do you mean, "broader policy"?

17          Q.      That either someone at OFO or the

18    San Diego field office, someone higher up, has

19    ordered or instructed that asylum seekers be turned

20    back?

21          A.      Yes.

22          Q.      So I think you said you were sworn in

23    on -- oh, I'm sorry.

24                  You were talking earlier about

25    supervisors who have instructed you to turn back
```



Page 47

1    asylum seekers.  What do you mean by "supervisors"?

2         A.    There was a muster in the morning

3    about -- or in the afternoon about what we needed to

4    do when an asylum seeker comes up.

5         Q.    Can you explain what a muster is, in the

6    CBP parlance?

7         A.    It's kind of like an order of what to

8    do.

9         Q.    And can a muster be written or oral?

10        A.    Yes.

11        Q.    And the muster that you received

12   regarding turning back asylum seekers, was it in

13   writing or was it oral?

14        A.    At first it was oral, and then it became

15   writing months later.

16        Q.    When do you first recall receiving a

17   muster telling you to turn back asylum seekers?

18        A.    Orally or written?

19        Q.    Oral.

20        A.    I -- I don't recall.  It was months

21   before I did my whistle-blowing.

22        Q.    And this occurred during your time at

23   Tecate or was it another port of entry?

24        A.    At Tecate.

25        Q.    Do you have friends who work at other



Page 48

1    ports of entry?

2         A.    Yes.

3         Q.    Where do your friends at other ports of

4    entry -- where do they work?

5         A.    Otay Mesa and San Ysidro.

6         Q.    Do you know whether your friends who

7    work at other ports of entry have received similar

8    musters?

9         A.    I don't.

10        Q.    Have you ever talked to them about it?

11        A.    No.

12        Q.    So it's possible they have, but you just

13   have discussed it with them?

14        A.    Exactly.

15        Q.    Let's go back for a second.

16              When you were talking about various

17   training you had on certain processes, and I think

18   the last one we talked about was the asylum process,

19   and the fourth process that you talked about was

20   people running into lanes, people rushing vehicle

21   lanes?

22        A.    Yes.

23        Q.    And when did you receive training on

24   people rushing the lanes?

25        A.    It's almost the same thing as -- it's an



Page 49

1    expedited removal as well.  So -- yeah.  It's the

2    same process.  They're called EWIs, entry without

3    inspections.

4         Q.    And individuals who rush the lanes, or

5    EWI, they're put into expedited removal?  Is that the

6    case?

7         A.    Yes.

8         Q.    Where did you receive training on

9    individuals who rush the lanes?

10        A.    Same SharePoint.

11        Q.    You received it at the Otay Mesa AEU?

12        A.    Yes.

13        Q.    And then if you wanted materials on

14   that, you'd access the SharePoint site?

15        A.    Yeah, or ask other officers.

16        Q.    Okay.  Have you ever asked other

17   officers for further training on the process for

18   inspecting and processing asylum seekers?

19        A.    I have.  I have told people I will do

20   them.

21        Q.    Okay.

22        A.    I don't mind.  I mean, I just know it's

23   a very time-consuming process.

24        Q.    Do you know how time-consuming?

25        A.    A couple of hours.



Page 93

1        Q.      In that capacity, that number that you

2   got from GSA, that's an actual number, right?

3        A.      Yes.

4        Q.      It's not something that's, you know,

5   amorphous and unknowable, right?  It's an actual

6   number?

7        A.      Yes.

8        Q.      So I want to focus on the next sentence.

9   It says, "Depending on port configuration operating

10  conditions, the DFO may establish and operate

11  physical access controls at the borderline, including

12  as close to the U.S.-Mexico border as operationally

13  feasible."

14          Did I read that correctly?

15       A.      Yes.

16       Q.      Okay.  I want to pick out some parts of

17  that sentence.

18          Do you have a sense of what the phrase

19  "physical access controls" means?

20       A.      I'm guessing officers?

21       Q.      Could it also be turnstiles as well?

22       A.      Yes.

23       Q.      ███████████████████████████████████████

24  ███████████████████████████████████  there's always been

25  some form of physical access control at the



Page 94

1    borderline of Tecate; is that right?

2         A.    Wait.  Three months before and now?

3         Q.    Yes.

4         A.    Yes, sir.

5         Q.    I want to look at the next sentence, and

6    I'll read it to you:  "DFOs may not create a line

7    specifically for asylum seekers only, but could, for

8    instance, create lines based on legitimate

9    operational needs, such as lines for those with

10   appropriate travel documents and those without such

11   documents."

12              Do you see that?

13        A.    Yes.

14        Q.    At Tecate, are there two different lines

15   of people approaching the port of entry?

16        A.    No.

17        Q.    At San Ysidro, were there?

18        A.    Yes.

19        Q.    And how many lines were there

20   approaching the port of entry?

21        A.    I believe there was four.

22        Q.    Who was in each of those lines?  How

23   were they broken down?

24        A.    There was a SENTRI, there was a ready

25   line, there was a general public lane -- that just



```
                                                      Page 95
 1    didn't have any -- just regular passport, wasn't a

 2    ready-lane document -- and then there was the

 3    handicapped lane.

 4         Q.     And these are the lanes of people

 5    approaching primary, right?

 6         A.     Correct.

 7         Q.     Were there lines of people approaching

 8    the limit line?

 9         A.     Yes.

10         Q.     And how were those lines broken down?

11         A.     They were the same.

12         Q.     The same?

13         A.     Yes.

14         Q.     And how about at Otay Mesa, were there

15    different lines at Otay Mesa?

16         A.     I don't -- well, yes, there was a SENTRI

17    line, for sure.  I don't remember there because there

18    was no limit line when I was there at Otay Mesa.

19         Q.     I see.  Okay.

20                There's a reference here to the border

21    line.  Do you see that in the memorandum?

22         A.     Yes.

23         Q.     Is the border line what you understand

24    to be the limit line?

25         A.     That's -- I -- what I understand is
```



Page 96

1   that's the actual physical line that separates Mexico

2   to the U.S.

3       Q.    And the officers who were posted to the

4   limit line at Tecate, do they stand at the actual

5   border, or do they stand some ways back of it?

6       A.    Some ways back of it.

7       Q.    How far back?

8       A.    Every port is different.

9       Q.    Okay.  At Tecate, how far back?

10      A.    Three feet.

11      Q.    Okay.  So if an asylum seeker approaches

12  the officer at the limit line and is turned back,

13  they've actually stepped three feet into U.S. soil

14  before being turned back; is that right?

15      A.    There's a possibility.

16      Q.    Where is -- when you say there's a

17  possibility --

18      A.    Because they could stop before and talk

19  to the officer.

20      Q.    Okay --

21      A.    So --

22      Q.    So unless they stand a yard away and

23  just yell at the officer, they're going to be on

24  U.S. soil, right?

25      A.    Yes.



Page 97

```
 1        Q.      Okay.  And in your experience, how often
 2  do asylum seekers just stand three feet back to have
 3  that conversation from you?
 4        A.      Very rare.
 5        Q.      In fact, they usually come up a normal
 6  speaking distance away, right?
 7        A.      Yes.
 8        Q.      So we're talking about a foot or so away
 9  from you?
10        A.      Correct.
11        Q.      So they're on U.S. soil, most cases,
12  when they come to the limit line at Tecate, right?
13        A.      Yes.
14        Q.      And so they would be -- in most cases,
15  asylum seekers would have their feet on U.S. soil and
16  then be turned back to Mexican soil and told to go to
17  another port of entry; is that right?
18        A.      Correct.
19        Q.      During the time that you were at
20  San Ysidro, where were the officers stationed at the
21  limit line with respect to the actual borderline
22  between the U.S. and Mexico?
23        A.      San Ysidro?  I don't remember where the
24  actual limit line is at San Ysidro.
25        Q.      And at Otay Mesa, no one was posted to
```



Page 98

1    the limit line, so you don't recall?

2         A.    No.

3         Q.    I want to move down to the second

4    paragraph of this memo, that begins with, "Ports

5    should."

6              Do you see that?

7         A.    Yes.

8         Q.    That sentence reads, "Ports should

9    inform the waiting travelers that processing at the

10   port of entry is currently at capacity.  And CBP is

11   permitting travelers to enter the port once there is

12   sufficient space and resources to process them."

13             Did I read that correctly?

14        A.    Yes.

15        Q.    Have you -- at the time you were at

16   Tecate, did officers ever tell individuals that the

17   port was at capacity and turn them back to Mexico?

18        A.    Yes.

19        Q.    And the Tecate port doesn't have an AEU,

20   right?

21        A.    No.

22        Q.    But asylum seekers can be processed at

23   Tecate, right?

24        A.    Yes.

25        Q.    There are individuals, officers at



Page 99

1    Tecate, who have training that enables them to

2    process asylum seekers, correct?

3         A.    Correct.

4         Q.    And do you know -- do you know of

5    instances where asylum seekers have actually been

6    processed at Tecate?

7         A.    Yes.

8         Q.    And do you know what the actual capacity

9    of Tecate is on a daily basis to process asylum

10   seekers?

11        A.    No.

12        Q.    Is it safe to say that it is higher than

13   zero?

14        A.    Yes.

15        Q.    And in most days that you were posted to

16   the limit line, the Tecate port was processing zero

17   asylum seekers per day, correct?

18        A.    Yes.

19        Q.    So it's just simply not true that when

20   officers told asylum seekers that the port was

21   currently at capacity and turning them back, that the

22   port was actually -- that Tecate was actually at

23   capacity, right?

24        A.    Correct.

25        Q.    So you were instructed to lie to people



Page 100

1   when turning them back; is that right?

2        A.      We were instructed, yes.

3        Q.      How did it make you feel that your

4   management was telling you to lie to people in order

5   to turn them back from U.S. soil to Mexican soil?

6        A.      I didn't do it.  I would have the

7   manager come down and they would have to do it.

8        Q.      So the management would lie?

9        A.      Yes.

10       Q.      They would lie for you, essentially; is

11  that right?

12       A.      Well, I wouldn't talk to them.  First

13  off, I don't -- a lot of time I don't speak the

14  language --

15       Q.      I see.

16       A.      -- enough to tell them all that.

17       Q.      But when the supervisor came down, they

18  would give this capacity excuse, correct?

19       A.      Not all the time.

20       Q.      So sometimes they would, though?

21       A.      Yes.

22       Q.      And when they said the port was at

23  capacity, you knew that was a lie, right?

24       A.      Yes.

25       Q.      And it would have been obvious to those



Page 101

1    supervisors that it was a lie as well, correct?

2         A.    Correct.

3         Q.    In fact, it was obvious to everybody who

4    was implementing this policy at Tecate that the

5    capacity excuse was a lie, right?

6         A.    Correct.

7              MR. MEDLOCK:  We'll mark the next

8         exhibit as Exhibit 4.

9              [Exhibit 4, a declaration, was marked

10        for identification.]

11   BY MR. MEDLOCK:

12        Q.    Okay, sir.  I put in front of you what

13   we've marked as Exhibit 4 to your deposition.  It's a

14   multipage declaration from Mariza Marin, whose name

15   I'm hoping I pronounced correctly, that was filed

16   earlier in this litigation.

17             Please take a moment to review it, and

18   then let me know verbally on the record when you've

19   finished doing that.

20        A.    This is going to take a while.  It looks

21   like a lot of it is not my port of entry.

22        Q.    Yes, that's correct.

23             You want me to direct you to the place I

24   would like to talk to you about?

25        A.    Sure.



1  MAYER BROWN LLP
     Matthew H. Marmolejo (CA Bar No. 242964)
2     *mmarmolejo@mayerbrown.com*
   350 S. Grand Avenue
3  25th Floor
   Los Angeles, CA 90071-1503
4     Ori Lev (DC Bar No. 452565)
     (*pro hac vice*)
5     *olev@mayerbrown.com*
     Stephen M. Medlock (VA Bar No. 78819)
6     (*pro hac vice*)
     *smedlock@mayerbrown.com*
7  1999 K Street, N.W.
   Washington, D.C. 20006
8  Telephone:  +1.202.263.3000
   Facsimile:   +1.202.263.3300
9
   SOUTHERN POVERTY LAW CENTER
10    Melissa Crow (DC Bar No. 453487)
     (*pro hac vice*)
11    *melissa.crow@splcenter.org*
   1101 17th Street, N.W., Suite 705
12 Washington, D.C. 20036
   Telephone: +1.202.355.4471
13 Facsimile: +1.404.221.5857

14 *Additional counsel listed on next page*
   *Attorneys for Plaintiffs*
15
               **UNITED STATES DISTRICT COURT**
16
             **SOUTHERN DISTRICT OF CALIFORNIA**
17

18 | Al Otro Lado, Inc., *et al.*, | Case No.:  17-cv-02366-BAS-KSC |
19 | | |
   | Plaintiffs, | **EXHIBIT 2 IN SUPPORT OF** |
20 | | **PLAINTIFFS' MEMORANDUM OF** |
   | v. | **POINTS AND AUTHORITIES IN** |
21 | | **SUPPORT OF THEIR MOTION** |
   | Chad F. Wolf,[1] *et al.*, | **FOR SUMMARY JUDGMENT** |
22 | | |
   | Defendants. | |
23

24

25

26

────────────────────
27 [1] Acting Secretary Wolf is automatically substituted for former Acting Secretary
   McAleenan pursuant to Fed. R. Civ. P. 25(d).
28
                    EXHIBIT 2 IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF
                    POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION
                                           FOR SUMMARY JUDGMENT

CENTER FOR CONSTITUTIONAL RIGHTS
   Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
   *bazmy@ccrjustice.org*
   Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
   *gschwarz@ccrjustice.org*
   Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
   *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
   Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
   *sarah.rich@splcenter.org*
   Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
   *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
   Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
   *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

EXHIBIT 2 IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION
FOR SUMMARY JUDGMENT

**HARALSON, WILLIAM T**

| | |
|---|---|
| From: | HARALSON, WILLIAM T |
| Sent: | Wednesday, March 15, 2017 12:09 PM |
| To: | HIGGERSON, DAVID P |
| Cc: | ATKINSON, DAVID; CLOUGH, ERIC; PONCE, EDUARDO H |
| Subject: | Step 3 Grievance (Failure to Process ER/CF & Asylum HID 2017) |
| Attachments: | CBP Abuse 1.pdf; Step3GrievanceFailureToProcessERCF&AsylumHID2017.pdf |

Mr. Higgerson,

During the grievance meetings, Agency Representatives acknowledged that the Agency's unilateral work polices broke CBP mandates, Federal immigration rules and Laws in formally processing persons who seek political asylum and screening for possible terrorists or fugitive status. Which places CBP Officers' safety, integrity and position to be questioned as the Agency lacks candor to the public in stating the true facts that the Agency intentionally placed the changes of denying and blocking asylum to persons and families in order to block the flow of asylum applicants in a chilling affects to all others attempting entry in to the United States.

The Agency's actions caused traumatic and emotional injury to children, persons, and families seeking asylum when: denying and blocking entry, threating that they would be processed separately , returned to Mexico without processing, kept in unsafe and unsanitary conditions, which placed CBP Officers in a injurious position to get sick and affected with the same, emotions, illness and infections as the asylum seekers.

The Agency's ill actions have caused Officers' working conditions, character and credibility to be altered and threaten by public and asylum seekers as the agency lacked candor in defending the CBP Officers for their ill implemented practices of denying and blocking asylum seekers to be processed at the Ports of Hidalgo, Texas.

For the reasons above and the back-pay compensation that could not be settled by the parties; the Union is requesting a STEP 3 Grievance with you covering all issues raised in the CBP Form 280 and its attachments.

Please respond within the allotted timeframe with a proposed date and time to meet.

Respectfully Submitted,

William T. Haralson
NTEU Representative
NTEU Chapter 149
956-843-5749 Union Office
956-239-2747 Cell



1

Exhibit
**292**

NTEU - 000132

1  MAYER BROWN LLP
     Matthew H. Marmolejo (CA Bar No. 242964)
2    *mmarmolejo@mayerbrown.com*
   350 S. Grand Avenue
3  25th Floor
   Los Angeles, CA 90071-1503
4    Ori Lev (DC Bar No. 452565)
     (*pro hac vice*)
5    *olev@mayerbrown.com*
     Stephen M. Medlock (VA Bar No. 78819)
6    (*pro hac vice*)
     *smedlock@mayerbrown.com*
7  1999 K Street, N.W.
   Washington, D.C. 20006
8  Telephone:  +1.202.263.3000
   Facsimile:   +1.202.263.3300
9
   SOUTHERN POVERTY LAW CENTER
10   Melissa Crow (DC Bar No. 453487)
     (*pro hac vice*)
11   *melissa.crow@splcenter.org*
   1101 17th Street, N.W., Suite 705
12 Washington, D.C. 20036
   Telephone: +1.202.355.4471
13 Facsimile: +1.404.221.5857

14 *Additional counsel listed on next page*
   *Attorneys for Plaintiffs*
15
                  **UNITED STATES DISTRICT COURT**
16
                **SOUTHERN DISTRICT OF CALIFORNIA**
17

18 | Al Otro Lado, Inc., *et al.*, | Case No.:  17-cv-02366-BAS-KSC |

19 |              Plaintiffs, | **EXHIBIT 10 IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** |

20 |       v. |

21 | Chad F. Wolf,[1] *et al.*, |

22 |              Defendants. |

23 | | **REDACTED VERSION** |

24

25

26

27  _____

28 [1] Acting Secretary Wolf is automatically substituted for former Acting Secretary McAleenan pursuant to Fed. R. Civ. P. 25(d).

EXHIBIT 10 IN SUPPORT OF PLAINTIFFS' MEMORANDUM
OF POINTS AND AUTHORITIES IN SUPPORT
OF THEIR MOTION FOR SUMMARY JUDGMENT

1-SER-169

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

CENTER FOR CONSTITUTIONAL RIGHTS
  Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
  *bazmy@ccrjustice.org*
  Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
  *gschwarz@ccrjustice.org*
  Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
  *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
  Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
  *sarah.rich@splcenter.org*
  Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
  *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
  Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
  *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

EXHIBIT 10 IN SUPPORT OF PLAINTIFFS' MEMORANDUM<br/>OF POINTS AND AUTHORITIES IN SUPPORT<br/>OF THEIR MOTION FOR SUMMARY JUDGMENT

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

--------------------------------x

AL OTRO LADO, INC., et al.,        :

               Plaintiffs,        : Case No.:

         vs.                    : 17-cv-02366-BAS-KSC

KEVIN K. MCALEENAN, et al.,        :

          Defendants.        :

--------------------------------x



DEPOSITION MARKED CONFIDENTIAL

DEPOSITION OF TODD OWEN

Washington, D.C.

Friday, December 13, 2019

9:40 a.m.




Job No.:  529549

Pages:  1 - 332

Reported by:  Elizabeth Mingione, RPR



Page 2

1

2          Deposition of TODD OWEN, held at the offices

3     of Mayer Brown, LLP, 1999 K Sreet, Northwest,

4     Washington, D.C., commencing at 9:40 a.m., Friday,

5     December 13, 2019, and taken down stenographically by

6     Elizabeth Mingione, Registered Professional Reporter

7     and Notary Public for the Commonwealth of Virginia.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22



```
                                                              Page  3

 1    A P P E A R A N C E S   O F   C O U N S E L:

 2    ON BEHALF OF PLAINTIFFS:

 3            MAYER BROWN, LLP

 4            Stephen M. Medlock, Esquire

 5            Ori Lev, Esquire

 6            1999 K Street, Northwest

 7            Washington, DC 20006

 8            (202) 263-3000

 9            Smedlock@mayerbrown.com

10

11    ON BEHALF OF DEFENDANTS:

12            U.S. DEPARTMENT OF JUSTICE

13            Katherine J. Shinners, Esquire

14            David White, Esquire

15            Ben Franklin Station

16            PO Box 868

17            Washington, DC 20044

18            (202) 598-8259

19            Katherine.J.Shinner@usdoj.gov

20

21    (Appearances, Continued)

22
```



Page 4

1                      A L S O    P R E S E N T

2                  Louisa Slocum,  Esquire

3                      Rameez Burney

4        Karolina Walters, American Immigration Council

5                      Kristine King

6           Matthew Fenn (via phone, as indicated)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22



Page 5

1                    C O N T E N T S

2                 WITNESS:  TODD OWEN

3   EXAMINATION BY:                            PAGE

4   Mr. Medlock ...................................   9

5   Ms. Shinners .................................  312

6   Mr. Lev ......................................  322

7

8                        *    *    *

9

10              DEPOSITION EXHIBITS

11                   TODD OWEN

12   NUMBER          DESCRIPTION                  PAGE

13   Exhibit 20   Notice of Deposition .............   19

14   Exhibit 21   Website Printout of Todd Owen

15        Description .............................   49

16   Exhibit 22   U.S. Customs and Border Protection

17        Standard of Conduct, AOL-DEF-00669013 ....   51

18   Exhibit 23   Metering Guidance Memorandum, Date

19        Stamped April 27, 2018 ..................   63

20   Exhibit 24   E-mail from Randy Howe, June 19,

21        2018, AOL-DEF-00088501 ..................   81

22   (Exhibits Continued)



Page 72

1    there were still large numbers of migrants seeking

2    entry into the country, primarily through the gateway

3    land borders, which there would then be a need to

4    meter, as the operational needs dictated.

5         Q.    So the answer to my question is yes, there

6    was metering that occurred in 20 --

7         A.    In 2017.  Yes.

8         Q.    Okay.  And metering occurred in 2018 as

9    well; is that right?

10        A.    Yes.

11        Q.    And 2019 it still occurs.

12        A.    Still occurs.

13        Q.    The metering policy did have a deterrent

14   effect though, didn't it?

15             MS. SHINNERS:  Objection argumentative.

16   You can answer.

17        A.    I don't believe it had a deterrent effect.

18   When you look at the number of migrants that have come

19   in and sought refuge at the ports of entry, the flows

20   -- there have been ebbs and flows as we typically see.

21   But again, last year 126,000 migrants came in and

22   sough refuge; 124,000 the year before.  So I don't



Page 73

1    believe the metering had a chilling effect.

2         Q.    You were told that the metering policy had

3    a deterrent effect, weren't you?

4         A.    I was told?

5         Q.    Yes.

6         A.    I do not recall being told.  I believe some

7    feel that it has a deterrent effect.

8         Q.    But you don't recall ever been told that

9    the metering policy had a deterrent effect?

10        A.    I may have.  I don't recall.

11        Q.    Were you told at any point that the

12   metering policy was working because it was cutting

13   down on the number of asylum seekers that came to the

14   port of entry?

15        A.    I don't recall that.

16        Q.    Were you told that the metering policy

17   created a humanitarian disaster?

18        A.    Humanitarian disaster?

19        Q.    Yeah.

20        A.    No.

21        Q.    Do you believe that the metering policy

22   created a humanitarian disaster?



Page 74

1       A.      No.  Disaster, no.

2       Q.      If somebody told you that the metering

3    policy created a humanitarian disaster, you would have

4    told them that's not correct; is that right?

5       A.      Well, I would tell them if that's their

6    opinion and I don't share that opinion.

7       Q.      Isn't it true that metering occurred at

8    ports of entry even when those ports have excess

9    capacity?

10       A.      You have to define capacity.

11       Q.      How do you define capacity?

12       A.      I define capacity as two parts.  There is

13    the physical capacity which is the space within the

14    detention cells.  Then there's the operational

15    capacity which takes into consideration such things as

16    the demographics of those in custody, the conditions

17    of those in custody T, the issues and sickness issues,

18    the other operational priorities as to how the

19    resources in the ports are being directed that day,

20    all of these other day-to-day operational

21    considerations which may keep a port from reaching the

22    full physical space that they have.



Page 75

1        Q.      So if a port decides to prioritize other

2   matters over processing migrants without proper travel

3   documents, they may have a lower operational capacity;

4   is that right?

5        A.      Could you repeat that question.

6        Q.      Sure.

7        A.      Trying to follow.

8        Q.      If as a policy matter a port decides that

9   they are going to prioritize other missions besides

10  inspecting and processing individuals that don't have

11  proper travel documents, that port will effectively

12  have a lower operational capacity; is that right?

13       A.      Correct.  The finite resources that we have

14  are directed amongst multiple priorities in the ports

15  of entry.  The more you direct towards narcotics

16  intradiction or the counter-terrorism threat means

17  there's less to do other things in, whether that's the

18  migrant processing, the trade enforcement, the

19  agriculture mission.  The full scope of what we do at

20  the ports of entry, if you push resources in one area,

21  there will be less resources in other areas including

22  migrant process.



Page 76

1          Q.     And if you wanted to intentionally lower

2     the operational capacity to process migrants, you

3     could assign more front-line officers to those other

4     missions; is that right?

5               MS. SHINNERS:   Objection.   Argumentative.

6     You can answer.

7          A.     The capacity drives the decisions.   And,

8     again, the capacity is not just the physical space but

9     the operational aspects of what's taking place.   There

10    are certain priority missions within CBP that we do

11    not pull officers off of to process the migrants.   We

12    will not sacrifice the counter-terrorism mission.   we

13    will not sacrifice the narcotics mission.

14               We would not reassign officers from those

15    key missions to process more migrants.

16         Q.     But you have a legal duty to process asylum

17    seekers, right?

18         A.     And we do.

19         Q.     And so but you won't sacrifice the

20    counter-terrorism mission and the narcotics mission to

21    process asylum seekers; is that right?

22         A.     I will not redirect resources from those



Page 77

1    priority missions to process migrants quicker.

2        Q.    Do you believe that counter-terrorism and

3    anti-narcotics are higher priority missions that

4    processing asylum seekers?

5        A.    Yes, I do.

6        Q.    Do you believe that having a orderly flow

7    of trade is a higher priority mission than processing

8    asylum seekers?

9        A.    Yes, I do.

10       Q.    Do you ever interact with individuals in

11   the Mexican government?

12       A.    Yes.

13       Q.    Have you ever -- do you know of an agency

14   in the Mexican government called INM or --

15       A.    INAMI.

16       Q.    -- or INAMI?

17       A.    Yes.  It's Mexican immigration.

18       Q.    Have you ever interacted with the

19   commissioner of INAMI?

20       A.    No.

21       Q.    Do you know of a commissioner of INAMI

22   called Commissioner Vargas?



Page 78

1    A.    I believe I recall the name.

2    Q.    Okay.  Did you ever receive any e-mail

3    traffic regarding Commissioner Vargas?

4    A.    Generally, I -- can you be more specific?

5    Q.    Well, let me ask it this way, CBP has

6    liaison units for foreign governments, correct?

7    A.    Correct.

8    Q.    And one of those liaison -- some of those

9    liaison units are stationed in Mexico City; is that

10   right?

11   A.    Yes.

12   Q.    And they interact with -- those liaison

13   units interact with agencies in the Mexican

14   government, correct?

15   A.    Correct.

16   Q.    Including INAMI, right?

17   A.    Correct.

18   Q.    And that would also include interactions

19   with the commissioner of INAMI, correct?

20   A.    Correct.

21   Q.    And as the EAC, occasionally you would get

22   communications from the liaison unit regarding the



Page 183

1       A.      To my recollection, in the first year or so

2    of metering, so throughout 2016, early '17.

3       Q.      Okay.  So certainly before you signed the

4    metering memorandum that we looked at earlier.

5       A.      In 2018.

6       Q.      You were aware that CRCL had investigated

7    allegations related to metering, correct?

8       A.      Correct.

9       Q.      You were aware that the judiciary committee

10   had questions about it?

11      A.      Correct.

12      Q.      You were aware that -- you had gotten

13   e-mails before then saying that the policy had a

14   deterrent effect, correct?

15      A.      You have refreshed my recollection on one

16   e-mail that used the word deterrent.

17      Q.      Right.  But you did receive an e-mail

18   saying it was --

19      A.      I received that one e-mail.  Yes.

20      Q.      And you also received an e-mail saying that

21   Mexican officials said that the metering policy was

22   causing the humanitarian crisis as well?



Page 184

1        A.     In their view.  Yes.

2        Q.     Okay.  And you also received MCAT reports

3   that said that individuals were being either held at

4   the line or held in shelters when there was no impact

5   to port capacity, correct?

6             MS. SHINNERS:  Objection.  Mischaracterizes

7   the document.

8        A.     The no-impact deport capacity on that

9   report is a general snapshot of significant issues to

10   be brought to our attention.  So I have, you know, I

11   disagree with the fact that it says no impact,

12   negative, non-- that that indicates that there was no

13   impact to port operations.  That column is used to

14   call senior leadership's attention to something

15   significant that had happened, such as a large number

16   of port runners, an outbreak of tuberculosis, things

17   of that nature.

18             I don't take the presence of no, negative,

19   none as meaning the metering is not having an impact

20   to the ports.

21        Q.     Okay.  Let's go back -- and I apologize.

22   I'm about to do a little bit of flipping through to



Page 185

1    find the prior e-mail we looked at.

2         A.    Yes.

3         Q.    From I believe it was June 19, 2018.  Do

4    you have that in front of you, sir?

5         A.    Sure.

6         Q.    Which exhibit is that, if you could help me

7    do my job.

8         A.    Exhibit 24.

9         Q.    So Exhibit 24 lists percentage capacities

10   for various ports, correct?

11        A.    Correct.

12        Q.    And you said that that is physical

13   capacity, not the actual detention capacity, correct?

14        A.    Not operational capacity.

15        Q.    Oh, I'm sorry.  I got the wrong word.

16   Operational capacity.  Okay.

17             Did you ever tell anyone from MCAT they

18   should start listing operational capacities, not

19   physical?

20        A.    No.

21        Q.    Did you ever criticize MCAT for not using

22   the operational capacities?



Page 186

1      A.    No.  Because as this report as I use it,

2  since it gives me a snapshot as to the number of folks

3  that are in our custody, how many folks are waiting in

4  Mexico, and any significant issues to be aware of,

5  that's how I used it.  I didn't correct them on each

6  heading of the category of the report.

7      Q.    Sure.  Did anybody to your knowledge in

8  senior leadership at CVP or OFO correct the -- request

9  that MCAT put together a version of this report that

10 actually used operational capacities?

11     A.    No.  Because the operational capacity

12 differs from port to port and from day-to-day.  And

13 that would just be too cumbersome to record every

14 event that's taking place in the port through out the

15 day, which has had an impact on how many migrants we

16 could come across.  If a port was working multiple

17 simultaneous seizures, and then we had to pull

18 officers to do that, we wouldn't record all of those

19 activities.  It's just too cumbersome of a report to

20 come together for the 46 crossings along the southwest

21 border as to what's taking place.

22              And again, the operational capacity is



Page 187

1    fluid.  It fluctuates from day to day.  There may be

2    no capacity at 9:00 a.m, but ERO comes and picks folks

3    up at 11:00.  And at 12 o'clock we have capacity.

4            So this is a static view that gives us a

5    high level understanding of what's taking place in the

6    ports in terms of our capacity.  The migrants that

7    have come in, the migrants that are waiting, and any

8    operation issues.  That's how I see this report.

9    That's how I use the report.

10       Q.    And --

11       A.    And similar reports like this.

12       Q.    Yeah, sure.  The queue management report as

13   well?

14       A.    Yeah.  It's modeled differently, but

15   generally the same information.

16       Q.    Okay.  Is it the case that there is no

17   regularly generated report at CBP or OFO that lists

18   the operational capacities for ports of entry on a

19   daily basis?

20       A.    No.  There are multiple reports that deal

21   with our different mission sense.  So there is

22   reporting that comes into what we call our situation



Page 188

1    room.  And there is a threshold limit as to what needs

2    to be reported.

3              So seizures of certain amounts have to be

4    reported.  There's a report that captures all of that

5    every day.  Our counter-terrorism connections or

6    encounters gets reported up a different way, and we

7    receive a report on that.  If we have outbound

8    operations underway, we would be made aware of those

9    that rise to a certain level of outbound operations.

10             So the migrant processing is just one

11   aspect of what we do within the port every single day.

12   And there are different reports for those other

13   activities.  And again, based on the operational area

14   we are talking about, the reports for the southern

15   border are different that the reports for the

16   airports, the sea ports, the northern border, and our

17   foreign operations.

18             So to understand the operational aspect of

19   what's taking place at any one port at any one given

20   time, you need to look at all of those mission sets

21   and what's being done with all of that.  And you also

22   have to then consider the staffing that we have on



Page 189

1    hand, things like that.  When you look at Calexico

2    here, 74 percent of capacity -- but we have 20 percent

3    of our officers vacant in El Paso -- I'm sorry,  in

4    Calexico.

5               So we have a huge staffing issue in

6    Calexico, which impacts our ability to bring more

7    folks in to process them for their asylum claims.

8        Q.    So I think my question -- and I appreciate

9    your answer, but I think my question was just a little

10   bit more focused, which was there's no single report

11   that's generated that lists the operational capacities

12   for migrant processing at each port of entry on a

13   daily basis, is there?

14       A.    No, because the operational capacity is

15   influenced by all of our other mission sets.  And

16   there's separate reports for those other missions

17   sets.

18       Q.    So is there any way that I could go back to

19   2016, 2017, or 2018 and reconstruct what the

20   operational capacity would have been at that port of

21   entry on a given day?

22       A.    I think it would be very, very difficult to



Page 190

1    do that because of all the barriers that you would

2    need to consider, including how many officers called

3    in sick that day, how many may have been out at the

4    range, how many may have been processing seizures.

5    All of those variables impact our operational

6    capacity.

7              You will not find that in one port or in

8    one report because the nuance is of everything that we

9    do in the port of entry.  We haven't talked about the

10   trade mission.  We haven't talked about passenger --

11   or traveler processing and wait times, cargo.  We

12   haven't talked about the agriculture mission.

13             We compete for limited resources in the

14   ports of entry.  Migrant processing is one aspect of

15   what we do.

16        Q.    Okay.

17        A.    You are looking for a totality across the

18   board.  There is not a single report that captures

19   that totality.

20        Q.    Okay.  So as we sit here today, although

21   it's imperfect, the best snapshot we have of what was

22   going on with capacity in the port would be these MCAT



Page 191

1    reports.

2         Q.    From the headquarters visibility aspect,

3    yes.  But this is why we allow the queue management,

4    the metering to be controlled by the local port

5    directors and their management teams because they have

6    the day-to-day visibility as to what's going on.

7         Q.    I see.

8         A.    This report again gives me a snapshot at a

9    very high level from my position as the executive

10   assistant commissioner what's taking place in this one

11   mission space.

12        Q.    I see.  Okay.  We talked a little bit about

13   the metering guidance.  Was there ever any subsequent

14   guidance that was given to field offices or port

15   directors regarding the implementation of the April

16   2018 metering guidance?

17        A.    ████████████████████████████████████

18   █████████████████████████████████████████

19        Q.    ████████████████████████

20        A.    ██████████████████████████████████

21   ████████████████████████████████████████████

22   █████████████



Page 192

1      Q.    Okay.  And I think you testified to this

2  earlier.  In 2018 -- so in general, just looking at

3  numbers of inadmissibles?

4      A.    Yes.

5      Q.    There's a fairly large number in 2016?

6      A.    Yes.

7      Q.    There was a large number but reduced in

8  2017?

9      A.    Correct.

10     Q.    2018 was a very high year for

11  inadmissibles, correct?

12     A.    Correct.  And '19 even higher.

13     Q.    So if I'm looking at this in sort of a

14  stair step fashion, was 2018 --

15     A.    Can I give you the --

16     Q.    Yeah.  If you have got the numbers, I'll

17  take them.

18     A.    FY '15, about 111 -- I'm sorry, 113,000

19  inadmissibles.

20     Q.    Okay.

21     A.    FY '16 about 154,000 inadmissibles; '17

22  dropped to 111,000; '18 was 124,000, And '19 was



Page 193

1    126,000.

2         Q.    Okay.

3         A.    So those are in our inadmissible numbers

4    across the southwest border.  I'm not giving you

5    airport inadmissibles and all of that.

6         Q.    And inadmissibles is a broader category of

7    an asylum seeker?  That's how --

8         A.    Correct.

9         Q.    -- are part of it.

10        A     In a -- yes, sir.

11        Q.    Okay.  So in 2018 is a year where you are

12   seeing increased numbers of inadmissibles coming to

13   the ports?

14        A.    Compared to '17, yes.

15        Q.    Okay.

16        A.    But not as large as '16.

17        Q.    Right.  And not as large as '19?

18        A.    Correct.

19        Q.    Okay.

20                    -   -   -

21             (A document was marked as Deposition

22   Exhibit Number 37.)



Page 319

1          Anybody that we arrest, and we make 40,000

2     arrests a year, they go into a cell separate from the

3     migrants.  The migrants are here for an administrative

4     matter, if you will.  Anyone that we arrest for a

5     criminal matter goes into a separate cell by

6     themselves.  So you may have a physical capacity of

7     42, but in this example you actually only have 7

8     people in your cells, and you are a full capacity.

9          Q.    Thank you.  Can you explain what impacts

10    there might be on trade and travel, in general, at any

11    port of entry, if resources are diverted from

12    facilitating trade and travel?

13         A.    Okay.

14               MR. LEV:  Objection.  Calls for

15    speculation.

16         A.    I do understand.

17         Q.    Just to clarify, I'm asking can you explain

18    to your knowledge --

19         A.    This is confusing with you objecting.  Do I

20    look at you or do I look at her.  Can I answer?

21         Q.    You may answer, but I'm going to go ahead

22    and rephrase.



Page 320

1      A.    Okay.

2      Q.    So can you explain, based on your knowledge

3  and your experience, in general any impacts on trade

4  and travel from -- if you divert resources, or if a

5  port of entry diverts resources from the facilitation

6  of trade or travel?

7            MR. LEV:  Same objection.

8      A.    Okay.  From my knowledge, we prioritize our

9  mission sets within the ports of entry along the

10  guidance that we receive from the secretary.  So if we

11  had to divert officers from the counter-terrorism

12  mission, or if we had to divert officers to put more

13  officers towards the processing of undocumented

14  migrants, we would not pull them from the

15  counter-terrorism mission.  We would not pull them

16  from the narcotics intradiction mission.

17            So the two missions that they would be

18  pulled from, one would be the facilitation of lawful

19  trade and travel.  So those are folks who have lawful

20  documents to enter the country.  Most of the

21  cross-border traffic on the southern border comes and

22  goes with border crossing cards.



Page 321

1            We would reduce travel lanes so you would

2     have fewer booths open.  This would impact the

3     business community as they crossed.  This would impact

4     the school kids that cross every day.  This would

5     impact the people coming for medical treatments, to do

6     their business, to do their shopping.  It Would result

7     in longer wait times to cross the border if we pulled

8     individuals from that mission set.

9            If we pulled officers from the processing

10    cargo mission set, your summer produce would be

11    delayed.  All of your cargo processing would be

12    delayed.  In the summer -- the spring and summer of

13    2019, when we reassigned 731 officers from field

14    operations from the ports of entry to assist the

15    border patrol because of the migrant crisis that they

16    were facing at that time, we saw cargo wait times in

17    places like El Paso and San Ysidro go up from 45

18    minutes to over five hours.

19            Those are the types of real impacts that

20    we would experience if we diverted more resources away

21    from the trade and travel mission, from the economic

22    security mission to put towards the migrant



Page 322

1    processing.

2              MS. SHINNERS:  All right.  Mr. Owen, thank

3    you.  I don't have any questions.  I don't have

4    further questions for Mr. Owen.

5              MR. LEV:  Can we take two minutes.

6                        -  -  -

7                   (Recessed at 4:30 p.m.)

8                   (Reconvened at 4:35 p.m.)

9                        -  -  -

10                 EXAMINATION CONDUCTED

11       BY MR. LEV:

12       Q.    I just have a few more questions for you.

13       A.    Yes, sir.

14       Q.    You just testified that in 2017 you

15    assessed what you did in 2016 in terms of converting

16    conference spaces and other rooms into holding

17    facilities and determined that you wouldn't do that

18    again.

19       A.    Yes.

20       Q.    Who conducted that assessment?

21       A.    We did internally, just with our leadership

22    at the ports.  It was not a formal report or anything



1  MAYER BROWN LLP
     Matthew H. Marmolejo (CA Bar No. 242964)
2     *mmarmolejo@mayerbrown.com*
   350 S. Grand Avenue
3  25th Floor
   Los Angeles, CA 90071-1503
4    Ori Lev (DC Bar No. 452565)
     (*pro hac vice*)
5     *olev@mayerbrown.com*
     Stephen M. Medlock (VA Bar No. 78819)
6    (*pro hac vice*)
      *smedlock@mayerbrown.com*
7  1999 K Street, N.W.
   Washington, D.C. 20006
8  Telephone:  +1.202.263.3000
   Facsimile:   +1.202.263.3300
9
   SOUTHERN POVERTY LAW CENTER
10   Melissa Crow (DC Bar No. 453487)
     (*pro hac vice*)
11    *melissa.crow@splcenter.org*
   1101 17th Street, N.W., Suite 705
12 Washington, D.C. 20036
   Telephone: +1.202.355.4471
13 Facsimile: +1.404.221.5857

14 *Additional counsel listed on next page*
   *Attorneys for Plaintiffs*
15
                **UNITED STATES DISTRICT COURT**
16
             **SOUTHERN DISTRICT OF CALIFORNIA**
17

18 | Al Otro Lado, Inc., *et al.*, | Case No.:  17-cv-02366-BAS-KSC |
   | :--- | :--- |
19 |                Plaintiffs, | **EXHIBIT 13 IN SUPPORT OF** |
   |  | **PLAINTIFFS' MEMORANDUM OF** |
20 |        v. | **POINTS AND AUTHORITIES IN** |
   |  | **SUPPORT OF THEIR MOTION** |
21 | Chad F. Wolf,[1] *et al.*, | **FOR SUMMARY JUDGMENT** |
22 |                Defendants. |  |
23 |  |  |
24 |  |  |

25

26

27 ────────────────────
   [1] Acting Secretary Wolf is automatically substituted for former Acting Secretary
28 McAleenan pursuant to Fed. R. Civ. P. 25(d).

EXHIBIT 13 IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT

CENTER FOR CONSTITUTIONAL RIGHTS
  Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
  *bazmy@ccrjustice.org*
  Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
  *gschwarz@ccrjustice.org*
  Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
  *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
  Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
  *sarah.rich@splcenter.org*
  Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
  *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
  Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
  *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EXHIBIT 13 IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT

**From:** FLORES, ALBERTO A
**Sent:** Monday, November 14, 2016 1:08 PM
**To:** LONGORIA, FRANK S
**CC:** ALVAREZ, GREGORY; CHAVEZ, JUAN; CHAVEZ, SYLVIA; ARCE, ADRIANA M; GARCIA, FRANCISCO; HERNANDEZ, JUAN J; HARRIS, RODNEY H; BARRERA, JESUS A; PENA, JAVIER A
**Subject:** RE: Meeting with INM

Good afternoon Frank,

Just a quick message to advise that the port of Laredo will be meeting with INM today at 12:30 pm. Summary of meeting will be provided by COB today.

Thanks,

Alberto A Flores
Deputy Port Director
Laredo Port of Entry
956-523-7386

**From:** LONGORIA, FRANK S
**Sent:** Saturday, November 12, 2016 2:42 PM

**Subject:** Meeting with INM
**Importance:** High

Port Directors:

At the request of C-1 and C-2, you are to meet with your INM counterpart and request they control the flow of aliens to the port of entry. For example, if you determine that you can only process 50 aliens at a time, you will request that INM release only 50.

If INM cannot or will not control the flow, your staff is to provide the alien with a piece of paper identifying a date and time for an appointment and return then to Mexico. This is similar to what San Diego is doing. We understand the alien may express a fear of returning to Mexico and we will address as the situation dictates.

Please schedule a meeting with your INM counterparts ASAP. Let us know the date and time of the meeting as soon as it's scheduled. We will also need a summary of your meeting to include who you met with, what was discussed, what was agreed to, issues/concerns, and timeline.

That's all the information we have on the tasking but we can anticipate being asked to provide an update early next week.


Frank S. Longoria
Assistant Director Field Operations - Border Security
Office of Field Operations
Laredo Field Office
          ffice)
          ell)



EXHIBIT NO. 35
Dec. 13, 2019

Highly Confidential/Attorneys' Eyes Only                                      AOL-DEF-00576607

Page
intentionally
left blank

Page
intentionally
left blank

Page
intentionally
left blank



1  MAYER BROWN LLP
     Matthew H. Marmolejo (CA Bar No. 242964)
2    *mmarmolejo@mayerbrown.com*
   350 S. Grand Avenue
3  25th Floor
   Los Angeles, CA 90071-1503
4    Ori Lev (DC Bar No. 452565)
     (*pro hac vice*)
5    *olev@mayerbrown.com*
     Stephen M. Medlock (VA Bar No. 78819)
6    (*pro hac vice*)
     *smedlock@mayerbrown.com*
7  1999 K Street, N.W.
   Washington, D.C. 20006
8  Telephone:  +1.202.263.3000
   Facsimile:   +1.202.263.3300
9
   SOUTHERN POVERTY LAW CENTER
10   Melissa Crow (DC Bar No. 453487)
     (*pro hac vice*)
11   *melissa.crow@splcenter.org*
   1101 17th Street, N.W., Suite 705
12 Washington, D.C. 20036
   Telephone: +1.202.355.4471
13 Facsimile: +1.404.221.5857

14 *Additional counsel listed on next page*
   *Attorneys for Plaintiffs*
15
                **UNITED STATES DISTRICT COURT**
16
               **SOUTHERN DISTRICT OF CALIFORNIA**
17

18 Al Otro Lado, Inc., *et al.*,          Case No.:  17-cv-02366-BAS-KSC

19              Plaintiffs,               **EXHIBIT 19 IN SUPPORT OF
                                          PLAINTIFFS' MEMORANDUM OF**
20      v.                                **POINTS AND AUTHORITIES IN
                                          SUPPORT OF THEIR MOTION**
21 Chad F. Wolf,[18] *et al.*,            **FOR SUMMARY JUDGMENT**

22              Defendants.

23

24

25

26

27 _____
   [18] Acting Secretary Wolf is automatically substituted for former Acting Secretary
28 McAleenan pursuant to Fed. R. Civ. P. 25(d).

EXHIBIT 19 IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION
FOR SUMMARY JUDGMENT

CENTER FOR CONSTITUTIONAL RIGHTS
  Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
  *bazmy@ccrjustice.org*
  Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
  *gschwarz@ccrjustice.org*
  Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
  *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
  Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
  *sarah.rich@splcenter.org*
  Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
  *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
  Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
  *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

EXHIBIT 19 IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION
FOR SUMMARY JUDGMENT

OFFICE OF INSPECTOR GENERAL

# Investigation of Alleged Violations of Immigration Laws at the Tecate, California, Port of Entry by U.S. Customs and Border Protection Personnel



Homeland Security

EXHIBIT 19
GIBBONS
11/21/19

**September 26, 2019**
**OIG-19-65**

Case: 22-55988, 02/21/2023, ID: 12657600, DktEntry: 24-2, Page 207 of 262

Case 3:17-cv-02366-BAS-KSC   Document 535-21   Filed 09/04/20   PageID.48024   Page 4 of 20
Case 3:17-cv-02366-BAS-KSC   Document 300-2   Filed 10/02/19   PageID.8556   Page 4 of 20

# DHS OIG HIGHLIGHTS

### Investigation of Alleged Violations of Immigration Laws at the Tecate, California, Port of Entry by U.S. Customs and Border Protection Personnel

**September 26, 2019**

## Why We Did This Special Review

Following a referral from the U.S. Office of Special Counsel (OSC) to the U.S. Department of Homeland Security (DHS) on August 23, 2018, the DHS Office of Inspector General (OIG) reviewed three allegations of immigration law violations at the Tecate, California, Port of Entry. We issued this report to DHS on July 9, 2019, and DHS provided a copy of the report to OSC on September 17, 2019.

## What We Recommend

This report contains no recommendations.

**For Further Information:**
Contact our Office of Public Affairs at (202) 981-6000, or email us at
DHS-OIG.OfficePublicAffairs@oig.dhs.gov.

## What We Found

We substantiated, in whole or in part, all three factual allegations referred to DHS by OSC.

First, we found that contrary to Federal law and U.S. Customs and Border Protection (CBP) policy, CBP officials at the Tecate, California, Port of Entry returned some asylum applicants from inside the United States back to Mexico and instructed those individuals to go to other ports of entry to make their asylum claims. However, we did not substantiate the allegation that managers instructed officers to do this or that it was the Port's standard practice.

Second, we found that Tecate and other ports of entry use a practice known as "metering" or "queue management" to prevent overcrowding at the ports. We identified three concerns with how CBP implemented this practice at Tecate, including that the Port generally refers most asylum seekers to go to other ports, despite representing Tecate as open to "all travelers."

Finally, we found that Tecate officials do not create records when they instruct individuals to go to other ports to make their asylum claims.

Case: 22-55988, 02/21/2023, ID: 12657600, DktEntry: 24-2, Page 208 of 262

Case 3:17-cv-02366-BAS-KSC   Document 535-21   Filed 09/04/20   PageID.48025   Page 5 of 20
Case 3:17-cv-02366-BAS-KSC   Document 300-2   Filed 10/02/19   PageID.8557   Page 5 of 20



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

Washington, DC 20528 / www.oig.dhs.gov

July 9, 2019

MEMORANDUM FOR:   The Honorable Randolph D. Alles
Deputy Under Secretary for Management
Department of Homeland Security

FROM:   Jennifer Costello
Acting Inspector General

SUBJECT:   Investigation of alleged violations of immigration laws
at the Tecate, California, Port of Entry by U.S.
Customs and Border Protection personnel (OSC File
No. DI-18-5034)

We write to provide the results of the Office of Inspector General's (OIG)
investigation into the whistleblower disclosures raised to the U.S. Office of
Special Counsel (OSC) concerning possible violations of immigration law at the
Tecate, California, Port of Entry by U.S. Customs and Border Protection (CBP),
Office of Field Operations (OFO) personnel.

In July 2018, CBP Officer Brandon Gibbons, who consented to the release of
his name by OSC as well as the OIG, raised several concerns regarding asylum-
processing practices at the Tecate Port of Entry, where he is assigned. OSC
relayed the following three allegations:

1. Since 2016, CBP managers have instructed CBP officers to physically
   escort asylum seekers arriving at the Tecate Port of Entry back to Mexico
   and to direct those asylum seekers to the San Ysidro Port of Entry.

2. In July 2018, CBP managers at the Tecate Port of Entry established a
   practice where CBP officers stand at the United States international
   border with Mexico to physically deny asylum seekers entry onto U.S.
   soil and instead direct those individuals to the San Ysidro Port of Entry.

3. CBP officers at the Tecate Port of Entry do not maintain a record or
   physical documentation when encountering asylum seekers.[1]

After OSC referred this complaint to DHS on August 23, 2018, the OIG agreed
to investigate the allegations.

---

[1] During his interviews with the OIG, Gibbons also raised concerns that he may have suffered
whistleblower retaliation because of these and other disclosures. Because he further stated
that he had submitted a complaint to OSC detailing his concerns, the OIG did not undertake
an investigation into the alleged retaliation.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

The OIG substantiated, in whole or in part, each of the three factual allegations:

1. First, we found instances of CBP officials returning some asylum applicants to Mexico after they had already entered the United States, and instructing those individuals to go to other ports to make their asylum claims. While we determined this occurred, and that it is contrary to Federal law and CBP policy requiring that asylum seekers present in the United States be accepted for processing, we were unable to substantiate that managers specifically instructed Gibbons or others to engage in the practice, or that it was otherwise the Port's standard practice.

2. Second, we found that at many ports of entry along the Southwest border, CBP has used a practice known as "metering" or "queue management" to prevent overcrowding within the port. When metering is in place, officers stand at a "limit line" position at or near the U.S.-Mexico border and prevent asylum seekers or others without travel documents from entering onto U.S soil until there is available space and resources to process them.[2] Certain ports have used metering at least as far back as 2016, and the Port of Tecate (Tecate) adopted the practice on or around July 9, 2018. However, while other ports allow asylum seekers to enter once there is available space, Tecate generally does not. Instead, when most individuals expressing an intent to apply for asylum arrive at Tecate's limit line position, officers inform them that they need to travel to other ports in order to have their claims processed. Because metering is the subject of pending litigation, the OIG expresses no opinion on the legality or propriety of the practice.

3. Finally, we confirmed that Tecate personnel do not document when they redirect asylum applicants at the limit line, or when they return asylum applicants who are already present in the United States back to Mexico.

In the course of this investigation and other related OIG work, we interviewed 24 current and former CBP officials (ten officers, five supervisory officers, and

---

[2] We use the terms "asylum seeker" or "asylum applicant" interchangeably to refer to an individual who has approached or crossed the U.S.-Mexico border and expressed to DHS personnel a fear of persecution or torture in their home country or any other statement of intent to apply for asylum in the United States.

2

Case: 22-55988, 02/21/2023, ID: 12657600, DktEntry: 24-2, Page 210 of 262

Case 3:17-cv-02366-BAS-KSC   Document 535-21   Filed 09/04/20   PageID.48027   Page 7 of 20
Case 3:17-cv-02366-BAS-KSC   Document 300-2   Filed 10/02/19   PageID.8559   Page 7 of 20



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

nine management officials),[3] and reviewed Federal law and regulations, relevant litigation filings, CBP guidance, and records and emails collected from CBP. We performed this work between August 2018 and March 2019.[4]

## BACKGROUND

Tecate is a relatively small port of entry, located in a remote area approximately 40 miles east of the much larger San Ysidro, California Port of Entry. Tecate is classified as a "Class A Port of Entry," which means it is supposed to be capable of accepting all travelers, including asylum seekers.[5] According to Gibbons and most other witnesses, due to its location, very few asylum seekers come to Tecate. However, despite the low volume, Tecate personnel stated that the Port is not equipped to handle the asylum applicants that do arrive there, noting the Port lacks detention space and officers trained in processing asylum claims. Moreover, unlike other ports that are open 24 hours per day, Tecate closes at 11:00 pm, so individuals taken into custody there must be transferred to another facility once Tecate closes.

Accordingly, for the past several years, the larger ports of San Ysidro and Calexico have handled most asylum processing within OFO's San Diego Field Office because they have more officers trained in asylum intake than other ports in the region. Throughout this time, when asylum seekers came to Tecate and other smaller ports in the region, officers generally were expected to "accept" them, meaning they would take the individuals into custody, initiate some basic processing, and then transport the individuals to the larger ports to complete the asylum processing. However, in some cases, officers apparently would not accept the asylum seekers and instead would instruct them to travel on their own through Mexico to San Ysidro or Calexico.[6]

---

[3] In accordance with Section 7(b) of the *Inspector General Act of 1978*, as amended, OIG is not identifying witnesses by name in this report other than Mr. Gibbons, who provided consent to the disclosure of his identity. *See* 5 U.S.C. App. § 7(b).

[4] Our work was delayed due to the government shutdown that began on December 22, 2018, and lasted through January 25, 2019.

[5] *See* CBP, *Tecate Port of Entry Information*, https://www.cbp.gov/contact/ports/tecate-class-california-2505; CBP, *Port of Entry Class Definitions*, https://www.cbp.gov/travel/international-visitors/visa-waiver-program/port-classes.

[6] The San Diego Field Office includes the Tecate, San Ysidro, Calexico, Otay Mesa, and Andrade Ports of Entry. CBP documents from the San Diego Field Office identify San Ysidro and Calexico as the two hub ports for asylum seekers. However, most officials at Tecate indicated that they refer asylum seekers just to San Ysidro, presumably because it is much closer to Tecate than Calexico.

3



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

Gibbons alleged that sometime in either late 2017 or early 2018, CBP managers at Tecate specifically instructed officers to stop accepting asylum seekers for even limited processing.[7] At that time, Tecate officers generally did not stand at the U.S.-Mexico border, so asylum applicants first encountered CBP officers once they were inside the Port of Tecate processing building where officers inspect each pedestrian traveler seeking to enter the United States. At Tecate, that position, referred to as "pedestrian primary" or "primary," is located approximately 200 feet inside the U.S. once a traveler crosses the U.S.-Mexico border. Gibbons alleged that when travelers reached that position and expressed an intent to apply for asylum, CBP officers or supervisors would escort them back to Mexico, and instruct them to travel through Mexico to the San Ysidro Port of Entry if they wanted to apply for asylum. Gibbons also alleged that, later in the summer of 2018, Tecate began placing officers at a limit line position near the U.S.-Mexico border and began "redirecting" asylum seekers to San Ysidro from that position rather than from inside the Port.

As used in this report, "redirect" means the practice of intercepting asylum seekers at a port's limit line position and instructing them to go to another port to apply for asylum. "Return and redirect" means the practice of sending asylum seekers from inside a port back into Mexico with instructions to go to another port to apply for asylum. The distinction between redirecting asylum seekers from the limit line versus returning and redirecting them from inside the port has potential legal significance. Returning asylum seekers to Mexico from inside a port violates Federal law and CBP policy, which require officers to accept and process asylum seekers who are physically present in the United States. The permissibility of redirection at the limit line position is the subject of ongoing litigation, and remains undecided.

### FINDINGS AND ANALYSIS

The OIG could not corroborate that CBP managers issued a specific instruction to Tecate Port personnel in the 2017-2018 time period to start returning and redirecting asylum seekers. However, we did find that in specific instances, both before and after that time, Tecate personnel returned some asylum seekers who were already present in the United States back to Mexico and redirected them to other ports. The OIG also corroborated that Tecate began redirecting asylum seekers from a limit line position in July 2018. Finally, we determined that both before and after the limit line was established, Tecate officers did not create records when sending asylum applicants to other ports.

---

[7] The OSC referral says this began in 2016, but Gibbons twice told the OIG that he believed it was late 2017 or early 2018, and that he was unsure of the source of OSC's date.

Case: 22-55988, 02/21/2023, ID: 12657600, DktEntry: 24-2, Page 212 of 262

Case 3:17-cv-02366-BAS-KSC   Document 535-21   Filed 09/04/20   PageID.48029   Page 9 of 20
Case 3:17-cv-02366-BAS-KSC   Document 300-2   Filed 10/02/19   PageID.8561   Page 9 of 20

 **OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

### A. The OIG substantiated that CBP officers have returned some asylum seekers present in the U.S. to Mexico, and redirected those individuals to other ports

According to Gibbons, during an in-person muster[8] in late 2017 or early 2018, a Tecate supervisor verbally instructed officers that the Port would no longer accept asylum seekers, and that officers should either return them to Mexico themselves, or should call a supervisor to do it for them. He said he asked the supervisor for a written instruction and was told there was none. Apart from Gibbons, no other officers, including those with whom Gibbons recommended we speak, recalled receiving any instruction to return asylum seekers from Tecate to Mexico.[9]

Nonetheless, documents reviewed by the OIG and nearly every witness interviewed during this investigation, including Tecate's former Port Director, two former Assistant Port Directors, and multiple supervisory officers, corroborated that at various times and for various reasons, Tecate returned some asylum seekers to Mexico and redirected them to the San Ysidro Port of Entry through Mexico.[10] One witness believed that Tecate may have returned and redirected some asylum seekers as far back as 2016, and the earliest document we identified discussing Tecate returning an asylum seeker to Mexico is from February 2017.[11]

Many witnesses also acknowledged that returning and redirecting asylum applicants who have crossed onto U.S. soil violates Federal law and CBP policy. Under the Immigration and Nationality Act (INA), with limited exceptions, "[a]ny alien who is physically present in the United States . . . may apply for

---

[8] Within CBP, "musters" are verbal or written instructions that often set forth, reinforce, or clarify CBP policy or guidance.

[9] We are aware that some witnesses may have chosen to be less than forthcoming regarding a practice most witnesses acknowledged as improper. However, even witnesses who admitted that some asylum seekers had been returned to Mexico and/or raised concerns with us regarding the limit line position – and who, therefore, could be reasonably expected to be forthcoming on this issue – did not recall any specific instruction to return asylum applicants to Mexico.

[10] The witnesses we interviewed were familiar with the practice of returning and redirecting asylum applicants, and distinguished it from situations where travelers voluntarily agree to withdraw their request for admission to the United States by completing form I-275 (Withdrawal of Application for Admission) and returning to Mexico.

[11] We collected documents from 2016 to present.

5

Case: 22-55988, 02/21/2023, ID: 12657600, DktEntry: 24-2, Page 213 of 262

Case 3:17-cv-02366-BAS-KSC   Document 535-21   Filed 09/04/20   PageID.48030   Page 10 of
20
Case 3:17-cv-02366-BAS-KSC   Document 300-2   Filed 10/02/19   PageID.8562   Page 10 of 20



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

asylum."[12] Further, "[a]n alien present in the United States who has not been admitted" "shall be inspected by immigration officers."[13] Consistent with the INA, CBP regularly circulated guidance throughout 2017-2019, instructing employees that, once an asylum applicant is on U.S. soil, officers must accept that individual for processing.

In spite of the legal and policy requirements, Tecate personnel we spoke with offered a few justifications for why they or others would return and redirect asylum applicants to other ports. First, many officers and management cited the Port's lack of holding space and personnel trained in processing asylum claims, and the challenges with transferring individuals when the Port closed at the end of the day. For example, one Tecate officer said the Port would usually (but not always) accept individuals or small groups of asylum seekers, but would instruct large groups that they needed to go to San Ysidro to be processed because Tecate did not have space to hold them. Second, Tecate personnel also noted that they believed some asylum seekers came to Tecate in an effort to skip the lines they had encountered at other ports of entry. According to these individuals, there was a time when other ports of entry (primarily, San Ysidro) had a limit line position in place, but Tecate did not, and individuals who became tired of waiting at those other ports would travel to Tecate to try to get into the U.S. more quickly. When Tecate officers encountered those individuals at pedestrian primary, they would instruct them to go back to the port where they had already been waiting. According to these officials, Tecate would have otherwise soon become overwhelmed with asylum seekers the Port could not accommodate.

Consistent with witness testimony, the OIG identified emails confirming some instances of Tecate returning and redirecting asylum seekers in 2017. However, the emails also suggest that it was not the Port's regular practice to do so and that Port management did not permit it. For example:

- In May 2017, Tecate's Port Director wrote to a San Diego Field Office official that, "Our guidance to our supervisors is that we do not return anybody that expresses fear in returning back to Mexico, we will process them and transport them to San Ysidro." That Port Director told the OIG that while he had been aware of a couple instances of asylum seekers being returned to Mexico and redirected to another port, he had issued

---

[12] 8 U.S.C. § 1158(a)(1); *see also Haitian Refugee Ctr., Inc. v. Baker*, 953 F.2d 1498, 1510 (11th Cir. 1992) (stating that § 1158(a) is "unambiguous" and permits aliens to apply for asylum if they are "within the United States or at United States' borders or ports of entry").

[13] 8 U.S.C. §§ 1225(a)(1),(3).

6

Case: 22-55988, 02/21/2023, ID: 12657600, DktEntry: 24-2, Page 214 of 262

Case 3:17-cv-02366-BAS-KSC   Document 535-21   Filed 09/04/20   PageID.48031   Page 11 of 20
Case 3:17-cv-02366-BAS-KSC   Document 300-2   Filed 10/02/19   PageID.8563   Page 11 of 20



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

verbal guidance to his staff that the practice was not permissible and should cease.[14]

- In an August 2017 email noting that a Guatemalan family had been returned to Mexico from Tecate, a former Assistant Port Director informed the Port's eight supervisory officers, "I would like to remind you all that we do not send any credible fear or asylum cases to another port for processing. I find it concerning that an officer feels he can make this kind of decision without consulting a supervisor."[15]

However, there is some evidence that it may have become more permissible to return and redirect asylum seekers at Tecate in late 2017:

- In December 2017, the same former Assistant Port Director emailed the then Port Director expressing confusion that Tecate had accepted a group of asylum seekers who had arrived there and stated, "I thought we were sending anyone claiming credible fear down the hill?" When interviewed by the OIG, that former Assistant Port Director confirmed that he was stating his understanding at the time that Tecate was returning asylum seekers to Mexico and redirecting them "down the hill" to San Ysidro.[16] That Assistant Port Director also told the OIG that he had been aware that one particular former supervisory officer would return asylum applicants back to Mexico with some regularity.[17]

- In March 2018, at a time when there was an acting Port Director, a supervisory officer drafted an internally inconsistent muster for an Assistant Port Director. First, the muster states that all asylum applicants encountered at primary must be taken into custody and

---

[14] Neither the OIG nor the Port Director were able to locate any emails or other written guidance the Port Director sent to Port staff, stating asylum seekers had to be processed. However, one officer we interviewed specifically recalled receiving guidance to that effect from the Port Director.

[15] One supervisor who received the email told the OIG that the former Assistant Port Director's representation that Tecate did not send asylum cases to other ports was not accurate. The supervisor said he understood the message to mean that supervisors, not officers, should be making the decision regarding returning asylum seekers to Mexico and redirecting them to other ports. However, another supervisor who also received that same email maintained that the Port's policy was to accept asylum applicants encountered at pedestrian primary.

[16] The OIG did not locate any email indicating the then Port Director responded to this question. During his interview, the then Port Director said he had a different interpretation of this email. He thought the Assistant Port Director meant that the Port would accept asylum applicants and then officers would drive them to San Ysidro to complete the intake process.

[17] The OIG attempted to schedule an interview with the former supervisory officer, who is now retired, but he did not respond to our messages.

Case: 22-55988, 02/21/2023, ID: 12657600, DktEntry: 24-2, Page 215 of 262

Case 3:17-cv-02366-BAS-KSC    Document 535-21   Filed 09/04/20   PageID.48032   Page 12 of 20
Case 3:17-cv-02366-BAS-KSC    Document 300-2   Filed 10/02/19   PageID.8564   Page 12 of 20



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

processed. However, it also states that "redirected applicants" could be "return[ed] to Mexico" with supervisory notification, and the document's author told the OIG that "redirected applicants" included asylum applicants. Therefore, as drafted, the muster required officers to take asylum applicants into custody and process them, but it also allowed officers to return asylum seekers already on U.S soil back to Mexico. The muster did not provide any explanation regarding when it would be permissible to return and redirect asylum applicants.[18]

Despite what appears to be an increasing openness to return and redirect asylum applicants beginning in December 2017, we found no documentary evidence of Tecate actually doing so between then and July 2018 when the limit line was established. To the contrary, we identified emails reflecting instances of Tecate accepting and processing asylum applicants in April and June 2018.

Although the timing of the December 2017 email and the March 2018 draft muster coincide with Gibbons' allegation, they do not directly confirm that Tecate's approach to asylum seekers fundamentally changed in late 2017 or early 2018. Nor did any witnesses corroborate his claim that an instruction was given to stop accepting asylum applicants at that time. Consequently, while we substantiate that Tecate did improperly return and redirect some asylum seekers in the past, we cannot substantiate Gibbons' allegation that it became the Port's standard practice in late 2017 or early 2018.

### B. The OIG substantiated that officers at Tecate stand at the limit line to prevent asylum seekers from entering the Port

The OIG corroborated Gibbons' allegation that, in July 2018, CBP managers at Tecate instituted the practice of positioning officers near the U.S.-Mexico international border, or limit line, in order to stop asylum seekers and others without appropriate travel documents from crossing the line and, instead, redirecting them to the San Ysidro Port of Entry.[19]

---

[18] The supervisor believed that this draft muster was eventually issued to Tecate personnel, but he was unable to provide documentation confirming that it was.

[19] We also corroborated that, as noted in OSC's referral letter, Tecate's limit line position is outside of the view of security cameras. The lack of camera coverage in that location is most likely due to the fact that there was little need to record that area before the limit line was established (since CBP personnel did not generally stand or interact with travelers there). Tecate officials did not install cameras there after establishing the limit line.

8

1-SER-215

Case: 22-55988, 02/21/2023, ID: 12657600, DktEntry: 24-2, Page 216 of 262

Case 3:17-cv-02366-BAS-KSC    Document 535-21    Filed 09/04/20    PageID.48033    Page 13 of 20
Case 3:17-cv-02366-BAS-KSC    Document 300-2    Filed 10/02/19    PageID.8565    Page 13 of 20



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

CBP's practice of placing officers at the limit line to check travelers' documents as they approach ports of entry along the southwest border – often referred to as "metering" or "queue management" – is well known and fully acknowledged by DHS and CBP leadership.[20] CBP has instituted metering at various times and locations in recent years, and in April 2018, OFO leadership issued a "Metering Guidance" memo, which informed the field offices along the southwest border that:

> When necessary or appropriate to facilitate orderly processing and maintain the security of the port and safe and sanitary conditions for the traveling public, DFOs [Directors of Field Operations] may elect to meter the flow of travelers at the land border to take into account the port's processing capacity. Depending on port configuration and operating conditions, the DFO may establish and operate physical access controls at the borderline, including as close to the U.S.-Mexico border as operationally feasible. DFOs may not create a line specifically for asylum-seekers only, but could, for instance, create lines based on legitimate operational needs, such as lines for those with appropriate travel documents and those without such documents.

The guidance further stated:

> Ports should inform the waiting travelers that processing at the port is currently at capacity and CBP is permitting travelers to enter the port once there is sufficient space and resources to process them. At no point may an officer discourage a traveler from waiting to be processed, claiming fear of return, or seeking any other protection. Officers may not provide tickets or appointments or otherwise schedule any person for entry. Once a traveler is in the United States, he or she must be fully processed.

---

[20] *See, e.g., Oversight of U.S. Customs and Border Protection: Hearing Before S. Comm. on the Judiciary,* 115th Cong. (Dec. 11, 2018) (statement of Kevin K. McAleenan, Commissioner, U.S. Customs and Border Protection) ("[W]e call it queue management, we're balancing based on our capacity, based on our responsibility to manage lawful trade and travel to carry out our counter-narcotics mission, our other security missions our agriculture protection mission and still process people arriving without documents efficiently and in any given day, there are only three to four ports of entry out of the 26 on our southwest border that actually have any backup at all."); *The Ingraham Angle: Secretary Nielsen talks immigration, relationship with Trump* (Fox News television broadcast May 15, 2018) ("We are 'metering', which means that if we don't have the resources to let them [asylum seekers] in on a particular day, they are going to have to come back. They will have to wait their turn and we will process them as we can, but that's the way that the law works. Once they come into the United States, we process them.").

Case: 22-55988, 02/21/2023, ID: 12657600, DktEntry: 24-2, Page 217 of 262

· Case 3:17-cv-02366-BAS-KSC   Document 535-21   Filed 09/04/20   PageID.48034   Page 14 of 20
Case 3:17-cv-02366-BAS-KSC   Document 300-2   Filed 10/02/19   PageID.8566   Page 14 of 20



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

After OFO issued this guidance, Tecate Port management established the limit line position on or about July 9, 2018. Every officer, supervisor, and management official interviewed by the OIG regarding metering at Tecate confirmed that the practice was in place and ongoing at the time of our review.

Initially, there was confusion among some officers regarding their obligations while manning the limit line position. For example, three officers recalled instances of asylum seekers being returned to Mexico from primary after Tecate established the limit line position. The individuals had made it past the officers screening travelers at the limit line, were encountered at pedestrian primary, and from there were told that they would have to return to Mexico and go to another port to present their asylum claim. Several officers mentioned that this may have happened because officers did not understand the Port's procedures for the limit line position. In an apparent effort to address that, Tecate's current Port Director, who assumed the role in late August 2018, issued a muster on September 5, 2018 providing guidance to officers on manning the limit line.[21] According to the muster:

> The line is not specifically for asylum-seekers, it is based on legitimate operational needs, and it's designated for those with appropriate travel documents and those without such documents. Due to the facility and operating hour limitations, this necessitates that we re-direct asylum seekers to our processing hubs in Calexico West or San Ysidro PedWest. Under no circumstances will an asylum applicant be denied entry into the U.S. Please re-direct all applicants to the San Ysidro Pedestrian West (PedWest) facility or Calexico West for proper intake and processing.

The muster also explained to officers that, "on a case-by-case basis, discretion should be exercised when encountering a humanitarian situation." Finally, the muster clarified that the Port could not return and redirect any asylum seekers who happened to make it past the limit line: "Any applicant for asylum encountered on primary (e.g.; pedestrian/vehicle) should be taken into custody, escorted to the security office, and transported to the San Ysidro PedWest facility for proper intake and processing."

The witnesses generally confirmed that, consistent with the muster, officers at Tecate's limit line now redirect most asylum seekers to San Ysidro, although, based on humanitarian concerns, they may accept certain individuals on a case-by-case basis, such as unaccompanied children or asylum seekers who

---

[21] In February 2019, the Port Director issued a more detailed muster with similar guidance that remains in place to date.

10

Case: 22-55988, 02/21/2023, ID: 12657600, DktEntry: 24-2, Page 218 of 262

Case 3:17-cv-02366-BAS-KSC   Document 535-21   Filed 09/04/20   PageID.48035   Page 15 of
20
Case 3:17-cv-02366-BAS-KSC   Document 300-2   Filed 10/02/19   PageID.8567   Page 15 of 20



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

may be injured or are in apparent immediate danger. Yet, given Tecate's remote location, the witnesses confirmed that relatively few asylum seekers have come to Tecate since the Port established the limit line.[22]

The OIG expresses no position on the legality of metering as that question is squarely pending before the courts.[23] However, the OIG identified three concerns regarding how Tecate is metering. First, CBP inaccurately publicly represents Tecate as "a designated port of entry for all travelers,"[24] even though the Port generally does not accept asylum seekers. While Tecate may have legitimate asylum processing limitations, if it truly cannot or will not accept most asylum seekers, it is misleading to represent itself as open to all travelers. Similarly, neither OFO's April 2018 Metering Guidance, nor leadership's public statements about metering, contemplate shutting down entire ports to asylum seekers. Rather, they indicate that individual ports may "meter the flow of travelers" for safety and security reasons, and that asylum seekers may have to "wait their turn" or "come back" another day. Indeed, OFO's Metering Guidance instructs ports to tell waiting travelers that "processing at the port is currently at capacity," but does not say that ports may decide they have no capacity to accept asylum applicants at all.[25]

Second, we note that officers manning the limit line at Tecate do not stand directly on the U.S.-Mexico boundary line, but instead are typically about 10 feet inside the line on the U.S. side.[26] When at the limit line position, officers generally stand just inside a security fence at Tecate, but according to Port management, a sidewalk on the outside of the fence is where U.S. territory begins. Tecate's limit line positioning near, but not directly on, the border is consistent with OFO's April 2018 Metering Guidance memo, which only requires officers to be "as close to the U.S.-Mexico border as operationally feasible," and there may be safety or other practical concerns justifying that positioning. However, the result is that when Tecate's limit line officers stop

---

[22] In fact, some officers reported encountering no asylum seekers while they were working at the limit line.

[23] *See Washington v. United States*, No. 18-cv-1979 (S.D. Cal. June 26, 2018) (transferred from Western District of Washington on Aug. 28, 2018); *Al Otro Lado, Inc. v. Nielsen*, No. 17-cv-2366 (S.D. Cal. July 12, 2017) (transferred from Central District of California on Nov. 22, 2017).

[24] *See* CBP, *Tecate Port of Entry Information*, https://www.cbp.gov/contact/ports/tecate-class-california-2505; CBP, *Port of Entry Class Definitions*, https://www.cbp.gov/travel/international-visitors/visa-waiver-program/port-classes.

[25] Tecate's Port Director did not unilaterally decide to close the Port to most asylum seekers. San Diego Field Office leadership was involved with, and may have directed, this approach.

[26] The OIG has also observed similar positioning of limit line officers at other ports of entry in California and Texas.

11

Case: 22-55988, 02/21/2023, ID: 12657600, DktEntry: 24-2, Page 219 of 262

Case 3:17-cv-02366-BAS-KSC   Document 535-21   Filed 09/04/20   PageID.48036   Page 16 of
Case 3:17-cv-02366-BAS-KSC   Document 300-20   Filed 10/02/19   PageID.8568   Page 16 of 20



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

individuals who indicate an intent to apply for asylum, those individuals most likely have already crossed onto U.S. soil, and are thus technically physically present in the United States. As discussed in the previous section, this means that those individuals may have a right under Federal law and CBP policy to apply for asylum, and not be returned and redirected to other ports.

Finally, the OIG also has concerns regarding how Tecate may be specifically handling Mexican national asylum seekers. Redirecting Mexican asylum seekers requires them to remain in and travel through the very country in which they claim they are subject to persecution. This could be considered contrary to Federal law prohibiting the U.S. from returning individuals to a country in which they claim to have a credible fear of persecution or torture.[27] OFO's Metering Guidance and Tecate's metering muster contain no specific instructions on how to handle Mexicans.[28] As a result, Tecate does not appear to have a consistent approach to handling Mexican asylum applicants. Some Tecate officers indicated that they would accept and process any Mexican asylum applicants, yet other officers and managers stated that nationality is not taken into account when redirecting at the limit line, and so Mexican nationals are redirected like any other asylum seekers.

### C. The OIG substantiated that officers do not create records when redirecting asylum seekers to other ports

The OIG substantiated that officers at the Tecate Port of Entry generally do not track or record in any way when they redirect asylum seekers at the limit line, or when they return and redirect asylum seekers to Mexico from pedestrian primary.[29]

All officers, supervisors, and managers we questioned regarding record-keeping practices confirmed that no records are created when redirecting asylum seekers from the limit line, as CBP Commissioner Kevin K. McAleenan also indicated during congressional testimony last year.[30] Given the directly

---

[27] *See* 8 U.S.C. § 1231(b)(3)(A) & note; 8 C.F.R. §§ 208.16-.17; *see also Innovation Law Lab v. Nielsen*, 366 F.Supp.3d 1110, 1126 (N.D. Cal. April 8, 2019), *stay granted by Innovation Law Lab v. McAleenan*, 924 F.3d 503 (9th Cir. May 7, 2019) .

[28] In contrast, when San Ysidro was metering in 2016, its muster instructed personnel that all Mexican credible fear cases should proceed to primary for processing.

[29] Tecate officials do create records once they accept asylum applicants. Specifically, they begin asylum processing in CBP's computer systems, and officials at San Ysidro finish the processing once Tecate officers transport the individuals there.

[30] In response to former Senator Jeff Flake's question, "OK, but do you have any information or [sic] the people who register I assume they sign some document as they are metered at a port of entry how many of them then turn up being apprehended between ports of entry?", McAleenan

12

Case: 22-55988, 02/21/2023, ID: 12657600, DktEntry: 24-2, Page 220 of 262

Case 3:17-cv-02366-BAS-KSC   Document 535-21   Filed 09/04/20   PageID.48037   Page 17 of 20
Case 3:17-cv-02366-BAS-KSC   Document 300-2   Filed 10/02/19   PageID.8569   Page 17 of 20



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

applicable ongoing litigation related to metering, we express no opinion on whether CBP is required to keep records when it redirects asylum seekers from the limit line.

Similarly, the witnesses who acknowledged that CBP returned asylum seekers to Mexico from primary all confirmed that records generally were not created when that occurred.[31] As noted above, returning asylum applicants who are in the United States to Mexico and declining to process their applications at that location is contrary to 8 U.S.C. § 1158(a)(1), 8 U.S.C. § 1225, and CBP policy. As such, there likely may be additional violations of other legal obligations when engaging in that practice, including certain record keeping requirements.[32]

## CONCLUSION

The OIG found that, contrary to Federal law and CBP policy, CBP officials at Tecate returned some asylum applicants from inside the United States back to Mexico in order to redirect those individuals to other ports. The OIG also substantiated that in July 2018, Tecate began manning a limit line position near the U.S.-Mexico border in order to prevent asylum seekers or others without travel documents from entering the port and, instead, redirecting most asylum seekers to San Ysidro. Lastly, the OIG confirmed that Tecate personnel do not document when they redirect asylum applicants to other ports of entry from the limit line, or when they returned and redirected asylum applicants from pedestrian primary.

---

stated, "They actually don't assign [sic] a document, they're not recorded when they approach the line the initial time." *Oversight of U.S. Customs and Border Protection: Hearing Before S. Comm. on the Judiciary*, 115th Cong. (Dec. 11, 2018) (statement of Kevin K. McAleenan, Commissioner, U.S. Customs and Border Protection).

[31] The OIG identified occasional emails reflecting instances of Tecate returning and redirecting asylum seekers from primary, but this appears to be the exception, and not the rule. Tecate officials were not instructed to record these situations in email, and do not appear to have regularly done so.

[32] *See, e.g.*, 8 C.F.R. § 235.3(b)(4) (providing that an "examining immigration officer shall record sufficient information in the sworn statement to establish and record that the alien has indicated such intention, fear, or concern, and to establish the alien's inadmissibility").

13

Case: 22-55988, 02/21/2023, ID: 12657600, DktEntry: 24-2, Page 221 of 262

Case 3:17-cv-02366-BAS-KSC    Document 535-21    Filed 09/04/20    PageID.48038    Page 18 of 20
Case 3:17-cv-02366-BAS-KSC    Document 300-2    Filed 10/02/19    PageID.8570    Page 18 of 20



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

Washington, DC 20528 / www.oig.dhs.gov

## Appendix A
## Objective, Scope, and Methodology

DHS OIG was established by the *Homeland Security Act of 2002* (Public Law 107-296) by amendment to the *Inspector General Act of 1978.*

We conducted this review in response to a referral from the U.S. Office of Special Counsel of three alleged violations of law at the Tecate, California, Port of Entry by U.S. Customs and Border Protection (CBP) personnel. We conducted this review between August 2018 and March 2019. We interviewed ten officers, five supervisory officers, and nine management officials, including three current or former Tecate Port Directors, and four current or former Tecate Assistant Port Directors. In addition to reviewing Federal law and regulations, relevant litigation filings, CBP guidance, and other records, we also collected, searched, and reviewed emails from twelve key officials.

We conducted this special review in accordance with the DHS OIG Special Reviews Group's quality control standards and the *Quality Standards for Federal Offices of Inspector General* issued by the Council of the Inspectors General on Integrity and Efficiency. These standards require that we carry out work with integrity, objectivity, and independence, and provide information that is factually accurate and reliable. This report reflects work performed by the DHS OIG Special Reviews Group pursuant to Section 2 of the *Inspector General Act of 1978*, as amended. Specifically, this report provides information about possible violations of law at the Tecate, California, Port of Entry for the purpose of keeping the Secretary of DHS and Congress fully and currently informed about problems and deficiencies relating to the administration of DHS programs and operations and the necessity for and progress of corrective action. This report is designed to promote the efficient and effective administration of, and to prevent and detect fraud, waste, and abuse in, the programs and operations of DHS.

Case: 22-55988, 02/21/2023, ID: 12657600, DktEntry: 24-2, Page 222 of 262

Case 3:17-cv-02366-BAS-KSC   Document 535-21   Filed 09/04/20   PageID.48039   Page 19 of
20
Case 3:17-cv-02366-BAS-KSC   Document 300-2   Filed 10/02/19   PageID.8571   Page 19 of 20



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## Appendix B
## Report Distribution

**Department of Homeland Security**

Secretary
Deputy Secretary
Under Secretary for Management
Chief of Staff
General Counsel
Executive Secretary
Director, GAO/OIG Liaison Office
Under Secretary, Office of Strategy, Policy, and Plans
Assistant Secretary for Office of Public Affairs
Assistant Secretary for Office of Legislative Affairs

**U.S. Customs and Border Protection**

CBP Commissioner

**Office of Management and Budget**

Chief, Homeland Security Branch
DHS OIG Budget Examiner

**Congress**

Congressional Oversight and Appropriations Committees

## Additional Information and Copies

To view this and any of our other reports, please visit our website at:
www.oig.dhs.gov.

For further information or questions, please contact Office of Inspector General
Public Affairs at: DHS-OIG.OfficePublicAffairs@oig.dhs.gov.
Follow us on Twitter at: @dhsoig.



## OIG Hotline

To report fraud, waste, or abuse, visit our website at www.oig.dhs.gov and click
on the red "Hotline" tab. If you cannot access our website, call our hotline at
(800) 323-8603, fax our hotline at (202) 254-4297, or write to us at:

> Department of Homeland Security
> Office of Inspector General, Mail Stop 0305
> Attention: Hotline
> 245 Murray Drive, SW
> Washington, DC 20528-0305

1   MAYER BROWN LLP
      Matthew H. Marmolejo (CA Bar No. 242964)
2     *mmarmolejo@mayerbrown.com*
    350 S. Grand Avenue
3   25th Floor
    Los Angeles, CA 90071-1503
4     Ori Lev (DC Bar No. 452565)
      (*pro hac vice*)
5     *olev@mayerbrown.com*
      Stephen M. Medlock (VA Bar No. 78819)
6     (*pro hac vice*)
      *smedlock@mayerbrown.com*
7   1999 K Street, N.W.
    Washington, D.C. 20006
8   Telephone:  +1.202.263.3000
    Facsimile:   +1.202.263.3300
9
    SOUTHERN POVERTY LAW CENTER
10    Melissa Crow (DC Bar No. 453487)
      (*pro hac vice*)
11    *melissa.crow@splcenter.org*
    1101 17th Street, N.W., Suite 705
12  Washington, D.C. 20036
    Telephone: +1.202.355.4471
13  Facsimile: +1.404.221.5857

14  *Additional counsel listed on next page*
    *Attorneys for Plaintiffs*
15
                **UNITED STATES DISTRICT COURT**
16
                **SOUTHERN DISTRICT OF CALIFORNIA**
17

18  Al Otro Lado, Inc., *et al.*,            Case No.:  17-cv-02366-BAS-KSC

19                    Plaintiffs,            **EXHIBIT 20 IN SUPPORT OF**
                                             **PLAINTIFFS' MEMORANDUM OF**
20          v.                               **POINTS AND AUTHORITIES IN**
                                             **SUPPORT OF THEIR MOTION**
21  Chad F. Wolf,[1] *et al.*,               **FOR SUMMARY JUDGMENT**

22                    Defendants.
                                             **FILED UNDER SEAL**
23

24

25

26

27  _____
    [1] Acting Secretary Wolf is automatically substituted for former Acting Secretary
28  McAleenan pursuant to Fed. R. Civ. P. 25(d).

                                EXHIBIT 20 IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF
                                       POINTS AND AUTHORITIES IN SUPPORT OF THEIR
                                                       MOTION FOR SUMMARY JUDGMENT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

CENTER FOR CONSTITUTIONAL RIGHTS
 Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
 *bazmy@ccrjustice.org*
 Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
 *gschwarz@ccrjustice.org*
 Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
 *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
 Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
 *sarah.rich@splcenter.org*
 Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
 *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
 Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
 *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

EXHIBIT 20 IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*, | Case No.: 17-cv-02366-BAS-KSC |
| Plaintiffs, | |
| v. | |
| Chad Wolf, *et al.*, | |
| Defendants. | |

EXPERT REPORT OF STEPHANIE LEUTERT

1

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

## I.      Introduction and Qualifications

1.      My name is Stephanie Leutert. I am the Director of the Central America & Mexico Policy Initiative ("CAMPI") at the Strauss Center for International Security and Law at the University of Texas. In this role, I lead the development and programming for CAMPI and conduct original research on the U.S.-Mexico border and Central American migration.

2.      I previously submitted declarations in connection with the Plaintiffs' September 26, 2019 motions for provisional class certification and preliminary injunction.[1]

3.      I am an expert on the practices of U.S. Customs and Border Protection ("CBP") officers and supervisors with respect to arriving asylum seekers at ports of entry ("POEs") on the U.S.-Mexico border from 2016 to the present. I am the lead author of the first-ever border-wide report on the U.S. Customs and Border Protection's ("CBP's") metering policy and the related asylum waitlists in Mexican border cities.

4.      I have also led the publication of four subsequent metering updates that document CBP's practices and the conditions faced by asylum seekers waiting in Mexican border cities.

_____

[1] ECF Nos. 293-8, 294-5.

2

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

5.      In addition to this work, I teach a graduate level course on Mexico's migration policy at the Lyndon B. Johnson School of Public Affairs at the University of Texas.

6.      Through my work at CAMPI, I have directly observed CBP's implementation of its turn-back policy at ports of entry ("POEs") on the U.S.-Mexico border. Since October 2018, I have personally conducted fieldwork in eight Mexican border cities[2] where asylum seekers affected by CBP's metering policy are forced to wait. In these cities, I have spoken directly with affected asylum seekers, along with migrant shelter staff, members of civil society organizations, and Mexican federal and local government officials. I have interviewed affected asylum seekers who were waiting on international bridges, affected asylum seekers who were sleeping in encampments near the international bridges, and affected asylum seekers waiting in migrant shelters. I have watched firsthand as asylum seekers arrived at the United States - Mexico international line and were turned back by CBP officers. I have seen copies of asylum waitlists in six Mexican border cities[3] and

---

[2] Those cities are Matamoros, Tamaulipas; Nuevo Progreso, Tamaulipas; Reynosa, Tamaulipas; Ciudad Miguel Alemán, Tamaulipas; Nuevo Laredo, Tamaulipas; Piedras Negras, Coahuila; Ciudad Acuña, Coahuila; Nogales, Sonora.

[3] Those cities are Matamoros, Tamaulipas; Nuevo Progreso, Tamaulipas; Reynosa, Tamaulipas; Piedras Negras, Coahuila; Ciudad Acuña, Coahuila; Ciudad Juárez, Chihuahua.

3

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

have spoken to eight individuals in charge of running these lists.[4] I have also partnered with colleagues who conducted similar fieldwork in five additional Mexican border cities.[5]

7.      A copy of my current curriculum vitae, which includes a list of all publications that I have authored in the prior 10 years, is attached as **Exhibit A** to this report.

8.      My typical consulting rate is $300 an hour. I have elected to waive that fee in this case and will receive no compensation for my work in this litigation.

9.      I understand from Plaintiffs' counsel that I have been retained to offer opinions on issues related to class certification in this litigation. This report contains a complete statement of all of my opinions related to class certification and reasons for them. It also contains all of the exhibits that will be used to summarize or support those opinions. I understand that some depositions and document productions will occur after my report is submitted.  I reserve the right to amend and revise this report and the exhibits to it if I should be made aware of information relevant to my

---

[4] These list managers were in the cities of Matamoros, Tamaulipas; Nuevo Progreso, Tamaulipas; Reynosa, Tamaulipas; Ciudad Miguel Alemán, Tamaulipas; Nuevo Laredo, Tamaulipas; Piedras Negras, Coahuila; and Ciudad Acuña, Coahuila (two list managers: individuals and families).

[5] Those cities are Ciudad Juárez, Chihuahua; Agua Prieta, Sonora; San Luís Rio Coloardo, Sonora; Mexicali, Baja California; and Tijuana, Baja California.

4

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

opinions.[6]

## II.    Materials Considered

10.    I considered the following facts and data when forming the opinions expressed in this report.

11.    Since December 2018, CAMPI has published regular reports on CBP's metering practices and the conditions for asylum seekers in Mexican border cities (the "Reports"). These reports include: (a) *Asylum Processing and Waitlists at the U.S.-Mexico Border* (December 2018), (b) *Metering Update* (February 2019), (c) *Metering Update* (May 2019), (d) *Metering Update* (August 2019), (e) *Metering Update* (November 2019).

12.    The Reports are based on information that I, other members of CAMPI, and colleagues from the University of California San Diego and the Migration Policy Centre, have collected directly from field and phone interviews and direct observation on visits to Mexican border cities. These Reports are cited throughout this report.

13.    This expert report also references documents produced by the defendants in this litigation during discovery.[7] I considered over 1,500 documents

---

[6] This is the only case in which I have testified in the previous four years as an expert at trial or by deposition.

[7] I understand from plaintiffs' counsel that the current defendants in this litigation

5

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

her four year old daughter reported that they were turned back in Laredo.[42]

Additional turn-back reports also began to emerge around this time, including in the

El Paso sector on November 20, 2016, expanding the practice of turn-backs into all

four Customs and Border Protection sectors.[43] A September 2019 DHS Office of the

Inspector General (OIG) Report also notes an interview in which a witness stated

that CBP's turn-backs of asylum seekers began in Tecate (in the San Diego sector)

in 2016.[44] However, the OIG did not discover any documentation of turn-backs at

Tecate until February 2017. None of the asylum seekers turned back from these ports

of entry were provided with appointments.

44.     During these initial turn-backs, asylum seekers arriving at U.S. ports of

entry would generally cross into U.S. territory before CBP officers told them that

they had to return to Mexico. According to turned back asylum seekers' testimony,

they were generally intercepted by CBP officers while already walking on the U.S.

---

cbp_systemic_denial_of_entry_to_asylum_seekers_advocacy_document.pdf.

[42] Ibid.

[43] Ibid.

[44] "Investigation of Alleged Violations of immigration Laws at the Tecate, California, Port of Entry by U.S. Customs and Border Protection Personnel, U.S. Department of Homeland Security, Office of the Inspector General, September 26, 2019, https://www.oig.dhs.gov/sites/default/files/assets/2019-10/OIG-19-65-Sep19_0.pdf.

22

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

side of the bridge or sent back to Mexico after approaching CBP officers at their desks in the port of entry's main hall. In December 2016, large groups of Cubans arrived to the Brownsville and Hidalgo ports of entry and spent several days waiting on or near the bridge before CBP processed the groups. Photos and video footage show the Cubans entering and lining up in U.S. territory on the Hidalgo international bridge.[45] A review of some of the first publicly recorded turn-backs confirms these initial locations.

**Table 1: Data and Location of First Publicly Recorded Turn-back (by Port of Entry)**

| Cities | Date of First Publicly Recorded Turn-back | Location of Turn-back |
|--------|-------------------------------------------|-----------------------|
| San Ysidro | July 11, 2016[46] | POE Entry Hall |

---

[45] Daniela Reyes, "Más de 50 cubanos se encuentran varados en elpuente de Reynosa," *Cuba en Miami*, December 5, 2016, https://www.cubaenmiami.com/mas-de-50-cubanos-se-encuentran-varados-en-el-puente-de-reynosa/; Marco Rodríguez, "Logran acceder a territorio estadounidense cubanos varados en Matamoros," *Hoy Tamaulipas*, December 14, 2016, https://www.hoytamaulipas.net/notas/273750/Logran-acceder-a-territorio-estadounidense-cubanos-varados-en-Matamoros.html. "Cubanos están 'atrapados' en el Puente Reynosa-Hidalgo," *Posta*, December 5, 2016, https://www.posta.com.mx/tamaulipas/cubanos-estan-atrapados-en-el-puente-reynosa-hidalgo.

[46] There were prior accusations of Mexican asylum seekers being returned to Mexico. However, this appears to be a separate issue from CBP metering. "Re: U.S. Customs and Border Protection's Systemic Denial of Entry to Asylum Seekers at Ports of Entry on U.S.-Mexico Border, American Immigration Council, January 13, 2017, https://www.americanimmigrationcouncil.org/sites/default/files/general_litigation/cbp_systemic_denial_of_entry_to_asylum_seekers_advocacy_document.pdf.

23

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| El Paso | November 20, 2016[47] | U.S. side of the International Bridge |
| Hidalgo | November 24, 2016[48] | POE Entry Hall |
| Otay Mesa | February 2017[49] | U.S. territory |
| Hidalgo | March 2017[50] | POE Entry Hall |

45.     The turn-backs were often paired with language explaining why the individual was not going to be allowed to seek asylum into the United States. These explanations were not standardized and included descriptions such as "We're not accepting any more people"[51] and "[CBP wasn't] receiving people from Honduras."[52] Despite turn-backs occurring now across the length of the U.S.-Mexico border, CBP officials were not using a uniform explanation for why they were taking

---

[47] Ibid.

[48] Ibid.

[49] "Crossing the Line: U.S. Border Agents Illegally Reject Asylum Seekers," Human Rights First, May 2017, https://www.humanrightsfirst.org/sites/default/files/hrf-crossing-the-line-report.pdf.

[50] Ibid.

[51] "Re: U.S. Customs and Border Protection's Systemic Denial of Entry to Asylum Seekers at Ports of Entry on U.S.-Mexico Border, American Immigration Council, January 13, 2017, https://www.americanimmigrationcouncil.org/sites/default/files/general_litigation/cbp_systemic_denial_of_entry_to_asylum_seekers_advocacy_document.pdf.

[52] Ibid.

24

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

December to August 2019, wait times continuously increased, and most of these lists

reached their peak levels around August 2019 (as seen in Table 3). However, as of

November 2019, asylum seekers were still waiting for months in Mexican cities to

cross at the ports of entry in Brownsville, Eagle Pass, El Paso, Douglas, Nogales,

Yuma, Calexico, and San Diego.

**Table 3: Peak Wait Times (August 2019)**

| Ports of Entry | Average Wait Time |
|---|---|
| Brownsville | 1 to 2 months |
| Hidalgo | 2 to 3 months |
| Roma | 9 days |
| Laredo | 1 month |
| Eagle Pass | 2 months |
| Del Rio | 4 months (adults) / 2 months (families) |
| El Paso | 3.5 to 6 months |
| Douglas | 2 months |
| Nogales | 2 to 3 months |
| San Luis | 3 months |
| Calexico | 6 to 12 months |
| San Ysidro | 6 to 9 months |

58.     To skip these wait times, some individuals or groups of asylum seekers

have sought alternative ways to enter U.S. territory. Some asylum seekers cross

between ports of entry[85] and others enter U.S. territory by running down the vehicle

lanes at ports of entry (as previously referenced). CBP refers to the individuals who

_____

[85] "Special Review – Initial Observations Regarding Family Separation Issues Under the Zero Tolerance Policy," Department of Homeland Security, Office of the Inspector General, September 27, 2018, https://www.oig.dhs.gov/sites/default/files/assets/2018-10/OIG-18-84-Sep18.pdf.

36

1-SER-234

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

run through vehicle lanes as "circumventors," and they are processed for expedited removal and as individuals who entered without inspection (EWI).[86] There are published reports of circumventors in multiple ports of entry, including in Rio Grande City[87], Tecate[88], Eagle Pass[89], Nogales[90], and Hidalgo[91]. These actions are a direct result of turn-backs and metering.

59.     On November 8, 2018, CBP operated controls at or near the midpoint of international bridges and turnstiles in at least 24 ports of entry along the U.S.-

---

[86] Gibbons, Deposition, November 21, 2019.

[87] "Metering Update," Strauss Center for International Security and Law and the Center for U.S.-Mexican Studies, November 2019, https://strausscenter.org/images/strauss/18-19/MSI/MeteringUpdate_191107.pdf.

[88] Gibbons, Deposition, November 21, 2019.

[89] "Podrían cerrar puentes internacionales, si migrantes intentan cruzar de forma irregular a EU: Enlace municipal," *La Rancherita del Aire*, May 13, 2019, https://rancherita.com.mx/noticias/detalles/66407/podrian-cerrar-puentes-internacionales-si-migrantes-intentan-cruzar-de-forma-irregular-a-eu-enlace-municipal.html#.Xef45TJKjGI.

[90] Astrid Galvan, "Asylum seekers jam US border crossings to evade Trump policy," *Associated Press*, December 3, 2019, https://www.washingtonpost.com/business/asylum-seekers-jam-us-border-crossings-to-evade-trump-policy/2019/12/03/24d6d30c-160f-11ea-80d6-d0ca7007273f_story.html.

[91] AOL-DEF-00088390.

37

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



67.    Table 4 shows the capacity levels at each port of entry, using Queue

Management Reports from June 2018 to July 2019. (MCAT data from 2016 through

2019 is in the Appendix).

**Table 4: Field Queue Management Reports (2018-2019)**

| Sector | Port of Entry | Days with Data | 0-50% Capacity | 51-100% Capacity | >100% Capacity |
|--------|---------------|----------------|----------------|------------------|----------------|
| Laredo | Brownsville | 314 | 86% | 14% | 0% |
| | Progreso | 314 | 93% | 6% | 1% |
| | Hidalgo | 314 | 46% | 26% | 28% |
| | Rio Grande | 314 | 96% | 4% | 0% |
| | Roma | 314 | 88% | 12% | 0% |
| | Laredo | 314 | 89% | 11% | 0% |
| | Eagle Pass | 314 | 9% | 47% | 44% |
| | Del Rio | 312 | 82% | 17% | 0% |
| El Paso | Port of El Paso | 213 | 6% | 66% | 28% |
| | Santa Teresa | 213 | 74% | 20% | 6% |
| | Columbus | 212 | 97% | 3% | 0% |
| | Tornillo | 213 | 99% | 1% | 0% |
| | Presidia | 213 | 91% | 8% | 1% |
| Tucson | Douglas | 213 | 60% | 19% | 21% |

43

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

|  |  |  |  |  |  |
|---|---|---|---|---|---|
|  | Lukerville | 213 | 80% | 9% | 11% |
|  | Naco | 213 | 92% | 4% | 4% |
|  | Nogales | 213 | 25% | 61% | 14% |
|  | San Luis | 214 | 62% | 38% | 0% |
| San Diego | San Ysidro | 219 | 5% | 89% | 5% |
|  | Otay Mesa | 219 | 100% | 0% | 0% |
|  | Tecate | 219 | 100% | 0% | 0% |
|  | Calexico West | 219 | 29% | 69% | 1% |
|  | Calexico East | 218 | 100% | 0% | 0% |
|  | Andrade | 219 | 100% | 0% | 0% |

*Total percent may not equal 100% due to rounding.*

68. This finding is consistent with CBP's own evaluation of its Queue Management data from June 2018 through November 2018. In this evaluation, CBP followed a similar methodology to the one that was used to create this expert report: CBP extracted its Queue Management Reports from emails within senior CBP personnel's official email accounts and entered the data into an excel spreadsheet.[103] Using this methodology, CBP's first conclusion was also that there exists a large deviation among the ports of entry, writing that "some ports are never close to capacity but still have aliens waiting and a few other ports (Eagle Pass, El Paso, and

---

[103] Also, similar to CBP, I also calculated the POE capacity based on the stated percent at capacity of each port of entry and using MCAT's reported capacity numbers. Similar to CBP, I also discovered multiple errors in CBP's capacity percentages, which often stated 100 percent capacity despite reporting low numbers of individuals in custody. I did not attempt to fix these errors in my calculations. AOL-DEF-00210504.

44

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Santa Teresa[104]) routinely exceed capacity."[105]

69.    The Queue Management Reports also include the number of people waiting at the "limit line," which is at or near the international boundary. This number serves to show that CBP was aware that asylum seekers were waiting in Mexican border cities. However, despite this recognition, multiple ports of entry continued to operate with capacity levels at or below 50 percent. For example, in the 313 Queue Management Reports from June 18, 2018 through July 15, 2019 that provide data for the Laredo port of entry, 227 of them noted that CBP was aware that there was a line of asylum seekers waiting in Nuevo Laredo. However, in 201 of those days (89 percent), the Laredo port of entry both reported that it had a line of asylum seekers waiting to enter the United States and that its utilized port capacity was at or below 50 percent. Table 5 contains the information for each port of entry. (Table 9 in the Appendix contains the percent of days at each port of entry where there was a reported line and the port capacity was at or below 75 percent).

**Table 5: Days with Reported Queues at the Limit Line and Port of Entry Capacity Levels Below 50 Percent**

---

[104] In the reviewed data, CBP calculated that Santa Teresa's average capacity was 48 percent for the period in question. Its data shows that Santa Teresa exceeded full capacity (defined as greater than 100 percent) in 10 out of the 95 days. This means that the Santa Teresa POE exceeded its capacity 10.5 percent of the time. By comparison, the Eagle Pass port of entry exceeded capacity 42.1 percent of the time and the El Paso port of entry exceeded capacity 22 percent of the time.

[105] AOL-DEF-00210504.

45

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

| City | # of Days with Data | # of Days with Reported Line | # of Days with Reported Line & Port Capacity at or Below 50% | Percent of Days with Reported Line Where Port Capacity at or Below 50% |
|---|---|---|---|---|
| Laredo | 313 | 227 | 201 | 89% |
| Rio Grande | 312 | 17 | 15 | 88% |
| Progreso | 313 | 105 | 90 | 86% |
| Brownsville | 313 | 247 | 207 | 84% |
| Roma | 313 | 95 | 65 | 68% |
| Del Rio | 312 | 92 | 48 | 52% |
| Nogales | 214 | 76 | 24 | 32% |
| Douglas | 214 | 13 | 4 | 31% |
| Eagle Pass | 313 | 145 | 13 | 9% |
| Hidalgo | 313 | 117 | 10 | 9% |
| El Paso | 214 | 123 | 7 | 6% |

70. Additionally, despite uniformly implementing turn-backs and metering, no port of entry appears to have activated a contingency plan for addressing mass migration or used OFO triggers to process additional people.[106] These contingency plans exist to provide roadmaps for ports of entry when they experience larger than normal migration numbers, allowing the ports to be flexible in their capacity and response.

---

[106] In an April 18, 2018 email, an Assistant Port Director in the San Diego Field Office sent an email outlining San Ysidro's Mass Migration Plan and the triggers in place to double OFO's daily processing capacity from 70 to 140. It appears that on April 18, 2018, this plan was beginning to be put in place, with the first trigger of eight people being reshuffled within the port to increase capacity after 307 asylum seekers arrived at the port of entry. After the Metering Guidance issuance, there were no additional documents discussing measures to increase capacity. AOL-DEF-00196691; AOL-DEF-00196695; AOL-DEF-00196745.

46

1   MAYER BROWN LLP
       Matthew H. Marmolejo (CA Bar No. 242964)
2       *mmarmolejo@mayerbrown.com*
    350 S. Grand Avenue
3   25th Floor
    Los Angeles, CA 90071-1503
4      Ori Lev (DC Bar No. 452565)
       (*pro hac vice*)
5       *olev@mayerbrown.com*
       Stephen M. Medlock (VA Bar No. 78819)
6      (*pro hac vice*)
        *smedlock@mayerbrown.com*
7   1999 K Street, N.W.
    Washington, D.C. 20006
8   Telephone:  +1.202.263.3000
    Facsimile:   +1.202.263.3300
9
    SOUTHERN POVERTY LAW CENTER
10     Melissa Crow (DC Bar No. 453487)
       (*pro hac vice*)
11      *melissa.crow@splcenter.org*
    1101 17th Street, N.W., Suite 705
12  Washington, D.C. 20036
    Telephone: +1.202.355.4471
13  Facsimile: +1.404.221.5857

14  *Additional counsel listed on next page*
    *Attorneys for Plaintiffs*
15
                 **UNITED STATES DISTRICT COURT**
16
              **SOUTHERN DISTRICT OF CALIFORNIA**
17

18  Al Otro Lado, Inc., *et al.*,          | Case No.:  17-cv-02366-BAS-KSC

19                    Plaintiffs,          | **EXHIBIT 33 IN SUPPORT OF**
                                           | **PLAINTIFFS' MEMORANDUM OF**
20         v.                              | **POINTS AND AUTHORITIES IN**
                                           | **SUPPORT OF THEIR MOTION**
21  Chad F. Wolf,[1] *et al.*,             | **FOR SUMMARY JUDGMENT**

22                    Defendants.

23

24

25

26

27  _____

28  [1]  Acting Secretary Wolf is automatically substituted for former Acting Secretary
    McAleenan pursuant to Fed. R. Civ. P. 25(d).

                            EXHIBIT 33 IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF
                               POINTS AND AUTHORITIES IN SUPPORT OF THEIR
                                              MOTION FOR SUMMARY JUDGMENT

CENTER FOR CONSTITUTIONAL RIGHTS
    Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
    *bazmy@ccrjustice.org*
    Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
    *gschwarz@ccrjustice.org*
    Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
    *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
    Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
    *sarah.rich@splcenter.org*
    Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
    *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
    Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
    *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

EXHIBIT 33 IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT

**Office of Field Operations**
**Incident Management Division**
**July 13, 2017**

**Action Required:** Information Only

**Time Constraint:** July 14, 2017

**Issue:** CBP Southwest Border Migration Surge – Asylum Issue

**Executive Summary:**
On July 12, 2017, Al Otoro Lado, Incorporated, filed a complaint with the United States District Court for the Central District of California (Los Angeles) alleging that U.S. Customs and Border Protection (CBP) officers systematically violated U.S. and International law by refusing to allow individuals to seek protection in the United States.

During the time period listed in the complaint, CBP was on the forefront of a global migration crisis. Increased numbers of unaccompanied alien children (UAC), family units (FAMUs), and single adults, seeking to unlawfully enter the United States, overwhelmed CBP's capabilities to protect and process those persons in an expeditious manner.

It is CBP's attempts to manage these challenges, in concert with the Government of Mexico, which are being challenged as a willful violation of human and civil rights by CBP officers and agents.

**Context:**
To understand the context of the large numbers of illegal migration experienced in 2016 and 2017, it is necessary to acknowledge that the immigration policies of Panama, Costa Rica, El Salvador, Guatemala, and Mexico, all sought to allow unlawful entry of person into those countries with the understanding that those persons would only transit, while en route to the United States. Years of unrestrained access through these countries facilitated the amassing of record numbers of unlawful migrants at, and between, United States southwest border ports of entry.

Beginning in early 2016 and cumulating in October 2016, unexpected levels of illegal migration caused a large draw on resources and outpaced temporary holding capacities at POEs (Figure 1). In that same month, CBP's total apprehensions were 76 percent above the previous five-year average.

Confidential                                                                                      AOL-DEF-00031442

**Figure 1: CBP Internal In-Custody Report vs. Capacity for October 30, 2016**



| PERSONS IN OFO CUSTODY | | | | | Capacity | | |
|---|---|---|---|---|---|---|---|
| Field Office | UAC | FAMU | SINGLE | TOTALS | Holding Space | Plus/Minus | % |
| San Diego | | | | | | | 150% |
| Tucson | | | | | | | 140% |
| El Paso | | | | | | | 226% |
| Laredo | | | | | | | 17% |
| **Totals:** | | | | | | | **140%** |

| SOUTHWEST BORDER TOTAL | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SWB Identified Ports | Intake vs. Discharge | | | | | | In Custody | | | | | |
| | CUSTODY INTAKE | | | RELEASED/TRANSFERRED | | | PROCESSING (Pending) | | | PROCESSED | | |
| | UAC | FAMU | SINGLE | UAC | FAMU | SINGLE | UAC | FAMU | SINGLE | UAC | FAMU | SINGLE |
| Grand Totals: | | | | | | | | | | | | |

While surges in illegal immigration on the southern Texas border created holding capacity challenges for the U.S. Border Patrol, the catalyst for detention space challenges for CBP' Office of Field Operations (OFO) occurred in San Ysidro California. As early as April 2016, OFO ports of entry in the San Diego area began experiencing a surge of Haitian nationals attempting to seek refuge in the U.S. when fleeing the economic collapse in Brazil (figure 2).

Figure 2 – Inadmissible Haitian nationals at San Diego Ports of Entry



Page **2** of **7**

Confidential

AOL-DEF-00031443

**Figure 3 – Total Inadmissible Alien Nationals at San Diego Area Ports of Entry**



Concurrently, the San Ysidro Port of Entry began extensive renovations which decreased temporary holding capacities by two-thirds. Detention space at the port of entry was originally certified for occupancy at ▌persons. By May of 2016, port leadership had converted office and administrative spaces to temporary holding areas to increase capacity to over 900 persons awaiting transfer to ICE/ERO for detention. However, the ultimate demolition of that building required the use of semi-mobile facilities to be set up, and the legal occupant capacity for the holding of inadmissible persons was again decreased to ▌individuals.

As construction at San Ysidro continued, it was necessary for officers to re-direct foreign nationals arriving by foot away from the old pedestrian entrance on the east side of port, to the **new** pedestrian facility, located on the west side of the port. It is believed that this redirection for processing may have been misconstrued as a denial of the applicant's request.

Additionally, because CBP was forced to limit intake of pedestrian applicants due to legal and safety capacity requirements, the Government of Mexico, in collaboration with the Government of Tijuana, and Non-Governmental Organizations (NGOs), sought to relieve the unsafe and unsanitary conditions created by people awaiting CBP processing outside the port of entry. Those entities established shelters to ensure their health and safety, and escorted them away from the elements while they waited. This humanitarian service is believed to be the source of allegations of collusion by CBP with the Government of Mexico to deny the illegal migrants the opportunity to ask for asylum in the U.S.

Page **3** of **7**

Confidential

**Management of Illegal Migration Surge:**

To mitigate, overcrowding at POEs, CBP:

- Modified administrative space to meet the needs of the growing detention population.
- POEs leveraged U.S. Border Patrol (USBP) facilities, if USBP locations were not already at capacity.
- CBP continued to coordinate with ICE-ERO as lack of available detention space limited their ability receive those referred by CBP for detention under sections 235 and 236 of the INA, as amended.
  - o  Due to the slow turn-over of custody, the numbers of those in CBP's temporary custody continued to increase, making conditions potentially unsafe and unsustainable.
- CBP surged agents and officers to southwest border locations in California, Arizona, and Texas (Figure 4)
- CBP further deployed agents and officers with special language abilities to assist in the immigration processing of persons representing many foreign language needs.
- CBP immediately began efforts to establish temporary holding facilities at heavily impacted areas on the southwest border.
  - o  On November 23, 2017 the first of these facilities became operational at Tornillo, TX at a cost of $2.6M for 30-days.
  - o  On December 10, 2017, the second facility became operational at Donna, TX at a cost of $3.8M for 30 days.
  - o  CBP spent a total of $20.2M on the operation of these facilities to ensure the health and safety of inadmissible family units (Figure 4).

Confidential                                                                                     AOL-DEF-00031445

**Figure 4 – FY17 Migrant Surge Cost Actuals**

| Office | Actuals as of 4/12/17 | Comments |
|---|---|---|
| **USBP** | **$9,126,299** | |
| Overtime | $4,385,823 | Includes FEPA OT only (excludes BPAPRA OT) |
| TDY | $1,743,714 | Actual TDY personnel supporting overflow operations in RGV |
| Operations Support | $2,996,763 | Increased wraparound services (laundry, shower, medical) and purchase card consumables/supplies |
| **OFO** | **$15,757,187** | |
| Overtime | $6,246,029 | OFO OT includes all overtime above what was originally planned pre surge |
| TDY | $7,972,128 | OFO TDY personnel supporting overflow operations in Tucson and San Diego, and TDY personnel for the Haitian Crisis |
| Operations Support | $1,539,030 | Includes purchase card purchases, supplies, blankets, care and feeding etc. |
| **Facilities and Maintenance** | **$20,244,931** | |
| Overtime | $14,952 | Site prep/stand-up and maintenance |
| TDY | $13,546 | Site prep/stand-up and maintenance |
| Facilities | $20,169,683 | Includes funding for both Donna and Tornillo soft sided facilities (as of 4.15.17 softsides are closed) |
| Operations Support | $46,749 | Site prep/stand-up and maintenance |
| **OIT** | **$121,786** | |
| Overtime | $23,128 | OIT overtime for support of El Centro Haitian efforts |
| Operations Support | $98,658 | Site prep/stand-up and maintenance |
| **Surge Total** | **$45,250,204** | |

- On November 11, 2016, Office of Field Operations (OFO) leadership held a conference call with southwest border Directors of Field Operations to discuss mitigation strategies to ensure the safety of officers and the individuals being processed by CBP. Discussion focused on utilizing available options to mitigate overcrowding such as:
  - o Leveraging OFO headquarters for additional resources.
  - o Utilizing all available space at ports of entry, adapting to supplement detention space.
  - o Collaborating with ERO to transfer and transport processed detainees.

Page 5 of 7

Confidential

AOL-DEF-00031446

o  Coordinating with USBP on available detention space.
o  Coordinating with local Government of Mexico officials on managing the flow of migrants without lawful status to enter the United States (referred to as "metering").

**Figure 5 - Collaborative Migration Management Efforts with the Government of Mexico**

| Location | Start | End |
|---|---|---|
| **San Diego Field Office:** | | |
| San Ysidro | May 30, 2016 | February 5, 2017 |
| Calexico | September 19, 2016 | February 5, 2017 |
| **Tucson Field Office:** | Not applicable | |
| **El Paso Field Office:** | | |
| Bridge of America | November 11, 2016 | December 2, 2016 |
| Paso Del Norte | November 11, 2016 | December 2, 2016 |
| Ysleta | November 11, 2016 | December 2, 2016 |
| **Laredo Field Office:** | | |
| Brownsville | November 2016 | January 2017 |
| Eagle Pass | November 2016 | January 2017 |
| Laredo | November 2016 | January 2017 |
| Hidalgo/Pharr/Anzalduas | November 2016 | January 2017 |

**Conclusion:**

The laws of the United States allow people to seek asylum on the grounds that they are being persecuted because of their race, religion, nationality, membership in a particular social group, or political opinion.  CBP policies and procedures are based on these laws and are designed to protect vulnerable and persecuted persons.  Those policies include compliance with federal and state laws, including Sections 101(b)(1) and 101(c)(1) of the Immigration and Naturalization Act (INA), 8 C.F.R. § 1236.2, 8 C.F.R. § 1236.3, Reno v. Flores settlement (including 9th Circuit ruling of Judges Gee and Moskowitz), and Certifications of Occupancy issued for CBP facilities.

It was the convergence of the high work demand and the legal guidelines which predicated CBP's otherwise extraordinary, efforts to ensure the health and welfare of all would-be asylum seekers, as well as the officers and agents on the front lines of this migration tsunami.

In unusual circumstances, where the number of individuals at a particular port of entry is more than the facility can safely accommodate, CBP limited the number of people permitted to enter at one time.  This process was designed to ensure the safety of officers and those being processed, in compliance with the laws and policies listed in paragraph 6, above).  In these rare instances where a port of entry could not accommodate all of those individuals seeking admission to the United States at one time, the Government of

Confidential                                                                              AOL-DEF-00031447

Mexico, in collaboration with the Government of Tijuana, and Non-Governmental Organizations (NGOs), established shelters to ensure their health and safety, while they waited.  Representatives of these humanitarian programs would keep in close contact with CBP to escort those awaiting processing to the port of entry, when it was safe to do so.

Confidential                                                                                      AOL-DEF-00031448

MAYER BROWN LLP
  Matthew H. Marmolejo (CA Bar No. 242964)
  *mmarmolejo@mayerbrown.com*
350 S. Grand Avenue
25th Floor
Los Angeles, CA 90071-1503
  Ori Lev (DC Bar No. 452565)
  (*pro hac vice*)
  *olev@mayerbrown.com*
  Stephen M. Medlock (VA Bar No. 78819)
  (*pro hac vice*)
  *smedlock@mayerbrown.com*
1999 K Street, N.W.
Washington, D.C. 20006
Telephone:  +1.202.263.3000
Facsimile:   +1.202.263.3300

SOUTHERN POVERTY LAW CENTER
  Melissa Crow (DC Bar No. 453487)
  (*pro hac vice*)
  *melissa.crow@splcenter.org*
1101 17th Street, N.W., Suite 705
Washington, D.C. 20036
Telephone: +1.202.355.4471
Facsimile: +1.404.221.5857

*Additional counsel listed on next page*
*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*,<br><br>                Plaintiffs,<br><br>        v.<br><br>Chad F. Wolf,[1] *et al.*,<br><br>                Defendants. | Case No.:  17-cv-02366-BAS-KSC<br><br>**EXHIBIT 34 IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** |

---

[1] Acting Secretary Wolf is automatically substituted for former Acting Secretary McAleenan pursuant to Fed. R. Civ. P. 25(d).

EXHIBIT 34 IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT

CENTER FOR CONSTITUTIONAL RIGHTS
    Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
    *bazmy@ccrjustice.org*
    Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
    *gschwarz@ccrjustice.org*
    Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
    *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
    Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
    *sarah.rich@splcenter.org*
    Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
    *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
    Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
    *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

EXHIBIT 34 IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT

| From: | Owen, Todd C (AC OFO) |
|---|---|
| Sent: | Wednesday, May 25, 2016 10:19 PM |
| To: | MARTEL, CARLOS C; WAGNER, JOHN P; HOFFMAN, TODD A; HUNOLT, KIRBY |
| Cc: | BRAUNSTEIN, MARGARET A; BORDEAUX, TYESHA; DODD, BRUCE E |
| Subject: | RE: Credible Fear Influx Spot Report |

Kirby, pls advise the status of the cap waiver request for San Diego.  Need to know by 11am Thursday.  In speaking with Pete Flores, we need to get this approved immediately.  Pls advise.

Thx.

Todd C. Owen
Executive Assistant Commissioner
Office of Field Operations
U.S. Customs & Border Protection

From: MARTEL, CARLOS C
Sent: Wednesday, May 25, 2016 6:20:03 PM
To: Owen, Todd C (AC OFO); WAGNER, JOHN P; HOFFMAN, TODD A
Cc: BRAUNSTEIN, MARGARET A
Subject: FW: Credible Fear Influx Spot Report

Gentlemen:  FYSA - Significant increase in CF cases at SYS/Otay POEs resulting in saturation of temp detention space. Mitigation actions are enumerated below to include virtual processing assistance from Detroit and MIA.  Media coverage is expected.

Carlos C. Martel
Acting Executive Director, Operations
Office of Field Operations
U. S. Customs and Border Protection

 Office
Mobile

From: ARMIJO, JOHNNY L
Sent: Thursday, May 26, 2016 1:59:31 AM
To: MARTEL, CARLOS C; BRAUNSTEIN, MARGARET A
Cc: OFO-FIELD LIAISON; FLORES, PETE ROMERO; BRINTON, WALTER A; HENNING, PAUL R; AKI, SIDNEY K; HOOD, ROBERT W; CARRILLO, SALLY R; MISENHELTER, JOSEPH; CASTILLO, MOISES; MARIN, MARIZA; TAITAGUE, CLAUDIA; GRANADOS, ANDREA M; COOK, VERNON; TIBBETTS, STEVEN L
Subject: Credible Fear Influx Spot Report

Greetings, Sir.  The SDFO has received multiple media requests regarding the Credible Fear/Asylum activity at the San Ysidro Port of Entry.  The inquiries are most likely attributed to our usage of a designated queuing area (Asylum line) in

1

EXHIBIT NO. 26
Dec. 13, 2019

Confidential

AOL-DEF-00761338

pedestrian that we utilize due to the infrastructure constraints that currently exist within our Admissibility Enforcement Unit.

Credible Fear Influx

· The number of Credible Fear encounters at the San Ysidro/Otay Mesa Ports of Entry remain elevated.

· This morning's San Ysidro/Otay Mesa Admissibility Enforcement Unit (AEU) activity report indicated a total 885 individuals in various stages of immigration removal proceedings.  Many of them asserting Credible Fear/Asylum.

· Additionally, Public Affair Officers/Liaisons have received multiple media inquiries regarding an influx of Haitians.

· A Borderstat query indicates 422 Haitians have presented themselves and asserted Credible Fear during the month of May 2016 (May 1-25).

· The San Ysidro/Otay Mesa AEU has exceeded its existing temporary detention capabilities and have undertaken the following remedies to create additional space.

1)   Utilized several Border Patrol Stations to temporarily hold detainees awaiting transfer to ICE-ERO.

2)   Transferred all accompanied and unaccompanied unit processing to the Old Port overflow processing area.

3)   Transferred all permit (I-94) processing to the Otay Mesa Port of Entry in order to secure additional workstations to conduct in person or virtual interviews.

4)   Converted GSA's recently vacated maintenance working area at the Old Port into a temporary holding room.

· Port management is currently working with San Diego Sector Border Patrol to utilize the Imperial Beach station to hold and process single adult males awaiting Credible Fear.
Johnny Armijo
Assistant Director Border Security
San Diego, California

Confidential                                                      AOL-DEF-00761339

1  MAYER BROWN LLP
    Matthew H. Marmolejo (CA Bar No. 242964)
2    *mmarmolejo@mayerbrown.com*
   350 S. Grand Avenue
3  25th Floor
   Los Angeles, CA 90071-1503
4    Ori Lev (DC Bar No. 452565)
     (*pro hac vice*)
5    *olev@mayerbrown.com*
     Stephen M. Medlock (VA Bar No. 78819)
6    (*pro hac vice*)
     *smedlock@mayerbrown.com*
7  1999 K Street, N.W.
   Washington, D.C. 20006
8  Telephone:  +1.202.263.3000
   Facsimile:    +1.202.263.3300
9
   SOUTHERN POVERTY LAW CENTER
10    Melissa Crow (DC Bar No. 453487)
      (*pro hac vice*)
11    *melissa.crow@splcenter.org*
   1101 17th Street, N.W., Suite 705
12  Washington, D.C. 20036
   Telephone: +1.202.355.4471
13  Facsimile: +1.404.221.5857

14  *Additional counsel listed on next page*
   *Attorneys for Plaintiffs*
15
                **UNITED STATES DISTRICT COURT**
16
              **SOUTHERN DISTRICT OF CALIFORNIA**
17

18  Al Otro Lado, Inc., *et al.*,          Case No.:  17-cv-02366-BAS-KSC

19                  Plaintiffs,           **EXHIBIT 39 IN SUPPORT OF**
                                          **PLAINTIFFS' MEMORANDUM OF**
20        v.                              **POINTS AND AUTHORITIES IN**
                                          **SUPPORT OF THEIR MOTION**
21  Chad F. Wolf,[1] *et al.*,            **FOR SUMMARY JUDGMENT**

22                  Defendants.

23

24

25

26

27  _____
28  [1] Acting Secretary Wolf is automatically substituted for former Acting Secretary
   McAleenan pursuant to Fed. R. Civ. P. 25(d).

EXHIBIT 39 IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

CENTER FOR CONSTITUTIONAL RIGHTS
  Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
  *bazmy@ccrjustice.org*
  Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
  *gschwarz@ccrjustice.org*
  Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
  *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
  Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
  *sarah.rich@splcenter.org*
  Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
  *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
  Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
  *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

EXHIBIT 39 IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT

From: Owen, Todd C (AC OFO)
Sent: Wednesday, May 25, 2016 9:23:08 PM
To: FLORES, PETE ROMERO
Subject: FW: Credible Fear Influx Spot Report

Pete, anything you need from us right now?

Todd C. Owen
Executive Assistant Commissioner
Office of Field Operations
U.S. Customs & Border Protection

_____

From: MARTEL, CARLOS C
Sent: Wednesday, May 25, 2016 6:20:03 PM
To: Owen, Todd C (AC OFO); WAGNER, JOHN P; HOFFMAN, TODD A
Cc: BRAUNSTEIN, MARGARET A
Subject: FW: Credible Fear Influx Spot Report

Gentlemen: FYSA - Significant increase in CF cases at SYS/Otay POEs
resulting in saturation of temp detention space. Mitigation actions are
enumerated below to include virtual processing assistance from Detroit
and MIA. Media coverage is expected.


Carlos C. Martel
Acting Executive Director, Operations
Office of Field Operations
U. S. Customs and Border Protection

    Office
                        Mobile

_____

From: ARMIJO, JOHNNY L
Sent: Thursday, May 26, 2016 1:59:31 AM
To: MARTEL, CARLOS C; BRAUNSTEIN, MARGARET A
Cc: OFO-FIELD LIAISON; FLORES, PETE ROMERO; BRINTON, WALTER A; HENNING,
PAUL R; AKI, SIDNEY K; HOOD, ROBERT W; CARRILLO, SALLY R; MISENHELTER,
JOSEPH; CASTILLO, MOISES; MARIN, MARIZA; TATTAGUE, CLAUDIA; GRANADOS,
ANDREA M; COOK, VERNON; TIBBETTS, STEVEN L
Subject: Credible Fear Influx Spot Report

Greetings, Sir. The SDFO has received multiple media requests regarding
the Credible Fear/Asylum activity at the San Ysidro Port of Entry. The
inquiries are most likely attributed to our usage of a designated queuing
area (Asylum line) in pedestrian that we utilize due to the
infrastructure constraints that currently exist within our Admissibility
Enforcement Unit.

Credible Fear Influx

    ·       The number of Credible Fear encounters at the San Ysidro/Otay
Mesa Ports of Entry remain elevated.

Highly Confidential/Attorneys' Eyes Only                                    AOL-DEF-00034741

· This morning's San Ysidro/Otay Mesa Admissibility Enforcement Unit (AEU) activity report indicated a total 885 individuals in various stages of immigration removal proceedings. Many of them asserting Credible Fear/Asylum.

· Additionally, Public Affair Officers/Liaisons have received multiple media inquiries regarding an influx of Haitians.

· A Borderstat query indicates 422 Haitians have presented themselves and asserted Credible Fear during the month of May 2016 (May 1-25).

· The San Ysidro/Otay Mesa AEU has exceeded its existing temporary detention capabilities and have undertaken the following remedies to create additional space.

1) Utilized several Border Patrol Stations to temporarily hold detainees awaiting transfer to ICE-ERO.

2) Transferred all accompanied and unaccompanied unit processing to the Old Port overflow processing area.

3) Transferred all permit (I-94) processing to the Otay Mesa Port of Entry in order to secure additional workstations to conduct in person or virtual interviews.

4) Converted GSA's recently vacated maintenance working area at the Old Port into a temporary holding room.

· Port management is currently working with San Diego Sector Border Patrol to utilize the Imperial Beach station to hold and process single adult males awaiting Credible Fear.
Johnny Armijo
Assistant Director Border Security
San Diego, California

Highly Confidential/Attorneys' Eyes Only

AOL-DEF-00034742

MAYER BROWN LLP
  Matthew H. Marmolejo (CA Bar No. 242964)
  *mmarmolejo@mayerbrown.com*
350 S. Grand Avenue
25th Floor
Los Angeles, CA 90071-1503
  Ori Lev (DC Bar No. 452565)
  (*pro hac vice*)
  *olev@mayerbrown.com*
  Stephen M. Medlock (VA Bar No. 78819)
  (*pro hac vice*)
  *smedlock@mayerbrown.com*
1999 K Street, N.W.
Washington, D.C. 20006
Telephone:  +1.202.263.3000
Facsimile:   +1.202.263.3300

SOUTHERN POVERTY LAW CENTER
  Melissa Crow (DC Bar No. 453487)
  (*pro hac vice*)
  *melissa.crow@splcenter.org*
1101 17th Street, N.W., Suite 705
Washington, D.C. 20036
Telephone: +1.202.355.4471
Facsimile: +1.404.221.5857

*Additional counsel listed on next page*
*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*,<br><br>                Plaintiffs,<br><br>        v.<br><br>Chad F. Wolf,[1] *et al.*,<br><br>                Defendants. | Case No.:  17-cv-02366-BAS-KSC<br><br>**EXHIBIT 41 IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** |

---

[1] Acting Secretary Wolf is automatically substituted for former Acting Secretary McAleenan pursuant to Fed. R. Civ. P. 25(d).

EXHIBIT 41 IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT

CENTER FOR CONSTITUTIONAL RIGHTS
  Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
  *bazmy@ccrjustice.org*
  Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
  *gschwarz@ccrjustice.org*
  Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
  *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
  Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
  *sarah.rich@splcenter.org*
  Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
  *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
  Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
  *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

EXHIBIT 41 IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT

**From:** HOOD, ROBERT W
**Sent:** Thursday, May 26, 2016 12:16 PM
**To:** AKI, SIDNEY K; CARRILLO, SALLY R; MISENHELTER, JOSEPH; WARD, WILLIAM B; AVILA, EDWARD; CASTILLO, MOISES; CHAVEZ, VERONICA J; DELGADO, ALBERT F; FORD, STEPHEN C; HALL, TONY L (OFO CBS POE); KAPCZYNSKI, ROBERT A; MCCULLOCH, CHANTELLE; MENDOZA, DANIEL; MILLER, CHRIS; RODRIGUEZ, CARLOS C; RODRIGUEZ, CARY; ROSSILLI, VONA M
**CC:** HUA, PHONG M; MARTINEZ, SUSAN E
**Subject:** RE: SY MIGRANTS

**Importance:** High

Sir,

We can activate Plan B. We now have a bus to transport Haitians to IMB.

_____

**Action Plan:** Process and house Haitian detainees at **Imperial Beach** Station, with the potential to house up to ▮ detainees.

| SDC-Available Detention Space by Station/Location | | | | |
|---|---|---|---|---|
| **Station** | **# Ce lls** | **Type of Cell/Description** | **Max Capa city** | **Notes** |
| | | | | |
| **Imperial Beach** | | | | |
| | 1 | General Detention | | Cell -1 |
| | 1 | General Detention | | Cell - 2 |
| | 1 | General Detention | | Cell - 3 |
| | 6 | Small Group/Isolation Cells | | Cells 5-10 - Capacity ▮ each |
| | 1 | Med "family unit/keeper" cells | | Cell 4 - ▮ |
| | | | | |
| | | | | |

**Staffing:**
Eight officers and one Supervisor will be assigned per shift.  The AEU supervisor will prepare the daily schedules for this location and coordinate with Miami Field Office for Virtual Processing with Creole speakers.

- Two (2) officers will intake and fingerprint.

- Two (2) officers will prep cases.

- Three (3) officers will process cases.

- One (1) officer will serve as the detention control officer and will take care of the detainee's needs.

- One (1) supervisor will be assigned to supervise the team and review case files.

Three (3) officers have been identified who speak Creole and will be assigned to conduct interviews. Miami has identified 20 officers who speak Creole and will schedule Virtual Processing of Haitians with the team assigned to Imperial Beach Station.  Imperial Beach Station has 13 work stations and 3 IAFIS machines.

**Meals:**

Confidential

AOL-DEF-00067551

Detainees will be fed breakfast, lunch and dinner (delivered by Quality Coast Inc.). The AEU duty supervisors will be responsible for coordinating with the off-site supervisor to ensure that sufficient meals are on hand.

- Additionally, juice, water and snacks will be readily available on site.

- Water will be delivered to the station as needed.

- The port will provide blankets for all detainees held at Imperial Beach Station.

**Transportation:**
Transportation of detainees between the POE and Imperial Beach will be coordinated by AEU and a dedicated transportation team of officers comprised of A-TCET, SRT and ATU. The transportation team will take Haitian detainees directly from the Asylum line and transport. Each detainee will be patted down for weapons prior to getting into the bus or van. Once at the station, detainees will receive a full pat down and an Appendix D will be completed by the transport team.

AEU is attempting to obtain a bus to transport Haitians directly from the Asylum Line to Imperial Beach Station. If a bus is obtained, the team will transport 40+ Haitians per trip with three (3) officers. If not, four (4) vans with two officers each (8) will be used to transport 12 per van load.

**Communication**: phones and contact numbers:
AEU Duty Supervisors:

BC Marin: (

WC Castillo

Brown Field

---

**From:** AKI, SIDNEY K
**Sent:** Thursday, May 26, 2016 8:20 AM

**Cc:** HUA, PHONG M <P                          , MARTINEZ, SUSAN E
**Subject:** FW: SY MIGRANTS

Bob/Sally,

We need to do all we can to get this under control. The media is asking about our influx of Haitians.

We need to continue to process in a timely matter, we need to stage the subjects in our courtyard then place in our housing as efficiently as possible. If needed we should be reaching out to BP and placing subjects in thier facility.

I would like to have this done immediately. Thx.

**From:** WASILUK, JACQUELINE E
**Sent:** Thursday, May 26, 2016 8:56:45 AM
**To:** FLORES, PETE ROMERO
**Cc:** ARMIJO, JOHNNY L; HENNING, PAUL R; AKI, SIDNEY K; DECIMA, ANGELICA D
**Subject:** FW: SY MIGRANTS

Sir –

Here is an email from Sandra Dibble early this morning, as well as the email I received yesterday from her colleague Tatiana. I also received a voicemail from ABC 10 news asking to confirm that there were hundreds of other than Mexican nationals at San Ysidro claiming asylum.

# DP

Confidential

AOL-DEF-00067552



Jackie Wasiluk
CBP Public Affairs

**From:** Dibble, Sandra [mailto:sandra.dibble@sduniontribune.com]
**Sent:** Thursday, May 26, 2016 4:11 AM
**To:** WASILUK, JACQUELINE E
**Cc:** Sanchez, Tatiana
**Subject:** SY MIGRANTS

Jackie,

As you must know, several hundred people are sleeping on the floor of the SY pedestrian entrance. Many appear to be from Haiti, or perhaps African countries, but not all, as some look Latino. Merchants on the Mexican side tell me that they've seen a large increase in groups of people coming and hoping to be let in since last weekend.

My questions are:
1. Who are these people, and why are they sleeping on the floor of the SY poe?
2. Are they expressing fear of returning to their countries, and if so, why aren't they being turned over to ICE for processing?
3. If the are not expressing fear, why aren't they being turned away at the border?
4. If an OTM comes to the border, trying to come in, what is the protocol? Who deports them?
5. How are these people getting to the border? Is there a new smuggling route or rings behind this?
6. What do your numbers say?> Is this business as usual to have this many people on the floor sleeping? I have never seen it before.

I will be writing an article, based on what I saw with my own eyes, on what merchants in MExico tell me, and what a couple of Haitians who were waiting to be let in told me when I spoke with them in Tijuana. And any other information I am able to get.

I hope you can answer my questions.

Thank you,

Sandra Dibble

**Sandra Dibble | Reporter, Sr**
O: +1 (619) 2931716
sandra.dibble@sduniontribune.com
600 B Street, San Diego, California 92101

San_Diego_Union-Tribune_SIG

---

Jackie Wasiluk
CBP Public Affairs

**From:** Sanchez, Tatiana [mailto:tatiana.sanchez@sduniontribune.com]
**Sent:** Wednesday, May 25, 2016 12:23 PM
**To:** WASILUK, JACQUELINE E
**Cc:** Dibble, Sandra
**Subject:** RE: Haitians in San Ysidro

I believe it was in one group (and this happened recently, within the last few days). Definitely not referring to the beginning of the fiscal year.

Sandra is heading to her tour with CBP, so she will speak to you about it further. In the meantime, I will reach out to USCIS.

Thanks,

Tatiana

Confidential

AOL-DEF-00067553

**Tatiana Sanchez | Reporter - Immigration**
O: +1 (619) 2931380
tatiana.sanchez@sduniontribune.com
600 B Street, San Diego, California 92101

**From:** WASILUK, JACQUELINE E [n
**Sent:** Wednesday, May 25, 2016 12:03 PM
**To:** Sanchez, Tatiana <tatiana.sanchez@sduniontribune.com>
**Cc:** Dibble, Sandra <sandra.dibble@sduniontribune.com>
**Subject:** RE: Haitians in San Ysidro

Tatiana, thanks. I figured I would have a chance to chat with Sandra about this in about an hour, but I'll follow up now… when you heard about 100 people that turned themselves in, what timeframe are we looking at? (In one day? In one group? Since the beginning of the fiscal year back in October?)

I will look into it, but if you have any additional information that would be helpful.

(Generally, my initial thought, not for quoting, but to help as you are reporting, is that if your source is saying "turning themselves in" then these would be persons entering the credible fear/asylum process. CBP has a very limited role in that process, and I would highly recommend that you reach out to USCIS for a broader picture about what it means when someone without proper documents enters the credible fear/asylum process in the U.S., and what steps have to be taken by the government.)

I will get back to you as soon as I can, but what kind of deadline are you all working on?

Thank you

Jackie Wasiluk
CBP Public Affairs

**From:** Sanchez, Tatiana [mailto:tatiana.sanchez@sduniontribune.com]
**Sent:** Wednesday, May 25, 2016 11:46 AM
**To:** WASILUK, JACQUELINE E
**Cc:** Dibble, Sandra
**Subject:** Haitians in San Ysidro

Hi Jackie,

We've learned that there are about 100 Haitians that turned themselves into the SY Port of Entry. Would you be able to confirm this and provide further information about where they are being housed, why and how they arrived here, etc. We are looking to get as many details as possible.

I know Sandra reached out to you about this but I'm following up because our editors would really like us to report on this.

Thanks,
Tatiana

**Tatiana Sanchez | Reporter - Immigration**
O: +1 (619) 2931380
tatiana.sanchez@sduniontribune.com
600 B Street, San Diego, California 92101

Confidential

AOL-DEF-00067554