Nos. 22-55988, 22-56036

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

AL OTRO LADO, INC., *et al*.,
*Plaintiffs-Appellees/Cross-Appellants*,
*v*.
ALEJANDRO MAYORKAS, Secretary of Homeland Security, *et al*.,
*Defendants-Appellants/Cross-Appellees*,

and

the EXECUTIVE OFFICE FOR IMMIGRATION REVIEW,
*Appellant/Cross-Appellee*.

On Appeal from the United States District Court
for the Southern District of California
Case No. 3:17-cv-02366-BAS-KSC
Judge Cynthia A. Bashant

# BRIEF FOR *AMICUS CURIAE* AMNESTY INTERNATIONAL IN SUPPORT OF PLAINTIFFS-APPELLEES/CROSS-APPELLANTS

Aileen M. McGrath
AKIN GUMP STRAUSS HAUER & FELD LLP
100 Pine Street, Suite 3200
San Francisco, California 94111
(415) 765-9500
amcgrath@akingump.com

*Attorney for Amicus Curiae Amnesty International*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 26.1 and 29(a)(4)(A), Amnesty International states that it is not a publicly traded corporation; it has no parent corporation; and there is no public corporation that owns 10% or more of its stock.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT .......................................................i

INTEREST OF *AMICUS CURIAE* .......................................................................1

SUMMARY OF ARGUMENT .............................................................................2

ARGUMENT .......................................................................................................5

A. The Refugee Act Of 1980 Incorporates The International Law Protections Afforded To Refugees And Asylum-Seekers ..................5

B. CBP's Policies With Regard To Asylum-Seekers Violate Both United States And International Law ................................................11

1. State of the U.S.-Mexico border ............................................11

2. Refusal to inspect and process asylum-seekers ......................13

3. Delay in processing ..............................................................21

CONCLUSION ...................................................................................................26

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Matter of D-L-S-*,
28 I. & N. Dec. 568 (BIA 2022) .......... 10

*Doe v. Att'y Gen.*,
956 F.3d 135 (3d Cir. 2020) .......... 10

*East Bay Sanctuary Covenant v. Biden*,
993 F.3d 640 (9th Cir. 2021) .......... 9

*I.N.S. v. Cardoza-Fonseca*,
480 U.S. 421 (1987) .......... 9

*Morales Lopez v. Garland*,
852 F. App'x 758 (5th Cir. 2021) .......... 9

*Negusie v. Holder*,
555 U.S. 511 (2009) .......... 10

*Matter of Negusie*,
28 I. & N. Dec. 120 (BIA 2020) .......... 10

*Matter of Q-T-M-T-*,
21 I. & N. Dec. 639 (BIA 1996) .......... 10

*Quintero v. Garland*,
998 F.3d 612 (4th Cir. 2021) .......... 10

*In re S-P-*,
21 I. & N. Dec. 486 (BIA 1998) .......... 10

**Statutes and Rules**

5 U.S.C. § 706(1) .......... 4, 27

Refugee Act of 1980, Pub. L. No. 96-212, § 101(a), 94 Stat. 102
(1980) .......... 9

**Other Authorities**

American Convention on Human Rights, June 1, 1977, 1144 U.N.T.S. 123, Art. 22(8) ....................6

Amnesty Int'l, *Americas: Pushback Practices and their Impact on the Human Rights of Migrants and Refugees, Amnesty International Submission to the United Nations (UN) Special Rapporteur on the Human Rights of Migrants* (Feb. 2021)....................3, 25

Amnesty Int'l, *Facing Walls: USA and Mexico's Violation of the Rights of Asylum-Seekers* (June 2017) ....................20

Amnesty Int'l, *No Choice: Americas Must Offer Refuge and Protection* (June 2019)....................4

Amnesty Int'l, *Overlooked, Under-Protected: Mexico's Deadly Refoulement of Central Americans Seeking Asylum* (Jan. 2018) ....................2, 25

Amnesty Int'l, *Pushed Into Harm's Way: Forced Returns of Unaccompanied Migrant Children to Danger by the USA and Mexico* (June 2021)....................4, 19, 24

Amnesty Int'l, *United States of America: Rolling Back of Human Rights Obligations: Amnesty International Submission for the UN Universal Periodic Review, 36th Session of the UPR Working Group, Nov. 2020 (updated Aug. 2020)* (Sept. 2020)....................3

Amnesty Int'l, *United States of America: Submission to the UN Committee on the Elimination of Racial Discrimination, 107th Session, 8-30 August 2022* (July 2022)....................3, 12

Amnesty Int'l, *USA: Submission to the UN Human Rights Committee, 125th Session, 4-29 March 2019, List of Issues Prior to Reporting* (Jan. 2019)....................3, 25

Amnesty Int'l, *USA: "They Did Not Treat Us Like People": Race and Migration-Related Torture and Other Ill-Treatment of Haitians Seeking Safety in the USA* (Sept. 2022) ....................20

Amnesty Int'l, *USA:* "*You Don't Have Any Rights Here": Illegal Pushbacks, Arbitrary Detention & Ill-Treatment of Asylum-Seekers in the United States* (Oct. 2018) .................... 3, 4, 13, 17, 21, 22, 23

Attorney Gen. Jeff Sessions, Remarks at National Sheriffs' Association Annual Conference (June 18, 2018) ....................15

Cindy Carcamo, *For many waiting in Tijuana, a mysterious notebook is the key to seeking asylum*, LOS ANGELES TIMES (July 5, 2018) ....................22

Congressional Research Service, *The Department of Homeland Security's "Metering" Policy: Legal Issues* (Mar. 8, 2022) ....................14

Dep't of Homeland Security, *About CBP* (Dec. 30, 2022)....................11

Dep't of Homeland Security, *Budget Overview FY 2019*....................12

Dep't of Homeland Security, *ICE Detention Statistics, Fiscal Year 2019*....................12

Dep't of Homeland Security, *ICE Detention Statistics, Fiscal Year 2020*....................12

Dep't of Homeland Security, *ICE's Inspections and Monitoring of Detention Facilities Do Not Lead to Sustained Compliance or Systemic Improvements* (June 26, 2018)....................12

Dep't of Homeland Security, *The Life Saving Missions of CBP* (Aug. 20, 2018) ....................11

Dep't of Homeland Security, *On a Typical Day in Fiscal Year 2018, CBP*... (May 11, 2022) ....................11

Dep't of Homeland Security, *On a Typical Day in Fiscal Year 2019, CBP*... (May 11, 2022) ....................11

Dep't of Homeland Security, *On a Typical Day in Fiscal Year 2020, CBP*... (Mar. 19, 2021) ....................11

Dep't of Homeland Security, *Special Review – Initial Observations Regarding Family Separation Issues Under the Zero Tolerance Policy* (Sept. 2018) ....................3

Dep't of Homeland Security, *United States Border Patrol, Southwest Border Sectors, Total Illegal Alien By Fiscal Year (Oct. 1st through Sept. 30th)* (2018)....................13

G.A. Res. 39/46, *Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*, Art. 3 (Dec. 10, 1984) ....................6, 8

G.A. Res. 51/75 (Feb. 12, 1997) ....................11

G.A. Res. 52/132 (Dec. 12, 1997) ....................11

G.A. Res. 61/177, *International Convention for the Protection of All Persons from Enforced Disappearance*, Art. 16(1) (Dec. 20, 2006) ....................6

Valerie Gonzalez, *Families consider separation to seek asylum as they face limited appointments through CBP app*, THE MONITOR (Feb. 2023) ....................25

H.R. REP. NO. 115-948 (2018) ....................15

Kate Morrissey, *Asylum-seekers overwhelming U.S. processing in San Diego ports*, SAN DIEGO UNION TRIB. (Dec. 26, 2017) ....................18

Press Release, Amnesty Int'l, Americas: US government endangers asylum seekers with unlawful policies (Nov. 26, 2018) ....................22

U.N. Committee Against Torture, *General Comment No. 4 (2017) on the implementation of Article 3 of the Convention in the context of article 22* (Sept. 4, 2018) ....................9, 25, 27

U.N. General Assembly, *Convention Relating to the Status of Refugees*, *in* 189 United Nations, Treaty Series (July 28, 1951)....................5, 7, 20, 27

U.N. General Assembly, *Protocol Relating to the Status of Refugees*, *in* 606 United Nations, Treaty Series (Jan. 31, 1967)....................5

U.N. General Assembly, *Note on International Protection*, ¶ 16, UN Doc. A/AC.96/951 (Sept. 13, 2001) ....................6

UNHCR, *Advisory Opinion on the Extraterritorial Application of Non-Refoulement Obligations under the 1951 Convention relating to the Status of Refugees and its 1967 Protocol* (Jan. 26, 2007)....................7, 10, 25, 27

UNHCR, *Asylum Processes (Fair and Efficient Asylum Procedures)* (May 31, 2001)....................8

UNHCR Executive Committee Conclusion No. 25, *General Conclusion on International Protection* (Oct. 20, 1982) ....................11

UNHCR Executive Committee Conclusion No. 79, *General Conclusion on International Protection* (Oct. 11, 1996) ....................10

UNHCR, *The Principle of Non-Refoulement as a Norm of Customary International Law. Response to the Questions Posed to UNHCR by the Federal Constitutional Court of the Federal Republic of Germany in Cases 2 BvR 1938/93*, *2 BvR 1953/93, 2 BvR 1954/93* (Jan. 31, 1994)....................5

U.S. Customs & Border Protection, *Southwest Border Inadmissibles by Field Office FY2018*....................21

U.S. Dep't of State, *Mexico Travel Advisory* (Oct. 5, 2022)....................16

## INTEREST OF *AMICUS CURIAE*[1]

Amnesty International is a non-governmental, non-profit organization with a global support base of more than ten million members, supporters, and activists in more than 150 countries and territories, and domestic entities set up in more than seventy countries and territories. Amnesty International's vision is of a world in which every person enjoys all of the human rights enshrined in the Universal Declaration of Human Rights and other international human rights instruments. Amnesty International works independently and impartially to promote respect for human rights. It monitors domestic law and practices in countries throughout the world for compliance with international human rights law and international humanitarian law and standards, and it engages in advocacy, litigation, and education to prevent and end human rights violations and to demand justice for those whose rights have been violated. Amnesty International has particular expertise in international law and policies concerning the rights of refugees and asylum-seekers.

[1] Pursuant to Fed. R. App. P. 29(a)(2), counsel for *amicus curiae* certifies that all parties have consented to the filing of this brief. Pursuant to Rule 29(a)(4), counsel for *amicus curiae* states that no counsel for a party authored this brief in whole or in part, and no person other than *amicus curiae*, its members, or its counsel made a monetary contribution to its preparation or submission.

## SUMMARY OF ARGUMENT

The Trump Administration created a humanitarian crisis at the U.S.-Mexico border by unlawfully turning back asylum-seekers, leaving them in squalor and in danger of both direct and indirect harm.[2] This crisis has continued under the current presidential Administration. Amnesty International has documented the misconduct of U.S. border officials over the last several years as they implemented policies that violate U.S. and international law. Those laws are intended to protect individuals fleeing their countries of origin and seeking refuge in the United States. International law prohibits states from turning individuals away to any place where they would be at real risk of serious human rights violations, and the United States expressly incorporated these protections into U.S. law by passing the Refugee Act of 1980. The U.S. government, including through its operative administrative agencies, has publicly acknowledged and affirmed its obligations to refugees and asylum-seekers

[2] Amnesty Int'l, *Overlooked, Under-Protected: Mexico's Deadly Refoulement of Central Americans Seeking Asylum* (Jan. 2018), https://www.amnestyusa.org/wp-content/uploads/2018/01/AMR4176022018-ENGLISH-05.pdf. Amnesty International conducted a survey of 500 migrants, including people seeking asylum, finding that the Mexican government is routinely failing in its obligations under international law to protect those most in need of international protection, as well as repeatedly violating the *non-refoulement* principle. These failures by the Mexican government in many cases can cost the lives of those returned to the country from which they fled.

on several occasions. But in recent years, the United States has fallen egregiously short of meeting those obligations.

In 2017 and 2018, Amnesty International began receiving a dramatic increase in reports of asylum-seekers being turned away by U.S. Customs and Border Protection ("CBP") at U.S. ports-of-entry.[3] To justify these "turnbacks," CBP has cited amorphous—and, in Amnesty International's view, fictional—"capacity" constraints without any corroborative support. As a result, from 2017 to 2020, asylum-seekers were turned away at unprecedented rates and without any cognizable justification.[4] This practice violates domestic and international law, as documented

[3] Dep't of Homeland Security, *Special Review – Initial Observations Regarding Family Separation Issues Under the Zero Tolerance Policy* 5-6 (Sept. 2018), https://www.oig.dhs.gov/sites/default/files/assets/2018-10/OIG-18-84-Sep18.pdf.

[4] Amnesty Int'l, *Americas: Pushback Practices and Their Impact on the Human Rights of Migrants and Refugees, Amnesty International Submission to the United Nations (UN) Special Rapporteur on the Human Rights of Migrants* (Feb. 2021), https://www.amnesty.org/en/documents/AMR01/3658/2021/en/; Amnesty Int'l, *United States of America: Rolling Back of Human Rights Obligations: Amnesty International Submission for the UN Universal Periodic Review, 36th Session of the UPR Working Group, Nov. 2020 (updated Aug. 2020)* (Sept. 2020), https://www.amnesty.org/en/documents/amr51/1407/2019/en/; Amnesty Int'l, *United States of America: Submission to the UN Committee on the Elimination of Racial Discrimination, 107th Session, 8-30 August 2022* (July 2022), https://www.amnesty.org/en/documents/amr51/5873/2022/en/; Amnesty Int'l, *USA: Submission to the UN Human Rights Committee, 125th Session, 4-29 March 2019, List of Issues Prior to Reporting* (Jan. 2019), https://www.amnesty.org/en/documents/amr51/9684/2019/en/.

in Amnesty International's October 2018 report entitled "USA: 'You Don't Have Any Rights Here': Illegal Pushbacks, Arbitrary Detention & Ill-Treatment of Asylum-Seekers in the United States"[5] and later research, including the report, "Pushed Into Harm's Way: Forced Returns of Unaccompanied Migrant Children to Danger by the USA and Mexico."[6]

The United States has an obligation to receive and process asylum-seekers' claims without discrimination or undue delay. But as evidenced by the treatment of Plaintiffs in this action, the United States has fallen far short of this obligation. For this reason, Amnesty International asks this Court to affirm the district court's judgment as to 5 U.S.C. § 706(1), the Fifth Amendment, and the Asylum Transit Rule, to reverse the district court's judgment on Plaintiffs' remaining claims, and to remand to the district court for entry of appropriate relief.

---

[5] Amnesty Int'l, *USA: "You Don't Have Any Rights Here": Illegal Pushbacks, Arbitrary Detention & Ill-Treatment of Asylum-Seekers in the United States* (Oct. 2018), https://www.amnesty.org/download/Documents/AMR5191012018ENGLISH.PDF; Amnesty Int'l, *No Choice: Americas Must Offer Refuge and Protection* (June 2019), https://www.amnesty.org/en/documents/amr01/0557/2019/en/.

[6] Amnesty Int'l, *Pushed Into Harm's Way: Forced Returns of Unaccompanied Migrant Children to Danger by the USA and Mexico* (June 2021), https://www.amnesty.org/en/documents/amr51/4200/2021/en/.

## ARGUMENT

### A. The Refugee Act Of 1980 Incorporates The International Law Protections Afforded To Refugees And Asylum-Seekers

The principle of *non-refoulement*, which prohibits returning or turning away individuals to a place where they would be at real risk of serious human rights violations, is well settled in international law and has acquired customary international law status.[7] The principle originates in international refugee law: the 1951 Convention Relating to the Status of Refugees codifies the principle of *non-refoulement* as it applies to asylum-seekers and refugees.[8] In recent decades, the principle has further developed in other areas of international human rights law and now applies to all individuals subjected to a transfer of jurisdiction, whether or not they claim international protection or are entitled to it. Several international and

[7] UNHCR, *The Principle of Non-Refoulement as a Norm of Customary International Law. Response to the Questions Posed to UNHCR by the Federal Constitutional Court of the Federal Republic of Germany in Cases 2 BvR 1938/93, 2 BvR 1953/93, 2 BvR 1954/93* (Jan. 31, 1994), https://www.refworld.org/docid/437b6db64.html (last visited Feb. 27, 2023).

[8] U.N. General Assembly, *Convention Relating to the Status of Refugees*, *in* 189 United Nations, Treaty Series 137 (July 28, 1951) (hereafter "1951 Convention") (codifying the principle of *non-refoulement* by prohibiting returning a refugee "in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion"); *see also* U.N. General Assembly, *Protocol Relating to the Status of Refugees*, *in* 606 United Nations, Treaty Series 267 (Jan. 31, 1967).

regional human rights instruments expressly codify the principle of *non-refoulement*.[9]

The United Nations Refugee Agency ("UNHCR") has described *non-refoulement* as encompassing "any measure attributable to a State which could have the effect of returning an asylum-seeker or refugee to the frontiers of territories where his or her life or freedom would be threatened," or where an asylum-seeker or refugee would risk persecution. This includes rejection at the frontier, interception, and indirect *refoulement*, whether of an individual seeking asylum or in situations of mass influx.[10]

---

[9] The Convention Against Torture prohibits *refoulement* to torture at Article 3(1): "No State Party shall expel, return ("refouler") or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." G.A. Res. 39/46, *Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*, Art. 3 (Dec. 10, 1984). Article 16(1) of the International Convention for the Protection of All Persons from Enforced Disappearance includes a similar provision: "No State Party shall expel, return ("refouler"), surrender or extradite a person to another State where there are substantial grounds for believing that he or she would be in danger of being subjected to enforced disappearance." G.A. Res. 61/177, *International Convention for the Protection of All Persons from Enforced Disappearance*, Art. 16(1) (Dec. 20, 2006). The American Convention on Human Rights, signed by the United States on June 1, 1977, includes a prohibition against *refoulement* to violations of the right to life or personal freedom on grounds of race, nationality, religion, social status, or political opinions. American Convention on Human Rights, June 1, 1977, 1144 U.N.T.S. 123, Art. 22(8)).

[10] U.N. General Assembly, *Note on International Protection* ¶ 16, UN Doc. A/AC.96/951 (Sept. 13, 2001).

In an authoritative advisory opinion on state obligations created by international refugee law,[11] the UNHCR held that the principle of *non-refoulement* is violated when refugees and asylum-seekers are denied admission at the border and returned not only to their countries of origin, but also to "any other place" where they have reason to fear for their lives.[12] Accordingly, a state not only must avoid returning asylum-seekers to danger, but also must take affirmative measures to prevent a risk of harm by "adopt[ing] a course that does not result in [asylum-seekers'] removal, directly or indirectly, to a place where their lives or freedom would be in danger."[13]

The protections afforded to refugees and asylum-seekers under the 1951 Convention also include access to "*fair and efficient* asylum procedures."[14] The right to fair and efficient procedures is "an essential element in the full and inclusive

[11] The legal status of Advisory Opinions of the UNHCR is explained in the Statute of the Office of the UNHCR, *available at* http://www.unhcr.org/4d944e589.pdf. These Advisory Opinions are generally considered to be guidance for compliance with the 1951 Convention.

[12] UNHCR, *Advisory Opinion on the Extraterritorial Application of Non-Refoulement Obligations Under the 1951 Convention Relating to the Status of Refugees and Its 1967 Protocol* ¶ 7 (Jan. 26, 2007), https://www.unhcr.org/4d9486929.pdf.

[13] *See* 1951 Convention, *supra* note 8.

[14] Advisory Opinion, *supra* note 12, at ¶ 8 (emphasis added).

application of the 1951 Convention."[15] To effectuate asylum-seekers' right to *non-refoulement*, the United States must implement and follow procedures to ensure that their requests for asylum are duly and efficiently received and considered. In practice, this obligation requires U.S. officials to allow those seeking protection in the United States to present a claim for asylum and to not deny or unreasonably delay asylum-seekers' access to a fair and efficient asylum determination process.

The binding principle of *non-refoulement* under international refugee law is complemented by other *non-refoulement* obligations under international human rights law. Most notably, the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"), which the United States has expressly ratified and incorporated into federal law, similarly prohibits *refoulement*.[16] In describing states' obligation of *non-refoulement* under the CAT, the U.N. Committee Against Torture has emphasized that this obligation includes a prohibition on policies and practices that dissuade people from seeking protection (also known as "constructive *refoulement*"):

---

[15] UNHCR, *Asylum Processes (Fair and Efficient Asylum Procedures)* (May 31, 2001), https://www.unhcr.org/protection/globalconsult/3b389254a/asylum-processes-fairefficient-asylum-procedures.html.

[16] G.A. Res. 39/46 ("No State Party shall expel, return ('refouler') or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture.").

> States parties should not adopt dissuasive measures or policies, such as detention in poor conditions for indefinite periods, refusing to process claims for asylum or prolonging them unduly . . . which would compel persons in need of protection under article 3 of the Convention to return to their country of origin in spite of their personal risk of being subjected to torture or other cruel, inhuman or degrading treatment or punishment there.[17]

Congress passed the Refugee Act in 1980 in a sweeping effort to bring the United States' domestic laws in line with these international principles and thereby provide additional assurances and protections to asylum-seekers and refugees.[18] More specifically, "one of Congress' primary purposes was to bring United States refugee law into conformance with the 1967 United Nations Protocol Relating to the Status of Refugees."[19] In keeping with this intent, federal courts have consistently looked to international standards when resolving legal issues regarding refugees and asylum-seekers.[20] The Board of Immigration Appeals ("BIA") has similarly

---

[17] U.N. Committee Against Torture, General Comment No. 4 (2017) on the Implementation of Article 3 of the Convention in the context of article 22, ¶ 14 (Sept. 4, 2018), http://www.ohchr.org/Documents/HRBodies/CAT/CAT-C-GC-4_EN.pdf.

[18] Refugee Act of 1980, Pub. L. No. 96-212, § 101(a), 94 Stat. 102 (1980); *see East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 672 (9th Cir. 2021) ("To . . . implement the country's new treaty commitments, Congress passed the Refugee Act of 1980").

[19] *See Morales Lopez v. Garland*, 852 F. App'x 758, 764 (5th Cir. 2021) (quoting *I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 446 (1987)).

[20] *See East Bay Sanctuary Covenant,* 993 F.3d at 672 (finding agency rule unreasonable in part because it contravened the United Nations 1967 Protocol and 1951 Convention); *Morales Lopez*, 852 F. App'x at 764 (applying United Nations definition to expound meaning of "reasonable degree of future persecution" under

acknowledged that Congress' intent in passing the Refugee Act was to align domestic refugee law with the United States' obligations under the 1967 United Nations Protocol Relating to the Status of Refugees, to give statutory meaning to "our national commitment to human rights and humanitarian concerns," and "to afford a generous standard for protection in cases of doubt."[21]

The principle of *non-refoulement* is specific, universal, and obligatory.[22] Indeed, in 1996, the United Nations Executive Committee on the International Protection of Refugees stated that the principle had achieved the status of a norm not

---

asylum law); *Quintero v. Garland*, 998 F.3d 612, 626 (4th Cir. 2021) (holding that "immigration judges have a legal duty to fully develop the record" in part because "such a duty necessarily arises from . . . the United States' obligations under the Refugee Convention"); *Doe v. Att'y Gen.*, 956 F.3d 135, 144-145 (3d Cir. 2020) (rejecting government's argument on past persecution under asylum law because it "would upend the fundamental humanitarian concerns of asylum law" reflected within the United Nations Convention and Protocol Relating to the Status of Refugees (internal citation and quotation marks omitted)).

[21] *In re S-P-*, 21 I. & N. Dec. 486, 492 (BIA 1998); *see also Matter of D-L-S*, 28 I. & N. Dec. 568, 571 (BIA 2022) ("It is well established that Congress enacted the Refugee Act of 1980 to 'bring United States refugee law into conformance with the country's obligations under the Protocol.'" (quoting *Matter of Q-T-M-T-*, 21 I. & N. Dec. 639, 645 (BIA 1996)); *Matter of Negusie*, 28 I. & N. Dec. 120, 138 (BIA 2020) ("It is true that 'one of Congress'[s] primary purposes in passing the Refugee Act was to implement the principles agreed to in the 1967 United Nations Protocol Relating to the Status of Refugees[.]'" (quoting *Negusie v. Holder*, 555 U.S. 511, 520 (2009)).

[22] UNHCR Executive Committee Conclusion No. 79, *General Conclusion on International Protection* (Oct. 11, 1996), https://www.refworld.org/docid/3ae68c430.html; *see also* Advisory Opinion, *supra* note 12.

subject to derogation and customary under international law.[23] Under this widely accepted principle, all persons, including but not limited to refugees and asylum-seekers, are afforded robust protections from *refoulement* by operation of both domestic and international law.

## B. CBP's Policies With Regard To Asylum-Seekers Violate Both United States And International Law

### 1. State of the U.S.-Mexico border

From 2018 to the present, CBP has claimed to employ more than 60,000 workers and officials in the United States, with the number of personnel steadily increasing each year.[24] The Department of Homeland Security ("DHS"), of which CBP is a component, maintains one of the largest immigration detention systems

[23] G.A. Res. 51/75, ¶ 3 (Feb. 12, 1997); G.A. Res. 52/132, preamble ¶ 12 (Dec. 12, 1997); UNHCR Executive Committee Conclusion No. 25, *General Conclusion on International Protection* (Oct. 20, 1982).

[24] Dep't of Homeland Security, *The Life Saving Missions of CBP* (Aug. 20, 2018), https://www.dhs.gov/news/2018/08/20/life-saving-missions-cbp; Dep't of Homeland Security, *About CBP* (Dec. 30, 2022), https://www.cbp.gov/about#:~:text=With%20more%20than%2060%2C000%20employees,lawful%20international%20travel%20and%20trade (last visited Feb. 27, 2023). In the 2018 Fiscal Year, CBP employed 60,014 individuals, in the 2019 Fiscal Year 61,506 individuals, and in the 2020 Fiscal Year 63,685 individuals. Dep't of Homeland Security, *On a Typical Day in Fiscal Year 2018*, *CBP…* (May 11, 2022), https://www.cbp.gov/newsroom/stats/typical-day-fy2018 (last visited Feb. 27, 2023); Dep't of Homeland Security, *On a Typical Day in Fiscal Year 2019*, *CBP…* (May 11, 2022), https://www.cbp.gov/newsroom/stats/typical-day-fy2019 (last visited Feb. 27, 2023); Dep't of Homeland Security, *On a Typical Day in Fiscal Year 2020*, *CBP…* (Mar. 19, 2021), https://www.cbp.gov/newsroom/stats/typical-day-fy2020 (last visited Feb. 27, 2023).

worldwide, with approximately 200 detention facilities[25] and the capacity to incarcerate roughly 40,000 people per day (despite there being viable alternatives to detention).[26]

Even so, from 2017 to 2020, the Trump Administration developed a false narrative of overwhelming numbers of asylum-seekers at the U.S.-Mexico border to justify its increasingly frequent denials of access to the asylum process.[27] According to available statistics, the supposedly unmanageable number of asylum-seekers appears to have been a complete fabrication. In reality, in October 2018, the actual monthly rate of people without legal status attempting to enter the United States from Mexico—including asylum-seekers—had remained at roughly the same level as that

---

[25] Dep't of Homeland Security, *ICE's Inspections and Monitoring of Detention Facilities Do Not Lead to Sustained Compliance or Systemic Improvements* (June 26, 2018), https://www.oig.dhs.gov/sites/default/files/assets/2018-06/OIG-18-67-Jun18.pdf. In Fiscal Year 2019, there were 213 detention facilities and in Fiscal Year 2020, 170 facilities. Dep't of Homeland Security, *ICE Detention Statistics, Fiscal Year 2019*, https://view.officeapps.live.com/op/view.aspx?src=https%3A%2F%2Fwww.ice.gov%2Fdoclib%2Fdetention%2FFY19-detentionstats.xlsx (last visited Feb. 27, 2023); Dep't of Homeland Security, *ICE Detention Statistics, Fiscal Year 2020*, https://view.officeapps.live.com/op/view.aspx?src=https%3A%2F%2Fwww.ice.gov%2Fdoclib%2Fdetention%2FFY20-detentionstats.xlsx (last visited Feb. 27, 2023).

[26] Dep't of Homeland Security, *Budget Overview FY 2019*, https://www.dhs.gov/sites/default/files/publications/ICE%20FY19%20CJ.pdf (last visited Feb. 27, 2023); *ICE Detention Statistics, Fiscal Year 2019*, *supra* note 25; *ICE Detention Statistics, Fiscal Year 2020*, *supra* note 25.

[27] *See United States of America: Submission to the UN Committee on the Elimination of Racial Discrimination*, *supra* note 4, at 5-6.

reported in the previous five years (when federal authorities regularly received and processed asylum claims without undue delays).[28] Indeed, in April 2018, President Trump publicly acknowledged that the rate of people seeking to enter the United States between ports-of-entry had reached a 46-year low—but nonetheless called the numbers "unacceptable."[29]

But despite its well-staffed ranks and the historically average influx of immigrants from 2016 to March 2020, CBP began to cite lack of capacity to refuse to process asylum-seekers.[30] What changed before March 2020 was not the number of asylum-seekers, but the systems for processing those seeking protection at the border that CBP implemented, beginning as early as 2016.

**2. Refusal to inspect and process asylum-seekers**

During this time period, the Trump Administration implemented a systematic and dangerous policy and practice of illegally turning away asylum-seekers to prevent them from requesting protection at official United States ports-of-entry.

---

[28] Dep't of Homeland Security, *United States Border Patrol, Southwest Border Sectors, Total Illegal Alien Apprehensions By Fiscal Year (Oct. 1st through Sept. 30th)* (2018), https://www.cbp.gov/sites/default/files/assets/documents/2019-Mar/bp-southwest-border-sector-apps-fy1960-fy2018.pdf (last visited Feb. 27, 2023).

[29] Donald J. Trump (@realDonaldTrump), TWITTER (Apr. 5, 2018, 4:40 AM), https://twitter.com/realdonaldtrump/status/981859214380462081 (last visited Feb. 27, 2023).

[30] *Illegal Pushbacks, supra* note 5, at 14-15.

Government officials refer to this practice as the "metering" of asylum claims.[31] Then-DHS Secretary Kirstjen Nielsen confirmed in a May 2018 interview that, at that time, the Department had adopted this de facto policy at United States ports-of-entry, dismissing her agency's legal obligation to receive and protect asylum-seekers as a mere "loophole."[32] Former Secretary Nielsen explained the policy of turning away asylum-seekers as follows:

> We are "metering," which means that if we don't have the resources to let [asylum-seekers] in on a particular day, they are going to have to come back. They will have to wait their turn and we will process them as we can, but that's the way that the law works. Once they come into the United States, we process them. We have asked Congress to fix this loophole. It's a huge gaping loophole that we need to fix because it is so abused.[33]

Notably, CBP's policy of turning away asylum-seekers expressly contradicted contemporaneous public statements from federal officials acknowledging that the United States remained obligated to receive all asylum-seekers at U.S. ports-of-entry.[34] Congress also recognized that the Trump Administration's pushbacks of

---

[31] Congressional Research Service, *The Department of Homeland Security's "Metering" Policy: Legal Issues* (Mar. 8, 2022), https://crsreports.congress.gov/product/pdf/LSB/LSB10295.

[32] Interview by Fox News with Kirstjen Nielsen, Sec'y, Homeland Sec. (May 15, 2018).

[33] *Id.*

[34] Sec'y Kirstjen M. Nielsen (@SecNielsen), TWITTER (June 17, 2017, 2:51 PM), https://twitter.com/SecNielsen/status/1008467318744240128 (last visited Feb.

asylum-seekers at ports-of-entry was illegal. For instance, in July 2018, while proposing over $58 billion in federal funding for DHS agencies, the federal House Appropriations Committee called on DHS to "ensure that the United States is meeting its legal obligations, to include reminding field officers and agents about CBP's legal responsibilities to ensure that asylum-seekers can enter at POEs [ports-of-entry]."[35] But despite these public assurances, in 2017 and early 2018, Amnesty International began receiving reports of CBP illegally turning away asylum-seekers all along the U.S.-Mexico border. While some of these reports appear to have been isolated instances of abuse of authority, from 2016 through March 2020, Amnesty International observed CBP repeatedly (and increasingly often) shutting the doors to asylum-seekers, often citing unspecified "capacity" constraints on a given day to justify refusing to process asylum claims.[36] These anecdotes, described below, are a mere handful out of thousands of similar examples that demonstrate a widespread practice.

---

27, 2023); *see also* Attorney Gen. Jeff Sessions, Remarks at National Sheriffs' Association Annual Conference (June 18, 2018).

[35] H.R. REP. NO. 115-948, at 4, 26 (2018).

[36] While Amnesty International acknowledges that there may be times when a state is genuinely unable to accept and process all asylum-seekers at its border, repeatedly refusing to accept asylum-seekers constitutes a failure to fulfill that state's obligations under the U.N. Convention.

For instance, a shelter coordinator in Tijuana informed Amnesty International that in 2017, CBP personnel at the San Ysidro port-of-entry turned away approximately 20 unaccompanied minors whom his shelter hosted, without allowing them to seek asylum. From January to April 2018, CBP turned back at least five more children who were seeking asylum at the San Ysidro port-of-entry.[37] The shelter coordinator recounted that most of those unaccompanied minors were Mexican nationals who had fled targeted violence in Guerrero and Michoacán, which the United States recognizes as two of Mexico's most violent states.[38]

In January 2018, Amnesty International spoke with a 17-year-old girl from Michoacán who had fled for her life after cartels killed several of her relatives. She confirmed that CBP had turned her away at the San Ysidro port-of-entry and that Mexican immigration officials had later informed her that Mexican asylum-seekers were not being accepted at that time. The Mexican officials gave her a piece of paper with contacts for a local shelter, transported her to the shelter, and told her to return and attempt to seek asylum another time. The shelter coordinator informed Amnesty International that CBP only later processed the girl's asylum claim when she

[37] Interview with Anonymous Source in Tijuana, Mex. (May 1, 2018).

[38] U.S. Dep't of State, *Mexico Travel Advisory* (Oct. 5, 2022), https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/mexico-travel-advisory.html.

returned to the port-of-entry accompanied by a U.S. immigration lawyer, who insisted that she be permitted to exercise her right to seek asylum in the United States.[39]

Three shelters in Tijuana separately informed Amnesty International that Mexican nationals requesting asylum at a port-of-entry were turned away by CBP more frequently than asylum-seekers from other countries. One shelter coordinator, who referred to this process of turnbacks as the "revolving door system," observed that Mexican women with children were turned away most frequently, perhaps because (in the coordinator's view) they lacked knowledge of the asylum process and CBP was especially disinclined to process families seeking asylum.

According to staff at a women's shelter in Tijuana, CBP turned away about 25 Mexican women who sought asylum at the San Ysidro port-of-entry on April 27, 2018.[40] The shelter staff also informed Amnesty International that CBP personnel at San Ysidro had refused to receive *any* asylum-seekers on several Sundays in 2018.

---

[39] Interview with Anonymous Source in Tijuana, Mex. (Jan. 2018); *Illegal Pushbacks, supra* note 5, at 15-16.

[40] Interview with Anonymous Shelter Staffer in San Ysidro, Mex. (Apr. 30, 2018). The shelter staffer witnessed approximately 50 Mexican women leave the shelter on April 27 with the intention of seeking asylum at the San Ysidro port-of-entry. She informed Amnesty International that, from her understanding, only 25 of the 50 women appeared to have successfully presented themselves at the port-of-entry and were processed for asylum by CBP. Half of the women who left the shelter that morning to present themselves returned unsuccessful that day.

In December 2017, CBP turned away dozens of asylum-seekers—primarily from Africa and Mexico—at the San Ysidro port-of-entry. When roughly 30 of the African asylum-seekers began sleeping in a plaza on the Mexican side of the border crossing, Mexican municipal police cleared the plaza and arrested those remaining asylum-seekers.[41] According to shelter coordinators who met with Amnesty International the following week, some of the asylum-seekers stayed in shelters as they waited to request asylum in the United States.[42]

In a meeting with Amnesty International on January 5, 2018, the CBP Field Office Director in charge of the San Ysidro port-of-entry defended the pushbacks by citing capacity constraints: "So they weren't being allowed into the port-of-entry. We said, 'we're at capacity, so wait here.' It's because of our detention space limitation, we were at capacity."[43] He stated that CBP was not involved in or aware

---

[41] Kate Morrissey, *Asylum-Seekers Overwhelming U.S. Processing in San Diego Ports*, SAN DIEGO UNION TRIB. (Dec. 26, 2017), https://www.sandiegouniontribune.com/news/immigration/sd-me-asylum-backlog-20171226-story.html.

[42] One staffer recalled their shelter hosting 21 African asylum-seekers after the release of those arrested by municipal police, including men from Eritrea, Cameroon, the Democratic Republic of the Congo, Gambia, Ghana, Kenya, Sierra Leone, and Togo.

[43] Interview with CBP Field Office Director at CBP Field Office, San Diego, CA (Jan. 5, 2018).

of the Mexican police's rationale for sweeping the plaza and detaining some of the asylum-seekers.

Additional research by Amnesty International conducted in 2019 and 2020 revealed that most unaccompanied children were not allowed to add their names to the asylum waitlists created under CBP's "metering" policy. Further, children were often turned away by U.S. border officials when they tried to present themselves directly at ports-of-entry.[44]

While CBP has publicly stated that it rarely exceeds its capacity to receive asylum-seekers, CBP officials have nonetheless frequently justified the regularly reported illegal pushbacks at the border by referring to capacity constraints. And by all indications, CBP has taken no significant steps to curtail agents or officials who engaged in illegal pushbacks. For instance, a San Diego CBP Field Office Director told Amnesty International that a process exists to investigate and sanction CBP officials if they deny asylum-seekers the opportunity to present their claims. But the official said he did not consider CBP pushbacks due to alleged capacity constraints to constitute such an offense and declined to share with Amnesty International how many—if any—CBP personnel were sanctioned for illegal pushbacks in 2017.[45]

---

[44] *Pushed Into Harm's Way*, *supra* note 6.

[45] Interview with CBP Field Office Director, *supra* note 43 ("Where we substantiate the fact that somebody was denied or turned around once they made a

Turnbacks are not an entirely new phenomenon at the U.S.-Mexico border—CBP officials are vested with broad discretion, and Amnesty International has documented abuses of that discretion, resulting in turnbacks, since at least 2015. But as a result of the Trump Administration's policy encouraging CBP officers to limit the number of asylum-seekers and otherwise deter them from seeking protection at the U.S. border, the scale of these turnbacks escalated from 2016 to March 2020.[46] Yet, as discussed above, the principle of *non-refoulement* mandates that states take affirmative measures to "adopt a course that does not result in [asylum-seekers'] removal, directly or indirectly, to a place where their lives or freedom would be in danger."[47] The federal policy of turnbacks at the U.S.-Mexico border is a flagrant violation of this obligation.[48]

---

credible fear case, then we have internal actions that we take during the disciplinary process and review. So there is a process for it. . . . I wouldn't be able to tell you that statistic, and it's probably not something that we would release at this point as far as numbers. Those are internal numbers of what we're doing with staff. That's not something our officers should be doing, turning people away.").

[46] *See* Amnesty Int'l, *USA: "They Did Not Treat Us Like People": Race and Migration-Related Torture and Other Ill-Treatment of Haitians Seeking Safety in the USA* 37-41 (Sept. 2022), https://www.amnesty.org/en/documents/amr36/5973/2022/en/. The "metering" policy was started as a direct result of an increase in Haitian asylum-seekers.

[47] *See* 1951 Convention, *supra* note 8.

[48] Amnesty Int'l, *Facing Walls: USA and Mexico's Violation of the Rights of Asylum-Seekers* (June 2017), https://www.amnestyusa.org/wp-

### 3. Delay in processing

In her statement on metering, former Secretary Nielsen said that "[o]nce [asylum-seekers] come into the United States, we process them."[49] This remark grossly oversimplifies the experience of those asylum-seekers who successfully crossed at points-of-entry from 2016 to March 2020. According to the aid organization Kino Border Initiative ("KBI"), from May 20 to June 22, 2018, CBP processed an average of only five to ten asylum applications per day and forced asylum-seekers to wait in lines ranging from 50 to 120 people on the Mexico side of the Nogales border crossing while they awaited processing. Those waiting in line were subjected to temperatures exceeding 100 degrees, in addition to threats of deportation and potential exploitation or violence by criminal gangs and smugglers, often for periods lasting from several days to more than two weeks.[50]

Such delayed processing became a consistent practice across ports-of-entry, including San Ysidro, where CBP received and processed a maximum of only 20 to 40 asylum-seekers per day in May and June 2018, according to NGOs active at the

content/uploads/2017/06/USA-Mexico-Facing-Walls-REPORT-ENG.pdf; *Illegal Pushbacks, supra* note 5.

[49] Nielsen, *supra* note 30.

[50] U.S. Customs & Border Protection, *Southwest Border Inadmissibles by Field Office FY2018*, https://www.cbp.gov/newsroom/stats/ofo-sw-border-inadmissibles (last updated Dec. 21, 2018).

California-Mexico border. Like those at the Nogales border, asylum-seekers at the San Ysidro port-of-entry were forced to queue in Tijuana, even though the city is dangerous for asylum-seekers (as U.S. authorities have recognized).[51]   On May 8, 2018, roughly 350 people were waiting to be inspected and processed at the San Ysidro port-of-entry.[52] By June 10, 2018, that number had grown to 1,200.[53] On July 5, 2018, the Los Angeles Times reported that the list of asylum-seekers waiting in Tijuana had grown to nearly 2,000 people.[54] When Amnesty International reviewed the list again on November 21, 2018, it contained the names of around 4,320 people who had arrived since November 15.[55] Those already on the list before the caravan's arrival had reportedly been waiting in Tijuana for nearly five weeks before U.S. officials started inspecting and processing them.[56]

---

[51] *Illegal Pushbacks, supra* note 5, at 19.

[52] Text Message from Caravan Organizer to Amnesty International, Tijuana, Mex. (May 8, 2018).

[53] E-mail from Caravan Organizer to Amnesty International, Tijuana, Mex. (June 10, 2018).

[54] Cindy Carcamo, *For Many Waiting in Tijuana, a Mysterious Notebook Is the Key to Seeking Asylum*, LOS ANGELES TIMES (July 5, 2018), https://www.latimes.com/local/california/la-me-asylum-seekers-notebook-holds-key-to-entry-20180705-story.html.

[55] Press Release, Amnesty Int'l, Americas: US Government Endangers Asylum Seekers with Unlawful Policies (Nov. 26, 2018), https://www.amnesty.org/en/latest/press-release/2018/11/americas-us-government-endangers-asylum-seekers-with-unlawful-policies/.

[56] *Id.*

Processing delays were similarly dire at the Texas-Mexico border where, in 2018, U.S. authorities temporarily stopped inspecting and processing *any* asylum-seekers at two ports-of-entry for substantial periods of time.[57] Amnesty International was informed in a meeting that on July 17, 2018, CBP officers stationed at the center of the Roma–Miguel Aleman international bridge told U.S. immigration lawyer Jennifer Harbury that CBP no longer accepted asylum-seekers at the Roma port-of-entry. CBP instructed asylum-seekers to travel to the Reynosa bridge—more than 60 miles away, and potentially through dangerous cartel-controlled territory on the Mexican side of the border. On August 17, 2018, KBI informed Amnesty International that CBP and the Mexican government's National Institute of Migration ("INM") officials had closed the Laredo port-of-entry to asylum-seekers and redirected them to the Eagle Pass port-of-entry, where they were told to sign up on a waitlist managed by the municipal government. At the time, CBP was reportedly processing only six to seven people per day, as over 100 asylum-seekers—many of whom municipal authorities did not allow to join the waitlist—waited in makeshift migrant shelters in Piedras Negras. Among them were families with small children, some of whom were sick and required medical attention at the local hospital. KBI reported that many of those asylum-seekers left Piedras Negras

[57] *Illegal Pushbacks, supra* note 5, at 22.

after being deterred from requesting asylum at the port-of-entry by CBP and municipal authorities.[58]

In 2019 and 2020, Amnesty International documented frequent instances of U.S. border authorities summarily turning away unaccompanied children when they requested protection at official ports-of-entry. For example, Amnesty International was told that CBP was turning away unaccompanied Mexican children from the San Ysidro port-of-entry and that the Grupo Beta Unit of INM prevented children from joining the asylum waitlist in Tijuana.[59]

Under its policy of systematic pushbacks, the U.S. government stranded tens of thousands of asylum-seekers in dangerous regions of northern Mexico, placing them in dire conditions and causing a humanitarian crisis that has continued under the current Administration. Asylum-seekers have been forced to wait in intolerable and often life-threatening conditions without any guarantee that CBP officials at their port-of-entry would ultimately grant them access to the U.S. asylum process. Regrettably, many of these delays prevented asylum-seekers from ever accessing

---

[58] *Id.*

[59] *Pushed Into Harm's Way*, *supra* note 6.

that process. And, once turned back to Mexico, asylum-seekers are often further subjected to systematic *refoulement* to their countries of origin.[60]

Not only are these turnbacks and delays unjustified, but they also violate domestic and international laws that expressly prohibit states from "refusing to process claims for asylum or unduly prolong[ing] them"[61] and mandate "access to the territory and to fair and efficient asylum procedures."[62] The federal government cannot be permitted to continue to contravene asylum-seekers' right to an efficient, lawful asylum process.

In January 2023, the federal government began allowing some asylum-seekers to use a mobile application ("CBP One") to request an appointment to be processed at an official port-of-entry. However, Amnesty International has received information that asylum-seekers are experiencing difficulties requesting appointments, given the limited number of appointments available. The use of CBP One is akin to metering in that asylum-seekers are now once again forced to sign up for appointments at ports-of-entry to access asylum.[63]

---

[60] *Overlooked, Under-Protected*, *supra* note 2; *Americas: Pushback Practices*, *supra* note 4; *USA: Submission to the UN Human Rights Committee*, *supra* note 4.

[61] U.N. Committee Against Torture, General Comment No. 4, *supra* note 17.

[62] Advisory Opinion, *supra* note 12, at ¶ 8 (emphasis added).

[63] Valerie Gonzalez, *Families consider separation to seek asylum as they face limited appointments through CBP app*, THE MONITOR (Feb. 2023),

## CONCLUSION

Regardless of the U.S. government's public acknowledgements and affirmations of its obligations under domestic and international law to inspect and promptly process asylum-seekers, the actions by its agents at the border tell a very different story. According to Amnesty International's research, from 2016 to March 2020, CBP's actions were clear, consistent, and synchronized at widely dispersed ports-of-entry, and these actions stifled the number of asylum-seekers permitted entry into the United States. Emboldened by former DHS Secretary Nielsen's public denouncement of the asylum process as a "huge gaping loophole,"[64] border officials relied on false lack-of-capacity claims to justify turning away asylum-seekers. Even those ports-of-entry that did not expressly turn away asylum-seekers subjected them to significant delays that resulted in their waiting—often in dangerous territories or intolerable conditions—for unspecified periods as they awaited processing. These delays are tantamount to a denial for many asylum-seekers.

These practices are not only morally repugnant but also flagrantly violate both domestic and international law. The United States has an obligation by virtue of the principle of *non-refoulement* to "grant individuals seeking international protection

---

https://myrgv.com/local-news/2023/02/21/families-consider-separation-to-seek-asylum-as-they-face-limited-appointments-through-cbp-app/.

[64] Nielsen, *supra* note 32.

access to the territory and to fair and efficient asylum procedures,"[65] and is similarly prohibited from "refusing to process claims for asylum or unduly prolong[ing] them."[66] Border officials' practice of metering violates both of these principles and effectively forces asylum-seekers to return to places where their "life or freedom" would be threatened.[67]

For these reasons, this Court should affirm the district court's judgment concerning 5 U.S.C. § 706(1), the Fifth Amendment, and the Asylum Transit Rule. The Court should reverse and remand the district court's judgment concerning Plaintiffs' remaining claims, and remand for entry of appropriate relief.

---

[65] Advisory Opinion, *supra* note 12.

[66] U.N. Committee Against Torture, General Comment No. 4, *supra* note 17.

[67] 1951 Convention, *supra* note 8.

Dated:  February 28, 2023                Respectfully submitted,

                                         /s/ *Aileen M. McGrath*

                                         Aileen M. McGrath
                                         AKIN GUMP STRAUSS HAUER & FELD LLP
                                         100 Pine Street, Suite 3200
                                         San Francisco, CA 94111
                                         *Attorney for Amicus Curiae*
                                         *Amnesty International*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the length limits permitted by Federal Rule of Appellate Procedure 29(a)(5) and Ninth Circuit Rule 32-1. The brief is 6,148 words, excluding the portions exempted by Federal Rule of Appellate Procedure 32(f) and Ninth Circuit Rule 32-1(c). The brief's type size and type face comply with Federal Rule of Appellate Procedure 32(a)(5) and (6) and Ninth Circuit Rule 32-1(d).

Dated: February 28, 2023

/s/ *Aileen M. McGrath*
Aileen M. McGrath