Nos. 22-55988, 22-56036

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

AL OTRO LADO, INC., *et al.,*
*Plaintiffs-Appellees/Cross-Appellants*,

v.

ALEJANDRO MAYORKAS, Secretary of Homeland Security, *et al.,*
*Defendants-Appellants/Cross-Appellees*

and

the EXECUTIVE OFFICE FOR IMMIGRATION REVIEW,
*Appellant/Cross-Appellee*

On Appeal from a Final Judgment of the United States District Court for the
Southern District of California (Case No. 3:17-cv-02366-BAS-KSC)

**BRIEF OF AMICI CURIAE KIDS IN NEED OF DEFENSE,**
**LEGAL SERVICES FOR CHILDREN, INC., PUBLIC COUNSEL AND**
**THE YOUNG CENTER FOR IMMIGRANT CHILDREN'S RIGHTS**
**IN SUPPORT OF PLAINTIFFS-APPELLEES/CROSS-APPELLANTS**
**SEEKING AFFIRMANCE IN PART**

Wendy Wylegala
KIDS IN NEED OF DEFENSE
252 West 37th Street, Floor 15
New York, NY 10018
Tel. (646) 970-2913

Jane Liu
YOUNG CENTER FOR IMMIGRANT
CHILDREN'S RIGHTS
2245 S. Michigan Ave., Ste. 301
Chicago, IL 60616
Tel. 202-527-1372

Alexander J. Cooper
KIDS IN NEED OF DEFENSE
801 South Grand Avenue, Suite 550
Los Angeles, CA 90017
Tel. (213) 274-0189

Stephany Arzaga
LEGAL SERVICES FOR CHILDREN
870 Market St, Suite 356
San Francisco, CA 94102
Tel. (415) 780-6352

*Additional counsel listed on next page*

Mary Tanagho Ross
PUBLIC COUNSEL
610 South Ardmore Avenue
Los Angeles CA 90005
Tel. (213) 385-2977 ext. 185

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure ("FRAP") 26.1(a), the undersigned counsel states that each of the amici curiae is a nonprofit corporation and has no corporate parent, and no publicly held corporation holds 10% of any stock that any amicus might issue.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... iii

INTEREST OF THE AMICI CURIAE .................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ...................................... 4

ARGUMENT

**I.** TURNBACK PRACTICES OBSTRUCT CHILDREN'S PROTECTION CLAIMS AND EXPOSE THEM TO HARM ............................................. 6

    **A.** Under the Turnback Policy, Children Were Misled About Their Rights and Denied Access to the Asylum Process .... 7

    **B.** Denying Access to Ports of Entry Prolongs Children's Exposure to Harmful Conditions at the Border ................... 9

**II.** CHILDREN MIGRATING TO SEEK SAFETY AND STABILITY MUST BE AFFORDED PROMPT ACCESS TO PROTECTION ....................... 13

    **A.** Violence and Other Harm are Primary Drivers of Child Migration ........................................................................... 13

    **B.** Child Migrants are Entitled to Seek Legal Relief on the Basis of Harm or Fear of Harm ....................................... 16

**III.** TURNBACKS VIOLATE LEGAL STANDARDS FOR THE TREATMENT OF UNACCOMPANIED CHILDREN ............................ 17

    **A.** Turnbacks are Incompatible With Mandatory Safeguards for Unaccompanied Children Arriving in the United States ... 18

    **B.** Turnbacks are Incompatible With a Regimen of Mandatory Standards for the Treatment of Children in DHS and HHS Custody ........................................................................... 21

    **C.** Enjoining Application of the Transit Rule to the Plaintiff Class is Essential to the Protection of Affected Minors .... 22

    CONCLUSION........................................................................... 23

# TABLE OF AUTHORITIES

## Cases

*Flores v. Sessions*, 862 F.3d 863  (9th Cir. 2017) ....................................................18

Stipulated Settlement Agreement, *Flores v. Reno*, No. CV 85-4544-RJK (Px) (C.D. Cal. Jan. 17, 1997) ..............................................................................................21

## Statutes

6 U.S.C. § 251 ...........................................................................................................18

6 U.S.C. § 279(a) ......................................................................................................18

8 U.S.C. § 1101(a)(15)(T)..........................................................................................17

8 U.S.C. § 1101(a)(27)(J) ..........................................................................................17

8 U.S.C. § 1101(a)(42)...............................................................................................16

8 U.S.C. § 1158(a)(1)..................................................................................................8

8 U.S.C. § 1232(b)(3).................................................................................................19

8 U.S.C. § 1232(c) ............................................................................................... 20, 21

8 USC § 1232 (b)(2)...................................................................................................19

8 USC § 1232(b)(1)....................................................................................................19

8 USC § 1232(b)(3).....................................................................................................19

Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135 § 462(g)(2) (Nov. 25, 2002)......................................................................................................4

William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110–457, 122 Stat. 5078 (2008).......................................................19

## Administrative Materials

Centers for Disease Control & Prevention, *Public Health Reassessment and Immediate Termination of Order Suspending the Right To Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists*

*With Respect to Unaccompanied Noncitizen Children*, 87 FR 15243 (Mar. 17, 2022) ...................................................................................................9

David Aguilar, Chief, U.S. Border Patrol, Memorandum, *Hold Rooms and Short Term Custody* (Jun. 2, 2008), ..............................................................22

Exec. Ofc. for Imm. Rev., PM 21-27, *Terminology* (Jul. 26, 2021).........................4

Office of Refugee Resettlement, *Fact Sheets and Data: Country of Origin*, Dep't of Health and & Human Servs.(Feb. 24, 2023)...................................14

ORR Unaccompanied Children Program Policy Guide: Section 1, Dep't of Health & Human Servs. (Oct. 31, 2022) ........................................................20

U.S. Customs & Border Protection, *National Standards on Transport, Escort, Detention, and Search* (Oct. 2015)....................................................22

U.S. Customs and Border Protection, *Guidance for Management and Processing of Undocumented Noncitizens at Southwest Border Land Ports of Entry* (Nov. 2, 2021) .................................................................................................12

USCIS Announces Policies to Better Protect Immigrant Children Who Have Been Abused, Neglected, or Abandoned, U.S. Citizenship & Imm. Servs. (Mar.7, 2022) .................................................................................................17

USCIS, Minor Children Applying for Asylum By Themselves (Dec. 8, 2021) .....16

**Regulations**

Asylum Eligibility and Procedural Modifications, 84 Fed. Reg. 33,829 (July 16, 2019) ............................................................................................ 22, 23

Asylum Eligibility and Proecdural Modifications, 85 Fed. Reg. 82,260 (Dec. 17, 2020) ............................................................................................ 22, 23

**Other Authorities**

148 Cong. Rec., No. 110 (daily ed. Sept. 4, 2002) ..................................................19

154 Cong. Rec. No. 185 (daily ed. Dec. 10, 2008)..................................................18

Center for Gender & Refugee Studies and Migration & Asylum Program, Center for Justice &Human Rights at the National University of Lanús, Argentina,

*Childhood and Migration in Central and North America: Causes, Policies, Practices and Challenges* (Feb. 2015) ...................................................................14

*Examining the Failures of the Trump Administration's Inhumane Family Separation Policy*, Before the Subcomm. on Oversight & Investigations of the H. Comm. on Energy and Commerce, 116th Cong. (Feb. 7, 2019).........................10

Jennifer Podkul, *The Protection Gauntlet: How the United States is Blocking Access to Asylum Seekers and Endangering Lives of Children at the US Border*, KIND (Dec. 21, 2018) ................................................................. 6, 7, 8, 9, 10, 11

Jessica Jones & Jennifer Podkul, *Forced from Home: The Lost Boys and Girls of Central America*, Women's Refugee Commission (Oct. 14, 2012) .....................15

Kiara Alvarez, Ph.D. & Margarita Alegría, Ph.D., *Understanding and Addressing the Needs of Unaccompanied Immigrant Minors*, American Psychological Association (June 2016) ......................................................................10

Manuel Paris, Jr. et al., *Vulnerable But Not Broken: Psychosocial Challenges and Resilience Pathways Among Unaccompanied Children from Central America*, Immigration Psychology Working Group  (Jan. 18, 2018).................................14

Meredith Hoffman, *Inside the Trauma-Filled Camp of Migrants Waiting at the U.S. Border*, Vice.com (Dec. 28, 2018) ...............................................................11

Muzaffar Chishti & Faye Hipsman, *Dramatic Surge in the Arrival of Unaccompanied Children Has Deep Roots and No Simple Solutions*, Migration Policy Institute (June 13, 2014)..........................................................................16

Peter J. Meyer, *Central American Migration: Root Causes and U.S. Policy*, Congressional Research Service (Dec. 12, 2022) .................................................14

United Nations High Commissioner for Refugees, *Children on the Run: Unaccompanied Children Leaving Central America and Mexico and the Need for International Protection* (2014)......................................................................15

United Nations High Commissioner for Refugees, *State Parties to the 1951 Convention relating to the Status of Refugees and the 1967 Protocol* (updated Apr. 17, 2015) .................................................................................................. 20

## INTEREST OF THE AMICI CURIAE

Kids in Need of Defense ("KIND") is a national nonprofit organization that provides free legal and social services to immigrant children who are unaccompanied by, or separated from, a parent or legal guardian. Since January 2009, KIND has received referrals for over 30,000 children from 80 countries and has trained and mentored pro bono attorneys at 800 law firms, corporations, law schools, and bar associations. KIND provides legal services to children facing removal proceedings in immigration court through seventeen office locations across the United States. Since February 2020, KIND has established programs assisting child migrants in Tijuana, Ciudad Juarez, Mexico City, and Tapachula, and works closely with government and civil society stakeholders to help strengthen systems for the protection of children. KIND's Mexico field office staff provides migrant children and displaced children in Mexico with accurate information about their rights to protection in Mexico and the United States, and offers therapeutic programming and psychological first aid to migrant children and displaced children in in Mexican government custody in select cities. KIND staff at the United States southern border also advocates to prevent the separation of children from trusted adults during processing by United States authorities, and to mitigate the impact of separations occurring at the border. KIND also works to address the root causes of child migration from Central America; and advocates for

laws, policies and practices to improve the protection of unaccompanied children in the United States.

Legal Services for Children ("LSC") provides free representation to children and youth who require legal assistance to stabilize their lives and realize their full potential. Through a holistic team approach utilizing legal advocacy and social work services, its goal is to empower clients and actively involve them in the critical decisions that impact their lives. LSC uses this model for its clients to achieve safety and stability at home, educational success and freedom from detention and deportation.

Public Counsel is the nation's largest nonprofit law firm specializing in delivering pro bono legal services. Through a pro bono model that leverages the talents of thousands of attorney and law student volunteers, Public Counsel annually assists more than 30,000 families, children, and nonprofit organizations, and addresses systemic poverty and civil rights issues through impact litigation and policy advocacy. Public Counsel's Immigrants' Rights Project provides pro bono placement and direct representation to individuals seeking asylum, withholding of removal and relief under the Convention Against Torture. Public Counsel has over a decade of experience representing unaccompanied minors who enter the United States at or through the Mexican border, and currently represents over 230 unaccompanied minors from Central America who are in removal proceedings

before the Los Angeles Immigration Court. Public Counsel has a strong interest in ensuring that immigrants receive the full and fair process and benefits to which they are entitled.

The Young Center for Immigrant Children's Rights ("Young Center") advocates on behalf of the best interests of unaccompanied and separated children in adversarial immigration proceedings. The Young Center has been appointed as the independent Child Advocate (akin to best-interests guardian ad litem) for thousands of particularly vulnerable children and runs Child Advocate programs in eight locations across the United States. In that capacity, the Young Center provides government officials with recommendations on the best interests of each child, considering his or her safety, expressed wishes, and rights to family, liberty, development, and identity. The Young Center also engages in policy initiatives to develop and promote standards for protecting the best interests of children while they are subject to decision-making by government officials.

Each of the amici has a strong interest in ensuring that the asylum process is accessible to those seeking protection from harm and that no child is turned away without a meaningful opportunity to seek protection.

Amici submit this brief pursuant to Federal Rule of Appellate Procedure 29.

All parties have consented to the submission of this amicus brief in this case.[1]

## INTRODUCTION AND SUMMARY OF ARGUMENT

Defendants' policy of restricting access to the asylum process by turning

back asylum seekers at the border – the "Turnback Policy" – was acutely harmful

for children, and for unaccompanied children in particular. Unaccompanied

children[2] who seek entry to the United States are among the most vulnerable of

migrants: they are fleeing harm and are often traumatized; they lack an adult's

capacity to navigate hazardous situations and to assert their rights; and they are on

their own without legal guardians or parents. Recognizing this vulnerability,

Congress and other U.S. policymakers have established certain essential

protections for unaccompanied children. While the Turnback Policy was officially

---

[1] Pursuant to FRAP 29(a)(4)(E), amici state that no counsel for a party authored this brief in whole or in part, and no party, no counsel for a party, and no person other than amici, their members, and their counsel made a monetary contribution intended to fund the preparation or submission of this brief.

[2] In 2002, Congress adopted a statutory definition of "unaccompanied alien child," describing a child under 18 years of age who lacks lawful immigration status in the United States, and has no parent present in the United States or no parent available to provide care and physical custody. Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135 § 462(g)(2) (Nov. 25, 2002) . In place of the defined term, this brief uses "unaccompanied child." In parallel, a 2021 policy memorandum of the Executive Office for Immigration Review (EOIR) notes that recent Executive Orders and Supreme Court decisions avoid the term "alien," and directs agency employees to do the same except in quoting legal authority. Exec. Ofc. for Imm. Rev., PM 21-27, *Terminology* (Jul. 26, 2021), https://www.justice.gov/eoir/book/file/1415216/download.

in effect it violated those safeguards; recent turnbacks continue to cause harm; and further violations will occur if Defendants are permitted to turn away children who approach ports of entry to seek protection. This Court must affirm Defendants' obligations to inspect and provide access to the asylum process for all migrants who seek to approach the border, particularly children. And the Court must not sanction Defendants' reliance on crowding or high-volume activity near the border as a justification for withholding or delaying lawfully required processing of protection-seekers, including children.

Turnbacks obstruct children's access to the asylum process, compromise their well-being and physical safety by prolonging their exposure to harmful conditions at the border, and violate Congressional mandates for the protection of unaccompanied children. In devising and defending the Turnback Policy, Defendants have pitted priorities like security, interdicting contraband, and regulating trade against the basic right of migrants to request asylum. This amicus brief highlights the insidious effect of such a zero-sum calculation on children in the migration context through three lenses. First, the brief describes KIND's direct observations of children adversely impacted when turned away from ports of entry, drawing from a 2018 fact-finding visit and from more recent incidents that have occurred notwithstanding the formal termination of Defendants' "metering" guidance. Second, it describes the context in which children flee unsafe

5

circumstances to seek asylum, other forms of protection, or family reunification, highlighting their needs for protection both as asylum-seekers and as children. Third, the brief outlines key statutory and policy provisions governing children's immigration cases, to examine how Defendants' policies and practices at ports of entry have directly contravened Congress's intent to provide basic safeguards for unaccompanied children in light of their unique vulnerability.

## ARGUMENT

### I. TURNBACK PRACTICES OBSTRUCT CHILDREN'S PROTECTION CLAIMS AND EXPOSE THEM TO HARM

Acting on reports of children suspended in unsafe situations when blocked from presenting at ports of entry, KIND personnel visited the San Ysidro – Tijuana border crossing in December 2018 and reported their observations of what migrant children were experiencing there.[3]  In the years since, KIND has responded to the protection needs of children in the border region by deploying legal services and social services staff, now totaling 12 individuals in Ciudad Juarez, Tijuana, and Brownsville, Texas.  The observations of KIND staff and the firsthand accounts of

---

[3] Jennifer Podkul, *The Protection Gauntlet:  How the United States is Blocking Access to Asylum Seekers and Endangering Lives of Children at the US Border*, KIND (Dec. 21, 2018), https://supportkind.org/wp-content/uploads/2018/12/Protection-Gauntlet_12-21-18-FINAL.pdf (hereinafter, "*Protection Gauntlet*").

children they encounter illustrate how the Turnback Policy endangers children when their right to request asylum is denied or delayed.

### A. Under the Turnback Policy, Children Were Misled About Their Rights and Denied Access to the Asylum Process

From the genesis of "metering" around May 2016 until the onset of Covid-related border restrictions in March 2020, a variety of turnback methods delayed children from seeking safety and prolonged their exposure to instability, insecurity, and violence – echoing conditions from which they had fled. Several turnback practices were on view in December 2018, when KIND's delegation interviewed children, government officials, and nonprofit organizations at the border. And even more recently, KIND staff in Mexico have worked directly with children who have shared accounts of being turned back after seeking protection at the border.

Under "metering," migrants were waitlisted in Mexico for an opportunity to present themselves at the United States border to request asylum.[4] But even that fraught process was often closed to unaccompanied children: KIND observed in the San Ysidro-Tijuana vicinity in 2018 that children received numbers on the metering waitlists only if they were in family units; unaccompanied children were systematically excluded.[5] At that time, KIND learned that both U.S. Customs and

---

[4] *See* 2d. Am. Compl. ¶¶ 52–57.
[5] *Protection Gauntle*t at 2–3.

7

Border Protection ("CBP") and Mexican officials had told unaccompanied children near that crossing that they were not eligible for inclusion on the waitlist.[6] Some children who did reach United States territory reported to KIND that officials told them they were not allowed to ask for protection in the United States[7] – which directly contravenes the statutory right of migrants arriving in the United States to request asylum.[8]

In the fall of 2021, KIND interviewed a pregnant teenager and sexual assault survivor who had been turned back from the Paso del Norte Port of Entry. Alejandra,[9] a deeply traumatized seventeen-year-old, is from southern Mexico, where she was kidnapped by cartel members, held captive, and repeatedly raped. After several months, Alejandra escaped from her captors and fled north with relatives who were also targeted by the cartel. Arriving in Ciudad Juarez in September 2021 in an advanced stage of pregnancy, Alejandra presented herself at the Paso del Norte Port of Entry. A CBP officer asked Alejandra if she was Mexican, but instead of assessing her needs for protection under United States law, the officer instructed her to go to a "white building" – the location of a social services support organization in Mexico. The turnback of Alejandra cannot be

---

[6] *Id.*

[7] *Protection Gauntlet* at 3.

[8] 8 U.S.C. § 1158(a)(1).

[9] Each of the children named in this brief is referred to by a pseudonym.

explained by the Title 42 directive, from which unaccompanied children were excepted at that time.[10] Only after a legal representative intervened was Alejandra inspected and permitted to enter the United States, where she gave birth to a son during her time in the custody of the Office of Refugee Resettlement ("ORR") of the Department of Health and Human Services ("HHS").

### B. Denying Access to Ports of Entry Prolongs Children's Exposure to Harmful Conditions at the Border

Denying or delaying unaccompanied children's access to a port of entry not only violates their legal rights by impeding their requests for protection, but also prolongs their exposure to unsafe and unhealthy conditions in the area of the border. As early as December 2018, KIND publicly reported its observations of children living in unsanitary conditions, without adequate shelter from the weather, without running water, without sufficient food, and in need of medical attention.[11] KIND encountered one toddler who suffered a seizure without access to adequate medical care; lacking for food and water, she was also eating the residue of infant formula directly from a package.[12] KIND also learned of a girl engaged in

---

[10] Centers for Disease Control & Prevention, *Public Health Reassessment and Immediate Termination of Order Suspending the Right To Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists With Respect to Unaccompanied Noncitizen Children*, 87 FR 15243 (Mar. 17, 2022), https://www.federalregister.gov/d/2022-05687.
[11] *Protection Gauntlet* at 1.
[12]*Id*.

prostitution to obtain food for her 13-year-old sibling; and a boy, age 11, who attached himself to unrelated adults so that officials would not perceive him as unaccompanied and subject to deportation from Mexico.[13]

Medical research indicates that exposure to such conditions can cause long-term psychological trauma for children – particularly unaccompanied children.[14] "Higher rates of anxiety, depression, conduct problems and post-traumatic stress disorder (PTSD) have been found among unaccompanied children when compared to their accompanied immigrant counterparts."[15] "Prolonged exposure to highly stressful situations – known as toxic stress – can disrupt a child's brain architecture and affect his or her short- and long-term health."[16]

Further, denying an immediate opportunity to seek protection places children at risk of crime, exploitation, or other harm. In December 2018, KIND learned of children who were exploited and abused after unrelated adults lured

---

[13] *Id.* at 2-3.

[14] *See* Kiara Alvarez, Ph.D. & Margarita Alegría, Ph.D., *Understanding and Addressing the Needs of Unaccompanied Immigrant Minors*, American Psychological Association (June 2016), https://www.apa.org/pi/families/resources/newsletter/2016/06/immigrant-minors.

[15] *Id.*

[16] *Examining the Failures of the Trump Administration's Inhumane Family Separation Policy*, Before the Subcomm. on Oversight & Investigations of the H. Comm. on Energy and Commerce, 116th Cong. (Feb. 7, 2019) (statement of Julie M. Linton, MD, Fellow, American Academy of Pediatrics), at 3, https://www.congress.gov/116/meeting/house/108846/witnesses/HHRG-116-IF02-Wstate-LintonJ-20190207-U1.pdf

them with offers of shelter.[17]  Around that time, two unaccompanied teenagers
from Honduras were tortured and killed, their bodies discovered in a Tijuana
alleyway; other children reported to a journalist that someone lured the teens out of
the camp by pretending to offer legal help.[18]  Understandably, many children
expressed fear of seeking assistance because they did not know whom they could
trust.[19]

In December 2021, after the District Court entered its order on summary
judgment, KIND staff met with two Honduran girls who had been turned back
from the Paso del Norte Port of Entry. Begonia, 13, and Ines, 11, who are related,
had fled Honduras together to escape ongoing abuse by their caretakers.  Hoping to
reach Begonia's sister in the United States, they reached Ciudad Juarez,
Chihuahua, Mexico in November 2021. At the Paso del Norte Port of Entry, the
two girls walked up the bridge from Mexico and approached a uniformed officer at
the demarcation between the two countries.  Begonia recalls greeting the officer,
then stating that the two were minors and wanted to go to her sister in the United

---

[17] *Protection Gauntlet* at 2.

[18] Meredith Hoffman, *Inside the Trauma-Filled Camp of Migrants Waiting at the
U.S. Border*, Vice.com (Dec. 28, 2018),
https://www.vice.com/en_us/article/439ebg/inside-the-trauma-filled-camp-of-
migrants-waiting-at-the-us-border.

[19] *Protection Gauntlet* at 2.  Many specifically avoided workers from Desarollo
Integral de la Familia ("DIF"), the Mexican child welfare agency, for fear of being
detained, deported or denied the opportunity to ask for protection in the United
States.  *Id.* at 3.

States. But the officer told the two girls to return to Mexico via the pedestrian walkway. Begonia and Ines turned to walk away, but quickly returned to again ask the officer to allow them in to the United States. In response, the officer pointed toward the Mexican side of the bridge and told the girls to move out of the way and let people pass. That action directly contravenes November 2021 CBP guidance specifying that "undocumented noncitizens who are encountered at the border line should be permitted to wait in line, if they choose, and proceed into the POE for processing as operational capacity permits."[20]

The girls walked south and descended from the bridge to a busy roadway on the Mexican side of the border. Within moments, a vehicle struck Ines and ran over her foot. She was taken by ambulance to a hospital for treatment of her significant injuries. Mexican child protection authorities took the girls into custody and later referred them to KIND for assistance. KIND staff accompanied the children to the port of entry, and this time CBP processed them as required by the INA and transferred them to ORR custody.

In June 2022, Diana, a teenager from an indigenous community in southern Mexico, was turned back from a port of entry. Diana fled home at age 16 after her father, an alcoholic who was deeply in debt, sought to sell Diana to an older man.

---

[20] U.S. Customs and Border Protection, *Guidance for Management and Processing of Undocumented Noncitizens at Southwest Border Land Ports of Entry* at 2 (Nov. 2, 2021).

Encouraged by her mother, Diana traveled north hoping to join her sister in Florida.  Arriving in Matamoros, Diana used her limited Spanish to ask officers at the International Gateway Bridge for help.  The CBP officials who turned her away did not explain why.  Diana slept near the bridge that night, and in the morning, CBP officers told workers from a nonprofit organization about Diana.  The workers guided Diana to a shelter and referred her case to KIND's program in Mexico.  At KIND's request, and with assistance from the sister nonprofit, officials at the Brownsville Port of Entry received Diana and processed her as an unaccompanied child as required by law.

In each of the recent examples of Alejandra, Begonia and Ines, and Diana, the turnbacks by CBP placed the children at risk of significant harm and could readily have had far worse consequences.  These examples illustrate the urgency of granting the relief Plaintiffs have requested.

## II.  CHILDREN MIGRATING TO SEEK SAFETY AND STABILITY MUST BE AFFORDED PROMPT ACCESS TO PROTECTION

An overview of factors that spur children's flight for protection, and the extreme risk entailed in that flight, illustrates the imperative of ensuring children's access to protection without delay once they reach the border.

### A.  Violence and Other Harm are Primary Drivers of Child Migration

Before arriving at the United States border, most children have endured

hardship or harm during a risky journey, as well as through the factors that

prompted that journey.  For at least a decade, three countries have accounted for

the vast majority of unaccompanied children arriving at the southwest border:

Honduras, Guatemala and El Salvador,[21] countries plagued by gang activity and

having high rates of homicide and other crime.[22]  A 2018 report found that "[d]ue

to the widespread insecurity and crime in the region, fleeing for survival has

overtaken leaving in search of opportunity and a more promising future as the

primary reason for migration."[23]  A study in 2015 found that violence or the threat

of violence by gangs, intrafamilial violence, gender-based violence, poverty,

violations of fundamental human rights, absence of caregivers, and the need to

reunify with family were among the chief causes of child migration from Central

---

[21] Office of Refugee Resettlement, *Fact Sheets and Data: Country of Origin*, Dep't of Health and & Human Servs.(Feb. 24, 2023), https://www.acf.hhs.gov/orr/about/ucs/facts-and-data.

[22] *See, e.g.*, Peter J. Meyer, *Central American Migration: Root Causes and U.S. Policy* 2, Congressional Research Service (Dec. 12, 2022), https://sgp.fas.org/crs/row/IF11151.pdf.

[23] Manuel Paris, Jr. et al., *Vulnerable But Not Broken: Psychosocial Challenges and Resilience Pathways Among Unaccompanied Children from Central America* 33, Immigration Psychology Working Group  (Jan. 18, 2018), [hereinafter, "*Vulnerable Not Broken*"] https://www.apa.org/topics/immigration-refugees/vulnerable.pdf.

America and Mexico.[24] Earlier studies identified constellations of reasons driving children to leave Central America or Mexico unaccompanied by parents: violence by gangs and cartels, targeting by largely gang-controlled police, gender-based violence, poverty, and family reunification;[25] and in addition to those factors, deprivation of basic needs, and abuse in the home.[26] Motivations such as reunification with family and poverty played a role, generally in combination with safety reasons.[27] The UNHCR found that a clear majority of children's cases raise international protection concerns.[28] As this data suggests, many unaccompanied children have suffered grievous harm in their countries of origin. Due to those factors, as further discussed below, many will qualify for protection under United States law.

---

[24] Center for Gender & Refugee Studies and Migration & Asylum Program, Center for Justice &Human Rights at the National University of Lanús, Argentina, *Childhood and Migration in Central and North America: Causes, Policies, Practices and Challenges* iii-ix (Feb. 2015). https://cgrs.uchastings.edu/sites/default/files/Childhood_Migration_HumanRights_English_1.pdf.

[25] Jessica Jones & Jennifer Podkul, *Forced from Home: The Lost Boys and Girls of Central America*, Women's Refugee Commission 1, 7-11 (Oct. 14, 2012) [hereinafter, *"Forced From Home"*], https://www.womensrefugeecommission.org/wp-content/uploads/2020/04/border_childrens_report_10-2012.pdf.

[26] United Nations High Commissioner for Refugees, *Children on the Run: Unaccompanied Children Leaving Central America and Mexico and the Need for International Protection* 9-11 (2014) [hereinafter "*Children on the Run*"], https://www.unhcr.org/56fc266f4.html.

[27] *Children on the Run* at 24.

[28] *Children on the Run* at 6.

A journey from Central American countries to the United States border covers thousands of miles, and some journeys have even more distant starting points. Often traveling by freight train or traversing difficult terrain on foot, many children in transit are "trafficked, robbed, sexually assaulted, and exploited by a host of bad actors including their smugglers, traffickers, gangs, cartels, and even government authorities."[29] "Children are exposed to health risks, hardships, frequent delays, victimization, loss of property, unsafe lodgings, exposure to the elements, and victimization by criminals, traffickers, smugglers, and corrupt government officials who take advantage of their predicament."[30] In one study, children were asked if they would take the journey again having direct knowledge of its risks; most replied that they would, reflecting a grim assessment of prospective risks of the journey against known risks of remaining in place.[31]

## B. Child Migrants are Entitled to Seek Legal Relief on the Basis of Harm or Fear of Harm

The risks and harms that spur children's migration may also constitute the basis for claims for humanitarian protection in the United States. Children, like adult migrants, may qualify for asylum based on persecution on account of

---

[29] Muzaffar Chishti & Faye Hipsman, *Dramatic Surge in the Arrival of Unaccompanied Children Has Deep Roots and No Simple Solutions*, Migration Policy Institute (June 13, 2014), https://www.migrationpolicy.org/article/dramatic-surge-arrival-unaccompanied-children-has-deep-roots-and-no-simple-solutions.
[30] *Vulnerable Not Broken* at 35-36.
[31] *Forced From Home* at 7.

protected grounds.[32]  Children are also among the victims of labor trafficking or sex trafficking who seek protection in the United States.[33]  In addition, certain children may need humanitarian protection because they have been abused, abandoned or neglected by a parent, and on that basis, may be eligible for special immigrant juvenile status.[34]  Approximately three-quarters of the children served through KIND appear to be eligible for this relief.

Thus, a history of harm in the country of origin, frequently compounded by harms incurred in transit, are the antecedents for a child's encounter with United States immigration officials.  On arrival, a child may be dehydrated, hungry, ill, injured, recently separated from trusted adults, or recently victimized. All of these factors mark the imperative of affording the child prompt access to protection.

## III.  TURNBACKS VIOLATE LEGAL STANDARDS FOR THE TREATMENT OF UNACCOMPANIED CHILDREN

---

[32] *See* USCIS, Minor Children Applying for Asylum By Themselves (Dec. 8, 2021), https://www.uscis.gov/humanitarian/refugees-and-asylum/asylum/minor-children-applying-for-asylum-by-themselves; *see generally* 8 U.S.C. § 1101(a)(42) (defining "refugee.").

[33] *See* 8 U.S.C. § 1101(a)(15)(T) (defining severe forms of trafficking).

[34] *See* USCIS Announces Policies to Better Protect Immigrant Children Who Have Been Abused, Neglected, or Abandoned, U.S. Citizenship & Imm. Servs. (Mar.7, 2022), https://www.uscis.gov/newsroom/news-releases/uscis-announces-policies-to-better-protect-immigrant-children-who-have-been-abused-neglected-or; *see generally* 8 U.S.C. § 1101(a)(27)(J).

Children of any age may be subject to immigration enforcement actions, including detention in federal custody and court proceedings to determine whether a child will be removed from the United States. Congress, however, has expressed the intention "to protect children . . . who have escaped traumatic situations such as armed conflict, sweatshop labor, human trafficking, forced prostitution and other life threatening circumstances" and to fulfill "a special obligation to ensure that these children are treated humanely and fairly."[35]  Over time, that obligation took shape in the form of safeguards that guarantee children a basic level of due process in "an immigration system designed for adults."[36]  As this Court has stated, these laws "reflected Congress's conviction that '[u]naccompanied minors deserve special treatment under our immigration laws and policies.'"[37]  The following discussion illustrates several ways in which turnbacks directly contravene these mandates and standards.

### A. Turnbacks are Incompatible With Mandatory Safeguards for Unaccompanied Children Arriving in the United States

---

[35]154 Cong. Rec. No. 185, S10886 (daily ed. Dec. 10, 2008) (statement of Sen. Feinstein), https://www.congress.gov/110/crec/2008/12/10/CREC-2008-12-10-pt1-PgS10886.pdf.

[36]*Id.* at 10887.

[37] *Flores v. Sessions*, 862 F.3d 863, 880 (9th Cir. 2017) (quoting 145 Cong. Rec. S8180 (daily ed. September 4, 2002)).

In 2002, Congress transferred most duties of the former Immigration and Naturalization Services to the newly formed Department of Homeland Security ("DHS"), but expressly carved out responsibility for the care and custody of unaccompanied children.[38] Congress instead delegated that duty to HHS and its Office of Refugee Resettlement. [39] The Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA 2008")[40] restates this mandate: "the care and custody of all unaccompanied alien children, including responsibility for their detention, where appropriate" shall lie with the HHS Secretary.[41]

The TVPRA further specifies that all federal agencies, which includes DHS and its components, must notify HHS within 48 hours of apprehending or discovering an unaccompanied child, or of "any claim or suspicion" that a noncitizen in custody is under the age of 18.[42] Barring exceptional circumstances, within 72 hours of determining that a child is an unaccompanied child, the child

---

[38] 6 U.S.C. §§ 251, 279(a).

[39] *See* 148 Cong. Rec., No. 110, S8180 (daily ed. Sept. 4, 2002) (statement of Sen. Kennedy) ("Currently, INS has responsibility for the care and custody of these children. It would not be appropriate to transfer this responsibility to a Department of Homeland Security . . . . ORR has decades of experience working with foreign-born children, and ORR administers a specialized resettlement program for unaccompanied refugee children."), https://www.congress.gov/107/crec/2002/09/04/CREC-2002-09-04-pt1-PgS8155-2.pdf.

[40] William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110–457, 122 Stat. 5078 (2008).

[41] 8 U.S.C. § 1232(b)(1).

[42] 8 U.S.C. § 1232 (b)(2).

must be transferred to the custody of HHS.[43]  Accordingly, apart from an initial period of up to 72 hours after encounter,[44] Congress charged HHS rather than any DHS law enforcement component with providing "safe and secure placements" for unaccompanied children.[45]  Having taken pains to so specify, Congress cannot possibly have intended for DHS to sidestep these statutory obligations and turn back unaccompanied children it encounters at the border to uncertain and potentially dangerous living conditions.  In so doing, the Turnback Policy violated statutory commands and clearly expressed Congressional intent.

Under the Turnback Policy, some children reported that the United States officials who turned them away stated that asylum was not available to them.  Such misrepresentation is contrary to the terms of the 1951 Convention Relating to the Status of Refugees, which is binding on the United States through its ratification of the 1967 Protocol Relating to the Status of Refugees.[46]  In these and other ways, turnbacks violate legal obligations and adversely impact unaccompanied children,

---

[43] 8 U.S.C. § 1232(b)(3).

[44] 8 U.S.C. § 1232(b)(3)

[45] *See* 8 U.S.C. § 1232(c); *see also* Office of Refugee Resettlement, ORR Unaccompanied Children Program Policy Guide: Section 1, Dep't of Health & Human Servs. (Oct. 31, 2022), https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-1.

[46] *See* United Nations High Commissioner for Refugees, *State Parties to the 1951 Convention relating to the Status of Refugees and the 1967 Protocol* (updated Apr. 17, 2015), https://www.unhcr.org/protection/basic/3b73b0d63/states-parties-1951-convention-its-1967-protocol.html.

in disregard of their heightened vulnerability.[47]  This incongruity highlights the policy's unlawfulness.

### B. Turnbacks are Incompatible With a Regimen of Mandatory Standards for the Treatment of Children in DHS and HHS Custody

Additional law and policy sets specific standards for children's custodial conditions.  A 1985 class action lawsuit challenging practices of DHS's predecessor agency INS resulted in the *Flores* Settlement Agreement ("FSA") in 1997.[48]  The FSA established nationwide policy for the detention, treatment, and release of minors in federal immigration custody.[49]  Its overarching principle is that children are to be treated "with dignity, respect, and special concern for their particular vulnerability as minors."[50]

Among other things, the FSA requires that immigration officials provide minors with notice of their rights, and specifies safe and sanitary conditions for the facilities where minors are held.[51]  FSA provisions requiring that children be

---

[48] Stipulated Settlement Agreement, *Flores v. Reno*, No. CV 85-4544-RJK (Px) (C.D. Cal. Jan. 17, 1997), http://www.aclu.org/files/pdfs/immigrants/flores_v_meese_agreement.pdf.
[49] FSA at § II.
[50] *Id.* at § IV.
[51] *Id.* § V (among other things, minors must be provided with necessities including sufficient food, water, emergency medical assistance, and adequate temperature control and ventilation, and must be held separately from unrelated adults whenever possible).

placed in the least restrictive setting that is appropriate have been incorporated into statutory requirements.[52]

Border Patrol policy on short-term custody references the FSA, and sets forth requirements for supervision of juveniles and for access to meals and snacks, drinking water, restrooms, bedding, and other necessities.[53] And CBP national standards contain this guidance on the treatment of children: "Officers/Agents will consider the best interest of the juvenile at all decision points beginning at the first encounter and continuing through processing, detention, transfer, or repatriation. Officers/Agents should recognize that juveniles experience situations differently than adults."[54] Turnbacks at the border thus are contrary to longstanding safeguards for children and the agencies' own custodial practices.

## C. Enjoining Application of the Transit Rule to the Plaintiff Class is Essential to the Protection of Affected Minors.

Upholding the permanent injunction against applying a 2019 regulatory bar to asylum to certain members of the Plaintiff class is also essential to protect

---

[52] *Id.* at § IV; 8 U.S.C. § 1232(c)(2).

[53] David Aguilar, Chief, U.S. Border Patrol, Memorandum, *Hold Rooms and Short Term Custody* ¶¶ 6.5.2, 6.8-6.11 (Jun. 2, 2008), https://www.cbp.gov/sites/default/files/assets/documents/2022-Jan/Hold%20Rooms%20and%20Short%20Term%20Custody%202008_1.pdf.

[54] U.S. Customs & Border Protection, *National Standards on Transport, Escort, Detention, and Search* § 1.6 (Oct. 2015), https://www.cbp.gov/sites/default/files/assets/documents/2020-Feb/cbp-teds-policy-october2015.pdf.

unaccompanied children who were subjected to turnbacks before the rule took effect. The rule, titled "Asylum Eligibility and Procedural Modifications" (the "Transit Rule"),[55] would have rendered ineligible for asylum any noncitizen who "enter[ed], attempt[ed] to enter, or arrive[d] in the United States across the southern land border on or after July 16, 2019, after transiting through at least one country" without applying for protection. The Transit Rule did not exempt unaccompanied children.  For children who sought to present themselves at the border before the Transit Rule took effect, falling within the ambit of the Transit Rule was yet another direct consequence of having been turned back. This Court should uphold the injunction against the Transit Rule to provide relief from those consequences.

## CONCLUSION

The practice of turning asylum-seekers away from ports of entry, thereby avoiding the duty to provide prompt access to the asylum process, contravenes Congress's commitment to protecting the rights and welfare of unaccompanied children. Amici urge the Court to affirm the judgment requiring prompt inspection of asylum-seekers arriving at ports of entry, and affirm the injunction against application of the asylum Transit Rule to affected class members.

February 28, 2023                          Respectfully submitted,

---

[55] 84 Fed. Reg. 33,829 (July 16, 2019); 85 Fed. Reg. 82,260 (Dec. 17, 2020).

s/Wendy Wylegala

Wendy Wylegala
KIDS IN NEED OF DEFENSE
252 West 37th Street, Floor 15
New York, NY 10018
Tel. 646-970-2913
wwylegala@supportkind.org

Alexander J. Cooper
KIDS IN NEED OF DEFENSE
801 South Grand Avenue, Suite 550
Los Angeles, CA 90017
Tel. (213) 274-0189
acooper@supportkind.org

Stephany Arzaga
LEGAL SERVICES FOR CHILDREN
870 Market St, Suite 356
San Francisco, CA 94102
Tel. 415-780-6352
stephany@lsc-sf.org

Mary Tanagho Ross
PUBLIC COUNSEL
610 South Ardmore Avenue
Los Angeles CA 90005
Tel. (213) 385-2977 ext. 185
mross@publiccounsel.org

Jane Liu
YOUNG CENTER FOR IMMIGRANT
CHILDREN'S RIGHTS
2245 S. Michigan Ave., Ste. 301
Chicago, IL 60616
Tel. 202-527-1372
jliu@theyoungcenter.org

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on February 28, 2023.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: February 28, 2023      s/Wendy Wylegala

Wendy Wylegala
KIDS IN NEED OF DEFENSE
252 West 37th Street, Floor 15
New York, NY 10018
Tel. 646-970-2913
wwylegala@supportkind.org
*Counsel for Amicus Curiae*
KIDS IN NEED OF DEFENSE, INC.

25

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 22-55988, 22-56036

I am the attorney or self-represented party.

**This brief contains** 5,119 **words,** including 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

  ☐ it is a joint brief submitted by separately represented parties.
  ☐ a party or parties are filing a single brief in response to multiple briefs.
  ☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated _____.

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Wendy Wylegala **Date** February 28, 2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** *Rev. 12/01/22*