**Nos. 22-55988, 22-56036**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

AL OTRO LADO, INC., *et al.,*
*Plaintiffs-Appellees/Cross-Appellants,*

v.

ALEJANDRO MAYORKAS, Secretary of Homeland Security, *et al,*
*Defendants-Appellants/Cross-Appellees*

and

the EXECUTIVE OFFICE FOR IMMIGRATION REVIEW,
*Appellant/Cross-Appellee*

_____

On Appeal from the United States District Court for the Southern District of
California, Case No. 3:17-cv-2366-BAS-KSC

**BRIEF OF *AMICI CURIAE* AMERICAN CIVIL LIBERTIES UNION,
ACLU OF SOUTHERN CALIFORNIA, ACLU OF NORTHERN
CALIFORNIA, AND NORTHWEST IMMIGRANT RIGHTS PROJECT
IN SUPPORT OF PLAINTIFFS-APPELLEES/CROSS-APPELLANTS**

Omar Jadwat
Lee Gelernt
Anand Balakrishnan
AMERICAN CIVIL LIBERTIES UNION
125 Broad Street
New York, NY 10004
(212) 549-2660
ojadwat@aclu.org
lgelernt@aclu.org
abalakrishnan@aclu.org

Katrina Eiland
Stephen Kang
Spencer Amdur
Cody Wofsy
Oscar Sarabia Roman
AMERICAN CIVIL LIBERTIES UNION
39 Drumm Street
San Francisco, CA 94111
(415) 343-0770
keiland@aclu.org
skang@aclu.org
samdur@aclu.org
cwofsy@aclu.org
osarabia@aclu.org

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................ ii

CORPORATE DISCLOSURE STATEMENT ........................................ vii

INTEREST OF AMICI CURIAE .................................................... 1

INTRODUCTION ................................................................... 2

ARGUMENT ........................................................................ 4

    I. SECTION 1252(f)(1) DOES NOT BAR INJUNCTIONS WITH ONLY
    COLLATERAL EFFECTS ON THE COVERED PROVISIONS. ................... 4

        A. The Text Is Clear: Collateral Effects on the Covered Provisions Do Not
        Trigger § 1252(f)(1). .................................................... 6

        B. The Government's Position Would Expand § 1252(f)(1) to Cover
        Statutes Throughout the INA and Beyond. ............................. 10

        C. The Supreme Court's Interpretation of Similar Statutes Underscores
        that Collateral Effects Cannot Trigger § 1252(f)(1). ................. 14

        D. Courts Routinely Distinguish Between an Injunction's Primary Target
        and Its Collateral Effects. ............................................. 18

    II. SECTION 1252(f)(1) DOES NOT BAR THE INJUNCTION IN THIS
    CASE. ....................................................................... 20

CONCLUSION ...................................................................... 24

i

# TABLE OF AUTHORITIES

**Cases**

*Advocate Health Care Network v. Stapleton*,
    581 U.S. 468 (2017) ...............................................................8

*CAIR v. Trump*,
    471 F. Supp. 3d 25 (D.D.C. 2020)........................................7

*Catholic Social Services, Inc. v. INS*,
    232 F.3d 1139 (9th Cir. 2000) ....................................... 11, 19, 21, 22

*CIC Servs., LLC v. IRS*,
    141 S. Ct. 1582 (2021)................................................... passim

*City & Cty. of San Francisco v. USCIS*,
    981 F.3d 742 (9th Cir. 2020) .................................................10

*Clark v. Rameker*,
    573 U.S. 122 (2014) ..............................................................14

*Corley v. United States*,
    556 U.S. 303 (2009) ................................................................9

*Direct Marketing Ass'n v. Brohl*,
    575 U.S. 1 (2015) ..............................................................6, 16

*Dittmer Properties, L.P. v. FDIC*,
    708 F.3d 1011 (8th Cir. 2013)..............................................15

*East Bay Sanctuary Covenant v. Barr*,
    519 F. Supp. 3d 663 (N.D. Cal. 2021).....................................7

*East Bay Sanctuary Covenant v. Biden*,
    993 F.3d 640 (9th Cir. 2021)................................................23

*East Bay Sanctuary Covenant v. Garland*,
    994 F.3d 962 (9th Cir. 2020).................................................7

*East Bay Sanctuary Covenant v. Trump*,
354 F. Supp. 3d 1094 (N.D. Cal. 2018)...................................................23

*Freeman v. FDIC*,
56 F.3d 1394 (D.C. Cir. 1995)...........................................................15

*Garland v. Aleman Gonzalez*,
142 S. Ct. 2057 (2022)................................................................. passim

*Gonzales v. DHS,*
508 F.3d 1227 (9th Cir. 2007) ....................................................... passim

*Gonzalez v. ICE*,
975 F.3d 788 (9th Cir. 2020) ...............................................................1

*Harper v. Rettig*,
46 F.4th 1 (1st Cir. 2022) ....................................................... 17, 19, 22

*Hindes v. FDIC*,
137 F.3d 148 (3d Cir. 1998) ...............................................................15

*Jennings v. Rodriguez*,
138 S. Ct. 830 (2018)........................................................................1

*Kucana v. Holder*,
558 U.S. 233 (2010) .......................................................................23

*McNary v. Haitian Refugee Ctr., Inc.*,
498 U.S. 479 (1991) .......................................................................14

*Moreno Galvez v. Jaddou,*
52 F.4th 821 (9th Cir. 2022)..............................................................2, 6

*Nielsen v. Preap*,
139 S. Ct. 954 (2019).......................................................................1

*United States v. Barone*,
71 F.3d 1442 (9th Cir. 1995) ..............................................................14

**Statutes**

8 U.S.C. § 1101(a)(16)................................................................9

8 U.S.C. § 1103(a)(3)................................................................9

8 U.S.C. § 1153................................................................7

8 U.S.C. § 1158................................................................ passim

8 U.S.C. § 1158(a)(2)(C)................................................................7

8 U.S.C. § 1158(b)(1)(B)(i)................................................................12

8 U.S.C. § 1158(b)(2)(B)(ii)................................................................12

8 U.S.C. § 1158(b)(2)(C)................................................................12

8 U.S.C. § 1158(c)(2)................................................................12

8 U.S.C. § 1158(d)................................................................12

8 U.S.C. § 1182................................................................ 7, 9, 11

8 U.S.C. § 1182(a)(4)................................................................10

8 U.S.C. § 1182(a)(9)(C)(ii)................................................................20

8 U.S.C. § 1184................................................................7

8 U.S.C  § 1187................................................................7

8 U.S.C. § 1201(f)................................................................8

8 U.S.C. § 1225(b)(1)................................................................23

8 U.S.C. § 1225................................................................6

8 U.S.C. § 1226................................................................6

8 U.S.C. § 1229a ........................................................................... 6

8 U.S.C. § 1231 .............................................................................. 6

8 U.S.C. § 1231(a)(1) ................................................................... 22

8 U.S.C. § 1231(a)(5) ................................................................... 22

8 U.S.C. § 1252(e)(3) ..................................................................... 6

8 U.S.C. § 1252(e)(3)(A)(ii) ......................................................... 8

8 U.S.C. § 1252(f)(1) ............................................................ passim

8 U.S.C. § 1255 ....................................................................... 7, 11

8 U.S.C. § 1255(i) ........................................................................ 20

8 U.S.C. § 1256(a) ......................................................................... 9

8 U.S.C. § 1304(b) ......................................................................... 8

8 U.S.C. § 1421 ....................................................................... 7, 13

8 U.S.C. § 1422 ....................................................................... 7, 13

8 U.S.C. § 1423 ....................................................................... 7, 13

8 U.S.C. § 1424 ....................................................................... 7, 13

8 U.S.C. § 1425 ....................................................................... 7, 13

8 U.S.C. § 1426 ....................................................................... 7, 13

8 U.S.C. § 1427 ....................................................................... 7, 13

8 U.S.C. § 1431 ............................................................................ 13

8 U.S.C. § 1481 ....................................................................... 7, 13

12 U.S.C. § 1821(j) .................................................................................14

12 U.S.C. § 4617(f) .................................................................................15

26 U.S.C. § 7421(a) ........................................................................... 17, 18

28 U.S.C. § 1341 .....................................................................................15

28 U.S.C. § 1342 .....................................................................................15

INA § 101(a)(16) .......................................................................................9

INA § 103(a)(3) .........................................................................................9

INA § 221(f) ..............................................................................................8

INA § 242(e)(3)(A)(ii) ...............................................................................8

INA § 246(a) ..............................................................................................9

INA § 264(b) ..............................................................................................8

Pub. L. No. 104-208, Div. C, § 306(a)(2), 110 Stat. (1996) .....................2

## Regulations

8 C.F.R. § 208.30(e)(5)(iii) ......................................................................23

## Other Authorities

USCIS Policy Manual, Vol. 12 ("Citizenship and Naturalization") ......................13

Ira J. Kurzban, IMMIGRATION LAW SOURCEBOOK 2982 (18th Ed. 2022) .................8

H.R. Rep. 104-469, vol. I (Mar. 4, 1996)……………..……………………….. 9, 13

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amici* state that they have no parent corporations. No publicly owned corporation holds ten percent or more of the stock of *amici*, as they do not issue any stock.

## INTEREST OF AMICI CURIAE

The American Civil Liberties Union ("ACLU") is a nationwide, non-partisan organization with approximately two million members dedicated to the principles of liberty and equality enshrined in the Constitution and the nation's civil rights laws. The ACLU, through its Immigrants' Rights Project ("IRP") and state affiliates, engages in a nationwide program of litigation, advocacy, and public education to enforce and protect the constitutional and civil rights of noncitizens.

The Northwest Immigrant Rights Project ("NWIRP") is a nonprofit organization that represents low-income immigrants who are applying for immigration benefits or who have been placed in removal proceedings. NWIRP has a long history of representing individual clients and classes of individuals seeking confirmation of their right to apply for asylum.

Amici have significant expertise on 8 U.S.C. § 1252(f)(1), having litigated several cases in the Supreme Court and dozens of cases in the courts of appeals addressing the provision's scope. *See, e.g.*, *Garland v. Aleman Gonzalez*, 142 S. Ct. 2057 (2022); *Nielsen v. Preap*, 139 S. Ct. 954 (2019); *Jennings v. Rodriguez*, 138 S. Ct. 830 (2018); *Gonzalez v. ICE*, 975 F.3d 788 (9th Cir. 2020).[1]

---

[1] No party or party's counsel authored this brief in whole or in part. No party, no party's counsel, and no person other than *amici*, their members, or their counsel made a monetary contribution intended to fund the preparation or submission of this brief. All parties have consented to the filing of this brief.

**INTRODUCTION**

*Amici* submit this brief to address the meaning of 8 U.S.C. § 1252(f)(1) after the Supreme Court's decision in *Garland v. Aleman Gonzalez*, 142 S. Ct. 2057 (2022), and in particular to explain why the government's view of the statute must be rejected. As the plaintiffs explain, this Court has held that an injunction's collateral effects on the covered provisions do not trigger § 1252(f)(1). *Amici* write to expand on why that is the correct rule, including after *Aleman*.

The text of § 1252(f)(1) bars only injunctions of policies that implement "the provisions of chapter 4 of title II [of the Immigration and Nationality Act (INA)]," which govern certain aspects of the detention and removal process. *Moreno Galvez v. Jaddou*, 52 F.4th 821, 830 (9th Cir. 2022); *see* Pub. L. No. 104-208, Div. C, § 306(a)(2), 110 Stat. at 3009-611 (1996).[2] The decision below did not enjoin any such policy. It enjoined the application of an asylum eligibility rule, which implements the asylum statute, 8 U.S.C. § 1158, a statute that is outside the provisions covered by § 1252(f)(1). The injunction nonetheless had collateral

---

[2] A clarifying point: As this Court explained in *Moreno Galvez*, the text of the statute as enacted by Congress conflicts with the text later codified in the U.S. Code at § 1252(f)(1). The version Congress enacted applies the injunction bar to "chapter 4 of title II" of the INA, whereas the codified version refers to "part IV of this subchapter," meaning U.S. Code Title 8, chapter 12, subchapter II, part IV. These two sets of statutes—"chapter 4" and "part IV"—are not coextensive, but the differences are not material to the questions presented here. Because the enacted text trumps the "changed" version in the U.S. Code, *Moreno Galvez*, 52 F.4th at 830, *amici* refer to the INA provisions that § 1252(f)(1) covers as those in "chapter 4."

2

effects on the removal system, because asylum law is applied in removal proceedings in addition to other contexts. The case thus presents the question of whether such collateral effects trigger § 1252(f)(1).

The government argues that even if an injunction targets a policy that implements a different part of the INA not covered by § 1252(f)(1), the injunction is barred if it has downstream effects on the removal process.

The Court should reject the government's position. Most of the INA can have some effect on removal, because every rule regarding eligibility, benefits, and other immigration matters can affect whether a person is ultimately removable. Applying § 1252(f)(1) based on collateral effects would therefore mean that the bar would cover most provisions in the INA, erasing Congress's choice to limit the bar to "chapter 4" only. The government's position would effectively write those words out of the text.

The government's view also conflicts with how the Supreme Court has interpreted anti-injunction provisions in other contexts. In the tax context, where, like § 1252(f)(1), statutes bar injunctions that "enjoin" or "restrain" tax collection, the Court has held that downstream effects on tax collection do not trigger the bars—only injunctions whose main focus is to block tax collection. In contrast, when Congress wants to bar judicial involvement more broadly, it uses more expansive

language, providing that courts may not order anything that even "affects" an agency's functions.

Properly understood, § 1252(f)(1) only bars injunctions whose primary object—the main thing being enjoined—implements one of the covered detention-and-removal statutes. It does not bar injunctions of policies that implement the dozens of other provisions in the INA, even if obeying the injunction requires the government to alter the substantive rules that apply in removal proceedings. That approach respects the statute's textual limits, adheres to this Court's prior precedents, and tracks the Supreme Court's approach in similar contexts.

Under these principles, § 1252(f)(1) does not bar the injunction in this case. The focus of the district court's order was an asylum rule, not a rule that implemented one of the covered statutes. The injunction's collateral effect on removal orders was the result of the fact that asylum rules—like rules governing inadmissibility, adjustment of status, and most other things in the INA—can impact removal proceedings. Such collateral effects do not trigger § 1252(f)(1).

## ARGUMENT

## I.    SECTION 1252(f) DOES NOT BAR INJUNCTIONS WITH ONLY COLLATERAL EFFECTS ON THE COVERED PROVISIONS.

The government maintains that § 1252(f)(1) bars injunctions of any policy if the injunction "affects [] removal proceedings," Govt. Br. 55 (quotation marks omitted), even if the enjoined policy implements a statute that is *outside* the

provisions specified in § 1252(f)(1). According to the government, if an injunction might affect people's ultimate removability, or their eligibility for an immigration status that would prevent removal, or the course of removal proceedings, then § 1252(f)(1) bars the relief. *Id.* at 53-56.

The Court should reject the government's central claim that collateral effects on the removal system are enough to trigger § 1252(f)(1). That claim would expand § 1252(f)(1) to cover the whole INA, erasing the statute's key textual limits. Properly understood, § 1252(f)(1) only bars certain injunctions of policies that implement the covered provisions in "chapter 4." It does not bar injunctions of *other* immigration policies just because the injunction has downstream effects on removal.

This Court recognized this principle in *Gonzales v. DHS*, where it held that when a court enjoins the operation of a non-covered statute, any "collateral effect[s]" on the removal system do not trigger § 1252(f)(1). 508 F.3d 1227, 1233 (9th Cir. 2007). The Supreme Court left this principle undisturbed in *Aleman*, where it explained that its ruling did not address the "proposition that a court may enjoin the unlawful operation of a provision *that is not specified in § 1252(f)(1)* even if that injunction has some collateral effect on the operation of a covered provision." 142 S. Ct. at 2067 n.4. And as explained below, in the related tax context, where statutes bar orders that "enjoin" or "restrain" tax collection, the Supreme Court has held that "downstream" effects or "after-effect[s]" on tax collection do not trigger the

jurisdictional bars. *CIC Servs., LLC v. IRS*, 141 S. Ct. 1582, 1589-91, 1595-96 (2021); *see Direct Marketing Ass'n v. Brohl*, 575 U.S. 1, 12-14 (2015).

## A. The Text Is Clear: Collateral Effects on the Covered Provisions Do Not Trigger § 1252(f)(1).

Section 1252(f)(1) provides that, with some exceptions, courts may not "enjoin or restrain the operation of" "the provisions of chapter 4 of title II [of the INA]." *Moreno Galvez*, 52 F.4th at 830-31; *see supra* n.2 (explaining discrepancy between enacted and codified versions). By its terms, this does not prevent courts from enjoining *all* immigration policies, only policies that implement a few specified statutes: those found in "chapter 4," which provide the procedures for the removal system, including detention, adjudication, and physical removal. *See, e.g.*, 8 U.S.C. §§ 1226 (detention), 1229a (regular removal proceedings), 1225 (expedited removal proceedings), 1231 (removal operations). In *Aleman*, the Supreme Court explained that "the 'operation of' the relevant statutes is best understood to refer to the Government's efforts to enforce or implement them." 142 S. Ct. at 2064; *see id.* at 2066 n.3 ("to 'implement' a statute is to 'carry out' that statute"). Thus, § 1252(f)(1) bars certain classwide injunctions against policies that implement the detention, adjudication, and removal provisions in chapter 4 of title II of the INA.[3]

---

[3] The Court need not, and should not, decide whether § 1252(f)(1) bars all injunctions against detention and removal policies; for example, 8 U.S.C. § 1252(e)(3) specifically authorizes "system[ic]" review of expedited removal

The INA contains many other provisions outside of chapter 4, to which § 1252(f)(1) does not apply. These include provisions governing immigrant visas, 8 U.S.C. § 1153, asylum, *id.* § 1158, grounds of inadmissibility, *id.* § 1182, temporary admission, *id.* §§ 1184, 1187, adjustment of status, *id.* § 1255, naturalization, *id.* §§ 1421-1427, denaturalization, *id.* § 1481, and many other things.

The enjoined policy in this case—the transit ban—is an asylum rule. It implements the government's view (when it was promulgated) of its authority under § 1158(a)(2)(C) to limit access to asylum.[4] Section 1158 is located in chapter 1 of the INA and is not covered by § 1252(f)(1). Yet the government argues that § 1252(f)(1) still applies because the injunction has downstream, collateral effects on the removal system, since asylum eligibility rules are applied by asylum officers and immigration judges. Govt. Br. 53-56 (rule "operates" within the removal system).

That position would eviscerate the careful limit that Congress wrote into the statute, because most immigration policies have some effect on removal proceedings. Removal can be defeated by a valid visa, or derivative citizenship, or

---

policies and procedures, and barring systemic relief in such cases would frustrate Congress's purpose in establishing that unusual review scheme.

[4] This Court and others have held that the transit ban was illegal. *See East Bay Sanctuary Covenant v. Garland*, 994 F.3d 962 (9th Cir. 2020); *CAIR v. Trump*, 471 F. Supp. 3d 25 (D.D.C. 2020); *East Bay Sanctuary Covenant v. Barr*, 519 F. Supp. 3d 663 (N.D. Cal. 2021).

adjustment of status, or asylum; immigration judges regularly apply admissibility rules of all kinds; the list goes on. An injunction of any visa, inadmissibility, adjustment, naturalization, or asylum policy could therefore affect removal cases. If the government were correct, then all of these statutes and more would be subject to § 1252(f)(1) because of their collateral effects on the removal system. *See infra* Part I.B (detailing examples).

That would eliminate the textual limit Congress wrote into the statute. If Congress meant what the government says, it could have erased "chapter 4" and written that courts could not "enjoin or restrain the operation of the provisions of ~~chapter 4 of~~ title II" of the INA, since title II contains most immigration rules. *See Advocate Health Care Network v. Stapleton*, 581 U.S. 468, 477-78 (2017) (refusing to interpret statute "as if it were missing [] two words"). Indeed, other INA provisions, including in the very same statutory section as § 1252(f)(1), refer more generally to "the provisions of this title." INA § 242(e)(3)(A)(ii), codified at 8 U.S.C. § 1252(e)(3)(A)(ii); *see* INA § 221(f), codified at 8 U.S.C. § 1201(f); INA § 264(b), codified at 8 U.S.C. § 1304(b).[5]

Nor is the logic of the government's position limited even to title II of the INA—on its view, § 1252(f)(1) would apply to a policy implementing the

---

[5] For a cross-reference of INA and U.S. Code sections, *see* Ira J. Kurzban, IMMIGRATION LAW SOURCEBOOK 2982 (18th Ed. 2022).

immigration-status categories in title I, or the naturalization rules in title III, since both could obviously affect the outcome of removal proceedings. That alters the statute even further, so that it could have simply said "enjoin or restrain the operation of the provisions of this Act." Again, Congress knows how to do that, and multiple parts of the INA refer to "the provisions of this Act." *See, e.g.*, INA § 101(a)(16), codified at 8 U.S.C. § 1101(a)(16); INA § 103(a)(3), codified at 8 U.S.C. § 1103(a)(3); INA § 246(a), codified at 8 U.S.C. § 1256(a).

Nor were those the only options to achieve the government's proposed reading. Congress could have prohibited courts from enjoining the operation of "the immigration system" or some other general phrase. Or it could have specified additional covered provisions like asylum (§ 1158) or inadmissibility (§ 1182) in the text of the law. "The short answer is that Congress did not write the statute that way." *Corley v. United States*, 556 U.S. 303, 314-15 (2009) (cleaned up). Instead it carefully tailored § 1252(f)(1) to address only the detention and removal procedures in chapter 4 that were enacted or amended along with § 1252(f)(1). *See* H.R. Rep. 104-469 at 161 (Mar. 4, 1996) (describing intention to address injunctions of "the new removal procedures established in this legislation"). Respecting that choice means rejecting the government's unlimited view of the statute.

**B. The Government's Position Would Expand § 1252(f)(1) to Cover Statutes Throughout the INA and Beyond.**

The government's argument relies on the fact that different parts of the immigration system are often linked. Chapter 4 of the INA provides the procedures for handling people's removal cases, including apprehension, detention, adjudication, and physical removal. But most of the INA's substantive rules come from outside chapter 4. These rules are independent of the removal process and are applied in a number of contexts, like visa processing, benefit applications, and affirmative asylum applications. But because the INA's substantive provisions can also be enforced in the removal process, nearly every INA provision can have some eventual effect on removal—and so an injunction of almost any immigration policy could have a collateral effect on chapter 4.

For example, 8 U.S.C. § 1182(a)(4) provides that an immigrant who is or is likely to become a "public charge" is inadmissible. The provision is in chapter 2. The government implements this provision by issuing rules that interpret who counts as a public charge. *See City & Cty. of San Francisco v. USCIS*, 981 F.3d 742, 751-53 (9th Cir. 2020) (describing these policies). Even though public-charge policies implement a provision in chapter 2, not chapter 4, the government's theory would mean that § 1252(f)(1) applies to all public-charge policies, because immigration judges apply them to determine admissibility during removal proceedings. In the government's words, an injunction of a public-charge policy would be improper

because it would "prohibit[] immigration judges" from finding people inadmissible on that basis. Govt. Br. 56. The same logic would apply to every policy that implements any ground of inadmissibility in § 1182, even though Congress excluded § 1182 from § 1252(f)(1)'s coverage.

The same is true for adjustment of status, which is governed by 8 U.S.C. § 1255 in chapter 5. Adjustment of status can be raised as a form of relief in removal proceedings, so an injunction of an adjustment-of-status policy would naturally affect people's removal cases. *See Gonzales*, 508 F.3d at 1233 (describing injunction of adjustment policy that prevented government "from executing final orders of removal" where adjustment "had been rejected because of the unlawful [policy]"). According to the government, that should mean that § 1252(f)(1) applies to § 1255, because an injunction of an adjustment policy might "require[] the Government to disturb determinations that have already been made under" the removal statutes. Govt. Br. 54. This Court has rightly rejected that argument in the adjustment context multiple times. In *Catholic Social Services, Inc. v. INS*, the Court upheld an injunction of an adjustment policy that explicitly prevented the government from executing removal orders that were issued because of the policy. 232 F.3d 1139, 1145, 1149-50 (9th Cir. 2000) (en banc). And in *Gonzales*, the Court explained that such "collateral effect[s]" do not trigger § 1252(f)(1) when the injunction only "directly implicates" a statute outside of chapter 4, by blocking the

11

"unlawful application" of that non-covered statute. 508 F.3d at 1233. The present case is indistinguishable. *See infra* Part II.

Asylum further illustrates the startling reach of the government's position. As mentioned, the substantive rules for asylum come from 8 U.S.C. § 1158, in chapter 1. These rules are applied not just in removal proceedings but also in affirmative applications for asylum. *See* 8 U.S.C. § 1158(d). Yet on the government's theory, every substantive rule in § 1158 is covered by § 1252(f)(1), because every rule can "operate[]" in expedited or regular removal proceedings, and every rule could be the basis to deny asylum and trigger detention and removal. Govt. Br. 55. Thus, an unlawful policy interpreting the refugee definition, 8 U.S.C. § 1158(b)(1)(B)(i), could not be enjoined because doing so would prevent "asylum officers from entering negative credible-fear determinations in expedited removal" based on the unlawful policy, Govt. Br. 53. An unlawful policy to terminate people's asylum status could not be enjoined, *id.* § 1158(c)(2), because that might require the government "to 'reopen or reconsider'" removal orders that were based on the unlawful termination, Govt. Br. 54. And, as the government argues in this case, courts could not enjoin policies that introduce new asylum bars of any kind, *id.* §§ 1158(b)(2)(C), 1158(b)(2)(B)(ii), since those bars are applied in removal proceedings.

12

The government's position extends further still, as it would apply equally to the citizenship and naturalization policies in title III of the INA, all of which could impact both detention and removal proceedings. *See, e.g.*, 8 U.S.C. §§ 1421-1427 (naturalization); *id.* § 1481 (denaturalization); *id.* § 1431 (derivative citizenship). A person's citizenship is a decisive factor in whether they can be subject to detention, adjudication, and removal under chapter 4. And these provisions are implemented by agency policies. *See, e.g.*, USCIS Policy Manual, Vol. 12 ("Citizenship and Naturalization"). For example, if a court enjoined an illegal denaturalization policy, immigration judges could no longer rely on the policy to determine that a person was not a U.S. citizen. These provisions are far afield from the provisions § 1252(f)(1) identifies, yet on the government's read all would be covered by § 1252(f)(1).

These are only a few examples. There are dozens, if not hundreds, of rules outside chapter 4 that have some impact on detention and removal. Critically, none of these rules "carry out" the policies in chapter 4 that address things like who should be detained, what adjudication procedures should be used, and when people should be removed. *Aleman*, 142 S. Ct. at 2065, 2066 n.3; *see* H.R. Rep. 104-469 at 161 (describing the covered policies as "removal procedures"). Rather, the non-chapter-4 provisions address, among other things, people's substantive rights to come to the United States and remain here.

13

The government's interpretation of § 1252(f)(1) would sweep in all of these rules, in blatant disregard of Congress's explicit choice to make § 1252(f)(1) cover "chapter 4" only. "[A]s between one interpretation that would render statutory text superfluous and another that would render it meaningful yet limited," the limited interpretation is "more faithful to the statute Congress wrote." *Clark v. Rameker*, 573 U.S. 122, 133 (2014).

### C. The Supreme Court's Interpretation of Similar Statutes Underscores that Collateral Effects Cannot Trigger § 1252(f)(1).

Congress has enacted a number of other statutes that bar injunctions of certain covered activities. Some of their language is similar to § 1252(f)(1), and the Supreme Court has held that these are not triggered by collateral effects on the covered activities. In other statutes, Congress has used notably broader language to show that collateral effects *do* trigger the statute. This contrast further erodes the government's argument that collateral effects trigger § 1252(f)(1). *See McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 494 (1991) (relying on the fact that Congress "could easily have used broader statutory language" but did not); *United States v. Barone*, 71 F.3d 1442, 1445 (9th Cir. 1995) (same).

For instance, Congress has provided that "no court may take any action . . . to restrain *or affect* the exercise of powers or functions of the [Federal Deposit Insurance Corporation] as a conservator or a receiver." 12 U.S.C. § 1821(j) (emphasis added). By prohibiting courts from even *affecting* the FDIC's functions,

14

and not limiting the ban to any specific agency functions, this language "effect[s] a sweeping ouster of courts' power to grant equitable remedies." *Freeman v. FDIC*, 56 F.3d 1394, 1399 (D.C. Cir. 1995). Courts have accordingly held that they may not issue orders that even have collateral effects on the relevant FDIC functions. *See Hindes v. FDIC*, 137 F.3d 148, 160 (3d Cir. 1998) ("an action can 'affect' the exercise of powers by an agency without being aimed directly at it"); *Dittmer Properties, L.P. v. FDIC*, 708 F.3d 1011 (8th Cir. 2013) (collecting cases). Numerous statutes contain similarly expansive language. *See, e.g.*, 12 U.S.C. § 4617(f) (same "restrain or affect" language); 28 U.S.C. § 1342 (similar).

Section § 1252(f)(1), by contrast, uses more limited language in two critical ways.

First, § 1252(f)(1) only prohibits orders that directly "enjoin or restrain" the operation of the covered provisions, not orders that merely "affect" them. The simple fact of excluding "effects" from the text of the statute is good evidence that Congress did not mean for § 1252(f)(1) to be triggered by collateral effects on chapter 4. Indeed, the Supreme Court has held that similar language in other statutes is too narrow to encompass downstream effects. The Tax Injunction Act provides that courts "shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law." 28 U.S.C. § 1341. The Supreme Court has held that this language—"enjoin, suspend or restrain"—refers only to court orders that "stop"

tax collection directly, not orders that "merely inhibit" tax collection as a downstream consequence. *Direct Marketing*, 575 U.S. at 12-13 (upholding injunction of notice provision that facilitated tax collection).

Second, the verbs "enjoin or restrain" in § 1252(f)(1) operate on a specified list of agency functions—"chapter 4"—not the plenary set of "powers or functions of the [agency]" in the FDIC statute and similar statutes discussed above. Here, too, the Supreme Court has found evidence of a narrowed statutory scope. The Tax Injunction Act's verbs similarly "act[] on a carefully selected list of technical terms—'assessment, levy, collection'—not on an all-encompassing term, like 'taxation.'" *Direct Marketing*, 575 U.S. at 13. Here, as in *Direct Marketing*, "the broad meaning" the government advocates would "defeat the precision of that list, as virtually any court action related to any phase of [immigration] might be said to 'hold back' [the removal system]." *Id.*

Notably, while the government itself "analogized" between the Tax Injunction Act and § 1252(f)(1) in *Aleman*, *see* 142 S. Ct. at 2065 n.2, it now suggests a far more sweeping interpretation of § 1252(f)(1).[6]

The Supreme Court has rejected the relevance of collateral effects even more explicitly when interpreting the Anti-Injunction Act, another tax-related statute that

_____

[6] In fact, the Tax Injunction Act is broader than § 1252(f)(1) given, *inter alia*, its additional prohibition on "suspen[sion]" of taxation. *See* Br. of *Amicus* ACLU 10-11, *Biden v. Texas*, No. 21-954 (U.S. May 9, 2022).

bars any "suit for the purpose of restraining the assessment or collection of any [federal] tax." 26 U.S.C. § 7421(a). This provision, like § 1252(f)(1), prohibits suits that would "restrain[]" tax collection, but not those that merely "affect" tax collection. The Court has held that § 7421(a) is not triggered by a suit's "downstream" effects on tax collection, only by suits seeking to directly enjoin the collection process. *CIC*, 141 S. Ct. at 1588, 1590; *see id.* at 1595-96 (Kavanaugh, J., concurring) ("the Anti-Injunction Act is best read as directing courts to look at the stated *object* of a suit rather than the suit's downstream effects."); *id.* (noting the Court's abrogation of earlier cases). The Act therefore does not prevent a court from enjoining an IRS reporting requirement, even when the requirement is enforced through a tax, and when the reported information would be used to assess and collect taxes. *Id.* at 1590-91.[7] Other courts have even held that, despite the Anti-Injunction Act, a court could order the IRS to *expunge* records that would have formed the basis for a tax assessment—much as the transit ban formed the basis for some class members' removal orders in this case—because the primary target of the suit was information reporting, not its downstream effect on taxes. *Harper v. Rettig*, 46 F.4th 1, 8 (1st Cir. 2022).

---

[7] The reference in the Anti-Injunction Act to the suit's "purpose" does not set it apart from § 1252(f)(1) by establishing a subjective inquiry. That provision directs the court to "inquire not into a taxpayer's subjective motive, but into the action's objective aim—essentially, the relief the suit requests." *Id*. at 1589.

Collateral effects don't trigger the Anti-Injunction Act despite some notably broad language in the statute, which bars suits "in any court by any person, whether or not such person is the person against whom such tax was assessed." 26 U.S.C. § 7421(a); *compare* 8 U.S.C. § 1252(f)(1) (similarly barring injunctions "[r]egardless of the nature of the action or claim or of the identity of the party or parties bringing the action"). In the tax cases, as here, this language is simply not enough to bar the entire universe of injunctions that might ultimately affect taxation or removal. Congress uses broader language to achieve that kind of goal, and it has not done so in § 1252(f)(1).

### D. Courts Routinely Distinguish Between an Injunction's Primary Target and Its Collateral Effects.

Properly understood, § 1252(f)(1)'s application turns on whether the injunction primarily operates against the implementation of a covered provision. If the main policy being enjoined—the one whose illegal application is the basis for the injunction—implements a statute in chapter 4, then § 1252(f)(1) may apply. But if the injunction primarily operates by barring a policy that implements something outside of chapter 4, then § 1252(f)(1) does not apply.

Courts apply this approach in the context of other anti-injunction statutes. For instance, under the Anti-Injunction Act, the Supreme Court has "looked to the 'relief requested'—the thing sought to be enjoined," and asks whether "the legal rule at issue is a tax provision." *CIC*, 141 S. Ct. at 1589-90, 1593; *see, e.g.*, *Harper*, 46

18

F.4th at 9 ("the dispute is not about a tax rule") (cleaned up). A rule that directly governs the process for assessing and collecting taxes triggers the ban; a rule that addresses something else—like reporting—does not, even if the reported information operates within the assessment and collection process. For § 1252(f)(1), the equivalent question is whether the challenged policy implements any of the "inspection, apprehension, examination, and removal" procedures set out in chapter 4. *Aleman*, 142 S. Ct. at 2064. As in *Aleman*, such a policy will typically be authorized by a covered statute and will set out how the government intends to "carry out the specified statutory provisions." *Id.* at 2065. In contrast, policies that aren't subject to § 1252(f)(1) will implement rules provided by non-chapter-4 statutes, and find authority in those other statutes.

Courts applying anti-injunction statutes must often distinguish between the suit's primary object and its collateral effects. Here, too, the difference is clear. An effect on the removal system is collateral if it follows from an injunction of some *other* policy. This collateral effect will often be implicit, such as when a court enjoins an asylum or inadmissibility rule that, as a result, can no longer be applied in removal proceedings. Other times, to ensure compliance with an injunction, courts must order those collateral effects explicitly. For instance, in *Catholic Social Services*, the primary target of the injunction was an illegal policy regarding inadmissibility waivers and adjustment of status—both outside chapter 4. *See* 8

19

U.S.C. §§ 1255(i), 1182(a)(9)(C)(ii).  The district court also enjoined removals, but not because there was anything independently illegal about the removal process, only because the removal orders resulted from the illegal adjustment policy.  As the Court explained in *Gonzales*, such an "injunction's effect on reinstatement proceedings is one step removed from the relief sought by Plaintiffs."  *Gonzales*, 508 F.3d at 1233 (quotation marks omitted).  Courts apply the same distinction in the tax context, and ask whether an injunction's effect on taxation constitutes "the suit's after-effect" or its "substance."  *CIC*, 141 S. Ct. at 1591.

Abiding by the narrow text of § 1252(f)(1) thus yields a clear distinction.  Courts typically cannot enjoin classwide the policies that implement the removal procedures in chapter 4.  But if an order's primary function is to enjoin an unlawful policy from outside chapter 4, the injunction bar does not apply.  And if a valid injunction affects people's removal cases, that impact on the removal system is merely collateral, an inevitable consequence of an intertwined statutory framework.

## II.    SECTION 1252(f)(1) DOES NOT BAR THE INJUNCTION IN THIS CASE.

Section 1252(f)(1) does not apply to the district court's injunction because the injunction does not operate primarily against a chapter 4 policy, and its effects on chapter 4 are merely downstream consequences of changed asylum eligibility.  The district court enjoined the application of the transit ban, an asylum eligibility rule that implements § 1158's asylum provisions.  The transit ban was unlawfully applied

to the relevant sub-class because its members arrived in the United States before the ban's effective date, which meant that by its own terms, the ban did not apply to them. Dkt. 816 at 46. Thus, "the thing . . . enjoined," *CIC*, 141 S. Ct. at 1590—the application of the asylum eligibility bar—does not trigger § 1252(f)(1).

Enjoining an asylum rule, as explained, will always have collateral effects on the removal process, because asylum rules apply in removal proceedings. *See supra* Part I.B. The district court initially left these collateral effects implicit: Its preliminary injunction order simply ordered the government not to apply the asylum bar to sub-class members. *See* Dkt. 330 at 36. To implement this injunction and abide by its downstream effects, the government issued guidance to adjudicators to identify class members and ensure that the enjoined bar was not applied to them. *See* Dkt. 816 at 7. The court ultimately resolved several disputes about what actions during the removal process were necessary to implement the injunction and prevent the bar from being erroneously applied to sub-class members. *See* Dkt. 605 (clarification order); Dkt. 816 (permanent injunction). But none of these follow-on orders was based on a challenge to the legality of a detention or removal policy from chapter 4; all simply addressed the steps necessary to ensure that the transit rule's eligibility bar was not erroneously applied to the sub-class in any context.

The injunction in this case is no different from the one upheld in *Catholic Social Services*. There, the district court enjoined a non-chapter-4 policy, which had

the collateral effect of undermining removal orders that had been entered because of the now-enjoined policy. *See Gonzales*, 508 F.3d at 1233. Those removal orders, of course, were issued and would be executed pursuant to the procedures in chapter 4. *See* 8 U.S.C. § 1231(a)(5) (reinstatement of removal); *id.* § 1231(a)(1) (execution of removal orders). Yet to ensure compliance, the district court explicitly ordered DHS not to remove people whose removal orders were undermined by the original injunction. *See Catholic Social Servs.*, 232 F.3d at 1145. The Court upheld this injunction in *Catholic Social Services* and applied the same rule in *Gonzales*. *Id.* at 1149-50; *Gonzales*, 508 F.3d at 1233. The government offers no real explanation for how this case differs from *Catholic Social Services* or *Gonzales*—in fact, it does not address *Catholic Social Services* at all. Govt. Br. 55.

The district court's injunction likewise tracks orders upheld in analogous tax injunction cases. In *CIC*, for instance, the Supreme Court upheld an injunction of an IRS reporting requirement even though violations of the requirement were "enforced" by a "downstream tax penalty." 141 S. Ct. at 1590. In other words, even though the reporting requirement "operate[d]" in tax proceedings and "affect[ed]" the plaintiffs' tax liability, Govt. Br. 55, those impacts were "the suit's after-effect, not its substance." *CIC*, 141 S. Ct. at 1591; *see also Harper*, 46 F.4th at 8 (similar).

Rather than meaningfully address *Catholic Social Services* or *Gonzales*, the government argues that the injunction here bars not only the substantive asylum

eligibility regulation (which implements the asylum statute, § 1158), but also 8 C.F.R. § 208.30(e)(5)(iii), an associated regulation "promulgated in the transit rule" with procedures for enforcing the eligibility bar in expedited removal under 8 U.S.C. § 1225(b)(1) (a covered provision). Govt. Br. 53, 55. None of the relevant orders below actually mentions this procedural regulation. *See* Dkts. 330, 605, 816. But in any event, it adds nothing to the government's § 1252(f)(1) argument. If the substantive asylum bar is inapplicable to class members, then tag-along procedures for its application are necessarily ineffective, whether they are specifically enjoined or not. The main object of the injunction remains the substantive asylum bar, and it does not matter whether the procedural rule is additionally enjoined or simply left without effect. *See East Bay Sanctuary Covenant v. Trump*, 354 F. Supp. 3d 1094, 1121 n.22 (N.D. Cal. 2018) (enjoining only substantive asylum provision, but noting that related provisions, which included procedures to implement the asylum rule in expedited removal, had "no independent effect"), *aff'd*, 993 F.3d 640 (9th Cir. 2021).

The government's argument, moreover, raises a troubling possibility: On its view, it could *always* shoehorn its rules into § 1252(f)(1) by issuing procedural regulations alongside any substantive rule that would otherwise fall outside of § 1252(f)(1). Under that rule, "the Executive would have a free hand to shelter its own decisions" well beyond chapter 4, raising "[s]eparation-of-powers concerns." *Kucana v. Holder*, 558 U.S. 233, 237, 252 (2010).

23

## CONCLUSION

The Court should affirm the injunction and hold that collateral effects on covered provisions do not trigger § 1252(f)(1).

Date: February 28, 2023

Respectfully submitted,

/s/ Spencer Amdur
Spencer Amdur
Katrina Eiland
Stephen Kang
Cody Wofsy
Oscar Sarabia Roman
AMERICAN CIVIL LIBERTIES UNION
39 Drumm Street
San Francisco, CA 94111
(415) 343-0770
samdur@aclu.org
keiland@aclu.org
skang@aclu.org
cwofsy@aclu.org
osarabia@aclu.org

Omar Jadwat
Lee Gelernt
Anand Balakrishnan
AMERICAN CIVIL LIBERTIES UNION
125 Broad Street
New York, NY 10004
(212) 549-2660
ojadwat@aclu.org
lgelernt@aclu.org
abalakrishnan@aclu.org

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

I certify that this document complies with the limitation set forth in Federal Rules of Appellate Procedure 29(b)(4) and Ninth Circuit Rule 29-2(c)(2) because it contains 5,483 words, exclusive of the portions of the brief that are exempted by Rule 32(f). I certify that this document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

/s/ Spencer Amdur
Spencer Amdur
February 28, 2023

## CERTIFICATE OF SERVICE

I hereby certify that on February 28, 2023, I electronically filed the foregoing Brief of *Amici Curiae* with the Clerk for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system. A true and correct copy of this brief has been served via the Court's CM/ECF system on all counsel of record.

<u>/s/ Spencer Amdur</u>
Spencer Amdur
February 28, 2023