Nos. 22-55988, 22-56036

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

———————————————

AL OTRO LADO, INC., et al.,

*Plaintiffs-Appellees/Cross-Appellants*,

v.

ALEJANDRO MAYORKAS, Secretary of Homeland Security, et al.,

*Defendants-Appellants/Cross-Appellees*,

and

THE EXECUTIVE OFFICE FOR IMMIGRATION REVIEW,

*Appellant/Cross-Appellee*.

———————————————

APPEAL FROM FINAL JUDGMENT OF THE UNITED STATES DISTRICT
COURT FOR THE SOUTHERN DISTRICT OF CALIFORNIA

No. 17-cv-02366-BAS-KSC

———————————————

**Brief of Amici Curiae International Refugee Law Scholars in Support of
Appellees/Cross-Appellants**

———————————————————————————————————

Sabrineh Ardalan
Tiffany J. Lieu
Sarah Leadem, *Supervised Law Student*
Simone Wallk, *Supervised Law Student*
Harvard Immigration and Refugee
Clinical Program
6 Everett Street, WCC 3106
Cambridge, MA 02138

Sarah Sherman-Stokes
Catherine Kannam, *Supervised Law Student*
Immigrants' Rights and Human Trafficking
Program
Boston University School of Law
765 Commonwealth Avenue
Boston, MA 02215

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, I, Sabrineh Ardalan as counsel for *amici curiae*, state that the Scholars of International Refugee Law do not have parent corporations, nor do they issue stock, and thus no publicly held corporation owns 10% or more of their stock.

DATED:  February 28, 2023

/s/ Sabrineh Ardalan
Sabrineh Ardalan
Harvard Immigration and Refugee
Clinical Program
Harvard Law School
6 Everett Street, Suite 3106
Cambridge, Massachusetts 02138
Telephone: (617) 384-7504
sardalan@law.harvard.edu

# TABLE OF CONTENTS

STATEMENT OF INTEREST OF AMICI .............................................................1

SUMMARY OF ARGUMENT .............................................................................1

ARGUMENT ......................................................................................................3

I.    The Principle of *Non-Refoulement* Is Actionable Under the ATS .....................4

      A.    A Norm Is Actionable Under the ATS If It Is Universal, Specific, and
            Obligatory ............................................................................................4

      B.    *Non-Refoulement* Constitutes an Actionable Norm Under *Sosa* .............6

II.   The Agency's Turnback Policy Violates the Principle of *Non-Refoulement* ..17

      A.    The Duty of *Non-Refoulement* Prohibits States from Turning Away
            Asylum Seekers at Their Borders. .........................................................17

      B.    The Turnback Policy Falls within the Scope of *Non-Refoulement* .......22

CONCLUSION .................................................................................................27

CERTIFICATE OF COMPLIANCE.....................................................................32

CERTIFICATE OF SERVICE .............................................................................33

# TABLE OF AUTHORITIES

## Cases

*Abdullahi v. Pfizer, Inc.*, 562 F.3d 163 (2d Cir. 2009) .........................................5, 10

*Al Otro Lado, Inc. v. McAleenan*, 394 F. Supp. 3d 1168 (S.D. Cal. 2019).............22

*Bringas-Rodriguez v. Sessions*, 850 F.3d 1051 (9th Cir. 2017) .............................16

*C & Others v. Dir. of Immigr. & Another*, Civil Appeals No. 132-137, H.K.: High Ct. (2011) ...........................................................................................................14

*Cabello v. Fernandez-Larios*, 402 F.3d 1148 (11th Cir. 2005)................................5

*Doe I v. Nestle USA, Inc.*, 766 F.3d 1013 (9th Cir. 2014) .............................. *passim*

*East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640 (9th Cir. 2020) ..................16

*Eur. Roma Rights Ctr. & Others v. Immigr. Officer at Prague Airport*, [2003] EWCA (Civ) 666 ..............................................................................................16

*Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir. 1980)........................................6, 13

*Flores v. S. Peru Pepper Corp.*, 414 F.3d 233 (2d Cir. 2003) .................................8

*Haitian Ctr. for Hum. Rts et al. v. United States*, Case 10.675, Inter-Am. Comm'n H.R., Report No. 51/96, OEA/Ser.L/V/II.95, doc. 7 rev. (1997) ........................16

*Hirsi Jamaa & Others v. Italy*, No. 27765/09, Eur. Ct. H.R. (2010) ......... 16, 20, 25

*INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987) ............................................... 12, 20

*INS v. Stevic*, 467 U.S. 428 (1984) ..........................................................................6

*In re Estate of Marcos Human Rights Litig.*, 25 F.3d 1467 (9th Cir. 1994) .......5, 13

*N.A. v. Finland*, No. 24244/18, Eur. Ct. H.R. (2019) ..............................................11

*N.D. & N.T. v. Spain*, Nos. 8675/15 and 8679/15, Eur. Ct. H.R. (2020).................20

*Pacheco Tineo Family v. Bolivia*, Inter-Am. Ct. H.R. (ser. C) No. 272 (Nov. 25, 2013) ........................................................................................................11

*Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155 (1993). .......................... *passim*

*Siderman de Blake v. Republic of Argentina*, 965 F.2d 699 (9th Cir. 1992)..........13

*Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004) ............................................ *passim*

*The Paquete Habana*, 175 U.S. 677 (1900)...............................................................4

## Statutes & Regulations

8 U.S.C. § 1158 ................................................................................ 5, 17, 22

8 U.S.C. § 1231 ...........................................................................................17

28 U.S.C. § 1350 .........................................................................................2, 4

8 C.F.R. § 208 .............................................................................................17

Foreign Affairs Reform and Restructuring Act of 1998, P.L. 105-277, § 2242(a) (1998) ...........................................................................................7, 17

## Other Authorities

Letter from ACLU to Joseph Cuffari & Patricia Nation, CBP's Unlawful Turn Back of Mexican Asylum Seekers at Ports of Entry (Nov. 14, 2019) .................25

Amnesty Int'l, USA: *"You Don't Have Any Rights Here": Illegal Pushbacks, Arbitrary Detention & Ill-Treatment of Asylum-Seekers in the United States* (2018) ..................................................................................... 23, 25

Cathryn Costello & Michelle Foster, *Nonrefoulement as Custom and Jus Cogens? Putting the Prohibition to the Test*, *in* Netherlands Yearbook of International Law (2016) ............................................................................. 8, 12, 14

Cathryn Costello, *The Human Rights of Migrants and Refugees in European Law* (2015) ................................................................................................22

Doctors Without Borders, *No Way Out: The Humanitarian Crisis For Migrants And Asylum Seekers Trapped Between The United States, Mexico and The Northern Triangle of Central America* (Feb. 2020) .............................................26

European Union Agency for Fundamental Rights, *Scope of the Principle of Non-Refoulement in Contemporary Border Management* (2016)................................21

Human Rights First, *Barred at the Border: Wait "Lists" Leave Asylum Seekers in Peril at Texas Ports of Entry* (Apr. 2019) ................................................ 23, 25, 26

Human Rights First, *Crossing the Line: U.S. Border Agents Illegally Rejected Asylum Seekers* (May 3, 2017) ...............................................................26

Human Rights Watch, *U.S.: Mexican Asylum Seekers Ordered to Wait* (Dec. 23, 2019) ................................................................................................24

James Leslie Brierly, *The Outlook for International Law* (1944) ...........................14

Press Release, UNHCR, *UNHCR Deeply Concerned About New U.S. Asylum Restrictions*, U.N. Press Release (July 15, 2019) ................................................20

Press Release, UNHCR, *UNHCR Warns Against "Exporting" Asylum, Calls for Responsibility Sharing for Refugees, Not Burden Shifting*, U.N. Press Release (May 19, 2021)..........................................................................................20

Sir Elihu Lauterpacht & Daniel Bethlehem, *The Scope and Content of the Principle of Non-Refoulement: Opinion*, *in* Refugee Protection in International Law: UNHCR's Global Consultations on International Protection (Erika Feller, Volker Türk & Frances Nicholson eds. 2003) .................................................21

*Status of Treaties: Protocol Relating to the Status of Refugees*, U.N. Treaty Collection ............................................................................................................9

Stephanie Leutert & Caitlyn Yates, *Metering Update: August 2022*, Univ. of Tex. at Austin Strauss Ctr. for Int'l Sec. & Law (2022)..............................................26

U.S. Department of Homeland Security Office of Inspector General, *Memo: CBP Has Taken Steps to Limit Processing of Undocumented Aliens at Ports of Entry* (Oct. 27, 2020) ...................................................................................................23

## Rules

Federal Rule of Appellate Procedure 29(a)(4)(E)........................................................1

## Treatises

Guy S. Goodwin-Gill & Jane McAdam, *The Refugee in International Law* (4th ed. 2021) ........................................................................................................ 15, 22

James C. Hathaway, *The Rights of Refugees Under International Law* (2d ed. 2021) ........................................................................................................ 16, 22

## International Law Authorities

1969 American Convention on Human Rights, Nov. 22, 1969, S. Treaty Doc. No. 95-21, 1144 U.N.T.S. 123........................................................................................8

Ad Hoc Committee on Statelessness and Related Problems, Status of Refugees and Stateless Persons – Memorandum by the Secretary General, U.N. Document E/AC.32/2 (Jan. 3, 1950) ...................................................................................18

Cartagena Declaration on Refugees, Nov. 19-22, 1984 ...........................................9

Charter of Fundamental Rights of the European Union, Oct. 26, 2012, 2012 O.J. (C 326) ...........................................................................................................................8

Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment Dec. 10, 1984, T.I.A.S. No. 94-1120.1, 1465 U.N.T.S. 85 ..... 1, 7, 17

Convention Governing the Specific Aspects of Refugee Problems in Africa, Sept. 10, 1969, 1001 U.N.T.S. 45 ....................................................................... 8

Convention Relating to the Status of Refugees, July 28, 1951, 189  U.N.T.S. 137 ................................................................................................................. *passim*

Decl. of States Parties to the 1951 Convention or its 1967 Protocol Relating to the Status of Refugees, U.N. Doc. HR/MMSP/2001/09 (Jan. 16, 2002) ................... 11

*Decl. on Territorial Asylum* (Dec. 14, 1967) ........................................................ 18

Exec. Comm. of the High Commissioner's Programme, *Note on Non-Refoulement*, U.N. Doc. EC/SCP/2 (1977) .................................................................. 3

G.A. Res. 51/75 (Feb. 12, 1997) .................................................................. 9

G.A. Res. 52/132 (Dec. 12, 1997) ................................................................ 9

G.A. Res. 57/187 (Feb. 6, 2003) ............................................................... 11

International Covenant on Civil and Political Rights, Dec. 16, 1966, T.I.A.S. No. 92-908, 999 U.N.T.S. 171 .................................................................. 7

Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6223 .. *passim*

Refugee Act of 1980, Pub. L. No. 96-212, § 101(a), 94 Stat. 102 ........... 1, 3, 12, 17

Statement of Mr. Henkin of the United States, U.N. Doc. E/AC.32/SR.20 (Feb 1, 1950) ...................................................................................................... 19

U.N. Committee Against Torture, *General Comment No. 4* (2017) ........................ 7

U.N. Human Rights Committee, *General Comment 31: The Nature of the General Legal Obligation Imposed on States Parties to the Covenant*, U.N. Doc. CCPR/C/21/Rev. 1/Add. 13 (May 26, 2004).........................................................7

UNHCR Executive Committee, *General Conclusion on International Protection No. 25 (XXXIII)*, U.N. Doc. No. A/37/12/Add.1 (Nov. 10, 1982) ........................9

UNHCR, *Advisory Opinion on the Extraterritorial Application of Non-Refoulement Obligations under the 1951 Convention relating to the Status of Refugees and its 1967 Protocol* (Jan. 26, 2007) ..................................... 15, 18, 19

UNHCR, *Annex to UNHCR Note on the "Externalization" of International Protection: Policies and Practices Related to the Externalization of International Protection* (May 28, 2021).....................................................................................19

UNHCR, *Executive Committee Conclusion No. 79 (XLVII)*, U.N. Doc. No. A/51/12/Add.1 (Oct. 11, 1996)...............................................................................9

UNHCR, *Submission by the Office of the United Nations High Commissioner for Refugees in the case of S.A.A. & Others v. Greece (No. 22146/21) before the European Court of Human Rights*, No. 22146/21 (July 2022).............................19

UNHCR, *UNHCR Intervention before the European Court of Human Rights in the Case of Hirsi & Others v. Italy*, Application no. 27765/09 (Mar. 29, 2011) .......19

## STATEMENT OF INTEREST OF AMICI

*Amici curiae* are over thirty scholars of international refugee law. *Amici* have an interest in this case because they write in the areas of refugee law and international law, including about U.S. *non-refoulement* obligations.[1]

## SUMMARY OF ARGUMENT

The right to seek asylum and the duty of *non-refoulement* constitute the basis of international refugee protection. When the United States signed and ratified the 1967 Protocol Relating to the Status of Refugees in 1968, it committed to *non-refoulement*—that is, protecting refugees from return to countries where they face a threat to their life or freedom. In 1980, the United States implemented that *non-refoulement* obligation into domestic law with the Refugee Act. The United States reaffirmed its commitment to the *non-refoulement* principle in 1994 when it ratified the United Nations ("U.N.") Convention Against Torture, which prohibits returning people to countries where they would face torture. The Turnback Policy violated these fundamental *non-refoulement* obligations, unlawfully rejecting asylum seekers

---

[1] Pursuant to Federal Rule of Appellate Procedure ("FRAP") 29(a)(4)(E), *amici curiae* states that: (1) no party's counsel authored this brief in whole or in part; (2) no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and (3) no person other than *amici curiae*, its members, and its counsel contributed money that was intended to fund preparing or submitting the brief. Counsel for Plaintiffs-Appellees/Cross Appellants and counsel for Defendants-Appellants/Cross-Appellees have indicated that all parties consent to the filing of this amicus brief pursuant to FRAP 29(a)(2).

1

at the border and returning them—directly or indirectly—to countries where they face persecution or torture. These violations are actionable under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350.

To begin, the challenged conduct gives rise to jurisdiction under the ATS because it violated these fundamental *non-refoulement* obligations. The duty of *non-refoulement*, a cornerstone of customary international law, prohibits the United States from returning asylum seekers to their countries of origin or to a third country such as Mexico, where they would face a real risk of persecution or torture. When the United States turned back asylum seekers at the border, it violated binding duties enshrined in both domestic and international law.

Second, the conduct of the United States pursuant to the Turnback Policy constituted both direct and indirect *refoulement*. The United States forced Mexican citizens to wait "for their turn" to seek asylum in dangerous conditions in the same country from which they tried to flee. The United States further subjected non-Mexican asylum seekers both to the risk of serious harm in Mexico and to the risk of persecution or torture in their countries of origin through forced removal by Mexico. With the Turnback Policy, the United States endangered the lives of the most vulnerable asylum seekers and undermined core *non-refoulement* protections the United States has enshrined in its laws for decades.

## ARGUMENT

The norm of *non-refoulement* prohibits any nation from returning an individual to a place where they face a real risk of persecution or torture. More specifically, a state may not expel or return an asylum seeker "in any manner whatsoever" to a country where their life or freedom would be threatened. Convention Relating to the Status of Refugees, art. 33(1), July 28, 1951, 189 U.N.T.S. 137 [hereinafter "Refugee Convention"].[2] *Non-refoulement* is the "most essential component" of international refugee law. Exec. Comm. of the High Commissioner's Programme, *Note on Non-Refoulement*, U.N. Doc. EC/SCP/2 (1977).

As a norm of customary international law, the principle of *non-refoulement* is actionable under the ATS. The Turnback Policy, which sent Mexican asylum seekers back to Mexico and placed non-Mexican asylum seekers at a substantial risk of serious harm in Mexico and of return to persecution or torture, violated the duty of *non-refoulement* and is accordingly actionable under the ATS.

---

[2] The United States is bound by the Refugee Convention because it ratified the 1967 Protocol Relating to the Status of Refugees in 1968. Protocol Relating to the Status of Refugees, art. 1, Jan. 31, 1967, 19 U.S.T. 6223 [hereinafter "Protocol"]. The United States subsequently incorporated the Protocol into U.S. law with the Refugee Act of 1980. Refugee Act of 1980, Pub. L. No. 96-212, § 101(a), 94 Stat. 102 [hereinafter "Refugee Act of 1980"].

3

## I.    The Principle of *Non-Refoulement* Is Actionable Under the ATS

The ATS allows foreign nationals to bring tort claims for violations of customary international law within U.S. courts. A norm is actionable under the ATS when it is universal, specific, and obligatory. The norm of *non-refoulement*, which prohibits states from rejecting or returning refugees to a place where they would face a real risk of persecution or torture, constitutes one such universal, specific, and obligatory norm that is recognized within customary international law. *Non-refoulement* is thus actionable under the ATS.

### A.    A Norm Is Actionable Under the ATS If It Is Universal, Specific, and Obligatory

The ATS is a jurisdictional statute that empowers courts to hear claims brought by foreign nationals for torts "committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350; *Sosa v. Alvarez-Machain*, 542 U.S. 692, 713–14 (2004). The "law of nations" refers to customary international law, which exists "independently of any express treaty." *The Paquete Habana*, 175 U.S. 677, 708 (1900). Customary international law, in turn, consists of those rules universally acceded to by states "out of a sense of legal obligation and mutual concern." *Doe I v. Nestle USA, Inc.*, 766 F.3d 1013, 1019 (9th Cir. 2014).

When Congress enacted the ATS in 1789, the statute conferred jurisdiction over violations of the paradigmatic norms at the time, which included offenses against ambassadors, violations of safe conduct, and piracy. *Sosa*, 542 U.S. at 719–

20. As international law has developed over the centuries, courts have recognized additional norms that have attained similar customary international law status and are accordingly actionable under the ATS. *See id.* at 732. Over the past two decades, for example, courts have recognized prohibitions against slavery, genocide, war crimes, and torture as actionable under the ATS. *See Doe I*, 766 F.3d at 1019, 1022; *see also Abdullahi v. Pfizer, Inc.*, 562 F.3d 163, 183–84 (2d Cir. 2009) (recognizing nonconsensual medical experimentation as an actionable norm under the ATS); *Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1154, 1158 (11th Cir. 2005) (holding that extrajudicial killing and cruel, inhumane, or degrading treatment or punishment are actionable norms under the ATS).

A norm attains the status of customary international law under the ATS if it is "specific, universal, and obligatory," as set forth in the U.S. Supreme Court's landmark decision, *Sosa v. Alvarez-Machain.* 542 U.S. at 732–33 (quoting *In re Estate of Marcos Human Rights Litig.*, 25 F.3d 1467, 1475 (9th Cir. 1994)) (examining the status of the norm in international law and weighing any prudential concerns with recognizing a new norm); *see also Doe I*, 766 F.3d at 1019 ("The body of international law that supplies the norms underlying an ATS claim is often referred to as 'customary international law,' which consists of 'rules that States universally abide by, or accede to, out of a sense of legal obligation and mutual concern.'" (citation omitted)). When assessing whether a norm meets the three-part

5

*Sosa* standard, courts look to "international conventions, international customs, the general principles of law recognized by civilized nations, judicial decisions, and the works of scholars," as well as sources "that provide an authoritative expression of the views of the international community." *Doe I*, 766 F.3d at 1019–20 (citations and internal quotation marks omitted); *see also Filartiga v. Pena-Irala*, 630 F.2d 876, 884 (2d Cir. 1980) (confirming that a norm is actionable under the ATS based on its recognition under customary international law).

### B. *Non-Refoulement* Constitutes an Actionable Norm Under *Sosa*

*Non-refoulement* is a customary international law actionable under the ATS because it is universal, specific, and obligatory.

First, *non-refoulement* is universal, as demonstrated by its inclusion in several widely ratified global and regional treaties, as well as other international instruments. *See Doe I*, 766 F.3d at 1019–20. For example, protection against *refoulement* is enshrined in the 1951 Refugee Convention and the 1967 Protocol. Refugee Convention, art. 33(1); Protocol, art. I(1); *see INS v. Stevic*, 467 U.S. 428, 428 n.22 (1984) ("Foremost among the rights which the Protocol would guarantee to refugees is the prohibition (under Article 33 of the 1951 Convention) against [*refoulement*]." (citation and internal quotation marks omitted)).

*Non-refoulement* is further included in the U.N. Convention Against Torture, which prohibits states from returning individuals to countries where they would face

6

torture. *See* Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment art. 3, Dec. 10, 1984, T.I.A.S. No. 94-1120.1, 1465 U.N.T.S. 85 [hereinafter "Torture Convention"]; U.N. Committee Against Torture, *General Comment No. 4* (2017) (declaring the principle of *non-refoulement* to torture as "similarly absolute" as the prohibition on torture itself); *see also* Foreign Affairs Reform and Restructuring Act of 1998, P.L. 105-277, § 2242(a) (1998) [hereinafter "FARRA"] (codifying the Torture Convention into U.S. law, including the duty "not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture"). *Non-refoulement* is also implicitly included in the International Covenant on Civil and Political Rights ("ICCPR"). ICCPR, arts. 2, 6, 7, Dec. 16, 1966, T.I.A.S. No. 92-908, 999 U.N.T.S. 171; U.N. Human Rights Comm., *General Comment 31: The Nature of the General Legal Obligation Imposed on States Parties to the Covenant*, ¶12, U.N. Doc. CCPR/C/21/Rev. 1/Add. 13 (May 26, 2004) (explaining ICCPR necessarily includes *non-refoulement*).

In addition, many regional agreements prohibit *non-refoulement* to persecution and torture. For example, the American Convention on Human Rights strictly prohibits *refoulement* of refugees, using language similar to Article 33 of the 1951 Refugee Convention. 1969 American Convention on Human Rights art. 22(8),

Nov. 22, 1969, S. Treaty Doc. No. 95-21, 1144 U.N.T.S. 123 ("In no case may [a non-citizen] be deported or returned to a country, regardless of whether or not it is his country of origin, if in that country his right to life or personal freedom is in danger of being violated because of [a protected ground]."); *see also* Charter of Fundamental Rights of the European Union art. 19(2), Oct. 26, 2012, 2012 O.J. (C 326) 2 ("No one may be removed, expelled or extradited to a State where there is a serious risk that he or she would be subject to the death penalty, torture or other inhuman or degrading treatment or punishment."); Convention Governing the Specific Aspects of Refugee Problems in Africa art. 2(3), Sept. 10, 1969, 1001 U.N.T.S. 45 ("No person shall be subjected by a Member State to measures such as rejection at the frontier, return or expulsion, which would compel him to return to or remain in a territory where his life, physical integrity or liberty would be threatened [because of a protected ground].").

That most countries around the world have recognized *non-refoulement* by acceding to a treaty that codifies its terms underscores its universality. *See Flores v. S. Peru Pepper Corp.*, 414 F.3d 233, 256–57 (2d Cir. 2003). Indeed, over 90 percent of U.N. member states are party to at least one global treaty prohibiting *refoulement*. *See* Cathryn Costello & Michelle Foster, *Nonrefoulement as Custom and Jus Cogens? Putting the Prohibition to the Test*, *in* Netherlands Yearbook of International Law 283–84 (2016). Additionally, 147 states are currently parties to

8

the 1967 Protocol, including the United States. *See Status of Treaties: Protocol Relating to the Status of Refugees*, U.N. Treaty Collection (last visited Feb. 17, 2023), https://treaties.un.org/pages/ViewDetails.aspx?src=TREATY&mtdsg_no= V-5&chapter=5.

As early as 1982, and repeatedly in the decades since then, the United Nations High Commissioner for Refugees ("UNHCR") described *non-refoulement* as "progressively acquiring the character of a peremptory rule of international law." UNHCR Executive Committee, *General Conclusion on International Protection No. 25 (XXXIII),* ¶(b), U.N. Doc. No. A/37/12/Add.1 (Nov. 10, 1982); *see also* G.A. Res. 52/132, preamble ¶12 (Dec. 12, 1997) ("recalling that the principle of non-refoulement is not subject to derogation" despite violations); G.A. Res. 51/75, ¶3 (Feb. 12, 1997) (calling on states to "respect scrupulously the fundamental principle of non-refoulement, which is not subject to derogation"); UNHCR, *Executive Committee Conclusion No. 79 (XLVII)*, ¶(h), U.N. Doc. No. A/51/12/Add.1 (Oct. 11, 1996) (same). The Cartagena Declaration on Refugees similarly describes *non-refoulement* as an "imperative" which "should be acknowledged and observed as a rule of jus cogens." Cartagena Declaration on Refugees, section III at 5, Nov. 19–22, 1984.

Second, the prohibition against *refoulement* is sufficiently specific under *Sosa*. 542 U.S. at 725. In *Sosa*, the Supreme Court explained that a norm is specific

9

if it has "definite content and acceptance among civilized nations" comparable to the eighteenth-century paradigmatic norms recognized by the ATS. *Id.* at 724, 732. To determine a norm's specific content, courts look to contemporary international law. *Doe I*, 766 F.3d at 1019.

*Non-refoulement* has definite content that is accepted internationally. The 1951 Convention and 1967 Protocol define the norm of *non-refoulement* precisely: states are prohibited from returning refugees "in any manner whatsoever" to any territory where their "life or freedom" would be threatened on account of a protected ground. Refugee Convention, art. 33(1); *see* Protocol, art. I(1). Subsequent treaties prohibiting *refoulement* similarly require states to guard against returning people to any country where they risk death, torture, or other serious harm. *See Abdullahi*, 562 F.3d at 184 (finding norm sufficiently specific to be actionable under the ATS because the acts alleged violated "the core of any reasonable iteration of the prohibition"). Because *non-refoulement* is consistently and specifically articulated in multiple international treaties, it easily satisfies the specificity requirement of the *Sosa* framework. 542 U.S. at 732 (discussing specificity of "piracy").

Finally, the norm of *non-refoulement* is obligatory. Indeed, the introductory comment to the Refugee Convention underscores that "[t]he principle of *non-refoulement* is so fundamental that no reservations or derogations may be made to it." Refugee Convention, *Introductory Note by the Office of the UNHCR* at 3.

International tribunals hold states accountable when they violate the norm. *See, e.g.*, *N.A. v. Finland*, No. 24244/18, Eur. Ct. H.R., ¶¶71–73, 85 (2019) (acknowledging the importance of *non-refoulement* in international law and that *refoulement* will give rise to liability under Article 3 of the European Convention on Human Rights where there are substantial grounds for believing an individual will be subject to torture in their country of origin), *overturned on other grounds*, *N.A. v. Finland*, No. 25244/18, Eur. Ct. H.R. (2021); *Pacheco Tineo Family v. Bolivia*, Inter-Am. Ct. H.R. (ser. C) No. 272, ¶¶180, 189, 197–99 (Nov. 25, 2013) (noting Bolivia violated the right to *non-refoulement* "by expelling the Pacheco Tineo family . . . without considering their asylum request" and reiterating that the American Convention, Articles 22(7) and (8), recognizes the principle of *non-refoulement*). Furthermore, the U.N. General Assembly and the States Parties to the 1951 Refugee Convention and its 1967 Protocol have affirmed that *non-refoulement* forms part of customary international law. *See* G.A. Res. 57/187, ¶4 (Feb. 6, 2003) (reiterating "the importance of full respect for the principle of non-refoulement"); *see also Decl. of States Parties to the 1951 Convention or its 1967 Protocol Relating to the Status of Refugees*, ¶4, U.N. Doc. HR/MMSP/2001/09 (Jan. 16, 2002) (describing *non-refoulement* as the "core" of international law and a customary international law norm).

*Non-refoulement*'s obligatory nature is further confirmed by the fact that more than 125 states, including the United States, have enacted domestic procedures to operationalize the principle of *non-refoulement*. *See* Costello & Foster, *supra*, at 299; *INS v. Cardoza-Fonseca*, 480 U.S. 421, 440 n.25 (1987) (discussing how the Immigration and Nationality Act as amended by the Refugee Act of 1980 corresponds to Article 33 of the Refugee Convention). Congress codified U.S. *non-refoulement* obligations with the Refugee Act of 1980, asserting that the United States would be a leader on the world stage and "encourage[ing] all nations to provide assistance and resettlement opportunities to refugees to the fullest extent possible." Refugee Act § 101(a); *see Cardoza-Fonseca*, 480 U.S. at 436 ("If one thing is clear from the legislative history of the new definition of 'refugee,' and indeed the entire 1980 Act, it is that one of Congress' primary purposes was to bring United States refugee law into conformance with the 1967 United Nations Protocol Relating to the Status of Refugees[.]"); Refugee Act § 101(a).

Accordingly, *non-refoulement* constitutes a norm of customary international law actionable under the ATS. Contrary to the District Court's determination, neither the breach of *non-refoulement* obligations by some states nor the Supreme Court's decision in *Sale v. Haitian Centers Council, Inc.* alter this conclusion. *Sale v. Haitian Centers Council, Inc.* 509 U.S. 155 (1993).

12

To begin, the breach of fundamental *non-refoulement* obligations by some states does not undermine the status of the norm. As the Second Circuit explained in *Filartiga v. Pena-Irala*, "[t]here is no doubt that these rights are often violated; but virtually all governments acknowledge their validity." 630 F.2d at 884 (quoting Department of State, Country Reports on Human Rights for 1979, published as Joint Comm. Print, House Comm. On Foreign Affairs, and Senate Comm. on Foreign Relations, 96th Cong. 2d Sess. (Feb. 4, 1980), Introduction at 1); *see also Filartiga*, 630 F.2d at 884 n.15 ("The fact that the prohibition of torture is often honored in the breach does not diminish its binding effect as a norm of international law."). This Court has held several times over that norms are actionable under the ATS, despite state violations of the norm. In *Siderman de Blake v. Republic of Argentina*, for example, this Court affirmed that the prohibition against torture remains fully actionable under the ATS despite state violations of the prohibition, which "cannot be doubted." 965 F.2d 699, 717 (9th Cir. 1992) ("That states engage in official torture cannot be doubted, but all states believe it is wrong, all that engage in torture deny it, and no state claims a sovereign right to torture its own citizens."); *see also In re Estate of Ferdinand Marcos, Human Rights Litig.*, 25 F.3d 1467, 1475 (9th Cir. 1994) (recognizing torture as an actionable norm under the ATS despite violations of that norm).

To measure a norm by instances of breach is to misconstrue the way courts

determine whether a norm is actionable under the ATS. The correct inquiry is whether the norm is recognized within the international community as a "law of nations"—with the same degree of universality, specificity, and obligatory character as envisioned by the drafters. *See Sosa*, 542 U.S. at 732. Such international recognition is not reversed by the mere existence of breach. Indeed, just as the commission of violent crimes in the United States do not undermine the U.S. penal code as the rule of law, neither do breaches of the duty of *non-refoulement* vitiate customary international law as supplying a cause of action under the ATS. *See* James Leslie Brierly, *The Outlook for International Law* 5 (1944) ("States often violate international law, just as individuals often violate municipal law; but no more than individuals do states defend their violations by claiming that they are above the law.").[3]

Nor does *Sale* preclude a finding that *non-refoulement* is a universal norm. 509 U.S. 155. The plaintiffs in *Sale* did not bring claims under the ATS, and

_____

[3] No state that has violated its *non-refoulement* duty has done so by directly challenging or denying the norm's universal, specific, and obligatory character under customary international law. *See* Costello & Foster, *supra*, at 301 (explaining that states do not justify *refoulement* on the "grounds that the State is entitled as a matter of international law"); *C & Others v. Dir. of Immigr. & Another*, Civil Appeals No. 132-137, H.K.: High Ct., 21 (2011) ("[N]o State has explicitly asserted that it is entitled, *solely as a matter of legal right in public international law*, to return genuine refugees to face a well-founded fear of persecution[.]" (emphasis in original)).

accordingly the Court did not conduct an analysis of the customary international law status of *non-refoulement*. *See* Guy S. Goodwin-Gill & Jane McAdam, *The Refugee in International Law* 300 n.426 (2021) (explaining that *Sale* does not "displace the customary rule [that the norm of *non-refoulement* applies extraterritorially] with respect to the US"). As discussed, such an analysis requires considering a multiplicity of conventions, norms, judicial decisions, and scholarship—which the Supreme Court did not do. *See Doe I*, 766 F.3d at 1019–20. Instead, the Supreme Court in *Sale* only reached the question of Article 33's applicability to the high seas. Accordingly, *Sale* has no bearing on the status of *non-refoulement* as a customary international law norm under the ATS.

Furthermore, as the District Court itself acknowledged, the UNHCR has flatly rejected the holding in *Sale* as out of line with international law and obligations. *See, e.g.*, UNHCR, *Advisory Opinion on the Extraterritorial Application of Non-Refoulement Obligations under the 1951 Convention relating to the Status of Refugees and its 1967 Protocol*, at 12 n.54 (Jan. 26, 2007) [hereinafter "*UNHCR Advisory Opinion*"] ("*Sale* does not accurately reflect the scope of Article 33(1)."). International courts have likewise critiqued *Sale* as wrongly decided. *See, e.g.*, *Haitian Ctr. for Human Rights et al. v. United States*, Case 10.675, Inter-Am. Comm'n H.R., Report No. 51/96, OEA/Ser.L/V/II.95, doc. 7 rev. ¶¶156–57 (1997) (stating that "the Commission does not agree with [the] finding" of *Sale*); *European*

*Roma Rts. Ctr. & Others v. Immigr. Officer at Prague Airport*, [2003] EWCA (Civ) 666 ¶34 (appeal taken from EWHC (QB)) (declaring *Sale* "wrongly decided"). *See also* James C. Hathaway, *The Rights of Refugees Under International Law* 380 (2d ed. 2021) (describing *Sale* as "[a]n outlier position"). As Judge Paulo Pinto de Albuquerque explained in *Hirsi Jamaa & Others v. Italy*, "the United States Supreme Court's interpretation [in *Sale*] contradicts the literal and ordinary meaning of the language of Article 33 . . . and departs from the common rules of treaty interpretation." *Hirsi Jamaa & Others v. Italy*, No. 27765/09, Eur. Ct. H.R. (2010) (Pinto de Albuquerque, J., concurring).

Ample authority thus reaffirms not only the humanitarian importance of *non-refoulement*, but also the binding nature of U.S. *non-refoulement* obligations. *See East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 674 (9th Cir. 2020) ("Article 31(1) of the 1951 Convention prohibits signatories from 'expel[ling] or return[ing] ("refouler") a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened[.]'"); *see also Bringas-Rodriguez v. Sessions*, 850 F.3d 1051, 1060 (9th Cir. 2017) (explaining that one reason Congress passed the Refugee Act of 1980 was to "fulfill international obligations"). In sum, *non-refoulement* is universal, specific, and obligatory, and thus constitutes an actionable norm under the ATS.

## II. The Agency's Turnback Policy Violates the Principle of *Non-Refoulement*

The Turnback Policy violated U.S. *non-refoulement* obligations under international and domestic law. Under the Turnback Policy, the United States implemented coercive tactics to preclude asylum seekers from accessing ports of entry and to return countless asylum seekers to "the frontiers of territories where [their lives] or freedom would be threatened on account of [their] race, religion, nationality, membership of a particular social group or political opinion." Refugee Convention, art. 33(1). The policy thus violated individuals' rights to seek asylum and the prohibition against *refoulement*, in direct contravention of Article 33 of the Refugee Convention and U.S. law. *See* 8 U.S.C. § 1158 (codifying asylum); 8 U.S.C. § 1231(b)(3) (codifying withholding of removal); FARRA, *supra*; 8 C.F.R. § 208.18 (implementing the Torture Convention). Specifically, the United States directly *refouled* Mexican asylum seekers to Mexico—the very country from which they fled persecution and torture. It also indirectly *refouled* non-Mexican asylum seekers by returning them to countries where they feared persecution or torture and to Mexico, where they faced a risk of serious harm.

### A. The Duty of *Non-Refoulement* Prohibits States from Turning Away Asylum Seekers at Their Borders.

It is well-established that *non-refoulement* encompasses border pushbacks. This scope of the norm is reflected in the Refugee Convention's prohibition against

"expel[ling] or return[ing]" individuals "in any manner whatsoever" to a territory where their lives or freedom would be threatened on account of a protected ground. Refugee Convention, art. 33(1); *see also Decl. on Territorial Asylum*, G.A. Res. 2312 (XXII), art. 3(1) (Dec. 14, 1967) (emphasizing that no asylum seeker "shall be subjected to measures such as rejection at the frontier or, if he has already entered the territory in which he seeks asylum, expulsion or compulsory return to any State where he may be subjected to persecution").

Indeed, during the drafting of the Refugee Convention, the U.N. Secretary-General stated in a Memorandum to the Ad Hoc Committee on Statelessness and Related Problems that "turning a refugee back to the frontier of the country where his life or liberty is threatened would be tantamount to delivering him into the hands of his persecutors." *UNHCR Advisory Opinion,* at 14 (citing Ad Hoc Committee on Statelessness and Related Problems, *Status of Refugees and Stateless Persons – Memorandum by the Secretary General, Comments on Article 24 of the preliminary draft*, ¶3, U.N. Document E/AC.32/2 (Jan. 3, 1950).

Likewise, during the discussions of the Committee, the representative of the United States vigorously argued that:

> Whether it was a question of closing the frontier to a refugee who asked admittance, or of turning him back after he had crossed the frontier, or even expelling him after he had been admitted to residence in the territory, the problem was more or less the same.

18

*UNHCR Advisory Opinion* at 14 (citing Statement of Mr. Henkin of the United States ¶¶54–55, U.N. Doc. E/AC.32/SR.20 (Feb. 1, 1950)).

The UNHCR has reiterated time and time again that *non-refoulement* encompasses "non-admission[s] at the border" and "informal transfer[s]," as well as "forcible removal[s]." *See, e.g.*, *UNHCR Advisory Opinion* at 3; UNHCR, *UNHCR Intervention before the European Court of Human Rights in the* Case of Hirsi & Others v. Italy ¶4.2.1, Application no. 27765/09 (Mar. 29, 2011) (describing "extraterritorial applicability of the principle of *non-refoulement*" as "firmly established in international human rights law"); UNHCR, *Submission by the Office of the United Nations High Commissioner for Refugees in the case of S.A.A. & Others v. Greece (No. 22146/21) before the European Court of Human Rights*, ¶3.2.2, No. 22146/21 (July 2022) (stating that *non-refoulement* applies to "pushback practices and non-admission at the border"); UNHCR, *Annex to UNHCR Note on the "Externalization" of International Protection: Policies and Practices Related to the Externalization of International Protection* ¶15 (May 28, 2021) ("States are not permitted to deny asylum-seekers access to territory or to asylum procedures on the basis of an arbitrarily fixed numerical limit. Purporting to do so will result in

19

discrimination, be at variance with the right to seek and enjoy asylum and creates a risk of refoulement.").[4]

The UNHCR even voiced its opposition to the Turnback Policy, condemning the policy because it "jeopardizes the right to protection from refoulement" and "is not in line with [our] international obligations." Press Release, UNHCR, *UNHCR Deeply Concerned About New U.S. Asylum Restrictions*, U.N. Press Release (July 15, 2019). The UNHCR has explicitly stated that countries "transferring" refugees in this way violates international law. *See* Press Release, UNHCR, *UNHCR Warns Against "Exporting" Asylum, Calls for Responsibility Sharing for Refugees, Not Burden Shifting*, U.N. Press Release (May 19, 2021).

Much like the UNHCR, courts around the world have interpreted *non-refoulement* to encompass border turnbacks. *See, e.g.*, *N.D. & N.T. v. Spain*, Nos. 8675/15 and 8679/15, Eur. Ct. H.R. ¶178 (2020) ("It is crucial to observe in this regard that the prohibition of *refoulement* includes the protection of asylum-seekers in cases of both non-admission and rejection at the border . . . ."); *Hirsi Jamaa*, Eur. Ct. H.R. ¶¶134–35 (reaffirming the principle that the duty of *non-refoulement* applies to pushbacks in the context of the high seas); *id.* (Pinto de Albuquerque, J.,

---

[4] This UNHCR guidance is directly relevant to the interpretation of the *non-refoulement* obligation under U.S. law. *See Cardoza-Fonseca*, 480 U.S. at 438–39 ("In interpreting the Protocol's definition of 'refugee' we are further guided by the analysis set forth in the Office of the [UNHCR].").

concurring) ("The act of *refoulement* may consist in expulsion, extradition, deportation, removal, informal transfer, 'rendition', rejection, refusal of admission or any other measure which would result in compelling the person to remain in the country of origin."); *see also* European Union Agency for Fundamental Rights, *Scope of the Principle of Non-Refoulement in Contemporary Border Management* at 38–39 (2016), https://fra.europa.eu/sites/default/files/fra_uploads/fra-2016-scope-non-refoulement-0_en.pdf (explaining that *non-refoulement* obligations adhere at designated border crossing points).[5]

Likewise, scholars agree that the contemporary scope of the universal norm of *non-refoulement* encompasses the principle of non-rejection at the border. *See, e.g.*, Sir Elihu Lauterpacht & Daniel Bethlehem, *The Scope and Content of the Principle of Non-Refoulement: Opinion*, *in* Refugee Protection in International Law: UNHCR's Global Consultations on International Protection 87, 111 (Erika Feller, Volker Türk & Frances Nicholson eds. 2003) ("[T]he principle of *non-refoulement* will apply to the conduct of State officials or those acting on behalf of the State *wherever this occurs* . . . [including] at border posts or other points of entry . . . .");

---

[5] Contrary to the District Court's determination below, the Supreme Court's decision in *Sale* has no bearing on the instant case. *Sale* addressed and is limited to interdiction on the high seas, while the instant case involves turnbacks at land borders and ports of entry. *See supra* Section I.B. Moreover, multiple courts and regional bodies around the world have critiqued the reasoning in *Sale*. *See id.*

Goodwin-Gill & McAdam, *supra*, at 245 (noting that *non-refoulement* "unequivocally encompasses non-rejection at the frontier, since protection begins with the ability of the refugee to secure admission to territory"); Cathryn Costello, *The Human Rights of Migrants and Refugees in European Law* 236 (2015) ("The weight of authority is now that [*non-refoulement*] also applies to rejection at the frontier."); Hathaway, *supra*, at 355 ("[T]he duty of *non-refoulement* has ordinarily been understood to constrain not simply ejection from within a state's territory, but also non-admittance at its frontiers.").

Accordingly, *non-refoulement* encompasses border pushbacks and prohibits states from turning away asylum seekers at their borders.

### B.      The Turnback Policy Falls within the Scope of *Non-Refoulement*

The Turnback Policy, which prevented asylum seekers from entering the United States through metering at the U.S.–Mexico border, violated U.S. *non-refoulement* obligations. *See Al Otro Lado, Inc. v. McAleenan*, 394 F. Supp. 3d 1168, 1200–04 (S.D. Cal 2019); 8 U.S.C. § 1158(a)(1) ("Any [non-citizen] . . . who arrives in the United States (whether or not at a designated port of arrival . . .) . . . may apply for asylum."). It did so directly by returning Mexican nationals to a country where they faced a real risk of persecution or torture. It did so indirectly by returning non-Mexican asylum seekers to Mexico where they, too, faced serious harm, and where they also faced deportation to the countries from which they fled.

Under the Turnback Policy, Customs and Border Protection ("CBP") stopped processing asylum seekers at seven ports of entry without public notice, informed asylum seekers that the port of entry was at capacity "regardless of actual capacity and capability at the time," reassigned CBP staff away from asylum processing, and *refouled* asylum seekers who had already entered the United States. *See* U.S. Department of Homeland Security Office of Inspector General, *Memo: CBP Has Taken Steps to Limit Processing of Undocumented Aliens at Ports of Entry*, at 7, 10, 15 (Oct. 27, 2020); *see also* Amnesty Int'l, USA: *"You Don't Have Any Rights Here": Illegal Pushbacks, Arbitrary Detention & Ill-Treatment of Asylum-Seekers in the United States*, at 15 (2018), https://www.amnesty.org/download/Documents/ AMR5191012018ENGLISH.PDF [hereinafter "Amnesty Report"]. Under this policy, CBP conducted border pushbacks in violation of the duty of *non-refoulement* by rejecting and not admitting refugees encountered at the border and by removing refugees already physically present in the United States.

Forcing Mexican asylum seekers to remain in their country of origin, where they faced ongoing threats to their lives and freedom and/or fear likely torture or persecution, directly flouted the obligation of *non-refoulement* under domestic and international law. Approximately 80 percent of asylum seekers stranded at some U.S.–Mexico ports of entry were Mexican citizens seeking refuge from persecution. *See* Human Rights First, *Barred at the Border: Wait "Lists" Leave Asylum Seekers*

23

*in Peril at Texas Ports of Entry*, at 4 (Apr. 2019), https://humanrightsfirst.org/wp-content/uploads/2022/10/BARRED_AT_THE_BORDER.pdf [hereinafter "*Barred at the Border*"]. By subjecting Mexican asylum seekers to metering pursuant to the Turnback Policy, the United States returned refugees to a territory where their lives or freedom were threatened in violation of the duty of *non-refoulement*.

Moreover, the metering and waitlist process placed Mexican refugees at heightened risk of persecution. CBP forced metered asylum seekers to put their names on a waitlist maintained by the Mexican government, which increased the risk that these asylum seekers would be "discovered by their persecutors—whether members of the [Mexican] government or non-state persecutors," whom the government is unable or unwilling to control. *See* Human Rights First, *Barred at the Border*, *supra*, at 8 (explaining that Mexican immigration authorities "have been implicated in organized crime and extortion of migrants"). The waitlist process often required asylum seekers to provide "their biographical information, photograph, and location to a Mexican local or federal official," making them easy targets for persecution. *Id.*

Concerns that Mexican citizens would be persecuted due to metering at the border were far from theoretical. *See, e.g.*, Human Rights Watch, *U.S.: Mexican Asylum Seekers Ordered to Wait* (Dec. 23, 2019), https://www.hrw.org/news/2019/12/23/us-mexican-asylum-seekers-ordered-wait (documenting dangers facing

Mexican asylum seekers waiting at the border where their Mexican persecutors may be able to locate them); Letter from ACLU to Joseph Cuffari & Patricia Nation, CBP's Unlawful Turn Back of Mexican Asylum Seekers at Ports of Entry (Nov. 14, 2019), https://www.aclutx.org/sites/default/files/aclu_oig_complaint_metering.pdf (Office of Inspector General complaint documenting threats to Mexican nationals subjected to metering); Human Rights First, *Barred at Border*, *supra*, at 2, 7–10 (documenting incidents of kidnapping, assault, and extortion faced by asylum seekers in Mexico).

The Turnback Policy also rendered non-Mexican asylum seekers vulnerable to indirect *refoulement* given Mexico's systematic deportation of thousands of asylum seekers to the countries from which they fled. *See Hirsi Jamaa*, Eur. Ct. H.R. ¶34 (framing *refoulement* as an act that can happen "directly or indirectly"); *see id.* ¶¶10, 11, 34, 143 (describing Libya's deportation of asylum seekers following Italy's "interception and push-back" of non-citizens as "chain *refoulements*"). Numerous reports document Mexico's problematic practice of returning asylum seekers to their home countries without considering their fears of return to persecution or torture. *See, e.g.*, Amnesty Int'l, USA, Amnesty Report, *supra*, at 24–26. In turn, the United States both explicitly and implicitly encouraged Mexican officials to deport asylum seekers in violation of U.S. *non-refoulement* obligations. *Id.* at 23 (quoting a senior Mexican official who described U.S. officials as making

Mexico "do their dirty work"). The United States thus bears responsibility for plaintiffs' indirect *refoulement* from Mexico to a country where they face threats to life or freedom or danger of persecution or torture. Mem. ISO Defs.' Cross-Mot. for Summ. J. (ECF No. 563-1) at 36 (conceding Mexico detained and deported Roberto Doe).

In addition to the risk of *refoulement*, the Turnback Policy subjected non-Mexican asylum seekers to violence and risk of persecution within Mexico. Due to the U.S. government's illegal Turnback Policy, bona fide asylum seekers left waiting in limbo in Mexico were vulnerable to violence, including kidnapping and rape. *See* Stephanie Leutert & Caitlyn Yates, *Metering Update: August 2022*, Univ. of Tex. at Austin Strauss Ctr. for Int'l Sec. & Law, at 2 (2022) (reporting 55,445 people remained on metering waitlists in eleven Mexican border cities as of August 2022); *see also* Human Rights First, *Barred at the Border*, *supra*, at 1-2, 7-9; Human Rights First, *Crossing the Line: U.S. Border Agents Illegally Rejected Asylum Seekers* (May 3, 2017), https://humanrightsfirst.org/library/crossing-the-line-u-s-border-agents-illegally-reject-asylum-seekers/; Doctors Without Borders, *No Way Out: The Humanitarian Crisis For Migrants And Asylum Seekers Trapped Between The United States, Mexico and the Northern Triangle of Central America*, at 6 (Feb. 2020) https://www.doctorswithoutborders.org/sites/default/files/documents/ Doctors%20Without%20Borders_No%20Way%20Out%20Report.pdf (reporting

that 57.3% of patients from Honduras, Guatemala, and El Salvador treated in Mexico experienced violence in Mexico; 39.2 % were violently attacked and 27.3 % were threatened or extorted).

The Turnback Policy subjected asylum seekers to significant risks of forced return to their countries of origin and to pervasive victimization, persecution, and torture in direct contravention of U.S. *non-refoulement* obligations. Upholding this policy violates U.S. law and international commitments and undermines U.S. credibility on the world stage.

## CONCLUSION

The Turnback Policy runs afoul of U.S. *non-refoulement* obligations for asylum seekers and is actionable under the ATS. Therefore, this Court should reverse the District Court's grant of Summary Judgment on the Plaintiffs' ATS claim.

Dated: February 28, 2023

Respectfully Submitted,

*/s/ Sabrineh Ardalan*
Sabrineh Ardalan
Tiffany J. Lieu
Sarah Leadem
    *Supervised Law Student*
Simone Wallk
    *Supervised Law Student*
Harvard Immigration and Refugee Clinical Program
6 Everett Street, WCC 3106
Cambridge, MA 02138

27

Sarah Sherman-Stokes
Catherine Kannam
   *Supervised Law Student*
Immigrants' Rights and Human
Trafficking Program
Boston University School of Law
765 Commonwealth Avenue
Boston, MA 02215

*Counsel for Amici Curiae*

## LIST OF AMICI*

- **Deborah Anker** (Clinical Professor of Law Emerita, Harvard Immigration and Refugee Clinical Program, Harvard Law School)

- **Sabrineh Ardalan** (Clinical Professor of Law, Harvard Immigration and Refugee Clinical Program, Harvard Law School)

- **David Baluarte** (Clinical Professor of Law, Washington and Lee University School of Law)

- **Jon Bauer** (Clinical Professor of Law and Richard D. Tulisano '69 Scholar in Human Rights, University of Connecticut School of Law)

- **Stella Burch-Elias** (Professor of Law, University of Iowa College of Law)

- **Kristina M. Campbell** (Professor of Law, University of the District of Columbia David A. Clarke School of Law, and Visiting Professor of Law, University of Utah S.J. Quinney College of Law)

- **Jennifer M. Chacón** (Professor of Law, Stanford Law School)

- **Michael J. Churgin** (Raybourne Thompson Centennial Professor in Law, The University of Texas at Austin)

- **Dree K. Collopy** (Adjunct Professor, American University Washington College of Law)

---

*All academic affiliations are listed for identification purposes only.

- **Julie A. Dahlstrom** (Clinical Associate Professor of Law, Boston University School of Law)

- **Ingrid Eagly** (Professor of Law, University of California Los Angeles School of Law)

- **Shane Ellison** (Clinical Professor of Law, Duke University School of Law)

- **Kate Evans** (Clinical Professor of Law, Duke University School of Law)

- **Mary Holper** (Associate Clinical Professor, Boston College Law School)

- **Daniel Kanstroom** (Professor of Law, Boston College Law School)

- **Nancy Kelly** (Lecturer on Law, Harvard Law School)

- **Fatma Marouf** (Professor of Law, Texas A&M School of Law)

- **Jane McAdam** (Scientia Professor of Law and Director, Kaldor Centre for International Refugee Law, University of New South Wales)

- **Jennifer Moore** (Professor of Law, University of New Mexico School of Law)

- **Lori A. Nessel** (Professor of Law, Seton Hall University School of Law)

- **Jaya Ramji-Nogales** (Professor of Law, Temple Law School)

- **Carrie Rosenbaum** (Visiting Assistant Professor, Chapman Fowler School of Law)

- **Faiza Sayed** (Assistant Professor of Law, Brooklyn Law School)

30

- **Erica Schommer** (Clinical Professor of Law, St. Mary's University School of Law)

- **Sarah Sherman-Stokes** (Clinical Associate Professor of Law, Boston University School of Law)

- **Anita Sinha** (Professor of Law, American University Washington College of Law)

- **Claire R. Thomas** (Assistant Professor of Law, New York Law School)

- **David B. Thronson** (Alan S. Zekelman Professor of International Human Rights Law, Michigan State University College of Law)

- **Philip L. Torrey** (Lecturer on Law, Harvard Law School)

- **Sheila Vélez Martínez** (Jack & Lovell Olender Professor of Refugee, Asylum, and Immigration Law, University of Pittsburgh School of Law)

- **Deborah M. Weissman** (Reef C. Ivey II Distinguished Professor of Law, University of North Carolina School of Law)

- **Anna Welch** (Clinical Professor, University of Maine School of Law)

- **John Willshire Carrera** (Lecturer on Law, Harvard Law School)

- **Beth K. Zilberman** (Assistant Professor of Law, Willamette University College of Law)

## CERTIFICATE OF COMPLIANCE

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** _____ Nos. 22-55988, 22-56036_____

I am the attorney or self-represented party.

**This brief contains _6,145_ words,** including __0__ words manually

counted in any visual images, and excluding the items exempted by FRAP 32(f).

The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

    [ ] it is a joint brief submitted by separately represented parties.

    [ ] a party or parties are filing a single brief in response to multiple briefs.

    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** _____/s/ Sabrineh Aradalan _____ **Date**____02/28/2023_____

## CERTIFICATE OF SERVICE

I, Tiffany J. Lieu, hereby certify that on February 28, 2023, I electronically filed the foregoing, Brief of *Amici Curiae*, International Refugee Law Scholars in Support of Appellees/Cross-Appellants, with the Clerk of the Court for the U.S. Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: February 28, 2023

/s/ Tiffany J. Lieu
Harvard Immigration and Refugee
Clinical Program
6 Everett Street, WCC 3106
Cambridge, MA 02138
Phone: 617-495-5497
Fax: 617-495-8595
Email: tlieu@law.harvard.edu

*Counsel for Amicus Curiae*