Nos. 22-55988, 22-56036

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

Al Otro Lado, Inc., et al.,

*Plaintiffs-Appellees/Cross-Appellants*,

v.

Alejandro Mayorkas, Secretary of Homeland Security, et al.,

*Defendants-Appellants/Cross-Appellees*,

and

the Executive Office for Immigration Review,

*Appellant/Cross-Appellee.*

On Appeal from the
United States District Court for the Southern District of California
in Case No. 17-cv-02366-BAS-KSC

**Brief of *Amici Curiae* Immigration Law Professors in Support of Plaintiff-Appellees/ Cross-Appellants**

Matthew C. McDonough
Andrew Savage
MORGAN, LEWIS & BOCKIUS LLP
One Federal Street
Boston, MA 02110
Telephone: +1.617.951.8000
Facsimile: +1.617.951.8376
matthew.mcdonough@morganlewis.com
andrew.savage@morganlewis.com

Raechel Keay Kummer
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: +1.202.739.3000
Facsimile: +1.202.739.3001
raechel.kummer@morganlewis.com

Counsel for *Amici Curiae*

# TABLE OF CONTENTS

**Page**

I.      INTEREST OF *AMICI CURIAE* ...................................................................1

II.    AUTHORITY TO FILE BRIEF OF *AMICUS CURIAE* ..............................3

III.   INTRODUCTION AND SUMMARY OF ARGUMENT...........................3

IV.   DEFENDANTS CANNOT EVADE THEIR LEGAL DUTIES BY INTERCEPTING ASYLUM SEEKERS AT OR NEAR THE BORDER. .........................................................................................5

      A.    Class Members Have a Statutory Right to Seek Asylum Even if CBP Prevents Them from Crossing the Border. .................................6

           1.    Under the INA, CBP Officials May Not Deny Asylum Seekers at the Border Access to the Asylum Process...............7

                 a.    Extraterritorial Application of U.S. Statutes. .................7

                 b.    The Statutory Text Makes Asylum Available to Noncitizens Who Are at, But May Not Have Yet Crossed, the Border. ........................................................8

                 c.    Agency Interpretation of the INA Confirms That Asylum Is Available to Noncitizens Who Are at, But May Not Have Yet Crossed, the Border.................13

                 d.    *Sale* Does Not Support Defendants' Statutory Interpretation.................................................................15

           2.    Defendants May Not Deny Class Members Access to the Asylum Process Without Due Process....................................20

V.    CONCLUSION.............................................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Al Otro Lado, Inc. v. Mayorkas,*
2021 WL 3931890 (S.D. Cal. Sept. 2, 2021)......................................................21

*Al Otro Lado, Inc. v. McAleenan,*
2019 WL 6134601 (S.D. Cal. 2019)..................................................................21

*Al Otro Lado, Inc. v. McAleenan,*
394 F. Supp. 3d 1168 (S.D. Cal. 2019) ......................................................12, 15

*Ark. Game & Fish Comm'n v. United States,*
568 U.S. 23 (2012)............................................................................................17

*Blazevska v. Raytheon Aircraft Co.,*
522 F.3d 948 (9th Cir. 2008) ............................................................................17

*Boumediene v. Bush,*
553 U.S. 723 (2008)..............................................................................20, 22, 25

*Duncan v. Walker,*
533 U.S. 167 (2001)..........................................................................................10

*East Bay Sanctuary Covenant v. Trump,*
932 F.3d 742, (9th Cir. 2018) .....................................................................11, 12

*In re French,*
320 B.R. 78 (D. Md. 2004), *aff'd*, 440 F.3d 145 (4th Cir. 2006) ......................17

*Hernandez v. Mesa,*
137 S. Ct. 2003 (2017) (Breyer, J., dissenting) ................................................24

*Hernandez v. Mesa,*
140 S. Ct. 735 (2020).........................................................................................21

*Ibrahim v. Dep't of Homeland Sec.,*
669 F.3d 983 (9th Cir. 2012) .......................................................................20, 21

*Johnson v. Eisentrager,*
339 U.S. 763 (1950)...........................................................................................20

*Loughrin v. United States,*
    573 U.S. 351 (2014) .................................................................................10

*Marbury v. Madison,*
    1 Cranch 137, 2 L. Ed. 60 (1803) ........................................................25

*Morrison v. Nat'l Australia Bank Ltd.,*
    561 U.S. 247 (2010) ................................................................................. 8

*Murphy v. Ramsey,*
    114 U.S. 15, 5 S. Ct. 747, 29 L. Ed. 47 (1885) ....................................25

*RJR Nabisco, Inc. v. Eur. Cmty.,*
    579 U.S. 325 (2016) .............................................................................7, 8

*Rodriguez v. Swartz,*
    899 F.3d 719 (9th Cir. 2018), *rev'd on other grounds* ..............................*passim*

*Ruiz-Diaz v. United States,*
    618 F.3d 1055 (9th Cir. 2010) ..............................................................14

*Sale v. Haitian Centers Council, Inc.,*
    509 U.S. 155 (1993) .........................................................................*passim*

*United States v. Balint,*
    201 F.3d 928 (7th Cir. 2000) ................................................................11

*United States v. Delgado-Garcia,*
    374 F.3d 1337 (D.C. Cir. 2004) ............................................................16

*United States v. Vance Crooked Arm,*
    788 F.3d 1065 (9th Cir. 2015) ..............................................................10

*United States v. Verdugo-Urquidez,*
    494 U.S. 259 (1990) ...............................................................................20

*WesternGeco LLC v. ION Geophysical Corp.,*
    138 S. Ct. 2129 (2018) ............................................................................7

**Statutes**

5 U.S.C. § 706(1) .............................................................................................4

8 U.S.C. § 1101(a)(13)(C) ...........................................................................12

8 U.S.C. § 1158(a)(1) ................................................................. 9

8 U.S.C. §§ 1158(a)(1), 1225(b)(1) ........................................... 3

8 U.S.C. § 1182(f) ..................................................................... 11

8 U.S.C. § 1225(a)(1) ............................................................ 9, 10

8 U.S.C. § 1225(a)(3) ........................................................... 10, 12

8 U.S.C. § 1225(b)(1)(A)(ii) ....................................................... 9

Refugee Act of 1980, Pub. L. No. 96-212, § 101(b), 94 Stat. 102, 102
    (1980) ................................................................................... 6

RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE
    UNITED STATES §§ 402-03, at 237-54 (AM. LAW INST. 1987) ............ 22

Treaty on the Utilization of Waters of Colorado and Tijuana Rivers
    and of the Rio Grande, Feb. 3, 1944, art. 2, 59 Stat. 1219, T.S. No.
    904 ....................................................................................... 23

**Other Authorities**

8 C.F.R. § 1.2 ...................................................................... 3, 13

8 C.F.R. § 235.3(b)(1)(i), (b)(4) ............................................ 3, 13

Anil Kalhan, *Immigration Surveillance*, 74 MD. L. REV. 1, 58–72
    (2014) ................................................................................. 24

COMPACT OXFORD ENGLISH DICTIONARY 1564 (2d ed. 1989) ............... 18

Eva Bitran, Note, *Boumediene at the Border? The Constitution and
    Foreign Nationals on the U.S.-Mexico Border*, 49 HARV. C.R.-C.L.
    L. REV. 229, 244–47 (2014) ................................................... 22

Fed. R. App. P. 29(a)(2) .............................................................. 3

*The Haitian Ctr. for Hum. Rights v. United States*, Case 10.675, Inter-
    Am. Comm'n H.R., Report No. 51/96, OEA/Ser. L/V/II.95, Doc. 7
    rev. ¶ 157 (1997), http://hrlibrary.umn.edu/cases/1996/unitedstat
    es51-96.htm .......................................................................... 19

*Hearing Before the Subcomm. on Border & Mar. Sec. of the H. Comm. on Homeland Sec.*, 112th.........................................................................22

Illegal Immigration Reform and Immigrant Responsibility Act of 1996: Hearing Before the Subcommittee on Immigration and Claims of the H. Comm. on the Judiciary, 105th Cong. 17-18 (1997) (correspondence dated Feb. 3, 1997 to Immigration and Naturalization Service from Chairman Smith).................................................15

*Jamaa v. Italy* (No. 27765/09), 2012-II Eur. Ct. H.R. 97, 173, 175 (2012), https://www.echr.coe.int/Documents/Reports_Recueil_2012-II.pdf .................19

S. Rep. No. 96-256, at 1 (1979) .................................................................6

U.N. High Comm'r for Refugees, Advisory Op. on the Extraterritorial Appl. of Non-Refoulement Obligations under the 1951 Convention relating to the Status of Refugees and its 1967 Protocol 12 (Jan. 26, 2007), https://www.unhcr.org/4d9486929.pdf ....................................................19

## I.    INTEREST OF *AMICI CURIAE*

*Amici curiae* are sixteen law professors who research, write, and practice in the area of immigration and refugee law.  *Amici* bring a rich understanding of the Immigration and Nationality Act ("INA") and write out of concern for government practices that deny migrants meaningful and timely access to the asylum process.  *Amici* write to stress that the INA and the constitutional constraints on the Executive Branch cannot be obviated by preventing refugees who seek to access the asylum process at the U.S. border from crossing.  To hold otherwise would undermine the bedrock principles of asylum law and permit a legal manipulation of jurisdictional rules that could carry dangerously into the future.  *Amici* are:

- **Lenni B. Benson** (Distinguished Professor of Immigration and Human Rights Law and Founder, Safe Passage Project Clinic, New York Law School);

- **Carolyn Patty Blum** (Clinical Professor of Law, Emerita, Berkeley Law, University of California, Senior Research Fellow, UC Berkeley Human Rights Center and Professor, International Human Rights Law Masters, Law School, University of Oxford);

- **Holly Cooper** (Co-Director, Immigration Law Clinic, U.C. Davis School of Law);

- **Denise L. Gilman** (Clinical Professor and Director, Immigration Clinic, University of Texas at Austin School of Law);

- **Lindsay M. Harris** (Professor of Law and Director, Immigration & Human Rights Clinic, University of the District of Columbia);

- **Anil Kalhan** (Professor of Law, Drexel University Thomas R. Kline School of Law);

- **Elizabeth Keyes** (Associate Professor and Director of the Immigrant Rights Clinic, University of Baltimore School of Law);

- **Ira Kurzban** (Adjunct Faculty, University of Miami School of Law);

- **Stephen Legomsky** (John S. Lehmann University Professor Emeritus, Washington University in St. Louis School of Law);

- **Nancy Morawetz** (Professor of Clinical Law, New York University School of Law);

- **Sarah Paoletti** (Practice Professor of Law, the University of Pennsylvania Law School);

- **Andrew I. Schoenholtz** (Professor from Practice, Georgetown Law);

- **Philip G. Schrag** (Delaney Family Professor of Public Interest Law, Georgetown University);

- **Jayashri Srikantiah** (Professor of Law and founding Director, Immigrants' Rights Clinic, Stanford Law School);

- **Maureen A. Sweeney** (Law School Professor, University of Maryland Carey School of Law); and

- **Michael Wishnie** (William O. Douglas Clinical Professor of Law, Yale Law School).[1]

## II. AUTHORITY TO FILE BRIEF OF *AMICUS CURIAE*

All parties have consented to the filing of this *amicus* brief. *See* Fed. R. App. P. 29(a)(2).

## III. INTRODUCTION AND SUMMARY OF ARGUMENT

Neither the U.S. Code nor the Constitution halts abruptly at a pinpoint in the desert or an eddy in a river. The "border" is more than a cartographical concept. It is built of ports of entry, of mountains, rivers, tidal areas that are land one hour and water six hours later, and of many places where U.S. power regularly crosses the cartographer's line. In the INA, Congress chose prepositions and gerundives to match the border's complexity, conferring rights on the asylum seeker when she "arrives in" the United States, and requiring the inspection of "arriving" persons— including certain persons who may not have yet crossed the line to stand on U.S. soil. 8 U.S.C. §§ 1158(a)(1), 1225(b)(1); *see also* 8 C.F.R. § 1.2; 8 C.F.R. § 235.3(b)(1)(i), (b)(4).

The government asserts that Customs and Border Protection ("CBP") officials who "meter[ed]" the class members and who refused to inspect and process them were stationed at the "international boundary," Br. at 2, and in many cases speaking

---

[1] All academic affiliations are listed for identification purposes only.

face-to-face with asylum seekers who stood in Mexico. *See also* Defs.' Mem. in Supp. of Mot. to Partially Dismiss the Second Am. Compl. at 2 n.1, *Al Otro Lado v. Nielsen* (Dkt. 192-1 Nov. 29, 2018) (contending that CBP officers standing in the United States spoke to and turned back individual plaintiffs who were at all times in Mexico). According to the government, it can use coercive power to meter asylum seekers—including blocking asylum seekers who are just steps away from crossing the border—to deny them access to the asylum process that the INA requires. In response to class members' claims under 5 U.S.C. § 706(1), the government contends that it has no obligations to the class members unless and until they stand on U.S. soil—a claim that runs counter to both the statute and the Constitution. *Amici* submit this brief to respond to the government's arguments about its duties and obligations—or purported lack of duties and obligations—in this type of cross-border interaction. *Amici* show that the inspection and asylum provisions of the INA apply both to (1) noncitizens physically present in the United States *and* (2) noncitizens who are "arriving" in this country. Under the statute's express terms and implementing regulations, the latter group includes the class members.

Defendants also plainly denied the class members' statutory right to access the asylum system without due process of law. Defendants cannot deprive the class members of their Fifth Amendment rights by barring these asylum seekers from crossing the line of the U.S.-Mexico border. The extraterritorial application of the

Constitution turns not on formalism, but on practical considerations. Here, all such considerations weigh in favor of recognizing the rights of asylum seekers at the border.

In addition, *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155 (1993), does not authorize Defendants' policy of turning back an asylum seeker who—if not actually in the United States—would enter but for the government's metering policy and who is often just steps from the border. Unlike the refugees in *Sale* who were interdicted on the high seas, asylum applicants presenting themselves—or trying to do so—at the border are protected by U.S. law.

*Amici* therefore respectfully request that the Court affirm the district court.

## IV. DEFENDANTS CANNOT EVADE THEIR LEGAL DUTIES BY INTERCEPTING ASYLUM SEEKERS AT OR NEAR THE BORDER.

Defendants argue that metering is lawful because the asylum laws of the United States "apply exclusively to noncitizens within the territorial borders of the United States." Br. at 24. This is true, the government claims, even where government's policy—which may be implemented just steps from the border—is the very reason that individuals cannot reach U.S. soil. The government contends that everything turns upon a cartographer's line that class members purportedly did not reach. This is incorrect.

**A.    Class Members Have a Statutory Right to Seek Asylum Even if CBP Prevents Them from Crossing the Border.**

It has been nearly forty years since Congress amended the INA to replace the *ad hoc* refugee and asylum system that grew up over the preceding century to establish "for the first time a comprehensive United States refugee resettlement and assistance policy."  S. Rep. No. 96-256, at 1 (1979).  The Refugee Act of 1980 (the "1980 Act") amended the INA to create "a permanent and systematic procedure for the admission to this country of refugees of special humanitarian concern to the United States."  Refugee Act of 1980, Pub. L. No. 96-212, § 101(b), 94 Stat. 102, 102 (1980).  Explaining the purpose of the law, Congress declared:

> [I]t is the historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands, including, where appropriate, humanitarian assistance for their care and maintenance in asylum areas, efforts to promote opportunities for resettlement or voluntary repatriation, aid for necessary transportation and processing, admission to this country of refugees of special humanitarian concern to the United States, and transitional assistance to refugees in the United States.

*Id*. § 101(a), 94 Stat. at 102.  The 1980 Act thus "reflects one of the oldest themes in America's history—welcoming homeless refugees to our shores" and "gives statutory meaning to our national commitment to human rights and humanitarian concerns."  S. Rep. No. 96-256, at 1.

Defendants contend that CBP officials barred class members from crossing the border.  But that cannot excuse the failure to inspect and process class members

seeking asylum. U.S. law indisputably bars the government from stripping statutory rights by barring asylum seekers at the border from stepping across the line.

**1.** **Under the INA, CBP Officials May Not Deny Asylum Seekers at the Border Access to the Asylum Process.**

The INA's asylum provisions extend to persons who are in the process of arriving in the United States, even if CBP officers stop them just short of the border. CBP officials act under color of U.S. law, and, whether they kept class members from crossing the mapmaker's line by using pre-checkpoints or by forcing asylum seekers to put themselves on a metering list, their very ability to exert governmental power shows that those class members had reached the place where U.S. power exists: that is, they were "arriving" in the United States. Both the text and broader statutory scheme of the INA require that when a noncitizen arriving in the United States indicates either an intention to apply for asylum or a fear of persecution to a U.S. immigration officer, she must be inspected and processed for asylum.

**a.** **Extraterritorial Application of U.S. Statutes.**

Courts analyze whether a statute applies extraterritorially using a two-step framework. *WesternGeco LLC v. ION Geophysical Corp.*, 138 S. Ct. 2129, 2136 (2018). First, the court considers "whether the presumption against extraterritoriality has been rebutted—that is, whether the statute gives a clear, affirmative indication that it applies extraterritorially." *RJR Nabisco, Inc. v. Eur. Cmty.*, 579 U.S. 325, 337 (2016). "While the presumption can be overcome only by

-7-

a clear indication of extraterritorial effect, an express statement of extraterritoriality is not essential. 'Assuredly context can be consulted as well.'" *Id*. at 340 (quoting *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 265 (2010)).

Where a statute clearly indicates that it applies extraterritorially, the analysis is complete. "The scope of an extraterritorial statute [] turns on the limits Congress has (or has not) imposed on the statute's foreign application." *RJR Nabisco*, 579 U.S. at 337-38. If a statute does not clearly indicate that it applies extraterritorially, the court will consider "whether the case involves a domestic application of the statute . . . by looking to the statute's 'focus.'" *Id.* at 337. "If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad." *Id*.

      **b.**    **The Statutory Text Makes Asylum Available to Noncitizens Who Are at, But May Not Have Yet Crossed, the Border.**

Congress clearly intended to legislate concerning the environs of the border, and therefore "extraterritorially" within the facts alleged in this case. Congress did not require an asylum seeker to have fully crossed the map-maker's line. Section 1158(a)(1) describes two categories of persons who may seek asylum:

> Any alien [1] who is physically present in the United States or [2] *who arrives in the United States* (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status, may apply for asylum

in accordance with this section or, where applicable, section 1225(b) of this title.

8 U.S.C. § 1158(a)(1) (emphasis added).[2]

Just as Section 1158(a)(1) makes "[a]ny alien . . . who arrives in the United States" eligible to apply for asylum, Section 1225(b)(1) also requires an immigration officer to refer "an alien . . . who is arriving in the United States" for a credible fear interview if he or she expresses the intent to apply for asylum or a fear of persecution.

> If an immigration officer determines that an alien . . . ***who is arriving in the United States*** . . . is inadmissible . . . and the alien indicates either an intention to apply for asylum under section 1158 of this title or a fear of persecution, the officer shall refer the alien for an interview by an asylum officer[.]

8 U.S.C. § 1225(b)(1)(A)(ii) (emphasis added).

Consistent with these asylum-specific provisions, Section 1225(a)(1) defines "applicant for admission" as including a noncitizen who "arrives" in the United States:

> An alien [1] present in the United States who has not been admitted or [2] ***who arrives in the United States*** (whether or not at a designated port of arrival . . . ) shall be deemed for purposes of this chapter an applicant for admission.

8 U.S.C. § 1225(a)(1) (emphasis added). The duty of immigration officers to inspect noncitizens—which will, in appropriate circumstances, trigger the duty to refer the

---

[2] This brief uses the term "alien" only when it appears in a quoted authority. Otherwise, the brief generally refers to persons seeking asylum as "asylum seekers" or "noncitizens."

noncitizen for an asylum interview—builds on the Section 1225(a)(1) definition of "applicant for admission," but is framed even more broadly:

> All aliens (including alien crewmen) [1] **who are applicants for admission** or [2] **otherwise seeking admission** or readmission to or transit through the United States shall be inspected by immigration officers.

8 U.S.C. § 1225(a)(3).

In each of the cited statutes, Congress carefully distinguished the categories from each other. First, each of the provisions uses the disjunctive "or." This makes clear that a person in either category must be appropriately inspected and, at minimum, referred for a credible fear interview. *See, e.g.*, *Loughrin v. United States*, 573 U.S. 351, 357 (2014) (the "ordinary use" of the word "or" "is almost always disjunctive, that is, the words it connects are to be given separate meanings"); *United States v. Vance Crooked Arm*, 788 F.3d 1065, 1074 (9th Cir. 2015) (the disjunctive "or," means "that the phrases have separate meanings"). Second, by setting out distinct categories of eligibility, Congress intended the terms "[physically] present in the United States" and "who arrives in the United States" (or "who is arriving in the United States") to mean different things, under the familiar canon against surplusage. *See, e.g.*, *Duncan v. Walker*, 533 U.S. 167, 174 (2001); *Vance Crooked Arm*, 788 F.3d at 1075 ("[O]ur rules of statutory interpretation strongly disfavor" interpretations that render language "superfluous"). Third, the use of the present tense ("arrives") and present progressive tense ("is arriving") of the verb "to arrive"

indicates an ongoing or continuing action. *See, e.g.*, *United States v. Balint*, 201 F.3d 928, 933 (7th Cir. 2000) ("[U]se of the present progressive tense, formed by pairing a form of the verb 'to be' and the present participle, or '-ing' form of an action verb, generally indicates continuing action."). A guest may be at the threshold without having yet entered the house and, still, we refer to him as an "arriving guest."

The hole in Defendants' argument appears most starkly in their recasting of the statutory text. Although Defendants argue about the meaning of an "arrival in" the United States, Br. at 28, the statute does not say "arriv*al*"; it says "arrive*s*" and "arriv*ing*." Set in the present progressive tense, the text does not require a noncitizen to complete her arrival, but only that she be in the process of doing so. Noncitizens who express an intent to seek asylum or express a fear of persecution are in the process of "arriving in the United States," even if CBP officials stop them from stepping across the cartographer's line.[3]

---

[3] *East Bay Sanctuary Covenant v. Trump*, upon which the government relies for the premise that "asylum concerns those 'physically present in the United States,'" is not to the contrary. 932 F.3d 742, 773 (9th Cir. 2018); *see* Br. at 28, 38. True, the *East Bay* court held that asylum seekers, by definition, *include* those "physically present in the United States," but not to the *exclusion* of she who "arrives" in the United States. *See id.* The *East Bay* court merely held that an executive action making ineligible for asylum all noncitizens who had crossed into the United States from Mexico outside of a port of entry could not be an exercise of the President's authority under 8 U.S.C. § 1182(f) because, in reaching those who already were "physically present in the United States," that executive action went beyond Section 1182(f), which only permits the President to "suspend the entry" of certain noncitizens. *East Bay*, 932 at 773. Returned to the context in which it was written,

The third category of noncitizens who must be inspected, and must be processed for asylum, are those who are "otherwise seeking admission" within the meaning of Section 1225(a)(3). As an earlier decision in the District Court noted, "Defendants fail to explain how, as a textual matter, Section 1225(a)(3)'s use of the phrase 'otherwise seeking admission . . . to . . . the United States' does not include aliens who may be located outside the United States, but who are in the process of seeking admission to the United States." *Al Otro Lado, Inc. v. McAleenan*, 394 F. Supp. 3d 1168, 1204 (S.D. Cal. 2019).

The government argues that noncitizens who are "otherwise seeking admission" refers to noncitizens such as lawful permanent residents who are subject to inspection but are not required to seek admission *per se* when returning from abroad. Br. at 36. That argument does not work. Unless one of six exceptions applies, a lawful permanent resident "shall not be regarded as seeking an admission into the United States for purposes of the immigration laws." 8 U.S.C. § 1101(a)(13)(C). Thus, lawful permanent residents typically do not seek "admission," but "readmission"—a situation Section 1225(a)(3) contemplates. *See* 8 U.S.C. § 1225(a)(3) ("All aliens (including alien crewmen) who are applicants for admission or otherwise seeking admission or readmission to or transit through the

---

the sentence from *East Bay* upon which the government relies does not mean what the government says it means.

United States shall be inspected by immigration officers."). Nothing in the text suggests that "otherwise seeking admission" applies only to the small number of lawful permanent residents who, because an exception applies, must seek admission.

> **c.    Agency Interpretation of the INA Confirms That Asylum Is Available to Noncitizens Who Are at, But May Not Have Yet Crossed, the Border.**

Although "arriving alien" is not a term expressly defined by statute, long-standing agency interpretation of the INA confirms that the asylum and inspection requirements of Sections 1158(a)(1), 1225(b)(1), and 1225(a)(3) apply to certain noncitizens who are at the border and seeking entry, but who may not yet have crossed the border.

> Arriving alien means an applicant for admission ***coming or attempting to come into the United States*** at a port-of-entry, or an alien seeking transit through the United States at a port-of-entry, or an alien interdicted in international or United States waters and brought into the United States by any means, whether or not to a designated port-of-entry, and regardless of the means of transport.

8 C.F.R. § 1.2; *see also* 8 C.F.R. § 235.3(b)(1)(i), (b)(4) (describing the procedure for an "arriving alien" to apply for asylum and the duties of immigration officers under the INA with respect to "arriving aliens" who are seeking asylum).  The present progressive tense phrase "coming . . . into the United States" refers to ongoing or continuing action, not the act of having *already* come into the United States.  It refers to individuals at the border and in the active process of entering the

United States, whether or not they have yet reached U.S. soil. And "attempting to come into the United States" could not more plainly have described the class members in this case. It also refers to a continuing action and necessarily excludes those who have accomplished what the government now asserts as the requirement—physical presence in the United States. This phrase plainly includes individuals who are at or near the border and actively seeking to enter the United States, but have not yet done so. Agency interpretation of the statute is strong evidence that Sections 1158(a)(1), 1225(b)(1), and 1225(a)(3) apply to noncitizens who are in the process of entering this country, even when they have not yet crossed the border. *Ruiz-Diaz v. United States*, 618 F.3d 1055, 1060 (9th Cir. 2010) ("When . . . Congress has expressly conferred authority on the agency to implement a statute by regulation, the regulations have 'controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute.'" (quoting *Chevron, U.S.A., Inc. v. Nat'l Res. Def. Council, Inc*., 467 U.S. 837, 843–44 (1984)).

During the rulemaking process Rep. Lamar Smith, Chairman of the House Judiciary Committee's Subcommittee on Immigration and Claims, commented on Congress's intent in adopting the term "arriving alien":

> **The term "arriving alien" was selected specifically by Congress in order to provide a flexible concept that would include all aliens who are in the process of physical entry past our borders**, regardless of whether they are at a designated port of entry, on a seacoast, or at a land border. . . . "Arrival" in this context should not be

considered ephemeral or instantaneous but, consistent with common usage, as a process. ***An alien apprehended at any stage of this process, whether attempting to enter, at the point of entry, or just having made entry, should be considered an "arriving alien" for the various purposes in which that term is used in the newly revised provisions of the INA***.

Implementation of Title III of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996: Hearing Before the Subcommittee on Immigration and Claims of the H. Comm. on the Judiciary, 105th Cong. 17–18 (1997) (correspondence dated Feb. 3, 1997 to Immigration and Naturalization Service from Chairman Smith) (emphasis added). A noncitizen "attempting to enter" the United States necessarily has not yet entered. Chairman Smith's comments confirm that the choice of statutory text was intentional: Congress meant to reach noncitizens who are in the active process of entering the United States even if they have not yet crossed the border. *See Al Otro Lado*, 394 F. Supp. 3d at 1201 (quoting Chairman Smith and finding that this statement "confirms the propriety of the Court's conclusion that the statute's use of the present tense encompasses aliens in the process of arriving").

> ### d. *Sale* Does Not Support Defendants' Statutory Interpretation.

Defendants describe *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155 (1993), as holding that "exclusion and deportation procedures (where asylum claims were raised) were not available beyond our borders because the relevant INA

provisions did not contemplate any extraterritorial application." Br. at 33. *Sale* does not say that.

A narrow decision, *Sale* was driven by the unique facts of the 1990s Haitian migration crisis. The Supreme Court analyzed whether INA Section 243(h), 8 U.S.C. § 1253(h) (1988) ("Withholding of deportation or return") (since abrogated), and U.S. treaty obligations under Article 33 of the United Nations Protocol on the Status of Refugees, controlled the interdiction of Haitian migrants outside the territorial waters of the United States and their subsequent return to Haiti. The Court held that neither set of obligations "applies to action taken by the Coast Guard ***on the high seas***." *Sale*, 509 U.S. at 159 (emphasis added); *see also id*. at 160, 166–67, 173, 179–80, 187 (all emphasizing migrants' presence on the high seas).

Both the statute and the facts here are very different from *Sale* and compel a different conclusion. Under the government's characterization of the facts, class members were at least at the "international boundary." Br. at 2. *Sale*'s review of the interdiction and summary repatriation of Haitian migrants on the high seas has no bearing on whether or how Sections 1158(a)(1), 1225(b)(1), and 1225(a)(3) apply to the current policy of metering asylum seekers at the U.S.-Mexico border. *Cf. United States v. Delgado-Garcia*, 374 F.3d 1337, 1348 (D.C. Cir. 2004) (finding that immigration-related statute applies extraterritorially and distinguishing *Sale* because the statute at issue in *Sale* referenced a domestic official, the Attorney

-16-

General, and deportation proceedings the Attorney General was not authorized to conduct outside the country). Other courts have also noted the importance of *Sale*'s unique facts to its analysis and holding. *See, e.g.*, *Blazevska v. Raytheon Aircraft Co.*, 522 F.3d 948, 954 (9th Cir. 2008) (describing *Sale* as involving the "deportation of aliens from international waters"); *In re French*, 320 B.R. 78, 82 n.8 (D. Md. 2004) (noting that Sale concerned "refugees apprehended in international waters"), *aff'd*, 440 F.3d 145 (4th Cir. 2006). *Sale* is properly understood as limited to its unique facts, and its holding applies only to refugees on the high seas.[4]

The Court's discussion of Article 33's prohibition on non-refoulement further supports *Sale*'s contrasting application here. The United States acceded to the United Nations Protocol Relating to the Status of Refugees in 1968, which obligated the United States to comply with certain articles of the United Nations Convention

---

[4] Statements that go beyond the Court's holding and related reasoning are properly understood as *dicta*. In particular, Justice Stevens's statement that "[b]ecause the text of Article 33 cannot reasonably be read to say anything at all about a nation's actions toward aliens outside its own territory, it does not prohibit such actions" was not the holding of the case. *Compare Sale*, 509 U.S. at 183, *with id.* at 159 ("We hold . . . ."). This statement is, at most, *dicta* that goes beyond the facts of the case, and the analysis necessary to the Court's specific holding. *See, e.g.*, *Ark. Game & Fish Comm'n v. United States*, 568 U.S. 23, 35 (2012) ("We resist reading a single sentence unnecessary to the decision as having done so much work. In this regard, we recall Chief Justice Marshall's sage observation that 'general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision.'" (citing *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 399 (1821)).

Relating to Status of Refugees. *Sale*, 509 U.S. at 169 n.19. "Congress amended our immigration law to reflect the Protocol's directives" in 1980. *Id*. at 188–89 (Blackmun, J., dissenting). The Convention provides:

> No Contracting State shall expel or return ("refouler") a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion.

*Id*. at 179 (quoting Convention Relating to the Status of Refugees, art. 33.1, July 28, 1951, 19 U.S.T. 6259, 6276, T.I.A.S. No. 6577). In evaluating this prohibition, the *Sale* Court noted that the English word "return" and the French term "refouler" are not exact synonyms, and that English-French dictionaries did not translate "refouler" as "return," or vice versa. *Id*. at 180–81.

> [Dictionary definitions] do, however, include words like "repulse," "repel," "drive back," and even "expel." To the extent that they are relevant, ***these translations imply that "return" means a defensive act of resistance or exclusion at a border*** rather than an act of transporting someone to a particular destination. ***In the context of the Convention, to "return" means to "repulse"*** rather than to "reinstate."

*Id*. at 181–82 (emphasis added); *see also* THE COMPACT OXFORD ENGLISH DICTIONARY 1564 (2d ed. 1989) ("repulse . . . trans. 1. To drive or beat back (an assailant); to repel by force of arms. . . . 2. To repel with denial; to reject, refuse, rebuff. . . . 3. To shut out, exclude from something." (emphasis in original)).

InAO *Sale*, individuals intercepted outside the territorial waters of the United States were not being "repulse[d]" from, or "exclu[ded] at a border." The Court viewed the issue in that case as whether the United States was obligated to transport migrants at large on the high seas to a country that they had neither come from nor approached. The Supreme Court held that it was not. *Sale*, 509 U.S. at 159. *Sale*'s holding that Article 33 does not apply to the high seas has no bearing on the facts of this case.

However, *Sale*'s statement that Article 33 *does* prohibit the "repuls[ion]" or "exclu[sion]" of refugees "at the border" is relevant here. *Id*. at 181–82.[5] It is undisputed that plaintiffs and other class members were at least at or near the U.S.-Mexico border. Turning class members back at the border and denying them access

---

[5] It is also consistent with other authoritative readings of Article 33. *See*, *e.g*., U.N. High Comm'r for Refugees, Advisory Op. on the Extraterritorial Appl. of Non-Refoulement Obligations under the 1951 Convention relating to the Status of Refugees and its 1967 Protocol 12 (Jan. 26, 2007), https://www.unhcr.org/4d9486929.pdf ("[T]he purpose, intent and meaning of Article 33(1) of the 1951 Convention are unambiguous and establish an obligation not to return a refugee or asylum-seeker to a country where he or she would be risk of persecution or other serious harm, *which applies wherever a State exercises jurisdiction, including at the frontier, on the high seas or on the territory of another State*." (emphasis added)); *Jamaa v. Italy* (No. 27765/09), 2012-II Eur. Ct. H.R. 97, 173, 175 (2012) (De Albuquerque, J., concurring), https://www.echr.coe.int/Documents/Reports_Recueil_2012-II.pdf ("The prohibition of refoulement is not limited to the territory of a State, but also applies to extraterritorial State action[.]"); *The Haitian Ctr. for Hum. Rights v. United States*, Case 10.675, Inter-Am. Comm'n H.R., Report No. 51/96, OEA/Ser. L/V/II.95, Doc. 7 rev. ¶ 157 (1997), http://hrlibrary.umn.edu/cases/1996/unitedstat es51-96.htm ("Article 33 had no geographical limitations.").

to the asylum process is a core example of the type of activity that Article 33 prohibits. *Id.*

**2.   Defendants May Not Deny Class Members Access to the Asylum Process Without Due Process.**

In addition to violating the INA, Defendants' summary refusal to permit class members access to the asylum process violated the Due Process Clause.   In *Boumediene v. Bush*, 553 U.S. 723, 759 (2008), the Supreme Court reviewed more than one hundred years of precedent regarding the Constitution's geographic scope, including the *Johnson v. Eisentrager*, 339 U.S. 763 (1950), and *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990), cases the government relies upon.   The Court found "a common thread uniting all [the] cases: the idea that extraterritoriality questions turn on objective factors and practical concerns, not formalism." *Boumediene*, 553 U.S. at 764; *see also Ibrahim v. Dep't of Homeland Sec.*, 669 F.3d 983, 997 (9th Cir. 2012) ("The Supreme Court has held in a series of cases that the border of the United States is not a clear line that separates aliens who may bring constitutional challenges from those who may not.").

Following *Boumediene*, this Court examined three factors to determine the Constitution's extraterritorial application: (1) the citizenship and status of the claimant; (2) the nature of the location where the constitutional violation occurred; and (3) the practical obstacles inherent in enforcing the claimed right.   *Rodriguez v.*

*Swartz*, 899 F.3d 719, 729 (9th Cir. 2018), *rev'd on other grounds* (Fourth Amendment analysis); *see also Ibrahim*, 669 F.3d at 994–97 (Fifth Amendment).[6]

Regarding the first factor, each class member is a noncitizen. Foreign citizenship cuts in class members' favor because asylum is conferred exclusively on noncitizens. So too does status. Each class member: (1) is an "asylum-seeker," i.e., is someone who alleges that he or she fled persecution in their home country; (2) is a "non-Mexican," meaning they traveled at least hundreds of miles before approaching the southern border of the United States with the intent of seeking asylum; and (3) "continue[s] to seek access to the U.S. asylum process." In other words, class members are within the group contemplated by the statutory scheme.

As to the second factor, each class member is, by definition, someone who was "unable to make a direct asylum claim at a U.S. POE . . . because of the U.S. Government's metering policy." *Al Otro Lado, Inc. v. McAleenan*, 2019 WL 6134601, at *20 (S.D. Cal. 2019). CBP officials apply the metering policy to persons who appear at the southern border; these asylum seekers are not interacting with CBP officials far from U.S. territory in international waters. *Cf. Sale*, 509 U.S. 155.

---

[6] As the district court explained, *Hernandez v. Mesa*, 140 S. Ct. 735 (2020), did not "invalidate the propositions in *Rodriguez* on which this Court relied," nor did it "hold that due process itself cannot extend extraterritorially in any circumstance or that exterritorial application would require a 'previous voluntary significant connection.'" *Al Otro Lado, Inc. v. Mayorkas*, 2021 WL 3931890, at *19 (S.D. Cal. Sept. 2, 2021).

To be an "asylum-seeker[]" who was prevented from making "a direct asylum claim . . . because of the U.S. Government's metering policy," class members necessarily must have been close enough to the border so that it was only U.S. government influence or control that prevented their further advance.  *See Boumediene*, 553 U.S. at 749 (applying constitutional habeas privilege in non-U.S. territory subject to U.S. control); *Rodriguez*, 899 F.3d at 731 ("American law controls what people do here.") (citing RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES §§ 402–03, at 237–54 (AM. LAW INST. 1987)).

Any suggestion that the border constitutes a bright line between the United States' *de jure* and *de facto* control over U.S. territory and genuinely foreign territory ignores the realities of the U.S.-Mexico border.  CBP officials regularly operate in Northern Mexico, and the United States exercises significant control over the entire border region, Mexico's de jure sovereignty notwithstanding.  *See, e.g.*, *Securing Our Borders—Operational Control and the Path Forward: Hearing Before the Subcomm. on Border & Mar. Sec. of the H. Comm. on Homeland Sec.*, 112th Cong. 8 (2011) (prepared statement of Michael J. Fisher, Chief of U.S. Border Patrol) (U.S. border security policy "extends [the nation's] zone of security outward, ensuring that our physical border is not the first or last line of defense, but one of many"); Eva Bitran, Note, *Boumediene at the Border? The Constitution and Foreign Nationals on the U.S.-Mexico Border*, 49 HARV. C.R.-C.L. L. REV. 229, 244–47 (2014)

(collecting historical examples showing that the United States "exerts and has exerted powerful influence over northern Mexico"). If U.S. power projects beyond the map line, then so too does the Constitution's demand that the government not deprive a statutorily recognized class of asylum seekers of due process.

Under the applicable treaties, the United States and Mexico have agreed jointly to maintain the Rio Grande and related limitrophe areas. *See* Treaty to Resolve Pending Boundary Differences and Maintain the Rio Grande and Colorado River as the International Boundary, art. IV, Nov. 23, 1970, 23 U.S.T. 390, T.I.A.S. No. 7313 (Rio Grande and Colorado River Treaty); *see also* Treaty on the Utilization of Waters of Colorado and Tijuana Rivers and of the Rio Grande, Feb. 3, 1944, art. 2, 59 Stat. 1219, T.S. No. 904 (a U.S.-Mexico joint International Boundary and Water Commission exercises its "jurisdiction" over limitrophe parts of the Rio Grande). As Justice Breyer recently observed:

> [I]international law recognizes special duties and obligations that nations may have in respect to limitrophe areas. Traditionally, boundaries consisted of rivers, mountain ranges, and other areas that themselves had depth as well as length. It was not until the late 19th century that effective national boundaries came to consist of an engineer's imaginary line, perhaps thousands of miles long, but having no width. Modern precision may help avoid conflicts among nations, but it has also produced boundary areas—of the sort we have described—which are subject to a special legal, political and economic regime of internal and international law.

*Hernandez v. Mesa*, 137 S. Ct. 2003, 2010 (2017) (Breyer, J., dissenting) (citations omitted); *see also* Anil Kalhan, *Immigration Surveillance*, 74 MD. L. REV. 1, 58–72 (2014). The constant presence of U.S. officials on both sides of the cartographer's line and the United States' significant control over the area of northern Mexico adjacent to the border weigh strongly in favor of a finding that asylum seekers may not be denied access to the asylum process when interdicted only by the extension of U.S. border control power within that limitrophe area.

As to the third factor, there are no practical obstacles inherent in requiring the government to evaluate the substance of class members' asylum claims. CBP officers metered class members who the government asserts were at the "international boundary." Br. at 2. It is no burden to require American officials in the United States to provide due process by inspecting and referring asylum seekers for appropriate evaluation, and to stop selectively turning back asylum seekers at the border.

*Amici* do not suggest that statutory asylum rights and the right to due process during the asylum process extend to anyone, anywhere who intends to seek asylum. But those rights do extend to those who are on the threshold of entering the United States and who are prevented from advancing further only by the extension of the government's power. *Cf. Rodriguez*, 899 F.3d at 731 ("The practical concerns . . . about regulating conduct on Mexican soil also do not apply here. There are many

-24-

reasons not to extend the Fourth Amendment willy-nilly to actions abroad. . . . But those reasons do not apply to [the CBP agent in *Rodriguez*]. He acted on American soil subject to American law."). Under the particular circumstances pled in the Complaint and inherent in the district court's definition of the class, the class members had a right to seek asylum under the INA, and a right to due process in the evaluation of those claims, even if they technically were standing in Mexico when they were metered. To hold otherwise would give Defendants *carte blanche* to ignore their duties under the INA.

The Supreme Court previously rejected similar claims that the Executive's conduct is without constraint:

> Even when the United States acts outside its borders, its powers are not "absolute and unlimited" but are subject "to such restrictions as are expressed in the Constitution." *Murphy v. Ramsey*, 114 U.S. 15, 44, 5 S. Ct. 747, 29 L. Ed. 47 (1885). Abstaining from questions involving formal sovereignty and territorial governance is one thing. To hold the political branches have the power to switch the Constitution on or off at will is quite another. The former position reflects this Court's recognition that certain matters requiring political judgments are best left to the political branches. The latter would permit a striking anomaly in our tripartite system of government, leading to a regime in which Congress and the President, not this Court, say "what the law is." *Marbury v. Madison*, 1 Cranch 137, 177, 2 L. Ed. 60 (1803).

*Boumediene*, 553 U.S. at 765.

## V.    CONCLUSION

For these reasons, *Amici Curiae* respectfully request that the Court affirm the district court.

_____

Dated: February 28, 2023

Respectfully submitted,
*s/ Raechel Keay Kummer*
_____

Matthew C. McDonough
Andrew Savage
MORGAN, LEWIS & BOCKIUS LLP
One Federal Street
Boston, Massachusetts 02110
Telephone: +1.617.951.8000
Facsimile: +1.617.951.8376
matthew.mcdonough@morganlewis.com
andrew.savage@morganlewis.com

Raechel Keay Kummer
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: +1.202.739.3000
Facsimile: +1.202.739.3001
raechel.kummer@morganlewis.com

Counsel for *Amici Curiae*

## FED. R. APP. P. 29 AND 32 CERTIFICATIONS

I certify that this brief complies with the requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared in a 14-point proportionally spaced serif font.

I further certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) because it contains 6,426 words excluding the parts of the brief exempted under Rule 32(f).

In compliance with Federal Rules of Appellate Procedure 29(a)(4)(E), I further certify that no party's counsel authored this brief in whole or in part, no party or party's counsel contributed money that was intended to fund preparing or submitting this brief, and no person other than amicus curiae or their counsel contributed money that was intended to fund preparing or submitting this brief.

s/ *Raechel Keay Kummer*
Raechel Keay Kummer

## CERTIFICATE OF SERVICE

I hereby certify that, on February 28, 2023, I caused the foregoing document to be electronically filed with the Clerk of the Court of the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. I certify that all participants in this case are registered CM/ECF users, and that service will be accomplished by the appellate CM/ECF system.

*s/ Raechel Keay Kummer*
Raechel Keay Kummer
