**Nos. 22-55988, 22-56036**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

AL OTRO LADO, INC, *et al.*,
*Plaintiffs-Appellees/Cross-Appellants*,

v.

ALEJANDRO MAYORKAS, Secretary of Homeland Security, *et al.*
*Defendants-Appellants/Cross-Appellees,*

and

the EXECUTIVE OFFICE FOR IMMIGRATION REVIEW,
*Appellant/Cross-Appellee.*

---

On Appeal from the United States District Court for the Southern
District of California (Civil Action No. 3:17-cv-02366-BAS-KSC)

---

### *AMICI CURIAE* BRIEF OF THE HAITIAN BRIDGE ALLIANCE, IRA KURZBAN, AND IRWIN STOTZKY IN SUPPORT OF PLAINTIFFS-APPELLEES/CROSS-APPELLANTS

---

Anne Aufhauser
Sarah F. Warren
Alison Goldman
Fried, Frank, Harris, Shriver
& Jacobson LLP
One New York Plaza
New York, NY 10004
Tel: (212) 859-8000 | Fax: (212) 859-4000
anne.aufhauser@friedfrank.com

*Counsel for Amici Curiae*

i

## <u>CORPORATE DISCLOSURE STATEMENT</u>

## <u>PURSUANT TO RULES 26.1 AND 29</u>

Pursuant to Rules 26.1 and 29(a)(4)(A) of the Federal Rules of Appellate Procedure, *amici curiae* Haitian Bridge Alliance, by its undersigned counsel, states that the Haitian Bridge Alliance is a non-profit, tax-exempt organization that has issued no stock, has no parent corporation, and that no publicly held company has 10% or greater ownership in it.

Pursuant to Rule 29(a)(4)(E), Counsel for *amici curiae* Haitian Bridge Alliance states that no counsel for any party authored this brief in whole or in part and no entity or person, aside from *amici curiae*, their members, or their counsel, made any monetary contribution intended to fund the preparation or submission of this brief. Counsel for *amici curiae* states that all parties consented to the filing of this brief.

Dated: February 28, 2023      /s/ Anne Aufhauser

Anne Aufhauser

Fried, Frank, Harris, Shriver
& Jacobson LLP
One New York Plaza
New York, NY 10004
(212) 859-8064
anne.aufhauser@friedfrank.com

*Counsel for Amici Curiae*

ii

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...............................................................v

STATEMENT OF INTEREST ...........................................................1

SUMMARY OF ARGUMENT ..........................................................2

ARGUMENT ....................................................................................4

I.    U.S. IMMIGRATION POLICY HAS LONG DISCRIMINATED
AGAINST HAITIAN MIGRANTS ..................................................4

    A.    American Influence Led to the Destruction of Haiti's
        Economy and the Rise of Authoritarianism, Forcing
        Haitians to Flee.................................................................5

    B.    The Arrival of the Haitian "Boat People" and
        Accelerated Processing to Remove Them...........................7

    C.    A Rise in the Use of Detention of Haitian Migrants as a
        Deterrent ...........................................................................8

        1.    Disparate Treatment of Haitian as Compared to
            Cuban Migrants.......................................................9

        2.    Detention Gives Rise to Interdiction of Haitian
            Refugees .................................................................11

II.    PRESENT DAY TREATMENT OF HAITIAN AND BLACK
MIGRANTS.....................................................................................13

    A.    The U.S. Government Recognized the Discriminatory
        Treatment of Haitians in the 1990s, But This Recognition
        was Short-Lived ...............................................................13

    B.    Recent Government Actions Perpetuate Discrimination
        Against Haitian Migrants ..................................................15

III.    METERING DISPROPORTIONATELY AFFECTS HAITIANS...............23

    A.    Metering Is Illegal .............................................................23

    B.    Metering is Colored by Deep-Seated Racial and Ethnic
        Animus and is Used to Deny Haitians Access to the
        Asylum Process ................................................................25

1.      Life at the Border under the Metering Policy ...........................25

2.      Haitians are Illegally Denied Asylum under the
        Metering Policy.........................................................................28

CONCLUSION .........................................................................................31

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*East Bay Sanctuary Covenant v. Trump,*
    950 F.3d 1242 (9th Cir. 2020) ........................................................... 30

*Haitian Ctrs. Council, Inc. v. Sale,*
    823 F. Supp. 1028 (E.D.N.Y. 1993) .................................................. 13

*Haitian Refugee Ctr. v. Civiletti,*
    503 F. Supp. 442 (S.D. Fla. 1980) .............................................. 6, 7, 8

*Haitian Refugee Ctr. v. Smith,*
    676 F.2d 1023 (5th Cir. 1982) ............................................................ 7

*Jean v. Nelson,*
    472 U.S. 846 (1985) .......................................................................... 11

*Louis v. Nelson,*
    544 F. Supp. 973 (S.D. Fla. 1982) ......................................... 9, 10, 11

*Munyua v. United States,*
    2005 U.S. Dist. LEXIS 11499 (N.D. Cal. Jan. 10, 2005).................. 24

*Saget v. Trump,*
    375 F. Supp. 3d 280 (E.D.N.Y. 2019) .............................................. 16

*Sale v. Haitian Ctrs. Council, Inc.,*
    509 U.S. 155 (1993)........................................................................... 13

**Statutes**

5 U.S.C. § 706 .......................................................................................... 24

5 U.S.C. § 706(1) ............................................................................ 3, 24, 31

5 U.S.C. § 706(2) .................................................................................. 3, 31

8 U.S.C. § 1225 .......................................................................................... 2

8 U.S.C. § 1225(a)(1).............................................................................. 23

8 U.S.C. § 1225(a)(3) ..................................................................................23

8 U.S.C. §§ 1225(b)(1)(A)(i)-(ii) ..............................................................23

8 U.S.C. § 1225(b)(2) .................................................................................23

8 U.S.C. § 1229 .............................................................................................2

8 U.S.C. § 1229(a) ......................................................................................23

8 U.S.C. § 1255 .............................................................................................9

28 U.S.C. § 1350 .........................................................................................25

Cuban Adjustment Act, Pub. L. 89-732, 80 Stat. 1161 .............................9

Naturalization Act of 1790, § 1, 1 Stat. 103 .............................................4

Naturalization Act of 1870, Pub. L. 41-254, § 7, 16 Stat. 254, 256 .........5

Nicaraguan Adjustment and Central American Relief Act, Pub. L. No.
   105-100, 111 Stat. 2160 (1997) (as amended, Pub. L. No. 105-139,
   111 Stat. 2644 (1997)...................................................................13, 14

## Regulations

79 Fed. Reg. 75,581 75,582 (Dec. 18. 2014) ...........................................15

88 Fed. Reg. 1243 (Jan. 9, 2023) ..............................................................23

## Other Authorities

A.G. Mariam, *International Law and the Preemptive Use of State
   Interdiction Authority on the High Seas: The Case of Suspected
   Illegal Haitian Immigrants Seeking Entry Into the U.S.*, 12 Md. J.
   Int'l L. & Trade 211, 213, 225 (1988) .........................................11, 12

*African Refugees See Racial Bias as US Welcomes Ukrainians*, Voice
   of America (Apr. 2, 2022), https://www.voanews.com/a/african-
   refugees-see-racial-bias-as-us-welcomes-ukrainians/6512390.html..................18

Alex Stepick, *Haitian Boat People: A Study in the Conflicting Forces
   Shaping U.S. Immigration Policy*, 45 U.S. Immigr. Pol'y 163, 163
   (1982) ...............................................................................................7

vi

Ariane Francisco & Josefina Salomon, *Mexican Officials Extort Asylum Seekers on Way to USA*, InSight Crime (Mar. 25, 2019), https://www.insightcrime.org/news/analysis/mexican-officials-extort-asylum-seekers/ ........................................................................28

*Biden Administration Use and Expansion of Trump Policy to Ban People Seeking Asylum Endangers Lives, Tramples Human Rights*, Human Rights First (Jan. 5, 2023), https://humanrightsfirst.org/library/biden-administration-use-and-expansion-of-trump-policy-to-ban-people-seeking-asylum-endangers-lives-tramples-human-rights/ ...........................................23

Carl Lindskoog, *How the Haitian refugee crisis led to the detention of immigrants*, Washington Post (Apr. 9, 2018), https://www.washingtonpost.com/news/made-by-history/wp/2018/04/09/how-the-haitian-refugee-crisis-led-to-the-indefinite-detention-of-immigrants/ ...................................................11

Carlos Ortiz Miranda, *Haiti and the U.S. in the 1980s and 1990s: Refugees, Immigration, and Foreign Policy*, 32 San Diego L. Rev. 673, 697 (1995).....................................................................13

Dan Sperling, *In 1825, Haiti Paid France $21 Billion To Preserve Its Independence—Time for France To Pay It Back*, Forbes (Dec. 6, 2017), https://www.forbes.com/sites/realspin/2017/12/06/in-1825-haiti-gained-independence-from-france-for-21-billion-its-time-for-france-to-pay-it-back/#2a3d48e7312b.......................................5

Deborah E. Anker, *Determining Asylum Claims in the United States: A Case Study on the Implementation of Legal Norms in an Unstructured Adjudicatory Environment*, 19 N.Y.U. Rev. L. & Soc. Change 433, 455 (1992) ..............................................8

Eileen Sullivan, *U.S. Accelerated Expulsions of Haitian Migrants in May*, The New York Times (June 9, 2022), https://www.nytimes.com/2022/06/09/us/politics/haiti-migrants-biden.html ....................................................................22

Elizabeth M. Iglesias, *Identity, Democracy, Communicate Power, Inter/National Labor Rights and the Evolution of LatCrit Theory and Community*, 53 U. Miami L. Rev. 575, 601 (1999)......................................14

Embassy of Haiti in Washington D.C., *Haiti at a Glance*, http://www.haiti.org/haiti-at-a-glance. (last visited Feb. 23, 2023) ..................30

Erin B. Logan, *Kamala Harris Says Footage of Border Patrol Evokes Images of Slavery*, Los Angeles Times (Sept. 24, 2021), https://www.latimes.com/politics/story/2021-09-24/kamala-harris-says-footage-of-border-patrol-on-horseback-evokes-images-of-american-slavery ................................................................................................21

Executive Office of the President, Statement of Administration Policy Regarding H.R. 382 and H.J. Res. 7 (Jan. 30, 2023), https://www.whitehouse.gov/wp-content/uploads/2023/01/SAP-H.R.-382-H.J.-Res.-7.pdf...................................................................20

*Fact Sheet: A Guide to Title 42 Expulsions at the Border*, American Immigration Council (modified May 25, 2022), https://www.americanimmigrationcouncil.org/research/guide-title-42-expulsions-border ................................................................................20

*Fact Sheet: Migrants' Repatriation and Reception Assistance in Haiti - Dec 2022*, U.N. International Organization for Migration (Jan. 25, 2023), https://haiti.iom.int/sites/g/files/tmzbdl1091/files/documents/Migrant%20Returns%20and%20Reception%20Assistance%20in%20Haiti%20-%20December%202022_rev%20yakin.pdf............................................22

Geneva Sands, *Trump admin ends family-based reunification programs for Haitians and Filipino World War II vets* (Aug. 2, 2019), https://www.cnn.com/2019/08/02/politics/trump-end-two-family-reunification-programs/index.html ...........................................15

*Haiti Events of 2021*, Human Rights Watch, https://www.hrw.org/world-report/2022/country-chapters/haiti .......................26

*Haiti in Turmoil* (Feb. 11, 2023), https://www.npr.org/2023/02/10/1156074464/haiti-in-turmoil .........................25

Harold Koh et al., *The Haiti Paradigm in United States Human Rights Policy,* 103 Yale L.J. 2391, 2392-93 (1994) .................................................11, 12

Hillel R. Smith, *The Department of Homeland Security's Reported "Metering" Policy: Legal Issues*, 2-3, Cong. Rsch. Serv. Legal Sidebar No. LS10295 (updated Mar. 8, 2022), https://fas.org/sgp/crs/homesec/LSB10295.pdf...................................................24

Ibram X. Kendi, *The Day Shithole Entered the Presidential Lexicon*
(Jan. 13, 2019),
https://www.theatlantic.com/politics/archive/2019/01/shithole-
countries/580054/ ................................................................................... 17

*Immigration and Blackness: What's Race Got to Do With It*; *Black
Immigrants Lives Are Under Attack*, Refugee and Immigrant
Center for Education and Legal Services (2020),
https://www.raicestexas.org/2020/07/22/black-immigrant-lives-
are-under-attack/ ..................................................................................... 29

Innovation Law Lab & Southern Poverty Law Center, *The Attorney
General's Judges: How the U.S. Immigration Courts became a
Deportation Tool*, 7 (June 2019),
https://innovationlawlab.org/report/the-attorney-generals-judges/ ...................... 8

James Dobbins, Natalie Kitroeff, Anatoly Kurmanaev, Edgar
Sandoval and Miriam Jordan, *How Hope, Fear, and
Misinformation Led Thousands of Haitians to the U.S. Border*,
N.Y. Times (October 5, 2021),
https://www.nytimes.com/2021/09/17/us/haitians-border-
patrol.html ............................................................................................ 26

Jasmine Aguilera & Harold Isaac, *A Haitian Man's Brutal Experience
With U.S. Border Agents Sparked Outrage. Now He's Telling His
Story,* TIME (March 16, 2022), https://time.com/6144970/mirard-
joseph-haitian-migrants-del-rio-border/ ........................................................ 20

Joe Penney, *Despite closed borders, the US is still deporting Africans
during the pandemic* (July 27, 2020),
https://qz.com/africa/1885398/us-ice-deporting-africans-even-
with-closed-borders-due-to-covid/ .............................................................. 17

Jordan E. Dollar & Allison D. Kent, *In Times of Famine, Sweet
Potatoes Have No Skin: A Historical Overview and Discussion of
Post-Earthquake U.S. Immigration Policy Towards the Haitian
People*, 6 Intercultural Hum. Rts. L. Rev. 87, 102-03 (2011) ........................... 15

Julia Neusner, *A Year After Del Rio, Haitian Asylum Seekers Expelled
Under Title 42 Are Still Suffering*, Human Rights First (Sept. 22,
2022), https://humanrightsfirst.org/library/a-year-after-del-rio-
haitian-asylum-seekers-expelled-under-title-42-are-still-suffering/ ................... 26

Julian Borger, *U.S. Ice officers 'used torture to make Africans sign own deportation orders'* (Oct. 22, 2020), https://www.theguardian.com/us-news/2020/oct/22/us-ice-officers-allegedly-used-torture-to-make-africans-sign-own-deportation-orders ................................................................................................17

Karla McKanders, *Immigration and Blackness: What's Race Got to Do With It?*, 44 Human Rights Magazine No. 1 (May 16, 2019), https://www.americanbar.org/groups/crsj/publications/human_rights_magazine_home/black-to-the-future/immigration-and-blackness/ .................17

Kate Morrissey, *Asylum seekers in Tijuana are scrambling through app error messages for few appointments into the U.S.*, San Diego Union-Tribune (Jan. 22, 2023), https://www.sandiegouniontribune.com/news/immigration/story/2023-01-22/cbp-one-app-asylum-tijuana ...............................................30

Kate Morrissey, *For Haitian Migrants, Waiting in Tijuana Brings Fear, Discrimination, Even Death*, San Diego Union-Tribune (June 12, 2022), https://www.sandiegouniontribune.com/news/immigration/story/2022-06-12/haitian-migrants-tijuana ...................................................27

Letter from Reps. Mondaire Jones and Ayanna Pressley Regarding Deportations of Haitians (March 15, 2022), https://pressley.house.gov/sites/pressley.house.gov/files/2022-03-15%20Pressley%20Jones%20Haiti%20Deportations%20Letter.pdf.................18

Letter to Biden, 2 (Oct. 13, 2020), http://www.ijdh.org/wp-content/uploads/2020/10/Biden-Harris-Letter-10-2020-k-grouped-FINAL-full-letter-2.pdf.....................................................................16

Mae M. Ngai, *The Architecture of Race in American Immigration Law: A Reexamination of the Immigration Act of 1924*, 86 J. Am. Hist. 67, 70 (1999) ................................................................................6

Malissia Lennox, *Refugees, Racism, and Reparations: A Critique of the U.S.' Haitian Immigration Policy*, 45 Stan. L. Rev. 687, 692 (1993) ..........................................................................................6, 9

Natalie Kitroeff, *As Haiti Unravels, U.S. Officials Push to Send in an Armed Foreign Force*, N.Y. Times (Nov. 29, 2022), https://www.nytimes.com/2022/11/29/world/americas/haiti-gangs-foreign-intervention.html?action=click&module=RelatedLinks&pgtype=Article .................................................................................................25

National Immigrant Justice Center, *A Better Way: Community-Based Programming As An Alternative to Immigrant Incarceration* (Apr. 2019), https://immigrantjustice.org/research-items/report-better-way-community-based-programming-alternative-immigrant-incarceration.........................................................................................9

Off. of Inspector Gen., U.S. Dep't of Homeland Security, OIG-18-84 *Special Review-Initial Observations Regarding Family Separation Issues Under the Zero Tolerance Policy*, 4-7 (Sept. 27, 2018), https://www.oig.dhs.gov/sites/default/files/assets/2018-10/OIG-18-84-Sep18.pdf; DHS OIG-21-02 Report, at 25-26.................................................29

Off. Of Inspector Gen., U.S. Dep't of Homeland Security, OIG-21-02, *CBP Has Taken Steps to Limit Processing of Undocumented Aliens at Ports of Entry* (Oct. 27, 2020), https://www.oig.dhs.gov/sites/default/files/assets/2020-10/OIG-21-02-Oct20.pdf ..................................................................................24, 29

Press Release, Office of the High Commissioner for Human Rights, United Nations, *Haiti: International Community Must Act Now to Avert Tragedy* (November 3, 2022), https://www.ohchr.org/en/press-releases/2022/11/haiti-international-community-must-act-now-avert-tragedy-turk..............................26

Press Release, U.S. Dep't of Homeland Security, *DHS Outlines Strategy to Address Increase In Migrants in Del Rio* (Sept. 18, 2021), https://www.dhs.gov/news/2021/09/18/dhs-outlines-strategy-address-increase-migrants-del-rio .......................................20

Press Release, U.S. Dep't of Homeland Security, *Secretary Mayorkas Designates Haiti for Temporary Protected Status for 18 Months* (May 22, 2021), https://www.dhs.gov/news/2021/05/22/secretary-mayorkas-designates-haiti-temporary-protected-status-18-months ..................18

Press Release, U.S. Dep't of Homeland Security, *Secretary Mayorkas Extends and Redesignates Temporary Protected Status for Haiti for 18 Months* (Dec. 5, 2022), https://www.dhs.gov/news/2022/12/05/secretary-mayorkas-extends-and-redesignates-temporary-protected-status-haiti-18 ........................19

Press Release, U.S. Senate Foreign Relations Committee, *Menendez, Senate Democrats Blast Mistreatment of Haitian Migrants at Border; Urge Administration to Support Long-Term Stability in Haiti* (Oct. 8, 2021), https://www.foreign.senate.gov/press/dem/release/menendez-senate-democrats-blast-mistreatment-of-haitian-migrants-at-border-urge-administration-to-support-long-term-stability-in-haiti..................21

Rachel Ida Buff, *How President Trump is dismantling the world's refugee regime*, Washington Post (Feb. 11, 2019), https://www.washingtonpost.com/outlook/2019/02/11/why-president-trump-has-won-immigration-standoff-even-if-he-doesnt-get-wall-funding/ .................................................................................10

Refugees International, *"It's Very Hard to Have Rights": The Impact of COVID-19 on Refugee and Migrant Communities in Tijuana* (December 2021) at 18, https://www.refugeesinternational.org/reports/2021/12/13/its-very-hard-to-have-rights-the-impact-of-covid-19-on-refugee-and-migrant-communities-in-tijuana ........................................................27

Rick Jervis, *At US-Mexico border, migrants from Africa, Haiti wait to seek asylum*, USA Today (June 4, 2019), https://amp.usatoday.com/amp/1319996001 .......................................29

Robbie Gramer & Zinya Salfiti, *Democrats See Broken Promises in Biden's Haiti Policies*, Foreign Policy (Oct. 8, 2021), https://foreignpolicy.com/2021/10/08/biden-haiti-migration-refugee-democrats-backlash-state-department/.................................19

Robbie Whelan, *Violence Plagues Migrants Under U.S. 'Remain in Mexico' Program*, Wall Street Journal (Dec. 28, 2019), https://www.wsj.com/articles/violence-plagues-migrants-under-u-s-remain-in-mexico-program-11577529000 .......................................28

Shayna S. Cook, *The Exclusion of HIV-Positive Immigrants Under the Nicaraguan Adjustment and Central American Relief Act and the Haitian Refugee Immigration Fairness Act, Statutory Interpretation, Communicable Disease, Public Health, Legislative Intent*, 99 Mich L. Rev. 452, 471-72 (2000)......................................................14

Thomas Reinhardt, *200 Years of Forgetting: Hushing up the Haitian Revolution*, 35 J. Black Stud. 246 (2005) ............................................................5

Tom Jawetz & Scott Shuchart, *Language Access Has Life-or-Death Consequences for Migrants*, Center for American Progress (Feb. 20, 2019), https://www.americanprogress.org/issues/immigration/reports/2019/02/20/466144/language-access-life-death-consequences-migrants/ ....................................................................................................30

U.S. Customs and Border Protection, Office of Professional Responsibility, U.S. Dep't of Homeland Security, Report of Investigation No. 202112280 (April 2022), https://www.cbp.gov/sites/default/files/assets/documents/2022-Jul/202112280-cbp-closing-report-public-redacted-final.pdf. ....................20, 21

U.S. Embassy in Haiti, *DHS Announces Six New Countries Eligible for H-2A and H-2B Visa Programs* (November 10, 2021), https://ht.usembassy.gov/dhs-announces-six-new-countries-eligible-for-the-h-2a-and-h-2b-visa-programs// ................................................16

*U.S. Immigration Policy on Haitian Migrants*, Cong. Rsch. Serv. Report No. RS21349 (2011), https://www.everycrsreport.com/files/20110517_RS21349_c6a8bc391c450f3244b0151c20deab7110d31290.pdf ............................................12, 14

United Nations Integrated Office in Haiti, *Report of the Secretary General*, S/2022/117 (February 15, 2022) https://www.securitycouncilreport.org/atf/cf/%7B65BFCF9B-6D27-4E9C-8CD3-CF6E4FF96FF9%7D/s_2022_117.pdf .............................25

The White House, *Fact Sheet: Biden-Harris Administration Announces New Border Enforcement Actions* (Jan. 5, 2023), https://www.whitehouse.gov/briefing-room/statements-releases/2023/01/05/fact-sheet-biden-harris-administration-announces-new-border-enforcement-actions/ ...................................................22

Wilde Merancourt, Mary Beth Sheridan, and Anthony Faiola, *Death toll in Haiti earthquake jumps past 1,900*, The Washington Post (Aug. 17, 2021), https://www.washingtonpost.com/world/2021/08/17/haiti-earthquake-tropical-storm-grace/.........................................................................19

## <u>STATEMENT OF INTEREST</u>

*Amici curiae* Haitian Bridge Alliance ("HBA"), Ira Kurzban and Irwin Stotzky (together, the "*Amici*") respectfully submit this brief in support of Plaintiffs-Appellees/Cross-Appellants' positions. (Dkt. # 23).[1]

HBA is a non-profit community organization based in San Diego that provides direct services to asylum seekers and other detained immigrants in California and across the United States, from Haiti and Africa. The organization responds to the ongoing Haitian immigration crisis that has affected Southern California and the United States more broadly as Haitians attempt to seek refuge from the tumultuous political and economic conditions in Haiti, and/or acclimate to new lives in America.

Messrs. Kurzban and Stotzky are experts in the field of immigration, particularly as it pertains to Haitian migrants. Mr. Kurzban is a founding partner in the law firm of Kurzban, Kurzban, Tetzeli, & Pratt P.A. in Miami and chair of the firm's immigration department. Mr. Stotzky is Professor of Law at the University of Miami School of Law. For over thirty years, Mr. Kurzban and Professor Stotzky have advocated for Haitian refugees in constitutional and human rights cases, including several before the U.S. Supreme Court.

*Amici* have a direct and deep-seated interest in this litigation, as Haitian migrants have accounted for a significant number of those being unlawfully turned back from multiple ports of entry ("POE") under Defendants' metering policy.

---

[1] "Dkt. #" refers to documents filed in the instant action.

*Amici*'s unique experience and perspective concerning the plight of Haitian migrants is directly relevant to the substantive issues to be decided in this case. *Amici* therefore respectfully ask that this Court consider this brief in connection with the appeal and cross-appeal pending in this Court. Pursuant to Federal Rule of Appellate Procedure 29(a)(2), *Amici* file this brief without an accompanying motion for leave to file because all parties have consented to its filing.

## **SUMMARY OF ARGUMENT**

"Metering" constitutes an unprecedented infringement on the rights of foreign migrants trying to access the asylum process.[2]  In contradiction to the clear processes established by the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1225, 1229, Defendants' metering policy mandated summarily turning back asylum seekers at the border before they were ever given a meaningful opportunity to plead their case. With no safe home country to return to, migrants wait, in squalid and dangerous conditions, for their opportunity to seek asylum. Haitians have been disproportionately impacted by metering due to longstanding racial and ethnic animus. Haitians have historically been denied access to the United States, and continue to be disproportionately denied such access, despite conditions in their home country that clearly entitle them to refuge under the law.

---

[2] "Metering" refers to Defendants' policy of turning back asylum seekers to Mexico at the southern border, thus denying access to the asylum process at POE. *See* Dkt. # 23 at 7 & n.2.

2

Looking back on the history of relations between Haiti and the United States, it is clear that anti-Haitian sentiment has long driven U.S. immigration policy. Discrimination and disparate treatment continue to this day, as Haitians struggle to recover from the 2010 earthquake, Hurricane Matthew in 2016, a presidential assassination in 2021 leading to continuing political instability, *another* earthquake in August 2021, the largest cholera outbreak in modern times, and country-wide societal collapse fueled by gang violence, all of which have led to increased economic and political turmoil. Haitians validly seek asylum in America, only to have been systematically denied access due to Defendants' illegal metering policy.

This policy reflects yet another discriminatory measure designed to make it more difficult for Haitian immigrants to apply for asylum. It should be set aside as unlawful to ensure that domestic and international laws are respected, and that all migrants are treated equally under U.S. immigration policy. For these reasons, *Amici* urge this Court to affirm the district court's determination that, pursuant to Administrative Procedure Act ("APA"), 5 U.S.C. § 706(1), and the Fifth Amendment's due process clause, it is unlawful for Defendants to turn back asylum seekers arriving in the U.S. at Class A POE and uphold its injunction prohibiting Defendants from applying an asylum-limiting rule to a subclass of plaintiffs. This Court should also reverse and remand the district court's determinations with respect to APA, 5 U.S.C. § 706(2), the Alien Tort Statute, and Plaintiffs' claim of ultra vires agency action.

3

## **ARGUMENT**

An examination of the history of U.S. discrimination against Haitians and Haitian migration to the United States underscores that Defendants' metering policy constituted the latest of a long series of illegal and discriminatory policies designed to keep Haitian and other Black migrants out of the United States. The history of U.S. anti-Haitian animus and disparate treatment is long and sordid, and Defendants will continue that tradition unless they are forced by the Court to follow the law as it was enacted. This is a matter of utmost urgency because Haiti is currently experiencing a profound economic and political crisis. Accordingly, this Court should uphold the portions of the district court's decision striking down the metering policy.

## I. U.S. IMMIGRATION POLICY HAS LONG DISCRIMINATED AGAINST HAITIAN MIGRANTS

To understand the full implications of Defendants' metering policy, it is crucial to recognize the plight of Haitian migrants and the legacy of injustices that have been perpetrated against Haitians and other Black migrants.

The United States has a long history of discrimination in the application of its immigration laws. In the first codification of U.S. naturalization law, the Naturalization Act of 1790, Congress specified that "any alien, *being a free white person*" could apply for citizenship. Naturalization Act of 1790, § 1, 1 Stat. 103, (emphasis added). It was not until 1870, after the passage of the Fourteenth Amendment, that the naturalization laws were extended to persons of "African

4

nativity and . . . descent." Naturalization Act of 1870, Pub. L. 41-254, § 7, 16 Stat. 254, 256.

A. **American Influence Led to the Destruction of Haiti's Economy and the Rise of Authoritarianism, Forcing Haitians to Flee**

America's history has long been intertwined with Haiti's. While the United States was enacting discriminatory immigration laws, the enslaved people of Haiti were fighting to overthrow the richest colony in the Americas, the French colony of Saint Domingue. *See generally*, Thomas Reinhardt, *200 Years of Forgetting: Hushing up the Haitian Revolution*, 35 J. Black Stud. 246 (2005). In 1804, Haiti declared its independence and became the first country to abolish slavery, threatening the U.S. racial hierarchy and driving fears in the United States that news of the Haitian Revolution could lead to violent uprisings by enslaved people at home. *Id.* at 247, 249-51. In response, the United States refused to recognize the new Haitian state and helped France impose "reparations" with high interest rates on Haiti — paid to former French slaveholders for their lost slaves — that crippled the young country's economy for decades. *See* Dan Sperling, *In 1825, Haiti Paid France $21 Billion To Preserve Its Independence—Time for France To Pay It Back*, Forbes (Dec. 6, 2017), https://www.forbes.com/sites/realspin/2017/12/06/in-1825-haiti-gained-independence-from-france-for-21-billion-its-time-for-france-to-pay-it-back/#2a3d48e7312b.

Following its independence, Haiti served as America's military stronghold in the Caribbean, and the U.S. military occupied Haiti from 1915 to 1934. *See* Malissia

Lennox, *Refugees, Racism, and Reparations: A Critique of the U.S.' Haitian Immigration Policy*, 45 Stan. L. Rev. 687, 692 (1993) [hereinafter "*Refugees, Racism and Reparation*"]. During that time, Congress passed the Immigration Act of 1924, establishing new immigration laws under which the whiteness of European immigrants was considered to "facilitate[] their Americanization," while non-European immigrants were racialized, rendering them "unalterably foreign and unassimilable to the nation." Mae M. Ngai, *The Architecture of Race in American Immigration Law: A Reexamination of the Immigration Act of 1924*, 86 J. Am. Hist. 67, 70 (1999).

By the time the U.S. exited Haiti, "twenty years of racism and exploitation had created an economically crippled and politically bankrupt nation." *Refugees, Racism, and Reparations* at 695. Worse yet, the United States' intervention left Haiti vulnerable to authoritarianism, and the United States even supported Francois Duvalier's rise to the presidency in 1957. *Id.* at 696. The Duvalier regime has been called "the most oppressive regime in the hemisphere," and was responsible for the deaths of over 30,000 people, leading hundreds of thousands of Haitians to flee for safety. *Haitian Refugee Ctr. v. Civiletti*, 503 F. Supp. 442, 475-77 (S.D. Fla. 1980); *see also, Refugees, Racism, and Reparations*, at 696 n.74. But America turned them away.

6

B.  **The Arrival of the Haitian "Boat People" and Accelerated Processing to Remove Them**

In 1972, Haitian migrants began arriving in Southern Florida *en masse* in rickety and often unseaworthy boats.  *See* Alex Stepick, *Haitian Boat People: A Study in the Conflicting Forces Shaping U.S. Immigration Policy*, 45 U.S. Immigr. Pol'y 163, 163 (1982).  Upon arriving in Miami, migrants were typically met by unsympathetic Immigration and Naturalization Service ("INS") officials.  *Id.* at 164.  The INS regularly contended that the Haitians were economic refugees merely attracted to U.S. employment opportunities, rather than fleeing true political persecution that would obligate the United States to protect Haitians under both domestic and international law.  *Id.* at 164-65.

In furtherance of this exclusionary practice, INS established a "Haitian Program" in 1978.  *See Haitian Refugee Ctr. v. Smith*, 676 F.2d 1023, 1029 (5th Cir. 1982).  Described (in Orwellian fashion) as "accelerated processing," "[t]he goal of the [Haitian] Program was to expel Haitian asylum applicants as rapidly as possible." *Civiletti*, 503 F. Supp. at 512-13, 519.  As the court in *Civiletti* observed, "[t]he existence of the program, and its impact, [were] uncontroverted.  All of the asylum claims were denied."  *Id.* at 510-11.  A judicial determination that the procedures used to process asylum claims were violations of due process came too late for over 4,000 Haitians denied asylum under the Haitian Program.  *Smith*, 676 F.2d at 1039. Upon being returned to Haiti, persons who had fled and sought asylum elsewhere

were seen as opponents of the Duvalier regime and imprisoned, persecuted, and in many cases, killed. *Civiletti*, 503 F. Supp. at 476-82.

### C. A Rise in the Use of Detention of Haitian Migrants as a Deterrent

In the early 1980s, immigration judges were removed from the purview of INS. *See* Innovation Law Lab & Southern Poverty Law Center, *The Attorney General's Judges: How the U.S. Immigration Courts became a Deportation Tool*, 7 (June 2019), https://innovationlawlab.org/report/the-attorney-generals-judges/. The stated intent was "to increase judicial independence and remove the appearance of prosecutorial bias." *Id*. In practice, however, "the newly formed immigration courts faced immediate critique for their biased treatment of asylum seekers from Haiti and Central America." *Id.* at 11.

For example, an eighteen-month study that concluded in 1988 examined one immigration court and reported that "although there existed extensive documentation of human rights abuses and high levels of politically motivated violence in Guatemala, Haiti, and El Salvador, the immigration court . . . granted asylum to no Guatemalans or Haitians and granted asylum to only one Salvadoran application." Deborah E. Anker, *Determining Asylum Claims in the United States: A Case Study on the Implementation of Legal Norms in an Unstructured Adjudicatory Environment*, 19 N.Y.U. Rev. L. & Soc. Change 433, 455 (1992). The study also found that immigration judges viewed asylum claims with "presumptive

skepticism" and "appeared to be reluctant to grant asylum claims over the objections of the government's attorney." *Id.* at 450.

1. **Disparate Treatment of Haitian as Compared to Cuban Migrants**

The evident bias displayed by immigration courts and INS became even more pronounced when Cuban refugees also began arriving to the United States in large numbers. While Haitians were fleeing the U.S.-backed Duvalier regime, boats began to leave Cuba's Mariel Harbor for South Florida, kicking off the Mariel Boatlift of 1980, during which some 125,000 Cuban migrants were brought to the U.S. *See Louis v. Nelson*, 544 F. Supp. 973, 978 (S.D. Fla. 1982). In contrast to Haitians, escaping Cubans were immediately greeted with preferential treatment. *See Refugees, Racism, and Reparations,* at 712-16. For example, under the Cuban Adjustment Act, Pub. L. 89-732, 80 Stat. 1161 (codified as amended at 8 U.S.C. § 1255 (1988)), which remains in effect to this day, any native or citizen of Cuba or their immediate relatives may apply for lawful permanent residence just one year after inspection, admission, or parole in the United States. *Refugees, Racism, and Reparations*, at 716. Haitians, by contrast, were consistently portrayed as economic refugees "lacking any political conviction." *Louis*, 544 F. Supp. at 979.

Prior to the 1980s, the U.S. rarely jailed people for alleged immigration violations. *See* National Immigrant Justice Center, *A Better Way: Community-Based Programming As An Alternative to Immigrant Incarceration* (Apr. 2019), https://immigrantjustice.org/research-items/report-better-way-community-based-

programming-alternative-immigrant-incarceration. But as Haitian migrants continued to arrive in the United States, President Reagan convened a special task force to address illegal immigration in 1981. *Louis*, 544 F. Supp. at 979. The task force issued several recommendations, including that the United States return to a policy of detaining migrants until they established a prima facie claim for admission, rather than granting parole. *Id.* at 979-80. Thus, in 1983, the Mass Immigration Emergency Plan was formed, requiring that 10,000 immigration detention beds be located and ready for use at any given time. *See* Rachel Ida Buff, *How President Trump is dismantling the world's refugee regime*, Washington Post (Feb. 11, 2019), https://www.washingtonpost.com/outlook/2019/02/11/why-president-trump-has-won-immigration-standoff-even-if-he-doesnt-get-wall-funding/.

Haitian petitioners who were incarcerated, rather than paroled, upon arrival in the United States under this plan challenged their parole denials in federal court as discriminatory based on race or national origin. *Louis*, 544 F. Supp. at 984. The district court acknowledged that INS' use of parole was racially inconsistent, stating:

> The evidence shows that both Haitians and non-Haitians are being detained, but that more Haitians are being detained and for longer periods of time than non-Haitians. The evidence also demonstrates that a larger percentage of non-Haitians are granted parole or deferred inspection than the percentage of Haitians. The only conclusion that can be drawn from this evidence is that Haitians are being impacted by the detention policy to a greater degree than aliens of any other nationality at the present time.

*Id.* at 982.  On appeal, the Supreme Court, however, avoided addressing why Haitians were being detained more often and for longer periods than other migrants. *See Jean v. Nelson*, 472 U.S. 846, 854-57 (1985).  Instead, the Court decided, based only on statutory grounds, that neither the parole statute at issue, nor the INS regulations that implemented it, authorized race or national origin based discrimination.  *Id.*

### 2.  Detention Gives Rise to Interdiction of Haitian Refugees

In September 1981, Haiti and the United States entered into an unprecedented agreement whereby the U.S. would interdict vessels in the high seas transporting Haitian migrants and return them to Haiti.[3]  Harold Koh et al., *The Haiti Paradigm in United States Human Rights Policy,* 103 Yale L.J. 2391, 2392-93 (1994) [hereinafter "*The Haiti Paradigm in United States Human Rights Policy*"]. Interdiction was never before used for immigration purposes.  A.G. Mariam, *International Law and the Preemptive Use of State Interdiction Authority on the*

---

[3] Carl Lindskoog, *How the Haitian refugee crisis led to the detention of immigrants*, Washington Post (Apr. 9, 2018), https://www.washingtonpost.com/news/made-by-history/wp/2018/04/09/how-the-haitian-refugee-crisis-led-to-the-indefinite-detention-of-immigrants/ (explaining that, "[w]hile oppressive, the Haitian regime was an anti-communist ally that the U.S. government did not want to alienate.  When state and local officials began to protest the arrival of these overwhelmingly poor and black migrants, the U.S. government classified them as economic migrants rather than as refugees, making them ineligible to receive asylum and remain in the United States.  And to deter future asylum seekers from Haiti, the government placed the Haitians in a hastily-assembled network of detention centers, jails and prisons.") [hereinafter *How the Haitian refugee crisis led to the detention of immigrants*].

*High Seas: The Case of Suspected Illegal Haitian Immigrants Seeking Entry Into the U.S.*, 12 Md. J. Int'l L. & Trade 211, 213, 225 (1988) [hereinafter "*International Law and the Preemptive Use of State Interdiction Authority on the High Seas*"].

When interdiction began, the United States generally viewed Haitians as economic migrants deserting one of the poorest countries in the world, rather than seeking political asylum. Under the 1981 interdiction agreement, an inspector from INS and a Coast Guard official would check the immigration status of the passengers and return to Haiti those passengers deemed to be undocumented. Although President Reagan tasked the Coast Guard with screening interdicted migrants and allowing those with a credible fear of persecution to enter the United States, in practice, an alien must have *volunteered* information regarding her fear of persecution in order to have been considered for asylum. *The Haiti Paradigm in United States Human Rights Policy,* at 2392-93; *see also U.S. Immigration Policy on Haitian Migrants*, 3-4, Cong. Rsch. Serv. Report No. RS21349 (2011), https://www.everycrsreport.com/files/20110517_RS21349_c6a8bc391c450f3244b 0151c20deab7110d31290.pdf [hereinafter "*U.S. Immigration Policy on Haitian Migrants*"]. In fact, there was "no indication that individual 'interviews' were undertaken," and it was unlikely that migrants were given a meaningful chance to state a credible fear. *International Law and the Preemptive Use of State Interdiction Authority on the High Seas*, at 239-40.

Between 1981 and 1991, the United States interdicted approximately 25,000 Haitians. *Haitian Ctrs. Council, Inc. v. Sale*, 823 F. Supp. 1028, 1034 (E.D.N.Y. 1993). Not all vessels were bound for the United States; many likely would have landed on the shores of other countries. *See id.* at 1034-35. Nevertheless, the Coast Guard interdicted these vessels, removed all passengers, and destroyed the vessels. *Id.* at 1035.

Because so many interdicted Haitians could not be safely processed by the Coast Guard, the Department of Defense established temporary facilities at the U.S. Naval Base in Guantanamo, Cuba, to hold Haitian migrants during the screening process. INS began interviewing Haitians at Guantanamo Bay, where the migrants were denied legal representation. *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 163, 166-67 (1993). When Guantanamo Bay filled to capacity, President George H. Bush signed the Kennebunkport Order, directing the Coast Guard to turn around interdicted Haitian vessels without screening migrants for asylum claims. Carlos Ortiz Miranda, *Haiti and the U.S. in the 1980s and 1990s: Refugees, Immigration, and Foreign Policy*, 32 San Diego L. Rev. 673, 697 (1995).

## II. PRESENT DAY TREATMENT OF HAITIAN AND BLACK MIGRANTS

### A. The U.S. Government Recognized the Discriminatory Treatment of Haitians in the 1990s, But This Recognition was Short-Lived

In November 1997, Congress enacted the Nicaraguan Adjustment and Central American Relief Act ("NACARA"), Pub. L. No. 105-100, 111 Stat. 2160 (1997) (as

amended, Pub. L. No. 105-139, 111 Stat. 2644 (1997)), which enabled Nicaraguans and Cubans to become legal permanent residents and permitted certain unsuccessful Central American and East European asylum applicants to seek another form of immigration relief. However, Congress deliberately opted not to include Haitian asylum seekers in that relief, concerned that including Haitians would "kill the bill." Elizabeth M. Iglesias, *Identity, Democracy, Communicate Power, Inter/National Labor Rights and the Evolution of LatCrit Theory and Community*, 53 U. Miami L. Rev. 575, 601 (1999) ("[T]housands of refugees and immigrants from Nicaragua, Cuba, El Salvador, Guatemala, the former Soviet Union, and Warsaw pact countries are enjoying the benefits of NACARA, leaving Haitians to wonder whether their self-restraint and self-sacrifice in this instance [would] be remembered and reciprocated in the next.").

The following year, Congress enacted the Haitian Refugee Immigration Fairness Act of 1998 ("HRIFA"), which enabled Haitians who filed asylum claims or were paroled into the United States before December 31, 1995 to adjust to legal permanent residence. *See U.S. Immigration Policy on Haitian Migrants,* at 5. The bill was modeled on NACARA, and, in a major departure from historical U.S. policy, was motivated by a desire to treat Haitian immigrants fairly and consistently with other immigrant populations. Shayna S. Cook, *The Exclusion of HIV-Positive Immigrants Under the Nicaraguan Adjustment and Central American Relief Act and the Haitian Refugee Immigration Fairness Act, Statutory Interpretation,*

14

*Communicable Disease, Public Health, Legislative Intent*, 99 Mich L. Rev. 452, 471-72 (2000). However, HRIFA nonetheless was more restrictive than NACARA, as it excluded individuals who entered the United States with false or fraudulent documents and Haitians who were not issued parole. *See* Jordan E. Dollar & Allison D. Kent, *In Times of Famine, Sweet Potatoes Have No Skin: A Historical Overview and Discussion of Post-Earthquake U.S. Immigration Policy Towards the Haitian People*, 6 Intercultural Hum. Rts. L. Rev. 87, 102-03 (2011). Unfortunately, Haitian migrants were often forced to use fraudulent or photo-switched documents to protect themselves from government-sponsored violence, and INS did not issue parole to all Haitians before 1996. *Id.* As such, HRIFA failed to protect many vulnerable Haitians validly seeking asylum.

## B. Recent Government Actions Perpetuate Discrimination Against Haitian Migrants

Although the Obama-Biden administration implemented the Haitian Family Reunification Parole Program ("HFRP") in 2014 (seven years after Cubans were offered the same benefit), Implementation of HFRP, 79 Fed. Reg. 75,581 75,582 (Dec. 18. 2014), which allowed U.S. citizens and lawful permanent residents to apply for parole for family members in Haiti, the Trump administration abruptly discontinued that program in 2019. Geneva Sands, *Trump admin ends family-based reunification programs for Haitians and Filipino World War II vets* (Aug. 2, 2019), https://www.cnn.com/2019/08/02/politics/trump-end-two-family-reunification-programs/index.html.

15

The Trump administration continued to erode protections for Haitian migrants and treated Haitians and other Black migrants discriminatorily. In November 2017, the Department of Homeland Security ("DHS") ended Temporary Protected Status ("TPS") for Haitians that were the victims of the 2010 earthquake that reportedly killed more than 200,000 people and left over one million homeless. *See Saget v. Trump*, 375 F. Supp. 3d 280, 323, 360, 379 (E.D.N.Y. 2019) (issuing preliminary injunction and enjoining termination of TPS, citing "political motivations" and "the White House's grander 'America First' strategy" as reasons for the government's ending TPS). The Trump administration also removed Haiti from the list of nations whose citizens may participate in the H-2A and H-2B visa programs, meaning Haitians could no longer enter the United States to do temporary work. *See* Letter to Biden, 2 (Oct. 13, 2020), http://www.ijdh.org/wp-content/uploads/2020/10/Biden-Harris-Letter-10-2020-k-grouped-FINAL-full-letter-2.pdf.[4]

That the Trump administration was motivated by racial animus was clear from its own public statements. For example, the government's disdain towards Haitian and Black immigrants was on full display when President Trump stated: "Why are we having all these people from shithole countries come here?" and "Why do we

---

[4] The Biden administration restored Haitian eligibility for the H-2A and H-2B visa programs in 2022. U.S. Embassy in Haiti, *DHS Announces Six New Countries Eligible for H-2A and H-2B Visa* Programs (November 10, 2021), https://ht.usembassy.gov/dhs-announces-six-new-countries-eligible-for-the-h-2a-and-h-2b-visa-programs//.

need more Haitians? . . . Take them out." Ibram X. Kendi, *The Day Shithole Entered the Presidential Lexicon* (Jan. 13, 2019), https://www.theatlantic.com/politics/archive/2019/01/shithole-countries/580054/. President Trump also expressed a preference for immigrants from European and Asian countries, continuing the construction of a racial hierarchy in U.S. immigration law. *Id.*

Moreover, in the last several years, African migrants were deported at far higher rates than migrants from other countries. Joe Penney, *Despite closed borders, the US is still deporting Africans during the pandemic* (July 27, 2020), https://qz.com/africa/1885398/us-ice-deporting-africans-even-with-closed-borders-due-to-covid/ [hereinafter "*Despite closed borders, the US is still deporting Africans during the pandemic*"]. In fact, although the overall numbers of removals have declined, Immigration and Customs Enforcement ("ICE") removed African nationals at an increased rate in 2017. Karla McKanders, *Immigration and Blackness: What's Race Got to Do With It?*, 44 Human Rights Magazine No. 1 (May 16, 2019), https://www.americanbar.org/groups/crsj/publications/human_rights_magazine_home/black-to-the-future/immigration-and-blackness/. The removal of African nationals appears to be on the rise again. For example, in 2020, Cameroonian and Congolese asylum seekers experienced an increase in deportations, and have reported being tortured and forced to sign their own deportation orders. Julian

Borger, *U.S. Ice officers 'used torture to make Africans sign own deportation orders'* (Oct. 22, 2020), https://www.theguardian.com/us-news/2020/oct/22/us-ice-officers-allegedly-used-torture-to-make-africans-sign-own-deportation-orders. Advocates and lawmakers have decried the racist hypocrisy of the Biden administration's extension of broad humanitarian protections to Ukrainians fleeing Russia's invasion, including the halting of deportations, all the while continuing deportations of Haitian and Cameroonian refugees. *See African Refugees See Racial Bias as US Welcomes Ukrainians*, Voice of America (Apr. 2, 2022), https://www.voanews.com/a/african-refugees-see-racial-bias-as-us-welcomes-ukrainians/6512390.html; Letter from Reps. Mondaire Jones and Ayanna Pressley Regarding Deportations of Haitians (March 15, 2022), https://pressley.house.gov/sites/pressley.house.gov/files/2022-03-15%20Pressley%20Jones%20Haiti%20Deportations%20Letter.pdf.

The indisputable common denominator for this disparate treatment of Haitian and African migrants is the color of their skin. Former President Trump made very clear that his administration's immigration policies were based on race and exclusion, perpetuating racist and xenophobic opposition to Haitian and Black migrants. Despite promoting less overtly racist rhetoric surrounding immigration policy and rolling back some Trump administration policies,[5] the Biden

---

[5] The "serious security concerns, social unrest, an increase in human rights abuses, crippling poverty, and lack of basic resources, which are exacerbated by the COVID-19 pandemic," led the Biden administration to redesignate Haiti for TPS in May 2021 for eighteen months. Press Release, U.S. Dep't of Homeland Security, *Secretary Mayorkas Designates Haiti for Temporary Protected Status for 18 Months*

administration has perpetuated policies that continue to erode lawful protections and treat Haitians and other Black migrants discriminatorily, all while country conditions in Haiti continue to deteriorate.

Conditions in Haiti spiraled dangerously downward in 2021 with the assassination of Haiti's President Jovenel Moïse in July and an earthquake in August which killed at least 2,200 people and left 650,000 in need of humanitarian assistance, followed two days later by Tropical Storm Grace. Robbie Gramer & Zinya Salfiti, *Democrats See Broken Promises in Biden's Haiti Policies*, Foreign Policy (Oct. 8, 2021), https://foreignpolicy.com/2021/10/08/biden-haiti-migration-refugee-democrats-backlash-state-department/; Wilde Merancourt, Mary Beth Sheridan, and Anthony Faiola, *Death toll in Haiti earthquake jumps past 1,900*, Washington Post (Aug. 17, 2021), https://www.washingtonpost.com/world/2021/08/17/haiti-earthquake-tropical-storm-grace/.

---

(May 22, 2021), https://www.dhs.gov/news/2021/05/22/secretary-mayorkas-designates-haiti-temporary-protected-status-18-months. In December 2022, in light of "socioeconomic challenges, political instability, and gang violence and crime - aggravated by environmental disaster" and in recognition of "grave insecurity[,] . . . gang crime[,] . . . a lack of access to food, water, fuel, and health care during a resurgence of cholera; and the recent catastrophic earthquakes," the Biden administration announced an additional extension of TPS by 18 months through August 2024. Press Release, U.S. Dep't of Homeland Security, *Secretary Mayorkas Extends and Redesignates Temporary Protected Status for Haiti for 18 Months* (Dec. 5, 2022), https://www.dhs.gov/news/2022/12/05/secretary-mayorkas-extends-and-redesignates-temporary-protected-status-haiti-18.

On September 18, 2021, following the summer of political and environmental crises within Haiti, DHS announced that it would begin mass expulsion under Title 42[6] of thousands of Haitian asylum-seekers (among others) who had gathered in Texas border cities. Press Release, U.S. Dep't of Homeland Security, *DHS Outlines Strategy to Address Increase In Migrants in Del Rio* (Sept. 18, 2021), https://www.dhs.gov/news/2021/09/18/dhs-outlines-strategy-address-increase-migrants-del-rio. This prompted an infamous display of force in Del Rio, Texas, where U.S. Border Patrol agents on horseback pursued Haitian migrants attempting to reenter an encampment after obtaining food and other necessities (the "Del Rio incident"). At times, the agents appeared to use horse reins as whips in their detainment efforts. Jasmine Aguilera & Harold Isaac, *A Haitian Man's Brutal Experience With U.S. Border Agents Sparked Outrage. Now He's Telling His Story,* TIME (March 16, 2022), https://time.com/6144970/mirard-joseph-haitian-migrants-del-rio-border/; U.S. Customs and Border Protection, Office of Professional Responsibility, U.S. Dep't of Homeland Security, Report of Investigation No.

---

[6] *See Fact Sheet: A Guide to Title 42 Expulsions at the Border*, American Immigration Council (modified May 25, 2022), https://www.americanimmigrationcouncil.org/research/guide-title-42-expulsions-border. On January 30, 2023, the White House announced it plans to allow the COVID-19 national emergency and public health emergency to expire on May 11, 2023, which in effect would end the Title 42 policy and its effects at the border. Executive Office of the President, Statement of Administration Policy Regarding H.R. 382 and H.J. Res. 7 (Jan. 30, 2023), https://www.whitehouse.gov/wp-content/uploads/2023/01/SAP-H.R.-382-H.J.-Res.-7.pdf. Because Title 42 superseded Defendants' metering policy, *Amici* are wary of the resurgence of illegal metering practices at the border.

202112280, at 5 (April 2022), https://www.cbp.gov/sites/default/files/assets/documents/2022-Jul/202112280-cbp-closing-report-public-redacted-final.pdf. [hereinafter "*CBP Report of Investigation*"].

The shocking images of the Del Rio incident elicited condemnation from all corners of American society, including a letter from sixteen members of the Senate Foreign Relations Committee and reflections from Vice President Kamala Harris, who likened the situation to the treatment of African American slaves. *See* Press Release, U.S. Senate Foreign Relations Committee, *Menendez, Senate Democrats Blast Mistreatment of Haitian Migrants at Border; Urge Administration to Support Long-Term Stability in Haiti* (Oct. 8, 2021), https://www.foreign.senate.gov/press/dem/release/menendez-senate-democrats-blast-mistreatment-of-haitian-migrants-at-border-urge-administration-to-support-long-term-stability-in-haiti; Erin B. Logan, *Kamala Harris Says Footage of Border Patrol Evokes Images of Slavery*, Los Angeles Times (Sept. 24, 2021), https://www.latimes.com/politics/story/2021-09-24/kamala-harris-says-footage-of-border-patrol-on-horseback-evokes-images-of-american-slavery. The U.S. Customs and Border Protection ("CBP") Office of Professional Responsibility issued a report on the Del Rio incident in April 2022, concluding that CBP agents engaged in the "unnecessary use of force against migrants who were attempting to reenter the United States with food." *CBP Report of Investigation*, at 5.

After this display of force by officials at the border, the United States began expelling tens of thousands of Haitian men, women, and children on flights back to Haiti's spiraling violence and instability without providing access to the U.S. asylum system. In fact, experts say that Haiti's political instability allows for the United States to send more expulsion flights to Haiti than any other South or Central American country with which the United States lacks the requisite diplomatic relationship needed to send expulsion flights. Eileen Sullivan, *U.S. Accelerated Expulsions of Haitian Migrants in May*, N.Y. Times (June 9, 2022), https://www.nytimes.com/2022/06/09/us/politics/haiti-migrants-biden.html. In 2022 alone, it is reported that 15,065 Haitian migrants were repatriated by the United States. *Factsheet: Migrants' Repatriation and Reception Assistance in Haiti - Dec 2022*, U.N. International Organization for Migration (Jan. 25, 2023), https://haiti.iom.int/sites/g/files/tmzbdl1091/files/documents/Migrant%20Returns %20and%20Reception%20Assistance%20in%20Haiti%20- %20December%202022_rev%20yakin.pdf.

Just last month, the Biden administration announced a new border enforcement policy targeting Haitians (along with Nicaraguans, Cubans, and Venezuelans). The administration negotiated an agreement that will allow it to expel Haitians back to Mexico under the Title 42 policy. The White House, *Fact Sheet: Biden-Harris Administration Announces New Border Enforcement Actions* (Jan. 5, 2023), https://www.whitehouse.gov/briefing-room/statements-

releases/2023/01/05/fact-sheet-biden-harris-administration-announces-new-border-enforcement-actions/.   The administration also extended the Venezuela parole process to allow for up to 30,000 Haitian, Nicaraguan, and Cuban nationals per month to receive permission to come to the United States if they have an eligible sponsor, pass vetting and background checks, possess an unexpired passport valid for international travel, and can pay to fly to an airport inside of the United States instead of showing up at a port of entry on the U.S.-Mexico border.   Implementation of a Parole Process for Haitians, 88 Fed. Reg. 1243 (Jan. 9, 2023).   This policy obviously favors wealthier Haitians who already have passports and who have family or connections in the United States willing to serve as sponsors, thus leaving the most vulnerable behind.   *See Biden Administration Use and Expansion of Trump Policy to Ban People Seeking Asylum Endangers Lives, Tramples Human Rights*, Human Rights First (Jan. 5, 2023), https://humanrightsfirst.org/library/biden-administration-use-and-expansion-of-trump-policy-to-ban-people-seeking-asylum-endangers-lives-tramples-human-rights/.

## III.   METERING DISPROPORTIONATELY AFFECTS HAITIANS

### A.   **Metering Is Illegal**

Pursuant to the INA, asylum seekers fleeing their home countries out of fear are supposed to be referred to an asylum officer for an interview, *see* 8 U.S.C. §§ 1225(a)(1), (3), (b)(1)(A)(i)-(ii), or be placed into removal proceedings, where they may pursue their claim in immigration court, *see* 8 U.S.C. §§ 1225(b)(2), 1229(a).

23

The metering policy, which began in 2016, contradicts these practices without justification or process. *See Munyua v. United States*, 2005 U.S. Dist. LEXIS 11499, at *16 (N.D. Cal. Jan. 10, 2005) (inspection and processing provisions of Section 1225 are "not discretionary").

Under the metering policy, asylum seekers passing through Mexico to various POE along the Southern border of the United States were turned back to Mexico in lieu of formal inspection and processing. Hillel R. Smith, *The Department of Homeland Security's Reported "Metering" Policy: Legal Issues*, 2-3, Cong. Rsch. Serv. Legal Sidebar No. LS10295 (updated Mar. 8, 2022), https://fas.org/sgp/crs/homesec/LSB10295.pdf. The government argues that it employed this practice only when POE are at operational capacity. *See* Dkt. # 12 at 12, 40. However, as detailed by Plaintiffs in their briefing, the metering policy specifically violates the INA because, inter alia, Defendants were defying the asylum processing framework without complying with their statutory obligations under the APA. Dkt. # 23 at 14, 15-17, 43; *see* 5 U.S.C. § 706. *See also* Off. of Inspector Gen., U.S. Dep't of Homeland Security, OIG-21-02, *CBP Has Taken Steps to Limit Processing of Undocumented Aliens at Ports of Entry* (Oct. 27, 2020), https://www.oig.dhs.gov/sites/default/files/assets/2020-10/OIG-21-02-Oct20.pdf (concluding that CBP, inter alia, stopped processing asylum seekers at seven POE, redirected them to other POE, and turned away asylum seekers at four POE after they entered the United States) [hereinafter "DHS OIG-21-02 Report"]. This is in

addition to the separate and distinct violations of the Due Process Clause, U.S. Const. amend. V, and the Alien Tort Statute, 28 U.S.C. § 1350. *See* Dkt. # 23 at 34-58.

    B.    **Metering is Colored by Deep-Seated Racial and Ethnic Animus and is Used to Deny Haitians Access to the Asylum Process**

        1.    **Life at the Border under the Metering Policy**

This illegal metering policy is especially relevant to Haitians as they continue to grapple with the desperate political, environmental, and health circumstances that have required them to seek sanctuary in the United States. Haitians currently face crises on every front. In the wake of the July 2021 assassination of President Moïse and ensuing political unrest, Haiti currently has no single regularly elected official. *See Haiti in Turmoil*, npr.org (Feb. 11, 2023), https://www.npr.org/2023/02/10/1156074464/haiti-in-turmoil. Armed gangs have stepped into this vacuum, engaging in kidnapping for ransom, rape, and violence towards civilians. United Nations Integrated Office in Haiti, *Report of the Secretary General*, S/2022/117 at ¶¶ 13-15, 16, 32 (February 15, 2022), https://www.securitycouncilreport.org/atf/cf/%7B65BFCF9B-6D27-4E9C-8CD3-CF6E4FF96FF9%7D/s_2022_117.pdf; *see also* Natalie Kitroeff, *As Haiti Unravels, U.S. Officials Push to Send in an Armed Foreign Force*, N.Y. Times (Nov. 29, 2022), https://www.nytimes.com/2022/11/29/world/americas/haiti-gangs-foreign-intervention.html?action=click&module=RelatedLinks&pgtype=Article (Conditions in Haiti "have plunged to horrifying new lows in recent months, as

gangs carried out such extreme violence that the carnage has been compared to civil war"). Exacerbating the instability are environmental disasters caused by devastating earthquakes in 2010 and 2021 and Tropical Storm Grace. *Haiti Events of 2021*, Human Rights Watch, https://www.hrw.org/world-report/2022/country-chapters/haiti. Coupled with the political turmoil, these disasters have contributed to nearly half of the Haitian population facing acute hunger and food insecurity, over two-thirds of Haitians lacking access to sanitation services, and a recent cholera outbreak. Press Release, Office of the High Commissioner for Human Rights, United Nations, *Haiti: International Community Must Act Now to Avert Tragedy* (November 3, 2022), https://www.ohchr.org/en/press-releases/2022/11/haiti-international-community-must-act-now-avert-tragedy-turk.

These situations have forced Haitians to flee, causing them to arrive at the U.S. border in increasingly high numbers. *See* James Dobbins, Natalie Kitroeff, Anatoly Kurmanaev, Edgar Sandoval and Miriam Jordan, *How Hope, Fear, and Misinformation Led Thousands of Haitians to the U.S. Border*, N.Y. Times (October 5, 2021), https://www.nytimes.com/2021/09/17/us/haitians-border-patrol.html (explaining that U.S. officials had intercepted more than six times the number of Haitian migrants at the U.S. Mexico border in 2021 than in 2020). Haitians continue to flee to the U.S.-Mexico border, despite the high risk of deportation. *Id.*

Life at the border for Haitians turned away at POE is dangerous and tragic. *See* Julia Neusner, *A Year After Del Rio, Haitian Asylum Seekers Expelled Under*

*Title 42 Are Still Suffering*, Human Rights First (Sept. 22, 2022), https://humanrightsfirst.org/library/a-year-after-del-rio-haitian-asylum-seekers-expelled-under-title-42-are-still-suffering/. A December 2021 report found that Black migrants in Tijuana are perceived "as easy targets who will not be protected by the police." Refugees International, *"It's Very Hard to Have Rights": The Impact of COVID-19 on Refugee and Migrant Communities in Tijuana* (December 2021), at 18, https://www.refugeesinternational.org/reports/2021/12/13/its-very-hard-to-have-rights-the-impact-of-covid-19-on-refugee-and-migrant-communities-in-tijuana. Haitians in Tijuana report that they do not go out at night for fear of attack or theft. *Id.* Access to healthcare is limited: Black migrants report being turned away by public hospitals in Tijuana, while pregnant Haitian women report lacking medical care and adequate food. *Id.* at 26.

These conditions have tragic consequences. In May 2022, Calory Archange, a 31-year-old Haitian man, died after being unable to find a doctor in Tijuana willing to see him about chest pain. Kate Morrissey, *For Haitian Migrants, Waiting in Tijuana Brings Fear, Discrimination, Even Death*, San Diego Union-Tribune (June 12, 2022), https://www.sandiegouniontribune.com/news/immigration/story/2022-06-12/haitian-migrants-tijuana. Jocelyn Anselme, another Haitian man, was beaten and robbed while walking home, and died that same month after being turned away from a Tijuana hospital. *Id.* Others report being robbed by the Tijuana police, and having difficulty finding housing because they are Black. *Id.* Living on the streets

27

in Mexico puts Haitians at risk of violent attack as "organized crime groups . . . prowl the streets," and kidnap, rape, and torture stranded migrants. Robbie Whelan, *Violence Plagues Migrants Under U.S. 'Remain in Mexico' Program*, Wall Street Journal (Dec. 28, 2019), https://www.wsj.com/articles/violence-plagues-migrants-under-u-s-remain-in-mexico-program-11577529000. Mexican officials have also begun extorting vulnerable Haitian asylum seekers who face unexpected extended stays in the country. Ariane Francisco & Josefina Salomon, *Mexican Officials Extort Asylum Seekers on Way to USA*, InSight Crime (Mar. 25, 2019), https://www.insightcrime.org/news/analysis/mexican-officials-extort-asylum-seekers/.

These desperate and degrading conditions, in and of themselves, warrant rejection of the metering policy. Failure to directly address the metering policy will only result in more death and devastation for the already downtrodden Haitian people.

### 2. Haitians are Illegally Denied Asylum under the Metering Policy

As Plaintiffs note, Defendants' metering policy is unlawful because agency determination cannot be pretextual, arbitrary and capricious, or an abuse of discretion. *See* Dkt. # 23 at 48-50 (citing 5 U.S.C. § 706(2)(A); *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 994 (9th Cir. 2014)). The government claims that POE are at operational capacity, and that metering was necessary for effective border maintenance. *See* Dkt. # 12 at 8-14. However, the available

evidence demonstrates that these capacity arguments are spurious, and there also is clear evidence of Haitian and Black discrimination at POE, as well as in immigration policy more generally. *See* Off. of Inspector Gen., U.S. Dep't of Homeland Security, OIG-18-84 *Special Review-Initial Observations Regarding Family Separation Issues Under the Zero Tolerance Policy*, 4-7 (Sept. 27, 2018), https://www.oig.dhs.gov/sites/default/files/assets/2018-10/OIG-18-84-Sep18.pdf; DHS OIG-21-02 Report, at 25-26.

Given existing immigration law's extensive protections for asylum-seekers, these race-based barriers to entry make a mockery of our laws. As one Black migrant at the border noted, "[w]e are suffering . . . [t]hey tell us to wait and write down our names[,] but nothing happens." Rick Jervis, *At US-Mexico border, migrants from Africa, Haiti wait to seek asylum*, USA Today (June 4, 2019), https://amp.usatoday.com/amp/1319996001. This sentiment tracks with the fact that migrants of African descent, particularly Haitians, are detained and deported at a greater rate, face higher bail rates, have higher percentages of family detention, and have among the highest asylum denial rates, when compared to their non-African peers. *See Immigration and Blackness: What's Race Got to Do With It*; *Black Immigrants Lives Are Under Attack*, Refugee and Immigrant Center for Education and Legal Services (2020), https://www.raicestexas.org/2020/07/22/black-immigrant-lives-are-under-attack/.

Haitians also face another barrier at the border in that they predominantly speak Haitian Creole. S*ee* Embassy of Haiti in Washington D.C., *Haiti at a Glance*, http://www.haiti.org/haiti-at-a-glance. (last visited Feb. 23, 2023). English is the primary language employed at the border, followed by Spanish. Limited French or Haitian Creole interpreters and resources are available. *See* Tom Jawetz & Scott Shuchart, *Language Access Has Life-or-Death Consequences for Migrants*, Center for American Progress (Feb. 20, 2019), https://www.americanprogress.org/issues/immigration/reports/2019/02/20/466144/language-access-life-death-consequences-migrants/; *see also* Kate Morrissey, *Asylum seekers in Tijuana are scrambling through app error messages for few appointments into the U.S.*, San Diego Union-Tribune (Jan. 22, 2023), https://www.sandiegouniontribune.com/news/immigration/story/2023-01-22/cbp-one-app-asylum-tijuana (explaining that as of January 2023, the CBP One mobile app—the only tool available to request a Title 42 exemption appointment—is not available in Haitian Creole).

In sum, both the history of U.S. treatment of Haitian migrants and the application of Defendants' metering policy reflect clear racial discrimination and the uncontested abdication of the INA's mandatory processing and inspection requirements. Accordingly, the metering policy reflects the arbitrary and capricious implementation of the INA and should be deemed unlawful. *See East Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1273-74 (9th Cir. 2020) (interpretation of

immigration statute to summarily deny entry to certain types of people was arbitrary and capricious).

## **CONCLUSION**

For all of the reasons stated above, as well as those submitted to this Court by Plaintiffs, Defendants' metering policy is unlawful. *Amici* respectfully urge this Court to (i) affirm the district court's determination that, pursuant to Section 706(1) of the APA and the Fifth Amendment's due process clause, it is unlawful for Defendants to turn back asylum seekers arriving in the United States at Class A POE; (ii) uphold the district court's injunction prohibiting Defendants from applying an asylum-limiting rule to a subclass of plaintiff; and (iii) reverse and remand the district court's determinations with respect to Section 706(2) of the APA, the Alien Tort Statute, and Plaintiffs' claim of ultra vires agency action.

DATED: February 28, 2023

FRIED, FRANK, HARRIS, SHRIVER
& JACOBSON LLP
Anne Aufhauser*
Sarah F. Warren
Alison Goldman
*Counsel of Record*

Respectfully submitted

By: */s/ Anne Aufhauser*
Anne Aufhauser

*Attorneys for* Amici Curiae
*Haitian Bridge Alliance,*
*Ira Kurzban, and*
*Irwin Stotzky*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 22-55988, 56036

I am the attorney or self-represented party.

**This brief contains** | 6,755 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [            ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Anne Aufhauser | **Date** | February 28, 2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8** | *Rev. 12/01/22*