# EXHIBIT A

Nos. 22-55988, 22-56036

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
_____

AL OTRO LADO, INC., *et al.*,

*Pls.-Appellees/Cross-Appellants*,

v.

ALEJANDRO MAYORKAS, Secretary of Homeland Security, *et al.*,

*Defendants-Appellants/Cross-Appellees*,

and

THE EXECUTIVE OFFICE FOR IMMIGRATION REVIEW,

*Appellant/Cross-Appellee*.

_____

### APPEAL FROM FINAL JUDGMENT OF THE UNITED STATES DISTRICT
### COURT FOR THE SOUTHERN DISTRICT OF CALIFORNIA
### No. 17-cv-02366-BAS-KSC
_____

## APPELLEES/CROSS-APPELLANTS' SUPPLEMENTAL EXCERPTS OF
## RECORD – VOLUME 3 UNDER SEAL

Stephen M. Medlock
Evan Miller
Rami Abdallah E. Rashmawi
VINSON & ELKINS LLP
2200 Pennsylvania Ave., N.W., Ste. 500 W.
Washington, DC 20036
(202) 639-6500

Baher Azmy
Angelo Guisado
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6464

Ori Lev
MAYER BROWN LLP
1999 K Street, N.W.
Washington, DC 20006
(202) 263-3270

Matthew H. Marmolejo
MAYER BROWN LLP
333 S. Grand Ave., 47th Floor
Los Angeles, CA 90071
(213) 229-9500

*Additional Counsel listed inside cover*

Melissa Crow
CENTER FOR GENDER & REFUGEE STUDIES
1121 14th Street, N.W., Suite 200
Washington, DC 20005
(202) 355-4471

Neela Chakravartula
Anne Dutton
CENTER FOR GENDER & REFUGEE STUDIES
200 McAllister Street
San Francisco, CA 94102
(415) 565-4877

Katherine Melloy Goettel
Gianna Borroto
Suchita Mathur
AMERICAN IMMIGRATION COUNCIL
1331 G St NW, Suite 200
Washington, DC 20005
(202) 507-7552

Sarah Rich
SOUTHERN POVERTY LAW CENTER
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
(404) 521-6700

Rebecca Cassler
SOUTHERN POVERTY LAW CENTER
201 Saint Charles Avenue, Suite 2000
New Orleans, LA 70170
(504) 486-8982

*Counsel for Appellees/Cross Appellants*

1  MAYER BROWN LLP
     Matthew H. Marmolejo (CA Bar No. 242964)
2    *mmarmolejo@mayerbrown.com*
   350 S. Grand Avenue
3  25th Floor
   Los Angeles, CA 90071-1503
4    Ori Lev (DC Bar No. 452565)
     (*pro hac vice*)
5    *olev@mayerbrown.com*
     Stephen M. Medlock (VA Bar No. 78819)
6    (*pro hac vice*)
     *smedlock@mayerbrown.com*
7  1999 K Street, N.W.
   Washington, D.C. 20006
8  Telephone:  +1.202.263.3000
   Facsimile:   +1.202.263.3300
9
   SOUTHERN POVERTY LAW CENTER
10   Melissa Crow (DC Bar No. 453487)
     (*pro hac vice*)
11   *melissa.crow@splcenter.org*
   1101 17th Street, N.W., Suite 705
12 Washington, D.C. 20036
   Telephone: +1.202.355.4471
13 Facsimile: +1.404.221.5857

14 *Additional counsel listed on next page*
   *Attorneys for Plaintiffs*
15
                **UNITED STATES DISTRICT COURT**
16
               **SOUTHERN DISTRICT OF CALIFORNIA**
17

18 Al Otro Lado, Inc., *et al.*,            Case No.:  17-cv-02366-BAS-KSC

19                Plaintiffs,              **EXHIBIT 15 IN SUPPORT OF**
                                          **PLAINTIFFS' REPLY IN SUPPORT**
20      v.                                **OF THEIR MOTION FOR**
                                          **SUMMARY JUDGMENT**
21 Chad F. Wolf,[1] *et al.*,

22                Defendants.             **FILED UNDER SEAL VERSION**

23

24

25

26

27 _____
   [1] Acting Secretary Wolf is automatically substituted for former Acting Secretary
28 McAleenan pursuant to Fed. R. Civ. P. 25(d).

                                    EXHIBIT 15 IN SUPP. OF REPLY IN SUPP. OF
                                    PLTFS' MOT. FOR S.J.

CENTER FOR CONSTITUTIONAL RIGHTS
    Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
    *bazmy@ccrjustice.org*
    Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
    *gschwarz@ccrjustice.org*
    Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
    *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
    Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
    *sarah.rich@splcenter.org*
    Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
    *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
    Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
    *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

EXHIBIT 15 IN SUPP. OF REPLY IN SUPP. OF
PLTFS' MOT. FOR S.J.

3-SER-507

| | |
|---|---|
| **From:** | Nicole Ramos |
| **To:** | CRCL Compliance |
| **Subject:** | CBP Refusing to Process Mexican Asylum Seekers @ San Ysidro POE |
| **Date:** | Monday, February 6, 2017 6:22:26 AM |
| **Attachments:** | Maria Guadalupe G-28 .pdf |

Dear CRCL Compliance Officer:

My name is Nicole Elizabeth Ramos (DOB 06/08/1979). I am a U.S. licensed immigration attorney working in the Tijuana border region with asylum seekers that wish to turn themselves over to American authorities at the San Ysidro port-of-entry. I am barred by the State of New York, and a former federal public defender. I am now writing to file a complaint regarding discrimination based on nationality by CBP at the San Ysidro / Pedwest Port of Entry.

My client, ████████████████████ presented herself at the port-of-entry on February 4th, 2017. During that encounter with CBP she stated that she was seeking asylum. This occurred in the presence of several others.

Following, ████████ was taken back for processing. In less than 24 hours she had been removed to Mexico by CBP officers. She refused to sign documents for her removal and expressed a fear of return, yet she was removed anyway. Even more disturbing, is that I specifically submitted my G-28 Notice of Representation to the CBP POE supervisor email, notifying them in writing that this client was an asylum seeker, and that she was requesting a credible fear interview.

She reported being coerced by CBP officers into recanting her fear of return, and told that simply, by virtue of her being Mexican, she did not qualify for asylum. She was threatened, that if she did not withdraw her asylum claim, that the "next time she tried" to seek asylum, she would be facing a deportation. Further, ████████ brought with her a declaration outlining her fear of return, and other case documents, none of which were returned to her.

Immediately upon learning that ████████ had been removed, I traveled to the port-of-entry to meet her. I accompanied her back to the gate of the port-of-entry and requested to speak with a supervisor.

I spoke with Supervisor DeJesus, and explained that CBP officers had been coercive and verbally abusive with ██ ████████ and that she had been removed despite her request, and my clear written request, that she be referred to an asylum officer for a credible fear interview.

Supervisor DeJesus then advised me that they would "take her back and decide what she qualifies for." That is not the legal standard. Under Title 8, Section 1225 of the U.S. Code, CBP officers must refer an asylum seeker to an asylum officer for a credible fear interview. It is certainly not the function of CBP to determine who qualifies for asylum, let alone that citizens of an entire country do not qualify. Today will be ████████████ third attempt at applying for asylum, despite CBP repeating to her that "there is no asylum for Mexicans."

Additionally, this is the third case in less than 30 days of Mexican women being coerced into withdrawing their asylum claims, berated for hours until they gave up. The two other complaints will be forthcoming.

This is a pattern and practice at the San Ysidro port-of-entry, and I personally, have interviewed seven families to which this has happened in the past three months.

I am requesting that the agency take action, and initiate appropriate investigations, making contact with actually impacted parties. If contacted, I am able to connect investigators with asylums seekers to which this has happened. Please do not ignore this. One day CBP is going to illegally turn away an asylum seeker, and that human rights violation may be the thing that gets them killed.

Regards,

Nicole Ramos

Confidential

Nicole Ramos, Esq.

*(Admitted in NY - practice consists exclusively of federal immigration matters)*

Law Office of Nicole Ramos
511 E. San Ysidro Blvd., # 333
San Ysidro, CA 92173
(664) 526-0145 (MX)
(619) 309-1539 (USA)

*"A lawyer is either a social engineer or a parasite on society."*
*Charles Hamilton Houston*

_____

This e-mail contains PRIVILEGED and CONFIDENTIAL information intended only for the use of the addressee(s) named above. If you are not the intended recipient of this e-mail, or an authorized agent employee responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination or copying of this e-mail is strictly prohibited.  If you received this e-mail in error, please notify us by reply e-mail. Thank you for your cooperation.

*"En la sociedad, un abogado es un ingeniero social o un parásito"*
*Charles Hamilton Houston*

_____

Este correo electrónico contiene información PRIVILEGIADA y CONFIDENCIAL destinada únicamente para el uso del destinatario(s) nombrado anteriormente. Si usted no es el destinatario original de este e-mail, o un empleado agente autorizado responsable de entregar este mensaje a su destinatario, se le notifica que cualquier diseminación o duplicación de este correo electrónico es estrictamente prohibido. Si ha recibido este correo electrónico por error, por favor notifique por correo electrónico de respuesta.Gracias por su cooperación.

Confidential

AOL-DEF-00014801



**Notice of Entry of Appearance
as Attorney or Accredited Representative**

Department of Homeland Security

**DHS
Form G-28**
OMB No. 1615-0105
Expires 03/31/2018

| Part 1. Information About Attorney or Accredited Representative | Part 2. Notice of Appearance as Attorney or Accredited Representative |
|---|---|

**Part 1. Information About Attorney or Accredited Representative**

1. USCIS ELIS Account Number *(if any)*
   ▶ [                    ]

*Name and Address of Attorney or Accredited Representative*

2.a. Family Name *(Last Name)* — Ramos

2.b. Given Name *(First Name)* — Nicole

2.c. Middle Name — Elizabeth

3.a. Street Number and Name — 511 E. San Ysidro Blvd

3.b. Apt. ☐  Ste. ☒  Flr. ☐  333

3.c. City or Town — San Ysidro

3.d. State — CA   3.e. ZIP Code — 92173

3.f. Province — [        ]

3.g. Postal Code — [        ]

3.h. Country — United States

4. Daytime Telephone Number — 619-309-1539

5. Fax Number — 619-202-7752

6. E-Mail Address *(if any)* — LawOffice Of Nicole Ramos@Gmail.com

7. Mobile Telephone Number *(if any)* — [        ]

**Part 2. Notice of Appearance as Attorney or Accredited Representative**

This appearance relates to immigration matters before *(Select only one box)*:

1.a. ☐ USCIS

1.b. List the form numbers
[                    ]

2.a. ☐ ICE

2.b. List the specific matter in which appearance is entered
[                    ]

3.a. ☒ CBP

3.b. List the specific matter in which appearance is entered
Asylum Seeker

I enter my appearance as attorney or accredited representative at the request of:

4. Select *only one* box:
☐ Applicant  ☐ Petitioner  ☐ Requestor
☒ Respondent (ICE, CBP)

*Information About Applicant, Petitioner, Requestor, or Respondent*

5.a. Family Name *(Last Name)* — ███████

5.b. Given Name *(First Name)* — ███████

5.c. Middle Name — ███████

6. Name of Company or Organization *(if applicable)*
[                    ]



Form G-28  05/05/16  Y

Page 1 of 4

Confidential

AOL-DEF-00014802

3-SER-510

## Part 2. Notice of Appearance as Attorney or Accredited Representative *(continued)*

### *Information About Applicant, Petitioner, Requestor, or Respondent (continued)*

7. USCIS ELIS Account Number *(if any)*
   ▶

8. Alien Registration Number (A-Number) or Receipt Number

9. Daytime Telephone Number

10. Mobile Telephone Number *(if any)*

11. E-Mail Address *(if any)*

### *Mailing Address of Applicant, Petitioner, Requestor, or Respondent*

NOTE: Provide the mailing address of the applicant, petitioner, requestor, or respondent. **Do not** provide the business mailing address of the attorney or accredited representative **unless** it serves as the safe mailing address on the application, petition, or request being filed with this Form G-28.

12.a. Street Number and Name  511 E San Ysidro

12.b. Apt. ☐  Ste. ☒  Flr. ☐  333

12.c. City or Town  San Ysidro

12.d. State  CA  12.e. ZIP Code  92173

12.f. Province

12.g. Postal Code

12.h. Country
   United States

## Part 3. Eligibility Information for Attorney or Accredited Representative

Select **all applicable** items.

1.a. ☒  I am an attorney eligible to practice law in, and a member in good standing of, the bar of the highest courts of the following states, possessions, territories, commonwealths, or the District of Columbia. *(If you need additional space, use Part 6.)*

   Licensing Authority
   New York State Bar

1.b. Bar Number *(if applicable)*
   466 - 0445

1.c. Name of Law Firm
   Law Office of Nicole Ramos

1.d. I *(choose one)* ☒ am not ☐ am subject to any order of any court or administrative agency disbarring, suspending, enjoining, restraining, or otherwise restricting me in the practice of law. If you are subject to any orders, explain in the space below. *(If you need additional space, use Part 6.)*

2.a. ☐  I am an accredited representative of the following qualified nonprofit religious, charitable, social service, or similar organization established in the United States, so recognized by the Department of Justice, Board of Immigration Appeals, in accordance with 8 CFR 292.2. Provide the name of the organization and the expiration date of accreditation.

2.b. Name of Recognized Organization

2.c. Date accreditation expires
   *(mm/dd/yyyy)* ▶



Form G-28  05/05/16  Y

Page 2 of 4

Confidential

AOL-DEF-00014803

## Part 3. Eligibility Information for Attorney or Accredited Representative *(continued)*

3. ☐ I am associated with

the attorney or accredited representative of record who previously filed Form G-28 in this case, and my appearance as an attorney or accredited representative is at his or her request.

**NOTE:** If you select this item, also complete **Item Numbers 1.a. - 1.b. or Item Numbers 2.a. - 2.c.** in **Part 3.** *(whichever is appropriate).*

4.a. ☐ I am a law student or law graduate working under the direct supervision of the attorney or accredited representative of record on this form in accordance with the requirements in 8 CFR 292.1(a)(2)(iv).

4.b. Name of Law Student or Law Graduate

## Part 4. Applicant, Petitioner, Requestor, or Respondent Consent to Representation, Contact Information, and Signature

### Consent to Representation and Release of Information

1. I have requested the representation of and consented to being represented by the attorney or accredited representative named in **Part 1.** of this form. According to the Privacy Act of 1974 and DHS policy, I also consent to the disclosure to the named attorney or accredited representative of any record pertaining to me that appears in any system of records of USCIS, ICE or CBP.

   When you (the applicant, petitioner, requestor, or respondent) are represented, DHS will send notices to both you and your attorney or accredited representative either through mail or electronic delivery.

   DHS will also send the Form I-94, Arrival Departure Record, to you **unless** you select **Item Number 2.a.** in **Part 4.** All secure identity documents and Travel Documents will be sent to you (the applicant, petitioner, requestor, or respondent) at your U.S. mailing address **unless** you ask us to send your secure identity documents to your attorney of record or accredited representative.

If you do not want to receive original notices or secure identity documents directly, but would rather have such notices and documents sent to your attorney of record or accredited representative, please select **all applicable** boxes below:

2.a. ☒ I request DHS send any notice (including Form I-94) on an application, petition, or request to the U.S. business address of my attorney of record or accredited representative as listed in this form. I understand that I may change this election at any future date through written notice to DHS.

2.b. ☒ I request that DHS send any secure identity document, such as a Permanent Resident Card, Employment Authorization Document, or Travel Document, that I am approved to receive and authorized to possess, to the U.S. business address of my attorney of record or accredited representative as listed in this form or to a designated military or diplomatic address for pickup in a foreign country (if permitted). I consent to having my secure identity document sent to my attorney of record or accredited representative's U.S. business address and understand that I may request, at any future date and through written notice to DHS, that DHS send any secure identity document to me directly.

3.a. Signature of Applicant, Petitioner, Requestor, or Respondent

➡ *[signature]*

3.b. Date of Signature *(mm/dd/yyyy)* ▶ 02/04/2017

## Part 5. Signature of Attorney or Accredited Representative

I have read and understand the regulations and conditions contained in 8 CFR 103.2 and 292 governing appearances and representation before the Department of Homeland Security. I declare under penalty of perjury under the laws of the United States that the information I have provided on this form is true and correct.

1. Signature of Attorney or Accredited Representative

   *[signature]*

2. Signature of Law Student or Law Graduate

3. Date of Signature *(mm/dd/yyyy)* ▶ 02/04/2017



Form G-28   05/05/16   Y

Page 3 of 4

Confidential

AOL-DEF-00014804

## Part 6. Additional Information

Use the space provided below to provide additional information pertaining to Part 3., Item Numbers 1.a. - 1.d. or to provide your U.S. business address for purposes of receiving secure identity documents for your client (if your client has consented to your receipt of such documents under Part 4.)

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

Confidential                                              AOL-DEF-00014805

1  MAYER BROWN LLP
     Matthew H. Marmolejo (CA Bar No. 242964)
2    *mmarmolejo@mayerbrown.com*
   350 S. Grand Avenue
3  25th Floor
   Los Angeles, CA 90071-1503
4    Ori Lev (DC Bar No. 452565)
     (*pro hac vice*)
5    *olev@mayerbrown.com*
     Stephen M. Medlock (VA Bar No. 78819)
6    (*pro hac vice*)
     *smedlock@mayerbrown.com*
7  1999 K Street, N.W.
   Washington, D.C. 20006
8  Telephone:  +1.202.263.3000
   Facsimile:   +1.202.263.3300
9
   SOUTHERN POVERTY LAW CENTER
10   Melissa Crow (DC Bar No. 453487)
     (*pro hac vice*)
11   *melissa.crow@splcenter.org*
   1101 17th Street, N.W., Suite 705
12 Washington, D.C. 20036
   Telephone: +1.202.355.4471
13 Facsimile: +1.404.221.5857

14 *Additional counsel listed on next page*
   *Attorneys for Plaintiffs*
15
                **UNITED STATES DISTRICT COURT**
16
                **SOUTHERN DISTRICT OF CALIFORNIA**
17

18 | Al Otro Lado, Inc., *et al.*, | Case No.:  17-cv-02366-BAS-KSC |
   | --- | --- |
19 |                Plaintiffs, | **EXHIBIT 18 IN SUPPORT OF PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** |
20 |        v. | |
21 | Chad F. Wolf,[1] *et al.*, | |
22 |                Defendants. | **FILED UNDER SEAL VERSION** |
23

24

25

26

27 _____
   [1] Acting Secretary Wolf is automatically substituted for former Acting Secretary
28 McAleenan pursuant to Fed. R. Civ. P. 25(d).

EXHIBIT 18 IN SUPP. OF REPLY IN SUPP. OF
PLTFS' MOT. FOR S.J.

3-SER-514

CENTER FOR CONSTITUTIONAL RIGHTS
   Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
   *bazmy@ccrjustice.org*
   Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
   *gschwarz@ccrjustice.org*
   Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
   *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
   Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
   *sarah.rich@splcenter.org*
   Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
   *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
   Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
   *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

EXHIBIT 18 IN SUPP. OF REPLY IN SUPP. OF
PLTFS' MOT. FOR S.J.

3-SER-515

# Case Summary Report
## C17-CBP-SND-13321

**Title:**  FNU LNU; CBP; San Diego, CA

| | | | | |
|---|---|---|---|---|
| Date Rcd: | 4/13/2017 | Date Assigned: | Date Opened: 4/13/2017 | Date Closed: 4/19/2017 |
| Rcd Method: | DHS Connect | | Agent: | |

Affected Agency: U.S. Customs and Border Protection (DHS)     PrimaryOffice:  San Diego, CA
Ref Agency:     Office for Civil Rights and Civil Liberties
Alleg Type:     Civil Rights / Civil Liberties \ Other Civil Rights/Civil Liberties
Special:        No          Privacy:   No   Confidential:  No      Dollar Loss: $0.00
Joint Agency:
Ref Cases:      17-07-CBP-0258
                CL-17-001345

Comments:  On April 10, 2017, CRCL received an email from Nicole Ramos on behalf of ▮▮▮▮▮ a
Honduran asylum seeker who was allegedly turned away by CBP Sergeant Pacheco and CBP Shift
Chief Soto on April 9, 2017. Specifically, Ms. Ramos alleges that when she presented ▮▮▮▮▮▮
and her child to CBP that they were told they needed to go to the INAMI (Mexican immigration) to be
placed on a list and obtain a ticket. Ms. Ramos informed Chief Soto that it was against the law to turn
the asylum seeker away, and attempted to provide Chief Soto with documentation from the Instituto
Nacioal de Migracion, which officially stated that its agency is not responsible for giving asylum
seekers tickets to seek asylum in the United
States. However, Chief Soto stood firm in his refusal to process the individual.

## People - Subjects

**LNU, FNU**                              **Home**
Aka:                            SSN:                        EOD:
POB City:                       POB State:
DOB:                            Alien Number:
Address:                        Company Name:
                                City:                State:        Zip:
DHS Emp:   YES                  DHS Exec:      No
Phone:
Email:

---

**LNU, FNU**                              **Work**
Aka:                            SSN:                        EOD:
POB City:                       POB State:
DOB:                            Alien Number:
Address:                        Company Name:
                                City:                State:        Zip:
DHS Emp:   YES                  DHS Exec:      No
Phone:
Email:

---

**IMPORTANT NOTICE**

This report is intended solely for the official use of the Department of Homeland Security, or any entity receiving a copy directly from the Office of Inspector General. This report remains the property of the Office of Inspector General, and no secondary distribution may be made, in whole or in part, outside the Department of Homeland Security, without prior authorization by the Office of Inspector General. Public availability of the report will be determined by the Office of Inspector General under 5 U.S.C. 552. Unauthorized disclosure of this report may result in criminal, civil, or administrative penalties.

Confidential                                                AOL-DEF-00014822

3-SER-516

# Case Summary Report
## C17-CBP-SND-13321

## People - Complainants

███████████                           **Home**

Aka:                          SSN:                        EOD:
POB City:                     POB State:
DOB:                          Alien Number:
Address:                      Company Name:
                              City:                State:        Zip:
DHS Emp:    No                DHS Exec:      No
Phone:
Email:

---

███████████                           **Work**

Aka:                          SSN:                        EOD:
POB City:                     POB State:
DOB:                          Alien Number:
Address:                      Company Name:
                              City:                State:        Zip:
DHS Emp:    No                DHS Exec:      No
Phone:
Email:

---

## People - Witness

## People - Victims

## Violations

## Case Dates:

| | | | | | |
|---|---|---|---|---|---|
| Received: | 4/13/2017 | Assigned: | | Reassigned: | |
| Prb Referral: | | Retention: | | Acknowledged: | |
| Incident Start: | 4/13/2017 12:00:00 AM | Incident End: | | Approx: | No |
| Police Report: | | Police Rpt #: | | | |
| Notified: | | Reesponse: | | Referred: | |
| Investigation Comp: | 4/13/2017 12:00:00 AM | Closed: | 4/19/2017 | | |
| Prb Decision: | 4/13/2017 12:00:00 AM | Reopened: | | | |

**IMPORTANT NOTICE**

This report is intended solely for the official use of the Department of Homeland Security, or any entity receiving a copy directly from the Office of Inspector General. This report remains the property of the Office of Inspector General, and no secondary distribution may be made, in whole or in part, outside the Department of Homeland Security, without prior authorization by the Office of Inspector General. Public availability of the report will be determined by the Office of Inspector General under 5 U.S.C. 552. Unauthorized disclosure of this report may result in criminal, civil, or administrative penalties.

2 of 3 Pages

# Case Summary Report
## C17-CBP-SND-13321

### Location

| | | | | | |
|---|---|---|---|---|---|
| Airport: | | Location: | | | |
| City: | San Diego | State: | CA | Zip: | |
| Facility: | | FFDO Airline: | | | |
| Investigation Loc: | | Region: | | | |
| Transport Mode: | | | | | |

---

### Technical

---

### Disposition - Criminal

---

### Dispositions - Civil

---

### Dispositions - Admin

---

### MA

---

### ROI / Referral

| | | | | | | |
|---|---|---|---|---|---|---|
| Case Type: | Complaint | Referral Date: 4/19/2017 | Response Date: | 4/19/2017 | Closed Date: | 4/19/2017 |
| Action: | Referred - No Reply | Agency Referred: | Office for Civil Rights and Civil Liberties | | | |

---

### Collaterals

---

### Uploaded Documents

| | | | |
|---|---|---|---|
| Date Prepared: | | Grand Jury: | No |
| Doc Type: | Complaint Origination Document(s) | | |
| Description: | | | |

---

| | | | |
|---|---|---|---|
| Date Prepared: | 4/19/2017 | Grand Jury: | No |
| Doc Type: | Box 1 | | |
| Description: | C1713321 _ 17-07-CBP-0258 | | |

---

| | | | |
|---|---|---|---|
| Date Prepared: | 4/19/2017 | Grand Jury: | No |
| Doc Type: | Other Document(s) | | |
| Description: | SOTO MEMO.pdf | | |

---

**IMPORTANT NOTICE**

This report is intended solely for the official use of the Department of Homeland Security, or any entity receiving a copy directly from the Office of Inspector General. This report remains the property of the Office of Inspector General, and no secondary distribution may be made, in whole or in part, outside the Department of Homeland Security, without prior authorization by the Office of Inspector General. Public availability of the report will be determined by the Office of Inspector General under 5 U.S.C. 552. Unauthorized disclosure of this report may result in criminal, civil, or administrative penalties.

Confidential                                                    AOL-DEF-00014824

1    MAYER BROWN LLP
       Matthew H. Marmolejo (CA Bar No. 242964)
2      *mmarmolejo@mayerbrown.com*
     350 S. Grand Avenue
3    25th Floor
     Los Angeles, CA 90071-1503
4      Ori Lev (DC Bar No. 452565)
       (*pro hac vice*)
5      *olev@mayerbrown.com*
       Stephen M. Medlock (VA Bar No. 78819)
6      (*pro hac vice*)
       *smedlock@mayerbrown.com*
7    1999 K Street, N.W.
     Washington, D.C. 20006
8    Telephone:  +1.202.263.3000
     Facsimile:  +1.202.263.3300
9
     SOUTHERN POVERTY LAW CENTER
10     Melissa Crow (DC Bar No. 453487)
       (*pro hac vice*)
11     *melissa.crow@splcenter.org*
     1101 17th Street, N.W., Suite 705
12   Washington, D.C. 20036
     Telephone: +1.202.355.4471
13   Facsimile: +1.404.221.5857

14   *Additional counsel listed on next page*
     *Attorneys for Plaintiffs*
15
                **UNITED STATES DISTRICT COURT**
16
               **SOUTHERN DISTRICT OF CALIFORNIA**
17

| | |
|---|---|
| 18  Al Otro Lado, Inc., *et al.*, | Case No.:  17-cv-02366-BAS-KSC |
| 19                 Plaintiffs, | **EXHIBIT 22 IN SUPPORT OF PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** |
| 20         v. | |
| 21  Chad F. Wolf,[1] *et al.*, | |
| 22                 Defendants. | **FILED UNDER SEAL VERSION** |
| 23 | |

24

25

26

27   ――――――――――――
     [1] Acting Secretary Wolf is automatically substituted for former Acting Secretary
28   McAleenan pursuant to Fed. R. Civ. P. 25(d).

EXHIBIT 22 IN SUPP. OF REPLY IN SUPP. OF
PLTFS' MOT. FOR S.J.

3-SER-519

CENTER FOR CONSTITUTIONAL RIGHTS
    Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
    *bazmy@ccrjustice.org*
    Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
    *gschwarz@ccrjustice.org*
    Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
    *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
    Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
    *sarah.rich@splcenter.org*
    Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
    *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
    Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
    *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

EXHIBIT 22 IN SUPP. OF REPLY IN SUPP. OF
PLTFS' MOT. FOR S.J.



# OFFICE OF INSPECTOR GENERAL
### Department of Homeland Security

Washington, DC 20528 / www.oig.dhs.gov

March 8, 2019

MEMORANDUM FOR:    File OSC Inquiry Metering Tecate POE

THROUGH:            Matthew Neuburger
                           Director
                           Special Reviews Group

FROM:                ▮▮▮▮▮▮▮▮
                           Investigative Counsel

                           ▮▮▮▮▮▮▮▮
                           Senior Program Analyst

SUBJECT:           *Memorandum of Interview with* ▮▮▮▮▮▮
                           *(Follow-up), Assistant Port Director, Port of Otay*
                           *Mesa, CA*

On February 15, 2019, ▮▮▮▮▮▮▮ Investigative Counsel, Special Reviews Group (SRG), Office of Inspector General (OIG), and ▮▮▮▮▮▮ Senior Program Analyst, SRG, OIG conducted a teleconference with ▮▮▮▮ Assistant Port Director (APD), Port of Otay Mesa, Office of Field Operations (OFO), U.S. Customs and Border Protection (CBP) regarding allegations made to the U.S. Office of Special Counsel (OSC) that employees at the Port of Tecate, California, engage in conduct that may constitute a violation of law, rule, or regulation. OSC referred this matter to the OIG for investigation. We followed up with Silva to discuss relevant email exchanges that the OIG had obtained involving him. This memorandum is not a verbatim transcript of the interview and includes the thoughts and impressions of OIG personnel.

[Note: At the start of the meeting, the OIG emailed ▮▮▮ a password protected PDF document containing a set of three email exchanges for discussion during the interview. For reference, these emails are included as an attachment to this memorandum.]

▮▮▮▮ provided the following information in substance:

1                  OSC Referral



# OFFICE OF INSPECTOR GENERAL
### Department of Homeland Security

Email 1

The OIG provided ███ time to read the first email exchange [page 1-2 of attached email packet]. When asked to explain ██████ role, ███ said that ██████ was a GS-14 manager at the San Diego Field Office. The San Diego Field Office oversees the six ports of entry (POEs) in the region. The Director of the San Diego Field Officer has several Assistant Directors. ██████ was working for the Assistant Director for Border Security at the San Diego Field Office.

When asked whether he recalled this email exchange, ███ said, "yes." The OIG asked why Supervisory CBP Officer (SCBPO) ██████ had asked ███ to call ██████ explained that ██████ had not called him directly, and SCBPO ██████ had taken a message for him.

The OIG asked why the San Diego Field Office was asking about Tecate's process for handling asylum claims, and seeking to confirm that Tecate was not returning anyone to Mexico. ███ said that there was a time when media was asking the San Diego Field Office Director, ██████ questions in this regard. ██████ had provided guidance to the Port Directors during a conference call that he wanted them to communicate to their personnel not to turn back any credible fear asylum claims.

The OIG asked about the first bullet in the email, which states that the Port of Tecate does not return anyone expressing fear of returning back to Mexico. The OIG asked whether ███ recalled that being the message given to personnel at the Port of Tecate. ███ said, "yes," this was the message given to personnel at the port.

The OIG asked about the second bullet, which discusses an instance when an alien was returned to Mexico because he had a waitlist number from Tijuana. Silva said that he could not recall the details about this incident, such as where this individual was from.

The OIG mentioned seeing a shift log from February 2017, which indicated that a man with a Russian passport entered pedestrian primary requesting asylum and was told to go to San Ysidro. ███ did not know if this could have been the same instance described in the second bullet of the email.

The OIG referred ███ to the top of the email where it says, "currently we are not returning anyone back," and asked whether at some other time there had been a different policy. Silva said, "no." However, there had been

2

Highly Confidential/Attorneys' Eyes Only

AOL-DEF-00210388



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

instances several years before of individuals from the Mexican state of Michoacán who were returned to Mexico. ▇▇ said this was explained in the third bullet of the email and he noted he had raised this issue during the OIG's previous interview of him.

Email 2

The OIG provided ▇▇ time to read the second email [page 4 of attached email packet]. The OIG referred ▇▇ to the last sentence, which said that, "Port Director ▇▇ will be sending out an email to the troops addressing this issue," and asked ▇▇ if he recalled sending out an email related to this matter. ▇▇ said that he recalled this incident, but he was unable to find the email he had sent. [Note: During our February 8, 2019 interview, the OIG had asked ▇▇ to look for any guidance he had sent out in response to incidents when an asylum seeker was redirected.]

Seeing that there were multiple emails over a period of time on this matter, the OIG asked whether there was concern that supervisors might not have been following instruction for handling asylum seekers. ▇▇ confirmed that the recipients of this email were the supervisors at the Port of Tecate. ▇▇ said that he did not remember the particulars of this incident ▇▇ said that it appears that in this instance a line Officer took action without properly clearing it with a supervisor. ▇▇ said this was a reminder that Officers must consult their supervisor prior to taking any such action.

The OIG asked whether ▇▇ or Assistant Port Director ▇▇ had a concern about whether supervisors were properly communicating the directive not to return asylum seekers to Mexico. ▇▇ said that their concern was that Officers might be acting on their own without consulting their supervisors.

Email 3

The OIG provided ▇▇ time to read the third email exchange [page 7-9 of attached email packet].

The OIG asked ▇▇ whether he remembered this email exchange. ▇▇ said that he did. The OIG referred ▇▇ to the bottom of page 6 and top of page 7, where ▇▇ wrote about his concern that accepting asylum seekers at the Port of Tecate and transferring them to the Port of San Ysidro could become a way for asylum seekers to avoid long waits at the Port of San Ysidro. ▇▇ said that the Port of Tecate is small. There are approximately

3



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

███ Officers staffing the port at any one time. There are two pedestrian lanes, and two vehicle passenger lanes. The port does not have asylum expertise, so they have to transfer individuals seeking asylum to the Port of San Ysidro. If asylum seekers started coming in through the Port of Tecate to avoid long waits at the Port of San Ysidro, it would be a problem because of the lack of resources, knowledge, and the time it takes to transport individuals to the Port of San Ysidro. Transporting individuals from the Port of Tecate to the Port of San Ysidro requires a several hour drive along winding roads. In this email, Silva said he was stating his concern and conveying that they might have to offer voluntary withdrawal as an alternative if the port started getting more asylum cases. ███ said that withdrawal of an individual's request for asylum at Tecate would have to be voluntary. The OIG asked whether the port had ever had to offer withdrawals. ███ said, "no," it did not become necessary ███ believed that part of the reason was that on the Mexican side of the border, the city of Tecate was directing individuals toward larger ports. ███ said that in Mexico the city of Tecate's population is about 80-100,000 people, and the outskirts nearly join with Tijuana.

The OIG referred ███ to the top of this email exchange on page 6, and asked what was meant by, "sending anyone claiming credible fear down the hill." ███ said that this referred to accepting asylum seekers at the Port of Tecate and transferring them to the Port of San Ysidro. The OIG asked whether in this case the Port of Tecate accepted the Eritreans and drove them to the Port of San Ysidro. ███ said that was correct. The OIG asked whether there were other instances when individuals seeking asylum were sent "down the hill?" ███ said, "no," he did not remember seeing any other instances after this one while at the Port of Tecate. [Note: ███ left the Port of Tecate in February 2018.] He could not remember if he and APD ███ had a conversation after Romero posed the question in his email.

The OIG asked whether anything else like this came up between December and February, when ███ transferred to the Port of Otay Mesa. ███ again said no and that he and his APDs were frequently communicating that the port had to accept all individuals seeking asylum. When asked whether he had ever heard that this guidance was not being followed, ███ said not at that time.

███ said that Officers were concerned that the Port of Tecate did not have the staffing to handle an influx of asylum seekers, and the port could be quickly overwhelmed. The OIG asked whether Officers and supervisors

4

Highly Confidential/Attorneys' Eyes Only



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

might have sought to address their concerns by redirecting asylum seekers. ███ said, "no," he had not heard that this happened. The OIG asked whether it was possible for Officers and supervisors to do this without ███ knowing. ███ said, "yes," it was possible and that was why they were doing so much messaging. Officers should not be able to return anyone seeking asylum to Mexico without their supervisor's approval. During the night shift, fist line supervisors would be the Watch Commander. The Port Director and APD are not on duty.

<u>Attachment</u>

[PDF containing the three email exchanges discussed during this interview.]

5

Highly Confidential/Attorneys' Eyes Only

| From: | SILVA, CARLOS NMI |
|---|---|
| To: | ROMERO, JUAN J; RIVERA, CARLOS GERMAN |
| Subject: | FW: CF Applicants |
| Date: | Wednesday, May 17, 2017 6:44:55 PM |
| Attachments: | FW Credible Fear - Processing Expedited Removal Cases.msg |

FYI

The Field Office (Claudia Taitague) reached out yesterday to confirm that currently we are not returning anyone back.

HQ sent an inquiry and they wanted to confirm again :). Below is the note I sent Claudia with the attachment.

Carlos Silva

**Port Director**
**OFO Chaplain**
**Customs & Border Protection**
**Tecate Port of Entry**
**Tecate, California**

<br>

**From:** SILVA, CARLOS NMI
**Sent:** Tuesday, May 16, 2017 4:21 PM
**To:** TAITAGUE, CLAUDIA
**Subject:** CF Applicants

Hello Claudia,

SCBPO McCarthy asked me to give you a call regarding our processing of Credible Fear applicants, I left you a voice mail and thought I would follow up with attached instructions that our Supervisors have been given.
Although I must say that we get very few CF applicants here due to the fact that the local government officials in Tecate, Mexico discourages non-locals coming to their city.

- Our guidance to our supervisors is that we do not return anybody that expresses fear in returning back to Mexico, we will process them and transport them to San Ysidro.
- Having said that, I did get briefed, (can't recall the date but it has been some time ago) that we had an occurrence where a traveler was advised to return to Tijuana as he had already been given a placement number there, (only one occurrence that I know of).
- About 3 years ago, we had an influx of people from Michoacan all carrying the same letter from a city representative indicating that there was a high crime rate in that city. At that time we referred them to the U.S. Consulate so that they could apply for a visa as they were not claiming Political Asylum or Credible Fear.

Hope this helps, I am leaving the office now but can be reached via cell phone if you should

Highly Confidential/Attorneys' Eyes Only                    AOL-DEF-00210392

need additional information.

Thank you,

Carlos Silva

**Port Director**
**OFO Chaplain**
**Customs & Border Protection**
**Tecate Port of Entry**
**Tecate, California**

BLANK PAGE

Highly Confidential/Attorneys' Eyes Only

AOL-DEF-00210394

| | |
|---|---|
| **From:** | ROMERO, JUAN J |
| **To:** | BERGADO, RONALDO P; BINUYA, JEFFREY L; CONTE, MICHAEL D; GARCIA, ANTONIO A; MCCARTHY, NOELLE C; NORED, SEAN S; SKINNER, AUSTIN G; SPENCER, ROBERT F |
| **Subject:** | Asylum/Credible Fear |
| **Date:** | Saturday, August 26, 2017 1:55:55 AM |

To all,

Today one of our officers decided to take it upon himself to send a Guatemalan family seeking credible fear to the San Ysidro port of entry to be processed. The family did what it was told and reported to San Ysidro. During the interview process they told the SYS officers they were sent there by an officer from the Tecate Port of Entry. As you can imagine that did not go over well with their management. I would like to remind you all that we do not send any credible fear or asylum cases to another port for processing. I find it concerning that an officer feels he can make this kind of decision without consulting a supervisor. We need to remind officers to consult supervisors prior to making decisions that can have a negative impact on the port. I suggest you establish a good line of communication with your team and tell them what you expect them to notify you of. Port Director Silva will be sending out an email to the troops addressing this issue.

Thank you,
**Juan Romero**
**Asst. Port Director**
**Tecate Port of Entry**
**Office of Field Operations**

BLANK PAGE

Highly Confidential/Attorneys' Eyes Only

AOL-DEF-00210396

3-SER-530

| | |
|---|---|
| **From:** | ROMERO, JUAN J |
| **To:** | SILVA, CARLOS NMI |
| **Subject:** | RE: Supreme Court Allows Full Implementation of Presidential Proclamation |
| **Date:** | Friday, December 22, 2017 2:50:26 PM |

Sir,

## DP

JRO

**From:** SILVA, CARLOS NMI
**Sent:** Friday, December 22, 2017 11:43 AM
**To:** ROMERO, JUAN J
**Subject:** RE: Supreme Court Allows Full Implementation of Presidential Proclamation

Looks like they are not subject to the executive order then.

Will SYS still take them since they are not Somalis?

It will not be a big issue then if in the future we allow them to withdrawal their application and have them go to San Ysidro on their own.

Eritrea is not a country in the Executive Order.

Thank you,
Carlos Silva

**From:** ROMERO, JUAN J
**Sent:** Friday, December 22, 2017 11:15:35 AM
**To:** SILVA, CARLOS NMI
**Subject:** RE: Supreme Court Allows Full Implementation of Presidential Proclamation

FYI- The subjects are form ERITREA

**From:** SILVA, CARLOS NMI
**Sent:** Friday, December 22, 2017 11:15 AM
**To:** MARICICH, ANNE L ; FLORES, PETE ROMERO
**Cc:** ARMIJO, JOHNNY L RIVERA, CARLOS GERMAN ; ROMERO, JUAN J AKI, SIDNEY K
**Subject:** RE: Supreme Court Allows Full Implementation of Presidential Proclamation

Anne,

We have been advised by WC Marin that San Ysidro is able to accommodate these ten

Somali's. Due to lack of resources at Tecate we will in turn be turning them over to AEU after personal searches and logging them in.

Our hope is that this occurrence is isolated and they don't start using us as a stepping stone to get to San Ysidro and not having to wait in the longer line at that location. **DP**
**DP**

I have asked APD Carlos Rivera to ensure Field Office Bullets are prepared for our role.

Thank you,

Carlos Silva

**Port Director**
**OFO Chaplain**
**Customs & Border Protection**
**Tecate Port of Entry**
**Tecate, California**

---

**From:** MARICICH, ANNE L
**Sent:** Friday, December 22, 2017 10:41 AM
**To:** SILVA, CARLOS NMI ▮; FLORES, PETE ROMERO
▮
**Cc:** ARMIJO, JOHNNY L ▮ RIVERA, CARLOS GERMAN
▮ ROMERO, JUAN J ▮
AKI, SIDNEY K ▮
**Subject:** RE: Supreme Court Allows Full Implementation of Presidential Proclamation

Thanks Carlos.

Anne Maricich
Deputy Director Field Operations
San Diego Field Office

---

**From:** SILVA, CARLOS NMI
**Sent:** Friday, December 22, 2017 10:38 AM
**To:** MARICICH, ANNE L ▮ FLORES, PETE ROMERO
▮
**Cc:** ARMIJO, JOHNNY L ▮ RIVERA, CARLOS GERMAN
▮ ROMERO, JUAN J ▮
AKI, SIDNEY K ▮

Highly Confidential/Attorneys' Eyes Only

**Subject:** FW: Supreme Court Allows Full Implementation of Presidential Proclamation

Anne / Pete,

We have ten Somali nationals that are applying for entry (Political Asylum) at the Port of Tecate. This is the first time we get them at our door step. We are coordinating with San Ysidro the processing of them as we will have to transport them there.

Bullets and more info will follow once we coordinate with AEU at San Ysidro.

Thank you,

Carlos Silva

**Port Director**
**OFO Chaplain**
**Customs & Border Protection**
**Tecate Port of Entry**
**Tecate, California**

---

**From:** MARICICH, ANNE L
**Sent:** Thursday, December 07, 2017 5:19 PM
**To:** SARRASIN, DAVID A <████████████████████>; SALAZAR, DAVID A ████████████████████>; SILVA, CARLOS NMI ████████████████████ HERNANDEZ, ROSA E ████████████████████; AKI, SIDNEY K ████████████████████; SNYDER, WILLIAM P <████████████████████
**Cc:** FLORES, PETE ROMERO ████████████████████; ARMIJO, JOHNNY L ████████████████████
**Subject:** FW: Supreme Court Allows Full Implementation of Presidential Proclamation

Port Directors,

The Supreme Court has issued Orders which permits the Presidential Proclamation of Enhanced Vetting to go into full effect for certain nationals of **Chad, Iran, Libya, North Korea, Somalia, Syria, Venezuela and Yemen** on **December 8, 2017**. This guidance supersedes all previously issued guidance on this Proclamation. This should have a limited operational impact at ports of entry as The Department of State will, in most cases, issue a wavier as appropriate.

This updated guidance is contained in the attached muster, which should be disseminated immediately. If you encounter a waiver request related to the travel restrictions Proclamation, please contact DFO Flores, ADFO Armijo or myself.

Thank you,

Highly Confidential/Attorneys' Eyes Only

AOL-DEF-00210399

Anne Maricich
Deputy Director Field Operations
San Diego Field Office

Highly Confidential/Attorneys' Eyes Only

AOL-DEF-00210400

1  MAYER BROWN LLP
     Matthew H. Marmolejo (CA Bar No. 242964)
2    *mmarmolejo@mayerbrown.com*
   350 S. Grand Avenue
3  25th Floor
   Los Angeles, CA 90071-1503
4    Ori Lev (DC Bar No. 452565)
     (*pro hac vice*)
5    *olev@mayerbrown.com*
     Stephen M. Medlock (VA Bar No. 78819)
6    (*pro hac vice*)
     *smedlock@mayerbrown.com*
7  1999 K Street, N.W.
   Washington, D.C. 20006
8  Telephone:  +1.202.263.3000
   Facsimile:   +1.202.263.3300
9
   SOUTHERN POVERTY LAW CENTER
10   Melissa Crow (DC Bar No. 453487)
     (*pro hac vice*)
11   *melissa.crow@splcenter.org*
   1101 17th Street, N.W., Suite 705
12 Washington, D.C. 20036
   Telephone: +1.202.355.4471
13 Facsimile: +1.404.221.5857

14 *Additional counsel listed on next page*
   *Attorneys for Plaintiffs*
15
                **UNITED STATES DISTRICT COURT**
16
                **SOUTHERN DISTRICT OF CALIFORNIA**
17

18 | Al Otro Lado, Inc., *et al.*, | Case No.:  17-cv-02366-BAS-KSC |

19                 Plaintiffs,        **EXHIBIT 38 IN SUPPORT OF
                                      PLAINTIFFS' REPLY IN SUPPORT
20      v.                           OF THEIR MOTION FOR
                                      SUMMARY JUDGMENT**
21 Chad F. Wolf,[1] *et al.*,

22                 Defendants.        **FILED UNDER SEAL VERSION**

23

24

25

26

27 _____

[1] Acting Secretary Wolf is automatically substituted for former Acting Secretary
28 McAleenan pursuant to Fed. R. Civ. P. 25(d).

                                  EXHIBIT 38 IN SUPP. OF REPLY IN SUPP. OF
                                            PLTFS' MOT. FOR S.J.

CENTER FOR CONSTITUTIONAL RIGHTS
  Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
  *bazmy@ccrjustice.org*
  Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
  *gschwarz@ccrjustice.org*
  Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
  *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
  Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
  *sarah.rich@splcenter.org*
  Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
  *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
  Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
  *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

EXHIBIT 38 IN SUPP. OF REPLY IN SUPP. OF
PLTFS' MOT. FOR S.J.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*,<br><br>            Plaintiffs,<br><br>      v.<br><br>Chad Wolf, *et al.*,<br><br>            Defendants. | Case No.: 17-cv-02366-BAS-KSC |

## MERITS EXPERT REPORT OF STEPHANIE LEUTERT

1

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## I.    Introduction and Qualifications

1.      My name is Stephanie Leutert. I am the Director of the Central America and Mexico Policy Initiative ("CAMPI") at the Strauss Center for International Security and Law at the University of Texas at Austin. In this role, I lead the development and programming for CAMPI and conduct original research on the U.S.-Mexico border and Central American migration.

2.      I previously submitted declarations in connection with the Plaintiffs' September 26, 2019 motions for provisional class certification and preliminary injunction.[1] I also submitted an expert report on December 10, 2019 in support of the Plaintiffs' motion for class certification and testified at a deposition in this case on January 28, 2020. My testimony and opinions in this report are consistent with my prior class certification expert report and deposition testimony but are informed by the full discovery record.

3.      I am an expert on the practices of U.S. Customs and Border Protection ("CBP") officers and supervisors, in particular, those assigned to the Office of Field Operations ("OFO"), with respect to asylum seekers who are in the process of arriving at ports of entry ("POEs") on the U.S.-Mexico border from January 1, 2016 to the present. I am the lead author of the first-ever border-wide report on CBP's metering policy and the related asylum waitlists in Mexican border cities. I have also

---

[1] Electronic Case Filing 293-8, 294-5.

2

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

led the publication of seven subsequent metering updates that document CBP's practices and the conditions faced by asylum seekers waiting in Mexican border cities.

4.     In addition to this work, I have taught a graduate-level course on Central American migration and Mexico's migration policy at the Lyndon B. Johnson School of Public Affairs at the University of Texas at Austin.

5.     Through my work at CAMPI, I have directly observed CBP's implementation of its turn-back policy at ports of entry on the U.S.-Mexico border.[2] Since October 2018, I have personally conducted fieldwork in eight Mexican border cities[3] where asylum seekers affected by CBP's metering policy are forced to wait. In these cities, I have spoken directly with affected asylum seekers, along with migrant shelter staff, members of civil society organizations, and Mexican federal and local government officials. I have also interviewed affected asylum seekers who

---

[2] I understand that Plaintiffs allege that, beginning in 2016, the Defendants, CBP, and the U.S. Department of Homeland Security ("DHS") implemented a practice and then policy of turning back asylum seekers who were in the process of arriving in the United States at ports of entry. Plaintiffs allege that, between 2016 and 2018, this turn-back policy was formalized and implemented at ports of entry across the U.S.-Mexico border. (Second Amended Complaint). I understand that metering or queue management is a part of this turn-back policy. For ease of reference, in this report I use the terms "turn-back," "metering," and "queue management" interchangeably.

[3] Those cities are Matamoros, Tamaulipas (Brownsville, Texas); Nuevo Progreso, Tamaulipas (Progreso, Texas); Reynosa, Tamaulipas (Hidalgo, Texas); Ciudad Miguel Alemán, Tamaulipas (Roma, Texas); Nuevo Laredo, Tamaulipas (Laredo, Texas); Piedras Negras, Coahuila (Eagle Pass, Texas); Ciudad Acuña, Coahuila (Del Rio, Texas); and Nogales, Sonora (Nogales, Arizona).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

were waiting on international bridges; affected asylum seekers who were living in

encampments near the international bridges; and affected asylum seekers waiting in

migrant shelters, hotels, and apartments. I have watched firsthand as asylum seekers

arrived at ports of entry along the United States - Mexico international border and

were turned back by CBP officers. I have seen copies of asylum waitlists in six

Mexican border cities[4] and have spoken to 13 individuals in charge of running these

lists.[5] I have also partnered with colleagues who conducted similar fieldwork in five

additional Mexican border cities.[6]

6.      A copy of my current curriculum vitae, which includes a list of all the

publications that I have authored in the prior 10 years, is attached as **Exhibit A** to

this report.

7.      My typical consulting rate is $300 an hour. I have elected to waive that

fee in this case and will receive no compensation for my work in this litigation. I

---

[4] Those cities are Matamoros, Tamaulipas (Brownsville, Texas); Nuevo Progreso, Tamaulipas (Progreso, Texas); Reynosa, Tamaulipas (Hidalgo, Texas); Piedras Negras, Coahuila (Eagle Pass, Texas); Ciudad Acuña, Coahuila (Del Rio, Texas); and Ciudad Juárez, Chihuahua (El Paso, Texas).

[5] These list managers were in the cities of Matamoros (three different Mexican list managers), Tamaulipas (Brownsville, Texas); Nuevo Progreso, Tamaulipas (Progreso, Texas); Reynosa, Tamaulipas (Hidalgo, Texas); Ciudad Miguel Alemán, Tamaulipas (Roma, Texas); Nuevo Laredo, Tamaulipas (three list managers) (Laredo, Texas); Piedras Negras (two list managers), Coahuila (Eagle Pass, Texas); and Ciudad Acuña, Coahuila (two list managers: individuals and families) (Del Rio, Texas).

[6] Those cities are Ciudad Juárez, Chihuahua (El Paso, Texas); Agua Prieta, Sonora (Douglas, Arizona); San Luís Rio Colorado, Sonora (San Luis, Arizona); Mexicali, Baja California (Calexico, California); and Tijuana, Baja California (San Diego, California).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

have chosen to waive any compensation given that Plaintiffs are a 501(c)(3) non-profit organization and Plaintiff's counsel are providing their legal services pro bono.

8.     I understand from Plaintiffs' counsel that I have been retained to offer opinions on issues related to the merits phase of this litigation. This report contains a complete statement of my opinions and the reasons for them. It also contains all of the exhibits that will be used to summarize or support those opinions.

9.     I understand that some discovery may occur, or that discovery responses may be supplemented, after this expert report is disclosed to Defendants' counsel. I reserve the right to amend and revise this report and the exhibits to it if I should be made aware of additional information relevant to my opinions. I also understand that the Defendants in this case may retain an expert to rebut my opinions. I understand that I may have an opportunity to rebut the opinions offered by the Defendants' expert. I reserve the right to do so.[7]

## II.     Materials Considered

10.     In arriving at the opinions expressed in this expert report, I considered a wide range of facts and data that were made available by the Defendants in discovery and facts and data in the public domain. Below is a summary of the facts

---

[7] This is the only case in which I have testified in the previous four years as an expert at trial or by deposition.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

86.    The metering and prioritization-based queue management policies remain in effect to this day.[138]

### E. CBP's Current Metering Policy Implementation

87.    With metering in place, asylum seekers arriving at the U.S.-Mexico border now face the following dynamic. When a pedestrian approaches the U.S.-Mexico dividing line, CBP officers stand at the "control stations" on the international line or right behind it and ask for the individual's migration paperwork. If the pedestrian does not have a U.S. passport or a visa to enter the United States, CBP officers physically block their passage into U.S. territory by standing in the center of the pedestrian walkway. Most if not all of these blocked individuals are asylum seekers.

88.    CBP officers then tell these arriving asylum seekers[139] that there is no capacity at the port of entry and the asylum seekers cannot currently be processed, which is also the explanation laid out in the April 2018 "Metering Guidance." At times, these stationed CBP officers may also instruct the arriving asylum seekers to contact officials on the Mexican side of the border, to go to local Mexican shelters, or to first get on an asylum waitlist.

---

[138] CBPALOTRO000303-08; CBPALOTRO000314-15.

[139] The CBP officers know that the person is an asylum seeker based on their lack of appropriate migratory documents or if they preemptively announce that they would like to seek asylum to the CBP officers stationed at the limit line.

44

89.     However, there is a caveat to this explanation. Even when CBP officers are stationed at control points near the international boundary, they may be several feet away from the border. This means that CBP officers still turn asylum seekers back to Mexico after they have already entered U.S. territory.[140] According to CBP's response to Plaintiff's Fourth Set of Interrogatories, only one out of the 14 surveyed ports of entry has its limit line located at the exact U.S.-Mexico international boundary.

**Table 4: Distance Between the Limit Line and the International Boundary (April 2020)[141]**

| Port of Entry | Entrance / Bridge | Distance from the International Boundary |
|---|---|---|
| San Ysidro | Pedestrian East (PedEast) | |
| San Ysidro | Pedestrian West (PedWest) | |
| Otay Mesa | | |
| Calexico | Calexico West | |
| Nogales | DeConcini | |
| Nogales | Morley Gate | |
| Nogales | Mariposa | |
| El Paso | Paso Del Norte | |
| El Paso | Yslete | |
| El Paso | Bridge of the Americas | |
| Laredo | Gateway to the Americas | |
| Hidalgo | Hidalgo International | |
| Brownsville | Gateway International | |
| Brownsville | Brownsville & Matamoros (B&M) | |

90.     For example, the San Ysidro limit line position is currently

---

[140] Ibid.
[141] Plaintiff's Fourth Set of Interrogatories, April 2020.

45

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

away from the border, the Nogales limit line position is ██████████ away from the border, the El Paso limit line positions are ██████████ from the border, and the Brownsville limit line position is ████████ away from the border. Additionally, CBP Officer ██████████████ deposition also outlines that asylum seekers crossed the border on to U.S. soil in Tecate "in most cases" before interacting with him at a queue management point.[142] Despite having stepped into U.S. territory, asylum seekers at these ports of entry are still turned back to Mexico.

91.    After being turned away from the U.S. port of entry, asylum seekers must figure out where to stay in the Mexican border city and how to get in line to ask for asylum in the United States. In the weeks and months after the "Metering Guidance" memo, asylum seekers generally held their place in line by waiting in physical lines on international bridges or outside the ports of entry. These initial lines were reported on the bridges outside ports of entry in Brownsville,[143] Hidalgo,[144]

---

[142] ██████████████, Deposition, November 21, 2019.
[143] Aurora Orozco, "Familias de inmigrantes esperan bajo inclmencias en puentes internacionales," *El Nuevo Heraldo*, June 19, 2018, http://www.elnuevoheraldo.com/el_valle/noticias_locales/familias-de-inmigrantes-esperan-bajo-inclemencias-en-puentes-internacionales/article_69abbd70-73dc-11e8-aa87-4b8d72916648.html.
[144] Sandra Tovar, "'Toman' migrantes Puente en busca de asilo en EU," *El Mañana*, May 22, 2018, https://www.elmanana.com/toman-migrantes-puente-busca-asilo-eu-puente-internacional-migrantes-asilo-politico/4415659.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Roma,[145] Laredo,[146] Eagle Pass,[147] Nogales,[148] El Paso,[149] and San Diego.[150] In the following months, due to local residents' concerns, hygiene issues, inclement weather, or disputes regarding fairness, Mexican officials, non-governmental organizations, or asylum seekers themselves began waitlists to allow people to hold their place in line with their name instead of physical presence. These asylum waitlists have no standardized procedure or structure. They remain in every city with waiting asylum seekers, and may be managed by the asylum seekers themselves, Mexican government officials, or humanitarian workers.

**Table 5: Groups that Run the Asylum Waitlist (May 2020)[151]**

| List Managers | Number of Lists | Lists by City |
|---|---|---|
| Non-governmental | 9 | Nuevo Laredo (6), Reynosa, Agua |

---

[145] Silvia Foster-Frau, "Asylum seekers denied legal entry into U.S. are camping out on bridges," *San Antonio Express News*, June 6, 2018, https://www.expressnews.com/news/local/article/Asylum-seekers-denied-legal-entry-into-U-S-are-12973965.php.

[146] Meredith Hoffman, "The Horrible Conditions Endured by Migrants Hoping to Enter the US Legally," *Vice News*, July 3, 2018, https://www.vice.com/en_us/article/59qny3/migrants-hoping-to-get-us-asylum-forced-to-wait-on-bridge.

[147] "Incomoda a automovilistas y peatones presencia de migrantes en puentes internacionales de Piedras Negras," La Rancherita del Aire, July 26, 2018, https://www.rancherita.com.mx/noticias/detalles/53790/incomoda-a-automovilistas-y-peatones-presencia-de-migrantes-en-puentes-internacionales-de-piedras-negras.html#.XcjjtudKjGJ.

[148] Simon Romero & Miriam Jordan, "On the Border, a Discouraging New Message for Asylum Seekers: Wait," *New York Times*, June 12, 2018, https://www.nytimes.com/2018/06/12/us/asylum-seekers-mexico-border.html.

[149] Silvia Foster-Frau, "Asylum seekers denied legal entry into U.S. are camping out on bridges," *San Antonio Express-News*, June 6, 2018, https://www.expressnews.com/news/local/article/Asylum-seekers-denied-legal-entry-into-U-S-are-12973965.php#photo-15680354.

[150] "Asylum seekers wait days and weeks at U.S.-Mexico border," *Associated Press*, June 7, 2018, https://www.cbsnews.com/news/asylum-seekers-wait-days-and-weeks-at-u-s-mexico-border/.

[151] Cities may be listed in multiple categories if the city contains multiple waitlists.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| organization | | Prieta, San Luis Río Colorado |
|---|---|---|
| Grupo Beta | 2 | Tijuana, Mexicali |
| Asylum Seekers | 1 | Matamoros |
| National Migration Institute | 1 | Matamoros |
| Civil Protection | 1 | Ciudad Acuña |
| State Population Agency | 1 | Ciudad Juárez |
| Municipal Government | 1 | Piedras Negras, Nogales |

92.     Similarly, there is no standardized Mexican or U.S. regulation of the asylum waitlists nor their managers.[152] There are also no controls to guarantee that these waitlists are being run transparently or without corruption. Due to this lack of oversight, asylum seekers and civil society organizations have alleged that some list managers have charged asylum seekers to get on the asylum waitlist, including in Piedras Negras[153] (Eagle Pass), Reynosa[154] (Hidalgo), and Matamoros[155] (Brownsville). This has made seeking asylum at a U.S. port of entry at times dependent on whether asylum seekers and their loved ones could pay hundreds or

---

[152] Despite Mexican government entities managing the lists in certain cities, there does not appear to be any standardized guidance. This is evidenced by the different list formats and processes in different cities even when the same federal government agency is running the asylum waitlist.

[153] "Metering Update," Strauss Center for International Security and Law and the Center for U.S.-Mexican Studies, November 2019,

https://www.strausscenter.org/images/strauss/18-19/MSI/MeteringUpdate_191107.pdf.

[154] Emily Green, "Mexican officials are extorting thousands of dollars from migrants applying for asylum," *Vice News*, May 13, 2019, https://www.vice.com/en_us/article/kzdy4e/exclusive-mexican-officials-are-extorting-thousands-of-dollars-from-migrants-to-apply-for-asylum;

Carolina Garza, "Cubanos denuncian a INM de corrupción en trámite de asilo humanitario," *Milenio*, June 5, 2019, https://www.milenio.com/politica/cubanos-denuncian-inm-corrupcion-tramite-asilo-humanitario.

[155] Molly Hennessy-Fiske, "Asylum seeker blocked at Texas border bridges say Mexican officials are demanding money to let them pass," *Los Angeles Times*, November 22, 2018, https://www.latimes.com/nation/la-fg-asylum-list-border-2018-story.html.

48

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**



108.   Table 7 shows the capacity levels at each port of entry, using Queue Management Reports from June 2018 to July 2019. (MCAT data from 2016 through 2019 is in the Appendix).

**Table 7: Field Queue Management Reports (2018-2019)**

61

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

| Field Office | Port of Entry | Days with Data | 0-50% Capacity | 51-100% Capacity | >100% Capacity |
|---|---|---|---|---|---|
| Laredo | Brownsville | 362 | 87% | 13% | 0% |
| | Progreso | 362 | 93% | 6% | 1% |
| | Hidalgo | 362 | 46% | 27% | 27% |
| | Rio Grande | 362 | 97% | 3% | 0% |
| | Roma | 362 | 88% | 12% | 0% |
| | Laredo | 362 | 90% | 10% | 0% |
| | Eagle Pass | 362 | 8% | 49% | 43% |
| | Del Rio | 362 | 84% | 16% | 0% |
| El Paso | Port of El Paso | 314 | 5% | 59% | 36% |
| | Santa Teresa | 314 | 71% | 23% | 6% |
| | Columbus | 314 | 96% | 4% | 1% |
| | Tornillo | 314 | 98% | 2% | 0% |
| | Presidia | 314 | 92% | 6% | 1% |
| Tucson | Douglas | 252 | 65% | 17% | 18% |
| | Lukerville | 252 | 81% | 10% | 9% |
| | Naco | 252 | 93% | 3% | 4% |
| | Nogales | 252 | 27% | 61% | 12% |
| | San Luis | 253 | 59% | 40% | 1% |
| San Diego | San Ysidro | 258 | 5% | 89% | 6% |
| | Otay Mesa | 258 | 100% | 0% | 0% |
| | Tecate | 258 | 100% | 0% | 0% |
| | Calexico West | 258 | 29% | 70% | 1% |
| | Calexico East | 257 | 100% | 0% | 0% |
| | Andrade | 257 | 100% | 0% | 0% |

*Total percent may not equal 100% due to rounding.*

109. This finding is consistent with CBP's own evaluation of its Queue Management data from June 2018 through November 2018. In this evaluation, CBP followed a similar methodology to the one that was used to create this expert report: CBP extracted its Queue Management Reports from emails within senior CBP

62

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

personnel's official email accounts and entered the data into an Excel spreadsheet.[190]
Using this methodology, CBP's first conclusion was also that there exists a large
deviation among the ports of entry, writing that "some ports are never close to
capacity but still have aliens waiting and a few other ports (Eagle Pass, El Paso, and
Santa Teresa[191]) routinely exceed capacity."[192]

110.   The Queue Management Reports also include the number of people
waiting at the "limit line," which is at or near the international boundary. This
number serves to show that CBP was aware that asylum seekers were waiting in
Mexican border cities.[193] However, despite this recognition, multiple ports of entry
continued to operate with capacity levels at or below 50 percent. For example, in the
362 Queue Management Reports from June 18, 2018 through July 15, 2019 that
provide data for the Laredo port of entry, 264 of them noted that CBP was aware
that there was a line of asylum seekers waiting in Nuevo Laredo. However, in 234

---

[190] Similar to CBP, I calculated the port of entry capacity based on the stated percent at capacity of each port of entry and using MCAT's reported capacity numbers. Also similar to CBP, I discovered multiple errors in CBP's capacity percentages, which often stated 100 percent capacity despite reporting low numbers of individuals in custody. I did not attempt to fix these errors in my calculations. AOL-DEF-00210504.

[191] In the reviewed data, CBP calculated that Santa Teresa's average capacity was 48 percent for the period in question. Its data shows that Santa Teresa exceeded full capacity (defined as greater than 100 percent) in 10 out of the 95 days. This means that the Santa Teresa port of entry exceeded its capacity 10.5 percent of the time. By comparison, the Eagle Pass port of entry exceeded capacity 42.1 percent of the time and the El Paso port of entry exceeded capacity 22 percent of the time.

[192] AOL-DEF-00210504.

[193] On May 3, 2019, CBP in the Laredo Field Office was asked to record the total number of individuals waiting in Mexico beyond those physically on the bridge.

of those days (89 percent), the Laredo port of entry both reported that it had a line of asylum seekers waiting to enter the United States and that its utilized port capacity was at or below 50 percent. Table 8 contains the information for each port of entry. (Table 13 in the Appendix contains the percent of days at each port of entry where there was a reported line and the port capacity was at or below 75 percent).

**Table 8: Days with Reported Queues at the Limit Line and Port of Entry Capacity Levels Below 50 Percent**

| City | # of Days with Data | # of Days with Reported Line | # of Days with Reported Line & Port Capacity at or Below 50% | Percent of Days with Reported Line Where Port Capacity at or Below 50% |
|---|---|---|---|---|
| Laredo | 362 | 264 | 234 | 89% |
| Rio Grande | 361 | 19 | 17 | 89% |
| Progreso | 362 | 117 | 100 | 85% |
| Brownsville | 362 | 284 | 240 | 85% |
| Roma | 362 | 111 | 76 | 68% |
| Del Rio | 362 | 104 | 60 | 58% |
| Nogales | 253 | 86 | 30 | 35% |
| Douglas | 253 | 13 | 4 | 31% |
| Eagle Pass | 361 | 161 | 14 | 9% |
| Hidalgo | 362 | 131 | 12 | 9% |
| El Paso | 304 | 145 | 8 | 6% |

111. The third finding is that despite uniformly implementing turn-backs and metering, no port of entry appears to have put in place a contingency plan for addressing mass migration nor implemented any suggestions that could have led to

MAYER BROWN LLP
    Matthew H. Marmolejo (CA Bar No. 242964)
    *mmarmolejo@mayerbrown.com*
350 S. Grand Avenue
25th Floor
Los Angeles, CA 90071-1503
    Ori Lev (DC Bar No. 452565)
    (*pro hac vice*)
    *olev@mayerbrown.com*
    Stephen M. Medlock (VA Bar No. 78819)
    (*pro hac vice*)
    *smedlock@mayerbrown.com*
1999 K Street, N.W.
Washington, D.C. 20006
Telephone:  +1.202.263.3000
Facsimile:   +1.202.263.3300

SOUTHERN POVERTY LAW CENTER
    Melissa Crow (DC Bar No. 453487)
    (*pro hac vice*)
    *melissa.crow@splcenter.org*
1101 17th Street, N.W., Suite 705
Washington, D.C. 20036
Telephone: +1.202.355.4471
Facsimile: +1.404.221.5857

*Additional counsel listed on next page*
*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*,<br><br>                    Plaintiffs,<br><br>        v.<br><br>Chad F. Wolf,[1] *et al.*,<br><br>                    Defendants. | Case No.:  17-cv-02366-BAS-KSC<br><br>**EXHIBIT 3 IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**<br><br>**FILED UNDER SEAL** |

[1] Acting Secretary Wolf is automatically substituted for former Acting Secretary McAleenan pursuant to Fed. R. Civ. P. 25(d).

CENTER FOR CONSTITUTIONAL RIGHTS
    Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
    *bazmy@ccrjustice.org*
    Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
    *gschwarz@ccrjustice.org*
    Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
    *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
    Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
    *sarah.rich@splcenter.org*
    Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
    *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
    Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
    *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

EXHIBIT 3 IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT

Page 1

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

AL OTRO LADO, INC., ET      )
AL.,                        )
                            )
    Plaintiffs,             )
                            ) CIVIL ACTION
VS.                         )
                            ) NO.: 17-cv-02366-BAS-KSC
KEVIN K. MCALEENAN, ET      )
AL.,                        )
                            )
    Defendants.             )
            -----------------------------------

        ORAL AND VIDEOTAPED CONFIDENTIAL

                DEPOSITION OF

                DAVID ATKINSON

                JUNE 12, 2020

        TAKEN VIA REMOTE VIDEOCONFERENCE

            -----------------------------------

    ORAL AND VIDEOTAPED DEPOSITION OF DAVID ATKINSON,
produced as a witness at the instance of the Plaintiffs,
and duly sworn, was taken in the above-styled and
numbered cause on June 12, 2020, from 9:32 a.m. to 3:19
p.m., before Annette Peltier, CSR, Texas Certified
Realtime Reporter, in and for the State of Texas,
reported by machine shorthand from Houston, Texas,
pursuant to the Federal Rules of Civil Procedure and the
provisions stated on the record or attached hereto.



Page 2

```
 1                  A P P E A R A N C E S
 2
 3
    FOR THE PLAINTIFFS:
 4
         (Appearing via Videoconference)
 5
         MR. STEPHEN M. MEDLOCK
 6       MR. ORI LEV
         Mayer Brown
 7       1999 K Street, N.W.
         Washington, D.C.  20006
 8       Phone: 202.263.3221
         E-Mail: Smedlock@mayerbrown.com
 9
10
11  FOR THE DEFENDANTS:
12       (Appearing via Videoconference)
13       MR. ALEXANDER HALASKA
         MS. KATHERINE J. SHINNERS
14       U.S. Department of Justice
         Office of Immigration Litigation
15       Ben Franklin Square, P.O. Box 868
         Washington, D.C.  20044
16       Phone: 202.598.8259
         E-Mail: Alexander.j.halaska@usdoj.gov
17              Katherine.j.shinners@usdoj.gov
18                 - and -
         MR. BENJAMIN WOLARSKY, CBP In-House Counsel
19
20
    FOR THE WITNESS:
21
         (Appearing via Videoconference)
22
         MR. DENIS DOWNEY
23       Attorney at Law
         1185 Ruben Torres Sr. Blvd., Suite 3
24       Brownsville, Texas 78521-1743
         Phone: 956.555.1234
25
```



```
                                                          Page 3
 1

     ALSO PRESENT:
 2

          (Appearing via Videoconference)
 3

          Solange Tran, Videographer
 4        Kevin Cranford, Exhibit Tech

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



Page 4

1                           Index
2                                             Page
3
        Appearances............................      2
4
        Examination by Mr. Medlock..............      6
5
        Examination by Mr. Halaska..............    166
6
        Adjournment............................    180
7
        Court Reporter's Certificate............    182
8
                          Exhibits
9    Number          Description                  Page
10   Exhibit 288     March 30, 2017 E-Mail
                     From Walter Dressler to
11                   William T. Haralson,
                     Concerning an incident
12                   On December 6, 2016,
                     Et al
13                   (NTEU 000136-137)..........     73
14
        Exhibit 289     December 23, 2016
15                      E-Mail from Jessica Ibarra
                        To William T. Haralson,
16                      Concerning the incident
                        On December 6, 2016
17                      (NTEU 000138).............     79
18   Exhibit 290     December 27, 2016
                     E-Mail from Eric Clough
19                   To David Atkinson, concerning
                     The incident on December 6,
20                   2016
                     (NTEU 000139-40)...........     84
21
        Exhibit 291     April 12, 2017, E-Mail
22                      From William T. Haralson
                        To Walter Dressler, Pages 1-19
23                      (NTEU 00141-159)...........     91
24
25



Page 68

```
1                    MR. MEDLOCK:  All right.  Can we go

2    off the record?

3                    THE VIDEOGRAPHER:  The time is

4    10:53 a.m.  We're going off the record.

5                    (Break taken from 10:53 a.m. to

6                    11:08 a.m.)

7                    THE VIDEOGRAPHER:  The time is

8    11:08 a.m.  We're back on the record.

9         Q.  (BY MR. MEDLOCK)  Welcome back, Mr. Atkinson.

10        A.  Welcome back.

11        Q.  Prior to 2016, have you seen any searches or

12   spikes in the number of migrants coming to the Hidalgo

13   port of entry?

14        A.  I would say yes.

15        Q.  In the instances where there were surges or

16   spikes in the number of migrants coming to the Hidalgo

17   port of entry, was CBP or its predecessor organizations

18   able to handle those prior surges or spikes without

19   resorting to metering or turn-backs?

20        A.  I would say that they had the capability of

21   doing it.

22        Q.  Why would you say they had the capability of

23   processing the spike or surge in migrants without

24   turning back asylum seekers?

25        A.  Oh, because we have a -- a -- you know, when --
```



Page 69

1  when we were having a -- a -- difficulties in -- in

2  processing individuals the second -- the second surge,

3  we had a vast amount of -- of port of entries that had

4  areas that could have easily created standalone tents

5  and -- and detention areas that -- in order to handle

6  those -- those -- those processing and they weren't

7  done.

8          We proposed them.  It just never -- never

9  came to be.  They had the areas --

10  Q.  So --

11  A.  -- and the people to do it, but they didn't.

12  Q.  So there were proposals --

13  A.  Yes.

14  Q.  -- to increase the capacity of the Hidalgo port

15  of entry, but management never acted on them; is that

16  right?

17  A.  Yes.

18          MR. HALASKA:  Objection, leading.

19  Q.  (BY MR. MEDLOCK)  You can answer, sir.

20  A.  We -- we verbally proposed putting up tents in

21  parking lots and -- and controlled fence areas from

22  port of entries, and they didn't want to do it.

23          We came with solutions, and they felt what

24  they implemented was in the best interest of the

25  government at the time.



Page 70

1    Q.  When you say "they," who's "they"?

2    A.  The port director at the time, David Gonzalez.

3    Q.  So from your perspective, if the metering or

4    turn-back policy did not exist and CBP just processed

5    people in the order that they came to the -- to the

6    border at the port of entry, CBP would have the

7    resources to do that; is that right?

8    A.  I would feel like they would.

9              MR. HALASKA:  Objection, leading.

10             Go ahead.

11             THE WITNESS:  Go ahead?

12             MR. HALASKA:  Go ahead.

13   A.  I felt they did have the resources because we

14   were doing it before.

15   Q.  (BY MR. MEDLOCK)  When you say "we were doing

16   it before," what do you mean by that?

17   A.  Well, we were funneling out detainees at

18   different areas to different points of areas to ensure

19   they got processing.  In other words, overtime

20   assignments -- there was assignments, there was TDYs,

21   there was -- they were using all the ports of entry.

22             I've actually had the opportunity to

23   represent several ports, not just the Port of Hidalgo.

24   I represent the ports from Roma port of entry all the

25   way to Harlingen port of entry that -- which includes



Page 71

1   the airport, Progresso, Donna, Mission, Los Ebanos,

2   Rio Grande City, Roma, Falcon -- Falcon Heights port of

3   entry.  So I have numerous ports of entries that --

4   that I represent.

5       Q.  And thank you for that clarification.

6               For each of those ports of entry that you

7   represent, are they in the Laredo field office of CBP?

8       A.  Yes.

9       Q.  And based on your representation and

10  observations of those ports of entry in the Laredo

11  field office, do you believe that CBP could process

12  asylum seekers in the order that they came to the port

13  of entry without resorting to metering or turn-backs?

14      A.  I would have to say they've done it before

15  under Obama.  I couldn't see a reason why they couldn't

16  do it when it was Trump's administration.

17      Q.  Okay.  Sir, I'd like to move on to some

18  documents that will hopefully refresh your recollection

19  about some of the things you testified to before.

20              What we'll do is we'll put them on the

21  screen.  Kevin, who is our exhibit tech, will

22  occasionally blow parts of them up so you can see them

23  better.

24              But at any point, if you're having trouble

25  looking at a document, just let myself or Kevin know



Page 72

```
1    and we'll try to enlarge it and get it in a version

2    that you can see.  But today -- today is about what you

3    know.  It's not a vision test.  Okay?

4         A.  Okay.  Thank you, sir.

5         Q.  Okay.

6              MR. MEDLOCK:  Kevin, can you please

7    bring up Tab 1, please?

8         Q.  (BY MR. MEDLOCK)  Okay, Mr. Atkinson.  I've

9    put --

10        A.  I -- I surely can't -- I surely can't see it.

11        Q.  Okay.  Thank you.  We'll -- we'll make it

12   bigger.

13        A.  I need at least three times as big.

14        Q.  So I'm going to have just some general

15   questions about the exhibits, sir; and then I'll -- we

16   can --

17        A.  Can -- can you make it bigger, please?

18        Q.  Sure.

19              EXHIBIT TECH:  We'll have to go one by

20   one per e-mail to make them each bigger one at a time.

21              MR. MEDLOCK:  Okay.

22              THE WITNESS:  Okay.  I can't -- it's

23   still -- it's still blurry.  I mean, I can't see it.

24              MR. MEDLOCK:  Can you see that, sir?

25              THE WITNESS:  I see part of it.
```



Page 154

1      A.   It's just -- is -- is -- getting all these

2   documents together.

3              And, you know, if you figure -- figure this

4   out, you've got 2018, 2019, 2020.  You know, we've

5   contacted the commissioner, the citizen commissioner,

6   the local management.

7              You know, now we need the -- the President

8   to see if he's going to do anything for us, you know;

9   and it's -- it's one of these things that -- you know,

10  at what point do -- do we exhaust our -- our

11  administrative remedy -- remedy until somebody gets --

12  until somebody dies out there.

13             We've already been hurt out there.

14  There's -- just about the whole reason for -- for --

15  for all these grievances.  Nobody's out there to help

16  us.

17     Q.   So -- and I -- I appreciate that.

18             I wanted to focus, if I could, with you on

19  some of the pictures that you attached to this e-mail.

20     A.   Yes, sir.

21             MR. MEDLOCK:  And let's start with the

22  picture on NTEU 113, please, Kevin.

23     Q.   (BY MR. MEDLOCK)  I'm sorry for the quality of

24  the photos, sir.  I only have this one e-mail in black

25  and white.



Page 155

1          A.  Yes, sir.

2          Q.  You write underneath this picture, quote:

3   Chairs reduced to minimize the amount of persons held

4   in the seating area, leaving a huge blank space.

5                  Did I read that correctly?

6          A.  Yes.

7          Q.  Okay.  And is -- is this the instance -- the

8   incident we were talking about earlier where chairs

9   were removed from a secondary inspection area?

10         A.  Well -- well, like I said, it happened in --

11  in -- in different times.  This was happening at one of

12  the worst times.  You're saying -- there's different --

13                 (Talking over each other.)

14         Q.  (BY MR. MEDLOCK)  -- multiple --

15         A.  -- you have to tell them --

16                 (Talking over each other.)

17         A.  -- there's multiple times that -- this was the

18  worst -- worst time it happened.

19         Q.  (BY MR. MEDLOCK)  Okay.  So there were multiple

20  incidents where CBP decided to remove chairs from the

21  secondary inspection area of the Port of Hidalgo; is

22  that right?

23         A.  Yes.

24         Q.  And you said initially you thought that

25  creating some space there was good for officer safety,



Page 156

1    correct?

2        A.  Correct, the -- at this time --

3        Q.  And --

4        A.  -- too many.

5        Q.  Right.

6            So there -- so CBP is actually removing

7    more chairs than is necessary to ensure officer safety;

8    is that right?

9                MR. HALASKA:  Objection, leading.

10       A.  I don't understand.

11           Can you repeat?

12       Q.  (BY MR. MEDLOCK)  Oh, sure.

13           So you said there were different phases in

14   which CBP removed chairs from the secondary inspection

15   area at the Port of Hidalgo.

16           And you said that this picture shows the

17   worst time.

18       A.  Yes, sir.

19       Q.  In your opinion, has CBP removed more chairs

20   than is necessary for ensuring officer safety?

21               MR. HALASKA:  Same objection.

22       A.  I still don't understand your -- your -- your --

23   your question.

24       Q.  (BY MR. MEDLOCK)  Okay.  Let me see if I can

25   say it a different way.



Page 157

1          You write:  (Reading) Chairs reduced to

2   minimize the amount of persons held in the seating

3   area.

4          What did you mean when you said it -- they

5   were reduced to minimize the amount of persons held in

6   the seating area?

7      A.  Well, my understanding at the time, at that

8   time, at this particular time, if we can -- my -- my --

9   my memory a little bit -- is that -- is that they're

10  moving the metering point to somewhere else, and they

11  wanted to claim that there was less room to sit people,

12  so they -- they reduced the amount of chairs in order

13  to push the people back to the metering points.

14     Q.  I see.

15         So CBP at this time intentionally removed

16  seats so that they could say that they couldn't process

17  as many people at the Port of Hidalgo; is that right?

18     A.  Yes.

19     Q.  Let's move to the next page, NTEU 114.

20     A.  Uh-huh.

21     Q.  And underneath this -- underneath this photo,

22  you write:  (Reading) No officers stationed to process

23  work at 10 to 11 p.m. and only for employees to process

24  the family unit credible -- creditable fear cases.

25         Did I read that correctly?



Page 158

1       A.  Yes.

2       Q.  And I think you meant "credible" fear cases; is

3   that right?

4       A.  Yes.

5       Q.  Okay.  What is this picture showing?

6       A.  Well, it shows that management isn't processing

7   the people from that time to that time.  They were

8   shutting down the area for some reason.

9       Q.  So --

10      A.  When I talk --

11      Q.  Go ahead.

12      A.  Go ahead.

13      Q.  Go ahead.

14      A.  No, go ahead.

15          I think I spoke to David John, and this is

16  before -- whoo, when he was acting port director.  And

17  he was stating at the time -- and I don't know if it

18  was this time of year or not.

19          He said that we had sent a total of 80

20  people to San Diego on TDY and we had all the services

21  open and we're processing all these people.  And it

22  shows that we can do more with less.

23          So in order to ask for more money and to

24  show how it's interfering with the -- with the agency,

25  they started closing services.



Page 159

1    Q.   Hmm.  So --

2    A.   In reality --

3    Q.   -- just so --

4    A.   -- in reality they had the people -- go ahead.

5    Q.   You said, "in reality they had the people."

6              Can you finish that sentence?

7    A.   In reality, they had the people.  All they

8    needed was the -- was the funding to have them there or

9    their realignment.

10   Q.   So in reality, CBP had the resources to inspect

11   and process the asylum seekers that were coming to the

12   Port of Hidalgo; but it chose to remove seats from the

13   secondary inspection area and at times shut down the

14   secondary inspection area.

15             Do I understand that correctly?

16   A.   They would shut down certain services, like the

17   one that is -- that is pictured.

18             When you brought that up to Mr. Owens at --

19   at the meeting -- and I think he made claim that the

20   southwest border was fully staffed.

21   Q.   Do you think that statement was true?

22   A.   Of course it's true.  You can't deploy 80 people

23   from every border -- a large amount of people at every

24   port to California, you know, and say -- still run full

25   services when they were out there and then come back



Page 160

1   and deploy less and say that you don't have enough

2   people.

3          You know, it's just the -- the money was --

4   was -- depending on their budgetary, what they felt

5   they had authorized at the time.

6   Q.  Okay.  So CBP, to your mind, made a decision to

7   prioritize things other than processing asylum seekers;

8   is that right?

9          MR. HALASKA:  Objection, leading.

10  A.  I -- I believed in -- in what I was told, that

11  they had to create some kind of disruption in the

12  service in order to get more money to handle the

13  situation because beforehand, when -- when they deployed

14  all the people, we had a hundred percent of everything

15  opened up; but they couldn't tell -- they couldn't show

16  Congress, they couldn't show anybody that they needed

17  more money if they didn't create some kind of suffrage

18  (phonetics) in -- in the orders.

19  Q.  (BY MR. MEDLOCK)  So they intentionally slowed

20  down work so that they could get more funding?

21  A.  Yes.

22  Q.  Okay.  Let's move to the next page of

23  Exhibit 294.  This was an attachment to your e-mail

24  that is a March 6th, 2019, letter from -- that was

25  signed by dozens of CBP officers.



1  MAYER BROWN LLP
     Matthew H. Marmolejo (CA Bar No. 242964)
2    *mmarmolejo@mayerbrown.com*
   350 S. Grand Avenue
3  25th Floor
   Los Angeles, CA 90071-1503
4    Ori Lev (DC Bar No. 452565)
     (*pro hac vice*)
5    *olev@mayerbrown.com*
     Stephen M. Medlock (VA Bar No. 78819)
6    (*pro hac vice*)
     *smedlock@mayerbrown.com*
7  1999 K Street, N.W.
   Washington, D.C. 20006
8  Telephone:  +1.202.263.3000
   Facsimile:   +1.202.263.3300
9
   SOUTHERN POVERTY LAW CENTER
10   Melissa Crow (DC Bar No. 453487)
     (*pro hac vice*)
11   *melissa.crow@splcenter.org*
   1101 17th Street, N.W., Suite 705
12 Washington, D.C. 20036
   Telephone: +1.202.355.4471
13 Facsimile: +1.404.221.5857

14 *Additional counsel listed on next page*
   *Attorneys for Plaintiffs*
15
                **UNITED STATES DISTRICT COURT**
16
                **SOUTHERN DISTRICT OF CALIFORNIA**
17

18 | Al Otro Lado, Inc., *et al.*, | Case No.:  17-cv-02366-BAS-KSC |
   | | |
19 | Plaintiffs, | **EXHIBIT 4 IN SUPPORT OF** |
   | | **PLAINTIFFS' MEMORANDUM OF** |
20 | v. | **POINTS AND AUTHORITIES IN** |
   | | **SUPPORT OF THEIR MOTION** |
21 | Chad F. Wolf,[1] *et al.*, | **FOR SUMMARY JUDGMENT** |
   | | |
22 | Defendants. | |
   | | **FILED UNDER SEAL** |
23

24

25

26

27 ─────────────────────
   [1] Acting Secretary Wolf is automatically substituted for former Acting Secretary
28 McAleenan pursuant to Fed. R. Civ. P. 25(d).

1

2   CENTER FOR CONSTITUTIONAL RIGHTS
       Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
3      *bazmy@ccrjustice.org*
       Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
4      *gschwarz@ccrjustice.org*
       Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
5      *aguisado@ccrjustice.org*
    666 Broadway, 7th Floor
6   New York, NY 10012
    Telephone: +1.212.614.6464
7   Facsimile: +1.212.614.6499

8
    SOUTHERN POVERTY LAW CENTER
9      Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
       *sarah.rich@splcenter.org*
10     Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
       *rebecca.cassler@splcenter.org*
11  150 E. Ponce de Leon Ave., Suite 340
    Decatur, GA 30030
12  Telephone: +1.404.521.6700
    Facsimile: +1.404.221.5857
13

14  AMERICAN IMMIGRATION COUNCIL
       Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
15     *kwalters@immcouncil.org*
    1331 G St. NW, Suite 200
16  Washington, D.C. 20005
    Telephone: +1.202.507.7523
17  Facsimile: +1.202.742.5619

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 4 IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

---------------------------x

AL OTRO LADO, INC., et al., :

    Plaintiff,           :

    -vs-              : Case No.

KEVIN K. McALEENAN, et al., : 17-cv-02366-BAS-KSC

    Defendants.       :

---------------------------x

CONFIDENTIAL

30(b)(6) Deposition of

U.S. CUSTOMS & BORDER PROTECTION

By and Through

RANDY J. HOWE

Washington, D.C.

Thursday, January 9, 2019

9:34 a.m.

Job No.: 541878

Pages 1 - 305

Reported by: Tammy S. Newton

Magna Legal Services
866-624-6221
www.MagnaLS.com



Page 2

1

2    30(b)(6) Deposition of Randy J. Howe held at the

3    offices of:

4        Mayer Brown

5        1999 K Street, N.W.

6        Washington, D.C. 20006

7

8

9

10    Pursuant to agreement, before Tammy S. Newton, a

11    Notary Public in and for the District of

12    Columbia.

13

14

15

16

17

18

19

20

21

22



Page 3

```
 1              A P P E A R A N C E S

 2        ON BEHALF OF PLAINTIFFS:

 3              STEPHEN M. MEDLOCK, ESQUIRE

 4              Mayer Brown

 5              1999 K Street, N.W.

 6              Washington, D.C. 20006

 7              (202) 263-3221

 8              smedlock@mayerbrown.com

 9                  and

10              ANGELO GUISADO, ESQUIRE

11              Center for Constitutional Rights

12              666 Broadway, 7th Floor

13              New York, New York 10012

14              (212) 614-6454

15              aguisado@ccrjustice.org

16

17

18

19

20

21

22
```



Page 4

```
 1       ON BEHALF OF DEFENDANTS:

 2            KATHERINE J. SHINNERS, ESQUIRE

 3            SUSAN IMERMAN, ESQUIRE

 4            U.S. Department of Justice

 5            Office of Immigration Litigation

 6            Ben Franklin Square, P.O. Box 868

 7            Washington, D.C. 20044

 8            (202) 598-8259

 9            katherine.j.shinners@usdoj.gov

10                and

11            SARAH RICH, ESQUIRE

12            REBECCA CASSLER, ESQUIRE

13            Southern Poverty Law Center

14            1101 17th Street, N.W.

15            Suite 705

16            Washington, D.C. 20036

17            (202) 355-4471

18            sarah.rich@splcenter.org

19            (Appeared via Telephone)

20

21

22
```



Page 5

1        Also Present:

2               Louisa Slocum, Esquire, CBP

3               Kristine King, Esquire, CBP

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22



Page 6

1                          C O N T E N T S

2    EXAMINATION OF RANDY J. HOWE            PAGE:

3        By Mr. Medlock                  9

4        By Mr. Guisado              257

5        By Ms. Shinners            297

6

7    DEPOSITION EXHIBITS                   PAGE:

8    Number 78 - January 8, 2020 Letter     18

9    Number 79 - Notice of Deposition      33

10    Number 80 - Expert Designation       59

11    Number 81 - LinkedIn Profile         63

12    Number 82 - February 20, 2017 Memo     96

13    Number 83 - E-mail Chain            98

14    Number 84 - E-mail Chain           108

15    Number 85 - E-mail Chain           111

16    Number 86 - June 5, 2018 Memo        120

17    Number 87 - E-mail Chain           137

18    Number 88 - E-mail Chain           140

19    Number 89 - E-mail Chain           144

20    Number 90 - E-mail Chain           150

21    Number 91 - Contingency Plan         158

22    Number 92 - E-mail Chain           177



Page 90

1    BY MR. MEDLOCK:

2        Q     Sir, is tracking the throughput ports

3    of entry on the U.S.-Mexico border operationally

4    important for CBP?

5        A     Yes.

6        Q     Is it important to have up-to-date

7    information about the throughput of port of entry

8    on the U.S.-Mexico border?

9        A     It is.

10       Q     Does CBP track the throughput of ports

11   of entry on the U.S.-Mexico border on a daily

12   basis?

13           MR. MEDLOCK:  If you're on the phone,

14   can you please mute please.

15   BY MR. MEDLOCK:

16       Q     Sorry.  Go ahead, sir.

17       A     Could you repeat?  I'm sorry.

18       Q     Sure.  Does CBP track the throughput

19   of ports of entry on the U.S.-Mexico border?

20       A     We do.

21       Q     How often does it do that?

22       A     It's daily.



Page 91

1    Q    What sort of report is generated to

2    track the throughput of ports of entry on the

3    U.S.-Mexico border?

4    A    There are multiple reports, but many

5    of the reports are just automated.  Information

6    is withdrawn from our systems to show how many

7    people are being refused admission, just to track

8    or operational tempo.

9    Q    Is the -- are reports from the

10   Migration Crisis Action Team or MCAT used to

11   track operational tempo?

12   A    Yes.

13   Q    Are reports from the Migration Crisis

14   Action Team used to track the throughput of ports

15   of entry?

16   A    The team isn't.  The report is -- the

17   report is what it is.  It's -- as I understand,

18   it's fully automated.

19   Q    But the reports are used.  Those

20   reports generated by MCAT are used to track

21   throughput; is that right?

22   A    That's one of the things, yes.



Page 92

1      Q      Is it true that a U.S. -- a non-U.S.

2   citizen who's seeking asylum in the country can

3   be paroled and released into the United States

4   under certain circumstances?

5      A      Yes.

6      Q      Who makes the determination regarding

7   whether an asylum seeker should be paroled and

8   released into the U.S.?

9      A      That decision is made in collaboration

10   with ICRO.

11      Q      And who makes that decision in

12   collaboration with ICRO?

13      A      I think it's done jointly.

14      Q      When it's done jointly, who on the OFO

15   side is part of that joint decision-making

16   process?

17      A      It's the port management, those that

18   are responsible for the processing of migrants.

19      Q      Currently under what circumstances

20   will asylum seekers be paroled and released into

21   the U.S.?

22      A      The main reason would be when ICRO is



Page 93

1 unable to take custody of individuals for certain

2 demographics.

3     Q     When you say "certain demographics,"

4 what do you mean?

5     A     Generally they have plenty of space

6 for single adults.  They are challenged when it

7 comes to housing and detaining family units.

8     Q     Has the policy that CBP follows with

9 respect to paroling asylum seekers changed at all

10 since 2016?

11     A     Not sure if I understand your

12 question.

13     Q     Sure.  Have the circumstances under

14 which an asylum seeker will be paroled and

15 released into the U.S. changed at all since 2016?

16     A     I don't recall any changes.

17     Q     Is it the case that noncitizens

18 seeking asylum in the U.S. can be processed in

19 regular removal proceedings and given a notice to

20 appear?

21     A     I guess I don't understand your

22 question.  I'm sorry.



Page 94

1      Q      Do you understand the difference

2   between a regular removal proceeding and

3   expedited removal proceeding?

4      A      I do.

5      Q      When a noncitizen is seeking asylum in

6   the U.S. at a port of entry, they can be

7   processed under either regular removal

8   proceedings or expedited removal proceedings; is

9   that right?

10     A      Correct.

11     Q      And if they're processed under regular

12  removal proceedings, they can be given a NTA or

13  notice to appear; is that right?

14          MS. SHINNERS:  Object to the scope.

15  Go ahead.

16          THE WITNESS:  CBP has mandatory

17  detention for individuals we're encountering.  So

18  in working with the ERO, if they are at a

19  position where they can't take individuals, then

20  in coordination with ICRO, ERO would be paroling

21  that person.

22  BY MR. MEDLOCK:



Page 95

1    Q    You mentioned that CBP has mandatory

2   detention.  Has that always been the case?

3    A    Yes.  Sorry.  Go ahead.

4         MS. SHINNERS:  Objection; vague.  Go

5   ahead.

6   BY MR. MEDLOCK:

7    Q    Did you understand my question?

8    A    Could you repeat it one more time?

9    Q    Sure.  In your answer -- prior answer

10  you said CBP has mandatory detention.  What did

11  you mean by that?

12   A    We're required by law to detain those

13  that we're encountering.  There are situations,

14  as you brought up, where we have discretion to

15  parole individuals or in collaboration with ERO

16  individuals that are paroled.

17   Q    Has the -- has there been any policies

18  that have been issued since 2016 that restrict

19  the discretion of CBP to parole asylum seekers

20  who are processed at ports of entry?

21   A    If the premise is we detain everybody

22  when ERO is unable to take individuals, then we



Page 96

1    may invoke the parole along with ERO.

2              MR. MEDLOCK:  Mark the next exhibit.

3              (Deposition Exhibit Number 82 was

4    marked for identification and attached to the

5    transcript.)

6    BY MR. MEDLOCK:

7         Q    I've marked Exhibit 82 to your

8    deposition, sir.  It's a multipage document that

9    bears the Bates numbers -- those are the numbers

10   in the bottom right AOL-DEF-4 through AOL-DEF-16.

11             My first question to you, does this

12   appear to be a February 20, 2017 memorandum from

13   John Kelly who was at the time secretary of DHS?

14        A    What's the question?

15        Q    Does this appear to be --

16        A    Yes, sir.

17        Q    Okay.  Amongst others, this memorandum

18   is for Kevin McAleenan who at the time was acting

19   commissioner of CBP, correct?

20        A    Correct.

21        Q    I'd like to direct your attention to

22   the second page, which is AOL-DEF-5.  At the top



Page 104

1    honest with you.

2    BY MR. MEDLOCK:

3        Q      Have you heard the term "detention

4    capacity" used with respect to processing asylum

5    seekers at ports of entry on the U.S.-Mexico

6    border?

7        A      I have.

8        Q      How does CBP define the term

9    "detention capacity"?

10       A      It's a couple different variables --

11   multiple variables but two main kind of buckets

12   I'll call them is our actual physical capacity

13   and then based on our operational priorities and

14   impact that falls from that and the attention

15   that we provide our priority mission, that all

16   feeds into our capacity.  Not only that, but also

17   the demographics of the individuals that we're

18   encountering, the types of situations that we're

19   interacting with, vehicle seizures, criminal

20   arrests, migrants processing are lots of

21   different factors that will feed into that

22   operational capacity.



Page 105

1    Q    I want to be clear.  I'm asking about

2    detention capacity, not operational capacity.  Do

3    you understand there's a difference between the

4    two terms?

5    A    I think my answer still stands.

6    Detention capacity, our ability to process

7    individuals is not solely on physical capacity.

8    It's what we're doing with the grand scope of

9    what we're doing at the port of entry feeds into

10   what we're able to.

11   Q    Is there any difference between

12   detention capacity and operational capacity as

13   those two terms are used at CBP?

14   A    They're totally different.

15   Q    How is detention capacity different

16   from operational capacity?

17   A    Detention capacity -- well, depends on

18   how you view it.  Detention capacity really is

19   the number of individuals that we're able to take

20   in a particular room.  So an example would be

21   Hidalgo port of entry, four different detention

22   rooms, three of them have they're wet cells where



Page 106

1   they have full facilities, one doesn't.  So if

2   they were -- depending upon the demographics of

3   what we're dealing with, criminal arrests,

4   unaccompanied children, a family that is ill, our

5   capacity to take in per room really dictates upon

6   what we're dealing with.

7           So to say that a room -- you can only

8   take four people in that room really gets fed

9   into what we're dealing with.  So four people

10  aren't just four people.  If we have one person

11  who's traveling alone, a felon, he's going to

12  take up that whole room.  We don't have the

13  capacity to put three more people in there.  Does

14  that make sense?

15     Q    That makes sense.  I'm trying to get

16  to something a little more fundamental than what

17  you're getting at there.  Let me give you another

18  example.

19          Is there a known detention capacity

20  for the AEU at San Ysidro?

21     A    There's a known physical capacity.

22     Q    And that's 316 individuals currently,



Page 107

1    correct?

2         A    Yes.

3         Q    When used with respect to AEU at San

4    Ysidro, what does the term "detention capacity"

5    refer to?

6         A    Repeat the question again.

7         Q    Sure.  So you have a physical capacity

8    of 316 individuals at the AEU at San Ysidro.

9    What does -- what would the detention capacity of

10   the AEU at San Ysidro be?

11        A    That is the physical capacity.

12        Q    Okay.  And the operational capacity

13   would depend on the factors that you were just

14   describing?

15        A    Yes, sir.

16        Q    That's the difference between

17   detention capacity and operational capacity,

18   correct?

19        A    Correct.

20        Q    At some point did OFO move from using

21   detention capacity as a metric to using

22   operational capacity as its metric?



Page 108

1      A      No.

2          (Deposition Exhibit Number 84 was

3   marked for identification and attached to the

4   transcript.)

5   BY MR. MEDLOCK:

6      Q      Sir, I put in front of you marked as

7   Exhibit 84 to your deposition.  It's a multipage

8   document that bears the Bates numbers

9   AOL-DEF-00274915 through 916.  And Exhibit 84,

10  sir, is a July 6 through July 9, 2018, e-mail

11  chain from Frank Longoria to Juan Chavez, Alberto

12  Flores, David Gonzalez, and others, correct?

13     A      I see that, yes.

14     Q      I want to focus on the July 6, 2018,

15  e-mail that Frank Longoria sent at 2:59 p.m.

16     A      Okay.

17     Q      If you just flip to that e-mail, Frank

18  Longoria was assistant director of field

19  operations for the Laredo field office, correct?

20     A      Correct.

21     Q      And the subject line of that e-mail is

22  "Queue management: 30 days in."



Page 160

1     Q     In the bottom right-hand corner it
2 should say Page 2, Page 3.
3     A     No.  I don't have page numbers.
4     Q     You're way beyond me.  If you can flip
5 at the beginning of the document.  Do you see
6 where it says Page 1, Page 2?
7     A     Got it.
8     Q     Just keeping going past Page 8.  Ninth
9 page is Annex A.
10     A     Got it.
11     Q     Are you with me?
12     A     Appendices generally are at the back
13 of the document.  That's why I flipped to the
14 back.
15     Q     Correct.  It seems the back of the
16 document seems to start after Page 8 in this
17 particular one, sir.  So at the top of that page
18 it reads, Annex A, Port of Brownsville, Laredo
19 field office contingency plan addressing possible
20 mass migration influxes."
21          Do you see that?
22     A     I do.



Page 161

```
 1      Q      ████████████████████████
 2   ████████████████████████
 3             Do you see that?
 4      A      I do.
 5      Q      I'm on subsection B of that that
 6   begins with "The port director will implement."
 7      A      Okay.
 8      Q      That reads, "The port director will
 9   implement a phased approach to managed mass
10   migration."
11             Did I read that correctly?
12      A      Yes.
13      Q      And then there's a reference to ████
14   ████████████████████████
15             Do you see that?
16      A      Yes.
17      Q      █████████████████████████
18   ██████████████
19             Do you see that?
20      A      I do.
21      Q      And it indicates when organic
22   capabilities are strained, the port director
```



Page 162

1 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

2 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

3 are blacked out.  Do you see that?

4      A     I do.

5      Q     ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

6 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

7 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

8 ▓▓▓▓▓▓▓▓▓▓▓▓

9           Do you see that?

10      A     I do.

11      Q     And my question is, when determining

12 whether a port director should exercise their

13 discretion to engage in metering, should that --

14 should port directors take into account whether

15 they can get assistance from other ports of entry

16 or U.S. Border Patrol stations or substations in

17 processing migrants?

18      A     Are you asking me in regards to this

19 document?

20      Q     I'm asking when you say -- when we say

21 that operational capacity has gotten to a point

22 where a port needs to engage in metering, does



Page 163

1    that take into account the ability to increase

2    throughput by using other ports or Border Patrol

3    stations?

4        A     It seems as though this document says.

5        Q     So ports can increase their throughput

6    in certain ways, correct?  They can use Border

7    Patrol substations?  They can use other ports of

8    entry; is that right?

9        A     This is a mass migration document.

10       Q     Sure.

11       A     This is their plans.  This is what the

12   document says.

13       Q     Sure.  And when there's -- when

14   there's mass migration, a port that's not

15   going -- that isn't open 24/7 could increase the

16   overtime cap and start processing asylum seekers

17   24/7, correct?

18       A     You asked a couple different questions

19   there.

20       Q     What are the two different questions?

21       A     You asked about overtime caps.

22       Q     Sure.  When a port is -- is dealing



Page 164

1  with mass migration and it's not a port that's

2  open 24 hours a day, 7 days a week, that port can

3  move to being open 24 hours a day, 7 days a week

4  to increase their throughput of asylum seekers;

5  is that right?

6      A    This document is referencing a

7  significant event.  It's not -- this is not a

8  current state.  This is not a day-to-day -- this

9  is not a standard operation procedures for port

10 of entry.  So mass migration event document.

11     Q    I understand that.  But this is --

12     A    That's the answer.

13     Q    Okay.  And my question is, this is an

14 option that's available to a port of entry when

15 their resources become constrained because of the

16 number of asylum seekers they have to process; is

17 that right?

18     A    In relation to an event that this is

19 put together for.

20     Q    Is that a yes in relation to that

21 event?

22     A    That was my answer.



Page 165

1    Q    Okay.  So my question is, a port

2  director has a situation where a number of asylum

3  seekers that are waiting either in shelters in

4  Mexico or at the boundary line exceed the

5  operational capacity of the port, one of the

6  options that the port director has is to increase

7  the throughput of the port by relying on U.S.

8  Border Patrol substations; is that right?

9    A    In relation to a specific event --

10   Q    Just generally they can do that.  Do

11  they have the discretion to do that?

12   A    You're asking me about a document that

13  references --

14   Q    You can put the document aside.

15   A    Okay.

16   Q    Let's just talk generally.  You said

17  that port directors have discretion to deal with

18  processing asylum seekers with respect -- when

19  taking into account the other mission sets --

20   A    They do.

21   Q    -- that CBP has; is that right?

22   A    Correct.



Page 166

1      Q      Do port directors also have the

2  discretion to use Border Patrol substations and

3  stations to increase the throughput of asylum

4  seekers?

5      A      We have at times -- we have at times

6  had that capability, yes.  So PDN in our current

7  MPP process, when individuals are being returned

8  to Mexico after their first hearing, in some

9  instances they're claiming asylum -- fear of

10  Mexico, so in very large numbers.  So in those

11  unique circumstances, in El Paso for example, the

12  Border Patrol station's right below our operation

13  at PDN, we would use Border Patrol facilities for

14  that unique situation with our officers providing

15  the care, feeding, and security of those

16  migrants.

17      Q      Do port directors also have the

18  discretion to increase the throughput of asylum

19  seekers by using waiting areas, lobbies, other

20  buildings in the port facility to temporarily

21  house and process asylum seekers?

22      A      We have done that in the past.  In



Page 167

1    particular, in San Diego during the Haitian

2    migration influx where we converted spaces that

3    weren't intended for detention, hallways,

4    conference rooms, lunch rooms, et cetera.  But

5    that was a very difficult time and something that

6    we learned from.

7           We're very, very fortunate that nobody

8    was hurt or there was any dangerous situations,

9    medical situations.  It was difficult and

10   something that we don't want to do again for the

11   health, safety of the migrants and for our

12   employees.

13      Q    So does a port director have

14   discretion to use those spaces or has OFO

15   headquarters decided that that cannot happen in

16   the future?

17      A    The instruction has been following

18   2016 that we will not take that risky approach of

19   placing people in unsafe situations where in

20   rooms where -- not designed for detention, unsafe

21   for the migrants and unsafe for our employees.

22      Q    Are you aware of something called



MAYER BROWN LLP
  Matthew H. Marmolejo (CA Bar No. 242964)
  *mmarmolejo@mayerbrown.com*
350 S. Grand Avenue
25th Floor
Los Angeles, CA 90071-1503
  Ori Lev (DC Bar No. 452565)
  (*pro hac vice*)
  *olev@mayerbrown.com*
  Stephen M. Medlock (VA Bar No. 78819)
  (*pro hac vice*)
  *smedlock@mayerbrown.com*
1999 K Street, N.W.
Washington, D.C. 20006
Telephone:  +1.202.263.3000
Facsimile:   +1.202.263.3300

SOUTHERN POVERTY LAW CENTER
  Melissa Crow (DC Bar No. 453487)
  (*pro hac vice*)
  *melissa.crow@splcenter.org*
1101 17th Street, N.W., Suite 705
Washington, D.C. 20036
Telephone: +1.202.355.4471
Facsimile: +1.404.221.5857

*Additional counsel listed on next page*
*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*, | Case No.:  17-cv-02366-BAS-KSC |
| Plaintiffs, | **EXHIBIT 6 IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| Chad F. Wolf,[1] *et al.*, | |
| Defendants. | **FILED UNDER SEAL** |

---

[1] Acting Secretary Wolf is automatically substituted for former Acting Secretary McAleenan pursuant to Fed. R. Civ. P. 25(d).

EXHIBIT 6 IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT

1

2
CENTER FOR CONSTITUTIONAL RIGHTS
3
   Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
   *bazmy@ccrjustice.org*
4
   Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
   *gschwarz@ccrjustice.org*
5
   Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
   *aguisado@ccrjustice.org*
6
666 Broadway, 7th Floor
New York, NY 10012
7
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499
8

9
SOUTHERN POVERTY LAW CENTER
   Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
10
   *sarah.rich@splcenter.org*
   Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
11
   *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
12
Decatur, GA 30030
Telephone: +1.404.521.6700
13
Facsimile: +1.404.221.5857

14
AMERICAN IMMIGRATION COUNCIL
15
   Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
   *kwalters@immcouncil.org*
16
1331 G St. NW, Suite 200
Washington, D.C. 20005
17
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619
18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 6 IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT

From: Owen, Todd C (AC OFO)
Sent: Friday, November 11, 2016 2:55:27 PM
To: MCALEENAN, KEVIN K; WAGNER, JOHN P
Subject: RE: Metering in TX

Deputy, we are on board with the metering. Wanted to express this verbally with the SWB
DFOs as oppossed to a written record. I thought we had advised them via telephone last
night to start, and that this would be among the various custody issues to discuss in more
depth next week.
We will call the 4 DFOs right now.


Todd C. Owen
Executive Assistant Commissioner
Office of Field Operations
U.S. Customs & Border Protection

_____
From: MCALEENAN, KEVIN K
Sent: Friday, November 11, 2016 7:48:19 PM
To: Owen, Todd C (AC OFO); WAGNER, JOHN P
Subject: Metering in TX

EAC/DEAC,
Just wanted to touch base directly because I'm not sure it was conveyed with full clarity
from CAT.  C1 and I briefed S1 that we wanted to increase efforts to meter arrivals of
non-UAC, non-Mexican CF cases mid-bridge.  If INAMI is not willing to help, we will push up
to the line and hold them back there.  This will be mostly CENTAM families.  Please advise
if you have concerns and let me know how implementation goes.
KM

Confidential                                                    AOL-DEF-00353883

1  MAYER BROWN LLP
    Matthew H. Marmolejo (CA Bar No. 242964)
2    *mmarmolejo@mayerbrown.com*
   350 S. Grand Avenue
3  25th Floor
   Los Angeles, CA 90071-1503
4    Ori Lev (DC Bar No. 452565)
     (*pro hac vice*)
5    *olev@mayerbrown.com*
     Stephen M. Medlock (VA Bar No. 78819)
6    (*pro hac vice*)
     *smedlock@mayerbrown.com*
7  1999 K Street, N.W.
   Washington, D.C. 20006
8  Telephone:  +1.202.263.3000
   Facsimile:   +1.202.263.3300
9
   SOUTHERN POVERTY LAW CENTER
10   Melissa Crow (DC Bar No. 453487)
     (*pro hac vice*)
11   *melissa.crow@splcenter.org*
   1101 17th Street, N.W., Suite 705
12 Washington, D.C. 20036
   Telephone: +1.202.355.4471
13 Facsimile: +1.404.221.5857

14 *Additional counsel listed on next page*
   *Attorneys for Plaintiffs*
15
                **UNITED STATES DISTRICT COURT**
16
                **SOUTHERN DISTRICT OF CALIFORNIA**
17

18 Al Otro Lado, Inc., *et al.*,          Case No.:  17-cv-02366-BAS-KSC

19                    Plaintiffs,          **EXHIBIT 8 IN SUPPORT OF**
                                           **PLAINTIFFS' MEMORANDUM OF**
20      v.                                 **POINTS AND AUTHORITIES IN**
                                           **SUPPORT OF THEIR MOTION**
21 Chad F. Wolf,[1] *et al.*,              **FOR SUMMARY JUDGMENT**

22                    Defendants.
                                           **FILED UNDER SEAL**
23

24

25

26

27 ―――――――――――
   [1] Acting Secretary Wolf is automatically substituted for former Acting Secretary
28 McAleenan pursuant to Fed. R. Civ. P. 25(d).

CENTER FOR CONSTITUTIONAL RIGHTS
    Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
    *bazmy@ccrjustice.org*
    Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
    *gschwarz@ccrjustice.org*
    Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
    *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
    Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
    *sarah.rich@splcenter.org*
    Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
    *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
    Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
    *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

EXHIBIT 8 IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT

# DEPARTMENT OF HOMELAND SECURITY
# U.S. CUSTOMS AND BORDER PROTECTION
## OFFICE OF PROFESSIONAL RESPONSIBILITY

## REPORT OF INVESTIGATION

### Office of Professional Responsibility
### San Diego, CA

### Case# 201802466



THIS REPORT CONTAINS SENSITIVE LAW ENFORCEMENT MATERIAL. IT MAY NOT BE LOANED OUTSIDE YOUR AGENCY AND, EXCEPT IN CONNECTION WITH OFFICIAL AGENCY ACTION, NO PORTION OF THE REPORT MAY BE COPIED OR DISTRIBUTED WITHOUT THE KNOWLEDGE AND CONSENT OF U.S. CUSTOMS AND BORDER PROTECTION

OFFICIAL USE ONLY                    SENSITIVE                    Page 1 of 11

| DEPARTMENT OF HOMELAND SECURITY | 1. CASE NUMBER |
|---|---|
| Customs and Border Protection | 201802466 |
| | **PREPARED BY** |
| | ANTUNEZ, YANINA C |
| **REPORT OF INVESTIGATION** | **2. REPORT NUMBER** |
| | 008 |

**3. TITLE**

███████ CBP OFFCR/0601 Detainee/Alien - Abuse (Physical Abuse)/SAN YSIDRO, SAN DIEGO, CA

**4. FINAL RESOLUTION**

| 5. STATUS | 6. TYPE OF REPORT | 7. RELATED CASES |
|---|---|---|
| Closing Report | Blue Book | |

**8. TOPIC**

CBPO ███████ dragged a UDA by the legs and returned the UDA to Mexico at the SY/POE.

**9. SYNOPSIS**

On December 18, 2017, ⌐ ‾ ‾ ‾ ‾ ‾ ‾ ‾ ‾ ‾ ‾ ‾ ‾ **LE** ‾ ‾ ‾ ‾ ‾ ‾ ‾ ‾ ‾ ‾ ¬

███████ **LE** ███████ contacted Senior Special Agent (SSA) Brian Miller, CBP, Office of Professional Responsibility, San Diego, CA (CBP OPR/San Diego), to report Officer (CBPO) ████████ allegedly pulled an Undocumented Alien (UDA) by the legs and returned the UDA to Mexico.

SSAs from the CBP OPR/San Diego, IOD Special Agent in Charge San Diego (SAC/San Diego) reviewed SY/POE video footage, performed record checks, and conducted CBPOs interviews. On July 24, 2018, CBPO ORRELL admitted he dragged a UDA by the legs and returned the UDA to Mexico via the SY/POE.

| 10. CASE OFFICER (Print Name & Title) | 11. COMPLETION DATE | 14. ORIGIN OFFICE |
|---|---|---|
| ANTUNEZ, YANINA C - CBP OPR Special Agent | 19-OCT-2018 | CBP OPR SAC SAN DIEGO |
| 12. APPROVED BY(Print Name & Title) | 13. APPROVED DATE | 15. TELEPHONE NUMBER |
| JEFFERY ARNDT / CBP OPR Special Agent Supervisor | 23-OCT-2018 | █████████ |

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO HEADQUARTERS, DEPARTMENT OF HOMELAND SECURITY, TOGETHER WITH A COPY OF THE DOCUMENT.

THIS DOCUMENT CONTAINS INFORMATION REGARDING CURRENT AND ON-GOING ACTIVITIES OF A SENSITIVE NATURE. IT IS FOR THE EXCLUSIVE USE OF OFFICIAL U.S. GOVERNMENT AGENCIES AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY. IT CONTAINS NEITHER RECOMMENDATIONS NOR CONCLUSIONS OF THE DEPARTMENT OF HOMELAND SECURITY. DISTRIBUTION OF THIS DOCUMENT HAS BEEN LIMITED AND FURTHER DISSEMINATION OR EXTRACTS FROM THE DOCUMENT MAY NOT BE MADE WITHOUT PRIOR WRITTEN AUTHORIZATION OF THE ORIGINATOR.

OFFICIAL USE ONLY                    SENSITIVE

| | DEPARTMENT OF HOMELAND SECURITY | 1. CASE NUMBER |
|---|---|---|
| | | 201802466 |
| | | PREPARED BY |
| | | ANTUNEZ, YANINA C |
| | REPORT OF INVESTIGATION CONTINUATION | 2. REPORT NUMBER |
| | | 008 |

**10. NARRATIVE**

ALLEGATION ONE: On January 2, 2018, CBPO ▮ dragged a UDA by the legs to return the UDA to Mexico at the SY/POE; Sustained.

# AC, WP, DP, LE

ALLEGATION TWO: CBPO ▮ did not follow CBP policy and procedures pertaining to the processing of asylum seekers; Sustained.

PROSECUTORIAL ACTION: N/A.

On December 18, 2017, SSA Miller, CBP OPR/San Diego, received a call from **LE** who reported an allegation of physical abuse of a traveler. ▮ **LE** ▮ provided a written summary and video footage, which indicated that on January 2, 2017, CBPO ▮ allegedly pulled a UDA by the legs, and returned the UDA to Mexico (Exhibit 1 and 2).

# AC, WP, DP, LE

The allegation reported states, on January 2, 2017, a group of five UDAs sought asylum at the SY/POE west pedestrian inspection area; four UDAs were escorted back to Mexico and one was processed as a credible fear/asylum applicant.

The above-mentioned video footage was thoroughly reviewed by CBP management as follows:

The video footage indicated five UDAs approached CBPO ▮ pedestrian primary inspection area. CBPO ▮ stepped out of his booth and directed the UDAs to Mexico. The UDAs did not comply and walked past CBPO ▮ booth into the U.S. CBPOs in the vicinity assisted CBPO ▮ and once three of the UDAs were subdued, they were escorted back to Mexico. During that time, CBPO ▮ was struggling with a non-compliant UDA who dropped to the ground and did not allow CBPO ▮ get a hold of his arms. Instead, CBPO ▮ grabbed the UDA by the legs and dragged the UDA back to Mexico. The fifth UDA, later identified as, ▮ **LE** ▮ was processed as an Expedited Removal/Credible Fear case (ER/CF).

Confidential      AOL-DEF-00014043

| DEPARTMENT OF HOMELAND SECURITY | 1. CASE NUMBER |
| --- | --- |
| | 201802466 |
| | PREPARED BY |
| | ANTUNEZ, YANINA C |
| REPORT OF INVESTIGATION CONTINUATION | 2. REPORT NUMBER |
| | 008 |

**10. NARRATIVE**

On April 4, 2018, [ LE ] was interviewed at his residence in Washington, D.C. by SSAs Ralph Velez and Shannon Malone, CBP OPR/Washington. [ LE ] was notified the interview would also be audio and video recorded. The DVD obtained from the interview was properly labeled and stored in the case file.

The interview below which was conducted in the Spanish language was transcribed and translated by SSA Yanina Antunez (Exhibit 3).

The interview is a summary and it is not intended to be a verbatim account and does not memorialize all statements made during the interview. The video recording captured the actual quoloquialisms and words spoken. The recording below is uniquely identified by authentication code [ LE ] (Exhibit 4).

After being advised of the identity of the interviewing SSAs, the nature of the interview, and review of the SY/POE video footage, [ LE ] provided the following information:

According to [ LE ] on January 2, 2017, he and four companions sought political asylum at the Otay Mesa Port of Entry (Otay/POE). However, the CBPO at primary inspection insulted them and directed them to the SY/POE.

Once [ LE ] and his companions arrived at the SY/POE, [ LE ] approached the CBPO at primary inspection and applied for entry. The CBPO left the primary inspection area, walked toward [ LE ] companions and directed them to the "Beta Group" south of the SY/POE.

[Agent's Note: The Beta group is a non-profit organization in Mexico who protects migrants.]

Despite of the CBPO's orders, [ LE ] and his companions did not comply. Several of [ LE ] companions were directed to exit the SY/POE and [ LE ] was cornered against the wall, where he was subsequently arrested.

During [ LE ] rrest, [ LE ] observed UDA [ LE ] Last Name Unknown (LNU) refusing to follow the CBPO's orders and dropped to the ground. At that point, the CBPO grabbed him/her foot and dragged him/her towards the SY/POE's exit gate.

In closing, [ LE ] stated that although he and his companions were all wearing black clothing, he was still able to identify the CBPO (CBPO [    ] and [ LE ] LNU. The video footage clearly showed the CBPO (CBPO [    ] dragging [ LE ] LNU.

Confidential

AOL-DEF-00014044

| | DEPARTMENT OF HOMELAND SECURITY | 1. CASE NUMBER |
|---|---|---|
| | | 201802466 |
| | | PREPARED BY |
| | | ANTUNEZ, YANINA C |
| | REPORT OF INVESTIGATION CONTINUATION | 2. REPORT NUMBER |
| | | 008 |

**10. NARRATIVE**

On June 7, 2017, SSA Antunez emailed Supervisory CBPO (SCBPO) ███████, SY/POE regarding a group of UDAs that crossed into the U.S. via CBPO ██████ primary booth on January 2, 2017. SSA Antunez particularly inquired about a UDA by the name of **LE** LNU and if he/she **LE** LNU) sought asylum sometime after January 2, 2017. SCBPO ██████ provided SSA Antunez names of UDAs who sought asylum, however none matched the description or name of ██████ **LE** ██████ Exhibit 5).

On June 7, 2018, Watch Commander (WC) ███████████ was interviewed at the SY/POE by SSAs Antunez and Christian Vermilyia, CBP OPR/San Diego. WC ████████ was notified the interview would also be audio and video recorded. The DVD obtained from the interview was properly labeled and stored in the case file.

The interview below is a summary and it is not intended to be a verbatim account and does not memorialize all statements made during the interview. The video recording captured the actual words spoken. The recording below is uniquely identified by authentication code **LE** ██████ (Exhibit 6).

After being advised of the identity of the interviewing SSAs, and the nature of the interview, WC ████████ provided the following information:

According to WC ██████ on or about October 2017, **LE** called WC ██████ into his office and asked her to review video footage from an incident that occurred on January 2, 2017, involving a group of UDAs and CBPO ██████ The video footage showed CBPO ██████ pulling a UDA by the legs to return to Mexico. After WC ████████ reviewed the video footage, she referred to her end of shift reports to confirm the incident. However, the end of shift reports did not confirm the indent because no one (CBPOs) reported anything.

On January 2, 2017, WC ███████ also stated the SY/POE was at adequate capacity. If the SY/POE would have been at maximum capacity, the UDAs would have been denied entry before they made it to the primary inspection booth.

Furthermore, WC ████████ stated that on said date, during a CBP Standard Operating Procedure, "Muster" briefing at the San Ysidro and Otay Mesa POEs, under no circumstances CBPOs were to deny asylum applicants entry into the U.S. CBPOs were also instructed to take into custody any asylum applicant encountered on primary inspection as long as the POE was at adequate capacity. After the briefings were conveyed, all of the CBPOs signed a muster sign-up sheet and acknowledged they were going to adhere by the new procedures (Exhibit 7).

Confidential AOL-DEF-00014045

OFFICIAL USE ONLY                    SENSITIVE                    Page 5 of 11

| DEPARTMENT OF HOMELAND SECURITY | 1. CASE NUMBER |
|---|---|
| | 201802466 |
| | **PREPARED BY** |
| | ANTUNEZ, YANINA C |
| **REPORT OF INVESTIGATION CONTINUATION** | **2. REPORT NUMBER** |
| | 008 |

## 10. NARRATIVE

[Agent's Note: The CBP Standards of Operating Procedures are relayed during "Muster" briefings. Muster briefings are informational short meetings conducted by management with CBPOs prior, during, or after the end of their shift. After said muster briefings, CBPOs sign a muster sign-up sheet in acknowledgement of the informational meeting. However, during this investigation CBP Management was unable to provide CBP OPR a copy of a sign-up sheet indicating CBPO ▮ acknowledged any of the muster briefings.]

After WC ▮ reviewed the video footage, she stated CBPO ▮ removed a UDA to Mexico and the other UDAs ran through primary inspection. At that point, the CBPOs assisting CBPO ▮ should have taken the UDAs into custody and processed them via the admissibility unit. Upon CBPO ▮ return, it appeared as if he was pointing at the CBPOs directing them not to allow the UDAs into the country.

According to the video footage, ▮ LE ▮ LNU purposely threw himself/herself to the ground when CBPO ▮ attempted to lift his/her arm, but he/she did not comply.

In Closing, WC McCulloch said she was surprised CBPO ▮ did not adhere by the muster's procedures. CBPO ▮ has worked in the admissibility unit, expedited removals and credible fear cases. WC ▮ stated, "He is just not someone new, he knows about asylum seekers and I was shocked. He knows better than to not process asylum seekers because of his background."

Lastly, WC ▮ stated that if she would have known about the incident she would have reported the incident to ▮ LE ▮

On June 7, 2018, Branch Chief (BC ▮ was interviewed at the SY/POE by SSAs Antunez and Vermilyia, CBP OPR/San Diego. BC ▮ was notified the interview would also be audio and video recorded. The DVD obtained from the interview was properly labeled and stored in the case file.

The interview below is a summary and it is not intended to be a verbatim account and does not memorialize all statements made during the interview. The video recording captured the actual words spoken. The recording below is uniquely identified by authentication code ▮ LE ▮ (Exhibit 8).

After being advised of the identity of the interviewing SSAs, and the nature of the interview, BC ▮ provided the following information:

OFFICIAL USE ONLY                    SENSITIVE

Confidential                                                      AOL-DEF-00014046

| DEPARTMENT OF HOMELAND SECURITY | 1. CASE NUMBER |
|---|---|
| | 201802466 |
| | PREPARED BY |
| | ANTUNEZ, YANINA C |
| REPORT OF INVESTIGATION CONTINUATION | 2. REPORT NUMBER |
| | 008 |

**10. NARRATIVE**

According to BC ▇▇▇▇ on or about June 2017, WC ▇▇▇▇ informed him of an incident that occurred on January 2, 2017, at approximately 2305 hours, involving CBPO ▇▇▇▇ and a group of UDAs at the SY/POE primary inspection area.

After BC ▇▇▇▇ was made aware of the aforementioned incident, he reviewed the Operations Chief Log for January 2, 2017. However, the log did not indicate there had been an incident involving CBPO ▇▇▇▇ or a group of UDAs.

On the day of the incident, BC ▇▇▇▇ stated that at the beginning of his shift at the SY/POE, he surveyed various areas within the POE and ensured all the CBPOs were in their assign post and equipment was working properly.

After BC ▇▇▇▇ made his rounds, he recalled he left the supervisor's office at approximately 2248 hours to the SENTRI office. When BC ▇▇▇▇ returned to the supervisor's office, no one (CBPOs) reported an incident had occurred. BC ▇▇▇▇ said he speculated the incident must have happened when he was surveying the SY/POE.

In closing, BC ▇▇▇▇ stated, "I have no knowledge of the event."

On July 20, 2018, CBPO ▇▇▇▇ was interviewed at the SY/POE by SSAs Antunez and Sara Hittinger, CBP OPR/San Diego. CBPO ▇▇▇▇ was notified the interview would also be audio and video recorded. The DVD obtained from the interview was properly labeled and stored in the case file.

The interview below is a summary and it is not intended to be a verbatim account and does not memorialize all statements made during the interview. The video recording captured the actual words spoken. The recording below is uniquely identified by authentication code **LE** ▇▇▇▇ (Exhibit 9).

After being advised of the identity of the interviewing SSAs, and the nature of the interview, CBPO ▇▇▇▇ provided the following information:

According to CBPO ▇▇▇▇ on January 2, 2017, he was assigned to the primary inspection pedestrian west facility at the SY/POE. It was a slow night at the SY/POE, when all of the sudden CBPO ▇▇▇▇ adjacent to CBPO ▇▇▇▇ primary booth, yelled for assistance. CBPO ▇▇▇▇ observed CBPO ▇▇▇▇ reaching for a subject and he (CBPO ▇▇▇▇ darted out of his booth to stop the subject. CBPO ▇▇▇▇ grabbed the subject by the arms and asked for

Confidential

AOL-DEF-00014047

| DEPARTMENT OF HOMELAND SECURITY | 1. CASE NUMBER |
|---|---|
| | 201802466 |
| | PREPARED BY |
| | ANTUNEZ, YANINA C |
| REPORT OF INVESTIGATION CONTINUATION | 2. REPORT NUMBER |
| | 008 |

**10. NARRATIVE**

immigration documents, but the subject gave him a blank stare. While that was happening CBPOs in the vicinity responded and as soon as they arrived he (CBPO⬛) turned over the subject to the CBPOs and walked back to his booth. At that moment, CBPO ⬛ observed CBPO⬛ drag a subject by the leg towards Mexico. CBPO ⬛ was unaware the above-mentioned subjects were seeking asylum. (Time Stamp 04:04:20)

In regards to muster briefings, CBPO ⬛ stated he abides by changes and new policies presented to the CBPOs. During CBPO⬛ ncident, the muster briefing indicated that all asylum seekers were supposed to be referred to secondary for processing.

In regards to reporting the incident to CBP management, CBPO⬛ reported the incident to the secondary CBPOs who sat next to the supervisor's office and was made aware ⟨LE⟩ was an asylum seeker. CBPO⬛ stated that if that would have happened to him, he would have reported the incident to CBP management.

In closing, CBPO⬛ stated he does not like to work with CBPO ⬛ because he (CBPO ⬛ sleeps on the job. CBPO⬛ is rude, arrogant and unprofessional to the traveling public and asylum seekers. Although CBPO⬛ is senior to CBPO ⬛, he (CBPO⬛ stated he would not want to learn anything from CBPO⬛ (Time Stamp 07:00:00)

On July 20, 2018, CBPO Alfred⬛ was interviewed at the SY/POE by SSAs Antunez and Hittinger, CBP OPR/San Diego. CBPO⬛ was notified the interview would also be audio and video recorded. The DVD obtained from the interview was properly labeled and stored in the case file.

The interview below is a summary and it is not intended to be a verbatim account and does not memorialize all statements made during the interview. The video recording captured the actual words spoken. The recording below is uniquely identified by authentication code ⟨LE⟩ (Exhibit 10).

After being advised of the identity of the interviewing SSAs, and the nature of the interview, CBPO ⬛ rovided the following information:

According to CBPO⬛ on January 2, 2017, CBPO⬛ requested assistance at the SY/POE primary inspection to manage a group of UDAs. CBPO⬛ responded and assisted with the arrest of a UDA later identified, as ⟨LE⟩ However,

Confidential     AOL-DEF-00014048

| DEPARTMENT OF HOMELAND SECURITY | **1. CASE NUMBER** |
|---|---|
| | 201802466 |
| | **PREPARED BY** |
| | ANTUNEZ, YANINA C |
| **REPORT OF INVESTIGATION CONTINUATION** | **2. REPORT NUMBER** |
| | 008 |

**10. NARRATIVE**

CBPO [ ] stated he was unaware UDA [ LE ] or the rest of the UDAs were asylum seekers. Furthermore, CBPO [ ] did not instruct CBPO [ ] to process the UDAs as asylum seekers. (Time Stamp 06:07:41)

During UDA [ LE ] arrest, CBPO [ ] observed CBPO [ ] drag a UDA by the legs to return the UDA to Mexico.

CBPO [ ] referenced the CBP muster briefing at the beginning of the shift and stated CBPOs were instructed to process all UDAs seeking asylum. CBPO [ ] stated, if he would have been the primary CBPO, he would have referred the group of UDAs to secondary inspection for processing and would have reported the incident to CBP management. (Time Stamp 5:53:58)

In closing, CBPO [ ] reiterated, during the aforementioned incident, they've (CBPOs) been instructed to process all UDAs seeking asylum. As to why the above-mentioned UDAs were not processed, CBPO [ ] stated he did not know.

On July 24, 2018, CBPO [ ] was interviewed at the Otay/POE by SSAs Antunez and Hittinger, CBP OPR/San Diego. CBPO [ ] was notified the interview would also be audio and video recorded. The DVD obtained from the interview was properly labeled and stored in the case file.

The interview below is a summary and it is not intended to be a verbatim account and does not memorialize all statements made during the interview. The video recording captured the actual words spoken. The recording below is uniquely identified by authentication code [ LE ] Exhibit 11).

After being advised of the identity of the interviewing SSAs, and the nature of the interview, CBPO [ ] provided the following information:

According to CBPO [ ] at the beginning of 2017, the SY/POE was undergoing an asylum seeker crisis. During that time, CBP management instructed CBPOs assigned to the midnight shift to follow current port policies, which he (CBPO [ ]) said were conflicting and constantly changing. Said policies instructed the CBPOs to stop the UDAs at the limit line within the SY/POE, and other policies instructed the CBPOs to stop the UDAs at the primary booth as long as they did not claim asylum. (Time Stamp 17:28:10)

**OFFICIAL USE ONLY**   **SENSITIVE**

| DEPARTMENT OF HOMELAND SECURITY | 1. CASE NUMBER |
|---|---|
|  | 201802466 |
| | PREPARED BY |
| | ANTUNEZ, YANINA C |
| REPORT OF INVESTIGATION CONTINUATION | 2. REPORT NUMBER |
| | 008 |

## 10. NARRATIVE

The above-mentioned policies indicated the UDAs would have to claim asylum at primary inspection before allowing them into the U.S. However, management instructed the CBPOs to direct UDAs to the Beta group in Tijuana, B.C., Mexico. (Time Stamp 17:29:00)

CBPO     explained CBP management kept CBPOs informed of new policies or changes during muster briefings and discussed said policies at the beginning of their shift. However, even though the CBPOs were briefed via a written muster, CBP management verbally directed them differently. (Time Stamp 17:34:18)

On January 2, 2017, CBPO     was assigned to the SY/POE primary pedestrian inspection area. CBPO     stated that a group of UDAs approached his booth and one of them placed a folder on the counter. CBPO     immediately identified the UDAs postures as travelers who routinely seek asylum.

However, in this case, the UDAs did not say anything; CBPO     simply directed the UDAs (south) to the Beta Group.

After CBPO     directed the UDAs to the Beta Group, the UDAs did not follow CBPO     orders and walked passed his (CBPO     ) booth without inspection. At that point, the UDAs were in the U.S. illegally and CBPO     requested CBPO assistance.

When the UDAs were intercepted, some complied and some did not comply with the CBPOs orders. One of the non-compliant UDAs, later identified as **LE** was arrested and taken into custody. During **LE** arrest, CBPO     intercepted one of the UDAs and directed him to the Beta Group. However, the UDA did not comply and threw himself/herself to the ground and became limp. CBPO     was then forced to lift him/her up, but since he/she refused to give CBPO     his/her hands or arms, CBPO     dragged him/her by the foot into Mexico.

Additionally, CBPO     believed that at the heat of the situation, dragging the UDA into Mexico was the best option given the circumstances. He dragged the UDA into Mexico because he/she refused to follow orders. "Yes, that is what I did." (Time Stamp 17:38:36)

CBPO     stated he failed to process the group of UDAs who walked passed his primary booth, due to CBP management's conflicting policies. CBPO     stated, "I do what I am told, what I am saying, I do what I am told. If they don't claim asylum, you could kick them back, if they tell me to process them that is what I am going do."

| DEPARTMENT OF HOMELAND SECURITY | 1. CASE NUMBER |
|---|---|
| | 201802466 |
| | **PREPARED BY** |
| | ANTUNEZ, YANINA C |
| **REPORT OF INVESTIGATION CONTINUATION** | **2. REPORT NUMBER** |
| | 008 |

**10. NARRATIVE**

Following CBPO ▮▮▮▮ above-mentioned statement, he was shown a copy of a muster briefing and was asked why he did not abide by the muster's instructions. CBPO ▮▮▮▮ stated that was his understanding and that is what he was going to do.

When CBPO ▮▮▮▮ was asked if he reported the incident to management, he stated, he probably should have reported the incident, but he did not.

According to the CBP Standard of Operating Procedures, CBPOs are to adhere to changes within the intake processing of UDAs seeking asylum. The procedures will ensure proper effectiveness of the CBPOs duties and responsibilities (Reference Exhibit 7).

In closing, CBPO ▮▮▮▮ reiterated, the SY/POE was in crisis mode and manned by a skeleton crew. CBPO ▮▮▮▮ stated he believes he performed his duties in good faith and he did not have malice towards the UDA he dragged into Mexico. In hindsight, he made a bad decision.

CPBO ▮▮▮▮ did not wish to review the January 2, 2017, incident between him and the UDA.

CBPO ▮▮▮▮ does not hold a security clearance.

Confidential        AOL-DEF-00014051

| DEPARTMENT OF HOMELAND SECURITY | 1. CASE NUMBER |
|---|---|
| | 201802466 |
| | **PREPARED BY** |
| | ANTUNEZ, YANINA C |
| **REPORT OF INVESTIGATION**<br>**Exhibit List** | **2. REPORT NUMBER** |
| | 008 |

1. **LE** written summary, dated November 16, 2017.
2. SY/POE video footage, dated January 2, 2017.
3. UDA **LE** video/audio recording, dated April 4, 2018.
4. UDA **LE** transcription, dated April 4, 2018.
5. SCBPO ████ email, dated June 7, 2018.
6. WC ████ video/audio recording, dated June 7, 2018.
7. Standard Operating Procedures (Muster), dated 6/27/16 to 12/7/17.
8. BC ████ video/audio recording, dated June 7, 2018.
9. CBPO ████ video/audio recording, dated July 20, 2018.
10. CBPO ████ video/audio recording, dated July 20, 2018.
11. CBPO ████ video/audio recording, dated July 24, 2018.

Confidential        AOL-DEF-00014052

3-SER-613

O F F I C I A L   U S E   O N L Y
DEPARTMENT OF HOMELAND SECURITY
U. S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY

NOVEMBER 16, 2017
# 201802466
# EXHIBIT 1
## LE written summary



DEPARTMENT OF HOMELAND SECURITY
U. S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
O F F I C I A L   U S E   O N L Y

201802466

EXHIBIT 1

Confidential

AOL-DEF-00014053

# AC, WP, DP, LE

**SUMMARY OF INCIDENT JANUARY 02, 2017:**

Report of Findings relates to CBPO ▓▓▓▓▓ pulling a passenger that attempted to apply for asylum on January 02, 2017 at approximately 2310 hours at the Pedwest facility at the San Ysidro Port of Entry.

The video reviewed reflects that five (5) individuals presented themselves at pedestrian primary booth 12, manned by CBPO ▓▓▓▓▓ One of the subjects has a brief discussion with CBPO ▓▓▓▓▓ at which time CBPO ▓▓▓▓ steps out of the booth to direct the group back to Mexico. The subjects fail to comply and three (3) of the five (5) proceed past the primary booth and attempt to Enter Without Inspection (EWI). CBPO(s) ▓▓▓▓▓▓▓▓ and ██████████ immediately approach the three subjects. CBPO ▓▓▓ returns to the post primary area and attempts to escort one of the subjects back to Mexico by placing his hands on the subject initiating movement towards Mexico. CBPO(s) ▓▓▓▓▓ and ▓ initiate the escort of the other subjects back to Mexico. CBPO(s) ▓▓▓▓▓▓▓▓▓▓▓▓▓ and Paragon contract security guards respond and assist with the escort back to Mexico.

While the group was being escorted, CBPO ▓▓▓ struggled with one of the subjects who falls to the ground. CBPO ▓▓▓ then grabs at the subject's legs and pulls her towards Mexico for a short distance. From the exterior camera viewed, the subject then stands and walks with the three other subjects who were all escorted back to Mexico.

The fifth subject later identified as [ LE ] was processed as an Expedited Removal/Credible Fear case (ER/CF). [ LE ] stated that she was a transgender and that she was traveling with three (3) other transgender persons and a gay man. Those four individuals appear to be the four individuals escorted back to Mexico.

1

Confidential

3-SER-615



In Secondary a personal search was conducted on ▨ LE ▨ by CBPO ████████ and witnessed by CBPO(s) ████████████████████████████████████
████████████████████

The CBPO officers involved in the initial encounter on pedestrian primary where the four subjects were encountered and eventually returned to Mexico were in violation of CBP's policy and guidance provided and mustered to all port of entry personnel on July, September, and November of 2016 reiterating the processing and handling of requests for asylum/credible fear.

The on duty supervisor at PedWest was Branch Chief ████████████ and the duty Watch Commander was ████████████████ who have indicated that they were not notified of the incident.

**BACKGROUND:**

In the first two quarters of FY 2017 the San Ysidro Port of Entry (SYS) continued to experience a surge of foreign nationals asserting claims of fear of returning to their home countries. San Ysidro continued to reach capacity and had to control the flow of undocumented travelers into our custody through queue management (metering). Queue management started at the San Ysidro POE on May 30, 2016 and concluded in February 2017. Through queue management, which was just one component of San Ysidro's planning to address the waves of incoming mass migration, San Ysidro was able to support an orderly process flow and prevent the facilities at the POEs from becoming dangerous – either to CBP officers or to those individuals being processed or detained by CBP. Queue management was a temporary measure that facilitated a safe process for people to apply to the United States at a time of historic migration movements to the United States along the SWB, including the surge of Haitian nationals arriving at the San Ysidro POE in the latter half of 2016. Queue management was conducted in partnership with entities of the government of Mexico responsible for immigration and humanitarian issues, as those entities similarly wanted to maintain an orderly flow of migrants. During periods when queue management protocols were used, Mexican nationals expressing a fear of return to Mexico were processed by the San Ysidro without delay, as their situation was distinct from those of third-country nationals, who were in Mexico awaiting processing by CBP for entry into the United States, and whose claim (if presented) related to the fear of returning to their country of origin, not the fear of remaining in Mexico. CBP officials engaged with various NGOs on the queue management process while it was happening. The San Ysidro Port Director held monthly in-person meetings with more than a dozen representatives from many non-governmental and humanitarian service organizations, to receive their feedback on how queue management was occurring. In July, September, and November of 2016 musters were sent to all San Ysidro and Otay Mesa CBP Officers informing them that under no circumstances will an asylum applicant be denied entry into the U.S and that any applicant for asylum encountered on primary should be taken into custody.

In January of 2017 San Ysidro was at capacity and under queue management protocols (metering). The AEU end of shift (2200) numbers for the time period of 01/02/17-01/04/17 indicate 292, 301 and 288. However, the situation in January was dynamic and fluid. Detention space was dependent on movement from ICE/ERO. San Ysidro were metering to capacity during that time period with additional numbers detained in AEU such as prosecutions and Material Witnesses not included in the AEU End of Shift report. Officers were briefed that any

2

applicant for asylum encountered on primary should be taken into custody, escorted to the security office, and transported to the PedWest facility for proper intake and processing.

# AC, WP, DP, LE

3

Confidential

AOL-DEF-00014056

3-SER-617

O F F I C I A L   U S E   O N L Y
DEPARTMENT OF HOMELAND SECURITY
U. S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY

JANUARY 2, 2017
# 201802466
# EXHIBIT 2
# SY/POE video footage



DEPARTMENT OF HOMELAND SECURITY
U. S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
O F F I C I A L   U S E   O N L Y

201802466

EXHIBIT 2

Confidential

AOL-DEF-00014057

OFFICIAL USE ONLY
DEPARTMENT OF HOMELAND SECURITY
U. S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY

APRIL 4, 2018
**201802466**
**EXHIBIT 3**

**LE**   video/audio recording



DEPARTMENT OF HOMELAND SECURITY
U. S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
OFFICIAL USE ONLY

201802466

**EXHIBIT 3**

Confidential

AOL-DEF-00014058

O F F I C I A L   U S E   O N L Y
**DEPARTMENT OF HOMELAND SECURITY**
**U. S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**

APRIL 4, 2018
# 201802466
# EXHIBIT 4
## LE interview's transcription



**DEPARTMENT OF HOMELAND SECURITY**
**U. S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
O F F I C I A L   U S E   O N L Y

201802466

**EXHIBIT 4**

Confidential

AOL-DEF-00014059

April 4, 2018

201802466 CBP █████/SSA Yanina Antunez/CBP OPR/San Diego

SSA Shannon Malone and SSA Ralph Velez/CBP OPR/Washington, D.C.

14:11:23 10:01 am

LE

***The following is a transcription of***
***interview:***

LE

**Ralph** - Declaracion de el LE

SSA Shannon Malon and SSA Ralph Velez

LE

**Ralph** - Bajo Juramento

**Ralph** — Estas aqui para oir que nos puede decir de que se acuerda de un evento que ocurrio que se alega que un oficial de CBP alegadamente arrastro a un pasagero por las piernas y lo regreso a Mexico, en Enero 2, 2017, San Ysidro.

LE De ese suceso, Bueno nosotros nos acercamos eramos hibamos unas companeras eras cinco en total nos acercamos al puerto de entrada de Otay Mesa en primer instancia a pedir ayuda por asilo politico.  Por lo cual en la puerta de entrada de Otay Mesa el official no nos agredio solamente nos saco y nos dijo que nos direigieramos al Puerto de San Ysidro.  Lo cual nosotros eso hicimos, estando en San Ysidro hicimos todo correctamente la linea como se tiene que hacer y al momento de pasar a el area donde se registra para entrar a los estados unidos yo doy frente mis companeros hiban atras de mi y yo platique con un agente, y dige que hibamos a pedir asilo.

**Ralph** — Mas despacio para captar toda su declaracion.

LE Yo entregue mi pasaporte, al momento de darle mi pasaporte el official salio de su cubiculo donde esta su computadora, y se dirigio asia la entrada y nosotros no hablamos ingles pero nos hacia entender con las mamos a senas de que salieramos por donde habiamos regresado y que por ahi nos hiban a ayudar que habia una cabinita no recuerdo "grupo veta" creo que grupo veta nos hiba a ayudar entonces nosotros nos decidimos salirnos una companera y mi persona comnsamos a caminar por el lado de la computadora pasamos la computadora porque yo sabia que por eso me hiban a arrestar. Osea se que es un error, que rompi una regla pero era la unica manera de que me arrestaran lo hize de una manera pacifica.

**Ralph** — Y usd lo hizo aproposito y porque usd hizo eso?

LE En Primer instancia porque yo pedi una ayuda puerta de entrada por la cual no se me brindo que fue en la de Otay Mesa.  Segunda instancia yo ya le habia pedido tanbien al official pedirle una ayda al official el official queria sacarme y mandarme a el grupo veta.  Que hace el grupo veta, deportar a personas a Mexico. Yo recorri Mexico por mucho tiempo fue un largo viaje para llegar a donde estaba lo

Confidential

AOL-DEF-00014060

que yo llagaba a buscar no hera una ayda que no se me estaba brindando. Pues la instancia por que yo tome esta decision fue una decision muy acelerada pero lo hice pore so porque yo estaba buscando ayuda por la cuel no se me estaba brindando, fue por eso. Continueando, lo que sucedio al momento que yo hice eso una companera y mi persona traspasamos la computadora come le dije y los otros tres companeros se quedaron de lado de donde estabe nosotros nos traspasamos y los otros tres se quedaron de el otro lado. Cuando yo me traspase unos oficiales llegaron y nos agarraron y me arrinconaron en la pared, no puedo decir a certeza cuantos oficiales fueron si puedo decir que eran mas de tres o cuatro oficiales me arrinconaron contra la pared segun lo que yo recuerdo recuerdo que me agarraban del cuello lo que ellos querian hacer era sacarnos. A mi otra companera tanbien le digeron que se saliera.

**Ralph** - Como se llama ella?

**LE**   **LE**   ▮ la que se habia metido con migo decidido salirse, se regreso para el lado de Mexico. Otra companera de los tres que estaban afuera ▮▮ estaba ▮ y estaba ▮▮ ▮ mi companera la sacaron a rastras de los pies.

**Ralph** – ▮ fue a la que sacaron.

**LE**   Si correcto, **LE**   se habia quedado con el grupo de lost res.

**Ralph** - Y usd precencio eso?

**LE**   En el momento que me estaban agarrando a mi estaba biendo todo estaba biendo por todos lados y vi como mis companeros se salieron.

**Ralph** – Y usd vio cuando **LE** el official de CBP la arrastro?

**LE**   La agarro de la pierna como para que se saliera ella no se queria salir.

**Ralph** – Usd presencio eso?

**LE**   Si, osea si fue un momento muy rapido pero si.

**Ralph** – Ok, y que paso despues.

**LE**   Bueno, a ellos los sacaron yo ya no supe que paso.

**Ralph** – Y usd que le paso con usd?

**LE**   Con migo se quedaron los oficiales, ahi forsejiando al final no me pudieron sacar y llego otro official y dijo que me hiban a arrastar que hera lo que yo queria y me arrestaron se fueron para Bueno me llevaron a un cuartito que estaba a la buelta.y empesaron a revisar todas mis pertenencias me diejiaron que me quitara mis anillos y mis aretes y me los quite y luego de eso empesaron a revisar mis pertenencias, yo soy una persona VIH positive yo utilize mis medicamentos yo llevava mis medicamentos ese dia con mi personal lo que sucedio fue de que el official al ver mis medicamentos solo se les quedo viendo los agaro y se fue con un grupo de oficiales no se que les dijo no puedo decirles que fue lo que les dijo. Cuando regreso me pregunto que si yo estaba enfermo? Perdon, me dijo que si estaba enfermo y le dije que si. Y me dijo guarda tus perternencias, de ahi me llevaron a tomar fotografia. Luego me encerraron en un cuartito no se que me imagina que era de madrugada. Perdi la nocion del tiempo.

**Ralph** - Te voy a mostrar el video para que tu me expliques que fue lo que paso? Paso a paso? Para el record, estamos tratando de prender el video para que el [ LE ] lo pueda observar. Ahora, quiero que me diga cual e suds aqui en este vido y el grupo que me esta hacienda referencia? Esos son uds? Creo que eran cinco, unos dos tres. Esta personal es parte del grupo. Es usd?

[ LE ] Si so yo, lo que esta sucediendo es lo que yo le mencionabe desde el principio llegamos hicimos la linea correctamente al momento de que llego nuestro turno.

**Ralph** – Bienen de Mexico?

[ LE ] Estabmos en Tijuana. Me parece si mas no recuerdo, que en esa computadora en una de las dos nos toco si fue en una computadora de este lado. El official llama, ella es [ LE ] Ahi estabamos el official me pidio los documentos le di mi pasaporte. Y le dije que pediamos asilo. El official toma mi pasaporte y me lo dio nos esta haciendo senales con la mano que vengamos y nos dirige hacia la salida. Que nos regresemos y que nos fueramos para el grupo veta also asi le entendimos que el grupo veta nos va a ayuda, nosotros ya sabemos el grupo veta lo que hace es deportar a las personas. Entonces los otros tres companeros se quedaron ayi en lo que el official se movio a otra area yo y otra companera estephanie nos metimos y yo commence a caminar por este lado obiamente yo sabia que me hiban a arrestar que me hiban a detener y fue lo que paso. Ahi Bueno ahi me tenian a mi, fue un forcejeo, esa persona es estephanie.

**Ralph** – Quien es la que esta en el piso?

[ LE ] Ella es [ LE ] Casi no distingo todos andabamos ropa negra. Ese es el official, la hiba arrastrando del pie, fue lo que vi fue algo muy rapido. Los oficiales me tenian arrinconado en la pared. ▮▮▮ se salio, estephani tanbien decidio salirse.

**Ralph** – Que mas me puede decir de ese suceso?

[ LE ] Que mas puedo decir, nunca pense que las cosas se fueran a dar como se dieron yo llegue buscando una ayuda y esperaba que me la brindaran esperaba un proceso correspondiente y correcto yo ya leido como es el proceso y yo me he metido en la pagina de imigracion y habia leido que puedes pedir ayuda en una puerta de entrada ya sea por barco..yo esperaba que se hiciera pues las cosas no se dieron como you pensaba.

**Ralph** – Entonces como salio usd del Puerto de san Ysidro?

[ LE ] Yo nunca Sali de ayi. Pase 14 dias encerrado en ese lugar. Luego me trasladaron al centro de detenciones en MCC. Y luego pase de esa fecha pase encerrado asta el 31 de julio fue que Sali. Desde que Sali me estube unos dias en casa de mis tios, y me mude aca el 28 de Agosto.

**Ralph** – Aguna otra cosa? Tiene algo que decir de el de la imagen/video? Cual fue el Puerto de entrada que usd utilize para buscar asilo?

[ LE ] El primer el de otay mesa, lo cual el official nos mando a san Ysidro. 5 personal, [ LE ]
[ LE ]

**Ralph** – Que Asian en Mexico?

**LE** Nos conosimos en un albergue de mariposas que esta ahi en Mexico. Ahi nos conosimos ese dia yo dije que me hiba a entregar, y ellos me acompanaron habiamos formado como una Amistad.

**Ralph** – Que les dijo usd a los oficiales de CBP cuando CBP se acerco a la inspeccion en primary?

**LE** Cuando me acerque a la computadora, que hibamos por asilo, que si nos podian ayudar me pregunto que si todos, le dije que si me pidio mis documentos le di mi pasaporte, lo que salio en el video salio que nos regresaramos.

**Ralph** – Eran usd siguieron las instrucciones de CBP?

**LE** En mi caso no, yo hiba con la intencion de que me arrestaran.

**Ralph** – Entonces usd da testimonio de que usd precencio hizo con **LE** fue la que se callo al pizo y el la arrastro.

**LE** 'o lo vi en una menera rapida, no como en el video yo vi cuando la hiban sacando.

**Ralph** – Alguna otra cosa que usd quiera decir.

**LE** No tengo por el momento algo mas que agregar.

**Ralph** – Se siente usd intimidado, nos hemos portado con mucho respeto?

**LE** Al principio le marque a mi abogada, pero ella me dijo que no habia ningun problema.

Ralph – Esto conclulle la declaracion de el **LE** son las 10:23 am

Confidential

AOL-DEF-00014063

O F F I C I A L   U S E   O N L Y
DEPARTMENT OF HOMELAND SECURITY
U. S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY

JUNE 7, 2018
## 201802466
## EXHIBIT 5
## SCBPO ███████ email



DEPARTMENT OF HOMELAND SECURITY
U. S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
O F F I C I A L   U S E   O N L Y

201802466

EXHIBIT 5

Confidential

AOL-DEF-00014064

**ANTUNEZ, YANINA (OPR)**

| | |
|---|---|
| **From:** | ANTUNEZ, YANINA (OPR) |
| **Sent:** | Thursday, June 7, 2018 4:44 PM |
| **To:** | |
| **Subject:** | RE: 201802466 |

Thank you.

**From:** 
**Sent:** Friday, June 08, 2018 12:40:45 AM
**To:** ANTUNEZ, YANINA (OPR)
**Subject:** RE: 201802466

10/4, I'll take a look tomorrow.

**From:** ANTUNEZ, YANINA (OPR)
**Sent:** Thursday, June 07, 2018 4:04:29 PM
**To:** 
**Subject:** RE: 201802466

> **LE**

Thank you so much,

Yanina

**From:** 
**Sent:** Thursday, June 07, 2018 11:25:37 PM
**To:** ANTUNEZ, YANINA (OPR)
**Subject:** RE: 201802466

Yanina,

We were never positive as to which person that arrived the following day was the one who was dragged. We have 2 possible.

> **LE**

And

> **LE**

Hope that helps!

1

Confidential

AOL-DEF-00014065

**From:** ANTUNEZ, YANINA (OPR)
**Sent:** Thursday, June 07, 2018 11:48 AM
**To:**
**Subject:** 201802466

Ms.

Per our telephone conversation, below is my contact information. Thank you in advance.

(January 2, 2017, five transgender individuals who sought political asylum at the SY/POE)

Yanina

*Yanina Antunez*
*Senior Special Agent*
*U.S. Department of Homeland Security*
*U.S. Customs and Border Protection*
*Office of Professional Responsibility*
*610 W. Ash St., Suite 1600*
*San Diego, CA 92101*

CONFIDENTIALITY NOTICE/SENSITIVITY NOTICE: This message is intended exclusively for the individual or entity to which it is addressed. This communication may contain information that is law enforcement sensitive, proprietary, privileged, or confidential, and may be legally protected or otherwise exempt from disclosure. This message may be forwarded by the addressee, as appropriate, to further disseminate law enforcement sensitive information, as needed. If you have received this message in error, please notify the sender immediately by email and delete all copies of this message.

2

AOL-DEF-00014066

O F F I C I A L   U S E   O N L Y
DEPARTMENT OF HOMELAND SECURITY
U. S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY

JUNE 7, 2018
# 201802466
# EXHIBIT 6
## WC ▮▮▮▮▮ video/audio recording



DEPARTMENT OF HOMELAND SECURITY
U. S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
O F F I C I A L   U S E   O N L Y

201802466

**EXHIBIT 6**

Confidential

AOL-DEF-00014067

O F F I C I A L   U S E   O N L Y
**DEPARTMENT OF HOMELAND SECURITY**
**U. S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**

**6-27-16 TO 12-7-17**
# 201802466
# EXHIBIT 7
# Standard Operating Procedures
# (Muster briefings)



**DEPARTMENT OF HOMELAND SECURITY**
**U. S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
O F F I C I A L   U S E   O N L Y

**201802466**

**EXHIBIT 7**

Confidential

AOL-DEF-00014068

3-SER-629




### Customs and Border Protection
### San Ysidro/Otay Mesa Ports of Entry
### STANDARD OPERATING PROCEDURES

# MUSTER

**TO:**     **All Uniformed Personnel**
            **San Ysidro/Otay Mesa**

**From:**   **Port Director Aki**
            **San Ysidro Port of Entry**

Due to the ongoing construction and infrastructure limitations at SYS/OTM port of entry; and to provide the most efficient processing of travelers, the following protocols will be adhered to:

**<u>Limit Line Personnel:</u>**

Under no circumstances will an asylum applicant be denied entry into the U.S. Please direct all applicants to the Pedestrian West (PedWest) facility for proper intake and processing.

**<u>Primary Personnel:</u>**

Any applicant for asylum encountered on primary (pedestrian/vehicle/CBX) should be taken into custody, escorted to the security office, and transported to the PedWest facility for proper intake and processing.

Your adherence to these procedures will ensure proper effectiveness of our duties and responsibilities. Thx.

1

---

San Ysidro/Otay Mesa Ports of Entry             July 27, 2016

Confidential             AOL-DEF-00014069



## Customs and Border Protection
## San Ysidro/Otay Mesa Ports of Entry
## STANDARD OPERATING PROCEDURES



# MUSTER

**TO:** **All Uniformed Personnel**
**San Ysidro/Otay Mesa**

**From: Port Director Aki**
**San Ysidro Port of Entry**

Due to the ongoing construction and infrastructure limitations at SYS/OTM port of entry; and to provide the most efficient processing of travelers, the following protocols will be adhered to:

### Limit Line Personnel:

Under no circumstances will an asylum applicant be denied entry into the U.S. Please direct all applicants to the Pedestrian West (PedWest) facility for proper intake and processing.

### Primary Personnel:

Any applicant for asylum encountered on primary (pedestrian/vehicle/CBX) will be taken into custody, escorted to the security office, and transported to the PedWest facility for proper intake and processing.

### PedWest:

All Mexican credible fear cases will proceed to primary for processing, under no circumstance will a Mexican credible fear case be returned to Mexico.

Your adherence to these procedures will ensure proper effectiveness of our duties and responsibilities. Please do not deviate from these procedures or misinform travelers applying for credible fear/asylum as it can result in a human rights violation and/or personal and agency liability.

1

San Ysidro/Otay Mesa Ports of Entry                    September 01, 2016

**ANTUNEZ, YANINA (OPR)**

| | |
|---|---|
| **From:** | RODRIGUEZ, CARLOS C |
| **Sent:** | Tuesday, November 15, 2016 8:26 PM |
| **To:** | ^CBP_ALL SAN YSIDRO POE EMPLOYEES; ^CBP_ALL OTAY MESA POE EMPLOYEES |
| **Subject:** | Limit Line Muster |

Team,

Due to the ongoing construction and infrastructure limitations at SYS/OTM port of entry; and to provide the most efficient processing of travelers, the following protocols will be adhered to:

Limit Line Personnel:

Under no circumstances will an asylum applicant be denied entry into the U.S. Please direct all applicants to the Pedestrian West (PedWest) facility for proper intake and processing.

Primary Personnel:

Any applicant for asylum encountered on primary (pedestrian/vehicle/CBX) should be taken into custody, escorted to the security office, and transported to the PedWest facility for proper intake and processing.

Your adherence to these procedures will ensure proper effectiveness of our duties and responsibilities.

1

**ANTUNEZ, YANINA (OPR)**

| | |
|---|---|
| **From:** | HOOD, ROBERT W |
| **Sent:** | Friday, April 14, 2017 2:35 PM |
| **To:** | SYS-OTM-MNGR |
| **Cc:** | HOOD, ROBERT W; AKI, SIDNEY K; CASTILLO, MOISES; MISENHELTER, JOSEPH; RODRIGUEZ, CARLOS C |
| **Subject:** | AEU Detention Space and Asylum Seekers |

**Importance:** High

To ALL Managers,

Currently AEU has adequate detention space to process any applicant for asylum encountered at our facilities. Any asylum applicant we encounter should be taken into custody, escorted to the security office, and then transported to AEU for proper intake and processing. We should not be sending any asylum seekers back to Mexico. Please remind our officers.

Thank you,

Robert Hood

Customs & Border Protection

Assistant Port Director

San Ysidro Tactical Operations

1

Confidential

AOL-DEF-00014072

3-SER-633

Confidential

AOL-DEF-00014073

O F F I C I A L   U S E   O N L Y
DEPARTMENT OF HOMELAND SECURITY
U. S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY

JUNE 7, 2018
**201802466**
**EXHIBIT 8**
**BC ███████ video/audio recording**



DEPARTMENT OF HOMELAND SECURITY
U. S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
O F F I C I A L   U S E   O N L Y

201802466

**EXHIBIT 8**

Confidential

AOL-DEF-00014074

O F F I C I A L   U S E   O N L Y
**DEPARTMENT OF HOMELAND SECURITY**
**U. S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**

**JULY 20, 2018**
# 201802466
# EXHIBIT 9
# CBPO ▮▮▮▮▮ video/audio recording



**DEPARTMENT OF HOMELAND SECURITY**
**U. S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
O F F I C I A L   U S E   O N L Y

201802466

**EXHIBIT 9**

Confidential

AOL-DEF-00014075

O F F I C I A L   U S E   O N L Y
**DEPARTMENT OF HOMELAND SECURITY**
**U. S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**

JULY 20, 2018
# 201802466
# EXHIBIT 10
# CBPO ▮▮▮▮ video/audio recording



**DEPARTMENT OF HOMELAND SECURITY**
**U. S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
O F F I C I A L   U S E   O N L Y

201802466

**EXHIBIT 10**

Confidential

AOL-DEF-00014076

O F F I C I A L   U S E   O N L Y
**DEPARTMENT OF HOMELAND SECURITY**
**U. S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**

**JULY 24, 2018**
# 201802466
# EXHIBIT 11
# CBPO ▮▮▮▮ video/audio recording



**DEPARTMENT OF HOMELAND SECURITY**
**U. S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
O F F I C I A L   U S E   O N L Y

201802466

**EXHIBIT 11**

Confidential

AOL-DEF-00014077

MAYER BROWN LLP
  Matthew H. Marmolejo (CA Bar No. 242964)
  *mmarmolejo@mayerbrown.com*
350 S. Grand Avenue
25th Floor
Los Angeles, CA 90071-1503
  Ori Lev (DC Bar No. 452565)
  (*pro hac vice*)
  *olev@mayerbrown.com*
  Stephen M. Medlock (VA Bar No. 78819)
  (*pro hac vice*)
  *smedlock@mayerbrown.com*
1999 K Street, N.W.
Washington, D.C. 20006
Telephone:  +1.202.263.3000
Facsimile:   +1.202.263.3300

SOUTHERN POVERTY LAW CENTER
  Melissa Crow (DC Bar No. 453487)
  (*pro hac vice*)
  *melissa.crow@splcenter.org*
1101 17th Street, N.W., Suite 705
Washington, D.C. 20036
Telephone: +1.202.355.4471
Facsimile: +1.404.221.5857

*Additional counsel listed on next page*
*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*, | Case No.:  17-cv-02366-BAS-KSC |
| Plaintiffs, | **EXHIBIT 12 IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| Chad F. Wolf,[1] *et al.*, | |
| Defendants. | **FILED UNDER SEAL** |

---

[1] Acting Secretary Wolf is automatically substituted for former Acting Secretary McAleenan pursuant to Fed. R. Civ. P. 25(d).

CENTER FOR CONSTITUTIONAL RIGHTS
    Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
    *bazmy@ccrjustice.org*
    Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
    *gschwarz@ccrjustice.org*
    Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
    *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
    Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
    *sarah.rich@splcenter.org*
    Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
    *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
    Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
    *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

EXHIBIT 12 IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT

3-SER-640



United Nations High Commissioner for Refugees
Haut Commissariat des Nations Unies pour les réfugiés

**UNHCR**
**United Nations High Commissioner for Refugees**
Regional Representation in Washington

1800 Massachusetts Ave NW      Tel.:  (202) 296.5191
Suite 500                       Fax:  (202) 296.5660
Washington, DC  20036           Email: cardoletti@unhcr.org

6 October 2016

René N. Hanna
Deputy Chief of Staff (Policy)
Office of the Commissioner
US Customs and Border Protection
1300 Pennsylvania Ave. NW, Ste. 4.4A
Washington, DC 20229

Re:      **UNHCR Site Visit to San Ysidro Port of Entry**

Dear Ms. Hanna,

On behalf of the United Nations High Commissioner for Refugees (UNHCR), I wish to thank you and
your staff for facilitating the site visit for me and my colleagues, Ms. Katie Tobin, Assistant Protection
Officer, and Mr. Jose Sieber Luz, Senior Protection Officer (Mexico), at the San Ysidro port of entry
during the week of 12 September 2016. The warm reception and thorough briefings received by my
colleagues from Customs and Border Protection (CBP) and Immigration and Customs Enforcement
(ICE) during the visit were very much appreciated.

We were particularly impressed to see the sincere efforts made by the various DHS counterparts at the
border to ensure access to the United States protection for vulnerable persons despite ongoing capacity
challenges and increasing numbers of arrivals.

Kindly find enclosed a short report reflecting UNHCR's findings and recommendations from the site
visit. These recommendations aim not only to address the situation of Haitians arriving at the San
Ysidro port of entry, but also ensure that access to asylum for all individuals seeking protection at the
US border is preserved.

We are aware that following our site visit, there has been a change in the US policy on returns to Haiti.
UNHCR advises careful consideration in the implementation of this new policy, particularly in light of
current events affecting stability in the country, such as the National Elections and Hurricane Matthew.

We remain available, of course, to discuss any aspects of the report and look forward to continued
collaboration on this situation and other issues of mutual concern.

Kind regards,

Chiara Cardoletti-Carroll
Deputy Regional Representative for
the USA & Caribbean

CC:      Serena Hoy, Senior Counsel, Office of the Deputy Secretary, DHS
Jennifer Higgins, Deputy Chief of Staff, Office of the Deputy Secretary, DHS
J. Ryan Hutton, Deputy Executive Director, Admissibility and Passenger Programs, CBP Office of Field
Operations, DHS

Confidential                                                                    AOL-DEF-00046740



United Nations High Commissioner for Refugees
Haut Commissariat des Nations Unies pour les réfugiés

**UNHCR Findings and Recommendations
Site Visit to San Ysidro Port of Entry
12-14 September 2016**

**Background:**

In recent months, the Office of the United Nations High Commissioner for Refugees (UNHCR) has been closely following the secondary movement of Haitians from Brazil to the United States and is aware that nearly 5000 have arrived at the San Ysidro port of entry since May 2016, disrupting business as usual for US Customs & Border Protection (CBP) and other sub-agencies within the Department of Homeland Security (DHS) processing cases there.

On the week of 12 September 2016, the Department of Homeland Security (DHS) Headquarters facilitated a site visit for UNHCR to observe CBP and ICE operations at San Ysidro to better understand the challenges created by the recent influx. In its advisory capacity, UNHCR agreed to provide confidential comments to DHS following the visit. Below is a summary of UNHCR's key findings and recommendations.

**Findings:**

- The number of Haitian nationals arriving at San Ysidro port of entry is on the rise. UNHCR witnessed large numbers being processed while visiting the port of entry on 13 September. According to CBP, most Haitian nationals seeking admission at the San Ysidro port of entry are not seeking asylum. While some may fear return to Haiti, CBP reports that the majority are not expressing fear at the port of entry. Instead, they are expressing interest in working and/or reuniting with family in the US. This was also confirmed by the anecdotal accounts of a group of Haitian nationals in CBP custody. A large majority of the Haitians are coming from Brazil. Many had children born there.

- When it comes to the magnitude of the phenomenon, UNHCR understands there is a significant backlog of Haitian cases at the Tijuana side of the border. Furthermore, the Mexican press reports that at least 950 Haitians requested appointments at the San Ysidro port of entry on 12 September alone. According to NGOs, Haitians have also been arriving in increasing numbers at other ports of entry in recent weeks, such as Calexico, which is far less resourced than San Ysidro. In addition to adult males, there is an increasing number of women and children making the journey. This flow is expected to continue in the coming months.

- According to CBP, some of the key reasons underlining this rise in movements are: 1) declining opportunities in Brazil following the end of the Olympics; 2) the recent extension of Temporary Protected Status (TPS) by the Secretary of DHS which has been interpreted by many Haitians (and smugglers) as a signal that the current favorable treatment of Haitians will continue.

- Both CBP and ICE in Southern California are currently doing what they can with existing resources to process the Haitians expeditiously and humanely and maintain regular

1

Confidential

AOL-DEF-00046741

processing of asylum-seekers. The agencies have also developed strong partnerships with local NGOs to manage release and family reunification. Due to the influx of Haitians, CBP's asylum processing capacity has however been significantly limited in recent months. At least half of CBP's staffing and space previously dedicated to processing asylum-seekers is now being used to process Haitian parole cases. A multi-year construction project is further limiting CBP's asylum processing capacity.

- Haitians and non-Mexican asylum-seekers, including those from Central America, continue to be subject to a metering system in Tijuana. The Mexican authorities (INM) are currently running the metering system in collaboration with CBP to issue appointments to be processed at the port of entry. Appointment dates are distributed every Monday, Wednesday and Friday. According to CBP, the wait time for an appointment is currently between four days and one week. NGOs in Mexico report that the wait time is considerably higher, averaging between 20 and 25 days. The metering system was developed in an effort to better manage the influx at the port of entry. However, by increasing reception and processing capacity at the port of entry and streamlining procedures, such a metering system could be avoided. Needless to say, a system that limits and regulates access to a border is inherently problematic, as it is vulnerable to abuse and exploitation. Just this week, UNHCR received reports of Haitians selling their appointments for 500 USD.

- On the positive side, according to CBP, Mexican asylum-seekers are no longer subject to the metering system at San Ysidro. However, INM and Mexican NGOs both report that a ceiling of 50 Mexican asylum-seekers per day persists. Mexican asylum-seekers turned away at the port of entry on a given day are seeking to stay at the same four migrant shelters as the Haitians. Many are also resorting to sleeping on the streets of Tijuana.

- Tijuana and San Diego are currently overwhelmed with the number of Haitians arriving and seeking shelter. In recent weeks, there has been increasing media coverage of what is being labeled a "humanitarian crisis." Images and stories of long lines in Tijuana featured prominently in the Mexican press this week. This vulnerable population requires urgent attention.

**Recommendations:**

- Recognize the Haitian situation at San Ysidro as a surge and activate existing protocols for mass migration processing. To this end, UNHCR recommends that DHS open as a pilot project a temporary central processing center near the San Ysidro port of entry to offer reception and process Haitian parole claims. This is something that CBP is already positively considering following discussions with them at the border.

- Re-evaluate current protocols and streamline parole processing at the port of entry to significantly reduce the processing time for Haitian parolees and look for opportunities to curtail the process and omit any duplicative steps taken by CBP and ICE in light of the rising numbers.

2

Confidential

AOL-DEF-00046742

- Urgently reconsider the use of a metering system (appointment system) for asylum-seekers and other vulnerable populations approaching the port of entry. This recommendation goes hand-in-hand with the recommendation for a central processing center.

- Invest in shelter capacity and other humanitarian aid in Tijuana and San Diego for the Haitian population. Take proactive steps to meet the needs of this vulnerable population.

**UNHCR Regional Office Washington**
**6 October 2016**

3

Confidential

AOL-DEF-00046743

1   MAYER BROWN LLP
      Matthew H. Marmolejo (CA Bar No. 242964)
2     *mmarmolejo@mayerbrown.com*
    350 S. Grand Avenue
3   25th Floor
    Los Angeles, CA 90071-1503
4     Ori Lev (DC Bar No. 452565)
      (*pro hac vice*)
5     *olev@mayerbrown.com*
      Stephen M. Medlock (VA Bar No. 78819)
6     (*pro hac vice*)
      *smedlock@mayerbrown.com*
7   1999 K Street, N.W.
    Washington, D.C. 20006
8   Telephone:  +1.202.263.3000
    Facsimile:   +1.202.263.3300
9
    SOUTHERN POVERTY LAW CENTER
10    Melissa Crow (DC Bar No. 453487)
      (*pro hac vice*)
11    *melissa.crow@splcenter.org*
    1101 17th Street, N.W., Suite 705
12  Washington, D.C. 20036
    Telephone: +1.202.355.4471
13  Facsimile: +1.404.221.5857

14  *Additional counsel listed on next page*
    *Attorneys for Plaintiffs*
15
                 **UNITED STATES DISTRICT COURT**
16
                **SOUTHERN DISTRICT OF CALIFORNIA**
17

18  Al Otro Lado, Inc., *et al.*,            Case No.:  17-cv-02366-BAS-KSC

19                    Plaintiffs,            **EXHIBIT 14 IN SUPPORT OF**
                                             **PLAINTIFFS' MEMORANDUM OF**
20          v.                               **POINTS AND AUTHORITIES IN**
                                             **SUPPORT OF THEIR MOTION**
21  Chad F. Wolf,[1] *et al.*,               **FOR SUMMARY JUDGMENT**

22                    Defendants.
                                             **FILED UNDER SEAL**
23

24

25

26

27  _____
    [1] Acting Secretary Wolf is automatically substituted for former Acting Secretary
28  McAleenan pursuant to Fed. R. Civ. P. 25(d).

1

2     CENTER FOR CONSTITUTIONAL RIGHTS
          Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
3         *bazmy@ccrjustice.org*
          Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
4         *gschwarz@ccrjustice.org*
          Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
5         *aguisado@ccrjustice.org*
6     666 Broadway, 7th Floor
      New York, NY 10012
7     Telephone: +1.212.614.6464
      Facsimile: +1.212.614.6499
8

9     SOUTHERN POVERTY LAW CENTER
          Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
          *sarah.rich@splcenter.org*
10        Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
          *rebecca.cassler@splcenter.org*
11    150 E. Ponce de Leon Ave., Suite 340
12    Decatur, GA 30030
      Telephone: +1.404.521.6700
13    Facsimile: +1.404.221.5857

14    AMERICAN IMMIGRATION COUNCIL
          Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
15        *kwalters@immcouncil.org*
16    1331 G St. NW, Suite 200
      Washington, D.C. 20005
17    Telephone: +1.202.507.7523
      Facsimile: +1.202.742.5619
18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 14 IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT

3-SER-646

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

```
                                )
AL OTRO LADO, INC., ET          )
AL.,                            )
    PLAINTIFFS,                 )
                                )
VS.                             ) CASE NO.
                                ) 17-cv-02366-BAS-KSC
                                )
KEVIN K. MCALEENAN, ET          )
AL.,                            )
    DEFENDANTS.                 )
```

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF

RODNEY HARRIS

JUNE 2, 2020

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION of RODNEY HARRIS,
produced as a witness at the instance of the Plaintiff,
and duly sworn, was taken in the above-styled and
numbered cause on June 2, 2020, from 10:23 a.m. to 6:27
p.m., before Delia Ordonez, CSR in and for the State of
Texas, reported by machine shorthand, via Webex Magna
LegalVision.

Magna Legal Services

866.624.6221

www.MagnaLS.com



Page 2

```
 1                  A P P E A R A N C E S
 2    FOR THE PLAINTIFFS:
 3         Rebecca Cassler
           Sara Rich
 4         Southern Poverty Law Center
           1101 17th Street, N.W., Suite 705
 5         Washington, D.C. 20036
           202.355.4471
 6         Rebecca.cassler@splcenter.org
           Sara.rich@splcenter.org
 7
           Allison Parr
 8         Steve Medlock
           Mayer Brown
 9         1999 K Street, N.W.
           Washington, D.C. 20006
10         202.263.3221
           AWParr@mayerbrown.com
11
      FOR THE DEFENDANTS:
12
           Ari Nazarov
13         Dhruman Y. Sampat
           U.S. Department of Justice
14         Office of Immigration Litigation
           P.O. Box 868, Ben Franklin Station
15         Washington, D.C. 20044
           202.598.8259
16         Ari.Nazarov@usdoj.gov
           Dhruman.y.sampat@usdoj.gov
17
18    ALSO PRESENT:
19         Louisa Slocum, CBP
20         Benjamin Wolarsky
21    THE VIDEOGRAPHER:
           Noah Fox
22
      THE MAGNA LEGAL TECHNICIAN:
23
           Kevin Cranford
24
25
```



MAGNA
LEGAL SERVICES

Page 3

```
 1                       INDEX
            ORAL AND VIDEOTAPED DEPOSITION OF
 2                   RODNEY HARRIS
                     JUNE 2, 2020
 3
 4              E X A M I N A T I O N
 5   RODNEY HARRIS                      P A G E
 6        By Ms. Rebecca Cassler...........    6
 7        By Ms. Allison Parr..............   236
 8        By Mr. Ari Nazarov..............    286
 9   FURTHER EXAMINATION
10        By Ms. Rebecca Cassler...........  291
11
12   Signature and Changes.................  294
13   Reporter's Certificate...............   296
14
15
16
17
18
19
20
21
22
23
24
25
```



Page 105

1    A.  Yes.

2    Q.  -- was "yes"?

3         Okay.  And then that list keeper will

4    provide the port information about who's next on the

5    list, right?

6    A.  Not necessarily.  In -- in -- that, again,

7    could vary by port.  In some ports, yes, and other

8    ports, you know, they might just send the number that

9    the port requested to the bridge.

10   Q.  Okay.  And when the list is kept by INM, then

11   INM and CBP coordinate to ensure that those migrants are

12   dropped off at a specified place and time, right?

13   A.  That's a fair statement.

14   Q.  Okay.  And when the list keeper is a shelter or

15   shelter staff, then the shelter and INM and CBP might

16   all communicate to arrange that processing, right?

17   A.  Yes, that's fair as well.

18   Q.  Okay.

19   A.  And I -- can I throw one more potential

20   situation at you?

21   Q.  Please do.

22   A.  Okay.  So the only -- I -- I thought of

23   a -- kind of -- it's a smaller port, but there is --

24   at -- at a point in time in Del Rio, there was a migrant

25   camp fairly close to the border on the -- on the Mexican



Page 106

1    side, and that particular camp kept their own list.  So

2    I don't know if you would consider that a shelter in

3    some respects, but we -- we always referred to it as a

4    migrant camp.  But they would keep -- they would keep

5    their own -- own list at that -- at that particular

6    place.

7         Q.  All right.  So then, there was a point of

8    contact at the migrant camp who would communicate with

9    CBP on the U.S. side about arranging for processing?

10        A.  No.  I believe they would still go through INM

11   and ask for the -- you know, the number of persons for

12   processing.  INM would then liaise with the -- the

13   migrant camp and --

14        Q.  Okay.

15        A.  -- escort over to CBP.

16        Q.  That makes -- thanks for clarifying.

17             You used one acronym, AOR.  What does that

18   mean?

19        A.  Area of responsibility.

20        Q.  Thanks.  All right.  Let's talk a little bit

21   about capacity.

22             So there's no one at CBP who's tasked with

23   calculating operational capacity of a port of entry,

24   right?

25             MR. NAZAROV:  Objection, form.



Page 107

1      A.  What I -- the question I heard was:  There's no

2  one at CBP who's tasked with calculating operational

3  capacity?

4      Q.  (BY MS. CASSLER)  Yeah, for a -- for a given

5  port of entry.

6      A.  Yeah.  No, that's -- we never -- we've never

7  had a calculation for an -- an operational capacity.

8      Q.  Okay.  Do ports report up to headquarters or at

9  least up to LFO management how many asylum seekers they

10  decided to process on any given day?

11      A.  As a matter of business?  As a course of

12  business every day?  No.

13      Q.  Okay.  Do they do it sometimes?

14      A.  No.  That's the port director's day-to-day

15  business that he's managing.  There wouldn't be any

16  reason to report that to the LFO unless there was

17  some -- some anomaly, some issue, something happened

18  during the, you know, during the processing, something

19  out of the ordinary.  But that's just -- you know,

20  processing X number of persons in a day is not something

21  we'd be -- that would be reported up.

22      Q.  Okay.  So we just talked about the wait list

23  process in general terms.  When did ports and LFOs start

24  using that wait list process?

25              MR. NAZAROV:  Objection, form.



Page 108

1       A.  Okay.  So to, you know, reiterate, ports and

2   the LFO don't maintain a wait list.  We don't use a wait

3   list to determine who we process.  We liaise with an

4   entity in -- in Mexico, you know, and ask for a certain

5   number of persons --

6       Q.  (BY MS. CASSLER)  Yeah.

7       A.  -- a day, and then they, you know, send us

8   people that are presumably on the -- on the --

9       Q.  Yeah.

10      A.  -- wait list.

11      Q.  So that process you just described, when did --

12      A.  Right.

13      Q.  -- that start happening?

14      A.  Okay.  So that would have started to happen, as

15  I mentioned earlier -- give me just one second to

16  silence this phone, please.

17              MS. CASSLER:  Oh, no problem.

18              THE WITNESS:  It's my office phone.  Sorry

19  about that.

20              MS. CASSLER:  That's okay.

21      A.  So I mentioned earlier that after June 2018,

22  when we were doing our queue management at the middle of

23  the bridge, some of the larger ports started seeing

24  larger numbers of people waiting on the bridge on the

25  Mexican side.  So as the Government of Mexico elected to



Page 109

1    not allow these people to wait on the bridge any longer,

2    then that's when that communication would have started

3    to occur.

4        Q.  (BY MS. CASSLER)  How did CBP even know that

5    there were waiting lists?

6        A.  So that would have -- the day-to-day business

7    conversations with our Mexican counterparts.

8        Q.  Yeah.  I mean, that makes sense.

9              And at this point, for the ports that have

10   wait lists, the process is, more or less, similar across

11   the ports, right, in terms of how the wait list works?

12   Like, you talk to INM, you give them a number, and then

13   processing happens; is that right?

14             MR. NAZAROV:  Objection, form.

15       A.  It's -- it's similar, not -- not -- it -- it's

16   going to vary at every port to a certain extent, but in

17   overall, high-level terms, yes.  We request a certain --

18       Q.  (BY MS. CASSLER)  Yeah.

19       A.  -- number of persons either that day, or I

20   think in the case of Hidalgo, they actually request

21   the -- the evening before, late, for the next morning.

22   And, yes, the next morning the -- the migrants will be

23   escorted to the middle of the bridge by INM in most

24   cases.

25       Q.  So that policy -- or -- sorry -- that -- that



Page 110

1  practice that you just described, was that ever

2  mustered?

3      A.  That is -- that practice is not -- is not our

4  policy.  It's not something that we have control over.

5  So we've never put out any sort of a muster telling

6  people this is how the process you've described is

7  go- -- is going to work.  That's something that would be

8  managed at the -- the local level.

9      Q.  Okay.  But all the ports seem to kind of do a

10  similar thing.  We -- we already talked about that,

11  right?

12              MR. NAZAROV:  Objection, form.

13      A.  Yes, it's similar, and it's -- and what --

14  what's happening in the current state, you know,

15  developed over time.

16      Q.  (BY MS. CASSLER)  Uh-huh.

17      A.  But it was not --

18      Q.  Was there information sharing between ports

19  about best practices on this issue?

20              MR. NAZAROV:  Objection, form.

21      A.  I would presume so.  Our ports are encouraged,

22  you know, to share information about best practices,

23  whether it be, you know, processing migrants or, you

24  know, narcotics enforcement.  Whatever the mission set

25  is, they're going to share information and best



Page 123

1    capacity of the detention cells that would typically be

2    used during the -- the processing of migrants.

3        Q.  Okay.  Yeah.  And that's often referred to as

4    detention capacity too, right?

5        A.  Yeah, that would be the detention capacity,

6    yes.

7        Q.  Okay.  Is that number -- like, is it from,

8    like, a building code, or where did the -- the -- the

9    number for how many people can be hold in a cell come

10   from?

11       A.  Every -- every cell is going to be rated at a

12   maximum capacity.

13       Q.  Uh-huh.

14       A.  That's not saying that we're always able to use

15   it at that maximum --

16       Q.  Right.

17       A.  -- capacity --

18       Q.  Right, right, right.

19       A.  -- but it's -- it -- it would be based on some

20   formula from -- from GSA, yes, with taking into account

21   the fire codes and -- and whatnot.  What exactly that

22   formula is, I don't know.  But when they -- you know,

23   when they build a building and there's a detention cell

24   there, it's going to be rated for --

25       Q.  Uh-huh.



Page 124

 1      A.  -- maximum number of people as -- at a

 2 maximum --

 3      Q.  Okay.

 4      A.  -- capacity.

 5      Q.  So it's a DSA number.  That's helpful.

 6      A.  I would presume.  So I don't have -- I've never

 7 seen anything that actually says that, but, I mean,

 8 your -- your capacity of any building is going to be,

 9 you know, based on those construction formulas, as far

10 as I'm aware.

11      Q.  Okay.  Has the detention capacity at any of the

12 LFO ports changed since 2016?

13      A.  Yes.

14      Q.  Let just start with the first one in your head

15 and go through and, like, talk about all the changes.

16           So what's one example of a change in

17 detention capacity at LFO?

18      A.  Probably the biggest would be the Port of

19 Laredo.

20      Q.  How did that change?

21      A.  So in Laredo, the two main passenger processing

22 facilities are bridges, Bridge 1, Bridge 2.  Gateway to

23 the Americas or Juárez-Lincoln/Lincoln-Juárez have both

24 undergone major reconstruction since 2016 that began in,

25 I believe, the summer of 2016.  One bridge was completed



Page 125

1    in April of 2018.  The second bridge was completed in

2    January of 2019, I believe.  I'm sorry.  It's escaping

3    me right now which bridge was the completed construction

4    at first --

5         Q.  That's okay.

6         A.  -- but, you know, during the course of that

7    time, the -- the detention capacity, the holding

8    capacity was changing on a fairly regular basis.

9         Q.  So --

10        A.  The buildings were completely -- Bridge 1 was

11   completely gutted and renovated on the inside.  The

12   outside didn't change.  But the facility at Bridge 2,

13   that was razed completely and rebuilt, so it's --

14        Q.  Oh, wow.

15        A.  -- a complete change.

16        Q.  So setting aside the construction period, like,

17   I know they're -- things were probably changing during

18   construction, but comparing before construction and

19   after construction, did the detention capacity go up or

20   down at those ports?

21        A.  At the Port of Laredo, it -- it went up, I

22   believe.

23        Q.  Okay.  Do you know how much?

24        A.  I think we were reporting 90 prior, at the very

25   beginning of that period, and now we should be reporting



Page 126

1   around 125.

2       Q.  Okay.  Other than Laredo, what other changes to

3   detention capacity have occurred since 2016?

4       A.  So there were some changes at the very

5   beginning at really all the ports.  We lowered

6   the -- the detention capacity or the holding capacity

7   once we had kind of a better understanding of what we

8   were really being asked to report on, some of the

9   initial reports.

10              And we included, you know, our -- the --

11  the entirety of our holding cell footprint, regardless

12  of whether the cell was in an area that was usable to

13  actually detain people, whether it was in a facility

14  that would process migrants or not, you know, example

15  being the cargo lots, an airport, a railroad.  Over

16  time, we started -- we removed those from the capacity

17  reports because they weren't --

18      Q.  When was --

19      A.  -- our understanding, they weren't really

20  relevant to the question that was being asked, which was

21  "What is your detention, your holding capacity, at the

22  places where you can process migrants?"

23      Q.  When would those have been removed from the

24  detention capacity numbers, roughly?

25      A.  Yeah.  I'm trying to think.  I can't recall



Page 127

1    the -- the dates.

2         Q.  Was it after --

3         A.  I can't recall --

4         Q.  -- these records started being created?

5         A.  I'm sorry?

6         Q.  I didn't mean to talk over you.  What were you

7    saying?

8         A.  I'm saying I can't recall the exact date.

9    I -- I'm sorry.

10        Q.  Oh, that's fine.  I was asking:  Was -- was it

11   after they started requiring this specific report?

12        A.  Yes, I believe so.  But when you say "this

13   specific report," I would say some version of this

14   report because this report has also changed over time.

15        Q.  Okay.  Did this -- sorry if I already asked

16   this.  This queue management report started being

17   required around June 2018; is that right?

18        A.  June 2018?

19        Q.  Uh-huh.

20        A.  That sounds about right.

21        Q.  Okay.

22        A.  I don't remember the exact date, but that

23   sounds about right.

24        Q.  Okay.  So the major changes to detention

25   capacity at LFO ports are -- one, there was construction



Page 128

1   at Laredo, and both bridges had their facilities majorly

2   upgraded.  And other than that, there were changes

3   showing up -- we -- we should expect to see changes

4   showing up in the data based on some detention capacity

5   being removed from the data; is that right?

6        A.   Yes.

7        Q.   Yeah.  Okay.

8        A.   Well, our -- like I said, our interpretation of

9   what they were -- what was actually being asked of us.

10  We used to have, you know, some facilities that may have

11  a holding cell there, but they would never be used to

12  actually, you know, hold a migrant.

13       Q.   Why not?

14       A.   Because of their location.  I've got -- you

15  know, going back to Laredo for an example, they have a

16  holding cell at -- I believe they have a holding cell

17  still at -- at the railroad.  There's holding cells at

18  our airports and some of the other, you know, cargo

19  lots.  Well, all of the cargo lots, you're going to have

20  cells, but you're not going to hold a migrant at a cargo

21  lot.

22            We have facilities that are only open part

23  of the day.  They may have a holding cell, which

24  would -- you know, could be included in your number of

25  hold ing cells that a -- you know, a field office report



Page 129

1   has, but a migrant's not going to be held there.  It's

2   just not operational --

3        Q.  And so -- oh, go ahead.

4        A.  No, I'm just saying it's not operationally

5   feasible to hold a migrant in a lot of these locations.

6        Q.  The cells at cargo lots specifically, are those

7   designed to hold people?

8        A.  Yes.

9        Q.  Okay.  Let's look back at this exhibit.  So

10  the -- the column -- it's -- one, two -- it's the fifth

11  column, "Number and Queue at Boundary Line."  That

12  refers to the number of asylum seekers, or, I guess, to

13  use your term, migrants, physically waiting on the

14  bridge on the Mexico side to be processed that day,

15  right?

16       A.  That's how I understand the column, yes.

17       Q.  Who collected that data?

18       A.  I'm sorry?

19       Q.  Who would have collected that data?

20       A.  So the ports of entry, all the ports of entry

21  are going to send that data to the Laredo Operations

22  Center every morning, and then we'll compile it --

23       Q.  Uh-huh.

24       A.  -- send it to OFO.

25       Q.  Okay.  And the "Impact to Port Operations"



Page 138

1    when did CBP start using the term "operational capacity"

2    in relation to queue management?

3        A.  I would say, from what I recall, maybe as early

4    as June 2018, but I don't have anything that says, you

5    know, "On this date we started using operational

6    capacity," so that's -- that's my recollection.

7        Q.  Okay.  So it was some -- probably sometime

8    around June 2018, right?

9        A.  June 2018?

10       Q.  Yeah.

11       A.  That -- that's -- that's my best estimation,

12   yes.

13       Q.  Let's look at Exhibit 233.  And I'll just read

14   into the record what it is.  It's -- so what will be

15   marked as Exhibit 233 is a one-page e-mail with Bates

16   No. AOL-DEF-00911232.

17            Do you see that e-mail on the screen?

18       A.  Yes.

19            MS. CASSLER:  And Ms. Rich sent it to the

20   government, I'm assuming.

21            MR. NAZAROV:  Yeah, we're waiting.

22            But, Mr. Harris, can you see this okay?

23            THE WITNESS:  Yes, I can.

24            MR. NAZAROV:  Okay.  You can go ahead,

25   Rebecca.



Page 139

```
 1                    MS. CASSLER:  Cool.
 2          Q.  (BY MS. CASSLER)  So this is an e-mail chain
 3     with the top e-mail, so the most recent, an -- it's an
 4     e-mail from Frank Longoria to Bradd Skinner, dated
 5     June 13th, 2018.  Do you see that?
 6          A.  Yes.
 7          Q.  And Mr. Longoria -- we've talked about through
 8     there.  Okay.  Yeah.
 9                    So this e-mail is a cover e-mail for
10     sending a draft queue management plan for Laredo, right?
11          A.  That would -- you know, without the attachment,
12     that would appear to be the case.  Yes, this --
13          Q.  Uh-huh.  Uh-huh.
14          A.  -- seems to pertain to that.
15          Q.  So the Laredo Field Office created a queue
16     management plan, right?
17          A.  Yes.
18          Q.  Yeah.  And that was in early 2018; is that
19     correct?
20          A.  In early 2018?  Well --
21          Q.  Or in June 2018.  I'm sorry.
22          A.  Yeah, mid-2018, so June 2018.
23          Q.  Great.  So could you please read out the second
24     line in this e-mail from Frank Longoria?
25          A.  "Do we need to revisit since we have moved from
```



Page 140

1   'detention capacity' to 'operational capacity'?"

2       Q.  So that's consistent with your thought that

3   operational capacity was a term that CBP started using

4   in June 2018, right?

5       A.  From what I remember, yes.  That appears to be

6   the case.

7       Q.  Uh-huh.  Uh-huh.  Then could you read the next

8   two sentences?

9       A.  "Recommend we send to the ports for their

10  review and comment before we go final.  This way we can

11  have port directors tell us what 'operational capacity'

12  means to them.  What say you?"

13      Q.  Uh-huh.  So I read this e-mail, and I think

14  Frank Longoria and Bradd Skinner don't know what

15  operational capacity means.  Is that --

16              MR. NAZAROV:  Objection, form.

17      Q.  (BY MS. CASSLER)  -- how you read it?

18              MR. NAZAROV:  Objection, form.

19      A.  Okay.  No.  The way I read it is there's not a

20  definition of operational capacity that we were giving,

21  so it would be up to interpretation.  So they wanted to

22  hear what the port directors think it means.  Well,

23  Mr. Longoria --

24      Q.  (BY MS. CASSLER)  Okay.

25      A.  -- wants to hear what the port directors think



Page 141

1    it means -- thinks it means.

2        Q.  Okay.

3        A.  That's how I would interpret it.

4              MS. CASSLER:  Okay.  We can -- okay.  We

5    can put that away.

6        Q.  (BY MS. CASSLER)  Since queue management

7    started, ports in LFO have metered asylum seekers after

8    they cross onto U.S. soil, right?

9              MR. NAZAROV:  Objection, form.

10       A.  They have not --

11       Q.  (BY MS. CASSLER)  What did you say?

12       A.  Talk -- talking to me or to the attorney?

13       Q.  To you, Mr. Harris.  I couldn't hear --

14       A.  Okay.  Yeah.

15       Q.  -- what you said.

16       A.  So, yeah.  No, that has happened in very

17   limited circumstances.  It -- it's -- you know, and we

18   were made aware of the situation, corrective actions

19   were taken.  It was, of course, in accordance with our

20   policy or the EEC's guidance.

21       Q.  Okay.  So you don't --

22       A.  I can't say that it hasn't happened.  It just

23   hasn't happened on a wide scale.  It's been very

24   limited --

25       Q.  Uh-huh.



Page 142

```
 1        A.  -- circumstances or incidents that I'm aware
 2   of.
 3        Q.  Okay.  So you don't deny that it happened,
 4   right?
 5        A.  No, I don't, in very, very limited
 6   circumstances and specific incidents.
 7        Q.  Did it happen at multiple ports of entry?
 8        A.  I'm sorry?
 9        Q.  Did it happen at more than one port of entry?
10        A.  Yes.
11        Q.  Which ports of entry did it happen at?
12        A.  So I'm aware of Eagle Pass and Laredo.  They
13   both had incidents of what you're describing.
14        Q.  Okay.
15        A.  And it said metered after crossing into the
16   U.S., so I'm presuming that means we actually sent
17   someone back to Mexico.  Is that what you're
18   insinuating?  Okay.
19        Q.  Yeah.
20        A.  Yes.
21        Q.  Yeah.  So you're aware of Eagle Pass and
22   Laredo?
23        A.  Yes.
24        Q.  Is it possible that it happened at other ports
25   and you're not aware of it?
```



Page 143

1          MR. NAZAROV:  Objection, form.

2      A.  I suppose it's possible.

3      Q.  (BY MS. CASSLER)  Let's look at Exhibit 243.

4  I'll just read what that is.  I'm showing you what will

5  be marked as Exhibit 243.  It's a two-page e-mail with

6  Bates numbers starting at AOL-DEF-00909668.

7          Can you see that e-mail?

8      A.  Yes.  It's a little fuzzy, but I can see it.

9      Q.  Okay.  Yeah.  This one's hard to read.

10          MS. CASSLER:  Ari, have you gotten it?  Are

11  you okay with going --

12          MR. NAZAROV:  We have not.  We have not.

13          Mr. Harris, has it become less fuzzy since

14  Kevin kind of blew it up?

15          THE WITNESS:  It's not as sharp as

16  the -- the other exhibits, but it -- it's -- it's

17  legible.  It's...

18          MR. NAZAROV:  You're able to read it?

19          THE WITNESS:  Yeah.  I'm trying to read it

20  now.

21          MR. NAZAROV:  Okay.

22          MS. CASSLER:  Okay.

23      Q.  (BY MS. CASSLER)  So let's go to --

24          MR. NAZAROV:  Are you --

25      Q.  (BY MS. CASSLER)  -- the second --



Page 233

1  manage more effectively, you know, our intake at the

2  ports --

3      Q.  (BY MS. CASSLER)  Uh-huh.

4      A.  -- not just to keep them out indefinitely.

5      Q.  But there's no promises that anybody who's

6  metered at the limit line is going to make it onto the

7  list and eventually be processed, is there?

8          MR. NAZAROV:  Objection, form.

9      A.  So I think you're kind of complaining (sic) a

10  couple of different things there that I don't, you know,

11  see the relationship there between seeing how the limit

12  line you know, told you, you have to wait and then

13  making it on the -- you know, the list that's not

14  managed by us.  I don't see those as one issue, you

15  know, bleeding into the other.

16      Q.  (BY MS. CASSLER)  Okay.  So after a person is

17  not permitted to cross into the United States at the

18  limit line, it's not CBP's problem anymore, is it?

19          MR. NAZAROV:  Objection, form.

20      A.  So say -- say that one more time, please.

21      Q.  (BY MS. CASSLER)  I mean, you just testified

22  that there's no link between a person being turned away

23  at the limit line and their sitting on the list in order

24  to be processed; is that right?

25          MR. NAZAROV:  Objection, form.



Page 234

1      A.  Yeah.  CBP doesn't maintain that list or, you

2  know, have any say-so on who gets on it or -- or -- or

3  what.  So I don't see the --

4      Q.  (BY MS. CASSLER)  Uh-huh.

5      A.  -- I don't see the applicability of what

6  you're -- you're saying there.

7      Q.  Okay.  So the purpose of the limit line

8  position, just to be clear, is to prevent people from

9  crossing the international boundary, right?

10     A.  Well, the purpose of that queue management

11  position or limit line position, using interchange areas

12  to keep migrants from crossing the international

13  boundary and overwhelming our ports of entry, and, you

14  know, allowing us to maintain a safe and orderly process

15  for the people we already have in custody, allowing us

16  to use our resources effectively and efficiently.

17     Q.  But as long as somebody stays on the U- -- on

18  the Mexico side of that international boundary, CBP's

19  view is there's no duty to process them, right?

20            MR. NAZAROV:  Objection, form.

21     A.  As long as the person is on -- in Mexico, which

22  being on the Mexican side of the international boundary

23  line, they would be in Mexico, then, yes, we don't see

24  it as our mandate to -- to process them nor could we.

25     Q.  (BY MS. CASSLER)  There's no guarantee that an



Page 235

1   asylum seeker or migrant who's prevented from crossing

2   the limit line when they first approach will ever be

3   allowed into the United States, is there?

4              MR. NAZAROV:  Objection, form.

5       A.  Guarantee?  So that implies some sort of

6   something from us.  So, no.  They're told that, you

7   know, if someone is -- is metered, if they are prevented

8   from crossing the limit line at any particular time,

9   they're told that, "The port is at -- you know, at

10  current capacity.  We can't take you in right now for

11  processing.  You're going to have to, you know, wait in

12  Mexico."

13             Now, no, there's no guarantee implied or

14  has ever been implied.  I'm not sure what sort

15  of -- what sort of guarantee we would -- so, no.  The

16  answer to your question is:  No, there's no guarantee,

17  but I'm really not sure where you are.  We don't give a

18  person anything saying at some point in the future, you

19  might be processed here.  That's the way I interpret

20  you're using "guarantee."

21      Q.  (BY MS. CASSLER)  If a person, a migrant, were

22  allowed to cross the limit line, then they would be

23  guaranteed inspection and process ing, right?

24      A.  I'm interpreting guarantee as we are going to

25  take them in, inspect them, and process them, yes.



Page 236

1    So...

2        Q.  I -- I think I'm using guarantee in the sense

3    of we can say we -- it's going to happen.

4              MR. NAZAROV:  Objection, form.

5        Q.  (BY MS. CASSLER)  Does that make sense to you?

6        A.  Yeah, that makes sense.  I'm sorry.  It's the

7    same answer.  If a person comes into the United States

8    and at that point makes a claim of a fear, they ask for

9    asylum, whatever the case is, then, yes, they would be

10   processed appropriately.

11             MS. CASSLER:  I think we can stop there.

12   And my colleague, Allison Parr, has questions about

13   Topic 15, so I'm going to mute, and Allison will take

14   over.

15             MS. PARR:  Thank you, Becky.

16                   EXAMINATION

17   BY MS. PARR:

18       Q.  Good afternoon, Mr. Harris.  My name is Allison

19   Parr, and I also represent Plaintiffs in this case.

20             You testified at the beginning of your

21   deposition that you were designated as the CBP

22   representative to speak to Topic 15 today, correct?

23       A.  Yes.

24       Q.  I apologize.

25             MS. PARR:  Is my video working?



1  MAYER BROWN LLP
    Matthew H. Marmolejo (CA Bar No. 242964)
2    *mmarmolejo@mayerbrown.com*
   350 S. Grand Avenue
3  25th Floor
   Los Angeles, CA 90071-1503
4    Ori Lev (DC Bar No. 452565)
     (*pro hac vice*)
5    *olev@mayerbrown.com*
     Stephen M. Medlock (VA Bar No. 78819)
6    (*pro hac vice*)
     *smedlock@mayerbrown.com*
7  1999 K Street, N.W.
   Washington, D.C. 20006
8  Telephone:  +1.202.263.3000
   Facsimile:   +1.202.263.3300
9
   SOUTHERN POVERTY LAW CENTER
10   Melissa Crow (DC Bar No. 453487)
     (*pro hac vice*)
11   *melissa.crow@splcenter.org*
   1101 17th Street, N.W., Suite 705
12  Washington, D.C. 20036
   Telephone: +1.202.355.4471
13  Facsimile: +1.404.221.5857

14  *Additional counsel listed on next page*
   *Attorneys for Plaintiffs*
15
               **UNITED STATES DISTRICT COURT**
16
             **SOUTHERN DISTRICT OF CALIFORNIA**
17

18  Al Otro Lado, Inc., *et al.*,          Case No.:  17-cv-02366-BAS-KSC

19              Plaintiffs,          **EXHIBIT 15 IN SUPPORT OF**
                              **PLAINTIFFS' MEMORANDUM OF**
20      v.                            **POINTS AND AUTHORITIES IN**
                              **SUPPORT OF THEIR MOTION**
21  Chad F. Wolf,[1] *et al.*,          **FOR SUMMARY JUDGMENT**

22              Defendants.

23                              **FILED UNDER SEAL**

24

25

26

27  ---

   [1] Acting Secretary Wolf is automatically substituted for former Acting Secretary
28  McAleenan pursuant to Fed. R. Civ. P. 25(d).

1

2  CENTER FOR CONSTITUTIONAL RIGHTS
     Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
3     *bazmy@ccrjustice.org*
     Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
4     *gschwarz@ccrjustice.org*
     Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
5     *aguisado@ccrjustice.org*
   666 Broadway, 7th Floor
6  New York, NY 10012
   Telephone: +1.212.614.6464
7  Facsimile: +1.212.614.6499

8
   SOUTHERN POVERTY LAW CENTER
9     Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
      *sarah.rich@splcenter.org*
10    Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
      *rebecca.cassler@splcenter.org*
11 150 E. Ponce de Leon Ave., Suite 340
   Decatur, GA 30030
12 Telephone: +1.404.521.6700
   Facsimile: +1.404.221.5857
13

14 AMERICAN IMMIGRATION COUNCIL
     Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
15    *kwalters@immcouncil.org*
   1331 G St. NW, Suite 200
16 Washington, D.C. 20005
   Telephone: +1.202.507.7523
17 Facsimile: +1.202.742.5619

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 15 IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT

FOR OFFICIAL USE ONLY



**Office of Inspector General**
**Office of Inspections**

Project #18-122-ISP-CBP

**Separation of Asylum-Seeking Parents from Children**

---

**San Ysidro East Port of Entry**
Preparer: Adam Brown, 9/12/18
Reviewer:
Paul Lewandowski 10/16/2018

**Memorandum of Record**

**Attendees:**

**BPA:**
Robert "Bob" W. Hood, Assistant Port
Director
Karen Ah Nee, Chief CBP Officer,
Admissibility Unit

**DHS OIG:**
Elizabeth Kingma, Team Lead
Adam Brown, Senior Inspector
Stephen Farrell, Inspector
Paul Lewandowski, Inspector

**Location:** San Ysidro Port of Entry, 720 E San Ysidro Blvd, San Diego, CA 92173

**Date/Time:** Tuesday, August 28, 2018, 10:00 a.m.

**Purpose:** To observe operations and conditions of CBP facilities used to hold immigrants pending determination of immigration status.

**Source:** Calexico Port of Entry staff and facility observations

**Scope:** To observe and learn about all aspects of processing and separating family members before, during, and after implementing "zero tolerance" and after the June 20, 2018 Executive Order that halted family separations.

**Methodology:** Tour facility and interview OFO staff members. This site visit was unannounced.

---

1 **Conclusion:**

2 • CBP uses a queue management system when a facility is at capacity and cannot
3 process aliens. They send aliens to Mexican Authorities to put their names on a list.
4 • The San Ysidro POE does not separate families unless the parent is a danger to the
5 child.
6 • San Ysidro encourages asylum-seekers to cross the border at the Ped East facility
7 because they have greater capacity.
8

9 **Details:**

10 **Background**

| [ PAGE \* MERGEFORMAT ]2

Highly Confidential/Attorneys' Eyes Only                    AOL-DEF-00205966

FOR OFFICIAL USE ONLY



**Office of Inspector General**
**Office of Inspections**

**Project #18-122-ISP-CBP**

## Separation of Asylum-Seeking Parents from Children

### San Ysidro East Port of Entry

Preparer: Adam Brown, 9/12/18
Reviewer:
Paul Lewandowski 10/16/2018

11 Ms. Karen Ah Nee (KAN):  Mexico redirects asylum-seekers to shelters in Tijuana until CBP
12 has the space to process them at the San Ysidro Pedestrian East (Ped East) Port of Entry
13 (POE). Asylum-seekers from San Ysidro Pedestrian West (Ped West) are redirected to Ped East
14 to be processed because of issues with space at Ped West. On the Mexican side, there is a
15 numerical tracking system for tracking and organizing asylum seekers. CBP tells Mexican
16 immigration how to prioritize people waiting to claim asylum. Unaccompanied children
17 (UACs), pregnant women, people with medical issues, and families take priority over others.
18 However, there is no formal agreement with Mexico.

19 Elizabeth Kingma (EK):  How do you let the Mexican authorities known when you have
20 space?

21 KAN:  We reach out via telephone to Grupo Beta, the humanitarian arm of the Mexican
22 Immigration system. We let them know how many people we can process. Grupo Beta goes to
23 the shelters in Tijuana and transfers asylum seekers to the POE by bus.

24 KAN: Otay Mesa is another nearby port of entry that used to be administratively part of San
25 Ysidro, but is now an independent Port of Entry. It processes asylum seekers separately, but
26 here is San Ysidro, we hold them longer term.

27 EK:  Are you concerned the metering process at Ped East makes it too dangerous for
28 Mexicans to claim asylum?

29 KAN:  I am not aware of any concerns from Mexicans. Most Mexican claiming asylum are
30 from deep in the middle of Mexican and they are trying to escape drug violence.

31 EK:  How long do most asylum-seekers wait?

32 KAN:  Families move quickly, usually within 48 hours but during the move to the new facility
33 at Ped East, CBP fell behind and families were waiting longer than normal. [OIG note: The
34 new Ped East facility opened August 16, 2018.] Most families are released with a Notice to
35 Appear (NTA). CBP uses NTA but Immigration and Customs Enforcement (ICE) makes the
36 decision whether to release or detain immigrants. The decision is based on available bed
37 space at detention facilities.

38 EK:  How did the zero-tolerance policy affect Ped East?

39 KAN:  We were not affected by the policy at all. We do not separate families unless the parent
40 has a violent criminal record or drug arrest. We may also separate families if the parent has a
41 warrant. Most families do not have criminal records. We have separated less than 5 families
42 since April 1, 2018.

43 EK:  What is the cell capacity at Ped East?

44 KAN:  The General Services Administration (GSA) determines our capacity and they say we
45 can hold 300 but in reality, we can hold far less. GSA does not take into account space for
46 sleeping.

47 EK:  How many pedestrians cross each day?

[ PAGE  \* MERGEFORMAT ]2

Highly Confidential/Attorneys' Eyes Only

AOL-DEF-00205967

FOR OFFICIAL USE ONLY



**Office of Inspector General**
**Office of Inspections**

**Project #18-122-ISP-CBP**

**Separation of Asylum-Seeking Parents from Children**

**San Ysidro East Port of Entry**
Preparer: Adam Brown, 9/12/18
Reviewer:
Paul Lewandowski 10/16/2018

48  KAN:  It varies but it's about 25,000 a day for both Ped East and Ped West. 40,000 – 45,000
49  vehicles cross each day.

50  **Ped West Port of Entry**

51  Ms. Ah Nee drove us to the Ped West facility which is just a few minutes away from Ped East.

52



53
54  KAN:  Undocumented immigrants used to wait on "the spiral" until CBP had space to process
55  them [The spiral is the winding staircase just across the border in Mexico at the Ped West
56  crossing. See it pictured above.]. They would use the bathroom right there right there in
57  public.

58  EK:  Can you describe the metering process>

[ PAGE  \* MERGEFORMAT ]2

Highly Confidential/Attorneys' Eyes Only

FOR OFFICIAL USE ONLY



**Office of Inspector General**
**Office of Inspections**

**Project #18-122-ISP-CBP**

### Separation of Asylum-Seeking Parents from Children

---

### San Ysidro East Port of Entry
Preparer: Adam Brown, 9/12/18
Reviewer:
Paul Lewandowski 10/16/2018

59  KAN:  We have had CBP officers at the border checking for documents long before metering
60  was a thing. We no longer accept asylum-seekers here at Ped West. They have to take buses
61  to Ped East. Ped West has 14 pedestrian lanes and Ped East has 22. CBP processes about
62  10,000 pedestrians a day at Ped East and 15,000 a day at Ped West. CBP expects the traffic
63  to shift once word gets out that Ped East is open with more pedestrian lanes.

64  We were only at Ped West for a few minutes until we got back into the van and Ms. Ah Nee
65  drove us back to Ped East for a tour.

66  **Ped East Tour**



67
68  The picture above is what border crossers see after they cross the border. Border crossers
69  enter through the door on the left and then wait in the primary pedestrian inspection lanes.

70  Below is a picture of the primary inspection lanes.

[ PAGE  \* MERGEFORMAT ]2

Highly Confidential/Attorneys' Eyes Only

AOL-DEF-00205969

FOR OFFICIAL USE ONLY



**Office of Inspector General**
**Office of Inspections**

**Project #18-122-ISP-CBP**

**Separation of Asylum-Seeking Parents from Children**

**San Ysidro East Port of Entry**
Preparer: Adam Brown, 9/12/18
Reviewer:
Paul Lewandowski 10/16/2018



71

[ PAGE  \* MERGEFORMAT ]2

Highly Confidential/Attorneys' Eyes Only                                    AOL-DEF-00205970

FOR OFFICIAL USE ONLY



**Office of Inspector General**
**Office of Inspections**

**Project #18-122-ISP-CBP**

**Separation of Asylum-Seeking Parents from Children**

**San Ysidro East Port of Entry**
Preparer: Adam Brown, 9/12/18
Reviewer:
Paul Lewandowski 10/16/2018
72    The Limit Line at San Ysidro.



73
74    While watching the "limit-line" or metering process at San Ysidro, we saw a family with a
75    single mom and 2 children approach the CBP Officer at the border and ask for asylum. The
76    CBP Officer explained the process of going to a shelter in Mexico to add their names to a list.
77    He appeared to direct them to a Groupo Beta official. We witnessed the family get into a
78    vehicle and drive away.

79    While the CBP officer talked to the family, we witnessed contract security personnel checking
80    documents at the limit line. They were letting people through the limit line. Chief Ah Nee said
81    the contract security officers only let people through the limit line if they have a Secure
82    Electronic Network for Travelers Rapid Inspection (SENTRI) card.

[ PAGE  \* MERGEFORMAT ]2

Highly Confidential/Attorneys' Eyes Only                                    AOL-DEF-00205971

FOR OFFICIAL USE ONLY



**Office of Inspector General**
**Office of Inspections**

**Project #18-122-ISP-CBP**

**Separation of Asylum-Seeking Parents from Children**

### San Ysidro East Port of Entry

Preparer: Adam Brown, 9/12/18
Reviewer:
Paul Lewandowski 10/16/2018

83  KAN:  Processing asylum-seekers is only 10 percent of what we do. Once we let the Mexican
84  authorities know how many asylum-seekers we can take, they figure out who is next on the
85  list and they bring them to the border by bus.

86  We walked from the limit line to the area CBP uses to process asylum seekers. [See picture
87  below.] It is an area that is separated from the regular primary lanes. Chief Ah Nee said it
88  designed this way to process busloads of people quickly.



89
90  At 2:30pm we witnessed 4 CBP Officers finish the initial intake of a group of 30 asylum
91  seekers in less than 25 minutes. When the group arrived to this area, CBP officers lined them
92  up against the wall and asked them to take off their shoes and remove their shoe laces. Then
93  the asylum-seekers make their way to the processing lanes where CBP officers asked for
94  biographical and health information.

[ PAGE  \* MERGEFORMAT ]2

Highly Confidential/Attorneys' Eyes Only

AOL-DEF-00205972

FOR OFFICIAL USE ONLY



**Office of Inspector General**
**Office of Inspections**

**Project #18-122-ISP-CBP**

## Separation of Asylum-Seeking Parents from Children

### San Ysidro East Port of Entry
Preparer: Adam Brown, 9/12/18
Reviewer:
Paul Lewandowski 10/16/2018

95  Once CBP finished primary inspection, the group went to another processing area where
96  more detailed information was captured. CBP officers also performed pat-downs. CBP officers
97  even check the pockets of the children. We witnessed a female CBP Officer jokingly asking
98  the children if they had any money before she checked their pockets. CBP officers were
99  generally respectful of the adult and minor asylum seekers during the process. CBP officers
100 also take the immigrants' luggage and tag it for storage in a room near the processing area.
101 CBP officers also make copies of documents and store the originals with the property. See the
102 luggage holding room below.



103

104 Once CBP stores the property, the immigrants go to a third processing area where
105 fingerprints and pictures are taken. This is where the CBP Officers enter information into
106 SIGMA to create the A-Files. The area has snacks, diapers, water fountains, and bathrooms.

107 KAN: Most detainees get 2 hot meals a day but children and pregnant women can eat
108 whenever they want. We also let families eat together. The final step is a more in depth
109 interview, which we complete and send to ICE. Occasionally, we receive asylum seekers from

Highly Confidential/Attorneys' Eyes Only

AOL-DEF-00205973

3-SER-682

FOR OFFICIAL USE ONLY



**Office of Inspector General**
**Office of Inspections**

**Project #18-122-ISP-CBP**

**Separation of Asylum-Seeking Parents from Children**

**San Ysidro East Port of Entry**
Preparer: Adam Brown, 9/12/18
Reviewer:
Paul Lewandowski 10/16/2018

110   countries with known security threats. These Special Interest Aliens are handled by
111   specialized processors.

112   KAN: Here is San Ysidro, we have a physician's assistant on staff who can provide basic
113   medical care and triage issues. Medications are held outside the cells and are issued to
114   detainees as required.

Highly Confidential/Attorneys' Eyes Only        AOL-DEF-00205974

3-SER-683

1  MAYER BROWN LLP
     Matthew H. Marmolejo (CA Bar No. 242964)
2    *mmarmolejo@mayerbrown.com*
   350 S. Grand Avenue
3  25th Floor
   Los Angeles, CA 90071-1503
4    Ori Lev (DC Bar No. 452565)
     (*pro hac vice*)
5    *olev@mayerbrown.com*
     Stephen M. Medlock (VA Bar No. 78819)
6    (*pro hac vice*)
     *smedlock@mayerbrown.com*
7  1999 K Street, N.W.
   Washington, D.C. 20006
8  Telephone:  +1.202.263.3000
   Facsimile:   +1.202.263.3300
9
   SOUTHERN POVERTY LAW CENTER
10   Melissa Crow (DC Bar No. 453487)
     (*pro hac vice*)
11   *melissa.crow@splcenter.org*
   1101 17th Street, N.W., Suite 705
12 Washington, D.C. 20036
   Telephone: +1.202.355.4471
13 Facsimile: +1.404.221.5857

14 *Additional counsel listed on next page*
   *Attorneys for Plaintiffs*
15
                    UNITED STATES DISTRICT COURT
16
                  SOUTHERN DISTRICT OF CALIFORNIA
17

18 | Al Otro Lado, Inc., *et al.*, | Case No.:  17-cv-02366-BAS-KSC |

19                Plaintiffs,        **EXHIBIT 17 IN SUPPORT OF
                                     PLAINTIFFS' MEMORANDUM OF
20       v.                          POINTS AND AUTHORITIES IN
                                     SUPPORT OF THEIR MOTION
21 Chad F. Wolf,[1] *et al.*,        FOR SUMMARY JUDGMENT**

22                Defendants.

23                                   **FILED UNDER SEAL**

24

25

26

27 _____
   [1] Acting Secretary Wolf is automatically substituted for former Acting Secretary
28 McAleenan pursuant to Fed. R. Civ. P. 25(d).

CENTER FOR CONSTITUTIONAL RIGHTS
  Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
  *bazmy@ccrjustice.org*
  Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
  *gschwarz@ccrjustice.org*
  Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
  *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
  Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
  *sarah.rich@splcenter.org*
  Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
  *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
  Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
  *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

EXHIBIT 17 IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT

3-SER-685

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA


AL OTRO LADO, INC., et al.,


        Plaintiffs,


        vs.               Case No.

                       17-cv-02366-BAS-KSC


KEVIN K. McALEENAN1, et al.,


        Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~


VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF

MARIZA MARIN


THURSDAY, MAY 28, 2020

8:37 A.M.


SAN DIEGO, CALIFORNIA


Reported remotely by Megan M. Grossman-Sinclair,

CSR No. 12586



Page 2

```
 1              APPEARANCES OF COUNSEL
 2
 3       For Plaintiffs:
 4           MAYER BROWN LLP
             STEPHEN M. MEDLOCK, ESQ.
 5           (By Videoconference)
             1999 K Street, N.W.
 6           Washington, D.C.  20006
             T:  (202) 263-3000
 7           smedlock@mayerbrown.com
 8
             CENTER FOR CONSTITUTIONAL RIGHTS
 9           ANGELO GUISADO, ESQ.
             (By Videoconference)
10           666 Broadway
             7th Floor
11           New York, New York  10012
             T:  (212) 614-6464
12           aguisado@ccrjustice.org
13
14       For Defendants:
15           U.S. Department of Justice
             OFFICE OF IMMIGRATION LITIGATION
16           KATHERINE J. SHINNERS, ESQ.
             (By Videoconference)
17           SUSAN IMERMAN, ESQ.
             (By Telephone)
18           Ben Franklin Square
             P.O. Box 868
19           Washington, D.C.  20044
             T:  (202) 598-8259
20           katherine.j.shinners@usdoj.gov
21
22
23
24
25
```



Page 65

1    on any given day on any shift that I don't think
2    it's fair to think that any watch commander would
3    get every single thing that happened on a shift in
4    all the reports.
5    BY MR. MEDLOCK:
6              Q.    When did you become the assistant
7    director of field operations for the San Diego
8    field office?
9              A.    In September of '19.
10             Q.    What are your current
11   responsibilities as assistant director of field
12   operations for the San Diego field office?
13             A.    So I provide support to the DFO for
14   the board of security realm.  So the San Diego
15   field office is kind of in a realignment phase.
16   So I also still do quite a bit of work and work
17   under the division director for the enforcement
18   division in San Diego.  So in the tactical
19   environment, I kind of serve dual purpose in that
20   role as well.
21             Q.    Who is the enforcement director
22   that you work under?
23             A.    Her name is Rosa Hernandez.
24             Q.    And what's the responsibilities of
25   enforcement as opposed to border security?



Page 66

1              MS. SHINNERS:  Object to the scope.

2              THE WITNESS:  So border security, a

3     lot of the enforcement teams, if you will, are

4     several units within the enforcement division.

5     Most fall under the scope of border security.  And

6     so there are several units kind of with specialty

7     skill sets within the enforcement division.

8     BY MR. MEDLOCK:

9              Q.  Let me just back out for a second

10    about the San Diego field office and make sure I

11    understand a couple things.

12              So there's four ports of entry in

13    the San Diego field office; is that correct?

14              A.  There are -- are we talking land

15    ports of entry?

16              Q.  Land ports of entry, that's

17    correct.

18              A.  There are five.

19              Q.  So there's San Ysidro, Otay Mesa,

20    Calexico West, Calexico East -- I'm sorry.  I see

21    what you are saying.  You have San Ysidro, Otay

22    Mesa, Calexico, Tecate, and Andrade.

23              Those are the five?

24              A.  Correct.

25              Q.  Have you ever heard the term



Page 67

```
1      "capacity" used with respect to any of those ports
2      of entry?
3              A.    Capacity in general or just have I
4      ever heard it?
5              Q.    Have you ever heard the term
6      "capacity" used with respect to inspecting and
7      processing noncitizens who present themselves at
8      those five land ports of entry?
9              A.    Yes, I have.
10             Q.    What does the term "capacity" mean
11     to you as it's used with respect to processing and
12     inspecting noncitizens that present themselves at
13     the five land ports of entry in the San Diego
14     field office?
15             MS. SHINNERS:  I just want to
16     clarify.  Are you asking her personally or asking
17     her view as a CBP?
18             MR. MEDLOCK:  So I am asking her
19     personally because I think that's not encompassed
20     in the two topics that she is being asked to
21     testify about.
22             MS. SHINNERS:  Okay.
23             THE WITNESS:  So I think we really
24     need to define "capacity," and so the term
25     "capacity," plus there are really two different
```



Page 68

1    terms for that.  There is a physical capacity

2    that's kind of a set number that's -- that really

3    is not operationally feasible.  There is an

4    operational capacity that fluctuates from day to

5    day, minute to minute.  So there are different

6    capacities of ports of entry.

7    BY MR. MEDLOCK:

8           Q.   To your knowledge, is the

9    distinction between physical capacity and

10   operational capacity memorialized in any sort of

11   regulation?

12          MS. SHINNERS:  Object to the scope.

13          THE WITNESS:  So to my knowledge, I

14   don't know that there is any regulation where

15   that's memorialized.

16   BY MR. MEDLOCK:

17          Q.   Is there any sort of statute that

18   makes a distinction between physical capacity and

19   operational capacity, to your knowledge?

20          MS. SHINNERS:  Object to the scope.

21          THE WITNESS:  My -- not to my

22   knowledge.

23   BY MR. MEDLOCK:

24          Q.   Is there any form of guidance from

25   OFO leadership that makes a distinction between



Page 69

```
1    physical capacity and operational capacity that

2    you are aware of?

3                    MS. SHINNERS:  Object to the scope.

4                    THE WITNESS:  So we have always had

5    an operational capacity, you know, for as long as

6    I have kind of worked in detention, and so that

7    there is specific guidance on what is and what is

8    not operational capacity, to my knowledge, no.

9    BY MR. MEDLOCK:

10               Q.   So the answer is you are not aware

11   of any guidance from OFO leadership that defines

12   the difference between physical capacity and

13   operational capacity; is that right?

14                   MS. SHINNERS:  Object to the scope.

15                   THE WITNESS:  I'm not sure I

16   understand your question fully.

17   BY MR. MEDLOCK:

18               Q.   Have you ever received a memorandum

19   from anybody in the leadership of OFO that

20   explained the difference between operational

21   capacity and physical capacity?

22                   MS. SHINNERS:  Object to the scope.

23                   THE WITNESS:  So I have seen a

24   memorandum that talks about operational capacity,

25   but to the extent that it defines it and gives us
```



Page 70

1   guidance on what that is, I would say it does not

2   do that.

3   BY MR. MEDLOCK:

4           Q.   Have you ever seen a standard

5   operating procedure that defines the term

6   "operational capacity" and explains what it is?

7               MS. SHINNERS:  Object to the scope.

8               THE WITNESS:  That defines it, no.

9   And I'm not sure.  I would have to look back at

10  any of the standard operating procedures, but,

11  again, for as long as I have worked in detention

12  as a manager, going back to '15-'16, we have

13  always used operational capacity.

14  BY MR. MEDLOCK:

15          Q.   Have you ever seen a written muster

16  that defines the term "operational capacity"?

17              MS. SHINNERS:  Object to the scope.

18              THE WITNESS:  That defines

19  "operational capacity"?  Not that I can recall,

20  no.

21  BY MR. MEDLOCK:

22          Q.   Are you aware of any sort of

23  official document at CBP that defines the term

24  "operational capacity"?

25              MS. SHINNERS:  Object to the scope.



Page 71

```
 1                  THE WITNESS:  Again, I have seen
 2      documents that say "operational capacity" and
 3      discuss it, but that actually define what that is,
 4      I am not aware, no.
 5                  MS. SHINNERS:  Is now --
 6                  MR. MEDLOCK:  I have just got a
 7      couple more questions.  I have just got a couple
 8      more questions and we can take a break.  Thank
 9      you, Katie.
10      BY MR. MEDLOCK:
11           Q.   So that I understand, you
12      understand what the term "operational capacity"
13      means, but you have never seen any sort of
14      document at CBP that defines the term?
15                  MS. SHINNERS:  Object to the scope.
16                  THE WITNESS:  That specifically
17      define what exactly it is, I have not seen that.
18      BY MR. MEDLOCK:
19           Q.   There is no official guidance that
20      tells CBP employees how they should define the
21      term "operational capacity"; correct?
22                  MS. SHINNERS:  Object to the scope.
23                  THE WITNESS:  Again, in my
24      knowledge, no.
25      ///
```



Page 72

1    BY MR. MEDLOCK:

2              Q.   Do you know whether your definition

3    of "operational capacity" is the same

4    understanding of operational capacity that a CBP

5    officer would have at the port of entry in Texas?

6              MS. SHINNERS:  Object to the scope.

7              THE WITNESS:  So all of the

8    dynamics that go into operational capacity, it

9    would not be the same understanding and it would

10   differ from port of entry to port of entry, from

11   day to day and sometimes by hour, you know, from

12   hour to hour because really ports of entry don't

13   know what's coming in towards them.

14   BY MR. MEDLOCK:

15             Q.   My question is a little different.

16             Have you ever spoken to somebody at

17   a port of entry in Texas to determine how they

18   define the term "operational capacity"?

19             A.   To define it --

20             MS. SHINNERS:  Object to the scope.

21   BY MR. MEDLOCK:

22             Q.   I couldn't hear you, Ms. Marin.

23   I'm sorry.

24             A.   I have not spoken to someone in

25   Texas to define "operational capacity."



Page 73

```
 1              Q.   So you don't know how they define
 2     it in the land ports of entry in Texas, do you?
 3              MS. SHINNERS:  Object to the scope.
 4              THE WITNESS:  I don't.
 5     BY MR. MEDLOCK:
 6              Q.   So "operational capacity" is a term
 7     that has never been officially defined by CBP, as
 8     far as you know?
 9              MS. SHINNERS:  Object to the scope.
10              THE WITNESS:  As far as I know, it
11     has not been officially defined, no.
12              MR. MEDLOCK:  Okay.  Now would be a
13     good time for a break.
14              MS. SHINNERS:  Okay, great.  Thank
15     you.
16              MR. MEDLOCK:  Want to take ten
17     minutes?
18              MS. SHINNERS:  I think -- yeah.
19     Like, 10 or 12 would be great.
20              MR. MEDLOCK:  Okay.
21              VIDEOGRAPHER:  The time is 9:56
22     a.m.  We are now off the record.
23          (Whereupon, a recess was held from
24          9:56 a.m. to 10:12 a.m.)
25              VIDEOGRAPHER:  The time is 12:13
```



Page 74

1    a.m.  We are now back on the record.

2    BY MR. MEDLOCK:

3              Q.   Welcome back, Ms. Marin.

4              During the break, did you discuss

5    the substance of your testimony with your counsel?

6              A.   I did.

7              Q.   Which counsel did you discuss the

8    substance of your testimony with?

9              A.   All of them.

10             Q.   And what was discussed about the

11   substance of your testimony?

12             MS. SHINNERS:  Objection.  Calls

13   for attorney-client communication.

14             MR. MEDLOCK:  No, it doesn't.  Hill

15   versus Clifton.  There is a lot of other cases

16   about this that when the witness is sworn in and

17   discusses the substance of their testimony during

18   the break, it is a -- it is proper grounds for

19   examination.  So I will ask my question again.

20             Sure, it's an Eastern District of

21   Pennsylvania case from, I believe, 1995, and

22   there's many, many cases that have followed it.

23             MS. SHINNERS:  Well, I am going to

24   ask what you mean by discussing the substance of

25   her testimony because otherwise I don't know



Page 75

```
 1    whether that falls under this case.
 2                MR. MEDLOCK:  All right.
 3    BY MR. MEDLOCK:
 4           Q.   Ms. Marin, you answered "yes," that
 5    you discussed the substance of your testimony with
 6    your attorneys.
 7                What did you mean by that?
 8           A.   We just discussed --
 9                MS. SHINNERS:  Object.  I think we
10    need a definition of "the substance of the
11    testimony" before I can let her answer without
12    instructing her not to answer about
13    attorney-client communications.  And the reason
14    for that is because there are other communications
15    that may not fall within the substance of her
16    testimony or that all the communications may not
17    fall within the substance of her testimony.
18                MR. MEDLOCK:  All right.  She said
19    "yes," so I am entitled to inquire about it.
20                Are you going to instruct her not
21    to answer, Katie?
22                MS. SHINNERS:  I -- if you would --
23    if you would allow us to consult regarding the
24    privilege --
25                MR. MEDLOCK:  Sure.  Do you want to
```



Page 76

1    go off for a second and then talk to Ms. Marin,

2    and then we will just wait here?

3                MS. SHINNERS:  Yes.  Yes.  Thank

4    you.

5                MR. MEDLOCK:  All right.  Why don't

6    we go off the record, then.

7                VIDEOGRAPHER:  Time is 10:15 a.m.

8    We are now off the record.

9                (Whereupon, a recess was held from

10               10:15 a.m. to 10:24 a.m.)

11               VIDEOGRAPHER:  The time is 10:24

12   a.m.  We are now back on the record.

13   BY MR. MEDLOCK:

14               Q.   Ms. Marin, I want to go back to the

15   question I asked you right after the prior break.

16               Did you have a conversation or

17   conversations with your attorneys during that

18   break regarding the substance of your testimony at

19   this deposition?

20               A.   So I had a conversation with the

21   attorneys, and I guess I over-generalized when I

22   said "yes" on substance.  It did not contain the

23   substance of the conversation.  It was a general

24   conversation about the way I was answering

25   questions.  I mean, we didn't go over what the



Page 100

1    Contingency Plan"?

2            A.   Yes.

3            Q.   And beneath that there is a

4    Subsection 11.1; correct?

5            A.   Correct.

6            Q.   And Subsection 11.1 reads in part:

7    ███████████████████████

8    ███████████████████████

9    █████████████████████████

10   ██████████████████

11           Did I read that correctly?

12           A.   Yes.

13           Q.   ████████████████████████

14   ████████████████████████████

15   ████████████████████████████

16   ██████

17           A.   Correct.

18           Q.   And you said earlier that it's

19   impossible to actually hit the physical capacity

20   of a port of entry; correct?

21           A.   I don't believe I said it's

22   impossible to hit the capacity, no.

23           Q.   Okay.  But in any instance, the San

24   Diego field office decided ████████

25   ████████████████████████



Page 101

1    individuals were in the AEU; correct?

2              A.    At the time this was drafted, yes.

3              Q.    Do you have any explanation for why

4    the overflow contingency doesn't consider

5    operational capacity?

6              MS. SHINNERS:  Object to the scope.

7              You can answer.

8              THE WITNESS:  Operational capacity

9    is not -- for us is not a hard number or hard

10   ceiling.  It's a ballpark that we attempt to stay

11   around to safely have the resources available to

12   process and adequately care for people in our

13   custody.  That does not mean that that is a

14   maximum ceiling of capacity for us.

15   BY MR. MEDLOCK:

16             Q.    So the maximum ceiling of capacity

17   can be higher than operational capacity; correct?

18             A.    Right, because operational capacity

19   will vary each day based on all of those factors.

20             Q.    And it can be the case that the

21   port -- a port of entry can physically hold more

22   people than the operational capacity of the port;

23   is that right?

24             A.    Could physically hold more, but we

25   have to weigh the ability to humanely uphold all



Page 102

1    of the detention standards that are required of us

2    by policy.

3             Q.   If you wanted to humanely uphold

4    those policies, why doesn't the overflow

5    contingency plan shown in Subsection 11.1 of

6    Exhibit 185 reference operational capacity?

7                 MS. SHINNERS:  Object to the scope.

8                 THE WITNESS:  I don't know the

9    answer to that.

10                MR. MEDLOCK:  Kevin, if you could

11   bring down the box for overflow contingency plan?

12   BY MR. MEDLOCK:

13            Q.   I am going to have Kevin flip

14   through this document, and please stop him when

15   you find a reference to the phrase "operational

16   capacity" anywhere in this AEU standard operating

17   procedure.

18                (Document reviewed by witness on

19                screen.)

20                MS. SHINNERS:  Object to the scope.

21                THE WITNESS:  I don't see it on

22   that page.

23                MR. MEDLOCK:  Okay.  Let's move to

24   the second page of the exhibit.

25                (Document reviewed by witness on



Page 103

1                     screen.)

2      BY MR. MEDLOCK:

3              Q.   Do you see a reference to the

4      phrase "operational capacity" anywhere on the

5      second page of Exhibit 185?

6                     MS. SHINNERS:  Object to the scope

7      and for this line of questioning.

8                     THE WITNESS:  I do not see it.

9      BY MR. MEDLOCK:

10             Q.   Okay.  Let's turn to the third page

11     of Exhibit 185.  Please let me know if you see the

12     phrase "operational capacity" mentioned anywhere

13     on the third page of Exhibit 185.

14                    (Document reviewed by witness on

15                    screen.)

16                    THE WITNESS:  I do not see it

17     there.

18     BY MR. MEDLOCK:

19             Q.   Let's go to the next page of

20     Exhibit 185, and let me know whether you see a

21     reference to operational capacity on this page of

22     Exhibit 185.

23                    (Document reviewed by witness on

24                    screen.)

25                    THE WITNESS:  I do not see it



Page 104

```
 1    there.
 2    BY MR. MEDLOCK:
 3              Q.   Let's move to the next page of
 4    Exhibit 185.  Let me know if you see the phrase
 5    "operational capacity" referenced anywhere on this
 6    page of Exhibit 185.
 7              (Document reviewed by witness on
 8              screen.)
 9              THE WITNESS:  I do not see that
10    phrase.
11    BY MR. MEDLOCK:
12              Q.   All right.  Let's move to the next
13    page of Exhibit 185, and let me know if you see a
14    reference to the phrase "operational capacity" on
15    this page of Exhibit 185.
16              (Document reviewed by witness on
17              screen.)
18              THE WITNESS:  I do not see that
19    phrase.
20    BY MR. MEDLOCK:
21              Q.   Let's move to the next page of
22    Exhibit 185.  Do you see a reference to the phrase
23    "operational capacity" anywhere on this page of
24    Exhibit 185?
25              (Document reviewed by witness on
```



Page 105

```
1                 screen.)
2                     THE WITNESS:  I do not see a
3       reference to the phrase "operational capacity,"
4       but I do see several reasons why physical capacity
5       may not be reached.
6       BY MR. MEDLOCK:
7                     Q.   But the phrase "operational
8       capacity" is not used anywhere on that page, is
9       it?
10                    A.   It is not.
11                    Q.   And there is no definition of
12      "operational capacity" anywhere on that page, is
13      there?
14                    A.   There is not.
15                    Q.   Okay.  Let's move to the next page.
16                    Ms. Marin, do you see any reference
17      to the phrase "operational capacity" anywhere on
18      this page of Exhibit 185?
19                    MS. SHINNERS:  I am just going to
20      reiterate the objection to scope to this line of
21      questioning which I previously stated.
22                    (Document reviewed by witness on
23                    screen.)
24                    THE WITNESS:  I do not see the
25      phrase there.
```



Page 106

1    BY MR. MEDLOCK:

2              Q.    Let's move to the next page.

3                    Do you see a reference to

4    "operational capacity" anywhere on this page of

5    Exhibit 185?

6              (Document reviewed by witness on

7              screen.)

8                    THE WITNESS:  I do not see it

9    there.

10   BY MR. MEDLOCK:

11             Q.    Let's move to the next page.

12                   And as before, let me know if you

13   see a reference to the phrase "operational

14   capacity" anywhere on this page of Exhibit 185.

15             (Document reviewed by witness on

16             screen.)

17                   THE WITNESS:  I do not see it.

18   BY MR. MEDLOCK:

19             Q.    All right.  Let's move to the next

20   page.  Let me know whether you see a reference to

21   "operational capacity" on this page of

22   Exhibit 185.

23             (Document reviewed by witness on

24             screen.)

25                   THE WITNESS:  No, I don't.



Page 107

1    BY MR. MEDLOCK:

2            Q.   Okay.  Let's move to the next page,

3    and let me know whether you see a reference to the

4    phrase "operational capacity" anywhere on the page

5    Bates numbered AOL-DEF-00749865.

6                (Document reviewed by witness on

7                screen.)

8                THE WITNESS:  I do not see it

9    there.

10   BY MR. MEDLOCK:

11           Q.   All right.  Let's move to the last

12   page of the document Bates numbered

13   ALO-DEF-00749866.

14               Let me know if you see the phrase

15   "operational capacity" mentioned anywhere on this

16   page of Exhibit 185.

17               (Document reviewed by witness on

18               screen.)

19               THE WITNESS:  I do not see it

20   there.

21   BY MR. MEDLOCK:

22           Q.   Okay.  So we have been through

23   every page of Exhibit 185, and the phrase

24   "operational capacity" appears nowhere in the

25   standard operating procedures for the San Ysidro



Page 108

```
1    port of entry's admissibility enforcement unit;
2    correct?
3              A.   Correct.
4              Q.   And you participated in drafting
5    this document in 2015; correct?
6              A.   Correct.
7              Q.   And at that time you understood
8    what the phrase -- you have already testified you
9    understand what the phrase "operational capacity"
10   meant; correct?
11             A.   Correct.
12             MS. SHINNERS:  Object to the scope.
13   BY MR. MEDLOCK:
14             Q.   And do you believe that Mr. Hood
15   and Mr. Castillo also understood what "operational
16   capacity" meant?
17             MS. SHINNERS:  Objection; calls for
18   speculation, scope.
19             THE WITNESS:  I believe I did.
20   BY MR. MEDLOCK:
21             Q.   Did you -- and you never included a
22   definition of the phrase "operational capacity"
23   anywhere in these standard operating procedures;
24   correct?
25             MS. SHINNERS:  Object to the form,
```



Page 109

1    scope.

2              THE WITNESS:  No.

3    BY MR. MEDLOCK:

4         Q.   Operational capacity, as you said,

5    is an important concept for the San Ysidro

6    admissibility enforcement unit; correct?

7         A.   It is.

8         Q.   It's an important concept for the

9    AEU, but it appears nowhere in the standard

10   operating procedures; is that right?

11             MS. SHINNERS:  Object to the scope.

12             THE WITNESS:  Correct.

13   BY MR. MEDLOCK:

14        Q.   So you expect the court in this

15   case to believe that operational capacity is so

16   important that it drives everything that's done on

17   a daily basis at the San Ysidro AEU but when it

18   was time to put together the standard operating

19   procedures that govern day-to-day business at that

20   AEU, the concept of operational capacity wasn't

21   mentioned once.

22             Is that what you expect the court

23   to believe?

24             MS. SHINNERS:  Object to the scope.

25   Argumentative.



Page 110

1                        THE WITNESS:  That was a given for

2      us.  Even during the drafting of that, we knew

3      that we always had the discretion to operate

4      within operational capacity.

5      BY MR. MEDLOCK:

6              Q.   So it was just a given, so you

7      didn't write it down.

8                   Is that your testimony?

9                   MS. SHINNERS:  Object to the scope.

10                  THE WITNESS:  Yes.

11     BY MR. MEDLOCK:

12              Q.   Is it your testimony that

13     "operational capacity" never needed to be defined

14     because everybody understood what it meant and

15     acted accordingly?

16                  MS. SHINNERS:  Object to the scope.

17                  THE WITNESS:  I can't speak to what

18     everyone knew, whether it meant or not, but the

19     decision-makers in the unit clearly understood

20     what operational capacity was and that it

21     fluctuated on any given day on what the detention

22     capacity.

23     BY MR. MEDLOCK:

24              Q.   Can you explain to me why, if

25     operational capacity was such an important concept



Page 111

1    for day-to-day operations of the admissibility

2    enforcement unit at San Ysidro, why it was never

3    defined or written down once?

4              MS. SHINNERS:  Object to the scope.

5              THE WITNESS:  I can't explain why

6    it was never written down, but why it's not

7    defined is that there isn't -- there isn't a

8    concrete definition of what that is.  There are

9    several factors that are always changing in

10   dynamic that would affect the capacity on any

11   given day.

12   BY MR. MEDLOCK:

13        Q.   Did anyone that you are aware of

14   any level at CBP ever write down what the factors

15   were that determined the operational capacity on

16   any given day?

17             MS. SHINNERS:  Object to the scope.

18             THE WITNESS:  Not to my knowledge.

19   BY MR. MEDLOCK:

20        Q.   And you certainly didn't do that in

21   the standard operating procedures for the

22   San Ysidro admissibility enforcement unit;

23   correct?

24             MS. SHINNERS:  Object to the scope.

25             THE WITNESS:  I did not.



Page 112

1    BY MR. MEDLOCK:

2            Q.   Are you aware of any form of

3    official or unofficial document at CBP that lays

4    out the factors to be considered when determining

5    what operational capacity is?

6            MS. SHINNERS:  Object to the scope.

7            THE WITNESS:  I am not aware.

8    BY MR. MEDLOCK:

9            Q.   So to your knowledge, no policy

10   exists defining the factors to be used when

11   determining operational capacity?

12           MS. SHINNERS:  Object to the scope.

13           THE WITNESS:  To my knowledge, no.

14   BY MR. MEDLOCK:

15           Q.   So operational capacity is really

16   just an unwritten policy that's based on the gut

17   of the officials at a port of entry; correct?

18           MS. SHINNERS:  Object to the scope.

19           THE WITNESS:  Operational capacity

20   is not based on the gut of officials.  I would not

21   say that, no.  There are several factors that go

22   into operational capacity.  If I have a family

23   unit that comes in and they have -- one of the

24   children in the family unit has chicken pox, a

25   hold room that could hold 24 -- that's a family



Page 113

```
 1    unit of four is going to affect my capacity that

 2    day because I can't potentially put anyone else at

 3    risk of contracting a contagious illness.  If they

 4    have --

 5    BY MR. MEDLOCK:

 6              Q.   Okay.  And that's your testimony,

 7    that's the actual policy of CBP that a family has

 8    to be put into an isolation unit; is that correct?

 9              MS. SHINNERS:  Object to the scope.

10              THE WITNESS:  I cannot speak to the

11    policy of CBP, but at San Ysidro in the

12    admissibility enforcement unit, if there is a

13    contagious illness, we will absolutely take every

14    step possible to make sure that the ill parties

15    are taken care of, but we also have a

16    responsibility to ensure that they are isolated

17    from the rest of the population to ensure that we

18    don't have an outbreak.

19    BY MR. MEDLOCK:

20              Q.   But you don't actually know what

21    the policy of CBP is on housing individuals with

22    chicken pox or another communicable disease, do

23    you?

24              MS. SHINNERS:  Object to the scope.

25              THE WITNESS:  I don't know the
```



Page 127

1          A.   Yes.

2          Q.   And when you use that term, you

3   don't distinguish to the person you are talking to

4   whether you are talking about operational capacity

5   or physical capacity, do you?

6               MS. SHINNERS:  Object to the scope.

7               THE WITNESS:  I can't say that I

8   never do, but in this e-mail I did not.

9   BY MR. MEDLOCK:

10          Q.   Okay.  And then you go on in the

11  next sentence to write:

12               "If we reach 316 tonight and

13               have to hold, I will send you

14               notification."

15               Did I read that correctly?

16          A.   Yes.

17          Q.   So in this e-mail, you stated that

18  316 was the number at which the San Ysidro port of

19  entry would have to hold; correct?

20          A.   Correct.

21          Q.   So it was the actual maximum

22  capacity listed on the standard operating

23  procedure that determined when San Ysidro had to

24  hold intake; correct?

25          A.   316, it appeared from this e-mail,



Page 128

1    would have been what I decided that day to be my

2    operational capacity.

3            Q.   Okay.  So it's just a coincidence

4    that the operational capacity that day was the

5    actual maximum capacity at the AEU?

6            A.   I can't speculate if it was

7    coincidence or not.

8            Q.   On how many days in a year is the

9    actual operational capacity of the San Ysidro port

10   of entry 316?

11           A.   I don't have that number.

12           Q.   You couldn't tell me -- you

13   couldn't tell me a percentage of days in which 316

14   is the actual operational capacity in any given

15   year?

16           A.   I cannot.  And even on that day, we

17   could have reached 316 from the limit line, and

18   then four imposters and eight vehicle cases come

19   in, and my new operational capacity was 328.  So,

20   again, that number is fluid for us when I am

21   talking operational capacity.

22           Q.   Do you know if the operational

23   capacity of the San Ysidro port of entry changed

24   on April 18, 2018?

25           A.   At any time?



Page 129

1              Q.   Yeah.

2              A.   I don't know off the top of my

3    head, no.

4              Q.   Do you know if it changed after

5    6:35 p.m. on April 18, 2018?

6              A.   I don't know.

7              Q.   Can you, as you sit here today, go

8    back and reconstruct for me what the operational

9    capacity of the San Ysidro port of entry was on

10   any given day between May 2016 and the present?

11             A.   Are you asking me to reconstruct

12   the daily operational capacity?

13             Q.   Yes, correct.

14             A.   I cannot do that.

15             Q.   Do you know of anybody at CBP who

16   can do that?

17             A.   Again, that number --

18             MS. SHINNERS:  Object to the scope.

19             THE WITNESS:  That number is fluid

20   and varies from day to day.  So no, I do not

21   believe anyone can do that.

22   BY MR. MEDLOCK:

23             Q.   Do you know of any sort of report

24   or data that exists at CBP that would enable

25   anyone at CBP or otherwise to determine what the



Page 130

1    daily operational capacity of any port of entry

2    was?

3            MS. SHINNERS:  Object to the scope.

4            THE WITNESS:  I do not know of any

5    report that's going to give you a daily

6    operational capacity.  Again, that's fluid, it's

7    very dynamic, and it changes multiple times even

8    within a day.

9    BY MR. MEDLOCK:

10         Q.  So let me get this straight.

11         The operational capacity of a port

12    of entry is not defined in any official document;

13    correct?

14         A.  To my knowledge --

15         MS. SHINNERS:  Object to the scope.

16    BY MR. MEDLOCK:

17         Q.  And you can't tell me what it is on

18    any given day; correct?

19         A.  Correct.

20         Q.  And you can't even tell me what the

21    factors were that would have led to the

22    operational capacity changing at any given point

23    in time, can you?

24         A.  I can tell you several factors that

25    would change our operational capacity at any given



Page 131

1   time.

2           Q.    But you can't tell me which factor

3   it was that caused the operational capacity to

4   change at any given time; correct?

5           A.    Correct.

6           MS. SHINNERS:  Object to the scope,

7   vague.

8   BY MR. MEDLOCK:

9           Q.    I'm sorry.  I couldn't hear you,

10  Ms. Marin.  What was your answer to my question?

11          A.    "Correct."

12          Q.    So how do you expect the court in

13  this case to believe you that operational capacity

14  exists when it isn't written down, you can't tell

15  the court what it is, and you can't tell the court

16  how it changed?

17          MS. SHINNERS:  Object to the scope.

18          THE WITNESS:  I can only speak to

19  the facts that it changed every day.  There are

20  concrete reasons on why it would change, and that

21  is the reality of the operation that we work with.

22  BY MR. MEDLOCK:

23          Q.    And was there ever any e-mail or

24  memorandum that was sent out that explained, our

25  operational capacity changed from 316 to 285 on



Page 187

```
 1    you Tab 17 --
 2                Kevin.
 3                -- which we will mark as
 4    Exhibit 197 to your deposition.  And Exhibit 197
 5    is a spreadsheet bearing the Bates number
 6    AOL-DEF-00523370.
 7                (Exhibit No. 197 was marked for
 8                identification by the shorthand
 9                reporter and is attached hereto.)
10    BY MR. MEDLOCK:
11                Q.    And my first question to you,
12    Ms. Marin, if this appears to be a queue
13    management report for July 2nd, 2019; correct?
14                A.    Correct.
15                Q.    And July 2nd, 2019, is the second
16    date that was mentioned in Paragraph 12 of your
17    declaration; correct?
18                A.    Correct.
19                Q.    And if you look in the row for
20    San Ysidro, it shows that there are 294
21    individuals in custody at the AEU for 98 percent
22    capacity; correct?
23                A.    Yes.
24                Q.    And by the way, in this chart it
25    says "percentage of capacity."  It doesn't say
```



Page 188

1    operational capacity.  It doesn't say physical
2    capacity.  It just says "capacity"; correct?
3              A.   Correct.
4              Q.   And then in the column for port
5    operations, it says "no impact"; correct?
6              A.   Correct.
7              Q.   Which you now claim means no impact
8    out of the ordinary; correct?
9              A.   Correct.
10             Q.   You could have written "no impact
11   out of the ordinary."  It's just three extra
12   words.  Why didn't you do that?
13             A.   Again, I'm not sure that I wrote
14   the report or another supervisor wrote the report,
15   but we knew that what we meant by "no impact" was
16   no impact out of the normal, impact that everyone
17   knew about.  We didn't see a reason to continue to
18   report on a day-to-day basis.
19             Q.   And you do want to be clear in the
20   communications that were going to management at
21   OFO; correct?
22             A.   Correct.
23             Q.   And you knew that management at OFO
24   saw a version of the queue management report;
25   correct?



Page 189

1          A.   Correct.

2          Q.   So if you wanted to be clear in

3     what you were communicating to your management and

4     senior leadership at OFO, why not just write the

5     three extra words to make this say "no impact out

6     of the ordinary"?

7          A.   It was our understanding that even

8     senior management knew "no impact" was -- were

9     things out of the ordinary for the port of entry

10    that was making the report.  So I can't speculate

11    as to why whoever filled out the report did not

12    write three extra words, but it was because we

13    knew that that's what that meant.

14         Q.   So you can't speculate as to why

15    they do it, but you knew that the reason why they

16    did that was -- why this just says "no impact" is

17    because everybody knew what "no impact" meant; is

18    that right?

19         A.   Correct.

20         Q.   Do you know what "no impact" means

21    when it's used with respect to Tecate?

22         A.   It would mean the same for all of

23    us.

24              MS. SHINNERS:  Sorry.  Object to

25    the scope.



Page 190

```
 1                   But go ahead.
 2      BY MR. MEDLOCK:
 3            Q.   Do you know what "no impact" means
 4      with respect to Calexico?
 5            A.   Yes.
 6            Q.   Okay.  And does "no impact" mean no
 7      impact out of the ordinary when it's used with
 8      respect to Calexico?
 9            A.   Yes.
10            Q.   Isn't it true that the queue
11      management reports said "no impact" to port
12      operations regardless of the number of people in
13      custody and the capacity of the port?
14            A.   Yes, that is true.
15            Q.   Okay.  Let's take a look at Tab 18,
16      which is an exhibit we will mark as Exhibit 198 to
17      your deposition.
18                   THE COURT REPORTER:  Excuse me,
19      Counsel.  This is the reporter.  There have been a
20      few documents marked as the same exhibit.  There's
21      a bit of confusion with the exhibits.  I just
22      wanted to let you know.  I don't know if you want
23      to go off the record to figure it out.
24                   MR. MEDLOCK:  Why don't we do this.
25      We will mark Tab 18 as Exhibit 200, and I know we
```



Page 191

```
 1    haven't hit that number yet.
 2              (Exhibit No. 200 was marked for
 3              identification by the shorthand
 4              reporter and is attached hereto.)
 5    BY MR. MEDLOCK:
 6              Q.   So, Ms. Marin, I have brought up
 7    what we have marked as Exhibit 200 to your
 8    deposition.  It's a multipage Federal Rule of
 9    Evidence 1006 summary exhibit entitled "San Ysidro
10    Port of Entry Impact to Port Operations."  It
11    summarizes the capacity of the San Ysidro port of
12    entry on everyday approach.  We have a queue
13    management report and what is listed in the impact
14    to port operations column.  And I will have Kevin
15    scroll through the pages of this summary exhibit.
16              Please tell me when an actual
17    impact to port operations is listed.
18              (Document reviewed by witness on
19              screen.)
20    BY MR. MEDLOCK:
21              Q.   That's the last page.
22              So for every queue management
23    report that's listed, it always -- there is no
24    impact to port operations listed; correct?
25              A.   Correct.
```

