# EXHIBIT C

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

AL OTRO LADO, INC., *et al*
    *Plaintiffs-Appellees,*

v.

ALEJANDRO MAYORKAS, *et al.,*
    *Defendants-Appellants.*

No. 19-56417

D.C. No. 3:17-cv-02366-BAS-KSC
Southern District of California,
San Diego

**DECLARATION OF VERNON FORET**

I, Vernon Foret, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge and information made known to me from official records, and reasonably relied upon in the course of my employment, hereby declare as follows relating to the above-captioned matter.

1.    I am currently the Executive Director for Operations, Office of Field Operations (OFO), U.S. Customs and Border Protection (CBP), U.S. Department of Homeland Security (DHS). I have been employed in this role since January 2020. I have over 30 years of experience in the federal government, to include 13 years with the U.S. Department of Agriculture, Animal and Plant Health Inspection Service, and 17 years with CBP as an Area Port Director in New Orleans, Louisiana; Director of Field Operations in Miami, Florida; and Executive Director in CBP Headquarters in Washington, D.C. As the Executive Director for Operations, I oversee more than 23,000 employees, with operations at 20 major field offices, 328 ports of entry (POEs), and 16 Preclearance locations.

2.    I make this declaration to support the filing of portions of the merits report of plaintiffs' expert witness in this case under seal. Specifically, the following types of information

1

should be filed under seal: (1) discussions revealing the U.S. government's communications with Mexico regarding efforts to manage migration flows; (2) discussions of the detention capacity at POEs across the southwest border and changes to that capacity over time; (3) operational details of efforts by CBP and DHS to plan for and address mass migration and other contingencies; and (4) details regarding the location and staffing of the limit line position at several POEs across the southwest border. All of this information would, if disclosed publicly, undermine and harm OFO's ability to execute its mission of protecting and securing the United States' borders.

*Communications with Mexico*

3.    In paragraphs 37, 40, 41, 43, 51, 53, 73, 76, 93, and 94, as well as footnotes 160 and 162, the report quotes from CBP emails and other documents reflecting communications between the U.S. government and officials and NGOs in Mexico related to efforts to manage migration flows across the border. The quoted portions reveal the recommendations, opinions, and reactions of various officials in both Mexico and the United States to the 2016 Haitian migration surge; requests for information and assistance from officials in both governments; and efforts to work together to manage the flow of migration. The report also provides examples of the Mexican government's own efforts to manage migration flows, and describes the nature, type, and frequency of communication between officials in CBP and individuals in Mexico related to such efforts. These examples are also drawn from an analysis of CBP emails and other documents.

4.    All of this information should remain confidential, as disclosure to the public would stifle the free flow of information that is critical to maintaining a safe and secure border. Given

the fluidity of operations on the southern border, government officials must often make quick decisions, some of which have significant implications for law enforcement, security, and diplomatic concerns. Therefore, it is critical that individuals in the U.S. government and governmental and non-governmental actors in Mexico have situational awareness of significant events, issues, and concerns on both sides of the border. In order to maintain this situational awareness, it is important that information be shared freely, quickly, and often. CBP works closely with the State Department and other agencies within the United States, as well as with individuals in the Mexican government, to ensure the most efficient and effective means of communication with all relevant Mexican partners.

5.    Officials on the ground must be able to communicate about all matters or issues that impact or have a potential impact to the border or border operations, without regard for the substance of the information shared or how it may be perceived by the public. Therefore, disclosure of such communications to the public would stifle the willingness of officials in both governments, as well as non-governmental organizations in Mexico, to freely share critical information, especially information that may be perceived in a negative fashion by the public. For instance, it may be critical for a U.S. official to provide information about an outbreak of a communicable disease in a particular border town with his counterpart in the Mexican government, so that the Mexican government can take appropriate public health measures. If the U.S. official was concerned about the potential that such a fact may lead to a panic, however, he may be more reluctant to share the information, thus preventing the Mexican government from taking appropriate public health steps.

6.    The examples of Mexico's efforts to manage the flow of migration, and efforts between

CBP and Mexico to work together to manage the flow, reveal operational details about

efforts to ensure that the U.S.-Mexico border is safe and secure that also should remain

confidential.  Specifically, because the United States and Mexico have a shared interest in

ensuring that their joint border is safe and secure, officials often work together on efforts

to maintain security and manage the flow of trade and travel across the border.  The exact

nature of the partnership varies based on the particular location and particular operational

issues, but officials often maintain regular communication in order to ensure that they

have sufficient situational awareness of particular events of interest and areas of

concerns.  The nature of such communications would, if disclosed to the public, stifle the

willingness of individuals to work together in this manner, as outlined above.  The

operational details also provide outside entities with insight into the relationship between

CBP and Mexican officials, including insight into what operational issues may be

particularly important in a particular area (for instance, which areas of the border have

faced historical migration trends),  the method by which officials work together to

address those issues (for instance, the historical response to mass migration), and even the

strength and nature of the local relationship.  Such insight would provide hostile actors

with a roadmap as to which areas of the border may be most vulnerable to becoming

overwhelmed during a mass migration event, or which local relationships may be most

vulnerable to manipulation.

*Capacity Information*

7.    In Tables 2, 3, 7, 8, 12-14, graphs 3-4, and paragraphs 80, 103, 105, 106, 109, 116, 119,

125, 130, and 134, as well as footnotes 194, 220, 231, 251-254, the report discusses and

4

analyzes several factors that reveal operational vulnerabilities about OFO operations: (1) the specific detention capacities of certain ports of entry along the southwest border, as well as an analysis of any changes in the detention capacity; (2) trends related to the percentages of holding capacities utilized by the ports of entry along the southwest border; (3) the specific numbers of individuals in custody at the ports of entry along the southwest border, and (4) San Ysidro's rate of processing.

8.    This data is derived, in part, from both CBP's Field Queue Management Reports and CBP's Migration Crisis Action Team (MCAT) Reports.  Field Queue Management Reports are reports, prepared for OFO leadership, which compile data from the OFO Field Offices on the southwest border, including the number of individuals in custody, the number of individuals waiting in Mexico to enter the port of entry, and any notable impact on operations.  These reports are used for maintaining awareness of any resource or operational vulnerabilities at the various POEs along the southwest border.  Similarly, CBP's MCAT reports provide raw data including the number of individuals apprehended or found inadmissible along the southwest border, the demographics of those individuals (e.g., family units or unaccompanied minors), and information relating to the capacity of various CBP facilities and the immigration system overall.

9.    A port of entry's detention capacity is the available space to hold individuals in custody. This is often based on the number of holding cells or other appropriate holding spaces. This number may change over time, based on construction, other facility issues, or a reassessment of whether a particular space is, in fact, appropriate for short-term detention.  While the detention capacity of a particular port is not the only factor that determines how many individuals the port can actually take in for processing on a

particular day, the detention capacity does provide critical information about the port's capability to process and hold individuals. A port with a detention capacity of, say, 100, will have the ability – at least in theory – to take in more individuals than a port with a detention capacity of 20.

10. Thus, this information can be exploited by hostile actors looking to harm port operations. For instance, if a smuggling organization knows that Port A has a capacity of 100, but that Port B has a capacity of 20, the smuggler could easily harm operations at Port B by sending a group of 50 people running through the vehicle lanes, such that the port would be holding significantly more than its detention capacity. Such a significant number of individuals in custody would likely require the port to redirect officers away from their front line duties and towards processing and providing appropriate treatment for these individuals. The smuggling group would also have knowledge that a similar sized group would *not* overwhelm operations at Port A. Thus, the smuggling organization could use this information to better allocate its resources towards disrupting OFO operations at particular ports with smaller detention capacities.

11. Similarly, in paragraphs 103, 105, 106, 109, graphs 2-4, and tables 2 and 3, the report discusses trends and changes in capacity over time, particularly at the El Paso POE. Specifically, the report analyzes three distinct periods of time in which El Paso POE's detention capacity changed, including a discussion of the specific listed detention capacity for each period of time. While this information is historical, it also reveals operational vulnerabilities that can be exploited in the same manner as described above. Specifically, the periods of time and the specific numbers referenced in the report can be cross-referenced with other information to potentially determine why the capacity of the

port changed over time or what specific factors led to the change. For instance, the dates in the report can be cross-referenced with CBP's publicly-available data on migration trends and the number of individuals encountered along the southwest border for a particular period of time. It would then be possible to determine whether the particular changes were related in any way to increased or decreased migration. This historical information could then be further extrapolated to predict whether CBP may take steps to increase or decrease detention capacity at the POE in response to similar changes in the future. Such predictive information could, as described above, be exploited to harm operations.

12.     The information in the report about the numbers of individuals in custody at various ports, and the percentage of capacity these numbers represent, also reveal operational vulnerabilities that can be exploited. Specifically, if a port has a high number of individuals in custody, port management may need to reallocate staffing and other resources towards addressing these capacity issues. For instance, if a port has a high number of individuals in custody, officers at the port must devote significant time and energy towards ensuring that these individuals have adequate food and water, and are held in sanitary conditions. This work of addressing the needs of individuals in custody takes officers away from other inspection and enforcement duties, including detecting and seizing drug and other contraband. This, in turn, makes the port more vulnerable to outside threats such as drugs, weapons, contraband, and individuals attempting to enter the port without inspection, such as by running through the vehicle lanes. Taking officers away from the front lines is particularly problematic for ports on the southwest border, as most of the cocaine, heroin, foreign-produced marijuana, and foreign-produced

methamphetamine available in the United States enters through the southwest border. Conversely, ports with low numbers of individuals in custody are able to devote more resources to inspection and enforcement.

13.   Therefore, information about the numbers of individuals in custody, as well as trends showing the numbers and percentages for several months (as provided in the report), provide outside entities with a picture of when certain ports were operating below, at, or above capacity, and thus how resources may be allocated at those ports. This data could also be combined with other publicly available data, such as seasonal migration trends, and be exploited by hostile actors. Specifically, if a smuggling organization had knowledge that a particular port consistently operated at or above capacity for a period of several days or several weeks, the smuggling organization could utilize that information, along with other information in its possession or gleaned from other sources, to develop a picture of what specific factors caused the port's resources to be strained, and reallocate its own resources to exploit this vulnerability.

14.   For instance, if a smuggling organization gained knowledge that a particular port operated at a particular capacity during a particular month of a particular year, the organization could combine that knowledge with seasonal migration trends to essentially create a vulnerability, such as by instructing a group of individuals to enter without inspection during a particular time period. Even historical trends, including those addressed in the report, reveal sufficient detail that, combined with other available information, can be exploited in this manner.

15.   Lastly, paragraph 116 contains a discussion of whether the San Ysidro POE could increase its capability to process individuals within a certain period of time. This

8

information, while historical, also reveals operational vulnerabilities. Specifically, this discussion shows San Ysidro's processing rate, which provides insight into how resources may or could be allocated towards processing, in relation to other operations at the port of entry. This information could be cross-referenced with other information, such as staffing levels and budgetary information, to understand potential vulnerabilities in the port's resource allocation that may be able to exploited.

*Operational Plans for Addressing Migration Surges*

16. In paragraphs 41, 42, 43, 44, 47, 49, 51, 71, 112, 113, 115, and 116, as well as footnotes 194 and 200, the report discusses contingency plans and efforts by CBP and DHS to plan for and address surges in migration, in particular the surge in Haitian migration in 2016 and the arrival of a caravan in April 2018. With regards to the 2016 Haitian migration surge, the report provides a timeline of DHS and CBP efforts to develop and construct a temporary processing facility, the reasons underlying that decision, and operational details about the facility (such as the number of beds at the facility and the personnel and other resources required to operate the facility). This section of the report also provides a snapshot of the substance of conversations between individuals within DHS and between the U.S. government and foreign partners. With regards to the April 2018 caravan, the report quotes from a DHS Integrated Concept of Operations (CONOP), which is a contingency plan prepared by DHS officials in southern California. This CONOP provides a specific operational plan that could be implemented in response to the arrival of a large number of individuals arriving at the border at the same time. The CONOP lays out the specific roles of OFO, U.S. Border Patrol, and U.S. Immigration and Customs Enforcement in such a response, provides specific operational triggers for taking

certain actions, and lays out specific operational steps for each agency to take as part of managing the influx.

17. All of these operational details could cause specific harm to DHS and CBP operations if disclosed to the public. With regards to the interagency discussions surrounding the construction of a processing facility, the report discusses the specific reasons why DHS made such a decision, provides operational details of the facility itself (such as the facility's location, size, and required personnel and resource needs), and discusses the challenges DHS faced in developing and constructing this facility. This discussion thus provides a detailed snapshot of the operational environment that DHS faced in 2016, and the specific actions the agency took to respond – including the exact size of the facility and the exact number of DHS employees required to staff the facility. This reveals details of how the agency may assess a similar migration surge in the future, and thus provides hostile actors with a roadmap for how to potentially interfere in such a response. For instance, this report reveals that DHS was capable of building a facility with X number of beds. A smuggling organization could take this information and gather a group of X+100 individuals to attempt to enter the United States illegally, knowing that DHS would not have the resources to process and hold the additional 100 individuals.

18. Similarly, the April 2018 CONOP provides specific details about how DHS operators in southern California anticipated responding to the arrival of a large caravan in their area, including specific trigger points that would lead to certain actions. For instance, the discussion of the CONOP provides that, if event A occurred, DHS would take B action. However, if event C occurred, DHS may take D action. The discussion thus reveals the specific operational context in which certain operational steps were anticipated to be

10

more or less useful, and places that assessment in a factual context. For instance, the discussion reveals what facts would need to be present in order for OFO to, request assistance from Border Patrol, or adjust its methods of processing. These assessments provide insight into specific operational vulnerabilities in southern California, and thus provide hostile actors with a roadmap for harming operations in that area.

19.  In paragraphs 138 and 139, as well as footnotes 194 and 200, the report also discusses specific contingency trigger points for the ports of San Ysidro and Laredo, as well as efforts by CBP and ICE to adjust the typical methods by which aliens are processed, in response to a surge of migration in the summer of 2019. While these details seem to be small in comparison to the discussion of the 2016 Haitian migration surge and the 2018 caravan, they too reveal specific operational details that can be exploited, especially when combined with other information in the report.

20.  Specifically, the report explains the specific factors that triggered the implementation of the port of San Ysidro's Mass Migration Plan, and the specific steps that the port took in accordance with the plan. The report also provides a specific timeframe under which the port of Laredo would implement additional processing alternatives. Similarly, the report explains the specific steps that CBP and ICE jointly took to attempt to mitigate the pressure on the immigration system during the summer of 2019. These details provide outside entities looking to harm operations with detailed insight into what specific factors San Ysidro and Laredo consider to be of particular concern, and what specific steps may be taken to address those concerns. Additionally, these details provide insight into how CBP and ICE, on a broader scale, perceive emergencies and attempt to respond to such emergencies. This information provides hostile actors with insight into how many people

they may need to send through the vehicle lanes at San Ysidro to trigger implementation

of a Mass Migration Plan and devoting resources away from OFO's inspectional and

enforcement activities. This information also provides insight into how CBP and ICE

may be required to reallocate resources to devote to a crisis, again devoting resources

away from securing the border and the country.

***Operational Details Regarding Limit Line Positions***

21.     Lastly, in Table 4, paragraphs 90 and 100, and footnotes 131 and 186, the report

discusses the location and staffing of OFO's "limit line" position at several ports of entry

along the southwest border. Specifically, the report describes the location at which

officers staffing the limit line during queue management at the San Ysidro, Otay Mesa,

Calexico, Nogales, El Paso, Laredo, Hidalgo, and Brownsville POEs stand, and how far

away those officers are from the physical border between the United States and Mexico.

The report also explains the number of officers assigned to staff the limit line position at

the Eagle Pass and Laredo POEs.

22.     These details would, if disclosed, jeopardize officer safety and the safety of travelers

approaching the limit line. Officers staffing the limit line stand as close to the border as

operationally feasible, and the exact distance varies by port of entry. While staffing the

limit line position, officers interact with all pedestrians seeking to enter the port of entry.

While most of these individuals are law-abiding, some individuals are seeking to cause

harm to either the officers or other travelers. Other individuals may seek to evade the

officer in some way, which may also lead to altercations or other officer safety concerns.

Public disclosure of the exact distance between the border and the limit line position

would give such individuals a concrete idea of far they may have to run to evade

detection, or whether they could feasibly deploy other methods to distract or endanger the CBP officer staffing the line in order to enter the port. More specifically, an individual who must cross several feet of distance to avoid the limit line officer may choose a different method of evasion than an individual who only has to get cross several inches. Public disclosure of this information thus places officers and the traveling public at risk.

23.   Similarly, public disclosure of the number of officers staffing the limit line position at Eagle Pass and Laredo would put both those officers and the safety of the entire POE at risk, as it reveals potential vulnerabilities that can be exploited. For instance, an individual could utilize this information to calculate how many officers he would need to injure, harass, or distract in order to evade detection. This information could also be used to calculate the degree to which the limit line position may be resistant to incursions or attempts to rush the port.

24.   For these reasons, the sections of the plaintiffs' expert report describing the operational details described above, should be filed under seal and kept confidential

25.   I declare, under penalty of perjury, that the foregoing is true and correct to the best of my knowledge and belief.

Executed this ___4th___ day of September, 2020.

Vernon Foret
Executive Director – Operations
Office of Field Operations
U.S. Customs and Border Protection

13