# EXHIBIT D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| Al Otro Lado, Inc., *et al.*, | ) | |
|     *Plaintiffs,* | ) | |
| | ) | |
| | ) | |
| v. | ) | No. 3:17-cv-02366-BAS-KSC |
| | ) | |
| Chad Wolf, *et al.*, | ) | |
|     *Defendants.* | ) | |
| | ) | |

**DECLARATION OF VERNON FORET**

I, Vernon Foret, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge and information made known to me from official records, and reasonably relied upon in the course of my employment, hereby declare as follows relating to the above-captioned matter.

1. I am currently the Executive Director for Operations, Office of Field Operations (OFO), U.S. Customs and Border Protection (CBP), U.S. Department of Homeland Security (DHS). I have been employed in this role since January 2020. I have over 30 years of experience in the federal government, to include 13 years with the U.S. Department of Agriculture, Animal and Plant Health Inspection Service, and 17 years with CBP as an Area Port Director in New Orleans, Louisiana; Director of Field Operations in Miami, Florida; and Executive Director in CBP Headquarters in Washington, D.C. As the Executive Director for Operations, I oversee more than 23,000 employees, with operations at 20 major field offices, 328 POEs, and 16 Preclearance locations.

2. I make this declaration to support the filing under seal of several exhibits to plaintiffs' Motion for Class Certification, specifically, Exhibit 23 (AOL-DEF-00372629), Exhibit 24 (AOL-DEF-00525116), Exhibit 29 (AOL-DEF-00041825), Exhibit 56 (AOL-DEF-

1

00036004), Exhibit 59 (AOL-DEF-00028473), Exhibit 60 (AOL-DEF-00028469), and Exhibit 61 (AOL-DEF-0050247).

3. These documents all contain detailed information regarding CBP and DHS operations, including information obtained from foreign partners, information routinely shared within and among CBP and its interagency partners, and information obtained through sensitive law enforcement techniques and methods. These internal documents also contain frank and unvarnished assessments of the strengths and weaknesses of particular operational and policy decisions, and assessments of operational and resources needs. The ability of OFO, as well as others within CBP, DHS, and across the executive branch, to share detailed operational information, including potential vulnerabilities and weakness, is of critical importance to ensuring that OFO is able to execute its mission of securing the borders and protecting the American public. The public release of such information undermines OFO's ability to execute that mission.

*Documents Relating to Communications with Foreign Governments*

4. The first set of documents that need to be filed under seal consist of emails referencing communications with, and information obtained from, foreign government partners. Specifically, Exhibit 23 is an email chain between individuals at DHS, CBP, and the Department of State discussing ongoing diplomatic engagements related to the 2016 Haitian migrant surge. Exhibit 29 is an email chain from CBP's attaché and other personnel in Mexico City, providing on-the-ground updates regarding the April 2018 migrant caravan.

5. Exhibit 23 reflects ongoing discussions among DHS and State Department officials relating to diplomatic efforts to address the 2016 Haitian migration surge. The email also

        includes a discussion of a forthcoming visit by the Haitian Ambassador to San Diego to observe the migration situation, as well as officials' recommendations regarding the most appropriate and effective actions for the Ambassador during his visit, based on operational and policy decisions that were currently in effect.  The email also includes a follow-up discussion between various CBP officials discussing their interpretation of operational reality on the ground, as well as expressing their opinions about the situation and the relevant policy decisions.

6.    This email should remain confidential, as it contains the personal opinions of various high-level officials within DHS, CBP, and the Department of State about the ongoing migration situation, the policy decisions implemented to address that surge, and efforts to engage diplomatically to address the surge.  The expression of such personal opinions is a critical part of the interagency process for responding to emergent situations such as the 2016 Haitian migrant surge, as it ensures that responding agencies are considering all relevant information from all individuals with relevant experience and operational knowledge.  This is particularly important in situations, like the 2016 Haitian migrant surge, that involve issues impacting the security of multiple countries.  If these personal opinions and reactions were disclosed to the public, however, it would have a significant chilling effect on such individuals' willingness to share such personal opinions in the future, as such disclosure would invite outside scrutiny and judgment of those opinions.  Any such chilling effect would severely hinder the ability of the U.S. government and its foreign partners to make reasoned, sound, and rational decisions in response to similar situations in the future.

7. Exhibit 29 is a multi-page email chain containing multiple factual updates, beginning on March 31, 2018, from CBP officials on the ground in Mexico City regarding a migrant caravan making its way towards the United States. These emails were circulated broadly among CBP operators along the southern border, as well as to CBP leadership, for situational awareness and to ensure that individuals responsible for planning and implementing CBP's response to the caravan's arrival had all relevant facts to determine the most effective response. The emails provide specific details about the caravan, including the number of individuals in the caravan, estimated timelines for the caravan's arrival in certain locations, and information about the caravan members' health and safety. The updates also include detailed information about the Mexican government's efforts to manage the caravan and its interactions with members in the caravan, as well as information about CBP employees' interactions with members of the caravan. The emails also contain maps, statistics, and other detailed operational data helpful for planning an effective response to the caravan.

8. The information in this email should remain confidential, as release of this information to the public could cause harm to CBP operations on the southern border, as well as to CBP's relationship with the Mexican government and the two countries' ability to jointly address security risks in the future. Specifically, this email provides operational details about the specific actions taken by the Mexican government to manage the caravan and address related security issues. This information was shared with CBP operational staff for law enforcement purposes. This detailed level of information was critical to ensuring that CBP had all relevant facts to determine the most appropriate response to the caravan's arrival at the border. For instance, it was critical for CBP to understand the size

of the caravan, as well as its approximate location and direction of travel, so that CBP could determine where it needed to focus its resources in advance of its arrival (for instance, California or Texas), and how many and what type of resources to surge to such locations. Without this granular level of detail from the Mexican government, CBP would be unable to properly respond to the caravan.

9. However, this information is of a nature that, if disclosed publicly, could be exploited to harm CBP operations. Specifically, the emails reveal the methods by which CBP and Mexico obtained and verified certain types of information about members of the caravan, as well as the reason for obtaining and verifying such information. If a hostile actor learned, for instance, that CBP and Mexico utilized certain law enforcement techniques to verify certain pieces of information, that actor could encourage individuals to take certain actions to evade those techniques, and evade law enforcement.

10. Such evasion would be particularly catastrophic in a situation like that faced in April 2018 – the anticipated arrival of a large number of individuals in one location along the southern border. In such a situation, it is critical that CBP have accurate, specific, and actionable information about where to send its resources in response and the amount of resources to deploy to that area. Any miscalculation would lead to significant security vulnerabilities, as any deployment of CBP's finite resources to one area necessarily pulls resources away from other areas of the border, leaving them unprotected and vulnerable to threats. Thus, if CBP anticipated the arrival of a large group in California, and pulled officers and agents away from other areas of the border to address that potential, hostile actors could easily divert the large group to another area of the border, knowing that CBP's resources would be focused in California. A hostile actor armed with knowledge

of how CBP obtains and shares information related to the group's arrival could easily use that knowledge to provide CBP with false or misleading information in an effort to pull CBP resources away from certain areas of the border.

*Document Relating to Haitian Migration Plan*

11. The second document that must be filed under seal is Exhibit 24, which is a multi-page email chain between then-CBP Deputy Commissioner Kevin McAleenan and other high-ranking officials within CBP relating to the 2016 Haitian migrant surge. In this email, Mr. McAleenan relays DHS's direction to develop and construct a temporary processing facility to address the Haitian migration surge, as well as a description of the Department's reasons for that decision, including inter-agency efforts and foreign assistance, as well as a description of port resource limitations. The email chain also includes internal discussions among CBP officials with their reactions to some of the policy and operational decisions implemented to address the surge, including their reactions to perceived weaknesses or vulnerabilities in those decisions.

12. This information should be kept confidential. With regards to the reasons behind the decision to develop a processing facility, this document reveals the specific reasons why DHS made such a decision, including an assessment of the operational situation facing the agency at the time and an assessment of the potential strengths and weakness of this chosen course of action. The email includes an assessment of anticipated actions by foreign government partners, an assessment of the current and anticipated migration flow, as well as an assessment of the potential operational vulnerabilities facing both CBP and its interagency partners. This information was conveyed in an open, frank, and honest manner, to ensure that CBP leadership had a full understanding of DHS' policy direction

and were able to fully and completely implement that direction. Publicly releasing this information, however, could lead to after-the-fact second-guessing of the importance of the information presented, thereby discouraging individuals from freely sharing similar information in the future. Additionally, publicly disclosing information obtained from foreign governments could have a significant chilling effect on those governments' willingness to share information with DHS and CBP.

13. Additionally, the emails showing CBP officials' reactions to certain policy and operational decisions to address the migrant surge should remain confidential. Specifically, these emails contain the personal reactions and opinions of various CBP officials to certain policy decisions, based on their own experiences and operational knowledge. Such open and honest communication is a critical part of the process by which CBP assesses the operational environment and determines whether it is appropriate to recommend changes to existing policies or procedures to others in the Department. In order to ensure that DHS and its components exercise their discretion in a reasonable manner, senior leadership must have sufficient knowledge of all aspects of operations on the ground, as well as individuals' reactions to those operational facts, so that they can maintain awareness and direct changes, when needed. Public disclosure of such frank communications would have a chilling effect on officials' willingness to continue to share information, which could in turn limit the agency's ability to assess and make changes to ongoing operations.

*Documents Relating to CBP and ICE Operations at San Ysidro*

14. The third set of documents that need to be filed under seal consist of emails relating to addressing a migration surge at the San Ysidro port of entry.

15. Exhibit 56 consists of a multi-page email chain between CBP and U.S. Immigration and Customs Enforcement (ICE) officials discussing the processing of family units at the San Ysidro port of entry. These emails contain specific details of ICE's capacity to accept family units from CBP's custody, specific operational triggers that would trigger certain actions, as well as the mechanics by which CBP and ICE would coordinate regarding this process. Additionally, the email includes the DFO's personal reactions to ICE's operational plan, and opinions regarding other potential policy options.

16. This information should remain confidential. With regards to the operational details surrounding the process of family units, this information reveals vulnerabilities in the immigration system that can be exploited by hostile actors or individuals seeking a particular processing determination. Specifically, the emails reveal ICE's operational capability to move individuals out of CBP custody, including specific numbers that ICE anticipated it could transport under certain conditions. With knowledge of this information, a smuggling organization could direct a significantly larger group of family units to enter without inspection at San Ysidro, overwhelming the ability of ICE to accept custody of the individuals, and thus guaranteeing release into the interior.

17. Additionally, the email conveying the DFO's personal reactions to ICE's operational plan should also remain confidential. As described above, it is of critical importance that CBP and ICE are able to communicate freely and openly about operational decisions, as it is critical that both components are able to share complete and accurate information a fast-moving, ever-changing operational environment. Disclosure of these honest communications will have a chilling effect on officials' willingness to share information

in the future, which will severely impact the agencies' ability to make sound operational decisions.

18. Exhibits 59, 60, and 61 consist of a multi-page email chain between CBP and ICE discussing CBP's efforts to address the surge of migrants arriving at the San Ysidro port of entry in 2018. The emails include OFO's assessment of the challenges they were facing in responding to the surge, as well as resources that would be needed from ICE to help address those challenges.

19. Exhibit 61 also includes an email from then-Deputy Commissioner McAleenan to various other CBP officials relaying direction from the Secretary of Homeland Security as to methods of addressing the surge. Specifically, the direction includes the pursuit of two distinct policy proposals, along with a discussion of the intended next steps in future policy implementation.

20. These email chains contain information that should also remain confidential. With respect to information about the operational challenges facing San Ysidro, and the resources needed to address those challenges, this information reveals vulnerabilities that can be exploited by hostile actors. For instance, this email reveals the specific factors of greatest concern to management at San Ysidro as it worked to address the surge, including specific groups of individuals facing longer times in custody and requiring additional resources to process and transport. The email also reveals resource limitations related to these populations, including, for instance, limitations on transportation and detention capacity. A hostile actor could use this information to, for instance, send an additional large number of individuals of these specific demographics to the port of entry,

9

further straining resources at the port, and using the resulting resource constraints to smuggle contraband into the port.

21. Additionally, the Secretary's policy direction relayed in Exhibit 61 should remain confidential, as it reveals DHS' priorities and preferred approach to addressing the surge, as well as direction for implementing future policy decisions. This information was conveyed in a concise and clear manner, in a manner sufficient to enable CBP to implement the policy direction in a timely manner. Such communications are critical to ensuring that CBP officials have an appropriate understanding of DHS policy direction and policy goals. However, if disclosed to the public, this information would have a chilling effect on the willingness of officials to communicate about such policy decisions and policy goals, thereby hampering the ability to effectively execute such policy.

22. For these reasons, the documents listed above, as well any charts, exhibits, or representations of information that contain information derived therefrom, should be filed under seal and kept confidential

23. I declare, under penalty of perjury, that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 9th day of March, 2020.

_____
Vernon Foret
Executive Director – Operations
Office of Field Operations
U.S. Customs and Border Protection

10