Nos. 22-55988, 56036

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

AL OTRO LADO, INC., *et al.*,
*Plaintiffs-Appellees/Cross-Appellants*,

v.

ALEJANDRO MAYORKAS, Secretary of Homeland Security, *et al.*
*Defendants-Appellants/Cross-Appellees*,

and

the EXECUTIVE OFFICE FOR IMMIGRATION REVIEW,
*Appellant/Cross-Appellee.*

On Appeal from a Final Judgment Issued by the U.S. District Court for the
Southern District of California (Civil Action No. 3:17-cv-02366-BAS-KSC)

**REPLY AND RESPONSE BRIEF FOR THE GOVERNMENT**

BRIAN M. BOYNTON
Principal Deputy Assistant
Attorney General

WILLIAM C. PEACHEY
Director

KATHERINE J. SHINNERS
Senior Litigation Counsel

ALEXANDER J. HALASKA
Senior Litigation Counsel
U.S. Department of Justice
Civil Division
Office of Immigration Litigation -
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 307-8704 | Fax: (202) 305-7000
Email: alexander.j.halaska@usdoj.gov

*Counsel for the Government*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION ..............................................................................1

STATEMENT OF THE ISSUES.........................................................2

SUMMARY OF THE ARGUMENT .....................................................4

ARGUMENT .....................................................................................6

    I.   The District Court Erred in Holding That Metering "Unlawfully Withheld" Mandatory Agency Action.........................................6

        A.  Sections 1158 and 1225 Do Not Apply to Noncitizens Outside the United States. ..........................................6

        B.  Metering Does Not "Unlawfully Withhold" Any Mandatory Agency Action on a Class-Wide Basis. ...............................24

    II.  The District Court Erred in Concluding That Metering Violates Procedural Due Process. ................................................26

    III. The District Court Erred in Granting Burdensome Class-Wide Injunctive and Declaratory Relief. ....................................29

        A.  The District Court Abused its Discretion.............................29

        B.  The INA Bars the Injunctive Relief Ordered. .......................32

    IV. This Court Should Not Reach Plaintiffs' Section 706(2) Claim.................35

        A.  Plaintiffs' Section 706(2) Claim is Moot. .............................35

        B.  Metering is Within the Executive's Authority, and the Metering Memoranda Were Reasonable and Reasonably Explained. .............................................37

    V.  The District Court Correctly Granted Summary Judgment for the Government on Plaintiffs' Standalone INA Claim. ...................44

    VI. The District Court Correctly Granted Summary Judgment for the Government on Plaintiffs' International-Law Claim. ................46

i

CONCLUSION ..................................................................................... 57

CERTIFICATE OF SERVICE ............................................................ 59

CERTIFICATE OF COMPLIANCE .................................................. 60

# TABLE OF AUTHORITIES

## Federal Cases

*Agency for International Development v. Alliance for Open Society International, Inc.*,
  140 S. Ct. 2082 (2020)......................................................................28

*Akiachak Native Community v. Dep't of Interior*,
  827 F.3d 100 (D.C. Cir. 2016)........................................................36

*Al Otro Lado v. Wolf*,
  952 F.3d 999 (9th Cir. 2020) .........................................................12

*Barrera-Echavarria v. Rison*,
  44 F.3d 1441 (9th Cir. 1995) .........................................................10

*Barrios v. Holder*,
  581 F.3d 849 (9th Cir. 2009) ...........................................................8

*BedRoc Ltd., LLC v. United States*,
  541 U.S. 176 (2004)..........................................................................7

*Biden v. Texas*,
  142 S. Ct. 2528 (2022)....................................................... 34, 35, 43

*Blazevska v. Raytheon Aircraft Co.*,
  522 F.3d 948 (9th Cir. 2008) .........................................................52

*Boumediene v. Bush*,
  553 U.S. 723 (2008)........................................................... 26, 27, 28

*Bruesewitz v. Wyeth LLC*,
  562 U.S. 223 (2011)........................................................................23

*California v. Trump*,
  963 F.3d 926 (9th Cir. 2020) .........................................................46

*Carr v. United States*,
  560 U.S. 438 (2010)........................................................................17

*Catholic Social Services, Inc. v. INS*,
  232 F.3d 1139 (9th Cir. 2000) .......................................................33

*Cetacean Community v. Bush*,
    386 F.3d 1169 (9th Cir. 2004) ......................................................15

*Clark v. Smith*,
    967 F.2d 1329 (9th Cir. 1992) .........................................................9

*Dep't of Commerce v. New York*,
    139 S. Ct. 2551 (2019) ............................................................ 40, 43

*Dep't of Homeland Security v. Thuraissigiam*,
    140 S. Ct. 1959 (2020) ...................................................... 27, 28, 29

*E.V. v. Robinson*,
    906 F.3d 1082 (9th Cir. 2018) ......................................................45

*East Bay Sanctuary Covenant v. Biden*,
    993 F.3d 640 (9th Cir. 2021) ........................................................12

*Filartiga v. Pena-Irala*,
    630 F.2d 876 (2d Cir. 1980) ..........................................................48

*Garcia v. Lawn*,
    805 F.2d 1400 (9th Cir. 1986) ......................................................31

*Garland v. Aleman Gonzalez*,
    142 S. Ct. 2057 (2022) ........................................................ 32, 33, 34

*Goldstar (Panama) S.A. v. United States*,
    967 F.2d 965 (4th Cir. 1992) ........................................................54

*Gonzales v. DHS*,
    508 F.3d 1227 (9th Cir. 2007) ......................................................33

*Gonzalez v. ICE*,
    975 F.3d 788 (9th Cir. 2020) ........................................................33

*Gorbach v. Reno*,
    219 F.3d 1087 (9th Cir. 2000) ......................................................38

*Graham v. FEMA*,
    149 F.3d 997 (9th Cir. 1998) ........................................................44

iv

*Guidiville Band of Pomo Indians v. NGV Gaming, Ltd.*,
  531 F.3d 767 (9th Cir. 2008) ................................................... 16, 17

*Henderson v. United States*,
  568 U.S. 266 (2013)....................................................................31

*Hernandez v. Mesa*,
  140 S. Ct. 735 (2020)............................................................. 1, 55

*Hing Sum v. Holder*,
  602 F.3d 1092 (9th Cir. 2010) ....................................................11

*Hourani v. Mirtchev*,
  796 F.3d 1 (D.C. Cir. 2015)........................................................57

*Ibrahim v. Dep't of Homeland Security*,
  669 F.3d 983 (9th Cir. 2012) ................................................ 27, 28

*INS v. Stevic*,
  467 U.S. 407 (1984).....................................................................53

*Jafarzadeh v. Duke*,
  270 F. Supp. 3d 296 (D.D.C. 2017).............................................45

*Jesner v. Arab Bank*,
  138 S. Ct. 1386 (2018)....................................... 46, 47, 53, 55

*Johnson v. Eisentrager*,
  339 U.S. 763 (1950).....................................................................27

*Khan v. Holder*,
  584 F.3d 773 (9th Cir. 2009) ......................................................53

*Langere v. Verizon Wireless Services, LLC*,
  983 F.3d 1115 (9th Cir. 2020) ....................................................27

*Lorillard v. Pons*,
  434 U.S 575 (1978).....................................................................12

*Morrison v. National Australia Bank Ltd.*,
  561 U.S. 247 (2010).....................................................................13

*Navajo Nation v. Dep't of the Interior*,
    876 F.3d 1144 (9th Cir. 2017) ........................................................54

*NEDC v. Gordon*,
    849 F.2d 1241 (9th Cir. 1988) ......................................................31

*Nestle USA, Inc. v. Doe*,
    141 S. Ct 1931 (2021) ..................................................................47

*Ninilchik Traditional Council v. United States*,
    227 F.3d 1186 (9th Cir. 2000) ......................................................44

*Norton v. Southern Utah Wilderness Association*,
    542 U.S. 55 (2004)................................................................ 29, 30

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*,
    582 F.3d 244 (2d Cir. 2009) ..........................................................48

*Quintero Perez v. United States*,
    8 F. 4th 1095 (9th Cir. 2021) ................................................ 49, 54

*Rasul v. Bush*,
    542 U.S. 466 (2004)......................................................................27

*Rasul v. Myers*,
    563 F.3d 527 (D.C. Cir. 2009)......................................................27

*Rowland v. California Men's Colony, Unit II Men's Advisory Council*,
    506 U.S. 194 (1993)......................................................................16

*Sale v. Haitian Centers Council, Inc.*,
    509 U.S. 155 (1993)............................................................ *passim*

*Sanchez-Espinoza v. Reagan*,
    770 F.2d 202 (D.C. Cir. 1985)......................................................54

*Shaughnessy v. United States ex rel. Mezei*,
    345 U.S. 206 (1953)............................................................ *passim*

*Siderman de Blake v. Republic of Argentina*,
    965 F.2d 699 (9th Cir. 1992) ........................................................50

*Sierra Club v. Trump*,
   929 F.3d 670 (9th Cir. 2019) ...........................................................44

*Singleton v. Wulff*,
   428 U.S. 106 (1976)............................................................... 26, 37

*Snowden v. Hughes*,
   321 U.S. 1 (1944)............................................................................29

*Sosa v. Alvarez-Machain*,
   542 U.S. 692 (2004)........................................................... *passim*

*Southeast Alaska Conservation Council v. U.S. Army Corps of Engineers*,
   486 F.3d 638 (9th Cir. 2007) ..........................................................36

*Steam Press Holdings, Inc. v. Hawaii Teamsters, Allied Workers Union, Local 996*,
   302 F.3d 998 (9th Cir. 2002) ................................................. 25, 26

*Telecommunications Research and Action Center v. FCC*,
   750 F.2d 70 (D.C. Cir. 1984)...........................................................25

*Tobar v. United States*,
   639 F.3d 1191 (9th Cir. 2011) ........................................................54

*Torres v. Barr*,
   976 F.3d 918 (9th Cir. 2020) ................................................. 10, 24

*United States ex rel. Knauff v. Shaughnessy*,
   338 U.S. 537 (1950)............................................................... 31, 39

*United States v. Delgado-Garcia*,
   374 F.3d 1337 (D.C. Cir. 2004).......................................................15

*United States v. Jackson*,
   480 F.3d 1014 (9th Cir. 2007) ................................................. 7, 18

*United States v. Ju Toy*,
   198 U.S. 253 (1905)..........................................................................9

*United States v. Lopez-Perara*,
   438 F.3d 932 (9th Cir. 2006) ................................................. 10, 12

*United States v. Montero-Camargo*,
    208 F.3d 1122 (9th Cir. 2000) ...................................................15

*United States v. Zavala-Mendez*,
    411 F.3d 1116 (9th Cir. 2005) ...................................................10

*Vazquez Romero v. Garland*,
    999 F.3d 656 (9th Cir. 2021) ....................................................19

*Webster v. Doe*,
    486 U.S. 592 (1988)...................................................................44

*WesternGeco LLC v. ION Geophysical Corp.*,
    138 S. Ct. 2129 (2018)........................................................ 13, 14

*Winston Research Corp. v. Minnesota Mining & Manufacturing Co.*,
    350 F.2d 134 (9th Cir. 1965) ....................................................30

*Xi v. INS*,
    298 F.3d 832 (9th Cir. 2002) ......................................................9

*Zadvydas v. Davis*,
    533 U.S. 678 (2001)......................................................................9

## **Federal Statutes**

1 U.S.C. § 1 .............................................................................. 15, 16

5 U.S.C. § 702 ......................................................................... 45, 54

5 U.S.C. § 706 .......................................................................... *passim*

6 U.S.C. § 111(b)(1).................................................................. 37, 39

6 U.S.C. § 202 .......................................................................... 37, 39

6 U.S.C. § 211(c) ...........................................................................37

6 U.S.C. § 211(g)(3)............................................................ 37, 38, 39

8 U.S.C. § 1101(a)(13)(C) ..............................................................19

8 U.S.C. § 1158(a)(1)................................................................. *passim*

8 U.S.C. § 1225(a)(1) ........................................................................ *passim*

8 U.S.C. § 1225(a)(3) ........................................................................ *passim*

8 U.S.C. § 1225(b)(1)(A)(ii) ............................................................. *passim*

8 U.S.C. § 1225(b)(2)(C) ......................................................................34

8 U.S.C. § 1231(b)(3)(A) ................................................................ 53, 56

8 U.S.C. § 1231(h) ................................................................................53

8 U.S.C. § 1252(a)(2) ............................................................................34

8 U.S.C. § 1252(a)(5) ..................................................................... 34, 54

8 U.S.C. § 1252(b)(9) ..................................................................... 34, 54

8 U.S.C. § 1252(e) ................................................................................34

8 U.S.C. § 1252(f)(1) ............................................................... 32, 33, 45

18 U.S.C. § 922(g) ................................................................................10

28 U.S.C. § 1350 ............................................................................. 3, 46

## Acts of Congress

Illegal Immigration Reform and Immigrant Responsibility Act of 1996,
    Pub. L. No. 104–208, Div. C, 110 Stat. 3009–546 (1996) .............. 11, 12, 13

Refugee Act of 1980,
    Pub. L. No. 96–212, 94 Stat. 102 (1980) ................................................ 12, 13

## Federal Regulations

8 C.F.R. § 1.2 ................................................................................ 21, 22

8 C.F.R. § 208.16(c)(2) ........................................................................56

8 C.F.R. § 208.17(a) ............................................................................56

## Administrative Decisions

*Matter of Collado-Munoz,*
    21 I. & N. Dec. 1061 (BIA 1998)...................................................24

*Matter of M-D-C-V-,*
    28 I. & N. Dec. 18 (BIA 2020).....................................................20

*Matter of Valenzuela-Felix,*
    26 I. & N. Dec. 53 (BIA 2012).....................................................19

## Administrative Rules

Amendment of the Regulatory Definition of Arriving Alien,
    63 Fed. Reg. 19382 (Apr. 20, 1998)...............................................22

Asylum Eligibility and Procedural Modifications,
    84 Fed. Reg. 33829 (July 16, 2019) ..............................................32

Inspection and Expedited Removal of Aliens,
    62 Fed. Reg. 10312 (Mar. 6, 1997) ..............................................22

Inspection and Expedited Removal of Aliens,
    62 Fed. Reg. 444 (Jan. 3, 1997)...................................................21

## Legislative Materials

H.R. Rep. No. 104-469 (1996)......................................................... 16, 23

*Implementation of Title III of the Illegal Immigration Reform and Immigrant
Responsibility Act of 1996: Hearing Before the Subcommittee on
Immigration and Claims of the House of Representatives Judiciary
Committee*, 105th Congress (1997) ...............................................23

## Other Authorities

U.S. Dep't of State, *U.S. Observations on UNHCR Advisory Opinion on
Extraterritorial Application of Non-Refoulement Obligations* (Dec.
28, 2007) ............................................................................52

UNHCR Exec. Comm., *Note on International Protection*, U.N. Doc.
A/AC.96/951 (Sept. 13, 2001).....................................................50

## **INTRODUCTION**

Congress has given the Department of Homeland Security (DHS) and U.S. Customs and Border Protection (CBP) the "daunting task" to "control the movement of people and goods across the border." *Hernandez v. Mesa*, 140 S. Ct. 735, 746 (2020). One tool that CBP's Office of Field Operations (OFO) relied on to accomplish that daunting task was "metering," a process of regulating the pace at which undocumented noncitizens crossed the border into the ports of entry to proactively avoid overcrowding and operational emergencies.

As the Government explained in the Opening Brief, the district court was wrong to declare metering unlawful. The district court's decision and accompanying relief erodes the Executive's authority to manage border operations and seeks to invalidate tools that the Executive has used to manage the flow of undocumented noncitizens into the Nation's ports of entry, by declaring an inflexible statutory obligation to inspect for admission any and all undocumented noncitizens who approach—but do not cross—the international border and may wish to seek asylum in the United States. Plaintiffs' arguments to the contrary ignore the Immigration and Nationality Act's (INA) plain language indicating that its asylum provisions apply only to noncitizens within the territory of the United States, are premised on faulty interpretation of the statutes' language and verb tenses, disregard the backdrop of longstanding precedent against which legislators drafted the relevant language, and

fail to acknowledge the reality that, under metering, CBP continued to discharge any obligations to inspect and refer asylum-seekers. This Court should thus reverse the district court's grant of summary judgment for Plaintiffs and vacate the entry of declaratory and injunctive relief.

There is no basis, however, to overturn the remainder of the district court's decision or to affirm its declaratory judgment on any alternative grounds. Plaintiffs' request for relief on their alternative theory that the metering guidance memoranda were in excess of statutory authority or arbitrary and capricious is moot, as those memoranda have been rescinded and there is no further relief that the Court can grant. In any event, the metering guidance was reasonable and supported by well-documented capacity constraints. The district court also correctly rejected Plaintiffs' duplicative claim for nonstatutory review and their claim seeking to create an unprecedented private right of action against the United States for purported violations of a claimed customary international-law norm of non-refoulement. This Court should affirm the grant of summary judgment for the Government on those claims.

## STATEMENT OF THE ISSUES

The Government's appeal presents two issues for review. *See* Opening Br. for the Government (First Br.) 5–6.

Plaintiffs' cross-appeal presents three additional questions:

1.     Should this Court decline to reach the merits of Plaintiffs' claim that DHS and CBP acted arbitrarily and capriciously or in excess of their constitutional or statutory authority when they issued metering guidance to facilitate orderly processing and ensure safe and sanitary conditions in the ports of entry along the U.S.-Mexico border and, later, to facilitate CBP's prioritization of its resources, when DHS and CBP do not owe statutory inspection and referral obligations to noncitizens in Mexico, and where DHS and CBP have rescinded that metering guidance?

2.     Did the district court correctly enter summary judgment for the Government on Plaintiffs' claim for nonstatutory review of metering under the INA, where that claim was entirely duplicative of Plaintiffs' claims under the Administrative Procedure Act (APA)?

3.     Did the district court correctly enter summary judgment for the Government on Plaintiffs' claim under the Alien Tort Statute (ATS), 28 U.S.C. § 1350, seeking to enforce a purported customary international law norm of non-refoulement, when the norm asserted is not universally or specifically defined to prohibit metering, and it would be an improper exercise of judicial authority to create a private right of action against the United States for alleged non-refoulement violations?

## SUMMARY OF THE ARGUMENT

This Court should reverse the district court's grant of summary judgment to Plaintiffs and remand with instructions to enter summary judgment for the Government on all claims and vacate the injunctive and declaratory relief.

The district court erred in granting summary judgment to Plaintiffs on their claim under the APA, at 5 U.S.C. § 706(1), that DHS and CBP "unlawfully withheld" discharging their obligations under Sections 1158(a) and 1225 to noncitizens outside the United States. By their plain language and context, 8 U.S.C. §§ 1158(a)(1), 1225(a)(1), 1225(a)(3), and 1225(b)(1)(A)(ii) do not confer rights upon or impose obligations toward noncitizens who are outside the United States—they apply only once a noncitizen has crossed the border into the United States. This understanding is not defeated, but is affirmatively supported, by the rule against surplusage, the Dictionary Act's default rules of statutory construction, the presumption against extraterritoriality, the legislative history, and the legal background against which Congress was legislating.

Even if the relevant statutes applied to noncitizens in Mexico, the district court still erred in granting summary judgment to Plaintiffs on their Section 706(1) claim because metering does not withhold agency action on a class-wide basis. Instead, and at most, it results in a delay of inspection and processing. The district court did not reach the question of whether any delay was unreasonable—in part because

Plaintiffs did not properly raise the issue—and this Court should not decide that question.

The district court further erred by granting summary judgment for Plaintiffs on their procedural due process claim because the Fifth Amendment and Sections 1158 and 1225 do not apply to foreign citizens on foreign soil. But even if they did, Plaintiffs have not demonstrated why the statutory violation (erroneously) found by the district court amounts to a deprivation of due process.

In addition to these errors on the merits, the district court abused its discretion by entering overbroad injunctive relief. The class-wide injunction is also prohibited by several provisions of 8 U.S.C. § 1252.

Nevertheless, the district court's remaining holdings should not be disturbed. Plaintiffs' claim under the APA, at 5 U.S.C. § 706(2), is moot because the metering policies at issue have since been rescinded, and the courts can grant no further relief on this claim. Even if that claim were not moot, metering is within DHS and CBP's statutory authority, and the metering policies were reasonably based on demonstrated capacity constraints. The Court should also affirm the grant of summary judgment for the Government on Plaintiffs' claim for nonstatutory review under the INA, because it is entirely duplicative of Plaintiffs' APA claims and thus subsumed under the APA. Likewise, the Court should affirm the grant of summary judgment for the

Government on Plaintiffs' international-law claim because any customary international law norm of non-refoulement is not universally understood to apply extraterritorially, and because it would be an improper judicial exercise of lawmaking power to create a novel tort action against the United States for non-refoulement violations.

## ARGUMENT

I.    **The District Court Erred in Holding That Metering "Unlawfully Withheld" Mandatory Agency Action.**

### A.    Sections 1158 and 1225 Do Not Apply to Noncitizens Outside the United States.

As the Government explained in its Opening Brief, the district court erred in holding that Sections 1158 and 1225 confer rights upon, and impose obligations toward, noncitizens outside the United States. *See* First Br. 27–39. Section 1158 permits a noncitizen who "is physically present in the United States or who arrives in the United States" to apply for asylum. 8 U.S.C. § 1158(a)(1). Section 1225 requires immigration officers to inspect for admission any noncitizen who is "present in the United States . . . or who arrives in the United States," *id.* § 1225(a)(1), (a)(3), and to refer a noncitizen who "is arriving in the United States" for credible-fear screening if the noncitizen is inadmissible on certain grounds and indicates an intention to apply for asylum or a fear of persecution, *id.* § 1225(b)(1)(A)(ii). By their plain language and context, these statutes do not apply to noncitizens who are *near* the territorial borders but remain outside of the United States. *See* First Br. 28–30. Relevant

6

legislative history, the presumption against extraterritoriality, the Dictionary Act's default rules of statutory interpretation, and the rule against surplusage all support the understanding that these provisions apply exclusively to noncitizens who have already crossed the border into the United States. *See* First Br. 30–39. Consequently, the district court erred in holding that metering "unlawfully withheld" those statutory rights and obligations from class members.

Plaintiffs' arguments that Sections 1158 and 1225 apply to noncitizens in Mexico are flawed. *See* Appellees/Cross-Appellants' Principal and Response Br. (Second Br.) 18–29.

*First*, Plaintiffs say that the Government's interpretation of the relevant provisions "leans heavily on the preposition 'in' and a dictionary definition of 'to arrive.'" Second Br. 25. But it is entirely proper—indeed, *necessary*—to cite to statutory text and look to dictionary definitions when interpreting an Act of Congress. *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004); *United States v. Jackson*, 480 F.3d 1014, 1022 (9th Cir. 2007). Under the "preeminent canon of statutory interpretation" that Congress "says in a statute what it means and means in a statute what it says," *BedRoc, Ltd.*, 541 U.S. at 183, this case should begin and end with the conclusion that Sections 1158(a)(1) and 1225(a)(1) apply to a noncitizen who is "present *in* the United States" or who "arrives *in* the United States," and that Section 1225(b)(1)(A)(ii) requires an immigration officer to refer a noncitizen for a credible-

7

fear interview only "[i]f" the noncitizen "is arriving *in* the United States," among other conditions. *See* First Br. 27–29.

*Second*, Plaintiffs say that, under rule against surplusage, the phrases "present in the United States" and "arrives in the United States" in Sections 1158(a)(1) and 1225(a)(1) must mean different things, and that "arrives in" "necessarily refer[s] to noncitizens not yet present in the United States." Second Br. 18. This ignores more than a century of precedent. The phrases "present in the United States" and "arrives in the United States" do capture different concepts, but there is no support for the proposition that "arrives in the United States" "necessarily" refers to noncitizens outside of the United States. Second Br. 18. As explained, *see* First Br. 27–39, there is another, better reading of the statutes, one that comports with the Supreme Court's and this Court's precedents and the rule against surplusage, and that does not extend U.S. immigration law into Mexico: The references to a noncitizen "who is physically present in the United States," 8 U.S.C. § 1158(a)(1), and "present in the United States," *id.* § 1225(a)(1), generally refer to a noncitizen who is in the United States. *See, e.g.*, *Barrios v. Holder*, 581 F.3d 849, 863 (9th Cir. 2009) ("physically present" means "corporeally being in the place in question or under consideration" (some punctuation omitted)). The phrases "arrives in the United States," 8 U.S.C. §§ 1158(a)(1), 1225(a)(1), and "arriving in the United States," *id.* § 1225(b)(1)(A)(ii), are terms of art that refer to noncitizens who have just crossed

the border into (or landed in) the United States and are awaiting a determination of their admissibility.

Congress's decision to include both sets of phrases in these provisions reflects its understanding of the longstanding distinction in constitutional and statutory immigration law between noncitizens who are already here, and those who have just landed on our shores or crossed our borders and stand "on the threshold of initial entry." *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953); *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001). Under this "entry fiction," *Xi v. INS*, 298 F.3d 832, 837 (9th Cir. 2002), a noncitizen who may be "physically within our boundaries[]" while awaiting a determination of his admissibility to the United States "is to be regarded as if he had been stopped at the limit of our jurisdiction, and kept there while his right to enter was under debate," *United States v. Ju Toy*, 198 U.S. 253, 263 (1905); *Clark v. Smith*, 967 F.2d 1329, 1331 (9th Cir. 1992) (a noncitizen's "status remains that of an alien seeking admission into the United States" "[u]ntil the Board [of Immigration Appeals] renders its final order"). Such noncitizens are "within the United States but . . . as a result of their status[] are deemed technically to be outside." *Xi*, 298 F.3d at 837. They are physically "within United States territory but not 'within the United States'" under the INA. *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155, 175 (1993).

This Court's cases recognize this point. In *United States v. Lopez-Perara*, 438 F.3d 932 (9th Cir. 2006)—one of Plaintiffs' primary cases, *see* Second Br. 23—this Court held that a noncitizen who had "driven into the San Ysidro Port of Entry" and was being inspected for violations of U.S. criminal law was not "'illegally or unlawfully *in* the United States'" because he "had not yet entered the United States." *Lopez-Perara*, 438 F.3d at 932, 936 (quoting 18 U.S.C. § 922(g)) (emphasis this Court's). Likewise, in *Barrera-Echavarria v. Rison*, 44 F.3d 1441 (9th Cir. 1995), this Court acknowledged that "excludable aliens are deemed under the entry doctrine not to be present on United States territory," despite their actual physical presence. *Id.* at 1450. In *United States v. Zavala-Mendez*, 411 F.3d 1116 (9th Cir. 2005), this Court restated its general rule that "someone who is in the border station itself, which is always on American soil, is nevertheless not 'found in' the United States." *Id.* at 1120. And in *Torres v. Barr*, 976 F.3d 918 (9th Cir. 2020), this Court explained that Section 1225(a)(1) creates a "fictive legal status" for "some physically-but-not-lawfully present noncitizens." *Id.* at 928.

These cases amply demonstrate that, in the INA, phrases like "physically present in," 8 U.S.C. § 1158(a)(1), and "present in," *id.* § 1225(a)(1), do not categorically include noncitizens who have just crossed the border and stand "on the threshold of initial entry," *Mezei*, 345 U.S. at 212. For that reason, when the drafters of

Sections 1158(a)(1), 1225(a)(1), and 1225(b)(1)(A)(ii) wanted to ensure that noncitizens subject to removal after enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. No. 104–208, Div. C, 110 Stat. 3009–546 (1996), had a right to apply for asylum in the United States, they could not rely exclusively on phrases like "present in" or "physically present in." Statements in immigration case law that noncitizens "[are] within United States territory but not 'within the United States'" by law, *Sale*, 509 U.S. at 175, precluded such an approach. The drafters needed to include additional terminology to ensure that the right to apply for asylum extended to noncitizens who, for example, have just crossed the border and await a determination of their admissibility. That additional terminology is "arrives in" in Sections 1158(a)(1) and 1225(a)(1), and "arriving in" in Section 1225(b)(1)(A)(ii). Those phrases do not refer to noncitizens outside the United States.

Plaintiffs' primary response to this extensive precedent is a single footnote stating that "there is no need to resort to legal fiction here." Second Br. 24 n.7. But the entry fiction is a long-settled legal precedent that existed in one form or another for almost a century before IIRIRA was enacted. The drafters of IIRIRA were well aware of that doctrine, and Congress is presumed to have legislated with that knowledge. *See Hing Sum v. Holder*, 602 F.3d 1092, 1100 (9th Cir. 2010) (explaining how IIRIRA specifically addressed aspects of the entry doctrine); *Lorillard v.*

*Pons*, 434 U.S 575, 580 (1978). To avoid the consequence of interpreting "physically present in," 8 U.S.C. § 1158(a)(1), or "present in," *id.* § 1225(a)(1), to exclude noncitizens who have just crossed the border—for example, like the interpretation in *Lopez-Perara*, where this Court said that a noncitizen who had "driven into the San Ysidro Port of Entry" was not "illegally or unlawfully *in* the United States," 438 F.3d at 932, 936 (quotation marks omitted) (emphasis this Court's)—it was important for Congress to include "arrives in" and "arriving in" to ensure those noncitizens could apply for asylum immediately after crossing the border.

*Third*, relying on a prior decision of a motions panel of this Court, Plaintiffs argue that "'historical changes to the statutory language'" demonstrate that "arrives in" in Section 1158(a)(1) includes noncitizens who have not yet crossed the border. Second Br. 19 n.4 (quoting *Al Otro Lado v. Wolf*, 952 F.3d 999, 1012 (9th Cir. 2020)). But the motions panel's conclusion on this issue is not binding on this panel, and it should not be followed. *See East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 661 (9th Cir. 2021). Section 1158(a) originally applied to "an alien physically present in the United States *or at a land border or port of entry*." Refugee Act of 1980, Pub. L. No. 96–212, § 201(b), 94 Stat. 102, 105 (1980) (emphasis added). In 1996, Congress amended Section 1158(a)(1) to apply to "[a]ny alien who is physically present in the United States *or who arrives in the United States*." IIRIRA § 604(a) (emphasis added). This amendment did not work a significant change in

Section 1158(a), as both iterations of that statute "obviously contemplate" that asylum proceedings "would be held in the country." *Sale*, 509 U.S. at 173 & n.29. But even assuming that this amendment did effect a significant change, it was to narrow the focus of the statute onto U.S. territory. If being "at a land border," Refugee Act § 201(b), plausibly refers to someone who is not yet across the border, as Plaintiffs suggest, "arrives in the United States," IIRIRA § 604(a), clearly refers to someone who is *in* the United States. Thus, to the extent the amendment significantly changed the scope of Section 1158(a) at all, the change demonstrates that Congress intended Section 1158(a)(1) to apply to noncitizens who have already crossed the border.

*Fourth*, Plaintiffs incorrectly contend that they have defeated the presumption against the extraterritorial application of Sections 1158 and 1225. Second Br. 25–26. Sections 1158 and 1225 contain no "clear indication of an extraterritorial application," *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247, 255 (2010), because the plain language of those provisions refers to noncitizens *in* the United States, and the rule against surplusage does not dictate that "arrives in" and "arriving in" be interpreted as applying to noncitizens who have not crossed the border. *See* First Br. 27–39; *supra* at 8–12. Accordingly, the presumption against extraterritoriality is not rebutted. *WesternGeco LLC v. ION Geophysical Corp.*, 138 S. Ct. 2129, 2136 (2018).

13

Plaintiffs also contend that the presumption is inapplicable because "this case 'involves a permissible domestic application' of" Sections 1225(a)(3) and 1225(b)(1)(A)(ii), because those statutes regulate immigration officers' "conduct occurring entirely *within* the United States." Second Br. 27 (quoting *WesternGeco LLC*, 138 S. Ct. at 2136) (emphasis Plaintiffs'). But that supports the Government's position, not Plaintiffs'. The focus of the statutory inquiry is to ascertain *to whom* CBP officers owe duties to inspect and refer. CBP officers must inspect "applicants for admission" and those who are "otherwise seeking admission," 8 U.S.C. § 1225(a)(3), and must refer a noncitizen for a credible-fear interview "[i]f [the] officer determines" that the noncitizen is inadmissible on specific grounds and the noncitizen indicates "an intention to apply for asylum . . . or a fear of persecution," *id.* § 1225(b)(1)(A)(ii). Interpreting Section 1225 to impose obligations on immigration officers toward noncitizens in another country would fall within the category of the "relevant conduct occur[ing] in another country," meaning that the case would "involve[] an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory." *WesternGeco LLC*, 138 S. Ct. at 2137 (quotation marks omitted).

Further, *Sale*'s analysis demonstrates that the INA does not contemplate extraterritorial application of asylum processing. *See* First Br. 33. Nor was *Sale*'s analysis "dicta." Second Br. 28 n.9. The Supreme Court's analysis of the structure of the

INA, including Section 1158(a), and the vesting of immigration responsibilities in an Executive official with exclusively domestic authority (like the CBP Commissioner), were all necessary to its decision that the withholding-of-removal statute did not apply to noncitizens on the high seas. *See Sale*, 509 U.S. at 173–74; *Cetacean Community v. Bush*, 386 F.3d 1169, 1173 (9th Cir. 2004) (explaining that "[a] statement is dictum when it is . . . unnecessary to the decision in the case" (alterations and quotation marks omitted)). That holding should control here. And even if it were dictum, it deserves substantial weight. *United States v. Montero-Camargo*, 208 F.3d 1122, 1132 n.17 (9th Cir. 2000). Plaintiffs' reliance on *United States v. Delgado-Garcia*, 374 F.3d 1337 (D.C. Cir. 2004) (at Second Br. 28) to distinguish *Sale* is misplaced, because that case involved a statute prohibiting "encouraging or inducing illegal immigration," which is "very different" from the statutes at issue in *Sale*. *Id.* at 1347–48.

*Fifth*, Plaintiffs contend that the simple present tense phrase "arrives in," 8 U.S.C. §§ 1158(a)(1), 1225(a)(1), includes "noncitizens who have not yet crossed the border," Second Br. 19, because the Dictionary Act mandates that "words used in the present tense include the future as well as the present," 1 U.S.C. § 1. Relatedly, they contend that the Government's reading of Sections 1158(a)(1) and 1225(a)(1) impermissibly changes "arrives in" into "arrived in." Second Br. 25; *see also id.* at 25 n.8.

15

As explained, the Dictionary Act does not apply here. *See* First Br. 35–36. That Act's default rules are inapplicable when statutory language has a "specific and unambiguous" definition, *Guidiville Band of Pomo Indians v. NGV Gaming, Ltd.*, 531 F.3d 767, 776 (9th Cir. 2008), and the phrases "arrives in" in Sections 1158(a)(1) and 1225(a)(1), and "arriving in" in Section 1225(b)(1)(A)(ii), have a specific and unambiguous definition that does not include noncitizens outside the United States, *see* First Br. 27–30. The Dictionary Act's default rules also do not apply in the way Plaintiffs contend because "the context" of Sections 1158(a)(1) and 1225(a)(1) "indicates otherwise." 1 U.S.C. § 1; *see Rowland v. California Men's Colony, Unit II Men's Advisory Council*, 506 U.S. 194, 199 (1993). The phrase "arrives in" was added to Sections 1158(a)(1) and 1225 as part of a system for the expedited removal of noncitizens "*from* the United States." 8 U.S.C. § 1225(b)(1)(A)(ii) (emphasis added). Logically, a noncitizen must be in the United States before he can be removed from the United States. *See also, e.g.*, H.R. Rep. No. 104-469, pt. 1, at 175–76 (1996) (recognizing that an asylum claim should "be commenced as soon as possible *after* the alien's arrival in the U.S." (emphasis added)).

In any event, Plaintiffs' application of the Dictionary Act is wrong. The rule that "words used in the present tense include the future as well as the present," 1 U.S.C. § 1, means that a statute containing present-tense language is prospective in its application and does not "reach preenactment conduct," *Carr v. United States*,

560 U.S. 438, 448 (2010). It does not mean that present-tense language *presently* regulates conduct that *may* occur in the future, but has not yet occurred or may never occur at all. That application of the Dictionary Act was specifically considered and rejected in *Guidiville Band of Pomo Indians*. In that case, this Court held that a statute defining "Indian lands" as "lands the title to which *is* held by the United States . . . or lands the title to which *is* held by an Indian tribe," does not include "*both* lands that are currently held in trust by the United States for an Indian tribe *and* lands that might eventually be held in similar fashion." 531 F.3d at 775 (emphases this Court's). Instead, this Court reasoned that the "use of the present tense in defining 'Indian lands' unambiguously prescribes that title to the real estate must *already* be held by the United States in trust for a tribe. Had Congress intended that [the statute] also extend to lands that might later be held in trust, it would have been the simplest of matters to word the statute differently." *Id.* at 775 (emphasis this Court's).

So too here. The reference to a noncitizen "who arrives in the United States," 8 U.S.C. §§ 1158(a)(1), 1225(a)(1), means a noncitizen who *has already arrived in* the United States, *see Guidiville Band of Pomo Indians*, 531 F.3d at 775, on or after the dates the statutes were enacted, *see Carr*, 560 U.S. at 448. Those provisions do not presently apply to a noncitizen who may arrive in the United States in the future, but who has not yet arrived or may never arrive at all.

Plaintiffs' application of the Dictionary Act also selectively applies that Act only to half of the relevant statutory language. When "Congress use[s] the *same* tense in both elements" of a statute, courts "give both the same temporal reach, absent some reason to do otherwise." *United States v. Jackson*, 480 F.3d 1014, 1020 (9th Cir. 2007). Thus, if the Dictionary Act gives "arrives in," 8 U.S.C. §§ 1158(a)(1), 1225(a)(1), a future tense, it must give "may apply for asylum," *id.*, a future tense, as well. In other words, someone who arrives in the United States today may apply for asylum today, and someone who arrives in the United States tomorrow may apply for asylum tomorrow. It cannot be that someone who arrives in the United States tomorrow may apply for asylum today.

*Sixth*, Plaintiffs argue that even if noncitizens outside the United States are not "applicants for admission" under Section 1225(a)(1), "they fit within the catch-all category of noncitizens 'otherwise seeking admission'" who must be inspected under Section 1225(a)(3). Second Br. 19–20. But the statute provides no basis to conclude that "otherwise seeking admission" refers to individuals outside the territorial United States. To the contrary, the statutory context and the presumption against extraterritoriality dictate that it does not, including because Section 1225 provides for the expedited removal of noncitizens "*from* the United States." 8 U.S.C. § 1225(b)(1)(A)(ii) (emphasis added). And, as explained, the distinction between

18

noncitizens "who are applicants for admission" and those who are "otherwise seeking admission," *id.* § 1225(a)(3), is between those who clearly fall within the categories of "applicants for admission" in Section 1225(a)(1) and those who do not, or for whom that determination cannot be made until later—for example, lawful permanent residents (LPRs). *See* First Br. 36.

Plaintiffs contend that the Government "fail[s] to explain how most LPRs are both 'otherwise seeking admission' and 'not . . . regarded as seeking an admission.'" Second Br. 20. LPRs generally are not applicants for admission. They "shall not be regarded as seeking an admission into the United States" unless an exception applies. 8 U.S.C. § 1101(a)(13)(C). But "whether a returning LPR meets one of the six exceptions in [Section 1101(a)(13)(C)] may not be self-evident" upon his arrival, "because the pertinent facts may not be practically ascertainable." *Vazquez Romero v. Garland*, 999 F.3d 656, 665 (9th Cir. 2021); *Matter of Valenzuela-Felix*, 26 I. & N. Dec. 53, 57–58 (BIA 2012). By directing immigration officers to inspect "applicants for admission" *and* those who are "otherwise seeking admission," Section 1225(a)(3) provides a statutory basis for the inspection of "[a]ll aliens," *id.*, even if it is unclear whether a noncitizen meets the technical definition of an "applicant for admission" under Section 1225(a)(1). Section 1225(a)(3) does not extend CBP's inspection obligations into Mexico. This is consistent with Section 1101(a)(13)(C), *see Vazquez Romero*, 999 F.3d at 663–66 (affording *Chevron* deference to *Matter of*

19

*Valenzuela Felix*), and other provisions of Section 1225 providing for the expedited removal of noncitizens "*from* the United States," 8 U.S.C. § 1225(b)(1)(A)(ii) (emphasis added). Plaintiffs offer no authority to the contrary.

*Seventh*, Plaintiffs contend that the present-progressive "arriving in the United States" in Section 1225(b)(1)(A)(ii) plausibly denotes a process of arrival that "logically begins as one approaches the POE to cross the physical border into the pre-inspection area." Second Br. 20–21. Yet the plain language of Section 1225(b)(1)(A)(ii) only requires an immigration officer to refer a noncitizen in expedited removal for a credible-fear interview "*[i]f* an immigration officer determines" that the noncitizen is inadmissible based on fraud or insufficient entry documents "*and* the [noncitizen] indicates either an intention to apply for asylum . . . or a fear of persecution." *Id.* (emphases added). A determination that a noncitizen is inadmissible on those specific grounds can only be made upon inspection, and inspection only occurs within the United States. This reading is supported by the cases the Government cited in its First Brief (at 30), all of which use the present progressive "arriving" or "entering" to refer to noncitizens who have already crossed the border and are awaiting a determination of admissibility. *See Matter of M-D-C-V-*, 28 I. & N. Dec. 18, 23 (BIA 2020); *Mezei*, 345 U.S. at 213. Plaintiffs, in contrast, offer no cases supporting their interpretation that "arriving" must refer to someone outside the United States. They rely only on an inapt analogy to a "flight attendant" announcing

that a flight is arriving at its destination before it actually lands, Second Br. 21, which does not rebut the courts' and the Board of Immigration Appeals' understanding that an "arriving alien" is someone already in the United States in fact, but not in contemplation of law.

*Eighth*, Plaintiffs assert that a regulation defining "arriving alien" as "an applicant for admission coming or attempting to come into the United States at a port-of-entry," 8 C.F.R. § 1.2, supports their position because the phrase "attempting to come into the United States," *id.*, "clearly encompasses individuals who have not yet crossed the border," Second Br. 21–22. Not so. An "arriving alien" is "*an applicant for admission* coming or attempting to come into the United States at a port-of-entry." 8 C.F.R. § 1.2 (emphasis added). "Arriving aliens" are a subset of "applicants for admission," who are defined by statute as noncitizens "present in the United States who ha[ve] not been admitted or who arrive[] in the United States." 8 U.S.C. § 1225(a)(1); *see* Inspection and Expedited Removal of Aliens, 62 Fed. Reg. 444, 445 (Jan. 3, 1997) ("IIRIRA distinguishes between the broader term 'applicants for admission' and a narrower group, 'arriving aliens'"). Because all applicants for admission are necessarily within the territorial borders of the United States, and because the ongoing nature of arriving only begins after a noncitizen crosses the border, *see supra* at 20–21, the regulation defining "arriving alien" does not purport to, and does not, include noncitizens outside the United States.

The regulatory history confirms that "coming or attempting to come into the United States at a port-of-entry," 8 C.F.R. § 1.2, does not refer to noncitizens in another country. The Immigration and Naturalization Service (INS) initially defined "arriving alien" in relevant part as "an alien who *seeks* admission to or transit through the United States . . . at a port-of-entry." Inspection and Expedited Removal of Aliens, 62 Fed. Reg. 10312, 10330 (Mar. 6, 1997) (emphasis added). The INS later amended the regulation to the current language defining an "arriving alien" as "an applicant for admission *coming or attempting to come into* the United States at a port-of-entry," because the word "seeks" in the initial definition "suggest[ed] that an alien must have a subjective intent to gain admission in order to be an arriving alien." Amendment of the Regulatory Definition of Arriving Alien, 63 Fed. Reg. 19382, 19383 (Apr. 20, 1998). That interpretation was "not consistent with the statute," *id.*, because IIRIRA's definition of "applicant for admission" makes no mention of subjective intent, *see* 8 U.S.C. § 1225(a)(1). Thus, the phrase "coming or attempting to come into the United States at a port-of-entry," 8 C.F.R. § 1.2, merely clarifies that a noncitizen can be an "arriving alien" "regardless of whether he or she subjectively desires admission." 63 Fed. Reg. at 19383.

*Ninth*, Plaintiffs argue that the record of a 1997 House of Representatives subcommittee hearing purportedly confirms "Congress' intent in adopting the term 'arriving alien.'" Second Br. 22 (citing *Implementation of [IIRIRA]: Hearing Before*

*the Subcommittee on Immigration and Claims of the House of Representatives Judiciary Committee*, 105th Congress 17–18 (1997) (hereinafter *Implementation of IIRIRA*)). As an initial matter, this 1997 record post-dates the 1996 enactment of IIRIRA. "Post-enactment legislative history (a contradiction in terms) is not a legitimate tool of statutory interpretation," because "by definition," it "could have had no effect on the congressional vote." *Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 242 (2011) (quotation marks omitted).

In any event, the House record supports the Government's position, not Plaintiffs'. The Chairman noted that the term "arriving alien" denotes "a flexible concept that would include all aliens who are in the process of *physical entry past our borders*," and that it includes, for example, "an alien *who has entered U.S. territory* . . . even if that alien has penetrated several hundred yards . . . into United States territory." *Implementation of IIRIRA* 17–18 (emphases altered). These statements confirm that an "arriving alien" is a noncitizen who is making "physical entry" and is already "past our borders" and in the United States. *Id.* Nothing about these statements indicate that the process of arrival begins in Mexico.

*Finally*, Plaintiffs claim that House Report No. 104-469 (cited at First Br. 31 and herein) "has zero relevance to this case" because it purportedly "refers to a bill that never became law." Second Br. 22. That is inaccurate. House Report No. 104–269 accompanied the Immigration in the National Interest Act of 1995, which was

later reintroduced as the Immigration Control and Financial Responsibility Act of 1996 (H.R. 2202), which was eventually passed as IIRIRA.[1] It is appropriately considered when examining IIRIRA's legislative history. *See, e.g.*, *Torres*, 976 F.3d at 928 (citing H. Rept. No. 104–469); *Matter of Collado-Munoz*, 21 I. & N. Dec. 1061, 1065 n.6 (BIA 1998) (same). That legislative history supports what the plain language already establishes: Sections 1158 and 1225 do not apply to noncitizens outside the United States.

### B. Metering Does Not "Unlawfully Withhold" Any Mandatory Agency Action on a Class-Wide Basis.

As the Government explained in its Opening Brief, even if Sections 1158 and 1225 were to apply to noncitizens in Mexico, the district court incorrectly concluded that DHS and CBP "unlawfully withheld" their obligations on a class-wide basis. 5 U.S.C. § 706(1); *see* First Br. 39–45. The undisputed evidence shows that the stated purpose of metering was not to prevent noncitizens from applying for asylum, but to regulate the flow of noncitizens without sufficient entry documents into the ports of entry, to facilitate orderly processing, maintain port security, maintain safe and sanitary conditions, or to facilitate the prioritization of CBP's resources. 2-ER-516; 2-ER-518–20, 2-ER-526–31; *see also* 3-SER-670. The undisputed evidence also shows that, while metering, CBP continued to inspect noncitizens for admission

---

[1] *See* https://www.congress.gov/congressional-report/104th-congress/house-report/469 (accessed Mar. 30, 2023).

at the southwest border ports of entry and refer them for credible-fear interviews at increasing rates. *See* 2-ER-523. These facts demonstrate that even if the INA imposes an obligation on immigration officers to inspect and process noncitizens in Mexico, CBP continued to discharge those obligations concurrently with the implementation of metering—meaning that, contrary to the district court's holding, the Government did not "unlawfully withhold" those obligations on a class-wide basis. 5 U.S.C. § 706(1).

Plaintiffs' arguments to the contrary are incorrect. *See* Second Br. 28–34. *First*, as explained, it is not true that every so-called "turnback" under metering "is mandatory 'agency action unlawfully withheld.'" Second Br. 30; *see* First Br. 42–45; *see also* Second Br. 30 (acknowledging that "some asylum seekers were subsequently processed at POEs").

*Second*, Plaintiffs argue that "[e]ven if turnbacks are delays, those delays are unreasonable" under the factors set forth in *Telecommunications Research and Action Center v. FCC* (*TRAC*), 750 F.2d 70 (D.C. Cir. 1984). This Court should not consider this argument because it "w[as] not properly raised at the lower court level." *Steam Press Holdings, Inc. v. Hawaii Teamsters, Allied Workers Union, Local 996*, 302 F.3d 998, 1005 (9th Cir. 2002). Plaintiffs did not raise any unreasonable-delay argument in their Motion for Summary Judgment, *see* FER-182–95, and Plaintiffs did not oppose the Government's Cross-Motion on the Section 706(1) claim (at

FER-117–18) on the alternative theory that any delays were unreasonable, *see* FER-43–67. Instead, Plaintiffs raised an unreasonable-delay argument for the first time in their Summary Judgment Reply, when the Government had no opportunity to respond. *See* FER-20–25. This Court should decline to consider their argument on appeal. *See Steam Press Holdings*, 302 F.3d at 1005. Further, the district court did not analyze any unreasonable-delay claims, and "[i]t is the general rule . . . that a federal appellate court does not consider an issue not passed upon below." *Singleton v. Wulff*, 428 U.S. 106, 120 (1976). Thus, although the Government maintains that the factual record precludes any finding that metering led to unreasonable delays on a class-wide basis, it would be improper for this Court to address this undeveloped factual issue for the first time on appeal, particularly where the practices at issue are now superseded.

## II.    The District Court Erred in Concluding That Metering Violates Procedural Due Process.

The district court also erred in concluding that the Due Process Clause applies to nonresident noncitizens in Mexico under *Boumediene v. Bush*, 553 U.S. 723 (2008), and that the Government deprived class members of procedural due process rights by not inspecting and referring them for credible-fear interviews before they crossed the U.S.-Mexico border. *See* First Br. 46–49.

Plaintiffs' contentions in response are wrong. *See* Second Br. 34–35. *Boumediene*'s functional-approach test is inapplicable to the Fifth Amendment because that case is about the Suspension Clause. *See* First Br. 47–48. Indeed, the Supreme Court in *Department of Homeland Security v. Thuraissigiam*, 140 S. Ct. 1959 (2020), impliedly rejected any reliance on *Boumediene* when analyzing Fifth Amendment rights of nonresident noncitizens. *See Thuraissigiam*, 140 S. Ct. at 1981; *see also Rasul v. Myers*, 563 F.3d 527, 529 (D.C. Cir. 2009) (explaining that the Supreme Court explicitly "disclaimed any intention to disturb existing law governing the extraterritorial reach of any constitutional provisions, other than the Suspension Clause"). This Court's decision in *Ibrahim v. Department of Homeland Security*, 669 F.3d 983 (9th Cir. 2012), which imported the functional approach into the Fifth Amendment, is therefore "clearly irreconcilable" with *Thuraissigiam*, and this Court "is not bound by the former and is free to reject it as effectively overruled." *Langere v. Verizon Wireless Services, LLC*, 983 F.3d 1115, 1121 (9th Cir. 2020) (quotation marks omitted).

Nor did *Boumediene* or *Rasul v. Bush*, 542 U.S. 466 (2004), limit the holding of *Johnson v. Eisentrager*, 339 U.S. 763 (1950), in this regard. *See* Second Br. 36 n.14. Those cases distinguished *Eisentrager*'s holding on the territorial application of the Suspension Clause. *See Rasul*, 542 U.S. at 476; *Boumediene*, 553 U.S. at 732.

They say nothing about *Eisentrager*'s holding that the Fifth Amendment is unavailable to noncitizens outside the United States. *See Thuraissigiam*, 140 S. Ct. at 1989 (Breyer, J., concurring) (noting that the Suspension Clause and the Due Process Clause are "distinct constitutional provision[s]"). That aspect of *Eisentrager* remains good law following *Rasul* and *Boumediene*. *See, e.g.*, *Agency for International Development v. Alliance for Open Society International, Inc.*, 140 S. Ct. 2082, 2086 (2020) (citing *Eisentrager* (and other cases) for the proposition that "foreign citizens outside U.S. territory do not possess rights under the U.S. Constitution").

In any event, Plaintiffs cannot demonstrate that class members satisfy *Boumediene*'s functional approach. *See* First Br. 48–50. Noncitizens who were subject to metering were standing in Mexico at the time they were allegedly deprived of due process. They are thus unlike the habeas petitioners in *Boumediene*, who were detained within territory over which the United States had "complete jurisdiction and control" and "*de facto* sovereignty." *Boumediene*, 553 U.S. at 755. They are also unlike the noncitizen with "substantial voluntary connection[s]" to the United States in *Ibrahim*, 669 F.3d at 996, because there is no class-wide evidence demonstrating any such connections. On these facts, it would be "impracticable and anomalous," *Boumediene*, 553 U.S. at 770, to permit class members to invoke the Fifth Amendment before they cross the border into the United States—especially when they would not have any independent Fifth Amendment protections in connection with

their admission to the United States once they set foot in the country. *See Thuraissi-giam*, 140 S. Ct. at 1981–82.

Finally, even if Sections 1158(a)(1) or 1225 applied to noncitizens in Mexico, Plaintiffs do not explain how any violation of these provisions amounts to a constitutional deprivation. *See* First Br. 49 (citing *Snowden v. Hughes*, 321 U.S. 1, 11 (1944)). This Court should reverse the district court on this claim.

## III.  The District Court Erred in Granting Burdensome Class-Wide Injunctive and Declaratory Relief.

### A.  The District Court Abused its Discretion.

The district court abused its discretion in enjoining DHS and EOIR from applying the third-country transit rule to certain class members who would have entered the United States before the transit rule's effective date but for metering, and by requiring DHS and EOIR to reopen and reconsider prior applications of the transit rule in closed asylum cases. *See* First Br. 50–51.

*First*, the injunction of the transit rule lacks a sufficient nexus to the violation found. *See* First Br. 50. Contrary to Plaintiffs' argument, the APA only permits a court to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). The rule expressed in *Norton v. Southern Utah Wilderness Association*, 542 U.S. 55, 64 (2004), that Section 706(1) "empowers a court only to compel an agency to perform a ministerial or non-discretionary act, or to take action

upon a matter, without directing *how* it shall act" is not "dicta," Second Br. 38, be-cause it was "central to the analysis of [that] case," *Norton*, 542 U.S. at 63. Although the injunction "does not compel [the Government] to grant or deny asylum to any-one," Second Br. 38, it dictates *how* the Government must process class members' asylum claims, including by requiring new and retrospective screening procedures that are not required by the relevant statutory provisions. *See* 1-ER-182–217; 1-ER-129–38; 1-ER-139–63; 1-ER-35–83. It thus exceeds the remedial authority afforded to courts under the APA—which would at most permit the Court to compel the pro-cedural inspection and referral duties the Court found were withheld.

Plaintiffs' argument that the injunction is nonetheless permissible because courts "can order relief necessary to remedy a constitutional violation," Second Br. 37 (citation and quotation marks omitted), is misplaced, because there is no consti-tutional violation here: The only basis for the district court's procedural due process ruling was a purported statutory violation, and the stated basis of the injunction is to prevent "the Government from taking actions 'not authorized by the [transit rule] or . . . by any implementing regulation or statute.'" 1-ER-78 (quoting Preliminary Injunction). It was not to remedy a constitutional violation. In any event, the remedy that would put class members "'in the position they would have occupied' if the legal violation had not occurred," Second Br. 37 (quoting *Winston Research Corp. v. Minnesota Mining & Manufacturing Co.*, 350 F.2d 134, 142 (9th Cir. 1965)), is

the same as under the APA: to order the Government to provide class members with what the statute requires—inspection and, if other predicates are met, referral for a credible-fear interview. *See* 8 U.S.C. § 1225(a)(3), 1225(b)(1)(A)(ii). Neither Section 1158(a)(1) nor Section 1225 requires the Government to follow rules and regulations that would have applied to class members if they had crossed the border on a different date, and class members do not have a right to any specific version of "the asylum process" that excludes the transit rule. Second Br. 37–38. There is "no vested right of entry which could be the subject of a prohibition against retroactive operation of regulations affecting [a noncitizen's] status." *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 544 (1950); *see also, e.g.*, *Henderson v. United States*, 568 U.S. 266, 271 (2013) (explaining that an adjudicator generally "must apply the law in effect at the time it renders its decision"); *Mezei*, 345 U.S. at 213 (holding that an "entering alien . . . may be excluded if unqualified for admission *under existing immigration laws*"—"whether he has been here once before or not" (emphasis added)). *NEDC v. Gordon*, 849 F.2d 1241 (9th Cir. 1988), and *Garcia v. Lawn*, 805 F.2d 1400 (9th Cir. 1986) (cited at Second Br. 37) are factually distinct and not to the contrary, as they both involve final relief that was substantially similar to the relief initially requested.

*Second*, the district court independently abused its discretion to the extent it continued to ground the injunction in the theory that the transit rule does not apply

by its own terms to noncitizens who would have entered the United States before the rule's effective date had they not been subject to metering. *See* 1-ER-80, 1-ER-135–36, 1-ER-211–12. Regardless of whether the district court's statutory interpretation is correct, the transit rule, while it was in effect, unambiguously applied to any noncitizen "who enters, attempts to enter, or arrives in the United States across the southern land border on or after July 16, 2019," after transiting through a third country and failing to seek protection there. Asylum Eligibility and Procedural Modifications, 84 Fed. Reg. 33829, 33843 (July 16, 2019). It thus clearly applied to noncitizens who entered after that date, even those who did so because of metering.

**B.    The INA Bars the Injunctive Relief Ordered.**

The injunction also violates the prohibition at 8 U.S.C. § 1252(f)(1) on class-wide orders that "enjoin or restrain the operation of" the relevant statutes, which prohibition "is best understood to refer to the Government's efforts to enforce or implement them." *Garland v. Aleman Gonzalez*, 142 S. Ct. 2057, 2064 (2022); First Br. 52–57. The injunction here enjoins the Government's efforts to implement covered statutes because it prohibits asylum officers and immigration judges from complying with regulations that (while they were in effect) required the application of a specific asylum-eligibility rule in removal proceedings under 8 U.S.C. § 1229a and

32

expedited removal under 8 U.S.C. § 1225, and requires asylum officers and immigration judges to affirmatively reopen or reconsider past applications of the transit rule in those proceedings. *See* First Br. 53–54.

Plaintiffs argue that the injunction does not violate Section 1252(f)(1) because the transit rule "implements § 1158(b)(2)(C) (which is not a 1252(f) provision)" and has only a "collateral" impact on the operation of Sections 1225 and 1229a under *Gonzalez v. ICE*, 975 F.3d 788 (9th Cir. 2020), *Gonzales v. DHS*, 508 F.3d 1227 (9th Cir. 2007), and *Catholic Social Services, Inc. v. INS*, 232 F.3d 1139 (9th Cir. 2000). Second Br. 40. Plaintiffs contend that the Government's argument would extend Section 1252(f)(1) to apply to "any action that *could* ultimately affect the outcome of an expedited or full removal proceeding." Second Br. 41; *see also* Amicus Br. of ACLU & NWIRP (ACLU Br.) 4–14. But the primary inquiry is not which statute supplies the authority for a given rule; it is whether an injunction imposes a restraint or requirement on the implementation of a covered provision. *Aleman Gonzalez*, 142 S. Ct. at 2064–65. If an injunction imposes a direct restraint or requirement on the procedures that implement a covered provision, its impact cannot be considered "collateral." As explained, the transit rule established a substantive bar on asylum eligibility *and* procedures for implementing that bar in expedited removal under Section 1225 and removal proceedings under Section 1229a—both of which are covered under Section 1252(f)(1). *See* First Br. 53–54. An injunction prohibiting

33

compliance with those aspects of the transit rule is an impermissible *direct* restraint on "the Government's efforts to enforce or implement" Sections 1225(b)(1)(B) and 1229a(c)(4)(A). *Aleman Gonzalez*, 142 S. Ct. at 2064; *see id.* ("[T]he operation of the provisions [in Section 1252(f)(1)] is a reference not just to the statute itself but to the way that it is being carried out."); *see also Biden v. Texas*, 142 S. Ct. 2528, 2538 (2022) (holding that requiring DHS to comply with a rescinded policy memorandum implementing 8 U.S.C. § 1225(b)(2)(C) "violated" Section 1252(f)(1)).[2]

Finally, Plaintiffs offer no response to the Government's point that the injunction violates 8 U.S.C. § 1252(a)(2), (a)(5), (b)(9), and (e), other than to suggest that a "single string cite" is insufficient to support the Government's position. Second Br. 42 n.16. But those provisions are self-explanatory in their prohibition on collateral attacks on closed removal proceedings. *See* First Br. 52. Together, they unambiguously stripped the district court here of any jurisdiction to require the Government to take affirmative steps to reopen or reconsider past applications of the transit

---

[2] It is imprecise to say that "[e]njoining an asylum rule . . . will always have collateral effects on the removal process," ACLU Br. at 21, because a substantive asylum bar is distinct from the procedures for implementing that bar in expedited removal and removal proceedings. For example, Section 1252(f)(1) potentially would not prohibit an injunction on applying a transit bar to noncitizens who file an affirmative asylum application outside of expedited removal or removal proceedings. Moreover, Section 1252(f)(1) only applies to *class-wide* injunctions that restrain the application of substantive asylum rules in removal proceedings. That is consistent with other provisions of Section 1252 that channel challenges through the statutorily-prescribed individual review process, *see* 8 U.S.C. § 1252(a)(5), (b)(9), or otherwise divest courts of jurisdiction to consider them, *see id.* § 1252(a)(2), (e).

rule in expedited removal or removal proceedings. The INA thus bars the district court's class-wide injunction prohibiting compliance with the transit rule.

## IV.     This Court Should Not Reach Plaintiffs' Section 706(2) Claim.

The district court did not separately address Plaintiffs' Section 706(2) theories of liability because the court had concluded that metering was categorically unlawful under Section 706(1) and the Due Process Clause, 1-ER-117, and it granted overly broad declaratory relief to Plaintiffs on this basis, 1-ER-4–5. Plaintiffs now argue that "the district court erred by declining to find the turnback policy unlawful under [the] APA" at 5 U.S.C. § 706(2), and they appear to ask this Court to grant them summary judgment on that claim and remand to determine "whether additional remedies—including injunctive relief—would be available." Second Br. 42–43 & n.17; *see also id.* at 43–50. But this claim is moot, cannot result in any "additional" remedy, and lacks merit.

### A.     Plaintiffs' Section 706(2) Claim is Moot.

As an initial matter, remand would be futile because Plaintiffs' Section 706(2) claim is moot. In November 2021, DHS and CBP rescinded and replaced CBP's metering guidance (and its justifications for issuing that guidance). *See* 2-ER-309–318. The rescinded guidance documents were the only specific agency actions that the APA empowered the district court to review. *See Biden*, 142 S. Ct. at 2545 ("To the extent that the Court of Appeals understood itself to be reviewing an abstract

decision apart from specific agency action, as defined in the APA, that was error."). When those memoranda were rescinded, Plaintiffs' challenge to that guidance (and CBP's implementation thereof) became moot. *See Akiachak Native Community v. Dep't of Interior*, 827 F.3d 100, 113 (D.C. Cir. 2016) (noting that it is "a perfectly uncontroversial and well-settled principle of law" that "when an agency has rescinded and replaced a challenged regulation, litigation over the legality of the original regulation becomes moot"). The district court correctly recognized this point and declined to vacate the already-rescinded memoranda or consider them in fashioning any relief. *See* 1-ER-27–28.

Relatedly, it would be futile to remand to the district court to consider the availability of "injunctive relief." Second Br. 43 n.17. Even assuming Plaintiffs were to succeed on any of their now-moot Section 706(2) theories raised on appeal, *see* Second Br. 43–50, vacatur is the most they could obtain. *See Southeast Alaska Conservation Council v. U.S. Army Corps of Engineers*, 486 F.3d 638, 654 (9th Cir. 2007) ("Under the APA, the normal remedy for an unlawful agency action is to 'set aside' the action." (quoting 5 U.S.C. § 706(2)), *rev'd and remanded on other grounds*, *Coeur Alaska, Inc. v. Southeast Alaska Conservation Council*, 557 U.S. 261 (2009). That is especially true because, as the district court correctly held, *see* 1-ER-26–27, 29–30, Section 1252(f)(1) prohibits a class-wide injunction against the manner in which CBP implements Section 1225, including by metering—a holding

that Plaintiffs do not challenge on appeal. And even if the claims were not moot, this Court should decline to consider an undeveloped factual issue that the district did not rule on below. *See Singleton*, 428 U.S. at 120.

### B. Metering is Within the Executive's Authority, and the Metering Memoranda Were Reasonable and Reasonably Explained.

In any event, Plaintiffs are incorrect that the metering policies exceed DHS or CBP's statutory authority and are arbitrary and capricious, as metering is a permissible and reasonable exercise of executive authority. The Executive has constitutional and statutory authority to regulate the manner and pace of pedestrian traffic across the U.S.-Mexico border, particularly as to noncitizens who lack sufficient entry documents. *See* First Br. 43 (citing cases); *Mezei*, 345 U.S. at 215 ("Aliens seeking entry from contiguous lands obviously can be turned back at the border without more." (internal citations omitted)); 6 U.S.C. §§ 111(b)(1), 202, 211(c), 211(g)(3).

Plaintiffs' argument that metering is "not in accordance with law" or "in excess of statutory . . . authority" under Section 706(2) is wrong. Second Br. 44; *see also id.* at 44–48. *First*, the Government's position is not that general statutory mandates "negat[e]" specific statutory commands. *See* Second Br. 45–46. Metering is a tool that CBP used to *concurrently* discharge its specific obligations under Section 1225 and its broader mandates to "[s]ecur[e] the borders" and "ports . . . of the United States" and "ensur[e] the speedy, orderly, and efficient flow of lawful traffic and commerce," 6 U.S.C. § 202(2), (8); "deter and prevent terrorists and terrorist

37

weapons from entering the United States at such ports of entry," *id.* § 211(g)(3)(A); "prevent illicit drugs, agricultural pests, and contraband from entering the United States," *id.* § 211(g)(3)(C); and "facilitate and expedite the flow of legitimate travelers and trade," *id.* § 211(g)(3)(D). Assuming that CBP owes any obligations under Section 1225 toward noncitizens in Mexico, metering does not "evade" those obligations, Second Br. 46, because the undisputed evidence shows CBP continued to inspect applicants for admission and refer noncitizens for credible-fear interviews along the southwest border. *See* First Br. 39–45; *supra* at 24–26; 2-ER-523.

*Second*, Plaintiffs argue that the Executive lacks "inherent power to turn back asylum seekers" because "agencies lack 'inherent' power outside of a statutory mandate." Second Br. 47 (quoting *Gorbach v. Reno*, 219 F.3d 1087, 1095 (9th Cir. 2000)). But CBP's policy was not to "turn back asylum seekers." Rather, the policy was to manage the flow of noncitizens without sufficient entry documents by "creat[ing] lines based on legitimate operational needs," 2-ER-528, and "inform[ing] the waiting travelers that processing at the port is currently at capacity and CBP is permitting travelers to enter the port once there is sufficient space and resources to process them," 2-ER-516. Metering's purpose was to "facilitate orderly processing and maintain the security of the port and safe and sanitary conditions for the traveling public," 2-ER-516, and to facilitate prioritization of CBP's resources in order of na-

tional security, counter-narcotics, economic security, and trade-and-travel facilitation, 2-ER-527. Indeed, even amici recognize there are times "when a state is genuinely unable to accept and process all asylum-seekers at its border." Amicus Br. of Amnesty International 15 n.36. CBP does have authority to meter under its "inherent executive power" "concerning the admissibility of aliens." *Knauff*, 338 U.S. at 542. CBP also has statutory authority to manage and operate Ports of Entry. 6 U.S.C. §§ 202, 211(g)(3). As implemented, metering is a management tool that is justified by CBP's mandates to "deter and prevent terrorists and terrorist weapons from entering the United States at such ports of entry," "prevent illicit drugs . . . and contraband from entering the United States," and "facilitate and expedite the flow of legitimate travelers and trade." *Id.* § 211(g)(3)(A), (C), (D). CBP cannot ignore these mandates either.

*Third*, Plaintiffs contend that "DHS's 'primary mission' is to 'ensure that functions of the agencies and subdivisions within the Department that are not related directly to securing the homeland,' such as inspection and processing of asylum seekers, '*are not diminished or neglected except by a specific explicit Act of Congress*,'" and that "no such Act of Congress" applies here. Second Br. 46 (quoting 6 U.S.C. § 111(b)(1)(E) (emphasis Plaintiffs')). But, assuming Plaintiffs' interpretation of the statute is correct, the mandate to ensure that DHS's non-national security functions "are not diminished or neglected," 6 U.S.C. § 111(b)(1)(E), is consistent

39

with CBP's implementation of a (now-superseded) prioritization-based queue management policy. The policy allowed CBP to "focus on the detection and apprehension of narcotics and currency smugglers" and "protect the economic security of the United States by enforcing trade laws and legitimate commerce," 2-ER-528, thereby *facilitating* DHS's mandate to ensure that its functions were not diminished by allowing CBP to direct resources toward the functions Congress specified, while concurrently discharging its obligations under Section 1225.

Further, the metering policies were not "arbitrary and capricious and an abuse of discretion under APA § 706(2)." Second Br. 48 (capitalization altered); *see also id.* at 48–50. Arbitrary-and-capricious review is "narrow" and evaluates "only whether the [decisionmaker] examined the relevant data and articulated a satisfactory explanation for his decision, including a rational connection between the facts found and the choice made." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2569 (2019) (quotation marks omitted). Courts must uphold agency action that is "reasonable and reasonably explained." *Id.* at 2571.

Plaintiffs base their arbitrary-and-capricious argument on the contention that the "stated justification for [metering]—lack of capacity—is demonstrably false." Second Br. 48. They significantly mischaracterize the factual record in an attempt to

support this contention.[3] First, they say that, if metering were "an attempt to deal with increased migration," it would have stopped in 2017 when migration levels decreased. Second Br. 10. Yet the record shows that use of metering did decrease at the end of 2016 and beginning of 2017, when the numbers of migrants decreased. *See, e.g.*, FER-239 (metering "ended in December of 2016" at the El Paso Port of Entry and "began again in May of 2018"); FER-213 (Plaintiffs' witness's statement that "by December 2016", the Nogales Port of Entry had "processed the waiting [noncitizens] in [Sonora, Mexico] and stopped metering"). Plaintiffs next say that ports of entry "routinely had excess capacity to process arriving asylum seekers." Second Br. 11. But this overgeneralization means that metering proactively prevented mass overcrowding, allowing CBP officers not to diminish other missions. *See, e.g.*, 2-ER-527 (showing increases in inbound drug seizures and outbound currency interdiction). Further, contrary to Plaintiffs' contentions, *see* Second Br. 12, DHS and CBP *did* increase detention capacity to address the 2016 migration surge by opening two facilities in Texas in November and December 2016, which together held almost 8,000 noncitizens while they were open, FER-143–47. And the fact that the Secretary of Homeland Security's office asked in June 2018 for "a rough magnitude of CBP folks that will be needed to man the boundary line," and a "rough

---

[3] The Government generally disputes Plaintiffs' Statement of the Case and refers the Court to its own Statement. *See* First Br. 7–24.

estimate of the number of folks that would likely be turned away per day," 2-SER-426, is not proof of a desire "to artificially limit" asylum seekers, Second Br. 49. Requesting information about the potential costs and impacts of implementing a policy is a regular aspect of the policymaking process.

At base, Plaintiffs' arbitrary-and-capricious argument fails because *CBP in fact was facing capacity constraints* each time it issued agency-wide metering guidance. When the San Ysidro Port of Entry began metering in late May 2016, the Port was overwhelmed by individuals seeking admission, even though the Port had already taken drastic contingency measures. *See* 2-ER-328–37; 2-ER-564; 3-ER-757; 3-ER-758; FER-216–17; FER-220. This prompted the Port Director to instruct his deputies to "hold the line the best we can" to enable staff to "only focus on processing case[s] at this time." FER-223. In October 2016, "CBP's total apprehensions were 76 percent above the previous five-year average," 3-ER-755, and CBP's southwest border regional offices were utilizing 140% of their detention capacity, 3-ER-756. The subsequent instructions to ports of entry along the southwest border to meter were animated by the same concerns as at San Ysidro. *See, e.g.*, 2-ER-344–57; 3-ER-696 ("As other ports were overwhelmed with the volume of migrants, then we adopted the same practice across the southwest border as needed."); FER-228 ("I just want our folks to have an additional tool to keep conditions safe and working at our POEs."). Likewise, in April and May 2018, the southwest border ports were

processing an increased number of inadmissible arriving noncitizens and had begun to report "impacts to frontline functions," 3-ER-674, and CBP was preparing for another potential mass migration event, *see* 3-ER-696; 3-ER-653, -659, -665, -671; 2-ER-519–20. By November 2019, the number of inadmissible arriving noncitizens referred by the southwest border Field Offices for credible-fear screening had doubled again, from 38,399 in FY 2018 to 80,055 in FY 2019. 2-ER-523. CBP was plainly facing capacity issues at each relevant time.

DHS and CBP thus "disclose[d] the basis of [their] action," which means their decisions must be upheld. *Dep't of Commerce*, 139 S. Ct. at 2573 (quotation marks omitted). Even if there were additional reasons for metering, "a court may not reject an agency's stated reasons for acting simply because the agency might also have had other unstated reasons." *Id.*[4] Metering is constitutionally and statutory permissible, and to the extent the Court decides to consider the merits of the now-rescinded metering policies at issue, there is no undisputed material evidence showing that those policies are arbitrary and capricious.

---

[4] Relatedly, "a court may not set aside an agency's policymaking decision solely because it might have been influenced by political considerations or prompted by an Administration's priorities." *Dep't of Commerce*, 139 S. Ct. at 2573; *see Biden*, 142 S. Ct. at 2547 (holding that an "agency's *ex ante* preference for terminating [a policy program]—like any other feature of an administration's policy agenda—should not be held against the" policy).

**V.    The District Court Correctly Granted Summary Judgment for the Government on Plaintiffs' Standalone INA Claim.**

The district court correctly entered summary judgment for the Government on Plaintiffs' claim for nonstatutory review of "violation of the right to seek asylum under the [INA]," because it is duplicative of their APA claims. 4-ER-910 (capitalization altered); *see* Second Br. 50–52. "[T]he APA is the general mechanism by which to challenge final agency action." *Sierra Club v. Trump*, 929 F.3d 670, 699 (9th Cir. 2019). "While a right to judicial review of agency action may be created by a separate statutory or constitutional provision, once created it becomes subject to the judicial review provisions of the APA unless *specifically* excluded." *Webster v. Doe*, 486 U.S. 592, 607 n.* (1988) (Scalia, J., dissenting); *see Ninilchik Traditional Council v. United States*, 227 F.3d 1186, 1194 (9th Cir. 2000) (citing Justice Scalia's *Webster* dissent with approval). "[I]if review is not available under the APA it is not available at all." *Webster*, 486 U.S. at 607 n.* (Scalia, J., dissenting); *Graham v. FEMA*, 149 F.3d 997, 1001 n.2 (9th Cir. 1998) (same), *recognized as abrogated on other grounds in Novak v. United States*, 795 F.3d 1012, 1019 (9th Cir. 2015).

Here, Plaintiffs sued Government officials in their official capacities; they challenged metering under the APA as an unlawful withholding of the Government's statutory obligations, as exceeding the Government's authority, and as violating procedural due process; and they sought non-monetary relief. *See* 4-ER-912–19, 4-ER-921–23. The APA provides a waiver of sovereign immunity for those claims in

5 U.S.C. § 702, and causes of action for those claims in 5 U.S.C. § 706. The district court thus correctly concluded in its first motion-to-dismiss order that Plaintiffs lack any cause of action to enforce the INA outside of the APA's judicial review framework, *see* FER-285–86, and it correctly entered summary judgment for the Government "because plaintiffs could obtain review under the APA," *see* 1-ER-96 (citing *Jafarzadeh v. Duke*, 270 F. Supp. 3d 296, 311 (D.D.C. 2017)).

Plaintiffs do not challenge the district court's reliance on *Webster*, *Graham*, *Ninilchik Traditional Council*, or *Jafarzadeh*. Instead, they argue that the district court misapplied *E.V. v. Robinson*, 906 F.3d 1082 (9th Cir. 2018), to hold that "the APA waiver [of sovereign immunity at 5 U.S.C. § 702] applies to Plaintiffs' claims and consequently abrogates Plaintiffs' ultra vires INA claim." 1-ER-96; *see* Second Br. 50–51. To be sure, it is unclear why the district court invoked *Robinson*, since there is no dispute that the APA waived sovereign immunity for Plaintiffs' APA claims. *See* 1-ER-96. In any event, what matters is that Plaintiffs' *ultra vires* claim was entirely duplicative of Plaintiffs' APA claims, and Plaintiffs do not otherwise contend that the APA provided an inadequate cause of action.[5] Thus, the district

---

[5] Plaintiffs may argue that their *ultra vires* claim permits broader relief than what they obtained on their APA claim, but that would be incorrect because Section 1252(f)(1) applies "[r]egardless of the nature of the action or claim." 8 U.S.C. § 1252(f)(1).

court was correct to enter summary judgment for the Government. *See* FER-285–86; *California v. Trump*, 963 F.3d 926, 941 n.12 (9th Cir. 2020).

## VI. The District Court Correctly Granted Summary Judgment for the Government on Plaintiffs' International-Law Claim.

The court correctly declined to create a federal common law cause of action for alleged violations of non-refoulement under the ATS, 28 U.S.C. § 1350. At a minimum, the contours of the customary international-law norm that Plaintiffs assert are not specific or universal. And it would be particularly improper to create a judicial tort remedy against the United States that was not contemplated by Congress. Finally, the undisputed facts fail to establish a non-refoulement violation.

The ATS confers jurisdiction on a federal district court over a civil action by a noncitizen for "a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. This language is "strictly jurisdictional" and does not create a cause of action. *Sosa v. Alvarez-Machain*, 542 U.S. 692, 713–14, 724 (2004). The Supreme Court has set forth a two-step test for determining whether to recognize a federal common law cause of action over which the ATS confers jurisdiction beyond those three specific offenses against the law of nations recognized at the time the ATS was enacted ("violation of safe conducts, infringements of the rights of ambassadors, and piracy"). *Id.* The threshold question is "whether a plaintiff can demonstrate that the alleged violation is 'of a norm that is specific, universal, and obligatory.'" *Jesner v. Arab Bank*, 138 S. Ct. 1386, 1399 (2018) (quoting

46

*Sosa*, 542 U.S. at 732). Second, even "assuming that, under international law, there is a specific norm that can be controlling, it must be determined further whether allowing th[e] case to proceed under the ATS is a proper exercise of judicial discretion." *Jesner*, 138 S. Ct. at 1399 (citing *Sosa*, 542 U.S. at 732–33). Courts must exercise "great caution in adapting the law of nations to private rights" and engage in "vigilant doorkeeping," because, among other reasons, the "decision to create a private right of action is one better left to legislative judgment in the great majority of cases," and Congress has not mandated courts "to seek out and define new and debatable violations of the law of nations." *Sosa*, 542 U.S. at 727, 728, 729. Only in "very limited circumstances" is creation of a cause of action warranted. *Nestle USA, Inc. v. Doe*, 141 S. Ct 1931, 1935 (2021) (Thomas, J.).

Here, the district court determined that Plaintiffs' ATS claim was not actionable because they did not establish that metering violates a universal non-refoulement standard. 1-ER-124, 1-ER-126. Although the district court believed Plaintiffs had provided sources to establish the existence of a norm of non-refoulement, the applicable question was "whether the duty of non-refoulement is universally understood to provide protection to those who present themselves at a country's borders but are not within a country's territorial jurisdiction." 1-ER-122. The district court concluded that "acceptance of [the] specific extraterritorial application of non-

refoulement [that Plaintiffs allege] is not universal." 1-ER-124. It noted that author-ities opining that "pushbacks are incompatible with the duty of non-refoulement" premise that opinion on the principle that the non-refoulement obligation set forth in Article 33 of the United Nations Convention Relating to the Status of Refugees (Ref-ugee Convention) applies extraterritorially. 1-ER-123. But the district court held that that underlying principle was not universally accepted. 1-ER-124. The court rea-soned that several European Union member states and Australia have adopted "pushback or 'offshoring' policies," and there is "significant disagreement over the scope and extent of the countries' jurisdictions" and of their non-refoulement obli-gations. *Id.* The district court also relied on controlling Supreme Court case law—*Sale*—that analyzed the language of Article 33 and determined it did not create ob-ligations as to individuals outside a nation's territory. *See* 1-ER-125–26; *Sale*, 509 U.S. at 179–87.

Based on this evidence that the non-refoulement norm that Plaintiffs advance was not universally accepted to apply extraterritorially, the district court correctly declined to recognize a cause of action under the ATS for non-refoulement violations based on metering. "[T]he requirement that a rule command the 'general assent of civilized nations' to become binding upon them all is a stringent one." *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 254 (2d Cir. 2009) (quoting *Filartiga v. Pena-Irala*, 630 F.2d 876, 881 (2d Cir. 1980)). Here, there is no such

general assent, as any standard of non-refoulement is not universally defined to *prohibit the conduct Plaintiffs complain of here*. *See, e.g.*, *Quintero Perez v. United States*, 8 F. 4th 1095, 1107 (9th Cir. 2021) (Friedland, J., concurring) (recognizing that the ATS plaintiff must establish that the *particular type* of extrajudicial killing at issue is a violation of a non-derogable norm). Put another way, non-refoulement principles are not "defined with the specificity comparable" to the features of the international-law norms recognized at the time Congress enacted the ATS, *Sosa*, 542 U.S. at 725, in part because it is at least debatable whether these non-refoulement principles contemplate any obligation toward individuals outside a nation's territory. As "federal courts should not recognize private claims under federal common law for violations of any international law norm with less definite content and acceptance among civilized nation as than the historical paradigms familiar when § 1350 was enacted," *Sosa*, 542 U.S. at 731, the district court correctly declined to recognize the cause of action Plaintiffs assert.

Plaintiffs and amici attempt to reframe the district court's analysis, arguing that the court held that a norm is no longer "obligatory" when some nations have violated it. Second Br. 53; Amicus Br. of International Refugee Law Scholars (IRLS Br.) 12–13. But the district court did not so hold. Instead, it determined based on various nation-state practices that extraterritorial application of non-refoulement obligations has not risen to the status of a universal norm (or, alternatively, that the

obligation is not universally defined to address individuals who are not within a nation's territory). *See* 1-ER-124–125. In contrast to official torture (*see, e.g.*, Second Br. 54), the examples cited by the district court indicate that nation-states have acknowledged, rather than disavowed, the cited "pushback" practices. *See* 1-ER-124; *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 717 (9th Cir. 1992) ("That states engage in official torture cannot be doubted, but all states believe it is wrong, all that engage in torture deny it, and no state claims a sovereign right to torture its own citizens.").

*Sale* reinforces that extraterritorial application of non-refoulement obligations is not a universal norm. Although *Sale* addressed the scope of Article 33 of the Refugee Convention, rather than customary international law, *Sale* is binding law that remains indicative of the limits of any non-refoulement obligation. As the district court noted, any arguments that a customary non-refoulement norm exists with respect to asylum-seekers are primarily based on the language of, and nation-states' accession to, Article 33 of the Refugee Convention. *See* 1-ER-123.[6] *Sale*'s analysis of the scope of Article 33 thus defines the United States' position on the limits of the

---

[6] Additional sources cited by Plaintiffs similarly rely on the text of Article 33 to define non-refoulement obligations. *See* UNHCR Exec. Comm., *Note on International Protection* ¶ 16 & n.10, U.N. Doc. A/AC.96/951 (Sept. 13, 2001) (citing Article 33 as source of non-refoulement obligation). Amici similarly acknowledge that the underlying treaty defines the scope of the nations' obligations. IRLS Br. 6–8, 10.

principle of non-refoulement, as well as the understanding of other Convention parties on this issue.

Although *Sale*'s ultimate holding addressed the interdiction of migrants on the high seas, its analysis of Article 33's non-refoulement obligation is not so narrow. The Supreme Court in *Sale* carefully analyzed the text and history of the Refugee Convention and its implementing statute to determine that neither applied outside the territory of the United States—and this analysis was key to its ultimate holding. *Sale*, 509 U.S. at 177, 179, 187. "[B]oth the text and the negotiating history of Article 33 affirmatively indicate that it was not intended to have extraterritorial effect." *Id.* at 179. Instead, it was meant to apply solely to "refugees" who were "already admitted into a country" or "already within the territory but not yet resident there." *Id.* at 182.[7] *Sale* thus defines the non-refoulement obligation as applying only to those within a nation's territory, and it does not distinguish between individuals who are outside that territory on the high seas and those who are in a contiguous territory. And, contrary to Plaintiffs' assertion, *see* Second Br. 55–57, *Sale* affirmatively concluded that Article 33 was not universally understood to prohibit what Plaintiffs term "rejection at the border" of individuals within a contiguous territory,

---

[7] Thus, although the Court stated that the English translation of "return ('refouler')" in Article 33 was akin to an "act of resistance or exclusion at the border," it specified that this applied only to those refugees who were "already within the territory but not yet resident there." *Sale*, 509 U.S. at 182 & n.40.

*Sale*, 509 U.S. at 185, 186 (citing history that several Convention parties agreed the non-refoulement obligation would apply solely to refugees already present in the Convention country, and that Article 33 did not impose obligations regarding, "mass migrations across frontiers or [] attempted mass migrations"); *see also* U.S. Dep't of State, *U.S. Observations on UNHCR Advisory Opinion on Extraterritorial Application of Non-Refoulement Obligations* (Dec. 28, 2007), at https://2001-2009.state.gov/s/l/2007/112631.htm (cited at 1-ER-126). Nor has this Court limited *Sale*'s application in this context. *See* Second Br. 55 (citing *Blazevska v. Raytheon Aircraft Co.*, 522 F.3d 948, 954 (9th Cir. 2008)). Accordingly, the district court correctly relied on *Sale* to hold that non-refoulement is not universally understood to extend obligations to migrants who are not within United States territory, and thus that it may not recognize the cause of action for non-refoulement that Plaintiffs assert.

Even if there were a sufficiently specific, universal norm at issue, the Court should nonetheless decline under *Sosa*'s second step to create a novel tort action against the United States for non-refoulement violations. For several reasons, it would be an extraordinary exercise of lawmaking power by the Judiciary that is nowhere suggested in the text or origins of the ATS to create such a private right of action.[8]

---

[8] The government does not concede that Plaintiffs' claim is a proper domestic application of the ATS. *See Kiobel* v. *Royal Dutch Petroleum Co*., 569 U.S. 108, 124–25 (2013).

*First*, the separation-of-powers concerns that "apply with particular force in the context of the ATS," *Jesner*, 138 S. Ct. at 1403, counsel strongly against recognizing a new cause of action here. In 1968, the United States acceded to Article 33 of the Refugee Convention when it signed on to the United Nations Protocol Relating to the Status of Refugees (Refugee Protocol). *INS v. Stevic*, 467 U.S. 407, 416 (1984). That Protocol is non-self-executing, and noncitizens thus have no domestically enforceable rights thereunder. *Khan v. Holder*, 584 F.3d 773, 783 (9th Cir. 2009). Congress has enacted legislation in 8 U.S.C. § 1231 to conform its standard for withholding of removal to Article 33's non-refoulement obligation. *See* 8 U.S.C. § 1231(b)(3)(A) (prohibiting the government from "remov[ing] an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country" on a protected ground); *Stevic*, 467 U.S. at 421 (The Refugee Act of 1980 amended the former withholding-of-removal statute to "basically conform[] it to the language of Article 33."). Yet Congress also provided in the same section that "[n]othing in this section shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person." 8 U.S.C. § 1231(h). And Congress has also limited judicial review of claims arising out of the withholding statute, divesting district courts of authority to hear such claims and channeling them instead into the courts of appeals to be reviewed alongside a final order of removal. *See* 8 U.S.C.

53

§ 1252(a)(5), (b)(9). In light of these Congressional limits on enforceable rights un-der Article 33 and available review, recognizing a federal common law claim for alleged violation of a customary international law norm of non-refoulement would be manifestly contrary to the Supreme Court's instruction in *Sosa* to exercise "great caution" in recognizing causes of action under the ATS. *Sosa*, 542 U.S. at 727–28.

*Second,* nothing in the ATS suggests that the judiciary may create a new cause of action against the United States. The ATS itself does not waive the United States' sovereign immunity. *Tobar v. United States*, 639 F.3d 1191, 1196 (9th Cir. 2011); *Quintero Perez*, 8 F.4th at 1100–01; *Goldstar (Panama) S.A. v. United States*, 967 F.2d 965, 968 (4th Cir. 1992); *Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 207 (D.C. Cir. 1985). The district court held that the APA supplies the waiver of sovereign immunity for Plaintiffs' ATS claim, because they seek injunctive and declaratory relief. *See* FER-269–71; 5 U.S.C. § 702; *Navajo Nation v. Dep't of the Interior*, 876 F.3d 1144, 1172 (9th Cir. 2017). Yet there is no reason to believe that Congress, when enacting either the ATS in 1789 or the APA's waiver provision in 1976, con-templated that it was waiving sovereign immunity for future torts against the United States (or other nation-states) for violations of international law. This is especially so because the ATS was intended to provide for personal liability and thus "to pro-mote harmony in international relations by ensuring foreign plaintiffs a remedy for international-law violations in circumstances where the absence of such a remedy

might provoke foreign nations to hold the *United States* accountable." *Jesner*, 138 S. Ct. at 1406 (emphasis added); *Sosa*, 542 U.S. at 724 (ATS was meant to provide federal jurisdiction for offenses with a potential for "personal liability").

*Third*, national security and foreign relations considerations similarly weigh against creating a cause of action concerning cross-border activity. In *Hernandez v. Mesa*, the Supreme Court held that courts may not fashion a *Bivens* cause of action against U.S. officials based on claimed violations arising out of cross-border shootings, reasoning that "the conduct of agents positioned at the border has a clear and strong connection to national security" and "regulating the conduct of agents at the border unquestionably has national security implications." *Hernandez*, 140 S. Ct. at 746, 747. "[T]he risk of undermining border security provides reason to hesitate before extending *Bivens* into this field." *Id.* at 747. The Court further reasoned that the claimed violations arose from cross-border shooting, which "is by definition an international incident; it involves an event that occurs simultaneously in two countries and affects both countries' interests." *Id.* at 744. The claims therefore "implicated" foreign relations and provided "even greater reason for hesitation" before creating a cause of action. *Id.* at 747. The same national-security and foreign-relations implications are present here. CBP's function at ports of entry "to control the movement of people and goods across the border" indisputably "implicates an element of national security," *id.* at 746, and affects Mexico's interests. Courts should thus decline

to fashion a private cause of action for the same reasons the Supreme Court declined to fashion one in *Hernandez*.

For these additional reasons, the Court should affirm the district court's decision not to imply a cause of action against the United States for non-refoulement. But if the Court were to recognize a tort cause of action under the ATS for non-refoulement violations, the undisputed facts establish that metering does not violate that principle. *First*, even if this Court creates a non-refoulement cause of action under the ATS, it should not extend further than the withholding statute. *Second*, the non-refoulement obligation attaches under U.S. and international law when an individual would be tortured, 8 C.F.R. §§ 208.16(c)(2), 208.17(a), or their life or freedom would be threatened *on account of a protected ground*, 8 U.S.C. § 1231(b)(3)(A); Refugee Convention, art. 1. Any generalized contention that Mexican border towns are unsafe is facially insufficient to establish this nexus.[9] *Third*, the theory asserted by Plaintiffs below concerning "indirect" or "chain" refoulement by Mexican officials is also not clearly part of the non-refoulement obligation acceded to by the United States. And such a theory is precluded under the act of state doctrine, which "prevents federal courts from declar[ing] invalid . . . the official act

---

[9] Further, evidence that some class members feared staying in Mexico would be insufficient to justify relief to the entire certified class, as such relief would not be "appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

of a foreign sovereign involving activities undertaken within its own territory," because it would require this Court to sit in judgment of Mexico's enforcement of its own immigration laws within its own borders. *Hourani v. Mirtchev*, 796 F.3d 1, 11–12 (D.C. Cir. 2015) (quotation marks omitted). *Fourth*, the undisputed facts demonstrate that, under metering, CBP continued to inspect and process noncitizens and refer them, as appropriate, for credible-fear interviews. *See* 2-ER-523. Metering did not amount to, as Plaintiffs frame it, class-wide "rejection" at the border, Second Br. 57, but instead was at most a delay to enter the United States for inspection and processing, *see* First Br. 39–40; *supra* at 24–26. Thus, even if the Court were to recognize a tort for violation of non-refoulement obligations, Plaintiffs cannot succeed on this claim.

## **CONCLUSION**

This Court should reverse the decision below and remand with directions to enter summary judgment for the Government on all counts and to vacate the declaratory and injunctive relief.

*//*

DATED: March 30, 2023       Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

WILLIAM C. PEACHEY
Director

KATHERINE J. SHINNERS
Senior Litigation Counsel

*/s/ Alexander J. Halaska*
ALEXANDER J. HALASKA
Senior Litigation Counsel
U.S. Department of Justice
Civil Division
Office of Immigration Litigation -
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 307-8704 | Fax: (202) 305-7000
Email: alexander.j.halaska@usdoj.gov

*Counsel for the Government*

## **CERTIFICATE OF SERVICE**

I certify that on March 30, 2023, I served a copy of this document on the Court and all parties by filing it with the Clerk of the Court through the CM/ECF system, which will provide electronic notice and a link to this document to all counsel of record.

DATED: March 30, 2023                    Respectfully submitted,

*/s/ Alexander J. Halaska*
ALEXANDER J. HALASKA
Senior Litigation Counsel
U.S. Department of Justice

*Counsel for the Government*

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that this brief complies with Federal Rules of Appellate Procedure 32(a)(4) and 32(a)(5) because it is double-spaced, has margins of at least one inch on all four sides, and uses proportionally spaced, 14-point Times New Roman font; and that this brief complies with the type-volume limitation of Ninth Circuit Rule 28.1-1(b) and this Court's Order of November 7, 2022 (Dkt. 1-3) because it contains 13,920 words, including headings and footnotes, as measured by the word processing application used to prepare this brief.

DATED: March 30, 2023              Respectfully submitted,

                                   */s/ Alexander J. Halaska*
                                   ALEXANDER J. HALASKA
                                   Senior Litigation Counsel
                                   U.S. Department of Justice

                                   *Counsel for the Government*