Nos. 22-55988, 56036

---

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

AL OTRO LADO, INC., *et al.*,
*Plaintiffs-Appellees/Cross-Appellants*,

v.

ALEJANDRO MAYORKAS, Secretary of Homeland Security, *et al.*
*Defendants-Appellants/Cross-Appellees*,

and

the EXECUTIVE OFFICE FOR IMMIGRATION REVIEW,
*Appellant/Cross-Appellee.*

---

On Appeal from a Final Judgment Issued by the U.S. District Court for the
Southern District of California (Civil Action No. 3:17-cv-02366-BAS-KSC)

---

## FURTHER EXCERPTS OF RECORD

---

BRIAN M. BOYNTON
Principal Deputy Assistant
Attorney General

WILLIAM C. PEACHEY
Director

KATHERINE J. SHINNERS
Senior Litigation Counsel

ALEXANDER J. HALASKA
Senior Litigation Counsel
U.S. Department of Justice
Civil Division
Office of Immigration Litigation -
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 307-8704 | Fax: (202) 305-7000
Email: alexander.j.halaska@usdoj.gov

*Counsel for the Government*

## INDEX

| Document | Filing Date | D. Ct. Dkt. No. | FER No. |
|---|---|---|---|
| Plaintiffs' Reply in Support of Their Motion for Summary Judgment | 10/30/2020 | 610 | 4 |
| Plaintiffs' Opposition to Defendants' Cross-Motion for Summary Judgment | 10/16/2020 | 585 | 33 |
| Memorandum in Support of Defendants' Cross-Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment | 09/25/2020 | 563-1 | 70 |
| Memorandum from John Roth, Inspector General, U.S. Department of Homeland Security<br><br>*Exhibit 33 to Defendants' Motion for Summary Judgment* | 09/25/2020 | 563-35 | 141 |
| Plaintiffs' Memorandum of Points and Authorities in Support of Their Motion for Summary Judgment | 09/04/2020 | 535-1 | 157 |
| Excerpts from the Report of Stephanie Leutert<br><br>*Exhibit 20 to Plaintiffs' Motion for Summary Judgment* | 10/13/2021<br><br>*Original sealed version filed 09/04/2020* | 772-6<br><br>*Original sealed version filed at 535-23* | 205 |
| Email from Todd C. Owen, "RE: Credible Fear Influx Spot Report" (May 25, 2016) | 09/30/2021<br><br>*Original sealed* | 767-14<br><br>*Original sealed version filed at 535-36* | 214 |

| | | | |
|---|---|---|---|
| *Exhibit 34 to Plaintiffs' Motion for Summary Judgment* | *version filed 09/04/2020* | | |
| Email from Robert W. Hood, "Actions Taken for Influx of Haitians" (May 26, 2016)<br><br>*Exhibit 35 to Plaintiffs' Motion for Summary Judgment* | 09/30/2021<br><br>*Original sealed version filed 09/04/2020* | 767-15<br><br>*Original sealed version filed at 535-37* | 218 |
| Email from Moises Castillo, "RE:SYS AEU movement and pass down for 5/27/2016 1400-2200" (May 28, 2016)<br><br>*Exhibit 43 to Plaintiffs' Motion for Summary Judgment* | 09/30/2021<br><br>*Original sealed version filed 09/04/2020* | 767-20<br><br>*Original sealed version filed at 535-45* | 221 |
| Email from Kevin K. McAleenan, "RE: Metering in TX" (Nov. 11, 2016)<br><br>*Exhibit 69 to Plaintiffs' Motion for Summary Judgment* | 09/04/2020 | 535-71 | 226 |
| Excerpts from the Transcript of the Deposition of Samuel Cleaves (May 20, 2020)<br><br>*Exhibit 102 to Plaintiffs' Motion for Summary Judgment* | 10/13/2021<br><br>*Original redacted version filed 09/04/2020* | 772-9<br><br>*Original redacted version filed at 535-104* | 229 |
| Order Granting in Part and Denying in Part Defendants' Motion to Dismiss the Complaint | 08/20/2018 | 166 | 241 |

1  MAYER BROWN LLP
     Matthew H. Marmolejo (CA Bar No. 242964)
2    *mmarmolejo@mayerbrown.com*
   350 S. Grand Avenue
3  25th Floor
   Los Angeles, CA 90071-1503
4    Ori Lev (DC Bar No. 452565)
     (*pro hac vice*)
5    *olev@mayerbrown.com*
     Stephen M. Medlock (VA Bar No. 78819)
6    (*pro hac vice*)
     *smedlock@mayerbrown.com*
7  1999 K Street, N.W.
   Washington, D.C. 20006
8  Telephone:  +1.202.263.3000
   Facsimile:   +1.202.263.3300
9
   SOUTHERN POVERTY LAW CENTER
10   Melissa Crow (DC Bar No. 453487)
     (*pro hac vice*)
11   *melissa.crow@splcenter.org*
   1101 17th Street, N.W., Suite 705
12 Washington, D.C. 20036
   Telephone: +1.202.355.4471
13 Facsimile: +1.404.221.5857

14 *Additional counsel listed on next page*
   *Attorneys for Plaintiffs*
15
                   **UNITED STATES DISTRICT COURT**
16
                  **SOUTHERN DISTRICT OF CALIFORNIA**
17

18 Al Otro Lado, Inc., *et al.*,          Case No.:  17-cv-02366-BAS-KSC

19           Plaintiffs,                    **PLAINTIFFS' REPLY IN SUPPORT
                                            OF THEIR MOTION FOR
20      v.                                  SUMMARY JUDGMENT**

21 Chad F. Wolf,[1] *et al.*,
                                            Special Briefing Schedule Ordered (*see*
22           Defendants.                    Dkt. 518)

23
                                            **NO ORAL ARGUMENT UNLESS
24                                          REQUESTED BY THE COURT**

25 ────────────────────
   [1] Defendants have represented that Mr. Wolf is the Acting Secretary of the U.S.
26 Department of Homeland Security. Numerous courts disagree. *Casa de Md., Inc. v.
   Wolf*, 2020 WL 5500165, at *23 (D. Md. 2020); *Immigrant Legal Res. Ctr. v. Wolf*,
27 2020 WL 5798269, at *7-9 (N.D. Cal. 2020); *N.W. Immigrant Rts. Project v. USCIS*,
   2020 WL 5995206, at *24 (D.D.C. 2020).
28
                                            REPLY  IN SUPP. OF PLTFS'
                                            MOT. TO EXCLUDE

CENTER FOR CONSTITUTIONAL RIGHTS
    Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
    *bazmy@ccrjustice.org*
    Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
    *gschwarz@ccrjustice.org*
    Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
    *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
    Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
    *sarah.rich@splcenter.org*
    Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
    *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
    Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
    *kwalters@immcouncil.org*
1331 G St. N.W., Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

REPLY  IN SUPP. OF
PLTFS' MOT S.J.

## TABLE OF CONTENTS

**PAGE**

I.     INTRODUCTION ......................................................................... 1

II.    THE DHS OIG REPORT ENDS THIS CASE .............................. 2

III.   DEFENDANTS IGNORE FACTS THAT UNDERMINE THEIR
       CASE ........................................................................................... 3

       A.     Defendants Ignore What Actually Occurred in May 2016 ................. 4

       B.     Defendants' Pattern of Refusing to Process Asylum Seekers ............ 6

       C.     Defendants Continued to Turnback Asylum Seekers in 2017 ............ 7

       D.     The April 2018 Migrant Caravan Never Materialized ....................... 8

       E.     The Turnback Policy Is Costly and Dangerous .................................. 9

       F.     Defendants Rely on Self-Contradictory Arguments .......................... 10

IV.    EVEN IF DEFENDANTS ARE CORRECT THAT TURNBACKS
       ARE A DELAY RA, THAT DELAY IS UNREASONABLE .................. 10

V.     PLAINTIFFS ARE ENTITLED TO THE RELIEF THEY SEEK ............. 15

       A.     The Court Should Enter a Permanent Injunction .............................. 16

       B.     Vacatur is Not Appropriate or Sufficient Relief .............................. 16

       C.     Plaintiffs Meet the Remaining Factors for Injunctive Relief ............ 17

       D.     8 U.S.C. § 1252(f)(1) Does Not Bar Relief ...................................... 19

       E.     The Court Should Enter Declaratory Relief ...................................... 20

VI.    CONCLUSION ............................................................................ 20

FER-0006

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Ali v. Ashcroft,*
    346 F.3d 873 (9th Cir. 2003) ............................................................ 19

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) ......................................................................... 3

*Asmai v. Johnson,*
    182 F. Supp. 3d 1086 (E.D. Cal. 2016) ........................................... 12

*In re Barr Labs., Inc.,*
    930 F.2d 72 (D.C. Cir. 1991) ........................................................... 15

*In re Community Voice,*
    878 F.3d 779 (9th Cir. 2017) ........................................................... 14

*Cutler v. Hayes,*
    818 F.2d 879 (D.C. Cir. 1987) .................................................... 14, 15

*Day v. D.C. DCRA*
    191 F. Supp. 2d 154 (D.D.C. 2002) ................................................ 17

*EBSC v. Trump,*
    932 F.3d 742 (9th Cir. 2018) ........................................................... 18

*GEICO v. Dizol,*
    133 F.3d 1220 (9th Cir. 1998) ......................................................... 20

*Hong Wang v. Chertoff,*
    550 F. Supp. 2d 1253 (W.D. Wash. 2008) ...................................... 12

*Indep. Mining Co. v. Babbitt,*
    105 F.3d 502 (9th Cir. 1997) ...................................................... 11, 15

*Innovation Law Lab v. Wolf,*
    951 F.3d 1073 (9th Cir. 2020) ......................................................... 17

*LaDuke v. Nelson,*
    762 F.2d 1318 (9th Cir. 1985) ......................................................... 17

REPLY  IN SUPP. OF
PLTFS' MOT S.J.

ii

### TABLE OF AUTHORITIES
#### (Continued)

**Page(s)**

*Latifi v. Neufeld*,
   2015 WL 3657860 (N.D. Cal. 2015)................................................................. 14

*League of Women Voters of U.S. v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016)............................................................................ 18

*McGraw-Edison Co. v. Preformed Line Products Co.*,
   362 F.2d 339 (9th Cir. 1966).......................................................................... 20

*Mugumoke v. Curda*,
   2012 WL 113800 (E.D. Cal. 2012) ................................................................. 14

*Nken v. Holder*,
   556 U.S. 418 (2009) ....................................................................................... 18

*Orantes-Hernandez v. Thornburgh*,
   919 F.2d 549 (9th Cir. 1990).......................................................................... 16

*Rodriguez v. Hayes*,
   591 F.3d 1105 (9th Cir. 2010)................................................................... 19, 20

*Santillan v. Gonzales*,
   388 F. Supp. 2d 1065 (N.D. Cal. 2005) .......................................................... 13

*Scott v. Harris*,
   550 U.S. 372 (2007) ..................................................................................... 3, 10

*Sierra Club v. Trump*,
   963 F.3d 874 (9th Cir. 2020).......................................................................... 17

*Singh v. Napolitano*,
   909 F. Supp. 2d 1164 (E.D. Cal. 2012)........................................................... 14

*Torres v. U.S. Dep't of Homeland Sec.*,
   411 F. Supp. 3d 1036 (C.D. Cal. 2019)........................................................... 19

*Tufail v. Neufeld*,
   2016 WL 1587218 (E.D. Cal. 2016) ............................................................... 14

**Statutes**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

REPLY  IN SUPP. OF PLTFS'
MOT. TO EXCLUDE

**TABLE OF AUTHORITIES**
(Continued)

Page(s)

6 U.S.C. § 211(c) ..................................................... 18

8 U.S.C. § 1225(b) ............................................. 19, 20

8 U.S.C. § 1252(f)(1) .......................................... 19, 20

**Other Authorities**

Caitlin Dickerson, *Inside the Refugee Camp on America's Doorstep*,
  N.Y. Times (Oct. 25, 2020) ................................... 9

Fed. R. Civ. P. 53(a)(1)(C) ....................................... 18

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

iv

REPLY  IN SUPP. OF PLTFS'
MOT. TO EXCLUDE

1

## CITATION FORM

2   "CBP" refers to U.S. Customs and Border Protection.

3   "CM" refers to Defendants' Cross-Motion for Summary Judgment (Dkt. 563).

4   "CM Opp." refers to Plaintiffs' Opposition to Defendants' Cross-Motion for

5   Summary Judgment (Dkt. 585).

6   "CM Opp. Ex." refers to the exhibits attached to Plaintiffs' Opposition to

7   Defendants' Cross-Motion for Summary Judgment (Dkt. 585).

8   "DHS" refers to the U.S. Department of Homeland Security.

9   "Ex." refers to the exhibits attached to the Declaration of Stephen Medlock filed

10   concurrently with this reply brief.

11   "INA" refers to the Immigration and Nationality Act.

12   "OFO" refers to CBP's Office of Field Operations.

13   "Op. Br." refers to Plaintiffs' Opening Brief in Support of their Motion for

14   Summary Judgment (Dkt. 533).

15   "Op. Ex." refers to the exhibits attached to Plaintiffs' Opening Brief in Support of

16   their Motion for Summary Judgment (Dkt. 533).

17   "POE" refers Class A ports of entry on the U.S.-Mexico border.

18

19

20

21

22

23

24

25

26

27

28

REPLY  IN SUPP. OF
PLTFS' MOT S.J.

v

FER-0010

## I.   INTRODUCTION

As a report issued this morning by DHS' Office of Inspector General ("OIG") makes clear, Plaintiffs caught the Government red-handed. *See* Ex. 1. Unrebutted evidence that OIG has now corroborated shows that when asylum seekers were in the process of arriving at POEs, CBP officers lied to them. Under instructions from their superiors, CBP officers told asylum seekers that POEs were "at capacity" when those POEs were actually operating well below 100% capacity. Rule 30(b)(6) witnesses admitted that these asylum seekers were attempting to enter the U.S. Therefore, they should have been inspected and processed as the INA requires.

Defendants' turnback policy had the intent and effect of turning back asylum seekers and denying them access to the asylum process. The Secretary of DHS requested information on how many asylum seekers would be turned back at POEs if a memorandum that memorializes certain aspects of the turnback policy were implemented. After learning that 650 asylum seekers per day would be turned back, she issued the memo. Ex. 1 at 6.

In addition, ███████████████████████████████████████ ████████████████████████████████████████████████. The reason for this decision is obvious. Defendants believed that processing asylum seekers more efficiently would undermine the purpose of the turnback policy by creating a "pull factor" that would cause more asylum seekers to arrive at POEs. As a result, they ████████████████████████████████████████████████ ██████████████████████████████████.

Defendants also admitted that their actions broke the law. In a flagrant violation of the law, Defendants routinely turned back asylum seekers who were standing on U.S. soil. And, behind closed doors, POE leadership told union officials that all turnbacks broke the law. *See* Ex. 1 at 17 ("I know from what came down from [CBP] HQ, we are trying to process the least amount of people.").

REPLY  IN SUPP. OF
PLTFS' MOT S.J.

1    Amazingly, Defendants' primary response—that they simply made inspecting
2    and processing asylum seekers a lower priority—*is itself a violation of law*.
3    Defendants repeatedly admitted that they were diminishing inspection and
4    processing of asylum seekers by making it a subordinate priority.

5    What is going on here is a shocking abuse of power by the Executive Branch
6    and abdication of Defendants' statutory and international law obligations.
7    Defendants claim that they alone have the discretion to decide when to inspect and
8    process an asylum seeker, and how many asylum seekers will be inspected and
9    processed. That is not true. In the INA and Homeland Security Act, Congress gave
10   Defendants specific instructions about when and how asylum seekers were to be
11   inspected and processed and the level of priority that should be given to that mission.

12   The goal of the turnback policy is to end asylum. Defendants' core argument
13   is that, despite clear statutory language, they alone have the discretion to end asylum
14   as we know it by standing astride the border and blocking access to the U.S. and to
15   the asylum process no matter what other missions they have and no matter what the
16   true facts are on the ground. Defendants argue that as long as POEs want to focus on
17   other missions, Defendants can process zero asylum seekers every day and this Court
18   can do nothing about it. That is not, and never has been, what the law says.

19   Plaintiffs are entitled to summary judgment on that basis alone. In this brief,
20   Plaintiffs address the remaining chaff in Defendants' opposition brief. First, the OIG
21   report is powerful evidence that Defendants broke the law. Second, Plaintiffs explain
22   why Defendants' cherry-picked factual recitation is wrong. Third, even if turnbacks
23   can be characterized as delay rather than denial of a mandatory duty, application of
24   the *TRAC* factors shows that delay is unreasonable. Finally, this Court can, and
25   should, enter declaratory and injunctive relief.

26   **II.    THE DHS OIG REPORT ENDS THIS CASE**

27   This morning, DHS OIG issued a report that puts the lie to all of Defendants'
28   factual arguments. In the blockbuster report, OIG concludes that "while DHS

REPLY  IN SUPP. OF
PLTFS' MOT S.J.

2

1    leadership urged asylum seekers to present themselves at [POEs], the agency took

2    deliberate steps to limit the number of undocumented aliens who could be processed

3    each day at the Southwest Border [POEs]." Ex. 1 at 10. According to the report,

4    Defendants "stopped the routine processing of . . . asylum seekers . . . at 7 of the 24"

5    POEs. *Id.* Asylum seekers that presented themselves for inspection at those POEs

6    were told to return to Mexico and were forced to walk miles through harsh terrain to

7    place themselves on a waitlist with hundreds of others. *Id.* at 12-13. Moreover, at

8    four POEs, CBP officers regularly turned back asylum seekers that had already

9    crossed the international border and entered the U.S. *Id.* at 15. Furthermore, using

10   the *exact same methodology* as Plaintiffs' expert, Stephanie Leutert, OIG concluded

11   that although increasing numbers of asylum seekers were waiting to be inspected

12   and processed in Mexico, POEs "were not using all available detention space." *Id.*

13   And OIG directly observed detention cells sitting empty while POEs were

14   continuing to turn back asylum seekers. *Id.* at 17. OIG also discounted DHS'

15   operational capacity excuse, stating "our evidence . . . indicates that [CBP] used

16   these reasons regardless of the port's actual capacity and capability." *Id.* at 20. As

17   the OIG concludes: "The law does not set limits as to the number of asylum seekers

18   the Government can or must process. Nevertheless, the [DHS] Secretary and CBP

19   have effectively limited access for undocumented aliens wishing to claim asylum in

20   the United States, sometimes without notice to the public." *Id.* at 19. This remarkable

21   admission ends this case. Defendants' own Inspector General has confirmed all of

22   Plaintiffs' substantive factual arguments are true. Summary judgment should be

23   issued in Plaintiffs' favor.

24   **III.    DEFENDANTS IGNORE FACTS THAT UNDERMINE THEIR CASE**

25         Defendants mischaracterize the record in an effort to manufacture disputed

26   facts where none exist. "[T]he mere existence of some alleged factual dispute

27   between the parties will not defeat an otherwise properly supported motion for

28   summary judgment; the requirement is that there can be no *genuine* issue of *material*

REPLY  IN SUPP. OF
PLTFS' MOT S.J.

FER-0013

1    fact." *Scott v. Harris*, 550 U.S. 372, 380 (2007). "Factual disputes that are irrelevant

2    or unnecessary" do not count. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

3    (1986). Plaintiffs have explained why every turnback is illegal regardless of the

4    excuse for it, Op. Br. at 18-25; CM Opp. at 1-4, and will not belabor that point here.

5    In addition, Defendants' attempt to excuse their conduct have no factual support.

6    The record shows that (a) the decision to start turning back asylum seekers in 2016

7    was caused by media pressure, not the number of arriving noncitizens; (b) the

8    decision to expand metering had nothing to do with the number of noncitizens

9    arriving at Texas POEs; (c) turnbacks continued in 2017, when there were no

10   capacity concerns at POEs; (d) Defendants' concerns about the April 2018 migrant

11   caravan were overblown; and (e) the turnback policy is costly and dangerous.

12   **A.    Defendants Ignore What Actually Occurred in May 2016**

13   Defendants claim that their actions were justified because they were dealing

14   with a "sustained and overwhelming surge of undocumented" noncitizens, and that

15   by late May 2016 the San Ysidro POE simply could not hold any more noncitizens

16   and started turning back asylum seekers. *See* CM at 1-3, 11. That is not true. In late

17   May 2016, CBP officials on the ground at the San Ysidro POE repeatedly explained

18   the steps that they were taking to deal with an uptick in arriving noncitizens at the

19   port and their future plans for doing so. ███████████████████████████████

20   ████████████████. *See, e.g.*, Op. Ex. 34 (█████████████████████████

21   ███████████████████████████████████████████████████████

22   ██████████████); Op. Ex. 39 (████████████████████████████████

23   ██████████████████████); Op. Ex. 38 (█████████████████████████

24   ███████████████████████████████████████████████████████);

25   Ex. 2 (███████████████████████████████████████████████████

26   ████████████████████████████████████). However, on May 25,

27   2016, Pete Flores, the Director of Field Operations for OFO's San Diego Field

28   Office, told Todd Owen, then the Executive Assistant Commissioner of OFO, that

REPLY  IN SUPP. OF
PLTFS' MOT S.J.

4

1   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

2   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 3. For his part, Todd Owen, the head of

3   OFO, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

4   ▮▮▮▮▮▮▮▮ *Id.*

5   A day later, their nightmare came true—a day before Donald Trump, then the

6   presumptive Republican nominee for President, was scheduled to hold a campaign

7   rally in San Diego,[2] OFO's San Diego Field Office ▮▮▮▮▮▮▮▮▮

8   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

9   ▮ Ex. 4; Ex. 5. A reporter sent CBP questions concerning ▮▮▮▮▮▮

10  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ many of

11  whom "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" She

12  informed CBP that she would be "writing an article" in the near future. Op. Ex. 40

13  at 872. Members of California's Congressional delegation also knew that ▮▮▮

14  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

15  ▮▮▮▮ Op. Ex. 40 at 870; Ex. 6; Ex. 7.

16  On May 26, 2016, the San Diego Union-Tribune published a story entitled

17  "Surge of Haitians at San Ysidro Port of Entry." The story noted that "more than

18  200 people were crowded inside the port's pedestrian entrance," even though the

19  San Ysidro POE had the ability to "process close to 25,000 northbound pedestrians

20  a day."[3] This story got the attention of senior DHS officials, ▮▮▮▮▮▮

21  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Ex. 8 at 631.

22  This was the breaking point for Defendants. They did not want to deal with

23  the media attention at the San Ysidro POE. On May 26, 2016, Pete Flores forwarded

24  an email chain regarding ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

25  ▮▮▮▮▮▮▮ to Sidney Aki, the Port Director of the San Ysidro POE. Ex. 9 at

26  _____

27  [2] *See, e.g.*, https://www.youtube.com/watch?v=tl5CJy1Fijc.

28  [3] https://www.sandiegouniontribune.com/news/border-baja-california/sdut-haitians-flood-san-ysidro-port-entry-2016may26-story.html.

REPLY IN SUPP. OF
PLTFS' MOT S.J.

1   354. Mr. Flores told Mr. Aki: " ████████████████████████████████

2   ████████████" *Id.* Mr. Aki responded: "█████" *Id.*; Ex. 10. Mr. Aki told his deputies:

3   "████████████████████████████████████████████████████████████

4   ███████████████████████████████" Op. Ex. 41. As Mr. Aki requested,

5   on May 27, 2016, the San Ysidro POE took steps to ██████████████████

6   ████████████████████████████████████████████████████████████

7   ██████████████. *See, e.g.*, Op. Ex. 43.

8          Therefore, it was *media attention*, not increased numbers of undocumented

9   noncitizens, that caused the San Ysidro POE to begin turning back asylum seekers.

10  Defendants wanted those asylum seekers out of sight and out of mind. *See, e.g.*, Ex.

11  1 at 10 ("We are hoping this thing just goes away."). They also did not want to send

12  a message that the San Ysidro POE had an efficient system for inspecting and

13  processing asylum seekers, because that might be a "pull factor" for future

14  immigration. *See* Op. Ex. 1 at 155:14-16 (Defendants refused to process asylum

15  seekers because "[t]he more you process, the more will come.").

16          **B.    Defendants' Pattern of Refusing to Process Asylum Seekers**

17          Defendants claim that it is mere happenstance that they decided to abandon

18  plans to open processing centers for undocumented noncitizens. *See* CM at 18. Not

19  so—it was, in fact, part of a pattern of refusing to efficiently process asylum seekers

20  for fear of "pulling" more of them to the border. On May 27, 2016, ███████████

21  ████████████████████████████████████████████████████████████

22  ████████████████████████████████████████████████████████████

23  ██████████████████████████████████████████████. Ex. 11; Ex.

24  12 at 828. ████████████████████████████████████████████████

25  ████████████████████████████████████████████████████████████

26  ████████████████████████████████████████████████████████████

27  ████████████████████████████████████████. Ex. 12 at 828. Because

28  Defendants were afraid that efficiently processing asylum seekers would be a "pull

6

1    factor," they repeatedly refused to implement plans to inspect and process asylum

2    seekers more efficiently. In November 2016, █████████████████████████████

3    ████████████████████████████████████████████████████████████████

4    ██████████████████████████████████████ Op. Br. 9-11. ██████

5    ████████████████████████████████████████████████████████████████

6    ███████████ Op. Ex. 3 at 69:12-70:2 (Hidalgo POE ███████████████

7    ████████████). Then, when the leadership of OFO's San Diego Field Office

8    ████████████████████████████████████████████████████████████████

9    ████████████, DHS Secretary Kirstjen Nielsen ordered ███████████████

10   █████████████ See, e.g., Op. Ex. 109 at 473-474; Op. Ex. 110; Op. Ex. 111.

11   Defendants' attempt to isolate and explain away these incidents makes no sense.[4]

12       **C.    Defendants Continued to Turnback Asylum Seekers in 2017**

13       Defendants claim that the "surge" of undocumented noncitizens arriving at

14   POEs ended in 2017 and that turnbacks ended "for the most part" shortly thereafter.

15   Opp. at 3, 21. Not so. CBP officers turned back asylum seekers at POEs in 2017.

16   *See, e.g.*, Op. Ex. 8 at 043 (January 2, 2017); Ex. 14 (January 26, 2017); Ex. 15

17   (February 6, 2017); Ex. 16 at 388 (February 2017 ███████████████████████

18   ████████████████████████); Ex. 17 (April 1, 2017); Op. Ex. 52 (DHS

19   received ████████████████████████████████████████); Ex. 18

20   (April 10, 2017); Ex. 19 (██████████████████████████████████████

21

---

22   [4] It is incorrect that "████████" caused the closure of El Centro. *See* CM at 18. The
     head of CBP's Crisis Action Team noted that ██████████████████████████████

23   ███████. Ex. 13 at 878. Furthermore, Defendants' excuse for closing the Nogales
     Facility makes no sense. ███████████████████████████████████████████

24   ████████████████████████ CM at 18. ████████████████████████████

25   ████████████████████████████████████████████. Op. Ex. 61 at 530. The only
     significant change between November 4, 2016, when the Nogales Facility was on

26   the path to opening, and November 15, 2016 when it was placed on hold, was that
     Donald Trump had been elected President and OFO had rolled out turnbacks border-

27   wide. *See* Op. Br. at 10-11. ████████████████████████████████████████

28   ████████████. *See* CM at 20.

REPLY IN SUPP. OF
PLTFS' MOT S.J.

FER-0017

1  ██████████████████████████████); Ex. 20  (May 12, 2017); Ex. 21 (May 18,

2  2017); Ex. 22 at 395 (August 26, 2017); Ex. 23 at 411 (December 5, 2017); Ex. 24

3  (December 7, 2017); Ex. 25 (December 8, 2017);  Ex. 26 (December 9, 2017); Ex.

4  27 (December 11, 2017); Ex. 28 (December 12, 2017); Ex. 29 (December 15, 2017);

5  Ex. 30 (December 17, 2017); Ex. 31 at 450 (December 18, 2017). And those exhibits

6  are a drop in the bucket. It is simply not true that Defendants stopped turning back

7  asylum seekers in 2017. They kept turning back asylum seekers because the turnback

8  policy has nothing to do with the capacity of POEs. *See* Ex. 38 at ¶¶ 22, 102-23; Ex.

9  1 at 16 (San Luis POE staff admitted "they could process more asylum seekers than

10  they were processing").

11      **D.**    **The April 2018 Migrant Caravan Never Materialized**

12         Defendants claim that CBP's April 2018 metering guidance was issued in

13  response to a fast-approaching migrant caravan that would overwhelm POEs. *See*

14  CM at 22-23. But Defendants ignore their own data. From late March until late April

15  2018, ███████████████████████████████. *See, e.g.*, Ex. 32. That

16  data shows that ████████████████████████████████████████.

17  On March 31, 2018, █████████████████ Op. Ex. 80 at 793. By

18  April 22, 2018, ████████████████████. *Id.* at 784. A

19  day later, on April 23, 2018, there were only "██████████████" in the group.

20  *Id.* at 783. These ███ asylum seekers did not even reach Tijuana at the same time.

21  *Id.* The Mexican government saw to it that caravan members "████████████

22  ████████████████████████████████████████" *Id.* Many of

23  the asylum seekers who reached Tijuana █████████████ were not even able

24  to make it to the border. *Id.* Mexican authorities set up "███████████████

25  ██████████████████████" *Id.* That is why, by April 29, 2018,

26  "█████████████████████████████" Ex. 33 at 694. Even

27  though the April 2018 migrant caravan was dispersed and would clearly pose *no*

28  logistical challenges to POEs, Defendants persisted with their plan to memorialize

8

REPLY  IN SUPP. OF<br/>PLTFS' MOT S.J.

1  the turnback policy on April 27, 2018 and enforced that policy. *See* Op. Ex. 82.

2      **E.**    **The Turnback Policy Is Costly, Dangerous, and Illegal**

3      Defendants claim that the turnback policy was "successful." CM at 4. The

4  thousands of class members living in unofficial refugee camps on the Mexican side

5  of the border beg to differ.[5]



15  Under the turnback policy, CBP officers lied, and asylum seekers died. Op. Br. at

16  16-18, 26-27. Anyone who calls that a "success" needs to open a dictionary.

17      Even measured by other standards, the turnback policy is a terrible idea. CBP

18  officers repeatedly complained that it put their safety at risk. *See, e.g.*, Op. Ex. 1 at

19  172:14-17; Op. Ex. 3 at 149:23-150:1. Because "[t]he safety of CBP employees" is

20  supposed to be "paramount during all aspects of CBP operations," CM Ex. 59 at

21  044, these safety flaws should have doomed the turnback policy from the start.

22      Moreover, turning back asylum seekers at the limit line between the U.S. and

23  Mexico created a new problem at POEs—so-called ▮▮▮▮▮▮▮▮▮" Op. Ex. 14 at

24  189:6-191:20. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

25  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.* at 198:25-

26

27  _____
[5] Caitlin Dickerson, *Inside the Refugee Camp on America's Doorstep*, N.Y. Times
28  (Oct. 25, 2020), https://www.nytimes.com/2020/10/23/us/mexico-migrant-camp-asylum.html.

REPLY  IN SUPP. OF
PLTFS' MOT S.J.

1   199:16. This meant that CBP had to ████████████████████████████

2   ████████████████. Ex. 34. As a result, ████████████████████████

3   ████████████████████. *See, e.g.*, Ex. 35 at 190-191; Ex. 36 at 277 ("█████

4   ████████████████████████████████████████████████████

5   ████████"); Ex. 37 ("████████████████████████████████

6   ████████████████████████"). So, sure, the turnback policy was a wild

7   "success"—all you need to do is ignore the fact that it killed and endangered asylum

8   seekers, cost more money, placed CBP officers in harm's way, and broke the law.

9        **F.**    **Defendants Rely on Self-Contradictory Arguments**

10        In addition to getting the facts wrong, Defendants' view of the facts is self-

11   contradictory. A chief example of this is how Defendants cite CBP's capacity data.

12   When Defendants believe that POEs had high capacity utilization numbers,

13   Defendants cite those documents as a justification for turning back asylum seekers.

14   *See* CM at 15. But when POEs reported low capacity utilization numbers,

15   Defendants argue that those figures are meaningless because "[a] port's capacity to

16   hold individuals is not a fixed number," CM at 24, and the figures are therefore

17   incomplete and inaccurate. *Id.* These figures are either meaningful or meaningless,

18   but Defendants cannot have it both ways. And "capacity" is certainly not a one-way

19   ratchet. Defendants focus on factors constraining capacity ignores ways that they

20   could expand their capacity by utilizing U.S. Border Patrol stations and soft-sided

21   facilities. Therefore, Defendants' attempt to conjure factual disputes is not genuine.

22   It cannot defeat summary judgment. *See Scott*, 550 U.S. at 380 ("When opposing

23   parties tell two different stories, one of which is blatantly contradicted by the record,

24   so that no reasonable jury could believe it, a court should not adopt that version of

25   the facts for purposes of ruling on a motion for summary judgment.").

26   **IV.**   **EVEN IF DEFENDANTS ARE CORRECT THAT TURNBACKS ARE**
27         **A DELAY, THAT DELAY IS UNREASONABLE**

28        Plaintiffs maintain that turnbacks amount to unlawful withholding of a

REPLY IN SUPP. OF
PLTFS' MOT S.J.

1   mandatory duty in every instance, but Plaintiffs are entitled to summary judgment

2   on their APA § 706(1) claim even if Defendants are correct in characterizing

3   turnbacks as "[a]t most, agency action [that] is delayed." CM at 40. Such delays are

4   unreasonable across the board under the "*TRAC* factors." *See Indep. Mining Co. v.*

5   *Babbitt*, 105 F.3d 502, 507 & n.7 (9th Cir. 1997) (citing *Telecomms. Research &*

6   *Action Ctr. v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984)).[6] Based on the undisputed facts,

7   the *TRAC* analysis weighs heavily in Plaintiffs' favor.

8   **Factor 1:**  When and whether a metered asylum seeker will ever be processed

9   under the turnback policy is an arbitrary decision made in a black box and is not

10  based on a "rule of reason." Wait times for metered asylum seekers have ranged

11  from days to many months, ███████████████████████████. CM Opp.

12  Exs. 6-7; Op. Ex. 100 at 247:2-5. Various features of the turnback policy make clear

13  the arbitrary nature of these inspection delays. Defendants require asylum seekers to

14  use a waitlist system operated by third parties in Mexico, but do not know how the

15  system works or even *if* it works, or how long the delay might take. Op. Ex. 14 at

16  108:1-5 ("████████████████████████████████████████████████████

17  ████████████████████████████████████████████████████████████

18  ████████████████████████████████████████████████████████████

19  ████████████████████"); Op. Ex. 17 at 301:13-16 ("C███████████████

20  ████████████████████████████████████████████████████████████

21  ████████████████████████████████████████████████████████████

22  ████████████████"). Defendants merely inspect and process the number of

23  _____

24  [6] The *TRAC* factors are: (1) whether the agency's timeline is governed by a "rule of reason"; (2) whether "Congress has provided a timetable or other indication of the speed

25  with which it expects the agency to proceed in the enabling statute"; (3) & (5) (usually considered together) the "nature and extent of the interests prejudiced by the delay," with

26  delays "that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake"; (4) "the effect of expediting delayed action

27  on agency activities of a higher or competing priority"; and (6) whether the agency acted in bad faith, though bad faith is not necessary to find a delay unreasonable. *Id.* at 507

28  n.7.

FER-0021

1    individuals Defendants requested from Mexican officials that day (if they requested

2    any at all). *See* Op. Ex. 4 at 171:7-13. But there is no guarantee that operation of the

3    waitlists is not completely arbitrary—that Mexican officials will follow the order on

4    the lists, Dkt. 591-1 ¶¶ 8-10, or that all class members will even be allowed to utilize

5    the lists, Dkt. 390-101 ¶¶ 12-13. Class members are thrown to the proverbial

6    wolves—turned back, told to participate in an opaque, informal waitlist "process"

7    that may or may not return them to the POE for processing and inspection, and left

8    to survive on their own in the interim.[7] "The 'rule' appears to be that once"

9    Defendants prevent an asylum seeker from accessing the POE, they "abdicate[]

10   responsibility for" what happens next. *Hong Wang v. Chertoff*, 550 F. Supp. 2d 1253,

11   1259 (W.D. Wash. 2008). "Where [Defendants] ha[ve] been assigned the mandatory

12   duty to [inspect arriving noncitizens], this policy cannot be considered a 'rule of

13   reason.'" *Id.*

14          Furthermore, the "Prioritization-Based Queue Management" memos inject

15   unwarranted discretion into the decision to inspect any asylum seekers at all, which

16   in turn impacts inspection wait times. Op. Ex. 98; CM Ex. 5. Under the memos,

17   POEs "must" prioritize certain activities ahead of inspecting and processing asylum

18   seekers, after which they "have discretion to allocate resources and staffing" as they

19   wish. Op. Ex. 98; CM Ex. 5. Purporting to grant agency actors *discretion* to

20   undertake a *mandatory* duty runs counter to the principle of reasoned

21   decisionmaking; "[t]he APA is not intended to permit agencies to define the

22   reasonability of their actions by issuing their own memoranda." *Asmai v. Johnson*,

23   182 F. Supp. 3d 1086, 1095 (E.D. Cal. 2016). Merely adopting a policy to delay

24

25
_____

26   [7] Op. Ex. 14 at 234:25-235:20 (if CBP prevents an asylum seeker from crossing the
     limit line, "███████████████████████████████████████████████████

27   ███████████████████████████████████████████████████████████████████████

28   ███████████████████████████████████████████████████████████████).

                                                                    REPLY IN SUPP. OF
                                12                                   PLTFS' MOT S.J.

1   inspecting asylum seekers, as Defendants did here, is not a rule of reason. *Id.*[8]

2       **Factor 2:**  The "statutory context" strongly suggests that any delay of days,

3   weeks, or months before an asylum seeker is inspected is unreasonable. *Santillan v.*

4   *Gonzales*, 388 F. Supp. 2d 1065, 1083 (N.D. Cal. 2005). As this Court has previously

5   held, § 1225(a)(3) requires Defendants to inspect all noncitizens who are in the

6   process of arriving at a POE. Dkt. 280 at 45-46. The duty does not apply only with

7   regard to asylum seekers—it encompasses all who are "applicants for admission" or

8   "otherwise seeking admission." Inspections must occur around the time that a

9   noncitizen arrives at the POE, rather than days, weeks, or months, later.[9] And CBP

10  handily inspects nearly all of the hundreds of thousands of people subject to

11  inspection each day, in roughly the order the applicants arrive. These inspections are

12  the bread and butter of POEs' functioning, and international travel would grind to a

13  halt if such inspections did not occur as a matter of course upon arrival. If CBP

14  officers at airports delayed inspections for weeks, arriving travelers would be stuck

15  sleeping inside airports. At land borders, students would never make it to school,

16  and employees would miss work if inspections were not required at the time of

17  arrival. Indeed, Defendants never acted otherwise prior to the adoption of the

18  turnback policy. Op. Ex. 14 at 53:21-56:1 (CBP 30(b)(6) witness with 21 years of

19  service at CBP and its predecessor agency could not recall ████████████████

20  ████████████████████████████████████████████████████████

21  ██████████████). The reasonable timeframe for the statutory inspection duty must

22  be interpreted in the context of this daily hubbub at POEs that the statute is meant to

23  regulate.

24  _____

25  [8] In addition, wait times are disconnected from the actual capacity of ports of entry,
    further eroding any claim that the challenged delays are based on a rule of reason.

26  *See* Op. Br. 26-29; CM Opp. at 11-18.

27  [9] Congress's decision to create special protections for asylum seekers arriving in the
    United States—barring their expedited removal without first giving them access to
    the asylum process, § 1225(b)(1)(A)(i)-(ii)—reinforces the point that metering is

28  unreasonable because it places such individuals in danger.

FER-0023

1    **Factors 3 & 5:**  The nature and extent of the interests prejudiced by the
2    turnback policy—human life and physical well-being—cannot be overstated and
3    weigh strongly in Plaintiffs' favor. The scale of the crisis created by turnbacks has
4    been enormous, and it includes makeshift camps in Mexican border towns that lack
5    toilets and clean water, as well as human trafficking and violence against those
6    forced to wait. *See* Op. Br. at 16-18. Courts routinely find these factors weigh in
7    favor of relief based on much less serious harm. *Singh v. Napolitano*, 909 F. Supp.
8    2d 1164, 1176 (E.D. Cal. 2012) (finding this factor weighed in a petitioner's favor
9    because it involved "humanitarian concerns"—Singh was "an asylee who [was]
10   attempting to become a lawful permanent resident"); *Tufail v. Neufeld*, 2016 WL
11   1587218, at *8 (E.D. Cal. 2016) (ongoing insecurity about one's immigration status
12   weighed in favor of relief); *Latifi v. Neufeld*, 2015 WL 3657860, at *7  (N.D. Cal.
13   2015) (being required to renew work authorization ever year was a hardship
14   weighing in plaintiff's favor).

15   **Factor 4:** While Defendants argue that turnbacks are justified by a
16   discretionary decision to prioritize other activities, Defendants' own records show
17   that they routinely engaged in metering even when the processing of asylum seekers
18   was not impacting port operations. Op. Ex. 38 at ¶¶ 22, 101-23. But "[e]ven
19   assuming that [Defendants] have numerous competing priorities under the fourth
20   factor," delay may still be unreasonable when other factors weigh heavily in favor
21   of relief, and particularly when "there is a clear threat to human welfare." *In re
22   Community Voice*, 878 F.3d 779, 787 (9th Cir. 2017) (finding unreasonable delay
23   when children were "severely prejudiced" by lead poisoning, even assuming the
24   agency acted in good faith to juggle competing priorities); *Cutler v. Hayes*, 818 F.2d
25   879, 898 (D.C. Cir. 1987) ("[An agency's] plea[s] of . . . administrative convenience,
26   practical difficulty in carrying out a legislative mandate, or need to prioritize in the
27   face of limited resources . . . become less persuasive as delay progresses, and must
28   always be balanced against the potential for harm."). Furthermore, "if the only effect

REPLY  IN SUPP. OF
PLTFS' MOT S.J.

14

1  of expediting [agency action] is the loss of an authority that . . . is *ultra vires*," such

2  as turning away asylum seekers, *see* Op. Br. at 7-16, the fourth factor "does not

3  militate in [the agency's] favor." *Mugumoke v. Curda*, 2012 WL 113800, at *9 (E.D.

4  Cal. 2012).

5     ***Factor 6:***  This Court may also invalidate the turnback policy because it was

6  adopted in bad faith. While a finding of bad faith is not necessary for a court to find

7  unreasonable delay, in this case each turnback and the turnback policy are

8  unlawful—resulting in delay that is unreasonable *per se* under the *TRAC* factors

9  because turnbacks were based on a pretext and not driven by capacity constraints,

10  and are therefore the result of bad faith. *Cutler*, 818 F.2d at 898 ("If the court

11  determines that the agency delays in bad faith, it should conclude that the delay is

12  unreasonable."). Here, Defendants have "manifested bad faith . . . by singling . . .

13  out [asylum seekers] for bad treatment," based on a pretextual excuse of lack of

14  capacity, and therefore, they "will have a hard time claiming legitimacy for [their]

15  priorities." *In re Barr Labs., Inc.*, 930 F.2d 72, 76 (D.C. Cir. 1991); Op. Br. at 26-

16  29; CM Opp. 11-18.[10]

17     In addition, Defendants are not "free to make . . . administrative changes with

18  the intent to defeat the mandate of the law by making the process so slow and/or

19  cumbersome to ensure" that only a small number of asylum seekers are ever

20  processed at POEs. *Babbitt*, 105 F.3d at 510. Yet that is exactly what Defendants

21  did. Defendants engaged in turnbacks to avoid projecting a public image of an

22  efficient system for processing asylum seekers at the border, in an effort to deter

23  people from attempting to access that system. *See supra* at 3-5. This manufactured

24  delay evinces bad faith. *Babbitt*, 105 F.3d at 510.

25  **V.  PLAINTIFFS ARE ENTITLED TO THE RELIEF THEY SEEK**

26  _____

27  [10] The turnback policy was also adopted in bad faith because it is the result of long-
standing racial animus toward Haitian asylum seekers, Dkt. 600-2 at 3-19, and a
28  desire to deter all asylum seekers, Dkt. 601-2 at 3-19.

1    **A.    The Court Should Enter a Permanent Injunction**

2        The Court should enter a permanent injunction prohibiting all forms of

3    turnbacks, requiring Defendants to inspect asylum seekers as they arrive at POEs,

4    and restoring those previously metered to their legal status quo ante. Injunctive relief

5    is necessary because Defendants' turnback policy reveals "past and present

6    misconduct [that] indicates a strong likelihood of future violations." *Orantes-*

7    *Hernandez v. Thornburgh*, 919 F.2d 549, 564 (9th Cir. 1990). This "past and present

8    misconduct" consists of more than the countless individual turnbacks committed by

9    CBP officers, because Defendants chose not to memorialize the turnback policy for

10   nearly two years. *See* Op. Br. at 12-15, 36. Thus, appropriate relief for Defendants'

11   policy of denying asylum seekers access to the U.S. asylum process must address

12   not only the memorialized aspects of this policy but all the past and present practices

13   that have been used under the policy to effectuate and legitimize turnbacks. This

14   Court should not ignore the likelihood of future violations that Defendants' past

15   practice reveals, and that injunctive relief is meant to address.[11]

16   **B.    Vacatur Is Not Appropriate or Sufficient Relief**

17       Defendants' argument that vacatur is an adequate alternative remedy is

18   without merit. Tellingly, Defendants never specify *what* exactly this court could

19   vacate to provide Plaintiffs the relief they seek. Nor could they. Plaintiffs do not

20   challenge a single regulation, memo, or executive order, but rather a comprehensive

21   policy to deny asylum seekers access to the U.S. asylum process that was enacted

22   through multiple directives because Defendants decided not to memorialize their

23   illegal conduct for nearly two years. Vacating a single memorandum or directive

24   will not stop Defendants from creating new directives to achieve the same objective.

25   In fact, the uncontested facts demonstrate that since 2016, when challenges to

26

27   [11] Although Plaintiffs submit that they are entitled to injunctive and declaratory
     relief, the parties agree that briefing on the appropriate scope of the remedy
28   following the Court's ruling on the merits may be warranted. *See* CM at 58.

REPLY IN SUPP. OF
PLTFS' MOT S.J.

16

FER-0026

1    Defendants' practices of turning back asylum seekers first arose, Defendants'

2    created new directives to explain and justify these practices. *See* Op. Br. at 12-15.

3    Even after OIG suggested that CBP's decision to stop processing asylum seekers at

4    seven POEs was illegal, CBP still refused to change its conduct. Ex. 1 at 21. The

5    only way "to combat [such] a 'pattern' of illicit . . . behavior" is to prohibit all forms

6    of turnbacks and affirmatively require Defendants to inspect asylum seekers as they

7    arrive at POEs. *LaDuke v. Nelson*, 762 F.2d 1318, 1324 (9th Cir. 1985) ("[t]he

8    Supreme Court has repeatedly upheld the appropriateness of federal injunctive

9    relief" to address such patterns of behavior), *amended on other grounds by* 796 F.2d

10   309 (9th Cir. 1986). That vacatur may be an adequate remedy for certain APA

11   violations does not make it an adequate remedy for the APA violations in this case.[12]

12   **C.      Plaintiffs Meet the Remaining Factors for Injunctive Relief**

13           Plaintiffs meet all the requisite factors for permanent injunctive relief. *See*

14   *Sierra Club v. Trump*, 963 F.3d 874, 895 (9th Cir. 2020); Op. Br. 26-39; *supra* at 16.

15   *First*, Defendants do not argue that Plaintiffs have failed to show irreparable injury,

16   and therefore Defendants concede the harm. *See* CM at 58-60; *see Day v. D.C.*

17   *DCRA* 191 F. Supp. 2d 154, 159 (D.D.C. 2002). Regardless, it is uncontroversial

18   that Defendants' commission of statutory, constitutional, and international legal

19   violations that put asylum seekers in grave danger in Mexico and deny them access

20   to the U.S. asylum process constitutes irreparable harm. *See Innovation Law Lab v.*

21   *Wolf*, 951 F.3d 1073, 1093 (9th Cir. 2020) (returning non-Mexicans to Mexico where

22   they "risk substantial harm, even death" while waiting for further steps in the U.S.

23   asylum process constitutes irreparable injury).

24   _____

25   [12] The two cases Defendants cite to support their vacatur argument are inapposite.
26   *California Wilderness Coalition v. U.S. Dep't of Energy* analyzed a specific
     government study issued in violation of statutory guidelines—not a series of
     multiple directives and practices comprising an unwritten policy. 631 F.3d 1072,
27   1095 (9th Cir. 2011). *Monsanto Co. v. Geertson Seed Farms* is irrelevant because
     the Plaintiff in that case agreed that vacatur was sufficient—not so here. 561 U.S.
28   139, 165-66 (2010).

REPLY IN SUPP. OF
PLTFS' MOT S.J.

FER-0027

1      *Second*, the balance of the hardships and the public interest—which should be

2      considered together when the government is a party—weigh in favor of Plaintiffs.

3      *See Sierra Club*, 963 F.3d at 895. Without injunctive relief, class members will

4      continue to face the statutory, constitutional, and international law violations that

5      result in grave risk of serious harm and even death in Mexico. *See* Op. Br. at 26-39.

6      Defendants' hardship, even if administratively burdensome, amounts to fulfilling

7      their statutory mandate, which they are not allowed to neglect or diminish in any

8      way. Defendants direct the Court to 6 U.S.C. § 211(c), *see* CM at *passim*, which

9      requires that CBP "enforce and administer all immigration laws . . . including . . .

10     the inspection, processing, and admission of persons who seek to enter . . . the United

11     States." *Id.* § 211(c)(8)(A). Until the turnback policy, CBP fulfilled this statutory

12     mandate and processed asylum seekers in the same way they process everyone else

13     arriving at the U.S.-Mexico border; that is, in the order that they arrive. Any

14     diversion of resources or costs associated with enjoining the turnback policy and

15     returning to prior lawful practices would be hardships of Defendants' own making.

16         And, "[t]here is generally no public interest in the perpetuation of unlawful

17     agency action." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir.

18     2016); *see also EBSC v. Trump*, 932 F.3d 742, 779 (9th Cir. 2018) (the public "has

19     an interest in ensuring that 'statutes enacted by [their] representatives' are not

20     imperiled by executive fiat"). An injunction ensuring access to the U.S. asylum

21     process will "prevent[ ] [noncitizens] from being wrongfully removed, particularly

22     to countries where they are likely to face substantial harm," which is "of course" in

23     the public interest. *Nken v. Holder*, 556 U.S. 418, 436 (2009). Thus, Plaintiffs have

24     satisfied the requirements for injunctive relief and the Court should enter an

25     injunction prohibiting all forms of turnbacks, requiring Defendants to inspect asylum

26     seekers as they arrive at POEs, and restoring previously-metered asylum seekers to

27

28

FER-0028

1    the same legal status they would have had absent metering.[13]

2          **D.    8 U.S.C. § 1252(f)(1) Does Not Bar Relief**

3          Section 1252(f)(1) does not bar injunctive relief in this case, because Plaintiffs

4    seek to enforce 8 U.S.C. § 1225(a) and (b), and not to "enjoin or restrain the

5    operation of" the statute. Although § 1252(f)(1) serves to limit injunctive relief, it

6    does so only so far as an injunction would "enjoin or restrain the operation of" certain

7    removal statutes within the INA. It does not limit an injunction seeking to enjoin "a

8    violation of the statutes." *Rodriguez v. Hayes*, 591 F.3d 1105, 1120 (9th Cir. 2010);

9    *see Torres v. U.S. Dep't of Homeland Sec.*, 411 F. Supp. 3d 1036, 1050 (C.D. Cal.

10   2019) (holding that § 1252(f)(1) does not apply where the relief, "far from

11   preventing the operation of the INA, seeks to enforce its provisions").

12         Plaintiffs seek to enjoin agency action that violates Defendants' inspection

13   and processing duties under § 1225(a) and (b). *See* Op. Br. at 36-38. Where, as here,

14   Plaintiffs "seek[] to enjoin conduct that allegedly is not even authorized by the

15   statute, the court is not enjoining the operation of [the removal statutes], and §

16   1252(f)(1) therefore is not implicated." *Ali v. Ashcroft*, 346 F.3d 873, 886 (9th Cir.

17   2003), *vacated on other grounds sub nom. Ali v. Gonzales*, 421 F.3d 795 (9th Cir.

18   2005). Defendants strain to make § 1252(f)(1) apply by arguing that Plaintiffs are

19   seeking to enjoin the operation of §1225(a) and (b) "by rewriting it to apply to aliens

20   outside the United States." CM at 58. First, this mischaracterization blatantly

21   disregards this Court's prior finding that "the plain language and legislative

22   histor[y]" of § 1225(b) "support[ ] the conclusion that the statute applies to asylum

23   seekers in the process of arriving." Dkt. 330 at 5. Furthermore, because the turnback

24   policy denies the operation of § 1225(a) and (b) to those asylum seekers in the

25   process of arriving, Plaintiffs seek to enjoin a violation of the statute. Defendants

26   _____

27   [13] If questions about interpretation and implementation arise with respect to any
     permanent injunction, this Court can appointment a special master to oversee the
28   implementation of the injunction. *See* Fed. R. Civ. P. 53(a) (1)(C).

FER-0029

1    may not like the Court's prior holding, but they certainly may not buttress a failed

2    legal argument into a bar to relief. Section 1252(f)(1) "is not implicated" in this case

3    and, therefore, does not bar the injunctive relief Plaintiffs seek. *Ali*, 346 F.3d at 886.

4         **E.    The Court Should Enter Declaratory Relief**

5         In addition to injunctive relief, this Court should enter a declaratory judgment

6    that the turnback policy violates the INA, the APA, class members' procedural due

7    process rights under the Fifth Amendment, and the Alien Tort Statute.[14]

8    "[D]eclaratory relief has long been recognized as distinct in purpose from . . .

9    injunctions." *Rodriguez*, 591 F.3d at 1120; *see McGraw-Edison Co. v. Preformed*

10   *Line Products Co.,* 362 F.2d 339, 342 (9th Cir. 1966). Here, in addition to an

11   injunction prohibiting all turnbacks, a declaration from the Court that turnbacks

12   violate § 1225(b) "will serve a useful purpose in clarifying the legal relations at

13   issue" between arriving noncitizens and CBP officers. *GEICO v. Dizol*, 133 F.3d

14   1220, 1225 n.5 (9th Cir. 1998).[15]  Declaratory relief would also be of assistance to

15   CBP officers who are "still unclear" on whether turnbacks are illegal. Ex. 1 at 12.

16   This Court should grant the requested injunctive and declaratory relief.

17   **VI.   CONCLUSION**

18        Summary judgment should be entered for Plaintiffs.

19   Dated:  October 30, 2020

20                                   MAYER BROWN LLP

21   [14] Notably, a declaratory judgment is not barred by 8 U.S.C. § 1252(f)(1).

22   [15] Defendants' reliance on *Sanchez-Espinoza v. Reagan* is misplaced. 770 F.2d 202,
     208 n.8 (D.C. Cir. 1985). In *Sanchez-Espinoza*, the court questioned whether it could
23   grant discretionary relief of any kind where it was asked to address the legality of
     support for military operations in a foreign country. *Id.* at 208. The court clarified
24   that "*in a context such as this* where federal officers are defendants," a declaratory
     judgment to terminate support would be "the practical equivalent of specific relief
25   such as an injunction or mandamus." *Id.* at 208 n.8 (emphasis added). Here, the
     declaratory and injunctive relief would not have an equivalent effect. The
26   declaratory relief would establish CBP officers' legal obligations to those in the
     process of arriving, something that ███████████████████. *See* Op.
27   Ex. 1 at 163:11-165:18; Op. Ex. 76 at 110, 115-126. In contrast, injunctive relief
     would prohibit specific actions by CBP officers. In *this* case, both are necessary to
28   afford Plaintiffs and class members complete relief.

1 | Matthew H. Marmolejo
2 | Ori Lev
   | Stephen M. Medlock
3 |
4 | SOUTHERN POVERTY LAW CENTER
   | Melissa Crow
5 | Sarah Rich
6 | Rebecca Cassler
7 | CENTER FOR CONSTITUTIONAL
8 | RIGHTS
   | Baher Azmy
9 | Ghita Schwarz
10 | Angelo Guisado
11 | AMERICAN IMMIGRATION COUNCIL
12 | Karolina Walters
13 |
   | By: */s/ Stephen M. Medlock*
14 | Stephen M. Medlock
15 |
   | *Attorneys for Plaintiffs*
16 |
17 |
18 |
19 |
20 |
21 |
22 |
23 |
24 |
25 |
26 |
27 |
28 |

REPLY  IN SUPP. OF
PLTFS' MOT S.J.

21

**CERTIFICATE OF SERVICE**

I certify that I caused a copy of the foregoing document to be served on all counsel via the Court's CM/ECF system.

Dated:  October 30, 2020

MAYER BROWN LLP


By  _/s/ Stephen M. Medlock_

FER-0032

1  MAYER BROWN LLP
     Matthew H. Marmolejo (CA Bar No. 242964)
2  *mmarmolejo@mayerbrown.com*
   350 S. Grand Avenue
3  25th Floor
   Los Angeles, CA 90071-1503
4  Ori Lev (DC Bar No. 452565)
     (*pro hac vice*)
5  *olev@mayerbrown.com*
     Stephen M. Medlock (VA Bar No. 78819)
6    (*pro hac vice*)
   *smedlock@mayerbrown.com*
7  1999 K Street, N.W.
   Washington, D.C. 20006
8  Telephone:  +1.202.263.3000
   Facsimile:   +1.202.263.3300
9
   SOUTHERN POVERTY LAW CENTER
10   Melissa Crow (DC Bar No. 453487)
     (*pro hac vice*)
11   *melissa.crow@splcenter.org*
   1101 17th Street, N.W., Suite 705
12 Washington, D.C. 20036
   Telephone: +1.202.355.4471
13 Facsimile: +1.404.221.5857

14  *Additional counsel listed on next page*
    *Attorneys for Plaintiffs*

15            **UNITED STATES DISTRICT COURT**

16            **SOUTHERN DISTRICT OF CALIFORNIA**

17

| 18 | Al Otro Lado, Inc., *et al.*, | Case No.:  17-cv-02366-BAS-KSC |
|---|---|---|
| 19 | Plaintiffs, | **PLAINTIFFS' OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT** |
| 20 | v. | |
| 21 | Chad F. Wolf,[1] *et al.*, | ***PUBLIC REDACTED VERSION*** |
| 22 | Defendants. | |
| 23 | | **NO ORAL ARGUMENT UNLESS REQUESTED BY THE COURT** |

24

25  ───────────────

26  [1] Defendants have represented that Mr. Wolf is the Acting Secretary of the U.S.
    Department of Homeland Security. Numerous courts disagree. *Casa de Md., Inc. v.
27  Wolf*, 2020 WL 5500165, at *23 (D. Md. Sept. 11, 2020); *Immigrant Legal Res. Ctr.
    v. Wolf*, 2020 WL 5798269, at *7-9 (N.D. Cal. Sept. 29, 2020); *N.W. Immigrant
28  Rights Project v. USCIS*, 2020 WL 5995206, at *24 (D.D.C. Oct. 8, 2020).

CENTER FOR CONSTITUTIONAL RIGHTS
  Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
  *bazmy@ccrjustice.org*
  Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
  *gschwarz@ccrjustice.org*
  Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
  *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
  Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
  *sarah.rich@splcenter.org*
  Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
  *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
  Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
  *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

FER-0034

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ....................................................................... 1

II.  THE TURNBACK POLICY VIOLATES THE APA ............................. 5

    A.   The Turnback Policy and Turnbacks Are Final Agency Actions ................................................................................. 5

    B.   The Turnback Policy Violates Congress's Unambiguous Statutory Scheme and Exceeds Defendants' Authority ............... 9

    C.   The Turnback Policy is Arbitrary and Capricious .................... 11

    D.   This Court Has Already Rejected Defendants § 706(1) Arguments ............................................................................. 18

III.  THE TURNBACK POLICY IS UNCONSITUTIONAL ..................... 21

IV.  THE TURNBACK POLICY VIOLATES THE ATS ............................. 21

V.   PLAINTIFFS' STAND-ALONE INA CLAIM IS VALID .................... 24

VI.  CONCLUSION ......................................................................... 25

FER-0035

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Aguayo v. Jewell,*
    827 F.3d 1213 (9th Cir. 2016) ............................................................. 7

*Al Otro Lado, Inc. v. Wolf,*
    952 F.3d 999 (9th Cir. 2020) ................................................... 1, 8, 19

*Al Shimari v. CACI Premier Tech., Inc.,*
    263 F. Supp. 3d 595 (E.D. Va. 2017) ................................................ 23

*Al Shimari v. CACI Premier Tech., Inc.,*
    320 F. Supp. 3d 781 (E.D. Va. 2018) ................................................ 23

*Al Shimari v. CACI Premier Tech., Inc.,*
    758 F.3d 516 (4th Cir. 2014) ............................................................ 23

*Amuur v. France,*
    App. No. 19776/92 ........................................................................... 22

*Aracely, R. v. Nielsen,*
    319 F. Supp. 3d 110 (D.D.C. 2018) .................................................... 5

*Bark v. U.S. Forest Serv.,*
    37 F. Supp. 3d 41 (D.D.C. 2014) ........................................................ 5

*Barrios v. Holder,*
    581 F.3d 849 (9th Cir. 2009), *abrogated on other grounds by*
    *Hernandez-Rivas v. Holder*, 707 F. 3d 1081 (9th Cir. 2013) ............. 20

*Bennett v. Spear,*
    520 U.S. 154 (1997) ........................................................................ 7, 8

*Burrage v. United States,*
    571 U.S. 204 (2014) ...................................................................... 3, 11

*Chevron, U.S.A., Inc. v. Nat'l Res. Def. Council, Inc.,*
    467 U.S. 837 (1984) ........................................................................... 3

*Columbia Riverkeeper v. U.S. Coast Guard,*
    761 F.3d 1084 (9th Cir. 2014) ............................................................ 7

OPP'N TO DEFS' CROSS-MOTION FOR S.J.

iv

*Compassion Over Killing v. FDA*,
    849 F.3d 849 (9th Cir. 2017) ............................................................... 11

*DHS v. Thuraissigiam*,
    140 S. Ct. 1959 (2020) ........................................................................ 19

*EBSC v. Trump*,
    932 F.3d 742 (9th Cir. 2018) ......................................................... 4, 11

*EBSC v. Trump*,
    950 F.3d 1242 (9th Cir. 2020) ............................................................. 11

*Fairbanks N. Star Borough v. U.S. Army Corps of Eng'rs*,
    543 F.3d 586 (9th Cir. 2008) ................................................................ 8

*FDA v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000) .............................................................................. 3

*Gilmore v. Wells Fargo Bank N.A.*,
    2014 U.S. Dist. LEXIS 104219 (N.D. Cal. 2014) .............................. 13

*Hernandez v. Mesa*,
    140 S. Ct. 735 (2020) .................................................................... 11, 23

*Hispanic Affairs Project v. Acosta*,
    901 F.3d 378 (D.C. Cir. 2018) .............................................................. 5

*Hosseini v. Johnson*,
    826 F.3d 354 (6th Cir. 2016) ................................................................ 8

*INS v. Stevic*,
    467 U.S. 407 (1984) ...................................................................... 22, 23

*Jesner v. Arab Bank, PLC*,
    138 S. Ct. 1386 (2018) ........................................................................ 24

*Keene Corp. v. United States*,
    508 U.S. 200 (1993) ............................................................................ 25

*Kiobel v. Royal Dutch Petroleum Co*,
    569 U.S. 108 (2013) ............................................................................ 22

*Lewis v. City of Chi.*,
    560 U.S. 205 (2010) .............................................................................. 4

OPP'N TO DEFS' CROSS-MOTION FOR S.J.

v

*Lightfoot v. District of Columbia*,
   273 F.R.D. 314 (D.D.C. 2011) ............................................................. 6

*Lujan v. Nat'l Wildlife Fed'n*,
   497 U.S. 871 (1990) ............................................................................ 5

*Massachusetts v. EPA*,
   549 U.S. 497 (2007) .......................................................................... 11

*Ms. L v. ICE*,
   302 F. Supp. 3d 1149 (S.D. Cal. 2018) ............................................. 25

*New Mexico v. McAleenan*,
   19-cv-00534 (D.N.M. June 10, 2019) ................................................ 25

*New Mexico v. McAleenan*,
   450 F. Supp. 3d 1130 (D.N.M. 2020) ................................................ 25

*ONRC Action v. Bureau of Land Mgmt.*,
   150 F.3d 1132 (9th Cir. 1998) ............................................................. 8

*Or. Natural Desert Ass'n v. U.S. Forest Serv.*,
   465 F.3d 977 (9th Cir. 2006) ............................................................... 8

*Pereira v. Sessions*,
   138 S. Ct. 2105 (2018) ........................................................................ 3

*R.I.L-R v. Johnson*,
   80 F. Supp. 3d 164 (D.D.C. 2015) ................................................... 5, 6

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
   566 U.S. 639 (2012) .......................................................................... 10

*Ragsdale v. Wolverine World Wide, Inc.*,
   535 U.S. 81 (2002) .............................................................................. 3

*Ramirez v. ICE*,
   310 F. Supp. 3d 7 (D.D.C. 2018) ........................................................ 5

*Saget v. Trump*,
   375 F. Supp. 3d 280 (E.D.N.Y. 2019) ............................................... 12

*Sale v. Haitian Ctrs. Council, Inc.*,
   509 U.S. 155 (1993) .......................................................................... 19

OPP'N TO DEFS' CROSS-MOTION FOR S.J.

vi

*San Luis & Delta-Mendota Water Auth. v. Locke*,
    776 F.3d 971 (9th Cir. 2014) ................................................................... 12

*Sierra Club v. Trump*,
    963 F.3d 874 (9th Cir. 2020) ......................................................... 24, 25

*Sosa v. Alvarez-Machain*,
    542 U.S. 692 (2004) ...................................................................... 22, 23

*Telecomms. Research & Action Ctr. v. FCC ("TRAC")*,
    750 F.2d 70 (D.C. Cir. 1984) .............................................................. 21

*United States v. Locke*,
    471 U.S. 84 (1985) ............................................................................... 4

*Util. Air Regulatory Grp. v. EPA*,
    573 U.S. 302 (2014) ............................................................................. 3

*Villiarimo v. Aloha Island Air, Inc.*,
    281 F.3d 1054 (9th Cir. 2002) ............................................................ 16

*Wild Fish Conservancy v. Jewell*,
    730 F.3d 791 (9th Cir. 2013) ................................................................ 5

*Wyeth v. Sandoz, Inc.*,
    570 F. Supp. 2d 815 (E.D.N.C. 2008) .................................................. 2

*Ziglar v. Abbasi*,
    137 S. Ct. 1843 (2017) ....................................................................... 23

**Statutes**

5 U.S.C. § 551(13) ...................................................................................... 7

5 U.S.C. § 706(2) ................................................................................. 5, 20

6 U.S.C. § 111(b)(1) ............................................................................. 9, 10

6 U.S.C. § 111(b)(1)(D) ....................................................................... 1, 10

6 U.S.C. § 111(b)(1)(E) ....................................................................... 1, 10

6 U.S.C. § 202 ............................................................................................ 9

6 U.S.C. § 211(c) ....................................................................................... 9

FER-0039

6 U.S.C. § 211(g)(3) ........................................................................... 10

8 U.S.C. 1101(a)(18), (34) ................................................................... 1

8 U.S.C. § 1158 .................................................................................. 19

8 U.S.C.§ 1158(a)(1) .......................................................................... 19

8 U.S.C. § 1158(d) .............................................................................. 25

8 U.S.C. § 1158(d)(7) .......................................................................... 25

8 U.S.C. § 1225 ............................................................................. *passim*

8 U.S.C. § 1225(a) .............................................................................. 10

8 U.S.C. § 1225(a)(1) .......................................................................... 19

8 U.S.C. § 1225(a)(3) ..................................................................... 10, 19

8 U.S.C. § 1225(b) .............................................................................. 10

8 U.S.C. §1225(b)(1) ............................................................................ 8

8 U.S.C. § 1225(b)(1)(A)(i) ................................................................. 19

8 U.S.C. § 1225(b)(1)(A)(ii) .......................................................... 19, 20

8 U.S.C. § 1229a ........................................................................... 16, 17

18 U.S.C. § 2340A .............................................................................. 22

28 U.S.C. § 1350 ........................................................................... 22, 23

**Other Authorities**

Alice Edwards, *Human Rights, Refugees, and the Right to Enjoy*
   *Asylum* INT'L J. REFUGEE L. 293 ................................................. 22

Cambridge Dictionary (2020) ................................................................ 1

Fed. R. Civ. P. 23 ................................................................................. 6

Fed. R. Civ. P. 30(c)(2) ...................................................................... 14

Fed. R. Evid. 611(c)(2) ....................................................................... 14

OPP'N TO DEFS' CROSS-MOTION FOR S.J.

vii

Mark Gibney, ENCYCLOPEDIA OF HUMAN RIGHTS (Oxford University
    Press, 2009) ...................................................................................22

Oxford English Dictionary (2020)........................................................1, 2

FER-0041

|   |   |
|---|---|
| 1 | **abbreviation and Citation form** |
| 2 | "ATS" refers to the Alien Tort Statute. |
| 3 |  |
| 4 | "CBP" refers to U.S. Customs and Border Protection. |
| 5 |  |
| 6 | "CM" refers to Defendants' Cross-Motion for Summary Judgment (*see* Dkt. 562). |
| 7 |  |
| 8 | "Def. Ex." refers to the exhibits to Defendants' Cross-Motion for Summary |
| 9 | Judgment (*see* Dkt. 562-2, *et seq.*). |
| 10 |  |
| 11 | "DHS" refers to the U.S. Department of Homeland Secuirty. |
| 12 |  |
| 13 | "HSA" refers to the Homeland Security Act. |
| 14 |  |
| 15 | "INA" refers to the Immigration and Nationality Act. |
| 16 |  |
| 17 | "Op. Br." refers to Plaintiffs' Opening Brief in Support of their Motion for Summary |
| 18 | Judgment (*see* Dkt. 533). |
| 19 |  |
| 20 | "Op. Ex." refers to the exhibits to Plaintiffs' Opening Brief in Support of their |
| 21 | Motion for Summary Judgment (*see* Dkt. 533-2, *et seq.*). |
| 22 |  |
| 23 | "POE" refers to Class A Ports of Entry on the U.S.-Mexico border. |
| 24 |  |
| 25 |  |
| 26 |  |
| 27 |  |
| 28 |  |

OPP'N TO DEFS' CROSS-MOTION FOR S.J.

x

## I.    INTRODUCTION

There is no genuine dispute about what happened here. Defendants implemented a policy that resulted in asylum seekers being turned back from POEs on the U.S.-Mexico border. There is also no genuine dispute that CBP officers turned back asylum seekers who either (a) were in the process of arriving in the United States at a POE or (b) had already set foot on U.S. soil.

Rather than addressing *what* occurred, Defendants' cross-motion spends dozens of pages on *post-hoc* rationalizations for *why* the turnbacks happened. Plaintiffs have shown that the purported reason for these turnbacks—so-called "capacity" constraints—is pretextual, *see* Op. Br. at 26-29, but more fundamentally, Defendants' asserted justification for the turnbacks is not relevant. The INA *mandates* that Defendants inspect and process asylum seekers arriving in the United States. Dkt. 280 at 47; *Al Otro Lado, Inc. v. Wolf*, 952 F.3d 999, 1011, 1013 (9th Cir. 2020) (this Court's interpretation of the INA has "considerable force" and is "likely correct"). Moreover, the HSA states that "ensur[ing] that the functions of [CBP] . . . that are not related directly to securing the homeland," such as inspecting and processing asylum seekers, are not "***diminished or neglected except by a specific explicit Act of Congress***." 6 U.S.C. § 111(b)(1)(E) (emphasis added). In addition, Defendants' mandatory duty to inspect and process asylum seekers in the process of arriving in the U.S is a co-equal part of Defendants' "primary mission."[2] 6 U.S.C. § 111(b)(1)(D) (DHS' "primary mission" includes "carry[ing] out all functions of entities transferred to [DHS]").[3] Defendants are not permitted to diminish[4] that duty

---

[2] Primary means "of chief importance." *Primary*, Oxford English Dictionary (2020); *Primary*, Cambridge Dictionary (2020) ("more important than anything else").

[3] 8 U.S.C. § 1225 sets out duties to be performed by "immigration officers," defined in 8 U.S.C. 1101(a)(18), (34), to include employees of DHS's predecessor agency, the Immigration and Naturalization Service.

[4] Diminished means "to make or cause to appear less; reduce in size, number, or degree." *Wyeth v. Sandoz, Inc.*, 570 F. Supp. 2d 815, 829 (E.D.N.C. 2008); *Diminished*, Oxford English Dictionary (2020) ("Made smaller or lessened").

OPP'N TO DEFS' CROSS-MOTION FOR S.J.

1

by relegating it to secondary status absent a specific and explicit Act of Congress. And no Act of Congress authorizes a diminishment or neglect of the duty to inspect arriving noncitizens at POEs due to Defendants' own analysis of the relative importance of their missions.

Defendants turned back asylum seekers who were in the process of arriving in the U.S. at POEs. *See, e.g.*, Op. Br. at 22-23. Defendants did so because they chose to diminish the priority given to inspecting and processing asylum seekers. For example, on June 5, 2018, Defendants adopted a policy memorandum that ***explicitly diminishes*** the importance of inspecting and processing asylum seekers, ordering POEs to prioritize other missions over that one. Op. Ex. at 98 at 296. DHS adopted this policy with ***specific knowledge*** that de-prioritizing the inspection and processing of asylum seekers would result in ███████████████████████████ ████████████████. *See* Op. Exs. 93-97.

Defendants have admitted what they did. The former head of CBP's Office of Field Operations ("OFO"), Todd Owen, testified that Defendants decided to de-prioritize inspecting and processing asylum seekers. Op. Ex. 10 at 201:20-203:3; *see also* Def. Ex. 1 at ¶ 10 (conceding that "priority is given" to missions other than processing and inspecting asylum seekers). The question is, was it legal? If the separation of powers means anything, the answer is clearly no. Defendants had no discretion to turn back asylum seekers who were in the process of arriving in the U.S. Nor did they have the authority to make inspection and processing of asylum seekers a secondary mission. Therefore, every turnback is illegal regardless of Defendants' justification for it. That ends the inquiry.

Defendants spend most of their brief explaining why breaking the law might result in preferable policy outcomes. They claim that by unilaterally diminishing their capacity to inspect and process asylum seekers they have been able to focus on interdicting drugs and to reduce overtime. CM at 25-31; Def. Ex. 1 at ¶ 9. They argue that turning back asylum seekers enables them to avoid taxing the resources of CBP

during upticks in the number of noncitizens arriving at POEs. *See* CM at 25-30. But Defendants are executive-agency officials, not legislators. They are not authorized to rewrite the INA. *See* Dkt. 280 at 65 ("the Executive cannot 'amend the INA' . . . through executive action to establish a procedure at variance with the scheme Congress chose."). As heads of agencies, they are bound to comply with the non-discretionary directives of governing statutes. *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 327-28 (2014) ("The power of executing the laws . . . does not include a power to revise clear statutory terms," and a "core administrative-law principle [is] that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate."); *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 91 (2002) ("Regardless of how serious the problem an administrative agency seeks to address, . . . it may not exercise its authority in a manner that is inconsistent with the administrative structure Congress enacted into law.").[5] Congress gave Defendants specific and mandatory instructions on inspecting and processing asylum seekers and no discretion to diminish their capacity to do so. *See Chevron, U.S.A., Inc. v. Nat'l Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984) ("If the intent of Congress is clear, that is the end of the matter."). Defendants' desire to manage the "'flow of traffic' across the border," does not give them "the authority to rewrite specific congressional mandates or to pretend that such mandates do not exist." Dkt. 280 at 58; *see also Burrage v. United States*, 571 U.S. 204, 218 (2014) ("The role of this Court is to apply the statute as it is written—even if we think some other approach might 'accor[d] with good policy.'"); *Pereira v. Sessions*, 138 S. Ct. 2105, 2118 (2018) (the government may not "pivot away from [a statute's] plain language" by "rais[ing] . . . practical concerns" because "practical considerations . . . do not justify departing from the statute's clear text").

---

[5] *See also FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125-26 (2000) (despite the fact that the FDA was acting to address "one of the most troubling public health problems facing our Nation today," it lacked the authority to act where "Congress ha[d] clearly precluded" the agency from doing so).

OPP'N TO DEFS' CROSS-MOTION FOR S.J.

3

1    Defendants conjure a parade of horribles that might emerge if they are forced
2    to obey governing statutes, *see* Def. Ex. 1 at ¶¶ 16-26, but that is an issue for
3    Congress to address. *See, e.g.*, *Lewis v. City of Chi.*, 560 U.S. 205, 217 (2010) ("[I]t
4    is not our task to assess the consequences of each approach [to interpreting a statute]
5    and adopt the one that produces the least mischief. Our charge is to give effect to the
6    law Congress enacted."); *United States v. Locke*, 471 U.S. 84, 95 (1985) ("[T]he fact
7    that Congress might have acted with greater . . . foresight does not give courts a carte
8    blanche to redraft statutes in an effort to achieve that which Congress is perceived
9    to have failed to do."). Even if the Court were to credit Defendants' speculation
10   about what would occur absent the turnback policy, "[t]here surely are enforcement
11   measures that [Defendants] can take to ameliorate the crisis" that they claim exists,
12   and Defendants' speculation "is not a sufficient basis under our Constitution for the
13   Executive to rewrite our immigration laws." *EBSC v. Trump*, 932 F.3d 742, 774-75
14   (9th Cir. 2018) ("[A]s much as we might be tempted to revise the law as we think
15   wise, revision of the laws is left with . . . Congress.").

16   There are three principal reasons why Plaintiffs should prevail on summary
17   judgment. ***First***, Congress gave Defendants no discretion to turn back asylum
18   seekers who are in the process of arriving in the U.S. Defendants' policy preferences
19   do not permit them to ignore the plain language of the INA. Moreover, Defendants
20   misconstrue the factual record; the undisputed facts show that the turnback policy
21   was arbitrary and capricious. ***Second***, this Court has already rejected Defendants'
22   due process argument, and Defendants provide no reason to reconsider that prior
23   holding. ***Third***, this Court should grant Plaintiffs' motion for summary judgment on
24   their ATS claim because Defendants in no way dispute that the duty of *non-*
25   *refoulement* is a non-derogable *jus cogens* norm that is cognizable under the ATS.[6]

26

27   [6] Defendants oppose Plaintiffs' request for declaratory and injunctive relief. *See* CM
28   at 58-60. Plaintiffs will address this oppositional argument in their forthcoming reply
     in support of their motion for summary judgment.

**II.      THE TURNBACK POLICY VIOLATES THE APA**

**A. The Turnback Policy and Turnbacks Are Final Agency Actions**

Like the policies reviewed in *Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 138-39 (D.D.C. 2018) and *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 174-77, 184-85 (D.D.C. 2015), the turnback policy is a final agency action reviewable under 5 U.S.C. § 706(2). *See* Dkt. 280 at 51-52. Defendants' arguments to the contrary, which merely recycle their motion to dismiss briefing, fare no better this time.

Defendants attempt to conflate the turnback policy with programs found unreviewable in *Bark v. U.S. Forest Serv.*, 37 F. Supp. 3d 41, 50 (D.D.C. 2014), *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 892-93 (1990), and *Wild Fish Conservancy v. Jewell*, 730 F.3d 791, 801 (9th Cir. 2013). But in those cases, plaintiffs challenged agencies' general "continuing (and thus constantly changing) operations." *Lujan*, 497 U.S. at 890; *see Bark*, 37 F. Supp. 3d at 50-51 ("generalized complaints about agency behavior"); *Wild Fish Conservancy*, 730 F.3d at 801 (challenging "day-to-day operations that merely implement operational plans").

Here, by contrast, Plaintiffs "attack *particularized* agency action," *R.I.L-R*, 80 F. Supp. 3d at 184—specifically, Defendants' decisions to purposefully restrict access to the asylum process in violation of their statutory obligations. *See Ramirez v. ICE*, 310 F. Supp. 3d  7, 20-21 (D.D.C. 2018) ("aggregation of similar, discrete purported injuries—claims that many people were injured in similar ways by the same type of agency action" is not "a broad programmatic attack"); *see also Hispanic Affairs Project v. Acosta*, 901 F.3d 378, 388 (D.C. Cir. 2018) (distinguishing *Lujan* where plaintiffs challenged "cabined and direct" "identified transgression" of statutes and regulations). Plaintiffs use the term "turnback policy" as shorthand to refer to the particularized agency action they challenge; Defendants need not refer to the policy with a succinct label in a formal policy document for it to be challengeable. *See R.I.L-R*, 80 F. Supp. 3d at 184 (noting that a policy of "consideration of an allegedly impermissible factor" is "*particularized* agency

1   action," without discussing whether ICE had a formal label for the policy).[7]

2       Defendants mistakenly suggest that Plaintiffs have "attach[ed] a policy label

3   to disparate agency practices or conduct." CM at 32-33. Yet all the agency practices

4   enumerated by Defendants—including turnbacks of asylum seekers between May

5   and November 2016, returns of asylum seekers standing on U.S. soil in late 2017,

6   removal of seats at the Hidalgo POE to reduce processing capacity, and the issuance

7   of metering guidance and the prioritization-based queue management memorandum

8   in 2018—bolster the existence of the turnback policy. No part of this policy, which

9   originated in 2016, was memorialized in writing until 2018 because CBP believed

10  that ██████████████████████ *See* Op. Br. at 12-13. Defendants' intentional

11  decision █████████████████████████████ meant that before then,

12  CBP officers used a variety of tactics to turn back asylum seekers from POEs. *See*

13  *id.* at 5. Nonetheless, the result was the same: denial of access to the asylum process

14  for tens of thousands of asylum seekers.

15      Plaintiffs have presented overwhelming evidence of verbal, and later written,

16  directives from high-level CBP officials that officers at POEs should "return

17  individuals who enter the U.S. and request asylum back to Mexico without" being

18  processed, *see, e.g.*, Op. Br. at 19. CBP officers lied to asylum seekers about their

19  lack of capacity to inspect and process them. Op. Ex. 1 at 100:22-101:6; Op. Ex. 118

20  at 93:4-12; Op. Ex. 3 at 157:15-18. Incredibly, Defendants argue that neither first-

21  hand testimony by CBP officers concerning lies to asylum seekers at POEs, nor

22  internal CBP documents disclosing the use of coercive tactics, constitute evidence

23

---

24  [7] *Lightfoot v. District of Columbia* is inapposite. That case addressed class
25  certification under Fed. R. Civ. P. 23, not the APA "final agency action" standard.
    In any event, it did not involve particularized agency action but instead an
    "amorphous claim of systemic or widespread [government] misconduct," and the
26  *Lightfoot* plaintiffs were seeking to aggregate claims that were not "susceptible to
    class-wide treatment" and that required individualized relief. 273 F.R.D. 314, 324,
27  327, 330, 335 (D.D.C. 2011). Unlike *Lightfoot*, Plaintiffs seek class-wide injunctive
    relief based on "questions of law applicable in the same manner to each member of
28  the class.'" *Id.* at 324 (citation omitted); Dkt. 513 at 10-12.

OPP'N TO DEFS' CROSS-MOTION FOR S.J.

6

1    of a border-wide policy. CM at 44. This "rogue officers" argument strains credulity.

2    Defendants standardized the turnback policy across all POEs out of a perceived

3    ████████████████████████████████████████████████████████████████████████

4    Op. Ex. 117. Given this standardization, Defendants have no explanation for why

5    conduct at multiple POEs is not indicative of a border-wide policy. Defendants'

6    turnback policy is precisely the type of final, particularized agency action

7    appropriate for APA review. *See* Op. Br. at 27-29.

8        Like the turnback policy, individual turnbacks are final agency actions and are

9    likewise amenable to APA review. First, each turnback "mark[s] the

10   'consummation' of the agency's decisionmaking process," *see Bennett v. Spear*, 520

11   U.S. 154, 177-78 (1997), because it functionally denies individuals access to the

12   U.S. asylum process. *See Aguayo v. Jewell*, 827 F.3d 1213, 1223 (9th Cir. 2016)

13   ("denial" of relief and "failure to act" are "agency action" that can be "final" under

14   5 U.S.C. § 551(13)); *Columbia Riverkeeper v. U.S. Coast Guard*, 761 F.3d 1084,

15   1094-95 (9th Cir. 2014) (considering the practical effect of agency action). CBP

16   officers may tell some asylum seekers to "wait," but the practical and intended effect

17   is to deprive them of access to the asylum process. *See, e.g.*, Op. Ex. 2 at 132

18   (Defendants "lack[ed] candor to the public [by not] stating the true facts that [CBP

19   is] … blocking asylum to persons and families in order to block the flow of asylum

20   applicants."). Indeed, CBP officers do not tell asylum seekers to "wait,"

21   contemporaneous recordings show that they tell asylum seekers to "go back to

22   Mexico." Op. Ex. 18 (audio recording of CBP officer telling asylum seeker to "go

23   back to Mexico" multiple times); Op. Ex. 17 at 308:4-8. After being turned back,

24   asylum seekers put their names on "waitlists" and attempt to find shelter in Mexican

25   border towns. *See* Op. Ex. 10 at 138:17 ("generally the migrants have returned to the

26   shelters"); Op. Ex. 17 at 292:2-11 (CBP generally does not process asylum seekers

27   who are not on a waitlist. Given the risks of living in Mexican border towns

28   (including physical violence and pursuit by persecutors) and the extraordinary delays

1  in processing asylum seekers, there is no guarantee that individuals who have been

2  turned back will ever have an opportunity to access the U.S. asylum process. *See*

3  Op. Br. at 16-18, 31. Thus, being told to "wait" has no bearing on whether an asylum

4  seeker is permitted to present herself at a POE in a "future yet distinct administrative

5  process." *Fairbanks N. Star Borough v. U.S. Army Corps of Eng'rs*, 543 F.3d 586,

6  593 (9th Cir. 2008); *see also Hosseini v. Johnson*, 826 F.3d 354, 362 (6th Cir. 2016)

7  (an applicant's ability to "reapply … as often as he wants" does not make a denial

8  non-final). And each turnback reflects a "conscious" and "deliberate decision" to

9  limit access to the asylum process at POEs. *ONRC Action v. Bureau of Land Mgmt.*,

10  150 F.3d 1132, 1137 (9th Cir. 1998).

11      Second, each individual turnback constitutes agency action "by which rights

12  and obligations have been determined, or from which legal consequences will flow."

13  *See Bennett*, 520 U.S. at 177-78. In examining finality, courts "focus on the practical

14  and legal effects of the agency action." *Or. Natural Desert Ass'n v. U.S. Forest Serv.*,

15  465 F.3d 977, 982 (9th Cir. 2006). This Court has already held that those who are

16  "in the process of arriving in" the U.S. fall within the scope of 8 U.S.C. §1225(b)(1)

17  and are entitled to be processed for asylum. Dkt. 280 at 46; *Al Otro Lado*, 952 F.3d

18  at 1013 (this Court's "linguistic and contextual analysis" "has considerable force"

19  and "is likely correct"). However, Defendants use turnbacks to deprive class

20  members of the right to seek asylum, in violation of the INA, which is a legal

21  consequence of each turnback. Even under Defendants' erroneous interpretation of

22  § 1225, legal consequences flow from turnbacks. Their argument to the contrary is

23  internally contradictory. Defendants assert that individuals arriving in the U.S. have

24  no rights until they physically cross the border. The decision to prevent them from

25  doing so therefore determines the extent of their rights, under Defendants' theory.

26  Defendants cannot have it both ways—they cannot argue both that asylum seekers

27  have no rights if they have not crossed the border *and* that their actions to prevent

28  asylum seekers from crossing the border have no legal consequences.

OPP'N TO DEFS' CROSS-MOTION FOR S.J.

8

1      Citing the case of Plaintiff Roberto Doe, Defendants disingenuously argue
2  that his denial of access to the U.S. asylum process was not a direct consequence of
3  CBP's action. CM at 36. Defendants should read Roberto Doe's declarations again.
4  Roberto Doe was turned back by CBP officers, which facilitated his detention by
5  Mexican officials, and was subsequently deported by the Mexican government. Dkt.
6  390-75 at ¶ 6; Dkt. 390-97 at ¶¶ 6-7. Defendants' argument that Roberto Doe was
7  not deprived of his rights under the INA when he was turned back by CBP is based
8  on their mistaken belief that his turnback somehow does not count.

9         **B. The Turnback Policy Violates Congress's Unambiguous Statutory**
10             **Scheme and Exceeds Defendants' Authority**

11      Defendants have no meaningful response to Plaintiffs' claim that the turnback
12  policy exceeds Defendants' statutory authority. They advocate a fundamentally
13  incorrect reading of their authorizing statutes and a shocking power grab by the
14  Executive Branch. Defendants assert that because they prefer the agency to function
15  with fewer asylum seekers being processed at POEs, that turning asylum seekers
16  away must be lawful—effectively conceding that they are substituting their view for
17  that of Congress. But the relevant statutes could not be clearer: Defendants must
18  inspect all arriving noncitizens and process those seeking asylum according to law.

19      The plain text of Defendants' authorizing statutes puts this matter to bed.
20  Congress delegated a number of functions to DHS and CBP. *See* 6 U.S.C. §
21  111(b)(1) (DHS's "primary mission" functions); 6 U.S.C. § 202 (DHS Secretary's
22  "border, maritime, and transportation responsibilities" functions); 6 U.S.C. § 211(c)
23  (CBP Commissioner's functions); 6 U.S.C. § 211(g)(3) (OFO duties at POEs). These
24  lists generally delegate authority—a far cry from a "detailed statutory scheme," CM
25  at 43; they also do not detail discrete, mandatory ministerial duties enforceable under
26  APA § 706(1). None of these lists specifically grant Defendants the power to refuse
27  to inspect any noncitizens arriving at POEs or to block asylum seekers from crossing
28  the international border to present themselves for inspection at POEs.

1    In contrast, Congress specifically mandated that Defendants carry out the
2    ministerial duty to inspect all noncitizens arriving at POEs. 8 U.S.C. § 1225(a)(3).
3    The mandatory duty to inspect all arriving noncitizens exists in the context of a
4    statutory scheme by which noncitizens seeking asylum may do so at POEs in
5    accordance with established procedures; in order to access that process, the first step
6    is inspection. *See id.* § 1225(a), (b). The duty to inspect is simply incompatible with
7    the unwritten power the agency asserts here: to refuse to inspect arriving asylum
8    seekers and to block their passage to POEs. *See* Op. Br. at 25; *RadLAX Gateway*
9    *Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (applying the
10   "commonplace of statutory construction that the specific governs the general").

11   Defendants' argument that in 6 U.S.C. § 111(b)(1) Congress "elevated DHS's
12   national security functions over all others, including processing undocumented
13   migrants," is untrue. CM at 43. That subsection lists eight items that together
14   constitute DHS's "primary mission"; it does not state that item (A), "prevent[ing]
15   terrorist attacks within the United States," is *more* primary than items (B) through
16   (H). *See* 6 U.S.C. § 111. To the contrary, the same subsection states that "carry[ing]
17   out all functions of entities transferred to [DHS]," § 111(b)(1)(D), including
18   inspections at POEs, is *equally* a part of DHS's "primary mission," as is "ensur[ing]
19   that the functions of the agencies and subdivisions within [DHS] that are not related
20   directly to securing the homeland are not diminished or neglected except by a
21   specific explicit Act of Congress," § 111(b)(1)(E). And Defendants cite no Act of
22   Congress that authorizes a diminishment or neglect of the duty to inspect arriving
23   noncitizens at POEs for any reason, much less Defendants' decision to re-prioritize
24   their missions. Defendants' decision to prioritize other missions by limiting the
25   number of inspections of asylum seekers is invalid as a matter of law and not
26   authorized by statute.

27   None of Defendants' case law compels a different result. *Massachusetts v.*
28   *EPA*, 549 U.S. 497 (2007), is inapplicable because Defendants have no statutory

1    authority to turn away asylum seekers. That case counsels that courts should defer

2    when an agency decides not to engage in enforcement or, to a lesser extent,

3    rulemaking activities. *Id.* at 527. It says nothing about an agency's power to

4    circumvent a mandatory duty and thereby undermine a statutory scheme. *See id.* And

5    it should go without saying that discretion not to make a rule does not also

6    encompass discretion to forgo a ministerial duty. *Compassion Over Killing v. FDA*,

7    849 F.3d 849 (9th Cir. 2017) is similarly irrelevant to this case. *Compassion* merely

8    outlines agency discretion to use case-by-case rulemaking rather than promulgating

9    regulations. *Id.* at 857. Finally, Defendants cite *Hernandez v. Mesa* for the

10   unremarkable proposition that controlling the movement of people and goods across

11   the border "implicates an element of national security." 140 S. Ct. 735, 746 (2020).

12       Defendants are left to argue that turning asylum seekers away is a better policy

13   outcome, and therefore they should be allowed to do it. CM at 42-43. Between the

14   lines, Defendants effectively concede that as a policy, turnbacks are useful to them

15   because they lower the number of asylum seekers who are inspected at POEs relative

16   to what the number would otherwise be. But Defendants are not legislators. They do

17   not get to amend the INA or the HSA to suit their needs. *Supra* at 3-4. Congress gave

18   them no discretion to do so. *Supra* at 3-4. Defendants' arguments about purported

19   necessity are irrelevant. They have improperly substituted their judgment for

20   Congress's. *Burrage*, 571 U.S. at 218; *EBSC*, 932 F.3d at 774.

21              **C. The Turnback Policy is Arbitrary and Capricious**

22       The turnback policy is also arbitrary and capricious. First, the turnback policy

23   is inconsistent with congressional intent. *See EBSC v. Trump*, 950 F.3d 1242, 1273

24   (9th Cir. 2020) (agency interpretation that "is inconsistent with clearly expressed

25   congressional intent" is arbitrary and capricious). As Plaintiffs explain above, the

26   INA requires Defendants to inspect and process asylum seekers who are in the

27   process of arriving in the U.S. *Supra* at 8. Inspecting and processing asylum seekers

28   is a part of Defendants' "primary mission" that cannot be "neglected or diminished"

OPP'N TO DEFS' CROSS-MOTION FOR S.J.

11

1    except by an explicit and specific Act of Congress. *See supra* at 1-4.

2           Second, Defendants' stated reason for adopting the turnback policy was a

3    "factor[] which Congress has not intended [them] to consider." *San Luis & Delta-*

4    *Mendota Water Auth. v. Locke*, 776 F.3d 971, 994 (9th Cir. 2014). As Defendants

5    admit, they diminished inspection and processing of arriving asylum seekers by

6    turning them back to Mexico to alleviate "capacity" constraints *in order to focus on*

7    *other missions*. *See* CM at 25-31. But Congress never gave Defendants authority to

8    reprioritize their various primary mission sets. *Supra* at 1-4. In fact, it said the

9    opposite. *Supra* at 1-4. Defendants' asserted reason for adopting the turnback policy

10   is therefore arbitrary and capricious. *Locke*, 776 F.3d at 994.

11          Finally, if the Court wants to go beyond the clear language of the INA and

12   HSA, Plaintiffs have submitted substantial evidence, including direct testimony

13   from a whistleblower, that the turnback policy is based on a pretext. *See Saget v.*

14   *Trump*, 375 F. Supp. 3d 280, 361 (E.D.N.Y. 2019) ("[A]gency[ ] actions are arbitrary

15   and capricious under the APA if they are pretextual."). Specifically, that Defendants'

16   "capacity" excuse is a lie. *See* Op. Ex. 1 at 100:22-101:6; Op. Ex. 118 at 93:4-12;

17   Op. Ex. 3 at 157:15-18. This evidence shows that the turnback policy is actually a

18   deterrence policy. And, contrary to Defendants' position (CM at 52-53), because

19   inspecting and processing asylum seekers in the process of arriving in the U.S. is a

20   "primary mission" that cannot be "diminish[ed] or neglect[ed]" except as authorized

21   by an explicit and specific Act of Congress, "there is no room for deterrence under

22   the scheme that Congress has enacted." Dkt. 280 at 65.

23          Defendants' attempt to dispute the mountain of pretextual evidence runs head-

24   long into the undisputed record. ***First***, Plaintiffs presented the testimony of a

25   whistleblower who testified that he was instructed to lie when turning asylum

26   seekers back to Mexico, Op. Ex. 1 at 99:25-100:2, and that "it was obvious to

27   everybody that was implementing [the turnback] policy" that the "capacity excuse

28   was a lie." *Id.* at 100:25-101:6. Defendants attempt to dismiss this testimony as

coming from merely "a single first-line officer" that is "probative only of what the officer believed occurred" at his POE. CM at 47. But Defendants *cite nothing* to support their argument. *See id.* For example, they do not claim that officers elsewhere were not instructed to lie. *See id.* And there is evidence elsewhere in the record that CBP officers at other POEs *were* acting dishonestly. *See* Op. Ex. 2 (CBP "lacks candor to the public in stating the true facts that the [a]gency intentionally . . . block[ed] asylum to persons and families in order to block the flow of asylum applicants" and to create a "chilling [e]ffect[] to all others attempting entry into the United States."); Op. Ex. 3 at 157:15-18 ███████████████████████████████ ██████████████████████████; Op. Ex. 118 at 93:4-12 (CBP officers told asylum seekers that a POE was "at capacity," but never checked to see if that was true); Op. Ex. 117 ████████████████████████████████████. Defendants cannot rely on mere attorney argument in hopes of avoiding this damning testimony. *Gilmore v. Wells Fargo Bank N.A.*, 2014 U.S. Dist. LEXIS 104219, at *11 (N.D. Cal. 2014) ("Attorney argument is not evidence.").[8]

**Second**, Defendants claim that a DHS Rule 30(b)(6) witness, Joseph Eaton, never said that CBP officers "were telling travelers that the [Otay Mesa] facility was at capacity but weren't actually checking on the capacity of the facility." CM at 47-48. To be clear, here is the testimony that is in the record:

> Q.  So these conclusions indicate that officers at Otay Mesa were telling travelers that the facility was at capacity but weren't actually checking on the capacity of the facility; correct?
>
> A.  That's how I read it, yes.

Op. Ex. 118 at 93:4-12 (objection omitted).[9]

---

[8] Defendants claim that the whistleblower "supports" their arguments, citing his testimony that the Tecate POE might "back up" if it did not turn asylum seekers back to Mexico. CM at 47. But the whistleblower clarified that his testimony on that point was a "guess." Op. Ex. 1 at 146:19-25.

[9] Defendants' claim that this was a leading question is a red herring. CM at 47. Mr. Eaton was a Rule 30(b)(6) witness for a party opponent. Fed. R. Evid. 611(c)(2).

OPP'N TO DEFS' CROSS-MOTION FOR S.J.

13

1    **Third**, Defendants argue that David Atkinson's testimony concerning seats

2    being removed from the Hidalgo POE is inadmissible because he lacked foundation

3    to testify about the issue. CM at 48. But Defendants' argument is misleading.

4    Defendants *never objected* to the question at issue for any reason, including lack of

5    foundation. Op. Ex. 3 at 157:14-18. Since Defendants did not raise an objection at

6    the time the question was posed, that objection is waived. Fed. R. Civ. P. 30(c)(2).

7    **Fourth**, Defendants' assertion that asylum seekers were turned back solely

8    due to operational exigencies is not true. For instance, Defendants' lead declarant

9    Beverly Good claims that the turnback policy was just the result of increased

10   numbers of asylum seekers coming to POEs. *See* Def. Ex. 1 at ¶ 21. But in November

11   2016, she emphasized to Todd Owen, the senior-most official at OFO, that in the

12   Laredo Field Office, ███████████████████████ Rep. Ex. 1 at

13   389. Ms. Good does not attempt to explain this statement anywhere in her 16-page

14   declaration.

15   And with good reason. The record is filled with evidence that Defendants

16   adopted the turnback policy to deter asylum seekers. For example, Defendants cite

17   Todd Owen's self-serving statement that the turnback policy was not "designed to

18   deter migrants from entering the U.S." Op. Ex. 10 at 70:1-5. But Mr. Owen ███

19   ████████████████████████████████████

20   ████████████████████████████ Op. Ex. 97. He

21   explained that the policy would result in ██████████████████

22   ████████████████████████████████████

23   ██████████ Op. Ex. 96. With knowledge of that likely consequence, Secretary

24   Nielsen issued the prioritization-based queue management memorandum. *See* Op.

25   Ex. 98. Then, CBP officers ██████████████████████

26   ████████████████████████ Op. Ex. 107.

27   Defendants claim that Secretary Nielsen was just "[r]equesting information about

28   the potential costs and impacts of implementing a policy." CM at 49. That is

OPP'N TO DEFS' CROSS-MOTION FOR S.J.

14

1  ridiculous. Secretary Nielsen was briefed about the fact that a contemplated policy

2  would result in ███████████████████████████████████████ *then she*

3  *adopted the policy*, and then ***CBP followed up*** ████████████████████████

4  ████████████████████ Op. Exs. 96, 97, 98, 107.[10]

5     *Fifth*, Defendants say that turnbacks "for the most part" stopped in January

6  2017. *See* CM at 3. The record says otherwise. ████████████████████████

7  ████████████████████████████ in January 2017 in order to effect a turnback.

8  CM at 20 n.1. ████████████████████████████████████████████████████

9  ██████████ *Id.* And the record is replete with evidence that turnbacks occurred in

10 2017. *See* Op. Ex. 17; CM at 21 n.2; Op. Ex. 7 ████████████████████████

11 ████████████████████████████████████████████████████████████████████

12 ██████████; Op. Ex. 19 at 1, 5 (DHS Office of Inspector General report

13 explaining that Tecate POE had been turning back asylum seekers "[s]ince 2016"

14 with no mention of stopping in 2017 and identified turnbacks that occurred in

15 February 2017); Rep. Ex. 2 at 724 (turnback in January 2017); Rep. Ex. 3 at 779

16 (same); Rep. Ex. 4 at 822 (April 2017). Defendants' claims are belied by the record.

17    *Sixth*, citing no evidence, Defendants claim that they could not use parole to

18 respond to surges in immigration. CM at 49. Here's what Exhibit 62 to their brief

19 says about the Haitian "surge" in 2016: "The majority of the arriving Haitian

20 nationals are processed under [8 U.S.C. § 1229a] removal proceedings, in lieu of

21 expedited removal under [8 U.S.C. § 1225]. This action circumvents mandatory

22 detention provisions under [§ 1225] and allows [ICE] to parole the aliens, utilizing

23 existing alternatives to detention." Def. Ex. 62 at 712. Defendants cannot defeat

24 summary judgment with arguments that are contradicted by their own exhibits. *See*

25

26 [10] Even if the Court were to ignore Secretary Nielsen's actions, Defendants'
   operational exigency argument is undermined by the record. Defendants'
27 contemporaneous reports show that, even in the rare instances where POEs were
   operating above 100% capacity, the number of asylum seekers ████████████
28 ██████████. *See* Op. Exs. 21-25; Op. Ex. 20 at ¶¶ 23, 88-91.

1    *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1063 (9th Cir. 2002).

2    **Seventh**, Defendants argue that they did not actually shift from using

3    detention capacity to operational capacity as the metric for determining the capacity

4    of a POE to temporarily detain asylum seekers and had "long" used operational

5    capacity as the measure. CM at 49-50. The record disagrees. Emails show that in

6    early June 2018 OFO ██████████████████████████████████████

7    Rep. Ex. 5 at 915. Witnesses testified that this shift occurred in June 2018. Op. Ex.

8    100 at 78:18-25; Op. Ex. 14 at 137:25-138:12.

9            The evidence Defendants cite does not contradict this record. The mere fact

10   that an email used the phrase "operational capacity" prior to June 2018 does not

11   mean that Defendants were using operational capacity as a metric justifying turning

12   back asylum seekers. *See* Def Ex. 62 at 712. While Mariza Marin testified "we have

13   always used operational capacity," Op. Ex. 17 at 70:12-13, she could not point to a

14   scintilla of evidence that supported her story. *Id.* at 95:16-108:3. And, despite

15   claiming that she "always used" operational capacity, when Ms. Marin wrote ████

16   ██████████████████████████████████████████████████████████

17   *she did not use the phrase "operational capacity" once*. *Id.* at 95:16-97:11, 102:13-

18   108:3. There is no genuine dispute that Defendants shifted from using detention

19   capacity to using operational capacity in June 2018.

20           **Eighth**, Defendants claim that they implemented "contingency plans," CM at

21   49, but "those efforts were insufficient to prevent overcrowding." *Id.* This argument

22   is a non sequitur. The contingency plans exist to address periods when a POE is

23   experiencing an influx of migrants. *See, e.g.*, Op. Ex. 28 at 261 (policy ████████

24   ██████████████████████████ ); Op. Ex. 30 at 011 (policy designed to address

25   ██████████████████ ). Complaining that there was overcrowding when a contingency

26   plan is activated is like complaining about getting wet when standing in the rain.

27           **Ninth,** Defendants claim that their "prioritization regime" was "successful"

28   because the number of credible fear interviews increased in 2018 and 2019. CM at

OPP'N TO DEFS' CROSS-MOTION FOR S.J.

16

4. This statistic is misleading. Since CBP can either refer arriving asylum seekers for credible fear interviews under § 1225 or place them directly into removal proceedings under 8 U.S.C. § 1229a, *see* Def. Ex. 62 at 712, increased credible fear referrals does not necessarily mean CBP inspected more arriving asylum seekers. It may simply mean that CBP chose to refer a higher percentage of arriving asylum seekers for a credible fear interview. Beyond that, even if the number of asylum seekers referred for credible-fear interviews increased by 108%, as Defendants claim, the number of asylum seekers forced to wait in Mexican border towns due to the turnback policy increased ***327%*** from 2018 to 2019. The increases in some border cities were considerably higher.

| **Mexican Border City** | **December 2018**[11] | **August 2019**[12] | **Increase** |
|---|---|---|---|
| Tijuana | 5,000 | 10,000 | 100% |
| Mexicali | 350 | 2,000 | 471% |
| San Luis Rio Colorado | 0 | 1,050 | N/A |
| Nogales | 170 | 680 | 300% |
| Ciudad Juarez | 170 | 5,645 | 3,220% |
| Ciudad Acuna | 0 | 303 | N/A |
| Piedras Negras | 0 | 1,000 | N/A |
| Nuevo Laredo | 80 | 1,000 | 1150% |
| Reynosa | 0 | 3,600 | N/A |
| Matamoros | 283 | 600 | 112% |
| **Total** | **6,053** | **25,878** | **327%** |

Even if the percentage of asylum seekers processed at POEs increased, the percentage of asylum seekers that Defendants turned back increased ***more***.

---

[11] Rep. Ex. 6 at 7.

[12] Rep. Ex. 7 at 4-13.

OPP'N TO DEFS' CROSS-MOTION FOR S.J.

17

1    Defendants' turnback policy was only a "success" with respect to turning back

2    asylum seekers and breaking the law.

3        *Finally*, citing misleading statistics regarding asylum seeker processing,

4    Defendants argue that there were no arbitrary caps on processing asylum seekers.

5    But Defendants do nothing to suggest that their contemporaneous emails referencing

6    arbitrary caps are inaccurate. *See, e.g.*, Op. Ex. 12 at 742 (San Ysidro POE had a

7    ████████████████████████████████████); Op. Ex. 104 (█████████████

8    ████████████████████████████████████); Op. Ex. 105 (CBP sent

9    guidance about ████████████████████████████). And the mere fact

10   that a number of asylum seekers were inspected and processed does not mean that

11   the number of asylum seekers processed and inspected would not have been higher

12   but for the turnback policy. Instituting such caps is wholly inconsistent with

13   Defendants' duty to inspect and process all noncitizens arriving at POEs.

14       **D. This Court Has Already Rejected Defendants § 706(1) Arguments**

15       Defendants continue to argue that they can withhold their mandatory duties of

16   inspection and referral from asylum seekers who have not yet set foot across the

17   physical border (because Defendants will not let them cross). CM at 37-39.

18   According to Defendants, they can decide who is permitted to cross the border and

19   thus to whom they owe the mandatory duties Congress imposed. *See id.* This Court

20   has already rejected these arguments multiple times and held that Defendants do, in

21   fact, owe mandatory inspection and referral duties to asylum seekers "who are in the

22   process of arriving in the United States," including those not yet on U.S. soil. Dkt.

23   280 at 46; *see also* Dkt. 330 at 31 (similar). The Court should do so again here.

24   Defendants add nothing to their previous arguments that would alter the Court's

25   "sound and persuasive" analysis on this issue. *Al Otro Lado*, 952 F.3d at 1011-12.[13]

26   _____

27   [13] Defendants' attempt to minimize the testimony of CBP's 30(b)(6) witness
     notwithstanding, *see* CM at 40 n.7, CBP's testimony establishes that the *agency*
     *itself*, not just its officers, views noncitizens seeking asylum who are turned back at

28

Defendants' first three points arguing against this Court's previous holdings concerning the meaning of 8 U.S.C. §§ 1158 and 1225, CM at 37-38, which touch on verb tense,[14] the definition of "arrive," and the presumption against extraterritoriality, have already been rejected by this Court.[15] Dkt. 280 at 35-47.

Defendants' fourth and fifth points about the structure of the INA and the "overall statutory scheme" are equally unavailing. CM at 38. Defendants refer to an observation in *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 173 (1993), that deportation and exclusion proceedings do not occur outside the U.S., and to two other cases discussing the significance of a noncitizen's entry into or "land[ing]" in the U.S. (not arrival at a POE), and make reference to § 1225(b)(1)(A)(i), which is not part of any of Plaintiffs' claims. CM at 38. None of these citations address the import of the statutory provisions at issue here: § 1158(a)(1) or § 1225(a)(1), (a)(3), and (b)(1)(A)(ii). These provisions establish a series of procedures by which noncitizens seeking asylum may do so at POEs. The first step in this procedural structure is inspection, which governs access to the remainder of the process.

If anything, the overall statutory scheme protects asylum seekers and does not allow Defendants to discriminate among arriving noncitizens, instead requiring Defendants to inspect and process them all. *See supra* 1-4.

Defendants' final point, on the legislative history of § 1225, is unconvincing for two reasons. First, they quote a report on H.R. 2202, the Immigration in the National Interest Act of 1995 (later renamed the Immigration Control and Financial

---

the border as "attempting" to come into the United States at a POE. *See* Op. Ex. 17 at 197:21-202:3; *see also* 8 C.F.R. § 1.2 (defining "arriving alien" as "an applicant for admission . . . attempting to come into the [U.S.] at a [POE]").

[14] Defendants' citation to *DHS v. Thuraissigiam*, 140 S. Ct. 1959, 1982 (2020), *see* CM at 37-38, adds nothing to the Court's existing statutory interpretation of the relevant INA sections. The quoted fragment from *Thuraissigiam* has nothing to do with the meaning of the present-tense use of "arrives" in §§ 1158 or 1225.

[15] This Court has also rejected Defendants' argument about the use of the present progressive tense ("arriving in"). *See* CM at 38 n.6; Dkt. 280 at 38-39, 46-47.

1    Responsibility Act of 1996), which ***never became law***. *See* H.R. Rep. No. 104-469,

2    pt. 1, at 1 (noting bill number); Immigration Control and Financial Responsibility

3    Act of 1996, H.R. 2202, 104th Cong. (1995). Second, the section of the bill they

4    quote discusses a proposed 30-day deadline to file an affirmative asylum application,

5    which never became law and is wholly distinct from the government's duty to

6    provide access to the asylum process at POEs.[16]

7         In addition to arguing against this Court's prior statutory analysis, Defendants

8    argue that Plaintiffs' § 706(1) claim should fail because CBP continues to process

9    *some* asylum seekers, notwithstanding the turnback policy.[17] But, the fact that some

10   number of asylum seekers were eventually inspected at POEs and referred for

11   interviews does not establish that they were not initially turned back or metered.

12   Every turnback is a § 706(1) violation in the moment it occurs because it is

13   mandatory "agency action unlawfully withheld," and the undisputed facts show that

14   turnbacks occurred. *See* Op. Br. at 22-23. Second, Defendants argue that there can

15   be no "categorical" turnback policy if at least *some* asylum seekers were inspected

16   and processed. CM at 39-40. But, as this Court already explained, "Plaintiffs . . . do

17   not claim that the Turnback Policy is a policy to categorically deny asylum seekers

18   entry into the United States. Instead, Plaintiffs have demonstrated this is a policy

19   aimed at deterring or limiting asylum seekers from seeking asylum in the United

20   States." Dkt. 280, at 53. Even if credible fear referrals occurred, there is no genuine

21

22   _____

23   [16] Defendants make the mistake of conflating access to the asylum process with a
     specific step in the process—the determination of inadmissibility necessary to
     proceed to the referral mandate in § 1225(b)(1)(A)(ii). *See* CM at 38 n.6. The same

24   footnote also runs directly counter to controlling case law, in particular the Ninth
     Circuit's holding that "physical presence" is not a term of art, *Barrios v. Holder*, 581

25   F.3d 849, 863 (9th Cir. 2009), *abrogated on other grounds by Hernandez-Rivas v.
     Holder*, 707 F. 3d 1081, 1093 (9th Cir. 2013), and thus cannot be read as applying

26   only to noncitizens who have effectuated an "entry."

27   [17] Defendants argue that this demonstrates that there is no overarching agency policy
     to withhold mandatory action required under the INA. But the existence of an
     overarching agency policy goes only to Plaintiffs' § 706(2) claims.

28

OPP'N TO DEFS' CROSS-MOTION FOR S.J.

20

1  dispute that the turnback policy "deterr[ed] or limit[ed]" class members from

2  seeking asylum in the U.S., which is the core of Plaintiffs' claims. *Id.*[18]

3      Plaintiffs, not Defendants, are entitled to summary judgment on their APA

4  claims.

5  **III.   THE TURNBACK POLICY IS UNCONSITUTIONAL**

6      Defendants concede up front that, at a minimum, Plaintiffs' constitutional due

7  process rights are coextensive with their statutory rights. As Plaintiffs have

8  demonstrated, *see supra* 1-4; Op. Br. at 21-25, the turnback policy denies class

9  members statutorily guaranteed procedures governing the inspection of asylum

10  seekers. Thereby, Defendants deny class members due process of law.

11      Defendants claim that class members cannot invoke constitutional procedural

12  protections at the border. CM at 54. But this Court has already recognized that there

13  is nothing "'impracticable [or] anomalous' in applying elementary due process

14  protection at the U.S. border." Dkt. 280 at 74 (quotation omitted). This is especially

15  so where "the practical necessities" warrant application of the Due Process Clause.

16  *Id.* at 76. Summary judgment for Plaintiffs is warranted on this ground as well.

17  **IV.   THE TURNBACK POLICY VIOLATES THE ATS**

18      Seemingly ignoring the wealth of authority Plaintiffs marshal in support of

19  their ATS claim, Defendants accuse Plaintiffs of failing to demonstrate why this

20  Court should "fashion [such] a cause of action" under the ATS for violations of the

21  duty of *non-refoulement*. CM at 55. Defendants' ATS arguments all miss the mark.

22      First, Defendants correctly identify the *Sosa* standard—*i.e.*, that to be

23  cognizable under the ATS, a norm must be "specific, universal and obligatory," *Sosa*

24  *v. Alvarez-Machain*, 542 U.S. 692,  732 (2004)—but do nothing to contest the fact

25  that the duty of *non-refoulement* has reached that *jus cogens* status, *see* Op. Br. at

26

27  [18] Defendants oppose Plaintiffs' motion for summary judgment under § 706(1) by
    citing the factors analyzed in *Telecomms. Research & Action Ctr. v. FCC ("TRAC")*,
28  750 F.2d 70, 80 (D.C. Cir. 1984). CM at 40. Plaintiffs will address the *TRAC* factors in
    their forthcoming reply in support of their motion for summary judgment.

FER-0063

1  33. Through the ATS, Congress conferred on federal courts the power to "recognize

2  private causes of action" involving serious violations of the law of nations. *Sosa*,

3  542 U.S. at 724. *Non-refoulement* is just such a violation, as evidenced by the

4  consensus of international law opinion and jurisprudence. Despite Defendants'

5  assertion, it is no valid objection that this duty was not part of "the law of nations"

6  as it existed in 1789. *See Kiobel v. Royal Dutch Petroleum Co*, 569 U.S. 108, 115

7  (2013) ("the First Congress did not intend the provision to be 'stillborn'").

8      Second, Defendants incorrectly assert that *non-refoulement*-type claims are

9  actionable only in removal proceedings because the U.S. incorporated the norm into

10  domestic law through the withholding of removal statute. CM at 55. Not so.[19] The

11  norms cognizable under the ATS routinely mirror domestic law enactments, as one

12  would expect from a statute that is designed to make violations of "universal" legal

13  norms actionable. For example, both the ATS on the one hand and the Torture

14  Victim Protection Act (TVPA), 28 U.S.C. § 1350, and 18 U.S.C. § 2340A, on the

15  other hand, reflect the *jus cogens* norm prohibiting torture; yet courts do not hold

16  that the domestic implementation of a parallel norm defeats ATS jurisdiction. *See*

17  *Sosa* 542 U.S. at 713, 731; S. Rep. No. 102-249, at 5 (1991) (explaining the TVPA

18  is designed to "enhance the remedy already available under" the ATS by

19  "extend[ing] a civil remedy also to U.S. citizens who may have been tortured

20  abroad"); *see also Al Shimari v. CACI Premier Tech., Inc.*,  263 F. Supp. 3d 595

21  ────────────

[19] This Court should reject Defendants' reliance on *Stevic* for the proposition that the
22  *non-refoulement* obligation is not "available to aliens at the border." CM at 57. The
citation to *Stevic* reflects only that the 1952 withholding of removal statute did not
23  apply to those seeking "admission." *INS v. Stevic,* 467 U.S. 407, 421 (1984).
Importantly, the "prevailing international interpretation" of *non-refoulement* states
24  that the principle applies not only to those individuals who are admitted within a
country's borders, but to those at the border as well. Mark Gibney, *Refugees*, 4
25  ENCYCLOPEDIA OF HUMAN RIGHTS 315, 318 (Oxford University Press, 2009). *See*
*also Amuur v. France*, App. No. 19776/92, ¶ 52 (Eur. Ct. H.R. June 25, 1996)
26  ("Where a State is deemed to have control, it may only return an asylum seeker to
another country if that country will also abide by the principle of nonrefoulement
27  and allow the individual to seek asylum in accordance with international law."); 
Alice Edwards, *Human Rights, Refugees, and the Right to Enjoy Asylum*, 17 INT'L
28  J. REFUGEE L. 293, 301 ("[W]ithout appropriate asylum procedures, obligations
of *non-refoulement*, including rejection at the frontier, could be infringed").

OPP'N TO DEFS' CROSS-MOTION FOR S.J.

22

1    (E.D. Va. 2017) (finding ATS jurisdiction over claims grounded in international law

2    prohibitions on torture despite congressional enactments also prohibiting torture).

3    That Congress amended the INA to "conform[] it to the language of Article 33 of

4    the United Nations Protocol," *Stevic*, 467 U.S. at 421, counsels in *favor* of ATS

5    recognition. *Sosa*, 542 U.S. at 725-26 (conferral of ATS jurisdiction is strengthened

6    by looking "for legislative guidance").

7        Third, Defendants' analogy to *Bivens* is particularly misplaced. *Bivens* is

8    fundamentally distinct from the ATS: judicial skepticism of new *Bivens* claims

9    derives from its status as a *wholly* judicially created cause of action. *See Ziglar v.*

10   *Abbasi*, 137 S. Ct. 1843, 1848 (2017). By contrast, Congress created the ATS,

11   delegating to courts authority to recognize certain common law causes of action.

12   *Sosa*, 542 U.S. at 732. No court has held that the "judicial caution" already built into

13   the *Sosa* inquiry is remotely similar to the *Bivens* test's "special factors [that]

14   counse[l] hesitation." *See Al Shimari v. CACI Premier Tech., Inc.*, 320 F. Supp. 3d

15   781, 783-85 (E.D. Va. 2018) (rejecting *Bivens*-type limitations on ATS).

16       Finally, Defendants invoke *Hernandez v. Mesa*, 140 S. Ct. 735 (2020)—a case

17   that turns on *Bivens* "special factors" not material here—for the proposition that the

18   U.S. government merits special protection and deference at the border. CM 56. But

19   the mere incantation of "national security," "foreign relations," and "border

20   security" cannot defeat application of the ATS. *Ziglar*, 137 S. Ct. at 1862 (invocation

21   of "national-security concerns" cannot be a "talisman used to ward off inconvenient

22   claims"). Courts have enforced the ATS in contexts far more connected with bona

23   fide national security concerns than Defendants claim here. *See Al Shimari v. CACI*

24   *Premier Tech., Inc.*, 758 F.3d 516, 528-29 (4th Cir. 2014) (upholding ATS

25   jurisdiction over claims arising out of abuse of detainees held by U.S. military in

26   Abu Ghraib prison). Indeed, as the Supreme Court emphasizes, the primary

27   objective of the ATS is "to promote harmony in international relations by ensuring

28   foreign plaintiffs a remedy for international-law violations." *Jesner v. Arab Bank,*

OPP'N TO DEFS' CROSS-MOTION FOR S.J.

23

1   *PLC*, 138 S. Ct. 1386, 1406 (2018). That is no less true when the violations are

2   committed by the U.S. government and is precisely why an ATS cause of action

3   exists here. Defendants cannot simply send back asylum seekers *en masse* to another

4   country in flagrant disregard for the norm of *non-refoulement*, and they must be held

5   accountable for their repeated violations of international law.

6   **V.**    **PLAINTIFFS' STAND-ALONE INA CLAIM IS VALID**

7          Defendants argue that the Court should grant summary judgment in their favor

8   on Plaintiffs' standalone INA claim because Plaintiffs supposedly "lack a private

9   right of action under the INA." CM at 31-32. But Defendants are wrong that the INA

10   can be enforced only through the APA or the grant of an explicit cause of action in

11   the INA itself.[20] The Ninth Circuit recently recognized a court's inherent power—

12   independent of the APA—to constrain executive violations of law, explaining:

13   "[e]quitable actions to enjoin *ultra vires* official conduct do not depend upon the

14   availability of a statutory cause of action; instead they seek a 'judge-made remedy'

15   for injuries stemming from unauthorized government conduct, and they rest on the

16   historic availability of equitable review." *Sierra Club v. Trump*, 963 F.3d 874, 890-

17   91 (9th Cir. 2020) (citation omitted). Like the *Sierra Club* plaintiffs, Plaintiffs claim

18   that Defendants lack statutory authority to turn back asylum seekers at POEs; and

19   just as Plaintiffs' due process claim may proceed separately from the APA's

20   strictures under nonstatutory review, so too may their *ultra vires* claim. *Id.* at 891.

21          Defendants' reliance on *Ms. L v. ICE* is misguided.  The portion of the case

22   they cite relies on § 1158(d)(7), in which Congress *explicitly* precluded private

23   enforcement of a short list of procedures found in § 1158(d) related to the filing of

24   asylum applications, and not access to the asylum process itself. 302 F. Supp. 3d

25

---

26  [20] Defendants would have the Court believe that it already decided this question in
Defendants' favor. *See* CM at 31-32. Not so. As this Court explained, "its prior
27  statement regarding the scope of judicial review flowed from the nature of the
parties' prior dismissal briefing," which was "limited . . . to the sufficiency of
28  Plaintiffs' APA claims" as pled in the original complaint. Dkt. 280 at 67.

1    1149, 1168 (S.D. Cal. 2018); *see* § 1158(d)(7) ("Nothing *in this subsection* shall be

2    construed to [create an enforceable right or benefit.]") (emphasis added); *Keene*

3    *Corp. v. United States*, 508 U.S. 200, 208 (1993) ("Where Congress includes

4    particular language in one section of a statute but omits it in another . . . , it is

5    generally presumed that Congress acts intentionally and purposely in the disparate

6    inclusion or exclusion."). Here, Plaintiffs do not seek enforcement of the procedures

7    in § 1158(d), and *Ms. L v. ICE* does not limit nonstatutory review of the INA

8    provisions actually at issue in this case. *See* 302 F. Supp. 3d at 1168. Defendants'

9    only other cited case, *New Mexico v. McAleenan*, 450 F. Supp. 3d 1130, 1166

10   (D.N.M. 2020), involved only APA and constitutional claims, so the court's offhand

11   remark about a private right of action under "the INA" as a whole was dicta, not a

12   holding, and is neither binding nor persuasive. *Id.*; *see also* Complaint at ¶¶ 40-62,

13   *New Mexico v. McAleenan*, 19-cv-00534 (D.N.M. June 10, 2019) (Dkt. 1) (not

14   asserting a private right of action under the INA).

15        Defendants' arguments on the INA provide no basis for summary judgment.

16   **VI.    CONCLUSION**

17        For the foregoing reasons, Plaintiffs are entitled to summary judgment.

18   Dated: October 16, 2020

                                    MAYER BROWN LLP
19                                      Matthew H. Marmolejo
                                        Ori Lev
20                                      Stephen M. Medlock

21                                  SOUTHERN POVERTY LAW
22                                  CENTER
                                        Melissa Crow
23                                      Sarah Rich
24                                      Rebecca Cassler

25                                  CENTER FOR CONSTITUTIONAL
26                                  RIGHTS
                                        Baher Azmy
27                                      Ghita Schwarz
                                        Angelo Guisado
28

                                    OPP'N TO DEFS' CROSS-MOTION FOR S.J.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

AMERICAN IMMIGRATION
COUNCIL
Karolina Walters


By: */s/ Stephen M. Medlock*
Stephen M. Medlock

*Attorneys for Plaintiffs*

OPP'N TO DEFS' CROSS-MOTION FOR S.J.

26

**CERTIFICATE OF SERVICE**

I certify that I caused a copy of the foregoing document to be served on all counsel via the Court's CM/ECF system.

Dated:  October 16, 2020                    MAYER BROWN LLP

By _/s/ Stephen M. Medlock_

OPP'N TO DEFS' CROSS-MOTION FOR S.J.

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General
Civil Division
WILLIAM C. PEACHEY
Director, Office of Immigration Litigation –
District Court Section
KATHERINE J. SHINNERS (DC 978141)
Senior Litigation Counsel
ALEXANDER J. HALASKA (IL 6327002)
Trial Attorney
United States Department of Justice
Civil Division
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 307-8704 | Fax: (202) 305-7000
alexander.j.halaska@usdoj.gov

*Counsel for Defendants*

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA
### (San Diego)

| | |
|---|---|
| AL OTRO LADO, Inc., *et al.*, | Case No. 3:17-cv-02366-BAS-KSC |
| *Plaintiffs*, | Hon. Cynthia A. Bashant |
| v. | **MEMORANDUM IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| CHAD F. WOLF, Acting Secretary of Homeland Security, *et al.*, in their official capacities, | |
| *Defendants*. | |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................ iii

INTRODUCTION ............................................................................. 1

LEGAL STANDARD ........................................................................ 7

UNDISPUTED FACTS ...................................................................... 7

    A.    Congress Charged DHS, CBP, and OFO With Numerous
            Duties to Safeguard America's Borders.................................. 7

    B.    The 2016 Migration Surge Stretches the San Ysidro Port of
            Entry's Capabilities and Diverts Resources From Other
            Statutory Missions............................................................. 10

    C.    The Surge's Adverse Impacts Expand to Other Ports of Entry. ......... 12

    D.    DHS and CBP Take Additional Steps to Address the Surge. ............ 15

    E.    As the 2018 Migrant Caravan Approaches, CBP Issues Written
            Metering Guidance........................................................... 22

    F.    DHS Directs CBP to Prioritize Statutory Mission Sets. ................. 25

    G.    CBP Issues the Prioritization-Based Queue Management
            Memorandum. .................................................................. 30

ARGUMENT .................................................................................. 31

    I.    Plaintiffs Lack a Private Right of Action to Enforce the INA. ........... 31

    II.    Defendants Have Not Taken Discrete and Final Agency Action
         of the Sort Plaintiffs Contend............................................ 32

         A.    There is No Discrete "Turnback Policy." ................................ 32

         B.    The Border-Wide Metering Decisions are Not Final
              Agency Action. ........................................................ 35

    III.    Defendants Have Not "Direct[ed] CBP Officers to Unlawfully
         Withhold a Discrete, Mandatory Ministerial Action." ...................... 37

    IV.    Metering is Statutorily Permissible.................................... 40

    V.    Defendants' Actions are Not Arbitrary and Capricious................... 44

         A.    Defendants' Border-Wide Actions are Not Based on
              "Pretext." ............................................................... 45

         B.    The "True Motivations" for Metering are Lawful................... 51

i

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

1

      C.     Metering is Consistent with Congressional Intent....................53

VI.    Metering Does Not Deprive Class Members of Procedural Due Process............................................................................................54

VII.   Plaintiffs' International-Law Claim is Not Actionable.......................55

VIII.  Plaintiffs are Not Entitled to the Relief They Seek.............................58

CONCLUSION .........................................................................................................60

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ii

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

# TABLE OF AUTHORITIES

**Federal Cases**

*AID v. All. for Open Soc. Int'l,*
    140 S. Ct. 2082 (2019)........................................................54

*Al Otro Lado, Inc. v. McAleenan,*
    394 F. Supp. 3d 1168 (S.D. Cal. 2019) ........................ 5, 32, 36, 38

*Al Otro Lado, Inc. v. Nielsen,*
    327 F. Supp. 3d 1284 (S.D. Cal. 2018) ........................... 31, 32, 40

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986)...........................................................7

*Arlington Heights v. Metro. Housing Dev. Corp.,*
    429 U.S. 252 (1977)..........................................................51

*Bark v. U.S. Forest Service,*
    37 F. Supp. 3d 41 (D.D.C. 2014)..............................................34

*Bennett v. Spear,*
    520 U.S. 154 (1997)..........................................................35

*Cal. Communities Against Toxics v. EPA,*
    934 F.3d 627 (D.C. Cir. 2019)................................................36

*Cal. Wilderness Coalition v. DOE,*
    631 F.3d 1072 (9th Cir. 2011)................................................59

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986)...........................................................7

*City of Indianapolis v. Edmond,*
    531 U.S. 32 (2000)...........................................................56

*Compassion Over Killing v. FDA,*
    849 F.3d 849 (9th Cir. 2017) ................................................44

*Dept. of Commerce v. New York,*
    139 S. Ct. 2551 (2019)............................................ 6, 46, 51, 52

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

*DHS v. Thuraissigiam,*
   140 S. Ct. 1959 (2020)................................................................... *passim*

*E. Bay Sanctuary Covenant v. Trump,*
   932 F.3d 742 (9th Cir. 2018) ............................................... 43, 60

*E. Bay Sanctuary Covenant v. Trump,*
   950 F.3d 1242 (9th Cir. 2020)) ............................................ 53, 59

*E. Bay,* 950 F.3d at 1273 ........................................................53

*Edmo v. Corizon, Inc.,*
   935 F.3d 757 (9th Cir. 2019) ....................................................59

*Gardner v. Toilet Goods Ass'n, Inc. v. Gardner,*
   387 U.S. 158 (1967)...................................................................36

*Hamama v. Adducci,*
   912 F.3d 869 (6th Cir. 2018) ....................................................58

*Hells Canyon Preservation Council v. U.S. Forest Service,*
   593 F.3d 923 (9th Cir. 2010) ....................................................37

*Hernandez v. Mesa,*
   140 S. Ct. 735 (2020)..................................................... 1, 43, 56

*INS v. Stevic,*
   467 U.S. 407 (1984)............................................................ 55, 57

*Jean v. Nelson,*
   472 U.S. 846 (1985)...................................................................53

*Jennings v. Rodriguez,*
   138 S. Ct. 830 (2018)................................................................49

*Lightfoot v. District of Columbia,*
   273 F.R.D. 314 (D.D.C. 2011) ........................................... 33, 35

*Lujan v. Nat'l Wildlife Fed'n,*
   497 U.S. 871 (1990)......................................................32, 34, 36

*Massachusetts v. EPA,*
   549 U.S. 497 (2007)............................................................ 6, 43

iv

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

*Monsanto Co. v. Geertson Seed Farms*,
   561 U.S. 139 (2010)...................................................................................60

*Morrison v. Nat'l Australia Bank Ltd.*,
   561 U.S. 247 (2010)...................................................................................38

*Motor Vehicle Mfts. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983).....................................................................................44

*Ms. L. v. ICE*,
   302 F. Supp. 3d 1149 (S.D. Cal. 2018) .......................................................31

*Munaf v. Geren*,
   553 U.S. 674 (2008)...................................................................................58

*Navajo Nation v. Dept. of the Interior*,
   876 F.3d 1144 (9th Cir. 2017) ....................................................................35

*New Mexico v. McAleenan*,
   450 F. Supp. 3d 1130 (D. N.M. 2020)..........................................................31

*Norton v. Southern Utah Wilderness Alliance*,
   542 U.S. 55 (2004)........................................................... 5, 32, 34, 37

*Padilla v. ICE*,
   953 F.3d 1134 (9th Cir. 2020) ....................................................................58

*Quidel Corp. v. Siemens Med. Solutions USA, Inc.*,
   --- F. Supp. 3d ---, 2020 WL 1820247 (S.D. Cal. 2020) ...............................7

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
   566 U.S. 639 (2012)...................................................................................43

*Rafeedie v. INS*,
   880 F.2d 506 (D.C. Cir. 1989).....................................................................55

*Sale v. Haitian Ctrs. Council, Inc.*,
   509 U.S. 155 (1993)...................................................................................38

*San Luis & Delta-Mendota Water Authority v. Locke*,
   776 F.3d 971 (9th Cir. 2014) .............................................................. 44, 51

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

FER-0075

*Sanchez-Espinoza v. Reagan*,
  770 F.2d 202 (D.C. Cir. 1985)...................................................................59

*Shaughnessy v. United States ex rel. Mezei*,
  345 U.S. 206 (1953)............................................................................ 39, 54

*Sierra Club v. Costle*,
  657 F.2d 298 (D.C. Cir. 1981)..............................................................46

*Sierra Club v. Trump*,
  963 F.3d 874 (9th Cir. 2020) ...............................................................59

*Sosa v. Alvarez-Machain*,
  542 U.S. 692 (2004)............................................................................ 55, 56

*Sturgeon v. Frost*,
  136 S. Ct. 1061 (2016)..........................................................................38

*Tripoli Rocketry Ass'n v. ATF*,
  437 F.3d 75 (D.C. Cir. 2006).................................................................50

*U.S. Army Corps of Engineers v. Hawkes Co., Inc.*,
  136 S. Ct. 1807 (2016).......................................................................... 5, 35

*Ukiah Valley Med. Ctr. v. FTC*,
  911 F.2d 261 (9th Cir. 1990) .................................................................35

*Underhill v. Hernandez*,
  168 U.S. 250, 252 (1897) ......................................................................58

*United States ex rel. Knauff v. Shaughnessy*,
  338 U.S. 537 (1950)...............................................................................54

*United States v. Balint*,
  201 F.3d 928 (7th Cir. 2000) .................................................................38

*United States v. City of Fulton*,
  475 U.S. 657 (1986)...............................................................................53

*Wild Fish Conservancy v. Jewell*,
  730 F.3d 791 (9th Cir. 2013) ............................................................... 32, 34

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

*Winter v. NRDC*,
    555 U.S. 7 (2008) ................................................................. 58, 60

*Zadvydas v. Davis*,
    533 U.S. 678 (2001) ............................................................. 38, 54

**<u>Federal Statutes</u>**

5 U.S.C. § 551(13) ........................................................................ 32

5 U.S.C. § 704 .............................................................................. 35

5 U.S.C. § 706(1) ........................................................................... 5

5 U.S.C. § 706(2) ..................................................... 6, 40, 44, 59

6 U.S.C. § 111(b)(1) ............................................................. *passim*

6 U.S.C. § 202 ................................................................... 1, 9, 41

6 U.S.C. § 211(a) ........................................................................... 9

6 U.S.C. § 211(c) ................................................................. *passim*

6 U.S.C. § 211(g) ................................................................. *passim*

8 U.S.C. § 1225(b)(1)(A)(i) ....................................................... 38

8 U.S.C. § 1225(b)(1)(A)(ii) ...................................................... 54

8 U.S.C. § 1225(b)(2)(A) ............................................................ 39

8 U.S.C. § 1225(b)(2)(C) ............................................................ 53

8 U.S.C. § 1231(b)(3)(A) ...................................................... 55, 57

8 U.S.C. § 1231(h) ....................................................................... 55

8 U.S.C. § 1252(a)(5) .................................................................. 56

8 U.S.C. § 1252(b)(9) .................................................................. 56

8 U.S.C. § 1252(f)(1) ................................................................... 58

28 U.S.C. § 1350 ......................................................................... 55

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

FER-0077

**Federal Regulations**

8 C.F.R. § 235.1(a) ................................................................................37

**Federal Rules**

Fed. R. Civ. P. 23(b)(2) ..........................................................................57

Fed. R. Civ. P. 56(a) ................................................................................7

**Acts of Congress**

Homeland Security Act of 2002,
    Pub. L. No. 107-296, 116 Stat. 2135 (2002) ................................40

Trade Facilitation and Trade Enforcement Act of 2015,
    Pub. L. No. 114-125, 130 Stat. 122 (2016) ..................................41

**Administrative Rules and Decisions**

*Matter of Lewiston-Queenston Bridge*,
    17 I. & N. Dec. 410 (BIA 1980) ...................................................38

**Legislative Materials**

H.R. Rep. No. 104-469, pt. 1 (1996) .......................................... 38, 49, 53

H.R. Rep. No. 104-828 (1996) .................................................................39

**Other Authorities**

The American Heritage Dictionary of the English Language (3d ed. 1992) ...........38

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

## INTRODUCTION

"The United States' border with Mexico extends for 1,900 miles, and every day thousands of persons and a large volume of goods enter this country at ports of entry on the southern border." *Hernandez v. Mesa*, 140 S. Ct. 735, 746 (2020). "One of the ways in which the Executive protects this country is by attempting to control the movement of people and goods across the border, and that is a daunting task." *Id.* This case is about whether U.S. Customs and Border Protection (CBP) can control the flow of undocumented aliens into the ports of entry to help accomplish that daunting task.

"[T]he inspection, processing, and admission" of aliens is one of CBP's functions, 6 U.S.C. § 211(c), but it is not the government's primary function at the ports of entry. Congress tasked CBP's Office of Field Operations (OFO), the component that operates the ports, with deterring and preventing terrorists, weapons, illegal entrants, illicit drugs, agricultural pests, and contraband from entering the United States through the ports and "facilitat[ing] and expedit[ing] the flow of legitimate travelers and trade." *Id.* § 211(g)(3). Congress directed the Secretary of Homeland Security to secure the borders and the ports and to "ensur[e] the speedy, orderly, and efficient flow of lawful traffic and commerce." *Id.* § 202. The Department of Homeland Security's (DHS) "primary mission" is preventing terrorism in the United States and "ensur[ing]" that its component agencies' functions "that are not related directly to securing the homeland are not diminished or neglected except by a specific explicit Act of Congress." *Id.* § 111(b)(1).

In recent years, however, inspecting, processing, and detaining inadmissible arriving aliens has consumed an outsize proportion of OFO's strained resources to the detriment of CBP's national-security, counter-narcotics, economic-security, and trade-and-travel-facilitation missions. Beginning in 2016, a sustained and overwhelming surge of undocumented Haitian nationals, the majority of whom were not seeking asylum, sought admission to the United States through the San Ysidro Port

1

of Entry in San Diego. CBP made every effort to expand the Port's processing and detention capacity, including implementing its contingency plan for surge events, converting office and other spaces into temporary holding areas, diverting port officers from anti-narcotics functions, and using virtual processing to allow CBP officers and Border Patrol agents at other locations to process migrants remotely. But the queue of migrants awaiting processing continued to grow, until eventually the line stretched from the primary inspection booth inside the Port building "clear south into Mexico." Pl. Ex. 17 at 160:12. In late May 2016, around the time the Port surpassed 1,000 individuals in custody and individuals were sleeping in the elements for lack of holding space, San Ysidro stopped intake at the international boundary and directed officers to focus their efforts on processing migrants in custody.

The surge continued into the fall of 2016, changed in composition, and spread east to other ports of entry in OFO's San Diego Field Office and then to ports in the Tucson, El Paso, and Laredo Field Offices. The severe overcrowding, case-processing delays, and adverse impacts to frontline operations followed with it. By the close of Fiscal Year (FY) 2016, ports in the four southwest border Field Offices had encountered and processed more than 150,800 inadmissible aliens, a 70% increase from the recent major surge in 2014. In FY 2016, the southwest border ports seized 8% less narcotics by weight than in FY 2015, a decrease that was not consistent with rising trends in the years preceding and the years since. Def. Ex. 1 ¶ 21. From October 2016 to mid-April 2017, CBP spent more than $45.25 million in overtime, temporary details, and facilities in maintenance costs to address the surge.

In the fall of 2016, DHS and CBP took overarching steps to address the overcrowding and lessen the strain from the unprecedented migrant surge on DHS's operations. CBP created a Crisis Action Team (CAT). DHS and CBP approved the construction of a temporary processing center in El Centro, California. The facility ultimately did not open due to contracting issues, but DHS opened two other facilities in Tornillo and Donna, Texas, later that year. And in November 2016, the CBP

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

1   Deputy Commissioner authorized the use of "metering" or "queue management"

2   procedures border-wide. Generally, when a port is metering, an officer stands at the

3   international boundary and screens pedestrians' travel documents. Travelers with

4   facially legitimate documents are permitted to proceed across the border into the port

5   for inspection, and travelers without such documents may be instructed to wait until

6   the port has sufficient capacity to process their resource-intensive applications for

7   admission. There have been isolated missteps, particularly in the initial phases, but

8   the government's policy is and has always been that aliens on U.S. soil must be

9   processed for admission. The Deputy Commissioner explained: "I just want our

10  folks to have an additional tool to keep conditions safe and working at our POEs."

11  Pl. Ex. 69 at 935.

12          In January 2017, the surge abruptly ended. By that time, the southwest border

13  ports for the most part had stopped metering. But in spring 2018, the ports saw an-

14  other sustained increase in inadmissible aliens and again reported impacts to their

15  frontline operations. CBP also had evidence that a "caravan" of 550 undocumented

16  migrants was heading north to the border from Central America. Faced with increas-

17  ing numbers and evidence of a potential mass influx event, and seeking to avoid the

18  crisis that consumed the southwest border in 2016, the OFO Executive Assistant

19  Commissioner issued guidance to the four border Field Offices memorializing their

20  discretion to use queue management "[w]hen necessary or appropriate to facilitate

21  orderly processing and maintain the security of the port and safe and sanitary condi-

22  tions for the traveling public." Def. Ex. 2. The guidance is clear that "[o]nce a trav-

23  eler is in the United States, he or she must be fully processed." *Id.*

24          Although not all 550 caravan members reached the border at once, the number

25  of inadmissible arriving aliens continued trending upwards. DHS and CBP knew the

26  adverse impacts that a sustained migrant surge can bring, so in June 2018, the Sec-

27  retary of Homeland Security decided that "CBP must focus on its primary mission:

28

3

1  to protect the American public from dangerous people and materials while enhanc-

2  ing our economic competitiveness through facilitating legitimate trade and travel."

3  Def. Ex. 3 at 294. The Secretary instructed CBP to structure its staffing and resources

4  at the southwest border ports of entry in order of CBP's national-security, counter-

5  narcotics, economic-security, and trade-and-travel-facilitation mission sets, and to

6  use queue management to ensure that the ports have sufficient operational capacity

7  to implement those missions. *Id.* at 296. The Secretary explained that processing

8  undocumented aliens "remains a component of CBP's mission," *id.*, and indeed, it

9  did: The border Field Offices processed 13,604 more inadmissible aliens in FY 2018

10  than they did in FY 2017, and they referred twice as many of those inadmissible

11  arriving aliens for credible-fear interviews. Def. Ex. 4 at 2. "[B]ut priority should be

12  given to the" four identified mission sets. Def. Ex. 3 at 296.

13       The prioritization regime was successful. From FY 2018 to FY 2019, the bor-

14  der Field Offices' narcotics seizure weights for fentanyl and methamphetamine in-

15  creased by 58% and 19%, respectively, and the value of interdicted outbound cur-

16  rency increased by more than $2.4 million. Def. Ex. 5 at 304. During the same pe-

17  riod, the Field Offices saw a moderate increase in the total number of inadmissible

18  arriving aliens (from 124,876 to 126,001), and again referred twice as many aliens

19  for credible-fear interviews in FY 2019 (80,055) as they did in FY 2018 (38,399).

20  Def. Ex. 4 at 2. In November 2019, OFO directed the Field Offices to renew their

21  focus on the priority missions, and the Acting CBP Commissioner ordered the OFO

22  Executive Assistant Commissioner to continue prioritizing staffing and resources at

23  the ports in accordance with the Secretary's June 2018 memorandum.

24       Plaintiffs contend that these and a host of other DHS and CBP actions since

25  2016 together constitute "the turnback policy," which is a purported "overarching

26  agency policy directing th[e] unlawful withholding of mandatory action" under the

27  INA, and which was adopted with the "desire to limit access to the asylum process

28  at POEs for its own sake."  Pls.' Mem. in Support of Mot. for Summ. J. 21, 29 (Pl.

4

1    MSJ; ECF No. 535-1). Plaintiffs contend that "the turnback policy" is unlawful un-

2    der the Immigration and Nationality Act (INA), the Administrative Procedure Act

3    (APA), the Due Process Clause, and the international law norm of non-refoulement.

4         Plaintiffs are wrong, and this Court should enter summary judgment for the

5    government on all counts.

6         *First*, Defendants are entitled to summary judgment on Plaintiffs' APA claims

7    because they fail to challenge a "circumscribed, discrete agency action[]." *Norton v.*

8    *Southern Utah Wilderness Alliance*, 542 U.S. 55, 62 (2004). There is no such thing

9    as "the turnback policy," nor is there any evidence that the myriad government ac-

10   tions that Plaintiffs identify were taken pursuant to the same agency policy. Plaintiffs

11   have "simply attach[ed] a policy label to disparate agency practices or conduct" and

12   called it agency action, which under the APA they simply "may not" do. *Al Otro*

13   *Lado, Inc. v. McAleenan*, 394 F. Supp. 3d 1168, 1207 (S.D. Cal. 2019). Further, the

14   government's border-wide metering decisions do not "give[] rise to direct and ap-

15   preciable legal consequences," *U.S. Army Corps of Engineers v. Hawkes Co., Inc.*,

16   136 S. Ct. 1807, 1814 (2016) (quotation marks omitted), and thus are not "final."

17   *Second*, Defendants are entitled to summary judgment on Plaintiffs' first APA

18   claim (under 5 U.S.C. § 706(1)) because the government has not "directed [CBP]

19   officers to unlawfully withhold" the government's obligations under 8 U.S.C.

20   §§ 1158 and 1225. *See* Pl. MSJ 21–23. Defendants respectfully maintain their posi-

21   tion that §§ 1158 and 1225 do not impose obligations on the government toward

22   aliens who stand outside the United States. But even if the statutes applied, the gov-

23   ernment has not "direct[ed] th[e] unlawful withholding of" its legal obligations. The

24   southwest border Field Offices continue to inspect and process inadmissible arriving

25   aliens and in fact referred almost five times as many of those aliens for credible-fear

26   interviews in FY 2019 than they did in FY 2017. Def. Ex. 4 at 2. At *most*, such

27   agency action is delayed, and Plaintiffs do not attempt to argue that delays attendant

28   to metering were unreasonable. *See* Pl. MSJ 19–31. Thus, their § 706(1) claim fails.

5

FER-0083

1    *Third*, Defendants are entitled to summary judgment on Plaintiffs' second

2    APA claim (under 5 U.S.C. § 706(2)) because the government's border-wide meter-

3    ing decisions are statutorily permissible. *See* Pl. MSJ 24–25. Congress ordered CBP

4    to perform a number of critical national-security, counter-narcotics, economic-secu-

5    rity, and trade-and-travel functions at the ports and elevated DHS's national-security

6    and counter-narcotics functions above all others, 6 U.S.C. §§ 111(b)(1), 211(c),

7    (g)(3), and the agency has reasonably exercised its "broad discretion to choose how

8    best to marshal its limited resources and personnel to carry out its delegated respon-

9    sibilities," *Massachusetts v. EPA*, 549 U.S. 497, 527 (2007) (citation omitted).

10    *Fourth*, each of the government's border-wide metering decisions is well-sup-

11    ported by the facts, is the product of reasoned decisionmaking, and is not based on

12    an arbitrary and capricious interpretation of the INA. *See* Pl. MSJ 26–31. The stated

13    purpose of metering is to address capacity constraints. There is no "pretext" because

14    CBP *in fact was facing capacity constraints*. Even if the evidence showed that there

15    were other reasons for metering, "a court may not reject an agency's stated reasons

16    for acting simply because the agency might also have had other unstated reasons."

17    *Dept. of Commerce v. New York*, 139 S. Ct. 2551, 2573 (2019).

18    *Fifth*, the government has not violated class members' procedural-due-process

19    rights, *see* Pl. MSJ 31–33, because they do not have a protected statutory interest

20    while they stand in Mexico. Even if class members had a protected interest, they

21    cannot obtain more than what the statute already provides.

22    *Sixth*, Plaintiffs' Alien Tort Statute (ATS) claim (at 33–36) is not actionable.

23    There is no cause of action for purported violations of the non-refoulement doctrine,

24    and it would be an extraordinary exercise of lawmaking power for this Court to cre-

25    ate such a cause of action here.

26    *Finally*, even if Plaintiffs were to succeed on their claims, they are not entitled

27    to the permanent injunctive and declaratory relief they seek. Vacatur of the border-

28    wide metering decisions is an appropriate legal remedy that provides complete relief.

6

1  Moreover, the balance of the harms weighs starkly against an injunction of metering,

2  as it would harm CBP's national-security and economic security functions and lead

3  to overcrowded facilities where class members would suffer.

4    This Court should enter summary judgment for the government on all Claims.

5  **LEGAL STANDARD**

6    The Court "shall grant summary judgment if the movant shows that there is

7  no genuine dispute as to any material fact and the movant is entitled to judgment as

8  a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if "the evidence is such

9  that a reasonable jury could return a verdict for the nonmoving party." *Anderson v.*

10  *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). The moving party

11  can carry its burden: "(1) by presenting evidence that negates an essential element

12  of the nonmoving party's case; or (2) by demonstrating that the nonmoving party

13  failed to make a showing sufficient to establish an element essential to that party's

14  case on which that party will bear the burden of proof at trial." *Quidel Corp. v. Sie-*

15  *mens Med. Solutions USA, Inc.*, --- F. Supp. 3d ---, 2020 WL 1820247, at *2 (S.D.

16  Cal. 2020) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). "'Credi-

17  bility determinations, the weighing of the evidence, and the drawing of legitimate

18  inferences from the facts are jury functions, not those of a judge" at the summary-

19  judgment stage. *Id.* at *3 (quoting *Anderson*, 477 U.S. at 255). The non-movant's

20  evidence "is to be believed, and all justifiable inferences are to be drawn in [its]

21  favor." *Anderson*, 477 U.S. at 255; *Quidel Corp.*, 2020 WL 1820247, at *3.

22  **UNDISPUTED FACTS**

23  **A.**  **Congress Charged DHS, CBP, and OFO With Numerous Duties to Safe-**

24     **guard America's Borders.**

25    CBP's Office of Field Operations is the largest component of the largest fed-

26  eral law-enforcement agency in the United States, with operations spanning over 328

27  ports of entry within 20 field offices and 70 international locations. *See* Def. Ex. 6

28  at 1. Almost 30,000 OFO employees implement CBP's mission "[t]o safeguard

7

MEM. IN SUPPORT OF DEFS.' CROSS-<br>MSJ & IN OPP'N TO PLS.' MSJ<br>Case No. 3:17-cv-02366-BAS-KSC

1    America's borders thereby protecting the public from dangerous people and materi-

2    als while enhancing the Nation's global economic competitiveness by enabling le-

3    gitimate trade and travel." Pl. Ex. 10, at 51:2–4; Def. Ex. 7 at 1.

4         Congress mandated that OFO "shall coordinate the enforcement activities of

5    [CBP] at United States air, land, and sea ports of entry to deter and prevent terrorists

6    and terrorist weapons from entering the United States at such ports of entry; conduct

7    inspections at such ports of entry to safeguard the United States from terrorism and

8    illegal entry of persons; prevent illicit drugs, agricultural pests, and contraband from

9    entering the United States; in coordination with the Commissioner, facilitate and

10   expedite the flow of legitimate travelers and trade; ... coordinate with the Executive

11   Assistant Commissioner for the Office of Trade with respect to the trade facilitation

12   and trade enforcement activities of [CBP]; and carry out other duties and powers

13   prescribed by the Commissioner." 6 U.S.C. § 211(g)(3) (numbering omitted).

14        OFO is only one of several offices within CBP. Congress has tasked CBP with

15   many additional functions, including to coordinate CBP's "security, trade facilita-

16   tion, and trade enforcement functions"; to direct and administer CBP's commercial

17   operations; to "detect, respond to, and interdict terrorists, drug smugglers and traf-

18   fickers, human smugglers and traffickers" and other national security threats from

19   abroad; to "ensure the overall economic security of the United States is not dimin-

20   ished by efforts, activities, and programs aimed at securing the homeland"; to "de-

21   velop and implement screening and targeting capabilities," including for passengers

22   and cargo; to "enforce and administer the laws relating to agricultural import and

23   entry inspection"; and, "in coordination with [ICE] and United States Citizenship

24   and Immigration Services [USCIS], [to] enforce and administer all immigration

25   laws ... including the inspection, processing, and admission of persons who seek to

26   enter or depart the United States, and the detection, interdiction, removal, departure

27   from the United States, short-term detention, and transfer of persons unlawfully en-

28   tering, or who have recently unlawfully entered, the United States." *Id.* § 211(c).

8

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

1  And CBP in turn is only one component agency of the Department of Home-

2  land Security (DHS). *Id.* § 211(a). DHS's "primary mission[s]" are focused on se-

3  curing the nation and the prevention of terrorism and terrorist attacks. *See id.*

4  § 111(b)(1). Further, DHS is charged with not only preventing the entry of terrorists

5  and securing the borders, but also administering customs laws, conducting agricul-

6  tural inspections, carrying out all immigration enforcement functions, administering

7  the laws governing permissions for aliens to enter the United States, and "establish-

8  ing national immigration policies and priorities." *Id.* §§ 202(1)–(7). "In carrying out

9  the foregoing responsibilities," the Secretary shall "[e]nsur[e] the speedy, orderly,

10  and efficient flow of lawful traffic and commerce." *Id.* § 202(8).

11  The southwest border Field Offices perform an immense job. In 2019, the

12  ports in those Field Offices processed approximately 49.2 million pedestrians; 73

13  million personal vehicles and 136.9 million personal passenger vehicles; 2.2 million

14  bus passengers; and 6.4 million trucks and 6.5 million truck containers. *See* Def. Ex.

15  8 at 1, 2, 4–5. OFO also "plays a vital role in interdicting illicit narcotics." Def. Ex.

16  9 at 1. The "vast majority of all opioids interdicted by CBP are seized at ports of

17  entry." *Id.* at 1; *see id.* at 4–5. From 2013 to 2017, 88% of CBP's opioid seizures

18  occurred at ports of entry, and 75% of those seizures occurred at ports on the south-

19  west border. *Id.* at 1. CBP currently "does not have technology that screens all pack-

20  ages, cargo, or vehicles," so the agency's "ability to detect narcotics hidden on indi-

21  viduals, in vehicles, or comingled with shipments of goods currently relies heavily

22  on targeting intelligence and officer training and experience." *Id.* at 16.

23  The ports of entry often operate with "significant shortages" of CBP officers.

24  *Id.* at 1. As of May 2018, there were "4,000 [CBP officers] less than the number

25  needed to staff all ports of entry. Ports of entry in the San Diego and Tucson areas ...

26  have required CBP to assign temporary staff details to fulfill staffing needs at those

27  locations. The practice of temporary details has become so systemic ... that CBP has

28  named it 'Operation Overflow.'" *Id.* at 2; *see also* Def. Ex. 10 at 836.

9

**B.     The 2016 Migration Surge Stretches the San Ysidro Port of Entry's Capabilities and Diverts Resources From Other Statutory Missions.**

Beginning in February 2016, inadmissible Haitian nationals traveling from Brazil began presenting themselves in significant numbers at the San Ysidro Port of Entry in San Diego, the busiest land border crossing in the Western Hemisphere. *See* Pl. Ex. 33 at 443; Def. Ex. 11 at 1. By May 2016, CBP officials in Southern California "exhausted every effort" to "expand any additional processing and [short-term] detention capacity" to accommodate this influx. Pl. Ex. 17 at 160:9–18. Measures included activating the San Ysidro Admissibility Enforcement Unit's (AEU) "Max Capacity Contingency Plan" San Ysidro's Admissibility Enforcement Unit, Pl. Ex. 35 at 271, which involved "convert[ing] office and administrative spaces to temporary holding areas to increase capacity to over 900 persons," Pl. Ex. 33 at 444; Pl. Ex. 29 at 660; Def. Ex. 12; converting a maintenance area recently vacated by the General Services Administration (GSA) into a holding area, Pl. Ex. 34 at 339; almost doubling the number of CBP officers assigned to the AEU per shift, Pl. Ex. 35 at 271; diverting officers from anti-narcotics functions to assist the AEU with processing, Pl. Ex. 35 at 271; using "virtual processing" to allow CBP officers in the San Diego, Los Angeles, Detroit, and Miami Field Offices and Border Patrol agents in the El Centro Sector to assist in processing migrants at San Ysidro, *id.*; Pl. Ex. 34 at 338; Def. Ex. 10 at 835; housing detainees at nearby Border Patrol facilities, if the facilities "were not already at capacity," Pl. Ex. 33 at 445; and transferring processing of all I-94 arrival records for documented non-resident aliens to the Otay Mesa Port of Entry to free up workstations at San Ysidro, Pl. Ex. 34 at 339. Even with all of these measures, undocumented aliens still had to wait to be processed and detained. Aliens "without documents for admission would queue in an area between the [international boundary] at the port of entry and the primary [pedestrian] lanes to wait until there was sufficient space" to be processed. Pl. Ex. 17 at 159:12–19. By late May 2016, this queue stretched from the primary inspection booths at the POE

10

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

1   "clear south into Mexico." *Id.* at 160:12.

2       The numbers of undocumented aliens seeking entry at San Ysidro continued

3   to grow, to the point that the Port reached surpassed 1,000 individuals in custody

4   and CBP officers at San Ysidro were compelled to "stop intake at the international

5   boundary" because there "was no space" left, and they needed to bring in everyone

6   from the queue "to make sure they were not left in the elements." Pl. Ex. 17 at 160:6–

7   161:9; Def. Ex. 10 at 836; *see also* Def. Ex. 1 ¶ 22. On May 26, 2016, when asked

8   by a media outlet about the "several hundred people [] sleeping on the floor of the

9   [San Ysidro] pedestrian entrance," the San Ysidro Port Director directed his staff "to

10   do all we can to get this under control." Pl. Ex. 41, at 552–53. He instructed them

11   "to continue to process in a timely manner" and locate temporary holding space "as

12   efficiently as possible." *Id.* at 552. On May 27, 2016, upon receiving word that

13   "[o]ne of the shelters" in Mexico was bringing "a van full" of individuals to the limit

14   line, the San Ysidro Assistant Port Director instructed the Watch Commander to

15   "hold them at the turnstile and not allow them to come into the line. We have no

16   space and it is ugly." Pl. Ex. 42 at 127; *see also* Def. Ex. 1 ¶ 21. Shortly thereafter,

17   the Port Director instructed his deputies "to hold the line the best we can" to enable

18   staff to "process cases and only focus on processing case[s] at this time." Pl. Ex. 43

19   at 657. The next evening, the Assistant Port Director remarked that "[t]his could go

20   on for a while. When they bring the 74+ from the shelter, the 50 I saw this morning

21   plus whatever else is arriving, we will be overcrowded." Pl. Ex. 44 at 316. In re-

22   sponse, the Port Director ordered his deputies to "coordinate and bring small groups

23   at a time and hold the line to prevent any from entering." *Id.*

24       On May 29, 2016, San Ysidro leadership notified supervisors that the govern-

25   ment of Mexico had "set[] up shelters in Tijuana to house those waiting to claim

26   credible fear/asylum," rather than continue to allow them to wait unsheltered in "a

27   line staged on the Mexican side" of the border. Pl. Ex. 11 at 298. The Mexican gov-

28   ernment would ███████████████████████████████████████

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

1   ███████████ *Id.* CBP officers were to "staff[] the ... Limit Line to ensure that trav-

2   elers have documents" and ensure that "those coming to seek credible fear/asylum

3   are identified and directed appropriately at the onset if feasible." *Id.*

4          To add to the operational challenges posed by surge, San Ysidro was in the

5   middle of a multi-phase, multi-year "complete reconfiguration and expansion of the

6   port" that "included the demolition and construction of the LPOE [land port of en-

7   try], including primary and secondary inspection areas, administration and pedes-

8   trian buildings, and all other support structures." Def. Ex. 11 at 1. In late June 2016,

9   as phase 2 of the GSA construction project began, the "PedEast" facilities that San

10  Ysidro had utilized in May to create makeshift detention space for the overflow of

11  undocumented migrants were demolished. Pl. Ex. 33 at 444; Def. Ex 12. This effec-

12  tively cut the Port's short-term detention capacity from ███ (which it achieved by

13  converting office and other space, *see* Pl. Ex. 33 at 444) to ███. Def. Ex. 10 at 837.

14  During the surge at San Ysidro, officers were regularly reminded that "[u]nder no

15  circumstances will an asylum applicant be denied entry into the U.S. Please direct

16  all applicants to the Pedestrian West (PedWest) facility for proper intake and pro-

17  cessing." Pl. Ex. 8 at 069, 070, 071 (instructions issued in July, Sept., and Nov. 2016

18  to the San Ysidro and Otay Mesa POEs).

19  **C.    The Surge's Adverse Impacts Expand to Other Ports of Entry.**

20          The migrant surge continued into the fall of 2016, began spreading east, and

21  started to change in composition to include more family units (FAMU or FMUA)

22  and unaccompanied alien children (UAC). *See* Pl. Ex. 10 at 313:9–319:8. Other ports

23  began to experience severe overcrowding, case-processing delays, and related ad-

24  verse impacts to their operations. For example, on September 3, 2016, the El Paso

25  Port of Entry in Texas, which around that time reported a detention capacity of ███

26  persons, Def. Ex. 13 at 100, "received 92 cases in one shift. Since th[at] date, the

27  Port [] experienc[ed] a significant spike in FAMU cases. In the ten day span between

28  September 4 and September 13 the Port [was] averaging ███ subjects in custody per

12

1  day." Def. Ex. 14 at 893–94; *see* Def. Ex. 15 at 737 (reporting on Sept. 9, 2016 "an

2  all-time high of 265 detainees in custody"). "During this spike, an average of 23%

3  FAMU cases [were] held at a POE in excess of 72 hours pending placement." Def.

4  Ex. 14 at 894. The Port was "providing up to 1,000 meals per day using microwaves.

5  The facility [was] not equipped for this amount of volume." *Id.* "Active caseload

6  management [was] being performed by transporting cases for processing to less af-

7  fected Ports." *Id.* But the El Paso Field Office "has no ground transportation contract.

8  All transports are performed by OFO officers." *Id.* at 893. "[T]he increased trans-

9  ports between Ports, to ERO facilities, and to the Airport is straining OFO vehicle

10  and personnel resources." *Id.* at 894. Moreover, the Field Office was "scheduled to

11  detail eight (8) Officers to San Diego" on October 3, 2016. *Id.; see also* Def. Ex. 16

12  at 099 (on Sept. 21, 2016, noting need for overflow holding area and more staffing).

13       On September 12, 2016, "at least 950 Haitians" arrived in Tijuana to be pro-

14  cessed at San Ysidro. Pl. Ex. 12 at 741; Pl. Ex. 50 at 747–48. "Haitians [were] also

15  [] arriving in increasing numbers at other ports of entry in [preceding] weeks, such

16  as Calexico, which is far less resourced than San Ysidro." Pl. Ex. 12 at 741. Repre-

17  sentatives from the U.N. High Commissioner for Refugees (UNHCR) "confirmed"

18  that "most" of the Haitian nationals were "not seeking asylum. ... Instead, they

19  [were] expressing interest in working and/or reuniting with family in the" United

20  States. *Id.* "At least half of CBP's staffing and space previously dedicated to pro-

21  cessing asylum-seekers [was] being used to process Haitian parole cases." *Id.* at 742.

22  UNHCR acknowledged that "[b]oth CBP and ICE in Southern California [were] ...

23  doing what they c[ould] with existing resources to process the Haitians expeditiously

24  and humanely and maintain regular processing of asylum-seekers." *Id.* at 741–42.

25       On September 27, 2016, the El Paso POE reported that it "ha[d] 361 detainees

26  in custody" (surpassing its September 9 "all-time high of 265 detainees in custody,"

27  Def. Ex. 15 at 737) "as more FAMU and UAC continue to arrive." Def. Ex. 17 at

28  817. On September 28, 2016, the El Paso POE reported that it had diverted resources

13

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

1   from various other operational areas "to address the current Credible Fear processing

2   and detention overflow at the" Port. Def. Ex. 18 at 684. It redirected officers who

3   work on terrorism-related enforcement to assist with inadmissible alien case pro-

4   cessing and related duties (*see id.*, "ATCET [Anti-Terrorism Contraband Enforce-

5   ment Team] Supervisors and Officers have been re-directed to assist with PCS [Pass-

6   port Control Secondary], PVP [Passenger-Vehicle-Pedestrian] and transportation

7   duties until further notice"); suspended new-officer training; redirected training of-

8   ficers and firearm staff to assist with inadmissible alien case processing and trans-

9   portation; redirected "CBP Techs assigned to the Administration Office ... to each

10   bridge location to assist with feeding and other duties as necessary to keep the Of-

11   ficers focused on processing." Def. Ex. 18 at 684; *see* Def. Ex. 19 at 859–68 (images

12   of overcrowding at the El Paso Field Office's ports of entry). Even so, on September

13   30, 2016, ports of entry in the El Paso Field Office ports "surpassed 400" in custody.

14   Def. Ex. 20 at 830. The situation was "critical." *Id.* Nevertheless, OFO was in the

15   process of transporting Haitian migrants into the El Paso Field Office from the San

16   Diego Field Office to relieve the pressure at the California ports. *Id.*

17       On October 3, 2016, the El Paso Field Office reported that the surge of UACs

18   and family units "continues to create adverse impacts to port operations, as UAC

19   and FAMU's [*sic*] are being placed throughout administrative spaces of the port.

20   Additionally, CBP personnel are being reassigned to support this influx, impacting

21   other critical areas." Def. Ex. 21 at 755. The same day, the El Paso Border Patrol

22   Sector reported that it was "barely staying afloat," and requested that the El Paso

23   Field Office move its detainees out of Border Patrol's Paso Del Norte facility and

24   into others because Border Patrol was "currently out of policy ... by holding subjects

25   in non-holding cells." Def. Ex. 22 at 270.

26       Other southwest border ports experienced similar overcrowding and adverse

27   impacts on port operations. *See, e.g.*, Def. Ex. 23 (Oct. 3, 2016 report that Browns-

28   ville POE had to re-allocate staff to address "high volume of detainees"); Def. Ex.

14

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

1    24 (Oct. 14, 2016 report that the Laredo Field Office had to divert staff, detail offic-

2    ers, and was "expanding use of port administrative space for temporary holding,"

3    which required additional personnel); Def. Ex. 25 (Oct. 16, 2016 report from the

4    Port of Hidalgo); Def. Ex. 26 (Oct. 25, 2016 report from the Port of Hidalgo); Def.

5    Ex. 27 (Oct. 10, 2016 report from the Port of San Luis in the Tucson Field Office);

6    Pl. Ex. 16 at 46:5–13 (numbers in custody at San Luis were "unsafe" and "un-

7    healthy"); Def. Ex. 28 (Oct. 19, 2016 report from Port of Nogales); Def. Ex. 29 (Oct.

8    25, 2016, Ports of Nogales and San Luis had "far exceeded capacity").

9            On October 5, 2016, ███████████████████████████████████████

10   ████████████████████████████████████████████████████████████████

11   ████████████████████████████████ the Deputy CBP Commissioner asked ICE

12   about the possibility of increasing the rate of pickups from the San Ysidro and Calex-

13   ico Ports of Entry. Def. Ex. 30 at 527. The Acting ICE Director responded that ICE

14   was "currently at 39,650 aliens in custody," "the highest level in [its] history." *Id.*

15           On October 17, 2016, the San Diego Field Office was utilizing 155% of its

16   detention capacity, the Tucson Field Office was utilizing 231% of its detention ca-

17   pacity, the El Paso Field Office was using 99% of its detention capacity, and the

18   Laredo Field Office was utilizing 106% of its detention capacity. Def. Ex. 31 at 585.

19   In FY 2016, the southwest border ports of entry encountered more than 150,800

20   inadmissible aliens, a 70% increase over FY 2014. Def. Ex. 32 at 562.

21   **D.    DHS and CBP Take Additional Steps to Address the Surge.**

22           Against this backdrop, in the fall of 2016, DHS and CBP evaluated and took

23   additional, overarching steps to address overcrowding and to lessen the strain of the

24   unprecedented migrant surge on DHS operations and mitigate humanitarian con-

25   cerns. These steps involved plans to increase processing and holding capacity, as

26   well as to meter the intake of aliens without documents sufficient for lawful entry.

27           In October 2016, the CBP Commissioner "established a single CBP Crisis

28   Action Team," Def. Ex. 33 at 4, the purpose of which was "to mitigate impacts to

15

1   mission essential functions," Def. Ex. 34 at 710, and "to learn lessons from and avoid

2   repeating mistakes made during a prior surge of UAC in 2014," Def. Ex. 33 at 4.

3   The Crisis Action Team (CAT) was "[c]omposed of representatives from various

4   CBP components" and "compiled data and developed strategies to address the surge

5   and overcrowding." *Id.* at 4.

6        On October 18, the day ICE reported surpassing 41,000 detention beds, CBP

7   Deputy Commissioner McAleenan communicated to CBP leadership that the Secre-

8   tary and Commissioner had approved the establishment of a temporary processing

9   center for Haitian nationals in El Centro, California. Pl. Ex. 47 at 116–17. Consid-

10  erations supporting the facility's establishment included the "current numbers in

11  Baja California and throughout the transit route from Panama," the "lack of near-

12  term removals to Haiti" because of Hurricane Matthew, the lack of "near-term agree-

13  ment with Brazil for returns of Haitians with residency status there," the "pressure

14  on Mexico and Central American partners" caused by "over 12,000 Haitian nationals

15  in various stages of transit and high-level requests from Mexico and others for US

16  assistance," and "no immediately available path for providing foreign assistance for

17  Central American partners to conduct detention and removal operations." *Id.* at 116.

18  In this broader discussion of regional migration patterns and international coordina-

19  tion, Mr. McAleenan also noted that ████████████████████████████████

20  ████████████████████████████████████████████████████████████████

21  ████████████████████████████████████████████████████████████████

22  ████████████████████████████████████████████████████████████████

23  ████  *Id.*

24       On October 30, 2016, the CBP Commissioner directed his staff "to continue

25  El Centro work" and "look[] at bringing the Nogales facility from 2014 back on

26  line." Pl. Ex. 55 at 175. On or about October 31, 2016, the Secretary and the Com-

27  missioner "approved moving forward with the plan to establish the infrastructure

28  that would support ████████ soft-sided FMUA or UAC beds." *Id.* at 173. On or about

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

1  November 1, 2016, the El Centro facility was expected to have a "soft opening on

2  November 14th and a full opening on November 28th." Pl. Ex. 56 at 316.

3         On November 2, 2016, the OFO Executive Assistant Commissioner wrote to

4  his deputies that he was "seeing engagement by senior leaders at the department and

5  in the administration on our migration and detention issues." Pl. Ex. 60 at 228. In

6  addition to steps identified above, DHS was working to █████████████

7  ████████████████████████████████████████████████████

8  ████████████████████████████████████████████████████

9  ████████████████████████████████  *Id.* at 228; *see also* Pl. Ex. 59 at 845

10 ████████████████████████████████████████████████████

11 ████████████████████████████████████████████████████

12 ██████.

13        At this time, the CAT began reporting on the ongoing DHS-coordinated plans

14 "for addressing the surge of migration along the Southwest border." Pl. Ex. 61 at

15 530. ████████████████████████████████████████████████

16 ████████████████████████████████████████████████████

17 ████████████████████████████████████████████████████

18 ████████████████████████████████████████████████████

19 ████████████████████████████████████████████████████

20 ████████████████████████████████████████████████████

21 ████████████████████████████████████████████████████

22 ████████████████████████████████████ *Id.*

23        On November 7, 2016, both the San Ysidro and Calexico Ports of Entry were

24 "at capacity and [were] prioritizing intake to manage the flow." Pl. Ex. 62 at 790.

25 That same day, the CAT held an "operational conference call" with the San Diego

26 Field Office to "discuss the 'soft opening' of the El Centro Processing center" on

27 November 14. *Id.* ████████████████████████████████████████████

28 ████████████████████████████████████████████████████

17

1  ████████████████████████████████████████ *Id.* ██████████████████████

2  ████████████████████████████████████████████████████████████████████

3  ████████████████████████████████████████████████████████████████████

4  ██████████████████████████████████████████████████████████████ *Id.* at 790,

5  791. ████████████████████████████████████████████████████████████

6  ████████████████████████████████████████████████████████████████████

7  ██████████████████████ *See id.* at 790.

On November 9, 2016, the CAT informed CBP leadership that the "El Centro Facility will NOT have a soft opening of 11/14 and will NOT go live on 11/28. Planning and contracting will continue but NO TDY personnel from OFO and ICE will be deployed. CBP will continue to work and have [the] facility ready for when trigger is pulled to staff it." Pl. Ex. 65 at 879. "[T]he issue [was] bed space." *Id.* at 878. ████████████████████████████████████████████████████████

14  ████████████████████████████████████████████████████████████████████

15  ██████████████████████████████████ Pl. Ex. 66 at 216. The CAT continued to discuss and work on other options for soft-sided facilities. Pls.' Ex. 65, at 879.

On November 10, 2016, CBP Deputy Commissioner McAleenan discussed "meter[ing] the flow ... at the POE bridges (at the middle of the bridge) at some of our Texas POEs to prevent the overflow at the actual POE." Pl. Ex. 67 at 936; *see also* Pl. Ex. 68 (Commissioner Kerlikowske and Mr. McAleenan "briefed" Secretary Jeh Johnson "that [they] wanted to increase efforts to meter arrivals of non-UAC, non-Mexican CF cases mid-bridge"). That afternoon, Secretary Johnson approved the proposal. Pl. Ex. 67 at 936. OFO was directed to "proceed with informing [the] OFO field leadership at some of our Texas POEs of this approval so they can start this new operational alignment to bring relief at the POEs." *Id.*

On November 11, 2016, the OFO Executive Assistant Commissioner informed the CBP Deputy Commissioner that he was "on board with the metering," and that he "advised [the Directors of Field Operations] via telephone last night to

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

1    start." Pl. Ex. 69 at 935. The Deputy Commissioner responded: "[t]he implementa-

2    tion [of metering] is subject to your discretion and theirs (and PDs') on what will

3    work best operationally and whether it is required on any given day or any specific

4    location." *Id*. The Deputy Commissioner explained that " ███████████████████

5    ██████████████████████████████████████████ I just want our folks to

6    have an additional tool to keep conditions safe and working at our POEs." *Id.*

7         On November 11, the El Paso POE reported "406 detainees in custody." Def.

8    Ex. 13 at 100; *see also* Def. Ex. 35. The Port "beg[a]n metering at the middle of the

9    bridge at all 3 crossing locations." Def. Ex. 13 at 100. On November 11 and 12,

10   2016, the Tucson, Laredo, and El Paso Field Offices transmitted instructions to their

11   ports authorizing metering-like practices. *See* Pl. Ex. 70 at 662 (Nov. 11, 2016 email

12   from Tucson Field Office to Port Directors); Pl. Ex. 71 at 496; Pl. Ex. 13 at 607

13   (Nov. 12, 2016 email from Laredo Field Office authorizing ports to use "appoint-

14   ment[s]" ██████████████████████████████████████ ); Def. Ex. 36

15   (Nov. 11, 2016 email from Laredo Field Office to Port Directors).

16        Metering practices at this time were "not standardized." Pl. Ex. 20 ¶ 47. For

17   example, on November 17, 2016, the Port of El Paso reported that it was using an

18   appointment system and that it was metering aliens "while on the U.S. side of the

19   bridge [walkway into the port]." Pl. Ex. 74 at 450. Upon learning that aliens may be

20   being turned away while on U.S. soil, OFO headquarters immediately began "work-

21   ing with the port to address" the issue. Def. Ex. 37 (Nov. 18, 2016 email noting that

22   the Ports of El Paso and Hidalgo were turning people away on U.S. soil, and that it

23   was being addressed); Def. Ex. 36 (Nov. 15, 2016 email from OFO headquarters

24   clarifying to Laredo Field Office that "[i]f any individual arrives at POE, we cannot

25   just send them back to MX ... but must process them upon arrival"); *see also* Def.

26   Ex. 38; Pl. Ex. 102 at 137:10–20 (the officers at El Paso were not stationed correctly

27   during the first week of metering in November 2016, "so we had some corrections

28   to make"); Def. Ex. 39 (El Paso "course corrected" and ceased using appointment

19

1   system). At this and all times, the use of physical force to return an asylum seeker to

2   Mexico was "CBP['s] policy and procedures pertaining to the processing of asylum

3   seekers." Pl. Ex. 8, at 043 (report from CBP's Office of Professional Responsibility

4   (OPR)).[1]

5        On November 15, 2016, the CAT informed CBP leadership that the planned

6   Nogales Processing Center was on hold. *See* Pl. Ex. 72 at 938, 939. The CAT ex-

7   plained that ███████████████████████████████████████████

8   ███████████████████████████████████████████████████████

9   ███████████████████████████████████████████████████████

10  ████████ *Id.* at 939. The same day, the CAT informed CBP leadership that a "No-

11  tice to Proceed issued last night to erect a temporary CBP processing center" at

12  Tornillo "with 500 bed capacity with option to expand." *Id.*

13       CBP then stood up two soft-sided facilities, one on November 25, 2016, in

14  Tornillo, Texas, and the other on December 10, 2016, in Donna, Texas. Def. Ex. 33

15  at 5; *see also* Pl. Ex. 33 at 445; Def. Ex. 42 (Dec. 8, 2016 CAT report). From No-

16  vember 25 until February 14, 2017, when the facility went to stand-by status, the

---

18  [1] Plaintiffs' "undisputed facts" recite a handful of unrelated incidents involving al-

19  leged coercion or use of physical force, claiming that these incidents are related to

    metering in 2016 and 2017. *See, e.g.*, Pl. MSJ 5 & n.4, 11. The one cited use-of-

20  force incident in January 2017 resulted in an internal OPR investigation and disci-

21  pline. Pl. Ex. 8; Def. Ex. 40 (disciplinary letter for unbecoming conduct and "failure

    to follow procedures"). Plaintiffs cite only three incidents of claimed coercion from

22  only one POE (San Ysidro), in which Plaintiffs were allegedly coerced in May 2017

23  into withdrawing their asylum applications. Pl. MSJ 5 n.4. Yet Plaintiffs do not, and

24  cannot, connect these claimed incidents to any overarching or border-wide DHS or

    CBP policy, let alone to the decisions to implement metering. The most Plaintiffs

25  cite is a San Diego Field Office policy regarding a "streamlined withdrawal" process

26  for aliens who chose to withdraw their applications for admission. *See* Pl. Ex. 7 at

27  611. Under that local policy, "[i]f the applicant indicates a request for asylum or

    articulates a fear of returning," he or she "must" be referred for a credible-fear inter-

28  view. Def. Ex. 41 at 619; *see also* Pl. Ex. 7 at 611.

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

1  Tornillo facility held a total of 5,721 aliens. Def. Ex. 33 at 6. From December 10

2  until February 10, 2017, when the facility went to stand-by status, the Donna facility

3  held 2,172 aliens. *Id.*

4       In December 2016, as the numbers of migrants abated, most ports stopped

5  using metering-like practices to control intake of aliens without documents sufficient

6  for lawful entry. Def. Ex. 43 (Dec. 17, 2016 custody report showing decreased num-

7  bers); Pl. Ex. 102 at 86:15–19 (El Paso engaged in metering for three weeks begin-

8  ning in November 2016); *accord* Pl. Ex. 20 ¶ 41 (noting that metering had ceased in

9  Nogales, Arizona in December 2016).[2]

10       In January 2017, the surge "abruptly, drastically, and unexpectedly ended."

11  Def. Ex. 33 at 2; *see also id.* at 5 ("[W]itnesses ... were stunned at how low the

12  numbers were."). "In March 2017, several CBP executives recommended perma-

13  nently closing the [Donna and Tornillo] facilities (which at that time were in stand-

14  by status) because they believed the migration levels would remain low due to policy

15  changes and other factors." *Id.* at 8. But Deputy Commissioner "McAleenan decided

16  to keep the facilities in stand-by status for one additional month" because "he wor-

17  ried [about] another backup," "he was mindful that a recent Executive Order and

18  DHS guidance ... instructed CBP to ensure sufficient short-term detention capacity,"

19  he was concerned that the migrants' initial reluctance to come to the U.S. after the

20  inauguration might wear off," and "he feared the annual Spring migration increase."

21  Def. Ex. 33 at 8 (footnote omitted).

22       Between October 1, 2016, and April 12, 2017, CBP spent more than $45.25

23

24  [2] Although San Ysidro did not cease metering in December 2016, it was usually not metering between February and December 2017 due to the low numbers. *See* Pl. Ex.

25  17 at 258:15–21. In April 2017, upon learning of a complaint that a CBP supervisor turned back an individual at the border, *see* Def. Ex 44, port leadership promptly

26  messaged San Ysidro and Otay Mesa managers: "Any asylum applicant we encoun-

27  ter should be taken into custody, escorted to the security office, and then transported to AEU for proper intake and processing. We should not be sending any asylum

28  seekers back to Mexico. Please remind our officers." Def. Ex 45.

21

MEM. IN SUPPORT OF DEFS.' CROSS-<br>MSJ & IN OPP'N TO PLS.' MSJ<br>Case No. 3:17-cv-02366-BAS-KSC

1    million to address the migrant surge. Pl. Ex. 33 at 446. This included OFO's ex-

2    penditure of $15.76 million in overtime, temporary duty assignments, and operations

3    support; Border Patrol's expenditure of $9.13 million in overtime, TDY, and opera-

4    tions support; and more than $20.24 million in facilities and maintenance costs. *Id.*

5    **E.    As the 2018 Migrant Caravan Approaches, CBP Issues Written Metering**

6    **Guidance.**

7        In early 2018, the number of undocumented aliens approaching the border

8    began to rise and "start[ed] to reach a high point in the spring of 2018." Pl. Ex. 10 at

9    68:19–20. In January 2018, the southwest border Field Offices processed 9,930 in-

10   admissible arriving aliens. Def. Ex. 46 at 4. In February 2018, the Field Offices pro-

11   cessed 10,085 inadmissible arriving aliens. Def. Ex. 47 at 4. In March 2018, the Field

12   Offices processed 12,957 inadmissible arriving aliens. Def. Ex. 48 at 4. In April

13   2018, the Field Offices processed 12,295 inadmissible arriving aliens. Def. Ex. 49

14   at 4. Ports began to report "impacts to frontline functions" from the "increase in

15   detainees." Def. Ex. 50 at 853 (Apr. 4, 2018 email from the El Paso Assistant Direc-

16   tor of Field Operations); *see also* Def. Ex. 51 (Apr. 3, 2018 Laredo Field Office

17   report of increased numbers and impact on processing and holding capacity, alt-

18   hough "currently manageable"); Def. Ex. 52 (Apr. 18, 2018 San Ysidro report of

19   passenger officers being diverted to provide emergency case-processing assistance).

20       Between March 31, 2018, and April 23, 2018, CBP received information that

21   a migrant caravan originating in Central America was making its way north from

22   southern Mexico to the U.S.-Mexico border. *E.g.*, Pl. Ex. 80. On April 21, 2018, 550

23   members of the caravan arrived in Hermosillo, Sonora (a city about 175 miles south

24   of Nogales, Arizona), intending to "continu[e] their voyage northward." *Id.* at 784.

25   On April 24, CBP Commissioner McAleenan wrote to his deputies: "While we are

26   working diligently with Mexico to address as many caravan members as possible,

27   pressing ICE and others to prepare effective coordination of detention and immigra-

28   tion proceedings, and recommending strong posture changes for [the Secretary's]

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

1 | decision, it is increasingly likely that we will face the arrival of a large portion of
2 | these 500–600 individuals ... in the coming days without a change in enforcement
3 | posture ... ." Pl. Ex. 81 at 778. Commissioner McAleenan continued: "I know that
4 | you have been planning and preparing, and that our field leadership and our officers
5 | will act with utmost professionalism and competence, in accordance with law, reg-
6 | ulation, and CBP policy, as well as the guidance from the Secretary to effectively
7 | enforce the immigration laws of the United States, while appropriately considering
8 | and processing claims of fear for those seeking protection. Please confirm that you
9 | have sent out guidance regarding safe processing and port security and capacity is-
10 | sues relating to queue management. Please confirm that, absent special circum-
11 | stances, we will utilize ER [expedited removal], vice NTA [notice to appear], and
12 | that release decisions will be made by ICE unless there is a medical emergency or
13 | humanitarian emergency." *Id.*

14 |      On April 25, 2018, at about 9:00 AM, the San Ysidro Port of Entry had ███
15 | individuals in custody, representing 92% of its detention capacity. Def. Ex. 53 at
16 | 712. Around 1:00 PM, the Mexican government notified CBP that ███████████
17 | ████████████████████████████████████████
18 | ████████████████████████████████████████
19 | Def. Ex. 54 at 632. That day, San Ysidro had brought in "50 Mexican Family Units
20 | claiming asylum." Def. Ex. 55 at 632. On April 26, 2018, at about 9:00 AM, the San
21 | Ysidro Port of Entry had ███ individuals in custody, representing 104% of its deten-
22 | tion capacity. Def. Ex. 56 at 645.

23 |      On April 27, 2018, the OFO Executive Assistant Commissioner issued a
24 | memorandum with the subject line "Metering Guidance" to the Directors of Field
25 | Operations (DFOs) for the El Paso, Laredo, San Diego, and Tucson Field Offices.
26 | *See* Def. Ex 2. The memorandum states: "When necessary or appropriate to facilitate
27 | orderly processing and maintain the security of the port and safe and sanitary condi-
28 | tions for the traveling public, DFOs may elect to meter the flow of travelers at the

23

1   land border to take into account the port's processing capacity." *Id.* When metering,

2   "[p]orts should inform the waiting travelers that processing at the port is currently at

3   capacity and CBP is permitting travelers to enter the port once there is sufficient

4   space and resources to process them." *Id.* DFOs "may establish and operate physical

5   access controls at the borderline." *Id.* Ports "may not create a line specifically for

6   asylum-seekers only, but could, for instance, create lines based on legitimate opera-

7   tional needs, such as lines for those with appropriate travel documents and those

8   without such documents." *Id.* "At no point may an officer discourage a traveler from

9   waiting to be processed, claiming fear of return, or seeking any other protection."

10  *Id.* "Once a traveler is in the United States, he or she must be fully processed." *Id.*

11          Thus, the memorandum clarifies that port leaders may exercise their discretion

12  to engage in metering "to facilitate orderly processing and maintain the security of

13  the port and safe and sanitary conditions for the traveling public." Def. Ex. 2. Me-

14  tered travelers are asked to wait on the other side of U.S.-Mexico border until there

15  is "sufficient space and resources to process them." *Id.* One factor in assessing "suf-

16  ficient space and resources" is the port's detention capacity. Def. Ex. 57 ¶ 6; Def.

17  Ex. 58 ¶¶ 13–16. A port's capacity to hold individuals is not a fixed number, but is

18  instead "fluid." Pls.' Ex. 14, at 291:1–3. Although GSA has established the ports'

19  numerical "cell capacit[ies]" (which is typically what is reported as the port's phys-

20  ical detention capacity), "in reality, [CBP] can hold far less" than that maximum-

21  occupancy number. Pl. Ex. 15 at 967. "GSA does not take into account space for

22  sleeping." *Id.*; *see also* Pls. Ex. 102 at 58:15-21. The reported detention capacity

23  number also does not account for the demographics of those in custody, which CBP

24  must account for when allocating detention space; for example, "a family unit with

25  a male head of household who has children who are older and another family unit

26  with a female head of household who has relatively young children" are not "able to

27  [be] detain[ed] ... in the same detention areas or holding" areas. Pl. Ex. 14 at 289:19–

28  288:2; *see also, e.g.*, Def. Ex. 59 at 055 (CBP's Nat'l Transportation, Escort, and

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

1  Detention Standards (TEDS) requiring gender and juvenile/adult segregation in

2  CBP's hold rooms); Def. Ex. 57 ¶ 10; Def. Ex. 60 ¶ 7; Def. Ex. 58 ¶¶ 13–15.

3       The memorandum was issued to give the ports the ability "to address the ca-

4  pacity" for "large numbers of volumes" of inadmissible aliens attempting to cross

5  into the United States. Pl. Ex. 10 at 70:6–13. There is "[n]o other reason" the mem-

6  orandum was issued. *Id.* at 70:18. The guidance "was not desired to deter migrants

7  from entering the [United States]." Pl. Ex. 10 at 70:1–5; *see also* Pl. Ex. 69 at 935

8  (Nov. 11, 2016 email from Mr. McAleenan: "I just want our folks to have an addi-

9  tional tool to keep conditions safe and working at our POEs.").

10  **F.    DHS Directs CBP to Prioritize Statutory Mission Sets.**

11       From FY 2017 to FY 2018, the number of inadmissible arriving aliens pro-

12  cessed by the southwest border Field Offices crept upwards, and the proportion of

13  those aliens who were placed into expedited removal and referred for a credible-fear

14  interview doubled. In FY 2017, those Field Offices processed 111,275 inadmissible

15  aliens, 17,284 of whom were placed into expedited removal and referred for a cred-

16  ible-fear interview. Def. Ex. 4 at 2. In FY 2018, those Field Offices processed

17  124,879 inadmissible arriving aliens, 38,399 of whom were placed into expedited

18  removal and were referred for a credible-fear interview. *Id.*

19       On June 5, 2018, the Secretary of Homeland Security issued a memorandum

20  to the CBP Commissioner entitled "Prioritization-Based Queue Management." *See*

21  Def. Ex. 3. The Secretary explained that "apprehensions of those crossing our border

22  illegally between the ports of entry and the number of arriving aliens determined to

23  be inadmissible at ports of entry continue to rise," all while CBP's "resources remain

24  strained along the Southwest Border. Inadmissible arriving aliens presenting at ports

25  of entry, many of whom arrive without possessing appropriate travel and identity

26  documents required by law, such as a visa and passport, require additional pro-

27  cessing time that delays the flow of legitimate trade and travel." Def. Ex. 3 at 294.

28

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

1    The Secretary instructed that "CBP must focus on its primary mission: to pro-

2    tect the American public from dangerous people and materials while enhancing our

3    economic competitiveness through facilitating legitimate trade and travel." *Id.* "The

4    processing of travelers without documentation draws resources away from CBP's

5    fundamental responsibilities." *Id.* at 295–96. "Moreover," the Secretary continued,

6    "staffing at Southwest Border ports of entry is below our target level for almost all

7    major ports, and our officers are increasingly working extensive overtime hours each

8    pay period, leading to increased fatigue and stress on the workforce. At several of

9    the largest ports of entry, upwards of 10 percent of the CBP officer workforce are

10   engaged in immigration secondary screening and processing functions, primarily ad-

11   dressing persons presenting without documents sufficient for admission or other

12   lawful entry." *Id.* at 296.

13   Thus, "[i]n recognition of (1) the continued prevalence of security threats,

14   (2) the dire consequences of illicit narcotics on our communities (especially the dev-

15   astating opioid epidemic), (3) the staffing and resource challenges summarized

16   above, and (4) the increase of irregular migration flows," the Secretary "direct[ed

17   the Commissioner] to initiate a 30-day pilot program to prioritize staffing and oper-

18   ations at all Southwest Border ports of entry in accordance with the following order

19   of priority": (1) national-security efforts; (2) counter-narcotics operations; (3) eco-

20   nomic security: trade and cargo processing efforts to facilitate lawful commerce into

21   the United States, while enforcing trade laws, protecting agriculture, and addressing

22   anticompetitive elements in the supply chain; and (4) trade and travel facilitation. *Id.*

23   at 296. The memorandum "memorializes a preexisting prioritization" scheme that

24   has been "CBP's policy since [it] w[as] created in 2003." Pl. Ex. 10 at 203:12–20.

25   The Secretary explained that "[p]rocessing persons without documents re-

26   quired by law for admission arriving at the Southwest Border remains a component

27   of CBP's mission." Def. Ex. 3 at 296; *see also* Pl. Ex. 4 at 133:12–18 (CBP "con-

28   tinue[s] to process migrants in the midst of prioritizing all these different things.").

26

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

1  "[B]ut priority should be given to the efforts described above in the prescribed order.

2  Field leaders have the discretion to allocate resources and staffing dedicated to any

3  areas of enforcement and trade facilitation not covered by the above priorities and

4  queue management process based on the availability of resources and holding ca-

5  pacity at the local port level. Depending on port configuration and operating condi-

6  tions, [DFOs] may establish and operate physical access controls at the borderline,

7  including as close to the U.S.-Mexico border as operationally feasible. DFOs may

8  create lines based on legitimate operational needs, such as lines for those with ap-

9  propriate travel documents and those without such documents. As in all operations

10  the safety of employees and the public is paramount in operational decisions." Def.

11  Ex. 3 at 296.

12      Before issuing the June 5, 2018 memo, DHS considered the impact of priori-

13  tization-based queue management on both staffing and daily intake. ███████

14  ████████████████████████████████████████████████

15  ████████████████████████████████████████████████

16  ████████████████████████████████████████████████

17  ████████████████████████████████████████████████

18  ████████████████████████████████████████████████

19  ████████████████████████████████████████████████

20  ████████████████████████████████████████████████

21  ███████████████████  Pl. Ex. 96 at 009.

22      Thus, under the June 5, 2018 memo, when determining whether and when to

23  conduct metering, ports were to consider not only the detention and processing ca-

24  pacity factors noted above, but also other operational factors, and were to avoid al-

25  locating resources away from priority mission sets. Accordingly, CBP officials be-

26  gan to more frequently refer to the ports' capacity to process inadmissible aliens in

27  terms of "operational capacity." *E.g.*, Pl. Ex. 99 at 864 (OFO "shifted from 'deten-

28

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

1   tion' capacity to 'operational' capacity" after June 5, 2018). "The operational capac-

2   ity at a POE varies depending on overall port volume, facility capacity, resource

3   constraints, and daily tactical and enforcement activities. Operational impact at

4   POEs cannot always be planned; for example, [OFO] do[es] not know in advance

5   when [it] will discover human, narcotics, or weapons smuggling attempts, or which

6   individuals may present a threat to our officers. It takes significant resources to man-

7   age this highly variable environment." Def. Ex. 61 at 279. There are "a lot of factors

8   that go into operational capacity." Pl. Ex. 14 at 286:9–10. Operational capacity turns

9   "primarily [on] what else is going on at the port," including "other mission sets that

10  [the port] ha[s] to fulfill," like "immigration secondary processing, drug seizures,

11  money seizures, weapons seizures," or "trade processing," *id.* at 286:25–287:1,

12  288:13–21; "how much physical space is available," which turns on a calculation of

13  the port's "holding capacity" or "detention capacity" and "how many people [the

14  port] already ha[s] in custody," *id.* at 287:2–7; "the type and the makeup of the

15  cases," such as "whether or not they are migrant cases or other types of admissibility

16  cases" and "the complexity of the cases," *id.* at 287:25–288:2, 287:3–4, 289:1; and

17  the number of "people that [the port] ha[s] to dedicate to the other mission sets,' *id.*

18  at 288:22–25; *see also* Pl. Ex. 102 at 222:16-24.

19      OFO does not regularly quantify, record, or report the ports' operational ca-

20  pacity, let alone its specific operational capacity to process aliens without entry doc-

21  uments. It "would just be too cumbersome to record every event that's taking place

22  in the port through out [*sic*] the day, which has had an impact on how many migrants

23  we could come across. If a port was working multiple simultaneous seizures, and

24  then we had to pull officers to do that, we wouldn't record all of those activities. It's

25  just too cumbersome of a report to come together for the 46 crossings along the

26  southwest border as to what's taking place." Pl. Ex. 10 at 186:11–21; *see also* Pl.

27  Ex. 102 at 66:13–14. "And," operational capacity "is fluid" and "differs from port

28  to port and from day-to-day." Pl. Ex. 10 at 186:11–12, 186:22–187:3. "There may

28

1    be no capacity at 9:00 a.m, but [ICE] ERO comes and picks folks up at 11:00. And

2    at 12 o'clock we have capacity." *Id.* at 186:22–187:3.

3         OFO has used "operational capacity" as a metric for port operations in the

4    past. *E.g.*, Def. Ex. 62 at 712 (Sept. 14, 2016 report from CBP's Incident Manage-

5    ment Division: "The current influx of inadmissible aliens coupled with added ad-

6    ministrative functions and decreased operational capacity due to construction has

7    created an untenable situation for which ERO assistance is critical."); Pl. Ex. 17 at

8    70:4–13 ("[F]or as long as I have worked in detention as a manager, going back to

9    '15–'16, we have always used operational capacity.").

10        On June 16, 2018, the Migration Crisis Action Team (MCAT) Deputy Com-

11   mander reported to ICE that "all the ports along the SWB [southwest border] will

12   increase their daily intake. The ports will not go beyond their capacity limits but will

13   get as close as possible without negatively impacting their other responsibilities.

14   This will result in a significant increase of referrals of FMUAs and single adults [to

15   ICE]." Def. Ex. 63 at 555. Another member of the MCAT "convey[ed]" this infor-

16   mation to the ICE field offices on the southwest border to "ensure ERO is ready to

17   support all facets of [the] mission." *Id.*

18        Between June 26 and July 3, 2018, a CBP officer in the San Diego Field Office

19   "worked toward gauging the overall sentiment of subjects detained at" the San

20   Ysidro Port of Entry. Pl. Ex. 107 at 2. His "goal was to determine what effect, if

21   any," measures "such as ... metering" were having "on subjects attempting entry ei-

22   ther illegally or through the credible fear/asylum process." *Id.* (quotation marks

23   omitted). The officer "assess[ed] that the Mexican, Honduran, El Salvadorian and

24   Guatemalan citizen sentiment detained at the POE is unshaken. Detainees did not

25   claim ... long wait times in Mexico as deterrent factors." *Id.*

26        On August 6, 2018, the MCAT Deputy Commander asked "[h]ow many cases

27   SYS [could] process a day if ERO moved them out the next day." Pl. Ex. 112 at 802.

28   The Watch Commander overseeing San Ysidro's AEU responded ███████ but

29

1   only if "half of the officers" were not already at their overtime cap. *Id.*[3] The Deputy

2   Commander indicated that he would not recommend that solution because

3   "throw[ing] money at" the problem "would defeat the purpose of queue manage-

4   ment." *Id.*

5   **G.    CBP Issues the Prioritization-Based Queue Management Memorandum.**

6          From FY 2018 to FY 2019, the number of inadmissible arriving aliens pro-

7   cessed by the southwest border Field Offices continued to creep upwards, and the

8   proportion of those inadmissible arriving aliens who were placed into expedited re-

9   moval and referred for a credible-fear interview doubled again. In FY 2018, those

10  Field Offices processed 124,879 inadmissible arriving aliens, 38,399 of whom were

11  referred for a credible-fear interview. Def. Ex. 4 at 2. In FY 2019, those Field Offices

12  processed 126,001 inadmissible arriving aliens, 80,055 of whom were referred for a

13  credible-fear interview. *Id.*

14         In late November 2019, CBP determined that OFO should renew its focus on

15  directing its resources toward the priority mission sets. *See* Def. Ex. 67 at 15–16. On

16  November 27, 2019, Mark Morgan, the Acting CBP Commissioner issued a memo-

17  randum to the OFO Executive Assistant Commissioner with the subject "Prioritiza-

18  tion-Based Queue Management." Def. Ex. 5. The Acting Commissioner cited the

19  sustained increase in the number of inadmissible aliens presenting at ports of entry

20  and the substantial resources their processing requires, and stated that "CBP must

21  carefully balance its space and resources to ensure that each POE has sufficient ca-

22  pacity to address its mission sets, in order of priority, including the safety and expe-

23  ditious processing of all travelers accessing the port." *Id.* at 303. The Acting Com-

24  missioner explained that Secretary Nielsen previously instructed the southwest bor-

25  der Field Offices to structure their staffing and resources to accomplish four priority

26

_____

27  [3] On August 7, 2018, San Ysidro reported that over the preceding 60 days, it aver-

28  aged ▮ intakes per day, processed ▮ cases per day, and ▮ individuals were moved
    from the Port per day. Pl. Ex. 92 at 964.

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

1    mission sets. *See id.* at 303–04. In Fiscal Year 2019, while the Nielsen memorandum

2    was in effect, CBP officers at the southwest border ports of entry arrested 1,800

3    convicted criminals, encountered 1,601 Special Interest Aliens,[4] and found three in-

4    dividuals on the terrorist watchlist. *Id.* at 304. CBP officers at the ports seized 19%

5    more methamphetamine and 58% more fentanyl by weight and interdicted $2.4 mil-

6    lion more in outbound currency than the previous fiscal year. *Id.* Accordingly, the

7    Acting Commissioner reiterated that "field leaders must continue to balance re-

8    sources according to the order of priority listed above," *i.e.*, national security efforts,

9    counter-narcotics and outbound operations, economic security, and trade and travel

10   facilitation. *Id.* at 305.

11                                    **ARGUMENT**

12   **I.    Plaintiffs Lack a Private Right of Action to Enforce the INA.**

13           Defendants are entitled to summary judgment on Claim I for purported inde-

14   pendent violations of the INA (*see* SAC ¶¶ 244–55) because Plaintiffs lack a private

15   right of action under the INA. *New Mexico v. McAleenan*, 450 F. Supp. 3d 1130,

16   1166 (D. N.M. 2020) (the INA "does not provide a private right of action" to litigants

17   seeking to enforce its terms); *Ms. L. v. ICE*, 302 F. Supp. 3d 1149, 1168 (S.D. Cal.

18   2018) (dismissing claim under § 1158 because "it is unclear to the Court whether

19   Plaintiffs have a private right of action under the Asylum Statute"). As this Court

20   recognized, "[w]hile a right to judicial review of agency action may be created by a

21   separate statutory or constitutional provision, once created it becomes subject to the

22   judicial review provisions of the APA unless specifically excluded." *Al Otro Lado,*

23   *Inc. v. Nielsen*, 327 F. Supp. 3d 1284, 1316 (S.D. Cal. 2018) (brackets in original;

24

25

26   _____

27   [4] A Special Interest Alien is "a non-U.S. person who, based on an analysis of travel
     patterns, potentially poses a national security risk to the United States or its inter-

28   ests."    https://www.dhs.gov/news/2019/01/07/mythfact-known-and-suspected-ter-
     roristsspecial-interest-aliens (last visited Sept. 25, 2020).

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

1  citation and quotation marks omitted). "Insofar as [Plaintiffs] have such an entitle-

2  ment under the INA and its implementing regulations, Plaintiffs may obtain all the

3  relief they request under the provisions of the APA." *Id.* (quotation marks omitted).

4  This Court should thus grant summary judgment for Defendants on Claim I.

5  **II.    Defendants Have Not Taken Discrete and Final Agency Action of the Sort**

6  **Plaintiffs Contend.**

7  **A.    There is No Discrete "Turnback Policy."**

8  Plaintiffs in their APA claims challenge "the turnback policy," a purported

9  "overarching agency policy directing th[e] unlawful withholding of mandatory ac-

10  tion" under 8 U.S.C. §§ 1158 and 1225. Pl. MSJ 19, 21; *see also id.* at 7–16, 19–21.

11  Defendants are entitled to summary judgment on these claims because "the turnback

12  policy," as Plaintiffs describe it, is not sufficiently discrete for APA review.

13  "The APA authorizes suit by '[a] person suffering legal wrong because of

14  agency action, or adversely affected or aggrieved by agency action within the mean-

15  ing of a relevant statute.'" *Norton*, 542 U.S. at 61 (brackets in original; quoting

16  5 U.S.C. § 702). "'[A]gency action' is defined in § 551(13) to include 'the whole or

17  a part of an agency rule, order, license, sanction, relief, or the equivalent or denial

18  thereof, or failure to act.'" *Id.* at 62 (brackets in original; emphasis omitted). These

19  are "circumscribed, discrete agency actions, as their definitions make clear." *Id.*

20  APA challenges can succeed only where the plaintiff "identif[ies] a discrete 'agency

21  action' that fits within the APA's definition of that term" *Wild Fish Conservancy v.*

22  *Jewell*, 730 F.3d 791, 801 (9th Cir. 2013) (citations omitted). It is "entirely certain"

23  that an "entire 'program'—consisting principally of the many individual actions ref-

24  erenced in the complaint, and presumably actions yet to be taken as well—cannot be

25  laid before the courts for wholesale correction under the APA." *Lujan v. Nat'l Wild-*

26  *life Fed'n*, 497 U.S. 871, 892–93 (1990). "A plaintiff may not simply attach a policy

27  label to disparate agency practices or conduct" to satisfy the APA's discrete agency

28  action requirement. *Al Otro Lado, Inc.*, 394 F. Supp. 3d at 1207. They must identify

32

1  an actual government policy. *See Lightfoot v. District of Columbia*, 273 F.R.D. 314,

2  326 (D.D.C. 2011).

3      The "turnback policy," as Plaintiffs describe it, is not a "circumscribed, dis-

4  crete" agency action. *Norton*, 542 U.S. at 62. It comprises many claimed actions or

5  decisions spanning several years that have different factual bases. These purported

6  various disparate actions include: the San Ysidro Port of Entry purportedly "aban-

7  don[ing]" its surge contingency plans in May 2016 and "turning back asylum seekers

8  instead," Pl. MSJ 8; OFO "turning back asylum seekers" at the Calexico Port of

9  Entry in September 2016, supposedly with knowledge that there were "multiple in-

10  vestigations" into the policy's legality, *id.* at 9; DHS and CBP deciding "[w]ithin

11  hours" of the 2016 presidential election "not to open" a temporary processing facility

12  in El Centro, California and expanding metering to Texas ports of entry, *id.* at 10;

13  DHS and CBP "plac[ing] the planned Nogales[, Arizona] processing center on hold"

14  "within a week of the 2016 presidential election" and electing instead "to expand

15  turnbacks" border-wide, *id.* at 11; the government "return[ing]" "asylum seekers

16  standing on U.S. soil" to Mexico in November and December 2017, *id.* at 11, 12; a

17  CBP officer at a Texas port of entry allegedly "'cross[ing] into Mexican territory to

18  keep a migrant from coming onto U.S. soil'"[5] in June 2018, *id.* (quoting Pl. Ex. 75

19  at 272); the Hidalgo Port of Entry purportedly "intentionally remov[ing] seats from

20  the secondary inspection area to reduce the number of asylum seekers processed at

21  the port," *id.* at 11 (quotation marks omitted); the OFO Executive Assistant Com-

22  missioner issuing metering guidance in April 2018, *id.* at 12–14; and DHS and CBP

23  "adopt[ing] the prioritization-based queue management policy" in June 2018 and

24  "using 'operational capacity' as [their] stated metric to justify turning back asylum

25

26  ───────────

27  [5] This statement is inadmissible hearsay. *See* Fed. R. Civ. P. 56(c)(2). It was made by an individual who has not testified or submitted a declaration, Pl. Ex. 75 at 272,

28  and Plaintiffs offer it for the truth of the matter asserted, *i.e.*, that an officer crossed the border to prevent a migrant from coming onto U.S. soil.

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

1   seekers," *id.* at 14.

2       Plaintiffs do not provide a sound representation of the facts. *See supra* at Facts

3   §§ B–G. But in any event, this constellation of actions grouped together under the

4   banner of "the turnback policy" is not a "'discrete' action[] by an agency" amenable

5   to APA review. *Bark v. U.S. Forest Service*, 37 F. Supp. 3d 41, 50 (D.D.C. 2014)

6   (quoting *Norton*, 542 U.S. at 63). In fact, there is no "turnback policy." The reference

7   appears only in litigation documents, and Plaintiff Al Otro Lado inexplicably has no

8   memory of where the term came from. *See* Pl. Ex. 113 at 121:11–126:11. The "turn-

9   back policy" is "simply the name by which" Plaintiffs "refer[] to the continuing (and

10  thus constantly changing) operations of" CBP at the southwest border ports of entry.

11  *Lujan*, 497 U.S. at 890. "It is no more an identifiable 'agency action'—much less a

12  'final agency action'—than a 'weapons procurement program' of the Department of

13  Defense or a 'drug interdiction program' of the Drug Enforcement Administration."

14  *Id.*; *see, e.g.*, *Wild Fish Conservancy*, 730 F.3d at 801 (government's operation of

15  dams "in a manner that obstructs fish passage" is "not ... a discrete 'agency action'").

16      Nor is there any evidence connecting these disparate actions to a single agency

17  policy. To the contrary, the evidence shows that many of these actions were *against*

18  government policy and that the agency took steps to correct them. *E.g.*, Def. Ex. 2

19  ("Once a traveler is in the United States, he or she must be fully processed."); Def.

20  Ex. 64 at 294–95 (finding the "misconduct" described in Pl. Ex. 8 to be "very seri-

21  ous" and "not in compliance" with CBP policy and suspending the officer for 30

22  days); Def. Ex. 37 at 927 (on Nov. 18, 2016, OFO immediately began "working with

23  the" El Paso and Hidalgo POEs "to address" use of appointments and metering on

24  U.S. soil). Plaintiffs say that CBP officers "lied to" asylum seekers, Pl. MSJ 5, "co-

25  erced some to withdraw their applications for admission" through the use of "stream-

26  lined withdrawal" procedures, *id.*, and "used physical force to turn back others," *id.*,

27  as part of a "widespread pattern and practice" sanctioned by DHS and CBP leader-

28  ship "of denying asylum seekers access to the asylum process at POEs on the U.S.-

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

1    Mexico border," SAC ¶ 2. But even if those allegations were true, the evidence does

2    not show they were part of or pursuant to any border-wide policy or practice that "is

3    common to the class." *Lightfoot*, 273 F.R.D. at 326. At *most*, Plaintiffs' Exhibits

4    show that "lies" occurred at the Tecate and Hidalgo POEs, *see* Pl. Ex. 1 at 99:25–

5    101:6 (testimony of Tecate CBP officer), *and* Pl. Ex. 3 at 145:3–7 (testimony of

6    Hidalgo CBP officer); and that "coercion" or "physical force" was used at the San

7    Ysidro POE, *see* Pl. Ex. 7 at 611 (email to San Ysidro CBP officers regarding

8    streamlined withdrawal procedures), *and* Pl. Ex. 8 at 042 (CBP OPR report relating

9    to a single incident at San Ysidro). The evidence does not show any border-wide

10   "turnback policy," nor is there any evidence of a border-wide policy, instruction, or

11   guidance that links these disparate actions together. The challenged "turnback pol-

12   icy" is not sufficiently discrete to permit review under the APA.

13       **B.    The Border-Wide Metering Decisions are Not Final Agency Action.**

14       Besides being sufficiently discrete, a challenged agency action must be "fi-

15   nal." 5 U.S.C. § 704; *Navajo Nation v. Dept. of the Interior*, 876 F.3d 1144, 1171

16   (9th Cir. 2017). Agency action is final when it "mark[s] the consummation of the

17   agency's decisionmaking process" and is an action "by which rights or obligations

18   have been determined, or from which legal consequences will flow." *Bennett v.*

19   *Spear*, 520 U.S. 154, 178 (1997) (citations and quotation marks omitted). "The gen-

20   eral rule" under the second *Bennett* prong is that agency action must "impose an

21   obligation, deny a right, or fix some legal relationship" to be final. *Ukiah Valley*

22   *Med. Ctr. v. FTC*, 911 F.2d 261, 264 (9th Cir. 1990) (quotation marks omitted).

23       While Defendants' border-wide metering decisions may be discrete and mark

24   the consummation of the decisionmaking process, none are "final" under *Bennett*

25   because they do not "give[] rise to direct and appreciable legal consequences" as to

26   the Plaintiff class. *Hawkes*, 136 S. Ct. at 1814 (quotation marks omitted). The me-

27   tering decisions do not compel or obligate class members to take a particular action,

28   do not deny class members any rights, and do not fix the legal relations between the

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

1    parties. An alien who is subject to metering is in the same legal position that he

2    would be in if he were never subject to metering. He still may cross the border into

3    a port of entry (albeit at a later date), and when he "is physically present in the United

4    States or [] arrives in the United States," he "may apply for asylum in accordance

5    with" the INA and its implementing regulations. 8 U.S.C. § 1158(a)(1).

6         Plaintiffs' arguments to the contrary (at Pl. MSJ 20–21) lack merit. *First*, me-

7    tering does not alter or change existing statutory entitlements or duties. Defendants

8    acknowledge that this Court previously held that certain aliens who are outside the

9    United States but are "in the process of arriv[ing] in" the country fall within the

10   scope of the asylum statute, *Al Otro Lado*, 394 F. Supp. 3d at 1200, but respectfully

11   maintain their position that §§ 1158 and 1225 by their terms do not apply to class

12   members outside the United States, *see infra* Argument § III. Even if class members

13   were within the scope of the statutes, Defendants' policies have not "den[ied] them

14   access to the asylum process." Pl. MSJ 20–21. Plaintiffs identify no direct order to

15   "deny access," and class members continue to be referred for asylum processing.

16   Def. Ex. 4 at 2. If Plaintiffs are correct that "[m]any" class members are "ultimately

17   deprived" of the opportunity to apply for asylum in the United States, Pl. MSJ 21,

18   this is not a direct legal consequence of the metering decisions, *see* Roberto Doe

19   Decl. ¶ 6 (ECF No. 390-75) (detention by Mexico); Roberto Doe Decl. ¶ 7 (ECF No.

20   390-97) (deportation by Mexico). *Second*, Plaintiffs assert that queue management

21   is final because it has an "'actual or immediately threatened effect,'" namely, class

22   members being "forced to wait" in Mexico. Pl. MSJ 21 (quoting *Lujan*, 497 U.S. at

23   894). But whether agency action has an "actual or immediately threatened effect"

24   goes to whether a claim is ripe, not whether it is final. *Lujan*, 497 U.S. at 894 (citing

25   *Gardner v. Toilet Goods Ass'n, Inc.*, 387 U.S. 158, 164–66 (1967)). Waiting in Mex-

26   ico may be an immediate and practical effect of queue management, but it is not a

27   *legal* consequence. *See Cal. Communities Against Toxics v. EPA*, 934 F.3d 627, 637

28   (D.C. Cir. 2019) ("pragmatic" inquiry looks to consequences of agency action "as a

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

1   result of the specific statutes and regulations that govern it"). Plaintiffs fail to chal-

2   lenge any discrete and final agency action. Therefore, Defendants are entitled to

3   summary judgment on Plaintiffs' APA claims.

4   **III.  Defendants Have Not "Direct[ed] CBP Officers to Unlawfully Withhold**

5   **a Discrete, Mandatory Ministerial Action."**

6   For two reasons, Defendants are entitled to summary judgment on Plaintiffs'

7   claim that Defendants "direct[ed] CBP officers to unlawfully withhold a discrete,

8   mandatory ministerial action" under §§ 1158 and 1225 in violation of the APA,

9   § 706(1). Pl. MSJ 21–23. *First*, § 706(1) requires Plaintiffs to show "that an agency

10  failed to take a *discrete* agency action that it is *required* to take." *Norton*, 542 U.S.

11  at 64; *Hells Canyon Preservation Council v. U.S. Forest Service*, 593 F.3d 923, 932

12  (9th Cir. 2010). Defendants respectfully maintain that §§ 1158 and 1225 do not man-

13  date any actions toward aliens who are outside the United States. Section 1158(a)(1)

14  allows an alien to apply for asylum if he "is physically present in the United States"

15  or "arrives in the United States." Section 1225(a)(3) requires the government to in-

16  spect for admission "[a]ll aliens ... who are applicants for admission or otherwise

17  seeking admission or readmission to or transit through the United States." Section

18  1225(a)(1) defines an applicant for admission as "[a]n alien present in the United

19  States who has not been admitted or who arrives in the United States," and regula-

20  tions require anyone who is seeking admission to do so "at a U.S. port-of-entry," all

21  of which are in the United States, *United States v. Aldana*, 878 F.3d 877, 880–82

22  (9th Cir. 2017), *cert. denied* 139 S. Ct. 157 (2018), "when the port is open for in-

23  spection," 8 C.F.R. § 235.1(a). Section 1225(b)(1)(A)(ii) requires the government to

24  refer for a credible-fear interview an alien "who is arriving in the United States,"

25  "[i]f" it "determines" that the alien is inadmissible on certain grounds "and the alien

26  indicates either an intention to apply for asylum" or fear.

27  Sections 1158 and 1225 apply exclusively to aliens "in the United States."

28  This reading is supported by: (1) the statutes' present-tense language, *see DHS v.*

1    *Thuraissigiam*, 140 S. Ct. 1959, 1982 (2020) ("[w]hen an alien arrives at a port of

2    entry ... the alien is on U.S. soil"); *United States v. Balint*, 201 F.3d 928, 933 (7th

3    Cir. 2000); (2) the definition of the word "arrive," which means "to reach a destina-

4    tion," The American Heritage Dictionary of the English Language 102 (3d ed. 1992);

5    (3) the presumption against extraterritoriality, *see Morrison v. Nat'l Australia Bank*

6    *Ltd.*, 561 U.S. 247, 255, 261 (2010) ("When a statute gives no clear indication of

7    extraterritorial application, it has none."); (4) the structure of the INA, *see Sale v.*

8    *Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 173 (1993) (there is "no provision in the

9    statute for the conduct of such proceedings outside the United States"); *Zadvydas v.*

10   *Davis*, 533 U.S. 678, 693 (2001) ("The distinction between an alien who has effected

11   an entry into the United States and one who has never entered runs throughout im-

12   migration law."); *Matter of Lewiston-Queenston Bridge*, 17 I. & N. Dec. 410, 413

13   (BIA 1980) ("when an individual comes to this country by way of an international

14   bridge, he has 'landed' when he touches United States soil"); (5) the rule that "the

15   words of a statute must be read in their context and with a view to their place in the

16   overall statutory scheme," *Sturgeon v. Frost*, 136 S. Ct. 1061, 1070 (2016) (citation

17   and quotation marks omitted), which here is a scheme for expedited "remov[al] *from*

18   the United States," 8 U.S.C. § 1225(b)(1)(A)(i) (emphasis added); and (6) the legis-

19   lative history of § 1225, *see* H.R. Rep. No. 104-469, pt. 1, at 175–76 (1996) (an

20   asylum claim should "be commenced as soon as possible *after* the alien's arrival in

21   the U.S." (emphasis added)).[6]

22

23   ───────────────

     [6] The use of the present-progressive tense ("arriving in") in § 1225(a)(1)(A)(ii) does
24   not change this conclusion. Even if "arriving in" may refer to a "process of arriving,"
     *Al Otro Lado, Inc.*, 394 F. Supp. 3d at 1200, for the reasons discussed, that process
25   does not begin before an alien crosses the border. Further, the obligation to refer an
     alien for a credible-fear interview does not attach until the government "determines"
26   the alien is inadmissible on certain grounds, 8 U.S.C. § 1225(b)(1)(A)(ii), and that
27   determination can occur only once an alien is physically present *in* the United States.
28   Nor does the rule against surplusage support a contrary interpretation. Congress

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

1       This entitles the government to summary judgment on all subclass members'

2   claims, since by the class definition they did not cross onto U.S. soil "as a result of

3   Defendants' metering policy." ECF No. 513, at 18. Pursuant to that policy, any class

4   member who is on U.S. soil must be inspected and processed and may not be re-

5   turned to Mexico. Def. Ex. 2; *supra* Facts §§ B–G; Argument § II.A (failure to pro-

6   cess aliens on U.S. soil is against CBP policy).

7       *Second*, even if the statutes applied to aliens outside the United States, De-

8   fendants have not in fact implemented "an overarching agency policy directing th[e]

9   unlawful withholding of [these] mandatory agency action[s]." Pl. MSJ 21. The un-

10  disputed evidence shows just the opposite: "Processing persons without documents

11  required by law for admission arriving at the Southwest Border remains a component

12  of CBP's mission." Def. Ex. 3 at 296; *accord* Def. Ex. 2. Moreover, class members

13  *are in fact* being processed for asylum. Concurrently with the implementation of

14  metering, the number of inadmissible arriving aliens referred by the southwest bor-

15  der Field Offices for credible-fear interviews increased four-and-a-half times over,

16  from 17,284 in FY 2017 to 80,055 in FY 2019. Def. Ex. 4 at 2. This figure represents

17  only a subset of class members whom CBP referred for asylum processing, since

18  some class members would have been placed into full removal proceedings to raise

19  their claim before an immigration judge. *See* 8 U.S.C. § 1225(b)(2)(A). Even if some

20  _____

21  wrote § 1225 to ensure that both aliens encountered within the United States (the
    alien who "is physically present") and aliens subject to expedited removal (the alien

22  "who arrives in") may apply for asylum, which was an important clarifying measure

23  included as part of Congress's enactment of major immigration legislation in 1996.
    *See* H.R. Rep. No. 104-828, at 209 (1996) ("[t]he purpose of these provisions is to

24  expedite [] removal *from* the United States" (emphasis added)). Without such clari-

25  fying language, Congress would have risked an interpretation of the statute that pre-
    cluded arriving aliens from applying for asylum at all, since, under the entry doc-

26  trine, "an alien detained after arriving at a port of entry ... is 'on the threshold'" and

27  is treated "'as if stopped at the border.'" *Thuraissigiam*, 140 S. Ct. at 1983, 1982

28  (quoting *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212, 215 (1953)).

1   class members ultimately did not enter the United States to seek asylum after being

2   subject to metering, as Plaintiffs' contend, *see* Pl. MSJ 21, the fact that "many more

3   asylum seekers were not denied access" to the asylum process "defeats the inference

4   that a categorical policy of the nature Plaintiffs intimate exists." *Al Otro Lado, Inc.*,

5   327 F. Supp. 3d at 1320–21.[7] There is no "overarching agency policy directing th[e]

6   unlawful withholding of mandatory action" under §§ 1158 and 1225. Pl. MSJ 21. At

7   most, agency action is delayed, and Plaintiffs make no attempt to argue that these

8   delays are unreasonable. *See id.* at 21–23. Defendants are thus entitled to summary

9   judgment on Plaintiffs' § 706(1) claim.

10  **IV.    Metering is Statutorily Permissible.**

11          Plaintiffs argue that "[e]ven if" the statutes do not apply to aliens in Mexico,

12  Defendants' "policy" nevertheless "contravenes" the "statutory scheme governing

13  inspection at POEs and exceeds Defendants' statutory authority" in violation of the

14  APA, § 706(2). Pl. MSJ 24; *see also id.* at 24–25. This is wrong. Metering is statu-

15  torily permissible. Defendants are thus entitled to summary judgment on this claim.

16          The government's border-wide metering decisions—which as discussed are

17  the only decisions that apply class-wide—are statutorily permissible. In the Home-

18  land Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (2002), Congress

19  ordered DHS as its "primary mission" to prevent terrorism in the United States and,

20  in so doing, "ensure that the functions of the agencies and subdivisions within [DHS]

21  that are not related directly to securing the homeland are not diminished or neglected

22  except by a specific explicit Act of Congress." 6 U.S.C. § 111(b)(1). Congress made

23

24  [7] Plaintiffs cite a Rule 30(b)(6) witness's statement that, "[i]n her experience[]," "asylum seekers who are at the border between the United States and Mexico [are] attempting to enter the United States at a port of entry." Pl. MSJ 23 (second brackets in original; quoting Pl. Ex. 17 at 201:22–202:3). But the witness's testimony (which was provided subject to a timely scope objection, Pl. Ex. 17 at 202:1–2) shows at most that CBP officers understood that those individuals intended to present them-selves at the port, not that CBP has a policy to withhold legal obligations. Those obligations are being discharged concurrently with metering. *See* Def. Ex. 4 at 2.

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

1   the Secretary "responsible for" "preventing the entry of terrorists," "securing the

2   borders [and] ports," "carrying out the immigration enforcement functions," "estab-

3   lishing and administering rules" governing "forms of permission ... to enter the

4   United States," "establishing national immigration enforcement policies and priori-

5   ties," and, "in carrying out the foregoing responsibilities, ensuring the speedy, or-

6   derly, and efficient flow of lawful traffic and commerce." *Id.* § 202 (capitalization

7   altered).

8          In the Trade Facilitation and Trade Enforcement Act of 2015, Pub. L. No.

9   114-125, 130 Stat. 122 (2016), Congress mandated that the CBP Commissioner

10  "shall" "coordinate and integrate [CBP's] security, trade facilitation, and trade en-

11  forcement functions," ensure the interdiction of illegal entrants and goods, "facilitate

12  and expedite the flow of legitimate travelers and trade," "direct and administer

13  [CBP's] commercial operations" and "enforce[] the customs and trade laws," "de-

14  tect, respond to, and interdict terrorists, drug smugglers and traffickers, human

15  smugglers and traffickers" and other dangerous persons, "safeguard the borders"

16  against "the entry of dangerous goods," coordinate with ICE and USCIS to "enforce

17  and administer all immigration laws," including "the inspection, processing, and ad-

18  mission of persons who seek to enter or depart the United States" and "the detection,

19  interdiction, removal, departure from the United States, short-term detention, and

20  transfer of persons unlawfully entering, or who have recently unlawfully entered,

21  the United States," and various other functions. 6 U.S.C. § 211(c). In the same Act,

22  Congress ordered the OFO Executive Assistant Commissioner to "coordinate

23  [CBP's] enforcement activities" at the ports of entry to "deter and prevent terrorists

24  and terrorist weapons from entering," "conduct inspections at [the] ports of entry to

25  safeguard [against] ... terrorism and illegal entry of persons," "prevent illicit drugs,

26  agricultural pests, and contraband from entering the United States," "in coordination

27  with the Commissioner, facilitate and expedite the flow of legitimate travelers and

28

41

1  trade," administer the National Targeting Center, coordinate the agency's "trade fa-

2  cilitation and trade enforcement activities" with CBP's Office of Trade, and "carry

3  out other duties and powers prescribed by the Commissioner." *Id.* § 211(g)(3).

4      Metering, whether to facilitate safe and orderly processing at the ports of en-

5  try, *see* Def. Ex. 2, or to facilitate the prioritization of resources in order of CBP's

6  national-security, counter-narcotics and outbound-operations, economic-security,

7  and trade-and-travel mission sets, *see* Def. Ex. 3 at 296; Def. Ex. 5 at 303–04, is

8  permissible under this statutory scheme. During the 2016 surge, the physical port

9  facilities at San Ysidro were overrun by the sheer volume of individuals waiting to

10 be processed. *See, e.g.*, Pl. Ex. 41 at 553 (referring to "several hundred people []

11 sleeping on the floor of the [San Ysidro] pedestrian entrance"). At the same time,

12 CBP was regularly diverting resources from the entire agency to process inadmissi-

13 ble arriving aliens at the southwest border. *See supra* at Argument § B–E; Def. Ex.

14 9 at 2 ("The practice of temporary details has become so systemic ... that CBP has

15 named it 'Operation Overflow.'"); Pl. Ex. 33 at 446 (showing more than $45 million

16 of expenditures in six and a half months). This was at the direct expense of CBP's

17 obligations (for example) to coordinate and integrate security, trade facilitation, and

18 trade enforcement functions at the ports and to facilitate and expedite the flow of

19 legitimate travelers and trade. 6 U.S.C. § 211(c). Border-wide metering was neces-

20 sary to CBP's functioning and performance of its statutory mission and duties.

21     In 2018, at the beginning of another sustained increase in undocumented mi-

22 gration on the southwest border and when faced with evidence of a forthcoming

23 potential mass influx event, CBP elected to issue border-wide guidance that permits

24 the ports to meter "[w]hen necessary or appropriate to facilitate orderly processing

25 and maintain the security of the port and safe and sanitary conditions for the traveling

26 public." Def. Ex 2. Then, rather that continuing to expend millions of dollars to ad-

27 dress another sustained surge, DHS instructed CBP to prioritize its national-security

28

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

1   and other critical missions at the southwest border ports and the use queue manage-

2   ment procedures to facilitate this prioritization, Def. Ex. 3 at 294–96, and later to

3   continue operating under this scheme, Def. Ex. 5 at 303–05. This is consistent with

4   Congress's elevation of DHS's national-security function over all others and is a

5   reasonable exercise of CBP's "broad discretion" to allocate its limited resources to

6   accomplish it many statutory functions. *Massachusetts*, 549 U.S. at 527; *Hernandez*,

7   140 S. Ct. at 746 ("attempting to control the movement of people and goods across

8   the border" "implicates an element of national security").

9       Plaintiffs contend that DHS and CBP have "'abandon[ed]'" § 1225 because

10   "they think it is not working well," Pl. MSJ 24 (quoting *E. Bay Sanctuary Covenant*

11   *v. Trump*, 932 F.3d 742, 774 (9th Cir. 2018)). Not so. CBP prioritizes certain mission

12   sets over processing undocumented aliens at the southwest border POEs, but the

13   processing of such individuals continues, Def. Ex. 4 at 2, and it "remains a compo-

14   nent of CBP's mission," Def. Ex. 3 at 296; *see also* Pl. Ex. 4 at 133:12–18.

15      Plaintiffs also contend that "CBP's general power to operate POEs does not

16   include authority to contravene more specific provisions of the INA" because the

17   "specific" provisions of § 1225 "govern[] the general.'" Pl. MSJ 25 n.16 (quoting

18   *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012)).

19   Plaintiffs never specify which "general" statutory provisions they are referring to.

20   Regardless, this argument ignores that Congress also enacted a detailed statutory

21   scheme setting forth CBP's and OFO's functions at the ports of entry. *See* 6 U.S.C.

22   §§ 211(c), (g)(3). As part of that scheme, it elevated DHS's national security func-

23   tions over all others, including processing undocumented migrants. *Id.*

24   § 111(b)(1)(A), (E). In all events, the Supreme Court "ha[s] repeated time and again"

25   that when faced with competing obligations, "an agency has broad discretion to

26   choose how best to marshal its limited resources and personnel to carry out its dele-

27   gated responsibilities." *Massachusetts*, 549 U.S. at 527. CBP continues to discharge

28   its obligations under § 1225 as intakes individuals from Mexico, *see* Def. Ex. 4 at 2,

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

1   so the "agency's decision to prioritize other projects is entitled to great deference,"

2   *Compassion Over Killing v. FDA*, 849 F.3d 849, 857 (9th Cir. 2017).

3   Plaintiffs further contend that "the logical result" of the government's position

4   is that DHS and CBP "would have sole authority to end asylum for noncitizens ar-

5   riving at POEs, without any involvement by Congress." Pl. MSJ 25. But none of the

6   government's border-wide metering decisions permit CBP to do this. The metering

7   decisions are well within the government's statutory authority.

8   **V.   Defendants' Actions are Not Arbitrary and Capricious.**

9   The undisputed facts also demonstrate that each of Defendants' relevant de-

10   cisions regarding metering is well-supported by the factual record before the agency,

11   is logical and coherent, and is the product of reasoned decisionmaking. Each deci-

12   sion more than satisfies the narrow and deferential standard for arbitrary-and-capri-

13   cious review. *See Motor Vehicle Mfts. Ass'n of U.S. v. State Farm Mut. Auto. Ins.*

14   *Co.*, 463 U.S. 29, 43 (1983)*.* Defendants are thus entitled to summary judgment.

15   The APA "requires a reviewing court to uphold agency action unless it is 'ar-

16   bitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"

17   *San Luis & Delta-Mendota Water Authority v. Locke*, 774 F.3d 971, 994 (9th Cir.

18   2014) (quoting 5 U.S.C. § 706(2)(A)). "Under this standard, [courts] will sustain an

19   agency action if the agency has articulated a rational connection between the facts

20   found and the conclusions made." *Id.* (quotation marks omitted). The 2016 metering

21   decisions were necessitated by overwhelming numbers of migrants seeking to pre-

22   sent themselves for processing, the resultant overcrowding and unsanitary condi-

23   tions at the ports, and the prolonged diversion of staffing resources from other stat-

24   utory mission sets. *See supra* at Facts §§ B–C. Each later decision by CBP or DHS

25   was made against this factual backdrop, and with consideration of substantiated in-

26   creases in the number of undocumented aliens seeking entry to the United States.

27   Plaintiffs claim that the capacity constraints are exaggerated or nonexistent, and thus

28   "pretextual," but this is not so. Moreover, Plaintiffs ignore that the stated reasons for

44

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

1   metering include to proactively *avoid* overcrowding and diversion of resources. Def.

2   Ex. 2 (metering to be used when "necessary or appropriate to facilitate orderly pro-

3   cessing"); Def. Ex. 5 at 303–05. It is eminently reasonable to act to prevent an oper-

4   ational crisis before one occurs. Further, the evidence shows that queue management

5   in fact facilitated orderly processing: The border Field Offices referred more inad-

6   missible arriving aliens for credible-fear interviews after the metering memoranda

7   were issued. *See* Def. Ex. 4 at 2. Field personnel attribute this to metering "allow[ing

8   them] to prevent emergencies." Pl. Ex. 102 at 188:18–25.

9        Plaintiffs nonetheless contend that the "turnback policy" is arbitrary and ca-

10   pricious because it is "based on pretext," its "true motivations are unlawful," and it

11   "amounts to an arbitrary and capricious interpretation of the INA." Pl. MSJ 26, 29,

12   30 (capitalization altered); *see also id.* at 26–31. Plaintiffs' arguments are flawed.

13       **A.**    **Defendants' Border-Wide Actions are Not Based on "Pretext."**

14        Plaintiffs say that "Defendants' stated justification for the turnback policy—

15   a 'lack of capacity' at POEs—is pretextual." *Id.* at 26 (quoting Answer ¶ 7). That is

16   not true. The undisputed facts demonstrate that the capacity concerns giving rise to

17   metering—and the resulting overcrowding and diversion of resources—are genuine.

18        When the San Ysidro Port of Entry began metering in late May 2016, the Port

19   was overwhelmed by individuals seeking admission despite having taken a number

20   of steps to increase its processing and detention capacity, *supra* at Facts § B, which

21   required the Port Director to eventually instruct his deputies to "hold the line the best

22   we can" to enable staff to "process cases and only focus on processing case[s] at this

23   time." Pl. Ex. 43 at 657. The subsequent instructions to other ports of entry to control

24   the flow of travelers through metering were animated by the same concerns. *See*

25   *supra* at Facts § C; Pl. Ex. 69 at 935 ("I just want our folks to have an additional tool

26   to keep conditions safe and working at our POEs.").

27        Likewise, in April and May 2018, directly preceding the April and June 2018

28

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

1    memoranda, the southwest border ports were processing an increased number of in-

2    admissible arriving aliens and had begun to report "impacts to frontline functions,"

3    Def. Ex. 50 at 853, and CBP was facing another potential mass migration event, *see*

4    Pl. Ex. 10 at 68:19–20; Def. Ex. 46 at 4; Def. Ex. 47 at 4; Def. Ex. 48 at 4; Def. Ex.

5    49 at 4; Def. Ex. 3 at 295–96; Pl. Ex. 80. By the time the CBP Acting Commissioner

6    issued the prioritization-based queue management memorandum in November 2019,

7    the number of inadmissible arriving aliens referred by the southwest border Field

8    Offices for credible-fear screening had doubled again, from 38,399 in FY 2018 to

9    80,055 in FY 2019. Def. Ex. 4 at 2.

10        Defendants' capacity justifications are not a "pretext" because *CBP in fact*

11   *was facing capacity constraints when the government made the border-wide meter-*

12   *ing decisions*. Even if there were additional reasons for the government's actions, "a

13   court may not reject an agency's stated reasons for acting simply because the agency

14   might also have had other unstated reasons." *Dept. of Commerce*, 139 S. Ct. at 2573.[8]

15   The facts show that the government truthfully "disclose[d] the basis of its action."

16   *Id.* (quotation marks omitted).

17        Plaintiffs' arguments to the contrary (at Pl. MSJ 26–29) lack merit. *First*,

18   Plaintiffs contend that that the government's justifications are pretextual because

19   "POEs generally operated well below 100%" while metering and the numbers "al-

20   most never impacted port operations." Pl. MSJ 26. But that is not evidence of pre-

21   text; it is evidence that the government's policies work as intended. When metering,

22

23

---

24   [8] "Relatedly, a court may not set aside an agency's policymaking decision solely
     because it might have been influenced by political considerations or prompted by an

25   Administration's priorities. Agency policymaking is not a 'rarified technocratic pro-
     cess, unaffected by political considerations or the presence of Presidential power.'

26   Such decisions are routinely informed by unstated considerations of politics, the leg-
     islative process, public relations, interest group relations, foreign relations, and na-

27   tional security concerns (among others)." *Dept. of Commerce*, 139 S. Ct. at 2573

28   (quoting *Sierra Club v. Costle*, 657 F.2d 298, 408 (D.C. Cir. 1981)).

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

FER-0124

1    ports will generally detain fewer people at a time, which in turn allows them to ded-

2    icate their resources to their priority missions. *See* Def. Ex. 5 at 303–05 (showing an

3    increase in inbound drug interdictions and currency seizure under the priority

4    scheme). When not metering, there are "impacts to frontline functions," Def. Ex. 50

5    at 853, including, for example, lower border-wide drug seizure weights, Def. Ex. 1

6    ¶ 21, and lines of people waiting to be processed that stretch "clear south into Mex-

7    ico," Pl. Ex. 17 at 160:12. Further, as explained, physical detention capacity is only

8    one aspect of a port's ability to detain individuals, and whether the port can safely

9    detain and orderly process them depends on myriad other factors, including the de-

10   mographics of the detained population, available staffing and overtime, and the other

11   enforcement actions occurring at the port. That CBP does not continuously max out

12   its detention capacity is not evidence of pretext, nor is it unlawful in any way.

13          *Second*, Plaintiffs raise several port-specific examples that purportedly show

14   that Defendants' capacity concerns are pretextual, but none support Plaintiffs' argu-

15   ment nor undermine Defendants' stated reasons for metering. Plaintiffs say that "a

16   CBP officer at the Tecate POE testified that this 'capacity excuse' is a lie." Pl. MSJ

17   26–27. But testimony from a single first-line officer at Tecate is probative only of

18   what the officer believes occurred at Tecate, not of whether an entire government

19   agency implemented a policy for a pretextual reason. In any event, the officer's tes-

20   timony supports the government's stated reasons for metering, because the officer

21   also testified that if the Port of Tecate were not permitted to meter, it would "back

22   up our operations very fast." Pl. Ex. 1 at 146:9–18.

23          Quoting their attorney's leading questions, Plaintiffs also say that CBP offic-

24   ers at Otay Mesa "were telling travelers that the facility was at capacity but weren't

25   actually checking on the capacity of the facility.'" Pl. MSJ 27 (quoting Pl. Ex. 118,

26   at 93:4–12; *see id.* at 93:9 (objection)). That is inaccurate. The evidence shows that

27   the officers "'*tell travelers they can go to San Ysidro or wait at the limit line*,'" Pl.

28   Ex. 118 at 92:18–93:1 (emphasis added), not that limit line officers tell travelers that

47                                      MEM. IN SUPPORT OF DEFS.' CROSS-
                                        MSJ & IN OPP'N TO PLS.' MSJ
                                        Case No. 3:17-cv-02366-BAS-KSC

1   the "facility was at capacity" without checking. Regardless of what line officers do,

2   this does not mean that supervisors at the port have not assessed a port's capacity

3   based on a number of operational considerations.

4        Again quoting their own attorney's leading questions, Plaintiffs say that the

5   Hidalgo POE "'intentionally removed seats' from the port's secondary inspection

6   area, 'so that they could say that [the port] couldn't process as many people.'" Pl.

7   MSJ 27 (quoting Pl. Ex. 3 at 157:15–18; *see id.* at 156:9, 21 (objections)). But this

8   testimony is inadmissible for lack of foundation and cannot be considered on sum-

9   mary judgment. *See* Fed. R. Civ. P. 56(c)(2). This witness (another first-line CBP

10  officer) was being asked his "opinion," Pl. Ex. 3 at 156:19–20, and he did not testify

11  that he personally knows port leadership to have removed seats with the intention of

12  processing fewer asylum seekers, *see id.* at 155:19–157:18.[9] Plaintiffs also incor-

13  rectly state that the same officer "testified that there was no justification for metering

14  because CBP could process asylum seekers in the order that they came to a POE

15  without resorting to turnbacks." Pl. MSJ 27 (quoting Pl. Ex. 3 at 71:9–16). What the

16  officer actually testified was that he "couldn't see a reason why [CBP] couldn't"

17  "process asylum seekers in the order that they came to the port of entry." Pl. Ex. 3

18  at 71:9–16. This merely shows that this one local officer does not have insight into

19  the government's border-wide operations and capacity constraints, not that those

20  constraints are false. As explained, those constraints are real.

21       *Third*, Plaintiffs say that prior to issuing the June 2018 memorandum, Secre-

22  tary Nielsen "explicitly asked for and considered the fact that the policy would result

23  in [] turnbacks ... without linking those expected turnback numbers to any actual

24  capacity shortage at POEs." Pl. MSJ 27 (emphasis removed). That is not accurate.

25  The Secretary's office asked, "if we fully implement the priority based Que [*sic*]

26

27  [9] The witness also has a self-described "traumatic brain injury," Pl. Ex. 3 at 179:13–

28  14, and expressed concern with "[his] memory a little bit" when asked about the
    chairs, *id.* at 157:7–13.

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

1    Management option—what's a rough magnitude of the CBP folks that will be
2    needed to man the boundary line? What's a rough estimate of the number of folks
3    that would likely be turned away per day?" Pl. Ex. 93 at 317. Requesting information
4    about the potential costs and impacts of implementing a policy is a regular aspect of
5    the policymaking process. It does not show that there were no capacity constraints.

6    *Fourth*, Plaintiffs say that "[i]f there really were capacity issues, Defendants
7    have long had contingency plans" for mass migration events but "repeatedly de-
8    clined to implement such plans and in some instances scrapped their rollout." Pl.
9    MSJ 27. Plaintiffs ignore that ports *did* implement contingency plans and that De-
10   fendants engaged in extensive contingency planning in 2016 before authorizing me-
11   tering border-wide. *See supra* at Facts §§ B–D.[10] But those efforts were insufficient
12   to prevent overcrowding in the event of a sustained migrant surge and came at the
13   expense of the government's other statutory obligations.

14   *Fifth*, Plaintiffs say that the government can simply parole class members
15   from the ports. Pl. MSJ 27. But mass parole would be manifestly contrary to the
16   plain language of § 1225, which "mandate[s]" the detention of an alien until his asy-
17   lum application is adjudicated or he is removed from the United States. *Jennings v.*
18   *Rodriguez*, 138 S. Ct. 830, 845 (2018). Parole "should not be used to circumvent
19   Congressionally-established immigration policy." H.R. Rep. No. 104-469, pt. 1, at
20   141. In any event, Plaintiffs acknowledge that Defendants attempted this approach
21   "in fall 2016," Pl. MSJ 27, but like the other steps taken, it did not solve the problem.

22   *Sixth*, Plaintiffs say that in June 2018, "CBP began using 'operational capac-
23   ity,' as opposed to 'detention capacity,'" to justify metering, and that this metric

24

25

26   ──────────────
     [10] The planned El Centro facility was delayed because of "bed space." Pl. Ex. 65 at
27   879. ████████████████████████████████████████
     ████    Pl. Ex. 66 at 216. The government would later open two soft-sided facilities in
28   Tornillo and Donna, Texas. Def. Ex. 33 at 5.

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

1    "'lacks any coherence,' and is anything but a 'concrete standard.'" Pl. MSJ 28 (quot-

2    ing *Tripoli Rocketry Ass'n v. ATF*, 437 F.3d 75, 77 (D.C. Cir. 2006)). This is wrong.

3    CBP used "operational capacity" long before June 2018. *E.g.*, Def. Ex. 62 at 712

4    (Sept. 2016); Pl. Ex. 17 at 70:4–13 (2015–16). While operational capacity may not

5    be quantifiable, that does not make it arbitrary and capricious. Operational capacity

6    is an established metric in detention contexts. *See Coleman v. Schwarzenegger*, 922

7    F. Supp. 2d 882, 921 (N.D. Cal. 2009) ("A prison system's capacity is not defined

8    by square footage alone; it is also determined by the system's resources and its abil-

9    ity to provide inmates with essential services such as food, air, and temperature and

10   noise control."); DOJ, Bureau of Justice Statistics, https://www.bjs.gov/index.cfm?

11   ty=tdtp&tid=1 (defining "operational capacity" as "[t]he number of inmates that can

12   be accommodated based on a facility's staff, existing programs, and services").

13          *Seventh*, it is not true that the purported "shift to 'operational capacity' simply

14   resulted in POEs processing 'fewer immigrants.'" Pl. MSJ 28 (quoting Pl. Ex. 100

15   at 207:7–14; *see also id.* at 207:12–13 (objection)). From FY 2018 (when Plaintiffs

16   say that CBP was not using operational capacity) to FY 2019 (when Plaintiffs say

17   that CBP was using operational capacity), the border Field Offices maintained their

18   overall levels of inadmissible-alien processing, and their credible-fear referrals more

19   than doubled. Def. Ex. 4 at 2. Further, the border Field Offices' inbound drug sei-

20   zures and currency interdictions increased following the Secretary's memorandum,

21   Def. Ex. 5 at 304, which shows that the Secretary's memorandum had its intended

22   effects on CBP's priority mission sets.

23          *Finally*, Plaintiffs say that "after June 2018, POEs set arbitrary numerical caps

24   on asylum seeker processing" below "actual capacity." Pl. MSJ 29. But again, more

25   class members were referred for asylum processing overall. Def. Ex. 4 at 2. As one

26   Assistant Port Director explained, his port was "able to process more with metering"

27   in 2019 "because metering allowed [CBP] to prevent emergencies," like those "that

28   occurred in 2016." Pl. Ex. 102 at 188:18–25. Metering is not pretextual.

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

**B.    The "True Motivations" for Metering are Lawful.**

Plaintiffs say that metering has an unlawful "[t]rue [m]otivation," Pl. MSJ 29; *id.* at 29–30, but this argument is flawed for several reasons. *First*, arbitrary-and-capricious review "is ordinarily limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record." *Dept. of Commerce*, 139 S. Ct. at 2573; *see San Luis & Delta-Mendota Water Auth.*, 776 F.3d at 992 (collecting cases). This rule "reflects the recognition that further judicial inquiry into 'executive motivation' represents 'a substantial intrusion' into the workings of another branch of Government and should normally be avoided." *Dept. of Commerce*, 139 S. Ct. at 2573 (quoting *Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 268 n.18 (1977)). As explained above, the government's border-wide metering decisions easily satisfy this test when evaluated against the evidence before the agency when the decisions were made. *Supra* at Facts §§ B–G; Argument § V.A. The decisions are "within the bounds of reasoned decisionmaking," and this Court should not "improperly substitute[] its judgment for that of the agency." *Dept. of Commerce*, 139 S. Ct. at 2569, 2570 (quotation marks omitted).

*Second*, even if this Court were to look behind the government's explanations, Plaintiffs offer no direct evidence that the "true motivation" for metering is to "limit access to the asylum process at POEs for its own sake." Pl. MSJ 29. The metering memoranda address the constraints on Defendants' capacity to process undocumented aliens, not just asylum-seekers. *See* Def. Ex. 2; *supra* at Argument § V.A. Further, border-wide metering has not resulted in reduced numbers of asylum seekers, as the southwest border Field Offices' credible-fear referrals doubled following the 2018 memoranda's implementation. Def. Ex. 4 at 2.

*Third*, Plaintiffs' circumstantial evidence falls well short of showing that Defendants "proceeded with the turnback policy in pursuit of" limiting asylum "for its own sake." Pl. MSJ 30. Plaintiffs say that CBP Deputy Commissioner McAleenan, "who ultimately proposed the turnback policy, lament[ed] in mid-2016 that there

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

1   was 'no appetite to try and refuse [asylum seekers] and push them back to Mexico.'"

2   *Id.* at 30 (quoting Pl. Ex. 47 at 116; alteration in Pl. MSJ). But the Deputy Commis-

3   sioner was not referring to "asylum seekers," he was referring to the Haitian nation-

4   als, whom UNHCR "confirmed" were mostly "not seeking asylum." Pl. Ex. 12 at

5   741. Moreover, Mr. McAleenan was not "lamenting"; he was discussing potential

6   policy proposals within a broader discussion about regional migration patterns and

7   international coordination. Pl. Ex. 47 at 116. He would later authorize metering be-

8   cause he "just want[ed] our folks to have an additional tool to keep conditions safe

9   and working at our POEs." Pl. Ex. 69 at 935. This does not show an intent to deter

10  asylum processing for its own sake. But even if it did, that would not show an APA

11  violation, particularly because "a court may not set aside an agency's policymaking

12  decision solely because it might have been influenced by political considerations or

13  prompted by an Administration's priorities." *Dept. of Commerce*, 139 S. Ct. at 2573.

14      *Fourth*, Plaintiffs say that a deterrence motive exists because ██████████

15  █████████████████████████████████████████████████████████████████████

16  ████████████ Pl. MSJ 30. █████████████████████████████████████████████

17  ██████████████████████████████████ Pl. Ex. 96 at 009. This shows that the

18  purpose of the request was to gather information about the policy's anticipated costs

19  and effects, which is a normal aspect of policymaking.

20      *Fifth*, Plaintiffs say that in November 2016, "CBP put out a call for proposals

21  'that would have a deterrent effect on the sending populations.'" Pl. MSJ 30. But a

22  call for proposals that deter people from making the dangerous journey to the United

23  States is not a call for proposals to deter people from seeking asylum. Indeed, most

24  of the Haitian population seeking admission at San Ysidro at the time were not asy-

25  lum seekers, but rather were seeking to work or reunite with family. Pl. Ex. 12 at

26  741. There is nothing unlawful about seeking policy solutions to irregular migration.

27      *Finally*, even if the evidence showed that Defendants implemented metering

28  to deter individuals from accessing the asylum process for its own sake, Defendants

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

1  respectfully maintain their position that this would not be contrary to the statute or

2  unlawful. *See, e.g.*, *Thuraissigiam*, 140 S. Ct. at 1964–67; H.R. Rep. No. 104-469,

3  pt. 1, at 1; *cf. Jean v. Nelson*, 472 U.S. 846, 880 (1985) (Marshall, J., dissenting)

4  (noting "the valid immigration goal of reducing the number of undocumented aliens

5  arriving at our borders"). Further, IIRIRA was motivated by "legitimate concerns"

6  that the government's "capacity for admitting, assimilating, and naturalizing immi-

7  grants ha[s] been strained by current levels of legal immigration," including in-

8  creases attributable to the 1980 Refugee Act. H.R. Rep. No. 104-469, pt. 1, at 133.

9  If Defendants had a "deterrence" motive, that would not be inconsistent with § 1225.

10      **C.      Metering is Consistent with Congressional Intent.**

11          Plaintiffs argue that metering "is 'inconsistent with clearly expressed congres-

12  sional intent'" because it "turns asylum seekers back to danger en masse." Pl. MSJ

13  30 (quoting *E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1273 (9th Cir.

14  2020)); *see also id.* at 30–31. This is wrong. *First*, Plaintiffs do not identify any

15  "clear[]" statutory language evidencing that Congress did not intend for asylum

16  seekers to wait in Mexico. *See E. Bay*, 950 F.3d at 1273 (citing *United States v. City

17  of Fulton*, 475 U.S. 657, 666–67 (1986)). Nor could they. Section § 1225 applies by

18  its terms to aliens "in the United States." Further, Congress included in § 1225 a

19  provision expressly permitting the government to "return [an] alien" "who is arriving

20  on land ... from a foreign territory contiguous to the United States" back "to that

21  territory pending" full removal proceedings. 8 U.S.C. § 1225(b)(2)(C). Congress did

22  not object to asylum seekers waiting in Mexico.

23          *Second*, policies that authorize metering to facilitate safe and orderly pro-

24  cessing, Def. Ex. 2, or the prioritization of specific statutory functions, Def. Ex. 5 at

25  303–04; *see also* Def. Ex. 3 at 294–96, are consistent with the relevant Acts of Con-

26  gress. As explained, the Homeland Security Act, IIRIRA, and the Trade and Travel

27  Facilitation Act prioritize DHS's national-security mission over all others and re-

28  quire CBP to facilitate the flow of legitimate travel and trade. Metering is consistent

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

1   with the Acts because it facilitates these functions. The government is entitled to

2   summary judgment on Plaintiffs' APA claims because the challenged metering de-

3   cisions are well-supported, are the product of reasoned decisionmaking, and are con-

4   sistent with congressional intent.

5   **VI.   Metering Does Not Deprive Class Members of Procedural Due Process.**

6   On their due-process claims (at Pl. MSJ 31–33), Plaintiffs first contend that

7   Defendants have deprived class members of their statutory "procedural protections"

8   to "be inspected and processed for asylum at POEs pursuant to § 1225." Pl. MSJ 32.

9   But § 1225 does not establish any such protections for aliens outside the United

10  States. *Supra* at Argument § III. Nor does the obligation to refer an alien for a cred-

11  ible-fear interview attach until the government "determines" that an alien is inad-

12  missible on certain grounds, which does not occur until an alien is physically present

13  *in* the United States. 8 U.S.C. § 1225(b)(1)(A)(ii). By seeking to compel inspection

14  and processing, class members seek to compel entry to the United States, which is

15  not provided by the statute or the Constitution. "[I]t is long settled as a matter of

16  American constitutional law that foreign citizens outside U.S. territory do not pos-

17  sess rights under the U.S. Constitution." *AID v. All. for Open Soc. Int'l*, 140 S. Ct.

18  2082, 2086 (2019) (collecting cases); *Zadvydas*, 533 U.S. at 693. Thus, Defendants

19  do not violate any claimed due-process interest by subjecting class members to me-

20  tering.

21  Plaintiffs argue "[i]n addition" that metering violates the due-process require-

22  ment of "fundamental procedural fairness" toward class members. Pl. MSJ 32–33.

23  It is unclear what Plaintiffs seek by raising this "addition[al]" argument, but in all

24  events class members cannot obtain more than what the statute already provides: to

25  be inspected and processed for admission. *Thuraissigiam*, 140 S. Ct. at 1983 (arriv-

26  ing alien "has only those rights regarding admission that Congress has provided by

27  statute," and "the Due Process Clause provides nothing more"); *Mezei*, 345 U.S. at

28  215; *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 544 (1950); *Rafeedie*

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

1   *v. INS*, 880 F.2d 506, 520 (D.C. Cir. 1989).[11]

2   **VII.   Plaintiffs' International-Law Claim is Not Actionable.**

3   Plaintiffs' claim under the ATS, 28 U.S.C. § 1350, is not actionable. *See* Pl.

4   MSJ 33–36. *First*, Plaintiffs fail to show why this Court should use its restricted

5   power to create federal common law to fashion a cause of action for injunctive and

6   declaratory relief against the United States for purported violations of the non-re-

7   foulement obligation. The "three primary offenses" cognizable under the ATS in-

8   clude "violation of safe conducts, infringements of the rights of ambassadors, and

9   piracy." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 724 (2004). While courts in certain

10   circumstances may create a cause of action for an additional offense that would in-

11   corporate a "specific, universal, and obligatory" international-law standard, *id.* at

12   732, courts must exercise "great caution in adapting the law of nations to private

13   rights," *id.* at 728, and engage in "vigilant doorkeeping," *id.* at 729.

14   The non-refoulement obligation is binding on the Executive only by statute

15   and regulation. *See* 8 U.S.C. § 1231(b)(3)(A) (prohibiting the government from "re-

16   mov[ing] an alien to a country if the Attorney General decides that the alien's life or

17   freedom would be threatened in that country" on a protected ground); *INS v. Stevic*,

18   467 U.S. 407, 421 (1984) (Congress amended the INA to "basically conform[] it to

19   the language of Article 33 of the United Nations Protocol"). When it acceded to the

20   obligation, Congress made clear that "[n]othing in this section shall be construed to

21   create any substantive or procedural right or benefit that is legally enforceable by

22   any party against the United States or its agencies or officers or any other person."

23   8 U.S.C. § 1231(h). And when it allowed for judicial review of claims arising out of

24   the withholding statute, Congress divested district courts of authority to hear such

25

26   ---
   [11] To the extent that Plaintiffs raise a *Mathews* balancing argument, *see* Pl. MSJ 33,

27   that argument fails. As discussed, class members lack a protected interest. Even if
   they had a protected interest, the burdens to those interests are far outweighed by the

28   burdens to the government's and the public's interests. *See infra* at Argument § VIII.

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

1    claims and channeled them instead into the courts of appeals to be reviewed along-
2    side a final order of removal. *Id.* §§ 1252(a)(5), (b)(9). In light of these statutory
3    restrictions, it would be an extraordinary exercise of lawmaking power by the Judi-
4    ciary that is nowhere suggested in the text or origins of the ATS, and that would be
5    manifestly contrary to the Supreme Court's instruction to exercise "great caution"
6    in recognizing new causes of action under the ATS, *Sosa*, 542 U.S. at 727–28, for
7    this Court to recognize Plaintiffs' novel cause of action. Plaintiffs seek to enforce
8    the same obligation that Congress adopted by statute, but to avoid the attendant lim-
9    itations on judicial review. Plaintiffs should not be permitted to circumvent those
10   statutory restrictions by couching their claims under the ATS.

11        *Second*, that Plaintiffs' claims implicate national security and foreign relations
12   further demonstrates that the Court should not fashion a cause of action here. The
13   Supreme Court recently held that courts may not fashion a cause of action for dam-
14   ages under *Bivens* against U.S. officials based on claimed violations arising out of
15   cross-border shootings, reasoning that "the conduct of agents positioned at the bor-
16   der has a has a clear and strong connection to national security" and "regulating the
17   conduct of agents at the border unquestionably has national security implications."
18   *Hernandez*, 140 S. Ct. at 746, 747; *see also City of Indianapolis v. Edmond*, 531
19   U.S. 32, 42 (2000). "[T]he risk of undermining border security provides reason to
20   hesitate before extending *Bivens* into this field." *Hernandez*, 140 S. Ct. at 747. Fur-
21   ther, the claimed violations arose from a cross-border shooting (which "is by defini-
22   tion an international incident," *id.* at 744) and "implicated" foreign relations, which
23   provided "even greater reason for hesitation" before creating a cause of action. *Id.*
24   at 747. The same national-security and foreign-relations implications are present
25   here. OFO's function "to control the movement of people and goods across the bor-
26   der" indisputably "implicates an element of national security," *id.* at 746, and its
27   cooperation with the Mexican government to regulate crossings of the shared border
28   is "by definition" an international affair, *id.* at 744. Thus, this Court should decline

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

1    to fashion a private cause of action for much the same reasons the Supreme Court

2    declined to fashion one in *Hernandez*.

3       Plaintiffs do not explain why this Court should recognize an ATS cause of

4    action, and instead merely argue that they *succeed* on an ATS claim. *See* Pl. MSJ

5    33–36. Those arguments are also flawed. *First*, the non-refoulement obligation that

6    Congress acceded to has never been "available to aliens at the border." *Stevic*, 467

7    U.S. at 415. Even if this Court creates an ATS cause of action under the ATS, Plain-

8    tiffs offer no explanation why it should extend further than the INA. *Second*, a non-

9    refoulement obligation attaches under U.S. law when an individual's life or freedom

10    would be threatened *on a protected ground*. 8 U.S.C. § 1231(b)(3)(A). Plaintiffs'

11    contention (at 34) that Defendants "'knew or should have known'" that Mexican

12    "border towns are ... dangerous" is facially insufficient to establish this nexus. *Third*,

13    Plaintiffs cite only eighteen declarations[12] filed in support of their class-certification

14    motion (but not attached to their summary-judgment motion) showing the declarants

15    fear waiting in Mexico. Pl. MSJ 34. Even if credited, the declarations do not show

16    that all class or sub-class members "fear persecution or other harm" in Mexico, it

17    shows only that the eighteen declarants do. Accordingly, Plaintiffs fail to show that

18    relief would be "appropriate respecting the class as a whole." Fed. R. Civ. P.

19    23(b)(2). *Finally*, Plaintiffs contend that Defendants have subjected class members

20    to "impermissible chain refoulement—that is, the risk that CBP's expulsion of mi-

21    grants to Mexico will lead to Mexican-initiated deportation." Pl. MSJ 35. But class

22    members have not been "exp[elled]" to Mexico, they are waiting in Mexico, a coun-

23    try through which many have voluntarily traveled. In any event, this theory would

24    require the Court to sit in judgment of Mexico's enforcement of its own immigration

25

---

26    [12] Defendants previously moved to strike some of these and other anonymous dec-

27    larations because Plaintiffs refused to share the declarants' identities under the terms of the protective order, which precluded Defendants from even evaluating whether

28    to seek discovery from the declarants. *See* ECF Nos. 411, 425. This Court should decline to consider the declarations for the reasons discussed in the motions to strike.

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

1    laws within its own borders, which is precluded under the act-of-state doctrine. *See*

2    *Underhill v. Hernandez*, 168 U.S. 250, 252 (1897) ("the courts of one country will

3    not sit in judgment on the acts of the government of another, done within its own

4    territory"); *see also Munaf v. Geren*, 553 U.S. 674, 700–01 (2008) (under the rule of

5    non-inquiry, "it is for the political branches, not the judiciary, to assess practices in

6    foreign countries and to determine national policy in light of those assessments").

7    Plaintiffs' ATS claim is not actionable, but even if it were it fails.

8    **VIII. Plaintiffs are Not Entitled to the Relief They Seek.**

9         Plaintiffs seek a permanent injunction requiring "Defendants to cease treating

10   asylum seekers differently from all other people arriving at POEs on foot or by ve-

11   hicle" and a declaratory judgment. Pl. MSJ 36–39. They are entitled to neither, and

12   this Court should deny the request or allow briefing on the appropriate remedy, if

13   necessary, after it rules on the merits.

14        *First*, Plaintiffs' requested injunction is prohibited by 8 U.S.C. § 1252(f)(1)

15   because it would "enjoin or restrain the operation of" § 1225(b)(1)(A)(ii) by rewrit-

16   ing it to apply to aliens outside the United States. *See Hamama v. Adducci*, 912 F.3d

17   869, 879–80 (6th Cir. 2018), *cert. denied* 2020 WL 3578681 (July 2, 2020)

18   (§ 1252(f)(1) prohibits injunctions that "create[] out of thin air a requirement ... that

19   does not exist in the statute"). Moreover, § 1252(f)(1) "restrict[s] courts' power to

20   impede" admission and removal statutes "on the basis of suits brought by organiza-

21   tional plaintiffs and noncitizens not yet facing [removal] proceedings." *Padilla v.*

22   *ICE*, 953 F.3d 1134, 1151 (9th Cir. 2020). Class members are by definition not yet

23   facing removal proceedings, so they cannot obtain the requested injunction that re-

24   writes § 1225's clear terms.

25        *Second*, Plaintiffs are not entitled to an injunction under the traditional test.

26   Injunctive relief is an "extraordinary remedy never awarded as of right." *Winter v.*

27   *NRDC*, 555 U.S. 7, 24 (2008). A party must demonstrate "(1) actual success on the

28   merits; (2) that it has suffered an irreparable injury; (3) that remedies available at

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

1   law are inadequate; (4) that the balance of hardships justify a remedy in equity; and

2   (5) that the public interest would not be disserved by a permanent injunction." *Edmo*

3   *v. Corizon, Inc.*, 935 F.3d 757, 784 (9th Cir. 2019). Because "it must be presumed

4   that federal officers will adhere to the law as declared by the court," the requirements

5   for discretionary declaratory relief in this context should be the same. *Sanchez-Es-*

6   *pinoza v. Reagan*, 770 F.2d 202, 208 n.8 (D.C. Cir. 1985) (Scalia, J.). An injunction

7   "should be no more burdensome to the defendant than necessary to provide complete

8   relief." *E. Bay*, 950 F.3d at 1282 (quotation marks omitted).

9        Plaintiffs' claims fail on the merits, so they are not entitled to an injunction.

10   But even if Plaintiffs showed actual success on the merits, the remaining prongs do

11   not support the injunctive relief they request. The third prong weighs against a per-

12   manent injunction because vacatur, which is the customary and "appropriate rem-

13   edy" for an APA violation, is an adequate legal remedy. *Cal. Wilderness Coalition*

14   *v. DOE*, 631 F.3d 1072, 1095 (9th Cir. 2011); 5 U.S.C. § 706(2). If Plaintiffs were

15   to succeed on their APA and duplicative due-process claims, the Court can vacate

16   Defendants' border-wide metering decisions rather than enter a permanent injunc-

17   tion and provide Plaintiff with complete relief on all claims, including their ATS

18   claim, which is based on the same operative facts. And because the APA is the only

19   statute that waives the United States' sovereign immunity for an injunctive ATS

20   claim, any ATS relief should be no broader than the relief granted under the APA.

21        The balance of hardships and the public interest, which should be considered

22   together, *Sierra Club v. Trump*, 963 F.3d 874, 895 (9th Cir. 2020), also weigh against

23   a permanent injunction. An order categorically enjoining metering at minimum

24   "would require OFO to divert staffing and resources, both at the southern land border

25   POEs and across the country, away from their priority missions and towards the

26   processing of" undocumented aliens. Def. Ex. 1 ¶ 16. Although some class members

27   may be adversely affected by metering, the order would impose direct economic

28   harms on border communities, *id.* ¶¶ 16–17, result in significantly fewer inbound

1    drug interdictions from Mexico, *id.* ¶ 18, and would create humanitarian challenges

2    by crowding class members into facilities that "do not have showers, beds, laundry

3    facilities, or space for recreation" and "are not equipped to meet the needs of families

4    with small children" or "those with unique medical needs," *id.* ¶ 19. It would also

5    significantly degrade the government's national-security and law-enforcement mis-

6    sions. *Winter*, 555 U.S. at 31 n.5; Def. Ex. 9 at 1; Pl. Ex. 102 at 136:7–18 (over-

7    crowding "flat out degraded [CBP's] ability to do other mission sets"), 184:7–21

8    (same); Def. Ex. 65; Def. Ex. 66 (showing diversions of resources); *supra* Facts

9    §§ B–D. There would also be a significant financial cost to the government. Def. Ex.

10   1 ¶ 23; Pl. Ex. 33 at 446. Mass parole, besides being contrary to the mandatory de-

11   tention scheme and the public's "weighty interest in efficient administration of the

12   immigration laws at the border," *E. Bay*, 932 F.3d at 779 (quotation marks omitted);

13   *supra* at Argument § V.A, would not alleviate these burdens. It would merely real-

14   locate them to "local NGOs, shelters, and other community organizations that often

15   provide assistance to aliens released from DHS custody." Def. Ex. 1 ¶ 25. These

16   costs to the public, class members, and the government vastly outweigh the harms

17   to class members' interests from metering.

18          Finally, Plaintiffs' requested injunction is more burdensome than necessary to

19   provide complete relief. The "less drastic remedy" of vacatur would be "sufficient

20   to redress [Plaintiffs'] injury," so "no recourse to the additional and extraordinary

21   relief of an injunction [is] warranted." *Monsanto Co. v. Geertson Seed Farms*, 561

22   U.S. 139, 165–66 (2010). Even if the Court were to issue an injunction, it should

23   order the narrowest relief permissible and preserve metering as an option in certain

24   circumstances to give CBP the flexibility to adapt to changing circumstances and

25   mitigate harms to the United States.

26                                    **CONCLUSION**

27          The Court should deny Plaintiffs' Motion for Summary Judgment and enter

28   summary judgment for Defendants.

60

1   DATED: September 25, 2020

2

3

4

Respectfully submitted,

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General
Civil Division

5

6

7

WILLIAM C. PEACHEY
Director, Office of Immigration Litigation –
District Court Section

8

9

KATHERINE J. SHINNERS
Senior Litigation Counsel

10

11

12

13

14

15

16

17

*/s/ Alexander J. Halaska*
ALEXANDER J. HALASKA
Trial Attorney
United States Department of Justice
Civil Division
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 307-8704 | Fax: (202) 305-7000
alexander.j.halaska@usdoj.gov

18

*Counsel for Defendants*

19

20

21

22

23

24

25

26

27

28

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

FER-0139

1

## <u>CERTIFICATE OF SERVICE</u>

2

No. 17-cv-02366-BAS-KSC

3        I certify that I served a copy of this document on the Court and all parties by

4 filing this document with the Clerk of the Court through the CM/ECF system, which

5 will provide electronic notice and an electronic link to this document to all counsel

6 of record.

7

8 DATED: September 25, 2020            Respectfully submitted,

9
                                      */s/ Alexander J. Halaska*
10                                     ALEXANDER J. HALASKA
                                       Trial Attorney
11                                     United States Department of Justice

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

FER-0140

1  JEFFREY BOSSERT CLARK
2  Acting Assistant Attorney General
   Civil Division
3  WILLIAM C. PEACHEY
4  Director, Office of Immigration Litigation –
   District Court Section
5  KATHERINE J. SHINNERS (DC 978141)
6  Senior Litigation Counsel
   ALEXANDER J. HALASKA (IL 6327002)
7  Trial Attorney
8  United States Department of Justice
   Civil Division
9  Office of Immigration Litigation
10 P.O. Box 868, Ben Franklin Station
   Washington, D.C. 20044
11 Tel: (202) 307-8704 | Fax: (202) 305-7000
12 alexander.j.halaska@usdoj.gov

13
14 *Counsel for Defendants*

15           **UNITED STATES DISTRICT COURT**
           **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**
16                      **(San Diego)**

17

18 AL OTRO LADO, Inc., *et al.*,          Case No. 3:17-cv-02366-BAS-KSC

19                    *Plaintiffs*,        **DEFENDANTS' EXHIBIT 33**

20
21                v.

22 Chad F. WOLF, Acting Secretary of
23 Homeland Security, in his official
   capacity, *et al.*,
24
25                    *Defendants.*

26

27

28



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

Washington, DC 20528 / www.oig.dhs.gov

October 10, 2017

| | |
|---|---|
| MEMORANDUM FOR: | The Honorable Claire M. Grady<br>Under Secretary for Management<br>Department of Homeland Security |
| FROM: | John Roth<br>Inspector General |
| SUBJECT: | Investigation of Allegations Related to Temporary<br>Holding Facilities and Non-Intrusive Inspection<br>Equipment at U.S. Customs and Border<br>Protection (OSC File No. DI-17-0368) |

The U.S. Office of Special Counsel (OSC) received a whistleblower disclosure alleging that Kevin McAleenan, Acting Commissioner, U.S. Customs and Border Protection (CBP), engaged in conduct that constitutes an abuse of authority and a gross waste of funds. Specifically, the whistleblower alleged that against the advice of senior CBP executives:

- McAleenan improperly allocated $32,200,000 of CBP's Operations and Maintenance (O&M) funds to construct and operate temporary holding facilities in Tornillo, Texas and Donna, Texas from November 2016 to March 2017; and

- McAleenan halted Border Patrol agents' use of Non-Intrusive Inspection (NII) equipment from June 9, 2017 to June 19, 2017 in order to avoid scrutiny from the National Border Patrol Council prior to his confirmation hearing.

On July 14, 2017, OSC referred this complaint to then-DHS Secretary General John F. Kelly. The Department referred the matter for our consideration, and we agreed to investigate the allegations. Pursuant to 5 U.S.C. § 1213(c)(1)(B) and OSC procedures, a response from the Secretary (or her delegate) is due by November 13, 2017.

We have not substantiated these allegations. The decision to establish and operate the Tornillo and Donna facilities was based on sound



## OFFICE OF INSPECTOR GENERAL
### Department of Homeland Security

evidence, after significant research, and with the consensus of CBP senior officials. Separately, while McAleenan did unilaterally decide to temporarily suspend the use of NII equipment by Border Patrol agents in the El Paso, Texas Sector for 10 days in June 2017, he did not receive objections from any senior officials, and we identified no evidence that his decision was based on anything other than a concern for the safety of CBP employees and their potential lack of confidence in the safety of the NII equipment. Consequently, we found no violations of law, rule, or regulation, or any gross mismanagement, gross waste of funds, abuse of authority, or substantial and specific danger to public health or safety. *See* 5 U.S.C. § 1213(a)(2).

In the course of this investigation, we interviewed approximately 15 witnesses and reviewed emails and other key documents. The whistleblower declined our request for an interview, but provided answers to our written questions.

### Tornillo and Donna Temporary Holding Facilities

According to the whistleblower, McAleenan decided to build temporary facilities to hold undocumented immigrants at Tornillo, Texas and Donna, Texas. The whistleblower alleged that McAleenan made this decision unilaterally, without a proper basis, and against the advice and objections of CBP senior executives. The whistleblower stated the facilities were each built to hold approximately 450 individuals, but they never held more than a fraction of that capacity. The whistleblower claimed that CBP spent approximately $32.2 million of O&M funds to build and operate these facilities, which left insufficient funds to purchase ammunition and other necessary equipment. Finally, the whistleblower claimed it was improper for CBP to use appropriated funds on holding facilities because U.S. Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO), and not CBP, is responsible for detaining aliens.

We found that the Tornillo and Donna facilities were built to address a documented surge of migrants arriving on the Southwest border in 2016. While the facilities were never filled to capacity, that was because the surge abruptly, drastically, and unexpectedly ended. The decision to build the facilities was collaborative, and we found no disagreement about that decision among CBP leadership. We also found that CBP kept DHS, Congress, and the White House informed about the need for and

2



# OFFICE OF INSPECTOR GENERAL
### Department of Homeland Security

cost of the holding facilities, and we identified no appropriations, accounting, or procurement abnormalities related to the temporary facilities.

### The decision to build the Tornillo and Donna facilities had a sound basis

In the summer and fall of 2016, CBP observed a large increase of foreign nationals arriving at the Southwest border. For example, in October and November 2016, the number of Border Patrol apprehensions and inadmissible aliens who arrived at Ports of Entry (POE) was 75% higher than the prior five-year averages for those months. Many witnesses told us this surge was related to the upcoming U.S. presidential election. Regardless of the election's outcome, there was a strong desire among migrants to arrive in the United States before the new president took office. According to the witnesses, the migrants believed they might receive amnesty if Hillary Clinton took office or that the border would close under Donald Trump's administration. Additionally, there were also substantial increases of Cubans and Haitians arriving at the U.S. border.

CBP lacked sufficient space to hold all the apprehended and inadmissible aliens. Generally, CBP only holds aliens for short periods of time while they are being processed and awaiting transfer to either the U.S. Department of Health and Human Services (HHS) (for unaccompanied alien children (UAC)) or to ICE ERO (for everyone else).[1] However, HHS and ICE ERO both struggled to keep up with the surge of individuals, which resulted in a backup at CBP facilities. In particular, the POEs became especially crowded. Several witnesses told us that aliens, including children, were forced to sleep in hallways, conference rooms, and breakrooms because there was nowhere else to put them. Witnesses told us that holding people in these conditions presented health and safety concerns for both the people being held and the CBP employees at these facilities. Moreover, CBP employees were taken away from their regular enforcement duties in order to help feed and care for the detainees. According to one witness, CBP facilities were "drowning in bodies."

---

[1] CBP's policy is to make every effort to hold individuals for the least amount of time possible and "generally not . . . longer than 72 hours." U.S. Customs and Border Protection, National Standards on Transport, Escort, Detention, and Search (Oct. 2015), § 4.1. Additionally, except in exceptional circumstances, UACs must be transferred to HHS within 72 hours of determining that the child is a UAC. 8 U.S.C. § 1232(b)(3).

3



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

Seeking to learn lessons from and avoid repeating mistakes made during a prior surge of UAC in 2014,[2] CBP established a Crisis Action Team (CAT team) in October 2016 to manage its response to this migration surge. Composed of representatives from various CBP components, the CAT team compiled data and developed strategies to address the surge and overcrowding. The CAT team combined data and intelligence gathered by different CBP offices into a daily report, which it provided to CBP leadership. The CAT team also briefed the leadership daily on the data and what it was doing to address the surge.

The CAT team considered several approaches to address the overcrowding. For example, it tried working with Mexico to "meter" the number of individuals allowed to enter the U.S. at a given time, to ensure that CBP had space for everyone. It also tried getting ICE to increase the number of deportation flights. Additionally, ICE offered to transfer a building it was no longer using to CBP so that CBP could convert it into a holding facility. However, the building was far from where CBP had the most need and CBP did not want to assume permanent control of it.

The CAT team, in conjunction with CBP's Office of Facilities & Asset Management (OFAM), also explored building temporary facilities to hold aliens until ICE ERO and HHS could accept them. In CBP's view, temporary facilities offered several advantages. First, they could be built much more quickly and less expensively than permanent facilities. Within just a few weeks, CBP could solicit bids, sign a contract, and have a facility built and operational. Temporary facilities were also scalable, meaning capacity could be increased or decreased relatively easily to meet demand. Additionally, the facilities could be primarily staffed by contractors, which was attractive to CBP because it would allow CBP personnel to return to their regular enforcement duties rather than caretaking and custodial work.

In evaluating potential sites for temporary facilities, OFAM, the CAT team, and CBP leadership evaluated several factors, such as the

---

[2] *See, e.g.*, Memoranda from John Roth, DHS Inspector General to the Honorable Jeh C. Johnson re: Oversight of Unaccompanied Alien Children (July 30, Aug. 28 & Oct. 2, 2014),
https://www.oig.dhs.gov/sites/default/files/assets/Mga/2016/Over_Un_Ali_Chil.pdf;
https://www.oig.dhs.gov/sites/default/files/assets/Mga/2016/Sig_Mem_Over_Unac_Alien_Child090214.pdf;
https://www.oig.dhs.gov/sites/default/files/assets/Mga/2016/Over_Un_Ali_Child_100214.pdf.

4



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

locations of migration flows, accessibility, and logistical needs. After considering several sites in Texas, Arizona, and California they ultimately selected Tornillo as the first location. They chose Tornillo because it was adjacent to a POE, it was on land already owned by the government, and it was only 45 miles from El Paso, which was one of the most overcrowded POEs. They later selected Donna as the second location because it was also near the migration flow, it had a lot of available land, and it met other logistical needs. Tornillo opened on November 25, 2016 and Donna opened on December 10, 2016. Both facilities became operational approximately two weeks after CBP selected the site. Both facilities were initially built to hold up to 500 people, and both could be expanded if necessary.

In December 2016 and January 2017, the number of aliens arriving at the border began to decline from the prior months but was still significantly higher than in prior years. Many witnesses told us this was a normal pattern. Every year, the numbers decline in these months because people stay in their native countries to celebrate the holidays. Then, the numbers begin to increase in the new year and into the spring. Therefore, even though fewer people arrived in December and January, the witnesses uniformly told us that they expected the numbers to rise again. However, this did not happen. After the presidential inauguration, the numbers dropped suddenly and drastically, to historic lows. The witnesses told us they were stunned at how low the numbers were.

Table 1, taken from the CAT team's May 2, 2017 briefing, shows the total number of Border Patrol apprehensions and inadmissible aliens who arrived at POEs on the Southwest border. As shown, from August 2016 through January 2017, this number was significantly higher than any of the prior five years, and it drastically declined beginning in February 2017. In prior years, the table shows the typical December – January decrease and February – May increase that many of the witnesses described to us.

5



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

Table 1



| | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FY17 | 66,710 | 63,363 | 58,431 | 42,477 | 23,570 | 16,712 | 15,850 | | | | | |
| FY16 | 45,546 | 45,774 | 48,761 | 33,676 | 38,316 | 46,150 | 48,541 | 55,442 | 45,722 | 46,966 | 51,961 | 56,535 |
| FY15 | 35,895 | 33,023 | 34,238 | 30,178 | 32,550 | 39,159 | 38,296 | 40,681 | 38,616 | 38,610 | 42,414 | 41,165 |
| FY14 | 41,828 | 38,685 | 36,695 | 35,181 | 42,399 | 57,405 | 59,119 | 68,804 | 66,541 | 48,819 | 39,758 | 34,003 |
| FY13 | 34,836 | 33,153 | 29,075 | 32,481 | 40,632 | 54,009 | 54,761 | 50,481 | 40,785 | 39,993 | 41,110 | 38,182 |
| FY12 | 31,323 | 28,601 | 24,360 | 30,758 | 36,990 | 48,520 | 46,660 | 42,995 | 36,794 | 32,801 | 33,686 | 32,375 |

As the numbers of apprehensions and inadmissible arrivals dropped, so too did the number of people being held at the Tornillo and Donna facilities. By February, there were only a few days in which the two facilities held more than 100 people combined (out of 1,000 total capacity). Therefore, in mid-February 2017, CBP decided to place the facilities in "stand-by" mode. This meant that the facilities remained intact with basic maintenance, but they did not hold any detainees. It cost approximately $1.8 million to keep the two facilities in stand-by mode each month, which was approximately $2.8 million less than keeping them fully operational. The facilities could be reactivated from stand-by status within 72 hours, at a minimal cost. In contrast, if the facilities were permanently closed, it would cost approximate $6.6 million to reopen them if necessary. Therefore, in CBP's view, keeping the facilities in stand-by mode was a form of insurance, in case the migration flow increased again. By mid-April 2017, the numbers had not increased and so McAleenan gave the order to permanently close the facilities.

The Tornillo facility held a total of 5,721 aliens over 82 days (November 25, 2016 – February 14, 2017). It held an average of 174.34 aliens per day. The Donna facility held 2,172 aliens over 63 days (December 10, 2016 – February 10, 2017). It held an average of 43.52 aliens per day.[3] The total cost for the two facilities was approximately $20 million.

---

[3] The daily average is higher than the number of aliens divided by the number of days the facility was open because aliens often remained at a facility for more than one day.

6



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

<u>The decision to build and maintain the facilities was a collaborative agency decision</u>

We found that McAleenan did not unilaterally make the decision to build the Tornillo and Donna facilities, as the whistleblower alleged. Many CBP senior executives, as well as the CAT team, were closely involved in the process of addressing the surge and the specific decisions to open and locate temporary holding facilities. The CAT team met with CBP senior executives daily during this time, and one senior member of the CAT team told us that McAleenan did not dictate any particular course of action. Instead, according to the witnesses we interviewed, there was always a discussion based on the information provided by the CAT team. Indeed, McAleenan was not even CBP's Commissioner when the facilities were built in 2016. Then-Commissioner Gil Kerlikowske ultimately made the decision to open the facilities.

Moreover, CBP was in constant communication about the migration surge with the White House, then-DHS Secretary Jeh C. Johnson, then-acting DHS Deputy Secretary Russ Deyo, and others throughout DHS and its components. One senior member of the CAT team recounted attending regular meetings at DHS headquarters where then-Secretary Johnson was briefed on the crisis and approved a number of proposed solutions, including the temporary facilities. We also identified emails confirming the Secretary's awareness and involvement.

Every current and former CBP senior executive whom we interviewed (which includes every person the whistleblower identified as objecting to the facilities) told us they agreed with the decision to establish the temporary facilities. Most witnesses also told us that all CBP senior executives agreed with the decision to open the Tornillo and Donna facilities, though one witness recalled another senior official who agreed with the need for the temporary facilities, but argued that it was ICE's responsibility to establish them. While we reviewed documents that identified potential benefits and risks of various measures for addressing the migration surge, including the temporary facilities, we found no emails or documents showing major objections to the proposed plan. Nor

---

The daily averages above reflect the total number of aliens that were at each facility each day, regardless of how long each alien spent at the facility. We identified other CBP reports that showed different figures because the data was collected using different methodologies (e.g. measuring the number of aliens at the facilities at one particular time each morning).

7



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

did we identify any documents that contradicted the witnesses' assertions that CBP leadership was generally all in agreement with the decision to open the Tornillo and Donna facilities.

However, there was some disagreement as to when to close the facilities. In March 2017, several CBP executives recommended permanently closing the facilities (which at that time were in stand-by status) because they believed the migration levels would remain low due to policy changes and other factors. However, McAleenan decided to keep the facilities in stand-by status for one additional month. He told us there were several reasons for his decision. First, he worried that policy changes at ICE might lead to another backup. Second, he was mindful that a recent Executive Order and DHS guidance for implementing that order instructed CBP to ensure sufficient short-term detention capacity.[4] Third, he was concerned that the migrants' initial reluctance to come to the U.S. after the inauguration might wear off. Finally, he feared the annual Spring migration increase. We identified a contemporaneous email demonstrating McAleenan's concern related to ICE, but no documentation of the other concerns he shared with us. Nonetheless, his explanation was credible and we found no evidence to the contrary.

In any event, no senior official we spoke to, including the ones who recommended closing the facilities in March, criticized McAleenan's decision to keep the facilities in stand-by status for another month. To the contrary, the officials said they understood McAleenan's decision, that it was a judgment call, and that it was not an objectively incorrect decision. The following month, McAleenan accepted the recommendation and decommissioned the facilities.

---

[4] On January 25, 2017, President Trump signed Executive Order 13,767, which directed the DHS Secretary to "take all appropriate action and allocate all legally available resources to immediately construct, operate, control, or establish contracts to construct, operate, or control facilities to detain aliens at or near the land border with Mexico" and "immediately take all appropriate actions to ensure the detention of aliens apprehended for violations of immigration law . . . ." Exec. Order No. 13,767, §§ 5(a), 6. On February 20, 2017, then-DHS Secretary General Kelly issued a memorandum implementing the Executive Order that instructed the ICE Director and CBP Commissioner to "take all necessary action and allocate all available resources to expand their detention capabilities and capacities at or near the border with Mexico to the greatest extent practicable" and for CBP to focus on expanding "short-term detention" capability. Memorandum from John Kelly, DHS Secretary to Kevin McAleenan, Acting Commissioner, CBP, *et al.*, Implementing the President's Border Security and Immigration Enforcement Improvements Policies, https://www.dhs.gov/sites/default/files/publications/17_0220_S1_Implementing-the-Presidents-Border-Security-Immigration-Enforcement-Improvement-Policies.pdf.

FER-0149



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

<u>We identified no appropriations, accounting, or procurement
abnormalities associated with the Tornillo and Donna facilities</u>

The whistleblower claimed it was unlawful for CBP to use appropriated
funds on "detention" facilities because only ICE may detain aliens.
Similarly, some witnesses told us that others within CBP believed ICE
should be responsible for building temporary facilities because ICE was
the cause of the backlog. As an initial matter, there was nothing
fundamentally improper about CBP establishing temporary facilities to
hold aliens. The Tornillo and Donna facilities merely did what CBP is
statutorily required to do (and has continued to do since the facilities
closed) – holding aliens in short-term detention until they can be
processed and transferred to HHS or ICE ERO. During the surge, CBP
simply ran out of space to hold the aliens in its existing facilities, and the
temporary facilities were built to expand its capacity.

Moreover, CBP was transparent about the Tornillo and Donna facilities
with DHS, Congress, and the White House. Indeed, CBP argued to then-
DHS Secretary Johnson that ICE should build the facilities, but he
decided that CBP would be responsible for standing up the facilities.
During the migration surge, CBP regularly briefed and communicated
with Congress about the surge and its costs, and provided specific
information about the Tornillo and Donna facilities. For example, in
November 2016, CBP representatives, along with representatives from
DHS, ICE, and U.S. Citizenship and Immigration Services, provided a
briefing on the surge to staff from the Homeland Security Subcommittees
of Congress' Appropriations Committees. During that briefing, CBP
summarized the surge's impact on its budget and identified its surge-
related expenses, including the actual and projected costs of the Tornillo
and Donna facilities. In January 2017, CBP again briefed staff from those
subcommittees on its surge response and provided updated cost
information on the Tornillo and Donna facilities. Finally, McAleenan told
us, and we found emails confirming, that White House officials were
closely involved in managing the surge and were well aware of the
Tornillo and Donna facilities.

Nor did we find any other appropriations issues related to the Tornillo
and Donna facilities. CBP was operating under two continuing
resolutions (CR) during much of the time it was addressing the surge.

9



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

During the first CR,[5] CBP was able to address its surge-related expenses, including the Tornillo and Donna facilities, with the funds it had been apportioned by the Office of Management and Budget (OMB). However, CBP projected that its surge-related expenses would continue to increase after the CR expired, and therefore asked Congress for the authority in the next CR "to obligate funding under the CR formula at a rate for operations necessary to respond to ongoing unpredictable surges in migration."[6] Congress granted CBP this flexibility through an anomaly in the second CR for Fiscal Year 2017.[7] A CBP official familiar with the anomaly process told us that CBP followed typical procedures for seeking and receiving this anomaly. After Congress included this anomaly in the second CR, DHS requested an exception apportionment from OMB on CBP's behalf.[8] The materials accompanying this request specifically referenced the Tornillo and Donna facilities. OMB approved the exception apportionment request in February 2017.

We also found that CBP used the correct source of funds for the temporary facilities and the other surge expenses. CBP used funds from the Operations and Support (O&S) appropriations category, which is the category used to support the costs associated with DHS operations and maintenance activities.[9] This funding category was new for Fiscal Year 2017 so there was no precedent for using it. However, Congress validated this approach by twice later using the O&S category for surge expenses: in the anomaly in the second CR and in its enacted Fiscal Year 2017 appropriation for CBP.

---

[5] The first CR was in place October 1, 2016 – December 9, 2016. Continuing Appropriations Act, 2017, Pub. L. No. 114-223, div. C, § 106, 130 Stat. 908, 909–10 (2016).

[6] *See* Office of Mgmt. & Budget, Exec. Office of the President, FY 2017 Continuing Resolution (CR) Appropriations Issues (anomalies required for a CR through March) 8.

[7] Further Continuing and Security Assistance Appropriations Act, 2017, Pub. L. No. 114-254, div. A, § 101, 130 Stat. 1005, 1008 (2016) (amending first CR to add section 163). The second CR for Fiscal Year 2017 was in place December 10, 2016 – April 28, 2017.

[8] An exception apportionment "is a colloquial term that describes the written apportionment that is issued for operations under a [CR], in lieu of the OMB-issued automatic apportionment." Office of Mgmt. & Budget, Exec. Office of the President, OMB Circular No. A-11, Preparation, Submission, and Execution of the Budget § 120 5 (2016).

[9] DHS, Financial Management Policy Manual ch. 2, § 2.0 15 (Oct. 1, 2016).

FER-0151



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

While we did not formally audit the procurement of the Tornillo and Donna facilities, we found nothing in either our review of documents or interviews of relevant personnel which would indicate any abnormality in the procurement process. Witnesses told us that CBP relied mainly on its procurement staff to handle the procurement process for the facilities, and that McAleenan and other senior executives did not interfere with or influence the process. Nor is there evidence that McAleenan benefitted in any way from the facilities contracts. He was not involved in the procurement process, his financial disclosure forms reveal no financial ties to the contractor that was selected, and no witnesses were aware of McAleenan receiving any benefit from the contracts. Indeed, McAleenan seemed to genuinely not recognize the name of the contractor during our interview of him.

Lastly, we did not substantiate the whistleblower's claim that the Tornillo and Donna facilities left CBP unable to purchase ammunition and other necessary equipment. We asked the whistleblower for more information about this allegation, but he/she could not identify any specific needs that were not met because CBP funded the facilities. In fact, in the Fiscal Year 2017 omnibus appropriation, Congress included sufficient "surge operations" funding to CBP to cover all of its surge-related costs. Therefore, CBP was eventually made whole for all of the costs associated with the Tornillo and Donna facilities. Before the omnibus appropriation, DHS acknowledged to Congress that CBP had temporarily diverted funds from other needs to pay for the facilities, but witnesses told us that no mission critical requirements or equipment were unfunded.

In our view, CBP's decision to stand up the two detention facilities in the manner it did was reasonable and did not constitute an abuse of authority or a gross waste of funds.

## **Shutdown of Non-Intrusive Inspection (NII) Equipment**

The whistleblower separately alleged that in response to a National Border Patrol Council (NBPC) advisory, McAleenan ordered Border Patrol agents on the Southwest Border to stop using NII equipment from June 9, 2017 to June 19, 2017. According to the whistleblower, McAleenan ordered this shutdown even though senior Border Patrol officials informed him that CBP had previously shut down the NII equipment, examined it, and determined it to be safe. Further, the whistleblower

11



# OFFICE OF INSPECTOR GENERAL
### Department of Homeland Security

suggested that McAleenan did not conduct a substantive review of the NII equipment during the June shutdown, and allowed Office of Field Operations (OFO) officers at POEs, who are not NBPC members, to continue using NII equipment. The whistleblower claimed McAleenan ordered the shutdown in order to avoid NBPC scrutiny before his confirmation hearing.

We found no evidence that McAleenan ordered the shutdown for any reasons other than his concerns for the health and safety of CBP employees and their confidence in the NII equipment. At the time he ordered the shutdown, McAleenan was unaware that the NII equipment in question was previously examined in March 2017. While he learned that shortly after ordering the shutdown, he did not cancel the shutdown because he believed the complaint was specific and credible and he did not know the details of the prior examination. Moreover, the NBPC advisory was specific to Border Patrol agents in the El Paso region and so, in McAleenan's view, there was no reason to stop using NII equipment in other regions or at POEs. During the June shutdown, CBP leadership reviewed the results of the prior examination, consulted with subject matter experts, and determined that no further testing was necessary to confirm the safety of the equipment.

> ### McAleenan was not aware of the prior examination when he ordered the shutdown

On June 9, 2017, the Deputy Chief of the Border Patrol briefed CBP leadership about a NBPC advisory she had just received. The advisory stated that there were "at least 8 confirmed cases of cancer (7 Papillary Thyroid Carcinoma, 1 Medullary Thyroid Carcinoma) among" Border Patrol agents who used NII equipment in the El Paso Sector. McAleenan was not at the briefing because he was on official travel in Mexico City. Following the briefing, the Acting CBP Chief of Staff forwarded the NBPC advisory to McAleenan, and 17 minutes later, McAleenan responded with an instruction to stand down the equipment.

We confirmed McAleenan's assertion that when he received the NBPC advisory on June 9, 2017, he was not aware that the NII equipment in El Paso previously had been shut down and examined in March 2017. The March shutdown was ordered by the El Paso Sector Chief, not by officials at CBP headquarters in Washington. Most of the headquarters officials we spoke to said they were not aware of the March shutdown when they received the NBPC advisory in June, and they did not think McAleenan

12



## OFFICE OF INSPECTOR GENERAL
### Department of Homeland Security

was aware of it either. We reviewed McAleenan's emails between March and June 2017, and found no mention of the March shutdown or any other NII equipment safety concerns until he received the NBPC advisory on June 9, 2017.

Later on June 9, 2017, after McAleenan had already ordered the shutdown, he received a brief timeline about the March shutdown. However, because he was in Mexico City and attending meetings all day, he was not able to speak to anybody extensively about the March shutdown or fully evaluate the thoroughness of that inspection. Therefore, he did not reverse his decision.

### McAleenan offered credible reasons for ordering the June shutdown and received no objections about that decision

McAleenan told us he was most concerned that eight people within the El Paso Sector had been diagnosed with cancer. He believed that eight agents with similar cancers within one region were too many to be a coincidence. Further, he thought the specificity of the diagnoses in the advisory gave it credibility. McAleenan said he decided to shut down the equipment only in the El Paso Sector, and only within the Border Patrol, because the eight diagnoses there suggested that the problem was localized. Moreover, shutting down OFO's use of NII equipment at the POEs would be much more debilitating than shutting down the Border Patrol's use of it. NII equipment is one of many tools that the Border Patrol uses, and a temporary shutdown would not substantially harm the Border Patrol's operations. In contrast, NII is an integral tool for OFO, and a shutdown at the POEs would have a major impact.

McAleenan's explanation is internally consistent and was corroborated by other witnesses. The existence of eight cancer cases within a relatively small population suggests specific faulty equipment rather than a widespread problem with NII equipment. Therefore, it was not unreasonable, in our view, to stop using and examine the particular equipment in El Paso rather than shutting down all equipment throughout the country. Additionally, many witnesses confirmed that NII equipment is much more important to OFO than the Border Patrol. For example, a senior OFO official told us that NII equipment "is a cornerstone" of their operations at POEs, while a senior Border Patrol official told us that NII equipment is not a primary tool. In fact, the Border Patrol generally does not employ replacement equipment when a NII machine breaks or is taken offline for repairs. Instead, while NII



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

equipment is out of service, the Border Patrol increases its use of other inspection tools.

The whistleblower claimed that several senior CBP officials communicated objections about the shutdown to McAleenan. While some witnesses told us they disagreed with McAleenan's decision and might have made a different decision, they understood his decision and did not express their objections to McAleenan. Nor did we find any emails suggesting that any objections were communicated to McAleenan about this decision. Before it was clear that McAleenan was only shutting down the Border Patrol's use of NII equipment, the head of OFO objected to shutting down the use of NII equipment at the POEs. But he did not express objections once he learned that the shutdown only affected the Border Patrol.

> ### The Border Patrol developed and presented sound evidence for restarting the use of NII equipment to McAleenan

During the June shutdown, the Border Patrol re-evaluated the testing done in March, spoke with experts from CBP's Occupational Safety and Health Division who oversaw the March testing, reviewed recent radiation measurements, met with other stakeholders, and prepared detailed timelines and issue papers on the NII equipment. Based on this work, the Border Patrol determined that the NII equipment in the El Paso Sector was safe, and that no new testing was necessary. Consequently, after they presented their findings to McAleenan on June 19, 2017, he ordered the end of the shutdown.

Importantly, during the shutdown CBP attempted to confirm the eight cancer diagnoses alleged by the NBPC, but only identified two people who claimed their cancer diagnoses were related to their use of NII equipment. Given the importance McAleenan had placed on the number of alleged diagnoses, discovering that number was incorrect gave McAleenan comfort that the NII equipment was safe.

> ### We found no evidence that McAleenan shut down the use of NII equipment to appease the union

McAleenan told us that he ordered the shutdown for two primary reasons – the safety of CBP employees and their confidence in using the NII equipment. First, he said safety of CBP employees "is paramount" and "an unacceptable risk." Secondarily, he said the morale and engagement

FER-0155



# OFFICE OF INSPECTOR GENERAL
### Department of Homeland Security

of CBP employees was important and he wanted to be sure that they were comfortable using the equipment. We found nothing that contradicted this. Other witnesses told us that McAleenan was concerned only with the safety and welfare of CBP employees. Not one witness thought his confirmation process or his relationship with the union factored into McAleenan's decision at all. Nor did we find anything in McAleenan's emails that suggested anything untoward in regard to the union. There were limited references to the union before and during the shutdown, and those references reflected a balance of tension and cooperation that would be expected between an agency and a union.

Based on our review of the evidence, we do not believe McAleenan's decision to temporarily shut down the use of NII equipment in El Paso constituted an abuse of authority. We believe it was a reasonable decision based on the information he had at the time, and that he ordered the shutdown out of concern for CBP employees rather than his own self-interest.

FER-0156

MAYER BROWN LLP
  Matthew H. Marmolejo (CA Bar No. 242964)
  *mmarmolejo@mayerbrown.com*
350 S. Grand Avenue
25th Floor
Los Angeles, CA 90071-1503
  Ori Lev (DC Bar No. 452565)
  (*pro hac vice*)
  *olev@mayerbrown.com*
  Stephen M. Medlock (VA Bar No. 78819)
  (*pro hac vice*)
  *smedlock@mayerbrown.com*
1999 K Street, N.W.
Washington, D.C. 20006
Telephone:  +1.202.263.3000
Facsimile:   +1.202.263.3300

SOUTHERN POVERTY LAW CENTER
  Melissa Crow (DC Bar No. 453487)
  (*pro hac vice*)
  *melissa.crow@splcenter.org*
1101 17th Street, N.W., Suite 705
Washington, D.C. 20036
Telephone: +1.202.355.4471
Facsimile: +1.404.221.5857

*Additional counsel listed on next page*
*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*, | Case No.:  17-cv-02366-BAS-KSC |
| Plaintiffs, | **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| Chad F. Wolf,[1] *et al.*, | ***REDACTED PUBLIC VERSION*** |
| Defendants. | Special Briefing Schedule Ordered (*See* Dkt. 518) |
| | **NO ORAL ARGUMENT UNLESS REQUESTED BY THE COURT** |

---

[1] Acting Secretary Wolf is automatically substituted for former Acting Secretary McAleenan pursuant to Fed. R. Civ. P. 25(d).

1  CENTER FOR CONSTITUTIONAL RIGHTS
      Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
2      *bazmy@ccrjustice.org*
      Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
3      *gschwarz@ccrjustice.org*
      Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
4      *aguisado@ccrjustice.org*
5  666 Broadway, 7th Floor
   New York, NY 10012
6  Telephone: +1.212.614.6464
7  Facsimile: +1.212.614.6499

8  SOUTHERN POVERTY LAW CENTER
      Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
9      *sarah.rich@splcenter.org*
      Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
10     *rebecca.cassler@splcenter.org*
   150 E. Ponce de Leon Ave., Suite 340
11 Decatur, GA 30030
   Telephone: +1.404.521.6700
12 Facsimile: +1.404.221.5857

13
   AMERICAN IMMIGRATION COUNCIL
14     Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
      *kwalters@immcouncil.org*
15 1331 G St. NW, Suite 200
   Washington, D.C. 20005
16 Telephone: +1.202.507.7523
17 Facsimile: +1.202.742.5619

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................. 1

II.   THE UNDISPUTED FACTS ............................................... 4

    A.    Overview of Defendants' Unlawful Conduct ............................. 4

    B.    Defendants Adopt the Turnback Policy ....................................... 7

    C.    Defendants Implement the Turnback Policy Border-Wide......................... 9

    D.    Defendants Knew that the Turnback Policy Violated the Law................. 11

    E.    Defendants Memorialize Aspects of the Turnback Policy....................... 12

    F.    Defendants Begin Using "Operational Capacity" As a Metric................. 14

    G.    Defendants Harmed the Class and Al Otro Lado....................................... 16

III.  LEGAL STANDARD ........................................................ 18

IV.   ARGUMENT .................................................................... 18

    A.    The Turnback Policy Violates the APA and INA ................................... 18

    B.    The Turnback Policy Violates the Due Process Clause ............................ 31

    C.    The Turnback Policy Violates the ATS ..................................................... 33

    D.    The Court Should Enter A Permanent Injunction ..................................... 36

    E.    The Court Should Enter A Declaratory Judgment .................................... 38

V.    CONCLUSION ................................................................ 39

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

FER-0159

TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Al Otro Lado v. Wolf,*
   952 F.3d 999 (9th Cir. 2020) ........................................................... 22, 24

*Allstate Ins. Co. v. Farmers Ins. Exch.,*
   2008 WL 11508663 (S.D. Cal. 2008) ................................................... 19

*Aracely, R. v. Nielsen,*
   319 F. Supp. 3d 110 (D.D.C. 2018) ..................................................... 30

*Bennett v. Spear,*
   520 U.S. 154 (1997) ..................................................................... 20, 21

*Bostock v. Clayton Cnty., Ga.,*
   140 S. Ct. 1731 (2020) ...................................................................... 25

*California v. Trump,*
   963 F.3d 926 (9th Cir. 2020) .............................................................. 39

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986) .......................................................................... 19

*County of Sacramento v. Lewis,*
   523 U.S. 833 (1998) ..................................................................... 32, 33

*Dep't of Commerce v. New York,*
   139 S. Ct. 2551 (2019) ...................................................................... 26

*DHS v. Regents of the Univ. of Calif.,*
   140 S. Ct. 1891 (2020) ................................................................. 27, 29

*E. Bay Sanctuary Covenant v. Trump,*
   349 F. Supp. 3d 838 (N.D. Cal. 2018) ................................................. 37

*eBay Inc. v. MercExchange LLC,*
   547 U.S. 388 (2006) .......................................................................... 37

*EBSC v. Barr,*
   964 F.3d 832 (9th Cir. 2020) .......................................................... 26, 37

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

*EBSC v. Trump*,
    932 F.3d 742 (9th Cir. 2018).................................................................24

*EBSC v. Trump*,
    950 F.3d 1242 (9th Cir. 2020).......................................................31, 32

*GEICO v. Dizol*,
    133 F.3d 1220 (9th Cir. 1998).............................................................39

*Goldberg v. Kelly*,
    397 U.S. 254 (1970) ............................................................................33

*Graham v. FEMA*,
    149 F.3d 997 (9th Cir. 1998)...............................................................32

*Hansen v. United States*,
    7 F.3d 137 (9th Cir. 1993)...................................................................19

*Hernandez v. Sessions*,
    872 F.3d 976 (9th Cir. 2017)...............................................................37

*I.N.S. v. Stevic*,
    467 U.S. 407 (1984) ............................................................................34

*Innovation Law Lab v. Wolf*,
    951 F.3d 1073 (9th Cir. 2020).............................................................35

*Kleindienst v. Mandel*,
    408 U.S. 753 (1972) .....................................................................25, 32

*LaDuke v. Nelson*,
    762 F.2d 1318 (9th Cir. 1985).......................................................37, 38

*League of Women Voters of U.S. v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016).................................................................38

*Lujan v. Nat'l Wildlife Federation*,
    497 U.S. 871 (1990) ............................................................................21

*Lyng v. Payne*,
    476 U.S. 926 (1986) ............................................................................24

*Marincas v. Lewis*,
    92 F.3d 195 (3d Cir. 1996)..................................................................33

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

FER-0161

*McGraw-Edison Co. v. Preformed Line Products Co.*,
    362 F.2d 339 (9th Cir. 1966) ........................................................................ 4, 39

*Meachum v. Fano*,
    427 U.S. 215 (1976) ........................................................................................... 32

*Munyua v. United States*,
    2005 WL 43960 (N.D. Cal. 2005) ....................................................................... 4

*Navajo Nation v. Dep't of the Interior*,
    876 F.3d 1144 (9th Cir. 2017) ............................................................................ 19

*Nken v. Holder*,
    556 U.S. 418 (2009) ........................................................................................... 38

*Norton v. S. Utah Wilderness All.*,
    542 U.S. 55 (2004) ............................................................................................. 22

*ONRC Action v. Bureau of Land Mgmt.*,
    150 F.3d 1132 (9th Cir. 1998) ............................................................................ 20

*Orantes-Hernandez v. Thornburgh*,
    919 F.2d 549 (9th Cir. 1990) ............................................................................. 36

*Perales v. Reno*,
    48 F.3d 1305 (2d Cir. 1995) ............................................................................... 32

*Planned Parenthood of Greater Wash. & N. Idaho v. U.S. Dep't of
    Health & Human Servs.*,
    946 F.3d 1100 (9th Cir. 2020) ............................................................... 22, 23, 25

*Principal Life Ins. Co. v. Robinson*,
    394 F.3d 665 (9th Cir. 2005) ............................................................................. 39

*R.I.L-R v. Johnson*,
    80 F. Supp. 3d 164 (D.D.C. 2015) ................................................................ 20, 31

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
    566 U.S. 639 (2012) ........................................................................................... 26

*San Luis & Delta-Mendota Water Auth. v. Locke*,
    776 F.3d 971 (9th Cir. 2014) .......................................................................26, 30

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

vi

*Siderman de Blake v. Rep. of Arg.*,
   965 F.2d 699 (9th Cir. 1992) ................................................................ 34

*Sierra Club v. Trump*,
   963 F.3d 874 (9th Cir. 2020) ......................................................... 37, 38

*Sosa v. Alvarez-Machain*,
   542 U.S. 692 (2004) ............................................................................ 34

*Superintendent v. Hill*,
   472 U.S. 445 (1985) ............................................................................ 33

*Tripoli Rocketry Ass'n, Inc. v. ATF*,
   437 F.3d 75 (D.C. Cir. 2006) ........................................... 26, 27, 28, 29

*Util. Air Regulatory Grp. v. E.P.A.*,
   573 U.S. 302 (2014) ............................................................................ 24

*Wagafe v. Trump*,
   2017 WL 2671254 (W.D. Wash. 2017) ....................................... 20, 21

*Walters v. Reno*,
   145 F.3d 1032 (9th Cir. 1998) ............................................................ 37

**OTHER CASES**

*Abdolkhani & Karimnia v. Turkey*,
   App. No. 30471/08 (Eur. Ct. H.R., Sep. 22, 2009) ............................ 34

*Hirsi Jamaa and Others v. Italy*,
   App. No. 27765/09 (Eur. Ct. H.R., Feb. 23, 2012) ................. 34, 35, 36

*Ilias v. Hungary*,
   App. No. 47287/15 (Eur. Ct. H.R. Mar. 14, 2017) ............................ 34

*M.S.S. v. Belgium and Greece*,
   App. No. 30696/09 (Eur. Ct. H.R., Jan. 21, 2011) ............................ 34

*T.I. v. United Kingdom*,
   App. No. 43844/98 (Eur. Ct. H.R., Mar. 7, 2000) ............................ 36

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

vii

FER-0163

**FEDERAL STATUTES**

5 U.S.C.
  § 704 ................................................................................................ 19
  § 706(1)............................................................................. 2, 22, 24, 25
  § 706(1), (2)(A), (C) ........................................................................ 19
  § 706(2)............................................................................. 2, 22, 24, 25
  § 706(2)(A), (C).................................................................... 22, 24, 26

8 U.S.C.
  §§ 1158(a)(1) .................................................................................. 22
  § 1225 ................................................................... 22, 24, 31, 32
  § 1225(a)(3) ............................................................................. 4, 22
  § 1225(b)(1) ...................................................................................... 4
  § 1225(b)(1)(a)(ii) .......................................................................... 22
  §§ 1225(b)(2) .................................................................................... 4
  § 1229(a)(1) .................................................................................... 28

28 U.S.C.
  § 1350 ............................................................................................ 34
  § 2201(a) ........................................................................................ 39

**OTHER AUTHORITIES**

8 C.F.R. § 235.3(b)(4) ...........................................................................22

Elyssa Pachico and Maureen Meyer, *One Year After U.S.-Mexico
  Migration Deal, a Widespread Humanitarian Disaster*, WOLA
  (Jun. 6, 2020) ....................................................................................36

Fed. R. Civ. P. 23(b)(2) .........................................................................37

Fed. R. Civ. P. 30(b)(6) .........................................................................23

Fed. R. Civ. P. 56(c) ..............................................................................19

H.R. Conf. Rep. No. 104-828, at 209 (1996) .........................................31

U.N. High Comm'r for Refugees, *Note on International Protection* .............34, 35

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

FER-0164

## I.    INTRODUCTION

Every day at ports of entry ("POEs") on the U.S.-Mexico border, U.S. Customs and Border Protection ("CBP") officers inspect thousands of people in vehicles in the order that those vehicles arrive at POEs. Until 2016, CBP officers also inspected thousands of pedestrians who traveled to POEs in the order that those pedestrians arrived at POEs. In May 2016, everything changed. Starting at the San Ysidro POE, CBP officers began turning asylum seekers—and only asylum seekers—back to Mexico, telling them that if they wanted to be inspected and processed—actions required by statute—they needed to return to the POE "later." Later that year, Defendants decided to expand this turnback policy to other POEs along the southern border, instead of doing what they have always done—finding solutions that enable them to inspect and process asylum seekers as they arrive at POEs.

Initially, Defendants did not put the turnback policy in writing, keeping it in a self-admitted gray area that CBP used to justify turning back asylum seekers by various means. Then, in the spring of 2018, CBP and the U.S. Department of Homeland Security ("DHS") issued memos memorializing aspects of the turnback policy—referred to as "metering" or "queue management." As Defendants drafted these memos, they explicitly contemplated turning back hundreds of asylum seekers at POEs each day pursuant to the memos, and disregarded obvious signs that a humanitarian disaster in Mexico would result. Then, they denied POEs permission to inspect and process asylum seekers more quickly.

The turnback policy is based on a lie. CBP told asylum seekers that POEs were "at capacity" when the POEs were actually well below capacity. Even in the rare cases where the capacity of a POE was close to 100% utilized, inspecting and processing asylum seekers had minimal or no impact on other POE operations. As a result, the "capacity excuse was a lie" that "was obvious to everybody" that

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

1    implemented it at POEs. Ex. 1 at 100:25-101:6.[2] Moreover, Defendants "lack[ed]

2    candor to the public [by not] stating the true facts that [CBP is] . . . blocking asylum

3    to persons and families in order to block the flow of asylum applicants." Ex. 2 at

4    132. Meanwhile, behind the scenes, CBP officials admitted that the turnback policy

5    broke the law. Ex. 2 ("[CBP] [r]epresentatives acknowledged that [CBP's] unilateral

6    work policies broke . . . Federal immigration rules and Laws"); Ex. 3 at 125:2-15.

7        The turnback policy violates the Immigration and Nationality Act ("INA"),

8    the Administrative Procedure Act ("APA"), the Due Process Clause of the Fifth

9    Amendment, and the Alien Tort Statute ("ATS") for several reasons. **First,** as this

10   Court has already recognized, turnbacks amount to unlawful withholding of a

11   discrete mandatory duty to inspect and process asylum seekers in violation of APA

12   § 706(1). **Second**, turnbacks are at odds with the statutory scheme governing POEs

13   in violation of APA § 706(2). **Third**, overwhelming and undisputed evidence shows

14   that Defendants' stated justification for the turnback policy is a pretext, their real

15   motivations are unlawful, and the policy is otherwise arbitrary and capricious in

16   violation of the APA. **Fourth**, since the turnback policy violates the statutory

17   procedure for inspecting and processing asylum seekers and otherwise represents an

18   arbitrary deprivation of a statutory entitlement, the policy violates the Due Process

19   Clause. **Fifth**, the turnback policy violates the ATS because it violates the specific,

20   universal, and obligatory norm of *non-refoulement*.

21       Defendants claim that they turned back asylum seekers to maintain the

22   "operational capacities" of POEs. *See* Dkt. 283 at ¶ 7. This argument fails for two

23   reasons. **First**, turnbacks are unlawful regardless of Defendants' justification for

24   them. **Second**, even if Defendants' justification were theoretically relevant, it is

25   undisputed that Defendants never defined the term "operational capacity," do not

26   track "operational capacity," cannot calculate the "operational capacity" of any POE,

27   ─────────────────

28   [2] "Ex." refers to the exhibits to the concurrently filed Declaration of Stephen M. Medlock.

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

2

1    and cannot link the decision to turn back asylum seekers to particular changes in

2    "operational capacity." Since Defendants cannot define, track or calculate

3    "operational capacity"—or link it to the decision to turn back asylum seekers—it is

4    not, in fact, a justification for their conduct.

5          Because Plaintiffs succeed on the merits, a permanent injunction is warranted.

6    *First*, Plaintiffs have suffered irreparable injuries. Class members have been killed,

7    raped, and seriously injured after Defendants turned them back to Mexico. In

8    addition, class members' loss of the right to seek asylum constitutes a loss of

9    statutory and constitutional rights that courts recognize as irreparable harm.

10   Similarly, Al Otro Lado suffered irreparable harm when it was forced to radically

11   change its operations in order to account for the turnback policy. *Second*, there is no

12   adequate remedy at law. Neither a declaratory judgment nor monetary damages

13   could adequately ensure access to the asylum process or prevent the harm that results

14   from class members being turned back at the U.S. border and left stranded in

15   dangerous border towns in Mexico. *Third*, the balance of hardships tips decisively

16   in Plaintiffs' favor. Plaintiffs only ask that asylum seekers be treated the same as

17   others who approach POEs, consistent with Defendants' longstanding practices. Any

18   asserted administrative burden on Defendants cannot outweigh the risk of

19   persecution, serious injury, and death that class members face when turned back.

20   *Fourth*, there is a strong public interest in Executive Branch agencies following the

21   plain language of the INA and complying with international law. There is no public

22   interest in violating the law. Because there is no genuine factual dispute concerning

23   the permanent injunction factors, Plaintiffs request that the Court enter a permanent

24   injunction prohibiting all forms of turnbacks and requiring Defendants to inspect

25   asylum seekers as they arrive at Class A POEs on the U.S.-Mexico border.

26         Furthermore, since the undisputed facts show that Defendants broke the law,

27   this Court should enter a declaratory judgment that the turnback policy violates the

28   INA, the APA, class members' procedural due process rights under the Fifth

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

3

1   Amendment, and the ATS. *See McGraw-Edison Co. v. Preformed Line Products*

2   *Co.*, 362 F.2d 339, 342 (9th Cir. 1966) (declaratory relief is appropriate regardless

3   of "whether . . . further relief is . . . sought").

4   **II.      THE UNDISPUTED FACTS**

5            **A. Overview of Defendants' Unlawful Conduct**

6            There is no cap on the number of asylum seekers who may arrive in the U.S.

7   in a particular time period. Dkt. 260 at 4:24-5:2 ("there aren't limits on the number

8   of people who can seek asylum."). When a person without entry documents is

9   arriving at a POE and asserts a fear of return to her home country or an intention to

10  seek asylum, CBP must inspect her, *see* 8 U.S.C. § 1225(a)(3), and process her—

11  either refer the asylum seeker for an interview with an asylum officer, *see* 8 U.S.C.

12  § 1225(b)(1), or place the asylum seeker into removal proceedings, which allows her

13  to pursue asylum in immigration court, *see* 8 U.S.C. §§ 1225(b)(2), 1229a. CBP's

14  statutory duty to inspect and process arriving asylum seekers is "not discretionary."

15  *Munyua v. United States*, 2005 WL 43960, at *6 (N.D. Cal. 2005).

16           In 2016, Defendants departed from this congressionally-mandated process

17  and implemented a policy to turn back asylum seekers who were in the process of

18  arriving at POEs on the U.S.-Mexico border. *See* Ex. 1 at 46:12-21; Ex. 3 at 55:8-

19  15. The policy was first implemented at the San Ysidro POE, the largest POE on the

20  U.S.-Mexico border. By the end of 2016, it had spread to other major POEs. Shortly

21  thereafter, it was implemented at every Class A POE on the U.S.-Mexico border.[3]

22           Initially, CBP management decided ██████████████████████████—

23  a practice that CBP uses when ████████████████████████████ Ex. 5

24  at 366 (CBP kept turnbacks "████████████████████████████████

25  ██████████"); Ex. 6 (head of CBP's Office of Field Operations ("OFO") stating that

26  he was "████████████████████" but "████████████████████████████

27  _____

28  [3] A Class A POE is open to all travelers, including asylum seekers. Ex. 4 at 75:18-76:8.

4

1  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮”). This ▮▮▮▮▮▮▮▮▮▮▮▮▮ meant that,

2  initially, CBP turned back asylum seekers from POEs using a variety of tactics. CBP

3  officers lied to some, Ex. 1 at 99:25-101:6; Ex. 3 at 145:3-7; coerced some to

4  withdraw their applications for admission, Ex. 7 at 611 (permitting the use of

5  "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

6  ▮▮▮▮▮▮▮▮▮▮▮▮▮"); and used physical force to turn back others, Ex. 8 at

7  045-046. Although the methods varied, the common result was clear: turning back

8  asylum seekers to Mexico without processing them for asylum.[4]

9  Over time, Defendants formalized these practices into what is known as

10  "metering" or "queue management."[5] When a POE is metering, "a non-citizen

11  without proper travel documents [who] arrives at the border, . . . will be told that the

12  port is at capacity and they should return to be processed later." Ex. 4 at 171:7-13.

13  Despite the formal documentation, CBP has no plan in place for asylum seekers to

14  "return to be processed later." *Id.* While metering, CBP often stations officers near

15  the physical border line between the U.S. and Mexico and attempts to physically

16  block those being metered from setting foot on U.S. soil. *Id.*[6] Initially, class members

---

18  [4] CBP's treatment of certain class representatives is illustrative of the disparate means CBP employed initially to turn back asylum seekers. *See, e.g.*, Dkt. 390-11 at ¶¶ 15-19 (Plaintiff Abigail Doe was forced to sign a document withdrawing her asylum claim and returned from the U.S. to Mexico); Dkt. 390-12 at ¶¶ 9-21 (Beatrice Doe was told she "had no right" to be in the U.S., was forced to withdraw her application for admission, and was returned from the U.S. to Mexico); Dkt. 390-13 at ¶¶ 18-26 (Carolina Doe was told she "would not receive asylum" and that she would be separated from her daughter and was then forced to withdraw her asylum claim before she was returned from the U.S. to Mexico); Dkt. 390-14 at ¶¶ 8-19 (Dinora Doe was told "Central Americans did not understand that there was no asylum for us" and was told that she would be separated from her daughter if she attempted to seek asylum in the U.S.); Dkt. 390-15 at ¶¶ 13, 17-18 (Ingrid Doe was told that "asylum had ended" and that "there was a new law in the United States that meant no asylum" before she was turned back from the U.S. to Mexico).

[5] "Metering" and "queue management" are synonyms. Ex. 4 at 176:18-22; Ex. 9 at 102:21-103:2; Ex. 10 at 43:2-4.

[6] *See, e.g.*, Dkt. 390-103 at ¶¶ 5-8 (Plaintiff Juan Doe was turned back after requesting protection at the middle of a bridge leading to a POE by two American officials who said that he "could not pass," "the port was closed," and that he had to "wait [his] turn"); Dkt. 390-104 at ¶¶ 5-6 (same for Ursula Doe).

1   remained in a line at the border, for days or even weeks, waiting to be processed.

2   *See, e.g.*, Ex. 10 at 152:16-153:8 (initially ████████████ ); Ex. 11 at 298

3   ("████████████████████"). This resulted in a growing

4   humanitarian crisis in Mexico. *See, e.g.*, Ex. 12 at 742 (UNHCR reporting ████

5   ████████████████████████████████). CBP

6   officers met with their Mexican counterparts to make arrangements to limit the flow

7   of asylum seekers to the U.S. border. *See* Ex. 13 at 607 ("████████████

8   ████████████████████████████████████

9   ████████████████████"); Ex. 14 at 123:21-124:20. Subsequently, a

10   new system arose in which asylum seekers placed their names on waitlists in Mexico

11   in order to be inspected at a POE, and when a particular POE decided to inspect

12   more asylum seekers, CBP would direct its Mexican counterparts to bring a certain

13   number of asylum seekers to the POE for processing.[7] *See, e.g.*, Ex. 15 at 966 ("███

14   ████████████████████████████████████

15   ████████████"); Ex. 16 at 140:1-16 ("If [Mexican immigration] brings

16   them over, we're going to take them in, if we've called [Mexican immigration] to

17   bring over some.").

18        Importantly, CBP concedes that asylum seekers approaching the U.S.-Mexico

19   border are "attempting to enter the United States at a [POE]" when they are turned

20   back. Ex. 17 at 201:22-202:3. CBP also admits that it has turned back asylum seekers

21   who were standing on U.S. soil. *See* Ex. 4 at 171:14-172:10; Ex. 3 at 101:21-102:10;

22   Ex. 1 at 96:11-97:18; Ex. 10 at 93:1-94:18; Ex. 18 (recording of turnback where an

23   asylum seeker was told to "go back to Mexico."); Ex. 19 at 2.

24        Defendants' justification for the turnback policy—a purported lack of

25

26   [7] *See, e.g.*, Dkt. 390-100 at ¶¶ 8-9, 14 (Plaintiff Bianca Doe put herself on a waitlist maintained by Mexican authorities who were restricting people from approaching the POE and was turned back by CBP officers who told her that the POE was "full");

27   Dkt 390-105 at ¶¶ 8-12 (a CBP officer told Plaintiff Emiliana Doe that "everywhere was full and they could not accept any more people" and she put her name on a

28   waitlist).

1    "operational capacity"—is a pretext. CBP kept daily records of POE capacities,

2    which show that POEs generally operated well below 100% capacity. Moreover,

3    POEs almost never reported that the number of asylum seekers at the POEs had ▮

4    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See* Ex. 20 at ¶¶ 22, 101-23; Ex. 21; Ex. 22; Ex. 23; Ex.

5    24; Ex. 25. In the few instances of high numbers of asylum seekers arriving at POEs,

6    Defendants could have operated in line with their historical practice and inspect and

7    process asylum seekers as they arrived, utilizing established contingency plans

8    created specifically for that purpose. Instead, Defendants turned asylum seekers back

9    to Mexico.

10    **B. Defendants Adopt the Turnback Policy**

11         In early 2016, CBP undertook a construction project that cut the San Ysidro

12    POE's detention capacity for asylum seekers from approximately ▮▮ to ▮▮ Ex. 26

13    at 002; Ex. 27 at 574-75 (noting that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

14    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

15    ▮▮▮▮▮▮▮▮).

16         That spring, the San Ysidro POE saw an increase in the number of asylum

17    seekers seeking entry. Like all POEs, San Ysidro had well-worn plans for dealing

18    with it. *See, e.g.*, Ex 28 (Southwest Border contingency plan); Ex. 29 (San Ysidro

19    POE activated its overflow contingency plan on March 25, 2016); Ex. 30 (Laredo

20    Field Office contingency plan); Ex. 31 (Eagle Pass contingency plan); Ex. 32

21    (Brownsville contingency plan). Indeed, despite the decrease in capacity due to the

22    construction project, until May 2016, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

23    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

24    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Ex. 33 at 444 ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮

25    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"). On May 26, 2016, San Ysidro POE

26    leadership wrote to CBP headquarters ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

27    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

28    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

1   ████████████████. Ex. 34 at 338-39; Ex. 35; Ex. 36 at 640 (May 27, 2016 report

2   listing "████████ taken "████████████████████████████████" at San Ysidro).

3   Notably, at that time the leadership of the San Ysidro POE did not ████████████

4   ████████████████████████████████████████████████████. Ex. 37

5   at 023; Ex. 38 at 099.

6        It was not until the San Ysidro POE received media inquiries about asylum

7   seekers at the port that CBP decided to abandon its existing contingency plans and

8   began turning back asylum seekers instead. By May 26, 2016, CBP's San Diego

9   Field Office[8] "████████████████████████████████████████████

10  ████████████████." Ex. 39 at 741. On the same day, the offices of Senator

11  Barbara Boxer and Representative Susan Davis asked questions about the asylum

12  seekers at the San Ysidro POE. Ex. 40 at 870. In response to those inquiries, Sidney

13  Aki, the Port Director of the San Ysidro POE, wrote, "████████████████████

14  ████████████████████████████████." Ex. 41 at 552.

15       The next day, the San Ysidro POE began turning back asylum seekers that

16  were in the process of arriving at the POE and preventing them from crossing the

17  international boundary. *See* Ex. 42 ("████████████████████████████

18  ████████"); Ex. 43 ("████████████████████████."); Ex. 44 ("████████

19  ████████████████."); Ex. 45 (instructing CBP officers "████████████

20  ████████████████"). However, San Ysidro POE leadership agreed that "████

21  ████████████████" to inspect a few asylum seekers "████████████████."

22  Ex. 46. By the end of May 2016, CBP was ████████████████████████

23  ████████████████████████████████████████████████████

24  ████████████████████████████. Ex. 11 at 298.

25       But senior leadership at CBP was becoming increasingly impatient with

26  asylum seekers being released into the U.S. rather than being turned back to Mexico.

27  _____

28  [8] CBP's Office of Field Operations has four field offices on the U.S.-Mexico border:
    San Diego, Tucson, El Paso, and Laredo.

1    Then-Deputy Commissioner of CBP, Kevin McAleenan, reacted to news that

2    asylum seekers ███████████████████████████████, "███████████████████

3    ███████████████████████████████████████████████████████████████████████

4    ███████████████████████████████." Ex. 47. Mr. McAleenan also expressed his

5    frustration that "███████████████████████████████████████████████████████

6    ████████████████████." *Id*. Defendants would later expand the turnback policy

7    border-wide in the fall of 2016, with McAleenan playing a key role.

8                    **C. Defendants Implement the Turnback Policy Border-Wide**

9            In the fall of 2016, Defendants again diverged from their historical practice

10   and Congressional mandates. They began turning back asylum seekers at the

11   Calexico West POE, in addition to the San Ysidro POE. *See* Ex. 48 at 086; Ex. 49 at

12   715, 718. They did so despite knowing that the turnback policy had created a

13   ████████████████ in Tijuana, Mexico, and that there were already ███████████

14   ████████████████████████. *See, e.g.*, Ex. 50 at 746; Ex. 51 at

15   438 (UNHCR urging CBP to "████████████████████████████████████████████");

16   Ex. 52 (DHS's Office of Civil Rights and Civil Liberties "█████████████████████

17   ███████████████████████████████████████████████████████████████████████

18   ██████████████████████████████████████████████████" starting

19   in July 2016); Ex. 53 at 294 (House Judiciary Committee ████████████████████).

20           But by October 2016, Defendants had made plans to find a way to inspect and

21   process asylum seekers arriving at POEs, instead of ignoring their statutory duty and

22   turning back asylum seekers at POEs. On October 16, 2016, then-DHS Secretary Jeh

23   Johnson and then-CBP Commissioner Gil Kerlikowske "█████████████████████████

24   ████████████████████████████████████████." Ex. 54 at 340. On

25   October 30, 2016, Commissioner Kerlikowske directed CBP "██████████████████████

26   ███████████████████████████████████████████████████████████████████████

27   ██████████████████████████████." Ex. 55 at 175.  In addition to the

28   processing facilities in ████████████████, Defendants began examining ways

                                            MEMO OF P. & A. IN SUPP. OF
                          9                 PLTFS' MOT. S.J.

1    to build other temporary processing facilities and expand detention capacity. On

2    October 31, 2016, the Commissioner of CBP and the DHS Secretary " ██████████

3    ████████████████████████████████████████████████████████████████████████

4    ████████████████████████."[9] *Id.* at 173. In particular, FEMA had identified

5    ████████████████████████████████████████████████████████████████████████

6    ████████████████████████. Ex. 56 at 316; Ex. 57 at 577-78 ("███████████

7    ██████████" were "█████████████████████████████████████████."); Ex.

8    58 ("████████████████████████████████████████████████████████████████

9    ████████████").

10       On November 2, DHS explained that it ████████████████████████████████

11   ████████████████████████████████████████████████████████████████████████

12   ████████████████. Ex. 59. DHS also directed CBP "████████████████████████

13   ████████████████████████████████████████████████████████████████████████

14   ████████████." Ex. 60.

15       Within days of that meeting, DHS outlined ████████████████████████████

16   ████████████████████████████████. Ex. 61. Then, CBP held

17   an "████████████████████████" with the management of OFO's San Diego Field

18   Office concerning ████████████████████████████████████████. Ex. 62.

19       On November 9, 2016, Donald Trump won the 2016 presidential election. Ex.

20   63 at 1; Ex. 64 at 114:20-115:2. Within hours, CBP ████████████████████████

21   ████████████████████████████████. Ex. 65 at 879; Ex. 66.  At a

22   meeting the next day, then-Deputy Commissioner McAleenan proposed "████████

23   ████████████████████████████████████████████████████████████████████████

24   ████████████████████████████████████████." Ex. 67 at 936. Shortly

25   after the meeting, then-DHS Secretary Johnson approved ████████████████████

26   ████████████████████████. *Id.*; *see also* Ex. 68 at 880.

27   _____

28   [9] "FMUA" refers to family units. "UAC" refers to unaccompanied minors.



MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

1   Todd Owen told McAleenan that he was "███████████████." Ex. 6.

2   However, Mr. Owen explained that he "██████████████████████████

3   ████████████████████████████████." *Id.*; *see also* Ex. 69 at 935 ("█

4   ████████████████████████████████████████████████████████

5   ████████."). Although CBP decided ████████████████████

6   ██████████████████████████, each field office on the U.S.-Mexico

7   border gave similar directions concerning turnbacks at POEs. William Brooks,

8   Director of Field Operations for Tucson, instructed the port directors to, "██████

9   ████████████████████████████████████████████████████████

10  ████████████████████████████████████████████████████████

11  ███████████████████." Ex. 70; *see also* Ex. 13 at 607 (similar, Laredo Field

12  Office); Ex. 71 at 496 (similar, El Paso Field Office). Finally, on November 15,

13  2016, CBP leadership ████████████████████████. Ex. 72

14  at 939. Thus, within a week of the 2016 presidential election, Defendants largely

15  abandoned their Congressionally-mandated duty of inspecting and processing

16  asylum seekers who were in the process of arriving at POEs, electing instead to

17  expand turnbacks.

18  **D. Defendants Knew that the Turnback Policy Violated the Law**

19  Defendants implemented the turnback policy, despite acknowledging that it

20  broke the law. In some cases, asylum seekers standing on U.S. soil were returned to

21  Mexico. *See* Ex. 73 at Resp. 7; Ex. 74 at 450 (El Paso Field Office officials reported

22  to CBP headquarters that "████████████████████████████████████

23  ████████████"). A CBP officer at the San Ysidro POE ████████████

24  ████████████████████. Ex. 8 at 045-046. At another POE, a CBP officer

25  "████████████████████████████████████████████████████." Ex.

26  75 at 272. At the Hidalgo POE, "████████████████████████████" from the

27  secondary inspection area to reduce the number of asylum seekers processed at the

28  port. Ex. 3 at 157:15-18; *see also* Ex. 76 at 113; Ex. 14 at 96:17-99:6 (Nogales POE

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

11

1       █████████████████████████████████ ).

2          In the Laredo Field Office, multiple CBP officers observed asylum seekers

3   being returned from U.S. territory to Mexico without being processed. Ex. 77 at 136.

4   The CBP officers who witnessed these turnbacks summarized them in emails sent to

5   Chapter 149 of the National Treasury Employees Union ("NTEU").[10] *See, e.g.*, Ex.

6   78 at 139-40. NTEU Chapter 149 sent a letter to the director of the Pharr POE, to

7   invoke a Step 1 grievance concerning "the Agency . . . unilaterally implement[ing]

8   a policy that prevents and/or blocks CBP Officers . . . from processing political

9   asylum seekers." Ex. 79 at 142-43. During a grievance meeting with representatives

10  of the NTEU, CBP "***acknowledged that***" the turnback policy "***broke . . . Federal***

11  ***immigration rules and Laws***." Ex. 2 at 0132 (emphasis added). Although CBP

12  officials would freely state that the turnback policy violated the law in conversations,

13  they refused to say so in writing. Ex. 3 at 125:17-21. Eventually, NTEU Chapter 149

14  asked then-CBP Commissioner McAleenan to provide the legal authority to support

15  CBP's "instructions to return individuals who enter the U.S. and request asylum back

16  to Mexico without" being processed. Ex. 76 at 110.

17          **E. Defendants Memorialize Aspects of the Turnback Policy**

18          In 2018,[11] Defendants memorialized aspects of the turnback policy in writing.

19  On April 23, 2018, "█████████████████████████████████████████████

20  ██████████████████████████████████████." Ex. 80 at 784. On

21  April 24, 2018, CBP Commissioner McAleenan directed his deputies to "███████

22  ███████████████████████████████." Ex. 81 at 778. Then, on April 27, 2018,

23  CBP issued its metering guidance memorandum, which was distributed to the four

24  Directors of Field Operations who oversee the operations of all POEs on the U.S.-

25  _____

26  [10] The NTEU represents CBP officers in the Laredo Field Office.

27  [11] In 2017, as the number of asylum seekers arriving at POEs on the U.S.-Mexico
    border declined precipitously, *see* Dkt. 390-91 at ¶¶ 5, 8, CBP continued to turn back
    asylum seekers arriving at those POEs, *see* Ex. 18 (April 2017 recording of turnback

28  where an asylum seeker was told to "go back to Mexico."), Ex. 17 at 307:8-308:8.

1    Mexico border. Ex. 82. Under the metering policy, Directors of Field Operations are

2    permitted to "meter the flow of travelers at the land border" between the U.S. and

3    Mexico. *Id.* When "metering" is in place, CBP officers tell "waiting travelers that

4    processing at the port of entry is currently at capacity and CBP is permitting travelers

5    to enter the port once there is sufficient space and resources to process them." *Id.*

6    　　　Although the policy was supposed to address "████████," Ex. 83 at 332,

7    there was no appreciable surge in asylum seekers in April 2018. For example, at the

8    San Ysidro POE, on April 24, 2018, ████████████████████████████

9    █████████████████████████. Ex. 84. On April 27-28, 2018, the port

10   still had ███████████████. Ex. 85 at 719-720; Ex. 86 at 722-23; Ex. 87 at

11   759. On April 29, 2018, San Diego Director of Field Operations, Pete Flores, wrote

12   to Kevin McAleenan that "█████████████████████████████████"

13   POE. Ex. 88 at 694. Ultimately, the April 2018 migrant caravan largely fizzled.

14   Mexican migration authorities "███████████████" as soon as it "████████

15   ███████████" to "██████████████." Ex. 89.[12]

16   　　　Because the low numbers of caravan members at the border could not justify

17   border-wide turnbacks, DHS began writing guidance on turning back asylum seekers

18   to permit turnbacks to occur outside of "surge events." In late May 2018, DHS

19   Secretary Nielsen began considering a "prioritization-based queue management"

20   approach that would allow port directors to turn back asylum seekers, purportedly

21   as a matter of "discretion," on the basis of amorphous considerations related to port

22   capacity and resources. During a May 24, 2018 meeting, DHS Secretary Nielsen

23   　

_____

24   [12] Even though the turnback policy would later create a queue of asylum seekers in
25   Tijuana, Mexico much larger than the number of asylum seekers who might
     approach the port on a typical day, CBP privately acknowledged that ████████████
     ████████████████████████████████████. For example, in its normal
26   posture, the San Ysidro POE can process approximately ██ asylum cases per day.
     Ex. 90 at 246; Ex. 91 at 676 (CBP could have cleared the queue existing on
27   November 9, 2018 in "[a]pproximately 11 days"). Even with no additional resources,
     the San Ysidro POE estimated that █████████████████████████████████
28   ████████████████████████████████████████████████████. Ex. 92 at 964.

                                                          MEMO OF P. & A. IN SUPP. OF
                                                          PLTFS' MOT. S.J.



1  "

2

3  ?" Ex. 93 at 317. In response, OFO's San Diego Field Office indicated that

4

5  s. *Id.* at 316. OFO's

6  El Paso Field Office reported that

7  Ex. 94 at 575. The Tucson Field Office said that it

8  could                              . Ex. 95. Synthesizing this information,

9  Todd Owen reported to CBP Commissioner McAleenan that

10

11  Ex. 96. However, he warned that this policy would result in "[

12

13  ." *Id.*

14  . Ex. 97. On June 5,

15  2018, Defendants adopted the prioritization-based queue management policy. Ex. 98

16  at 294. The policy directs POEs to focus on other missions, such as inspecting

17  incoming food and other cargo, instead of processing asylum seekers. *Id.* at 296.

18  **F. Defendants Begin Using "Operational Capacity" As a Metric**

19       At the same time, CBP began using a new metric to justify its turnbacks of

20  asylum seekers. While the "                " for implementing the April 2018

21  metering policy was "detention capacity" (*i.e.*, the number of persons who can be

22  held at a POE, Ex. 17 at 158:4-7), in June 2018, CBP began using "operational

23  capacity" as its stated metric to justify turning back asylum seekers. Ex. 99 at 864.

24  This change was significant. Detention capacity is a known, quantifiable number

25  that CBP regularly tracks. *See* Ex. 4 at 105:11-106:14; Ex. 10 at 185:9-20. On the

26  other hand, operational capacity has no definition and is not tracked by CBP. Ex. 10

27  at 74:11-76:15, 189:8-191:6. Defendants thus shifted from the measurable metric of

28  detention capacity to an unmeasurable and pretextual metric of operational capacity,

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

14

1   in order to "███████████████████." Ex. 100 at 207:7-14.

2        "Operational capacity," as Defendants use the term, is essentially a fiction.

3   ████████████████████████████████████████—after the

4   turnback policy was already in effect and this litigation was filed. Ex. 100 at 161:8-

5   10. The distinction between detention capacity and operational capacity is not

6   memorialized in any statute, regulation, guidance, memorandum, or official

7   document. Ex. 17 at 68:8-71:24; Ex. 100 at 161:20-162:12. ███████████████

8   ██████████████████████████████████████████████████

9   ████████. Ex. 17 at 102:13-111:11; *see also* Ex. 101. In fact, the term

10  "operational capacity" has no concrete definition. Ex. 17 at 73:6-11, 110:24-111:11.

11  CBP never even wrote down the factors that a port director should consider when

12  determining a POE's operational capacity. *Id.* at 111:13-112:13; Ex. 14 at 292:13-

13  15. CBP did not track operational capacity at any of its ports. Ex. 102 at 66:10-25.

14  CBP has no way of reconstructing what the operational capacity of a POE would

15  have been at any given time. Ex. 17 at 129:7-14; Ex. 14 at 106:20-107:7. In the end,

16  operational capacity is what the port director says it is, without any reference to a

17  port's actual holding space. Ex. 100 at 181:22-182:4; *see also* Ex. 14 at 140:19-21

18  ("████████████████████████████████████████████████

19  ██████████."); Ex. 103 at 57:2-20.

20        The reason that Defendants changed the metric they used to justify metering

21  is no secret. According to CBP's daily capacity figures, POEs routinely operated

22  below capacity. *See* Ex. 20 at ¶¶ 22, 101-23. Contemporaneous reports also show

23  that the number of asylum seekers detained at POEs ████████████████

24  ████████. *See* Exs. 14-15, 17-19. Once CBP enabled port directors to ignore

25  the actual capacity of their POEs, ████████████████████████

26  ████████. *See, e.g.*, Ex. 12 at 742 (San Ysidro POE had a "██████████

27  ████████████████"); Ex. 104 (████████████████████

28  ████████████████"); Ex. 105 (CBP sent guidance about "████████

                                                         MEMO OF P. & A. IN SUPP. OF
                          15                                PLTFS' MOT. S.J.



1    ███████████████████████████████").

2         As the turnback policy was rolled out border-wide, POEs tracked ████████

3    ████████████████████████████████████████████████████. *See,*

4    *e.g.*, Ex. 106 at 089 ("██████████████████████████████████████

5    ████████████████████████████"); Ex. 107 at 2 (internal CBP study

6    analyzing  whether  ██████████████████████████████████); Ex. 108

7    ("████████████████████████████████████").

8         Defendants refused to implement plans that could have considerably increased

9    the capacity of POEs to process asylum seekers. For instance, in November 2018,

10   Pete Flores, the Director of Field Operations for OFO's San Diego Field Office,

11   ████████████████████████████████████████████████████████

12   ████████████████████████████████████████████████████████

13   ██████████████████████████████████████████████████████. Ex.

14   109; Ex. 110. DHS Secretary Nielsen ███████████████████████████████

15   ████████████████████████ Ex. 111.

16         CBP also considered whether ██████████████████████████████████

17   ████████████████████████████████████████████████████████

18   ███████████████████. Ex. 112. However, ████████████████████████

19   ██████████████████████████████████ *Id.*

20        **G. Defendants Harmed the Class and Al Otro Lado**

21        The turnback policy seriously harmed asylum seekers, returning them to

22   Mexican border cities that Defendants knew were dangerous. *See* Ex. 96 ("███

23   ████████████████████████████████████████████████████████

24   ████████████████████████"); Ex. 100 at 202:24-203:5; Ex. 50 at 746 (report

25   indicating that turnbacks were "██████████████████████████████████" in Tijuana). In

26   response to "the needs of particularly vulnerable migrants who ha[d] been metered[,

27   s]pecifically those who are in imminent danger of harm or death in Tijuana,"

28   Plaintiff Al Otro Lado, as the only organization that offered comprehensive,

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

16

1    emergency services to migrants in Tijuana, found itself "constantly having to pull

2    resources from [its] other offices" to address those needs. Ex. 113 at 92:12-96:4. The

3    need to provide services in Tijuana to asylum seekers who had been turned back

4    strained Al Otro Lado's resources and frustrated its other missions, including its

5    deportee program and medical-legal program. *Id.* at 153:3-154:23.

6       Moreover, turnbacks were responsible for the deaths of asylum seekers. Ex.

7    113 at 161:25-162:9 (discussing murders of and assaults on unaccompanied minors

8    who were turned back). For example, on June 23, 2019, CBP officers turned back

9    Oscar Alberto Martinez Ramirez, his wife, and their 23-month-old daughter, Valeria,

10    when they attempted to enter the U.S. at the Brownsville POE. Ex. 114 at 139; *see*

11    *also* Ex. 115 at 64. There was no reason to turn the family back; the Brownsville

12    POE was operating at only ██% capacity that day. Ex. 115 at 64. After aid workers

13    in Matamoros told Oscar there were hundreds of people in front of him waiting to

14    be processed at the Brownsville POE, *id.*, Oscar waded into the Rio Grande River

15    near the Brownsville POE with his daughter on his back. *Id.* The rapid current swept

16    Oscar off his feet and pulled him and Valeria under. Ex. 115 at 139. They drowned.

17    *Id.* When their bodies washed up along the U.S. side of the riverbank, Valeria's hand

18    was wrapped around her father's shoulders. *Id.*



MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

1  Ex. 116.

2       Defendants take no responsibility for the harm they have caused. When Todd

3  Owen was asked, "Do you take responsibility for instances where the metering

4  policy was implemented in ways that broke the law?", he answered, "I do not take

5  responsibility for the 30,000 officers that work under me." Ex. 10 at 239:22-240:6.

6  When asked whether he takes responsibility for asylum seekers staying in squalid

7  conditions at migrant shelters in Mexico as a result of his turnback policy, Mr. Owen

8  answered, "No." *Id.* at 289:14-17. When asked whether he took any responsibility

9  for parents who were sleeping on the street in Mexico with toddlers in temperatures

10 over 100 degrees as a result of the turnback policy, Mr. Owen answered, "No." *Id.*

11 at 291:15-20. And finally, when he was asked whether he took any responsibility for

12 the death of Oscar Alberto Martinez Ramirez and his two-year-old daughter, Mr.

13 Owen answered, "No." *Id.* at 292:13-21.

14 **III.   LEGAL STANDARD**

15      Summary judgment should be granted where the moving party demonstrates

16 there "is no genuine issue as to any material fact and [it] is entitled to judgment as a

17 matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R.

18 Civ. P. 56(c)). Upon such a showing, the burden shifts to the nonmoving party to

19 "come forth with specific facts to show that a genuine issue of material fact exists."

20 *Hansen v. United States*, 7 F.3d 137, 138 (9th Cir. 1993). On cross-motions for

21 summary judgment, a court "must consider each motion separately 'on its own

22 merits' to determine whether any genuine issue of material fact exists." *Allstate Ins.*

23 *Co. v. Farmers Ins. Exch.*, 2008 WL 11508663, *3 (S.D. Cal. 2008).

24 **IV.   ARGUMENT**

25      **A. The Turnback Policy Violates the APA and INA**

26      Section 706 of the APA directs courts to "compel agency action unlawfully

27 withheld" and to "hold unlawful and set aside agency action" that is "not in

28 accordance with law," "in excess of statutory jurisdiction, authority, or limitations,"

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

1    or otherwise "arbitrary, capricious [or] an abuse of discretion." 5 U.S.C. § 706(1),

2    (2)(A), (C). The turnback policy is a final agency action that is unlawful and must

3    be set aside under those standards. ***First***, as this Court recognized, the policy violates

4    the specific mandates in the INA governing how Defendants must treat arriving

5    noncitizens at POEs. Similarly, each instance when a class member is turned back

6    amounts to the unlawful withholding of agency action. ***Second***, as this Court

7    likewise recognized, the policy violates the statutory scheme Congress created to

8    ensure access to the asylum process for noncitizens at POEs. ***Third***, the policy is

9    arbitrary, capricious, and an abuse of discretion because Defendants' stated

10   justification is a pretext, the real reasons for the policy are unlawful, and the policy

11   is at odds with congressional intent.

12              **a.     The turnback policy is a final agency action**

13          The APA permits judicial review over agency actions that are "final." 5 U.S.C.

14   § 704; *Navajo Nation v. Dep't of the Interior*, 876 F.3d 1144, 1171 (9th Cir. 2017).

15   Agency action is "final" when (1) it "mark[s] the 'consummation' of the agency's

16   decisionmaking process" and (2) as a result of the action, "'rights or obligations have

17   been determined,' or … 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S.

18   154, 177-78 (1997). The turnback policy, under which CBP officers at POEs along

19   the U.S.-Mexico border restrict the flow of asylum seekers by turning them back to

20   Mexico, fulfills both requirements. *See* Dkt. 280 at 49-54 (concluding Plaintiffs'

21   allegations, which the evidence now substantiates, satisfy the *Bennett* test).

22          The turnback policy satisfies the finality test's first prong because it reflects a

23   "conscious" and "deliberate decision" by Defendants, *ONRC Action v. Bureau of*

24   *Land Mgmt.*, 150 F.3d 1132, 1137 (9th Cir. 1998), and is "an active program

25   implemented by the agency." *Wagafe v. Trump*, 2017 WL 2671254, at *10 (W.D.

26   Wash. 2017); *see R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 184 (D.D.C. 2015) (an

27   implemented policy directing an ongoing practice affecting individual cases is final

28   agency action).

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

1      Defendants first began turning back asylum seekers at the San Ysidro POE in

2  May 2016. In the fall of 2016, Defendants expanded the turnback policy to other

3  POEs along the U.S.-Mexico border. Both decisions amounted to "conscious" and

4  "deliberate" choices by Defendants to reject their standard contingency plans and

5  pursue a different option. *See supra* at 9-12, 13-15; Ex. 110; Ex. 111; Ex. 112; Ex.

6  65 at 879; Ex. 66; Ex. 67 at 936; *ONRC Action*, 150 F.3d at 1137. Defendants

7  previously had plans to utilize temporary facilities near POEs to fulfill their

8  congressionally-mandated duty to inspect and process asylum seekers, yet they

9  abdicated this duty following the 2016 election by expanding the turnback policy.

10  *See supra* at 9-12; Ex. 54 at 340; Ex. 55 at 173; Ex. 67 at 936. On the instruction of

11  the DHS Secretary and the CBP Commissioner, OFO leadership instructed the

12  Directors of Field Operations overseeing POEs along the southern border to

13  coordinate with Mexican government officials to begin metering. *See supra* at 11;

14  Ex. 67 at 936.

15      Then, in April and June 2018, Defendants memorialized aspects of the

16  turnback policy in formal guidance documents. *See supra* at 12-14; Ex. 85; Ex. 98

17  at 294. CBP also disseminated instructions to POEs requiring them to meter asylum

18  seekers, assign staff to "limit line" positions to prevent asylum seekers from entering

19  U.S. territory, and avoid surpassing an arbitrary cap on POEs' detention capacity.

20  *See, e.g.*, Ex. 14 at 74:2-8; Ex. 117 ("holding at the line will soon become the norm

21  so all along the SW border need to act the same so the NGOs don't try to play one

22  port against the other."). The implementation of the policy has been confirmed by

23  high-level government officials, as well as CBP officers with firsthand experience

24  implementing it. *See supra* at 9-16; Ex. 1 at 100:25-101:6; Ex. 2 at 132. Defendants'

25  top-down, calculated efforts to restrict the flow of asylum seekers leaves no doubt

26  that it "mark[s] the 'consummation' of the agency's decisionmaking process."

27  *Bennett*, 520 U.S. at 177-78.

28      With respect to the second prong, legal consequences flow from the turnback

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

1   policy because it instructs CBP officers to reject asylum seekers at POEs and deny

2   them access to the asylum process, in contravention of their mandatory statutory

3   duties. Asylum seekers are forced to wait in dangerous Mexican border towns, where

4   they risk grave harm or even death. *See infra* at 16-18. Many are ultimately deprived

5   of any ability to access the asylum process at a POE as a result of the policy. *See,*

6   *e.g.*, Dkt. 390-75 at ¶ 6 (Roberto Doe was turned back from Hidalgo POE); Dkt.

7   390-97 at ¶¶ 6-7 (Roberto Doe was subsequently deported from Mexico). These

8   "actual or immediately threatened effect[s]" satisfy the finality test's second prong.

9   *Lujan v. Nat'l Wildlife Federation*, 497 U.S. 871, 894 (1990); *Wagafe*, 2017 WL

10  2671254, at \*10 (action was final when policy resulted in "thousands of . . . qualified

11  applications [being] allegedly indefinitely delayed or denied").

12          **b.      The policy directs CBP officers to unlawfully withhold a**

13                   **discrete, mandatory ministerial action**

14          Congress has spoken clearly about what Defendants are required to do when

15  noncitizens come to POEs—inspect them when they arrive and allow those seeking

16  asylum to access the asylum process. *See* 8 U.S.C. §§ 1158(a)(1), 1225(a)(1), (3),

17  and (b)(1)(A)(ii). Because Defendants have a discrete mandatory duty to inspect and

18  refer asylum seekers arriving at POEs, *see* Dkt. 280 at 31-46; 8 U.S.C. § 1225, each

19  turnback amounts to the unlawful withholding of mandatory agency action. 5 U.S.C.

20  § 706(1). Moreover, the turnback policy—which is an overarching agency policy

21  directing this unlawful withholding of mandatory action—is "not in accordance with

22  law" and is "in excess of statutory jurisdiction, authority, or limitations." *Id.* §

23  706(2)(A), (C).

24          Section 706(1) of the APA requires a court to "compel agency action

25  unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). Agency actions

26  that are "legally *required*," *i.e.*, that are "ministerial or non-discretionary," are

27  subject to § 706(1), and courts may compel them as in a mandamus action. *Norton*

28  *v. S. Utah Wilderness All.*, 542 U.S. 55, 63-64 (2004). Section 706(2) of the APA

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

1    directs the court to "hold unlawful and set aside agency action," 5 U.S.C. §

2    706(2)(A), (C), that is "contrary to clear congressional intent" or "inconsistent with

3    the statutory mandate," or that "frustrate[s] the policy that Congress sought to

4    implement." *Planned Parenthood of Greater Wash. & N. Idaho v. U.S. Dep't of*

5    *Health & Human Servs.*, 946 F.3d 1100, 1112 (9th Cir. 2020) (quotations omitted).

6           This Court previously concluded that "the mandatory duties to inspect all

7    aliens and refer certain aliens seeking asylum are discrete actions for which this

8    Court can compel Section 706(1) relief under 8 U.S.C. § 1225(a)(3), 8 U.S.C.

9    § 1225(b)(1)(a)(ii), and 8 C.F.R. § 235.3(b)(4)." Dkt. 280 at 31. Defendants' duty to

10   inspect and refer applies to those "who are in the process of arriving in the United

11   States," including those who may not yet have set foot across the physical border.

12   Dkt. 280 at 46. The Ninth Circuit found this analysis "sound and persuasive." *Al*

13   *Otro Lado v. Wolf*, 952 F.3d 999, 1011-12 (9th Cir. 2020). The Court's prior

14   conclusion stems directly from a straightforward interpretation of sections 1158 and

15   1225 of the INA, aided by traditional canons of statutory construction and

16   Defendants' own regulations. *See* Dkt. 280 at 31-46. Similarly, the turnback

17   policy—a  policy to evade those mandatory duties—is "contrary to clear

18   congressional intent" and "inconsistent with the statutory mandate," and would

19   "frustrate the policy that Congress sought to implement." *Planned Parenthood*, 946

20   F.3d at 1112.

21          Summary judgment is warranted on Plaintiffs' 706(1) and 706(2) claims

22   because it is undisputed that Defendants have a policy of turning back asylum

23   seekers and refusing to inspect and process them when they are arriving at POEs

24   along the U.S.-Mexico border, and that they do so to individual asylum seekers. As

25   CBP's Rule 30(b)(6) witness, Randy Howe, conceded:

26       Q.    Is it the case currently that when a port is engaged in metering,

27             when a noncitizen without proper travel documents arrives at the

28             border, they will be told that the port is at capacity and they

1   should return to be processed later?

2   A.   Yes.

3   Ex. 4 at 171:7-13; Ex. 17 at 201:22-202:3. A second Rule 30(b)(6) witness, Mariza

4   Marin, admitted that asylum seekers approaching POEs are attempting to enter the

5   United States:

6   Q.   Okay.  In your experience[], are asylum seekers who are at the
       border between the United States and Mexico attempting to enter
7       the United States at a port of entry?

8   A.   Yes.

9

10  Ex. 17 at 201:22-202:3 (objection omitted).[13] Thus, Defendants have admitted that

11  it is their policy to turn back asylum seekers who are in the process of arriving in the

12  United States. Dkt. 280 at 31-46; *see also Al Otro Lado*, 952 F.3d at 1012.[14]

13      Defendants also turned back to Mexico asylum seekers who were standing *on*

14  *U.S. soil*. *See, e.g.*, Ex. 1 at 97:14-18; Ex. 3 at 61:13-16; Ex. 73 at Resp. 7; Ex. 74

15  at 450; Ex. 8 at 045-046; Ex. 14 at 141:6-142:23; Ex. 102 at 205:16-206:11. No

16  statutory analysis of the term "arriving in" is required to determine that CBP broke

17  the law by turning back asylum seekers ***who were already on U.S. soil***.

18      Plaintiffs are thus entitled to an order compelling Defendants to comply with

19  their mandatory, ministerial inspection and processing duties set out in § 1225. *See*

20  5 U.S.C. § 706(1). Furthermore, it is undisputed that it is agency policy to withhold

21  these mandatory actions, and therefore the Court should set aside the policy because

22  it is incompatible with applicable law. *See id.* § 706(2)(A), (C).

23

24  _____

[13] A third CBP witness testified that when CBP tells an asylum seeker to wait in
25  Mexico because the POE is "at current capacity," "there's no guarantee" "ever
   implied" that "at some point in the future, [the asylum seeker] might be processed."
26  Ex. 14 at 234:25-235:20.

[14] To the extent the turnback policy purports to grant POEs discretion to turn back
27  asylum seekers, *see e.g.* Ex. 98, the policy is unlawful because, as the Court has
   stated, the duty to inspect and process asylum seekers is mandatory.  *See* Dkt. 280
28  at 29.

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

23

1
2

**c.    The policy contravenes Congress' unambiguous statutory scheme and exceeds Defendants' authority**

3    Even if CBP's ministerial duties to inspect and process were not triggered

4  until an asylum seeker steps onto U.S. soil, summary judgment is still warranted on

5  Plaintiffs' § 706(2) claim because the turnback policy contravenes Congress'

6  statutory scheme governing inspection at POEs and exceeds Defendants' statutory

7  authority. "[A]n agency's power is no greater than that delegated to it by Congress."

8  *Lyng v. Payne*, 476 U.S. 926, 937 (1986); *Util. Air Regulatory Grp. v. E.P.A.*, 573

9  U.S. 302, 328 (2014) ("[A] core administrative-law principle [is] that an agency may

10  not rewrite clear statutory terms to suit its own sense of how the statute should

11  operate."). In particular, agencies lack authority to "abandon" a "detailed scheme"

12  established by Congress if they think it is not working well. *EBSC v. Trump*, 932

13  F.3d 742, 774 (9th Cir. 2018). Because Congress designed a "statutory scheme" by

14  which all noncitizens are to be inspected at POEs and asylum seekers must be

15  referred for credible fear interviews, Dkt. 280 at 62, Defendants have no authority

16  to turn back any noncitizens at POEs, much less single out asylum seekers for such

17  treatment. *Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731, 1747 (2020) (when

18  Congress makes a "broad rule" and includes no exceptions, the rule applies and no

19  "tacit exception" may be inferred).[15]

20    Since 2016, it has been Defendants' policy to turn back asylum seekers at

21  POEs. *See, e.g.*, *supra* at 7-14; Ex. 4 at 171:7-13; Ex. 10 at 102:21-103:22; Ex. 93

22  at 317; Ex. 94 at 575; Ex. 95; Ex. 96. Asylum seekers are turned back when they are

23

---

24  [15] Even if the Court were to reject its prior conclusion that Defendants' duties to inspect and refer attach to individual asylum seekers in the process of arriving in the

25  United States at a POE who may not have stepped across the international border, the Court could still "hold unlawful and set aside" Defendants' *policy* to turn back

26  such asylum seekers. 5 U.S.C. § 706(2). Any such policy runs counter to the statutory scheme, and thus is "contrary to clear congressional intent" and "inconsistent with

27  the statutory mandate" of inspecting all noncitizens at POEs and referring all asylum seekers for credible fear interviews, even if asylum seekers whom the government

28  prevents from accessing U.S. territory cannot enforce those duties via a  § 706(1) claim. *Planned Parenthood*, 946 F.3d at 1112.

1  "attempting to enter the United States at a [POE]." Ex. 17 at 201:22-202:3. CBP

2  officers at POEs physically block those perceived to be asylum seekers—and only

3  asylum seekers—from crossing the border, and tell them "that the port is at capacity

4  and they should return to be processed later." Ex. 4 at 171:7-13; Ex. 14 at 232:8-15

5  (acknowledging that "officers staffing the limit line are directed to prevent migrants

6  from crossing [the] international boundary," "because once they do cross the

7  boundary, then they have to be processed").

8       The formulation of policies "prescrib[ing] the terms and conditions upon

9  which [noncitizens] may come to this country" "is entrusted exclusively to

10  Congress," not the executive. *Kleindienst v. Mandel*, 408 U.S. 753, 766-67 (1972);

11  *see also* Dkt. 280 at 23 ("[O]ver no conceivable subject is the legislative power of

12  Congress more complete than it is over the admission of [noncitizens]."). Here,

13  Defendants claim that they have the power to selectively screen out asylum seekers

14  and deny them processing. The logical result of Defendants' argument is that they

15  would have sole authority to end asylum for noncitizens arriving at POEs, without

16  any involvement by Congress—an interpretation of the INA that plainly conflicts

17  with Congress' statutory scheme. *See* 5 U.S.C. § 706(2)(A), (C).[16]

18       Defendants may not usurp Congress' role in this way. Because Congress

19  never authorized Defendants to turn back any noncitizens at POEs, and in fact

20  created a statutory scheme that "specifically addresse[s]" how Defendants must treat

21  individuals who are coming to POEs to seek asylum, *EBSC v. Barr*, 964 F.3d 832,

22  848 (9th Cir. 2020), the turnback policy is "not in accordance with law" and is "in

23  excess of statutory . . . authority," 5 U.S.C. § 706(2)(A), (C).

24

25

---

26  [16] CBP's general power to operate POEs does not include authority to contravene more specific provisions of the INA. "[I]t is a commonplace of statutory construction
27  that the specific governs the general," particularly where "Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific
28  solutions." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (citations omitted).

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

**d.     The Turnback Policy is arbitrary and capricious**

In addition to the turnback policy's categorical incompatibility with the INA, the policy is also illegal under APA § 706(2)(A) because it is "arbitrary, capricious, [and] an abuse of discretion" for a number of reasons, each of which provides an independent basis to grant Plaintiffs' motion.

**i.     The Turnback Policy Is Based On Pretext**

It is arbitrary and capricious for an agency to "offer[] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 994 (9th Cir. 2014) (citation omitted). "[A]gencies [must] offer genuine justifications for important decisions." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575-76 (2019). An agency is due no deference when the explanation provided for its action "lacks any coherence." *Tripoli Rocketry Ass'n, Inc. v. ATF*, 437 F.3d 75, 77 (D.C. Cir. 2006). Courts must not "simply accept whatever conclusion an agency proffers merely because the conclusion reflects the agency's judgment." *Id*. "[R]easoned decisionmaking" is required. *Id*. Similarly, an agency action cannot survive APA review if it is supported only by post hoc rationalizations. *DHS v. Regents of the Univ. of Calif.*, 140 S. Ct. 1891, 1907-09 (2020).

The undisputed evidence shows that Defendants' stated justification for the turnback policy—a "lack of capacity" at POEs, Dkt. 283 ¶ 7—is pretextual. CBP's own daily internal statistics capturing "capacity" show that POEs generally operated well below 100% during the policy's implementation and that the number of asylum seekers at POEs ███████████████████████████. *See* Ex. 20 at ¶¶ 22, 101-23; Ex. 21; Ex. 22; Ex. 23 Ex. 24; Ex. 25. Indeed, a CBP officer at the Tecate POE testified that this "capacity excuse" is a lie:

> Q.     And when [your supervisors] said the port was at capacity, you knew that was a lie, right?

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

1  A.     Yes.

2  Q.     And it would have been obvious to those supervisors that it was
        a lie as well, correct?

3  A.     Correct.

4  Q.     In fact, it was obvious to everybody that was implementing the
        policy at [the] Tecate [POE] that the capacity excuse was a lie,

5        right?

6  A.     Correct.

7  Ex. 1 at 100:22-101:6. Meanwhile, CBP "███████████████████████████

8  ████████████████████████████████████████████████████████████████

9  ████████████████████." Ex. 118 at 93:4-12. At the Hidalgo POE, CBP "████████

10 ████████████" from the port's secondary inspection area, "███████████████████

11 █████████████████████████." Ex. 3 at 157:15-18. A CBP officer

12 from the Laredo Field Office testified that there was no justification for metering

13 because CBP could process asylum seekers in the order that they came to a POE

14 without resorting to turnbacks. *Id.* at 71:9-16. Finally, prior to issuing the

15 prioritization-based queue management guidance, then-DHS Secretary Nielsen

16 █████████████████████████████████████████████████████████████████

17 █████████████████████████████████████████████████████████████████

18 ███████████████████████████████████████████████. *Supra* at 13-14.

19        If there really were capacity issues, Defendants have long had contingency

20 plans ready to obviate any genuine need to turn back asylum seekers. Yet Defendants

21 have repeatedly ██████████████████████████████████████████████████████

22 ██████████████████████████████. *See, e.g.*, Ex. 65 at 879; Ex. 66; Ex. 14

23 at 156:12-157:22; *supra* at 10-11. Moreover, Defendants have always had the power

24 to release asylum seekers from POEs rather than waiting for ICE to pick up and

25 transfer them to a detention facility. *See, e.g.*, Ex. 119 at 545 (DHS Secretary

26 Johnson ████████████████████████████ in fall 2016 ████████████████

27

28

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

1 ██████████████████████████).[17] ████████████████████████

2 ████████████████████████████████████████████████████████

3 █████████████████████████████████████████████████. *See, e.g.,*

4 Ex. 3 at 157:15-18; Ex. 14 at 96:17-99:6.

5    In June 2018—well after this litigation began—CBP began using "operational

6 capacity," as opposed to "detention capacity," as its justification for turnbacks. *See*

7 *supra* at 14-16. The new metric, "operational capacity," has no definition and is

8 not—and has never been—tracked, and it is impossible to reconstruct a port's

9 operational capacity. *See supra* at 14-15. "Operational capacity" means w████

10 ████████████████████████████████████████████████████████

11 ███████████████████████████. Ex. 100 at 181:22-182:4; *see also* Ex.

12 14 at 140:19-21. "Operational capacity" as a reason for turning back asylum seekers

13 "lacks any coherence," and is anything but a "concrete standard." *Tripoli Rocketry*,

14 437 F.3d at 77. Defendants have offered no contemporaneous data or documents to

15 support an "operational capacity" defense. *Id*. Reliance on the "operational capacity"

16 concept demonstrates a lack of "reasoned decisionmaking" and is therefore arbitrary

17 and capricious. *Id*.

18    The shift to "operational capacity" simply resulted in ███████████ "████

19 ██████." Ex. 100 at 207:7-14. Around the same time, Defendants issued the

20 prioritization-based queue management memo. *See* Ex. 98 at 294. The memo

21 purports to give port directors "discretion" not to inspect and process asylum seekers

22 at all.[18] *Id*. at 296 ("Field leaders have the discretion to allocate resources and staffing

23 dedicated to any areas of enforcement and trade facilitation not covered by the

24 _____

25 [17] "NTA" refers to a "notice to appear," which institutes removal proceedings in immigration court. *See* 8 U.S.C. § 1229(a)(1).

26 [18] While the June 2018 memo on its face grants POEs discretion to meter asylum
27 seekers or not, CBP subsequently directed POEs to undertake metering. *See, e.g.,* Ex. 14 at 93:2-24 (

28 ████████████████████████████████████████████████).

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

1  [specified] priorities and queue management process based on the availability of

2  resources and holding capacity at the local port level."). The combination of

3  "operational capacity" and "prioritization-based queue management" meant that

4  POEs could rely on CBP's explicit policies to justify not inspecting and processing

5  any asylum seekers at all, independent of the actual availability of processing or

6  detention capacity at a given POE. Indeed, after June 2018, POEs set ███████

7  ███████████████████████████████████████████████████████████████████.

8  *See supra* at 15-16.

9       Defendants' sole stated rationale for the turnback policy—that they lacked

10  "capacity" to inspect and process asylum seekers—has always been pretextual.

11  When CBP officers told asylum seekers at POEs that they could not be processed

12  due to lack of "capacity" under the turnback policy, these were "obvious" "lies" in

13  violation of APA § 706(2)(A). Ex. 1 at 99:19-101:2. As a whistleblower testified,

14  metering is "a solution in search of a problem." *Id.* at 153:24-154:1. This is textbook

15  arbitrary and capricious action. *See DHS*, 140 S. Ct. at 1907-09 (post hoc

16  rationalization violates § 706(2)(A)).

17          **ii.**    **The True Motivations for Metering Are Unlawful**

18       Defendants needed to fabricate a seemingly legitimate excuse to turn back

19  asylum seekers from POEs because their true motivations—limiting access to the

20  asylum process, deterring asylum seekers from seeking protection in the U.S., and

21  evading a statutory command—are arbitrary and capricious and an abuse of

22  discretion. It is a violation of § 706(2)(A) for an agency to "rel[y] on factors which

23  Congress has not intended it to consider." *Locke*, 776 F.3d at 994 (citation omitted).

24       A desire to limit access to the asylum process at POEs for its own sake is not

25  a legitimate basis for the turnback policy. *See* Dkt. 280 at 63 (explaining that unlike

26  the statutory numerical limit on refugee admissions, the INA does not cap the

27  number of people who may access the asylum process at ports, and a "*de facto*

28  numerical limit" would be "unlawful"). The undisputed facts are that Defendants

MEMO OF P. & A. IN SUPP. OF<br>PLTFS' MOT. S.J.

1    nonetheless proceeded with the turnback policy in pursuit of this purpose. *See, e.g.*,

2    Ex. 47 (McAleenan, who ultimately proposed the turnback policy, ██████████

3    ████████████████████████████████████████████████████████

4    ████████████); Ex. 96 (prior to implementing prioritization-based queue

5    management, CBP leadership ████████████████████████████████████

6    ██████████████████████).

7        In addition, deterring lawful migration is not a proper basis for the turnback

8    policy, yet deterrence has always been at the core of the policy. In fall 2016, CBP

9    put out a call for proposals "██████████████████████████████████

10   ████████." Ex. 57 at 577-578. In November of that year, McAleenan proposed

11   ████████████████████████. Ex. 67 at 936; Ex. 68 at 880.

12   After the turnback policy's adoption, Defendants sought to determine whether ████

13   ████████████████████████████████████████. *See, e.g.*,

14   Ex. 109 at 2. As this Court has correctly observed, "there is no room for deterrence

15   under the scheme Congress has enacted." Dkt. 280 at 65; *see also Locke*, 776 F.3d

16   at 994; *Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 154 (D.D.C. 2018) (finding

17   challenge to a policy that took deterrence into account showed a likelihood of

18   success on the merits by "demonstrat[ing] the incompatibility of the deterrence

19   policy and [applicable law]"); *R.I.L-R*, 80 F. Supp. 3d at 174–76 (similar).

20       **iii.    The Policy Amounts to an Arbitrary and Capricious**

21       **Interpretation of the INA**

22       Even if the Court were to conclude that the INA's text is ambiguous as to

23   whether turnbacks could be permissible in some form and even if, contrary to the

24   evidence, Defendants adopted the turnback policy for a legitimate reason, the fact

25   that the policy turns asylum seekers back to danger *en masse* nevertheless amounts

26   to an arbitrary and capricious interpretation of § 1225 because it is "inconsistent with

27   clearly expressed congressional intent," *EBSC v. Trump*, 950 F.3d 1242, 1273 (9th

28   Cir. 2020).

1    The turnback policy has resulted in a humanitarian crisis across the border in

2    contravention of the INA and the humanitarian principles Congress sought to

3    enshrine in it. *See* Ex. 51 at 746. Under the policy, Defendants have forced thousands

4    of asylum seekers to wait in dangerous border towns where they risk physical harm

5    or death. *See, e.g.*, Ex. 96 at 009; Ex. 100 at 202:24-203:5; Ex. 51 at 746. And

6    Defendants are well aware of the dangers asylum seekers face in Mexico. *See, e.g.*,

7    Ex. 14 at 97:4-99:5 (CBP is aware of S█████████████████████████████████

8    ████████████████████████████████████████████████████████████████████

9    ████████). But in enacting § 1225, Congress adopted inspection and processing

10   requirements that ensure that despite CBP's general ability to perform summary

11   expedited removal, those with claims for humanitarian protection have the ability to

12   seek asylum *before* they are summarily sent back to Mexico. *See* H.R. Conf. Rep.

13   No. 104-828, at 209 (1996) (noting the purposes of § 1225 are to "expedite the

14   removal from the [U.S.] of aliens who indisputably have no authorization to be

15   admitted" while concurrently providing individuals in that category who claim

16   asylum to have that claim "promptly assessed"). Thus, Congress intended processing

17   of asylum seekers—and only asylum seekers—instead of expedited removal, to

18   avert the harm such individuals might face if summarily removed. The human toll

19   of the turnback policy evinces an abject failure to consider Congress's guiding

20   concern in crafting the relevant portions of § 1225—preventing just such harm.

21   Thus, in the context of the current dangers asylum seekers face in Mexico, the

22   turnback policy is "inconsistent with clearly expressed congressional intent," *EBSC*

23   *v. Trump*, 950 F.3d at 1273.

24   **B. The Turnback Policy Violates the Due Process Clause**

25   As this Court has already held and as Defendants concede, Plaintiffs have

26   Fifth Amendment due process rights that are coextensive with their statutory rights

27   under the INA. Dkt. 280 at 70, 76; *see also Meachum v. Fano*, 427 U.S. 215, 226

28   (1976) (minimum due process rights attach to statutory rights); *Graham v. FEMA*,

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

1   149 F.3d 997, 1001 & n.2 (9th Cir. 1998). "In the enforcement of [congressional

2   immigration] policies, the Executive Branch of the Government must respect the

3   procedural safeguards of due process." *Kleindienst v. Mandel*, 408 U.S. 753, 767

4   (1972) (quotation omitted). Congress "has plainly established procedural protections

5   for" class members, requiring that they "shall" be inspected and processed for

6   asylum at POEs pursuant to § 1225 of the INA. Dkt. 280 at 76-77; *cf. Perales v.*

7   *Reno*, 48 F.3d 1305, 1314 (2d Cir. 1995) (Congress's use of word "shall" in IRCA

8   gives rise to statutory entitlements which are subject to due process protections).

9   This is so even if the Court concludes that Plaintiffs have not met all the technical

10  requirements necessary to succeed on their APA claims. Dkt. 280 at 67 n.13, 68.

11  Accordingly, Plaintiffs have proven a due process violation on this basis alone.

12       In addition, the government's policy to categorically deny class members their

13  statutorily mandated entitlement to the asylum scheme also constitutes a violation of

14  fundamental due process principles. At its core, due process is a "protection of the

15  individual against arbitrary action of government," *County of Sacramento v. Lewis*,

16  523 U.S. 833, 845 (1998), and its procedural component protects against "denial of

17  fundamental procedural fairness." *Id.* at 845-46. In applying procedural due process,

18  courts are to prevent an "arbitrary deprivation" of rights "without threatening

19  institutional interests or imposing undue administrative burdens." *Superintendent v.*

20  *Hill*, 472 U.S. 445, 455 (1985). Due process is "flexible and depend[s] on a balancing

21  of the interests affected by the relevant government action." *Id.* at 454.

22       The undisputed facts show that the turnback policy violates this due process

23  requirement. The weight of the procedural right at stake here is enormous: Plaintiffs'

24  statutorily-enshrined right to seek protection from persecution for themselves and

25  their families. *See Goldberg v. Kelly,* 397 U.S. 254, 264-65 (1970) (potential for

26  grave consequences necessitates maximum procedural due process protections); Ex.

27  20 at ¶ 86 ("[T]here are . . . cases of turn-backs and metering that have led to an

28  effective end to asylum seekers' claims, and even their lives."); *cf. Marincas v.*

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

1   *Lewis*, 92 F.3d 195, 203 (3d Cir. 1996) ("The basic procedural rights Congress

2   intended to provide asylum applicants . . . are particularly important because an

3   applicant erroneously denied asylum could be subject to death or persecution if

4   forced to return to his or her home country."). Further, it is self-evident that in a

5   system of separation of powers, the executive branch is not free to ignore statutorily

6   mandated procedures by claiming that they impose a "burden." Defendants need

7   only return to inspecting and processing asylum seekers in accordance with the

8   statutorily required procedure, as Defendants were doing before the turnback

9   policy.  Where individual interest in the mandatory, life-saving protections of a

10  statute is so grave, and the government's actual—as opposed to manufactured and

11  pretextual (*see supra* at 26-29)—burden to abide by the statute is negligible,

12  Defendants' willful and arbitrary decision to deny individuals access to those

13  statutory protections violates fundamental due process principles.

14          **C.    The Turnback Policy Violates the ATS**

15          As this Court recognized, the ATS allows noncitizens to seek redress for a

16  "violation of the law of nations," 28 U.S.C. § 1350, that is "specific, universal, and

17  obligatory." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 732 (2004) (quotation omitted);

18  Dkt. 280 at 80.  The duty of *non-refoulement* has achieved the status of a *jus cogens*

19  norm—*i.e.* "an elite subset of . . . customary international law" from which no

20  derogation is ever permitted. *Siderman de Blake v. Rep. of Arg.*, 965 F.2d 699, 714-

21  15 (9th Cir. 1992). Plaintiffs have previously summarized the international law

22  authorities recognizing *non-refoulement* as a *jus cogens* norm, *see* Dkt. 210 at 27-

23  30, a point which Defendants "concede[d]." Dkt. 280, at 82. That should be

24  sufficient to meet the *Sosa* standard and authorize jurisdiction under the ATS. *Id.*

25          The duty of *non-refoulement* forbids a government from returning or

26  expelling an individual to a country where he or she has a well-founded fear of

27  persecution, torture, or other harm, whether it is the individual's home country or

28  another country, *see  I.N.S. v. Stevic*, 467 U.S. 407, 417 & n.20 (1984) (referencing

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

33

1  obligations under 1951 Refugee Convention), and it "encompass[es] any measure .

2  . . which could have the effect of returning an asylum-seeker or refugee to the

3  frontiers of territories where his or her life or freedom would be threatened[.]" U.N.

4  High Comm'r for Refugees, *Note on International Protection*, ¶ 16 (citing Refugee

5  Convention, art. 33(1)).  As interpreted by the European Court of Human Rights, the

6  principle of *non-refoulement* "essentially means that States must refrain from

7  returning a person (directly or indirectly) to a place where he or she could face a real

8  risk of being subjected to torture or to inhuman[e] or degrading treatment."[19]

9       The Turnback Policy violates the duty of *non-refoulement*—and thus the

10  ATS—on multiple grounds. First, Defendants have *refouled* class members to

11  Mexico where they fear persecution or other harm, and Defendants "knew or should

12  have known" of those likely risks. *Hirsi Jamaa and Others v. Italy*, App. No.

13  27765/09 ¶¶ 131, 156 (Eur. Ct. H.R., Feb. 23, 2012). Three of the Plaintiffs—

14  Abigail, Beatrice, and Carolina—are Mexican nationals who claimed fear of

15  persecution in Mexico—the country to which they were *refouled*.  *See* Dkt. 390-11

16  at ¶¶ 18-20; 390-12 at ¶¶ 26-27; 390-13 at ¶¶ 28-31. Many other class members

17  stated a substantial fear of harm in Mexico. *See, e.g.*, Dkts. 390-11, 390-12, 390-13,

18  390-14, 390-15, 390-16, 390-73, 390-74, 390-75, 390-76, 390-77, 390-78, 390-79,

19  390-80, 390-81, 390-82, 390-83, 390-85.

20       Further, Defendants knew that class members were at risk of such harms in

21  Mexico. Other Executive agencies had stated the risks publicly. Many border towns

22  are so dangerous the Department of State prohibits U.S. government employees from

23  traveling there, of which this Court may take judicial notice. Dkt. 216 at 10, n.32;

24  *see also* Ex. 14 at 97:4-99:5 (CBP is aware of State Department's travel advisories

---

25  [19] *Hirsi Jamaa and Others v. Italy*, App. No. 27765/09 ¶ 34 (Eur. Ct. H.R., Feb. 23,

26  2012), available at shorturl.at/nEHNQ.  Numerous courts are in accord. *See, e.g.*,
    *Ilias v. Hungary,* App. No. 47287/15 ¶ 98, 244 (Eur. Ct. H.R. Mar. 14, 2017)

27  available at shorturl.at/aizK2; *M.S.S. v. Belgium and Greece*, App. No. 30696/09 ¶
    (Eur. Ct. H.R., Jan. 21, 2011) available at shorturl.at/yKWY7; *Abdolkhani &*

28  *Karimnia v. Turkey*, App. No. 30471/08, ¶ 88 (Eur. Ct. H.R., Sep. 22, 2009),
    available at shorturl.at/dyTU8.

1  for Mexican border states). Plaintiffs also have presented undisputed evidence that

2  non-Mexican asylum seekers are at particular risk of harm in Mexico after CBP

3  *refoulement*. Although these class members do not claim persecution from Mexico,

4  this showing is not required under *non-refoulement* doctrine if Plaintiffs otherwise

5  show that their "life or freedom would be threatened," UNHCR, *Note on*

6  *International Protection*, ¶ 16, or that they have a substantial fear of "inhuman[e]

7  treatment." *See supra* note 18. Migrants marooned on the Mexican side of the border

8  await a full panoply of dangers, including "disappearances, kidnappings, rape[,]

9  sexual and labor exploitation," and worse. Dkt. 104-C at 16; *see Innovation Law Lab*

10  *v. Wolf*, 951 F.3d 1073, 1078 (9th Cir. 2020) (discussing danger). It has been

11  described as a "human rights catastrophe," Dkt. 293-34 at 1, and overwhelming

12  evidence corroborates the existence of these threats. *See, e.g.*, Ex. 20 at ¶¶ 83-86.

13  Defendants are or should be fully aware of the peril the turnback policy places on its

14  targets, and have thus violated their duty of *non-refoulement* by implementing it.

15  *See, e.g.*, Ex. 100 at 201:1-203:5.

16      Finally, the Turnback Policy subjects asylum-seekers to impermissible chain

17  *refoulement*—that is, the risk that CBP's expulsion of migrants to Mexico will lead

18  to Mexican-initiated deportation.[20] Mexico—whose asylum system has been

19  described as on "the brink of collapse"[21]—has continually violated migrants' rights.

20  To wit, when CBP turned back Plaintiff Roberto Doe in October 2018, it specifically

21  instructed Mexican immigration officials to remove him from the bridge, and

22  Roberto was later deported from Mexico. Dkt. 390-75 at ¶ 4, 9, 390-97 at ¶¶ 6-7.

23  Plaintiff Cesar Doe would have suffered the same fate were it not for the timely

24  intervention of an attorney who thwarted his deportation twelve days into his

25  _____

26  [20] *See, e.g.*, *Hirsi Jamaa and Others v. Italy*, App. No. 27765/09 (Eur. Ct. H.R., Feb. 23, 2012) (Italy violated *non-refoulement* when it refused to consider whether Libya would onwardly deport asylum seekers); *T.I. v. United Kingdom*, App. No. 43844/98, ¶ 2 (Eur. Ct. H.R., Mar. 7, 2000) available at shorturl.at/iHK68 (same).

27  

28  [21] Elyssa Pachico and Maureen Meyer, *One Year After U.S.-Mexico Migration Deal, a Widespread Humanitarian Disaster*, WOLA (Jun. 6, 2020).

Mexican-ordered detention. Dkt. 390-101 at ¶¶ 8-9. CBP's cooperation with Mexican immigration authorities jeopardizes hundreds—if not thousands—of individuals' legitimate claims to asylum through the *chain refoulement* process. *See, e.g.*, Dkt. 293-47 at ¶¶ 11-16; 293-46 at ¶¶ 39-46.

### C. The Court Should Enter A Permanent Injunction

The relief Plaintiffs seek is simple: for Defendants to cease treating asylum seekers differently from all other people arriving at POEs on foot or by vehicle. Prior to instituting the Turnback Policy, the government inspected those seeking access to the asylum process just like everybody else; that is, in the order in which they approached the POE. Defendants' self-generated "operational capacity" constraints have created an unlawful and untenable situation at the U.S.-Mexico border and absent injunctive relief, Defendants' "past and present misconduct indicates a strong likelihood of future violations." *Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 564 (9th Cir. 1990). "The Supreme Court has repeatedly upheld the appropriateness of federal injunctive relief to combat [such] a 'pattern' of illicit law enforcement behavior." *LaDuke v. Nelson*, 762 F.2d 1318, 1324 (9th Cir. 1985).

Because they have succeeded on the merits of their claims, *see supra* 20-37, Plaintiffs' ability to satisfy the remaining factors warranting permanent injunctive relief is uncontroversial. "A permanent injunction is appropriate when: (1) a plaintiff will suffer an irreparable injury absent injunction, (2) remedies available at law are inadequate, (3) the balance of hardships between the parties supports an equitable remedy, and (4) the public interest would not be disserved." *Sierra Club v. Trump*, 963 F.3d 874, 895 (9th Cir. 2020) (citing *eBay Inc. v. MercExchange LLC*, 547 U.S. 388, 391 (2006)).

*First*, as discussed *supra* 16-18, the statutory, constitutional, and international law violations Defendants commit through implementation of the turnback policy put asylum seekers in grave danger in Mexico and deny them access to the U.S.

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

1   asylum process. These violations constitute irreparable harm. *See E. Bay Sanctuary*

2   *Covenant v. Trump*, 349 F. Supp. 3d 838, 864 (N.D. Cal. 2018) (loss of the right to

3   seek asylum constitutes irreparable harm); *Hernandez v. Sessions*, 872 F.3d 976, 994

4   (9th Cir. 2017) ("the deprivation of constitutional rights 'unquestionably constitutes

5   irreparable injury'") (citation omitted). Moreover, the "ongoing harms to [Plaintiff

6   Al Otro Lado's] organizational missions" also constitute irreparable harm. *E. Bay*

7   *Sanctuary Covenant v. Barr*, 964 F.3d at 854 (citation omitted).

8        ***Second***, injunctive relief is appropriate because the turnback policy strands

9   class members in border towns where they face grave harm while waiting

10  indefinitely to seek asylum in the U.S., *see supra* 16-18, and there "are no legal

11  remedies available that would adequately compensate the class members" for this

12  type of harm. *Walters v. Reno*, 145 F.3d 1032, 1048 (9th Cir. 1998) (there is "no

13  way to calculate the value of such a constitutional deprivation or the damages that

14  result from erroneous deportation") (citation omitted). Moreover, where, as here, a

15  court has certified a class action under Rule 23(b)(2), Dkt. 513 at 18, the Rule

16  "literally permits only class applications for injunctive or declaratory relief."

17  *LaDuke*, 762 F.2d at 1330.

18       ***Third*** and ***Fourth***, the balance of the hardships and the public interest weigh

19  in Plaintiffs' favor. "When the government is a party to the case, the court should

20  consider the balance of hardships and public interest factors together." *Sierra Club*,

21  963 F.3d at 895 (citation omitted). Even if Defendants suffer some hardship by

22  processing more asylum seekers, that harm is far outweighed by denying class

23  members access to the U.S. asylum process. On the one hand, processing and

24  inspecting asylum seekers is *CBP's job*. Asking an agency to do its job is not a

25  hardship. Defendants inspected asylum seekers as they approached a POE without

26  resorting to turnbacks before 2016, *see* Ex. 3 at 71:9-16, and continue to do so for

27  individuals who approach a POE with travel documents and for vehicular traffic, Ex.

28  118 at 24:17-25:13. There is no reason why CBP cannot return to inspecting and

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

1  processing even high numbers of asylum seekers. Ex. 3 at 71:9-16. On the other

2  hand, any hardships the government faces pale in comparison to the denial of

3  statutory rights and the grave risk of persecution, torture, and death that class

4  members will face absent an injunction. *See supra* at 16-18.

5      Complying with an injunction should not be difficult. Defendants have ███

6  ██████████████████████████████████████████████████████ Ex. 120 at

7  270 ("█████████████████████████████████████████████████████████

8  ███████████████████████"). Moreover, the Supreme Court has recognized that

9  "preventing aliens from being wrongfully removed, particularly to countries where

10  they are likely to face substantial harm," is "of course" in the public interest. *Nken*

11  *v. Holder*, 556 U.S. 418, 436 (2009); *see also League of Women Voters of U.S. v.*

12  *Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("There is generally no public interest in the

13  perpetuation of unlawful agency action."). Turning back Mexican class members to

14  their country of origin and stranding non-Mexican class members in Mexico

15  constitutes an unlawful denial of access to the U.S. asylum process. Defendants have

16  sought to do through policy what they cannot do by law: deny those in need of

17  protection access to the U.S. asylum process. Therefore, the Court should enter an

18  injunction that permanently enjoins all forms of turnbacks and requires Defendants

19  to inspect and process asylum seekers as they arrive at Class A POEs on the U.S.-

20  Mexico border.

21      **E. The Court Should Enter A Declaratory Judgment**

22      In addition to a injunctive relief, the Court should also enter a declaratory

23  judgment that Defendants have violated the APA, Fifth Amendment, and ATS.

24  "[A]ny court of the United States . . . may declare the rights and other legal relations

25  of any interested party seeking such declaration, whether or not further relief is or

26  could be sought." 28 U.S.C. § 2201(a); *see also McGraw-Edison Co.*, 362 F.2d at

27  342 (declaratory relief is appropriate in addition to other forms of relief). Here,

28  Plaintiffs seek a declaratory judgment that "will serve a useful purpose in clarifying

38

1  the legal relations at issue," *GEICO v. Dizol*, 133 F.3d 1220, 1225 n.5 (9th Cir.

2  1998), namely adjudicating whether the turnback policy broke the law. Because

3  Plaintiffs have shown via undisputed facts that Defendants' conduct was unlawful,

4  this Court should enter a declaratory judgment that Defendants violated the APA,

5  Fifth Amendment, and ATS. *See California v. Trump*, 963 F.3d 926, 949 (9th Cir.

6  2020) (affirming summary judgment entering a declaratory judgment where the

7  undisputed facts showed that the Government broke the law).

8  **V.      CONCLUSION**

9          For the foregoing reasons, Plaintiffs are entitled to summary judgment,

10  declaratory relief, and a permanent injunction.

11  Dated: September 4, 2020

MAYER BROWN LLP
12          Matthew H. Marmolejo
          Ori Lev
13          Stephen M. Medlock

14  SOUTHERN POVERTY LAW
15  CENTER
          Melissa Crow
16          Sarah Rich
17          Rebecca Cassler

18  CENTER FOR CONSTITUTIONAL
19  RIGHTS
          Baher Azmy
20          Ghita Schwarz
          Angelo Guisado
21

22  AMERICAN IMMIGRATION
COUNCIL
23          Karolina Walters

24

25  By: */s/ Stephen M. Medlock*
          Stephen M. Medlock
26

27  *Attorneys for Plaintiffs*

28

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

1    **CERTIFICATE OF SERVICE**

2        I certify that I caused a copy of the foregoing document to be served on all

3    counsel via the Court's CM/ECF system.

4    Dated:  September 4, 2020                    MAYER BROWN LLP

5

6                                                By  _/s/ Stephen M. Medlock_____

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

FER-0204



1   MAYER BROWN LLP
       Matthew H. Marmolejo (CA Bar No. 242964)
2      *mmarmolejo@mayerbrown.com*
    350 S. Grand Avenue
3   25th Floor
    Los Angeles, CA 90071-1503
4      Ori Lev (DC Bar No. 452565)
       (*pro hac vice*)
5      *olev@mayerbrown.com*
       Stephen M. Medlock (VA Bar No. 78819)
6      (*pro hac vice*)
       *smedlock@mayerbrown.com*
7   1999 K Street, N.W.
    Washington, D.C. 20006
8   Telephone:  +1.202.263.3000
    Facsimile:   +1.202.263.3300
9
    SOUTHERN POVERTY LAW CENTER
10     Melissa Crow (DC Bar No. 453487)
       (*pro hac vice*)
11     *melissa.crow@splcenter.org*
    1101 17th Street, N.W., Suite 705
12  Washington, D.C. 20036
    Telephone: +1.202.355.4471
13  Facsimile: +1.404.221.5857

14  *Additional counsel listed on next page*
    *Attorneys for Plaintiffs*
15
                  **UNITED STATES DISTRICT COURT**
16
                **SOUTHERN DISTRICT OF CALIFORNIA**
17

18  Al Otro Lado, Inc., *et al.*,          Case No.:  17-cv-02366-BAS-KSC

19              Plaintiffs,            **EXHIBIT 20 IN SUPPORT OF
                                       PLAINTIFFS' MEMORANDUM OF
20       v.                            POINTS AND AUTHORITIES IN
                                       SUPPORT OF THEIR MOTION
21  Chad F. Wolf,[1] *et al.*,         FOR SUMMARY JUDGMENT**

22              Defendants.
                                       **FILED UNDER SEAL**
23

24

25

26

27  ─────────────────
    [1]  Acting Secretary Wolf is automatically substituted for former Acting Secretary
28  McAleenan pursuant to Fed. R. Civ. P. 25(d).

                              EXHIBIT 20 IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF
                                   POINTS AND AUTHORITIES IN SUPPORT OF THEIR
                                            MOTION FOR SUMMARY JUDGMENT

CENTER FOR CONSTITUTIONAL RIGHTS
  Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
  *bazmy@ccrjustice.org*
  Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
  *gschwarz@ccrjustice.org*
  Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
  *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
  Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
  *sarah.rich@splcenter.org*
  Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
  *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
  Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
  *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

EXHIBIT 20 IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*, | Case No.:  17-cv-02366-BAS-KSC |
| Plaintiffs, | |
| v. | |
| Chad Wolf, *et al.*, | |
| Defendants. | |

**EXPERT REPORT OF STEPHANIE LEUTERT**

1



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## I.    Introduction and Qualifications

1.      My name is Stephanie Leutert. I am the Director of the Central America & Mexico Policy Initiative ("CAMPI") at the Strauss Center for International Security and Law at the University of Texas. In this role, I lead the development and programming for CAMPI and conduct original research on the U.S.-Mexico border and Central American migration.

2.      I previously submitted declarations in connection with the Plaintiffs' September 26, 2019 motions for provisional class certification and preliminary injunction.[1]

3.      I am an expert on the practices of U.S. Customs and Border Protection ("CBP") officers and supervisors with respect to arriving asylum seekers at ports of entry ("POEs") on the U.S.-Mexico border from 2016 to the present. I am the lead author of the first-ever border-wide report on the U.S. Customs and Border Protection's ("CBP's") metering policy and the related asylum waitlists in Mexican border cities.

4.      I have also led the publication of four subsequent metering updates that document CBP's practices and the conditions faced by asylum seekers waiting in Mexican border cities.

---

[1] ECF Nos. 293-8, 294-5.

2

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

5.     In addition to this work, I teach a graduate level course on Mexico's migration policy at the Lyndon B. Johnson School of Public Affairs at the University of Texas.

6.     Through my work at CAMPI, I have directly observed CBP's implementation of its turn-back policy at ports of entry ("POEs") on the U.S.-Mexico border. Since October 2018, I have personally conducted fieldwork in eight Mexican border cities[2] where asylum seekers affected by CBP's metering policy are forced to wait. In these cities, I have spoken directly with affected asylum seekers, along with migrant shelter staff, members of civil society organizations, and Mexican federal and local government officials. I have interviewed affected asylum seekers who were waiting on international bridges, affected asylum seekers who were sleeping in encampments near the international bridges, and affected asylum seekers waiting in migrant shelters. I have watched firsthand as asylum seekers arrived at the United States - Mexico international line and were turned back by CBP officers. I have seen copies of asylum waitlists in six Mexican border cities[3] and

---

[2] Those cities are Matamoros, Tamaulipas; Nuevo Progreso, Tamaulipas; Reynosa, Tamaulipas; Ciudad Miguel Alemán, Tamaulipas; Nuevo Laredo, Tamaulipas; Piedras Negras, Coahuila; Ciudad Acuña, Coahuila; Nogales, Sonora.

[3] Those cities are Matamoros, Tamaulipas; Nuevo Progreso, Tamaulipas; Reynosa, Tamaulipas; Piedras Negras, Coahuila; Ciudad Acuña, Coahuila; Ciudad Juárez, Chihuahua.

3

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

have spoken to eight individuals in charge of running these lists.[4] I have also partnered with colleagues who conducted similar fieldwork in five additional Mexican border cities.[5]

7.   A copy of my current curriculum vitae, which includes a list of all publications that I have authored in the prior 10 years, is attached as **Exhibit A** to this report.

8.   My typical consulting rate is $300 an hour. I have elected to waive that fee in this case and will receive no compensation for my work in this litigation.

9.   I understand from Plaintiffs' counsel that I have been retained to offer opinions on issues related to class certification in this litigation. This report contains a complete statement of all of my opinions related to class certification and reasons for them. It also contains all of the exhibits that will be used to summarize or support those opinions. I understand that some depositions and document productions will occur after my report is submitted.  I reserve the right to amend and revise this report and the exhibits to it if I should be made aware of information relevant to my

---

[4] These list managers were in the cities of Matamoros, Tamaulipas; Nuevo Progreso, Tamaulipas; Reynosa, Tamaulipas; Ciudad Miguel Alemán, Tamaulipas; Nuevo Laredo, Tamaulipas; Piedras Negras, Coahuila; and Ciudad Acuña, Coahuila (two list managers: individuals and families).

[5] Those cities are Ciudad Juárez, Chihuahua; Agua Prieta, Sonora; San Luís Rio Coloardo, Sonora; Mexicali, Baja California; and Tijuana, Baja California.

4

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

opinions.[6]

## II.    Materials Considered

10.    I considered the following facts and data when forming the opinions expressed in this report.

11.    Since December 2018, CAMPI has published regular reports on CBP's metering practices and the conditions for asylum seekers in Mexican border cities (the "Reports"). These reports include: (a) *Asylum Processing and Waitlists at the U.S.-Mexico Border* (December 2018), (b) *Metering Update* (February 2019), (c) *Metering Update* (May 2019), (d) *Metering Update* (August 2019), (e) *Metering Update* (November 2019).

12.    The Reports are based on information that I, other members of CAMPI, and colleagues from the University of California San Diego and the Migration Policy Centre, have collected directly from field and phone interviews and direct observation on visits to Mexican border cities. These Reports are cited throughout this report.

13.    This expert report also references documents produced by the defendants in this litigation during discovery.[7] I considered over 1,500 documents

---

[6] This is the only case in which I have testified in the previous four years as an expert at trial or by deposition.

[7] I understand from plaintiffs' counsel that the current defendants in this litigation

5

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

individuals arriving at the San Ysidro and Otay Mesa ports of entry began to report being turned back to Mexico. At the Ped-West crossing—a pedestrian crossing for northbound travelers in the San Ysidro port of entry—asylum seekers were told that they had to speak with Mexican immigration officials before their asylum claims could be processed in the United States.[32] In July 2016, the American Immigration Council documented the case of a Mexican man being returned to Tijuana, and the following month another three teenage Guatemalans and a 21 year old Guatemalan man were also turned back.[33]

41.    The San Diego metering system soon spread across the border. It first spread to nearby cities, such as Calexico (in the San Diego sector) and Nogales (in the Tucson sector), where metering systems were put in place after the arrival of a large number of Haitian asylum seekers in a short period of time. In September 2016, large numbers of Haitians arrived in Mexicali (across the border from Calexico) and Grupo Beta, the humanitarian agency inside Mexico's National Migration Institute, began organizing a list for the waiting Haitians as well as providing them with dates

---

[32] "Re: U.S. Customs and Border Protection's Systemic Denial of Entry to Asylum Seekers at Ports of Entry on U.S.-Mexico Border, American Immigration Council, January                    13,                    2017, https://www.americanimmigrationcouncil.org/sites/default/files/general_litigation/cbp_systemic_denial_of_entry_to_asylum_seekers_advocacy_document.pdf.

[33] Ibid.

19

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

for when they should show up at the U.S. port of entry.[34] By October 19, 2016, a line

of Haitian asylum seekers was also waiting at the Nogales port of entry. In Nogales,

Sonora (across the border from Nogales, Arizona), the municipal government

created a waitlist for the asylum seekers.[35] Yet, by December 2016 the list had

dissolved, as CBP officers processed the waiting Haitians in the city and stopped

metering.

42.    Around the same time, metering also expanded to the other end of the

border. It first spread to the Laredo sector, which was experiencing an increase in

the number of Cubans arriving to Nuevo Laredo in the final months of 2016.[36] On

November 12, 2016, the Assistant Director of Field Operations for the Laredo Field

Office wrote an email to all Laredo sector port directors,[37] asking them to meet with

---

[34] "Asylum Processing and Waitlists at the U.S.-Mexico Border," Strauss Center for
International Security and Law, Center for U.S.-Mexican Studies, & Migration
Policy Centre, December 2018, https://www.strausscenter.org/images/strauss/18-
19/MSI/AsylumReport_190308.pdf; "Mexicans Respond To Haitians, Africans
With         Unusual         Hospitality,"         September         22,         2016,
https://www.youtube.com/watch?v=UzaCrd8R_LA.

[35] Curt Prendergast, "Haitians hoping for US asylum gather at Nogales border
crossing,"        *Arizona        Daily        Star*,        October        26,        2016
https://tucson.com/news/local/border/haitians-hoping-for-us-asylum-gather-at-
nogales-border-crossing/article_7c401363-f48e-540b-9cf8-4390b1ce7b55.html.

[36] "Southwest Border Inadmissibles by Field Office FY2017," U.S. Customs and
Border         Protection,         accessed         December         6,         2019,
https://www.cbp.gov/newsroom/stats/ofo-sw-border-inadmissibles-fy2017.

[37] This includes port directors in Brownsville, Del Rio, Eagle Pass, Hidalgo, Laredo,

20

1   MAYER BROWN LLP
      Matthew H. Marmolejo (CA Bar No. 242964)
2      mmarmolejo@mayerbrown.com
    350 S. Grand Avenue
3   25th Floor
    Los Angeles, CA 90071-1503
4     Ori Lev (DC Bar No. 452565)
      (*pro hac vice*)
5      olev@mayerbrown.com
      Stephen M. Medlock (VA Bar No. 78819)
6     (*pro hac vice*)
       smedlock@mayerbrown.com
7   1999 K Street, N.W.
    Washington, D.C. 20006
8   Telephone:  +1.202.263.3000
    Facsimile:   +1.202.263.3300
9
    SOUTHERN POVERTY LAW CENTER
10    Melissa Crow (DC Bar No. 453487)
      (*pro hac vice*)
11     melissa.crow@splcenter.org
    1101 17th Street, N.W., Suite 705
12  Washington, D.C. 20036
    Telephone: +1.202.355.4471
13  Facsimile: +1.404.221.5857

14  *Additional counsel listed on next page*
    *Attorneys for Plaintiffs*

15              **UNITED STATES DISTRICT COURT**

16            **SOUTHERN DISTRICT OF CALIFORNIA**

17

18  Al Otro Lado, Inc., *et al.*,                  Case No.:  17-cv-02366-BAS-KSC

19              Plaintiffs,              **EXHIBIT 34 IN SUPPORT OF**
                                         **PLAINTIFFS' MEMORANDUM OF**
20      v.                               **POINTS AND AUTHORITIES IN**
                                         **SUPPORT OF THEIR MOTION**
21  Chad F. Wolf,[1] *et al.*,           **FOR SUMMARY JUDGMENT**

22              Defendants.

23

24

25

26

27  ──────────────
    [1] Acting Secretary Wolf is automatically substituted for former Acting Secretary
28  McAleenan pursuant to Fed. R. Civ. P. 25(d).

FER-0214



CENTER FOR CONSTITUTIONAL RIGHTS
  Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
  *bazmy@ccrjustice.org*
  Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
  *gschwarz@ccrjustice.org*
  Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
  *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
  Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
  *sarah.rich@splcenter.org*
  Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
  *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
  Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
  *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EXHIBIT 34 IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT

en

| From: | Owen, Todd C (AC OFO) |
|---|---|
| Sent: | Wednesday, May 25, 2016 10:19 PM |
| To: | MARTEL, CARLOS C; WAGNER, JOHN P; HOFFMAN, TODD A; HUNOLT, KIRBY |
| Cc: | BRAUNSTEIN, MARGARET A; BORDEAUX, TYESHA; DODD, BRUCE E |
| Subject: | RE: Credible Fear Influx Spot Report |

Kirby, pls advise the status of the cap waiver request for San Diego.  Need to know by 11am Thursday.  In speaking with Pete Flores, we need to get this approved immediately.  Pls advise.

Thx.

Todd C. Owen
Executive Assistant Commissioner
Office of Field Operations
U.S. Customs & Border Protection

---

From: MARTEL, CARLOS C
Sent: Wednesday, May 25, 2016 6:20:03 PM
To: Owen, Todd C (AC OFO); WAGNER, JOHN P; HOFFMAN, TODD A
Cc: BRAUNSTEIN, MARGARET A
Subject: FW: Credible Fear Influx Spot Report

Gentlemen:  FYSA - Significant increase in CF cases at SYS/Otay POEs resulting in saturation of temp detention space. Mitigation actions are enumerated below to include virtual processing assistance from Detroit and MIA.  Media coverage is expected.

Carlos C. Martel
Acting Executive Director, Operations
Office of Field Operations
U. S. Customs and Border Protection

 Office
Mobile

---

From: ARMIJO, JOHNNY L
Sent: Thursday, May 26, 2016 1:59:31 AM
To: MARTEL, CARLOS C; BRAUNSTEIN, MARGARET A
Cc: OFO-FIELD LIAISON; FLORES, PETE ROMERO; BRINTON, WALTER A; HENNING, PAUL R; AKI, SIDNEY K; HOOD, ROBERT W; CARRILLO, SALLY R; MISENHELTER, JOSEPH; CASTILLO, MOISES; MARIN, MARIZA; TAITAGUE, CLAUDIA; GRANADOS, ANDREA M; COOK, VERNON; TIBBETTS, STEVEN L
Subject: Credible Fear Influx Spot Report

Greetings, Sir.  The SDFO has received multiple media requests regarding the Credible Fear/Asylum activity at the San Ysidro Port of Entry.  The inquiries are most likely attributed to our usage of a designated queuing area (Asylum line) in

1

EXHIBIT NO. 26
Dec. 13, 2019

Confidential

AOL-DEF-00761338

pedestrian that we utilize due to the infrastructure constraints that currently exist within our Admissibility Enforcement Unit.

Credible Fear Influx

·   The number of Credible Fear encounters at the San Ysidro/Otay Mesa Ports of Entry remain elevated.

·   This morning's San Ysidro/Otay Mesa Admissibility Enforcement Unit (AEU) activity report indicated a total 885 individuals in various stages of immigration removal proceedings.  Many of them asserting Credible Fear/Asylum.

·   Additionally, Public Affair Officers/Liaisons have received multiple media inquiries regarding an influx of Haitians.

·   A Borderstat query indicates 422 Haitians have presented themselves and asserted Credible Fear during the month of May 2016 (May 1-25).

·   The San Ysidro/Otay Mesa AEU has exceeded its existing temporary detention capabilities and have undertaken the following remedies to create additional space.

1)   Utilized several Border Patrol Stations to temporarily hold detainees awaiting transfer to ICE-ERO.

2)   Transferred all accompanied and unaccompanied unit processing to the Old Port overflow processing area.

3)   Transferred all permit (I-94) processing to the Otay Mesa Port of Entry in order to secure additional workstations to conduct in person or virtual interviews.

4)   Converted GSA's recently vacated maintenance working area at the Old Port into a temporary holding room.

·   Port management is currently working with San Diego Sector Border Patrol to utilize the Imperial Beach station to hold and process single adult males awaiting Credible Fear.
Johnny Armijo
Assistant Director Border Security
San Diego, California

2

Confidential

AOL-DEF-00761339

FER-0217

1   MAYER BROWN LLP
      Matthew H. Marmolejo (CA Bar No. 242964)
2      *mmarmolejo@mayerbrown.com*
    350 S. Grand Avenue
3   25th Floor
    Los Angeles, CA 90071-1503
4      Ori Lev (DC Bar No. 452565)
       (*pro hac vice*)
5      *olev@mayerbrown.com*
      Stephen M. Medlock (VA Bar No. 78819)
6      (*pro hac vice*)
       *smedlock@mayerbrown.com*
7   1999 K Street, N.W.
    Washington, D.C. 20006
8   Telephone:  +1.202.263.3000
    Facsimile:   +1.202.263.3300
9
    SOUTHERN POVERTY LAW CENTER
10     Melissa Crow (DC Bar No. 453487)
       (*pro hac vice*)
11     *melissa.crow@splcenter.org*
    1101 17th Street, N.W., Suite 705
12  Washington, D.C. 20036
    Telephone: +1.202.355.4471
13  Facsimile: +1.404.221.5857

14  *Additional counsel listed on next page*
    *Attorneys for Plaintiffs*
15
                    **UNITED STATES DISTRICT COURT**
16
                  **SOUTHERN DISTRICT OF CALIFORNIA**
17

18  Al Otro Lado, Inc., *et al.*,          Case No.:  17-cv-02366-BAS-KSC

19              Plaintiffs,                **EXHIBIT 35 IN SUPPORT OF**
                                           **PLAINTIFFS' MEMORANDUM OF**
20        v.                               **POINTS AND AUTHORITIES IN**
                                           **SUPPORT OF THEIR MOTION**
21  Chad F. Wolf,[1] *et al.*,             **FOR SUMMARY JUDGMENT**

22              Defendants.

23

24

25

26

27  ────────────────────
    [1] Acting Secretary Wolf is automatically substituted for former Acting Secretary
28  McAleenan pursuant to Fed. R. Civ. P. 25(d).

                        EXHIBIT 35 IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF
                                 POINTS AND AUTHORITIES IN SUPPORT OF THEIR
                                                    MOTION FOR SUMMARY JUDGMENT



CENTER FOR CONSTITUTIONAL RIGHTS
   Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
   *bazmy@ccrjustice.org*
   Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
   *gschwarz@ccrjustice.org*
   Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
   *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
   Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
   *sarah.rich@splcenter.org*
   Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
   *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
   Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
   *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

EXHIBIT 35 IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT

**From:** HOOD, ROBERT W
**Sent:** Thursday, May 26, 2016 5:38 PM
**To:** AKI, SIDNEY K
**CC:** CASTILLO, MOISES; MARIN, MARIZA
**Subject:** Actions Taken for Influx of Haitians

**Importance:** High

Sir, for your information below are the actions we have since May 15, 2016 taken regarding the current Haitian influx.

### Actions Taken to Mitigate Mass Migration at San Ysidro

- Activation of SYS AEU Max Capacity Contingency Plan
- Priority cases being processed – 1) UAC's, 2) Medical issues, 3)Families and 4) Haitians (NTA-Released) May 16
- All three shifts have been up staffed from 20 officers to 38 officers per shift. (Note: not all officers assigned as additional staffing from passenger can process cases. Some are assigned to Intake, Detention Control, transportation and file preparation).
- Request, coordination and activation of Virtual Processing with local SDFO Ports (Cargo, APSP, Tecate, CLX, Andrade and JTF-W OFO team depending on staffing and availability – schedule is being worked on).
- Activation of El Centro OBP Virtual Processing through JTF-W Imperial Valley (generally 1 – 2 agents per shift).
- Dedication of a separate expedited intake of families into the Old Port 2nd floor with full intake and processing.
- Coordination with OBP to house completed single ER/CF cases. Brownfield will house a capacity of ▮ and Imperial Beach ▮
- Temporary realignment of CEU officers working HSI narcotics cases to assist AEU. CEU will only work guideline alien cases.
- Reassignment of three (3) CBPO Creole speakers to interview Haitians.
- Full usage of Barracks 5 with all beds dedicated to OFO detainees of ▮ bed spaces.
- Coordination in process with the Detroit Field Office to do Virtual Processing (Pending schedule and equipment i.e. E-signature pads)
- Coordination in process with the Miami Field Office to do Virtual Processing of Haitians with Creole speakers (Pending scheduling).
- Plan A: Closed Old Port to Process Haitians and converted GSA Offices and GSA garage area into holding rooms of approximately ▮ (May 25, 2016). Supplies ordered – blankets, mats etc.
- Transferred Asylum line from Pedestrian hall to Courtyard for staging.
- Plan B: Process and house Haitian detainees at **Imperial Beach** Station, with the potential to house up to ▮ detainees (not yet activated).

Robert Hood
Customs & Border Protection
Assistant Port Director
San Ysidro Tactical Operations
Desk ▮
Cell: ▮
Email: ▮

Highly Confidential/Attorneys' Eyes Only

AOL-DEF-00030271



1    MAYER BROWN LLP
       Matthew H. Marmolejo (CA Bar No. 242964)
2      *mmarmolejo@mayerbrown.com*
     350 S. Grand Avenue
3    25th Floor
     Los Angeles, CA 90071-1503
4      Ori Lev (DC Bar No. 452565)
       (*pro hac vice*)
5      *olev@mayerbrown.com*
       Stephen M. Medlock (VA Bar No. 78819)
6      (*pro hac vice*)
       *smedlock@mayerbrown.com*
7    1999 K Street, N.W.
     Washington, D.C. 20006
8    Telephone:  +1.202.263.3000
     Facsimile:   +1.202.263.3300
9
     SOUTHERN POVERTY LAW CENTER
10     Melissa Crow (DC Bar No. 453487)
       (*pro hac vice*)
11     *melissa.crow@splcenter.org*
     1101 17th Street, N.W., Suite 705
12   Washington, D.C. 20036
     Telephone: +1.202.355.4471
13   Facsimile: +1.404.221.5857

14   *Additional counsel listed on next page*
     *Attorneys for Plaintiffs*
15
                 **UNITED STATES DISTRICT COURT**
16
                **SOUTHERN DISTRICT OF CALIFORNIA**
17

18   Al Otro Lado, Inc., *et al.*,          Case No.:  17-cv-02366-BAS-KSC

19                 Plaintiffs,              **EXHIBIT 43 IN SUPPORT OF**
                                           **PLAINTIFFS' MEMORANDUM OF**
20          v.                             **POINTS AND AUTHORITIES IN**
                                           **SUPPORT OF THEIR MOTION**
21   Chad F. Wolf,[1] *et al.*,            **FOR SUMMARY JUDGMENT**

22                 Defendants.

23

24
     _____
25

26

27   ────────────────
     [1]  Acting Secretary Wolf is automatically substituted for former Acting Secretary
28   McAleenan pursuant to Fed. R. Civ. P. 25(d).

FER-0221



CENTER FOR CONSTITUTIONAL RIGHTS
  Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
  *bazmy@ccrjustice.org*
  Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
  *gschwarz@ccrjustice.org*
  Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
  *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
  Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
  *sarah.rich@splcenter.org*
  Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
  *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
  Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
  *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

EXHIBIT 43 IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT

**From:** CASTILLO, MOISES
**Sent:** Saturday, May 28, 2016 2:13 PM
**To:** AKI, SIDNEY K; HOOD, ROBERT W
**CC:** MARIN, MARIZA
**Subject:** RE: SYS AEU movement and pass down for 5/27/2016 1400-2200

Consulate employees are also making donations to the shelters that are housing the people that were moved yesterday.

**From:** AKI, SIDNEY K
**Sent:** Friday, May 27, 2016 10:52 PM
**To:** HOOD, ROBERT W <                          >
**Cc:** MARIN, MARIZA <                        , CASTILLO, MOISES
**Subject:** RE: SYS AEU movement and pass down for 5/27/2016 1400-2200

We are not prepared and we told BP that we were not going this weekend.

Please guide our team to process cases and only focus on processing case at this time. Let's hold the line the best we can. Please call and muster the supervisors and focus them on the task. Thx.

**From:** HOOD, ROBERT W
**Sent:** Saturday, May 28, 2016 12:46:33 AM
**To:** HOOD, ROBERT W; AKI, SIDNEY K
**Cc:** MARIN, MARIZA; CASTILLO, MOISES
**Subject:** RE: SYS AEU movement and pass down for 5/27/2016 1400-2200

Sir,

Respectfully,

**From:** HOOD, ROBERT W
**Sent:** Friday, May 27, 2016 10:31:26 PM
**To:** AKI, SIDNEY K
**Cc:** MARIN, MARIZA; CASTILLO, MOISES
**Subject:** FW: SYS AEU movement and pass down for 5/27/2016 1400-2200

Sir,

Below are the numbers.

It looks like 28 Haitians were completed and 20 VP.

**From:** PORTOCARRERO, WILSON
**Sent:** Friday, May 27, 2016 10:18:30 PM
**To:** SYS AEU
**Subject:** SYS AEU movement and pass down for 5/27/2016 1400-2200

**San Ysidro AEU Detainee Movement for May 27, 2016 (1400-2200)**

- (3)    Detainees Transported to BK5
- (2)    Detainees Paroled by CBP

Highly Confidential/Attorneys' Eyes Only                          AOL-DEF-00303657

- (7)    Detainees Paroled by ICE-ERO
        Total movement: (12) detainees moved

***Other Movement***
    (14)    Detainees Transported to Imperial Beach BP Station
    (15)    Detainees Transported to Brownfield BP Station

        Total Movement: (29) Detainees Moved

***Subjects brought into AEU from PAX and Asylum line (43)***

| START of Shift Numbers | | END of Shift Numbers | |
|---|---|---|---|
| CASA | CEU/ICE | CASA | CEU/ICE |
| 0 | 0 | 0 | 0 |
| CAI | MEX CONSUL | CAI | MEX CONSUL |
| 0 | 4 | 0 | 5 |
| BK5 | HOSPITAL | BK5 | HOSPITAL |
| 61 | 1 | 61 | 1 |
| OLD PORT | CELL 4 | OLD PORT | CELL 4 |
| 199 | 1 | 203 | 0 |
| Brown Field | Imperial Bch | Brown Field | Imperial Bch |
| 7 | 0 | 4 | 12 |
| ON SITE | ASYLUM LINE | On Site | Asylum Line |
| 636 | 0 | 716 | 15 |

| SYS CASES PROCESSED | |
|---|---|
| ER/CF | 0 |
| NTA-R | 28 |
| CUBAN | 0 |
| NTA-D | 5 |
| UAC | 2 |
| ER | 0 |
| TGIS (NEG) | 0 |
| TTRT | 7 |
| TTRT Mismatch | 7 |
| WD | 0 |
| VWR | 0 |
| VEHICLE CASE | 0 |
| TOTAL | 49 |

| Virtual Processed Cases | |
|---|---|
| Murrieta | 0 |
| San Ysidro | 0 |
| El Centro BP | 3 |
| Winterhaven OFO | 2 |
| Long Beach | 3 |
| Tecate | 3 |
| San Diego Airport | 0 |
| Ft Lauderdale | 4 |
| MIAMI | 5 |
| TOTAL | 20 |

Turnover Notes:

- You will start with 716 detainees on-site.
- Mexico is bringing 24 asylees from their facility to be processed at 1400 hrs. so you will have 24 to start your intaking at the beginning of your shift. **38 were actually brought into the Asylum line**
- All of the detainees were taken into AEU.
- AEU brought 15 from Otay Mesa's asylum and were taken to SYS asylum line.
- Old Port has 203 detainees plus 245 old port warehouse.
- Deaf Detainee in custody was unable to establish communication on swings. We need to determine if she can sign, and proceed from there.

Highly Confidential/Attorneys' Eyes Only

AOL-DEF-00303658

- Fraud cases were brought from Otay Mesa and have been taken into SYS AEU.
- Pending Priority TARS will need to be ready for the PA in the morning.
- Detainees transported to IMB and Brownfield BP Stations.
- Mexico will be bringing 20 Haitians to our asylum lane.
- 1 vehicle cases pending.
- 0 CTR/TGIS pending.

**Previous Notes:**

- 1 Japanese VWPR meet and greet emailed and confirmed with SAN. Detainee will depart on May 28, 2016.
- 1 Haitian female infant (███████████████████ admitted to Radys Children's Hospital. Bullets sent. STILL AT HOSPITAL.
- 2 Daily Placement schedule were created one for AEU and one for Old Port.
- Haitian (███████████ POC will call with update on bus ticket, ticket was purchased for downtown SD, will call with new time for bus ticket from SYS bus station.
- Have old port monitor closely the detainees. Several complaints from job options for restrooms.

Wilson Portocarrero
Supervisory Customs and Border Protection Officer
SD National Frontline Recruiting Command
Tactical Terrorism Response Team
Admissibility Enforcement Unit
San Ysidro Port of Entry

Highly Confidential/Attorneys' Eyes Only                                                                AOL-DEF-00303659

1  MAYER BROWN LLP
      Matthew H. Marmolejo (CA Bar No. 242964)
2      mmarmolejo@mayerbrown.com
   350 S. Grand Avenue
3  25th Floor
   Los Angeles, CA 90071-1503
4      Ori Lev (DC Bar No. 452565)
      (pro hac vice)
5      olev@mayerbrown.com
      Stephen M. Medlock (VA Bar No. 78819)
6      (pro hac vice)
      smedlock@mayerbrown.com
7  1999 K Street, N.W.
   Washington, D.C. 20006
8  Telephone: +1.202.263.3000
   Facsimile:  +1.202.263.3300
9
   SOUTHERN POVERTY LAW CENTER
10     Melissa Crow (DC Bar No. 453487)
      (pro hac vice)
11     melissa.crow@splcenter.org
   1101 17th Street, N.W., Suite 705
12  Washington, D.C. 20036
   Telephone: +1.202.355.4471
13  Facsimile: +1.404.221.5857

14  Additional counsel listed on next page
   Attorneys for Plaintiffs
15
                 **UNITED STATES DISTRICT COURT**
16
               **SOUTHERN DISTRICT OF CALIFORNIA**
17

18  Al Otro Lado, Inc., et al.,                | Case No.:  17-cv-02366-BAS-KSC

19            Plaintiffs,                       | **EXHIBIT 69 IN SUPPORT OF**
                                               | **PLAINTIFFS' MEMORANDUM OF**
20     v.                                       | **POINTS AND AUTHORITIES IN**
                                               | **SUPPORT OF THEIR MOTION**
21  Chad F. Wolf,[1] et al.,                   | **FOR SUMMARY JUDGMENT**

22            Defendants.                       |

23                                             | **FILED UNDER SEAL**

24

25

26

27  _____
   [1] Acting Secretary Wolf is automatically substituted for former Acting Secretary
28  McAleenan pursuant to Fed. R. Civ. P. 25(d).

                        EXHIBIT 69 IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF
                           POINTS AND AUTHORITIES IN SUPPORT OF THEIR
                                     MOTION FOR SUMMARY JUDGMENT

1

2  CENTER FOR CONSTITUTIONAL RIGHTS
   Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
3  *bazmy@ccrjustice.org*
   Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
4  *gschwarz@ccrjustice.org*
   Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
5  *aguisado@ccrjustice.org*
6  666 Broadway, 7th Floor
   New York, NY 10012
7  Telephone: +1.212.614.6464
   Facsimile: +1.212.614.6499
8

9  SOUTHERN POVERTY LAW CENTER
   Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
10 *sarah.rich@splcenter.org*
   Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
11 *rebecca.cassler@splcenter.org*
   150 E. Ponce de Leon Ave., Suite 340
12 Decatur, GA 30030
   Telephone: +1.404.521.6700
13 Facsimile: +1.404.221.5857

14 AMERICAN IMMIGRATION COUNCIL
   Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
15 *kwalters@immcouncil.org*
16 1331 G St. NW, Suite 200
   Washington, D.C. 20005
17 Telephone: +1.202.507.7523
   Facsimile: +1.202.742.5619
18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 69 IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT

**From:** MCALEENAN, KEVIN K
**Sent:** Friday, November 11, 2016 3:00 PM
**To:** Owen, Todd C (AC OFO); WAGNER, JOHN P
**Subject:** RE: Metering in TX

Thanks. The implementation here is subject to your discretion and theirs (and PDs') on what will work best operationally and whether it is required on any given day or any specific location. We should try to bring INAMI on board with us and certainly give them a heads up. I just want our folks to have an additional tool to keep conditions safe and working at our POEs. Thanks Todd

---

**From:** Owen, Todd C (AC OFO)
**Sent:** Friday, November 11, 2016 2:55:27 PM
**To:** MCALEENAN, KEVIN K; WAGNER, JOHN P
**Subject:** RE: Metering in TX

Deputy, we are on board with the metering. Wanted to express this verbally with the SWB DFOs as oppossed to a written record. I thought we had advised them via telephone last night to start, and that this would be among the various custody issues to discuss in more depth next week.
We will call the 4 DFOs right now.


Todd C. Owen
Executive Assistant Commissioner
Office of Field Operations
U.S. Customs & Border Protection

---

From: MCALEENAN, KEVIN K
Sent: Friday, November 11, 2016 7:48:19 PM
To: Owen, Todd C (AC OFO); WAGNER, JOHN P
Subject: Metering in TX

EAC/DEAC,
Just wanted to touch base directly because I'm not sure it was conveyed with full clarity from CAT. C1 and I briefed S1 that we wanted to increase efforts to meter arrivals of non-UAC, non-Mexican CF cases mid-bridge. If INAMI is not willing to help, we will push up to the line and hold them back there. This will be mostly CENTAM families. Please advise if you have concerns and let me know how implementation goes.
KM

**EXHIBIT**

**167**

Highly Confidential/Attorneys' Eyes Only

AOL-DEF-00272935

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA


                              ) IN THE DISTRICT COURT
AL OTRO LADO, INC., ET        )
AL.,                          )
     PLAINTIFFS,              ) CASE NO.
                              ) 17-cv-02366-BAS-KSC
VS.                           )
                              )
                              )
KEVIN K. MCALEENAN, ET        )
AL.,                          )
     DEFENDANTS.              )



*******************************************************
                     CONFIDENTIAL
        ORAL AND VIDEOTAPED DEPOSITION OF
                   SAMUEL CLEAVES
                   MAY 20, 2020
*******************************************************

        ORAL AND VIDEOTAPED DEPOSITION of SAMUEL CLEAVES,
produced as a witness at the instance of the Plaintiff,
and duly sworn, was taken in the above-styled and
numbered cause on May 20, 2020, from 8:59 a.m. to 5:04
p.m., Mountain Time, before Delia Ordonez, CSR in and
for the State of Texas, reported by machine shorthand,
via Webex Magna LegalVision.

                 Magna Legal Services
                   866.624.6221
                   www.MagnaLS.com



```
                                                          Page 2
 1                   A P P E A R A N C E S
 2
 3    FOR THE PLAINTIFFS:
 4        Matthew Fenn
          Sydney Fields
 5        Mayer Brown
          1999 K Street, N.W.
 6        Washington, D.C. 20006
          202.263.3221
 7        Mfenn@mayerbrown.com
          Sfields@mayerbrown.com
 8
      FOR THE DEFENDANTS:
 9
          Katherine J. Shinners
10        Ari Nazarov
          U.S. Department of Justice
11        Office of Immigration Litigation
          Ben Franklin Station, P.O. Box 868
12        Washington, D.C. 20044
          202.598.8259
13        Katherine.j.shinners@usdoj.gov
          Ari.Nazarov@usdoj.gov
14
          Rebecca Cassler
15        Southern Poverty Law Center
          1101 17th Street, N.W., Suite 705
16        Washington, D.C. 20036
          202.355.4471
17
18    ALSO PRESENT:
19        Evan McCulloch
20        Louisa Slocum, CBP
21    THE VIDEOGRAPHER:
22        Solange Tran
23    THE MAGNA LEGAL TECHNICIAN:
24        Kevin Cranford
25
```



Page 3

1                           INDEX

                ORAL AND VIDEOTAPED DEPOSITION OF

2                      SAMUEL CLEAVES

                       MAY 20, 2020

3

4                 E X A M I N A T I O N

5    SAMUEL CLEAVES                            P A G E

6    Examination by Mr. Matthew E. Fenn....     7

7    Examination by Ms. Sydney Fields......    199

8    Examination by Ms. Katherine J. Shinners  246

9    Signature and Changes.................    250

10   Reporter's Certificate................    252

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



```
                                                              Page 4
  1                            EXHIBITS
                  ORAL AND VIDEOTAPED DEPOSITION OF
  2                         SAMUEL CLEAVES
                            MAY 20, 2020
  3
  4   NO.            DESCRIPTION                   P A G E
  5   Exhibit 3      Metering Guidance              121
  6   Exhibit 79     30(b)(6) Notice                 14
  7   Exhibit 86     AOL-DEF-00041455               183
  8   Exhibit 159    AOL-DEF-00090647                33
  9   Exhibit 160    AOL-DEF-00290938                32
 10   Exhibit 161    AOL-DEF-00273818                68
 11   Exhibit 162    AOL-DEF-00027382                81
 12   Exhibit 163    FRE 1006 Summary of Impact to   83
                     Port Operation 2018
 13
      Exhibit 164    Defendants' Supplemental and    90
 14                  Amended Responses to
                     Plaintiffs' Fourth Set of
 15                  Interrogatories to All
                     Defendants
 16
      Exhibit 165    AOL-DEF-00047772               125
 17
      Exhibit 166    AOL-DEF-01267496               132
 18
      Exhibit 167    AOL-DEF-00272935               134
 19
      Exhibit 168    AOL-DEF-00272936               141
 20
      Exhibit 169    Defendants' Objections and     149
 21                  Responses to Plaintiffs'
                     Fifth Set of Interrogatories
 22                  to All Defendants
 23   Exhibit 170    Human Rights First Report      155
 24   Exhibit 171    AOL-DEF-00038270               163
 25   Exhibit 172    AOL-DEF-00037758               171
```



Page 5

```
 1                          EXHIBITS
                 ORAL AND VIDEOTAPED DEPOSITION OF
 2                       SAMUEL CLEAVES
                         MAY 20, 2020
 3
 4    NO.           DESCRIPTION                    P A G E
 5    Exhibit 173   Beto O'Rourke Twitter Video     175
 6    Exhibit 174   AOL-DEF-00095574                189
 7    Exhibit 175   AOL-DEF-00799450                200
 8    Exhibit 176   AOL-DEF-00808783                206
 9    Exhibit 177   AOL-DEF-00845774                214
10    Exhibit 178   AOL-DEF-00811791                218
11    Exhibit 179   AOL-DEF-00838795                224
12    Exhibit 180   AOL-DEF-00851607                236
13    Exhibit 181   AOL-DEF-00842504                241
14
15
16
17
18
19
20
21
22
23
24
25
```



Page 6

1                THE VIDEOGRAPHER:  We are now on the

2    record.  This begins Media No. 1 in the deposition of

3    Sam Cleaves in the matter of Al Otro Lado, Inc., et al.

4    versus Kevin K. McAleenan, et al., in the United States

5    District Court Southern District of California.

6                Today is Wednesday, May 20th, 2020, and the

7    time is 9:59 a.m.  This deposition is being held

8    remotely at the request of Mayer Brown, LLP.

9    Videographer is Solange Tran, our trial tech, Kevin

10   Cranford, and the court reporter is Delia Ordonez, all

11   through Magna Legal Services.

12               Will counsel and all parties present please

13   state their appearances and who they represent?

14               MR. FENN:  Matthew Fenn from Mayer Brown,

15   and I represent the plaintiffs.

16               MS. FIELDS:  Sydney Fields from Mayer

17   Brown, also for the plaintiffs.

18               MS. SHINNERS:  Katherine Shinners from U.S.

19   Department of Justice for the defendants.

20               MR. NAZAROV:  Ari Nazarov, also from the

21   U.S. Department of Justice, for the defendants.

22               MS. SHINNERS:  And we have agency counsel

23   present from U.S. Customs and Border Protection, Louisa

24   Slocum, and Evan McCulloch on the phone.

25               THE VIDEOGRAPHER:  Will the court reporter



                                                        Page 7

1    please swear in the witness?

2                     SAMUEL CLEAVES,

3    having been first duly sworn, testified as follows:

4                     EXAMINATION

5    BY MR. FENN:

6       Q.  Good morning, Mr. Cleaves.  Thank you for

7    taking the time to testify today -- we -- we appreciate

8    it -- under more challenging circumstances than -- than

9    normal.

10      A.  Yes, sir.

11      Q.  My name is Matt Fenn, and I represent the

12   plaintiffs in this action, as you just heard.  Before we

13   begin, I'd like to go over some ground rules.  This is a

14   one-way conversation in which I and my colleague,

15   Ms. Fields, will ask you questions, and you answer them.

16   So that the court reporter can accurately record your

17   testimony, you must give audible responses, no head

18   shakes, no "uh-huhs."  Do you understand that?

19      A.  Yes.

20      Q.  And as you've probably seen already, given the

21   web format and the slight time lag in the audio

22   transmission, it's even more important than usual that

23   we not talk over each other.  So if you could please

24   wait until I finish a question before answering it, I

25   will also do my best to wait for you to finish your



Page 83

1    phrase "operational capacity" anywhere in -- in the

2    columns and information in this chart, do you?

3        A.  No.

4        Q.  There is a column that says:  "Do you have any

5    UDAs in line waiting on the Mexico side?  If yes, how

6    many?"

7            Do you see that column?

8        A.  Yes.

9        Q.  Can you explain to me what UDAs are?

10       A.  Undocumented aliens.

11       Q.  And this particular report indicates that the

12   Columbus Port of Entry has ███ detainees in custody,

13   which equates to 25 percent of the Columbus Port of

14   Entry's capacity; is that right?

15       A.  Yes.

16       Q.  So if my math is correct, as of the date of

17   this report, the capacity at the Columbus Port of Entry

18   was ██ detainees; is that correct?

19       A.  Yes.

20       Q.  Okay.

21           MR. FENN:  If we could pull up Exhibit 163,

22   please.

23       Q.  (BY MR. FENN)  I'm showing you what will be

24   marked as Exhibit 163 to your deposition.  It is a

25   multipage Federal Rule of Evidence 1006 Summary Exhibit



Page 84

1    entitled "El Paso Port of Entry:  Impact to Port

2    Operations."

3              Do you see that?

4         A.  I see the title, yes.

5         Q.  And I will represent to you that this document

6    summarizes the capacity and impact to port operations

7    portions of every queue management report produced by

8    defendants with data for the Port of El Paso from

9    June 16th, 2018, through December 31st, 2018.

10              Can you please look at the entry for

11    June 19th, 2018?

12         A.  Yes.

13         Q.  On that date, capacity for the Port of El Paso

14    was listed as 95 percent; is that correct?

15         A.  Yes.

16         Q.  But the Impact to Port Operations column lists

17    the impact to port operations for that day as "no

18    impact," correct?

19         A.  That's what it says.

20              MS. SHINNERS:  And objection.  This -- this

21    assumes the accuracy of the summary of the documents.

22              You can answer, Mr. Cleaves.

23         A.  Yes.

24              MR. FENN:  Okay.  Now I'd like to look at

25    the entries from July 17th, 2018, through July 20th,



Page 85

1    2018.  It should be on the next page of the exhibit.

2         Q.  (BY MR. FENN)  And again, we're looking at

3    July 17th, 2018, through July 20th, 2018.  On those

4    dates, the Port of El Paso was listed at 110 percent

5    capacity, 110 percent capacity, 85 percent capacity, and

6    97 percent capacity respectively; is that correct?

7         A.  Yes, that's what it says.

8         Q.  And yet the impact to port operations for those

9    days is listed as "minimal impact"; is that correct?

10        A.  That's what it says.

11        Q.  What does the word "minimal" mean to you in

12   ordinary conversation?

13        A.  Small.  However, this report is definitely not

14   used in ordinary conversation.

15        Q.  So if something is having a minimal con- -- a

16   minimal impact, will you agree that its impact is small?

17        A.  I would agree that whatever was happening at

18   the port at the time, we were able to handle it with

19   minimal impact to normal operations, which would include

20   everything at the port.

21        Q.  Okay.  I'd like to shift gears a little bit and

22   discuss the manner in which metering is implemented at

23   the ports of entry in the El Paso Field Office.

24             But before doing so, I'd like to define the

25   term "limit line."  If I use that term, I mean the



Page 86

1    location at which officers stand when assigned to

2    conduct queue management operations at a port of

3    operation.  Do you understand that?

4         A.  Yes, okay.

5         Q.  So let's talk about Paso del Norte first.  From

6    2016 to the present, at any time, have asylum seekers

7    been metered at Paso del Norte?

8               MS. SHINNERS:  Object to the form.

9               THE WITNESS:  I --

10              MS. SHINNERS:  Go ahead, Mr. Cleaves.

11              THE WITNESS:  I -- okay.  Yeah.  I just

12   wanted to make sure.

13        A.  From 2016 until now at the Paso del Norte

14   border crossing, metering has been conducted, yes.

15        Q.  (BY MR. FENN)  And do you know when metering

16   began at the Paso del Norte border crossing?

17        A.  Yes.  It was in November of 2016 for three

18   weeks, ended in December of 2016, began again in May of

19   2018.  It was pretty consistent until January of 2020.

20   And in February of 2020, we started pulling back on

21   metering, stopped metering periodically because the

22   Mexican Immigration had reported that we had reached the

23   end of the line.  So everyone that was waiting to be

24   processed had been processed.  They had no one else

25   left.  So throughout February, they would either have



Page 87

1    small numbers waiting or none at all of 20 --

2    February 2020.

3        Q.  And when you say you had -- you had "reached

4    the end of the line," are you referring to specifically

5    asylum seekers who are waiting at the Paso del Norte

6    crossing or at the El Paso Port of Entry in general?

7              MS. SHINNERS:  Objection, form.

8        A.  I should have clarified that, yes.  For the

9    Port of El Paso in general.  In other words, migrants

10   waiting in Ciudad Juárez for processing, Mexican

11   Immigration was reporting that we had reached the end of

12   those people waiting in late January of 2020.

13       Q.  (BY MR. FENN)  So in late January of 2020,

14   there was nobody -- there were no migrants waiting to

15   cross the border into the El Paso Port of Entry in

16   Ciudad Juárez?

17       A.  Yes.  Mexican Immigration, that's what they

18   reported.

19       Q.  When an asylum see- -- seeker approaches the

20   limit line at the Paso del Norte border crossing, are

21   they told to wait in Mexico?

22             MS. SHINNERS:  Object to the form.

23       A.  No, they're not given any specific location.

24   They're told that we're unable to take in any for

25   processing at this time, and they would have to wait.



1
2
3
4
5
6
7
8

## UNITED STATES DISTRICT COURT

9

## SOUTHERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| AL OTRO LADO, INC., a California Corporation; ABIGAIL DOE, BEATRICE DOE, CAROLINA DOE, DINORA DOE, INGRID DOE, and JOSE DOE, individually and on behalf of all others similarly situated, | Case No. 17-cv-02366-BAS-KSC **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS THE COMPLAINT** |
| Plaintiffs, | **[ECF No. 135]** |
| v. | |
| KIRSTJEN NIELSEN, Secretary, U.S. Department of Homeland Security, in her official capacity; KEVIN K. MCALEENAN, Acting Commissioner, U.S. Customs and Border Protection, in his official capacity; TODD C. OWEN, Executive Assistant Commissioner, Officer of Field Operations, U.S. Customs and Border Protection, in his official capacity, | |
| Defendants. | |

23      This case concerns an alleged practice in which U.S Customs and Border

24  Protection ("CBP") officials at ports of entry ("POE") along the U.S.-Mexico border

25  deny asylum seekers access to the U.S. asylum process.  The Defendants in this case

26  are Kirstjen Nielsen, the Secretary of the U.S. Department of Homeland Security;

27  Kevin K. McAleenan, Acting Commissioner of CBP; and Defendant Todd C. Owen,

28  the Executive Assistant Commissioner of the Office of Field Operations for CBP.

FER-0241

1   Each Defendant has a role in the direction and oversight of CBP and each is sued in

2   his or her official capacity.  Defendants move to dismiss the Complaint in its entirety

3   pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  (ECF No. 135.)

4   Plaintiffs oppose (ECF No. 143) and Defendants have replied in support (ECF No.

5   145).  For the reasons herein, the Court grants in part and denies in part Defendants'

6   motion to dismiss.

7   **I.     BACKGROUND**

8        **A.     Relevant Statutory and Regulatory Background[1]**

9        At the heart of this case are several provisions of the Immigration and

10  Nationality Act ("INA") and its implementing regulations which elaborate a

11  procedure by which asylum seekers who arrive at POEs may seek asylum in the

12  United States—a procedure Plaintiffs refer to as "access to the U.S. asylum process."[2]

13  (*See generally* ECF No. 1, Compl.)  The INA generally provides that "[a]ny alien who

14  is physically present in the United States or who arrives in the United States [],

15  irrespective of such alien's status, may apply for asylum in accordance with . . . where

16  applicable, section 1225(b)[.]"  8 U.S.C. § 1158(a)(1).

17       An alien who arrives in the United States, including at a designated POE, is

18

19  _____

20      [1] The Court relies on portions of the statutory and regulatory background
identified in the Complaint and the parties' briefing to outline the relevant background

21  for the purposes of this opinion.  (*See* Compl. ¶¶ 104–118; ECF No. 135-1; ECF No.
143.)  The Court does not include all aspects of the statutory and regulatory scheme

22  concerning asylum.

23

24      [2] Defendants take issue with Plaintiffs' use of the phrase "access to the asylum
process," asserting that "Plaintiffs misstate the law" because the INA does not use

25  that phrase.  (ECF No. 135-1 at 5 n.2.)  However, Defendants themselves use the
phrase "asylum process" to refer to the statutory provisions identified in the

26  Complaint.  (ECF No. 67-3 Ex. B.)  The Court does not understand the phrase "access

27  to the asylum process" as a statement of the law itself, but rather as a shorthand to
collectively describe certain provisions of the INA and its implementing regulations

28  at issue in this case.  The Court similarly uses this shorthand in this opinion.

1   deemed an "applicant for admission," who "shall be inspected by immigration
2   officers," and may be removed "without further hearing" "if an immigration officer
3   determines" that the alien "is inadmissible."  *See* 8 U.S.C. § 1225(a)(1); 8 U.S.C. §
4   1225(a)(3); 8 U.S.C. § 1182(a).  The INA, however, treats asylum seekers differently.

5   An "alien [who] indicates either an intention to apply for asylum under section
6   1158 . . . or a fear of persecution" is excepted from this summary removal.  8 U.S.C.
7   § 1225(b)(1)(A)(i).  Instead, "[i]f an immigration officer determines that an alien . . .
8   who is arriving in the United States . . . is inadmissible . . . and the alien indicates
9   either an intention to apply for asylum under section 1158 of this title or a fear of
10  persecution, the officer shall refer the alien for an interview by an asylum officer[.]"
11  8 U.S.C. § 1225(b)(1)(A)(ii).  An implementing regulation similarly requires that if a
12  noncitizen in expedited removal proceedings asserts an intention to apply for asylum
13  or a fear of persecution, "the inspecting officer shall not proceed further with removal
14  of the alien until the alien has been referred for an interview by an asylum officer[.]"
15  8 C.F.R. § 235.3(b)(4).  The regulation further mandates that "the examining
16  immigration officer shall record sufficient information in the sworn statement to
17  establish and record that the alien has indicated such intention, fear, or concern, and
18  to establish the alien's inadmissibility."  *Id.*

19  An alien seeking asylum is subsequently referred to an "asylum officer," who
20  is statutorily required to be "an immigration officer who has had professional training
21  in country conditions, asylum law, and interview techniques comparable to that
22  provided to full-time adjudicators of applications under section 1158 of this title," and
23  "is supervised by an officer who," *inter alia*, "has had substantial experience
24  adjudicating asylum applications."  8 U.S.C. § 1225(b)(1)(E).  The INA further
25  elaborates the conduct of asylum officers in the interview and a process for removal
26  if the officer determines that an alien does not have a credible fear of persecution.  8
27  U.S.C. § 1225(b)(1)(B).

28  At any point during this process, "[a]n alien applying for admission may, in the

– 3 –

17cv2366

1    discretion of the Attorney General and at any time, be permitted to withdraw the

2    application for admission and depart immediately from the United States."  8 U.S.C.

3    § 1225(a)(4).  An implementing regulation further provides that "the alien's decision

4    to withdraw his or her application for admission must be made voluntarily[.]"   8

5    C.F.R. § 235.4.

6        **B.      Factual Synopsis**

7        The Plaintiffs are six individuals, Plaintiffs Abigail Doe, Beatrice Doe,

8    Carolina Doe, Dinora Doe, Ingrid Doe, and Jose Doe (collectively, the "Individual

9    Plaintiffs"), and organizational Plaintiff Al Otro Lado, Inc. ("Al Otro Lado").[3]  They

10   allege that CBP officials have "systematically violated U.S. law and binding

11   international human rights law by refusing to allow individuals . . . who present

12   themselves at POEs along the U.S.-Mexico border and assert their intention to apply

13   for asylum or a fear of returning to their home countries—to seek protection in the

14   United States."  (Compl. ¶¶ 1–6, 37.)  Plaintiffs allege that "[b]y refusing to follow

15   the law, Defendants are engaged in an officially sanctioned policy or practice[.]"  (*Id*.

16   ¶ 5.)

17       Plaintiffs  point  to  several  reports  from  non-governmental  organizations

18   working in the U.S.-Mexico border region and Al Otro Lado's firsthand account,

19   which  describe  instances  in  which  CBP  officials  denied  asylum  seekers  who

20   presented themselves at POEs along the border access to the U.S. asylum process

21   between December 2015 and June 2017.  (*Id*. ¶¶ 37–39, 96–103.)  Plaintiffs allege

22   that CBP officials have carried out this practice through misrepresentations, threats

23   and intimidation, verbal and physical abuse, and coercion.  (*Id*. ¶¶ 84–103.)  For

24   example, CBP officials are alleged to turn away asylum seekers by falsely informing

25

26          [3] The Court granted each of the Individual Plaintiffs permission to proceed
27   pseudonymously in this litigation due to their asserted fears for their physical safety.
     (ECF No. 138.)  Accordingly, each of these names is a fictitious name used by an
28   Individual Plaintiff solely for the purposes of this litigation.

1    them that the U.S. is no longer providing asylum, that President Trump signed a new

2    law ending asylum, that a law providing asylum to Central Americans ended, that

3    Mexican citizens are not eligible for asylum, and that the U.S. is no longer accepting

4    mothers with children for asylum.  (*Id.* ¶ 85.)  CBP officials are alleged to intimidate

5    asylum seekers by threatening to take away their children if they do not renounce a

6    claim for asylum and to deport the asylum seekers.  (*Id.* ¶ 87.)  CBP officials are also

7    alleged to force asylum seekers to sign forms in English, without translation, in which

8    the asylum seekers recant their fears of persecution.  (*Id.* ¶ 92.)  CBP officials are

9    further alleged to instruct the asylum seekers to recant their fears of persecution while

10   being recorded on video.  (*Id.* ¶ 92.)  The Court briefly sets forth the Individual

11   Plaintiffs' and Al Otro Lado's experiences of these alleged practices.

12                          The Individual Plaintiffs

13        Plaintiffs Abigail Doe ("A.D."), Beatrice Doe ("B.D."), and Carolina Doe

14   ("C.D.") are natives and citizens of Mexico, each of whom fled with their families to

15   Tijuana, Mexico, where they attempted to access the U.S. asylum process.  (Compl.

16   ¶¶ 19–21.)  Plaintiff A.D. sought to flee Mexico in May 2017 after her husband

17   disappeared at the hands of a Mexican drug cartel.  A cartel member threatened her

18   with death.  (*Id.* ¶¶ 19, 39–40.)  She alleges that CBP officials at the San Ysidro POE

19   coerced her into signing a form which falsely stated that she did not have a fear of

20   returning to Mexico and withdrew her application for admission to the U.S., and

21   forced her and her children to return to Mexico.  (*Id.* ¶¶ 41–45.)  Plaintiff B.D. sought

22   to flee Mexico in May 2017 with her nephew and three children after the Zetas, a

23   Mexican drug cartel in southern Mexico, targeted her nephew, and after she suffered

24   severe domestic violence from her husband.  (*Id.* ¶¶ 20, 46–47.)  She presented herself

25   at the Otay Mesa POE and twice at the San Ysidro POE, where CBP officials coerced

26   her into signing a form in which she stated that she and her children have no fear of

27   returning to Mexico and withdrew her application for admission.  (*Id.* ¶¶ 48–54.)

28   Plaintiff C.D. sought to flee Mexico in May 2017 with her three children after a drug

1   cartel kidnapped and dismembered her brother-in-law and subsequently targeted her

2   family with death and severe harm.  (*Id.* ¶¶ 21, 55–56.)  She alleges that CBP officials

3   coerced her into recanting her fear on video and into signing a form withdrawing her

4   application for admission to the U.S.  (*Id.* ¶¶ 57–60.)

5        Plaintiffs Dinora Doe ("D.D."), Ingrid Doe ("I.D."), and Jose Doe ("J.D.") are

6   natives and citizens of Honduras.  (*Id.* ¶¶ 22–24.)  Plaintiff D.D. alleges that MS-13

7   gang members threatened to kill her and her 17-year old daughter if they did not leave

8   their home, and subsequently repeatedly raped her and her daughter over a three-day

9   period.  (*Id* ¶¶ 22, 61–62.)  D.D and her daughter fled to Mexico where MS-13 gang

10  members threatened them again.  (*Id.* ¶ 63.)  On three occasions in August 2016, D.D.

11  and her daughter sought asylum in the United States at the Otay Mesa POE, but CBP

12  officials told her that "there was no asylum in the United States," including

13  specifically "for Central Americans," and that she "would be handed over to Mexican

14  authorities and deported to Honduras."  (*Id.* ¶¶ 64–69.)  Plaintiff I.D. alleges that 18th

15  Street gang members in Honduras murdered her mother and three siblings and that

16  the gang threatened her with death.  (*Id.* ¶¶ 23, 71.)  She also alleges that her partner

17  in Honduras severely abused her and her three children for several years, and

18  regularly raped her, including in front of her children.  (*Id.* ¶¶ 23, 72.)  In June 2017,

19  I.D. and her children fled to Tijuana and sought asylum at the Otay Mesa and the San

20  Ysidro POEs, where CBP officers told them that they could not seek asylum in the

21  U.S.  (*Id.* ¶¶ 73–77.)  Plaintiff J.D. alleges that 18th Street gang members murdered

22  several of his family members in Honduras.  He further alleges that gang members

23  attacked him and threatened to kidnap and harm his two daughters.  (*Id.* ¶¶ 24, 78–

24  79.)  J.D. fled Honduras in June 2017 and sought asylum at the Laredo, Texas POE,

25  but CBP officers told him he could not get asylum in the United States.  (*Id.* ¶¶ 80–

26  82.)

27        At the time the Complaint was filed, the Individual Plaintiffs alleged that they

28  "would like to present themselves again to seek asylum, but based on their experience

FER-0246

1  and the experience of others with CBP's practice at POEs, [they] understand that they

2  would likely be turned away again[.]"  (*Id*. ¶¶ 44, 53, 59, 68, 76, 81.)  They also allege

3  that they are not alone.  Rather, CBP officials are alleged to have a "prevalent and

4  persistent" illegal practice since summer 2016 of denying other asylum seekers who

5  present themselves at POEs along the U.S.-Mexico border access to the U.S. asylum

6  system.  Accordingly, the Individual Plaintiffs seek to represent a class of individuals

7  with similar claims.  (*Id*. ¶¶ 131–138 (class allegations).)

8                                        Al Otro Lado

9         Al Otro Lado is a non-profit California legal services organization established

10  in 2014, which provides services to indigent deportees, migrants, refugees, and their

11  families.  (Compl. ¶ 12; Decl. of Erika Pinheiro, ECF No. 90–1 ("Pinheiro Decl.") ¶

12  2.)  Al Otro Lado's mission is to coordinate and to provide screening and legal

13  representation for individuals in asylum and other immigration proceedings, seek

14  redress for civil rights violations, and provide assistance with other legal and social

15  services. (Compl. ¶ 12; Pinheiro Decl. ¶ 2.) Since December 2015, its representatives

16  have accompanied asylum seekers to the San Ysidro POE and witnessed the alleged

17  conduct of CBP officials.  (Compl. ¶ 101.)  In response to the alleged practices of

18  CBP officials, Al Otro Lado has diverted significant time and resources from its L.A.

19  operations and several of its non-refugee programs to send representatives to Tijuana.

20  (*Id.* ¶¶ 14, 16–17; Pinheiro Decl. ¶¶ 4, 6–7.)  Al Otro Lado has altered its previous

21  "large-scale, mass-advisal legal clinics" in Tijuana that provided a general overview

22  on asylum laws and procedures to provide individualized assistance and direct

23  representation of asylum seekers, which has required Al Otro Lado to recruit and train

24  more attorneys.  (Compl. ¶¶ 13–14; Pinheiro Decl. ¶¶ 3–4.)  Al Otro Lado expends

25  significant time and resources to provide individual screenings and in-depth trainings

26  to educate asylum seekers about CBP's conduct and challenge the alleged practices.

27  (*Id.* ¶ 14; Pinheiro Decl. ¶ 4.)

28

FER-0247

### C.    Relevant Procedural Background

Plaintiffs filed the putative class action Complaint in the Central District of California on July 12, 2017.  (ECF No. 1.)  The Complaint presses three claims against the Defendants related to the INA provisions.  Plaintiffs allege that (1) Defendants have violated various provisions of the INA that together constitute a "right to seek asylum under the [INA]," (Compl. ¶¶ 139–150); (2) the INA statutory violations also violate the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.* (Compl. ¶¶ 151–164) (asserting claims under Sections 706(1) and 706(2) of the APA); and (3) Defendants have violated Plaintiffs' Fifth Amendment procedural due process rights based on the alleged failure to comply with the INA's statutory protections (*id.* ¶¶ 165–176).  Plaintiffs also assert claims pursuant to the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, for Defendants' alleged "violation of the *non-refoulement* doctrine," a doctrine which Plaintiffs contend is a "specific, universal, and obligatory norm," "which has also achieved the status of a *jus cogens* norm." (Compl. ¶¶ 177–185).  Plaintiffs seek declaratory and injunctive relief for their claims.  (*Id.* at 52–53.)

## II.    LEGAL STANDARDS

### A.    Rule 12(b)(1) and Federal Court Jurisdiction

Pursuant to Rule 12(b)(1), a party may move to dismiss based on the court's lack of subject-matter jurisdiction.  Fed. R. Civ. P. 12(b)(1).  A defendant may challenge the court's subject-matter jurisdiction in several ways, two of which are raised by Defendants' motion to dismiss: mootness and sovereign immunity.  When a defendant challenges the Article III standing of a plaintiff or the related issue of mootness, Rule 12(b)(1) is the appropriate standard of review because it is the court's subject-matter jurisdiction which is challenged.  *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000) ("Mootness . . . pertain[s] to a federal court's subject-matter jurisdiction under Article III, [so it is] properly raised in a motion to dismiss under [Rule] 12(b)(1).").  A Rule 12(b)(1) motion is also "a proper vehicle for invoking sovereign immunity from suit."  *Pistor v. Garcia*, 791 F.3d 1104, 1111 (9th Cir.

1    2015).  When the United States is sued or a suit implicates its sovereign immunity, a

2    waiver of sovereign immunity is deemed a prerequisite for jurisdiction.  *FDIC v.*

3    *Meyer*, 510 U.S 471, 475 (1994) ("Absent a waiver, sovereign immunity shields the

4    Federal Government and its agencies from suit."); *Jachetta v. United States*, 653 F.3d

5    898, 903 (9th Cir. 2011) ("It is axiomatic that the United States may not be sued

6    without its consent and that the existence of consent is a prerequisite for jurisdiction.")

7    (quoting *United States v. Mitchell,* 463 U.S. 206, 212 (1983)).  When sovereign

8    immunity is invoked as the basis for the absence of subject-matter jurisdiction, "[a]s

9    the party asserting a claim against the United States, [the plaintiff] has the burden of

10   'demonstrating an unequivocal waiver of immunity.'"  *United States v. Park Place*

11   *Associates, Ltd*., 563 F.3d 907, 924 (9th Cir. 2009) (quoting *Cunningham v. United*

12   *States*, 786 F.2d 1445, 1446 (9th Cir. 1986)).

13       **B.      Rule 12(b)(6) and the Sufficiency of the Complaint**

14       Federal Rule of Civil Procedure 8(a)(2) requires that a complaint set forth "a

15   short and plain statement of the claim showing that the pleader is entitled to relief,"

16   in order to "give the defendant fair notice of what the . . . claim is and the grounds

17   upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting

18   *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  A defendant may move to dismiss a

19   complaint on the ground that its allegations fail to state a claim upon which relief may

20   be granted. Fed. R. Civ. P. 12(b)(6).  A Rule 12(b)(6) motion tests the sufficiency of

21   a complaint's allegations.  *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581

22   (9th Cir. 1983).  To survive such a motion, a plaintiff is required to set forth "enough

23   facts to state a claim for relief that is plausible on its face."  *Twombly*, 550 U.S. at

24   570.  "A claim has facial plausibility when the plaintiff pleads factual content that

25   allows the court to draw reasonable inferences that the defendant is liable for the

26   misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).

27   Factual allegations must be enough to raise a right to relief above the speculative

28   level. *Twombly*, 550 U.S. at 556.  In assessing the sufficiency of a complaint, a court

FER-0249

1   accepts as true the complaint's factual allegations and construes them in the light most
2   favorable to the plaintiff.  *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).  Yet,
3   the court need not accept as true legal conclusions pled in the guise of factual
4   allegations.  *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754–55 (9th Cir. 1994).
5   A pleading is insufficient if it offers only "labels and conclusions" or "a formulaic
6   recitation of the elements of a cause of action," without adequate factual allegations.
7   *Twombly*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 676.  Generally, a court assesses a
8   complaint's sufficiency based on its allegations, but a court may consider materials
9   properly submitted as part of the complaint to resolve a Rule 12(b)(6) motion to
10  dismiss.  *Lee v. City of Los Angeles*, 250 F.3d 668, 688–89 (9th Cir. 2001).

11  **III.   DISCUSSION**

12      **A.   Mootness**

13      In the days following the filing of the Complaint, Defendants agreed to process
14  the Individual Plaintiffs for inspection and to permit them to access the asylum
15  process.  The agreement provides that: "[t]he government agrees to allow the class
16  representatives and their children to present themselves at the San Ysidro and Laredo
17  ports of entry and access the credible fear, withholding-only, or asylum process as
18  appropriate under the [INA]."  (ECF No. 67-3 Ex. B.)  Three Individual Plaintiffs
19  were processed at the San Ysidro POE on July 15, 2017 and another was processed
20  on July 18, 2017.  (ECF No. 135-2 Ex. A ¶ 4.)  A fifth Individual Plaintiff was
21  processed at the Laredo, Texas POE on July 18, 2017.  (ECF No. 135-3 Ex. B. ¶ 4.)
22  According to the Defendants, these five Individual Plaintiffs have been either referred
23  to the asylum process or placed in removal proceedings.  (ECF No. 135-1 at 1, 3.)

24      The parties have different views about what this means for the Court's
25  jurisdiction.  Defendants contend that the Individual Plaintiffs' Section 706(1) claims
26  are now moot and so the Court should dismiss the entire case.  (*Id.* at 1, 4–9.)
27  Defendants assert that the Individual Plaintiffs have received "all the relief the Court
28  could have granted" on their Section 706(1) claims: "the verifiable opportunity to be

– 10 –                                    17cv2366

1    processed as applicants for admission" at a POE along the U.S.-Mexico border

2    consistent with the INA's provisions.  (*Id.* at 3, 6.)  Plaintiffs argue that the Section

3    706(1) claims are not moot because (1) Plaintiff Beatrice Doe has not been processed

4    for admission and therefore has not "actually received" the relief and (2) the

5    Individual Plaintiffs who have been processed for admission only received "partial

6    relief."  (ECF No. 143 at 11.)  Plaintiffs further argue that all Individual Plaintiffs

7    who "crossed the U.S.-Mexico border" have a "continuing interest in pursuing a Rule

8    23 class action" for the conduct challenged in this case.  (*Id*. at 11, 14.)

9           Article III limits the jurisdiction of the federal courts to "cases" or

10   "controversies."  U.S. Const. art. III, § 2; *see also Allen v. Wright*, 468 U.S. 737, 750

11   (1984).  Because of this Article III limitation, a plaintiff must show the "irreducible

12   constitutional minimum" of standing to invoke the federal judicial power: (1) an

13   "injury in fact," (2) fairly traceable to the challenged action of the defendant, (3)

14   which is "likely" to be redressed by a favorable judicial decision.  *Lujan*, 504 U.S. at

15   560–61.  "This requirement ensures that the Federal Judiciary confines itself to its

16   constitutionally limited role of adjudicating actual and concrete disputes, the

17   resolution of which have direct consequences on the parties involved."  *Genesis*

18   *Healthcare Corp. v. Symczyk*, 569 U.S. 66, 71 (2013).  Standing frames mootness.

19   Mootness is "the doctrine of standing set in a time frame: the requisite personal

20   interest that must exist at the commencement of litigation (standing) must continue

21   throughout its existence (mootness)."  *U.S. Parole Comm'n v. Geraghty*, 445 U.S.

22   388, 397 (1980).  To avoid mootness, "an actual controversy must be extant at all

23   stages of review, not merely at the time the complaint is filed."  *Arizonans for Official*

24   *English v. Arizona*, 520 U.S. 43, 67 (1997) (internal quotation marks and citation

25   omitted).  When a case becomes moot, a federal court must dismiss it for lack of

26   jurisdiction.  *Pitts v. Terrible Herbst, Inc*., 653 F.3d 1081, 1086–87 (9th Cir. 2011).

27          To resolve Defendants' mootness challenge, the Court first considers whether

28   the Individual Plaintiffs' receipt of Section 706(1) relief could alone moot this case—

17cv2366

FER-0251

1   it does not—and, second, whether the Individual Plaintiffs' Section 706(1) claims

2   asserted on behalf of a putative class warrant a mootness exception—they do.   In

3   considering these issues, the Court keeps in mind that "[t]he party asserting mootness

4   has a heavy burden to establish that there is no effective relief remaining for a court

5   to provide." *In re Palmdale Hills Property*, 654 F.3d 868, 874 (9th Cir. 2011); *San*

6   *Luis & Delta-Mendota Water Auth. v. United States DOI*, 870 F. Supp. 2d 943, 953

7   (E.D. Cal. 2012).

8                    **1.     This Case is Not Moot**

9           Defendants' argument that this case is moot ignores organizational Plaintiff Al

10   Otro Lado's presence in this case and the Individual Plaintiffs' other requests for

11   relief.   "A case becomes moot only when it is impossible for a court to grant any

12   effectual relief whatever to the prevailing party." *Knox v. SIEU, Local 1000*, 567 U.S.

13   298, 307 (2012); *Johnson v. Rancho Santiago Cmty. College Dist.*, 623 F.3d 1011,

14   1018 (9th Cir. 2010) (internal quotations and citation omitted) (a case is moot when

15   there is no "present controversy as to which effective relief can be granted").   "[A]s

16   long as the parties have a concrete interest, however small, in the outcome of the

17   litigation, the case is not moot." *Knox*, 567 U.S. at 307–08 (quoting *Ellis v. Railway*

18   *Clerks*, 466 U.S. 435, 442 (1984)).   Setting aside whether the Individual Plaintiffs'

19   Section 706(1) claims are moot, this case is not moot given that it remains possible

20   for the Court to grant effectual relief to Al Otro Lado and the Individual Plaintiffs.

21                    **a.     Al Otro Lado**

22           Faced with Al Otro Lado's argument that it possesses Article III standing,

23   Defendants assert that they do not "yet dispute[] Al Otro Lado's Article III standing."

24   (ECF No. 145 at 8.)   Despite Defendants' assertion, the Court has an independent

25   duty to assess whether Al Otro Lado satisfies Article III's "irreducible constitutional

26   minimum" of standing.   *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990)

27   ("The federal courts are under an independent obligation to examine their own

28   jurisdiction, and standing 'is perhaps the most important of [the jurisdictional]

FER-0252

1  doctrines.'" (quoting *Allen*, 468 U.S. at 750)).  The Court readily concludes that Al
2  Otro Lado has Article III standing.

3       An organizational plaintiff like Al Otro Lado may have Article III standing to
4  sue in its own right.  *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).
5  "An organization has 'direct standing to sue [when] it show[s] a drain on its resources
6  from both a diversion of its resources and frustration of its mission.'"  *Valle Del Sol,*
7  *Inc. v. Whiting*, 732 F.3d 1006, 1018 (9th Cir. 2013) (quoting *Fair Hous. Council of*
8  *San Fernando Valley v. Roomate.com, LLC*, 666 F.3d 1216, 1219 (9th Cir. 2012)).
9  Of course, "[a]n organization cannot manufacture the injury by incurring litigation
10  costs or simply choosing to spend money fixing a problem that would not otherwise
11  affect the organization[.]"  *La Asociacion de Trabajadores de Lake Forest v. Lake*
12  *Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010).  Al Otro Lado satisfies this test.

13       Al Otro Lado is a non-profit that provides services to indigent deportees,
14  migrants, refugees, and their families in Los Angeles, California and Tijuana, Mexico.
15  Its core mission is, *inter alia*, to coordinate and provide screening, advocacy, and
16  legal representation for individuals in asylum and other immigration proceedings.
17  (Compl. ¶ 12.)  As a result of CBP officers' conduct at POEs along the U.S.-Mexico
18  border since 2016, Al Otro Lado alleges that it has diverted significant time and
19  resources from its L.A. operations and its non-refugee programs to send
20  representatives to Tijuana to provide individualized assistance and coordination of
21  legal and social services, including individual screenings and in-depth trainings to
22  educate asylum seekers about CBP's alleged conduct of denying the most basic form
23  of access to the asylum process.  (*Id.* ¶¶ 14, 16–18.)  These alleged harms are
24  sufficient for Article III standing.  *See Valle Del Sol Inc.*, 732 F.3d at 1018
25  (organization had standing because its diverted resources from its core mission to
26  address constituents' concerns); *Smith v. Pac. Props & Dev. Corp.*, 358 F.3d 1097,
27  1105 (9th Cir. 2004) (finding standing where an organization alleged that "[it] has
28  had . . . to divert its scarce resources from other efforts . . . to benefit the disabled

1    community in other ways").  Accordingly, Al Otro Lado has an interest in this case

2    that is not mooted by Defendants' post-Complaint conduct. [4]

3                    **b.      The Individual Plaintiffs' Other Claims for Relief**

4          For the Individual Plaintiffs, Defendants' mootness challenge is narrow.  It

5    concerns only one form of relief in the Complaint on only one of the Plaintiffs' four

6    claims.  (*See* Compl. ¶¶ 152–153.)  But the Individual Plaintiffs request other forms

7    of relief, including: (1) "relief prohibiting Defendants" and their agents "from

8    engaging in the unlawful policies, practices, acts and/or omissions . . . at POEs along

9    the U.S.-Mexico border" and (2) "relief requiring Defendants to implement

10   procedures to provide effective oversight and accountability in the inspection and

11   processing of individuals who present themselves at POEs along the U.S.-Mexico

12   border and indicate an intention to apply for asylum or assert a fear of persecution in

13   their home countries."  (*Id.* at 52–53.)  The Complaint also requests a declaratory

14   judgment that "Defendants' policies, practices, acts and/or omissions . . . violate" the

15   INA, the APA, the Due Process Clause of the Fifth Amendment, and/or the "duty of

16   *non-refoulement* under international law."  (*Id*. at 52.)   Defendants make no

17   meaningful attempt to argue that their agreement to process the Individual Plaintiffs

18   moots these requests for injunctive and declaratory relief.

19         Rather, Defendants' mootness argument treats these requests as irrelevant on

20   the ground that Plaintiffs' other claims fail because the Plaintiffs do not plausibly

21   allege that Defendants have a policy or practice.  But a "party's prospects of success

22   on a claim are not pertinent to the mootness inquiry."  *Looks Filmproduktionen GmbH*

23   *v. CIA*, 199 F. Supp. 3d 153, 179 (D.D.C. 2016) (internal quotations and alterations

24   _____

25        [4] "The general rule applicable to federal court suits with multiple plaintiffs is
     that once the court determines that one of the plaintiffs has standing, it need not decide
26   the standing of the others."  *Leonard v. Clark*, 12 F.3d 885, 888 (9th Cir. 1993).
     However, because the parties dispute the ability of the Individual Plaintiffs to seek
27   Section 706(1) relief for the putative class in this case, the Court does not limit its
28   mootness analysis to organizational Plaintiff Al Otro Lado.

                                   – 14 –                          17cv2366

1  omitted) (quoting *Schnitzler v. United States*, 761 F.3d 33, 39 (D.C. Cir. 2014)); *see*
2  *also Aracely, R. v. Nielsen*, No. 17-cv-1976-RC, —F. Supp. 3d—, 2018 WL 3243977,
3  at *15 (D.D.C. July 3, 2018); *Ramirez v. ICE*, 310 F. Supp. 3d 7, 18 (D.D.C. 2018).
4  Defendants' argument that Plaintiffs' other claims are moot because there is no policy
5  or practice "confuses mootness with the merits." *Chafin v. Chafin*, 568 U.S. 165, 166
6  (2013). "[J]urisdiction . . . is not defeated . . . by the possibility that the averments
7  might fail to state a cause of action[.]" *Bell v. Hood*, 327 U.S. 678, 682 (1946); *see*
8  *also Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 642–43 (2002)
9  ("It is firmly established in our cases that the absence of a valid (as opposed to
10  arguable) cause of action does not implicate subject-matter jurisdiction." (quoting
11  *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 89 (1998))); *Eubanks v. McCotter*,
12  802 F.2d 790, 793 (5th Cir. 1986) ("If federal jurisdiction turned on the success of a
13  plaintiff's federal cause of action, no such case could ever be dismissed on the
14  merits.").

15      Even on the merits, Defendants' argument cannot show that this entire case is
16  moot because it conflates whether the Complaint plausibly shows the existence of a
17  policy with whether the Complaint plausibly shows the existence of a practice. As
18  the Court later explains, although the Complaint fails to show the existence of a
19  policy, it plausibly shows the existence of a pattern or practice of denials faced by
20  some asylum seekers. Accordingly, the Court cannot find that this entire case is moot
21  by virtue of Defendants' agreement to process the Individual Plaintiffs.

22          **2.      The Section 706(1) Claims Are Not Moot**

23      Although this *case* is not moot, Defendants' narrow mootness argument
24  squarely raises the issue whether the Section 706(1) *claims* for relief asserted in the
25  Complaint are. "A lawsuit—*or an individual claim*—becomes moot when a plaintiff
26  actually receives all of the relief he or she could receive on the claim through further
27  litigation." *Chen v. Allstate Ins. Co*., 819 F.3d 1136, 1144 (9th Cir. 2016) (emphasis
28  added). The Court must consider whether the agreement moots all the Section 706(1)

1   claims asserted in this case and concludes that it does not.  Al Otro Lado asserts APA

2   claims, including a Section 706(1) claim, yet the agreement does not purport to

3   provide any relief to Al Otro Lado.  The Individual Plaintiffs also assert Section

4   706(1) claims on behalf of a putative class—a point Defendants' motion to dismiss

5   elides.  *See Pitts*, 653 F.3d at 1087 ("The distinction between issues that have become

6   moot and parties whose interest in the issue may have become moot is especially

7   visible in the context of class actions.").

8                        **a.      Al Otro Lado's APA Claims**

9       Defendants' Section 706(1) mootness challenge contains a key omission:

10   Plaintiff Al Otro Lado's Section 706(1) claim.    (Compl. ¶¶ 151, 159–164.)

11   Defendants omit discussion of any of Al Otro Lado's APA claims by assuming the

12   merits of their separate argument that Al Otro Lado fails the zone of interests test

13   applicable to claims asserted pursuant to the APA.  (ECF No. 135 at 10–11.)  The

14   Court does not find that argument to be meritorious.[5]

15       "In addition to [Article III's standing] requirements, a plaintiff bringing suit

16   under the [APA] for a violation of [a statute] must show that his alleged injury falls

17   within the 'zone of interests' that [the statute] was designed to protect."  *Cantrell v.*

18   *City of Long Beach*, 241 F.3d 674, 679 (9th Cir. 2001).  "[T]he breadth of the zone of

19   interests varies according to the provisions of law at issue[.]"  *Bennett v. Spear*, 520

20   U.S. 154, 163 (1997).  Courts "presume that a statutory cause of action extends only

21   to plaintiffs whose interests 'fall within the zone of interests protected by the law

22   invoked.'"  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129

23

24       [5] The Court recognizes that the zone of interests test does not itself implicate

25   the Court's subject matter jurisdiction, but rather whether a particular plaintiff has a
     statutory cause of action.  *Pit River Tribe v. Bureau of Land Mgmt.*, 793 F.3d 1147,

26   1155 (9th Cir. 2015) (citing *Lexmark Int'l, Inc. v. Static Control Components*, 572
     U.S. 118, 127–28 (2014)).  Because Defendants' mootness argument concerns the

27   Plaintiffs' Section 706(1) claims, however, the Court addresses whether Al Otro Lado

28   may assert any APA causes of action in this case as part of its mootness analysis.

FER-0256

1   (2014) (quoting *Allen*, 468 U.S. at 751).  The APA's "'zone of interests' test is 'not

2   meant to be especially demanding,' and a court should deny standing only 'if the

3   plaintiff's interests are *so marginally related to or inconsistent with* the purposes

4   implicit in the statute that it cannot reasonably be assumed that Congress intended to

5   permit the suit.'"  *Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1177 (9th Cir. 2004)

6   (quoting *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987)) (emphasis added).

7   The test does not require a specific congressional purpose to benefit the would-be

8   plaintiff.  *Clarke*, 479 U.S. at 399–400.  And the "benefit of any doubt goes to the

9   plaintiff."  *Match–E–Be–Nash–She–Wish Band of Pottawatomi Indians v. Patchak*,

10   567 U.S. 209, 225 (2012).

11       Defendants first argue that Al Otro Lado fails the zone of interests test because

12   it does not cite any INA provision permitting it to sue.  (ECF No. 135 at 10–11.)  This

13   argument is unavailing.  "The APA confers a general cause of action upon persons

14   'adversely affected or aggrieved by action within the meaning of the relevant statute,'

15   but withdraws that cause of action to the extent the relevant statute 'preclude[s]

16   judicial review."  *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984); see *also*

17   *Reeb v. Thomas*, 636 F.3d 1224, 1226 (9th Cir. 2011) (same); *Defenders of Wildlife*

18   *v. Tuggle*, 607 F. Supp. 2d 1095, 1098 (D. Ariz. 2009) (same).  Defendants do not

19   purport to argue that the INA itself precludes judicial review in this case.

20       Defendants' second argument is that Al Otro Lado "ha[s] failed to plead

21   sufficient facts to demonstrate that [it] has statutory standing as a legal advocacy

22   group to pursue a claim under 8 U.S.C. §§1158 or 1225."  (ECF No. 145 at 8.)

23   Defendants ground this argument in an opinion decided by a single Supreme Court

24   justice, which granted the government's application to stay a district court's

25   injunction order entered in favor of several legal organizations pending appeal.  *See*

26   *INS v. Legalization Assistance Project of L.A. Cty. Fed'n of Labor*, 510 U.S. 1301

27   (1993) (O'Connor, J.) [hereinafter "*L.A.P.*"].  *L.A.P.* concerned the Immigration

28   Reform and Control Act of 1986 ("IRCA"), a statute which created a limited amnesty

1    period for certain undocumented aliens to seek legalization.  Considering whether to

2    grant a stay, Justice O'Connor "predict[ed]" that "this Court would grant certiorari

3    and conclude that the respondents"—organizations "that provide legal help to

4    immigrants"—"are outside the zone of interests IRCA seeks to protect, and that

5    therefore they had no standing to seek the order entered by the District Court." *Id.* at

6    1302, 1305.   She reasoned that although IRCA provided a role for legal help

7    organizations during the amnesty period in the role of "so-called 'qualified designated

8    entities,'"  there was "no indication" that IRCA was addressed to the interests of the

9    organizations, but rather it was "clearly meant to protect" the interests of

10   undocumented aliens.  *Id*. at 1305 (citing 8 U.S.C. § 1255(a)(2)).  Defendants argue

11   that, like the respondent organizations who Justice O'Connor predicted the Supreme

12   Court would find as outside IRCA's zone of interests, Al Otro Lado falls outside the

13   INA's zone of interests.  The Court rejects this argument.

14        As an initial matter, the precedential value of Justice O'Connor stay opinion is

15   questionable.  Justice O'Connor recognized that her task in deciding whether to grant

16   a stay was a "difficult and speculative inquiry" that required her "to predict whether

17   four Justices would vote to grant certiorari and whether the Court would then set the

18   order aside." *L.A.P*., 510 U.S. at 1304.  In relevant part, her zone of interests answer

19   to that concededly speculative inquiry did not prove true.  The Court granted certiorari

20   and, instead of adopting Justice O'Connor's merits reasoning, it vacated the judgment

21   below and remanded to the Ninth Circuit for further consideration in light of, *inter

22   alia*, *Reno v. Catholic Social Services, Inc*., 509 U.S. 43 (1993).  *See INS v. L.A.P*.,

23   510 U.S. 1007 (1993).  Given the posture of Justice O'Connor's opinion and the

24   Supreme Court's ultimate disposition, this Court does not view *L.A.P.* as binding.  *See

25   Lozano v. City of Hazleton*, 496 F. Supp. 2d 477, 502 & n.2 (M.D. Pa. 2007)

26   ("Because of the nature of [*L.A.P.*]—a speculative opinion by one Supreme Court

27   Justice sitting as a Circuit Court Justice—and the fact the decision served only to

28   delay implementation of an order pending appeal, we do not consider that opinion as

– 18 –

17cv2366

binding, but rather as persuasive authority."), *aff'd in part and rev'd in part on other grounds by*, 620 F.3d 170 (3d Cir. 2010), *vacated and remanded* on *other grounds by*, 563 U.S. 1030 (2011).

Setting aside its questionable precedential value, the Court does not find *L.A.P.*'s reasoning helpful because *L.A.P.* concerned IRCA's zone of interests—not the INA.  This distinction is important.  Justice O'Connor's analysis cannot be isolated from the cases her opinion discussed, which narrowly interpreted standing to sue under IRCA even as applied to undocumented aliens.  For example, Justice O'Connor began her opinion with a discussion of *Reno*, decided some five months earlier and which the INS argued required vacating the district court's order.  *L.A.P.*, 510 U.S. at 1303.  In *Reno*, the Supreme Court held that "the only people who could ask for injunctive or declaratory relief under IRCA" from an alleged administrative INS "front-desking policy" of discouraging legalization applications were those to whom that policy was directly applied.  *L.A.P.*, 510 U.S. at 1303 (quoting *Reno*, 509 U.S. at 61–67).  *Reno*'s view of standing was adopted in *Ayuda, Inc. v. Reno*, 7 F.3d 246 (D.C. Cir. 1993), a decision with which Justice O'Connor viewed the decisions of the district court and Ninth Circuit in *L.A.P.* as in "conflict."  *L.A.P.*, 510 U.S. at 1305.  In *Ayuda, Inc.*, the D.C. Circuit held that "in light of the [*Reno*] analysis, it is now quite clear that the organizational plaintiffs did not have standing to raise their claims challenging INS policies or regulations that interpreted aliens' rights to legalization under IRCA."  *Ayuda, Inc.*, 7 F.3d at 251 (citing *Reno*, 509 U.S. at 61) (vacating district court orders for lack of jurisdiction).[6]  Placed in context, Justice

---

[6] The INS's petition for a writ of certiorari in *L.A.P.* is also illuminative.  The INS argued that the Ninth Circuit's treatment of the organizational standing question was "in substantial tension" with the D.C. Circuit's earlier opinion in *Ayuda, Inc*.  *L.A.P.*, Petition for Writ of Certiorari, 510 U.S. 1007 (1993) (No. 93-73), 1993 WL 13076006, at *8 (citing *Ayuda, Inc. v. Thornburgh*, 880 F.3d 1325, 1339 (D.C. Cir. 1989), *vacated on other grounds by*, 498 U.S. 1117 (1991)).  The earlier *Ayuda* opinion determined that "qualified designated entities" ("QDEs") established by

– 19 –

1  O'Connor's view of IRCA's zone of interests says much about the restrictive judicial

2  treatment of challenges concerning IRCA and little about the INA's zone of interests.

3       Courts have not interpreted the INA's zone of interests as narrowly as IRCA's

4  and non-alien plaintiffs, including organizational plaintiffs, have been permitted to

5  assert claims based on the INA.[7]  *See Hawaii v. Trump*, 859 F.3d 741, 766 (9th Cir.

6  2017) (finding that plaintiff states' "efforts to enroll students and hire faculty

7  members who are nationals from six countries" affected by president order fell within

8  zone of interests), *vacated on other grounds by Trump v. Hawaii*, 138 S. Ct. 377

9  (2017); *Doe v. Trump*, 288 F. Supp. 3d 1045, 1067–68 (W.D. Wash. 2017) (relying

10  on *Hawaii* to conclude that two organizational plaintiffs fell within the zone of

11  interests of the INA and the Refugee Act of 1980 because of their "core mission"

12  involved "[m]aking provisions for the resettlement and absorption of refugees"); *V.*

13  *Real Estate Group, Inc. v. United States Citizenship & Immigration Servs*., 85 F.

---

IRCA fell outside IRCA's zone of interests because "Congress, at most, intended the QDEs to act as intermediaries, not litigating ombudsmen.  And even if the QDEs are thought of as agents for the aliens, we doubt Congress intended the agents to have broader rights to seek judicial review than do the principals."  *Ayuda, Inc.*, 880 F.3d at 1339.

[7] Other district courts have found that organizational plaintiffs like Al Otro Lado can fall within the INA's zone of interests when it has members or clients targeted by the government action.  *See Vidal v. Nielsen*, 291 F. Supp. 3d 260, 269 n.3 (E.D.N.Y. 2018) (determining that organizational plaintiff met zone of interests test to challenge DACA rescission because it had members, clients, and employees who received DACA); *see also NAACP v. Trump*, 298 F. Supp. 3d 209, 235 (D.D.C. 2018) (determining that organizational plaintiffs fells within INA's zone of interests because "each has members who are DACA beneficiaries and whose interests consequently fall within the zone of interests regulated by the INA").  Although Al Otro Lado has not expressly invoked representative standing as the basis for its Article III standing in this case, the asylum seekers Al Otro Lado serves and represents are ostensibly its clients.  *Vidal* and *NAACP* provide a persuasive basis for the conclusion that Al Otro Lado would likely also fall within the INA's zone of interests on this basis as well.

1   Supp. 3d 1200, 1209 (D. Nev. 2015) (company could sue for USCIS's revocation of

2   an EB-5 foreign investor visa because its "interest . . is more than just marginally

3   related to the statutes' purpose since the company was actually founded with the intent

4   that its model would satisfy the requirements of the EB-5 program and bring Chinese

5   investors to the country.").

6           The specific INA provisions in this case evince a congressional intent that

7   aliens—including those arriving at POEs and those facing expedited removal—have

8   "an opportunity . . . to have the merits of his or her claim promptly assessed by

9   officers." *Castro v. United States Dep't of Homeland Sec*., 163 F. Supp. 3d 157, 161

10  (E.D. Pa. 2016) (quoting H.R. Rep. No. 104-828, at 209–10 (1996) (Conf. Rep.)); *see*

11  *also* 8 U.S.C. § 1158; 8 U.S.C. § 1225.  Al Otro Lado alleges that part of its mission

12  is to serve and represent asylum and refugee seekers.  (Compl. ¶ 12.)  In furtherance

13  of this mission, Al Otro Lado established and operates its Refugee Program in

14  Tijuana, Mexico, which services individuals who wish to seek asylum in the United

15  States.  (*Id*. ¶ 13.)  The alleged conduct of CBP officers has caused Al Otro Lado to

16  expend significant time and resources to assist asylum seekers in responding to CBP

17  officials' alleged conduct of foreclosing even the most basic aspect of the INA's

18  asylum procedures—the opportunity to be processed in the first place.  (*Id*. ¶¶ 12–

19  15.)  This Court finds Al Otro Lado's interests in this case "are related to the basic

20  purposes of the INA['s]" goal of permitting aliens to apply for asylum in the United

21  States at POEs and not so marginally related that its interests fall outside the INA's

22  zone of interests.  *Hawaii*, 859 F.3d at 766; *Doe v. Trump*, 288 F. Supp. 3d at 1067–

23  68.  Accordingly, the Court rejects Defendants' challenge to Al Otro Lado's INA-

24  based claims.

25                  **b.      The Individual Plaintiffs' Section 706(1) Claims**

26          Five of the six Individual Plaintiffs have received the requested relief from

27  Defendants' agreement to process these "class representatives and their children" at

28  POEs.  Thus, their Section 706(1) claims are moot unless an exception applies.

1  Plaintiffs contend, however, that the Section 706(1) claim of Beatrice Doe is not moot
2  because she has not "actually received" the relief provided in the agreement.  (ECF
3  No. 143 at 11.)  The Court does not share Plaintiffs' view.

4       Plaintiffs' argument relies solely on case law holding that a rejected or
5  unaccepted Rule 68 offer of judgment does not moot a plaintiff's individual claims
6  even when that offer would provide full relief.  *See Chen*, 819 F.3d at 1136; *Diaz v.*
7  *First. Am. Home Buyers Prot. Corp*., 732 F.3d 948, 954–55 (9th Cir. 2013) ("[A]n
8  unaccepted offer that would . . . fully satisf[y] a plaintiff's claim does not render that
9  claim moot.").  This is true of an unaccepted settlement offer as well.  *See Campbell-*
10 *Ewald Co. v. Gomez*, 136 S. Ct. 663, 672 (2016).

11      Defendants' agreement, however, is not a Rule 68 offer of judgment or a
12 settlement offer and thus *Chen* and *Diaz* are not directly applicable.  Even if the
13 reasoning of these cases extends to less formal offers, what is before the Court is not
14 an *offer* which Beatrice Doe has yet to accept or reject, but rather an *agreement*.  The
15 agreement permits her to be processed by CBP officials at a POE in accordance with
16 the INA and has no expiration.  The evidence shows that five of the six Individual
17 Plaintiffs were processed pursuant to the agreement and there is no basis for the Court
18 to find that Beatrice Doe will be treated any differently.  Defendants readily concede
19 that Beatrice Doe "can return to a port of entry to be processed as an arriving alien at
20 any time, should she choose to do so" pursuant to the agreement.  (ECF No. 135-1 at
21 3.)   And they "fully expect that 'she would be processed as an applicant for
22 admission[.]'"  (ECF No. 145 at 2 (quoting ECF No. 135-2 Ex. A ¶ 4).).  Beatrice
23 Doe is in no different a position than she would be with a court order compelling
24 agency action.  Accordingly, her individual Section 706(1) claim, like those of the
25 other Individual Plaintiffs, is moot unless an exception applies.

26      Even when a claim becomes moot due to subsequent events after the
27 commencement of a lawsuit, "the flexible character of the Art[icle] III mootness
28 doctrine" may warrant the exercise of jurisdiction over the claim.  *United States*

– 22 –                                    17cv2366

1    *Parole Comm'n v. Geraghty*, 445 U.S. 388, 401 (1980); *see also San Luis & Delta-*

2    *Mendota Water Auth.*, 870 F. Supp. 2d at 958 ("Even if a case is technically moot, it

3    may nevertheless be judiciable if one of three exceptions to the mootness doctrine

4    applies," including "'for wrongs capable of repetition yet evading review.'") (quoting

5    *Ctr. for Biological Diversity v. Lohn*, 511 F.3d 960, 964–66 (9th Cir. 2007)). Under

6    the "capable of repetition, yet evading review" exception, a claim is justiciable

7    notwithstanding mootness if: (1) there is "a 'reasonable expectation' that the same

8    party will confront the same controversy again" and (2) if the underlying dispute is

9    "inherently limited in duration such that it is likely always to become moot before

10    federal court litigation is completed." *W. Coast Seafood Processors Ass'n v. NRDC*,

11    643 F.3d 701, 704 (9th Cir. 2011) (quoting *Feldman v. Bomar*, 518 F.3d 637, 644

12    (9th Cir. 2008)), *id*. at 705 (quoting *Ctr. for Biological Diversity*, 511 F.3d at 965

13    (internal quotations omitted)). The parties dispute whether this exception applies.

14        Defendants argue that it does not. (ECF No. 135-1 at 8.) In Defendants' view,

15    "[t]here is no reason to anticipate that the Doe Plaintiffs . . . will return to a [POE] as

16    applicants for admission in the future, or that, upon doing so, they will not be properly

17    processed, especially considering the low percentage rate of improper processing[.]"

18    (*Id*.) It is unclear what basis there is for Defendants' assertion. Unless the Individual

19    Plaintiffs are granted asylum, there is nothing in the Complaint that suggests that they

20    will not attempt to seek asylum again and, if so, that CBP officers will not turn them

21    away from a POE. Each Individual Plaintiff has alleged that he or she does not wish

22    to return to his or her home country because of a fear of violence. Each Individual

23    Plaintiff has also alleged being turned away by CBP officials on multiple occasions

24    and a practice of such conduct. Even if Defendants are correct that the Complaint

25    fails to show a blanket policy of turning away asylum seekers at POEs, "the 'capable

26    of repetition yet evading review' exception is not so narrowly circumscribed." *San*

27    *Luis & Delta-Mendota Water Auth.*, 870 F. Supp. 2d at 960. Based on the limited

28    nature of the Court's review of the pleadings at this stage, the Court cannot say that

1  the Individual Plaintiffs' allegations do not show a reasonable expectation that they

2  would again be subjected to the conduct they have alleged experiencing.

3      Furthermore, contrary to Defendants' argument (ECF No. 135-1 at 9), the

4  putative class action nature of this case does change the Court's analysis regarding

5  the effect of their agreement.[8]  Courts are sensitive to assertions of mootness in the

6  class action context.  *See Cty. of Riverside v. McLaughlin*, 500 U.S. 44, 51–52 (1991);

7  *Sosna v. Iowa*, 419 U.S. 393, 401 (1975); *Gerstein v. Pugh*, 420 U.S. 103, 110 (1975).

8  The "capable of repetition, yet evading review" mootness exception has a particular

9  application in the class action context when the defendant's actions after the filing of

10  the complaint moot the proposed class representative's individual claims.  Courts are

11  sensitive to a defendant's tactics of "picking off lead plaintiffs" so as "to avoid a class

12  action," even when a proposed class representative's "claims are not 'inherently

13  transitory as a result of being time sensitive."  *Pitts*, 653 F.3d at 1091 (quoting *Weiss*

14  *v. Regal Collections*, 385 F.3d 337, 347 (3d Cir. 2004)).  "The end result is the same:

15  a class transitory by its very nature and one transitory by virtue of the defendant's

16  litigation strategy share the reality that both claims would evade review."  *Id*.  Even

17  if the named plaintiff in a putative class action receives "complete relief on [his or

18  her] individual claims . . . before class certification, fully satisfying those individual

19  claims, [the plaintiff] still would be entitled to seek certification."  *Chen*, 819 F.3d at

20  1142.

21      Defendants acknowledge *Pitts* and *Chen*, yet they contend that unlike the

22  defendants in those cases, they have not sought to "buy-off" the Plaintiffs in this case

23  to avoid a class action.  (ECF No. 135-1 at 9; ECF No. 145 at 4.)  However, Plaintiffs

24

---

25      [8] Central to Defendants' argument is the notion that "[t]he styling of the
Complaint as a putative class action does not change this analysis."  (ECF No. 135-1

26  at 9)  Contrary to this characterization of the Complaint, the Complaint contains class

27  action allegations and the conduct at issue is alleged to affect the putative class.
(Compl. ¶¶ 131–138 (the "class action allegations").)  Defendants have not moved to

28  strike these allegations; they remain an integral feature of the Complaint in this case.

1   seek only declaratory and injunctive relief.  The fact that Defendants have provided

2   one form of the injunctive relief solely to the "class representatives" (ECF No. 67-3

3   Ex. B) after the filing of this case is no less a potential "buy-off" strategy that

4   effectively renders transitory the claims they seek to assert on behalf of a putative

5   class.  The government could simply render moot any class action Section 706(1)

6   claims concerning the conduct at issue in this case by affording relief to any individual

7   plaintiffs who seek to challenge such conduct as soon as the case is filed and long

8   before a court could reasonably be expected to rule on a motion for class certification.

9   *See Haro v. Sebelius*, 747 F.3d 1099, 1110 (9th Cir. 2014) (determining that the

10  expiration of the plaintiff's claim one month after filing the lawsuit did not moot the

11  class's claim for injunctive relief because "the district court could not have been

12  expected to rule on a motion for class certification in that period").

13      Defendants possess the authority to direct CBP officials to process aliens who

14  present themselves at POEs along the U.S.-Mexico border in accordance with the

15  requirements of the INA and implementing regulations.  Defendants' agreement to

16  exercise that authority occurred a mere two days after the filing of the Complaint and

17  only when confronted with the possibility that Plaintiffs would file an *ex parte* request

18  for a temporary restraining order that all Individual Plaintiffs be processed at a POE.

19  (ECF No. 67-1 ¶¶ 2–7.)  Under these circumstances, the Court is convinced that the

20  Section 706(1) claims the Individual Plaintiffs assert on behalf of themselves and the

21  putative class fall within an exception from mootness.

22      **B.    Sovereign Immunity**

23      Defendants' motion to dismiss also raises the issue of sovereign immunity.

24  (ECF No. 135-1 at 21; ECF No. 145 at 1.)   "Sovereign immunity is a threshold

25  question that is sometimes described as 'jurisdictional.'"  *Forester v. Chertoff*, 500

26  F.3d 920, 925 n.5 (9th Cir. 2007) (citing *Irwin v. Dep't of Veterans Affairs*, 498 U.S.

27  89, 94 (1990)); *see also Reed v. Dep't of Homeland Sec.*, No. CV 16-7170 CJC (JC),

28  2017 WL 2701940, at *3 (C.D. Cal. May 25, 2017) ("Sovereign immunity is a

– 25 –                                    17cv2366

1     threshold issue [that] goes to the court's subject matter jurisdiction.") (quoting

2     *Cassirer v. Kingdom of Spain*, 616 F.3d 1019, 1026 (9th Cir. 2010) (en banc), *cert.*

3     *denied*, 564 U.S. 1037 (2011)).

4           Plaintiffs sue the named Defendants in their official capacity as United States

5     officers, each of whom is alleged to oversee the enforcement and administration of

6     U.S. immigration laws, including oversight of CBP. (Compl. 1–2 (caption); *id.* ¶¶

7     25–27.). "An action against an officer, operating in his or her official capacity as a

8     United States agent, operates as a claim against the United States." *Ministerio Roca*

9     *Solida v. McKelvey*, 820 F.3d 1090, 1095 (9th Cir. 2016) (citing *Farmer v. Perrill*,

10    275 F.3d 958, 963 (10th Cir. 2001)); *see also Kentucky v. Graham*, 473 U.S. 159,

11    165–66 (1985). Plaintiffs must therefore contend with the sovereign immunity of the

12    United States. *See Gilbert v. DaGrossa*, 756 F.2d 1455, 1458 (9th Cir. 1985) ("It has

13    long been held that the bar of sovereign immunity cannot be avoided by naming

14    officers and employees of the United States as defendants."); *Allen v. United States,*

15    871 F. Supp. 2d 982, 988 (N.D. Cal. 2012) (the issue of sovereign immunity "includes

16    suits against federal officers in their official capacities to compel them to act") (citing

17    *Dugan v. Rank*, 372 U.S. 609, 620 (1963)).

18         "The United States, as a sovereign, is immune from suit *unless* it has waived

19    its immunity." *Consejo de Desarrollo Economico de Mexicali, A.C. v. United States*,

20    482 F.3d 1157, 1173 (9th Cir. 2007) (emphasis added) (citing *Dep't of Army v. Blue*

21    *Fox, Inc*., 525 U.S. 255, 260 (1999)); *United States v. Mitchell*, 445 U.S. 535, 538

22    (1980)). "When the United States consents to be sued, the terms of its waiver of

23    sovereign immunity define the extent of the court's jurisdiction." *United States v.*

24    *Mottaz*, 476 U.S 834, 841 (1986) (citing *United States v. Sherwood*, 312 U.S. 584,

25    586 (1941)); *see also Cent. Sierra Envtl. Res. Ctr. v. Stanislaus Nat'l Forest*, 304 F.

26    Supp. 3d 916, 932–33 (E.D. Cal. 2018) (same) (quoting *Balser v. Dep't of Justice,*

27    *Office of U.S. Tr.*, 327 F.3d 903, 907 (9th Cir. 2003)). Thus, consistent with sovereign

28    immunity and any waiver of it, a court may only exercise jurisdiction over claims

1    against the United States within the parameters set by Congress.

2                   **1.    The APA Supplies the Relevant Waiver**

3        The APA "contains a specific waiver of the United States' sovereign

4    immunity." *Matsuo v. United States*, 416 F. Supp. 2d 982, 988 (D. Haw. 2006) (citing

5    *Bowen v. Massachusetts*, 487 U.S. 879, 891–92 (1988)).   As a general matter, the

6    APA permits suits against the United States by "[a] person suffering legal wrong

7    because of the agency action, or adversely affected or aggrieved by agency action

8    within the meaning of relevant statute." 5 U.S.C. § 702.  This portion of Section 702

9    constitutes the APA's judicial review provision and dates to the APA's original

10   enactment in 1946. *See* Administrative Procedure Act, Pub. L. No. 79-404 § 10(a),

11   60 Stat. 237, 243 (1946) (codified as amended at 5 U.S.C. § 702); *see also Navajo*

12   *Nation v. Dep't of the Interior*, 876 F.3d 1144, 1168 (9th Cir. 2017).  Claims asserted

13   pursuant to the APA must satisfy Section 702's "agency action" requirement and the

14   further requirement under Section 704 of the APA that a plaintiff must identify a

15   "final agency action" to obtain judicial review.  5 U.S.C. § 704.

16       Apart from Section 702's judicial review provision for APA claims is the

17   APA's waiver of sovereign immunity, also located in Section 702.   The waiver

18   provides that: "[a]n action in a court of the United States seeking relief other than

19   money damages and stating a claim that an agency or an officer or employee thereof

20   acted or failed to act in an official capacity . . . shall not be dismissed nor relief therein

21   be denied on the ground that it is against the United States." 5 U.S.C. § 702.  This

22   waiver of sovereign immunity was enacted as a 1976 amendment to the APA, which

23   aimed "to clear up a morass of federal sovereign immunity jurisprudence" and "aimed

24   to 'broaden the avenues for judicial review of agency action by eliminating the

25   defense of sovereign immunity in cases covered by the amendment.'" *Navajo Nation*,

26   876 F.3d at 1168 (quoting *Bowen v. Massachusetts*, 487 U.S. 879, 891–92 (1988)).

27   Unlike Section 702's judicial review provision, which is textually limited to "agency

28   action," Section 702's waiver of sovereign immunity contains no such textual

– 27 –                                          17cv2366

1    limitation.  5 U.S.C. § 702; *see also Navajo Nation*, 876 F.3d at 1171.  Accordingly,

2    as amended, the APA "waives sovereign immunity broadly for all causes of action

3    that meet its terms" irrespective of whether the claims satisfy the APA's requirements

4    for judicial review of an agency action.  *Navajo Nation*, 876 F.3d at 1172; *see also*

5    *The Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 525 (9th Cir. 1989)

6    (Section 702 is "an unqualified waiver of sovereign immunity in actions seeking

7    nonmonetary relief").[9]  Thus, a plaintiff need only seek nonmonetary relief against

8    the government in order to avail himself of the APA's waiver of sovereign immunity.

9    In this case, Plaintiffs invoke the APA's waiver and seek only non-monetary relief

10   against Defendants, based on claims regarding the purported actions and failures to

11   act of CBP officials and the named Defendants.  (Compl. ¶ 10; *id.* at 52–53.)

12   Accordingly, Plaintiffs' claims for relief fall squarely within the broad waiver of

13   sovereign immunity reflected in Section 702.

14        Because the APA supplies the relevant waiver of the sovereign immunity in

15

---

16        [9] There is Ninth Circuit precedent which suggests that the APA's sovereign
     immunity waiver is tethered to the APA's requirements for judicial review of APA
17   causes of action.  *See Gallo Cattle Co. v. U.S. Dep't of Agric.*, 159 F.3d 1194, 1198
18   (9th Cir. 1998) (determining that the APA's waiver of sovereign immunity contains
     several limitations," including Section 704's limitations to review of only "final
19   agency action" and "agency action otherwise reviewable by statute"); *Tucson Airport
     Auth. v. Gen. Dynamics Corp.*, 136 F.3d 641, 645 (9th Cir. 1998) (referring to
20   Sections 702 and 704 to conclude that "the APA waives sovereign immunity for [a
21   plaintiff's] claims only if three conditions are met: (1) its claims are not for money
     damages, (2) an adequate remedy for its claims is not available elsewhere and (3) its
22   claims do not seek relief expressly or impliedly forbidden by another statute.").  In
23   the face of Ninth Circuit precedent that grafts the APA's review requirements onto
     Section 702's waiver, the *Navajo Nation* panel attempted to clarify that the APA's
24   waiver exists independently of the APA's requirements for APA causes of action.  *See*
25   *Navajo Nation*, 876 F.3d at 1171; *id.* at 1172 (summing up conclusion as "the second
     sentence of § 702 waives sovereign immunity broadly for all causes of action that
26   meet its terms, while § 704's 'final agency action' limitation applies only to APA
27   claims").  This Court finds *Navajo Nation*'s reading of Section 702 persuasive and
28   appropriate, and applies it in this case.

1   this case, the Court can easily reject Defendants' argument that "Congress has not

2   waived sovereign immunity to create a private right of action for a *per se* 'pattern or

3   practice' claim against federal law enforcement."  (ECF No. 135-1 at 21; ECF No.

4   145 at 1.)  Setting aside that the Complaint does not separately plead such a claim and

5   that the Plaintiffs disavow bringing one (*see generally* Compl.; *see also* ECF No. 143

6   at 19 n.6), Defendants' argument fails under *Navajo Nation*.  Because Plaintiffs'

7   claims fall within the scope of Section 702's waiver, they do not need to identify a

8   separate waiver of sovereign immunity for "pattern or practice" claims against the

9   government.  *See Navajo Nation*, 876 F.3d at 1172 ("§ 702 waives sovereign

10   immunity broadly for all causes of action that meet its terms[.]").  To the extent

11   Defendants are arguing that pattern or practice claims are not cognizable under the

12   APA, that is an issue that concerns the sufficiency of such claims, not whether the

13   United States or its officers are immune from such claims.  *See id.*; *see also Trudeau*

14   *v. FTC*, 456 F.3d 178, 187 (D.C. Cir. 2006) (concluding that Section 702's waiver of

15   sovereign immunity applies regardless of whether the challenged conduct itself

16   satisfies the APA's review provisions).

17                    **2.    The APA's Waiver Extends to Plaintiffs' ATS Claims**

18          The APA's waiver of sovereign immunity also resolves one of Defendants'

19   challenges to Plaintiffs' ATS claims.  The Complaint alleges ATS claims against the

20   Defendants for "violation of the *non-refoulement* doctrine" under international law.

21   (Compl. ¶ 180.)  Defendants argue that the ATS "does not constitute a waiver of

22   sovereign immunity and therefore does not create a cause of action against the

23   government."  (ECF No. 135-1 at 11–12 n.5.)[10]  Defendants thus appear to suggest

24

_____

25          [10]  Defendants also argue that although Plaintiffs refer to the "duty of *non-*

26   *refoulement*" as the basis for their ATS claims, Plaintiffs "fail to explain how it

     imposes relevant legal obligations on the government beyond the obligations captured

27   in 8 U.S.C. § 1225(b)(1)(A)(ii)."  (ECF No. 135-1 at 12 n.5.)  To the extent that

28   Defendants contend that the ATS claims must be dismissed because a remedy is

     available under domestic law, the Court rejects that argument.  "Contrary to

                                        – 29 –                           17cv2366

1   that this Court lacks jurisdiction over the ATS claims asserted against the Defendants

2   as a matter of sovereign immunity.

3          Defendants are correct that the ATS does not waive the sovereign immunity of

4   the United States.  The ATS provides only that "the district courts shall have original

5   jurisdiction of any civil action by an alien for a tort only, committed in violation of

6   the law of nations or a treaty of the United States."  28 U.S.C. § 1350.  The text of the

7   ATS says nothing about sovereign immunity and, thus, it cannot be construed as a

8   waiver.  *See Lane v. Pena*, 518 U.S. 187, 192 (1996) (internal citations omitted)

9   (stating that "[a] waiver of the Federal Government's sovereign immunity must be

10  unequivocally expressed in statutory text and will not be implied").  Specifically, the

11  ATS does not waive the government's sovereign immunity.  *Tobar v. United States*,

12  639 F.3d 1191, 1196 (9th Cir. 2011) ("[T]he Alien Tort Statute has been interpreted

13  as a jurisdiction statute only—it has not been held to imply any waiver of sovereign

14  immunity.").

15         However, at least one appellate court has suggested that the APA is "arguably

16  available" as a waiver of sovereign immunity for claims asserted against federal

17  officers sued in their official capacity for nonmonetary relief.  *See Sanchez-Espinoza*

18  *v. Reagan*, 770 F.2d 202, 207 (D.C. Cir. 1985) (recognizing the possibility that ATS

19  suits seeking non-monetary relief may proceed against the Secretary of Defense and

20  the Director of the CIA under the APA's waiver of sovereign immunity).  The D.C.

21  Circuit ultimately declined to apply the APA's waiver to the ATS claims in *Sanchez-*

22  *Espinoza* because it did not believe that the alien plaintiffs in that case who challenged

23

24  defendants' argument, there is no absolute preclusion of international law claims by

25  the availability of domestic remedies for the same alleged harm."  *See Hawa Abdi*

26  *Jama v. United States INS*, 22 F. Supp. 2d 353, 364 (D.N.J. 1998).  Defendants raise
    no other arguments showing that dismissal of Plaintiffs' ATS claims is warranted and

27  neither side has briefed the sufficiency of the claims.  Accordingly, the Court
    expresses no further view on them in this opinion aside from the sovereign immunity

28  issue.

1   "support for military operations" were entitled to the discretionary declaratory and

2   injunctive relief available under the APA in an area "so sensitive a[s] foreign affairs."

3   *Id.* at 208.  The notion that the APA's waiver of sovereign immunity should not apply

4   to permit equitable relief in military matters or sensitive foreign affairs cases has been

5   echoed by other courts.  *See, e.g., Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1, 41–43

6   (D.D.C. 2010) (questioning "whether the APA should be interpreted as a waiver of

7   sovereign immunity for an ATS claim like plaintiff's" against the U.S. Secretary of

8   Defense and Director of the CIA which requested "discretionary relief that would

9   prohibit military and intelligence activities against an alleged enemy abroad").

10      This case, however, does not involve military matters, nor do Defendants argue

11  that it involves sensitive foreign affairs.  At least one district court has applied the

12  APA's waiver of sovereign immunity for international law claims asserted against the

13  U.S. government for non-monetary relief in such circumstances.  *See Rosner v. United*

14  *States*, 231 F. Supp. 2d 1202, 1211–12 (S.D. Fla. 2002).  In line with the APA's broad

15  waiver of sovereign immunity for claims against the United States for nonmonetary

16  relief, the Court finds that the APA's unqualified waiver of sovereign immunity

17  supplies a waiver for the ATS claims asserted in this case.  *See* 5 U.S.C. § 702; *Navajo*

18  *Nation*, 876 F.3d at 1171.

19      **C.    The Sufficiency of the APA Claims**

20      The Complaint asserts two APA claims against the Defendants.  First, the

21  Complaint raises Section 706(1) claims "to compel agency action unlawfully

22  withheld or unreasonably delayed."  (Compl. ¶ 152 (citing 5 U.S.C. § 706(1).)  The

23  basis of these claims is CBP officials' alleged "failure to take actions mandated" by

24  various provisions of the INA and implementing regulations.  (*Id.* ¶ 153; *see also id.*

25  ¶ 157 (referring to "Defendants' repeated and pervasive failure to act").)  The

26  Complaint also alleges a Section 706(2) claim to "hold unlawful and set aside agency

27  action."  5 U.S.C. § 706(2).  The basis of this claim is that "CBP officials have acted

28  in excess of their statutorily proscribed authority and without observance of the

– 31 –                                                17cv2366

1    procedures required by law in violation of the APA." (*Id.* ¶ 154 (citing 5 U.S.C.

2    §§706(2)(C), (D)), *id.* ¶ 155 (alleging that "in turning Class Plaintiffs . . . away at

3    POEs along the U.S.-Mexico border without following the procedures mandated by

4    the INA, CBP officials have acted in excess of the authority granted them by

5    Congress"); *id.* ¶ 157 (referring to Defendants' "action taken in excess of their

6    authority").)

7           In moving to dismiss, Defendants argue that (1) Plaintiffs' "only well-pleaded"

8    claims are the Section 706(1) claims and (2) Plaintiffs have failed to identify a "final

9    agency action" necessary to seek review of Defendants' alleged policy pursuant to

10   Section 706(2). (ECF No. 135-1 at 4–9 (mootness for Section 706(1) claims), 11–20

11   (failure to state a Section 706(2) claim).) In opposition, Plaintiffs argue that they have

12   pleaded Section 706(1) claims and not brought a Section 706(2) claim. (ECF No. 143

13   at 19–21.) Independently of their Section 706(1) claims, however, the Plaintiffs

14   contend that they have plausibly pleaded that Defendants have "an illegal policy or

15   practice." (*Id.* at 21–23.) To resolve the parties' dispute, the Court first outlines the

16   APA's framework for judicial review of agency action. The Court then considers the

17   sufficiency of Plaintiffs' Section 706(1) claims. Finally, the Court determines that

18   Defendants' alleged policy must be reviewed pursuant to Section 706(2) and

19   concludes that Plaintiffs have failed to identify a final agency action subject to judicial

20   review.

21          **1.    Judicial Review of Agency Action Pursuant to the APA**

22          As a general matter, the APA provides that "[a] person suffering legal wrong

23   because of agency action, or adversely affected or aggrieved by agency action within

24   the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. §

25   702. This judicial review provision "is not so all-encompassing as to authorize . . .

26   judicial review over everything done by an administrative agency." *Wild Fish*

27   *Conservancy v. Jewell*, 703 F.3d 791, 800–01 (9th Cir. 2013). The APA confines

28   what is subject to judicial review by limiting review to an "agency action," which is

– 32 –                                                    17cv2366

1    in turn defined to only "include[] the whole or a part of an agency rule, order, license,

2    sanction, relief, or the equivalent or denial thereof, or failure to act."  5 U.S.C. §

3    551(13); 5 U.S.C. § 701(b)(2) (incorporating Section 551's definition of "agency

4    action").

5         The APA also places limits on when agency action is subject to judicial review.

6    "Agency action made reviewable by statute and final agency action for which there

7    is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704;

8    *see also Navajo Nation*, 876 F.3d at 1171 ("[Section] 704's requirement that to

9    proceed under the APA, agency action must be final or otherwise reviewable by

10   statute is an independent element without which courts may not determine APA

11   claims.").  "Where no other statute provides a private right of action, the 'agency

12   action' complained of must be 'final agency action.'" *Norton v. S. Utah Wilderness*

13   *Alliance*, 542 U.S. 55, 61–62 (2004) [hereinafter "*SUWA*"] (quoting 5 U.S.C. § 704);

14   *see also Fairbanks N. Star Borough v. U.S. Army Corps of Eng'rs*, 543 F.3d 586, 591

15   (9th Cir. 2008) (referring to "final agency action" as a "jurisdictional requirement

16   imposed by statute"); *Ukiah Valley Med. Ctr. v. FTC*, 911 F.2d 261, 266 (9th Cir.

17   1990) (same).

18        Section 706 of the APA further defines the "scope of review" for an agency

19   action that is subject to judicial review.  As a general matter, a court "shall decide all

20   relevant questions of law" and "interpret constitutional and statutory provisions" as

21   part of its review of agency action "[t]o the extent necessary to decision and when

22   presented."  5 U.S.C. § 706.  In addition, a court may provide relief from agency

23   action in one of two ways.  Under Section 706(1), a court "shall . . . compel agency

24   action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1).  Under

25   Section 706(2), a court "shall hold unlawful and set aside agency action . . . found to

26   be," *inter alia*, "in excess of statutory jurisdiction, authority, or limitations, or short

27   of statutory rights" or "without observance of procedure required by law."  5 U.S.C.

28   § 706(2).  A challenge to an agency's alleged failure to act is more appropriately

FER-0273

1    channeled through Section 706(1).  *See Rosario v. United States Citizenship*, No.

2    C15-0813JLR, 2017 WL 3034447, at *7 n.6 (W.D. Wash. July 18, 2017); *Leigh v.*

3    *Salazar*, No. 3:13-cv-00006-MMD-VPC, 2014 WL 4700016, at *4 (D. Nev. Sept. 22,

4    2014) (construing a Section 706(2) claim regarding an agency's alleged failure to act

5    as in fact a Section 706(1) claim).  Section 706(2) is typically reserved for completed

6    agency actions whose validity can be assessed according to the bases for setting aside

7    agency action set forth in that provision.  *See Nw. Envtl. Defense Ctr. v. Bonneville*

8    *Power Admin.*, 477 F.3d 668, 680–81 & n.10 (9th Cir. 2007).  With these general

9    principles in mind, the Court turns to the APA claims in this case.

10          **2.     The Complaint States Section 706(1) Claims for "Unlawfully**

11                 **Withheld" Access to the U.S. Asylum Process**

12          The Court turns first to the Individual Plaintiffs' Section 706(1) claims that

13   CBP officials have failed permit asylum seekers to access the U.S. asylum process.

14   Defendants concede that the Individual Plaintiffs' Section 706(1) claims are "well-

15   pleaded." (ECF No. 135-1 at 4–5; ECF No. 145 at 1.)  Defendants, however, suggest

16   that such claims are not cognizable insofar as they concern a putative class of other

17   asylum seekers who have experienced the alleged pattern of denials.  Plaintiffs in turn

18   argue that they have stated Section 706(1) claims for Defendants' alleged "failure to

19   act" and that they can challenge a pattern of violations.  (ECF No. 143 at 19–20, *id*.

20   at 19 n.6.)  Because Section 706(1) claims may be dismissed if the plaintiff fails to

21   show an entitlement to agency action that a court can properly compel, the Court

22   addresses the sufficiency of the Complaint's Section 706(1) claims as they pertain to

23   the Individual Plaintiffs and the putative class.[11]  *See Alvarado v. Table Mountain*

24   *Rancheria*, 509 F.3d 1008, 1019–20 (9th Cir. 2007) ("a Section 706(1) claim may be

25   dismissed for lack of jurisdiction" when plaintiff fails to show he is entitled to relief

26

27   _____

28          [11] Defendants do not raise an issue as to whether Al Otro Lado has plausibly
     stated a claim for Section 706(1) relief.

1  under the provision); *Gros Ventre Tribe v. United States*, 469 F.3d 801, 814 (9th Cir.

2  2006).

3          **a.    The Individual Plaintiffs**

4        Section 706(1) grants a court authority to "compel agency action unlawfully

5  withheld."  5 U.S.C. §706(1).  Under this provision, a court's "ability to 'compel

6  agency action' is carefully circumscribed to situations where an agency has ignored

7  a specific legislative command." *Hells Canyon Pres. Council v. United States Forest*

8  *Serv.*, 593 F.3d 923, 932 (9th Cir. 2010).  When a plaintiff challenges an agency's

9  alleged failure to act, that challenge must satisfy certain limitations.  The APA's use

10  of the phrase "failure to act" means "a failure to take an *agency action*—that is, a

11  failure to take one of the agency actions (including their equivalents) earlier defined

12  in § 551(13)," *i.e.*, an "agency rule, order, license, sanction, or relief." *SUWA*, 542

13  U.S. at 62–63; *see also* 5 U.S.C. §551(13).  Thus, a Section 706(1) claim "can only

14  proceed where a plaintiff asserts that an agency failed to take a *discrete* agency action

15  that it is *required* to take." *SUWA*, 542 U.S. at 64 (emphasis in original).

16        These requirements to obtain Section 706(1) relief from a court are mutually

17  reinforcing.  The discrete agency action "limitation" precludes a "broad programmatic

18  attack" against an agency.  *Id.*  As such, it "protect[s] agencies from undue judicial

19  interference with their lawful discretion" and "avoid[s] entanglement in abstract

20  policy disagreements which courts lack both expertise and information to resolve."

21  *Id.* at 66–67.  Thus, a plaintiff "cannot seek wholesale improvements of [a] program

22  by court decree" under the guise of a Section 706(1) claim. *Lujan v. Nat'l Wildlife*

23  *Fed'n*, 497 U.S. 871, 891 (1990); *Public Lands for the People, Inc. v. U.S. Dep't of*

24  *Agric.*, 733 F. Supp. 2d 1172, 1183 (E.D. Cal. 2010) ("This interpretation effectively

25  precludes enforcement of broad statutory mandates under section 706(1), insofar as a

26  broad mandate typically is not one that requires discrete agency action.").  The

27  "limitation to required agency action rules out judicial direction of even discrete

28  agency action that is not demanded by law." *SUWA*, 542 U.S. at 65.  Because of that

         17cv2366

1    limitation, courts "have no authority to compel agency action merely because the

2    agency is not doing something we may think it should do." *Zixiang Li v Kerry*, 710

3    F.3d 995, 1004 (9th Cir. 2013) (Smith, M.D., J.). Thus, a plaintiff seeking relief under

4    Section 706(1) must identify an actual legal obligation for the agency to take some

5    action. *Id*.

6         The gravamen of Plaintiffs' Section 706(1) claims is that CBP officials failed

7    to take actions that the INA requires when a noncitizen asserts an intent to seek

8    asylum. The Complaint grounds these claims in various statutory and regulatory

9    provisions, including 8 U.S.C. § 1225(a)(1)(3), 8 U.S.C. § 1225(b)(1)(A)(ii), 8 U.S.C.

10   § 1225(b)(2)(A), and 8 C.F.R. § 235.3(b)(4). (Compl. ¶¶ 104–121, 153.)[12] There is

11   no dispute between the parties regarding the sufficiency of the Individual Plaintiffs'

12   Section 706(1) claims under these provisions. Defendants agree that "APA relief

13   under section 706(1)" is "an appropriate remedy" for the failures to act the Individual

14   Plaintiffs allege. (ECF No. 145 at 1.)[13] These concessions buttress the Court's

15

16        [12] The Complaint's Section 706(1) claim invokes 8 U.S.C. § 1158(a)(1).

17   (Compl. ¶ 153.) The Court observes that it likely could not compel relief for this
     statutory provision. 8 U.S.C. § 1158(a)(1) does not identify any specific obligations

18   placed on an immigration officer and, therefore, may not serve as the basis for Section
     706(1) relief. *See Public Lands for the People, Inc.*, 733 F. Supp. 2d at 1183

19   ("[W]here a statutory directive does not require action, that statute may be so 'broad'
     that it cannot be enforced under section 706(1)[.]"). Plaintiffs do not invoke 8 U.S.C.

20   § 1158 in discussing the sufficiency of their Section 706(1) claims and so the Court
     deems any claims premised on it as waived. The Complaint also invokes 8 C.F.R. §

21   235.4, a regulation which provides that "[t]he alien's decision to withdraw his or her

22   application admission must be made voluntarily[.]" (Compl. ¶ 153.) As the Court
     discusses separately, Plaintiffs cannot seek Section 706(1) relief with respect to this

23   regulation and any Section 706(1) claims seeking to compel agency action based on

24   it are subject to dismissal.

25

26        [13] However, Defendants argue that because the parties agree on what the law

27   requires, "Plaintiffs have failed to identify any legal dispute between the parties," and
     thus there is no "live case or controversy." (ECF No. 135-1 at 19 & n.9.) Defendants'

28   argument is an inartful attempt to attack Plaintiffs' Article III standing. To have

FER-0276

1    conclusion that Plaintiffs have stated Section 706(1) claims for discrete and legally

2    required agency actions.

3    **b.    The Putative Class and Practice Allegations**

4    A salient aspect of the Complaint are the allegations that there is a "practice"

5    of CBP officials refusing to permit asylum seekers who present themselves at POEs

6    along the U.S.-Mexico border to access the asylum process in the United States.  (*See*

7    *generally* Compl.)   Plaintiffs' Section 706(1) claims incorporate these allegations.

8    (*Id.* ¶ 157 ("Defendants' repeated and pervasive failure to act . . ., which denied Class

9    Plaintiffs access to the statutorily prescribed asylum process . . . mandates relief under

10   the APA."); *id.* ¶ 163 (alleging that "Defendants' conduct and practices, as alleged in

11   this Complaint, violate the APA.").)   Defendants primarily take issue with these

12   pattern allegations as a matter of sovereign immunity.   As the Court has already

13   concluded, that argument lacks merit.   Even so, Defendants' argument that there is

14   "no cause of action" for pattern or practice claims raises a different issue: whether

15   and how pattern and practice claims are cognizable under the APA.

16   Two courts have considered this issue in the context of Section 706(1) claims

17   based on an agency's alleged failure to act.  These courts concluded that pattern and

18   practice challenges to an agency's alleged failure to act are not legally cognizable

19   under the APA.  *See Californians v. United States EPA*, No. C 15-3292 SBA, 2018

20   WL 1586211, at *19 (N.D. Cal. Mar. 30, 2018) (dismissing separately pleaded claim

21

22   _____

22   standing, a plaintiff must allege: (1) an injury in fact (2) "fairly traceable to the

23   challenged action of the defendant" (3) that may be "redressed by a favorable

23   decision" from a court.  *Lujan*, 504 U.S. at 560−61 (internal citations and quotations

24   omitted).  The Complaint plainly shows that the Plaintiffs have standing based on the

25   injuries caused by CBP officials at POEs along the U.S.-Mexico border in violation

25   of the INA and its implementing regulations.  This Court has the authority to redress

26   those injuries.  *See* 5 U.S.C. § 706(1).  The parties' apparent agreement in their legal

27   memoranda submitted to this Court on what the INA and its implementing regulations

27   require cannot vitiate Plaintiffs' standing based on the harms resulting from CBP

28   officials' alleged violations of those provisions.

– 37 –                                    17cv2366

against EPA for an alleged pattern or practice of failing to timely act on administrative complaints); *Del Monte Fresh Produce N.A., Inc. v. United States*, 706 F. Supp. 2d 116 (D.D.C. 2010) (dismissing claim against FDA for an alleged unlawful pattern and practice of delay in sampling and inspecting food imported by plaintiff). The reasoning underlying these conclusions turns on Section 706(1)'s discrete agency action limitation. *See Californians*, 2018 WL 1586211, at *19 (citing *Lujan*, 497 U.S. at 891; *SUWA*, 542 U.S. at 66–67); *Del Monte*, 706 F. Supp. 2d at 119 (citing *SUWA*, 542 U.S. at 64, 66–67). As the Court has previously discussed, that limitation precludes a plaintiff from using Section 706(1) to launch a "programmatic attack" or seek "wholesale improvement" of an agency's procedures. *SUWA*, 542 U.S. at 64. Both the *Del Monte* and *Californians* courts determined that the "pattern or practice" claims in those cases were impermissible attacks on the relevant agency.

For example, in *Del Monte*, the court concluded that the plaintiffs could not pursue a claim against the FDA for its alleged pattern and practice of not inspecting Del Monte products within a reasonable time period. The *Del Monte* court reasoned that such a claim would require the court to "consider the procedures by which the FDA inspects samples and makes decisions as to their suitability for import" as a general matter. *Del Monte*, 706 F. Supp. 2d at 119. As such, the court would have engaged in "broad review of agency operations" of "just the sort of 'entanglement' in daily management of the agency's business that the Supreme Court has instructed is in appropriate." *Id*. The *Del Monte* plaintiff never challenged, nor sought relief for specific instances of the FDA's alleged failure to act or unreasonable delay in taking action despite referring to several such instances. *Id.* at 120 n.6. In *Californians*, the court similarly determined that the plaintiffs' separately pleaded pattern and practice claim against "the EPA's general practice in handling [administrative] complaints, as opposed to seeking relief on a specific complaint" was "in effect" "a programmatic attack" on the EPA's procedures and therefore "impermissible." *Californians*, 2018 WL 1586211, at *19. The court, however, reached this conclusion even as it

1    determined that the plaintiffs' other five claims "seek[ing] relief based on the EPA's

2    failure to act on each of the Plaintiffs' respective [administrative] complaints"

3    "clearly satisf[ied] the discrete agency action requirement."  *Id*.  *Del Monte* and

4    *Californians*, as well as their reliance on *SUWA* and *Lujan*, caution this Court to take

5    a closer look at the practice allegations in this case to ensure that they do not constitute

6    an impermissible broad-based programmatic attack against CBP.

7         Plaintiffs assert that they have not "attempt[ed] to bring a so-called 'pattern or

8    practice' claim as an independent cause of action."  (ECF No. 143 at 19 n.6.)  This

9    assertion is supported by the Complaint, which does not facially plead independent

10   Section 706(1) claims for Defendants' alleged practice of denying asylum seekers

11   who present themselves at POEs along the U.S.-Mexico border access to the asylum

12   process.  Instead of raising an independent pattern or practice claim, the Section

13   706(1) claims incorporate the practice allegations as part of Plaintiffs' request for

14   relief from "Defendants' repeated and pervasive failure to act."  (Compl. ¶ 157.)

15   Plaintiffs challenge not only alleged agency failures to act in their particular cases,

16   they challenge CBP officials' failures to act experienced by other individuals.

17   (*Compare id.* ¶¶ 39–82 (allegations of each Individual Plaintiff's experiences) *with*

18   *id.* ¶¶ 83, 85–91, 96(a)–(d), 97, 98(b), (d), 99, 100, 101(a)–(e), 102 (allegations that

19   "CBP officials have systematically denied numerous other asylum seekers access to

20   the asylum process") *and id.* ¶¶ 131–138 (setting forth "class action allegations").)

21   Neither *Del Monte*, which involved an attempt to bring a freestanding pattern or

22   practice claim, nor *Californians*, which involved an attempt to plead a pattern or

23   practice claim independently of claims targeting discrete agency actions, is thus on

24   point.

25        The Court does not view the incorporation of these pattern allegations as an

26   impermissible "programmatic" attack.  Unlike this case, *SUWA*, *Lujan*, *Del Monte*,

27   and *Californians*, did not involve Section 706(1) claims asserted on behalf of a

28   putative class of individuals.  The Section 706(1) relief is no less discrete and lawfully

1    required simply because it is requested on behalf of a putative class.  *See Ramirez*,

2    310 F. Supp. 3d at 21 ("Defendants confuse aggregation of similar, discrete purported

3    injuries—claims that many people were injured in similar ways by the same type of

4    agency action—for a broad programmatic attack.") (rejecting challenge to Section

5    706(1) relief sought on behalf of class).  This conclusion is reinforced by the fact that

6    Section 706(1) claims to compel agency action may be asserted on behalf of a class.

7    *See, e.g., Vietnam Veterans of Am. v. CIA*, 811 F.3d 1068, 1971 (9th Cir. 2016)

8    (affirming district court preliminary injunction in a case involving Section 706(1)

9    claims asserted on behalf of a class of all current or former members of the armed

10   forces who were test subjects in certain government programs during their service);

11   *Ramirez*, 310 F. Supp. 3d at 21; *Venantius Nkafor Ngwanya v. Gonzales*, 376 F.

12   Supp. 2d 923, 925 (D. Minn. 2005) (approving settlement in a class action suit

13   involving allegations that federal immigration agencies improperly administered the

14   system by which asylees become lawful permanent residents).

15         Defendants suggest that Section 706(1) relief is not available on a class-wide

16   basis, arguing that "Plaintiffs 'pattern or practice' allegations are too speculative to

17   otherwise establish a live case or controversy" and, thus, "the Court should dismiss

18   any 'pattern or practice' claims under Rule 12(b)(1)."  (ECF No. 135-1 at 22, 24.)

19   Central to this argument is Defendants' contention that "Plaintiffs have not alleged

20   that all CBP officers at [POEs] always deny asylum seekers access to the asylum

21   process." (*Id*. at 24.)  Like Defendants' misguided attack on the Individual Plaintiffs'

22   Article III standing based on the parties' agreement about what the INA requires,

23   Defendants' targeting of the pattern allegations as "too speculative" to establish a

24   "live case or controversy" misses the mark.

25         Defendants readily concede that the Complaint identifies incidents in which

26   asylum seekers who presented themselves at POEs along the U.S.-Mexico border

27   have been denied access to the asylum process.  (ECF No. 135-1 at 24.)  Even in the

28   absence of Defendants' concession, the Complaint incorporates numerous reports

1    from non-governmental organizations operating in the U.S.-Mexico border region,

2    which document hundreds of examples of asylum seekers who CBP officials denied

3    access to the U.S. asylum process.  (Compl. ¶¶ 37–38, 96–102.)  While Defendants

4    may seek to minimize those allegations by selectively casting doubt on the reliability

5    of those portions of the reports that reflect negatively on CBP and by characterizing

6    the reports as showing only "an alleged 1.6% denial rate," (ECF No. 135-1 at 14), the

7    volume of denials is irrelevant to whether the Complaint concretely alleges that other

8    individuals have been subjected to the same alleged failures to act by CBP officials.

9    The Complaint plainly alleges such failures, which the Court is required to take as

10   true at this stage.  Because the Individual Plaintiffs have standing in their own right

11   to seek Section 706(1) relief to compel the Defendants to inspect and process them

12   for admission, they may request that relief for a putative class of others asylum

13   seekers who have allegedly experienced the same failures to act.  *See O'Shea v.*

14   *Littleton*, 414 U.S. 488, 494 (1974).  Accordingly, the Court rejects Defendants'

15   challenge to the Complaint's practice allegations, which are merely a feature of the

16   class action nature of this case.

17            **3.     The Complaint Fails to State a Section 706(1) Claim for Relief**

18                        **Pursuant to 8 C.F.R. § 235.4**

19        Although the Complaint states Section 706(1) claims regarding the alleged

20   failures of CBP officials to permit the Individual Plaintiffs to access the U.S. asylum

21   process, certain Individual Plaintiffs also seek relief regarding alleged coercion by

22   CBP officials.  As the Court has discussed, all Plaintiffs argue that they only press

23   Section 706(1) claims to compel agency action unlawfully withheld.  (ECF No. 143

24   at 19.)  The Court will therefore consider these Plaintiffs' coercion allegations within

25   the Section 706(1) framework.

26        Plaintiffs A.D., B.D., and C.D. each allege that on of one of the occasions they

27   sought asylum, CBP officials coerced them to into signing documents which stated

28   that they lacked a fear of persecution.  (Compl. ¶¶ 42–43, 50–51, 56–58.)  A.D. and

C.D. further allege that CBP officials forced them to recant their fears in video recorded statements.  (*Id.* ¶¶ 42–43, 56–58.)  They further refer to their allegations regarding CBP's alleged coercion of certain Individual Plaintiffs in discussing their Section 706(1) claims.  (ECF No. 143 at 20.)  Both sides further agree that "the law requires an alien's decision to withdraw his or her application for admission be voluntary" under 8 C.F.R. § 235.4.  (ECF No. 135-1 at 20; ECF No. 143 at 20.)  That the parties agree on the text of the INA's provisions and certain implementing regulations, however, does not mean that the Court in fact has authority to provide Section 706(1) relief based on 8 C.F.R. § 235.4.  The Court concludes that it does not.

The Court has the authority to compel an agency action pursuant to Section 706(1) only when there is "a specific, unequivocal command" placed on the agency to take a "discrete agency action," and the agency has failed to take that action. *SUWA*, 542 U.S. at 63–64.  The obligation placed on the agency action must be "so clearly set forth that it could traditionally have been enforced through a writ of mandamus." *Hells Canyon Pres. Council*, 593 F.3d at 932.  The action must be a "precise, definite act." *Id.*  The only provision Plaintiffs cite in the Complaint and their opposing papers regarding the alleged coercion of withdrawal statements is 8 C.F.R. § 235.4, a regulation which states that "[t]he alien's decision to withdraw his or her application [for admission] must be made voluntarily[.]"  8 C.F.R. § 235.4. This language is an insufficient basis for the Court to grant any Section 706(1) relief pursuant to the regulation.

Although the clear objective of 8 C.F.R. § 235.4 is to ensure that an alien's withdrawal of an application for admission is made voluntarily, the regulation's plain text "does not instruct [the Defendants] to do anything." *San Luis Unit Food Producers v. United States*, 709 F.3d 798, 807 (9th Cir. 2013).  The regulation does not require CBP officers to determine whether a withdrawal was made voluntarily, and it does not specify what CBP officers must do if a withdrawal was not.  The regulation thus "leaves [the agency] a great deal of discretion in deciding how to

FER-0282

1    achieve" its objective and, in turn, lacks "the clarity necessary to support judicial

2    action under § 706(1)."   *SUWA*, 542 U.S. at 66; *see also San Luis Unit Food*

3    *Producers*, 709 F.3d at 803 ("Statutory goals that are 'mandatory as to the object to

4    be achieved; but that leave the agency 'with discretion in deciding how to achieve'

5    those goals are insufficient to support a 'failure to act claim because such

6    discretionary actions are not 'demanded by the law.'").

7        Although Plaintiffs' allegations may show that there are "[g]eneral deficiencies

8    in compliance," *SUWA*, 542 U.S. at 66, there is nothing this Court can permissibly

9    compel from Defendants pursuant to with 8 C.F.R. § 235.4 to correct those

10   deficiencies.   Accordingly, the Court dismisses Plaintiff A.D., B.D., and C.D.'s

11   Section 706(1) claims without prejudice *only insofar* as these Plaintiffs seek relief

12   pursuant to this regulation.   This determination does not affect the Court's conclusion

13   that these Plaintiffs have otherwise stated Section 706(1) claims regarding their

14   alleged denial of access to the asylum process in the United States.

15       **4.    The Complaint Fails to State a Section 706(2) Claim**

16             **Regarding Defendants' Alleged Policy**

17        The Complaint alleges that CBP officials have systematically prevented

18   asylum seekers arriving at POEs along the U.S.-Mexico border from accessing the

19   U.S. asylum process since summer 2016.  (Compl. ¶¶ 1, 5, 37.)  Plaintiffs allege that

20   this conduct has been documented "in hundreds of cases" at POEs along the border.

21   (*Id.* ¶¶ 37–38.)   The bulk of Defendants' motion to dismiss concerns whether

22   Plaintiffs have stated a Section 706(2) claim regarding an alleged "policy" of the

23   Defendants to deny asylum seekers who present themselves at POEs along the U.S.-

24   Mexico border access to the asylum process.  (ECF No. 135-1 at 11–20.)  Defendants

25   argue that "[w]hile the Complaint does not expressly seek judicial review of a final

26   agency action, it alleges that CBP has adopted an 'officially sanctioned policy'[.]"

27   (*Id.* at 11 (citing Compl. ¶¶ 5, 154).)  Defendants contend that "to the extent the Court

28   construes those references as a request for judicial review of an alleged unlawful

1    policy under the APA" pursuant to Section 706(2), the Court should dismiss that

2    request because: (1) Plaintiffs fail to identify an agency action and, even if Plaintiffs

3    have done so, (2) the Complaints fails to show a final agency action. (*Id*. at 12.)

4         Plaintiffs assert that "Defendants' critique is misplaced" because "the review

5    of 'final agency action' . . . under [] § 706(2) is distinct from the analysis for APA

6    claims to compel agency action under § 706(1), and Plaintiffs brought the latter APA

7    claim." (ECF No. 143 at 19.)   Normally, the Court would construe Plaintiffs'

8    response as a concession that they do not press a Section 706(2) claim and would not

9    address the issue further.   However, two points convince the Court that further

10   analysis warranted.   For one, the Complaint expressly invokes Section 706(2) as a

11   basis for judicial review of Defendants' alleged conduct. (Compl. ¶¶ 151–164.)

12   Plaintiffs' requested injunctive relief in turn includes "prohibiting Defendants . . .

13   from engaging in the unlawful policies . . . described herein at POEs along the U.S.-

14   Mexico border." (*Id.* at 52–53.)   Therefore, contrary to Plaintiffs' assertion, the

15   Complaint appears to include a Section 706(2) claim.   Second, in opposing

16   Defendants' motion, Plaintiffs assert that they "have alleged an illegal policy or

17   practice" because they "have pled sufficient facts . . . to support a reasonable inference

18   of liability" of the named Defendants. (ECF No. 143 at 21.) Plaintiffs' assertion is

19   made *independently* of the APA's basis for judicial review of agency action.

20   (*Contrast id.* at 19–20 (arguing that Section 706(1) APA claim is plausible) *with id.*

21   at 21–23 (arguing that Defendants' policy is plausible).)

22         The Complaint and Plaintiffs' assertions raise two issues.   First, the Court must

23   consider whether Plaintiffs may seek review of Defendants' alleged policy

24   independently of the APA.   The Court concludes that they may not.   Second, because

25   Plaintiffs must seek review of any alleged policy pursuant to Section 706(2), the Court

26   must consider whether the Plaintiffs have satisfied the APA's requirements for

27   judicial review and, specifically, the final agency action requirement.   The Court

28   concludes they have not.

17cv2366

### a.   Judicial Review of Defendants' Alleged Policy Must Proceed Under the APA

Plaintiffs assert that Defendants may be held liable for an alleged policy of denying asylum seekers who present themselves at POEs along the U.S.-Mexico border access to the U.S. asylum process.  And they make that assertion by relying solely on cases in which courts considered Section 1983 and *Bivens* challenges. Neither Section 1983, nor *Bivens*, however, provides a basis for holding the Defendants liable.  Nor does either supply the appropriate legal framework for review of Defendants' alleged policy.  Based on the pleadings, the APA supplies the appropriate framework for judicial review of the alleged policy.

As a general matter, "[t]he APA governs the conduct of federal administrative agencies," *Aracely, R.*, —F. Supp. 3d—, 2018 WL 3243977, at *5, and it provides a "default judicial review standard" for agency action,  *Ninilchik Traditional Council v. United States*, 227 F.3d 1186, 1194 (9th Cir. 2000).  "While a right to judicial review of agency action may be created by a separate statutory or constitutional provision, once created it becomes subject to the judicial review provisions of the APA unless specifically excluded."  *Webster v. Doe*, 486 U.S. 592, 607 n* (1988) (Scalia, J., dissenting); *Ninilchik Traditional* Council, 227 F.3d at 1194 (citing Scalia's *Webster* dissent approvingly).  In this case, the Complaint challenges agency action pursuant to the APA.  (Compl. ¶¶ 151–164.)  Although the Complaint purports to bring a separate claim for violation of the Plaintiffs' "procedural due process rights under the Fifth Amendment," that claim expressly incorporates the alleged APA violations.  (*Id*. ¶¶ 166, 171.)  Plaintiffs allege that "the INA and its implementing regulations provide Class Plaintiffs the right to be processed at a POE and granted access to the asylum process" and that "CBP officials have denied Class Plaintiffs access to the asylum process and failed to comply with procedures set forth in the INA and its implementing regulations."  (*Id*. ¶¶ 168, 169.)  "Insofar as [Plaintiffs] have such an entitlement" under the INA and its implementing regulations, Plaintiffs

FER-0285

1    "may obtain all the relief they request under the provisions of the APA."  *Graham v.*

2    *Fed. Emergency Mgmt. Agency*, 149 F.3d 997, 1001 n.2 (9th Cir. 1998).  Obtaining

3    such relief from Defendants' alleged policy of course requires Plaintiffs to satisfy the

4    APA's judicial review requirements.  *See Navajo Nation*, 876 F.3d at 1171 ("§ 704's

5    requirement that to proceed under the APA, agency action must be final or otherwise

6    reviewable by statute is an independent element without which court may not

7    determine APA claims.").  Plaintiffs' reliance on Section 1983 and *Bivens* case law

8    does not convince the Court otherwise.

9          Liability under Section 1983 is inapt in this case.  The Complaint does not

10   invoke Section 1983 as a basis for holding the named Defendants liable.  Even if it

11   did, liability would not lie against the Defendants.  Defendants Nielsen, McAleenan,

12   and Owen are Federal Executive officers or officials sued in their official capacity for

13   their duties pursuant to federal law.  (Compl. ¶¶ 25–27.)  As Defendants recognize

14   (ECF No. 145 at 9–10), Section 1983's plain terms do not provide a cause of action

15   against federal officers acting in their official capacity.  *See* 42 U.S.C. § 1983; *see*

16   *also Ziglar v. Abbasi*, 137 S. Ct. 1843, 1854 (2017) ("[Section 1983] entitles an

17   injured person to money damages if a state official violates his or her constitutional

18   rights.  Congress did not create an analogous statute for federal officials."); *Pangacos*

19   *v. Towery*, 782 F. Supp. 2d 1983, 1189 (W.D. Wash. 2011) ("Federal officers are

20   exempt from the proscription of § 1983) (citing *District of Columbia v. Carter*, 409

21   U.S 418, 424–25 (1973); *McCloskey v. Mueller*, 446 F.3d 262, 271 (1st Cir. 2006));

22   *Comm. for Immigrant Rights v. Cty. of Sonoma*, 644 F. Supp. 2d 1177, 1203 (N.D.

23   Cal. 2009) ("Federal officers acting under federal authority are immune from suit

24   under § 1983 unless the state or its agents significantly participated in the challenged

25   activity).  Plaintiffs' reliance on Section 1983 to assert that the Defendants may be

26   held liable is thus inappropriate.  *See Morse v. North Coast Opportunities, Inc*., 118

27   F.3d 1338, 1343 (9th Cir. 1997) ("Lest there be any continuing confusion, we take

28   this opportunity to remind the Bar that by its very terms, § 1983 precludes liability in

– 46 –

FER-0286

1   federal government actors.").

2       Taking for granted that Section 1983 does not apply to federal officers,
3   Plaintiffs further assert that their "allegations of a policy or practice are analogous to
4   claims brought under *Monell*[.]" (ECF No. 143 at 21 n.7.)  *Monell* permits a Section
5   1983 plaintiff to establish municipal liability for an alleged constitutional violation in
6   certain circumstances, including by showing that a municipal employee committed
7   an alleged constitutional violation pursuant to a formal government policy or a
8   longstanding practice or custom which constitutes the standard operating procedure
9   of the local governmental entity.  *See Jett v. Dallas Indep. Sch. Dist*., 491 U.S. 701,
10  737(1989); *Gillette v. Delmore*, 979 F.2d 1342, 1346 (9th Cir. 1992).  To the extent
11  Plaintiffs are arguing that an alleged policy is subject to judicial review because their
12  allegations could establish *Monell* liability, the Court rejects this argument.  *Monell*
13  arose in the context of a statute that is fundamentally different from the APA.  Most
14  relevant here are two limitations: (1) whereas the APA is limited to "agency action,"
15  Section 1983 reaches the conduct of "[e]very person" alleged to have violated federal
16  law, and (2) whereas the APA permits judicial review of only a "final agency action"
17  unless another statute makes the action reviewable, Section 1983 contains no identical
18  or analogous limitation on review.  *Contrast* 5 U.S.C. §§ 702, 704 *with* 42 U.S.C. §
19  1983.  Given these key differences, analogizing to Section 1983 liability is not
20  helpful.

21      The remaining cases cited by both parties involve *Bivens* actions against federal
22  officers sued in their individual capacity for alleged constitutional violations.  (ECF
23  No. 135-1 at 11, 17; ECF No. 143 at 23.)  In *Bivens*, the Supreme Court fashioned a
24  judicial cause of action for damages to redress constitutional violations committed by
25  a federal officer by treating such an action as one against the officer in his or her
26  individual capacity and thus not barred by sovereign immunity.  *Bivens*, 403 U.S. 388,
27  409–10 (1971) (Harlan, J, concurring).  By its nature, a *Bivens* suit is limited to
28  *damages* claims against a federal officer in his or her *individual capacity*.  *See*

– 47 –                          17cv2366

1    *Ministerio Roca Solida*, 820 F.3d at 1093–94; *see also Consejo de Desarrollo*

2    *Economico de Mexicali, A.C.*, 482 F.3d at 1173; *Vaccaro v. Dobre*, 81 F.3d 854, 857

3    (9th Cir. 1996) (a *Bivens* action "can be maintained against a defendant in his or her

4    individual action only, and not in his or her official capacity."). A *Bivens* action "does

5    not encompass injunctive and declaratory relief where . . . the equitable relief requires

6    official government action." *Ministerio Roca Solida*, 820 F.3d at 1093–94; *Consejo*

7    *de Desarrollo Economico de Mexicali, A.C.*, 482 F.3d at 1173. In such cases, "*Bivens*

8    is both inappropriate and unnecessary" in large part "because the Administrative

9    Procedure Act waives sovereign immunity for such claims" and thus provides a

10   mechanism for judicial review. *Ministerio Roca Solida*, 820 F.3d at 1095, 1096.

11          Much of the dispute between the parties regarding Plaintiffs' policy allegations

12   concerns whether Defendants may be held liable for the alleged conduct of some CBP

13   officials along the U.S.-Mexico border, liability which requires some connection

14   between the conduct of those officials and the named Defendants in this case.

15   (*Compare* ECF No. 135-1 at 11, 17 *with* ECF No. 143 at 23.) [14]   This dispute

16   overlooks a key point: the *Bivens* framework for holding federal government officials

17   liable for alleged constitutional violations has no application in this case  This case is

18   far from a *Bivens* action in form and substance.  The Complaint names the Defendants

19   in their official capacity and seeks declaratory and injunctive relief that undoubtedly

20   requires official government action.  Thus, *Bivens* liability is not appropriate.

21   _____

22          [14] For example, Defendants rely on *Perez v. United States*, 103 F. Supp. 3d
     1180, 1200 (S.D. Cal. 2015), to argue that Plaintiffs have failed to allege "any factual
23   connection between the alleged misconduct of a handful of officers and a policy" of
     the named Defendants and thus cannot show a "broadly sanctioned policy."  (ECF
24   No. 135-1 at 11, 17.)  In contrast, Plaintiffs argue that the Complaint demonstrates an
     alleged "high-level knowledge and acquiescence in the unlawful conduct," of CBP
25   officials by the named Defendants for which the latter may be held liable.  (ECF No.
     143 at 23.)   The assumption underlying each of these arguments is that *Bivens*
26
     supervisory liability for the allegedly unconstitutional conduct of low-level officers is
27   applicable in this case.  It is not.
28

                                    – 48 –                                17cv2366

1    With neither Section 1983, nor *Bivens* providing a framework applicable to

2    Defendants' alleged policy, the Court affirms that the APA supplies the relevant

3    framework for considering Defendants' alleged policy. *See Am. Fin. Benefits Ctr. v.*

4    *Fed. Trade Comm'n*, No. 17-04817, 2018 WL 3203391, at *5 (N.D. Cal. May 29,

5    2018) (analyzing plaintiffs' claims under the APA because "although Plaintiffs assert

6    that the APA is inapplicable, they fail to identify any other basis for judicial review

7    or the exercise of this Court's jurisdiction").

8         **b.    The Complaint Does Not Identify a Final Agency Policy**

9    The APA limits judicial review to agency action in the form of "the whole or

10   part of an agency rule, order, license, sanction, relief, or the equivalent or denial

11   thereof, or failure to act." 5 U.S.C. § 551(13).  An agency action must be "reviewable

12   by statute or a "final agency action for which there is no other adequate remedy[.]"  5

13   U.S.C. § 704.  Two conditions must be satisfied for an agency action to be final: (1)

14   "the action must mark the consummation of the agency's decisionmaking process—

15   it must not be of a merely tentative or interlocutory nature" and (2) "the action must

16   be one by which rights or obligations have been determined, or from which legal

17   consequences will flow." *United States Army Corps of Engineers v. Hawkes Co*., 136

18   S. Ct. 1807, 1813 (2016) (quoting *Bennett*, 520 U.S. at 177–78).  Although the finality

19   requirement is "flexible" and must be applied in a "pragmatic way," it is nevertheless

20   a requirement that a plaintiff seeking review of agency action must satisfy.[15]  *See*

21

22   ───────────────

     [15]  The Ninth Circuit has previously referred to the final agency action

23   requirement as a jurisdictional requirement. *See City of San Diego v. Whitman*, 242

     F.3d 1097, 1102 (9th Cir. 2001).  However, this view of the final agency requirement,

24   as applicable to courts in the Ninth Circuit, has been questioned. *See Pebble Ltd.*

     *P'ship v. United States EPA*, 604 Fed. App'x 623, 625–26 (9th Cir. 2015) (Watford,

25   J., concurring) ("[I]n my view the D.C. Circuit has persuasively explained why our

     court's precedent on this point is wrong.  As that court held in *Trudeau v. FTC*, 456

26   F.3d 178 (D.C. Cir. 2006), § 704 is not a jurisdiction-conferring statute.").  The

27   *Navajo Nation* panel at least suggested that Section 704's finality requirement should

28   not be viewed as jurisdictional. *See Navajo Nation*, 876 F.3d at 1171 ("[Section]

– 49 –                                                              17cv2366

1    *Oregon Natural Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006).

2    The Complaint contains a single allegation that Defendants have an "officially

3    sanctioned policy" of denying asylum seekers who present themselves at POEs along

4    the U.S.-Mexico border access to the U.S. asylum process.  (Comp. ¶ 5.)  The only

5    formulation of the alleged policy suggested by Plaintiffs is that CBP officials have a

6    categorical policy of denying asylum seekers who present themselves at POEs along

7    the U.S.-Mexico border access to the U.S. asylum system.  (*Id.* ¶¶ 1–6.)  A further

8    variant of this policy is one in which CBP officials deny access through tactics of

9    misrepresentations, harassment, coercion, threats, and physical violence.  (*Id.* ¶¶ 95–

10   101, ECF No. 143 at 23.)  But the Court cannot locate a single agency action reflecting

11   Defendants' alleged policy, let alone one that is final.

12   Neither the Complaint, nor Plaintiffs' opposition to the motion to dismiss

13   "refer[s] to a single . . . order or regulation" of the Defendants' which constitutes or

14   reflects an agency policy applicable to all CBP officials at POEs along the U.S.-

15   Mexico border for the challenged conduct.  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S.

16   871, 890 (1990) (rejecting plaintiffs' challenge to the Bureau of Land Management's

17   alleged "land withdrawal program" because there was no agency action on which to

18   base their challenge under the APA); *ONRC Action v. BLM*, 150 F.3d 1132, 1136 (9th

19   Cir. 1998) (rejecting APA claims because "this case presents a situation where there

20   is no identifiable agency order, regulation, policy or plan that may be subject to

21   challenge as a final agency action').

22   Plaintiffs observe in opposition that a policy need not be in written form to

23   exist, thus suggesting that the Court should infer the existence of a policy even if the

24   Court cannot locate one reduced to writing.  (ECF No. 143 at 21.)  The Court readily

25   acknowledges that "agency action . . . need not be in writing to be final and judicially

26   _____

27   704's requirement that to proceed under the APA, agency action must be final or
     otherwise reviewable by statute is an *independent element* without which courts may
28   not determine APA claims.").

– 50 –                                    17cv2366

1    reviewable" pursuant to the APA.  *R.I.L.-R v. Johnson*, 80 F. Supp. 3d 164, 184
2    (D.D.C. 2015).  An unwritten policy can still satisfy the APA's pragmatic final agency
3    action requirement.  *See Venetian Casino Resort LLC v. EEOC*, 530 F.3d 925, 929
4    (D.C. Cir. 2008) (reviewing challenge to an agency's "decision . . . to adopt [an
5    unwritten] policy of disclosing confidential information without notice" because such
6    a policy was "surely a consummation of the agency's decisionmaking process" that
7    impacted the plaintiff's rights); *R.I.L.-R*, 80 F. Supp. 3d at 174–176 (determining that
8    plaintiffs had shown a reviewable unwritten "DHS policy direct[ing] ICE officers to
9    consider deterrence of mass migration as a factor in their custody determinations" as
10   underlying the plaintiffs' detention).  "[A] contrary rule 'would allow an agency to
11   shield its decisions from judicial review simply by refusing to put those decisions in
12   writing.'"  *R.I.L.-R*, 80 F. Supp. at 184 (quoting *Grand Canyon Tr. v. Pub. Serv. Co.
13   of N.M.*, 283 F. Supp. 2d 1249, 1252 (D.N.M. 2003)); *see also Aracely R*., —F. Supp.
14   3d—, 2018 WL 3243977, at *16 ("Despite Defendants' assertions to the contrary,
15   agency action need not be in writing to be judicially reviewable as a final action.").

16       Recent cases provide examples of challengeable unwritten agency policies in
17   the immigration context.  For example, in *R.I.L.-R*, the plaintiffs challenged two
18   variants of an alleged DHS detention policy affecting Central American mothers
19   accompanied by minor children.  In sustaining the "narrower formulation of the
20   relevant policy," the court rejected the government's APA finality argument that the
21   plaintiffs had failed to identify a regulation, policy memoranda, or any other
22   document memorializing the challenged policy.  *R.I.L.-R*, 80 F. Supp. 3d at 174.  The
23   court determined that the plaintiffs had shown the existence of a "DHS policy
24   direct[ing] ICE officers to consider deterrence of mass migration as a factor in their
25   custody determinations" through firsthand knowledge and data showing that "ICE has
26   been largely denying release to Central American mothers accompanied by minor
27   children since June 2014."  *Id*.  These denials were "contrary to past practice" of DHS
28   and, while claiming there was no policy document, Defendants had "essentially

– 51 –

17cv2366

1    conceded that the recent surge in detention during a period of mass migration . . .

2    reflects a design to deter such migration." *Id.* at 175. The plaintiffs in *Aracely, R. v.*

3    *Nielsen* challenged prolonged detention of asylum seekers who present themselves at

4    POEs. They alleged a "de facto immigration policy promulgated by high-level

5    officials in Washington D.C.," which began in 2014 and was "re-emphasized . . . after

6    the 2016 Presidential election." *Aracely, R*., —F. Supp. 3d—, 2018 WL 3243977, at

7    *4. The alleged policy was "designed to serve as a deterrent to asylum seekers" by

8    "ordering local officials to heavily weight immigration deterrence in deciding parole

9    and similar forms of release." *Id*. The plaintiffs pointed to data showing that the

10   parole release rate of the asylum seekers who crossed a U.S. POE was 80% in 2012,

11   but dropped to 47% in 2015. *Id*. The *Aracely* court found this sufficient to show a

12   final agency policy subject to APA review. *Id.* at *16.

13        To assess whether the Complaint shows an unwritten policy, the Court turns to

14   the Complaint's pattern allegations. Plaintiffs rely on those allegations to defend the

15   existence of an alleged policy and argue that they "have pled sufficient facts to show

16   a widespread pattern or practice of denial of access to the asylum process[.]" (ECF

17   No. 143 at 21.) The Court, however, is not convinced that the Complaint's disparate

18   "examples"—in Plaintiffs' words—of conduct by CBP officials supports the

19   inference that there is an overarching policy. *See Pearl River Union Free Sch. Dist.*

20   *v. King*, 214 F. Supp. 3d 241 (S.D.N.Y. 2016) ("[T]his is not a case where a policy of

21   some kind was plainly adopted and illuminated, albeit imperfectly . . . rather, at best,

22   Plaintiff has alleged that Defendants took certain action with respect to it and asks the

23   Court to surmise therefrom the existence of a broader policy."); *Bark v. U.S. Forest*

24   *Serv.*, 37 F. Supp. 3d 41, 50 (D.D.C. 2014) ("Plaintiffs appear to have attached a

25   'policy' label to their own amorphous description of the [defendant government

26   agency's] practices. But a final agency action requires more.").

27        Unlike the unwritten policies challenged in *R.I.L.-R* and *Aracely*, the Complaint

28   does not plausibly show the existence of the unwritten policy the Plaintiffs ask this

17cv2366

FER-0292

1  Court to infer.  As an initial matter, while the Complaint contains allegations about

2  the tactics employed by various CBP officials (Compl. ¶¶ 83–103), there are no

3  allegations connecting any of that conduct with an unwritten policy created by the

4  Defendants.  In fact, Plaintiffs do not even allege that the Defendants were involved

5  in the development of any policy in this case.  *Aracely, R.*, —F. Supp. 3d—, 2018

6  WL 3243977, at *4.   The Complaint's pattern allegations also fail to show a

7  categorical unwritten policy of the type Plaintiffs suggest.   Even accepting the

8  Complaint's references to documented instances of asylum seekers at POEs along the

9  U.S.-Mexico border who were denied access to the asylum process, the Complaint

10  expressly incorporates reports which show that many more asylum seekers were not

11  denied access.[16]  For example, the Complaint cites a 2017 report from Human Rights

12  First, which reports at least 125 occasions between December 2016 and March 2017

13  in which applicants for admission were denied access.  (Compl. ¶ 38 n.27.)[17]  Yet, the

14  report also states that "CBP agents referred some 8,000 asylum seekers at [POEs]"

15  along the U.S-Mexico border to credible fear interviews during the same period.  *See*

16  *Crossing the Line*, at 1.  This information defeats the inference that a categorical

17  policy of the nature Plaintiffs intimate exists.  *See R.I.L.-R*, 80 F. Supp. 3d at 174

18  (declining to find that "DHS adopted a categorical policy in June 2014 of denying

19

20      [16] Plaintiffs contend that "evidentiary arguments" regarding the existence of the

21  unwritten policy they allege are not appropriate at the pleading stage.  (ECF No. 143

22  at 23 n.8.)  Because the Complaint expressly incorporates various reports and articles

23  and provides the web links to them, the Court may consider these materials in full to

24  assess the sufficiency of the allegations in the Complaint.  *See Knievel v. ESPN*, 393

25  F.3d 1068, 1076 (9th Cir. 2005) (courts may also consider "documents 'whose

26  contents are alleged in a complaint and whose authenticity no party questions, but

27  which are not physically attached to the [plaintiff's] pleading.'").

26      [17] The Complaint provides the following source: B. Shaw Drake, *et al.*,

27  *Crossing the Line: U.S. Border Agents Illegally Reject Asylum Seekers*, Human Rights

28  First, 16 (2017), https://www.humanrightsfirst.org/sites/default/files/hrf-crossing-

the-line-report.pdf ["*Crossing the Line*"].

1  release to all asylum-seeking Central American families in order to deter further
2  immigration" given that "in some small number of cases" ICE granted bonds).

3      Both sides also dispute whether the Complaint shows the existence of an
4  unwritten policy based on the following allegation: "[o]n June 13, 2017, in
5  questioning before the House Appropriations Committee, the Executive Assistant
6  Commissioner for CBP's OFO admitted that CBP officials were turning away asylum
7  applicants at POEs along the U.S.-Mexico border." (Compl. ¶ 103.) However, the
8  Complaint does not incorporate any particular portion of the testimony of John
9  Wagner, Deputy Executive Assistant Commissioner for the Office of Field
10  Operations of CBP, and thus it is not clear that this information is properly reviewable
11  at the motion to dismiss stage. Even if it were, the Court does not find the testimony
12  sufficient to show the existence of the unwritten policy Plaintiffs allege. Insofar as
13  CBP is "working with Mexico to develop methods to control the flow of migrants
14  entering U.S. [POEs] at any given time" (ECF No. 135-1 at 16), that information does
15  not show the consummation of an agency decision-making process, let alone one that
16  applies to asylum seekers in the manner Plaintiffs allege. As for the "contingency
17  plans" for a future "surge of migrants," (*id.*), it is unclear how a such a plan has any
18  application in this case because the Complaint does not allege that any Plaintiff was
19  turned away by CBP officials as part of a policy concerning migrant "surges."

20      In the absence of allegations showing a final agency order, rule, regulation,
21  policy, or plan to deny asylum seekers who present themselves at POEs along the
22  U.S-Mexico border—or allegations from which the Court could infer that one
23  exists—the Complaint fails to plead that Defendants have a policy this Court can
24  "hold unlawful and set aside." 5 U.S.C. § 706(2). Because Plaintiffs may be able to
25  allege the existence of a policy, the Court dismisses without prejudice Plaintiffs'
26  Section 706(2) claim concerning an alleged policy. This conclusion does not affect
27  the sufficiency of Plaintiffs' Section 706(1) claims. *See Bark v. U.S. Forest Serv.*, 37
28  F. Supp. 3d 41, 50–51 (D.D.C. 2014) (rejecting challenge to "a generalized, unwritten

– 54 –                                    17cv2366

administrative 'policy,'" but permitting challenge to five challenged permits).

**IV.   CONCLUSION & ORDER**

For the foregoing reasons, the Court **HEREBY ORDERS** that:

1.     The Court **GRANTS IN PART** Defendants' motion to dismiss and **DISMISSES WITHOUT PREJUDICE**:  (a) Plaintiffs A.D, B.D., and C.D.'s claims under Section 706(1) only insofar as they have sought to compel agency action under 8 C.F.R § 235.4, and (b) all Plaintiffs' claims under Section 706(2) regarding Defendants' alleged policy.

2.     The Court **DENIES ON ALL OTHER GROUNDS** Defendants' motion.

3.     The Court Plaintiffs **GRANTS LEAVE TO AMEND** the pleadings consistent with this Order.  Plaintiffs may file a First Amended Complaint **no later than September 15, 2018**.

4.     If Plaintiffs do not file an amended complaint or request additional time to do so by the foregoing date, Defendants shall file an Answer **no later than September 24, 2018**.

**IT IS SO ORDERED.**

**DATED:  August 20, 2018**

**Hon. Cynthia Bashant**
**United States District Judge**

– 55 –

17cv2366