Nos. 22-55988, 22-56036

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

AL OTRO LADO, INC., *et al.*,
*Plaintiffs-Appellees/Cross-Appellants*,

v.

ALEJANDRO MAYORKAS, Secretary of Homeland Security, *et al.*,
*Defendants-Appellants/Cross-Appellees*,

and

The EXECUTIVE OFFICE FOR IMMIGRATION REVIEW,
*Appellant/Cross-Appellee*.

_____

APPEAL FROM FINAL JUDGMENT OF THE UNITED STATES DISTRICT
COURT FOR THE SOUTHERN DISTRICT OF CALIFORNIA
No. 17-cv-02366-BAS-KSC
_____

**APPELLEES/CROSS-APPELLANTS' CROSS APPEAL REPLY BRIEF**

Melissa Crow
CENTER FOR GENDER & REFUGEE STUDIES
1121 14th Street, N.W., Suite 200
Washington, DC 20005
(202) 355-4471

Neela Chakravartula
Anne Dutton
CENTER FOR GENDER & REFUGEE STUDIES
200 McAllister Street
San Francisco, CA 94102
(415) 565-4877

Baher Azmy
Angelo Guisado
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6464

Ori Lev
MAYER BROWN LLP
1999 K Street, N.W.
Washington, DC 20006
(202) 263-3270

Stephen M. Medlock
Evan Miller
Rami Rashmawi
VINSON & ELKINS LLP
2200 Pennsylvania Ave., N.W.
Suite 500 West
Washington, DC 20036
(202) 639-6500

*Counsel for Appellees*

Sarah Rich
SOUTHERN POVERTY LAW CENTER
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
(404) 521-6700

Rebecca Cassler
SOUTHERN POVERTY LAW CENTER
1101 17th Ave. NW, Suite 705
Washington, D.C., 20036
(404) 521-6700

Katherine Melloy Goettel
Gianna Borroto
Suchita Mathur
AMERICAN IMMIGRATION COUNCIL
1331 G St NW, Suite 200
Washington, DC 20005
(202) 507-7552

753988227.2

# <u>TABLE OF CONTENTS</u>

**Page**

I.   THE DISTRICT COURT SHOULD HAVE ADDRESSED PLAINTIFFS' APA § 706(2) CLAIM ..........................................................2

    A.   Plaintiffs' § 706(2) Claim Is Not Moot and Relief Is Available..........2

    B.   The Turnback Policy Exceeds Defendants' Authority .......................4

    C.   The Turnback Policy Is Arbitrary and Capricious ...............................8

II.   PLAINTIFFS SHOULD PREVAIL ON THEIR INDEPENDENT INA CLAIM ......................................................................................111

III.   PLAINTIFFS SHOULD PREVAIL ON THEIR ATS CLAIM...................14

    A.   *Sale* Does Not Foreclose Recognition that Non-Refoulement Applies at the Border..........................................................................14

    B.   The Government's Asserted Prudential Factors Do Not Foreclose Recognition of the Norm ...................................................17

    C.   Defendants' Novel ATS Arguments on the Merits Are Unpersuasive ..................................................................................23

753988227.2

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Akiachak Native Community v. Department of Interior*,
    827 F.3d 100 (D.C. Cir. 2016) ...............................................................3

*Al Shimari v. CACI Premier Tech., Inc.*,
    368 F. Supp. 3d 935 (E.D. Va. 2019) .............................................22, 23

*Al Shimari v. CACI Premier Tech., Inc.*,
    758 F.3d 516 (4th Cir. 2014) ...............................................................18

*Al Shimari v. CACI Premier Tech., Inc.*,
    840 F.3d 147 (4th Cir. 2016) ...............................................................20

*Alaska v. United States*,
    64 F.3d 1352 (9th Cir. 1995) ...............................................................21

*Armstrong v. Exceptional Child Ctr., Inc.*,
    575 U.S. 320 (2015)......................................................................13, 22

*Biden v. Sierra Club*,
    142 S. Ct. 46 (2021).............................................................................13

*Biden v. Texas*,
    142 S. Ct. 2528 (2022)...........................................................................3

*Blazevska v. Raytheon Aircraft Co.*,
    522 F.3d 948 (9th Cir. 2008) ...............................................................15

*C.D.A. v. United States*,
    2023 WL 2666064 (E.D. Pa. Mar. 28, 2023) .....................................23

*California v. Trump*,
    963 F.3d 926 (9th Cir. 2020) ...............................................................12

*Chambers v. NASCO, Inc.*,
    501 U.S. 32 (1991)..................................................................................6

ii

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Dart v. United States*,
   848 F.2d 217 (D.C. Cir. 1988)...........................................................................13

*E. Bay Sanctuary Covenant v. Trump*,
   932 F.3d 742 (9th Cir. 2018) .............................................................................7

*E.V. v. Robinson*,
   906 F.3d 1082 (9th Cir. 2018) ..........................................................................11

*East Bay Sanctuary Covenant v. Biden*,
   993 F.3d 640 (9th Cir. 2021) ...............................................................................3

*In re Estate of Marcos, Human Rights Litig.*,
   25 F.3d 1467 (9th Cir. 1994) ......................................................................18, 20

*In re Federal Bureau of Prisons' Execution Protocol Cases*,
   980 F.3d 123 (D.C. Cir. 2020)...............................................................................3

*Filártiga v. Pena–Irala*,
   630 F.2d 876 (2d Cir. 1980) ......................................................................18, 20

*Flomo v. Firestone Nat. Rubber Co.*,
   643 F.3d 1013 (7th Cir. 2011) ...........................................................................18

*Graham v. FEMA*,
   149 F.3d 997 (9th Cir. 1998) ...........................................................................13

*Hernandez v. Mesa*,
   140 S. Ct. 735 (2020)..........................................................................................19

*Hernandez v. Mesa*,
   582 U.S. 548 (2017) (Breyer, J., dissenting) ...................................................15

*Hirsi Jamaa and Others v. Italy*,
   2012-II Eur. Ct. H.R. 97 (2012).........................................................................23

*Jafarzadeh v. Duke*,
   270 F. Supp. 3d 296 (D.D.C. 2017)..............................................................11, 12

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Jesner v. Arab Bank, PLC*,
　138 S. Ct. 1386 (2018)........................................................................20

*Kadic v. Karadzic*,
　70 F.3d 232 (2d Cir. 1995) ...........................................................20, 22

*Kiobel v. Royal Dutch Petroleum Co.*,
　569 U.S. 108 (2013)...........................................................................19

*U.S. ex rel. Knauff v. Shaughnessy*,
　338 U.S. 537 (1950).........................................................................6, 7

*Leng May Ma v. Barber*,
　357 U.S. 185 (1958)...........................................................................16

*Mireskandari v. Mayne*,
　2016 WL 1165896 (C.D. Cal. Mar. 23, 2016)...................................22

*Murphy Co. v. Biden*,
　65 F.4th 1122 (9th Cir. 2023) ...........................................................11

*Navajo Nation v. Dep't of the Interior*,
　876 F.3d 1144 (9th Cir. 2017) .....................................................12, 21

*Nestlé USA, Inc. v. Doe*,
　141 S. Ct. 1931 (2021).......................................................................19

*Ninilchik Traditional Council v. United States*,
　227 F.3d 1186 (9th Cir. 2000) ...........................................................13

*Plaskett v. Wormuth*,
　18 F.4th 1072 (9th Cir. 2021) ..............................................................6

*Sale v. Haitian Centers Council, Inc.*,
　509 U.S. 155 (1993)..........................................................14, 15, 16, 17

*Sarei v. Rio Tinto, PLC, 671 F.3d 736 (9th Cir. 2011), amended by*
　*772 F.3d 1109 (9th Cir. 2013)* ............................................................20

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Siderman de Blake v. Republic of Argentina*,
   965 F.2d 699 (9th Cir. 1992) ...............................................................15, 17, 22

*Sierra Club v. Trump*,
   929 F.3d 670 (9th Cir. 2019) .............................................................................12

*Sierra Club v. Trump*,
   963 F.3d 874 (9th Cir. 2020), *vacated on other grounds sub nom*
   *Biden v. Sierra Club,* 142 S. Ct. 46 (2021).......................................................13

*Sosa v. Alvarez-Machain*,
   542 U.S. 692 (2004).....................................................................................*passim*

*Stark v. Wickard*,
   321 U.S. 288 (1944).............................................................................................11

*United States v. Beggerly*,
   524 U.S. 38 (1998)...............................................................................................21

*United States v. Matta-Ballesteros*,
   71 F.3d 754 (9th Cir. 1995), *modified by* 98 F.3d 1100 (9th Cir.
   1996) ....................................................................................................................19

*Washington v. U.S. Dep't of Homeland Security*,
   614 F. Supp. 3d 863 (W.D. Wash. 2020) .............................................................2

*Yousuf v. Samantar*,
   699 F.3d 763 (4th Cir. 2012) .............................................................................22

*Ziglar v. Abbasi*,
   582 U.S. 120 (2017)............................................................................................21

**Statutes**

5 U.S.C. § 702.........................................................................................................21

5 U.S.C. § 706...................................................................................................*passim*

6 U.S.C. § 111 ..................................................................................................4, 5, 8

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

6 U.S.C. § 202 ................................................................................4, 5

6 U.S.C. § 211 ................................................................................4, 5

8 U.S.C. § 1103 ............................................................................4, 5, 6

8 U.S.C. § 1158 ...............................................................................5, 6

8 U.S.C. § 1252 ............................................................................4, 11

18 U.S.C. § 2340 ................................................................................18

18 U.S.C. § 2441 ................................................................................18

Immigration and Nationality Act ....................................................*passim*

Torture Victims Protection Act of 1991, 8 U.S.C. § 1350 note sec.
   2(a), 106 Stat. 73 (1992) ...............................................................18

## Other Authorities

Fed. R. Civ. P. 12 ...............................................................................21

G.A. Res. 2312, *Declaration on Territorial Asylum*, 22 U.N. GAOR
   Supp. (No. 16) at 31, U.N. Doc. A/6716 (1967) ................................23

U.N. Human Rights Comm., *Views of the Human Rights Committee
   Under Article 5(4) of the Optional Protocol to the International
   Covenant on Civil and Political Rights* ............................................17

## INTRODUCTION

The facts are not in dispute. Defendants turned back asylum seekers who were in the process of arriving at Class A ports of entry ("POEs") on the U.S.-Mexico border, in direct violation of domestic statutes and the specific, universal, and obligatory international law norm known as non-refoulement. After adopting a policy to illegally turn people back, Defendants memorialized it in writing.[1] Because those facts are undisputed, the district court should have granted summary judgment to Plaintiffs on their claims regarding § 706(2) of the Administrative Procedure Act ("APA"), *ultra vires* agency action in violation of the Immigration and Nationality Act ("INA"), and the Alien Tort Statute ("ATS"). At the very least, the district court should have reached Plaintiffs' § 706(2) claim and should not have granted summary judgment to Defendants on the INA and ATS claims.

Defendants' answering brief demonstrates that they have no legitimate defense for their wrongdoing. Defendants argue that the court should overlook their illegal conduct because (a) the Executive branch does not actually have to follow the law when it does not want to, (b) they preferred to focus on other responsibilities assigned to them, and (c) they let some asylum seekers into the United States. Those arguments are irrelevant. Defendants have no right to ignore the INA simply because

---

[1] Defendants subsequently replaced that written policy document with another written policy document that similarly permits them to turn back arriving asylum seekers.

1

they believe that Congress' dictates are not helpful to them. Furthermore, the fact that Defendants' turnback policy did not foreclose all access to the U.S. asylum process is no defense. Plaintiffs should have won this case on all counts.

## ARGUMENT

## I. The District Court Should Have Addressed Plaintiffs' APA § 706(2) Claim

### A. Plaintiffs' § 706(2) Claim Is Not Moot and Relief Is Available

*First*, Plaintiffs' § 706(2) claim is not mooted by Defendants' rescission or replacement of CBP's original memoranda concerning the turnback policy. The §706(2) claim is not limited to the earlier memoranda. It instead challenges the entirety of Defendants' turnback policy, which began in 2016 and was in effect for two years before being memorialized in writing. *See* 3-ER-824, 916; 2-ER-339, 369-72, 383, 389. And Defendants' replacement of the memoranda in November 2021 did not mark the end of the turnback policy, as the new guidance continues to authorize the use of turnbacks based on the illusory concept of "operational capacity." 2-ER-315; *see* Second Br. 11-12.

As the district court recognized, "[a]gency action . . . need not be in writing to be final and judicially reviewable" under the APA. 1-ER-267; *see also Washington v. U.S. Dep't of Homeland Security*, 614 F. Supp. 3d 863, 872 & n.11 (W.D. Wash. 2020) (collecting cases). The turnback policy—not just the 2018 memoranda—met the standard for final agency action as of 2016, a point Defendants

do not challenge in their answering brief. *See* Second Br. 43. That policy is still in effect today.

The caselaw Defendants cite is inapposite. Third Br. 35-36. Unlike in *Biden v. Texas*, 142 S. Ct. 2528, 2545 (2022), here the turnback policy indisputably exists independent of the now-rescinded written guidance in effect from 2018 to 2021. *See e.g.,* 2-ER-372 (November 2016 email directing that "each [POE] management work with their Mexican counterparts to meter the [flow] of Haitians, South and Central Americans"). And *Akiachak Native Community v. Department of Interior* simply states that when plaintiffs challenge a single regulation, their case is mooted by the government's rescission of that regulation since "the scope of a federal court's jurisdiction . . . is defined by the affirmative claims to relief sought in the complaint." 827 F.3d 100, 105-06 (D.C. Cir. 2016). Plaintiffs' § 706(2) claim challenges the turnback policy itself and is not limited to the memoranda. *See* 4-ER-824, 916.

*Second*, injunctive relief is available for §706(2) claims. *Contra* Third Br. 36. Courts routinely approve injunctions in APA challenges, contrary to Defendants' claim that vacatur is the *only* relief available in § 706(2) cases. *See, e.g.*, *East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 681 (9th Cir. 2021) (describing "broad equitable relief available in APA challenges" and affirming preliminary injunction entered on §706(2) challenge); *In re Federal Bureau of Prisons' Execution Protocol*

3

*Cases*, 980 F.3d 123, 128 (D.C. Cir. 2020) (discussing standards for evaluating when a permanent injunction is warranted for an APA claim).

*Third*, the district court did not address the question of whether injunctive relief is available for Plaintiffs' § 706(2) claim because it did not reach the merits; there is thus no holding Plaintiffs could have challenged on appeal. *See* Second Br. 43 n.17; *contra* Third Br. 36. As discussed further below, Plaintiffs' § 706(2) claim contends that the turnback policy—including Defendants' policy of affirmatively blocking class members' access to POEs—is unlawful because it is pretextual and *ultra vires* of all of the statutes Defendants claim provide this authority.[2] Because the district court's 8 U.S.C. § 1252(f)(1) holding does not address Plaintiffs' § 706(2) claim, remand to allow the district court to address the issue in the first instance is warranted.

## B.    The Turnback Policy Exceeds Defendants' Authority

No Act of Congress or other source of legal authority allows Defendants to limit the flow of asylum seekers entering the United States. Defendants' argument that turnbacks were merely a means of "*concurrently*" discharging their "specific

---

[2] Defendants have consistently taken the position that metering is an exercise of their statutory authority under 6 U.S.C. §§ 111, 202, 211 and 8 U.S.C. § 1103. *See* FER-118. However, in their appellate answering brief, they assert for the first time that metering is "the manner in which CBP implements [8 U.S.C.] § 1225," and that the district court found this to be true. Third Br. 36. In fact, the district court's analysis makes clear that it understood Defendants to be claiming 6 U.S.C. § 202 and 8 U.S.C. § 1103 as the statutory authorization for metering. 1-ER-29.

obligations under Section 1225" and their "broader mandates" is wrong as a matter of law and fact. Third Br. 37. Defendants quote various other duties assigned to them by Congress, *id.* 37-38, but fail to grapple with four key points.

*First*, they ignore the fact that those general statutes also direct Defendants to "administer all immigration laws," including "the inspection, processing, and admission of persons who seek to enter or depart the United States." 6 U.S.C. § 211(c)(8)(A). *See also* 1-ER-104.

*Second*, they ignore the statutory interpretation principles relied upon by the District Court and Plaintiffs with regard to the scope of Defendants' general authority granted in 6 U.S.C. §§ 111, 202, 211 and 8 U.S.C. § 1103, that "the specific [here, Sections 1158(a) and 1225] governs the general," Second Br. 44-45 (citing cases) and that "a specific statute will not be controlled or nullified by a general one," 1-ER-104 (citing cases).

*Third*, Defendants argue that they did not "evade" their inspection obligations because they inspected some arriving asylum seekers while turning away the majority. Third Br. at 38. This argument misses the point. Whatever other general duties Congress may have imposed on Defendants are irrelevant—Congress required Defendants to inspect all arriving asylum seekers and did not provide them any authority to implement a turnback policy or otherwise limit the number of individuals granted access to the asylum process. *See* 6 U.S.C. §§ 111, 202, 211; 8

5

U.S.C. § 1103 (containing no authorization to limit the number of asylum seekers at ports or to turn asylum seekers back); *see also* 8 U.S.C. §§ 1158(a) (right to apply for asylum), 1225(a)(3) (requiring inspection of all arriving noncitizens), 1225(b)(1)(A)(ii) (providing for referral of arriving asylum seekers for interviews). The question here is not whether Defendants "evaded" their obligations *in toto*, but instead whether Defendants have any authority to limit the inspection and referral of arriving asylum seekers. Defendants have cited no such authority because none exists. The turnback policy is in excess of Defendants' statutory authority and not in accordance with law, notwithstanding any other general duties Congress assigned to them.

*Fourth*, Defendants continue to assert that they have inherent authority to turn away asylum seekers, Third Br. 37-39, without acknowledging that agency authority springs from statutes alone. *Plaskett v. Wormuth*, 18 F.4th 1072, 1087 (9th Cir. 2021) (an administrative agency "has no powers except those specifically conferred upon it by statute" (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45 (1991))). Even if that were not the case, there can certainly be no inherent executive authority to defy a statute.[3]

---

[3] *U.S. ex rel. Knauff v. Shaughnessy*, 338 U.S. 537 (1950), which Defendants cite to support their expansive claim of executive power, Third Br. 39, is inapposite. In *Knauff*, a pre-INA case, the executive decision at issue was made pursuant to a delegation of authority from Congress permitting the exclusion of noncitizens based

6

Defendants' argument that their "policy was not to 'turn back asylum seekers,'" but instead to "manage the flow" of asylum seekers based on operational needs, is belied by the undisputed factual record. *See* 1-ER-99-100 ("the record contains undisputed evidence that … CBP officers did not carry out their discrete statutory duties to inspect and refer asylum seekers to start the asylum process once they arrived at POEs; instead, Defendants stationed CBP personnel at the limit line to 'turn away' or 'push back' asylum seekers as they reached POEs."); *see also infra* Section I.C.[4]

Finally, Defendants contend, in Orwellian fashion, that the turnback policy is justified by the statutory directive that they "ensure that the functions of the ... Department that are not related directly to securing the homeland are not diminished or neglected except by a specific explicit Act of Congress." Third Br. 39 (quoting 6

---

on national security concerns during wartime. 338 U.S. at 543-44. Here, by contrast, Defendants are acting in contravention of an express Congressional directive to inspect and process arriving asylum seekers. Given that "Congress is vested with the principal power to control the nation's borders," *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 755 (9th Cir. 2018), any inherent authority the executive might have is irrelevant in this context.

[4] Defendants' citation to amici's statement that "there may be times when a state is genuinely unable to accept and process all asylum-seekers at its border," Third Br. 39, (a) ignores the rest of that sentence, which warns that "repeatedly refusing to accept asylum-seekers constitutes a failure to fulfill that state's obligations under the U.N. Convention," Amicus Br. of Amnesty Int'l, Dkt. 30 at 15 n. 36, and (b) ignores the factual record that Defendants were not "genuinely unable" to process arriving asylum seekers.

U.S.C. §111(b)(1)(E) (internal quotations and emphasis omitted). This language clearly indicates that Congress wanted to ensure that the then-new Department of Homeland Security (DHS) would not prioritize its homeland security obligations at the expense of its other mandates. Yet that is precisely what the turnback policy does—subordinating the inspection and processing of arriving asylum seekers to virtually every other DHS mission. 2-ER-520 (prioritizing national security, counter-narcotics, and economic security, and noting that asylum processing "remains a component of CBP's mission, but priority should be given to the efforts described above in the prescribed order.").

At bottom, Defendants argue that so long as they processed some asylum seekers (regardless of how many were arriving at POEs), they could do as they pleased. That is not what Congress said in the INA, however, and absent any other source of authority to "'turn back' or 'push back' asylum seekers as they reached POEs," 1-ER-100, Defendants' conduct is a violation of §706(2)(C).

### C.    The Turnback Policy Is Arbitrary and Capricious

Defendants argue that the turnback policy is not arbitrary and capricious because they were actually facing capacity constraints and turning back arriving asylum seekers helped alleviate those constraints. Third Br. 40-43. That is incorrect for three reasons.

*First*, the turnback policy was not designed to address actual capacity issues. Defendants' own employee testified that "it was obvious to everyone implementing [the turnback policy] . . . that the capacity excuse was a lie." 1-SER-165. Another CBP officer testified that CBP had the resources to process asylum seekers in the order that they came to POEs, but chose not to. 3-SER-559. Moreover, a report from DHS' Office of Inspector General concluded that seven POEs "effectively stopped processing" arriving asylum seekers, despite being legally required to do so. 1-SER-20. At two POEs, Defendants "stopped using blocks of available holding cells, allowing those cells to sit empty while [asylum seekers] waited in . . . lines in Mexico." 1-SER-21. Finally, a contemporaneous email from a CBP officer noted that the Hidalgo POE had removed seats from its secondary inspection area to decrease its processing capacity. 2-SER-350; 3-SER-565. Apart from a meaningless footnote buried in Defendants' brief stating that the "Government generally disputes" those facts for unspecified reasons, *see* Third Br. 41, Defendants have no response to these specific facts from their own employees and documents. Defendants cannot defeat summary judgment merely by "generally disput[ing]" witness testimony.

*Second,* turnbacks continued regardless of the actual number of asylum seekers arriving at POEs. For example, the number of asylum seekers presenting themselves for inspection at POEs dropped significantly in 2017, but Defendants

9

continued turning back arriving asylum seekers. 1-SER-82, 103, 106, 109, 112, 116, 120, 176; 2-SER-287; 3-SER-508, 516; *see also* Third Br. 41 (arguing only that "use of [turnbacks] did decrease" in late 2016/early 2017, but conceding that turnbacks still occurred). Similarly, after an anticipated "caravan" of asylum seekers failed to materialize at POEs in the spring of 2018, Defendants nonetheless continued to turn back arriving asylum seekers and took further steps to memorialize the turnback policy in the 2018 memoranda.

*Third*, Defendants ignore additional factual context showing that turnbacks had nothing to do with asserted capacity concerns. Defendants processed *more* asylum seekers at POEs prior to implementing the turnback policy, demonstrating their capacity to do so. *See* 3-SER-557; 1-FER-010-012.[5] Moreover, when CBP officials came up with ways to increase the processing capacity of POEs, their management told them to keep turning back asylum seekers. 4-SER-909 ("maintain queue management"); 4-SER-915 (declining proposal that "would defeat the purpose of queue management").

The turnback policy was arbitrary and capricious. Defendants' half-hearted attempt to misrepresent the record only emphasizes that conclusion.

---

[5] Citations to 1-FER and 2-FER are to the volumes of the Further Excerpts of Record filed by Plaintiffs contemporaneously with this brief. Citations to FER without a volume number are to the Futher Excerpts of Record filed by Defendants at docket entry 63.

## II.     Plaintiffs Should Prevail on Their Independent INA Claim

Plaintiffs separately challenge Defendants' *ultra vires* actions of turning away asylum seekers from POEs. Should Plaintiffs' allegations not satisfy the § 706(2) requirements for reviewability, this independent cause of action is a viable source of relief under courts' longstanding equitable authority to grant nonmonetary relief to remedy unauthorized government action. FER-066; *see Murphy Co. v. Biden*, 65 F.4th 1122, 1129 (9th Cir. 2023) (explaining, in a non-APA case, that "actions by subordinate Executive Branch officials that extend beyond delegated statutory authority—*i.e.*, *ultra vires* actions—are reviewable"); *Stark v. Wickard*, 321 U.S. 288 (1944) (holding, pre-APA, that an injunction was available against the Secretary of Agriculture for allegedly exceeding statutory authority).[6]

Defendants concede that the district court's analysis under *E.V. v. Robinson*, 906 F.3d 1082 (9th Cir. 2018), which formed the basis for its grant of summary judgment to Defendants on this claim, was incorrect. Third Br. 45. Defendants' attempt to portray the decision below as based on anything other than *E.V. v. Robinson* is disingenuous. Defendants incorrectly assert that the district court granted summary judgment on this claim because Plaintiffs "could obtain review under the APA," citing *Jafarzadeh v. Duke*, 270 F. Supp. 3d 296, 311 (D.D.C. 2017).

---

[6] As with Plaintiffs' § 706(2) claim, the district court did not analyze the application of 8 U.S.C. § 1252(f)(1) to Plaintiffs' independent INA claim. The district court should address that issue on remand.

Third Br. 45. The district court did cite *Jafarzadeh*, but only to support its incorrect reasoning that if the APA's *waiver of sovereign immunity* is available, there can be no claim for nonstatutory review. 1-ER-96.[7] Defendants also misleadingly cite the district court's first motion-to-dismiss opinion, Third Br. 45 (citing FER-285-286), which was superseded when Plaintiffs amended the complaint. In its second motion-to-dismiss opinion, the district court expressly reconsidered its prior reasoning, 1-ER-283-85, and did not dismiss the independent INA claim, 1-ER-301.

Affirming summary judgment on this claim would be premature and directly contrary to binding Ninth Circuit precedent. First, Plaintiffs' independent INA claim was brought in the alternative to their APA §706(2) claim, and the district court has decided the merits of neither claim in the first instance. Second, the law in the Ninth Circuit is clear on this point: APA and equitable *ultra vires* claims "can proceed separately." *California v. Trump*, 963 F.3d 926, 941 n.12 (9th Cir. 2020) (noting this was permissible even where the claims sought the same scope of relief, but ultimately declining to address the equitable claim where the APA claim provided complete relief). Defendants misleadingly quote this Court's decision in *Sierra Club*

---

[7] The district court's reasoning and reliance on *Jafarzadeh* contradict clear Ninth Circuit precedent holding that the APA's waiver of sovereign immunity "enacted a broad, unqualified waiver for *all* non-monetary claims for relief against federal agencies," not just claims that meet the requirements of the APA. *Navajo Nation v. Dep't of the Interior*, 876 F.3d 1144, 1172 (9th Cir. 2017) (emphasis added).

*v. Trump*, 929 F.3d 670 (9th Cir. 2019), in an attempt to turn binding precedent on its head. Third. Br. 44. In *Sierra Club*, this Court held that although "the APA is the general mechanism by which to challenge final agency action," it does not "foreclose[] other causes of action" and plaintiffs can bring "an equitable cause of action for injunctive relief" outside of the APA. 929 F.3d at 699. *See also Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015) (the Court has "long held" that courts may enjoin violations of federal law by federal officials, based on a "long history of judicial review of illegal executive action" in courts of equity); *Sierra Club v. Trump*, 963 F.3d 874, 890-93 (9th Cir. 2020), *vacated on other grounds sub nom Biden v. Sierra Club*, 142 S. Ct. 46 (2021) (noting that "[w]hen Congress limits its delegation of power, courts infer (unless the statute clearly directs otherwise) that Congress expects this limitation to be judicially enforced," and that the APA "has not altered this presumption" (quoting *Dart v. United States*, 848 F.2d 217, 223 (D.C. Cir. 1988))).

Defendants' other citations on this point fare no better. *Graham v. FEMA* revised a district court's dismissal of an alternative "nonstatutory" constitutional claim to dismissal without prejudice, *to allow for potential later adjudication*. 149 F.3d 997, 1001 n.2 (9th Cir. 1998). *Ninilchik Traditional Council v. United States*, turns on the proper standard of review for actions brought under APA § 706(2) and

does not discuss independent "nonstatutory" claims. 227 F.3d 1186, 1994 (9th Cir. 2000).

The district court's grant of summary judgment to Defendants on Plaintiffs' alternative nonstatutory review INA claim should be reversed.

## III. Plaintiffs Should Prevail on Their ATS Claim

Defendants have no meaningful response to the consensus of international law authority identified by Plaintiffs and their amicus, International Refugee Scholars, which demonstrates that non-refoulement at the border is a *jus cogens* norm that meets the "specific, universal and obligatory" standard under *Sosa v. Alvarez-Machain*, 542 U.S. 692, 732, 748-49 (2004), and is therefore judicially enforceable under the ATS. Defendants' maximalist interpretation of *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155, 183 (1993), and their novel invocation of prudential considerations do not foreclose Plaintiffs' entitlement to relief.

### A. *Sale* Does Not Foreclose Recognition that Non-Refoulement Applies at the Border

Defendants' nearly exclusive reliance on dicta from *Sale* to support a categorical rule foreclosing *any* "extraterritorial" recognition of non-refoulement

753988227.2

under the ATS is misguided, as the norm unambiguously applies at least to the border.[8]

*Sale*'s actual holding was, at most, that Article 33 of the 1951 Refugee Convention was silent on whether the non-refoulement language applied to protect migrants interdicted on the "high seas." *See* 509 U.S. at 187 ("We do not read that text to apply to aliens interdicted on the high seas."); *see also id.* at 159; 160, 166-67; 173; 179-80 (all referencing "high seas"); *Blazevska v. Raytheon Aircraft Co.*, 522 F.3d 948, 954 (9th Cir. 2008) (*Sale* involved the "deportation of aliens from international waters").

Nevertheless, Defendants seek to transform what they concede is this limited, "ultimate holding" of *Sale*, Third Br. 51, into a maximalist principle foreclosing recognition of the norm if a person claiming fear is located *anywhere* outside a bright territorial line. But, both legally and practically speaking, the distance between the high seas and the land border is significant: an individual "intercepted on the high

---

[8] Defendants essentially replicate the district court's erroneous conclusion that select departures from an international-law norm displace its universal or obligatory status. Third Br. 49-50. This Court should not give weight to departures from the norm by a small number of states when considering the overwhelming support of most countries for non-rejection at the frontier of individuals who would otherwise be likely to suffer persecution. *See* Second Br. 53-54 & 56-58 nn. 19-22; *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 715 (9th Cir. 1992) (*jus cogens* "is derived from values taken to be fundamental by the international community, rather than from the fortuitous or self-interested choices of nations").

seas is in no country at all," *Sale*, 509 U.S. at 179, whereas international law has developed a consensus that, in part because of a sovereign's assertion of power at the border, the non-refoulement norm unambiguously applies there. *See* Second Br. 56-58 nn. 19-22; Amicus Br. Refugee Scholars, Dkt. 35 at 20; *see also Hernandez v. Mesa*, 582 U.S. 548, 559 (2017) (Breyer, J., dissenting) (border is a "limitrophe" area, a liminal frontier region where "international law recognizes special duties and obligations").[9]

Indeed, *Sale*'s own analysis of the meanings of "expel" and "return" ('refouler')" in Article 33.1 supports this distinction.[10] *Sale* concluded that expel "has the same meaning as deport," referring to someone already "present in the host country," and that return (*refouler*) refers to individuals "on the threshold of initial entry." 509 U.S. at 180 (citing *Leng May Ma v. Barber*, 357 U.S. 185, 187 (1958)). Critically, the Court observed that English translations of "refouler" "imply that 'return' means a defensive act of resistance or exclusion *at a border* rather than an act of transporting someone to a particular destination." *Id*. at 182 (emphasis added).

---

[9] Defendants argue that non-refoulement is not defined with requisite "specificity," Third Br. 49, but that is only because Defendants focus on whether the norm applies in *all circumstances extraterritorial*, as opposed to the question at issue here: whether the norm applies *specifically at the border*.

[10] The English-language version of the 1951 Refugee Convention uses the French verb *refouler* to explain the English verb "return": "No Contracting State shall expel or return ('refouler') a refugee . . . ." Convention Relating to the Status of Refugees, art. 33.1, July 28, 1951 19 U.S.T. 6259, 6276,  189 U.N.T.S. 150.

16

*Sale* did not address the contours of the non-refoulement *at the border* because the refugees in question were on the high seas. In contrast, it is hard to conjure a more apt description of those "on the threshold of initial entry," and thus protected from being "returned" (*refouler*) than Plaintiffs and class members. It is even harder to identify a policy that more accurately represents "a defensive act of resistance or exclusion *at a border*" than the turnback policy. *Id.* at 192.

Finally, Defendants fail to address that *Sale* was not an ATS case and limited its consideration of international law to whether the provisions of Article 33 directly afforded relief to petitioners. But the ATS' focus on the "law of nations" requires the court to consider a multiplicity of *other*—and more contemporary—sources of law. *See Siderman*, 965 F.2d at 714-15. As further detailed in the Second Brief and the amicus of Refugee Scholars, the turnback policy violates nonrefoulement of an asylum seeker "at the frontier." *See* U.N. Human Rights Comm., *Views of the Human Rights Committee Under Article 5(4) of the Optional Protocol to the International Covenant on Civil and Political Rights*, at 176, U.N. Doc. A/36/40 (June 6, 1979).

### B. The Government's Asserted Prudential Factors Do Not Foreclose Recognition of the Norm

None of Defendants' newly-asserted prudential reasons are persuasive.

<u>Separation of Powers</u>

Defendants assert that the existence of U.S. treaty obligations and statutes governing withholding of removal (as well as concomitant limitations on judicial

17

review of those statutes) foreclose an ATS cause of action. Defendants cite no authority for this novel proposition, as the existence of statutory enactments that run parallel to the ATS has nothing to do with the court's independent duty to enforce customary international law norms under *Sosa*. The district court correctly rejected this "preemption" argument when it was raised in seeking to dismiss Plaintiffs' ATS claim in the First Amended Complaint. 1-ER-299 ("there is no absolute preclusion of international law claims by the availability of domestic remedies for the same alleged harm.") (internal quotations omitted). *See also Flomo v. Firestone Nat. Rubber Co.,* 643 F.3d 1013, 1022 (7th Cir. 2011) ("the fact that Congress may not have enacted legislation implementing a particular treaty or convention . . . does not make a principle of customary international law evidenced by the treaty or convention unenforceable in U.S. courts.").

Defendants' argument runs headlong into settled ATS jurisprudence. For example, Congress has enacted limited prohibitions on torture via the federal Torture Statute, 18 U.S.C. § 2340; the War Crimes Act of 1996, 18 U.S.C. § 2441; and the Torture Victims Protection Act of 1991, 8 U.S.C. § 1350 note sec. 2(a), 106 Stat. 73 (1992). Yet none of the dozens of cases enforcing the anti-torture norm via the ATS took that substantial congressional action as a reason to displace the judiciary's independent authority to enforce the norms against torture, war crimes, or cruel, inhuman, and degrading treatment. *See e.g. Sosa*, 542 U.S. at 728, 732 (quoting with

18

approval *Filártiga v. Pena–Irala,* 630 F.2d 876, 890 (2d Cir. 1980)) (torture); *In re Estate of Marcos, Human Rights Litig.,* 25 F.3d 1467, 1475 (9th Cir. 1994) (torture)); *Al Shimari v. CACI Premier Tech., Inc*., 758 F.3d 516, 525-31 (4th Cir. 2014) (torture).

<u>National Security and Foreign Relations</u>

Defendants assert that undifferentiated national security and foreign relations "considerations" "at the border" categorically foreclose recognizing an ATS cause of action. Third Br. 55-56. Defendants' exclusive reliance on *Hernandez v. Mesa*, 140 S. Ct. 735, 746 (2020)—a *Bivens* case—reveals a fundamental error in their argument. *Bivens* claims are a judicially created remedy for implied causes of action against federal officials; they lack any congressional imprimatur whatsoever. But, as *Hernandez* explains, this "problem" with judicially implied causes of action "does not exist when a common-law court, which exercises a degree of lawmaking authority, fleshes out the remedies available for a common law tort." *Id*. at 742. As the Supreme Court held in *Sosa* and its progeny*,* the ATS provides express congressional authorization to the judiciary—absent in the *Bivens* context—to recognize causes of action for a limited set of common law norms. *See Sosa*, 542 U.S. at 724; *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 137-38 (2013); *Nestlé USA, Inc. v. Doe*, 141 S. Ct. 1931, 1935 (2021).

ATS claims for violations of *jus cogens* norms cannot be subject to a foreign affairs or national security exception, moreover, because such norms are non-derogable. *See* Second Br. 52-54; *see also United States v. Matta-Ballesteros*, 71 F.3d 754, 764 n.5 (9th Cir. 1995), *modified by* 98 F.3d 1100 (9th Cir. 1996). Like the norm prohibiting torture, non-refoulement by a state actor is not subject to exceptions in the name of national security. *See Filartiga*, 630 F.2d at 884.

In addition, a foreign affairs or national security exception for ATS claims would swallow the rule regarding enforcement of customary international law, given that ATS cases routinely touch on issues of foreign relations and national security, and no court has ever created such an exception. *See, e.g.*, *Al Shimari v. CACI Premier Tech., Inc*., 840 F.3d 147, 159 (4th Cir. 2016) (claims of national security or military commands do not foreclose ATS claims of torture and war crimes); *Sarei v. Rio Tinto, PLC, 671 F.3d 736, 758-64 (9th Cir. 2011), amended by 772 F.3d 1109 (9th Cir. 2013)* (genocide and war crimes); *Kadic v. Karadzic*, 70 F.3d 232, 242 (2d Cir. 1995) (war crimes and genocide); *In re Estate of Marcos*, 25 F.3d at 1475 (military's torture). Indeed, because the congressional purpose in enacting the ATS was "to ensure the availability of a federal forum where the failure to provide one might cause another nation to hold the United States responsible for an injury to a foreign citizen," *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1397 (2018), the interest in foreign relations only supports enforcing a cause of action here, to benefit asylum-

seeking plaintiffs aggrieved by U.S. human rights violations. *Compare Jesner*, 138 S. Ct. at 1407 (declining to recognize ATS action against *foreign* corporation whose sovereign government strenuously objected to suit).

Finally, Defendants' invocation of "national security" lacks analysis or evidence demonstrating that it is a *bona fide* concern in this case. In any event, "national-security concerns must not become a talisman used to ward off inconvenient claims—a 'label' used to 'cover a multitude of sins.'" *Ziglar v. Abbasi*, 582 U.S. 120, 143 (2017). The actual record conclusively proves that metering was driven by domestic political calculations, not national security. *See supra* Section I.C.

Sovereign Immunity

Defendants argue that sovereign immunity is a prudential factor that also precludes recognizing an ATS claim. Notably, Defendants do not actually invoke sovereign immunity as a basis to dismiss the claim, likely because they failed to raise this defense in response to the Second Amended Complaint, thereby waiving the defense under Federal Rule of Civil Procedure 12(h).[11]

---

[11] The Ninth Circuit recognizes that federal sovereign immunity "despite the label 'immunity'" is properly understood as "a defense to liability rather than a right to be free from trial"—that is, not a bona fide immunity, *Alaska v. United States*, 64 F.3d 1352, 1355-56 (9th Cir. 1995), demonstrating that the defense, like other non-jurisdictional defenses, is waivable. *See United States v. Beggerly*, 524 U.S. 38, 42–48 (1998).

Regardless, sovereign immunity is a red herring because Plaintiffs seek only non-monetary relief, and Congress expressly waived sovereign immunity for all claims for non-monetary relief as part of the APA. 5 U.S.C. § 702; *Navajo Nation v. Dep't of the Interior*, 876 F.3d 1144, 1171 (9th Cir. 2017) ("§ 702 waives whatever sovereign immunity the United States enjoyed from prospective relief with respect to *any* action for injunctive relief") (internal quotations omitted) (emphasis added). *See also Armstrong v. Exceptional Child Ctr., Inc.* 575 U.S. 320, 327 (2015) (confirming availability of equitable relief "with respect to violations of federal law by federal officials").

Finally, any nominal interest in sovereign immunity would be outweighed in the face of the violation of *jus cogens* norms. Federal sovereign immunity has no constitutional provenance; it is a creature of federal common law. *Al Shimari v. CACI Premier Tech., Inc.*, 368 F. Supp. 3d 935, 944 n.4 (E.D. Va. 2019). The ATS is a jurisdictional statute that instructs judges to look to federal common law (as informed by the law of nations) for substantive rules of decision. *Sosa*, 542 U.S. at 732; *Kadic*, 70 F.3d at 246. Where, as here, the relevant substantive law is a *jus cogens* norm, that norm trumps an interest in sovereign immunity. *Siderman*, 965 F.2d at 718; *see also Al Shimari*, 368 F. Supp. 3d at 963 (prohibition on *jus cogens* violations "necessarily" imposes a "rule requiring an effective means to redress that violation," lest the "prohibitory norm itself would be toothless"). Put another way,

because "*jus cogens* violations are, by definition, acts that are not officially authorized by the Sovereign," immunity cannot extend to actions that violate *jus cogens* norms. *Yousuf v. Samantar*, 699 F.3d 763,776 (4th Cir. 2012); *Al Shimari*, 368 F. Supp. 3d at 966 (similar); *Mireskandari v. Mayne*, 2016 WL 1165896, at *17 (C.D. Cal. Mar. 23, 2016) (following *Samantar*); *C.D.A. v. United States*, 2023 WL 2666064, at *18-20 (E.D. Pa. Mar. 28, 2023) (following *Al Shimari*).

## C. Defendants' Novel ATS Arguments on the Merits Are Unpersuasive

This Court can dispense with Defendants' remaining arguments, raised for the first time on appeal. Third Br. 56-57. *First*, in recognizing a non-refoulement cause of action, the court should be guided by the law of nations, which strives to protect the right to apply for *asylum*,[12] and not limit the right to the scope of "the withholding statute." Third Br. 56.

*Second*, the facts in this case demonstrate that Plaintiffs likely face persecution based on protected grounds. *Id.* Three Doe Plaintiffs—Abigail, Beatrice, and Carolina—are Mexican nationals who claimed fear of persecution in Mexico, the country to which they were *refouled*. *See* 1-FER-090–91; 101–103; 114–115.

---

[12] Many international sources refer to non-refoulement as protecting the right to apply for *asylum* specifically. *See, e.g., See Hirsi Jamaa and Others v. Italy*, 2012-II Eur. Ct. H.R. 97 (2012); G.A. Res. 2312, *Declaration on Territorial Asylum*, 22 U.N. GAOR Supp. (No. 16) at 31, U.N. Doc. A/6716 (1967); U.N. High Comm'r for Refugees, Exec. Comm., *Protection of Asylum-Seekers in Situations of Large-Scale Influx No. 22 (XXXII)*, ¶ II.A, U.N. Doc. A/36/12/Add. 1 (Oct. 21,1981).

Non-Mexican Plaintiffs reported a substantial fear of harm in Mexico. *See, e.g.*, 1-FER-014-240; 2-FER-258-267. And, to the extent this Court believes that Plaintiffs' "generalized contention[s]" are "insufficient to establish [the] nexus" with protected bases of persecution, it then becomes a proper triable issue that can be addressed on remand.

*Finally*, no court is being asked to "sit in judgment of Mexico's enforcement of its own immigration laws," Third Br. 57, only to recognize the reality of what the record supports—CBP's expulsion of migrants to Mexico will lead to Mexico-initiated deportations.

This Court should reverse the district court's holding and grant summary judgment on Plaintiffs' ATS claim.

## CONCLUSION

Plaintiffs should have prevailed on all of their claims at summary judgment, not just on their APA § 706(1) and Fifth Amendment claims. This Court should reverse the District Court's rulings concerning § 706(2), the independent INA claim, and the ATS claim, grant Plaintiffs summary judgment on their ATS claim, and remand the case for reconsideration of Plaintiffs' § 706(2) and independent INA claims under the proper legal standard.

Dated: May 22, 2023

Respectfully submitted,

Melissa Crow
CENTER FOR GENDER & REFUGEE STUDIES
1121 14th Street, N.W., Suite 200
Washington, DC 20005
(202) 355-4471

Neela Chakravartula
Anne Dutton
CENTER FOR GENDER & REFUGEE STUDIES
200 McAllister Street
San Francisco, CA 94102
(415) 565-4877

Baher Azmy
Angelo Guisado
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6464

Sarah Rich
SOUTHERN POVERTY LAW CENTER
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
(404) 521-6700

Rebecca Cassler
SOUTHERN POVERTY LAW CENTER
1101 17th Ave. NW, Suite 705
Washington, D.C. 20036
(404) 521-6700

Kate Melloy Goettel
Gianna Borroto
Suchita Mathur
AMERICAN IMMIGRATION COUNCIL
1331 G St. N.W., Suite 200
Washington, DC 20005

/s/ Ori Lev
Ori Lev
MAYER BROWN LLP
1999 K Street, N.W.
Washington, DC 20006
(202) 263-3270

Matthew H. Marmolejo
MAYER BROWN LLP
350 S. Grand St., 25th Floor
Los Angeles, CA 90071
(213) 621-9483

Stephen M. Medlock
Evan Miller
Rami Rashmawi
VINSON & ELKINS LLP
2200 Pennsylvania Ave., N.W.
Suite 500 West
Washington, DC 20036
(202) 639-6500

753988227.2

(202) 507-7552

26

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that:

1. The motion is proportionally spaced, has a typeface of 14 point or more, and contains 5,778 words, exclusive of the exempted portions of the brief.

2. The brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font. As permitted by Fed. R. App. P. 32, the undersigned has relied on the word-count feature of this word-processing system in preparing this certificate.

Dated: May 22, 2023

Respectfully submitted,

/s/ Ori Lev
Ori Lev
MAYER BROWN LLP
1999 K Street, N.W.
Washington, DC 20006
(202) 263-3270