Nos. 22-55988, 22-56036

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

————————————————

AL OTRO LADO, INC., *et al.*,

*Pls.-Appellees/Cross-Appellants*,

v.

ALEJANDRO MAYORKAS, Secretary of Homeland Security, *et al.*,

*Defendants-Appellants/Cross-Appellees*,

and

The EXECUTIVE OFFICE FOR IMMIGRATION REVIEW,

*Appellant/Cross-Appellee*.

————————————————

APPEAL FROM FINAL JUDGMENT OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF CALIFORNIA
No. 17-cv-02366-BAS-KSC

————————————————

## APPELLEES/CROSS-APPELLANTS' FURTHER
## EXCERPTS OF RECORD VOLUME 1

Melissa Crow
CENTER FOR GENDER & REFUGEE STUDIES
1121 14th Street, N.W., Suite 200
Washington, DC 20005
(202) 355-4471

Neela Chakravartula
Anne Dutton
CENTER FOR GENDER & REFUGEE STUDIES
200 McAllister Street
San Francisco, CA 94102
(415) 565-4877

Baher Azmy
Angelo Guisado
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6464

Ori Lev
MAYER BROWN LLP
1999 K Street, N.W.
Washington, DC 20006
(202) 263-3270

Stephen M. Medlock
Evan Miller
Rami Rashmawi
VINSON & ELKINS LLP
2200 Pennsylvania Ave., N.W.,
Suite 500 West
Washington, DC 20036
(202) 639-6500

*Additional Counsel listed inside cover*

Sarah Rich
SOUTHERN POVERTY LAW CENTER
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
(404) 521-6700

Rebecca Cassler
SOUTHERN POVERTY LAW CENTER
201 Saint Charles Avenue, Suite 2000
New Orleans, LA 70170
(504) 486-8982

Katherine Melloy Goettel
Gianna Borroto
Suchita Mathur
AMERICAN IMMIGRATION COUNCIL
1331 G St NW, Suite 200
Washington, DC 20005
(202) 507-7552

*Counsel for Appellees/Cross Appellants*

1   MAYER BROWN LLP
    Matthew H. Marmolejo (CA Bar No. 242964)
2    *mmarmolejo@mayerbrown.com*
3   350 S. Grand Avenue
    25th Floor
    Los Angeles, CA 90071-1503
4    Ori Lev (DC Bar No. 452565)
     (*pro hac vice*)
5    *olev@mayerbrown.com*
     Stephen M. Medlock (VA Bar No. 78819)
6    (*pro hac vice*)
     *smedlock@mayerbrown.com*
7   1999 K Street, N.W.
    Washington, D.C. 20006
8   Telephone:  +1.202.263.3000
    Facsimile:   +1.202.263.3300
9
    SOUTHERN POVERTY LAW CENTER
10   Melissa Crow (DC Bar No. 453487)
     (*pro hac vice*)
11   *melissa.crow@splcenter.org*
    1101 17th Street, N.W., Suite 705
12  Washington, D.C. 20036
    Telephone: +1.202.355.4471
13  Facsimile: +1.404.221.5857

14  *Additional counsel listed on next page*
    *Attorneys for Plaintiffs*
15

16                **UNITED STATES DISTRICT COURT**

                **SOUTHERN DISTRICT OF CALIFORNIA**
17

18  | Al Otro Lado, Inc., *et al.*, | Case No.:  17-cv-02366-BAS-KSC |
19  |                               |                                |
    |              Plaintiffs,      | **EXHIBIT 3 IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** |
20  |                               |                                |
    |          v.                   |                                |
21  | Chad F. Wolf,[1] *et al.*,    |                                |
22  |                               |                                |
    |              Defendants.      | **FILED UNDER SEAL**           |
23  |                               |                                |
24

25

26

27  _____

28  [1]  Acting Secretary Wolf is automatically substituted for former Acting Secretary McAleenan pursuant to Fed. R. Civ. P. 25(d).

1
2   CENTER FOR CONSTITUTIONAL RIGHTS
3       Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
        *bazmy@ccrjustice.org*
4       Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
        *gschwarz@ccrjustice.org*
5       Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
        *aguisado@ccrjustice.org*
6   666 Broadway, 7th Floor
    New York, NY 10012
7   Telephone: +1.212.614.6464
    Facsimile: +1.212.614.6499
8
9   SOUTHERN POVERTY LAW CENTER
        Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
10      *sarah.rich@splcenter.org*
        Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
11      *rebecca.cassler@splcenter.org*
    150 E. Ponce de Leon Ave., Suite 340
12  Decatur, GA 30030
    Telephone: +1.404.521.6700
13  Facsimile: +1.404.221.5857
14
    AMERICAN IMMIGRATION COUNCIL
15      Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
        *kwalters@immcouncil.org*
16  1331 G St. NW, Suite 200
    Washington, D.C. 20005
17  Telephone: +1.202.507.7523
    Facsimile: +1.202.742.5619
18
19
20
21
22
23
24
25
26
27
28

EXHIBIT 3 IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT

Page 1

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

AL OTRO LADO, INC., ET              )
AL.,                                )
                                    )
    Plaintiffs,                     )
                                    ) CIVIL ACTION
VS.                                 )
                                    ) NO.: 17-cv-02366-BAS-KSC
KEVIN K. MCALEENAN, ET              )
AL.,                                )
                                    )
    Defendants.                     )
          ------------------------------------

            ORAL AND VIDEOTAPED CONFIDENTIAL

                    DEPOSITION OF

                    DAVID ATKINSON

                    JUNE 12, 2020

            TAKEN VIA REMOTE VIDEOCONFERENCE

          ------------------------------------

    ORAL AND VIDEOTAPED DEPOSITION OF DAVID ATKINSON,
produced as a witness at the instance of the Plaintiffs,
and duly sworn, was taken in the above-styled and
numbered cause on June 12, 2020, from 9:32 a.m. to 3:19
p.m., before Annette Peltier, CSR, Texas Certified
Realtime Reporter, in and for the State of Texas,
reported by machine shorthand from Houston, Texas,
pursuant to the Federal Rules of Civil Procedure and the
provisions stated on the record or attached hereto.



```
                                                              Page 2
 1                    A P P E A R A N C E S
 2
 3
    FOR THE PLAINTIFFS:
 4
          (Appearing via Videoconference)
 5
          MR. STEPHEN M. MEDLOCK
 6        MR. ORI LEV
          Mayer Brown
 7        1999 K Street, N.W.
          Washington, D.C.  20006
 8        Phone: 202.263.3221
          E-Mail: Smedlock@mayerbrown.com
 9
10
11  FOR THE DEFENDANTS:
12        (Appearing via Videoconference)
13        MR. ALEXANDER HALASKA
          MS. KATHERINE J. SHINNERS
14        U.S. Department of Justice
          Office of Immigration Litigation
15        Ben Franklin Square, P.O. Box 868
          Washington, D.C.  20044
16        Phone: 202.598.8259
          E-Mail: Alexander.j.halaska@usdoj.gov
17                Katherine.j.shinners@usdoj.gov
18              - and -
          MR. BENJAMIN WOLARSKY, CBP In-House Counsel
19
20
    FOR THE WITNESS:
21
          (Appearing via Videoconference)
22
          MR. DENIS DOWNEY
23        Attorney at Law
          1185 Ruben Torres Sr. Blvd., Suite 3
24        Brownsville, Texas 78521-1743
          Phone: 956.555.1234
25
```



Page 3

1
        ALSO PRESENT:

2
                (Appearing via Videoconference)

3
                Solange Tran, Videographer

4               Kevin Cranford, Exhibit Tech

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Page 4

1                          Index

2                                                    Page

3

    Appearances.............................    2

4

    Examination by Mr. Medlock..............    6

5

    Examination by Mr. Halaska..............  166

6

    Adjournment.............................  180

7

    Court Reporter's Certificate............  182

8

                        Exhibits

9    Number        Description                 Page

10   Exhibit 288   March 30, 2017 E-Mail
                   From Walter Dressler to

11                 William T. Haralson,
                   Concerning an incident

12                 On December 6, 2016,
                   Et al

13                 (NTEU 000136-137)..........   73

14

     Exhibit 289  December 23, 2016

15                E-Mail from Jessica Ibarra
                  To William T. Haralson,

16                Concerning the incident
                  On December 6, 2016

17                (NTEU 000138)..............   79

18   Exhibit 290  December 27, 2016
                  E-Mail from Eric Clough

19                To David Atkinson, concerning
                  The incident on December 6,

20                2016
                  (NTEU 000139-40)...........   84

21

     Exhibit 291  April 12, 2017, E-Mail

22                From William T. Haralson
                  To Walter Dressler, Pages 1-19

23                (NTEU 00141-159)...........   91

24

25



```
                                                    Page 5
 1   Exhibit 292    March 15, 2017, E-Mail
                    From William T. Haralson to
 2                  David Higgerson, Step 3
                    Grievance(Failure to
 3                  Process ER/CF & Asylum HID 2017)
                    (NTEU 000132).............      122
 4
     Exhibit 293    March 15, 2017, Letter from
 5                  William Haralson to David
                    Higgerson, Director of
 6                  Field Operations, Step 3
                    Grievance, et al,
 7                  (NTEU 000133-135)..........      140
 8   Exhibit 294    March 19, 2017, E-Mail
                    From David Atkinson to
 9                  Tony Reardon, Requesting
                    Asylum,
10                  (NTEU 000110-131)..........      140
11                         * * * * *
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



Page 31

1      A.  I was -- I was working as a -- two things.  I

2   was working as a security guard at the U.S. immigration

3   camp.  I was a supervisor out there, supervising the

4   movement and care of detainees.

5           And second, I was hired as a -- as a cook

6   foreman out there.  I actually was going to become a --

7   selected for a detection officer, but a -- a freeze

8   happened and they asked me if I wanted to go back as a

9   security guard or take this position, so I took the cook

10  foreman position as a government position first.

11     Q.  And when you said you were a security guard and

12  a cook foreman, what government installation were you

13  working at at that time?

14     A.  At the Port Isabel Immigration Processing

15  Center for the Immigration and National --

16  Naturalization Service in Bayview, Texas.

17     Q.  Okay.  And at -- at that time, Port Isabel was

18  dealing -- was dealing with an influx of migrants from

19  Cuba and other countries, correct?

20     A.  Correct.

21     Q.  And to your observation, how did the INS

22  facility at Port Isabel deal with that influx of

23  migrants from Cuba?

24     A.  They did it very professionally, very

25  professionally.  They -- they -- they made sure they



Page 32

1    had bathing equipment, food, essentials.  They made

2    adequate space for them in the facility, and -- it was

3    a 24-hour operation.

4              Due to the limited amount of -- of

5    equipment spaces, it had to be a 20 -- 24-hour service

6    for the -- for the immigrants.

7      Q.  So is it the -- is it your opinion that when

8    CBP or its predecessor organization wants to deploy the

9    resources necessary to handle a spike in migrants, it

10   can do so?

11             MR. HALASKA:  Objection to the extent

12   that it calls for expert testimony.

13             Mr. Atkinson -- or excuse me -- yes,

14   Mr. Atkinson, you may answer the question.

15             THE WITNESS:  I may answer the

16   question?

17             MR. HALASKA:  You may.

18             THE WITNESS:  Is the CBP attorney

19   going to allow me to answer the question?

20             MR. HALASKA:  I represent the United

21   States government.  You may answer the question.

22             THE WITNESS:  Thank you, sir.

23     A.  Yes, I do.

24     Q.  (BY MR. MEDLOCK)  Why do you believe that,

25   then?



Page 33

1       A.  I've -- I've seen it firsthand of -- of how it

2   worked, how it worked in the Covid.  I think the --

3   the -- the lack of -- of -- lack of competent people

4   running the -- the -- the system didn't allow it to

5   happen.

6       Q.  When you say "lack of people running" --

7   "competent people running the system didn't allow it to

8   happen," are you talking about what's going on today?

9       A.  I'm talking about the agency's official that --

10  that -- agency officials that -- that ran it at the

11  time --

12      Q.  The --

13      A.  -- at the local and national level.

14      Q.  Okay.  And when you -- in March 1991, when you

15  were sworn in to be a U.S. Customs officer, did you

16  receive any training prior to being sworn in?

17      A.  No.

18      Q.  How about afterwards?  Did you receive any

19  training --

20      A.  Yes.

21      Q.  -- from U.S. Customs?

22      A.  Yes.

23      Q.  Where did that training take place?

24      A.  It took place in Front Royal, Virginia.

25      Q.  Was that the -- at the Federal Law Enforcement



Page 34

1    Training Center?

2        A.  No.  It was at the Canine -- Canine --

3        Q.  Ah.

4        A.  -- Enforcement Academy, Training Academy.

5        Q.  Oh, okay.  I know where that is.  I've driven

6    by that on I-66.  Okay.

7               Is it -- and was your first position at --

8    at the U.S. Customs Service to -- to be a canine

9    officer?

10       A.  My understanding, I was hired -- hired as a

11   CBP -- I mean, I'm sorry, as a Customs inspector; but I

12   was assigned a canine enforcement position.  And I

13   found that out when they were doing my background

14   investigation.  They told me it was for an inspector,

15   and they had me in -- you know, I mean, they had sent

16   me to a -- to a canine enforcement officer position.

17               I applied for both of them.  It was

18   just crisscrossed --

19       Q.  When -- when you -- sorry.  I didn't mean to

20   talk over you.

21               After you received training to be a canine

22   enforcement officer, where was your first posting

23   within U.S. Customs?

24       A.  I was assigned to the Port of Hidalgo, Texas;

25   but my assignment was unique, as I was hired as one of



1-FER-013

MAYER BROWN LLP
  Matthew H. Marmolejo (CA Bar No. 242964)
  *mmarmolejo@mayerbrown.com*
350 S. Grand Avenue
25th Floor
Los Angeles, CA 90071-1503
  Ori Lev (DC Bar No. 452565)
  (*pro hac vice*)
  *olev@mayerbrown.com*
  Stephen M. Medlock (VA Bar No. 78819)
  (*pro hac vice*)
  *smedlock@mayerbrown.com*
1999 K Street, N.W.
Washington, D.C. 20006
Telephone:  +1.202.263.3000
Facsimile:  +1.202.263.3300

SOUTHERN POVERTY LAW CENTER
  Melissa Crow (DC Bar No. 453487)
  (*pro hac vice*)
  *melissa.crow@splcenter.org*
1101 17th Street, N.W., Suite 705
Washington, D.C. 20036
Telephone: +1.202.355.4471
Facsimile: +1.404.221.5857

*Additional counsel listed on next page*
*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*,<br><br>                    Plaintiffs,<br><br>        v.<br><br>Chad F. Wolf,[1] *et al.*,<br><br>                    Defendants. | Case No.:  17-cv-02366-BAS-KSC<br><br>**EXHIBIT 8 TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>**AOL-DEF-00217179 to AOL-DEF-00217247**<br><br>*FILED UNDER SEAL* |

---

[1] Acting Secretary Wolf is automatically substituted for former Acting Secretary McAleenan pursuant to Fed. R. Civ. P. 25(d).

CENTER FOR CONSTITUTIONAL RIGHTS
Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
*bazmy@ccrjustice.org*
Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
*gschwarz@ccrjustice.org*
Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
*aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
*sarah.rich@splcenter.org*
Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
*rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.401.221.5857

AMERICAN IMMIGRATION COUNCIL
Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
*kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.56

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

```
 1                        United States District Court

 2                    for the Southern District of California

 3                                        )
     AL OTRO LADO, Inc., et al.,          )
 4                                        )   No. 17cv2366-BAS
             Plaintiffs,                  )
 5                                        )   May 10, 2019
                 v.                       )
 6                                        )   San Diego, California
     KIRSTJEN NIELSEN, Secretary,         )
 7   U.S. Department of Homeland          )
     Security, in her official            )
 8   capacity, et al.,                    )
                                          )
 9        Defendants.

10
                        TRANSCRIPT OF MOTION HEARING
11                 BEFORE THE HONORABLE CYNTHIA BASHANT
                       United States District Judge
12
     APPEARANCES:
13
     For the Plaintiffs:      MAYER BROWN LLP
14                                 MATTHEW H. MARMOLEJO
                                   Attorney at Law
15
                              THE CENTER FOR CONSTITUTIONAL RIGHTS
16                                 BAHER AZMY
                                   ANGELO R. GUISADO
17                                 Attorneys at Law

18                            SOUTHERN POVERTY LAW CENTER
                                   MELISSA E. CROW
19                                 SARAH MARION RICH
                                   REBECCA CASSLER
20                                 Attorneys at Law

21   For the Defendants:      U.S. DEPARTMENT OF JUSTICE
                                   ALEXANDER JAMES HALASKA
22                                 GISELA ANN WESTWATER
                                   Attorneys at Law
23
     Court Reporter:          Dana Peabody, RDR, CRR
24                            District Court Clerk's Office
                              333 West Broadway, Suite 420
25                            San Diego, California 92101
                              DanaPeabodyCSR@gmail.com
```

AOL-DEF-00217179

```
 1            San Diego, California, May 10, 2019

 2                         *   *   *

 3            THE CLERK:  Calling matter number 1, 17cv2366, Al Otro

 4   Lado, Inc., et al. versus Nielsen, on calendar for motion

 5   hearing.

 6            THE COURT:  Counsel, state your appearances for the

 7   record, please.

 8            MR. MARMOLEJO:  Your Honor, Matthew Marmolejo, Mayer

 9   Brown, LLP, for plaintiffs.

10            MR. AZMY:  Your Honor, Baher Azmy, A-Z-M-Y, for the

11   plaintiffs, along with my colleague Angelo Guisado.

12            MS. CROW:  And Melissa Crow, along with my colleagues

13   Sarah Rich and Rebecca Cassler, for the plaintiffs.

14            MS. WESTWATER:  Good morning, Your Honor.

15   Gisela Westwater.  I am here from Department of Justice on

16   behalf of the defendants.

17            MR. HALASKA:  Alexander Halaska, also from the

18   Department of Justice, for defendants.

19            MS. WESTWATER:  This is our agency counsel.

20            THE COURT:  Let me tell you -- this is going to be a

21   little bit stream of consciousness, but let me tell you, sort

22   of, where I sort of stand at this point in time, and maybe that

23   will help focus your arguments.

24       First of all, I don't really see that the political

25   question doctrine bars review of the issues.  It seems to me
```

AOL-DEF-00217180

3

```
       1    that the issues at this point raised in the complaint are

       2    whether the defendants have complied with the statutes that

       3    govern the border patrol activity.  So I don't really see that

       4    as being an issue.

10:02  5        With respect to 706(1), I mean, to a certain extent, I feel

       6    like I've already ruled on some of these issues already.  And

       7    we're at the stage where I have to assume the truth of the

       8    plaintiffs' allegation, so assuming the truth of the

       9    plaintiffs' allegations, that they were coerced into

10:03  10   withdrawing their applications for admission, it seems to me

       11   that the fact that they then withdrew their applications for

       12   admission doesn't make it moot.  At this point they've at least

       13   alleged that they were coerced into doing so.

       14       With respect to the extraterritorial -- the arguments about

10:03  15   extraterritoriality over the new plaintiffs, it seems to me

       16   that some of the new plaintiffs, there are allegations, again,

       17   assuming they are true, that the individuals were at the port

       18   of entry.  So to the extent there are allegations that the

       19   individuals were at the port of entry, that doesn't seem to me

10:03  20   to be an issue.

       21       With respect to the ones who were not at the port of entry,

       22   who were maybe coming over the bridge, I agree that there are

       23   some limits, some extraterritorial limits.  I think that at

       24   this point, when I look at it, the issue is going to be whether

10:04  25   they were arriving at the port of entry, whether they were
```

AOL-DEF-00217181

1  seeking admission to the port of entry, and I think probably

2  there are sufficient allegations at this point to meet that

3  burden, but I certainly welcome argument on that issue.

4      With respect to 706(2), first of all, I'm not entirely

10:04    5  clear why you need 706(2) if you've got 706(1), but be that as

6  it may, I still have some trouble with it.  To the extent there

7  are allegations that there's this, you know, pattern and

8  practice, I think I really addressed that in the first motion

9  to dismiss.

10:04   10      To the extent there are allegations of individual

11  turnbacks, I think that's a 706(1), not a 706(2).

12      So that leaves me with this turnback policy, or whatever

13  you want to call it, turnback policy or metering policy or

14  whatever it is.  It seems to me that there is an allegation

10:05   15  that there's a policy which the defendants are not denying, and

16  I think the real question I have is whether that policy

17  is -- whether the allegations say that it is based on motive to

18  deter people from seeking asylum that is then decreasing the

19  number -- basically, it's a de facto limit on the number of

10:05   20  asylum seekers.

21      Because to the extent the plaintiffs are alleging there's a

22  policy that limits the number of asylum seekers, I think that's

23  barred under the statute or at least I think that implication

24  can be made.  There are limits on the number of refugees, but

10:05   25  there aren't limits on the number of people who can seek

AOL-DEF-00217182

5

1  asylum.  Anyone who wants to seek asylum can seek asylum, at

2  least that's the way I read the statutes.

3      With respect to the Fifth Amendment extraterritoriality, I

4  think it does apply under Boumediene, B-O-U-M-E-D-I-E-N-E, and

10:06  5  Rodriguez.  I think those are both applicable.

6      With respect to the state claims under the ATS, you know, I

7  have some real concerns about identifying a brand-new cause of

8  action under the ATS, and I am concerned about the

9  implications, for example, for an alien who is denied asylum or

10:06  10  denied refugee status, and under the INA, do they then get to

11  claim this AT -- this, you know, new cause of action as a way

12  to kind of do an end run around the INA?  And I think the

13  plaintiffs can obtain all the relief they seek under the INA,

14  and I just don't think at this point -- but I'll certainly

10:06  15  listen to it.  When you talk about an international norm, it's

16  got to be specific, universal, and obligatory.  I think you

17  have the specific.  Universal, you're a little further away.

18  And the obligatory, I'm really struggling.

19      So that's sort of where I stand right now to give you an

10:07  20  idea of what my thoughts are, and then I'll take argument from

21  there, and I think I'd like to hear from the defense first

22  since it's their motion.

23          MS. WESTWATER:  Okay, thank you.  Well, good morning.

24  Thank you.

10:07  25      Seeing how the Court has laid out -- I actually had a

AOL-DEF-00217183

6

|        |    |                                                                              |
|--------|----|------------------------------------------------------------------------------|
|        | 1  | document that we were wanting to present to the Court, which is               |
|        | 2  | actually the CBP's metering guidance because since this                      |
|        | 3  | Court -- since this case has started, I think plaintiffs                      |
|        | 4  | incorporated by reference -- first, they referred to, and then                |
| 10:07  | 5  | they incorporated by reference in their second amended                       |
|        | 6  | complaint, some emails talking about metering.  But since then,              |
|        | 7  | the government has formalized its metering guidance in a                      |
|        | 8  | memorandum.  And since we believe some of that will be talked                |
|        | 9  | about and will be fleshed out, what is this metering guidance,               |
| 10:08  | 10 | I'd like to present that.  We've already produced it in                       |
|        | 11 | discovery.                                                                    |
|        | 12 | THE COURT:  I'll tell you what you can do:  You can                          |
|        | 13 | present it, but I'm not going to reach the issue of whether                   |
|        | 14 | it's proper for me to consider it at this stage of the                        |
| 10:08  | 15 | proceedings or not.  I need some time to think about that and                 |
|        | 16 | take a look at what's alleged in the complaint and whether it's               |
|        | 17 | actually incorporated by reference.  So I will give plaintiffs                |
|        | 18 | the opportunity, if they want to, to argue that it should not                 |
|        | 19 | be considered at the motion-to-dismiss stage, but I'll let you                |
| 10:08  | 20 | present it with the understanding that it may or may not be                   |
|        | 21 | considered at this stage of the proceedings.                                  |
|        | 22 | MS. WESTWATER:  Yes, Your Honor.  And we don't believe                       |
|        | 23 | it's actually anything inconsistent perhaps with what we've                   |
|        | 24 | already had.  It is simply more put together and jelled                       |
| 10:08  | 25 | together.                                                                     |

AOL-DEF-00217184

1       Starting off with the political question, I think putting
2   that together, we believe it also goes together with a lot of
3   other cases.  So if you read Baker versus Carr, which is really
4   the quintessential case on political question, it limits -- it
10:09  5   gives you a little outline of what are political questions, but
6   one of them is really operational decisions that are open to
7   discretion.  And we believe that is really what CBP's metering
8   policy is.  They claim it a turnback or actually, guidance,
9   which we say is the guidance memo, really is.  You know, CBP,
10:09  10   if you look here on the southern border, you know, they are
11   responsible for inspecting vehicles.  They are responsible for
12   car lanes.  They are responsible for inspecting individuals.
13   On a given day, you know, there's thousands of people and
14   trucks and buses and cars that pass through the southern ports.
10:09  15   And so CBP has to decide every day how many lanes are we going
16   to have for inspecting vehicles?  How many lanes are we going
17   to have for inspecting goods?  And they have to determine how
18   many people are going to be in secondary inspection.  They're
19   required to look for smuggling of goods.  They're required to
10:10  20   look for bad visas.  They're required --
21       THE COURT:  The problem with all this is there's no
22   statute that says you have to -- if someone comes to the port
23   of entry, say, X, you have to refer them to secondary, and then
24   an allegation saying they were not following what they're
10:10  25   supposed to do because if someone comes, you're supposed to do

AOL-DEF-00217185

1  this, and in this case, there's an allegation that there's a

2  statute that says "you must do this" that they are not

3  following.

4  MS. WESTWATER:  That's where we would disagree.

10:10  5  Actually, plaintiffs' claims are you must process more people

6  without documents per day, and their claim is we want the Court

7  to get in and tell you, CBP -- I mean, they're complaining that

8  there aren't enough people there.  They're not taking people

9  without documents.

10:10  10  THE COURT:  It's way more than that that's alleged.

11  It's way more than that.  I mean, they're alleging -- there's

12  an active policy of discouraging by saying it's closed, you

13  can't come through, we're not processing people -- asylum

14  applications anymore, Trump has done away with asylum, there's

10:11  15  no -- Mexicans can't seek asylum, Central Americans can't seek

16  asylum.  There's a lot more than just metering.

17  MS. WESTWATER:  And I'm referring, Your Honor,

18  specifically for metering, to the individuals who are not yet

19  in the United States.  And so to the degree -- so I would kind

10:11  20  of put your other claims, and we'll talk about those ones that

21  we find -- we've sort of referred to as the territorial

22  plaintiff, but as far as the idea that an individual can bring

23  suit to force the United States to add more resources to the

24  processing of alien -- of travelers who do not have documents,

10:11  25  to the detriment of CBP's other missions, that is something we

AOL-DEF-00217186

1  feel is foreclosed by the Ninth Circuit case Graham as well as,

2  we believe, the Delmonte court -- case, the Delmonte case this

3  Court had referred to earlier.  We believe all of those

4  decisions where plaintiffs are challenging what resources and

10:12  5  saying that they're a false capacity claims, the Court can't

6  get into.  CBP goes to Congress with a budget.  Congress in

7  statutes has given CBP a wide range of missions.  And under

8  8 USC 1101 as well as 6 USC 202, CBP has the authority and the

9  discretion to balance its internal resources consistent with

10:12  10  what has been given by Congress to figure out where to process

11  these.

12       THE COURT:  So are you basically saying the Court has

13  no authority to consider the legality of government officials

14  in the immigration context ever?

10:12  15       MS. WESTWATER:  No, Your Honor, only to the degree

16  where this is saying CBP needs to move them -- needs to accept

17  individuals without travel documents across the border faster

18  and that this Court should get into whether or not CBP is not

19  taking people to its full capacity, which are some of the

10:13  20  claims that plaintiffs have made.

21    So we would say, first of all, an individual outside of the

22  United States who is not on U.S. soil has no right to cross the

23  border.  All of their rights, as we've said, attach once that

24  individual has his or her foot on U.S. soil, and that's very

10:13  25  clear from Movimiento as well as the Cuban American Bar

AOL-DEF-00217187

1    Association case.  Those all go over the history of the

2    importance of being on U.S. soil and so not being outside the

3    border.

4         THE COURT:  Seeking admission.

10:13   5         MS. WESTWATER:  No, when you read the text as it's

6    used in the INA, and as it's been construed by the Supreme

7    Court in Sale, as well as in other cases, "being at the border"

8    refers to being in the area of the port of entry.  It does not

9    mean being outside the border.

10:14  10         THE COURT:  Even if the allegations are that the

11   border patrol is going out there and saying you may not enter,

12   you may not come any closer, you may not approach?

13        MS. WESTWATER:  Yes, Your Honor.  The United States

14   has closed its borders when it has required to in response to

10:14  15   security situations, when people are coming across the border,

16   when they're storming.  It has the authority to do so in other

17   cases.  An individual who is not on U.S. soil, it is very clear

18   from Sale, I would also say from the Haitian Refugee Center

19   cases, as well as from the Cuban American Bar Association case,

10:14  20   those individuals, they are directly outside of the

21   United States, not yet on U.S. soil, and you will find those

22   cases find it is the putting of your foot on the soil that

23   makes the difference, even if you are interacting with U.S.

24   individuals.

10:15  25       We would say the cases that the Court was relying on to

AOL-DEF-00217188

1    find extraterritorial application, such as Boumediene and

2    Rodriguez, are very different.  Boumediene itself is, and the

3    Supreme Court stipulated, that its decision was based on the

4    fact that these individuals were in U.S. custody.

10:15   5         THE COURT:  What about the extent that there are new

6    plaintiffs that allege they were at the port of entry?  Your

7    argument is not applying to them.  Is that correct?

8         MS. WESTWATER:  So our argument is that in the

9    complaint, they have not sufficiently alleged facts that they

10:15   10   were on U.S. soil.

11        THE COURT:  "At the port of entry" is not on U.S.

12   soil?

13        MS. WESTWATER:  We do not believe that the language

14   they have used -- we believe in the complaint they are very

10:15   15   unclear about their language, and we believe under Iqbal and

16   Twombly that they have to be more clear if they are asserting

17   that they were in the United States at the time of those

18   interactions.

19        We believe that the Court, even though this is a motion to

10:16   20   dismiss, under Iqbal and Twombly, no longer has to fill the

21   gaps and infer facts that are not there.

22        So while you would take facts that are in the complaint,

23   and on that -- those assume that they're true facts, facts that

24   are not in the complaint, this Court does not have a duty and

10:16   25   in fact, cannot infer those facts in order to help plaintiffs

AOL-DEF-00217189

 1   make their claim.

 2       To the degree, however, that the Court finds that they were

 3   in the United States, the United States --

 4           THE COURT:  I wouldn't be finding they were in the

10:16   5   United States.  I would be finding that the plaintiffs have

 6   alleged they were in the United States.

 7           MS. WESTWATER:  Yes, Your Honor.  Yes, Your Honor.  To

 8   the degree the Court finds that plaintiffs have adequately

 9   alleged that certain individuals were in the United States, on

10:16  10   U.S. soil, at the time that they made these claims and were

11   turned back, the United States would say that was -- that is

12   not consistent with CBP's policy and that an individual who is

13   on U.S. soil would be processed under the statutes in

14   accordance with any claims that they've made.

10:17  15       We believe that any of those individuals -- as we have

16   said, we don't believe any of the individuals, so the

17   territorial or if there's what we claim is an extraterritorial

18   plaintiff, but if the Court finds that they've adequately

19   alleged they were actually in the United States, we would say

10:17  20   that those claims are moot because they have already received

21   any relief.

22       The difference here where we would -- we believe they

23   haven't stated a policy or a pattern and practice.  We don't

24   feel their claims are sufficient because what they've taken are

10:17  25   just amorphous, sort of a constellation of things that are not

AOL-DEF-00217190

13

| | |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 10:18 | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 10:18 | 10 |
| | 11 |

1  related, and tried to make them into a pattern and practice

2  claim.

3      We believe, as the Court has, sort of, said, that these

4  would be individual claims, but the problem here is if they are

5  individual claims, then there is no relief, and the Court had

6  said earlier well, they can't get injunctive relief because

7  they're already here, and they've already been processed, so

8  the only type of relief that you would normally think for

9  somebody who has already arrived and been processed would be

10  perhaps some sort of damages, which is not what plaintiffs are

11  seeking.

12      THE COURT:  Isn't there something, sort of,

13  fundamentally inconsistent with the government's position that

14  we have no obligation to these plaintiffs, we have no

15  obligation to admit them, and yet we've facilitated their

16  admission, we facilitated their entry into the United States?

17  Isn't that sort of fundamentally inconsistent?

18      MS. WESTWATER:  Well, for the first groups of

19  plaintiffs, we were very clear that what they were alleging,

20  such as that they'd been given misinformation or that somehow

21  they had been coerced while on U.S. soil, that those were

22  things that, if true, we believed were not consistent with

23  CBP -- with the INA, with U.S. policy.  So we do not find that

24  inconsistent.

25      And for the second group of individuals, the fact that the

AOL-DEF-00217191

1   United States would facilitate -- the United States in their

2   metering policy -- it's very important to recognize it is not a

3   policy that bars individuals without documents from crossing

4   the border.  It is a management tool that is applied when a

10:19   5   port of entry has reached its capacity to safely and under

6   sanitary conditions process individuals.

7       The United States does not manage the queue in Mexico, and

8   it was Mexican officials who found that it was very unsanitary

9   to have a thousand people waiting in line on foot for who knows

10:19   10   how long waiting to be processed.

11       The United States' policy is simply that as capacity opens

12   up, ports are able to take in individuals, but to the degree

13   they can no longer do so safely and effectively, and protecting

14   the travelers as well as CBP, they may then tell individuals to

10:20   15   wait, and that is the claim, so we don't feel it's inconsistent

16   to then say, when somebody has filed suit and threatens a

17   preliminary injunction, that we would actually process

18   individuals and prioritize these individuals when we have

19   capacity.

10:20   20       And that is what the United States committed to do.  That

21   does not in any way say that an individual has a right to

22   enter, and as we said, I believe the Supreme Court is very

23   clear in Sale that an individual who is not on our shores does

24   not have any right to cross.

10:20   25       THE COURT:  Sale is pretty different factually.

AOL-DEF-00217192

1          MS. WESTWATER:  Well, it is, but if you go to -- if

2     you read the Cuban American Bar Association case, actually it

3     is very clear in bringing -- to the very much -- the discussion

4     about foot on U.S. soil and the importance of that, as well as

10:21  5     the Haitian Refugee cases.  So while you might find Sale is

6     different, if you really read those cases in their full

7     context, you'll see they're not.  And as far as plaintiffs'

8     claim to try and say that the non-refoulement is somehow

9     granting them -- granting individuals a right, what they're

10:21  10    doing is taking and turning on its head something that says

11    once an individual's in the United States, the United States

12    may not return them to a place where they have fear and turning

13    that to say that's now an affirmative right.

14         Well, again, Sale dealt with this.  If you'll read in Sale,

10:21  15    they're referring to how, I think it was, one of the delegates

16    from Sweden specifically read into the record that

17    non-refoulement does not place an obligation on countries

18    towards anyone who is not on their territory.

19         You can also go, and there are other cases that also

10:21  20    reiterate this.  I think it was non -- I think it's the

21    Movimiento case, which also discusses specifically that

22    non-refoulement does not create a right for an individual who

23    is outside the United States to enter.  But what's more, in

24    order to find a cause of action for that, you would

10:22  25    have -- where the Court looked previously for the Alien Tort

AOL-DEF-00217193

1    Statute, so 8 USC 1350, the difference there is if you read the

2    case law, it is very clear, yes, it is only -- it is limited to

3    really very limited types of cases.  Under Sosa the Supreme

4    Court found, you know, they can only be piracy, torture, crimes

10:22    5    against ambassadors.

6            THE COURT:  I don't disagree with you on that, and I

7    think I told you in the tentative that I tend to agree with you

8    on the Alien Tort Statute, but I'm more interested in the INA

9    and the violations of that.  I mean, it seems to me that in its

10:22    10   enforcement of the INA, the Department of Homeland Security

11   defines "an arriving alien," what is an arriving alien, and it

12   seems under their statutes, these allegations meet that

13   definition.  This is someone arriving in the United States.  It

14   includes people in the process of arriving.

10:23    15           MS. WESTWATER:  Well, actually, Your Honor, the

16   difference there is because it is always referring to

17   individuals at a port of entry, but it might be an individual

18   who has crossed onto U.S. soil and is going to be inspected.

19   So even if you read that, the case law and the statutes, the

10:23    20   definitions, are very clear.  At a port of entry -- if you read

21   Mezei or you read Knauff, or, I think, maybe Knauff for

22   Americans' pronunciation, those cases are very clear.  They use

23   the same language, but those individuals were on U.S. soil, and

24   so why are they using that language, "arriving at" or "at"?  It

10:23    25   is because we have, if you do immigration cases, the entry

AOL-DEF-00217194

1   fiction; that as long as you're in the port of entry and we are

2   inspecting you, you are at the border.  You are not

3   officially -- you have not effectuated entry into the

4   United States.  And that is why we can also take a person at

10:24   5   the port of entry and we parole them.

6         THE COURT:  I'm laughing because I hear every week in

7   this court cases of drug smuggling where the people haven't

8   even made it to the inspection booth yet, before they're

9   waiting in line, and the government argues they have brought

10:24   10   drugs into the United States because they're in line, getting

11   ready to enter the United States.

12         MS. WESTWATER:  Well, but that is because they're

13   getting ready to effectuate.

14         THE COURT:  They're arriving in the United States.

10:24   15   MS. WESTWATER:  But they're on U.S. soil, Your Honor,

16   and so that goes to the whole language where they are saying

17   you are arriving in the United States, you are attempting to

18   enter the United States, but you are on U.S. soil.  And so the

19   language is being used to refer to is, sort of, you have a

10:24   20   bubble around the port of entry where you're attempting to

21   enter.  And that is why we have -- I think in our brief, my

22   colleague Mr. Halaska, who wrote it, did a very good job at

23   pointing out the difference of why in the prior regime, you

24   used to have aliens who were inadmissible, and so they would be

10:25   25   expelled or excluded.  We'd have exclusion proceedings.  And if

AOL-DEF-00217195

1   you read Mezei and Knauff, those are individuals who we were

2   considering to be excluding, but they were actually on U.S.

3   soil.

4       And then we have other individuals who have already been

10:25   5   into the United States, so people who might have crossed

6   illegally, not come through a port of entry, or individuals who

7   crossed some other way and were found in the United States.

8   Those individuals were then removed from the United States or

9   were deported from the United States.  And there was a big

10:25   10   dichotomy in the language, which is reflected in the language

11   that you're referring to.  And now we have removal proceedings,

12   but we still have this historical language which refers to,

13   sort of, people at the port of entry, which means on U.S. soil,

14   who are attempting to arrive, which means attempting to go to

10:25   15   be inspected, and individuals who are, what we consider,

16   arriving aliens, but all of those individuals, and I believe if

17   you look at the case law, it's very clear, they're on U.S.

18   soil.  And the United States was very clear when it signed,

19   even to the non-refoulement agreements at the U.N. Convention,

10:26   20   that it was not self-executing, and the United States has

21   executed -- or has implemented those through its statutes and

22   the INA.

23       This is just another reason also why the Alien Tort Statute

24   wouldn't apply because under the Alien Tort Statute, again,

10:26   25   even if it is jus cogens, so something has risen to the level

AOL-DEF-00217196

1   of binding international law, it is not binding in the U.S. if

2   it's contrary to U.S. law, and I think you can get that -- the

3   case is escaping me, but in one of cases that was cited in the

4   brief.  And so it was the one that had to do with the Foreign

10:26   5   Sovereign Immunity Act.  I think it was Chen.

6       Anyway, and so when you look at that, the United States,

7   under the INA, has made very clear that those obligations do

8   not apply unless an individual is on U.S. soil.  And again, I

9   think this explanation of what it means to be arriving at a

10:27   10   port of entry is very clear just from the case law and the way

11   that they describe it.

12       I think the Supreme Court rejected it, but also if you look

13   in the Haitian Refugee cases, Refugee Center cases, out of the

14   Eleventh Circuit, there's a very clear description of even the

10:27   15   same terms that the plaintiffs are relying on here, and they do

16   a good job of distinguishing them and saying why there are

17   actually no rights for individuals outside the United States

18   based on that same terminology.

19       So as I said, then, based upon those claims, we believe

10:27   20   plaintiffs have not stated a claim for a policy or practice.

21   We believe, in fact --

22       THE COURT:  Kind of going back to your U.S. soil

23   argument, doesn't the U.S. have sovereignty over the portion of

24   the bridge where the border patrol agents go?  I mean, isn't

10:28   25   that --

AOL-DEF-00217197

|        |    |                                                                    |
|--------|----|--------------------------------------------------------------------|
|        | 1  | MS. WESTWATER:  So the United States -- if somebody is             |
|        | 2  | on the U.S. -- has crossed on the bridges, just as even here,      |
|        | 3  | San Ysidro or some of the local ports, there's a boundary line,    |
|        | 4  | and it's demarcated, and there is also on the bridge.  And so      |
| 10:28  | 5  | if an individual is on the Mexico side of the bridge, the          |
|        | 6  | United States does not have sovereignty over the Mexican side      |
|        | 7  | of the bridge, but if an individual is on the U.S. side of the     |
|        | 8  | bridge, then that individual will be processed under the INA.      |
|        | 9  | THE COURT:  And is on U.S. soil?                                   |
| 10:28  | 10 | MS. WESTWATER:  We would consider that to be on                   |
|        | 11 | U.S. -- if you read the Cuban American Bar Association case,       |
|        | 12 | we'll say there's some extra limits, but we are not haggling       |
|        | 13 | over that.  If somebody is on the U.S. side of the bridge, we      |
|        | 14 | will consider that, for those individuals, to then be processed    |
| 10:28  | 15 | under the INA.                                                     |
|        | 16 | THE COURT:  So do border patrol officers go into                  |
|        | 17 | Mexico and tell people in Mexico what the rules are at the port    |
|        | 18 | of entry?                                                          |
|        | 19 | MS. WESTWATER:  So at several of the                              |
| 10:29  | 20 | different -- where there's large -- where there are capacity       |
|        | 21 | issues, so at some ports of entry, there may be no problems        |
|        | 22 | with capacity.  There may not be that many people coming.         |
|        | 23 | There may not be that many individuals coming without             |
|        | 24 | documents, and so I don't want to use the words "asylum           |
| 10:29  | 25 | seekers" because until somebody has actually come into the        |

AOL-DEF-00217198

1    United States and expressed fear, CBP does not know.  These are

2    people coming without documents who take longer to process, so

3    if you're coming across the border in a port of entry and

4    you're in your car and you have a passport or you have a visa,

10:29    5    CBP is allowed to have so many seconds or minutes, depending on

6    the circumstances, to process each of those people so that that

7    line is not so long.

8        Same thing for goods coming through in a truck, right,

9    because if you make trucks wait too long, that could violate

10:29    10   some of our international trade agreements.  So they're very

11   cognizant of times.  A person who comes to the border and comes

12   to the port of entry and wants to enter, but has no documents

13   is going to take a long time because that individual is -- per

14   se, they're inadmissible.  They have no basis to authorize them

10:30    15   to come.  So CBP knows they're going to have to process this

16   person in some way that is going to take more than processing

17   the other individuals.

18        THE COURT:  So I'm still waiting for the answer to my

19   question.  Do border patrol agents go across the bridge and go

10:30    20   past the U.S. Border and go into Mexico and tell people down

21   there what's going on, or do they stay on the U.S. side?

22        MS. WESTWATER:  They generally stay on the U.S. side,

23   although they might be right at it or they might -- they're

24   right there, but often, in some of the ports of entry, it is

10:30    25   the Mexican government has officials who are actually

AOL-DEF-00217199

1    doing -- control of exit, knowing that they do not want lines

2    of hundreds or thousands.

3         THE COURT:  The reason I ask is to the extent the

4    plaintiffs are alleging Plaintiff A came across the

10:30  5  International Bridge, was met by a border patrol agent, talked

6    to the border patrol agent, and the border agent said no, you

7    can't cross, isn't that de facto at that point on U.S. soil,

8    the allegations again?

9         MS. WESTWATER:  No, Your Honor.  Yesterday I was at

10:31 10  San Ysidro.  There's a line.  There's a sally port, a little

11   turnstile.  The turnstile is on the Mexican side, but before

12   the turnstile is allowed to turn, the United States Border

13   Patrol agent -- or CBP agent, excuse me, could look at the

14   person's identification to make sure that they have

10:31 15  identification before the person is able to come through the

16   turnstile.

17      There's other sorts of controls that individuals can have,

18   as far as gates, to ensure that before an individual comes onto

19   U.S. soil, that they have the sort of documentation that

10:31 20  they're required to have.  Otherwise, they would not be able to

21   come through the gate.  What happens and how the line is

22   managed on the other side of the gate, so on Mexican territory,

23   that is not managed by the United States.

24        THE COURT:  What if someone's standing at the

10:31 25  turnstile and says, "I'm seeking asylum"?  Isn't there an

AOL-DEF-00217200

1    obligation at that point to refer them for asylum?  Are you

2    saying that because they're standing on the other side of the

3    turnstile, that this law that requires that someone who seeks

4    asylum -- it doesn't apply to those people?  Is that what

10:32   5    you're saying?

6            MS. WESTWATER:  Yes, Your Honor.  And I think that's

7    consistent with international law, with U.S. law, and I believe

8    if you read -- if you really read -- that is consistent, yes,

9    there is -- until a person is in the United States, they are

10:32   10   not able to claim asylum under U.S. law, but the U.S. has a

11   provision for individuals who are not on U.S. soil and wish to

12   seek protection, and that's called Refugee Protections, and

13   that is a different statute, and individuals can go to their

14   consulates in their own countries or in a third country, and

10:32   15   they can seek refugee status.  And the United States, in fact,

16   does not require -- unlike other countries, the United States

17   does not require an individual to leave his or her country in

18   order to apply for refugee status.  They may do so in their own

19   country, and so no, Your Honor, an individual who is in a

10:33   20   foreign country does not have a right to apply for asylum.  And

21   actually --

22           THE COURT:  At the port of entry can't come in and

23   say -- be arriving at the United States and say, "I'm here, and

24   I'm applying for asylum"?

10:33   25           MS. WESTWATER:  And that is not at a port of entry.

AOL-DEF-00217201

1  As we've said, under the United States law and terminology and

2  case law, "at a port of entry" means you are on U.S. soil.  So

3  an individual outside a U.S. port of entry, no, may not claim

4  asylum.  Those INA procedures and rights that CBP -- the

10:33  5  procedures CBP must follow, those all accrue when the

6  individual -- yes, those all accrue when the individual crosses

7  on to the United States.

8          THE COURT:  Okay.

9          MS. WESTWATER:  May I just confer with my colleague

10:34  10  for a moment, Your Honor?

11          THE COURT:  Sure.

12          MS. WESTWATER:  And as my colleague, I'm sorry,

13  pointed out, and I should say, CBP is not denying that an

14  individual may ever enter.  So metering is directing

10:34  15  individuals to wait until CBP has the capacity to process these

16  individuals safely and securely.  Having too many individuals

17  just waiting around to be processed at the port of entry

18  presents a danger to CBP officers, to other travelers, but also

19  can be leading to unsanitary conditions, overcrowding.

10:34  20      I found it significant that plaintiffs pointed to -- I

21  don't know if it was maybe an OIG or a document to support

22  their case that CBP wasn't taking enough people.  The document

23  did not say that there were nobody there or that they were

24  under capacity.  It simply said they did not see overcrowding.

10:35  25  Wouldn't we think that's a success?  When there's overcrowding,

AOL-DEF-00217202

1   we have other lawsuits, we have other problems regarding

2   sanitary conditions, regarding safety.  Those reports did not

3   say that there were not people being processed at the port.

4       And if you look at the different policy or different emails

10:35   5   that were referenced by the plaintiffs in their complaint or

6   even the up-to-date 2018 metering guidance is very clear that

7   individuals are not to be discouraged from coming.  They're not

8   to be told that, "There's no asylum, you may never come here."

9   Instead, the policy is to process all travelers in a safe and

10:35   10   efficient way that keeps healthy conditions for everyone.  And

11   so whatever policy CBP may have or -- it is a policy that

12   is -- it's a guidance here, so we would say it's not a policy.

13   We believe under the cases we've cited that the Court shouldn't

14   get into are we -- should we accept 25 today and 3,000

10:36   15   tomorrow.

16       THE COURT:  No, but as I said, the complaint alleges

17   more than that, and I understand what you're saying is that's

18   not true, but isn't that sort of a premature argument?  We're

19   talking about a motion to dismiss at this stage.  Whether it's

10:36   20   true or not, they get to prove up whether you can prove that or

21   not.

22       MS. WESTWATER:  Well, to the degree they have

23   individual claims, "This happened to me, you told me to go

24   away."

10:36   25       THE COURT:  They're saying more than that.  They're

AOL-DEF-00217203

26

1    saying this is happening across the U.S. Border because there

2    is this policy that's unwritten that is telling border patrol

3    agents, "Keep as many out as you can."  It's more than just the

4    metering.  They're alleging more than that.

10:36    5             MS. WESTWATER:  And we believe those are different

6    claims.

7             THE COURT:  They're not.  They're claiming it's all

8    part of the same policy.

9             MS. WESTWATER:  And I, again, would say, Your Honor --

10:37   10             THE COURT:  And I think --

11             MS. WESTWATER:  -- that's a constant.

12             THE COURT:  You're saying that's not true, but I'm

13    saying this is a motion-to-dismiss stage, and I'm saying what

14    do they say, and is that enough?

10:37   15             MS. WESTWATER:  Well, we would say, as I've said, this

16    is an amorphous policy that they're claiming.  They're taking a

17    constellation of things.  So some of their claims are things

18    that on their face are not even unlawful.  So one of the claims

19    was a plaintiff and her daughter were detained.  Okay.  Any

10:37   20    alien who comes undocumented, inadmissible, is going to be

21    detained.  It was telling somebody that they would be detained.

22        So I'm not sure, but that would seem to say that telling

23    somebody that you're going to do what you're required to do by

24    statute is now deterring somebody, and that is part of this

10:37   25    procedure.  It is telling an individual that they would not be

AOL-DEF-00217204

1   detained with their nephew, which CBP does not detain women and

2   children with a male, depending on what the age is or

3   unrelated.  Those are all things that they've taken,

4   Your Honor, to claim part of this amorphous policy.

10:38  5        THE COURT:  What they're claiming is, I agree, an

6   amorphous policy.  They're saying there is this policy to

7   deter, and then they give examples.  Here are a whole bunch of

8   examples of how that policy is being implemented.  Isn't that

9   enough at the motion-to-dismiss stage?

10:38  10        MS. WESTWATER:  No, Your Honor, we believe under the

11   case law regarding APA and being able to challenge, sort of,

12   amorphous policies that fails to state a claim.  It also is

13   belied by the fact of how many individuals are coming.  Last

14   month there were 10,000 people, inadmissible people, being

10:38  15   processed along the southern border.

16        THE COURT:  But you're getting to facts again, and

17   this is a motion-to-dismiss stage.  You're trying to prove up

18   whether it's true or not.

19        MS. WESTWATER:  But those were also facts of the

10:38  20   plaintiffs.  Those were facts that the plaintiffs had

21   incorporated in their reference.  Maybe not last month's

22   statistics, but more recent statistics, which also show

23   thousands of individuals have been coming.  And this is just at

24   the ports of entry.  So I'm not referring to the other 80- or

10:39  25   90,000 that were coming through other places.  And so that is

AOL-DEF-00217205

28

1   belied by that.

2        So I think the case law is very clear.  I think if we look

3   at Graham, which is a Ninth Circuit case, I think if you look

4   at Lujan, you look at Norton, you see that it really fails to

5   state a claim to take all of these unrelated things and try to

6   pull them together.

7        Now, that does not mean that they haven't stated individual

8   claims, which is sort of what the Court had said earlier in the

9   first round, and so maybe if there's some relief that this

10  Court finds has made these not moot, but we do find that there

11  is simply not enough to pull these together to allege some sort

12  of deterrent policy.

13       Now, regarding the individuals who are in the

14  United States, we would -- that would be different for an

15  individual outside the United States.  It is also if there's a

16  challenge to the guidance of metering, to metering individuals,

17  we would say that individual day-to-day operations, those

18  operational decisions about how many people do you let in a

19  day, those capacity decisions cannot be reviewed by the Court.

20       We would say under, as we have said, the political question

21  doctrine, also under just the APA guidance that we've been

22  citing, because courts cannot, I think, as Graham said, get

23  into the day-to-day operations.

24       If there's a problem with how CBP is carrying out overall

25  allocating its resources, which is really what Graham goes

AOL-DEF-00217206

|  | 1 | into, that is better left either with Congress or with the |
|--|---|--|
|  | 2 | executive itself.  That's not for the Court to get into |
|  | 3 | day-to-day management. |
|  | 4 | THE COURT:  I should ask you, and I'll ask both sides, |
| 10:40 | 5 | whether you think the Innovation Law Lab has any bearing on |
|  | 6 | this case, the latest case from the Ninth Circuit on asylum, |
|  | 7 | the one that just came out, the one that says you can send |
|  | 8 | asylum seekers back to Mexico.  Well, it doesn't really say |
|  | 9 | that because of the procedural posture of the case, but I'm |
| 10:41 | 10 | trying to remind you of the case. |
|  | 11 | MS. WESTWATER:  Yes, that helped, Your Honor. |
|  | 12 | We don't specifically see that it does.  We do think that |
|  | 13 | any of its discussion of immigration rights I think are |
|  | 14 | consistent with what we are saying, but otherwise, I don't |
| 10:41 | 15 | think those are the -- I don't think that case is the first one |
|  | 16 | to say we're not relying on it, and we don't think it says |
|  | 17 | anything inconsistent with what we're saying here today, |
|  | 18 | Your Honor. |
|  | 19 | And I would just like to reiterate that we think any |
| 10:41 | 20 | extraterritorial application of the Constitution, the Fifth |
|  | 21 | Amendment, we would say, really only under Boumediene, we think |
|  | 22 | that was clearly set aside by the Supreme Court under the facts |
|  | 23 | of those case, which are individuals in detention. |
|  | 24 | And that would actually bring me to two of the cases this |
| 10:42 | 25 | Court relied on in its earlier decision, which would be RILR |

AOL-DEF-00217207

1   and Araceli R.  Both of those cases were very different in that

2   they referred to individuals who were in the United States and

3   were in detention.  So deterrence claims regarding to

4   individuals who were in the United States and are in detention

10:42   5   are very different than simply a claim -- than deterrence of

6   individuals who are not in the United States.

7        And as we said, we do not believe that CBP's policy as it's

8   been -- different documents that we've shown in any way shows

9   that deterrence is what's taking place and that people are not

10:42  10  being allowed to come in, but to the degree they are not

11  individuals in U.S. custody, we believe those cases do not

12  apply.

13       For an individual who is in the United States, there would

14  be perhaps more of an application of those cases, but those

10:43  15  cases are very different in themselves also because they were

16  all alleging one specific act.  Each of those cases had one,

17  not a constellation of things, of ways that deterrence was

18  being somehow used.  They had a specific claim, and it was a

19  claim that referred to detention.  And the Court in both of

10:43  20  those cases found it was because detention itself is so

21  regulated or -- under the Constitution and under the case law

22  that deterrence was not an appropriate factor unless it was

23  criminal detention, but we don't believe that those cases have

24  any broader implication to here where there's simply a

10:43  25  discussion of the processing of travelers after they've crossed

AOL-DEF-00217208

1    on to U.S. soil, but we also believe they are not useful here

2    in the fact that the types of policies -- I think in RILR, the

3    government, the United States, there admitted that deterrence

4    was a factor that could be considered.

10:44    5        So we believe that is very different, and in that set, it

6    was not some sort of a policy that was claimed to be exhibited

7    through unrelated, very different types of claims of how this

8    policy came about, but also not through conduct that on its

9    face is legitimate.

10:44    10       So plaintiffs have not claimed these separate acts:

11   Detaining somebody; telling somebody they're going to be

12   detained; telling them they're not going to be detained with

13   their nephew; what INA provision, what law, what regulation,

14   does that violate.  And so they're taking many actions which in

10:44    15   themselves are not violative of any provision and using those

16   to try and pull together simply to show an intent behind them

17   that somehow now is supposed to make one policy that,

18   therefore, this Court is supposed to review.  And we would say

19   that this has failed to state a claim, and this is the type of

10:45    20   claim specifically that on a mass policy level the courts have

21   said is simply not enough, but that does not mean, much as this

22   Court found, and I believe much as in Graham, the Court there,

23   the Ninth Circuit, also found, though, that the individual

24   claims could go forward, but not some sort of broader policy

10:45    25   claim.

AOL-DEF-00217209

 1   Let me just have one moment.

 2   Unless Your Honor has any questions, thank you.

 3       THE COURT:  Why don't you start by talking about

 4   Innovation Lab.

10:46  5       MR. AZMY:  We divided the arguments.

 6       THE COURT:  That's fine.

 7       MS. CROW:  Good morning, Your Honor.  May it please

 8   the Court:

 9   In response to your question about Innovation Law Lab

10:46  10  versus Nielsen, we do think it has some bearing on this case in

11   a couple of ways.  First of all, in that case --

12       THE COURT:  Nondissent.  You like what Fletcher has to

13   say, I'm sure.

14       MS. CROW:  We did, but that actually isn't the part of

10:46  15  the case that I was going to talk about this morning.

16   In the principal opinion, in Judge O'Scannlain's opinion,

17   he referred to Section 235(a)(3) of the Immigration and

18   Nationality Act, which is also 8 USC 1225(a)(3), as an

19   exhaustive inspection regime for all non-U.S. citizens seeking

10:47  20  admission to the United States.

21   And that is quite consistent with our reading of

22   8 USC 1225(a)(3), which applies to two groups of noncitizens

23   who must be inspected:  applicants for admission and then a

24   catchall category of noncitizens who are, quote, otherwise

10:47  25  seeking admission.

AOL-DEF-00217210

1     An "applicant for admission" is defined in 1225(a)(1) as a

2     noncitizen who is, quote, present in the U.S. who has not been

3     admitted or a noncitizen who arrives in the U.S.

4         The Ninth Circuit has defined "arrives in" to include

10:47  5     someone at the border, and that case was Ortega-Cervantes

6     versus Gonzales, which is cited in our brief.

7         But even if the plaintiffs in our case are not

8     covered -- they're not characterized as applicants for

9     admission, which we think they are, they must be covered by the

10:48  10    phrase "otherwise seeking admission" because otherwise that

11    language would be superfluous.  So that's one key part.

12        More substantively, though -- just one moment.  The Court

13    did acknowledge, and this may have been Judge Watford, that the

14    plaintiffs in that case did face a risk of harm if returned to

10:48  15    Mexico, but found that that risk was somewhat tempered by the

16    Mexican government's agreement to give them humanitarian status

17    and to give them work permits and to generally comply with

18    their obligations under international law.

19        In this case, of course, we have no such guarantees from

10:48  20    the Mexican government.

21        I would also note that in the context of "remain in

22    Mexico," there is a fear-determination process, which we think

23    is woefully inadequate, and in the interest of full disclosure,

24    we are counsel in that case as well.

10:49  25        So we've alleged that it's woefully inadequate.  I believe

AOL-DEF-00217211

34

1    Judge Watford made that clear in his opinion, but in this case,

2    Your Honor, the plaintiffs aren't subject to any kind of

3    screening process, so the risk of harm is much greater than in

4    the context of "remain in Mexico."

10:49    5            THE COURT:  Okay.

6            MS. CROW:  Slight change of plans, Your Honor.

7            THE COURT:  Okay.

8            MS. CROW:  I'm going to turn back to the statute more

9    generally --

10:49    10            THE COURT:  Okay.

11            MS. CROW:  -- and speak a bit about the statutory

12    scheme that Congress enacted which provides specific procedural

13    protections to people fleeing persecution who are either in the

14    United States or who arrive at its borders seeking refuge.

10:50    15        As we explained in our brief, the asylum framework includes

16    two key sections of the Immigration and Nationality Act:

17    8 USC 1158, which sets forth the right to apply for asylum and

18    also particular processes that must be followed to facilitate

19    such applications; and then also 8 USC 1225, which requires

10:50    20    immigration officers to inspect all noncitizens arriving at the

21    border, as we've already discussed, and refer those seeking

22    asylum for further process.

23        That's exactly what the plaintiffs in this case seek:

24    access to the asylum process.

10:50    25            THE COURT:  What about the defense argument that

AOL-DEF-00217212

1     their -- the only allegations are that they were being delayed

2     or that they're slowing it down or that they're limiting the

3     number in a given day or given hour and that that is not

4     required under statute?

10:51   5          MS. CROW:  Your Honor, the government would have us

6     believe that the government is merely making people wait in

7     line as you would at the Department of Motor Vehicles, which

8     can be a cumbersome process, it can take a long time, but you

9     have to wait until you get to the front.

10:51  10     That is, in fact, how ports are supposed to work.  CBP

11     officers, as I said, are supposed to inspect anyone who shows

12     up on a given day, as required by 8 USC 1225(a)(3), even though

13     some of them might have to wait a long time.

14     In fact, what's actually going on is that people are turned

10:52  15     away outright or they're referred to a wait list or they're

16     told to get on a wait list, which is dysfunctional and corrupt.

17     Certain categories of individuals are denied access to the

18     list.  Those have included LGBT asylum seekers, unaccompanied

19     minors, and most recently, black asylum seekers.

10:52  20          THE COURT:  Is any of that alleged in the complaint?

21          MS. CROW:  We do allege that the wait list is

22     dysfunctional.

23          THE COURT:  I think that's a little bit more than

24     dysfunctional.

10:52  25          MS. CROW:  Yes, more evidence about this has surfaced

AOL-DEF-00217213

1  recently, and we were looking forward to the discovery process

2  to learn more about that.

3      It's also true that -- and I believe we did allege this in

4  the complaint -- that Mexican government officials are

10:52  5  implicated in the keeping of the wait list, which effectively

6  means that Mexican asylum seekers have to seek the permission

7  of their government to leave the country when they fear

8  persecution.

9      And as an aside, Your Honor, and we did not know this at

10:53  10  the time we filed the second amended complaint, but we've

11  recently received evidence that higher slots on the wait list

12  can be obtained in exchange for money and in exchange for

13  sexual favors.

14          THE COURT:  None of this is in front of me.

10:53  15          MS. CROW:  No, it's not.

16      Anyway, but our fundamental argument is that by turning

17  people away, the government is effectively depriving them of

18  access to the asylum process.

19      And that is true for a number of reasons.

10:53  20      First of all, it's true because the government's own data,

21  as we alleged in our brief, indicates that claims of capacity

22  are pretextual.

23      From January through September of 2018 the number of people

24  without valid travel documents who were attempting to enter the

10:54  25  United States from Mexico, which includes asylum seekers,

AOL-DEF-00217214

1    stayed at roughly the same level as over the past five years,

2    and during those five years, CBP regularly processed these

3    individuals without the delays that we've now seen.

4        In early 2018, senior CBP and ICE officials in San Ysidro

10:54    5    indicated in an interview with Amnesty International that CBP

6    has only actually reached its detention capacity a couple of

7    times per year and during one short period in 2017, and we also

8    cite a letter from members of Congress regarding a briefing

9    that occurred with Hill staff by DHS officials.

10:54   10        THE COURT:  Are you arguing that there is, sort of, a

11    final action or policy under 706(2)?  Is that what you're

12    covering right now?  I'm not sure who's covering what.

13        MS. CROW:  Right, I'm arguing that and that -- yes.

14        THE COURT:  Okay.

10:55   15        MS. CROW:  We're arguing that this is, in fact, a

16    deprivation of access to the process and not simply a directive

17    or an instruction to people that they have to wait in line.

18        Migrants face grave harm in Mexico, and that's evidenced by

19    the experiences of two of our plaintiffs.  Beatrice Doe was a

10:55   20    victim of domestic abuse.  She was actually pursued by her

21    persecutor while she was waiting in Tijuana to cross, and she

22    was lured back to her hometown.

23        THE COURT:  I guess my concern is under 706(2), and I

24    think I stated this the first time around in my first order, is

10:55   25    there's sort of all these individual claims, each of which I

AOL-DEF-00217215

1    think there's -- you've made a valid, at least at this stage,

2    claim, but the question is whether this is a policy basically

3    and whether you've alleged enough to make it a final agency

4    action, and as opposed to under 706(1), which is just

10:56  5    individual turnback, the challenges to the individual

6    turnbacks, and I guess the only policy I see is the metering or

7    the turnback policy, which is the government, and I understand

8    you're arguing there's more to it than that, but how is this a

9    final agency action?  How do you get under the 706(2) with all

10:56  10   these allegations?

11          MS. CROW:  Well, Your Honor, assuming that you find

12   that there is a policy, and we've alleged in our complaint that

13   there is, and we've cited a lot of evidence.

14          THE COURT:  When you talk about "is a policy," I don't

10:56  15   think I have any trouble finding that there is a turnback or a

16   metering policy.  The question is what policy are you asking me

17   to find from this complaint?

18          MS. CROW:  Right.  We believe that the turnback policy

19   is broader than metering.  We define it as a directive by

10:56  20   high-level government officials to systematically limit the

21   number of asylum seekers inspected and processed at ports of

22   entry along the U.S./Mexico Border for the purpose of denying

23   access to the asylum process and deterring future asylum

24   seekers.

10:57  25      The tactics employed by the government include metering,

AOL-DEF-00217216

 1   but are not limited to metering.

 2       And the email correspondence that we cited from the

 3   government goes back to 2016, which is when the incidents that

 4   were outlined in our initial complaint happened.

10:57    5          THE COURT:  So let's say you win on the 706(2).  What

 6   agency action would I be setting aside?  The metering policy

 7   or -- I mean, there has to be a specific final agency action

 8   that I'm -- that I'm ruling on in this case.  What would I

 9   order?

10:57   10          MS. CROW:  So we would ask you to enjoin the policy

11   whereby government officials are systematically restricting the

12   number of the asylum seekers who are inspected and processed

13   for these unlawful purposes, as I've outlined it.

14       We believe that more information about the precise contours

10:58   15   of the policy will come out in discovery, but we've alleged

16   what we can based on the information we have, which includes --

17          THE COURT:  So are you saying that the capacity issues

18   could be a lawful consideration, but you have alleged they're

19   simply inapplicable in this case because the motive is

10:58   20   deterrence?

21          MS. CROW:  Your Honor, the motive is twofold.  The

22   motive is -- the primary motive is depriving people of access

23   to the asylum process.  We believe that high-level statements

24   by high-level government officials bolster our claim that this

10:58   25   is also for the purpose of deterrence, but at a minimum, they

AOL-DEF-00217217

1    bolster the validity of the plausibility of our allegations.

2         THE COURT:  Okay.  Are you saying that it could be a

3    lawful consideration if the high-level government conduct

4    wasn't saying true motive is to keep people out, is deterrence?

10:59  5         MS. CROW:  I don't think so, Your Honor, because the

6    statutory obligations are mandatory.  CBP is required to

7    inspect noncitizens seeking admission under 1225(a)(3), and in

8    the event that they are intending to seek asylum or they have a

9    fear of persecution --

10:59  10         THE COURT:  So if a million people arrived at the

11   border tomorrow and said, "We are all seeking asylum," the

12   government would have an obligation to hear every one of them

13   right away, is what you're saying?

14         MS. CROW:  Not right away, Your Honor, "without

10:59  15   unreasonable delay."

16         THE COURT:  So that goes back to my original question.

17   You could consider lawful capacity issues if there were

18   a million people at the border, and you simply didn't have the

19   capacity to hear all of them in a reasonable amount of time.

10:59  20   They didn't have any -- there's no allegations of deterrence,

21   there's no allegations, it's just the government saying, "We're

22   trying to do this as fast as we can."

23         MS. CROW:  The government needs to act in a manner

24   that complies with its mandatory statutory obligations, and

11:00  25   under the facts of this case, as exemplified by the

AOL-DEF-00217218

1  plaintiffs -- what happened to the plaintiffs, they are not

2  doing that.

3       THE COURT:  Okay.

4       MS. CROW:  Your Honor, I was going to talk more about

11:00  5  why the obligations of the government under the statute apply

6  to people who are arriving in the United States.

7       THE COURT:  Okay.

8       MS. CROW:  So, as indicated, on page 11 of the amicus

9  brief from immigration law professors' representative Lamar

11:01  10  Smith who, at the time of the 1996 law was the chair of the

11  House Judiciary Committee Subcommittee on Immigration and

12  Claims, described Congress' reasoning behind the use of the

13  term "arriving alien" in the following way:  He said the term

14  "arriving alien" was selected specifically by Congress in order

11:01  15  to provide a flexible concept that would include all aliens who

16  are in the process of physical entry past our borders

17  regardless of whether they are at a designated port of entry,

18  on a seacoast, or at a land border.  "Arrival" in this context

19  should not be considered ephemeral or instantaneous, but

11:01  20  consistent with common usage as a process.

21       THE COURT:  But I mean, there are limits to this,

22  right?  I mean, if someone makes up their mind this morning,

23  "I'm going to the port of entry, and I'm packing up," and

24  they're not arriving at the port of entry, so at what point do

11:01  25  you say they are arriving?

AOL-DEF-00217219

42

1        MS. CROW:  So for purposes of the government's motion

2    to dismiss, in this case, all we need to look at is the facts

3    presented by the plaintiffs in this case.  And all of them were

4    arriving -- were noncitizens arriving at the border who would

11:02  5    be in an inspection station at a port of entry but for CBP's

6    obstructive conduct.

7        THE COURT:  So if CBP went down to Mexico in my

8    original order and stopped people down in Mexico, would that

9    count as well?

11:02  10       MS. CROW:  Your Honor, that isn't at issue in this

11   case because it's not a situation presented by any of our

12   plaintiffs.  If and when we move on to class certification, you

13   know, we will present a class definition that hopefully will

14   capture --

11:02  15       THE COURT:  I should ask this question at this point,

16   just to make sure I get it on the record:  There's a lot of

17   conduct by Mexican officials alleged in the complaint.  You are

18   not premising any of your claims on conduct by Mexican

19   government officials.  Is that correct?

11:03  20       MS. CROW:  No, Your Honor, we're not asking you to

21   enjoin the conduct of Mexican government officials.

22       So one more note on the issue of arriving.  I'll just note,

23   also, the language of 8 CFR 1.2, which defines "an arriving

24   alien" as "an applicant for admission coming or attempting to

11:03  25   come into the United States at a port of entry," which, as we

AOL-DEF-00217220

1    read it, covers asylum seekers en route to the United States.

2        I'd like to respond to something that the defendants raised

3    for the first time in their reply brief and also alluded to in

4    today's argument.

11:03  5        Defendants seem to argue that the language of 8 USC 1158

6    means that people have to be in the United States, so 1158,

7    which is the provision about the right to apply for asylum,

8    covers both individuals who are physically present in the U.S.

9    and who arrive in the U.S.

11:04  10       First of all, the argument in their reply brief seems to

11   be, as far as we understand it, based on the drafting history

12   of a different statute.

13       But regardless of that, the plaintiffs' reading is a lot

14   more straightforward, and we're arguing that the statute means

11:04  15   what it says.  Prevailing case law establishes that "physical

16   presence" is not a term of art and should be interpreted based

17   on its plain meaning.

18       And I'm happy to provide some cases if that would be

19   helpful to Your Honor.

11:04  20       THE COURT:  Cases that say it should be based on its

21   plain meaning?  I don't need that.

22       MS. CROW:  All right.  Anyway, the other point I

23   wanted to address is one that they raised this morning as well

24   about the Refugee Admissions Program that's addressed in

11:05  25   8 USC 1157.  That program relates to refugee resettlement,

AOL-DEF-00217221

44

 1   which is completely separate and distinct from the asylum

 2   process under 1158.

 3        Refugee resettlement involves the selection and transfer of

 4   refugees from a country in which they have sought protection to

11:05  5   a third country, which could be the United States.

 6        THE COURT:  Although I think it's interesting that the

 7   refugee resettlement places numbers and the asylum does not.

 8        MS. CROW:  Precisely, and that's an important

 9   distinction, Your Honor, because --

11:05  10       THE COURT:  It's fair to assume, then, that Congress

11   didn't intend to limit the number.

12        MS. CROW:  Correct, and I would note that Congress has

13   repeatedly rejected such limits, most recently in January of

14   this year.

11:05  15       So refugee resettlement is a discretionary program that is

16   operated by countries with the assistance of the United Nations

17   High Commissioner for Refugees.  The president has discretion

18   to designate particular categories of refugees that the U.S.

19   will accept, and as you said, the number of refugees is capped

11:06  20   now at 30,000 for fiscal year 2019.

21        And I would note that overseas refugee processing is not

22   available in any of the northern triangle countries.

23        Asylum, by contrast, imposes an obligation on the U.S. to

24   grant asylum to anyone who arrives in the U.S. and meets the

11:06  25   refugee definition.

AOL-DEF-00217222

1    Defendants also cited Mezei and Knauff versus Shaughnessy.

2    We believe that those cases aren't as definitive, as the

3    government suggests, about the question of whether somebody has

4    to be standing in U.S. territory.  They use the language "at

11:06    5    the border."

6        In terms of our APA claim, going back to the 706(1), 706(2)

7    distinction, Your Honor has already acknowledged with respect

8    to the initial plaintiffs that CBP has a mandatory duty under

9    8 USC 1225 to perform discrete agency actions; namely,

11:07    10    inspecting and processing them, and Your Honor found further

11    that CBP's failure to fulfill this duty is actionable under

12    706(1).

13        Assuming that Your Honor agrees that the new plaintiffs are

14    also arriving aliens for the reasons that we've outlined, they

11:07    15    would also be covered by 706(1).

16        But we've also pleaded the existence of the turnback policy

17    and included a claim under 706(2) because we believe that both

18    the policy itself and the individual turnbacks, viewed

19    collectively, are ultra vires because they exceed CBP's

11:07    20    statutorily prescribed authority and violate the Immigration

21    and Nationality Act.

22        For the reasons that I've explained, and a few more that

23    I'll add, they're also arbitrary and capricious under 706(2).

24        Even if you find that there's no mandatory duty that's

11:08    25    actionable under 706(1), Your Honor can still enjoin the

AOL-DEF-00217223

46

1   government's conduct under 706(2), which doesn't depend on the
2   existence of a mandatory duty.
3       I think I hit most of the arbitrary and capricious reasons
4   when we were speaking before.
11:08  5       I will note the gravity of the situation in Mexico again,
6   and on the subject of arbitrariness and capriciousness, I will
7   note that the turnback policy and individual turnbacks have the
8   rather perverse result of encouraging unlawful behavior;
9   namely, entry between ports of entry, which the government has
11:08  10  consistently said that it wants to discourage, and also
11  smuggling.
12       If Your Honor has no further questions, I will turn the
13  podium over to my co-counsel.
14           THE COURT:  And he's going to talk about?
11:08  15          MR. AZMY:  I can explain.
16           THE COURT:  I want to make sure that -- what are you
17  going to talk about because I'll save some of my questions for
18  you.
19           MS. CROW:  He's going to talk about Sale, Your Honor,
11:09  20  political question, Alien Tort Statute --
21           THE COURT:  Okay.
22           MS. CROW:  -- and --
23           THE COURT:  That's fine.  I'll save my questions.
24           MS. CROW:  -- and due process.  Thank you, Your Honor.
11:09  25          THE COURT:  Thank you.

AOL-DEF-00217224

1          MR. AZMY:  Thank you, Your Honor.

2     Before I get to Sale, and because there's been a lot of

3     complicated technical parsing provisions of the INA because the

4     government seeks -- they want to do that to render our

11:09   5     plaintiffs extraterritorial, I thought it was important to

6     ground us in the purpose of the Refugee Act, which Congress has

7     said is meant to reflect a historical policy of the

8     United States to respond to the urgent needs of persons subject

9     to persecution in their homelands.

11:09   10    And as Your Honor knows, the Refugee Act was designed to

11    implement the global commitment in the 1951 Refugee Convention

12    to prevent horrors of World War II, which I would note

13    includes, to its lingering regret, the State Department cable

14    to German Jews outside a New York port on the boat St. Louis

11:10   15    that they, quote, must await their turn on a waiting list.

16    And humanitarian crises are the purpose of asylum law, not,

17    as we allege the defendants think, an exception to it, nor is

18    there any security exception to Congressional commands.

19    So before I get to Sale, I just want to make a couple of

11:10   20    observations:  First, as a matter of fact, Your Honor does not

21    have to accept the government's characterization that -- an

22    inference that our plaintiffs were one foot on the Mexican

23    border as opposed to one foot on the U.S. Border.  All our

24    Tijuana plaintiffs allege they were at the port of entry.  All

11:11   25    our Texas plaintiffs allege they were in the middle of the

AOL-DEF-00217225

48

1    bridge.  And we concede that is somewhat ambiguous because we

2    don't entirely know with precision what part of a ruler, a

3    one-foot ruler, they were on.

4        And part of the reason it's ambiguous is, I think the

11:11   5    United States, the CBP, has continually shifted the inspection

6    points to make it ambiguous, and so that leads me to a couple

7    of points about the law.

8        Congress fully anticipated the ambiguity in creating a

9    comprehensive statutory and implementing an international law

11:11   10   scheme that contemplates that the border is itself ambiguous,

11   what the Supreme Court has called the limitrophe, where the

12   United States is back and forth, and to recognize that asylum

13   seekers come here exhausted, traumatized, confused, tired,

14   sick, poor, you could say, and that they're entitled to a

11:12   15   presumption from the statute.

16       And as Your Honor was suggesting, it cannot be the law that

17   CBP officials can stand on the U.S. side of the border and

18   physically tell asylum seekers they must have to turn around

19   while welcoming everyone else that has papers.  That cannot be

11:12   20   consistent with the law.

21       And if I heard the Department of Justice correctly, it

22   today just said in open court that the United States has closed

23   its borders.

24            THE COURT:  I think what her point was, in the past

11:12   25   they have closed the borders, and that's something that they

AOL-DEF-00217226

|  |  |  |
|---|---|---|
|  | 1 | were allowed to do as part of their discretion in the executive |
|  | 2 | branch. |
|  | 3 | MR. AZMY:  Fair enough, Your Honor.  But of course, we |
|  | 4 | allege this is a kind of de facto practice of closing the |
| 11:12 | 5 | borders.  And, you know, we've cited a number of instances |
|  | 6 | reflecting high-level policymaking -- policymakers who wish to |
|  | 7 | limit asylum seekers because of antipathy to the process. |
|  | 8 | So let me turn to Sale and sort of clear that brush away. |
|  | 9 | As Your Honor suggested, it's a very narrow decision driven |
| 11:13 | 10 | by unique factual circumstances.  The basic proposition is it |
|  | 11 | involved the question of whether a now abrogated INA statute |
|  | 12 | governing the conduct of the Attorney General specifically |
|  | 13 | applied on the high seas.  So first the high seas was integral |
|  | 14 | to the Court's decision and to the actual holding.  They cite |
| 11:13 | 15 | the notion of the high seas at least four times, and it |
|  | 16 | expressly concluded that the border is something different. |
|  | 17 | This is at page 159 of the Sale decision.  "The INA offers |
|  | 18 | these statutory protections only to aliens who reside in," the |
|  | 19 | government's view, "or have arrived at the border of the |
| 11:14 | 20 | United States."  And that does not mean inside the |
|  | 21 | United States. |
|  | 22 | With respect to the Haitians, the Court goes on, "For 12 |
|  | 23 | years, in one form or another, the interdiction program |
|  | 24 | challenged here has prevented Haitians, such as respondents, |
| 11:14 | 25 | from reaching our shores and invoking these protections." |

AOL-DEF-00217227

1    So it imagines that individuals in our plaintiffs'

2    circumstances are not barred by this principle of

3    extraterritoriality.

4        I also would want to in further support of our position in

11:14  5    Sale, at 163 of the opinion, the Court examined what the

6    term -- and pardon my French in advance, although I'm not going

7    to curse -- the term "refouler" was synonymous with "return,"

8    which was the position of the Haitians, that you cannot return

9    us to Haiti.

11:14  10    The Court said, actually, refouler means repulse, repel

11    with denial, reject, refuse, rebuff, or to shut out or exclude

12    from something.  So that didn't apply to returning Haitians

13    interdicted in the middle of the high seas, but it would apply

14    to our plaintiffs.

11:15  15        Just a couple of quick points about due process.

16        I think, as Your Honor suggested, it's unambiguous that

17    Rodriguez controls.  It clearly holds that U.S. agents acting

18    on U.S. soil with cross-border effects -- the Constitution

19    applies to U.S. actions on U.S. soil with cross-border effects.

11:15  20        The government conceded that CBP officials -- CBP officials

21    were on U.S. soil when they were repelling individuals, so it

22    clearly controls.

23        And just quickly, with respect to Boumediene, it is not

24    limited to detention of the suspension clause.  The whole point

11:15  25    of Boumediene was to wipe away the kind of bright line

AOL-DEF-00217228

51

```
 1   territorial rules that the government uses, and I would just
 2   stress that both Rodriguez and Ibrahim, the case they cite,
 3   adopt Boumediene.
 4           THE COURT:  To the extent you talk about Ibrahim, what
 5   significant -- I mean, the government does a lot about the
 6   significant voluntary connection.  What significant voluntary
 7   connection do the new individual plaintiffs have to the U.S.?
 8           MR. AZMY:  Your Honor, just so -- I think what Ibrahim
 9   suggests is post-Boumediene.  Voluntary connections can be one
10   of the practical circumstances in the impractical and anomalous
11   framework, but it is not itself a requirement.
12       And we know that for two reasons:  First, if it were,
13   Boumediene would have come out entirely differently because, I
14   dare say, the petitioners' there connection to the
15   United States were not voluntary; and second, Rodriguez itself
16   explains neither citizenship nor voluntary submission to
17   American law is a prerequisite to constitutional rights.
18       I think it just made sense that Ibrahim focuses on
19   voluntary connections given the petitioners.
20       So just quickly, what it means, that due process applies,
21   it means that this statutory entitlements under the INA cannot
22   be -- plaintiffs cannot be deprived of them without due process
23   of law.
24       So even if, for example, this Court were to find no final
25   agency action, the due process clause would still apply and
```

11:16  5
11:16 10
11:16 15
11:17 20
11:17 25

AOL-DEF-00217229

52

|  |  |  |
|--|--|--|
| | 1 | prevent any kind of arbitrary deprivations of statutory rights; |
| | 2 | say, for example, the use of denial of asylum for purposes of |
| | 3 | deterrence.  So the claims, for now, are coterminous, but due |
| | 4 | process is an independent claim, in our view. |
| 11:17 | 5 | THE COURT:  Do I need to even delve into the |
| | 6 | extraterritorial reach of the due process -- I mean of the |
| | 7 | Fifth Amendment?  Can't I resolve plaintiffs' claims, due |
| | 8 | process claims, by looking at whether the underlying INA |
| | 9 | provisions include them? |
| 11:18 | 10 | MR. AZMY:  Yes, Your Honor, I think the due process |
| | 11 | claim -- whether or not it applies -- that is, if Your Honor |
| | 12 | finds that -- I'm sorry.  Are you saying that the -- |
| | 13 | THE COURT:  The extraterritorial, whether the due |
| | 14 | process clause that applies is extraterritorial.  I'm not sure |
| 11:18 | 15 | I even have to reach that.  Or do I? |
| | 16 | MR. AZMY:  I don't think you do, Your Honor.  I think |
| | 17 | they're slightly different tests, for whatever reason.  I think |
| | 18 | the statutory test is looking, parsing the statutory language, |
| | 19 | and the constitutional test happens to be this flexible one. |
| 11:18 | 20 | And I'm not going to stand here and say that this doctrine |
| | 21 | is super coherent.  It is what it is, but given what it is, I |
| | 22 | think we'd urge you to decide that both govern the plaintiffs |
| | 23 | in this case. |
| | 24 | And just quickly with political question before I get to |
| 11:19 | 25 | ATS, we agree completely with Your Honor that we are not |

AOL-DEF-00217230

1    seeking to question any discretionary judgment or interaction

2    between U.S. officials and Mexican officials.  We're seeking

3    simply to enforce a statutory duty, which the Supreme Court has

4    said over and over again is not a political question.

11:19   5    Most recently, in the Zivotofsky versus Clinton case,

6    which, after all, was a case involving enormously sensitive

7    matters, the Court said it's not a political question for the

8    State Department to comply with a federal statute requiring the

9    listing of a U.S./Israeli citizen's place of birth in his

11:19   10   passport as Jerusalem, which contravened 60 years of State

11   Department policy and terrified the State Department because it

12   would deeply affect their diplomatic relationships because they

13   didn't -- it was their policy not to recognize Jerusalem as

14   part of Israel.  And nevertheless, the Court said this is not a

11:20   15   problem.  As a matter of separation of powers, you have to

16   apply the statute.

17   And with respect to the resources question, as I think

18   Your Honor was suggesting, courts order compliance with law all

19   the time.  And then it's up to the defendant to figure out how

11:20   20   to comply with law.

21   It is true that Your Honor might not want to put in an

22   actual order an order that they spend money, but that's not

23   how, as Your Honor knows far better than I, how court

24   injunctions work.

11:20   25   So last but not least, the --

AOL-DEF-00217231

54

| | 1 | THE COURT:  The Alien Tort Statute. |
| | 2 | MR. AZMY:  -- the curious Alien Tort Statute. |
| | 3 | So as I think Your Honor is aware, it's a jurisdictional |
| | 4 | statute to which Congress has authorized the federal courts to |
| 11:20 | 5 | develop common law causes of actions arising out of a law of |
| | 6 | nations or customary international law, and as Your Honor |
| | 7 | recognized, it has to be specific, universal, and obligatory. |
| | 8 | I believe we have demonstrated that has reached that status. |
| | 9 | THE COURT:  Are there specific instances of the norm |
| 11:21 | 10 | being enforced against government officials in the |
| | 11 | United States and other countries?  I mean, how is it |
| | 12 | obligatory?  How do you demonstrate that it's obligatory? |
| | 13 | MR. AZMY:  Well, I think "obligatory" is sort of a |
| | 14 | term of art about how the norm is non-dirigible; that is, there |
| 11:21 | 15 | aren't exceptions to it.  I think that's what the term |
| | 16 | "obligatory" gets when you think about the other kinds of norms |
| | 17 | that have met that high-level status. |
| | 18 | So it is obligatory based on treaties, the Refugee |
| | 19 | Convention, the Convention Against Torture, and the ICCPR. |
| 11:21 | 20 | Given the universal conduct of nations, it would be |
| | 21 | considered obligatory that the United States would abide by its |
| | 22 | obligation, just as all other countries have to, so that we're |
| | 23 | not rendered an outlier in this universal scheme of |
| | 24 | international law. |
| 11:22 | 25 | And for what it's worth, you know, commentators also |

AOL-DEF-00217232

55

```
         1   recognize that it's obligatory.
         2        THE COURT:  Am I correct that there is not a single
         3   other federal court that has recognized this as a specific
         4   universal and obligatory norm, the duty of non-refoulement as
11:22    5   a --
         6        MR. AZMY:  I think that's probably right, Your Honor,
         7   and so it would be -- it would be a first, but I think it would
         8   also be a principled application of the Alien Tort Statute,
         9   just as the courts did in Filártiga in recognizing other norms.
11:22   10   That's sort of, I think, the process of how the norms should
        11   work.
        12        THE COURT:  Can you get all the relief that you're
        13   seeking under the INA?  Is there anything different that you're
        14   getting under the Alien Tort Statute?
11:22   15        MR. AZMY:  We would argue that the refoulement duty is
        16   slightly broader to the extent that it requires, you know, very
        17   efficient processing, but I think there's not a dramatic
        18   difference.
        19        THE COURT:  Other than a nice statement by me that
11:23   20   there's this obligation by our country to do this.
        21        MR. AZMY:  It would be a nice and important statement,
        22   Your Honor, for sure.  And, you know, we need some of those.
        23   So but just -- you had a question at the outset, so what would
        24   it mean if someone were denied asylum?  Would that violate --
11:23   25        THE COURT:  I was a little concerned about that.
```

AOL-DEF-00217233

56

|       |    |                                                                      |
|-------|----|----------------------------------------------------------------------|
|       | 1  | MR. AZMY:  The answer is that would not violate the                  |
|       | 2  | norm of non-refoulement because that individual was given a          |
|       | 3  | process, and that's not sort of a repulsion or a genuine             |
|       | 4  | refusal.  The norm includes the opportunity --                       |
| 11:23 | 5  | THE COURT:  A due process, sort of, right?                           |
|       | 6  | MR. AZMY:  Exactly, and that's, you know, what we're                 |
|       | 7  | broadly saying is --                                                 |
|       | 8  | THE COURT:  So you're saying they wouldn't -- if                     |
|       | 9  | they're denied asylum under the INA, they wouldn't have any          |
| 11:23 | 10 | fallback ATS claim?                                                  |
|       | 11 | MR. AZMY:  Exactly, exactly, just like if they're                   |
|       | 12 | denied -- just as we say we don't necessarily have a right to        |
|       | 13 | an appositive result under the INA, just access to the process.     |
|       | 14 | And if I could just -- oh, just quickly on the preemption            |
| 11:24 | 15 | argument, I think it may be true that a comprehensive                |
|       | 16 | regulatory scheme in the INA might preempt customary                 |
|       | 17 | international law as such, and all the cases that the                 |
|       | 18 | government cites involves an individual who is in deportation         |
|       | 19 | proceedings and simply cites a provision of the customary            |
| 11:24 | 20 | international law to oppose or override an INA provision, and         |
|       | 21 | the courts say I can't do that.                                      |
|       | 22 | I think it's difficult when you have a federal statute               |
|       | 23 | authorizing the courts to look at federal common law, and I'm        |
|       | 24 | not aware of a principle where one statute can preempt another.      |
| 11:25 | 25 | And if I just might close in the way as my colleague                 |

AOL-DEF-00217234

1    mentions -- is there something else?  Oh, yeah, I've been asked

2    to remind the Court about the Court's East Bay decision in the

3    Ninth Circuit, which I think simply reinforces that the

4    government can't do -- and that case involved a formal attempt

11:25  5  to amend the INA, and what we're alleging here is this is a

6    de facto attempt to amend the INA, and the executive branch has

7    no authority to do that.  They have to go back to Congress.

8        If I could say just one last word about Boumediene, and

9    full disclosure, as my co-counsel said about the Innovation Law

11:25  10  Lab, we're counsel in that case.  There's a reason the

11   government -- as the government stresses, that the Court in

12   Boumediene focused so much on the de facto control over

13   Guantanamo.  And that wasn't a technical reason.  I think it

14   was a fundamental reason because the Court was concerned that

11:26  15  if U.S. law didn't apply there, then no law would apply there,

16   and the Court, as a normative principle, said that can't

17   happen, but I think, fundamentally, that's what the government

18   is suggesting here.  Just as in Boumediene, the Court said

19   there cannot be prisons beyond the law.  I think the principle

11:26  20  here is that there cannot be a border without law subject

21   exclusively to the discretion of executive officials.

22            THE COURT:  Thank you.

23            MR. AZMY:  Thank you.

24            MS. WESTWATER:  Your Honor, if I may just respond to a

11:26  25  few of my colleagues' comments.

AOL-DEF-00217235

1        THE COURT:  Sure.

2        MS. WESTWATER:  First, we just want to return to the

3    idea that metering is a guidance.  It is not refusing to allow

4    individuals to come across the line.

5        THE COURT:  Again, you're arguing facts.  We're

6    talking about what they've alleged.  They've alleged in this

7    case that it is.

8        MS. WESTWATER:  Actually, they haven't, Your Honor.

9    They referred to waiting, to individuals being told to get in

10   line.

11       THE COURT:  No, they allege that this is a policy

12   across the board to keep people from seeking asylum.  That's

13   what they allege.

14       MS. WESTWATER:  Well, we would also like to then look

15   at some of their numbers that plaintiffs put forward, and the

16   same numbers relative of individuals who were processed before

17   this alleged policy are still processed.  The reason, you know,

18   the -- and that in itself calls into question the whole

19   validity of their even claiming that there is some --

20       THE COURT:  Great arguments for your summary judgment

21   motion.

22       MS. WESTWATER:  All right.  So we also -- although I

23   think the Court touched on this, the question is also that, you

24   know, the plaintiffs do make a lot of allegations as to the

25   dangers in Mexico or as to individuals and what is going on in

AOL-DEF-00217236

1    Mexico.  And we would say that, you know, individuals, as we

2    have said, have an ability to avail themselves of the

3    protections of the Mexican government while they're in Mexico.

4         So the real question we would ask this Court to then focus

11:28  5    on is the rights of an alien who has entered the United States.

6         And again, we would turn to why an individual has to

7    have -- be standing on U.S. soil.

8         And we go back to a couple different provisions.

9         First, we do believe that Knauff and Mezei matter because

11:29  10    the same words that plaintiffs are using at a port of entry --

11    those were the words used from Mezei and from Knauff, and both

12    of those individuals were on U.S. soil.  They were seeking to

13    enter.  Seeking admission.  They were on U.S. soil.

14         These are terms of art as they are used in immigration law,

11:29  15    and, therefore, they have never been used.  Plaintiffs haven't

16    cited any cases where they have been used to refer to a person

17    who is not on U.S. soil.  And there is a bright line, and that

18    bright line is U.S. soil.

19         So we disagree.  At least some of plaintiffs, at least,

11:29  20    claim they were -- such as one in Mexico -- one in Texas claim

21    that they were approaching the middle of the bridge, which, to

22    us, would still indicate they were on Mexican territory.

23         So to the degree that the Court finds plaintiffs have not

24    clearly stated that they were on U.S. territory, we urge the

11:30  25    Court to very much look -- and in our brief we've cited the

AOL-DEF-00217237

1  language of 1225(a)(1), which says, "An alien present in the

2  United States who has not been admitted or who arrives in the

3  United States, whether or not at a designated port of entry,

4  shall be deemed for purposes of this chapter an applicant for

11:30  5  admission."

6      And those are the definitions of who are the people who are

7  going to have the full panoply of rights under the INA.

8      We also respond to the claims of plaintiffs regarding an

9  obligation that they say CBP has to process aliens without

11:31  10  unreasonable delay.

11      Plaintiffs have not cited actually a citation

12  for the without-reasonable-delay claim, let alone for allowing

13  the individuals to -- that does not apply to crossing the

14  border, which plaintiffs have put together.  We, again, say

11:31  15  there are no standards.

16      Whether the Court considers it under political question, we

17  don't think the Court has to.  We think the APA also makes

18  clear that where there is no standard, that the Court is not to

19  get into the day-to-day operations of the agency and their

11:31  20  resource allocations.

21      We would ask the Court also to look at Ahmed, which is

22  another case out of the Southern District of New York, where a

23  Court was asked to determine whether -- I think it was DHS --

24  should station people overseas to process various benefits.

11:32  25          THE COURT:  I agree, the timing isn't in the statute,

AOL-DEF-00217238

|  | 1 | but they do say, "You shall refer the alien for an interview by |
|---|---|---|
|  | 2 | an asylum officer," and they're alleging in their complaint |
|  | 3 | that they are not, the government is not referring people |
|  | 4 | for -- |
| 11:32 | 5 | MS. WESTWATER:  Well, the question is, Your Honor, we |
|  | 6 | believe, to the degree that those have individuals who are in |
|  | 7 | the United States, their claims were -- those claims might be |
|  | 8 | different. |
|  | 9 | We're simply saying for an individual who is outside the |
| 11:32 | 10 | United States, there is -- plaintiffs have not pointed to any |
|  | 11 | language except for what they claim are these words, |
|  | 12 | "attempting to arrive in the United States," to claim that |
|  | 13 | there is some sort of extraterritorial right. |
|  | 14 | We would look at -- refer the Court also to the specific |
| 11:32 | 15 | language in Sale, which I believe plaintiffs were |
|  | 16 | trying -- were referring to in order to say that these terms |
|  | 17 | regarding refoulement, regarding asylum apply |
|  | 18 | extraterritorially. |
|  | 19 | In Sale the Supreme Court specifically said, "The text of |
| 11:33 | 20 | Article 33 thus fits with Edwards' understanding that |
|  | 21 | 'expulsion' would refer to a refugee already admitted into a |
|  | 22 | country and that 'return' would refer to a refugee already |
|  | 23 | within the territory, but not yet resident there.  Thus the |
|  | 24 | protocol was not intended to govern parties' conduct outside of |
| 11:33 | 25 | their national borders." |

AOL-DEF-00217239

1    And the Supreme Court then cites the Haitian Refugee Center

2    case, which is from the Eleventh Circuit, which we would refer

3    the Court to then for further discussion as to the importance

4    of territoriality and being on the soil.

11:33   5    And in further analysis, the Court in Sale said that,

6    "There is no change in the 1980 amendment, however, that could

7    only be explained by an assumption that Congress also intended

8    to provide for the statute's extraterritorial application."

9    So we would find that there's no basis under the INA to

11:33   10   find under the interpretations of the Supreme Court that there

11   is an extraterritorial right.

12   THE COURT:  And you're still saying that it's not

13   enough to say they were at the port of entry, that that's not

14   enough of an allegation?

11:34   15   MS. WESTWATER:  We believe, based on the clear

16   parsing, I think, that we've done well in the brief as to the

17   language of plaintiffs and what they've referred, that it is

18   not.

19   We would urge the Court, however, if it does make a -- if

11:34   20   it finds that that is sufficient, that the Court would be clear

21   that that is sufficient to say that they were in the

22   United States.

23   We believe in any decision issued by this Court, it should

24   be clear that -- we would hope that you would not find there's

11:34   25   an extraterritorial right for aliens who are outside on Mexican

AOL-DEF-00217240

63

```
 1    territory.
 2         And we would find -- as far as the Alien Tort Statute, we
 3    would point this Court to Cortez-Gastelum, which is a Ninth
 4    Circuit case from 2013, as well as Siderman, Ninth Circuit,
11:35  5    1992.  And they both say that, "where controlling legislation
 6    exists, customary international law does not apply."
 7         And those were both referring to even where there's
 8    jus cogens, so where it is considered binding international
 9    law, if there is contrary U.S. law that fills that area, then
11:35 10    that is what controls, even if it is --
11         THE COURT:  But can't they make allegations in the
12    alternative?  I mean, don't the Federal Rules of Civil
13    Procedure allow someone to say this and this, and if I don't
14    win on this, then I go forward on this?
11:35 15         MS. WESTWATER:  But we believe the ATS claim -- we
16    believe they haven't appropriately alleged a claim that could
17    fall under the Alien Tort Statute, first, because we don't
18    believe it has risen to the level of jus cogens, but even if it
19    had, we believe that the U.S. law, as discussed in Sale, as in
11:35 20    Haitian Refugee Center, under those cases, it's clear that that
21    is not the norm in the United States, and that is not what the
22    INA refers to.
23         So we believe plaintiffs simply haven't shown any right
24    that applies extraterritorially to an alien seeking to cross
11:36 25    the border.
```

AOL-DEF-00217241

1    If, however, this Court finds, nonetheless, that there are

2  plaintiffs who were in the United States or that there were

3  plaintiffs who have the ability to challenge the metering

4  policy or the metering guidance anyway, we would still say that

11:36  5  as far as a metering policy and how fast the United States must

6  process or how long an alien can wait -- we would say that that

7  is, as we said -- there is no standard for the Court to get

8  involved in those sorts of day-to-day decisions, and we would

9  say that under the APA, there is also no cause of action.

11:36  10    Regarding a broader claim, we believe -- as far as a

11  turnback policy, we believe that's very similar to -- I think

12  it's in Bark.  It has some great language about plaintiffs

13  taking a bunch of different actions and trying to put them all

14  together in a programmatic challenge, and we would say that

11:37  15  plaintiffs have taken a constellation.  Some of them may be

16  that they had been inappropriately metered from the U.S. side

17  of the border.  Some might be that they were told they'd be

18  detained.  We say those are all too different to allege a

19  common policy.  We believe it fails a standard under Iqbal, but

11:37  20  we also feel under the different cases for the APA that it

21  fails to state a policy.

22    It may, however, this Court found earlier in its earlier

23  decision, state individual claims.  So if the Court finds that

24  there are any individual claims stating that -- due process

11:38  25  rights under the INA, so as to their statutory rights under the

AOL-DEF-00217242

1    INA, that individuals were not appropriately processed, that

2    those go forward.

3        We have stated -- I believe we stated before we still

4    believe that those are moot because we believe that all of the

11:38  5    individuals have received all the relief they could.  They're

6    not seeking financial damages, so, therefore, for individuals

7    who have already been processed, we believe that the Court

8    could offer no remedy to those individuals.

9        THE COURT:  What about the case law out there in class

11:38  10   action cases that don't allow corporations to go out and pay

11   off the individuals to get rid of the class action case to moot

12   the class action case?  And that happens.  You have a class

13   action, you have five individual plaintiffs, and the

14   corporation pays off the five individual plaintiffs, and then

11:38  15   says, "Oh, we took care of them, so there was no class

16   anymore."  The courts have said no, you can't do that.  Isn't

17   that what you're trying to argue here?

18       MS. WESTWATER:  Well, Your Honor, I think that may be

19   more in the line of another -- of a case where plaintiffs have

11:39  20   been able to show a policy that's applied across the border,

21   such as maybe in a RILR where the government was admitting it

22   was -- and not necessarily because it was admitting.  The Court

23   also found there was evidence, but the Court found there was

24   one factor that was being applied in one type of decision

11:39  25   always.

AOL-DEF-00217243

1    This, obviously, can't be the claims here.  Plaintiffs

2    admit there are 10,000 people a month who are coming -- they

3    don't all claim that they have the same experiences with CBP.

4    They're very different experiences.  They simply have not

11:39   5    distilled one action at one time that's similar and binds these

6    individuals together.

7        Based on that, we don't see that that has risen to the

8    level of being able to -- yes, later on we would challenge

9    class claims, but we believe, even now, to allege a pattern and

11:40   10   practice, as is required under just the case law that we've

11   read, even under a 706(1), to be compelling the future actions,

12   and so that is a little difficult because we don't believe that

13   a claim that doesn't meet the standard, that isn't cohesive,

14   just because they try to bring it as a class action, therefore,

11:40   15   should survive at this stage.  And so that is really -- you

16   know, our position is, you know, if we were to go forward on

17   the individual claims, that could then -- plaintiffs could have

18   more discovery and defendants into exactly what happened to

19   these individuals and what allegations there are.

11:40   20   But the problem at the end of the day is these are so

21   separate and different, they turn on the individuals.  What is

22   the relief?

23       A declaration could be an advisory opinion.  If it's

24   really -- as they've made, it is not a policy.  The advisory

11:40   25   opinion is improper for the Court.  And what relief would it

AOL-DEF-00217244

67

```
 1    give to others?
 2        As they've alleged it, these seem to be various actions
 3    over different periods of time, different ports, by different
 4    people, and there's no consistency to it.
 5        The only consistency -- I think this takes us to some of
 6    the cases we've cited -- is something they put a label on it.
 7        And that's the problem, is putting a label on something.
 8    That seems to be the sort of conclusory allegations that Iqbal
 9    says don't survive.
10        And that's, more or less, what we're raising as far as
11    going forward, that there's simply the type of relief that
12    plaintiffs would then be seeing, a declaration or an
13    injunction, the injunction to follow the law seems very awkward
14    to process people, which the individuals were all processed.
15    And plaintiffs don't really say that they aren't being
16    processed.  It seems to be that they're deterring them or
17    saying things that the individuals don't like.  So it just
18    leaves a real conundrum for the Court, we believe, in
19    fashioning an appropriate relief.
20            THE COURT:  Thank you.
21            MR. AZMY:  Very briefly.
22            THE COURT:  Sure.
23            MR. AZMY:  Two quick substantive points and a
24    housekeeping matter.
25        Just quickly, with respect to Sale, I think one reason you
```

11:41  5
11:41  10
11:41  15
11:42  20
11:42  25

AOL-DEF-00217245

|       |    |                                                                              |
|-------|----|------------------------------------------------------------------------------|
|       | 1  | barely see Sale cited in the Federal Reporter is it's all over               |
|       | 2  | the place and heavily criticized, and the piece that counsel                 |
|       | 3  | read about the Refugee Act is dicta.  And the ultimate holding               |
|       | 4  | relates to the high seas and is limited to the particular                    |
| 11:42 | 5  | statute at issue there and not 1225, which references "at the                |
|       | 6  | border" and "arriving," as my colleague said.                                |
|       | 7  | Second, my co-counsel wanted me to stress that the                           |
|       | 8  | unreasonable delay argument comes both from 706(1) or under the              |
|       | 9  | arbitrary and capricious analysis under 706(2), and you'll find              |
| 11:43 | 10 | that in our briefing.                                                        |
|       | 11 | And just quickly on the housekeeping matter, we just object                  |
|       | 12 | to the introduction into the record of the metering guidance.               |
|       | 13 | We disagree that it's incorporated because the document wasn't               |
|       | 14 | attached.  We didn't have advanced notice.                                   |
| 11:43 | 15 | And in any event, we allege that any content in that memo                     |
|       | 16 | is pretextual, and the arguments about capacity are pretextual                |
|       | 17 | and false, and so, at most, it would create a disputed issue of              |
|       | 18 | fact later.                                                                   |
|       | 19 | THE COURT:  Okay.  Thank you.  The matter is                                 |
| 11:43 | 20 | submitted.                                                                    |
|       | 21 | ---oOo---                                                                     |
|       | 22 |                                                                              |
|       | 23 |                                                                              |
|       | 24 |                                                                              |
|       | 25 |                                                                              |

AOL-DEF-00217246

```
 1                        C-E-R-T-I-F-I-C-A-T-I-O-N

 2

 3       I certify that the foregoing is a correct transcript from

 4  the record of proceedings in the above-entitled matter.

 5

 6       Dated May 20, 2019, at San Diego, California.

 7

 8
                         /s/ Dana Peabody_____
 9                       Dana Peabody,
                         Registered Diplomate Reporter
10                       Certified Realtime Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

AOL-DEF-00217247

1   MAYER BROWN LLP
      Matthew H. Marmolejo (CA Bar No. 242964)
2      *mmarmolejo@mayerbrown.com*
    350 S. Grand Avenue
3   25th Floor
    Los Angeles, CA 90071-1503
4      Ori Lev (DC Bar No. 452565)
      (*pro hac vice*)
5      *olev@mayerbrown.com*
      Stephen M. Medlock (VA Bar No. 78819)
6      (*pro hac vice*)
      *smedlock@mayerbrown.com*
7   1999 K Street, N.W.
    Washington, D.C. 20006
8   Telephone:   +1.202.263.3000
    Facsimile:   +1.202.263.3300
9
    SOUTHERN POVERTY LAW CENTER
10     Melissa Crow (DC Bar No. 453487)
      (*pro hac vice*)
11     *melissa.crow@splcenter.org*
    1101 17th Street, N.W., Suite 705
12   Washington, D.C. 20036
    Telephone: +1.202.355.4471
13   Facsimile: +1.404.221.5857

14   *Additional counsel listed on next page*
    *Attorneys for Plaintiffs*
15
                **UNITED STATES DISTRICT COURT**
16
              **SOUTHERN DISTRICT OF CALIFORNIA**
17

| | |
|---|---|
| 18   Al Otro Lado, Inc., *et al.*, | Case No.:  17-cv-02366-BAS-KSC |
| 19          Plaintiffs, | |
| 20          v. | **EXHIBIT 9 TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |
| 21   Chad F. Wolf,[1] *et al.*, | |
| 22          Defendants. | **Declaration of Abigail Doe in support of Plaintiffs' Motion for Class Certification** |

27

28   _____

[1] Acting Secretary Wolf is automatically substituted for former Acting Secretary McAleenan pursuant to Fed. R. Civ. P. 25(d).

CENTER FOR CONSTITUTIONAL RIGHTS
  Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
  *bazmy@ccrjustice.org*
  Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
  *gschwarz@ccrjustice.org*
  Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
  *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
  Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
  *sarah.rich@splcenter.org*
  Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
  *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.401.221.5857

AMERICAN IMMIGRATION COUNCIL
  Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
  *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.56

Case: 22-55988, 05/22/2023, ID: 12720559, DktEntry: 71-2, Page 87 of 255

Case 3:17-cv-02366-BAS-KSC Document 390-11 Filed 01/14/20 PageID.29785 Page 3 of 9
Case 2:17-cv-05111-JFW-JPR Document 38-2 Filed 11/13/17 Page 2 of 7 Page ID #:330

LATHAM & WATKINS LLP
  Manuel A. Abascal (Bar No. 171301)
  *manny.abascal@lw.com*
  Wayne S. Flick (Bar No. 149525)
  *wayne.s.flick@lw.com*
  James H. Moon (Bar No. 268215)
  *james.moon@lw.com*
  Robin A. Kelley (Bar No. 287696)
  *robin.kelley@lw.com*
  Faraz R. Mohammadi (Bar No. 294497)
  *faraz.mohammadi@lw.com*
355 South Grand Avenue, Suite 100
Los Angeles, California  90071-1560
Telephone:  +1.213.485.1234
Facsimile:  +1.213.891.8763

AMERICAN IMMIGRATION COUNCIL
Melissa Crow (*pro hac vice* pending)
  *mcrow@immcouncil.org*
Karolina Walters (*pro hac vice* pending)
  *kwalters@immcouncil.org*
Kathryn Shepherd (*pro hac vice* pending)
  *kshepherd@immcouncil.org*
1331 G Street, NW, Suite 200
Washington, DC  20005
Telephone:  +1.202.507.7523
Facsimile:  +1.202.742.5619

CENTER FOR CONSTITUTIONAL
RIGHTS
Baher Azmy (*pro hac vice* pending)
  *bazmy@ccrjustice.org*
Ghita Schwarz (*pro hac vice* pending)
  *gschwarz@ccrjustice.org*
Angelo Guisado (*pro hac vice* pending)
  *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY  10012
Telephone:  +1.212.614.6464
Facsimile:  +1.212.614.6499

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>Elaine C. Duke, *et al.*,<br><br>Defendants. | Case No.:  2:17-cv-5111 JFW (JPRx)<br>Hon. John F. Walter (Courtroom 7A)<br><br>**DECLARATION OF ABIGAIL DOE IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>Hearing Date:  December 11, 2017<br>Hearing Time:  1:30 p.m.<br><br>Pre-Trial Conf.:  July 20, 2018<br>Trial:  July 31, 2018 |

## DECLARATION OF ABIGAIL DOE

I, ABIGAIL DOE, hereby declare as follows:

1.      I make this declaration based on my personal knowledge except where I have indicated otherwise.  If called as a witness, I could and would testify competently and truthfully to these matters.  Out of fear for my life and the lives of my children, I am submitting this declaration using a pseudonym so I do not reveal my true identity and my current whereabouts. Further, I have withheld particular dates and names of places because I am afraid that my persecutors may be able to identify me and will harm me or my family as a result.

2.      I am a female Mexican national.  I have two children.  They are 7 and 9 years old.  Until recently, we lived in Central Mexico.  In May 2017, my husband disappeared.

3.      My husband worked transporting food and goods across Mexico via tractor-trailer.  In May 2017, before his disappearance, my husband told me he was approached by individuals who wanted him to use his tractor-trailer to transport drugs for them.  He said no.  I believe that they threatened my husband that if he did not do what they said, that he or his family would be harmed.  My husband sounded very worried when he told me about what had happened.  He told me that he did not want to work for these individuals because he did not want to put my life, or the lives of our children, in danger.

4.      One day in May, 2017, per his usual routine, my husband awoke early and left the house for a long delivery trip.  By mid-morning, he had not called me, which was highly unusual and it worried me very much because of the threat the cartel made against him.  Even though I tried many times over the next two days, I was unable to reach him.  I feared the worst because he usually was in constant communication with me.

5.      About two days after he disappeared, still unable to reach him, I went to the local governmental authorities to file a missing person's report.  Because the

1

1   authorities told me I had to wait 72 hours to submit such a report, I was turned

2   away.

3         6.    A few hours after trying to file the report, on my way to pick up my

4   children from school, I was stopped at gunpoint by three armed men in black head-

5   coverings in a black van or SUV.  These men grabbed me and forced me into the

6   car.  They told me that if I continued to ask about my husband's disappearance,

7   they would kill me and my children.  They told me that if I continued to look for

8   him, that I would find him in pieces in a remote field.  They warned me that if my

9   children and I wanted to stay alive, we must leave.  I still do not know where my

10   husband is, and I fear that he was murdered because he refused to collaborate in

11   transporting drugs. Central Mexico  is controlled by cartels, and primarily *La*

12   *Familia Michoaocan (*Michoacan Family)*,* the Zetas and the *Caballeros*

13   *Templarios* (the Knights Templar).  I believe that members from one of these

14   cartels most likely killed my husband and I am afraid that they will kill my

15   children and me also.

16         7.    The gunmen seemed to know where I lived, knew my phone number,

17   and knew what happened to my husband.  I was terrified, confused, and incredibly

18   anxious.  I called my parents for advice, and we decided that my only hope of

19   being safe and protecting the lives of my children was to seek asylum in the United

20   States.

21         8.    I quickly gathered my children, packed some clothes, and boarded the

22   first available bus to Tijuana.  The bus ride took nearly two days.

23         9.    My children and I arrived in Tijuana on May 24 around 4:00 p.m.  We

24   went immediately to what appeared to be an immigration processing line, which I

25   later discovered was the Port of Entry at San Ysidro.

26         10.    When I reached the front of the line, I informed a person in a dark-

27   blue shirt who spoke Spanish that I wanted to apply for asylum.  I told him about

28   my husband's disappearance and the threats to me and to my children.  I explained

briefly what happened to our family and our fear of return.  He escorted me to different immigration officers inside of the building.

11.     When I met with other officials, I repeated my desire to apply for asylum, but I was not allowed to explain my circumstances in detail.  I was searched, photographed, and fingerprinted, as were my children.

12.     I was next led into another room and asked to wait.  Eventually, I was approached by other officers who asked me to explain the nature of my husband's disappearance.  I was able to explain briefly that my husband had disappeared and that I was abducted and threatened by men who I believe are members of a well-known cartel.  There are two major cartels in my community who are always fighting over territory.  I do not know which cartel made my husband disappear, or threatened my children and me.  I again repeated my desire to apply for asylum.  I told them I was scared for my life and for the lives of my children and that I did not feel safe in Mexico.

13.     The officers did not allow me to explain further and instead told me that I did not qualify for political asylum in the United States.  I tried to express in greater detail the circumstances of why I wanted to apply for asylum but this was met with the same response: I simply did not qualify.

14.     The officers also said that they would keep me there all night if I kept asking questions, that if I insisted on entering the United States, that my children would be taken away from me.  They did not explain why.

15.     The officers told me that the only option I had would be to let the Mexican government handle my situation.  They explained that Mexican authorities could help me relocate within Mexico and that they would help keep me safe.  They let me know I had two choices: I could pass through and have my children taken away, or I could return to Mexico and seek help from the Mexican government.  I did not want to lose my children.  And I did not understand what the Mexican authorities had to do with my desire to apply for asylum, especially

because I had already asked for help from the authorities in my hometown, and they had failed to help or protect us.

16.     The officials gave me a document in English that I could not read or understand.  I asked what it meant and was told that it was so that "Mexican authorities can help you," that it was "not a deportation form," and that "it was not anything bad."  They recorded me with a video camera and told me to say that I agreed to accept the help of the Mexican authorities.  They repeated this multiple times, and at no point did they explain to me anything further about the document or video.

17.     I agreed to sign the document even though I did not understand what it said.  The document was not translated for me.  I had been threatened with death at gunpoint only two days before, and had taken a two-day bus ride across the country.  I was exhausted, confused, and frightened: not just for myself, but for my children as well.  I was afraid if I did not sign the document, the officers would carry out their threats and take my children away from me.

18.     Later, I was taken to a different office and the officers there orally translated the document into Spanish. However, I really did not know if the translation had been done correctly. I do not speak English and was not able to confirm. I do not recall being asked any of the questions on the form by the immigration officers and I do not recall giving the answers that the officers wrote on the form.  The form states that I said I do not have a fear of return to my home country of Mexico.  This is absolutely false.  I was threatened by men at gunpoint who I believe killed my husband and I am still terrified they will find me and my family in Mexico.  The authorities are unable to protect us and there is no one who can keep us safe.

19.     After I signed the documents, an immigration officer took me back into Mexico and left me and my children to fend for ourselves.  Initially, my children and I stayed at a shelter in Tijuana because we had no money to stay

1  anywhere else. I met other families in the shelter who were also not permitted to
2  cross into the United States to apply for asylum.

3      20.    Two weeks ago, the people who run the shelter told me I could not
4  stay there any longer. A lawyer from Al Otro Lado found a place for my children
5  and me to stay temporarily, but we cannot live here much longer. I cannot support
6  myself in Mexico because my children and I must remain in hiding to protect our
7  lives.

8      21.    I still wish to seek asylum inside the United States, where my family
9  and I would be safe, and would like to try again. But I am afraid that if I try again,
10  I will simply be turned away again or be given the same choice by the officers –
11  that if I cross, I will lose my children.

12      I declare under penalty of perjury under the laws of the United States of
13  America that the foregoing is true and correct.

14      Executed on July 7, 2017 at Tijuana, Mexico.

15
16
17                                     _Abigail Doe_
18                                     Abigail Doe

19
20
21  **CERTIFICATION**

22      I, Hilda Gissela Bonilla, declare that I am fluent in the English and Spanish
23  languages. On July 7, 2017, I read the foregoing declaration and orally translated
24  it faithfully and accurately into Spanish in the presence of the declarant. After I
25  completed translating the declaration, the declarant verified that the contents of the
26  foregoing declaration are true and accurate.

27      I declare under penalty of perjury under the laws of the United States of
28  America that the foregoing is true and correct.

1

Executed on July 7, 2017 at Tijuana, Mexico.

2

3

4

5
                Hilda Gissela Bonilla

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  MAYER BROWN LLP
       Matthew H. Marmolejo (CA Bar No. 242964)
2      *mmarmolejo@mayerbrown.com*
   350 S. Grand Avenue
3  25th Floor
   Los Angeles, CA 90071-1503
4      Ori Lev (DC Bar No. 452565)
       (*pro hac vice*)
5      *olev@mayerbrown.com*
       Stephen M. Medlock (VA Bar No. 78819)
6      (*pro hac vice*)
       *smedlock@mayerbrown.com*
7  1999 K Street, N.W.
   Washington, D.C. 20006
8  Telephone:  +1.202.263.3000
   Facsimile:   +1.202.263.3300
9
   SOUTHERN POVERTY LAW CENTER
10     Melissa Crow (DC Bar No. 453487)
       (*pro hac vice*)
11     *melissa.crow@splcenter.org*
   1101 17th Street, N.W., Suite 705
12  Washington, D.C. 20036
   Telephone: +1.202.355.4471
13  Facsimile: +1.404.221.5857

14  *Additional counsel listed on next page*
   *Attorneys for Plaintiffs*
15
                **UNITED STATES DISTRICT COURT**
16
              **SOUTHERN DISTRICT OF CALIFORNIA**
17

18  Al Otro Lado, Inc., *et al.*,          Case No.:  17-cv-02366-BAS-KSC

19              Plaintiffs,

20       v.                                **EXHIBIT 10 TO
                                           PLAINTIFFS' MOTION
                                           FOR CLASS
21  Chad F. Wolf,[1] *et al.*,             CERTIFICATION**

22              Defendants.
                                           **Declaration of Beatrice Doe in support
23                                         of Plaintiffs' Motion for Class
                                           Certification**
24

25

26

27  _____

28  [1] Acting Secretary Wolf is automatically substituted for former Acting Secretary
   McAleenan pursuant to Fed. R. Civ. P. 25(d).

CENTER FOR CONSTITUTIONAL RIGHTS
    Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
    *bazmy@ccrjustice.org*
    Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
    *gschwarz@ccrjustice.org*
    Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
    *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
    Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
    *sarah.rich@splcenter.org*
    Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
    *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.401.221.5857

AMERICAN IMMIGRATION COUNCIL
    Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
    *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.56

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Case: 22-55988, 05/22/2023, ID: 12720559, DktEntry: 71-2, Page 96 of 255

Case 3:17-cv-02366-BAS-KSC   Document 390-12   Filed 03/14/20   PageID.29794   Page 3 of 11
Case 2:17-cv-05111-JFW-JPR   Document 50-3   Filed 11/13/17   Page 1 of 3   Page ID #:1397

LATHAM & WATKINS LLP
  Manuel A. Abascal (Bar No. 171301)
  *manny.abascal@lw.com*
  Wayne S. Flick (Bar No. 149525)
  *wayne.s.flick@lw.com*
  James H. Moon (Bar No. 268215)
  *james.moon@lw.com*
  Robin A. Kelley (Bar No. 287696)
  *robin.kelley@lw.com*
  Faraz R. Mohammadi (Bar No. 294497)
  *faraz.mohammadi@lw.com*
355 South Grand Avenue, Suite 100
Los Angeles, California  90071-1560
Telephone:  +1.213.485.1234
Facsimile:  +1.213.891.8763

AMERICAN IMMIGRATION COUNCIL
Melissa Crow (*pro hac vice* pending)
  *mcrow@immcouncil.org*
Karolina Walters (*pro hac vice* pending)
  *kwalters@immcouncil.org*
Kathryn Shepherd (*pro hac vice* pending)
  *kshepherd@immcouncil.org*
1331 G Street, NW, Suite 200
Washington, DC  20005
Telephone:  +1.202.507.7523
Facsimile:  +1.202.742.5619

CENTER FOR CONSTITUTIONAL
RIGHTS
Baher Azmy (*pro hac vice* pending)
  *bazmy@ccrjustice.org*
Ghita Schwarz (*pro hac vice* pending)
  *gschwarz@ccrjustice.org*
Angelo Guisado (*pro hac vice* pending)
  *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY  10012
Telephone:  +1.212.614.6464
Facsimile:  +1.212.614.6499

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>Elaine C. Duke, *et al.*,<br><br>Defendants. | Case No.:  2:17-cv-5111 JFW (JPRx)<br>Hon. John F. Walter (Courtroom 7A)<br><br>**DECLARATION OF BEATRICE DOE IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>Hearing Date:  December 11, 2017<br>Hearing Time:  1:30 p.m.<br><br>Pre-Trial Conf.:  July 20, 2018<br>Trial:  July 31, 2018 |

**DECLARATION OF BEATRICE DOE**

I, BEATRICE DOE, hereby declare as follows:

1.      I make this declaration based on my personal knowledge except where I have indicated otherwise.  If called as a witness, I could and would testify competently and truthfully to these matters.  Because I am scared for my safety, I am submitting this declaration using a pseudonym so I do not reveal my true identity and my current whereabouts. Further, I have withheld particular dates and names of places because I am afraid that my persecutors may be able to identify me and will harm me or my family as a result.

2.      I am a native and citizen of Mexico.  I am 33 years old.  I have three children.  They are seven years old, eleven years old, and fifteen years old.

3.      On May 24, 2017, I fled Southern Mexico with my three children and my nephew.  My nephew is like a son to me because I have raised him since he was about three years old. His parents abandoned him shortly after he was born and he lived with his grandmother for about two years before coming to live with me.

4.      For about the past year, my nephew was targeted by the Zetas, a dangerous drug cartel in Mexico that controls much of Southern Mexico including the place where we are from.  My nephew worked with a group of young men selling goods.  In the state in which I am from in Southern Mexico, the Zetas demand money from people who work in the market.  The Zetas demand that the people in the market pay this fee, which they call the *cuota* ("fee"), in order to be able to work.  If they fail to pay the *cuota*, then the Zetas will kill them for failing to obey and to use them as examples to others in the community.

5.      The Zetas threatened my nephew by saying that if he did not pay the fees that they would beat him up or cut him into pieces and put him in a plastic bag.  He paid the fees for about a year.  He was afraid that if he did not continue to pay, that the men would kill him.  The Zetas also threatened to harm his family

Case: 22-55988, 05/22/2023, ID: 12720559, DktEntry: 71-2, Page 98 of 255

Case 2:17-cv-02366-RAS-KSC   Document 990-12   Filed 01/14/20   Page 9 of 29   Page ID 796
Case 2:17-cv-02366-RAS-KSC   Document 998-3   Filed 11/13/17   Page 5 of 29   Page ID 1399
11

1   alleging that they knew where to find them. They made these threats to my nephew
2   so that he would continue to make payments.

3      6.    After about six months, the demands for the fees became more
4   frequent, and they increased the amount he had to pay.  When he was not able to
5   pay, the Zetas told him they would kill him and his family to punish him.  This
6   happened around the same time that they began to pressure him into joining them.
7   My nephew understood this to mean that they wanted him to work for them.
8   Again, the Zetas told him that if he did not join them, that they would beat him up
9   and increase the fees.  The Zetas beat up my nephew on at least two separate
10  occasions for not being able to pay the increased fees amount.  He was reluctant to
11  tell me that the Zetas had beaten him because he knew how worried I would be.  I
12  did not see the bruises on his body until several days later. I feel responsible for
13  him and treat him like he is my own son.  When I learned that the Zetas were
14  targeting him, I was very concerned and was not able to sleep at night. I was afraid
15  that they would hurt him again.

16     7.    To escape this violence, my children, my nephew and I all fled
17  Southern Mexico to seek asylum in the United States.  My nephew told me that the
18  Zetas are looking for him in Southern Mexico.  One of the young men who worked
19  with him called him after we unsuccessfully tried to seek asylum and told him that
20  the Zetas already knew that he fled and were looking for him to kill him.

21     8.    We also fled Southern Mexico because I suffered terrible domestic
22  violence at the hands of my husband, the father of my children.  In May, 2017, I
23  reported my husband to the Office of Integral Development for Families
24  (*Desarrollo Integral de la Familia*– "DIF") and to the office of the Municipal
25  Agent (*Agente Municipal*) for the domestic violence.  I reported him because I
26  could not stand his abuse any longer and wanted to protect my children.  He would
27  beat me regularly, several times a month.  I often had bruises on my body.  These
28  agencies called him to present himself to speak about the situation, but he told

Case: 22-55988, 05/22/2023, ID: 12720559, DktEntry: 71-2, Page 99 of 255

Case 3:17-cv-02366-BAS-KSC   Document 390-12   Filed 03/14/20   PageID 29797   Page 6 of
Case 3:17-cv-02366-BAS-KSC   Document 535-3   Filed 11/13/19   Page 4 of 9   Page 100 of
11

1   them that he would continue to do what he wanted with me and his children.  I was

2   afraid that the beatings would worsen as a result of making a report to the

3   authorities.  I left my house that same day and stayed at my mother's house.  Two

4   days after I reported my husband, we left Southern Mexico and started our journey

5   to Tijuana, where I intended to ask for asylum in the United States.

6       9.      We first attempted to seek asylum on May 25, 2017.  We went to the

7   Otay Mesa Port of Entry.  We walked up to the port and stood in line to enter.  We

8   passed by the first security post.  A man standing in a black uniform motioned for

9   us to go into one of two lines.  He did not ask for any documents, and he did not

10  say anything to us.  We passed through the turnstile and then encountered two

11  immigration officers in blue uniforms.  One of the officers stood to the side and did

12  not say anything.  The other officer asked for our documents.  I told him that we

13  were from Mexico and showed him my Mexican identification card.  He told me

14  that we needed other documents in order to enter the United States.  He told me to

15  wait while he got another officer.

16      10.     When the next officer came to talk to us, I told him that we wanted to

17  apply for asylum.  This officer was also dressed in a blue uniform.  I told him that

18  we were being threatened and wished to request asylum in the United States.  He

19  listened to me and said that they did not provide that type of service at the Otay

20  Mesa Port of Entry, but that we should go to the San Ysidro Port of Entry instead.

21  One of the officers escorted us to the gate, and we left the Otay Mesa Port.  As we

22  were leaving, the same officer who asked for my identification said that the

23  officers were tired of poor people coming to the United States.

24      11.     We then took a taxi cab to the San Ysidro Port.  The taxi driver

25  pointed to the entrance of the Port and told us where to go.  We proceeded to the

26  Port until we encountered a large gate.  There were immigration officers in blue

27  uniforms.  We got in line.  One of the immigration officers asked for our

28  documents, and I handed him my Mexican identification card.  He asked me what

3

we were doing there and what we wanted. I told him that we needed help because my life and the lives of my children and my nephew were in danger in Mexico. I told him that I was afraid of my husband.

12.    The immigration officer told me that many people from Veracruz, Guerrero, Michoacan, and other states in Mexico had done the same exact thing – come to the United States to ask for help. He asked me why we had to go to the United States, and said that Mexico has 32 states and that we could have gone to any of those states to be safe. He told me that the United States government had no obligation to help us. He also told me that we did not have a right to enter the United States because we were not born in the United States. He told me that I had no rights. He told me that I should be asking for help from the Mexican government.

13.    This officer then led us into an office. Next, a female immigration officer in a blue uniform walked into the room. She put gloves on and put my children behind me. She told me to put my hands on my head. She spread my legs and patted me down. When she did this, I cried out in pain. My husband had beaten the side of my body, and the bruises were still fresh. She did the same to my children. She told me to remove all accessories. She checked my hair as if she was checking my hair for lice. She told me that she was checking my hair, which was in a bun, for drugs. She told me it was for national security. She made sure that I did not have anything sharp. She also checked our bags for drugs.

14.    This officer did the same to my children. The officer instructed the children to take off their sweaters and to empty their pockets. The officer also took away the children's belts.

15.    The officer then took us to a separate room next door. There were two women and two men in this room. They all were speaking in English. The officers asked us again why we were trying to go to the United States. I explained

1  that we were fleeing violence and that we wished to ask for asylum in the United

2  States.

3      16.   I gave the officer each of my children's birth certificates.  The officer

4  then asked about my nephew.  I told the officer that he was my nephew.  She

5  replied that I had probably kidnapped him.  She said that if I did not provide

6  documentation proving that he was my nephew, that they would take him away

7  from me.

8      17.   The officer then took a picture of me.  I explained again that we were

9  trying to leave Mexico because we had been threatened and because I had suffered

10 domestic violence and was afraid for my life.  The woman with the gloves on – the

11 one who had searched me and my children before – was walking around the room

12 saying that "it was always the same."

13     18.   As the immigration officers were interrogating me, another mother

14 and her two small children were brought into the room.  A different female officer

15 also searched this mother and her children.  The officer searched the mother by

16 touching her private parts and was aggressive.  The mother was crying.

17     19.   Next, the officer took my fingerprints and told me that we were now

18 going to speak to another officer.  We sat and waited while the other mother in the

19 room was being harshly interrogated, in the same way.  After about thirty minutes,

20 a male immigration officer came into the room and told us to follow him.  They

21 took my nephew away to another room to talk to him separately.

22     20.   My nephew told me later that the immigration officers asked him a lot

23 of questions about where his parents were, where he was from and how long he

24 had been living with me.  The immigration officers asked my nephew if he was

25 willing to enter the United States if I stayed in Mexico.  He said no and that he

26 wanted to stay with me.  They told my nephew that if he still wanted to cross to the

27 United States, they were going to place him in the custody of Mexican authorities.

28 My nephew told the officers that he was afraid to go back to Mexico.  The

5

1  immigration officers told him all the same things they had already told me – that it

2  did not matter that we were afraid, and that there were many other places for him

3  to live in Mexico.

4      21.    The immigration officers asked me for my husband's name and told

5  me that they were going to take my nephew away from me unless I signed a

6  document that they placed in front of me.  The officers told me that if I signed the

7  document, I would still have the opportunity in the future to get a work visa in the

8  United States.  They said I did not have a right to be there, but if I insisted, that I

9  was going to go to jail.  They said that for my own good, I should sign the

10 document and that it would not affect my record.  When I asked the immigration

11 officer what he meant by "record," he started banging on the table and yelled at me

12 that I had to sign the document.  I was afraid and felt that I did not have another

13 option but to sign the document.  I told the officer that I did not understand what I

14 was signing because the document was in English and I only speak Spanish.  The

15 only words I understood on the form were my name and the names of my children

16 and my nephew.

17     22.    After I signed the document, the immigration officer took us from the

18 room, returned our belongings to us, and handed me the document that I had just

19 signed.  As we left, he said that we were already in Tijuana and that we would be

20 safe there.  We were then escorted to another office with Mexican immigration

21 officials, and we returned to Tijuana.

22     23.    The same day, just a few hours after leaving the San Ysidro Port of

23 Entry, my nephew received a phone call from a friend in Southern Mexico who

24 told him that the Zetas were looking for him and that he should be careful.  I called

25 my sister in Southern Mexico and explained what had happened.  She told us to go

26 back to the Port of Entry and try again.

27     24.    The next day, on May 26, 2017, we again went to the San Ysidro Port

28 of Entry very early in the morning to try for the third time to seek asylum in the

6

United States.  I saw one of the same female immigration officers wearing a blue uniform that I had seen the day before.  The female officer recognized me and said, "You again!?"  The female immigration officer asked me how I could assure her that my children were not going to become delinquents in the United States.  She told us that we had no right to ask for asylum, and no right to enter the United States.  She told me that if I tried to return, I would be put in jail for three years.  I told her that we were afraid to return to Mexico because we feared for our lives.  She said that this did not matter.

25.     They took us to a different office, and they separated my nephew from my children and me.  More officers spoke to my nephew separately.   I could not hear what they were saying, but afterwards, he told me that they had again threatened to transfer him to Mexican authorities and return him to Southern Mexico.  Later, they gave us food and then escorted us out of the office and back to Mexico. We were very tired.

26.     We returned to Tijuana, where we stayed in a shelter because we have no money.  Two weeks ago, the people who run the shelter said we could not stay there any longer.   A lawyer from Al Otro Lado found a place for us to stay temporarily, but we cannot live here much longer.   I cannot support myself in Mexico because my children and I must remain in hiding to protect our lives.

27.     I am afraid with every day that passes that the Zetas, or my husband, will find us in Tijuana.  My husband has called me since I have been in Tijuana and told me that he knows I am here.  Because it only took us about one day to travel to Tijuana, we are very vulnerable staying here. I would like to try to cross again with my family and ask for asylum in the United States, where my family and I will be safe.  But I am afraid that if I try a fourth time, they will turn us away again or put me in jail.

7

1  I declare under penalty of perjury under the laws of the United States of

2  America that the foregoing is true and correct.

3  Executed on July 7, 2017 at Tijuana, Mexico.

4

5

6  _BEATRICE DOE_
          Beatrice Doe

7

8  **CERTIFICATION**

9  I, Hilda Gissela Bonilla, declare that I am fluent in the English and Spanish

10 languages.  On July 7, 2017, I read the foregoing declaration and orally translated

11 it faithfully and accurately into Spanish in the presence of the declarant.  After I

12 completed translating the declaration, the declarant verified that the contents of the

13 foregoing declaration are true and accurate.

14 I declare under penalty of perjury under the laws of the United States of

15 America that the foregoing is true and correct.

16 Executed on July 7, 2017 at Tijuana, Mexico.

17

18

19

20 _Hilda Gissela Bonilla_
          Hilda Gissela Bonilla

21

22

23

24

25

26

27

28

8

1 MAYER BROWN LLP
    Matthew H. Marmolejo (CA Bar No. 242964)
2    *mmarmolejo@mayerbrown.com*
  350 S. Grand Avenue
3 25th Floor
  Los Angeles, CA 90071-1503
4    Ori Lev (DC Bar No. 452565)
     (*pro hac vice*)
5    *olev@mayerbrown.com*
     Stephen M. Medlock (VA Bar No. 78819)
6    (*pro hac vice*)
     *smedlock@mayerbrown.com*
7  1999 K Street, N.W.
  Washington, D.C. 20006
8  Telephone:  +1.202.263.3000
  Facsimile:   +1.202.263.3300
9
  SOUTHERN POVERTY LAW CENTER
10    Melissa Crow (DC Bar No. 453487)
     (*pro hac vice*)
11    *melissa.crow@splcenter.org*
  1101 17th Street, N.W., Suite 705
12 Washington, D.C. 20036
  Telephone: +1.202.355.4471
13 Facsimile: +1.404.221.5857

14 *Additional counsel listed on next page*
  *Attorneys for Plaintiffs*
15
                **UNITED STATES DISTRICT COURT**
16
              **SOUTHERN DISTRICT OF CALIFORNIA**
17

18 | Al Otro Lado, Inc., *et al.*, | Case No.:  17-cv-02366-BAS-KSC |

19                Plaintiffs,

20    v.                              **EXHIBIT 11 TO**
                                      **PLAINTIFFS' MOTION**
21 Chad F. Wolf,[1] *et al.*,         **FOR CLASS**
                                      **CERTIFICATION**
22                Defendants.
                                      **Declaration of Carolina Doe in support**
23                                    **of Plaintiffs' Motion for Class**
                                      **Certification**
24

25

26

27 _____

28 [1] Acting Secretary Wolf is automatically substituted for former Acting Secretary
  McAleenan pursuant to Fed. R. Civ. P. 25(d).

CENTER FOR CONSTITUTIONAL RIGHTS
  Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
  *bazmy@ccrjustice.org*
  Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
  *gschwarz@ccrjustice.org*
  Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
  *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
  Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
  *sarah.rich@splcenter.org*
  Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
  *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.401.221.5857

AMERICAN IMMIGRATION COUNCIL
  Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
  *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.56

LATHAM & WATKINS LLP
Manuel A. Abascal (Bar No. 171301)
 *manny.abascal@lw.com*
Wayne S. Flick (Bar No. 149525)
 *wayne.s.flick@lw.com*
James H. Moon (Bar No. 268215)
 *james.moon@lw.com*
Robin A. Kelley (Bar No. 287696)
 *robin.kelley@lw.com*
Faraz R. Mohammadi (Bar No. 294497)
 *faraz.mohammadi@lw.com*
355 South Grand Avenue, Suite 100
Los Angeles, California 90071-1560
Telephone: +1.213.485.1234
Facsimile: +1.213.891.8763

AMERICAN IMMIGRATION COUNCIL
Melissa Crow (*pro hac vice* pending)
 *mcrow@immcouncil.org*
Karolina Walters (*pro hac vice* pending)
 *kwalters@immcouncil.org*
Kathryn Shepherd (*pro hac vice* pending)
 *kshepherd@immcouncil.org*
1331 G Street, NW, Suite 200
Washington, DC 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

CENTER FOR CONSTITUTIONAL
RIGHTS
Baher Azmy (*pro hac vice* pending)
 *bazmy@ccrjustice.org*
Ghita Schwarz (*pro hac vice* pending)
 *gschwarz@ccrjustice.org*
Angelo Guisado (*pro hac vice* pending)
 *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>Elaine C. Duke, *et al.*,<br><br>Defendants. | Case No.: 2:17-cv-5111 JFW (JPRx)<br>Hon. John F. Walter (Courtroom 7A)<br><br>**DECLARATION OF CAROLINA DOE IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>Hearing Date: December 11, 2017<br>Hearing Time: 1:30 p.m.<br><br>Pre-Trial Conf.: July 20, 2018<br>Trial: July 31, 2018 |

## DECLARATION OF CAROLINA DOE

1

2    I, Carolina Doe, hereby declare as follows:

3       1.   I make this declaration based on my personal knowledge except where

4    I have indicated otherwise.  If called as a witness, I could and would testify

5    competently and truthfully to these matters.  Because I fear for my safety, I am

6    submitting this declaration using a pseudonym so I do not reveal my true identity

7    and my current whereabouts.  Further, I have withheld particular dates and names

8    of places because I am afraid that my persecutors may be able to identify me and

9    will harm me or my family as a result.

10      2.   I am a female Mexican national and was born in 1979.  I have three

11   children, one of whom is a U.S. citizen.  They are 9, 15 and 18 years old.  Until

12   recently, we lived in Southern Mexico.

13      3.   In May 2017, my brother-in-law (my husband's brother) was

14   kidnapped, tortured and killed by members of a drug trafficking cartel.  There are

15   two primary criminal organizations in  the state in which I live in Southern Mexico

16   that traffic drugs and that are in a war with each other.  These groups regularly

17   kidnap and murder civilians and especially police officers, which is why I believe

18   that members of a drug trafficking cartel targeted my brother-in-law.  Also, my

19   brother-in-law had already been kidnapped and severely beaten about one year

20   before, in May 2016.  During that incident, the cartel members told my brother-in-

21   law that if he ceased investigating their activities, that they would leave him alone.

22   However, he continued because that is his job.

23      4.   One day at the police station, several of my husband's coworkers ran

24   to him while he was working and told him that his brother, my brother-in-law, was

25   being kidnapped.  My husband ran to where his brother was being taken away in a

26   van, just across the street from where he worked. My husband tried to follow the

27   van but the men in the van started shooting at him. My brother in law's

28

1

1  dismembered body was found the same day he was kidnapped in garbage bags in a

2  cemetery.  They targeted my brother-in-law because, like my husband, he was a

3  police officer.  Police officers are frequently targeted by the cartels in our

4  community.  We filed a police report the same day that my brother-in-law's body

5  was found.  There was no substantial investigation.

6       5.      My husband is a police officer in Southern Mexico. One day after my

7  brother-in-law was killed, my husband came home and showed me a picture on his

8  phone of two men. He told me that one of these individuals in the picture was one

9  of the men who had killed his brother.  My husband recognized these men because

10 the two men were former police officers who had defected and were now working

11 for one of the cartels.

12      6.      After my brother-in-law was kidnapped and murdered by the cartel,

13 members of a different cartel threatened my husband, both in person and over the

14 phone.  We knew that the threats were from the second, different, cartel because

15 they demanded to know intelligence about the first cartel who had killed my

16 brother-in-law.  I think that many people believe that police officers such as my

17 husband have information.

18      7.      The threats to my husband were related to my brother-in-law's

19 murder.  In particular, in May 2017, at my brother-in-law's funeral, members of

20 the other cartel approached my husband and demanded to know more information

21 about the cartel members who had kidnapped his brother.  The cartels want to have

22 as much information as possible because information is power.  They told my

23 husband that if he did not provide the information they had requested, he would

24 meet the same fate as his brother had: killed and put in bags.  The next evening, my

25 husband and I saw a van drive by our house at least twice.  It was the same van that

26 had been used to kidnap my brother-in-law.

27      8.      My husband went into hiding at his parents' house because he was

28 afraid for his life.

9.      Several days later, members of one of the cartels threatened me when I was in town taking care of business.  They demanded to know where my husband was, and they reminded me that I had three girls.  I understood this to be a threat to my children and me.

10.      Later that day, my children and I were followed by two men when I left work.  My children were with me at work that day because I was afraid for our safety and I wanted them close.  They were waiting outside of my work and followed us as we rode home on the bus.  I was frightened and got off at a different stop instead of traveling to our normal stop to return home.  The men followed us off the bus and into a restaurant.  They sat down next to us at the restaurant and took pictures of us.  The men then left the restaurant, and we immediately took a taxi home.

11.      The next evening, two cars stopped in front of my house, and five men got out.  Two of the men came onto my property while the other three men waited outside.  The two men used flashlights to search through the windows of my home to see if anyone was inside.  I hid with my daughters in the bathroom so that the men would not see us.  I was terrified and feared for my life and the lives of my daughters.

12.      Based on these incidents and the threats my family received, I decided to flee with my children.  We did not file another police report because we did not think that the police would carry out an investigation, especially after no one had been arrested following my brother-in-law's murder.  Also, we were afraid that the cartels would harm us in retaliation for bringing charges.

13.      My husband also fled but did not tell anyone where he was going out of fear for our family.  The cartel members were actively looking for my husband, so we decided to flee separately, in the hope that my daughters and I would be safer.  My daughters and I packed two bags and left in the middle of the night on May 17, 2017.  We took a bus to Mexico City and a plane to Tijuana the same day.

3

1 When we arrived in Tijuana, we went immediately to the San Ysidro Port of Entry.

2 We arrived at the San Ysidro Port of Entry at approximately 6:30 p.m.

3    14.    My daughters and I walked for a long time on a bridge with a tunnel.

4 At the end of the bridge, there was a door with approximately six officers all

5 wearing dark navy blue uniforms.  The officers asked me where we were going.  I

6 told the officers that I wanted to apply for asylum.  The officers directed us to an

7 area with cubicle stations.

8    15.    There were other officers waiting at the cubicle stations who all had

9 the same uniform.  One of the officers looked at my documents, including my U.S.

10 citizen daughter's U.S. birth certificate, her expired identification card from

11 Portland, Oregon, and her U.S. passport, which was also expired.  After I explained

12 what had happened to my family and that we were afraid of returning, I was taken

13 to another room where a female immigration officer took my fingerprints and

14 searched us.

15    16.    The officer then took my three children and me to a separate room.

16 Another officer came by and locked us in the room.  No one explained to us what

17 was happening.  We waited for someone to come back to the room but no one

18 came.  We were exhausted having fled in the middle of the night, so we went to

19 sleep.  The room only had mats on the floor and did not have beds.

20    17.    The next morning, on May 18, 2017, I was taken to a large room with

21 a table.  Two male officers sat on one side of the table.  My children were told to

22 wait outside the room.  The two men asked me questions in Spanish regarding why

23 I came from Southern Mexico, and I again explained what happened to my family

24 and me.  The two men searched on the Internet regarding information about how

25 my brother-in-law was killed to confirm what I had told them, and one of them

26 mentioned an article he found about the murder that said my brother-in-law had

27 two brothers.  I believed that the officer understood that my husband was also in

28 danger.

4

18.     The two officers then talked amongst themselves in English, which I did not understand as I only speak Spanish.  One of the officers told me that based on his experience, I would not receive asylum.  He said that the protection I was seeking in the United States could be provided by the Tijuana authorities.

19.     The officer then asked if anyone was waiting to pick up my 15-year-old U.S. citizen daughter after she crossed.  I explained that her godfather, who is a permanent resident, lived in Portland, Oregon.  The officer said that my daughter would not be taken to Portland, Oregon, and only would be taken as far as Los Angeles, California.  I explained that I could contact my daughter's godfather to make arrangements, but the officer told me that the state would take her and place my daughter in foster care until she turned 18.  The officers did not give me the opportunity to contact my daughter's godfather, and I did not want her separated from her sisters and me and placed in foster care.

20.     The officer then told me that if I was granted asylum, I could get my daughter out of foster care, but that he was certain I would not be granted asylum and that I would be deported.  He said that I would not be allowed to return to the United States for 10 years and therefore would not be able to see my daughter until she became an adult.

21.     The officer then told me that there was a way that I could get out of there voluntarily so that my daughter would not be taken from me and placed in foster care.  He told me that unless I wanted them to take my daughter from me, I had to make a statement on video showing that I was not afraid of returning to Southern Mexico.

22.     I did not want my daughter, who is only 15 years old, to be taken from me and placed alone in foster care.  I felt like I had no choice but to do what the officer told me to avoid being separated from my daughter.

23.     The two officers then went over the questions that they were going to ask me on video and told me how to answer each question.  One of the officers

5

read the questions from a laptop he had on the table.  They recorded me using a laptop.  He asked me if I was scared to go back to Mexico, and I responded, "Yes." He stopped me and instructed me to respond "No" to all of the questions if I wanted to get out voluntarily and prevent the state from taking my minor U.S. citizen daughter and putting her in foster care.  The officers then went over the questions with me twice and made me practice the answers before they turned on the video camera.

24.     Next, they turned on the video camera on the laptop and asked me the same set of questions for a third time.  I did not respond as they had instructed me to do because the responses they told me to say were not true.  I was afraid and wanted to respond that I was very scared to return to Mexico.  The officer then repeated that the only way we could leave voluntarily was if I stated confidently on video that I was not scared.

25.     I was tired and scared. We had been locked in a room overnight, and I felt like we were in jail.  I did not think that I would be allowed to leave with all of my daughters unless I did as they said.  I believed I had no choice but to do what they wanted or else my daughter would be taken from me.  They continued to pressure me to say what they wanted on video. I finally did what they told me to do, and the officers were satisfied with my responses.

26.     The officers then made me sign a document in English that had my picture on it.  The officers did not read the document to me in Spanish, nor did they explain to me what the document meant.  The one officer who said he was certain I would not be granted asylum told me if I signed the document, it would keep me from violating the law.  I agreed to sign the document because I did not want to violate the law and because I believed that my minor daughter would be taken from me if I did not sign it.

27. I did not understand what I was signing, or what the document said. I only understood that signing these documents was the only way to prevent them from taking my daughter away from me.

28. I was very anxious and scared because I knew that we could not return to Southern Mexico. My children and I fled our home in the middle of the night because we were in fear for our lives. If we are forced to return to Southern Mexico, I fear that we will meet the same fate as my brother-in-law: tortured, mutilated, and killed. I am also worried that these men may find us in Tijuana. It is this fear that I wished to explain to U.S. Immigration, including on the video, but the officers kept telling me that I did not qualify for asylum and that my daughter would be taken away from me if I did not sign the document.

29. After I signed the document, the officers brought my 18-year-old daughter into the room. They told her that she had to sign the document that they placed in front of her. She cannot read English either. They did not read the form to her in Spanish or explain to her what the form meant. After leaving the San Ysidro Port of Entry that day, my children and I went into hiding in a shelter in Tijuana. We stayed in a shelter because we could not afford to stay anywhere else. A few days after we left the port, I made arrangements with a family friend in San Diego who came to Tijuana and walked my U.S. citizen daughter across the border to the United States. My daughter is currently living with her aunt in Portland, Oregon.

30. Two weeks ago, the people who run the shelter in Tijuana told me that my children and I could not stay there any longer. A lawyer from Al Otro Lado found a place for us to stay temporarily, but we cannot live here much longer.

31. I am afraid of staying in Mexico with my daughters because of the threats that my family has received. We are not safe here. I have not seen or heard from my husband in several weeks, and I fear for his safety. I want to apply for asylum in the United States to save my family and me. However, I am afraid that

7

1  if we try to cross again, the officials will again turn us away or try to take my other
2  children from me.
3      I declare under penalty of perjury under the laws of the United States of
4  America that the foregoing is true and correct.
5      Executed on July 7, 2017 at Tijuana, Mexico.

6

7

8              *Carolina Doe*
9              _____
               Carolina Doe

10

11

12              **CERTIFICATION**
13      I, Hilda Gissela Bonilla, declare that I am fluent in the English and Spanish
14  languages.  On July 7, 2017, I read the foregoing declaration and orally translated
15  it faithfully and accurately into Spanish in the presence of the declarant.  After I
16  completed translating the declaration, the declarant verified that the contents of the
17  foregoing declaration are true and accurate.
18      I declare under penalty of perjury under the laws of the United States of
19  America that the foregoing is true and correct.
20      Executed on July 7, 2017 at Tijuana, Mexico.

21

22

23              _____
24              Hilda Gissela Bonilla

25

26

27

28

8

MAYER BROWN LLP
  Matthew H. Marmolejo (CA Bar No. 242964)
  *mmarmolejo@mayerbrown.com*
350 S. Grand Avenue
25th Floor
Los Angeles, CA 90071-1503
  Ori Lev (DC Bar No. 452565)
  (*pro hac vice*)
  *olev@mayerbrown.com*
  Stephen M. Medlock (VA Bar No. 78819)
  (*pro hac vice*)
  *smedlock@mayerbrown.com*
1999 K Street, N.W.
Washington, D.C. 20006
Telephone:  +1.202.263.3000
Facsimile:   +1.202.263.3300

SOUTHERN POVERTY LAW CENTER
  Melissa Crow (DC Bar No. 453487)
  (*pro hac vice*)
  *melissa.crow@splcenter.org*
1101 17th Street, N.W., Suite 705
Washington, D.C. 20036
Telephone: +1.202.355.4471
Facsimile: +1.404.221.5857

*Additional counsel listed on next page*
*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*, | Case No.:  17-cv-02366-BAS-KSC |
| Plaintiffs, | |
| v. | **EXHIBIT 12 TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |
| Chad F. Wolf,[1] *et al.*, | |
| Defendants. | **Declaration of Dinora Doe in support of Plaintiffs' Motion for Class Certification** |

---

[1] Acting Secretary Wolf is automatically substituted for former Acting Secretary McAleenan pursuant to Fed. R. Civ. P. 25(d).

CENTER FOR CONSTITUTIONAL RIGHTS
  Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
  *bazmy@ccrjustice.org*
  Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
  *gschwarz@ccrjustice.org*
  Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
  *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
  Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
  *sarah.rich@splcenter.org*
  Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
  *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.401.221.5857

AMERICAN IMMIGRATION COUNCIL
  Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
  *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.56

Case: 22-55988, 05/22/2023, ID: 12720559, DktEntry: 71-2, Page 118 of 255

Case 3:17-cv-02366-BAS-KSC Document 390-14 Filed 01/14/20 PageID.29816 Page 2 of 8
Case 2:17-cv-05111-JFW-JPR Document 38-5 Filed 11/13/17 Page 2 of 6 Page ID #:341

1  LATHAM & WATKINS LLP
2    Manuel A. Abascal (Bar No. 171301)
      *manny.abascal@lw.com*
3    Wayne S. Flick (Bar No. 149525)
      *wayne.s.flick@lw.com*
4    James H. Moon (Bar No. 268215)
      *james.moon@lw.com*
5    Robin A. Kelley (Bar No. 287696)
      *robin.kelley@lw.com*
6    Faraz R. Mohammadi (Bar No. 294497)
      *faraz.mohammadi@lw.com*
7
8  355 South Grand Avenue, Suite 100
   Los Angeles, California  90071-1560
9  Telephone:  +1.213.485.1234
   Facsimile:  +1.213.891.8763
10
11 AMERICAN IMMIGRATION COUNCIL   CENTER FOR CONSTITUTIONAL
   Melissa Crow (*pro hac vice* pending)   RIGHTS
12    *mcrow@immcouncil.org*               Baher Azmy (*pro hac vice* pending)
   Karolina Walters (*pro hac vice* pending)   *bazmy@ccrjustice.org*
13    *kwalters@immcouncil.org*            Ghita Schwarz (*pro hac vice* pending)
   Kathryn Shepherd (*pro hac vice* pending)   *gschwarz@ccrjustice.org*
14    *kshepherd@immcouncil.org*           Angelo Guisado (*pro hac vice* pending)
   1331 G Street, NW, Suite 200              *aguisado@ccrjustice.org*
15 Washington, DC  20005                  666 Broadway, 7th Floor
   Telephone:  +1.202.507.7523            New York, NY  10012
16 Facsimile:  +1.202.742.5619            Telephone:  +1.212.614.6464
                                          Facsimile:  +1.212.614.6499
17
   *Attorneys for Plaintiffs*
18
19             **UNITED STATES DISTRICT COURT**
20             **CENTRAL DISTRICT OF CALIFORNIA**
21
   Al Otro Lado, Inc., *et al.*,          Case No.:  2:17-cv-5111 JFW (JPRx)
22                                         Hon. John F. Walter (Courtroom 7A)
                Plaintiffs,
23                                         **DECLARATION OF DINORA DOE IN**
        v.                                 **SUPPORT OF PLAINTIFFS' MOTION**
24                                         **FOR CLASS CERTIFICATION**
25 Elaine C. Duke, *et al.*,
                                           Hearing Date:   December 11, 2017
26              Defendants.                Hearing Time:   1:30 p.m.
27                                         Pre-Trial Conf.:  July 20, 2018
                                           Trial:             July 31, 2018
28

# <u>DECLARATION OF DINORA DOE</u>

I, Dinora Doe, declare as follows:

1. I make this declaration based on my personal knowledge except where I have indicated otherwise.  If called as a witness, I could and would testify competently and truthfully to these matters.  Because I am scared for my safety, I am submitting this declaration using a pseudonym so I do not reveal my true identity and my current whereabouts.  Further, I have withheld particular dates and names of places because I am afraid that my persecutors may be able to identify me and will harm me or my family as a result.

2. I am a native and citizen of Honduras.  I am 39 years old.  I have four children.  I have one son who is 21 years old, and three daughters who are 19, 18 and 17 years old.  I currently reside in a cheap apartment in Tijuana, with my 18-year old daughter, Emilia.  The apartment is not safe, and we hope that we can move soon to a place that is more secure.  We are not safe here because we are in a dangerous neighborhood. We even sleep together in the same bed because we are so afraid at night.

3. My daughter and I fled Honduras for many reasons.  In November 2015, we were targeted by the MS-13 gang, which controlled our neighborhood and wanted to take our house from us and force us to leave.  I understood this to mean that they wanted us to leave the country.  Our house was in MS-13 territory, and members of the gang wanted to live there.  I think they wanted the house for one of their families to live in or they wished to conduct illegal activities there.  I was living alone with my middle daughter, Emilia, who was 17 years old at the time.  My other children are still living in Honduras with other family members.  I separated from my husband about 7 seven years ago.

4. I received several notes from the gang saying that if we did not leave our house, they would kill us.  One of the notes told me that we had to leave the house.  Another note said that I had to leave the house and that the gang does not

1

give second chances.  I quit my job after receiving another note, which said that if we did not leave, my head would hang from the doorway of the front door. After I quit, we fled to another city about 6 hours away by bus, where we remained in hiding.

5.    A few weeks later, my daughter and I returned to our home because I had to pick up uniforms which belonged to my employer; if I did not return the uniforms, then I would not be able to collect my last paycheck. When we walked into the house, we found three MS-13 members there.  They repeatedly raped my daughter and me in front of each other for three days.

6.    After we escaped, we stayed in many different hotels in San Pedro Sula.  A friend who lives in the U.S. sent me money so that we could flee the country.  By the middle of January 2016, we made it to a town in Southern Mexico, where we spent the next six months living in a shelter.  But we were not safe there.

7.    One day in July 2016, my daughter and I were at a park in the town with a friend and her baby, when a group of about eight men approached us.  I knew that they were members of MS-13 because all of them had MS-13 tattoos. Three of the men talked to us and told us that they knew that we were staying at the shelter in the town. They told us they knew we were from Honduras.  They said the name of the man who ran the shelter, which confirmed that they really knew where we were staying and that we were not safe.  I was terrified and knew we had to leave Mexico for the United States as soon as possible.  We fled the town within a few days.

8.    My daughter and I first attempted to seek asylum in the United States in August 2016.  We went to the Otay Mesa port of entry in Tijuana.  At around 8:00 am, we walked up to the entrance where we encountered a group of men in uniforms.  Some of them were standing and some of them were sitting behind a desk.  There were about four tall men in dark blue uniforms.  I told one of the men

2

1   that I wanted to ask for asylum in the United States.  Right after I said this, he
2   signaled for back up.

3          9.     About five more officers then came to talk to us.  One of these new
4   officers told me that there was no asylum in the United States.  This same man told
5   us to go back to Mexico.  I noticed that there were other people asking for asylum
6   who were also being turned away.  I overheard them asking for asylum, but the
7   officers also told them that they could not get asylum in the United States.

8         10.    Officers then escorted us out of the port. I thought that they were
9   going to take us somewhere else so that we could apply for asylum, but then I
10   realized that they were not going to let us in.  We decided to wait outside the port.

11         11.    A few hours later, at around 5:00 pm that same afternoon, we
12   approached the port entrance a second time.  We walked up to the port, and I again
13   told the officers that we were from Honduras, and that we wanted to apply for
14   asylum.  Again, there were a group of officers in dark blue uniforms.  I did not
15   recognize any of the officers from earlier that day, so I hoped that we would have
16   better luck and that they would let us apply for asylum this time.

17         12.    One of the officers told me that Central Americans did not understand
18   that there was no asylum in the United States for us.  He stated this in perfect
19   Spanish.  He told me that if we returned to the port again, they would transfer us to
20   Mexican officials who would deport us back to Honduras.  Again, five officers
21   escorted us out of the port.  I was becoming hopeless.

22         13.    We waited outside the port.  I knew we had to try again because
23   returning to Honduras was not an option for us.  I considered trying again that
24   same day.  However, we were tired and scared because it was getting dark, so I
25   decided that we should wait until the next morning.

26         14.    While we were waiting outside the port, we saw many Mexican
27   officials around the entrance.  I believe they were Mexican policemen based on the
28   uniforms they were wearing and the small Mexican flag badges on their sleeves.

3

Case: 22-55988, 05/22/2023, ID: 12720559, DktEntry: 71-2, Page 122 of 255

Case 3:17-cv-02366-BAS-KSC   Document 390-14   Filed 01/14/20   PageID.29820   Page 7 of 8
Case 2:17-cv-05111-JFW-JPR   Document 380-5   Filed 11/13/17   Page 95 of 6   Page ID #:419

15.     The next morning, at around 7:00 am, we approached the port at Otay Mesa to try to ask for asylum a third time.  I told the first officer I encountered that we wanted to apply for asylum because we were scared for our lives and could not return to Honduras.

16.     At the gate, one of the officers tried to separate me from my daughter. They pulled me inside the gate while another officer stayed behind with my daughter.  The officers told me that I could pass through the port, but that I had to leave my daughter behind.  I told them that I could not leave her behind; I said that she was just a child, and I told them that we had a right to apply for asylum.  I told them that what they were doing was illegal.

17.     The officers told me that there was no asylum for us, but that I did not seem to understand that.  I continued to insist that we had a right to apply for asylum, but they still did not let us in.  The officers escorted us out of the port. One of them tried to drag me by the arm.

18.     After this, we went to my brother-in-law's house in Tijuana for several days. We could not stay there for very long because there was not enough space for us.  We have very little money so we have moved several times since then trying to find somewhere safe to stay.

19.     Having been turned away so many times, we have not attempted to ask for asylum in the U.S. again.  I am afraid that the officers at the port will reject us again or try to separate me from my daughter.

20.     About a month ago, a woman called me and asked me what part of Mexico I was in.  I recognized her voice.  She said she was calling to let me know that her nephew, who was a gang member in Honduras, wanted to leave. I think she was calling me under false pretenses to help the gangs find out where I was.  I am very afraid that gang members will find us if we remain in Mexico.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

4

Case: 22-55988, 05/22/2023, ID: 12720559, DktEntry: 71-2, Page 123 of 255

Case 3:17-cv-02366-BAS-KSC   Document 390-14   Filed 01/14/20   PageID.6984   Page 6 of 8
Case 2:17-cv-05211-JFW-JPR   Document 385-14   Filed 11/18/17   Page 6 of 8   Page ID #:420

Executed on July 7, 2017 at Tijuana, Mexico.

_Dinora Doe_
Dinora Doe

## CERTIFICATION

I, Hilda Gissela Bonilla, declare that I am fluent in the English and Spanish languages. On July 7, 2017, I read the foregoing declaration and orally translated it faithfully and accurately into Spanish in the presence of the declarant. After I completed translating the declaration, the declarant verified that the contents of the foregoing declaration are true and accurate.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July 7, 2017 at Tijuana, Mexico.

Hilda Gissela Bonilla

5

1  MAYER BROWN LLP
      Matthew H. Marmolejo (CA Bar No. 242964)
2      *mmarmolejo@mayerbrown.com*
   350 S. Grand Avenue
3  25th Floor
   Los Angeles, CA 90071-1503
4      Ori Lev (DC Bar No. 452565)
      (*pro hac vice*)
5      *olev@mayerbrown.com*
      Stephen M. Medlock (VA Bar No. 78819)
6      (*pro hac vice*)
      *smedlock@mayerbrown.com*
7  1999 K Street, N.W.
   Washington, D.C. 20006
8  Telephone:  +1.202.263.3000
   Facsimile:   +1.202.263.3300
9
   SOUTHERN POVERTY LAW CENTER
10     Melissa Crow (DC Bar No. 453487)
      (*pro hac vice*)
11     *melissa.crow@splcenter.org*
   1101 17th Street, N.W., Suite 705
12  Washington, D.C. 20036
   Telephone: +1.202.355.4471
13  Facsimile: +1.404.221.5857

14  *Additional counsel listed on next page*
   *Attorneys for Plaintiffs*
15
                  **UNITED STATES DISTRICT COURT**
16
                 **SOUTHERN DISTRICT OF CALIFORNIA**
17

18  Al Otro Lado, Inc., *et al.*,            Case No.:  17-cv-02366-BAS-KSC

19                  Plaintiffs,

20          v.                              **EXHIBIT 71 TO
                                           PLAINTIFFS' MOTION
21  Chad F. Wolf,[1] *et al.*,              FOR CLASS
                                           CERTIFICATION**
22                  Defendants.
                                           **Declaration of Djamal Doe**
23

24

25

26

27  _____

28  [1] Acting Secretary Wolf is automatically substituted for former Acting Secretary
   McAleenan pursuant to Fed. R. Civ. P. 25(d).

CENTER FOR CONSTITUTIONAL RIGHTS
  Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
  *bazmy@ccrjustice.org*
  Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
  *gschwarz@ccrjustice.org*
  Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
  *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
  Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
  *sarah.rich@splcenter.org*
  Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
  *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.401.221.5857

AMERICAN IMMIGRATION COUNCIL
  Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
  *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.56

### DECLARATION OF DJAMAL DOE

I, Djamal Doe, hereby declare under the penalty of perjury under the laws of the United States of America:

    1.    I make this declaration based on my personal knowledge except where I have indicated otherwise. If called as a witness, I could and would testify competently and truthfully to these matters.

    2.    I am a citizen and national of Cameroon. I am 24 years old.

    3.    I fled my home country around May 10, 2019 because I was sequestered in a police station where I was kept for nearly a week without food. I was beaten, humiliated and tortured by the government police because I belong to the minority Anglophone group and because of my political opinions. I am afraid to return to my home country because I will be detained, tortured or killed.

    4.    I traveled through many countries on my way to Mexico, including Turkey, Ecuador, Colombia, Panama, Costa Rica, Nicaragua, Honduras, and Guatemala. I actually happened to bump into my own cousin at the airport in Cameroon because he was also fleeing the Anglophone Crisis and we journeyed all this way together.

    5.    Once I arrived in Quito, I met other asylum seekers in my hotel and we took a bus to Colombia. Once we were in Colombia we had to pass through the jungle by foot to Panama. One of the men from the hotel fell, hit his head and died in the jungle. I saw other corpses of other migrants, too.

    6.    We were robbed by armed men on several occasions in that jungle. Girls were raped there as well by these men. It was an awful journey with deadly snakes and other dangers.

    7.    From Colombia, we traveled to Panama, then Costa Rica, then Nicaragua, then Honduras, and then Guatemala, and eventually Mexico. We finally arrived in Chiapas, Mexico on or about June 28, 2019. There we spent a few days

until we were given a paper showing we have temporary permission to travel in Mexico.

8.     On the bus route from Chiapas, Mexico to Tijuana my cousin and I were nearly kidnapped by Sinaloa cartel members. We narrowly escaped and I was so relieved because the Mexican men on the bus told us that they usually do not even hold Africans for ransom, but instead kill them and sell their organs.

9.     I arrived in Tijuana, Mexico on or about July 10, 2019. Some migrants in the area told us that we had arrived too late to the port of entry and to come back the next day early in the morning. That morning, I planned to present myself at the port of entry in order to seek asylum in the United States. I thought I would be able to walk right up to the U.S. border.

10.     When I arrived to the Chaparral plaza just outside of the port of entry, I saw a line of migrants. I walked up to the front of the line and asked the Mexican immigration official where do I go to ask for asylum in the United States and he told me that I have to get to the back of that line. So, I got in the line and waited. When I made it to the front of the line, I presented the Mexican immigration officials with my national identification card and gave them my information. They issued me a "ficha" number. My number on the waitlist is 3643.

11.     I put my name on the waitlist at the San Ysidro port of entry because I was instructed to do so by the Mexican immigration officials. Moreover, all the migrants here me told me that American officials will refuse you if you try to cross directly into the United States, or that Mexican officials will arrest and detain you.

12.     If I had not been turned away from the San Ysidro PedWest port of entry and required to wait on the waitlist, I would have entered the United States on or about July 10, 2019.

13.     As of September 19, 2019, people with the number 2983 were called to present themselves at the San Ysidro PedWest port of entry. I am still waiting in

Tijuana for my number to be called.

14.     I did not apply for asylum in Turkey because I did not believe I would be safe there, and I only stopped there for a layover and had to stay in the airport. I did not apply for asylum in any of the Latin American countries that I traveled through because it was never an option. I tried to ask about the procedure to apply for asylum in Panama, but the officials never provided us with information. It was only an NGO worker that I met there who told me that people are hardly ever granted asylum in Panama and that it would be better to move on. I also feel completely unsafe here in Mexico. We were nearly kidnapped by cartel members. People are shot and murdered here frequently. The police also randomly arrest Cameroonians every day because our pass from Chiapas has expired, even though they know we are all waiting for our numbers to be called from the asylum list. They are targeting us for being black. There is a lot of violence and I feel scared and discriminated against here in Mexico.

15.     I am only able to get random work. Sometimes it is carrying boxes, another day it is a cleaning job. I am paid about $270 pesos per day for these odd jobs. It is not nearly enough to survive on.

16.     I am terrified of being forced to return to Cameroon. I cannot go back or I will be arrested and beaten again or killed.

17.     When I learned about the new rule that we will not be allowed to seek asylum in the United States unless we were denied asylum in another country we crossed to arrive here, I felt it was a completely cruel and discriminatory law. Given everything I have suffered and endured, I could not believe this was happening, too. I have left everything back home. I was a law student in Cameroon with hopes and dreams for my future. I fled to save my life, hoping to be received well and provided help and safety in the United States. I still have hope that when my number is called, I will be able to seek asylum in the U.S. and find justice.

I declare under penalty of perjury under the laws of the United States of America that the things described above are true and correct.

Executed on September 19, 2019 at Tijuana, Baja California, Mexico.

_____

Djamal Doe

MAYER BROWN LLP
  Matthew H. Marmolejo (CA Bar No. 242964)
  *mmarmolejo@mayerbrown.com*
350 S. Grand Avenue
25th Floor
Los Angeles, CA 90071-1503
  Ori Lev (DC Bar No. 452565)
  (*pro hac vice*)
  *olev@mayerbrown.com*
  Stephen M. Medlock (VA Bar No. 78819)
  (*pro hac vice*)
  *smedlock@mayerbrown.com*
1999 K Street, N.W.
Washington, D.C. 20006
Telephone:  +1.202.263.3000
Facsimile:   +1.202.263.3300

SOUTHERN POVERTY LAW CENTER
  Melissa Crow (DC Bar No. 453487)
  (*pro hac vice*)
  *melissa.crow@splcenter.org*
1101 17th Street, N.W., Suite 705
Washington, D.C. 20036
Telephone: +1.202.355.4471
Facsimile: +1.404.221.5857

*Additional counsel listed on next page*
*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> Chad F. Wolf,[1] *et al.*, <br><br> Defendants. | Case No.:  17-cv-02366-BAS-KSC <br><br> **EXHIBIT 72 TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** <br><br> **Declaration of Bianka Doe** |

---

[1] Acting Secretary Wolf is automatically substituted for former Acting Secretary McAleenan pursuant to Fed. R. Civ. P. 25(d).

CENTER FOR CONSTITUTIONAL RIGHTS
  Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
  *bazmy@ccrjustice.org*
  Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
  *gschwarz@ccrjustice.org*
  Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
  *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
  Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
  *sarah.rich@splcenter.org*
  Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
  *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.401.221.5857

AMERICAN IMMIGRATION COUNCIL
  Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
  *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.56

### DECLARATION OF BIANKA DOE

I, Bianka Doe, hereby declare under the penalty of perjury under the laws of the
United States of America:

     1.    I make this declaration based on my personal knowledge except where
I have indicated otherwise.  If called as a witness, I could and would testify
competently and truthfully to these matters.

     2.    I am a citizen and national of El Salvador. I am 37 years old.

     3.    I am a transgender woman and I have two children, ages 15 and 13,
whom I had to leave behind in El Salvador because my life was in danger. I fled
my home country in November 2017 because I have endured violent attacks and
threats of death for being a transgender woman. Gang members stormed my home
looking for me because I filed police reports against them after they kidnapped and
stabbed me, mutilating my breasts. I am afraid to return to El Salvador because I
am sure I will be tortured and killed by these transphobic criminals.

     4.    I traveled through Belize and Guatemala on my way to Mexico. I
stayed for a long while in Belize because I had sisters there to look after me and
help me. I had to leave Belize in or about January 2019 because it is even more
transphobic than El Salvador. In Belize a group of men attacked me, beat me and
cut off my hair for being trans. I spent one day in Guatemala on my way to
Mexico. In Chiapas, Mexico I received medical from Doctors Without Borders. I
fell into a deep depression and was hospitalized. However, Mexico is violently
transphobic and I know I cannot stay living safely here. After healing and getting
back on my feet, I finally made my way to Tijuana in July 2019.

     5.    I arrived to the San Ysidro PedWest port of entry in Tijuana on or
about July 12, 2019. I was not allowed to go up the bridge to cross into the United
States because Mexican officials told me I had to get in line to obtain a number on
a waitlist for asylum. I was given the "ficha" number 3646. As of September 19,

2019, people with the number 2983 were called to present themselves at the San Ysidro PedWest port of entry. I am still waiting for my number to be called.

6.      If I had not been turned away from the San Ysidro port of entry and forced to wait in Tijuana, I would have entered the United States on or about July 12, 2019.

7.      I was not expecting to be forced to wait in Tijuana to apply for asylum in the U.S. and I felt terrified. I was scared of being attacked in Mexico and had no one to stay with in Tijuana. I found an LGBT shelter to stay at, but I did not feel comfortable there because it is in a violent and dangerous area rife with drug trafficking. In the shelter they treat us like children with strict curfews for waking up and going to sleep. I made plans to move elsewhere with the little money I was able to save. While packing my things to leave, I was robbed of all of my possessions, including my identity documents, my clothes and my phone. Life here is dangerous and exhausting for me.

8.      When I learned about the new rule that you cannot apply for asylum in the United States unless you were denied asylum in another country you crossed, I felt hopeless.

9.      I cannot be safe seeking asylum in Belize, Guatemala, or Mexico because people are so transphobic in these countries, like they are in El Salvador. My life in Tijuana is extremely difficult and dangerous. I do not have money and I cannot work because I do not have legal permission. A man who owns a hair salon has provided me shelter and food in exchange for helping him around the shop. I live in fear and despair, but I still have hope that I will be able to seek safety in the Untied States and be granted asylum. That is why I am still waiting here for my number to be called.

I declare under penalty of perjury under the laws of the United States of America that the things described above are true and correct.

Executed on September 20, 2019 at Tijuana, Baja California, Mexico.

Branka Doe

<u>CERTIFICATION</u>

I, Michelle P. Gonzalez, declare that I am proficient in the English and Spanish languages.

On September 20, 2019, I read the foregoing declaration and orally translated it faithfully and accurately into Spanish in the presence of the declarant. After I completed translating the declaration, the declarant verified that the contents of the foregoing declaration are true and accurate.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 20, 2019 at Tijuana, Baja California, Mexico.

_____          09|20|2019
Michelle P. Gonzalez                                        Date

1  MAYER BROWN LLP
     Matthew H. Marmolejo (CA Bar No. 242964)
2     *mmarmolejo@mayerbrown.com*
   350 S. Grand Avenue
3  25th Floor
   Los Angeles, CA 90071-1503
4     Ori Lev (DC Bar No. 452565)
     (*pro hac vice*)
5     *olev@mayerbrown.com*
     Stephen M. Medlock (VA Bar No. 78819)
6     (*pro hac vice*)
     *smedlock@mayerbrown.com*
7  1999 K Street, N.W.
   Washington, D.C. 20006
8  Telephone:  +1.202.263.3000
   Facsimile:  +1.202.263.3300
9
   SOUTHERN POVERTY LAW CENTER
10    Melissa Crow (DC Bar No. 453487)
     (*pro hac vice*)
11    *melissa.crow@splcenter.org*
   1101 17th Street, N.W., Suite 705
12  Washington, D.C. 20036
   Telephone: +1.202.355.4471
13  Facsimile: +1.404.221.5857

14  *Additional counsel listed on next page*
   *Attorneys for Plaintiffs*
15
                    **UNITED STATES DISTRICT COURT**
16
                    **SOUTHERN DISTRICT OF CALIFORNIA**
17

18  Al Otro Lado, Inc., *et al.*,          Case No.:  17-cv-02366-BAS-KSC

19              Plaintiffs,

20      v.                                **EXHIBIT 73 TO
                                          PLAINTIFFS' MOTION
21  Chad F. Wolf,[1] *et al.*,            FOR CLASS
                                          CERTIFICATION**
22              Defendants.
                                          **Declaration of Roberto Doe**
23

24

25

26

27  _____

28  [1] Acting Secretary Wolf is automatically substituted for former Acting Secretary
   McAleenan pursuant to Fed. R. Civ. P. 25(d).

CENTER FOR CONSTITUTIONAL RIGHTS
    Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
    *bazmy@ccrjustice.org*
    Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
    *gschwarz@ccrjustice.org*
    Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
    *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
    Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
    *sarah.rich@splcenter.org*
    Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
    *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.401.221.5857

AMERICAN IMMIGRATION COUNCIL
    Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
    *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.56

Roberto Doe

# DECLARATION OF ▮

Roberto Doe
I, ▮ hereby declare under the penalty of perjury pursuant to 28 U.S.C. § 1746:

1.    I make this declaration based on my personal knowledge except where I have indicated otherwise. If called as a witness, I could and would testify competently and truthfully to these matters.

2.    I am a national and citizen of Nicaragua. My date of birth is November 13, 1975. I am married and have three children. They are 10, 18, and 19 years old. I am currently living in a shelter in Reynosa, Mexico, having fled my country to seek asylum in the United States.

3.    I fled Nicaragua in early September of 2018. I fear for my life and the life of my family members due to threats of violence from the government and paramilitaries allied with the government. I participated in protests, marches, and strikes against the government. When I closed my carpentry business during a general strike, the police and paramilitary organizations threatened me for participating. They said that if I closed my business then they were going to burn it down. They walked by my house nearly every day and sometimes threatened me and pointed gun at me and son and workers. I feared that the government would hurt my family if I stayed in Nicaragua, so I fled in the middle of the night so that the government would not notice. The day after I left, someone wrote "Plomo," which means lead (as in bullets) three times on the garage door of my business. This marked me as a target to be killed. My wife and children also

left for another part of the country and are in hiding.

4.     I arrived in Reynosa, Tamaulipas on Saturday September 29, 2018. On October 2, 2018, I attempted to present myself at the Reynosa-Hidalgo Port of Entry to apply for asylum. I was at the back of the line of a group of six Nicaraguan nationals and one Honduran that tried to apply for asylum. As we walked on the bridge, we saw several U.S. immigration officials standing at the exact middle point of the bridge that divides the United States from Mexico. Our group approached the U.S. immigration officials, and we told them we wanted to apply for asylum.

5.     After we asked for asylum, one of the U.S. officials told us that he had to talk to his office first made a call on his radio in English. He then told us to stand to the side. After that, he told us that the port of entry was "all full" and that we couldn't enter. He told us that we might have to wait for "hours, days, or weeks" before we could apply for asylum.

6.     A short while after that, a different U.S. official, a woman, made another call. I heard her say in Spanish for someone to come and pick up some people. A few minutes later, a Mexican immigration official approached from the Mexican side of the border and asked to see all of our papers. We all handed our papers to this official. He looked at them and told us to come with them. Another one of the Nicaraguans I was with asked the U.S. official to help him, saying that the Mexican immigration officials would deport us. The U.S official said that he did not care and then did nothing else.

7.      The Mexican immigration official then walked us back down the bridge towards the Mexican side and took us into an office. He left us with other INM officials. We waited for a long time there while various officials were on the phone. I overheard one of the officials saying to someone on the other end of the line that they needed seven or eight spaces for the next deportation transport. I believe that this was a threat to scare us, because we had a legal visa to travel in Mexico.

8.      Eventually, the Mexican officials took our phones, and told us to wait in the bathroom of the office. We were very crowded together in a small bathroom, even though the waiting area was fairly empty. We had to stay there for an hour. I think they did this to make us feel uncomfortable.

9.      As we were waiting in the bathroom, a Mexican official entered the room as well. He told us that we did not have the right to apply for asylum in the U.S., that it was a crime for us to try to apply for asylum in the United States. He told us that they would tear up our visas and deport us if we tried to come back. He told us that they were in communication with U.S. authorities and that if we came back to the bridge and attempted to apply for asylum again, the U.S. officials would send us back to Mexican authorities and that we would then be deported to Nicaragua.

10.     After all of that, the Mexican official told us we could apply for a humanitarian visa of some sort in Mexico, but did not tell us how to apply. Either way, we said that we did not want to because it is so dangerous here in Mexico. They then gave us our papers back and told us to leave. It felt dangerous outside of the office, and

we anxiously waited there to try to get in contact with people from the migrant shelter. An official from the Instituto Tamaulipeco para Los Migrantes (Tamaulipan Institute for Migrants), which helps people who have been deported to Mexico by Americans, came up to us and told us that it was not safe there. This official told us that we were in danger of being kidnapped if we stayed there. We followed him back to their office, and then they called the police. We were escorted by two police cars in a van back to the migrant shelter.

11.    I do not feel safe here in Reynosa. There are constant threats everywhere. There are armed men by the river close by. There is nowhere to go. I want to apply for asylum, but it is dangerous to cross, and I don't have the money to pay cartels to cross the river.

12.    I cannot return to Nicaragua because of the threats against my life there. But staying in Mexico is not possible, as it may be even more dangerous here than Nicaragua for me. I would like to apply for asylum in the U.S., but am afraid to try again after what happened the first time, and my visa is about to expire.

13.    I make this declaration based on my personal knowledge except where I have indicated otherwise. If called as a witness, I could and would testify competently and truthfully to these matters.

14.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Executed on October 10, 2018 at Reynosa, Mexico.

[signature of Roberto Doe]

Roberto Doe

## CERTIFICATION

I, A̶a̶r̶o̶n̶ R̶e̶i̶c̶h̶l̶i̶n̶-M̶e̶l̶n̶i̶c̶k̶ declare that I am fluent in the English and
Spanish languages.

On  O̶c̶t̶ ̶1̶0̶,  , 2018, I read the foregoing declaration and orally
translated it faithfully and accurately into Spanish in the presence of the declarant.
After I completed translating the declaration, the declarant verified that the
contents of the foregoing declaration are true and accurate.

I declare under penalty of perjury under the laws of the United States of
America that the foregoing is true and correct.

Executed on  O̶c̶t̶ ̶1̶0̶ , 2018 at  R̶e̶g̶ ̶r̶o̶s̶a̶ , Mexico.

10 -10 - 2018

Signature                         Date

A̶a̶r̶o̶n̶ R̶e̶i̶c̶h̶l̶i̶n̶-M̶e̶l̶n̶i̶c̶k̶

Printed Name

1-FER-143

1  MAYER BROWN LLP
    Matthew H. Marmolejo (CA Bar No. 242964)
2    *mmarmolejo@mayerbrown.com*
   350 S. Grand Avenue
3  25th Floor
   Los Angeles, CA 90071-1503
4    Ori Lev (DC Bar No. 452565)
    (*pro hac vice*)
5    *olev@mayerbrown.com*
    Stephen M. Medlock (VA Bar No. 78819)
6    (*pro hac vice*)
    *smedlock@mayerbrown.com*
7  1999 K Street, N.W.
   Washington, D.C. 20006
8  Telephone:  +1.202.263.3000
   Facsimile:   +1.202.263.3300
9
   SOUTHERN POVERTY LAW CENTER
10   Melissa Crow (DC Bar No. 453487)
    (*pro hac vice*)
11   *melissa.crow@splcenter.org*
   1101 17th Street, N.W., Suite 705
12  Washington, D.C. 20036
   Telephone: +1.202.355.4471
13  Facsimile: +1.404.221.5857

14  *Additional counsel listed on next page*
   *Attorneys for Plaintiffs*
15
                    **UNITED STATES DISTRICT COURT**
16
                **SOUTHERN DISTRICT OF CALIFORNIA**
17

18  Al Otro Lado, Inc., *et al.*,          Case No.:  17-cv-02366-BAS-KSC

19              Plaintiffs,

20        v.                              **EXHIBIT 74 TO
                                          PLAINTIFFS' MOTION
21  Chad F. Wolf,[1] *et al.*,             FOR CLASS
                                          CERTIFICATION**
22              Defendants.
                                          **Declaration of S.N.**
23

24

25

26

27  _____

28  [1] Acting Secretary Wolf is automatically substituted for former Acting Secretary
   McAleenan pursuant to Fed. R. Civ. P. 25(d).

CENTER FOR CONSTITUTIONAL RIGHTS
  Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
  *bazmy@ccrjustice.org*
  Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
  *gschwarz@ccrjustice.org*
  Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
  *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
  Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
  *sarah.rich@splcenter.org*
  Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
  *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.401.221.5857

AMERICAN IMMIGRATION COUNCIL
  Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
  *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.56

## DECLARATION OF "S.N."

I, "S.N.", hereby declare under the penalty of perjury under the laws of the United States of America:

1) I make this declaration based on my personal knowledge except where I have indicated otherwise. If called as a witness, I could and would testify competently and truthfully to these matters.

2) I am a citizen and national of Uganda.

3) I am 45 years old.

4) I have four biological children who are still alive. They are all under the age of twenty-one. They are all still stuck in Uganda and are in danger. They already killed one of my young sons; I used to have five children. I also raise two other children ~~aww~~, my neices, since the death of my brother.

5) I fled my home country of Uganda in or about January 2019 because I was fleeing political violence, beatings, the killing of my young son, the disappearance of my husband, and death threats against me. I am terrified to return because they will definitely kill me.

6) I traveled from Uganda to Kenya to Ethiopia to Argentina to Brazil, all by plane except for taking a bus to Kenya. In Brazil, I flew from

Brazil to Mexico.

7) I was in Kenya for approximately ~~three~~ three months. I did not apply for asylum in Kenya because it is the country that borders my country of Uganda and I knew that my life would still be in danger. It is very easy to travel from Uganda to Kenya by bus. Everyone told me that Ugandans cannot hide in Kenya with success because the people who want to kill them will always find them.

8) I did not apply for asylum in Ethiopia because I was only there for one night; a layover while I waited for my plane the next day to Argentina.

9) I did not apply for asylum in Argentina because I was only there for a few hours; a layover while I waited for my plane ~~the~~ ~~me~~ to Brazil.

10) I did not apply for asylum in Brazil because I was only there for a few hours; a layover while I waited for my plane to Mexico. We did not even get off of the plane in Brazil.

11) I flew from Brazil to the airport in Mexico City. Immigration officials arrested me at the airport. They kept me

in a small room at the airport for 3 days and did not give me any food. I got sick and they finally brought me a doctor. The doctor gave me medicine and ordered them to give me food. They then finally transferred me to an immigration detention center. The immigration officers told me that I was applying for asylum. I filled out forms. I was at the immigration detention center for about 13 days. The officials then gave me a piece of paper with my picture and took me to a hotel. I slept there one night. In the morning, the hotel staff got mad at me and started telling me they wanted money. It was all in Spanish and I only speak a very, very small amount of Spanish. I showed them my paper and they took it from me. They then kicked me out of the hotel angry. I kept asking them to give me back my paper and they would not. They made me go onto the street and kept yelling at me that they were going to call the police. This scared me very much. The hotel was in a scary neighborhood. There were many strange people around. I was on the streets all alone and had

no idea where I was. I even thought about trying to go back to the detention center, but I did not know where it was. I slept on the street all alone for two nights. It was very scary. People would laugh and yell at me in Spanish, so I did not understand what they were saying. People would come up to me and ask to take my picture but I would run away and say no. Several people even grabbed me, and pulled at my arms. I walked all over the city trying to stay safe. I did not eat.

12) Finally, on the third day, I saw a man who was black like me walking down the street. I chased after him; I was so excited to see someone who looked like me and I thought he was African. I ran up to him and asked him, and was so disappointed when he told me that he was Cuban not African. However, he was so kind to me and he spoke ~~spanish~~ English. He took me home with him and his roommates and they gave me something to eat. He told me that he was going to help me buy a bus ticket from Mexico City to Ciudad Juarez so that I could go to the Santa Fe Bridge to ask for asylum

in the United States. He warned me about being very careful in Juarez because it is very dangerous.

13) I took the bus from Mexico City without too many problems. However, everyone else on the bus stared at me. Also, no one would sit next to me and they acted like they were scared of me.

14) When I arrived at the Bus Station in Ciudad Juarez, I took a taxi directly to the Santa Fe Bridge. He took me to the bridge and showed me where to walk. My only money was a $100 bill and I gave it to him and he did not give me any change. I was scared to get in an argument with him because I had heard that Ciudad Juarez was dangerous and because I had already made it to the bridge.

15) I walked up to the bridge and was stopped by the bridge security guards. I explained to them that I wanted to go to America. ~~They~~ ~~took me into the immigration office~~. They took me into the immigration office and made some phone calls in Spanish. I was crying and scared. They took me to another hotel close and told me to come back in the morning because it was late at night. I was very

scared to be in a hotel again, but luckily this time I did not have problems.

16) I went back to the bridge the next morning and a nice person paid my toll at the bridge and I got in the same line as everyone else. I was so excited that I was finally on my way. I got to the middle of the bridge and was stopped by two men dressed like police officers. They were wearing dark blue uniforms. They asked me for my number. I was confused and told them that I wanted to go to America. They told me that I could not come in and that I needed to go back and get a number. I went and registered myself and got a number. The people there took me to the shelter where I live now. They told me that I would probably only have to wait about 2 months, but it has been much, much longer.

17) I put my name on the asylum waiting list because I was told it was the only way to ask for asylum legally in the United States. My number is 12,632.

18) The Pastor at the shelter tells us every day what number has been called to enter the United States and ask for

asylum. Many days, they do not call anyone at all. I believe that as of today's date, the last number to be called was 12,597.

19) If I had not been turned away from the Santa Fe Bridge, I would have entered the United States around the middle of April 2019.

20) It has been very hard to wait all of these months in Ciudad Juarez for my chance to ask for asylum in the United States. First, there is a lot of racism in Mexico; Ciudad Juarez is just like what I described in Mexico City. People point at me and laugh at me and try and take pictures of me. They grab at my skin and they even grab my hair. It scares me to have everyone staring at me like that. There is also even a lot of racism here in the shelter with many of the Central Americans.

21) Second, Ciudad Juarez is very dangerous. The Pastor has told us that this neighborhood is very dangerous. We have a curfew at 5:30pm because it is so dangerous. I used to go jogging in the neighborhood but stopped because of the danger. We hear shootings all the time. It would be very easy for

criminals to enter the shelter; there is no security. There are shootings all the time. We have to be inside our rooms and quiet by 10pm because of the vidence that gets worse at night. Recently, two Cameroonians were attacked outside of the shelter somewhere nearby.

22) Third, things are very difficult at the shelter. We only get two meals per day, and I often have to go to bed hungry. I cannot find work and I cannot speak the language. I feel sad because I am not with my family and also for my child that I lost. It gets lonely here. I feel very anxious and worried. I get scared that I am never going to see my family again, especially now that I heard that I would no longer be allowed to win asylum. It feels so unfair because I waited and waited instead of going in illegally. It makes me feel like I should have not waited and I should have done it illegal so this would not have happened. Now I am so sad and so worried that I will never see my children again. I am not a young woman. I did not need to come to America to make my life; I already

had a good life and a good job and had all the money that I needed to take care of me and my children. I am a professional woman. I have lost everything; they killed my young son and disappeared my husband. My children who are still alive are hiding. I am so scared for them.

I declare under penalty of perjury under the laws of the United States of America that the things described above are true and correct.

Executed on 20th of September, 2019 at Ciudad Juarez, Mexico.

"S.N."

1-FER-154

1   MAYER BROWN LLP
       Matthew H. Marmolejo (CA Bar No. 242964)
2        mmarmolejo@mayerbrown.com
     350 S. Grand Avenue
3    25th Floor
     Los Angeles, CA 90071-1503
4        Ori Lev (DC Bar No. 452565)
         (pro hac vice)
5        olev@mayerbrown.com
         Stephen M. Medlock (VA Bar No. 78819)
6        (pro hac vice)
         smedlock@mayerbrown.com
7    1999 K Street, N.W.
     Washington, D.C. 20006
8    Telephone:  +1.202.263.3000
     Facsimile:   +1.202.263.3300
9
     SOUTHERN POVERTY LAW CENTER
10      Melissa Crow (DC Bar No. 453487)
        (pro hac vice)
11       melissa.crow@splcenter.org
     1101 17th Street, N.W., Suite 705
12   Washington, D.C. 20036
     Telephone: +1.202.355.4471
13   Facsimile: +1.404.221.5857

14   Additional counsel listed on next page
     Attorneys for Plaintiffs
15
                 UNITED STATES DISTRICT COURT
16
                SOUTHERN DISTRICT OF CALIFORNIA
17

18   Al Otro Lado, Inc., et al.,            Case No.:  17-cv-02366-BAS-KSC

19              Plaintiffs,
                                            **EXHIBIT 75 TO**
20       v.                                 **PLAINTIFFS' MOTION**
                                            **FOR CLASS**
21   Chad F. Wolf,[1] et al.,               **CERTIFICATION**

22              Defendants.                 **Declaration of S.M.R.G**
23

24

25

26

27   _____

28   [1] Acting Secretary Wolf is automatically substituted for former Acting Secretary
     McAleenan pursuant to Fed. R. Civ. P. 25(d).

1  CENTER FOR CONSTITUTIONAL RIGHTS
      Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
2     *bazmy@ccrjustice.org*
      Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
3     *gschwarz@ccrjustice.org*
      Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
4     *aguisado@ccrjustice.org*
   666 Broadway, 7th Floor
5  New York, NY 10012
   Telephone: +1.212.614.6464
6  Facsimile: +1.212.614.6499

7  SOUTHERN POVERTY LAW CENTER
      Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
8     *sarah.rich@splcenter.org*
      Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
9     *rebecca.cassler@splcenter.org*
   150 E. Ponce de Leon Ave., Suite 340
10 Decatur, GA 30030
   Telephone: +1.404.521.6700
11 Facsimile: +1.401.221.5857

12 AMERICAN IMMIGRATION COUNCIL
      Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
13    *kwalters@immcouncil.org*
   1331 G St. NW, Suite 200
14 Washington, D.C. 20005
   Telephone: +1.202.507.7523
15 Facsimile: +1.202.742.56

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF S.M.R.G.

I, S.M.R.G., hereby declare under the penalty of perjury under the laws of the United States of America:

1) I make this declaration based on my personal knowledge except where I have indicated otherwise. If called as a witness, I could and would testify competently and truthfully to these matters.

2) I am a citizen and national of El Salvador.

3) I am 24 years old.

4) I fled my home country of El Salvador on or around April 1, 2019, because I was attacked, persecuted, and threatened with death because I am a lesbian. I was raped by a gang member who yelled homophobic slurs at me during the rape. I was also constantly harassed by the police in my hometown for being a lesbian. I am afraid to return to my home country because the gang members have threatened me with death and I know that the police will not protect me.

5) I traveled through Guatemala on my way to Mexico. I was only in Guatemala for approximately one day and

traveled directly to the Mexico. I did not ask for asylum in Guatemala because for me, it is identical to El Salvador when it comes to the treatment of lesbians. There are huge amounts of violence against lesbians in Guatemala and many lesbians in Guatemala have been murdered. I know this because I read the news frequently; I was also studying law in the University before I had to leave my country. I also have friends who are lesbians in Guatemala and one of my ex-girlfriends was Guatemalan. I did not apply for asylum in Guatemala because I knew I would never be safe there. Additionally, the gangs in Guatemala are very powerful, and the same gang that threatened me in El Salvador operates in Guatemala.

(6) I arrived in Ciudad Juarez, Mexico on or about May 15, 2019. I planned to ask for asylum in the United States. However, I had already heard from my friends that I was going to need to ask for a number and wait in line to ask for asylum.

7) When I arrived in Ciudad Juarez, Mexico, I went directly to the LGBT migrant shelter.

When I arrived at the shelter, it was night time. The people in the shelter told me how to get a number. The next day, the shelter director took me to the office by the Mexican side of the Paso del Norte Port of Entry to register and request a number. I never personally tried to enter at the bridge myself because everyone had told me that I had to get a number and wait my turn. Additionally, I wanted to do things the right way.

8) I put my name on the waiting list at the Mexican side of the Paso del Norte Port of Entry because I thought it was the only way to legally seek asylum in the United States. My number on the waitlist is 14,432.

9) In Ciudad Juarez, there is a facebook group for the people who are waiting on the asylum waitlist. I am a member of this facebook group. According to this facebook group, the last number that was called to present to ask for asylum in the United States was 12,597.

10) I did not apply for asylum in Mexico for various reasons. More than anything, Mexico is very dangerous, especially for

lesbians and other members of the LGBT community. Apart from that, Tapachula was very dangerous and I had to sleep for several nights on the street. I was robbed on the street two times while waiting outside the immigration offices. In the end, I was able to get my humanitarian visa, but I did not apply for asylum because I knew I would never be safe as a lesbian living in Mexico. I have various lesbian friends and acquaintances who have been attacked in Mexico because of their sexual orientation. I have also read news articles about violence against lesbians in Mexico.

11) If I had not been forced to register my name on the asylum waiting list on the Mexican side of the Paso de Norte Port of Entry, I would have entered the United States on or about the 16th of May, 2019.

12) I have been living in the LGBT migrant shelter the whole time since arriving in Ciudad Juarez. However, we are not safe here at the shelter. I do not feel safe at all; any illusions of safety are all lies. For one,

Ciudad Juarez is the city of Femicides, and I am a woman. Additionally, here in Ciudad Juarez there is a lot of violence against the LGBT community. For example, I have heard that they have murdered a few transgender women here in Ciudad Juarez recently. Also, I was working for a little bit and there were various women who were murdered near my job. One day when I was working, several men came in and hid their guns inside the clothing boxes. This scared me and made me quit my job. Now, I almost never leave the shelter because I am too afraid. Additionally, I know that the shelter itself is not safe. The building lacks security; it would be very easy to kick in the front door because it is basically broken. Also, many of the windows are broken. I am very afraid that one day someone is going to break into the shelter and do us harm. I am scared every night when I go to sleep.

13) I suffered a lot in my country. I then suffered more on my journey

to Ciudad Juarez. I am suffering here; I am constantly afraid. All I want is a chance to ask for asylum in the United States and save my life.

I declare under penalty of perjury under the laws of the United States of America that the things described above are true and correct.

Executed on the 18th of September 2019 at Ciudad Juarez, Mexico,

S. M. R. G.

S. M. R. G

## CERTIFICATION

I, _Taylor Kristine Levy_ declare that I am proficient in the English and Spanish languages.

On _September 18_ 2019, I read the foregoing declaration and orally translated it faithfully and accurately into Spanish in the presence of the declarant. After I completed translating the declaration, the declarant verified that the contents of the foregoing declaration are true and accurate.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on _September 18_ 2019 at Ciudad Juarez, Mexico.

_Taylor Kristine Levy_

_9/18/19_

Date

1   MAYER BROWN LLP
      Matthew H. Marmolejo (CA Bar No. 242964)
2      *mmarmolejo@mayerbrown.com*
    350 S. Grand Avenue
3   25th Floor
    Los Angeles, CA 90071-1503
4      Ori Lev (DC Bar No. 452565)
       (*pro hac vice*)
5      *olev@mayerbrown.com*
       Stephen M. Medlock (VA Bar No. 78819)
6      (*pro hac vice*)
       *smedlock@mayerbrown.com*
7   1999 K Street, N.W.
    Washington, D.C. 20006
8   Telephone:   +1.202.263.3000
    Facsimile:    +1.202.263.3300
9
    SOUTHERN POVERTY LAW CENTER
10     Melissa Crow (DC Bar No. 453487)
       (*pro hac vice*)
11     *melissa.crow@splcenter.org*
    1101 17th Street, N.W., Suite 705
12  Washington, D.C. 20036
    Telephone: +1.202.355.4471
13  Facsimile: +1.404.221.5857

14  *Additional counsel listed on next page*
    *Attorneys for Plaintiffs*
15
                **UNITED STATES DISTRICT COURT**
16
                **SOUTHERN DISTRICT OF CALIFORNIA**
17

18  Al Otro Lado, Inc., *et al.*,         Case No.:  17-cv-02366-BAS-KSC

19                  Plaintiffs,

20          v.                            **EXHIBIT 76 TO
                                          PLAINTIFFS' MOTION
21  Chad F. Wolf,[1] *et al.*,            FOR CLASS
                                          CERTIFICATION**
22                  Defendants.
                                          **Declaration of K.S.**
23

24

25

26

27  _____

28  [1] Acting Secretary Wolf is automatically substituted for former Acting Secretary
    McAleenan pursuant to Fed. R. Civ. P. 25(d).

CENTER FOR CONSTITUTIONAL RIGHTS
  Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
  *bazmy@ccrjustice.org*
  Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
  *gschwarz@ccrjustice.org*
  Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
  *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
  Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
  *sarah.rich@splcenter.org*
  Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
  *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.401.221.5857

AMERICAN IMMIGRATION COUNCIL
  Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
  *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.56

## DECLARATION OF "K-S"

I, "K-S", hereby declare under the penalty of perjury under the laws of the United States of America:

1) I make this declaration based on my personal knowledge except where I have indicated otherwise. If called as a witness, I could and would testify competently and truthfully to these matters.

2) I am a citizen and national of Uganda.

3) I am 24 years old.

4) I am single and do not have any children.

5) I left Uganda around March 5, 2019 because of political issues and death threats. I am afraid to return to my home country because there are people who want to kill me because of my political opinion and I know that I will not be safe if I return to Uganda.

6) I left Uganda ~~by~~ to Kenya. I left Kenya by plane to Ethiopia. I left Ethiopia by plane to Brazil. I left Brazil by plane to Argentina. I left Argentina by plane to Mexico.

7) I did not apply for asylum in any of the countries through which I traveled.

8) I did not apply for asylum in Kenya because I knew that I would not be safe in Kenya. There were people looking for me to kill me, and I knew that they could easily find me in Kenya.

9) I did not apply for asylum in Ethiopia because I was only there in a "transit room" while waiting for my plane to Brazil. I was only in Ethiopia for a few hours.

10) I did not apply for asylum in Brazil because I was only there for approximately thirty minutes. I did not even get off the plane in Brazil.

11) I did not apply for asylum in Argentina because I was only there in a "transit room" waiting for my plane to Mexico. I was only in Argentina for about an hour.

12) I did not apply for asylum in Mexico because I knew that I would not be safe here. First, Mexico is a very dangerous country. Second, Mexico is a very racist country. There is a lot of discrimination against Africans here in Mexico. For example, when I was in immigration detention in Mexico

City, Africans were always given the food last after everyone else. Also, the Mexican immigration agents took my passport and did not give it back, even though they gave me a document that allowed me to be in Mexico for 45 days. Even at the shelter where I am living now, sometimes the other people here discriminate against me because I am African and because I do not speak much Spanish. When I walk on the streets of Ciudad Juarez, I become a tourist attraction. People laugh at me, point at me, and take pictures of me. One time in a grocery store with other Africans, a Mexican man walked up to us and started cussing at us in Spanish for no reason. Another time, a woman came up to me and started rubbing the skin of my arm without asking. Every time I take the bus in Ciudad Juarez — even if it is very crowded — people move away from me to make sure they do not touch my skin.

13) The neighborhood where the shelter is located is also very dangerous. There is a lot of crime in this neighborhood. We hear gun shots all the time. The shelter has a curfew of 5:30pm because of how

dangerous the neighborhood is. Even though the shelter has a wall around it, this wall is not very tall and it would be easy for people to get in. We do not have any security guards here.

14) I arrived in Ciudad Juarez, Mexico on or about April 22, 2019. I planned to present myself at the Port of Entry in order to seek asylum in the United States.

15) When I arrived in Ciudad Juarez, Mexico, it was about 2 a.m., and I went directly to the Paso del Norte Port of Entry and started walking over the bridge to ask for asylum. Since I had never been there before, I accidentally walked on the wrong side of the bridge. When I got to the middle of the bridge where the Mexican and American flags are, I was stopped by two men in uniforms with assault rifles. I think their uniforms were either black or dark blue, but it was dark. The officers spoke to me in English without an accent. They got mad at me and asked me what I was doing. They even touched me with their gun! I told them that I wanted to ask for asylum. They told me that I had to go back and

get a number and wait. I told them that
I could not leave that place; it was
very cold that night and I was also
scared. They told me that if I wanted
to get a number, I would have to wait,
because the offices would not be open
until the morning. They made me leave
the bridge and I slept under a tree just
outside of the bridge entrance. The next
morning, I went to the office to register
myself and get my number.

16) I put my name on the waitlist at the Mexican
side of the Paso del Norte Port of Entry
because I was told that this was the
only way to legally seek asylum in the
United States. My number on the
waitlist is 12,635.

17) In Ciudad Juarez, there is a Facebook
group for people who are waiting on
the asylum waitlist. I am a member
of this group and I get updates through
here. According to the facebook group,
the last number to be called was 12,597.

18) If I had not been turned away from the
Paso del Norte Port of Entry, I would
have entered the United States on or
about April 22, 2019.

19) I have been waiting to enter the United States for almost five months. It has been very difficult. I am very tired and feel like I have a lazy mind. The people who run the shelter are very nice, but they do not give us everything we need. Sometimes, I go to bed hungry because there is not enough food for dinner. When I first arrived, the list was moving much faster. Now, it moves very slowly. Sometimes, they do not call anyone at all. Not knowing how fast the list will move is very difficult; pyschologically, it is torturing me. Sometimes, I feel very depressed.

20) I have known many people who have given up on the waiting list and decided to instead enter the country illegally. This has been hard for me psychologically because I am stuck behind waiting while they are in the United States starting their process. Sometimes I question myself if I made the right decision waiting.

21) I love my country. I wish I had not had to leave. However, I had to leave to save my life. I already had my mother taken from me; she

was murdered by the same people who want to kill me. Maybe if she were still here, she could take care of me. Instead, I feel alone.

22) I have heard about the new rule that says I cannot qualify for asylum. This seems very unfair. It makes me very perturbed. I left my country to seek asylum. If they had let me enter the United States on April 22, 2019, maybe I would have qualified for asylum. Now, I am really worried that I may never qualify to win asylum.

I declare under penalty of perjury under the laws of the United States of America that the things described above are true and correct.

Executed on 19th of September, 2019, at Ciudad Juarez, Mexico.

"K-S"

MAYER BROWN LLP
  Matthew H. Marmolejo (CA Bar No. 242964)
  *mmarmolejo@mayerbrown.com*
350 S. Grand Avenue
25th Floor
Los Angeles, CA 90071-1503
  Ori Lev (DC Bar No. 452565)
  (*pro hac vice*)
  *olev@mayerbrown.com*
  Stephen M. Medlock (VA Bar No. 78819)
  (*pro hac vice*)
  *smedlock@mayerbrown.com*
1999 K Street, N.W.
Washington, D.C. 20006
Telephone:  +1.202.263.3000
Facsimile:    +1.202.263.3300

SOUTHERN POVERTY LAW CENTER
  Melissa Crow (DC Bar No. 453487)
  (*pro hac vice*)
  *melissa.crow@splcenter.org*
1101 17th Street, N.W., Suite 705
Washington, D.C. 20036
Telephone: +1.202.355.4471
Facsimile: +1.404.221.5857

*Additional counsel listed on next page*
*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*,<br><br>    Plaintiffs,<br><br>    v.<br><br>Chad F. Wolf,[1] *et al.*,<br><br>        Defendants. | Case No.:  17-cv-02366-BAS-KSC<br><br>**EXHIBIT 77 TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>**Declaration of Courtney Collins** |

[1] Acting Secretary Wolf is automatically substituted for former Acting Secretary McAleenan pursuant to Fed. R. Civ. P. 25(d).

CENTER FOR CONSTITUTIONAL RIGHTS
  Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
  *bazmy@ccrjustice.org*
  Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
  *gschwarz@ccrjustice.org*
  Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
  *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
  Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
  *sarah.rich@splcenter.org*
  Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
  *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.401.221.5857

AMERICAN IMMIGRATION COUNCIL
  Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
  *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.56

## Declaration of Courtney Collins

I, Courtney Collins, hereby declare under the penalty of perjury under the laws of the United States of America:

1) I make this declaration based on my personal knowledge except where I have indicated otherwise. If called as a witness, I could and would testify competently and truthfully to these matters.

2) I am a citizen and national of Honduras.

3) I am twenty (20) years old.

4) I left my home country in October 2018 because I was fleeing violence based on my dark skin and my sexual identity as a queer person. I am afraid to return to my home country because there are gang members who are looking for me and they already found me different times when I moved inside of Honduras. I am also afraid to return to Honduras because there is a lot of vidence that happens to queer people and to people who are black like me.

5) Before arriving in Ciudad Juarez, I traveled through Guatemala and also through the rest of Mexico.

6) I did not apply for asylum in Guatemala because it did not seem like a safe place for me. I was robbed at gunpoint in Guatemala and then had to sleep in the park. I was very scared. I am black and I was one of the only black people I saw. People would stare at me; laugh at me; call me names like "monkey" and "slave-blood." People would also threaten me for being queer. They called me names like "puto" [faggot] and "hueco" [derogatory slang for gay people; hole]. They also made threats about how I was going to "wake up in a river", meaning that I was going to be killed. I was very scared.

7) When I was crossing from Guatemala to Mexico, I was caught by Mexican immigration officials and taken to "Estación Siglo 21", an immigration detention center. They gave me two options: 1) to be deported to Honduras; or 2) to apply for asylum in Mexico. Therefore, I decided to apply for asylum in Mexico, and they released me from detention to continue my process. I went to live in an apartment in

Tapachula, Chiapas. I had to check in with COMAR, the Mexican asylum and refugee agency, every Tuesday. I did this every week for approximately five months. However, I was once attacked by the Mexican Federal Police in Tapachula. They punched me and took my money and called me a "negro puto" [black faggot]. I was very scared that this would happen again. Therefore, COMAR gave me permission to go to Saltillo, Coahuila.

8) In Saltillo, I had to keep checking in with COMAR every Tuesday. I did this every week for approximately three months. However, then I had a problem with my neighbor. He threatened me and told me that he was a "sicario" [hitman]. I called the police, but they did not take me seriously, and they let the man go the next day. He threatened me again and told me again that he could kill me whenever he wanted, and that the police obviously did not care about protecting a "negro puto" [black faggot]. Once again, I was very scared, and this is when I decided that I had to leave Saltillo for my safety.

9) I arrived in Ciudad Juarez, Mexico on or about the 4th of May. My plan was to present myself at the port of entry in order to seek asylum in the United States since I knew that Mexico was not safe for me.

10) I went to the "Puente Santa Fe" [Paso del Norte Port of Entry] on or about May 5th, 2019. My plan was to present myself and ask for asylum. I paid the toll to enter the bridge on the Mexican side and started to walk over the bridge. I think that I only walked about twenty steps before I was stopped by a Mexican man wearing a light blue uniform. I do not know why he stopped me. He asked me if I had papers to enter the United States, and I told him, "No." He told me that I could not cross and that I had to go back. He told me that I had to get a number to be allowed to cross, and explained to me where to go. I followed his instructions and went where he told me to go.

11) I put my name on the waitlist on the Mexican side of the Paso del Norte Port of Entry because this is what

I was told to do. My number on the waitlist is 13,377.

12) There is a Facebook group for people who are on the waiting list to ask for asylum. According to the Facebook group today, the last number that was called is 12,597.

13) About a month ago, I got frustrated about how long the wait has been, especially because I remain scared in Mexico. I called COMAR in Saltillo to ask about my asylum application, and they told me that it was cancelled because I had missed my appointments. I explained what happened and why I had to flee Saltillo, and they did not care. They told me that it was impossible to apply for asylum again in Mexico, at least for many years.

14) If I had not been turned away from the Paso del Norte Port of Entry, I would have entered the United States on or about May 5, 2019.

15) Since being given my metering number on the waiting list, I have been living in a shelter in Ciudad Juarez for queer people. I do not feel safe in this shelter. First, the neighborhood is

not safe. There are many people in this neighborhood who sell drugs and it is scary. Also, there is a lot of violence against queer people here in Juarez. In the time that I have been here, I have heard about five transgender women being murdered in Juarez. This scares me extra because even though I identify as queer and non-binary, I dress as a woman about 80% of the time. I almost never leave the shelter because I am so scared. The shelter does not have a gate or a fence and many of the windows are broken and it would be very easy for people to enter. I do not feel safe here. I am also the only black person in the shelter and sometimes even the other people in the shelter discriminate against me for my skin color.

16) Like I said, I almost never leave the shelter because I am so scared. At the beginning, in May, I left the shelter one night with some friends. We were all dressed as women. A man stopped us and started calling us "putos" [faggots] and he attacked us. He stabbed me in the wrist with a knife. We were lucky because we were able to run away.

17) Since that time, I almost never leave the shelter because I am so afraid. Every once in awhile, I leave with the shelter director, who is a transgender woman. However, even this is not safe. One time we left and I was dressed as a woman. We were walking on the street in daylight and a man still screamed "putos" [faggots] at us. It was very scary.

18) I am very afraid to remain in Mexico. I know that it is not safe for me as a queer person or as a black person. I feel like a prisoner here, trapped in the shelter. I am anxious, depressed, sad and scared. I have trouble sleeping and have nightmares.

I declare under penalty of perjury under the laws of the United States of America that the things described above are true and correct.

Executed on the 18th of September, 2019 in Ciudad Juarez, Mexico.

Courtney Collins.
Courtney Collins.

<u>CERTIFICATION</u>

I, _____Taylor Levy_____ declare

that I am proficient in the English and Spanish languages.

On _____18th of September_____ 2019, I read the foregoing

declaration and orally translated it faithfully and accurately into Spanish in the

presence of the declarant.  After I completed translating the declaration, the

declarant verified that the contents of the foregoing declaration are true and

accurate.

I declare under penalty of perjury under the laws of the United States of

America that the foregoing is true and correct.

Executed on _18th of September_ 2019 at Ciudad Juarez,

Mexico.

_____Taylor Kristine Levy_____          ___9/18/19___

                                        Date

MAYER BROWN LLP
  Matthew H. Marmolejo (CA Bar No. 242964)
  *mmarmolejo@mayerbrown.com*
350 S. Grand Avenue
25th Floor
Los Angeles, CA 90071-1503
  Ori Lev (DC Bar No. 452565)
  (*pro hac vice*)
  *olev@mayerbrown.com*
  Stephen M. Medlock (VA Bar No. 78819)
  (*pro hac vice*)
  *smedlock@mayerbrown.com*
1999 K Street, N.W.
Washington, D.C. 20006
Telephone:   +1.202.263.3000
Facsimile:    +1.202.263.3300

SOUTHERN POVERTY LAW CENTER
  Melissa Crow (DC Bar No. 453487)
  (*pro hac vice*)
  *melissa.crow@splcenter.org*
1101 17th Street, N.W., Suite 705
Washington, D.C. 20036
Telephone: +1.202.355.4471
Facsimile: +1.404.221.5857

*Additional counsel listed on next page*
*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>Chad F. Wolf,[1] *et al.*,<br><br>Defendants. | Case No.:  17-cv-02366-BAS-KSC<br><br>**EXHIBIT 78 TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>**Declaration of China** |

---

[1] Acting Secretary Wolf is automatically substituted for former Acting Secretary McAleenan pursuant to Fed. R. Civ. P. 25(d).

1    CENTER FOR CONSTITUTIONAL RIGHTS
        Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
2        *bazmy@ccrjustice.org*
        Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
3        *gschwarz@ccrjustice.org*
        Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
4        *aguisado@ccrjustice.org*
     666 Broadway, 7th Floor
5    New York, NY 10012
     Telephone: +1.212.614.6464
6    Facsimile: +1.212.614.6499

7    SOUTHERN POVERTY LAW CENTER
        Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
8        *sarah.rich@splcenter.org*
        Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
9        *rebecca.cassler@splcenter.org*
     150 E. Ponce de Leon Ave., Suite 340
10   Decatur, GA 30030
     Telephone: +1.404.521.6700
11   Facsimile: +1.401.221.5857

12   AMERICAN IMMIGRATION COUNCIL
        Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
13       *kwalters@immcouncil.org*
     1331 G St. NW, Suite 200
14   Washington, D.C. 20005
     Telephone: +1.202.507.7523
15   Facsimile: +1.202.742.56

16

17

18

19

20

21

22

23

24

25

26

27

28

## DECLARATION OF CHINA

I, China, hereby declare under the penalty of perjury under the laws of the United States of America:

1) I make this declaration based on my personal knowledge except where I have indicated otherwise. If called as a witness, I could and would testify competently and truthfully to these matters.

2) I am a citizen and national of Honduras.

3) I am twenty-nine (29) years old.

4) I left my country on or about February 5, 2019, because I had to leave to save my life. I am a transgender woman. I am afraid to return to Honduras because I have been attacked in the past and because the men who attacked me told me they would kill me if they saw me again.

5) Before arriving here in Ciudad Juarez, Mexico, I traveled through Guatemala and through the rest of Mexico.

6) I did not apply for asylum in Guatemala because I knew it was the same as my country. I had heard from many people that it was a very dangerous place for

transgender women. I also heard from many people that the transgender Guatemalans dislike transgender Hondurans and also mistreat them. I had a friend who is a transgender woman from Honduras and she was kidnapped by transgender women in Guatemala. When I was walking in Guatemala, people would yell at me words like "culeros" [derogatory term for LGBT people; faggot]. I was only in Guatemala for about one day but even though it was such a short time, I still felt very unsafe.

7) When I entered Mexico in Tapachula, I applied for asylum with COMAR, the Mexican asylum and refugee agency. I stayed in a shelter for approximately fifteen days, but then was not permitted to stay any longer. I tried to find work and was able to rent a place to stay for a little bit. However, then I ran out of work and money for rent and had to go sleep in the park in Tapachula. One night when I was sleeping there, I saw two men from the same gang that attacked me in my neighborhood in Honduras. As soon as they saw me, I ran away and barely escaped. This is why I had to abandon my process with COMAR.

8) I arrived in Ciudad Juarez, Mexico, on or about May 22, 2019. My plan was to present myself at the port of entry in order to seek asylum in the United States. However, I went directly to the LGBT shelter here in Ciudad Juarez. That same day, the people here explained to me the process of getting a number to ask for asylum in the United States. They told me that it was impossible to go directly to the bridge to ask for asylum. Instead, they took me to the office where you register to get a number to wait for your chance to ask for asylum. I also did not personally try to ask for asylum directly at the bridge because two of my friends tried this a couple of days later and they were rejected by the agents standing at the middle of the bridge and they told me all about what happened.

9) I put my name on the waitlist at the office near the Paso del Norte Port of Entry because I thought it was the only way to ask for asylum in the United States.

10) My number on the waitlist is 15,271.

11) There is a facebook group for people waiting on the asylum waitlist here in Ciudad Juarez. I am a member of this group. As of today's date, I believe that the last number called was 12,597. This is depressing for me because it seems like it will be a long, long time before they call my number.

12) If I had not been forced to place myself on the asylum waitlist, I would have entered the United States on or about May 22, 2019.

13) I have been living here at the LGBT Shelter in Ciudad Juarez the entire time I have been in this city. In the four months that I have been here in Ciudad Juarez, Mexico, I have heard about four transgender women who have been murdered in this city. This makes me very afraid because I am also a transgender woman. Additionally, I believe that I am at an even higher risk of violence because I am also a migrant. I almost never leave the shelter because I am so scared. One time

I left the shelter to run some errands. I was walking on the street in the daylight and using my phone. A man ran by and grabbed my phone. When I tried to get it back, he yelled at me, "puto!" [faggot]. I am afraid also here in the shelter because there are many people in this neighborhood who use and sell drugs. One night, I was scared because we heard lots of motorcycles and police sirens. We went on the roof and saw two men on the neighbor's roof with assualt rifles, which are illegal in Mexico. It was very scary and we all hid. Later that same night, someone was shining flashlights into our shelter. Other times, I have seen people standing on the street and staring at the shelter. We always have the front door locked, but I am still scared because there is no gate or fence to protect the shelter, and many of the windows are broken.

14) It is very difficult for me to remain waiting here in Mexico. I cry all the time. This is a place where I feel very insecure and not tranquil. Mexico

is a country where I cannot be free
because of the insecurity that we experience
daily. I am not wanting to come to
the United States to look for the
American Dream; I am coming so I
can save my life and be free. I want
to live somewhere that I can go about
each day free from insults, bad looks,
beatings, and death threats. I am
certain that it is impossible for me to
find this kind of safety in Mexico.
Instead, I know that every day when
I wake up, my life is at risk.

I declare under penalty of perjury under the
laws of the United States of America that the
things described above are true and correct.
   Executed on 18th of September, 2019 at
   Ciudad, Juarez, Mexico

     China
      "China"

<u>CERTIFICATION</u>

I, _Taylor Kristine Levy_ declare that I am proficient in the English and Spanish languages.

On _18th of September_ 2019, I read the foregoing declaration and orally translated it faithfully and accurately into Spanish in the presence of the declarant. After I completed translating the declaration, the declarant verified that the contents of the foregoing declaration are true and accurate.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on _18th of September_ 2019 at Ciudad Juarez, Mexico.

_Taylor Kristine Levy_      _9/18/2019_

                                     Date

1  MAYER BROWN LLP
   Matthew H. Marmolejo (CA Bar No. 242964)
2    *mmarmolejo@mayerbrown.com*
   350 S. Grand Avenue
3  25th Floor
   Los Angeles, CA 90071-1503
4    Ori Lev (DC Bar No. 452565)
     (*pro hac vice*)
5    *olev@mayerbrown.com*
     Stephen M. Medlock (VA Bar No. 78819)
6    (*pro hac vice*)
     *smedlock@mayerbrown.com*
7  1999 K Street, N.W.
   Washington, D.C. 20006
8  Telephone:  +1.202.263.3000
   Facsimile:   +1.202.263.3300
9
   SOUTHERN POVERTY LAW CENTER
10   Melissa Crow (DC Bar No. 453487)
     (*pro hac vice*)
11   *melissa.crow@splcenter.org*
   1101 17th Street, N.W., Suite 705
12 Washington, D.C. 20036
   Telephone: +1.202.355.4471
13 Facsimile: +1.404.221.5857
14 *Additional counsel listed on next page*
   *Attorneys for Plaintiffs*
15
                   **UNITED STATES DISTRICT COURT**
16
                   **SOUTHERN DISTRICT OF CALIFORNIA**
17

18 Al Otro Lado, Inc., *et al.*,        | Case No.:  17-cv-02366-BAS-KSC

19          Plaintiffs,

20     v.                                **EXHIBIT 79 TO
                                          PLAINTIFFS' MOTION
21 Chad F. Wolf,[1] *et al.*,            FOR CLASS
                                          CERTIFICATION
22          Defendants.

23                                        **Declaration of A.V.M.M**

24

25

26

27 _____

28 [1] Acting Secretary Wolf is automatically substituted for former Acting Secretary
   McAleenan pursuant to Fed. R. Civ. P. 25(d).

CENTER FOR CONSTITUTIONAL RIGHTS
Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
*bazmy@ccrjustice.org*
Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
*gschwarz@ccrjustice.org*
Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
*aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
*sarah.rich@splcenter.org*
Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
*rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.401.221.5857

AMERICAN IMMIGRATION COUNCIL
Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
*kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.56

## DECLARATION OF A.V.M.M.

I, A.V.M.M., hereby declare under the penalty of perjury under the laws of the United States of America:

1) I make this declaration based on my personal knowledge except where I have indicated otherwise. If called as a witness, I could and would testify competently and truthfully to these matters.

2) I am a citizen and national of El Salvador.

3) I am 23 years old.

4) I am traveling with my two children. My son is 5 years old. My daughter is 3 years old.

5) I fled my home country of El Salvador on or about April 3, 2019, because I was fleeing death threats, gang violence, domestic violence, and threats against the lives of my children. I am afraid to return to my home country because the gang members want to kill me. I am also afraid because I am a lesbian woman who ~~experiencing~~ experienced violence and persecution because of my sexual orientation. Lesbians and other people in the LGBT community are not safe in my country.

6) Before arriving here in Ciudad Juarez, Mexico, I traveled briefly through Honduras and Guatemala. I was only in each of those countries for a short period of time, just a few days. I did not apply for asylum in Honduras or Guatemala because I know that the same gangs who was threatening me and my children in El Salvador also operates in these countries. I knew that me and my children were never going to be safe from these death threats in these countries because the gang is very powerful.

7) I arrived in Ciudad Juarez, Mexico on or about April 22, 2019. I planned to present myself at the port of entry in order to seek asylum in the United States.

8) When I arrived in Ciudad Juarez, I went directly to the LGBT migrant shelter, I had heard about this shelter from my family members in the United States, When I arrived at the shelter, the people here told me that the only way to seek asylum in the United States was to register myself and get a number on the waiting list. The

next day, people from the shelter took me to the office near the Mexican side of the Paso del Norte Port of Entry so that I could register myself and receive a number on the waiting list. I never tried to ask for asylum directly at the Port of Entry because everyone had told me that it was impossible and that I had to wait for my turn using my number.

9) I put my name of the waitlist at the Mexican side of the Paso del Norte Port of Entry because I believed that it was the only way to ask for asylum legally in the United States. My number on the asylum waitlist is 12,760. My son's number on the asylum waitlist is 12,758. My daughter's number on the asylum waitlist is 12,759.

10) There is a facebook group here for people who are on the asylum waiting list in Ciudad Juarez. I am a member of this facebook group. To the best of my knowledge, the last number called on the asylum waiting list was 12,597.

11) I did not apply for asylum in Mexico because I had heard that it was a very dangerous country. I know that

the gangs in Mexico are also very powerful, and I know that the same people who threatened me could also find me and hurt me and my children here in Mexico. Additionally, I had heard from lots of people that there is a lot of violence against the LGBT community here in Mexico.

12) If I had not been forced to place my name on the asylum waiting list on the Mexican side of the Paso del Norte Port of Entry, myself and my children would have entered the United States on or about April 23, 2019.

13) Ever since the first day I arrived here in Ciudad Juarez, I have been living here at the LGBT migrant shelter. Even though the person who runs the shelter is a good person, I still do not feel safe here in the shelter. I do not feel safe in this neighborhood because it is very dangerous and there are many people who sell and use drugs around the shelter. I do not even feel safe going to the corner store. My children and I spend most of our time inside the shelter because we are afraid

to leave. Since I have been living here in Ciudad Juarez, I have heard about 4 or 5 transgender women who have been murdered. Even though I am not transgender myself, this still scares me as member of the LGBT community.

14) My children are suffering here in Mexico. It is very difficult for them to be cooped up here at the shelter all the time. I did not put my son in school at the start of the school year because I was afraid of what might happen to him. I do not even like to take my children to the store because I am so scared. My children always ask me things like, "why are we not allowed to go to the park?" My son wakes up in the middle of the night almost every night sobbing from his nightmares.

15) I also do not feel safe here in Ciudad Juarez or anywhere in Mexico because I am very worried that the same people I am fleeing have followed me here to Mexico. About a month ago, I received a facebook message from them telling me that they knew I was in Ciudad Juarez and that

they could come and get me within one day. This was very scary, especially because I do not know how they realized that I was in Ciudad Juarez.

16) It has been very difficult for me and my two children to be stuck here in Mexico. Even though it has been so difficult, I decided to keep waiting for our turn to cross because I wanted to do things the right way and follow the law. I also know that it is very dangerous to cross in another way with small children. I am asking for asylum in the United States to save my life and the lives of my children.

I declare under penalty of perjury under the laws of the United States of America that the things above are true and correct.

Executed on 18th of September, 2019 at Ciudad Juarez, Mexico.

A.V.M.M.

<u>CERTIFICATION</u>

I, _____Taylor Kristine Levy_____ declare

that I am proficient in the English and Spanish languages.

On ___18th of September___ 2019, I read the foregoing

declaration and orally translated it faithfully and accurately into Spanish in the

presence of the declarant.  After I completed translating the declaration, the

declarant verified that the contents of the foregoing declaration are true and

accurate.

I declare under penalty of perjury under the laws of the United States of

America that the foregoing is true and correct.

Executed on ___18th of September___ 2019 at Ciudad Juarez,

Mexico.

_____Taylor Kristine Levy_____        ___9/18/19___

Date

1-FER-200

1   MAYER BROWN LLP
      Matthew H. Marmolejo (CA Bar No. 242964)
2       mmarmolejo@mayerbrown.com
    350 S. Grand Avenue
3   25th Floor
    Los Angeles, CA 90071-1503
4       Ori Lev (DC Bar No. 452565)
        (pro hac vice)
5       olev@mayerbrown.com
        Stephen M. Medlock (VA Bar No. 78819)
6       (pro hac vice)
        smedlock@mayerbrown.com
7   1999 K Street, N.W.
    Washington, D.C. 20006
8   Telephone:  +1.202.263.3000
    Facsimile:   +1.202.263.3300
9
    SOUTHERN POVERTY LAW CENTER
10      Melissa Crow (DC Bar No. 453487)
        (pro hac vice)
11      melissa.crow@splcenter.org
    1101 17th Street, N.W., Suite 705
12  Washington, D.C. 20036
    Telephone: +1.202.355.4471
13  Facsimile: +1.404.221.5857

14  *Additional counsel listed on next page*
    *Attorneys for Plaintiffs*
15
                **UNITED STATES DISTRICT COURT**
16
              **SOUTHERN DISTRICT OF CALIFORNIA**
17

18  Al Otro Lado, Inc., *et al.*,          Case No.:  17-cv-02366-BAS-KSC

19                  Plaintiffs,
                                           **EXHIBIT 80 TO**
20          v.                             **PLAINTIFFS' MOTION**
                                           **FOR CLASS**
21  Chad F. Wolf,[1] *et al.*,             **CERTIFICATION**

22                  Defendants.
                                           **Declaration of A.N.H.**
23

24

25

26

27  _____

28  [1] Acting Secretary Wolf is automatically substituted for former Acting Secretary
    McAleenan pursuant to Fed. R. Civ. P. 25(d).

1    CENTER FOR CONSTITUTIONAL RIGHTS
          Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
2         *bazmy@ccrjustice.org*
          Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
3         *gschwarz@ccrjustice.org*
          Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
4         *aguisado@ccrjustice.org*
     666 Broadway, 7th Floor
5    New York, NY 10012
     Telephone: +1.212.614.6464
6    Facsimile: +1.212.614.6499

7    SOUTHERN POVERTY LAW CENTER
          Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
8         *sarah.rich@splcenter.org*
          Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
9         *rebecca.cassler@splcenter.org*
     150 E. Ponce de Leon Ave., Suite 340
10   Decatur, GA 30030
     Telephone: +1.404.521.6700
11   Facsimile: +1.401.221.5857

12   AMERICAN IMMIGRATION COUNCIL
          Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
13        *kwalters@immcouncil.org*
     1331 G St. NW, Suite 200
14   Washington, D.C. 20005
     Telephone: +1.202.507.7523
15   Facsimile: +1.202.742.56

16

17

18

19

20

21

22

23

24

25

26

27

28

## DECLARATION OF "A.N.H."

I, "A.N.H.", hereby declare under the penalty of perjury under the laws of the United States of America:

1) I make this declaration based on my personal knowledge except where I have indicated otherwise. If called as a witness, I could and would testify competently and truthfully to these matters.

2) I was born in Guatemala. I am a citizen of Guatemala. I am an indigenous woman. I speak Chuj.

3) I am 27 years old.

4) I traveled to Mexico from Guatemala with my son who is 5 years old.

5) I left my country of Guatemala on or about the 23rd of April, because my husband hurts me and he stole my other child and wants to take my son. I am afraid to return to Guatemala because he will hurt me again and my son. I know that if I return to Guatemala, he will kill me.

6) I arrived in Ciudad Juarez on or about May 1, 2019. When I arrived in Juarez, I went to the main bridge

I do not know the name of the bridge. I paid the coins to enter the bridge. I walked up the bridge with my son. In the middle of the bridge, there were men dressed like Police Officers. They had blue uniforms and guns. They stopped me and told me that I could not pass. I was scared, hungry, and thirsty. They told me I had to leave and get a number. They pointed at a building and said I needed to go there for the number. I walked away from them crying and crying, so scared because I did not know what to do. I went to the building where they told me and got my number. That same night, I slept on the ground with my son outside of the office where I got my number. I had nowhere to go and no money. Finally, the next day, the people in the office found a shelter for me and my son.

16) I put my name on the waiting list for asylum because I believed that it was the only way I could safely ask for asylum for me and my son in the United States. My number on the waiting list is 13049. My son's number on the waiting list is 13050.

17) I do not have a cell phone. However, I ask the other people in the shelter to tell me what numbers have been called on the asylum waitlist. They use their phones to find the number. They told me that the last number called was 12,597.

18) If I had not been told to go back at the bridge in the center of Juarez, I would have entered the United States on or about May 1, 2019.

19) It is very hard to wait in Juarez. I do not have money. I do not have a cell phone. I don't have money to buy medicine or clothing for my son. I am very afraid to be here in Juarez. I cannot leave the shelter ever because of my dialect and because I do not speak Spanish well. I cannot leave because people say I could be kidnapped or that the bad men will hurt me. You can see the bad men walking around the shelter. They have guns and tattoos and smoke and do drugs. I almost never leave the shelter. I am so scared. My son is not in school either, because of the fear. My son asks me if we can

go out of the shelter, but I have to tell him no because it is not safe. At night time I am very sad. I cry and cry. I have bad dreams every night about my husband chasing me and trying to kill me. I get very sad because my shelter is on a hill very close to the border and at night we can see all the lights in the United States. I stare at them and get very sad and think about how I cannot go there. Sometimes I think that I cannot take it anymore, all the suffering, but then I remember that only death waits for me in Guatemala and I have to keep putting up with the pain. The list is moving very slowly now.

20) I did not apply for asylum in Mexico because I have nothing here. It is dangerous in Mexico for indigenous people. When I traveled here, sometimes people on the streets would yell mean things to me. I have so much fear in Mexico.

21) Everything that is happening is unfair. Me and my son are suffering so much. My son does not want to eat the food here at the shelter because it is always

the same thing: beans and rice. He is very hungry sometimes. When my son gets sick, I cannot get medicine for him. We sleep on a mat on the floor because there are not enough beds for everyone. Sometimes other people here who come to stay at the shelter make fun of me for saying words wrong in Spanish or for being indigenous. The Mexicans who stay here are always the most mean.

I declare under penalty of perjury under the laws of the United States of America that the things described above are true and correct.

Executed on the 20th of September, 2019, at Ciudad Juarez, Mexico.

"A.N.H"

<u>CERTIFICATION</u>

I, _Taylor Kristine Levy_ declare that I am proficient in the English and Spanish languages.

On _20th of September_ 2019, I read the foregoing declaration and orally translated it faithfully and accurately into Spanish in the presence of the declarant.  After I completed translating the declaration, the declarant verified that the contents of the foregoing declaration are true and accurate.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on _20th of September_ 2019 at Ciudad Juarez, Mexico.

_Taylor Kristine Levy_ _____ _9/20/19_

Date

1-FER-208

1  MAYER BROWN LLP
2     Matthew H. Marmolejo (CA Bar No. 242964)
       *mmarmolejo@mayerbrown.com*
3     350 S. Grand Avenue
       25th Floor
4     Los Angeles, CA 90071-1503
         Ori Lev (DC Bar No. 452565)
5        (*pro hac vice*)
          *olev@mayerbrown.com*
6        Stephen M. Medlock (VA Bar No. 78819)
         (*pro hac vice*)
7         *smedlock@mayerbrown.com*
       1999 K Street, N.W.
8     Washington, D.C. 20006
       Telephone:  +1.202.263.3000
9     Facsimile:   +1.202.263.3300

10  SOUTHERN POVERTY LAW CENTER
        Melissa Crow (DC Bar No. 453487)
11       (*pro hac vice*)
          *melissa.crow@splcenter.org*
12     1101 17th Street, N.W., Suite 705
       Washington, D.C. 20036
13     Telephone: +1.202.355.4471
       Facsimile: +1.404.221.5857

14  *Additional counsel listed on next page*
     *Attorneys for Plaintiffs*
15
                 **UNITED STATES DISTRICT COURT**
16
                **SOUTHERN DISTRICT OF CALIFORNIA**
17

18  Al Otro Lado, Inc., *et al.*,            Case No.:  17-cv-02366-BAS-KSC

19                 Plaintiffs,

20       v.                                  **EXHIBIT 81 TO
                                             PLAINTIFFS' MOTION
21  Chad F. Wolf,[1] *et al.*,               FOR CLASS
                                             CERTIFICATION**
22                 Defendants.
                                             **Declaration of B.B.**
23

24

25

26

27  _____

28  [1]  Acting Secretary Wolf is automatically substituted for former Acting Secretary
     McAleenan pursuant to Fed. R. Civ. P. 25(d).

CENTER FOR CONSTITUTIONAL RIGHTS
    Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
    *bazmy@ccrjustice.org*
    Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
    *gschwarz@ccrjustice.org*
    Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
    *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
    Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
    *sarah.rich@splcenter.org*
    Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
    *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.401.221.5857

AMERICAN IMMIGRATION COUNCIL
    Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
    *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.56

## DECLARATION OF B.B.

I, B.B., hereby declare under the penalty of perjury:

1.      I make this declaration based on my personal knowledge except where I have indicated otherwise. If called as a witness, I could and would testify competently and truthfully to these matters.

2.      I am a citizen and national of Venezuela. I am 55 years old.

3.      I am married and I have four adult children.

4.      I fled my home country because I was active in an opposition political party and I fought for human rights. I was threatened with arrest and I was afraid I would be tortured if captured. I left Venezuela with my wife and my youngest son. I am afraid to return to Venezuela because I think the people in power will arrest me, torture me, and likely kill me for my political activity.

5.      We left Venezuela about December 21, 2018. From there we went by car to Colombia. We took a plane from Colombia to Mexico City. From there we took a bus to Nuevo Laredo in Mexico.

6.      I did not apply for asylum in Colombia or Mexico.

7.      I arrived at Nuevo Laredo, Mexico on about May 23, 2019. My wife, my son, and I presented ourselves at the border to U.S. immigration officials on the middle of the bridge in the pedestrian lane, and we asked for asylum.

8.      When we got to the U.S. border, we crossed by foot on Bridge 1 – to get to the area with Mexican and American officials. Four officials were on the bridge. Two were Mexican officials, a man and a woman. I think they were in brown uniforms. They looked to see that we did not have American visas. They let us talk to the U.S. immigration officials. There was a man and a woman in blue uniforms who were the U.S. officials. We asked for asylum from them. The two American officials sent us to an immigration office on the Mexico side to get on the list to seek asylum. The officials in the Mexican office took copies of our

passports and put us on the list at # 589.

9.      We put our names on the list because we believed in the process. This was the requirement to get asylum so we followed it.

10.     Around July 27, 2019, we checked where we were in line. We were told we were #226.

11.     We were afraid to stay in Mexico because we were nearly kidnapped by the Zetas – a cartel of the North. There was a group of about 18 Venezuelans together who went to the bus station. The Zetas were waiting for us. My son, my wife, and I were able to run away. From what I saw, the rest of the group was taken in vans by the Zetas. To this day, I do not know what happened to them.

12.     After seeing this, we knew we could not stay in Mexico. We crossed the border via the river and turned ourselves in to border patrol to seek asylum.

13.     My wife, son, and I were each sent to different detention centers. I am currently detained in the United States. A U.S. immigration officer interviewed me around September 9, 2019 about my fear of returning to Venezuela. They asked me if I was afraid of returning to Venezuela and I said yes. They never asked me why was afraid of returning to Venezuela. I did not receive a decision yet about whether my interview result was "positive" or "negative." On September 17, 2019, a U.S. immigration officer from ICE told me that I had to answer additional questions as part of my interview process. The questions were about whether I had previously applied for asylum in Mexico and Colombia and if not, why not.

I declare under penalty of perjury that the things described above are true and correct.

Executed on September 24, 2019.



_____

B.B.

<u>CERTIFICATION</u>

I, Rebecca Cassler, declare that I am proficient in the English and Spanish languages.

On September 24, 2019, I read the foregoing declaration and orally translated it faithfully and accurately into Spanish in the presence of the declarant. After I completed translating the declaration, the declarant verified that the contents of the foregoing declaration are true and accurate.

I declare under penalty of perjury that the foregoing is true and correct. Executed on September 24, 2019 at Decatur, Georgia.

_Rebecca Cassler_                    9/24/19

Rebecca Cassler                       Date

1  MAYER BROWN LLP
     Matthew H. Marmolejo (CA Bar No. 242964)
2     *mmarmolejo@mayerbrown.com*
   350 S. Grand Avenue
3  25th Floor
   Los Angeles, CA 90071-1503
4     Ori Lev (DC Bar No. 452565)
      (*pro hac vice*)
5     *olev@mayerbrown.com*
      Stephen M. Medlock (VA Bar No. 78819)
6     (*pro hac vice*)
      *smedlock@mayerbrown.com*
7  1999 K Street, N.W.
   Washington, D.C. 20006
8  Telephone:  +1.202.263.3000
   Facsimile:   +1.202.263.3300
9
   SOUTHERN POVERTY LAW CENTER
10    Melissa Crow (DC Bar No. 453487)
      (*pro hac vice*)
11    *melissa.crow@splcenter.org*
   1101 17th Street, N.W., Suite 705
12 Washington, D.C. 20036
   Telephone: +1.202.355.4471
13 Facsimile: +1.404.221.5857

14 *Additional counsel listed on next page*
   *Attorneys for Plaintiffs*
15
                **UNITED STATES DISTRICT COURT**
16
             **SOUTHERN DISTRICT OF CALIFORNIA**
17

18 | Al Otro Lado, Inc., *et al.*, | Case No.:  17-cv-02366-BAS-KSC |
   | --- | --- |
19 | Plaintiffs, | |
   | | **EXHIBIT 82 TO** |
20 | v. | **PLAINTIFFS' MOTION** |
   | | **FOR CLASS** |
21 | Chad F. Wolf,[1] *et al.*, | **CERTIFICATION** |
22 | Defendants. | **Class Member Declaration** |
23 | | |
24 | | |

25
26
27 _____
28 [1] Acting Secretary Wolf is automatically substituted for former Acting Secretary
   McAleenan pursuant to Fed. R. Civ. P. 25(d).

CENTER FOR CONSTITUTIONAL RIGHTS
  Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
  *bazmy@ccrjustice.org*
  Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
  *gschwarz@ccrjustice.org*
  Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
  *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
  Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
  *sarah.rich@splcenter.org*
  Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
  *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.401.221.5857

AMERICAN IMMIGRATION COUNCIL
  Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
  *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.56

**Declaration of** ▮▮▮▮▮▮▮▮▮▮▮

I swear under penalty of perjury of the laws of the United States of America that the following is true and correct.

1. My name is ▮▮▮▮▮▮▮▮▮▮▮ I was born on ▮▮▮▮▮▮▮▮ in Guatemala. I am currently detained in the South Texas Family Residential Center with my 1-year old daughter.

2. I fled death threats in Guatemala to seek asylum in the United States. On Friday, April 27, 2018 around 4:10 in the afternoon, I arrived at the port of entry between Piedras Negras, Mexico and Eagle Pass, Texas with my daughter and my 15-year-old sister.

3. We paid coins to enter and crossed the bridge. Before we arrived at the line, four immigration officials with a dog approached us and asked us if we had papers. I said no and that we had come to seek asylum. They told to wait in a corner.

4. All four officials came over. The one that spoke to us was not very tall but was very muscular. He was bald and had glasses. He asked us why we had come. I said I wanted to turn myself in to seek asylum. He asked for my papers and asked our ages. He asked us who the baby belonged to. I said she was mine.

5. My Guatemalan ID had been stolen in Mexico so I only gave him a copy. He said that the copy did not count. I also showed him the original birth certificates of my daughter and sister but he said that those did not count either. I said that they were given to us by our government. Throughout the whole conversation, another official with blue eyes with brown hair who did not speak Spanish was telling the bald official in English what to say to us.

6. The bald official said that we had to go back because there were a lot of people inside so they could not accept us. He asked me how many more people were going to come with us. I said that it was just the three of us. He kept yelling at me how many people had come with us and that he knew we were lying. He said that if I did not tell him the truth, he was going to put me in jail and take away my daughter. I told him that I was telling him the truth and that we were coming ask for help. The other officials walked away one by one.

7. The official said he did not understand why we came if his country is full of people like us aready. He said that we should stop coming and that he did not want us to keep asking because there was no space for us.

8. I said I could not go back because I was out of money. He said I would have to see what I would do because I could not stay there. He walked away very angry. Another official came over and explained that it was not that they did not want to accept us but it was because many people had come and no one had come to get them yet. He told us to stay in a church or another shelter.

9. I left because it was getting to be night and it would be more dangerous for us once it was dark. We had to sleep in the street because we had nowhere else to go.

10. We went back to the port of entry the next morning around 9 in the morning on Saturday April 28. When we had crossed about half of the bridge, a different official that I had not seen the day before said that asylum had ended and that that law did not exist anymore and that we could not pass. He said if I did not go back he would turn me into the Mexican officials and that they would not be patient like him and they would return me to my country. I went back to Mexico because I was afraid for my life if they deported me to Guatemala.

11. We stayed in a migrant shelter that night. On Sunday, April 29, we crossed the river even though we were risking our lives because I felt we had no other choice. I did not want to cross the river because it was very deep and my daughter and sister were sick. None of us know how to swim. The water was very cold and the current was very fast. The three of us sat on one tire and a man pulled us across. We all got completely soaked. I was afraid that my daughter would fall in the water.

I, ███████████████ , swear under the penalties of perjury that the attached declaration is true and correct to the best of my abilities. This declaration was read back to me word for word in Spanish, a language in which I am fluent.

Sign███████                                    5/9/18
                                              Date

I, _Katherine Murdza_ , certify that I am proficient in both Spanish and English. I read the declaration above in its entirety to ████████████ in Spanish.

_____KER Murdza_____                          5/9/18
Signature                                     Date

1   MAYER BROWN LLP
      Matthew H. Marmolejo (CA Bar No. 242964)
2     *mmarmolejo@mayerbrown.com*
    350 S. Grand Avenue
3   25th Floor
    Los Angeles, CA 90071-1503
4     Ori Lev (DC Bar No. 452565)
      (*pro hac vice*)
5     *olev@mayerbrown.com*
      Stephen M. Medlock (VA Bar No. 78819)
6     (*pro hac vice*)
      *smedlock@mayerbrown.com*
7   1999 K Street, N.W.
    Washington, D.C. 20006
8   Telephone:  +1.202.263.3000
    Facsimile:   +1.202.263.3300
9
    SOUTHERN POVERTY LAW CENTER
10    Melissa Crow (DC Bar No. 453487)
      (*pro hac vice*)
11    *melissa.crow@splcenter.org*
    1101 17th Street, N.W., Suite 705
12  Washington, D.C. 20036
    Telephone: +1.202.355.4471
13  Facsimile: +1.404.221.5857
14  *Additional counsel listed on next page*
    *Attorneys for Plaintiffs*
15
                  **UNITED STATES DISTRICT COURT**
16
                **SOUTHERN DISTRICT OF CALIFORNIA**
17
18  Al Otro Lado, Inc., *et al.*,            Case No.:  17-cv-02366-BAS-KSC

19              Plaintiffs,            **PLAINTIFFS' NOTICE**
                                       **REGARDING EXHIBIT**
20        v.                           **ATTACHMENT**

21  Chad F. Wolf,[1] *et al.*,

22              Defendants.

23

24

25

26  _____

27  [1] Acting Secretary Wolf is automatically substituted for former Acting Secretary
    McAleenan pursuant to Fed. R. Civ. P. 25(d).

28                                          PLAINTIFFS' NOTICE REGARDING EXHIBIT
                                                                        ATTACHMENT

CENTER FOR CONSTITUTIONAL RIGHTS
    Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
    *bazmy@ccrjustice.org*
    Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
    *gschwarz@ccrjustice.org*
    Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
    *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
    Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
    *sarah.rich@splcenter.org*
    Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
    *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
    Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
    *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

PLAINTIFFS' NOTICE REGARDING EXHIBIT
ATTACHMENT

2

1   Plaintiffs respectfully submit this Notice to ask to the Court to withdraw from
2   the docket of this case document numbered 390-85, as protected personal
3   information of a witness appears thereon in unredacted form. Plaintiffs hereby
4   submit a replacement version of this document, filed as an exhibit to this Notice. The
5   failure to redact this information was an error by Plaintiffs' counsel.

6   Plaintiffs sought the position of counsel for Defendants, who indicated that
7   they do not oppose Plaintiffs' request only to the extent that it seeks to substitute the
8   version of the exhibit on the public docket with a version that redacts each instance
9   of the declarant's name.

10   Based on the foregoing, Plaintiffs respectfully request that the Court withdraw
11   current ECF document 390-85 and replace it with the redacted version submitted
12   with this Notice.

13   Dated: January 23, 2020                    MAYER BROWN LLP
14                                                Matthew H. Marmolejo
                                                 Ori Lev
15                                               Stephen S. Medlock

16                                               SOUTHERN POVERTY LAW
17                                               CENTER
                                                 Melissa Crow
18                                               Sarah Rich
19                                               Rebecca Cassler

20                                               CENTER FOR CONSTITUTIONAL
21                                               RIGHTS
                                                 Baher Azmy
22                                               Ghita Schwarz
                                                 Angelo Guisado
23
24                                               AMERICAN IMMIGRATION
                                                 COUNCIL
25                                               Karolina Walters

26
27                                          By: */s/ Stephen M. Medlock*
                                                 Stephen M. Medlock
28
                                                    PLAINTIFFS' NOTICE REGARDING EXHIBIT
                                                    ATTACHMENT
                              1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Attorneys for Plaintiffs*

PLAINTIFFS' NOTICE REGARDING EXHIBIT
ATTACHMENT

2

**CERTIFICATE OF SERVICE**

I certify that I caused a copy of the foregoing document to be served on all counsel via the Court's CM/ECF system.

Dated:  January 23, 2020                    MAYER BROWN LLP


                                            By  _/s/ Stephen M. Medlock_____

PLAINTIFFS' NOTICE REGARDING EXHIBIT
ATTACHMENT

1-FER-223

1  MAYER BROWN LLP
     Matthew H. Marmolejo (CA Bar No. 242964)
2     *mmarmolejo@mayerbrown.com*
   350 S. Grand Avenue
3  25th Floor
   Los Angeles, CA 90071-1503
4     Ori Lev (DC Bar No. 452565)
     (*pro hac vice*)
5     *olev@mayerbrown.com*
     Stephen M. Medlock (VA Bar No. 78819)
6     (*pro hac vice*)
     *smedlock@mayerbrown.com*
7  1999 K Street, N.W.
   Washington, D.C. 20006
8  Telephone:  +1.202.263.3000
   Facsimile:   +1.202.263.3300
9
   SOUTHERN POVERTY LAW CENTER
10    Melissa Crow (DC Bar No. 453487)
     (*pro hac vice*)
11    *melissa.crow@splcenter.org*
   1101 17th Street, N.W., Suite 705
12 Washington, D.C. 20036
   Telephone: +1.202.355.4471
13 Facsimile: +1.404.221.5857

14 *Additional counsel listed on next page*
   *Attorneys for Plaintiffs*
15
                **UNITED STATES DISTRICT COURT**
16
                **SOUTHERN DISTRICT OF CALIFORNIA**
17

18 Al Otro Lado, Inc., *et al.*,          Case No.:  17-cv-02366-BAS-KSC

19              Plaintiffs,
                                          **EX. 1 TO PLAINTIFFS' NOTICE**
20    v.                                  **REGARDING EXHIBIT**
                                          **ATTACHMENT**
21 Chad F. Wolf,[1] *et al.*,
                                          **CORRECTED EXHIBIT 83 TO**
22              Defendants.               **PLAINTIFFS' MOTION FOR**
                                          **CLASS CERTIFICATION:**
23                                        **Class Member Declaration**

24

25

26

27 _____

28 [1] Acting Secretary Wolf is automatically substituted for former Acting Secretary
   McAleenan pursuant to Fed. R. Civ. P. 25(d).

CENTER FOR CONSTITUTIONAL RIGHTS
    Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
    *bazmy@ccrjustice.org*
    Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
    *gschwarz@ccrjustice.org*
    Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
    *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
    Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
    *sarah.rich@splcenter.org*
    Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
    *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.401.221.5857

AMERICAN IMMIGRATION COUNCIL
    Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
    *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.56

**Declaration of** ██████████████

I swear under penalty of perjury of the laws of the United States of America that the following is true and correct.

1. My name is ████████████████ I was born on ██████████████ in Honduras. I am currently detained in the South Texas Family Residential Center (STFRC) with my 8-month-old daughter.

2. I fled Honduras to seek asylum in the United States. On or around May 2, 2018 around 8:30 PM, I arrived at the San Ysidro port of entry with my daughter.

3. There was no one waiting in line. There were four U.S. immigration officials inside and two Mexican officials outside. I approached an U.S. immigration official who asked for my documents. I gave him my daughter's birth certificate and a photocopy of my Honduran ID card. I said that I was there to seek asylum. The official said that they were not granting asylum and told me to go away. He said something in English and I understood only the word "children". I did not move because I was afraid that the Mexican officials would deport.

4. Another official asked me where I was from. I said Honduras and showed him my Honduran ID too. He said, "Fuck Honduras". The first official told me there was no space and said again to go away. Again, I did not move. The official yelled at me that he was telling me to leave. One of the Mexican officials came over and told me I had to listen to them and walked me out. There was another woman behind me who asked to seek asylum and was also turned away.

5. I sat down and cried because I didn't know what to do. The Mexican official tried to console me and said that I should hurry because it was 8:45 and the shelter closed in 15 minutes. During our conversation he told me that when I heard the word "children", the U.S. official had been saying that they did not want more children in the United States. I told the Mexican official that I had no money and I could not arrive in time. He went and spoke to the U.S. officials.

6. After a little while, one of the U.S. officials came over and told me to go inside. Once I was inside, a woman with dark skin patted me down and asked me if I was pregnant. I said no. She said that that was good because they did not want more children in the United States.

7. My daughter and I were detained at the port of entry for an entire week. We had a mattress for 3 nights but then they moved us to another room and we only had a thin mat that felt the same as sleeping on the floor. We were not given pillows and a thin blanket. There was light and noise all night so that it was difficult to sleep. It was extremely cold there and my daughter shivered and became congested and had a cough. We were only allowed to shower and brush our teeth once during the week.

8.  We ate only ham sandwiches, hamburgers, and burritos. Sometimes we were given carrots and celery. The food was so bad that at the end of the week I stepped eating. For the last couple days, the officials just opened the door quickly and threw in food as if we were animals. The officials would get mad at us if we did not walk and eat quickly. They would throw the children's food away if they did not eat quickly. There were many people there are they all left more quickly than me. My daughter was the youngest child there.

9.  After a week, I was transferred to the STFRC. The doctor here said that my daughter had bronchitis.

I, ███████████████████████, swear under the penalties of perjury that the attached declaration is true and correct to the best of my abilities. This declaration was read back to me word for word in Spanish, a language in which I am fluent.

████████████████████

Signature

5/17/18

Date

I, _Katherine Murdza_, certify that I am proficient in both Spanish and English. I read the declaration above in its entirety to ████████████████████ in Spanish.

_KZR Murdza_

Signature

5/17/18

Date

MAYER BROWN LLP
  Matthew H. Marmolejo (CA Bar No. 242964)
  *mmarmolejo@mayerbrown.com*
350 S. Grand Avenue
25th Floor
Los Angeles, CA 90071-1503
  Ori Lev (DC Bar No. 452565)
  (*pro hac vice*)
  *olev@mayerbrown.com*
  Stephen M. Medlock (VA Bar No. 78819)
  (*pro hac vice*)
  *smedlock@mayerbrown.com*
1999 K Street, N.W.
Washington, D.C. 20006
Telephone:  +1.202.263.3000
Facsimile:   +1.202.263.3300

SOUTHERN POVERTY LAW CENTER
  Melissa Crow (DC Bar No. 453487)
  (*pro hac vice*)
  *melissa.crow@splcenter.org*
1101 17th Street, N.W., Suite 705
Washington, D.C. 20036
Telephone: +1.202.355.4471
Facsimile: +1.404.221.5857

*Additional counsel listed on next page*
*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*, | Case No.:  17-cv-02366-BAS-KSC |
| Plaintiffs, | |
| v. | **EXHIBIT 84 TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |
| Chad F. Wolf,[1] *et al.*, | |
| Defendants. | **Class Member Declaration** |

---

[1] Acting Secretary Wolf is automatically substituted for former Acting Secretary McAleenan pursuant to Fed. R. Civ. P. 25(d).

CENTER FOR CONSTITUTIONAL RIGHTS
  Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
  *bazmy@ccrjustice.org*
  Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
  *gschwarz@ccrjustice.org*
  Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
  *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
  Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
  *sarah.rich@splcenter.org*
  Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
  *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.401.221.5857

AMERICAN IMMIGRATION COUNCIL
  Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
  *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.56

**Declaration of** ███████████

I swear under penalty of perjury of the laws of the United States of America that the following is true and correct.

1. My name is ███████████. I was born on ███████████ in Cuba. I am currently detained in the South Texas Family Residential Center with my 5- and 4-year old sons.

2. I fled Cuba to seek asylum in the United States. On June 2, 2018 around 11 a.m. or noon, I arrived at the port of entry between Nuevo Laredo, Mexico and Laredo, Texas and my two sons.

3. We paid the coins to enter and started to walk across the bridge. There were two immigration officials standing in the middle of the bridge at the border. I told them that I came to seek political asylum. They said that I had to wait in line.

4. There were thirty or forty people already waiting on the Mexican side of the border on the bridge. My sons had only the food and water that people passing by gave them, which was not enough. It is very painful for me as a mother remembering that my children suffered and I was powerless to help them. We were hot during the day and cold at night lying on the cement. I tried to hug my sons to keep them warm but they cried and could not sleep.

5. The bathroom was at the entrance to the bridge on the Mexican side. We waited long periods of time putting off going to the bathroom because we were afraid that we would miss our name being called while we were gone.

6. The officials allowed small groups in one at a time. On June 3 around 5 in the afternoon, after about 27 hours on the bridge, we were finally allowed in. Many people were still waiting outside.

I, ▆▆▆▆▆▆▆▆▆▆ , swear under the penalties of perjury that the attached declaration is true and correct to the best of my abilities. This declaration was read back to me word for word in Spanish, a language in which I am fluent.

_____          ___6/11/18_____
Signature                                 Date

I, _Katherine Murdza_ , certify that I am proficient in both Spanish and English. I read the declaration above in its entirety to ▆▆▆▆▆▆▆▆▆▆ in Spanish.

_____          ___6/11/18_____
Signature                                 Date

1  MAYER BROWN LLP
     Matthew H. Marmolejo (CA Bar No. 242964)
2     *mmarmolejo@mayerbrown.com*
   350 S. Grand Avenue
3  25th Floor
   Los Angeles, CA 90071-1503
4     Ori Lev (DC Bar No. 452565)
     (*pro hac vice*)
5     *olev@mayerbrown.com*
     Stephen M. Medlock (VA Bar No. 78819)
6     (*pro hac vice*)
     *smedlock@mayerbrown.com*
7  1999 K Street, N.W.
   Washington, D.C. 20006
8  Telephone:  +1.202.263.3000
   Facsimile:   +1.202.263.3300
9
   SOUTHERN POVERTY LAW CENTER
10    Melissa Crow (DC Bar No. 453487)
     (*pro hac vice*)
11    *melissa.crow@splcenter.org*
   1101 17th Street, N.W., Suite 705
12 Washington, D.C. 20036
   Telephone: +1.202.355.4471
13 Facsimile: +1.404.221.5857

14 *Additional counsel listed on next page*
   *Attorneys for Plaintiffs*
15
                    **UNITED STATES DISTRICT COURT**
16
                  **SOUTHERN DISTRICT OF CALIFORNIA**
17

18 | Al Otro Lado, Inc., *et al.*, | Case No.:  17-cv-02366-BAS-KSC |
19 | Plaintiffs, | |
20 | v. | **EXHIBIT 85 TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |
21 | Chad F. Wolf,[1] *et al.*, | |
22 | Defendants. | **Class Member Declaration** |
23 | | |
24 | | |

25

26

27 _____

28 [1] Acting Secretary Wolf is automatically substituted for former Acting Secretary McAleenan pursuant to Fed. R. Civ. P. 25(d).

CENTER FOR CONSTITUTIONAL RIGHTS
    Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
    *bazmy@ccrjustice.org*
    Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
    *gschwarz@ccrjustice.org*
    Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
    *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
    Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
    *sarah.rich@splcenter.org*
    Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
    *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.401.221.5857

AMERICAN IMMIGRATION COUNCIL
    Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
    *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.56

**Declaration of** ██████████████████

I swear under penalty of perjury of the laws of the United States of America that the following is true and correct.

1. My name is ███████████████████ I was born on ████████████ in El Salvador. I am currently detained in the South Texas Family Residential Center with my 6-year old son.

2. I fled El Salvador to seek asylum in the United States. I am not sure of the date, but around May 29, 2018 around 3 p.m., I arrived at the port of entry between Reynosa, Mexico and Hidalgo, Texas with my son.

3. I paid coins to enter and walked across the bridge. I approached two immigration officials, one man and one woman.  I told them I had come to turn myself in with my son. They asked for my documents. They looked at my documents and then said that I could not enter because people had to enter in order and there were Cubans who had been there for a week and I had to go to the back of the line.

4. There were already about fifty people waiting on the bridge. The immigration officials did not give us bedding, food, or water so we had to make do with what people passing by gave us. A few people came in a car and gave us pizza and water. An immigration official came over and told them not to give us anything more because we already had enough.

5. We slept for three nights on the sidewalk under a roof. It was very cold at night and very hot during the afternoon. Between about 7:30 p.m. and 7 a.m. the bathroom on the bridge closed. If we needed to go to the bathroom during the night, we had to go in a bucket behind a blanket that other people held up for us. My son had a bad rash but there was no medicine available. My son was begging me for us to leave.

6. On the second day, an official told all of the men to come with him. He allowed about twenty men to enter, leaving the women and children outside. That same day, I approached an immigration official again and asked to enter. I said that I had been told to wait but I still had not been allowed to enter. He told me that I could not enter and that I had to be patient and wait. He told me that there were many people waiting. I told him that I had a child with me. He said that that did not matter.

7. After three days, an immigration official called a woman with two little girls and said that she could enter. I told him that I wanted to enter too because I had been waiting with my son for three days. He thought for a few seconds and then said that I could enter.

I, ███████████████████, swear under the penalties of perjury that the attached declaration is true and correct to the best of my abilities. This declaration was read back to me word for word in Spanish, a language in which I am fluent.

_____                    6/8/18
Signature                                    Date

I, _Katherine   Murdza_, certify that I am proficient in both Spanish and English. I read the declaration above in its entirety to ███████████████ in Spanish.

_KdR Murdza_                                 6/18/18
Signature                                    Date

MAYER BROWN LLP
   Matthew H. Marmolejo (CA Bar No. 242964)
   *mmarmolejo@mayerbrown.com*
350 S. Grand Avenue
25th Floor
Los Angeles, CA 90071-1503
   Ori Lev (DC Bar No. 452565)
   (*pro hac vice*)
   *olev@mayerbrown.com*
   Stephen M. Medlock (VA Bar No. 78819)
   (*pro hac vice*)
   *smedlock@mayerbrown.com*
1999 K Street, N.W.
Washington, D.C. 20006
Telephone:  +1.202.263.3000
Facsimile:   +1.202.263.3300

SOUTHERN POVERTY LAW CENTER
   Melissa Crow (DC Bar No. 453487)
   (*pro hac vice*)
   *melissa.crow@splcenter.org*
1101 17th Street, N.W., Suite 705
Washington, D.C. 20036
Telephone: +1.202.355.4471
Facsimile: +1.404.221.5857

*Additional counsel listed on next page*
*Attorneys for Plaintiffs*

### UNITED STATES DISTRICT COURT

### SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*,<br><br>              Plaintiffs,<br><br>       v.<br><br>Chad F. Wolf,[1] *et al.*,<br><br>              Defendants. | Case No.:  17-cv-02366-BAS-KSC<br><br>**EXHIBIT 86 TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>**Class Member Declaration** |

---

[1] Acting Secretary Wolf is automatically substituted for former Acting Secretary McAleenan pursuant to Fed. R. Civ. P. 25(d).

CENTER FOR CONSTITUTIONAL RIGHTS
   Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
   *bazmy@ccrjustice.org*
   Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
   *gschwarz@ccrjustice.org*
   Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
   *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
   Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
   *sarah.rich@splcenter.org*
   Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
   *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.401.221.5857

AMERICAN IMMIGRATION COUNCIL
   Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
   *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.56

**Declaration of** ███████████████████

I swear under penalty of perjury of the laws of the United States of America that the following is true and correct.

1. My name is ██████████████████ I was born on ████████████ in Guatemala. I am currently detained in the South Texas Family Residential Center with my son, who is one and a half years old.

2. I fled Guatemala to seek asylum in the United States. On May 23, 2018, I arrived at the port of entry between Nogales, Mexico and Nogales, Arizona with my son. There were about sixty asylum seekers already waiting to enter.

3. An official asked me if I was Guatemalan and I said yes. He told me to write my name on a list and wait to enter. He did not give me the opportunity to explain why I had come. The officials allowed a couple families or minors to enter each day. Some days no one was allowed to enter.

4. I did not want to leave at all because I was afraid I would miss my turn to enter. We slept on the ground and it was cold at night. My son had diarrhea. The officials did not give us anything but volunteers came and gave us food. Sometimes however we had to go hungry.

5. Finally, after waiting a week, on May 30 at 4 a.m., we were allowed to enter the United States with one other family from the line.

I, ██████████████████, swear under the penalties of perjury that the attached declaration is true and correct to the best of my abilities. This declaration was read back to me word for word in Spanish, a language in which I am fluent.

████████████                                    6/16/18
Signature                                        Date

I, Katherine Murdza, certify that I am proficient in both Spanish and English. I read the declaration above in its entirety to ██████████████ in Spanish.

K2R Murdza                                       6/16/18
Signature                                        Date

1
2
3
4
5
6
7
8    **UNITED STATES DISTRICT COURT**

9    **SOUTHERN DISTRICT OF CALIFORNIA**

10

11   AL OTRO LADO, INC.; ABIGAIL               Case No. 17-cv-02366-BAS-KSC
     DOE, BEATRICE DOE, CAROLINA
12   DOE, DINORA DOE, INGRID DOE,              **ORDER GRANTING IN PART
     ROBERTO DOE, MARIA DOE,                   AND DENYING IN PART
13   JUAN DOE, ÚRSULA DOE,                      DEFENDANTS' MOTION TO
     VICTORIA DOE, BIANCA DOE,                  DISMISS THE SECOND
14                                              AMENDED COMPLAINT**
     EMILIANA DOE, AND CÉSAR
15   DOE, individually and on behalf of all    **[ECF No. 192]**
     others similarly situated,
16
17                              Plaintiffs,

18         v.

19   KEVIN MCALEENAN, Acting
20   Secretary of U.S. Department of
     Homeland Security, in his official
21   capacity, *et al.*,

22                              Defendants.

23

24         In this case, Organizational Plaintiff Al Otro Lado, Inc. ("Al Otro Lado"), an

25   organization that helps individuals seek asylum in the United States, and thirteen

26   Individual Plaintiffs—Abigail Doe, Beatrice Doe, Carolina Doe, Dinora Doe, Ingrid

27   Doe, Roberto Doe, Maria Doe, Juan Doe, Úrsula Doe, Victoria Doe, Bianca Doe,

28   Emiliana Doe, and César Doe—challenge conduct that they allege is "designed to

                                         – 1 –                           17cv2366

1   policies, the Executive Branch of the Government must respect the procedural

2   safeguards of due process[.]"  *Id.* at 767.  Here, as the Court has discussed in its

3   construction of the relevant statutory provisions, Congress has plainly established

4   procedural protections for aliens like the New Individual Plaintiffs in this case, who

5   allege that they were in the process of arriving to the United States and expressed an

6   intent to seek asylum.  The New Individual Plaintiffs have plausibly alleged that

7   immigration officers failed to discharge their mandatory duties under the relevant

8   provisions.  Consequently, the Court concludes that the New Individual Plaintiffs

9   have stated procedural process claims and the Court denies Defendants' motion to

10  dismiss these claims.

11

12  **IV.   ATS Claims**

13         The ATS provides in full that "[t]he district courts shall have original

14  jurisdiction of any civil action by an alien for a tort only, committed in violation of

15  the law of nations or a treaty of the United States."  28 U.S.C. § 1350.  All Individual

16  Plaintiffs and Al Otro Lado seek to raise ATS claims for Defendants' alleged

17  "violation of the non-*refoulement* doctrine."   (SAC ¶¶ 294–303.)   Plaintiffs

18  specifically allege that:

19              CBP officials have systematically denied, or unreasonably
20              delayed, access to the asylum process by Class Plaintiffs, and the
                asylum seekers they represent, in violation of customary
21              international law reflected in treaties which the United States has
22              ratified and implemented: namely, the specific, universal and
                obligatory norm of non-*refoulement*, which has also achieved the
23              status of a *jus cogens* norm, and which forbids a country from
24              returning or expelling an individual to a country where he or she
25              has a well-founded fear of persecution and/or torture . . .

26  (SAC ¶ 295.)  Plaintiffs contend that Defendants' alleged violations have caused

27  them harm by forcing them to return to Mexico or other countries where they face

28  threats of further persecution.  (*Id.* ¶ 296.)  Al Otro Lado also raises ATS claims for

1    these alleged violations on the ground that its core mission is harmed through
2    resource diversion. (*Id.* ¶ 300.)

3

4          As a preliminary matter, Defendants argue that Plaintiffs' "non-*refoulement*
5    claims are [not] actionable as presented" based on the Court's prior ruling that
6    "Plaintiffs 'may not' seek judicial review of Defendants' conduct 'independently' of
7    the APA's judicial review framework." (ECF No. 192-1 at 23.) Defendants misstate
8    the Court's prior ruling, which did not speak to the Court's jurisdiction over
9    Plaintiffs' ATS claims. The ATS is a "strictly jurisdictional statute" in its own right
10   that "creates no new causes of action." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 713,
11   742 (2004); *Tobar v. United States*, 639 F.3d 1191, 1196 (9th Cir. 2011) (noting the
12   ATS "has been interpreted as a jurisdiction statute only"). Thus, independently of
13   the APA, the relevant issue is whether Plaintiffs can state claims under the ATS over
14   which the Court has jurisdiction.

15

16         **A.    No Jurisdiction Exists for Al Otro Lado's ATS Claims**
17         Insofar as Defendants move to dismiss ATS claims that Organizational
18   Plaintiff Al Otro Lado raises, (ECF No. 192-1 at 28 (citing SAC ¶¶ 294–303)), the
19   Court finds that such claims must be dismissed for lack of subject matter jurisdiction
20   because "Al Otro Lado is corporation." (ECF No. 238 at 20.) Although the fact that
21   Al Lado Lado is a corporation does not preclude Al Otro Lado's assertion of APA
22   claims, its status as a corporation has jurisdictional consequences under the ATS.

23

24         Under its plain language, the ATS provides for federal jurisdiction only over
25   civil actions "by an alien." 28 U.S.C. §1350. Thus, irrespective of the substantive
26   cause of action that underlies an asserted ATS claim, a federal court lacks
27   jurisdiction under the ATS over claims asserted by anyone or anything other than an
28   alien. *See Serra v. Lappin*, 600 F.3d 1191, 1198 (9th Cir. 2010) ("The ATS admits

– 78 –                                                      17cv2366

1   no cause of action by non-aliens."); *Yousuf v. Samantar*, 552 F.3d 371, 375 n.1 (4th
2   Cir. 2009) ("To the extent that any of the claims under the ATS are being asserted
3   by plaintiffs who are American citizens, federal subject-matter jurisdiction may be
4   lacking."); *Kadic v. Karadzic*, 70 F.3d 232, 238 (2d Cir. 1995) (same); *Sikhs for*
5   *Justice Inc. v. Indian Nat'l Cong. Party*, 17 F. Supp. 3d 334, 345 (S.D.N.Y. 2014)
6   ("[J]urisdiction is inapplicable because Plaintiff Sikhs is not an 'alien' under the
7   ATS[.]"); *S.K. Innovation, Inc. v. Finpol*, 854 F. Supp. 2d 99, 113 (D.D.C. 2012)
8   ("[T]he American corporate Plaintiffs, as non-aliens, lack standing to bring claims
9   under the ATS"); *Presbyterian Church of Sudan v. Talisman Energy, Inc*., 453 F.
10  Supp. 2d 633, 661 (S.D.N.Y. 2006) (concluding that an institutional plaintiff that is
11  a United States corporation "is not an alien and may not bring suit under the ATS."),
12  *aff'd*, 582 F.3d 244 (2d Cir. 2009).   Al Otro Lado is concededly not an alien.
13  Accordingly, the Court grants Defendants' motion to dismiss Organizational
14  Plaintiff Al Otro Lado's ATS claims lack of jurisdiction.

15

16          **B.      The Individual Plaintiffs' ATS Claims**

17          Defendants initially moved to dismiss the ATS claims of only the New
18  Individual Plaintiffs and Al Otro Lado.  (ECF No. 192-1 at 22–25.)   In reply,
19  Defendants extend the scope of their motion to dismiss Plaintiffs' ATS claims to
20  encompass the Original Individual Plaintiffs as well.  (ECF No. 238 at 16–18.)  To
21  resolve Defendants' present motion, the Court will not venture beyond Defendants'
22  actual arguments.  Reviewing these arguments, the Court finds that Defendants have
23  failed to show that the ATS claims must be dismissed at this juncture.

24

25          **1.      The Asserted Law of Nations Norm**

26          Defendants first argue that (1) the ATS "has no bearing in this case" because
27  Plaintiffs "have not brought a civil action for a tort[.]"  (ECF No. 192-1 at 25, ECF
28  No. 238 at 16–17.)  Defendants point to the ATS's use of the word "tort" and argue

1   that Plaintiffs have no ATS claim here because they have not sued for a "tort."  (ECF

2   No. 192-1 at 25, ECF No. 238 at 16–17.)  Defendants' argument misconstrues the

3   ATS.

4

5        By its terms, the ATS "enable[s] federal courts to hear claims in a very limited

6   category defined by the law of nations and recognized at common law."  *Sosa*, 542

7   U.S. at 712.  For this reason, it should not be disputed that "[t]he ATS 'grants

8   jurisdiction over two types of claims: those for violations of a treaty of the United

9   States, and those for violations of the law of nations.'"  *Aragon v. Ku*, 277 F. Supp.

10  3d 1055, 1064 (D. Minn. 2017) (quoting 14A Charles Alan Wright & Arthur R.

11  Miller, Federal Practice and Procedure § 3661.2 (4th ed., Apr. 2017 Update)); *see*

12  *also Al-Tamimi v. Adelson*, 916 F.3d 1, 11 (D.C. Cir. 2019) (recognizing that "[a]n

13  ATS claim . . . incorporates the law of nations").  When a plaintiff seeks to plead an

14  ATS claim based on an alleged violation of the law of nations, the plaintiff must

15  identify an international norm that is "specific, universal, and obligatory."  *Sosa*, 542

16  U.S. at 732.  As a general matter, "[c]ourts ascertain customary international law 'by

17  consulting the works of jurists, writing professedly on public law; or by the general

18  usage and practice of nations; or by judicial decisions recognizing and enforcing that

19  law.'"  *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 714–15 (9th Cir.

20  1992) (quoting *United States v. Smith*, 18 U.S. 153, 160–61 (1820)).

21

22      Plaintiffs allege that the duty of non-*refoulement* is a *jus cogens* norm

23  recognized by the law of nations.  (SAC ¶¶ 227–35.)[13]   And, in opposition to

24  _____

25      [13] "As defined in the Vienna Convention on the Law of Treaties, a *jus cogens*
    norm, also known as a 'peremptory norm' of international law, 'is a norm accepted
26  and recognized by the international community of states as a whole as a norm from
    which no derogation is permitted and which can be modified only by a subsequent
27  norm of general international law having the same character.'"  *Siderman de Blake*
28  *v. Republic of Argentina*, 965 F.2d 699, 714 (9th Cir. 1992) (quoting Vienna

                                        – 80 –                        17cv2366

1   dismissal, Plaintiffs elaborate on these allegations under the applicable standard,

2   locating the asserted *jus cogens* norm in (1) a range of fundamental international

3   treaties, including Article 33 of the Convention on the Status of Refugees and its

4   Protocol ("Refugee Convention"), Article 13 of the International Covenant on Civil

5   and Political Rights ("ICCPR"), and Article 3 of the Convention Against Torture

6   and Other Cruel, Inhuman and Degrading Treatment or Punishment ("CAT"); (2)

7   statements by international law bodies, including the Executive Committee of the

8   United Nations High Commissioner for Refugees (UNHCR); and (3) international

9   law commentators.  (ECF No. 210 at 27–30.)  Defendants simply fail to grapple with

10  Plaintiffs' allegations or arguments on whether non-*refoulement* is a norm that is

11  recognized by the law of nations.[14]

12

_____

13  Convention on the Law of Treaties, art. 53, May 23, 1969, 1155 U.N.T.S. 332, 8
    I.L.M. 679).  Courts determine whether a *jus cogens* norm exists by looking to the
14  works of jurists, writing professedly on public law; or by the general usage and
    practice of nations; or by judicial decisions recognizing and enforcing that law, but
15  courts must make the additional determination "whether the international
    community recognizes the norm as one 'from which no derogation is permitted.'"
16  *Id.* (quoting *Committee of U.S. Citizens Living in Nicaragua v. Reagan*, 859 F.2d
17  929, 940 (D.C. Cir. 1988)).

18

19  [14] None of Defendants' dismissal arguments grapples with the Plaintiffs'
    fundamental contention that non-refoulement is a *jus cogens* norm whose violation
20  is actionable.  Defendants initially moved to dismiss the "non-*refoulement* claims"
    of the New Individual Plaintiffs allegedly in Mexico at the time of their alleged
21  injuries on three grounds.  First, Defendants argued that each of the treaties the SAC
    identifies is not independently enforceable and separately analyzed each treaty.
22  (ECF No. 192-1 at 23–24.)  Second, Defendants argued that the Refugee Act of 1980
    does not provide Plaintiffs with any independent cause of action in this Court
23  because the Act only allows claims to be adjudicated defensively before an
24  immigration judge or affirmatively before USCIS.  (*Id.* at 24.)  These arguments
    elide the ATS claims that Plaintiffs have actually pleaded.  Plaintiffs' opposition
25  brief expressly observes that Defendants' opening brief fundamentally misconstrues
    Plaintiffs' ATS claims.  (ECF No. 210 at 27.)  And the SAC is fairly clear in alleging
26  Plaintiffs' theory that the duty of non-*refoulement* is a *jus cogens* norm whose
27  violation is actionable—not that each individual treaty cited in the SAC is a separate
28

1    The only somewhat applicable argument Defendants raise is that "even if the
2    Extraterritorial Plaintiffs had raised tort claims, Defendants' alleged conduct does
3    not come close to the type of egregious 'violations of the law of nations' even
4    potentially within the ATS's grant of jurisdiction."  (ECF No. 192-1 at 25 (citing
5    *Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir. 1980) as "allowing wrongful death
6    claim to proceed against Paraguayan police supervisor alleged to have 'deliberate[ly]
7    tortured' an individual in Paraguay 'under color of official authority'").  The inquiry
8    under the ATS, however, does not turn on subjective assertions about whether the
9    challenged conduct is "egregious" or not.   The Court can only understand
10    Defendants' current briefing to concede, at this stage, the core contention underlying
11    Plaintiffs' ATS claims that there exists a recognized duty of non-*refoulement* that
12    qualifies as an international law norm under the law of nations.

13

14             **2.    The INA Does Not "Preempt" Plaintiffs' ATS Claims**

15    Defendants' second argument is that the existence of a "comprehensive and
16    exclusive scheme of legislation" under the INA "preempt[s] the enforcement of a
17    freestanding international law norm of non-*refoulement* in this Court."  (ECF No.
18    238 at 17–18.)  Curiously, Defendants raise this argument while arguing in the same
19    breath that the New Individual Plaintiffs fall outside the scope of the relevant INA
20    provisions in this case.  If this latter argument is to be credited, then there is no
21    comprehensive and exclusive scheme under which these Plaintiffs could seek relief
22    and Defendants' argument collapses.

23

24    In any event, the Court has already rejected Defendants' argument.  The Court
25    expressly stated in the prior dismissal order, "[t]o the extent that Defendants contend
26    that the ATS claims must be dismissed because a remedy is available under domestic

27    ───────────────────

28    basis for Plaintiffs' ATS claims.

– 82 –                                17cv2366

1   law, the Court rejects that argument.  'Contrary to defendants' argument, there is no

2   absolute preclusion of international law claims by the availability of domestic

3   remedies for the same alleged harm.'"  *Al Otro Lado*, 327 F. Supp. 3d at n.10

4   (quoting *Hawa Abdi Jama v. United States INS*, 22 F. Supp. 2d 353, 364 (D.N.J.

5   1998)).  Defendants' latest assertion of their prior argument under a "preemption"

6   label overlooks *Jawa*'s express recognition that "there is nothing in the [ATS] which

7   limits its applications to situations where there is no relief available under domestic

8   law" and *Jawa*'s conclusion that "[t]here is no reason why plaintiffs cannot seek

9   relief on alternative grounds." *Jama v*, 22 F. Supp. 2d at 364.  Defendants otherwise

10  direct the Court to cases in which federal courts rejected an alien's attempt to rely

11  on international law norms to seek immigration relief and, in doing so, stated that

12  "where a controlling executive or legislative act does exist, customary international

13  law is inapplicable." *See Cortez-Gastelum v. Holder*, 526 Fed. App'x 747 (9th Cir.

14  2013); *Galo-Garcia v. INS*, 86 F.3d 916, 918 (9th Cir. 1996).  Defendants' reliance

15  on this caselaw underscores for the Court that, at a minimum, Plaintiffs may plead

16  their ATS claims as alternative claims in the event that their INA-based claims fail.

17  *See* Fed. R. Civ. P. 8(a)(3) ("A pleading that states a claim for relief must contain . .

18  . a demand for the relief sought, which may include relief in the alternative or

19  different types of relief."); Fed. R. Civ. P. 8(d)(3) ("A party may state as many

20  separate claims . . . as it has, regardless of consistency.").  Thus, the Court rejects

21  Defendants' "preemption" argument.

22

23                                   *      *      *

24       Nevertheless, the Court observes that Plaintiffs do not cite a single case in

25  which another federal court has recognized that the duty of non-*refoulement* is

26  actionable through a federal court's ATS jurisdiction.  The paucity of such caselaw

27  should at least give this Court pause on whether it is appropriate to recognize the

28  particular ATS cause of action the Individual Plaintiffs raise in this case.  Having

                                    – 83 –

1  reviewed Defendants' present dismissal arguments, however, the Court cannot

2  conclude that it lacks jurisdiction over the Individual Plaintiffs' ATS claims.

3  Because the ATS is a jurisdictional statute, Defendants are not foreclosed from

4  challenging the Plaintiffs' ATS claims at a later stage. *See* Fed. R. Civ. P. 12(h)(3)

5  (recognizing that subject matter jurisdiction can be assessed "at any time"); *see also*

6  *Baloco v. Drummond Co*., 767 F.3d 1229, 1234 (11th Cir. 2014) (affirming dismissal

7  of ATS claims under Rule 12(b)(1)); *Best Med. Belg., Inc. v. Kingdom of Belg*., 913

8  F. Supp. 2d 230, 236 (E.D. Va. 2012) ("The [ATS] is jurisdictional in nature and

9  also subject to challenge by a Rule 12(b)(1) motion."); *In re Chiquita Brands Int'l,*

10 *Inc*., 792 F. Supp. 2d 1301, 1354 (S.D. Fla. 2011) (observing that "a complaint that

11 fails to sufficiently plead the elements of an ATS claim is analyzed under Rule

12 12(b)(1)").

14                          **CONCLUSION & ORDER**

15        For the foregoing reasons, the Court **GRANTS IN PART AND DENIES IN**

16 **PART** Defendants' motion to dismiss the SAC.  The Court **GRANTS** Defendants'

17 motion as follows:

18        1.      The Court **DISMISSES WITHOUT LEAVE TO AMEND** the

19 Section 706(1) claims of the New Individual Plaintiffs for alleged failures to take

20 agency action required by 8 U.S.C. § 1225(b)(2)(A).

21        2.      The Court **DISMISSES WITH PREJUDICE** Organizational Plaintiff

22 Al Otro Lado's ATS claim for lack of subject matter jurisdiction.

23        The Court otherwise **DENIES** Defendants' motion to dismiss the SAC.

24 Defendants **SHALL ANSWER** the SAC **no later than August 16, 2019**.  Given the

25 length of time this case has been pending at the motion to dismiss stage, the Court

26 will not grant extensions of the deadline.

27        **IT IS SO ORDERED.**

28 **DATED:  July 29, 2019**

**Hon. Cynthia Bashant**
**United States District Judge**

– 84 –

1   JOSEPH H. HUNT
2   Assistant Attorney General, Civil Division
    AUGUST E. FLENTJE
3   Special Counsel
4   WILLIAM C. PEACHEY
    Director, Office of Immigration Litigation –
5   District Court Section
6   GISELA A. WESTWATER (NE 21801)
    Assistant Director
7   YAMILETH G. DAVILA (FL 47329)
8   Assistant Director
9   ALEXANDER J. HALASKA (IL 6327002)   KATHERINE J. SHINNERS (DC 978141)
    Trial Attorney                      Senior Litigation Counsel
10  United States Department of Justice BRIAN C. WARD (IL 6304236)
11  Civil Division                      Senior Litigation Counsel
    Office of Immigration Litigation – District   DANIELLE LINDERMUTH (MD Bar)
12  Court Section                       Trial Attorney
13  P.O. Box 868, Ben Franklin Station  SAIRAH G. SAEED (IL 6290644)
    Washington, D.C. 20044              Trial Attorney
14  Tel: (202) 307-8704 | Fax: (202) 305-7000
15  alexander.j.halaska@usdoj.gov       *Counsel for Defendants*

16              **UNITED STATES DISTRICT COURT**

17          **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

18                        **(San Diego)**

19
    AL OTRO LADO, Inc., *et al.*,           Case No. 3:17-cv-02366-BAS-KSC
20
                          *Plaintiffs*,     Hon. Cynthia A. Bashant
21

22                    v.                    **DEFENDANTS' MEMORANDUM IN
                                            SUPPORT OF THEIR MOTION TO
23                                          PARTIALLY DISMISS THE SECOND
    Kirstjen NIELSEN, Secretary, U.S.       AMENDED COMPLAINT**
24  Department of Homeland Security, in her
    official capacity, *et al.*,
25
26                        *Defendants*.
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ............................................................................. ii

INTRODUCTION .........................................................................................1

STATEMENT ................................................................................................1

ARGUMENT .................................................................................................5

   I.   The Extraterritorial Plaintiffs' Claims Fail as a Matter of Law. ..................6

      A.  The Extraterritorial Plaintiffs' Section 706(1) Claims Fail
          Because the INA Does Not Apply to Individuals in Mexico.................6

      B.  The Extraterritorial Plaintiffs' Section 706(2) Claims Fail
          Because Metering is Lawful....................................................11

      C.  The Extraterritorial Plaintiffs' Section 706(2) Claims Fail
          Because Defendants' Have Not Taken Final Agency Action..............15

      D.  The Extraterritorial Plaintiffs Fail to State Due Process
          Claims.................................................................................18

      E.  The Extraterritorial Plaintiffs Fail to State INA Claims or
          Non-*Refoulement* Claims. ....................................................22

   II.  The Political Question Doctrine Precludes Consideration of
      Defendants' Coordination with a Foreign Nation to Regulate
      Border Crossings. ..................................................................25

   III. Al Otro Lado's Claims Fail as a Matter of Law.........................................28

   IV. The Territorial Plaintiffs' Re-Pleaded Claims Fail as a Matter of
      Law. ...................................................................................29

      A.  Abigail's, Beatrice's, and Carolina's Section 706(1) Claims
          Fail as a Matter of Law..........................................................29

      B.  The Territorial Plaintiffs' Section 706(2) Claims Fail Because
          Defendants Have Not Taken Final Agency Action............................30

CONCLUSION ...........................................................................................31

CERTIFICATE OF SERVICE ......................................................................33

i    DEFS' MEMO. IN SUPPORT OF MOT. TO
PARTIALLY DISMISS SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

abroad. *See supra* at I.A. The Extraterritorial Plaintiffs do not claim a protected interest in any other independent sources from which a protected interest might be discerned. *See Goss*, 419 U.S. at 572; ECF No. 189 ¶¶ 225–26, 283–93. Thus, even if the Fifth Amendment applied to them, any Extraterritorial Plaintiff who was prevented from immediately crossing the border at the time and place of his or her choosing was not deprived of a protected interest at all. *See* ECF No. 189 ¶¶ 153–202; *Kerry v. Din*, 135 S. Ct. 2128, 2132 (2015) (Scalia, J., plurality) ("Although the amount and quality of process that [the Supreme Court's] precedents have recognized as 'due' under the Clause has changed considerably since the founding, it remains the case that *no* process is due if one is not deprived of 'life, liberty, or property.'" (internal citations omitted)); *Serra v. Lappin*, 600 F.3d 1191, 1196 (9th Cir. 2010) ("[T]he Due Process Clause protects only against deprivation of existing interests in life, liberty or property."). The Extraterritorial Plaintiffs fail as a matter of law to state a procedural due process claim under the Fifth Amendment. *See* Fed. R. Civ. P. 12(b)(6); *Navarro*, 250 F.3d at 732.

### E. The Extraterritorial Plaintiffs Fail to State INA Claims or Non-*Refoulement* Claims.

The Extraterritorial Plaintiffs argue that Defendants' alleged conduct is independently actionable under various provision of the INA and Defendants' non-*refoulement* obligations under the Convention Relating to the Status of Refugees, July 28, 1951, 189 U.N.T.S. 150 ("1951 Convention"), the Protocol Relating to the Status of Refugees, Jan. 31, 1967, 606 U.N.T.S. 267 ("1967 Protocol"), the International Covenant on Civil and Political Rights, Dec. 19, 1966, 999 U.N.T.S. 171 ("ICCPR"), the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, 1465 U.N.T.S. 114 ("CAT"), and the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102 (1980). ECF No. 189 ¶¶ 244–255, 294–303. Plaintiffs also assert that "Defendants' conduct is actionable under the Alien Tort Statute, 28 U.S.C. § 1350, which authorizes

22                    DEFS' MEMO. IN SUPPORT OF MOT. TO
                     PARTIALLY DISMISS SECOND AM. COMPL.
                     Case No. 3:17-cv-02366-BAS-KSC

1   declaratory and injunctive relief." *Id.* ¶ 298.

2   　　Neither their INA claims nor the non-*refoulement* claims are actionable as

3   presented. As Court already ruled, Plaintiffs "may not" seek judicial review of

4   Defendants' conduct "independently" of the APA's judicial review framework.

5   ECF No. 166 at 44; *see id.* at 31 ("The Complaint asserts two APA claims against

6   the Defendants."); *id.* at 34–41 (evaluating Plaintiffs' independent INA claim

7   under the APA's section 706(1) framework). Thus, the Extraterritorial Plaintiffs'

8   INA claims must be evaluated under the APA, as the Court described, or not at all.

9   *Id.* at 31; *see Webster v. Doe*, 486 U.S. 592, 607 n.* (1988) (Scalia, J., dissenting)

10  ("While a right to seek judicial review of agency action may be created by a

11  separate statutory or constitutional provision, once created it becomes subject to

12  the judicial review provisions of the APA unless *explicitly* excluded."); *Ninilchik*

13  *Traditional Council v. United States*, 227 F.3d 1186, 1194 (9th Cir. 2000) (citing

14  Justice Scalia's *Webster* dissent approvingly and ruling that "§ 706 of the APA

15  functions as the default judicial review standard"); ECF No. 166 at 45. Those INA

16  claims fail for the reasons discussed above. *Supra* at I.A.

17  　　The Extraterritorial Plaintiffs' non-*refoulement* claims also fail as a matter of

18  law because the United States does not have a non-*refoulement* obligation to aliens

19  outside its borders. *Sale*, 509 U.S. at 180–87. As to the treaties themselves, neither

20  the 1967 Protocol, the ICCPR, nor the CAT are self-executing, which means none

21  of them is independently enforceable.[6] *See Medellin v. Texas*, 552 U.S. 491, 505

22  n.2 (2008); *Sluss v. U.S. Dept. of Justice, Int'l Prisoner Transfer Unit*, 898 F.3d

23  1242, 1249 (D.C. Cir. 2018) ("Non-self-executing treaties are much like federal

24  statutes that do not supply a private cause of action."); *see also Yuen Jin v.*

25  _____

26  [6] The United States has never acceded to the 1951 Convention, *see I.N.S. v. Stevic*,
    467 U.S. 407, 416 n.9 (1984), which means it is enforceable only to the extent that
27  the 1967 Protocol is enforceable. Plaintiffs seem to acknowledge this. *See* ECF No.
28  189 ¶ 230.

1   *Mukasey*, 538 F.3d 143, 159 (2d Cir. 2008) ("[E]ven if treaties were self-executing,

2   there is a strong presumption against inferring individual rights from international

3   treaties."). The 1967 Protocol "is not self-executing" and therefore "does not have

4   the force of law in American courts." *Khan v. Holder*, 584 F.3d 773, 783 (9th Cir.

5   2009). The ICCPR neither "confer[s] individual rights," nor is it self-executing,

6   and it therefore "d[oes] not itself create obligations enforceable in the federal

7   courts." *Serra*, 600 F.3d at 1196–97. The CAT "is not self-executing and by itself

8   does not have the status of law within the United States."[7] *Barapind v. Gov't of*

9   *Republic of India*, 844 F.3d 824, 831 (9th Cir. 2016).

10          Further, while the Refugee Act of 1980 allows the Attorney General, and

11   subsequently the Secretary, to grant asylum to aliens physically present or arriving

12   in the United States, such claims may be adjudicated only defensively before an

13   immigration judge or affirmatively before USCIS. *See* Refugee Act of 1980, Pub

14   L. No. 96-212, § 201(b); 8 U.S.C. § 1252(a)(4); *Dhakal v. Sessions*, 895 F.3d 532,

15   536–37 (7th Cir. 2018) (overview of affirmative and defensive asylum claims);

16   ECF No. 189 ¶ 232. Thus, the Refugee Act of 1980 does not provide Plaintiffs any

17   independent cause of action enforceable in this Court. *Sale*, 509 U.S. at 172–74

18   (explaining that "there is no provision in the [INA] for the conduct of [removal and

19   former exclusion] hearings outside the United States"); *id.* at 175–76 (Refugee Act

20   of 1980 "did nothing to change the presumption that [covered] aliens would . . . be

21   found only within United States territory"). Neither the cited treaties nor the

22

23   _____

23   [7] Article 3 of the CAT has been implemented domestically by regulation. *See*

24   Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No,

24   105-277, Div. G., Title XXII, § 2242(b), 112 Stat. 2681 (1998) (codified at

25   8 U.S.C. § 1231 note). But those regulations state that "there shall be no judicial

26   appeal or review of any action, decision, or claim raised under the [CAT] . . .

26   except as part of the review of a final order of removal pursuant to section 242 of

27   the [INA]." 8 C.F.R. § 208.18(e)(1); *id.* § (e)(2); *see also* 8 U.S.C. § 1252(a)(4).

28   Thus, the CAT does not create any cause of action enforceable in this Court.

24

DEFS' MEMO. IN SUPPORT OF MOT. TO
PARTIALLY DISMISS SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

1   Refugee Act of 1980 provides the Extraterritorial Plaintiffs with a private cause of

2   action enforceable in this Court. Any claim for relief based upon them must be

3   dismissed under Rule 12(b)(6). *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696,

4   699 (9th Cir. 1988) ("Dismissal [under Rule 12(b)(6)] can be based on the lack of a

5   cognizable legal theory or the absence of sufficient facts alleged under a

6   cognizable legal theory.").

7        Finally, the Alien Tort Statute has no bearing on this case. The ATS gives

8   district courts "original jurisdiction of any civil action by an alien for a tort only,

9   committed in violation of the law of nations or a treaty of the United States."

10   28 U.S.C. § 1350. But the Extraterritorial Plaintiffs have not brought a civil action

11   for a tort, and so the ATS does not give the Court jurisdiction over their claims.

12   *See* ECF No. 189 ¶¶ 244–303; *Sosa v. Alvarez-Machain*, 542 U.S. 692, 713 (2004)

13   (referring to the ATS as "strictly jurisdictional"); *Tobar v. United States*, 639 F.3d

14   1191, 1196 (9th Cir. 2011) (noting the ATS "has been interpreted as a jurisdiction

15   statute only"). Even if the Extraterritorial Plaintiffs had raised tort claims,

16   Defendants' alleged conduct does not come close to the type of egregious

17   "violations of the law of nations" even potentially within the ATS's grant of

18   jurisdiction. *Compare, e.g.*, *Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir. 1980)

19   (allowing wrongful death claim to proceed against Paraguayan police supervisor

20   alleged to have "deliberate[ly] tortured" an individual in Paraguay "under color of

21   official authority"). Thus, the Extraterritorial Plaintiffs are incorrect that the ATS

22   confers the Court with jurisdiction over any part of the SAC.

23   **II.    The Political Question Doctrine Precludes Consideration of Defendants'
         Coordination with a Foreign Nation to Regulate Border Crossings.**

24

25        All Plaintiffs allege that Defendants have coordinated with the government

26   of Mexico to "prevent" individuals in Mexico from crossing into the United States.

27   *See* ECF No. 189 ¶¶ 3, 7, 50–83. Although it is unclear whether Plaintiffs intend to

28   predicate any of their claims on these allegations specifically, their requests for

25       DEFS' MEMO. IN SUPPORT OF MOT. TO
         PARTIALLY DISMISS SECOND AM. COMPL.
         Case No. 3:17-cv-02366-BAS-KSC