Nos. 22-55988, 22-56036

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

———————————

AL OTRO LADO, INC., *et al.*,
    *Plaintiffs-Appellees/Cross-Appellants*,

v.

ALEJANDRO MAYORKAS, Secretary of Homeland Security, *et al.*,
    *Defendants-Appellants/Cross-Appellees*,

and

The EXECUTIVE OFFICE FOR IMMIGRATION REVIEW,
    *Appellant/Cross-Appellee*.

———————————

APPEAL FROM FINAL JUDGMENT OF THE UNITED STATES DISTRICT
COURT FOR THE SOUTHERN DISTRICT OF CALIFORNIA
No. 17-cv-02366-BAS-KSC

———————————

## APPELLEES/CROSS-APPELLANTS' SUPPLEMENTAL BRIEF

———————————

Melissa Crow
CENTER FOR GENDER & REFUGEE STUDIES
1121 14th Street, N.W., Suite 200
Washington, DC 20005
(202) 355-4471

Neela Chakravartula
Anne Dutton
CENTER FOR GENDER & REFUGEE STUDIES
200 McAllister Street
San Francisco, CA 94102
(415) 565-4877

Baher Azmy
Angelo Guisado
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6464

Ori Lev
MAYER BROWN LLP
1999 K Street, N.W.
Washington, DC 20006
(202) 263-3270

Stephen M. Medlock
Evan Miller
Rami Rashmawi
VINSON & ELKINS LLP
2200 Pennsylvania Ave., N.W.
Suite 500 West
Washington, DC 20037
(202) 639-6500

*Counsel for Appellees*

Sarah Rich
SOUTHERN POVERTY LAW CENTER
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
(404) 521-6700

Rebecca Cassler
SOUTHERN POVERTY LAW CENTER
1101 17th Ave. NW, Suite 705
Washington, D.C., 20036
(404) 521-6700

Katherine Melloy Goettel
Gianna Borroto
Suchita Mathur
AMERICAN IMMIGRATION COUNCIL
1331 G St NW, Suite 200
Washington, DC 20005
(202) 507-7552

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................... ii

INTRODUCTION ..................................................................................................... 1

ARGUMENT ............................................................................................................. 1

    I.    TransUnion Does Not Apply Because There Is No Dispute That Class Members Suffered Concrete Harm ............................................... 1

    II.   *Mendoza-Linares* Is Inapposite ............................................................ 7

CONCLUSION ........................................................................................................ 13

CERTIFICATE OF COMPLIANCE ...................................................................... 15

CERTIFICATE OF SERVICE ................................................................................ 16

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Al Otro Lado, Inc. v. McAleenan*,
  423 F. Supp. 3d 848 (S.D. Cal. 2019) ..............................................................9, 11
*Dep't of Homeland Sec. v. Thuraissigiam*,
  140 S. Ct. 1959 (2020) ...........................................................................................12
*East Bay Sanctuary Covenant v. Biden*,
  993 F.3d 640 (9th Cir. 2021) ................................................................................11
*Guerrier v. Garland*,
  18 F.4th 304 (9th Cir. 2021) .................................................................................12
*Mendoza-Linares v. Garland*,
  51 F.4th 1146 (9th Cir. 2022) ....................................................................... passim
*Smith v. Pac. Props. & Dev. Corp.*,
  358 F.3d 1097 (9th Cir. 2004) ................................................................................6
*TransUnion LLC v. Ramirez*,
  141 S. Ct. 2190 (2021) ............................................................................. 1, 2, 6, 7

**Statutes**

28 U.S.C. § 1651 ......................................................................................................11
5 U.S.C. § 706(1) ............................................................................................. 12, 13
8 U.S.C. § 1225(b)(1) ..........................................................................................9, 10
8 U.S.C. § 1252(a)(2)(A) ........................................................................................10
8 U.S.C. § 1252(a)(2)(A)(iii) ................................................................................9, 10
8 U.S.C. § 1252(e) ...................................................................................................11

**Regulations**

8 C.F.R. § 1.2 ............................................................................................................9
8 C.F.R. § 208.13(c)(4) .............................................................................................9

**INTRODUCTION**

*TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021), and *Mendoza-Linares v. Garland*, 51 F.4th 1146 (9th Cir. 2022), do not impact this Court's ability to affirm the district court's judgment on Plaintiffs' claims brought under Section 706(1) of the Administrative Procedure Act and the Fifth Amendment, affirm the district court's permanent injunction, and remand all other claims as Plaintiffs have requested in their cross-appeal. *TransUnion* is inapposite because the undisputed evidence at summary judgment showed that Plaintiffs suffered concrete harm as a result of the government's turnback policy. *Mendoza-Linares* does not apply because (a) Plaintiffs are not challenging individual expedited removal orders, (b) the district court did not enter an order concerning the application of the Transit Ban, and (c) Plaintiffs are not bringing an extra-statutory due process claim.

**ARGUMENT**

**I. TransUnion Does Not Apply Because There Is No Dispute That Class Members Suffered Concrete Harm**

In *TransUnion*, a class of consumers sued a credit reporting company for statutory damages even though most of the class members had suffered no real-world harm. 141 S. Ct. at 2200. A group of 8,185 individuals claimed that TransUnion had failed to use adequate procedures to ensure the accuracy of their credit files. *Id.* As a result, TransUnion provided misleading credit reports for 1,853 of those individuals to third-party businesses. *Id.* But, for the remaining 6,332 individuals,

1

the inaccurate information simply sat in TransUnion's credit files without being shared with anyone or affecting those individuals' lives in any way. *Id.* The Supreme Court found that those 6,332 individuals lacked standing because they had not suffered a concrete harm. *Id.* at 2204–05.

The Court noted that certain harms "readily qualify as concrete injuries," "such as physical harms and monetary harms." *Id.* at 2204. Even if the harm is intangible, it may still be concrete. *Id.* at 2204–05. Indeed, in *TransUnion* the Supreme Court cited numerous examples of intangible harms that are sufficiently concrete to confer standing, including reputational harm, disclosure of private information, intrusion upon seclusion, and deprivation of constitutional rights. *Id.* at 2204. The Court also reiterated the longstanding principle that risk of future harm that is imminent and substantial satisfies Article III standing with regard to requests for injunctive relief. *Id.* at 2210–12. However, the Court held that absent such a physical, monetary, or concrete intangible harm, or the imminent and substantial risk of such future harm, the mere existence of a cause of action under the Fair Credit Reporting Act could not alone confer standing to pursue damages. *Id.* at 2207.

The class plaintiffs here are nothing like the plaintiffs in *TransUnion*. While the class in this case and the class in *TransUnion* both seek redress for the defendants' failure to comply with their statutory obligations—as is the case in thousands of federal actions—the similarities stop there. Here, all class members

have suffered concrete real-world harms as a result of the U.S. government's statutory violations. The class members in this case are noncitizens seeking asylum in the United States. They are fleeing torture and persecution in their home countries. 1-FER-092, 103, 114, 122, 128, 133, 146, 157, 171. In clear contrast to the facts of *TransUnion*, the undisputed evidence at summary judgment showed that the class members suffered concrete harm:[1]

- Defendants turned all class members back from Class A ports of entry (POEs) without giving them a date to return, in violation of the procedures mandated by the Immigration and Nationality Act (INA), 1-SER-200, 1-SER-153–54; 4-SER-845;

- Class members were forced to wait for weeks or months in Mexico and put their names on waitlists maintained by various groups in Mexican border towns, 3-SER-670–71; 2-SER-475–78; 1-SER-234; 1-FER-91–92, 103, 127–28, 132–33, 151–53, 158–61, 170–71;

- The turnback policy caused the number of class members waiting to be processed and inspected at POEs to skyrocket, 1-SER-23–24;

- Nongovernmental organizations, like Al Otro Lado, that provide legal and humanitarian services to class members were overwhelmed and struggled

---

[1] Defendants do not challenge either of the district court's class certification opinions.

- to scrape together the resources for this exponentially increasing group of waiting migrants, 2-SER-462–66, 470–71;

- Class members waiting in Mexican border towns due to the turnback policy experienced or lived in imminent risk of grave harm at the hands of armed gangs, 2-SER-475–78; and

- Some class members were so desperate to get into the United States that after being turned back by Defendants, they attempted to enter between POEs and died while crossing the Rio Grande or the Sonoran Desert, 2-SER-482, 498–500, 503.

As a result of these statutory violations, class members were deprived of reliable shelter, basic necessities, and security, and either became, or were at imminent risk of becoming, victims of serious crimes, such as assaults, robberies, or kidnappings. *See, e.g.*, 1-FER-092 (named class member Abigail Doe forced to live in hiding without means to support herself after being turned back by Defendants); 1-FER-103 (named class member Beatrice Doe lived in hiding from Zetas cartel after being turned back to Mexico); 1-FER-122 (named class member Dinora Doe had very little money and had to leave an overcrowded house and go into hiding after being turned back); 1-FER-128 (named class member Djamal Doe was nearly kidnapped while waiting in Mexico after being turned back); 1-FER-133 (named class member Bianka Doe was robbed after being turned back); 1-FER-153 (after being turned

4

back, class member S.N. lived in a shelter without security and frequently went to bed hungry due to lack of available food); 1-FER-171 (after being turned back, class member K-S was hungry and alone in a shelter); 1-FER-180 (class member was stabbed after being turned back); 1-FER-189 (class member was robbed after being turned back); 1-FER-198–99 (class member was threatened by persecutors after being turned back); 1-FER-207 (class member slept on a mat on the floor of a shelter after being turned back and could not access medicine for her children); 1-FER-212 (class member was nearly kidnapped by Zetas cartel after being turned back). As one class member described her life in Mexico after being turned back: "I am suffering here; I am constantly afraid. All I want is a chance to ask for asylum in the United States and save my life." 1-FER-162.

Al Otro Lado similarly suffered myriad concrete harms due to Defendants' actions. As a result of the turnback policy, Al Otro Lado was unable to fully implement other portions of its mission, 2-SER-459–60, because it was "constantly having to pull resources from [its] other offices to address the needs of particularly vulnerable migrants" whom Defendants had turned back, 2-SER-463. Al Otro Lado was also "constantly having to shift resources around to address . . . emergency situations" caused by the unlawful policy. 2-SER-463. In addition, Al Otro Lado had to fundamentally change the way it provides legal services to migrants, moving from a group orientation format to more individualized representations that consumed

more time and resources. 2-SER-467. The turnback policy also "strain[ed]" Al Otro Lado's "organizational resources" by complicating the task of recruiting volunteers who were "willing and able to work longer term on cases [for] individuals who ha[d] been . . . turned back and [were] stuck in Tijuana." 2-SER-468. That is the definition of organizational standing. *Smith v. Pac. Props. & Dev. Corp.*, 358 F.3d 1097, 1105 (9th Cir. 2004).

Here, unlike in *TransUnion*, the class members have a significant "personal stake" in the case. 141 S. Ct. at 2203. Its outcome will determine whether the U.S. government can arbitrarily prevent them from seeking safety and protection in this country, despite clear statutory mandates that Defendants inspect and process *all* arriving noncitizens, and a statutory scheme designed to protect asylum seekers and require inspection of all noncitizens who come to our ports of entry seeking admission. The class members' situation is entirely different from the hypothetical Hawai'i resident discussed by the *TransUnion* majority, who sought to sue a private company for harms caused by environmental damage in Maine. *Id.* at 2205–06. Here, U.S. government defendants prevented class members from presenting themselves at POEs to seek asylum, often by physically blocking them from stepping onto U.S. soil through direct interactions during which Defendants' agents and class members were mere feet or inches from each other. As a direct result, class members suffered the real world harms detailed above. This is clearly "a real controversy with

6

real impact on real persons," *id.* at 2203 (citation omitted), and Plaintiffs have standing to pursue their claims.

Indeed, the U.S. government did not even bother to advance an Article III standing argument at summary judgment, enter evidence into the record suggesting that class members were unharmed, or argue that any of the named plaintiffs or class members lacked Article III standing.[2] While Plaintiffs appreciate that standing is an issue that can be raised at any stage of the proceedings, the record concerning harm to the named plaintiffs and class members is undisputed.[3]

## II. *Mendoza-Linares* Is Inapposite

*Mendoza-Linares v. Garland*, 51 F.4th 1146 (9th Cir. 2022), raised completely different statutory and constitutional questions and thus has no bearing on this case. In *Mendoza-Linares* the petitioner sought to challenge his individual

---

[2] Remarkably, the government now claims that this harm is not redressable because it may decide not to follow the district court's declaratory judgment. *See* Gov't Supplemental Br. at 6-7. But the government cites no case, and Plaintiffs are aware of no case, holding that the mere fact that a litigant may ignore court orders make the injuries suffered by the plaintiff unredressable.

[3] The district court's Remedies Opinion contains a typographical error that makes its declaratory judgment inconsistent with its summary judgment decision. Plaintiffs proffer that the declaratory judgment should read as follow: "This Court enters a DECLARATORY JUDGMENT that, absent any independent, express, and lawful statutory authority, Defendants' ~~refusal to deny~~ **denial of** inspection or asylum processing to noncitizens who have not been admitted or paroled and who are in the process of arriving in the United States at Class A POE is unlawful regardless of the purported justification for doing so." ECF No. 817 at 28–29. This change is reflected in the Court's Final Judgment. ECF No. 819 at 2.

expedited removal order after exhausting the statutory process afforded by the INA, including through an extra-statutory due process challenge.

By contrast, the class members in this case were never provided with the statutory process required by the INA because they were turned back from ports of entry. Therefore, Plaintiffs are bringing Administrative Procedure Act and due process claims arguing that they were denied the statutory process afforded by the INA.

*Mendoza-Linares* does not apply for at least three reasons. *First*, unlike in *Mendoza-Linares*, Plaintiffs are not challenging individual expedited removal orders. *Second*, the district court did not enter an order concerning the legal validity of the Transit Ban. At most, it determined that the Transit Ban should not apply to certain class members who were metered before it went into effect. *Third*, the dicta in *Mendoza-Linares* concerning extra-statutory due process claims does not apply here because Plaintiffs' due process claim is coextensive with their statutory claim.

1. The panel in *Mendoza-Linares* concluded that it lacked subject matter jurisdiction over an individual noncitizen's challenge to an expedited removal order. The Plaintiffs in this case are not challenging their expedited removal orders. Instead, they are seeking access to the asylum process.

8

In *Mendoza-Linares*, the petitioner entered the United States without inspection.[4] 51 F.4th at 1149. The U.S. government placed the petitioner into expedited removal proceedings under 8 U.S.C. § 1225(b)(1), *id.*, and referred him to an asylum office for a credible fear interview. *Id.* at 1150. Based on the Transit Ban,[5] the asylum officer found, and subsequently an immigration judge affirmed, that the petitioner did not have a credible fear of persecution. *Id.* at 1151, 1152–53. The petitioner then filed a petition for review with the Ninth Circuit seeking review of the expedited removal order and the immigration judge's determination—a form of review expressly precluded by jurisdiction-limiting provisions of the INA. *Id.* at 1153.

The Ninth Circuit dismissed the petition for lack of subject matter jurisdiction. *Mendoza-Linares*, 51 F.4th at 1155. It found that 8 U.S.C. § 1252(a)(2)(A)(iii) stripped the court of subject matter jurisdiction over Mendoza-Linares' request that

---

[4] Because Mendoza-Linares entered without inspection between ports of entry, the court incorrectly refers to him as an "arriving alien." *See* 8 C.F.R. § 1.2 (defining an "arriving alien" to be a person who is "coming or attempting to come into the United States at a port-of-entry").

[5] 8 C.F.R. § 208.13(c)(4) rendered a person who traveled through one or more third countries and entered the United States on or after July 16, 2019 ineligible for asylum unless they previously sought and received a final denial of protection in at least one of those countries. The *Mendoza-Linares* panel refers to this regulation as the "Transit Bar"; Plaintiffs and the district court below have referred to the regulation as the "Asylum Ban." *See Al Otro Lado, Inc. v. McAleenan*, 423 F. Supp. 3d 848, 868 (S.D. Cal. 2019).

that it review "the application of [§ 1225(b)(1)] to [him]." 51 F.4th at 1155. The Ninth Circuit explained that, "[o]nce the expedited removal procedure . . . has been invoked," 8 U.S.C. § 1252(a)(2)(A)(iii) "precludes any judicial review of 'the *application* of such section to *individual aliens*.'" *Id.* at 1154–55.

Similarly, the *Mendoza-Linares* panel concluded that it lacked subject matter jurisdiction to review the petitioner's colorable constitutional claim based on the plain language of § 1252(a)(2)(A). 51 F.4th at 1162.

Those holdings are not relevant in this case. Plaintiffs are not seeking review of their individual expedited removal orders. Plaintiffs were not provided access to the U.S. asylum process because they were turned back by Customs and Border Protection officers at Class A ports of entry on the U.S.-Mexico border. In other words, Defendants did not even place Plaintiffs into expedited removal proceedings because they turned them away instead.

2. In *Mendoza-Linares*, the panel noted that the petitioner's challenge to his expedited removal order could conceivably be viewed as a challenge to a policy or procedure adopted by the Attorney General to implement the provisions of 8 U.S.C. § 1225(b)(1). 51 F.4th at 1156. The court then engaged in a lengthy discussion of the jurisdictional provisions that would apply to such a challenge. *Id.* at 1156-59.

That discussion is inapposite here, as Plaintiffs have not challenged either the regulation requiring a negative credible fear finding where the Transit Ban applies or the substance of the Transit Ban itself. Plaintiffs have challenged only the U.S. government's policy and practice of illegally turning back asylum seekers at POEs. True, the district court entered a preliminary injunction (and later a permanent injunction) prohibiting the application of the Transit Ban to certain class members who were turned back before July 16, 2019. *See Al Otro Lado, Inc. v. McAleenan*, 423 F. Supp. 3d 848, 868–69 (S.D. Cal. 2019). Applying the All Writs Act, 28 U.S.C. § 1651, the district court found that applying the Transit Ban to certain class members turned back prior to July 16, 2019 and who ultimately entered the United States and were processed after that date "would effectively moot" those class members' claims "by extinguishing their asylum claims." 423 F. Supp. 3d at 869. The district court never ruled on the validity of the Transit Ban. *Id.* at 858. Rather, it found that the Transit Ban did not apply to those class members and provided them with relief under the All Writs Act. *Id.* at 858, 869. Thus, the *Mendoza-Linares'* discussion of 8 U.S.C. § 1252(e) is inapplicable to the case at bar.[6]

---

[6] 8 U.S.C. § 1252(e) similarly does not apply to Plaintiffs' claims concerning the turnback policy. 8 U.S.C. § 1252(e) does not affect challenges to access to the U.S. asylum process. *See East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 666–67 (9th Cir. 2021) (bars to asylum eligibility are not governed by 8 U.S.C. § 1252(e)).

11

3. In dicta, *Mendoza-Linares* noted that noncitizens do not have free-standing constitutional rights regarding their expedited removal proceedings. 51 F.4th at 1164. That dicta is not applicable here. Although arriving noncitizens have "no constitutional rights regarding [their] application[s]," the due process rights of arriving noncitizens are prescribed by statute. *Id.*; *see also Dep't of Homeland Sec. v. Thuraissigiam*, 140 S. Ct. 1959, 1982 (2020) (recognizing that noncitizens' due process rights are coextensive with their statutory rights); *Guerrier v. Garland*, 18 F.4th 304, 312 (9th Cir. 2021) (same).

Plaintiffs here, in a manner consistent with *Thuraissigiam*, do not lodge a due process challenge to the relevant statutory scheme; they invoke due process to protect their coterminous rights under the statutory scheme. Because resolution of Plaintiffs' statutory claim under APA § 706(1) would likewise resolve their due process claim, the Court need not address whether Plaintiffs have a colorable extra-statutory due process claim.[7]

---

[7] To the extent that the Court reads *Mendoza-Linares* as standing for the broader proposition that noncitizens at the border lack *any* constitutional rights—even those coterminous with their statutory rights—*see Mendoza-Linares*, 51 F.4th at 1167, such a holding would be in tension with the Court's holding in *Guerrier* that "in the expedited removal context, a petitioner's due process rights are coextensive with the statutory rights Congress provides," and that petitioner there in fact raised a colorable constitutional claim. *Guerrier*, 18 F.4th at 310–11. In any event, this Court need not address any perceived intra-circuit conflict between *Mendoza-Linares* and *Guerrier* given the pendency of Plaintiffs' statutory claims.

12

## CONCLUSION

*TransUnion* and *Mendoza-Linares* should not change any part of this Court's analysis. This Court should affirm the district court's judgment on Plaintiffs' claims brought under Section 706(1) of the Administrative Procedure Act and the Fifth Amendment, affirm the district court's permanent injunction, and remand all other claims as Plaintiffs have requested in their cross-appeal.

Dated: November 20, 2023

Respectfully submitted,

/s/ Stephen M. Medlock

| | |
|---|---|
| Melissa Crow<br>CENTER FOR GENDER & REFUGEE STUDIES<br>1121 14th Street, N.W., Suite 200<br>Washington, DC 20005<br>(202) 355-4471 | Ori Lev<br>MAYER BROWN LLP<br>1999 K Street, N.W.<br>Washington, DC 20006<br>(202) 263-3270 |
| Neela Chakravartula<br>Anne Dutton<br>CENTER FOR GENDER & REFUGEE STUDIES<br>200 McAllister Street<br>San Francisco, CA 94102<br>(415) 565-4877 | Matthew H. Marmolejo<br>MAYER BROWN LLP<br>350 S. Grand St., 25th Floor<br>Los Angeles, CA 90071<br>(213) 621-9483 |
| Baher Azmy<br>Angelo Guisado<br>CENTER FOR CONSTITUTIONAL RIGHTS<br>666 Broadway, 7th Floor<br>New York, NY 10012<br>(212) 614-6464 | Kate Melloy Goettel<br>Gianna Borroto<br>Suchita Mathur<br>AMERICAN IMMIGRATION COUNCIL<br>1331 G St. N.W., Suite 200<br>Washington, DC 20005<br>(202) 507-7552 |
| Sarah Rich<br>SOUTHERN POVERTY LAW CENTER | Stephen M. Medlock<br>Evan Miller |

13

150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
(404) 521-6700

Rebecca Cassler
SOUTHERN POVERTY LAW CENTER
1101 17th Ave. NW, Suite 705
Washington, D.C. 20036
(404) 521-6700

Rami Rashmawi
VINSON & ELKINS LLP
2200 Pennsylvania Ave., N.W.
Suite 500 West
Washington, DC 20037
(202) 639-6500

*Attorneys for Appellees / Cross-Appellants*

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that:

1. The motion is proportionally spaced, has a typeface of 14 point or more, and contains 2,998 words, exclusive of the exempted portions of the brief.

2. The brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font. As permitted by Fed. R. App. P. 32, the undersigned has relied on the word-count feature of this word-processing system in preparing this certificate.

Dated: November 20, 2023

                                           Respectfully submitted,

                                           /s/ Stephen M. Medlock
                                           Stephen M. Medlock
                                           VINSON & ELKINS LLP
                                           2200 Pennsylvania Ave., N.W.
                                           Suite 500 West
                                           Washington, DC 20036
                                           (202) 639-6500

## CERTIFICATE OF SERVICE

I certify that on November 20, 2023, I served a copy of this document on the Court and all parties by filing it with the Clerk of Court through the CM/ECF system.

Dated: November 20, 2023

                                                      Respectfully submitted,

                                                     /s/ Stephen M. Medlock
Stephen M. Medlock
VINSON & ELKINS LLP
2200 Pennsylvania Ave., N.W.
Suite 500 West
Washington, DC 20036
(202) 639-6500