Nos. 22-55988, 22-56036

---

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

---

AL OTRO LADO, INC., *et al.*,
*Plaintiffs-Appellees/Cross-Appellants*,

v.

ALEJANDRO MAYORKAS, Secretary of Homeland Security, *et al.*
*Defendants-Appellants/Cross-Appellees*,

and

the EXECUTIVE OFFICE FOR IMMIGRATION REVIEW,
*Appellant/Cross-Appellee.*

---

On Appeal From a Final Judgment Issued By the U.S. District Court for the
Southern District of California (Civil Action No. 3:17-cv-02366-BAS-KSC)

---

**SUPPLEMENTAL BRIEF IN RESPONSE TO COURT ORDER**

---

BRIAN M. BOYNTON
Principal Deputy Assistant
Attorney General

WILLIAM C. PEACHEY
Director

EREZ REUVENI
Counsel

SAMUEL P. GO
Assistant Director

KATHERINE J. SHINNERS
ALEXANDER J. HALASKA
Senior Litigation Counsel
U.S. Department of Justice
Civil Division
Office of Immigration Litigation -
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 598-8259 | Fax: (202) 305-7000
Email: katherine.j.shinners@usdoj.gov

*Counsel for the Government*

# <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ..................................................................... ii

INTRODUCTION ...................................................................................... 1

BACKGROUND ......................................................................................... 6

ARGUMENT ............................................................................................. 10

    I.    Questions 1 and 2: To Assess Whether Agency Action Has Been Withheld versus Delayed, Courts Should Look to the Scope of the Underlying Statutory Obligation and the Manner in Which the Agency Is Discharging That Obligation. ............................................... 10

    II.   Question 3: Any Delays in Inspection and Referral Cannot Be Determined to Be Unreasonable as to the Class Under the *TRAC* Factors ......................................................................................................... 20

    III. Question 4: In All Events, This Court Should Not In The First Instance Make Factual Findings Based On A Contested Record Where The Government Lacked a Full Opportunity to Litigate and Appeal Issues Related to an Unreasonable-Delay Claim. .................... 37

CONCLUSION ........................................................................................... 43

CERTIFICATE OF SERVICE ................................................................. 45

CERTIFICATE OF COMPLIANCE ......................................................... 46

## TABLE OF AUTHORITIES

### Cases

*Al Otro Lado v. Mayorkas, No.*
17-cv-2366, 2021 WL 3931890 (S.D. Cal. Sept. 2, 2021) ............................... 14

*Almeida-Sanchez v. United States,*
413 U.S. 266 (1973) ...................................................................... 30

*B.K. v. Snyder,*
922 F.3d 957 (9th Cir. 2019) .......................................................... 41

*Brown v. Duringer L. Grp. PLC,*
86 F.4th 1251 (9th Cir. 2023) ......................................................... 40

*City of Chicago v. Morales,*
527 U.S. 41 (1999) ....................................................................... 15

*Coal. on Homelessness v. City & Cnty. of San Francisco,*
--- F.4th ---, 2024 WL 119672 (9th Cir. Jan. 11, 2024) ................................... 39

*Ctr. for Sci. in the Pub. Int. v. United States Food & Drug Admin.,*
74 F. Supp. 3d 295 (D.D.C. 2014) ..................................................... 21

*Cutler v. Hayes,*
818 F.2d 879 (D.C. Cir. 1987) ....................................... 18, 31, 33, 34

*Forest Guardians v. Babbitt,*
174 F.3d 1178 (10th Cir. 1999) ........................................... 10, 11, 12

*Heckler v. Chaney,*
470 U.S. 821 (1985) ..................................................................... 31

*In re A Community Voice,*
878 F.3d 779 (9th Cir. 2017) ................................................ 3, 13, 37

*In re Natural Resources Defense Council,*
956 F.3d 1134 (9th Cir. 2020) .......................................... 16, 21

*Independent Mining Co. v. Babbitt,*
105 F.3d 502 (9th Cir. 1997) ........................................................... 21

*Lujan v. Defenders of Wildlife,*
497 U.S. 871 (1990) ..................................................................... 42

*Mashpee Wampanoag Tribal Council, Inc v. Norton,*
    336 F.3d 1094 (D.C. Cir. 2003) ................................................................. 25, 26

*Massachusetts v. E.P.A.,*
    549 U.S. 497 (2007) .......................................................................... 31

*Monk v. Wilkie,*
    30 Vet. App. 167 (Ct. Vet. App. 2018) ........................................................ 18

*Norton v. S. Utah Wilderness All.,*
    542 U.S. 55 (2004) ...................................................................... 10, 37

*Organization for Competitive Markets v. USDA,*
    912 F.3d 455 (8th Cir. 2018) .............................................................. 12

*Poursohi v. Blinken,*
    2021 WL 5331446 (N.D. Cal. Nov. 16, 2021) ........................................ 26, 28

*Reno v. Am.-Arab Anti-Discrimination Comm.,*
    525 U.S. 471 (1999) ...................................................................... 15

*San Francisco BayKeeper v. Whitman,*
    297 F.3d 877 (9th Cir. 2002) ............................................................. 3

*Schneider v. Cnty. of San Diego,*
    28 F.3d 89 (9th Cir. 1994) ................................................................ 38

*Coleman v. Schwarzenegger*
    922 F. Supp. 2d 882 (N.D. Cal. 2009) .................................................. 35

*Sierra Club v. Gorsuch,*
    715 F.2d 653 (D.C. Cir. 1983) ........................................................... 13

*Sierra Club v. Thomas,*
    828 F.2d 783 (D.C. Cir. 1987) ........................................................... 16

*Sierra Club v. Whitman,*
    268 F.3d 898 (9th Cir. 2001) ............................................................ 15

*Singleton v. Wulff,*
    428 U.S. 106 (1976) ...................................................................... 38

*Steam Press Holdings, Inc. v. Hawaii Teamsters, Allied Workers Union, Local 996,*
    302 F.3d 998 (9th Cir. 2002) ............................................................. 38

*Steel Co. v. Citizens for a Better Env't,*
523 U.S. 83 (1998) ........................................................................ 38

*Tekmen v. Reliance Standard Life Insurance Co.,*
55 F.4th 951 (4th Cir. 2022) ........................................................ 39

*Telecommunications Research & Action Center v. FCC (TRAC),*
750 F.2d 70–80 (D.C. Cir. 1984) ......................................... 1, 11, 41

*Town of Castle Rock, Colo. v. Gonzales,*
545 U.S. 748 (2005) ................................................................ 15, 31

*TransUnion LLC v. Ramirez,*
594 U.S. 413 (2021) ...................................................................... 42

*United Cook Inlet Drift Ass'n v. Nat'l Marine Fisheries Serv.,*
837 F.3d 1055 (9th Cir. 2016) ....................................................... 15

*United States v. Texas,*
599 U.S. 670 (2023) ...................................................................... 15

*Vaz v. Neal,*
33 F.4th 1131 (9th Cir. 2022) ............................................ 13, 14, 30

*Winter v. NRDC,*
555 U.S. 7 (2008) .......................................................................... 12

## Statutes

5 U.S.C. § 555 ..................................................................... 10, 13
5 U.S.C. § 706 ........................................... 1, 2, 6, 7, 8, 9, 10, 13, 41
6 U.S.C. §§ 111 ............................................................................ 31
8 U.S.C. § 1103 (5) ...................................................................... 31
8 U.S.C. § 1158 ........................................................... 2, 3, 8, 9, 14, 37
8 U.S.C. § 1225 ................................... 1, 2, 3, 4, 9, 11, 14, 15, 30, 37, 42
8 U.S.C. § 1252 ............................................................................ 41

## Regulations

8 C.F.R. § 235.3 ........................................................................... 14

iv

**<u>Rules</u>**

Federal Rule of Civil Procedure 23 .................................................... 5, 6, 7, 18, 41

# **INTRODUCTION**

After oral argument, this Court directed the parties to submit supplemental briefs addressing four questions:

1. What standard should courts use to decide whether to analyze agency conduct as withholding versus delay under 5 U.S.C. § 706(1)?

2. Was the Government's metering policy withholding or delay under that standard?

3. If the Government's metering policy was a delay, was the delay reasonable under the factors announced in *Telecommunications Research & Action Center v. FCC*, 750 F.2d 70, 79–80 (D.C. Cir. 1984) (*TRAC*)?

4. Is there any procedural or other reason that this court should not decide the second or third questions in the present appeal?

Order 2 (Dkt. 94). The government submits this supplemental brief in response.

The primary question presented in the government's appeal is whether the Immigration and Nationality Act (INA) requires immigration officers to inspect a noncitizen for admissibility to the United States before the noncitizen is physically in U.S. territory, and whether a noncitizen in Mexico may seek asylum in the United States before they are in U.S. territory. Under the plain language of the statutes and various canons of statutory construction, the answer is no. The law requires immigration officers to inspect a noncitizen who is "present in the United States . . . or who arrives in the United States," 8 U.S.C. §§ 1225(a)(1), (3), and it permits a noncitizen "who is physically present in the United States or who arrives in the

1

United States" to apply for asylum, *id.* § 1158(a)(1). Those statutes apply to someone *in* the United States, not someone in Mexico. *See* Opening Br. (Dkt. 12) 27–38.

The district court incorrectly ruled otherwise. It held that an immigration officer's obligation under Section 1225(a) to inspect a noncitizen who "arrives in the United States," and a noncitizen's ability under Section 1158(a)(1) to apply for asylum when he "arrives in the United States," actually apply to noncitizens who are "in the process of arriving" in the United States from Mexico. 1-ER-254, 1-ER-261–264. In other words, it held that the statutes apply to noncitizens "who are not physically in the United States." 1-ER-253–254 n.10. Based on that reasoning, the lower court denied the government's motion to dismiss the complaint, 1-ER-218–301; granted summary judgment to a broad class of noncitizens under the Administrative Procedure Act (APA), 5 U.S.C. § 706(1), 1-ER-84–128; issued a declaratory judgment memorializing in perpetuity its interpretations of Sections 1158 and 1225 as to all two dozen Class A ports of entry (POEs) along the U.S.-Mexico border, 1-ER-3; and entered permanent injunctive relief that, in its ongoing operative effect, requires the Department of Homeland Security (DHS) and immigration judges within the non-party Executive Office for Immigration Review (EOIR) to review and reopen or reconsider certain class members' final orders of removal and expedited removal,

2

depending on the date they might have entered the United States had they not been metered at the border, 1-ER-4–5.

The district court's erroneous interpretation of Sections 1158 and 1225 is the foundation upon which this expansive class action is built. This Court should not hesitate to reach the issues of statutory interpretation that are presented and ripe for decision. Moreover, it is necessary to decide the antecedent question of whether a duty is owed in the first instance—that is, whether the district court erroneously read the statute to apply in Mexico—before determining whether that duty has been withheld or delayed. *See, e.g.*, *In re A Community Voice*, 878 F.3d 779, 784 (9th Cir. 2017) ("[A]n agency cannot unreasonably delay that which it is not required to do, so the first step before applying the *TRAC* factors is *necessarily* to determine whether the agency is required to act.") (emphasis added); *San Francisco BayKeeper v. Whitman*, 297 F.3d 877, 886 (9th Cir. 2002) ("EPA does not presently have a statutory duty to act. Therefore, there can be no unreasonable delay in this case.").

Nevertheless, even if the Court were to determine that Sections 1158 and 1225 apply to noncitizens in Mexico, the district court still erred in holding that U.S. Customs and Border Protection (CBP) officers unlawfully withheld their obligations to inspect noncitizens for admissibility to the United States as to the entire class. To assess whether CBP's conduct should be viewed as a withholding of agency action

3

versus a delay, the Court should look to whether the underlying statute imposes any mandatory or precatory timing obligations and to the manner in which CBP continued to discharge its substantive obligations during the relevant period. The underlying provisions of the INA do not impose any mandatory or precatory timeline on CBP officers to discharge their obligations to "inspect[]" applicants for admission, 8 U.S.C. § 1225(a)(3), or to "refer" certain noncitizens "for an interview by an asylum officer," *id.* § 1225(b)(1)(A)(ii). And as a factual matter, the undisputed material evidence demonstrates that CBP continued to inspect noncitizens at POEs along the U.S.-Mexico border at the same time it was implementing metering procedures, and that it continued referring growing numbers of those noncitizens for credible fear interviews under the statute. *See* 2-ER-401, 2-ER-423–424. Because the law does not impose a specific timeline for CBP to discharge its inspection obligations and confers broad authority to control the borders and POEs, and because CBP *in fact* continued to discharge those obligations toward the class, the district court had no basis to conclude that metering amounts to a classwide withholding of CBP's statutory obligations. At most, CBP delayed discharging inspection obligations.

But in all events, the Court need not and should not reach the question of whether these delays were reasonable under the *TRAC*-factor analysis. There can be no actionable delay if there is no mandatory ministerial obligation to begin with, and

4

the statutes here impose no such obligation toward noncitizens in Mexico. But even if the Court were to determine that the relevant statutory procedures extend to noncitizens who have not yet crossed the border into the United States, Plaintiffs have forfeited the issue for purposes of appeal because they did not properly advance that theory on summary judgment.

Further, given the factual realities of managing the POEs, the Court cannot determine that CBP's delays in inspection were *categorically* unreasonable "on grounds that apply generally to the class" such that the district court's "final injunctive relief or corresponding declaratory relief [was] appropriate" with respect to the entire class. Fed. R. Civ. P. 23(b)(2). There can be no commonality across the class on this theory, because there were varied wait times for inspection under different iterations of metering guidance at 25 different POEs with varying capacity over the course of a three-year-plus period. The current judgment and classwide relief certainly cannot be supported on unreasonable-delay grounds and must be vacated.

Moreover, the Court should decline to decide the intensely factual issues concerning the reasonableness of inspection wait times in the first instance, where the unreasonable-delay theory was not properly raised on summary judgment and was never addressed by the district court. Thus, at a minimum, the Court would need to

remand to the district court to consider this issue, including whether the case can continue as a class action based on a theory of delay.

## BACKGROUND

The district court concluded on summary judgment that CBP, through metering and queue management practices, had engaged in "turnbacks," which it determined constituted a "withholding of agency action" under the APA, 5 U.S.C. § 706(1). 1-ER-96–117.

In their operative complaint, Plaintiffs asserted a claim under § 706(1), which permits courts to "compel agency action unlawfully withheld or unreasonably delayed." 4-ER-912–916. Plaintiffs alleged that the government (Defendants CBP and DHS) "fail[ed] to act, and/or to act within a reasonable time" to fulfill statutory and regulatory inspection and processing duties toward Plaintiffs and the proposed class, which "denied and/or unreasonably delayed Class Plaintiffs' access to the statutorily prescribed asylum process." 4-ER-913–914.

In ruling on class certification, the district court premised its finding of commonality under Federal Rule of Civil Procedure 23(a)(2) on a theory of "withholding of agency action." 1-ER-172–175. It found the factual practices alleged had sufficient common factual underpinnings, and thus the question that remained for it to "resolve on the merits is whether [metering] practices constitute 'agency actions

6

unlawfully withheld'—namely, a refusal to inspect or process asylum-seekers." 1-ER-174. The district court determined that this question was "sufficient" to satisfy Rule 23's commonality requirement. *Id.* It never addressed whether this requirement was met with respect to a theory of unreasonable delay, *see id.*, and Plaintiffs had argued that a *TRAC* analysis was not relevant to class certification because "*TRAC* applies to claims of agency delay, not outright denial," Dist. Ct. Dkt. 413 at 5. The district court also determined that the purported "refusal to process asylum-seekers" constituted a "generally applicable ground for class-wide relief" for purposes of Rule 23(b)(2). 1-ER-180. The district court certified a class of "all noncitizens who seek or will seek to access the U.S. asylum process by presenting themselves at a Class A POE on the U.S.-Mexico border, and were or will be denied access to the U.S. asylum process by or at the instruction of CBP officials on or after January 1, 2016," and a subclass of the same individuals who were "denied access . . . as a result of Defendants' metering policy." 1-ER-181

After class certification, Plaintiffs moved for summary judgment on their § 706(1) claim, arguing only that they were entitled to summary judgment on the theory that "turnbacks" of class members "amount[] to the unlawful withholding of mandatory agency action" of inspection and referral, and that the government's so-called "turnback policy" is unlawful because it directs this withholding. FER-185;

7

*see generally* FER-182–195. Plaintiffs did not seek summary judgment on this claim on an unreasonable-delay theory. Their brief did not argue that inspections were unreasonably delayed due to "turnbacks" and did not cite to or analyze the *TRAC* factors. *See generally id.*

The government opposed Plaintiffs' motion and cross-moved for summary judgment on Plaintiffs' § 706(1) claim, asserting that CBP did not have a policy directing the withholding of agency action. The government asserted that "at most, agency action is delayed, and Plaintiffs make no attempt to argue that these delays are unreasonable," and that it was entitled to summary judgment on the § 706(1) claim. 2-ER-475. In their opposition to the government's cross-motion, Plaintiffs did not argue against a grant of summary judgment for the government on the basis of unreasonable delay. *See* FER-43–67. Instead, they argued for the first time in their separate reply in support of their motion—to which the government had no opportunity to respond under the briefing schedule—that there was unreasonable delay under *TRAC*. *See* FER-20–25.

The district court granted summary judgment for Plaintiffs on their § 706(1) claim, determining that by metering, CBP unlawfully withheld discharging its purported mandatory obligations to class members under 8 U.S.C. §§ 1158(a) and 1225. *See* 1-ER-96–117. Relying on its motion-to-dismiss order, the court concluded that

8

"the plain language" of Sections 1158(a) and 1225 "applies to migrants who are 'in the process of arriving,' which includes 'aliens who have not yet come into the United States, but who are attempting to do so' and may still be physically outside the international boundary line at a POE." 1-ER-102 (quoting 1-ER-264). The court employed a *Chevron* analysis that was not argued by either party to conclude that CBP's statutory obligations to inspect and refer noncitizens "attach when asylum seekers arrive at a POE the first time," and metering thus constituted an unlawful failure under 5 U.S.C. § 706(1) to discharge the mandatory obligations imposed by § 1225 (rather than a delay in discharging those obligations) because it required class members to "make return trips" to the POEs "to access the [asylum] process." *See* 1-ER-109–117. The court did not address whether the record alternatively supported a finding of unreasonable delay. 1-ER-117. It noted that Plaintiffs did not "expressly raise this argument but address this issue for the first time in reply to Defendants' characterization of metering as a delayed agency action." 1-ER-109. The district court concluded that neither party had moved for summary judgment on that aspect of Plaintiffs' § 706(1) claim. 1-ER-109.

9

**ARGUMENT**

**I.**   **Questions 1 and 2: To Assess Whether Agency Action Has Been Withheld versus Delayed, Courts Should Look to the Scope of the Underlying Statutory Obligation and the Manner in Which the Agency Is Discharging That Obligation.**

The Court should not reach the question of whether agency action has been withheld versus delayed without reaching the statutory interpretation issue, because "the only agency action that can be compelled under the APA is action legally *required*." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63 (2004). It is thus necessary to decide the antecedent question of whether a duty is owed before determining whether that duty has been either withheld or delayed. But if the Court determines that CBP owes mandatory ministerial obligations toward class members in Mexico, the district court was incorrect to determine that CBP withheld, versus delayed, mandatory action.

The APA permits courts to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). It also requires administrative agencies "to conclude a matter presented to it" "within a reasonable time." *Id.* § 555(b). Although courts historically "have given little attention to the distinction between agency action unlawfully withheld and agency action unreasonably delayed," *Forest Guardians v. Babbitt*, 174 F.3d 1178, 1189 (10th Cir. 1999), the distinction is important in

10

this case because CBP did not stop inspecting and processing class members. Even assuming Section 1225 imposes mandatory obligations on immigration officers toward noncitizens in Mexico, the statute sets no timetable for when CBP must finish complying with those obligations, and CBP continued to discharge those obligations on a classwide basis by continuing to inspect those noncitizens for admissibility and, as appropriate, refer them for credible fear interviews.

Although courts have developed case law to determine whether an agency's delays are unreasonable, *e.g.*, *TRAC*, 750 F.2d at 80, the decisions of this Court do not indicate how to decide in the first instance whether agency action has been withheld versus delayed, *see Forest Guardians*, 174 F.3d at 1189–90 & n.15. In light of that lack of controlling authority, this Court should look to two primary factors to decide whether agency action has been withheld versus delayed: (1) whether Congress imposed a mandatory or precatory deadline in the organic statute a plaintiff seeks to enforce; and (2) whether the agency has wholly abandoned its statutory obligations or instead is continuing to discharge its obligations. Other factors may also be relevant, but these primary factors make good practical sense and incorporate the background principles identified by this Court and other courts in conducting their *TRAC* analyses.

11

First, the Court should look to whether the underlying statute a plaintiff seeks to enforce imposes any mandatory or precatory deadlines for compliance. As the Tenth Circuit has reasoned:

> [I]f an agency has no concrete deadline establishing a date by which it must act, and instead is governed only by general timing provisions—such as the APA's general admonition that agencies conclude matters presented to them "within a reasonable time," *see* 5 U.S.C. § 555(b)—a court must compel only action that is delayed unreasonably. Conversely, when an entity governed by the APA fails to comply with a statutorily imposed absolute deadline, it has unlawfully withheld agency action . . . .

*Id.* "[T]he distinction between agency action 'unlawfully withheld' and 'unreasonably delayed' turns on whether Congress imposed a date-certain deadline on agency action." *Id.* "[W]hen an agency is required to act—either by organic statute or by the APA—within an expeditious, prompt, or reasonable time, § 706 leaves in the courts the discretion to decide whether agency delay is unreasonable." *Id.*[1]

---

[1] Although the existence of a statutory deadline is useful in deciding whether agency action has been withheld versus delayed, the government does not advocate the "categorical[]" approach the Tenth Circuit appears to have adopted. *See Organization for Competitive Markets v. USDA*, 912 F.3d 455, 462 (8th Cir. 2018). Even when a statute imposes a deadline, the injunctive remedy afforded by the APA is still governed by equitable standards and thus is not mandatory in every case. *See, e.g.*, *Winter v. NRDC*, 555 U.S. 7, 24 (2008) (An "injunction is an extraordinary remedy never awarded as of right."); *Organization for Competitive Markets*, 912 F.3d at 463 (declining to compel the promulgation of final regulations even in the face of a statutory deadline because "[t]his is not a case where an agency has failed to take action in the face of multiple unambiguous commands").

Thus, mandatory agency action generally cannot be considered to have been "unlawfully withheld" unless there is an expired statutory deadline. Without that, the proper inquiry is whether there has been unreasonable delay as assessed under the *TRAC* factors. This is a "straight forward common sense reading" of Section 706(1) that gives effect to both of its phrases. *Id.* at 1190. It is also consistent with this Court's case law. This Court has recognized that, when the timing of agency action is governed by Section 555(b) rather than the underlying statute, the agency's obligation is "to fully respond to matters that are presented to it under its internal processes." *In re A Community Voice*, 878 F.3d at 784 (emphasis added). "Absent a precise statutory timetable," such internal processes are "entitled to considerable deference." *Sierra Club v. Gorsuch*, 715 F.2d 653, 658 (D.C. Cir. 1983). Courts retain the ability to decide under the *TRAC* factors whether the agency's pace is reasonable. *See In re A Community Voice*, 878 F.3d at 786–88 (applying *TRAC*).

This Court applied that approach in *Vaz v. Neal*, 33 F.4th 1131 (9th Cir. 2022). There, a noncitizen sought to compel EOIR to comply with a regulation stating that, "[u]pon receipt of a disciplinary complaint" against an attorney, "the EOIR disciplinary counsel will initiate a preliminary inquiry." *Vaz v. Neal*, 33 F.4th 1131, 1136 (9th Cir. 2022) (citing 8 C.F.R. § 1003.104(b)). The regulation did not include any deadline by which EOIR must act. This Court concluded based on the regulation that

"EOIR has a clear, mandatory duty to investigate Vaz's complaint *within a reasonable time*," *id.* at 1137 (emphasis added), and the Court thus considered whether EOIR was unreasonably delaying agency action under the *TRAC* factors, *id.* at 1137–38.

So too here. Section 1225 does not impose any timetable for inspecting a noncitizen for admissibility or referring them for a credible fear interview. The statute merely imposes the antecedent criteria for such obligations to attach. Specifically, inspection is required as to an "applicant for admission," 8 U.S.C. § 1225(a)(3), which is defined as a noncitizen who is "present in the United States . . . or who arrives in the United States," *id.* § 1225(a)(1). And if the noncitizen is processed for expedited removal, referral for a credible fear interview is required after an "immigration officer determines that an alien . . . who is arriving in the United States . . . is inadmissible under" 8 U.S.C. §§ 1182(a)(6)(C) or 1182(a)(7), "and the alien indicates either an intention to apply for asylum under" 8 U.S.C. § 1158 "or a fear of persecution." *Id.* § 1225(b)(1)(A)(ii). As the district court recognized, "[t]here is no temporal element to [Section 1225], i.e., how much time can elapse between arrival [at the border] and inspection or inspection and referral." *Al Otro Lado v. Mayorkas*, No. 17-cv-2366, 2021 WL 3931890, at *15 n.13 (S.D. Cal. Sept. 2, 2021). The lack of any temporal element weighs in favor of concluding that

14

CBP at most delayed, rather than withheld, discharging any obligations it owed to class members.[2]

Second, the Court should look to what the agency is actually doing with regard to its statutory obligations. Even if the underlying statute does not impose a deadline, an agency that has renounced or wholly abandoned any attempt to comply with a statute might be viewed as withholding it obligations. But the same cannot be said for an agency that is complying or attempting to comply with its obligations. An agency in that position is not "refrain[ing] from granting [or] giving" an obligation it owes. *See Withhold*, Webster's New International Dictionary of the English Language, unabridged (2d ed. 1947) ("to desist or refrain from granting, giving,

---

[2] Plaintiffs may argue that the word "shall" in Sections 1225(a)(3) and (b)(1)(A)(ii) imposes a requirement to promptly perform the task. But even assuming the word "shall" makes the task mandatory, it does not itself denote a time frame, and the statute contains no accompanying language indicating when the task must be started or completed. *United Cook Inlet Drift Ass'n v. Nat'l Marine Fisheries Serv.*, 837 F.3d 1055, 1062 (9th Cir. 2016) ("We ordinarily resist reading words or elements into a statute that do not appear on its face."). Further, the word "shall" must be read in the context of the discretion necessarily afforded to CBP to manage POEs at the nation's borders. "[W]hen used in a statute that prospectively affects government action, 'shall' is sometimes the equivalent of 'may.'" *Sierra Club v. Whitman*, 268 F.3d 898, 904 (9th Cir. 2001). The Supreme Court has made clear that even seemingly mandatory duties give way to discretion in the law-enforcement context, including immigration enforcement. *United States v. Texas*, 599 U.S. 670, 682 (2023); *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 761 (2005); *City of Chicago v. Morales*, 527 U.S. 41, 62 n.32 (1999); *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483 (1999).

15

allowing, or the like"); *Withhold*, Merriam-Webster's Dictionary, https://www.merriam-webster.com/dictionary/withhold (last accessed Dec. 26, 2023). Rather, it is merely delaying compliance, or acting perhaps more slowly than the plaintiff desires. *See, e.g.*, *Sierra Club v. Thomas*, 828 F.2d 783, 794 (D.C. Cir. 1987) ("Unlike claims alleging agency recalcitrance in the face of a 'clear statutory duty,' the petitioner alleging 'unreasonable delay' does not contend that agency inaction violates a clear duty to take a particular action by a date certain."). Such delays are the quintessential types of claims reviewed under the *TRAC* framework. *See, e.g.*, *In re Natural Resources Defense Council*, 956 F.3d 1134, 1140 (9th Cir. 2020) (using *TRAC* factors to determine whether delay was reasonable where agency had taken some steps toward completing action, even where progress was minimal).

In this case, DHS and CBP consistently stated that metering was not a refusal to inspect noncitizens at POEs along the U.S.-Mexico border, but rather was a practice of regulating the pace of entry so as to promote secure and safe conditions in the POEs and to prioritize CBP's resources at the POEs. *See, e.g.*, 2-ER-516 (April 2018 memorandum from the head of CBP's Office of Field Operations stating that POEs may "create lines based on legitimate operational needs, such as lines for those with appropriate travel documents and those without such documents," and that POEs "should inform the waiting travelers that . . . CBP is permitting travelers to enter the

16

port once there is sufficient space and resources to process them"); 2-ER-518–520 (June 2018 memorandum from the Secretary of Homeland Security establishing a resource prioritization scheme at POEs while also committing that "processing persons without documents required by law for admission . . . remains a component of CBP's mission"); 2-ER-526–531 (November 2019 memorandum from the Acting CBP Commissioner stating same). These facts show that CBP did not intend to abandon any obligations to inspect undocumented noncitizens at the border.

The undisputed material facts also show that CBP *in fact* continued to inspect undocumented noncitizens at the southwest border POEs and refer them for credible fear interviews as appropriate. For example, in Fiscal Year 2017, CBP inspected 111,275 inadmissible noncitizens at POEs along the U.S.-Mexico border and referred 17,284 of them for credible fear interviews. 2-ER-523. In Fiscal Year 2018, those numbers increased to 124,876 inspections and 38,399 credible fear referrals. 2-ER-532. In Fiscal Year 2019, those numbers increased again to 126,001 inspections and 80,055 credible fear referrals. 2-ER-523. These figures—which the district court never addressed—plainly show that CBP was not refusing to comply with its obligations. It was in fact discharging its obligations. Plaintiffs may take issue with classwide or individual delays, but that is not the same as withholding agency action on a classwide basis, and that is not the theory under which the Court certified a class

17

nor the claim that Plaintiffs advanced on summary judgment. Plaintiffs may also take issue with individual instances of alleged refusals to process, but that is not conduct that applies to the entire class. *See* Fed. R. Civ. P. 23(b)(2). Instead, that represents individual claims rather than a classwide or programmatic claim, which may be subject to particular jurisdictional defenses. To examine whether delays of inspection and referral are reasonable, the district court would have had to consider the government's justifications for delay in each individual case. *See, e.g.*, *Cutler v. Hayes*, 818 F.2d 879, 898 (D.C. Cir. 1987) ("The agency must justify its delay to the court's satisfaction."); *Monk v. Wilkie*, 30 Vet. App. 167, 178 (Ct. Vet. App. 2018) ("Because reasonableness and unreasonableness are relative concepts, it is impossible to determine whether VA's delay in adjudicating disability compensation claims falls into either category without exploring the reasons for the delay."), *aff'd*, 978 F.3d 1273 (Fed. Cir. 2020).

The district court was thus wrong to determine that CBP *withheld* agency action. The district court acknowledged the lack of *any* "temporal element" to the inspection and referral requirements, *see* 1-ER-111–112 n.13, but nonetheless determined that metering withheld inspection and referral. The district court conclusorily determined that because a duty attaches when a noncitizen approaches a POE, CBP withholds this duty as to class members if the class member has to come back to the

18

POE to be inspected—even though it was undisputed that CBP continued to inspect and process these class members. The district court's analysis is not grounded in the language of § 706(1) or any reasoned distinction between withholding and delay of agency action. Its analysis ignores that, even if CBP had a statutory duty to inspect and refer, it did not have a statutory duty to inspect and refer in a particular time frame or manner, so it could not have withheld that duty, particularly because it continued to inspect and refer class members. Indeed, the district court's analysis appears to import into § 1225 a different duty that is nowhere mentioned in the statutory text: a duty to allow individuals to promptly *cross the border* so they can be inspected and referred.[3]

Thus, even if this Court were to determine that CBP owes inspection and referral duties to noncitizens in Mexico, the district court's conclusion that CBP's actions *withheld* such duties (rather than, at most, delayed them) was incorrect and should be reversed.

---

[3] This underscores that the district court's interpretation of the statute to impose duties toward those who are still in Mexico is erroneous.

II.  **Question 3: Any Delays in Inspection and Referral Cannot Be Determined to Be Unreasonable as to the Class Under the *TRAC* Factors.**

If this Court agrees with the district court that the statutory inspection and referral duties extend to noncitizens in Mexico but determines that the district court erred in determining that metering *withheld* agency action, the Court should not go on to assess whether delays of agency action were unreasonable, including because Plaintiffs forfeited this argument for purposes of this appeal. *See* Third Br. (Dkt. 62) 25–26; *infra* § III. Regardless, due to the nature of metering's implementation, unreasonable delay cannot be assessed on a classwide basis. Varying delays at *different* POEs on *different* days or even months over a three-plus year time period, under different iterations of metering guidance, cannot justify the one-size-fits-all classwide injunctive and declaratory relief the district court issued. Thus—although any delays as a result of metering were generally reasonable in light of CBP's need to effectively and safely manage ports of entry to the United States while balancing multiple statutory missions—the unreasonable-delay theory cannot support the district court's grant of classwide summary judgment and accompanying relief, and the Court must reverse the district court's decision.

This Court looks to the "so-called *TRAC* factors in assessing whether relief" for delay under § 706(1) is appropriate:

20

(1) the time agencies take to make decisions must be governed by a "rule of reason"; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by the delay; and (6) the court need not "find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed."

*Independent Mining Co. v. Babbitt*, 105 F.3d 502, 507 & n.7 (9th Cir. 1997)

(quoting *TRAC*, 750 F.2d at 79–80).

***Rule of Reason.*** Under the first and "most important" *TRAC* factor, courts "consider whether the time for agency action has been reasonable," *see In re Natural Resources Defense Council*, 956 F.3d at 1139, taking into account the agency's rationale for its response time, *see Ctr. for Sci. in the Pub. Int. v. United States Food & Drug Admin.*, 74 F. Supp. 3d 295, 300 (D.D.C. 2014). Here, the length of and justifications for wait times for those who were subject to metering necessarily varied over time, by POE, and individually, which means wait times cannot be determined to be unreasonable on a classwide basis in this case.

However, the overarching justifications for adopting metering practices were sensible and amply supported by CBP's experience in 2016, when overwhelming

21

numbers of migrants seeking to enter at POEs severely strained ports' resources and created potentially unsafe and unsanitary conditions. Opening Br. 8–11. That year, at the San Ysidro POE in San Diego, *see* 2-ER-578; 3-ER-756, migrants were arriving at the port "in the hundreds," and CBP officials had "exhausted every effort" to "expand any additional processing and detention capacity" to accommodate this influx. 3-ER-751. These efforts—including converting numerous administrative spaces into temporary holding rooms, increasing staffing, and reassigning staff from other missions or tasks, *see, e.g.*, 2-ER-328–336—proved insufficient to address the number of undocumented noncitizens seeking to enter the United States through the port. 3-ER-750–51. The number of individuals in custody at the POE eventually surpassed 1,000, and CBP officers at San Ysidro were compelled to "stop intake at the international boundary" because there "was no space" left and they needed to bring in everyone from the queue "to make sure they were not left in the elements." 3-ER-751–752; 2-ER-565; 2-ER-511–512; *see also* 2-SER-267. On a single day, "at least 950" migrants arrived in Tijuana to seek admission. 3-ER-719; 3-ER-765–766. Eventually, the Government of Mexico "set[] up shelters in Tijuana" for people waiting to seek admission to the United States, rather than allow them to wait unsheltered in "a line staged on the Mexican side" of the border. 3-ER-712.

22

This increase in undocumented noncitizens seeking admission to the United States continued into the fall of 2016 and began spreading east, *see* 3-ER-702–708, such that other POEs besides San Ysidro began to experience severe overcrowding, case-processing delays, and related adverse impacts to their operations. *See* Opening Br. 10–11 (citing, *inter alia*, 2- ER-584; 2-ER-586; 2-ER-589–592; 2-ER-594–595; 2-ER-597; 3-ER-732 (numbers in custody at San Luis POE were "unsafe" and "unhealthy"); 2-ER-599; 3-ER-603 (two POEs had "far exceeded capacity" and were "in desperate need of relief")). By mid-October 2016, the southwest-border field offices had either met or far exceeded their detention capacities. *See* Opening Br. 10–11; 3-ER-609. It was against this backdrop that CBP more broadly authorized metering practices to allow its ports to lessen the strain of unprecedented levels of migration on operations and mitigate associated humanitarian concerns. Opening Br. 11 (citing 3-ER-623–627; 3-ER-758; 3-ER-647–48; 2-ER-344–73); 4-SER-842 (email from then-Deputy CBP Commissioner: "I just want our folks to have an additional tool to keep conditions safe and working at our POEs."); 2-ER-371. In 2017, the numbers of undocumented noncitizens seeking entry abated, and POEs generally ceased metering. *E.g.*, Dist. Ct. Dkt. 772-9 (originally filed at Dist. Ct. Dkt. 535-104) at 86:15–19 (El Paso POE engaged in metering in November 2016, ceased

23

metering in December 2016, and did not meter again until May 2018); Dist. Ct. Dkt. 535-22 ¶ 41 (noting that metering had ceased in Nogales in December 2016).

In 2018, as the numbers of undocumented noncitizens crossing the southwest border at POEs again began to rise, ports began to report "impacts to frontline functions" from the "increase in detainees." 3-ER-674; *see also* 3-ER-696–697; 3-ER-653; 3-ER-659; 3-ER-665; 3-ER-671; 3-ER-676; 3-ER-678; 3-ER-773–774. In April 2018, CBP issued its "Metering Guidance" memorandum that authorized ports to engage in metering to control the flow of intake "when necessary or appropriate to facilitate orderly processing and maintain the security of the port and safe and sanitary conditions for the traveling public." 2-ER-516. And in June 2018, in recognition of rising encounters of undocumented noncitizens and CBP's resource constraints, DHS issued its Prioritization-Based Queue Management Guidance directing CBP to proactively prevent the diversion of necessary resources from other statutory missions by prioritizing staffing operations in order of national-security efforts, counter-narcotics operations, economic security, and trade and travel facilitation. *See* 2-ER-518–520; *see also* Opening Br. 11–14. CBP continued inspecting and processing undocumented noncitizens at POEs at the same or greater pace: the number of undocumented noncitizens processed by southwest-border POEs continued to trend upwards through Fiscal Year 2019, and the number of such noncitizens

24

referred for credible-fear interviews doubled. 2-ER-523. During the same time period, CBP was able to increase southwest-border narcotics seizure weights for fentanyl and methamphetamine by 58% and 19%, respectively, and the value of interdicted outbound currency increased by more than $2.4 million. 2-ER-527.

Thus, during the relevant time period, southwest-border port managers were authorized to use their discretion to control intake of undocumented noncitizens at the border to address the resource constraints, impact on other statutory missions, and humanitarian concerns posed when high numbers of undocumented noncitizens seek to enter at POEs. Resulting wait times for undocumented noncitizens to be inspected—which ranged over time and by POE—are generally reasonable in response to these constraints and concerns.

However, wait times cannot be determined to be unreasonable on a classwide basis in this case. In assessing the reasonableness of delay, courts must examine "the facts of [the] particular case" before them. *Mashpee Wampanoag Tribal Council, Inc v. Norton*, 336 F.3d 1094, 1101 (D.C. Cir. 2003). Such an inquiry necessarily involves an analysis of the particular time frame for action in each case—that is, here, the wait time for inspection for each member of the class. *See id.* The wait times at issue vary widely over time depending on a variety of factors unique to each particular POE along the southwest border, including the POE's conditions and

25

infrastructure as well as the numbers of undocumented noncitizens who were seeking to present at that particular POE. For example, a report submitted by Plaintiffs to the district court stated that, due to different "processing capacities" of different POEs and the varying number of individuals waiting near that POE, "wait times vary significantly." Dist. Ct. Dkt. 585-7 at 5–6. That same report indicated that in December 2018 the average wait time in El Paso (Ciudad Juarez) was one to two weeks, while the average wait time in San Ysidro (Tijuana)—where it reported 5,000 migrants were then waiting—was 12 weeks. *Id.* at 6. And in early 2020, there was little to no wait time for inspection at the El Paso POE. *See* Dist. Ct. Dkt. 772-9 at 86:19–87:12.

Under the "rule of reason" approach, the reasonableness of the delay will depend on the assessment of the length of the delay in connection with the reasons for the delay, including the constraints facing the agency. *See Mashpee Wampanoag Tribal Council*, 336 F.3d at 1102 (explaining that the rule of reason will depend upon "the complexity of the task at hand, the significance (and permanence) of the outcome, and the resources available to the agency"); *Poursohi v. Blinken*, 2021 WL 5331446, at *6 (N.D. Cal. Nov. 16, 2021) (addressing agency constraints and reasons for delay in determining whether delay is governed by a "rule of reason"). In this case, that is a necessarily individualized approach, as the reasonableness of the

26

varying wait times at each POE at any given time would have to be assessed against other highly variable factors such as the POE's actual holding capacity, the characteristics and demographics of those being held at the POE at any given time—including whether there were family units with children in custody and whether housed individuals were dangerous or have communicable illnesses—the POE's ability to transfer noncitizens to longer-term detention based on DHS's detention capacity at any given time, and its staffing and processing capacity. *See, e.g.*, Dist. Ct. Dkt. 563-59 ¶ 12 (assessing custody demographics on one day in 2019 at San Ysidro POE); Dist. Ct. Dkt. 563-60 ¶¶ 11-18 (detailing capacity factors). Thus, unlike in cases where the reasonableness of wait times can potentially be assessed as to a class—for example, where there is centralized application processing and standard wait times—an analysis of the varying delays in this case is dependent on POE- and time-period- specific justifications. To assess the reasonableness of the delay, the court would need to engage in a particularized assessment of each POE's decisions as to the intake of undocumented noncitizens, even on a day-by-day basis, over a period of three-plus years.

Plaintiffs acknowledge that wait times varied greatly among the class, but they argue that variations in wait times must mean there is no "rule of reason" or rationale for the wait times. Second Br. (Dkt. 23) 31. Yet Plaintiffs cannot dispute that the

government did articulate a rationale for managing intake based on capacity and maintenance of statutory missions. They dispute that rationale by arguing that wait times were not tied to the POEs' actual capacities, *id.*, but testing Plaintiffs' assertion requires a searching, individualized factual inquiry. At a minimum, the government disputes Plaintiffs' generalized assertions of "excess capacity" (Second Br. 11) over the relevant time period. *See, e.g.*, Dist. Ct. Dkt. 563-59; 563-60 ¶¶ 11-18.

Further, variations in wait times across a large class of individuals spanning all Class A POEs across the southwest border largely reflects the differences in the number of noncitizens waiting and the relative size of the port—not that wait times are arbitrary. Indeed, this variation demonstrates that Plaintiffs' delay claim can be assessed only by a highly particularized inquiry into individual wait times and the particular implementation of metering at particular ports. Plaintiffs argue, however, that CBP did not track wait times for noncitizens who sought to present at the border. Second Br. 31. But this does not mean that wait times were arbitrary as to the class. During times when CBP was engaged in metering, various different independent actors in Mexico developed and administered waitlists for particular ports in lieu of noncitizens waiting in line at the border. *See* 1-ER-44 n.10. Noncitizens began putting their names directly on waitlists rather than approaching CBP officers at the ports. *See, e.g.*, 1-ER-178 (discussing examples). CBP did not administer the

28

waitlists, but often coordinated with waitlist administrators as to the intake of noncitizens for inspection and processing. 1-ER-44 n.10. Plaintiffs may argue that CBP does not ensure that the operation of the wait lists is not arbitrary. But, even if that were relevant, that does not mean the wait times were unreasonable. Plaintiffs have not pointed to evidence that wait times were arbitrary across the class due to waitlists. No named Plaintiff claimed to have been subject to arbitrary waitlist administration, 4-ER-880–897, and even if there were longer-than-average wait times for particular noncitizens due to arbitrary treatment by waitlist administrators, this would be a different claim and would also not demonstrate arbitrary wait times across the entire class.

The "rule of reason" factor thus demonstrates that the reasonableness of wait times in this case cannot be determined on a class-wide basis over the three-plus years during which CBP intermittently or consistently implemented metering practices. CBP's actions were certainly governed by legitimate, rational reasons grounded in its past experience with overcrowding and its overall responsibility to promote national security, guard against illegal entries and contraband, and maintain safe and sanitary conditions for all travelers, including undocumented noncitizens. But the reasonableness of each wait time is highly individualized, and the evidence cannot demonstrate that this factor was met across the entire class.

29

***Congressional Timetable.*** As to the second TRAC factor, Congress has set forth no timetable or indication of expected timing for the inspection of any noncitizens seeking admission under § 1225(a)(3). *See Vaz*, 33 F. 4th at 1138 n.6. Plaintiffs nonetheless argue that the "statutory context" suggests that "any delay" of inspection is unreasonable. Second Br. 31–32. But they cite no statute indicating that management of POEs requires immediate or prompt inspection of noncitizens, regardless of whether or not those noncitizens possess documents facially sufficient for admission to the United States. The only statute Plaintiffs cite is 8 U.S.C. § 1225(b)(1)(A)(i)-(ii), which requires immigration officers to refer certain noncitizens who claim fear or express an intent to seek asylum for a credible-fear interview before removal to their home country. But this statute speaks to post-inspection referral in lieu of prompt removal from the United States; it does not give any indication of an expected timetable for the initial inspection to occur.

To the contrary, the statutory and historical context affords the Executive considerable discretion as to how to manage immigration inspection at POEs and thus this factor weighs in favor of declining to find unreasonable delay. The authority to control the flow of travel across the border is rooted in the government's "undoubted[]" constitutional power "to exclude aliens from the country." *Almeida-Sanchez v. United States*, 413 U.S. 266, 272 (1973); Opening Br. 43–44. Congress

30

has likewise vested both DHS and CBP with the broad authority to manage the U.S. POEs in a manner that balances competing priorities including combatting terrorism, managing and securing the safety of the borders, and ensuring orderly and efficient flow of lawful traffic and commerce. *See* 6 U.S.C. §§ 111(b)(1), 202, 211(c), (g)(3); 8 U.S.C. § 1103(a)(1), (3), (5). This statutory scheme necessarily affords CBP discretion to manage POEs as it deems appropriate in aid of balancing and fulfilling those multiple, competing statutory missions. *See Heckler v. Chaney,* 470 U.S. 821, 831–32 (1985) (decision is committed to agency discretion and is unreviewable when it "involves a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise," such as "the procedures it adopts for implementing [a] statute"). Generally, "an agency has broad discretion to choose how best to marshal its limited resources and personnel to carry out its delegated responsibilities." *Massachusetts v. E.P.A.*, 549 U.S. 497, 527 (2007); *see also Town of Castle Rock*, 545 U.S. at 761 (noting the "deep-rooted nature of law-enforcement discretion, even in the presence of seemingly mandatory legislative commands"). Accordingly, the second TRAC factor favors a determination that inspection wait times are a reasonable exercise of the agency's discretion to manage POEs. *Cutler*, 818 F.2d at 897 (courts may consider "the degree of discretion given the agency by Congress").

31

***Effect of Expediting Consideration on Competing Agency Priorities.*** Similarly, as to the fourth *TRAC* factor, a court order forcing the agency to abandon its discretion to manage the POEs and to inspect undocumented noncitizens on a particular time frame—particularly in times of high levels of migration—would result in a diversion of resources from competing agency priorities. *See, e.g*, 2-ER-502–503. In 2016, POEs trying to accommodate inspection of ever-increasing numbers of undocumented noncitizens had to divert resources from other missions, *see, e.g.*, 2-ER-336; 2-ER-347, obtain staffing from other ports and Border-Patrol sectors, *see, e.g.*, 2-ER-352–353, use already-overwhelmed Border-Patrol facilities, *see, e.g*, 2-ER-334; 2-ER-348–349, and convert office space to makeshift holding space, *see, e.g.*, 2-ER-334. Even so, POEs remained overcrowded. *See* 3-ER-751–752; 2-SER-267; 2-ER-511–512; 2-ER-337. In 2018, DHS recognized that CBP was facing staffing shortages and that devoting substantial resources toward inspection and processing of undocumented noncitizens can compromise other priority missions—such as counter-narcotics. 2-ER-518–20. Forcing CBP to adhere to particular timelines for inspection and referral will remove its discretion to manage POEs and unduly constrain CBP's ability to adhere to its statutory missions.

***Effect on Health and Welfare and Consideration of Interests Prejudiced by Delays.*** As to the third and fifth *TRAC* factors, the government acknowledges that

32

CBP's prior metering practices managing intake of undocumented noncitizens at POEs impacted some noncitizens. But metering was aimed at addressing humanitarian concerns with respect to those noncitizens as well. Metering allowed for more efficient management of POEs in times of high levels of migration and prevented overcrowding and unsanitary conditions. *See* 2-ER-511. This helped facilitate humane conditions for noncitizens who were awaiting inspection at POEs or who were otherwise in CBP custody at the port. 2-ER-501 (explaining that metering allows CBP to ensure that POEs only take in as many noncitizens "as they are able to safely process and hold in accordance with CBP's short-term detention standards"); 2-ER-502 (metering protects "against unsafe conditions at the POEs"). Orderly processing at POEs promotes the interests of those who wait, by both allowing the maintenance of safe and sanitary conditions and by facilitating efficient processing once inspection is conducted. *See id.* As one Assistant Port Director explained, his POE was "able to process more [undocumented noncitizens] with metering" in 2019 "because metering allowed [CBP] to prevent emergencies," like those "that occurred in 2016." Dist. Ct. Dkt. 772-9 at 188:18–25, 189:1–10. Metering also promoted public welfare by proactively preventing diversions of CBP resources from other missions, including national security and counter-narcotics measures. *See* 2-ER-507–510. Indeed,

33

CBP increased its interdiction of controlled substances like fentanyl during the time period its ports were engaged in metering. 2-ER-527.

Further, because the record demonstrates that wait times and individual circumstances vary, this factor too requires an individualized inquiry into the impact of particular wait times on particular class members. The Court cannot conclude that the varying wait times in varying cities across the U.S.-Mexico border over a period of years uniformly had a negative impact on the welfare of noncitizens, nor that any impact is sufficient to overcome the government's strong showing on the first and fourth factors.

***Lack of Bad Faith.*** Contrary to Plaintiffs' arguments, the record does not establish bad-faith delay of inspection and referral.

Plaintiffs first argue that CBP's capacity constraints were pretextual because they claim that CBP did not cease metering in 2017 when numbers of undocumented noncitizens were lower, ports generally had "excess capacity," CBP began using the undefined concept "operational capacity" in 2018, and the government did not expand its capacity to process more undocumented noncitizens. Second Br. 33 (citing *id.* 10–12). The district court never ruled on these factual issues, and the government disputes certain underlying facts as well as Plaintiffs' characterization of the facts. For example, the government disputes that POEs generally engaged in metering in

34

2017. *See, e.g.*, Dist. Ct. Dkt. 772-9 at 86:15–19. Additionally, operational capacity is an established concept that, while perhaps difficult to quantify on a classwide basis, has been long used by CBP and in the custodial context generally. *See, e.g.*, *Coleman v. Schwarzenegger*, 922 F. Supp. 2d 882, 921 (N.D. Cal. 2009) ("A prison system's capacity is not defined by square footage alone; it is also determined by the system's resources and its ability to provide inmates with essential services such as food, air, and temperature and noise control."); Dist. Ct. Dkt. 563-64, at 2 (Sept. 2016 CBP report noting "decreased operational capacity"). Relatedly, the government also disputes that "excess capacity" can be measured by looking only to the percentages of physical holding capacity in use. *See, e.g.*, Dist. Ct. Dkt. 563-59; Dist. Ct. Dkt. 563-60 ¶¶ 11-18. Further, in 2018 and 2019, while metering, CBP continued and increased its pace of processing undocumented noncitizens at POEs. *See supra* 17. In any event, as already explained, determinations whether particular ports in fact had excess capacity are not capable of classwide resolution and these assertions of bad faith cannot be resolved on a classwide basis.[4]

---

[4] The government also raised evidentiary objections to certain of Plaintiffs' evidence that have not been resolved. *See* 2-ER-483 (asserting objection to testimony regarding alleged reduction in capacity at Hidalgo POE); 2-ER-468 (asserting hearsay objection to evidence as to the extent any metering continued in 2017).

Plaintiffs next argue that metering singles out asylum seekers for longer wait times (presumably over other noncitizens who seek to enter at the port). *See* Second Br. 33. But metering is not directed specifically at those who are seeking asylum—it applies to all noncitizens who lack documents sufficient for admission. Regardless of whether such noncitizens seek asylum their applications for admission are undisputedly more resource-intensive than are inspections of noncitizens with documentation sufficient for admission and U.S. citizens with travel documents. *See* 2-ER-518. It is thus not in bad faith for CBP to have a different queue management policy or different lines for noncitizens with documents sufficient for admission than for those without.

For these reasons, the *TRAC* analysis does not support a determination that summary judgment is appropriate on Plaintiffs' § 706(1) claim on an unreasonable-delay theory as to either certified class and cannot support the relief entered. The Court thus should not affirm on this ground. At most, this Court may reverse and remand to the district court to consider this issue, including whether the case may continue as a class action on this theory.

**III.    Question 4: In All Events, This Court Should Not In The First Instance Make Factual Findings Based On A Contested Record Where The Government Lacked a Full Opportunity to Litigate and Appeal Issues Related to an Unreasonable-Delay Claim.**

This Court need not and should not decide whether metering resulted in with-holding versus a delay of agency action, nor whether any delays in inspection or processing caused by metering were reasonable. *First*, it is necessary to determine whether the agency owes a mandatory obligation to a plaintiff before deciding whether the agency has withheld or unreasonably delayed its actions. "[A] delay cannot be unreasonable with respect to action that is not required." *Norton*, 542 U.S. at 63 n.1; *see also In re A Community Voice*, 878 F.3d at 784. As explained, Sections 1158 and 1225 do not impose any obligations on CBP officers toward noncitizens in Mexico, so there is no actionable § 706(1) claim based on metering. Further, it would not be proper to assume a statutory duty if the result would be to affirm the grant of summary judgment on the alternative ground of unreasonable delay (which was not properly before the district court) or to remand for the district court to consider the reasonableness of delays, as the determination that a duty exists is a prerequisite to a finding of unreasonable delay under § 706(1). Such an assumption may be proper in some circumstances (such as if the Court were to conclude that, regardless of whether a duty exists, that duty was not withheld or unreasonably delayed),

37

but not where the assumption is dispositive. *Cf. Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 105 n.6 (1998) (assuming without deciding an issue because "it makes no difference to our disposition of the case").

*Second*, even if the Court were to conclude that the statutes impose mandatory obligations toward noncitizens in Mexico who approach a port of entry but that metering did not withhold agency action, the Court should not decide whether delays due to metering were unreasonable because the issue was not properly raised before the district court. "It is the general rule . . . that a federal appellate court does not consider an issue not passed upon below." *Singleton v. Wulff*, 428 U.S. 106, 120 (1976). The *TRAC* analysis calls for a fact-intensive inquiry that was not developed in briefing in the district court, as Plaintiffs did not move for summary judgment on this basis or raise any arguments in support of an unreasonable-delay theory until their reply brief. Accordingly, the issue "w[as] not properly raised at the lower court level." *Steam Press Holdings, Inc. v. Hawaii Teamsters, Allied Workers Union, Local 996*, 302 F.3d 998, 1005 (9th Cir. 2002). Indeed, the district court declined to address this issue on summary judgment, *see* 1-ER-109, and this Court should decline to address it in the first instance now. *See, e.g.*, *Schneider v. Cnty. of San Diego*, 28 F.3d 89, 93 (9th Cir. 1994).

38

Further, as discussed above, the record cannot support a classwide judgment and relief on an unreasonable-delay claim. At a minimum, the *TRAC* analysis in this case raises factual issues and disputes, which the district court is best equipped to try and resolve, particularly as they were not fully developed below. "[A]lthough Courts of Appeals are also capable of reviewing cold records, district courts are institutionally assigned the role of finder of fact." *Tekmen v. Reliance Standard Life Insurance Co.*, 55 F.4th 951, 961 (4th Cir. 2022); *see also Coal. on Homelessness v. City & Cnty. of San Francisco,* --- F.4th ---, 2024 WL 119672, at *3 (9th Cir. Jan. 11, 2024) (declining to decide "factually intensive issues" on a "disputed factual record"). As discussed, determining whether delays were reasonable requires searching inquiries into actual wait times and capacities of ports over time. Thus, resolution of Plaintiffs' arguments on this point requires resolution of factual issues that are best left to the district court to decide.

*Third*, and relatedly, if this Court were to determine in the first instance that delay is unreasonable, it would deprive the Defendants of a full opportunity to defend against the claim of unreasonable delay—including by challenging the appropriateness of such a theory for class treatment. As noted, Plaintiffs did not move for summary judgment on their § 706(1) claim on an unreasonable-delay theory, and only raised arguments on delay for the first time in their reply, to which Defendants

39

had no opportunity to respond. Had Plaintiffs moved for summary judgment on an unreasonable-delay theory and briefed the issue in the ordinary course, Defendants could have submitted additional evidence in response. Under these circumstances, if the Court determines that Defendants owe relevant statutory duties to class members, it should remand rather than affirm summary judgment on this ground that was not developed below. *See Brown v. Duringer L. Grp. PLC*, 86 F.4th 1251, 1255 (9th Cir. 2023) (remanding for district court to consider issue that was not initially addressed by district court and as to which a party may wish to submit evidence).

Even more importantly, a ruling by this Court affirming summary judgment on grounds of unreasonable delay—rather than on the theory addressed by the district court—would effectively deprive Defendants of the ability to appeal or otherwise challenge issues that they did not challenge because they were operating within the contours of the district court's actual ruling. For example, had the district court granted summary judgment for Plaintiffs on unreasonable-delay grounds, the government might have raised different arguments to that court or on appeal. The government did not specifically argue on appeal that the district court erred in certifying the two classes, because the issues the district court addressed on a classwide basis in its summary-judgment ruling were (1) whether CBP owes statutory inspection and referral duties to class members who are in Mexico; and (2) whether CBP's conduct

40

withholds or delays agency action. However, had the district court inquired into whether agency action was unreasonably delayed, it could not have held that CBP's conduct was categorically *unlawful* as to the class because of the nature of the un-reasonable-delay inquiry. *See TRAC*, 750 F.2d at 79–80; *supra* § II. Had the district court so held, the government could have moved to reconsider or appealed the class-certification ruling to this Court after final judgment on the ground that commonality and other Rule 23 requirements could not be satisfied under the unreasonable-delay theory. *See, e.g.*, *B.K. v. Snyder*, 922 F.3d 957, 974–77 (9th Cir. 2019) (analyzing whether commonality is satisfied as to the particular legal theory asserted). There-fore, if this Court were to affirm summary judgment based on an unreasonable-delay theory, it would effectively deprive the government of appellate rights or the oppor-tunity to seek decertification of the class based on the invocation of a legal theory that is not suitable for class treatment or relief.

*Fourth*, the unreasonable-delay claim cannot support injunctive or declaratory relief for other reasons. As the metering policies at issue in this case have been re-scinded and practices at POEs have changed, it is unlikely that Plaintiffs can "com-pel" agency action that was unreasonably delayed due to those challenged policies and practices. *See* 5 U.S.C. § 706(1). As the district court held (a holding Plaintiffs do not challenge on appeal), 8 U.S.C. § 1252(f)(1) prohibits classwide injunctive

41

relief based on the § 706(1) claim. 1-ER-6–34. There is also no evidence that any Individual Plaintiff or class member who was subject to the particular metering practices at the core of Plaintiffs' unreasonable-delay challenge has the requisite injury necessary to obtain any prospective relief. *See TransUnion LLC v. Ramirez,* 594 U.S. 413, 431 (2021) (standing must be demonstrated as to each class member for each form of relief).[5] Beatrice Doe, the only remaining Individual Plaintiff who has not re-entered the United States, did not allege that she was subject to delays as a result of metering. *See* 4-ER-881–882. Instead, she alleged she was inspected at the POE but was not referred for a credible-fear interview because she was coerced into withdrawing her application for admission. *Id.*; 4-ER-868; *see also* 8 U.S.C. § 1225(a)(4) (statute governing withdrawals). Beatrice Doe's claims are not typical of unreasonable-delay claims and cannot support a broad classwide judgment on this theory.

---

[5] Plaintiffs have argued that their challenge to metering practices is not moot because they argue CBP's current guidance allows for turnbacks based on operational capacity constraints. Fourth Br. (Dkt. 70) 2. Yet the prior practices addressed in this litigation cannot reasonably be grouped with any current policy for purposes of APA review, particularly for purposes of assessing the reasonableness of delay. Plaintiffs must identify discrete agency action—not an amorphous and ever-changing "turnback policy." *See Lujan v. Defenders of Wildlife*, 497 U.S. 871, 890 (1990). Further, Plaintiff Al Otro Lado and other individual plaintiffs have since brought a separate putative class action challenging current practices at POEs. *See Al Otro Lado v. Mayorkas*, No. 23-cv-1367 (S.D. Cal. filed July 27, 2023).

For these reasons, the Court should decline to address whether any delay in inspections as to the class as a result of metering practices was unreasonable.

## **CONCLUSION**

For the reasons explained in the government's Merits and Supplemental Briefs, this Court should reverse the grant of summary judgment for Plaintiffs and remand the case with directions to enter summary judgment for the government and to vacate the declaratory and injunctive relief.

//

DATED: January 17, 2024

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

WILLIAM C. PEACHEY
Director

EREZ REUVENI
Counsel

SAMUEL P. GO
Assistant Director

*/s/ Katherine J. Shinners*
KATHERINE J. SHINNERS
ALEXANDER J. HALASKA
Senior Litigation Counsel
U.S. Department of Justice
Civil Division
Office of Immigration Litigation -
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 598-8259 | Fax: (202) 305-7000
Email: katherine.j.shinners@usdoj.gov

*Counsel for the Government*

44

## <u>CERTIFICATE OF SERVICE</u>

I certify that on January 17, 2024, I served a copy of this document on the Court and all parties by filing it with the Clerk of the Court through the CM/ECF system, which will provide electronic notice and a link to this document to all counsel of record.

DATED: January 17, 2024       Respectfully submitted,

                      */s/ Katherine J. Shinners*
                      KATHERINE J. SHINNERS
                      Senior Litigation Counsel
                      U.S. Department of Justice

                      *Counsel for the Government*

45

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that this brief complies with Federal Rules of Appellate Procedure 32(a)(4) and 32(a)(5) because it is double-spaced, has margins of at least one inch on all four sides, and uses proportionally spaced, 14-point Times New Roman font; and that this brief complies with the word-count limitations of this Court's Order (Dkt. 94) because it is 9,995 words, including headings and footnotes, as measured by the word processing application used to prepare this brief.

DATED: January 17, 2024      Respectfully submitted,

*/s/ Katherine J. Shinners*
KATHERINE J. SHINNERS
Senior Litigation Counsel
U.S. Department of Justice

*Counsel for the Government*

46