Nos. 22-55988, 22-56036

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

AL OTRO LADO, INC., *et al.*,

*Plaintiffs-Appellees/Cross-Appellants*,

v.

ALEJANDRO MAYORKAS, Secretary of Homeland Security, *et al.*,

*Defendants-Appellants/Cross-Appellees*,

and

THE EXECUTIVE OFFICE FOR IMMIGRATION REVIEW,

*Appellant/Cross-Appellee*.

_____

APPEAL FROM FINAL JUDGMENT OF THE UNITED STATES DISTRICT
COURT FOR THE SOUTHERN DISTRICT OF CALIFORNIA
No. 17-cv-02366-BAS-KSC

_____

**APPELLEES/CROSS-APPELLANTS' REDACTED
SUPPLEMENTAL BRIEF**

Melissa Crow
CENTER FOR GENDER & REFUGEE STUDIES
1121 14th Street, N.W., Suite 200
Washington, DC 20005
(202) 355-4471

Neela Chakravartula
CENTER FOR GENDER & REFUGEE STUDIES
200 McAllister Street
San Francisco, CA 94102
(415) 565-4877

Robert Pauw
CENTER FOR GENDER & REFUGEE STUDIES
c/o Gibbs Houston Pauw
1000 Second Avenue, Suite 1600
Seattle, WA 98104

Stephen M. Medlock
Evan Miller
Rami Rashmawi
VINSON & ELKINS LLP
2200 Pennsylvania Avenue, N.W.
Suite 500 West
Washington, DC 20036
(202) 639-6500

Michelle N. Webster
MAYER BROWN LLP
1999 K Street, N.W.
Washington, DC 20006
(202) 263-3270

Matthew Fenn
MAYER BROWN LLP
71 S. Wacker Drive
Chicago, IL 60606
(312) 701-7040

Baher Azmy
Angelo Guisado
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6464

Sarah Rich
SOUTHERN POVERTY LAW CENTER
150 E. Ponce de Leon Avenue, Suite 340
Decatur, GA 30030
(404) 521-6700

Rebecca Cassler
SOUTHERN POVERTY LAW CENTER
1101 17th Avenue N.W., Suite 705
Washington, DC 20036
(404) 521-6700

Katherine Melloy Goettel
Gianna Borroto
Suchita Mathur
AMERICAN IMMIGRATION COUNCIL
1331 G Street N.W., Suite 200
Washington, DC 20005
(202) 507-7552

Matthew Marmolejo
MAYER BROWN LLP
333 S. Grand Avenue, 47th Floor
Los Angeles, CA 90071
(213) 621-9483

*Counsel for Appellees*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................1

BACKGROUND ................................................................................2

    I.    Defendants' Turnbacks Have Resulted in Grave Harm to
        Asylum-Seekers .......................................................................2

    II.   Defendants Offered False Justifications for Turnbacks. ......................6

PROCEDURAL HISTORY ...................................................................8

ARGUMENT ..................................................................................13

    I.    Binding Ninth Circuit Precedent Establishes that an Agency's
        Refusal To Act Based on Disregard or Misinterpretation of a
        Mandatory Duty Constitutes Unlawful Withholding Under 5
        U.S.C. §706(1) ......................................................................14

    II.   The District Court Correctly Applied Ninth Circuit Precedent
        and Found Turnbacks Amount to Withholding. ...............................21

    III.  If Turnbacks Amount to Delay, That Delay Was Unreasonable
        Under *TRAC*. .......................................................................28

    IV.  The Court May Reach the Second and Third Supplemental
        Briefing Questions .................................................................36

CONCLUSION ................................................................................40

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alaska Indus. Dev. & Exp. Auth. v. Biden*,
F. Supp. 3d, 2023 WL 5021555 (D. Alaska Aug. 7, 2023) ................................ 18

*Asmai v. Johnson*,
182 F. Supp. 3d 1086 (E.D. Cal. 2016) ............................................................. 30

*Biodiversity Legal Found. v. Badgley*,
309 F.3d 1166 (9th Cir. 2002) ............................................................. 15, 17, 18

*Bracken v. Okura*,
869 F.3d 771 (9th Cir. 2017) ............................................................................. 38

*Cabaccang v. USCIS*,
627 F.3d 1313 (9th Cir. 2010) .......................................................................... 27

*California v. U.S. Env't Prot. Agency*,
385 F. Supp. 3d 903 (N.D. Cal. 2019) .............................................................. 28

*Castro v. United States*,
540 U.S. 375 (2003) ........................................................................................... 40

*Cutler v. Hayes*,
818 F.2d 879 (D.C. Cir. 1987) ..................................................................... 34, 35

*E. Bay Sanctuary Covenant v. Biden*,
2023 WL 4729278 (N.D. Cal. July 25, 2023), *appeal filed*, No. 23-
16032 (9th Cir. July 29, 2023) .......................................................................... 32

*E. Bay Sanctuary Covenant v. Trump*,
349 F. Supp. 3d 838 (N.D. Cal. 2018) .............................................................. 32

*Fairbanks N. Star Borough v. U.S. Army Corps of Eng'rs*,
543 F.3d 586 (9th Cir. 2008) ............................................................................. 26

*Forest Guardians v. Babbitt*,
174 F.3d 1178 (10th Cir. 1999) ................................................................... 17, 18

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Gonzalez Rosario v. USCIS*,
365 F. Supp. 3d 1156 (W.D. Wash. 2018) ........................................................33

*Hells Canyon Pres. Council v. U.S. Forest Serv.*,
593 F.3d 923 (9th Cir. 2010) ..............................................................................21

*Hong Wang v. Chertoff*,
550 F. Supp. 2d 1253 (W.D. Wash. 2008) ........................................................30

*Hosseini v. Johnson*,
826 F.3d 354 (6th Cir. 2016), *aff'd*, 911 F.3d 366 (6th Cir. 2018) ...................26

*In re A Community Voice*,
878 F.3d 779 (9th Cir. 2017) ......................................................................*passim*

*In re Barr Lab'ys, Inc.*,
930 F.2d 72 (D.C. Cir. 1991)......................................................................17, 35

*In re Bluewater Network*,
234 F.3d 1305 (D.C. Cir. 2000).........................................................................17

*In re Cal. Power Exch. Corp.*,
245 F.3d 1110 (9th Cir. 2001) .....................................................................19, 25

*In re Nat. Res. Def. Council, Inc.*,
956 F.3d 1134 (9th Cir. 2020) ...........................................................................29

*In re Ozone Designation Litig.*,
286 F. Supp. 3d 1082 (N.D. Cal. 2018)............................................................28

*In re Pesticide Action Network N. Am.*,
798 F.3d 809 (9th Cir. 2015) .................................................................19, 25, 26

*Indep. Mining Co. v. Babbitt*,
105 F.3d 502 (9th Cir. 1997) .....................................................................*passim*

*Jie Fang v. Director U.S. ICE*,
935 F.3d 172 (3d Cir. 2019) ..............................................................................27

iii

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Latifi v. Neufeld*,
2015 WL 3657860 (N.D. Cal. June 12, 2015)....................................................33

*League of United Latin Am. Citizens v. Regan*,
996 F.3d 673 (9th Cir. 2021) .................................................................16, 22, 23

*Leiva-Perez v. Holder*,
640 F.3d 962 (9th Cir. 2011) ...............................................................................33

*Miller v. Gammie*,
335 F.3d 889 (9th Cir. 2003) ...............................................................................22

*Mt. Emmons Mining Co. v. Babbitt*,
117 F.3d 1167 (10th Cir. 1997) ...........................................................................17

*Mugomoke v. Curda*,
2012 WL 113800 (E.D. Cal. Jan. 13, 2012) ........................................................34

*Munden v. Stewart Title Guar. Co.*
8 F.4th 1040 (9th Cir. 2021) ................................................................................39

*Nat. Res. Def. Council v. Train*,
510 F.2d 692 (D.C. Cir. 1974)..............................................................................28

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004).................................................................................................16

*Or. Natural Desert Ass'n v. Bushue*,
644 F. Supp. 3d 813 (D. Or. 2022) ......................................................................18

*Perez v. Discover Bank*,
74 F.4th 1003 (9th Cir. 2023) ..............................................................................39

*Pinho v. Gonzales*,
432 F.3d 193 (3d Cir. 2005) ................................................................................27

*Pit River Tribe v. Bureau of Land Mgmt.*,
512 F. Supp. 3d 1055 (E.D. Cal. 2021) ...............................................................16

iv

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Santillan v. Gonzales*,
388 F. Supp. 2d 1065 (N.D. Cal. 2005) ............................................................31

*Sierra Club v. Ruckelshaus*,
602 F. Supp. 892 (N.D. Cal. 1984) ...................................................................28

*Singh v. Napolitano*,
909 F. Supp. 2d 1164 (E.D. Cal. 2012) ............................................................33

*South Carolina v. United States*,
907 F.3d 742 (4th Cir. 2018) ............................................................................17

*Telecomms. Rsch. & Action Ctr. v. FCC*,
750 F.2d 70 (D.C. Cir. 1984) ....................................................................1, 9, 28

*Tufail v. Neufeld*,
2016 WL 1587218 (E.D. Cal. Apr. 20, 2016) ..................................................33

*United States v. Easterday*,
564 F.3d 1004 (9th Cir. 2009) ...........................................................15, 16, 21

*Vaz v. Neal*,
33 F.4th 1131 (9th Cir. 2022) .............................................................19, 20, 25

*Viet. Veterans of Am. v. Cent. Intel. Agency*,
811 F.3d 1068 (9th Cir. 2016) ...................................................................*passim*

*Wyo-Ben Inc. v. Haaland*,
63 F.4th 857 (10th Cir. 2023) ..........................................................................17

**Statutes**

5 U.S.C. §706(1) ....................................................................................*passim*

5 U.S.C. §706(2) ...............................................................................................1, 9

8 U.S.C. §1158(a)(1) ...............................................................13, 24, 27, 28

8 U.S.C. §1225 .......................................................................................*passim*

# INTRODUCTION[1]

Binding Ninth Circuit precedent establishes that an agency's refusal to act based on repudiation of a mandatory legal duty constitutes unlawful withholding of agency action under the Administrative Procedure Act (APA), 5 U.S.C. §706(1). The district court correctly applied that precedent to the undisputed facts, which establish that Appellants/Cross-Appellees ("Defendants") turn back asylum-seekers arriving at the U.S.-Mexico border based on a wholesale rejection of mandatory inspection provisions in the INA. The district court's decision that turnbacks constitute unlawful withholding should be affirmed.[2] Should the Court conclude that

---

[1] This Court ordered supplemental briefing on the following:
1. What standard should courts use to decide whether to analyze agency conduct as withholding versus delay under 5 U.S.C. §706(1)?
2. Was the Government's metering policy withholding or delay under that standard?
3. If the Government's metering policy was a delay, was the delay reasonable under the factors announced in *Telecommunications Research & Action Center v. F.C.C.*, 750 F.2d 70, 79–80 (D.C. Cir. 1984) ("*TRAC*")? *See Indep. Mining Co., Inc. v. Babbitt*, 105 F.3d 502, 507 (9th Cir. 1997) ("We look to the so-called *TRAC* factors in assessing whether relief under the APA is appropriate." (footnote omitted)).
4. Is there any procedural or other reason that this Court should not decide the second or third questions in the present appeal?

Dkt. 94. Plaintiffs have referred to the "metering policy" as a "turnback policy." ER-0085 (district court referred to turnback policy alternatively as "metering").

[2] Because this brief addresses only their §706(1) claim, Plaintiffs generally refer to "turnbacks," rather than the "turnback policy," as the agency action subject to review. While Plaintiffs did allege an ultra vires policy in violation of 5 U.S.C. §706(2), the district court did not address that claim. ER-0097 (the turnback policy "is a feature only of the §706(2) claim"). Instead, the district court concluded that

---

turnbacks are delay, however, that delay was unreasonable. Finally, this Court may reach Questions 2 and 3 of its Supplemental Briefing Order, Dkt. 94; if it reaches Question 3, it should grant Appellees/Cross-Appellants ("Plaintiffs") a chance to respond to Defendants' arguments on the *TRAC* factors, which Defendants chose not to brief at any point in this years-long litigation.

## BACKGROUND[3]

## I. Defendants' Turnbacks Have Resulted in Grave Harm to Asylum-Seekers.

In May 2016, Defendants broke from decades of established practice and began ignoring their statutory duty to inspect and process asylum-seekers arriving at ports of entry on the U.S.-Mexico border (POEs).[4] Turnbacks of asylum-seekers first occurred at the San Ysidro POE when that port experienced an increased number of arrivals from Haiti. ER-0326–28. Initially, the Customs and Border Protection (CBP) officers at the POE did not turn back arriving non-citizens and instead used other, established port management tools. 1-SER-245, 251–52, 255–56; 4-SER-814, 818. In late May 2016, in response to concerns about media coverage of the increase, senior CBP officials first authorized officers on the ground to "hold the line" and

---

each individual turnback constitutes the withholding of a mandatory duty under §706(1).

[3] *See* Dkt. 27 for the full factual background relevant to this appeal.

[4] *See* Dkt. 27 at 3–5 for the statutory basis for, and contours of, this duty.

prevent arriving asylum-seekers from accessing the POE. ER-0338, 0712; 1-SER-051, 057, 061, 072, 077, 260; 2-SER-270, 267, 272, 275.

Between that time and the 2016 election, the U, S. Department of Homeland Security (DHS) outlined a plan to increase POEs' capacity to process asylum-seekers and began to implement it. 2-SER-294, 301, 322, 329; 4-SER-822. But, on November 10, 2016, then-Assistant Commissioner of CBP Kevin McAleenan proposed more broadly turning back individuals approaching POEs, termed "metering" or "queue management," instead of expanding processing capacity. Shortly thereafter, DHS leadership approved the use of turnbacks border-wide. 1-SER-153–54, 200; 2-SER-340; 4-SER-839, 845.

At first, ███████████████████████████████████████████████ ███████████████████████████████. 3-SER-599; 2-SFER-235; *see also* 1-SER-168. Eventually, Defendants decided to memorialize their policy authorizing turnbacks of asylum-seekers approaching POEs in a series of guidance documents. ER-0516 ("Metering Guidance"); 0518 ("Prioritization-Based Queue Management" or "PBQM"); 0315 ("Guidance for Management and Processing of Undocumented Noncitizens at Southwest Border Land POEs" or "2021 Guidance").

The initial Metering Guidance was issued in April 2018, purportedly in anticipation of a migrant caravan, but the guidance remained in place even though the caravan never materialized. 2-SER-395–96, 401–02, 406–07, 412, 417; 4-SER-

3

851. The Metering Guidance authorized CBP officers to "meter the flow of travelers" at the U.S.-Mexico land border. ER-0516.

Then, in June 2018, then-Secretary of DHS Kirstjen Nielsen adopted the PBQM memorandum after being informed that it would result in turnbacks of 650 asylum-seekers per day, along with warnings that it would strain communities on the Mexican side of the border. 2-SER-420–21, 424, 429, 432. The PBQM memo directed POEs to deprioritize their duty to inspect and process people without travel documents (a group that includes asylum-seekers and nearly nobody else) and instead focus on other aspects of their work. ER-0520.

Finally, in November 2021, after the district court granted summary judgment on Plaintiffs' claims that turnbacks are unlawful, Defendants rescinded the guidance documents that had previously memorialized their turnback policy and replaced them with the 2021 Guidance, which nonetheless continues to authorize turnbacks based on the amorphous concept of "operational capacity." ER-0315. The 2021 Guidance remains in place to date.

Initially, Defendants engaged in turnbacks regardless of whether an asylum-seeker had crossed the U.S.-Mexico border and sometimes after inspection had already begun. *E.g.*, 1-FER-087–91, 099–103, 110–14, 120–22.[5] While turnbacks

---

[5] Defendants now agree that turnbacks occurring after a person has crossed the international border are unlawful. ER-0097.

on U.S. territory continued, 1-SER-160–61, Defendants' stated policy since this litigation was filed has been that turnbacks may occur only when a person has not yet crossed the physical border line between the United States and Mexico. Under that policy as implemented thus far, CBP officers generally stand just inside U.S. territory. 1-SER-159–61. Those CBP officers identify individuals likely to be asylum-seekers by determining if they lack documents permitting their travel to the United States, block those individuals from crossing the border, and then order them to go back to Mexico. *See* 1-SER-003–04, 153–54, 200; 4-SER-845; 1-FER-139–40; 1-SFER-063–65. CBP officers do not give asylum-seekers a date to return to the POE and keep no records of these interactions. ER-0208, 0516; 1-SER-023.

After being turned back, asylum-seekers still interested in accessing the POE would have to try to present themselves again, some other way. Many placed their names on waitlists maintained by groups in Mexico. ER-0115; 1-SER-019; 1-SFER-071–72, 088–89. Instead of inspecting asylum-seekers as they approached POEs— as CBP had always done in the past—CBP coordinated with Mexican officials to bring a small number of asylum-seekers off these waitlists to the POEs for processing each day, often weeks or months after they had put their names on the lists. 1-SER-234; 2-SER-475–78; 3-SER-670–71. Defendants did not control how the lists were managed and "were not aware how Mexican officials determined who

5

came over from the list[s]." ER-0115; 1-SER-028; 3-SER-320–23; 2-SFER-244, 250–51.

The waitlist "process" was incredibly fraught. Some people were never able to put their names on the lists. 1-SFER-049–60, 077–82, 161–62. Others succeeded in putting their names on lists only to be kidnapped, killed, located by their persecutors, or deported from Mexico while they were awaiting inspection. ER-0115; 1-SER-004; 2-SER-475–76, 482. Waiting asylum-seekers, easily identifiable in Mexican border towns, were targets of such crimes as extortion, assault, and rape, and many lived in makeshift refugee camps without sufficient access to food, water, or basic hygiene. ER-0020; 1-SFER-010–13, 094–95, 164; 2-SFER-176. Due to Defendants' artificial limitations on the number of asylum-seekers who could access POEs, the number of people waiting for inspection ballooned as turnbacks continued. 1-SER-028, 233–34; 1-SFER- 23–25, 099–100, 115–16. Some asylum-seekers saw no choice but to enter the U.S. between POEs and died while crossing the Rio Grande or the Sonoran Desert. 2-SER-482, 498–500, 503.

## II.    Defendants Offered False Justifications for Turnbacks.

The record establishes that the turnback policy was not created to deal with increased numbers of migrants at POEs. First, if turnbacks were actually an attempt to deal with increased migration, Defendants would presumably have stopped turning back arriving non-citizens in 2017, when migration numbers at the southern

border hit historic lows. That did not happen. *See*, *e.g.*, 1-SER-082, 103, 106, 109, 112, 116, 120, 176; 2-SER-287; 3-SER-508, 516. Instead, seven POEs "effectively stopped processing" arriving asylum-seekers "despite being designated as Class A ports, which are 'Port[s] of Entry for all [non-citizens].'" 1-SER-020. At two POEs, CBP "stopped using blocks of available holding cells, allowing those cells to sit empty while [asylum-seekers] waited in Queue Management lines in Mexico." 1-SER-021. The Hidalgo POE went a step further and removed seats from the secondary inspection area to decrease capacity to process arriving asylum-seekers. 2-SER-350; 3-SER-565. A CBP officer testified that "it was obvious to everyone implementing [the turnback policy] . . . that the capacity excuse was a lie." 1-SER-165.

Second, CBP's data shows that POEs routinely had excess capacity to process arriving asylum-seekers, and, ████████████████████████████████████ ████████████████████████████████████████████. 1-SER-236–37; 4-SER-728–44, 747–63, 766–82, 785–95, 798–811. To create the false impression that the POEs were full, CBP redefined how it measured capacity. POE capacity had always been a quantifiable number based on the POE's physical space. 1-SER-185–90 (Defendants' internal reports always used this traditional capacity figure). But, in June 2018, CBP began using a newly invented "operational capacity" metric to justify turning back arriving asylum-seekers. 2-SER–436 (July 2018 email

referencing operational capacity). CBP has no internal definition for "operational capacity," does not have a methodology for calculating "operational capacity," and does not track "operational capacity." 1-SER-185–90; 3-SER-691–94, 696, 701–12; 4-SER-873–74, 892. Defendants have no way to reconstruct the "operational capacity" of a POE at any point in time. 1-SER-185–90; 3-SER-651–52, 716. In short, operational capacity is an undefined concept that allows Defendants to arbitrarily cap the number of arriving asylum-seekers they process. 1-SER-185–90; 2-SER-450; 3-SER-691–94, 696, 701–12; 4-SER-873–74, 892, 897.

Third, Defendants resisted efforts to expand capacity to process asylum-seekers. When a senior official proposed increasing the San Ysidro POE's processing capacity, 4-SER-900, 905, ██████████████████████ ████████████████████████████ 4-SER-909. CBP dismissed another inquiry regarding increasing the capacity of the San Ysidro POE, because it ██████████ ████████████████████████████ 4-SER-915.

## PROCEDURAL HISTORY

In the operative complaint, Plaintiffs alleged, among other things, that turnbacks amount to an unlawful withholding of Defendants' mandatory duty to inspect and process asylum-seekers, or, alternatively, an unreasonable delay of that duty, in violation of 5 U.S.C. §706(1). ER-0912, 0914, 0922.

8

The Ninth Circuit uses the factors announced in *Telecommunications Research & Action Center v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984) ("*TRAC* factors"), to determine whether agency delay is unreasonable. *Indep. Mining Co. v. Babbitt*, 105 F.3d 502, 507 & n.7 (9th Cir. 1997) (adopting *TRAC*). The *TRAC* factors first came up in Plaintiffs' opposition to Defendants' motion to dismiss the claim that the turnback policy is unlawful under 5 U.S.C. §706(2). Plaintiffs argued, in the alternative, that, to the extent the turnback policy results in delays, they are unreasonable under the *TRAC* factors, and the turnback policy as a whole is unlawful. 1-SFER-170–71. On reply, Defendants did not substantively engage with the *TRAC* factors. 1-SFER-167. The Court denied Defendants' motion based on Plaintiffs' other arguments. ER-0276.

After extensive discovery, the district court granted Plaintiffs' motion for class certification with regard to all claims, including their alternative "unreasonable delay" claim under §706(1). ER-0173 (identifying this as part of Plaintiffs' motion). In their briefing on class certification, Defendants characterized turnbacks as delays and argued that the reasonableness of any given turnback could not be decided on a class-wide basis. ER-0173–74, 0177. At argument, Defendants also incorrectly argued that the need to apply the *TRAC* standard to Plaintiffs' unreasonable delay claim precluded class certification on that claim. 1-SFER-015–16 (Defendants' argument); 017–20 (Plaintiffs' argument). The district court disagreed, instead

granting Plaintiffs' motion *in toto* and noting that, while the thrust of Plaintiffs' §706(1) claim was unlawful withholding, Plaintiffs had also put forward evidence showing that, writ large, Defendants' justifications for turnbacks were pretextual. ER-0174, 0181.

Cross-motions for summary judgment followed. Defendants did not explicitly seek summary judgment on the basis that turnbacks are reasonable delays under the established *TRAC* standard. ER-0109. In their summary judgment reply brief, Defendants disavowed that they had raised the issue of reasonableness of delay under the *TRAC* factors in their motion or in opposition to Plaintiffs' motion. 1-SER-009.

In light of the undisputed facts showing that each turnback amounts to a refusal to inspect and process an individual class member, Plaintiffs moved for summary judgment under §706(1) only on their claim that turnbacks unlawfully withhold agency action. 2-SFER-208–09. Defendants argued in response that turnbacks are not "withholding" of agency action, because CBP continued to inspect and process some non-citizens at POEs and therefore did not have a "categorical policy" of turning back *all* people seeking access to asylum at POEs.[6] ER-0474–75;

---

[6] Plaintiffs did not argue that Defendants have a categorical policy of turning back all asylum-seekers—just that they turn some back and that doing so is unlawful. Indeed, the class definition is limited to asylum-seekers who have been or will be turned back; asylum-seekers who have been inspected and processed are not part of the class. ER-0181.

1-SER-008–09. Defendants also asserted that turnbacks are "at most" delays in processing, without arguing why, citing any case law, or engaging in any statutory analysis. ER-0440, 0474–75. Defendants then posited that, because Plaintiffs had not argued that this alleged "delay" was unreasonable, Defendants were entitled to summary judgment on this claim. ER-0475. In short, Defendants claimed victory on Plaintiffs' alternative unreasonable delay claim (a) without invoking any legal standard under which turnbacks could be considered delays rather than denials, (b) without ever affirmatively arguing any delays *were* reasonable under the applicable legal standard—the *TRAC* factors—and (c) without the claim being encompassed in either party's affirmative motion. On reply, in response to Defendants' argument that Plaintiffs were wrong to characterize turnbacks as withholding of agency action, and after giving Defendants notice in an earlier brief that they would do so, FER-0063, Plaintiffs briefed the *TRAC* factors out of an abundance of caution, 2-SFER-177–82.

In its summary judgment decision, the district court agreed with Plaintiffs that turnbacks amount to unlawful withholding of agency action—meaning they are not mere delay. The district court rejected Defendants' argument that turnbacks are delay rather than withholding because some asylum-seekers are able to return at some other time to be inspected and processed. ER-0096–97, 0109 (acknowledging Defendants' argument), ER-0109–17 (concluding, based on a statutory analysis, that

11

a turnback is agency action withheld even if a person is able to approach a port again at some other time and be inspected). Noting that neither party had affirmatively moved for summary judgment on the issue of whether turnbacks amount to unreasonable delay, ER-0109, and having concluded that turnbacks are withholding, the district court did not analyze whether turnbacks, if delay, are unreasonable under the *TRAC* factors.

On appeal, Defendants reiterated their position that turnbacks are not withholding because Defendants continued to inspect and process *some* asylum-seekers so, in Defendants' view, there was no withholding of mandatory duty "on a class-wide basis." They also restated their unsupported assertion that turnbacks amount to "at most" delays. Dkt. 12 at 25, 39–43. For the first time on appeal, Defendants explicitly argued that these delays are reasonable, still without applying the applicable *TRAC* standard. *Id.* at 25, 40.[7] Also for the first time on appeal, Defendants argued, based on out-of-circuit case law, that, because 8 U.S.C. §§1225 and 1158 do not set an explicit deadline for when inspection and processing must occur, the district court should have analyzed turnbacks under §706(1)'s

_____

[7] Oddly, Defendants assert in their opening brief that they moved for summary judgment on this basis before the district court, Dkt. 12 at 41 & n.2, despite having argued below that this issue was *not* one that they had raised in their summary judgment motion or opposition to Plaintiffs' summary judgment motion. 1-SER-009.

"unreasonable delay" prong. Dkt. 12 at 42–43. Defendants had ample opportunity but failed to raise either argument below.

Plaintiffs responded to Defendants' new arguments on appeal by reiterating arguments they had made below: the undisputed facts show that turnbacks are a refusal to act, and, even if turnbacks could be characterized as delays, those delays are unreasonable under *TRAC*. Dkt. 23 at 29–33.

On reply, Defendants *again* declined to brief the *TRAC* factors. Dkt. 62 at 25–26. Defendants also retreated from their opening salvo that they are entitled to reversal on the question of unreasonable delay, instead arguing that reasonableness is an "undeveloped factual issue" that would be improper to resolve in this appeal. Dkt. 62 at 26. Defendants seek to profit, via remand, from their procedural default on the *TRAC* factors issue. If there are "undeveloped" issues, this is only because Defendants have repeatedly declined to brief the *TRAC* factors, and Plaintiffs have accordingly been denied an opportunity to respond to any such argument.

## ARGUMENT

Under binding Ninth Circuit precedent, an agency's refusal to act based on disregard or misinterpretation of a mandatory legal duty constitutes agency action unlawfully withheld. 5 U.S.C. §706(1); *Viet. Veterans of Am. v. Cent. Intel. Agency*, 811 F.3d 1068, 1076, 1079 (9th Cir. 2016). The district court correctly applied that precedent in this case. ER-0109. The undisputed facts establish that the government

13

routinely refuses to inspect and process many asylum-seekers based on its view that the law does not require such inspection and processing; that these turnbacks are final decisions by the agency with respect to each of those asylum-seekers; and that CBP, in turning back class members, provides no guarantee of future access to the asylum process. If this Court affirms the district court's holding that Defendants owed class members a mandatory ministerial duty, it must also affirm the holding that turnbacks constitute unlawful withholding of that duty. There is no need to examine delay.

If this Court disagrees that turnbacks are withholding and holds that they instead constitute delay, it can and should apply the *TRAC* factors to conclude that the delay is not reasonable; however, it should give Plaintiffs an opportunity to respond to Defendants' arguments on the *TRAC* factors, which Defendants will make for the first time in their supplemental brief.

I. **Binding Ninth Circuit Precedent Establishes that an Agency's Refusal To Act Based on Disregard or Misinterpretation of a Mandatory Duty Constitutes Unlawful Withholding Under 5 U.S.C. §706(1).**

Binding circuit precedent establishes the types of cases that constitute "unlawful withholding" and "unreasonable delay" under §706(1). When the government (1) refuses or fails to take an action and repudiates any duty to act or (2) fails to comply with a binding statutory deadline, the government's refusal or failure to act should be analyzed as "unlawful withholding." *See Viet. Veterans*, 811 F.3d

at 1075–76; *Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1177 n.11 (9th Cir. 2002). By contrast, when an administrative process that is not subject to an already-lapsed statutory or regulatory deadline has been initiated, but the agency has not resolved or finished it quickly enough, according to the plaintiff, then the court should apply the *TRAC* factors and analyze it as potential "unreasonable delay." *See In re A Community Voice*, 878 F.3d 779, 786 (9th Cir. 2017) ("In this circuit, . . . unreasonable delay is evaluated under the *TRAC* factors.").

*Vietnam Veterans* clearly establishes that the situation before the Court in this case, where the government denies that the law imposes a duty to act and thus refuses to carry out that duty for class members, should be analyzed as unlawful withholding. *Viet. Veterans*, 811 F.3d at 1079 ("It is clear that section 706(1) applies to the situation where a federal agency refuses to act in disregard of its legal duty to act."). *See also id*. at 1076, 1081; *United States v. Easterday*, 564 F.3d 1004, 1010 (9th Cir. 2009) ("Generally, a panel opinion is binding on subsequent panels unless and until overruled by an en banc decision of this circuit."). In *Vietnam Veterans*, the parties disagreed about the obligations that certain regulations imposed on the Army. The Army refused to provide relevant health information to human test subjects whose experiments had occurred before the regulations were adopted or to provide medical care to those subjects after the experiments had ended. *Id*. at 1076, 1081. This Court read the regulations differently than the Army and affirmed an

injunction under §706(1) to "compel agency action unlawfully withheld[]," because the regulations contained "a 'specific, unequivocal command' that the agency must act." *Id.* at 1081 (quoting §706(1) and *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63–64 (2004)).

An agency's refusal to act constitutes withholding even when there is no specific statutory or regulatory deadline by which the agency must act. *See id.* at 1080 (finding withholding of a mandatory duty under regulation requiring Army to warn former human test subjects of "newly acquired information . . . when that information becomes available"); *League of United Latin Am. Citizens v. Regan*, 996 F.3d 673, 700 (9th Cir. 2021) ("*LULAC*") (finding withholding of a mandatory duty where agency had statutory duty to revoke or modify pesticide's approval "if the Administrator determines it is not safe" and the agency had already made this determination); *see also Pit River Tribe v. Bureau of Land Mgmt.*, 512 F. Supp. 3d 1055, 1064–65 (E.D. Cal. 2021) (finding that plaintiff stated a §706(1) withholding claim by alleging agency's "failure to meet its ongoing duty" where the governing regulations contained no deadline and concluding that "[e]ach day that BLM fails to [meet its duty] constitutes a single, discrete violation of the statute").

Ninth Circuit case law makes clear that, in addition to a flat-out refusal to act, an agency's violation of a statutory deadline should also be analyzed as unlawful withholding. *Badgley*, 309 F.3d at 1177 n.11 (where a statutory deadline exists, there

is no need to apply the *TRAC* factors). The Fourth and Tenth Circuits have reached the same conclusion.[8] *See*, *e.g.*, *Wyo-Ben Inc. v. Haaland*, 63 F.4th 857, 876 n.19 (10th Cir. 2023); *South Carolina v. United States*, 907 F.3d 742, 760 (4th Cir. 2018). The Tenth Circuit has suggested that "unlawful withholding" was limited to situations where there was a Congressionally imposed "date-certain deadline on agency action" in an agency's "organic statute." *Forest Guardians v. Babbitt*, 174 F.3d 1178, 1190 (10th Cir. 1999). However, that was not a categorical rule, as it did not overrule the Tenth Circuit's prior decision in *Mt. Emmons Mining Co. v. Babbitt*, 117 F.3d 1167 (10th Cir. 1997), which held that, if a statute requires agency action and the agency "ignores the duty Congress places on" it, then the agency's refusal to act "unlawfully withholds agency action." *Id*. at 1170, 1172. The Tenth Circuit recently characterized *Forest Guardians* as merely "*seemingly indicat[ing] that violating a statutory deadline is the typical mechanism by which an agency withholds action unlawfully*." *Wyo-Ben*, 63 F.4th at 876 n.19 (emphasis added).

The Ninth Circuit never adopted the *Forest Guardians* approach. *Badgley* mentioned *Forest Guardians* without adopting its holding and concluded only that, where a statutory deadline exists, there is no need to apply the *TRAC* factors. 309

---

[8] The D.C. Circuit, by contrast, analyzes even clear violations of specific statutory deadlines as "unreasonable delay" under the *TRAC* factors. *See In re Bluewater Network*, 234 F.3d 1305, 1315 (D.C. Cir. 2000); *In re Barr Lab'ys, Inc.*, 930 F.2d 72, 74–75 (D.C. Cir. 1991).

F.3d at 1177 n.11. The import of *Badgley* is that failure to meet a statutory deadline is *one* form of unlawful withholding.[9] Defendants cited *Forest Guardians* in their opening brief on appeal, *see* Dkt. 12 at 42, but not only is it not binding in this Circuit, it is not squarely good law in its own circuit.

Unlike unlawful withholding cases, however, unreasonable delay cases present a very different factual scenario—one in which the agency is not refusing to act or ignoring statutory deadlines, but is simply not acting fast enough after the start of a process or task that it has a duty to complete. And, in these cases, a binding statutory or regulatory deadline either does not exist or has not yet passed. *See*, *e.g.*, *Indep. Mining*, 105 F.3d 502 (claim of unreasonable delay by Bureau of Land Management in adjudicating pending application for mineral patent where statute

---

[9] A recent district court opinion from Alaska overreads *Badgley* as imposing a bright-line rule along the lines suggested by *Forest Guardians*. *See Alaska Indus. Dev. & Exp. Auth. v. Biden*, – F. Supp. 3d –, 2023 WL 5021555, at *27 (D. Alaska Aug. 7, 2023). Another recent district court opinion from Oregon cites *Forest Guardians* to require a statutory deadline in order to analyze agency inaction as "unlawful withholding." *See Or. Natural Desert Ass'n v. Bushue*, 644 F. Supp. 3d 813, 838–39 (D. Or. 2022). Both decisions misread Ninth Circuit precedent on "unlawful withholding" claims.

The *Oregon Natural* opinion also summarizes three other district court opinions within the Ninth Circuit as having "found the Tenth Circuit's rationale for distinguishing agency actions in *Forest Guardians* persuasive," which overstates the role of *Forest Guardians* in those cases considerably. *Id.* (citing *Ctr. for Food Safety v. Hamburg*, 954 F. Supp. 2d 965, 970–71 (N.D. Cal. 2013); *Ctr. for Biological Diversity v. Brennan*, 571 F. Supp. 2d 1105, 1131 (N.D. Cal. 2007); *Butte Env't Council v. White*, 145 F. Supp. 2d 1180, 1184 (E.D. Cal. 2001)). Those cases cite *Forest Guardians* only for the proposition that violating a statutory deadline is *one* form of unlawful withholding—not the *only* form.

18

set a deadline that had not yet passed and agency was in the process of deciding whether to grant or deny the application).

In one type of unreasonable delay case, the agency is in receipt of a petition, application, or complaint that it must review and adjudicate. *See*, *e.g.*, *Vaz v. Neal*, 33 F.4th 1131 (9th Cir. 2022) (claim of unreasonable delay by Executive Office for Immigration Review in completing investigation of complaint against immigration attorney, where agency had initiated inquiry but had no time frame for completing it); *In re Pesticide Action Network N. Am.*, 798 F.3d 809 (9th Cir. 2015) (claim of unreasonable delay by EPA in responding to petition seeking revocation of pesticide's approval, where agency had been taking steps to respond and had a planned date for finalizing the response); *In re Cal. Power Exch. Corp.*, 245 F.3d 1110 (9th Cir. 2001) (claim of unreasonable delay by Federal Energy Regulatory Commission in processing refund requests from wholesale power purchasers where agency had received the requests and planned to process them without further action by the requestors).

Unreasonable delay cases also encompass situations where the agency has adjudicated an initial petition but is taking too long to finalize the task that it voluntarily assumed by approving the petition. *See*, *e.g.*, *In re A Community Voice*, 878 F.3d 779 (claim of unreasonable delay by EPA in issuing a proposed rule after

granting rulemaking petition, where agency had been working on the proposed rule and estimated it would issue years later).

In both withholding and delay cases, the agency must have a duty to act—either imposed by statute or regulation or self-imposed by, for example, the agency's own decision to approve a rulemaking petition.[10] *Viet. Veterans*, 811 F.3d at 1075–76; *In re A Community Voice*, 878 F.3d at 784–85. A court's finding that a duty exists, however, has significantly different implications in unlawful withholding cases than it does in unreasonable delay cases. In an unlawful withholding case, if the court finds that the agency has a duty to act, then the agency's refusal to do so or its failure to meet a statutory deadline constitutes unlawful withholding. The duty inquiry and the withholding inquiry are one and the same. In unreasonable delay cases, by contrast, a determination that a duty exists does not resolve the matter but merely allows the case to progress to the equitable *TRAC* analysis of whether the agency has delayed unreasonably in carrying out its duty.

This is not an unreasonable delay case. This case is on all fours with *Vietnam Veterans*, which the district court cited in its summary judgment opinion, *see infra*, Part II, and can be resolved based on that precedent alone.

---

[10] In some unreasonable delay cases, the agency takes the litigation position that it has no *ministerial* duty to take action enforceable in §706(1), even if it does not refuse to act. *See*, *e.g.*, *Vaz*, 33 F.4th at 1136; *In re A Community Voice*, 878 F.3d at 785.

**II.   The District Court Correctly Applied Ninth Circuit Precedent and Found Turnbacks Amount to Withholding.**

The district court concluded, based on the undisputed factual record, that turnbacks amount to an unlawful withholding of the mandatory duty to inspect and process asylum-seekers.[11] *See* ER-0116–17, 0101–02 ("[I]t remains undisputed on summary judgment that Defendants did not inspect and refer class members as they arrived at POEs and instead turned them away."); ER-0099–100 (similar). To reach this conclusion, the district court relied on the holding in *Vietnam Veterans* that an agency unlawfully withholds mandatory action when it "refuses to act in disregard of its legal duty to act." ER-0109 (quoting 811 F.3d at 1075–76, and citing *Hells Canyon Pres. Council v. U.S. Forest Serv.*, 593 F.3d 923, 932 (9th Cir. 2010), for the proposition that an agency's decision to "ignore[] a specific legislative command" gives courts authority to "compel agency action" pursuant to §706(1)). Because the facts are undisputed and *Vietnam Veterans* is binding precedent, the district court's conclusion on this point is unquestionably correct.[12]

---

[11] The parties have long agreed there is a mandatory ministerial duty to inspect and process non-citizens arriving at POEs. ER-0098–99. The disputed question of whether that ministerial duty is due to class members whom CBP turned back before crossing the international boundary is discussed at length in the main briefs in this appeal.

[12] No intervening en banc or Supreme Court decision undercuts or overrules *Vietnam Veterans*, and thus it continues to bind this Court. *Easterday*, 564 F.3d at 1010; *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc).

*Vietnam Veterans* definitively resolves the question of whether turnbacks are "withholding" or "delay" under §706(1), because, under the turnback policy, Defendants have "refuse[d] to act in disregard of [their] legal duty to act." 811 F.3d at 1079. As discussed in detail above, this Court held that, where an agency refuses to act and disclaims a mandatory duty to do so, the agency has withheld, and not delayed, mandatory action. *Id.* at 1079–80, 1081–82; *see also LULAC*, 996 F.3d at 700–03 (EPA withheld mandatory action when it deemed a pesticide unsafe— triggering a mandatory statutory duty to modify or revoke the pesticide's registration—and thereafter denied petition seeking modification or revocation of the registration).

As in *Vietnam Veterans* and *LULAC*, Defendants deny the existence of a duty—here, the relevant duty being to inspect and process arriving asylum-seekers who were "not standing on U.S. soil at the time they interacted with CBP officers who turned them back." ER-0103; Dkt. 12 at 27 (repudiating the existence of a duty to inspect and process people whom CBP has turned back). Indeed, Defendants purposefully turned back asylum-seekers before they crossed the international border in an attempt to evade the duties that they acknowledge arise when someone is standing on U.S. soil. 3-SER-670 (CBP 30(b)(6) witness stating that ████████

████████████████████████████████████████████████████████████████████

████████.

22

While the legality of this practice is at the heart of this case, the undisputed facts demonstrate that CBP officers have consistently refused to act and maintained that they have no duty to act, as was the case in *Vietnam Veterans* and *LULAC*. When a class member is turned back, CBP refuses to inspect and process them, keeps no record of the interaction, ER-0161, 0208, and denies any duty to take any action with regard to that class member, at the time of the turnback or in the future. *See* 3-SER-670–72; Dkt. 12 at 27. Defendants' refusal to act and repudiation of any duty to do so are the quintessential elements of a §706(1) withholding claim under *Vietnam Veterans*.

Although cognizant that the inspection and referral statute, §1225, contains "no temporal element . . ., i.e., how much time can elapse between arrival and inspection or inspection and referral," the district court did not find that relevant to its "unlawful withholding" analysis. ER-0111. *Vietnam Veterans* and *LULAC* support that conclusion.[13] In *Vietnam Veterans*, there was no statutory deadline by which the Army had to notify former test subjects or to supply medical care; it was an ongoing obligation, which the Army repudiated, and the Court compelled. Nor did the statute in *LULAC* specify a deadline by which the EPA must revoke or

---

[13] As discussed *supra*, no court limits unlawful withholding claims to statutes or regulations with specific deadlines. The absence of such a deadline in §1225 is thus irrelevant.

23

modify approval of a pesticide deemed unsafe, yet the Court ordered such action after the agency refused to do so.

Similarly here, the district court entered a declaratory judgment stating that Defendants violate §§1158 and 1225 each time they refuse to inspect and refer an asylum-seeker arriving at a POE. ER-0116–17. The district court undertook a lengthy analysis of why this obligation, although not explicitly time-bound by the language of the statute, must logically attach upon an asylum-seeker's initial arrival. ER-0111–16. The court explained:

> If immigration officers can forgo inspection upon an asylum seeker's first arrival and defer this duty to some unspecified future arrival without flouting the statute, the first arrival loses legal significance. *See Al Otro Lado v. Wolf*, 952 F.3d 999, 1013–14 (9th Cir. 2020) ("It is the INA . . . that makes an alien's first arrival legally significant."). Moreover, if the statute is construed in this way, this would permit Defendants to turn back asylum seekers any number of times—perhaps indefinitely—without running afoul of their statutory obligations.

ER-0112–13. The district court further explained that the statute only requires an asylum-seeker to arrive and indicate a desire to seek asylum, at which point Defendants' duties to inspect and process are triggered. ER-0111. A turnback, by contrast, requires an asylum-seeker to complete additional steps—additional arrivals, additional requests to access the asylum process—before the government, in its view, is required to carry out those duties. And, as the district court noted, Defendants' theory of the case would allow them to disclaim any duty to inspect any given asylum-seeker indefinitely, as Defendants could turn the individual back any

number of times and no inspection duty would ever attach. ER-0112; *see also* ER-0114–16 (noting the "uncontroverted evidence" that turnbacks created additional logistical hurdles and burdens for asylum-seekers, which in some cases prevented asylum-seekers from completing the necessary additional steps). Thus, turnbacks are unlawful withholding.

Moreover, the facts here are wholly distinct from cases of agency delay—the more commonly litigated scenario—where an administrative process is initiated (often through the filing of an application or request), the ball is in the agency's court, and it must act but has not yet finalized its action. *Supra* 19–20 (describing *Vaz*, 33 F.4th 1131; *In re A Community Voice*, 878 F.3d 779; *In re Pesticide Action Network*, 798 F.3d 809; *In re Cal. Power Exch. Corp.*, 245 F.3d 1110; and *Indep. Mining*, 105 F.3d 502). If Defendants actually allowed asylum-seekers to enter the POE or at least wait in line for inspection and processing, instead of turning them back, that might give rise to an unreasonable delay case. Defendants would presumably be planning to carry out their duty, rather than repudiating it, and the issue would be whether they are doing it fast enough under the *TRAC* factors. But that is not what the facts show.

Instead, turnbacks resemble a refusal to receive a petition in the first place, not the chugging away of a bureaucracy considering a received petition but doing so excessively slowly. *See*, *e.g.*, *In re Pesticide Action Network*, 798 F.3d 809. It is as

though Congress legislated new benefits and an application process for them, but the relevant agency refused to provide consistent access to that application process—and thus disclaimed its duty to determine eligibility for those benefits for people who could not apply. In this case, if an asylum-seeker was turned back and then inspected and processed at a later time, she obtained that result not by waiting for CBP to finish some process it began when an officer first turned the person back—it is undisputed that there is no such process, as Defendants take no action in that situation and deny any duty to do so. Rather, she would have had to present herself for inspection again, at a different time, when CBP was favorably inclined to inspect and process her.

In other words, a prior turnback has no bearing on whether a class member will be permitted to present herself at a POE; Defendants' arguments "conflate[] one decision with a future yet distinct administrative process." *Fairbanks N. Star Borough v. U.S. Army Corps of Eng'rs*, 543 F.3d 586, 593 (9th Cir. 2008) (cleaned up) (explaining that, while the agency "might later decide to initiate some *other* Corps process" after finalizing the decision subject to challenge, this "d[id] not detract from the definiteness of" that decision); *see Hosseini v. Johnson*, 826 F.3d 354, 362 (6th Cir. 2016) (an applicant's ability to "reapply . . . as often as he wants" does not make a denial non-final), *aff'd*, 911 F.3d 366 (6th Cir. 2018); *Jie Fang v. Director U.S. ICE*, 935 F.3d 172, 182 (3d Cir. 2019) (noting the prior holding in *Pinho v. Gonzales*, 432 F.3d 193 (3d Cir. 2005), that an agency action's "finality

26

cannot depend on the institution of removal proceedings *which may never occur*" (emphasis added)); *Cabaccang v. USCIS*, 627 F.3d 1313, 1317 (9th Cir. 2010) (citing *Pinho* approvingly). And, after being turned back, many class members were, predictably, deprived of any opportunity to present themselves at a POE a second time and access the asylum process. *Supra* 5–6.

Defendants have argued that they were not withholding their duty on a class-wide basis, because CBP continued to inspect some asylum-seekers at POEs. Dkt. 12 at 25. But CBP's duty is not to inspect some portion of the group of people seeking access to the asylum process; rather, it is to inspect and process each individual arriving at a POE. 8 U.S.C. §§1158(a)(1), 1225(a)(1), (a)(3), (b)(1)(a). And, as the district court noted years ago, Plaintiffs do not challenge a categorical policy to reject all asylum-seekers. ER-0268–70. This suit aims to address the harms to those individuals whom CBP excludes; indeed, the class is defined to encompass only those individuals. ER-0181. Thus, Defendants' statistics on the aggregate numbers of asylum-seekers who were processed, Dkt. 12 at 39–40, say nothing about what happened to those who were turned back. Over the six-and-a-half years of this litigation, Defendants have provided no meaningful response when confronted with evidence that turnbacks do, in fact, cut off individuals' access to the asylum

process.[14] The import of the undisputed facts under *Vietnam Veterans* is clear:

turnbacks amount to a withholding of agency action rather than a delay.

## III. If Turnbacks Amount to Delay, That Delay Was Unreasonable Under *TRAC*.

While Plaintiffs maintain that turnbacks amount to unlawful withholding of a

mandatory duty in every instance, *supra* Pt. II, even if Defendants' turnbacks

amounted to delay, any such delay is unreasonable under the *TRAC* factors. *See*

*Indep. Mining*, 105 F.3d at 507 & n.7 (citing *TRAC*, 750 F.2d at 80).[15] Based on the

---

[14] Defendants did not plead a defense of impossibility in their Answer (which they omitted from the excerpts of record). Nor do they properly raise or even attempt to prove the impossibility of compliance with their clear statutory duties. The Ninth Circuit follows the rule announced by the D.C. Circuit in *Nat. Res. Def. Council v. Train*, 510 F.2d 692, 724 (D.C. Cir. 1974) ("*NRDC*"), for determining when a plaintiff is seeking to compel agency action that the agency claims is "impossible or infeasible." *In re Ozone Designation Litig.*, 286 F. Supp. 3d 1082, 1086 (N.D. Cal. 2018); *see also California v. U.S. Env't Prot. Agency*, 385 F. Supp. 3d 903, 909 (N.D. Cal. 2019). Under that formulation, "'the agency bears a heavy burden to demonstrate the existence of an impossibility' of complying with the statute." *Sierra Club v. Ruckelshaus*, 602 F. Supp. 892, 899 (N.D. Cal. 1984) (quoting *Ala. Power Co. v. Costle*, 636 F.2d 323, 359 (D.C. Cir. 1980) (alterations omitted)). Defendants state in a conclusory fashion that they must be permitted to neglect their ministerial duties of inspection and processing to properly exercise the Executive's "authority to control the border." Dkt. 12 at 45. This factually unsupported claim, however, does not come close to meeting their burden of proof that compliance with §§1158 and 1225 is "beyond the agency's capacity or would unduly jeopardize the implementation of other essential programs." *NRDC*, 510 F.2d at 712.

[15] The *TRAC* factors are (1) whether the agency's timeline is governed by a "rule of reason," (2) whether "Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute[]," (3) and (5) (usually considered together) the "nature and extent of the interests prejudiced by the delay," with delays "that might be reasonable in the sphere of economic

undisputed facts, the *TRAC* analysis weighs heavily in Plaintiffs' favor, as Plaintiffs have previously briefed to the district court and this Court. *See* 1-SFER-170–71; 2-SFER-177–82; Dkt. 23 at 29–33.

**Factor 1:** The most important factor in the *TRAC* analysis is the rule of reason, but Defendants' turnbacks are anything but reasonable. *In re Nat. Res. Def. Council, Inc.*, 956 F.3d 1134, 1139 (9th Cir. 2020). The decision when and whether to turn back an asylum-seeker, for the first time or repeatedly, is entirely arbitrary and not based on *any* rule—much less a "rule of reason." Moreover, turnbacks result in unpredictable, uncontrollable delays—often at the whim of third parties—which cannot constitute a rule of reason. This factor thus weighs heavily in Plaintiffs' favor.

For those asylum-seekers lucky enough to return to the POE a second or third time after being turned back, wait times between an initial turnback and an ultimately successful presentation at a POE have ranged from days to weeks to many months, 1-SER-234; 2-SER-475–78; 3-SER-670–71, and are untethered from the POEs' actual capacity, 1-SER-020–21, 165, 236-37; 2-SER-350; 3-SER-565; 4-SER-728–44, 747–63, 766–82, 785–95, 798–811. This is a departure from previous practice, where CBP managed varying numbers of asylum-seekers—even during surges in

---

regulation [considered] less tolerable when human health and welfare are at stake," (4) "the effect of expediting delayed action on agency activities of a higher or competing priority," and (6) whether the agency acted in bad faith, though bad faith is not necessary to find a delay unreasonable. *Id*. at 507 n.7.

arrivals at the southwest border—without resorting to turnbacks. *See* 3-SER-559–60.

Defendants often instructed asylum-seekers to use a waitlist system operated by third parties in Mexico—the Mexican government, NGOs, and other migrants. 3-SER-666–67, 669–71; 1-SFER-102–10. In fact, getting one's name on a waitlist was no guarantee of a future opportunity for inspection and processing. 3-SER-669–70. "The 'rule' appears to be that, once" Defendants turn back an asylum-seeker, they "abdicate[] responsibility for" what happens next. *Hong Wang v. Chertoff*, 550 F. Supp. 2d 1253, 1259 (W.D. Wash. 2008). "Where [a government agency] has been assigned the mandatory duty . . . this policy cannot be considered a 'rule of reason.'" *Id.*

Finally, the Metering Guidance, PBQM memo, and 2021 Guidance purport to grant the agency discretion to undertake its mandatory inspection and processing duties only after it has prioritized other POE activities or when it has "operational capacity" for those duties—stretching inspection wait times to whatever duration the agency feels like. 2-SER-420, 424, 429, 432. Inventing discretion where only a duty exists runs counter to any rule of reason: "The APA is not intended to permit agencies to define the reasonability of their actions by issuing their own memoranda." *Asmai v. Johnson*, 182 F. Supp. 3d 1086, 1095 (E.D. Cal. 2016).

*Factor 2*: The "statutory context" strongly suggests that any delay of days, weeks, or months before an asylum-seeker is inspected is unreasonable. *Santillan v. Gonzales*, 388 F. Supp. 2d 1065, 1083 (N.D. Cal. 2005). As the lower court held, §1225(a)(3) requires Defendants to inspect all non-citizens who are in the process of arriving at a POE. ER-0111–13. The duty does not apply only to asylum-seekers; it encompasses all who are "applicants for admission" or "otherwise seeking admission." ER-0222. Inspections must occur around the time that a non-citizen arrives at the POE rather than days, weeks, or months later. Congress has made these inspections a critical component of the agency's POE responsibilities, and international travel would grind to a halt if such inspections did not occur as a matter of course upon arrival. If CBP officers at airports delayed inspections for weeks, arriving travelers would miss connecting flights and be stuck sleeping inside airports. At land borders, students would miss school and employees would miss work if inspections were not required at or around the time of arrival. Indeed, Defendants never acted otherwise prior to the adoption of the turnback policy in 2016. *See* 3-SER-557–60.

The reasonable time frame for Defendants' statutory inspection duty must be interpreted in the context of this daily traffic at POEs that the statute regulates. Additionally, Congress's decision to create special protections for asylum-seekers arriving in the United States—barring their expedited removal without first giving

31

them access to the asylum process, §1225(b)(1)(A)(i)-(ii)—reinforces that turnbacks are unreasonable, because they place such individuals in danger. This factor, too, weighs heavily in Plaintiffs' favor.

***Factors 3 and 5***: The nature and extent of the interests prejudiced by the turnback policy—human life and physical well-being—cannot be overstated and weigh strongly in Plaintiffs' favor. The scale of the crisis created by turnbacks has been enormous, from makeshift camps in Mexican border towns that lack toilets and clean water to human trafficking and violence against those forced to wait. *See* 2-SER-475–78 (describing extortion, rape, and murder of asylum-seekers in Northern Mexico, including the murder of two children); *see also E. Bay Sanctuary Covenant v. Biden*, 2023 WL 4729278, at *16 (N.D. Cal. July 25, 2023) ("[T]he record suggests that migrants waiting in Mexico are at serious risk of violence."), *appeal filed*, No. 23-16032 (9th Cir. July 29, 2023); *E. Bay Sanctuary Covenant v. Trump*, 349 F. Supp. 3d 838, 864 (N.D. Cal. 2018) ("[A]sylum seekers experience high rates of violence and harassment while waiting to enter [the United States], as well as the threat of deportation to the countries from which they have escaped.") (subsequent history omitted). And, if returned to their countries of origin, Plaintiffs risk persecution, torture, and death, as the lower court has already established. *See* ER-0213 (Plaintiffs established likelihood of irreparable harm due to the "physical danger if [an asylum-seeker is] returned to his or her home country"); *see also Leiva-*

32

*Perez v. Holder*, 640 F.3d 962, 970 (9th Cir. 2011) (persecution consisting of extortion or beatings "would certainly constitute irreparable harm").

In considering these factors in immigration-related cases, courts have routinely found they weigh in non-citizens' favor based on less serious harms. *See*, *e.g.*, *Gonzalez Rosario v. USCIS*, 365 F. Supp. 3d 1156, 1162 (W.D. Wash. 2018) (human welfare interests at stake where asylum-seekers unable to work because employment authorization documents were delayed); *Tufail v. Neufeld*, 2016 WL 1587218, at \*8 (E.D. Cal. Apr. 20, 2016) (ongoing insecurity about immigration status weighed in favor of relief); *Latifi v. Neufeld*, 2015 WL 3657860, at \*7 (N.D. Cal. June 12, 2015) (being required to renew work authorization every year was a hardship weighing in plaintiff's favor); *Singh v. Napolitano*, 909 F. Supp. 2d 1164, 1176 (E.D. Cal. 2012) (finding "humanitarian concerns" where plaintiff was "asylee who [was] attempting to become a lawful permanent resident"). Insecurity about status and work authorization for asylum-seekers in the United States pales in comparison to the profound humanitarian concerns for class members who are at risk of murder, rape, kidnapping, extortion, deportation by Mexican authorities, and other threats while waiting in danger and squalor in northern Mexico. Accordingly, factors 3 and 5 weigh strongly in Plaintiffs' favor.

***Factor 4***: While Defendants argue that turnbacks are justified by their discretionary decision to prioritize other activities, their own record shows they have

routinely turned back asylum-seekers even when their inspections were not impacting port operations and that their capacity excuse is a pretext. *See* 1-SER-20–21; *supra* 6–8.

But, setting aside Defendants' fabricated "capacity" excuses and "[e]ven assuming that [Defendants] ha[ve] numerous competing priorities under the fourth factor," delay may still be unreasonable when other factors weigh heavily in favor of relief, particularly when "there is a clear threat to human welfare." *In re A Community Voice*, 878 F.3d at 787 (delay unreasonable when children were "severely prejudiced" by lead poisoning, even assuming agency acted in good faith to juggle competing priorities); *Cutler v. Hayes*, 818 F.2d 879, 898 (D.C. Cir. 1987) ("[An agency's] plea[s] of . . . administrative convenience, practical difficulty in carrying out a legislative mandate, or need to prioritize in the face of limited resources . . . become less persuasive as delay progresses, and must always be balanced against the potential for harm."). Furthermore, "if the only effect of expediting [agency action] is the loss of an authority that . . . is *ultra vires*," such as turning back asylum-seekers, the fourth factor "does not militate in [the agency's] favor." *Mugomoke v. Curda*, 2012 WL 113800, at *9 (E.D. Cal. Jan. 13, 2012). Given the gravity of harm at stake, and Defendants' duty to inspect and process asylum-seekers, this factor also weighs in Plaintiffs' favor.

34

***Factor 6***: This Court may also find turnbacks to be unreasonable delay because they were adopted in bad faith and based on pretextual rationales. While a finding of bad faith is not necessary for a court to find unreasonable delay, where an agency has acted in bad faith, the court "should conclude that the delay is unreasonable." *Cutler*, 818 F.2d at 898 (where an agency has acted in bad faith, the agency delay is *per se* unreasonable); *Indep. Mining*, 105 F.3d at 510 (adopting *Cutler*). Here, Defendants have "manifested bad faith . . . by singling . . . out [asylum-seekers] for bad treatment," based on a pretextual excuse of lack of capacity, and therefore, they "will have a hard time claiming legitimacy for [their] priorities." *In re Barr Lab'ys*, 930 F.2d at 76.[16]

In addition, Defendants are not "free to make . . . administrative changes with the intent to defeat the mandate of the law by making the process so slow and/or cumbersome as to ensure" that only *some* asylum-seekers are ever processed at POEs. *Indep. Mining*, 105 F.3d at 510. Yet that is exactly what Defendants did. Defendants have no authority in the law to pick and choose among the arriving non-citizens they will inspect and process; they have a statutory duty to inspect *all* of

---

[16] Moreover, turnbacks were originally driven by longstanding racial animus toward Haitian asylum-seekers and perpetuated based on a desire to deter asylum-seekers more generally. Dkt. 37 at 23–30.

them. This manufactured delay—for asylum-seekers and asylum-seekers only—evinces bad faith and is thus *per se* unreasonable. *Id*.

Plaintiffs maintain that Defendants' unlawful conduct constituted withholding of mandatory agency action, but, even if it were considered a delay, the delay is plainly unreasonable under *TRAC*.

## IV. The Court May Reach the Second and Third Supplemental Briefing Questions.

Question Two: This Court may, of course, reach the question of whether the district court correctly held that turnbacks constitute unlawful withholding. This issue was squarely before the district court: Plaintiffs argued that turnbacks constitute unlawful withholding of a mandatory duty under §706(1), ER-0109, and Defendants countered that turnbacks are delays, not withholding, ER-0097.

The district court started with the undisputed facts. ER-0099–102. After concluding that Defendants have mandatory ministerial duties to inspect and process arriving asylum-seekers and that those duties attach to asylum-seekers who have not yet crossed the international border but are in the process of arriving, the district court held that a refusal to inspect and process is an unlawful withholding of that duty, even if some asylum-seekers are later inspected and processed after being turned back. ER-0102–17. The district court discussed why Defendants' duty to inspect and process attaches when an asylum-seeker first arrives at a POE—and thus why later inspection and processing of some asylum-seekers does not mean that

36

turnbacks are not withholding of mandatory action. The court then correctly applied circuit precedent to conclude that turnbacks are unlawful withholding, not delay. ER-0109 (citing *Viet. Veterans*, 811 F.3d at 1075–76). This conclusion rules out the possibility that turnbacks are mere delays. Given the binding precedent of *Vietnam Veterans*, Defendants' clear and consistent disavowal of their duty to inspect and process class members whom they turn back, and Defendants' undisputed refusal to do so, that is the only possible answer.

Question Three: This Court may also reach the issue of whether Defendants' delays in inspecting and processing asylum-seekers were unreasonable under *TRAC*, should it conclude that the district court erred in Question Two.

Plaintiffs included an unreasonable delay claim as an alternative in their complaint and moved for class certification on all claims, including that one. *Supra* 8–9. Plaintiffs viewed the *TRAC* analysis as at least arguably responsive to arguments that Defendants made, both below and on appeal. Below, Defendants asserted that turnbacks are delays, not denials, and extensively briefed a version of the facts and law that emphasized Defendants' purported reasonable basis for turnbacks, without citing *TRAC* or applying the facts to its six-factor test. ER-0436–39, 441–66, 479–89. On appeal, Defendants directly asserted that this panel should reverse because turnbacks are delays and that those delays are reasonable—again, without citing or applying *TRAC*. Dkt. 12 at 39–41.

In light of this briefing, Plaintiffs have made every effort not to waive the argument that, if turnbacks are delays, those delays are unreasonable in light of the undisputed facts and the applicable *TRAC* standard.[17] Both below and on appeal, Plaintiffs briefed the *TRAC* factors. Dkt. 23 at 29–33; 1-SFER-170–71; 2-SFER-177–82. In each instance, Defendants had the opportunity to do so as well and opted not to. Dkt. 12 at 25, 39–43; Dkt. 62 at 25–26; ER-0440, 0474–75; 1-SER-009. Nonetheless, the issue was more than "sufficiently [raised] for the trial court to rule on it," although the district court ultimately did not do so, because Plaintiffs briefed it extensively and the substantive issues were also discussed in other parts of the parties' briefing.[18] *Bracken v. Okura*, 869 F.3d 771, 776 n.3 (9th Cir. 2017) (no

---

[17] In their reply and at oral argument, Defendants asserted that the issue of unreasonable delay cannot be decided on a class-wide basis. Dkt. 62 at 26. This argument is a sideshow. Defendants have repeatedly suggested the specter of a different result under *TRAC* depending on the class member in question, yet have never bothered to put forward arguments based on record evidence showing such differences between the class representatives. The class-wide evidence in the record is more than sufficient to resolve the question of unreasonable delay. And, crucially, Defendants waived the issue by not appealing class certification.

[18] Defendants' briefing below touches on four of the five substantive issues in the *TRAC* standard: the "rule of reason" concept (factor 1) and Defendants' bad faith (factor 6) were both discussed in briefing on Plaintiffs' arbitrary and capricious claim, the statutory context (factor 2) was briefed extensively by the parties, and Defendants discussed their "competing agency priorities" (factor 4) at length. ER-0436–466, ER-0472–488; 1-SFER-036–49; *see also* 2-SFER-194–97, 204–06, 211–21. Although Defendants have never before addressed the harms to human health and welfare that are at stake (factors 3 and 5), this is not for lack of opportunity, as the issue has been perennially present in this case as a basis for standing. *E.g.*, ER-0020, 0115–116, 0876, 0878; 2-SFER-206–08, 220–21.

waiver where issue had been raised below in opposition to motion to dismiss and in motion for reconsideration after summary judgment); *see also Perez v. Discover Bank*, 74 F.4th 1003, 1008 (9th Cir. 2023) (court of appeals "may address an issue even though the district court refused to resolve it so long as it was raised sufficiently for the trial court to rule on it" (quoting *Munden v. Stewart Title Guar. Co.*, 8 F.4th 1040, 1049 (9th Cir. 2021))). In *Munden*, this Court deemed an issue adequately presented below where one party argued it in a motion for summary judgment. 8 F.4th at 1049. Here, although neither party moved for summary judgment on the issue of unreasonable delay, Defendants raised the issue in their response brief and Plaintiffs fully briefed the *TRAC* analysis in their reply brief, which more than meets the *Munden* standard. As the district court could have ruled on unreasonable delay based on the record before it at summary judgment, the issue was not waived, and this Court may reach it.

Should this Court reach Question Three, however, it should not decide the merits of unreasonable delay without giving Plaintiffs the opportunity to respond to Defendants' substantive arguments on the *TRAC* factors. To do so would be manifestly unfair to Plaintiffs, who have presented their arguments on this issue multiple times but have never seen or been able to respond to Defendants' *TRAC* factors arguments.

Defendants chose, over and over again throughout the long course of this litigation, *not* to explicitly brief the *TRAC* factors. *See Castro v. United States*, 540 U.S. 375, 386 (2003) (Scalia, J., concurring in part) ("Our adversary system is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief."). Defendants are now being ordered to brief the *TRAC* factors, but they come to their task with full knowledge of Plaintiffs' positions on the issue. Plaintiffs, by contrast, are filing a concurrent brief without a preview of how Defendants view the facts applying to the *TRAC* factors.

Thus, in the event this Court reaches Question Three, Plaintiffs request the opportunity to respond to Defendants' arguments on the *TRAC* factors. As Defendants have seen Plaintiffs' *TRAC* arguments multiple times, they have no need for an additional opportunity to respond.

## CONCLUSION

For all of the reasons stated herein, the Court should affirm the district court's decision that turnbacks amount to unlawful withholding of mandatory agency action.

40

Dated: January 17, 2024

Respectfully submitted,

/s/ Michelle N. Webster

| | |
|---|---|
| Melissa Crow | Michelle N. Webster |
| CENTER FOR GENDER & REFUGEE STUDIES | MAYER BROWN LLP |
| 1121 14th Street, N.W., Suite 200 | 1999 K Street, N.W. |
| Washington, DC 20005 | Washington, DC 20006 |
| (202) 355-4471 | (202) 263-3270 |
| | |
| Neela Chakravartula | Matthew Fenn |
| CENTER FOR GENDER & REFUGEE STUDIES | MAYER BROWN LLP |
| 200 McAllister Street | 71 S. Wacker Drive |
| San Francisco, CA 94102 | Chicago, IL 60606 |
| (415) 565-4877 | (312) 701-7040 |
| | |
| Robert Pauw | Matthew Marmolejo |
| CENTER FOR GENDER & REFUGEE STUDIES | MAYER BROWN LLP |
| c/o Gibbs Houston Pauw | 333 S. Grand Avenue, 47th Floor |
| 1000 Second Avenue, Suite 1600 | Los Angeles, CA 90071 |
| Seattle, WA 98104 | (213) 621-9483 |
| | |
| Baher Azmy | Katherine Melloy Goettel |
| Angelo Guisado | Gianna Borroto |
| CENTER FOR CONSTITUTIONAL RIGHTS | Suchita Mathur |
| 666 Broadway, 7th Floor | AMERICAN IMMIGRATION COUNCIL |
| New York, NY 10012 | 1331 G Street N.W., Suite 200 |
| (212) 614-6464 | Washington, DC 20005 |
| | (202) 507-7552 |
| Sarah Rich | |
| SOUTHERN POVERTY LAW CENTER | Stephen M. Medlock |
| 150 E. Ponce de Leon Avenue, Suite 340 | Evan Miller |
| Decatur, GA 30030 | Rami Rashmawi |
| (404) 521-6700 | VINSON & ELKINS LLP |
| | 2200 Pennsylvania Avenue, N.W. |
| Rebecca Cassler | Suite 500 West |
| SOUTHERN POVERTY LAW CENTER | Washington, DC 20036 |
| 1101 17th Avenue N.W., Suite 705 | (202) 639-6500 |
| Washington, DC 20036 | |

(404) 521-6700

42

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that:

1. The motion is proportionally spaced, has a typeface of 14 point or more, and contains 9,994 words, exclusive of the exempted portions of the brief.

2. The brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font. As permitted by Fed. R. App. P. 32, the undersigned has relied on the word count feature of this word-processing system in preparing this certificate.

Dated: January 17, 2024

Respectfully submitted,

/s/ Michelle N. Webster
Michelle N. Webster