Nos. 22-55988, 22-56036

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

———————————

AL OTRO LADO, INC., *et al.*,

*Pls.-Appellees/Cross-Appellants*,

v.

ALEJANDRO MAYORKAS, Secretary of Homeland Security, *et al.*,

*Defendants-Appellants/Cross-Appellees*,

and

THE EXECUTIVE OFFICE FOR IMMIGRATION REVIEW,

*Appellant/Cross-Appellee.*

———————————

APPEAL FROM FINAL JUDGMENT OF THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF CALIFORNIA
No. 17-cv-02366-BAS-KSC

———————————

**APPELLEES/CROSS-APPELLANTS' SUPPLEMENTAL FURTHER EXCERPTS OF
RECORD - VOLUME 1**

Melissa Crow
CENTER FOR GENDER & REFUGEE STUDIES
1121 14th Street, N.W., Suite 200
Washington, DC 20005
(202) 355-4471

Neela Chakravartula
CENTER FOR GENDER & REFUGEE STUDIES
200 McAllister Street
San Francisco, CA 94102
(415) 565-4877

Robert Pauw
CENTER FOR GENDER & REFUGEE STUDIES
c/o Gibbs Houston Pauw
1000 Second Avenue, Suite 1600
Seattle, WA 98104

Stephen M. Medlock
Evan Miller
Rami Rashmawi
VINSON & ELKINS LLP
2200 Pennsylvania Avenue, N.W.
Suite 500 West
Washington, DC 20036
(202) 639-6500

Michelle N. Webster
MAYER BROWN LLP
1999 K Street, N.W.
Washington, DC 20006
(202) 263-3270

Baher Azmy
Angelo Guisado
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6464

Sarah Rich
SOUTHERN POVERTY LAW CENTER
150 E. Ponce de Leon Avenue, Suite 340
Decatur, GA 30030
(404) 521-6700

Rebecca Cassler
SOUTHERN POVERTY LAW CENTER
1101 17th Avenue N.W., Suite 705
Washington, DC 20036
(404) 521-6700

Katherine Melloy Goettel
Gianna Borroto
Suchita Mathur
AMERICAN IMMIGRATION COUNCIL
1331 G Street N.W., Suite 200
Washington, DC 20005
(202) 507-7552

Matthew Fenn
MAYER BROWN LLP
71 S. Wacker Drive
Chicago, IL 60606
(312) 701-7040

Matthew Marmolejo
MAYER BROWN LLP
333 S. Grand Avenue, 47th Floor
Los Angeles, CA 90071
(213) 621-9483

*Counsel for Appellees/Cross Appellants*

MAYER BROWN LLP
  Matthew H. Marmolejo (CA Bar No. 242964)
  *mmarmolejo@mayerbrown.com*
350 South Grand Avenue
25th Floor
Los Angeles, California  90071-1503
United States of America
  Ori Lev (DC Bar No. 452565)
  *olev@mayerbrown.com*
  Stephen M. Medlock (VA Bar No. 78819)
  *smedlock@mayerbrown.com*
1999 K Street, N.W.
Washington, District of Columbia  20006-1101
United States of America71
Telephone:  +1.202.263.3000
Facsimile:   +1.202.263.3000

SOUTHERN POVERTY LAW CENTER
  Melissa Crow (DC Bar No. 453487)
  (*pro hac vice*)
  *melissa.crow@splcenter.org*
1101 17th Street, N.W., Suite 705
Washington, D.C. 20036
Telephone: +1.202.355.4471
Facsimile: +1.404.221.5857

*Additional counsel listed on next page*
*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Al Otro Lado, Inc. , *et al.*, <br><br> Plaintiff, <br><br> vs. <br><br> Alejandro Mayorkas,[1] *et al.*, <br><br> Defendant. | Case No. 17-cv-02366-BAS-KSC <br><br> **EXHIBIT 1 TO DECLARATION OF STEPHEN M. MEDLOCK** |

---

[1] Secretary Mayorkas is automatically substituted pursuant to Fed. R. Civ. P. 25(d).

1-SFER-003

CENTER FOR CONSTITUTIONAL RIGHTS
   Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
   *bazmy@ccrjustice.org*
   Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
   *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
   Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
   *sarah.rich@splcenter.org*
   Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
   *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
   Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
   *kwalters@immcouncil.org*
   Gianna Borroto (IL Bar No. 6305516) (*pro hac vice*)
   *gborroto@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

- 2 -

1-SFER-004

MAYER BROWN LLP
  Matthew H. Marmolejo (CA Bar No. 242964)
  *mmarmolejo@mayerbrown.com*
350 S. Grand Avenue
25th Floor
Los Angeles, CA 90071-1503
  Ori Lev (DC Bar No. 452565)
  *(pro hac vice)*
  *olev@mayerbrown.com*
  Stephen M. Medlock (VA Bar No. 78819)
  *(pro hac vice)*
  *smedlock@mayerbrown.com*
1999 K Street, N.W.
Washington, D.C. 20006
Telephone:  +1.202.263.3000
Facsimile:   +1.202.263.3300

SOUTHERN POVERTY LAW CENTER
  Melissa Crow (DC Bar No. 453487)
  *(pro hac vice)*
  *melissa.crow@splcenter.org*
1101 17th Street, N.W., Suite 705
Washington, D.C. 20036
Telephone: +1.202.355.4471
Facsimile: +1.404.221.5857

*Additional counsel listed on next page*
*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>Alejandro Mayorkas,[1] *et al.*,<br><br>Defendants. | Case No.: 17-cv-02366-BAS-KSC<br><br>**DECLARATION OF ERIKA PINHEIRO IN SUPPORT OF PLAINTIFFS' BRIEF CONCERNING DECLARATIVE AND INJUNCTIVE RELIEF** |

---

[1] Secretary Mayorkas is automatically substituted for former Acting Secretary Wolf pursuant to Fed. R. Civ. P. 25(d).

DECLARATION OF ERIKA PINHEIRO

1  CENTER FOR CONSTITUTIONAL RIGHTS
2      Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
       *bazmy@ccrjustice.org*
3      Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
       *aguisado@ccrjustice.org*
4  666 Broadway, 7th Floor
   New York, NY 10012
5  Telephone: +1.212.614.6464
6  Facsimile: +1.212.614.6499

7  SOUTHERN POVERTY LAW CENTER
       Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
8      *sarah.rich@splcenter.org*
       Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
9      *rebecca.cassler@splcenter.org*
   150 E. Ponce de Leon Ave., Suite 340
10 Decatur, GA 30030
   Telephone: +1.404.521.6700
11 Facsimile: +1.404.221.5857

12
13 AMERICAN IMMIGRATION COUNCIL
       Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
       *kwalters@immcouncil.org*
14     Gianna Borroto (IL Bar No. 6305516) (*pro hac vice*)
       *gborroto@immcouncil.org*
15 1331 G St. NW, Suite 200
16 Washington, D.C. 20005
   Telephone: +1.202.507.7523
17 Facsimile: +1.202.742.5619

18
19
20
21
22
23
24
25
26
27
28

2                    DECLARATION OF ERIKA PINHEIRO

# DECLARATION OF ERIKA PINHEIRO

I, Erika Pinheiro, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746:

1. I make this declaration based on my personal knowledge. If called as a witness, I could and would testify competently and truthfully to these matters.

2. I am the Litigation and Policy Director of Al Otro Lado ("AOL"), a binational nonprofit serving refugees, deportees, and other migrants in Tijuana, Mexico and throughout Southern California. I am currently based primarily in Tijuana and help manage Al Otro Lado and oversee its legal and humanitarian services in Tijuana, San Diego, and Los Angeles. I cross the U.S. - Mexico border at the San Ysidro Port of Entry approximately one or two times per week. I also serve as a facilitator for the California Welcoming Task Force, which is described in more detail below

**CHANGES IN ASYLUM PROCESSING AT PORTS OF ENTRY IN 2021**

3. From November 2020 through January 2021, I joined representatives of a broad coalition of border organizations in numerous meetings with President Biden's transition team and DHS Secretary Alejandro Mayorkas concerning U.S. border policy, with the understanding that border nonprofits would be assisting the Biden administration to wind down the Migrant Protection Protocols (MPP), under which certain asylum seekers were required to await their immigration court proceedings in Mexico, and restart asylum processing at ports of entry. By February of 2021, nonprofit organizations providing legal, humanitarian, and medical services on both sides of the US-Mexico divided into five regional border task forces/welcoming committees—the California Welcoming Task Force, Arizona Welcoming Task Force, Frontera Welcome Coalition (El Paso), Mid Texas Welcoming Committee, and the Rio Grande Valley Welcoming Committee. These groups would regularly engage with the White House, DHS, and other federal agencies that supposedly shared our goal of increasing capacity for asylum

3                    DECLARATION OF ERIKA PINHEIRO

processing at ports.

4.    I am a co-lead of the Legal Subcommittee of the California Welcoming Task Force ("CA Task Force"), a coalition of approximately 100 nonprofit organizations on both sides of the California-Mexico border. Al Otro Lado leads the CA Task Force organizations' efforts to provide legal and humanitarian services to refugees residing in Tijuana and other border cities. The CA Task Force coordinated with San Diego County, California State, and U.S. federal agencies to effectuate the wind-down of MPP and the humanitarian exemption process for Title 42. We also coordinate with local, state, and federal agencies, elected officials, and partner NGOs in Mexico to build systems to streamline asylum seeker processing and meet refugees' immediate humanitarian and medical needs. Al Otro Lado works with intergovernmental partners (including UNHCR, IOM, and UNICEF) on both sides of the border to facilitate COVID testing for paroled migrants, distribute PPE through shelters, and increase COVID testing capacity amongst migrant service providers in Baja California. I also participate in biweekly meetings with DHS and other relevant agency leads to address border issues.

5.    All regional task forces have built capacity to safely process asylum seekers through ports of entry, in coordination with CBP and other federal, state, and local agencies. For example, there are two main shelter hubs in the San Diego area that receive asylum seekers admitted by CBP at the border. Jewish Family Service provides transportation from CBP custody, testing, quarantine, case management, and onward travel assistance to any migrant being processed through the Port of Entry. Catholic Charities serves those who cross between ports. The state, counties, and cities all work together to create local capacity for migrants as needed. For example, California has established several hubs for health screening, COVID testing, vaccination, and medical treatment for migrants paroled in at the California - Mexico border. Long Beach, San Diego, and other cities provided convention centers and other facilities to meet the needs of unaccompanied children during a

4                    DECLARATION OF ERIKA PINHEIRO

recent increase.

6. The capacity built through the task forces have supported the processing of thousands of asylum seekers at ports of entry in 2021. Between February 19, 2021 and August 16, 2021, over 12,500 migrants were paroled into the U.S. at ports of entry. During this time, the San Ysidro Port of Entry was processing between 25 and 100 asylum seekers per day. Between March and August 31, 2021, over 16,000 migrants were processed at ports of entry. At San Ysidro, asylum seekers paroled by CBP were processed at the Pedestrian West facility, which has otherwise been closed to U.S.-bound travelers since March 2020.

7. Throughout 2021, CBP has consistently posted officers at the limit line for the pedestrian walkway at the San Ysidro Port of Entry to turn back asylum seekers who seek protection there. In recent months, asylum seekers have increasingly resorted to attempting to cross the limit line and reach CBP inspection booths through the car lanes by purchasing cheap vehicles in Tijuana. In response, CBP has stationed one officer in each car lane at the limit line, where they ask travelers to show travel documents before their vehicle crosses onto U.S. soil. Travelers unable to produce documents are turned back to Mexico in coordination with Mexican law enforcement. I have personally observed more than a dozen CBP officers at a time posted in car lanes at the limit line—personnel resources that otherwise could be used to process asylum seekers in accordance with the law. Despite CBP's efforts, a considerable number of asylum seekers have been able to reach car inspection booths, and have either been paroled into the United States, expelled pursuant to Title 42, or potentially subjected to expedited removal.

**DENIAL OF ACCESS TO ASYLUM AT THE SAN YSIDRO PORT OF ENTRY AFTER SEPTEMBER 2, 2021**

8. Since this Court issued its Summary Judgment opinion on September 2, 2021, CBP officers have been continually posted at the limit line to prevent migrants from accessing the U.S. asylum system at ports of entry. Following media

DECLARATION OF ERIKA PINHEIRO

coverage of the decision, on September 3, 2021, several dozen asylum seekers walked to the San Ysidro Port of Entry to see if they could be processed. In response, CBP closed the SENTRI lanes, suspended pedestrian processing, and posted several dozen officers in riot gear to block access to the car lanes. The asylum seekers chanted "we want asylum" in Spanish before dispersing.

9.     Currently, with all asylum access blocked at ports of entry, Al Otro Lado and other nonprofits working with migrants in Mexico have submitted numerous humanitarian parole applications to CBP on behalf of particularly vulnerable asylum seekers. Virtually all of these applications have been either ignored or denied. CBP's recent practice of blanket denials stands in stark contrast to its policies earlier this year and even under the Trump administration, when we had dozens of humanitarian parole applications approved for asylum seekers with serious medical conditions or at imminent risk of harm.

**CURRENT CONDITIONS FOR ASYLUM SEEKERS WAITING IN MEXICO TO BE PROCESSED AT PORTS OF ENTRY**

10.     Asylum seekers in Tijuana face extreme danger and live in precarity. Few have access to safe housing, medical care, or work to support themselves. They face kidnapping, rape, extortion, and other violence on a regular basis. Clients frequently report to us that they are unable to afford food, medicine, and other basic necessities. Families travelling with minor children frequently report attempts to kidnap their children. Families with children who identify as female frequently report sexual harassment and other sexual violence. Three of our clients have died since March 2021 because they were denied the ability to seek medical care in the U.S.

11.     Thousands of migrants live in a makeshift tent encampment in El Chaparral next to the San Ysidro port of entry. They sleep under plastic tarps, without bathrooms, and are subject to extreme weather conditions. There is no running water or sanitation. Organized criminal groups control the camp, and Al

Otro Lado has received reports of kidnappings, assaults, and sexual abuse against migrants. Smugglers pressure migrants into hiring them through fraud and force. Al Otro Lado has received multiple reports of migrants who were held for ransom by smugglers. Others have been kidnapped by traffickers and forced into prostitution or other types of labor. Aid workers have received numerous threats from those controlling the camp. Few groups are willing to provide in-person services, so there is a lack of food and supplies for those living in the camp.

12. Families with members who identify as LGBTQ are frequently subjected to violence and discrimination. One family that we represented in this process was forced to leave three different housing situations after the owners of each property discovered that the mother was in a same-sex relationship. Another LGBTQ couple that we represented were kidnapped and raped in Mexico, after which both contracted HIV. While in Tijuana, they had to leave a shelter due to constant threats. Another client, a Haitian LGBTQ man who was unable to present himself to U.S. authorities to seek asylum, was living in a rented room in Tijuana when armed men broke into his dwelling, raped him, and stole all of his belongings and documents. He had to go into hiding because these same people continued to threaten him.

13. Migrants who are not from Mexico frequently struggle to access medical care. When they are able to be admitted to a hospital, they frequently report discrimination by medical staff. Multiple Haitian clients have reported to us that they refer to the hospitals in Tijuana as "where Haitians go to die."

14. AOL staff members transported a Honduran man with an epidural hematoma between hospitals because the initial hospital refused to touch him without an upfront payment in full for the emergency neurosurgery he required. At that point, he was lying on a bed with a nosebleed and struggling to breathe. When AOL staff members tried to call an ambulance because of the delicate nature of his condition, the hospital refused to communicate with the receiving hospital. AOL

7  DECLARATION OF ERIKA PINHEIRO

staff members were left with no alternative but to transport him themselves or risk watching him die.

15.     A Haitian woman who wanted to seek asylum suffered third degree burns while living in Tijuana. Her injuries were so severe that an external fixator had to be applied to hold the bone in her arm together. While she was able to access emergency treatment, she was unable to access any follow-up care or cleaning for her burn wounds. The woman, her husband, and their young daughter were living in the tent camp where they had no access to running water or sanitation.

16.     AOL's clients in other cities across the southwest border face similarly dangerous situations due to their inability to access the U.S. asylum system. A client in Reynosa, traveling with his wife and children, was kidnapped by a criminal group. He was tortured and left for dead, covered in blood with burn and stab wounds all over his body. He survived, and the family fled to Tijuana, but they have still been unable to seek asylum at a port of entry. As a result, they have been forced to live in the tent camp outside the San Ysidro port of entry, where the client's wounds became infected due to lack of medical treatment and sanitation.

17.     Al Otro Lado has conducted an online survey of over 17,000 asylum seekers stuck in Mexico near the U.S. border. Over 12,500 refugees surveyed arrived at the US - Mexico border before March 2020, when the Title 42 restrictions were implemented. Over 30% reported having been kidnapped or having escaped an attempted kidnapping, and over 40% reported having been assaulted while waiting in Mexico. Other Al Otro Lado staff and I have conducted "know your rights" presentations with thousands of migrants, many of whom have told us horrific stories of tragedies suffered while waiting to access the U.S. asylum system. A significant number have also suffered kidnapping, extortion, rape, or trafficking at the hands of smugglers and organized crime groups. Many are desperate to access the U.S. asylum system at the port of entry to avoid victimization at the hands of smugglers. However,  due to CBP's continued practice of turning migrants away at ports of

8                                          DECLARATION OF ERIKA PINHEIRO

entry, those facing extreme harm in Mexico must risk their lives by crossing between ports of entry in the hope of a chance to access protection in the United States.

I declare under penalty of perjury under the laws of the United States of America that the proceeding declaration is true and correct.

Executed on this 30th day of September, 2021, in Tijuana, Mexico.

*/s/ Erika Pinheiro*

Erika Pinheiro

DECLARATION OF ERIKA PINHEIRO

1-SFER-013

1       United States District Court

2         for the Southern District of California

3                                    )
        AL OTRO LADO, Inc., et al.,  )
4                                    )  No. 17cv2366-BAS
            Plaintiffs,              )
5                                    )  JULY 30, 2020
                v.                   )
6                                    )  San Diego, California
        KIRSTJEN NIELSEN, Secretary, )
7       U.S. Department of Homeland  )
        Security, in her official    )
8       capacity, et al.,            )

9           Defendants.

10

                    TRANSCRIPT OF PROCEEDINGS
11          BEFORE THE HONORABLE CYNTHIA BASHANT
                 United States District Judge
12
        APPEARANCES:
13
        For the Plaintiffs:    SOUTHERN POVERTY LAW CENTER
14                                 REBECCA CASSLER
                                   MELISSA CROW
15                                 SARAH RICH
                                   Attorneys at Law
16                              MAYER BROWN LLP
                                   STEPHEN MEDLOCK
17                                 ORI LEV
                                   Attorneys At Law
18                              CENTER FOR CONSTITUTIONAL RIGHTS
                                   ANGELO GUISADO
19                                 Attorney at Law

20      For the Defendants:    U.S. DEPARTMENT OF JUSTICE
                                   ALEXANDER JAMES HALASKA
21                                 KATHERINE SHINNERS
                                   Attorneys at Law
22

23

        Court Reporter:        Dana Peabody, RDR, CRR
24                             District Court Clerk's Office
                               333 West Broadway, Suite 420
25                             San Diego, California 92101
                               DanaPeabodyCSR@gmail.com

1    So, for example, in Parsons, what we're talking about is an
2    Eighth Amendment claim where you'd have to show that you've
3    been placed at a substantial risk by the condition there.  You
4    don't have to look in those situations at, you know, what
5    happened with the affected policies of each individual class
6    member.
7        The government's contention here is not that the effect of
8    the policies matter on each of the individual asylum citizens
9    or noncitizens.  The government's contention is that, for
10   example, to prove a 706(1) unreasonable delay claim, you have
11   to look at the TRAC factors.  Some of those factors are whether
12   the effect of the mandamus order on priorities of
13   competing -- activities of a competing or higher priority, you
14   have to look at -- there's a number of factors under the TRAC
15   decision whether there's a rule of reason, the nature and
16   extent of the interests that are prejudiced by the delay, so
17   those -- it doesn't necessarily matter what happens at the
18   individual class members, right?  The individual class members
19   can allege a common policy, but, here, to show whether the
20   delay is reasonable or not, for example, right, whether CBP is
21   bringing people into the port at a reasonable pace, you have to
22   look at what else is going on at the ports.  It's not even a
23   defense, right?  It's part of the affirmative claim, the
24   affirmative set of factors that the Court would have to look at
25   to determine whether the government's actions are reasonable

1    here.

2        I think plaintiffs -- they do say that metering is unlawful

3    in no circumstances.  We think that the Court's ruling in its

4    motion to dismiss order where it talks about how there may

5    potentially be legitimate factors that would justify metering

6    really kind of defeats that claim that categorically metering

7    is unlawful.

8        So, really, unless these decisions are of the types that

9    can be categorically decided, and we don't think a 706(1) claim

10   can, then this is much, much more like Wal-Mart when you're

11   looking at -- the question there that the Court had to answer

12   was, why was I disfavored?  So here the question is, why was I

13   delayed from entering?  And so I think that's really the

14   distinction between this case and a case like Parsons where you

15   just look at whether there is a policy, whether it affects all

16   people, and whether that policy places someone at a substantial

17   risk.

18       And that's similar to cases like Lion where the Court there

19   held that there is a -- you know, a constitutional floor,

20   right, that has to be met by the policy.  And so in that case,

21   you're looking at the categorical application of the policies

22   as a class to see whether it does not meet the legal threshold.

23       Here, in 706(1) claims, there really aren't, you know,

24   legal thresholds.  No one disputes as a matter of policy,

25   right -- this is what all the memorandums say -- as a matter of

1   Owens' memorandum.  It has since been updated in several

2   iterations.

3        So, first off, unlike Wal-Mart, there is a policy.

4   Secondly, where the statistical evidence in Wal-Mart suggested

5   that some Wal-Mart stores followed the law, here the

6   contemporaneous statistical figures kept by CBP point in only

7   one direction.  The turn-back policies that they adopted was a

8   pretext.  The actual capacity numbers published on a daily

9   basis by CBP simply do not show that these ports were

10  overcrowded, whether there was a capacity-based reason to

11  implement turn-backs.

12       So we believe that, if anything, comparing this case to

13  Wal-Mart demonstrates why the Court's tentative order granting

14  certification was correct.

15       And, really, Mr. Halaska has the question wrong.  It's not,

16  why was I delayed?  It's, was I delayed?  And, does that

17  violate the law?  Those are common questions.

18       And the reason that defendants say that you need to get

19  into why was I delayed at the -- at the class certification

20  stage is based on a misreading in its application of the TRAC

21  factors.

22       I think it's important to consider, first off, the

23  procedural posture of TRAC.  TRAC was a decision on the merits.

24  And in their briefing, defendants cite no case that has ever

25  applied TRAC at the class certification stage.  And we're not

 1   aware of one.  In fact, the only case that we're aware of that

 2   explicitly cites the argument that you need to look at the TRAC

 3   factors at the class certification stage is Burwell, which is

 4   reported at 2015 U.S. District Lexis 75238, pages 14 -- pages

 5   14 through 15 of that opinion, and in that opinion the district

 6   court explicitly refused to apply the TRAC factors at the class

 7   certification stage and wrote, quote, although the principles

 8   that drive the application of these TRAC factors may be worth

 9   considering at a later date, the government has pointed to no

10   authority that would impose the TRAC factors in a class

11   certification context like this, end quote.

12        And I think that that just shows Your Honor is on good

13   ground to not go into the merits of the TRAC argument at this

14   stage.

15        At any rate, I believe that defendants are misinterpreting

16   plaintiffs' argument under Section 706(1).  TRAC only applies

17   to agency delay.  Turn-back is not a delay.  The refusal to

18   inspect and process a noncitizen that is arriving in the

19   United States, i.e. an outright denial of the required agency

20   process; therefore, the 706(1) analysis that defendants suggest

21   is simply not a -- should not be governed by TRAC.

22        And I'll briefly touch on the legitimate factors argument

23   that defendants went into.

24        Defendants, I think, undermine this legitimate factors

25   argument by the concession that they made in oral argument a

1   few minutes ago where they told you that you don't have to get

2   into the merits of common questions, you simply need to

3   identify the common questions that can be litigated at the

4   merit stage of the case.  So whether there is or is not a

5   legitimate factor, I think they've undermined that point, but

6   be that as it may, it's always been the case that plaintiffs

7   have argued that turn-backs are illegal, full stop, regardless

8   of the justification for them.

9        And I believe defendants are misreading your opinion that

10  there must be some sort of justification analysis for them.  I

11  don't read your motion to dismiss opinion to say that.  At

12  most, I believe it's that there may be times when the duty to

13  inspect may not happen instantaneously, which I don't think

14  anybody actually disputes in this case.

15       But I think it's really important to look at the evidence

16  that has come in so far.  Mr. Halaska tries to minimize this

17  saying that, well, the whistle-blower is only one employee in

18  one field office, and then he says, well, there's also some

19  evidence from the Laredo field office.

20       Well, there's only four field offices on the U.S./Mexico

21  border, and as he pointed out, there's already evidence from

22  two of them.  So the argument that only 50 percent of the field

23  offices have direct evidence showing that the turn-back policy

24  was based on pretext doesn't hold much water.

25       But I'll just point out, Your Honor, that the testimony

1    that we cited from the whistle-blower, he's the first person

2    deposed in the case.  We'd only taken three depositions by the

3    time that class -- by the time our class certification motion

4    was due.  There is considerable evidence, including testimony

5    from the second whistle-blower-type witness from a different

6    field office and a different port of entry who have a very

7    similar experience as the whistle-blower and corroborates the

8    whistle-blower's testimony nearly in its entirety.

9        So I think that trying to limit this case to the testimony

10   of one whistle-blower from emails and some declarations is

11   simply incorrect at this stage of the case.

12       We have a mountain of evidence showing that the turn-back

13   policy existed, that the public statements given by the

14   government was a pretext and some examples of patently

15   inequitable conduct that was engaged in by CBP officers at the

16   direction of headquarters in order to enforce that policy.

17       So I'll pause there, Your Honor, and see if you have any

18   questions.

19           THE COURT:  No questions.

20       Anything further?

21           MR. MEDLOCK:  Nothing further from plaintiffs,

22   Your Honor.

23           THE COURT:  Okay.  Anything from the defendants?

24           MR. HALASKA:  Yes, Your Honor, I would like to respond

25   to Mr. Medlock's argument.

# EXHIBIT H

1-SFER-021

# METERING UPDATE

## NOVEMBER 2019







1-SFER-022

# INTRODUCTION

In the summer of 2018, Customs and Border Protection (CBP) officers began to be stationed at the United States' international boundary with Mexico to inform arriving asylum seekers that U.S. ports of entry were full and that they needed to wait their turn in Mexico. Simultaneously, these CBP officials accepted limited numbers of asylum seekers a day—in a process known as metering—often communicating directly with Mexican officials regarding these numbers. As lines of asylum seekers grew longer in border cities, Mexican authorities and civil society groups responded by providing humanitarian assistance and creating informal waitlists.

In December 2018, the Strauss Center at the University of Texas at Austin, the Center for U.S.-Mexican Studies (USMEX) at the University of California San Diego, and the Migration Policy Centre published a report documenting these practices. This report highlighted how metering had spread across the U.S.-Mexico border and described the waitlist systems in eight border cities. It found that 6,000 asylum seekers were waiting along the border in Mexico and that the waitlist process varied in each Mexican border city. Since the report's publication, there have been changes in every border community. Some of these changes were documented in the February 2019, May 2019, and August 2019 updates, which estimated that 4,800, 19,000, and 26,000 asylum seekers, respectively, were waiting along the border.

Since August 2019, asylum seekers have continued to arrive at the U.S.-Mexico border, although in lower numbers than in previous months. This November 2019 metering update estimates that there are currently around 21,398 asylum seekers on waitlists in 11 Mexican border cities.

---

**Figure 1: Number of People on Asylum Waitlists (November 2019)**

---



*Authors' elaboration. Data collected from October 27, 2019, to November 6, 2019.*

1-SFER-023

This represents a 21 percent decrease since August 2019 in the total number of people on asylum waitlists, with a downward shift both in the numbers of people arriving at the border and the number of people showing up when their waitlist number is called. For example, in Tijuana, in the last month and a half, only 33 percent of asylum seekers showed up for their numbers.[1]   As a result, the current waitlist totals likely overstate the number of people who are still waiting in Mexican border cities, as some people have likely returned to their countries of origin, moved to another port of entry with a shorter waitlist, or attempted to enter the United States undetected.

**Figure 2: Number of People on Asylum Waitlists (November 2018 - November 2019)**



*Authors' elaboration. Data collected from October 27, 2019, to November 6, 2019.*

Along some parts of the border, such as South Texas, this downward shift appears to be in large part due to the Trump administration's steps to curb migration and the number of asylum seekers arriving at the border. In particular, the Migrant Protection Protocols (MPP) have returned all Spanish speaking asylum seekers to Mexico (except Mexicans), after registering their asylum cases in the United States. MPP began in January 2019 in San Diego, but has since spread across the entire border, with individuals being returned to Tijuana, Mexicali, Ciudad Juárez, Piedras Negras, Nuevo Laredo, and Matamoros. Since MPP's expansion, the total number of asylum seekers arriving at the border has decreased and this overall drop has been reflected in the waitlists.

Additional U.S. and Mexican policies have also contributed to this decrease. The United States has continued to implement the third-country transit asylum bar, which currently blocks anyone arriving in the United States from seeking asylum if they traveled first through another country. While in Mexico, the federal government has increased its immigration enforcement during the past three months. The National Guard (*Guardia Nacional*)

has provided support to the National Migration Institute (*Instituto Nacional de Migración*, INM), with a result-ing increased number of apprehensions and deportations. INM has also stopped providing temporary transit permits to individuals from outside the Western Hemisphere and has begun deporting these individuals back to their countries of origin. These policies make it more difficult for asylum seekers to arrive at the U.S.-Mexico border and sign up on an asylum waitlist.

Yet as U.S. and Mexican policies have become more restrictive for non-Mexican migrants and asylum seekers, the number of Mexicans waiting at the border to seek asylum in the United States has increased. This update counted more than 11,040 Mexicans at the U.S.-Mexico border, making up 52 percent of everyone currently on asylum waitlists in Mexican border cities. These Mexican asylum seekers are predominantly coming from the states of Guerrero, Chiapas, Oaxaca, Michoacán, Zacatecas, and Veracruz.

---

**Figure 3: Mexican Asylum Seekers Waiting on Waitlists (November 2019)**

---



*Authors' elaboration. Data collected from October 27, 2019, to November 6, 2019.*

1-SFER-025

This update aims to highlight changes over the past three months across 14 Mexican border cities. It looks at changes in the asylum waitlist process, the number of asylum seekers waiting in each border city, and current CBP processing levels. The update draws on interviews with government officials, representatives from civil society organizations, and members of the public on both sides of the border.

---

**Figure 4: Mexican Border Cities Covered in the November 2019 Update**

---



1-SFER-026

**Metering & Asylum Waitlists: November 2019**

| Port of Entry<br><br>*List Administrator* | # of Asylum Seekers on List<br><br>*Date Recorded* | Estimated Wait Time | CBP Processing #s | Recent Changes |
|---|---|---|---|---|
| **Matamoros, Tamaulipas**<br><br>*National Migration Institute (Instituto Nacional de Migración, INM): Non-Mexican list at the Gateway Bridge*<br><br>*Asylum Seekers: Mexican lists at the Gateway Bridge and the B&M Bridge* | ~285 (95 families)<br><br>*Mexican lists Gateway Bridge*<br><br>…<br><br>0<br><br>*Non-Mexican list Gateway Bridge*<br><br>…<br><br>~225 (76 families)<br><br>*Mexican lists B&M Bridge*<br><br>*November 4, 2019* | 1 to 2 months<br><br>*Gateway Bridge*<br><br>4 weeks<br><br>*B&M Bridge* | 1 to 2 families a day<br><br>*Per bridge* | There are three list systems in Matamoros divided between the city's two international bridges.<br><br>INM officials maintain the list for non-Mexicans at the Gateway Bridge. As of November 5, 2019, INM reported that this list did not have any asylum seekers. Mexican asylum seekers also run a second list at the Gateway Bridge. These families are in large part from Chiapas, Guerrero, and Oaxaca. Individuals on this list stay in a tent camp near the international bridge, alongside asylum seekers who were returned through the Migrant Protection Protocols (MPP). Inside the tent camp, people use the few restrooms that are constructed from plywood, bathe and wash their clothes in the Rio Grande, and charge their phones in a nearby store.<br><br>The B&M Bridge's list is comprised of asylum seekers from Mexico, and in particular the states of Guerrero, Chiapas, and Oaxaca (there is also one family from Michoacán). A representative from the group maintains the list. This group of asylum seekers alleges that CBP began to process fewer families after the October 10, 2019 protest on the Gateway Bridge that shut down international traffic. According to the waiting asylum seekers, CBP did not process any families for the seven days following the incident. Now, CBP only takes one to two families a day instead of the three to four families that they were accepting prior to the protest. |

1-SFER-027

**Metering & Asylum Waitlists: November 2019 (continued)**

| Port of Entry<br><br>*List Administrator* | # of Asylum Seekers on List<br><br>*Date Recorded* | Estimated Wait Time | CBP Processing #s | Recent Changes |
|---|---|---|---|---|
| **Nuevo Progreso, Tamaulipas** | 0<br><br>*November 3, 2019* | N/A | N/A | |
| **Reynosa, Tamaulipas**<br><br>*Senda de Vida migrant shelter* | <30<br><br>*November 2, 2019* | 1 to 3 days | 15 to 20 people a day | The number of asylum seekers in Reynosa has declined over the past three months.<br><br>When asylum seekers arrive at the Senda de Vida shelter, staff send their paperwork to CBP. Each day, CBP alerts the shelter regarding how many people they will take that day. Currently, the number of people arriving to the shelter is very low, which means that asylum seekers cross into the United States after waiting only for a day or two.<br><br>There are reports that more people are crossing between ports of entry and attempting to evade Border Patrol. These individuals may have previously sought asylum at a port of entry, but now report not wanting to be returned to Mexico through MPP. |
| **Rio Grande City, Tamaulipas** | 0<br><br>*November 2, 2019* | N/A | N/A | |

1-SFER-028

**Metering & Asylum Waitlists: November 2019 (continued)**

| Port of Entry<br><br>*List Administrator* | # of Asylum Seekers on List<br><br>*Date Recorded* | Estimated Wait Time | CBP Processing #s | Recent Changes |
|---|---|---|---|---|
| **Ciudad Miguel Alemá, Tamaulipas** | 0<br><br>*November 2, 2019* | N/A | N/A | Currently, there is no asylum waitlist in Ciudad Miguel Alemán and there are no asylum seekers waiting on the international bridge. September 2019 was the last time that asylum seekers were reported to be staying on the bridge.<br><br>It is not clear what happened to the waiting asylum seekers. There are some reports that the asylum seekers were removed from the bridge and disappeared overnight. Yet other individuals reported that CBP had processed all the waiting asylum seekers. |
| **Nuevo Laredo, Tamaulipas**<br><br>*Network of six migrant shelters managing six separate lists (one per shelter)* | ~300<br><br>*November 2, 2019* | 1 to 3 weeks | 15 to 30 people a day | The city's six migrant shelters each keep an asylum waitlist. INM contacts a different shelter every day of the week to send people to the international bridge to cross. The shelter order is as follows: Casa Nazareth, AMAR, Barrios de Cristo, Municipal Shelter, Oradel, and Voz de Cielo.<br><br>During the previous three months, the number of non-Mexican asylum seekers arriving to Nuevo Laredo has declined.<br><br>On October 28, 2019, Casa Nazareth reported that they had 168 people waiting to seek asylum, with a vast majority from Cameroon. They also reported that they were housing 27 individuals from Mexico.[2]<br><br>On November 2, 2019, Casa AMAR reported that the shelter was housing 60 people waiting to seek asylum. Of these 60 people, 56 were of Mexican origin, from the states of Guerrero, Michoacán, and |

1-SFER-029

**Metering & Asylum Waitlists: November 2019 (continued)**

| Port of Entry<br><br>*List Administrator* | # of Asylum Seekers on List<br><br>*Date Recorded* | Estimated Wait Time | CBP Processing #s | Recent Changes |
|---|---|---|---|---|
| **Nuevo Laredo, Tamaulipas (continued)** | | | | Chiapas. On the same day, the municipal shelter reported that 30 people were waiting there to seek asylum. They also reported an increase in the number of Mexicans arriving to the city over the last month.<br><br>The kidnapping of asylum seekers in Nuevo Laredo has reached extremely high levels. Individuals are kidnapped while entering the city, waiting in local shelters, or after being returned to Nuevo Laredo through MPP. |
| **Piedras Negras, Coahuila**<br><br>*Municipal government* | ~300<br><br>*October 30, 2019* | 3 to 4 weeks<br><br>*According to the list manager*<br><br>2 to 4 months<br><br>*According to waiting asylum seekers* | 15 people a day | The asylum waitlist in Piedras Negras is run by a member of the municipal government. Some 70 percent of the individuals on the waitlist are from Venezuela, followed by people from Cuba and Honduras. There are seven to eight people from Mexico on the list.<br><br>There are currently eight shelters in Piedras Negras. These include Casa del Migrante Frontera Digna, which has a capacity for 100 people and is currently housing 70 people; Casa de Tanya, which has a capacity for 40 people and is currently lodging 14 people; and Betel, which has a capacity for 70 people and is currently housing 14 people.<br><br>There are allegations that asylum seekers can pay US$1,000 each to move more quickly on the Piedras Negras asylum waitlist. Individuals who reported that they had not paid any money also reported that they had been waiting for months rather than weeks. |

1-SFER-030

**Metering & Asylum Waitlists: November 2019 (continued)**

| Port of Entry  <br><br>*List Administrator* | # of Asylum Seekers on List  <br><br>*Date Recorded* | Estimated Wait Time | CBP Processing #s | Recent Changes |
|---|---|---|---|---|
| **Piedras Negras, Coahuila (continued)** | | | | On October 28, 2019, MPP began in Eagle Pass. During the following days, CBP returned approximately 10 people per day to Piedras Negras. The asylum seekers who were returned via MPP are staying in local shelters and also renting rooms. They will have to travel to Nuevo Laredo, which is two hours away, for their U.S. court hearings in Laredo. |
| **Ciudad Acuña, Coahuila**  <br><br>*Civil Protection (Protección Civil): individuals*  <br><br>*Grupo Beta: families* | <50  <br><br>*November 1, 2019* | 1 week | 2 to 3 people a day | There are currently two asylum waitlists in Ciudad Acuña: one for adults and one for families. Both lists are currently "closed" to new entrants.  <br><br>Civil Protection maintains the list for individuals. Their first list for individuals had been closed to new entrants since April 2019 and the last individual from this list was processed on October 6, 2019. Once this first list was finished, Civil Protection began a second list for the 46 individuals who were still waiting in Ciudad Acuña at the time. This second list is also closed, and currently there are 12 individuals left to be processed. Civil Protection estimates that there are around 12 additional asylum seekers in the city who arrived after the second list began and was closed.  <br><br>The individuals on this list are currently renting rooms in Ciudad Acuña. They are mostly from Cuba and various African countries. Around 12 individuals from Cuba have decided to stay and live permanently in the city. |

1-SFER-031

**Metering & Asylum Waitlists: November 2019 (continued)**

| Port of Entry<br><br>*List Administrator* | # of Asylum Seekers on List<br><br>*Date Recorded* | Estimated Wait Time | CBP Processing #s | Recent Changes |
|---|---|---|---|---|
| **Ciudad Acuña, Coahuila (continued)** | | | | Grupo Beta maintains a second list for families, which is also closed to new entrants. There are only four families still in the city waiting to be processed. These four families stay at a city shelter. There are another three to four families that are currently waiting in Ciudad Acuña, but not on the list. |
| **Ciudad Juárez, Chihuahua**<br><br>*State Population Council (Consejo Estatal de Población, COESPO): Non-Mexican list*<br><br>*Asylum seekers: Mexican lists* | 4,101<br><br>*Non-Mexican list*<br><br>…<br><br>~3,000<br><br>*Mexican lists*<br><br>*October 29, 2019* | 6 months<br><br>*Non-Mexican list*<br><br>1 month<br><br>*Mexican lists* | ~10 people a day<br><br>*Non-Meixcan list*<br><br>~2 to 3 families a day<br><br>*Mexican lists* | There are two list systems in Ciudad Juárez. One system for non-Mexican asylum seekers and another for Mexican asylum seekers.<br><br>The State Population Council (COESPO) maintains the list for non-Mexicans. COESPO registers asylum seekers in the city and CBP calls them one to two times a day regarding the numbers of asylum seekers that they will process. Some 80 percent of the individuals on the list are from Cuba, 12 percent are from Central America or other countries, and the remaining 8 percent are from Mexico. However, COESPO reports that most, if not all, of the Mexicans registered on their list have switched to the Mexican-only lists at the bridges.<br><br>The asylum seekers on the COESPO list stay in 16 shelters that are run by local government and religious groups. Asylum seekers report that armed men have targeted the shelters where they are staying.<br><br>Despite more than 4,000 asylum seekers registered on the COESPO waitlist, the true number of asylum seekers in the city may be lower. For every ten numbers called, the list may advance 100 to 150 spots, given |

**Metering & Asylum Waitlists: November 2019 (continued)**

| Port of Entry<br><br>*List Administrator* | # of Asylum Seekers on List<br><br>*Date Recorded* | Estimated Wait Time | CBP Processing #s | Recent Changes |
|---|---|---|---|---|
| **Ciudad Juárez, Chihuahua (continued)** | | | | that many asylum seekers do not show up. COESPO believes that some of these asylum seekers may have crossed the Rio Grande and attempted to enter the United States undetected or returned to their countries of origin.<br><br>The second list system in Ciudad Juárez is for Mexican asylum seekers. There are three lists for Mexicans, with a separate list for each of the city's pedestrian bridges. Mexican asylum seekers stay in shelters and in camps alongside each bridge. Mexican asylum seekers check in directly with CBP regarding the number of Mexican asylum seekers that will be processed each day. |
| **Agua Prieta, Sonora**<br><br>*CAME migrant shelter* | ~500<br><br>*October 31, 2019* | 5 to 6 months | 0 to 4 families a day | The CAME migrant shelter runs the asylum waitlist in Agua Prieta. Currently, about half of the asylum seekers on the waitlist are Mexican and the other half are from Central America, Cuba, and Venezuela.<br><br>Unlike other waitlists along the border, the CAME migrant shelter allows asylum seekers to add their name to the list before arriving in Agua Prieta. Asylum seekers can add their name to list by sending a photo of their identification to the CAME shelter team through Whatsapp. |

1-SFER-033

**Metering & Asylum Waitlists: November 2019 (continued)**

| Port of Entry

List Administrator | # of Asylum Seekers on List

Date Recorded | Estimated Wait Time | CBP Processing #s | Recent Changes |
|---|---|---|---|---|
| **Nogales, Sonora**

*Municipal government of Nogales through Civil Protection* | 1,759

*October 29, 2019* | 2.5 months | 8 to 15 people a day | On September 12, 2019, the Nogales municipal government took over the administration of the asylum waitlist and delegated its management to Civil Protection.[3]

Currently, there are 710 Mexicans on the asylum waitlist (making up 40 percent of the total number). There are also 573 people from Cuba and 276 people from Venezuela. Many on the list—especially Cubans— are renting rooms in Nogales due to limited space in local shelters. |
| **San Luis Rô Colorado, Sonora**

*Casa del Migrante " La Divina Providencia"* | 1,361

*October 27, 2019* | 3 months | 6 people a day | The Casa del Migrante "La Divina Providencia" runs the asylum waitlist in San Luis Río Colorado. Currently, 1,211 people on the waitlist are from Mexico (89 percent), 91 are from Cuba, 28 are from Honduras, 12 are from Guatemala, 7 are from Uganda, 6 are from Nicaragua, and 4 are from Cameroon. There is also one person from Ethiopia and one person from Venezuela. |

1-SFER-034

**Metering & Asylum Waitlists: November 2019 (continued)**

| Port of Entry<br><br>*List Administrator* | # of Asylum Seekers on List<br><br>*Date Recorded* | Estimated Wait Time | CBP Processing #s | Recent Changes |
|---|---|---|---|---|
| **Mexicali, Baja California**<br><br>*Grupo Beta* | 651<br><br>*October 30, 2019* | 2 months | 10 to 20 people a day | Grupo Beta runs the asylum waitlist in Mexicali. On the list, 385 asylum seekers are Mexican (59 percent of the total).<br><br>Mexicali's 11 main shelters have a capacity for 1,380 people.[4] There are continued reports that most of these shelters charge asylum seekers for their stay and for donated goods.[5]<br><br>Over the past three months, the shelter population has declined, since fewer people are being returned to Mexicali under MPP. The people who were returned to Mexicali under MPP were offered a one-way bus trip to the Mexican city of Tapachula, which is on the country's southern border with Guatemala. |
| **Tijuana, Baja California**[6]<br><br>*Grupo Beta / Support from asylum seekers* | 8,836<br><br>*November 6, 2019* | 4.5 to 5 months | 20 to 40 people a day | After peaceful protests over the summer, the list in the notebook was digitized. Over the past three months, an estimated 5,700 people have signed up on the asylum waitlist in Tijuana, for an average of 62 asylum seekers per day. Since July 16, 2019, the number of asylum seekers from outside the Western Hemisphere has decreased and constituted only 5 to 7 percent of all sign-ups. Instead, roughly 80 percent of the new sign-ups were people from Mexico. The remaining 12 to 15 percent were of people from other countries in Latin America, including Haiti, Cuba, Venezuela, and Central America.<br><br>Over the past three months, the rate of people showing up when their number is called has dropped considerably. From August 1, 2019 to September 15, 2019, 62 percent of people were present when their |

1-SFER-035

**Metering & Asylum Waitlists: November 2019 (continued)**

| Port of Entry *List Administrator* | # of Asylum Seekers on List *Date Recorded* | Estimated Wait Time | CBP Processing #s | Recent Changes |
|---|---|---|---|---|
| **Tijuana, Baja California (continued)** | | | | number was called. However, from September 16, 2019 to November 1, 2019, only 33 percent of people showed up.[7]  On several days, list managers read 300 to 500 names in order to reach 30 or 40 people. This situation has generated confusion, as many people were not present when their names were called and showed up the following day. By contrast, Mexicans show up at a higher rate than other nationalities when their numbers are called.<br><br>Tijuana's 15 main shelters have a capacity for 1,573 people.[8]  There are reports that some shelters are charging people a small fee per night for their stay. |

*The numbers shift every day and should be interpreted as a general range rather than an exact figure.*

1-SFER-036

# ENDNOTES

1    In line with previous updates, this update will report total asylum list number in order to maintain a standardized methodology.

2    Fernanda Valtierra, "Esperan asilo 168 migrantes," *El Mañana*, October 28, 2019, https://elmanana.com.mx/esper-an-asilo-168-migrantes/.

3    Rafael Carranza, "Nogales, Mexico, takes over asylum list from nonprofits as Trump administration tightens rules," *Arizona Republic*, September 26, 2019,  https://www.azcentral.com/story/news/politics/border-issues/2019/09/26/nogales-mexico-takes-control-list-asylum-seeking-migrants/2386225001/.

4    These shelters are currently housing 845 people, including asylum seekers on the waitlists, others returned through MPP, and Mexicans deported from the U.S. 276 of these individuals are Mexican, 577 are Central American, and 11 from other countries.

5    Interview with Border Kindness.

6    The data provided for the asylum waitlist in Tijuana was collected by a team of Al Otro Lado volunteers during daily visits to the Chaparral port of entry.

7    Al Otro Lado calculates these "appearance rates" by dividing the number of people who crossed by the number of names in the book that were read. The figures are complicated by the fact that, every day, Grupo Beta allows a certain number or asylum seekers to cross before their number is called due to "special circumstances." These special circumstances could include acute medical conditions or due to their time volunteering as list managers. As a result, appearance rates may be even lower.

8    Currently, there are 1,194 people staying at Tijuana's shelters, which includes those on the waitlist, those returned through MPP, and Mexicans deported from the United States. In the shelters, there are 667 people from Mexico, 399 people from Central America, and 110 people from other countries. These 15 shelters have the capacity to hold 1,573 individuals. Interview conducted in Tijuana.5

1-SFER-037

1  JEFFREY BOSSERT CLARK
2  Acting Assistant Attorney General,
   Civil Division
3  WILLIAM C. PEACHEY
4  Director, Office of Immigration Litigation –
   District Court Section
5  KATHERINE J. SHINNERS (DC 978141)
6  Senior Litigation Counsel
7  ALEXANDER J. HALASKA (IL 6327002)
   Trial Attorney
8  United States Department of Justice
9  Civil Division
   Office of Immigration Litigation
10 P.O. Box 868, Ben Franklin Station
11 Washington, D.C. 20044
   Tel: (202) 307-8704 | Fax: (202) 305-7000
12 alexander.j.halaska@usdoj.gov
13
14 *Counsel for Defendants*

15          **UNITED STATES DISTRICT COURT**
16    **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**
                  **(San Diego)**
17

18 AL OTRO LADO, Inc., *et al.*,          | Case No. 3:17-cv-02366-BAS-KSC
19                      *Plaintiffs*,      | Hon. Cynthia A. Bashant
20                  v.
21                                         | **DEFENDANTS' REPLY IN SUP-**
                                           | **PORT OF THEIR CROSS-MO-**
22 CHAD F. WOLF, Acting Secretary of       | **TION FOR SUMMARY JUDG-**
23 Homeland Security, *et al.*, in their offi- | **MENT AND OPPOSITION TO**
   cial capacities,*                       | **PLAINTIFFS' MOTION FOR**
24                                         | **SUMMARY JUDGMENT**
25                      *Defendants*.

26 _____
27 * Pursuant to Federal Rule of Civil Procedure 25(d), Acting Commissioner Morgan
   is automatically substituted as a Defendant for former Commissioner McAleenan,
28 and Executive Assistant Commissioner Ferrara is automatically substituted as a De-
   fendant for former Executive Assistant Commissioner Owen.

1-SFER-038

1  class members' legal rights when they are subject to metering.[2]

2    Plaintiffs' imagined "turnback policy" is not discrete and final agency action,

3  and the border-wide metering decisions, while discrete, are not final because they

4  do not alter the parties' legal relationship.

5  **III.  Defendants Have Not "Direct[ed] CBP Officers to Unlawfully Withhold**
   **a Discrete, Mandatory Ministerial Action."**

6    As the government has demonstrated, Defendants have not directed CBP of-

7  ficers to unlawfully withhold discrete mandatory actions mandated by 8 U.S.C.

8  §§ 1158 or 1225. *See* Def. MSJ 37–40. Defendants respectfully maintain their posi-

9  tion that these statutes do not apply to aliens in Mexico, but even if they did, CBP

10 has demonstrably not withheld this action, having referred for credible-fear screen-

11 ing a high volume of inadmissible arriving aliens subject to expedited removal con-

12 currently with the implementation of metering. *Id.* Plaintiffs' arguments to the con-

13 trary, *see* Pl. Opp. 18–21, are incorrect.

14   *First*, Plaintiffs argue that §§ 1158 and 1225 apply to aliens in Mexico because

15 the government has conceded that "noncitizens seeking asylum who are turned back

16 at the border [are] 'attempting' to come into the United States at a POE." Pl. Opp.

17 18–19 n.13 (citing Pl. Ex. 17 at 197:21–202:3 and 8 C.F.R. § 1.2). This argument is

18 flawed. Plaintiffs cannot use fact deposition testimony to bind Defendants to a legal

19 conclusion. *See* Pl. Ex. 17 at 199:6–7, 13–14 (objections to questions as outside the

20 scope of 30(b)(6) topics); *United States v. Crawford*, 239 F.3d 1086, 1090 (9th Cir.

21 2001) ("The lay witness may not ... testify as to a legal conclusion."); *see also*

22 *Snapp v. United Transp. Union*, 559 F.3d 1088, 1104 (9th Cir. 2018) ("A 30(b)(6)

---

[2] Plaintiffs say that Defendants "disingenuously" argue that Roberto Doe did not suffer a "direct consequence" of being subject to metering. Pl. Opp. 9. But Defendants argued that Roberto Doe's removal from Mexico by Mexican officials was "not a direct *legal* consequence" of being subject to metering. Def. MSJ 36 (emphasis added). Nothing about metering automatically subjects an alien to removal from Mexico, as evidenced by the fact that many aliens continue to be processed at U.S. ports of entry and referred for credible-fear interviews. *See* Def. Ex. 4 at 2.

DEFS.' REPLY IN SUPPORT
OF CROSS-MSJ
Case No. 3:17-cv-02366-BAS-KSC

1-SFER-039

witness's legal conclusions are not binding on the party who designated him, and a designee's testimony likely does not bind [its employer] in the sense of a judicial admission." (citations and quotation marks omitted)). Even if credited for that purpose, the witness merely confirmed examining counsel's statement that "asylum seekers that are at the border ... want to make it onto U.S. soil so they can claim asylum in the United States." Pl. Ex. 17 at 199:2–9. Further, the regulation defining "arriving alien" as "an applicant for admission coming or attempting to come into the United States at a port-of-entry," 8 C.F.R. § 1.2, does not support Plaintiffs' argument: An "applicant for admission," *id.*, is an alien who is "present in the United States" or "arrives in the United States," 8 U.S.C. § 1225(a)(1). And to be "at a port-of-entry," 8 C.F.R. § 1.2, the alien must be on U.S. soil, *see United States v. Aldana*, 878 F.3d 877, 880–82 (9th Cir. 2017), *cert. denied* 139 S. Ct. 157 (2018); *DHS v. Thuraissigiam*, 140 S. Ct. 1959, 1982 (2020) ("[w]hen an alien arrives at a port of entry ... the alien is on U.S. soil").

*Second*, Plaintiffs urge this Court to disregard *Thuraissigiam*, asserting that it "has nothing to do with the meaning of the present-tense use of 'arrives' in §§ 1158 or 1225." Pl. Opp. 19 n.14. Yet the Supreme Court's analysis was informed by its thorough overview of § 1225. *See* 140 S. Ct. at 1964–65. Its clear declaration that "[w]hen an alien arrives at a port of entry ... the alien is on U.S. soil," *id.* at 1982, strongly supports the conclusion that the plain language of § 1225 does not encompass aliens on Mexican soil.

*Third*, Plaintiffs urge this Court to disregard *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155 (1993), because it does not "address the import" of §§ 1158 or 1225. Pl. Opp. 19. This is inaccurate. In *Sale*, the Supreme Court held that protections typically sought in former deportation and removal proceedings were not available to aliens interdicted on the high seas because "there is no provision in the statute for the conduct of [deportation and exclusion] proceedings outside the United States," and the provisions governing such proceedings "and other provisions of the

DEFS.' REPLY IN SUPPORT
OF CROSS-MSJ
Case No. 3:17-cv-02366-BAS-KSC

1-SFER-040

1   INA"—specifically, § 1158—"obviously contemplate that such proceedings would
2   be held in the country." *Sale*, 509 U.S. at 173 & n.29. Although Congress later
3   amended these statutes, *see* IIRIRA, Pub. L. No. 104-208, §§ 302, 604, 110 Stat.
4   3009 (1996), the amended language is just as *or more* territorially-focused than the
5   language interpreted in *Sale*. Compare 8 U.S.C. § 1226(a) (1952) (officer shall "de-
6   termine whether an arriving alien ... shall be excluded and deported"), *with* 8 U.S.C.
7   § 1225 (1996) (referring to alien who "arrives in" or "is arriving in"); *compare*
8   8 U.S.C. § 1158 (1980) (requiring asylum procedures for an alien "at a land border
9   or port of entry"), *with* 8 U.S.C. § 1158 (1996) (permitting an alien who "arrives in"
10  the United States to apply for asylum). That the *Sale* Court interpreted the arguably
11  *broader* language not to cover aliens outside the United States is dispositive of the
12  inquiry here: Sections 1158 and 1225 do not apply to class members.[3]

13  *Fourth*, Plaintiffs argue that this Court has "rejected Defendants' argument
14  about the use of the present progressive tense ('arriving in')" in § 1225(b)(1)(A)(ii),
15  Pl. Opp. 19 n. 15, that Defendants' argument about the threshold at which their duty
16  to "refer" is triggered (following the requisite determination of inadmissibility)
17  "conflat[es] access to the asylum process with a specific step in the process," *id.* at
18  20 n.16, and that Defendants' argument is contrary to the Ninth Circuit's holding in
19  *Barrios v. Holder*, 581 F.3d 849, 863 (9th Cir. 2009), "that 'physical presence' is
20  not a term of art," *id.* These points are incorrect. This Court held that the phrase
21  "arriving in" "encompasses aliens who are in the process of arriving," but it did not
22  hold that "arriving in" is by itself sufficient to trigger the duty to "refer." *Al Otro*
23  *Lado v. McAleenan*, 394 F. Supp. 3d 1168, 1204 (S.D. Cal. 2019). That duty is trig-
24  gered when an immigration officer "determines" that an alien "who is arriving in the

---

25
26  [3] Defendants respectfully submit that this Court did not address *Sale* in its prior anal-
27  ysis of the statutory language and therefore should reconsider its analysis. *See Al*
    *Otro Lado*, 394 F. Supp. 3d at 1199–1201, 1203–05; *Hoefer v. Fluor Daniel, Inc.*,
28  92 F. Supp. 2d 1055, 1059 (C.D. Cal. 2000) ("Reconsideration is proper if the
    Court's prior ruling was clear error.").

1    United States" is inadmissible on certain grounds, 8 U.S.C. § 1225(b)(1)(A)(ii), and

2    Plaintiffs do not claim that CBP fails to make such referrals following the requisite

3    inadmissibility determinations. Similarly, it is irrelevant to Plaintiffs' § 706(1) claim

4    that class members seek "access to the asylum process" writ large. Pl. Opp. 20. Un-

5    der § 706(1), a court may compel performance only of *discrete* legal obligations,

6    *Hells Canyon Preservation Council v. U.S. Forest Serv.*, 593 F.3d 923, 932 (9th Cir.

7    2010), and the only discrete legal obligation set forth in § 1225(b)(1)(A)(ii) is to

8    refer an alien for an interview, not to "grant access" to a process. *Barrios* is not to

9    the contrary, as it says only that "the definition of 'physical presence' does not re-

10   quire a specific 'status, intent, or state of mind'" and does not address §§ 1158 or

11   1225 at all. 581 F.3d at 863.

12       *Fifth*, Plaintiffs downplay H. Rept. 104-469 (1996) because it is associated

13   with H.R. 2202, a bill that supposedly "never became law," and because the legisla-

14   tive history relates to a "proposed 30-day deadline to file an affirmative asylum ap-

15   plication, which never became law." Pl. Opp. 19–20 (emphasis omitted). This is

16   wrong. H.R. 2202 was enacted as IIRIRA, and H. Rept. 104-469 is part of its legis-

17   lative history. *See* "Actions Overview," https://www.congress.gov/bill/104th-con-

18   gress/house-bill/2202/actions; H. Rept. 104-879, at 104 (1997) ("[m]ore complete

19   detail on the ... legislative history of [IIRIRA] may be found in ... Rept. 104–469,

20   Part I" (parenthesis omitted)). And although Congress ultimately provided more than

21   30 days to file an affirmative asylum application, that does not alter the point for

22   which Defendants cited H. Rept. 104-469: Congress clearly intended such applica-

23   tions to be made after "the date of the alien's arrival in the United States." 8 U.S.C.

24   § 1158(a)(2)(B).

25       *Sixth*, Plaintiffs contend that the Court should disregard the drastic increase in

26   CBP's credible-fear referrals, *see* Def. Ex. 4, because it "does not establish that [class

27   members] were not initially turned back or metered," Pl. Opp. 20. But Plaintiffs

28   challenge a class-wide policy "'aimed at deterring or limiting asylum seekers from

DEFS.' REPLY IN SUPPORT
OF CROSS-MSJ
Case No. 3:17-cv-02366-BAS-KSC

seeking asylum in the United States.'" *Id.* (quoting *Al Otro Lado*, 394 F. Supp. 3d at 1208). That there has been such a drastic increase in credible-fear referrals concurrent with the implementation of metering (and other alleged measures purportedly part of a "turnback policy") defeats the inference that Defendants have implemented such a policy or have taken such action for that purpose as to the entire class.

Plaintiffs' § 706(1) claim fails on the facts and the law.[4]

## IV.   Metering is Statutorily Permissible.

As the government has demonstrated, metering to facilitate safe and efficient processing or the prioritization of CBP's resources is statutorily permissible. *See* Def. MSJ 40–44. Plaintiffs' arguments to the contrary, *see* Pl. Opp. 9–11, rest on the incorrect view that CBP's duties to inspect applicants for admission are elevated over all other statutory duties.

*First*, Plaintiffs argue that 6 U.S.C. §§ 111(b), 202, 211(c), and 211(g)(3) do not "specifically grant Defendants the power to" meter, Pl. Opp. 9, whereas Congress in 8 U.S.C. § 1225(a)(3) "specifically mandated" that the government "inspect all noncitizens arriving at POEs," *id.* at 10. Relatedly, Plaintiffs contend that Defendants lack authority "to amend the INA or the HSA [Homeland Security Act] to suit their needs." *Id.* at 11. These points misapprehend the statutory obligations at

---

[4] Plaintiffs indicate that they will argue "in their forthcoming reply" that metering imposes unreasonable delays. Pl. Opp. 21 n.18 (citing *Telecommunications Research and Action Center v. FCC* (*TRAC*), 750 F.2d 70 (D.C. Cir. 1984)). But "Plaintiffs ma[d]e no attempt" in their opening brief "to argue that these delays are unreasonable," Def. MSJ 40, so they cannot raise an unreasonable delay argument for the first time in reply, *see Eberle v. City of Anaheim*, 901 F.2d 814, 818 (9th Cir. 1990) ("general rule" is that parties "cannot raise a new issue for the first time in their reply briefs"). Plaintiffs will likely argue that their unreasonable-delay argument is responsive to Defendants' arguments, *see* Pl. Opp. 18 n.21 (asserting that "Defendants oppose Plaintiffs' motion for summary judgment under § 706(1) by citing the [*TRAC*] factors"), but Defendants never cited the *TRAC* factors at all, *see* Def. MSJ 1–60, and "merely not[ing] that [Plaintiffs] ... failed to raise the issue" "does not constitute raising the issue," *Eberle*, 901 F.2d at 818.

1    issue. That § 1225 includes specific procedures does not give those duties higher

2    priority than those imposed by 6 U.S.C. §§ 111(b), 202, 211(c), or 211(g)(3). CBP's

3    immigration inspection duty is only one of many statutory obligations, *see id.*

4    § 211(c)(8), and Defendants have broad discretion to allocate their limited resources

5    and personnel to accomplish those obligations, *see* Def. MSJ 43–44 (citing *Massa-*

6    *chusetts v. EPA*, 549 U.S. 497, 527 (2007), and *Compassion Over Killing v. FDA*,

7    849 F.3d 849, 857 (9th Cir. 2017)). Plaintiffs invoke the interpretive canon that the

8    "specific governs the general," Pl. Opp. 10 (quoting *RadLAX Gateway Hotel, LLC*

9    *v. Amalgamated Bank*, 566 U.S. 639, 645 (2012)), but that canon applies where a

10   statute's "general permission or prohibition is contradicted by a specific prohibition

11   or permission," or where "a general authorization and a more limited, specific au-

12   thorization exist side-by-side," *RadLAX Gateway Hotel*, 566 U.S. at 645. This case,

13   in contrast, involves multiple statutory *obligations*. CBP does not claim authority to

14   avoid obligations imposed by § 1225, *see* Def. MSJ 40–44, and it continues to dis-

15   charge such obligations, *see* Def. Ex 4. Metering to help facilitate multiple statutory

16   obligations is well within the government's authority.

17       *Second*, Plaintiffs contend that *Massachusetts v. EPA* and *Compassion Over*

18   *Killing* apply only to an agency's discretion "not to engage in enforcement" or to

19   "use case-by-case rulemaking rather than promulgating regulations." Pl. Opp. 11.

20   This is wrong. *Massachusetts* says that an agency's discretion "is at its height when

21   the agency decides not to bring an enforcement action," but the Supreme Court sep-

22   arately emphasized that, as a general rule, "an agency has broad discretion to choose

23   how best to marshal its limited resources and personnel to carry out its delegated

24   responsibilities." 549 U.S. at 527. Nothing in the decision limits its application to

25   non-enforcement decisions. Likewise, the Ninth Circuit in *Compassion Over Killing*

26   held that an agency may choose between various forms of rulemaking *and* stated

27   that "the agency's decision to prioritize other projects is entitled to great deference

28   by a reviewing court." 849 F.3d at 857. Thus, the case is consistent with black-letter

DEFS.' REPLY IN SUPPORT
OF CROSS-MSJ
Case No. 3:17-cv-02366-BAS-KSC

1-SFER-044

administrative law that an agency is in the "unique—and authoritative—position to view its projects as a whole, estimate the prospects for each, and allocate its resources in the optimal way." *In re Barr Labs, Inc.*, 930 F.2d 72, 76 (D.C. Cir. 1991) (cited in *Compassion Over Killing*, 849 F.3d at 857). DHS and CBP have exercised that inherent authority to prioritize and facilitate CBP's national-security, counter-narcotics, economic-security, and trade-and-travel mission sets, while concurrently processing the same volume of inadmissible arriving aliens and referring significantly more of those aliens for credible-fear interviews. *See* Def. MSJ 25–31. Where the government is discharging its multiple obligations concurrently, courts sitting in APA review "have no basis for reordering agency priorities." *In re Barr Labs*, 930 F.2d at 76. Defendants' actions are statutorily permissible.

## V.   Defendants' Actions are Not Arbitrary and Capricious.

As Defendants have demonstrated, each of the border-wide metering decisions is well supported by the factual record that was before the agency, is logical and coherent, is the product of reasoned decisionmaking, and readily satisfies the narrow standard for arbitrary-and-capricious review. *See* Def. MSJ 44–54. Plaintiffs contend that the government's actions are based on pretext, that the true motivations for metering are unlawful, and the metering is inconsistent with Congressional intent, *see* Pl. Opp. 11–18, but those arguments are flawed.

### A.   Defendants' Border-Wide Actions are Not Based on "Pretext."

Plaintiffs make several arguments that the border-wide metering decisions are arbitrary and capricious because the stated reasons for metering are allegedly "pretextual" and have a deterrence motive. *See* Pl. Opp. 12–18. These points are flawed.

As a general matter, Plaintiffs' arguments continue to ignore the APA standard for when an agency action is challenged as "pretextual." *See* Def. MSJ 44–54. In such cases, "an agency must disclose the basis of its action." *Dept. of Commerce v. New York*, 139 S. Ct. 2551, 2573 (2019) (quotation marks omitted). Defendants have disclosed the basis of the border-wide metering decisions—to facilitate orderly

processing and the prioritization of CBP's resources. *See* Def. Exs. 2, 3, 5; Def. MSJ 45–47. Even if the government "might also have had other unstated reasons" for acting, "a court may not reject an agency's stated reasons" on that basis. *Dept. of Commerce*, 139 S. Ct. at 2573. This Court could vacate the metering decisions only if "the evidence tells a story that does not match the explanation the [government] gave for [its] decision," *id.* at 2575, but that is simply not the case here. Further, it is a "valid immigration goal [to] reduc[e] the number of undocumented aliens arriving at our borders." *Jean v. Nelson*, 472 U.S. 846, 880 (1985) (Marshall, J., dissenting).

In any event, Plaintiffs' arguments are wrong on their own terms. *First*, Plaintiffs contend that they have shown "pretext" because they presented evidence that an officer at the Tecate POE was "instructed to lie." Pl. Opp. 12 (citing Pl. Ex. 1). This does not show "pretext" because it does not rebut the ample and undisputed factual support that Defendants were *in fact facing capacity constraints* and resultant overcrowding and diversion of resources away from other missions because of surge events when they made the border-wide metering decisions. *See* Def. MSJ 10–31, 45–47. Plaintiffs assert that Defendants "cite nothing" in support of their argument that the Tecate officer lacked knowledge of events at other POEs. Pl. Opp. 12–13 (emphasis omitted). But *Plaintiffs* have the burden of establishing the scope of a witness's firsthand knowledge, including that he has knowledge of a border-wide policy. *See Pfingston v. Ronan Eng'g Co.*, 284 F.3d 999, 1004 (9th Cir. 2002) (party seeking admission "bears the burden of proof of admissibility"); *Moriarty v. County of San Diego*, No. 17-cv-1154, 2020 WL 5656689, at *3 (S.D. Cal. Sept. 23, 2020) ("a percipient witness' testimony must be based on personal knowledge, not speculation or conjecture"). At his deposition, the witness was responding to questions about his experience at the Tecate POE. *See* Pl. Ex. 1 at 98:15–101:6. This is facially insufficient to establish a border-wide agency action to "lie" to aliens who intend to seek asylum. It is no answer to say that Defendants "do not claim that officers elsewhere were not instructed to lie," Pl. Opp. 13, because *Plaintiffs* have the burden of

15

1   pointing to evidence supporting their claims of "pretext," *see Quidel Corp. v. Sie-*
2   *mens Med. Solutions USA, Inc.*, — F. Supp. 3d —, 2020 WL 1820247, at *2 (S.D.
3   Cal. Apr. 9, 2020) ("[i]f the moving party fails to discharge [its] initial burden, sum-
4   mary judgment must be denied"). Plaintiffs cite Pl. Ex. 117 for the proposition that
5   CBP "standardized its conduct across POEs," Pl. Opp. 13, but that Exhibit shows
6   that "*holding the line*" would be standardized across the border. Pl. Ex. 117 at 620
7   (emphasis added). It misrepresents the facts to insinuate that this Exhibit shows that
8   "lies" or other allegedly "dishonest[]" acts were CBP's standard practice.

9       *Second*, Plaintiffs again suggest that Otay Mesa officers lied by telling travel-
10   ers that the facility was at "capacity" without actually checking. Pl. Opp. 13. But
11   they have no response to Defendants' point that officers at the limit line do not make
12   metering decisions, so it would not necessarily show "lies" even if the officers did
13   not check the port's capacity at every turn. *See* Def. MSJ 48; Def. Ex. 2 ("DFOs
14   [Directors of Field Operations] may elect to meter"); Pl. Ex. 102 at 44:17–20 (As-
15   sistant Port Director "ha[s] responsibility for implementing" metering).

16       *Third*, Plaintiffs contend that David Atkinson's testimony opining on the rea-
17   sons why the Hidalgo POE removed chairs from the secondary inspection area is
18   admissible because "Defendants never objected to the question." Pl. Opp. 14 (em-
19   phasis omitted). As explained, Defendants object to the testimony, not the question,
20   and that objection is not waived. *See supra* at pp. 4–5 & n.1. David Atkinson's "be-
21   lief that [Defendants] acted from an unlawful motive, without evidence supporting
22   that belief, is no more than speculation or unfounded accusation about whether the
23   defendant really did act from an unlawful motive." *Carmen*, 237 F.3d at 1028.

24       *Fourth*, Plaintiffs say it is "not true" that "asylum seekers were turned back
25   solely due to operational exigencies," because in a November 22, 2016 email, Bev-
26   erley Good stated in passing that metering in the Laredo Field Office at that time
27   "seems to have had a deterrent effect." Pl. Opp. 14 (citing Pl. Opp. Ex. 1). But De-
28   fendants do not claim that metering occurs "solely" due to "operational exigencies."

DEFS.' REPLY IN SUPPORT
OF CROSS-MSJ
Case No. 3:17-cv-02366-BAS-KSC

Metering is authorized to facilitate safe and efficient processing and to facilitate CBP's priority missions, and the factual record shows that metering is used for those purposes. *See* Def. MSJ 45–50. Ms. Good's email is not to the contrary, nor is it inconsistent with her declaration. Moreover, an after-the-fact characterization of a policy's effects by an individual who did not issue the policy does not show why the policy was implemented in the first place. *See DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1907 (2020) (agency's contemporaneous explanation is the "natural starting point" for assessing agency action); *id.* at 1916 (Roberts, C.J., plurality) (non-contemporaneous statements by persons not involved in policy decision "are unilluminating").

*Fifth*, Plaintiffs contend that Mr. Owen's sworn testimony that metering is "not 'designed to deter migrants from entering the U.S.'" should not be credited because Mr. Owen briefed the Secretary on, among other things, the estimated number of undocumented aliens whom would be affected by metering, and the Secretary issued the June 2018 memorandum with that knowledge. Pl. Opp. 14 (quoting Pl. Ex. 10 at 70:1–5; citing Pl. Ex. 97). But as explained, knowledge of a policy's impact does not establish that the stated reasons for the policy—avoiding overcrowding at the ports and managing capacity—are untrue. Def. MSJ 48–49; *see Dept. of Commerce*, 139 S. Ct. at 2573.

*Sixth*, Plaintiffs say that the government's "operational exigency argument is undermined" by contemporaneous reports purportedly showing that even "where POEs were operating above 100% capacity, the number of asylum seekers did not impact POE operations." Pl. Opp. 15 n.10. Yet the adverse impacts of exceeding or approaching physical detention capacity are otherwise well documented in different contemporaneous reports. *See, e.g.*, Def. MSJ 10–22; Pl. Ex. 42 at 127 ("We have no space [at San Ysidro POE] and it is ugly."). In any event, not all ports reported "no impact" when operating above 100% physical detention capacity. *See, e.g.*, Pl. Ex. 24 at 8–10 (the El Paso POE reported "Queue Management in Process" in the

DEFS.' REPLY IN SUPPORT
OF CROSS-MSJ
Case No. 3:17-cv-02366-BAS-KSC

"Impact to Port Operations" column for several days that exceeded 100% capacity).[5]

*Seventh*, Plaintiffs argue that the government is wrong that "turnbacks 'for the most part' stopped in January 2017" because there is evidence of "turnbacks" occurring in 2017. Pl. Opp. 15 (quoting Def. MSJ 15). Presumably, this is an argument that metering is pretextual, and therefore arbitrary and capricious, because it occurred when there were relatively few arrivals. But Defendants never contended that CBP categorically ceased metering at all POEs in 2017. Rather, the evidence—including Plaintiffs' class-certification expert's report—shows that metering decreased in prevalence in 2017 roughly in tandem with the decrease in inadmissible arriving aliens. *See* Def. MSJ 21 & n.2; Pl. Ex. 20 ¶ 41. This shows that CBP has used metering to mitigate operational issues stemming from overcrowded ports of entry. The instances that Plaintiffs cite are not evidence that CBP continued to meter as its default operational posture in 2017 despite a decline in numbers. Instead, the evidence shows that CBP suspended for 30 days the officer who improperly returned an asylum seeker from U.S. soil, Def. Ex. 40; that the San Diego Field Office's streamlined-withdrawal policy requires officers to refer an applicant for a credible-fear interview if he "indicates a request for asylum or articulates a fear of returning," Def. Ex. 41 at 619; that, in any event, San Ysidro personnel were instructed not to use streamlined withdrawals in June 2017 because "apprehensions [were] currently manageable," Pl. Ex. 7 at 611; and that upon learning of a metering complaint in April 2017 (*see* Pl. Opp. Ex. 2), San Ysidro leadership reminded all managers that the Port "ha[d] adequate detention space" and that "[a]ny asylum applicant should

---

[5] There is no consensus among the reporting Field Offices as to the meaning of the column labeled "Impact to Port Operations" in the reports Plaintiffs summarize. For example, the San Ysidro POE did not agree that this column meant "whether the number of detainees held at the AEU had an impact on port operations." Pl. Ex. 17 at 183:21–184:1. Instead, because everyone knew that the San Ysidro POE had a queue and "was regularly operating at its operational capacity," that Port defined "impact to port operations" to mean "anything out of the norm." *Id.* at 184:2–11.

DEFS.' REPLY IN SUPPORT
OF CROSS-MSJ
Case No. 3:17-cv-02366-BAS-KSC

be taken into custody ... for proper intake and processing," Def. Ex. 45. These are not actions to restrict access to the asylum process "for its own sake." Pl. MSJ 29.

*Eighth*, Plaintiffs say: "citing no evidence, Defendants claim that they could not use parole to respond to surges in immigration." Pl. Opp. 15 (citing Def. MSJ 49). But Defendants actually said: "mass parole would be manifestly contrary to the plain language of § 1225." Def. MSJ 49 (citing *Jennings v. Rodriguez*, 138 S. Ct. 830, 845 (2018), and H. Rept. 104-469, pt. 1, at 141 (1996)). In contrast to mass parole, it is consistent with Congress's intent that undocumented aliens wait in Mexico, as evidenced by its enactment of 8 U.S.C. § 1225(b)(2)(C).

*Ninth*, Plaintiffs dispute Defendants' point that OFO used "operational capacity" before June 2018. *See* Pl. Opp. 16. To start, whether and when CBP used the term "operational capacity" is immaterial to whether any of the four border-wide metering decisions are arbitrary and capricious or whether the reasons for those decisions were pretextual. It merely shows that CBP accounts for operational factors consistent with the directive in the June 2018 memorandum. In any event, Plaintiffs are wrong. OFO has always accounted for operational factors in detention contexts, as evidenced by CBP's National Standards on Transportation, Escort, and Detention Standards, Def. Ex 59 at 055, and OFO personnel's testimony, Pl. Ex. 17 at 101:8–14; Def. Ex. 57 ¶ 10; Def. Ex. 58 ¶¶ 13–15; Def. Ex. 60 ¶ 7; Def. Ex. 61 at 279.

*Tenth*, Plaintiffs suggest that it is immaterial that Defendants implemented their contingency plans before implementing metering border-wide. *See* Pl. Opp. 16. Specifically, they contend that Defendants' argument is "a non sequitur" because contingency plans are exclusively associated with influx events, and "[c]omplaining that there was overcrowding when a contingency plan is activated is like complaining about getting wet when standing in the rain." *Id.* Not so. At the risk of extending the analogy, choosing to meter after contingency plans prove insufficient is more like choosing to wear a raincoat after learning that your umbrella has a hole. The border-wide metering decisions are reasonable attempts to solve a problem that, in

DEFS.' REPLY IN SUPPORT
OF CROSS-MSJ
Case No. 3:17-cv-02366-BAS-KSC

2016, almost pushed DHS past its breaking point and could not be mitigated through the Department's existing plans. *See* Def. MSJ 10–31. Such actions must be upheld under deferential arbitrary-and-capricious review because "the choice between reasonable policy alternatives in the face of uncertainty [is] the [government's] to make." *Dept. of Commerce*, 139 S. Ct. at 2570.

*Eleventh*, Plaintiffs take issue with Defendants' purported argument that the "'prioritization regime' was 'successful' because the number of credible fear interviews increased in 2018 and 2019." Pl. Opp. 16–17 (citing Def. MSJ 4). They argue that the border Field Offices' drastic increase in credible-fear referrals is "misleading" because it "may simply mean that CBP chose to refer a higher percentage of arriving asylum seekers for a credible fear interview" instead of full removal proceedings. *Id.* at 17. And they claim that "even if" there was a drastic increase in credible-fear referrals from 2018 to 2019, there was a 327% increase in the number of aliens waiting in Mexican border towns. *Id.* Plaintiffs' points are flawed. There was nothing "misleading" in the government's citation to the increase in credible-fear referrals—the government explained that this "figure represents only a subset of class members whom CBP referred for asylum processing." Def. MSJ 39. Further, the government did not argue that the prioritization regime was successful because it increased credible-fear referrals; it argued that the regime was successful because it allowed the border Field Offices to increase their drug-seizure weights and out-bound currency interdictions *while also* permitting them to maintain the overall level of inadmissible-alien processing. *See* Def. MSJ 4, 50. Plaintiffs speculate that the drastic increase in credible-fear referrals "may" not mean that Defendants "inspected more arriving asylum seekers," but they offer no facts supporting that contention, and they have no meaningful response to the prioritization regime's successes. *See* Pl. Opp. 16–18. This Court may consider those points uncontested. And Plaintiffs never explain why an increase in the number of undocumented aliens waiting in border towns supports their argument that metering is arbitrary and capricious. *See*

20

*id.* If anything, the fact that there was such a drastic increase in undocumented aliens at the same time that the border ports were inspecting roughly the same number of inadmissible aliens overall, *see* Def. Ex. 4 at 2, corroborates Defendants' argument that there was an unmanageable surge of undocumented aliens in 2019, and that metering helped to prevent another operational crisis. No part of Plaintiffs' response overcomes Defendants' strong factual showing on these points.

*Finally*, Plaintiffs say that Defendants "do nothing" to contest that some ports sometimes had "arbitrary caps" on intakes after June 2018. Pl. Opp. 18. But the documents Plaintiffs cite do not in fact demonstrate that ports imposed an arbitrary ceiling on intakes. *See, e.g.*, Pls.' Ex. 105 (suggesting that capacity should not be lower than 60–70%). And even if this were true for some ports at some times, Plaintiffs have not explained how this renders the Secretary's June 2018 prioritization-based queue management memorandum arbitrary and capricious. Defendants pointed out that the border Field Offices referred more inadmissible arriving aliens for credible-fear interviews overall, *see* Def. MSJ 50, and the evidence shows that the ports inspected the same number of inadmissible aliens overall, *see* Def. Ex. 4 at 2. In a border-wide class action such as this, the overall numbers are more probative of whether CBP adopted an *agency-wide* policy designed to restrict "access to the asylum process" than any given port's numbers viewed in isolation.

The border-wide metering decisions were well-supported by the factual record before the agency, are logical and coherent, are the product of reasoned decisionmaking, and more than satisfy the narrow and deferential standard for arbitrary-and-capricious review. None of Plaintiffs' evidence demonstrates pretext or shows that Defendants' stated reasons for metering are untrue. At minimum, evidence of pretext is genuinely disputed and precludes summary judgment for Plaintiffs.

### B.   Metering is Consistent with Congressional Intent.

Plaintiffs' contentions that metering is inconsistent with Congressional intent are also incorrect. *See* Pl. Opp. 9–10. *First*, Plaintiffs say that metering is arbitrary

DEFS.' REPLY IN SUPPORT
OF CROSS-MSJ
Case No. 3:17-cv-02366-BAS-KSC

1-SFER-052

1   MAYER BROWN LLP
      Matthew H. Marmolejo (CA Bar No. 242964)
2     *mmarmolejo@mayerbrown.com*
    350 S. Grand Avenue
3   25th Floor
    Los Angeles, CA 90071-1503
4     Ori Lev (DC Bar No. 452565)
      (*pro hac vice*)
5     *olev@mayerbrown.com*
      Stephen M. Medlock (VA Bar No. 78819)
6     (*pro hac vice*)
      *smedlock@mayerbrown.com*
7   1999 K Street, N.W.
    Washington, D.C. 20006
8   Telephone:  +1.202.263.3000
    Facsimile:   +1.202.263.3300
9
    SOUTHERN POVERTY LAW CENTER
10    Melissa Crow (DC Bar No. 453487)
      (*pro hac vice*)
11    *melissa.crow@splcenter.org*
    1101 17th Street, N.W., Suite 705
12  Washington, D.C. 20036
    Telephone: +1.202.355.4471
13  Facsimile: +1.404.221.5857

14  *Additional counsel listed on next page*
    *Attorneys for Plaintiffs*
15
                  **UNITED STATES DISTRICT COURT**
16
                **SOUTHERN DISTRICT OF CALIFORNIA**
17

18  Al Otro Lado, Inc., *et al.*,          Case No.:  17-cv-02366-BAS-KSC

19                  Plaintiffs,            **EXHIBIT 20 IN SUPPORT OF**
                                           **PLAINTIFFS' MEMORANDUM OF**
20          v.                             **POINTS AND AUTHORITIES IN**
                                           **SUPPORT OF THEIR MOTION**
21  Chad F. Wolf,[1] *et al.*,             **FOR SUMMARY JUDGMENT**

22                  Defendants.
                                           **FILED UNDER SEAL**
23

24

25

26

27  _____
    [1] Acting Secretary Wolf is automatically substituted for former Acting Secretary
28  McAleenan pursuant to Fed. R. Civ. P. 25(d).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

CENTER FOR CONSTITUTIONAL RIGHTS
  Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
  *bazmy@ccrjustice.org*
  Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
  *gschwarz@ccrjustice.org*
  Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
  *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
  Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
  *sarah.rich@splcenter.org*
  Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
  *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
  Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
  *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

EXHIBIT 20 IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

documents in hand, CBP began systematically blocking asylum seekers from ever reaching the U.S. side of the bridge or the port of entry's entrance hall.

51.     When a pedestrian approaches the U.S.-Mexico dividing line, CBP officers stand at the "control stations" on the international line or right behind it and ask for the individual's migration paperwork. If the pedestrian does not have a U.S. passport or visa to enter the United States, CBP officers often physically block their passage into U.S. territory by standing in the center of the pedestrian walkway. CBP officers then tell arriving asylum seekers[66] that there is no capacity at the port of entry and the asylum seekers cannot currently be processed, which is also the explanation laid out in the "Metering Guidance." At times, these stationed CBP officers may also instruct the arriving asylum seekers to contact officials on the Mexican side of the border, to go to local Mexican shelters, or to first get on an asylum waitlist.

52.     After being turned away from the U.S. port of entry, asylum seekers must figure out where to stay in the Mexican border city and how to get in line to ask for asylum in the United States. In the weeks and months after the "Metering Guidance" memo, asylum seekers generally held their place in line by waiting in

---

[66] The CBP officers know that the person is an asylum seeker based on their lack of appropriate migratory documents or if they preemptively announce that they would like to seek asylum to the CBP officers stationed at the limit line.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

physical lines on international bridges or outside the ports of entry. These initial lines were reported on the bridges outside ports of entry in Brownsville[67], Hidalgo[68],

---

[67] Aurora Orozco, "Familias de inmigrantes esperan bajo inclmencias en puentes internacionales," *El Nuevo Herald*, June 19, 2018, http://www.elnuevoheraldo.com/el_valle/noticias_locales/familias-de-inmigrantes-esperan-bajo-inclemencias-en-puentes-internacionales/article_69abbd70-73dc-11e8-aa87-4b8d72916648.html.

[68] Sandra Tovar, "'Toman' migrantes Puente en busca de asilo en EU," *El Mañana*, May 22, 2018, https://www.elmanana.com/toman-migrantes-puente-busca-asilo-eu-puente-internacional-migrantes-asilo-politico/4415659.

1-SFER-056

Roma[69], Laredo[70], Eagle Pass[71], Nogales[72], El Paso[73], and San Diego[74]. In the following months, due to local residents' concerns, hygiene issues, inclement weather, or disputes regarding fairness, Mexican officials, non-governmental organizations, or asylum seekers themselves began waitlists to allow people to hold their place in line with their name instead of physical presence. These asylum

---

[69] Silvia Foster-Frau, "Asylum seekers denied legal entry into U.S. are camping out on bridges," *San Antonio Express News*, June 6, 2018, https://www.expressnews.com/news/local/article/Asylum-seekers-denied-legal-entry-into-U-S-are-12973965.php.

[70] Meredith Hoffman, "The Horrible Conditions Endured by Migrants Hoping to Enter the US Legally," *Vice News*, July 3, 2018, https://www.vice.com/en_us/article/59qny3/migrants-hoping-to-get-us-asylum-forced-to-wait-on-bridge.

[71] "Incomoda a automovilistas y peatones presencia de migrantes en puentes internacionales de Piedras Negras," La Rancherita del Aire, July 26, 2018, https://www.rancherita.com.mx/noticias/detalles/53790/incomoda-a-automovilistas-y-peatones-presencia-de-migrantes-en-puentes-internacionales-de-piedras-negras.html#.XcjjtudKjGJ.

[72] "Simon Romero & Miriam Jordan, "On the Border, a Discouraging New Message for Asylum Seekers: Wait," *New York Times*, June 12, 2018, https://www.nytimes.com/2018/06/12/us/asylum-seekers-mexico-border.html.

[73] Silvia Foster-Frau, "Asylum seekers denied legal entry into U.S. are camping out on bridges," *San Antonio Express-News*, June 6, 2018, https://www.expressnews.com/news/local/article/Asylum-seekers-denied-legal-entry-into-U-S-are-12973965.php#photo-15680354.

[74] "Asylum seekers wait days and weeks at U.S.-Mexico border," *Associated Press*, June 7, 2018, https://www.cbsnews.com/news/asylum-seekers-wait-days-and-weeks-at-u-s-mexico-border/.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

waitlists have no standardized procedure or structure. These waitlists are still in place in every city with waiting asylum seekers, and may be managed by the asylum seekers themselves, Mexican government officials, or humanitarian workers.

**Table 2: Groups that Run the Asylum Waitlist (November 2019)[75]**

| List Managers | Number of Lists | Lists by City |
|---|---|---|
| Non-governmental organization | 9 | Nuevo Laredo (6), Reynosa, Agua Prieta, San Luis Río Colorado |
| Grupo Beta | 3 | Tijuana, Mexicali, Ciudad Acuña |
| Asylum Seekers | 5 | Ciudad Juárez (3), Brownsville (2) |
| National Migration Institute | 1 | Brownsville |
| Civil Protection | 2 | Ciudad Acuña, Nogales |
| State Population Agency | 1 | Ciudad Juárez |
| Municipal Government | 1 | Piedras Negras |

53.     Similarly, there is no standardized Mexican or U.S. regulation of the asylum waitlists nor their managers.[76] There are also no controls to guarantee that these waitlists are being run transparently or without corruption. Due to this lack of oversight, asylum seekers and civil society organizations have alleged that some list managers charge asylum seekers to get on the asylum waitlist, including in Piedras

---

[75] Cities may be listed in multiple categories if the city contains multiple waitlists. For example, in Ciudad Juárez, there are currently three Mexican asylum waitlists (one at each international bridge) and a non-Mexican asylum waitlist.

[76] Despite Mexican government entities managing the lists in certain cities, there does not appear to be any standardized guidance. This is evidenced by the different list formats and processes in different cities even when the same federal government agency is running the asylum waitlist.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Negras[77], Reynosa[78], and Matamoros[79]. This makes seeking asylum at a U.S. port of entry dependent on whether asylum seekers and their loved ones can pay hundreds or thousands of dollars.

54. Additionally, the lack of regulations means that some cities can stop asylum seekers from joining waitlists altogether. For example, in Ciudad Acuña—opposite from Del Rio, Texas—the asylum waitlists for both individuals and families have been "closed" since March 2019.[80] This means that list managers (Civil

---

[77] "Metering Update," Strauss Center for International Security and Law and the Center for U.S.-Mexican Studies, November 2019, https://www.strausscenter.org/images/strauss/18-19/MSI/MeteringUpdate_191107.pdf.

[78] Emily Green, "Mexican officials are extorting thousands of dollars from migrants applying for asylum," *Vice News*, May 13, 2019, https://www.vice.com/en_us/article/kzdy4e/exclusive-mexican-officials-are-extorting-thousands-of-dollars-from-migrants-to-apply-for-asylum; Carolina Garza, "Cubanos denuncian a INM de corrupción en trámite de asilo humanitario," *Milenio*, June 5, 2019, https://www.milenio.com/politica/cubanos-denuncian-inm-corrupcion-tramite-asilo-humanitario.

[79] Molly Hennessy-Fiske, "Asylum seeker blocked at Texas border bridges say Mexican officials are demanding money to let them pass," *Los Angeles Times*, November 22, 2018, https://www.latimes.com/nation/la-fg-asylum-list-border-2018-story.html.

[80] There were also reports that the Piedras Negras was periodically closed throughout 2019. "Metering Update," Strauss Center for International Security and Law and the Center for U.S.-Mexican Studies, November 2019, https://www.strausscenter.org/images/strauss/18-19/MSI/MeteringUpdate_191107.pdf.

33

Protection for adults and Grupo Beta for families) are not accepting any additional asylum seekers onto the waitlists. While CBP officers are not involved in managing these lists, in certain cities such as Reynosa[81], Piedras Negras[82], and Mexicali[83], the list managers reportedly share asylum seekers' information with CBP officers before the asylum seekers return to the U.S. border to seek asylum.

55.     Once asylum seekers get on a waitlist, they have to wait until their number is called. Every day, a CBP official communicates the number of people that they will receive that day to an individual in Mexico. This exact process depends on the port of entry and the waitlist structure in each Mexican city. According to list managers in cities such as Ciudad Juárez, Ciudad Acuña, and Piedras Negras, CBP officers directly call the Mexican individuals who manage the lists.[84] In other cities,

---

[81] "Metering Update," Strauss Center for International Security and Law and the Center for U.S.-Mexican Studies, November 2019, https://www.strausscenter.org/images/strauss/18-19/MSI/MeteringUpdate_191107.pdf.

[82] "Barred at the Border," Human Rights First, April 2019, https://www.humanrightsfirst.org/sites/default/files/BARRED_AT_THE_BORDER.pdf.

[83] "Asylum Processing and Waitlists at the U.S.-Mexico Border," Strauss Center for International Security and Law, Center for U.S.-Mexican Studies, & Migration Policy Centre, December 2018, https://www.strausscenter.org/images/strauss/18-19/MSI/AsylumReport_190308.pdf.

[84] In Ciudad Juárez, the list manager is a representative from the State Population Council (*Consejo Estatal de Población*, COESPO); in Ciudad Acuña, it is a representative from the city's Civil Protection agency (Protección Civil); and in

MAYER BROWN LLP
  Matthew H. Marmolejo (CA Bar No. 242964)
  *mmarmolejo@mayerbrown.com*
350 S. Grand Avenue
25th Floor
Los Angeles, CA 90071-1503
  Ori Lev (DC Bar No. 452565)
  (*pro hac vice*)
  *olev@mayerbrown.com*
  Stephen M. Medlock (VA Bar No. 78819)
  (*pro hac vice*)
  *smedlock@mayerbrown.com*
1999 K Street, N.W.
Washington, D.C. 20006
Telephone:  +1.202.263.3000
Facsimile:   +1.202.263.3300

SOUTHERN POVERTY LAW CENTER
  Melissa Crow (DC Bar No. 453487)
  (*pro hac vice*)
  *melissa.crow@splcenter.org*
1101 17th Street, N.W., Suite 705
Washington, D.C. 20036
Telephone: +1.202.355.4471
Facsimile: +1.404.221.5857

*Additional counsel listed on next page*
*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*,<br><br>                Plaintiffs,<br><br>        v.<br><br>Chad F. Wolf, [1] *et al.*,<br><br>                Defendants. | Case No.:  17-cv-02366-BAS-KSC<br><br>**EXHIBIT 97 TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>**Declaration of Maria Doe** |

---

[1] Acting Secretary Wolf is automatically substituted for former Acting Secretary McAleenan pursuant to Fed. R. Civ. P. 25(d).

CENTER FOR CONSTITUTIONAL RIGHTS
   Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
   *bazmy@ccrjustice.org*
   Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
   *gschwarz@ccrjustice.org*
   Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
   *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
   Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
   *sarah.rich@splcenter.org*
   Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
   *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.401.221.5857

AMERICAN IMMIGRATION COUNCIL
   Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
   *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.56

Maria Doe

# DECLARATION OF █████

Maria Doe

I, ████ hereby declare under the penalty of perjury pursuant to 28 U.S.C. § 1746:

1.    I make this declaration based on my personal knowledge except where I have indicated otherwise. If called as a witness, I could and would testify competently and truthfully to these matters.

2.    I am a citizen of Guatemala. I am 36 years old. I have two children; one is 7, and the other is 12. I was married to a Mexican, and I am a permanent resident of Mexico. My children were born in Mexico.

3.    I lived in Chiapas, Mexico for seven years with my husband and children. My husband became involved with cartels and became very abusive toward me and the children. When I found out that he was involved with cartels, I left him. After I left my husband, the cartel he has been associated with started searching for me and my children. We searched for a safe place to live in Mexico or Guatemala for about two years, but wherever we went the cartels found us and came after us. Now he is involved with a new cartel, and is threatening us.

4.    In September 2018, I traveled with my children to Nuevo Laredo, Mexico. I intended to cross the bridge and ask for asylum in the United States. On September 10, 2018, I went to the port of entry in Nuevo Laredo with my two kids. It was around 8:00 p.m. After paying the toll to access the bridge, when we approached the midpoint I was stopped by two United States immigration officials. They asked to see my identification. I showed them my identification and I told them that I wished to seek asylum in the United States They told me to wait on the Mexican side of the bridge for my turn and they would call me. I waited just a few minutes and then two Mexican officials walked toward me from the Mexican side of the bridge.

5.    The Mexican officials told me that the United States officials would

1

not let me cross the bridge, but if I paid the Mexican officials $1500, or $500 for each of the three of us, they would arrange for us to cross the bridge. I did not have the money. Instead, I travelled Reynosa, Mexico to try to cross a different bridge to apply for asylum in the United States.

6.     After I arrived in Reynosa, I ended up staying at a shelter near the border because the situation in Reynosa and all of Tamaulipas state is incredibly dangerous. We did not feel safe immediately going to the bridge until we knew what the situation was. While I was in the shelter, I met with an American lawyer, Jennifer Harbury, who agreed to help me present for asylum at the Reynosa-Hidalgo Port of Entry.

7.     My children and I walked up to the bridge in Reynosa on September 19, 2018 in the late afternoon. I was accompanied by my American lawyer as well. I had my Mexican permanent residence card and my children's Mexican birth certificates. We were at the turnstile to walk onto the bridge, but only took a few steps before a Mexican immigration official demanded to see my documents. I gave him our identification documents. The Mexican officials started screaming at the top of his lungs, saying that I was abusing my Mexican residence for an illegal purpose by trying to cross the bridge to ask for asylum. He warned that he would rip up my identity documents if I continued to "abuse" my permanent residence in Mexico. His manner was very verbally abusive and many people were watching. Despite me and my lawyer arguing that I had the right to apply for asylum, I was afraid that the Mexican official would hurt us or destroy our documents and deport us to Guatemala, so we left the bridge.

8.     After we left the bridge, we returned to the same shelter as before. My children and I stayed at the shelter for the next two weeks, afraid to leave because of how dangerous it was, while my attorney tried to resolve the problem. After the delay, I resolved to present myself and apply for asylum a second time.

2

9.     My children and I walked up to the bridge in Reynosa again on October 9, 2018 to apply for asylum. We were again accompanied by my American lawyer. We paid quarters and entered the turnstile to walk onto the bridge. We walked to the middle of the bridge where U.S. officials check people's documents. We started to tell them that we wanted asylum, and at that moment a Mexican immigration officer grabbed my arm and demanded to see my papers. I told the Mexican officer that I was a legal resident with two Mexican citizen children and I showed him our papers. He then told me that my Mexican residency permit does not allow me to go to the United States. This was a different officer than the one who had told me this the first time.

10.     The officer told me that I had to go to the station on the Mexican side of the border, and I argued with him that I had a right to leave Mexico and seek asylum in the United States. My lawyer said the same thing. He then called for backup, and two more officers arrived from the Mexican side. When we tried to argue with them, they ordered us to go with them.

11.     During that time, my lawyer from Texas was with me and she spoke with the U.S. officials standing at the bridge and explained that I wanted to apply for asylum, and that my children and I were in danger. The U.S. officials were standing just a few feet away from my children and me. They heard everything that the Mexican officials were saying to us, but they did not intervene even though my American lawyer told them that I had a right to apply for asylum. The American officials said that what was happening had nothing to do with them, that it was a Mexican action. Even though we repeatedly asked to seek asylum, they refused to help us.

12.     The Mexican officials took me to an office of Mexican immigration at the foot of the bridge. They separated me from my children and my lawyer and took me into a small room on the side.  They told me that if I came back to this

3

Port of Entry, they would revoke my Mexican residency and that possibly I could try another port of entry if I wanted to cross to the United States, but I could not cross in Reynosa.

13.     I am terrified of the cartels, and I know that my children and I are not safe staying in Mexico. Since I came to Reynosa I have received many phone calls from blocked numbers and I believe the cartels are trying to track my location. Two days ago my ex-husband called me and threatened me. I am afraid for my life. I want to return to a port of entry to apply for asylum but I am afraid that U.S. officials will not let me apply and that Mexican officials will deport me to Guatemala, where I will not be safe.

14.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Executed on October 10, 2018 at Reynosa, Mexico.




Maria Doe

1-SFER-066

## CERTIFICATION

I, _Jennifer V. Harbury_ , declare that I am fluent in the English and
Spanish languages.

On _Oct 10_ , 2018, I read the foregoing declaration and orally
translated it faithfully and accurately into Spanish in the presence of the declarant.
After I completed translating the declaration, the declarant verified that the
contents of the foregoing declaration are true and accurate.

I declare under penalty of perjury under the laws of the United States of
America that the foregoing is true and correct.

Executed on _Oct 10_ , 2018 at _Reynosa_ , Mexico.

_10 Oct 2018_

Signature                                     Date

_Jennifer K. Harbury_

Printed Name

1  MAYER BROWN LLP
     Matthew H. Marmolejo (CA Bar No. 242964)
2    *mmarmolejo@mayerbrown.com*
   350 S. Grand Avenue
3  25th Floor
   Los Angeles, CA 90071-1503
4    Ori Lev (DC Bar No. 452565)
     (*pro hac vice*)
5    *olev@mayerbrown.com*
     Stephen M. Medlock (VA Bar No. 78819)
6    (*pro hac vice*)
     *smedlock@mayerbrown.com*
7  1999 K Street, N.W.
   Washington, D.C. 20006
8  Telephone:  +1.202.263.3000
   Facsimile:   +1.202.263.3300
9
   SOUTHERN POVERTY LAW CENTER
10    Melissa Crow (DC Bar No. 453487)
     (*pro hac vice*)
11    *melissa.crow@splcenter.org*
   1101 17th Street, N.W., Suite 705
12 Washington, D.C. 20036
   Telephone: +1.202.355.4471
13 Facsimile: +1.404.221.5857

14 *Additional counsel listed on next page*
   *Attorneys for Plaintiffs*

15              **UNITED STATES DISTRICT COURT**
16              **SOUTHERN DISTRICT OF CALIFORNIA**

17

18 Al Otro Lado, Inc., *et al.*,           Case No.:  17-cv-02366-BAS-KSC

19              Plaintiffs,

20       v.                                **EXHIBIT 98 TO PLAINTIFFS'
                                           MOTION FOR CLASS
21 Chad F. Wolf,[1] *et al.*,              CERTIFICATION**

22              Defendants.                **Declaration of Bianca Doe**

23

24

25

26

27 ──────────────────
28 [1] Acting Secretary Wolf is automatically substituted for former Acting Secretary
   McAleenan pursuant to Fed. R. Civ. P. 25(d).

CENTER FOR CONSTITUTIONAL RIGHTS
    Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
    *bazmy@ccrjustice.org*
    Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
    *gschwarz@ccrjustice.org*
    Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
    *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
    Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
    *sarah.rich@splcenter.org*
    Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
    *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.401.221.5857

AMERICAN IMMIGRATION COUNCIL
    Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
    *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.56

### DECLARATION OF Bianca Doe

I, Bianca Doe hereby declare under the penalty of perjury pursuant to 28 U.S.C. § 1746:

1. I make this declaration based on my personal knowledge except where I have indicated otherwise. If called as a witness, I could and would testify competently and truthfully to these matters.

2. My name is Bianca Doe I was born on ███████ in Honduras. I am currently staying in a shelter in Tijuana, Mexico.

3. I fled Honduras on April 2, 2018. I was forced to leave Honduras because of constant threats of violence and extreme discrimination against me because I am a transgender woman. I went to the police, but they refused to help me. In fact, they insulted me for being a transgender woman.

4. I entered Mexico and arrived in Tapachula, Chiapas, Mexico. After I crossed the border and entered Mexico, I was arrested and taken to a detention center. While I was detained, I told the authorities about my fear of being transgender in Honduras. I was detained for around fifteen days. I was later released and I was given a document that stated I had 45 days to regularize my immigration status in Mexico. I filed the application and, after an interview, I was granted refugee status.

5. During the 45 days that I was in Tapachula, I suffered discrimination and violence similar to what I had endured in Honduras. On one occasion, I was beaten so badly that I still have a scar on my breast. After that, I rarely went outside.

6. On June 24, 2018, after my refugee status was approved, I left Tapachula

---

[1] To protect my life and the lives of my family members, I am proceeding under initials.

1

and went to Mexico City, thinking that I would be safer in a larger town.

7.      To my dismay, the situation was just as bad, if not worse, than in Mexico City. For 3 months, I tried to find a job but everywhere I went, people would only hire me if I cut my hair, dressed like, and acted like a man. I was also harassed by police, federal officials, and others because I am transgender.

8.      After three months, I left Mexico City and made my way to Tijuana with the intention of seeking political asylum in the United States. I reached Tijuana in late September 2018. The next day, I presented myself at the Port of Entry in Tijuana to seek asylum in the United States. The American guards told me that I could not apply now because they were full. Then a few Mexican officials in white shirts and told me that I could not wait outside the gate, and that I had to move. The officials told me that I had to put my name on a waitlist in order to seek asylum.

9.      After speaking to people at the shelter where I was staying, I learned that to put my name on the waitlist, I had to return to the plaza outside the port of entry. I returned the next day, put my name on a list, and received the number "919." At the plaza outside the port of entry I saw two women and two men who were asking for people's documents in order to be placed on the waitlist.They asked me for my identification. I provided my national identification card from Honduras and was then given my number, I was told that when my number came up, I would be able to present my case to U.S. immigration officers. When I learned that my number would not be called for several weeks, I was devastated.

10.     I am very afraid to be in Tijuana because I have heard that it is very

2

dangerous for transgender people here. I felt so desperate after I was told that I would have to wait for several weeks that I decided to climb the fence on the beach in Tijuana a few days later.

11.    On the day that I climbed over the fence, I went to the beach at around 1:00 a.m.. I was with two other transgender women from El Salvador. We climbed over the fence on the beach and got to the other side. After walking for about ten minutes, we saw a man in a truck. The man was wearing the uniform of the U.S. Border Patrol, and the truck was white with a green stripe. We explained to the officer that we wanted to seek asylum. He said that we could not because all the detention centers were full. After the officer refused to help we continued walking. We did not give importance to what he had told us because we are fleeing for our lives. He became very angry and threatened to call the Mexican police if we did not climb back over the fence and return to Mexico. Terrified, we started walking back towards the fence, and he followed us in his truck. He waited there until we climbed back over the fence into Mexico.

12.    We then walked to a different part of the fence near the beach and again climbed the wall. We soon saw another border patrol officer and we tried to hide. However he saw us and got out of his truck. He shined his flashlight on us and told us that we had to return to Mexico. We told him we wanted to seek asylum and he replied that there was "no asylum." After he told us this we climbed back over the wall and returned to Mexico.

13.    We began walking toward the ocean to try to climb the fence at a different part. The two border patrol officers watched us from their vehicles. We could not find

3

another place to climb the wall that was not being monitored. We had nowhere else to go at that time because it was too late to travel safely. So we sat down on the concrete near the border wall until morning.

14.   On October 8, 2018, I attempted once again to seek asylum by going to the port of entry in Tijuana. At the port of entry, a U.S. Officer by the name of "Soto" told me and other asylum seekers that we could not seek asylum s because they were full. He was wearing a blue uniform. He instructed us to stand aside and wait for a Mexican official. We waited for a while, but no Mexican official ever came.

15.   I still wish to apply for asylum in the United States, where I can live safely as a transgender woman. I do not feel safe in Honduras based on my experiences and discrimination against transgender people more generally. In Mexico, even though I have received refugee status based on my status as a transgender woman, I feel very unsafe. I was assaulted in Tapachula. I was not allowed to work in Mexico City unless I acted and dressed like a man. In Tijuana, I feel unsafe because there have been many incidents of violence against transgender people. At the shelter I have heard that around nine transgender women have been killed in Tijuana this year. I have also heard that immigrants are often kidnapped in Tijuana.

16.   I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 12, 2018 at Tijuana, Mexico.



Bianca Doe

4

## CERTIFICATION

I, RIGOBERTO MARTINEZ AGUILAR, declare that I am fluent in the English and Spanish languages.

On October 12, 2018, I read the foregoing declaration and orally translated it faithfully and accurately into Spanish in the presence of the declarant. After I completed translating the declaration, the declarant verified that the contents of the foregoing declaration are true and accurate.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 12, 2018 at Tijuana, Mexico.

RIGOBERTO MARTINEZ AGUILAR          October 12, 2018

6

1-SFER-074

MAYER BROWN LLP
  Matthew H. Marmolejo (CA Bar No. 242964)
  *mmarmolejo@mayerbrown.com*
350 S. Grand Avenue
25th Floor
Los Angeles, CA 90071-1503
  Ori Lev (DC Bar No. 452565)
  (*pro hac vice*)
  *olev@mayerbrown.com*
  Stephen M. Medlock (VA Bar No. 78819)
  (*pro hac vice*)
  *smedlock@mayerbrown.com*
1999 K Street, N.W.
Washington, D.C. 20006
Telephone:  +1.202.263.3000
Facsimile:   +1.202.263.3300

SOUTHERN POVERTY LAW CENTER
  Melissa Crow (DC Bar No. 453487)
  (*pro hac vice*)
  *melissa.crow@splcenter.org*
1101 17th Street, N.W., Suite 705
Washington, D.C. 20036
Telephone: +1.202.355.4471
Facsimile: +1.404.221.5857

*Additional counsel listed on next page*
*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*,<br><br>              Plaintiffs,<br><br>       v.<br><br>Chad F. Wolf,[1] *et al.*,<br><br>              Defendants. | Case No.:  17-cv-02366-BAS-KSC<br><br>**EXHIBIT 99 TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>**Declaration of César Doe** |

---

[1] Acting Secretary Wolf is automatically substituted for former Acting Secretary McAleenan pursuant to Fed. R. Civ. P. 25(d).

CENTER FOR CONSTITUTIONAL RIGHTS
   Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
   *bazmy@ccrjustice.org*
   Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
   *gschwarz@ccrjustice.org*
   Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
   *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
   Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
   *sarah.rich@splcenter.org*
   Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
   *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.401.221.5857

AMERICAN IMMIGRATION COUNCIL
   Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
   *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.56

**DECLARATION OF** ███ Cesar Doe

I, ███ Cesar Doe hereby declare under the penalty of perjury pursuant to 28 U.S.C. § 1746:

1.    I make this declaration based on my personal knowledge except where I have indicated otherwise.  If called as a witness, I could and would testify competently and truthfully to these matters.

2.    My name is ███ Cesar Doe I was born on ███ n Honduras. I am currently staying in a shelter in Tijuana, Mexico.

3.    I fled Honduras in June 2018.  The 18th Street gang, a notorious gang in my country that controls my neighborhood, demanded multiple times that I join the gang on threat of death. I refused.  Later in June, multiple members of the gang kidnapped me and kept me for a day in an abandoned house in the mountains. While they were distracted, I was able to escape. I was very scared and the next day after I escaped, I fled Honduras.

4.    I reached Tijuana on August 1, 2018.  I went to the Port of Entry in order to apply for asylum in the United States.  Before I was able to see a U.S. immigration officer, in the plaza  adjacent to the bridge that leads to the Port of Entry known as "Chapparal," I was approached by individuals whom I later learned belonged to a group known as "Grupo Beta."  Grupo Beta informed me

---

[1] To protect my life and the lives of my family members, I am proceeding under initials.

1

that I would need to go through them to apply for asylum. They explained that they would put me on a list and give me a number. They told me that once my number was called, I could proceed to the Port of Entry and apply for asylum.

5. Soon thereafter, Grupo Beta began physically organizing a number of individuals who also appeared intent on applying for asylum. Grupo Beta organized us into three groups: Group One consisted of individuals from Central American countries; Group Two consisted of African-appearing individuals; and Group Three consisted of Mexicans. I did not understand why we were segregated in this manner. I waited for about a half hour in Group One thinking that we would proceed to the Port of Entry sometime soon. When nothing happened, I asked a Grupo Beta official if I could leave. He said that I did not have permission to leave and that I had to go back and wait with my group.

6. About 15 minutes later, a Mexican immigration officer came. He started telling us that we needed a paper to present ourselves to U.S. officials and ask for asylum. He said that they would give us this paper at a detention center. Then they  took 15 of us from Group One, Central Americans, and about 4 or 5 from Group Two, African-appearing people, to 4 vans that were parked in the plaza of "El Chapparral". I asked the officer why we needed to go on the van and to the

1-SFER-078

2   detention center.  He said it was necessary for us to go there to get this paper so we

3   can ask for political asylum in the US.  They put us in 3 of the 4 vans and drove us

4   about 5 kms from "El Chapparral".

5       7.    When we arrived at the detention center, they asked if we had

6   permission to be in Mexico and they asked us our names and dates of birth. When

7   we said we did not  have permission to be in Mexico they locked us up.  There

8   were four cells, one for minors, one for women and two for men.  As soon as I got

9   to the detention center, I asked for permission to make a phone call.  I called the

10  shelter where I had been staying in Tijuana to ask if they could help me.   When I

11  started to tell the shelter worker what had happened, a detention officer came and

12  hung the phone up. I did not have the opportunity to tell the person at the shelter

13  where I was.  I asked for another phone call, but they would not allow it.

14      8.    Two days later while I was still incarcerated in the detention center, a

15  Mexican lawyer came to see us.  I asked what was going to happen to us.  The

16  lawyer said that we were going to be deported to our countries.  At that time, I

17  learned that the Mexican officials planned to deport me to Honduras. They called

18  the Honduran Consulate by phone to tell them I was detained.  They asked me to

    get on the phone and tell them my name, date of birth and other details, which I

3

did, and the consular official confirmed that I would be sent back. I was very scared.

9.     I was detained for around twelve days when the Mexican lawyer came back and told me that a human rights group had made it possible for me to leave the detention center and go back to the shelter in Tijuana.  Somehow, thankfully, they were able to secure my release. I have been staying at the shelter ever since.

10. About three days after I left detention, I went with an employee of the organization Al Otro Lado to try to put my name on the waitlist for asylum seekers waiting to speak with U.S. officials. When I arrived at the plaza, I spoke to a member of Grupo Beta. He seemed to be the person who was in charge of registering me for a number. The Grupo Beta officer wore an orange shirt with the Grupo Beta logo. He was located in the plaza adjacent to the bridge that leads to the port of entry.  In order to  get on the list, I had to tell him my  age and show him a copy of my  birth certificate. I was given the number 740.

11.     A few weeks later, during early September 2018, I returned to the port of entry to try again to present myself to the U.S. immigration officers to ask for political asylum. I wanted to try again because I did not feel safe. I was followed by a group of gang members in Mexicali before arriving to Tijuana.

4

There appears to be even more gang members here in Tijuana and this is why I am afraid to leave the shelter. I also fear being deported by Mexican Immigration. They have already tried to deport me on one occasion, and on another occasion the officers attempted to take me into custody for not having legal status in Mexico. I wanted to see if I could be processed before the date that my number on the waitlist was to be called. I was living like a prisoner in the shelter because of my fear of being on the street. I went with two female lawyers from the organization, Al Otro Lado. The attorneys spoke to the U.S. immigration officers and told them that I wanted to apply for political asylum. The officers did not speak to me. They only spoke to the lawyers. They told the lawyers that I could not seek political asylum, and that they would not accept me. I left with the two lawyers and returned to the shelter.

12.     A few weeks later, toward the end of September, 2018, I returned to the port of entry because it was the day that my number on the waitlist was to be called, and I believed that finally I would be allowed to present my case to the U.S. officials.  When I arrived at the port of entry, a group of officers from Grupo Beta began asking me many questions. I was approached by three male Grupo Beta officers. I knew that they were Grupo Beta officers because they wore orange vests

5

that were marked with their logo. They told me that I did not have sufficient documentation to prove my identity. They accused me of being a minor although I presented a photocopy of my birth certificate that showed I was eighteen years old. The officers asked me if I had legal documents to prove that I had permission from Mexican Immigration to be present in Mexico, and I responded that I did not. The officers then threatened to call Mexican Immigration and to have me picked up by the child protective services agency, the "DIF."

13.     When the Grupo Beta officers found out that I did not have legal documents to reside in Mexico, they began to push me toward a corner of the plaza while they called Mexican Immigration. I was terrified of being sent back to the detention center and being deported to Honduras. Fortunately, the same employee of Al Otro Lado who helped me to put my name on the waitlist was at the port of entry while this was happening, and he intervened on my behalf.  He told the Grupo Beta officers that I was an adult, and that they should let me join the asylum seekers who were being processed. The Grupo Beta officers told him the same thing that they told me, that my birth certificate was not sufficient proof to show my age and that I was illegal in Mexico. To prevent me from being taken into custody, the Al Otro Lado employee escorted me away from the Grupo Beta

6

officers and helped me get back to the shelter.

14. I still wish to apply for asylum in the United States. I do not feel safe in Mexico, and I am worried that the 18th Street gang can track me here. I am too afraid to go back to Grupo Beta to get on the list to apply for asylum. I fear that they will just call Mexican Immigration and have me deported to Honduras, as they have already tried to do. I just want to feel safe. I hope the United States can offer me protection.

15. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 11, 2018 at Tijuana, Mexico.

_____

█████ esar Doe

## CERTIFICATION

I, RIGOBERTO MARTINEZ AGUILAR, declare that I am fluent in the English and Spanish languages.

On October, 11, 2018, I read the foregoing declaration and orally translated it faithfully and accurately into Spanish in the presence of the declarant. After I

1

2  completed translating the declaration, the declarant verified that the contents of the

3  foregoing declaration are true and accurate.

4      I declare under penalty of perjury under the laws of the United States of

5  America that the foregoing is true and correct.

6      Executed on October 11, 2018 at Tijuana, Mexico.

7  RIGOBERTO MARTINEZ AGUILAR                    October 8, 2018

8

9

10

11

12

13

14

15

16

17

18

8

MAYER BROWN LLP
  Matthew H. Marmolejo (CA Bar No. 242964)
  *mmarmolejo@mayerbrown.com*
350 S. Grand Avenue
25th Floor
Los Angeles, CA 90071-1503
  Ori Lev (DC Bar No. 452565)
  (*pro hac vice*)
  *olev@mayerbrown.com*
  Stephen M. Medlock (VA Bar No. 78819)
  (*pro hac vice*)
  *smedlock@mayerbrown.com*
1999 K Street, N.W.
Washington, D.C. 20006
Telephone:  +1.202.263.3000
Facsimile:   +1.202.263.3300

SOUTHERN POVERTY LAW CENTER
  Melissa Crow (DC Bar No. 453487)
  (*pro hac vice*)
  *melissa.crow@splcenter.org*
1101 17th Street, N.W., Suite 705
Washington, D.C. 20036
Telephone: +1.202.355.4471
Facsimile: +1.404.221.5857

*Additional counsel listed on next page*
*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>Chad F. Wolf,[1] *et al.*,<br><br>Defendants. | Case No.:  17-cv-02366-BAS-KSC<br><br>**EXHIBIT 103 TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>**Declaration of Emiliana Doe** |

---

[1] Acting Secretary Wolf is automatically substituted for former Acting Secretary McAleenan pursuant to Fed. R. Civ. P. 25(d).

CENTER FOR CONSTITUTIONAL RIGHTS
Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
*bazmy@ccrjustice.org*
Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
*gschwarz@ccrjustice.org*
Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
*aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
*sarah.rich@splcenter.org*
Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
*rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.401.221.5857

AMERICAN IMMIGRATION COUNCIL
Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
*kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.56

**DECLARATION OF** ▮

I, ▮, hereby declare under the penalty of perjury pursuant to 28 U.S.C. § 1746:

1. I make this declaration based on my personal knowledge except where I have indicated otherwise. If called as a witness, I could and would testify competently and truthfully to these matters.

2. My name is ▮ was born on ▮ in Honduras. I am currently staying in a hotel with a friend in Tijuana, Mexico.

3. I fled Honduras on June 5, 2018. I was forced to leave Honduras because of constant threats of violence against me because I am a transgender woman. Transnational drug dealers threatened me that if I did not leave within 15 days, I would be killed. I asked them whether I could relocate to another part of Honduras, but they warned that if I did not leave Honduras, they would find out and I would be killed.

4. In Honduras, I suffered greatly as a transgender woman. I have been raped many times by police officers who believe that they can treat me like trash because I am transgender. I was also kidnapped and held for three day by a group of transnational drug dealers. They beat me for three days. The group later threw me out of a moving vehicle and I suffered significant injuries. I tried obtaining medical attention at the hospital but they refused to treat my injuries. I later tried to make a report with the police. They took down some information and told me to return with more evidence. When I returned to the police to follow up on my police report, I was told that there was no record of my report.

5. I left Honduras on foot. I crossed the border from Honduras to Guatemala.

---

[1] To protect my life and the lives of my family members, I am proceeding under initials.

1

I would sleep outside wherever I could, and get up early in the morning to keep walking.

6.      It took me five months to get to Tijuana. I rode the freight train, "La
Bestia," for three weeks, from Coatepeque to Mexico City, and walked and caught rides
for the rest of the way. While I was on the train, I was raped six times by different men.
They would demand money and since I didn't have any, they would take everything I
had. I was threatened with machetes and called terrible names for transgender people.

7.      I got off the train in Mexico City, where I stayed  for five days, living on
the street and sleeping in a park. I then decided to get back on the train. I traveled on the
train until it did not go any further. I then met a  soft-drink truck driver gave me a ride to
Tijuana. I decided to come to Tijuana to seek asylum because I had heard that the other
border points are very dangerous for transgender women.

8.      I'm not certain of the date when I reached Tijuana but it was sometime in
late September. I slept in a park for two nights. Men would tell me the most vulgar things
to me and demand sex. I felt very afraid that I would be raped again. I did not have
money for food, and was very hungry. After that, I met a young man from El Salvador
who is gay, and he let me stay with him in the hotel room that he was renting.

9.      Feeling unsafe in Tijuana, I decided to apply for asylum in the United
States but I was not sure how.  I eventually found out from another asylum seeker that I
had to  put my name on a "waiting list."  The next day I went to the border where he said
to go and asked people in a nearby office where I could get on the waiting list.  They told
me that I needed to go to the parking lot next to the Chaparral Port of Entry and that I
should go the next day in the morning.

2

10. The following morning, I went to the parking lot next to the Port of Entry. I asked a woman who was accompanied by two children where to go. She pointed to two women, one sitting on the curb and the other lying in a car nearby.

11. I approached the women and asked them if this was where I could get a number to be placed on the waitlist to ask for political asylum in the United States. They told me that in order to be placed on the list, I had to show them my identification. I showed them my identification card from Honduras ("cedula"), and one of them put my name down on a clipboard and gave me a tiny piece of paper with the number "1014" on it. She told me to come back in six weeks to see what number they were on and if it was my turn yet to enter the United States.

12. On October 8, 2018, I went to the Chaparral Port of Entry in Tijuana. I waited in the line, along with four other transgender women. When it was my turn to speak to the U.S. Customs and Border Protection official, I said that I wanted to ask for asylum. The official spoke to us in Spanish. He told us that everywhere was full and they could not accept any more people. He asked us to wait over on one side until a Mexican immigration official could come. We stood there for some time but nobody came, and we did not see any Mexican immigration officials.

13. I wish to apply for asylum in the United States. I am in as much danger in Mexico as I am in Honduras. Here in Mexico I fear for my life because I am transgender and also because I am a foreigner. For that reason, I have not applied for any kind of legal status in Mexico.

14. Two years ago, I suffered a stroke and I have high blood pressure. The

3

stress of feeling unsafe as a transgender woman in Mexico—which is very much like the situation in Honduras—causes my blood pressure to elevate. I am worried about the possibility of having another stroke or being attacked for being transgender. I hope that I can go to the United States to save my life.

15.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 12, 2018 at Tijuana, Mexico.



Emiliana Doe

## CERTIFICATION

I, RIGOBERTO MARTINEZ AGUILAR , declare that I am fluent in the English and Spanish languages.

On October 12, 2018, I read the foregoing declaration and orally translated it faithfully and accurately into Spanish in the presence of the declarant. After I completed translating the declaration, the declarant verified that the contents of the foregoing declaration are true and accurate.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 12, 2018 at Tijuana, Mexico.

RIGOBERTO MARTINEZ AGUILAR        October 12, 2018

4

MAYER BROWN LLP
  Matthew H. Marmolejo (CA Bar No. 242964)
  *mmarmolejo@mayerbrown.com*
350 S. Grand Avenue
25th Floor
Los Angeles, CA 90071-1503
  Ori Lev (DC Bar No. 452565)
  *olev@mayerbrown.com*
  Stephen M. Medlock (VA Bar No. 78819)
  *smedlock@mayerbrown.com*
1999 K Street, N.W.
Washington, D.C. 20006
Telephone:  +1.202.263.3000
Facsimile:   +1.202.263.3300

SOUTHERN POVERTY LAW CENTER
  Melissa Crow (DC Bar No. 453487)
  (*pro hac vice*)
  *melissa.crow@splcenter.org*
1101 17th Street, N.W., Suite 705
Washington, D.C. 20036
Telephone: +1.202.355.4471
Facsimile: +1.404.221.5857

*Additional counsel listed on next page*
*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>Kevin K. McAleenan,[1] *et al.*,<br><br>　　　　　Defendants. | Case No.:  17-cv-02366-BAS-KSC<br><br><br>**DECLARATION OF STEPHANIE LEUTERT** |

---

[1] Acting Secretary McAleenan is automatically substituted for former Secretary Nielsen pursuant to Fed. R. Civ. P. 25(d).

DECLARATION OF STEPHANIE LEUTERT

1-SFER-091

CENTER FOR CONSTITUTIONAL RIGHTS
  Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
  *bazmy@ccrjustice.org*
  Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
  *gschwarz@ccrjustice.org*
  Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
  *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
  Mary Bauer (VA Bar No. 31388) (*pro hac vice*)
  *mary.bauer@splcenter.org*
1000 Preston Ave.
Charlottesville, VA
  Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
  *sarah.rich@splcenter.org*
  Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
  *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030

AMERICAN IMMIGRATION COUNCIL
  Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
  *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

2                          DECLARATION OF STEPHANIE LEUTERT

1-SFER-092

Case 3:17-cv-02366-BAS-KSC Document 294-5 Filed 09/26/19 PageID.7923 Page 3 of 66

# DECLARATION OF STEPHANIE LEUTERT

I, Stephanie Leutert, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746:

1.      My name is Stephanie Leutert. I am the Director of the Central America & Mexico Policy Initiative ("CAMPI") at the Strauss Center for International Security and Law at the University of Texas. In this role, I lead the development and programming for CAMPI and conduct original research on the U.S. Mexico border and Central American migration. I am the lead author of the first-ever border-wide report on the U.S. Customs and Border Protection's ("CBP's") metering practice and subsequent metering updates that document CBP's practices and the conditions faced by asylum seekers waiting in Mexican border cities. I also teach a graduate level course on Mexico's migration policy at the Lyndon B. Johnson School of Public Affairs at the University of Texas.

2.      I make this declaration based on my personal knowledge except where I have indicated otherwise. If called as a witness, I could and would testify competently to the matters discussed in this declaration.

3.      Since December 2018, CAMPI has published regular reports on CBP's metering practices and the conditions for asylum seekers in Mexican border cities. These reports include: (a) *Asylum Processing and Waitlists at the U.S.-Mexico Border* (December 2018), (b) *Metering Update* (February 2019), (c) *Metering Update* (May 2019), (d) *Metering Update* (August 2019) (collectively, the "Reports").  The Reports are attached to my declaration as Exhibits A-D.

4.      The Reports are based on information that I, other members of CAMPI, and colleagues from the University of California San Diego and the Migration Policy Centre, have collected directly from field and phone interviews and direct observation on visits to Mexican border cities. In the case of the interviews utilized in creating the Reports, the interviewer documents the statements explaining or describing CBP's metering practice and the conditions for asylum seekers affected

DECLARATION OF STEPHANIE LEUTERT

by that practice, made after the declarant interacted with CBP and/or asylum seekers in Mexican border cities. The Reports are created and published near the time that this information is collected. Creating these Reports is a regular activity of CAMPI and they are kept on CAMPI's publications website, https://www.strausscenter.org/campi-content/campi-reports-working-papers.html. In addition, pursuant to Fed. R. Evid. 902(11), I certify that Exhibits A-D to my declaration are originals or copies of the Reports.

5.      Through my work at CAMPI, I have also directly observed CBP's implementation of its metering practice at ports of entry on the U.S.-Mexico border. Since October 2018, I have personally conducted fieldwork in eight Mexican border cities[2] where asylum seekers affected by CBP's metering practice are forced to wait. In these cities, I have spoken with affected asylum seekers, along with migrant shelter staff, members of civil society organizations, and Mexican federal and local government officials. I have interviewed affected asylum seekers who were waiting on bridges, affected asylum seekers who were sleeping in encampments near the international bridges, and affected asylum seekers waiting in migrant shelters. I have watched firsthand as asylum seekers arrived at the United States - Mexico international line and were subjected to metering by CBP officials. I have also seen physical or virtual copies of five asylum waitlists in five Mexican border cities and have spoken to five individuals in charge of running these lists. I have also partnered with colleagues who conducted similar fieldwork in five additional Mexican border cities.

6.      I have directly observed the implementation of the metering practice at ports of entry on the U.S.-Mexico border and how it has affected noncitizens seeking to present themselves at ports of entry and access the U.S. asylum process. At CBP's

---

[2] Those cities are Matamoros Tamaulipas; Nuevo Progreso, Tamaulipas; Reynosa, Tamaulipas; Ciudad Miguel Alemán, Tamaulipas; Nuevo Laredo, Tamaulipas; Piedras Negras, Coahuila; Ciudad Acuña, Coahuila; Nogales, Sonora.

DECLARATION OF STEPHANIE LEUTERT

1-SFER-094

"Class A" ports of entry, pedestrian traffic for non-asylum-seekers flows freely—pedestrians cross into the United States at the international line on bridge midpoints or at turnstiles located at the international boundary; pedestrians then enter the POE's arrival hall where they encounter a CBP officer at one of several desks. The CBP officer may admit the pedestrian into the country or send the pedestrian to secondary inspection for further review. The process for asylum seekers is different from every other type of pedestrian that attempts to enter the United States. While other pedestrians flow freely over the international line or through the turnstiles if they hold their travel documents in their hands, CBP officers intercept asylum seekers at the international boundary before they can pass into U.S. territory. CBP officers turn back asylum seekers at the international boundary, telling them that there is no capacity at the port of entry and at times instructing them to contact officials on the Mexican side of the border to get on a waitlist to enter the United States.

7.     Due to the metering practice, more than 26,000 asylum seekers have been forced to wait in Mexican border towns in dangerous conditions, oftentimes without access to basic shelter. Because migrant shelters are over capacity, and some cities lack migrant shelters altogether, asylum-seekers, including families with young children, are forced in some cases to live on international bridges, in encampments near the ports of entry, or on the street, where temperatures regularly exceed 100 degrees in the summer. These asylum seekers may not have adequate access to bathrooms or places to bathe. They are also at risk for criminal activity, including assaults, robberies, kidnapping, and murder. Even within some migrant shelters, conditions may not be much better, given overcrowding, limited resources, and few safety measures.

8.     Prior to CBP's implementation of the metering practice, asylum seekers could proceed past the international boundary to the entry hall at the POE. Then they were processed in the order that they arrived at the POE. The Government did not

DECLARATION OF STEPHANIE LEUTERT

1   turn back asylum seekers, and asylum seekers were not forced to spend months on
2   waitlists on the Mexican side of the border.
3       I declare under penalty of perjury under the laws of the United States of
4   America that the proceeding declaration is true and correct.
5       Executed on this 23rd day of September 2019 at Austin, Texas.

9   Stephanie Leutert

6   DECLARATION OF STEPHANIE LEUTERT

Case 22-55988, 04/17/2024, ID: 12849067, DktEntry: 107-2, Page 97 of 171   Page 7 of 66

# Leutert Decl. – Ex. A

Case 3:17-cv-02366-BAS-KSC   Document 294-5   Filed 09/26/19   PageID.7928   Page 8 of 66

# METERING UPDATE

## AUGUST 2019







# INTRODUCTION

In the summer of 2018, CBP officers began to be stationed at the United States' international boundary with Mexico to inform arriving asylum seekers that U.S. ports of entry were full and that they needed to wait their turn in Mexico. Simultaneously, these CBP officials accepted limited numbers of asylum seekers a day—in a process known as metering—often communicating directly with Mexican officials regarding these numbers. As lines of asylum seekers grew longer in border cities, Mexican authorities and civil society groups responded by providing humanitarian assistance and creating informal waitlists.

In December 2018, the Robert Strauss Center at the University of Texas at Austin, the Center for U.S.-Mexican Studies (USMEX) at the University of California San Diego, and the Migration Policy Centre published a report documenting these practices. This report highlighted how metering had spread across the U.S.-Mexico border and described the waitlist systems in eight border cities. It found that 6,000 asylum seekers were waiting along the border in Mexico and that the waitlist process varied in each Mexican border city. Since the report's publication, there have been changes in every border community. Some of these changes were documented in the February 2019 and May 2019 report updates, which estimated that 4,800 and 19,000 asylum seekers, respectively, were waiting along the border.

However, since May 2019, asylum seekers have continued to arrive at the U.S.-Mexico border, Mexican responses have evolved, and U.S. policy has continued to shift. One prominent change is the expansion of the Migrant Protection Protocols (MPP) to Laredo and Brownsville. While MPP began in late January 2019 in San Diego, it quickly spread to Calexico and El Paso. In early July, the program finally arrived to the Rio Grande Valley in south Texas. Under MPP, asylum seekers are processed briefly in the United States and then returned to Mexico to wait for the duration of their U.S. asylum cases. So far, the United States has returned more than 30,000 individuals to Mexico under MPP. This means that people on metering lists may spend weeks or months in a border city before being admitted to the United States to ask for asylum, and then are returned to Mexico to wait during their court case.

Over the past three months, the Trump administration has taken additional steps to curb migration and the number of asylum seekers arriving at the border. On July 15, the Trump administration created a new "interim rule" to bar asylum seekers who pass through any country before arriving to the United States.[1]  Less than two weeks later, this latest policy was blocked by a California court.[2]  However, the administration has also signed a similar agreement with Guatemala's president that aims to achieve the same objective and is attempting to sign Safe Third Country agreements with Mexico, Honduras, El Salvador, Panama, and Brazil. These latter shifts would ban all asylum seekers—except Mexican nationals—who are currently waiting on the U.S. border from seeking asylum. Simultaneously, the Mexican government has also increased its immigration enforcement during the past three months, deploying the National Guard to provide support for the National Migration Institute (INM). This has made it more difficult for an asylum seeker to arrive at the U.S.-Mexico border and sign up on an asylum waitlist.

This August metering update estimates that there are currently around 26,000 asylum seekers on waitlists or waiting to get on these waitlists in 12 Mexican border cities. This is an increase of 40 percent since May 2019, with the biggest increases in the number of asylum seekers occurring in Tijuana, Reynosa, and Ciudad Juárez.

Case 3:17-cv-02366-BAS-KSC   Document 294-5   Filed 09/26/19   PageID.7932   Page 10 of 66

The waitlists in these three cities account for 72 percent of all asylum seekers waiting to enter the United States through a port of entry. However, it is possible that the actual number of people waiting along the border is lower than the number of people on waitlists, given that a portion of waiting asylum seekers grow desperate and cross into the United States between ports of entry.

**Figure 1: Number of People Waiting on Asylum Waitlists**



This update aims to highlight changes over the past three months across 14 Mexican border cities. It looks at changes in the asylum waitlist process, the number of asylum seekers waiting in each border city, and current CBP processing levels. The update draws on interviews with government officials, representatives from civil society organizations, and members of the public on both sides of the border.

1-SFER-100

Case 3:17-cv-02366-BAS-KSC   Document 294-5   Filed 09/26/19   PageID.7931   Page 11 of 66

**Figure 2: Mexican Border Cities Covered in the August 2019 Asylum Waitlist Update**



1-SFER-101

Case 3:17-cv-02366-BAS-KSC    Document 294-5    Filed 09/26/19    PageID.7932    Page 12 of 66

**Metering & Asylum Waitlists: August 2019**

| Port of Entry | # of Asylum Seekers on List | Estimated Wait Time | CBP Processing #s | Recent Changes |
|---|---|---|---|---|
| *List Administrator* | *Date Recorded* | | | |
| **Matamoros, Tamaulipas**<br><br>*National Migration Institute (Instituto Nacional de Migración, INM)* | 600<br><br>*August 5, 2019* | 1 to 2 months | 10 to 15 per day | There is one waitlist system in Matamoros, which is administered by INM. In the past few months, there have been reports that asylum seekers who lack documentation and legal status in Mexico are being barred from signing up on the list, and are instead being deported.<br><br>Since MPP's implementation, the number of asylum seekers processed every day appears to have increased, while wait times have decreased. However, MPP returnees have filled the city, leading to its two main migrant shelters being closed to newcomers.<br><br>A few smaller shelters have opened but their capacity is limited. Asylum seekers who are waiting for their turn on the waitlist stay in hotels, if they can afford them, or in a makeshift camp by the Gateway bridge. The makeshift camp lacks bathrooms, and there have been reports of asylum seekers using the river as both a restroom and a place to wash clothes.<br><br>Civil society members bring asylum seekers food and water and have paid to rent portable restrooms and showers. However, they have only been able to afford such amenities intermittently. There are also concerns regarding the extreme heat and lack of drinking water in the camp.<br><br>Asylum seekers on the waitlist are from a range of countries, including Nicaragua, El Salvador, Cuba, Venezuela, Colombia, and Russia. |

1-SFER-102

**Metering & Asylum Waitlists: August 2019 (continued)**

| Port of Entry | # of Asylum Seekers on List | Estimated Wait Time | CBP Processing #s | Recent Changes |
|---|---|---|---|---|
| *List Administrator* | *Date Recorded* | | | |
| **Nuevo Progreso, Tamaulipas** *Senda de Vida migrant shelter* [in next row] | 0 | N/A | N/A | There are no longer any Cubans or Venezuelans waiting on the Nuevo Progreso - Progreso bridge. Two security guards now stand watch at the bridge's turnstiles on the Mexican side, ostensibly to stop asylum seekers from entering the international bridge. On June 25, 2019, there were 45 Cubans waiting the bridge. These Cubans had organized their own waitlist and noted that INM had told them that no one else would be able to get on the bridge after they entered the United States. As of July 23, 2019, there were only 7 Cubans left on the bridge.[3] CBP processed the last Cuban on the bridge at the end of July. There are reports of asylum seekers running into U.S territory via the international bridge's car lanes in order to seek asylum. Currently, CBP officers are stationed in the car lanes on the international bridge to check drivers' migration documents as they cross the bridge's midpoint and enter U.S. territory. |
| | *August 4, 2019* | | | |
| **Reynosa, Tamaulipas** *Senda de Vida migrant shelter* | 3,600 | 2 to 3 months | 25 to 30 per day | The Senda de Vida Migrant Shelter in Reynosa runs four separate lists: a single adult male list, a single adult female list, a family list, and a list for pregnant women. Asylum seekers must sign up on the waitlist at the shelter, regardless of whether they stay at the shelter or find other accommodations, such as hotels or rented apartments. Asylum seekers who stay elsewhere often return to the shelter to eat and check their place on the list. As of August 5, 2019, there were |
| | *August 5, 2019* | | | |

1-SFER-103

**Metering & Asylum Waitlists: August 2019 (continued)**

| Port of Entry<br><br>*List Administrator* | # of Asylum Seekers on List<br><br>*Date Recorded* | Estimated Wait Time | CBP Processing #s | Recent Changes |
|---|---|---|---|---|
| **Reynosa, Tamaulipas (continued)** | | | | 530 asylum seekers staying in the Senda de Vida shelter.<br><br>There continue to be reports that asylum seekers can pay Mexican migration officials to move up on the list faster. Additionally, there have been reports of asylum seekers paying to be driven across the international bridge's midpoint to seek asylum in the United States. Currently, CBP officers are stationed in the car lanes on the international bridge to check drivers' migration documents as they cross the bridge's midpoint and enter U.S. territory.<br><br>There are also reported safety concerns for the waiting asylum seekers. The Mexican National Guard was brought to the shelter in July to protect migrants and asylum seekers from criminal elements.[4]<br><br>The majority of the asylum seekers waiting in Reynosa are from Venezuela, Cuba, Guatemala, Honduras, and El Salvador. |
| **Rio Grande City, Tamaulipas**<br><br>*August 4, 2019* | 0 | N/A | N/A | In the past few weeks, there have been incidents at the Rio Grande City port of entry where Cuban asylum seekers crossed the international midpoint and entered U.S. territory via cars. These asylum seekers hired Mexican drivers who took them into U.S. territory right before the U.S. port of entry. The Cuban asylum seekers then jumped out and ran toward the port of entry, and the Mexican drivers attempted to return to Mexico. To stop these incidents, CBP officers are now stationed in the car lanes on the international bridge to check drivers' migration documents as they cross the midpoint and enter U.S. territory. |

**Metering & Asylum Waitlists: August 2019 (continued)**

| Port of Entry<br><br>*List Administrator* | # of Asylum Seekers on List<br><br>*Date Recorded* | Estimated Wait Time | CBP Processing #s | Recent Changes |
|---|---|---|---|---|
| **Ciudad Miguel Alemán, Tamaulipas**<br><br>*National Migration Institute (Instituto Nacional de Migración, INM)* | 30<br><br>*August 3, 2019* | 9 days | 3 to 6 per day | When an asylum seeker arrives to the Ciudad Miguel Alemán - Roma international bridge, he or she signs up on the INM waitlist. The asylum seekers then wait on the bridge until it is their turn. On August 3, 2019, there were 30 Cubans (17 women and 13 men) on the bridge.<br><br>Due to safety concerns in the city, these asylum seekers never leave the bridge after they arrive and rely on church groups to bring food. They also rely on Mexicans to take out money for them and purchase basic goods. |
| **Nuevo Laredo, Tamaulipas**<br><br>*Network of six migrant shelters managing six separate lists (one per shelter)* | ~1,000<br><br>*August 6, 2019* | 1 month<br><br>(This was 3 to 4 months prior to MPP's expansion to Laredo) | 25 to 40 per day | After MPP's implementation in Laredo, the waitlist system was taken over by a network of six migrant shelters that work in conjunction with Mexican migration officials. Each shelter operates their own list, and has been assigned a day of the week when migration officials notify the shelter regarding how many asylum seekers CBP will accept that day.<br><br>The shelters select which asylum seekers will cross. They claim that this allows them to prioritize urgent cases, such as families or those with severe medical needs. The shelters have also established partnerships with local hospitals to administer care to asylum seekers.<br><br>Asylum seekers report dangerous conditions in Nuevo Laredo, such as robberies and kidnappings near the shelters and international bridges.[5] |

1-SFER-105

**Metering & Asylum Waitlists: August 2019 (continued)**

| Port of Entry<br><br>*List Administrator* | # of Asylum Seekers on List<br><br>*Date Recorded* | Estimated Wait Time | CBP Processing #s | Recent Changes |
|---|---|---|---|---|
| **Piedras Negras, Coahuila**<br><br>*Municipal government* | ~1,000 people<br><br>*July 30, 2019* | 2 months | 0 to 12 per day | On July 11, 2019, Hector Menchaca—the list manager from the municipal government—noted that there were ~380 people on the list.[6]  However, in early August, civil society members noted that due to the asylum waitlist being closed, the total numbers of people on the list or currently waiting to get on the list in Piedras Negras is closer to 1,000. |
| **Ciudad Acuña, Coahuila**<br><br>*Civil Protection (Protección Civil): individuals*<br><br>*Grupo Beta: families* | 303 individuals<br><br>30 families (113 family members)<br><br>*August 2, 2019* | 4 months (individuals)<br><br>2 months (families) | 1 to 3 per day (individuals) | There are two list systems in Ciudad Acuña: one for adult individuals and one for families. The adult list is run by Civil Protection and is now closed. The majority of the 303 asylum seekers who are on the adult list are from Cuba (237), with the remaining 47 asylum seekers from the African countries of Angola, Congo, and Cameroon. There is also one asylum seeker from Russia.[7]<br><br>The adult asylum seekers have set up a makeshift camp in a park near the international bridge, comprised of tents and tarps. One asylum seeker acts as a spokesman for the camp, and communicates with Civil Protection officials about the asylum waitlist. Some of the asylum seekers in the camp work in Ciudad Acuña during the day. The asylum seekers who are next on the list stay in another area that is close to the international bridge. |

1-SFER-106

**Metering & Asylum Waitlists: August 2019 (continued)**

| Port of Entry<br><br>*List Administrator* | # of Asylum Seekers on List<br><br>*Date Recorded* | Estimated Wait Time | CBP Processing #s | Recent Changes |
|---|---|---|---|---|
| **Ciudad Acuña, Coahuila (continued)** | | | | The family list appears to remain open. The list was publicly available outside the Grupo Beta office and the last family signed up had arrived on August 1, 2019. Families stay at a migrant shelter. As of August 1, 2019, on the family list there were 30 families. Within these families, 43 people were from Mexico, 28 from Congo, 13 from Cuba, 12 from Honduras, 10 from Angola, 6 children from the United States, and 1 baby with Brazilian nationality. |
| **Ciudad Juárez, Chihuahua**<br><br>*State Population Council (Consejo Estatal de Población, COESPO)* | 5,645<br><br>*August 5, 2019* | 3.5 to 6 months | 0 to 15 per day[8] | The Mexican State Population Council (COESPO) continues to administer the waitlist in Ciudad Juárez, where a total of 17,778 asylum seekers have registered from October 29, 2018 to August 2, 2019.[9]<br><br>CBP calls COESPO twice a day, once in the morning around 9am, and once in the afternoon around 3pm, to let them know how many asylum seekers will be accepted that day.<br><br>COESPO uses a closed Facebook group to notify asylum seekers when it is their turn to cross. An estimated 80 percent of those currently registered on the list are from Cuba, 10 to 12 percent are from Central America, and the rest are from Mexico.<br><br>Enrique Valenzuela, head of COESPO, estimates that the number of asylum seekers in Ciudad Juárez may be closer to 3,600 - 3,800 due to asylum seekers crossing into the United States between ports of entry or returning to their countries of origin.[10] |

1-SFER-107

**Metering & Asylum Waitlists: August 2019 (continued)**

| Port of Entry<br><br>*List Administrator* | # of Asylum Seekers on List<br><br>*Date Recorded* | Estimated Wait Time | CBP Processing #s | Recent Changes |
|---|---|---|---|---|
| **Ciudad Juárez, Chihuahua (continued)** | | | | Asylum seekers stay in a variety of accommodations, including shelters and hotels. Civil society organizations, churches, and the municipal government have established a combined 16 shelters in the city. All shelters are approaching full capacity.<br><br>There have also been reports of criminal groups targeting asylum seekers in Ciudad Juárez, and cases of asylum seekers who have been injured and killed.[11] |
| **Agua Prieta, Sonora**<br><br>*CAME migrant shelter* | 100<br><br>*August 1, 2019* | 2 months | 1 family | At the end of June 2019, the National Guard tried to enter the CAME shelter, claiming that they had received a report of an armed man in the shelter. In recent weeks, the shelter has reported a marked decrease in the arrival of asylum seekers. The shelter only has capacity for 50 people. |
| **Nogales, Sonora**<br><br>*Private individual* | 680<br><br>*July 30, 2019* | 9 to 11 weeks | 0 to 6 families | The number of asylum seekers that CBP processes every day in Nogales has varied widely. Days have passed when no one was being processed. Shelters are over capacity and currently housing roughly 300 asylum seekers. |

1-SFER-108

**Metering & Asylum Waitlists: August 2019 (continued)**

| Port of Entry | # of Asylum Seekers on List | Estimated Wait Time | CBP Processing #s | Recent Changes |
|---|---|---|---|---|
| *List Administrator* | *Date Recorded* | | | |
| **San Luis Río Colorado, Sonora**<br><br>*Casa del Migrante "La Divina Providencia"* | 1,050<br><br>*August 1, 2019* | 3 months | 3 to 4 per day | On May 31, 2019, Grupo Beta transferred the list management to the Casa del Migrante "La Divina Providencia," which currently houses 80 to 85 asylum seekers (mainly women and children). To get on the shelter list, asylum seekers register their name, date of birth, state/country of origin, and phone number. The other shelter in the city, Don Chon, houses roughly 180 asylum seekers.<br><br>Since most asylum seekers cannot stay in shelters, they rent a room or go to other cities to wait their turn. They call the shelter to see if their turn is coming up. The list currently has 882 registrants, but the total number of individuals is higher since every family is given a single number. CBP calls the shelter and either requests single adults or families. CBP recently requested single adults for the first time in 2 weeks, which had led to a backlog.<br><br>The asylum seekers on the list are from 18 different countries. Roughly 57 percent are from Mexico, 27 percent from Cameroon, 5 percent from Cuba, and 4 percent from Honduras. The asylum seekers from Cameroon traveled together first to Tijuana, but due to the length of the waitlist they decided to go to San Luis Río Colorado. |

1-SFER-109

**Metering & Asylum Waitlists: August 2019 (continued)**

| Port of Entry<br><br>*List Administrator* | # of Asylum Seekers on List<br><br>*Date Recorded* | Estimated Wait Time | CBP Processing #s | Recent Changes |
|---|---|---|---|---|
| **Mexicali, Baja California**<br><br>*Grupo Beta* | 2,000<br><br>*August 2, 2019* | 6 to 12 months | 5 to 10 per day | The average temperature in Mexicali in the summer is 110 degrees Fahrenheit, which has been a challenge for asylum seekers waiting in the city. Mexicali's 14 shelters have space for roughly 3,000 people. Yet, many asylum seekers don't have access to food, water, or shelter, and must pay to stay in places such as Hotel Migrante. These conditions have led some Central American asylum seekers to return home.<br><br>There are also allegations of unfair practices that put Mexicans and others at the top of the list. |
| **Tijuana, Baja California**[12]<br><br>*Grupo Beta / Support from asylum seekers* | 10,000<br><br>*August 4, 2019* | 6 to 9 months | 0 to 69 per day[13] | Grupo Beta operates and stores the notebook with the asylum waitlist, but receives list management support from asylum-seekers who are also on the list. The asylum seekers who help with the list have previously been from Central America, although in recent months, they have been almost exclusively from Mexico. For the last two weeks, African asylum seekers have served as list managers for the first time.<br><br>In the current iteration of the list, 37,590 people have signed their name into the notebook, and the names of approximately 27,690 asylum seekers have been called. Currently, most asylum seekers signing up for the list are from Haiti or Africa.[14]  About a third of the people signing up for the list are from Mexico, which are generally families that come from the country's southern states. Central Americans make up around 10 percent of signees, and another roughly 10 percent come from a |

**Metering & Asylum Waitlists: August 2019 (continued)**

| Port of Entry<br><br>*List Administrator* | # of Asylum Seekers on List<br><br>*Date Recorded* | Estimated Wait Time | CBP Processing #s | Recent Changes |
|---|---|---|---|---|
| **Tijuana, Baja California (continued)** | | | | range of other countries such as Iraq, Russia, and Turkey. According to the Municipal Migrant Attention Office, Tijuana currently has space for 1,500 people across 18 shelters.<br><br>The legal services organization Al Otro Lado reports that an estimated 35 percent of people do not show up to cross when their names are called. Although this figure is complicated by the number of asylum seekers who cross into the United States without ever being on the list.[15]  These asylum seekers allegedly pay bribes to Grupo Beta to be able to cross, with the bribe amount reportedly increasing over the last three months from US$300 to US$1,200. |

*The numbers shift every day and should be interpreted as a general range rather than an exact figure.

# ENDNOTES

1 "Asylum Eligibility and Procedural Modifications," Department of Homeland Security & Executive Office for Immigration Review, July 16, 2019, https://www.federalregister.gov/documents/2019/07/16/2019-15246/asylum-eligibility-and-procedural-modifications.

2 Miriam Jordan and Zolan Kanno-Youngs, "Trump's latest attempt to bar asylum seekers is blocked after a day of dueling rulings," New York Times, July 24, 2019, https://www.nytimes.com/2019/07/24/us/asylum-ruling-tro.html.

3 "El testimonio de Emma, una cubana que lleva meses esperando en México para cruzar la frontera de EE.UU.," CiberCuba, July 23, 2019, https://www.cibercuba.com/noticias/2019-07-23-u1-e20037-s27061-enma-cubana-lleva-meses-esperando-cruzar-frontera-eeuu.

4 "El calvario de migrantes en la frontera: albergues en Reynosa registran sobrecupo de 450%," Infobae, July 23, 2019, https://www.infobae.com/america/mexico/2019/07/23/el-calvario-de-migrantes-en-la-frontera-albergues-en-reynosa-registran-sobrecupo-de-450/'.

5 María Verza, "Asylum seekers waiting in Nuevo Laredo fear lurking dangers," Associated Press, July 18, 2019, https://www.apnews.com/9da8f4c1d433417a9dba2ae17d67e404.

6 Alejandro Montenegro, "En espera 380 migrantes de asilo político en los EU; 20 son menores de edad," Vanguardia, July 12, 2019, https://vanguardia.com.mx/articulo/en-espera-380-migrantes-de-asilo-politico-en-los-eu-20-son-menores-de-edad.

7 In July 2019, groups of Haitians reportedly arrived at the makeshift camp during the daytime and then crossed the Rio Grande river at night to ask for asylum in the United States. Mexican officials are now stationed along the river to prevent such crossings. There were reports of asylum seekers who drowned during these river crossings.

8 In May 2019, CBP officials processed 20 to 50 asylum seekers a day. However, from July 21, 2019 through July 31, 2019, CBP did not process any asylum seekers. CBP stated that its facilities were at capacity. On July 31, 2019, CBP processed 15 asylum seekers.

9 Over the last three months, COESPO reports that the average number of asylum seekers registering on the asylum waitlist every day has declined. In May, COESPO registered an average of 100 to 130 asylum seekers a day, with a maximum of 250 people registered in a single day and a minimum of 80 people. In June, that average fell to between 30 and 40 asylum seekers a day, and in July, the highest number of asylum seekers registered in one day was 50 and the lowest number was 9. Currently, there is an average of 20 asylum seekers registering on the list every day.

10 Julian Resendiz, "CBP stops calling asylum seekers in Juárez," KTSM, July 30, 2019, https://www.ktsm.com/news/border-report/cbp-stops-calling-asylum-seekers-in-juarez/.

11 Javier Olmos, "Van 9 migrantes muertos en Juárez desde octubre," El Diario, July 29, 2019, https://diario.mx/juarez/van-9-migrantes-muertos-en-juarez-desde-octubre-20190729-1544701.html

12 The data provided for the asylum waitlist in Tijuana was collected by a team of Al Otro Lado volunteers during daily visits to the Chaparral port of entry.

13 From June 16 to July 16, 2019, CBP reduced the number of asylum-seekers that they would accept on any given day. For several four- or five-day periods in early July, zero people were accepted. On July 4 and July 9, 2019, dozens of African asylum-seekers, led by those from Cameroon and Eritrea, led small, peaceful sit-ins in protest.

14 Al Otro Lado has documented cases of discrimination against black asylum seekers, and their documents are often subjected to a higher level of scrutiny than other asylum seekers. Additionally, acquiring proper documentation can be more difficult for asylum seekers coming from outside of the Western Hemisphere, and language barriers complicate their inquiries with Grupo Beta or the list managers.

15 The result of these people skipping the line is that those who have been waiting are forced to wait even longer. This climate bred distrust and frustration with the list process in late May through early June.

1-SFER-112

# Leutert Decl. – Ex. B

# METERING UPDATE

## MAY 2019









## INTRODUCTION

In the summer of 2018, CBP officers began to be stationed at the United States' international boundary with Mexico to tell arriving asylum seekers that U.S. ports of entry were full and that they needed to wait their turn in Mexico. Simultaneously, these CBP officials accepted limited numbers of asylum seekers a day—in a process known as metering—often communicating directly with Mexican officials regarding these numbers. As lines of asylum seekers grew in border cities, Mexican authorities and civil society groups responded by providing humanitarian assistance and creating informal waitlists.

In December 2018, the Robert Strauss Center at the University of Texas at Austin, the Center for U.S.-Mexican Studies (USMEX) at the University of California San Diego, and the Migration Policy Centre **published a report documenting these practices**. This report highlighted how metering had spread across the U.S.-Mexico border and described the waitlist structures in eight border areas.

Since the report's publication, there have been changes in every border community. Some of these changes were documented in **a February 2019 update**. However, since then, asylum seekers have continued to arrive at the border, Mexican responses have evolved, and U.S. policy has continued to shift.

These more recent changes include five additional border cities with asylum waitlists or lines of waiting asylum seekers, longer wait times along the entire border, closed waitlists in Piedras Negras and Ciudad Acuña, and widespread shortages in housing and resources among shelters and civil society organizations. Additionally, due to the Migrant Protection Protocol (MPP), U.S. authorities have begun to return some asylum seekers to Mexican cities, including in Tijuana, Mexicali, and Ciudad Juárez.

This update estimates that there are currently more than 18,700 asylum seekers on waitlists in Mexican border cities or waiting to get on these waitlists. This is an increase from the 6,000 that were documented in November 2018, after a Honduran migrant caravan arrived in Tijuana, Baja California, and the 5,000 in February 2019, after another Honduran migrant caravan arrived in Piedras Negras, Coahuila.



**Graph 1: Estimated Total Number of Asylum Seekers Waiting in Mexican Border Cities**

*Author Elaboration*

Case 3:17-cv-02366-BAS-KSC   Document 284-5   Filed 09/26/19   PageID.7940   Page 28 of 66

The increase in the number of asylum seekers has strained shelters across the border, which have the combined capacity for around 4,000 individuals. As a result, asylum seekers are renting hotel rooms and apartments or sleeping on the streets, increasing their risks for predation by organized crime or other opportunistic actors. These factors have pushed some asylum seekers to cross into the United States between ports of entry, which has fostered confusion regarding wait times as individuals do not show up for their turns.

**Graph 2: Estimated Number of Asylum Seekers Waiting in Each Mexican Border City**



*Author Elaboration*

This update aims to highlight changes over the past three months across 13 Mexican border cities. It looks at changes in the asylum waitlist process, the number of asylum seekers waiting in each border city, and current CBP processing levels. The update draws on interviews with government officials, representatives from civil society organizations, and members of the public on both sides of the border.

**Map 1: Mexican Border Cities with Waiting Asylum Seekers**

*Cities marked by blue dots were recorded in previous reports. Cities marked by red dots are being included for the first time.*



1-SFER-116

**Metering & Waitlists: May 2019**

| Port of Entry<br>*List Administrator* | # of Asylum Seekers on List | Estimated Wait Time | CBP Processing #s | Recent Changes |
|---|---|---|---|---|
| **Matamoros, Tamaulipas**<br><br>*National Migration Institute (Instituto Nacional de Migración, INM)* | 1,525 (Gateway Bridge)<br><br>43 (B&M Bridge)<br><br>*May 8, 2019* | 2 to 3 months | 0 to 10 per day | As of May 8, 2019, there are two waitlists in Matamoros: one waitlist for the Gateway Bridge and another for the B&M Bridge.<br><br>The Gateway Bridge list is now posted publicly so that asylum seekers waiting at this bridge can know their place in line. The 50 or so asylum seekers who are first in line wait on the bridge. The others stay at shelters, which are over capacity, or in apartments and hotels.<br><br>Previously, Mexican migration officials would periodically limit civil society's access to asylum seekers. However, over the past six months, civil society in Matamoros has developed a much stronger relationship with Mexico's National Migration Institute (INM). Civil society coordinates with them, intervenes on behalf of migrants, and directs complaints to them. Instances of corruption and extortion of migrants are reportedly down.<br><br>The B&M Bridge list is maintained by an INM official and is not public. Everyone on the list waits at the bridge. |
| **Nuevo Progreso, Tamaulipas**<br><br>*Asylum seekers* | ~90<br><br>*May 10, 2019* | 1.5 to 2 months | 0 to 2 per day | In mid-April 2019, a group of roughly 70 asylum seekers began camping out on Las Flores International Bridge.[1] These asylum seekers have since started their own waitlist. U.S. authorities have taken pictures of this waitlist to keep track of who is next in line.[2] The majority of the asylum seekers are Cuban and Honduran. Nuevo Progreso—a town with around 10,000 residents—has no migrant shelter. |
| **Reynosa, Tamaulipas**<br><br>*Senda de Vida Migrant Shelter* | ~500<br><br>*May 9, 2019* | 1 to 2 months | 0 to 25 per day | In February 2019, the Senda de Vida Migrant Shelter created a waitlist for asylum seekers who were on the bridge. Asylum seekers are no longer allowed to wait on the bridge and are directed instead to the Senda de Vida shelter. CBP notifies INM regarding how many people they will take each day and INM notifies the shelter.<br><br>The Senda de Vida shelter has 300 beds and is at full capacity. It has turned away asylum seekers after they have placed their name on the list given insufficient capacity to house and feed them. |



**Metering & Waitlists: May 2019, continued**

| Port of Entry<br>*List Administrator* | # of Asylum Seekers on List | Estimated Wait Time | CBP Processing #s | Recent Changes |
|---|---|---|---|---|
| **Ciudad Miguel Alemán, Tamaulipas**<br><br>*National Migration Institute (INM)* | 25 to 40<br><br>*May 14, 2019* | 7 to 10 days | 0 to 8 per day | In February 2019, a group of Cubans arrived at the international bridge. Civil Protection periodically provides blankets and food to the asylum seekers on the bridge and offered to convert a fire station six kilometers away from border into a shelter.[3] However, the asylum seekers refused to leave the bridge. In late April 2019, there was no list and conflicts arose over allegations that CBP wasn't following the order in which asylum seekers had arrived. By mid-May, the National Migration Institute had created a waiting list. Ciudad Miguel Alemán has a population of around 20,000 and does not have a migrant shelter. |
| **Nuevo Laredo, Tamaulipas**<br><br>*National Migration Institute (INM)* | ~2,500 waiting in Nuevo Laredo<br><br>(It is unclear the number that are officially on the INM waitlist)<br><br>*May 9, 2019* | 1.5 to 2.5 months<br><br>The Nuevo Laredo municipal president recently said it was 4 to 10 months.[4] | | Nuevo Laredo's shelters—with space for only 200 migrants—are full, and there have been reports of scarce food and resources. Hundreds of asylum seekers are living in hotels or on the street. These asylum seekers come from a range of countries, including Cuba, Central America, Angola, Congo, Cameroon, Eritrea, Pakistan, Afghanistan, Syria, Russia, and Nepal. In April, CBP ran simulation tests along the border to prepare for situations where migrants might arrive to the ports of entry in large groups.[5] |
| **Piedras Negras, Coahuila**<br><br>*Municipal government* | <360 on the list.[6]<br><br>1,200 waiting in Piedras Negras.<br><br>*May 8, 2019* | 1 to 1.5 months | 5 to 7 per day | In mid-April 2019, the municipal government closed the waitlist. The waitlist is scheduled to reopen on June 1, 2019. The majority of the asylum seekers in Piedras Negras are from Honduras. The main shelter is full and facing shortages of basic goods. |

1-SFER-118



**Metering & Waitlists: May 2019, continued**

| Port of Entry<br>*List Administrator* | # of Asylum<br>Seekers on List | Estimated<br>Wait Time | CBP<br>Processing #s | Recent Changes |
|---|---|---|---|---|
| **Ciudad Acuña,<br>Coahuila**<br><br>*Municipal<br>Civil Protection<br>(individuals)/<br>Grupo Beta<br>(families)* | ~755<br><br>(525 individuals<br>/ 230 family<br>members)<br><br>*May 9, 2019* | Individuals:<br>2.5 months;<br><br>Families:<br>4 months | 4 individuals<br>per day;<br>1 family<br>per week | On November 29, 2018, Grupo Beta created the first list for asylum seekers arriving in Ciudad Acuña. There are now two waitlists, one run by Grupo Beta for families and another run by the Municipal Civil Protection for single adults. Both agencies communicate directly with CBP.<br><br>In mid-April 2019, the single adults camped out on the bridge and refused to leave. In response, Grupo Beta stopped managing the list for single adults (and continued managing a list just for families). As a result, single adult asylum seekers created their own list, and kept waiting on the bridge. The Municipal Civil Protection eventually took control of the list for single adults. The agency provides two shelters for the migrant families, which are now at full capacity. The individuals have had to pay for hotels. Currently, 90 percent of the single adults are Cuban. As of May 9, 2019, the lists are now closed and asylum seekers are being asked to go to different border crossings.[7]<br><br>According to Ciudad Acuña's Municipal Civil Protection, the influx of asylum seekers to the city was due to a rumor that CBP was processing 20 people per day in Del Rio, Texas. |
| **Ciudad Juárez,<br>Chihuahua**<br><br>*State Population<br>Council (Consejo<br>Estatal de<br>Población,<br>COESPO)* | 4,600<br><br>*May 6, 2019* | 4 months | 20 to 50 per day | At the end of March 2019, the State Population Council (COESPO) took over waitlist management from the Casa de Migrante due to reports of cloned bracelets (which had migrant's waitlist numbers), and rumors that some asylum seekers had sold their bracelets to people who wanted to skip the line.<br><br>Currently, COESPO is managing the list through a closed Facebook group that is updated twice a day. In this Facebook group, asylum seekers can check how many people CBP is accepting.[8] COESPO has reported that between 40 and 150 asylum seekers register on the list each day, and that the majority of the asylum seekers are Cuban. However, around 30 percent of asylum seekers do not show up when their number is called and Ciudad Juárez authorities believe that these individuals cross between ports of entry.<br><br>Ciudad Juárez shelters are at full capacity, leaving thousands of people on their own for accommodations. |

1-SFER-119



Case 3:17-cv-02366-BAS-KSC   Document 284-5   Filed 09/26/19   PageID.7950   Page 30 of 66

**Metering & Waitlists: May 2019, continued**

| Port of Entry <br> *List Administrator* | # of Asylum Seekers on List | Estimated Wait Time | CBP Processing #s | Recent Changes |
|---|---|---|---|---|
| **Agua Prieta, Sonora** <br><br> *CAME Migrant Shelter* | 440 <br><br> May 13, 2019 | 1.5 months | 0 to 5 per day | In mid-March 2019, Grupo Beta created a waitlist when 60 asylum seekers arrived in Agua Prieta in a single weekend. Two weeks later, they passed the waitlist to the Center for Migration Attention (Centro de Atención para Migrantes, CAME), due to constant threats from criminal groups. During the past month, CAME has managed the waitlist and received 18 threats from criminal groups. <br><br> The CAME shelter has room for 44 people but is currently housing 110 migrants and asylum seekers. The Agua Prieta municipal government also runs a shelter—Casa de la Mujer Migrante—that can provide lodging to 60 people. The remaining asylum seekers rent hotel rooms. An American church group supports CAME in some shelter operations and also accompanies asylum seekers to the ports of entry to help protect them from organized crime. <br><br> Outside the Agua Prieta port of entry, there is an improvised shelter where the five individuals at the top of the waitlist stay until it is their turn. This shelter consists of blankets tied to the border wall. There is a nearby building with a bathroom, water, and a shower. Every afternoon, a Christian group provides food to these waiting asylum seekers. |
| **Nogales, Sonora** <br><br> *Private individual* | ~900 <br><br> May 10, 2019 | 2.5 months | 2 to 3 families per day | Brenda Nieblas, a private individual, runs the list in Nogales. Her family runs migrant shelters in Nogales. Asylum seekers arriving in the city are first redirected to the Red Cross for medical care. They then contact Nieblas, who adds them to the waitlist and assigns them to a shelter. Nieblas notifies them directly when it is their turn.[9] |
| **San Luis Rio Colorado, Sonora** <br><br> *Grupo Beta* | 470 <br><br> May 9, 2019 | 4 to 6 months | 0 to 7 per day | In January 2019, a group of asylum seekers began camping out on the international bridge. In response, Grupo Beta began managing a waitlist. <br><br> There is no migrant shelter in San Luis Colorado that offers overnight accommodations. Instead, asylum seekers either rent rooms or go to other cities to wait their turn. Asylum seekers are told to call Grupo Beta directly to check if their number is coming up on the list. |

1-SFER-120



**Metering & Waitlists: May 2019, continued**

| Port of Entry<br>*List Administrator* | # of Asylum<br>Seekers on List | Estimated<br>Wait Time | CBP<br>Processing #s | Recent Changes |
|---|---|---|---|---|
| **Mexicali, Baja California**<br><br>*Grupo Beta* | ~500<br><br>*May 9, 2019* | 2 months | 0 to 20 per day | |
| **Tijuana, Baja California**<br><br>*Grupo Beta / Asylum seekers* | 5,230<br><br>*May 13, 2019* | 2 months | 20 to 80 per day | Every day, between 40 and 180 asylum seekers add themselves to the waiting list. Over the past several months, the times when asylum seekers can add themselves to the waitlist has decreased from four hours to two.[10] A volunteer has created a website for the list (elnumerodelalista.com) so that asylum seekers can track the waitlist numbers without having to travel daily to the port of entry, where the latest number is posted. |

*\*The numbers shift every day and should be interpreted as a general range rather than an exact figure.*

## END NOTES

1  "Migrantes Pernoctan en Nuevo Progreso en Inmediaciones del Puente Las Flores," *Despertar de Tamaulipas,* April 26, 2018, http://www.despertardetamaulipas.com/sitio/?q=node/79783.

2  "Migrantes Se Adueñan del Cruce Internacional en Nuevo Progreso," *Despertar de Tamaulipas,* May 10, 2019, https://despertardetamaulipas.com/sitio/?q=node/80519.

3  "Migrantes piden asilo político en puentes internacionales," *Manifiesto Tamaulipas*, April 25, 2019, https://manifiestotamaulipas.com/?p=5335.

4  "No hay espacio para más migrantes en Nuevo Laredo, México," *Periódico Cubano,* April 26, 2019, https://www.periodicocubano.com/no-hay-espacio-para-mis-migrantes-en-nuevo-laredo-mexico/.

5  Ricardo Hernández, "Se preparan contra estampida de migrantes en cruces fronterizos," *Milenio,* April 23, 2019. https://www.milenio.com/politica/comunidad/cierran-puente-internacional-tras-simulacro.

6  Elliot Spagat, Nomaan Merchant, and Patricio Espinoza, "For thousands of asylum seekers, all they can do is wait," *Associated Press,* May 9, 2019, https://www.apnews.com/ed788f5b4269407381d79e588b6c1dc2.

7  Modesto Chavez Ramirez, "Cierran registro de migrantes en Ciudad Acuña," *Contra Punto,* May 8, 2019, https://www.contrapunto.red/cierran-registro-de-migrantes-en-ciudad-acuna/.

8  Elliot Spagat, Nomaan Merchant, and Patricio Espinoza, "For thousands of asylum seekers, all they can do is wait," *Associated Press,* May 9, 2019, https://www.apnews.com/ed788f5b4269407381d79e588b6c1dc2.

9  Ibid.

10  Kate Morrissey, "Back story: A closer look at the asylum line at the San Diego border," *San Diego Union Tribune,* April 28, 2019, https://www.sandiegouniontribune.com/news/immigration/story/2019-04-25/back-story-a-closer-look-at-the-asylum-line-at-the-san-diego-border.

# Leutert Decl. – Ex. C

# METERING UPDATE

## FEBRUARY 2019







## INTRODUCTION

Since early 2016, U.S. officials in cities such as San Diego and Calexico began "metering" individuals arriving to the U.S.-Mexico border to seek protection—turning them back and asking them to wait in Mexico for a period of time. While this practice was created in response to large numbers of Haitian migrants arriving at specific ports of entry along the border, this past summer, CBP officials expanded metering to ports of entry in every border state.

At this time, CBP officers began to be stationed at the international boundary between the United States and Mexico, telling asylum seekers that U.S. ports of entry were full and that they needed to wait their turn in Mexico. As lines of asylum seekers grew in border cities, Mexican authorities and civil society groups responded by providing humanitarian assistance and creating informal waiting lists.

In December 2018, the Robert Strauss Center at the University of Texas at Austin, the Center for U.S-Mexican Studies (USMEX) at the University of California San Diego, and the Migration Policy Centre published a report documenting these practices. This report highlighted how metering had spread along the U.S.-Mexico border and the various waiting list structures in eight border areas.

Since the report's publication, the movement of asylum seekers and U.S. policy has continued to shift. The large numbers of asylum seekers who arrived in Tijuana with the migrant caravan have now almost all been processed. Yet in January 2019, the Trump administration began implementing the Migration Protection Protocol at the San Ysidro Port of Entry in San Diego to return asylum seekers back to Mexico for the duration of their asylum cases in the United States. Meanwhile, in early February, an estimated 2,000 asylum seekers arrived in Piedras Negras, Coahuila to seek asylum at the Eagle Pass port of entry.

This update aims to highlight changes over the past two months in the numbers of asylum seekers waiting in each Mexican border city and the current CBP processing times.

**Map 1: Ports of Entry**



*Author elaboration*

1-SFER-124



**Metering & Waitlists: February 2019**

| POE | # of Asylum Seekers on List | Estimated Wait Time | CBP Processing #s | Changes from December |
|---|---|---|---|---|
| Matamoros, Tamaulipas (Gateway Bridge) | < 30 | 10 days to 2 months | 0 to 10 people per day | Migrants are no longer allowed to stay in the Grupo Beta shelter next to the bridge. Instead they must wait in the migrant shelter. Additionally, migration officials no longer provide transportation from the shelters to the bridge for those migrants whose turn it is. Instead, migration officials call the shelter when it is a migrant's turn, and the shelter provides transportation. There are allegations that this has increased wait times, and some migrants fear that they are not being notified. When it is their turn, the migrants must wait on the bridge itself, instead of the shelter that was previously used. Civil society reports that migrants are exposed to cold weather conditions. |
| Matamoros, Tamaulipas (B&M Bridge) | < 20 | 2 to 10 days | 0 to 10 people per day | A new list organized by INM officers has been implemented for this bridge. Whereas before, migrants reserved their place on this bridge with their physical presence, now they sign up with a migration official. Civil society reports that Cubans predominantly use this bridge. There are allegations that Central Americans continue to be removed from this bridge and are told to sign up for the Gateway bridge list and wait at the migrant shelter. |
| Reynosa, Tamaulipas | N/A | N/A | N/A | INM officers (often lacking full uniforms) are apprehending Central Americans at the Reynosa international bridge and entering them into deportation proceedings. There are allegations that asylum seekers are only allowed onto the international bridge after paying Mexican migration officials. |
| Nuevo Laredo, Tamaulipas | < 200 | ~ 6 to 8 weeks | 1 to 2 people per day | Over the last few months, the number of asylum seekers has increased. Africans now make up a smaller percent of total, with an increased number of asylum seekers from Cuba and other countries in Latin America. |

*The numbers shift every day and should be interpreted as a general range rather than an exact figure.*

1-SFER-125



**Metering & Waitlists: February 2019 Continued**

| POE | # of Asylum Seekers on List | Estimated Wait Time | CBP Processing #s | Changes from December |
|---|---|---|---|---|
| Piedras Negras, Coahuila | ~ 120 (late January); ~ 1,600 more people arrived in early February | ~ 1 to 2 weeks (late January); ~ 5 to 6 months (early February) | 0 to 15 people per day | In the beginning of 2019, a new municipal government assumed the responsibility of running the migrant list, taking over from the old municipal government. During the first week of February, an estimated 2,000 asylum seekers arrived to Piedras Negras. The municipal government converted an old factory into temporary housing to receive the group, but will likely be phasing out the response in the coming days. |
| Ciudad Juárez, Chihuahua | < 550 | ~3 to 5 days | 0 to 65 people per day | An increasing number of asylum seekers appear to be crossing between ports of entry near El Paso. From July 2018 to December 2018, the total number of families entering the El Paso and Big Bend sectors increased by 266 percent. During this time frame, the number of families entering through ports of entry went up by only 14 percent, compared to a 414 percent increase for families crossing between ports of entry.[1] |
| Nogales, Sonora | ~ 80 to 100 | ~ 7 to 10 days | 5 to 10 families per day | While the majority of asylum seekers continue to hail from Central America's Northern Triangle, since November, Nogales has seen an influx of migrants from Nicaragua. They travel directly to Nogales. Processing times have also sped up in recent months and NGOs and local activists believe that this has to do with the mass releases in Tucson. |
| Mexicali, Baja California | ~ 40 | ~ 6 to 7 days | 6 people per day | |
| Tijuana, Baja California | ~ 2,300 | ~ 1.5 months | 20 to 80 people per day | Many migrants on the waitlist have abandoned the process due to the long wait times and choose to either cross between POEs to request asylum, stay in Tijuana permanently, or return to their country of origin. This requires the list administrators to read off numerous names until all of the slots allotted by CBP for the day are filled. |

[1] U.S. Customs and Border Protection, "Southwest Border Migration FY2019," accessed February 7, 2019, https://www.cbp.gov/news-room/stats/sw-border-migration.

# Leutert Decl. – Ex. D

Case 3:17-cv-02366-BAS-KSC   Document 294-5   Filed 09/26/19   PageID.7958   Page 38 of 66

# ASYLUM PROCESSING AND WAITLISTS AT THE U.S. - MEXICO BORDER

## DECEMBER 2018



Photograph by Rey Perezoso is licensed under CC BY-SA 2.0
https://creativecommons.org/licenses/by/2.0/







ROBERT STRAUSS CENTER
FOR INTERNATIONAL SECURITY AND LAW
THE UNIVERSITY OF TEXAS AT AUSTIN



CENTER FOR
U.S.–MEXICAN STUDIES
UC San Diego School of
Global Policy & Strategy

## AUTHORS

- **Robert Strauss Center: Stephanie Leutert, Ellie Ezzell**
- **Center for U.S.-Mexican Studies: Savitri Arvey**
- **Migration Policy Centre: Gabriella Sanchez**
- **IBI Consultants: Caitlyn Yates**
- **Independent Consultant: Paul Kuhne**

## ABOUT THE ORGANIZATIONS

The Robert Strauss Center's Mexico Security Initiative (MSI) research program launched in 2016. MSI is an effort to spur sophisticated inquiry into the causes, dimensions, and consequences of transnational crime and violence as well as the adequacy of past, present, and potential U.S. and Mexican policy responses.

The Center for U.S.-Mexican Studies (USMEX), based at the UC San Diego School of Global Policy and Strategy (GPS), was founded in 1980 to study Mexico and the full range of issues affecting economic, social and political relations between Mexico and the United States. USMEX is a go-to source for rigorous academic research that can be applied to the creation, implementation and evaluation of public policy.

The Migration Policy Centre (MPC) at the Robert Schuman Centre of the European University Institute conducts advanced research on the transnational governance of international migration, asylum and mobility. It aims to provide new ideas, rigorous evidence and critical thinking to inform major European and global policy debates.

## ACKNOWLEDGEMENTS

We are grateful to the many government officials, law enforcement officers, representatives from civil society organizations, journalists, and members of the public on both sides of the U.S.-Mexico border who contributed their time and effort in preparation of this report. The authors would also like to thank Ashley Carreon for the report's design and layout. Any omissions or errors concerning the information and views set out in this report are the responsibility of its authors.

Cover photograph by Rey Perezoso is licensed under CC BY-SA 2.0, and is free to use on public materials. Report does not reflect views or endorsed by photographer. https://creativecommons.org/licenses/by/2.0/



# TABLE OF CONTENTS

Introduction ................................. 1

Legal Framework for Asylum
Processing Procedures at the
U.S.-Mexico Border .................... 1

U.S. Ports of Entry and Asylum
Processing Overview .................. 2

History of CBP Turnbacks and
Metering of Asylum Seekers ....... 3

Mexico's Response to Turnbacks and
Metering: Waiting List Systems .... 5

Procedures for Asylum Seekers in
Mexican Border Cities ................. 9

Tijuana, Baja California ............... 9

Mexicali, Baja California ............ 11

Nogales, Sonora ....................... 12

Ciudad Juárez, Chihuahua ......... 13

Piedras Negras, Coahuila .......... 14

Nuevo Laredo, Tamaulipas ......... 15

Reynosa, Tamaulipas ................. 16

Matamoros, Tamaulipas ............. 17

Conclusion ................................ 18

Endnotes ................................. 19

## EXECUTIVE SUMMARY

For more than two years, CBP has implemented "metering" procedures for asylum seekers in multiple ports of entry across the U.S.-Mexico border. However, over the past six months, these practices have become institutionalized and have been extended across the entire southern border. Currently, CBP officers are stationed at the international dividing line between the United States and Mexico at all ports of entry and provide a similar message— "there is currently no processing capacity"—to arriving asylum seekers. Instead, each port of entry coordinates with Mexican officials to accept a certain number of asylum seekers every day. These shifts in CBP procedures have left lines of asylum seekers waiting in almost every major Mexican border city.

Yet while CBP officers have standardized their practices, there is no set process for asylum seekers on the Mexican side of the border. While almost all border cities now have a "list" that functions as a virtual line for asylum seekers—for example, the infamous "notebook" in Tijuana—the list management and logistics vary significantly by city. For example, the actual list managers have ranged from Grupo Beta (the Mexican government agency in charge of humanitarian assistance for migrants) to civil society organizations to municipal governments, and the processing steps may entail providing asylum seekers with bracelets or taking their photos after they arrive to the U.S.-Mexico border.

There are also a range of practices and dynamics in Mexican border cities that block asylum seekers from accessing U.S. ports of entry. In Reynosa, Tamaulipas, Mexican migration officials stationed near the international bridges have stopped all asylum seekers from crossing during the past three months. In Nuevo Laredo, Tamaulipas and Piedras Negras, Coahuila, Central Americans cannot access the international border bridges without temporary transit permits. In Matamoros, Tamaulipas there are allegations of asylum seekers having to pay a fee in order to get on the waiting list, and in Tijuana, Baja California asylum seekers currently face a three month wait time in order to make their claim.

This report provides a snapshot of the asylum processing system at the U.S.-Mexico border, with particular attention to asylum seekers waiting in Mexico. The report compiles fieldwork carried out in eight cities along the U.S.-Mexico border in November 2018. It draws on in-person and phone interviews with government officials, law enforcement officers, representatives from civil society organizations, journalists, and members of the public on both sides of the border. The report also relies on observations carried out at ports of entry and neighboring areas, and draws from government and legal documents, and news articles to detail current asylum processing dynamics.



## INTRODUCTION

Every year, tens of thousands of people leave their countries and travel to the United States in order to request asylum. These asylum seekers include Central Americans fleeing gang or domestic violence, Venezuelans and Cubans fleeing political repression, and people from as far as West Africa and South Asia escaping wars or targeted violence. Over the past two and a half years, U.S. authorities have increasingly adjusted the processing procedures for asylum seekers arriving at the southern border. These adjustments appear to be part of a two-pronged approach: 1) pushing asylum seekers toward ports of entry and 2) regulating or 'metering' the number of asylum seekers processed at these ports.

The latest policy adjustments began on April 6, 2018, when former U.S. Attorney General Jeff Sessions announced the administration's "Zero Tolerance" policy. This policy obligated federal prosecutors along the border to criminally prosecute everyone crossing between ports of entry, including asylum seekers and families.[1] The family separations that ensued—which resulted from parents being criminally charged and children being sent to detention centers and shelters across the country—led more asylum seekers to lodge their claims at ports of entry. The U.S. Department of Homeland Security (DHS) further encouraged would-be asylum seekers to apply for protection at official crossings.[2] Finally, on November 9, 2018, a presidential proclamation went as far as to deny asylum to individuals who enter the United States between official ports of entry. A U.S. district court, however, issued an injunction blocking the proclamation.[3]

While asylum seekers found themselves being pushed toward ports of entry, U.S. Customs and Border Protection (CBP) simultaneously took steps to limit the number of individuals who could lodge asylum claims at these ports. Their efforts included stationing officers at the U.S.-Mexico international boundary to check all crossers' documents, and only accepting a limited number of individuals every day or week for asylum processing. This shift changed both the admission dynamics at the ports of entry and created a backlog of asylum seekers in Mexico. In response, Mexican government officials and civil society organizations created informal waiting list systems to coordinate these asylum seekers.

This report provides a snapshot of the asylum processing system at the U.S.-Mexico border, with particular attention to asylum seekers waiting in Mexico. The report compiles fieldwork carried out in eight cities along the U.S.-Mexico border in November 2018. It draws on in-person and phone interviews with government officials, law enforcement officers, representatives from civil society organizations, journalists, and members of the public on both sides of the border. The report also relies on observations carried out at ports of entry and neighboring areas, and draws from government and legal documents, and news articles to detail the current dynamics.

## LEGAL FRAMEWORK FOR ASYLUM PROCESSING PROCEDURES AT THE U.S.-MEXICO BORDER

International conventions provide the guiding principles for the United States' obligations toward refugees and asylum seekers.[4] These conventions—including the 1951 Convention Relating to the Status of Refugees and the 1967 Protocol Relating to the Status of Refugees—establish the principles upon which U.S. asylum law is based. An essential part of this international framework is the doctrine of non-refoulement, which protects any person from being returned to a country where that person's life, physical integrity, or liberty would be in danger.[5] Legal scholars have argued that the principle of non-refoulement applies not only to the 'non-return' of individuals already within a country but also to the 'non-rejection' of people arriving at a country's borders.[6]

The U.S. Immigration and Nationality Act (INA) specifically outlines the right to ask for asylum in the United States. The INA establishes that: "any alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status, may apply for asylum in accordance with this section or, where applicable, section 1225(b) of this title."[7] In 1996, Congress

added the phrase "whether or not at a designated port of arrival" as part of the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), thus broadening the definition of asylum applicability.[8]

The process of seeking asylum in the United States can occur through two separate pathways: affirmative or defensive claims. Individuals may make affirmative asylum claims by entering into the United States uninspected or under an immigration status not related to asylum, and then file a claim with U.S. Citizenship and Immigration Services (USCIS) within a year of their arrival to U.S. territory. Alternatively, anyone may lodge a defensive asylum claim at a U.S. port of entry—including land, air, or maritime ports—or by presenting him or herself to a U.S. Border Patrol agent between ports of entry. According to DHS data, since 2008, an increasing number of people have sought humanitarian protections both at ports of entry and in-between them.[9] This report will focus on defensive claims, and specifically on asylum seekers' current attempts to lodge claims at ports of entry along the U.S.-Mexico border.

CBP officers that process defensive asylum claims at ports of entry must follow certain guidelines. First, CBP officers allow asylum seekers into the United States and place them in temporary holding cells.[10] Next, officers

from CBP's Office of Field Operations process the asylum seekers within the port of entry. This process includes reviewing the asylum seekers' identification and travel documents and asking them a set of preliminary questions—also known as a sworn statement—to begin the asylum request process. CBP officers also record basic biometric data (fingerprints and photographs) and complete criminal background checks.[11] Asylum seeking adults and families are ultimately transferred to an ICE detention facility to continue their asylum process. Unaccompanied minors are transferred to the Department of Health and Human Services' Office of Refugee Resettlement.[12]

## U.S. PORTS OF ENTRY AND ASYLUM PROCESSING OVERVIEW

Despite CBP's assertions that asylum processing is available at all 328 U.S. ports of entry, in multiple border cities, processing only takes place at specific ports of entry.[13] For example, in the ports of entry connecting Tijuana with San Diego's border communities, there are three ports of entry for pedestrians but only one is currently processing asylum seekers. Table 1 provides a breakdown of asylum processing in the eight cities outlined in this report.

Table 1: U.S. Ports of Entry & Asylum Processing

| Port of Entry | Pedestrian Entrances | Entries that Process Asylum Seekers | Size of POE Processing Facilities (Estimate) |
|---|---|---|---|
| Brownsville, TX | B&M Bridge; Gateway International Bridge; Veterans International Bridge at los Tomates | B&M Bridge; Gateway International Bridge[14] | ~20 people[15] |
| McAllen, TX | Pharr-Reynosa International Bridge; McAllen-Hidalgo International Bridge; Anzaldúas International Bridge | McAllen-Hidalgo International Bridge | ~19-39 people |
| Laredo, TX | Gateway to the Americas International Bridge | Gateway to the Americas International Bridge | - |
| Eagle Pass, TX | Bridge 1; Bridge 2 | Bridge 2 | - |



Case 3:17-cv-02366-BAS-KSC   Document 394-9   Filed 09/28/19   PageID.7944   Page 44 of 56

**Table 1 Continued: U.S. Ports of Entry & Asylum Processing**

| Port of Entry | Pedestrian Entrances | Entries that Process Asylum Seekers | Size of POE Processing Facilities (Estimate) |
|---|---|---|---|
| El Paso, TX | Paso del Norte; Zaragoza; Free Bridge Córdova Américas | Paso del Norte; Zaragoza | ~60-80 people[16] |
| Nogales, AZ | DeConcini; Mariposa; Morley Gate | DeConcini; Mariposa | ~50 people |
| Calexico, CA | Calexico West; Calexico East | Calexico West | - |
| San Diego, CA | San Ysidro PedWest; San Ysidro; Otay Mesa | San Ysidro PedWest | ~300-800 people[17] |

## HISTORY OF CBP TURNBACKS AND METERING OF ASYLUM SEEKERS

In March 2016, human rights organizations and news outlets began reporting that CBP officers along the U.S.-Mexico border were preventing asylum seekers from making claims in U.S. territory and turning them back to Mexico ("turnbacks").[18] By May 2016, these turnbacks were documented in San Diego, Nogales, El Paso, and Brownsville, and appeared to be increasing in frequency. At the same time, CBP officers in San Diego, Calexico, and Nogales were processing Haitian asylum seekers through a process that involved turnbacks to Mexico and requests that they wait their turn while in Mexican territory. A June 2016 email from a San Diego CBP watch commander confirmed the use of turnbacks, stating that "line officers [must] ask for and check documents to ensure that groups that may be seeking asylum are directed to remain in the waiting area on the Mexican side."[19]

By summer 2017, CBP officers were using turnbacks more frequently, although the practice appeared to be generally ad hoc. CBP officers did not appear to have a standard explanation for turning away asylum seekers, and testimonies allege that CBP officers provided a range of explanations, such as "the holding cells are full," "you can't just show up here," and "[the United States is] not giving asylum anymore."[20] At the time, CBP officials defended the turnback practice, arguing that it was not rejecting asylum seekers but rather responding to limited processing capacity. On June 13, 2017, CBP's Deputy Executive Assistant Commissioner John Wagner testified that the turnback policy "was really a question of the space available to process people."[21] A Laredo CBP spokesperson explained that the space for processing asylum seekers varies by port of entry, and depends on "holding and detention space, overall port volume, ongoing enforcement actions, case complexity, available resources, medical needs, and translation requirements."[22]

In May 2018, CBP began solidifying and uniformly implementing the turnback practices across the entire U.S.-Mexico border. These changes included more "border access controls," such as stationing an average of two CBP officers at the U.S.-Mexico international boundary on border bridges to check crossers' immigration documents. (Previously, CBP officers were only stationed within the ports of entry.[23]) According to a September 2018 letter from CBP to the DHS Office of the Inspector General, when asylum seekers arrive at the bridge, CBP stationed officers are supposed to

"radio the ports of entry" to check for available space and alert the asylum seeker if there is no space.[24] CBP officers stationed on the international bridges are also allowed to prioritize certain individuals with urgent needs such as those "traveling with children, or individuals who may be pregnant or have other medical emergencies."[25] On various border bridges, these CBP officers are accompanied by cones or mini booths and tents to mark their presence.

These new border access controls are part of CBP's "metering" or "queue management" effort. This report understands metering to refer to both turnbacks and the entire process of limiting the number of asylum seekers entering into U.S. territory. In some border cities, CBP officers regularly coordinate with Mexican authorities to alert them about their daily processing capacity. For example, every morning in Mexicali, Mexican authorities email CBP officers the latest version of the asylum waiting list and CBP officials respond with the number of people that they can process that day. In May

2018, DHS Secretary Kirstjen Nielsen described CBP's metering process in a television interview, saying: "if we don't have the resources to let [asylum seekers] in on a particular day… they are going to have to wait their turn and we will process them as we can."[26]

In October 2018, the Southern Poverty Law Center filed a civil complaint against Secretary of Homeland Security Kirstjen Nielsen, among others, regarding the border turnbacks. The complaint documented turnbacks at 14 ports of entry and claimed that this practice violated the Immigration and Nationality Act (INA), the Administrative Procedures Act (APA), and due process under the Constitution's fifth amendment. The complaint also claimed that CBP officers did not just alert asylum seekers regarding a lack of processing space but also used lies, threats, intimidation, coercion, verbal abuse, and physical force to block their access to U.S. ports of entry.[32] At the time of this report's publication the Southern District of California had not ruled on this complaint.

**Table 2: U.S. Ports of Entry and Metering**

| Port of Entry | Border Access Control (Y/N) | Number of CBP Officers | Estimated Date of Placement | # of Processed Asylum Seekers |
|---|---|---|---|---|
| Brownsville, TX | Yes | 2-3 CBP officers | June 2018 | ~0-6 per day[27] |
| McAllen, TX | Yes | 2 CBP officers | June 2018[28] | N/A[29] |
| Laredo, TX | Yes | 2 CBP officers | May 2018 | ~ 1-4 a day |
| Eagle Pass, TX | Yes | 2 CBP officers and a patrol car | July 2018 | ~2-8 per day |
| El Paso, TX | Yes | 2-4 CBP officers[30] | May 2018[31] | ~40-60 per day |
| Nogales, AZ | Yes | 2 CBP officers (Mariposa) / 1 CBP officer (DeConcini) | May 2018 | ~0-20 per day |



**Table 2 Continued: U.S. Ports of Entry and Metering**

| Port of Entry | Border Access Control (Y/N) | Number of CBP Officers | Estimated Date of Placement | # of Processed Asylum Seekers |
|---|---|---|---|---|
| Calexico, CA | Yes | 2 CBP officers | Summer 2016 | ~0-20 per day |
| San Diego, CA | Yes | 2 CBP officers | Summer 2016 | ~20-80 per day |

## MEXICO'S RESPONSE TO TURNBACKS AND METERING: WAITING LIST SYSTEMS

Over the past two years, CBP's metering system and use of turnbacks has been communicated to its National Migration Institute (Instituto Nacional de Migración, INM) counterparts. As far back as November 12, 2016, CBP's assistant director of field operations in Laredo wrote in an email that each port director was to meet with their Mexican counterparts and request that Mexican authorities "control the flow of aliens to the port of entry."[33] While during his May 2017 testimony, CBP Deputy Executive Assistant Commissioner John Wagner explained that "[CBP] worked out a process with the Mexican authorities to be able to limit how many people a day could come across the border into [the] facility to be able to be processed."[34] More recently, an article by The Nation from November 30, 2018 cites an email where a CBP representative acknowledged that the agency has "established a collaborative bi-national effort with the government of Mexico and non-government organizations to assist with the flow of individuals to the border, based on capacity and infrastructure constraints."[35]

Mexican officials and civil society organizations have frequently taken steps to address the effects from the United States' metering practices. This includes managing the backlogs of hundreds or thousands of asylum seekers waiting in Mexican territory. In the summer of 2016, the first approach to processing these backlogged

asylum seekers emerged, as CBP officials implemented a metering system for Haitian asylum seekers. In response, INM created an appointment system in Tijuana, offering Haitians specific dates for their interviews and Grupo Beta—the Mexican government's humanitarian agency for migrants—set up a waiting list system in Mexicali. From late October 2016 through December 2016, the Nogales municipal government also implemented a waiting list system for arriving Haitians.

Beginning in the summer of 2018—as asylum seekers camped out around ports of entry—the waiting list systems spread to almost every Mexican border city. These lists were often created to allow asylum seekers to move into shelters while they waited and to reduce conflicts among the individuals waiting in line. However, across Mexico's border cities, there is no standardized waiting list administrator: Grupo Beta plays this role in Tijuana and Mexicali, local civil society organizations in Nogales and Ciudad Juárez, INM officials in Nuevo Laredo, and, until late November 2018, the municipal government in Piedras Negras. In Matamoros, both INM and Grupo Beta run a list at the Gateway International Bridge. Asylum seekers may also assist in managing the waiting system. For example, in Tijuana, an asylum seeker volunteer is in charge of documenting arriving asylum seekers' information and calling out the numbers for daily CBP processing.

There are also significant differences in the number of asylum seekers waiting at each port of entry. In Nuevo

**Map 1: Mexican Border Cities and Waiting List Administrators**



*Author elaboration*

Laredo, the number of waiting asylum seekers was estimated to range between 60 and 80, while in Tijuana, there are currently more than 5,000 asylum seekers on the list. These varying numbers and the differences in CBP processing capacities (outlined in Table 2), mean that wait times vary significantly. On average, asylum seekers appeared to be waiting in Mexican border cities for two to three weeks. However, in Ciudad Juárez, the wait time was estimated to be between one to two weeks and in Tijuana it is currently estimated at 12 weeks.

Asylum seekers stay in a range of accommodations while they wait in Mexican border cities. In the summer of 2016, when metering was first implemented in San Diego, Haitians camped out on the sidewalks outside the San Ysidro port of entry. However, as Mexican officials developed waiting lists in Tijuana and Mexicali, Haitians moved off the streets and into shelters or hotels. In the summer of 2018, similar situations began playing out with asylum seekers from Central America and Africa who were staying outside the ports of entry in Texas and Arizona. The creation of waiting lists in these cities moved these asylum seekers off the bridges and away from the ports. Currently, most asylum seekers stay in migrant shelters or hotels, depending on the asylum seekers' budgets and the shelter capacity in the given border city (see Table 4 for housing information by Mexican border city).



**Table 3: Waiting List Systems in Mexican Border Cities**

| POE | Waiting List Administrator in Mexico | Date of Waiting List Enactment | # of Asylum Seekers on List | Estimated Wait Time |
|---|---|---|---|---|
| Matamoros, Tamaulipas (Gateway International Bridge) | Grupo Beta/ INM Officials | June 2018 | ~283 | 2-8 weeks |
| Matamoros, Tamaulipas (B&M Bridge) | No List / Previously: Mexican Civil Society Organization | May 2018 - June 2018 | N/A | 1-2 weeks |
| Reynosa, Tamaulipas | No List | N/A | N/A | N/A |
| Nuevo Laredo, Tamaulipas | INM | July 2018 | ~60-80 | ~2 weeks |
| Piedras Negras, Coahuila | No List / Previously: Mayor's Office | July 2018 - November 2018 | N/A | N/A |
| Ciudad Juárez, Chihuahua | Casa del Migrante | November 2018 | ~170 | ~1-2 weeks |
| Nogales, Sonora | Mexican Civil Society Organization | June 2018[36] | ~170 | ~1.5-2 weeks |
| Mexicali, Baja California | Grupo Beta | September 2016 (for Haitians) / September 2017 (for all asylum seekers) | ~350 | ~3.5-4 weeks |
| Tijuana, Baja California | Asylum seekers manage the list / Grupo Beta stores the list | Summer 2016 (for Haitians) / Summer 2017 (for all asylum seekers) | ~5,000[37] | ~ 12 weeks |



**Table 4: Housing Capacity for Asylum Seekers in Mexican Border Cities**

| POE | Shelters and Capacity (Estimated) | Other Housing Arrangements |
|---|---|---|
| Matamoros, Tamaulipas | La Bugambilia Shelter (35 beds), Casa del Migrante[38] | There are temporary areas for asylum seekers next to both international bridges. The area next to the B&M Bridge can hold 10-15 people in camping tents. The area next to the Gateway International Bridge has around 20 cots. Asylum seekers may also stay in hotels.[39] |
| Reynosa, Tamaulipas | Casa de Migrante Señora de Guadalupe (100-150 beds), Casa Senda de Vida (300 beds) | Asylum seekers generally do not stay in hotels due to security risks. |
| Nuevo Laredo, Tamaulipas | Casa del Migrante Nazareth (150 beds) / Casa del Migrante de la Asociación Ministerio de Adventistas de Rehabilitación (60 beds) | Asylum seekers occasionally stay in the Refugio Temporal homeless shelter or housing arranged by local churches. They tend not to stay in hotels due to security risks. |
| Piedras Negras, Coahuila | Casa del Migrante Frontera Digna (100 beds) | Asylum seekers may also stay in the Piedras Negras Firefighters building (40 beds), five church-affiliated housing arrangements (65 beds). There are also low cost dormitories. |
| Ciudad Juárez, Chihuahua | Casa del Migrante (280 beds)[40] | Asylum seekers often opt to stay at low-cost hotels in the downtown and port of entry area. |
| Nogales, Sonora | Multiple migrant shelters (170 beds) | Asylum seekers may also stay in hotels. During last few days in Nogales, asylum seekers wait in a room on the Mexican side of the port of entry. |
| Mexicali, Baja California | Casa de Ayuda Alfa y Omega, Cobina, Ángeles Sin Frontera - "Hotel Migrante," Grupo de Ayuda para el Migrante, Albergue del Desierto, El Camino a un Nuevo Amanecer, Casa del Migrante Betania, Centro Pastoral Mana (700 beds total) | Asylum seekers may also stay in hotels. |
| Tijuana, Baja California | Casa de Migrante, Madre Assunta, Movimiento Juventud 2000, Desayunador "Padre Chava", Ejército de Salvación, Roca de Salvación, Casa YMCA para Menores Migrantes, Embajadores de Jesús, La Viña de Tijuana, Jesús es mi Roca, El Calvario, y Nueva Jerusalén, Camino de Salvación (700 beds total, before the arrival of the Fall 2018 caravan) | Asylum seekers may also stay at low-cost hotels near the San Ysidro port of entry. On November 14, 2018 the local Tijuana government created a temporary shelter in the Benito Juárez Sports Complex. On November 30, 2018 the federal government created an indoor temporary shelter on the outskirts of the city. |



## PROCEDURES FOR ASYLUM SEEKERS IN MEXICAN BORDER CITIES

The following sections will provide more detailed information on the history of asylum processing and the current state of metering and waiting list systems in eight Mexican border cities.

### TIJUANA, BAJA CALIFORNIA

CBP metering at the San Diego ports of entry began in early 2016 as tens of thousands of Haitians arrived in Tijuana. Many of these Haitians left their homes after the devastating 2010 earthquake, emigrating first to Brazil, and then—facing an economic downturn in Brazil—continued on to the United States. Initially the Haitians could enter the United States through ports of entry on humanitarian parole and stay for up to three years under a program initiated by the Obama administration. This humanitarian parole process appears to have initially encouraged an increasing number of Haitians to make the journey.[41]

Most of the Haitians arriving at the U.S. southern border went to Tijuana. In March 2016, civil society organizations in Tijuana documented the first cases of asylum seekers being turned away from the San Diego ports of entry. Over the following months, these turnbacks continued with greater frequency, and hundreds, perhaps thousands of Haitians, including men, women, and young children began to regularly camp outside the San Ysidro port of entry. To ensure that they were being processed in their order of arrival, Haitians began creating their own waiting lists.

In August 2016, the local Tijuana Migrant Attention Office and INM created an appointment system for Haitians. INM officials began granting Haitians 20-day permits to stay in Mexico and handing out paper slips with dates to appear at the San Ysidro ports of entry.[42] To schedule the appointment, Mexican authorities would ask Haitians to

**Map 2: Mexican Border Cities**



*Author elaboration*



**Graph 1: Haitian Inadmissibles in San Diego Sector**



*Data from U.S. Customs and Border Protection*

show their temporary transit permits (oficios de salida) that INM officials had issued at the Mexico-Guatemala border.[43] Civil society organizations, such as Al Otro Lado, documented that CBP officials redirected arriving Haitians—and increasingly other nationalities—to these Mexican authorities to receive an "appointment."[44] While Haitians were given appointments, INM often rejected asylum seekers from other countries, claiming that the system wasn't designed for them.[45] In the first half of 2017, the number of Haitians decreased and this appointment system was terminated.

However, in 2017, large numbers of asylum seekers from other nationalities—particularly Mexicans from the states of Michoacán and Guerrero—started to arrive in Tijuana. Since CBP officials would not process them upon arrival, these asylum seekers also began to create their own waiting lists. Multiple waiting lists began circulating and causing conflicts among the asylum seekers. In summer 2017, Grupo Beta created a single waiting list for all asylum seekers regardless of nationality.[46] Grupo Beta asked asylum seekers to manage the list on a daily basis, to avoid perceptions of corruption or favoritism.

Currently, CBP officers tell asylum seekers arriving at Tijuana's three ports of entry that there are others who are waiting in line and point them to the San Ysidro

PedWest bridge. At this bridge, volunteers—who are usually asylum seekers themselves—write down the asylum seeker's name and provide him or her with a number. Each number represents ten asylum seekers. Every night, Grupo Beta stores the notebook to ensure that it is not lost, as there is no digital version of the list.[47]

Prior to the caravan, waiting asylum seekers stayed primarily in migrant shelters. However, the number of beds—totaling approximately 700—often fell short of demand.[48] Some asylum seekers looked for other accommodations, such as the city's many hotels. As a result, many asylum workers found temporary informal jobs in Tijuana, where they could early roughly MX$1,500 per week (US$75) to support themselves during the wait time. Others begged for money on the streets. For those with a limited budget, hotels near the San Ysidro Port of Entry—such as Hotel California—charge MX$25 to $50 a person per night. Meanwhile, to house the migrant caravan that arrived in November 2018, the local Tijuana government set up a temporary shelter in the Benito Juárez Sports Complex. After conditions worsened in the shelter, the federal government opened an indoor shelter on the outskirts of Tijuana.

Every day, CBP notifies INM regarding how many asylum seekers they will be able to process. Grupo Beta notifies the volunteer who is administering the list,

Case: 22-55988, 01/17/2024, ID: 12849067, DktEntry: 107-2, Page 142 of 171

and this volunteer then reads off the corresponding numbers. In general, one to three numbers are called at 7am and another one to three numbers are called at 9am. This means that between 20 and 80 asylum seekers are processed a day. Once an asylum seeker's number is called, he or she then waits in front of the San Ysidro Port of Entry until 9am for the morning shift or until 1pm for the afternoon shift. When it is the asylum seeker's turn, a Grupo Beta official escorts him or her to the CBP officers at the international dividing line.

In the weeks prior to the caravan's arrival, roughly 2,400-2,500 asylum seekers were registered on the waiting list, according to Grupo Beta. This meant that asylum seekers were waiting for between four to six weeks to make asylum claims. After the caravan's arrival, the list grew to 5,000 people with a wait time of roughly three months. On November 30, 2018, the last number called was 1,147. Since each number represents ten asylum seekers, this means that 11,470 asylum seekers had been processed through the waiting list since its creation.[49]

However, there are allegations that not all asylum seekers have access to the waiting list. According to Al Otro Lado, their staff have witnessed the volunteer list administrator refuse to add black asylum seekers and



Graph 2: Unaccompanied Minors in San Diego and El Centro Sectors

*Data from U.S. Customs and Border Protection*

unaccompanied minors.[50] There are other accounts that list administrators have asked unaccompanied minors to show official identification or come with a parent in order to be included on the list.[51] These minors are not always allowed directly into U.S. territory, with Amnesty International documenting cases where CBP turned them away.[52] These factors may potentially contribute to the high number (60 percent) of unaccompanied minors who continue to cross between ports of entry in the San Diego sector (see Graph 2). Due to long wait times, adult asylum seekers may also cross between ports of entry, a trend that journalists have documented.[53]

## MEXICALI, BAJA CALIFORNIA

In the summer of 2016, CBP officials implemented a metering system in Mexicali after approximately 2,000 Haitians arrived to the city in a span of five days. In response, Grupo Beta in Mexicali established a waiting system for Haitians. Officials cite the city's extreme temperatures and the small space around the ports of entry as their motivation for making the list. In September 2017, the list was expanded beyond Haitians and began incorporating asylum seekers from all nationalities.[54]



Currently, when asylum seekers approach the turnstiles at the Mexicali ports of entry, CBP officials tell them that there is a line and redirect them to the Grupo Beta offices. These offices are on the Mexican side of the Calexico West Port of Entry, and asylum seekers can register in the offices for the waiting list and receive a number. Asylum seekers leave their phone number and/or the name of the shelter or hotel where they will be staying with Grupo Beta, so that these officials can notify them to return to the port of entry when it is their turn to be processed.

Every morning at 8am, Grupo Beta emails CBP with the updated list of asylum seekers and CBP emails back with the number of asylum seekers that it will be processing that day. This number is generally between 10 and 20 asylum seekers. When it is an asylum seeker's turn to be processed, Grupo Beta calls the phone number that the asylum seeker left, and at times an official will pick them up at the shelter where they are staying. Currently, there are an estimated 350 people waiting in Mexicali to seek asylum, with Mexicans making up around 60 percent of the individuals on the list. Central Americans constitute another 10 percent and other nationalities makeup the remaining 30 percent. These asylum seekers' generally wait between 25 to 30 days.

## NOGALES, SONORA

In late October 2016, Nogales' municipal government organized its first waiting list after dozens of Haitian asylum seekers arrived to the city. When CBP would not let them pass into the port of entry, the Haitians began camping outside the DeConcini port. In response, the Nogales municipal government created a list to organize the waiting Haitians. The system ended in December 2016, as the number of Haitians in Nogales decreased.[55]

In June 2018, the Kino Border Initiative, a binational civil society organization, set up Nogales' second waiting list system. The month before, dozens of families—mostly from Guatemala—arrived in Nogales seeking asylum and began lining up at the DeConcini port of entry.[56] In response, CBP stationed an officer at the port of entry turnstile and began stopping asylum seekers from entering

U.S. territory. As the families waited outside the port, they maintained the order of the line by taping a sheet of paper to the port's walls. Several weeks after, the Kino Border Initiative assumed control of the list and shifted to an Excel spreadsheet.[57] This process continued through July 2018, until the number of asylum seekers declined.[58]

Finally, in late September 2018, a different Nogales-based civil society organization created another waiting list system for asylum seekers.[59] This time, the motivation for creating the list came after CBP processed only three asylum claims during a two week period. In addition to a spreadsheet, this civil society organization now provides bracelets to the asylum seekers that include the person's name, date of arrival, and number.

For asylum seekers, the waiting list process begins after they reach the Nogales port of entry. CBP officers are stationed at the turnstiles and these officers inform asylum seekers that there is "insufficient processing capacity" and direct them to wait on the Mexican side of the border. At this point, a Nogales municipal police officer—charged with providing security at the port of entry—will bring the asylum seekers to a staging area.[60] Another municipal police officer stationed near the room will contact the civil society organization that runs the list to register the asylum seeker. While they wait in Nogales, asylum seekers stay in one of three migrant shelters—which combined have around 170 beds. On average, 30 to 40 asylum seekers are processed every week, although the numbers vary by day. There are days when the Nogales port of entry may accept 20 asylum seekers, while other days it may not take a single one.[61]

Finally, when it is an asylum seeker's turn, the individual or family goes to a waiting area on the Mexican side of the port of entry to wait for 24 to 72 hours until they are allowed to enter the United States.[62] The staging area is a 150 square foot space with blankets, small mats, and access to a bathroom (although, the bathroom contains only a toilet and sink with no shower).[63] CBP officers will alert the Nogales municipal police officer stationed nearby that there is additional space at the port of entry, and the second municipal police officer will retrieve the next individual or family in line. As of November 19, 2018, one of the asylum seekers waiting in the staging area wore a bracelet with the

Case: 22-55988, 01/17/2024, ID: 12849067, DktEntry: 107-2, Page 144 of 171

number 337, indicating that since early October 2018, 337 asylum seekers had passed through the list.[64]

## CIUDAD JUÁREZ, CHIHUAHUA

In Spring 2016, isolated reports began to emerge of CBP personnel discouraging asylum seekers from pursuing their claims at El Paso ports of entry. According to court filings, by May 2016, civil society organizations increasingly began to witness CBP officers asking asylum seekers to "come back later" since the United States was "no longer taking asylum seekers" or because the port of entry "was full."[65] Asylum seekers arriving in El Paso ports of entry also reported specific forms of harassment and intimidation, including being told that Mexican nationals did not receive asylum, having weapons pointed at them, and being threatened with separation from their children.[66] Since then, local organizations, often in partnership with journalists, have continued to document these practices.[67]

In May 2018, CBP officers implemented border access controls at the midpoint of the El Paso international bridges to pre-screen individuals en route to the U.S. ports of entry. These controls included plastic cones and ad-hoc screening stations. At the Paso del Norte Bridge, the controls also included a tent-like structure.[68]



**Graph 3: Family Units in El Paso and Big Bend Sectors**

*Data from U.S. Customs and Border Protection*

These border access controls appear to have affected the number of asylum seekers admitted to ports of entry. In April 2018, CBP data indicates that 2,315 family members and unaccompanied minors were admitted through the El Paso ports of entry (77 people per day). However, by June 2018, these numbers had fallen by two-thirds, with CBP processing only 26 asylum seekers a day.[69]

Some of the asylum seekers who were turned back as part of these border access controls appear to have instead opted to cross in between ports of entry (see Graph 3 and Graph 4). A September 2018 report by the DHS Office of the Inspector General (OIG) confirms this trend, documenting that: "OIG saw evidence that limiting the volume of asylum-seekers entering at ports of entry leads some aliens who would otherwise seek legal entry into the United States to cross the border illegally."[70]

Following CBP's metering procedures, arriving asylum seekers began to accumulate in Mexican territory. By the beginning of November, 193 asylum seekers were waiting on the Paso del Norte bridge. On November 9, 2018, as the city braced for particularly cold weather, the Ciudad Juárez municipal government approached the waiting asylum seekers and asked them to move to the city's migrant shelter, La Casa del Migrante. To preserve the asylum seekers' place in line, the Red Cross—which had been providing first aid, food and water to individuals

Case: 22-55988, 01/17/2024, ID: 12849067, DktEntry: 107-2, Page 145 of 171

Date Filed: 02/06/BAS KSC Document 2043-1 Filed 02/2019 PageID 7975 Page 33 of 68

on the bridge since October—organized a waiting list. Grupo Beta transported the group of asylum seekers to the shelter.[71] The list was soon transferred to the migrant shelter, which continues to administer it to this day.

Currently, when asylum seekers arrive to one of El Paso's international bridges, they are instructed to alert Grupo Beta of their presence so that they can be referred to or transported to La Casa del Migrante. Upon arrival at the shelter, staff complete forms and assign each migrant a number, which is written inside his or her forearm with a black marker.[72] Asylum seekers remain in the shelter until it is their turn to be processed by CBP. Every day, Mexico's Municipal System for Integral Family Development (Desarollo Integral de la Familia, DIF) transports two groups of 20 to 30 asylum seekers to the Paso del Norte bridge to be processed.[73] As of November 30, only 82 people remained at the shelter.[74] While there is no data available on waiting asylum seekers demographics, social media posts made public by the shelter indicate asylum seekers involve people from Guatemala, Honduras, El Salvador, Mexico, Cuba, and Brazil.[75]

## PIEDRAS NEGRAS, COAHUILA

Metering in Piedras Negras, Coahuila began in July 2018, when CBP officers set up a border access control point

**Graph 4: Unaccompanied Minors in El Paso and Big Bend Sectors**



*Data from U.S. Customs and Border Protection*

at the international dividing line. At this time, asylum seekers from Africa and Cuba were arriving to the city.[76] The asylum seekers initially stayed on international bridges, prompting local residents to complain about having to walk around the camped out groups in order to enter the United States. In response, the Piedras Negras Mayor's Office organized the asylum seekers, moving them to migrant shelters and then setting up a waiting list. This system lasted for the following four months.

While the Mayor's Office's wait list was in place, asylum seekers arriving in Piedras Negras would reach the international bridges and CBP would tell them that there was "no processing capacity." Asylum seekers would then return to the Mexican side of the bridge, where representatives from Mexico's Federal Roads and Bridges (Caminos y Puentes Federales, CAPUFE)—the authorities charged with managing the border bridge—would provide information regarding next steps. The CAPUFE representatives would provide the asylum seekers with the phone number of a representative from the Mayor's Office and information about the local migrant shelter. They would also take a picture of the asylum seekers, which was sent to the Mayor's Office.[77]

However, for asylum seekers from Central America, getting on Piedras Negras waiting list was not always an option. The Mayor's Office reports that it only added





asylum seekers to the waiting list system if they had temporary transit permits (oficios de salida). These temporary transit permits are generally only granted to migrants arriving to Mexico's southern border if they come from countries where Mexico does not have a consular presence or where there is a prohibitive deportation cost. In other words, while African asylum seekers are often provided with temporary transit permits, these documents are not provided to asylum seekers from countries in Central America. The Mayor's Office reported that it made exceptions for families, allowing them to join the list regardless of their immigration paperwork. CBP officers also reportedly allow unaccompanied minors to pass into U.S. territory for immediate processing, so they were also exempt from the list.[78]

During the fall of 2018, asylum seekers waiting in Piedras Negras would first go to the local shelter to receive assistance. They could only stay for three days, but many were quickly transferred to housing for asylum seekers that was coordinated by the municipal government. The largest housing facility was at "Bomberos," the municipal firefighters building, which holds up to 40 people. Five other locations have a capacity for an additional 65 people.[79] Every day, the municipal authorities would ask the next 10 to 15 asylum seekers on the list to wait on Bridge 2 in case CBP officials signaled that they had processing space. During this time, CBP processed 5 to 10 asylum seekers a day, although some days they did not process anyone.[80]

In late November 2018, the Mayor's Office decided that it would no longer manage the asylum waiting list. A representative from the municipal government reported that during the previous weeks, CBP had significantly decreased the number of asylum seekers that it was processing. This drop combined with an end to the municipal government's time in office (a new mayor is scheduled to take office on January 1, 2019) led the outgoing government to terminate the list.[81] By the beginning of December 2018, asylum seekers began once again waiting in a physical line at the Bridge 2, ordering themselves by their waiting list numbers. As of December 3, 2018, there were 60 asylum seekers waiting on the bridge. Another 100 asylum seekers

had reportedly left for other border crossings or had attempted to cross between ports of entry.[82]

## NUEVO LAREDO, TAMAULIPAS

Historically, Nuevo Laredo served as a popular crossing point for Cubans planning to enter the United States both during the "wet foot, dry foot" policy and after the policy's end in January 2017.[83] Since 2012, CBP data reports that more than 113,000 Cubans traveled through Nuevo Laredo as part of their journey to the United States. When the policy ended, some 1,000 Cubans remained in Nuevo Laredo. Unlike CBP's processing of Haitians in Tijuana, CBP never implemented a metering policy to process these Cubans.

Increasingly Nuevo Laredo has served at a port of entry for asylum seekers from other areas of the world. In May 2018, this diversity gained attention as dozens of asylum seekers from African countries, such as Kenya, Angola, the Congo, and Cameroon, arrived to Nuevo Laredo.[84] From April 2018 through September 2018, more than 1,600 Africans entered Mexico and received temporary transit permits, and several hundred traveled to Nuevo Laredo.[85] These asylum seekers lined up across the international bridge, and in July 2018, there were 15 to 50 people camped out every day. While not as significant in sheer numbers, the asylum seekers from different nationalities garnered attention and brought asylum issues to the forefront of local news.

In July 2018, the INM began to maintain a waiting list for asylum seekers in Nuevo Laredo given concerns of bridge overcrowding, citizen security risks, and health concerns, especially for children. Currently, when asylum seekers arrive to the bridge, INM officials take down names and nationalities and provide those on the bridge with the addresses of the city's two shelters: AMAR and Casa de Migrante Nazareth.[86] The asylum seekers generally remain in these shelters during their time in Nuevo Laredo. Every day, CBP notifies INM regarding how many asylum seekers they will process, and INM calls the shelters to notify the asylum seekers. The city's two migrant shelters then provide asylum seekers with transportation back to the port of entry.

**Graph 5: Cuban Inadmissibles in the Laredo Sector**



*Data from U.S. Customs and Border Protection*

Similar to the waiting list system in Piedras Negras, asylum seekers from Central America are generally not allowed to join INM's waiting list or to cross Nuevo Laredo's international bridge. On July 19, 2018, INM spokesperson Sofía Aurora Vega Gutiérrez, gave an interview to LMT Online confirming that INM officers detained any asylum seekers arriving to the International Bridge 1 in Laredo if they did not have the appropriate paperwork to be in Mexico legally. She claimed that individuals entering Mexico to seek asylum in the United States should request the temporary transit permit to move through Mexico. According to Vega Gutiérrez, "If the migrants arrive to the Mexican side without a visa, it is very probable that they will be deported to their country of origin."[87] On December 3, 2018, a member of Nuevo Laredo's civil society confirmed that asylum seekers without temporary transit permits continue to be denied access to INM's waiting list and the Nuevo Laredo international bridge. In October 2018, there were documented cases that INM officials were letting Central American asylum seekers onto the international bridge after charging them US$500.[88]

In late November 2018, INM officials reported that there were an estimated 70-80 asylum seekers waiting in shelters and that CBP officers were only processing around 10 claims per week. The AMAR shelter said that it had 60 asylum seekers, and most were from Africa. INM officials noted that asylum seekers waiting in Laredo often continued on to Piedras Negras or Ciudad Acuña in the neighboring state of Coahuila in an effort to find shorter wait times. However, civil society organizations and government officials in Piedras Negras offered a different explanation, claiming that asylum seekers chose avoid Nuevo Laredo on the basis of security concerns. Additionally, it is possible that some asylum seekers may leave Nuevo Laredo after being denied access to the bridge.

## REYNOSA, TAMAULIPAS

In June 2018, CBP officers erected border barriers in McAllen, Texas, with one to two officers placed at the midpoint of the Hidalgo bridge. These officers arrived soon after a group of 60 asylum seekers, the majority Cuban nationals, arrived at the Hidalgo bridge in May 2018.[89] There was no waiting list system in Reynosa, so the asylum seekers reserved their place in line with their physical presence. As these asylum seekers waited on the bridge, Mexican officials cited concerns for the asylum seekers' safety and the bridge's cleanliness. From May through August 2018, CBP processed around 20 to 50 asylum seekers per week.[90]

However, since August, an INM official—positioned at the foot of the Hidalgo International Bridge —began to turn away asylum seekers, telling asylum seekers that they could not pass and that the bridge was closed to people



making asylum claims.[91] According to a Tamaulipas government official, the only time that asylum seekers have successfully crossed the bridge since August is when the INM official was taking a break.[92] Since the INM officer began stopping asylum seekers, CBP has processed approximately 10 asylum seekers a month.[93] For the asylum seekers that do arrive to Reynosa, some stay in Reynosa's two shelters: Senda de Vida, with a 300 person capacity, or La Casa de Nuestra Señora de Guadalupe, which can house almost 150 individuals.[94]

Beyond the structural barriers to seek asylum, Reynosa's security situation also affects asylum seekers. Over the past six months, civil society organizations report that kidnappings rates continue to increase, and that asylum seekers are primary targets, especially individuals staying near the ports of entry. In response to the current conditions, members of Reynosa's civil society have recommended that asylum seekers travel to neighboring ports of entry such as Nuevo Laredo and Matamoros.[95]

## MATAMOROS, TAMAULIPAS

In Matamoros, there are two primary pedestrian bridges that asylum seekers use to cross to make their claims: the Gateway Bridge, known locally as the "new bridge," and the Brownsville & Matamoros Express International Bridge (B&M Bridge), the "old bridge." At the end of May 2018, CBP officials began to be stationed at the midpoint of both bridges. At this time, officials also began limiting the number of asylum seekers who could be processed at the bridges. In response to these CBP metering practices, two different groups began to implement waiting systems at each bridge. Asylum seekers were permitted to make their claims at either bridge.

At the B&M International bridge, a civil society group managed a waiting list system from May 2018 through June 2018. However, in July 2018, INM announced that the B&M bridge would no longer allow asylum requests, and that asylum seekers would need to go to the Gateway bridge.[96] This meant that from June through October 2018, few asylum seekers used the B&M bridge. Those who attempted to request asylum on the B&M bridge

did not use a waiting list system, but rather reserved their place in line with their physical presence. INM officials would also intermittently require that waiting asylum seekers leave the B&M bridge, and lodge their asylum request at the Gateway bridge. Civil society organizations report that asylum seekers who were able to maintain a presence on the B&M bridge experienced shorter wait times than those on the Gateway bridge.[97]

Conditions at the B&M bridge shifted in late November 2018 when asylum seekers were again allowed to wait on the bridge.[98] Currently, it appears that there is a tacit agreement between the bridge operator and INM officials that four to five families may wait for asylum on the B&M bridge at a time. The asylum seekers manage the order themselves. Those waiting to cross at the B&M bridge stay in a small makeshift holding area behind the bridge. In this area, there are a number of tents, some of which are camping tents and others are tents constructed from tarp and twine, forming a camp. On November 27, 2018 there were ten asylum seekers waiting in the camp, and wait times varied from several days to a week. At this time, the majority of those waiting in the camp were Cuban.[99]

Meanwhile, at the Gateway International Bridge, INM and Grupo Beta officials jointly run a waiting list system based out of a notebook. Whether the Mexican immigration official is from INM or Grupo Beta depends on the personnel that is stationed at the bridge at any time.[100] When asylum seekers arrive to the bridge, the immigration official adds them to the list and provides them with a number, which they must remember. At this point, INM agents or Grupo Beta officials—depending on availability—transport the asylum seekers to one of the city's two migrant shelters: the Bugambilia Shelter, which has a capacity between 30 and 40 beds, or the Casa del Migrante shelter.[101] Asylum seekers wait in these shelters until INM or Grupo Beta arrive at the shelter to inform them that their number will soon be called and bring them to a holding area at the Gateway bridge. Every day, INM shares the list with Grupo Beta, and Grupo Beta inputs the list in a database.[102]

Although the waiting list is sequential, both Mexican immigration officials and civil society organizations



report that pregnant women, unaccompanied minors, and families with minors are given priority and move to the top of the list. Each day, INM coordinates with CBP as to the number of asylum seekers who will be processed, which range from zero to a reported maximum of six.[103] Additionally, an INM official stated that CBP, at times, dictates which nationalities are accepted from the list, citing as an example that CBP might tell INM that they will not accept asylum seekers from Africa at this time, and for INM to send an asylum seeker from Cuba.[104] A civil society member also mentioned hearing a similar rejection of African asylum seekers in favor of other nationalities and these accounts have also been documented by journalists.[105]

Finally, there are also allegations that bribes influence an asylum seeker's ability to be added to the list or to advance on the list. During fieldwork, researchers documented accounts of asylum seekers paying fees from US$200 to $500. These allegations have also been documented in various news publications.[106] As of late November, there were an estimated 283 people on the Gateway bridge list, with an average wait time varying widely from two to eight weeks.

## CONCLUSION

For more than two years, CBP has implemented metering and turnbacks in multiple ports of entry across the U.S.-Mexico border. However, over the past six months, these practices have become institutionalized and extended across the entire border. CBP officers are now stationed at the international dividing line between the United States and Mexico in every port of entry and they now have official guidance.[107] This standardization is evident in the message that CBP officers provide to asylum seekers across almost all U.S. ports of entry, which is that "there is currently no processing capacity."

The increasing CBP standardization stands in sharp contrast to the lack of similarities across Mexican border cities for attending to waiting asylum seekers. While almost all Mexican border cities have a "list" that functions as a virtual line for asylum seekers—

so that they do not have to wait in a physical line at the ports of entry—the list management and logistics vary significantly by city. The actual list managers range from Grupo Beta to civil society organizations to a municipal government, while the processing steps may entail providing asylum seekers with bracelets or taking their photos after they arrive at the U.S.-Mexico border. This lack of standardization comes from the reactive way that most of these processes were created, with asylum seekers, civil society organizations, or government officials only taking steps in response to individuals waiting on the Mexican side of the border.

Yet, on both sides of the border, a lack of transparency was a common factor. Despite being well-documented by civil society organizations, journalists, and DHS documents, CBP has not issued any public statement that explains its metering system and its legal justification and logistical processes. Upon request, CBP provides a broad press release to interested parties regarding metering but will not discuss processing capacity or specific details. Similarly, there is no Mexican government statement or report on the informal waiting line systems in border cities. And while a number of Mexican government officials were willing to discuss the waiting list procedures, others were more reluctant to answer questions regarding the system or any interactions with CBP officials. In some cities, there was also secrecy, although to a lesser extent, among civil society organizations regarding how the waiting lists were being managed.

Among all the U.S. metering systems, the non-standardized Mexican waiting list processes, and the overall lack of transparency, the asylum seekers are the most affected. After journeys that lasted weeks or months, they must navigate an unclear system on both sides of the border. Depending on the border crossing, these asylum seekers may not only need to wait in a 'line' but also pay bribes for the chance to seek asylum, avoid serious security threats, and live in migrant shelters for weeks or months. Despite international and U.S. law that outlines asylum seekers' ability to request asylum in the United States, today's asylum seekers face a daunting binational asylum metering system before ever setting foot on U.S. soil.



## Endnotes

[1] Until the announcement, prosecutors could exercise discretion and refer cases involving families or asylum seekers to civil immigration and asylum proceedings rather than for criminal prosecution. This policy shift obligated prosecutors to charge parents and asylum seekers apprehended outside of ports of entry with a criminal offense, and moved their children to detention facilities and shelters around the country. This practice of family separation ended on June 20, 2018 via an executive order. "Affording Congress an Opportunity to Address Family Separation," White House, June 20, 2018.

[2] "CBP Addresses False Claims of Separation for those Seeking Asylum at U.S. Ports of Entry," U.S. Customs and Border Protection, July 9, 2018, https://www.cbp.gov/newsroom/national-media-release/cbp-addresses-false-claims-separation-those-seeking-asylum-us-ports.

[3] White House, "Presidential Proclamation Addressing Mass Migration Through the Southern Border of the United States," November 8, 2018; "Order granting Temporary Restraining Order; Order to Show Cause re Preliminary Injunction - East Bay Sanctuary Covenant vs. Donald J. Trump," November 19, 2018.

[4] These conventions include the 1951 Convention Relating to the Status of Refugees, the 1967 Protocol Relating to the Status of Refugees, the 1966 International Covenant on Civil and Political Rights, the 1987 Convention against Torture and Other Cruel and Degrading Treatment or Punishment, and the 1989 Convention on the Rights of the Child.

[5] "The Principle of non-refoulement in the migration context: 5 key points." International Committee of the Red Cross. March 30, 2018, http://blogs.icrc.org/law-and-policy/2018/03/30/principle-of-non-refoulement-migration-context-5-key-points/.

[6] "Crossing the Line: U.S. Border Agents Illegally Reject Asylum Seekers," Human Rights First, May 2017, http://www.humanrightsfirst.org/sites/default/files/hrf-crossing-the-line-report.pdf.

[7] Immigration and Nationality Act (INA) of 1952, No. 8 U.S. Code § 1158.

[8] "Order Granting Temporary Restraining Order; Order to Show Cause re Preliminary Injunction - East Bay Sanctuary Covenant vs. Donald J. Trump," November 19, 2018.

[9] "Border Security Metrics Report," U.S. Department of Homeland Security, May 1, 2018, https://www.dhs.gov/sites/default/files/publications/BSMR_OIS_2016.pdf; FOIA request to CBP, September 8, 2017.

[10] Families are held separately from adult men or unaccompanied minors. LGBTI asylum seekers may also be placed in separate areas.

[11] "Special Review - Initial Observations Regarding Family Separation Issues Under the Zero Tolerance Policy," Office of Inspector General, U.S. Department of Homeland Security, September 27, 2018.

[12] The ICE detention centers are where adults and families remain for their credible fear interview. However, in some instances, asylum seekers may also be transferred to locally-run shelters on the U.S. side of the border. At the shelters—which are administered by civil society and religious groups—asylum seekers are provided with basic support to transition into the community or to reunite with family members or a sponsor.

[13] Tweet by CBP San Diego (@CBPSanDiego): "Footage from a #USBP thermal camera captures multiple men climbing the border barrier near Imperial Beach and destroying recently installed concertina wire. All seeking to enter the U.S. are urged to do so at one of more than 320 official U.S. Ports of Entry. #CBP #bordersecurity," November 16, 2018.

[14] Veterans International Bridge at Los Tomates is used less frequently due to its length (just under a mile long), security concerns for the surrounding area, and inconsistent asylum processing rates. In August, CBP officers reportedly allowed 20 asylum seekers to cross, but have let very few cross in the following months.

[15] Interview with civil society member, November 27, 2018, Brownsville, Texas.

[16] CBP keeps a detention area at Paso del Norte bridge that is comprised of between four to six cells for about 20 people each. These cells are destined for temporary, short-term detention. Most admissions are processed at the Paso del Norte bridge.

[17] Al Otro Lado (@AlOtroLado_Org) tweeted, "San Ysidro Port of Entry used to have capacity to hold around 300 asylum seekers at a time; they just opened an expansion that is supposed to hold around 800. So why, exactly, are they only taking in a handful per day, and on some days, none at all?", November 12, 2018.

[18] In a letter to the Inter-American Commission on Human Rights (IAHCR), 22 civil society organizations argued that turnbacks began as early as March 2016. "Request for a thematic hearing on measures criminalizing asylum seekers and impeding the process of requesting asylum in the United States." June 1, 2017.

[19] Civil Complaint Al Otro Lado, et.al v. Kirstjen Nielsen, et. al. Southern District of California, October 12, 2018, page 28.

[20] Crossing the Line: U.S. Border Agents Illegally Reject Asylum Seekers," Human Rights First, May 2017, http://www.humanrightsfirst.org/sites/default/files/hrf-crossing-the-line-report.pdf.

[21] U.S. House of Representatives, Subcommittee on Appropriations: Hearings before the Subcommittee on Homeland Security, 115th Cong., 1st Session, 2017, https://www.gpo.gov/fdsys/pkg/CHRG-115hhrg27050/pdf/CHRG-115hhrg27050.pdf, 289-290.

[22] The following statement was provided by a CBP spokesperson based in Laredo, TX on November 20, 2018: "The number of inadmissible individuals CBP is able to process varies based upon case complexity; available resources; medical needs; translation requirements; holding/detention space; overall port volume; and ongoing enforcement actions. Depending upon port circumstances at the time of arrival, individuals presenting without documents may need to wait in Mexico as CBP officers work to process those already within our facilities. CBP officers allow more people into our facilities for processing once space becomes available or other factors allow for additional parties to arrive."

[23] Sometimes these are random requests to review documents. At times they involve all people coming through the point, many of whom are permanent residents and U.S. citizens.

[24] "Special Review - Initial Observations Regarding Family Separation Issues Under the Zero Tolerance Policy," Office of Inspector General, U.S. Department of Homeland Security, September 27, 2018.

[25] Ibid.

[26] DHS Secretary Nielsen stated: "we are metering, which means that if we don't have the resources to let them in on a particular day, they are going to have to come back. So they are going to have to wait their turn and we will process them as we can. But that's the way that the law works." Laura Ingraham, "Interview with Department of Homeland Security Secretary Kirstjen Nielsen," The Ingraham Angle - Fox News, May 15, 2018, https://video.foxnews.com/v/5785340898001/?#sp=show-clips.

[27] In fieldwork in late November, some asylum seekers had been waiting for several days, while three individuals from Cameroon had been waiting for two months.

[28] CBP officers began standing at the midpoint between June 7 and June 19, 2018. The formal booth was constructed in August 2018.

[29] There is currently an INM officer stationed on the bridge and blocking access for asylum seekers. From May 2018 through July 2018, asylum seekers were being processed at both bridges.

[30] On July 28, 2018, guards from what appeared to be private security companies were also present. While CBP officers carry assigned holstered pistols, in November 2018 some of those who were posted on the bridge also carried M16-AF semi-automatic rifles.

[31] Border access controls are placed at the top of the bridge, five to ten feet into U.S. territory.

[32] Civil Complaint Al Otro Lado, et.al v. Kirstjen Nielsen, et. al. ibid, page 1.



[33] Civil Complaint Al Otro Lado, et.al v. Kirstjen Nielsen, et. al. ibid, page 30.

[34] U.S. Congress, House of Representatives, Subcommittee on Committee on Appropriations: Hearings before the Subcommittee on Homeland Security,  2017, 289.

[35] Lolita Brayman and Robert Langellier, "The Notebook: Asylum Seekers Improvise a New Border Bureaucracy," The Nation, November 30, 2018, https://www.thenation.com/article/notebook-border-tijuana/.

[36] Previously, Nogales' municipal government implemented a waiting list system from October 2016 to December 2016.

[37] On November 12, 2018, there were an estimated 2,400 to 2,500 asylum seekers waiting on the list with a wait time of four to six weeks. This was prior to the arrival of the caravan. Interview with representative from Grupo Beta, November 7, 2018, Tijuana, Baja California; Jonathan Blitzer, "The Long Wait for Tijuana's Migrants to Process Their Own Asylum Claims," The New Yorker, November 29, 2018, https://www.newyorker.com/news/dispatch/the-long-wait-for-tijuanas-migrants-to-process-their-own-asylum-claims.

[38] Researchers called the Casa del Migrante shelter on November 20, 2018 and November 30, 2018 but were not provided with the capacity information.

[39] In these informal shelters, local civil society groups from both Matamoros and Brownsville provide meals and other necessities for asylum seekers. The Matamoros group, Ayundándoles a Triumfar coordinates these efforts.

[40] While Casa del Migrante only has 280 beds, government officials indicated it was ready to receive up to 1.500 migrants. The municipal government also made available the city's stadium, which would shelter an additional 600 people in case of overflow. Caitlin Dickson, "Take a number: Migrants, blocked at the border, wait their turn to apply for asylum," Yahoo News, November 30, 2018, https://ca.sports.yahoo.com/news/take-number-migrants-blocked-border-wait-turn-apply-asylum-210835939.html; "Se translada el 95 por ciento de los migrantes apostados en el Puente Paso del Norte a Casa del Migrante," Asociación de Periodistas de Ciudad Juárez, November 9, 2018, http://monitorapcj.com/se-traslada-el-95-por-ciento-de-los-extranjeros-apostados-en-el-puente-paso-del-norte-a-casa-del-migrante/.

[41] In September 2016, with estimates that 40,000 Haitians were transiting to the U.S. southern border, the Obama administration suspended the Temporary Protected Status that they had put in place following the 2010 earthquake and resumed expedited removals.

[42] Ibid.

[43] Crossing the Line: U.S. Border Agents Illegally Reject Asylum Seekers," Human Rights First, May 2017, http://www.humanrightsfirst.org/sites/default/files/hrf-crossing-the-line-report.pdf.

[44] Joshua Partlow, "U.S. border officials are illegally turning away asylum seekers, critics say," Washington Post, January 16, 2017.

[45] There are reports that they also accepted asylum seekers from other nationalities who possessed transit permits (oficios de salida).

[46] Interview with representative from Grupo Beta, November 7, 2018, Tijuana, Baja California.

[47] Ibid

[48] Similar to other border cities, the beds at these shelters are not just occupied by asylum seekers but also by recently-deported Mexicans.

[49] Jonathan Blitzer, "The Long Wait for Tijuana's Migrants to Process Their Own Asylum Claims," The New Yorker, November 29, 2018, https://www.newyorker.com/news/dispatch/the-long-wait-for-tijuanas-migrants-to-process-their-own-asylum-claims.

[50] Declaration of Erika Pinheiro, November 9, 2018, https://www.courtlistener.com/recap/gov.uscourts.cand.334557/gov.uscourts.cand.334557.8.4.pdf.

[51] Dara Lind, "Kids are stranded in Mexico because officials won't let them seek asylum in the US," Vox, November 21, 2018, https://www.vox.com/2018/11/20/18104676/asylum-border-trump-children?fbclid=IwAR3SboFP9CEtR6quSwHDcomndZlmu-RB8v-YRbGhdgkf2bTI1RzXkNEPegQ.

[52] "Illegal Pushbacks, Arbitrary Detention & Ill-Treatment of Asylum Seekers in the United States," Amnesty International, 2018, https://www.amnesty.org/download/Documents/AMR5191012018ENGLISH.PDF.

[53] Adolfo Flores, "Facing a Months-Long Wait to Apply for Asylum, These Members of the Caravan Went Searching for Another Way In," Buzzfeed, December 2, 2018, https://www.buzzfeednews.com/article/adolfoflores/caravan-migrants-border-patrolhide-seek.

[54] Interview with representative from Grupo Beta, November 17, 2018, Mexicali, Baja California.

[55] Kendal Blust, "Still in Limbo, Haitians Give up U.S. Dreams," Nogales International, November 30, 2018, https://www.nogalesinternational.com/news/still-in-limbo-haitians-give-up-u-s-dreams/article_f38a6fba-e9a8-11e6-900d-4b3fae9cf4a9.html; Interview with representative of Kino Border Initiative, November 29, 2018, Nogales, Sonora.

[56] Perla Trevizo, "Dozens of families, many from Guatemala, arrive in Nogales seeking US asylum," Tucson Star, May 15, 2018, https://tucson.com/news/local/dozens-of-families-many-from-guatemala-arrive-in-nogales-seeking/article_4dd45e2f-0b19-5b7b-880e-74a82e3515ea.html.

[57] Romero, Simon, and Miriam Jordan. "On the Border, a Discouraging New Message for Asylum Seekers: Wait." The New York Times, June 12, 2018, sec. U.S. https://www.nytimes.com/2018/06/12/us/asylum-seekers-mexico-border.html.

[58] By August 5, 2018, CBP in Nogales reported that it was able to process all arriving asylum seekers. Perla Trevizo, "Director: Nogales port now keeping up with arrivals of asylum seekers," Tucson Daily Star, August 5, 2018, https://tucson.com/news/local/director-nogales-port-now-keeping-up-with-arrivals-of-asylum/article_74f16ca2-96d3-5b76-ab59-89941635c059.html.

[59] CBP processed three asylum claims the week of September 17 and did not process any asylum seekers during the week of September 24.

[60] This staging area is owned by the Instituto de Administración y Avaluos de Bienes Nacionales. Interview with representative of Kino Border Initiative, November 28, 2018, Nogales, Sonora.

[61] Ibid.

[62] This system's implementation shifted in mid-November, when asylum seekers began to wait inside of a room instead of outside. During fieldwork on November 19, 2018, there were 15 individuals from Nicaragua, Mexico, Venezuela, and Honduras waiting in the staging area. This included nine adults (male and female) and six children with their parents.

[63] Asylum seekers receive hot and cold food from NGOs. The Red Cross administers medical services both on demand and on a weekly basis. Asylum seekers are allowed to leave the staging area once they are at the POE, but municipal police noted that many stay in the room.

[64] Fieldwork on November 19, 2018.

[65] Staff from the El Paso organization Annunciation House witnessed turnbacks on May 25, 2018, May 30, 2018 and around June 20, 2016. See State of Washington et al vs. Donald Trump, Declaration of Tyler Levy in support of the State of Washington, U.S. District Court Western District of Washington at Seattle.

[66] "Sealing the Border: Criminalization of Asylum Seekers in the Trump Era," HOPE Border Institute & Border Immigration Council, January 2018; Al Otro lado, et al vs. Elaine C. Duke et al. Declaration of Diego Iniguez Lopez in support of plaintiff's motion for class certification, October 13, 2017; "Customs and Border Protection's Systemic Denial of Entry to Asylum Seekers at Ports of Entry on U.S.-Mexico Border," American Immigration Council, January 13, 2017.

[67] Robert Moore, "Border agents are using a new weapon against asylum seekers," Texas Monthly, June 2, 2018, https://www.



Case 3:17-cv-02366-BAS-KSC   Document 535-6   Filed 09/28/19   PageID.7944   Page 64 of 56

texasmonthly.com/politics/immigrant-advocates-question-legality-of-latest-federal-tactics/; Debbie Nathan, "Desperate asylum seekers are being turned away by US Border Agents claiming there is "no room,"" The Intercept, June 16, 2018, https://theintercept.com/2018/06/16/immigration-border-asylum-central-america/.

[68] Non-white border crossers were primarily the target of the screening procedure, as witnessed during fieldwork.

[69] The total number of families and unaccompanied minors decreased by 9 percent during this time frame.

[70] The OIG report also includes the following quote: "According to one Border Patrol supervisor, the Border Patrol sees an increase in illegal entries when aliens are metered at ports of entry." "Special Review - Initial Observations Regarding Family Separation Issues Under the Zero Tolerance Policy," Office of Inspector General, U.S. Department of Homeland Security, September 27, 2018.

[71] "Se translada el 95 por ciento de los migrantes apostados en el Puente Paso Del Norte a Casa del Migrante," Asociación de Periodistas de Ciudad Juárez, November 9, 2018, http://monitorapcj.com/se-traslada-el-95-por-ciento-de-los-extranjeros-apostados-en-el-puente-paso-del-norte-a-casa-del-migrante/.

[72] Facebook page of the Casa del Migrante en Juárez: https://www.facebook.com/pg/CasaDelMigranteEnJuarezAC/posts/?ref=page_internal.

[73] Ibid.

[74] Video on the Facebook page of the Casa del Migrante en Juárez, November 30, 2018, https://www.facebook.com/pg/CasaDelMigranteEnJuarezAC/posts/?ref=page_internal.

[75] Facebook page of the Casa del Migrante en Juárez: https://www.facebook.com/pg/CasaDelMigranteEnJuarezAC/posts/?ref=page_internal.

[76] Lorena Carrillo, "Viven un vía crucis migrantes en PN," Zocalo, July 26, 2018 http://www.zocalo.com.mx/new_site/articulo/se-atrinchera-en-pn-migrante-cubana-embarazada.

[77] Interview with representative from a Piedras Negras civil society organization, November 17, 2018; Phone interview with representative from the Piedras Negras Mayor's Office, November 20, 2018.

[78] However, if an unaccompanied minor arrives at the migrant shelter in Piedras Negras, staff are under instruction to send the children to the DIF shelter in the city. Minors that are sent to this shelter are not allowed to leave and are sent back to their countries of origin.

[79] Interview with representative from a Piedras Negras civil society organization, November 17, 2018

[80] Phone interview with representative from the Piedras Negras Mayor's Office, November 20, 2018.

[81] Phone interview with representative from the Piedras Negras Mayor's Office, December 3, 2018.

[82] Phone interview with representative from the Piedras Negras Mayor's Office, December 3, 2018.

[83] Wet foot, dry foot was a policy that allowed Cuban nationals to enter the United States without a visa so long as at least one foot was in United States' territory. The policy began immediately after the Cuban revolution in 1959 and continued until the Obama administration ended the policy in January 2017. Scott Simon, "What the End of Wet Foot, Dry Foot Means for Cubans," NPR, January 14, 2017, https://www.npr.org/2017/01/14/509807177/what-the-end-of-wet-foot-dry-foot-means-for-cubans.

[84] "Atraviesa por Tamaulipas éxodo africano," Expreso, October 8, 2018, http://elmanana.com.mx/noticia/177024/Atraviesa-por-Tamaulipas-exodo-africano.html; Interview with Laredo shelter representative, November 26, 2018.

[85] Secretaría de Gobernación, "Extranjeros Presentado y Devueltos 2018 - Cuadro 3.1.1," accessed on December 3, 2018, http://www.politicamigratoria.gob.mx/es_mx/SEGOB/Extranjeros_presentados_y_devueltos.

[86] INM officials do not provide transportation to the migrant shelters.

[87] María Gardner, "Aumenta número de personas pidiendo asilo," LMT Online, July 29, 2018, https://www.lmtonline.com/lmtenespanol/article/Aumenta-n-mero-de-personas-pidiendo-asilo-13113828.php.

[88] Gus Bova, U.S. and Mexican Officials Collaborating to Stop Asylum-Seekers, Attorneys Allege," Texas Observer, October 12, 2018, https://www.texasobserver.org/u-s-and-mexican-officials-collaborating-to-stop-asylum-seekers-attorneys-allege/.

[89] In September, CBP constructed a more formal booth at the midpoint of the bridge to protect officers from inclement weather.

[90] Estimate provided by an official at the Instituto Tamaulipeco Para Los Migrante on November 26, 2018.

[91] Lines began forming on June 7, 2018 and an agent was officially posted there some time before June 19, 2018. Interview with journalists, November 26, 2018.

[92] Interview with representative from the Instituto Tamaulipeco Para Los Migrante, November 26, 2018.

[93] Ibid.

[94] Interviews with representatives at the Senda de Vida and La Casa de Nuestra Señora de Guadalupe shelters, November 26, 2018.

[95] Representatives from both Reynosa based migrant shelters and the Instituto Tamaulipeco para Los Migrantes said they would deliver this message to any asylum seekers in the city.

[96] Interviews with local civil society representatives on November 27, 2018.

[97] Interviews with local civil society representatives on November 27, 2018.

[98] Civil society organizations report that asylum seekers find out about this second bridge through word of mouth.

[99] Observations from field work on November 27, 2018.

[100] Phone interview with representative from Mexico's National Migration Institute, December 3, 2018.

101 An INM official commented that nationality appears to determine an asylum seeker shelter, stating that Cubans appear to wait at the Bugambilia shelter and other nationalities wait at the Casa de Migrantes. Researchers called the Casa del Migrante shelter on November 20, 2018 and November 30, 2018 but were not provided with the capacity information. It was unclear whether the shelter was still operating.

[102] Phone interview with Grupo Beta official on December 2, 2018.

[103] Phone interview with representative from Mexico's National Migration Institute, December 3, 2018.

[104] Phone interview with representative from Mexico's National Migration Institute, December 3, 2018.

[105] Molly Hennessy-Fiske, "Asylum Seekers blocked at Texas border bridges say that Mexican officials are demanding money to let them pass." Los Angeles Times, November 22, 2018, https://www.msn.com/en-us/news/world/asylum-seekers-blocked-at-texas-border-bridges-say-mexican-officials-are-demanding-money-to-let-them-pass/ar-BBPZkb8.

[106] Molly Hennessy-Fiske, "Asylum Seekers blocked at Texas border bridges say that Mexican officials are demanding money to let them pass." Los Angeles Times, November 22, 2018, https://www.msn.com/en-us/news/world/asylum-seekers-blocked-at-texas-border-bridges-say-mexican-officials-are-demanding-money-to-let-them-pass/ar-BBPZkb8.

[107] "Special Review - Initial Observations Regarding Family Separation Issues Under the Zero Tolerance Policy," Office of Inspector General, U.S. Department of Homeland Security, September 27, 2018.










European University Institute
ROBERT SCHUMAN CENTRE FOR ADVANCED STUDIES
MIGRATION POLICY CENTRE

ROBERT STRAUSS CENTER
FOR INTERNATIONAL SECURITY AND LAW
THE UNIVERSITY OF TEXAS AT AUSTIN

CENTER FOR U.S.-MEXICAN STUDIES
UC San Diego School of Global Policy & Strategy

1  MAYER BROWN LLP
   Matthew H. Marmolejo (CA Bar No. 242964)
2  *mmarmolejo@mayerbrown.com*
   350 S. Grand Avenue
3  25th Floor
   Los Angeles, CA 90071-1503
4  Ori Lev (DC Bar No. 452565)
   (*pro hac vice*)
5  *olev@mayerbrown.com*
   Stephen M. Medlock (VA Bar No. 78819)
6  (*pro hac vice*)
   *smedlock@mayerbrown.com*
7  1999 K Street, N.W.
   Washington, D.C. 20006
8  Telephone:  +1.202.263.3000
   Facsimile:   +1.202.263.3300
9
   SOUTHERN POVERTY LAW CENTER
10   Melissa Crow (DC Bar No. 453487)
     (*pro hac vice*)
11   *melissa.crow@splcenter.org*
   1101 17th Street, N.W., Suite 705
12  Washington, D.C. 20036
   Telephone: +1.202.355.4471
13  Facsimile: +1.404.221.5857
14  *Additional counsel listed on next page*
   *Attorneys for Plaintiffs*
15
              **UNITED STATES DISTRICT COURT**
16            **SOUTHERN DISTRICT OF CALIFORNIA**
17
18  Al Otro Lado, Inc., *et al.*,          Case No.:  17-cv-02366-BAS-KSC
19              Plaintiffs,
20       v.                                **DECLARATION OF NICOLE
                                           RAMOS**
21  Kevin K. McAleenan,[1] *et al.*,
22              Defendants.
23
24
25
26
27  _____
28  [1] Acting Secretary McAleenan is automatically substituted for former Secretary
   Nielsen pursuant to Fed. R. Civ. P. 25(d).

CENTER FOR CONSTITUTIONAL RIGHTS
Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
*bazmy@ccrjustice.org*
Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
*gschwarz@ccrjustice.org*
Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
*aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
Mary Bauer (VA Bar No. 31388) (*pro hac vice*)
*mary.bauer@splcenter.org*
1000 Preston Ave.
Charlottesville, VA
Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
*sarah.rich@splcenter.org*
Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
*rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030

AMERICAN IMMIGRATION COUNCIL
Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
*kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.56

RAMOS DECLARATION

1-SFER-158

## DECLARATION OF NICOLE RAMOS

I, Nicole Ramos hereby declare under the penalty of perjury under the laws of the United States of America:

1.      I make this declaration based on my personal knowledge except where I have indicated otherwise.  If called as a witness, I could and would testify competently and truthfully to these matters.

2.      I am the Border Rights Project Director of Al Otro Lado. In this capacity, I am responsible for managing the provision of legal orientation to asylum seekers and other migrants in Tijuana, Mexico. I supervise staff and volunteers, who assist at legal clinics and with human rights monitoring at the Pedwest Port of Entry.

**The Metering Policy Began in 2016**

3.      Since December 2015 I have accompanied asylum seekers to the ports of entries in Tijuana and observed patterns in how U.S. Customs and Border Protection ("CBP") officers engage with asylum seekers seeking access to the asylum process by presenting themselves to U.S. immigration authorities at the port of entry.

4.      In June 2016, the CBP and Mexican authorities instituted the first phase of metering in response to the arrival of the Haitian Exodus. Over an

approximately six month period, more than 15,000 Haitians migrated to Tijuana with the intent to seek protection in the United States.

5.    During the first iteration of metering, asylum seekers were expected to register with Grupo Beta, a service run by the Mexican Government's National Institute of Migration ("INM").  Officials from Grupo Beta would communicate with the main shelters in Tijuana to inform the shelter administrators how many asylum seekers could be processed, and the asylum seekers could travel back to the port of entry to be processed. However, the process was disorderly. Asylum seekers who did not stay at a participating shelter had no information as to how the process functioned.

**Mexican Immigration Officials Changed Their Conduct After CBP Issued Its Previously-Secret Metering Policy**

6.    I understand from the Government's filings in this case that CBP issued a formal metering policy on April 27, 2018.  I am not aware of CBP or any other agency of the U.S. Government communicating the existence of this policy to asylum seekers approaching ports of entry ("POEs") on the U.S.-Mexico border. I first became aware of this policy was after an attorney for the Government in this matter disclosed the existence of the metering policy to the Court during oral argument on the Government's motion to dismiss in this litigation on May 10, 2019.

7.     On May 6, 2018, Grupo Beta formalized a waiting list/metering system in Tijuana, Mexico that has continued to this day. Each morning starting around 7:00 AM, a group of asylum seekers who are on the list and Grupo Beta gather on the Mexican side of the Pedwest Port of Entry with a notebook. New asylum seekers who arrive at the Pedwest Port of Entry are added to the list. CBP communicates its daily capacity to Grupo Beta, which uses that information to call the appropriate numbers from the top of the list. Grupo Beta then loads the asylum seekers into vans and transports them to CBP for processing.

**The Waitlist in Tijuana, Mexico is Underinclusive**

8.     Grupo Beta sets the rules for who can be added to the list in Tijuana. The rules require that each asylum seeker present identification, which has prevented asylum seekers who lack identification from being added to the list. The identification requirement appears to disproportionately affect Black migrants—their documents are often stolen on their perilous journeys to the United States border or lost in the process of fleeing dangers such as violence from state- and non-state actors or natural predators. In addition, the document requirements frequently change for Black migrants; on some days Grupo Beta requires original travel permission documents from México and original identification documents from Black asylum seekers, and then on other days, only requires that Black asylum seekers present copies. Transgender migrants whose gender presentation

does not match their identification documents are also, at times, prevented from adding their names to the list.

9.     The rules instituted by Grupo Beta in Tijuana also require that no unaccompanied minors can be added to the list without a parent or guardian present. Ostensibly, unaccompanied minors should be able to present themselves at any US port of entry, but they are frequently stopped by officials on the Mexican side as they try to approach, detained, and transferred to the custody of the Mexican Department for Children and Families (commonly known as "DIF"). Once in DIF custody, unaccompanied children do not have access to outside counsel and are often prevented from seeking protection in the United States. Central American children in DIF custody are often deported back to their home countries by the Mexican government. Those unaccompanied children who do manage to reach a CBP official at the port of entry are often told by CBP officials that they must add their names to the metering list on the Mexican side. CBP officials often call Mexican authorities to detain unaccompanied children after they are turned away from the port of entry.

10.     Our organization has received numerous reports of corruption of the list administered by Grupo Beta in Tijuana. In November of 2018, one of the list managers reported to our organization that another list manager was moving asylum seekers up on the list in exchange for money or sexual favors. The list

manager also told us that there were several asylum seekers who paid to have their names added to the list while still in South America.

**The Metering Policy Exposes Asylum Seekers to Violence in Mexico**

11.     As of today, there are over 10,000 asylum seekers on the metering waitlist in Tijuana. Our office engages in human rights monitoring at the Pedwest and San Ysidro Ports of Entry every day and has observed a precipitous drop in the average daily number of asylum seekers admitted for processing over the past few months. Specifically, the reduction began on June 16, 2018, thirty days before the "Asylum Ban" was promulgated. From June 16, 2018 to July 15, 2018, CBP/Grupo Beta admitted only 332 people. By contrast, in the 30 days prior, they'd admitted 1,041 people, which was still lower than the monthly average of 1,200 admitted from January through May 15, 2019. Through all of early 2019, CBP/Grupo Beta had admitted asylum seekers from the waitlist on all but three days, New Year's Day, Easter, and World Refugee Day. Aside from those days, CBP admitted between 20 and 80 asylum seekers off of the list each day, with a daily average of 40 admitted per day. In the 30 days before the "Asylum Ban" was promulgated, there were zero asylum seekers processed by CBP on eleven of the thirty days, and 13 days with admissions in the single digits, for an average of 5-6

asylum seekers per day during that period. CBP sped up processing again once the "Asylum Ban" was announced.

12.     Given the low daily average of asylum seekers processed at the Pedwest Port of Entry, asylum seekers currently adding themselves to the list can expect to wait nine or more months in Tijuana until they are able to be processed. Because of the long wait times, at least one-third of the asylum seekers on the list won't be present when their numbers are called, and fewer asylum seekers are attempting to add their numbers to the list now than in the past.

13.     Due to the long wait for asylum seekers on the metering waitlist, asylum seekers stuck in Tijuana have been victims of sexual assault, aggravated assaults, kidnapping, extortion, and trafficking by criminal groups. Al Otro Lado has received numerous reports from asylum seekers who have been threatened by smugglers. Smugglers understand that many asylum seekers have family in the United States who could pay smuggling fees. Asylum seekers waiting to be processed are forced to accept these services and obtain payment from relatives in the United States. We have also received reports from waiting asylum seekers who have been kidnapped and trafficked by criminal groups. Migrants are reluctant to report threats or victimization to Mexican law enforcement officials due to their fear of official corruption or deportation.

I declare under penalty of perjury under the laws of the United States of

America that the things described above are true and correct.

Executed on September 25, 2019 at Tijuana, Mexico.


Nicole Ramos                          September 25, 2019

1  JOSEPH H. HUNT
2  Assistant Attorney General, Civil Division
   AUGUST E. FLENTJE
3  Special Counsel
   WILLIAM C. PEACHEY
4  Director, Office of Immigration Litigation –
   District Court Section
5  GISELA A. WESTWATER (NE 21801)
6  Assistant Director
   YAMILETH G. DAVILA (FL 47329)
7  Assistant Director
8  ALEXANDER J. HALASKA (IL 6327002)    KATHERINE J. SHINNERS (DC 978141)
9  Trial Attorney                        Senior Litigation Counsel
10 United States Department of Justice   BRIAN C. WARD (IL 6304236)
   Civil Division                        Senior Litigation Counsel
11 Office of Immigration Litigation – District    DANIELLE LINDERMUTH (MD Bar)
12 Court Section                         Trial Attorney
13 P.O. Box 868, Ben Franklin Station    SAIRAH G. SAEED (IL 6290644)
   Washington, D.C. 20044               Trial Attorney
14 Tel: (202) 307-8704 | Fax: (202) 305-7000
15 alexander.j.halaska@usdoj.gov         *Counsel for Defendants*

16              **UNITED STATES DISTRICT COURT**
17          **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**
18                        **(San Diego)**

19 AL OTRO LADO, Inc., *et al.*,          Case No. 3:17-cv-02366-BAS-KSC
20
21                       *Plaintiffs*,    Hon. Cynthia A. Bashant
22            v.                          **DEFENDANTS' REPLY IN SUPPORT**
23                                        **OF THEIR MOTION TO PARTIALLY**
   Kirstjen NIELSEN, Secretary, U.S.     **DISMISS THE SECOND AMENDED**
24 Department of Homeland Security, in her    **COMPLAINT**
25 official capacity, *et al.*,
                                          Special Briefing Schedule Ordered
26                      *Defendants*.
27
28

Case 3:22-55988 · 01/17/2024 · ID: 12849067 · DktEntry: 107-2 · Page 167 of 171

Finally, Plaintiffs are incorrect that the *TRAC* factors apply to section 706(2) claims. *See* ECF No. 210 at 22–23 (citing *Telecomms. Research & Action Ctr. v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984)). The *TRAC* decision applies only where the Court considers "whether the agency's delay is so egregious as to warrant mandamus" relief, *i.e.*, section 706(1) relief. *TRAC*, 750 F.2d at 79–80. *Wagafe* does not counsel otherwise, as it addresses only whether agency action is final, not whether *TRAC* applies to section 706(2) claims. *Wagafe*, 2017 WL 2671254, at *10.

Thus, as Defendants explained, the Secretary has broad constitutional and statutory authority to control the flow of travel across the international border. ECF No. 192-1 at 11–15; 8 U.S.C. § 1103(a)(3); 6 U.S.C. §§ 202(2), (8). Metering does not exceed that authority, nor does it infringe on the right of an alien within the United States to apply for asylum.

### E. The Extraterritorial Plaintiffs Fail to State Due Process Claims.

The Extraterritorial Plaintiffs fail to state due process claims because the Due Process Clause does not apply to them. "Decisions of the Supreme Court . . . hold that the due process clause does not apply to aliens without property or presence in

---

address an "exodus [that had] expanded dramatically," overburdening screening facilities and "pos[ing] a . . . danger to thousands of persons embarking on long voyages in dangerous craft," and explaining that the "wisdom of the policy choices . . . is not a matter for our consideration"); Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims, 83 Fed. Reg. 55,934, 55,935 (Nov. 9, 2018) ("In recent weeks, United States officials have each day encountered an average of approximately 2,000 inadmissible aliens at the southern border. At the same time, large caravans of thousands of aliens, primarily from Central America, are attempting to make their way to the United States, with the apparent intent of seeking asylum after entering the United States unlawfully or without proper documentation."); *id.* at 55,947; CBP, "Southwest Border Migration FY 2019," *available at* https://www.cbp.gov/newsroom/stats/sw-border-migration (last modified Mar. 5, 2019). In any event, CBP is certainly under no affirmative obligation to take actions that would exacerbate the strain on this country's already-overburdened immigration system or risk the safety and security of the traveling public at ports of entry.

12

DEFS.' REPLY IN SUPPORT OF MOT. TO
PARTIALLY DISMISS SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

1  MAYER BROWN LLP
   ORI LEV* (DC Bar No. 452565)
2  *olev@mayerbrown.com*
   STEPHEN M. MEDLOCK* (VA Bar No. 78819)
3  *smedlock@mayerbrown.com*
   1999 K Street, N.W.
4  Washington, D.C. 20006-1101
   Telephone: (202) 263-3000
5  Facsimile:  (202) 263-3300
   *Pro Hac Vice* Motion Pending
6
   MATTHEW H. MARMOLEJO (CA Bar No. 242964)
7  *mmarmolejo@mayerbrown.com*
   350 South Grand Avenue, 25th Floor
8  Los Angeles, CA 90071-1503
   Telephone: (213) 229-9500
9  Facsimile:  (213) 625-0248

10 SOUTHERN POVERTY LAW CENTER
   MELISSA CROW (DC Bar No. 453487)
11 (*pro hac vice*)
   *melissa.crow@splcenter.org*
12 1666 Connecticut Avenue, N.W., Suite 100
   Washington, D.C. 20009
13 Telephone: (213) 229-9500
   Facsimile:  (213) 625-0248

14
15 *Additional counsel listed on next page*
   *Attorneys for Plaintiffs*

16           **UNITED STATES DISTRICT COURT**

17          **SOUTHERN DISTRICT OF CALIFORNIA**

18 Al Otro Lado, Inc., *et al.*,          | Case No.:  3:17-cv-02366-BAS-KSC
                                          | *Hon. Cynthia A. Bashant*
19            Plaintiffs,
                                          | **PLAINTIFFS' OPPOSITION TO**
20      v.                                | **DEFENDANTS' MOTION TO**
                                          | **DISMISS**
21 Kirstjen M. Nielsen, *et al.*,
                                          | **SPECIAL BRIEFING SCHEDULED**
22            Defendants.                 | **ORDERED**

23                                        | **NO ORAL ARGUMENT**
                                          | **REQUESTED BY THE COURT**
24
25
26
27
28

1   LATHAM & WATKINS LLP
    Manuel A. Abascal (CA Bar No. 171301)
2   *manny.abascal@lw.com*
    355 South Grand Avenue, Suite 100
3   Los Angeles, CA  90071-1560
    Telephone: +1.213.485.1234
4   Facsimile: +1.213.891.8763

5
    CENTER FOR CONSTITUTIONAL RIGHTS
6   Baher Azmy  (NY Bar No. 2860740)
    (*pro hac vice*)
7   *bazmy@ccrjustice.org*
    Ghita Schwarz  (NY Bar No. 3030087)
8   (*pro hac vice*)
    *gschwarz@ccrjustice.org*
9   Angelo Guisado (NY Bar No. 5182688)
    (*pro hac vice*)
10  *aguisado@ccrjustice.org*
    666 Broadway, 7th Floor
11  New York, NY 10012
    Telephone: +1.212.614.6464
12  Facsimile: +1.212.614.6499
13

14  SOUTHERN POVERTY LAW CENTER
    Mary Bauer (VA Bar No. 31388)
15  (*pro hac vice*)
    *mary.bauer@splcenter.org*
16  1000 Preston Ave.
    Charlottesville, VA
17  Sarah Rich (GA Bar No. 281985)
    (*pro hac vice*)
18  *sarah.rich@splcenter.org*
19  Rebecca Cassler (MN Bar No. 0398309)
    (*pro hac vice*)
20  *rebecca.cassler@splcenter.org*
    150 E. Ponce de Leon Ave., Suite 340
21  Decatur, GA 30030
22

23  AMERICAN IMMIGRATION COUNCIL
    Karolina Walters (DC Bar No. 1049113)
24  (*pro hac vice*)
    *kwalters@immcouncil.org*
25  1331 G St. NW, Suite 200
    Washington, DC 20005
26  Telephone: +1.202.507.7523
    Facsimile: +1.202.742.5619
27

28

1    a misleading attempt to dodge the well-pleaded allegations in the SAC. Moreover,

2    Defendants twice cite to a declaration from Sidney K. Aki that was filed in another

3    case in an attempt to support their arguments on the limits of POEs' "operational

4    capacity." (ECF 192-1 at 5, 13.) Because Defendants' evidence goes directly to the

5    contested merits of the dispute, it cannot be the basis for dismissal of the SAC. *See*

6    *United States v. Ritchie*, 342 F.3d 903, 907–09 (9th Cir. 2003).

### 3. Alternatively, the Turnback Policy Is Unlawful Because It Unreasonably Delays Processing of Asylum Seekers.

8    Even if the Court finds that the Turnback Policy results in delay in accessing

9    the asylum process rather than outright denial, it is still actionable under § 706(2).

10   Normally, courts review individual instances of delay under § 706(1) and the

11   "*TRAC* factors" test, to determine if that delay is unreasonable. *Indep. Mining Co.*

12   *v. Babbitt*, 105 F.3d 502, 507 & n.7 (9th Cir. 1997).[22] But an affirmative policy of

13   unreasonably delaying mandatory agency action is itself an "agency action"

14   challengeable under § 706(2). *See, e.g.*, *Wagafe*, 2017 WL 2671254, at *10

15   (reviewing a policy of allegedly unreasonable processing delays and unexplained

16   denials of applications as a final agency action under § 706(2)).

17   Accordingly, the Turnback Policy is unlawful—resulting in delay that is

18   unreasonable *per se* under the *TRAC* factors—because it is the result of the sixth

19   *TRAC* factor, bad faith. *Cutler v. Hayes*, 818 F.2d 879, 898 (D.C. Cir. 1987) ("If

20   the Court determines that the agency delays in bad faith, it should conclude that the

21   delay is unreasonable."), *quoted in Babbitt*, 105 F.3d at 510. Defendants are not

---

22   [22]    The *TRAC* factors are: (1) whether the agency's timeline is governed by a "rule

23   of reason"; (2) whether "Congress has provided a timetable or other indication of the

speed with which it expects the agency to proceed in the enabling statute"; (3) & (5)

24   (usually considered together) the "nature and extent of the interests prejudiced by the

25   delay," with delays "that might be reasonable in the sphere of economic regulation

[being] less tolerable than when human health and welfare are at stake"; (4) "the effect

26   of expediting delayed action on agency activities of a higher or competing priority";

27   and (6) whether the agency acted in bad faith, though bad faith is not necessary to find

a delay unreasonable. *Babbitt*, 105 F.3d at 507 n.7 (quoting *Telecomms. Research &*

28   *Action Ctr. v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984)).

<div align="center">22</div>

"free to make [even] otherwise allowable administrative changes with the intent to defeat the mandate of the law by making the process so slow and/or cumbersome to endure" that a disproportionately small number of asylum seekers are processed at POEs. *Babbitt*, 105 F.3d at 510.[23]

Plaintiffs' well-pleaded allegations regarding Defendants' false "capacity" excuse and deterrence motives demonstrate bad faith, as does Defendants' practice of attempting to prevent asylum seekers' physical entry into the United States in order to evade judicial review. *See Rajput v. Mukasey*, No. C07-1029RAJ, 2008 WL 2519919, at *5 (W.D. Wash. June 20, 2008) (noting concern over the agency's "apparently conscious decision to adopt a policy to evade judicial review").[24]

## IV. PLAINTIFFS STATE DUE PROCESS CLAIMS, EVEN IF THEY WERE IN MEXICO WHEN TURNED BACK.

It is "unobjectionable" that procedural due process rights attach to statutorily-created liberty interests. *Kerry v. Din*, 135 S. Ct. 2128, 2136 (2015). As discussed in Section II, the right to seek asylum under the INA extends to noncitizens who are attempting to enter the United States through a POE to access the asylum process, and are denied entry by U.S. officials standing acted on U.S. soil, even if the noncitizens stand

---

[23]    In addition to the dispositive nature of bad faith in *TRAC* analysis, bad faith is also a basis to determine that an agency acted unlawfully under § 706(2)(A). *Simmons v. Smith*, 888 F.3d 994, 1001 (8th Cir. 2018); *see Styrene Info. & Research Ctr., Inc. v. Sebelius*, 944 F. Supp. 2d 71 (D.D.C. 2013) (explaining that under § 706(2)(A), "the reasonableness of the agency's actions is judged in accordance with its stated reasons . . . unless there is a showing of bad faith or improper behavior" (emphasis omitted) (quoting *In re Subpoena Duces Tecum*, 156 F.3d 1279, 1279 (D.C. Cir. 1998)).

[24]    Though bad faith is dispositive in this case, Plaintiffs also have strong, uniformly applicable allegations on all other *TRAC* factors: (1) Delays in processing are arbitrary and based on a scheme to flout the mandatory duty to process rather than on a rule of reason; (2) the statutory structure and legislative history suggest that an asylum seeker should be processed at the time she presents herself at a POE; (3)/(5) the extreme negative impacts on health and human welfare cannot be overstated; and (4) the agency's argument that it must balance resource and capacity limits is not genuine.