# EXHIBIT A

Nos. 22-55988, 22-56036

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

———————————

AL OTRO LADO, INC., *et al.*,

*Pls.-Appellees/Cross-Appellants*,

v.

ALEJANDRO MAYORKAS, Secretary of Homeland Security, *et al.*,

*Defendants-Appellants/Cross-Appellees*,

and

THE EXECUTIVE OFFICE FOR IMMIGRATION REVIEW,

*Appellant/Cross-Appellee*.

———————————

APPEAL FROM FINAL JUDGMENT OF THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF CALIFORNIA
No. 17-cv-02366-BAS-KSC

———————————

## APPELLEES/CROSS-APPELLANTS' SUPPLEMENTAL FURTHER EXCERPTS OF RECORD - VOLUME 2 UNDER SEAL

---

Melissa Crow
CENTER FOR GENDER & REFUGEE STUDIES
1121 14th Street, N.W., Suite 200
Washington, DC 20005
(202) 355-4471

Neela Chakravartula
CENTER FOR GENDER & REFUGEE STUDIES
200 McAllister Street
San Francisco, CA 94102
(415) 565-4877

Robert Pauw
CENTER FOR GENDER & REFUGEE STUDIES
c/o Gibbs Houston Pauw
1000 Second Avenue, Suite 1600
Seattle, WA 98104

Stephen M. Medlock
Evan Miller
Rami Rashmawi
VINSON & ELKINS LLP
2200 Pennsylvania Avenue, N.W.
Suite 500 West
Washington, DC 20036
(202) 639-6500

Michelle N. Webster
MAYER BROWN LLP
1999 K Street, N.W.
Washington, DC 20006
(202) 263-3270

Baher Azmy
Angelo Guisado
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6464

Sarah Rich
SOUTHERN POVERTY LAW CENTER
150 E. Ponce de Leon Avenue, Suite 340
Decatur, GA 30030
(404) 521-6700

Rebecca Cassler
SOUTHERN POVERTY LAW CENTER
1101 17th Avenue N.W., Suite 705
Washington, DC 20036
(404) 521-6700

Katherine Melloy Goettel
Gianna Borroto
Suchita Mathur
AMERICAN IMMIGRATION COUNCIL
1331 G Street N.W., Suite 200
Washington, DC 20005
(202) 507-7552

Matthew Fenn
MAYER BROWN LLP
71 S. Wacker Drive
Chicago, IL 60606
(312) 701-7040

Matthew Marmolejo
MAYER BROWN LLP
333 S. Grand Avenue, 47th Floor
Los Angeles, CA 90071
(213) 621-9483

*Counsel for Appellees/Cross Appellants*

MAYER BROWN LLP
  Matthew H. Marmolejo (CA Bar No. 242964)
  *mmarmolejo@mayerbrown.com*
350 S. Grand Avenue
25th Floor
Los Angeles, CA 90071-1503
  Ori Lev (DC Bar No. 452565)
  (*pro hac vice*)
  *olev@mayerbrown.com*
  Stephen M. Medlock (VA Bar No. 78819)
  (*pro hac vice*)
  *smedlock@mayerbrown.com*
1999 K Street, N.W.
Washington, D.C. 20006
Telephone: +1.202.263.3000
Facsimile: +1.202.263.3300

SOUTHERN POVERTY LAW CENTER
  Melissa Crow (DC Bar No. 453487)
  (*pro hac vice*)
  *melissa.crow@splcenter.org*
1101 17th Street, N.W., Suite 705
Washington, D.C. 20036
Telephone: +1.202.355.4471
Facsimile: +1.404.221.5857

*Additional counsel listed on next page*
*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*, | Case No.: 17-cv-02366-BAS-KSC |
|          Plaintiffs, | **PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** |
|     v. | |
| Chad F. Wolf,[1] *et al.*, | **Special Briefing Schedule Ordered (***see*** Dkt. 518)** |
|          Defendants. | **NO ORAL ARGUMENT UNLESS REQUESTED BY THE COURT** |

---

[1] Defendants have represented that Mr. Wolf is the Acting Secretary of the U.S. Department of Homeland Security. Numerous courts disagree. *Casa de Md., Inc. v. Wolf*, 2020 WL 5500165, at *23 (D. Md. 2020); *Immigrant Legal Res. Ctr. v. Wolf*, 2020 WL 5798269, at *7-9 (N.D. Cal. 2020); *N.W. Immigrant Rts. Project v. USCIS*, 2020 WL 5995206, at *24 (D.D.C. 2020).

REPLY IN SUPP. OF PLTFS'
MOT. TO EXCLUDE

CENTER FOR CONSTITUTIONAL RIGHTS
  Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
  *bazmy@ccrjustice.org*
  Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
  *gschwarz@ccrjustice.org*
  Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
  *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
  Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
  *sarah.rich@splcenter.org*
  Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
  *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
  Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
  *kwalters@immcouncil.org*
1331 G St. N.W., Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

1  the turnback policy on April 27, 2018 and enforced that policy. *See* Op. Ex. 82.

2  **E. The Turnback Policy Is Costly, Dangerous, and Illegal**

3  Defendants claim that the turnback policy was "successful." CM at 4. The

4  thousands of class members living in unofficial refugee camps on the Mexican side

5  of the border beg to differ.[5]



15  Under the turnback policy, CBP officers lied, and asylum seekers died. Op. Br. at

16  16-18, 26-27. Anyone who calls that a "success" needs to open a dictionary.

17  Even measured by other standards, the turnback policy is a terrible idea. CBP

18  officers repeatedly complained that it put their safety at risk. *See, e.g.*, Op. Ex. 1 at

19  172:14-17; Op. Ex. 3 at 149:23-150:1. Because "[t]he safety of CBP employees" is

20  supposed to be "paramount during all aspects of CBP operations," CM Ex. 59 at

21  044, these safety flaws should have doomed the turnback policy from the start.

22  Moreover, turning back asylum seekers at the limit line between the U.S. and

23  Mexico created a new problem at POEs—so-called "circumventers." Op. Ex. 14 at

24  189:6-191:20. Circumventers avoided the CBP officers stationed at the pedestrian

25  limit line by running up vehicle lanes or riding to the U.S. in taxis. *Id.* at 198:25-

26

27  [5] Caitlin Dickerson, *Inside the Refugee Camp on America's Doorstep*, N.Y. Times
28  (Oct. 25, 2020), https://www.nytimes.com/2020/10/23/us/mexico-migrant-camp-asylum.html.

199:16. This meant that CBP had to *assign more officers* to the vehicle lanes to deal with circumventers. Ex. 34. As a result, POEs spent *more* money on overtime pay as a result of the turnback policy. *See, e.g.*, Ex. 35 at 190-191; Ex. 36 at 277 ("Seven of the eight [POEs] reported a significant increase in overtime attributable to Queue Management"); Ex. 37 ("queue management" required "additional postings" that "increase[d] daily overtime expenditures"). So, sure, the turnback policy was a wild "success"—all you need to do is ignore the fact that it killed and endangered asylum seekers, cost more money, placed CBP officers in harm's way, and broke the law.

### F. Defendants Rely on Self-Contradictory Arguments

In addition to getting the facts wrong, Defendants' view of the facts is self-contradictory. A chief example of this is how Defendants cite CBP's capacity data. When Defendants believe that POEs had high capacity utilization numbers, Defendants cite those documents as a justification for turning back asylum seekers. *See* CM at 15. But when POEs reported low capacity utilization numbers, Defendants argue that those figures are meaningless because "[a] port's capacity to hold individuals is not a fixed number," CM at 24, and the figures are therefore incomplete and inaccurate. *Id.* These figures are either meaningful or meaningless, but Defendants cannot have it both ways. And "capacity" is certainly not a one-way ratchet. Defendants focus on factors constraining capacity ignores ways that they could expand their capacity by utilizing U.S. Border Patrol stations and soft-sided facilities. Therefore, Defendants' attempt to conjure factual disputes is not genuine. It cannot defeat summary judgment. *See Scott*, 550 U.S. at 380 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

### IV. EVEN IF DEFENDANTS ARE CORRECT THAT TURNBACKS ARE A DELAY, THAT DELAY IS UNREASONABLE

Plaintiffs maintain that turnbacks amount to unlawful withholding of a

1   mandatory duty in every instance, but Plaintiffs are entitled to summary judgment
2   on their APA § 706(1) claim even if Defendants are correct in characterizing
3   turnbacks as "[a]t most, agency action [that] is delayed." CM at 40. Such delays are
4   unreasonable across the board under the "*TRAC* factors." *See Indep. Mining Co. v.*
5   *Babbitt*, 105 F.3d 502, 507 & n.7 (9th Cir. 1997) (citing *Telecomms. Research &*
6   *Action Ctr. v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984)).[6] Based on the undisputed facts,
7   the *TRAC* analysis weighs heavily in Plaintiffs' favor.

8       ***Factor 1:*** When and whether a metered asylum seeker will ever be processed
9   under the turnback policy is an arbitrary decision made in a black box and is not
10   based on a "rule of reason." Wait times for metered asylum seekers have ranged
11   from days to many months, which CBP officers viewed as unacceptable. CM Opp.
12   Exs. 6-7; Op. Ex. 100 at 247:2-5. Various features of the turnback policy make clear
13   the arbitrary nature of these inspection delays. Defendants require asylum seekers to
14   use a waitlist system operated by third parties in Mexico, but do not know how the
15   system works or even *if* it works, or how long the delay might take. Op. Ex. 14 at
16   108:1-5 ("[P]orts . . . don't maintain a wait list. We don't use a wait list to determine
17   who we process. We liaise with an entity in . . . Mexico, you know, and ask for a
18   certain number of persons . . . a day, and then they, you know, send us people that
19   are presumably on the . . . wait list."); Op. Ex. 17 at 301:13-16 ("CBP never verified
20   with Grupo Beta if [asylum seekers they escorted to the POE] were on a list.
21   Whatever Grupo Beta brought to us, what's in that number what we requested would
22   come in for intake."). Defendants merely inspect and process the number of

23   _____

24   [6] The *TRAC* factors are: (1) whether the agency's timeline is governed by a "rule of
     reason"; (2) whether "Congress has provided a timetable or other indication of the speed
25   with which it expects the agency to proceed in the enabling statute"; (3) & (5) (usually
     considered together) the "nature and extent of the interests prejudiced by the delay," with
26   delays "that might be reasonable in the sphere of economic regulation are less tolerable
     when human health and welfare are at stake"; (4) "the effect of expediting delayed action
27   on agency activities of a higher or competing priority"; and (6) whether the agency acted
     in bad faith, though bad faith is not necessary to find a delay unreasonable. *Id.* at 507
28   n.7.

REPLY IN SUPP. OF
PLTFS' MOT S.J.

1    individuals Defendants requested from Mexican officials that day (if they requested

2    any at all). *See* Op. Ex. 4 at 171:7-13. But there is no guarantee that operation of the

3    waitlists is not completely arbitrary—that Mexican officials will follow the order on

4    the lists, Dkt. 591-1 ¶¶ 8-10, or that all class members will even be allowed to utilize

5    the lists, Dkt. 390-101 ¶¶ 12-13. Class members are thrown to the proverbial

6    wolves—turned back, told to participate in an opaque, informal waitlist "process"

7    that may or may not return them to the POE for processing and inspection, and left

8    to survive on their own in the interim.[7] "The 'rule' appears to be that once"

9    Defendants prevent an asylum seeker from accessing the POE, they "abdicate[]

10   responsibility for" what happens next. *Hong Wang v. Chertoff*, 550 F. Supp. 2d 1253,

11   1259 (W.D. Wash. 2008). "Where [Defendants] ha[ve] been assigned the mandatory

12   duty to [inspect arriving noncitizens], this policy cannot be considered a 'rule of

13   reason.'" *Id.*

14           Furthermore, the "Prioritization-Based Queue Management" memos inject

15   unwarranted discretion into the decision to inspect any asylum seekers at all, which

16   in turn impacts inspection wait times. Op. Ex. 98; CM Ex. 5. Under the memos,

17   POEs "must" prioritize certain activities ahead of inspecting and processing asylum

18   seekers, after which they "have discretion to allocate resources and staffing" as they

19   wish. Op. Ex. 98; CM Ex. 5. Purporting to grant agency actors *discretion* to

20   undertake a *mandatory* duty runs counter to the principle of reasoned

21   decisionmaking; "[t]he APA is not intended to permit agencies to define the

22   reasonability of their actions by issuing their own memoranda." *Asmai v. Johnson*,

23   182 F. Supp. 3d 1086, 1095 (E.D. Cal. 2016). Merely adopting a policy to delay

24

25

26   ───────────────
     [7] Op. Ex. 14 at 234:25-235:20 (if CBP prevents an asylum seeker from crossing the
     limit line, "there's no guarantee implied or has ever been implied . . . [that] at some
27   point in the future, [the person] might be processed" and that there is no connection
     between being turned away at the limit line and being inspected off the waitlist).
28

1    inspecting asylum seekers, as Defendants did here, is not a rule of reason. *Id.*[8]

2        ***Factor 2:*** The "statutory context" strongly suggests that any delay of days,

3    weeks, or months before an asylum seeker is inspected is unreasonable. *Santillan v.*

4    *Gonzales*, 388 F. Supp. 2d 1065, 1083 (N.D. Cal. 2005). As this Court has previously

5    held, § 1225(a)(3) requires Defendants to inspect all noncitizens who are in the

6    process of arriving at a POE. Dkt. 280 at 45-46. The duty does not apply only with

7    regard to asylum seekers—it encompasses all who are "applicants for admission" or

8    "otherwise seeking admission." Inspections must occur around the time that a

9    noncitizen arrives at the POE, rather than days, weeks, or months, later.[9] And CBP

10   handily inspects nearly all of the hundreds of thousands of people subject to

11   inspection each day, in roughly the order the applicants arrive. These inspections are

12   the bread and butter of POEs' functioning, and international travel would grind to a

13   halt if such inspections did not occur as a matter of course upon arrival. If CBP

14   officers at airports delayed inspections for weeks, arriving travelers would be stuck

15   sleeping inside airports. At land borders, students would never make it to school,

16   and employees would miss work if inspections were not required at the time of

17   arrival. Indeed, Defendants never acted otherwise prior to the adoption of the

18   turnback policy. Op. Ex. 14 at 53:21-56:1 (CBP 30(b)(6) witness with 21 years of

19   service at CBP and its predecessor agency could not recall any instance prior to 2016

20   could not recall an instance in which CBP stopped asylum seekers in the process of

21   arriving at POEs). The reasonable timeframe for the statutory inspection duty must

22   be interpreted in the context of this daily hubbub at POEs that the statute is meant to

23   regulate.

24   _____

25   [8] In addition, wait times are disconnected from the actual capacity of ports of entry, further eroding any claim that the challenged delays are based on a rule of reason.

26   *See* Op. Br. 26-29; CM Opp. at 11-18.

27   [9] Congress's decision to create special protections for asylum seekers arriving in the United States—barring their expedited removal without first giving them access to the asylum process, § 1225(b)(1)(A)(i)-(ii)—reinforces the point that metering is

28   unreasonable because it places such individuals in danger.

REPLY IN SUPP. OF
PLTFS' MOT S.J.

13

***Factors 3 & 5:*** The nature and extent of the interests prejudiced by the turnback policy—human life and physical well-being—cannot be overstated and weigh strongly in Plaintiffs' favor. The scale of the crisis created by turnbacks has been enormous, and it includes makeshift camps in Mexican border towns that lack toilets and clean water, as well as human trafficking and violence against those forced to wait. *See* Op. Br. at 16-18. Courts routinely find these factors weigh in favor of relief based on much less serious harm. *Singh v. Napolitano*, 909 F. Supp. 2d 1164, 1176 (E.D. Cal. 2012) (finding this factor weighed in a petitioner's favor because it involved "humanitarian concerns"—Singh was "an asylee who [was] attempting to become a lawful permanent resident"); *Tufail v. Neufeld*, 2016 WL 1587218, at *8 (E.D. Cal. 2016) (ongoing insecurity about one's immigration status weighed in favor of relief); *Latifi v. Neufeld*, 2015 WL 3657860, at *7 (N.D. Cal. 2015) (being required to renew work authorization ever year was a hardship weighing in plaintiff's favor).

***Factor 4:*** While Defendants argue that turnbacks are justified by a discretionary decision to prioritize other activities, Defendants' own records show that they routinely engaged in metering even when the processing of asylum seekers was not impacting port operations. Op. Ex. 38 at ¶¶ 22, 101-23. But "[e]ven assuming that [Defendants] have numerous competing priorities under the fourth factor," delay may still be unreasonable when other factors weigh heavily in favor of relief, and particularly when "there is a clear threat to human welfare." *In re Community Voice*, 878 F.3d 779, 787 (9th Cir. 2017) (finding unreasonable delay when children were "severely prejudiced" by lead poisoning, even assuming the agency acted in good faith to juggle competing priorities); *Cutler v. Hayes*, 818 F.2d 879, 898 (D.C. Cir. 1987) ("[An agency's] plea[s] of . . . administrative convenience, practical difficulty in carrying out a legislative mandate, or need to prioritize in the face of limited resources . . . become less persuasive as delay progresses, and must always be balanced against the potential for harm."). Furthermore, "if the only effect

of expediting [agency action] is the loss of an authority that . . . is *ultra vires*," such as turning away asylum seekers, *see* Op. Br. at 7-16, the fourth factor "does not militate in [the agency's] favor." *Mugumoke v. Curda*, 2012 WL 113800, at *9 (E.D. Cal. 2012).

**Factor 6:** This Court may also invalidate the turnback policy because it was adopted in bad faith. While a finding of bad faith is not necessary for a court to find unreasonable delay, in this case each turnback and the turnback policy are unlawful—resulting in delay that is unreasonable *per se* under the *TRAC* factors because turnbacks were based on a pretext and not driven by capacity constraints, and are therefore the result of bad faith. *Cutler*, 818 F.2d at 898 ("If the court determines that the agency delays in bad faith, it should conclude that the delay is unreasonable."). Here, Defendants have "manifested bad faith . . . by singling . . . out [asylum seekers] for bad treatment," based on a pretextual excuse of lack of capacity, and therefore, they "will have a hard time claiming legitimacy for [their] priorities." *In re Barr Labs., Inc.*, 930 F.2d 72, 76 (D.C. Cir. 1991); Op. Br. at 26-29; CM Opp. 11-18.[10]

In addition, Defendants are not "free to make . . . administrative changes with the intent to defeat the mandate of the law by making the process so slow and/or cumbersome to ensure" that only a small number of asylum seekers are ever processed at POEs. *Babbitt*, 105 F.3d at 510. Yet that is exactly what Defendants did. Defendants engaged in turnbacks to avoid projecting a public image of an efficient system for processing asylum seekers at the border, in an effort to deter people from attempting to access that system. *See supra* at 3-5. This manufactured delay evinces bad faith. *Babbitt*, 105 F.3d at 510.

## V.     PLAINTIFFS ARE ENTITLED TO THE RELIEF THEY SEEK

---

[10] The turnback policy was also adopted in bad faith because it is the result of long-standing racial animus toward Haitian asylum seekers, Dkt. 600-2 at 3-19, and a desire to deter all asylum seekers, Dkt. 601-2 at 3-19.

MAYER BROWN LLP
  Matthew H. Marmolejo (CA Bar No. 242964)
  *mmarmolejo@mayerbrown.com*
350 S. Grand Avenue
25th Floor
Los Angeles, CA 90071-1503
  Ori Lev (DC Bar No. 452565)
  (*pro hac vice*)
  *olev@mayerbrown.com*
  Stephen M. Medlock (VA Bar No. 78819)
  (*pro hac vice*)
  *smedlock@mayerbrown.com*
1999 K Street, N.W.
Washington, D.C. 20006
Telephone:  +1.202.263.3000
Facsimile:   +1.202.263.3300

SOUTHERN POVERTY LAW CENTER
  Melissa Crow (DC Bar No. 453487)
  (*pro hac vice*)
  *melissa.crow@splcenter.org*
1101 17th Street, N.W., Suite 705
Washington, D.C. 20036
Telephone: +1.202.355.4471
Facsimile: +1.404.221.5857

*Additional counsel listed on next page*
*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*,<br><br>    Plaintiffs,<br><br>    v.<br><br>Chad F. Wolf,[1] *et al.*,<br><br>    Defendants. | Case No.:  17-cv-02366-BAS-KSC<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**<br><br>***FILED UNDER SEAL***<br><br>Special Briefing Schedule Ordered (*See* Dkt. 518)<br><br>**NO ORAL ARGUMENT UNLESS REQUESTED BY THE COURT** |

[1] Acting Secretary Wolf is automatically substituted for former Acting Secretary McAleenan pursuant to Fed. R. Civ. P. 25(d).

CENTER FOR CONSTITUTIONAL RIGHTS
  Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
  *bazmy@ccrjustice.org*
  Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
  *gschwarz@ccrjustice.org*
  Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
  *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
  Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
  *sarah.rich@splcenter.org*
  Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
  *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
  Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
  *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................................................. 1

II. THE UNDISPUTED FACTS ............................................................................. 4

    A. Overview of Defendants' Unlawful Conduct .......................................... 4

    B. Defendants Adopt the Turnback Policy .................................................. 7

    C. Defendants Implement the Turnback Policy Border-Wide ...................... 9

    D. Defendants Knew that the Turnback Policy Violated the Law ................ 11

    E. Defendants Memorialize Aspects of the Turnback Policy ....................... 12

    F. Defendants Begin Using "Operational Capacity" As a Metric ................ 14

    G. Defendants Harmed the Class and Al Otro Lado ................................... 16

III. LEGAL STANDARD ..................................................................................... 18

IV. ARGUMENT ................................................................................................... 18

    A. The Turnback Policy Violates the APA and INA .................................. 18

    B. The Turnback Policy Violates the Due Process Clause .......................... 31

    C. The Turnback Policy Violates the ATS .................................................. 33

    D. The Court Should Enter A Permanent Injunction .................................. 36

    E. The Court Should Enter A Declaratory Judgment .................................. 38

V. CONCLUSION .................................................................................................. 39

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Al Otro Lado v. Wolf,*
  952 F.3d 999 (9th Cir. 2020) ...................................................................22, 24

*Allstate Ins. Co. v. Farmers Ins. Exch.,*
  2008 WL 11508663 (S.D. Cal. 2008) ..............................................................19

*Aracely, R. v. Nielsen,*
  319 F. Supp. 3d 110 (D.D.C. 2018) .................................................................30

*Bennett v. Spear,*
  520 U.S. 154 (1997) ...................................................................................20, 21

*Bostock v. Clayton Cnty., Ga.,*
  140 S. Ct. 1731 (2020) ....................................................................................25

*California v. Trump,*
  963 F.3d 926 (9th Cir. 2020) ...........................................................................39

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986) .........................................................................................19

*County of Sacramento v. Lewis,*
  523 U.S. 833 (1998) ...................................................................................32, 33

*Dep't of Commerce v. New York,*
  139 S. Ct. 2551 (2019) ....................................................................................26

*DHS v. Regents of the Univ. of Calif.,*
  140 S. Ct. 1891 (2020) ...............................................................................27, 29

*E. Bay Sanctuary Covenant v. Trump,*
  349 F. Supp. 3d 838 (N.D. Cal. 2018) .............................................................37

*eBay Inc. v. MercExchange LLC,*
  547 U.S. 388 (2006) .........................................................................................37

*EBSC v. Barr,*
  964 F.3d 832 (9th Cir. 2020) .....................................................................26, 37

2-SFER-186

*EBSC v. Trump*,
    932 F.3d 742 (9th Cir. 2018)..................................................................24

*EBSC v. Trump*,
    950 F.3d 1242 (9th Cir. 2020)..........................................................31, 32

*GEICO v. Dizol*,
    133 F.3d 1220 (9th Cir. 1998)................................................................39

*Goldberg v. Kelly*,
    397 U.S. 254 (1970)................................................................................33

*Graham v. FEMA*,
    149 F.3d 997 (9th Cir. 1998)..................................................................32

*Hansen v. United States*,
    7 F.3d 137 (9th Cir. 1993)......................................................................19

*Hernandez v. Sessions*,
    872 F.3d 976 (9th Cir. 2017)..................................................................37

*I.N.S. v. Stevic*,
    467 U.S. 407 (1984)................................................................................34

*Innovation Law Lab v. Wolf*,
    951 F.3d 1073 (9th Cir. 2020)................................................................35

*Kleindienst v. Mandel*,
    408 U.S. 753 (1972)..........................................................................25, 32

*LaDuke v. Nelson*,
    762 F.2d 1318 (9th Cir. 1985)..........................................................37, 38

*League of Women Voters of U.S. v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016)...................................................................38

*Lujan v. Nat'l Wildlife Federation*,
    497 U.S. 871 (1990)................................................................................21

*Lyng v. Payne*,
    476 U.S. 926 (1986)................................................................................24

*Marincas v. Lewis*,
    92 F.3d 195 (3d Cir. 1996).....................................................................33

*McGraw-Edison Co. v. Preformed Line Products Co.*,
  362 F.2d 339 (9th Cir. 1966) ................................................... 4, 39

*Meachum v. Fano*,
  427 U.S. 215 (1976) ............................................................... 32

*Munyua v. United States*,
  2005 WL 43960 (N.D. Cal. 2005) ........................................... 4

*Navajo Nation v. Dep't of the Interior*,
  876 F.3d 1144 (9th Cir. 2017) ............................................... 19

*Nken v. Holder*,
  556 U.S. 418 (2009) ............................................................... 38

*Norton v. S. Utah Wilderness All.*,
  542 U.S. 55 (2004) ................................................................. 22

*ONRC Action v. Bureau of Land Mgmt.*,
  150 F.3d 1132 (9th Cir. 1998) ............................................... 20

*Orantes-Hernandez v. Thornburgh*,
  919 F.2d 549 (9th Cir. 1990) ................................................. 36

*Perales v. Reno*,
  48 F.3d 1305 (2d Cir. 1995) ................................................... 32

*Planned Parenthood of Greater Wash. & N. Idaho v. U.S. Dep't of
  Health & Human Servs.*,
  946 F.3d 1100 (9th Cir. 2020) ..................................... 22, 23, 25

*Principal Life Ins. Co. v. Robinson*,
  394 F.3d 665 (9th Cir. 2005) ................................................. 39

*R.I.L-R v. Johnson*,
  80 F. Supp. 3d 164 (D.D.C. 2015) .................................... 20, 31

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
  566 U.S. 639 (2012) ............................................................... 26

*San Luis & Delta-Mendota Water Auth. v. Locke*,
  776 F.3d 971 (9th Cir. 2014) ........................................... 26, 30

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

*Siderman de Blake v. Rep. of Arg.*,
   965 F.2d 699 (9th Cir. 1992)................................................34

*Sierra Club v. Trump*,
   963 F.3d 874 (9th Cir. 2020)...........................................37, 38

*Sosa v. Alvarez-Machain*,
   542 U.S. 692 (2004) ........................................................34

*Superintendent v. Hill*,
   472 U.S. 445 (1985) ........................................................33

*Tripoli Rocketry Ass'n, Inc. v. ATF*,
   437 F.3d 75 (D.C. Cir. 2006) ......................................26, 27, 28, 29

*Util. Air Regulatory Grp. v. E.P.A.*,
   573 U.S. 302 (2014) ........................................................24

*Wagafe v. Trump*,
   2017 WL 2671254 (W.D. Wash. 2017) ...............................20, 21

*Walters v. Reno*,
   145 F.3d 1032 (9th Cir. 1998) ............................................37

**OTHER CASES**

*Abdolkhani & Karimnia v. Turkey*,
   App. No. 30471/08 (Eur. Ct. H.R., Sep. 22, 2009) ....................34

*Hirsi Jamaa and Others v. Italy*,
   App. No. 27765/09 (Eur. Ct. H.R., Feb. 23, 2012) ...............34, 35, 36

*Ilias v. Hungary*,
   App. No. 47287/15 (Eur. Ct. H.R. Mar. 14, 2017)....................34

*M.S.S. v. Belgium and Greece*,
   App. No. 30696/09 (Eur. Ct. H.R., Jan. 21, 2011)....................34

*T.I. v. United Kingdom*,
   App. No. 43844/98 (Eur. Ct. H.R., Mar. 7, 2000)....................36

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

# FEDERAL STATUTES

5 U.S.C.
§ 704 .............................................................................................. 19
§ 706(1) ............................................................................. 2, 22, 24, 25
§ 706(1), (2)(A), (C) .................................................................... 19
§ 706(2) ............................................................................. 2, 22, 24, 25
§ 706(2)(A), (C) ..................................................................... 22, 24, 26

8 U.S.C.
§§ 1158(a)(1) ............................................................................. 22
§ 1225 .............................................................................. 22, 24, 31, 32
§ 1225(a)(3) .............................................................................. 4, 22
§ 1225(b)(1) ...................................................................................... 4
§ 1225(b)(1)(a)(ii) ........................................................................ 22
§§ 1225(b)(2) .................................................................................... 4
§ 1229(a)(1) .................................................................................. 28

28 U.S.C.
§ 1350 ............................................................................................ 34
§ 2201(a) ....................................................................................... 39

# OTHER AUTHORITIES

8 C.F.R. § 235.3(b)(4) ....................................................................... 22

Elyssa Pachico and Maureen Meyer, *One Year After U.S.-Mexico
Migration Deal, a Widespread Humanitarian Disaster*, WOLA
(Jun. 6, 2020) ................................................................................... 36

Fed. R. Civ. P. 23(b)(2) .................................................................... 37

Fed. R. Civ. P. 30(b)(6) .................................................................... 23

Fed. R. Civ. P. 56(c) ........................................................................ 19

H.R. Conf. Rep. No. 104-828, at 209 (1996) ............................... 31

U.N. High Comm'r for Refugees, *Note on International Protection* ............. 34, 35

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

2-SFER-190

# I.    INTRODUCTION

Every day at ports of entry ("POEs") on the U.S.-Mexico border, U.S. Customs and Border Protection ("CBP") officers inspect thousands of people in vehicles in the order that those vehicles arrive at POEs. Until 2016, CBP officers also inspected thousands of pedestrians who traveled to POEs in the order that those pedestrians arrived at POEs. In May 2016, everything changed. Starting at the San Ysidro POE, CBP officers began turning asylum seekers—and only asylum seekers—back to Mexico, telling them that if they wanted to be inspected and processed—actions required by statute—they needed to return to the POE "later." Later that year, Defendants decided to expand this turnback policy to other POEs along the southern border, instead of doing what they have always done—finding solutions that enable them to inspect and process asylum seekers as they arrive at POEs.

Initially, Defendants did not put the turnback policy in writing, keeping it in a self-admitted gray area that CBP used to justify turning back asylum seekers by various means. Then, in the spring of 2018, CBP and the U.S. Department of Homeland Security ("DHS") issued memos memorializing aspects of the turnback policy—referred to as "metering" or "queue management." As Defendants drafted these memos, they explicitly contemplated turning back hundreds of asylum seekers at POEs each day pursuant to the memos, and disregarded obvious signs that a humanitarian disaster in Mexico would result. Then, they denied POEs permission to inspect and process asylum seekers more quickly.

The turnback policy is based on a lie. CBP told asylum seekers that POEs were "at capacity" when the POEs were actually well below capacity. Even in the rare cases where the capacity of a POE was close to 100% utilized, inspecting and processing asylum seekers had minimal or no impact on other POE operations. As a result, the "capacity excuse was a lie" that "was obvious to everybody" that

1  implemented it at POEs. Ex. 1 at 100:25-101:6.[2] Moreover, Defendants "lack[ed]

2  candor to the public [by not] stating the true facts that [CBP is] . . . blocking asylum

3  to persons and families in order to block the flow of asylum applicants." Ex. 2 at

4  132. Meanwhile, behind the scenes, CBP officials admitted that the turnback policy

5  broke the law. Ex. 2 ("[CBP] [r]epresentatives acknowledged that [CBP's] unilateral

6  work policies broke . . . Federal immigration rules and Laws"); Ex. 3 at 125:2-15.

7      The turnback policy violates the Immigration and Nationality Act ("INA"),

8  the Administrative Procedure Act ("APA"), the Due Process Clause of the Fifth

9  Amendment, and the Alien Tort Statute ("ATS") for several reasons. *First,* as this

10  Court has already recognized, turnbacks amount to unlawful withholding of a

11  discrete mandatory duty to inspect and process asylum seekers in violation of APA

12  § 706(1). *Second*, turnbacks are at odds with the statutory scheme governing POEs

13  in violation of APA § 706(2). *Third*, overwhelming and undisputed evidence shows

14  that Defendants' stated justification for the turnback policy is a pretext, their real

15  motivations are unlawful, and the policy is otherwise arbitrary and capricious in

16  violation of the APA. *Fourth*, since the turnback policy violates the statutory

17  procedure for inspecting and processing asylum seekers and otherwise represents an

18  arbitrary deprivation of a statutory entitlement, the policy violates the Due Process

19  Clause. *Fifth*, the turnback policy violates the ATS because it violates the specific,

20  universal, and obligatory norm of *non-refoulement*.

21      Defendants claim that they turned back asylum seekers to maintain the

22  "operational capacities" of POEs. *See* Dkt. 283 at ¶ 7. This argument fails for two

23  reasons. *First*, turnbacks are unlawful regardless of Defendants' justification for

24  them. *Second*, even if Defendants' justification were theoretically relevant, it is

25  undisputed that Defendants never defined the term "operational capacity," do not

26  track "operational capacity," cannot calculate the "operational capacity" of any POE,

27

---

28  [2] "Ex." refers to the exhibits to the concurrently filed Declaration of Stephen M. Medlock.

and cannot link the decision to turn back asylum seekers to particular changes in "operational capacity." Since Defendants cannot define, track or calculate "operational capacity"—or link it to the decision to turn back asylum seekers—it is not, in fact, a justification for their conduct.

Because Plaintiffs succeed on the merits, a permanent injunction is warranted. ***First***, Plaintiffs have suffered irreparable injuries. Class members have been killed, raped, and seriously injured after Defendants turned them back to Mexico. In addition, class members' loss of the right to seek asylum constitutes a loss of statutory and constitutional rights that courts recognize as irreparable harm. Similarly, Al Otro Lado suffered irreparable harm when it was forced to radically change its operations in order to account for the turnback policy. ***Second***, there is no adequate remedy at law. Neither a declaratory judgment nor monetary damages could adequately ensure access to the asylum process or prevent the harm that results from class members being turned back at the U.S. border and left stranded in dangerous border towns in Mexico. ***Third***, the balance of hardships tips decisively in Plaintiffs' favor. Plaintiffs only ask that asylum seekers be treated the same as others who approach POEs, consistent with Defendants' longstanding practices. Any asserted administrative burden on Defendants cannot outweigh the risk of persecution, serious injury, and death that class members face when turned back. ***Fourth***, there is a strong public interest in Executive Branch agencies following the plain language of the INA and complying with international law. There is no public interest in violating the law. Because there is no genuine factual dispute concerning the permanent injunction factors, Plaintiffs request that the Court enter a permanent injunction prohibiting all forms of turnbacks and requiring Defendants to inspect asylum seekers as they arrive at Class A POEs on the U.S.-Mexico border.

Furthermore, since the undisputed facts show that Defendants broke the law, this Court should enter a declaratory judgment that the turnback policy violates the INA, the APA, class members' procedural due process rights under the Fifth

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

1   Amendment, and the ATS. *See McGraw-Edison Co. v. Preformed Line Products*
2   *Co.*, 362 F.2d 339, 342 (9th Cir. 1966) (declaratory relief is appropriate regardless
3   of "whether . . . further relief is . . . sought").

4   **II.    THE UNDISPUTED FACTS**

5       **A. Overview of Defendants' Unlawful Conduct**

6       There is no cap on the number of asylum seekers who may arrive in the U.S.
7   in a particular time period. Dkt. 260 at 4:24-5:2 ("there aren't limits on the number
8   of people who can seek asylum."). When a person without entry documents is
9   arriving at a POE and asserts a fear of return to her home country or an intention to
10  seek asylum, CBP must inspect her, *see* 8 U.S.C. § 1225(a)(3), and process her—
11  either refer the asylum seeker for an interview with an asylum officer, *see* 8 U.S.C.
12  § 1225(b)(1), or place the asylum seeker into removal proceedings, which allows her
13  to pursue asylum in immigration court, *see* 8 U.S.C. §§ 1225(b)(2), 1229a. CBP's
14  statutory duty to inspect and process arriving asylum seekers is "not discretionary."
15  *Munyua v. United States*, 2005 WL 43960, at *6 (N.D. Cal. 2005).

16      In 2016, Defendants departed from this congressionally-mandated process
17  and implemented a policy to turn back asylum seekers who were in the process of
18  arriving at POEs on the U.S.-Mexico border. *See* Ex. 1 at 46:12-21; Ex. 3 at 55:8-
19  15. The policy was first implemented at the San Ysidro POE, the largest POE on the
20  U.S.-Mexico border. By the end of 2016, it had spread to other major POEs. Shortly
21  thereafter, it was implemented at every Class A POE on the U.S.-Mexico border.[3]

22      Initially, CBP management decided not to write down the turnback policy—
23  a practice that CBP uses when it knows that a policy is in a legal "gray area." Ex. 5
24  at 366 (CBP kept turnbacks "in a 'gray area' by not establishing official
25  procedures"); Ex. 6 (head of CBP's Office of Field Operations ("OFO") stating that
26  he was "on board with metering" but "wanted to express [the policy] verbally . . . as

27

28  [3] A Class A POE is open to all travelers, including asylum seekers. Ex. 4 at 75:18-
    76:8.

1  opposed to with a written record"). This intentional lack of formalization meant that,

2  initially, CBP turned back asylum seekers from POEs using a variety of tactics. CBP

3  officers lied to some, Ex. 1 at 99:25-101:6; Ex. 3 at 145:3-7; coerced some to

4  withdraw their applications for admission, Ex. 7 at 611 (permitting the use of

5  "streamlined withdrawal of applications for admission . . . if we start receiving large

6  numbers [of asylum seekers]"); and used physical force to turn back others, Ex. 8 at

7  045-046. Although the methods varied, the common result was clear: turning back

8  asylum seekers to Mexico without processing them for asylum.[4]

9       Over time, Defendants formalized these practices into what is known as

10 "metering" or "queue management."[5] When a POE is metering, "a non-citizen

11 without proper travel documents [who] arrives at the border, . . . will be told that the

12 port is at capacity and they should return to be processed later." Ex. 4 at 171:7-13.

13 Despite the formal documentation, CBP has no plan in place for asylum seekers to

14 "return to be processed later." *Id.* While metering, CBP often stations officers near

15 the physical border line between the U.S. and Mexico and attempts to physically

16 block those being metered from setting foot on U.S. soil. *Id.*[6] Initially, class members

17

---

18 [4] CBP's treatment of certain class representatives is illustrative of the disparate
    means CBP employed initially to turn back asylum seekers. *See, e.g.*, Dkt. 390-11 at
19 ¶¶ 15-19 (Plaintiff Abigail Doe was forced to sign a document withdrawing her
    asylum claim and returned from the U.S. to Mexico); Dkt. 390-12 at ¶¶ 9-21
20 (Beatrice Doe was told she "had no right" to be in the U.S., was forced to withdraw
    her application for admission, and was returned from the U.S. to Mexico); Dkt. 390-
21 13 at ¶¶ 18-26 (Carolina Doe was told she "would not receive asylum" and that she
    would be separated from her daughter and was then forced to withdraw her asylum
22 claim before she was returned from the U.S. to Mexico); Dkt. 390-14 at ¶¶ 8-19
    (Dinora Doe was told "Central Americans did not understand that there was no
23 asylum for us" and was told that she would be separated from her daughter if she
    attempted to seek asylum in the U.S.); Dkt. 390-15 at ¶¶ 13, 17-18 (Ingrid Doe was
24 told that "asylum had ended" and that "there was a new law in the United States that
    meant no asylum" before she was turned back from the U.S. to Mexico).

25 [5] "Metering" and "queue management" are synonyms. Ex. 4 at 176:18-22; Ex. 9 at
26 102:21-103:2; Ex. 10 at 43:2-4.

27 [6] *See, e.g.*, Dkt. 390-103 at ¶¶ 5-8 (Plaintiff Juan Doe was turned back after
    requesting protection at the middle of a bridge leading to a POE by two American
28 officials who said that he "could not pass," "the port was closed," and that he had to
    "wait [his] turn"); Dkt. 390-104 at ¶¶ 5-6 (same for Ursula Doe).

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

remained in a line at the border, for days or even weeks, waiting to be processed. *See, e.g.*, Ex. 10 at 152:16-153:8 (initially line was on U.S. soil); Ex. 11 at 298 ("there is a line staged on the Mexican side"). This resulted in a growing humanitarian crisis in Mexico. *See, e.g.*, Ex. 12 at 742 (UNHCR reporting long lines in Tijuana and that the situation had been described as a "humanitarian crisis."). CBP officers met with their Mexican counterparts to make arrangements to limit the flow of asylum seekers to the U.S. border. *See* Ex. 13 at 607 ("At the request of [senior management], you are to meet with your INM counterpart and request they control the flow of aliens to the port of entry."); Ex. 14 at 123:21-124:20. Subsequently, a new system arose in which asylum seekers placed their names on waitlists in Mexico in order to be inspected at a POE, and when a particular POE decided to inspect more asylum seekers, CBP would direct its Mexican counterparts to bring a certain number of asylum seekers to the POE for processing.[7] *See, e.g.*, Ex. 15 at 966 ("CBP uses a queue management system . . . [t]hey send aliens to Mexican Authorities to put their names on a list."); Ex. 16 at 140:1-16 ("If [Mexican immigration] brings them over, we're going to take them in, if we've called [Mexican immigration] to bring over some.").

Importantly, CBP concedes that asylum seekers approaching the U.S.-Mexico border are "attempting to enter the United States at a [POE]" when they are turned back. Ex. 17 at 201:22-202:3. CBP also admits that it has turned back asylum seekers who were standing on U.S. soil. *See* Ex. 4 at 171:14-172:10; Ex. 3 at 101:21-102:10; Ex. 1 at 96:11-97:18; Ex. 10 at 93:1-94:18; Ex. 18 (recording of turnback where an asylum seeker was told to "go back to Mexico."); Ex. 19 at 2.

Defendants' justification for the turnback policy—a purported lack of

---

[7] *See, e.g.*, Dkt. 390-100 at ¶¶ 8-9, 14 (Plaintiff Bianca Doe put herself on a waitlist maintained by Mexican authorities who were restricting people from approaching the POE and was turned back by CBP officers who told her that the POE was "full"); Dkt 390-105 at ¶¶ 8-12 (a CBP officer told Plaintiff Emiliana Doe that "everywhere was full and they could not accept any more people" and she put her name on a waitlist).

"operational capacity"—is a pretext. CBP kept daily records of POE capacities, which show that POEs generally operated well below 100% capacity. Moreover, POEs almost never reported that the number of asylum seekers at the POEs had an impact on port operations. *See* Ex. 20 at ¶¶ 22, 101-23; Ex. 21; Ex. 22; Ex. 23; Ex. 24; Ex. 25. In the few instances of high numbers of asylum seekers arriving at POEs, Defendants could have operated in line with their historical practice and inspect and process asylum seekers as they arrived, utilizing established contingency plans created specifically for that purpose. Instead, Defendants turned asylum seekers back to Mexico.

### B. Defendants Adopt the Turnback Policy

In early 2016, CBP undertook a construction project that cut the San Ysidro POE's detention capacity for asylum seekers from approximately 800 to 316. Ex. 26 at 002; Ex. 27 at 574-75 (noting that DHS leadership might ask "what contingency plans did you make when you knew that you were going to lose 2/3 of your POE detention space?").

That spring, the San Ysidro POE saw an increase in the number of asylum seekers seeking entry. Like all POEs, San Ysidro had well-worn plans for dealing with it. *See, e.g.*, Ex 28 (Southwest Border contingency plan); Ex. 29 (San Ysidro POE activated its overflow contingency plan on March 25, 2016); Ex. 30 (Laredo Field Office contingency plan); Ex. 31 (Eagle Pass contingency plan); Ex. 32 (Brownsville contingency plan). Indeed, despite the decrease in capacity due to the construction project, until May 2016, CBP met its operational needs by increasing staffing, utilizing videoconferencing to interview asylum seekers remotely, and streamlining inspection procedures as needed. Ex. 33 at 444 ("port leadership . . . increase[d] capacity to over 900 persons"). On May 26, 2016, San Ysidro POE leadership wrote to CBP headquarters listing additional strategies for ensuring sufficient processing capacity at the San Ysidro POE due to the increase in asylum seekers arriving at the POE, including utilizing U.S. Border Patrol substations and

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

the Otay Mesa POE. Ex. 34 at 338-39; Ex. 35; Ex. 36 at 640 (May 27, 2016 report listing "remedies" taken "to create additional space for processing" at San Ysidro). Notably, at that time the leadership of the San Ysidro POE did not recommend turnbacks as a response to an increased number of asylum seekers at the port. Ex. 37 at 023; Ex. 38 at 099.

It was not until the San Ysidro POE received media inquiries about asylum seekers at the port that CBP decided to abandon its existing contingency plans and began turning back asylum seekers instead. By May 26, 2016, CBP's San Diego Field Office[8] "ha[d] received multiple media requests regarding [asylum seekers] at the San Ysidro [POE]." Ex. 39 at 741. On the same day, the offices of Senator Barbara Boxer and Representative Susan Davis asked questions about the asylum seekers at the San Ysidro POE. Ex. 40 at 870. In response to those inquiries, Sidney Aki, the Port Director of the San Ysidro POE, wrote, "We need to get this under control. . . . I would like to have this done immediately." Ex. 41 at 552.

The next day, the San Ysidro POE began turning back asylum seekers that were in the process of arriving at the POE and preventing them from crossing the international boundary. *See* Ex. 42 ("hold them at the turnstile and not allow them to come in[]"); Ex. 43 ("Let's hold the line as best we can."); Ex. 44 ("hold the line to prevent any from entering."); Ex. 45 (instructing CBP officers "not to allow any asylees past the limit line"). However, San Ysidro POE leadership agreed that "[i]t would be a good symbol" to inspect a few asylum seekers "at a time and meter it." Ex. 46. By the end of May 2016, CBP was coordinating with the Mexican government to limit the number of asylum seekers who approached the San Ysidro POE and to turn back asylum seekers who reached the POE. Ex. 11 at 298.

But senior leadership at CBP was becoming increasingly impatient with asylum seekers being released into the U.S. rather than being turned back to Mexico.

---

[8] CBP's Office of Field Operations has four field offices on the U.S.-Mexico border: San Diego, Tucson, El Paso, and Laredo.

Then-Deputy Commissioner of CBP, Kevin McAleenan, reacted to news that asylum seekers were being paroled in Yuma, Arizona by writing, ███████████

██████████████████████████████████████████████████

█████████████████████████ " Ex. 47. Mr. McAleenan also expressed his frustration that "[t]here [was] no appetite to try and refuse [asylum seekers] and push them back to Mexico." *Id.* Defendants would later expand the turnback policy border-wide in the fall of 2016, with McAleenan playing a key role.

### C. Defendants Implement the Turnback Policy Border-Wide

In the fall of 2016, Defendants again diverged from their historical practice and Congressional mandates. They began turning back asylum seekers at the Calexico West POE, in addition to the San Ysidro POE. *See* Ex. 48 at 086; Ex. 49 at 715, 718. They did so despite knowing that the turnback policy had created a humanitarian crisis in Tijuana, Mexico, and that there were already multiple investigations underway into the policy's legality. *See, e.g.*, Ex. 50 at 746; Ex. 51 at 438 (UNHCR urging CBP to "[u]rgently reconsider the use of a metering system"); Ex. 52 (DHS's Office of Civil Rights and Civil Liberties "received multiple allegations that CBP refused to inspect and process undocumented foreign nationals seeking asylum in the U.S. at several POEs along the U.S.-Mexico border" starting in July 2016); Ex. 53 at 294 (House Judiciary Committee inquiring about turnbacks).

But by October 2016, Defendants had made plans to find a way to inspect and process asylum seekers arriving at POEs, instead of ignoring their statutory duty and turning back asylum seekers at POEs. On October 16, 2016, then-DHS Secretary Jeh Johnson and then-CBP Commissioner Gil Kerlikowske " ██████████████████

██████████████████████████████████████████ Ex. 54 at 340. On October 30, 2016, Commissioner Kerlikowske directed CBP "to continue El Centro work and new task to looking at bringing the [additional] Nogales[, Arizona processing] facility from 2014 back on line." Ex. 55 at 175. In addition to the processing facilities in El Centro and Nogales, Defendants began examining ways

1 to build other temporary processing facilities and expand detention capacity. On

2 October 31, 2016, the Commissioner of CBP and the DHS Secretary "approved

3 moving forward with the plan to establish the infrastructure that would support 1-

4 3K soft-sided FMUA or UAC beds."[9] *Id.* at 173. In particular, FEMA had identified

5 a site in San Marcos, Texas that would have expanded the holding capacity for

6 asylum seekers by 2,500 beds. Ex. 56 at 316; Ex. 57 at 577-78 ("A number of

7 proposals" were "being considered to . . . add temporary detention capacity."); Ex.

8 58 ("efforts are underway [to] build[] soft sided tents in several locations in Texas

9 and California").

10       On November 2, DHS explained that it planned to build temporary processing

11 and detention facilities for asylum seekers in Port Isabel, Texas; Mission, Texas; and

12 San Marcos, Texas. Ex. 59. DHS also directed CBP "to identify POES and stations

13 where soft sided tents with cots, shower trailers, eating areas, can be deployed in the

14 next 7-10 days." Ex. 60.

15       Within days of that meeting, DHS outlined a multi-phase plan for increasing

16 the capacity of POEs to inspect and process asylum seekers. Ex. 61. Then, CBP held

17 an "operational conference call" with the management of OFO's San Diego Field

18 Office concerning the planned opening of the El Centro Processing Facility. Ex. 62.

19       On November 9, 2016, Donald Trump won the 2016 presidential election. Ex.

20 63 at 1; Ex. 64 at 114:20-115:2. Within hours, CBP reversed course and decided not

21 to open the El Centro, California processing center. Ex. 65 at 879; Ex. 66. At a

22 meeting the next day, then-Deputy Commissioner McAleenan proposed "meter[ing]

23 the flow of [family units] at the POE bridges (at the middle of the bridge) at some of

24 our Texas POEs to prevent the overflow at the actual POEs." Ex. 67 at 936. Shortly

25 after the meeting, then-DHS Secretary Johnson approved McAleenan's proposal to

26 expand metering to POEs in Texas. *Id.*; *see also* Ex. 68 at 880.

27

28   [9] "FMUA" refers to family units. "UAC" refers to unaccompanied minors.

Todd Owen told McAleenan that he was "on board with the metering." Ex. 6. However, Mr. Owen explained that he "wanted to express [the metering guidance] verbally . . . as opposed to with a written record." *Id.*; *see also* Ex. 69 at 935 ("We should try to bring [Mexican immigration] on board with us and certainly give them a heads up."). Although CBP decided not to memorialize the turnback policy in a memorandum or formal guidance to the field, each field office on the U.S.-Mexico border gave similar directions concerning turnbacks at POEs. William Brooks, Director of Field Operations for Tucson, instructed the port directors to, "work with their Mexican counterparts to meter the flow of Haitians, South and Central Americans. While this is being done for Haitians at most locations it is not so for South and Central Americans." Ex. 70; *see also* Ex. 13 at 607 (similar, Laredo Field Office); Ex. 71 at 496 (similar, El Paso Field Office). Finally, on November 15, 2016, CBP leadership placed the planned Nogales processing center on hold. Ex. 72 at 939. Thus, within a week of the 2016 presidential election, Defendants largely abandoned their Congressionally-mandated duty of inspecting and processing asylum seekers who were in the process of arriving at POEs, electing instead to expand turnbacks.

**D. Defendants Knew that the Turnback Policy Violated the Law**

Defendants implemented the turnback policy, despite acknowledging that it broke the law. In some cases, asylum seekers standing on U.S. soil were returned to Mexico. *See* Ex. 73 at Resp. 7; Ex. 74 at 450 (El Paso Field Office officials reported to CBP headquarters that "all aliens are being turned away . . . while on the U.S. side of the bridge"). A CBP officer at the San Ysidro POE dragged an asylum seeker back into Mexican territory. Ex. 8 at 045-046. At another POE, a CBP officer "crossed into Mexican territory to keep a migrant from coming onto U.S. soil." Ex. 75 at 272. At the Hidalgo POE, "CBP . . . intentionally removed seats" from the secondary inspection area to reduce the number of asylum seekers processed at the port. Ex. 3 at 157:15-18; *see also* Ex. 76 at 113; Ex. 14 at 96:17-99:6 (Nogales POE

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

1   stopped using available detention space in 2018).

2       In the Laredo Field Office, multiple CBP officers observed asylum seekers

3   being returned from U.S. territory to Mexico without being processed. Ex. 77 at 136.

4   The CBP officers who witnessed these turnbacks summarized them in emails sent to

5   Chapter 149 of the National Treasury Employees Union ("NTEU").[10] *See, e.g.*, Ex.

6   78 at 139-40. NTEU Chapter 149 sent a letter to the director of the Pharr POE, to

7   invoke a Step 1 grievance concerning "the Agency . . . unilaterally implement[ing]

8   a policy that prevents and/or blocks CBP Officers . . . from processing political

9   asylum seekers." Ex. 79 at 142-43. During a grievance meeting with representatives

10   of the NTEU, CBP "***acknowledged that***" the turnback policy "***broke . . . Federal***

11   ***immigration rules and Laws***." Ex. 2 at 0132 (emphasis added). Although CBP

12   officials would freely state that the turnback policy violated the law in conversations,

13   they refused to say so in writing. Ex. 3 at 125:17-21. Eventually, NTEU Chapter 149

14   asked then-CBP Commissioner McAleenan to provide the legal authority to support

15   CBP's "instructions to return individuals who enter the U.S. and request asylum back

16   to Mexico without" being processed. Ex. 76 at 110.

17      **E. Defendants Memorialize Aspects of the Turnback Policy**

18       In 2018,[11] Defendants memorialized aspects of the turnback policy in writing.

19   On April 23, 2018, "███████████████████████████████████████████

20   ███████████████████████████████████████." Ex. 80 at 784. On

21   April 24, 2018, CBP Commissioner McAleenan directed his deputies to "sen[d] out

22   guidance regarding . . . queue management." Ex. 81 at 778. Then, on April 27, 2018,

23   CBP issued its metering guidance memorandum, which was distributed to the four

24   Directors of Field Operations who oversee the operations of all POEs on the U.S.-

---

[10] The NTEU represents CBP officers in the Laredo Field Office.

[11] In 2017, as the number of asylum seekers arriving at POEs on the U.S.-Mexico border declined precipitously, *see* Dkt. 390-91 at ¶¶ 5, 8, CBP continued to turn back asylum seekers arriving at those POEs, *see* Ex. 18 (April 2017 recording of turnback where an asylum seeker was told to "go back to Mexico."), Ex. 17 at 307:8-308:8.

1  Mexico border. Ex. 82. Under the metering policy, Directors of Field Operations are
2  permitted to "meter the flow of travelers at the land border" between the U.S. and
3  Mexico. *Id.* When "metering" is in place, CBP officers tell "waiting travelers that
4  processing at the port of entry is currently at capacity and CBP is permitting travelers
5  to enter the port once there is sufficient space and resources to process them." *Id.*

6       Although the policy was supposed to address "surge events," Ex. 83 at 332,
7  there was no appreciable surge in asylum seekers in April 2018. For example, at the
8  San Ysidro POE, on April 24, 2018, there were no asylum seekers waiting at the
9  turnstiles at the PedWest entrance to the port. Ex. 84. On April 27-28, 2018, the port
10 still had excess detention capacity. Ex. 85 at 719-720; Ex. 86 at 722-23; Ex. 87 at
11 759. On April 29, 2018, San Diego Director of Field Operations, Pete Flores, wrote
12 to Kevin McAleenan that "[n]o caravan subjects have arrived at the San Ysidro"
13 POE. Ex. 88 at 694. Ultimately, the April 2018 migrant caravan largely fizzled.
14 Mexican migration authorities "███████████████" as soon as it "███████████
15 ███████████████" to "███████████." Ex. 89.[12]

16       Because the low numbers of caravan members at the border could not justify
17 border-wide turnbacks, DHS began writing guidance on turning back asylum seekers
18 to permit turnbacks to occur outside of "surge events." In late May 2018, DHS
19 Secretary Nielsen began considering a "prioritization-based queue management"
20 approach that would allow port directors to turn back asylum seekers, purportedly
21 as a matter of "discretion," on the basis of amorphous considerations related to port
22 capacity and resources. During a May 24, 2018 meeting, DHS Secretary Nielsen

23

24 [12] Even though the turnback policy would later create a queue of asylum seekers in
25 Tijuana, Mexico much larger than the number of asylum seekers who might
   approach the port on a typical day, CBP privately acknowledged that the San Ysidro
26 POE had the ability to clear that queue in a matter of days. For example, in its normal
   posture, the San Ysidro POE can process approximately 75 asylum cases per day.
27 Ex. 90 at 246; Ex. 91 at 676 (CBP could have cleared the queue existing on
   November 9, 2018 in "[a]pproximately 11 days"). Even with no additional resources,
28 the San Ysidro POE estimated that as of August 2018, it could "get rid of the current
   back log [of asylum seekers] in Mexico" in as little as "22 days." Ex. 92 at 964.

1  "ask[ed] if we fully implement the priority based Que[ue] Management option . . .
2  What's a rough estimate of the number of folks that would likely be turned away per
3  day?" Ex. 93 at 317. In response, OFO's San Diego Field Office indicated that the
4  San Ysidro and Calexico POEs could cut asylum seeker processing by 50% or more
5  and the Otay Mesa POE could completely close to asylum seekers. *Id.* at 316. OFO's
6  El Paso Field Office reported that there would be a "60% reduction . . . in those
7  [asylum seekers] processed." Ex. 94 at 575. The Tucson Field Office said that it
8  could turn back 65 asylum seekers per day. Ex. 95. Synthesizing this information,
9  Todd Owen reported to CBP Commissioner McAleenan that the prioritization-based
10 queue management policy would enable CBP to "turn away approx. 650 [asylum
11 seekers] a day." Ex. 96. However, he warned that this policy would result in "[t]he
12 number waiting in [Mexico] . . . grow[ing] each day and [would] begin to strain . . .
13 local [Mexican] border communities." *Id.* Todd Owen briefed DHS Secretary
14 Nielsen on these conclusions on the afternoon of May 24, 2018. Ex. 97. On June 5,
15 2018, Defendants adopted the prioritization-based queue management policy. Ex. 98
16 at 294. The policy directs POEs to focus on other missions, such as inspecting
17 incoming food and other cargo, instead of processing asylum seekers. *Id.* at 296.

18      **F. Defendants Begin Using "Operational Capacity" As a Metric**

19      At the same time, CBP began using a new metric to justify its turnbacks of
20 asylum seekers. While the "driving factor" for implementing the April 2018
21 metering policy was "detention capacity" (*i.e.*, the number of persons who can be
22 held at a POE, Ex. 17 at 158:4-7), in June 2018, CBP began using "operational
23 capacity" as its stated metric to justify turning back asylum seekers. Ex. 99 at 864.
24 This change was significant. Detention capacity is a known, quantifiable number
25 that CBP regularly tracks. *See* Ex. 4 at 105:11-106:14; Ex. 10 at 185:9-20. On the
26 other hand, operational capacity has no definition and is not tracked by CBP. Ex. 10
27 at 74:11-76:15, 189:8-191:6. Defendants thus shifted from the measurable metric of
28 detention capacity to an unmeasurable and pretextual metric of operational capacity,

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

14

in order to "process fewer immigrants." Ex. 100 at 207:7-14.

"Operational capacity," as Defendants use the term, is essentially a fiction. CBP did not begin using the term "operational capacity" until 2018—after the turnback policy was already in effect and this litigation was filed. Ex. 100 at 161:8-10. The distinction between detention capacity and operational capacity is not memorialized in any statute, regulation, guidance, memorandum, or official document. Ex. 17 at 68:8-71:24; Ex. 100 at 161:20-162:12. Key documents that define the standard detention procedures at POEs do not mention operational capacity at all. Ex. 17 at 102:13-111:11; *see also* Ex. 101. In fact, the term "operational capacity" has no concrete definition. Ex. 17 at 73:6-11, 110:24-111:11. CBP never even wrote down the factors that a port director should consider when determining a POE's operational capacity. *Id.* at 111:13-112:13; Ex. 14 at 292:13-15. CBP did not track operational capacity at any of its ports. Ex. 102 at 66:10-25. CBP has no way of reconstructing what the operational capacity of a POE would have been at any given time. Ex. 17 at 129:7-14; Ex. 14 at 106:20-107:7. In the end, operational capacity is what the port director says it is, without any reference to a port's actual holding space. Ex. 100 at 181:22-182:4; *see also* Ex. 14 at 140:19-21 ("there's not a definition of operational capacity that we were giv[en], so it would be up to interpretation."); Ex. 103 at 57:2-20.

The reason that Defendants changed the metric they used to justify metering is no secret. According to CBP's daily capacity figures, POEs routinely operated below capacity. *See* Ex. 20 at ¶¶ 22, 101-23. Contemporaneous reports also show that the number of asylum seekers detained at POEs had minimal or no impact on port operations. *See* Exs. 14-15, 17-19. Once CBP enabled port directors to ignore the actual capacity of their POEs, ports began imposing arbitrary caps on processing asylum seekers. *See, e.g.*, Ex. 12 at 742 (San Ysidro POE had a "ceiling of 50 Mexican asylum-seekers per day"); Ex. 104 ("[W]e [should be] processing up to 70% of detention/holding capacity[.]"); Ex. 105 (CBP sent guidance about "keeping

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

1   our capacity numbers around 60-70%").

2       As the turnback policy was rolled out border-wide, POEs tracked whether it

3   was successfully deterring asylum seekers from attempting to enter the U.S. *See,*

4   *e.g.*, Ex. 106 at 089 ("Metering is definitely working. Overall numbers for poes are

5   significantly down since initiating metering[.]"); Ex. 107 at 2 (internal CBP study

6   analyzing whether metering had a deterrent effect on asylum seekers); Ex. 108

7   ("Metering has deterred OTM [Other Than Mexican] traffic").

8       Defendants refused to implement plans that could have considerably increased

9   the capacity of POEs to process asylum seekers. For instance, in November 2018,

10  Pete Flores, the Director of Field Operations for OFO's San Diego Field Office,

11  ████████████████████████████████████████████████████████████

12  ████████████████████████████████████████████████████████████

13  ██████████████████████████████████████████████████████. Ex.

14  109; Ex. 110. DHS Secretary Nielsen rejected this proposal and directed the port to

15  "maintain queue management." Ex. 111.

16      CBP also considered whether the San Ysidro POE could increase its capacity

17  to process asylum seekers by requiring all asylum seekers at the port to be processed

18  in 24 hours or less. Ex. 112. However, CBP rejected this proposal, because it "would

19  defeat the purpose of queue management." *Id.*

20      **G. Defendants Harmed the Class and Al Otro Lado**

21      The turnback policy seriously harmed asylum seekers, returning them to

22  Mexican border cities that Defendants knew were dangerous. *See* Ex. 96 ("The

23  number waiting in [Mexico] . . . [would] grow each day and begin to strain . . . local

24  [Mexican] border communities."); Ex. 100 at 202:24-203:5; Ex. 50 at 746 (report

25  indicating that turnbacks were "causing a local humanitarian crisis" in Tijuana). In

26  response to "the needs of particularly vulnerable migrants who ha[d] been metered[,

27  s]pecifically those who are in imminent danger of harm or death in Tijuana,"

28  Plaintiff Al Otro Lado, as the only organization that offered comprehensive,

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

emergency services to migrants in Tijuana, found itself "constantly having to pull resources from [its] other offices" to address those needs. Ex. 113 at 92:12-96:4. The need to provide services in Tijuana to asylum seekers who had been turned back strained Al Otro Lado's resources and frustrated its other missions, including its deportee program and medical-legal program. *Id.* at 153:3-154:23.

Moreover, turnbacks were responsible for the deaths of asylum seekers. Ex. 113 at 161:25-162:9 (discussing murders of and assaults on unaccompanied minors who were turned back). For example, on June 23, 2019, CBP officers turned back Oscar Alberto Martinez Ramirez, his wife, and their 23-month-old daughter, Valeria, when they attempted to enter the U.S. at the Brownsville POE. Ex. 114 at 139; *see also* Ex. 115 at 64. There was no reason to turn the family back; the Brownsville POE was operating at only 33% capacity that day. Ex. 115 at 64. After aid workers in Matamoros told Oscar there were hundreds of people in front of him waiting to be processed at the Brownsville POE, *id.*, Oscar waded into the Rio Grande River near the Brownsville POE with his daughter on his back. *Id.* The rapid current swept Oscar off his feet and pulled him and Valeria under. Ex. 115 at 139. They drowned. *Id.* When their bodies washed up along the U.S. side of the riverbank, Valeria's hand was wrapped around her father's shoulders. *Id.*



1  Ex. 116.

2       Defendants take no responsibility for the harm they have caused. When Todd

3  Owen was asked, "Do you take responsibility for instances where the metering

4  policy was implemented in ways that broke the law?", he answered, "I do not take

5  responsibility for the 30,000 officers that work under me." Ex. 10 at 239:22-240:6.

6  When asked whether he takes responsibility for asylum seekers staying in squalid

7  conditions at migrant shelters in Mexico as a result of his turnback policy, Mr. Owen

8  answered, "No." *Id.* at 289:14-17. When asked whether he took any responsibility

9  for parents who were sleeping on the street in Mexico with toddlers in temperatures

10 over 100 degrees as a result of the turnback policy, Mr. Owen answered, "No." *Id.*

11 at 291:15-20. And finally, when he was asked whether he took any responsibility for

12 the death of Oscar Alberto Martinez Ramirez and his two-year-old daughter, Mr.

13 Owen answered, "No." *Id.* at 292:13-21.

14 **III.   LEGAL STANDARD**

15      Summary judgment should be granted where the moving party demonstrates

16 there "is no genuine issue as to any material fact and [it] is entitled to judgment as a

17 matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R.

18 Civ. P. 56(c)). Upon such a showing, the burden shifts to the nonmoving party to

19 "come forth with specific facts to show that a genuine issue of material fact exists."

20 *Hansen v. United States*, 7 F.3d 137, 138 (9th Cir. 1993). On cross-motions for

21 summary judgment, a court "must consider each motion separately 'on its own

22 merits' to determine whether any genuine issue of material fact exists." *Allstate Ins.*

23 *Co. v. Farmers Ins. Exch.*, 2008 WL 11508663, *3 (S.D. Cal. 2008).

24 **IV.   ARGUMENT**

25     **A. The Turnback Policy Violates the APA and INA**

26      Section 706 of the APA directs courts to "compel agency action unlawfully

27 withheld" and to "hold unlawful and set aside agency action" that is "not in

28 accordance with law," "in excess of statutory jurisdiction, authority, or limitations,"

1  or otherwise "arbitrary, capricious [or] an abuse of discretion." 5 U.S.C. § 706(1),
2  (2)(A), (C). The turnback policy is a final agency action that is unlawful and must
3  be set aside under those standards. *First*, as this Court recognized, the policy violates
4  the specific mandates in the INA governing how Defendants must treat arriving
5  noncitizens at POEs. Similarly, each instance when a class member is turned back
6  amounts to the unlawful withholding of agency action. *Second*, as this Court
7  likewise recognized, the policy violates the statutory scheme Congress created to
8  ensure access to the asylum process for noncitizens at POEs. *Third*, the policy is
9  arbitrary, capricious, and an abuse of discretion because Defendants' stated
10 justification is a pretext, the real reasons for the policy are unlawful, and the policy
11 is at odds with congressional intent.

12         a.      **The turnback policy is a final agency action**

13         The APA permits judicial review over agency actions that are "final." 5 U.S.C.
14 § 704; *Navajo Nation v. Dep't of the Interior*, 876 F.3d 1144, 1171 (9th Cir. 2017).
15 Agency action is "final" when (1) it "mark[s] the 'consummation' of the agency's
16 decisionmaking process" and (2) as a result of the action, "'rights or obligations have
17 been determined,' or … 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S.
18 154, 177-78 (1997). The turnback policy, under which CBP officers at POEs along
19 the U.S.-Mexico border restrict the flow of asylum seekers by turning them back to
20 Mexico, fulfills both requirements. *See* Dkt. 280 at 49-54 (concluding Plaintiffs'
21 allegations, which the evidence now substantiates, satisfy the *Bennett* test).

22         The turnback policy satisfies the finality test's first prong because it reflects a
23 "conscious" and "deliberate decision" by Defendants, *ONRC Action v. Bureau of*
24 *Land Mgmt.*, 150 F.3d 1132, 1137 (9th Cir. 1998), and is "an active program
25 implemented by the agency." *Wagafe v. Trump*, 2017 WL 2671254, at *10 (W.D.
26 Wash. 2017); *see R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 184 (D.D.C. 2015) (an
27 implemented policy directing an ongoing practice affecting individual cases is final
28 agency action).

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

Defendants first began turning back asylum seekers at the San Ysidro POE in May 2016. In the fall of 2016, Defendants expanded the turnback policy to other POEs along the U.S.-Mexico border. Both decisions amounted to "conscious" and "deliberate" choices by Defendants to reject their standard contingency plans and pursue a different option. *See supra* at 9-12, 13-15; Ex. 110; Ex. 111; Ex. 112; Ex. 65 at 879; Ex. 66; Ex. 67 at 936; *ONRC Action*, 150 F.3d at 1137. Defendants previously had plans to utilize temporary facilities near POEs to fulfill their congressionally-mandated duty to inspect and process asylum seekers, yet they abdicated this duty following the 2016 election by expanding the turnback policy. *See supra* at 9-12; Ex. 54 at 340; Ex. 55 at 173; Ex. 67 at 936. On the instruction of the DHS Secretary and the CBP Commissioner, OFO leadership instructed the Directors of Field Operations overseeing POEs along the southern border to coordinate with Mexican government officials to begin metering. *See supra* at 11; Ex. 67 at 936.

Then, in April and June 2018, Defendants memorialized aspects of the turnback policy in formal guidance documents. *See supra* at 12-14; Ex. 85; Ex. 98 at 294. CBP also disseminated instructions to POEs requiring them to meter asylum seekers, assign staff to "limit line" positions to prevent asylum seekers from entering U.S. territory, and avoid surpassing an arbitrary cap on POEs' detention capacity. *See, e.g.*, Ex. 14 at 74:2-8; Ex. 117 ("holding at the line will soon become the norm so all along the SW border need to act the same so the NGOs don't try to play one port against the other."). The implementation of the policy has been confirmed by high-level government officials, as well as CBP officers with firsthand experience implementing it. *See supra* at 9-16; Ex. 1 at 100:25-101:6; Ex. 2 at 132. Defendants' top-down, calculated efforts to restrict the flow of asylum seekers leaves no doubt that it "mark[s] the 'consummation' of the agency's decisionmaking process." *Bennett*, 520 U.S. at 177-78.

With respect to the second prong, legal consequences flow from the turnback

1  policy because it instructs CBP officers to reject asylum seekers at POEs and deny
2  them access to the asylum process, in contravention of their mandatory statutory
3  duties. Asylum seekers are forced to wait in dangerous Mexican border towns, where
4  they risk grave harm or even death. *See infra* at 16-18. Many are ultimately deprived
5  of any ability to access the asylum process at a POE as a result of the policy. *See,*
6  *e.g.*, Dkt. 390-75 at ¶ 6 (Roberto Doe was turned back from Hidalgo POE); Dkt.
7  390-97 at ¶¶ 6-7 (Roberto Doe was subsequently deported from Mexico). These
8  "actual or immediately threatened effect[s]" satisfy the finality test's second prong.
9  *Lujan v. Nat'l Wildlife Federation*, 497 U.S. 871, 894 (1990); *Wagafe*, 2017 WL
10  2671254, at *10 (action was final when policy resulted in "thousands of . . . qualified
11  applications [being] allegedly indefinitely delayed or denied").

12          **b.      The policy directs CBP officers to unlawfully withhold a**
13                  **discrete, mandatory ministerial action**

14          Congress has spoken clearly about what Defendants are required to do when
15  noncitizens come to POEs—inspect them when they arrive and allow those seeking
16  asylum to access the asylum process. *See* 8 U.S.C. §§ 1158(a)(1), 1225(a)(1), (3),
17  and (b)(1)(A)(ii). Because Defendants have a discrete mandatory duty to inspect and
18  refer asylum seekers arriving at POEs, *see* Dkt. 280 at 31-46; 8 U.S.C. § 1225, each
19  turnback amounts to the unlawful withholding of mandatory agency action. 5 U.S.C.
20  § 706(1). Moreover, the turnback policy—which is an overarching agency policy
21  directing this unlawful withholding of mandatory action—is "not in accordance with
22  law" and is "in excess of statutory jurisdiction, authority, or limitations." *Id.* §
23  706(2)(A), (C).

24          Section 706(1) of the APA requires a court to "compel agency action
25  unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). Agency actions
26  that are "legally *required*," *i.e.*, that are "ministerial or non-discretionary," are
27  subject to § 706(1), and courts may compel them as in a mandamus action. *Norton*
28  *v. S. Utah Wilderness All.*, 542 U.S. 55, 63-64 (2004). Section 706(2) of the APA

1  directs the court to "hold unlawful and set aside agency action," 5 U.S.C. §
2  706(2)(A), (C), that is "contrary to clear congressional intent" or "inconsistent with
3  the statutory mandate," or that "frustrate[s] the policy that Congress sought to
4  implement." *Planned Parenthood of Greater Wash. & N. Idaho v. U.S. Dep't of*
5  *Health & Human Servs.*, 946 F.3d 1100, 1112 (9th Cir. 2020) (quotations omitted).

6        This Court previously concluded that "the mandatory duties to inspect all
7  aliens and refer certain aliens seeking asylum are discrete actions for which this
8  Court can compel Section 706(1) relief under 8 U.S.C. § 1225(a)(3), 8 U.S.C.
9  § 1225(b)(1)(a)(ii), and 8 C.F.R. § 235.3(b)(4)." Dkt. 280 at 31. Defendants' duty to
10 inspect and refer applies to those "who are in the process of arriving in the United
11 States," including those who may not yet have set foot across the physical border.
12 Dkt. 280 at 46. The Ninth Circuit found this analysis "sound and persuasive." *Al*
13 *Otro Lado v. Wolf*, 952 F.3d 999, 1011-12 (9th Cir. 2020). The Court's prior
14 conclusion stems directly from a straightforward interpretation of sections 1158 and
15 1225 of the INA, aided by traditional canons of statutory construction and
16 Defendants' own regulations. *See* Dkt. 280 at 31-46. Similarly, the turnback
17 policy—a  policy to evade those mandatory duties—is "contrary to clear
18 congressional intent" and "inconsistent with the statutory mandate," and would
19 "frustrate the policy that Congress sought to implement." *Planned Parenthood*, 946
20 F.3d at 1112.

21       Summary judgment is warranted on Plaintiffs' 706(1) and 706(2) claims
22 because it is undisputed that Defendants have a policy of turning back asylum
23 seekers and refusing to inspect and process them when they are arriving at POEs
24 along the U.S.-Mexico border, and that they do so to individual asylum seekers. As
25 CBP's Rule 30(b)(6) witness, Randy Howe, conceded:

26      Q.    Is it the case currently that when a port is engaged in metering,
27            when a noncitizen without proper travel documents arrives at the
              border, they will be told that the port is at capacity and they
28

1    should return to be processed later?

2    A.    Yes.

3 Ex. 4 at 171:7-13; Ex. 17 at 201:22-202:3. A second Rule 30(b)(6) witness, Mariza

4 Marin, admitted that asylum seekers approaching POEs are attempting to enter the

5 United States:

6    Q.    Okay.  In your experience[], are asylum seekers who are at the
       border between the United States and Mexico attempting to enter
7       the United States at a port of entry?

8    A.    Yes.

9

10 Ex. 17 at 201:22-202:3 (objection omitted).[13] Thus, Defendants have admitted that

11 it is their policy to turn back asylum seekers who are in the process of arriving in the

12 United States. Dkt. 280 at 31-46; *see also Al Otro Lado*, 952 F.3d at 1012.[14]

13    Defendants also turned back to Mexico asylum seekers who were standing *on*

14 *U.S. soil*. *See, e.g.*, Ex. 1 at 97:14-18; Ex. 3 at 61:13-16; Ex. 73 at Resp. 7; Ex. 74

15 at 450; Ex. 8 at 045-046; Ex. 14 at 141:6-142:23; Ex. 102 at 205:16-206:11. No

16 statutory analysis of the term "arriving in" is required to determine that CBP broke

17 the law by turning back asylum seekers *who were already on U.S. soil*.

18    Plaintiffs are thus entitled to an order compelling Defendants to comply with

19 their mandatory, ministerial inspection and processing duties set out in § 1225. *See*

20 5 U.S.C. § 706(1). Furthermore, it is undisputed that it is agency policy to withhold

21 these mandatory actions, and therefore the Court should set aside the policy because

22 it is incompatible with applicable law. *See id.* § 706(2)(A), (C).

23

24 _____

[13] A third CBP witness testified that when CBP tells an asylum seeker to wait in
25 Mexico because the POE is "at current capacity," "there's no guarantee" "ever
   implied" that "at some point in the future, [the asylum seeker] might be processed."
26 Ex. 14 at 234:25-235:20.

27 [14] To the extent the turnback policy purports to grant POEs discretion to turn back
   asylum seekers, *see e.g.* Ex. 98, the policy is unlawful because, as the Court has
28 stated, the duty to inspect and process asylum seekers is mandatory.  *See* Dkt. 280
   at 29.

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

**c.     The policy contravenes Congress' unambiguous statutory scheme and exceeds Defendants' authority**

Even if CBP's ministerial duties to inspect and process were not triggered until an asylum seeker steps onto U.S. soil, summary judgment is still warranted on Plaintiffs' § 706(2) claim because the turnback policy contravenes Congress' statutory scheme governing inspection at POEs and exceeds Defendants' statutory authority. "[A]n agency's power is no greater than that delegated to it by Congress." *Lyng v. Payne*, 476 U.S. 926, 937 (1986); *Util. Air Regulatory Grp. v. E.P.A.*, 573 U.S. 302, 328 (2014) ("[A] core administrative-law principle [is] that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate."). In particular, agencies lack authority to "abandon" a "detailed scheme" established by Congress if they think it is not working well. *EBSC v. Trump*, 932 F.3d 742, 774 (9th Cir. 2018). Because Congress designed a "statutory scheme" by which all noncitizens are to be inspected at POEs and asylum seekers must be referred for credible fear interviews, Dkt. 280 at 62, Defendants have no authority to turn back any noncitizens at POEs, much less single out asylum seekers for such treatment. *Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731, 1747 (2020) (when Congress makes a "broad rule" and includes no exceptions, the rule applies and no "tacit exception" may be inferred).[15]

Since 2016, it has been Defendants' policy to turn back asylum seekers at POEs. *See, e.g., supra* at 7-14; Ex. 4 at 171:7-13; Ex. 10 at 102:21-103:22; Ex. 93 at 317; Ex. 94 at 575; Ex. 95; Ex. 96. Asylum seekers are turned back when they are

---

[15] Even if the Court were to reject its prior conclusion that Defendants' duties to inspect and refer attach to individual asylum seekers in the process of arriving in the United States at a POE who may not have stepped across the international border, the Court could still "hold unlawful and set aside" Defendants' *policy* to turn back such asylum seekers. 5 U.S.C. § 706(2). Any such policy runs counter to the statutory scheme, and thus is "contrary to clear congressional intent" and "inconsistent with the statutory mandate" of inspecting all noncitizens at POEs and referring all asylum seekers for credible fear interviews, even if asylum seekers whom the government prevents from accessing U.S. territory cannot enforce those duties via a § 706(1) claim. *Planned Parenthood*, 946 F.3d at 1112.

1  "attempting to enter the United States at a [POE]." Ex. 17 at 201:22-202:3. CBP

2  officers at POEs physically block those perceived to be asylum seekers—and only

3  asylum seekers—from crossing the border, and tell them "that the port is at capacity

4  and they should return to be processed later." Ex. 4 at 171:7-13; Ex. 14 at 232:8-15

5  (acknowledging that "officers staffing the limit line are directed to prevent migrants

6  from crossing [the] international boundary," "because once they do cross the

7  boundary, then they have to be processed").

8      The formulation of policies "prescrib[ing] the terms and conditions upon

9  which [noncitizens] may come to this country" "is entrusted exclusively to

10  Congress," not the executive. *Kleindienst v. Mandel*, 408 U.S. 753, 766-67 (1972);

11  *see also* Dkt. 280 at 23 ("[O]ver no conceivable subject is the legislative power of

12  Congress more complete than it is over the admission of [noncitizens]."). Here,

13  Defendants claim that they have the power to selectively screen out asylum seekers

14  and deny them processing. The logical result of Defendants' argument is that they

15  would have sole authority to end asylum for noncitizens arriving at POEs, without

16  any involvement by Congress—an interpretation of the INA that plainly conflicts

17  with Congress' statutory scheme. *See* 5 U.S.C. § 706(2)(A), (C).[16]

18      Defendants may not usurp Congress' role in this way. Because Congress

19  never authorized Defendants to turn back any noncitizens at POEs, and in fact

20  created a statutory scheme that "specifically addresse[s]" how Defendants must treat

21  individuals who are coming to POEs to seek asylum, *EBSC v. Barr*, 964 F.3d 832,

22  848 (9th Cir. 2020), the turnback policy is "not in accordance with law" and is "in

23  excess of statutory . . . authority," 5 U.S.C. § 706(2)(A), (C).

24

25

---

26  [16] CBP's general power to operate POEs does not include authority to contravene
    more specific provisions of the INA. "[I]t is a commonplace of statutory construction

27  that the specific governs the general," particularly where "Congress has enacted a
    comprehensive scheme and has deliberately targeted specific problems with specific

28  solutions." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645
    (2012) (citations omitted).

1             **d.**      **The Turnback Policy is arbitrary and capricious**

2       In addition to the turnback policy's categorical incompatibility with the INA,

3 the policy is also illegal under APA § 706(2)(A) because it is "arbitrary, capricious,

4 [and] an abuse of discretion" for a number of reasons, each of which provides an

5 independent basis to grant Plaintiffs' motion.

6             **i.**      **The Turnback Policy Is Based On Pretext**

7       It is arbitrary and capricious for an agency to "offer[] an explanation for its

8 decision that runs counter to the evidence before the agency, or is so implausible that

9 it could not be ascribed to a difference in view or the product of agency expertise."

10 *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 994 (9th Cir. 2014)

11 (citation omitted). "[A]gencies [must] offer genuine justifications for important

12 decisions." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575-76 (2019). An

13 agency is due no deference when the explanation provided for its action "lacks any

14 coherence." *Tripoli Rocketry Ass'n, Inc. v. ATF*, 437 F.3d 75, 77 (D.C. Cir. 2006).

15 Courts must not "simply accept whatever conclusion an agency proffers merely

16 because the conclusion reflects the agency's judgment." *Id*. "[R]easoned

17 decisionmaking" is required. *Id*. Similarly, an agency action cannot survive APA

18 review if it is supported only by post hoc rationalizations. *DHS v. Regents of the*

19 *Univ. of Calif.*, 140 S. Ct. 1891, 1907-09 (2020).

20       The undisputed evidence shows that Defendants' stated justification for the

21 turnback policy—a "lack of capacity" at POEs, Dkt. 283 ¶ 7—is pretextual. CBP's

22 own daily internal statistics capturing "capacity" show that POEs generally operated

23 well below 100% during the policy's implementation and that the number of asylum

24 seekers at POEs almost never impacted port operations. *See* Ex. 20 at ¶¶ 22, 101-23;

25 Ex. 21; Ex. 22; Ex. 23 Ex. 24; Ex. 25. Indeed, a CBP officer at the Tecate POE

26 testified that this "capacity excuse" is a lie:

27          Q.     And when [your supervisors] said the port was at capacity, you
                   knew that was a lie, right?

28

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

1    A.    Yes.

2    Q.    And it would have been obvious to those supervisors that it was
              a lie as well, correct?

3    A.    Correct.

4    Q.    In fact, it was obvious to everybody that was implementing the
              policy at [the] Tecate [POE] that the capacity excuse was a lie,

5               right?

6    A.    Correct.

Ex. 1 at 100:22-101:6. Meanwhile, CBP "officers at [the] Otay Mesa [POE] were telling travelers that the facility was at capacity but weren't actually checking on the capacity of the facility." Ex. 118 at 93:4-12. At the Hidalgo POE, CBP "intentionally removed seats" from the port's secondary inspection area, "so that they could say that [the port] couldn't process as many people." Ex. 3 at 157:15-18. A CBP officer from the Laredo Field Office testified that there was no justification for metering because CBP could process asylum seekers in the order that they came to a POE without resorting to turnbacks. *Id.* at 71:9-16. Finally, prior to issuing the prioritization-based queue management guidance, then-DHS Secretary Nielsen ***explicitly asked for and considered*** the fact that the policy would result in the ***turnbacks of hundreds of asylum seekers each day***—without linking those expected turnback numbers to any actual capacity shortage at POEs. *Supra* at 13-14.

      If there really were capacity issues, Defendants have long had contingency plans ready to obviate any genuine need to turn back asylum seekers. Yet Defendants have repeatedly declined to implement such plans and in some instances scrapped their rollout, despite extensive preparation. *See, e.g.*, Ex. 65 at 879; Ex. 66; Ex. 14 at 156:12-157:22; *supra* at 10-11. Moreover, Defendants have always had the power to release asylum seekers from POEs rather than waiting for ICE to pick up and transfer them to a detention facility. *See, e.g.*, Ex. 119 at 545 (DHS Secretary Johnson approved such action, authorizing "NTAs," in fall 2016 "if CBP and ICE

1  cannot keep up with the flow").[17] Defendants also intentionally reduced their

2  capacity to inspect and process asylum seekers at ports—in other words, they

3  consciously manufactured the appearance of a justification for the policy. *See, e.g.*,

4  Ex. 3 at 157:15-18; Ex. 14 at 96:17-99:6.

5       In June 2018—well after this litigation began—CBP began using "operational

6  capacity," as opposed to "detention capacity," as its justification for turnbacks. *See*

7  *supra* at 14-16. The new metric, "operational capacity," has no definition and is

8  not—and has never been—tracked, and it is impossible to reconstruct a port's

9  operational capacity. *See supra* at 14-15. "Operational capacity" means whatever a

10  port director or other decisionmaker wants it to mean, and it can justify inspecting

11  any number of asylum seekers—or none at all. Ex. 100 at 181:22-182:4; *see also* Ex.

12  14 at 140:19-21. "Operational capacity" as a reason for turning back asylum seekers

13  "lacks any coherence," and is anything but a "concrete standard." *Tripoli Rocketry*,

14  437 F.3d at 77. Defendants have offered no contemporaneous data or documents to

15  support an "operational capacity" defense. *Id.* Reliance on the "operational capacity"

16  concept demonstrates a lack of "reasoned decisionmaking" and is therefore arbitrary

17  and capricious. *Id.*

18       The shift to "operational capacity" simply resulted in POEs processing "fewer

19  immigrants." Ex. 100 at 207:7-14. Around the same time, Defendants issued the

20  prioritization-based queue management memo. *See* Ex. 98 at 294. The memo

21  purports to give port directors "discretion" not to inspect and process asylum seekers

22  at all.[18] *Id.* at 296 ("Field leaders have the discretion to allocate resources and staffing

23  dedicated to any areas of enforcement and trade facilitation not covered by the

24

---

25  [17] "NTA" refers to a "notice to appear," which institutes removal proceedings in immigration court. *See* 8 U.S.C. § 1229(a)(1).

26  [18] While the June 2018 memo on its face grants POEs discretion to meter asylum

27  seekers or not, CBP subsequently directed POEs to undertake metering. *See, e.g.*, Ex. 14 at 93:2-24 (around June 8, 2018, ports in the Laredo Field Office were given

28  a mandatory order to set up queue management points near the line of demarcation "regardless of their capacity at the time").

[specified] priorities and queue management process based on the availability of resources and holding capacity at the local port level."). The combination of "operational capacity" and "prioritization-based queue management" meant that POEs could rely on CBP's explicit policies to justify not inspecting and processing any asylum seekers at all, independent of the actual availability of processing or detention capacity at a given POE. Indeed, after June 2018, POEs set arbitrary numerical caps on asylum seeker processing that were well below actual capacity. *See supra* at 15-16.

Defendants' sole stated rationale for the turnback policy—that they lacked "capacity" to inspect and process asylum seekers—has always been pretextual. When CBP officers told asylum seekers at POEs that they could not be processed due to lack of "capacity" under the turnback policy, these were "obvious" "lies" in violation of APA § 706(2)(A). Ex. 1 at 99:19-101:2. As a whistleblower testified, metering is "a solution in search of a problem." *Id.* at 153:24-154:1. This is textbook arbitrary and capricious action. *See DHS*, 140 S. Ct. at 1907-09 (post hoc rationalization violates § 706(2)(A)).

### ii. The True Motivations for Metering Are Unlawful

Defendants needed to fabricate a seemingly legitimate excuse to turn back asylum seekers from POEs because their true motivations—limiting access to the asylum process, deterring asylum seekers from seeking protection in the U.S., and evading a statutory command—are arbitrary and capricious and an abuse of discretion. It is a violation of § 706(2)(A) for an agency to "rel[y] on factors which Congress has not intended it to consider." *Locke*, 776 F.3d at 994 (citation omitted).

A desire to limit access to the asylum process at POEs for its own sake is not a legitimate basis for the turnback policy. *See* Dkt. 280 at 63 (explaining that unlike the statutory numerical limit on refugee admissions, the INA does not cap the number of people who may access the asylum process at ports, and a "*de facto* numerical limit" would be "unlawful"). The undisputed facts are that Defendants

1  nonetheless proceeded with the turnback policy in pursuit of this purpose. *See, e.g.,*
2  Ex. 47 (McAleenan, who ultimately proposed the turnback policy, lamenting in mid-
3  2016 that there was "no appetite to try and refuse [asylum seekers] and push them
4  back to Mexico"); Ex. 96 (prior to implementing prioritization-based queue
5  management, CBP leadership requested an estimate of likely turnbacks and the
6  response from the field was 650 people per day).

7  In addition, deterring lawful migration is not a proper basis for the turnback
8  policy, yet deterrence has always been at the core of the policy. In fall 2016, CBP
9  put out a call for proposals "that would have a deterrent effect on the sending
10  populations." Ex. 57 at 577-578. In November of that year, McAleenan proposed
11  border-wide turnbacks, and the proposal was accepted. Ex. 67 at 936; Ex. 68 at 880.
12  After the turnback policy's adoption, Defendants sought to determine whether it was
13  successfully deterring asylum seekers from attempting to enter the U.S. *See, e.g.,*
14  Ex. 109 at 2. As this Court has correctly observed, "there is no room for deterrence
15  under the scheme Congress has enacted." Dkt. 280 at 65; *see also Locke*, 776 F.3d
16  at 994; *Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 154 (D.D.C. 2018) (finding
17  challenge to a policy that took deterrence into account showed a likelihood of
18  success on the merits by "demonstrat[ing] the incompatibility of the deterrence
19  policy and [applicable law]"); *R.I.L-R*, 80 F. Supp. 3d at 174–76 (similar).

20          **iii.   The Policy Amounts to an Arbitrary and Capricious**
21                   **Interpretation of the INA**

22  Even if the Court were to conclude that the INA's text is ambiguous as to
23  whether turnbacks could be permissible in some form and even if, contrary to the
24  evidence, Defendants adopted the turnback policy for a legitimate reason, the fact
25  that the policy turns asylum seekers back to danger *en masse* nevertheless amounts
26  to an arbitrary and capricious interpretation of § 1225 because it is "inconsistent with
27  clearly expressed congressional intent," *EBSC v. Trump*, 950 F.3d 1242, 1273 (9th
28  Cir. 2020).

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

The turnback policy has resulted in a humanitarian crisis across the border in contravention of the INA and the humanitarian principles Congress sought to enshrine in it. *See* Ex. 51 at 746. Under the policy, Defendants have forced thousands of asylum seekers to wait in dangerous border towns where they risk physical harm or death. *See, e.g.*, Ex. 96 at 009; Ex. 100 at 202:24-203:5; Ex. 51 at 746. And Defendants are well aware of the dangers asylum seekers face in Mexico. *See, e.g.*, Ex. 14 at 97:4-99:5 (CBP is aware of State Department's travel advisories for Mexican border states, including the Level 4 "do not travel" advisory for the state of Tamaulipas). But in enacting § 1225, Congress adopted inspection and processing requirements that ensure that despite CBP's general ability to perform summary expedited removal, those with claims for humanitarian protection have the ability to seek asylum *before* they are summarily sent back to Mexico. *See* H.R. Conf. Rep. No. 104-828, at 209 (1996) (noting the purposes of § 1225 are to "expedite the removal from the [U.S.] of aliens who indisputably have no authorization to be admitted" while concurrently providing individuals in that category who claim asylum to have that claim "promptly assessed"). Thus, Congress intended processing of asylum seekers—and only asylum seekers—instead of expedited removal, to avert the harm such individuals might face if summarily removed. The human toll of the turnback policy evinces an abject failure to consider Congress's guiding concern in crafting the relevant portions of § 1225—preventing just such harm. Thus, in the context of the current dangers asylum seekers face in Mexico, the turnback policy is "inconsistent with clearly expressed congressional intent," *EBSC v. Trump*, 950 F.3d at 1273.

## B. The Turnback Policy Violates the Due Process Clause

As this Court has already held and as Defendants concede, Plaintiffs have Fifth Amendment due process rights that are coextensive with their statutory rights under the INA. Dkt. 280 at 70, 76; *see also Meachum v. Fano*, 427 U.S. 215, 226 (1976) (minimum due process rights attach to statutory rights); *Graham v. FEMA*,

149 F.3d 997, 1001 & n.2 (9th Cir. 1998). "In the enforcement of [congressional immigration] policies, the Executive Branch of the Government must respect the procedural safeguards of due process." *Kleindienst v. Mandel*, 408 U.S. 753, 767 (1972) (quotation omitted). Congress "has plainly established procedural protections for" class members, requiring that they "shall" be inspected and processed for asylum at POEs pursuant to § 1225 of the INA. Dkt. 280 at 76-77; *cf. Perales v. Reno*, 48 F.3d 1305, 1314 (2d Cir. 1995) (Congress's use of word "shall" in IRCA gives rise to statutory entitlements which are subject to due process protections). This is so even if the Court concludes that Plaintiffs have not met all the technical requirements necessary to succeed on their APA claims. Dkt. 280 at 67 n.13, 68. Accordingly, Plaintiffs have proven a due process violation on this basis alone.

In addition, the government's policy to categorically deny class members their statutorily mandated entitlement to the asylum scheme also constitutes a violation of fundamental due process principles. At its core, due process is a "protection of the individual against arbitrary action of government," *County of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998), and its procedural component protects against "denial of fundamental procedural fairness." *Id.* at 845-46. In applying procedural due process, courts are to prevent an "arbitrary deprivation" of rights "without threatening institutional interests or imposing undue administrative burdens." *Superintendent v. Hill*, 472 U.S. 445, 455 (1985). Due process is "flexible and depend[s] on a balancing of the interests affected by the relevant government action." *Id.* at 454.

The undisputed facts show that the turnback policy violates this due process requirement. The weight of the procedural right at stake here is enormous: Plaintiffs' statutorily-enshrined right to seek protection from persecution for themselves and their families. *See Goldberg v. Kelly,* 397 U.S. 254, 264-65 (1970) (potential for grave consequences necessitates maximum procedural due process protections); Ex. 20 at ¶ 86 ("[T]here are . . . cases of turn-backs and metering that have led to an effective end to asylum seekers' claims, and even their lives."); *cf. Marincas v.*

*Lewis*, 92 F.3d 195, 203 (3d Cir. 1996) ("The basic procedural rights Congress intended to provide asylum applicants . . . are particularly important because an applicant erroneously denied asylum could be subject to death or persecution if forced to return to his or her home country."). Further, it is self-evident that in a system of separation of powers, the executive branch is not free to ignore statutorily mandated procedures by claiming that they impose a "burden." Defendants need only return to inspecting and processing asylum seekers in accordance with the statutorily required procedure, as Defendants were doing before the turnback policy. Where individual interest in the mandatory, life-saving protections of a statute is so grave, and the government's actual—as opposed to manufactured and pretextual (*see supra* at 26-29)—burden to abide by the statute is negligible, Defendants' willful and arbitrary decision to deny individuals access to those statutory protections violates fundamental due process principles.

## C. The Turnback Policy Violates the ATS

As this Court recognized, the ATS allows noncitizens to seek redress for a "violation of the law of nations," 28 U.S.C. § 1350, that is "specific, universal, and obligatory." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 732 (2004) (quotation omitted); Dkt. 280 at 80. The duty of *non-refoulement* has achieved the status of a *jus cogens* norm—*i.e.* "an elite subset of . . . customary international law" from which no derogation is ever permitted. *Siderman de Blake v. Rep. of Arg.*, 965 F.2d 699, 714-15 (9th Cir. 1992). Plaintiffs have previously summarized the international law authorities recognizing *non-refoulement* as a *jus cogens* norm, *see* Dkt. 210 at 27-30, a point which Defendants "concede[d]." Dkt. 280, at 82. That should be sufficient to meet the *Sosa* standard and authorize jurisdiction under the ATS. *Id.*

The duty of *non-refoulement* forbids a government from returning or expelling an individual to a country where he or she has a well-founded fear of persecution, torture, or other harm, whether it is the individual's home country or another country, *see I.N.S. v. Stevic*, 467 U.S. 407, 417 & n.20 (1984) (referencing

obligations under 1951 Refugee Convention), and it "encompass[es] any measure . . . which could have the effect of returning an asylum-seeker or refugee to the frontiers of territories where his or her life or freedom would be threatened[.]" U.N. High Comm'r for Refugees, *Note on International Protection*, ¶ 16 (citing Refugee Convention, art. 33(1)). As interpreted by the European Court of Human Rights, the principle of *non-refoulement* "essentially means that States must refrain from returning a person (directly or indirectly) to a place where he or she could face a real risk of being subjected to torture or to inhuman[e] or degrading treatment."[19]

The Turnback Policy violates the duty of *non-refoulement*—and thus the ATS—on multiple grounds. First, Defendants have *refouled* class members to Mexico where they fear persecution or other harm, and Defendants "knew or should have known" of those likely risks. *Hirsi Jamaa and Others v. Italy*, App. No. 27765/09 ¶¶ 131, 156 (Eur. Ct. H.R., Feb. 23, 2012). Three of the Plaintiffs—Abigail, Beatrice, and Carolina—are Mexican nationals who claimed fear of persecution in Mexico—the country to which they were *refouled*. *See* Dkt. 390-11 at ¶¶ 18-20; 390-12 at ¶¶ 26-27; 390-13 at ¶¶ 28-31. Many other class members stated a substantial fear of harm in Mexico. *See, e.g.*, Dkts. 390-11, 390-12, 390-13, 390-14, 390-15, 390-16, 390-73, 390-74, 390-75, 390-76, 390-77, 390-78, 390-79, 390-80, 390-81, 390-82, 390-83, 390-85.

Further, Defendants knew that class members were at risk of such harms in Mexico. Other Executive agencies had stated the risks publicly. Many border towns are so dangerous the Department of State prohibits U.S. government employees from traveling there, of which this Court may take judicial notice. Dkt. 216 at 10, n.32; *see also* Ex. 14 at 97:4-99:5 (CBP is aware of State Department's travel advisories

---

[19] *Hirsi Jamaa and Others v. Italy*, App. No. 27765/09 ¶ 34 (Eur. Ct. H.R., Feb. 23, 2012), available at shorturl.at/nEHNQ. Numerous courts are in accord. *See, e.g.*, *Ilias v. Hungary*, App. No. 47287/15 ¶ 98, 244 (Eur. Ct. H.R. Mar. 14, 2017) available at shorturl.at/aizK2; *M.S.S. v. Belgium and Greece*, App. No. 30696/09 ¶ (Eur. Ct. H.R., Jan. 21, 2011) available at shorturl.at/yKWY7; *Abdolkhani & Karimnia v. Turkey*, App. No. 30471/08, ¶ 88 (Eur. Ct. H.R., Sep. 22, 2009), available at shorturl.at/dyTU8.

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

1  for Mexican border states). Plaintiffs also have presented undisputed evidence that
2  non-Mexican asylum seekers are at particular risk of harm in Mexico after CBP
3  *refoulement*. Although these class members do not claim persecution from Mexico,
4  this showing is not required under *non-refoulement* doctrine if Plaintiffs otherwise
5  show that their "life or freedom would be threatened," UNHCR, *Note on*
6  *International Protection*, ¶ 16, or that they have a substantial fear of "inhuman[e]
7  treatment." *See supra* note 18. Migrants marooned on the Mexican side of the border
8  await a full panoply of dangers, including "disappearances, kidnappings, rape[,]
9  sexual and labor exploitation," and worse. Dkt. 104-C at 16; *see Innovation Law Lab*
10 *v. Wolf*, 951 F.3d 1073, 1078 (9th Cir. 2020) (discussing danger). It has been
11 described as a "human rights catastrophe," Dkt. 293-34 at 1, and overwhelming
12 evidence corroborates the existence of these threats. *See, e.g.*, Ex. 20 at ¶¶ 83-86.
13 Defendants are or should be fully aware of the peril the turnback policy places on its
14 targets, and have thus violated their duty of *non-refoulement* by implementing it.
15 *See, e.g.*, Ex. 100 at 201:1-203:5.

16      Finally, the Turnback Policy subjects asylum-seekers to impermissible chain
17 *refoulement*—that is, the risk that CBP's expulsion of migrants to Mexico will lead
18 to Mexican-initiated deportation.[20] Mexico—whose asylum system has been
19 described as on "the brink of collapse"[21]—has continually violated migrants' rights.
20 To wit, when CBP turned back Plaintiff Roberto Doe in October 2018, it specifically
21 instructed Mexican immigration officials to remove him from the bridge, and
22 Roberto was later deported from Mexico. Dkt. 390-75 at ¶ 4, 9, 390-97 at ¶¶ 6-7.
23 Plaintiff Cesar Doe would have suffered the same fate were it not for the timely
24 intervention of an attorney who thwarted his deportation twelve days into his

25 ───────────────
26 [20] *See, e.g.*, *Hirsi Jamaa and Others v. Italy*, App. No. 27765/09 (Eur. Ct. H.R., Feb. 23, 2012) (Italy violated *non-refoulement* when it refused to consider whether Libya would onwardly deport asylum seekers); *T.I. v. United Kingdom*, App. No. 43844/98, ¶ 2 (Eur. Ct. H.R., Mar. 7, 2000) available at shorturl.at/iHK68 (same).
28 [21] Elyssa Pachico and Maureen Meyer, *One Year After U.S.-Mexico Migration Deal, a Widespread Humanitarian Disaster*, WOLA (Jun. 6, 2020).

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

35

Mexican-ordered detention. Dkt. 390-101 at ¶¶ 8-9. CBP's cooperation with Mexican immigration authorities jeopardizes hundreds—if not thousands—of individuals' legitimate claims to asylum through the *chain refoulement* process. *See, e.g.*, Dkt. 293-47 at ¶¶ 11-16; 293-46 at ¶¶ 39-46.

### C. The Court Should Enter A Permanent Injunction

The relief Plaintiffs seek is simple: for Defendants to cease treating asylum seekers differently from all other people arriving at POEs on foot or by vehicle. Prior to instituting the Turnback Policy, the government inspected those seeking access to the asylum process just like everybody else; that is, in the order in which they approached the POE. Defendants' self-generated "operational capacity" constraints have created an unlawful and untenable situation at the U.S.-Mexico border and absent injunctive relief, Defendants' "past and present misconduct indicates a strong likelihood of future violations." *Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 564 (9th Cir. 1990). "The Supreme Court has repeatedly upheld the appropriateness of federal injunctive relief to combat [such] a 'pattern' of illicit law enforcement behavior." *LaDuke v. Nelson*, 762 F.2d 1318, 1324 (9th Cir. 1985).

Because they have succeeded on the merits of their claims, *see supra* 20-37, Plaintiffs' ability to satisfy the remaining factors warranting permanent injunctive relief is uncontroversial. "A permanent injunction is appropriate when: (1) a plaintiff will suffer an irreparable injury absent injunction, (2) remedies available at law are inadequate, (3) the balance of hardships between the parties supports an equitable remedy, and (4) the public interest would not be disserved." *Sierra Club v. Trump*, 963 F.3d 874, 895 (9th Cir. 2020) (citing *eBay Inc. v. MercExchange LLC*, 547 U.S. 388, 391 (2006)).

***First***, as discussed *supra* 16-18, the statutory, constitutional, and international law violations Defendants commit through implementation of the turnback policy put asylum seekers in grave danger in Mexico and deny them access to the U.S.

asylum process. These violations constitute irreparable harm. *See E. Bay Sanctuary Covenant v. Trump*, 349 F. Supp. 3d 838, 864 (N.D. Cal. 2018) (loss of the right to seek asylum constitutes irreparable harm); *Hernandez v. Sessions*, 872 F.3d 976, 994 (9th Cir. 2017) ("the deprivation of constitutional rights 'unquestionably constitutes irreparable injury'") (citation omitted). Moreover, the "ongoing harms to [Plaintiff Al Otro Lado's] organizational missions" also constitute irreparable harm. *E. Bay Sanctuary Covenant v. Barr*, 964 F.3d at 854 (citation omitted).

**Second**, injunctive relief is appropriate because the turnback policy strands class members in border towns where they face grave harm while waiting indefinitely to seek asylum in the U.S., *see supra* 16-18, and there "are no legal remedies available that would adequately compensate the class members" for this type of harm. *Walters v. Reno*, 145 F.3d 1032, 1048 (9th Cir. 1998) (there is "no way to calculate the value of such a constitutional deprivation or the damages that result from erroneous deportation") (citation omitted). Moreover, where, as here, a court has certified a class action under Rule 23(b)(2), Dkt. 513 at 18, the Rule "literally permits only class applications for injunctive or declaratory relief." *LaDuke*, 762 F.2d at 1330.

**Third** and **Fourth**, the balance of the hardships and the public interest weigh in Plaintiffs' favor. "When the government is a party to the case, the court should consider the balance of hardships and public interest factors together." *Sierra Club*, 963 F.3d at 895 (citation omitted). Even if Defendants suffer some hardship by processing more asylum seekers, that harm is far outweighed by denying class members access to the U.S. asylum process. On the one hand, processing and inspecting asylum seekers is *CBP's job*. Asking an agency to do its job is not a hardship. Defendants inspected asylum seekers as they approached a POE without resorting to turnbacks before 2016, *see* Ex. 3 at 71:9-16, and continue to do so for individuals who approach a POE with travel documents and for vehicular traffic, Ex. 118 at 24:17-25:13. There is no reason why CBP cannot return to inspecting and

1   processing even high numbers of asylum seekers. Ex. 3 at 71:9-16. On the other
2   hand, any hardships the government faces pale in comparison to the denial of
3   statutory rights and the grave risk of persecution, torture, and death that class
4   members will face absent an injunction. *See supra* at 16-18.

5          Complying with an injunction should not be difficult. Defendants have had a
6   plan to comply with an injunction issued in this case since October 2018. Ex. 120 at
7   270 ("EAC [Todd Owen] also wants . . . a white paper on what happens if we get a
8   TRO prohibiting metering."). Moreover, the Supreme Court has recognized that
9   "preventing aliens from being wrongfully removed, particularly to countries where
10  they are likely to face substantial harm," is "of course" in the public interest. *Nken*
11  *v. Holder*, 556 U.S. 418, 436 (2009); *see also League of Women Voters of U.S. v.*
12  *Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("There is generally no public interest in the
13  perpetuation of unlawful agency action."). Turning back Mexican class members to
14  their country of origin and stranding non-Mexican class members in Mexico
15  constitutes an unlawful denial of access to the U.S. asylum process. Defendants have
16  sought to do through policy what they cannot do by law: deny those in need of
17  protection access to the U.S. asylum process. Therefore, the Court should enter an
18  injunction that permanently enjoins all forms of turnbacks and requires Defendants
19  to inspect and process asylum seekers as they arrive at Class A POEs on the U.S.-
20  Mexico border.

21         **E. The Court Should Enter A Declaratory Judgment**

22         In addition to a injunctive relief, the Court should also enter a declaratory
23  judgment that Defendants have violated the APA, Fifth Amendment, and ATS.
24  "[A]ny court of the United States . . . may declare the rights and other legal relations
25  of any interested party seeking such declaration, whether or not further relief is or
26  could be sought." 28 U.S.C. § 2201(a); *see also McGraw-Edison Co.*, 362 F.2d at
27  342 (declaratory relief is appropriate in addition to other forms of relief). Here,
28  Plaintiffs seek a declaratory judgment that "will serve a useful purpose in clarifying

1  the legal relations at issue," *GEICO v. Dizol*, 133 F.3d 1220, 1225 n.5 (9th Cir.

2  1998), namely adjudicating whether the turnback policy broke the law. Because

3  Plaintiffs have shown via undisputed facts that Defendants' conduct was unlawful,

4  this Court should enter a declaratory judgment that Defendants violated the APA,

5  Fifth Amendment, and ATS. *See California v. Trump*, 963 F.3d 926, 949 (9th Cir.

6  2020) (affirming summary judgment entering a declaratory judgment where the

7  undisputed facts showed that the Government broke the law).

8  **V.  CONCLUSION**

9       For the foregoing reasons, Plaintiffs are entitled to summary judgment,

10  declaratory relief, and a permanent injunction.

11  Dated: September 4, 2020

MAYER BROWN LLP
12        Matthew H. Marmolejo
          Ori Lev
13        Stephen M. Medlock

SOUTHERN POVERTY LAW
14  CENTER
15        Melissa Crow
16        Sarah Rich
          Rebecca Cassler
17

CENTER FOR CONSTITUTIONAL
18  RIGHTS
19        Baher Azmy
20        Ghita Schwarz
          Angelo Guisado
21

AMERICAN IMMIGRATION
22  COUNCIL
23        Karolina Walters
24

By: */s/ Stephen M. Medlock*
25        Stephen M. Medlock
26

*Attorneys for Plaintiffs*
27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**CERTIFICATE OF SERVICE**

I certify that I caused a copy of the foregoing document to be served on all counsel via the Court's CM/ECF system.

Dated:  September 4, 2020                    MAYER BROWN LLP


By _/s/ Stephen M. Medlock_____

MAYER BROWN LLP
  Matthew H. Marmolejo (CA Bar No. 242964)
  *mmarmolejo@mayerbrown.com*
350 S. Grand Avenue
25th Floor
Los Angeles, CA 90071-1503
  Ori Lev (DC Bar No. 452565)
  (*pro hac vice*)
  *olev@mayerbrown.com*
  Stephen M. Medlock (VA Bar No. 78819)
  (*pro hac vice*)
  *smedlock@mayerbrown.com*
1999 K Street, N.W.
Washington, D.C. 20006
Telephone:  +1.202.263.3000
Facsimile:   +1.202.263.3300

SOUTHERN POVERTY LAW CENTER
  Melissa Crow (DC Bar No. 453487)
  (*pro hac vice*)
  *melissa.crow@splcenter.org*
1101 17th Street, N.W., Suite 705
Washington, D.C. 20036
Telephone: +1.202.355.4471
Facsimile: +1.404.221.5857

*Additional counsel listed on next page*
*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*, | Case No.:  17-cv-02366-BAS-KSC |
| Plaintiffs, | **EXHIBIT 5 IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| Chad F. Wolf,[1] *et al.*, | |
| Defendants. | **FILED UNDER SEAL** |

---

[1] Acting Secretary Wolf is automatically substituted for former Acting Secretary McAleenan pursuant to Fed. R. Civ. P. 25(d).

CENTER FOR CONSTITUTIONAL RIGHTS
   Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
   *bazmy@ccrjustice.org*
   Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
   *gschwarz@ccrjustice.org*
   Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
   *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
   Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
   *sarah.rich@splcenter.org*
   Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
   *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
   Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
   *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

EXHIBIT 5 IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

Washington, DC 20528 / www.oig.dhs.gov

December 19, 2018

MEMORANDUM FOR: ███████████████

Director
Special Reviews Group

FROM: ███████████

Investigative Counsel

Steve Staats
Senior Program Analyst

SUBJECT: *Memorandum of Interview with* ███████████
*CBP Officer, Port of Tecate, CA*

On December 11, 2018, ███████████ Investigative Counsel, Special
Reviews Group (SRG), Office of Inspector General (OIG), and ███████████
Senior Program Analyst, SRG, OIG conducted a teleconference with ███████
███████, Officer, Port of Tecate, Office of Field Operations (OFO), U.S
Customs and Border Protection (CBP) regarding allegations made to the
U.S. Office of Special Counsel (OSC) that employees at the Port of Tecate,
California, engage in conduct that may constitute a violate of law, rule, or
regulation. OSC referred this matter to the OIG for investigation.

███████████ provided the following information in substance:

███████████ has been an officer at the port of Tecate for 6 years, and the main
union representative there for 3 years. He stated that in his position as the
union representative, officers frequently raise any issues they have with
their position with him.

Instruction to Redirect Asylum Seekers to San Ysidro at the Limit Line

When asked when the limit line position was first introduced, ███████████
recalled that he was out for a long time after foot surgery starting in
January 2018, but when he started working again in March or April 2018
he believed the limit line was already in place. ███████████ said that the
decision to implement the limit line position was mandated by the San

1                                          OSC Referral



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

Diego field office. It was not an independent decision by the Port of Tecate.
▬▬▬▬▬ said San Ysidro has had a limit line position for years.

When asked how officers at the limit line identify aliens to be redirected,
▬▬▬▬▬ said that management instructed officers to ask to see people's
documents before they pass through the limit line. Tecate is a very small
port and some people cross several times a day and officers are familiar
with them. ▬▬▬▬▬ said that those seeking asylum tend to stick out, and
they would not have documents. The limit line position was intended to
stop aliens without documents before they entered U.S. soil. ▬▬▬▬ e said
that officers at the limit line were instructed to redirect aliens seeking
asylum to San Ysidro because it was a much larger POE, with many more
officers and physical facilities to handle asylum cases. That was the
rationale management provided, according to ▬▬▬▬▬.

▬▬▬▬▬ said that he is the chief steward for the union at the port of
Tecate. He participated in a Labor-Management Relations Committee
(LMRC) meeting between management and the union to address concerns
about the limit line position. ▬▬▬▬▬ thought the LMRC meeting was on
October 22, 2018, but he was not positive. The limit line had become a
"hot topic." At the LMRC meeting, the union tried to resolve several
concerns officers had with the position. Some officers were unwilling to
participate with the limit line position because of their concerns about its
legality.

▬▬▬▬▬ said that after the LMRC meeting, the Port Director, ▬▬▬▬▬
sent an email instructing officers on the limit line to call a supervisor if
they came into contact with someone seeking asylum or making a credible
fear claim, so that the supervisor would be the one responsible for making
the decision to redirect that individual or not. ▬▬▬▬▬ said he would
forward this email to the OIG.

When asked if there was any written guidance on this position, ▬▬▬▬▬
said the point of the LMRC meeting was to address union concerns with
the lack of a standard operating procedure (SOP). ▬▬▬▬▬ said that
officers were confused and wanted better guidance. Port Director ▬▬▬▬
said he would not write an SOP on the position, but in order to take the
pressure off the officers, he agreed to a process whereby officers would
contact their supervisor to come to the limit line and assume responsibility
for redirecting aliens. ▬▬▬▬▬ said that the officers were happy with this
solution because it put the accountability on the supervisors. ▬▬▬▬▬
said that officers were also concerned with whether they would be held

2

AOL-DEF-00210365



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

responsible if an individual made it past the limit line who should not have. ▮▮▮▮ said they were told "no."

▮▮▮▮ said that Tecate has a protocol in place now for redirecting aliens, but it is still unclear to him if it is legal or illegal. ▮▮▮▮ thought that management wanted to keep the process of redirecting individuals to another port in a "gray area" by not establishing official procedures or acknowledging limit line duty as a permanent position. Management's justification for the position was that the port of Tecate was a small facility with limited staff that is not open 24 hours per day, which made it a challenge to hold individuals.

▮▮▮▮ had concerns that there were no cameras covering the limit line position. If there was an incident, such as an allegation of sexual harassment, there would not be any video footage. Everywhere else within the port of Tecate had cameras. Officers had the impression that there were no cameras covering the limit line because management was doing something "shady." ▮▮▮▮'s understanding of the rationale for the position was that once someone was on U.S. soil seeking asylum, the port had to process that individual. But if that individual was stopped at the border, it would be a "loophole" in the law, and it was permissible to redirect that individual to another port.

▮▮▮▮ said that the language used by supervisors when redirecting an individual was precise. When an officer calls a supervisor to come to the limit line to talk to someone without documents that asserts an intent to apply for asylum, the supervisor will tell the migrant that they were not denying anyone entry and that they need to go to San Ysidro to be processed because it was a larger facility. ▮▮▮▮ said that there was an example two or three months ago when a supervisor tried to turn around an alien who had a lawyer present. The lawyer said that their feet were on U.S. soil because they had stepped up a curb onto a small sidewalk in front of a tall fence that CBP considers to be U.S. soil. There is no official border marking at the pedestrian entryway at the POE. ▮▮▮▮ acknowledged that due to the position of the limit line officer inside the U.S., individuals that approach are already on U.S. soil just before being asked to show their documents to the officer.

In this case, the lawyer and the asylum seeker left and came back an hour or so later with a G-28 form indicating that the lawyer was representing the individual seeking asylum. At that point, the Port Director informed a supervisor on duty that the officers should just bring the individual in to

3



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

be processed. ▮▮▮▮▮▮ said he could not recall what country that individual was from, maybe Guatemala. ▮▮▮▮▮▮said that he thought an exception was made in this instance because of the presence of the attorney.

When asked whether supervisors made exceptions to redirecting, such as for unaccompanied children, or an injured individual, ▮▮▮▮▮▮ said that he has not seen that specifically, but he imagines management would consider those factors, and he assumed if someone was injured they would definitely take them in. ▮▮▮▮▮▮ said he has seen children as young as three to four with families redirected. But he thought unaccompanied children would be taken in. When asked whether any consideration was given to an alien's country of origin when the determination was made whether to redirect them to San Ysidro, ▮▮▮▮▮▮said no, it was not.

When asked how often he had called a supervisor to come assist with redirecting someone, ▮▮▮▮▮▮ said that personally he has not done it very often. ▮▮▮▮▮▮ said that the recent caravan activity has led to an increase in the last couple of weeks. ▮▮▮▮e said that before the caravan influx, the port would often go all day without redirecting anyone, and sometimes there would be multiple in a day. When asked if there was ever a situation where those without documents were asked and decided to wait at the port's entrance on the Mexican side, ▮▮▮▮▮▮said "no," they have not had that.

▮▮▮▮▮▮ said that one officer is assigned to the limit line. Recently, they added a "rover" position who is supposed to go between the vehicle pre-primary position and the limit line officer as needed. ▮▮▮▮▮▮ said that he was assigned to the rover position the previous night. He said there is no SOP for the new rover position leaving officers to make assumptions about what they should be doing – as with the limit line position, officers also need direction on the rover position. ▮▮▮▮▮▮ said that the officers assigned to this position tend to either hang out with the limit line officer, or the vehicle pre-primary officer so he or she will have someone to talk to. He mentioned that there had been rain recently, and officers were unsure if they were supposed to stand out in the rain – another example of why an SOP was needed.

Escorting Asylum Seekers Arriving at Primary Back to Mexico

▮▮▮▮▮▮said there have been individuals without valid entry documents that have gotten past the limit line and then expressed an intent to apply

4



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

for asylum and supervisors walked those individuals back to the border and redirected them to San Ysidro. Initially, some officers might have let them go past the limit line because they did not think the limit line position was legal.

There was an incident in which an Assistant Port Director (APD) wanted to write up an officer when an individual made it past the line limit and had to be turned back at primary inspection. ▮▮▮▮ said that because there was no SOP on the limit line position, the APD decided not to write the officer up.

▮▮▮▮ said that before the limit line, Tecate had been redirecting aliens to San Ysidro for years. ▮▮▮▮ identified the supervisors he knew of that had done this:

- ▮▮▮▮
- ▮▮▮▮
- ▮ ▮▮▮▮ (retired, first name uncertain)

▮▮▮▮ said that he works the night shift, and so he doesn't know the names of day shift supervisors, but he has heard that they have done it too. One of the day shift supervisors who may have done it is ▮▮▮▮

▮▮▮e said that supervisor ▮▮▮ was often the one who redirected them because he was nearing retirement and was not concerned about whether walking individuals back to the border was permissible. ▮▮▮▮ retired about a year ago. There was an impression among some officers that it was illegal, but once ▮▮▮ started doing it, others did it too. If an officer encountered an alien raising an intent to apply for asylum, he or she would call the Watch Commander who would tell the officer whether to walk them back to the border.

▮▮▮▮ said that three or four years ago, the Port Director at that time, ▮▮▮▮ got word this was going on and sent out an email telling personnel that they could not walk people back to the border and should stop. ▮▮ is now the Port Director at Otay Mesa. ▮▮▮▮ recommended that the OIG speak to ▮▮ . ▮▮▮▮ said he would look for ▮▮ 's email and send it to the OIG.

Prior to the limit line, ▮▮▮▮ estimated that there were quite a few cases in which an individual arrived at pedestrian primary and was walked back to the border and redirected. ▮▮▮▮ thought this practice had been

5

AOL-DEF-00210368



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

going on as far back as he could remember – at least 5 years. ▬▬▬▬ said that after Port Director ▬▬ a got word of the practice and sent an email to stop, some supervisors stopped for a while. There was a point when the port had enough credible fear cases that personnel had to stay at the port from 11pm to 4am to monitor individuals held at the port. ▬▬▬▬ said that management's fear was that word would get out that Tecate was no longer redirecting individuals and the port might go from receiving one case every other day to being overwhelmed. ▬▬▬ e said that supervisor ▬▬▬ continued to redirect aliens even after ▬▬ 's email stating that officers should not walk individuals back to Mexico from pedestrian primary. ▬▬▬▬ was not sure about the timeframe, but eventually after ▬▬▬▬ email, the practice of redirecting resumed as before.

When asked if he could estimate the number of times individuals have been redirected since the limit line was put in place, ▬▬▬▬ said his buest guess would be about 100 people. ▬▬▬▬ estimated that maybe 20-30 individuals made it past the limit line that should have been redirected and were walked back to Mexico and redirected to San Ysidro. Prior to the LMRC meeting, officers may have allowed more individuals past the limit line. Since that meeting, ▬▬▬▬ estimates there have been less than 10 individuals that have made it past the limit line. Officers like being able to call their supervisor to handle these cases, and 90% of the time individuals are caught at the limit line now. ▬▬▬▬ said the supervisor who walked the individual back to the border might comment to the limit line officer that he or she had "let one past." But officers know they cannot get in trouble for this.

When asked if there were any records created when an individual was redirected at the limit line or at primary, ▬▬▬▬ said "no." ▬▬▬▬ explained that that was the point of the limit line position – individuals could be redirected even before they enter primary where there are cameras or records created. When individuals are redirected at primary, there is also no record created, but the interaction is on camera.

▬▬▬▬ recommended that the OIG also speak to:

- ▬▬▬▬, Assistant Port Director – ▬▬▬▬ was the supervisor who considered writing an officer up for letting someone past the limit line.
- ▬▬▬▬, Supervisory Officer – ▬▬▬▬ was involved with the individual who arrived with a lawyer and was initially redirected,

6



**OFFICE OF INSPECTOR GENERAL**

Department of Homeland Security

but returned with a G-28 form and the Port Director decided to take the individual in.

- ▆▆▆▆▆▆, Officer – ▆▆▆▆ e said that ▆▆▆ may have been involved with an instance where someone making a credible fear claim made it past the Limit Line and was walked back to Mexico and redirected to San Ysidro.

7

Confidential

AOL-DEF-00210370

2-SFER-239

MAYER BROWN LLP
  Matthew H. Marmolejo (CA Bar No. 242964)
  *mmarmolejo@mayerbrown.com*
350 S. Grand Avenue
25th Floor
Los Angeles, CA 90071-1503
  Ori Lev (DC Bar No. 452565)
  (*pro hac vice*)
  *olev@mayerbrown.com*
  Stephen M. Medlock (VA Bar No. 78819)
  (*pro hac vice*)
  *smedlock@mayerbrown.com*
1999 K Street, N.W.
Washington, D.C. 20006
Telephone:  +1.202.263.3000
Facsimile:   +1.202.263.3300

SOUTHERN POVERTY LAW CENTER
  Melissa Crow (DC Bar No. 453487)
  (*pro hac vice*)
  *melissa.crow@splcenter.org*
1101 17th Street, N.W., Suite 705
Washington, D.C. 20036
Telephone: +1.202.355.4471
Facsimile: +1.404.221.5857

*Additional counsel listed on next page*
*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*, | Case No.:  17-cv-02366-BAS-KSC |
| Plaintiffs, | **EXHIBIT 17 IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| Chad F. Wolf,[1] *et al.*, | |
| Defendants. | **FILED UNDER SEAL** |

---

[1] Acting Secretary Wolf is automatically substituted for former Acting Secretary McAleenan pursuant to Fed. R. Civ. P. 25(d).

1

2
CENTER FOR CONSTITUTIONAL RIGHTS
3
  Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
  *bazmy@ccrjustice.org*
  Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
4
  *gschwarz@ccrjustice.org*
  Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
5
  *aguisado@ccrjustice.org*
6
666 Broadway, 7th Floor
New York, NY 10012
7
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499
8

9
SOUTHERN POVERTY LAW CENTER
  Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
  *sarah.rich@splcenter.org*
10
  Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
  *rebecca.cassler@splcenter.org*
11
150 E. Ponce de Leon Ave., Suite 340
12
Decatur, GA 30030
Telephone: +1.404.521.6700
13
Facsimile: +1.404.221.5857

14
AMERICAN IMMIGRATION COUNCIL
15
  Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
  *kwalters@immcouncil.org*
16
1331 G St. NW, Suite 200
Washington, D.C. 20005
17
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619
18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 17 IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

AL OTRO LADO, INC., et al.,

        Plaintiffs,

        vs.                Case No.
                             17-cv-02366-BAS-KSC

KEVIN K. McALEENAN1, et al.,

        Defendants.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~

VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF

MARIZA MARIN

THURSDAY, MAY 28, 2020

8:37 A.M.

SAN DIEGO, CALIFORNIA

Reported remotely by Megan M. Grossman-Sinclair,

CSR No. 12586



Page 2

```
 1              APPEARANCES OF COUNSEL
 2
 3        For Plaintiffs:
 4             MAYER BROWN LLP
               STEPHEN M. MEDLOCK, ESQ.
 5             (By Videoconference)
               1999 K Street, N.W.
 6             Washington, D.C.  20006
               T:  (202) 263-3000
 7             smedlock@mayerbrown.com
 8
               CENTER FOR CONSTITUTIONAL RIGHTS
 9             ANGELO GUISADO, ESQ.
               (By Videoconference)
10             666 Broadway
               7th Floor
11             New York, New York  10012
               T:  (212) 614-6464
12             aguisado@ccrjustice.org
13
14        For Defendants:
15             U.S. Department of Justice
               OFFICE OF IMMIGRATION LITIGATION
16             KATHERINE J. SHINNERS, ESQ.
               (By Videoconference)
17             SUSAN IMERMAN, ESQ.
               (By Telephone)
18             Ben Franklin Square
               P.O. Box 868
19             Washington, D.C.  20044
               T:  (202) 598-8259
20             katherine.j.shinners@usdoj.gov
21
22
23
24
25
```



Page 301

1          A.    Yeah.  I would just like to

2     clarify.  It is, but I would like to clarify that

3     Grupo Beta would seldomly relay a different number

4     than what CBP said there was space for.

5          Q.    So CBP would tell Grupo Beta a

6     number that signified how much -- how many asylum

7     seekers to bring roughly, Grupo Beta would bring

8     that many asylum seekers, and those asylum seekers

9     had to have their name in the notebook

10     memorializing the wait-list process before they

11     could apply at the San Ysidro port of entry; is

12     that correct?

13          A.    CBP never verified with Grupo Beta

14     if they were on a list.  Whatever Grupo Beta

15     brought to us, what's in that number that we

16     requested would come in for intake.

17          Q.    And so this process or -- is it

18     fair to call it a "process"?

19          A.    I think that's fair.

20          Q.    Can I call it the "asylum-seeking

21     process at San Ysidro"; is that fair?

22          A.    There are individuals in the list

23     that arrive at a port of entry that do not always

24     seek asylum.

25          Q.    Okay.  Let's stick specifically to



MAYER BROWN LLP
   Matthew H. Marmolejo (CA Bar No. 242964)
   *mmarmolejo@mayerbrown.com*
350 S. Grand Avenue
25th Floor
Los Angeles, CA 90071-1503
   Ori Lev (DC Bar No. 452565)
   (*pro hac vice*)
   *olev@mayerbrown.com*
   Stephen M. Medlock (VA Bar No. 78819)
   (*pro hac vice*)
   *smedlock@mayerbrown.com*
1999 K Street, N.W.
Washington, D.C. 20006
Telephone:  +1.202.263.3000
Facsimile:   +1.202.263.3300

SOUTHERN POVERTY LAW CENTER
   Melissa Crow (DC Bar No. 453487)
   (*pro hac vice*)
   *melissa.crow@splcenter.org*
1101 17th Street, N.W., Suite 705
Washington, D.C. 20036
Telephone: +1.202.355.4471
Facsimile: +1.404.221.5857

*Additional counsel listed on next page*
*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*, | Case No.:  17-cv-02366-BAS-KSC |
| Plaintiffs, | **EXHIBIT 102 IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| Chad F. Wolf,[1] *et al.*, | |
| Defendants. | **FILED UNDER SEAL** |

---

[1] Acting Secretary Wolf is automatically substituted for former Acting Secretary McAleenan pursuant to Fed. R. Civ. P. 25(d).

1

2
CENTER FOR CONSTITUTIONAL RIGHTS
     Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
3
     *bazmy@ccrjustice.org*
     Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
4
     *gschwarz@ccrjustice.org*
     Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
5
     *aguisado@ccrjustice.org*
6
666 Broadway, 7th Floor
New York, NY 10012
7
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499
8

9
SOUTHERN POVERTY LAW CENTER
     Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
     *sarah.rich@splcenter.org*
10
     Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
     *rebecca.cassler@splcenter.org*
11
150 E. Ponce de Leon Ave., Suite 340
12
Decatur, GA 30030
Telephone: +1.404.521.6700
13
Facsimile: +1.404.221.5857

14
AMERICAN IMMIGRATION COUNCIL
15
     Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
     *kwalters@immcouncil.org*
16
1331 G St. NW, Suite 200
Washington, D.C. 20005
17
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619
18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 102 IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT

2-SFER-246

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA


|                              |   | IN THE DISTRICT COURT |
| AL OTRO LADO, INC., ET       | ) |                       |
| AL.,                         | ) |                       |
|     PLAINTIFFS,              | ) | CASE NO.              |
|                              | ) | 17-cv-02366-BAS-KSC   |
| VS.                          | ) |                       |
|                              | ) |                       |
|                              | ) |                       |
| KEVIN K. MCALEENAN, ET       | ) |                       |
| AL.,                         | ) |                       |
|     DEFENDANTS.             | ) |                       |


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

CONFIDENTIAL

ORAL AND VIDEOTAPED DEPOSITION OF

SAMUEL CLEAVES

MAY 20, 2020

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

     ORAL AND VIDEOTAPED DEPOSITION of SAMUEL CLEAVES,
produced as a witness at the instance of the Plaintiff,
and duly sworn, was taken in the above-styled and
numbered cause on May 20, 2020, from 8:59 a.m. to 5:04
p.m., Mountain Time, before Delia Ordonez, CSR in and
for the State of Texas, reported by machine shorthand,
via Webex Magna LegalVision.

Magna Legal Services

866.624.6221

www.MagnaLS.com



Page 2

```
 1                  A P P E A R A N C E S
 2
 3    FOR THE PLAINTIFFS:
 4         Matthew Fenn
           Sydney Fields
 5         Mayer Brown
           1999 K Street, N.W.
 6         Washington, D.C. 20006
           202.263.3221
 7         Mfenn@mayerbrown.com
           Sfields@mayerbrown.com
 8
      FOR THE DEFENDANTS:
 9
           Katherine J. Shinners
10         Ari Nazarov
           U.S. Department of Justice
11         Office of Immigration Litigation
           Ben Franklin Station, P.O. Box 868
12         Washington, D.C. 20044
           202.598.8259
13         Katherine.j.shinners@usdoj.gov
           Ari.Nazarov@usdoj.gov
14
           Rebecca Cassler
15         Southern Poverty Law Center
           1101 17th Street, N.W., Suite 705
16         Washington, D.C. 20036
           202.355.4471
17
18    ALSO PRESENT:
19         Evan McCulloch
20         Louisa Slocum, CBP
21    THE VIDEOGRAPHER:
22         Solange Tran
23    THE MAGNA LEGAL TECHNICIAN:
24         Kevin Cranford
25
```



Page 3

1                          INDEX

         ORAL AND VIDEOTAPED DEPOSITION OF

2                     SAMUEL CLEAVES

                      MAY 20, 2020

3

4               E X A M I N A T I O N

5   SAMUEL CLEAVES                         P A G E

6   Examination by Mr. Matthew E. Fenn....    7

7   Examination by Ms. Sydney Fields......  199

8   Examination by Ms. Katherine J. Shinners  246

9   Signature and Changes.................  250

10  Reporter's Certificate................  252

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Page 216

1    A.  Yes, ma'am.

2    Q.  And you testified that CBP communicates with

3  Grupo Beta via phone calls and text messages; is that

4  correct?

5    A.  Yes, yes.

6    Q.  How frequently does CBP communicate with Grupo

7  Beta about metering?

8    A.  Today we don't.  It's because we're under the

9  public health order, and no metering is being conducted.

10  When it was being conducted, it was on a daily basis.

11    Q.  Was it more than once a day?

12    A.  Yes, frequently more than once a day.

13    Q.  Okay.  Does Grupo Beta maintain a list of

14  individual asylum seekers at the Port of El Paso?

15    A.  My understanding --

16        MS. SHINNERS:  Objection, scope.

17        Go ahead.

18    A.  My understanding is they do not.

19    Q.  (BY MS. FIELDS)  Okay.  And when CBP

20  communicates with Grupo Beta, does it provide the number

21  of individuals it has capacity to process?

22    A.  Yes, we do.

23    Q.  And then Grupo Beta selects individuals to be

24  processed that day; is that correct?

25    A.  I don't know how they gain the people.  I know



Page 217

1    that there is some coordination.  I know that there is a

2    list, from what Mexican Immigration says.  I think

3    there's a state agency involved with it or that became

4    involved with it over time, that the migrants are

5    heavily involved with maintaining that as well.

6              So I don't know how Mexican Immigration

7    brings the people or selects the people or even if they

8    do select the people, but I do know they're the ones who

9    bring them, that transports them to the Paso del Norte

10   border crossing.

11        Q.  Okay.  So your understanding is that someone in

12   Mexican Immigration, in conjunction with migrants,

13   maintains the wait list?

14        A.  No.  My understanding is that Mexican

15   Immigration is not involved with the list.

16        Q.  And it's only the state agencies in Mexico?

17        A.  My understanding is the state agency has some

18   sort of involvement with that, yes.

19        Q.  Okay.  So when you communicate with grupo (sic)

20   INAMI, they would then have to communicate with the

21   state agency to relay the information --

22              MS. SHINNERS:  Objection --

23        Q.  (BY MS. FIELDS)  -- CBP has provided about --

24              MS. SHINNERS:  Objection -- objection,

25   calls for speculation.

