**FOR PUBLICATION**

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

| | |
|---|---|
| AL OTRO LADO, a California corporation; ABIGAIL DOE; BEATRICE DOE; CAROLINA DOE; DINORA DOE; INGRID DOE; URSULA DOE; VICTORIA DOE; BIANCA DOE; JUAN DOE; ROBERTO DOE; CESAR DOE; MARIA DOE; EMILIANA DOE, individually and on behalf of all others similarly situated, | Nos. 22-55988 22-56036 D.C. No. 3:17-cv-02366-BAS-KSC ORDER AND AMENDED OPINION |
| *Plaintiffs-Appellees / Cross-Appellants*, | |
| v. | |
| EXECUTIVE OFFICE FOR IMMIGRATION REVIEW, | |
| *Appellant / Cross-Appellee*, | |
| and | |
| KRISTI NOEM, Secretary of Homeland Security; PETE FLORES, Acting Commissioner of U.S. Customs and Border Protection (CBP); DIANE | |

2                          AL OTRO LADO V. NOEM

SABATINO, Acting Executive
Assistant Commissioner of CBP's
Office of Field Operations, in their
official capacities,

                    *Defendants-Appellants /*
                    *Cross-Appellees*.

Appeal from the United States District Court
for the Southern District of California
Cynthia A. Bashant, District Judge, Presiding

Argued and Submitted November 28, 2023
San Diego Carter & Keep U.S. Courthouse

Filed October 23, 2024
Amended May 14, 2025

Before: John B. Owens, Michelle T. Friedland, and Ryan
D. Nelson, Circuit Judges.

Order;
Opinion by Judge Friedland;
Dissent by Judge R. Nelson;
Dissent from Order by Judge Bress;
Statement Respecting Denial of Rehearing En Banc by
Judge Bea

# SUMMARY[*]

## Immigration/Injunctions

The panel filed (1) an order amending the opinion filed on October 23, 2024, denying rehearing en banc, and stating that no further petitions may be filed; (2) an amended majority opinion affirming in part and vacating in part the district court's permanent injunction relating to the application of the "Asylum Transit Rule"—which generally required persons traveling through a third country to apply for asylum there before seeking asylum in the United States—to noncitizens turned away at the border between Mexico and the United States under the policy of metering; and (3) an amended dissent.

Under the metering policy, whenever border officials deemed a port of entry to be at capacity, they turned away all people lacking valid travel documents. The district court entered a permanent injunction prohibiting application of the Asylum Transit Rule to members of a class of asylum seekers who were turned away under the metering policy before the Asylum Transit Rule took effect. The court also ordered the Government to unwind past denials of asylum to such individuals.

The panel affirmed the district court's conclusion that the metering policy violated section 706(1) of the Administrative Procedure Act ("APA"), which provides that

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

a court shall "compel agency action unlawfully withheld or unreasonably delayed."

The Government contended that officials lack any duty to noncitizens who have not stepped across the border. Rejecting that argument, the panel held that a noncitizen stopped at the border is eligible to apply for asylum under 8 U.S.C. § 1158(a)(1), which provides that a noncitizen may apply for asylum if she is "physically present in the United States" or "arrives in the United States." The panel concluded that the latter encompasses those stopped at the border, whichever side they are standing on.

The panel also held that such a noncitizen is an "applicant for admission" under 8 U.S.C. § 1225, which sets out the responsibilities of officials with respect to noncitizens at the border. Accordingly, border officials have a mandatory duty to inspect them. The panel explained that the presumption against extraterritorial application of statutes did not change its interpretation of § 1158 or § 1225.

As to § 706(1) of the APA, the panel held that when an agency refuses to accept, in any form, a request that it take a required action, it has "withheld" that duty. Explaining that officials turned away noncitizens without taking any steps to keep track of them or otherwise allow them to open asylum applications, the panel concluded that the metering policy constituted withholding of action, not delay.

The panel wrote that it need not reach Plaintiffs' cross-appeal of the district court's denial of their other claims. The panel also vacated the district court's entry of judgment for Plaintiffs on their due process claim, explaining that when a constitutional holding is unnecessary, the court may simply vacate that portion of the judgment without discussing the merits.

Next, the panel affirmed the district court's entry of classwide declaratory relief. As the Government conceded, precedent foreclosed its argument that classwide declaratory relief is barred by 8 U.S.C. § 1252(f)(1), which provides that "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation" of specified immigration statutes on a classwide basis.

The panel affirmed the grant of negative injunctive relief, which prohibits the Government from applying the Asylum Transit Rule to class members. The panel concluded that this relief was not barred by § 1252(f)(1) because it concerns § 1158, which is not covered by § 1252(f)(1).

The panel concluded that § 1252(f)(1) does not bar the components of the district court's affirmative relief requiring the Government to identify possible class members and notify them about their class membership and the significance of the injunction. However, the panel held that § 1252(f)(1) barred the portion requiring the Government, on its own initiative, to reopen or reconsider a prior decision.

Dissenting, Judge R. Nelson concluded that an alien "arrives in the United States" only when she crosses the border into it and that the majority's interpretation of that phrase twists the statutory language, ignores history, flips multiple presumptions, and ignores common-sense English usage. In doing so, the majority imposes on the federal government—for the first time—an obligation to interview asylum seekers who are still in Mexico.

Judge R. Nelson also wrote that the majority erroneously concluded that the government "withheld" a statutory duty (rather than merely delaying it) by telling aliens to come back later. In his view, the panel should have rejected

Plaintiffs' claims, including those that the majority saved for another day.

Dissenting from the denial of rehearing en banc, Judge Bress, joined by Judges Gould, Callahan, M. Smith, Ikuta, Bennett, R. Nelson, Bade, Collins, Lee, Bumatay, and VanDyke, wrote that the majority's holding violates clear statutory text, precedent, the presumption against extraterritoriality, and long-held understandings limiting application of the asylum and inspection laws to aliens "in" the United States—which aliens in Mexico are not. The panel's serious misreading of the statutory text then led it to an extraordinary result: after extending asylum protections to aliens who are physically in Mexico, the panel upheld an unprecedented district court order severely limiting the Executive Branch's ability to manage the large flow of undocumented aliens trying to enter the United States at overrun ports of entry along the Mexican border.

Respecting the denial of rehearing en banc, Judge Bea, joined by Judges Wallace and O'Scannlain, wrote in agreement with Judge Bress's dissent from denial of rehearing en banc and with Judge R. Nelson's dissent to the panel's majority opinion. Specifically, Judge Bea agreed that the best reading and meaning of § 1158 is that an alien claiming asylum under that statute must be *in* the United States when the claim is made. Judge Bea wrote that he is deeply disappointed that the court did not vote to rehear this problematic decision en banc.

**COUNSEL**

Melissa E. Crow (argued), Center for Gender and Refugee Studies, Washington, D.C.; Neela O. Chakravartula and Anne Dutton, Center for Gender and Refugee Studies, San Francisco, California; Robert Pauw, Center for Gender and Refugee Studies, Seattle, Washington; Baher Azmy (argued) and Angelo Guisado, Center For Constitutional Rights, New York, New York; Rebecca M. Cassler, Southern Poverty Law Center, Immigrant Justice Project, Washington, D.C.; Sarah Rich, Southern Poverty Law Center, Decatur, Georgia; Matthew E. Fenn, Mayer Brown LLP, Chicago, Illinois; Matthew H. Marmolejo, Mayer Brown LLP, Los Angeles, California; Michelle N. Webster and Ori Lev, Mayer Brown LLP, Washington, D.C.; Stephen M. Medlock, Evan Miller, and Rami A. E. Rashmawi, Vinson & Elkins LLP, Washington, D.C.; Katherine M. Goettel, Gianna Borroto, Michelle R. Lapointe, and Suchita Mathur, American Immigration Counsel, Washington, D.C.; for Plaintiffs-Appellees.

Alexander J. Halaska (argued) and Katherine J. Shinners, Senior Litigation Counsel; Jason Wisecup, Assistant United States Attorney; Samuel P. Go, Assistant Director; Erez Reuveni, Counsel; August E. Flentje, Acting Director; William C. Peachey, Director; Office of Immigration Litigation; Yaakov M. Roth, Acting Assistant Attorney General; Brian M. Boynton, Principal Deputy Assistant Attorney General, Civil Division; United States Department of Justice, Washington, D.C.; for Appellant and Defendants-Appellants.

Aileen M. McGrath, Morrison & Forester, San Francisco, California, for Amicus Curiae Amnesty International.

Wendy Wylegala, Kids in Need of Defense, New York, New York; Alexander J. Cooper, Kids in Need of Defense, Los Angeles, California; Jane Liu, Young Center for Immigrant Children's Rights, Chicago, Illinois; Stephany Arzaga, Legal Services for Children, San Francisco, California; Mary T. Ross, Public Counsel, Los Angeles, California; for Amici Curiae Kids in Need of Defense, Legal Services for Children, Inc., Public Counsel, and The Young Center for Immigrant Children's Rights.

Katrina Eiland, Stephen Kang, Spencer E. Wittmann Amdur, Cody Wofsy, and Oscar S. Roman, American Civil Liberties Union, San Francisco, California; Omar Jadwat, Lee Gelernt, and Anand Balakrishnan, American Civil Liberties Union, New York, New York; for Amici Curiae American Civil Liberties Union, ACLU of Southern California, ACLU of Northern California; and Northwest Immigrant Rights Project.

Sabrineh Ardalan and Tiffany J. Lieu, Supervising Attorneys; Sarah Leadem and Simone Wallk, Supervised Law Students; Harvard Immigration and Refugee Clinical Program, Cambridge, Massachusetts; Sarah R. Sherman-Stokes, Supervising Attorney; Catherine Kannam, Supervised Law Student; Immigrants' Rights and Human Trafficking Program, Boston University School of Law, Boston, Massachusetts; for Amici Curiae International Refugee Law Scholars.

Anne Aufhauser, Sarah F. Warren, and Alison Goldman, Fried Frank Harris Shriver & Jacobson LLP, New York, New York, for Amici Curiae Haitian Bridge Alliance, Ira Kurzban, and Irwin Stotzky.

Raechel K. Kummer, Morgan Lewis & Bockius LLP, Washington, D.C.; Matthew C. McDonough and Andrew

Savage, Morgan Lewis & Bockius LLP, Boston, Massachusetts; for Amici Curiae Immigration Law Professors.

---

## ORDER

The opinion and dissent filed on October 23, 2024, and published at 120 F.4th 606, are amended. The amended opinion and amended dissent are filed concurrently with this order.

A judge of this court sua sponte requested a vote on whether to rehear this case en banc. A vote was taken, and the matter failed to receive a majority of the votes of the nonrecused active judges in favor of en banc consideration. *See* Fed. R. App. P. 40. Rehearing en banc is **DENIED**. Judge Bress's dissent from the denial of en banc rehearing and Judge Bea's separate statement respecting the denial of en banc rehearing are filed concurrently herewith. No further petitions for rehearing or rehearing en banc may be filed.

**OPINION**

FRIEDLAND, Circuit Judge:

In 2016, Customs and Border Protection adopted a policy of "metering" asylum seekers at ports of entry along the border between Mexico and the United States.  Under that policy, whenever border officials deemed a port of entry to be at capacity, they turned away all people lacking valid travel documents.  Many of those people intended to seek asylum in the United States but were not allowed to even apply.  They could try to come back some other time, but there was no guarantee that they would ever be processed.

The immigrant rights group Al Otro Lado and various individuals filed suit in federal district court challenging that metering policy on behalf of classes of asylum seekers. While the litigation was ongoing, the Government adopted a regulation, known as the "Asylum Transit Rule," that generally required persons traveling through a third country to apply for asylum there before seeking asylum in the United States.  For many asylum seekers who already had been turned away under the metering policy, the Asylum Transit Rule effectively barred them from qualifying for asylum if they were ever able to apply—even though they would not have been subject to the Rule if they had been processed when they first presented themselves at the border.

The district court ultimately declared the metering policy to be unlawful.  As part of the remedy, the district court enjoined the Government from applying the Asylum Transit Rule to noncitizens turned away under the metering policy before the Rule's adoption.  The court also ordered the

Government to unwind past denials of asylum to such individuals.

We must evaluate the lawfulness of the metering policy to decide whether to uphold the district court's remedy, even though the Government rescinded the metering policy years ago. We largely affirm.

**I.**

Under federal law, asylum protects noncitizens who face persecution in their home countries because of their race, religion, nationality, membership in a particular social group, or political opinion. 8 U.S.C. §§ 1158(b)(1)(A), 1101(a)(42)(A). A noncitizen is eligible to apply for asylum if she is "physically present in the United States" or if she "arrives in the United States." *Id.* § 1158(a)(1).

People seeking to lawfully enter the United States via the southern border generally must present themselves for processing at a designated port of entry. 8 C.F.R. § 235.1(a). By statute, immigration officials are required to inspect all noncitizens "present in the United States who [have] not been admitted," noncitizens who "arrive[] in the United States," and noncitizens "otherwise seeking admission." 8 U.S.C. § 1225(a)(1), (3). If, during inspection at a port of entry, a noncitizen expresses an intent to apply for asylum or a fear of persecution, the inspecting border official must refer the noncitizen to an asylum officer for an interview to determine whether the noncitizen has a credible fear of persecution. *Id.* § 1225(b)(1)(A)(ii), (B). Otherwise, and if the noncitizen is inadmissible within the meaning of the statute, the official shall order her removed "without further hearing or review." *Id.* § 1225(b)(1)(A)(i).

Until 2016, noncitizens seeking asylum at ports of entry on the U.S.-Mexico border would cross over onto U.S. soil and then wait in line to be inspected.  In 2016, citing capacity constraints, Customs and Border Protection ("CBP") officials began taking steps to prevent asylum seekers from entering port buildings or otherwise joining an inspection queue.  In November 2016, the Department of Homeland Security ("DHS"), which includes CBP, approved "metering," allowing border officials who deemed a port of entry to be at capacity to turn away all people lacking valid travel documents.  CBP gave ports of entry flexibility to implement metering based on "what [worked] best operationally and whether it [was] required on any given day or [at] any specific location."  At some ports of entry, people were stepping onto U.S. soil before being turned back.  CBP soon determined that it could not send such people back to Mexico without processing them, so it directed officials to implement metering at "the actual boundary line."  Officials standing on the U.S. side of the border therefore stopped people right before they crossed the border.

The Government formalized its metering policy in the spring of 2018.  In an April 2018 guidance memorandum, CBP authorized border officials to "meter the flow of travelers at the land border" based on "the port's processing capacity."  The memorandum specifically permitted officials to "establish and operate physical access controls at the borderline."  It further stated that officers "may not provide tickets or appointments or otherwise schedule any person for entry" and that "[o]nce a traveler is in the United States, he or she must be fully processed."  The DHS Secretary publicly explained that the metering policy meant "that if we don't have the resources to let them in on a particular day, they are going to have to come back."  A June 2018 guidance

memorandum from the DHS Secretary stated that the agency was prioritizing other components of its mission, such as national security and trade, above "[p]rocessing persons without documents required by law for admission arriving at the Southwest Border."

Due to the metering policy, asylum seekers began to accumulate on the Mexico side of the border. Many camped near the bridges at ports of entry. In an attempt to impose some order, Mexican government officials and nonprofits made lists of people waiting to be processed. U.S. border officials sometimes coordinated informally with those keeping lists, but they did not keep lists of their own.

Asylum seekers waited in Mexico for days, weeks, or months. Many were subject to persecution and crime, and they often lacked adequate food and shelter. Some were murdered in Mexico while waiting for an opportunity to be processed by U.S. officials. Some attempted to reach U.S. soil by other means, such as running down vehicle lanes at ports of entry, so that they could apply for asylum. Others, including young children, tried to swim across the Rio Grande River and drowned.

The immigrant rights organization Al Otro Lado, Inc., and thirteen individual asylum seekers (collectively "Plaintiffs") challenged the lawfulness of the metering policy in a putative class action in the United States District Court for the Southern District of California. They named as defendants the DHS Secretary, the CBP Commissioner, and the Executive Assistant Commissioner of CBP's Office of Field Operations (collectively "the Government").

Plaintiffs asserted five claims, each presenting a different legal theory for why the metering policy was unlawful. One claim alleged that metering violated § 706(1) of the

Administrative Procedure Act ("APA"), which prohibits agencies from unlawfully withholding or unreasonably delaying action that they are required by law to take. Another claim alleged that the Government violated § 706(2) of the APA by acting "in excess of [its] statutorily prescribed authority." Plaintiffs also alleged that metering violated the Immigration and Nationality Act ("INA"), the Alien Tort Statute, and the Due Process Clause of the Fifth Amendment. Plaintiffs sought the same relief for each claim: classwide declaratory and injunctive relief ending the Government's metering policy.[1]

The Government moved to dismiss the Complaint, and the district court denied the motion in relevant part. *Al Otro Lado, Inc. v. McAleenan*, 394 F. Supp. 3d 1168 (S.D. Cal. 2019).

At around the same time, DHS and the Department of Justice jointly adopted the Asylum Transit Rule as an interim final rule. That Rule rendered ineligible for asylum nearly any noncitizen "who enter[ed], attempt[ed] to enter, or arrive[d] in the United States across the southern land border on or after July 16, 2019, after transiting through at least one country" unless she first applied for protection in that other country and received a final denial. *Asylum Eligibility and Procedural Modifications*, 84 Fed. Reg. 33829, 33843 (July 16, 2019), *codified at* 8 C.F.R. § 208.13(c)(4) (2019).

---

[1] In addition to challenging the metering policy, Plaintiffs alleged that border officials used misrepresentations, threats, and coercion to deny noncitizens the opportunity to seek asylum. On appeal, the parties do not raise issues related to those other allegations and instead focus only on the formalized metering policy. We therefore also focus only on that policy.

Plaintiffs moved for provisional class certification and for a preliminary injunction blocking application of the Asylum Transit Rule to the provisional class.  They asserted that, without an injunction, tens of thousands of people who had been turned away under the metering policy would be denied asylum under the Asylum Transit Rule.  Plaintiffs argued that people unable to seek asylum because of the metering policy should not be subjected to asylum rules that they would not have faced had they been processed when they first presented themselves at the border.  The district court provisionally certified a "Preliminary Injunction Class" ("P.I. class"), represented by named Plaintiff Roberto Doe, consisting of "all non-Mexican asylum-seekers who were unable to make a direct asylum claim at a U.S. [port of entry] before July 16, 2019[,] because of the U.S. Government's metering policy, and who continue to seek access to the U.S. asylum process."  The court granted the requested preliminary injunction as to that class.

The court later clarified that the preliminary injunction required the Government to reopen past denials of class members' asylum applications that were based on the Asylum Transit Rule.  The court also clarified that the preliminary injunction bound the Executive Office of Immigration Review ("EOIR"), which is the division of the Department of Justice that includes immigration judges ("IJs") and the Board of Immigration Appeals ("BIA"). Although EOIR was not a named defendant, the court held that EOIR was bound by the injunction because it operated in concert with the named defendants.[2]

---

[2] The Government filed two interlocutory appeals regarding the preliminary injunction.  The first appeal challenged the district court's

A final version of the Asylum Transit Rule took effect in January 2021. *See Asylum Eligibility and Procedural Modifications*, 85 Fed. Reg. 82260 (Dec. 17, 2020). The accompanying statement in the Federal Register "clari[fied]" that DHS and the Department of Justice intended the Rule to apply to noncitizens subject to metering prior to the Rule's promulgation. *Id.* at 82268 & n.22. The district court entered a temporary restraining order against application of the Final Rule to members of the P.I. class. The parties stipulated to the conversion of that temporary restraining order into a second preliminary injunction.

As the litigation progressed, the district court certified an additional class consisting of "all noncitizens who seek or will seek to access the U.S. asylum process by presenting themselves at a Class A [port of entry] on the U.S.-Mexico border, and were or will be denied access to the U.S. asylum process by or at the instruction of [CBP] officials on or after January 1, 2016."

The parties filed cross-motions for summary judgment. The district court granted summary judgment in favor of the Government on the INA and Alien Tort Statute claims. It granted summary judgment in favor of Plaintiffs on the APA

---

initial entry of the preliminary injunction. Our court denied a stay pending appeal, noting without deciding that Plaintiffs' statutory analysis was "likely correct." *Al Otro Lado v. Wolf*, 952 F.3d 999, 1013-16 (9th Cir. 2020). The second appeal challenged the district court's order clarifying the scope of the preliminary injunction. We again denied a stay pending appeal. Order, *Al Otro Lado v. Wolf*, No. 20-56287 (9th Cir. Jan. 14, 2021), ECF No. 30. Both interlocutory appeals were later dismissed as moot when the district court entered final judgment. *Al Otro Lado v. Wolf*, No. 19-56417, 2022 WL 15399693 (9th Cir. Sept. 20, 2022); *Al Otro Lado v. Wolf*, No. 20-56287, 2022 WL 17369223 (9th Cir. Sept. 20, 2022).

§ 706(1) and due process claims and concluded that it did not need to reach the APA § 706(2) claim.  It then ordered the parties to brief the appropriate remedy.

Shortly thereafter, in November 2021, CBP rescinded the metering policy.  CBP issued new guidance stating that "[a]bsent a [port of entry] closure, officers . . . may not instruct travelers that they must return to the [port of entry] at a later time."

About a year after the district court ruled on the parties' summary judgment motions, it entered declaratory and injunctive relief in favor of Plaintiffs and entered final judgment.  The declaratory relief stated that the "denial of inspection or asylum processing to [noncitizens] who have not been admitted or paroled, and who are in the process of arriving in the United States at Class A Ports of Entry, is unlawful regardless of the purported justification for doing so."

The court entered permanent injunctive relief as to the P.I. class.  The permanent injunction replaced the two preliminary injunctions and similarly prohibited the application of the Asylum Transit Rule to members of the P.I. class.  The district court's permanent injunction order further clarified the scope of the Government's obligations under the injunction by summarizing (and largely approving) the Government's ongoing efforts to comply with the preliminary injunctions.  Those efforts included identifying possible class members, notifying them of the injunction, and reopening and reconsidering P.I. class members' asylum denials that were based on the Asylum Transit Rule.

The parties timely cross-appealed.  We heard oral argument at the end of November 2023.  The parties then

engaged in six months of mediation, but their efforts to reach a settlement ultimately failed.

## II.

The district court exercised jurisdiction under 28 U.S.C. § 1331. We have jurisdiction over this appeal under 28 U.S.C. § 1291.**[3]**

"We review legal questions de novo." *Romero v. Garland*, 7 F.4th 838, 840 (9th Cir. 2021). We review the scope of a permanent injunction for abuse of discretion. *United States v. Washington*, 853 F.3d 946, 962 (9th Cir. 2017). "A district court abuses its discretion when it makes an error of law." *Native Ecosystems Council v. Marten*, 883 F.3d 783, 789 (9th Cir. 2018).

## III.

Section 706(1) of the Administrative Procedure Act provides that a court shall "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). A claim under § 706(1) can reach only "discrete agency action" that an agency is "required to take." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (emphasis omitted). The Government acknowledges that border officials have a mandatory duty to process noncitizens, including allowing them to apply for asylum. But the

---

[3] The rescission of the metering policy does not render this case moot because Plaintiffs sought (and the district court entered) equitable relief to ameliorate past and present harms stemming from the policy, and the relief ordered imposes ongoing obligations on the Government. Because that relief could be modified, it is possible for us to "grant any effectual relief whatever to the prevailing party," preventing this appeal from being moot. *Edmo v. Corizon, Inc.*, 935 F.3d 757, 782 (9th Cir. 2019) (quoting *Shell Offshore Inc. v. Greenpeace, Inc.*, 815 F.3d 623, 628 (9th Cir. 2016)).

Government contends that the metering policy did not violate § 706(1) because border officials lack any duty to noncitizens who have not stepped across the border. The Government also contends that even if the officials' mandatory duty extends to such noncitizens, the metering policy did not constitute withholding of that duty within the meaning of § 706(1).

We disagree on both fronts.

**A.**

The extent of the Government's duty turns on two interacting statutes. One statute, 8 U.S.C. § 1158, defines the rights of noncitizens to apply for asylum. Another statute, 8 U.S.C. § 1225, governs the obligations of border officials to process noncitizens. We begin with the statute defining the right to apply for asylum because, as a practical matter, the Government's obligation to process a noncitizen stopped at the border only matters here if that noncitizen is eligible to apply for asylum. We agree with Plaintiffs that a noncitizen stopped at the border is eligible to apply for asylum under § 1158. We next conclude that a border official must process such a noncitizen under § 1225. We reject the Government's contrary interpretations, including its argument based on the presumption that statutes do not apply extraterritorially.

**1.**

The right of a noncitizen to apply for asylum is codified at 8 U.S.C. § 1158(a)(1), which states that:

> Any alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of

> > arrival and including an alien who is brought
> > to the United States after having been
> > interdicted in international or United States
> > waters), irrespective of such alien's status,
> > may apply for asylum.

The parties agree that a noncitizen stopped by officials right
at the border is not yet "physically present in the United
States." They disagree about whether such a person is
covered by the language "arrives in the United States."

In the Government's view, a noncitizen stopped at the
border is not eligible to apply for asylum because she is not
covered by the phrase "arrives in the United States." The
Government's position is that one only "arrives in the United
States" upon stepping across the border.

The Government improperly reads a fragment of
statutory text in isolation. "Statutory language 'cannot be
construed in a vacuum. It is a fundamental canon of
statutory construction that the words of a statute must be read
in their context and with a view to their place in the overall
statutory scheme.'" *Sturgeon v. Frost*, 577 U.S. 424, 438
(2016) (quoting *Roberts v. Sea-Land Servs., Inc.*, 566 U.S.
93, 101 (2012)). And another "cardinal principle of statutory
construction [is] that we must 'give effect, if possible, to
every clause and word of a statute.'"[4]   *Williams v. Taylor*,

---

[4] The dissent criticizes our consideration of these commonsense canons
of statutory interpretation as "skip[ping]" a step, Dissent at 52, but until
we look at the language of the provision—the whole provision—and
figure out what it means, we cannot simply announce that Congress
"says in [the] statute what it means and means in [the] statute what it
says," *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992). Contrary
to the dissent, Dissent at 52 n.1, our reliance on context here neither

529 U.S. 362, 404 (2000) (quoting *United States v. Menasche*, 348 U.S. 528, 538-39 (1955)). Section 1158(a)(1) covers a noncitizen who is *either* "physically present in the United States *or* who arrives in the United States" (emphasis added).**[5]** We therefore must endeavor to give the phrase "arrives in the United States" a meaning that is not completely subsumed within the phrase "physically present in the United States." *See Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 174 (1993) (refusing to adopt an interpretation of the word "return" that would make the word "deport" redundant in another INA statute that uses both words). The Government's interpretation fails to do so because it reads the phrase "arrives in the United States" to

---

replaces the statute's ordinary meaning nor imposes a meaning it cannot bear. *See King v. Burwell*, 576 U.S. 473, 486 (2015) ("[O]ftentimes the 'meaning—or ambiguity—of certain words or phrases may only become evident when placed in context.'" (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000))).

[5] The dissent engages in a corpus linguistics analysis even though no party or amicus made a corpus linguistics argument in this case. Whether or not this could be a helpful interpretive methodology, the relevant question to ask the database would be how the phrase "physically present in the United States or who arrives in the United States" has been used. Because the corpus linguistics database tool is incapable of performing this search, it has limited utility in this case. The dissent's narrow focus on the two words "arrives in," Dissent at 53-58, wrenches these words out of the context in which they are used in the statute, *see Sturgeon*, 577 U.S. at 438; *Abuelhawa v. United States*, 556 U.S. 816, 819 (2009) ("[S]tatutes are not read as a collection of isolated phrases."). We also note that the database the dissent consults does not contain statutes, which would seem to limit any value it has for determining how Congress uses particular terms. *See, e.g., Peter v. Nantkwest, Inc.*, 589 U.S. 23, 32 (2019) (looking to how two terms were used "across various statutes" to indicate how "Congress understands" the terms).

apply only to those who are also "physically present in the United States."**[6]**

Considering the provision's "text and context," *Pulsifer v. United States*, 601 U.S. 124, 141 (2024), we conclude that it is possible to give nonredundant meaning to those two categories. The phrase "physically present in the United States" encompasses noncitizens within our borders, and the phrase "arrives in the United States" encompasses those who encounter officials at the border, whichever side of the border they are standing on. 8 U.S.C. § 1158(a)(1). The two categories overlap, because one might be both physically present in the United States (that is, standing on U.S. soil) while presenting oneself to a border official at a port of entry.   But each category includes people not included in the other, such that every clause and word of the provision has meaning.

Start with the text. The statute refers to any noncitizen "who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters)." *Id.* Although the statute does not define what it means to "arrive[] in the United States," that phrase plainly pertains to the border. To "arrive" means "to reach a destination." *Arrive*, Merriam-

---

[6] The dissent all but concedes that the Government's reading renders the phrase "arrives in the United States" redundant with the phrase "physically present in the United States," calling that redundancy a "belt-and-suspenders approach." Dissent at 62.   The dissent notes that "[s]ometimes the better overall reading of the statute contains some redundancy." *Id.* at 63 (quoting *Barton v. Barr*, 590 U.S. 222, 239 (2020)).   But the Government's reading does not merely create "some redundancy" in the statutory scheme.   It creates *total* redundancy between two phrases that Congress enacted side by side.

Webster's Collegiate Dictionary (10th ed. 1996). For a person coming to the United States to seek asylum, the relevant destination is the U.S. border, where she can speak with a border official. A person who presents herself to an official at the border has therefore reached her destination—she has "arrive[d]." Although it is possible to imagine that the prepositional phrase "in the United States" means that she must both present herself to a border official *and* get one of her feet onto U.S. soil, that is not the best reading of the phrase. The lengthy parenthetical that follows the phrase "arrives in the United States" specifies that the phrase covers those "at a designated port of arrival." A noncitizen who presents herself to a border official at a port of entry has "arrive[d] in the United States . . . at a designated port of arrival," whether she is standing just at the edge of the port of entry or somewhere within it.[7]

Our construction of the statute's language also comports with the larger context of the immigration system. In particular, it avoids creating a "perverse incentive to enter at an unlawful rather than a lawful location." *DHS v. Thuraissigiam*, 591 U.S. 103, 140 (2020); *see also* 8 C.F.R. § 235.1(a) ("Application to lawfully enter the United States shall be made in person to an immigration officer at a U.S.

---

[7] The dissent's corpus linguistics examples actually illustrate how the phrases surrounding "arrives in" provide useful context to help understand its meaning. For example, the dissent relies on the phrase "greeted with a ticker-tape parade" to infer that "arrives in New York" means that Nelson Mandela must be "inside the Empire State" because he is "parad[ing] through New York." Dissent at 54-55. But imagine if the sentence instead read "arrives in New York at Ellis Island." That would describe a person who had reached Ellis Island, even if he might technically be standing on the New Jersey side. Similarly, here, the phrase "at a designated port of arrival" provides important context to understand the meaning of "arrives in the United States."

port-of-entry when the port is open for inspection."). Under the Government's reading, an asylum seeker who knows she will be turned away at a port of entry before being allowed to apply for asylum may well be better off circumventing the official channels for entering the United States. If she manages to surreptitiously cross the border, she will be able to apply for asylum. We do not think Congress would have created that incentive.

The Government proposes an alternative theory for why § 1158(a)(1) refers to both a noncitizen "physically present in the United States" and a noncitizen who "arrives in the United States." It argues that the language "arrives in the United States" is necessary to address the "entry fiction," a concept in immigration law that deems noncitizens physically within the United States, but not legally admitted, to be outside the United States for some legal purposes. *See Lin Guo Xi v. INS*, 298 F.3d 832, 837 (9th Cir. 2002). For instance, the Supreme Court has explained that noncitizens "who arrive at ports of entry—even those paroled elsewhere in the country for years pending removal—are 'treated' for due process purposes 'as if stopped at the border.'" *Thuraissigiam*, 591 U.S. at 139 (quoting *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 215 (1953)). To give another example, the Supreme Court once held that a woman paroled into the United States pending a determination on her assertion of U.S. citizenship was not "within the United States" within the meaning of an INA provision that would have allowed the Attorney General to withhold her deportation. *Leng May Ma v. Barber*, 357 U.S. 185, 190 (1958). According to the Government, the entry fiction means that some noncitizens, such as those who have just crossed the border into the United States, are not "physically present in the United States," so Congress added

the phrase "arrives in the United States" to allow them to apply for asylum.

The Government's explanation is unpersuasive. Other language in § 1158(a)(1) already makes clear that the entry fiction does not interfere with a noncitizen's right to apply for asylum. The statute grants that right to noncitizens "*physically* present in the United States." *Id.* (emphasis added). The entry fiction means that certain noncitizens who are physically present are nonetheless not legally present, but it does not change the fact that they are physically present. *See, e.g.*, *Leng May Ma*, 357 U.S. at 188 (stating that "the detention of an alien in custody pending determination of his admissibility does not *legally* constitute an entry [into the United States] though the alien is *physically* within the United States" (emphasis added)). By specifying "physically present," Congress instructed courts not to apply the entry fiction when interpreting § 1158(a)(1). Moreover, both the "physically present" and "arrives in" categories are modified by the phrase "irrespective of such alien's status." *Id.* The entry fiction applies only to those who lack lawful immigration "status." *See, e.g.*, *Leng May Ma*, 357 U.S. at 190 (explaining that because parole into the United States does not "affect an alien's status," a paroled person was still not "within the United States" under the entry fiction). It would have been very strange for Congress to define two categories essentially based on immigration status and then modify both with the phrase "irrespective of such alien's status." Given those other features of the statutory text, there is no reason to think that the phrase "arrives in the United States" serves the purpose suggested by the Government.

Furthermore, if the rest of the statutory language in § 1158(a)(1) were insufficient to ensure that someone

potentially subject to the entry fiction can apply for asylum, the phrase "arrives in the United States" would not do so either. The Government contends that a person standing on U.S. soil at a port of entry, waiting to be inspected by an immigration officer, is not yet "physically present in the United States" because of the entry fiction. According to the Government, the phrase "arrives in the United States" fills that gap. But if we thought that the entry fiction required us to conclude that such a person on U.S. soil was not "physically present *in the United States*," then to be consistent we would also have to conclude that she had not yet "arrive[d] *in the United States*," either. The Government's interpretation therefore does not make sense as a way to address the entry fiction.

We note that our interpretation of § 1158 is not breaking new ground. A prior version of § 1158 provided, "The Attorney General shall establish a procedure for an alien physically present in the United States or at a land border or port of entry, irrespective of such alien's status, to apply for asylum." 8 U.S.C. § 1158(a) (1980).[8] It is indisputable that a noncitizen stopped at a border is "at a land border" whether or not they have stepped across. So our interpretation of the current "arrives in" category does not radically expand the right to apply for asylum—it gives that category essentially the same scope as the previous "at a land border" category.

---

[8] The dissent suggests that this prior version of § 1158 contained the phrase "arrives at," Dissent at 52-53, but it did not. The dissent also suggests that the italicized part of the phrase "an alien physically present in the United States or *at a land border* or port of entry" (emphasis added) somehow "compel[s] th[e] conclusion" that it was only discussing people "in the United States." *Id.* at 66. That not only ignores the meaning of "or," but it also makes the entire italicized phrase surplusage—far from compelling the meaning the dissent offers.

Indeed, the Government's reading would reflect a radical contraction of the right to apply for asylum because it would give the Executive Branch vast discretion to prevent people from applying by blocking them at the border.**[9]**

The Government contends that interpreting § 1158 to apply to persons stopped right before the border misses the distinction between asylum under § 1158 and refugee resettlement under 8 U.S.C. § 1157. Section 1157 empowers

---

[9] Congress adopted the current text of § 1158(a)(1) in a 1996 omnibus bill. Omnibus Consolidated Appropriations Act, 1997, Pub. L. No. 104-208, tit. VI, subtit. A, § 604, 110 Stat. 3009, 3009-690 to -694 (1996). The dissent argues that "the [amendment] history suggests the opposite" of our interpretation. Dissent at 64 (alteration in original) (quoting *Trump v. Hawaii*, 585 U.S. 667, 692 (2018)). But, as the dissent notes, Congress "amend[ed] the [INA] in dozens of important but technical ways." *Id.* at 65 (alterations in original) (quoting *Renteria-Gonzalez v. INS*, 322 F.3d 804, 809 (5th Cir. 2002)). This situation is therefore unlike *Trump v. Hawaii*, where Congress "borrow[ed] 'nearly verbatim' from the pre-existing statute," aside from "one critical alteration." 585 U.S. at 692. Nor is this case like *Stone v. INS*, 514 U.S. 386, 397 (1995), where Congress amended the INA to add a brand-new exception to the Hobbs Act procedures.

We have recognized that "[t]he mere fact of an amendment itself does not [always] indicate that the legislature intended to change a law." *United States v. Pepe*, 81 F.4th 961, 978 (9th Cir. 2023) (alterations in original) (quoting *Callejas v. McMahon*, 750 F.2d 729, 731 (9th Cir. 1985)), *cert. denied*, 144 S. Ct. 2565 (2024). Indeed, at least one part of the legislative history indicates that the revisions to § 1158 were not understood to substantively change the scope of the right to apply for asylum. A committee report described the new language as "provid[ing] that any alien who is physically present in the United States or at the border of the United States, regardless of status, is eligible to apply for asylum." H.R. Rep. No. 104-469, pt. 1, at 259 (1996). In other words, the report understood the new phrase, "arrives in the United States," to be essentially equivalent to the old phrase, "at a land border or port of entry."

the Attorney General to "admit any refugee who is not firmly resettled in any foreign country" (subject to numerical limitations and other restrictions). 8 U.S.C. § 1157(c)(1). In *INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987), the Supreme Court explained that § 1157 "governs the admission of refugees who seek admission from foreign countries" while § 1158 "sets out the process by which refugees currently in the United States may be granted asylum." *Id.* at 433. We made a similar statement in *Yang v. INS*, 79 F.3d. 932 (9th Cir. 1996), where we explained that § 1157 "establishes the procedure by which an alien *not* present in the United States may apply for entry as a refugee" and that § 1158 "sets out procedures for granting asylum to refugees *within* the United States." *Id.* at 938. Relying on those statements, the Government contends that the noncitizens stopped at the border under the metering policy remained within the ambit of § 1157 because they were still in Mexico, and that they therefore did not fall within § 1158.

*Cardoza-Fonseca* and *Yang* do not support the Government's position. Neither case concerned people presenting themselves at the border. The sentences seized upon by the Government were general background summaries of § 1157 and § 1158. Nothing about the analysis in those cases suggested that either the Supreme Court or our court was trying to define which statute would apply to someone seeking protection at the border. Moreover, both cases were referencing the prior version of § 1158, which covered both noncitizens "physically present in the United States" and noncitizens "at a land border or port of entry." *Cardoza-Fonseca*, 480 U.S. at 427; *Yang*, 79 F.3d. at 934 & n.2. The cases' willingness to gloss § 1158 the way they did indicates that someone "at a land border" is "in the United States" for purposes of asylum. That is consistent with our

conclusion that someone "arrives in the United States" under the current version of § 1158 when she encounters officials at a land border.[10]

We therefore conclude that a noncitizen stopped by U.S. officials at the border is eligible to apply for asylum under § 1158(a)(1).

**2.**

The responsibilities of officials with respect to noncitizens at the border are set out in 8 U.S.C. § 1225. That section defines as an "applicant for admission" any noncitizen "present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters)." *Id.* § 1225(a)(1). Border officials must "inspect[]" such applicants for admission—essentially, process them to determine their admissibility. *Id.* § 1225(a)(3). If, during inspection, a noncitizen "indicates either an intention to apply for asylum . . . or a fear of persecution, the officer shall refer" her for an asylum interview. *Id.* § 1225(b)(1)(A)(ii).

The definition of an "applicant for admission" in § 1225(a)(1) is nearly identical to the language of § 1158(a)(1). The minor ways in which the relevant language of § 1225(a)(1) differs from § 1158(a)(1) all relate

---

[10] The dissent argues that the Fourth Circuit "disagrees" with our conclusion. Dissent at 66 n.10 (citing *Cela v. Garland*, 75 F.4th 355, 361 n.9 (4th Cir. 2023)). But just as in *Cardoza-Fonseca* and *Yang*, the Fourth Circuit in *Cela* provided background on the asylum and refugee statutes; it did not address whether § 1158 applies to someone stopped at the border. *Cela*'s discussion of the relationship between the asylum and refugee statutes is entirely consistent with our holding here.

to the fact that § 1225(a)(1) is solely about people seeking admission to the country. Accordingly, for the same reasons we just articulated regarding § 1158(a)(1), we conclude that a noncitizen stopped by officials at the border is an "applicant for admission" under § 1225(a)(1) because she "arrives in the United States." That is consistent with our prior en banc holding that § 1225(a)(1) "ensures that all immigrants who have not been lawfully admitted, regardless of their physical presence in the country, are . . . 'applicant[s] for admission.'" *Torres v. Barr*, 976 F.3d 918, 928 (9th Cir. 2020) (en banc) (quoting 8 U.S.C. § 1225(a)(1)).

Our conclusion comports with the Government's own reference in a regulation to an "applicant for admission coming *or attempting to come* into the United States at a port-of-entry." 8 C.F.R. § 1.2 (emphasis added). Here, the Government contends that a person "attempting to come into the United States" cannot be an applicant for admission because she has not yet succeeded in crossing the border. But that would mean its own regulation erroneously refers to just such a person: "an applicant for admission . . . attempting to come into the United States." *Id*. It may be that the Government was wrong when it drafted its regulation and that it is right today, but we "may consider the consistency of an agency's views when we weigh the persuasiveness of any interpretation it proffers in court." *Bittner v. United States*, 598 U.S. 85, 97 (2023). We think that the Government had it right when it drafted its regulation, before the question became the subject of this litigation.

Our reading of § 1225(a)(1) is bolstered by the surrounding statutory text, which indicates that Congress did not intend to impose strict limits on which noncitizens at the

border must be inspected. The statute requires inspection not
only of "applicants for admission" but also of noncitizens
"otherwise seeking admission or readmission to or transit
through the United States." 8 U.S.C. § 1225(a)(3). The
statute also provides that even a stowaway on a ship, who
"[i]n no case may . . . be considered an applicant for
admission," is subject to "inspection by an immigration
officer" and must be referred for an asylum interview if the
stowaway states an intention to apply for asylum or a fear of
persecution. *Id.* § 1225(a)(2). Given that Congress took
care to provide for the inspection of both the catch-all
category of noncitizens "otherwise seeking admission" and
stowaways, we are confident that Congress did not define
the category of "applicant[s] for admission" to exclude those
stopped by U.S. officials right before the border.

Because noncitizens stopped right before the border are
"applicant[s] for admission" under § 1225(a)(1), border
officials have a mandatory duty to inspect them under
§ 1225(a)(3).

**3.**

The presumption against extraterritorial application of
statutes does not change our interpretation of § 1158 or
§ 1225. The presumption against extraterritoriality is "a
canon of statutory construction" that "[a]bsent clearly
expressed congressional intent to the contrary, federal laws
will be construed to have only domestic application." *RJR
Nabisco v. Eur. Cmty.*, 579 U.S. 325, 335 (2016) (citing
*Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255
(2010)). The Supreme Court has set out "a two-step
framework for analyzing extraterritoriality issues." *Id.* at
337. At the first step, a court must ask whether the statute in
question "gives a clear, affirmative indication that it applies

extraterritorially." *Id.* If so, the presumption is rebutted, and
the scope of the statute's extraterritorial application "turns
on the limits Congress has (or has not) imposed" in the
statutory text. *Id.* at 337-38. If not, then the court must
proceed to the second step and ask if the case at hand
involves a "permissible domestic application" of the statute.
*Id.* at 337. For example, in *Morrison*, the Supreme Court
first determined that there was no affirmative indication in
the Securities Exchange Act of 1934 that § 10(b) applied
extraterritorially. 561 U.S. at 265. At the second step, the
Court determined that the focus of § 10(b) was securities
transactions in the United States. *Id.* at 266. Because all of
the alleged transactions in *Morrison* undisputedly occurred
on foreign exchanges, the Supreme Court concluded that the
case did not involve a permissible domestic application of
the Exchange Act. *Id.* at 266-67, 273.

The presumption against extraterritoriality makes sense
to consider if a litigant is asking a court to apply a federal
statute to conduct occurring outside the United States. But
the issue presented here is whether a noncitizen turned away
by U.S. officials at the border had "arrive[d] in the United
States." In other words, the entire question in this case is
whether the U.S. officials' conduct of standing on the U.S.
side of the border and stopping people right before they
crossed the border is foreign or domestic. The presumption
that "federal laws will be construed to have only domestic
application," *RJR Nabisco*, 579 U.S. at 335, just begs the
question: is the conduct at issue in this case a domestic
application? Because we hold that the answer is "yes," the
presumption against extraterritoriality has no role to play
here. The dissent takes the position that the answer is "no,"
and therefore contends that the presumption against
extraterritoriality comes into play. Either way, the

presumption against extraterritoriality does not help address the threshold issue that is the core of this case: has a noncitizen encountering U.S. officials at the border "arrive[d] in the United States"?  As an illustration from another context, if the dispute in *Morrison* had been whether the exchange on which the alleged transactions took place were a foreign or a domestic exchange, the presumption against extraterritoriality would have been of no help.

## B.

Section 706(1) of the APA provides that "[t]he reviewing court shall . . . compel agency action unlawfully withheld or unreasonably delayed."    5 U.S.C. § 706(1).    The Government offers two theories why, even if § 1158 and § 1225 create a mandatory duty to inspect noncitizens stopped at the border, the metering policy did not withhold that required action within the meaning of § 706(1).

First, the Government contends that the duty was not withheld because the metering policy did not result in universal denial of the opportunity to apply for asylum, given that some noncitizens were processed in some instances.   But even if the Government processed other noncitizens, the district court certified classes of people who were not processed.   The Government does not argue on appeal that class certification was inappropriate, and whether other people were processed does not affect whether the Government fulfilled its obligations to the class members here.

Second, the Government argues that the duty to inspect was merely delayed as to each person, not withheld.   The distinction between agency withholding and delay is important.   If an agency withholds a required action, it violates § 706(1) regardless of its reason for doing so.   But

if an agency delays a required action, it violates § 706(1) only if the delay is "unreasonabl[e]." *Id.* The reasonableness of any delay is a fact-intensive inquiry analyzed under "the so-called *TRAC* factors." *Indep. Mining Co. v. Babbitt*, 105 F.3d 502, 507 (9th Cir. 1997) (citing *Telecomms. Rsch. & Action Ctr. v. FCC*, 750 F.2d 70, 79-80 (D.C. Cir. 1984)).**[11]**

The Tenth Circuit has articulated an apparently categorical rule that agency action can be considered "withheld" only if there is "a date-certain deadline" by which the agency must act—otherwise the failure to act is evaluated for unreasonable delay. *Forest Guardians v. Babbitt*, 174 F.3d 1178, 1190 (10th Cir. 1999). If we were to apply that rule, we would have to analyze the metering

---

[11] The *TRAC* factors are:

> (1) the time agencies take to make decisions must be governed by a "rule of reason"[;] (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason[;] (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake[;] (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority[;] (5) the court should also take into account the nature and extent of the interests prejudiced by the delay[;] and (6) the court need not "find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed."

*Indep. Mining Co.*, 105 F.3d at 507 n.7 (alterations in original) (quoting *Telecomms. Rsch. & Action Ctr.*, 750 F.2d at 80).

policy for unreasonable delay because § 1158 and § 1225 do not include specific deadlines.

But our court has taken a different approach from that of the Tenth Circuit. In *Vietnam Veterans of America v. CIA*, 811 F.3d 1068 (9th Cir. 2016), we considered a regulation that "unequivocally command[ed] the Army to provide former [chemical-weapons] test subjects with current information about their health." *Id.* at 1076. The regulation imposed no deadline for carrying out that duty, stating only that the Army was required to provide test subjects with "newly acquired information . . . when that information becomes available." *Id.* We concluded that the Army's obligations were enforceable under § 706(1) of the APA, and we affirmed the district court's decision to enter an injunction requiring the Army to provide such information. *Id.* at 1071, 1078-80. We did not state explicitly whether the Army's failure to comply with the regulation constituted withholding or delay under the APA. *See id.* at 1078-80. But we did not evaluate the *TRAC* factors or otherwise consider the reasonableness of the Army's failure to act, *id.*, as would have been required before we could affirm the injunction if agency action had been delayed instead of withheld. Our decision therefore must have rested on a conclusion that the Army's failure to act constituted withholding. Under that precedent, then, the fact that 8 U.S.C. § 1158 and § 1225 do not include a specific deadline does not resolve whether the Government's failure to act in this case constitutes withholding.**[12]**

---

[12] The dissent would set aside *Vietnam Veterans* based on the briefing in that case and would instead rely on *Biodiversity Legal Foundation v. Badgley*, 309 F.3d 1166 (9th Cir. 2002). Dissent at 72-75. But *Badgley*

We hold that when an agency refuses to accept, in any form, a request that it take a required action, it has "withheld" that duty within the meaning of § 706(1). That holding is informed by a provision of the APA that requires an agency to "conclude a matter presented to it" "within a reasonable time." 5 U.S.C. § 555(b). By refusing to accept a matter at all, an agency indicates that it will not "conclude" it at any time in the future. In other words, it withholds action entirely. *See Viet. Veterans*, 811 F.3d at 1079 (treating as withholding a "situation where a federal agency refuses to act in disregard of its legal duty to act" (quoting *EEOC v. Liberty Loan Corp.*, 584 F.2d 853, 856 (8th Cir. 1978))).

Our interpretation of the difference between withholding and delay in § 706(1) comports with the ordinary meaning of those terms. When an action is delayed, one expects that, with the passage of time (maybe even an unreasonable amount of time), the action eventually will be completed. By contrast, when an action has been withheld, no amount of waiting can be expected to change the situation. With

_____

holds only that where there is a statutory deadline, failure to comply by that deadline constitutes unlawful withholding of agency action. 309 F.3d at 1177–78, 1177 n.11. It does not say that an agency can have withheld action only if there is a statutory deadline. In other words, *Badgley* holds that violating a statutory deadline is a sufficient condition for concluding that agency inaction constitutes withholding, but nothing in *Badgley* suggests it is a necessary condition. The same is true of the D.C. Circuit and Fourth Circuit cases on which the dissent relies. Indeed, the Fourth Circuit described "an agency's failure to meet a hard statutory deadline" as only one example of when agency action can be "unlawfully withheld" under 5 U.S.C. § 706(1), indicating that such a deadline is not a necessary condition. *South Carolina v. United States*, 907 F.3d 742, 760 (4th Cir. 2018).

patience, one can wait out delay, but even with superhuman patience, one cannot wait out withholding.

Consider someone who heads to the post office to mail a package shortly before the holidays. The postal workers tell the person that they will not accept her package that day because they are very busy, but that she is welcome to come back the next day. They do not give her an appointment, and they warn her that tomorrow they are likely to be just as busy as today. Just keep coming back, they say—eventually, perhaps within a few days or a few weeks or a few months, the post office might accept her package. Have the postal workers delayed carrying out the task of mailing her package? No, they have withheld their services. That is true even though the person could come back the next day to try to mail the package again. If the postal employees gave the customer an appointment to come back when they would accept her package, then their conduct would amount to delay. So too if they made a waitlist of customers and guaranteed they would work through it. If the postal workers accepted the package but were unable to ship it promptly, that too would be delay, not withholding. But it is not mere delay to tell a person requesting an action that her current request will not be entertained but that she is welcome to make the request again another time.

We accordingly conclude that the metering policy constituted withholding of agency action, not delay. Under the metering policy, border officials turned away noncitizens without taking any steps to keep track of who was being turned away or otherwise allowing them to open asylum applications. Such a wholesale refusal to carry out a mandatory duty—leaving the responsibility to try again in each noncitizen's hands—cannot be called delay within the meaning of § 706(1). Nor did the Government's informal

and sporadic coordination with Mexican government officials or nonprofits keeping waitlists transform the metering policy into delay rather than withholding. Organizing by interested third parties did not satisfy the *Government's* obligation to inspect asylum seekers. If anything, it indicates that the Government was not fulfilling its obligations.

We stress that our decision leaves the Government with wide latitude and flexibility to carry out its duties at the border. Our role as a court is not to superintend the Executive Branch's decisions about how to carry out its many obligations. Our role is only to enforce the requirements enacted into law by Congress. Even minimal steps by the Government, such as implementing and following a waitlist system or initiating the asylum process, would shift the § 706(1) analysis of any challenge from the withholding category into the delay category. But because the Government in this case did not take any such steps, we need not (and cannot) reach the question whether any delay would have been reasonable. Sections 1158 and 1225 require border officials to inspect noncitizens seeking asylum at the border, and the metering policy withheld that duty.

## IV.

Because we affirm the district court's conclusion that the metering policy violated § 706(1) of the APA, we need not reach the other merits claims. Plaintiffs acknowledge that, if they prove a § 706(1) violation, nothing about the scope or validity of the district court's relief turns on whether they also prevail on any of the other claims in their Complaint. We accordingly construe Plaintiffs' cross-appeal on the § 706(2), INA, and Alien Tort Statute claims as merely

presenting alternative grounds for affirmance, which we decline to reach. *See, e.g.*, *Townsel v. Contra Costa County*, 820 F.2d 319, 320 (9th Cir. 1987). We also vacate the district court's entry of judgment for Plaintiffs on the constitutional due process claim without further analysis of the parties' arguments as to that claim. "A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them." *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988). That principle requires courts "to determine, before addressing [a] constitutional issue, whether a decision on that question could have entitled [the plaintiffs] to relief beyond that to which they were entitled on their statutory claims." *Id.* at 446. "If no additional relief would have been warranted, a constitutional decision" is "unnecessary and therefore inappropriate." *Id.* When we are persuaded that a district court's constitutional holding was "unnecessary," we may "simply vacate the relevant portions of the judgment . . . without discussing the merits of the constitutional issue." *Id.* We do so here.

## V.

We turn finally to the appropriateness of the declaratory and injunctive relief entered by the district court.

### A.

The district court entered classwide declaratory relief stating that the metering policy violated § 1158 and § 1225. Such relief was proper under the Declaratory Judgment Act, 28 U.S.C. § 2201(a). The Government presents only one argument to the contrary: that the classwide declaratory relief is prohibited by 8 U.S.C. § 1252(f)(1), which provides that "no court (other than the Supreme Court) shall have

jurisdiction or authority to enjoin or restrain the operation"
of specified immigration statutes on a classwide basis. As
the Government concedes, however, that argument is
foreclosed by circuit precedent holding that § 1252(f)(1)
does not "bar classwide declaratory relief." *Rodriguez v.
Hayes*, 591 F.3d 1105, 1119 (9th Cir. 2010). We therefore
affirm the district court's entry of classwide declaratory
relief.**[13]**

## B.

The district court entered a permanent injunction
prohibiting application of the Asylum Transit Rule to
members of the P.I. class—who were prevented by the
metering policy from applying for asylum before the Rule
took effect—and requiring the Government to unwind past
denials of P.I. class members' asylum applications based on
the Rule. The Government asserts that the permanent
injunction violates 8 U.S.C. § 1252(f)(1), which, as
explained, prohibits courts other than the Supreme Court
from entering classwide injunctive relief regarding the
operation of specified immigration statutes. We summarize
the requirements of the district court's injunction before
addressing the meaning of § 1252(f)(1) and its application
here.

---

[13] The Supreme Court recently declined to reach the question whether
§ 1252(f)(1) prohibits classwide declaratory relief. *Garland v. Aleman
Gonzalez*, 596 U.S. 543, 551 n.2 (2022). Because the Supreme Court's
reservation of a question is not clearly irreconcilable with a precedent of
our court that resolves the same question, we follow our binding
precedent. *Mont. Consumer Couns. v. FERC*, 659 F.3d 910, 920 (9th
Cir. 2011) (citing *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003)
(en banc)).

**1.**

The permanent injunction includes both negative injunctive relief (prohibiting the Government from taking certain actions) and affirmative injunctive relief (requiring the Government to take certain actions). The negative injunctive relief prohibits the application of the Asylum Transit Rule to asylum applications by P.I. class members. The affirmative injunctive relief has three components. First, the Government "must make all reasonable efforts to identify" P.I. class members. Second, the Government must notify identified P.I. class members "in administrative proceedings before United States Citizenship and Immigration Services or EOIR, or in DHS custody, of their class membership, as well as the existence and import of the" injunction. Finally, DHS and EOIR "must take immediate affirmative steps to reopen or reconsider past determinations that potential [P.I. class members] were ineligible for asylum based on the [Asylum Transit Rule], for all potential [P.I. class members] in expedited or regular removal proceedings." The district court specified that "[s]uch steps include identifying affected [P.I. class members] and either directing immigration judges or the Board of Immigration Appeals to reopen or reconsider their cases or directing DHS attorneys representing the government in such proceedings to affirmatively seek, and not oppose, such reopening or reconsideration."**14**

---

[14] The district court's permanent injunction order detailed how the Government was complying with its obligations under the materially identical preliminary injunctions. Order, *Al Otro Lado, Inc. v. Mayorkas*, No. 17-cv-2366 (S.D. Cal. Aug. 5, 2022), ECF No. 816. The district court largely concluded that the Government's actions were adequate, so we accept the parties' understanding that the court's

**2.**

The Government contends that the injunction is prohibited by 8 U.S.C. § 1252(f)(1), which provides in full:

> Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter [8 U.S.C. chapter 12, subchapter II], as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ["IIRIRA"], other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated.

That provision poses no bar to injunctions concerning § 1158, the asylum statute, which falls within part I (not part IV) of the relevant subchapter. But the provision prohibits certain injunctions affecting the operation of expedited removal proceedings under § 1225 and regular removal proceedings under § 1229a, both of which do fall within part IV of the relevant subchapter.**[15]** We therefore

---

recitation of those actions defined the details of the injunction's requirements. It is not necessary for us to recount all those details here to resolve this appeal.

[15] We have explained that § 1252(f)(1) does not apply to every section codified within the specified portion of the U.S. Code, but rather applies only to such sections that are also part of the INA. *Galvez v. Jaddou*, 52 F.4th 821, 829-31 (9th Cir. 2022). That wrinkle makes no difference

must decide whether any of the injunction's requirements "enjoin or restrain the operation of" those statutory sections.

Precedent offers some guidance. The Supreme Court explained in *Aleman Gonzalez* that § 1252(f)(1) "generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions" with respect to an entire class. 596 U.S. at 550. Such an injunction is barred even if a court determines that the Government's "operation" of a covered provision is unlawful or incorrect. *Id.* at 552-54. Applying § 1252(f)(1), the Supreme Court concluded that the provision prohibits classwide injunctions requiring the Government to hold bond hearings for individuals detained pending removal pursuant to a covered statutory provision. *Id.* at 551. The Court explained that such an injunction improperly "require[s] officials to take actions that (in the Government's view) are not required" by the detention provision "and to refrain from actions that (again in the Government's view) are allowed by" that provision. *Id.* One clear lesson of *Aleman Gonzalez* is that § 1252(f)(1) prohibits courts from awarding injunctive relief that directly adds a new procedural step to the Government's operation of covered provisions.

What else § 1252(f)(1) may prohibit is a more difficult question. Our court has repeatedly held that § 1252(f)(1) does not prohibit an injunction simply because of collateral effects on a covered provision. In *Gonzales v. DHS*, 508 F.3d 1227 (9th Cir. 2007), we held that an injunction regarding "the unlawful application of statutory provisions

---

here because § 1225 and § 1229a are part of the INA. *See* Ira J. Kurzban, Kurzban's Immigration Law Sourcebook 2400 (17th ed. 2020-21).

regarding adjustment of status" was not barred by § 1252(f)(1). *Gonzales v. DHS*, 508 F.3d at 1233. We explained that a court may enter a classwide injunction regarding adjustment of status even though adjustment of status can change the outcome of a removal proceeding under a covered provision. *Id.* We observed that the injunction would have at most a "collateral" effect on DHS's operation of proceedings under covered provisions, and that the injunction "directly implicate[d]" a non-covered provision. *Id.* We reasoned that a "one step removed" effect on a covered provision did not bring the injunction within the scope of § 1252(f)(1). *Gonzales v. DHS*, 508 F.3d at 1233.

More recently, in *Gonzalez v. ICE*, 975 F.3d 788 (9th Cir. 2020), we considered an injunction concerning the issuance of "immigration detainers," with which federal officials request that law enforcement agencies temporarily keep a noncitizen in custody so that DHS can assume custody and initiate removal proceedings. *Id.* at 797-99. We concluded that the injunction in that case did not run afoul of § 1252(f)(1) because DHS's authority to issue such detainers arises out of a section not covered by § 1252(f)(1). *Gonzalez v. ICE*, 975 F.3d at 812-15, 814 n.17. Although the detainers served to facilitate DHS's authority to arrest and detain noncitizens pending removal proceedings—an authority that *does* arise from statutory sections covered by § 1252(f)(1)—any effect on that authority was collateral. *See Gonzalez v. ICE*, 975 F.3d at 815 & n.19.

The Supreme Court acknowledged our collateral-effect rule in *Aleman Gonzalez* and left it undisturbed. 596 U.S. at 553 n.4 (citing *Gonzales v. DHS*, 508 F.3d at 1233).

**3.**

Applying those precedents here, the negative injunctive relief entered by the district court is not barred by § 1252(f)(1). That relief, which prohibits the Government from applying the Asylum Transit Rule to P.I. class members, concerns asylum eligibility under § 1158, which is not covered by § 1252(f)(1). The Asylum Transit Rule was promulgated under § 1158(b)(2)(C) and § 1158(d)(5)(B), which allow the Attorney General to establish additional substantive and procedural requirements for obtaining asylum. *See* 84 Fed. Reg. 33829, 33830 (July 16, 2019). The negative injunctive relief therefore "directly implicates" asylum eligibility under § 1158. *Gonzales v. DHS*, 508 F.3d at 1233. Even though asylum eligibility may change the outcome of a removal proceeding under a covered provision, such an effect is collateral under our precedents. In litigation concerning the validity of a different rule excluding some people from eligibility for asylum, we explained that "[a]t best, the law governing asylum is collateral to the process of removal" because noncitizens "can apply and be eligible for asylum and never encounter any of the statutory provisions governing removal." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 667 (9th Cir. 2021). Although in that case we were not addressing § 1252(f)(1), our reasoning that asylum eligibility is collateral to removal is equally applicable here. The negative injunctive relief prohibiting the application of the Asylum Transit Rule to P.I. class members' asylum applications is therefore permissible.

That conclusion is not affected by the fact that an asylum application can arise within an expedited removal proceeding under § 1225 or a regular removal proceeding under § 1229a (which are covered provisions). The text of

§ 1225 repeatedly makes clear that applications for asylum raised within expedited removal proceedings are nevertheless made "under section 1158."  8 U.S.C. § 1225(a)(2), (b)(1)(A)(i)-(ii), (b)(1)(B)(v), (b)(1)(C).  An asylum officer acting under § 1225 essentially predicts whether a noncitizen "could establish eligibility for asylum under section 1158." *Id.* § 1225(b)(1)(B)(v). Section 1229a likewise refers to asylum as relief "under section[] 1158." *Id.* § 1229a(c)(7)(C)(ii).  In evaluating the merits of a noncitizen's application for "relief or protection from removal," *id.* § 1229a(c)(4)(A), an IJ applies "the applicable eligibility requirements," *id.* § 1229a(c)(4)(A)(i), which for asylum are set out under § 1158.**[16]** None of those provisions shift asylum determinations out from § 1158, which is not covered by § 1252(f)(1).

The first two components of the affirmative injunctive relief, which require the Government to identify possible P.I. class members and notify them about their class membership and the significance of the injunction, are also permissible under § 1252(f)(1).  Those requirements do not "enjoin or restrain the operation" of any covered provision. *Id.* § 1252(f)(1).  Indeed, the Government offers no specific argument to the contrary.

The final portion of the affirmative injunctive relief requires the Government either to "direct[] immigration judges or the Board of Immigration Appeals to reopen or

---

[16] Although § 1229a also suggests that asylum relief might arise under 8 U.S.C. § 1231(b)(3), that provision merely states that the Government cannot remove a noncitizen to a country where the noncitizen's "life or freedom would be threatened" because of his or her "race, religion, nationality, membership in a particular social group, or political opinion."

reconsider" asylum determinations sua sponte for P.I. class members denied asylum under the Asylum Transit Rule or to "direct[] DHS attorneys representing the government in such proceedings to affirmatively seek, and not oppose, such reopening or reconsideration." According to the Government, that requirement is barred by § 1252(f)(1) because it "affirmatively requires the Government to disturb determinations that have already been made" under covered removal provisions.

We agree that, in requiring the Government to take the initiative to revisit determinations in removal proceedings even absent a motion by the noncitizen, the injunction "require[s] officials to take actions that (in the Government's view) are not required by" the covered removal provisions. *Aleman Gonzalez*, 596 U.S. at 551. In effect, that requirement forces the Government to add a new procedural step within the removal process with respect to the P.I. class. It "thus interfere[s] with the Government's efforts to operate" the covered removal provisions. *Id.* Because that interference cannot be categorized as a collateral effect under our precedents, we must narrow the district court's injunction in the following way: The injunction may not require the Government, *on its own initiative*, to reopen or reconsider (or to move to reopen or reconsider) an asylum officer, IJ, or BIA decision in a removal proceeding.

That said, the *negative* injunctive relief properly prohibits the Government from applying the Asylum Transit Rule to a P.I. class member, even if it permissibly applied the Rule to that person in the past. For instance, if an IJ has denied a P.I. class member's asylum application on the basis of the Asylum Transit Rule, and the P.I. class member moves for reconsideration by the IJ, the negative injunctive relief prohibits the IJ from relying on the Asylum Transit Rule to

deny the motion (although the IJ may deny the motion if
there is a different valid ground). Likewise, if that P.I. class
member appeals to the BIA, the BIA may not use the Asylum
Transit Rule to affirm the IJ's decision (although the BIA
may affirm if there is a different valid ground). And if the
BIA reverses the IJ's decision and remands, the IJ may not
apply the Asylum Transit Rule on remand. The same
principle applies if a P.I. class member moves to reopen her
removal proceeding: The IJ or the BIA may not use the
Asylum Transit Rule to deny the motion (although they may
deny the motion on a different valid ground). In each of
those scenarios, the negative injunctive relief operates under
§ 1158 and has only collateral effects on the operation of the
immigration statutes covered by § 1252(f)(1), as explained
above.

## VI.

For the foregoing reasons, we affirm the judgment in
favor of Plaintiffs on the APA § 706(1) claim, vacate the
judgment in favor of Plaintiffs on the constitutional due
process claim, affirm the declaratory relief, and affirm the
injunctive relief other than the requirement that the
Government reopen or reconsider (or move to reopen or
reconsider) past determinations on its own initiative.

**AFFIRMED IN PART, VACATED IN PART.**

R. Nelson, J., dissenting:

In 1996, Congress provided that an alien may apply for asylum when she "arrives in the United States." 8 U.S.C. § 1158(a)(1). That can mean only one thing: the alien must be physically present in the United States. After years of litigation, Plaintiffs have not identified a single example of when "arrives in" means anything besides physically reaching a destination. The majority does not provide an example, either. For good reason. A basic corpus linguistic analysis shows that no English speaker uses the term "arrives in" to mean anything but being physically present in a location. This statutory language is as unambiguous as it gets.

Yet the majority concludes that aliens currently in Mexico have "arrive[d] in the United States" and can apply for asylum. No circuit court has ever reached such a strained conclusion. Not since the current act was adopted 30 years ago. Not under the prior act adopted 45 years ago which had even more permissive language. At oral argument, Plaintiffs' counsel acknowledged that in several years of legal research, she could not find a single judicial precedent supporting this interpretation. And the motions panel majority four years ago entered an injunction without deciding that Plaintiffs' strained statutory argument was likely correct. *Al Otro Lado v. Wolf*, 952 F.3d 999, 1013 (9th Cir. 2020) (concluding it "need not decide" the issue).

The majority's holding is wrong, troubling, and breathtaking. In its struggle to create ambiguity in the statutory language, the majority skips over the statute's plain meaning, ignores a common-sense understanding of the English language, misapplies a semantic canon, disregards the typical presumption against extraterritoriality, and

usurps Congress' authority to make law. By so doing, the majority strikes Congress's selected language ("arrives in the United States," whether "at a designated port of arrival") and replaces it with language of the majority's choosing ("stopped at the border"). Maj. at 19. As a result, it imposes on the federal government—for the first time—an obligation to interview asylum seekers who are still in Mexico. Finally, perhaps recognizing the breathtaking consequences of its ruling, the majority tries to limit its practical impact—not by correcting its interpretation of "arrives in," but by misinterpreting yet another statute: the APA.

After securing an unprecedented and favorable decision and attempting to evade further review, Plaintiffs asked the district court to set aside the relief they spent years seeking. Now, the majority also amends its opinion. While the majority couches its rhetoric more palatably, it fails to correct its fundamental legal errors—it makes them worse. The majority's wavering confirms what its reasoning makes obvious: this decision needs to be corrected en banc or by the Supreme Court.

Because a person standing on Mexican soil has not "arrive[d] in the United States" or "at a designated port of arrival," I dissent.

I

8 U.S.C. § 1158(a)(1) allows an alien who is "physically present in the United States" or who "arrives in the United States" to apply for asylum. A different statute, 8 U.S.C. § 1225(a)(1), provides that aliens who are unadmitted but "present" in the United States or who "arrive[]" in the United States" can apply for admission. An applicant for admission must, in turn, be inspected. Asylum officers then interview inspected aliens to determine whether they have a credible

fear of persecution. *Id.* § 1225(b)(1)(B). The statute imposes no deadline on these obligations.

All agree that "physically present in the United States" refers to those located in the United States. *Id.* § 1158(a)(1). As the majority explains, this phrase "encompasses noncitizens within our borders." Maj. at 22. That reading is supported by our precedent. *Barrios v. Holder*, 581 F.3d 849, 863 (9th Cir. 2009) ("physically present" means "corporeally being in the place in question or under consideration" (cleaned up)).

### A

We disagree on whether an alien who has not "stepped across the border," Maj. at 19, "arrives in the United States." Text, history, precedent, and common sense show that she has not—even if that means that "arrives in the United States" and "physically present in the United States" have nearly identical meanings.

### 1

Begin with the text. When, as here, "a statute does not define a term, we typically give the phrase its ordinary meaning." *FCC v. AT&T Inc.*, 562 U.S. 397, 403 (2011) (quotation omitted). The ordinary meaning is not merely a *possible* meaning. "[S]tatutes, no matter how impenetrable, do—in fact, must—have a single, best meaning." *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2266 (2024). Our role as judges is to "use every tool at [our] disposal to determine th[at] best reading." *Id.* "The starting point for statutory interpretation is the actual language of the statute"—what the words mean to an ordinary American. *United States v. Yankowski*, 184 F.3d 1071, 1072 (9th Cir.

1999). The majority skips this important and basic first
step—which is dispositive here.[1]

The first term is the verb "arrive." Since at least the 14th
Century, the word "arrive" has meant to "reach[] a
destination." John Ayto, *Dictionary of Word Origins* 36
(2011). Its meaning remained the same in 1996, when the
statute was enacted. Then, as now, "arrive" meant to "reach
a destination" or "come to a particular place." *The American
Heritage Illustrated Encyclopedic Dictionary* 102 (1987).
Other dictionaries confirm that a person "arrives"
somewhere when she "come[s] to a certain point in the
course of travel" or "reach[es] [her] destination." *Random
House Webster's Unabridged Dictionary* 116 (2001).

Thus, to "arrive at" a place means to reach it after
traveling. *Id.*; *see also Al Otro Lado*, 952 F.3d at 1028
(Bress, J., dissenting) (collecting examples from other
dictionaries).[2] Had Congress used the term "arrive at,"
perhaps the majority's ambiguity argument would have
some plausible force. But Congress didn't use "arrives at"—
it used "arrives in." Indeed, in 1996, Congress changed the

---

[1] The majority claims that it cannot interpret "arrives in" without looking
to the whole statute. *See* Maj. at 20 n.4. True, words must be understood
in context. *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 569
(2012). But context is a tool to understand a law's ordinary meaning,
not a tool to replace it. *See id.* We cannot use context to impose a
meaning that a term cannot bear. *See id.* (using context only after
determining that a term "can encompass" two meanings); *see also King
v. Burwell*, 576 U.S. 473, 500–01 (2015) (Scalia, J., dissenting). The
majority's proposed interpretation is not only unnatural, but unheard of.

[2] For example, the term "at" is used with the "verb[] of motion" "arrive"
to "indicat[e] attainment of a position." 1 *Oxford English Dictionary*
739 (2d ed. 1989). So a person could "arrive at" the border on either
side, depending on which direction they are coming from.

statutory language from "at" to "in."   And *that* is the
language we interpret.

"Arrive in," the term Congress used, has a clearer
meaning—it is used "[w]hen the place of arrival is the
object." *Webster's Dictionary of English Usage* 120 (1989).
Consider the preposition "in."  "*In* has remained in use with
verbs of motion" for hundreds of years.  *Id.* at 533.  It
describes being "[w]ithin the limits or bounds of" a place
with "material extension." 7 *Oxford English Dictionary* 759
(2d ed. 1989).  Accordingly, it is typically used "with the
proper names of . . . countries." *Id.*  Putting those two terms
together, a person "arrives in" a country when she has
reached its inner limits or bounds.

Real-life experience bears this out.   Imagine, for
example, that Apple says a new iPhone will "arrive in stores"
on January 2.  Hearing this, you would expect the phone to
be on the shelves on January 2—not in an unloaded
semitrailer behind the store.  Or imagine that Amazon tells
you a package will "arrive in your mailbox" on June 3.  On
June 3, you would expect the package to be inside your
mailbox—not at the local post office, ready for delivery.  As
these common-sense examples show, to "arrive in" a
location means to be physically within the premises.  Not at
the border, or in the process of arriving.

Linguistic data confirms that these are not isolated
examples. *See Wilson v. Safelite Grp.*, 930 F.3d 429, 440
(6th Cir. 2019) (Thapar, J., concurring in part) (courts "ought
to embrace" corpus linguistics as "another tool to ascertain
the ordinary meaning").   The Corpus of Contemporary
American English is a database of over one billion words
spoken in everyday contexts between 1990 and 2010.
Within that database, "arrives in" was used to describe a

destination 161 times between 1990 and 1996 (when the statute was enacted).[3]   Appendix 1.  Of those, 160—the overwhelming majority—referenced someone or something physically within the destination.  And not once was the phrase clearly used to mean standing at the destination's border.

A few examples are illustrative.  One source describes a plane that "arrives in Newark but late," forcing the passengers to rush through the airport to catch their connections.[4]  Did the plane "arrive" when, circling miles above the city, the captain announced that the plane was cleared to begin its descent?  Of course not.  The plane "arrive[d] in Newark" when it touched Newark ground. After all, the passengers could not rush through the airport until the plane physically landed.

Other sources describe dignitaries who "arrive[d] in" a city to attend a summit.  To attend the summit, of course, the dignitaries must have been physically present.  Nelson Mandela, for example, "arrives in New York" and is "greeted with a ticker-tape parade and crowds of

---

[3] This search can be replicated by searching "arrives in" on english-corpora.org/coca.  Restrict results to those occurring before 1996.  That yields 219 results.  But 58 are irrelevant.  The statute uses "arrives in" to describe *where* immigrants are located.  By contrast, 58 results use "arrives in" to describe either *when* something arrives ("arrives in two hours") or *how* it arrives ("arrives in a bad mood").  Setting aside those 58, 161 results use "arrives in" to describe a location.  *See* Appendix 1.

[4] Valerie Lister, *Road Trip: The Women's Pro Basketball Way*, USA Today (1996), *relevant text available at Corpus of Contemporary American English*, https://www.english-corpora.org/coca (last accessed Sep. 18, 2024).

thousands."[5]    Clearly, to parade through New York, Mandela was inside the Empire State—not standing just across the river in Jersey City.

Finally, consider an example from the great American sport: "[a]s the pitch arrives in the catcher's hands, the catcher digs in to take on [the runner]."[6] A pitch "arrives in" the catcher's hands when it physically lands in the mitt. Not when leaving the pitcher's hand, flying through the air, or even spinning inches from the catcher's outstretched mitt.

We could go on and discuss all 161 usages. But the underlying point is clear. English speakers use "arrives in" to mean standing within a destination, not outside.[7] The majority does not identity a counterexample. Nor does it deny what this linguistic data suggests: its interpretation of

---

[5] Barbara Reynolds, *Mandela's Visit*, USA Today (1990), *relevant text available at Corpus of Contemporary American English*, https://www.english-corpora.org/coca (last accessed Sep. 18, 2024).

[6] *Cobb* (1994), *relevant text available at Corpus of Contemporary American English*, https://www.english-corpora.org/coca (last accessed Sep. 18, 2024).

[7] Of the 161 examples, one usage is arguable. A TV script said, "the elevator arrives in the hall, bringing more people." *Metropolis* (1995), *relevant text available at Corpus of Contemporary American English*, https://www.english-corpora.org/coca (last accessed Sep. 18, 2024). Perhaps one could argue that elevators are at a hall's border, not physically inside. But even so, one ambiguous example out of 161 does not show that "arrives in" *ordinarily* means to stand at a destination's border. If anything, the (arguable) exception proves the rule. To "arrive in" a location is unambiguous and means only one thing: to be physically inside.

"arrives in" is not only unnatural, but unheard of.[8] *See* Maj. at 21 n.5.

Instead, the majority emphasizes that statutory language must be understood in context. *Id.* at 21 n.5, 23 n.7. I agree. Statutory interpretation must determine how words are ordinarily understood, and ordinary English speakers leverage context to convey and interpret meaning. It's because of context, after all, that we easily distinguish "drove the sheep into the pen" from "used the pen to sign a contract." But context never justifies giving a term a meaning that it cannot bear. *See Taniguchi*, 566 U.S. at 569 (using context only after determining a term "can encompass" two meanings); *see also King*, 576 U.S. at 500–01 (Scalia, J., dissenting). That is why the sentence "used the corral to sign the contract" leaves readers scratching their heads. Unlike "pen," the term "corral" simply does not mean a writing instrument, even if all the context suggests it might.

So too here. Dictionaries catalogue the possible uses of "arrives in," and linguistic evidence indicates which of those uses are ordinary. Together, these tools confirm that "arrives in" simply cannot mean standing outside a destination's border. No amount of context can change that linguistic fact. *See Taniguchi*, 566 U.S. at 569.

Here, moreover, the context supports the plain meaning. I discuss other contextual clues below, *see infra* at 60–61,

---

[8] The majority notes that neither party relied on corpus linguistics. Maj. at 21 n.5. But both parties extensively briefed the ordinary meaning of "arrives in." And when interpreting a statute, we are not limited to the tools the parties cite, just as we are not limited to the caselaw cited by the parties when evaluating a legal proposition. *See Muscarello v. United States*, 524 U.S. 125, 129 (1998) (relying on corpus linguistics when neither party briefed the tool).

but two points are worth emphasis here. First, contrary to the majority's suggestion, the fact that the statute covers an alien "who arrives in the United States *(whether or not at a designated port of arrival)*" does not alter the plain meaning of "arrives in." Maj. at 22–23 & n.7. The parenthetical clarifies that the statute applies to immigrants who arrived through designated entry ports and those who crossed the border elsewhere. It does not mean that immigrants who have yet to enter an arrival port have somehow arrived in the United States. *Contra id.* Because entry ports are part of the United States, an immigrant "arrives in the United States" whether she stands on Ellis Island or in rural Texas. But either way, the immigrant does not "arrive in" until she steps onto United States soil.

Second, the majority suggests that because "arrives in" appears in the context of a statute, the only relevant linguistic evidence is other statutory language. Maj. at 21 n.5. Why would that be? Congress presumably uses words "in their natural sense." *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 71 (1824). So evidence of how "arrives in" is used in everyday contexts is highly probative. *See Muscarello*, 524 U.S. at 129 (citing dictionaries and "searching computerized newspaper databases" to determine a word's ordinary meaning); *United States v. Costello*, 666 F.3d 1040, 1044 (7th Cir. 2012) (Posner, J.) (relying on dictionaries and a Google search). Even so, other statutes use "arrives in" in its ordinary sense. *See* 22 U.S.C. § 2507a(c) (providing for training "[o]nce a volunteer has arrived in" a country). One provision, for example, states that aliens who arrive in the United States at undesignated times or locations are inadmissible. 8 U.S.C. § 1182(a)(6)(A)(i). Are immigrants who approach border agents after hours therefore inadmissible? What about Mexican citizens who come

within 20 feet of an undesignated portion of the border? Of course not. Congress, like ordinary English speakers, uses "arrives in" to mean those physically present, not those standing in Mexico—or as the majority calls it—"at the border." Maj. at 19.**[9]**

In sum, the linguistic data confirms what dictionaries and intuition suggest: for a person to "arrive in the United States," she must arrive "in the United States"—"there is no in-between." *Al Otro Lado*, 952 F.3d at 1028 (Bress, J., dissenting).

Today, the majority divines an "in-between." Moving forward, a person who "encounter[s] officials at the border," Maj. at 22, or is "in the process of arriving" in the United States, Maj. at 17, 48, may apply for asylum.

The majority leaves each phrase ambiguously open-ended. At any rate, none of these phrases appears in the text. The statute does not say "encounter officials at the border." Nor does it say "in the process of arriving." It says "arrives in." No amount of context justifies the majority's redlining of Congress's statutory language.

In a half-hearted attempt to change the statutory text, the majority cites a single dictionary definition for "arrive." Maj. at 22–23. But, again, the statute says "arrives in," not just "arrive." And why credit that single definition over all the other evidence discussed above? The majority does not say. Nor does the majority explain how "arrives in" can

---

[9] The majority initially held that aliens "on the United States' doorstep" had "arrived in" the United States. *Al Otro Lado v. Exec. Off. for Immigr. Rev.*, 120 F.4th 606, 615 (9th Cir. 2024); *id.* at 634 (R. Nelson, J., dissenting). The majority replaces "on the United States' doorstep" with "at the border." Maj. at 19. The majority's softer word choice does nothing to diminish its dangerous holding and strained logical analysis.

mean "at the border" or "in the process of arriving" when each phrase has a historically different meaning.

More than being wrong, the majority's conclusion is harmful. Judicial redlining of statutes, as the majority does here, undercuts Congress's authority, eliminates citizens' ability to rely on the law, and erodes democracy, allowing unelected judges to revise the decisions of the People's representatives.

There is more. Borders define the very bounds of a nation's sovereign power. Border, *Black's Law Dictionary* (12th ed. 2024) ("The boundary between one country (or a political subdivision) and another."). They also protect a country from those outside it and are, by their nature, exclusionary. Thus, the Supreme Court has recognized a "longstanding concern for the protection of the integrity of the border." *United States v. Montoya de Hernandez*, 473 U.S. 531, 538 (1985). So strong is that interest that even constitutional rights yield when "[b]alanced against the sovereign's interests at the border." *Id.* at 539. The majority subverts these interests. It treats those in Mexico—but ambiguously close to the border—as if they were "in" the United States. And it assumes that Congress implicitly set aside constitutional principles that, for centuries, have uniformly been applied to protect our border.

The statutory language forecloses the majority's interpretation. A person at the border, but on the Mexican side, might be close to the United States. She might have arrived *at* the United States border. But until she crosses the border, she has not arrived in the United States. This is not just the best reading of the statute; it is the only reading. The majority has not pointed to any example in which "arrives in" means anything besides crossing the border into the

destination. We would expect Congress to use clearer language to subvert long-established border protections.

2

The statute's context reinforces the unambiguous plain meaning. Another provision, § 1225, provides for the expedited removal of noncitizens "*from* the United States." 8 U.S.C. § 1225(b)(1)(A)(i) (emphasis added). As the Supreme Court has explained, § 1225 allows applicants for admission to "avoid expedited removal by claiming asylum." *DHS v. Thuraissigiam*, 591 U.S. 103, 109 (2020); *see also United States v. Gambino-Ruiz*, 91 F.4th 981, 985 (9th Cir. 2024). We have explained that the statute "ensures that all immigrants who have not been lawfully admitted, regardless of their physical presence in the country, are . . . 'applicant[s] for admission.'" *Torres v. Barr*, 976 F.3d 918, 928 (9th Cir. 2020) (en banc) (quoting § 1225(a)(1)).

The majority reads "regardless of their physical presence in the country" to mean that the expedited removal protections can be avoided even when an alien is outside the country. But that line is better understood to make asylum available to those subject to expedited removal regardless of whether they are in a port of entry or elsewhere within the country. After all, a person not yet in the United States cannot be "removed" from it.

This conclusion further follows from the fact that Congress provided separate protections for immigrants who have not yet arrived in the United States. *See* 8 U.S.C. § 1157. The Supreme Court has explained that § 1157, and not § 1158, "governs the admission of refugees who seek admission from foreign countries." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 433 (1987). The majority's reading places aliens on the Mexican side of the border in a

penumbral zone where they can apply for refugee status under § 1157 or for asylum under § 1158. Thus, while the statutory scheme applies different protections to an alien based on her location—either in the United States or out of it—the majority's reading creates a fiction where these aliens are entitled to both.

In no other statute has Congress provided more asylum protection to aliens outside the United States than those inside. On the contrary, Congress consistently provides foreign aliens fewer protections, as § 1157 demonstrates. Thus, it makes sense that § 1158 applies only to those physically within the United States.

3

History and precedent further support this conclusion. We have long treated aliens who arrive at a port of entry "as if stopped at the border" even if they are "on U.S. soil." *Thuraissigiam*, 591 U.S. at 139 (quotation omitted). This is called the "entry fiction." Maj. at 24–25. For at least a century, our immigration laws have treated those at ports of entry as though they have not "entered the country." *Thuraissigiam*, 591 U.S. at 139. An alien who arrived at Ellis Island, for example, "was to be regarded as stopped at the boundary line and kept there unless and until her right to enter should be declared." *Kaplan v. Tod*, 267 U.S. 228, 230 (1925). So it makes sense that in § 1158, Congress listed both those who "arrive in the United States" and those already "physically present." By so doing, Congress clarified that, despite the entry fiction, those who just crossed the border can apply for asylum on the same terms as someone who is otherwise "physically present."

The majority resists this conclusion. It notes that the entry fiction is just that—a fiction. Whether aliens in ports

of entry are legally deemed to be outside the country, they are nonetheless physically present. That is true. But that is hardly a reason to set aside the statute's plain meaning. And, given the entry fiction's long history, Congress can hardly be faulted for going out of its way to respond to it. Congress clarified that the two categories of aliens contemplated in § 1158 and § 1225—those physically present and those just arriving in the United States—can apply for asylum. This belt-and-suspenders approach makes sense, and it cleanly supports the statute's plain meaning.

Thus, text, history, and precedent all point in one direction. An alien "arrives in the United States" only when she crosses the border into it.

B

The majority ignores or diminishes this text, history, and precedent. It engages in "textual backflips to find some way[,] any way," *Fischer v. United States*, 144 S. Ct. 2176, 2195 (2024) (Barrett, J., dissenting), to conclude that aliens in Mexico have arrived in the United States. Each attempt fails.

1

The majority begins with the rule against surplusage. Because the majority deems it "possible to give nonredundant meaning to those two categories," it concludes it must give "arrives in the United States" a different meaning than "physically present in the United States." Maj. at 22.

But as I have already suggested, there is no surplusage. The phrase "arrives in" addresses the entry fiction, ensuring that those in ports of entry can apply for asylum just like those who are otherwise physically present in the United

States.  Thus, "arrives in" does not totally overlap with "physically present"; it plays a meaningful, independent role in the statute.  *Contra* Maj. at 22 n.6.

Even if the majority were right that "arrives in" and "physically present" totally overlap, *id.*, that would not justify disregarding the statute's plain meaning.  True, courts often presume that ordinary speakers of English avoid surplusage.  But the presumption is just that—a presumption. As anyone who has read a contract or deed knows, surplusage is common.  *Moskal v. United States*, 498 U.S. 103, 120 (1990) (Scalia, J., dissenting) ("give, grant, bargain, sell, and convey" (quotation omitted)); *Freeman v. Quicken Loans, Inc.*, 566 U.S. 624, 635 (2012).  And, in any case, the presumption "should not be used to distort ordinary meaning."  *Moskal*, 498 U.S. at 120 (Scalia, J., dissenting). "Sometimes the better overall reading of the statute contains some redundancy."  *Barton v. Barr*, 590 U.S. 222, 239 (2020) (quotation omitted).  Courts should "tolerate a degree of surplusage rather than adopt a textually dubious construction."  *United States v. Atl. Rsch. Corp.*, 551 U.S. 128, 137 (2007); A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 177–78 (2012).  After all, ordinary meaning—not nonduplicative meaning—is the lodestar in statutory interpretation.  The statute's ordinary meaning is clear, and the presumption against surplusage does not justify rewriting it.

2

The majority next turns to the 1980 version of the statue. The majority urges that its interpretation is not "breaking new ground" because that prior version allowed aliens "at a land border or port of entry" to apply for asylum.  Maj. at 26 (quoting 8 U.S.C. § 1158(a) (1980)).  Because this forty-

five-year-old statute used language that—in the majority's view—allowed aliens on the Mexican side of the border to apply for asylum, the majority argues that its interpretation of the current statute "does not radically expand" the asylum right. *Id*.

No court, however, interpreted the 1980 statute like the majority does now. *Al Otro Lado*, 952 F.3d at 1029 (Bress, J., dissenting). That concern aside, the meaning of the 1980 statute cannot change the meaning of the 1996 statute now before us.

"If anything, the [amendment] history suggests the opposite" of what the majority suggests*. Trump v. Hawaii*, 585 U.S. 667, 692 (2018). That Congress replaced "at a land border" with "arrives in the United States" suggests that it understood the terms to have different meanings. After all, when Congress amends a statute, "we presume it intends its amendment to have real and substantial effect." *Stone v. INS*, 514 U.S. 386, 397 (1995). Thus, the better view is that Congress resolved whatever ambiguity existed in "at" by using "in" in the 1996 statute. *See supra* at 52–53.

The majority suggests that the 1996 act did not substantively change the law. Maj. at 27 n.9. But Congress used language in 1996 that differs in meaning from the 1980 statute. We cannot disregard a statute's amendment history simply by declaring that the statute's new terms—though quite different—mean the same thing as the old terms. Yet that is what the majority does. It claims the amendment had no practical impact. And it provides no textual analysis to support this *ipse dixit*.

Moreover, we have already rejected the majority's suggestion that the 1996 amendments were minor. As we have noted, those amendments made "large scale changes to

the INA." *Gonzales v. DHS*, 508 F.3d 1227, 1229 (9th Cir. 2007). Other circuits agree. *Groccia v. Reno*, 234 F.3d 758, 759 (1st Cir. 2000) ("In 1996, Congress made massive changes to the immigration laws."); *Acevedo v. Barr*, 943 F.3d 619, 623 n.6 (2d Cir. 2019) (enacted "comprehensive immigration reform"); *Prestol-Espinal v. Att'y Gen. of U.S.*, 653 F.3d 213, 216, 222 n.9 (3d Cir. 2011) ("significant changes"); *Renteria-Gonzalez v. INS*, 322 F.3d 804, 809 (5th Cir. 2002) ("amend[ed] the [INA] in dozens of important but technical ways"). That overhaul went only one direction—the 1996 act was "widely regarded as placing important new limits on immigration." *Al Otro Lado*, 952 F.3d at 1029 (Bress, J., dissenting). So even that major overhaul did not, as the majority concludes, collapse § 1158 into § 1157 and drastically expand asylum protections.

In any case, the majority is of two minds with respect to the reach of the 1980 statute. When citing it as evidence of the 1996 statute's meaning, it assures the public that the 1996 amendments were minor. Everything changes when the majority claims the 1996 amendments abrogated two binding cases. Maj. at 28–29. In *INS v. Cardoza-Fonseca*, 480 U.S. at 433, the Supreme Court explained that § 1158 sets out the process by which refugees "currently in the United States" can get asylum. We recognized the same in *Yang v. INS*, 79 F.3d 932, 938 (9th Cir. 1996). After waiving away those unambiguous statements as mere "general background summaries," the majority says these cases are not helpful anyway because they reference the prior version of § 1158. Maj. at 28. But this just shows that the Supreme Court thought even the prior version of § 1158, which used the much broader "at a land border" applied only on our side of the border. Further, if the majority is correct that the 1996 changes were "minor," then it is hard to say that those

changes extended the statute's protections to aliens in another country.

In any event, the majority errs in waiving away the clear language of *Cardoza-Fonseca* and *Yang*. Those cases recognized that § 1158 applied only to people "in the United States" because the statute's plain meaning compelled that conclusion. Never has our court—or any other court— concluded that § 1158 applies to aliens who seek admission from foreign countries. The reason is clear. As discussed above, such aliens—including Plaintiffs—can seek refugee status under § 1157.[10]   *Cardoza-Fonseca*, 480 U.S. at 433. So if anything, the 1996 amendments confirm that aliens can apply for asylum only when they have entered the United States.

3

Even if the majority could show that "arrives in the United States" ordinarily references those just outside the United States, its analysis still falls short. For at most, the majority could show that "arrives in" is ambiguous. And the Supreme Court has instructed us to apply a presumption against extraterritoriality to ambiguous statutes.

"Congress ordinarily legislates with respect to domestic, not foreign, matters." *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255 (2010). Thus, "[w]hen a statute gives no

---

[10] At least one of our sister circuits disagrees with the majority's conclusion that Congress silently collapsed the differences between § 1157 and § 1158. *See Cela v. Garland*, 75 F.4th 355, 361 n.9 (4th Cir. 2023) ("Unlike aliens granted asylum—who are physically present in the United States or arrive in the United States when they seek asylum— aliens admitted as refugees seek admission to the United States from foreign countries." (citing *Cardoza-Fonseca*, 480 U.S. at 433)).

clear indication of an extraterritorial application, it has none." *Id.*

True, Congress need not enact an "express statement of extraterritoriality" to overcome the presumption. *RJR Nabisco, Inc. v. Eur. Cmty.*, 579 U.S. 325, 340 (2016). But it must provide "a clear indication of extraterritorial effect." *Id.* Only the "rare statute" will meet this standard without "an express statement of extraterritoriality." *Id.*

The majority does not dispute that 8 U.S.C. § 1158 lacks a clear indication of extraterritorial effect.[11] Yet it declines to apply the presumption against extraterritoriality. According to the majority, the presumption doesn't apply because "the entire question in this case" is whether the border officials' conduct "is foreign or domestic." Maj. at 32. Applying the presumption "just begs the question." *Id.*

Not so. The "entire question" is *not* whether interviewing aliens on Mexican soil is "foreign or domestic." The answer is clear and, except for a single paragraph in the majority opinion, undisputed. Take it from the majority itself: all parties "agree that a noncitizen stopped by officials right at the border is not yet 'physically present in the United States.'" Maj. at 20. Exactly. If an alien is standing on Mexican soil (as Plaintiffs were), sending federal officials to interview him is definitionally extraterritorial.

The question is whether Congress, through the phrase "arrives in the United States," extended asylum protections

---

[11] The majority initially held that § 1158 contains a clear indication of extraterritorial effect. *Al Otro Lado*, 120 F.4th at 621–22. The majority now amends its opinion to excise that argument. For good reason. As I explained in my initial dissent, there is no indication of extraterritorial effect. *Id.* at 638–39 (R. Nelson, J., dissenting). Switching gears, the majority now raises a new argument—one that neither party briefed.

to aliens on Mexican soil. In other words, the question is whether 8 U.S.C. § 1158 has extraterritorial application. If the presumption against extraterritoriality doesn't apply to that question of statutory interpretation, it doesn't apply anywhere.**[12]**

Arguing otherwise, the majority refocuses the analysis from the aliens seeking asylum to the border officials interviewing them. According to the majority, if the officials are in the United States, any interview they conduct is domestic—even if the interviewee is in Mexico.

This reframing fails on two levels. First, the statutes focus on the location of the alien, not the officer. *See RJR Nabisco*, 579 U.S. at 336 (looking to the "statute's focus"). Section 1158 gives aliens the right to apply for asylum when they "arrive[] in" the United States; it does not discuss officer conduct at all. And the statute that creates officer obligations triggers those duties only when the alien "arrives in" the United States. 8 U.S.C. § 1225(a)(1). Because both statutes focus on the alien's location, the majority errs by defining the conduct in terms of where the officer stands. Second, wherever the officer was standing, it is undisputed that Plaintiffs were on Mexican soil. So even if the statute focused on the officer's location, the officer's interactions with Plaintiffs were still cross-border interviews. *See Hernandez v. Mesa*, 589 U.S. 93, 97, 104 (2020). And cross-border conduct is extraterritorial.

---

[12] The majority misunderstands substantive canons when describing the presumption as "beg[ging] the question," as if that were a reason not to apply the presumption. Substantive canons pick a winner between two competing interpretations. By putting a policy thumb on the scales, substantive canons are designed to "beg the question" as the majority uses that term.

The majority also suggests that it matters that Plaintiffs were close to—even "at"—the United States border. But it is undisputed that Plaintiffs were standing on Mexican soil. *See* Maj. at 12. And whether ten feet from the border or twenty, Mexican soil is Mexican. *See Hernandez*, 589 U.S. at 97, 104. When it comes to the applicability of the presumption against extraterritoriality, there is no distinction between Mexican land right next to the United States and Mexico City. Anything across the border is, by definition, extraterritorial.

Even if there were ambiguity in the statute (there is not), the majority cannot overcome the presumption against extraterritoriality. That presumption confirms that § 1158 applies only to aliens who have crossed the border.

4

The majority next argues that its interpretation is necessary to avoid a perverse incentive for aliens to enter the United States somewhere other than a designated port of entry. Maj. at 23–24 (quoting *Thuraissigiam*, 591 U.S. at 140).**[13]** This argument is grounded in the presumption against ineffectiveness, which provides that interpretations that "further[] rather than obstruct[] the document's purpose" are to be favored. *See* Scalia & Garner, *supra*, at 63.

This presumption prevents interpretations that would "enable offenders to elude its provisions in the most easy

---

[13] *Thuraissigiam* addresses perverse incentives in a single sentence and only after the Supreme Court had rejected all other textual arguments. 591 U.S. at 140. That case provides weak support for the majority's reliance on the presumption against ineffectiveness, particularly because the majority uses the presumption to avoid the text's plain meaning.

manner." *Garland v. Cargill*, 602 U.S. 406, 428 (2024)
(quoting *The Emily*, 22 U.S. (9 Wheat.) 381, 389 (1824)).
But like all presumptions, it is rebuttable. The majority's
reliance on this presumption is misplaced for at least two
reasons. First, as with the other interpretive canons, the
presumption only applies to textually permissible
interpretations. Scalia & Garner, *supra*, at 63. As already
explained, the majority's interpretation is not textually
permissible.

Second, the presumption does not allow courts to
supplant or "rewrite statutory text" just because a bad actor
might evade the statute to avoid an interpretation that its
plain text requires. *Cargill*, 602 U.S. at 428 (quotation
omitted).

*Cargill* illustrates this principle. There, the Supreme
Court considered whether semiautomatic rifles equipped
with a bump-stock device are machineguns as defined by
statute.   26 U.S.C. § 5845(b) defines machineguns as
weapons that can fire more than one shot "automatically . . .
by a single function of the trigger." Bump stocks allow a
semiautomatic rifle to fire quickly, but they still require a
shooter to "reset the trigger between every shot." *Cargill*,
602 U.S. at 415. Faced with these facts, the Supreme Court
concluded that, although bump-stock-equipped
semiautomatic rifles can fire at rates that approach those of
true machineguns, they were not machineguns as defined in
the statute. In so concluding, the Court rejected arguments
grounded in the presumption against ineffectiveness. *Id.*
at 427–28. The Court applied the statute's plain meaning—
even if that meaning would undermine the statute's overall
purpose in some applications.

As in *Cargill*, adopting the statute's plain meaning may well have perverse consequences. And those consequences may well undermine the very purpose of the INA—to regulate the border in an orderly fashion. But those consequences exist under any interpretation of the statute. The several hoops through which aliens must jump when seeking admission to the United States already encourage millions to enter the country at unlawful locations. And even though laws require those procedures, "it remains relatively easy for individuals to enter the United States," and often "without detection." *United States v. Martinez-Fuerte*, 428 U.S. 543, 552 (1976). Our cases are full of examples of aliens doing just that. *See United States v. Gambino-Ruiz*, 91 F.4th 981, 983–84 (9th Cir. 2024) (discussing one alien who repeatedly illegally crossed the border at various points). This reality does not give the majority a blank check to cash any atextual interpretation. Nor may the majority adopt a textually impermissible interpretation just to avoid perverse incentives.

In sum, the statute's plain text precludes the majority's interpretation. But even if the statute were ambiguous, the presumption against extraterritoriality, properly applied, supports the plain meaning. The majority's attempts to find a workaround fail. All roads lead to the same conclusion: an alien "arrives in the United States" only when she crosses the border.

II

After erroneously holding that the government has a duty to process asylum seekers in Mexico, the majority narrowly defines what it means for the government to "withh[old]" that duty. *See* 5 U.S.C. § 706(1). The majority assures the government that it retains broad discretion to decide how to

process asylum seekers in Mexico. And it suggests that the government could comply with its duty simply by keeping a list of potential asylum seekers. Maj. at 38.

The majority's narrow interpretation of "withholding" limits the practical impact of its opinion. Indeed, because the government retains broad discretion to limit access to asylum, plaintiffs just across the border likely will still not get any relief—despite the majority's expansive reading of "arrives in." That is a salutary effect. But the way the majority gets there—narrowly interpreting "withholding"— is wrong. And two wrongs do not make a right.

Section 706(1) of the APA requires us to compel agency action if it is either "withheld or unreasonably delayed." 5 U.S.C. § 706(1). Under this section, "the only agency action that can be compelled under the APA is action legally *required*." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63 (2004) (emphasis in original). Even when an organic statute requires agency action, it may not require *immediate* agency action. Unless the statute imposes a deadline, agencies need only complete their statutory duties "within a reasonable time." 5 U.S.C. § 555(b).

We have held that agency action is "withheld" when "Congress has specifically provided a deadline for performance." *Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1177 n.11 (9th Cir. 2002). We explained that the "failure to complete" the required agency action "within the mandated time frame compelled the court to grant injunctive relief."[14] *Id.* at 1178.

---

[14] Although we did not analyze the text of § 706(1) in *Badgley*, the Fourth Circuit correctly recognized that, by declining to apply the

AL OTRO LADO V. NOEM                    73

Other circuits follow a similar approach. In the D.C. Circuit, agency action is withheld when "agency inaction violates a clear duty to take a particular action by a date certain." *Sierra Club v. Thomas*, 828 F.2d 783, 794 (D.C. Cir. 1987).**[15]** The Fourth Circuit similarly recognizes that "an agency's failure to meet a hard statutory deadline" is withholding. *South Carolina*, 907 F.3d at 760. So too the Tenth Circuit, which has concluded that agency action is withheld only if "Congress imposed a date-certain deadline on agency action" that the agency fails to meet. *Forest Guardians v. Babbitt*, 174 F.3d 1178, 1190 (10th Cir. 1999).

The weight of authority—including our opinion in *Badgley*—thus provides that agency action is withheld only when an agency fails to act by a statutory deadline. Rather than create a circuit split, we should follow this clear consensus. Applying that standard here, the government did not withhold one of its duties. The statute does not impose any deadline on the government's obligation to process asylum seekers (assuming an obligation exists). So not even the majority argues that the government "withheld" agency action under this standard.

Instead, the majority concludes that we have already rejected this standard. It reaches this conclusion based on a

---

unreasonable-delay factors, we necessarily concluded that the agency action was "unlawfully withheld." *South Carolina v. United States*, 907 F.3d 742, 760 (4th Cir. 2018) (citing *Badgley*, 309 F.3d at 1176–77 & n.11).

[15] The D.C. Circuit recognizes that "[a]n agency's own timetable for performing its duties in the absence of a statutory deadline is due 'considerable deference.'" *Cobell v. Norton*, 240 F.3d 1081, 1096 (D.C. Cir. 2001) (quoting *Sierra Club v. Gorsuch,* 715 F.2d 653, 658 (D.C. Cir. 1983)). This suggests that it is difficult, if not impossible, for an agency to withhold an action in the absence of a statutory deadline.

questionable reading of *Vietnam Veterans of Am. v. CIA*, 811 F.3d 1068, 1081 (9th Cir. 2016). There, we granted relief under the APA under a statute that did not impose a deadline. The majority concludes that, because we did not address whether agency action was unreasonably delayed, we must have decided that the government "withheld" its obligations.

At the start, *Vietnam Veterans* was decided more than a decade after *Badgley*. To the extent there is any conflict, *Badgley*—which held that a missed deadline was withholding, not delay—controls.[16]

In any event, the majority overreads *Vietnam Veterans*. It concedes that *Vietnam Veterans* did not analyze "whether the Army's failure to comply with the regulation constituted withholding or delay under the APA." Maj. at 35. Rather, we held that the Army had a mandatory obligation enforceable under § 706(1)—without deciding whether the Army withheld or delayed action. Thus, *Vietnam Veterans* cannot have defined what it means for agency action to be "withheld."

The majority concludes otherwise, arguing that the only possible conclusion in *Vietnam Veterans* was that the "failure to act constituted withholding." *Id*. This cannot withstand scrutiny. First, for a century, the Supreme Court

---

[16] To circumvent *Badgley*, the majority notes that *Badgley* held a statutory deadline was a sufficient (but not necessary) condition for withholding. Maj. at 35 n.12. But the majority fails to identify another case addressing the distinction between withholding and delay. *Badgley* is the closest we have. Even so, the relevant question is not whether a statutory deadline is necessary or sufficient for withholding. The relevant question is instead whether the government "withheld" an obligation (rather than "delayed" it) when it told aliens to come back later.

has cautioned that "[q]uestions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *Cooper Indus. v. Aviall Servs., Inc.*, 543 U.S. 157, 170 (2004) (quoting *Webster v. Fall*, 266 U.S. 507, 511 (1925)). We have applied that rule to issues lurking in our own cases. *See Schram v. Robertson*, 111 F.2d 722, 725 (9th Cir. 1940). And it should govern with greater force here. The briefing in *Vietnam Veterans* suggests that the issue litigated was not whether a duty was withheld or delayed, but whether there was a duty at all.[17] In *Badgley*, by contrast, the government argued—and we rejected—that any deviation from the statutorily mandated deadline was reasonable delay. 309 F.3d at 1177 n.11. Thus *Badgley*, not *Vietnam Veterans*, governs whether agency inaction constitutes withholding.

Second, *Vietnam Veterans* is distinguishable. Here, the government told Plaintiffs—like it told all other metered aliens—to come back to the overwhelmed port of entry for processing later. The Army in *Vietnam Veterans*, by contrast, gave no indication that it would ever take the actions the plaintiffs sought. *See generally Vietnam Veterans*, 811 F.3d at 1068. Unlike in *Vietnam Veterans*, the government has not "withheld" any duty to process asylum applications. At most, it has delayed that duty.

---

[17] *See generally* Opening Brief of Appellants, *Vietnam Veterans*, 811 F.3d at 1068; Opening Brief for Defendants-Appellees/Cross-Appellants, *Vietnam Veterans*, 811 F.3d at 1068; Appellants'/Cross-Appellees' Reply Brief and Opposition to Cross-Appeal, *Vietnam Veterans*, 811 F.3d at 1068; Reply Brief for Defendants-Appellees/Cross-Appellants, *Vietnam Veterans*, 811 F.3d at 1068.

Unmoored from precedent, the majority's sweeping new rule—that the government withholds a duty whenever it "refuses to accept, in any form, a request that it take a required action" for any period is indefensible. Maj. at 36. The majority's rule swallows the distinction between "withheld" and "delayed" agency action. After all, the government did not say it would never process Plaintiffs. It merely told those aliens who were turned away to come back when the Ports of Entry were not overwhelmed. That is a far cry from "refus[ing] to accept" a duty to interview those aliens.

In any event, as even *Vietnam Veterans* recognizes, "the operation of § 706(1) is restricted to discrete actions that are unequivocally compelled by statute or regulation." *Vietnam Veterans*, 811 F.3d at 1081. That obligation must be "so clearly set forth that it could traditionally have been enforced through a writ of mandamus." *Id.* at 1076 (quoting *Hells Canyon Pres. Council v. U.S. Forest Serv.*, 593 F.3d 923, 932 (9th Cir. 2010)). The majority does not even try to explain how its withholding rule satisfies this standard.

To the contrary, the majority suggests the government would not have "withheld" its duty to process aliens if it had kept a waitlist or immediately initiated the asylum process. Maj. at 38. But under *Vietnam Veterans*, we can grant § 706(1) relief only if the statute "unequivocally compels" those actions. The relevant statute says nothing about a waitlist or immediate processing. Thus, the majority imposes on agencies a requirement to do "that which [they are] not required to do." *In re A Cmty. Voice*, 878 F.3d 779, 784 (9th Cir. 2017). Section 706(1) gives the majority no such authority. *See Norton*, 542 U.S. at 63.

The good news is the majority's error is limited. If—as the majority concludes—"[e]ven minimal steps," such as keeping a waitlist, would evade the majority's rule and "shift the § 706(1) analysis . . . from the withholding category into the delay category," then the majority's rule is good for this case only. Maj. at 38. But the narrowness of the majority's conclusion only limits its harm; it does not make it legally correct. We should reverse the grant of summary judgment to Plaintiffs on their § 706(1) claim and vacate the corresponding injunction.

## III

Plaintiffs' other claims also fail.

## A

The majority properly vacates the injunction based on Plaintiffs' Due Process claim. It does so, however, on constitutional avoidance grounds. Maj. at 39. I would reject the claim on the merits.

"[M]ore than a century of precedent" establishes that aliens denied entry have no Due Process rights beyond "the procedure authorized by Congress." *Thuraissigiam*, 591 U.S. at 138–39 (quotation omitted). In other words, arriving noncitizens' procedural rights "are purely statutory in nature and are not derived from, or protected by, the Constitution's Due Process Clause." *Mendoza-Linares v. Garland*, 51 F.4th 1146, 1167 (9th Cir. 2022). Plaintiffs thus warrant no relief on their Due Process claim.

## B

Plaintiffs also raise a claim under § 706(2) of the APA. The district court did not reach this claim. But I would dismiss this claim as moot because the memoranda

promulgating the metering policy were rescinded years ago.
*See Akiachak Native Cmty. v. Dep't of Interior*, 827 F.3d
100, 113 (D.C. Cir. 2016) ("[W]hen an agency has rescinded
and replaced a challenged regulation, litigation over the
legality of the original regulation becomes moot.").

Even if the § 706(2) claim remained live, it fails on the
merits. The metering policy was a lawful exercise of the
government's authority to "[s]ecur[e] the borders," 6 U.S.C.
§ 202(2), (8), and the ability to admit aliens falls within the
Executive's inherent powers, *United States ex rel. Knauff v.
Shaughnessy*, 338 U.S. 537, 543 (1950). The government's
exercise of its inherent authority was reasonable given the
pressures it faced at the border when it enacted the metering
policy.

C

Finally, Plaintiffs raise a claim under the Alien Tort
Statute (ATS), arguing that the metering policy violated the
international-law norm of non-refoulement. This claim also
lacks merit.

The ATS gives district courts "original jurisdiction of
any civil action by an alien for a tort only, committed in
violation of the law of nations or a treaty of the United
States." 28 U.S.C. § 1350. This modest statute is an
ordinary jurisdictional statute. It does not say when an
action violates the law of nations or a federal treaty. Nor
does it say which torts properly fall within its reach.

In *Sosa v. Alvarez-Machain*, the Supreme Court
established a path for "recogni[zing] . . . new causes of
action" under the ATS. *Doe v. Cisco Sys., Inc.*, 73 F.4th 700,
714 (9th Cir. 2023) (citing *Sosa v. Alvarez-Machain*, 542
U.S. 692, 728 (2004)). Gratefully, that path is exceedingly

narrow. The bar for recognizing a new cause of action is "high." *Sosa*, 542 U.S. at 727. The ATS creates a cause of action only for "violations of international law norms that are 'specific, universal, and obligatory.'" *Kiobel*, 569 U.S. at 117 (citing *Sosa*, 542 U.S. at 732).[18] But even identifying such a norm is not enough—once identified, courts then apply a second, "extraordinarily strict" step of asking whether there is "even one" reason to think that Congress might "doubt the efficacy or necessity of the new remedy." *Nestle USA, Inc. v. Doe*, 593 U.S. 628, 637 (2021) (plurality op.) (quotation omitted). If the answer to the second question is "yes," then "courts must refrain from creating [a] remedy" for even a specific, universal, and obligatory norm. *Jesner v. Arab Bank, PLC*, 584 U.S. 241, 264 (2018) (quotation omitted).

Since both steps must be met, private rights of action under the ATS are available only "in very limited circumstances." *Nestle*, 593 U.S. at 631 (plurality op.). Indeed, the Supreme Court has "yet to find [the two-part test] satisfied." *Id.* at 637. The Court's reluctance to expand the ATS beyond *Sosa* underscores its commitment to ending the "*ancien regime*" when the Court "ventur[ed] beyond Congress's intent" to create rights of action that were—at best—only implied. *Alexander v. Sandoval*, 532 U.S. 275, 287 (2001). A plurality of the Court has already suggested that it will not infer any rights of action beyond "the three historical torts identified in *Sosa*": "violation of safe conducts, infringement of the rights of ambassadors, and

---

[18] This test "bears a marked resemblance to the 'clearly established law' standard in qualified immunity analysis." Gerald Weber, *The Long Road Ahead: Sosa v. Alvarez-Machain and "Clearly Established" International Tort Law*, 19 Emory Int'l L. Rev. 129, 132 (2005).

piracy." *Nestle*, 593 U.S. at 635, 637 (plurality op.).
Reading between the lines, we should *never* infer additional
causes of action under the ATS. The three torts identified in
*Sosa*, and no more.

Finally, even if plaintiffs allege violations of one of the
three torts identified in *Sosa*, they must go a step further and
show that the violation took place in the United States. That
is because the ATS lacks extraterritorial effect. Any claim
alleging "violations of the law of nations occurring outside
the United States is barred." *Kiobel*, 569 U.S. at 124.

Plaintiffs' ATS claim founders on all these shoals.
Extraterritoriality is a good place to start. Plaintiffs seek a
remedy under the ATS for actions that occurred in Mexico.
Because "the presumption against extraterritoriality applies
to claims under the ATS," *id.*, their claim cannot succeed
even if non-refoulement is a "specific, universal, and
obligatory" norm.

Besides seeking to give extraterritorial effect to the ATS,
Plaintiffs also seek to elevate non-refoulement to a universal
status it does not have. Assume Plaintiffs are right to define
non-refoulement     as     they     do:     non-refoulement
"encompass[es] any measure . . . which could have the effect
of returning an asylum-seeker or refugee to the frontiers of
territories where his or her life or freedom would be
threatened[.]" UNHCR Exec. Comm., Note on International
Protection, ¶ 16, U.N. Doc. A/AC.96/951 (Sept. 13, 2001).
Even on that definition, the metering policy is not non-
refoulement. The United States did not accept any metered
aliens into the United States. So how could it have returned
asylum-seekers or refugees anywhere?

In any event, assuming that the metering policy was non-
refoulement, Plaintiffs' arguments remain unpersuasive.

Plaintiffs argue that non-refoulement has reached *jus cogens* status, meaning that it is binding on the United States regardless of whether it has consented to it. *Siderman de Blake v. Republic of Arg.*, 965 F.2d 699, 714–17 (9th Cir. 1992). Because finding that a norm has *jus cogens* status is harsh medicine, only the rarest of norms will achieve that status. *Jus cogens* norms must be "so universally disapproved by other nations" that they are "automatically unlawful." *Sosa*, 542 U.S. at 751 (Scalia, J., concurring in part). The list of such norms is so small that the Restatement (Third) of the Foreign Relations Laws of the United States enumerates them: only norms prohibiting "official torture," "genocide, slavery, murder or causing disappearance of individuals, prolonged arbitrary detention, and systematic racial discrimination" have achieved that status. *Siderman de Blake*, 965 F.2d at 717. The refoulement of aliens who have never entered the United States is a far cry from that status.

As the district court correctly recognized, many European countries and Australia have policies that belie any claim that the non-refoulement standard universally applies extraterritorially. Indeed, some countries have policies that mirror the metering policy here. That is unsurprising. Most countries, including the United States, respect and protect their borders. Only the Ninth Circuit—which is not a sovereign nation—seems to reject this nearly universal goal of national border security. Plaintiffs cannot identify the "general assent of civilized nations" necessary to create a cause of action under the ATS. *See Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 254 (2d Cir. 2009).

But even if non-refoulement were as universally disapproved as Plaintiffs suggest, a cause of action would

still not exist under the ATS. Under the second prong of the Court's ATS test, there are countless sound reasons to think that Congress would doubt the efficacy or necessity of a remedy under the ATS. *Jesner*, 584 U.S. at 264.

I offer just one—the ATS "has not been held to imply any waiver of sovereign immunity." *Tobar v. United States*, 639 F.3d 1191, 1196 (9th Cir. 2011). "A waiver of sovereign immunity cannot be implied but must be unequivocally expressed." *Id.* at 1195 (quoting *United States v. Mitchell*, 445 U.S. 535, 538 (1980)). Thus, recognizing an ATS claim *against the United States* for violating a norm of non-refoulement would require us to find that Congress, which generally legislates against the backdrop of existing law, *see Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 533 (1994), silently waived the Nation's sovereign immunity in cases brought by any alien not immediately processed at the border. Nothing Plaintiffs identify would support such a drastic departure from precedent, particularly in a case that would open the federal coffers to aliens who have never stepped foot in the United States.

In sum, for a host of reasons, Plaintiffs' ATS claim, which would mark a drastic expansion of *Sosa*, fails.

IV

The majority's interpretation of "arrives in the United States" is indefensible. It twists the statutory language, ignores history, flips multiple presumptions, and ignores common-sense English usage. The majority also erroneously concludes that the government "withheld" a statutory duty (rather than merely delaying it) by telling aliens to come back later. We should have rejected Plaintiffs' claims, including those that the majority saves for another day. I dissent.

AL OTRO LADO V. NOEM                83

## APPENDIX 1

*Table 1: 161 Uses of "Arrives in" to Describe a Destination*

| Year | Source | Context |
|------|--------|---------|
| 1990 | Christian Science Monitor | Transplanted from her West Indian home, the 19-year-old arrives in a large East Coast city…to work as an au pair. |
| 1990 | USA Today | Nelson Mandela, who arrives in New York today, is being greeted with a ticker-tape parade and crowds of thousands. |
| 1990 | Christian Science Monitor | Mr. Gorbachev arrives in Washington [for a summit]. |
| 1990 | Washington Post | Prime Minister Tadeusz Mazowiecki, the diffident, sad-faced leader of Poland's Solidarity-controlled government, arrives in Washington [to meet with President Bush]. |
| 1990 | Washington Post | When the new Congress arrives in Washington in January, it will face a major piece of unfinished business. |
| 1990 | J. of Am. Ethnic History | [She] used to think that money was got on the streets here, but if ever she arrives in this country she will find it quite different, as there is nothing got here by idleness. |
| 1990 | Ethnology | A vendor arrives in the market with a small supply of capital and knowledge of market trade. |

| Year | Source | Context |
|------|--------|---------|
| 1990 | World Affairs | Soviet leader Mikhail Gorbachev arrives in Beijing for the first Sino-Soviet summit in thirty years. |
| 1990 | Style | When Roderick arrives in London, he must concoct a voice with which to advance his career. |
| 1990 | American Heritage | In "Squaring the Circle," a mountain man from Kentucky arrives in Manhattan and is made vertiginous by its pitiless rush forward. |
| 1990 | American Heritage | [Photo description:] Lajos Kossuth arrives in America in 1851, with the Guardian Genius of Hungary in attendance. |
| 1990 | White Hunter: Black Heart | You can leave if you want. I'm staying. The company arrives in Entebbe the day after tomorrow [to film a movie]. |
| 1990 | USA Today | Ragged arrives in an era of declining rock' n' roll, a drift that hasn't alarmed Young. |
| 1990 | Newsweek | [Photo description:] Ambassador to Kuwait Nathaniel Howell arrives in Germany. |
| 1990 | ABC | Mikhail Gorbachev arrives in Washington next Wednesday evening [for a summit]. |
| 1990 | CNN Specials | [We have to design the equipment so that it] is lighter and able to get there and then do a different job when it arrives in the arena. |
| 1990 | CNN Crossfire | And your view is that…let[ting] food supplies go into Kuwait would be an excellent idea?...The moment that food |

AL OTRO LADO V. NOEM                85

| Year | Source | Context |
|------|--------|---------|
|  |  | arrives in Kuwait, it will be taken by the Iraqis. |
| 1990 | PBS Newshour | Mandela arrives in New York on Wednesday for a 12-day visit to the U.S. |
| 1990 | PBS Newshour | Each day a new harvest of inmates arrives in The Crosses [where they are detained for months, waiting for investigations to finish.] |
| 1990 | PBS NewsHour | I think he is positioning himself also to improve the chances for his foreign minister, Teraq Aziz, when he arrives in Washington [for negotiations]. |
| 1990 | ABC Nightline | Furthermore, he said when Perez de Cuellar arrives in Amman, they are not arriving with any proposals for the secretary general. |
| 1990 | Atlantic | As first light arrives in a beech and hemlock forest, setting the birds sounding their chaotic vowels… |
| 1990 | Interior Landscapes | I am the one by whom my past arrives in this world. |
| 1990 | Good Fellas | A bedraggled Henry arrives in his brother, Michael's, room. Michael is all dressed and sitting in his wheelchair, ready to go. |
| 1990 | Newsweek | Hence, productivity begins even before the worker arrives in the office. |
| 1990 | Newsweek | This child…is the grandson of…a Russian Jew who arrives in Baltimore on the Fourth of July, 1914, and declares it the most beautiful place he's ever seen. |

| Year | Source | Context |
|------|--------|---------|
| 1990 | U.S. News & World Report | Until the supertanker arrives in the U.S., no one knows the price its oil cargo will bring. |
| 1990 | Changing Times | [A cruise ship], for example, leaves Miami on Saturdays and after two days at sea arrives in St. Martin/St. Maarten, which is half French and half Dutch. |
| 1990 | Weatherwise | [T]he Count, disguised as a large, black dog, arrives in England. Fortunately for His Excellency, immigration and quarantine laws were much less strict then than now. |
| 1990 | TIME | If you think of the telephone purely as a secular voice thrower, it arrives in the mind at its most irritating. |
| 1991 | ABC Special | On November 15th, a second ambassador arrives in the United States to help Nomura, the current ambassador, who's been negotiating for almost a year. |
| 1991 | ABC Special | [T]he note is seen as an ultimatum. The same day Hull's note arrives in Japan, the Japanese fleet departs from Japan. |
| 1991 | PBS Newshour | Terry Anderson arrives in Germany [to begin his first full day of freedom at an American military base] |
| 1991 | ABC Nightline | James Baker arrives in Saudi Arabia tonight [to meet with Kuwait's leader.] |
| 1991 | ABC Nightline | Once the food arrives in the port, yes, there will have to be some work done on the roads. |
| 1991 | ABC Nightline | He will likely tell the President which way it's going to go before he arrives in |

| Year | Source | Context |
|------|--------|---------|
| | | Moscow for the summit with Mr. Gorbachev, July 30th, 31st. |
| 1991 | JFK | Six months after he arrives in Russia, Francis Gary Powers' U2 spy flight goes down in Russia. |
| 1991 | Forbes | [I]f the wine is likely to cost at least 20%-25% more when it arrives in the U.S. 18 to 24 months later. |
| 1991 | Nat'l Rev. | Her calculation is shown in one sequence in Truth or Dare when her tour arrives in Toronto and she is told that the police are prepared to arrest her if [she performs a specific bit.] |
| 1991 | Saturday Evening Post | In New York City, only 32 cents of every education dollar arrives in the classroom. |
| 1991 | Compute! | The robot will sell for less than $1,000 when it arrives in stores and catalogs next February. |
| 1991 | Compute! | When the shuttle arrives in space, the crew reconfigures the computers for orbital operations. |
| 1991 | Weatherwise | [Photo description:] An ore carrier bearded with the frozen spray of the Great Lakes arrives in Superior, Wisconsin, in a -15 degrees F deep freeze. |
| 1991 | NY Times | She gives one party each summer for about 400 Saratogians, even before the racing crowd arrives in town. |
| 1991 | Christian Science Monitor | Gorbachev decided to speed it up and finish everything before the delegation arrives in Vilnius….Then the delegation will arrive to find 'order' restored. |

| Year | Source | Context |
|------|--------|---------|
| 1991 | Associated Press | First Egyptian contingent arrives in Saudi Arabia. Iraqi President Saddam Hussein urges Arabs to sweep "emirs of oil" from power. |
| 1991 | USA Today | The Giffords will be reunited temporarily Friday. Kathie Lee arrives in Tampa to tape Regis & Kathie Lee. |
| 1991 | USA Today | John Major is expected to brief President Bush on the positions of Britain, Italy, France and Germany when he arrives in the United States Wednesday for a three-day visit. |
| 1991 | USA Today | His new album, Dangerous, arrives in stores Tuesday. |
| 1992 | Houston Chronicle | Uher said he would support a rules change requiring the Calendars Committee to schedule a bill for floor debate within 30 days after it arrives in Calendars. |
| 1992 | ABC Business | President Bush arrives in Japan on Tuesday on a mission to open Japanese markets to American products. |
| 1992 | ABC Special | As Clinton arrives in Albuquerque, New Mexico, it is very late at night and [local supporters are gathered to meet him.] |
| 1992 | NPR All Things Considered | The vice president arrives in Tokyo on Tuesday to take part in a ceremony. |
| 1992 | CNN | One drawback to electing a governor President is that he arrives in the White House with little foreign policy experience. |

| Year | Source | Context |
|------|--------|---------|
| 1992 | ABC Nightline | President Bush arrives in Japan with a demand: Japanese markets must be opened to American-made goods. |
| 1992 | NPR Weekend | Boris Yeltsin arrives in Washington, DC, on Tuesday [for a summit.] |
| 1992 | Batman 2 | Descending the stone stairs, Alfred arrives in the Batcave. |
| 1992 | Batman 2 | Frick arrives in the doorway [to speak to someone.] |
| 1992 | Jennifer Eight | [A man] spits gum at the sink as he arrives in the kitchen. |
| 1992 | Jennifer Eight | [She] hurr[ies] into her dressing gown with a similar urgency to get out. She arrives in the living room as the figure is clambering through the window. |
| 1992 | Newsweek | [Photo description:] A shipload of Somali refugees arrives in Yemen |
| 1992 | America | The hero of *And You, Too* arrives in France [to study] |
| 1992 | Christian Science Monitor | A young senator, Jefferson Smith, arrives in the nation's capital [to serve his term] |
| 1992 | Associated Press | Churchill arrives in Cairo, disturbed by a telegram from Gen. Auchinlek saying Britain's 8th Army will not have the strength to make new attacks. |
| 1992 | Associated Press | Churchill arrives in Moscow to tell Stalin no second front will be opened in Europe in 1942. |
| 1992 | Washington Post | The first installment of her $60 million, multimedia deal with Time Warner arrives in stores today. |

| Year | Source | Context |
|------|--------|---------|
| 1992 | Washington Post | The Subway Finally Arrives in Woodbridge and Waldorf[, expanding] the Metro into the outer counties. |
| 1992 | Washington Post | Hillary Clinton arrives in town today still in the process of figuring out how to be an impeccable |
| 1992 | Atlanta J.-Const. | Joel Fleischman, a whiny New Yorker, arrives in Alaska to fulfill his obligation under a state program that had paid his tuition |
| 1992 | San Francisco Chronicle | His co-star, Susan Strasberg, portrays a naive deaf woman who arrives in the Haight looking for her missing brother. She's quickly befriended. |
| 1992 | World Affairs | The first Mainland Chinese to visit Taiwan arrives in Taipei. |
| 1993 | ABC 20/20 | Three days before Kennedy arrives in Dallas, [Lee Harvey Oswald is] given a gift on a silver platter. Jack Kennedy's going to pass in front of the Depository. |
| 1993 | NPR All Things Considered | But Clinton arrives in Tokyo [for negotiations] with his stature as an international leader tarnished by his performance over the last four months. |
| 1993 | NPR Morning | Bosnia's President Alija Izetbegovic arrives in New York today. He'll address the U.N. tomorrow. |
| 1993 | ABC Nightline | The President arrives in Tampa, Florida, a medium-sized city where one out of five people has no health insurance. [The President is interviewed.] |

AL OTRO LADO V. NOEM                    91

| Year | Source | Context |
|------|--------|---------|
| 1993 | CNN | A young English nurse, a new bride, arrives in Africa with a man that she met while working as a nurse during the war…[and] sought out friends among the local Africans. |
| 1993 | CNN | A package arrives in the mail.  You open it… |
| 1993 | Southern Review | Mariana of Austria is not yet queen the day that Mari Barbola arrives in Madrid: someone else fills that role, an Isabella. |
| 1993 | So I Married an Axe Murderer | Charlie runs across the dance floor, fighting for an exit to the outside. He arrives in someone's arms on his way [and says,] 'I need your help.' |
| 1993 | NY Times | William Nathaniel Showalter III arrives in Fort Lauderdale, Fla., for spring training today. |
| 1993 | NY Times | When Mr. Clinton arrives in Des Moines, he will join Mr. Harkin for a helicopter tour. |
| 1993 | Christian Science Monitor | One-and-a-half hours northeast of the Salvadoran capital…, one arrives in Ilobasco, marked by its red-tiled roofs. Here, the combination of fine-grained clay and local talent has produced a cottage industry of ceramic crafts. |
| 1993 | Christian Science Monitor | But when our renga arrives in the morning mail, I find that the wind that climbs the pine hill behind David's house is stirring the apple boughs behind me. |

| Year | Source | Context |
|------|--------|---------|
| 1993 | Associated Press | The flight from Miami arrives in Iquitos, Peru, late at night and you get on the boat immediately…. |
| 1993 | Washington Post | The first, a nonstop from Ocean City to Washington, departs Ocean City at 8 a.m. daily and arrives in Washington at 1:50 p.m. |
| 1993 | Washington Post | The second departs Ocean City at 11:20 a.m., stops in Rehoboth Beach at 12:05 p.m. and arrives in Washington at 3:55. |
| 1993 | Washington Post | The last bus, also a nonstop, leaves Ocean City at 5 p.m. and arrives in Washington at 10:45. |
| 1993 | Atlanta J.-Const. | [T]he Ladies Professional Golf Association arrives in Stockbridge this week for the $ 600,000 Atlanta Women's Championship. |
| 1993 | Atlanta J.-Const. | He arrives in Atlanta via impressive stints as a staff conductor with the [several symphonies.] |
| 1993 | Houston Chronicle | Neeson…stars as Oskar Schindler, a Nazi Party member who arrives in Krakow, Poland, shortly after the Nazi army crushes Polish resistance in 1939. |
| 1993 | Raritan | The brisk rhythm…builds up to this shot as an arresting point of confluence; the ship's entering frame as it arrives in the town harbor carries the accumulated charge of all that has been transpiring. |
| 1993 | Raritan | [Photo description:] The phantom ship entering frame as it arrives in the town harbor. |

| Year | Source | Context |
|------|--------|---------|
| 1993 | Geographical Review | By the time the caravan arrives in Amazonia, the forest is largely felled, the resources pillaged… |
| 1993 | Music Educators Journal | A new magazine of practical music teaching arrives in your mailbox this summer. |
| 1994 | Social Studies | Constance Hopkins arrives in the New World aboard the Mayflower and relates the early years of Plymouth Plantation from November 1620 to February 1626. |
| 1994 | CBS 60 Minutes | Boris Yeltsin arrives in the U.S. tonight for a summit meeting with President Clinton. |
| 1994 | CBS Special | This delegation arrives in a situation in which, by and large, the Haitian people, as best anyone can determine, are saying to themselves and anyone else who will listen, 'We just hope this thing gets over with.' |
| 1994 | ABC Day One | Nearly every week, a Chinese freighter arrives in the port of Long Beach, California. |
| 1994 | CBS Eye to Eye | Last week [a package] arrives in New Jersey, where Jay Skidmore is a U.S. postal inspector. |
| 1994 | Gerald Rivera Show | When he arrives in the house, do you give him a kiss? MARGIE: No. (Audience-reaction). |
| 1994 | ABC Saturday News | [A] convoy of U.N. peacekeepers arrives in Gorazde after Bosnia's Serbs defy NATO's ultimatum and intensify their shelling. |

| Year | Source | Context |
|------|--------|---------|
| 1994 | NPR Morning | [I]t's comforting to know that there is poetry out there worse than my poetry. And it arrives in the mail…. |
| 1994 | ABC Nightline | There is always a certain element of pomp and ceremony when a U.S. president arrives in a foreign capital, but it's essentially fluff. |
| 1994 | ABC Nightline | [Mr. Swing] will be hosting the high-powered delegation when it arrives in Haiti tomorrow. |
| 1994 | Literary Rev. | For instance, James Bond arrives in Munich and knows where he can eat the best liverwurst in the city. |
| 1994 | Critical Matrix | [S]he sails around for several years…until she finally arrives in Britain, which has recently been conquered by a non-Christian people…[S]he succeeds in spreading the word of God among the Britons. |
| 1994 | North of Montana | She believes she is escaping those dead-end streets, but instead arrives in California with the phone number of an old high school boyfriend written out like a prescription. |
| 1994 | Cobb | Here comes Cobb with a recklessness beyond reason.  And as the pitch arrives in the Catcher's hands, the Catcher digs in to take on Cobb. |
| 1994 | The Fist of God | A Mossad team arrives in London to mount an operation against a Palestinian undercover squad. |

| Year | Source | Context |
|------|--------|---------|
| 1994 | Harpers Magazine | I have been avoiding the club where we had lunch. If a package arrives in the mail, I shake it slightly. |
| 1994 | NY Times | [H]e arrives in Naples [for a summit] with the best economic performance of the participants. |
| 1994 | NY Times | Prime Minister John Major arrives in Naples [for a summit] in a curious position: Britain's economy is growing…. |
| 1994 | Associated Press | [L]arge artificial marshes…will be used to cleanse farm run-off before it arrives in the Everglades. |
| 1994 | Associated Press | The prevailing south winds are lashing gnarled mesquite trees as a visitor arrives in Rule, population 783. |
| 1994 | Associated Press | British Foreign Secretary Douglas Hurd arrives in Hanoi Wednesday to expand his country's trade and investment links. |
| 1994 | Washington Post | In one scene, a group of children arrives in England and is welcomed and hugged by people they don't know but with whom they will live temporarily. |
| 1994 | San Francisco Chronicle | Johnny…is 27 and arrives in London in a stolen car, penniless but full of dire thoughts. |
| 1994 | San Francisco Chronicle | California Governor Wilson will be the latest visitor when he arrives in El Paso today to tour the border and see what lessons the blockade may hold for his state. |

| Year | Source | Context |
|------|--------|---------|
| 1994 | Chicago Sun-Times | She was in love with Lime, who is seemingly killed just as Cotton arrives in Vienna. |
| 1994 | Chicago | A once-in-a-lifetime event arrives in Chicago and you might wind up with your nose pressed against the window. |
| 1994 | Armed Forces & Soc. | This is how Amnon expresses what it means to be scared when one arrives in Gaza for the first time. |
| 1994 | Sirens | When the exhibition arrives in London, the English will be convinced. |
| 1994 | NPR Weekend | Here's a president who arrives in Moscow [for discussions] with no new money. The only amounts of money that are going to be given to help Russia have all been stipulated before. |
| 1995 | Metropolis | As they head into the apartment, the elevator arrives in the hall, bringing more people. Christoph ushers in this new group, then slips into the elevator. |
| 1995 | CBS Morning | Shirley Harris arrives in the emergency room at 2:00 PM with chest pain. She's immediately hooked up to a monitor. |
| 1995 | NPR Morning | Private hospitals, by law, have to treat anyone who arrives in the emergency room. |
| 1995 | Mass. Rev. | Meanwhile, I open a letter that arrives in the mail. |
| 1995 | Va. Quarterly Rev. | One week later, a letter to me arrives in the office mail. The return address is The New York Herald Tribune Book. |
| 1995 | Outbreak | [D]awn arrives in the Motaba Valley. |

AL OTRO LADO V. NOEM                    97

| Year | Source | Context |
|------|--------|---------|
| 1995 | Sports Illustrated | Within 48 hours a representative of the testing agency used by Major League Baseball arrives in Binghamton, N.Y., home of the Mets' Double A affiliate, to collect a urine sample from Gooden. |
| 1995 | Astronomy | At certain separations, a light wave from one star arrives in sync with a light wave from the other star and adds to it. |
| 1995 | Christianity Today | U.S. Marines salute Pope John Paul II as he arrives in Queens. |
| 1995 | Associated Press | Pope John Paul II proclaims himself "a pilgrim of peace" as he arrives in the United States for a five-day visit. |
| 1995 | Washington Post | Indeed, before he arrives in the United States, Peres says he plans to develop a list of options…. |
| 1995 | Atlanta J.-Const. | Clayton County has become a multi-cultured and diverse community. When student-led prayer arrives in the classroom, it will include Hindu, Muslim, Jewish and pagan chants. |
| 1995 | Atlanta J.-Const. | A tired young man arrives in Atlanta one evening. He has no relatives to support him…. |
| 1995 | Atlanta J.-Const. | Stoichkov could play more than 60 matches before he arrives in Atlanta. |
| 1995 | Atlanta J.-Const. | When the world arrives in our city next summer, challenging these barriers must be accomplished if Atlanta is to emerge as the next great international city for people with disabilities. |

| Year | Source | Context |
|------|--------|---------|
| 1995 | San Francisco Chronicle | Levada arrives in San Francisco following several years of bitter protests over Quinn's decision to close more than a dozen churches. |
| 1995 | Symposium | As soon as she arrives in the village, a network that resembles a transparent web weaves itself around Samya. |
| 1995 | NPR Morning | The first among this new old breed of scary critters arrives in Species, a sci-fi thriller that owes a lot to Alien. |
| 1995 | Mighty Morphin Power Rangers | [The] world famous coach Gunthar Scmidt arrives in Angel Grove today [to scout for his gymnastics team.] |
| 1996 | Smithsonian | [A man on a tour received increased media attention with] each successive stop. In fact, a few days from now, when he arrives in Buffalo, New York, for a Juneteenth Festival…he'll be greeted by 60,000 festival goers." |
| 1996 | Associated Press | Volkswagen's biggest car, the Passat, will see slicker styling and improved safety features when it arrives in the United States next spring. |
| 1996 | CBS 48 Hours | Two people…are the keepers of the [Olympic] flame…until it arrives in Atlanta [for the Olympics.] |
| 1996 | People Weekly | Runaway Jury, the story of a high-stakes lawsuit against a tobacco company, which arrives in bookstores this week. |

| Year | Source | Context |
|------|--------|---------|
| 1996 | Ark. Rev.: J. Delta Studies | Marcie arrives in Baton Rouge at six o'clock.  When I open the door, she throws her arms around my neck. |
| 1996 | Ark. Rev.: J. Delta Studies | [She] goes right into a detailed description of how she plans to breed iguanas once she arrives in Texas. |
| 1996 | Fantasy & Sci. Fiction | It seems as if the 1992 elections just ended, and yet this magazine arrives in your mailbox at the beginning of primary season. |
| 1996 | House Mouse, Senate Mouse | Later in the story, the children's letter arrives in the House mail room. |
| 1996 | Basquiat | She balls up the drawing and puts it in her pocket.  Gina arrives in the doorway, wearing a robe.  The landlady's trapped between them. |
| 1996 | Popular Mechanics | What Mitsubishi's 40-in. glass-plasma display will actually look like and how it will be configured when it arrives in stores in early 1997 are still mysteries. |
| 1996 | Esquire | Dan "the Beast" Severn arrives in the Octagon [with people who announce him for a wrestling match.] |
| 1996 | Field & Stream | [A] fish [changes] between the evening when it is caught and the next morning when the fisherman arrives in the local coffee shop to tell of his catch. |
| 1996 | Smithsonian | If this were a video game, the screen might first show a stranger.  He arrives in a rainy city [and founds a school]. |

| Year | Source | Context |
|------|--------|---------|
| 1996 | Associated Press | [The] Cuban President arrives in Chile [for a summit.] |
| 1996 | USA Today | The flight arrives in Newark but is late, and the team must go to the other end of the airport to catch its connecting flight to Hartford. |
| 1996 | San Francisco Chronicle | Yet nothing is for sure now. Moceanu arrives in Atlanta with a four-centimeter stress fracture in her tibia that kept her out of the Olympic Trials |
| 1996 | The Simpsons | Every month, Good Housekeeping arrives in my mailbox bursting with recipes. |
| 1996 | Chicago Sun-Times | None of this rich thematic material arrives in the form of dry discourse in *Arcadia*. |
| 1996 | Associated Press | The imported Catera arrives in small quantities this year in California, Oregon and Washington, then debuts in the Washington, D.C.-to-Boston area. |

*Table 2: 58 Uses of "Arrives in" to Describe When or How One Arrives*

| Year | Source | Context |
|------|--------|---------|
| 1990 | Nat'l Rev. | The obliging taxi driver who has taken us to a sung Latin Mass at St. Vitus's Gothic cathedral this morning arrives in time. |
| 1990 | Omni | Ninety percent of Hawaii's energy arrives in the form of imported oil. |
| 1991 | Atlanta J.-Const. | Bert Blyleven, also disabled, arrives in time before each home game to take a 90-minute bike ride around the stadium. |
| 1990 | San Francisco Chronicle | Moments after Hackman and his crony find Archer in a wilderness cabin, the mob arrives in a commando-style helicopter raid. |
| 1990 | Ethnology | Animals are slaughtered and a meal arrives in large brass trays. |
| 1990 | Rolling Stone | She arrives in a new red BMW, as well as in a wide-brimmed hat. |
| 1992 | Passenger 57 | Stuart Ramsay arrives in mid-conversation with a top executive. |
| 1992 | USA Today | A [BMW] 325is coupe arrives in March. |
| 1992 | USA Today | [The] [c]onvertible version of the 300ZX sports car arrives in April at about $39,000. |
| 1992 | USA Today | A station wagon arrives in September. |
| 1992 | Atlanta J.-Const. | Mussels and clams are average; chicken is chunks of white meat resembling the stuff that arrives in boxes, not on the bone; sliced chorizo sausage is so-so. |
| 1992 | Atlanta J.-Const. | [T]he daily stream of traffic arrives in 1994. |

| Year | Source | Context |
|------|--------|---------|
| 1992 | Boston Coll. Env't Affairs L. Rev. | Perhaps the threat arrives in the form of a nearby sanitary landfill or a nuclear power plant. |
| 1992 | J. Info. Sys. | Since information arrives in time-sequenced, discrete event' packets, this is essentially an optimal stopping problem. |
| 1992 | J. Info. Sys. | Since information arrives in discrete time-sequenced packets…. |
| 1992 | J. Info. Sys. | [A]ssume that S is updated in clusters of m=3 (e.g., it arrives in "bursts"). |
| 1993 | ABC Sun News | A young girl is chosen to be the Rangeley angel and arrives in snowland style to light the tree. |
| 1993 | Babylon 5: The Gathering | [The four] governments have ambassadors here. Almost. The fourth arrives in two days. |
| 1993 | Kenyon Rev. | The lamb, a tiny, pure white female, arrives in a laundry basket. For Ariella it's love at first sight. |
| 1993 | Being Human | Hector's girlfriend Anna arrives in her car. It is a bright pink station wagon. |
| 1993 | Field & Stream | The Nobilem…is mechanically good and optically superb, comes with a leather neck strap that is too long, and arrives in a leather hard case that is an object of great beauty. |
| 1993 | Compute! | Help arrives in the form of another undocumented feature. |

| Year | Source | Context |
|------|--------|---------|
| 1993 | Omni | [T]he date Nostradamus named for the end of the world can be figured in several ways, depending on the chosen starting point, so that Armageddon arrives in the year 2000 or later, in 3797. |
| 1993 | Chicago Sun-Times | [A m]id-size, extra-roomy Sonata sedan arrives in March as [a] thoroughly revamped but inexpensive early 1995 model. |
| 1993 | Chicago Sun-Times | [This] Eclipse has [a] short production run because [the] redesigned 1995 model arrives in spring. |
| 1994 | Cobb | Wagner takes the throw as Cobb arrives in a spikes-up slide. |
| 1994 | Literary Rev. | [I]t never occurs to him that he arrives in a plaid suit and all others are wearing T-shirts. |
| 1994 | Mass. Rev. | Then the Don, Death arrives in a big old Benz. |
| 1994 | Fantasy & Sci. Fiction | The ship arrives in midafternoon. Why don't we just wait for it? |
| 1994 | San Francisco Chronicle | As is now usual with Stone films, this one arrives in a highly marketable cloud of controversy. |
| 1994 | Chicago Sun-Times | Callaway arrives in midmorning, having read late into the night before. |
| 1994 | Giorgino | Professor Beaumont arrives in a moment. |
| 1995 | San Francisco Chronicle | The adulation arrives in torrents, gathering at Mike Tyson's feet in three-foot drifts. |

| Year | Source | Context |
|------|--------|---------|
| 1995 | TIME | It will take an outsider to revive this troubled lot, and she arrives in the form of Bette Mack, a taciturn beauty in pink sneakers. |
| 1995 | Copycat | Ruben arrives in a taxi. |
| 1995 | Braveheart | The undertaker arrives in his hearse. |
| 1995 | Feminist Studies | The boss always arrives in a bad mood, but he never has a reason for being angry with Mery Yagual. |
| 1995 | Chicago Sun-Times | Not to be outdone, the tiramisu arrives in a wine glass. |
| 1995 | Am. Studies Int'l | The great white buffalo heralded by Native prophesy arrives in the form of a white motor home.  The medicine pipe is sold. |
| 1995 | Space: Above and Beyond | The miners are preparing to transfer ice ore to a heavily armed convoy which arrives in two days. |
| 1996 | Chicago Sun-Times | Amish-raised chicken arrives in a deep bowl, the pieces of chicken sharing space with chunks of roasted potatoes. |
| 1996 | NY Times | Sally Field arrives in a square Volvo wagon for the wild children's birthday party. |
| 1996 | NY Times | When Harrison Ford is called to the White House in *Clear and Present Danger*, he arrives in his Taurus station wagon. |

| Year | Source | Context |
|------|--------|---------|
| 1996 | Popular Sci. | If these procedures or any of the team's diagnostic tests indicate that an engine is malfunctioning, it's removed entirely, placed in a handsome aluminum shipping container, and replaced—straightaway—with another that arrives in a similar container. |
| 1996 | The Rock | The President arrives in three hours. |
| 1996 | Bicycling | Kestrel, the first production, one-piece, airfoil-designed carbon frame, arrives in '86. |
| 1996 | Beavis and Butt-head Do America | We pan back to the hotel as Muddy arrives in a cab. |
| 1996 | Saturday Evening Post | Sometimes a rescue squad arrives in time to revive the victim. |
| 1996 | USA Today | The front-wheel-drive S70 sedan arrives in fall as the successor to the midrange 800-series. |
| 1996 | USA Today | An all-new Accent arrives in fall. |
| 1996 | USA Today | The sexy SLK roadster that's been making the rounds of the international auto shows arrives in early '97, with two key features. |
| 1996 | The Rock | Okay. Okay. The President arrives in three hours. |
| 1996 | USA Today | A redesigned version of the midsize Regal arrives in spring. |
| 1996 | USA Today | A successor to the compact Corsica sedan arrives in early 1997. |
| 1996 | USA Today | In addition, a successor to the Ciera, rebadged a Cutlass, arrives in early 1997. |

| Year | Source | Context |
|------|--------|---------|
| 1996 | USA Today | A redesigned Maxima sedan arrives in fall. |
| 1996 | Raritan | And Auden's version of the faithful Sarah Young arrives in time to see what he is up to. |
| 1996 | ABA J. | This [comment] arrives in the ponderous, thoughtful tones you would expect from someone who has Higginbotham's new life as an ombudsman for the American establishment. |

BRESS, Circuit Judge, with whom GOULD, CALLAHAN, M. SMITH, IKUTA, BENNETT, R. NELSON, BADE, COLLINS, LEE, BUMATAY, and VANDYKE Circuit Judges, join, dissenting from the denial of rehearing en banc:

The panel majority in this case reached the remarkable conclusion that our asylum statute extends to undocumented aliens in Mexico ambiguously close to the United States border, "whichever side of the border they are standing on." *Al Otro Lado v. Exec. Office for Immigr. Rev.*, No. 22-55988, --- F.4th ---, Slip Op. at 22 (May 14, 2025), *as amended*. That holding violates clear statutory text, precedent, the presumption against extraterritoriality, and long-held understandings limiting application of the asylum and inspection laws to aliens "*in*" the United States—which aliens in Mexico of course are not. 8 U.S.C. §§ 1158(a)(1), 1225(a)(1). The panel's serious misreading of the statutory text then led it to an extraordinary result: after extending asylum protections to aliens who are physically *in Mexico*, the panel upheld an unprecedented district court order severely limiting the government's ability to manage the large flow of undocumented aliens trying to enter the United States at overrun ports of entry along the Mexican border. And that is surely only one of the many governmental efforts to manage the border that the panel's precedential opinion will affect going forward.

This long-running case has now spanned three presidential administrations, all of whom have strenuously opposed the panel's result and reasoning. I tried to head this off at the pass years ago, when the government sought emergency relief from the district court's preliminary injunction. *Al Otro Lado v. Wolf*, 952 F.3d 999, 1016 (9th Cir. 2020) (Bress, J., dissenting). Judge R. Nelson in his

panel dissent picked up where I left off, powerfully explaining why the majority's decision is fundamentally mistaken. *Al Otro Lado*, Amended Op. at 49 (R. Nelson, J., dissenting).

The panel's decision is clearly wrong and has created—and will continue to create—untold interference with the Executive Branch's ability to manage the southern border. I respectfully but strongly dissent from our court's decision not to rehear this matter en banc.

I

In 2016, and in response to a massive surge of undocumented aliens seeking admission to the United States at ports of entry along the U.S.-Mexico border, the Department of Homeland Security (DHS) and U.S. Customs and Border Protection (CBP) instituted the practice of "metering," or "queue management," to regulate the flow of undocumented aliens into border entry stations. Metering gives border officials the flexibility to limit the number of aliens without valid travel documents who can enter a port of entry for processing when the port is at capacity.

In 2017, a consortium of plaintiffs challenged this policy, which the district court declared unlawful after concluding that federal immigration statutes required CBP to inspect and process for asylum eligibility undocumented aliens *approaching* the U.S.-Mexico border. The district court also enjoined the United States from enforcing as to metered aliens a later (and now-rescinded) rule, sometimes called the Third Country Transit Rule, 8 C.F.R. § 208.13(c)(4) (2019), which required asylum-seekers at the southern border to first apply for asylum in another country through which they transited. The district court held that this Rule could not be applied to non-Mexican asylum-seekers who, but for

metering, would have entered the United States before the Rule's effective date.  The Third Country Transit Rule was enacted after this lawsuit was filed, yet was still caught up in it.

The lengthy litigation continued.  Ultimately, a Ninth Circuit panel largely affirmed the district court's sweeping declaratory and injunctive relief, adopting the district court's theory that our asylum and inspection statutes extend to aliens physically located in Mexican territory who are in the process of arriving in the United States.  *Al Otro Lado v. Exec. Office for Immigr. Rev.*, 120 F.4th 606, 611, 614–21 (9th Cir. 2024).  In connection with its order denying en banc review, the panel issued an amended opinion, which, if anything, is even more problematic than its original decision. *Al Otro Lado v. Exec. Office for Immigr. Rev.*, No. 22-55988, --- F.4th ---, Slip Op. (May 14, 2025), *as amended*.

A

The panel's decision is manifestly incorrect and will severely intrude on the Executive Branch's prerogative to manage our country's borders.  *See Al Otro Lado*, 952 F.3d at 1016–45 (Bress, J., dissenting); *Al Otro Lado*, Amended Op. at 49–82 (R. Nelson, J., dissenting).  The reason the panel's decision is wrong is straightforward: the United States did not unlawfully withhold any duty to inspect undocumented aliens at the border or refer them for asylum processing because these duties do not extend to aliens outside the territorial border of the United States.

Under 8 U.S.C. § 1158(a)(1), "[a]ny alien who is physically present in the United States or who arrives in the United States" may apply for asylum.  Immigration officials must also inspect aliens "who are applicants for admission or otherwise seeking admission or readmission to or transit

through the United States." 8 U.S.C. § 1225(a)(3). The statute defines "an applicant for admission" as "[a]n alien present in the United States who has not been admitted or who arrives in the United States." *Id.* § 1225(a)(1). If an applicant for admission "who is arriving in the United States" expresses an intent to apply for asylum or a fear of persecution, the immigration officer shall refer the alien to an asylum officer for an interview. *Id.* § 1225(b)(1)(A)(ii), (B). Otherwise, if the alien is inadmissible, "the officer shall order the alien removed from the United States without further hearing or review." *Id.* § 1225(b)(1)(A)(i).

These statutes do not apply to undocumented aliens in Mexico, on the Mexico side of the border, for the simple reason that these persons are not "*in* the United States," as the statutory text requires. These aliens are obviously not "physically present in the United States." *Id.* § 1158(a)(1). Nor is an alien outside the territorial jurisdiction of the United States someone "who arrives in the United States." *Id.* As I explained previously, "[w]hen we say that a person 'arrives' in a location, we mean he *reaches* that location, not that he is somewhere on his travels toward it. An alien thus 'arrives in' the United States or he does not; there is no in-between." *Al Otro Lado*, 952 F.3d at 1028 (Bress, J., dissenting). Or as Judge R. Nelson explained using dictionary definitions and examples from common parlance, "arrive" means "to reach a destination or come to a particular place," and when used with the preposition "in," "a person 'arrives in' a country when she has reached its inner limits or bounds." *Al Otro Lado*, Amended Op. at 52–53 (R. Nelson, J., dissenting) (internal quotations and citations omitted). The text does not say "arrives at" or even just "arrives." It says "arrives *in*." And that phrase clearly means

that the person must be "in" the United States to apply for asylum and be inspected for asylum eligibility.

Statutory context supports this plain reading of §§ 1158(a)(1) and 1225. Section 1225 provides for the expedited removal of aliens "from the United States." 8 U.S.C. § 1225(b)(1)(A)(i). Thus, "[f]or an alien to be 'removed from the United States,' the alien must of course have been *in* the United States in the first place." *Al Otro Lado*, 952 F.3d at 1031 (Bress, J., dissenting); *see also Al Otro Lado*, Amended Op. at 60 (R. Nelson, J., dissenting) ("[A] person not yet in the United States cannot be 'removed' from it."). Nor is there any suggestion that § 1225 inspections by immigration officers and related asylum proceedings could take place anywhere other than the place that aliens have arrived "in," namely, the United States. *Cf. Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 173 (1993) (explaining that statutory provisions governing deportation and exclusion hearings in the predecessor statute "obviously contemplate that such proceedings would be held in the" United States).

The history of our immigration laws further supports the view that the asylum and inspection laws apply only to persons "in" the United States, not those "in" Mexico. The Refugee Act of 1980 originally ordered the Attorney General to accept asylum applications from any "alien physically present in the United States or at a land border or port of entry, irrespective of such alien's status." 8 U.S.C. § 1158(a) (1980). Even with this potentially broader language—"at a land border"—no court treated the asylum statute as covering aliens who were somewhere near the border but had not yet crossed into the United States. *See Al Otro Lado*, 952 F.3d at 1028–29 (Bress, J., dissenting); *Al Otro Lado*, Amended Op. at 64 (R. Nelson, J., dissenting).

Instead, both the Supreme Court and this court explained that the 1980 Act applied to "refugees currently in the United States," *I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 433 (1987), that is, "refugees *within* the United States," *Yang v. INS*, 79 F.3d 932, 938 (9th Cir. 1996). Indeed, that was a key objective of the 1980 Act, because "[p]rior to the 1980 amendments there was no statutory basis for granting asylum to aliens who applied from within the United States." *Cardoza-Fonseca*, 480 U.S. at 433.

Courts have long understood that § 1158 differs in this respect from § 1157, which concerns applications for admission from refugees who are outside of the United States (these are capped at certain numbers by statute). As the Supreme Court has succinctly stated, "Section 207, 8 U.S.C. § 1157, governs the admission of refugees who seek admission from foreign countries. Section 208, 8 U.S.C. § 1158, sets out the process by which refugees currently in the United States may be granted asylum." *Id.* Our court has made the same point: "Section 207 [8 U.S.C. § 1157] establishes the procedure by which an alien *not* present in the United States may apply for entry as a refugee. . . . Section 208 [8 U.S.C. § 1158], on the other hand, sets out procedures for granting asylum to refugees *within* the United States." *Yang*, 79 F.3d at 938. Many cases have drawn this same key distinction. *See Al Otro Lado*, 952 F.3d at 1028 (Bress, J., dissenting) (citing cases).

Finally, even if the statutory text were ambiguous, which it is not, it could not overcome the venerable presumption against extraterritoriality. "It is a longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." *Abitron Austria GmbH v. Hetronic Int'l Inc.*, 600 U.S. 412, 417 (2023) (quoting

*Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255 (2010)).  For a statute to apply outside the United States, we ask "whether 'Congress has affirmatively and unmistakably instructed that' the provision at issue should 'apply to foreign conduct.'"  *Id.* at 417–18 (quoting *RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325, 335, 337 (2016)).  Here, applying §§ 1158 and 1225 to aliens in Mexico is an extraterritorial application of the immigration laws, because the aliens are themselves outside of the United States.  And it can hardly be said that §§ 1158(a)(1) and 1225—which refer to aliens "*in*" the United States—somehow reflect a "clear indication of an extraterritorial application," so as to overcome the presumption against extraterritoriality. *Morrison*, 561 U.S. at 255.

In short, unambiguous text, precedent, longstanding practice, and the presumption against extraterritoriality all demonstrate that the § 1158(a)(1) and § 1225 asylum and inspection provisions apply only to persons "in" the United States.  Metering undocumented aliens approaching ports of entry thus cannot violate these statutes, which do not apply to persons outside the United States.

B

The panel majority nevertheless held that by using "arrives in," "Congress crafted a scheme for the inspection of noncitizens both physically present in the United States *and on its doorstep*."  *Al Otro Lado*, 120 F.4th at 622 (emphasis added).  In other words, according to the majority, the statutory text "encompasses those who encounter officials at the border, whichever side of the border they are standing on."  *Al Otro Lado*, Amended Op. at 22.  The majority thus endorsed the district court's view—entirely unclear in its scope—that "arrives in" refers to "the process

of arriving in the United States." *Id.* at 17. And by that
interpretation, the panel majority held that the United States
owes various legal duties under § 1158(a)(1) and § 1225 to
persons on the other side of the border in Mexico, rendering
the CBP metering policies unlawful.[1]

It is hard to overstate the radical nature of the majority
and district court's decisions. No other court has ever held
that the asylum and inspection laws apply to persons who are
not "in" the United States. *See id.* at 49 (R. Nelson, J.,
dissenting) ("No circuit court has ever reached such a
strained conclusion. Not since the current act was adopted
30 years ago. Not under the prior act adopted 45 years ago
which had even more permissive language."). And as set
forth above, both the Supreme Court and this court have said
the opposite in distinguishing §§ 1157 and 1158. *See
Cardoza-Fonseca*, 480 U.S. at 433; *Yang*, 79 F.3d at 938.
Unsurprisingly, then, the majority's conclusion rests on a
fundamentally flawed interpretation of the statutory text.

The majority's central argument is that because the
statute uses the phrases "physically present in the United
States" and "arrives in the United States," 8 U.S.C.
§ 1158(a)(1), we must read "arrives in" to mean something

---

[1] The panel's original opinion described its holding as applying to
persons both physically present in the United States and on its
"doorstep." *Al Otro Lado*, 120 F.4th at 615, 619. The panel's amended
opinion removes the word "doorstep." But its holding remains the same,
still extending U.S. law to undocumented aliens on the other side of the
Mexican border, "whichever side of the border they are standing on."
Amended Op. at 22. Of course, if the amended opinion is now extending
our asylum and inspection laws to persons in Mexico even further away
from the United States' "doorstep," the amended opinion has only
aggravated a core ambiguity about how far into Mexico the court's
decision reaches.

different than "physically present in" to avoid surplusage. *See Al Otro Lado*, Amended Op. at 21–23. The majority badly erred.

As an initial matter, there is nothing wrong with Congress using a belt-and-suspenders approach that creates surplus coverage, as "redundancies are common in statutory drafting." *Barton v. Barr*, 590 U.S. 222, 239 (2020). The Supreme Court has thus recognized that "'[s]ometimes the better overall reading of the statute contains some redundancy,'" and that "[r]edundancy in one portion of a statute is not a license to rewrite or eviscerate another portion of the statute contrary to its text." *Id.* (quoting *Rimini Street, Inc. v. Oracle USA, Inc.*, 586 U.S. 334, 346 (2019)); *see also Pugin v. Garland*, 599 U.S. 600, 609 (2023) (explaining that sometimes Congress wants "to be doubly sure"). That is especially the case here, when the claimed redundancy concerns merely two phrases in a broader statutory scheme. In short, any redundancy in §§ 1158(a)(1) and 1225 did not permit the majority's counter-textual reading that someone outside the United States has "arrive[d] *in* the United States." *See Al Otro Lado*, Amended Op. at 63 (R. Nelson, J., dissenting) ("The statute's ordinary meaning is clear, and the presumption against surplusage does not justify rewriting it."). Undocumented aliens who are physically located "in" Mexico lack rights under our asylum laws as persons who are "in the United States." 8 U.S.C. § 1158(a)(1).

Regardless, there is not necessarily surplusage because Congress could have plausibly included the phrases "physically present in the United States" and "arrives in the United States" for distinct reasons. Immigration law has long operated under an "entry fiction" by which aliens who have arrived in a port of entry are not regarded as within the United States for some purposes. By this logic, "[w]hen an

alien arrives at a port of entry—for example, an international airport—the alien is on U.S. soil, but the alien is not considered to have entered" the United States. *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 139 (2020); *see also Kaplan v. Tod*, 267 U.S. 228, 230 (1925); *Xi v. U.S. I.N.S.*, 298 F.3d 832, 837 (9th Cir. 2002). The majority's convoluted response notwithstanding, *Al Otro Lado*, Amended Op. at 24–26, Congress could have plausibly used "arrives in the United States," in addition to "physically present in the United States," to ensure that those aliens who arrived in ports of entry could apply for asylum, regardless of the legal fiction that they were "stopped at the border." *Thuraissigiam*, 591 U.S. at 139 (quoting *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 215 (1953)); *see also Al Otro Lado*, Amended Op. at 61 (R. Nelson, J., dissenting).

The majority's remaining reasoning is also seriously mistaken. The majority writes that "[f]or a person coming to the United States to seek asylum, the relevant destination is the U.S. border, where she can speak with a border official. A person who presents herself to an official at the border has therefore reached her destination—she has 'arrive[d].'" *Al Otro Lado*, Amended Op. at 23. But the statutory text says "arrives *in the United States*." The majority thus completely rewrites the statute in holding that Congress crafted a scheme for the inspection of undocumented aliens "whichever side of the border they are standing on." *Id.* at 22.

The majority seemingly holds that the parenthetical phrase "at a designated port of arrival"—located in the statutory phrasing "arrives in the United States (whether or not at a designated port of arrival . . . )," 8 U.S.C. § 1158(a)(1)—suggests a broader construction. *Al Otro*

*Lado*, Amended Op. at 23. But the majority again reads "arrives *in the United States*" out of the statute, regarding it as sufficient that someone has arrived *at the border*, which is not what the statute says. The statutory parenthetical about designated ports of arrival "clarifies that the statute applies to immigrants who arrived through designated entry ports and those who crossed the border elsewhere. It does not mean that immigrants who have yet to enter an arrival port have somehow arrived in the United States." *Id.* at 57 (R. Nelson, J., dissenting). Nor can the majority justify its interpretation on the theory that it will disincentivize asylum-seekers from crossing the border at places other than a port of entry. *See id.* at 23–24. There are already prohibitions against illegally entering the United States, and yet there are many people who nonetheless do so. A plain reading of "arrives in" does not change those dynamics.

C

The majority opinion also provides no plausible response to the presumption against extraterritoriality. Even if one were inclined to think that 8 U.S.C. §§ 1158(a)(1) and 1225(a)(1) could cover undocumented aliens in Mexico, as the panel majority does, the presumption against extraterritoriality creates an insurmountable hurdle to reaching that result.

In its original opinion, the panel agreed that the presumption against extraterritoriality applied—that by its decision, U.S. law would extend extraterritorially—but held that "§ 1158 and § 1225 contain a 'clear, affirmative indication' of extraterritorial reach." *Al Otro Lado*, 120 F.4th at 621 (quoting *RJR Nabisco*, 579 U.S. at 337). Specifically, the panel held that §§ 1158 and 1225 apply extraterritorially and rebut the presumption against

extraterritoriality because "the arrival of noncitizens to the United States . . . 'almost always originates outside the United States.'" *Id.* at 622 (quoting *United States v. Ubaldo*, 859 F.3d 690, 700 (9th Cir. 2017)).

This original reasoning was plainly mistaken. Because "[i]mmigration always originates outside the United States," *id.* at 639 (R. Nelson, J., dissenting), the panel's original reasoning would effectively exempt all immigration laws from the presumption against extraterritoriality, a remarkable proposition with no basis in law. The panel's original analysis also contradicted the Supreme Court's decision in *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155, 173–77 & n.29 (1993), which held that the former exclusion and deportation procedures in the Immigration and Nationality Act—including the predecessor to the current 8 U.S.C. § 1158(a)(1)—did not apply extraterritorially.

In a sudden about-face, the panel's amended opinion now drops its original extraterritoriality analysis and concludes that there is no extraterritoriality question in the first place. *Al Otro Lado*, Amended Op. 31–33. The panel now holds that "the presumption against extraterritoriality has no role to play here" after all, because the presumption "just begs the question: is the conduct at issue in this case a domestic application?" *Id.* at 32. According to the amended opinion, once the court has concluded that the phrase "arrives in the United States" applies to undocumented aliens in Mexico, the presumption against extraterritoriality is irrelevant because it "does not help address" that "threshold issue." *Id.* at 33.

The plaintiffs never made this argument, presumably because it is not correct. *See id.* at 67 n.11 (R. Nelson, J., dissenting). The effect of the majority's statutory

interpretation is to extend the *legal* protections in §§ 1158 and 1225 to undocumented aliens in Mexico. But this does not and cannot change where these aliens are physically located: *in Mexico*. The presumption against extraterritoriality does not "beg the question," as the amended opinion asserts, *see id.* at 32, but is rather a required tool of statutory interpretation for *answering the question* of whether the statute can be read to cover persons beyond our borders. *See RJR Nabisco*, 579 U.S. at 335 (describing the presumption against extraterritoriality as "a canon of statutory construction"); *Morrison*, 561 U.S. at 255 ("a presumption about a statute's meaning").

We do not interpret statutes using an artificially limited set of interpretative tools, reach an answer, and then conclude that other relevant or required tools of interpretation—here, a clear statement rule—need not be considered because we are satisfied with our own interpretation. The Supreme Court has emphasized that the presumption against extraterritoriality is based on vital considerations, namely, "avoid[ing] the international discord that can result when U.S. law is applied to conduct in foreign countries" and respecting the "commonsense notion that Congress generally legislates with domestic concerns in mind." *Abitron*, 600 U.S. at 417 (quoting *RJR Nabisco*, 579 U.S. at 335–36). The panel's amended opinion lays waste to these considerations, boldly concluding that it need not follow the Supreme Court's directions for interpreting statutes because those directions are, in the panel's view, apparently not "help[ful]." *Al Otro Lado*, Amended Op. at 33. The panel's amended opinion states that "[t]he presumption against extraterritoriality makes sense to consider if a litigant is asking a court to apply a federal statute to conduct occurring outside the United States." *Id.*

at 32.  But that is exactly what the plaintiffs in this case are
asking for based on their conduct of arriving close to—but
not *in*—the United States.  In holding that the presumption
against extraterritoriality is not even implicated here, the
panel elides decades of Supreme Court precedent.**[2]**

Equally mistaken is the amended opinion's apparent
holding that there is no extraterritoriality question here
because what matters is that U.S. officials acted from within
the United States in applying the metering policy.  The
amended opinion thus states that "the entire question in this
case is whether the U.S. officials' conduct of standing on the
U.S. side of the border and stopping people right before they
crossed the border is foreign or domestic."  *Id.*  This serious
mis-framing of the case contradicts law and logic.

To determine "whether the suit seeks a (permissible)
domestic or (impermissible) foreign application of the

---

[2] The panel therefore badly errs in analogizing this case to a hypothetical
based on the Supreme Court's *Morrison* decision, which involved
trading on foreign exchanges.  The amended opinion asserts that "if the
dispute in *Morrison* had been whether the exchange on which the alleged
transactions took place were a foreign or a domestic exchange, the
presumption against extraterritoriality would have been of no help."  *Al
Otro Lado*, Amended Op. at 33.  It is true that the presumption against
extraterritoriality does not tell you where something is located.  A
transaction that occurred on a domestic exchange would have fallen
within the Securities Exchange Act of 1934's scope in *Morrison* because
there would have been no extraterritorial application of that
statute.  *Morrison*, 561 U.S. at 266–67.  But in this case, the physical
location of the aliens is not the issue; they are indisputably in Mexico.
The question is whether to read §§ 1158 and 1225 to extend to them.
That is not a factual question about where certain conduct is taking place,
but a legal question of statutory interpretation.  It is to that interpretative
inquiry that the presumption against extraterritoriality most definitely
applies.

provision," "courts must start by identifying the 'focus of congressional concern' underlying the provision at issue." *Abitron*, 600 U.S. at 418 (quoting *RJR Nabisco*, 579 U.S. at 336). According to the Supreme Court, "[t]he focus of a statute is the object of its solicitude, which can include the conduct it seeks to regulate, as well as the parties and interests it seeks to protect or vindicate." *Id.* (quoting *WesternGeco LLC v. ION Geophysical Corp.*, 585 U.S. 407, 414 (2018)). And the Supreme Court has "repeatedly and explicitly held that courts must 'identif[y] the statute's focus *and* as[k] whether the *conduct relevant to that focus* occurred in United States territory.'" *Id.* (quoting *WesternGeco*, 585 U.S. at 413).

Although the panel completely failed to conduct the required analysis, in this case the "object" of §§ 1158's and 1225's "solicitude"—and the "parties and interests" they "seek[] to protect or vindicate"—are quite obviously the aliens "physically present in the United States or who arrive[] in the United States." 8 U.S.C. § 1158(a)(1). And the "conduct relevant to that focus" is the aliens entering into the United States, for it is that conduct that triggers the statutory protections and entitlements of §§ 1158(a)(1) and 1225. *See Al Otro Lado*, Amended Op. at 68 (R. Nelson, J., dissenting). Once again, although the majority's *legal* conclusion is that aliens on the threshold of the United States have "arrived in the United States," there is no dispute that as a factual matter, they are in Mexico. Thus, the conduct relevant to the statute's focus is occurring in Mexico, which means that the presumption against extraterritoriality must be overcome. Even if the panel's interpretation of "arrives in the United States" were plausible—it is not—the presumption against extraterritoriality would plainly foreclose that interpretation.

If anything, and although the panel's original extraterritoriality analysis was profoundly mistaken, its amended opinion is cause for equal if not greater concern. Whereas the original panel opinion exempted all immigration laws from the presumption against extraterritoriality by treating them as definitionally extraterritorial, the amended opinion treats the extraterritorial extension of immigration laws as definitionally domestic. On top of extending the asylum and inspection laws to aliens "in" Mexico, the panel's amended opinion is now a blueprint for avoiding the presumption against extraterritoriality, contrary to Supreme Court case law.

II

In running roughshod over statutory text and decisional law through its unprecedented extension of §§ 1158 and 1225 to undocumented aliens outside the United States, the majority opinion creates major impediments to the Executive Branch's ability to manage our nation's borders. That is already a "daunting task" at our 1,900-mile border with Mexico, which involves high traffic and acute security concerns. *Hernandez v. Mesa*, 589 U.S. 93, 107 (2020). But the majority opinion only bedevils matters further given the large numbers of migrants at the southern border in recent years. This case thus easily presented a question of "exceptional importance," justifying en banc review. Fed. R. App. P. 40(b)(2)(D).

This litigation alone shows the enormous impact of the majority and district court's novel statutory interpretation, which produced a judicial declaration that metering is effectively illegal. *See Al Otro Lado*, Amended Op. at 39 ("The district court entered classwide declaratory relief

stating that the metering policy violated § 1158 and
§ 1225."). The majority opinion says that the government
might have complied with its (new) obligations as to aliens
in Mexico if CBP officials had undertaken supposedly
"minimal steps," such as "implementing and following a
waitlist system or initiating the asylum process" for
undocumented aliens on the Mexico side of the border. *Id.*
at 38. But it would hardly be a "minimal" undertaking for
the government to assume the extraordinary obligation of
keeping track of the many thousands of undocumented aliens
approaching our busy ports of entry across the entire
southern border, to say nothing of interviewing aliens for
asylum eligibility when they are not even in the United
States. The majority opinion imposes on U.S. officials at the
border vast court-created obligations that are nowhere in the
statute. And more broadly, it creates uncertainty as to who
is even covered by the statutes in the first place. *See Al Otro
Lado*, 952 F.3d at 1030 (Bress, J., dissenting) ("The
uncertainty of what it means to be 'in the process of arriving'
raises a host of interpretative and practical issues that the
majority does not address.").

    The majority opinion also largely affirmed the district
court's remarkable injunction preventing the government
from applying the Third Country Transit Rule to aliens who
had been metered and who would have otherwise entered the
United States before that Rule took effect. *See Al Otro Lado*,
Amended Op. at 45. This injunction required the
government to identify these persons and notify them about
their rights as members of the district court's certified class.
*Id.* at 46. By plaintiffs' own telling, complying with this
injunction required "time-consuming and expensive
measures." D. Ct. Dkt. #842, at 5 (Dec. 27, 2024). In the
meantime, the injunction created an unwieldy patchwork of

immigration laws "frozen in time as of the point that the plaintiffs were first arriving at a port of entry (or, more accurately, in the process of arriving there)." *Al Otro Lado*, 952 F.3d at 1033 (Bress, J., dissenting). The example of the Third Country Transit Rule only underscores the degree to which the majority's erroneous statutory interpretation will cause major disruption in the uniform administration of the immigration laws. This lawsuit has now foiled border operations for years, when the case should have been dismissed at the outset under Rule 12(b)(6).

Although the Third Country Transit Rule and metering policies are now no longer in place, the panel decision itself confirms that this case is not moot. As the panel majority explained, rescission of the metering policy did "not render this case moot because Plaintiffs sought (and the district court entered) equitable relief to ameliorate past and present harms stemming from the policy, and the relief ordered imposes ongoing obligations on the Government." *Al Otro Lado*, Amended Op. at 18 n.3. And because the panel decision is binding precedent in the Ninth Circuit, it will seemingly govern every future effort to limit the entry of undocumented aliens at important ports of entry on the U.S.-Mexico border.

Perhaps sensing the possibility of further judicial review of the panel's decision, the plaintiffs in this case have recently taken the highly unusual step of asking the district court to vacate its own injunction regarding the Third Country Transit Rule. D. Ct. Dkt. #842 (Dec. 27, 2024). The plaintiffs made this request ostensibly because the injunction has served its purposes and because of "the burdens" the injunction "places on the parties." D. Ct. Dkt. #842 (Dec. 27, 2024). Given that plaintiffs fought vigorously for this injunction for years, it is hard to understand this strange

maneuver as anything other than an attempt to forestall further review of the panel's opinion. But even if the district court were to grant plaintiffs' request for an indicative ruling, that would not moot the case either, given the ongoing declaratory relief that will continue to impose binding obligations on the United States. *See Al Otro Lado*, Amended Op. at 18 n.3. This case thus presented an entirely proper vehicle for en banc review. Nor did it make any sense to allow the panel opinion to remain in place, only to await the next case in which the majority's rule of decision will inevitably produce yet more interference with valid Executive Branch efforts to manage the border and limit the entry of undocumented aliens into the United States.

\*       \*       \*

The majority opinion is gravely wrong, breaking through numerous guardrails of clear statutory text and precedent. In conferring asylum and inspection protections on persons "in the United States," 8 U.S.C. § 1158(a)(1), Congress did not impose on border officials nebulous obligations as to undocumented aliens on the other side of the border, yet close to it. The majority's decision will seriously harm our country's ability to manage its borders, and it has already resulted in years of unwarranted disruption of Executive Branch border operations. I sincerely regret that this decision remains the law of the Ninth Circuit.

BEA, Circuit Judge,[1] joined by WALLACE and
O'SCANNLAIN, Circuit Judges, respecting the denial of
rehearing en banc:

I write in agreement with Judge Bress's dissent from
denial of rehearing en banc and with Judge R. Nelson's
dissent to the panel's majority opinion. Their analyses of the
decisive statutory language of 8 U.S.C. § 1158—"Any alien
who is physically present in the United States or who arrives
in the United States . . ."—is clear and conclusive. Its best
reading and meaning is that an alien claiming asylum under
that statute must be *in* the United States when the claim is
made. I am deeply disappointed that we did not vote to
rehear this problematic decision en banc.

---

[1] As a judge of this court in senior status, I cannot vote on calls for
rehearing cases en banc or formally join a dissent from failure to rehear
en banc. *See* 28 U.S.C. § 46(c); Fed. R. App. 35(a). However, I may
participate in discussions of en banc proceedings pursuant to our court's
general orders. *See* Ninth Circuit General Order 5.5(a).